Lycos, Inc. v. Verizon Communications, Inc. Doc. 125

Elizabeth J. Cabraser (State Bar No. 083151)
Barry R. Himmelstein (State Bar No. 157736)
Michael W. Sobol (State Bar No. 194857)
Eric B. Fastiff (State Bar No. 182260)
Allison S. Elgart (State Bar No. 241901)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Interim Class Counsel for MCI Class

Ronald L. Motley
Jodi W. Flowers
Don Migliori
Vincent Parrett (State Bar No. 237563)
MOTLEY RICE, LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465
Telephone: (843) 216-9000
Facsimile: (843) 216-9027

Interim Class Counsel for Verizon Class

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(San Francisco Division)

| | |
|---|---|
| IN RE NATIONAL SECURITY AGENCY TELECOMMUNICATIONS RECORDS LITIGATION | MDL Docket No. 06-1791 (VRW) |
| THIS DOCUMENT RELATES TO: All Actions Brought Against MCI Defendants and/or Verizon Defendants | **MASTER CONSOLIDATED COMPLAINT AGAINST MCI DEFENDANTS AND VERIZON DEFENDANTS** <br> **<u>DEMAND FOR JURY TRIAL</u>** <br> Judge: Hon. Vaughn R. Walker |



Dockets.Justia.com

## PRELIMINARY STATEMENT

1. This Master Consolidated Complaint ("Complaint") is filed pursuant to the Order of this Court and presents claims brought against the MCI Defendants and Verizon (as defined below) in the separate cases filed in this District or transferred to this District by the Judicial Panel on Multidistrict Litigation. Unless otherwise ordered by the Court, all claims presented in any case against the MCI Defendants or Verizon subsequently made a part of this multidistrict litigation proceeding shall be deemed to be included in this Complaint.

2. This Complaint is filed solely as an administrative device to promote judicial efficiency and economy in the adjudication and resolution of pretrial matters and is not intended to effect consolidation for trial of the transferred cases. Neither is this Complaint intended to change the rights of the parties, nor to make those who are plaintiffs in one case plaintiffs in another. *See In re Propulsid Products Liability Litigation*, 208 F.R.D. 133, 140-41 (E.D. La. 2002).

3. This case challenges the legality of Defendants' participation in an illegal federal government program to intercept and analyze vast quantities of Americans' telephone and electronic communications and records, surveillance done without any statutorily authorized permission, customers' knowledge or consent, or the authorization of a court, and in violation of federal and state electronic surveillance and telecommunications statutes and state consumer protection statutes, as well as the First and Fourth Amendments to the United States Constitution.

4. Allegations concerning Verizon's alleged violations of law are made solely by Verizon Plaintiffs (as defined below), and allegations concerning the MCI Defendants' alleged violations of law are made solely by plaintiff Spielfogel-Landis.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332(d), 18 U.S.C. § 2707, and 47 U.S.C. § 605. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

6. Venue for coordinated pretrial proceedings is proper in this District

pursuant to transfer orders issued by the Judicial Panel on Multidistrict Litigation. Venue in the districts in which the underlying cases were originally filed was also proper, as set forth by Plaintiffs in their respective original complaints.

## MCI PARTIES

7. Defendant MCI Communications Services, Inc. ("MCI") is a Delaware corporation and is a "telecommunication carrier" within the meaning of the Communications Act of 1934, 47 U.S.C. §§ 151, *et seq.*, and provides "electronic communication" services to the public.

8. Plaintiff Elaine Spielfogel-Landis is an individual residing in Orange County, California. Ms. Spielfogel-Landis is and has been a subscriber and user of MCI's local and long distance wireline telephone services at all times since October 6, 2001.

9. At the request of the federal government, MCI, Inc. exercised domination and control over its wholly-owned subsidiary, MCI, and specifically directed it to engage in the violations of law alleged herein.

10. Defendant MCI, LLC is a Delaware limited liability company and the successor to MCI, Inc., which was acquired by Verizon Communications, Inc. in a merger transaction that closed on January 6, 2006. As explained by MCI, Inc. in a proxy statement regarding the merger filed with the Securities and Exchange Commission, "[u]nder the merger agreement, MCI [Inc.] will merge with and into Eli Acquisition, LLC, sometimes referred to as Eli Acquisition, a direct, wholly-owned subsidiary of Verizon. Eli Acquisition will continue as the surviving entity and will be renamed 'MCI, LLC.'"

11. At the time of the merger, MCI had approximately 14 million residential customers and approximately one million business customers for its wireline telephone services.

12. In this Complaint, MCI and MCI, LLC shall be referred to collectively as "MCI Defendants."

13. Prior to or following completion of the merger, Defendant Verizon Communications, Inc. became aware of the misconduct of MCI alleged herein. Following completion of the merger, Verizon Communications, Inc. ratified MCI's misconduct by

permitting it to continue.

## VERIZON PARTIES

14. Defendant Verizon Communications, Inc. is a Delaware corporation with its principal place of business at 140 West Street, NY, NY, 10007, with offices at various locations throughout the United States and is a "telecommunication carrier" within the meaning of the Communications Act of 1934, 47 U.S.C. §§ 151, *et seq;* providing remote computing and electronic communication services to the public.

15. Defendant Verizon Communications, Inc. wholly-owns and controls the following operating units which do business in various states, including but not limited to: Verizon California, Inc., Verizon Delaware, Inc., Verizon Florida, Inc., Verizon Maryland Inc., Verizon New England, Inc., Verizon New Jersey, Inc., Verizon New York, Inc., Verizon North, Inc., Verizon Northwest, Inc., Verizon Pennsylvania, Inc., Verizon South, Inc., Verizon Virginia, Inc., Verizon Washington, D.C., Inc., Verizon West Virginia, Inc., GTE Corporation, GTE Southwest Incorporates (dba "Verizon Southwest"), Contel of the South, Inc. (dba "Verizon Mid-States" in all states; dba "Verizon South Systems" in Alabama and Georgia only; and dba "Verizon North Systems" in Indiana and Michigan only), Verizon Federal, Inc., Bell Atlantic Communications, Inc. (dba "Verizon Long Distance"), Verizon Select Services, Inc., NYNEX Long Distance Company (dba "Verizon Enterprise Solutions"), and Verizon Business Network Services, Inc. (collectively, "Verizon Communications").

16. Verizon Communications, Inc. also owns and controls a number of companies that provide wireless telephone service. These companies include: Cellco Partnership (dba "Verizon Wireless"), NYNEX Corporation, GTE Wireless, Inc., GTE Wireless of the South, Inc., NYNEX PCS, Inc., and Verizon Wireless of the East LP (collectively, "Verizon Wireless").

17. Verizon Communications provides landline, residential, and commercial telephone services to customers throughout at least 28 states and the District of Columbia and Verizon Wireless provides wireless services to customers in the District of Columbia and every State with the exception of Alaska.

18. In addition, Verizon Communications, Inc. owns and controls a number of

companies offering electronic and Internet data services. These companies include Verizon Internet Services, Inc., Bell Atlantic Entertainment and Information Services Group, Verizon Internet Solutions, Inc., Verizon Technology Corporation, and Verizon Advanced Data, Inc. (collectively, "Verizon Internet").

19. In this Complaint, Verizon Communications, Verizon Wireless, and Verizon Internet shall be referred to collectively as "Verizon."

20. Verizon is a Dow 30 Company, a self-proclaimed leader in delivering phone service to residents of the United States.

21. Verizon claims to have 48.8 million U.S. Wire-line Access Lines, 5.1 million Broadband Connections, and one of the most expansive wholly-owned global IP networks with a presence in 140+ countries.

22. Following its merger with MCI, Verizon has a diverse workforce of approximately 250,000 and generates annual consolidated operating revenues of approximately $90 billion.

23. The following plaintiffs (collectively, "Verizon Plaintiffs") are users and/or subscribers of Verizon's electronic communication and/or remote computing services.

24. Plaintiff Charmaine Crockett is an individual residing in Honolulu, Hawaii, and has been a user and subscriber of Verizon and Verizon's wireless cellular phone service. Plaintiff Charmaine Crockett has been a user and subscriber of Verizon through Hawaiian Telecom, Inc. d/b/a Verizon Hawaii.

25. Plaintiff, A. Joris Watland is an individual residing in Honolulu, Hawaii, and has been a user and subscriber of Verizon through Hawaiian Telecom, Inc. d/b/a Verizon Hawaii.

26. Plaintiff, Kim Coco Iwamoto is an individual residing in Honolulu, Hawaii, and has also been a user and subscriber of Verizon through Hawaiian Telecom, Inc. d/b/a Verizon Hawaii. Plaintiff Iwamoto has a special interest in call privacy because she is an attorney legally obligated to protect the confidentiality of communications with her clients.

27. Plaintiff Ian Walker is an individual residing in the District of Columbia.

Walker has been a user and subscriber of Verizon's residential local and long distance telephone service since at least January 1996.

28. Plaintiff Mark P. Solomon, MD, is an individual residing in Montgomery County, Pennsylvania. Plaintiff was a residential and business subscriber and user of Verizon's residential and business long distance telephone services.

29. Plaintiff The Rev. Joe McMurray is a user and subscriber of Verizon since October 2002 and residing at Trinity Methodist Community Church in Gainesville, Florida.

30. Plaintiff The Rev. Charlene Mann is a user and subscriber of Verizon Communications Inc. and has been during the relevant time period and residing in Fitchburg, Massachusetts.

31. Plaintiff Dr. Michael F. Reusch is a user and subscriber of Verizon since 1996 and residing in Princeton Junction, New Jersey.

32. Plaintiff Dr. Trudy Bond is a user and subscriber of Verizon and has been during the relevant time period and residing in Toledo, Ohio.

33. Plaintiff Prof. Robert Newby is a user and subscriber of Verizon and has been during the relevant time period and residing in Mount Pleasant, Michigan.

34. Plaintiff Eleanor M. Lynn, Esq. is a user and subscriber of Verizon since 2000 and residing in Salem, Massachusetts.

35. Plaintiff Stephanie Meket is a user and subscriber of Verizon and has been during the relevant time period and residing in Riverdale, New York.

36. Plaintiff Thomas S. Dwyer is a user and subscriber of Verizon and residing in Pittsburgh, Pennsylvania.

37. Plaintiff James Van Alstine is a user and subscriber of Verizon and has been during the relevant time period and residing in New York.

