Steven E. Schwarz
THE LAW OFFICES OF STEVEN E. SCHWARZ, ESQ.
2461 W. Foster Ave., #1W
Chicago, IL 60625
Telephone: (773) 837-6134
Facsimile: (773) 837-6134
stevenschwarz23@yahoo.com

ATTORNEY FOR PLAINTIFFS

ADDITIONAL PLAINTIFFS' COUNSEL APPEAR ON SIGNATURE PAGE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(San Francisco Division)

| | |
|---|---|
| IN RE NATIONAL SECURITY TELECOMMUNICATIONS RECORDS LITIGATION<br><br>THIS DOCUMENT RELATES TO: ALL CASES BROUGHT AGAINST DEFENDANTS BELLSOUTH, BELLSOUTH COMMUNICATIONS, LLC, BELLSOUTH CORP, BELLSOUTH CORP., BELLSOUTH CORPORATION, AND BELLSOUTH TELECOMMUNICATIONS, INC. | MDL Docket No. 06-1791 (VRW)<br><br>MASTER CONSOLIDATED COMPLAINT AGAINST DEFENDANT "BELLSOUTH" FOR DAMAGES, DECLARATORY AND EQUITABLE RELIEF<br><br>**CLASS ACTION**<br><br>JUDGE: Hon. Vaughn R. Walker<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs, by their attorneys, for their Master Consolidated Complaint against Defendants BellSouth, BellSouth Communications, LLC, BellSouth Corp, BellSouth Corp., BellSouth Corporation, BellSouth Telecommunications, Inc., and AT&T Southeast (formerly BellSouth Corporation) (hereafter "BellSouth") allege, upon information and belief, as follows:

## PRELIMINARY STATEMENT

1. This Master Consolidated Complaint Against Defendant BellSouth (hereafter "BellSouth Master Complaint") is filed pursuant to the Order of this Court and presents

all claims brought against Defendant BellSouth in the separate cases transferred by the Judicial Panel on Multidistrict Litigation in this matter in its orders dated August 9, 2006 and September 25, 2006 (hereafter "transferred cases"). Unless otherwise ordered by this Court, all claims presented in any case against Defendant BellSouth subsequently transferred to this Court by the Judicial Panel on Multidistrict Litigation in this matter shall be deemed to be included in this BellSouth Master Complaint.

2. This BellSouth Master Complaint is filed solely as an administrative device to promote judicial efficiency and economy in the adjudication and resolution of pretrial matters and is not intended to effect consolidation for trial of the transferred cases. Neither is this BellSouth Master Complaint intended to cause, nor to change the rights of the parties, nor to make those who are parties in one transferred case parties in another.

3. This case challenges the legality of Defendants' participation in a secret and illegal government program to intercept and analyze vast quantities of Americans' telephone and Internet communications and records, surveillance done without any statutorily authorized permission, customers' knowledge or consent, or the authorization of a court, and in violation of federal electronic surveillance and telecommunications statutes, as well as the First and Fourth Amendments to the United States Constitution. In addition, Plaintiffs challenge Defendant's conduct under state law.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332(d), 18 U.S.C. § 2707, and 47 U.S.C. § 605. Supplemental jurisdiction over state law claims is founded on 28 U.S.C. § 1367.

5. Venue is proper in this District pursuant to the order of the Judicial Panel on Multidistrict Litigation.

## PARTIES

6. Plaintiff Reverend Joe McMurray, an individual residing in Gainesville, Florida, has been a subscriber and user of BellSouth's wireline residential telephone service since

August, 2005. Reverend McMurray has used such electronic communications services to place and receive telephone calls. Many of Reverend McMurray's communications with his congregant are privileged pursuant to the clergyman-congregant privilege recognized under Federal Rule of Evidence 501.

7. Plaintiff Rabbi Steven Lebow, an individual residing in Marietta, Georgia, has been a subscriber and user of BellSouth's wireline local and long distance domestic and international telephone service and DSL Internet service. Rabbi Lebow has used such electronic communications services to place and receive domestic and international telephone calls for Internet and e-mail services. Many of Rabbi Lebow's communications with his congregant are privileged pursuant to the clergyman-congregant privilege recognized under Federal Rule of Evidence 501.

8. Plaintiff Jim Nurkiewicz, an individual residing in Key West, Florida, is and has been a subscriber and user of BellSouth's wireline residential telephone service since January, 2000 and has used such electronic communications services to place and receive telephone calls.

9. Plaintiffs Steven and Cathy Bruning, individuals residing in Marietta, Georgia, have been subscribers to and users of BellSouth's wireline local and long distance residential domestic and international telephone service and DSL Internet service. The Brunings have used such electronic communications services to place and receive domestic and international telephone calls and for Internet and e-mail services.

10. Plaintiff Jonnie Starkey, an individual residing in Covington, Georgia, has been a subscriber to and user of BellSouth's wireline local and long distance residential domestic telephone service and DSL Internet service. Ms. Starkey has used such electronic communications services to place and receive domestic and international telephone calls and for Internet and e-mail services.

11. Plaintiffs Barry and Meredith Kaltman, individuals residing in Marietta, Georgia, have been subscribers to and users of BellSouth's wireline local and long distance

residential domestic and international telephone service. The Kaltmans have used such electronic communications services to place and receive domestic and international telephone calls and for Internet and e-mail services.

12. Plaintiff Ilene Pruett, an individual residing in Anniston, Alabama, is and has been during the relevant time period a subscriber to and user of BellSouth's wireline residential telephone service. Ms. Pruett has used such electronic communications services to place and receive domestic and international telephone calls.

13. Plaintiff Thomas Michael Fain, an individual residing in Raleigh, North Carolina, is and has been during the relevant time period a subscriber to and user of BellSouth's wireline residential telephone service. Mr. Fain has used such electronic communications services to place and receive domestic and international telephone calls.

14. Plaintiff John Fitzpatrick, an individual residing in Boynton Beach, Florida, is and has been during the relevant time period a subscriber to and user of BellSouth's wireline residential telephone service. Mr. Fain has used such electronic communications services to place and receive telephone calls.

15. Plaintiff Linda Gettier, an individual residing in Raleigh, North Carolina, is and has been during the relevant time period a subscriber to and user of BellSouth's wireline residential telephone service. Ms. Gettier has used such electronic communications services to place and receive telephone calls.

16. Plaintiff Anthony Barthelemy, an individual residing in Miami, Florida, is and has been during the relevant time period a subscriber to and user of BellSouth's wireline residential telephone service. Mr. Barthelemy has used such electronic communications services to place and receive telephone calls.

17. Plaintiff Jane Winston, an individual residing in Miami, Florida, is and has been a subscriber to and user of BellSouth's wireline residential telephone service since 1999. Ms. Winston has used such electronic communications services to place and receive telephone calls.

18. Plaintiff John Clark, an individual residing in Yulee, Florida, is and has been during the relevant time period a subscriber to and user of BellSouth's wireline residential telephone services. Mr. Clark has used such electronic communications services to place and receive telephone calls.

19. Plaintiffs Jane and Mark Youd, individuals residing in Ormond Beach, Florida, are and have been subscribers to and user of BellSouth's wireline residential telephone service since 1977. The Youds have used such electronic communications services to place and receive telephone calls.

20. Plaintiffs Carolyn R. and Douglas S. Hensley, individuals residing in Raleigh, North Carolina, are and have been subscribers to and user of BellSouth's wireline residential telephone service since 1992. The Hensleys have used such electronic communications services to place and receive telephone calls.

21. Plaintiffs Fred and Darlene Rogers, individuals residing in Rockmart, Georgia, are and have been subscribers to and user of BellSouth's wireline residential telephone service since February, 2005. The Rogers' have used such electronic communications services to place and receive telephone calls.

22. Plaintiff Peter Hollings, an individual residing in Atlanta, Georgia, is and has been during the relevant time period a subscriber to and user of BellSouth's wireline residential telephone service. Mr. Hollings has used such electronic communications services to place and receive telephone calls.

23. Plaintiff Lisa Lockwood, an individual residing in Roswell, Georgia, is and has been since 2005 a subscriber to and user of BellSouth's wireline residential telephone service. Ms. Lockwood has used such electronic communications services to place and receive telephone calls.

24. Plaintiff Clyde Michael Morgan, an individual residing in Swannanoa, North Carolina, is and has been during the relevant time period a subscriber to and user of BellSouth's wireline residential telephone service. Mr. Morgan has used such electronic

communications services to place and receive telephone calls.

25. Plaintiff Simon Champagne, an individual residing in Lawrenceville, Georgia, is and has been during the relevant time period a subscriber to and user of BellSouth's wireline residential telephone service. Mr. Champagne has used such electronic communications services to place and receive telephone calls.

