ELECTRONIC FRONTIER FOUNDATION
CINDY COHN (145997)
cindy@eff.org
LEE TIEN (148216)
tien@eff.org
KURT OPSAHL (191303)
kurt@eff.org
KEVIN S. BANKSTON (217026)
bankston@eff.org
CORYNNE MCSHERRY (221504)
corynne@eff.org
JAMES S. TYRE (083117)
jstyre@eff.org
454 Shotwell Street
San Francisco, CA 94110
Telephone: 415/436-9333
415/436-9993 (fax)

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE NATIONAL SECURITY AGENCY TELECOMMUNICATIONS RECORDS LITIGATION, MDL No. 1791<br><br>This Document Relates To:<br><br>ALL CASES | MDL Docket No. 06-1791 VRW<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' OPPOSITION TO GOVERNMENT MOTION TO STAY PROCEEDINGS**<br><br>Date: February 9, 2007<br>Time: 2:00 p.m.<br>Courtroom: 6, 17th Floor<br>Judge: The Hon. Vaughn R. Walker |



Dockets.Justia.com

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 4

A. FACTUAL BACKGROUND ........ 4

B. PROCEDURAL BACKGROUND ........ 5

III. ARGUMENT ........ 5

A. THE GOVERNMENT HAS NOT MET THE LEGAL STANDARD FOR A STAY PENDING APPEAL ........ 5

B. THE MOVANTS MANIFESTLY CANNOT MEET THEIR BURDEN FOR THE NON-*HEPTING* CASES ........ 7

C. THE BALANCE OF HARDSHIPS TIPS SHARPLY IN FAVOR OF PLAINTIFFS, NOT THE GOVERNMENT OR THE CARRIERS ........ 9

*1. A Stay Would Impose Substantial Hardship Upon Plaintiffs* ........ *9*

*2. The Government and the Defendants Do Not Yet Face the Purported Harm* ........ *16*

*3. The Procedure Of Section 1806(f) Can Be Used Where Necessary To Allow the Case to Proceed While Preventing Any Possible Irreparable Harm.* ........ *18*

D. THE MOVANTS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR APPEALS. ........ 23

*1. Courts Continue to Reject the Government's State Secret Arguments* ........ *23*

*2. Congressional Hearings May Confirm that the Defendants Participated in the Governments Massive Warrantless Surveillance Program* ........ *24*

*3. The Government's Assertion of a Privilege Prohibiting Any Decision By This Court Should Be Put to Rest* ........ *25*

E. SIGNIFICANT STEPS CAN AND SHOULD BE TAKEN WHILE AWAITING THE NINTH CIRCUIT'S *HEPTING* DECISION. ........ 27

*1. Discovery that Does Not Implicate the State Secret Privilege Can Advance The Litigation Without Harming the Movants' Interests* ........ *27*

*2. To Increase Judicial Economy, the Court Can Tee Up Likely Future Disputes Over the Application of the State Secrets Privilege to Specific Discovery.* ........ *32*

*3. Plaintiffs Are Willing To Postpone Some Litigation Activities At This Time* ..... *36*

F. THE COURT RETAINS JURISDICTION TO CONTINUE THIS LITIGATION ..... 36

IV. CONCLUSION ..... 40

## TABLE OF AUTHORITIES

**CASES**

*Abbassi v. I.N.S.,* 143 F.3d 513 (9th Cir. 1998) .......... 6, 7

*ACF Industries Inc. v. California State Bd. of Equalization*, 42 F.3d 1286 (9th Cir. 1994) .......... 37

*ACLU Found. of S. Cal. v. Barr*, 952 F.2d 457 (D.C. Cir. 1991) .......... 22

*ACLU v. NSA*, 438 F.Supp.2d 754 (E.D. Mich. 2006) .......... 9, 11, 23

*Adler v. Federal Republic of Nigeria*, 107 F.3d 720 (9th Cir. 1997) .......... 35

*Al-Haramain Islamic Found. Inc. v. Bush,* 451 F.Supp.2d 1215 (D. Or. 2006) .......... 19, 22, 23, 24

*American Federation of Government Employees, Local 1533 v. Cheney*, 754 F. Supp. 1409 (N.D. Cal. 1990) .......... 10

*Anhydrides & Chemicals, Inc. v. United States*, 130 F.3d 1481 (Fed. Cir. 1997) .......... 21

*Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997) .......... 25

*Ashland Oil, Inc. v. FTC*, 409 F.Supp. 297 (D.D.C. 1976) .......... 17

*Asseo v. Pan Am. Grain Co*., 805 F.2d 23 (1st Cir. 1986) .......... 12

*Atchison, Topeka and Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255 (10th Cir. 1984) .......... 11

*Benda v. Grand Lodge of Int'l Assoc. of Machinists and Aerospace Workers*, 584 F.2d 308 (9th Cir. 1978) .......... 6

*Britton v. Co-op Banking Group*, 916 F.2d 1405 (9th Cir. 1990) .......... 38, 39

*Burlington N. R.R. Co. v. Dep't of Revenue*, 934 F.2d 1064, 1074 (9th Cir. 1991) .......... 10

*Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303 (1983) .......... 29

*Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988) .......... 17

*Cerro Metal Prods. v. Marshall*, 620 F.2d 964 (3d Cir. 1980) .......... 10

*Chalk v. U.S. Dist. Court Cent. Dist. of California*, 840 F.2d 701 (9th Cir. 1988) .......... 17

*City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882 (9th Cir. 2001) .......... 38

*City of New York v. Beretta U.S.A. Corp*., 234 F.R.D. 46 (E.D.N.Y. 2006) .......... 37

*Clift v. United States*, 597 F.2d 826, 829 (2d Cir. 1979) .......... 20

*Concrete Pipe & Products v. Construction Laborers Pension*, 508 U.S. 602 (1993) .......... 35

*Connecticut v. Massachusetts*, 282 U.S. 660 (1931) .......... 17

*Covino v. Patrissi*, 967 F.2d 73 (2d Cir. 1992) .......... 10

*Doe v. Tenet*, No. 2:99-cv-01597-RSL, (W.D. Wash. Mar. 14, 2001) .......... 18

*Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996) ..... 10
*Ellsberg v. Mitchell,* 709 F.2d 51 (D.C. Cir. 1983) ..... 30, 33
*Ex Parte Nat'l Enameling & Stamping Co.,* 201 U.S. 156 (1906) ..... 36
*Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d 1236 (4th Cir. 1985) ..... 33
*Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389 (9th Cir. 1984) ..... 11
*Gelbard v. U.S.*, 408 U.S. 41 (1972) ..... 11
*Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466 (9th Cir. 1984) ..... 17
*Gomez v. Vernon*, 255 F.3d 1118 (9th Cir. 2001) ..... 10
*Grauberger v. St. Francis Hospital*, 169 F.Supp.2d 1172 (N.D. Cal. 2001) ..... 37
*Halpern v. United States*, 258 F.2d 36 (2nd Cir. 1958) ..... 20, 33, 34
*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ..... 25, 26
*Hepting v. AT&T*, 439 F.Supp.2d 974 (N.D. Cal. 2006) ..... passim
*Hoffman. v. Beer Drivers and Salesmen's Local Union No. 888*, 536 F.2d 1268 (9th Cir. 1976) ..... 39
*Hoopa Valley Tribe v. Christie*, 812 F.2d 1097 (9th Cir. 1987) ..... 6
*In re Four Seasons Securities Laws Litigation* 370 F.Supp. 219 (W.D.Okl. 1974) ..... 8
*In re Grand Jury Investigation*, 431 F. Supp. 2d 584 (E.D. Va. 2006) ..... 22
*In re Grand Jury Subpoena Dated Aug. 9, 2000*, 218 F. Supp. 2d 544 (S.D.N.Y. 2002) ..... 29
*Jago v. U.S. District Court*, 570 F.2d 618 (6th Cir. 1978 ..... 39
*Kasza v. Browner*, 133 F3d 1159 (9th Cir. 1998) ..... 19, 21, 29, 30
*Kelley v. Metropolitan County Bd. of Ed. of Nashville and Davidson County, Tenn.*, 436 F.2d 856 (6th Cir. 1970) ..... 9
*Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004) ..... 12
*Landis v. North American Co.*, 299 U.S. 248 (1936) ..... 8
*Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001) ..... 27
*Lopez v. Heckler*, 713 F.2d 1432 (9th Cir. 1983) ..... 5, 6, 23
*Loral Corp. v. McDonnell Douglas Corp.*, 558 F.2d 1130 (2d Cir. 1977) ..... 33
*Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197 (9th Cir. 1980) ..... 6, 7
*Lowry v. Barnhart*, 329 F.3d 1019 (9th Cir. 2003) ..... 25
*Marbury v. Madison*, 5 U.S. 137 (1803) ..... 25

*Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90 (3d Cir. 1988) .......... 39
*Masalosalo by Masalosalo v. Stonewall Ins. Co.*, 718 F.2d 955 (9th Cir. 1983) .......... 38
*McGehee v. Casey*, 718 F.2d 1137 (D.C. Cir. 1983) .......... 29
*Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150 (6th Cir. 1991) .......... 17
*Nat'l Ctr. for Immigrants Rights v. INS*, 743 F.2d 1365 (9th Cir. 1984) .......... 6
*Nevada Airlines, Inc. v. Bond*, 622 F.2d 1017 (9th Cir. 1980) .......... 6
*New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1071 (C.D. Cal. 2003) .......... 11
*Oakland Tribune, Inc. v. Chronicle Publishing Co*, 762 F.2d 1374 (9th Cir. 1985) .......... 6, 23
*Plotkin v. Pacific Tel. and Tel. Co.* 688 F.2d 1291 (9th Cir. 1982) .......... 36
*Republic of the Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988) .......... 6, 11
*Rosen Entm't Sys. LP v. Eiger Vision*, 343 F. Supp 2d 908 (C.D. Cal. 2004) .......... 11
*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814 (9th Cir. 2001) .......... 10
*Smallwood v. Nat'l Can Co.*, 583 F.2d 419 (9th Cir. 1978) .......... 10
*Spock v. United States*, 464 F. Supp. 510 (S.D.N.Y. 1978) .......... 28
*Sterling v. Tenet*, 416 F.3d 338 (4th Cir. 2005) .......... 18
*Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115 (9th Cir. 1999) .......... 6
*Tenet v. Doe*, 544 U.S. 1 (2005) .......... 21
*Terkel v. AT&T Corp.,* 441 F.Supp.2d 899 (N.D. Ill. 2006) .......... 23
*Totten v. United States*, 92 U.S. 105 (1876) .......... 3, 21, 34
*U.S. v. Griffin*, 440 F.3d 1138 (9th Cir. 2006) .......... 18
*U.S. v. Milligan*, 324 F.Supp.2d 1062, 1066 (D. Ariz. 2004) .......... 7
*U.S. v. Reynolds,* 345 U.S. 1 (1953) .......... 31, 33
*U.S. v. U.S. District Court (Keith)*, 407 U.S. 297 (1972) .......... 9
*Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549 (9th Cir. 1977) .......... 6
*WCI Cable, Inc. v. Alaska Railroad Corp.*, 285 B.R. 476 (D. Or. 2002) .......... 7
*Webster v. Doe*, 486 U.S. 592 (1988) .......... 26
*Williams v. Poulos*, 801 F. Supp. 867 (D. Me. 1992) .......... 11
*Wisconsin Gas Co. v. Federal Energy Regul. Comm'n*, 758 F.2d 669 (D.C.Cir. 1985) .......... 17

*Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579 (1952) ........ 21, 26

**STATUTES**

18 U.S.C. § 2511(2)(a)(ii) ........ 34

28 U.S.C. § 1292(b) ........ 1, 36, 37

28 U.S.C. § 1407 ........ 8

42 U.S.C. § 6001 ........ 21

50 U.S.C. § 1805(a)(3) ........ 4

50 U.S.C. § 1806(f) ........ passim

50 U.S.C. § 1825(g) ........ 20

50 U.S.C. § 1845(f) ........ 20

**OTHER AUTHORITIES**

*AT&T Says Cooperation with NSA Could Be Legal*, CNET News (August 22, 2006) ........ 16

*Bush Lets US Spy on Callers Without Courts*, The New York Times (Dec 16, 2005) ........ 5

FR Doc. 06-4538, 71 Fed. Reg. 27943 (May 12, 2006) ........ 30

H.R. Conf. Rep. No. 95-1720, 1978 U.S.C.C.A.N. 4048 (Oct. 5, 1978) ........ 19, 22

*Is the NSA spying on U.S. Internet traffic?,* Salon Magazine (June 21, 2006 ........ 16

*Lawmakers: NSA Database Incomplete*, USA Today, (June 30, 2006) ........ 5, 13

*National Security Dept. Listening In*, The New Yorker (May 29, 2006) ........ 15

*NSA Data Mining Is Legal, Necessary, Chertoff Says*, Roll Call Newspaper (January 25, 2006) ........ 5, 14

*NSA Has Massive Database of Americans' Phone Calls*, USA Today (May 11, 2006) ........ 5

Rutter Group, Cal. Practice Guide: 9th Cir. Civ. App. Prac. ........ 37

S. Rep. No. 95-701, 1978 U.S.C.C.A.N. 3973 (Mar. 14, 1978) ........ 20

*Spy Agency Mined Vast Data Trove, Officials Report,* The New York Times, (December 24, 2005) ........ 12

*Telecoms Let NSA Spy On Calls,* USA Today (February 6, 2006) ........ 13

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. Introduction

As the Court has previously noted, the general rule is that a case continues forward in an orderly manner in the District Court during the interlocutory appellate review of an order certified under 28 U.S.C. § 1292(b). *See* 11/17/06 CMC Tr. at 59 (MDL-1791 Dkt. 77) (THE COURT: "... it's hard to square [defendants'] position, isn't it, with the notion that proceedings can proceed in the district court during the pendency of an interlocutory appeal[.] After all, we have cases where there are interlocutory appeals and discovery goes forward and even trials go forward."). Both the government and the defendant telecommunications carriers, however, attempt to turn this well-settled rule upside down and convince the Court that until the final conclusion of appellate review of the Court's denial of the government's motion to dismiss in *Hepting v. AT&T* (*Hepting* C-06-00672-VRW Dkt. 308, published at 439 F.Supp.2d 974), it lacks jurisdiction to permit any "meaningful" litigation activities to go forward not only on the claims pending against AT&T but also on the claims pending against the other carrier defendants in the Multidistrict Litigation ("MDL").

