PILLSBURY WINTHROP SHAW PITTMAN LLP
BRUCE A. ERICSON  #76342
DAVID L. ANDERSON  #149604
JACOB R. SORENSEN  #209134
MARC H. AXELBAUM  #209855
DANIEL J. RICHERT  #232208
50 Fremont Street
Post Office Box 7880
San Francisco, CA  94120-7880
Telephone: (415) 983-1000
Facsimile: (415) 983-1200
Email: bruce.ericson@pillsburylaw.com

SIDLEY AUSTIN LLP
DAVID W. CARPENTER (admitted *pro hac vice*)
BRADFORD A. BERENSON (admitted *pro hac vice*)
DAVID L. LAWSON (admitted *pro hac vice*)
EDWARD R. MCNICHOLAS (admitted *pro hac vice*)
ERIC A. SHUMSKY #206164
1501 K Street, N.W.
Washington, D.C.  20005
Telephone:  (202) 736-8010
Facsimile:  (202) 736-8711

Attorneys for AT&T Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | MDL Dkt. No. 06-1791-VRW |
| | |
| NATIONAL SECURITY AGENCY TELE-COMMUNICATIONS RECORDS LITIGA-TION | **MOTION OF DEFENDANTS AT&T COMMUNICATIONS OF SOUTHWEST, INC., ET AL. TO DISMISS PLAINTIFFS' APPLICATION TO COMPEL; SUPPORTING MEMORANDUM** |
| | [Fed. R. Civ. P. 12(b)(6)] |
| | Date:        June 14, 2007 |
| This Document Relates To: | Time:        2 p.m. |
| | Courtroom:  6, 17th Floor |
| *Clayton, et al. v. AT&T Communications of the Southwest, Inc., et al.*, No. 07-1187 | Judge:       Hon. Vaughn R. Walker |
| | Filed concurrently: |
| | 1. Proposed Order |

# TABLE OF CONTENTS

                                                                                    Page

TABLE OF AUTHORITIES.................................................................................ii

NOTICE OF MOTION AND MOTION TO DISMISS.................................................... viii

MEMORANDUM OF POINTS AND AUTHORITIES.......................................................1

INTRODUCTION ..............................................................................................1

BACKGROUND ...............................................................................................3

ARGUMENT ..................................................................................................5

I.      STATE AUTHORITIES LACK POWER UNDER THE
        CONSTITUTION TO OVERSEE OR INVESTIGATE ALLEGED
        FEDERAL INTELLIGENCE ACTIVITIES ............................................................5

II.     FEDERAL STATUTES PROHIBIT THE PLAINTIFFS' ATTEMPTS TO
        COMPEL DISCLOSURE OF INFORMATION REGARDING
        TELECOMMUNICATIONS CARRIERS' ALLEGED ASSISTANCE TO
        THE NSA .................................................................................................12

III.    BECAUSE FEDERAL STATUTES OCCUPY THE FIELD OF
        TELECOMMUNICATIONS CARRIERS' ALLEGED ASSISTANCE TO
        THE NSA, THE SUBPOENAS ARE PREEMPTED .................................................16

IV.     ENFORCEMENT OF THE SUBPOENAS IS PREEMPTED BY
        FEDERAL COMMON LAW...........................................................................18

V.      PLAINTIFFS DO NOT HAVE AUTHORITY UNDER STATE LAW TO
        ENFORCE THE SUBPOENAS IN ANY EVENT ...................................................21

CONCLUSION ...............................................................................................24

AT&T MOTION TO DISMISS –
CLAYTON v. AT&T, No. 07-1187
MDL No. 06-1791-VRW

# TABLE OF AUTHORITIES

**CASES**

*ACLU v. NSA*,
438 F. Supp. 2d 754 (E.D. Mich. 2006), *appeal docketed*,
Nos. 06-2099, 06-2140 (6th Cir. Aug. 17, 2006) ............................................................20

*AMCA Int'l Corp. v. Krouse*,
482 F. Supp. 929 (S.D. Ohio 1979) ................................................................................19

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) ........................................................................................................3, 7

*Asbestos Worker Syracuse Pension Fund ex rel. Collins v. M.G. Indus. Insulation Co.*,
875 F. Supp. 132 (N.D.N.Y. 1995) ................................................................................24

*Balcorta v. Twentieth Century-Fox Film Corp.*,
208 F.3d 1102 (9th Cir. 2000) ........................................................................................17

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
489 U.S. 141 (1989) ........................................................................................................15

*Boudette v. Barnette*,
923 F.2d 754 (9th Cir. 1991) ..........................................................................................13

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988) ........................................................................................................18

*Brooks v. Pool-Leffler*,
636 S.W.2d 113 (Mo. Ct. App. 1982), *recognized as abrogated by statute on
other grounds*, *Gerlach v. Mo. Comm'n on Human Rights*,
980 S.W.2d 589 (Mo. Ct. App. 1998) ..............................................................22, 23, 24

*Chlorine Inst. Inc. v. Cal. Highway Patrol*,
29 F.3d 495 (9th Cir. 1994) ............................................................................................15

*City of Richmond Heights v. Bd. of Equalization*,
586 S.W.2d 338 (Mo. 1979) ...........................................................................................22

*Coburn v. Coleman*,
75 F. Supp. 107 (W.D.S.C. 1947) ..............................................................................21, 24

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ........................................................................................................15

*Deutsch v. Turner Corp.*,
324 F.3d 692 (9th Cir. 2003) ...................................................................................2, 8, 9

*El-Masri v. United States*,
__ F.3d __, 2007 WL 625130 (4th Cir. Mar. 2, 2007) ..............................................21

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990) ..........................................................................................................16

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
373 U.S. 132 (1963) ...............................................................................................2

*Founding Church of Scientology v. NSA*,
610 F.2d 824 (D.C. Cir. 1979)............................................................................13

*Hagely v. Bd. of Educ.*,
841 S.W.2d 663 (Mo. 1992)................................................................................22

*Hayden v. NSA*,
608 F.2d 1381 (D.C. Cir. 1979)..........................................................................13

*Hepting v. AT&T Corp.*,
439 F. Supp. 2d 974 (N.D. Cal. 2006), *appeal docketed*,
Nos. 06-60809, 06-60810 (9th Cir. Aug. 1, 2006) .........................................19, 20

*Hillsborough County v. Auto. Med. Labs.*,
471 U.S. 707 (1985) .........................................................................................3, 12

*Hines v. Davidowitz*,
312 U.S. 52 (1941) .........................................................................................2, 6, 7

*Kasza v. Browner*,
133 F.3d 1159 (9th Cir. 1998) .............................................................................19

*Linder v. NSA*,
94 F.3d 693 (D.C. Cir. 1996)..............................................................................13

*MITE Corp. v. Dixon*,
633 F.2d 486 (7th Cir. 1980), *aff'd on other grounds sub nom.*
*Edgar v. MITE Corp.*, 457 U.S. 624 (1982)........................................................18

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) ..............................................................................9

*In re Miles*,
430 F.3d 1083 (9th Cir. 2005) .............................................................................17

*Moore v. Mitchell*,
281 U.S. 18 (1930) ...............................................................................................24

*Murphy v. Waterfront Comm'n*,
378 U.S. 52 (1964)...............................................................................................16

*Muskovich v. Crowell*,
No. 3-95-CV-80007, 1995 WL 905403 (S.D. Iowa Mar. 21, 1995) ...................17

*In Re NSA Telecomm. Records Litig.*,
No. 06-1791-VRW, 2007 WL 163106 (N.D. Cal. Jan. 18, 2007)....................17, 20

*N.Y. Times Co. v. United States*,
403 U.S. 713 (1971) ...............................................................................................8

*Nat'l Foreign Trade Council v. Natsios,*
181 F.3d 38 (1st Cir. 1999), *aff'd on other grounds sub nom.*
*Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363 (2000)................................7

*New SD, Inc. v. Rockwell Int'l Corp.,*
79 F.3d 953 (9th Cir. 1996) ................................................................................19

*North Dakota v. United States,*
495 U.S. 423 (1990) ............................................................................................11

*Perpich v. Dep't of Def.,*
496 U.S. 334 (1990) ..............................................................................................6

*Quon v. Arch Wireless Operating Co.,*
445 F. Supp. 2d 1116 (C.D. Cal. 2006) ...............................................................17

*Rackley v. Firemen's Ret. Sys.,*
848 S.W.2d 26 (Mo. Ct. App. 1993) .....................................................................22

*Sperry v. Florida,*
373 U.S. 379 (1963) ............................................................................................14

*State ex rel. City of Blue Springs v. Rice,*
853 S.W.2d 918 (Mo. 1993) .................................................................................23

*State ex rel. Philipp Transit Lines, Inc. v. Pub. Serv. Comm'n,*
552 S.W.2d 696 (Mo. 1977) .................................................................................23

*Stehney v. Perry,*
101 F.3d 925 (3d Cir. 1996) ........................................................................7, 10, 11

*Sterling v. Tenet,*
416 F.3d 338 (4th Cir. 2005), *cert. denied,*
126 S. Ct. 1052 (2006) ........................................................................................20

*Sullivan v. Am. Airlines, Inc.,*
424 F.3d 267 (2d Cir. 2005) .................................................................................17

*Superior Minerals Co. v. Mo. Pac. R.R.,*
45 S.W.2d 912 (Mo. Ct. App. 1932) .....................................................................24

*In re Tarble,*
80 U.S. (13 Wall.) 397 (1871) ...............................................................................10

*Tenet v. Doe,*
544 U.S. 1 (2005) ................................................................................................21

*Terkel v. AT&T Corp.,*
441 F. Supp. 2d 899 (N.D. Ill. 2006).....................................................................20

