1   WILMER CUTLER PICKERING HALE            MUNGER, TOLLES & OLSON LLP
    AND DORR LLP                            Henry Weissmann    # 132418
2   John A. Rogovin      (pro hac vice)     Susan R. Szabo     # 155315
    Randolph D. Moss     (pro hac vice)     Aimee A. Feinberg  # 223309
3   Samir C. Jain        # 181572           355 South Grand Avenue
    Brian M. Boynton     # 222193           35th Floor
4   Catherine M.A. Carroll  (pro hac vice pending)   Los Angeles, CA  90071-1560
    Benjamin C. Mizer    (pro hac vice)     Tel.: 213-683-9100
5   1875 Pennsylvania Ave, NW               Fax: 213-683-5150
    Washington, DC  20006                   Email: Henry.Weissmann@mto.com
6   Tel.: 202-663-6000
    Fax:  202-663-6363
7   Email: john.rogovin@wilmerhale.com

8   Randal S. Milch      (pro hac vice)
    Verizon Communications Inc.
9   One Verizon Way
    VC43E043
10  Basking Ridge, NJ  07920
    Tel.: 908-559-1752
11  Fax: 908-696-2136

12
    Attorneys for Verizon Communications Inc.,
13  Verizon Northwest Inc., Verizon Florida Inc.,
    and MCI Communications Services, Inc.
14

15                   UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17                    SAN FRANCISCO DIVISION

18
                                      )   MDL NO. 06-1791 VRW
19                                    )
    IN RE:                            )   **MEMORANDUM IN SUPPORT OF**
20                                    )   **VERIZON'S MOTION TO DISMISS**
    NATIONAL SECURITY AGENCY          )   **PLAINTIFFS' MASTER CONSOLIDATED**
21  TELECOMMUNICATIONS                )   **COMPLAINT**
    RECORDS LITIGATION                )
22                                    )
    This Document Relates To:         )   Hearing Date: June 21, 2007
23                                    )   Time:         2:00 p.m.
    All Actions Against the MCI and   )   Courtroom:    6 (17th floor)
24  Verizon Defendants in the Master MCI )   Judge:        Hon. Vaughn R. Walker
    and Verizon Consolidated Complaint, )
25  Dkt. 125                          )
                                      )
26  _____ )

27

28

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... iii

ISSUES TO BE DECIDED…………………………………………………...…………..x

ARGUMENT .......................................................................................................3

I.      THE STATE-SECRETS DOCTRINE MANDATES DISMISSAL OF ALL CLAIMS
        …………………………………………………………………………………....3

II.     THE CALL CONTENT CLAIMS MUST BE DISMISSED (CLAIMS 3 AND 5)......7

        A.      Title III Does Not Apply To National Security Intelligence............................7

        B.      The Complaint Fails to State a Claim for Interception or Surveillance..........9

        C.      The FISA Claim Must Be Dismissed …………………………………………..10

III.    THE RECORDS CLAIM FAILS BECAUSE ECPA DOES NOT APPLY TO THE
        FACTS ALLEGED (CLAIM 2) ..................................................................11

        A.      ECPA Does Not and Cannot Be Construed To Restrict the Collection of
                Intelligence for National Defense Purposes ....................................11

        B.      The AUMF Is  Statutory Authority to Obtain Access to Call Record Information
                ...……………………………………………………………………...…19

        C.      The Emergency Exception Applies ................................................20

        D.      The State-Secrets Privilege Requires Dismissal Of The Records Claim ........22

IV.     IF ECPA'S RECORDS PROVISIONS WERE APPLICABLE, THE SECOND CLAIM
        NEVERTHELESS FAILS AS A MATTER OF LAW ..............................................22

        A.      Defendants' Alleged Provision Of Call Records For Inclusion In A Database
                Does Not Constitute The "Divulgence" Of Records......................................23

        B.      Plaintiffs' Records Claim Under ECPA Must Be Dismissed Because It Seeks to
                Hold Defendants Liable For Activity Protected by the First Amendment......26

                1.      Defendants' Alleged Communications Are "Speech" Protected by the
                        First Amendment..................................................................27

                2.      Defendants Cannot Be Held Liable for Their Alleged Petitioning
                        Activity ................................................................29

                3.      Defendants Cannot Be Held Liable for Their Alleged Speech ..........32

                        a.      Strict Scrutiny Applies .........................................32

                        b.      Prohibiting the Speech Alleged Fails Strict Scrutiny..............35

                                (1)     No Compelling Interest Exists That Would Justify
                                        Prohibiting The Speech Alleged..................................35

- i -

(2) Prohibiting The Speech Alleged Is Not The Least Restrictive Means ........................................................................ 34

c. Prohibiting Speech As Alleged In The Complaint Fails Intermediate Scrutiny ................................................................... 39

d. The Complaint Must Be Dismissed Because It Seeks To Impose Liability On Protected Speech................................................ 41

4. Under *Ashwander*, ECPA Must Be Construed To Permit Defendants' Alleged Speech and Petitioning Activity ........................................... 42

V. THE REMAINING CLAIMS MUST BE DISMISSED............................................ 46

 A. Claim 4, Under 47 U.S.C. § 605, Must Be Dismissed ................................... 46

 B. Claim 1, Under 18 U.S.C. § 2702(a)(1) and (a)(2), Must Be Dismissed ........ 46

 C. The State-Law Claims Must Be Dismissed.................................................... 46

VI. CLAIMS AGAINST MCI ARE BARRED BY THE BANKRUPTCY DISCHARGE ...................................................................................................................... 48

CONCLUSION ............................................................................................................. 50

- ii -

1

## <u>TABLE OF AUTHORITIES</u>

2

### **FEDERAL CASES**

3

*Advanced Computer Services v. MAI Sys. Corp.*,
   161 B.R. 771 (E.D. Va. 1993) ........................................................................50

4

*Am. Fed'n of Gov't Employees v. HUD*,
   118 F.3d 786 (D.C. Cir. 1997) .......................................................................37

5

*Armstrong v. Bush*,
   924 F.2d 282 (D.C. Cir. 1991) .......................................................................14

6

*Bartnicki v. Vopper*,
   532 U.S. 514 (2001) ................................................................................passim

7

*BE&K Constr. Co. v. NLRB*,
   536 U.S. 516 (2002) ..............................................................................31, 35

8

*BellSouth Corp. v. FCC*,
   144 F.3d 58 (D.C. Cir. 1998) ....................................................................28, 29

9

*Boone v. Redevelopment Agency of City of San Jose*,
   841 F.2d 886 (9th Cir. 1988) ....................................................................27, 29

10

*Brownsville Golden Age Nursing Home, Inc. v. Wells*,
   839 F.2d 155(3d Cir. 1988) ...........................................................................30

11

*California Motor Transp. Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972) .......................................................................................29

12

*Campbell v. Clinton*,
   203 F.3d 19 (D.C. Cir. 2000) .........................................................................13

13

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
   447 U.S. 557 (1980) .......................................................................................39

14

*Chapman v. Houston Welfare Rights Org.*,
   441 U.S. 600 (1978) .......................................................................................30

15

*CIA v. Sims*,
   471 U.S. 159 (1985) .......................................................................................13

16

*City of Lakewood v. Plain Dealer Pub. Co.*,
   486 U.S. 750 (1988) ..................................................................................29, 40

17

*Connick v. Myers*,
   461 U.S. 138 (1983) .......................................................................................33

18

*Cox Broad. Corp. v. Cohn*,
   420 U.S. 469 (1975) ..................................................................................33, 36

19

*Ctr. for Fair Public Policy v. Maricopa County, Arizona*,
   336 F.3d 1153 (9th Cir. 2003) .......................................................................34

20

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) .......................................................................................20

21

*Dep't of the Navy v. Egan*,
   484 U.S. 518 (1988) ..................................................................................13, 14

22

*Dyer v. Northwest Airlines Corp.*,
   334 F. Supp. 2d 1196 (D.N.D. 2004) ............................................................48

23
24
25
26
27
28

- iii -

*Eastern R.R. President's Conference v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961) ...................................................................................29

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988) ............................................................................43, 46

*El-Masri v. United States*,
    479 F.3d 296 (2007) ...................................................................................5, 6

*Fleming v. Page*,
    50 U.S. (9 How.) 603 (1850) ..............................................................18

*Florida Star v. B.J.F.*,
    491 U.S. 529 (1989) ....................................................................35, 37, 38

*Forro Precision, Inc. v. IBM Corp*,
    673 F.2d 1045 (9th Cir. 1982) ...................................29, 30, 31, 32

*Foti v. City of Menlo Park*,
    146 F.3d 629 (9th Cir. 1998) .................................................................34

*Franchise Realty Interstate Corp. v. San Francisco Local Joint Exec. Bd. of*
    *Culinary Workers*, 542 F.2d 1076 (9th Cir. 1976) ............................................27

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ....................................................................13, 14

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ..................................................................................41

*Giebel v. Sylvester*,
    244 F.3d 1182 (9th Cir. 2001) ...............................................................27

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
    527 U.S. 173 (1999) ....................................................................40, 44

*Halkin v. Helms*,
    598 F.2d 1 (D.C. Cir. 1978) ......................................................6, 9, 10

*Halkin v. Helms*,
    690 F.2d 977 (D.C. Cir. 1982) ...............................................................6, 9

*Hamdan v. Rumsfeld*,
    126 S.Ct. 2749 (2006) ..............................................................................19

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) ..........................................................................19, 20

*Hamilton v. Dillin*,
    88 U.S. 87 (1874 ........................................................................................13

*Hamilton v. Regents*,
    293 U.S. 245 (1934) ..................................................................................45

*Hartman v. Moore*,
    547 U.S. 250 (2006) ..................................................................................42

*Hassanally v. Republic Bank (In re Hassanally)*,
    208 B.R. 46 (9th Cir. BAP 1997) ....................................................49, 50

*Hepting v. AT&T*,
    439 F. Supp. 2d 974 (N.D. Cal. 2006)..................................................3, 5

*Hill v. Colorado*,
    530 U.S. 703 (2000) ................................................................................34

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988) .........................................................................41, 42

*In re Emelity*,
    251 B.R. 151 (Bankr. S.D. Cal. 2000) ....................................................49

*In re Jensen*,
    995 F.2d 925 (9th Cir. 1993) ...................................................................49

*In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*,
    140 B.R. 969 (N.D. Ill. 1992) ..................................................................50

*In re Primus*,
    436 U.S. 412 (1978) ................................................................................32

*In re Quarles*,
    158 U.S. 532 (1894) ................................................................................30

*In re Russell*,
    193 B.R. 568 (Bankr. S.D. Cal. 1996) ....................................................49

*In re Sacred Heart Hosp.*,
    133 F.3d 237 (3d Cir. 1998) ....................................................................30

*In re Sealed Case*,
    310 F.3d 717 (FISA Ct. of Rev. 2002) ....................................................10

*In re WorldCom, Inc.*,
    320 B.R. 772 (Bankr. S.D.N.Y. 2005) ....................................................50

*In re WorldCom, Inc.*,
    328 B.R. 35 (Bankr. S.D.N.Y. 2005) ......................................................50

*INS v. St. Cyr*,
    533 U.S. 289 (2001) ....................................................................21, 26, 42

*Johnson v. Eisentrager*,
    339 U.S. 763 (1950) ................................................................................13

*Junger v. Dailey*,
    209 F.3d 481 (6th Cir. 2000) ...................................................................27

*Kansas v. Hendricks*,
    521 U.S. 346 (1997) ................................................................................12

*Kasza v. Browner*,
    133 F.3d 1159 (9th Cir. 1998) ...................................................................4

*King v. Idaho Funeral Serv. Ass'n*,
    862 F.2d 744 (9th Cir. 1988) ...................................................................29

*Knievel v. ESPN*,
    393 F.3d 1068 (9th Cir. 2005) .................................................................47

*Kottle v. Northwest Kidney Ctrs.*,
    146 F.3d 1056 (9th Cir. 1998) ...........................................................31, 32

*Landmark Commc'ns, Inc. v. Virginia*,
    435 U.S. 829 (1978) ................................................................................27

*Mills v. Alabama*,
    384 U.S. 214 (1966) ................................................................................33

*Mills v. Wex-Tex Indus.*,
    991 F.Supp. 1370 (M.D. Ala 1997)...................................................24

*Molerio v. FBI*,
    749 F.2d 815 (D.C. Cir. 1984) ........................................................6

*Nat'l Archives & Records Admin. v. Favish*,
    541 U.S. 157 (2004) .......................................................................42

*New York Times v. Sullivan*,
    376 U.S. 254 (1964) .......................................................................41

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977) ...............................................................11, 22

*Oja v. U.S. Army Corps of Eng'rs*,
    440 F.3d 1122 (9th Cir. 2006) ......................................................24

*Ottensmeyer v. Chesapeake & Potomac Tel. Co.*,
    756 F.2d 986 (4th Cir. 1985) ........................................................29

*Overstreet v. United Bhd. of Carpenters & Joiners of Am.*,
    409 F.3d 1199 (9th Cir. 2005) ......................................................43

*Philip Morris USA v. Williams*,
    127 S. Ct. 1057 (2007) ....................................................................5

*Pinkney v. District of Columbia*,
    439 F.Supp. 519 (D.D.C. 1977) ....................................................24

*Planned Parenthood of Southern Arizona v. Lawall*,
    307 F.3d 783 (9th Cir. 2002) ........................................................25

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993) ..................................................................29, 31

*Public Citizen v. Dep't of Justice*,
    491 U.S. 440 (1989) .......................................................................14

*Reporters Committee v. AT&T*,
    593 F.2d 1030 (D.C. Cir. 1978) ....................................................36

*Republican Party of Minn. v. White*,
    536 U.S. 765 (2002) .......................................................................33

*Rubin v. Coors Brewing Co.*,
    514 U.S. 476 (1995) .......................................................................34

*Salisbury v. United States*,
    690 F.2d 966 (D.C. Cir. 1982) ........................................................4

*Sanders v. Robert Bosch, Inc.*,
    38 F.3d 736 (4th Cir. 1994).……………………………………....…10

*Sanford's Estate v. Commissioner of Internal Revenue*,
    308 U.S. 39 (1939) .........................................................................12

*Smith v. Daily Mail Pub. Co.*,
    443 U.S. 97 (1979) ..................................................................36, 38

*Smith v. Maryland*,
    442 U.S. 735 (1979) ................................................................13, 36

*Sosa v. DIRECTV, Inc.*
    437 F.3d 923 (9th Cir. 2006)...................................................passim

*Stromberg v. California*,
283 U.S. 359 (1931) ................................................................................33

*Sutherland v. Mayer*,
271 U.S. 272 (1926) ................................................................................45

*Tenet v. Doe*,
544 U.S. 1 (2005) ....................................................................................4

*The Prize Cases*,
67 U.S. (2 Black) 635 (1862) ................................................................13

*Thomson v. Western States Medical Center*,
535 U.S. 357 (2002) ................................................................................41

*Totten v. United States*,
92 U.S. 105 (1875) ........................................................................4, 5, 13

*Trans Union Corp. v. FTC*,
245 F.3d 809 (D.C. Cir. 2001) ..............................................................28

*U.S. West, Inc. v. FCC*,
182 F.3d 1224 (10th Cir. 1999) ......................................................38, 40

*United States v. Aguilar*,
515 U.S. 593 (1995) ................................................................................35

*United States v. Barnard*,
490 F.2d 907 (9th Cir. 1973) ................................................................46

*United States v. Bass*,
404 U.S. 336 (1971) ................................................................................14

*United States v. Butenko*,
494 F.2d 593 (3d Cir. 1974) ..........................................................14, 50

*United States v. Caltex (Philippines), Inc.*,
344 U.S. 149 (1952) ................................................................................45

*United States v. Grace*,
461 U.S. 171 (1983) ..........................................................................34, 39

*United States v. Koyomejian*,
970 F.2d 536 (9th Cir. 1992) ..................................................................8

*United States v. Marchetti*,
466 F.2d 1309 (4th Cir. 1972) ..............................................................13

*United States v. O'Brien*,
391 U.S. 367 (1968) ..........................................................................34, 40

*United States v. Sarkissian*,
841 F.2d 959 (9th Cir. 1988) ..................................................................8

*United States v. Smith*,
155 F.3d 1051 (9th Cir. 1998) ..............................................................10

*United States v. Stone*,
305 F.Supp. 75 (D.D.C. 1969) ..............................................................46

*United States v. Torres*,
751 F.2d 875 (7th Cir. 1985) ..................................................................8

*United States v. United States Dist. Court*,
407 U.S. 297 (1972) ..................................................................................7

- vii -

*Universal City Studios, Inc. v. Corley*,
  273 F.3d 429 (2d Cir. 2001) ..................................................................................27

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*,
  425 U.S. 748 (1976) .........................................................................................28

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) ....................................................................29, 34

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .........................................................................................15

### STATE CASES

*Arim v. General Motors Corp.*,
  520 N.W.2d 695 (Mich. Ct. App. 1994).............................................................30

*Equifax Services, Inc. v. Cohen*,
  420 A.2d 189 (Maine 1980) ...............................................................................28

*LaMon v. City of Westport*,
  44 Wash.App. 664 (1986) ...................................................................................24

*Mars, Inc. v. Gonzalez*,
  71 S.W.3d 434 (Tx. App. 2002) .........................................................................25

*Morrow v. II Morrow Inc*,
  911 P.2d 964 (Or. App. 1996) ............................................................................25

