PEGGY A. WHIPPLE (MO 54758)
peggy.whipple@psc.mo.gov

JENNIFER HEINTZ (MO 57128)
jennifer.heintz@psc.mo.gov

**Attorneys for Missouri Public Service Commission**

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE NATIONAL SECURITY AGENCY TELECOMMUNICATIONS RECORDS LITIGATION, MDL No. 1791<br><br>This Document Relates To:<br><br><u>Robert Clayton, et al. v. AT&T</u><br><u>  Communications of the Southwest, Inc.,</u><br><u>  et al., (W.D.Mo.)</u> | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

MDL Docket No. 06-1791 VRW

Relates to Case No.

07-cv-1187-VRW

MISSOURI STATE OFFICIALS'
BRIEF OF POINTS AND AUTHORITIES
IN OPPOSITION TO AT&T'S
MOTION TO DISMISS

Date: June 14, 2007
Time 2:00 p.m.
Courtroom: 6, 17th Floor
Judge: The Hon. Vaughn R. Walker

Dockets.Justia.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................iii, iv, v, vi

ISSUES TO BE DECIDED ................................................................................................ vii

STATEMENT OF FACTS ................................................................................................... 1

ARGUMENT ...................................................................................................................... 3

    I.  The State Officials' State Law Investigative Subpoenas are Narrowly Focused Only
       On the Unilateral Actions of Missouri AT&T and Need Not Intrude on Federal
       Intelligence Activities ................................................................................................ 3

    II.  The State Officials' Actions Are Not Preempted Because They Neither Regulate
       Areas Of Exclusive Federal Authority Nor Conflict With Federal Law ....................... 8

    III. The Information Sought By the State Officials Does Not Expose State
       Secrets or Jeopardize National Security .................................................................. 18

    IV.  It is AT&T who Seeks to Violate the *Totten/Tenet* Rule, Not the State
       Officials Through their Subpoenas ........................................................................... 22

    V.  The State Officials are Fully Authorized Under Missouri Law to
       Pursue Their Investigation ....................................................................................... 23

CONCLUSION................................................................................................................. 25

MISSOURI STATE OFFICIALS BRIEF                     MDL NO. 06-1791-VRW
OF POINTS AND AUTHORITIES IN         ii         RELATES TO CASE NO. 07-cv-1187-VRW
OPPOSITION TO AT&T'S MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Cases:**

*American Insurance Association v. Garamendi*, 539 U.S. 396 (2003)............................................. 7

*Arkansas Electric Coop. v. Arkansas Public Service Commission*, 461 U.S. 375 (1983)............ 16

*AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366 (1999)...................................................... 9

*Baker & Drake, Inc. v. Pub. Serv. Comm'n of Nev.*, 35 F.3d 1348 (9th Cir. 1994) .................... 12

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992) ............................................... 10

*Ctr. for Bio-Ethical Reform, Inc. v. City & County of Honolulu*, 455 F.3d 910
    (9th Cir. 2006)............................................................................ 12

*Deutsch v. Turner Corp.*, 324 F.3d 692 (9th Cir. 2003) ............................................... 6

*English v. General Electric Company*, 496 U.S. 72 (1990).......................................... 15, 16

*Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963)........................................ 14

*Hancock v. Train*, 426 U.S. 167 (1976)................................................................ 13

*Hepting v. AT&T Corp,* 439 F.Supp.2d 974 (N.D. Cal. 2006.) ........................................ 13, 18

*Herring v. United States of America*, 424 F.3d 384 (3rd Cir. 2005.) ............................................ 21

*Hillsborough County v. Automated Medical Labs*, 471 U.S. 707 (1985)...................................... 14

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ............................................................... 6

*Hisquierdo v. Hisquierdo*, 439 U.S. 572 (1979) ........................................................ 11

*In re Tarble*, 80 U.S. 397 (1871) ................................................................... 7, 8

*In re World War II Era Japanese Forced Labor Litigation*, 164 F.Supp.2d 1160
    (N.D.Cal. 2001)............................................................................ 6

*Incalza v. Fendi N. Am., Inc.*, 479 F.3d 1005 (9th Cir. 2007) ............................................ 10, 13

*Jones v. Rath Packing Co.*, 430 U.S. 519 (1977)........................................................ 11

*Kroske v. U.S. Bank Corp.*, 432 F.3d 976 (9th Cir. 2005) *cert. den. sub nom U.S. Bank Corp. v.
    Kroske*, 127 S. Ct. 157 (2006) ............................................................... 10

*National Foreign Trade Council v. Natsios*, 181 F.3d. 38 (1st Cir. 1999) .................................. 7

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350 (1989) ............... 9

*North Dakota v. New Mexico*, 495 U.S. 423 (1990) ................................................................ 7

*Pac. Gas & Elec. Co. v. California*, 350 F.3d 932 (9th Cir. 2003) ............................................ 10

*Perpich v. Department of Defense*, 496 U.S. 334 (1990) ....................................................... 6

*Skysign Int'l, Inc. v. City & County of Honolulu*, 276 F.3d 1109 (9th Cir. 2002) ...................... 12

*Tenet v. Doe*, 544 U.S. 1 (2005) ........................................................................................ 22, 23

*Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003) ..................................................................... 10, 11, 12

*TOPA Equities, Ltd. v. City of Los Angeles*, 342 F.3d 1065 (9th Cir. 2003) ............................. 11

*Total TV v. Palmer Communications, Inc.*, 69 F.3d 298 (9th Cir. 1995) ................................... 13

*Totten v. United States*, 92 U.S. 105 (1875) ....................................................................... 22, 23

*United States v. Belmont*, 301 U.S. 324 (1937) ................................................................... 7

*United States v. Curtiss-Wright*, 299 U.S. 304 (1936) .......................................................... 7

*United States v. Maine*, 420 U.S. 515 (1975) ...................................................................... 6

*United States v. New Mexico*, 455 U.S. 720 (1982) .............................................................. 7

*United States v. Pink*, 315 U.S. 203 (1942) ........................................................................ 6

*United States v Reynolds, et al.*, 345 U.S 1 (1953) ............................................................... 21, 22

*Volt Info. Science, Inc. v. Bd. of Trs. of the Leland Stanford, Jr. Univ.*, 489 U.S. 468. .............. 11

*Zschernig v. Miller*, 389 U.S. 429 (1968) ............................................................................ 6

**Statutes:**

18 U.S.C. Sec. 798 .......................................................................................................... 13

18 U.S.C. Section 2510 ................................................................................................... 13, 14, 15

18 U.S.C. Section 2522(a) ................................................................................................ 15

MISSOURI STATE OFFICIALS' BRIEF      iv      MDL NO. 06-1791-VRW
OF POINTS AND AUTHORITIES IN      RELATES TO CASE NO. 07-cv-1187-VRW
OPPOSITION TO AT&T'S MOTION TO DISMISS