38. Plaintiff Michele Rosen is a user and subscriber of Verizon and has been during the relevant time period and residing in Delaware.

39. Plaintiff Harris Sondak is a user and subscriber of Verizon and has been during the relevant time period and residing in Salt Lake City, Utah.

40. Plaintiff Merrilyn Romen is a user and subscriber of Verizon and has been during the relevant time period and residing in Malibu, California.

41. Plaintiff Brad Marston is a user and subscriber of Verizon and has been during the relevant time period and residing in Rhode Island.

42. Plaintiffs Theodore Jonathan Morris and Sharon Ann Morris are subscribers of Verizon and have been during the relevant time period and residing in Oak Harbor, Washington.

43. Plaintiff Serge Popper is a user and subscriber of Verizon since 1996 and residing in Goode, Virginia.

44. Plaintiff Greg L. Smith is a user and subscriber of Verizon and has been during the relevant time period and residing in Milton Mills, New Hampshire.

45. Plaintiff Michael Brooks is a user and subscriber of Verizon and has been during the relevant time period and residing in Portland, Oregon.

46. Plaintiff Michael S. Rothmel is a user and subscriber of Verizon and has been during the relevant time period and residing in Mount Holly, New Jersey.

47. Plaintiff Ray Anderson is a user and subscriber of Verizon since May 2002 and residing in Irvine, California.

48. Plaintiff John Barrett is a user and subscriber of Verizon since 1995 and residing in Brick, New Jersey.

49. Plaintiff Michael Brooks is a user and subscriber of Verizon since 2002 and residing in Oregon City, Oregon.

50. Plaintiff Peter Catizone is a user and subscriber of Verizon since 2001 and residing in Somerville, Massachusetts.

51. Plaintiff Sharon L. Davis is a user and subscriber of Verizon and has been during the relevant time period and residing in Littleton, Colorado.

52. Plaintiff Diane Gavlinski is a user and subscriber of Verizon since 1991 and residing in New Port Richie, Florida.

53. Plaintiff Toni DiDona is a user and subscriber of Verizon and has been

during the relevant time period and residing in Miami, Florida.

54. Plaintiff Theresa R. Duffy is a user and subscriber of Verizon since 1993 and residing in Phillipsburg, New Jersey.

55. Plaintiff Sarah Folio is a user and subscriber of Verizon and has been during the relevant time period and residing in Oakland, Maryland.

56. Plaintiff Margaret Franklin is a user and subscriber of Verizon and has been during the relevant time period and residing in Scotch Plains, New Jersey.

57. Plaintiff Jit Gill is a user and subscriber of Verizon and has been during the relevant time period and residing in Newport News, Virginia.

58. Plaintiff Todd Graff is a user and subscriber of Verizon since 2000 and residing in Emmaus, Pennsylvania.

59. Plaintiff Susan Grossman is a user and subscriber of Verizon since 2000 and residing in West New York, New Jersey.

60. Plaintiffs Don and Donna Hawkings are users and subscribers of Verizon since 2003 and residing in Fayetteville, North Carolina.

61. Plaintiffs Stephanie Gustave and Kevin Shawler are users and subscribers of Verizon since 2004 and residing in Columbus, Ohio.

62. Plaintiff Joyce Jackson is a user and subscriber of Verizon since 2004 and residing in Kennesaw, Georgia.

63. Plaintiff Terry Mancour is a user and subscriber of Verizon and has been during the relevant time period and residing in Durham, North Carolina.

64. Plaintiff Alicia McCollum is a user and subscriber of Verizon and has been during the relevant time period and residing in Hoyt, Kansas.

65. Plaintiff Chris von Obenauer is a user and subscriber of Verizon and has been during the relevant time period and residing in Petersburg, Florida.

66. Plaintiff Dan Patton is a user and subscriber of Verizon since and residing in Washington, DC.

67. Plaintiff Martin Razo is a user and subscriber of Verizon and has been

during the relevant time period and residing in Oaklyn, New Jersey.

68. Plaintiff Mark Richards is a user and subscriber of Verizon and has been during the relevant time period and residing in Littleton, Massachusetts.

69. Plaintiffs Fred and Darlene Rogers are users and subscribers of Verizon since 1989 and residing in Rockmart, Georgia.

70. Plaintiff William J. Romansky is a user and subscriber of Verizon and has been during the relevant time period and residing in Pennsville, New Jersey.

71. Plaintiff Gregory L. Smith is a user and subscriber of Verizon and has been during the relevant time period and residing in Milton Mills, New Hampshire.

72. Plaintiffs Paul and Regina Sundberg are users and subscribers of Verizon and have been during the relevant time period and residing in South Bloomfield, Ohio.

73. Plaintiff Barry W. Tribble is a user and subscriber of Verizon and has been during the relevant time period and residing in Marion, North Carolina.

74. Plaintiff Fred Trinkoff is a user and subscriber of Verizon and has been during the relevant time period and residing in Marlborough, Massachusetts.

75. Plaintiff Vickie Votaw is a user and subscriber of Verizon since 2003 and residing in Madison Heights, Virginia.

76. Plaintiff Leon Dwight Wallace is a user and subscriber of Verizon and has been during the relevant time period and residing in Santa Monica, California.

77. Plaintiff Achieng Warambo and Ulrich Geister are subscribers of Verizon and have been during the relevant time period and residing in Teaneck, New Jersey.

78. Plaintiff Beth White is a user and subscriber of Verizon and has been during the relevant time period and residing in Wichita, Kansas.

79. Plaintiff Justin Wiley is a user and subscriber of Verizon and has been during the relevant time period and residing in Santa Cruz, California.

80. Plaintiff Kevin Wright is a user and subscriber of Verizon and has been during the relevant time period and residing in Studio City, California.

81. Plaintiff Simon Champagne is a user and subscriber of Verizon and has

been during the relevant time period and residing in Lawrenceville, Georgia.

82. Plaintiff James Flynn is a user and subscriber of Verizon and has been during the relevant time period and residing in LaPorte, Indiana.

83. Plaintiff Elizabeth T. Arnone is a user and subscriber of Verizon since 2000 and residing in Brick, New Jersey.

84. Plaintiff Jay H. Rowell is a user and subscriber of Verizon since 2005 and residing in Chicago, Illinois.

85. Plaintiff Daniel Reimann is a user and subscriber of Verizon and has been during the relevant time period and residing in Pompano Beach, Florida.

86. Plaintiff Vivian Phillips is a user and subscriber of Verizon and has been during the relevant time period and residing in Chapel Hill, North Carolina.

87. Plaintiff Jeffrey G. Marsocci is a user and subscriber of Verizon and has been during the relevant time period and residing in Raleigh, North Carolina.

88. Plaintiff Roslyn Payne is a resident of Richmond, Vermont and a customer of Verizon's telephone services and has been such since before September 11, 2001 and continuing to date.

89. Plaintiff Sean Basinski is an individual residing in New York, NY. Plaintiff Basinski is a user and subscriber of Verizon's residential long distance telephone service.

90. Plaintiff Gina Migliaccio is an individual residing in Long Beach, NY. Plaintiff Migliaccio is a user and subscriber of Verizon's residential long distance telephone service.

91. Plaintiff Rhea Fuller is an individual residing in Missoula, Montana. Plaintiff is and has been a user and subscriber of Verizon's telephone services.

92. Plaintiff Darryl Hines is a user and subscriber of Verizon and has been during the relevant time period and residing in Beaverton, Oregon.

93. Plaintiff Pamela A. Mahoney is an individual residing in Warwick, Rhode Island. Plaintiff was a user and subscriber of Verizon's residential telephone service.

94. Plaintiff Edward Marck is an individual residing in Deer Park, New York.

Marck personally utilized the communications facilities of Verizon since well before 2001 to present, to place and receive telephone calls to/from various places.

95. Plaintiff Carol Waltuch is an individual residing in Rockville Centre, New York, currently and at all times relevant hereto. Waltuch personally utilized the communications facilities of Verizon since well before 2001 to present, to place and receive telephone calls to/from various places.

96. Plaintiff Charles F. Bissitt, a resident of North Providence, Rhode Island, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

97. Plaintiff Sandra Bissitt, a resident of North Providence, Rhode Island, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

98. Plaintiff June Matrumalo, a resident of North Providence, Rhode Island, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

99. Plaintiff George Hayek, III, a resident of the City of Warwick, Rhode Island, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

100. Plaintiff Gerard Thibeault, a resident of City of Cranston, Rhode Island, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

101. Plaintiff Arthur Bouchard, a resident of Glocester, Rhode Island, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

102. Plaintiff Maryann Bouchard, a resident of Glocester, Rhode Island, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

103. Plaintiff Aldo Caparco, a resident of Scituate, Rhode Island, at all material

times was and is a user and subscriber of Verizon's telephone and communication services.

104. Plaintiff Janice Caparco, a resident of Scituate, Rhode Island, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

105. Plaintiff Jenna Caparco, a resident of Scituate, Rhode Island, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

106. Plaintiff Rose DeLuca, a resident of Providence, Rhode Island, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

107. Plaintiff Nicole Mirabella, a resident of Providence, Rhode Island, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

108. Plaintiff Patricia Pothier, a resident of Warwick, Rhode Island, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

109. Plaintiff Paul Pothier, a resident of Warwick, Rhode Island, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

110. Plaintiff Marshall Votta, a resident of Smithfield, Rhode Island, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

111. Plaintiff Vincent Matrumalo, a resident of North Providence, Rhode Island, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

112. Plaintiff Paula Matrumalo, a resident of North Providence, Rhode Island, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

113. Plaintiff Jennifer Thomas, a resident of Cumberland, Rhode Island, at all material times was and is a user and subscriber of Verizon's telephone and communication

services.

114. Plaintiff Christine Douquette, a resident of Cumberland, Rhode Island, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

115. Plaintiff Maryanne Klaczynski, a resident of Warwick, Rhode Island, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

116. Plaintiff Lloyd Brown, a resident of the State of California, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

117. Plaintiff Steven Kampmann, a resident of the State of California, at all material times was and is a user and subscriber of Verizon's telephone and communication services.

118. Plaintiff David Kadlec is an individual residing in Indianapolis, Indiana, and has been a user and subscriber of Verizon's wireless cellular phone service since at least 2002, and has used it to make wireless telephone calls.