26. Plaintiff Tina Herron, an individual residing in the Parish of La Fourche, Louisiana, is and has been during the relevant time period a subscriber to and user of BellSouth's wireline residential domestic and long distance telephone service. Ms. Herron has used such electronic communications services to place and receive telephone calls.

27. Plaintiff Brandy Sergi, an individual residing in the Parish of La St. Tammany, Louisiana, is and has been during the relevant time period a subscriber to and user of BellSouth's wireline residential domestic and long distance telephone service and Internet service. Ms. Sergi has used such electronic communications services to place and receive telephone calls and e-mail messages.

28. Plaintiff Mike Haney, an individual residing in California was a subscriber to and user of Cingular Wireless' telephone service during the class period. Mr. Haney has used such electronic communications services to place and receive telephone calls.

29. Plaintiff Steve Kampmann, an individual residing in California is and was during the class period a subscriber to and user of Cingular Wireless' telephone service. Mr. Kampmann has used such electronic communications services to place and receive telephone calls.

30. Plaintiff Janet Orlando, an individual residing in California is and was during the class period a subscriber to and user of Cingular Wireless' telephone service. Ms. Orlando has used such electronic communications services to place and receive telephone calls.

31. Plaintiff Melissa Scroggins, an individual residing in California is and was during the class period a subscriber to and user of Cingular Wireless' telephone service. Ms. Scroggins has used such electronic communications services to place and receive telephone calls.

32. Plaintiff Mike Haney, an individual residing in California was a subscriber to and user of Cingular Wireless' telephone service during the class period. Mr. Haney has used such electronic communications services to place and receive telephone calls.

33. Plaintiff Heather Derosier, an individual residing in Washington is and has been since at least 2004 a subscriber to and user of Cingular Wireless' telephone service. Ms. Derosier has used such electronic communications services to place and receive telephone calls.

34. Defendant BellSouth is a Georgia corporation with its principal place of business in Atlanta, Georgia. Defendant BellSouth is a "telecommunication carrier" within the meaning of the Communications Act of 1934, 47 U.S.C. §§ 151, *et seq.* and provides remote computing and electronic communications services to the public.

## FACTUAL ALLEGATIONS

35. In Section 222 of the Communications Act of 1934 (47 U.S.C. § 222(c)(1)), Congress imposed upon telecommunication carriers, such as Defendants, a duty to protect sensitive, personal customer information from disclosure. This information includes "information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship" and data concerning service customers' telephone calling histories (*i.e.*, date, time, duration, and telephone numbers of calls placed or received) or call-detail records, and such information constitutes "individually identifiable customer proprietary network information" within the meaning of Section 222 of the Communications Act of 1934.

36. Federal law prohibits the federal government from obtaining customers' call-detail records without a warrant, subpoena, or other lawful authorization.

37. Sometime on or after February 1, 2001, BellSouth commenced its program ("the Program") of providing the federal government with the telephone call contents and records and Internet communications of its customers and subscribers. BellSouth continues to provide

this information to the federal government.

38. On December 16, 2005, in an article entitled "Bush Lets U.S. Spy on Callers Without Courts," *The New York Times* reported on an NSA program of eavesdropping on the telephone conversations of Americans without court order as required by the Foreign Intelligence Surveillance Act.

39. In a December 17, 2005 radio address, President George W. Bush admitted that "[i]n the weeks following the terrorist attacks on our nation, [he] authorized the National Security Agency, consistent with U.S. law and the Constitution, to intercept the international communications of people with known links to al Qaeda and related terrorist organizations." President Bush further stated that "the activities [he] authorized are reviewed approximately every 45 days"; that he had "reauthorized this program more than 30 times since the September the 11th attacks"; and that he intended to continue authorizing such activity "for as long as our nation faces a continuing threat from al Qaeda and related groups."

40. In a press briefing on December 19, 2005 by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence, the government claimed that the NSA Surveillance Program targets communications between a party outside the United States and a party inside the United States when one of the parties of the communication is believed to be "a member of al Qaeda, <u>affiliated</u> with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda."

41. In a press release on December 19, 2005, Attorney General Alberto Gonzales stated that the Program involved "intercepts of contents of communications . . . ." While the Attorney General's description of the Program was limited to interception of communications with individuals "outside the United States," Attorney General Gonzales explained that his discussion was limited to those parameters of the program already disclosed by the President and that many other operational aspects of the program remained highly classified.

42. On December 24, 2005, *The New York Times* reported in an article entitled, "Spy Agency Mined Vast Data Trove, Officials Report," that:

> [t]he National Security Agency has traced and analyzed large volumes of telephone and Internet communications flowing into and out of the United States as part of the eavesdropping program that President Bush approved after the Sept. 11, 2001, attacks to hunt for evidence of terrorist activity, according to current and former government officials. The volume of information harvested from telecommunication data and voice networks, without court-approved warrants, is much larger than the White House has acknowledged, the officials said. It was collected by tapping directly into some of the American telecommunication system's main arteries, they said.

The officials said that as part of the program, "the N.S.A. has gained the cooperation of American telecommunications companies to obtain backdoor access to streams of domestic and international communications" and that the program is a "large data-mining operation" in which N.S.A. technicians have combed through large volumes of phone and Internet traffic in search of patterns that might point to terrorism suspects. In addition, the article reports, "[s]everal officials said that after President Bush's order authorizing the N.S.A. program, senior government officials arranged with officials of some of the nation's largest telecommunications companies to gain access to switches that act as gateways at the borders between the United States' communication networks and international networks."

43. In a January 3, 2006 article entitled, "Tinker, Tailor, Miner, Spy" (available at http://www.slate.com/toolbar.aspx?action=print&id=2133564), *Slate.com* reported, "[t]he agency [the NSA] used to search the transmissions it monitors for key words, such as names and phone numbers, which are supplied by other intelligence agencies that want to track certain individuals. But now the NSA appears to be vacuuming up all data, generally without a particular phone line, name, or e-mail address as a target. Reportedly, the agency is analyzing the length of a call, the time it was placed, and the origin and destination of electronic transmissions."

44. In a January 17, 2006 article, "Spy Agency Data After Sept. 11 Led F.B.I. to Dead Ends," *The New York Times* stated that officials who were briefed on the N.S.A. program said that "the agency collected much of the data passed on to the F.B.I. as tips by tracing phone numbers in the United States called by suspects overseas, and then by following the domestic numbers to other numbers called. In other cases, lists of phone numbers appeared to result from

the agency's computerized scanning of communications coming into and going out of the country for names and keywords that might be of interest."

45. A January 20, 2006 article in the *National Journal*, "NSA Spy Program Hinges On State-of-the-Art Technology," reported that "[o]fficials with some of the nation's leading telecommunications companies have said they gave the NSA access to their switches, the hubs through which enormous volumes of phone and e-mail traffic pass every day, to aid the agency's effort to determine exactly whom suspected Qaeda figures were calling in the United States and abroad and who else was calling those numbers. The NSA used the intercepts to construct webs of potentially interrelated persons."

46. In a January 21, 2006 article in *Bloomberg News* entitled "Lawmaker queries Microsoft, other companies on NSA wiretaps," Daniel Berninger, a senior analyst at Tier 1 Research in Plymouth, Minnesota, said, "[i]n the past, the NSA has gotten permission from phone companies to gain access to so-called switches, high-powered computer into which phone traffic flows and is redirected, at 600 locations across the nation. . . . From these corporate relationships, the NSA can get the content of calls and records on their date, time, length, origin and destination."

47. On January 25, 2006, an article appearing in the *Reporter-Times* entitled "NSA Data Mining is Legal, Necessary, Chertoff Says" stated that "while refusing to discuss how the highly classified program works (Department of Homeland Security Secretary) Chertoff made it pretty clear that it involves 'data-mining' – collecting vast amounts of international communications data, running it through computers to spot key words and honing in on potential terrorists." In that same interview Secretary Chertoff is quoted as saying "…if you're trying to sift through an enormous amount of data very quickly, I think it (obtaining a FISA warrant) would be impractical", and that getting an ordinary FISA warrant is "a voluminous, time-consuming process" and "if you're culling through literally thousands of phone numbers… you could wind up with a huge problem managing the amount of paper you'd have to generate."