The government and the defendants contend that the Court must allow them to continue unimpeded their unconstitutional and illegal surveillance of millions of Americans, while the claims pending against them remain frozen. In their view, the section 1292(b) appeal is a shield that immunizes their conduct during the months or years that the appeal remains pending. It would be surprising and ironic if the government and the defendants were correct that this litigation, intended to stop their unlawful conduct, could itself be turned into the vehicle by which that conduct is permitted to continue without any progress towards a judicial resolution. Not surprisingly, their position is not correct.

To the contrary, when the proper legal standard is applied—balancing the parties' probability of success on the merits of the appeal versus the possibility of irreparable harm from proceeding forward—the conclusion is unavoidable that the Court can and should continue to proceed forward with this case as it has to date, in a careful, step-by-step process in which it proceeds one stage at a time, deciding no more than is necessary to resolve the issue immediately

before it. This was the essence of the methodology the Court adopted in its July 20, 2006 Order deciding the motions to dismiss of the government and of AT&T in *Hepting*. *E.g.*, *Hepting*, 439 F.Supp.2d at 990 ("at this point in the litigation [the Court] eschews the attempt to weigh the value of the information"); 994 ("The court also declines to decide at this time whether this case should be dismissed on the ground that the government's state secrets assertion will preclude evidence necessary for the plaintiffs to establish a *prima facie* or for AT&T to raise a valid defense to the claims. . . . It would be premature to decide these issues at this time."); 997 ("The court stresses that it does not presently conclude that the state secrets privilege will necessarily preclude AT&T from revealing later in this litigation information about the alleged communication records program."); 998 ("After discovery begins, the court will determine step-by-step whether the privileges prevent plaintiffs from discovering particular evidence."). The Court has repeatedly declined the invitations of the government and of AT&T to simply throw up its hands and announce at the outset that the case could never be litigated because of the state secrets privilege, deciding instead to proceed step-by-step in a process of iterative deliberation. By their stay motion, the government and the defendants are seeking to have the Court abandon that prudent course.

The Court should continue on the course it has begun and engage in the balancing test for stay motions mandated by the Ninth Circuit, applying it to the differing facts and circumstances of the non-AT&T carrier defendants and the AT&T defendants. Although the facts relevant to the balancing test are different for different defendants, the result of that analysis is the same for all defendants. The non-AT&T carriers are not involved in any pending appeal and have asserted that the Ninth Circuit's rule in the *Hepting* appeal cannot bind them. Thus, with respect to these defendants, the balancing test tips firmly in plaintiffs' favor because the non-AT&T carriers cannot claim any possibility of success on the merits of an appeal that they are not parties to and assert will not bind them,[1] and because the irreparable harm due to the continued surveillance is

[1] While plaintiffs will likely argue that this Court's *Hepting* decision and any Ninth Circuit decision should be directly applicable to the remaining cases, the government and the non-AT&T carriers have taken the contrary position and so cannot use the pendency of the *Hepting* appeal as a ground for staying the non-AT&T actions. *See discussion in section III.B below; see also* 11/17/06

unquestionable.

As for AT&T, a stay is not appropriate under the Ninth Circuit's standard because the government has not shown that it faces immediate irreparable harm from the litigation activities that plaintiffs propose go forward first. As with the other carriers, the balance of hardships tips sharply towards the plaintiffs, who are facing ongoing and irreparable constitutional injury. Any potential harm claimed by the government and the defendants, on the other hand, is not yet ripe since the plaintiffs' proposed discovery has not even been served, much less clarified and narrowed through the ordinary process of making objections, meeting and conferring, and the bringing of motions to compel or for a protective order. Nor have the Court and the parties explored in the context of specific discovery requests the use of the procedures of 50 U.S.C. section 1806(f) and other mechanisms to avoid harm to the government's interests by keeping any purportedly state secret information under the protection of the court pending decision of the *Hepting* section 1292(b) appeal. Moreover, the movants have a low probability of success on the merits of the appeal: in the period since the *Hepting* decision, three courts have followed this Court's ruling and held that the state secrets privilege and the *Totten* doctrine, *see Totten v. United States*, 92 U.S. 105 (1876), do not require the dismissal of actions challenging the government's surveillance program.

Ultimately, it serves the interests of justice to keep as much of this litigation moving forward as possible, so that, once the Ninth Circuit issues the *Hepting* decision, both *Hepting* and the other cases in this MDL proceeding are ready to proceed quickly to a resolution on the merits. The Administration has stated that it intends to continue the warrantless surveillance that admittedly began over five years ago. Thus, if plaintiffs ultimately prevail on the merits of their claims, every day of delay will have meant more illegal surveillance.[2] And if the government or

CMC Tr. (MDL-1791 Dkt. 77) at 54:13-15 (Verizon counsel John Rogovin: "And as I said earlier, we were not a party to *Hepting*, we don't agree to be, you know, bound by those rulings.").

[2] Earlier today, the government announced that it will seek authorization from the FISA court for any future electronic surveillance of international communications involving al Qaeda suspects as part of the "Terrorist Surveillance Program." See Letter from Attorney General Gonzales to Chairman Leahy and Senator Specter (January 17, 2007) (MDL-1791 Dkt. 127, Ex. 1). This announcement is irrelevant to Plaintiff'' claim that the carriers are assisting the government in the interception and electronic surveillance of all or most of the communications, both domestic and international, that transit the carriers' networks. Nor does the FISA court have the statutory or constitutional authority to issue a general warrant authorizing such dragnet surveillance of millions

the carriers prevail, a speedy resolution will have been in their interests too by sparing them further burdens from this litigation.

By postponing any work on the numerous litigation tasks that can and should go forward in the months or years that the section 1292(b) appeal is pending, a stay would unnecessarily delay final resolution of these numerous cases once the appeal is decided. Given the ongoing massive surveillance that the class members and those with whom they communicate must endure daily, any stay would also unnecessarily imposes irreparable harm to the privacy and security of the communications of millions of other Americans in the interim. Careful, step-by-step procedures crafted by the Court, on the other hand, will fully protect the government's interests without the necessity for a stay. Accordingly, a stay is inappropriate here and the motion of the government in which the carriers have joined should be denied.

## II. Background

### A. <u>Factual Background</u>

This MDL proceeding involves cases brought on behalf of customers and subscribers of defendants AT&T, Verizon, MCI, BellSouth, Sprint, Cingular and their associated entities and subsidiaries, as well as numerous other telecommunications carrier defendants, asserting (1) claims that defendants, acting on behalf of the government, have unlawfully intercepted the content of domestic and international communications of millions of Americans, including plaintiffs, and (2) claims that the defendants have unlawfully disclosed to the government detailed communications records about millions of their customers, again including plaintiffs.

Plaintiffs have alleged serious and ongoing irreparable harm to their statutory and constitutional rights, and to the rights of millions of other Americans, through this ongoing dragnet surveillance of their telephone calls and Internet activity. While most cases in this proceeding had not yet proceeded beyond the filing of the complaint before they were transferred (*see e.g.* Dkt #19 (Order Granting Defendants' Motion to Vacate Pending Deadlines)), in the *Hepting* case, plaintiffs

---

of innocent Americans. Rather, under FISA, a FISA court judge must find probable cause to believe that the particular target of electronic surveillance is a foreign power or agent thereof before authorizing that surveillance. *See* 50 U.S.C. § 1805(a)(3). Nonetheless, to the extent the government attempts to use this development in its reply memorandum, plaintiffs request the opportunity to file a surreply prior to the stay hearing.

have supported these allegations with credible evidence of AT&T's active participation in this surveillance. *See* Declaration of Mark Klein (*Hepting* Dkt. 230); Declaration of J. Scott Marcus (*Hepting* Dkt. 231); Plaintiffs' Request for Judicial Notice (*Hepting* Dkt. 20); *see generally* James Risen and Eric Lichtblau, *Bush Lets US Spy on Callers Without Courts*, The New York Times (Dec 16, 2005) (*Hepting* Dkt. 19, Cohn Decl, Ex. J); Leslie Cauley, *NSA Has Massive Database of Americans' Phone Calls*, USA Today (May 11, 2006) (*Hepting* Dkt. 182, Markman Decl., Ex. 5); Susan Page, *Lawmakers: NSA Database Incomplete*, USA Today, (June 30, 2006) (*Hepting* Dkt. 298, DiMuzio Decl., Ex. 1); Morton Kondracke, *NSA Data Mining Is Legal, Necessary, Chertoff Says*, Roll Call Newspaper (January 25, 2006) (*Hepting* Dkt. 19, Cohn Decl., Ex. G).

### B. Procedural Background

Following this Court's order of July 20, 2006 (*Hepting* Dkt. 308), denying the motions to dismiss of AT&T and the government, AT&T and the government filed petitions for permission to appeal with the Ninth Circuit. *See* Ninth Cir. App. Case Nos. 06-80109, 06-80110. In addition, the Judicial Panel on Multidistrict Litigation issued an order transferring *Hepting* to this Court, among other cases. (MDL-1791 Dkt. 1).

In the interim, the *Hepting* litigation was stayed until August 8, 2006, and then until September 29, 2006, by prior orders of this Court. (*Hepting* Dkt. 330 and 336). On November 7, 2006, the Ninth Circuit accepted the government and AT&T's petitions for appeal. (MDL-1791 Dkt. 61, Attachment B). On November 8, 2006,the government moved for a stay of all the cases in this MDL proceeding pending the appeal. (MDL-1791 Dkt. 67). On December 22, 2006, the various telecommunications defendants joined the government's motion. (MDL-1791 Dkt. 98, 99, 100 and 101).

## III. Argument

### A. The Government Has Not Met the Legal Standard for a Stay Pending Appeal

"The standard for evaluating stays pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction." *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983), *rev'd in part on other grounds*, 463 U.S. 1328 (1983) (noting the common language of the test for stay pending appeal and the test for a preliminary injunction, citing *Nevada*

*Airlines, Inc. v. Bond*, 622 F.2d 1017, 1018 n.3 (9th Cir. 1980)); *Abbassi v. I.N.S.,* 143 F.3d 513, 514 (9th Cir. 1998) ("We evaluate stay requests under the same standards employed by district courts in evaluating motions for preliminary injunctive relief.").

In the Ninth Circuit, there are two legal tests a party must meet for the issuance of a preliminary injunction: a showing of either "(1) a combination of probable success and the possibility of irreparable harm, or (2) that serious questions are raised and the balance of hardship tips in its favor." *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 874 (9th Cir. 2000); *accord, Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (*en banc*); *Hoopa Valley Tribe v. Christie*, 812 F.2d 1097, 1102 (9th Cir. 1987). These tests are "not separate" but rather represent "the outer reaches 'of a single continuum.'" *Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980). "Traditional standards for granting a preliminary injunction impose a duty on the court to balance the interests of all parties and weigh the damage to each, mindful of the moving party's burden to show the possibility of irreparable injury to itself and the probability of success on the merits." *Id.* at 1203. However, "[u]nder any formulation of the test, [the movant] must demonstrate that there exists a significant threat of irreparable injury." *Oakland Tribune, Inc. v. Chronicle Publishing Co*, 762 F.2d 1374, 1376 (9th Cir. 1985) (citations omitted).