*Totten v. United States,*
92 U.S. 105 (1875) .......................................................................................3, 20, 21

*In re United States,*
872 F.2d 472 (D.C. Cir. 1989)...............................................................................20

*United States v. Adams,*
__ F. Supp. 2d ___, 2007 WL 441876 (D. Me. filed Feb. 08, 2007) ................................7, 11

*United States v. Belmont,*
301 U.S. 324 (1937) ................................................................................................................11

*United States v. Curtiss-Wright Exp. Corp.,*
299 U.S. 304 (1936) ..............................................................................................................7, 8

*United States v. Kimbell Foods,*
440 U.S. 715 (1979) ...............................................................................................................15

*United States v. Koyomejian,*
946 F.2d 1450 (9th Cir. 1992) ........................................................................................15, 17

*United States v. Maine,*
420 U.S. 515 (1975) .................................................................................................................6

*United States v. New Mexico,*
455 U.S. 720 (1982) ...............................................................................................................11

*United States v. Nixon,*
418 U.S. 683 (1974) ...............................................................................................................19

*United States v. Pink,*
315 U.S. 203 (1942) .......................................................................................................7, 9, 10

*United States v. Reynolds,*
345 U.S. 1 (1953) ...................................................................................................................19

*United States v. Truong Dinh Hung,*
629 F.2d 908 (4th Cir. 1980) ...................................................................................................8

*Wayne v. DHL Worldwide Express,*
294 F.3d 1179 (9th Cir. 2002) ...............................................................................................17

*In re World War II Era Japanese Forced Labor Litig.,*
164 F. Supp. 2d 1160 (N.D. Cal. 2001), *aff'd sub nom.*
*Deutsch v. Turner Corp.,* 324 F.3d 692 (9th Cir. 2003)..........................................2, 6, 7, 8, 9

*Young v. Coloma-Agaran,*
340 F.3d 1053 (9th Cir. 2003) .........................................................................................12, 14

*Zschernig v. Miller,*
389 U.S. 429 (1968) .................................................................................................................7

**CONSTITUTION AND STATUTES**

U.S. Const. art. I ......................................................................................................................6
U.S. Const. art. II .....................................................................................................................6

National Security Agency Act of 1959, Pub. L. No. 83-36, 73 Stat. 63 ...............................13

2 U.S.C. §§ 192-194 ...............................................................................................................23

2 U.S.C. § 288b(b) ........................................................................................23
2 U.S.C. § 288d .............................................................................................23

18 U.S.C. § 798 ..........................................................................................2, 12
18 U.S.C. § 2510 *et seq* ........................................................................15, 16
18 U.S.C. § 2511 ...........................................................................................16
18 U.S.C. § 2519 ...........................................................................................16
18 U.S.C. § 2520 ...........................................................................................16
18 U.S.C. § 2522 ...........................................................................................16
18 U.S.C. § 2701 *et seq* .............................................................................16
18 U.S.C. § 2702 ...........................................................................................16
18 U.S.C. § 2703 ...........................................................................................16
18 U.S.C. § 2707 ...........................................................................................16

28 U.S.C. § 1365 ...........................................................................................23

47 U.S.C. §§ 151-152 ....................................................................................14
47 U.S.C. § 201 *et seq* ................................................................................14
47 U.S.C. § 1001 *et seq* ..............................................................................16
47 U.S.C. § 1002 ...........................................................................................16
47 U.S.C. § 1004 ...........................................................................................16
47 U.S.C. § 1005 ...........................................................................................16

50 U.S.C. § 402 note .......................................................................................2
50 U.S.C. § 1801 *et seq* ........................................................................15, 16
50 U.S.C. § 1802(a)(4) ..................................................................................16
50 U.S.C. § 1805(c)(2)(B) .............................................................................16
50 U.S.C. § 1807 ...........................................................................................15
50 U.S.C. § 1808 ...........................................................................................15
50 U.S.C. § 1809 ...........................................................................................16
50 U.S.C. § 1810 ...........................................................................................16
50 U.S.C. § 1826 ...........................................................................................15
50 U.S.C. § 1827 ...........................................................................................16
50 U.S.C. § 1828 ...........................................................................................16
50 U.S.C. § 1846 ...........................................................................................15
50 U.S.C. § 1862 ...........................................................................................15

RSMo. § 386.130 ...........................................................................................23
RSMo. § 386.360 ...........................................................................................23
RSMo. § 536.010(4) .......................................................................................22

**RULES**

Fed. R. Civ. P. 17(b) .....................................................................................24

Mo. R. Civ. P. 58.01(b)(2) ............................................................................21
Mo. R. Civ. P. 61.01(d) .................................................................................21

**LEGISLATIVE HISTORY**

H.R. Rep. No. 103-827, pt. 1 (1994) .............................................................16

**SCHOLARLY AUTHORITIES**

*The Federalist* No. 42, (James Madison) (Clinton Rossiter ed., 1961) ....................6

1 *The Records of the Federal Convention of 1787* (Max Farrand ed., rev. ed. 1937).............6

20 Missouri Practice, *Administrative Practice & Procedure* (4th ed. 2007) ......................22

15 Missouri Practice, *Civil Rules Practice* (3d ed. 2006) ....................................................24

5A Charles A. Wright et al., *Federal Practice and Procedure* (2d ed. 1990)......................21

**OTHER AUTHORITIES**

S. Rule XXVI(1)...........................................................................................................23

H.R. Rule XI(2)(m)(1)................................................................................................23

Press Release, *ACLU Launches Nationwide Action Against NSA Snooping on Americans' Phone Calls* (May 24, 2006), *at* www.aclu.org/safefree/nsaspying/25647prs20060524.html ...................................................4

Jemimah Noonoo, *Calling for the Truth: Missouri Wants to Know if Phone Companies Gave Data to NSA*, Columbia Missourian, Apr. 2, 2007, *available at* http://www.columbiamissourian.com/news/story.\php?ID=24997 ........................................8

1                   **NOTICE OF MOTION AND MOTION TO DISMISS**

2 TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3        PLEASE TAKE NOTICE that on June 14, 2007, at 2 p.m., before the Honorable

4 Vaughn R. Walker, United States District Chief Judge, in Courtroom 6, 17th floor, 450

5 Golden Gate Avenue, San Francisco, California, defendants **AT&T Communications of**

6 **the Southwest, Inc., SBC Long Distance, LLC, SBC Advanced Solutions, Inc., TCG St.**

7 **Louis Holdings, Inc. d/b/a TCG St. Louis, Southwestern Bell Telephone, L.P.,** and

8 **TCG Kansas City, Inc.** (collectively, "AT&T"), will move and hereby do move, pursuant

9 to Federal Rule of Civil Procedure 12(b)(6), to dismiss Plaintiffs' First Amended

10 Application to Compel Production of Documents And To Compel Witnesses to Appear and

11 Answer Questions Upon Oral Examination (Dkt. 1-6) filed by Commissioners of the

12 Missouri Public Service Commission Robert M. Clayton III and Steve Gaw ("Plaintiffs").

13        This motion is made on the grounds that Plaintiffs have no authority under the

14 United States Constitution to compel AT&T to disclose information related to an alleged

15 foreign intelligence-gathering program of the National Security Agency ("NSA"); that their

16 effort to do so is preempted by federal statutory and common law; and that the suit is

17 invalid because state law does not authorize the Commissioners to bring this suit.

18        This motion is based on this notice of motion and motion, the memorandum that

19 follows, all pleadings and records on file in this action, and any other arguments and

20 evidence presented to this Court at or before the hearing on this motion.

21                   **ISSUES TO BE DECIDED**

22        1.     Do state officials have authority under the United States Constitution to

23 investigate or otherwise oversee alleged federal governmental activity, especially in the

24 context of national defense or foreign intelligence?

25        2.     Does federal statutory and common law preempt Plaintiffs' efforts to enforce

26 their subpoenas seeking information concerning AT&T's alleged foreign intelligence

27 assistance to the National Security Agency?

28        3.     Does state law authorize Plaintiffs to enforce these subpoenas?

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

3      Plaintiffs, two of five commissioners of the Missouri Public Service Commission

4 ("PSC"), have issued investigative subpoenas in an effort to discover what assistance

5 AT&T[1] may have provided to the NSA, an agency of the Department of Defense, with re-

6 spect to the NSA's alleged counterterrorism and foreign intelligence surveillance activi-

7 ties.[2] Specifically, Plaintiffs seek to require AT&T to testify before the PSC about what is

8 claimed to be a highly classified government program targeting suspected foreign terrorists.

9 They purport to require AT&T to disclose specific operational details about this alleged

10 program, including "[t]he nature or type of information disclosed to the NSA," when the

11 disclosures were made, how many disclosures occurred, and the legal authority supporting

12 disclosure.[3] Subpoena Ad Testificandum ¶¶ 1-4, *Clayton v. AT&T Commc'ns of the S.W.,*

13 *Inc.*, No. 07-1187, Dkt. 1-3, at 9. Furthermore, these two public utilities commissioners

14 would require AT&T to produce related documents, including "all records" "involving the

15 disclosure of [Customer Proprietary Network Information] to a third party," including the

16 NSA and other federal government agencies. Subpoena Duces Tecum ¶ 4, Dkt. 1-3, at 12.

17      The Office of the Director of National Intelligence has instructed AT&T that re-

18 sponding to these subpoenas, including admitting or denying whether any disclosures were

19 made, "would violate various specific provisions of federal statutes and Executive Orders."