*Pressley v. Cont. Can Co.*,
  250 S.E.2d 676 (N.C. App. 1979) ......................................................................24

*U.D. Registry, Inc. v. California*,
  34 Cal.App.4th 107 (1995) .................................................................................28

### FEDERAL STATUTES

11 U.S.C. § 101 ........................................................................................................49

18 U.S.C. § 2510 .........................................................................................................9

18 U.S.C. § 2511 ................................................................................................passim

18 U.S.C. § 2520 ......................................................................................................8, 9

18 U.S.C. § 2701 ......................................................................................................10

18 U.S.C. § 2702 ...............................................................................................passim

18 U.S.C. § 2703 ...............................................................................................passim

18 U.S.C. § 2705.......................................................................................................12

18 U.S.C. § 2707 ......................................................................................................37

18 U.S.C. § 2709.................................................................................................... 18

26 U.S.C. § 6103 ......................................................................................................39

42 U.S.C. § 14135e ..................................................................................................39

42 U.S.C. § 5195 ......................................................................................................44

47 U.S.C. § 605 ........................................................................................................14

50 U.S.C. § 201 .........................................................................................................8

50 U.S.C. § 1541 ...................................................................................................1, 19

50 U.S.C. § 1621 ...................................................................................................21, 44

50 U.S.C. § 1801 .................................................................................................. 9

50 U.S.C. § 1809 .................................................................................................. 8

50 U.S.C. § 1810 .................................................................................................. 8

50 U.S.C. § 1811 ................................................................................................ 15

## LEGISLATIVE HISTORY

H.R. Rep. No. 95-1283 (1977) ............................................................................. 8

H.R. Rep. No. 95-1720 (1977) ........................................................................ 8, 15

H.R. Rep. No. 99-647 (1986) ............................................................................. 11

H.R. Rep. No. 99-952 (1986) ............................................................................. 17

S. Rep. No. 90-1097 (1968) ................................................................................. 7

S. Rep. No. 95-604 (1977) ............................................................................... 7, 8

S. Rep. No. 99-307 (1986) ................................................................................. 17

S. Rep. No. 99-541 (1986) ........................................................................... 11, 17

## FEDERAL RULES & REGULATIONS

47 C.F.R. § 61.19(c .......................................................................................... 54

Federal Rule of Civil Procedure 12(b)………………………………………………….48

Federal Rule of Criminal Procedure 6(e) ……………………………………………….39

## OTHER FEDERAL AUTHORITIES

9 Op. Att'y Gen. 462 (1860) ............................................................................. 18

66 Fed. Reg. 48201 …………………………………………………………………………1

Executive Order No. 13231, 66 Fed. Reg. 53063 (Oct. 16, 2001) ........................ 45

Military Order, 66 Fed. Reg. 57833 (Nov. 13, 2001)…………………………………….45

Presidential Proclamation No. 7463, 66 Fed. Reg. 48199 ((Sept. 14, 2001) ........................... 1

Continuation of the National Emergency with Respect to Certain Terrorist Attacks, 67 Fed.
        Reg. 58,317 (2002)………………………………………….……………………..21

Continuation of the National Emergency with Respect to Certain Terrorist Attacks, 68 Fed.
        Reg. 53,665 (2003)………………………………………….……………………..21

Continuation of the National Emergency with Respect to Certain Terrorist Attacks, 69 Fed.
        Reg. 55,313 (2004)………………………………………….……………………..21

Continuation of the National Emergency with Respect to Certain Terrorist Attacks, 70 Fed.
        Reg. 54,229 (2005)………………………………………….……………………..21

Continuation of the National Emergency with Respect to Certain Terrorist Attacks, 71 Fed.
        Reg. 52,733 (2002)………………………………………….……………………..21

## OTHER AUTHORITIES

Restatement (Second) of Torts § 139 ……...………………………………………31, 42

Restatement (Second) of Torts § 577 ………………………………………………..24

Restatement (Second) of Torts § 598 …………………………………………….31, 33

**ISSUES TO BE DECIDED**

1.     Does the state-secrets privilege bar litigation of the claims alleged?

2.     Does the Complaint fail to state a claim under 18 U.S.C. §§ 2511, 2702(a)(1), 2702(a)(2), 2702(a)(3), and 47 U.S.C. § 605, where those statutes do not prohibit the foreign intelligence-gathering activities alleged in the Complaint?

3.     Does the Complaint fail to state a claim for interception or surveillance?

4.     Does the Complaint fail to state a claim under 18 U.S.C. § 2702(a)(3), where plaintiffs fail to plead facts that would constitute a "divulgence" under that statute?

5.     Should the statutes upon which plaintiffs base their claims be construed as not applying to the alleged divulgence of records to the government in order to avoid a violation of the First Amendment to the United States Constitution?

6.     Does federal law preempt plaintiffs' state-law claims?

7.     Do plaintiffs fail to state deception and breach-of-contract claims where plaintiffs (a) fail to allege any promises by MCI not to disclose call information, (b) fail to identify any contracts they assert Verizon breached, and (c) where the Verizon privacy policies they cite expressly permit the acts alleged?

8.     Are the claims against MCI barred by the bankruptcy discharge?

On September 11, 2001, al Qaeda terrorists carried out the most lethal attack on the American homeland in the country's history.  On September 14, the President declared a national emergency, stating that there was a "continuing and immediate threat of further attacks on the United States."  Presidential Proclamation 7463, 66 Fed. Reg. 48199.  Congress passed the Authorization for Use of Military Force ("AUMF"), declaring that the attacks "continue to pose an unusual and extraordinary threat" to the country and calling on the President "to use all necessary and appropriate force" against those he determines were responsible for the attacks in order to prevent future attacks.  Pub. L. 107-40, 50 U.S.C. § 1541 note.

Thirty-five thousand reservists and national guard troops were mobilized for homeland defense.  66 Fed. Reg. 48201.  The Pentagon launched "Operation Noble Eagle": fighters flew Combat Air Patrols over New York and Washington 24-hours a day; interceptors were put on around-the-clock alert at 26 airbases; Aegis cruisers were deployed to New York and other coastal areas for air defense; troops in combat gear took up positions at airports, bridges, tunnels, subways, and other sensitive sites throughout the New York and Washington areas.

Officials expected a "second wave" of attacks and feared that a "network of terrorists [was] still in place for another wave of attacks."[1]  On September 30, the country was warned that, when the U.S. started operations in Afghanistan, there was a high probability of new attacks.[2]  After those operations began, on October 8, the Attorney General put all federal and state law enforcement and corporate America on the "highest alert."[3]  On October 11, the FBI announced that the government "had reason to believe" that new terrorist attacks might be launched within the United States "over the next several days."[4]  It was reported that attacks were "imminent" and that the CIA had gathered "highly credible" information "pointing to possible multiple attacks in the

---

[1] Pierre Thomas & Peter Jennings, World News Tonight, *FBI Continues to Search for Suspects in Attacks on the United States* (ABC Television Broadcast, Sept. 20, 2001); *see also* Eric Pianin et al., *Across U.S., A Security Scramble*, Wash. Post, Sept. 23, 2001.
[2] Jim Landers, *U.S.: Terror Threat Remains; 'Substantial Risks' Loom As Nation Plans Retaliation*, Dallas Morning News, Oct. 1, 2001.
[3] Attorney General Remarks, *available at* http://www.usdoj.gov/opa/pr/2001/October/516ag.htm.
[4] Dan Eggen & Bob Woodward, *Terrorist Attacks Imminent, FBI Warns*, Wash. Post, Oct. 12, 2001.

- 1 -

very near future" on a scale larger than 9/11.[5]  On October 29, the Attorney General announced

that there was credible information indicating the threat of terrorist attacks over "the next week"

and warned Americans to be "on highest alert."[6]  Americans were told that "[g]overnment analysts

have been forced into broad agreement that the threat of terrorists wielding mass-casualty

weapons—chemical, biological or even nuclear—is more serious than they had believed."[7]

This is the historical context in which the Master Complaint ("Complaint") (Dkt. # 125)

alleges the government requested defendants' help.  Taking plaintiffs' allegations as true for the

purposes of this motion only,[8] the conduct alleged would have taken place during a national

defense emergency declared by Congress and the President, and, according to plaintiffs'

allegations, as part of an effort to defend the country against impending attacks by a foreign

enemy.  This context bears directly on the proper legal analysis of plaintiffs' claims.

Specifically, the President authorized the National Security Agency ("NSA") to intercept

transnational calls of persons with known links to al Qaeda and related terrorist organizations.

Compl. ¶ 139.  The President directed these activities, known as the Terrorist Surveillance

Program ("TSP"), to establish an early warning system "to detect and prevent" another terrorist

attack on the country.  Alexander Decl. ¶ 10 (Dkt. # 254).  In authorizing the TSP, the President

found these activities "necessary to the defense of the United States."[9]  Although the Complaint

references the TSP, it does not allege that plaintiffs' calls were subject to that targeted program.

The Complaint alleges that NSA also engaged in two other types of activities, neither of

which the government has acknowledged.  First, based on two articles in *USA Today*, plaintiffs

allege that NSA obtained access to databases of call record information, i.e., data reflecting what

telephone numbers a given customer called.  Compl. ¶¶ 149-152.  Second, plaintiffs allege that

---

[5] *Id.*

[6] Attorney General Remarks, *available at* http://www.usdoj.gov/archive/ag/speeches/2001/agcrisisremarks10_29.htm.

[7] William J. Broad, et al., *A Nation Challenged: The Threats; Assessing Risks, Chemical, Biological, Even Nuclear*, N.Y. Times, Nov. 1, 2001.

[8] Nothing in this brief should be construed as an admission or denial regarding the existence of the programs alleged in the Complaint or that defendants participated in any such alleged activities.

[9] U.S. Dep't of Justice, *Legal Authorities Supporting the Activities of the National Security Agency Described by the President*, 34-35 (Jan. 19, 2006), *available at* http://www.usdoj.gov/opa/whitepaperonnsalegalauthorities.pdf.

1   NSA was given access to all or substantially all calls while in transmission, and that it used

2   computers to filter the content of those calls to search for words or phrases indicating that

3   particular calls warranted further scrutiny by intelligence officers. *Id*. ¶¶ 142-143, 168.

4         Rather than challenge NSA's alleged actions by suing the government directly, plaintiffs

5   seek to hold defendants liable for allegedly assisting NSA in carrying out these purported

6   programs.  Plaintiffs allege that (1) NSA undertook these alleged programs to collect intelligence

7   to detect and prevent terrorist activities, *id*. ¶¶ 140, 145, 148; (2) as part of this alleged counter-

8   terrorism program, NSA asked defendants to assist it by providing access to call record

9   information and to their networks, *id*. ¶¶ 142, 149; (3) defendants agreed to provide the assistance

10  allegedly requested for the "purpose of assisting the government" in its efforts to prevent and

11  detect terrorist attacks, *id*. ¶ 259; and (4) NSA actually used the records and call content that it

12  obtained with defendants' alleged assistance in its counter-terrorism program, *id*. ¶¶ 142, 145, 164.

13  **ARGUMENT**

14  **I.     THE STATE-SECRETS DOCTRINE MANDATES DISMISSAL OF ALL CLAIMS**

15        Defendants join the government's motion, which shows that the state-secrets privilege

16  requires dismissal of the Complaint.  First, the Complaint falls into both categories requiring

17  dismissal—without the need for any granular analysis—because of the nature of the claims:

18  (1) those whose "very subject matter" are secret, and/or (2) those that would involve courts in

19  exposing, probing, or betraying alleged intelligence relationships between the executive and

20  private parties.  Second, beyond these categorical rules, dismissal is required because a forward-

21  looking analysis reveals that full litigation of the claims would involve state secrets.  As the

22  government has shown, and as amplified below, these doctrines bar litigation of each of the three

23  categories of activities alleged in the Complaint.

24       <u>Records</u>: In *Hepting v. AT&T*, the Court noted that the government has not acknowledged

25  that a records program exists or, if it did, how it worked or any role played by any particular

26  telecommunications provider, and on this basis prohibited plaintiffs from conducting discovery

27  with respect to the alleged records program.  *See* 439 F. Supp. 2d 974, 997 (N.D. Cal. 2006).  The

28  Court nevertheless stated that it was hesitant *at that time* to dismiss the records claims.  *Id*.

- 3 -

1    Defendants respectfully suggest that now is the time to dismiss the records claims.

2         First, the "very subject matter" of plaintiffs' challenge to the alleged records program is

3    secret.  Alexander Decl. ¶ 12.  Only the Executive can waive the state-secrets privilege, and it has

4    not done so with respect to that alleged program.  Vague statements by Senators about a program,

5    Compl. ¶¶ 154-56, or statements attributed to unnamed members of Congress about MCI's alleged

6    involvement, *id.* ¶ 158, cannot defeat the Executive's invocation of the privilege.  *See Salisbury v.*

7    *United States*, 690 F.2d 966, 971 (D.C. Cir. 1982) (congressional discussion of NSA methods

8    "cannot be equated with disclosure by the agency itself of its methods of information gathering").

9         Second, if the alleged records program existed, the role, if any, that defendants played in it

10   would be shielded by the *Totten* doctrine, which prohibits litigation that would expose, probe, or

11   betray a confidential relationship the President has entered into with a private party to collect

12   intelligence.  *See Totten v. United States*, 92 U.S. 105, 107 (1875); *Tenet v. Doe*, 544 U.S. 1, 11

13   (2005).  Beyond harm to the alleged records program itself (if one existed), such litigation would

14   cause broader harms that *Totten* is designed to avoid.  In *Totten* itself, there was no possibility that

15   litigation would harm the particular activity in which the alleged spy was involved; the case arose

16   years after the Civil War.  *Totten* bars litigation probing intelligence-gathering relationships as a

17   *general category* in order to avoid damaging the Executive's ability to obtain private help in *other*

18   cases and to avoid harming the agent.  *See Totten*, 92 U.S. at 106 (confidentiality of spying

19   relationships should be maintained because disclosure of such relationships "might compromise or

20   embarrass our government in its public duties, or endanger the person or injure the character of the

21   agent").  Plaintiffs' allegations fall squarely into this prohibited category.

22        Third, if a secret records program existed, the prospective evaluation that must be

23   undertaken now makes clear that the government's invocation of the state-secrets privilege would

24   make the full and fair litigation of challenges to any such program impossible.  State secrets would

25   not only prevent plaintiffs from making out a prima facie case, but also would deprive defendants

26   of evidence that could support their defenses.  *See Kasza v. Browner*, 133 F.3d 1159, 1166 (9th

27   Cir. 1998) (court must evaluate impact that removal of secret evidence from case will have on both

28   prima facie case and on defenses).  The state-secrets doctrine mandates dismissal not only when

1   secret matters would deprive a defendant of a defense entirely, but also when the defendant could

2   present its defense more fully if secrets were used to support it.  When this is so, the state-secrets

3   doctrine mandates dismissal, for it would violate fundamental due process for the government to

4   subject a defendant to liability and at the same time deprive it of evidence that could be useful in

5   its defense.  *See Philip Morris USA v. Williams*, 127 S. Ct. 1057, 1063 (2007) (Due Process Clause

6   prohibits "punishing an individual without first providing that individual with an opportunity to

7   present every available defense" (citation and internal quotation marks omitted)).

8        If a records program existed, the state-secrets privilege would prevent defendants from

9   presenting the most basic facts about it, such as what records were involved, how the government

10   accessed them, any controls over access, the predicate facts required for any government searches,

11   the results of those searches, the past and prospective usefulness of this information in detecting

12   and preventing terrorist attacks, the gravity and nature of the threat of future attacks, and what, if

13   anything, defendants were told about the foregoing by the government or learned through their

14   alleged participation in the alleged program.  Alexander Decl. ¶¶ 12, 18.  Because such facts might

15   be helpful to defendants' case if they existed but have been rendered unavailable by the state-

16   secrets privilege, the records claims must be dismissed forthwith.

17        <u>TSP</u>: If the Complaint were read to challenge the legality of the TSP, the very subject

18   matter of that action would be a state secret because details as to the operation of that program

19   would be needed to adjudicate the claim.  As the Fourth Circuit stated in a decision released after

20   this Court's ruling in *Hepting*, the subject matter bar applies even when the existence of the

21   program has been acknowledged in general terms, but the operational details remain secret.  *El-

22   Masri v. United States*, 479 F.3d 296, 308 (2007).  While the government has described "the

23   general contours" of the TSP, *Hepting*, 439 F. Supp. 2d at 31, it has not disclosed specific

24   activities taken to implement that program.  A challenge to the legality *of those activities* cannot be

25   pursued without revealing secret information.  Alexander Decl. ¶¶ 12, 17 & n.4.

26        In addition, claims against defendants based on their alleged involvement in the TSP would

27   be categorically barred by *Totten*.  In *Hepting*, the Court found *Totten* inapplicable based on its

28   observation that it was "unclear" whether the TSP could have existed without AT&T's help, given

- 5 -

1    AT&T's "ubiquity." 439 F. Supp. 2d at 992.  Putting aside whether the Court's inferences were

2    appropriate with respect to AT&T, the same inferences cannot be drawn as to MCI (which was a

3    far smaller long-distance carrier than AT&T) or Verizon (which was mainly a local service

4    provider).  *Totten*'s applicability, moreover, depends not on whether the judiciary can surmise that

5    a clandestine relationship may have existed, but rather on whether the Executive has stated that

6    any such relationship is secret.  *Totten* is designed to prevent litigation that would confirm or

7    disprove the existence of such suspected relationships, as well as their nature and scope.