18 U.S.C. Sec. 2701 *et seq.* ......................................................................................... 13

18 U.S.C. Section 2703(b) and (c) .............................................................................. 15

18 U.S.C. Section 3127(2) ............................................................................................ 15

345 U.S. 1 (1953) ......................................................................................................... 21

47 U.S.C. Sec. 201(b) .................................................................................................. 12

47 U.S.C. Sec. 1001 *et seq.* ......................................................................................... 13

50 U.S.C. Sec. 402 ................................................................................................ 13, 14

50 U.S.C. Sec. 403-1(i)(1) ........................................................................................... 13

50 U.S.C. Sec. 1801 *et seq.* ......................................................................................... 13

50 U.S.C. Section 1809(d) ........................................................................................... 14

Section 386.130 RSMo 2000 ....................................................................................... 25

Section 386.320.3 RSMo2000 .................................................................................. 1, 23

Section 386.420.2 RSMo 2000 ............................................................................ 1, 23, 24

Section 536.077 RSMo 2000 ............................................................................... 2, 24

**Other Authorities:**

James Risen, *Legislation Seeks to Ease Rules on Domestic Spying*, The New York Times, A13, April 14, 2007 .......................................................................................... 20

Jemimah Noonoo, *Calling for the Truth*, April 2, 2007, http://www.ColumbiaMissourian.com .................................................................... 5

Niraj Warikoo, *ACLU: Companies Violated Privacy*, The Detroit Free Press, July 27, 2006 .... 20

PBS Online NewsHour, "NSA Wiretapping Program Revealed," May 11, 2006 .................... 18

U.S. Department of Justice, Office of the Inspector General *A Review of the Federal Bureau of Investigation's Use of National Security Letters*, March 2007, http://www.usdoj.gov/oig/special/s0703b/final.pdf ........................................... 19, 20

Senate Majority Leader William Frist (R-TN), CNN Late Edition with Wolf Blitzer, May 14, 2006 ............................................................................................................. 18

Senator Pat Roberts (R-KS), NPR All Things Considered, "Senate Intelligence Chair Readies For Hayden Hearings," May 17, 2006 ...................................................................................... 18

Title 4, Code of State Regulations 240-33.160 ............................................................................ 1

MISSOURI STATE OFFICIALS' BRIEF
OF POINTS AND AUTHORITIES IN
OPPOSITION TO AT&T'S MOTION TO DISMISS

MDL NO. 06-1791-VRW
RELATES TO CASE NO. 07-cv-1187-VRW

# ISSUES TO BE DECIDED

I.     **Whether The State Officials' State Law Investigative Subpoenas are Narrowly Focused Only on the Unilateral Actions of Missouri AT&T and Therefore Need Not Intrude on Federal Intelligence Activities?**

II.     **Whether The State Officials' Actions Are Not Preempted Because They Neither Regulate Areas Of Exclusive Federal Authority Nor Conflict With Federal Law?**

III.     **Whether The Information Sought By the State Officials Does Not Expose State Secrets or Jeopardize National Security?**

IV.     **Whether It is AT&T who Seeks to Violate the *Totten/Tenet* Rule and, Not the State Officials Through their Subpoenas?**

V.     **Whether The State Officials are Fully Authorized Under Missouri Law to Pursue Their Investigation?**

MISSOURI STATE OFFICIALS BRIEF                                 MDL NO. 06-1791-VRW
OF POINTS AND AUTHORITIES IN       vii       RELATES TO CASE NO. 07-cv-1187-VRW
OPPOSITION TO AT&T'S MOTION TO DISMISS

**STATEMENT OF FACTS**

Two Commissioners (state officials) of the Missouri Public Service Commission (PSC)

applied to the Circuit Court of Cole County Missouri for an order compelling the six Missouri

AT&T companies (AT&T) to obey the commands of investigative subpoenas duly authorized

and served by the state officials (06-CV-4177, Notice of Removal, Ex. A, Docket #1). The state

officials issued the investigative subpoenas pursuant to the authority granted by Sections 386.320

and 386.420 of the Revised Statutes of Missouri 2000. Section 386.320.3 provides for the

Missouri Public Service Commission's "General supervision of telegraph and telephone

corporations" as follows:

> 3. The commission *and each commissioner* shall have power to examine all books, contracts, records, documents and papers of any person or corporation subject to its supervision, and by subpoena duces tecum to compel production thereof….(emphasis added).

Additionally, Section 386.420.2 of the Revised Statutes of Missouri 2000 provides as

follows:

> …The commission *or any commissioner* or any party may, *in any investigation* or hearing before the commission, cause the deposition of witnesses residing within or without the state to be taken in the manner prescribed by law for like depositions in civil actions in the circuit courts of this state and to that end may compel the attendance of witnesses and the production of books, waybills, documents, papers, memoranda and accounts…. (emphasis added).

The state officials issued the investigative subpoenas in order to determine whether

AT&T had used, disclosed, or permitted access to customer proprietary network information in

violation of the safeguards regarding such disclosure which are provided in Title 4, Code of State

Regulations 240-33.160. The subpoenas were duly served upon AT&T on June 19 and June 22,

2006, and the properly-executed Returns of Service were subsequently filed with the Circuit

Court of Cole County Missouri (06-CV-4177, Notice of Removal, Ex. A, Docket #1). All

subpoenas requested the appearance of witnesses and the production of documents at 10:00 a.m. on July 12, 2006 (06-CV-1132, related case *USA v. Gaw, et al.*, Memorandum in Opposition to Summary Judgment, Ex. B-M, Docket #38).

No defendant moved to quash the investigative subpoenas. On the afternoon of July 11, 2006, Paul G. Lane, "Attorney for AT&T Affiliated Entities" faxed a letter to the state officials suggesting they "…cancel the attendance of the court reporter and reschedule [their] day." (*Id.*, Ex. N). At 10:45 a.m. on July 12, 2006, as no witnesses had appeared on behalf of AT&T to answer questions upon oral examination and no documents were produced, the state officials' counsel contacted AT&T's counsel by telephone but was unable to resolve the matter.

Consequently, on July 12, 2006, the state officials filed with the Circuit Court of Cole County Missouri their Application to Compel Production of Documents and to Compel Witnesses to Appear and Answer Questions Upon Oral Examination (06-CV-4177, Notice of Removal, Ex. A, Docket #1). The state officials' application to the state court for enforcement of their valid subpoenas is based on Section 536.077 of the Revised Statutes of Missouri 2000, which provides:

> …The agency shall enforce subpoenas by *applying to a judge of the circuit court* of the county of the hearing…for an order upon any witness who shall fail to obey a subpoena to show cause why such subpoena should not be enforced, which said order and a copy of the application therefore shall be served upon the witness in the same manner as a summons in a civil action, and if the said circuit court shall, after a hearing, determine that the subpoena should be sustained and enforced, said court shall proceed to enforce said subpoena in the same manner as though said subpoena had been issued in a civil case in the circuit court. Any such agency may delegate to any member, officer, or employee thereof the power to issue subpoenas…. (emphasis added).