119. Plaintiff Tim Peterson is an individual residing in Indianapolis, Indiana, and has been a user and subscriber of Verizon's wireless cellular phone services since at least 2003, and has used Verizon wireless to make wireless calls. Plaintiff Peterson has a special interest in call privacy in that he is a licensed attorney legally obligated to protect communications with his clients.

120. Plaintiff Carolyn W. Rader is an individual living in Indianapolis, Indiana, and has been a user and subscriber of Verizon's wireless telecommunications services, and has used it to make wireless calls. Ms. Rader has a special interest in call privacy in that she is a licensed attorney legally obligated to protect communications with her clients.

121. Plaintiff Joan DuBois resides in West Olive, Michigan, and is a user and subscriber of Verizon's wireless telecommunications services and has used their services to make telephone or wireless calls and/or to send and receive internet messages and e-mails.

122. Plaintiffs Christopher and Rebecca Yowtz, husband and wife, reside in

Coopersville, Michigan, and are subscribers and users of Verizon's wireless telecommunications services, and have also used their services to make telephone or wireless calls and/or to send and receive internet messages and e-mails.

123. Plaintiffs Steven and Cathy Bruning are individuals residing in Marietta, Georgia. Steven and Cathy Bruning have been subscribers to and users of Verizon wireless cell phone services. The Brunings have also used such electronic communications services to place domestic and international telephone calls and for internet and e-mail services.

## CLASS ACTION ALLEGATIONS

124. Plaintiff Spielfogel-Landis brings this action under Federal Rule of Civil Procedure 23 on behalf of herself and an "MCI Class," defined as:

> All individuals and entities located in the United States that have been subscribers or customers of MCI's wireline long distance telephone services at any time since October 6, 2001. Excluded from the Class are Defendants, Defendants' predecessors, affiliates, parents, subsidiaries, officers and directors; all federal, state, and local governmental entities; any and all judges and justices assigned to hear any aspect of this litigation, their court staffs, their spouses, any minor children residing in their households, and any persons within the third degree of relationship to any judge or justice assigned to hear any aspect of this litigation.

125. Plaintiff Spielfogel-Landis also bring this action, pursuant to Rule 23, on behalf of an "MCI California Subclass," defined as:

> All individuals and entities located in California that have been subscribers or customers of MCI's wireline long distance telephone services at any time since October 6, 2001. Excluded from the Subclass are Defendants, Defendants' predecessors, affiliates, parents, subsidiaries, officers and directors; all federal, state, and local governmental entities; any and all judges and justices assigned to hear any aspect of this litigation, their court staffs, their spouses, any minor children residing in their households, and any persons within the third degree of relationship to any judge or justice assigned to hear any aspect of this litigation.

126. Verizon Plaintiffs bring this action under Federal Rule of Civil Procedure 23 on behalf of themselves and a "Verizon Class," defined as:

> All individuals and entities located in the United States that have been subscribers or customers of Verizon's wireline telephone, wireless, or other electronic communications or remote computing services at any time since October 6, 2001. Excluded from the Class are Defendants, Defendants' predecessors, affiliates, parents,

> subsidiaries, officers and directors; all federal, state, and local governmental entities; any and all judges and justices assigned to hear any aspect of this litigation, their court staffs, their spouses, any minor children residing in their households, and any persons within the third degree of relationship to any judge or justice assigned to hear any aspect of this litigation.

127. Plaintiffs Merrilyn Romen, Ray Anderson, Leon Dwight Wallace, Justin Wiley, and Kevin Wright also bring this action, pursuant to Rule 23, on behalf of a "Verizon California Subclass," defined as:

> All individuals and entities located in California that have been subscribers or customers of Verizon's wireline telephone, wireless or other electronic communications or remote computing services at any time since October 6, 2001. Excluded from the Subclass are Defendants, Defendants' predecessors, affiliates, parents, subsidiaries, officers and directors; all federal, state, and local governmental entities; any and all judges and justices assigned to hear any aspect of this litigation, their court staffs, their spouses, any minor children residing in their households, and any persons within the third degree of relationship to any judge or justice assigned to hear any aspect of this litigation.

128. Plaintiffs seek certification of the Classes and Subclasses under Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

129. The Classes each number in the millions, and the Subclasses each contain at least several hundred thousand members, so that joinder of all members is impractical.

130. The claims of Plaintiffs are typical of the claims of their respective Classes and Subclasses. Plaintiffs will fairly and adequately protect the interests of their respective Class and Subclass. Plaintiffs have no conflicts with any other member of their respective Class and Subclass, and have retained competent counsel experienced in consumer class actions, telecommunications, complex litigation, and civil rights litigation.

131. Common questions of law and fact exist, including:

a. whether Defendants intercepted their customers' wire and/or electronic communications;

b. whether Defendants disclosed and/or divulged their customers' call-detail records and/or the contents of their wire and/or electronic communications to the federal government;

c. whether Defendants violated applicable federal and state laws in disclosing and/or divulging their customers' call-detail records and/or the contents of their wire and/or electronic communications to the federal government;

d. whether Defendants violated their privacy policies and breached their agreements with their subscribers by doing the things alleged;

e. whether Plaintiffs and the members of the Classes and Subclasses are entitled to damages; and

f. whether Plaintiffs and the members of the Classes and Subclasses are entitled to equitable relief.

132. These and other questions of law and fact are common to the Classes and the Subclasses, and predominate over any questions affecting only individual members.

133. Class actions are a superior method for the fair and efficient adjudication of the controversies described herein. Class actions provide an efficient and manageable method to enforce the rights of Plaintiffs and the members of the Classes and the Subclasses.

134. The prosecution of separate actions by individual members of the Classes and Subclasses would create a risk of inconsistent or varying adjudication, establishing incompatible standards of conduct for Defendants.

135. Defendants have acted, and refused to act, on grounds generally applicable to the Classes and Subclasses, thereby making appropriate relief with respect to the Classes and Subclasses as a whole.

## COMMON FACTUAL ALLEGATIONS

136. In Section 222 of the Communications Act of 1934 (47 U.S.C. § 222(c)(1)), Congress imposed upon telecommunication carriers, such as Defendants, a duty to protect sensitive, personal customer information from disclosure. This information includes "information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship" and data concerning service customers' telephone

calling histories (*i.e.*, date, time, duration, and telephone numbers of calls placed or received), also known as "call-detail records." Such information constitutes "individually identifiable customer proprietary network information" within the meaning of Section 222 of the Communications Act of 1934.

137. Federal law prohibits the federal government from obtaining customers' call-detail records without a warrant, subpoena, or other valid legal process, and similarly prohibits telecommunications providers, such as Defendants, from giving such information to the government without judicial or other lawful authorization, probable cause, individualized suspicion, and/or legally-sanctioned approval.

138. On December 16, 2005, in an article entitled "Bush Lets U.S. Spy on Callers Without Courts," *The New York Times* reported on a National Security Agency ("NSA") program of eavesdropping on the telephone conversations of Americans without court order, as required by the Foreign Intelligence Surveillance Act ("FISA").

139. In a December 17, 2005 radio address, President George W. Bush stated that "[i]n the weeks following the terrorist attacks on our nation, [he] authorized the National Security Agency, consistent with U.S. law and the Constitution, to intercept the international communications of people with known links to al Qaeda and related terrorist organizations." President Bush further stated that "the activities [he] authorized are reviewed approximately every 45 days"; that he had "reauthorized this program more than 30 times since the September the 11th attacks"; and that he intended to continue authorizing such activity "for as long as our nation faces a continuing threat from al Qaeda and related groups."

140. In a press briefing on December 19, 2005 by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence, the government claimed that the NSA surveillance program targets communications between a party outside the United States and a party inside the United States when one of the parties of the communication is believed to be "a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda."

141. In a press release on December 19, 2005, Attorney General Alberto

Gonzales stated that the program involved "intercepts of contents of communications . . . ." While the Attorney General's description of the program was limited to interception of communications with individuals "outside the United States," Attorney General Gonzales explained that his discussion was limited to those parameters of the program already disclosed by the President and that many other operational aspects of the program remained highly classified.

142. On December 24, 2005, *The New York Times* reported in an article entitled, "Spy Agency Mined Vast Data Trove, Officials Report" that:

> [t]he National Security Agency has traced and analyzed large volumes of telephone and Internet communications flowing into and out of the United States as part of the eavesdropping program that President Bush approved after the Sept. 11, 2001 attacks to hunt for evidence of terrorist activity, according to current and former government officials. The volume of information harvested from telecommunication data and voice networks, without court-approved warrants, is much larger than the White House has acknowledged, the officials said. It was collected by tapping directly into some of the American telecommunication system's main arteries, they said.

The officials said that as part of the program, "the N.S.A. has gained the cooperation of American telecommunications companies to obtain backdoor access to streams of domestic and international communications," and that the program is a "large data-mining operation," in which N.S.A. technicians have combed through large volumes of phone and Internet traffic in search of patterns that might point to terrorism suspects. In addition, the article reports, "[s]everal officials said that after President Bush's order authorizing the N.S.A. program, senior government officials arranged with officials of some of the nation's largest telecommunications companies to gain access to switches that act as gateways at the borders between the United States' communication networks and international networks."

143. In a January 3, 2006 article entitled, "Tinker, Tailor, Miner, Spy" (available at http://www.slate.com/toolbar.aspx?action=print&id=2133564), Slate.com reported, "[t]he agency [the NSA] used to search the transmissions it monitors for key words, such as names and phone numbers, which are supplied by other intelligence agencies that want to track certain individuals. But now the NSA appears to be vacuuming up all data, generally without a particular phone line, name, or e-mail address as a target. Reportedly, the agency is analyzing the

length of a call, the time it was placed, and the origin and destination of electronic transmissions."

144. In a January 17, 2006 article, "Spy Agency Data After Sept. 11 Led F.B.I. to Dead Ends," *The New York Times* stated that officials who were briefed on the N.S.A. program said that "the agency collected much of the data passed on to the F.B.I. as tips by tracing phone numbers in the United States called by suspects overseas, and then by following the domestic numbers to other numbers called. In other cases, lists of phone numbers appeared to result from the agency's computerized scanning of communications coming into and going out of the country for names and keywords that might be of interest."

145. A January 20, 2006 article in the *National Journal*, "NSA Spy Program Hinges On State-of-the-Art Technology," reported that "[o]fficials with some of the nation's leading telecommunications companies have said they gave the NSA access to their switches, the hubs through which enormous volumes of phone and e-mail traffic pass every day, to aid the agency's effort to determine exactly whom suspected Qaeda figures were calling in the United States and abroad and who else was calling those numbers. The NSA used the intercepts to construct webs of potentially interrelated persons."