48. On February 5, 2006, an article appearing in the *Washington Post* entitled

"Surveillance Net Yields Few Suspects" stated that officials said "[s]urveillance takes place in several stages . . . the earliest by machine. Computer-controlled systems collect and sift basic information about hundreds of thousands of faxes, e-mails and telephone calls into and out of the United States before selecting the ones for scrutiny by human eyes and ears. Successive stages of filtering grow more intrusive as artificial intelligence systems rank voice and data traffic in order of likeliest interest to human analysts." The article continues, "[f]or years, including in public testimony by Hayden, the agency [the NSA] has acknowledged use of automated equipment to analyze the contents and guide analysts to the most important ones. According to one knowledgeable source, the warrantless program also uses those methods. That is significant . . . because this kind of filtering intrudes into content, and machines 'listen' to more Americans than humans do."

49. On February 6, 2006, in an article entitled "Telecoms let NSA spy on calls," the nationwide newspaper *USA Today* reported that "[t]he National Security Agency has secured the cooperation of large telecommunications companies, including AT&T, MCI and Sprint, in its efforts to eavesdrop without warrants on international calls by suspected terrorists, according to seven telecommunications executives." The article acknowledged that *The New York Times* had previously reported that the telecommunications companies had been cooperating with the government but had not revealed the names of the companies involved. In addition, it stated that long-distance carriers AT&T, MCI, and Sprint "all own 'gateway' switches capable of routing calls to points around the globe, and that "[t]elecommunications executives say MCI, AT&T, and Sprint grant the access to their systems without warrants or court orders. Instead, they are cooperating on the basis of oral requests from senior government officials."

50. On May 11, 2006, in an article entitled "NSA has massive database of Americans' phone calls," *USA Today* reported that "[t]he National Security Agency has been secretly collecting the phone call records of tens of millions of Americans, using data provided by AT&T, Verizon and Bellsouth," according to multiple sources with "direct knowledge of the arrangement." One of the confidential sources for the article reported that the NSA's goal is "to

create a database of every call ever made" within the United States. The confidential sources reported that AT&T and the other carriers are working "under contract" with the NSA, which launched the program in 2001 shortly after the September 11, 2001 terrorist attacks. At the U.S. Senate confirmation hearing on his nomination to become Director of the Central Intelligence Agency, General Michael Hayden, who was the Director of the NSA at the time, confirmed that the program was "launched" on October 6, 2001.

51. The *USA Today* story was confirmed by a U.S. intelligence official familiar with the program. The story reports that the NSA requested that AT&T, SBC, and the other carriers "turn over their 'call-detail records,' a complete listing of the calling histories of their millions of customers," and provide the NSA with "updates" of the call-detail records. The confidential sources for the story reported that the NSA informed the carriers that it was willing to pay for the cooperation, and that both "AT&T, which at the time was headed by C. Michael Armstrong," and "SBC, headed by Ed Whitacre," agreed to provide the NSA with the requested information.

52. The *USA Today* story reported that the NSA requested that Qwest Communications, Inc. ("Qwest"), another telecommunications carrier, provide the NSA with its customers' call-detail records, but Qwest refused. Qwest requested that the NSA first obtain a court order, a letter of authorization from the U.S. Attorney General's office, or permission from a Court operating under the Foreign Intelligence Surveillance Act ("FISA"), but the NSA refused, because it was concerned that the FISA Court and the Attorney General would find the NSA's request unlawful.

53. As of the date of the filing of this complaint, no part of the USA *Today* story has been publicly denied by any representative of the federal government, including the NSA.

54. On May 16, 2006, in an article entitled "BellSouth Denies NSA Contract," *eWeek.com* reported that BellSouth's vice president of corporate communications, Jeff Battcher, in an interview disputed the accuracy of information contained in the May 11, 2006 USA Today

article but “note(d) that his company owns 40% of wireless carrier Cingular” and that he “(didn’t) want to speak for Cingular”.

55. Qwest’s decision not to participate was also reported in an article from *The New York Times* on May 13, 2006, entitled, “Questions Raised For Phone Giants In Spy Data Furor.” The article reported that Qwest’s former CEO, Joseph Nacchio, “‘made inquiry as to whether a warrant or other legal process had been secured in support of that request. When he learned that no such authority had been granted, and that there was a disinclination on the part of the authorities to use any legal process,’ Nacchio concluded that the requests violated federal privacy requirements ‘and issued instructions to refuse to comply.’” According to the May 11, 2006 USA Today article, “Nacchio’s successor, Richard Notebaert, finally pulled the plug on the NSA talks in late 2004.”

56. Senator Christopher “Kit” Bond (R-MO), who also has received access to information on warrantless surveillance operations, explained on May 11, 2006 on a PBS Online NewsHour program entitled “NSA Wire Tapping Program Revealed” that “[t]he president's program uses information collected from phone companies . . . what telephone number called what other telephone number.”

57. On May 14, 2006, when Senate Majority Leader William Frist (R-TN) was asked on CNN Late Edition with Wolf Blitzer whether he was comfortable with the program described in the *USA Today* article, he stated, “Absolutely. I am one of the people who are briefed . . . I've known about the program. I am absolutely convinced that you, your family, our families are safer because of this particular program.”

58. Senator Pat Roberts (R-KS), the chair of Senate Intelligence Committee, described the program on “All Things Considered” on NPR on May 17, 2006. When asked about whether he had been briefed that the NSA had collected millions of phone records for domestic calls, Roberts stated: “Well, basically, if you want to get into that, we're talking about business records.”

59. On May 29, 2006, Seymour Hersh reported in *The New Yorker* in an article

entitled "Listening In" that a security consultant working with a major telecommunications carrier "told me that his client set up a top-secret high-speed circuit between its main computer complex and Quantico, Virginia, the site of a government-intelligence computer center. This link provided direct access to the carrier's network core – the critical area of its system, where all its data are stored. 'What the companies are doing is worse than turning over records,' the consultant said. 'They're providing total access to all the data.'"

60. A June 30, 2006 *USA Today* story reported that 19 members of the intelligence oversight committees of the U.S. Senate and House of Representatives "who had been briefed on the program verified that the NSA has built a database that includes records of Americans' domestic phone calls," and that four of the committee members confirmed that "MCI, the long-distance carrier that Verizon acquired in January, did provide call records to the government."

61. BellSouth knowingly and intentionally provides the aforementioned telephone [contents and] records to the federal government.

62. As part of the Program the NSA's operational personnel identify particular individual targets, and their communications, through a software data mining process that NSA runs against vast databases of BellSouth's stored electronic records of their customers' domestic and international telephone and Internet communications in search of particular names, numbers, words or phrases and patterns of interest. Upon information and belief, NSA's operational personnel also identify communications of interest in real-time through similar data-mining software functionality.

63. Besides actually eavesdropping on specific conversations, NSA personnel have intercepted large volumes of domestic and international telephone and Internet traffic in search of patterns of interest, in what has been described in press reports as a large "data mining" program.

64. As part of this data-mining program, the NSA intercepts millions of communications made or received by people inside the United States, and uses powerful

computers to scan their contents for particular names, numbers, words, or phrases.

65. Additionally, the NSA collects and analyzes a vast amount of communications traffic data to identify persons whose communications patterns the government believes may link them, even if indirectly, to investigatory targets.

66. The NSA has accomplished its massive surveillance operation by arranging with some of the nation's largest telecommunications companies to gain direct access to the telephone and Internet communications transmitted via those companies' domestic telecommunications facilities, and to those companies' records pertaining to the communications they transmit.

67. BellSouth has intercepted and continue to provide the government with direct access to all or a substantial number of the communications transmitted through its key domestic telecommunications facilities, including direct access to streams of domestic, international, and foreign telephone and Internet communications.

68. Since on or about February 1, 2001, BellSouth has disclosed and/or divulged the "call-detail records" of all or substantially all of their customers, including Plaintiffs, to the NSA, in violation of federal law, as more particularly set forth below.

69. BellSouth has, since on or about February 1, 2001, been disclosing to the NSA "individually identifiable customer proprietary network information" belonging to all or substantially all of their customers, including Plaintiffs, in violation of federal law, as more particularly set forth below.

70. BellSouth has disclosed and continues to disclose and/or provide the government with direct access to its databases of stored telephone and Internet records, which are updated with new information in real time or near-real time.

71. BellSouth has provided at all relevant times and continue to provide computer or storage processing services to the public, by means of wire, radio, electromagnetic, photo-optical, or photo-electronic facilities for the transmission of wire or electronic communications, and/or by means of computer facilities or related electronic equipment for the

electronic storage of such communications.

72. BellSouth has knowingly authorized, and continues to knowingly authorize, NSA and affiliated governmental agencies to install and use, or have assisted government agents in installing or using, interception devices and pen registers and/or trap and trace devices on BellSouth's domestic telecommunications facilities in connection with the Program.

73. The interception devices and pen registers and/or trap and trace devices capture, record or decode the various information pertaining to individual class member communications including dialing, routing, addressing and/or signaling information ("DRAS information") for all or a substantial number of all wire or electronic communications transferred through BellSouth's domestic telecommunications facilities where those devices have been installed.