Thus, "the relative hardship to the parties" is a "critical element" in deciding at which point along the continuum a stay is justified. *Benda v. Grand Lodge of Int'l Asssoc. of Machinists and Aerospace Workers*, 584 F.2d 308, 315 (9th Cir. 1978), *cert. dismissed*, 441 U.S. 937 (1979). On the one hand, "the greater the relative hardship to the moving party, the less probability of success must be shown." *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir. 1999), quoting *Nat'l Ctr. for Immigrants Rights v. INS*, 743 F.2d 1365, 1369 (9th Cir. 1984). On the other hand, where, as here, the relative hardship is greater for the non-moving party, the party seeking a stay must show a higher probability of success on the merits. Finally, in cases such as this one, "the public interest is a factor to be strongly considered." *Lopez v. Heckler*, 713 F.2d at 1435; *Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549, 551 (9th Cir. 1977).

This standard is not limited, as the government suggests, to stays of injunctions pending

appeal. *Compare* Gov't Motion for Stay at 10 n.4 (MDL-1791 Dkt. 67) *with, e.g., Abbassi,* 143 F.3d 513 (applying standard to deny stay of deportation); *WCI Cable, Inc. v. Alaska Railroad Corp.*, 285 B.R. 476, 478 (D. Or. 2002) (applying preliminary injunction standard to motion to "stay all proceedings in this Court pending resolution of their appeal from the bankruptcy court order denying them immunity under the Eleventh Amendment."); *U.S. v. Milligan*, 324 F.Supp.2d 1062, 1066 (D. Ariz. 2004) (in a subpoena enforcement matter, holding "In the Ninth Circuit, the standard for evaluating whether a stay pending appeal should be issued is similar to whether a preliminary injunction should be issued.").

As the party seeking a stay, the government has the burden of proof on these factors. *L.A. Memorial Coliseum,* 634 F.2d at 1203 ("Traditional standards for granting a preliminary injunction impose a duty on the court to balance the interests of all parties and weigh the damage to each, mindful of the *moving party's burden* to show the possibility of irreparable injury to itself and the probability of success on the merits." (emphasis added)).

Yet, as discussed below, the government can demonstrate no current, irreparable or even substantial hardship that would justify a stay. The Court has already made clear its intention to proceed in a careful, step-by-step manner. It has made clear that it will closely supervise each stage of the proceedings to protect against any harm to national security, the only legitimate hardship the government can assert here. In light of these protections, the likelihood of harm to national security during the pendency of the interlocutory appeal is minimal.

### B. The Movants Manifestly Cannot Meet Their Burden for the Non-*Hepting* Cases

First, and most importantly, the only case on appeal is *Hepting*, and both the non-AT&T carriers and the government have taken the position that **neither** the ruling by this Court on the *Hepting* motion to dismiss **nor** the Ninth Circuit's decision in *Hepting* will be binding on them except concerning the claims against AT&T. *See* Joint Case Management Statement (MDL-1791 Dkt. 61) at 22-23 ("The Government will not stipulate to be bound by the *Hepting* decision in these consolidated actions," and the carriers suggest "further briefing and reconsideration of how the state secrets privilege applies to the allegations and circumstances of the non-*Hepting* cases after

appellate guidance is received.”). This strategic decision undermines their claim that a stay should reach the non-AT&T cases, because it makes it pointless to wait for a *Hepting* decision before proceeding in the other cases. *See In re Four Seasons Securities Laws Litigation* 370 F.Supp. 219, 228 (W.D.Okl. 1974) (holding that the pendency of “an appeal should not prevent a transferee court from hearing and deciding questions raised in a case transferred by the Panel under 28 U.S.C. § 1407, which will materially advance the coordinated or consolidated discovery and other pretrial proceedings in the several transferred cases.”). Moreover, because the non-AT&T cases are *not under appeal*, it is impossible for the movants to meet the likelihood-of-success standard for a stay pending appeal in those cases, since they obviously have no likelihood of a successful appeal where no appeal is pending. Likewise, as discussed in more detail below, the movants can show no harm from continuing to litigate the non-AT&T cases.

This Court has already properly taken steps to bring those other cases up to the place where *Hepting* is, by ordering the parties to show cause why the *Hepting* ruling should not apply to them. This is a first step, but it should not stop there. Since the non-AT&T defendants have announced their intention to seek to limit the *Hepting* decision by the Ninth Circuit to only the AT&T defendants, the non-*Hepting* cases should not be restricted from moving forward.[3] The non-AT&T defendants should be required to answer; discovery and motion practice should commence as in any other case. Should the government wish to raise a state secrets privilege as to particular issues in those cases, this can be handled as it was in *Hepting* and this Court will have the same tools to handle the privilege claim available to it in those cases as it has there.

Moreover, a district court’s discretion to stay proceedings pending the outcome of other proceedings may be abused by a stay of indefinite duration in the absence of a pressing need. The Supreme Court in *Landis v. North American Co*., 299 U.S. 248 (1936), held that the limits of fair

[3] The JPML has also transferred the *Al-Haramain* case to this Court (Clerk’s Notice, MDL-1791 Dkt. 114), and the Ninth Circuit has granted the government’s petition for an interlocutory appeal of the *Al-Haramain* decision denying its motion to dismiss, and elected to stay briefing in that appeal pending its decision in *Hepting*. There is a separate motion to stay this Court’s proceedings in *Al-Haramain* pending the outcome of the *Al-Haramain* appeal, which has been fully briefed. *See generally* Letter from Jon Eisenberg to Judge Walker re: Pending Motions and Discovery Conference (MDL-1791 Dkt. 113). The *Al-Haramain* appeal, however, presents no independent reason to stay *Al-Haramain* or any other transferred case pending the decision in *Hepting*.

discretion were exceeded by the district court's stay until after a decision in other proceedings and until the determination by the Supreme Court of any appeal therefrom. *See also Kelley v. Metropolitan County Bd. of Ed. of Nashville and Davidson County, Tenn.*, 436 F.2d 856 (6th Cir. 1970) (vacating order staying all pupil-desegregation proceedings in the present, long-pending cases until the decision of school-desegregation cases then under consideration by the United States Supreme Court).

### C. The Balance of Hardships Tips Sharply in Favor of Plaintiffs, Not the Government or the Carriers

The balance of hardships tilts sharply in plaintiffs' favor because the millions of plaintiff class members are facing ongoing and irreparable harm to their constitutional and statutory rights, while the harm asserted by the government and the carriers is not yet ripe. Moreover, the procedures Congress enacted in section 1806(f) of the Foreign Intelligence Surveillance Act allow for the litigation to continue without the government facing any harm.

#### 1. A Stay Would Impose Substantial Hardship Upon Plaintiffs

A stay would impose substantial hardship upon the named plaintiffs and the millions of other class members. As the Court has recognized, "AT&T's alleged actions here violate the constitutional rights clearly established in *Keith* [*U.S. v. U.S. District Court (Keith)*, 407 U.S. 297 (1972)]." *Hepting*, 439 F.Supp.2d at 1010; *see also ACLU v. NSA*, 438 F.Supp.2d 754, 782 (E.D. Mich. 2006) ("The irreparable injury necessary to warrant injunctive relief is clear, as the First and Fourth Amendment rights of Plaintiffs are violated by the TSP.") If the telecommunications defendants are engaging in the wholesale interception and disclosure of the communications of millions of ordinary Americans in violation of statutes and the Constitution, then irreparable harm is occurring on a massive scale. The unlawful, ongoing exposure of the most private thoughts and affairs of millions of Americans to government scrutiny is a harm that is both serious and irreparable.

AT&T dismisses this violation of statutory and constitutional rights and invasion of the privacy of its residential customers, who comprise more than 73 million American households, as mere "private harm," unworthy of significant weight. AT&T Joinder at 11 (MDL-1791, Dkt. 100-

1).[4] When AT&T's customers are combined with those of the other telecommunications defendants, however, the harm alleged in these actions reaches almost every household in the United States.

Courts have consistently found that statutory and constitutional violations constitute irreparable injury. *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996); *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) (irreparable injury shown by "a possible deprivation of his constitutional [Fourth Amendment] rights"); *Cerro Metal Prods. v. Marshall*, 620 F.2d 964, 974 (3d Cir. 1980) (holding that "an [OSHA] inspection violating the Fourth Amendment would constitute irreparable injury for which injunctive relief would be appropriate"); *American Federation of Government Employees, Local 1533 v. Cheney*, 754 F. Supp. 1409, 1416 (N.D. Cal. 1990) ("It is established that violation of an individual's constitutional right to be free from unreasonable searches as articulated in the Fourth Amendment causes irreparable harm.").

The Ninth Circuit has repeatedly held that where a constitutional violation is part of a "pattern or policy," the irreparable harm prong of the injunctive relief analysis has been satisfied. *Gomez v. Vernon*, 255 F.3d 1118, 1129-30 (9th Cir. 2001) (injunctive relief necessary in light of past pattern of unconstitutional retaliation).

Moreover, irreparable harm is presumed for violation of statutes, like Title III, that provide for injunctions. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001); *Smallwood v. Nat'l Can Co.*, 583 F.2d 419, 420 (9th Cir. 1978) (for Title VII claim, holding that where an "injunction [is] issued in response to a statutory provision . . . irreparable harm is presumed from the fact of the violation of the Act"); *Burlington N. R.R. Co. v. Dep't of Revenue*, 934 F.2d 1064, 1074 (9th Cir. 1991) ("When the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown.") (*quoting Atchison, Topeka and Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255, 259 (10th Cir.

[4] Curiously, AT&T attempts to argue *against* the existence of harm to the plaintiffs by acknowledging that the "Eastern District of Michigan has already opined that the TSP is unconstitutional." AT&T Joinder at 11 (MDL-1791 Dkt. 100-1). That the narrower warrantless surveillance TSP program has been found to violate the Constitution shows that plaintiffs are irreparably harmed, rather than showing the absence of harm.

1984)).

Plaintiffs are suffering the irreparable harm of ongoing statutory and constitutional violations and the unlawful disclosure of their communications and private information, and should not have their case unnecessarily delayed. The harm faced by plaintiffs is current and ongoing, while, as discussed in detail in Section III.C.2 below, the litigation activities proposed at this time will cause no harm to the government.

In addition, there is a strong public interest in protecting plaintiffs' privacy from dragnet surveillance and in enforcing this nation's constitution and surveillance laws. *See Williams v. Poulos*, 801 F. Supp. 867, 875 (D. Me. 1992) ("There is [a] strong public interest in protecting the privacy and security of communications in a society so heavily dependent on information."); *Gelbard v. U.S.*, 408 U.S. 41, 48 (1972) (protection of privacy was an overriding Congressional concern in enacting Title III); *ACLU v. NSA*, 438 F.Supp.2d at 782 ("the public interest is clear, in this matter. It is the upholding of our Constitution.").

*(a) The Court May Consider Newspaper Articles in Determining the Motion for a Stay*

It is well established that this Court has the discretion to consider hearsay or otherwise inadmissible evidence for purposes of deciding whether to issue a preliminary injunction. *Republic of the Philippines v. Marcos*, 862 F.2d at 1363 (allowing hearsay evidence); *accord Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."); *Rosen Entm't Sys. LP v. Eiger Vision*, 343 F. Supp 2d 908, 912 (C.D. Cal. 2004) ("District courts have discretion to consider otherwise inadmissible evidence in ruling on the merits of an application for a preliminary injunction."); *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1071, 1076 n.3 (C.D. Cal. 2003) ("the Court may, in its discretion, accept hearsay for purposes of deciding whether to issue the preliminary injunction.").

Accordingly, "[d]istrict courts must exercise their discretion in 'weighing all the attendant

factors, including the need for expedition,' to assess whether, and to what extent, affidavits or other hearsay materials are 'appropriate given the character and objectives of the injunctive proceeding.'" *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 719 (3d Cir. 2004) (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986) ("The dispositive question is not their classification as hearsay but whether, weighing all the attendant factors, including the need for expedition, this type of evidence was appropriate given the character and objectives of the injunctive proceeding.")).

Since the standard for determining whether a stay is proper is the same as the test for deciding whether to issue a preliminary injunction, and given the character and objectives of this motion for a stay, this Court is empowered to considered a wider range of evidence. This is especially the case here where, as in a threshold preliminary injunction motion, plaintiffs have been denied any discovery that would allow them to present additional non-hearsay evidence of the same facts establishing the ongoing constitutional harm.

Thus, while for purposes of the government's motion to dismiss, the "court consider[ed] only public admissions or denials by the government, AT&T and other telecommunications companies," *Hepting*, 439 F.Supp.2d at 990, for purposes of evaluating the government's motion for a stay, it is proper for this Court to consider the hearsay evidence in news reports. As discussed below, the evidence from news reports overwhelmingly shows that plaintiffs continue to suffer irreparable harm.