20 Letter from Benjamin A. Powell, Gen. Counsel, Office of the Dir. of Nat'l Intelligence, to

21 Edward R. McNicholas (July 11, 2006) ("Powell Letter"), Ex. E, Dkt. 1-37. Plaintiffs

22 nonetheless filed suit to compel compliance. *See* Pls.' First Am. Application ("Applica-

23 [1] Collectively, AT&T Communications of the Southwest, Inc., SBC Long Distance, LLC, SBC Advanced Solutions, Inc., TCG St. Louis Holdings, Inc. d/b/a TCG St. Louis, South-
24 western Bell Telephone, L.P., and TCG Kansas City, Inc.

25 [2] The subpoenas are included in Exhibit A to Defendant AT&T Communications of the Southwest, Inc.'s Notice of Removal, Dkt. 1-3 ("Notice of Removal"). For representative samples, see *Clayton v. AT&T Comm'ns of S.W., Inc.*, No. 07-1187, Dkt. 1-3, at 8-10 (Sub-
26 poena Ad Testificandum), and *id.* at 11-13 (Subpoena Duces Tecum).

27 [3] Nothing herein should be construed as an admission or denial by AT&T of its participa-
tion in any alleged activities by the NSA.

28

1 tion"), Ex. A, Dkt. 1-6, at 16-19.

2      Plaintiffs' Application must be dismissed for a number of reasons. *First* and fore-

3 most, the subject matter of this litigation—the alleged role of private companies in federal

4 foreign intelligence activities designed to support an ongoing military conflict—is commit-

5 ted exclusively to the federal government by the United States Constitution. *See In re*

6 *World War II Era Japanese Forced Labor Litig.*, 164 F. Supp. 2d 1160, 1168 (N.D. Cal.

7 2001) (Walker, J.) ("[T]he national government's exclusive authority to regulate the foreign

8 affairs of the United States has long been recognized as a constitutional principle of broad

9 scope."), *aff'd sub nom. Deutsch v. Turner Corp.*, 324 F.3d 692 (9th Cir. 2003); *accord*

10 *Deutsch*, 324 F.3d at 711. That these state officials are conducting their investigation into

11 purported federal intelligence activities by targeting the allegedly participating telecommu-

12 nications carriers rather than the NSA itself does not render the subpoenas any less contrary

13 to principles of federal supremacy and does not alter the fact that States have no authority to

14 regulate, investigate, or oversee the activities of the federal government.

15      *Second*, Plaintiffs' actions are preempted by federal law. Conflict preemption fore-

16 closes Plaintiffs' actions because "compliance with both [the] federal and state regulations

17 is a physical impossibility." *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132,

18 142-43 (1963). The conflict here could not be clearer: Plaintiffs seek to compel the disclo-

19 sure of information that federal authorities have instructed AT&T not to disclose, both be-

20 cause it is a federal crime to disclose classified information relating to the communications

21 intelligence activities of the United States, *see* 18 U.S.C. § 798, and because the National

22 Security Act forbids the disclosure of "*any information* with respect to the activities" of the

23 NSA, 50 U.S.C. § 402 note (emphasis added). Moreover, because Congress has carefully

24 balanced national security and privacy interests in federal statutes on the same subject, in-

25 terference in this realm by state authorities acting under state law is preempted because it

26 "stands as an obstacle to the accomplishment and execution of the full purposes and objec-

27 tives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

28      *Third*, under the Supremacy Clause of the United States Constitution, a field of state

1    law is preempted (including state regulatory actions such as issuing subpoenas, *see Am. Ins.*

2    *Ass'n v. Garamendi*, 539 U.S. 396, 411 (2003)), when a "scheme of federal regulation is

3    sufficiently comprehensive to make reasonable the inference that Congress 'left no room'

4    for supplementary state regulation." *Hillsborough County v. Auto. Med. Labs.*, 471 U.S.

5    707, 713 (1985). Here, Congress has enacted detailed legislation that regulates the field of

6    telecommunications carriers' assistance to the federal government in foreign intelligence

7    and counterterrorism surveillance. Accordingly, the subpoenas at issue here and their en-

8    forcement are preempted.

9    *Fourth*, this suit must be dismissed because federal common law preempts enforce-

10    ment of the subpoenas. Two federal common-law doctrines—the state secrets privilege and

11    the *Totten* bar, *see Totten v. United States*, 92 U.S. 105 (1875)—demonstrate that federal

12    common law pervades the uniquely federal realm of foreign intelligence activity. Here, the

13    subpoenas by their terms seek to discover whether or not AT&T assisted the NSA in its for-

14    eign intelligence surveillance activities—the very thing the state secrets privilege and *Tot-*

15    *ten* bar forbid.

16    *Finally*, Plaintiffs' Application should be dismissed because state law does not au-

17    thorize this action. Plaintiffs filed suit pursuant to RSMo. § 536.077, but that statute only

18    authorizes enforcement of subpoenas issued in contested cases and not, as here, investiga-

19    tive subpoenas. Investigative subpoenas can only be enforced, if at all, pursuant to

20    § 386.360, which requires that enforcement actions be undertaken by the PSC as a whole

21    and not, as here, on the orders of individual commissioners who constitute a minority of the

22    Commission and who do not speak for the entire PSC.

23    **BACKGROUND**

24    In late 2005 and early 2006, the popular press reported that telecommunications car-

25    riers, including AT&T, had assisted the NSA in post-9/11 foreign intelligence and counter-

26    terrorism activities. These press reports led to the private-party lawsuits with which this

27    Court already is familiar. In addition, they led to a coordinated campaign in which state

28    regulatory authorities were urged to use state law to investigate carriers that were believed

1   to have participated in the supposed NSA programs.  *See* Press Release, *ACLU Launches*

2   *Nationwide Action Against NSA Snooping on Americans' Phone Calls* (May 24, 2006), *at*

3   www.aclu.org/safefree/nsaspying/25647prs20060524.html.   Most state commissions have

4   properly refrained from opening investigations into the alleged cooperation between the

5   nation's telecommunications carriers and the NSA, as has the Federal Communications

6   Commission, which recognized that investigating classified intelligence programs is beyond

7   its purview.  *See* Letter from Kevin J. Martin, Chairman, FCC, to the Hon. Edward J.

8   Markey (May 22, 2006) ("FCC Letter"), Ex. B, Dkt. 1-34.  In the rare instance in which a

9   state official has taken a contrary approach, the United States has filed suit to halt state in-

10   trusion into its exclusive authority over military affairs and foreign intelligence.[4]

11         Here, two individual state public utilities commissioners (a minority of the five-

12   member Missouri Commission) are attempting to investigate AT&T's alleged assistance in

13   NSA counterterrorism surveillance activities.   They have done so alone, unsupported by

14   either the State of Missouri or a majority of the PSC.  On June 19 and June 22, 2006, Plain-

15   tiffs issued on their own behalf subpoenas seeking information relating to AT&T's alleged

16   disclosure of customer call records to the NSA.  *See, e.g.*, Subpoena Ad Testificandum

17   ¶¶ 1-5, Dkt. 1-3, at 9; Subpoena Duces Tecum ¶¶ 1-4, Dkt. 1-3, at 12.  The subpoenas pur-

18   port to compel AT&T to disclose a variety of details concerning its alleged participation in

19   the alleged programs, including "[t]he number of Missouri customers . . . whose calling re-

20   cords have been delivered to the [NSA]"; "[t]he date or dates on which [such] disclosures

21   . . . were made"; "[t]he nature or type of information disclosed to the NSA"; and "[t]he par-

22   ticular exchanges for which any number was disclosed to the NSA."  Subpoena Ad Testifi-

23   candum ¶¶ 1, 3, 4, 5, Dkt. 1-3, at 9.

24         On July 11, 2006, the General Counsel of the Office of the Director of National In-

---

25   [4] There are currently five such cases, all of which have been transferred to this Court as part
26   of MDL-1791.  *See United States v. Gaw*, No. 07-1242 (Missouri); *United States v. Adams*,
     No. 07-1323 (Maine); *United States v. Rabner*, No. 07-1324 (New Jersey); *United States v.*
27   *Palermino*, No. 07-1326 (Connecticut); *United States v. Volz*, No. 07-1396 (Vermont).  As
     described *infra* at n.5, in *Gaw* the United States filed suit to prevent the enforcement of the
28   same subpoenas that are at issue in this action.

1 telligence instructed AT&T that compliance with the subpoenas would "place [AT&T] in a

2 position of having to confirm or deny the existence of information that cannot be confirmed

3 or denied without harming national security" and that "responding to[] the subpoenas would

4 be inconsistent with, and preempted by, federal law." *See* Powell Letter, Dkt. 1-37. That

5 same day, AT&T submitted objections to Plaintiffs explaining why it could not comply.

6 *See* Letters from Paul G. Lane, AT&T Gen. Counsel-Missouri and Kansas, to PSC

7 Comm'rs Robert M. Clayton III and Steve Gaw (July 11, 2006), Ex. D, Dkt. 1-36. Plain-

8 tiffs did not engage in a meaningful dialogue with either AT&T or the federal government,

9 nor does it appear that they attempted to achieve consensus (or even a majority) with the

10 other three Commissioners; instead, they simply sought to force compliance with their indi-

11 vidually-issued subpoenas by filing suit in state court.