8            Any claims based on the TSP also could not be proven, or defenses presented fully and

9    fairly, without secret information.  In particular, plaintiffs could not establish standing without

10   obtaining secret information about whose calls were actually intercepted.  *Halkin v. Helms*, 690

11   F.2d 977, 998 (D.C. Cir. 1982) ("*Halkin II*") ("inability to adduce proof of actual acquisition of

12   their communications" made it impossible for plaintiffs to prove standing).  This standing problem

13   cannot be deferred because it is apparent now that plaintiffs cannot establish standing and thus

14   cannot establish this Court's jurisdiction.  Moreover, allowing plaintiffs to establish standing based

15   simply on the allegations of their complaint would be "unfair to the individual defendants who

16   would have no way to rebut it."  *Halkin v. Helms*, 598 F.2d 1, 11 (D.C. Cir. 1978) ("*Halkin I*").

17   Beyond standing, the state-secrets privilege bars discovery of "the roles, if any, that the defendants

18   played in the events" plaintiffs allege—facts essential for plaintiffs to establish their claim and for

19   defendants to present a defense.  *El-Masri*, 479 F.3d at 309.

20         Untargeted Access to Content: Similarly, the state-secrets doctrine requires dismissal of

21   plaintiffs' claims based on an alleged untargeted program of obtaining access to call content.  The

22   government has denied that the TSP is a dragnet of content surveillance and has demonstrated that

23   proof of the matter would involve state secrets.  Alexander Decl. ¶ 17.  It would be a "mockery of

24   justice" to allow the case to proceed based solely on the allegations of the Complaint.  *Molerio v.*

25   *FBI*, 749 F.2d 815, 825 (D.C. Cir. 1984).  Moreover, as the government has shown, any challenge

26   to the government's assertion would necessarily involve secret facts about the scope and operation

27   of the TSP.  Again, it would be unfair to the defendants to deprive them of evidence that could be

28   useful in rebutting plaintiffs' allegations.  *See Halkin I*, 598 F.2d at 11.

1    **II.    THE CALL CONTENT CLAIMS MUST BE DISMISSED (CLAIMS 3 AND 5)**

2         **A.    Title III Does Not Apply To National Security Intelligence**

3         Plaintiffs' Third Claim—that defendants' alleged assistance in NSA's alleged program of

4    accessing the content of calls violated 18 U.S.C. § 2511—must be dismissed. Plaintiffs allege that

5    defendants provided this purported assistance for the purpose of helping the government in

6    preventing and detecting terrorist attacks. *See, e.g.*, Compl. ¶¶ 142, 145, 259. Thus, under

7    plaintiffs' allegations, the alleged surveillance was conducted for national security purposes.

8    Title III, including § 2511, however, applies solely to the interception of calls for law enforcement

9    purposes—not surveillance conducted for national security purposes. Claims regarding alleged

10   surveillance of content for national security purposes are governed exclusively by the Foreign

11   Intelligence Surveillance Act ("FISA").

12        When Congress enacted Title III in 1968, it expressly disclaimed any intent to curtail the

13   President's authority to conduct electronic surveillance for national security purposes:

14            Nothing contained in this chapter . . . shall limit the constitutional power of the President
             to take such measures as he deems necessary to protect the Nation against actual or
15           potential attack or other hostile acts of a foreign power, [or] to obtain foreign intelligence
             information deemed essential to the security of the United States . . . .

16   Pub. L. No. 90-351, § 802, 82 Stat. 214 (1968) (formerly codified at 18 U.S.C. § 2511(3)). In the

17   legislative history, Congress confirmed that "[n]othing in the proposed legislation seeks to disturb

18   the power of the President . . . when international relations and internal security are at stake."

19   S. Rep. No. 90-1097, *reprinted in* 1968 U.S.C.C.A.N. 2112, 2156-2157 (1968); *see also id.* at

20   2182. As the Supreme Court stated, Title III "simply did not legislate with respect to national

21   security surveillances." *United States v. United States Dist. Court*, 407 U.S. 297, 306 (1972).

22        When Congress later decided to regulate electronic surveillance for foreign intelligence and

23   national security, it did so *not* by extending the prohibitions and procedures of Title III to that area,

24   but by enacting a *separate* statute: the Foreign Intelligence Surveillance Act of 1978, Pub. L.

25   No. 95-511, 92 Stat. 1783. FISA regulates the collection of "foreign intelligence information,"

26   and thereby "complement[s]" Title III, "which deals with electronic surveillance for law

27   enforcement purposes." S. Rep. No. 95-604, at 63 (1977). FISA is situated in Title 50 ("War and

28

- 7 -

1   National Defense"), while Title III appears in Title 18 ("Crimes and Criminal Procedure").

2   Consistent with this dual structure, FISA amended Title III to provide that various procedural

3   requirements in Title III apply only to law enforcement interceptions carried out pursuant to that

4   statute.  *See* FISA §§ 201(e)-(h) (amending 18 U.S.C. §§ 2518, 2519).

5        FISA eliminated the national-security disclaimer that previously appeared in § 2511(3) and

6   replaced it with a provision stating that Title III and the new FISA were the "exclusive means" by

7   which the government can conduct electronic surveillance and the interception of domestic wire,

8   oral, and electronic communications.  18 U.S.C. § 2511(2)(f).  The elimination of the disclaimer

9   was a "technical and conforming" amendment to Title III, S. Rep. No. 95-604, at 3, reflecting the

10  adoption of a new regime for national security surveillance.  Congress did not thereby expand

11  Title III to apply to the subject matter that FISA was adopted to address.  *United States v.*

12  *Koyomejian*, 970 F.2d 536, 541 (9th Cir. 1992) (en banc) ("'All this section [§ 2511(2)(f)] means to

13  us, however, is that [FISA] is intended to be exclusive in its domain and Title III in its.'" (quoting

14  *United States v. Torres*, 751 F.2d 875, 881 (7th Cir. 1984)).  In short, the 1978 amendments did

15  not create two overlapping regimes, but two separate and complementary regimes covering

16  different fields—FISA for national security and Title III for law enforcement and all other matters.

17  *See United States v. Sarkissian*, 841 F.2d 959, 964-65 (9th Cir. 1988) (whether surveillance is

18  regulated by FISA or Title III depends on purpose of surveillance).

19       Consistent with this dual structure, Title III does not create a right of action for improper

20  surveillance for foreign intelligence purposes; the remedy for such surveillance arises solely under

21  FISA.  *See* 50 U.S.C. §§ 1809, 1810.  In enacting FISA, Congress *rejected* an amendment

22  extending the cause of action in § 2520 to electronic surveillance regulated by FISA.[10]  Moreover,

23  it would be absurd to construe the cause of action under Title III to apply to foreign intelligence

24  surveillance.  FISA creates a cause of action for surveillance that violates FISA, but only for

25  _____

26  [10] The Senate would have amended 18 U.S.C. § 2520 to include a cause of action for surveillance in
    violation of FISA.  *See* S. 1566, 95th Cong., § 4(k) (as passed by Senate, Apr. 24, 1978).  Congress
    rejected that approach in favor of the House version, which created a separate cause of action under
27  FISA and did not extend the Title III cause of action to foreign intelligence surveillance.  *See* H.R.
    Rep. No. 95-1720, at 33-34 (1978) (Conf. Rep.); H. R. Rep. No. 95-1283, Pt. I, at 97-98 (1978).

28

1    aggrieved persons "other than a foreign power or an agent of a foreign power." 50 U.S.C. § 1810.

2    No such limitation appears in the cause of action in Title III. *See* 18 U.S.C. § 2520. Construing

3    Title III to permit a plaintiff to seek damages for alleged foreign intelligence surveillance would

4    allow agents of a foreign power to seek relief for unauthorized wiretapping under § 2520, despite

5    Congress's clear intent that such persons should be disqualified from suing.

6    **B.        The Complaint Fails To State A Claim For Interception Or Surveillance**

7            The Third and Fifth Claims also fail because they do not allege facts establishing that

8    plaintiffs' calls were "intercept[ed]" or subject to "electronic surveillance" under Title III and

9    FISA. Both statutes define the prohibited act as the "acquisition" of the contents of calls. 18

10   U.S.C. § 2510(4); 50 U.S.C. § 1801(f). Plaintiffs have not alleged that their calls were actually

11   listened to or recorded. At most, they allege that their calls may have been subject to a

12   computerized "sift[ing]" process, Compl. ¶¶ 142, 143, 144, 147, 164, whereby computers allegedly

13   applied search parameters to identify calls containing names, word, or phrases that warrant

14   "scrutiny by human eyes and ears." *Id*. ¶ 147. But plaintiffs nowhere allege that their calls were

15   among those selected for such scrutiny. Nor could plaintiffs ever make such a showing: if a

16   computer-sifting program existed as alleged, the identity of any person whose calls were isolated

17   for human examination would be a state secret. Plaintiffs' inability to show "actual acquisition of

18   *their* communications" prevents them "from stating a claim cognizable in the federal courts"

19   because it renders them incapable of establishing standing. *Halkin II*, 690 F.2d at 998-99

20   (emphasis added).

21           Nor can Plaintiffs state a claim under Title III or FISA merely by alleging that their calls

22   were subject to computerized sifting, as that process does not involve the "acquisition" of call

23   content. In *Halkin I*, the plaintiffs alleged that NSA computers "scan[ned]" "enormous numbers of

24   communications" using "watchlists" of words and phrases to select particular communications for

25   review by intelligence analysts. 598 F.2d at 4. The plaintiffs, whose names were on the

26   watchlists, brought claims under Title III and the Fourth Amendment for unlawful interception of

27   their communications. The court rejected "the plaintiff's argument that the *acquisition* of a

28   plaintiff's communications may be presumed from the existence of a name on the watchlist" and

- 9 -

1   held that, to establish that their calls were "acquired," plaintiffs would need to prove that their calls

2   were selected by the computer for human examination.  598 F.2d at 11 (emphasis added).  *Halkin I*

3   thus establishes that computer scanning, by itself, does not amount to the "acquisition" of calls or

4   permit the inference that scanning *led to* the acquisition of plaintiffs' calls.

5        The reasoning in *Halkin I* is consistent with the Ninth Circuit's discussion in *United States*

6   *v. Smith*, 155 F.3d 1051 (9th Cir. 1998).  In *Smith*, the court distinguished an unlawful "intercept"

7   under Title III from illegal "access" to a stored communication under 18 U.S.C. § 2701: "The

8   word 'intercept' entails *actually* acquiring the contents of a communication, whereas the word

9   'access' merely involves *being in position* to acquire the contents of a communication."  *Id.* at

10  1058 (emphasis in original).  For instance, one could access a voicemail system by entering a

11  password and "roaming about" the system "without *listening to* or *recording*" any of the messages

12  it stores.  *Id*. at 1058-59 (emphasis added).  But a defendant who "retrieve[s] and record[s]" a

13  voicemail "crosse[s] the line" separating access from interception.  *Id*. at 1058.  Likewise, while

14  automated scanning of communications might be said to put one in "position to acquire the

15  contents of a communication," it does not constitute "actually acquiring" contents that are not

16  retrieved and recorded.  *See also Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 742 (4th Cir. 1994)

17  (Title III requires "proof of listening or of preservation for listening purposes" and finding no

18  acquisition when a live microphone picked up sounds and transmitted them to the defendant's

19  security control room).

20       **C.      The FISA Claim Must Be Dismissed**

21       The only statute relevant to national security surveillance is FISA.  Hence, if the Court

22  does not dismiss the case on state-secret grounds, and if standing could be established, then the

23  threshold legal issue would be whether any interception of content was prohibited by FISA, and if

24  so, whether such prohibition is constitutional.  If the President was acting within his authority then

25  defendants could not be found to have violated any law for allegedly assisting the President.  The

26  only court to have addressed the issue concluded that the President has such authority.  *See In re*

27  *Sealed Case*, 310 F.3d 717, 742 (FISA Ct. Rev. 2002) ("[A]ll the other courts to have decided the

28  issue [have] held that the President did have inherent authority to conduct warrantless searches to

- 10 -

1   obtain foreign intelligence information . . . . *We take for granted that the President does have that*

2   *authority and, assuming that is so, FISA could not encroach on the President's constitutional*

3   *power*." (emphasis added)).  To reach the *contrary* conclusion—that FISA validly restricts the

4   President's constitutional authority—would require a finding that Congress's interests outweigh

5   the needs of the Executive in the particular circumstances alleged in the Complaint.  *See Nixon v.*

6   *Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977).  This finding, however, could not be made

7   without considering evidence regarding the nature of the al Qaeda threat and the importance of the

8   TSP in combating that threat—evidence that is shielded by the state-secrets privilege.  Because

9   state secrets make it impossible to determine that the President lacked authority, the claims against

10  defendants for allegedly assisting the President must be dismissed.

### III.   THE RECORDS CLAIM FAILS BECAUSE ECPA DOES NOT APPLY TO THE FACTS ALLEGED (CLAIM 2)

12          The Complaint alleges that, after 9/11, NSA requested access to call records as part of an

13  alleged program to prevent further terrorist attacks, Compl. ¶¶ 142, 149, and that defendants

14  voluntarily provided NSA such access, *id.* ¶¶ 146, 150, 167, 169, with the "intent to assist or [for

15  the] purpose of assisting the government" in its efforts to prevent and detect terrorist attacks, *id.*

16  ¶ 259.  The Second Claim alleges that such assistance violated the Electronic Communications

17  Privacy Act ("ECPA"), 18 U.S.C. § 2702(a)(3).  In addition to being barred by the state-secrets

18  doctrine, this claim fails as a matter of law.

### A.   ECPA Does Not and Cannot Be Construed To Restrict the Collection of Intelligence for National Defense Purposes

21          1. In Title III and FISA, Congress recognized a clear distinction between the realms of law

22  enforcement and intelligence for national security.  In ECPA, Congress restricted the provision of

23  call record information in the former realm; it exhibited no intent to address the President's

24  constitutional authority to gather intelligence, much less to constrain that authority.  ECPA neither

25  mentions the President nor addresses armed conflict.  Rather, as an amendment to Title 18

26  ("Crimes and Criminal Procedure"), ECPA addresses how law enforcement officers obtain call

27  record information.  ECPA was adopted to update Title III to take account of changes in

28  technology.  House Rep. No. 99-647, at 17-19 (1986) (attached as Ex. 2); S. Rep. No. 99-541, at 2-

- 11 -

1   3 (1986).  Thus, ECPA is *in pari materia* with Title III and has the same scope: it restricts the

2   government's access to evidence for criminal justice and administrative purposes, not its gathering

3   of intelligence for national security purposes.  *See* H.R. Rep. No. 99-647, at 16 (purpose of ECPA

4   is to provide means for "federal law enforcement officers" to obtain records); *cf. Sanford's Estate*

5   *v. CIR*, 308 U.S. 39, 42-44 (1939) (gift tax statute must be read *in pari materia* with estate tax

6   statute, which it was intended to supplement).  ECPA's codification in the same title and part of

7   the U.S. Code as Title III confirms that both provisions deal with law enforcement.  *See Kansas v.*

8   *Hendricks*, 521 U.S. 346, 361 (1997) (objective of statute evidenced by placement in code).

9        The plain language of ECPA's records provisions confirms that it deals with law

10  enforcement.  For example, it authorizes the government to obtain a court order requiring

11  disclosure of records by showing that they are relevant and material to a criminal investigation

12  (§ 2703(d)); permits the government to obtain records without court intervention by submitting a

13  request relevant to an investigation of telemarketing fraud (§ 2703(c)(1)(D)); and enables the

14  government to obtain an order directing the provider not to notify the customer of the provision of

15  records if there is a risk of flight from prosecution or intimidation of witnesses (§ 2705(b)).  These

16  are workaday criminal justice matters, unrelated to the collection of defense intelligence.

17       Finally, in ECPA, Congress deliberately chose not to impair the government's ability to

18  obtain records through other lawful means.  Section 2511(2)(f) provides that Title III, ECPA, and

19  FISA are the "exclusive means" by which the government can conduct "electronic *surveillance* . . .

20  and the *interception* of domestic wire, oral, and electronic communications."  18 U.S.C. § 2511

21  (emphases added).  This exclusivity provision thus applies only to the acquisition of call content; it

22  *does not apply to records*.  Although Congress amended § 2511(2)(f) in ECPA, it did not enlarge

23  the scope of "exclusivity" to cover records.  Pub. L. 99-508, § 101(b).  This shows that Congress

24  did not intend for ECPA to be the only way for the government lawfully to obtain records.

25       2.  Under traditional canons of statutory construction, ECPA cannot be construed to limit

26  the President's ability to obtain information to defend the country because Congress has not made

27  a "clear statement" of intent to impinge upon the President's constitutional powers.  Under

28  Article II, the President has the authority to direct the defense of the country in an armed conflict

- 12 -

and to repel foreign attack.  *See Hamilton v. Dillin*, 88 U.S. 73, 87 (1874) (President "is constitutionally invested with the entire charge of hostile operations"); *Johnson v. Eisentrager*, 339 U.S. 763, 788-89 (1950); *The Prize Cases*, 67 U.S. (2 Black) 635, 668-70 (1862); *Campbell v. Clinton*, 203 F.3d 19, 27 (D.C. Cir. 2000) (Silberman, J., concurring) ("the President has independent authority to repel aggressive acts by third parties even without specific congressional authorization"); *id.* at 40 (Tatel, J., concurring) (similar).  In undertaking such defensive actions, moreover, an indispensable part of the President's constitutional power is his authority to collect intelligence concerning the identity, location, and plans of the enemy.  *See Dep't of Navy v. Egan*, 484 U.S. 518, 527-528 (1988); *United States v. Marchetti*, 466 F.2d 1309, 1315 (4th Cir. 1972) ("Gathering intelligence information" is "within the President's constitutional responsibility for the security of the Nation as the Chief Executive and as Commander in Chief of our Armed forces.").