On July 17, 2006, counsel for all parties appeared before Cole County Circuit Court Judge Thomas J. Brown who accepted for filing the returns of service of Plaintiffs' Application to Compel and Proposed Order, and who set this matter for hearing before Senior Judge Byron

Kinder on August 28, 2006 at 9:30 a.m.  However, on August 10, 2006, AT&T filed a Notice of

Removal to the United States District Court for the Western District of Missouri (06-CV-4177,

Notice of Removal, Ex. A, Docket #1).  On August 16, 2006 the state officials filed their Motion

to Remand (06-CV-4177, Motion for Remand and Suggestions in Support of Motion, Docket #

17.)  On October 13, 2006, the United States District Court for the Western District of Missouri

denied the state officials' Motion to Remand.  (*Id.*, Docket #47).  Over the objections of these

state officials, the Judicial Panel on Multidistrict Litigation ordered the transfer of this action to

the MDL pending before this Court.  Transfer was ordered on February 15, 2007.

None of the defendant AT&T companies have filed an Answer in this case, and there has

been no discovery in this case.

## ARGUMENT

I.      **The State Officials' State Law Investigative Subpoenas are Narrowly Focused Only
        on the Unilateral Actions of Missouri AT&T and Need Not Intrude on Federal
        Intelligence Activities.**

The state officials' investigative proceeding is focused only on the unilateral actions of

the six Missouri AT&T companies regulated by the Missouri PSC.  The state officials have

never, even peripherally, attempted to "oversee, investigate or intrude into the exclusively

federal realms of foreign intelligence or military activities," as AT&T claims.  (AT&T

Memorandum, page 6).  Throughout its motion and supporting memorandum AT&T

misrepresents the intent and the basis for the state officials' investigative proceeding.  These

misrepresentations are uncalled for in light of the facts herein, and in light of each of the state

officials' history of public service.  AT&T's posturing can not be permitted to distract this Court

and all concerned from the only real issue herein, which is the legality of the unilateral actions of

these six AT&T Missouri telecommunications companies which are regulated by the Missouri PSC.

The subpoenas at issue herein themselves define the scope of the state officials' attempted investigatory inquiry into AT&T's possible violation of Missouri privacy laws. This attempted investigation has been and remains very specifically limited to *only the actions of the six defendants*, who are private parties, authorized to conduct telecommunications business in the state of Missouri, subject to the supervision and regulation of the Missouri Public Service Commission. "Whether or not AT&T disclosed customer proprietary information in violation of Missouri law" is both the beginning and the end of the state officials' inquiry. Identifying the third parties to whom disclosure of these customer records was made, if there was such disclosure, or ascertaining what was done with these customer records after such disclosure, is not now and never has been part of the state officials' inquiry.

As is evidenced by the subpoenas themselves (06-CV-1132, related case *USA v. Gaw, et al*., Memorandum in Opposition to Summary Judgment, Ex. B-M, Docket #38) there is no inquiry whatsoever regarding what, if anything, was done with any customer records after disclosure (if any) by AT&T to a third party. The subpoenas duces tecum make no reference whatsoever to the identity or potential identity of any third party who might have received the records at issue. Although the subpoenas ad testificandum do make positional references to the National Security Agency (NSA), they do not make any inquiry at all regarding any actions of the NSA.

Significantly, AT&T acknowledges at page 2 of its supporting memorandum that the subpoenas at issue here "target[] the allegedly participating telecommunications carriers rather than the NSA itself." Therefore, the fact that the reference to the NSA is only positional is

admittedly clear to all parties. It was made in response to media reports (which are also referenced by AT&T in its supporting memorandum) for the sole purpose of avoiding an objection for vagueness, and the state officials would even consent to removing that reference from their subpoenas. As the state officials have consistently maintained, their inquiry begins and ends with the actions of the Missouri AT&T companies.

An admittedly positional reference to the NSA in state law investigatory administrative subpoenas can not be elevated by rhetoric to an impermissible intrusion upon "federal intelligence activities," especially in light of AT&T's further admission that "not every state action that merely touches upon national security or foreign affairs is foreclosed" (AT&T Supporting Memorandum, page 7.) Neither does a misrepresentation of a statement of one of these state officials support AT&T's argument that these state officials seek to "intrude" upon federal matters. Commissioner Robert Clayton's statements to the press regarding the responsibility of the Missouri PSC to oversee its regulated utilities have been unfairly misquoted at page 7 and 8 of AT&T's supporting memorandum; therefore, the full section of the lengthy article is set forth for the Court's consideration:

> In a conversation later that week, Clayton told Commissioner Steve Gaw he was concerned about the lack of oversight for AT&T Missouri and its affiliates, such as SBC Long Distance. "I just remember posing the question, 'Who watched over the telephone companies as they decide whose records to release?'" said Clayton, an attorney and a Columbia resident. "If police want to get a search warrant, they go before the judge and get probable cause. In this instance, it doesn't appear that anyone signs off on the release of the data." "We had a potential violation of state law on our hands," said Gaw, the other commissioner working with Clayton on the case. "It was our duty to investigate."

Jemimah Noonoo, *Calling for the Truth*, April 2, 2007, available at

http://www.ColumbiaMissourian.com

None of the known facts in this proceeding support AT&T's argument that the state officials' attempt to investigate AT&T's possible violation of Missouri privacy laws is unlawful as an intrusion on federal or foreign intelligence activities, military activities, national security, national defense or foreign affairs, particularly in light of AT&T's admissions that these subpoenas do not "target" the NSA and that not every state action that "touches upon" federal matters is foreclosed.  Additionally, the factual situations presented in even the Supreme Court and Ninth Circuit case law cited by AT&T and briefly distinguished below are not in line with the facts and admissions of this case.  Therefore, AT&T's motion to dismiss is neither grounded in fact nor law.