146. In a January 21, 2006 article in *Bloomberg News* entitled "Lawmaker Queries Microsoft, Other Companies on NSA Wiretaps," Daniel Berninger, a senior analyst at Tier 1 Research in Plymouth, Minnesota, said, "[i]n the past, the NSA has gotten permission from phone companies to gain access to so-called switches, high-powered computers into which phone traffic flows and is redirected, at 600 locations across the nation. . . . From these corporate relationships, the NSA can get the content of calls and records on their date, time, length, origin and destination."

147. On February 5, 2006, an article appearing in the *Washington Post* entitled "Surveillance Net Yields Few Suspects" stated that officials said "[s]urveillance takes place in several stages . . . the earliest by machine. Computer-controlled systems collect and sift basic information about hundreds of thousands of faxes, e-mails and telephone calls into and out of the United States before selecting the ones for scrutiny by human eyes and hears. Successive stages of filtering grow more intrusive as artificial intelligence systems rank voice and data traffic in

order of likeliest interest to human analysts." The article continues, "[f]or years, including in public testimony by Hayden, the agency [the NSA] has acknowledged use of automated equipment to analyze the contents and guide analysts to the most important ones. According to one knowledgeable source, the warrantless program also uses those methods. That is significant . . . because this kind of filtering intrudes into content, and machines 'listen' to more Americans than humans do."

148. On February 6, 2006, in an article entitled "Telecoms let NSA spy on calls," the nationwide newspaper *USA Today* reported that "[t]he National Security Agency has secured the cooperation of large telecommunications companies, including AT&T, MCI and Sprint, in its efforts to eavesdrop without warrants on international calls by suspected terrorists, according to seven telecommunications executives." The article acknowledged that *The New York Times* had previously reported that the telecommunications companies had been cooperating with the government but had not revealed the names of the companies involved. In addition, it stated that long-distance carriers AT&T, MCI, and Sprint "all own 'gateway' switches capable of routing calls to points around the globe," and that "[t]elecommunications executives say MCI, AT&T, and Sprint grant the access to their systems without warrants or court orders. Instead, they are cooperating on the basis of oral requests from senior government officials."

149. On May 11, 2006, in an article entitled "NSA has massive database of Americans' phone calls," *USA Today* reported that "[t]he National Security Agency has been secretly collecting the phone call records of tens of millions of Americans, using data provided by AT&T, Verizon and Bellsouth," according to multiple sources with "direct knowledge of the arrangement." One of the confidential sources for the article reported that the NSA's goal is "to create a database of every call ever made" within the United States. The confidential sources reported that AT&T and the other carriers are working "under contract" with the NSA, which launched the program in 2001 shortly after the September 11, 2001 terrorist attacks. At the U.S. Senate confirmation hearing on his nomination to become Director of the Central Intelligence Agency, General Michael Hayden, who was the Director of the NSA at the time, confirmed that the program was "launched" on October 6, 2001.

150. The *USA Today* story was confirmed by a U.S. intelligence official familiar with the program. The story reports that the NSA requested that AT&T, SBC, and the other carriers "turn over their 'call-detail records,' a complete listing of the calling histories of their millions of customers," and provide the NSA with "updates" of the call-detail records. The confidential sources for the story reported that the NSA informed the carriers that it was willing to pay for the cooperation, and that both "AT&T, which at the time was headed by C. Michael Armstrong," and "SBC, headed by Ed Whitacre," agreed to provide the NSA with the requested information.

151. The *USA Today* story reported that the NSA requested that Qwest Communications, Inc. ("Qwest"), another telecommunications carrier, provide the NSA with its customers' call-detail records, but Qwest refused. Qwest requested that the NSA first obtain a court order, a letter of authorization from the U.S. Attorney General's office, or permission from a Court operating under the FISA, but the NSA refused, because it was concerned that the FISA Court and the Attorney General would find the NSA's request unlawful.

152. As of the date of the filing of this complaint, no part of the USA *Today* story has been publicly denied by any representative of the federal government, including the NSA.

153. Qwest's decision not to participate was also reported by *The New York Times* in a May 13, 2006 article entitled, "Questions Raised For Phone Giants In Spy Data Furor." The article reported that Qwest's former CEO, Joseph Nacchio, "'made inquiry as to whether a warrant or other legal process had been secured in support of that request. When he learned that no such authority had been granted, and that there was a disinclination on the part of the authorities to use any legal process,' Nacchio concluded that the requests violated federal privacy requirements 'and issued instructions to refuse to comply.'" According to the May 11, 2006 *USA Today* article, "Nacchio's successor, Richard Notebaert, finally pulled the plug on the NSA talks in late 2004."

154. Senator Christopher "Kit" Bond (R-MO), then a member of the Senate Select Committee on Intelligence with access to information on warrantless surveillance

operations, explained on May 11, 2006 on a PBS Online NewsHour program entitled "NSA Wire Tapping Program Revealed" that "[t]he president's program uses information collected from phone companies . . . what telephone number called what other telephone number."

155. On May 14, 2006, when Senate Majority Leader William Frist (R-TN) was asked on CNN Late Edition with Wolf Blitzer whether he was comfortable with the program described in the *USA Today* article, he stated, "Absolutely. I am one of the people who are briefed . . . I've known about the program. I am absolutely convinced that you, your family, our families are safer because of this particular program."

156. Senator Pat Roberts (R-KS), the chair of Senate Select Committee on Intelligence, described the program on "All Things Considered" on National Pubic Radio on May 17, 2006. When asked about whether he had been briefed that the NSA had collected millions of phone records for domestic calls, Roberts stated: "Well, basically, if you want to get into that, we're talking about business records."

157. On May 29, 2006, Seymour Hersh reported in *The New Yorker* in an article entitled "Listening In" that a security consultant working with a major telecommunications carrier "told me that his client set up a top-secret high-speed circuit between its main computer complex and Quantico, Virginia, the site of a government-intelligence computer center. This link provided direct access to the carrier's network core – the critical area of its system, where all its data are stored. 'What the companies are doing is worse than turning over records,' the consultant said. 'They're providing total access to all the data.'"

158. A June 30, 2006 *USA Today* story reported that 19 members of the intelligence oversight committees of the U.S. Senate and House of Representatives "who had been briefed on the program verified that the NSA has built a database that includes records of Americans' domestic phone calls," and that four of the committee members confirmed that "MCI, the long-distance carrier that Verizon acquired in January, did provide call records to the government."

159. Beginning on or about May 12, 2006, Verizon made a series of public statements in response to the allegations of its participation in the intelligence gathering program

disclosed on the preceding day, May 11, 2006.

160. On May 12, 2006, Verizon issued a press release entitled “Verizon Issues Statement on NSA and Privacy Protection,” stating that:

> Verizon will provide customer information to a government agency only where authorized by law for appropriately-defined and focused purposes. . . . Verizon does not, and will not, provide any government agency unfettered access to our customer records or provide information to the government under circumstances that would allow a fishing expedition.
>
> In January 2006, Verizon acquired MCI, and we are ensuring that Verizon's policies are implemented at that entity and that all its activities fully comply with law.

161. On May 16, 2006, Verizon issued a press release entitled “Verizon Issues Statement on NSA Media Coverage,” identifying its spokesperson as Peter Thonis, and stating that:

> One of the most glaring and repeated falsehoods in the media reporting is the assertion that, in the aftermath of the 9/11 attacks, Verizon was approached by NSA and entered into an arrangement to provide the NSA with data from its customers’ domestic calls.
>
> This is false. From the time of the 9/11 attacks until just four months ago, Verizon had three major businesses — its wireline phone business, its wireless company and its directory publishing business. It also had its own Internet Service Provider and long-distance businesses. Contrary to the media reports, Verizon was not asked by NSA to provide, nor did Verizon provide, customer phone records from any of these businesses, or any call data from those records. None of these companies — wireless or wireline — provided customer records or call data.

162. On May 16, 2006, *USA Today* reported that:

> Verizon's [May 16, 2006] statement does not mention MCI, the long-distance carrier the company bought in January. Before the sale, Verizon sold long-distance under its own brand. Asked to elaborate on what role MCI had, or is having, in the NSA program, spokesman Peter Thonis said the statement was about Verizon, not MCI.

163. Defendants MCI and Verizon knowingly and intentionally provided and continue to provide the aforementioned telephone call contents and records to the federal government.

164. As part of the program the NSA’s operational personnel identify particular

individual targets, and their communications, through a software data mining process that NSA runs against vast databases of MCI and Verizon's stored electronic records of their customers' domestic and international telephone and electronic communications in search of particular names, numbers, words or phrases and patterns of interest. Upon information and belief, NSA's operational personnel also identify communications of interest in real-time through similar data-mining software functionality.

165. As part of this data-mining program, the NSA intercepts millions of communications made or received by people inside the United States, and uses powerful computers to scan their contents for particular names, numbers, words, or phrases.

166. Additionally, the NSA collects and analyzes a vast amount of communications traffic data to identify persons whose communications patterns the government believes may link them, even if indirectly, to investigatory targets.

167. The NSA has accomplished its massive surveillance operation by arranging with some of the nation's largest telecommunications companies to gain direct access to the telephone and electronic communications transmitted via those companies' domestic telecommunications facilities and to those companies' records pertaining to the communications they transmit.

168. Defendants have intercepted and continue to provide the government with direct access to all or a substantial number of the communications transmitted through their key domestic telecommunications facilities, including direct access to streams of domestic, international, and foreign telephone and electronic communications.

169. Since in or about October 2001, MCI and Verizon have disclosed and/or divulged the "call-detail records" of all or substantially all of their customers, including Plaintiffs, to the NSA, in violation of federal law, as more particularly set forth below.

170. Defendants MCI and Verizon have, since in or about October 2001, been disclosing to the NSA "individually identifiable customer proprietary network information" belonging to all or substantially all of their customers, including Plaintiffs, in violation of federal law, as more particularly set forth below.

171. Defendants have disclosed and continue to disclose and/or provide the government with direct access to their databases of stored telephone and electronic communications records, which are updated with new information in real time or near-real time.