74. Using these devices, government agents have acquired and are acquiring wire or electronic communications content and DRAS information directly via remote or local control of the device, and/or BellSouth has disclosed and is disclosing those communications and information to the government after interception, capture, recording or decoding.

75. BellSouth has knowingly authorized, and continues to knowingly authorize, NSA and affiliated governmental agencies to directly access through the installed devices all domestic, international and foreign wireline and wireless telephone and Internet communications transmitted through BellSouth's domestic telecommunications infrastructure and facilities for use in the Program.

76. BellSouth provides the aforementioned telephone contents and records to the federal government in the absence of judicial or other lawful authorization, probable cause, and/or individualized suspicion, and/or without a court order, warrant, subpoena, statutory authorization, or certification pursuant to Chapters 119 and 121 of Title 18 of the United States Code.

77. BellSouth did not disclose to its customers, including Plaintiffs, that it was

providing the aforementioned telephone contents and records to the federal government. Thus, BellSouth's customers, including plaintiffs, had no opportunity to, and did not, consent to the disclosure of their telephone contents and records.

78. The telephone contents and records intercepted and/or disclosed and/or divulged by BellSouth to the federal government pursuant to the program challenged herein were not divulged (a) pursuant to a law enforcement investigation concerning telemarketing fraud; (b) as a necessary incident to the rendition of services to customers; (c) to protect the rights or property of BellSouth; (d) based on a reasonable and/or good faith belief that an emergency involving danger of death or serious physical injury required disclosure without delay; (e) to the National Center for Missing and Exploited Children; or (f) to a non-governmental person or entity.

79. According to the "Investor Relations" page of its website, "BellSouth's wireless business consists of a 40 percent interest in Cingular Wireless. Cingular Wireless is a joint venture that was formed by combining the former domestic wireless operations of BellSouth and AT&T (formerly SBC). Cingular Wireless is operated independently from both parents, currently with a six member Board of Directors comprised of three directors from each parent. *BellSouth and AT&T share control of Cingular Wireless*." (emphasis added).

80. In a press release dated March 5, 2005, announcing plans for a merger between AT&T Inc. and BellSouth Corporation, the companies stated that "the merger would also give business and government customers, including military and *national security agencies*, a reliable U.S.-based provider of integrated, secure, high-quality and competitively priced services to meet their needs anywhere in the world. (emphasis added).

81. On December 29, 2006, Reuters reported that "AT&T closed its $86 billion purchase of BellSouth Corp."

82. According to AT&T's website, "BellSouth and Cingular are now part of the new AT&T"

83. According to an AT&T press release dated December 29, 2006, "AT&T

Inc. closed its acquisition of BellSouth Corporation… (t)he transaction consolidates ownership and management of Cingular Wireless… AT&T will immediately start to implement a carefully planned integration process to converge the AT&T, BellSouth, and Cingular Wireless and wireline Internet Protocol (IP) networks." According to the same press release, BellSouth Corporation is now or will be known as "AT&T Southeast".

84. Defendant's violations were done with knowledge of their illegality, and therefore were done in bad faith.

85. Defendant acted in collusion with a federal governmental agency.

## CLASS ACTION ALLEGATIONS

86. Plaintiffs bring this action under Federal Rule of Civil Procedure 23 on behalf of themselves and a Class, defined as:

> All individuals and entities located in the United States that have been subscribers or customers of Defendant's wireless, wireline telephone, and/or Internet services at any time since February 1, 2001. Excluded from the Class are Defendant, Defendant's predecessors, affiliates, parents, subsidiaries, officers and directors; all federal, state, and local governmental entities; any and all judges and justices assigned to hear any aspect of this litigation, their court staffs, their spouses, any minor children residing in their households, and any persons within the third degree of relationship to any judge or justice assigned to hear any aspect of this litigation.

87. Plaintiffs also bring this action, pursuant to Rule 23, on behalf of distinct state subclasses, including: (a) a State of California Subclass, and (b) a State of Georgia Subclass.

88. The State of California Subclass is defined as:

> All individuals and entities located in California that have been subscribers or customers of Defendant's wireless, wireline telephone, and/or Internet services at any time since February 1, 2001. Excluded from the Class are Defendant, Defendant's predecessors, affiliates, parents, subsidiaries, officers and directors; all federal, state, and local governmental entities; any and all judges and justices assigned to hear any aspect of this litigation, their court staffs, their spouses, any minor children residing in their households, and any persons within the third degree of relationship to any judge or justice assigned to hear any aspect of this litigation.

89. The State of Georgia Subclass is defined as:

> All individuals and entities located in Georgia that have been subscribers or customers of Defendant's wireless, wireline telephone, and/or Internet services at any time since February 1, 2001. Excluded from the Class are Defendant, Defendant's predecessors, affiliates, parents, subsidiaries, officers and directors; all federal, state, and local governmental entities; any and all judges and justices assigned to hear any aspect of this litigation, their court staffs, their spouses, any minor children residing in their households, and any persons within the third degree of relationship to any judge or justice assigned to hear any aspect of this litigation.

90. Plaintiffs seek certification of the Class and the Subclasses under Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

91. The Class and Subclasses each number in the millions, so that joinder of all members is impractical.

92. The claims of Plaintiffs are typical of the claims of the Class and the Subclasses. Plaintiffs will fairly and adequately protect the interests of the Class and the Subclasses. Plaintiffs have no conflicts with any other Class or Subclass member, and have retained competent counsel experienced in class actions, consumer, telecommunications, and civil rights litigation.

93. Common questions of law and fact exist, including:

a. Whether BellSouth intercepted its customers' wire and electronic communications;

b. Whether BellSouth disclosed and/or divulged its customers' telephone records and content to the federal government;

c. Whether BellSouth violated federal law in disclosing and/or divulging its customers' telephone records and content to the federal government;

d. Whether Plaintiffs and Class members are entitled to damages; and

e. Whether Plaintiffs and Class members are entitled to equitable relief.

94. These and other questions of law and fact are common to the Class and the Subclasses and predominate over any questions affecting only individual members.

95. A class action is a superior method for the fair and efficient adjudication of the controversy described herein. A class action provides an efficient and manageable method to enforce the rights of Plaintiffs and members of the Class and the Subclasses.

96. The prosecution of separate actions by individual members of the Class and Subclasses would create a risk on inconsistent or varying adjudication, establishing incompatible standards of conduct for Defendant.

97. Defendant has acted, and refused to act, on grounds generally applicable to the Class and Subclasses, thereby making appropriate relief with respect to the Class and Subclasses as a whole.

## NECESSITY OF INJUNCTIVE RELIEF

98. The named Plaintiffs and the Members of the Class and Subclasses will continue in the future to use their telephones and Internet services.

99. Unless this Court enjoins BellSouth's program challenged herein, BellSouth will continue to engage in the program.

100. The named Plaintiffs and the Members of the Class and Subclasses will suffer irreparable harm as a result of the continuation of BellSouth's program, and they have no adequate remedy at law.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Violation of 18 U.S.C. §§ 2702(a)(1) and/or (a)(2)

101. Plaintiffs incorporate all of the allegations contained in the preceding paragraphs of this complaint, as if set forth fully herein.

102. In relevant part, 18 U.S.C. § 2702 provides that:

> (a) Prohibitions. Except as provided in subsection (b) or (c)—
>
> (1) a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service; and
>
> (2) a person or entity providing remote computing service to the

> public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service—
>
> (A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such service;
>
> (B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing. . . .

103. BellSouth knowingly divulged to one or more persons or entities the contents of Plaintiffs' and Class Members' communications while in electronic storage by a BellSouth electronic communication service, and/or while carried or maintained by a BellSouth remote computing service, in violation of 18 U.S.C. §§ 2702(a)(1) and/or (a)(2).

104. BellSouth did not notify Plaintiffs or Class Members of the divulgence of their communications, nor did Plaintiffs or Class Members consent to such.

105. Neither the NSA nor any other governmental entity has obtained a warrant authorizing the disclosures, pursuant to 18 U.S.C. § 2703(c)(1)(A).

106. Neither the NSA nor any other governmental entity has obtained a court order authorizing the disclosures, pursuant to 18 U.S.C. § 2703(c)(1)(B) and (d).

107. Neither the NSA nor any other governmental entity has issued or obtained an administrative subpoena authorized by a federal or state statute authorizing such disclosures, pursuant to 18 U.S.C. § 2703(c)(1)(E) and (c)(2).

108. Neither the NSA nor any other governmental entity has issued or obtained a federal or state grand jury or trial subpoena authorizing such disclosures, pursuant to 18 U.S.C. § 2703(c)(1)(E) and (c)(2).