The record already includes newspaper articles that confirm plaintiffs' surveillance and stored record allegations. For example, as early as December 2005 current and former government officials confirmed that major telecommunications companies gave the NSA backdoor access to streams of domestic and international communications, access to major telecommunication switches, and access to large volumes of stored information on calling patterns. *See* Eric Lichtblau and James Risen, *Spy Agency Mined Vast Data Trove, Officials Report,* The New York Times, (December 24, 2005), at A1 (reporting that "a former technology manager at a major telecommunications company said that since the Sept. 11 attacks, the leading companies in the industry have been storing information on calling patterns and giving it to the federal government

to aid in tracking possible terrorists.") (*Hepting* Dkt. 19, Cohn Decl., Ex. C).[5]

By February 2006, seven telecommunications executives had confirmed that telecommunications companies, including AT&T, MCI, and Sprint, have cooperated with the surveillance program. *See* Leslie Cauley and John Diamond, *Telecoms Let NSA Spy On Calls,* USA Today (February 6, 2006), at A1 (*Hepting* Dkt. 19, Cohn Decl., Ex. C). By June, the evidence was supplemented by five members of the Congressional intelligence committees, who all confirmed that AT&T is cooperating in the surveillance program. *See* Susan Page, *Lawmakers: NSA Database Incomplete*, USA Today (June 30, 2006), at A2 (*Hepting* Dkt. 298, DiMuzio Decl., Ex. 1) ("Five members of the intelligence committees said they were told by senior intelligence officials that AT&T participated in the NSA domestic calls program.") Furthermore, nineteen members of the intelligence committees verified "that the NSA has built a database that includes records of Americans' domestic phone calls." *Id.* Finally, four Members of Congress confirmed that "MCI, the long-distance carrier that Verizon acquired in January, did provide call records to the government." *Id.*

In addition, news reporting includes comments, both on and off the record, that either explicitly confirm (or implicitly confirm by pre-supposing the existence of) a program including both the disclosure of call records and the interception and disclosure of communications. For example, *USA Today* quoted Senator Ted Stevens, who receives briefings as chairman of the Senate Appropriations Defense subcommittee, as stating about the call records program, "[i]t was long-distance. It was targeted on (geographic) areas of interest, places to which calls were believed to have come from al-Qaeda affiliates and from which calls were made to al-Qaeda affiliates." *Id.*

The *USA Today* article also quoted Senator Orrin Hatch of the Senate Intelligence Committee as stating about the warrantless surveillance program that "[i]t was within the president's inherent powers" and Representative Anna Eshoo of the House Intelligence Committee as saying that officials had made the claim about the program that " 'It's legal.' But in the same breath they say, 'Perhaps we should take another look at FISA.'" *Id.* Each was in a position to know about the program, and none of these statements make sense unless the program exists.

[5] Available at < http://www.nytimes.com/2005/12/24/politics/24spy.html>.

In addition to the *USA Today* article, in May 2006, the retired CEO of the telecommunications company Qwest, Joseph P. Nacchio, announced that the government approached his company seeking to access customer information in the Fall of 2001. Statement of Herbert J. Stern, attorney for Joseph P. Nacchio (*Hepting* Dkt. 135, Scarlett Decl. Ex. 1). Mr. Nacchio refused to comply, and the government continued its requests throughout his tenure at Qwest until he left in June of 2002. *Id*.

On January 25, 2006, a newspaper article showed that "while refusing to discuss how the highly classified program works [Department of Homeland Security Secretary] Chertoff made it pretty clear that it involves 'data-mining' – collecting vast amounts of international communications data, running it through computers to spot key words and honing in on potential terrorists." Morton Kondracke, *NSA Data Mining Is Legal, Necessary, Chertoff Says*, Roll Call Newspaper (January 25, 2006) (*Hepting* Dkt. 19, Cohn Decl., Ex. G).[6] In particular, Chertoff said "…if you're trying to sift through an enormous amount of data very quickly, I think it [obtaining a FISA warrant] would be impractical;" getting an ordinary FISA warrant is "a voluminous, time-consuming process" and "if you're culling through literally thousands of phone numbers… you could wind up with a huge problem managing the amount of paper you'd have to generate." *Id.*

Senator Bill Frist, in an interview aired on CNN on May 14, 2006, also indicated knowledge about the call data records program. (*Hepting* Dkt. 182, Markman Decl., Ex. 3). When asked by reporter Wolf Blitzer if Senator Frist knew about the NSA's collecting "of call records of tens of millions of Americans using data provided by AT&T," Frist replied "Absolutely. Absolutely. I am one of the people who are briefed. I've known about the program. I am absolutely convinced that you, your family, our families are safer because of this particular program. I absolutely know that it is legal." *Id.* While plaintiffs respectfully disagree with the Senator on the program's legality, the statement unequivocally confirms the existence of the call records program.

Senator Pat Roberts, the chair of Senate Intelligence Committee, also described the call

[6] Reprinted at <http://www.reporter-times.com/?module=displaystory&story_id=30032&format=html>.

records portion of the program on NPR. When asked about whether he had been briefed that the NSA had collected millions of phone records for domestic calls, Roberts stated: "Well, basically, if you want to get into that, we're talking about business records. We're not, you know, we're not listening to anybody. This isn't a situation where if I call you, you call me, or if I call home or whatever, that that conversation is being listened to." *Senate Intelligence Chair Readies For Hayden Hearings*, NPR All Things Considered (May 17, 2006) (*Campbell v. AT&T,* C-06-03596-VRW, Dkt. 17-5, Plaintiffs' Request for Judicial Notice in Support of Motion for Remand, Ex. D).[7] In addition, Senator Christopher "Kit" Bond, who, as a member of the Senate Intelligence Committee, has confirmed his receipt of access to information on warrantless surveillance operations, has publicly made a statement that indicates that the call data records collection efforts of the NSA are not separate from the NSA's warrantless surveillance program admitted by the President. He explained on PBS that "[t]he president's program uses information collected from phone companies . . . what telephone number called what other telephone number." *NSA Wire Tapping Program Revealed*, PBS Online NewsHour (May 11, 2006) (*Campbell* Dkt. 17-7, Plaintiffs' Request for Judicial Notice, Ex. F).[8]

In late May, noted journalist Seymour Hersh reported that a "security consultant working with a major telecommunications carrier told me that his client set up a top-secret high-speed circuit between its main computer complex and Quantico, Virginia, the site of a government-intelligence computer center. This link provided direct access to the carrier's network core—the critical area of its system, where all its data are stored. 'What the companies are doing is worse than turning over records,' the consultant said. 'They're providing total access to all the data.'" Seymour Hersh, *National Security Dept. Listening In*, The New Yorker (May 29, 2006) (*Campbell* Dkt. 17-4, Plaintiffs' Request for Judicial Notice, Ex. C).[9]

In late June, the press reported that two former AT&T employees had revealed that at AT&T's Bridgton technical command center in St. Louis, "AT&T has maintained a secret, highly secured room since 2002 where government work is being conducted" and that "only government

[7] Available at <http://www.npr.org/templates/story/story.php?storyId=5412153>.
[8] Transcript available at <http://www.pbs.org/newshour/bb/law/jan-june06/nsa_05-11.html>.
[9] Available at <http://www.newyorker.com/talk/content/articles/060529ta_talk_hersh>.

officials or AT&T employees with top-secret security clearance are admitted to the room." *See* Kim Zetter, *Is the NSA spying on U.S. Internet traffic?,* Salon Magazine (June 21, 2006) (Decl. of Cindy Cohn in Support of Opp. to Motion to Stay, Ex. 1).[10]

Subsequent to the hearing, James Cicconi, AT&T's senior executive vice president for external and legislative affairs, said, on August 22, that there are "very specific federal statutes that prescribe means, in black and white law, for provision of information to the government under certain circumstances. . . . We have stringently complied with those laws." As Cicconi said, "[i]t's pretty obvious, you know, as far as the court case is going, that they've not reached a different conclusion." *See* Declan McCullagh, *AT&T Says Cooperation with NSA Could Be Legal*, CNET News (August 22, 2006) (Decl. of Cindy Cohn, Ex. 2).[11] Again, this statement is nonsensical unless AT&T is participating in the program.

When the Court considers these articles (in addition to the statements of the government and the carriers already considered), it becomes all the more clear that the plaintiffs are suffering irreparable harm from the ongoing surveillance program, and therefore the balance of harm tips sharply in plaintiffs' favor.[12]

2. The Government and the Defendants Do Not Yet Face the Purported Harm

The movants do not and cannot meet their burden of showing an even minimal amount of harm because any alleged harm from plaintiffs' potential discovery demands is not ripe. Indeed, because of the normal discovery and motion to compel processes under the Federal Rules of Civil Procedure, any purported harm from the disclosure of information will only occur after (1) discovery is issued (and non-controversial information is produced); (2) the government and

---

[10] Available at <http://www.salon.com/news/feature/2006/06/21/att_nsa/index_np.html>.

[11] Available at <http://news.com.com/at38t+says+cooperation+with+NSA+could+be+legal/2100-1030_3-6108386.html>.

[12] In addition to the overwhelming evidence in news reports, now that the *Al-Haramain* case is consolidated into this MDL proceeding, the Court is entitled to examine the "Sealed Document" filed in the *Al-Haramain* District of Oregon proceeding. "According to plaintiffs, the document shows that their communications were intercepted under the Surveillance Program....," *Al-Haramain*, 451 F.Supp.2d at 1221, and the "plaintiffs know from the Sealed Document whether their communications were intercepted." *Id.* at 1226. The Sealed Document not only shows whether the *Al-Haramain* plaintiffs were surveilled, but this document may also evidence that the *Al-Haramain* plaintiffs' telecommunications providers were indeed participating in the warrantless dragnet surveillance program.

carriers raise whatever objection(s) they believe apply; (3) the plaintiffs move to compel; and, finally, (4) the court rules in plaintiffs' favor.

"Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction," nor, under the preliminary injunction standard, a stay pending appeal. *Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citing *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984)); *see also Chalk v. U.S. Dist. Court Cent. Dist. of California*, 840 F.2d 701, 710 (9th Cir. 1988) (finding that the defendant's asserted "theoretical risk is insufficient to overcome plaintiff's probability of success on the merits, and it is likewise insufficient to outweigh the injury which plaintiff is likely to suffer.").

Other circuits agree that speculative harm is insufficient. *See Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991) ("the harm alleged must be both certain and immediate, rather than speculative or theoretical"); *Wisconsin Gas Co. v. Federal Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C.Cir. 1985) ("[T]he injury must be both certain and great; it must be actual and not theoretical. Injunctive relief 'will not be granted against something merely feared as liable to occur at some indefinite time,' *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931); the party seeking injunctive relief must show that '[t]he injury complained of [is] of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm.' *Ashland Oil, Inc. v. FTC*, 409 F.Supp. 297, 307 (D.D.C. 1976), *aff'd*, 548 F.2d 977 (D.C.Cir. 1976).").

Accordingly, even assuming that disclosure might create harm, that harm would not occur at the moment when plaintiffs first seek the information. It would, at most, occur only after the government lost a motion to compel. Beginning these often lengthy discovery processes now, rather than waiting until after the Ninth Circuit rules, can both narrow and sharpen these debates and focus both the parties and the Court on the specific information that is both required by the plaintiffs and claimed to be protected by the state secrets privilege by the government. Along the way, the Court and the parties can weed out and decide the foreseeable disputes based on claims of trade secrecy (as has occurred in the case of the Klein evidence), and other non-state secret

privileges and objections made by the carriers or the government.

The cases cited by the government do not hold to the contrary. Gov't Motion to Stay at 17-18. Neither *U.S. v. Griffin*, 440 F.3d 1138 (9th Cir. 2006), nor *Sterling v. Tenet*, 416 F.3d 338 (4th Cir. 2005), addressed a motion to stay a case in its entirety, nor considered whether the harm from disclosure was ripe prior to any disclosure. *See U.S. v. Griffin*, 440 F.3d at 1142 ("Griffin has shown a 'real possibility' that he will be irreparably harmed *by the disclosure* of these letters …" (emphasis added))

A secondary harm the carriers assert is that it would be "wasteful and ill-advised" to deny them the stay. AT&T Joinder at 12 (MDL-1791 Dkt. 100-1). Yet in doing so they ignore the ongoing harm suffered by plaintiffs, whose communications are subjected to continuing illegal surveillance. They also ignore the judicial economy that will be promoted by taking steps during the pendency of the Ninth Circuit appeal that will ensure that the case can move along quickly and smoothly once the appeal is complete.[13]

3. The Procedure Of Section 1806(f) Can Be Used Where Necessary To Allow the Case to Proceed While Preventing Any Possible Irreparable Harm.