12    AT&T removed Plaintiffs' action from Cole County Circuit Court to the United

13 States District Court for the Western District of Missouri on August 10, 2006 (Dkt. 1-1, at

14 1-6), and moved to dismiss shortly thereafter (Dkt. 1-41).[5]  While AT&T's motion was

15 pending, on September 28, 2006, the JPML conditionally transferred the matter to this

16 Court. On January 31, 2007, the district court in Missouri dismissed all pending motions

17 without prejudice, apparently for docket management purposes. (Dkt. 1-94, at 15.) On

18 February 15, 2007, over Plaintiffs' objection, the JPML transferred this case to the MDL.

19 Pursuant to this Court's scheduling orders of February 20 and March 30, 2007 (MDL 1791

20 Dkts. 172, at 2, 225, at 5), AT&T now moves to dismiss Plaintiffs' Application.

21                                    **ARGUMENT**

22 **I.    STATE AUTHORITIES LACK POWER UNDER THE CONSTITUTION TO
         OVERSEE OR INVESTIGATE ALLEGED FEDERAL INTELLIGENCE
23       ACTIVITIES.**

24    This action must be dismissed, first and foremost, because state officials lack any

---

25 [5] The United States independently filed suit to prevent the Plaintiffs from enforcing, and
   AT&T from complying with, the subpoenas. *See Gaw*, No. 07-1242. That suit, originally
26 filed in the Eastern District of Missouri, also has been transferred to this Court as part of
   MDL 1791. It requests a declaration that the subpoenas are "invalid under, preempted by,
27 and inconsistent with" federal law, as well as an injunction barring their enforcement. *See*
   Compl. Prayer ¶ 1, *Gaw*, No. 07-1242, Dkt. 1-1, at 13.

28

1    authority under the Constitution to oversee, investigate, or intrude into the exclusively fed-

2    eral realms of foreign intelligence or military activities. "This principle, which prohibits

3    state action that unduly interferes with the federal government's authority over foreign af-

4    fairs[,] derives from both the text and structure of the Constitution." *See In re World War II*

5    *Era Japanese Forced Labor Litig.*, 164 F. Supp. 2d 1160, 1168 (N.D. Cal. 2001). The

6    United States Constitution vests exclusive power over defending the nation against foreign

7    attack—necessarily including intelligence-gathering related to that purpose—in the federal

8    government. Congress possesses the power to "provide for the common Defence," to

9    "regulate Commerce with foreign Nations," and to "declare War," among other national-

10   security powers. U.S. Const. art. I, § 8, cls. 1, 3, 11; *see id.* § 8, cls. 4, 10; *id.* § 9, cl. 8.

11   The President is the Commander in Chief and is endowed with other related powers. *Id.*

12   art. II, § 2, cls. 1, 2; *id.* § 3. States, by contrast, are expressly prohibited from exercising

13   power in these realms. *Id.* art. I, § 10 (forbidding states from entering into treaties or alli-

14   ances, granting letters of marque and reprisal, or engaging in war unless invaded).

15       The decision to vest sole responsibility in the federal government for defending the

16   nation was critical to the enactment of the Constitution: The experience of the Articles of

17   Confederation convinced the Framers that relations with the outside world, whether in the

18   form of national defense, warmaking or diplomacy, required a robust and unified national

19   response.[6] Accordingly, it long has been recognized that "as a matter of 'purely legal prin-

20   ciple . . . the Constitution . . . allotted to the federal government jurisdiction over foreign

21   commerce, foreign affairs and national defense.'" *United States v. Maine*, 420 U.S. 515,

22   522 (1975); *see also Perpich v. Dep't of Def.*, 496 U.S. 334, 353 (1990) ("several constitu-

23

24   ------

     [6] *See The Federalist* No. 42, at 264 (James Madison) (Clinton Rossiter ed., 1961) (The
     power to "regulate the intercourse with foreign nations . . . forms an obvious and essential
     branch of the federal administration. If we are to be one nation in any respect, it clearly

25   ought to be in respect to other nations."); 1 *The Records of the Federal Convention of 1787*,
     at 19 (Max Farrand ed., rev. ed. 1937) (Edmund Randolph) ("the confederation produced

26   no security agai[nst] foreign invasion"); *see also Hines v. Davidowitz*, 312 U.S. 52, 63 n.9
     (1941) ("The importance of national power in all matters relating to foreign affairs and the

27   inherent danger of state action in this field are clearly developed in Federalist papers No. 3,
     4, 5, 42 and 80.").

28

1  tional provisions commit matters of foreign policy and military affairs to the exclusive con-

2  trol of the National Government"); *Zschernig v. Miller*, 389 U.S. 429, 432 (1968) (striking

3  down state law because it constituted "an intrusion by the State into the field of foreign af-

4  fairs which the Constitution entrusts to the President and the Congress"); *Stehney v. Perry*,

5  101 F.3d 925, 939 (3d Cir. 1996) (affirming the "exclusive federal responsibility in matters

6  of national security").[7]  It was for precisely this reason that, in *United States v. Adams*, a

7  federal district court held—in this same context, where the Maine PUC sought to require

8  discovery from Verizon concerning its alleged participation in NSA activities—that "[it] is

9  painfully obvious that . . . the PUC is acting beyond its depth." *United States v. Adams*, __

10 F. Supp. 2d __, 2007 WL 441876, No. 06-0097, at *9 (D. Me. filed Feb. 08, 2007).

11        To be sure, not every state action that merely touches upon national security or for-

12 eign affairs is foreclosed. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 418 (2003)

13 ("state action with more than incidental effect on foreign affairs is preempted").[8]  But the

14 effect of the Plaintiffs' actions here is hardly "incidental":  The acknowledged purpose of

15 the subpoenas is to compel the disclosure of information, if any, concerning the alleged

16 classified intelligence-gathering activities of an agency of the Department of Defense. *E.g.*,

17 Subpoena Ad Testificandum ¶ 3, Dkt. 1-3, at 9 (requesting testimony regarding "[t]he na-

18 ture or type of information disclosed to the NSA").  Indeed, Plaintiff Commissioner Clay-

19 ton has publicly admitted that he began his investigation precisely because of the media re-

---

20 [7] *See also United States v. Pink*, 315 U.S. 203, 233 (1942) ("Power over external affairs is
21 not shared by the States; it is vested in the national government exclusively."); *Hines*, 312
   U.S. at 63 ("Our system of government is such that the interest of the cities, counties and
22 states, no less than the interest of the people of the whole nation, imperatively requires that
   federal power in the field affecting foreign relations be left entirely free from local interfer-
23 ence."); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 316-18 (1936) ("The
   powers to declare and wage war, to conclude peace, to make treaties, to maintain diplo-
24 matic relations with other sovereignties, if they had never been mentioned in the Constitu-
   tion, would have vested in the federal government as necessary concomitants of national-
25 ity."); *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 49-50 (1st Cir. 1999), *aff'd on
   other grounds sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).

26 [8] *Accord In re World War II Era*, 164 F. Supp. 2d at 1171 ("[S]tates may legislate with re-
   spect to traditional state concerns, such as inheritance and property rights, even if the legis-
27 lation has international implications, but such conduct is unconstitutional when it has more
   than an 'incidental or indirect effect in foreign countries.'").

28

ports about alleged disclosures to the NSA, and because he was "concerned about the lack of oversight" of AT&T in its supposed cooperation with the federal government. Jemimah Noonoo, *Calling for the Truth: Missouri Wants to Know if Phone Companies Gave Data to NSA*, Columbia Missourian, Apr. 2, 2007, *available at* http://www.columbiamissourian. com/news/story. php?ID=24997. The disclosures Plaintiffs seek directly attack the secrecy that is central to the NSA's mission with the Department of Defense and to the federal government's ability to gather foreign intelligence and protect our citizens from military threats. *See United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) ("Secrecy in respect of information gathered by [the Executive Branch's agents] may be highly necessary, and the premature disclosure of it productive of harmful results."); *N.Y. Times Co. v. United States*, 403 U.S. 713, 728 (1971) (Stewart, J., concurring) ("[I]t is elementary that the . . . maintenance of an effective national defense require[s] both confidentiality and secrecy."); *United States v. Truong Dinh Hung*, 629 F.2d 908, 913 (4th Cir. 1980) ("[A]ttempts to counter foreign threats to the national security require the utmost stealth, speed and secrecy.").

Consistent with these first principles of the constitutional allocation of power, this Court has held that the powers of national defense and foreign affairs are exclusively committed to the federal government. *See In re World War II Era*, 164 F. Supp. 2d at 1168 ("The Constitution allocates power for external affairs to the legislative and executive branches of the national government and simultaneously prohibits the states from engaging in activities that might interfere with the national government's exercise of these powers."). On appeal, the Ninth Circuit affirmed that the state law at issue—which created a cause of action against corporations that were implicated in slave labor during World War II—was preempted because it "intrude[d] on the federal government's *exclusive* power to make and resolve war." *Deutsch*, 324 F.3d at 712 (emphasis added). The Ninth Circuit recognized that the "Supreme Court has long viewed the foreign affairs powers specified in the text of the Constitution as reflections of a generally applicable constitutional principle that power over foreign affairs is reserved to the federal government." *Id.* at 709 (citing, *inter alia*,

1 *Pink*, 315 U.S. at 233); *see also In re World War II Era*, 164 F. Supp. 2d at 1168-69.

2 "While neither the Constitution nor the courts have defined the precise scope of the foreign

3 relations power that is denied to the states, it is clear that matters concerning war are part of

4 the inner core of this power." *Deutsch*, 324 F.3d at 711. And the gathering of intelligence

5 about the nation's foes—their plans, communications, and intentions—is and always has

6 been an inseparable and indispensable part of the conduct of war.

7    Importantly, both this Court and the Ninth Circuit rejected the argument that there

8 could be no preemption in the absence of a conflict between state law and a federal statute.

9 Rather, even "[i]n the absence of [federal authorization], states are prohibited from exercis-

10 ing foreign affairs powers." *Id.* at 714; *see also In re World War II Era*, 164 F. Supp. 2d at

11 1168 ("'[A]ll state action, *whether or not consistent with current foreign policy*, that dis-

12 torts the allocation of responsibility to the national government for the conduct of American

13 diplomacy is void as an unconstitutional infringement on an exclusively federal sphere of

14 responsibility.'" (emphasis added)). This is because "the Constitution allocates the power

15 over foreign affairs to the federal government exclusively, and the power to make and re-

16 solve war, including the authority to resolve war claims, is central to the foreign affairs

17 power in the constitutional design." *Deutsch*, 324 F.3d at 713-14.