Putting statutes aside, the President's *constitutional* powers give him broad discretion to obtain the requisite intelligence from any willing source, using the means he judges most effective and timely, provided only that he respects constitutional rights.  This constitutional power includes the authority to enlist the voluntary assistance of private parties.  *See Totten*, 92 U.S. at 106 (President authorized, as Commander-in-Chief, to enter into contract with secret agent); *see also CIA v. Sims*, 471 U.S. 159, 171 (1985).  Thus, the President may ask for and receive access to business records that could help detect an attack.  The Fourth Amendment is inapplicable in such cases, and the President is not limited to the use of compulsory legal process to obtain the information he needs.  *See Smith v. Maryland*, 442 U.S. 735 (1979) (no Fourth Amendment protection for call records).  Construing ECPA to impede the President's ability to enlist private help, or to require him to use compulsory legal process to gather intelligence information, would constrain the President's exercise of defense powers that arise directly under Article II.

The Supreme Court has consistently held that statutes must not be read as curtailing the President's exercise of constitutional functions absent a clear statement that Congress had such a purpose.  *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).  This rule is based in part on separation-of-powers and comity concerns: a court should not lightly ascribe to Congress the intent to tread on the constitutional powers of a co-equal branch.  "Out of respect for the separation of

- 13 -

1   powers and the unique constitutional position of the President," an "express statement by

2   Congress" is required before concluding that it meant to regulate the President's exercise of his

3   executive functions.  *Id*.  The "requirement of clear statement assures that the legislature has in fact

4   faced, and intended to bring into issue, the critical matters involved in the judicial decision."

5   *United States v. Bass*, 404 U.S. 336, 349 (1971).  The rule also reflects the *Ashwander* principle

6   that a court should not decide a serious constitutional question, especially involving conflicts

7   between the political branches, unless it must do so.  *Public Citizen v. Dep't of Justice*, 491 U.S.

8   440, 466 (1989) ("reluctance to decide constitutional issues is especially great" where they concern

9   the "relative powers of coordinate branches of government"); *Armstrong v. Bush*, 924 F.2d 282,

10  289 (D.C. Cir. 1991) (clear statement of intent to restrict President required because legislation

11  regulating presidential action raises serious constitutional questions).  The clear statement rule

12  applies with special force when construing statutes that might impinge on "the authority of the

13  Executive in military and national security affairs."  *Egan*, 484 U.S. at 530.  Thus, a court should

14  not construe a statute as constraining the President's exercise of constitutional powers unless

15  Congress has forced the issue in unmistakable terms, foreclosing any other plausible construction.

16      For these reasons, 47 U.S.C. § 605, which prohibits divulging the content of calls, has been

17  held not to apply to the interception of the content of calls carried out on the President's behalf for

18  the purpose of gathering foreign intelligence, even in peacetime.  *United States v. Butenko*, 494

19  F.2d 593, 601 (3d Cir. 1974) (en banc).  Noting the importance of gathering intelligence to the

20  President's ability to fulfill his responsibilities, the court reasoned that construing § 605 to apply to

21  foreign intelligence "arguably would hamper . . . the President's effective performance of his

22  duties in the foreign affairs field."  *Id*.  Because Congress had not "address[ed] the statute's

23  possible bearing on the President's constitutional duties," *id*., the court followed the well-settled

24  principle that "[i]n the absence of any indication that the legislators considered the possible effect"

25  of the statute on the President's constitutional responsibilities, the court "should not lightly ascribe

26  to Congress an intent" that the statute reach activities conducted by the President in furtherance of

27  those responsibilities.  *Id*.  ECPA likewise cannot be construed to regulate the President's

28  collection of records for the purpose of gathering military intelligence against al Qaeda.

- 14 -

3.  ECPA's limited scope is confirmed by the contrast with FISA.  Unlike ECPA, FISA makes a "clear statement" of congressional intent to constrain the President's constitutional powers in the national security realm.  FISA's express purpose was to address the President's use of electronic surveillance to collect intelligence to support national security activities (an activity to which Title III expressly did not apply).  In adopting FISA, Congress expressly considered the President's inherent Article II authority; repealed an earlier provision that deferred to the President's constitutional authority with respect to national security surveillance; and, in its place, explicitly stated that FISA was the "exclusive means" for conducting electronic surveillance for such purposes, 18 U.S.C. § 2511(2)(f).  FISA also specifically considered and addressed, to some degree, the applicability of FISA in wartime, providing that, after a declaration of war, the President could conduct warrantless surveillance for 15 days to give Congress time to consider rules appropriate to the circumstances.  50 U.S.C. § 1811.

FISA's legislative history confirms that Congress considered the President's constitutional powers and deliberately intended to limit those powers, to whatever extent Congress could, in the case of foreign intelligence surveillance.  Congressional subcommittees extensively examined the extent to which the President's authority to conduct electronic surveillance for foreign intelligence purposes would or should be constrained by the legislation.[11]  The FISA Conference Report quotes Justice Jackson's concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952), which sets forth a three-part framework for evaluating the extent of the President's constitutional power.  The Report expresses Congress's intent to place the President into zone 3 of Justice Jackson's framework, where the President can "rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter."  H.R. Rep. No. 95-1720, at 35 (Conf. Rep.).

---

[11] *See Foreign Intelligence Surveillance Act of 1977: Hearings Before the Subcomm. on Criminal Laws and Procedures of the Sen. Comm. on the Judiciary*, 95th Cong. (1977); *Foreign Intelligence Electronic Surveillance: Hearings Before the Subcomm. on Legislation of the H. Permanent Select Comm. on Intelligence*, 95th Cong. (1978); *Foreign Intelligence Surveillance Act of 1978: Hearings Before the Subcomm. on Intelligence and the Rights of Americans of the Sen. Select Comm. on Intelligence*, 95th Cong. (1978); *Foreign Intelligence Surveillance Act: Hearings Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the H. Comm. on the Judiciary*, 95th Cong. (1978).

1    Moreover, in seeking to restrict surveillance, Congress sought to give effect to what it saw

2    as a countervailing constitutional limit on the President's authority, namely, the Fourth

3    Amendment's protection of the content of calls.  Whereas the Executive had asserted that no

4    warrant was required to intercept calls for foreign intelligence collection, Congress asserted its

5    position that such surveillance should be governed by a judicially-administered probable cause

6    standard.  FISA's rules were thus designed to give effect to a constitutional limit.

7    Congress's intent to regulate the President's acquisition of national security information is

8    not only clearly stated in FISA, but was the statute's *raison d'être*.  It is only the clarity of

9    Congress's purpose, the Fourth Amendment interests involved, and, especially, the statutory

10   mandate that FISA serve as the "exclusive means" of conducting foreign intelligence surveillance,

11   that allow the argument to be made that FISA relegates the President, when conducting warrantless

12   surveillance, to Justice Jackson's zone 3.

13   Whatever the merits of those arguments with regard to FISA's impact on content

14   interception, no comparable claim can be made with respect to ECPA and non-content intelligence

15   collection allegedly undertaken to defend the country in an armed conflict.  In striking contrast to

16   FISA, ECPA contains no indication that Congress even considered, let alone intended to constrain,

17   the President's exercise of Article II powers.  ECPA does not purport to impose any limitation on

18   the President, and ECPA nowhere states that it is the exclusive means by which the President can

19   obtain records.  In even more striking contrast to FISA, ECPA is utterly silent about whether and

20   how it would apply in time of armed conflict.  That silence is telling; it is inconceivable that

21   Congress would authorize, under FISA, the President to engage in limitless electronic surveillance

22   during the first fifteen days of a war, while restricting, under ECPA, the President from the far less

23   intrusive collection of *records* during the same crisis.  It is similarly incredible to suppose that

24   Congress would authorize the divulgence of call records requested by the government to

25   investigate telemarketing fraud, *see* 18 U.S.C. § 2703(c)(1)(D), but not to protect the country from

26   attack.  Likewise, it is wholly implausible to suggest that Congress gave states authority to pass

27   laws authorizing their agencies to compel the production of records for the most mundane

28   purposes, *see id.* § 2703(c)(2), yet implicitly curtailed the authority that the Constitution itself

- 16 -

1   gives the President to obtain such records.  ECPA simply does not speak to the context of declared

2   hostilities and the President's authority as Commander-in-Chief.

3          Additionally, while under FISA Congress at least could claim that in constraining the

4   President it was giving effect to a constitutional limit, no comparable argument could be made

5   with respect to records.  A clear statement of congressional intent to regulate the President's

6   constitutional authority in this context is imperative.  Congress's ability to constrain the

7   President's constitutional authority to gather records for intelligence purposes, in the absence of

8   any countervailing constitutional limit, is at least dubious, and ECPA cannot be read as reflecting

9   an unexpressed intent to test these constitutional boundaries.

10          Section 2709 of ECPA, which grants the FBI additional authority to compel the production

11   of records in its "investigation of counterintelligence cases," S. Rep. 99-541, at 44 (1986),

12   confirms that ECPA's restrictions do not apply to the voluntary provision of records for national

13   security purposes.  Section 2709 was originally included in the Intelligence Authorization Act for

14   Fiscal Year 1987.  The Senate Committee Report on that Act states that telecommunications

15   carriers had been voluntarily providing call record information to the government in response to

16   requests in particular counterintelligence cases for years.  S. Rep. No. 99-307, at 18-19 (1986)

17   (attached as Ex. 3) ("FBI has stated that most communications common carriers cooperate

18   voluntarily with the FBI in making available" telephone records; AT&T and the Department of

19   Justice had reached an agreement ten years earlier by which AT&T would provide access to such

20   information without a subpoena).  Noting that certain state regulators had created obstacles to

21   providers' ability to supply such information voluntarily, the Report described this provision as

22   giving the FBI the authority to compel the production of records in order to "preempt[]" the states

23   and enable the FBI to continue receiving records as in the past.  *Id*. at 19.  The Report emphatically

24   stated that "[t]he new mandatory FBI authority for counterintelligence access to records *is in*

25   *addition to, and leaves in place, existing non-mandatory arrangements for FBI access based on*

26   *voluntary agreement by communications common carriers*."  *Id*. (emphasis added).  This provision

27   was later moved out of the Intelligence Authorization Act and added to ECPA.  H.R. Rep. No. 99-

28   952, at 30 (1986) (Conf. Rep.) (conference report on the Intelligence Authorization Act did not

1  include the provision because it "is expected to become law as part of [ECPA]").  The Senate

2  Report on ECPA states that § 2709 "is substantially the same as language recently reported by the

3  Intelligence Committee," S. Rep. No. 99-541, at 43 (1986), and it recapitulates the Intelligence

4  Committee's rationale for granting the FBI authority to compel the production of telephone

5  records.  The Senate Report on ECPA observes that "in states where public regulatory bodies have

6  created obstacles" to carriers' voluntary provision of access to records for counterintelligence

7  purposes, "the FBI has been prevented from obtaining these records," and that § 2709 would give

8  the FBI authority to "gain access on a mandatory basis" in these circumstances.  *Id*. at 44.

9         This history makes clear that § 2709's grant of additional authority to the FBI to compel

10  the production of records in a particular situation cannot be construed to suggest that ECPA

11  restricts the voluntary provision of call record information to the government for military

12  intelligence purposes.  Certainly, the history of § 2709 defeats any suggestion that ECPA contains

13  a "clear statement" of intent to limit the President's broad power to gather intelligence for national

14  defense purposes.  Nor can the affirmative grant of power to compel the production of records in

15  § 2709 be taken as a "clear statement" of intent to limit the government's ability to receive records

16  produced voluntarily, especially in the absence of any language indicating that the authority

17  granted in § 2709 was the "exclusive means" for the government to obtain records.  Indeed, if

18  ECPA were construed as a general prohibition on the collection of records for intelligence

19  purposes—except to the extent the FBI can compel the production of such records for counter-

20  intelligence and counter-terrorism purposes—it would preclude the government from obtaining

21  records for many intelligence purposes outside the specific types of investigations mentioned in

22  § 2709, and would require the President to rely solely on the FBI as his source of intelligence

23  information of this kind.  ECPA is devoid of any suggestion, let alone a "clear statement," that

24  Congress intended such a radical—and constitutionally problematic[12]—restriction on Presidential

---

25  [12] The President has constitutional authority to collect national security intelligence, and Congress
cannot override the President's authority to decide how to allocate operational responsibility for
26  national defense activities by decreeing that he can gather military intelligence only through the
FBI.  *See* 9 Op. Att'y Gen. 462, 468-69 (1860) (President "[a]s commander-in-chief of the army it
27  [has the] right to decide according to [his] own judgment what officer shall perform any particular
duty"); *see also Fleming v. Page*, 50 U.S. (9 How.) 603, 615 (1850).

28

- 18 -

1    power.  On the contrary, ECPA's history shows that Congress had just the opposite intent—that it

2    wished to preserve the Executive's ability to obtain records through voluntary arrangements.

3        Because ECPA lacks a clear statement of intent to tie the President's hands in collecting

4    intelligence, ECPA cannot be construed to apply to defendants' alleged divulgence of records,

5    which plaintiffs allege was done to help the President prevent future attacks, Compl. ¶ 259.

6    **B.      The AUMF Is Statutory Authority to Obtain Access to Call Record
             Information**

7

8        Beyond his constitutional powers, Congress has given the President ample additional

9    authority in the specific matter of combating al Qaeda.  Even if plaintiffs' allegations about records

10   were true, the AUMF would provide statutory authority to collect records as alleged.

11       The AUMF, 50 U.S.C. § 1541 note, calls on the President to use "all necessary and

12   appropriate force" to defend against "the unique and extraordinary" threats posed by al Qaeda.  As

13   the Supreme Court has held, this language endorses the President's use of the full panoply of

14   traditional war-fighting powers against al Qaeda.  *Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004)

15   (plurality opinion); *id*. at 587 (Thomas, J., dissenting).  While those powers are not unlimited,

16   *Hamdan v. Rumsfeld*, 126 S.Ct. 2749 (2006) (AUMF does not authorize trial by military

17   commission inconsistent with the laws of war), there can be no question that gathering intelligence

18   about an enemy is a "fundamental incident" of using force against that enemy.  *Cf. Hamdi*, 542

19   U.S. at 519 (plurality); *id*. at 587-88 (Thomas, J., dissenting).

20       Indeed, the AUMF *specifically* invokes the power to gather intelligence.  By calling on the

21   President to "determine" who was responsible for the 9/11 attacks, Congress necessarily confirmed

22   his authority to gather the facts needed to make that determination.  Further, the AUMF's

23   authorization to use all necessary force "*to prevent future*" attacks necessarily includes the power

24   to learn where the enemy is and what their plans are *in advance*.  If the AUMF "clearly and

25   unmistakably" authorized the detention of American citizens, *id*. at 519, then it even more "clearly

26   and unmistakably" granted authority to learn about al Qaeda's operations and plans.

27       Thus, in defending against further al Qaeda attacks, the President is exercising not only his

28   own constitutional powers but also the powers granted by Congress.  And the powers conferred by

- 19 -

1    the AUMF must be construed broadly.  Especially in the areas of foreign policy and national

2    security, "legislation closely related to the question of the President's authority in a particular case

3    which evinces legislative intent to accord the President broad discretion may be considered to

4    'invite' 'measures on independent presidential responsibility.'"  *Dames & Moore v. Regan*, 453

5    U.S. 654, 678 (1981).  The broad powers granted by the AUMF in this specific conflict make it

6    even more implausible to construe ECPA to prohibit the collection of records as alleged.

7         The powers affirmatively granted in the AUMF do not, and could not, conflict with ECPA.

8    ECPA expressly contemplates that "statutory authorization" can exist outside of ECPA to obtain

9    call record information.  18 U.S.C. §§ 2703(e), 2707(e).  The AUMF, as construed in *Hamdi*,

10   provides just such authorization in the *specific* case of al Qaeda, broadly authorizing the collection

11   of intelligence to defend against that particular enemy.  Apart from ECPA's inapplicability to

12   defense activities, the AUMF—the later-enacted statute specifically addressing this conflict—

13   governs.  While some argue that § 2511(2)(f)'s exclusivity language with respect to call *content*

14   precludes construing the AUMF to authorize warrantless surveillance, there can be no comparable

15   claim as to ECPA's *records* provisions.  ECPA has no such exclusivity provision.

16        *Hamdi* sets forth the controlling analysis.  There, the pre-existing statute, adopted

17   specifically to control emergency Executive detentions of citizens, provided: "No citizen shall be

18   imprisoned or otherwise detained by the United States except pursuant to an Act of Congress."