In *In re World War II Era Japanese Forced Labor Litigation*, 164 F.Supp.2d 1160 (N.D.Cal. 2001) and *Deutsch v. Turner Corp.*, 324 F.3d 692 (9th Cir. 2003), the federal government's exclusive power over foreign affairs rendered unconstitutional a California statute permitting suits for compensation for World War II forced labor.  The federal Alien Registration Act of 1940 was ruled superior to a Pennsylvania statute in *Hines v. Davidowitz*, 312 U.S. 52 (1941).  In *United States v. Maine*, 420 U.S. 515 (1975), the United States Supreme Court ruled that the Submerged Lands Act of 1953 granted paramount rights to the federal government to control the Atlantic ocean seabed.  Article I of the United States Constitution was held to authorize Congress to order the National Guard to serve outside the country without the consent of the states in *Perpich v. Department of Defense*, 496 U.S. 334 (1990).  An Oregon statute that conditioned the ability of a non-resident alien to inherit Oregon property was held to improperly intrude upon foreign affairs in *Zschernig v. Miller*, 389 U.S. 429 (1968).  In *United States v. Pink*, 315 U.S. 203 (1942), the United States Supreme Court ruled that the presidentially-negotiated Litvinov Agreement granted superior rights to the federal government over the state

of New York concerning the assets of a Russian insurance company. The federal Burma Law was held by the First Circuit Court of Appeals to preempt a Massachusetts statute intended to restrict business dealings with the country of Burma. *National Foreign Trade Council v. Natsios*, 181 F.3d. 38 (1st Cir. 1999). A California statute requiring insurance companies to disclose information about their business dealings during the Holocaust was ruled inferior to the federal government's authority over foreign policy in *American Insurance Association v. Garamendi*, 539 U.S. 396 (2003). In *United States v. Curtiss-Wright*, 299 U.S. 304 (1936) an alleged conspiracy to sell arms to a foreign government was found to be in violation of a joint resolution of Congress. In *United States v. Belmont*, 301 U.S. 324 (1937), the laws of the state of New York were found subordinate to an international compact between the U.S. and Soviet governments.

Curiously, although the facts are distinguishable from the facts before this Court, two of the cases cited by AT&T involve rulings that the federal interests were not intruded upon by the state actions. North Dakota laws regulating liquor sales to military bases were determined not to be preempted by federal law and not a substantial burden on the federal government in *North Dakota v. New Mexico*, 495 U.S. 423 (1990) and the state taxes levied on federal contractors were found to be valid in *United States v. New Mexico*, 455 U.S. 720 (1982).

In support of its argument that the state officials here have attempted to intrude upon federal matters by asserting their state investigative authority over the public utilities regulated by the Missouri PSC, AT&T relies heavily on the Supreme Court's ruling in *In re Tarble*, 80 U.S. 397 (1871) which AT&T alleges to be a case "closely analogous to this one." The *Tarble* case involved a habeas corpus proceeding by a father for the discharge of his minor son who had enlisted in the United States' military. Although the facts of *Tarble* are completely dissimilar

from the facts before this Court, the Supreme Court's admonition about the necessary respect for

the co-existing spheres of federal and state governments is appropriately considered here.

> Such being the distinct and independent character of the two governments, within their respective spheres of action, it follows that neither can intrude with its judicial process into the domain of the other, except so far as such intrusion may be necessary on the part of the National government to preserve its rightful supremacy in cases of conflict of authority.  In their laws, and mode of enforcement, neither is responsible to the other.  How their respective laws shall be enacted; how they shall be carried into execution; and in what tribunals, or by what officers; and how much discretion, or whether any at all shall be vested in their officers, are matters subject to their own control, and in the regulation of which neither can interfere with the other.

*In re Tarble*, 80 U.S. 397, 407-408 (1871).

Plaintiffs' investigatory subpoenas do not, factually or legally, intrude upon foreign

intelligence and/or military activities.  Therefore, AT&T's Motion is not well-grounded and must

be denied.

## II.     The State Officials' Actions Are Not Preempted Because They Neither Regulate Areas Of Exclusive Federal Authority Nor Conflict With Federal Law.

The preemption claims set forth in Sections II and III of AT&T's supporting

memorandum depend on two fallacies: (1) They presuppose AT&T's compliance with the state

officials' inquiries would divulge state secrets and imperil national security; and (2) they rest on

the erroneous premise the state officials are investigating, and thus impeding, alleged federal

foreign intelligence gathering activities, national security matters, and military and foreign

affairs.  Neither proposition withstands scrutiny, and, without them, AT&T's preemption

arguments are meritless.

First, as explained in Point III, *infra*, the public statements of government officials and

telecommunications carriers' executives, coupled with the recent Justice Department report

regarding the Federal Bureau of Investigation's (FBI) improper usage of national security letters,

undercut the notion that the state officials' inquiries require AT&T to disclose state secrets. This, in turn, defeats AT&T's preemption claims, which only have meaning in the context of some information as to which the federal government has the authority to safeguard.

Second, as explained more fully in the preceding Section I, the record evidences a set of narrow inquiries properly initiated by the state officials under Missouri laws, not attempts to discover detailed information about foreign intelligence gathering operations and policy. Thus, there is no force behind AT&T's assertion that the state officials are attempting to investigate or interfere with federal functions. Without reliance on that erroneous premise, AT&T cannot sustain its claims that the state officials' actions invade an area occupied by the federal government or conflict with federal authority.

The state officials have attempted to properly exercise their undisputed police power to ensure AT&T's activities do not compromise the privacy rights of Missouri citizens. *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 375, 381 n.8 (1999) (states possess wide latitude to regulate intrastate telecommunications matters); *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 365 (1989) ("[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States. . . ."). The state officials have limited their inquiry to the unilateral actions of their regulated utilities, specifically, whether or not AT&T disclosed customer records to third parties in violation of Missouri privacy laws. Significantly, the state officials have not inquired as to the fate of any information after disclosure, nor requested responses of any kind from any recipient of such disclosures. The state officials' inquiry begins and ends with the AT&T Missouri companies, and does not attempt to investigate any other entity, including the federal government.

Once AT&T's specious characterization of the state officials' conduct is removed, its preemption claims fall apart. First, because the state officials' conduct relates to the regulation of intrastate telecommunications and public utilities—fields traditionally regulated by the states—AT&T's arguments must be evaluated "'in light of the presumption against the pre-emption of state police power regulations.'" *Pac. Gas & Elec. Co. v. California*, 350 F.3d 932, 944 (9th Cir. 2003) (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 518 (1992). Indeed, the Ninth Circuit has applied the presumption even where a state's exercise of its traditional police power overlaps to some extent with an area traditionally occupied by the federal government. *See Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 981 (9th Cir. 2005) (acknowledging "significant federal presence in the regulation of national banks," but nonetheless applying presumption because the state statute at issue "was enacted pursuant to the State's historic police powers to prohibit discrimination"), *cert. den. sub nom U.S. Bank Corp. v. Kroske*, 127 S. Ct. 157 (2006).

Next, there can be no preemption where, as here, the complained-of state conduct does not invade a field occupied by federal law.[1] Field preemption occurs when "the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation." *Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003) (quotations omitted). Field preemption presupposes state action in a fully occupied federal realm. The state officials' focused inquiries lie within their traditional police power over intrastate telecommunications and public utilities. Thus, the state action at issue here cannot be

---

[1] "Preemption can occur in one of three ways: express preemption by statute, occupation of the field, or conflict between state and federal regulation." *Incalza v. Fendi N. Am., Inc.*, 479 F.3d 1005, 1010 n.2 (9th Cir. 2007) (quotations omitted).

construed as "supplementary state regulation" within the realm of foreign intelligence, national security, or military or foreign affairs.