172. According to the Winter Corporation, a leading center of expertise in database scalability, Defendant Verizon maintains multiple databases with a combined contents of 19,923 Gigabytes of data, as of September 14, 2005.[1]

173. MCI and Verizon have knowingly authorized, and continue to knowingly authorize, NSA and affiliated governmental agencies to install and use, or have assisted government agents in installing or using, interception devices and pen registers and/or trap and trace devices on MCI and Verizon's domestic telecommunications facilities in connection with the above-described program.

174. The interception devices and pen registers and/or trap and trace devices capture, record, or decode the various information pertaining to individual class member communications including dialing, routing, addressing, and/or signaling information ("DRAS information") for all or a substantial number of all wire or electronic communications transferred through Defendants' domestic telecommunications facilities where those devices have been installed.

175. Using these devices, government agents have acquired and are acquiring wire or electronic communications content and DRAS information directly via remote or local control of the device, and/or Defendants MCI and Verizon have disclosed and are disclosing those communications and information to the government after interception, capture, recording or decoding.

176. Defendants have knowingly authorized, and continue to knowingly authorize, NSA and affiliated governmental agencies to directly access through the installed devices all domestic, international, and foreign wireline and wireless telephone and electronic communications transmitted through Defendants' domestic telecommunications infrastructure and facilities for use in the program.

[1] *Pascazi, et al. v. Verizon, et al.*

177. MCI and Verizon provide the aforementioned telephone contents and records pertaining to their communications to the federal government in the absence of judicial or other lawful authorization, probable cause, and/or individualized suspicion, and/or without a court order, warrant, subpoena, statutory authorization, or certification pursuant to Chapters 119 and 121 of Title 18 of the United States Code.

178. Defendants MCI and Verizon did not disclose to their customers, including Plaintiffs, that they were providing the aforementioned telephone contents and records to the federal government. Thus, Defendants' customers, including Plaintiffs, had no opportunity to, and did not, consent to the disclosure of their telephone contents and records.

179. Verizon regularly publishes statements regarding the treatment of its customers' private information. Such statements uniformly assure Verizon's customers that the information obtained by Verizon is used only for business purposes and that any other use of the information would prompt a communication from Verizon to the customer revealing the intended use or disclosure of such information. For example, Verizon has published the following description of its privacy practices:

> We obtain and use your personally identifiable information for business purposes only.
> We obtain personally identifiable information about you that helps us to provide you with our services. We may also use this information to protect customers, employees and property against fraud, theft or abuse, to conduct industry or consumer surveys and to maintain good customer relations. We may ask you questions to better serve your special needs and interests. For example, we may ask whether you work at home, whether any members of your household have special needs or whether teenagers reside in your household in order to determine whether you may be interested in certain services. For training or quality assurance, we may also monitor or record our calls with you.
>
> We inform you how personally identifiable information we obtain about you is used, as well as your options regarding its use.
> Our Customer Agreement contains disclosures about personally identifiable information that we are required to protect under federal law, how and when we use this information, when we may disclose it and ways you can restrict how we use or disclose it. We may also include information about the privacy implications of individual products and services in the terms and conditions for those products and services. These terms and conditions typically are found in the printed brochures for particular products or services, or sometimes you may view them on our websites, or electronically the first time you use the products or services.

180. Defendant Verizon openly acknowledges the expectation of privacy it has fostered with its customers at http://www22.verizon.com/about/privacv/customer/:

> For more than a century, customers have counted on Verizon's telephone companies to respect and protect the privacy of information we obtain in the normal course of providing service. While we are working hard to serve you in new and exciting ways, our commitment to protecting your privacy remains as strong as ever.
>
> **Disclosure of Information Outside Verizon**
> As a rule, Verizon will notify you and give you the opportunity to "opt out" when we disclose telephone customer information outside of Verizon. In fact, we generally keep our records of the services you buy and the calls you make private, and will not ordinarily disclose this information to outside parties without your permission. However, we do release customer information without involving you if disclosure is required by law or to protect the safety of customers, employees or property. This is further explained below.
>
> Examples where disclosure is required by law or to protect the safety of customers, employees or property:
>
> - When you dial 911, information about your location may be transmitted automatically to a public safety agency. Certain information about your long distance calls is transmitted to your long distance company for billing purposes. Verizon also is required by law to give competitive local exchange carriers access to its customer databases for purposes of serving their customers, to exchange credit information with other carriers, and to provide listings (other than certain non-published and non-listed information) to directory publishers.
> - Verizon must disclose information, as necessary, to comply with court orders or subpoenas. Verizon also will share information to protect its rights or property and to protect users of its services and other carriers from fraudulent, abusive or unlawful use of services.
> - We may, where permitted by law, provide information to credit bureaus, or provide information and/or sell receivables to collection agencies, to obtain payment for Verizon billed products and services.
> - Verizon also occasionally uses contractors to do work for the company. These contractors have the same obligations as our regular employees concerning customer information.

181. In light of the facts alleged herein, Verizon’s representations to its customers (and, since consummation of the merger, to customers of MCI) that it will only provide its customers’ information to third parties without the customers’ permission “if disclosure is required by law or to protect the safety of customers, employees or property” is blatantly false, deceptive, and misleading, and violates the consumer protection laws in all states in which

Defendants operate.

182. The telephone contents and records intercepted and/or disclosed and/or divulged by MCI and Verizon to the federal government pursuant to the program challenged herein were not divulged (a) pursuant to a law enforcement investigation concerning telemarketing fraud; (b) as a necessary incident to the rendition of services to customers; (c) to protect the rights or property of Defendants MCI and Verizon; (d) based on a reasonable and/or good faith belief that an emergency involving danger of death or serious physical injury required disclosure without delay; (e) to the National Center for Missing and Exploited Children; or (f) to a non-governmental person or entity.

183. Defendants' violations of federal law, as more particularly described herein, were committed with knowledge of their illegality, and therefore in bad faith.

## VERIZON PLAINTIFFS' SEPARATE ALLEGATIONS

184. Verizon Plaintiffs have received further representations by Verizon, as follows:

1) Norman LeBoon, Sr. is a Verizon landline subscriber residing in Philadelphia, Pennsylvania. On May 11, 2006, after reading the USA Today article disclosing the intelligence gathering program, Subscriber LeBoon sent an e-mail to Verizon objecting that records were being given to the government and asking if his records were turned over. Verizon issued tracking number 14497914 in connection with Subscriber LeBoon's inquiry.

   On the following day, May 12, 2006, Subscriber LeBoon received a reply from "Albert" at Verizon's Encore customer service office, stating substantially that Verizon could not comment affirmatively or negatively as to the existence of such a program because of national security concerns. Within approximately five minutes of receiving the e-mail reply, Subscriber LeBoon called the Encore customer service center and asked to speak with Albert. He was told by a woman who answered that "Albert was busy" but that she "would be glad to help". Upon inquiry, the woman at the Encore customer service center identified herself as "Ellen".

   Subscriber LeBoon told Ellen that he had e-mailed Defendant Verizon asking "if my records have been shared with the government, the NSA, the CIA or anyone without my authorization." He then told Ellen he had received a reply from Albert that did not answer his inquiry. Subscriber LeBoon then asked Ellen whether his records have been given to the government. Ellen expressly confirmed to LeBoon that his records have been given to the government. Ellen stated as follows: "I can tell you

Mr. LeBoon that your records have been shared with the government, but that's between you and me."

Ellen then told LeBoon that Verizon would deny that it has disclosed the records and that Verizon was operating under the assumption that it had "plausible deniability". Ellen told Subscriber LeBoon:

> "They [Verizon] are going to deny it because of national security. The government is denying it and we have to deny it, too. Around here we are saying that Verizon has 'plausible deniability."

Subscriber LeBoon then asked, "So there's going to be no resolution about the company telling people what they did?" Ellen replied, "That's right -- plausible deniability." Subscriber LeBoon then said, "That's pathetic, why is this happening?" Ellen replied, "Sir we're at war." Subscriber LeBoon repeated, "So there's going to be no resolution of this?" Ellen replied, "Bingo."

2) Between May 11 and May 16, 2006, Verizon subscriber Mark Baker communicated by e-mail and telephone with Verizon customer service representatives, supervisors, and senior management. On each of these occasions Baker expressed his opposition to Verizon's turning over of customer records to the NSA or any other government agency without warrant or subpoena.

   In the first of such conversations, on or about May 16, 2006, Subscriber Baker told a Verizon customer service supervisor that he objected to his records being turned over to the NSA or any other government agency. In reply, the customer service supervisor expressly acknowledged to Baker that Defendant Verizon has turned its subscriber records over to the NSA. After making such admission, the supervisor proceeded to ask Baker, "Are you involved in a criminal activity such that you are concerned with us turning over your records?"

3) On May 11, 2006, after reading the *USA Today* article published that day, Verizon subscriber Michael Colonna, a resident of Hackettstown, New Jersey, called the Verizon customer service number on his wireless statement. Subscriber Colonna informed the customer services representative that he was "upset at the disclosures [of subscriber records]" to the government and wanted "to get out of my wireless contract without payment of the usual termination fee." Subscriber Colonna believed that the disclosure of subscriber records was in violation of the understandings he had as a Verizon subscriber and believed that these circumstances justified a termination of his contract with Verizon.

   The customer service representative placed Colonna on hold while he went to speak to a Verizon supervisor concerning Colonna's request. Upon returning, the customer service representative told Colonna that although the records of <u>other</u> Verizon customers were disclosed, the records of Verizon wireless customers were not disclosed. Colonna reports he was told the following:

> "You should not be concerned because we did not give away records of Verizon *Wireless* customers — that applied to Verizon customers, not Verizon Wireless customers."
>
> -*Conversation of Michael Colonna with Verizon Customer Service Supervisor,* May 11, 2006 [emphasis added].

185. Defendant Verizon, through its Verizon Wireless division (dba Cellco Partnership) or its affiliate(s), has engaged and maintained and still does maintain a high speed data transmission line from its wireless call center to a remote location in Quantico, Virginia, the site of a U.S. government intelligence and military base.

186. Defendant Verizon, through its Verizon Wireless division (dba Cellco Partnership) or its affiliate(s), permitted the installation of a high speed transmission line in its data center that had the capacity to transfer volumes of data from the carrier to an external third party located in Quantico, Virginia, the site of a United States intelligence and military base.

187. The transmission line at the data center was labeled "Quantico" and was known to all employees at the data center as a transmission line terminating at a remote location in Quantico, Virginia.