109. Defendant has not been provided with a certification in writing by a person specified in 18 U.S.C. § 2518(7) or by the Attorney General of the United States meeting the

requirements of 18 U.S.C. § 2511(2)(a)(ii)(B), *i.e.*, a certification that no warrant or court order authorizing the disclosures is required by law, and that all statutory requirements have been met.

110. The disclosures were and are not authorized by any statute or legislation.

111. Defendant's disclosures in violation of 18 U.S.C. § 2702(a)(3) were and are knowing, intentional, and willful.

112. There is a strong likelihood that Defendants are now engaging in and will continue to engage in the above-described divulgence of Plaintiffs' and class members' communications while in electronic storage by Defendants' electronic communication service(s), and/or while carried or maintained by Defendants' remote computing service(s), and that likelihood represents a credible threat of immediate future harm.

113. Plaintiffs and Class members have been and are aggrieved by Defendants' above-described divulgence of the contents of their communications.

114. Pursuant to 18 U.S.C. § 2707, which provides a civil action for any person aggrieved by knowing or intentional violation of 18 U.S.C. § 2702, Plaintiffs and Class Members seek such preliminary and other equitable or declaratory relief as may be appropriate; statutory damages of no less than $1,000 for each aggrieved Plaintiff or Class Member; punitive damages as the Court considers just, and reasonable attorneys' fees and other litigation costs reasonably incurred.

**SECOND CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 2702(a)(3)**

115. Plaintiffs incorporate all of the allegations contained in the preceding paragraphs of this complaint, as if set forth fully herein.

116. In relevant part, 18 U.S.C. § 2702 provides that:

> (a) Prohibitions. – Except as provided in subsection . .(c)
>
> > (3) a provider of . . . electronic communication service to the public shall not knowingly divulge a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications covered by paragraph (1) or (2) to any governmental entity.

117. Defendant's wireline telephone services are "electronic communication

service[s]," as that term is defined in 18 U.S.C. § 2510(15), provided to the public, including Plaintiff and Class members.

118. BellSouth violated 18 U.S.C. § 2702(a)(3) by knowingly and intentionally divulging to the federal government records or other information pertaining to subscribers or customers of BellSouth's remote computing and electronic services.

119. BellSouth's challenged program of disclosing telephone records to the federal government does not fall within any of the statutory exceptions or immunities set forth in 18 U.S.C. §§ 2702(c), 2703(c), or 2703(e).

120. Neither the NSA nor any other governmental entity has obtained a warrant authorizing the disclosures, pursuant to 18 U.S.C. § 2703(c)(1)(A).

121. Neither the NSA nor any other governmental entity has obtained a court order authorizing the disclosures, pursuant to 18 U.S.C. § 2703(c)(1)(B) and (d).

122. Neither the NSA nor any other governmental entity has issued or obtained an administrative subpoena authorized by a federal or state statute authorizing such disclosures, pursuant to 18 U.S.C. § 2703(c)(1)(E) and (c)(2).

123. Neither the NSA nor any other governmental entity has issued or obtained a federal or state grand jury or trial subpoena authorizing such disclosures, pursuant to 18 U.S.C. § 2703(c)(1)(E) and (c)(2).

124. Defendant has not been provided with a certification in writing by a person specified in 18 U.S.C. § 2518(7), by the Director of the Federal Bureau of Investigation or his designee or a Special Agent in Charge in a Bureau field office pursuant to 18 U.S.C. § 2709(b), or by the Attorney General of the United States to meet the requirements of 18 U.S.C. § 2511(2)(a)(ii)(B), *i.e.*, a certification that no warrant or court order authorizing the disclosures is required by law, and that all statutory requirements have been met.

125. The disclosures were and are not authorized by any statute or legislation.

126. Plaintiffs and their Class are aggrieved by BellSouth's knowing and intentional past disclosure and/or imminent future disclosure of their records to the federal

government. Accordingly, plaintiffs may challenge this violation of 18 U.S.C. § 2702(a)(3) pursuant to the cause of action created by 18 U.S.C. § 2707(a).

## THIRD CLAIM FOR RELIEF
## Violation of 18 U.S.C. §§ 2511(1)(a), (1)(c), (1)(d), and (3)(a)

127. Plaintiffs incorporate all of the allegations contained in the preceding paragraphs of this complaint, as if set forth fully herein.

128. In relevant part, 18 U.S.C. § 2511 provides that:

> (1) Except as otherwise specifically provided in this chapter, any person who – (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral or electronic communication. . . . (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; (d) intentionally uses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection. . . . . (3)(a) Except as provided in paragraph (b) of this subsection, a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than addressee or intended recipient of such communication or an agent of such addressee or intended recipient.

129. BellSouth violated 18 U.S.C. §§ 2511(1)(a), (1)(c), (1)(d), and (3)(a) by intentionally intercepting and disclosing to the federal government the contents of telephone calls and Internet communications of BellSouth customers.

130. BellSouth violated 18 U.S.C. § 2511(1)(d) by intentionally using, or endeavoring to use, the contents of Plaintiffs' and class members' wire or electronic communications, while knowing or having reason to know that the information was obtained

through the interception of wire or electronic communications.

131. BellSouth's challenged program of intercepting and disclosing the contents of telephone calls and Internet communications to the federal government does not fall within any of the statutory exceptions or immunities set forth in 18 U.S.C. §§ 2511(2), 2511(3)(b), or 2520(d).

132. Plaintiffs and their Class are aggrieved by BellSouth's intentional past and/or imminent future interception and disclosure of telephone call and Internet communication contents to the federal government. Accordingly, plaintiffs may challenge this violation of 18 U.S.C. §§ 2511(1)(a), (1)(c), (1)(d) and (3)(a) pursuant to the cause of action created by 18 U.S.C. § 2520(a).

**FOURTH CLAIM FOR RELIEF**
**Violation of 47 U.S.C. § 605**

133. Plaintiffs incorporate all of the allegations contained in the preceding paragraphs of this complaint, as if set forth fully herein.

134. In relevant part, 47 U.S.C. § 605 provides that:

> (a) Practices prohibited – Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence . . . thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpoena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority.

135. BellSouth received, assisted in receiving, transmitted, or assisted in transmitting, Plaintiff's and Class members' interstate communications by wire.

136. BellSouth violated 47 U.S.C. § 605 by divulging or publishing the "existence" of Plaintiff's and Class Members' communications to the federal government, by means other than through authorized channels of transmission or reception. BellSouth's disclosure and publication of the existence of Plaintiff's and Class Members' communications

was not authorized by any provision of 18 U.S.C. §§ 2510-2522.

137. BellSouth's disclosure and publication of the existence of Plaintiff's and Class Members' communications was willful and for purposes of direct or indirect commercial advantage or private financial gain as they were paid for their cooperation, and a failure to cooperate might have jeopardized their ability to obtain lucrative government contracts.

138. BellSouth failed to notify Plaintiffs or Class Members of the Defendant's disclosure and/or publication of the existence of Plaintiff's and Class Members' communications, nor did Plaintiff or Class Members consent to such disclosure and publication.

139. Pursuant to 47 U.S.C. § 605(e)(3), Plaintiff and Class Members seek: (a) a declaration that the disclosures are in violation of 47 U.S.C. § 605(a); (b) a preliminary injunction restraining Defendant from continuing to make such unlawful disclosures; (c) a permanent injunction restraining Defendant from continuing to make such unlawful disclosures; (d) statutory damages of not less than $1,000 or more than $10,000 for each violation, plus, in the Court's discretion, an increase in the statutory damages of up to $100,000 for each violation; and (e) reasonable attorneys' fees and reasonable costs of this litigation.

## FIFTH CLAIM FOR RELIEF
## Violation of 50 U.S.C. § 1809

140. Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein.

141. In relevant part, 50 U.S.C. §1809 provides that:

> (a) Prohibited activities - A person is guilty of an offense if he intentionally - (1) engages in electronic surveillance under color of law except as authorized by statute; or (2) discloses or uses information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized by statute.

142. In relevant part 50 U.S.C. §180l provides that:

> (f) "Electronic surveillance" means - (1) the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire or radio communication sent by or intended to be received by a particular, known United

> States person who is in the United States, if the contents are acquired by intentionally targeting that United States person, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes; (2) the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire communication to or from a person in the United States, without the consent of any party thereto, if such acquisition occurs in the United States, but does not include the acquisition of those communications of computer trespassers that would be permissible under section 2511 (2)(i) of Title 18; (3) the intentional acquisition by an electronic, mechanical, or other surveillance device of the contents of any radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes, and if both the sender and all intended recipients are located within the United States; or (4) the installation or use of an electronic, mechanical, or other surveillance device in the United States for monitoring to acquire information, other than from a wire or radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes.