For those instances in which the government asserts the state secrets privilege, Congress has established mechanisms by which the necessary disclosures may be made while avoiding harm to the government. *See generally* Plaintiffs' Opp. to Gov't Motion to Dismiss at 21-24 (*Hepting* Dkt. 181). 50 U.S.C § 1806(f), Congress has directly spoken to the question of access to evidence concerning electronic surveillance activity where the legality of the surveillance program is at issue—and it has spoken in favor of ***granting*** access to such evidence so that cases challenging the legality of surveillance may be decided on the merits. As the statute makes clear, these procedures apply even when the government believes that the disclosure would harm national security. The law provides:

[13] AT&T's example of *Doe v. Tenet*, No. 2:99-cv-01597-RSL (W.D. Wash. Mar. 14, 2001) is unintentionally instructive. AT&T Joinder at 10:5-16. The stay in that case lasted for four years. In *Tenet,* only money damages for breaches of an individual's employment contract were at stake. Here, the claims that the government seeks to block are not private tort or contract claims for past injury, but claims of ongoing constitutional and statutory violations of the highest order. A similar four-year delay in this case would mean that millions of telephone calls and emails by ordinary Americans will be illegally surveilled for the next four years.

> Whenever any motion or request is made by an aggrieved person ... to discover or obtain applications or orders or other materials relating to electronic surveillance ... the United States district court ... *shall*, *notwithstanding any other law*, if the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States, review in camera and *ex parte* the application, order, and *such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted*.

50 U.S.C. § 1806(f) (emphasis added). Thus, upon a request by the plaintiffs for discovery, the Court "shall" obtain and review the relevant materials relating to the electronic surveillance "as may be necessary to determine whether the surveillance was lawfully authorized and conducted." Moreover, in addition to providing a procedure by which the Court may determine the legality of the surveillance that plaintiffs challenge, Congress also provided a mechanism for disclosure of information to plaintiffs:

> In making this determination [of the legality of the surveillance], the court *may disclose to the aggrieved person*, under appropriate security procedures and protective orders, portions of the application, order, or *other materials relating to the surveillance* only where such disclosure is necessary to make an *accurate determination of the legality of the surveillance*.

*Id.* (emphasis added).

Through this provision, Congress enacted a discovery procedure that is to be followed "*notwithstanding any other law*"—including the common law state secrets privilege. In the area of electronic surveillance, by enacting section 1806(f) Congress thus has narrowed the common law state secrets privilege by a statute that "speaks directly to the question otherwise answered by federal common law." *Kasza v Browner*, 133 F.3d 1159, 1167 (internal quotation marks, citations, and brackets omitted); *see also id.* ("the state secrets privilege is an evidentiary privilege rooted in federal common law."); *Al-Haramain Islamic Found. Inc. v. Bush,* 451 F.Supp.2d 1215, 1231 (D. Or. 2006). The Conference Report for the statute enacting section 1806(f) noted that "the conferees also agree that the standard for disclosure in the Senate bill adequately protects the rights of the aggrieved person, and that the provision for security measures and protective orders ensures adequate protection of national security interests." H.R. Conf. Rep. No. 95-1720, 1978 U.S.C.C.A.N. 4048, 4061 (Oct. 5, 1978); *see also* S. Rep. No. 95-701, 1978 U.S.C.C.A.N.

3973,4032-33 (Mar. 14, 1978) (calling section 1806(f) "a reasonable balance between an entirely in camera proceeding ... and mandatory disclosure, which might occasionally result in the wholesale revelation of sensitive foreign intelligence information.").[14]

Further demonstrating its intent, Congress enacted two other surveillance disclosure provisions that parallel section 1806(f), and require disclosure under protections similar to section 1806(f) of information relating to physical searches under FISA and information relating to the use of pen registers and trap-and-trace devices when disclosure is necessary to determine the legality of those activities. 50 U.S.C. §§ 1825(g) (physical searches); 1845(f) (pen registers and trap-and-trace devices). These provisions demonstrate Congress's specific intent that the government not be permitted merely to declare surveillance to be a "state secret" and thereby eliminate the possibility of judicial review.

Where the alleged secret in some way implicates the legality of the surveillance, the Court is empowered by section 1806(f) to review and to direct disclosure of the classified material—subject to appropriate safeguards. Any other result would indeed render FISA's private rights of action "completely illusory, existing only at the mercy of government officials." *Halpern v. United States*, 258 F.2d 36, 43 (2nd Cir. 1958).[15] By affirmatively enacting the statutory scheme of

[14] The disclosure provisions of section 1806(f) apply to all electronic surveillance, not just the foreign intelligence surveillance that is the focus of FISA. Not only does section 1806(f) describe what may be disclosed (i.e., the application, the order, and whatever other materials are necessary to determine the legality of the surveillance), but it also details *when* that disclosure is possible.

[15] In the November 7, 2006 Joint Case Management Statement, the government and the carriers argued that "[i]n *Clift v. United States*, 597 F.2d 826, 829 (2d Cir. 1979), the Second Circuit revisited *Halpern* and rejected the notion that statutory law superseded the state secrets privilege and that *in camera* proceedings involving the governments state secrets privilege assertion could proceed." (MDL-1791 Dkt. 61 at 32 n.20). This argument lacks merit.

First, *Clift* is not a section 1806(f) case and does not speak to Congress's intent in enacting section 1806(f). In the statute at issue in *Clift*, the Invention Secrecy Act, Congress had provided no mechanism for judicial disclosure, unlike Congress's deliberate decision in section 1806(f) to provide such a mechanism. Contrary to the government's statement (MDL-1791 Dkt. 61 at 32 n.20), there was no "statutory *in camera* process" under the Invention Secrecy Act. Nonetheless, the *Clift* court noted that by creating a cause of action "'Congress must have . . . implicitly empowered the district court to tailor the procedure within reasonable limits to meet individual situations' " and held that "[i]t would seem quite possible to have an *in camera* production in this case in a secured area at Fort Meade [i.e., NSA headquarters], where the documents are." *Clift*, 579 F.2d at 829 n.2. The *Clift* court noted, however, that "*[i]n camera* discovery would do no good unless any favorable results could be communicated to Mr. Clift." *Id.* at 829. Although the Invention Secrecy Act lacked such a mechanism, section 1806(f) by contrast provides just such a mechanism. Second, *Clift* did not purport to modify or overrule *Halpern*., or to suggest in any way that Congress lacks the constitutional power to establish a state secrets discovery mechanism like

section 1806(f), Congress reduced any residual Presidential authority under the state secrets privilege to its "lowest ebb." H.R. Conf. Rep. 95-1720 (1978) at 35, reprinted in 1978 U.S.C.C.A.N. 4048, 4064 (quoting *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635 (1952) (Jackson, J., concurring)).

Section 1806(f) broadly applies "*whenever* any motion or request is made … [1] to discover or obtain applications or orders or other materials relating to *electronic surveillance* or [2] to discover, obtain, or suppress evidence or information obtained or derived from *electronic surveillance under this Act [i.e., FISA]. . . .*" 50 U.S.C. § 1806(f) (emphasis added). The limitation "under this Act" only applies to the last antecedent "electronic surveillance." *See Anhydrides & Chemicals, Inc. v. United States*, 130 F.3d 1481, 1483 (Fed. Cir. 1997) ("Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent, which consists of the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence"). Thus, Congress adopted two clauses, one for "electronic surveillance" generally and the other for "electronic surveillance under this Act." This plain language interpretation is consistent with the reason why Congress enacted section 1806(f): to permit the courts to assess the legality of particular electronic surveillance, an important component of which is whether the surveillance complies with FISA. Accordingly, section 1806(f) applies to electronic surveillance, whether that surveillance is within the scope of FISA or not.

Moreover, section 1806(f) applies to civil cases like those before this Court. One of the three events that can trigger a disclosure is a civil motion to compel—demonstrating that section 1806(f) is not limited to surveillance conducted under warrants issued under FISA. 50 U.S.C.

---

section 1806(f). Indeed, the holding of *Clift* was that the district court had erroneously ignored the rule of *Halpern* and had erroneously dismissed the action on state secret and *Totten* grounds and that instead the action should go forward.

Moreover, the Ninth Circuit has concluded that Congress may limit the state secret privilege. In the *Kasza* decision, the Ninth Circuit considered whether the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. § 6001, preempts the common law state secrets privilege. *Kasza*, 133 F.3d at 1167. Far from determining that Congress lacks the constitutional power to limit the state secrets privilege, the Court engaged in a searching analysis of the statutory scheme of the RCRA to assess its implications for the state secrets privilege. Ultimately, the Court held that the environmental statute did not speak to the common law state secrets privilege and Congress had not intended to modify the privilege. RCRA, of course, contains no provision similar to section 1806(f). *See also Tenet v. Doe*, 544 U.S. 1, 11 (2005) (Stevens, J., concurring) ("Congress can modify the federal common-law rule announced in *Totten*") .

§ 1806(f). The legislative history confirms that section 1806(f) applies with equal force in civil proceedings: "The conferees agree that an *in camera* and *ex parte* proceeding is appropriate for determining the lawfulness of electronic surveillance in both criminal and civil cases." H.R. Conf. Rep. No. 95-1720, 1978 U.S.C.C.A.N. 4048, 4061 (Oct. 5, 1978).

Thus, the government's assertion that section 1806(f) is "not applicable" is unavailing. Joint Case Management Statement at 32 (MDL-1791 Dkt. 61). As the *Al-Haramain* court noted, "[t]o accept the government's argument that Section 1806(f) is only applicable when the government intends to use information against a party would nullify FISA's private remedy and would be contrary to the plain language of Section 1806(f)." *Al-Haramain,* 451 F.Supp.2d at 1231 (ultimately the court found it unnecessary to reach the question of whether section 1806(f) modifies the state secrets privilege).

The decision in *ACLU Found. of S. Cal. v. Barr*, 952 F.2d 457, 462 (D.C. Cir. 1991), on which the government relies, does not hold otherwise. In that case, the D.C. Circuit noted that "[t]he court conducting a § 1806(f) review may disclose to the 'aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance only where such disclosure is necessary to make an accurate determination of the legality of the surveillance.'" *Id.* at 463. The court only held that the particular facts of the individual case supported the conclusion that disclosure to the aggrieved person was not necessary.[16] Similarly, the final case cited by the government in the Joint Case Management Statement, *In re Grand Jury Investigation*, 431 F. Supp. 2d 584, 591-92 (E.D. Va. 2006), also concerns notice under FISA, and makes no mention of section 1806(f) whatsoever.

Accordingly, any information that the government asserts is secret and will cause harm if disclosed may initially be filed with the Court pursuant to section 1806(f) and kept securely by the Court. While we have no doubt that the Court is capable of holding this information securely, it can also be kept in the government's San Francisco Sensitive Compartmented Information Facility.

---

[16] Nor is *ACLU v. Barr*'s footnote 13 controlling: that footnote references only FISA's notice provision, 50 U.S.C. § 1806(j), not the disclosure provisions of 1806(f).

**D. <u>The Movants Are Not Likely to Succeed on the Merits of Their Appeals.</u>**

Because the movants have failed to meet the "minimum showing" of a threat of an immediate irreparable injury, this Court "need not decide whether [movants are] likely to succeed on the merits." *Oakland Tribune v. Chronicle Pub'l Co.*, 762 F.2d at 1376.; *Lopez*, 713 F.2d at 1435. Even if the Court did consider the likelihood of success, however, the movants are not likely to overturn this Court's decision.

The majority of the government's brief simply rehashes the same arguments the government raised and lost in its motion to dismiss. They are no more likely to succeed now than they were then. Instead of accepting their invitation to re-argue the motion to dismiss in full a second time, plaintiffs will focus on the developments since this Court's decision. First, the only changes to the legal landscape provide additional support for this Court's decision, and, second, the fact that the telecoms are helping the government in the NSA spying program is likely to become even more obvious as Congress begins to hold hearings on domestic surveillance.

1. <u>Courts Continue to Reject the Government's State Secret Arguments</u>

In addition to this Court's order, three other courts have rejected the arguments upon which the government relies. *ACLU v. NSA,* 438 F.Supp.2d 754*, Al-Haramain*, 451 F.Supp.2d 1215, and *Terkel v. AT&T Corp.,* 441 F.Supp.2d 899 (N.D. Ill. 2006), have rejected the state secrets privilege arguments in the government's motions to dismiss, and have embraced this Court's analysis.

In *ACLU v. NSA,* the Eastern District of Michigan followed the analysis of this Court, by which "'in determining whether a factual statement is a secret, the court considers only public admissions or denials by the government.'" *ACLU v. NSA*, 438 F.Supp.2d at 764 (quoting *Hepting*). The court subsequently rejected the very arguments the government advanced in its motion to dismiss and advances once again in its stay motion, holding that the state secret privilege did not bar the "claims challenging the validity of the [Terrorist Surveillance Program], since Plaintiffs are not relying on or requesting any classified information to support these claims and Defendants do not need any classified information to mount a defense against these claims." *Id.* at 766.