18    Thus, in the specified realms that are reserved to the federal government, the States

19 simply have no role. This holding applies here directly. Plaintiffs seek to use their powers

20 under state law as members of the Missouri Public Service Commission to force disclosure

21 of information concerning the alleged military and foreign intelligence-gathering activities

22 of the United States. Because "[m]atters related to war"—which necessarily include intel-

23 ligence-gathering related to that purpose—"are for the federal government alone to ad-

24 dress," *id.* at 712, Plaintiffs are disabled by the Constitution from acting here.

25    This disability is even more clear-cut where, as here, a State seeks to oversee the ac-

26 tivities of the federal government, violating long-established principles of inter-

27 governmental immunity. It is black-letter law, set forth nearly 200 years ago in *McCulloch*

28 *v. Maryland*, that "the states have no power, by taxation or otherwise, to retard, impede,

1  burden, or in any manner control, the operations of the constitutional laws enacted by con-

2  gress to carry into execution the powers vested in the general government."  17 U.S. (4

3  Wheat.) 316, 436 (1819); *see also Pink*, 315 U.S. at 233 ("Power over external affairs is not

4  shared by the States; it is vested in the national government exclusively.  It need not be so

5  exercised as to conform to state laws or state policies whether they be expressed in constitu-

6  tions, statutes, or judicial decrees.").  Thus, the Supreme Court held in *In re Tarble*, a case

7  closely analogous to this one, that state courts could not exercise their habeas corpus power

8  to examine or call into doubt federal military enlistments.  This is because military mat-

9  ters—there, raising and supporting armies—fall "within the line of [the federal govern-

10  ment's] duties; and its control over the subject is plenary and exclusive."  80 U.S. (13

11  Wall.) 397, 408 (1871).  The Court observed that "in times of great popular excitement,

12  there may be found in every State large numbers ready and anxious to embarrass the opera-

13  tions of the government, and easily persuaded to believe every step taken for the enforce-

14  ment of its authority illegal and void."  *Id.*  If state authorities could intrude into spheres

15  reserved to the federal government, "[i]n many exigencies the measures of the National

16  government might in this way be entirely bereft of their efficacy and value."  *Id.* at 409.  "It

17  is manifest that the powers of the National government could not be exercised with energy

18  and efficiency at all times, if its acts could be interfered with and controlled for any period

19  by officers or tribunals of another sovereignty."  *Id.*

20       For these same reasons, the Third Circuit has held that state law cannot interfere

21  with the exclusively federal functions of the NSA.  In *Stehney v. Perry*, a plaintiff sued her

22  former employer, a New Jersey-based contractor for the NSA, for failing to comply with a

23  New Jersey employment law that bars the use of lie-detector tests as a condition of em-

24  ployment.  101 F.3d 925 (3d Cir. 1996).  Department of Defense policy, by contrast, obli-

25  gated NSA personnel with access to classified materials, including private contractors, to

26  take a polygraph examination.  Recognizing that the application of New Jersey law would

27  inhibit the NSA's activities, the Third Circuit held that the state law must yield because it

28  would "prevent any New Jersey employer from serving as an NSA contractor, an impermis-

1  sible state interference with [the] exclusive federal responsibility in matters of national se-

2  curity." *Id.* at 939. That holding is dispositive here: forcing companies that do business in

3  Missouri to disclose information which, if it existed, would serve to confirm or deny sus-

4  pected intelligence-gathering activities by the NSA—information the federal government

5  has deemed a state secret—would not only inhibit the NSA's conduct of operations in Mis-

6  souri but also nationally. The Constitution unequivocally forbids such interference in the

7  "exclusively federal" field of national security. *Id.*; *supra* at 6-7 (citing cases); *see also*

8  *United States v. Belmont*, 301 U.S. 324, 332 (1937) ("[C]omplete power over international

9  affairs is in the national government and is not and cannot be subject to any curtailment or

10 interference on the part of the several states. . . . [I]n respect of our foreign relations gener-

11 ally, state lines disappear."); *North Dakota v. United States*, 495 U.S. 423, 437-38 (1990)

12 (plurality) ("the States may not directly obstruct the activities of the Federal Government");

13 *id.* at 451-52 (Brennan, J., concurring) ("those dealing with the Federal Government enjoy

14 immunity from state control . . . when a state law actually and substantially interferes with

15 specific federal programs"); *United States v. New Mexico*, 455 U.S. 720, 735 n.11 (1982)

16 ("[S]tate taxes . . . are constitutionally invalid if they . . . substantially interfere with [the

17 Federal Government's] activities.").

18     This case is controlled by the principles of *Tarble* and *Stehney*. If state courts may

19 not investigate federal military enlistments through their time-honored powers of habeas

20 corpus; and if they may not enforce against the NSA generally applicable employment stat-

21 utes enacted pursuant to basic state police powers; then, *a fortiori*, state officials may not

22 use regulatory subpoenas to investigate the suspected intelligence operations of the federal

23 government. In seeking to compel AT&T to provide information concerning the NSA's

24 alleged counterterrorism and foreign intelligence activities, Plaintiffs have overstepped their

25 constitutional authority. Because the subpoenas purport to inquire into matters of exclu-

26 sively federal concern, they are without effect. *See, e.g.*, *Adams*, 2007 WL 441876, at *8-9

27 (enjoining the Maine Commission from acting with regard to NSA activities).

28

## II. FEDERAL STATUTES PROHIBIT THE PLAINTIFFS' ATTEMPTS TO COMPEL DISCLOSURE OF INFORMATION REGARDING TELECOMMUNICATIONS CARRIERS' ALLEGED ASSISTANCE TO THE NSA.

Even if Plaintiffs' efforts to investigate national security activities were not outside their constitutional authority, the subpoenas would be preempted by federal law. As an initial matter, the subpoenas are displaced under the Supremacy Clause by virtue of the clear conflict between what they seek to compel and what federal law prohibits. The subpoenas impermissibly conflict with federal law for two independent reasons: (1) "'it is impossible . . . to comply with both [the] state and federal requirements'" and (2) "'state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Young v. Coloma-Agaran*, 340 F.3d 1053, 1055-56 (9th Cir. 2003) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)).

In the first category, the subpoenas seek to compel the disclosure of information the disclosure of which federal law forbids. This is therefore the quintessential case in which "'compliance with both federal and state regulations is a physical impossibility.'" *Hillsborough County v. Automated Med. Labs.*, 471 U.S. 707, 713 (1985). AT&T cannot comply with both the subpoenas and with 18 U.S.C. § 798(a), which makes it a federal crime to disclose to unauthorized persons classified information relating to communications intelligence.[9] Plaintiffs have never contended that they are authorized by federal law to receive such information, and so any information responsive to the subpoenas would be forbidden. The United States has thus stated directly that "[p]roviding responses to the Subpoenas would be inconsistent with and would violate . . . 18 U.S.C. § 798." Compl. ¶ 47, *United States v. Gaw*, No. 07-1242, Dkt. 1-1, at 12.[10]

---

[9] Section 798(a)(3) prohibits "knowingly and willfully communicat[ing], furnish[ing], transmit[ting], or otherwise mak[ing] available to an unauthorized person, or publish[ing], or us[ing] in any manner prejudicial to the safety or interest of the United States, . . . any classified information . . . concerning the communication intelligence activities of the United States." 18 U.S.C. § 798(a)(3). "Communication intelligence" refers to "*all procedures and methods* used in the interception of communications and the obtaining of *information* from such communications by other than the intended recipients." *Id.* § 798(b) (emphases added).

[10] Congress created limited exceptions to this categorical bar on disclosure but, significantly, not for unauthorized disclosure to state officers. *See* 18 U.S.C. § 798(c) ("Nothing (continued...)

1        For similar reasons, AT&T cannot comply with the subpoenas without running

2  afoul of section 6 of the National Security Agency Act of 1959, Pub. L. No. 83-36, § 6, 73

3  Stat. 63, 64 (codified at 50 U.S.C. § 402 note). That statute broadly prohibits the disclosure

4  of any information regarding the NSA's activities: "[N]othing in this Act *or any other law*

5  . . . shall be construed to require the disclosure of the organization *or any other function* of

6  the National Security Agency, [or] *of any information with respect to the activities*

7  *thereof* . . . ." *Id.* (emphases added). "The protection afforded by section 6 is, by its very

8  terms, absolute." *Linder v. NSA*, 94 F.3d 693, 698 (D.C. Cir. 1996). This is no accident. In

9  enacting section 6, Congress was "fully aware of the 'unique and sensitive activities of the

10  [NSA],' which require 'extreme security measures.'" *Hayden v. NSA*, 608 F.2d 1381, 1390

11  (D.C. Cir. 1979). The statute thus "reflects . . . a congressional judgment that, in order to

12  preserve national security, information elucidating the subjects specified ought to be safe

13  from forced exposure." *Founding Church of Scientology v. NSA*, 610 F.2d 824, 828, 830

14  n.50 (D.C. Cir. 1979) ("'the techniques of the NSA are of the most sensitive and fragile

15  character'").