19   The Supreme Court held that the AUMF's authorization to use "all necessary and appropriate

20   force" against al Qaeda was such a subsequent authorization and "satisfied the [Non-Detention

21   Act's] requirement that a detention be 'pursuant to an Act of Congress.'"  *Hamdi*, 542 U.S. at 517

22   (plurality opinion); *see also id*. at 587 (Thomas, J., dissenting).  The AUMF also authorizes the

23   collection of intelligence information to deal with al Qaeda and thus constitutes "statutory

24   authorization" within the meaning of ECPA.

25        **C.    The Emergency Exception Applies**

26        ECPA's prohibitions do not reach national defense activities.  But if ECPA were found to

27   apply to such activities, its provision authorizing disclosure in the case of "an emergency involving

28   danger of death or serious physical injury" would also apply.  18 U.S.C. § 2702(c)(4).  That

1  language encompasses a broad range of exigent circumstances and would certainly be capacious

2  enough to cover the threat that was of paramount national concern: that foreign operatives were

3  stealthily insinuating themselves into the United States to carry out sudden and massive attacks.  In

4  the AUMF, Congress declared that acts of terrorism "continue to pose an unusual and

5  extraordinary threat to the national security."  115 Stat. 224.  The President declared that a

6  "national emergency exists" by reason of the 9/11 attacks and "the continuing and immediate

7  threat of further attacks on the United States," 50 U.S.C. § 1621 note, a determination he has

8  renewed annually.[13]  These findings by the political branches conclusively establish the existence

9  of an emergency involving the danger of death or serious physical injury.  In addition, the

10  Complaint itself alleges that the call record information related to the emergency: allegedly,

11  defendants provided access to this information in response to a government request for assistance,

12  and it was actually used by the government in its alleged counter-terrorism program.  Accepting

13  these allegations as true, the activities alleged fall within the emergency exception as a matter of

14  law.

15      The clear statement rule requires this conclusion.  Because ECPA lacks any clear indication

16  of intent to restrict the President's defense intelligence activities, the emergency exception must be

17  construed consistent with the presumption that Congress did not wish to intrude into the

18  constitutional powers of a co-equal branch.  Moreover, a serious constitutional problem would

19  arise if ECPA's emergency exception were construed narrowly to impede the President's ability to

20  obtain information he judges useful in defending the country.  Because it is "fairly possible" to

21  construe the emergency exception to permit the activities alleged, it must be so construed.  *See INS*

22  *v. St. Cyr*, 533 U.S. 289, 299-300 (2001) ("[I]f an otherwise acceptable construction of a statute

23  would raise serious constitutional problems, and where an alternative interpretation of the statute is

24  'fairly possible,' [a court is] obligated to construe the statute to avoid such problems.").  Nor can

25  the inevitable conclusion that the emergency exception must apply be evaded or deferred by

26  suggesting that its application turns on a factually intensive inquiry into the provider's subjective

27  ───────────────
   [13] *See* 66 Fed. Reg. 48,199 (2001); 67 Fed. Reg. 58,317 (2002); 68 Fed. Reg. 53,665 (2003); 69
   Fed. Reg. 55,313 (2004); 70 Fed. Reg. 54,229 (2005); 71 Fed. Reg. 52,733 (2006).

28

- 21 -

1   state of mind.  The President has constitutional power to collect information that may be useful in

2   defending the country, regardless of the provider's motives.  Thus, to avoid a conflict with

3   Article II, ECPA cannot be read to condition the President's access to information in a defense

4   crisis on the subjective perceptions or motives of the provider.  In addition, requiring a provider to

5   endure a protracted proceeding to test its subjective state of mind would deter providers from

6   voluntarily cooperating with the President, which also would impair his ability to collect

7   information.

8          **D.**      **The State-Secrets Privilege Requires Dismissal Of The Records Claim**

9        For the foregoing reasons, ECPA must be interpreted not to apply to the alleged records

10  program.  A contrary conclusion would require the Court to confront whether, if the alleged

11  records program existed and operated as plaintiffs claim, Congress had the power to restrict the

12  President's authority under the Constitution to collect intelligence in this way.  As noted, this

13  would entail a balancing of Congress's interests in regulating the President against the needs of the

14  Executive in the particular circumstances alleged in the Complaint.  *See Nixon*, 433 U.S. at 443.  If

15  the alleged records program existed, this balancing could not be undertaken without access to facts

16  covered by the state-secrets privilege.  *See* Alexander Decl. ¶ 12.

17  **IV.**   **IF ECPA'S RECORDS PROVISIONS WERE APPLICABLE, THE SECOND
           CLAIM NEVERTHELESS FAILS AS A MATTER OF LAW**

18

19       Even if ECPA applied to the alleged records program, and even if the state-secrets

20  privilege could be overcome, the Second Claim must be dismissed for two reasons.  First, plaintiffs

21  have failed to plead the "divulgence" required to make out a claim under § 2702(a)(3).  Second,

22  the activities alleged are protected from liability by the Free Speech and Petition Clauses of the

    First Amendment; ECPA must be construed not to impose liability for such activities.

23       The Second Claim alleges that defendants divulged "call-detail records," reflecting the

24  "date, time, duration and telephone numbers of calls placed or received."  Compl. ¶ 136.  The

25  Complaint alleges that access to such records was provided through a two-step process: first, call

26  record information was put into a database, *id.* ¶¶ 149-150, 158, 171, 172, and then NSA was

27  allowed to run computer programs against it to extract relevant information, *id.* ¶¶ 147, 164.

28

- 22 -

1   Plaintiffs allege that this "data mining" process involved the use of "[c]omputer-controlled

2   systems" to "sift" record data through "[s]uccessive stages of filtering" before "selecting the ones

3   for scrutiny by human eyes." *Id.* ¶ 147. This automated winnowing allegedly allowed extraction

4   of information about "persons whose communications patterns the government believes may link

5   them, even if indirectly, to investigatory targets." *Id.* ¶ 166. More specifically, the Complaint

6   alleges, NSA used this process "to determine exactly whom suspected [al] Qaeda figures were

7   calling in the United States and abroad and who else was calling those numbers." *Id.* ¶ 145.

8   　　Even if the alleged records program existed and operated as plaintiffs describe, their

9   characterization depicts a sifting process, in which only a subset of data is extracted based on its

10   suspected link to terrorism. Plaintiffs allege that this process involves correlating data from

11   different sources to find a match or link to terrorist activities. Under the scenario portrayed by

12   plaintiffs, if the government learned the number of a foreign phone used by an al Qaeda agent

13   planning an attack in the United States, a computer would be used to "determine . . . who else was

14   calling" that number, *id.* ¶ 145, by running the foreign numbers against a database of calls made

15   from the United States, *id.* ¶ 164, for the purpose of identifying potential al Qaeda operatives in the

16   United States, *id.* ¶ 166.

17   　　**A.**　　**Defendants' Alleged Provision Of Call Records For Inclusion In A Database Does Not Constitute The "Divulgence" Of Records**

18
19   　　ECPA states that a provider may not "divulge" a record or other information pertaining to a

20   subscriber to the government. 18 U.S.C. § 2702(a)(3). Plaintiffs cannot establish a violation of

21   ECPA simply by alleging that information about them was put into a database that was subject to

22   being electronically queried. Information is "divulged" only when it is actually *made known* to

23   another person. Each plaintiff must plead and prove that information about him or her was

24   actually extracted from the database and *divulged* to someone in the government. Because the

25   Complaint lacks this essential allegation, the Second Claim must be dismissed.

26   　　The verb "divulge" means to make information known to another. It comes from the Latin

27   verb *divulgare*, which means to publish among the common people. American Heritage

28   Dictionary 413 (2d ed. 1985). The indispensable core of its meaning has always been that

- 23 -

1   previously secret information is actually made known to another person. *See* Black's Law
2   Dictionary 480 (6th ed. 1990) (defining "divulge" as "[t]o disclose or make known, as to divulge
3   secret or classified information"); Webster's Third New International Dictionary 664 (2002)
4   (defining "divulge" as "to tell or make known (a secret or confidence or what had been previously
5   unknown)"); American Heritage Dictionary 544 (3d ed. 1996) (defining "divulge" as "[t]o make
6   known (something private or secret)"). The clear connotation of the word is that the act of
7   "divulging" is not complete until the secrecy is extinguished by the information being apprehended
8   by another. Merely making information available to another, without more, does not constitute
9   "divulgence." If one leaves a confidential document in a mailbox, the information in that
10  document is not "divulged" unless someone actually retrieves the document and reads it.

11      The language of federal privacy laws is to be construed in light of comparable common law
12  concepts, including defamation. *Oja v. U.S. Army Corps of Eng'rs*, 440 F.3d 1122, 1129 (9th Cir.
13  2006). "Divulge" as used in ECPA is analogous to "publication" in libel law; indeed, the term
14  "publish" is sometimes used in defining divulge. *See* Webster's at 664; American Heritage
15  Dictionary.

16      Defamation law requires a plaintiff to prove that a defendant "published" defamatory
17  statements about him. To show publication, a plaintiff must prove that a defamatory statement
18  was actually made known to a third party. *See* Restatement (Second) of Torts § 577; *id.*, cmt. b. It
19  is not enough to show that information was made available to others; it must be shown that another
20  person actually apprehended the information. *Id.*, cmt. d (words spoken in a foreign language are
21  not published if not heard by one who understands the language). Thus, placing defamatory
22  information in a file that is available to be viewed by others is not a publication, absent evidence
23  that someone actually read the file. *Pinkney v. District of Columbia*, 439 F.Supp. 519 (D.D.C.
24  1977); *LaMon v. City of Westport*, 44 Wash.App. 664, 668-69 (1986); *Pressley v. Cont. Can Co.*,
25  250 S.E.2d 676, 677 (N.C. App. 1979). Similarly, in the context of electronic information, a
26  plaintiff must prove that libelous materials were not merely delivered to a computer but also read
27  by a human being. *Mills v. Wex-Tex Industries*, 991 F.Supp. 1370 (M.D. Ala 1997) (document
28  saved on a computer was not published because there was no evidence that anyone other than the

1    plaintiff and the author actually read it); *Mars, Inc. v. Gonzalez*, 71 S.W.3d 434 (Tex. App. 2002)

2    (sending libelous statements in an e-mail or a fax did not constitute publication absent evidence

3    that those communications were received by a third person); *Morrow v. II Morrow Inc.*, 911 P.2d

4    964 (Or. App. 1996) (saving a document to a computer network was not publication).

5        The words surrounding "divulge" in § 2702 reinforce this meaning.  As used in

6    § 2702(a)(3), the object of the verb "divulge" is "a" record (or other information) about "a"

7    customer.  The prohibition is thus directed at making known specific information about a specific

8    customer.  Section 2702 does not address providing access to a system of records or a database.  If

9    Congress intended to prohibit providing access to a database, it would have chosen a broader word

10   than "divulge," such as to "*provide*" or to "*send*" information, and would have applied the

11   restriction to entire record systems rather than only to specific records of specific customers.

12       The narrow meaning of "divulge" is further confirmed by ECPA's use of different

13   language to address precisely the kind of conduct alleged by plaintiffs: providing access to

14   databases.  In neighboring § 2701(a), Congress described conduct that does not necessarily involve

15   divulgence of information but that does involve access to facilities that may house such

16   information.  That section speaks in terms of "accessing" a "facility."  As the Ninth Circuit noted

17   in a different context, "[a]ccess does not necessarily mean disclosure."  *Planned Parenthood of*

18   *Southern Arizona v. Lawall*, 307 F.3d 783, 788 n.5 (9th Cir. 2002).

19       The Complaint, however, does not allege that information about each plaintiff was actually

20   extracted from a database and *divulged* to someone in the government.  Instead, plaintiffs allege

21   only that defendants provided NSA access to databases that NSA could search, Compl. ¶¶ 146,

22   167, 197, not that any information about them was actually "divulged" to any person in the

23   government.  Moreover, the "data mining" process alleged in the Complaint, in which computers

24   "sift" information "before selecting the ones for scrutiny by human eyes," *id*. ¶ 147, means that

25   only a select few records would ever be seen by any person in the government.  *Cf.* Richard A.

26   Posner, Not a Suicide Pact: The Constitution in a Time of National Emergency (Oxford Univ.

27   Press 2006), p. 97 ("Rather than invading privacy, computer sifting prevents most private data

28   from being read by an intelligence officer or other human being by filtering them out.").  Nor does

- 25 -

1    the Complaint allege that the records allegedly communicated by the defendants to the government

2    were in a form that identifies which customers are associated with which records, absent additional

3    actions that might be taken after the government's computer isolates particular records as

4    warranting additional investigation.

> **B.      Plaintiffs' Records Claim Under ECPA Must Be Dismissed Because It Seeks to Hold Defendants Liable For Activity Protected by the First Amendment**

6          There is a fundamental constitutional right to communicate information to the government

7    to help it protect public peace and safety.  When the country is engaged in an armed conflict with

8    foreign enemies, that right applies to communicating information that may be useful in defending

9    the country from expected attacks.  Based on plaintiffs' own allegations, defendants' right to

10   communicate such information to the government is fully protected by the Free Speech and

11   Petition Clauses of the First Amendment, and is a privilege and immunity that arises directly under

12   the federal Constitution.  Any construction of ECPA that purported to prohibit such

13   communications, and to subject defendants to monetary liability for engaging in the

14   communications alleged, would violate these constitutional rights.

15          Under *Ashwander*, because it is "fairly possible" to construe ECPA to avoid these serious

16   constitutional problems, *see St. Cyr*, 533 U.S. at 299-300, ECPA must be so construed.  ECPA

17   expressly allows carriers to communicate information to the government to address emergencies

18   involving a serious danger to the public or to protect the carrier's property.  *See* 18 U.S.C.

19   § 2702(c)(4), (c)(3).  Not only is it "fairly possible" to read the emergency and property exceptions

20   to permit the communications that allegedly occurred in the context of the "unusual and

21   extraordinary threat" recognized by Congress and the President, but it would be unreasonable to

22   read the statute in any other way.  In any event, *Ashwander* mandates that these provisions be

23   construed to allow the communications alleged by the Complaint, *as a matter of law*.

24          The First Amendment also requires the Court to resolve this legal issue at this stage of the

25   proceeding.  Because "discovery can be both harassing and expensive" and "large damages [are]

26   usually claimed . . . and sometimes awarded, an action [challenging petitioning activity] can be,

27   from the very beginning, a most potent weapon to deter the exercise of First Amendment rights."

28

- 26 -

1   *Franchise Realty Interstate Corp. v. San Francisco Local Joint Exec. Bd. of Culinary Workers*,

2   542 F.2d 1076, 1082 (9th Cir. 1976).  Accordingly, the Court should determine whether plaintiffs'

3   allegations impermissibly attack constitutionally protected activity at the motion-to-dismiss stage.

4   *See id.*; *see also Boone v. Redevelopment Agency of City of San Jose*, 841 F.2d 886, 894 (9th Cir.

5   1988) (noting importance of examining First Amendment argument at the pleading stage "[i]n

6   order not to chill legitimate" petitioning activity).

                1.      Defendants' Alleged Communications Are "Speech" Protected by the First
                        Amendment

7

8        The gravamen of plaintiffs' records claims is that defendants allegedly communicated

9   "information" about them to the government—namely, that a call was placed from a certain

10  telephone number to another number.  Compl. ¶ 218.  Communicating such factual information to

11  the government would be speech that is fully protected by the First Amendment.

12       The essence of speech is the communication of information.  *Giebel v. Sylvester*, 244 F.3d

13  1182, 1187 (9th Cir. 2001) ("[B]ecause Giebel's handbill was designed *to convey information*, it

14  constitutes a form of speech protected by the First Amendment." (emphasis added)).  "Even dry

15  information, devoid of advocacy, political relevance, or artistic expression, has been accorded First

16  Amendment protection."  *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446 (2d Cir. 2001);

17  *see also Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 838-39 (1978) (publication of name

18  of judge who was the subject of a disciplinary proceeding was "accurate factual information" that

19  was "near the core of the First Amendment"); *Junger v. Dailey*, 209 F.3d 481 (6th Cir. 2000)

20  (communication of computer source code is speech).

21       *Bartnicki v. Vopper*, 532 U.S. 514 (2001), establishes that the disclosure of call information

22  constitutes speech.  In *Bartnicki*, an unknown person unlawfully intercepted and recorded a phone

23  call and delivered that recording to Jack Yocum, who in turn delivered it to a radio station, which

24  played it on the air.  *Id.* at 519.  Plaintiffs sued under Title III and its state counterpart, which

25  imposed liability on one who "discloses" the content of a call that the person has reason to know

26  was unlawfully obtained.  *Id.* at 520 n.3.  The Court held that the claim was barred by the First

27  Amendment.  *Id.* at 518.  The Court concluded that "the naked prohibition against *disclosures* is

28

- 27 -

1    fairly characterized as a regulation of pure speech." *Id.* at 526 (emphasis added).  The Court made

2    no distinction between Yocum and the radio station, finding that they both engaged in speech.  *Id.*

3    at 525 n.8.  Yocum engaged in speech by handing over the tape because his purpose was to convey

4    whatever information was contained on the tape—not because the tape contained a conversation

5    between two other people.  The Court concluded: "given that *the purpose of such a delivery is to*

6    *provide the recipient with the text of recorded statements*, it is like the delivery of a handbill or a

7    pamphlet, and as such, it is the kind of 'speech' that the First Amendment protects."  *Id.* at 527

8    (emphasis added, footnote omitted).  Similarly, because the Complaint alleges that the "purpose"

9    of the defendants' alleged "disclosure" of call records was to provide the government with

10   "information" about the calls reflected in such records, Compl. ¶¶ 259, 226, 218, plaintiffs' records

11   claims seek to impose liability for engaging in speech.