AT&T's conflict preemption arguments fare no better. Conflict preemption exists "when either 1) it is not 'possible to comply with the state law without triggering federal enforcement action,' *Jones v. Rath Packing Co.*, 430 U.S. 519, 540 (1977), or 2) state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' *Volt Info. Science, Inc. v. Bd. of Trs. of the Leland Stanford, Jr. Univ.*, 489 U.S. 468, 477." *Incalza*, 479 F.3d at 1009-10. In determining whether state law "stands as an obstacle" to a federal program, "the 'pertinent question[]' is whether the state law 'sufficiently injure[s] the objectives of the federal program to require nonrecognition.'" *TOPA Equities, Ltd. v. City of Los Angeles*, 342 F.3d 1065, 1071 (9th Cir. 2003) (quoting *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 583 (1979). AT&T, rejecting these established principles, argues that the state officials are preempted from engaging in any conduct that, in its view, would result in disclosure of information related to national security or foreign intelligence gathering. In AT&T's view, it can invoke preemption by simply articulating a national security or intelligence gathering function that the state officials' actions hypothetically have some effect on. This blank-check approach is far too blunt an instrument for achieving the balance between state and federal power at the core of preemption analysis.

Indeed, Ninth Circuit conflict preemption jurisprudence evinces a nuanced, fact-specific approach that contrasts sharply with AT&T's self-executing formula. For example, in *Ting*, after acknowledging that the presumption against preemption did not apply "because of the long history of federal presence in regulating long-distance telecommunications," *Ting*, 319 F.3d at 1136, the court held that California's consumer protection laws did not "stand as an obstacle to

the accomplishment and execution of the full purposes and objectives" of the federal Communications Act. *Id*. at 1137. AT&T argued that by concluding that its Consumer Services Agreement (CSA) violated California consumer protection and unconscionability law, the district court effectively forced AT&T to afford more favorable treatment to its California consumers, in violation of 47 U.S.C. §§ 201(b) (requiring that all charges be just and reasonable) and 202(a) (prohibiting carrier from discriminating in its charges or practices with respect to any person, group, or locality). *Id*. at 1138. The Ninth Circuit rejected AT&T's preemption arguments in part because, despite "extensive factual findings" after trial, AT&T had produced no evidence to support its assumptions concerning the effect of holding that the state laws were preempted. *Id*. at 1146. Thus, *Ting* illustrates that even where state action intersects a traditionally federal field of authority, the proponent of preemption must demonstrate how the state action actually impedes some federal function or purpose. *See also Skysign Int'l, Inc. v. City & County of Honolulu*, 276 F.3d 1109, 1116-17 (9th Cir. 2002) (holding that federal law did not preempt city's aerial signage ordinance even though the ordinance related to navigable airspace, an area in which there is a significant federal presence); *Ctr. for Bio-Ethical Reform, Inc. v. City & County of Honolulu*, 455 F.3d 910, 917-18 (9th Cir. 2006) (same); *Baker & Drake, Inc. v. Pub. Serv. Comm'n of Nev.*, 35 F.3d 1348, 1353-54 (9th Cir. 1994) (holding that federal bankruptcy code does not preempt state taxicab regulation that arguably made Baker & Drake's reorganization more difficult).

AT&T's argument boils down to the misconception that states cannot take any action that might hypothetically touch upon the federal government's activities, no matter how incidental or tangential the purported contact. As the Ninth Circuit recently observed, "[t]ension between federal and state law is not enough to establish conflict preemption," and a "'hypothetical

conflict is not a sufficient basis for preemption.'" *Incalza*, 479 F.3d at 1010 (quoting *Total TV v.*

*Palmer Communications, Inc.*, 69 F.3d 298, 304 (9th Cir. 1995); *see also Hancock v. Train*, 426

U.S. 167, 179 (1976) ("Neither the Supremacy Clause nor the Plenary Powers Clause bars all

state regulation which may touch the activities of the Federal Government."). Even assuming

that the state officials' narrow inquiries create some tension with federal functions, any

intersection between the state officials' actions and areas of federal authority is so slight as to be

negligible for preemption purposes.

AT&T's reliance on specific provisions of federal law—18 U.S.C. Sec. 798, 50 U.S.C.

Sec. 402 note (Section 6 of the National Security Agency Act of 1959), 50 U.S.C. Sec. 1801 *et*

*seq*. (Foreign Intelligence Surveillance Act), 18 U.S.C. Sec. 2510 *et seq*. (Title III of the

Omnibus Crime Control and Safe Streets Act), 47 U.S.C. Sec. 1001 *et seq*. (Communications

Assistance to Law Enforcement Act), and 18 U.S.C. Sec. 2701 *et seq*. (Stored Communications

Act)—is misplaced. The actions of the state officials do not conflict with any of these provisions

such that preemption is appropriate. Indeed, this Court rejected the government's argument that

50 U.S.C. § 402 note and 50 U.S.C. § 403-1(i)(1) required dismissal of a suit brought against

AT&T by individuals. *Hepting v. AT&T Corp.*, 439 F. Supp. 2d 974, 998 (N.D. Cal. 2006).

Given AT&T's refusal to Answer or otherwise provide any facts herein, it is currently

impossible for the state officials to determine whether or not the federal statute that AT&T cites

as a bar to their compliance with Missouri privacy laws and the state officials' obligation to

enforce same is, in fact, such a bar. A reading of the statute, 18 U.S.C. Section 798, does

however indicate that there are some persons, perhaps in the right circumstances the state

officials or this Court, who would be considered "an authorized person" to receive the

information specified within that statute. Additionally, the first two cases cited by AT&T in

support of their assertion of "conflict preemption" do not so hold.  In *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963) a California statute which gauged the maturity of avocados was found to not offend either the Supremacy Clause or a similar federal statute, and federal regulations governing the collection of blood plasma did not preempt Florida local ordinances in *Hillsborough County v. Automated Medical Labs*, 471 U.S. 707 (1985).

Moreover, as discussed fully in Section I of this brief, AT&T has admitted that the state officials' subpoenas do not "target" the NSA, therefore, the state officials' actions are not preempted by 50 U.S.C. Sec. 402 note.

Given the very limited facts known in this proceeding, the state officials cannot determine whether or not any of the remaining federal statutes cited by AT&T are applicable herein.  However, the state officials can generally address these federal laws in light of AT&T's assertion of complete preemption.  Contrary to AT&T's claims that each of these federal statutes completely preempts the state officials' investigatory proceeding, each federal statute specifically carves out an area of authority for state laws, state courts and/or state officials.

The Foreign Intelligence Surveillance Act, arguably the most comprehensive federal scheme of the statutes cited by AT&T, infers the authority of state courts over non-federal parties by specifying federal jurisdiction solely for offenses of "an officer or employee of the United States."  50 U.S.C. Section 1809(d).