188. By virtue of the high speed transmission line, the Quantico recipient was enabled by Defendant Verizon to receive real time information as to all customer calling data and transmission of real time contemporaneous calls, including call history information and content.

189. The Verizon data center where the Quantico line was situated was a clearing house for all calls placed on Defendant Verizon's wireless network. Among the data center's functions was to survey all wireless calls placed on the network to determine if wireless telephone numbers had been accessed by parties illegally; to carry out such a function, the data center required access to all calls placed on the Verizon Wireless network.

190. Because the data center was a clearinghouse for all Verizon Wireless calls, the transmission line provided the Quantico recipient direct access to all content and all information concerning the origin and termination of telephone calls placed on the Verizon Wireless network, as well as the actual content of calls.

191. The transmission line was unprotected by any firewall and would have

enabled the recipient on the Quantico end to have unfettered access to Verizon Wireless customer records, data and content information. Any customer databases, records and information could be downloaded from this center.

192. Verizon officials placed the high speed transmission line off-limits to Verizon employees responsible for protecting the integrity of Verizon Wireless data from external intruders.

193. Said high speed transmission line to Quantico was first publicly disclosed in a report by journalist Seymour Hersh in *The New Yorker* in May 2006.

194. Said high speed transmission line was installed at the Verizon Wireless data center, a division, subsidiary, and/or affiliate of Defendant Verizon Communications, Inc.

195. Based upon the foregoing, Defendant Verizon, through its Verizon Wireless division (dba Cellco Partnership) or its affiliate(s), maintained an unprotected high speed transmission line at its Wireless data center terminating at a remote location in Quantico, Virginia that enabled the recipient(s) to have unfettered and unrestricted access to all Verizon Wireless data and voice content. This high speed transmission line to Quantico fed Verizon Wireless data to a U.S. government agency situated in or near Quantico, Virginia.

196. Unlike other transmission lines at the data center, the "Quantico" line was not connected to any firewall that would have restricted access to Verizon's records. The "Quantico" recipient(s) was thereby enabled by Verizon to access all calls, calling histories, and call content placed on the Verizon Wireless network.

197. Based upon the foregoing, Verizon provided unlimited, unrestricted, and unfettered access to all wireless call data, information and content to a government agency situated in Quantico, Virginia. This access was provided in violation of the law as enunciated herein.

## NECESSITY OF INJUNCTIVE RELIEF

198. The named Plaintiffs and the members of the Classes and Subclasses will continue in the future to use their telephones and other electronic communication devices.

199. Unless this Court enjoins Defendants from continuing to participate in the

unlawful programs challenged herein, Defendants will continue to participate in the programs.

200. The named Plaintiffs and the members of the Classes and Subclasses will suffer irreparable harm as a result of Defendants' continued participation in the programs, and have no adequate remedy at law.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

Violation of 18 U.S.C. §§ 2702(a)(1) and/or (a)(2)

201. Plaintiffs incorporate all of the allegations contained in the preceding paragraphs of this Complaint, as if set forth fully herein.

202. In relevant part, 18 U.S.C. § 2702 provides that:

> (a) Prohibitions. Except as provided in subsection (b) or (c)—
>
> (1) a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service; and
>
> (2) a person or entity providing remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service—
>
> (A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such service;
>
> (B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing. . . .

203. Defendants MCI and Verizon knowingly divulged to one or more persons or entities the contents of Plaintiffs' and Class members' communications while in electronic storage by Defendants' electronic communication services, and/or while carried or maintained by Verizon Internet's remote computing services, in violation of 18 U.S.C. §§ 2702(a)(1) and/or (a)(2).

204. Defendants MCI and Verizon did not notify Plaintiffs or Class or Subclass members of the divulgence of their communications, nor did Plaintiffs or Class or Subclass members consent to such.

205. Neither the NSA nor any other governmental entity has obtained a warrant authorizing the disclosures, pursuant to 18 U.S.C. § 2703(c)(1)(A).

206. Neither the NSA nor any other governmental entity has obtained a court order authorizing the disclosures, pursuant to 18 U.S.C. § 2703(c)(1)(B) and (d).

207. Neither the NSA nor any other governmental entity has issued or obtained an administrative subpoena authorized by a federal or state statute authorizing such disclosures, pursuant to 18 U.S.C. § 2703(c)(1)(E) and (c)(2).

208. Neither the NSA nor any other governmental entity has issued or obtained a federal or state grand jury or trial subpoena authorizing such disclosures, pursuant to 18 U.S.C. § 2703(c)(1)(E) and (c)(2).

209. Defendants have not been provided with a certification in writing by a person specified in 18 U.S.C. § 2518(7) or by the Attorney General of the United States meeting the requirements of 18 U.S.C. § 2511(2)(a)(ii)(B), *i.e.*, a certification that no warrant or court order authorizing the disclosures is required by law, and that all statutory requirements have been met.

210. The disclosures were and are not authorized by any statute or legislation.

211. Defendants' disclosures in violation of 18 U.S.C. § 2702(a)(1) and/or (a)(2) were and are knowing, intentional, and willful.

212. There is a strong likelihood that Defendants are now engaging in and will continue to engage in the above-described divulgence of Plaintiffs' and Class members' communications while in electronic storage by Defendants' electronic communication services, and/or while carried or maintained by Verizon Internet's remote computing services, and that likelihood represents a credible threat of immediate future harm.

213. Plaintiffs and Class members have been and are aggrieved by Defendants' above-described divulgence of the contents of their communications. Accordingly, Plaintiffs may

challenge this violation of 18 U.S.C. § 2702(a)(1) and/or (a)(2) pursuant to the cause of action created by 18 U.S.C. § 2707(a).

214. Pursuant to 18 U.S.C. § 2707, Plaintiffs and Class members seek such preliminary and other equitable or declaratory relief as may be appropriate; statutory damages of no less than $1000 for each aggrieved Plaintiff or Class member; punitive damages as the Court considers just; and reasonable attorneys' fees and other litigation costs reasonably incurred.

**SECOND CLAIM FOR RELIEF**
Violation of 18 U.S.C. § 2702(a)(3)

215. Plaintiffs incorporate all of the allegations contained in the preceding paragraphs of this Complaint, as if set forth fully herein.

216. In relevant part, 18 U.S.C. § 2702 provides that:

(a) Prohibitions. – Except as provided in subsection . . . (c) –

> (3) a provider of remote computing service or electronic communication service to the public shall not knowingly divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by paragraph (1) or (2)) to any governmental entity.

217. MCI's wireline telephone services, Verizon Communications' wireline telephone services, and Verizon Wireless' wireless telephone services are "electronic communication service[s]," as that term is defined in 18 U.S.C. § 2510(15), provided to the public, including Plaintiffs and Class members.

218. Defendants violated 18 U.S.C. § 2702(a)(3) by knowingly and intentionally divulging to the federal government records or other information pertaining to subscribers or customers of Defendants' remote computing and electronic service(s).

219. Defendants' challenged programs of disclosing telephone records to the federal government does not fall within any of the statutory exceptions or immunities set forth in 18 U.S.C. §§ 2702(c), 2703(c), or 2703(e).

220. Neither the NSA nor any other governmental entity has obtained a warrant authorizing the disclosures, pursuant to 18 U.S.C. § 2703(c)(1)(A).

221. Neither the NSA nor any other governmental entity has obtained a court order authorizing the disclosures, pursuant to 18 U.S.C. § 2703(c)(1)(B) and (d).

222. Neither the NSA nor any other governmental entity has issued or obtained an administrative subpoena authorized by a federal or state statute authorizing such disclosures, pursuant to 18 U.S.C. § 2703(c)(1)(E) and (c)(2).

223. Neither the NSA nor any other governmental entity has issued or obtained a federal or state grand jury or trial subpoena authorizing such disclosures, pursuant to 18 U.S.C. § 2703(c)(1)(E) and (c)(2).

224. Defendants have not been provided with a certification in writing by a person specified in 18 U.S.C. § 2518(7), by the Director of the Federal Bureau of Investigation or his designee or a Special Agent in Charge in a Bureau field office pursuant to 18 U.S.C. § 2709(b), or by the Attorney General of the United States meeting the requirements of 18 U.S.C. § 2511(2)(a)(ii)(B), *i.e.*, a certification that no warrant or court order authorizing the disclosures is required by law, and that all statutory requirements have been met.

225. The disclosures were and are not authorized by any statute or legislation.

226. Plaintiffs and the Classes are aggrieved by MCI and Verizon's knowing and intentional past disclosure and/or imminent future disclosure of their records to the federal government. Accordingly, Plaintiffs may challenge this violation of 18 U.S.C. § 2702(a)(3) pursuant to the cause of action created by 18 U.S.C. § 2707(a).

227. Pursuant to 18 U.S.C. § 2707, Plaintiffs and Class members seek such preliminary and other equitable or declaratory relief as may be appropriate; statutory damages of no less than $1000 for each aggrieved Plaintiff or Class member; punitive damages as the Court considers just; and reasonable attorneys' fees and other litigation costs reasonably incurred.

## **THIRD CLAIM FOR RELIEF**
Violation of 18 U.S.C. §§ 2511(1)(a), (1)(c), (1)(d), and (3)(a)

228. Plaintiffs incorporate all of the allegations contained in the preceding paragraphs of this Complaint, as if set forth fully herein.

229. In relevant part, 18 U.S.C. § 2511 provides that:

> (1) Except as otherwise specifically provided in this chapter, any person who – (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral or electronic communication. . . . (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; (d) intentionally uses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection. . . . . (3)(a) Except as provided in paragraph (b) of this subsection, a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than addressee or intended recipient of such communication or an agent of such addressee or intended recipient.

230. Defendants MCI and Verizon violated 18 U.S.C. §§ 2511(1)(a), (1)(c), (1)(d), and (3)(a) by intentionally intercepting and disclosing to the federal government the contents of telephone calls of MCI and Verizon customers.

231. Defendants violated 18 U.S.C. § 2511(1)(d) by intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class members' wire or electronic communications, while knowing or having reason to know that the information was obtained through the interception of wire or electronic communications.

232. Defendants' challenged programs of intercepting and disclosing the contents of telephone calls to the federal government does not fall within any of the statutory exceptions or immunities set forth in 18 U.S.C. §§ 2511(2), 2511(3)(b), or 2520(d).