143. BellSouth has intentionally acquired, by means of a surveillance device, the contents of one or more wire communications to or from Plaintiffs and Class Members or other information in which Plaintiffs or Class Members have a reasonable expectation of privacy, without the consent of any party thereto, and such acquisition occurred in the United States.

144. By the acts alleged herein, BellSouth has intentionally engaged in electronic surveillance (as defined by 50 U.S. C. §1801(f)) under color of law, but which is not authorized by any statute, and BellSouth has intentionally subjected Plaintiffs and Class Members to such electronic surveillance, in violation of 50 U.S.C. §1809.

145. Additionally or in the alternative, by the acts alleged herein, BellSouth has intentionally disclosed or used information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized by statute.

146. BellSouth did not notify Plaintiffs or class members of the above-described electronic surveillance, disclosure, and/or use, nor did Plaintiffs or Class Members consent to

such.

147. BellSouth’s challenged program of electronic surveillance does not fall within any of the statutory exceptions or immunities set forth in 50 U.S.C. § 1809(b).

148. There is a strong likelihood that BellSouth is now engaging in and will continue to engage in the above-described electronic surveillance, disclosure, and/or use of Plaintiffs' and Class Members' wire communications described herein, and that likelihood represents a credible threat of immediate future harm.

149. Plaintiffs and Class Members have been and are aggrieved by BellSouth’s electronic surveillance, disclosure, and/or use of their wire communications.

150. Pursuant to 50 U.S.C. §1810, which provides a civil action for any person who has been subjected to an electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of 50 U.S.C. §1809, Plaintiffs and class members seek equitable and declaratory relief; statutory damages for each Plaintiff and class member of whichever is the greater of $100 a day for each day of violation or $1,000; punitive damages as appropriate; and reasonable attorneys' fees and other litigation costs reasonably incurred.

## SIXTH CLAIM FOR RELIEF
## Violation of the First and Fourth Amendments to the United States Constitution

151. Plaintiffs incorporate all of the allegations contained in the preceding paragraphs of this complaint, as if set forth fully herein.

152. Plaintiffs and class members have a reasonable expectation of privacy in their communications, contents of communications, and/or records pertaining to their communications transmitted, collected, and/or stored by BellSouth, which was violated by BellSouth’s above-described actions as an agent of the government, which constitute a search ad seizure of plaintiffs’ and class members’ communications and records.

153. Plaintiffs and Class Members use BellSouth’s services to speak or receive speech anonymously and to associate privately.

154. The above-described acts of interception, disclosure, divulgence and/or use of Plaintiffs' and Class Members' communications, contents of communications, and records pertaining to their communications occurred without judicial or other lawful authorization, probable cause, and/or individualized suspicion.

155. At all relevant times, the federal government instigated, directed, and/or tacitly approved all of the above-described acts of BellSouth.

156. At all relevant times, the federal government knew of and/or acquiesced in all of the above-described acts of BellSouth, and failed to protect the First and Fourth Amendment rights of the Plaintiffs and class members by obtaining judicial authorization.

157. In performing the acts alleged herein, BellSouth had at all relevant times a primary or significant intent to assist or purpose of assisting the government in carrying out BellSouth's program and/or other government investigations, rather than to protect its own property or rights.

158. By the acts alleged herein, BellSouth acted as an instrument or agent of the government, and thereby violated Plaintiffs' and class members' reasonable expectations of privacy and denied Plaintiffs and class members their right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment to the Constitution of the United States, and additionally violated Plaintiffs' and class members' rights to speak and receive speech anonymously and associate privately under the First Amendment.

159. By the acts alleged herein, BellSouth's conduct proximately caused harm to Plaintiffs and class members.

160. BellSouth's conduct was done intentionally, with deliberate indifference, or with reckless disregard of, Plaintiffs' and Class Members' Constitutional rights.

## SEVENTH CLAIM FOR RELIEF
**(On Behalf of Plaintiffs Rabbi Steven Lebow, Steven Bruning, Cathy Bruning, Jonnie Starkey, Brian Bradley, Barry Kaltman, Meredith Kaltman, and the Georgia State Subclass) Electronic Surveillance: Unlawful Eavesdropping or Surveillance: Georgia Code § 16-11-62 *et seq.***

161. Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

162. Plaintiffs and Georgia Subclass Members are permitted to maintain a civil action against Defendants pursuant to Georgia Code § 16-11-62(4)(6)(7), which prohibits Defendants from intentionally and secretly intercepting Plaintiffs' and Georgia Subclass Members' private communications by the use of any device, instrument, or apparatus and/or giving or distributing such communications, without legal authority, to any person or entity.

163. Upon information and belief, Defendants were not provided with any proper legal authority permitting Defendants to undertake the activities complained of above.

164. By the acts alleged herein, Defendants have intentionally and secretly intercepted Plaintiffs' and Georgia Subclass Members' private communications through the use of a surveillance device and/or have provided the contents of such communications to third parties without proper legal authority.

165. Defendants did not notify Plaintiffs or Georgia Subclass Members of either Defendants' interception of Plaintiffs' or Georgia Subclass Members' communications and/or Defendants' provision of the contents of such communications to third parties, nor did Plaintiffs or Georgia Subclass Members consent to such.

166. On information and belief, there is a strong likelihood that Defendants are now engaging in and will continue to intercept Plaintiffs' and Georgia Subclass Members' communications and will continue to provide the contents of such communications to third parties, and that likelihood represents a credible threat of immediate future harm.

167. Plaintiffs and Georgia Subclass Members have been and are aggrieved by Defendants' above-described interception of Plaintiffs' or Georgia Subclass Members' communications and/or Defendants' provision of the contents of such communications to third

parties.

168. Pursuant to Georgia Code § 16-11-62, Plaintiffs and Georgia Subclass members are entitled to obtain against Defendants damages and such relief as the Court considers just.

**EIGHTH CLAIM FOR RELIEF**
**(On Behalf of Plaintiffs Mike Haney, Steve Kampmann, Janet Orlando, Melissa Scroggins, and the California State Subclass) The Constitution of the State of California**

169. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if set forth fully herein.

170. By the acts alleged herein, Defendant violated Plaintiffs' and Class Members' reasonable expectations of privacy and their right to speak and receive speech anonymously and associate privately.

171. By the acts alleged herein, Defendant's conduct proximately caused harm to the Plaintiffs and Class Members.

172. On information and belief, Defendant's conduct was done intentionally, in conscious disregard or with reckless disregard of Plaintiffs' and Class Members' rights.

**NINTH CLAIM FOR RELIEF**
**(On Behalf of Plaintiffs Mike Haney, Steve Kampmann, Janet Orlando, Melissa Scroggins, and the California State Subclass) Violation of Business and Professions Code Section 17200, *et seq.***

173. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

174. California Business & Professions Code § 17200 defines unfair competition as any unlawful, unfair, or fraudulent business act or practice.

175. Defendants and each of them have committed an unlawful, unfair and/or fraudulent business act or practice by selling and disclosing private and confidential customer information in violation of the Constitutional provisions and laws cited herein above.

176. California Business & Professions Code §17201 defines the term person as

all natural persons, corporations, firms, partnerships, stock companies, associations and other organizations of persons.

177. California Business & Professions Code § 17203 provides as follows:

> "Any person who engages, has engaged, or proposes to engage in unfair competition will be enjoined in any court of common jurisdiction. The court may make such orders or judgments including the employment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as it may be necessary to restore to any person in interest any money or property real or personal, which may have been acquired by means of such unfair competition. Any person may pursue representative claims for relief on behalf of others only if the claimant meets the standing requirements of §17204 and complies with §§382 of the Code of Civil Procedure, but these limitations do not apply to claims brought under this chapter by the attorney general or the district attorney, county counsel, city attorney, or city prosecutor in this state."

178. Pursuant to Business and Professions Code §17203, Plaintiffs request that the Court enjoin Defendants, and each of them, from continuing to sell and disclose the private and confidential information of the Plaintiff and Class Members in violation of the Constitutional provisions and laws cited herein above.

**TENTH CLAIM FOR RELIEF**
**(On Behalf of Plaintiffs Mike Haney, Steve Kampmann, Janet Orlando, Melissa Scroggins, and the California State Subclass) Violation of Penal Code Section 11149.4.**

179. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if set forth fully herein.