Likewise, in *Al-Haramain*, the government asserted the same state secrets privilege arguments, which the District of Oregon rejected, holding that "the existence of the Surveillance Program is not a secret, the subjects of the program are not a secret, and the general method of the program—including that it is warrantless—is not a secret." *Al-Haramain*, 451 F.Supp.2d at 1222. In analyzing whether the information at issue was a secret, the court relied upon this Court's ruling in *Hepting*. *Id.*

In *Terkel*, originally only a communications records case, the Northern Illinois district court denied the motion to dismiss filed by defendant AT&T, but distinguished *Hepting* and granted the motion to dismiss, with leave to amend, filed by the intervenor United States. *See Terkel*, 441 F.Supp.2d at 920. The court held that the government's assertion of the state secrets privilege was a bar to the plaintiffs obtaining the discovery they required to prove standing for prospective injunctive relief on their records claim. *Id*. at 901. While the result was different from *Hepting*, the court nevertheless agreed with the *Hepting* analysis, distinguishing the *Terkel* records claim from the content surveillance alleged in *Hepting*.[17]

Since the three courts that considered the *Hepting* decision have applied its analysis and supported its conclusion, the probability of the government's success on the merits on the same argument has only diminished since it last briefed these issues.

2. <u>Congressional Hearings May Confirm that the Defendants Participated in the Governments Massive Warrantless Surveillance Program</u>

The 110th Congress is now in session and has repeatedly promised to undertake investigations of the government's domestic surveillance program. In addition to the previous statements in the record from fully-informed Members of Congress that confirm the existence of a call detail record database, there now will likely be hearings and testimony that will make the conclusion that the telecommunications industry is participating in the program inescapable. To the extent that these hearing reveal additional public facts about the nature of the program, they

[17] On July 31, 2006, the *Terkel* plaintiffs filed a Motion for Reconsideration or Clarification, arguing, *inter alia*, that the Court should clarify that the dismissal of the records claim was without prejudice. On August 3, 2006, the district court granted the *Terkel* plaintiffs motion for clarification, advising that the dismissal was without prejudice and that the Court was going to allow *Terkel* plaintiffs to continue to include their records claim in their Second Amended Complaint.

will both increase the likelihood that this Court's decision in *Hepting* will be sustained and further inform this Court in its application of the state secrets doctrine going forward. To stay the proceeding of this action in advance of the revelation of these facts would further impede the prompt adjudication of issues this Court may rightfully determine.

While new hearings are not part of the record on appeal, the Ninth Circuit is entitled to take judicial notice pursuant to Federal Rule of Evidence 201, and this Court may consider the likelihood of whether such additional revelations will moot the appeals by making the supposed secrets not actually secret. *See Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2003) ("Consideration of new facts may even be mandatory, for example, when developments render a controversy moot…" (citing *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n. 23 (1997)).

3. <u>The Government's Assertion of a Privilege Prohibiting Any Decision By This Court Should Be Put to Rest</u>

The government asserts in its motion to stay, as it has in other briefs, the preposterous notion that the common law state secret privilege prevents this Court from rendering a decision on the legality of the government's surveillance program. Gov't Motion at 19:23-26. The core of this government argument is that even if this Court were to find the warrantless wiretapping program illegal and unconstitutional, this Court would nevertheless be powerless to render a decision because, by issuing such an opinion, it would implicitly confirm the existence of the program. The government provides no caselaw in support of this claim, for there is none. To the contrary, it has been established from the earliest days that the judiciary, as a co-equal branch, has and must have the power to pass upon the legality of executive action, and has the duty to do so when the issue is presented to it in a case or controversy. *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is").

The Supreme Court recently reaffirmed the continuing vitality of the judiciary as a co-equal branch of government that must stand ready to adjudicate individual rights notwithstanding assertions regarding national security. In *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), the habeas petitioner Hamdi was a citizen captured with enemy forces on a foreign field of battle and held as

an "enemy combatant" without trial or charges in executive detention in the United States. The executive asserted that the Article III court could not exercise its habeas jurisdiction to adjudicate the factual basis of Hamdi's detention, *i.e.*, whether he was in fact an enemy combatant. The executive contended this fact was nonjusticiable and was exclusively within the power of the executive to determine, just as the executive claims here that Plaintiffs' constitutional challenge to the alleged massive, warrantless executive searches and seizures is nonjusticiable.

In *Hamdi*, the Court rejected the notion that the executive's national security powers can restrict the scope of constitutional liberties or negate the power of the judiciary to adjudicate claims by citizens for invasions of those liberties. The four-justice plurality held that "we necessarily reject the government's assertion that separation of powers principles mandate a heavily circumscribed role for the courts in such circumstances." *Hamdi*, 542 U.S. at 535. It noted that the claim of executive supremacy, no different than the one made by the government here,

> cannot be mandated by any reasonable view of separation of powers, as this approach serves only to *condense* power into a single branch of government. We have long since made clear that a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens. *Youngstown Sheet & Tube*, 343 U.S., at 587. Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, *it most assuredly envisions a role for all three branches when individual liberties are at stake*.

*Hamdi*, 542 U.S. at 535-36 (plur. opn.) (first emphasis original, second emphasis added); *accord*, *Webster v. Doe*, 486 U.S. 592 (1988) (a "'serious constitutional question' ... would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim"). Four other Justices were even more emphatic in their rejection of the executive's assertion that the courts were powerless to adjudicate the factual basis of Hamdi's constitutionally-created habeas corpus claim. *Id*. at 553 (conc. opn. of Souter, J.), 576 (dis. opn. of Scalia, J.).

"[I]t would turn our system of checks and balances on its head to suggest that a citizen could not make his way to court with a challenge to the factual basis for his detention by his government, simply because the Executive opposes making available such a challenge." *Hamdi*, 542 U.S. at 536-37 (plur. opn.). So, too, here, it would turn our constitutional system on its head to hold that Plaintiffs were barred from offering proof that the telecommunications companies and the

government were violating the Fourth Amendment by their program of warrantless, suspicionless mass searches and seizures under color of law, or barred from seeking relief for those violations "simply because the Executive opposes making available such a challenge."[18] *Id.*

Finally, to the extent the government is arguing that the state secrets privilege prevents the Court from deciding the merits of plaintiffs' claims or from proceeding forward with discovery or other litigation activities because the very subject matter of plaintiffs' claims is a state secret, the Court has already rejected that argument. "[T]he very subject matter of this action is hardly a secret." *Hepting,* 439 F.Supp.2d at 994.

### E. Significant Steps Can and Should Be Taken While Awaiting the Ninth Circuit's *Hepting* Decision.

As discussed above, the movants have failed to meet their burden of showing concrete and irreparable harm and are not likely to succeed on the merits of their appeal. To the contrary, this Court has many tools available to it to prevent any harmful disclosure while undertaking a step-by-step methodical approach to advancing the litigation. As discussed in detail below, there are many steps that can be taken that have no possible connection to state secrets, and even as to issues where a potential state secrets issue could lie, this Court can do much in the coming months to separate potentially harmful disclosures from information that bears no threat to the governments' interests, and to narrowly and specifically articulate the remaining disputes.

#### 1. Discovery that Does Not Implicate the State Secret Privilege Can Advance The Litigation Without Harming the Movants' Interests

In *Hepting,* two categories of steps can be taken: matters that have no relationship to the states secrets privilege and matters which may have some relationship to the privilege in the future

---

[18] The Supreme Court recently reiterated that litigation is strongly protected against government interference, not only on First Amendment grounds but also to protect the integrity of judicial review. *See generally Legal Services Corp. v. Velazquez*, 531 U.S. 533, 542, 545-550 (2001) (holding that publicly funded legal services attorneys' representation of indigent clients was "private speech"). Courts depend on attorneys' freedom to speak in litigation "for the proper exercise of the judicial power." *Id.* at 545-46. The government is "seeking to prohibit the analysis of certain legal issues and to truncate presentation to the courts," which is "inconsistent with the proposition that attorneys should present all the reasonable and well-grounded arguments necessary for proper resolution of the case." *Id.* at 545. The courts "must be vigilant" when the government seeks in effect to insulate its own conduct "from legitimate judicial challenge." *Id.* at 548.

but require development before those issues will be ripe. The first category is information that does not implicate the state secrets privilege. Production of this information in the interim, including allowing the government and carriers to raise all proper non-state secrets objections, will allow both the Court and the parties to act more quickly once the Ninth Circuit has ruled.

*(a) Public Statements by Government and Carriers.*

The first and most obvious category of information that has no relationship to the state secret privilege is information that is admittedly not secret: public statements by the government and the carriers. In response to this request, which the *Hepting* plaintiffs have been making since August 2006, the government asserts a novel theory that even discovery of public statements by them and the carrier defendants is somehow barred by the state secrets privilege, apparently because that discovery would show that certain information is not secret and thereby undermine the government's argument.[19]

This claim—that even information that is admittedly public cannot be produced in this litigation because it is still somehow secret—has no basis in the law, and should not be given any weight. The state secrets privilege does not bar from the courtroom information that already is in the public domain. *See Spock v. United States*, 464 F. Supp. 510, 518 (S.D.N.Y. 1978). In *Spock*, the plaintiff sued the government for unlawful interception of his oral, wire, telephone and telegraph communications. *Id.* at 512. Just as it does here, the government in *Spock* argued that the case had to be dismissed because "defendants can neither admit nor deny the allegations of the complaint without disclosing state secrets." *Id.* at 519. The plaintiffs countered that "[t]his one factual admission or denial ... reveals no important state secret, particularly since the interception of Dr. Spock's communications was previously disclosed in an article in the *Washington Post*, dated October 13, 1975." *Id.* The court agreed with plaintiffs and declined to dismiss the case:

> Here, where the only disclosure in issue is the admission or denial of the allegation that interception of communications occurred, an allegation which has already

[19] The government attempts to bolster this argument by noting that the telecommunications defendants cannot waive the state secrets privilege. This is beside the point – the question is not whether the carriers have waived, it is whether the information is secret. Under the government's view, the carriers could confess their interception activities during televised testimony before Congress and the court would still need to pretend it's a secret.

> received widespread publicity, the abrogation of the plaintiff's right of access to the courts would undermine our country's historic commitment to the rule of law.

*Id.* at 520; *see also Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303, 1306 (1983) (noting Court has not "permitted restrictions on the publication of information that would have been available to any member of the public"); *McGehee v. Casey*, 718 F.2d 1137, 1141 (D.C. Cir. 1983) (noting "[t]he government has no legitimate interest in censoring unclassified materials" or "information ... derive[d] from public sources"); *In re Grand Jury Subpoena Dated Aug. 9, 2000*, 218 F. Supp. 2d 544, 560 (S.D.N.Y. 2002) ("[T]he contours of the privilege for state secrets are narrow, and have been so defined in accord with uniquely American concerns for democracy, openness, and separations of powers."); *Kasza v. Browner*, 133 F3d at 1166 ("The plaintiff's case then goes forward based on evidence not covered by the privilege.")

As plaintiffs detailed in their portion of the Case Management Conference Statement (MDL-1791 Dkt. 71 at 40:22-43:9), the specific categories of information requested that are already public include:

1) Public statements by the United States, government officials, carriers, or their spokespersons or agents regarding any warrantless interceptions of communications or disclosure of communications records held or maintained by any telecommunications carrier or their agents, as well as all non-privileged internal documents concerning those statements.
2) The testimony of AT&T's Chief Executive Officer Edward Whiteacre on or about June 22, 2006, before the Senate Judiciary Committee, and any non-privileged preparatory materials.
3) Defendants' responses to the investigations undertaken by public utility commissions nationwide, as well as the responses of other telecommunications providers, and any non-privileged drafts or preparatory materials.
4) Any statements by defendants or other telecommunications carriers or their agents to the Securities and Exchange Commission regarding warrantless interceptions of communications or disclosure of communications records, and any non-privileged drafts or preparatory materials.

5) Any waivers or other correspondence from the Director of National Intelligence or his agents in reliance on the authority granted by the President in FR Doc. 06-4538, 71 Fed. Reg. 27943 (May 12, 2006) and sent to private telecommunications companies exempting them from SEC reporting requirements.
6) Responses by defendants and third-party telecommunications providers or their agents to congressional inquiries, or inquiries by others including their own customers, concerning warrantless interceptions of communications or disclosure of communications records, and any non-privileged drafts or preparatory materials.