16        It is clear from the face of the subpoenas that Plaintiffs would have AT&T make

17  precisely the sort of disclosures that, as federal authorities have instructed AT&T, section 6

18  prohibits. The Subpoena Ad Testificandum, for instance, seeks testimony regarding "[t]he

19  number of Missouri customers, if any, whose calling records have been delivered or other-

20  wise disclosed to the [NSA]"; "[t]he nature or type of information disclosed to the NSA";

21  and, "[t]he particular exchanges for which any number was disclosed to the NSA." Sub-

22  poena Ad Testificandum ¶¶ 1, 3, 5, Dkt.1-3, at 9. These requests plainly demand "informa-

23  tion with respect to the activities" of the NSA. 50 U.S.C. § 402 note; *cf. Hayden*, 608 F.2d

24  at 1389 (interpreting section 6: "[R]elease of the documents would disclose a function of

25  ————————————

26  in this section shall prohibit the furnishing, upon lawful demand, of information to any
regularly constituted committee of the Senate or House of Representatives of the United

27  States of America, or joint committee thereof."); *see also Boudette v. Barnette*, 923 F.2d
754, 756-57 (9th Cir. 1991) (with respect to "a statute [that] designates certain . . . manners

28  of operation, all omissions should be understood as exclusions").

1  the NSA, since signals intelligence is one of the Agency's primary functions; and would

2  disclose information with respect to Agency activities, since any information about an in-

3  tercepted communication concerns an NSA activity").

4     The United States has formally affirmed that disclosing this information would vio-

5  late section 6. *See* Compl. ¶ 47, *United States v. Gaw*, No. 07-1242, Dkt. 1-1, at 12; *see*

6  *also* Powell Letter, Dkt. 1-37. The FCC has likewise recognized that because it "has no

7  power to order the production of classified information," and because section 6 prohibits

8  the disclosure of information relating to NSA activities, it lacks authority to compel the

9  production of the information necessary to investigate the alleged NSA programs. *See* FCC

10  Letter at 2, Dkt. 1-34. If the FCC, a federal agency that has express statutory authority to

11  regulate carriers under federal law, *see, e.g.*, 47 U.S.C. §§ 151-152, 201 *et seq.*, cannot in-

12  vestigate this matter without running afoul of federal protections for intelligence informa-

13  tion, then *a fortiori* the Plaintiffs cannot do so on the basis of state regulatory provisions.[11]

14     Furthermore, the subpoenas are preempted because they "'stand[] as an obstacle to

15  the accomplishment and execution of the full purposes and objectives of Congress.'"

16  *Young*, 340 F.3d at 1056. A conflict of this sort arises when state law "impose[s] . . . addi-

17  tional conditions not contemplated by Congress." *Sperry v. Florida*, 373 U.S. 379, 385

18  (1963). Permitting enforcement of the subpoenas would impose "additional conditions"

19  upon the NSA's conduct of foreign intelligence-gathering: If telecommunication carriers

20  were subject to state investigations and liability for alleged cooperation with national secu-

21  rity agencies, those agencies would have the burden of responding to state as well as federal

22  oversight and ensuring that their own conduct (as well as the conduct of any partners in the

23

24  [11] As regards section 6, this situation is therefore quite unlike *Hepting v. AT&T Corp.*,
   where this Court found section 6 inapplicable because it concluded that the private plain-
   tiffs might support their claims with unclassified information. 439 F. Supp. 2d 974, 998

25  (N.D. Cal. 2006) ("plaintiffs could rely on many non-classified materials including present
   and future public disclosures of the government or AT&T on the alleged NSA programs,

26  the AT&T documents and the supporting Klein and Marcus declarations and information
   gathered during discovery"), *appeal docketed*, Nos. 06-60809, 06-60810 (9th Cir. Aug. 1,

27  2006). Even assuming that analysis were correct, the subpoenas here directly seek informa-
   tion that, if it existed, would fall directly within Section 6's prohibitions.

28

1   private sector) satisfied the numerous, varied, and sometimes conflicting requirements of all

2   fifty States.  *See Chlorine Inst. Inc. v. California Highway Patrol*, 29 F.3d 495, 498 (9th

3   Cir. 1994) (federal law preempted state regulations that "impose[d] substantial require-

4   ments additional to those imposed by" federal law); *Bonito Boats, Inc. v. Thunder Craft*

5   *Boats, Inc.*, 489 U.S. 141, 161 (1989) (preemption analysis must consider the "prospect" of

6   action by "all 50 States").  These "additional conditions" would make no functional sense

7   in the context of foreign intelligence activities and manifestly were not contemplated by

8   Congress.  *See United States v. Kimbell Foods*, 440 U.S. 715, 728 (1979) ("Undoubtedly,

9   federal programs that 'by their nature are and must be uniform in character throughout the

10  Nation' necessitate the formulation of controlling federal rules.").

11      On the contrary, both the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C.

12  § 1801 *et seq.*, and Title III of the Omnibus Crime Control and Safe Streets Act ("Title

13  III"), 18 U.S.C. § 2510 *et seq.*, already specify the manner in which the disclosure of cus-

14  tomer calling information is to be overseen—namely, through committees of the United

15  States Congress and other federal instrumentalities.  *See* 18 U.S.C. § 2519; 50 U.S.C.

16  §§ 1807, 1808, 1826, 1846, 1862 (requiring reports to Congress and the Administrative Of-

17  fice of the U.S. Courts); *see also United States v. Koyomejian*, 946 F.2d 1450, 1456 (9th

18  Cir. 1992) ("[C]ongressional debate leading to the enactment of FISA focused on striking a

19  balance between the privacy interests of individuals and the government's needs—here,

20  those of national security.").  When Congress makes a policy choice of this kind, state ac-

21  tion that has the effect of revisiting, altering, or second-guessing it is preempted.  *See*

22  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 379-80 (2000) ("The conflicts are

23  not rendered irrelevant by the State's argument that there is no real conflict between the

24  statutes because they share the same goals. . . . The fact of a common end hardly neutralizes

25  conflicting means . . . ."); *see also Bonito Boats*, 489 U.S. at 152 (States may not "second-

26  guess" a balance struck by Congress).

27

28

III. **BECAUSE FEDERAL STATUTES OCCUPY THE FIELD OF TELECOMM-
UNICATIONS CARRIERS' ALLEGED ASSISTANCE TO THE NSA, THE
SUBPOENAS ARE PREEMPTED.**

In addition, the subpoenas are preempted because Congress has occupied the field of telecommunications carriers' cooperation with federal intelligence agencies. Pursuant to the Supremacy Clause, Congress can occupy an entire field of law, and thereby preempt the enforcement of related state laws and regulations, (1) "where an Act of Congress 'touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject" or (2) where the "scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Both are true here.

As set forth above, *see supra* Section I, the federal government has not only a "dominant," but indeed an exclusive, interest in the field of foreign intelligence-gathering, whether in support of diplomacy or the conduct of hostilities. *See, e.g., Murphy v. Water-front Comm'n*, 378 U.S. 52, 76 n.16 (1964). This exclusive constitutional power has been given effect in the precise field the Missouri PSC Commissioners seek to invade here through a set of interlocking statutes that regulate the provision of assistance by telecommunications carriers to federal authorities. In general terms, these statutes include the Communications Assistance to Law Enforcement Act ("CALEA"), 47 U.S.C. § 1001 *et seq.*, the Stored Communications Act ("SCA"), 18 U.S.C. § 2701 *et seq.*, Title III, 18 U.S.C. § 2510 *et seq.*, and FISA, 50 U.S.C. § 1801 *et seq.*[12] Although these statutes un-

---

[12] Together these statutes impose technical requirements on telecommunications carriers, *see, e.g.,* 47 U.S.C. §§ 1002, 1004, 1005; specify the circumstances under which they may (or must) provide designated types of customer information to the federal government, 18 U.S.C. §§ 2702, 2703; *id.* § 2511(2); 50 U.S.C. § 1802(a)(4) (permitting the Attorney General to "direct" carriers to participate in warrantless electronic surveillance); *id.* § 1805(c)(2)(B) (governing carrier participation in court-approved electronic surveillance); and include civil and criminal enforcement mechanisms for the statutory requirements, 18 U.S.C. §§ 2520, 2522, 2707; 50 U.S.C. §§ 1809, 1810, 1827, 1828; *see also* H.R. Rep. No. 103-827, pt. 1, at 28 (1994) ("[i]n order to avoid disparate enforcement actions throughout the country which could be burdensome for telecommunications carriers, this authority is vested in the Attorney General of the United States"), as well as special litigation immunities for cooperating carriers, *see, e.g.,* 18 U.S.C. §§ 2511, 2520(d), and 2707(e).

doubtedly leave room for state regulation or supplementation on these subjects in areas of state concern, such as the conduct of state investigations by state law enforcement officers, none remotely suggests that the states may impose independent requirements (of disclosure or otherwise) on federal officials carrying out exclusively federal functions, or on private parties allegedly cooperating with such officials. In this field, federal law supplies the exclusive rules.

In enacting FISA specifically, "Congress believed it was *completely regulating* electronic surveillance in . . . foreign intelligence-gathering." *Koyomejian*, 946 F.2d at 1456 (emphasis added) (noting that FISA contains a "detailed set of procedural requirements" for the conduct by federal agencies of national security surveillance). Likewise, in the SCA, "'Congress "left no room" for supplementary state regulation'" of federal activities. *Quon v. Arch Wireless Operating Co.*, 445 F. Supp. 2d 1116, 1137 (C.D. Cal. 2006); *see also Muskovich v. Crowell*, No. 3-95-CV-80007, 1995 WL 905403, at *1 (S.D. Iowa Mar. 21, 1995) ("In section 2708, Congress unequivocally expressed an intent to 'occupy the field' and provide the exclusive remedies . . . .").