12        Even the commercial sale to private parties of large quantities of personal information

13   culled from databases is speech under the First Amendment.  *Trans Union Corp. v. FTC*, 245 F.3d

14   809, 818 (D.C. Cir. 2001) (sale of marketing lists is speech), *on rehearing*, 267 F.3d 1138, 1140

15   (D.C. Cir. 2001) (same; referring to sale of marketing lists as "targeted speech"); *U.D. Registry,*

16   *Inc. v. California*, 34 Cal. App. 4th 107, 109-10 (1995) (sale of databases containing truthful

17   information about prospective renters is speech); *Equifax Services, Inc. v. Cohen*, 420 A.2d 189,

18   198 (Maine 1980) (sale of credit reports is speech); *see also BellSouth Corp. v. FCC*, 144 F.3d 58,

19   67 (D.C. Cir. 1998) (telephone companies' dissemination of databases and other information is

20   "expressive activity within the scope of the First Amendment").  There can be no doubt that the

21   voluntary provision of such information to the government is speech.

22        The fact that ECPA gives the government the discretion to *compel* the communication of

23   records does not change ECPA's character as a flat prohibition on speech.  The government may

24   not prohibit persons from *voluntarily* speaking simply by reserving the prerogative to compel the

25   provision of information when it chooses to do so.  "We are aware of no general principle that

26   freedom of speech may be abridged when the speaker's listeners could come by his message by

27   some other means *such as seeking him out and asking him what it is*."  *Virginia State Bd. of*

28   *Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 757 n.15 (1976) (emphasis

- 28 -

1   added).  The Constitution places the decision about the need to speak in the hands of the speaker,

2   not the government.  *See, e.g., City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 758

3   (1988) (prohibiting speech unless and until government demands it is an invalid prior restraint).

4               2.       Defendants Cannot Be Held Liable for Their Alleged Petitioning Activity

5               The alleged communication of call records is protected not just as speech, but also as

6   petitioning activity.  The Petition Clause protects communications made to a branch of government

7   concerning a proper subject for that branch to act on.  *See Eastern R.R. President's Conference v.*

8   *Noerr Motor Freight, Inc.*, 365 U.S. 127, 137 (1961); *California Motor Transp. Co. v. Trucking*

9   *Unlimited*, 404 U.S. 508, 510 (1972).  Communicating facts to the government is protected

10  petitioning activity.  *See Boone*, 841 F.2d at 894; *see also Noerr*, 365 U.S. at 139 (describing as

11  protected those "who provide much of the information upon which government must act").

12  Petitions are protected without regard to the petitioners' purpose or intent.  *Prof'l Real Estate*

13  *Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 58 (1993).

14              The *Noerr-Pennington* doctrine, which implements the right to petition, provides that those

15  who petition the government are "immune from liability for statutory violations, notwithstanding

16  the fact that their activity might otherwise be proscribed by the statute involved."  *White v. Lee*,

17  227 F.3d 1214, 1231 (9th Cir. 2000).  While originally developed under the antitrust laws, the

18  *Noerr-Pennington* rule precludes liability under *any* statute "that could implicate the rights

19  protected by the Petition Clause."  *Sosa v. DIRECTV*, 437 F.3d 923, 931 (9th Cir. 2006).

20              Communications to the government in connection with the investigation and prevention of

21  threats to public safety are protected as petitioning activity under *Noerr-Pennington*.  The

22  Executive Branch is responsible for protecting the safety of the public, and communicating

23  information to the Executive to enable it to carry out that function is petitioning activity protected

24  by the First Amendment.  Accordingly, the Ninth Circuit has held that "citizen communications

25  with police" are petitioning activities covered by *Noerr-Pennington*.  *Forro Precision, Inc. v. IBM*

26  *Corp*, 673 F.2d 1045, 1060 (9th Cir. 1982); *see also King v. Idaho Funeral Serv. Ass'n*, 862 F.2d

27  744, 745 (9th Cir. 1988) (report to state officials that caskets were being sold without a required

28  license); *Ottensmeyer v. Chesapeake & Potomac Tel. Co.*, 756 F.2d 986, 994 (4th Cir. 1985)

1    (following *Forro*, report to police about suspected tariff violations); *Brownsville Golden Age*

2    *Nursing Home, Inc. v. Wells*, 839 F.2d 155, 160 (3d Cir. 1988) (reports on alleged regulatory

3    violations by nursing home); *Arim v. General Motors Corp.*, 520 N.W.2d 695, 700 (Mich. Ct. App.

4    1994) (per curiam) (defendant's "assistance and cooperation" with law enforcement operation,

5    including the provision of cars and other facilities, were protected under the First Amendment).

6    The purpose of assisting the government is bound up with the purpose of enlisting the government

7    in carrying out its protective function.

8         While, for obvious reasons, the petitioning cases have arisen mainly in the law enforcement

9    arena, the Petition Clause even more strongly protects the communication of information to the

10   Executive to assist in protecting the nation against foreign attack.  The threat to the body politic

11   posed by a foreign enemy is of an entirely different and graver kind than that posed by ordinary

12   criminals.  Foreign enemies threaten to inflict far greater death and destruction and seek to impose

13   their will on our nation by force of arms, thus eviscerating the very essence of our self-governance.

14   Especially when an armed conflict has been declared, a private citizen's voluntary communication

15   of information that may be useful in protecting the country from foreign enemies is of paramount

16   public importance and entitled to the highest level of constitutional protection.

17        Apart from the Petition Clause, there is a fundamental constitutional right to provide

18   information to the government that may be of assistance to the government in protecting the safety

19   of the public at large.  In *In re Quarles*, 158 U.S. 532, 535-36 (1894), the Supreme Court

20   recognized that every citizen has "the duty and the right" to "assist in prosecuting, and in securing

21   the punishment of, any breach of the peace," which includes the right and duty "to communicate to

22   the executive officers any information which he has of the commission of an offence against those

23   laws."  *Id.* at 535.  The Court emphasized that this right "does not depend upon any of the

24   Amendments to the Constitution, but arises out of the creation and establishment by the

25   Constitution itself of a national government."  *Id.* at 536.  The *Quarles* principle has been

26   reaffirmed many times.  *See, e.g.*, *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 513

27   n.29 (1978); *In re Sacred Heart Hospital*, 133 F.3d 237, 245 n.11 (3d Cir. 1998).

28        These constitutional protections carry over and expand on a principle as old as the common

1    law itself: persons have a right and duty to assist government authorities in protecting the public

2    peace. That right extends not only to providing physical assistance, Restatement (Second) of Torts

3    § 139(2), but has always been understood to encompass the communication of information that

4    aids officials in protecting the public, *id.* § 598 & cmts. d & e. The common law protection is

5    based largely on society's interest in encouraging such assistance. But the Constitution goes

6    further. It not only recognizes society's interest, but also establishes that engaging in such

7    communication is a fundamental personal right, integral to self-governance.

8         The Petition Clause also protects a breathing space around petitions. *BE&K Construction*

9    *Co. v. NLRB*, 536 U.S. 516, 531 (2002); *Sosa*, 437 F.3d at 931-32. This breathing space is

10   deliberately "overprotect[ive]" so as to avoid chilling petitioning activity. *See Sosa*, 437 F.3d at

11   933. Under this breathing space principle, conduct incidental to petitions, such as discovery in a

12   lawsuit, is protected. *Id.* at 935. Likewise, *Noerr-Pennington* immunity is not limited to

13   successful petitions. *BE&K*, 536 U.S. at 531. Litigation activity loses its protected character only

14   if it is *both* objectively baseless *and* subjectively motivated by an improper purpose. *Prof'l Real*

15   *Estate Investors*, 508 U.S. at 60-61. If the plaintiff fails to plead facts showing that the litigation is

16   objectively baseless, however, the Complaint must be dismissed, without any inquiry into the

17   defendant's subjective motivation. *See id.* at 60 (court may not examine subjective motives until

18   after plaintiff establishes that the litigation is objectively baseless).

19        *Noerr-Pennington*'s protection is wider still when the petitioning activity involves assisting

20   the government protect public safety. The scope of *Noerr-Pennington* immunity "depends on the

21   degree of political discretion exercised by the government agency." *Kottle v. Northwest Kidney*

22   *Ctrs.*, 146 F.3d 1056, 1062 (9th Cir. 1998) (quoting *Forro*, 673 F.2d at 1060 n.10). Thus, *Noerr-*

23   *Pennington* immunizes a wider range of activity in the legislative than in the judicial realm,

24   because legislators and constituents have wider discretion in how they act on and communicate

25   information than do courts and litigants. *Kottle*, 146 F.3d at 1061 (area of unprotected activity in

26   legislative realm is "extraordinarily narrow"). In the law enforcement context, the scope of

27   discretion—and hence the scope of protection afforded to private citizens—is even wider than

28   the legislative context. *Id.* at 1062. Liability may not be imposed unless a defendant's assistance

- 31 -

1    to the government had no conceivable relationship to a legitimate law enforcement objective.

2    　　　The Complaint must be dismissed because it seeks to impose liability on defendants for

3    allegedly engaging in protected petitioning activity.  The records claim is premised on the

4    allegation that defendants cooperated with NSA by communicating call information as part of the

5    government's effort to detect and thwart terrorist attacks.  Such communications are protected as

6    petitions.  *See, e.g.*, *Forro*, 673 F.2d at 1060.  Even if they were not, all of the acts alleged are

7    within the wide breathing space afforded those who assist the government in protecting public

8    safety.  *See Kottle*, 146 F.3d at 1062.  Accordingly, *Noerr-Pennington* immunizes the conduct

9    alleged and requires that plaintiffs' records claim be dismissed.  *See, e.g.*, *Sosa*, 437 F.3d at 942

10   (affirming dismissal of complaint under Rule 12(b)(6) based on *Noerr-Pennington*); *Kottle*, 147

11   F.3d at 1059-60 (same).

12   　　　　　　　3.　　　Defendants Cannot Be Held Liable for Their Alleged Speech

13   　　　Plaintiffs' attempt to impose liability under ECPA is also barred by the Free Speech

14   Clause.  A complete prohibition on truthful speech to the government about information lawfully

15   acquired and involving political speech and speech on matters of public concern would violate the

16   First Amendment on numerous grounds, as discussed below.  There are two overarching flaws.

17   First, an outright prohibition on truthful speech about information lawfully acquired is anathema to

18   the First Amendment.  Second, a ban on such speech is not narrowly tailored to achieve the

19   objective of preventing the government's misuse of customer call records.  When such concerns

20   exist, the only proper remedy, consistent with the First Amendment, is to impose restrictions on

21   the government, not on the speaker's right to communicate.

22   　　　　　　　　a.　　　Strict Scrutiny Applies

23   　　　Applying § 2702(a)(3) to prohibit the speech alleged in the Complaint would trigger strict

24   scrutiny.  ECPA operates as a "naked prohibition" of "pure speech," *Bartnicki*, 532 U.S. at 526,

25   and, if applied to the conduct alleged, would prohibit speech that is entitled to the highest level of

26   constitutional protection.  Strict scrutiny applies whenever laws are applied to restrict political

27   speech or speech on issues of public concern.  *See In re Primus*, 436 U.S. 412, 424-25 (1978)

28   (restriction on solicitation by attorneys is usually subject to intermediate scrutiny but is subject to

1    strict scrutiny when applied to solicitation of clients for civil rights cases, which involves core

2    political speech).

3         Speech is "political" if it is designed to influence the actions of the government.  *Stromberg*

4    *v. California*, 283 U.S. 359, 369 (1931); *see also Mills v. Alabama*, 384 U.S. 214, 218-219 (1966)

5    ("major purpose" of First Amendment is to protect discussion of "government affairs," including

6    "the manner in which government is operated or should be operated").  Such speech is political

7    whether it is addressed to the public in an effort indirectly to influence the government or is

8    spoken directly to the government.

9         Speech involves a matter of public concern when it transcends a purely personal interest of

10   the speaker, *Connick v. Myers*, 461 U.S. 138, 148 & n.8 (1983), and addresses a matter in which

11   the public at large has a stake, *see Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975) (speech

12   about the commission of a crime is of public concern).  The societal importance of encouraging

13   speech about threats to public peace is the basis for the common law privilege for providing

14   information relating to public safety as well as a fundamental part of our constitutional structure.

15   *See supra* Section IV.B.2; *see also* Restatement (Second) of Torts § 598 & cmts. d & e.

16   Communications that are of such great public importance that they are privileged at common law

17   are by definition of public concern.  *See Connick*, 461 U.S. at 143 n.5 (noting that First

18   Amendment standard for determining if speech is of public concern is related to common law tort

19   standards).

20        Defendants' communications as alleged in the Complaint are political speech and speech

21   on matters of public concern under these standards.  The Complaint alleges that defendants

22   provided call record information to help the government's efforts to detect terrorist activity and

23   that they were in fact used for that purpose.  As such, the speech would be "political" because it

24   would be designed to influence government action, and would be of "public concern" because it

25   would involve matters that are of great societal importance.

26        Strict scrutiny applies for a second, independent reason as well: applying ECPA to prohibit

27   communication of call records would be content-based.  *See Republican Party of Minn. v. White*,

28   536 U.S. 765, 774-75 (2002) (strict scrutiny applies to content-based restrictions).  "'[W]hether a

- 33 -

1   statute is content neutral or content based is something that can be determined on the face of it; if

2   the statute describes speech by content then it is content based.'"  *Ctr. for Fair Public Policy v.*

3   *Maricopa County*, 336 F.3d 1153, 1164 (9th Cir. 2003) (citation omitted).  The only

4   communications prohibited by ECPA are those that disclose information *about customers*.  The

5   applicability of ECPA's prohibition therefore depends entirely on the *content* of the

6   communication.  In addition, ECPA's content-based exceptions, *see* 18 U.S.C. § 2702(c)(5)

7   (permitting carrier to disclose records relating to child pornography), demonstrate that the

8   remaining prohibitions are likewise content-based; the permitted communications involve the same

9   potential harms—invasion of customer privacy without legal process and the risk of government

10  misuse—as do those prohibited.  *See Hill v. Colorado*, 530 U.S. 703, 723 (2000) (restriction of

11  certain categories of speech and not others is problematic "if there is a significant number of

12  communications, raising the same problem that the statute was enacted to solve, that fall outside

13  the statute's scope, while others fall inside"); *Foti v. City of Menlo Park*, 146 F.3d 629, 636 (9th

14  Cir. 1998) ("[W]hen 'exceptions to the restriction on noncommercial speech are based on content,

15  the restriction itself is based on content.'" (citation omitted)).

16          Finally, the communications alleged do not fall into any of the three categories to which the

17  Supreme Court has applied intermediate scrutiny.  The speech alleged in the Complaint does not

18  propose a commercial transaction and hence is not "commercial" speech.  *See Rubin v. Coors*

19  *Brewing Co.*, 514 U.S. 476, 482 (1995).  As a "naked prohibition against disclosures," ECPA

20  directly targets speech and therefore is "a regulation of pure speech," and "not a regulation of

21  conduct" under *United States v. O'Brien*, 391 U.S. 367 (1968).  *See Bartnicki*, 532 U.S. at 526-27.

22  Finally, where it applies, ECPA does not limit the time, place, and manner of carriers' speech, *see*

23  *United States v. Grace*, 461 U.S. 171, 177 (1983), but prohibits such speech entirely.  Accordingly,

24  strict scrutiny is the appropriate standard.

25                          b.       Prohibiting the Speech Alleged Fails Strict Scrutiny

26          To survive strict scrutiny, a speech restriction must be justified by a compelling interest

27  and must be the least restrictive means of serving that interest.  *White*, 536 U.S. at 775.  ECPA, as

28  plaintiffs seek to apply it in this case, fails both these elements.

(1)    No Compelling Interest Exists That Would Justify
Prohibiting The Speech Alleged

"[T]he Government may not generally restrict individuals from disclosing information that lawfully comes into their hands in the absence of a 'state interest of the highest order.'" *United States v. Aguilar*, 515 U.S. 593, 605 (1995) (citation omitted).  No such compelling interest would justify applying ECPA to the alleged communication of call information to the government in response to the government's request for assistance in protecting the nation from terrorist attack.

The interest in protecting customers' privacy is not sufficiently compelling to justify suppressing speech in the circumstances alleged.  *Bartnicki* is again dispositive.  In *Bartnicki*, the plaintiff sought damages for defendants' disclosure of a tape recording of the content of a call. Although the call was illegally intercepted, defendants did not participate in the interception.  532 U.S. at 525.  The disclosure of the tape recording implicated a matter of public concern because the recorded conversation involved a pending labor negotiation.  *Id*.  The Court held that, under these facts, the First Amendment barred the imposition of liability.

The Court found that the government had failed to demonstrate any sufficiently compelling interest.  First, the Court rejected the government's assertion that the prohibition was justified as a means of removing the incentive for illegal interception.  "The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it [i.e., the person who illegally intercepts the call] . . . .  But it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party."  *Id.* at 529-30.  Second, the Court found that the government's interest in protecting the privacy of communications did not justify imposing "sanctions on the publication of truthful information of public concern" because "privacy concerns give way when balanced against the interest in publishing matters of public importance."  *Id.* at 534.