The Wiretap Act defines an "investigative or law enforcement officer" to include an officer "of a State or political subdivision thereof, who is empowered by law to conduct investigations of…offenses enumerated in this chapter…" 18 U.S.C. Section 2510(7).  Further, the Act defines a "judge of competent jurisdiction" to include "a judge of any court of general criminal jurisdiction of a State who is authorized by a statute of that State to enter orders

authoring interceptions of wire, oral, or electronic communications." 18 U.S.C. Section 2510

(9). Like the Communications Assistance for Law Enforcement Act, the Wiretap Act permits a

court to issue a surveillance order pursuant to a State statute. 18 U.S.C. Section 2522(a).

The Communications Assistance to Law Enforcement Act requires the U.S. Attorney

General to coordinate with state and local law enforcement agencies, and to consult with State

utility commissions "to ensure the efficient and industry-wide implementation" of the Act. 47

U.S.C. Section 1006(a)(1). Additionally, the Act authorizes the issuance of a surveillance order

under the provisions of the Act itself, and also under State statutes. 18 U.S.C. Section 2522(a).

The Stored Communications Act permits the use of "an administrative subpoena

authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena." 18

U.S.C. Section 2703(b) and (c). Moreover, the Act authorizes enforcement in any "court of

competent jurisdiction," which is defined to include "a court of general criminal jurisdiction of a

State authorized by the law of that State to enter orders authorizing the use of a pen register or a

trap and trace device." 18 U.S.C. Section 3127(2).

Perhaps because each of the federal statutory schemes cited by AT&T does, in fact,

specifically reserve areas and functions for state law and state officials (and AT&T admits this

fact at pages 16-17 of its supporting memorandum), AT&T also argues that complete federal

preemption can and should be *inferred* over these proceedings. Curiously, however, AT&T's

primary cited case holds just the opposite.

In *English v. General Electric Company*, 496 U.S. 72 (1990), the United States Supreme

Court addressed the potential conflict between a state law cause of action for emotional distress

and the Energy Reorganization Act of 1974. The Court held that "[w]e conclude that petitioner's

claim for intentional infliction of emotional distress does not fall within the pre-empted field of

nuclear safety as that field has been defined in prior cases." *Id*. at 89. The Court's cautionary

words regarding the *inference* of federal preemption are particularly appropriate here, where the

federal statutes cited by AT&T specifically reserve some state authority. The *English* Court

stated, "[o]rdinarily, the mere existence of a federal regulatory or enforcement scheme, even one

as detailed as [the Energy Reorganization Act], does not by itself imply pre-emption of state

remedies. The Court has observed: 'Undoubtedly, every subject that merits congressional

legislation is, by definition, a subject of national concern. That cannot mean, however, that

every federal statute ousts all related state law….'" *Id*. at 87.

State authority is specifically reserved within the federal statutory schemes cited by

AT&T. The Supreme Court, in the *English* case, warned against presuming preemption simply

because of the detailed nature of a federal statute. Further, the Supreme Court has stated that

"the regulation of utilities is one of the most important of the functions traditionally associated

with the police power of the States." *Arkansas Electric Coop. v. Arkansas Public Service

Commission*, 461 U.S. 375, 377 (1983). A presumption here of federal preemption would be

contrary to the specific language of the federal statutes cited by AT&T and contrary to the settled

law and underlying policy set forth by the United States Supreme Court.

Setting aside the specific statutes cited by AT&T and addressing their general assertion

of impossibility of compliance with both Missouri and federal laws, there appear to be several

ways in which AT&T could respond to the state officials' state law investigation that are also

compatible with the federal law asserted by AT&T. If AT&T has not and is not disclosing any

Missouri customer proprietary information to anyone, it need only so affirm and the state

officials' duty to uphold Missouri law is satisfied and the investigation is concluded. If AT&T

has not and is not disclosing customer proprietary information but cannot so deny or, if it has or

is disclosing such information but cannot so affirm, because an authorized federal official has lawfully so instructed AT&T, it can reference the appropriate legal authority and, again, the state officials' duty to uphold Missouri law is satisfied and the investigation is concluded.

In short, if AT&T's actions or inactions have been lawful, there should be no conflict between AT&T's obligations under federal and state law. "Conflict" might arise, however, if AT&T has acted unlawfully and has raised these "national security" issues simply to avoid the resulting consequences. "Conflict" might also arise if AT&T is deliberating pushing the limits of the existing law. This Court has been entrusted with the responsibility of adjudicating this matter consistent with the existing applicable law, to the benefit of the parties and particularly to the citizenry represented by these state officials. AT&T seeks to prevent not the disclosure of protected information, but the very act of asking for that information, as well as any judicial scrutiny of whether AT&T's claim of grave threats to national security is, in fact, valid. According to AT&T, no one, not even the agencies vested with traditional state police power to protect the public interest and to enforce state laws governing intrastate telecommunications service providers, can question whether a carrier has disclosed confidential customer information in violation of state law. If Congress intended to vest such sweeping power in the federal government to the derogation of the states and the detriment of the general public's privacy rights, it would have stated so expressly. There is no statement of such intent anywhere in federal law. Whatever impact the state officials' actions may have on the federal government's functioning, it would be only incidental and cannot support AT&T's preemption arguments. AT&T's motion to dismiss must be denied.

**III.** **The Information Sought By the State Officials Does Not Expose State Secrets or Jeopardize National Security.**

By their refusal to engage in any meaningful communication with the state officials, the Missouri AT&T companies have disregarded Missouri law and their responsibilities under that law as regulated utilities doing business in Missouri. In their letter faxed to the state officials on July 11, 2006 (06-CV-1132, related case *USA v. Gaw, et al.*, Memorandum in Opposition to Summary Judgment, Ex. N, Docket #38), one day prior to the due date of the testimony and document production ordered by the investigative subpoenas, AT&T asserted no facts at all but instead raised a boiler-plate "state and military secrets" privilege and a "national security" defense that they later admitted they had no standing to assert. (06-CV-4177, Defendants' Motion to Change Venue or In the Alternative to Stay, page 9, Docket #26).

Despite their admission of no standing filed in the record in the Western District of Missouri, the arguments raised by AT&T in the pending motion are predicated on its "factual" assertion that the investigative subpoenas of the state officials amount to an inquiry into "state or military secrets" or matters relating to the "national security," and AT&T's arguments somewhat blur the line between its allegations of *factual* "secrets"[2] on the one hand, and its assertion of the *evidentiary privilege* for "state or military secrets" and the "national security" *defense* on the other hand. If no secret exists, then the assertion of the state secrets privilege cannot be carried. *Hepting v. AT&T Corp,* 439 F.Supp.2d 974, 986 (N.D. Cal. 2006.)