233. Plaintiffs and their Class are aggrieved by Defendants' intentional past and/or imminent future interception and disclosure of telephone call contents to the federal government. Accordingly, Plaintiffs may challenge this violation of 18 U.S.C. §§ 2511(1)(a), (1)(c), (1)(d) and (3)(a) pursuant to the cause of action created by 18 U.S.C. § 2520(a).

234. Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class members seek such preliminary and other equitable or declaratory relief as may be appropriate; statutory damages of the greater of $100 a day for each day of violation or $10,000 for each aggrieved Plaintiff or

Class member; punitive damages as the Court considers just; and reasonable attorneys' fees and other litigation costs reasonably incurred.

**FOURTH CLAIM FOR RELIEF**
Violation of 47 U.S.C. § 605

235. Plaintiffs incorporate all of the allegations contained in the preceding paragraphs of this Complaint, as if set forth fully herein.

236. In relevant part, 47 U.S.C. § 605 provides that:

> (a) Practices prohibited –
>
> Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents . . . thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpoena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority.

237. Defendants MCI and Verizon received, assisted in receiving, transmitted, or assisted in transmitting, Plaintiffs' and Class members' interstate communications by wire.

238. Defendants violated 47 U.S.C. § 605 by divulging or publishing the "existence" and "contents" of Plaintiffs' and Class members' communications to the federal government, by means other than through authorized channels of transmission or reception. Defendants' disclosure and publication of the existence and contents of Plaintiffs' and Class members' communications were not authorized by any provision of 18 U.S.C. §§ 2510-2522.

239. Defendants' disclosure and publication of the existence and contents of Plaintiffs' and Class members' communications was willful and in bad faith and for purposes of direct or indirect commercial advantage or private financial gain, as they were paid for their cooperation, and a failure to cooperate might have jeopardized their ability to obtain lucrative government contracts.

240. Defendants failed to notify Plaintiffs or Class members of the Defendants'

disclosure and/or publication of the existence of Plaintiffs' and Class members' communications, nor did Plaintiffs or Class members consent to such disclosure and publication.

241. Pursuant to 47 U.S.C. § 605(e)(3), Plaintiffs and Class members seek a declaration that the disclosures are in violation of 47 U.S.C. § 605(a); a preliminary injunction restraining Defendants from continuing to make such unlawful disclosures; a permanent injunction restraining Defendants from continuing to make such unlawful disclosures; statutory damages of not less than $1,000 or more than $10,000 for each violation, plus, in the Court's discretion, an increase in the statutory damages of up to $100,000 for each violation; and reasonable attorneys' fees and reasonable costs of this litigation.

## FIFTH CLAIM FOR RELIEF
Violation of 50 U.S.C. § 1809

242. Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

243. In relevant part, 50 U.S.C. §1809 provides that:

> (a) Prohibited activities - A person is guilty of an offense if he intentionally - (1) engages in electronic surveillance under color of law except as authorized by statute; or (2) discloses or uses information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized by statute.

244. In relevant part 50 U.S.C. §180l provides that:

> (f) "Electronic surveillance" means - (1) the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire or radio communication sent by or intended to be received by a particular, known United States person who is in the United States, if the contents are acquired by intentionally targeting that United States person, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes; (2) the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire communication to or from a person in the United States, without the consent of any party thereto, if such acquisition occurs in the United States, but does not include the acquisition of those communications of computer trespassers that would be permissible under section 2511 (2)(i) of Title 18; (3) the intentional acquisition by an electronic, mechanical, or other surveillance device of the contents of any radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes, and if both the

> sender and all intended recipients are located within the United States; or (4) the installation or use of an electronic, mechanical, or other surveillance device in the United States for monitoring to acquire information, other than from a wire or radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes.

245. Defendants MCI and Verizon have intentionally acquired, by means of a surveillance device, the contents of one or more wire communications to or from Plaintiffs and class members or other information in which Plaintiffs or Class members have a reasonable expectation of privacy, without the consent of any party thereto, and such acquisition occurred in the United States.

246. By the acts alleged herein, Defendants have intentionally engaged in electronic surveillance (as defined by 50 U.S. C. §1801(f)) under color of law, but which is not authorized by any statute, and Defendants have intentionally subjected Plaintiffs and class members to such electronic surveillance, in violation of 50 U.S.C. §1809.

247. Additionally, or in the alternative, by the acts alleged herein, Defendants have intentionally disclosed or used information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized by statute.

248. Defendants did not notify Plaintiffs or Class members of the above-described electronic surveillance, disclosure, and/or use, nor did Plaintiffs or Class members consent to such.

249. Defendants' challenged programs of electronic surveillance do not fall within any of the statutory exceptions or immunities set forth in 50 U.S.C. § 1809(b).

250. There is a strong likelihood that Defendants are now engaging in and will continue to engage in the above-described electronic surveillance, disclosure, and/or use of Plaintiffs' and Class members' wire communications described herein, and that likelihood represents a credible threat of immediate future harm.

251. Plaintiffs and Class members have been and are aggrieved by Defendants' electronic surveillance, disclosure, and/or use of their wire communications.

252. Pursuant to 50 U.S.C. §1810, which provides a civil action for any person who has been subjected to an electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of 50 U.S.C. §1809, Plaintiffs and Class members seek equitable and declaratory relief; statutory damages for each Plaintiff and Class member of the greater of $100 a day for each day of violation or $1,000; punitive damages as appropriate; and reasonable attorneys' fees and other litigation costs reasonably incurred.

## SIXTH CLAIM FOR RELIEF
Violation of the First and Fourth Amendments
to the United States Constitution

253. Plaintiffs incorporate all of the allegations contained in the preceding paragraphs of this Complaint, as if set forth fully herein.

254. Plaintiffs and Class members have a reasonable expectation of privacy in their communications, contents of communications, and/or records pertaining to their communications transmitted, collected, and/or stored by Defendants MCI and Verizon, which was violated by Defendants' above-described actions as agents of the government, which constitute a search and seizure of Plaintiffs' and Class members' communications and records.

255. Plaintiffs and Class members use Defendants' services to speak or receive speech anonymously and to associate privately.

256. The above-described acts of interception, disclosure, divulgence and/or use of Plaintiffs' and Class members' communications, contents of communications, and records pertaining to their communications occurred without judicial or other lawful authorization, probable cause, and/or individualized suspicion.

257. At all relevant times, the federal government instigated, directed, and/or tacitly approved all of the above-described acts of Defendants MCI and Verizon.

258. At all relevant times, the federal government knew of and/or acquiesced in all of the above-described acts of Defendants MCI and Verizon, and failed to protect the First and Fourth Amendment rights of the Plaintiffs and Class members by obtaining judicial authorization.

259. In performing the acts alleged herein, Defendants had at all relevant times a

primary or significant intent to assist or purpose of assisting the government in carrying out Defendants' programs and/or other government investigations, rather than to protect their own property or rights.

260. By the acts alleged herein, Defendants MCI and Verizon acted as instruments or agents of the government, and thereby violated Plaintiffs' and Class members' reasonable expectations of privacy and denied Plaintiffs and Class members their right to be free from unreasonable searches and seizures, as guaranteed by the Fourth Amendment to the Constitution of the United States, and additionally violated Plaintiffs' and Class members' rights to speak and receive speech anonymously and associate privately under the First Amendment.

261. By the acts alleged herein, Defendants' conduct proximately caused harm to Plaintiffs and Class members.

262. Defendants' conduct was done intentionally, with deliberate indifference, or with reckless disregard of Plaintiffs' and Class members' constitutional rights.

## **SEVENTH CLAIM FOR RELIEF**
Violation of State Surveillance Statutes

263. Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

264. Plaintiffs further state that Defendants have engaged and continue to engage in the unlawful eavesdropping, surveillance, and/or interception of wire, oral, and/or electronic communications, the disclosure and/or divulgence and/or use of the contents of such communications, and/or the unlawful installation and/or use of pen registers or trap and trace devices.

265. The foregoing conduct violates the following state statutes:

a. Ala. Code §§ 13A-11-30, 13A-11-31;

b. Alaska Stat. § 42.20.310;

c. Ariz. Rev. Stat. Ann. § 13-3005;

d. Ark. Code Ann. § 5-60-120;

e. Cal. Penal Code § 630 *et seq.;*

f. Colo. Rev. Stat. §§ 18-9-301, 18-9-303;

g. Conn. Gen. Stat. § 52-570d;

h. Del. Code Ann. Tit. 11, § 2402;

i. D.C. Code §§ 23-541, 23-542;

j. Fla. Stat. §§ 934.01-03;

k. Ga. Code Ann. §§ 16-11-62 *et seq.*;

l. Haw. Rev. Stat. § 803-42, 803-48 (2005)

m. Idaho Code Ann. § 18-6702;

n. 720 Ill. Comp. Stat. 5/14-1, -2;

o. Ind. Code § 35-33.5-1 *et seq.*;

p. Iowa Code § 727.8;

q. Kan. Stat. Ann. §§ 21-4001, 21-4002;

r. Ky. Rev. Stat. Ann. §§ 526.010-.020;

s. La. Rev. Stat. Ann. § 15:1303;

t. Me. Rev. Stat. Ann. Tit. 15, §§ 709-710;

u. Md. Code Ann. Cts. & Jud. Proc. § 10-402 *et seq.*; § 10-4A-4B *et seq.;*

v. Mass. Gen. Laws ch. 272, § 99;

w. Mich. Comp. Laws § 750.539 *et seq.*;

x. Minn. Stat. §§ 626A.01, .02;

y. Miss. Code Ann. § 41-29-501 *et seq.*;

z. Mo. Rev. Stat. §§ 392.170, .350, 542.402, .418;

aa. Mont. Code Ann. § 45-8-213;

bb. Neb. Rev. Stat. § 86-290;

cc. Nev. Rev. Stat. 200.610-.620;

dd. N.H. Rev. Stat. Ann. §§ 570-A:1, -A:2;

ee. N.J. Stat. Ann. § 2A:156A-1 *et seq.*;

ff. N.M. Stat. § 30-12-1;

gg. N.Y. Penal Law §§ 250.00, .05;

hh. N.C. Gen. Stat. § 15A-287;

ii. N.D. Cent. Code § 12.1-15-02;

jj. Ohio Rev. Code Ann. § 2933.51 *et seq.*;

kk. Okla. Stat. tit. 13, § 176.1 *et seq.*;

ll. Or. Rev. Stat. §§ 165.540, .543;

mm. 18 Pa. Cons. Stat. § 5701 *et seq.*;

nn. R.I. Gen. Laws § 11-35-21;

oo. S.C. Code Ann. §§ 17-30-20, -30;

pp. S.D. Codified Laws §§ 23A-35A-1, 23A-35A-20;

qq. Tenn. Code Ann. § 39-13-601;

rr. Tex. Penal Code Ann. § 16.02 *et seq.*; Tex. Code Crim. Proc. art. 18.20 § 16(a);

ss. Utah Code Ann. § 77-23a-1 *et seq.*;

tt. Va. Code Ann. §§ 19.2-61, -62;

uu. Wash. Rev. Code § 9.73.030;

vv. W. Va. Code § 62-1D-1 *et seq.*;

ww. Wis. Stat. §§ 968.27, .31; and

xx. Wyo. Stat. Ann. §§ 7-3-701, -702.