180. California Penal Code §11149.4 provides as follows:

> "Any vendor or employee of a vendor who intentionally disclosed information, not otherwise public, which that person knows or should reasonably know was obtained from confidential information, shall be subject to a civil action for invasion of privacy by the individual to whom the information pertains. In any successful action brought under this section, the complainant, in addition to any special or general damages awarded, shall be awarded a minimum of two thousand five hundred dollars ($2,500) in exemplary damages as well as attorney's fees and other

> litigation costs reasonably incurred in the suit. The right, remedy, and cause of action set forth in this section shall be nonexclusive and is in addition to all other rights, remedies, and causes of action for invasion of privacy inherent in Section 1, Article I of the California Constitution."

181. Defendants, and each of them, intentionally disclosed the Plaintiffs' and Class Members' information about the details of each and every one of their telephone calls and Internet communications, including, but not limited to, whom they called, when the call was placed, and how long the call lasted. This information is "not otherwise public".

182. Defendants, and each of them, knew or reasonably should have known that the disclosure of the specific details of their customers call records was confidential information.

183. Therefore, Defendants, and each of them, are liable to the Plaintiffs, and each Class member, for exemplary damages in the amount of $2,500 as well as an award of reasonable attorney's fees and costs.

**ELEVENTH CLAIM FOR RELIEF**
**Violation of State Surveillance Statutes**

184. Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein.

185. Plaintiffs further state that Defendants have engaged and continue to engage in the unlawful eavesdropping, surveillance, and/or interception of wire, oral, and/or electronic communications, the disclosure and/or divulgence and/or use of the contents of such communications, and/or the unlawful installation and/or use of pen registers or trap and trace devices.

186. The foregoing conduct violates the following state statutes:

a. Ala. Code §§ 13A-11-30, 13A-11-31 (2006)

b. Alaska Stat. § 42.20.310 (2005)

c. Ariz. Rev. Stat. Ann. § 13-3005 (2006)

d. Ark. Code Ann. § 5-60-120 (2005)

e. Cal. Penal Code § 630 *et seq.* (2006)

f. Colo. Rev. Stat. §§ 18-9-301, 18-9-303 (2006)

g. Conn. Gen. Stat. § 52-570d (2006)

h. Del. Code Ann. Tit. 11, § 2402 (2005)

i. D.C. Code §§ 23-541, 23-542 (2006)

j. Fla. Stat. §§ 934.01-03 (2005)

k. Ga. Code Ann. §§ 16-11-62 *et seq.* (2005)

l. Haw. Rev. Stat. § 803-42, 803-48 (2005)

m. Idaho Code Ann. § 18-6702 (2005)

n. 720 Ill. Comp. Stat. 5/14-1, -2 (2006)

o. Ind. Code § 35-33.5-1 *et seq.* (2005)

p. Iowa Code § 727.8 (2005)

q. Kan. Stat. Ann. §§ 21-4001, 21-4002 (2004)

r. Ky. Rev. Stat. Ann. §§ 526.010-.020 (2005)

s. La. Rev. Stat. Ann. § 15:1303 (2005)

t. Me. Rev. Stat. Ann. Tit. 15, §§ 709-710 (2006)

u. Md. Code Ann. Cts. & Jud. Proc. § 10-402 *et seq.*; § 10- 4A-4B *et seq.* (2006)

v. Mass. Gen. Laws ch. 272, § 99 (2006)

w. Mich. Comp. Laws § 750.539 *et seq.* (2006)

x. Minn. Stat. §§ 626A.01, .02 (2005)

y. Miss. Code Ann. § 41-29-501 *et seq.* (2006)

z. Mo. Rev. Stat. §§ 392.170, .350, 542.402, .418 (2006)

aa. Mont. Code Ann. § 45-8-213 (2006)

bb. Neb. Rev. Stat. § 86-290 (2006)

cc. Nev. Rev. Stat. 200.610-.620 (2006)

dd. N.H. Rev. Stat. Ann. §§ 570-A:1, -A:2 (2005)

ee. N.J. Stat. Ann. § 2A:156A-1 *et seq.* (2006)

ff. N.M. Stat. § 30-12-1 (2006)

gg. N.Y. Penal Law §§ 250.00, .05 (2006)

hh. N.C. Gen. Stat. § 15A-287 (2006)

ii. N.D. Cent. Code § 12.1-15-02 (2006)

jj. Ohio Rev. Code Ann. § 2933.51 *et seq.* (2006)

kk. Okla. Stat. tit. 13, § 176.1 *et seq.* (2006)

ll. Or. Rev. Stat. §§ 165.540, .543 (2006)

mm. 18 Pa. Cons. Stat. § 5701 *et seq*. (2005)

nn. R.I. Gen. Laws § 11-35-21 (2005)

oo. S.C. Code Ann. §§ 17-30-20, -30 (2005)

pp. S.D. Codified Laws §§ 23A-35A-1, 23A-35A-20 (2006)

qq. Tenn. Code Ann. § 39-13-601 (2006)

rr. Tex. Penal Code Ann. § 16.02 *et seq.*; Tex. Code Crim. Proc. art. 18.20 § 16(a) (2005)

ss. Utah Code Ann. § 77-23a-1 *et seq.* (2005)

tt. Va. Code Ann. §§ 19.2-61, -62 (2006)

uu. Wash. Rev. Code § 9.73.030 (2006)

vv. W. Va. Code § 62-1D-1 *et seq.* (2006)

ww. Wis. Stat. §§ 968.27, .31 (2005)

xx. Wyo. Stat. Ann. §§ 7-3-701, -702 (2005)

**TWELFTH CLAIM FOR RELIEF**
**Violation of State Consumer Protection Statutes**

187. Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein.

188. Plaintiffs further state that Defendants violated and continue to violate state consumer protection statutes by divulging records or other information pertaining to subscribers and customers to a governmental entity, specifically the NSA, without Class members'

knowledge or consent.

189. The unfair and deceptive trade acts and practices of Defendants directly, foreseeably, and proximately cause damages and injury to Plaintiffs and the Class.

190. Defendants’ actions and failure to act, including the false and misleading representations and omissions of material facts regarding the protection and use of Class members' private information, constitute unfair competition and/or unfair and/or deceptive acts or practices and/or false representations, in violation of the following state consumer protection statutes:

a. Ala. Code § 8-19-1 *et seq.*;

b. Alaska Stat. § 45.50.531(a);

c. Ariz. Rev. Stat. § 44-1522 *et seq.*;

d. Ark. Code § 4-88-101 *et seq.*;

e. Cal. Bus. & Prof. Code § 17200 *et seq.*;

f. Colo. Rev. Stat. § 6-1-105 *et seq.*;

g. Conn. Gen. Stat. § 42-110b *et seq.*;

h. 6 Del. Code § 2511 *et seq.*;

i. D.C. Code Ann. § 28-3901 *et seq.*;

j. Fla. Stat. § 501.201 *et seq.*;

k. Ga. Stat. § 10-1-392 *et seq.*;

l. Haw. Rev. Stat. § 480 *et seq.*;

m. Idaho Code § 48-601 *et seq.*;

n. 815 Ill. Comp. Stat. § 505.1 *et seq.*;

o. Ind. Code § 24-5-0.5 *et seq.*;

p. Iowa Code § 714.16 *et seq.*;

q. Kan. Stat. Ann. § 50-623 *et seq.*;

r. Ky. Rev. Stat. § 367.1 10 *et seq.*;

s. La. Rev. Stat. § 51:1401 *et seq.*;

t. 5 Me. Rev. Stat. Ann. § 207 *et seq.*;

u. Massachusetts General Laws Ch. 93A *et seq.*;

v. Md. Com. Law Code § 13-101 et seq.

w. Mich. Stat. § 445.901 *et seq.*;

x. Minn. Stat. § 8.31 *et seq.*;

y. Miss. Code Ann. § 75-24-1 *et seq.*;

z. Mo. Ann. Stat. § 407.010 *et seq.*;

aa. Mont. Code § 30-14-101 *et seq.*;

bb. Neb. Rev. Stat. § 59-1601 *et seq.*;

cc. Nev. Rev. Stat. § 598.0903 *et seq.*;

dd. N.H. Rev. Stat. § 358-A:1 *et seq.*;

ee. N.J. Rev. Stat. § 56:8-1 *et seq.*;

ff. N.M. Stat. § 57-12-1 *et seq.*;

gg. N.Y. Gen. Bus. Law § 349 *et seq.*;

hh. N.C. Gen. Stat. §§ 75-1.1 *et seq.*;

ii. N.D. Cent. Code § 51-15-01 *et seq.*;

jj. Ohio Rev. Stat. § 1345.01 *et seq.*;

kk. Okla. Stat. 15 § 751 *et seq.*;

ll. Or. Rev. Stat. § 646.605 *et seq.*;

mm. 73 Pa. Stat. § 201-1 *et seq.*;

nn. R.I. Gen. Laws § 6-13.1-1 *et seq.*;

oo. S.C. Code Laws § 39-5-10 *et seq.*;

pp. S.D. Code Laws § 37-241 *et seq.*;

qq. Tenn. Code Ann. § 47-18-101 *et seq.*;

rr. Tex. Bus. & Com. Code § 17.41 *et seq.*;

ss. Utah Code § 13-11-1 *et seq.*;

tt. 9 Vt. Stat. § 2451 *et seq.*;

uu. Va. Code § 59.1-196 *et seq.*;

vv. Wash. Rev. Code § 19.86.010 *et seq.*;

ww. W. Va. Code § 46A-6-101 *et seq.*;

xx. Wis. Stat. § 100.18 *et seq.*; and

yy. Wyo. Stat. Ann. § 40-12-101 et seq.