*(b) Discovery of Network Architecture.*

A second category of information that bears no relationship to the government's state secret privilege is information related to the network architecture of the carriers. This technical information, likely known to many carrier employees, is not and cannot credibly be claimed to be a state secret. The information is needed by plaintiffs to demonstrate the size of the class and to begin to determine class membership. It will also assist in further factual development of their claims. As with the public statements, this information has been already requested by the *Hepting* plaintiffs in the requested discovery for their Motion for Preliminary Injunction filed in April 2006.

In response, the government claims that the information is protected by the state secret privilege because its "purpose" is to "confirm whether classified intelligence NSA activities are occurring through AT&T." (Gov't Motion to Stay at 21:3-10). Yet the relevant inquiry under the state secrets privilege is whether the information sought is or is not a state secret, not the "purpose" for which the information is sought by plaintiffs. Under the government's argument even the most obviously discoverable information—the name of the CEO of AT&T, for instance—would be declared a state secret if plaintiffs' purpose in seeking it was to pursue their claims. To the contrary, "[t]he state secrets privilege is a common law evidentiary privilege that allows the government to deny discovery of *military secrets*." *Kasza*, 133 F.3d at 1165 (emphasis added). If this Court does determine that the privilege applies to a particular piece of evidence, "[t]he plaintiff's case then goes forward based on *evidence not covered by the privilege*." *Id*. at 1166 (emphasis added); *see also Ellsberg v. Mitchell,* 709 F.2d 51, 57 (D.C. Cir. 1983) ("[w]henever

possible, sensitive information must be disentangled from nonsensitive information to allow for the release of the latter.")

Not surprisingly, the government cites no authority embracing such an overbroad application of the state secrets privilege and presents no declaration from a properly charged governmental official as would be required for them to even begin to make such a claim. *See U.S. v. Reynolds,* 345 U.S. 1, 7-8 (1953) (state secrets privilege must be asserted by head of department which has control over issue).

The categories of information in this request include:

1) Discovery into the AT&T network aimed at confirming which communications travel through the San Francisco facility as well as similar facilities referenced in Mr. Klein's declaration and supporting materials and communications, and in the media.
2) Discovery as to how information is routed by defendants and third-party telecommunications providers or their agents, which networks are shared by the defendants and third-party telecommunications providers or their agents, and what information is sent over these networks.
3) Discovery into which defendants, if any, have or had access to other defendants' communications records, and which non-party companies have or had access to defendants' communications records for purposes of providing billing, customer management or other services to defendants.

*(c) Written Discovery As To The Proper Entities To Be Named As Defendants.*

This category was not addressed by either the government or the carriers, but is also not related to the state secrets privilege. While the parties have been holding informal discussions aimed at ensuring that the proper entities are named as defendants, if they cannot agree plaintiffs should be allowed to issue written discovery in order to clarify defendants' often changing and Byzantine corporate structures.

*(d) Discovery Raised By Any Defenses Raised In Defendants' Answers That Do Not Implicate The Government's State Secrets Claims.*

Finally, to the extent that defendants wish to assert non-state secrets defenses, defendants

should be required to assert those defenses (see Section III(E)(2)(a) below) and plaintiffs should be allowed to conduct discovery into them.

2. <u>To Increase Judicial Economy, the Court Can Tee Up Likely Future Disputes Over the Application of the State Secrets Privilege to Specific Discovery.</u>

There is a second category of actions that the Court can take: actions that do not squarely raise the state secrets privilege, but that nonetheless may reasonably trigger an invocation of the privilege by the government that requires the Court's consideration. As the Court explained, "[a]fter discovery begins, the court will determine step-by-step whether the privileges prevent plaintiffs from discovering particular evidence." *Hepting*, 439 F.Supp.2d at 998. While the Ninth Circuit appeal is pending, this court can take steps to "tee up" these currently speculative disputes about the state secrets privilege so that they can be more quickly disposed of once the Ninth Circuit rules. Congress has already provided a tool in section 1806(f) that can be of great assistance to this Court in handling these disputes.

*(a) AT&T Can And Should File Its Answer in Hepting*

AT&T should be compelled to file its Answer to the Complaint in *Hepting*. The Court has already held that information about a certification concerning the interception of communications "would be revealed only at the same level of generality as the government's public disclosures, [and that] permitting this discovery should not reveal any new information on the NSA's activities or its intelligence sources or methods, assuming that the government has been truthful." *Hepting*, 439 F.Supp.2d at 997. This Court has also held that "the very subject matter of this action is not a 'secret.'" *Id.* at 994. Given these findings, AT&T's claims that it cannot provide any portion of its Answer without disclosing state secrets is unwarranted. *Id.* at 996-997 ("[t]he court envisions that AT&T could confirm or deny the existence of a certification authorizing monitoring of communication content through a combination of responses to interrogatories and in camera review by the court").

Even if some portions of the Answer might raise states secrets concerns, the correct response is not to dispense with any response, but instead to follow the Congressionally created processes provided in section 1806(f) for determining the legality of electronic surveillance

activities claimed to be secret. *See Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d 1236, 1238 n. 3 (4th Cir. 1985) ("Often, through creativity and care, [the] unfairness caused [by assertion of the state secrets privilege] can be minimized through the use of procedures which will protect the privilege and yet allow the merits of the controversy to be decided in some form."); *Halpern*, 258 F.2d at 43; *Loral Corp. v. McDonnell Douglas Corp.*, 558 F.2d 1130 (2d Cir. 1977); *Spock v. United States*, 464 F. Supp. at 520 (endorsing creative solutions to manage state secrets privilege issues).

As the plaintiffs have noted on several occasions, since the state secrets privilege belongs to the government, *see U.S. v. Reynolds*, 345 U.S. at 7-8 (1953), AT&T may need some guidance from the government in preparing its Answer. It would seem appropriate for the government to file a brief identifying which specific paragraphs of the Complaint it would object to AT&T answering publicly pending the resolution of its appeal. *See* Joint CMC Statement (MDL-1791 Dkt. 61) at 33 (government and carriers concede that "[i]f the Court wishes to have an Answer, one could be submitted which states, where applicable, that a response to a particular paragraph would implicate the government's state secrets privilege assertion."). Upon receipt of the government's papers, AT&T should be required to immediately file the redacted version.

The concerns raised in AT&T's joinder do not obviate the need to file an answer. AT&T argues that "plaintiffs' suggestion that AT&T should file an answer, perhaps *in camera* and *ex parte*, or perhaps redacted with the 'guidance' of the government … could not produce a meaningful answer." AT&T Joinder at 8. AT&T misses the point entirely. "[I]nvocation of the privilege results in no alteration of pertinent substantive or procedural rules…." *Ellsberg*, 709 F.2d at 51. AT&T could file a full answer as provided for in the Federal Rules of Civil Procedure, complete with any affirmative defenses to which AT&T believes it is entitled, for this Court's *in camera* eyes pursuant to section 1806(f), and no state secrets would be revealed to the public.[20]

The answer, once filed, would be subject to the Court's review pursuant to section 1806(f),

[20] AT&T also suggests that, in lieu of an answer, it may file another motion to dismiss should this Court's *Hepting* decision be affirmed. AT&T Joinder at 9. Putting aside whether or not its further Rule 12 objections and defenses were waived pursuant to FRCP 12(g), even AT&T's hypothetical facts, *id.* at 13-14, do not provide the basis for a further motion to dismiss.

as discussed above, but would not present any danger of disclosing allegedly state secret information before the government had an opportunity for further briefing. And AT&T's answer would be far from meaningless: even if the answer is never fully disclosed to the public or the plaintiffs, "[a] trial *in camera* in which the privilege relating to state secrets may not be availed of by the United States is permissible, if, in the judgment of the district court, such a trial can be carried out without substantial risk that secret information will be publicly divulged." *Halpern*, 258 F.2d at 44.

*(b) AT&T Can Confirm or Deny the of the Existence of Certifications Because the Bare Fact of AT&T's Participation is Not a Secret As A Matter of Fact*

In its July 20, 2006 Order, this Court held that AT&T could be required to "confirm or deny the existence of a certification authorizing monitoring of communication content through a combination of responses to interrogatories and *in camera* review by the court." *Hepting*, 439 F.Supp.2d at 997. Pursuant to this procedure and section 1806(f), the Court may determine whether or not AT&T received a valid certification, pending appeal, with no risk to the state secrets privilege. As this Court determined in its Order, the bare fact that that AT&T assists the government in the admitted warrantless surveillance program is hardly a secret. *Hepting*, 439 F.Supp.2d at 993 ("AT&T's assistance in national security surveillance is hardly the kind of 'secret' that the *Totten* bar and the state secrets privilege were intended to protect or that a potential terrorist would fail to anticipate."); *id.* at 995 ("[I]t is not a secret for purposes of the state secrets privilege that AT&T and the government have some kind of intelligence relationship.") Rather, the only 'secret' hidden by protecting from discovery the existence or non-existence of a certification is whether the surveillance program was done with or without a particular legal defense.[21] This not a military or state secret; at best it serves to hide the government and AT&T from the embarrassment of acknowledging that the program was done without even the fig leaf of a certification. Determination of the existence of this asserted defense will substantially advance the resolution of these actions.

[21] Plaintiffs maintain that 18 U.S.C. § 2511(2)(a)(ii) does not allow for a certification that would encompasses AT&T's participation, and that therefore there can be no valid certification. However, this Court need not rule on this point for purposes of this motion.

The government has no reasonable likelihood of success in appealing this Court's determination that AT&T's participation is not a secret. To successfully appeal this Court's factual determination that AT&T's assistance is not a secret that "a potential terrorist would fail to anticipate," the government must show clear error. *Adler v. Federal Republic of Nigeria*, 107 F.3d 720, 729 (9th Cir. 1997). To find this Court's factual finding clearly erroneous, the Ninth Circuit must have a "definite and firm conviction that a mistake has been committed." *Concrete Pipe & Products v. Construction Laborers Pension*, 508 U.S. 602, 622 (1993). It is not sufficient that the Ninth Circuit might take a different view of the evidence if it were deciding the matter.

As noted in Section III.C.1(a) above, this Court may examine facts contained in news reports as evidence in determining this motion. National news reports from highly respected newspapers show that members of the very Congressional committees that the Administration has briefed on the program have publicly discussed the fact of AT&T's participation. In light of both the evidence submitted in support of the *Hepting* plaintiffs' Motion for a Preliminary Injunction and in opposition to the Motions to Dismiss (*see Hepting* Dkt. 19, 20, 184, 230, 231 and 298 and attachments thereto) and the statements of Members of Congress discussed above, this Court's determination is not clearly erroneous.

At this time, plaintiffs are not asking that the contents of any certifications, if any really do exist, be publicly disclosed. The Court can initially receive the certifications for *ex parte* and *in camera* review. This Court has demonstrated its ability to maintain the security of information already presented to it *in camera* by the government – it is no less able to do so when the information comes from AT&T. The Court may then determine whether any of that information can be turned over to plaintiffs pursuant to section 1806(f).

*(c) Other Discovery*

Finally, plaintiffs should be able to issue and tee up discovery that they have been seeking since April 2006, arising from the evidence presented by Mr. Klein (which the government has conceded is not a state secret). While the government may wish to raise the state secrets privilege as to some of the discovery requests, it will substantially narrow and clarify the issues for the Court if (1) plaintiffs are permitted to issue the discovery; (2) defendants and the government respond to it; (3)

the parties to brief any necessary motion to compel; and, if necessary, (4) the information sought by the discovery is provided to the Court under section 1806(f). The proposed discovery includes:

1) Any contracts between AT&T and the company that provided the sophisticated machinery referenced in Mr. Klein's declaration, plus all supporting materials and communications.
2) All documents regarding the San Francisco facility (and similar facilities) referenced in Mr. Klein's declaration and supporting materials and communications provided to AT&T Inc. during the due diligence portion of the merger between AT&T Corp. and AT&T Inc.
3) All versions and drafts of the documents attached to Mr. Klein's declaration.

3. Plaintiffs Are Willing To Postpone Some Litigation Activities At This Time

As these narrowly prescribed categories make clear, plaintiffs are cognizant of the important issues at stake in this litigation, as well as the government's arguments of potential harm. Because of them, plaintiffs are willing temporarily to forego the actual disclosure to them of the contents of any certifications, should it turn out that some exist. They are also willing to delay their full discovery rights to depose and seek documents from governmental or AT&T officials involved in the wiretapping. Finally, they are willing to delay the renewal of the *Hepting* Motion for Preliminary Injunction until after the earlier of whenever the discovery referenced above is completed or the Ninth Circuit rules. While none of these would be required in an ordinary case, and while we maintain that this case should not deviate from the ordinary rules governing litigation unless absolutely necessary, plaintiffs' suggestions voluntarily embrace a measured approach to discovery in the *Hepting* case during the pendency of the interlocutory appeal.