This Court's discussion of these statutes in the different context of "complete preemption" is not to the contrary. *See In re NSA Telecomms. Records Litig.*, No. 06-1791-VRW, 2007 WL 163106, at *3-5 (N.D. Cal. Jan. 18, 2007). Unlike the commonplace defense of field preemption, "complete preemption" is a jurisdictional doctrine that arises in different circumstances and employs a different test. *See Balcorta v. Twentieth Century-Fox Film Corp.*, 208 F.3d 1102, 1107 n.7 (9th Cir. 2000) (the "'complete preemption' doctrine is actually a doctrine of jurisdiction and is not to be confused with ordinary preemption doctrine (although it is related to preemption law)"); *see also In re Miles*, 430 F.3d 1083, 1088 (9th Cir. 2005) (citing *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987)); *Wayne v. DHL Worldwide Express*, 294 F.3d 1179, 1183-84 (9th Cir. 2002); *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 273 n.7 (2d Cir. 2005) (despite confusion in the law between complete preemption and field preemption, "[t]he two types of preemption are . . . better considered distinct."). Although AT&T continues to believe that there is complete

preemption of state law remedies for jurisdictional purposes, this Court's contrary ruling does not reject the possibility of ordinary field preemption. The Court regarded the authorities and materials it cited in support of its ruling on complete preemption—such as § 1806(f)'s application to certain state-court litigation related to "electronic surveillance" or § 1861 of FISA—as indicating that Congress took sufficient cognizance of state law and process to preserve concurrent judicial jurisdiction, but those provisions in no way suggest that substantive state law may govern the activities of federal officers or their agents conducting exclusively federal functions such as gathering foreign intelligence. As to that very different question, there is not a shred of evidence that Congress contemplated that state law requirements, whether disclosure requirements or otherwise, could be imposed over and above the requirements that Congress itself imposed in federal statutes. Federal officers performing federal functions are governed by federal law. To the extent that state law is deployed to impose oversight of federal activities beyond that provided for in federal statutes, it is displaced.

## IV.    ENFORCEMENT OF THE SUBPOENAS IS PREEMPTED BY FEDERAL COMMON LAW.

Even if the complex of federal statutes described above left gaps relating to the provision of assistance by telecommunications carriers to the federal defense or intelligence establishments, those gaps would be filled not by state law but by federal common law. "[A] few areas, involving 'uniquely federal interests,' are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by courts—so-called 'federal common law.'" *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) (citation omitted). The federal interest in military and intelligence activities designed to protect the nation from attack is the quintessential example. *See, e.g.*, *MITE Corp. v. Dixon*, 633 F.2d 486, 491 (7th Cir. 1980) ("In the realms of national security and foreign affairs, state legislation has been held implicitly preempted because both areas are of unquestionably vital significance to the nation as a whole."), *aff'd on other grounds sub*

1    *nom. Edgar v. MITE Corp.*, 457 U.S. 624 (1982); *AMCA Int'l Corp. v. Krouse*, 482 F.

2    Supp. 929, 934 (S.D. Ohio 1979) ("There is an overriding federal interest in the spheres of

3    foreign affairs and national security.").   Indeed, in *New SD, Inc. v. Rockwell Int'l Corp.*, 79

4    F.3d 953 (9th Cir. 1996), the Ninth Circuit held that "on government contract matters hav-

5    ing to do with national security, state law is totally displaced by federal common law." *Id.*

6    at 955.   The Court recognized that "[w]here the federal interest"—"national security"—

7    "requires that 'the rule must be uniform throughout the country,' . . . then the 'entire body

8    of state law applicable to the area conflicts and is replaced by federal rules.'" *Id.* (quoting

9    *Am. Pipe & Steel Corp. v. Firestone Tire & Rubber Co.*, 292 F.2d 640, 643 (9th Cir. 1961),

10   and *Boyle*, 487 U.S. at 508).

11          Two related but distinct federal common-law doctrines, which are of central rele-

12   vance to the proper disposition of Plaintiffs' claims, demonstrate that federal common law

13   suffuses the realm of federal intelligence activities such that state law has no room to oper-

14   ate.   These are the state secrets doctrine and the *Totten* bar, with which the Court is already

15   familiar.   Whether or not either or both of these doctrines would independently bar a state

16   public utility commission from investigating alleged cooperation by telecommunications

17   carriers in an NSA call records program—and there is considerable reason, including this

18   Court's own ruling in *Hepting*, to believe that they would—the existence of these doctrines

19   establishes the uniquely federal nature of the interest in foreign intelligence activities and

20   the independent preemptive force of federal law in this area.

21          The state secrets privilege is a common-law evidentiary privilege "protect[ing] mili-

22   tary and state secrets" from being disclosed.   *United States v. Reynolds*, 345 U.S. 1, 7

23   (1953); *see also Kasza v. Browner*, 133 F.3d 1159, 1165 (9th Cir. 1998) ("The state secrets

24   privilege is a common law evidentiary privilege that allows the government to deny discov-

25   ery of military secrets.").   The privilege has a constitutional, separation-of-powers founda-

26   tion, deriving from the President's Article II authority over the nation's diplomatic and

27   military affairs.   *See United States v. Nixon*, 418 U.S. 683, 710 (1974); *Reynolds*, 345 U.S.

28   at 7-8.   It prevents, among other harms to national security, the disclosure of information

1   that might impair "'the nation's defense capabilities'" or reveal "'intelligence-gathering

2   methods or capabilities.'"  *In re United States*, 872 F.2d 472, 476 (D.C. Cir. 1989) (quoting

3   *Molerio v. FBI*, 749 F.2d 815, 820-21 (D.C. Cir. 1984) (Scalia, J.)); *see also Sterling v.*

4   *Tenet*, 416 F.3d 338, 346 (4th Cir. 2005), *cert. denied*, 126 S. Ct. 1052 (2006).  This Court

5   has already addressed the United States' state secrets assertion over the very type of infor-

6   mation demanded by Plaintiffs through their subpoenas and held that such information can-

7   not be disclosed.  *See Hepting v. AT&T*, 439 F. Supp. 2d 974, 998 (N.D. Cal. 2006) ("pres-

8   ently declin[ing] to permit any discovery regarding the alleged communication records pro-

9   gram"), *appeal docketed*, Nos. 06-60809, 06-60810 (9th Cir. Aug. 1, 2006).  And each of

10  the other federal courts that has considered a claim by the United States that the state se-

11  crets privilege prevents disclosure of any information concerning an alleged call records

12  program has agreed and held that this information cannot be revealed.[13]  These rulings un-

13  derscore that disclosure of the information Plaintiffs seek would conflict with the para-

14  mount interests of national security—undoubtedly a uniquely federal interest.  *See In re*

15  *NSA Telecomm. Records Litig.*, 2007 WL 163106, at *6 ("The court agrees with defendants

16  that the state secrets privilege plays a unique role in the present cases.").  Plaintiffs' efforts

17  to use state regulatory subpoenas to obtain this information are therefore preempted.

18      Likewise, *Totten v. United States*, 92 U.S. 105 (1875), establishes a rule of federal

19  common law that suits—like this one—premised on the alleged existence of a secret espio-

20  nage relationship are non-justiciable.  While this Court under similar circumstances in

21  *Hepting* found that the facts of *Totten* were "not strictly analogous," *Hepting*, 439 F. Supp.

22  2d at 991, compliance with the subpoenas would require confirming or denying the exis-

23  _____

[13] *See ACLU v. NSA*, 438 F. Supp. 2d 754, 766 (E.D. Mich. 2006) ("[T]he court holds that
24  the state secrets privilege applies to Plaintiffs' data-mining claim and that claim is dis-
     missed."), *appeal docketed*, Nos. 06-2099, 06-2140 (6th Cir. Aug. 17, 2006); *Terkel v.*
25  *AT&T Corp.*, 441 F. Supp. 2d 899, 917 (N.D. Ill. 2006) ("[T]he Court is persuaded that re-
     quiring AT&T to confirm or deny whether it has disclosed large quantities of telephone re-
26  cords to the federal government could give adversaries of this country valuable insight into
     the government's intelligence activities.  Because requiring such disclosures would there-
27  fore adversely affect our national security, such disclosures are barred by the state secrets
     privilege.").

28

1  tence of a relationship involving "secret services for the government" within the meaning of

2  *Totten*, 92 U.S. at 107, and *Tenet v. Doe*, 544 U.S. 1, 8 (2005). It would be impossible to

3  disclose "[t]he number of Missouri customers . . . whose calling records have been deliv-

4  ered to the [NSA]"; "[t]he date or dates on which [such] disclosures . . . were made"; "[t]he

5  nature or type of information disclosed to the NSA"; or "[t]he particular exchanges for

6  which any number was disclosed to the NSA," Subpoena Ad Testificandum ¶¶ 1, 3, 4, 5,

7  Dkt. 1-3, at 9, without confirming or denying the existence of a relationship between AT&T

8  and the NSA involving covert intelligence activities. *Totten* makes clear that federal com-

9  mon law operates to forbid such inquiries, as the Fourth Circuit recently held. *See El-Masri*

10  *v. United States*, __ F.3d __, 2007 WL 625130, at *9 (4th Cir. Mar. 2, 2007) (holding, with

11  respect to alleged espionage contracts to which plaintiff was not a party, that plaintiff

12  "would have to demonstrate the existence and details of CIA espionage contracts, an en-

13  deavor practically indistinguishable from that categorically barred by *Totten*").