*Bartnicki* followed a long line of cases holding that the government's interest in protecting privacy cannot justify prohibiting the press from reporting the identity of persons involved in law enforcement proceedings.  For example, *Florida Star v. B.J.F.*, 491 U.S. 529, 537 (1989), held that the state's interest in protecting the privacy of the victim was insufficient to justify prohibiting the

- 35 -

1   publication of her name, because speech about "the commission, and investigation, of a violent

2   crime which had been reported to authorities" is "of paramount public import."  *See also Cox*

3   *Broad.*, 420 U.S. at 491 (state's interest in protecting privacy of victim's family insufficient to

4   justify prohibiting truthful report of victim's name obtained from court records); *Smith v. Daily*

5   *Mail Publ'g Co.*, 443 U.S. 97, 104 (1979) (juvenile defendant's privacy interest insufficient to

6   justify prohibiting publication of his name).  These cases establish that privacy interests cannot

7   trump the right to speak on matters of public concern.

8           Under these cases, the privacy interests asserted in this case cannot justify prohibiting

9   alleged communications to the government to help protect the nation from terrorist attack.  Indeed,

10  the privacy interests in this case are far weaker than those addressed in prior cases.

11          First, information about what numbers a customer dials is far less private than call content.

12  Because the customer voluntarily conveys phone numbers to the telephone company, no Fourth

13  Amendment privacy interest is implicated if the company were to communicate those records to

14  the government: "a person has no legitimate expectation of privacy in information he voluntarily

15  turns over to third parties."  *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979).  As explained in an

16  earlier case involving AT&T's voluntary provision of call records to the government:

17              In any normal life, even in pursuing his most private purposes, the individual must
                occasionally transact business with other people.  When he does so, he leaves behind, as
18              evidence of his activity, the records and recollections of others.  He cannot expect that
                these activities are his private affair.  To the extent an individual knowingly exposes his
19              activities to third parties, he surrenders Fourth Amendment protections, and, if the
                Government is subsequently called upon to investigate his activities for possible
20              violations of the law, it is free to seek out these third parties, to inspect their records, and
                to probe their recollections for evidence . . . .  [¶]  In a sense, then, the Fourth
21              Amendment carries with it both a promise and a warning.  It promises each individual
                that there is a zone in which he may conduct his affairs in private, shielded from
22              unwarranted investigative scrutiny, and yet it warns each individual that, once he projects
                his activities beyond this private enclave, the Government is free to scrutinize them for
23              law enforcement purpose.

24  *Reporters Committee v. AT&T*, 593 F.2d 1030, 1043 (D.C. Cir. 1978) (emphases and footnote

25  omitted).

26          *Bartnicki* holds that even a privacy interest protected by the Fourth Amendment (the

27  privacy of call contents) is insufficiently compelling to justify abridgment of the First Amendment

28  right to speak on a matter of public concern.  Because the privacy interest in information about

1   what numbers a customer dialed is far weaker—indeed, not even protected by the Fourth

2   Amendment—it cannot justify suppressing speech about similarly important matters.

3       Second, the information that defendants allegedly communicated to the government was

4   lawfully acquired in the ordinary course of business.  Even an illegal act in the creation of

5   information that is subsequently disclosed by a lawful recipient is not sufficient "to remove the

6   First Amendment shield from speech about a matter of public concern."  *Bartnicki*, 532 U.S. at

7   535.  This case is even clearer: the information allegedly communicated was acquired by

8   defendants lawfully and as part of their business.

9       Third, defendants' alleged communications *to the government* implicate privacy to a far

10  lesser extent than does disclosure *to the public* through mass media, as occurred in *Bartnicki*,

11  *Florida Star*, and similar cases.  "[T]he individual interest in protecting the privacy of the

12  information sought by the government is significantly less important where the information is

13  collected by the government but not disseminated publicly."  *Am. Fed'n of Gov't Employees v.*

14  *HUD*, 118 F.3d 786, 793 (D.C. Cir. 1997).  The Complaint does not allege that information about

15  the plaintiffs' calls was divulged by NSA to anyone else in the government, let alone to the public.

16  If a government records program exists, it is classified, and disclosure of information compiled in

17  such a program would be stringently restricted.  ECPA, moreover, prohibits a government

18  employee from willfully disclosing a record for improper purposes.  18 U.S.C. § 2707(g).

19      Fourth, whereas in *Bartnicki* a private conversation was actually made known to a broad

20  audience through a radio broadcast, plaintiffs allege that record information was included in a

21  database that was selectively accessed through a computer search.  The Complaint does not allege

22  that a human being examined any of the records pertaining to the plaintiffs.  An individual whose

23  records are contained in a database but never examined by a human being does not suffer the

24  dignitary harm of another person learning a private fact about that individual, nor an impingement

25  on any action that the individual may wish to take, nor any adverse effect on the individual's

26  employment or reputation.  As the Tenth Circuit stated when it invalidated, under the less stringent

27  intermediate scrutiny standard, an FCC rule restricting telephone carriers from using call records to

28  identify customers to whom they would market additional services:

- 37 -

> In the context of a speech restriction imposed to protect privacy by keeping certain information confidential, the government must show that the dissemination of the information desired to be kept private would inflict *specific and significant harm on individuals*, such as undue embarrassment or ridicule, intimidation or harassment, or misappropriation of sensitive personal information for the purposes of assuming another's identity . . . .   A general level of discomfort from knowing that people can readily access information about us does not necessarily rise to the level of a substantial state interest . . . .

*U.S. West, Inc. v. FCC*, 182 F.3d 1224, 1235 (10th Cir. 1999) (emphasis added).  Absent human apprehension of an individual's call records, the harm to privacy is *de minimis*.

Fifth, ECPA's underinclusiveness defeats any claim that the government's interest in prohibiting disclosure of call records is compelling.  ECPA prohibits disclosures of records only to the government, not "to any person other than a governmental entity."  18 U.S.C. §§ 2702(a)(3), 2702(c)(6).  In addition, ECPA permits carriers voluntarily to disclose customer records to the government in connection with a report of a violation of law relating to child pornography.  *Id.* § 2702(c)(5).  Disclosures to private third parties, and to the government in connection with child pornography, implicate privacy interests at least as much as the communication of records to the government for inclusion in a database.  Any claim that the latter restriction is justified by a compelling interest in protecting privacy is defeated by the former exceptions.  *See Florida Star*, 491 U.S. at 540 ("facial underinclusiveness" of statute "raises serious doubts" about whether statute serves claimed privacy interests); *Daily Mail*, 443 U.S. at 104-05 (statute prohibiting publication in electronic media of the name of a juvenile defendant, but permitting publication in newspapers, does not accomplish stated purpose of protecting anonymity).

More broadly, the government's ability to compel production of call records under ECPA undermines any claim that the statute is justified by a compelling need to protect privacy, at least as applied to records allegedly relevant to a counter-terrorism program.  ECPA permits federal or state government agencies to compel the production of call records simply by issuing an administrative subpoena, without judicial intervention.  18 U.S.C. § 2703(c)(2).  ECPA thus reflects Congress's judgment that any privacy interests in call records are trumped when such information is relevant to a mere administrative function; *a fortiori*, the privacy interest is not sufficiently compelling to justify suppressing defendants' ***right to speak***, where the information

- 38 -

1   allegedly communicated is relevant to the government's effort to prevent future terrorist attacks.

2   As noted, the Complaint alleges that the call records were in fact used for such purposes.

3         Any asserted interest in protecting customers from government misconduct also is

4   insufficient.  The government cannot prohibit speech to deter *another party* from breaking the law.

5   *See Bartnicki*, 532 U.S. at 529-30 ("[I]t would be quite remarkable to hold that speech by a law-

6   abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding

7   third party.").  In addition, the Complaint does not allege that the government collected records in

8   bad faith or that the information was unrelated to a legitimate purpose.  Rather, plaintiffs allege

9   that the records purportedly provided were in fact used for the purpose of tracking down terrorism

10  suspects.

11                    (2)    Prohibiting The Speech Alleged Is Not The Least Restrictive
                             Means

12

13        Prohibiting speech is not the least restrictive means of advancing any governmental interest

14  in protecting privacy.  Instead, that interest can be served by restricting the government's use and

15  handling of such information.  The government often receives sensitive information about people

16  that could cause harm if disclosed to the public or used for an improper purpose.  The traditional

17  means of mitigating these risks, consistent with the First Amendment, is not to prohibit private

18  citizens from divulging such information to the government, but to restrict the government's use

19  and disclosure of such information.  *See e.g.*, 26 U.S.C. § 6103 (prohibiting disclosure of tax return

20  information); 42 U.S.C. § 14135e (barring unauthorized use of DNA information); Fed. R. Crim.

21  P. 6(e)(2)(B)(vi) (barring disclosure of matters occurring before a grand jury).

22                c.    Prohibiting Speech As Alleged In The Complaint Fails Intermediate
                        Scrutiny

23        Applying ECPA to the speech alleged in the Complaint triggers strict scrutiny.  Even under

24  intermediate scrutiny, however, applying ECPA's prohibition to defendants' alleged

25  communications would be invalid.  Intermediate scrutiny gives the government some latitude to

26  regulate when, where, and how speech can be delivered, provided it "'leave[s] open ample

27  alternative channels of communication.'"  *Grace*, 461 U.S. at 177 (citation omitted); *see also*

28  *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 n.9

- 39 -

1   (1980).  It does not permit the government to prohibit speech altogether.  Where it applies, ECPA

2   entirely bans carriers from communicating to the government information about what calls

3   customers make.  Allowing speech only when the government—in its sole discretion—compels it

4   is not an "alternative channel" for voluntary speech, but an impermissible prior restraint.  *See, e.g.*,

5   *City of Lakewood*, 486 U.S. at 757.  For this reason alone, ECPA would be invalid under

6   intermediate scrutiny if applied to the speech alleged in the Complaint.

7        In addition, to pass muster under intermediate scrutiny, a restriction must further a

8   substantial or important interest, and the restriction on speech must be no greater than is essential

9   to further that interest.  *O'Brien*, 391 U.S. at 377.  First, for the same reasons as discussed in the

10  strict scrutiny analysis, the interests in protecting privacy and preventing government misconduct

11  are not substantial.  As noted, the Tenth Circuit held that a restriction on the use of call records

12  violated intermediate scrutiny.  *U.S. West*, 182 F.3d at 1237-38.  After expressing "doubts" about

13  whether the government's interest in preventing the disclosure of call records was substantial, *id*.

14  at 1235, the court found that the government failed to demonstrate that the harm to privacy was

15  "real" because there was no evidence of who would receive customers' private information.  *Id*. at

16  1237-38.  Likewise, as to customers whose records were allegedly made available to the

17  government but not examined by a human being, and who suffered no tangible harm, the interest

18  in protecting privacy would not be substantial and a prohibition on such communications would

19  not directly advance any such interest.  Nor would prohibiting this alleged speech directly advance

20  a substantial interest in preventing government misconduct, absent evidence that the government

21  improperly disseminated the information or used it for an improper purpose.

22        Second, the substantially underinclusive nature of ECPA's prohibition, as discussed

23  previously, renders application of the prohibition to defendants' alleged speech invalid.  A

24  prohibition on speech "pierced by exemptions and inconsistencies" fails intermediate scrutiny.

25  *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 190 (1999).

26        Third, the prohibition on speech is not narrowly tailored to protecting privacy and

27  preventing government misconduct.  As noted, these interests can be addressed by imposing

28  restrictions on the government's use of call records, without depriving providers of their right to

- 40 -

1   speak.  Under intermediate scrutiny, "if the Government could achieve its interests in a manner

2   that does not restrict speech, or that restricts less speech, the Government must do so."  *Thomson v.*

3   *Western States Med. Center*, 535 U.S. 357, 371 (2002).

        d.       The Complaint Must Be Dismissed Because It Seeks To Impose
                Liability On Protected Speech

4

5        The Complaint alleges that defendants provided call information to help the government

6   prevent further attacks by al Qaeda, and that the government actually used the information for this

7   purpose.  Taking these allegations as true, defendants' alleged speech is protected from liability.

8        But the Speech Clause safeguards not only speech that turns out to be relevant to protecting

9   the nation, but also speech that an objectively reasonable person would have believed could be

10  relevant.  Like the Petition Clause, the Free Speech Clause establishes a zone of protection to

11  preserve the "breathing room" necessary to safeguard First Amendment freedoms and to prevent

12  "chilling" of valuable speech.  *See, e.g., Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988);

13  *New York Times v. Sullivan*, 376 U.S. 254, 271-72 (1964).

14       To protect this "breathing room," the First Amendment bars a regime of strict liability in

15  which the speaker is punished if, after the fact, it is determined that its speech was not protected.

16  At least if there were an objectively reasonable basis for believing that the speech was protected,

17  the government may not punish the speaker.  *See, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323,

18  347 & n.10 (1974) (requiring plaintiff to demonstrate at least negligence in order to hold defendant

19  liable for speaking).  Hence, a provider is constitutionally protected either if the information were

20  *in fact* relevant to protecting the public, or if there were an objectively reasonable basis for

21  believing that it was.  In these circumstances, a speaker cannot be held liable, regardless of the

22  speaker's subjective intent.  *Hustler*, 485 U.S. at 53 ("even when a speaker or writer is motivated

23  by hatred or ill will his expression [is] protected by the First Amendment").

24       Plaintiffs have not and cannot meet their burden of demonstrating that defendants' alleged

25  speech was not protected.  Not only do they allege that defendants' purported communications

26  were in fact relevant to the government's effort to protect the nation, but they also allege facts

27  establishing that any objectively reasonable person would have concluded that the information was

28

- 41 -

relevant in this way.  The dispositive allegation is that defendants' alleged assistance was not unprompted, but rather was provided in direct response to the government's *request*.  Compl. ¶¶ 9, 148, 166, 257, 259.  The law has always insisted that, when authorities ask for specific assistance in an emergency, it is objectively reasonable for citizens to rely on the government's judgment as to need.  As the Restatement explains in discussing the privilege afforded to private parties who respond to a call for help from the police:

> The officer's need for assistance often arises in a sudden emergency and the assistance must be given at once to be effective.  To require a person whom a peace officer calls upon to assist in making an arrest to take the risk of being liable in the event that the officer is not himself privileged to make it, unless such person exercises such judgment and makes such investigations as he would be required to make were he acting on his own initiative, would seriously deter such persons from giving the prompt aid necessary to effect arrests which, save in an insignificant minority of cases, the officer is privileged to make.  Therefore, the actor is privileged to rely upon the officer's request and assist him unless the facts are such that the actor knows or is convinced beyond a reasonable doubt that the officer is not himself privileged to make the arrests.

Restatement (Second) of Torts § 139, cmt. d.  The person providing assistance, moreover, need not second-guess the officer's stated need for assistance.  "It is for the peace officer and not the actor to determine the necessity for assistance."  *Id.*, cmt. e.  As in other areas, a "presumption of legitimacy" is afforded to official conduct.  *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004); *see also Hartman v. Moore*, 547 U.S. 250, 126 S.Ct. 1695, 1705-06 (2006) (presumption that prosecutor has legitimate grounds for taking action).  These principles are especially salient in the national security context, where (1) information concerning the degree of threat and the potential utility of the information sought are peculiarly within the government's control, and (2) the government's ability to explain why it is seeking help is necessarily limited.

Because the First Amendment requires plaintiffs to allege that defendants lacked an objectively reasonable basis to believe that their alleged speech related to a matter of public concern, and because the Complaint fails to do so, it must be dismissed.

4.      Under *Ashwander*, ECPA Must Be Construed To Permit Defendants' Alleged Speech and Petitioning Activity

*Ashwander* requires a court to adopt a "fairly possible" construction of a statute that will avoid the need to address a serious constitutional question.  *St. Cyr*, 533 U.S. at 299-300.  To determine if a narrowing construction is required, a court need not decide "whether the First

- 42 -

1   Amendment *does* protect [defendants' activity], or even whether it probably does.  Rather '[it

2   must] make a narrow inquiry whether [granting plaintiff's requested relief] presents a significant

3   risk that the First Amendment will be infringed.'"  *Overstreet v. United Bhd. of Carpenters &*

4   *Joiners of Am.,* 409 F.3d 1199, 1210 (9th Cir. 2005) (citation omitted).  If so, a court must construe

5   the statute as not prohibiting the speech or petitioning activity in question, unless such a

6   construction is "foreclosed."  *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr.*

7   *Trades Council*, 485 U.S. 568, 588 (1988) (rejecting agency's construction of statute because, as

8   applied, it raised serious First Amendment questions).

9        The Ninth Circuit applied these principles in *Sosa*, concluding that "the *Noerr-Pennington*

10   doctrine stands for a generic rule of statutory construction, applicable to any statutory

11   interpretation that could implicate the rights protected by the Petition Clause.  Under the *Noerr-*

12   *Pennington* rule of statutory construction, *we must construe federal statutes so as to avoid*

13   *burdening conduct that implicates the protections afforded by the Petition Clause unless the*

14   *statute clearly provides otherwise*."  437 F.3d at 931 (emphasis added, citations omitted).  The

15   court described this rule as a "specific application" of the *Ashwander* principle.  *Id*. at n.5.