---

[2] The state officials strongly contest AT&T's claim that the state officials' investigation into AT&T's actions, if any, concerning the customer records in their possession touches upon a program that is "secret." Briefly, the state officials would refer this Court to the public statement of Senator Christopher "Kit" Bond (R-MO) that "[t]he President's program uses information collected from phone companies…what telephone number called what other telephone number." PBS Online NewsHour, "NSA Wiretapping Program Revealed," May 11, 2006. Similar statements were also made by Senator Pat Roberts (R-KS), NPR All Things Considered, "Senate Intelligence Chair Readies For Hayden Hearings," May 17, 2006, and by Senate Majority Leader William Frist (R-TN), CNN Late Edition with Wolf Blitzer, May 14, 2006.

The actual records targeted by the state officials' investigative subpoenas are not, factually-speaking, "state secrets." Attached hereto for the Court's convenience is the previously-filed Affidavit of Natelle Dietrich, a Regulatory Economist and Supervisor, Telecommunications Department, Missouri Public Service Commission (06-CV-1132, related case *USA v. Gaw, et al.*, Memorandum in Opposition to Summary Judgment, Ex. P, Docket #38.) As is set forth fully in her Affidavit, Ms. Dietrich is qualified by knowledge, skill, experience, training and education to testify as an expert in the field of telecommunications, with particular emphasis herein regarding customer records and the Missouri laws governing the same. Ms. Dietrich has based her opinion, according to reliable principles and methods, upon her personal knowledge and the facts and data particular to this case. In Ms. Dietrich's expert opinion, the information sought by the narrowly-focused inquiry of the investigative subpoenas served by the state officials upon the six Missouri AT&T companies and regarding only the actions of AT&T, pertains to the customer records kept (and presumably protected from unauthorized disclosure) in the ordinary course of the everyday business activities of AT&T providing telecommunications services in the state of Missouri to Missouri customers and citizens. These customer records are not, on their face, "state or military secrets" or kept by AT&T for the "national security." Rather, they are kept to resolve customer disputes regarding billing or other related issues. (Service, connection, disconnection, etc.). (*See*, Affidavit of Natelle Dietrich, attached hereto for the Court's convenience as Exhibit P).

Since the filing of the primary briefs in these matters, persuasive evidence has come to light that at least one government agency, the FBI, routinely violated federal law in the issuance of national security letters to carriers seeking call record information. *See* U.S. Department of Justice, Office of the Inspector General *A Review of the Federal Bureau of Investigation's Use of*

*National Security Letters*, March 2007, available at

http://www.usdoj.gov/oig/special/s0703b/final.pdf (IG's report).  The Inspector General also

confirmed that the FBI entered into contracts with three carriers between May 2003 and March

2004 to provide "near real-time servicing of legal process" of FBI requests.  *Id*. at 88.  On more

than 700 occasions, these requests for call record information were processed by the carriers

even before proper authorization, in the form of a grand jury subpoena or national security letter,

was issued.  *Id.* at 90.

There has been no showing that the bare disclosure of any carriers' compliance with, or

rejection of, similar requests by third parties to turn over customer call records would damage

national security.  The IG's report lends great weight to the state officials' argument that

compliance with the subpoena requests is proper to ensure that no criminal conduct occurred.[3]

The IG's report also lends weight to the argument that no "secret," namely whether

carriers have provided bulk phone record calling data to the federal government, exists.

Some carriers have admitted they comply with what they view as lawful requests for

information by the federal government. *See, e.g.*  Niraj Warikoo, *ACLU:  Companies Violated*

*Privacy*, The Detroit Free Press, July 27, 2006.  It strains logic to suggest that, in light of the

prior public disclosures by governmental and telecommunications officials and the more recent

disclosure of contractual arrangements between the government and carriers to expedite requests

for that compliance, responding to the state officials' investigation would either expose state

secrets or jeopardize national security.

---

[3] Indeed, the need for judicial scrutiny of this conduct has become more urgent since the Bush
Administration's announcement that it is proposing legislation that shields telecommunications
carriers from liability when complying with requests made of them by the federal government
under the Foreign Intelligence Surveillance Act.  James Risen, *Legislation Seeks to Ease Rules*
*on Domestic Spying*, The New York Times, A13, April 14, 2007.

The Supreme Court set forth the requirements for the proper use of the "state secrets" evidentiary privilege over fifty years ago. "The privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party. It is not to be lightly invoked. There must a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." *United States v. Reynolds, et al.*, 345 U.S 1, 7 – 8 (1953).[4]

In this proceeding, AT&T has no standing to assert the privilege, and has previously so admitted. (06-CV-4177, Defendants' Motion To Change Venue Or In The Alternative To Stay, page 9, Docket #26). Additionally, even if AT&T could overcome their lack of standing, there has not been an adequate formal claim of this privilege by the head of the department with control over the matter "after actual personal consideration by that officer." The unsworn letter from Benjamin Powell, General Counsel for the Director of National Intelligence to a Washington D.C. law firm, referenced at pages 1, 2 and 14 fails to meet the *Reynolds* requirements for the assertion of the "state secrets" evidentiary privilege. Mr. Powell does not formally assert the privilege, nor does he claim any personal knowledge or consideration of the facts and data particular to this matter, stating vaguely instead that, "We understand that

---

[4] The importance of the careful application of the "state secrets" evidentiary privilege is well-illustrated by the *Reynolds* case and its subsequent history. The *Reynolds* Court applied the privilege to bar discovery of the government's classified report concerning the crash of a military plane carrying both secret military equipment and military and civilian personnel, but did not dismiss the suit and remanded the case for further proceedings, and the case was subsequently settled. 345 U.S. at 11. However, just last year, one of the original plaintiffs in *Reynolds,* along with others, sued to basically reopen the *Reynolds* case, alleging that the recently de-classified government accident report showed the likely cause of the crash, previously hidden under the "state secrets" privilege, to have been mechanical and technical failure. Because the Court did not find sufficient evidence of "fraud upon the court," the case was dismissed. *Herring v. United States of America*, 424 F.3d 384 (3rd Cir. 2005.) However, the real risk of the concealment of an illegal act by the assertion of the "state secrets" privilege must surely always be of concern to the court.

subpoenas duces tecum…were served…"  It is additionally unclear whether or not Mr. Powell

satisfies the second prong of the *Reynolds* test:  that the privilege be lodged by the head of the

department with control over the matter.  If further persuasion is helpful to this Court, the state

officials would again refer to the Supreme Court's guidance in *Reynolds*, which cautioned that,

"[j]udicial control over the evidence in a case cannot be abdicated to the caprice of executive

officers."  *Reynolds*, 345 U.S. at 9-10. AT&T's attempt to assert the "state secrets" evidentiary

bar in this proceeding should thereupon fail.

**IV.     It is AT&T who Seeks to Violate the *Totten/Tenet* Rule, Not the State Officials Through their Subpoenas.**

The United States Supreme Court has consistently held, since its decision in *Totten v.*

*United States*, 92 U.S. 105 (1875) to its decision in *Tenet v. Doe*, 544 U.S. 1 (2005) that a private

party to a secret, espionage agreement with the U.S. government cannot disclose the existence of

that secret agreement through a court action intended to enforce the benefits of that agreement.