## <u>EIGHTH CLAIM FOR RELIEF</u>
Violation of State Consumer Protection Statutes

266. Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

267. Plaintiffs further state that Defendants violated and continue to violate state consumer protection statutes by divulging records or other information pertaining to subscribers and customers to a governmental entity, specifically the NSA, without Plaintiffs' or Class members' knowledge or consent.

268. Defendants' privacy policies falsely assure Plaintiffs Class members that

information pertaining to their telephone calls and/or electronic communications will not be disclosed to third parties absent a valid court order or subpoena.

269. Defendants' actions and failure to act, including the false and misleading representations and omissions of material facts regarding the protection and use of Class members' private information, constitute unfair competition and/or unfair and/or deceptive acts or practices and/or false representations, in violation of the following state consumer protection statutes:

a. Ala. Code § 8-19-1 *et seq.*;

b. Ariz. Rev. Stat. § 44-1522 *et seq.*;

c. Ark. Code § 4-88-101 *et seq.*;

d. Cal. Bus. & Prof. Code § 17200 *et seq.*;

e. Colo. Rev. Stat. § 6-1-105 *et seq.*;

f. Conn. Gen. Stat. § 42-110b *et seq.*;

g. 6 Del. Code § 2511 *et seq.*;

h. D.C. Code Ann. § 28-3901 *et seq.*;

i. Fla. Stat. § 501.201 *et seq.*;

j. Ga. Stat. § 10-1-392 *et seq.*;

k. Haw. Rev. Stat. § 480 *et seq.*;

l. Idaho Code § 48-601 *et seq.*;

m. 815 Ill. Comp. Stat. § 505.1 *et seq.*;

n. Ind. Code § 24-5-0.5 *et seq.*;

o. Iowa Code § 714.16 *et seq.*;

p. Kan. Stat. Ann. § 50-623 *et seq.*;

q. Ky. Rev. Stat. § 367.1 10 *et seq.*;

r. La. Rev. Stat. § 51:1401 *et seq.*;

s. 5 Me. Rev. Stat. Ann. § 207 *et seq.*;

t. Massachusetts General Laws Ch. 93A *et seq.*;

u. Md. Com. Law Code § 13-101 *et seq.*;

v. Mich. Stat. § 445.901 *et seq.*;

w. Minn. Stat. § 8.31 *et seq.*;

x. Miss. Code Ann. § 75-24-1 *et seq.*;

y. Mo. Ann. Stat. § 407.010 *et seq.*;

z. Mont. Code § 30-14-101 *et seq.*;

aa. Neb. Rev. Stat. § 59-1601 *et seq.*;

bb. Nev. Rev. Stat. § 598.0903 *et seq.*;

cc. N.H. Rev. Stat. § 358-A:1 *et seq.*;

dd. N.J. Rev. Stat. § 56:8-1 *et seq.*;

ee. N.M. Stat. § 57-12-1 *et seq.*;

ff. N.Y. Gen. Bus. Law § 349 *et seq.*;

gg. N.C. Gen. Stat. §§ 75-1.1 *et seq.*;

hh. N.D. Cent. Code § 51-15-01 *et seq.*;

ii. Ohio Rev. Stat. § 1345.01 *et seq.*;

jj. Okla. Stat. 15 § 751 *et seq.*;

kk. Or. Rev. Stat. § 646.605 *et seq.*;

ll. 73 Pa. Stat. § 201-1 *et seq.*;

mm. R.I. Gen. Laws § 6-13.1-1 *et seq.*;

nn. S.C. Code Laws § 39-5-10 *et seq.*;

oo. S.D. Code Laws § 37-241 *et seq.*;

pp. Tenn. Code Ann. § 47-18-101 *et seq.*;

qq. Tex. Bus. & Com. Code § 17.41 *et seq.*;

rr. Utah Code § 13-11-1 *et seq.*;

ss. 9 Vt. Stat. § 2451 *et seq.*;

tt. Va. Code § 59.1-196 *et seq.*;

uu. Wash. Rev. Code § 19.86.010 *et seq.*;

vv. W. Va. Code § 46A-6-101 *et seq.*;

ww. Wis. Stat. § 100.18 *et seq.*; and

xx. Wyo. Stat. Ann. § 40-12-101 *et seq*.

270. The unfair and deceptive acts and practices of Defendants in violation of the foregoing consumer protection statutes directly, foreseeably, and proximately caused damages and injury to Plaintiffs and Class members.

271. This injury is of a type the state consumer protection and deceptive practices statutes were intended to prevent, and results directly from Defendants' unlawful conduct.

## NINTH CLAIM FOR RELIEF
Breach of Contract

272. Plaintiffs incorporate all of the allegations contained in the preceding paragraphs of this Complaint, as if set forth fully herein.

273. At all times relevant herein, Defendants agreed to provide, for a subscription fee, and Plaintiffs agreed to purchase from Defendants, various telecommunication and electronic communication services.

274. At all times relevant herein, Defendants impliedly and expressly promised to protect the privacy and confidentiality of their customers' information, identity, records, subscription, use details, and communications, and, to abide by federal and state laws governing the disclosure of this information.

275. By the conduct alleged, Defendants have breach their contracts with Plaintiffs and Class members, and have breached the covenant of good faith and fair dealing implied in all contracts.

276. As a result of Defendants' breach of contractual duties owed to the Plaintiffs, Defendants are liable for damages including, but limited to nominal and consequential damages.

## TENTH CLAIM FOR RELIEF
(On Behalf of the MCI California Subclass and the Verizon California Subclass)
Unlawful Business Practices in Violation of California State Law

277. Plaintiffs Spielfogel-Landis, Romen, Anderson, Wallace, Wiley, and Wright (collectively, “California Plaintiffs”) incorporate all of the allegations contained in the

preceding paragraphs of this Complaint, as if set forth fully herein.

278. By engaging in the acts and practices described herein, Defendants MCI and Verizon have engaged in unlawful business practices in violation of California's Unfair Competition Law, Business & Professions Code §§ 17200, *et seq.*

279. Defendants' acts and practices are unlawful because, as described above, they violate 47 U.S.C. § 222, 18 U.S.C. §§ 2702(a)(1), (a)(2), and (a)(3), 18 U.S.C. §§ 2511(1)(a), (1)(c), (1)(d), and (3)(a), 40 U.S.C. § 1809, 47 U.S.C. § 605, and Cal. Penal Code § 630 *et seq.*

280. Defendants' acts and practices are also unlawful because they violate 18 U.S.C. § 3121. In relevant part, 18 U.S.C. § 3121 provides that:

> In general. – Except as provided in this section, no person may install or use a pen register or a trap and trace device without first obtaining a court order under section 3123 of this title or under the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 *et seq.*).

281. As defined by 18 U.S.C. § 3127:

> (3) the term "pen register" means a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, provided, however, that such information shall not include the contents of any communication, but such term does not include any device or process used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by such provider or any device or process used by a provider or customer of a wire communication service for cost accounting or other like purposes in the ordinary course of its business;
>
> (4) the term "trap and trace device" means a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication, provided, however, that such information shall not include the contents of any communication . . . .

282. Defendants have installed or used pen registers and/or trap and trace devices without first obtaining a valid court order under 18 U.S.C. § 3123 or a subpoena.

283. The pen registers and/or trap and trace devices installed and used by

Defendants have captured, recorded, or decoded, and continue to capture, record or decode, dialing, routing, addressing or signaling information pertaining to California Plaintiffs' and California Subclass members' telephone and/or electronic communications.

284. Defendants did not notify California Plaintiffs or California Subclass members of the installation or use of pen registers and/or trap and trace devices. California Plaintiffs and California Subclass members have not consented to Defendants' installation or use of pen registers and/or trap and trace devices.

285. Defendants' acts and practices are also unlawful because they violate 47 U.S.C. § 222, which in relevant part provides that:

> (c) Confidentiality of customer proprietary network information – (1) Privacy requirements for telecommunications carriers – Except as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories.

286. Defendants MCI and Verizon are telecommunications carriers that have obtained and continue to obtain customer proprietary network information by virtue of their provision of telecommunications services.

287. Defendants disclosed to the NSA and/or permitted the NSA access to individually identifiable customer proprietary network information pertaining to California Plaintiffs and California Subclass members.

288. Defendants failed to notify California Plaintiffs or California Subclass members of the disclosure of and/or access to their personally identifiable customer proprietary network information to the NSA, nor did California Plaintiffs or California Subclass members consent to such.

289. Plaintiffs and the California Subclass seek restitution, injunctive relief, and all other relief available under §§ 17200, *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and for all others similarly situated, respectfully request that the Court:

A. Declare that MCI's and Verizon's conduct as alleged herein violates applicable law;

B. Enjoin MCI and Verizon's continuing violations of applicable law;

B. Award statutory damages to Plaintiffs, the Classes, and Subclasses, as provided by federal law;

C. Award punitive damages to Plaintiffs and the Classes and Subclasses;

D. Award Plaintiffs' reasonable attorneys' fees and costs of suit;

E. Award compensatory damages, statutory damages, and all other forms of monetary and non-monetary relief recoverable under state law; and

G. Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims so triable.

Dated: January 16, 2007

Respectfully submitted,

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

By: *\s\ Barry R. Himmelstein*
Barry R, Himmelstein
Interim Class Counsel for MCI Class

MOTLEY RICE LLC

By: *\s\ Jodi W. Flowers*
Jodi W. Flowers
Interim Class Counsel for Verizon Class

Pursuant to General Order 45, Part X-B, the filer attests that concurrence in the filing of this Complaint has been obtained from Jodi W. Flowers.