191. This injury is of the type the state consumer protection and deceptive practices statutes were designed to prevent and directly results from Defendants' unlawful conduct.

**THIRTEENTH CLAIM FOR RELIEF**
**(On Behalf of Plaintiff and the California State Subclass)**
**Unlawful and Unfair Business Practices in Violation of the State Law**

192. Plaintiffs incorporate all of the allegations contained in the preceding paragraphs of this complaint, as if set forth fully herein.

193. By engaging in the acts and practices described herein, Defendant has engaged in unlawful and unfair business practices in violation of California's Unfair Competition Law, Business & Professions Code §§ 17200, *et seq.*

194. Defendant's acts and practices are unlawful because, as described above, they violate 47 U.S.C. § 222, 18 U.S.C. §§ 2702(a)(1), (a)(2), and (a)(3), 18 U.S.C. §§ 2511(1)(a), (1)(c), (1)(d), and (3)(a), 40 U.S.C. § 1809, and 47 U.S.C. § 605.

195. Defendant's acts and practices are also unlawful because they violate 18 U.S.C. § 3121. In relevant part, 18 U.S.C. § 3121 provides that:

> In general. – Except as provided in this section, no person may install or use a pen register or a trap and trace device without first obtaining a court order under section 3123 of this title or under the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 *et seq.*).

196. As defined by 18 U.S.C. § 3127:

> (3) the term "pen register" means a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, provided, however, that such information shall not include the contents of any communication, but such term does not

> include any device or process used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by such provider or any device or process used by a provider or customer of a wire communication service for cost accounting or other like purposes in the ordinary course of its business;
>
> (4) the term "trap and trace device" means a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication, provided, however, that such information shall not include the contents of any communication . . . .

197. Defendant has installed or used pen registers and/or trap and trace devices without first obtaining a valid court order under 18 U.S.C. § 3123 or a subpoena.

198. The pen registers and/or trap and trace devices installed and used by Defendant have captured, recorded, or decoded, and continue to capture, record or decode, dialing, routing, addressing or signaling information pertaining to Plaintiffs and/or California Subclass Members' wireline telephone, wireless telephone, and Internet communications.

199. Defendant did not notify Plaintiffs or California Subclass Members of the installation or use of pen registers and/or trap and trace devices. Plaintiff and California Subclass Members have not consented to Defendant's installation or use of pen registers and/or trap and trace devices.

200. Defendant is a telecommunications carrier that obtains and has obtained customer proprietary network information by virtue of its provision of telecommunications service.

201. Defendant used and/or disclosed to the NSA, a government entity, individually identifiable customer proprietary network information pertaining to Plaintiff and California Subclass Members.

202. Defendant failed to notify Plaintiff or California Subclass Members of the disclosure and/or divulgence of their personally identifiable customer proprietary network information to the NSA, nor did Plaintiff or California Subclass Members consent to such.

203. Defendant's acts and practices also constitute unfair business practices in violation of California's Unfair Competition Law, Business & Professions Code §§ 17200, *et seq.*, because they contravene Defendant's privacy policy, which assures Plaintiff and California Subclass Members that information pertaining to their telephone calls and/or Internet communications will not be disclosed to third parties absent a valid court order or subpoena.

204. In violation of this policy and in breach of its trust with Plaintiff and Class members, including the California Subclass Members, Defendant disclosed the customer proprietary network information belonging to Plaintiff and the California Subclass, *i.e.*, their call-detail records, to the NSA without a court order or subpoena.

205. Plaintiff and the California Subclass seek restitution, injunctive relief, and all other relief available under §§ 17200, *et seq.*

**FOURTEENTH CLAIM FOR RELIEF**
**On Behalf of the Class Members for Breach of Contract**

206. Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

207. At all times relevant herein, Defendants agreed to provide for a subscription fee, and Plaintiffs and Class Members agreed to purchase from the Defendants various telecommunication and electronic communication services and/or devices.

208. At all times relevant herein, Defendants impliedly and expressly promised to protect the privacy and confidentiality of their customers' information, identity, records, subscription, use details, and communications, and, to abide by federal and state law.

209. Defendants by their conduct as alleged, breached their contract with the Plaintiffs and Class Members. Defendants have also by their conduct as alleged breached the implied covenant of good faith and fair dealing[1].

210. As a result of Defendants' breach of contractual duties owed to the

[1] Plaintiffs preserve such claims with respect to states in which breach of the implied covenant of good faith and fair dealing is pled separately.

Plaintiffs and Class members, Defendants are liable for damages including, but not limited to nominal and consequential damages.

**FIFTEENTH CLAIM FOR RELIEF**
**On Behalf of the Class Members for Breach of Warranty**

211. Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

212. At all times relevant herein, Defendants agreed to provide for a subscription fee, and Plaintiffs and Class Members agreed to purchase from the Defendants various telecommunication and electronic communication services and/or devices.

213. At all times relevant herein, Defendants impliedly and expressly warranted or otherwise represented to Plaintiffs and Class Members that Defendants would safeguard, protect, and maintain the privacy and confidentiality of their customers' information, identity, records, subscription, use details, and communications, and to abide by all applicable law.

214. Plaintiffs and Class members relied upon these express and implied warranties and representations in entering into their subscriptions with Defendants.

215. At all times relevant, Defendants by their conduct as alleged, breached those warranties and representations.

216. As a direct and proximate result of Defendants' breaches of warranty as detailed herein, Plaintiffs and Class Members have suffered damages including, but not limited to, nominal and consequential damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and for all others similarly situated, respectfully requests that the Court:

A. Declare that Defendant's conduct as alleged herein violates applicable law;

B. Award statutory damages to Plaintiff and the Class;

C. Award punitive damages to Plaintiff and the Class;

D. Award Plaintiff's reasonable attorneys' fees and costs of suit;

E. Award restitution and all other relief allowed under State law claims;

F. Enjoin Defendant's continuing violations of applicable law; and

Grant such other and further relief as the Court deems just and proper.

Dated: January 16, 2007

Respectfully submitted,

THE LAW OFFICES OF STEVEN E. SCHWARZ, ESQ.

By: /s/ Steven E. Schwarz_____
Steven E. Schwarz, Esq.
2461 W. Foster Ave., #1W
Chicago, IL 60625
Telephone: (773) 837-6134
Facsimile: (773) 837-6134

ATTORNEY FOR BELLSOUTH CLASS PLAINTIFFS

Additional Counsel for BellSouth Class Plaintiffs:

KRISLOV & ASSOCIATES, LTD.
CLINTON A. KRISLOV
W. JOEL VANDER VLIET
20 North Wacker Drive
Suite 1350
Chicago, IL 60606
Telephone: (312) 606-0500
Facsimile: (312) 606-0207

LISKA, EXNICIOS & NUNGESSER
ATTORNEYS-AT-LAW
VAL PATRICK EXNICIOS
One Canal Place, Suite 2290
365 Canal Street
New Orleans, LA 70130
Telephone: (504) 410-9611
Facsimile: (504) 410-9937

BRUCE I. AFRAN, ESQ.
10 Braeburn Drive
Princeton, NJ 08540
Telephone: (609) 924-2075

MAYER LAW GROUP
CARL J. MAYER
66 Witherspoon Street, Suite 414
Princeton, NJ 08542
Telephone: (609) 921-8025
Facsimile: (609) 921-6964

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2006, I electronically filed the foregoing Master Complaint Against BellSouth with the Clerk of the court using the CM/ECF system which will send notification of such filing to the email addresses noted on the attached Electronic Mail Notice List

/s/ Steven E. Schwarz
Steven E. Schwarz

THE LAW OFFICES OF STEVEN E. SCHWARZ, ESQ.
2461 W. Foster Ave., #1W
Chicago, IL 60625
Telephone: (773) 837-6134
Facsimile: (773) 837-6134
E-mail: stevenschwarz23@yahoo.com