**F. The Court Retains Jurisdiction to Continue this Litigation**

Section 1292(b) explicitly requires that an interlocutory appeal "shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order." 28 U.S.C. § 1292(b); *see also Plotkin v. Pacific Tel. and Tel. Co.,* 688 F.2d 1291 (9th Cir. 1982) ("We hold that an appeal from an interlocutory order does not stay the proceedings, as it is firmly established that an appeal from an interlocutory order does not divest the trial court of jurisdiction to continue with other phases of the case.") (citing *Ex Parte Nat'l Enameling & Stamping Co.,* 201 U.S. 156, 162 (1906) ("The case, except for the hearing on the appeal from the

interlocutory order, is to proceed in the lower court as though no such appeal had been taken, unless otherwise specially ordered."); *see also* Rutter Group, Cal. Practice Guide: 9th Cir. Civ. App. Prac. at 3-79, § 3:425 ("absent a stay order, the interlocutory appeal does not prevent the district court from *moving forward* with the *rest of the case*" (emphasis original)).

As explained above, much of the case in the short-term does not implicate state secrets at all, and therefore is undisturbed by the interlocutory appeal. *See, e.g., Grauberger v. St. Francis Hospital*, 169 F.Supp.2d 1172 (N.D. Cal. 2001) ("[D]efendants' motion to dismiss does not implicate the issues raised by defendants' interlocutory appeal. Accordingly, the Court is not divested of jurisdiction to proceed with the instant motion.")

Even though a reversal of this Court's order denying the motions to dismiss would terminate the litigation, this does not mean that an interlocutory appeal of such an order permeates the litigation such that it divests the court of jurisdiction to proceed. *See ACF Industries Inc. v. California State Bd. of Equalization*, 42 F.3d 1286, 1292 n.4 (9th Cir. 1994) (holding that "district court retained jurisdiction to enter the stipulated dismissal" during pendency of appeal of denial of motion to dismiss).

In *City of New York v. Beretta U.S.A. Corp*., 234 F.R.D. 46 (E.D.N.Y. 2006), defendants, like the movants in this case, "challenge[d] this court's jurisdiction over proceedings in this litigation during their attempted appeal of the court's December 2, 2005 interlocutory order denying their motion to dismiss." *Id.* at 48. The defendants argued that the court had no jurisdiction to "conduct any other proceedings pending decision on their appeals by the Court of Appeals for the Second Circuit." *Id.* at 49. The court disagreed, holding:

> Defendants cite no authority for their assertion that this court lacks jurisdiction to proceed after its section 1292 certification of an interlocutory appeal. Absent an order of the trial court or the court of appeals staying proceedings, the district court has continuing authority to proceed with the litigation. 28 U.S.C. § 1292(b). *See also Ex Parte Nat'l Enameling & Stamping Co*., 201 U.S. at 162, 26 S.Ct. 404; *New York State NOW*, 886 F.2d at 1350. No stay has issued from the Court of Appeals for the Second Circuit; this court has lifted its temporary stay. The action may proceed in this court while the Second Circuit considers the interlocutory appeal.

*Id.* at 50.

The government's reliance on *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882 (9th Cir. 2001), is misplaced. Gov't Motion for Stay at 11. In that case, the Ninth Circuit acknowledged the unremarkable proposition that, once an appeal was taken, the District Court is divested of jurisdiction to reconsider, rescind, or modify the appealed interlocutory order (or, as was at issue in *City of Los Angeles*, rescind the order certifying the interlocutory order for appeal). Nowhere does *City of Los Angeles* assert that an interlocutory appeal requires a stay at all, let alone a stay of a case in its entirety.

The government's citation to *Britton v. Co-op Banking Group*, 916 F.2d 1405 (9th Cir. 1990), *see* Gov't Motion for Stay at 11, is similarly unavailing, and actually supports plaintiffs' request that the Court continue "moving the case along consistent with its view of the case as reflected in its order," *id.* at 1412. In *Britton,* the district court denied the defendant's motion to compel arbitration. While the defendant's interlocutory appeal of the order denying arbitration was pending, the defendant refused to comply with discovery requests, leading to a default judgment against the defendant as a discovery sanction. On appeal from the default judgment, the defendant argued "that the present appeal from the district court's denial of his motion to compel arbitration divested the district court of jurisdiction, making any subsequent orders, including the entry of the default judgment, null." *Id.* at 1411. The Ninth Circuit "disagree[d]," noting that "[t]he district court is simply moving the case along consistent with its view of the case as reflected in its order denying arbitration." *Id.* at 1412.

Here, the litigation can proceed without this Court reconsidering or modifying the order under appeal, leaving the propriety of that order in the hands of the Ninth Circuit while moving the case forward on issues *other than* the reconsideration of the order. For the reasons described above, it is eminently practical for the Court to do so.

This is consistent with the purposes of judicial prudence that underlie the transfer of jurisdiction. "That rule of exclusive appellate jurisdiction is a creature of judicial prudence, however, and is not absolute. It is designed to avoid the confusion and inefficiency of two courts considering the same issues simultaneously." *Masalosalo by Masalosalo v. Stonewall Ins. Co.*, 718 F.2d 955, 956 (9th Cir. 1983) (citing *Hoffman. v. Beer Drivers and Salesmen's Local Union No.*

*888*, 536 F.2d 1268, 1276 (9th Cir. 1976) ("rule is not a creature of statute and is not absolute in character.")); *accord, Jago v. U.S. District Court*, 570 F.2d 618 (6th Cir. 1978) ("Generally, a notice of appeal deprives the district court of jurisdiction of all matters forming the basis of the appeal. This rule, however, is neither a creature of statute nor is it absolute in character."); *see also Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 97 (3d Cir. 1988) ("As a prudential doctrine, the rule should not be applied when to do so would defeat its purpose of achieving judicial economy."). The purpose of the "rule of prudence" is to forestall the district court from revising the order on appeal so that the court of appeals will not be presented with a "moving target": "[T]he appeals court would be dealing with a moving target if it ruled on the revised order or, alternatively, its ruling would be obsolete if it ruled on the 'old' order." *Britton*, 916 F.2d at 1412.

Since this Court need not reconsider the propriety of its order denying the motion to dismiss in order to proceed with the litigation activities plaintiffs have outlined above, there is no danger of confusions and inefficiency in proceeding while the Ninth Circuit considers the order.

Accordingly, the Court is entitled (1) to move forward without restriction on discovery and other litigation activities that do not implicate the state secrets privilege, and (2) to move forward, in the manner described above and subject to the protections afforded by section 1806(f), on other aspects of the case that might implicate states secrets consistent with its view of the case as reflected in its order, because neither of these activities requires the Court to reconsider, rescind, or modify its order denying the motion to dismiss.

To the extent that movants suggest that the litigation activities plaintiffs seek might moot the appeal, there are two responses. First, the "rule of prudence" of exclusive appellate jurisdiction does not protect against all possible sources of mootness, only against mootness caused by the district court reconsidering, rescinding, or modifying the order that is on appeal. Second, the mootness that movants posit is that the state secrets information would be publicly disclosed and lose its confidentiality. By definition, no such mootness could occur here until *after* alleged state secrets are revealed to the public. Lodging AT&T's answer and certifications (if any exist) *in camera* pursuant to section 1806(f), for example, would not moot the appeal, and would position this case to move forward as quickly as possible once the Court's decision is affirmed.

## IV. Conclusion

"[T]he court cannot conclude that merely maintaining this action creates a 'reasonable danger' of harming national security." *Hepting*, 439 F.Supp.2d at 994. The issue before the Court, properly understood, is not whether to proceed forward, but in what sequence to sensibly and efficiently proceed forward. For the reasons stated above, plaintiffs respectfully request that this Court deny the government's motion, joined in by the defendant carriers, to stay these proceedings.

DATED: January 17, 2007

ELECTRONIC FRONTIER FOUNDATION

By /s/

Cindy A. Cohn, Esq. (SBN 145997)
Lee Tien, Esq. (SBN 148216)
Kurt Opsahl, Esq. (SBN 191303)
Kevin S. Bankston, Esq. (SBN 217026)
Corynne McSherry, Esq. (SBN 221504)
James S. Tyre, Esq. (SBN 083117)
454 Shotwell Street
San Francisco, CA 94110
Telephone: (415) 436-9333 x108
Facsimile: (415) 436-9993

ATTORNEYS FOR AT&T CLASS PLAINTIFFS AND CO-CHAIR OF PLAINTIFFS' EXECUTIVE COMMITTEE

Additional Plaintiffs' Counsel:

ROGER BALDWIN FOUNDATION OF ACLU
HARVEY GROSSMAN
ADAM SCHWARTZ
180 North Michigan Avenue
Suite 2300
Chicago, IL 60601
Telephone: (312) 201-9740
Facsimile: (312) 201-9760

PLAINTIFFS' COUNSEL FOR AT&T SUBSCRIBER CLASS AND CO-CHAIR OF PLAINTIFFS' EXECUTIVE COMMITTEE

LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
ERIC ALAN ISAACSON
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

ATTORNEYS FOR AT&T CLASS PLAINTIFFS AND PLAINTIFFS' LIASON COUNSEL

LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
JEFF D. FRIEDMAN
SHANA E. SCARLETT
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: (415) 288-4545
Facsimile: (415) 288-4534

ATTORNEYS FOR AT&T CLASS PLAINTIFFS AND PLAINTIFFS' LIASON COUNSEL

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
ELIZABETH J. CABRASER
BARRY R. HIMMELSTEIN
MICHAEL W. SOBOL
ERIC B. FASTIFF
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

PLAINTIFFS' COUNSEL FOR MCI SUBSCRIBER CLASS

MOTLEY RICE LLC
RONALD MOTLEY
DONALD MIGLIORI
JODI WESTBROOK FLOWERS
JUSTIN KAPLAN
28 Bridgeside Boulevard
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9163
Facsimile: (843) 216-9680

PLAINTIFFS' COUNSEL FOR VERIZON SUBSCRIBER CLASS AND MISCELLANEOUS SUBSCRIBER CLASSES

GEORGE & BROTHERS, L.L.P.
R. JAMES GEORGE, JR.
DOUGLAS BROTHERS
1100 Norwood Tower
114 W. 7th Street
Austin, Texas 78701
Telephone: (512) 495-1400
Facsimile: (512) 499-0094

PLAINTIFFS' COUNSEL FOR CINGULAR SUBSCRIBER CLASS

THE MASON LAW FIRM, PC
GARY E. MASON
NICHOLAS A. MIGLIACCIO
1225 19th St., NW, Ste. 500
Washington, DC 20036
Telephone: (202) 429-2290
Facsimile: (202) 429-2294

PLAINTIFFS' COUNSEL FOR SPRINT SUBSCRIBER CLASS

WHITFIELD & COX P.S.C.
JOHN C. WHITFIELD
29 East Center Street
Madisonville, KY 42431
(270)-821-0656
(270)-825-1163 (fax)

PLAINTIFFS' COUNSEL FOR SPRINT SUBSCRIBER CLASS

BRUCE I AFRAN, ESQ.
10 Braeburn Drive
Princeton, NJ 08540
609-924-2075

PLAINTIFFS' COUNSEL FOR BELLSOUTH SUBSCRIBER CLASS

LISKA, EXNICIOS & NUNGESSER
ATTORNEYS-AT-LAW
VAL PATRICK EXNICIOS
One Canal Place, Suite 2290
365 Canal Street
New Orleans, LA 70130
Telephone: (504) 410-9611

Facsimile: (504) 410-9937

PLAINTIFFS' COUNSEL FOR BELLSOUTH SUBSCRIBER CLASS

KRISLOV & ASSOCIATES, LTD.
CLINTON A. KRISLOV
W. JOEL VANDER VLIET
20 North Wacker Drive
Suite 1350
Chicago, IL 60606
Telephone: (312) 606-0500
Facsimile: (312) 606-0207

PLAINTIFFS' COUNSEL FOR BELLSOUTH SUBSCRIBER CLASS

MAYER LAW GROUP
CARL J. MAYER
66 Witherspoon Street, Suite 414
Princeton, New Jersey 08542
Telephone: (609) 921-8025
Facsimile: (609) 921-6964

PLAINTIFFS' COUNSEL FOR BELLSOUTH SUBSCRIBER CLASS

THE LAW OFFICES OF STEVEN E. SCHWARZ, ESQ.
STEVEN E. SCHWARZ
2461 W. Foster Ave., #1W
Chicago, IL 60625
Telephone: (773) 837-6134

PLAINTIFFS' COUNSEL FOR BELLSOUTH SUBSCRIBER CLASS

**CERTIFICATE OF SERVICE**

I hereby certify that on January 17, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties whose e-mail addresses have been registered in the case as required by the Court..

DATED: January 17, 2007

ELECTRONIC FRONTIER FOUNDATION

/s/

Cindy A. Cohn, Esq. (SBN 145997)
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
Telephone: (415) 436-9333 x108
Facsimile: (415) 436-9993
cindy@eff.org