14  **V.    PLAINTIFFS DO NOT HAVE AUTHORITY UNDER STATE LAW TO EN-
       FORCE THE SUBPOENAS IN ANY EVENT.**

15       Finally, this action must be dismissed because Plaintiffs have no statutory authority

16  under Missouri law to bring their Application. When lack of capacity is clear from the

17  complaint, dismissal under Rule 12(b) is proper. *See Coburn v. Coleman*, 75 F. Supp. 107,

18  109 (D.S.C. 1947) (dismissing suit where plaintiff lacked capacity to sue under state law);

19  5A Charles A. Wright et al., *Federal Practice and Procedure* § 1360 (2d ed. 1990). Al-

20  though Plaintiffs purport to have brought suit pursuant to RSMo. § 536.077, *see* Applica-

21  tion at 2, Dkt. 1-6, at 17,[14] this provision by its plain terms applies only to subpoenas issued

22  within the context of a "contested case," and therefore may not be used to enforce subpoe-

23

_____

24  [14] Plaintiffs also cite Missouri Rules of Civil Procedure 58.01 and 61.01 as authority for this
    action. *See* Application at 2, Dkt. 1-6, at 17. As this case is pending in federal court, the

25  relevance of the Missouri Rules of Civil Procedure is unclear. In any event, Rules 58.01
    and 61.01 on their face do not apply here, as they pertain only to requests for production

26  issued pursuant to a pending civil action. *See* Mo. R. Civ. P. 58.01(b)(2) (request for pro-
    duction may be served on a plaintiff after an action is commenced, or on any other party

27  after process has been served, an appearance has been entered, or a pleading has been filed);
    *id.* 61.01(d) (authorizing the court to issue an order compelling compliance with Rule 58.01

28  request for production).

-21-                            AT&T MOTION TO DISMISS
                               CLAYTON v. AT&T, No. 07-1187
                               MDL No. 06-1791-VRW

1    nas, like these, that are investigative.  *See Brooks v. Pool-Leffler*, 636 S.W.2d 113, 121

2    (Mo. Ct. App. 1982), *recognized as abrogated by statute on other grounds*, *Gerlach v. Mo.*

3    *Comm'n on Human Rights*, 980 S.W.2d 589, 592 (Mo. Ct. App. 1998); *see also* 20 Mis-

4    souri Practice, *Administrative Practice & Procedure* § 10.40 (14th ed. 2007) ("an agency

5    could not rely on § 536.077 subpoena power to subpoena witnesses for an investigation").

6    Plaintiffs themselves admit that the subpoenas here were not issued in the context of a con-

7    tested case, but rather are "investigative subpoenas."  *See* Sugg. in Supp. of Mot. for Re-

8    mand of Proceeding to State Court and Req. for Oral Argument and Expedited Treatment,

9    Dkt. 1-27, at 2.  This admission is plainly correct:  A contested case is "a proceeding before

10   an agency in which legal rights, duties or privileges of specific parties are required by law

11   to be determined after hearing."  RSMo. § 536.010(4).  A hearing required by law is one

12   that must be held before an agency where a record will be made.  *Hagely v. Bd. of Educ.*,

13   841 S.W.2d 663, 668 (Mo. 1992).  It is essential that the hearing be adversarial.  *City of*

14   *Richmond Heights v. Bd. of Equalization*, 586 S.W.2d 338, 342-43 (Mo. 1979).  Moreover,

15   there must be formal procedures such as notice of the hearing, the presentation of oral evi-

16   dence, examination and cross-examination of witnesses, the use of exhibits, and evidentiary

17   rules.  *Rackley v. Firemen's Ret. Sys.*, 848 S.W.2d 26, 28 (Mo. Ct. App. 1993).  Conversely,

18   non-contested cases are "'decisions which are not required by law to be determined after

19   hearing.'"  *Hagely*, 841 S.W.2d at 667.  Plaintiffs do not allege that a hearing of any kind

20   was required prior to issuance of the subpoenas, and no hearing was in progress when the

21   subpoenas were authorized, much less with formal procedures required or observed.  Be-

22   cause the subpoenas at issue here are purely investigative in nature, Plaintiffs may not use

23   § 536.077 to enforce them.

24        The only other authorities cited by Plaintiffs for bringing this enforcement action are

25   RSMo. §§ 386.320 and 386.420.  *See* Application at 2, Dkt. 1-6, at 17.  While these statutes

26   grant authority to individual commissioners to *issue* subpoenas or to take depositions in cer-

27   tain circumstances (the former statute in investigative actions, the latter in contested cases),

28   neither purports to bestow power on an individual commissioner to initiate court action to

1 enforce compliance with a subpoena. As is the case in the United States Congress, the

2 more serious coercive power to enforce a subpoena is vested in the PSC as a whole, not in

3 the individual commissioners that might have issued the subpoena in the first instance.[15]

4 *See* RSMo. §§ 386.130, 386.360. Before the coercive power of the State is deployed to

5 compel the compliance of an unwilling private party, the State must act in a democratically

6 legitimate way, and the PSC must speak as an official body. The chaos of individual com-

7 missioners filing court actions, perhaps at cross-purposes with one another, is neither con-

8 templated nor permitted under state law.

9 Thus, the only statute that addresses authority to enforce, rather than issue, investi-

10 gative subpoenas requires action by the full PSC rather than its individual commissioners.

11 Section 386.360.1 permits the PSC to sue a public utility for an injunctive order or in man-

12 damus whenever "*the commission* shall be of the opinion" that doing so is necessary to pre-

13 vent any "violation of law." *Id.* (emphasis added). The language of this section plainly re-

14 quires such actions to be brought on behalf of the PSC as a whole: The section states that

15 the general counsel of the PSC "*shall*" file such suits "*in the name of the commission,*" *id.*

16 (emphases added). "[T]he word 'shall' connotes a mandatory duty." *State ex rel. City of*

17 *Blue Springs v. Rice*, 853 S.W.2d 918, 920 (Mo. 1993). Under § 386.130, "[a] majority of

18 the commissioners" is required "for the exercise of any power of the commission," includ-

19 ing the aforementioned power to enforce a subpoena. RSMo. § 386.130; *see also State ex*

20 *rel. Philipp Transit Lines, Inc. v. Pub. Serv. Comm'n*, 552 S.W.2d 696, 701 n.4 (Mo. 1977)

21 (powers and duties of commissions may not be exercised by individual members but only

22 by commission with quorum and majority vote, especially where acts involving discretion

23 and judgment, particularly in a judicial or quasi-judicial capacity, are at issue); *Brooks*, 636

24 S.W.2d at 118 n.7 (referring to "*the Commission's* power to . . . obtain judicial enforcement

25

---

26 [15] In Congress, subpoenas may be issued by individual committees or subcommittees under both House and Senate rules, and this power may be, and often is, delegated to individual

27 chairmen. *See generally* H.R. Rule XI(2)(m)(l); S. Rule XXVI(1). However, judicial pro-

ceedings to enforce such subpoenas can only be initiated by a vote of the entire House or

Senate. *See generally* 2 U.S.C. §§ 192-194; 288b(b); 288d; 28 U.S.C. § 1365.

28

1  of [a] subpoena" and "the authority to enforce the subpoena" of a "*governmental body*"

2  (emphases added)).

3       Missouri law is clear that plaintiffs thus cannot bring suit in their own names to en-

4  force subpoenas, and this incapacity independently requires dismissal. "[W]here a stat-

5  ute . . . points out the persons who may sue, they and they alone can sue." *Superior Miner-*

6  *als Co. v. Mo. Pac. R.R.*, 45 S.W.2d 912, 914 (Mo. Ct. App. 1932); *see* 15 Missouri Prac-

7  tice, *Civil Rules Practice* §§ 52.01-8 & -9 (3d ed. 2006); *see also* Fed. R. Civ. P. 17(b)

8  ("The capacity of an individual . . . to sue or be sued shall be determined by the law of the

9  individual's domicile."). And, when a party without statutory authority sues, its petition

10 "will state no cause of action" and dismissal is appropriate. *Superior Minerals*, 45 S.W.2d

11 at 914; *see Moore v. Mitchell*, 281 U.S. 18, 23-24 (1930) (dismissing suit due to plaintiff's

12 lack of capacity); *see also Asbestos Worker Syracuse Pension Fund ex rel. Collins v. M.G.*

13 *Indus. Insulation Co.*, 875 F. Supp. 132, 141-42 (N.D.N.Y. 1995) (dismissing suit for lack

14 of capacity where plaintiff failed to obtain necessary authorization to file action); *Coburn*,

15 75 F. Supp. at 109. These rules have particular force in this context, because under Mis-

16 souri law, agencies have no inherent subpoena power, and accordingly may issue and en-

17 force subpoenas only as authorized by statute. *See Brooks*, 636 S.W.2d at 119. For this

18 reason too, the Application must be dismissed.

19 **<u>CONCLUSION</u>**

20      For the foregoing reasons, Plaintiffs' Application should be dismissed.

21 //

22 //

23 //

24 //

25 //

26 //

27 //

28 //

1    Dated:  April 9, 2007

2                                        Respectfully submitted,

3    PILLSBURY WINTHROP                  SIDLEY AUSTIN LLP
       SHAW PITTMAN LLP                  DAVID W. CARPENTER*
4    BRUCE A. ERICSON                    BRADFORD A. BERENSON*
     DAVID L. ANDERSON                   DAVID L. LAWSON*
5    JACOB R. SORENSEN                   EDWARD R. MCNICHOLAS*
     MARC H. AXELBAUM                    ERIC A. SHUMSKY
6    DANIEL J. RICHERT                   1501 K Street, N.W.
     50 Fremont Street                   Washington, DC 20005
7    Post Office Box 7880
     San Francisco, CA 94120-7880        * admitted *pro hac vice*
8

9    By _____*/s/ Marc H. Axelbaum*_____      By _____*/s/ Bradford A. Berenson*_____
     Marc H. Axelbaum                    Bradford A. Berenson
10

11                        *Attorneys for AT&T Defendants*

12         **DECLARATION PURSUANT TO GENERAL ORDER 45, § X.B**

13         I, MARC H. AXELBAUM, hereby declare pursuant to General Order 45, § X.B,

14   that I have obtained the concurrence in the filing of this document from the other signatory

15   listed above.

16         I declare under penalty of perjury that the foregoing declaration is true and correct.

17         Executed on April 9, 2007, at San Francisco, California.

                                        _____*/s/ Marc H. Axelbaum*_____
18                                        Marc H. Axelbaum

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28