16        *Sosa* applied these principles to affirm the dismissal of a RICO claim based on pre-suit

17   demand letters.  The court found that pre-suit demand letters are within the "breathing space

18   required for the effective exercise of" the right to petition the courts, *id*. at 933, in that they are

19   "incidental" or "intimately related" to petitioning activities, *id*. at 934.  Because restricting such

20   communications "could impair the right of access to the courts protected by the First

21   Amendment," *id*. at 936, the court found that RICO must be construed, if possible, to avoid the

22   constitutional issue that would arise from imposing liability for engaging in such communications.

23   The statutes at issue did not "clearly" or "directly" address presuit demand letters, *id*. at 939, 941,

24   nor did they "unambiguously" or "unavoidably" require the imposition of liability for such

25   communications, *id*. at 940.  Because the statutes could be "construed to avoid burdening" such

26   communications, *id*. at 941, under the *Noerr-Pennington* doctrine they had to be so interpreted, *id*.

27        Accordingly, ECPA must be construed as not prohibiting the communications alleged, as

28   long as such an interpretation is possible and not clearly and unambiguously foreclosed.  ECPA is

1   plainly susceptible to such a narrowing construction.

2       First, the Court can—and therefore must—construe the term "divulge" in § 2702(a)(3) as

3   not prohibiting the alleged provision of access to records in a database, in the absence of an

4   allegation that the information was actually made known to a person in the government.

5       Second, the Court can—and therefore must—construe ECPA as not restricting the alleged

6   collection of records for military intelligence purposes as alleged in the Complaint.

7       Third, the Court can—and therefore must—also construe ECPA's emergency exception as

8   authorizing the communications alleged.  That section authorizes a carrier voluntarily to divulge

9   records to the government "if the provider, in good faith, believes that an emergency involving

10  danger of death or serious physical injury to any person requires disclosure without delay of

11  information relating to the emergency."  18 U.S.C. § 2702(c)(4).  As noted, the political branches

12  had determined that acts of terrorism "continue to pose an unusual and extraordinary threat to the

13  national security," 115 Stat. 224, and that a "national emergency exists" by reason of the 9/11

14  attacks and "the continuing and immediate threat of further attacks on the United States," 50

15  U.S.C. § 1621 note.  These determinations provide an objectively reasonable basis, as a matter of

16  law, for believing that the information allegedly requested was relevant to the government's effort

17  to protect the nation.

18      Finally, the Court can—and therefore must—interpret ECPA's "rights or property"

19  exception as authorizing the communications alleged.  While the emergency exception applies

20  when anyone is in danger, the right to act goes further when the company itself is at serious risk,

21  becoming a matter of self-protection.  In these cases, ECPA permits the divulgence of a record for

22  "the protection of the rights or property of the provider."  18 U.S.C. § 2702(c)(3).  Verizon had

23  already suffered massive losses in 9/11, including the destruction of property adjacent to the World

24  Trade Center valued at $1.25 billion.  Verizon remained at especially high risk of terrorist attack,

25  both because its facilities are part of the critical national communications infrastructure and thus a

26  target in its own right, and also because, as the events of 9/11 showed, Verizon's facilities are

27  embedded in key financial and government facilities that themselves were likely targets of further

28  attacks.  *See* Critical Infrastructure Protection Act, codified at 42 U.S.C. § 5195c; National

1   Strategy for the Physical Protection of Critical Infrastructures and Key Assets, issued by the White

2   House in February 2003, p. 48; Testimony of Robert S. Mueller III, Director, FBI, Before Senate

3   Select Committee on Intelligence (Feb. 11, 2003) ("Mueller Testimony").  Verizon faced not only

4   the risk of physical destruction of its property, but also of the compromise of its network through

5   cyber attack.  *See* Mueller Testimony.  The President formally recognized that al Qaeda had the

6   capability and intention to launch further attacks that would "cause massive destruction of

7   property."  Military Order of Nov. 13, 2001, § 1(a), 66 Fed. Reg. 57833, 57833.  To mitigate these

8   risks, the President issued Executive Order No. 13231, 66 Fed. Reg. 53063 (Oct. 16, 2001), calling

9   on government and the private sector to coordinate efforts to protect critical information

10  infrastructure, including the physical assets that support telecommunications.

11          The danger to property in these circumstances was not just its destruction, but also that al

12  Qaeda would use telecommunications facilities as its own command-and-control network to plan

13  and execute attacks on the country.  When the country is facing foreign attack, citizens have a duty

14  "according to [their] capacity, to support and defend government against all enemies."  *Hamilton*

15  *v. Regents*, 293 U.S. 245, 262-63 (1934).  Hence, citizens must avoid taking any action that could

16  furnish resources to the enemy, and all commercial activity with the enemy is therefore prohibited.

17  *Sutherland v. Mayer*, 271 U.S. 272, 286-87 (1926).  This duty applies even more strongly when

18  private property can be used by the enemy as a weapon against the country.  In these

19  circumstances, the government has the authority to destroy private property to prevent it from

20  falling into enemy hands.  *See United States v. Caltex (Philippines), Inc.*, 344 U.S. 149, 155 (1952)

21  (private property that was "a potential weapon of great significance to the invader" could be

22  destroyed by the government).  It follows that the government has the lesser power to ask or

23  require a property owner to take steps to prevent the use of its property as a weapon by the enemy.

24  Complying with NSA's alleged request for access to databases to identify terrorists and prevent

25  their use of the telecommunications network to plan and carry out further attacks, as alleged in the

26  Complaint, would, if true, certainly fall within this traditional property right.

27          Construing ECPA to permit the communications alleged is at least possible.  The statute

28  does not clearly and unambiguously foreclose those interpretations, which must therefore be

1  adopted to avoid the serious constitutional problem that would otherwise arise.  *See Edward J.*

2  *DeBartolo*, 485 U.S. at 588; *Sosa*, 437 F.3d at 940-42.

3  **V.      THE REMAINING CLAIMS MUST BE DISMISSED**

4   **A.      Claim 4, Under 47 U.S.C. § 605, Must Be Dismissed**

5    The Fourth Claim, under 47 U.S.C. § 605, must be dismissed to the extent it relates to

6  alleged content interception.  As discussed above, § 605 does not apply to the President's

7  interception of calls for foreign intelligence purposes.  *United States v. Butenko*, 494 F.2d 593, 601

8  (3d Cir. 1974) (en banc) ("In the absence of any indication that the legislators considered the

9  possible effect of § 605 in the foreign affairs field, we should not lightly ascribe to Congress an

10  intent that § 605 should reach electronic surveillance conducted by the President in furtherance of

11  his foreign affairs responsibilities."); *see also United States v. Stone*, 305 F. Supp. 75, 80-82

12  (D.D.C. 1969) (same).  Those holdings reflect an established rule, based on separation-of-powers

13  principles, that statutes should not be construed to apply to the President's constitutional powers

14  absent a clear statement, as discussed more fully above in connection with ECPA's records

15  provisions.  In addition, to the extent the Complaint implies that the alleged divulgence of call

16  records violated § 605, this claim too fails.  "[T]elephone toll records . . . do not fall within the

17  scope of [§ 605]."  *United States v. Barnard*, 490 F.2d 907, 913 (9th Cir. 1973) (citation omitted).

18   **B.      Claim 1, Under 18 U.S.C. § 2702(a)(1) and (a)(2), Must Be Dismissed**

19    As noted, ECPA, including § 2702(a), does not prohibit carriers from voluntarily providing

20  information for national intelligence purposes.  In addition, in light of plaintiffs' dismissal of the

21  Verizon entities that provide Internet and e-mail services, the claim based on alleged disclosure of

22  stored content is inapplicable to the remaining defendants and should be dismissed.

23   **C.      The State-Law Claims Must Be Dismissed**

24    The state claims based on the alleged divulgence of records are preempted by ECPA,

25  which states that "[n]o cause of action shall lie in any court" against a provider who provides

26  information or assistance "in accordance with the terms of a statutory authorization."  18 U.S.C.

27  § 2703(e).  If defendants divulged records to NSA as alleged, such divulgence would have been

28  statutorily authorized by the "emergency" and "rights and property" exceptions.  In addition, as

1  discussed in defendants' motion to dismiss the complaints in *Riordan*, *Bready*, and *Chulsky*, state

2  law cannot be applied to the activities alleged, which arise in a field that the Constitution entrusts

3  solely to the federal government.  If the Court grants that motion, defendants will, if necessary,

4  seek the dismissal of the state-law claims in the Master Complaint on this ground.

5       In addition, two issues specific to the state-law claims pled in Master Complaint warrant

6  special comment.  First, Claims 8 and 9—alleging deception and breach of contract based on the

7  purported violation of Verizon's privacy policy—must be dismissed as to defendant MCI.

8  Plaintiffs do not cite any MCI privacy policies or allege that MCI ever promised not to disclose

9  call information to the government.  Plaintiffs acknowledge that Claims 8 and 9 are based solely

10  on alleged representations *by Verizon*.  Compl. ¶ 181.  The MCI plaintiff's claim against Verizon

11  for alleged "representations" made by Verizon after the merger on January 6, 2006 (*see id*. ¶ 10),

12  must likewise be dismissed.  The only plaintiff who was an MCI customer, Elaine Spielfogel-

13  Landis ("Landis"), alleges that she has been a customer since 2001 and hence remains subject to

14  her MCI contract.  *Id*. ¶ 8.  She does not allege entering into a new service agreement with

15  Verizon, modifying her service agreement with MCI, or relying on any privacy policy of

16  Verizon's.  Thus, Landis's allegations fail to state a claim against Verizon.

17       Second, Claims 8 and 9 must be dismissed against Verizon because the privacy policies

18  cited by plaintiffs would expressly allow the disclosures alleged.  In those policies, Verizon

19  expressly reserves the right to disclose information on its own initiative "to protect the safety of

20  customers, employees or property."  *Id*. ¶ 180.[14]  This is broad language, and plaintiffs' own

21  allegations establish that the alleged disclosures by Verizon fall well within its ambit.  Plaintiffs

22  have alleged that—after both Congress and the President had declared that the country faced an

23  "extraordinary" and "immediate threat of further attacks"—Verizon disclosed information for the

24  "purpose of assisting the government" to prevent such further attacks.  *Id.* ¶ 259.  These allegations

25  demonstrate that the alleged disclosures of customer records by Verizon were to protect the safety

26  ───────────────
[14] The policy cited in ¶ 179 contains the same language, although the Complaint does not quote it.
27  The Court may consider the full text of that document, which is attached as Exhibit 1 to the
concurrently-filed Request for Judicial Notice, because it was referenced in the complaint.  *See*
*Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

28

- 47 -

1   of Americans and their property—a purpose that brings Verizon squarely within the terms of its

2   privacy policies.  While the nexus between the alleged disclosures and public safety is established

3   by Verizon's alleged purpose alone, plaintiffs' allegations regarding the manner of disclosure

4   reinforce that nexus.  The Complaint describes a minimization process in which information is

5   purportedly made known to NSA personnel selectively by an automated winnowing process that

6   identifies those records that are linked to suspected terrorists.  *Id.* ¶ 166.  If the program plaintiffs

7   allege existed, the plain terms of Verizon's policies encompass such disclosures.

8          Third, the breach of contract claim must be dismissed because plaintiffs have not identified

9   any contracts that Verizon allegedly breached.  The Complaint does not allege that the privacy

10  policies, which are quoted, were incorporated into any contracts with Verizon.  Indeed, although

11  the FCC requires carriers to enter into written contracts with customers, *see* 47 C.F.R. § 61.19(c),

12  plaintiffs fail to reference the contract or describe its terms.  Absent such allegations, the claim for

13  breach of contract based on a claimed breach of a privacy policy through the alleged disclosure of

14  information to the government for counter-terrorism purposes must fail.  *See Dyer v. Northwest*

15  *Airlines Corp.*, 334 F. Supp. 2d 1196, 1199-1200 (D.N.D. 2004) (rejecting similar claim).

16  **VI.   CLAIMS AGAINST MCI ARE BARRED BY THE BANKRUPTCY DISCHARGE**

17         Plaintiff Landis alleges that MCI established a system to provide NSA access to its call

18  content and records shortly after 9/11.  This alleged course of conduct, according to plaintiff's

19  theory, began prior to July 21, 2002—the date on which MCI and its affiliate debtors filed a

20  Chapter 11 bankruptcy petition.  *See* Compl. ¶¶ 149, 169-70; *see also In re WorldCom, Inc.*,

21  No. 02-13533 Docket No. 1 (Bankr. S.D.N.Y. July 21, 2002).

22         The Bankruptcy Court's Order confirming the plan of reorganization (the "Plan") states

23  that persons holding pre-discharge claims against WorldCom and its affiliate debtors "shall be

24  forever precluded and enjoined, pursuant to § 524 of the Bankruptcy Code, from prosecuting or

25  asserting any such discharged Claim against . . . the Debtors."  *In re WorldCom*, No. 02-13533

26  Docket No. 9686 (Oct. 31, 2003) ¶ 17.  Those asserting pre-discharge claims against MCI, as an

27  affiliate debtor, are barred from recovering against MCI and its successor in interest, Verizon, in

28  this Court.  Strict compliance with the Bankruptcy Court's injunction ensures that all creditors of

- 48 -

1   MCI will be treated equally.  It is for the Bankruptcy Court to evaluate under the Bankruptcy Code

2   any "claim" (or "right to payment") that the plaintiffs in this action may have.  11 U.S.C. § 101(5).

3   Landis is required to seek leave to file a proof of claim in Bankruptcy Court, which will then

4   determine whether the claim should be "allowed" and, if so, in what amount.

5          The Bankruptcy Code's definition of "claim" is broad, and it includes any claim Landis

6   may assert in this lawsuit.  A claim is defined as a "right to payment, whether or not such right is

7   reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,

8   undisputed, legal, equitable, secured, or unsecured."  *Id.* § 101(5)(A).  The Code's broad definition

9   of "claim" "is designed to ensure that all legal obligations of the debtor, *no matter how remote or*

10  *contingent*, will be able to be dealt with in the bankruptcy case."  *Cal. Dep't of Health Svcs. v.*

11  *Jensen (In re Jensen)*, 995 F.2d 925, 929-30 (9th Cir. 1993) (internal citations omitted); *see also*

12  *Hassanally v. Republic Bank (In re Hassanally)*, 208 B.R. 46, 53 (9th Cir. BAP 1997).

13         Courts have interpreted *Jensen* as requiring only that the creditor had a *prior relationship*

14  with the debtor before the bankruptcy; if so, then any claim arising out of the debtor's pre-

15  discharge conduct would be deemed discharged:  "[W]here debtor committed the act or omission

16  complained of prior to filing bankruptcy, and the claimant has a *relationship* to the act or omission

17  at the time, such as being the patient or a contracting party, the claim arose at that point in time

18  *even if there has been no indication or manifestation of the consequences of the act or omission.*"

19  *In re Russell*, 193 B.R. 568, 571 (Bankr. S.D. Cal. 1996) (emphasis added); *see also In re Emelity*,

20  251 B.R. 151, 156 (Bankr. S.D. Cal. 2000).

21         The Complaint alleges that Landis, the sole named MCI Plaintiff, has been a customer of

22  MCI since October 2001—well before the July 21, 2002 petition date.  Compl. ¶ 8.  Any claim she

23  could seek to assert arising out of MCI's alleged decision in October 2001 to establish a system to

24  allow NSA access to customer contents and records was discharged in bankruptcy under the Plan.

25  *See Emelity*, 251 B.R. at 156; *Russell*, 193 B.R. at 572.  Finally, any claim Landis could seek to

26  assert arose before discharge, even though she may claim injury that occurred after the discharge.

27  "The fact that the consequences of the wrongful conduct materialized at a later date does not

28  metamorphose the pre-existing conduct into future conduct, thereby endowing the results of the

1 wrongful conduct with an independent and unconnected quality." *Hassanally* 208 B.R. at 54; *see*

2 *also In re WorldCom, Inc.*, 320 B.R. 772, 782-83 (Bankr. S.D.N.Y. 2005); *In re WorldCom, Inc.*,

3 328 B.R. 35, 57-58 (Bankr. S.D.N.Y. 2005).  Likewise, claims based on alleged conduct that

4 started prepetition and continued postpetition are properly regarded as prepetition claims.  *See*

5 *Advanced Computer Svcs. v. MAI Sys. Corp.*, 161 B.R. 771, 774-75 (E.D. Va. 1993); *see also In re*

6 *Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 140 B.R. 969, 971, 977 (N.D. Ill.

7 1992).

8      The claims based on MCI's alleged conduct were discharged in the MCI bankruptcy, and

9 Landis is enjoined from bringing her claim against MCI in this lawsuit.  Landis's sole recourse is

10 to seek leave from the WorldCom Bankruptcy court to file a claim in that court.

11 **CONCLUSION**

12      For the foregoing reasons, the Complaint should be dismissed with prejudice.  While the

13 reasons set forth in this brief and the government's state-secrets submission are amply sufficient to

14 require dismissal, defendants respectfully suggest that, if the Court rules otherwise, it convene a

15 case management conference to establish an orderly sequence of briefing on other threshold legal

16 issues affecting the viability of all of the consolidated cases.

17

18 Dated:  April 30, 2007

    WILMER CUTLER PICKERING HALE
19     AND DORR LLP

20     MUNGER, TOLLES & OLSON LLP

21     Randal S. Milch

22     By:  /s/  John A. Rogovin

23     _____

       John A. Rogovin

24     Attorneys for Verizon Communications Inc.,
    Verizon Northwest Inc., Verizon Florida Inc.,
25     and MCI Communications Services, Inc.

26

27

28

- 50 -