The *Totten* and *Tenet* rulings do not operate against the state officials in the instant proceeding,

because the facts of both of these cases are opposite the known facts before this Court.

However, the Court's rulings and analyses in *Totten* and *Tenet* do apply to AT&T's actions

herein.

In *Totten*, the administrator of the estate of a deceased former spy in the Civil War filed

suit to collect payment on the secret services performed.  The Court affirmed the dismissal of the

cause of action, stating that, "[b]oth employer and agent must have understood that the lips of the

other were to be for ever sealed respecting the relation of either to the matter….The secrecy

which such contacts impose precludes any action for their enforcement."  *Totten*, 92 U.S. at 106-

107.  In *Tenet v. Doe*, a high-ranking diplomat for a foreign country and his wife entered into a

secret espionage agreement with the CIA to provide intelligence information in exchange for a

secure life in the U.S. Years later, when the husband and wife team sought through court action to enforce the financial terms of their secret agreement with the CIA, the Supreme Court again refused to allow a private party to a secret espionage agreement to pursue judicial enforcement of that agreement. *Tenet*, 544 U.S. at 1.

In the proceeding before this Court, the state officials' only inquiry regards the unilateral actions of AT&T. Therefore, AT&T can simply affirm or deny their unilateral actions in response to the state officials' inquiry. However, AT&T has chosen instead to violate the *Totten/Tenet* rule by raising the possible existence of a "secret, espionage" agreement between themselves and the National Security Agency. It is AT&T who seeks to disclose this relationship to this Court in order to accrue the benefit of that relationship, namely, a defense for their actions which may, without the defense, be found to be unlawful. Pursuant to the *Totten/Tenet* rule, it is AT&T who must be precluded from avoiding the state officials' investigation by asserting the beneficial terms of some "secret espionage" agreement. Further, AT&T may not be permitted to assert the existence of such a secret agreement in order to gain the benefit of a dismissal of this proceeding.

## V. The State Officials are Fully Authorized Under Missouri Law to Pursue Their Investigation.

As is set forth more fully in the Statement of Facts herein, the state officials issued the investigative subpoenas pursuant to the authority granted by Sections 386.320 and 386.420 of the Revised Statutes of Missouri 2000. Section 386.320.3 provides for the Missouri Public Service Commission's "General supervision of telegraph and telephone corporations" as follows:

> 3. The commission *and each commissioner* shall have power to examine all books, contracts, records, documents and papers of any person or corporation subject to its supervision, and by subpoena duces tecum to compel production thereof…. (emphasis added).

Additionally, Section 386.420.2 of the Revised Statutes of Missouri 2000 states:

> …The commission *or any commissioner* or any party may, *in any investigation* or hearing before the commission, cause the deposition of witnesses residing within or without the state to be taken in the manner prescribed by law for like depositions in civil actions in the circuit courts of this state and to that end may compel the attendance of witnesses and the production of books, waybills, documents, papers, memoranda and accounts…. (emphasis added).

The state officials filed their Application to the state court for enforcement of their valid subpoenas in their official capacities as Commissioners of the Missouri Public Service Commission. That Application, of course, refers to the Missouri Rules of Civil Procedure among other authorities relevant to this state court action which is based on Section 536.077 of the Revised Statutes of Missouri 2000:

> …The agency shall enforce subpoenas by *applying to a judge of the circuit court* of the county of the hearing…for an order upon any witness who shall fail to obey a subpoena to show cause why such subpoena should not be enforced, which said order and a copy of the application therefore shall be served upon the witness in the same manner as a summons in a civil action, and if the said circuit court shall, after a hearing, determine that the subpoena should be sustained and enforced, said court shall proceed to enforce said subpoena in the same manner as though said subpoena had been issued in a civil case in the circuit court. Any such agency may delegate to any member, officer, or employee thereof the power to issue subpoenas…. (emphasis added).

AT&T has requested this Court to assume the jurisdiction necessary to construe Missouri law. Moreover, AT&T would have this Court construe that Missouri law to be superfluous and ineffective. AT&T has asked this Court to hold that, although the Missouri legislature specifically granted each Commissioner of the Missouri Public Service Commission the power and authority to conduct investigations and issue subpoenas to compel the testimony of witnesses and the production of documents, the Missouri legislature knowingly and intentionally precluded each Commissioner from ever being able to enforce the powers specifically granted him or her.

24

In advancing their argument for this illogical construction of existing Missouri law,

AT&T has failed to cite the statute that specifically defines the "powers of a commissioner."

The state officials set forth that statute below:

> Any investigation, inquiry or hearing which the commission has power to undertake or to hold may be undertaken or held by or before any commissioner. All investigations, inquiries, hearing and decisions of a commissioner shall be and be deemed to be the investigations, inquiries, hearings and decisions of the commission, and every order and decision made by a commissioner, when approved and confirmed by the commission and ordered filed in its office, shall be and be deemed to be the order of the commission. Section 386.130 RSMo.

The logical construction of all of the Missouri statutes which define the authority of the

state officials herein is that the Missouri legislature fully intended to authorize each

Commissioner to possess and use the power necessary to effectively conduct the business of the

Commission as if it were acting as a whole, subject always and at the appropriate time, to

approval and confirmation by the body of the Commission. This matter, if it remains at all an

issue, is one properly addressed by the State Courts of Missouri, and not appropriately raised in

AT&T's Motion to Dismiss.

## CONCLUSION

For the foregoing reasons, the state officials respectfully request that AT&T's motion to

dismiss be denied.

DATED: May 1, 2007

Respectfully submitted,

/s/ Peggy A. Whipple
Peggy A. Whipple
Missouri Bar No. 54758
peggy.whipple@psc.mo.gov

Jennifer Heintz
Missouri Bar No. 57128
jennifer.heintz@psc.mo.gov

P. O. Box 360
Jefferson City, MO 65102
Tel:  (573) 526-6715
Fax:  (573) 751-9285
Attorneys for the
Missouri Public Service Commission

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2007, a copy of the foregoing MISSOURI STATE OFFICIALS' BRIEF OF POINTS AND AUTHORITIES IN OPPOSITION TO AT&T'S MOTION TO DISMISS was filed with the Court's Electronic Case File System and thereby served by e-mail in a manner constituting service pursuant to point 4 of this Court's General Order regarding Electronic Filing Procedures on all parties.

/s/ Peggy A. Whipple
Peggy A. Whipple
Missouri Bar No. 54758
peggy.whipple@psc.mo.gov

Jennifer Heintz
Missouri Bar No. 57128
jennifer.heintz@psc.mo.gov

P. O. Box 360
Jefferson City, MO 65102
Tel:  (573) 526-6715
Fax:  (573) 751-9285
Attorneys for the
Missouri Public Service Commission