1   Laurence F. Pulgram (CSB No. 115163)
lpulgram@fenwick.com
2   Candace Morey (CSB No. 233081)
cmorey@fenwick.com
3   FENWICK & WEST LLP
555 California Street, 12th Floor
4   San Francisco, CA 94104
Telephone:    (415) 875-2300
5   Facsimile:     (415) 281-1350

6   Ann Brick (CSB No. 65296)
abrick@aclunc.org
7   AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
8   39 Drumm Street
San Francisco, CA 94111
9   Telephone: (415) 621-2493
Facsimile: (4150 255-8437
10
Attorneys for Plaintiffs in
11   Dennis P. Riordan, *et al.*

12   Barry R. Himmelstein (CSB No. 157736)
bhimmelstein@lchb.com
13   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
14   San Francisco, CA 94111-3339
Telephone: 415-956-1000
15   Facsimile: 415-956-1008

16   Interim Class Counsel for MCI Class

Vincent I. Parrett (CSB No. 237563)
vparrett@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Boulevard
P. O. Box 1792
Mount Pleasant, SC 29465
Telephone: (843) 216-9000
Facsimile: (843) 216-9440

Interim Class Counsel for
Verizon Class

17       UNITED STATES DISTRICT COURT

18       NORTHERN DISTRICT OF CALIFORNIA

19       SAN FRANCISCO DIVISION

| | |
|---|---|
| 20   IN RE: | MDL No. 06-1791 VRW |
| 21   NATIONAL SECURITY AGENCY TELECOMMUNICATIONS RECORDS LITIGATION, | **PLAINTIFFS' JOINT OPPOSITION TO MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT BY THE UNITED STATES OF AMERICA AND TO STATE SECRETS AND RELATED ARGUMENTS IN VERIZON'S MOTION TO DISMISS** |
| 22 | |
| 23   This Document Relates To: | |
| 24   (1) All Class Actions Against MCI and Verizon Defendants in the Master MCI and Verizon Consolidated Complaint, Dkt. 125; | |
| 25   (2) *Bready v. Verizon Maryland* (06-6313); (3) *Chulsky v. Cellco Partnership & Verizon Communications Inc.* (06-6570); and | Date:       August 30, 2007 Time:       2:00 p.m. |
| 26 | Courtroom: 6, 17th Floor |
| 27   (4) *Riordan v. Verizon Communications Inc.* (06-3574) | Judge:     Hon. Vaughn R. Walker |
| 28 | |

*(left margin, vertical text)* FENWICK & WEST LLP   ATTORNEYS AT LAW   SAN FRANCISCO

1   Jennifer L. Kelly (CSB No. 193416)
jkelly@fenwick.com

2   Aaron K. Perzanowski (CSB No. 244921)
aperzanowski@fenwick.com

3   FENWICK & WEST LLP
555 California Street, 12th Floor

4   San Francisco, CA  94104
Telephone:     (415) 875-2300

5   Facsimile:      (415) 281-1350

6   Peter J. Eliasberg (CSB No. 189110)
peliasberg@aclu-sc.org

7   Peter Bibring (CSB No. 223981)
pbibring@aclu-sc.org

8   AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN

9   CALIFORNIA
1616 Beverly Boulevard

10  Los Angeles, CA 90026
Telephone: (213) 977-9500

11  Facsimile: (213) 250-3919

12  Nicole A. Ozer (CSB No. 228643)
nozer@aclunc.org

13  AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN

14  CALIFORNIA
39 Drumm Street

15  San Francisco, CA  94111
Telephone:  (415) 621-2493

16  Facsimile:  (4150 255-8437

17  Attorneys for Plaintiffs in
Dennis P. Riordan, *et al.*

18

19  Ronald L. Motley
rmotley@motleyrice.com

20  Jodi W. Flowers
jflowers@motleyrice.com

21  Don Migliori
dmigliori@motleyrice.com

22  Justin B. Kaplan
jkaplan@motleyrice.com

23  MOTLEY RICE LLC
28 Bridgeside Boulevard

24  P. O. Box 1792
Mount Pleasant, SC  29465

25  Telephone:  (843) 216-9000
Facsimile:   (843) 216-9440

26

27  Interim Class Counsel for
Verizon Class

28

Elizabeth Cabraser (CSB No. 83151)
ecabraser@lchb.com
Eric B. Fastiff (CSB No. 182260)
efastiff@lchb.com
Allison Elgart (CSB No. 241901)
aelgart@lchb.com
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone:  415-956-1000
Facsimile:  415-956-1008 (fax)

Interim Class Counsel for MCI Class

Joshua Graeme Whitaker
(Appearing pursuant to MDL Rule 1.4 [U.S.
Dist. Ct. for the Dist. of Md. Bar No. 16457])
joshuawhitaker@griffinwhitaker.com
Edward Nelson Griffin
(Appearing pursuant to MDL Rule 1.4 [U.S.
Dist. Ct. for the Dist. of Md. Bar No. 16435])
edwardgriffin@griffinwhitaker.com
GRIFFIN WHITAKER LLP
8730 Georgia Avenue Suite LL100
Silver Spring, MD  20910
Telephone:  (301) 587-3345
Facsimile:  (888) 367-0383

Attorneys for Plaintiffs
Christopher Bready, *et al.*

David H. Sternlieb
dsternlieb@shapirosternlieb.com
Gary S. Shapiro
gshapiro@shapirosternlieb.com
(Appearing pursuant to MDL Rule 1.4) (U.S.
Dist. Ct. for the Dist. of N.J.)
SHAPIRO & STERNLIEB, LLC
Attorneys At Law
800 Tennent Road
Manalapan, New Jersey 07726
Telephone:  (732) 617-8050
Facsimile:  (732) 617-8060

Counsel for
Plaintiffs Glen Chulsky, *et al.*

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

Page(s)

ISSUES TO BE DECIDED ........................................................................................... xi

INTRODUCTION ...................................................................................................... 1

THE FACTUAL BACKGROUND ................................................................................ 2

A.   This Court Has Already Rightly Concluded that Evidence Confirms the
     Existence of the NSA Content Surveillance Program................................... 2

B.   Reliable Public Information Unequivocally Confirms the Existence of an
     NSA Program for Collecting Customer Call Records ................................... 4

     1.   The Executive Branch Has Confirmed a Call Records Program
          Exists ................................................................................................. 5

     2.   Members of Congress Fully Briefed on the NSA Programs Have
          Acknowledged the Call Records Program ......................................... 5

     3.   Verizon, as Well as Qwest, Has Confirmed the Call Records
          Program. ............................................................................................ 8

C.   The Facts Regarding Verizon's and MCI's Participation in the Content and
     Records Programs Is Not a Secret................................................................ 9

D.   Verizon's and MCI's Turnover of Call Records to the Government Is a
     Public Fact Well Known to Potential Terrorists ........................................ 11

ANALYSIS ............................................................................................................. 14

I.   THIS COURT IN *HEPTING* APPLIED THE PROPER STANDARDS FOR
     ANALYSIS OF THE STATE SECRETS PRIVILEGE.................................................. 14

A.   The Judiciary, Not the Executive, Determines the Applicability and Effect
     of the State Secrets Privilege.................................................................... 14

B.   The Court Must First Find the Information to be Secret Before Reasonable
     Harm from Disclosure Could Become Relevant........................................ 16

     1.   Information Publicly Disclosed by Reliable Sources Is Not Secret.......... 17

     2.   The Government's Claim that It Has Not Intentionally Waived the
          Privilege Cannot Cloak Non-Secret Information ................................ 18

     3.   Truly Secret Information Is Subject to the Privilege Only if
          Disclosure Threatens National Security............................................ 19

1

**TABLE OF CONTENTS**
(continued)

2

Page(s)

3    II.    "THE VERY SUBJECT MATTER" OF THIS LITIGATION IS NOT A SECRET;
4           ACCORDINGLY THE GOVERNMENT'S ASSERTION OF THE STATE
            SECRETS PRIVILEGE CANNOT BAR ALL CLAIMS AT THE OUTSET ................ 20
5
           A.    Dismissal is a Draconian Remedy Unsupported by Precedent Here .................... 20
6
           B.    The Public Record Reveals the Existence of the Programs and the
7                 Participation of MCI and Verizon ........................................................................ 23

8                 1.    The Existence of the Content Monitoring Program Is Not Secret. ........... 23

9                 2.    The Existence of the Call Records Program Is Not Subject to the
10                       State Secrets Privilege ............................................................................. 24

11                       a.    Executive Disclosures Reveal the Existence of the Call
                                Records Program ........................................................................ 24
12
                          b.    Congressional Disclosures Reveal the Existence of the Call
13                              Records Program ........................................................................ 25

14                       c.    Party Disclosures Reveal the Existence of the Call Records
15                              Program ...................................................................................... 26

16                3.    Participation by MCI and Verizon in Both the Content and Records
                         Program Is Not Secret ............................................................................... 27
17
                          a.    The Participation of Verizon and MCI in the Content
18                              Surveillance Program Is Not Secret .............................................. 27

19                       b.    Participation by Verizon's MCI Subsidiary in the Call
20                              Records Program Is Not Secret .................................................... 28

21                       c.    Verizon's Direct Participation in the Call Records Program
                                Is Not Secret .............................................................................. 29
22
                          d.    Testing Verizon's Participation Through More Formal
23                              Means Will Not Harm National Security ...................................... 29

24    III.   THESE CASES MAY NOT BE DISMISSED AT THE PLEADING STAGE
25           BASED ON THE HYPOTHESIS THAT PLAINTIFFS MAY BE UNABLE TO
             ESTABLISH A *PRIMA FACIE* CASE, THAT DEFENSES MAY BE
26           UNAVAILABLE, OR THAT PLAINTIFFS MAY BE UNABLE TO PROVE
             STANDING ........................................................................................................ 31
27
           A.    Mere Speculation That Evidence Needed to Establish a *Prima Facie* Case
28                or Defense May Be Unavailable Cannot Support Dismissal ................................ 31

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**TABLE OF CONTENTS**
(continued)

Page(s)

B.   The Government's Hypothesized Lack of Standing Provides No Basis for
     Dismissal on the Pleadings ....................................................................... 33

     1.   The Government's Motion For Summary Judgment is Premature .......... 34

          a.   It Is Not Appropriate to Address Standing Before a Ruling
               on the Government's Assertion that the Very Subject Matter
               of this Litigation is a State Secret ................................................. 34

          b.   Plaintiffs Are Not Required to *Prove* Standing Before
               Discovery ...................................................................................... 35

          c.   Neither *Halkin* Nor *Ellsberg* "Foreclose Litigation" Before
               Discovery ...................................................................................... 36

     2.   Proof of the Existence of the Content and Records Programs
          Establishes Standing ................................................................................ 37

          a.   Establishing that the Dragnet Programs Exist Establishes
               Plaintiffs' Standing ....................................................................... 38

          b.   Plaintiffs Can Establish Standing to Sue for Damages for
               Past Injuries and to Enjoin Probable Future Injuries. .................. 39

     3.   Plaintiffs Can Establish Standing Via In Camera Proceedings................ 41

IV.   THE *TOTTEN/TENET* BAR DOES NOT APPLY........................................... 42

      A.   *Totten/Tenet* Only Bars Spies from Suing the Government to Enforce Their
           Espionage Contracts........................................................................ 43

      B.   Verizon's Public and Admitted Assistance to Government Surveillance Is
           Not a "Secret" that the *Totten/Tenet* Bar Protects.................................... 45

V.    STATUTORY PRIVILEGES DO NOT BAR DISCOVERY INTO VERIZON'S
      AND MCI'S ACTIONS, AND IN ANY EVENT, DISMISSAL AT THIS STAGE
      WOULD NOT BE WARRANTED ..................................................................... 46

VI.   EVEN IF THE SUBJECT MATTER WERE SECRET, THE EXECUTIVE
      CANNOT IGNORE EXPLICIT PROCEDURES CONGRESS ESTABLISHED
      FOR REVIEW OF THE REQUESTED INFORMATION. ............................. 49

      A.   Congress May Properly Limit Executive Authority by Statute ............................ 49

      B.   FISA's Well-Defined Procedures Govern Secret Information Relating to
           Electronic Surveillance .................................................................... 50

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

**TABLE OF CONTENTS**
**(continued)**

2

**Page(s)**

3      C.      Dismissal on the Pleadings Is Impermissible Under § 1806(f)............................. 53

4   CONCLUSION .......................................................................................................................... 54

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**CASES**

4

*ACLU v. NSA,*
     438 F. Supp. 2d 754 (E.D. Mich. 2006)...................................................................... 18

5

*ACLU Found. of Southern Cal. v. Barr,*
     952 F.2d 457 (D.C. Cir. 1991) ................................................................................... 53

6

*ACLU v. Brown,*
     619 F.2d 1170 (7th Cir. 1980) (*en banc*) ................................................................. 17

7

8

*Al-Haramain Islamic Found. v. Bush,*
     451 F. Supp. 2d 1215 (D. Or. 2006) .................................................................. passim

9

*Am. Petroleum Inst. v. EPA,*
     216 F.3d 50 (D.C. Cir. 2000) ..................................................................................... 40

10

*American Library Ass'n v. FCC,*
     401 F.3d 489 (D.C. Cir. 2005) ................................................................................... 40

11

*Baker v. Carr,*
     369 U.S. 186 (1962)..................................................................................................... 41

12

*Bareford v. Gen. Dynamics Corp.,*
     973 F.2d 1138 (5th Cir. 1992)..................................................................................... 31

13

*Barker v. Wingo,*
     407 U.S. 514 (1972)..................................................................................................... 19

14

15

*Baur v. Veneman,*
     352 F.3d 625 (2d Cir. 2003)................................................................................. 39, 40

16

*Capital Cities Media, Inc. v. Toole,*
     463 U.S. 1303 (1983)................................................................................................... 17

17

*Central Delta Water Agency v. United States,*
     306 F.3d 938 (9th Cir. 2002)................................................................................. 38, 40

18

*CIA v. Sims,*
     471 U.S. 159 (1985)..................................................................................................... 48

19

20

*Clift v. United States,*
     597 F.2d 826 (2d Cir. 1979)................................................................................. 21, 31

21

*Clift v. United States,*
     808 F. Supp. 101 (D. Conn. 1991) ............................................................................ 21

22

*Clinton v. New York,*
     524 U.S. 417 (1998)..................................................................................................... 40

23

*Covington v. Jefferson County,*
     358 F.3d 626 (9th Cir. 2004)....................................................................................... 40

24

25

*Dept. of Commerce v. U.S. House of Reps.,*
     525 U.S. 316 (1999)..................................................................................................... 41

26

*Dickerson v. United States,*
     530 U.S. 428 (2000)..................................................................................................... 50

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

2

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

3   *Does I through XXIII v. Advanced Textile Corp.*,
        214 F.3d 1058 (9th Cir. 2000)..............................................................42

4   *Edmond v. United States*,
        520 U.S. 651 (1997)............................................................22, 47

5

6   *Edmonds v. DOJ*,
        323 F. Supp. 2d 65 (D.D.C. 2004),
        *aff'd*, 161 Fed. Appx. 6 (D.C. Cir. 2005)....................................22

7

8   *Ellsberg v. Mitchell*,
        709 F.2d 51 (D.C. Cir. 1983)...........................................................passim

9   *El-Masri v. United States*,
        479 F.3d 296 (4th Cir. 2007)................................17, 21, 22, 45

10  *Farnsworth Cannon, Inc. v. Grimes*,
        635 F.2d 268 (4th Cir. 1980),
        *rev'd en banc on other grounds*,

11      1980 U.S. App. LEXIS 11406 (4th Cir. 1980) .......................14

12  *FDA v. Brown & Williamson Tobacco Corp.*,
        529 U.S. 120 (2000) ............................................................47

13

14  *Fitzgerald v. Penthouse Int'l, Ltd.*,
        776 F.2d 1236 (4th Cir. 1985)...........................................................21

15  *Fitzgibbon v. CIA*,
        911 F.2d 755 (D.C. Cir. 1990) ......................................................48

16  *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
        204 F.3d 149 (4th Cir. 2000)..............................................................40

17  *Halkin v. Helms*,
        598 F.2d 1 (D.C. Cir. 1978) ...................................25, 26, 36, 37

18

19  *Halkin v. Helms*,
        690 F.2d 977 (D.C. Cir. 1982) ..................................15, 36, 37, 38

20  *Hall v. Norton*,
        266 F.3d 969 (9th Cir. 2001).............................................................40

21  *Halpern v. United States*,
        258 F.2d 36 (2d Cir. 1958)................................................41, 50, 52

22  *Hamdan v. Rumsfeld*,
        126 S. Ct. 2749 (2006) ....................................................15, 49

23

24  *Hamdi v. Rumsfeld*,
        542 U.S. 507(2004)................................................16, 50

25  *Helling v. McKinney*,
        509 U.S. 25 (1993) ............................................................39

26  *Hepting v. AT&T Corp.*,
        439 F. Supp. 2d 974 (N.D. Cal. 2006) ....................................passim

27  *Home Bldg. & Loan Ass'n v. Blaisdell*,
        290 U.S. 398 (1934)............................................................50

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re NSA Telcoms. Records Litig.*,
483 F. Supp. 2d 934 (N.D. Cal. 2007) .................................................. 23

*In re United States*,
872 F.2d 472 (D.C. Cir. 1989) ........................................... 15, 16, 19, 21

*Int'l Bhd. of Teamsters v. TSA*,
429 F.3d 1130 (D.C. Cir. 2005) ........................................................ 40

*Jabara v. Kelley*,
75 F.R.D. 475 (E.D. Mich. 1977) ................................................ 18, 25

*Johnson v. Zerbst*,
304 U.S. 458 (1938) ...................................................................... 19

*Kasza v. Browner*,
133 F.3d 1159 (9th Cir. 1998) ................................................ passim

*Loral Corp. v. McDonnell Douglas Corp.*,
558 F.2d 1130 (2d Cir. 1977) ........................................................ 41

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ...................................................................... 35

*Maxwell v. First Nat'l Bank*,
143 F.R.D. 590 (D. Md. 1991),
*aff'd*, 998 F.2d 1009 (4th Cir. 1993) ........................................... 22

*McGhehee v. Casey*,
718 F.2d 1137 (D.C. Cir. 1983) ...................................................... 17

*Mistretta v. United States*,
488 U.S. 361 (1989) ...................................................................... 49

*Myers v. United States*,
272 U.S. 52 (1926) ........................................................................ 49

*Nat'l Coal. for Students with Disabilities Educ. and
Legal Defense Fund v. Scales*,
150 F. Supp. 2d 845 (D. Md. 2001) ................................................ 35

*Pengate Handling Sys. v. Westchester Surplus Lines Ins. Co.*,
No. 1:06-CV-0993, 2007 U.S. Dist. LEXIS 13303
(M.D. Pa. Feb. 27, 2007) ............................................................ 19

*People for the Am. Way Found. v. NSA Cent. Sec. Serv.*
462 F. Supp. 2d 21 (D.D.C. 2006) ................................................ 48

*Public Citizen v. U.S. DOJ*,
491 U.S. 440 (1989) ...................................................................... 15

*Salisbury v. United States*,
690 F.2d 966 (D.C. Cir. 1982) ...................................................... 26

*Scanlon v. Bricklayers & Allied Craftworkers, Local No. 3*,
No. 05-CV-628A(F), 2007 U.S. Dist. LEXIS 29798
(W.D.N.Y. Apr. 23, 2007) ............................................................ 19

*Sedco Int'l, S. A. v. Cory*,
683 F.2d 1201 (8th Cir. 1982) ...................................................... 19

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Snepp v. United States*,
   444 U.S. 507 (1980) .................................................................................... 48

*Spock v. United States*,
   464 F. Supp. 510 (S.D.N.Y. 1978) ......................................................... 18, 41

*Sterling v. Tenet*,
   416 F.3d 338, 347 (4th Cir. 2005),
   *cert. denied*, 126 S. Ct. 1052 (2006) ........................................................ 22

*Tenet v. Doe*,
   544 U.S. 1 (2005) ................................................................................. 42-45, 50

*Terkel v. AT&T Corp.*,
   441 F. Supp. 2d 899 (N.D. Ill. 2006) .................................................. passim

*Totten v. United States*,
   92 U.S. 105 (1875) ............................................................................. 42-46, 50

*United States v. Adams*,
   473 F. Supp. 2d 108 (D. Me. 2006) ........................................................ 27

*United States v. Fell*,
   360 F.3d 135 (2d Cir. 2004) .................................................................... 50

*United States v. Nixon*,
   418 U.S. 683 (1974) ................................................................................ 49

*United States v. Reynolds*,
   345 U.S. 1 (1953) ................................................................................... passim

*Upjohn Co. v. United States*,
   449 U.S. 383 (1981) ............................................................................... 19

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*,
   429 U.S. 252 (1977) ............................................................................... 41

*Walters v. Edgar*,
   163 F.3d 430 (7th Cir. 1998) .................................................................. 40

*Weinberger v. Catholic Action of Hawaii/Peace Educ. Project*,
   454 U.S. 139 (1981) ..................................................................... 30, 44, 45

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S, 579 (1952) ..................................................................... 49, 51, 54

*Zuckerbraun v. Gen. Dynamics Corp.*,
   935 F.2d 544 (2d Cir. 1991) ................................................................... 22

**STATUTES**

18 U.S.C. § 2511(2)(f) ................................................................................. 51

18 U.S.C. § 2520(a) ..................................................................................... 51

18 U.S.C. § 2707(a) ..................................................................................... 51

18 U.S.C. § 2709 ......................................................................................... 13

18 U.S.C. § 2709(d) ..................................................................................... 13

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3   47 U.S.C. § 605(e)(3)(A) ........................................................................................ 51

4   50 U.S.C. § 402 ........................................................................................................ 47

    50 U.S.C. § 403-1(i)(1) ............................................................................................ 47

5   50 U.S.C. § 1801(f)(1) .............................................................................................. 53

6   50 U.S.C. § 1801(f)(2) .............................................................................................. 52

7   50 U.S.C. § 1806(f) ........................................................................................... passim

    50 U.S.C. § 1809 ...................................................................................................... 51

8   50 U.S.C. § 1810(a)(I) .............................................................................................. 51

9   50 U.S.C. § 1845(f) .................................................................................................. 47

10  50 U.S.C. § 2511(2)(a)(ii)(B) .................................................................................. 47

11  **RULES**

12  Fed. R. Civ. P. 56 .................................................................................................... 37

13  Fed. R. Civ. P. 56(f) ........................................................................................... 33, 35

    Pub. L. No. 95-511, 92 Stat. 1783, § 201 (1978) .................................................... 51
14

15  **OTHER AUTHORITIES**

16  1A. Conte & H. Newberg, *Newberg on Class Actions* § 2.5 (4th ed. 2002)................................. 41

17  26 Wright & Graham, *Fed. Prac. & Proc.* § 5665 ........................................... 19, 27

    S. Rep. No. 94-755 (II) ............................................................................................ 51
18
    S. Rep. No. 95-604 (I) ................................................................................... 51, 52, 53

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**ISSUES TO BE DECIDED**

1.      Whether, under the appropriate standard of review and method of analysis as articulated in *Hepting v. AT&T Corp,* 439 F. Supp. 2d 974 (N.D. Cal. 2006), Plaintiffs' claims are barred by the Government's assertion of the state secrets privilege.

2.      Whether reliable public disclosures confirming or denying Verizon's and MCI's participation in the Executive's warrantless communications content and call records surveillance programs render "the very subject matter" of the cases non-secret.

3.      Whether facts alleged by Plaintiffs are sufficient at this initial stage of the case to establish standing.

4.      Whether the *Totten/Tenet* categorical bar applies where Plaintiffs do not seek to enforce terms of their own secret espionage relationship with the Government.

5.      Whether statutory privileges that only address information disclosures by the Government are a basis for dismissing these cases their entirety.

6.      Whether procedures prescribed by Congress in the Foreign Intelligence Surveillance Act, 18 U.S.C. § 1806(f), for challenges to foreign intelligence surveillance activities mandate the procedure for analysis of Defendants' challenged electronic surveillance activity, notwithstanding the Executive's efforts to preclude inquiry at the outset.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

**INTRODUCTION**

2          In their Motions to Dismiss on state secrets grounds, the Government and Verizon

3    Communications, Inc. ("Verizon")[1] doggedly dispute the analytical framework in *Hepting v.*

4    *AT&T Corp.*, 439 F. Supp. 2d 974 (N.D. Cal. 2006).  They challenge, among other things, the

5    Court's findings as to the threshold showing necessary for application of the state secrets

6    privilege, the impropriety of dismissal prior to discovery, the reach of the *Totten* doctrine, the

7    impact of any privilege on Plaintiffs' ability to establish standing and the application of statutory

8    privileges.  Although these arguments are no more persuasive the second time around, the

9    Government's effort to rehash them is not surprising.  Unless the Government succeeds in

10   displacing this Court's reasoned analysis in *Hepting*, the Motion to Dismiss is doomed.  The

11   Government therefore urges the Court to abandon its conclusions in *Hepting* and adopt the

12   Executive's preferred approach—one that transgresses the line separating judicial deference from

13   subservience.

14          The Government fails to identify a single fact in the Verizon lawsuits that would lead to a

15   more favorable outcome for it under the analysis the Court employed in *Hepting*.  Indeed, it does

16   not even try.  And while there *are* significant factual differences between *Hepting* and the present

17   cases, they support this Court's analysis and lead to an even more favorable result for Plaintiffs.

18   The challenged content surveillance program has become no more secret over the past year.  By

19   contrast, any shroud of uncertainty cloaking the call records program has since lifted.  As this

20   Court predicted, disclosures have continued, including from numerous members of Congress fully

21   briefed on the program and Verizon itself, confirming that an NSA program exists to amass and

22   analyze telephone calling records.  These disclosures provide ample factual certainty to overcome

23   this Court's hesitancy to allow discovery on such claims a year ago.  *See* 439 F. Supp. 2d at 997-

24   98 (suggesting that plaintiffs "can request that the court revisit this issue" if future "disclosures []

25   make [the records] program's existence or non-existence no longer a secret").

26          The same analysis that demanded rejection of the Government's efforts to scuttle *Hepting*

27   _____

28   [1] This brief also responds to the state secrets arguments Verizon makes in support of its Motion to
     Dismiss the Master Consolidated Complaint ("MCC") (Docket No. 273).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   at the pleading stage militates even more strongly against such a harsh and aberrant result here

2   and warrants discovery on both the call records and content surveillance programs.

3                          **THE FACTUAL BACKGROUND**

4          It is now indisputable that telecommunications companies have been helping the NSA

5   intercept telephone calls as well as providing tens of millions of call records to the NSA.  In the

6   year since this Court issued its decision in *Hepting*, new public disclosures have continued to pile

7   up verifying the existence and nature of both, including:

8        • An ever growing roster of Congresspersons have, primarily in attempts to defend the
              program, acknowledged the turnover of call records;
9
10       • Verizon as well as Qwest Communications International, Inc. ("Qwest") have now
              directly acknowledged the Government's requests for their participation in the call
              records program; and
11
12       • Verizon as well as Department of Justice ("DOJ") officials have acknowledged
              Verizon's cooperation in turning over call records in response to National Security
              Letters—at times without the required legal authorization of an NSL.
13

14   These facts are known to anyone who cares to look, whether he bids our nation ill or good.

15   Verizon's and MCI's assistance in the unlawful surveillance therefore cannot be cloaked as a

16   "state secret" immune from judicial scrutiny.

17          A.      **This Court Has Already Rightly Concluded that Evidence Confirms
                    the Existence of the NSA Content Surveillance Program.**
18

19          This Court has previously found that because "significant amounts of information about

20   the government's monitoring of communication content and AT&T's intelligence relationship

21   with the Government are already nonclassified or in the public record," the existence of the

22   NSA's warrantless program of intercepting and monitoring communications content is "hardly a

23   secret."  *Hepting*, 439 F. Supp. 2d at 994; *see also, id.* at 991-92 ("AT&T and the government

24   have for all practical purposes already disclosed that AT&T assists the government in monitoring

25   communication content.").  President Bush admitted the existence of the NSA's communications

26   content monitoring program in his December 17, 2005 radio address, stating that he "authorized

27   the National Security Agency . . . to intercept the international communications of people with

28   known links to Al Qaeda and related terrorist organizations."  Ex. A at 2 (President's Radio

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Address).[2]  Likewise, Attorney General Alberto Gonzales subsequently confirmed that the program involved "intercepts of contents of communications."  Ex. B at 1 (Alberto Gonzales Press Briefing, Dec. 19, 2005).  The Government thereby revealed "the general contours" of NSA's program that "monitor[s] communication content [and] operates without warrants." *Hepting*, 439 F. Supp. 2d at 992-93.  Plaintiffs allege that the NSA's surveillance program is far broader that the limited interceptions of international calls than the Government has disclosed.

More recently, the dramatic Congressional testimony of Deputy Attorney General James Comey has exposed new facts about the illegal nature of the Administration's surveillance activities.  Ex. C (Sen. Judiciary Comm. Hearing, May 15, 2007).  Comey, who was chief deputy to John Ashcroft, testified about the March 2004 efforts of then White House Counsel Alberto Gonzales and Chief of Staff Andrew Card to strong-arm Ashcroft into reauthorizing a secret program from his hospital bed.  *Id*. at 8-9.  Both Ashcroft and Comey, who was Acting Attorney General at that time, agreed that they could *not* attest to the program's legality and *refused* to sign the reauthorization.  *Id*. at 8-9.  The White House nonetheless reauthorized the program, *id*. at 12, 21-22, allowing its operation for weeks without legal certification from the DOJ.  Ex. D at 4 (Comey Written Response).  Only under threats of resignation by Comey, FBI Director Robert Mueller and others did the White House approve changes to bring the program within the strictures demanded by the Administration's own appointees.  *See* Ex. C at 12-14.

Although Mr. Comey has not identified which classified program was up for reapproval, it was a program for intelligence surveillance of communications.  Yet, Attorney General Gonzales has testified that there was never any "serious disagreement" within the DOJ about the legality of what the President describes as the "TSP"—warrantless tapping into *international* calls of known Al Qaeda operatives.  *See* Ex. E at 9-10 (Sen. Judiciary Comm. Hearing, Feb. 6, 2006) (Comey's reservations were about other "operational capabilities," but "did not deal with the program that I'm here testifying about today,"—the TSP).  Thus, the program Comey testified about was likely an aspect of the dragnet surveillance of telecommunications content, or the turnover of call

---

[2] All citations to Exhibits herein are exhibits to the Declaration of Candace J. Morey In Support of Plaintiffs' Joint Opposition to the Motions to Dismiss by the United States and Verizon.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    records.  In any event, full facts about the program will likely come to light during this litigation.

2    Two days ago, by a 13-3 vote, the Senate Judiciary Committee authorized subpoenas to the DOJ

3    and White House for documents related to legal justifications for the NSA programs.  Ex. F at 1.

4    The House Intelligence Committee intends to hear private testimony next month from Attorney

5    General Gonzales, FBI Director Mueller, and CIA Director Michael Hayden on the programs,

6    with the goal of holding public hearings in the fall.  *Id.*  The House Judiciary Committee has also

7    asked Comey to clarify what programs were at issue.  Ex. G at 2 (Conyer's Letter, May 17, 2007).

8         **B.    Reliable Public Information Unequivocally Confirms the Existence of
              an NSA Program for Collecting Customer Call Records.**

9

10        One year ago this Court was "hesitant to conclude that the existence or non-existence of

11   the communication records program necessarily constitutes a state secret."  *Hepting*, 439

12   F. Supp. 2d at 997.  The Court need hesitate no longer.  As predicted, substantial public

13   disclosures have since confirmed the existence and revealed the general contours of a program

14   highlighted by a May 11, 2006, *USA Today* article about the provision of telephone calling

15   records of tens of millions of Americans to the NSA.  Ex. H at 1.[3]

16        The President has publicly acknowledged the call records program in an attempt to justify

17   its legality.  So have members of Congress who were fully briefed on the program and attempted

18   to defend it as gathering mere "business records."  As more members of Congress were briefed,

19   the number of confirmations grew, and by May 2007, nine fully briefed members of Congress had

20   publicly confirmed the program's existence.  Finally, in April 2007, Verizon joined Qwest in

21   publicly confirming that the NSA asked for its customers' call records.  Individually and

22   collectively, these sources confirm that the NSA was not only intercepting calls, but was also

23   amassing a database of personal call records.

24   _____

25   [3]  The *USA Today* article called attention to reports that the NSA "besides actually eavesdropping
     on specific conversations, [has] combed through large volumes of phone and internet traffic," in a
26   "large data-mining operation." Ex. I at 1 (N.Y. Times, Dec. 24, 2005).  *See also, e.g.*, Ex. J at 1
     (New Yorker, May 29, 2006) (Seymour Hersh reporting that "[a] security consultant working
27   with a major telecommunications carrier told me that his client set up a top-secret high-speed
     circuit between its main computer complex and . . . the site of a government-intelligence
28   computer center," providing "total access to all the data"); Ex. K at 1 (N.Y. Times, Jan. 17,
     2006); Ex. L at 1 (Nat'l. J., Jan. 20, 2006); Ex. M at 1 (Wash. Post, Feb. 5, 2006).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**1.    The Executive Branch Has Confirmed a Call Records Program Exists.**

The Administration jumped to defend the legality of the call records program revealed by

the original *USA Today* article—a defense that only confirmed the program's existence.  Indeed,

just four days later, President Bush's response to a question about the call records database

acknowledged its existence, while also arguing that Congressional briefing about the program

should allay concerns.  He spoke during a May 15, 2006 press conference:

> Q:  Thank you, Mr. President.  Mr. President, you've said that the government is
> not trolling through the lives of innocent Americans, ***but why shouldn't ordinary
> people feel that their privacy is invaded by the NSA compiling a list of their
> telephone calls?***
>
> PRESIDENT BUSH:  What I have told the American people is, we'll protect them
> against an al Qaeda attack, and we'll do so within the law. . . .
>
> ***The program he's asking about*** is one that has been fully briefed to members of
> the United States Congress, in both political parties.  They are very aware of what
> is taking place. . . .

Ex. N at 2 (White House Press Conference).  This colloquy did ***not*** address content interception.

The President's answer was in direct response to a question about "the NSA compiling a list of

[ordinary people's] telephone calls" and his reference to "the program . . . fully briefed" to

Congress can only be taken as confirmation of the call records program.

A week later, Attorney General Gonzales defended the program in response to a question

about the collection of "telephone detail records from the phone companies."  In comments not

submitted before the *Hepting* decision, he said that "what was in the *USA Today* story did relate

to business records" and that "[t]here are a number of legal ways, of course, that the government

can have access to business records."  Ex. O at 6-7 (Press Conference, May 23, 2006).

**2.    Members of Congress Fully Briefed on the NSA Programs Have
Acknowledged the Call Records Program.**

The efforts to circle the wagons and defend the call records program did not stop at the

Executive Branch.  In the weeks after *USA Today* broke the story, several Senators—whom the

Administration admits have been fully briefed on *all* NSA programs—made on-the-record

defenses of the program.  These defenses acknowledged its existence (if not its details) in

sounding the same "business records" defense as the Attorney General.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

For example, Senator Pat Roberts characterized the collection of private customer call records as "business records" of the telecommunications companies, in an attempt to downplay the intrusion of privacy relative to the content surveillance program.  His statements to Melissa Block on National Public Radio ("NPR") (which were not submitted before the *Hepting* decision) clearly acknowledge the call records program:

> BLOCK:  You're saying that you are read into it.  I'm curious then if you're saying that you have had oversight directly of ***the program as has been reported, under which the NSA has collected millions of phone records of domestic calls.***
>
> Senator ROBERTS:  Well, basically, ***if you want to get into that, we're talking about business records***.  We're not, you know, we're not listening to anybody.  This isn't a situation where if I call you, you call me, or if I call home or whatever, that that conversation is being listened to.

Ex. P at 2 (All Things Considered, May 17, 2006) (emphasis added).  Likewise, CBS News' Gloria Borger reported that Senator Roberts stated that "the NSA was looking at the phone calls collected during the surveillance, but he said not at the content, just at the pattern of phone calls."  Ex. Q at 1 (May 16, 2006).  His statements alone confirm an NSA program exists to collect call records, distinct from the content surveillance program, under a "business records" rationale.

Senator Roberts is a reliable, fully informed source for the information he disclosed.  He has been "read into" (*i.e.*, briefed on) the operational details of the program since its inception, "along with Senator Rockefeller, and along with our two counterparts in the House and along with the leadership."  Ex. P at 2.[4]  Senator Roberts attended briefings on the programs on ten occasions over a period of more than three years.  Ex. S at 2-3 (John D. Negroponte Letter, May 17, 2006).  He had even "actually gone out and seen the program at work."  Ex. P at 2.

Senator Roberts was not the only member of the Senate Intelligence Committee who was in-the-know and publicly defending the Administration's collection of call records as mere collection of "business records."  An interview with Senator Kit Bond on PBS Online (which was also not submitted before the *Hepting* decision) leaves no doubt about the program's existence:

---

[4]  Indeed, as the White House noted, "all intelligence matters conducted by the National Security Agency—and we've said this many times—have been fully briefed to a handful of members of the Senate Intelligence and House Intelligence Committees and to the leadership."  Ex. R at 1 (White House Press Briefing, May 16, 2006).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

JIM LEHRER: … You're a member of the Senate Intelligence Committee.  Did you know about this?

SEN. KIT BOND, R-Mo.:  Yes.  I'm a member of the **subcommittee** of the Intelligence Committee **that's been thoroughly briefed** on **this** program and other programs….

Now, to move on to the points, number one, my colleague, Senator Leahy, is a good lawyer, and I believe that he knows, as any lawyer should know, that **business records** are not protected by the Fourth Amendment….

JIM LEHRER:  Excuse me, Senator Leahy, and let me just ask just one follow-up question to Senator Bond so we understand what this is about.

What these are, are records.  And nobody then—now, these are—but **there are tens of millions of records that are in this database, right**?  And they say somebody, Billy Bob called Sammy Sue or whatever, and that's all it says, and then they go and try to match them with other people?

SEN. KIT BOND:  First, let me say that I'm not commenting on in any way any of the allegations made in the news story today.  **I can tell you about the president's program**.

**The president's program uses information collected from phone companies. The phone companies keep their records.  They have a record.  And it shows what telephone number called what other telephone number.**

Ex. T at 4-5 (May 11, 2006) (emphasis added).  Senator Bond was also briefed numerous times on these issues, as a member of the subcommittee of the Senate Select Committee on Intelligence that had oversight of the NSA programs.  *See* Ex. S at 3 (Mar. 9 & 10, 2006 meetings).

Even before the disclosures by Senators Roberts and Bonds, Former Senate Majority Leader William Frist spoke out in defense of the call records programs to CNN's Wolf Blitzer:

BLITZER:  Let's talk about the surveillance program here in the United States since 9/11.  USA Today reported a bombshell this week.  Let me read to you from the article on Thursday.

"The National Security Agency has been secretly collecting the phone call records of tens of millions of Americans using data provided by AT&T, Verizon and BellSouth...."

Are you comfortable with **this program**?

FRIST:  **Absolutely.  Absolutely.  I am one of the people who are briefed…**

BLITZER:  You've known about this for years.

FRIST:  I've known about **the program**.  I am absolutely convinced that you, your family, our families are safer because of **this particular program**.

1  Ex. U at 18 (CNN Late Edition, May 14, 2006) (emphasis added).[5]

2  In response to the uproar over the call records program reported by *USA Today,* the White

3  House announced that NSA Director, General Keith Alexander, would brief the full membership

4  of both the House and Senate Intelligence Committees on the "[f]ull terrorist surveillance

5  program," including "the entire scope of NSA surveillance," not to be "limited to the program

6  that the President has publicly acknowledged." Ex. V at 1-2, 8 (White House Press Briefing,

7  May 17, 2006). Following those briefings, *USA Today* reported that ***nineteen*** "[m]embers of the

8  House and Senate intelligence committees confirm that the National Security Agency has

9  compiled a massive database of domestic phone call records," and that "[t]he program collected

10  records of the numbers dialed and the length of calls." Ex. W at 1 (USA Today, June 30, 2006).

11  Further, several members of Congress spoke on the record. Senator Saxby Chambliss,

12  bemoaning BellSouth's refusal to participate, opined that "[i]t probably would be better to have

13  records of every telephone company." *Id.* at 2. According to Senator Ted Stevens, the records

14  program targeted long-distance, not "cross-city" or "mom-and-pop calls." *Id.* at 2. Senator Orrin

15  Hatch, Rep. Anna Eshoo, and Rep. Rush Holt also made statements on the record acknowledging

16  the program. *Id.* at 3.

17  Separately, Representative Jane Harman has noted that "there is a program that involves

18  the collection of some phone records." Ex. X at 8 (Congressional Hearing, Mar. 14, 2007). This

19  makes nine members of Congress, each fully briefed on "the entire scope of NSA surveillance," [6]

20  who have acknowledged the call records program publicly and on-the-record.

21  **3.  Verizon, as Well as Qwest, Has Confirmed the Call Records Program.**

22  As noted in the *Hepting* decision, Qwest has unequivocally confirmed requests by the

23  Government for "private telephone records of Qwest customers," which Qwest refused after

24  learning that it would not be provided with any lawful authority permitting such access. 439

25

26  [5] As part of the Senate leadership, Senator Frist was also briefed on the program. *See* Ex. P at 1, Ex. R at 1, Ex. S at 2-3 (Negroponte letter).

27

28  [6] Representative Harman is a member of the subcommittee that received numerous briefings on the NSA programs on at least eight occasions. Ex. S at 2-3.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   F. Supp. 2d at 988; *see also* Ex. Y at 1 (Wall St. J. Online, May 12, 2006).[7]  At that time, no other

2   telecommunications company had acknowledged that it had been asked to provide customer call

3   records.  Now, Verizon Wireless also admits it was asked by the Government to hand over private

4   phone records, through a pre-recorded statement by a Regional President, Kelly Kurtzman,

5   reported by PBS's Lee Hochberg on *Newshour*:

6       LEE HOCHBERG:  Privacy advocate Hendricks . . . notes, after 9/11, the Bush
7       administration asked phone companies for billions of private phone records.

8       Federal law forbids turning them over without a court order, but most phone
        companies did so anyway.  Verizon's landline division was hit with a $50 billion
9       consumer lawsuit for doing so.  ***Verizon Wireless emphasizes it withheld its
        phone records***.

10      KELLY KURTZMAN:  ***Absolutely, absolutely. We were asked, but we said, no,
11      we would not give that information***, again, you know, trying to protect the privacy
        of our customers.  We take that very seriously.

12  Ex. Z at 3 (PBS Online NewsHour, April 11, 2007).

13      As confirmed by Verizon, Qwest, the President, and the informed members of Congress

14  quoted above, the existence of the call records program is now anything but secret.

15      **C.      The Facts Regarding Verizon's and MCI's Participation in the
                 Content and Records Programs Is Not a Secret.**

16

17      Unlike AT&T, which refused to either confirm or deny the existence of a content

18  surveillance or call records program (*see Hepting*, 439 F. Supp. 2d at 989), Verizon has not

19  remained silent.  The recent statement by Kelly Kurtzman makes clear that Verizon was asked to

20  turn over call records.  Meanwhile, Verizon's other public statements, although couched as

21  denials, tacitly admit that its newly-acquired subsidiary MCI is also implicated in the turnover of

22  records to the government.  These admissions corroborate widespread public acknowledgement

23  that "the N.S.A. has gained the cooperation of American telecommunications companies to obtain

24  backdoor access to streams of domestic and international communications." Ex. I at 1.[8]

25  ────────────────────

26  [7]  According to Joseph Nacchio, "Chairman and CEO of Qwest [who] was serving pursuant to the
     President's appointment as the Chairman of the National Security Telecommunications Advisory
27   Committee," the refusal to comply was based on a "disinclination on the part of the authorities to
     use any legal process" in support of the request.  *Id.*

28  [8]  Further, Verizon customer service representatives have told customers that Verizon turned over
     call records of Verizon wireline customers to the NSA.  *See, e.g.*, MCC ¶ 184(3) (on May 11,

1   Verizon issued a press release on May 12, 2006 stating that, because the call records

2   program was highly classified, Verizon could not "confirm or deny whether we have had any

3   relationship to it." Ex. AA at 1 (Verizon Press Release). As to MCI, it stated: "In January 2006,

4   Verizon acquired MCI, ***and we are ensuring*** that Verizon's policies are implemented at that

5   entity and that all its activities fully comply with law." *Id.* (emphasis added).

6   As popular uproar over the call records program grew, Verizon issued a second statement

7   four days later in a very different tone. That May 16 statement expressly denied that "Verizon"

8   brand businesses had turned over call records, but tacitly admitted MCI's participation. Ex. BB

9   at 1 (Verizon Press Release). Describing the actions of the company ***prior to*** Verizon's January

10   2006 acquisition of MCI, it explained:

11   From the time of the 9/11 attacks ***until just four months ago, Verizon had three***
     ***major businesses***-its wireline phone business, its wireless company and its
12   directory publishing business. It also had its own Internet Service Provider and
     long-distance businesses. Contrary to the media reports, Verizon was not asked by
13   NSA to provide, nor did Verizon provide, customer phone records from any of
     ***these businesses***, or any call data from ***those records***. None of ***these companies*** -
14   wireless or wireline - provided customer records or call data.

15   *Id.* (emphasis added). Pressed on the point, Peter Thonis, Verizon's Chief Communications

16   Officer, said the May 12, 2006 denial of participation in the call records program was about

17   Verizon, *not* MCI. *See* Ex. CC at 1-2 (USA Today, May 16, 2006). Verizon's earlier promise to

18   ensure that its policies "are implemented" at MCI, with Verizon's calculated exclusion of MCI

19   from its public denial of involvement must fairly be read as an admission of MCI's participation

20   in the call records program.

21   MCI's participation was also confirmed in the June 30, 2006 *USA Today* story that

22   followed the full briefing of all members of the Intelligence Committees on all aspects of the

23   NSA's surveillance activities. Ex. W at 1-2. Four intelligence committee members verified that

24   "MCI, the long-distance carrier that Verizon acquired in January, did provide call records to the

25   2006, a "customer service representative told [Michael Colonna of New Jersey] that although the
     records of *other* Verizon customers were disclosed, the records of Verizon wireless customers
26   were not disclosed;" MCC ¶ 184(1) (on May 12, 2006, Verizon customer service representative
     Ellen "expressly confirmed to [landline customer Norman LeBoon of Pennsylvania:] . . . 'I can
27   tell you Mr. LeBoon that your records have been shared with the government, but that's between
     you and me'"); MCC ¶ 184(2) (Verizon customer service representative on May 16, 2006 told
28   Verizon subscriber Mark Baker that "Verizon has turned its subscriber records over to the NSA").

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    government," while "[f]ive members of the intelligence committees said they were told by senior

2    intelligence officials that AT&T participated in the NSA domestic calls program." *Id.* at 1-2.

3    And, like AT&T, MCI plays a critical role in the long distance and international calling

4    infrastructure targeted under the NSA programs.  Before the merger, MCI was the second largest

5    long distance carrier with "14 million residential customers and about a million corporate

6    customers.  Ex. DD at 1 (N.Y. Times, Feb. 14, 2005).[9]  Indeed, a majority of international calls

7    are handled by long-distance carriers AT&T, MCI, and Sprint.  Ex. FF at 1 (USA Today, Feb. 6,

8    2006).

9         Verizon's ubiquity in providing telecommunications services is also beyond dispute.  As

10   of year-end 2006, Verizon's wireline network included more than 45 million access lines

11   nationwide, with approximately 13 million miles of local, inter-city and long-distance fiber-optic

12   systems.  Ex. GG. at 4 (Recent Verizon History).

13        **D.    Verizon's and MCI's Turnover of Call Records to the Government Is**
            **a Public Fact Well Known to Potential Terrorists.**
14

15        Verizon's May 16, 2006 press release confirms that, like AT&T, Verizon is committed to

16   assisting the government with national security programs, stating that:  "Verizon always stands

17   ready, however, to help protect the country from terrorist attack," and "[w]hen asked for help, we

18   will always make sure that any assistance is authorized by law and that our customers' privacy is

19   safeguarded."  Ex. BB at 1.  Its May 12, 2006 press release similarly emphasized that "Verizon

20   will provide customer information to a government agency only where authorized by law for

21   appropriately-defined and focused purposes."  Ex. AA at 1.  As is apparent from its Motion to

22   Dismiss, Verizon, like AT&T, "at least presently believes that any such assistance would be legal

23   if [it] were simply a passive agent of the government."  *Hepting*, 439 F. Supp. 2d at 992.

24        Verizon's cooperation is further confirmed by the government's recent reports on the

25   FBI's call record collections.  The FBI's general counsel, Valerie Caproni, testified before

26   Congress that both Verizon and MCI have current contracts with the FBI to provide telephone toll

27

28   [9] In 2003, MCI received 20.8 percent of all long distance toll service revenues, trailing only
     AT&T.  Ex. EE at 9-11, 9-12 (FCC Report, June 21, 2005).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  billing records.  Ex. HH at 45 (Congressional Hearing, Mar. 20, 2007).  She confirmed details

2  revealed by a March 2007 report by the DOJ's Office of Inspector General (Ex. II, "IG's Report,"

3  Mar. 2007) about numerous abuses by Verizon, MCI and AT&T in turning over reams of

4  telephone toll records.

5          The IG's Report harshly criticized the way the FBI has exercised its authority to obtain

6  customer call records through the issuance of National Security Letters ("NSLs") to Verizon,

7  MCI and AT&T.[10]  The FBI issued 143,074 separate NSL requests during 2003 to 2005 alone;

8  the "overwhelming majority" of which sought "telephone toll billing records information,

9  subscriber information (telephone or e-mail) or electronic communication transactional records."

10  *Id.* at 36.  In just nine of those NSLs, the FBI requested subscriber information on 11,100 separate

11  telephone numbers.  *Id.*  Their contracts enabled Verizon and MCI to "provide 'near real-time

12  servicing'" of records requests and meet the FBI's need to quickly obtain billing data.  *Id.* at 88.

13          Further, beyond the abuses of NSLs, "one of the [IG's] most troubling findings" was that

14  the "FBI improperly obtained telephone toll billing records and subscriber information from three

15  telephone companies [Verizon, MCI and AT&T] pursuant to over 700 so-called exigent letters."

16  Ex. HH at 10 (Inspector General, Glenn A. Fine testifying).  In response to these exigent letters,

17  Verizon and MCI provided call records to the FBI prior to receiving either an NSL or a grand jury

18  subpoena.  *See* Ex. II at 89-90.  The phone companies not only acted "contrary to the provisions

19  of the contracts," *id.* at 90; the IG also concluded that such use of exigent letters, without first

20  issuing NSLs, violated the NSI Guidelines and internal FBI policies.  *Id.* at 92-93.  A subsequent

21  internal FBI audit also disclosed thousand of potential violations of law or agency rules while

22  collecting data about domestic phone calls, e-mails and financial transactions in recent years, "far

23  more than was documented" in the IG's report.  Ex. JJ at 1 (Wash. Post, June 14, 2007).

24  _____

25  [10] NSLs are written directives from the FBI to third parties instructing them to provide specific
records which include telephone subscriber information or toll billing records.  *Id*. at 1-2.  To
26  obtain approval to issue an NSL, an FBI agent must determine that the information is "relevant to
an authorized investigation to protect against international terrorism or clandestine intelligence
27  activities and, with respect to an investigation involving a 'U.S. person,' is 'not solely conducted
on the basis of activities protected by the First Amendment.'"  *Id*. at 22.  Every NSL must be
28  approved and signed by an appropriate certifying official (either the Special Agent in Charge or
specified designees at FBI Headquarters).  *Id*. at 24.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    The very public IG report, Senate testimony, and Verizon's press releases leave no doubt

2    that Verizon and MCI are turning over customer calling records.  Moreover, because NSLs may

3    seek any records the FBI claims are "relevant to an authorized investigation to protect against

4    international terrorism[,]" Ex. II at 13, *see also* 18 U.S.C. § 2709, requests are not limited to

5    records of an identified suspect.  Indeed, the IG noted use of NSLs to access information about

6    individuals who are *"two or three steps removed* from their subjects without determining if these

7    contacts reveal suspicious connections." *Id.* at 109 (emphasis added).  Thus, potential terrorists

8    who may not believe they are themselves yet suspects know that their records will nonetheless be

9    captured if they communicate even indirectly with suspects.

10    Terrorists also know that other members of the intelligence community, including the

11    NSA, may access records collected in response to NSLs.  *See* 18 U.S.C. § 2709(d) (FBI may

12    disseminate information and records obtained under this section pursuant to Attorney General's

13    guidelines for foreign intelligence collection and counterintelligence investigations); *see also* Ex.

14    KK at 11, 24-29 (Guidelines for FBI National Security Investigations).  As the IG reported,

15    records provided in electronic format are uploaded into a massive "Telephone Applications

16    database," which "contains raw data derived from NSLs, known as 'metadata,' including the call

17    duration."  Ex. II at 28 & n.59.  From 2003 to 2005, approximately 2,000 non-FBI personnel had

18    accounts permitting them to access this specialized application for telephone record data. *Id.*  The

19    records were also periodically uploaded into an Investigative Data Warehouse (the "IDW"), a

20    centralized repository of over 560 million FBI and other agency records with "advanced search

21    capabilities."  *Id.* at 30 & n.64, 53.  Finally, the "raw data" consisting of telephone numbers or

22    account information may be packaged in "Intelligence Information Reports," *id*. at 54, and

23    disseminated to other members of the intelligence community, including the National Security

24    Agency.  *Id.* at 59; *id.* at 47 (diagram showing FBI disseminates "Intelligence Information

25    Reports" to NSA).

26    All of these very public confirmations would lead any terrorist to conclude that by using

27    Verizon or MCI—or communicating with those who did—his calling records would be exposed

28    to regular and ongoing surveillance and/or analysis when requested by the government.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**ANALYSIS**

I.    **THIS COURT IN *HEPTING* APPLIED THE PROPER STANDARDS FOR ANALYSIS OF THE STATE SECRETS PRIVILEGE.**

The Government's Motion to Dismiss depends on the premise that "the Court's analysis [in *Hepting*] did not reflect a proper application of the standard of review." Gov. Brief at 18. In fact, this Court's application of the legal standards in *Hepting* was correct. The Executive's dispute of those standards provides no basis to reverse this Court's conclusions.

A.    **The Judiciary, Not the Executive, Determines the Applicability and Effect of the State Secrets Privilege.**

The state secrets privilege does not confer upon the Executive branch unilateral authority to terminate unwanted litigation at the pleading stage—whether brought against the Government itself, or, as here, against private parties.

"The state secrets privilege is a common law evidentiary privilege that allows the government to *deny discovery* of military secrets." *Kasza v. Browner*, 133 F.3d 1159, 1165 (9th Cir. 1998) (emphasis added). Thus, unlike the *Totten/Tenet* bar, *see infra* at Section IV, even when the state secrets privilege is properly invoked, it generally does not require dismissal. Instead, "the result is simply that the [secret] evidence is unavailable, as though a witness had died, and the case will proceed accordingly, with no consequences save those resulting from the loss of the evidence." *Ellsberg v. Mitchell*, 709 F.2d 51, 56 (D.C. Cir. 1983); *see also Kasza*, 133 F.3d at 1166 ("the plaintiff's case then goes forward based on evidence not covered by the privilege"). Thus, where the plaintiff has "sufficient admissible evidence to enable a fact finder to decide in its favor without resort to the privileged material, then the potential helpfulness to plaintiff's case of other secret, inadmissible information is not grounds for dismissal. . . . The superiority of more direct, but unavailable proof does not invalidate findings of fact rationally based on the circumstantial evidence which is before the fact finder." *Farnsworth Cannon, Inc. v. Grimes*, 635 F.2d 268, 271, 274 (4th Cir. 1980), *rev'd en banc on other grounds*, 1980 U.S. App. LEXIS 11406 (4th Cir. 1980). Thus, cases holding that the privilege necessitates dismissal at the pleading stage are exceedingly rare. *See infra*, Section II.A.

1    Moreover, it is up to *the Court*—not the Government—to decide whether the state secrets

2    privilege applies in a particular case. *United States v. Reynolds*, 345 U.S. 1, 7-8 (1953) ("*the*

3    *Court itself must determine* whether the circumstances are appropriate for the claim of privilege")

4    (emphasis added). Indeed, while the privilege has been characterized as "absolute" when it

5    applies, the law is clear that the Judiciary retains its traditional and vital role in determining the

6    circumstances in which the Executive's assertion of the privilege should be accepted in the first

7    instance. *See id.* at 9-10 ("judicial control over the evidence in a case cannot be abdicated to the

8    caprice of executive officers"); *see also In re United States*, 872 F.2d 472, 475 (D.C. Cir. 1989)

9    ("[A] court must not merely unthinkingly ratify the executive's assertion of absolute privilege,

10   lest it inappropriately abandon its important judicial role.").[11]

11   Accordingly, it is only *after the Court is satisfied* that there is a "reasonable danger that

12   national security would be harmed by the disclosure of state secrets" that the privilege will be

13   applied. *Kasza*, 133 F.3d at 1166; *see also, Ellsberg*, 709 F.2d at 57 ("the privilege may not be

14   used to shield any material not strictly necessary to prevent injury to national security; and,

15   whenever possible, sensitive information must be disentangled from nonsensitive information to

16   allow for the release of the latter"). The Court must determine whether "the showing of the harm

17   that might reasonably be seen to flow from disclosure is adequate in a given case to trigger the

18   absolute right to withhold the information sought in that case." *Halkin v. Helms*, 690 F.2d 977,

19   990 (D.C. Cir. 1982).

20   Contrary to the Government's assertion, this Court properly exercised this power of

21   independent review in *Hepting*. In recognizing that "even the state secrets privilege has its

22   limits," this Court "respect[ed] the executive's constitutional duty to protect the nation from

23   threats [while] tak[ing] seriously its constitutional duty to adjudicate the disputes that come

24   before it." *Hepting*, 439 F. Supp. 2d at 995 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 536

25   _____

[11] The Judiciary's exercise of independent review over assertions of the privilege plays a critical
26   role in sustaining governmental checks and balances. "Concentration of power puts personal
liberty in peril of arbitrary action by officials, an incursion the Constitution's three-part system is
designed to avoid." *Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2800 (2006) (Kennedy, J.,
27   concurring). *See also Public Citizen v. U.S. DOJ*, 491 U.S. 440, 468 (1989) (Kennedy, J.,
concurring) ("It remains one of the vital functions of this Court to police with care the separation
28   of the governing powers. . . . When structure fails, liberty is always in peril.").

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   (2004)).  No less than in *Hepting*, "dismissing this case at the outset would sacrifice liberty for no

2   apparent enhancement in security."  439 F. Supp. 2d at 995.

3   **B.     The Court Must First Find the Information to be Secret Before Reasonable Harm from Disclosure Could Become Relevant.**

4

5       As this Court recognized in *Hepting*, determining whether the state secrets privilege

6   applies in a given case involves two questions.  *See Hepting*, 439 F. Supp. 2d at 986, 990.  "The

7   first step . . . is determining whether that information actually is a 'secret.'"  *Id.* at 986.  The

8   second step, assuming the information is secret, is determining whether its verification or

9   substantiation "possesses the potential to endanger national security."  *Id.* at 990.  *Both* questions

10  must be answered in the affirmative in order for the privilege to apply.  *Accord Al-Haramain*

11  *Islamic Found. v. Bush*, 451 F. Supp. 2d 1215, 1221 (D. Or. 2006) ("Prior to determining whether

12  the state secrets privilege requires dismissal of plaintiff's case, [the court] first determine[d]

13  whether this information qualifies as a secret."); *Terkel v. AT&T Corp.*, 441 F. Supp. 2d 899, 913

14  (N.D. Ill. 2006) ("The question the Court must determine is whether the information sought by

15  the plaintiffs is truly a secret or whether it has become sufficiently public to defeat the

16  government's privilege claim.").

17      The Government argues that in *Hepting* this Court "substitute[d] its judgment for the

18  judgment of the most senior members of the intelligence community" and "appeared to avoid

19  assessing the harms of disclosure identified by the DNI through its own analysis of the statements

20  by AT&T and Government and conclusions that it drew from these statements."  Gov. Brief at 19.

21  The Government's criticism of *Hepting* fails to grasp the distinction between the two inquiries

22  at issue in the state secrets determination.  Although both must be satisfied to establish

23  entitlement to the privilege, the secrecy-in-fact inquiry logically precedes the question of

24  reasonable harm.  *See Hepting*, 439 F. Supp. 2d at 986, 990.  Certainly, the Executive's claim of

25  the likely harm flowing from disclosure of secret information is entitled to some measure of

26  deference.  *Kasza*, 133 F.3d at 1166; *see also In re United States*, 872 F.2d at 475-76.  But this

27  claim guides the Court in the second inquiry, not the first.  To the extent the putative secret has

28  *already* been revealed through reasonably reliable public statements, claims of harm flowing from

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  confirmation or discovery of a *non-secret* are immaterial. *See Hepting*, 439 F. Supp. 2d at 994.[12]

2      Thus, even assuming the Executive may "occupy a position superior to that of the courts

3  in evaluating the consequences of a release of sensitive information," *El-Masri v. United States*,

4  479 F.3d 296, 305 (4th Cir. 2007), the Executive can claim no unique ability to determine which

5  facts have been publicly disclosed.  Given its impartiality, the Court is better positioned to guard,

6  as it must, against self-serving claims of privilege by the Executive, particularly where it is the

7  Executive that is asserted to have overstepped its lawful authority.  *See Reynolds*, 345 U.S. at 9-

8  10; *see also ACLU v. Brown*, 619 F.2d 1170, 1173 (7th Cir. 1980)  (*en banc*) ("*in camera* review

9  of documents allegedly covered by the privilege" is necessary to avoid "permit[ting] the

10  Government to classify documents just to avoid their production even though there is need for

11  their production and no true need for secrecy").  Indeed, the Government's objection to this

12  Court's engaging in "its own analysis" of the facts (Gov. Brief at 19) would reduce the Judiciary

13  to a mere functionary of the Executive.  Such an outcome cannot be squared with the Supreme

14  Court's insistence that "[j]udicial control over the evidence in a case cannot be abdicated to the

15  caprice of executive officers."  *Reynolds*, 345 U.S. at 9-10.

16          **1.      Information Publicly Disclosed by Reliable Sources Is Not Secret.**

17      The state secrets privilege is not a tool designed to shield from examination awkward facts

18  or unpleasant realities.  It exists to preclude discovery of secret information that, in addition,

19  presents a reasonable threat of harm to national security if disclosed.  *Kasza*, 133 F.3d at 1166.

20  Where disclosure has already occurred, the government has no power to retract information from

21  the public sphere.  *See infra* note 13.

22      While not every unconfirmed public report renders previously secret information a matter

23  of public knowledge, where the source's relationship to the underlying facts "possesses

24  substantial indicia of reliability," the published information can no longer reasonably be termed

25  ──────────────

26  [12] *See also Kasza*, 133 F.3d at 1165 ("[t]he state secrets privilege . . . allows the government to
    deny discovery of military *secrets*") (emphasis added); *Capital Cities Media, Inc. v. Toole*, 463

27  U.S. 1303, 1306 (1983) ("restrictions on the publication of information that would have been
    available to any member of the public" not permitted); *McGhehee v. Casey*, 718 F.2d 1137, 1141

28  (D.C. Cir. 1983) ("The government has no legitimate interest in censoring unclassified materials"
    or information "derive[d] from public sources.").

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

secret. *Hepting*, 439 F. Supp. 2d at 990 (considering reliable "public admissions or denials by the government, AT&T and other telecommunications companies, which are the parties indisputably situated to disclose whether and to what extent the alleged programs exist"). Other courts facing widely disseminated putative "state secrets" likewise have examined the Executive's claims of privilege in light of reliable contrary information.[13]

The Court in *Terkel* followed this Court's lead, accepting as bearing "persuasive indication of reliability" both government reports and "admissions or denials by private entities claimed to have participated in purportedly secret activity." 441 F. Supp. 2d at 913. The court noted that, "[i]n particular, public admissions by the government about the specific activity at issue ought to be sufficient to overcome a later assertion of the state secrets privilege." *Id.*

### 2. The Government's Claim that It Has Not Intentionally Waived the Privilege Cannot Cloak Non-Secret Information.

The Government is wrong in insisting that, because it has not officially "waived" the state secrets privilege, this Court must ignore the impact of public disclosures regarding the NSA's surveillance programs. This argument is a red herring.

Here, as in *Hepting*, the question is not whether the state secrets privilege has been waived; the question is whether the Government is entitled to claim the privilege in the first place, *i.e.*, whether sufficient reliable information in the public record demonstrates that the information sought to be concealed by the privilege is not a secret. The public disclosures made by the Executive, the Congress, and the telecommunications carriers asked to participate in the NSA's

---

[13] *See, e.g., Al-Haramain*, 451 F. Supp. 2d at 1222, 1224 (contrary to the Government's argument, "the existence of the Surveillance Program is not a secret, the subjects of the program are not a secret, and the general method of the program—including that it is warrantless—is not a secret"); *Jabara v. Kelley*, 75 F.R.D. 475, 492-493 (E.D. Mich. 1977) (concluding that "it would be a farce to conclude that the name of this other federal agency remains a military or state secret" where "[t]he name of this other federal agency has been revealed in a final report of the United States Senate Select Committee on Intelligence"); *ACLU v. NSA*, 438 F. Supp. 2d 754 (E.D. Mich. 2006) (sufficient information about NSA warrantless surveillance program had been made public to proceed to merits of plaintiff's claim without any risk to national security); *Spock v. United States*, 464 F. Supp. 510, 520 (S.D.N.Y. 1978) ("Here, where the only discussion in issue is the admission or denial of the allegation that interception of communications occurred[,] an allegation which has already received widespread publicity[,] the abrogation of the plaintiff's right of access to the courts would undermine our country's historic commitment to the rule of law.").

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   surveillance programs, *see supra* at pp. 5-11, are directly relevant to this inquiry.  In arguing that

2   the privilege has not been "waived," the Government has put the cart before the horse.

3       Public disclosure of information is very different from the concept of waiver, a legal term

4   of art.  Waiver refers to "an intentional relinquishment or abandonment of a known right or

5   privilege."  *Barker v. Wingo*, 407 U.S. 514, 525 (1972) (quoting *Johnson v. Zerbst*, 304 U.S. 458,

6   464 (1938)).  It presupposes an applicable right or privilege in the first instance, regardless of

7   who holds the authority to waive.  *Pengate Handling Sys. v. Westchester Surplus Lines Ins. Co.*,

8   No. 1:06-CV-0993, 2007 U.S. Dist. LEXIS 13303, at *10 n.5 (M.D. Pa. Feb. 27, 2007) ("Waiver

9   is irrelevant if the privilege does not apply.").[14]  The Government cannot shift focus away from

10  its inability to *establish* secrecy by insisting it has not *waived* it.

11      Although the Government may prefer that only intentional statements by authorized

12  members of the Executive can render secret information non-secret, that is not the way of the

13  world.  This Court's analysis in *Hepting* was correct, and its application in this case likewise

14  cannot justify dismissal on the pleadings.

15           **3.    Truly Secret Information Is Subject to the Privilege Only if Disclosure
                      Threatens National Security.**

16

17      Even where information actually remains secret, the Court must also determine whether

18  its disclosure poses a reasonable threat of harm.  *Hepting*, 439 F. Supp. 2d at 990.  Only if the

19  Court finds "a reasonable danger that compulsion of the evidence will expose military matters

20  which, in the interest of national security, should not be divulged" is discovery precluded on that

21  particular evidence.  *Reynolds*, 345 U.S. at 10.  Thus, the Court must still "be satisfied that under

22  the particular circumstances of the case" a reasonable danger to national security exists.  *Kasza*,

23  133 F.3d at 1166; *see also In re United States*, 872 F.2d at 475-76.  On the other hand, the Court

24

25  ──────────────
    [14] *See also* 26 Wright & Graham, *Fed. Prac. & Proc.* § 5665 ("[T]he secrecy required for the
    privilege can be destroyed without regard to who made or authorized the disclosure."); *Scanlon v.*

26  *Bricklayers & Allied Craftworkers*, *Local No. 3*, No. 05-CV-628A(F), 2007 U.S. Dist. LEXIS
    29798, *17-18 (W.D.N.Y. Apr. 23, 2007) ([W]here defendants failed to establish that the

27  attorney-client privilege was applicable, it was "not necessary to consider defendants' argument
    that there was no waiver of the privilege"); *Sedco Int'l, S. A. v. Cory*, 683 F.2d 1201, 1205 (8th

28  Cir. 1982)("No contention can be made that the attorney-client privilege precludes disclosure of
    factual information.") (citing *Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981)).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    must reject the privilege if it finds disclosure presents no reasonable threat of harm.  *See*

2    *Reynolds*, 345 U.S. at 10; *see, e.g.*, *Al-Haramain*, 451 F. Supp. 2d at 1224 (under the

3    circumstances, "no harm to the national security would occur").

4          To make this determination in *Hepting*, this Court assessed "the value of the information

5    to an individual or group bent on threatening the security of the country."  *Hepting*, 439 F. Supp.

6    2d at 990.  It recognized that whether individuals inclined to commit acts threatening the national

7    security engage in rational calculations remains "an open question."  *Id.*  But this Court adopted

8    what may be termed a "reasonably prudent terrorist" standard, under which the likelihood of any

9    potential harm to national security is gauged against the utility of disclosure to a hypothetical

10   rational opponent.  *Id.*  This test, and its broader analytical framework, were proper in *Hepting*,

11   and remain appropriate here.  *See also Terkel*, 441 F. Supp. 2d at 913 (adopting this Court's

12   analysis, but applying it to call records program in the absence of many of the public admissions

13   now presented here).

14   **II.   "THE VERY SUBJECT MATTER" OF THIS LITIGATION IS NOT A SECRET;
         ACCORDINGLY THE GOVERNMENT'S ASSERTION OF THE STATE**

15   **SECRETS PRIVILEGE CANNOT BAR ALL CLAIMS AT THE OUTSET.**

16         Even after this Court's order to show cause why the *Hepting* ruling does not govern these

17   cases, the Government makes no effort to distinguish the facts relating to Verizon and MCI from

18   those applicable to AT&T.  The Government thinks that the facts make no difference.  But, of

19   course they do.  And, as this Court noted, additional facts or confirmation of earlier allegations

20   often emerge during the course of litigation.  *Hepting*, 439 F. Supp. 2d at 1001.  As this Court

21   predicted, disclosures have only continued since *Hepting* was decided, and they now plainly

22   include public acknowledgment of the turnover of call records as well as intercepted content.  As

23   shown below, both the existence of and Verizon's and MCI's relationships to these programs are

24   anything but secret.  Accordingly, the "very subject matter" of these actions cannot be deemed a

25   state secret.  Unless this Court's analytical framework in *Hepting* was mistaken—which it was

26   not—the state secrets privilege cannot bar claims against Verizon and MCI.

27         **A.     Dismissal is a Draconian Remedy Unsupported by Precedent Here.**

28         The Government argues that these cases should be dismissed before any discovery has

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    occurred because the very subject matter of the actions is a state secret. As the Court recognized

2    in *Hepting*, it is a rare case indeed that is dismissed at the outset on this basis. *Hepting*, 439

3    F. Supp. 2d at 993 ("[N]o case dismissed because its 'very subject matter' was a state secret

4    involved ongoing, widespread violations of individual constitutional rights, as plaintiffs allege

5    here. Indeed, most cases in which the 'very subject matter' was a state secret involved classified

6    details about either a highly technical invention or a covert espionage relationship."). Indeed,

7    courts have recognized that "[d]ismissal of a suit, and the consequent denial of a forum without

8    giving the plaintiff her day in court . . . is indeed draconian." *In re United States*, 872 F.2d at

9    477; *see also Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d 1236, 1242 (4th Cir. 1985) ("[D]enial

10   of the [Judicial] forum provided under the Constitution is a drastic remedy that has rarely been

11   invoked.").

12       In truth, not *one* of the cases cited by the Government actually supports its position. Gov.

13   Brief at 16, 21. To begin with, both *Kasza* and *Fitzgerald* involved dismissals that occurred well

14   *after* the pleading stage. In *Kasza*, dismissal occurred subsequent to both discovery and summary

15   judgment motions, when it became obvious that the "plaintiff [could not] prove the *prima facie*

16   elements of her claim with nonprivileged evidence." 133 F.3d at 1166. In *Fitzgerald*, the Fourth

17   Circuit upheld dismissal of the plaintiff's libel claim on the basis that there was no way plaintiff

18   could demonstrate the falsity of the allegedly libelous statements without revealing military

19   secrets, but only after years of litigation and pretrial preparation. 776 F.2d at 1238 n.3.[15]

20       The few cases offered by the Government that actually involved dismissal on state secrets

21   grounds at the pleading stage are readily distinguishable. In *El-Masri*, the plaintiff claimed that

22   he had been illegally detained and interrogated by the CIA. 479 F.3d at 299. The Fourth Circuit

23   concluded that, to establish his claims, El-Masri would have been required to prove the "details of

24   [15] The Government also relies on *Clift v. United States*, 808 F. Supp. 101 (D. Conn. 1991), a case
     that was litigated for well over a decade. *See* Gov. Brief at 21 n.10. Clift filed suit in 1976; after
25   he sought discovery of allegedly secret information the district court dismissed his claims on state
     secrets grounds. 808 F. Supp. at 102. Although the Second Circuit agreed that discovery of the
26   secret information was unavailable, it vacated the dismissal, holding that plaintiff had a right to
     pursue his claims using non-privileged evidence. *Clift v. United States*, 597 F.2d 826, 830 (2d
27   Cir. 1979). Only twelve years later, after Clift demonstrated his "inability to marshal additional
     nonprivileged evidence," were his claims dismissed. 808 F. Supp. at 104. *Clift* hardly supports
28   dismissal at the pleading stage as the Government demands here.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CIA espionage contracts" and "the roles, if any, that the defendants played in the events he

alleges." *Id.* at 309.  The Court dismissed on the theory that "evidence that exposes how the CIA

organizes, staffs, and supervises its most sensitive intelligence operations" was "so central to the

subject matter of the litigation that any attempt to proceed w[ould] threaten disclosure of the

privileged matters." *Id.* at 306, 309; *see also Hepting*, 439 F. Supp. 2d at 994 (distinguishing *El-

Masri* on this same ground).  Similarly, in *Zuckerbraun v. Gen. Dynamics Corp.*, the court

affirmed dismissal of a negligence claim alleging negligent design and manufacture of a Navy

weapons system.  935 F.2d 544, 546 (2d Cir. 1991).  Because the design of the weapons—the

central factual dispute of the plaintiff's claim—was itself a state secret and plaintiff lacked "any

sources of reliable evidence" of negligent design, dismissal was appropriate.  *Id.* at 548. The two

remaining cases relied upon by the Government required discovery into the employment histories

and personnel decisions of the nation's intelligence agencies themselves.[16]

     Here, in stark contrast, the subject matter of this case focuses not on details of the

intelligence apparatus, but "only on whether [the carriers] intercepted and disclosed

communications or communications records to the government."  *Hepting*, 439 F. Supp. 2d

at 994.  As this Court observed, Plaintiffs' claims do not necessarily require inquiry into methods

by which the Government obtains access to their communication or records, or what the

Government does with information once obtained.  Rather, it is the mere fact of disclosure by

*Defendants*—in the absence of compliance with the relevant statutory procedures—that is

---

[16] In *Sterling v. Tenet*, the Fourth Circuit dismissed a CIA agent's claims of employment discrimination because they would have required him to present secret evidence about "the relative job performance of [CIA] agents, details of how such performance is measured, and the organizational structure of CIA intelligence-gathering." 416 F.3d 338, 347, 341 (4th Cir. 2005), *cert. denied*, 126 S. Ct. 1052 (2006).  Likewise, in *Edmonds v. United States*, the court dismissed the plaintiff's claims where she would be required to prove "the nature of plaintiff's employment[,] . . . the events surrounding her termination[,] . . . the content of what may be contained in a system of records and who had access to it."  323 F. Supp. 2d 65, 79-81 (D.D.C. 2004), *aff'd*, 161 Fed. Appx. 6 (D.C. Cir. 2005).  "[B]ecause the Court [found] that documents related to the plaintiff's employment, termination and security review that comprise the system of records are privileged," the case could not proceed.  *Id.* at 81.

The Government also cites *Maxwell v. First Nat'l Bank*, 143 F.R.D. 590 (D. Md. 1991), *aff'd*, 998 F.2d 1009 (4th Cir. 1993).  Gov. Brief 16 n.8.  Although *Maxwell* made reference to other cases dismissing claims on the basis of the state secrets privilege, 143 F.R.D. at 598-99, that case did not involve a motion by the Government to dismiss the plaintiff's claims, much less at the outset of the case.  *Id.* at 600.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   sufficient to establish Plaintiffs' claims.  *See In re NSA Telcoms. Records Litig.*, 483 F. Supp. 2d

2   934, 944-45 (N.D. Cal. 2007) ("*Riordan* Remand Order") ("the exact procedures allegedly used

3   to disclose the records are of little consequence to plaintiffs' legal theories. . . . [T]he particular

4   methods defendants used to submit the customer calling records to the NSA would not matter;

5   absent a statutory exemption, mere disclosure is enough.").

6        In short, the Government has failed to cite a single factually analogous case supporting its

7   insistence that this case be dismissed at the pleading stage.  As discussed below, the public record

8   suffers from no shortage of disclosures revealing the central subject of Plaintiffs' claims.

9   **B.    The Public Record Reveals the Existence of the Programs and the
            Participation of MCI and Verizon.**

10

11        **1.    The Existence of the Content Monitoring Program Is Not Secret.**

12        As this Court rightly concluded in *Hepting*, because of "public disclosures by the

13   government and AT&T," the existence of a widespread program of intercepting and monitoring

14   domestic communications is "hardly a secret."  *Hepting*, 439 F. Supp. 2d at 994.  There, this

15   Court concluded that the government has publicly "admitted the existence" of the program, that it

16   "monitor[s] communication content," "tracks calls into the United States or out of the United

17   States," and "operates without warrants."  *Id.* at 992 (internal quotations and citations omitted).

18   Other courts have agreed.[17]

19        The Government contends that "disproving Plaintiffs' allegation of a content surveillance

20   dragnet would require demonstrating what the United States *is* doing," thereby "revealing specific

21   intelligence sources and methods about the TSP that the DNI and NSA Director have explained

22   must be protected."  Gov. Brief at 11.  But as this Court recognized in *Hepting*, the President and

23   Attorney General have already described in detail the alleged scope of the TSP program; protests

24   that the TSP's contours "must remain secret" cannot depublicize that information.  *Id.*; *Hepting*,

25   439 F. Supp. 2d at 996.  Indeed, "the government has disclosed the universe of possibilities in

26   ────────────────────

27   [17] *See Al-Haramain*, 451 F. Supp. 2d at 1222 ("the existence of the Surveillance Program is not a
     secret, the subjects of the program are not a secret, and the general method of the program—
     including that it is warrantless—is not a secret"); *ACLU v. NSA*, 438 F. Supp. 2d at 765 (Plaintiffs
28   established  "*prima facie* case based solely on Defendants' public admissions regarding the
     TSP").

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   terms of whose communications it monitors and where those communicating parties are located."

2   *Id*.  "[T]he exact procedures" and "particular methods" employed by the program are of no

3   consequence, and, to the extent they are secret, need not be disclosed.

4          Moreover, this Court also found it significant that the Government has denied the

5   existence of the broader content program, a denial that the Government repeats in its brief here.

6   Gov. Brief at 51.  As the Court rightly concluded, those denials "opened the door for judicial

7   inquiry."  439 F. Supp. 2d at 996.  "[I]f the government has not been truthful, the state secrets

8   privilege should not serve as a shield for its false public statements."  *Id.*  Regardless of the secret

9   status of the particular operational details of the program, which are, in any event, far from the

10  "very subject matter" of this litigation, the existence of the Government's warrantless content

11  surveillance program is not subject to the state secrets privilege.

12         **2.      The Existence of the Call Records Program Is Not Subject to the State
                    Secrets Privilege.**

13

14         Although a year ago the Court was "hesitant to conclude that the existence or non-

15  existence of the communications record program necessarily constitutes a state secret," *Hepting*,

16  439 F. Supp. 3d at 997, no tenable claim of secrecy remains.  The confirmation of that program is

17  now undeniable and comes in the form of on-the-record statements by fully informed and reliable

18  witnesses from the Executive branch, the Congress, and Verizon itself.

19         **a.      Executive Disclosures Reveal the Existence of the Call Records
                    Program.**

20

21         Both President Bush and Attorney General Gonzales have acknowledged the existence of

22  a program "that has been fully briefed to members of the United States Congress" and entails "the

23  NSA compiling a list of [Americans'] telephone calls."  *See supra* at p. 5; *see also* Ex. N at 2-3;

24  Ex. O at 6-7 (Gonzales defending program).  While not revealing the details of the operation of

25  the program, these on-the-record comments confirm that the very subject of this litigation—the

26  existence of a call records program—is not a secret.  *Cf. Hepting*, 439 F. Supp. 2d at 996 (relying

27  on statements of the President and Attorney General).

28

Fenwick & West LLP
Attorneys At Law
San Francisco

b.    **Congressional Disclosures Reveal the Existence of the Call Records Program.**

More illuminating than the rather cryptic admissions of the Executive are statements of members of Congress who have been fully briefed on the call records program.  Nine members of Congress who have been briefed on and/or observed the program have provided *on-the-record* confirmation of its existence; *USA Today* reported confirmation by nineteen members.  Five confirmed AT&T's participation and four confirmed MCI's.  *See supra* at pp. 5-8.  Against these consistent acknowledgements, not a single member of Congress or the Executive branch has denied—or even cast doubt upon—the program's existence.  Any "reasonably prudent terrorist" engaging in the sort of risk versus efficiency calculations postulated by the Court (*see Hepting*, 439 F. Supp. 2d at 990) must assume that the program exists and that AT&T and MCI were, and may still be, its largest participants.

Both the Government and Verizon chose to ignore these Congressional disclosures in their opening papers, although they were highlighted in Class Plaintiffs' Consolidated Response to Order to Show Cause (Dkt. No. 155).  Yet, even if the Executive *prefers* to disseminate information through its own channels, the reliability of governmental disclosures, whether gauged by this Court or our nation's enemies, is not confined to statements by the Executive.  Courts have acknowledged that Legislative statements can eliminate secrecy, and in cases involving disclosures far less than these.  In *Jabara*, the plaintiff sought disclosure of the name of a federal agency that had admittedly intercepted his communications.  75 F.R.D. at 490.  Where the name of this agency previously had been revealed in a report of the United States Senate Select Committee on Intelligence, the privilege was unavailable since, according to the court, "it would be a farce to conclude that the name of this other federal agency remains a military or state secret."  *Id.* at 492-93;[18] *see also Ellsberg*, 709 F.2d at 61 n.47 (reversing dismissal of the

---

[18] *Terkel* took issue with *Jabara* to the extent it was cited for the notion that "once executive officials have disclosed certain activities to members of Congress, those activities are no longer covered by the state secrets privilege."  *Terkel*, 441 F. Supp. 2d at 914.  Plaintiffs make no such argument here; rather, they argue merely that if legislators intimately involved with the program make authoritative, on the record, public disclosures defending it on national broadcasts, no claim of secrecy can survive.  Nor does *Halkin* challenge the proposition that congressional statements are sufficiently reliable to undermine claims of secrecy.  There the court simply held that the

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  plaintiff's claims where congressional disclosure "detract[ed] from the government's ability to

2  rely on inferences drawn from the 'surrounding circumstances' in justifying its privilege claim").

3  *Salisbury v. United States*, 690 F.2d 966 (D.C. Cir. 1982), offers no reason to disregard

4  the statements of fully-briefed Members of Congress.  *See* Verizon Motion to Dismiss the MCC

5  at 4.  As the court explained, in rejecting Plaintiff's Freedom of Information Act ("FOIA")

6  request, "bare discussions by this court and the Congress of NSA's methods generally cannot be

7  equated with disclosure by the agency itself of its methods of information gathering." *Id.* at 971.

8  This statement, offered in connection with Plaintiff's FOIA request rather than the government's

9  state secret claim, merely reiterates the uncontroversial proposition that the disclosure of general

10  facts about a program does not necessarily compel further disclosure of its operational details.

11  *Salisbury* in no way intimates that, where Senators and Representatives acknowledge the

12  existence of an intelligence program in an effort to publicly defend it, the Executive remains free

13  to assert, in response to a legal challenge, that the very existence of that same program is a secret.

14  Our notions of judicial review have not yet stepped that far through the looking glass.

15  These congressional disclosures should be accorded equal weight to the statements of the

16  Executive and telecommunications providers recognized as reliable in *Hepting*.  In light of these

17  statements, the Government cannot maintain that the program's existence remains secret.

18      c.    **Party Disclosures Reveal the Existence of the Call Records**
19            **Program.**

20  The record of disclosures by telecommunications companies also presents far stronger

21  confirmation of the records program than was present in *Hepting*.  In a lawsuit against Verizon,

22  public admissions through a current Verizon Regional President that Verizon was asked to turn

23  over billions of private phone records, Ex. Z at 3, carry even more "indicia of reliability" than the

24  earlier public statements offered by the former CEO of Qwest.  *See Hepting*, 439 F. Supp. 2d

25  at 988, 990 ("telecommunications providers" are "indisputably situated to disclose whether and to

26

27  disclosure of some general information through "congressional committees investigating
    intelligence matters" did not eliminate the threat posed by further disclosure of detailed
    information *not* previously revealed through that investigation.  *Halkin v. Helms*, 598 F.2d 1, 10
28  (D.C. Cir. 1978).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   what extent the alleged programs exist").[19] "[A]dmissions or denials by private entities . . . may,

2   under appropriate circumstances, constitute evidence supporting a contention that the state secrets

3   privilege cannot be claimed as to that particular activity. Like official governmental disclosures,

4   such statements reasonably may be considered reliable because they come directly from persons

5   in a position to know whether or not the supposedly covert activity is taking place." *Terkel*, 441

6   F. Supp. 2d at 913. Taken together, the statements of Verizon and Qwest, the revelations from

7   members of Congress, and the disclosures from the Executive leave no *reasonable* doubt as to the

8   existence of the call records program.[20]

9                   **3.      Participation by MCI and Verizon in Both the Content and Records**
10                            **Programs Is Not Secret.**

11          In addition to establishing the existence of the content monitoring and call records

12   programs, reliable publicly disclosed information renders the participation or non-participation in

13   those programs by MCI and Verizon non-secret.

14                          **a.      The Participation of Verizon and MCI in the Content**
                                      **Surveillance Program Is Not Secret.**
15

16          Attorney General Gonzales has already disclosed the general contours and existence of the

17   NSA program involving "intercepts of contents of communications," Ex. B at 1, whereby "the

18   N.S.A. has gained the cooperation of American telecommunications companies to obtain

19   backdoor access to streams of domestic and international communications." Ex. I at 1. As in

20   _____

21   [19] The preliminary ruling in *United States v. Adams*, 473 F. Supp. 2d 108 (D. Me. 2006) supports
     no different result. That court, in an attempt to "preserve the status quo," granted the government
22   a temporary restraining order and preliminary injunction precluding, pending review by this
     Court, enforcement of the Maine PUC's order that Verizon confirm the content of its press
23   releases. *Id.* at 121. The *Adams* court asked the parties to "understand the temporal constraints
     under which the district court labored in arriving at its decision," which afforded "precious little
24   time with the press of other matters to research and write a decision on an issue of manifest public
     significance, due within hours of oral argument." *Id.* at 114 n.7. In giving any consideration to
25   *Adams*, we respectfully suggest this Court bear the same in mind.

26   [20] The Government's argument that the Court may not rely "on statements made by a private
     party in attempting to decide whether information is properly protected under the privilege," Gov.
27   Brief at 19, n.9, makes the same mistake as its argument that only the Government can "waive"
     the state secrets privilege, discussed *supra* at Part I(B)(2). "The secrecy required for the privilege
     can be destroyed without regard to who made or authorized the disclosure." 26 *Wright &*
28   *Graham*, Fed. Prac. & Proc. § 5665.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    *Hepting*, "[c]onsidering the ubiquity of [MCI & Verizon's] telecommunications services, it is

2    unclear whether this [communications content] program could even exist without [MCI &

3    Verizon's] acquiescence and cooperation."  *Hepting*, 439 F. Supp. 2d at 992.  *See supra* at p. 10-

4    (detailing Verizon's 14 million residential customers, 45 million wirelines, millions of miles of

5    fibre optic cable).  Moreover, much like AT&T, Verizon has stated that it "always stands ready"

6    to assist the government when it believes, as it claims to here, that the law allows its cooperation.

7    Ex. BB at 1. Thus, like AT&T, Verizon's "assistance in national security surveillance is hardly

8    the kind of 'secret' that the *Totten* bar and the state secrets privilege were intended to protect or

9    that a potential terrorist would fail to anticipate." *Hepting*, 439 F. Supp. 2d at 993.

10   **b.    Participation by Verizon's MCI Subsidiary in the Call Records**
**Program Is Not Secret.**

11

12       Verizon has affirmatively taken over responsibility for MCI's activities with respect to the

13   call records program, publicly stating that it is now "ensuring that Verizon's policies are

14   implemented at [MCI] and that all its activities fully comply with the law."  Ex. AA at 1.

15   Meanwhile, even as it denied its own participation in the program, Verizon first carved out MCI

16   from that denial, then explicitly disavowed any denial as to MCI.  *Compare* Ex. AA (May 12,

17   2006 press release) with Ex. BB (May 16, 2006 press release); *see also* Ex. CC at 1-2.  The

18   implications of Verizon's carefully crafted public statements are unmistakable, providing far

19   greater certainty of MCI's participation than ever pertained to AT&T.

20       Congressional disclosures likewise have laid bare MCI's participation in the records

21   program.  *See supra* at pp. 5-8; Ex. W at 2.  Such participation is hardly surprising since, like

22   AT&T, MCI plays a critical role in the long distance and international calling infrastructure

23   targeted under the NSA programs.  Most international calls are handled by long-distance carriers

24   AT&T, MCI, and Sprint, Ex. FF at 1, again rendering "it [ ] unclear whether this program could

25   even exist without [MCI's] acquiescence and cooperation." *Hepting*, 439 F. Supp. 2d at 992.

26   These public disclosures make it impossible to pretend that MCI's participation remains a secret.

27   They also make it impossible to dismiss this case at the outset against either MCI itself or

28   Verizon, which has now acquired and assumed responsibility for MCI.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### c.   Verizon's Direct Participation in the Call Records Program Is Not Secret.

Although Verizon initially refused to "confirm or deny whether we have any relationship to [the call records program]," Ex. AA at 1, Verizon subsequently parted with AT&T by issuing a highly publicized statement expressly denying that "Verizon" brand phone and internet businesses turned over call records. *See Hepting,* 439 F. Supp. 2d at 988-89; *supra* at p. 10. Verizon's very publicly proclaimed non-participation renders its status no longer a secret and fairly subject to confirmation under oath.

Verizon made the choice whether or not to speak. Having attempted to negate its role, Verizon cannot use the state secrets privilege to protect against judicial inquiry. *Id.* at 996 ("the state secrets privilege should not serve as a shield for its false public statements"). Just as "the government opened the door for judicial inquiry by publicly confirming and denying material information about its monitoring of communication content," *id.*, so have Verizon's statements opened the door—with or without the government's approval. Having publicized its denial, Verizon can now assert its non-participation as a *defense*. But no one can assert it is a secret.[21]

### d.   Testing Verizon's Participation Through More Formal Means Will Not Harm National Security.

In *Hepting*, after the Court concluded AT&T's assistance in surveillance was not sufficiently secret to halt the litigation, the Court determined that "revealing whether AT&T has received a certification to assist in monitoring communication content should not reveal any new information that would assist a terrorist and adversely affect national security." 439 F. Supp. 2d at 996. By analogy, the Court should conclude here that confirming Verizon's roles will not reveal new information that would materially assist a terrorist or impact national security.

---

[21] The *Riordan* Plaintiffs intend to amend their complaint to add (1) an express allegation that Verizon Communications, Inc. has controlled and bears responsibility for the actions of MCI following the acquisition, and (2) claims directly against MCI's California operating entities, because MCI is Plaintiff Dennis Riordan's long distance service provider. *Riordan* Compl. ¶ 9. Thus, if this Court concluded that only MCI's participation in the call records program is not secret, the *Riordan* Plaintiffs' claims could proceed. The *Riordan* Plaintiffs sought a stipulation allowing them to amend now without impacting the briefing or hearing schedule, but Verizon refused.

1    In fact, the public record already reveals that Verizon and MCI routinely provide massive

2    volumes of call records to federal intelligence agencies, pursuant to contracts designed to provide

3    "real time" access to customer calling records.  The General Counsel of the FBI and the DOJ

4    Inspector General have admitted that Verizon and MCI voluntarily provided such records on

5    thousands of occasions when no legal authorization was first obtained under the NSL process.

6    *See supra* at pp. 11-13.  Much like AT&T in *Hepting*, there is no doubt that "[Verizon] helps the

7    government in classified matters when asked, and [Verizon] at least currently believes, on the

8    facts as alleged in plaintiff's complaint, its assistance is legal."  439 F. Supp. 2d at 993.

9    Thus, additional confirmation of the turnover of records without judicial process will not

10   assist a rational terrorist, who already has ample reason to expect Verizon will turn over his

11   calling records to federal authorities, with or without legal process.   From the terrorist's point of

12   view, given the other intelligence agencies' ability to access call record information obtained by

13   the FBI, *supra* at pp. 11-13, it makes little difference which intelligence agency initially collects

14   this information.  Confirmation of Verizon's participation in the NSA's call records program,

15   therefore, will not alter the communications methods employed by the "reasonable" terrorist.

16   Finally, the Government's very public announcement of Verizon's and MCI's contracts to

17   provide call records to the federal intelligence agencies demonstrates that the Government is

18   asserting the "secrecy" of the carriers' conduct only when convenient.  The turnover of call

19   records is the very subject of this litigation.  The Government's willingness to disclose such

20   events demonstrates that this very subject cannot always be a secret.  The *Terkel* Court, in

21   distinguishing *Tenet* and *Weinberger*, put it well:

22        "***Disclosing the mere fact that a telecommunications provider is providing its
          customer records to the government, however, is not a state secret without some
23        explanation about why disclosures regarding such a relationship would harm
          national security***.  Put another way, the Court cannot think of a situation in which
24        publicly acknowledging a covert espionage contract or a secret nuclear weapons
          facility would not threaten national security.  In contrast, the ***Court can
25        hypothesize numerous situations in which confirming or denying the disclosure
          of telephone records to the government would not threaten national security and
26        would clearly reveal wholesale violations of the plaintiffs' statutory rights***."

27   *Terkel,* 441 F. Supp. 2d at 907-08 (emphasis added).  Here, the government has already

28   demonstrated its own belief that disclosure of the mass turnover of call records will not

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   necessarily threaten national security.  And Plaintiffs have demonstrated good reason to suspect a

2   wholesale violation of their statutory and constitutional rights.  The very subject of this litigation

3   therefore is not a state secret, and the Court should, as in *Hepting*, adjudicate Plaintiffs' claims by

4   assessing state secrets not *ab initio*, but as the individual evidentiary issues arise.

### III.   THESE CASES MAY NOT BE DISMISSED AT THE PLEADING STAGE BASED ON THE HYPOTHESIS THAT PLAINTIFFS MAY BE UNABLE TO ESTABLISH A *PRIMA FACIE* CASE, THAT DEFENSES MAY BE UNAVAILABLE, OR THAT PLAINTIFFS MAY BE UNABLE TO PROVE STANDING.

#### A.   Mere Speculation That Evidence Needed to Establish a *Prima Facie* Case or Defense May Be Unavailable Cannot Support Dismissal.

9        Where, as here, the very subject matter of litigation is not a state secret, dismissal can

10  occur on state secrets grounds only if the Court is satisfied "after further proceedings, [that] the

11  plaintiff cannot prove the *prima facie* elements of her claim," *Kasza*, 133 F.3d at 1166, or that

12  "the privilege deprives the defendant of information that would otherwise give the defendant a

13  valid defense." *Id.* at 1166 (quoting *Bareford v. Gen. Dynamics Corp.,* 973 F.2d 1138, 1141 (5th

14  Cir. 1992)); *see also Ellsberg*, 709 F.2d at 65 (remanding case to determine if plaintiffs can prove

15  *prima facie* case without privileged information); *Clift*, 597 F.2d at 830 (same).

16       Because such dismissal would necessarily depend on the significance of potentially

17  unavailable items of evidence, Plaintiffs must be afforded "at least some discovery" and a context

18  to assess the significance of the missing evidence before dismissal is appropriate.  *See Hepting*,

19  439 F. Supp. 2d at 994; *Kasza*, 133 F.3d at 1166.  Nonetheless, the Government and Verizon

20  insists on dismissal, not because any identified item of evidence has been excluded due to

21  privilege, but rather on the basis of its hypothesis that evidence that *might* be critical to the case

22  *might* prove undiscoverable.  Such surmise cannot preclude discovery.

23       Aside from being premature, the Government's contention that Plaintiffs are unable to

24  establish their *prima facie* case is mistaken.  *See* Gov. Brief at 31.  This Court has recognized that

25  Plaintiffs' case turns on the question of interception or disclosure by Verizon and MCI; it does

26  not require Plaintiffs to establish the details of the Government's acquisition or use of the

27  information.  *See Riordan* Remand Order, 483 F. Supp. 2d at 944-45 ("the exact procedures

28  allegedly used to disclose the records are of little consequence . . . [and] the particular methods

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    defendants used to submit the customer calling records to the NSA would not matter; . . . mere

2    disclosure is enough."); *Hepting*, 439 F. Supp. 2d at 994.  As noted above, neither the existence of

3    the challenged programs nor Defendants' participation remains a secret.  *See supra* at pp. 5-11.

4    The state secrets privilege, therefore, imposes no barrier to Plaintiffs' ability to establish a *prima*

5    *facie* case.

6            Likewise, given the posture of this litigation, the argument that Verizon will be prevented

7    from proving necessary defenses is entirely premature.  Defendants have yet to serve an Answer

8    asserting any defenses.  Nor has this Court had the opportunity to rule as to the applicability of

9    the privilege to any particular evidence sought to establish such a defense, or an evidentiary

10   record permitting the Court to assess the availability of a defense on the basis of non-privileged

11   evidence.  The mere possibility that Verizon or MCI may choose to raise a defense, that may

12   require one item of evidence instead of another, that may in turn be subject to the state secrets

13   privilege, is far too attenuated a chain to justify dismissal at the outset of a case of this import.

14           In *Hepting*, this Court faced nearly identical arguments and rightly concluded that

15   discovery on potential defenses was necessary before consideration of dismissal was appropriate.

16   *Hepting*, 439 F. Supp. 2d at 996-97.  As to AT&T's potential certification defense, the Court

17   understood that, because the existence of the content program was not a secret, "the state secrets

18   privilege will not prevent AT&T from asserting a certification-based defense."  *Id.*  Accordingly,

19   it recognized that AT&T could "confirm or deny the existence of a certification . . . through a

20   combination of responses to interrogatories and *in camera* review by the court."  *Id.* at 997.  The

21   same is true for Verizon and MCI.  Likewise, the state secrets privilege need not prevent

22   Defendants' presentation of a defense, however tenuous, based on federal statutes.  *See* Verizon

23   MTD at 20-22.  Only after real evidence is adduced or withheld can that determination occur.

24           Once this Court determines the very subject matter of this litigation is not a secret,

25   discovery should proceed.  *Hepting*, 439 F. Supp. 2d at 994.  Further efforts to dispose of this

26   litigation will turn on the outcome of a careful discovery process, not the parties' speculation.

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**B.     The Government's Hypothesized Lack of Standing Provides No Basis for Dismissal on the Pleadings.**

The Government also tries to subvert the discovery process by insisting that the state secrets privilege prevents Plaintiffs from establishing standing.  This attempt also fails.

Neither the Government nor Verizon seriously contends these complaints should be dismissed on the ground that Plaintiffs have failed to adequately *plead* standing.[22]  Nor could they.  The allegations of the complaints are more than sufficient.  *See, e.g.,* MCC ¶¶ 169-71, 173-74, 203, 212, 226, 233, 238, 245.  Rather, the Government argues here, as it did in *Hepting*, that it is entitled to summary judgment because Plaintiffs cannot *prove*—before discovery—that the communications or records of any individual Plaintiff were intercepted and/or disclosed.  *See Hepting*, Dkt. No.124 at pp. 16-20  (Government's argument for summary judgment that Plaintiffs had burden to "prove standing").  The Government's current motion should be denied for the following reasons, each of which we discuss in detail below.

First, the Government's motion is premature.  The Government takes the position that its very assertion of the state secrets privilege deprives Plaintiffs of the ability to establish standing.  That is not the case.  Before the Court may evaluate the Government's argument that Plaintiffs cannot *presently* prove standing, there must first be a ruling on the Government's assertion that the very subject matter of this litigation is a state secret.  That ruling will determine whether the case proceeds to discovery, in which event discovery of particular evidentiary facts will directly bear on the standing issue.  Indeed, given the ever-changing state of available information concerning these programs, it is particularly premature to determine standing before Plaintiffs have had any opportunity to develop a factual record.  The Government's prove-standing-now arguments ignore traditional principles for assessing standing at each appropriate stage of the litigation.  Plaintiffs are, at a minimum, entitled to discovery pursuant to Fed. R. Civ. P. Rule 56(f) ("Rule 56(f)") before the issue of standing can be addressed on a motion for summary

---

[22] Although it has filed only a motion to dismiss, Verizon nevertheless briefly argues that the complaint should be dismissed because Plaintiffs will be unable to *prove* standing.  Verizon Motion to Dismiss the MCC at 6.  Because only the government may assert the state secrets privilege, *Reynolds*, 345 U.S. at 7, the only relevant issue on Verizon's motion to dismiss is whether plaintiffs have *adequately alleged* standing.

1  judgment.

2      Second, as in *Hepting*, Plaintiffs here allege the existence of dragnet programs through

3  which Verizon and MCI engaged in the wholesale interception and/or disclosure of their

4  customers' communications and communications records.  Thus, as this Court held in *Hepting*,

5  439 F. Supp. 2d at 1000-01, proof of the programs' existence and participation in them by

6  Plaintiffs' carriers will, by definition, establish the interception and/or disclosure of Plaintiffs'

7  communications and records.  Likewise, the dragnet nature of the challenged programs gives rise

8  to a high probability that Plaintiffs' communications and call records have been intercepted and

9  disclosed.  This, too, is sufficient to establish standing, which, like all the elements of Plaintiffs'

10  claims, need be proven only by a preponderance of the evidence.

11          **1.    The Government's Motion For Summary Judgment is Premature.**

12          **a.    It Is Not Appropriate to Address Standing Before a Ruling on
                    the Government's Assertion that the Very Subject Matter of
13                  this Litigation is a State Secret.**

14      The Government has made its alternative motion for summary judgment on standing to

15  address the possibility that this Court may decline to dismiss the litigation based on either the

16  *Totten/Tenet* argument or the Government's claim that the very subject matter of the litigation is a

17  state secret.  Gov. Brief at 39 n.20.  However, if the Court rules, as it did in *Hepting*, that the very

18  subject matter of this litigation is *not* a state secret, that will fundamentally alter the landscape of

19  this litigation, including the potential scope of eventual discovery.

20      In *Hepting,* this Court confronted the same contention that the Government makes here:

21  that the state secrets privilege bars Plaintiffs from establishing standing.  In rejecting that claim,

22  the Court noted that, "the state secrets privilege will not prevent plaintiffs from receiving at least

23  some evidence tending to establish the factual predicate for the injury-in-fact underlying their

24  claims directed at AT&T's alleged involvement in the monitoring of communication content."

25  *Hepting*, 439 F. Supp. 2d at 1001 (referring to ruling that plaintiffs would be entitled to discovery

26  on existence of certification).  Similarly, the Court reiterated that additional facts might come to

27  light that would alleviate many of the secrecy concerns about the communication records

28  program.  *Id.*  The Court went on to note that, should that happen, it might very well be possible

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    for Plaintiffs to obtain information about AT&T's "participation, if any," in that program, as well,

2    without running afoul of the state secrets privilege. *Id.*

3          As detailed above, that observation was prescient. The existence of the records program

4    has been amply confirmed, thus opening the door to further discovery on standing. In short,

5    because the Government's arguments on standing are premised on the assumption that there can

6    be no discovery because the very subject matter of this litigation is a secret, should the Court

7    deny the motion on that ground, the standing argument falls as well.

8                    **b.      Plaintiffs Are Not Required to *Prove* Standing Before
                              Discovery.**

9

10         Elements of standing, like all other elements of a plaintiff's case, need only be

11   "supported . . . with the manner and degree of evidence required at the successive stages of the

12   litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The rule does not change

13   just because the Government has couched its motion to dismiss in the alternative as a summary

14   judgment motion. The Government's claim that Plaintiffs must *prove* standing now, at this

15   initial, pre-discovery stage, goes too far. The Court thus has discretion to treat the motion for

16   summary judgment as a motion to dismiss. *See, e.g., Nat'l Coal. for Students with Disabilities*

17   *Educ. and Legal Defense Fund v. Scales*, 150 F. Supp. 2d 845, 848 (D. Md. 2001). That is what

18   this Court did in *Hepting*, 439 F. Supp. 2d at 1001, and it should follow that same course here.

19         Moreover, Plaintiffs have filed herewith a declaration under Rule 56(f) specifying the

20   discovery they should be permitted to conduct before having to respond to a motion for summary

21   judgment—including facts relating to standing. That declaration seeks the same sort of

22   information that this Court held would be available to plaintiffs in *Hepting*, such as evidence

23   testing the truthfulness of the Government's and Verizon's statements as to the existence of the

24   contents program, and the participation in the records program by Verizon and MCI. *See e.g.,*

25   *Hepting*, 439 F. Supp. 2d at 996 ("the government has opened the door for judicial inquiry by

26   publicly confirming and denying material information about its monitoring of communications

27   content").[23] This includes determining whether Verizon and/or MCI have obtained a certification

28   [23] Both the Government and Verizon have opened this door. *See, e.g.,* Ex. HH at 10, 45, (AT&T,

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   with respect to their participation in either.  *Id*. at 996-97.  It also includes information, not

2   remotely subject to a claim of state secrets privilege, such as Verizon's and MCI's network

3   architecture and the manner in which they keep their call records, which may tend to confirm

4   which individuals' information is being divulged.  Finally, it sets out the means by which

5   Plaintiffs would pursue discovery on other information, already made public.

6        If the Government wishes to claim that particular portions of the evidence sought in

7   discovery are protected by the state secrets privilege, it may do so at the appropriate time, based

8   on a concrete record.  If Verizon wishes to assert that the evidence ultimately gathered cannot

9   support standing, that time will come as well.  But especially in a case raising such fundamental

10  issues of individual liberty, there is no basis to foreclose all development of the record, once this

11  Court concludes that the very subject of this litigation is not a state secret.

12         c.      **Neither *Halkin* Nor *Ellsberg* "Foreclose Litigation" Before
                   Discovery.**

13

14       Invoking the two *Halkin* cases and *Ellsberg*, the Government insists that "litigation over

15  Plaintiffs' standing is foreclosed" now by the state secrets privilege.  Gov. Brief at 45; *see*

16  *generally* Gov. Brief at 40-46.  As this Court has already recognized, those cases do not entitle

17  the Government to summary judgment or dismissal here.

18       First, none of those cases was dismissed on standing grounds at inception.  The dismissal

19  in *Halkin II* came six years after that case was filed, and only after "the parties [had] fought the

20  bulk of their dispute on the battlefield of discovery" regarding the propriety of *specific* discovery

21  requests.  *Halkin II*, 690 F.2d at 984.  In *Ellsberg*, dismissal occurred only after more than four

22  years of detailed discovery that occurred in two phases, in which the Government ultimately

23  admitted intercepting the conversations of five of the 16 plaintiffs.  709 F.2d at 53, 54, 55.  In

24  *Hepting*, this Court followed this same path and allowed discovery.  439 F. Supp. 2d at 994.

25       Moreover, neither the *Halkin* cases nor *Ellsberg* support the proposition that plaintiffs in a

26  *dragnet* surveillance and disclosure case must prove that a specific communication by a specific

27  Verizon and MCI have contracts to provide Government with "toll billing information"); Ex. Z
    at 3, (Kurtzman statement that Verizon was asked by Government to provide customer phone
28  records).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   plaintiff has been intercepted.  Rather, those cases involved *targeted* surveillance programs, as to

2   which this Court has already recognized a fundamental difference from the cases now pending.

3   *Hepting*, 439 F. Supp. 2d at 1000.

4          The *Halkin* cases are particularly instructive on this point.  *Halkin I*'s analysis of the state

5   secrets privilege focused on an NSA surveillance operation that selected messages to individuals

6   on a targeted "watchlist" compiled from a larger group of messages seized by monitoring targeted

7   international communications circuits.  *Halkin I*, 598 F.2d at 4, 11 & n.8; *see also, Halkin II*, 690

8   F.2d at 983 & n.23.  *Halkin I* applied the privilege because "confirmation or denial of acquisition

9   of *a particular individual's* international communications" could provide valuable information

10   about the reasoning behind the surveillance and about the methods used in carrying it out.  598

11   F.2d at 8.  The same is not true here, both because Plaintiffs allege programs of untargeted

12   dragnet surveillance and in light of public disclosures that Verizon and MCI have contracts to

13   provide call records in near-real time—for example, in connection with foreign intelligence

14   gathering through the use (or misuse) of NSLs.  *See supra* at p. 12.

15          In *Halkin II*, *after further discovery* and pretrial proceedings, the plaintiffs were unable to

16   obtain proof that any of *their* calls had been intercepted, because the appearance of their names on

17   the watchlist did not mean that their calls were being monitored.  Rather, if a message *mentioned*

18   a name on the watchlist, the message would be monitored, regardless of whether the named

19   person was actually a party to the conversation.  *Halkin I*, 598 F.2d at 11 & n.8; *Halkin II*, 690

20   F.2d at 983 & n.23.  Unlike the "watchlist" of *Halkin II*, in this case of dragnet surveillance, as

21   long as the named plaintiffs were Verizon and MCI "customers during the relevant time period

22   [as alleged at MCC ¶¶ 24-117], the alleged dragnet would have imparted a concrete injury on

23   each of them."  *Hepting*, 439 F. Supp. 2d at 1000.

### 2.   Proof of the Existence of the Content and Records Programs Establishes Standing.

26          Although not required to do so at this early stage of the proceedings, Plaintiffs have

27   already provided the Court with sufficient evidence potentially to establish a genuine issue of fact

28   as to their ability to establish standing.  *See* Fed. R. Civ. P. 56; *Central Delta Water Agency v.*

1    *United States*, 306 F.3d 938, 947 (9th Cir. 2002) (at summary judgment).  As in *Hepting*, if the

2    Court believes that Plaintiffs can provide, or obtain through discovery or other means, some

3    evidence of standing, the Government's motion should be denied.  *See Hepting*, 439 F. Supp. 2d

4    at 1001.

a.    **Establishing that the Dragnet Programs Exist Establishes Plaintiffs' Standing.**

7    The core grievance alleged by Plaintiffs is the operation of a dragnet that sweeps in all

8    communications and records.  As this Court recognized in *Hepting*, these allegations are

9    sufficient to establish standing.  The same analysis applies here:

> [T]he gravamen of plaintiffs' complaint is that [Verizon and MCI have] created a
> dragnet that collects the content and records of its customers' communications. . . .
> The court cannot see how any one plaintiff will have failed to demonstrate injury-
> in-fact if that plaintiff effectively demonstrates that all class members have so
> suffered. . . .   As long as the named plaintiffs were, as they allege, [Verizon/MCI]
> customers during the relevant time period . . . , the alleged dragnet would have
> imparted a concrete injury on each of them."

14    *Hepting*, 439 F. Supp. 2d at 1000 (distinguishing *Halkin II*, 690 F.2d at 999-1001); *see also id.* at

15    1001 ("this dragnet necessarily inflicts a concrete injury that affects each customer in a distinct

16    way, depending on the content of that customer's communications and the time that customer

17    spends using [the carrier's] services").[24]

18    Just as these allegations are sufficient to establish standing at the pleading stage, *proof* of

19    these allegations at a subsequent stage, after appropriate discovery, will establish standing

20    sufficient to defeat summary judgment.  Indeed, substantial information is already available.  *See*

21    *supra* at pp. 5-13.  Moreover, the Government is simply wrong when it asserts that its denial of

22    the existence of the dragnet content program obligates Plaintiffs to come forward, before any

23    discovery, with evidence rebutting that denial.  To the contrary, as this Court has already held, by

24    issuing a denial, "the government has opened the door for judicial inquiry" *Hepting*, 439 F. Supp.

25    2d at 996, including on the question of the existence of a certification.  *Id.* at 996-97.

26    Similarly, the existence of the call records program has now been confirmed by on-the-

---

27    [24]   *See* MCC ¶¶ 163-178 (alleging a dragnet that collects and discloses their customers'
communications and records);  MCC ¶¶ 24-117 (alleging that each of the named plaintiffs was a

28    Verizon or MCI customer during the relevant time period).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    record statements of members of Congress who have been briefed on and observed the program,

2    as well as by Verizon and Qwest.  *See supra* pp. 5-8.  Plaintiffs are also entitled to discovery on

3    Verizon's participation in the call records program, since it is no secret that Verizon provides call

4    records to the Government for terrorism investigations.  *See supra* pp. 11-13.  Since the mere

5    existence of a dragnet records program will be sufficient to create standing here, Plaintiffs are

6    entitled to prove such a program, and will have no need for allegedly secret information as to

7    such operational details as what the government does with the information collected.

8         In sum, here, as in *Hepting*, the Court should "not conclude at this juncture that plaintiffs'

9    claims would necessarily lack the factual support required to withstand a future jurisdictional

10   challenge based on lack of standing." 439 F. Supp. 2d at 1001.

11                   **b.      Plaintiffs Can Establish Standing to Sue for Damages for Past**
                             **Injuries and to Enjoin Probable Future Injuries.**
12

13        The dragnet nature of the programs challenged here is significant for purposes of standing

14   for another reason as well:  even in the absence of certainty at this stage of the proceedings, given

15   the likelihood that Plaintiffs' calls and records have been and will be caught up in the dragnets,

16   Plaintiffs have standing to proceed.  These programs are, by design, intended to sweep up all

17   communications and all call records.  MCC ¶¶ 169-71, 173-74, 203, 212, 226, 233, 238.

18   Moreover, the programs have been in place for years.  *See, e.g.,* Exs. H at 1, I at 1 (reporting that

19   TSP or "warrantless surveillance" began after September 11, 2001).  It is therefore inconceivable

20   that of the thousands of communications made and received by Plaintiffs during this period, not

21   one of Plaintiffs' calls or call records was swept up in these programs.  While the Government

22   argues that this is not sufficient, the certainty of injury it demands is simply not required.

23        As to the future, "the courts of appeals have generally recognized that threatened harm in

24   the form of an increased risk of future injury may serve as injury-in-fact for Article III standing

25   purposes."  *Baur v. Veneman*, 352 F.3d 625, 633 (2d Cir. 2003) (plaintiff had standing to

26   challenge USDA regulations that increased likelihood that beef carrying "mad cow disease" could

27   be sold, based on an allegation that plaintiff ate meat regularly).[25]  As to the past, the courts have

28   [25] *See also, Helling v. McKinney*, 509 U.S. 25, 35 (1993) (allowing Eighth Amendment claim

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  also consistently allowed plaintiffs to sue based upon past events, even where they cannot prove

2  with certainty that they personally suffered the injury.[26]  As the Ninth Circuit has observed "a

3  credible threat of harm is sufficient to constitute actual injury for standing purposes." *Central*

4  *Delta Water Agency*, 306 F.3d at 949.  Certain harms are "'by nature probabilistic,' yet an

5  unreasonable exposure to risk may itself cause cognizable injury." *Baur*, 352 F.3d at 634

6  (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 160 (4th

7  Cir. 2000)).[27]

8       Here, Plaintiffs' allegations easily establish likelihood-of-injury to support standing on the

9  pleadings.  As Plaintiffs allege that they were regular users and subscribers of Verizon and MCI

10  since 2001, MCC ¶¶ 24-117, and that Verizon and MCI have used, are using and will continue to

11  use their dragnet to intercept and disclose Plaintiffs' communications and communications, MCC

12  ¶¶ 169-71, 173-74, 203, 212, 226, 233, 238, there is a high likelihood that at least one call or call

13  record of each Plaintiff was intercepted in the past *and* will be intercepted in the future.  *See, e.g.,*

14  MCC ¶ 212 ("[t]here is a strong likelihood that Defendants are now engaging in and will continue

15  to engage in the above-described divulgence of Plaintiffs' and Class members'

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16
17  based on allegations that prison officials had "exposed him to levels of [second-hand smoke] that pose an unreasonable risk of serious damage to his future health"); *American Library Ass'n v. FCC*, 401 F.3d 489, 493 (D.C. Cir. 2005) (where librarians' association sought review of an FCC
18  rule, injury-in-fact could be established by showing "that there is a substantial probability that the FCC's order will harm the concrete and particularized interests of at least one of their members");
19  *Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001) (plaintiff had standing to challenge government's exchange of land with private developer under Clean Air Act based on allegation
20  that new development could aggravate his respiratory discomfort).

21  [26] *See, e.g., Clinton v. New York*, 524 U.S. 417, 432 (1998) (New York had standing to challenge line item veto law where President vetoed provision that New York could have used as a
22  "statutory 'bargaining chip,'" based on reasoning that "the cancellation inflicted a sufficient likelihood of economic injury to establish standing under our precedents"); *Covington v. Jefferson*
23  *County*, 358 F.3d 626, 641 (9th Cir. 2004) (holding that evidence of leakage of ozone-depleting materials was "sufficient to show injury in fact because the failure to comply with [the Clean Air
24  Act] has increased the risk of harm to the Covingtons' property"); *Baur*, 352 F.3d at 641 ("as we have clarified, the relevant 'injury' for standing purposes may be exposure to a sufficiently
25  serious risk of medical harm—not the anticipated medical harm itself").

26  [27] *See also Int'l Bhd. of Teamsters v. TSA*, 429 F.3d 1130, 1134 (D.C. Cir. 2005) (to establish standing on summary judgment, the plaintiff need only "show a 'substantial probability' that it
27  has been injured, that the defendant caused its injury, and that the court could redress that injury") (quoting *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 63 (D.C. Cir. 2000)); *Walters v. Edgar*, 163
28  F.3d 430, 434 (7th Cir. 1998) (Posner, C.J.) ("[a] probabilistic harm, if nontrivial, can support standing").

1   communications").  At minimum, the Court should find Plaintiffs' allegations suffice to establish

2   standing on the pleadings for prospective relief.

3               **3.      Plaintiffs Can Establish Standing Via *In Camera* Proceedings.**

4          The purpose of the Article III "case or controversy" requirement is "to assure that

5   concrete adverseness which sharpens the presentation of issues upon which the court so largely

6   depends . . . ."  *Baker v. Carr*, 369 U.S. 186, 204 (1962).  It is not, as the Government would have

7   it, a cloak of invisibility to be thrown over the courthouse door.  Accordingly, to the extent any

8   further demonstration of any Plaintiff's standing was required, it could be provided *in camera*.

9          If *any* plaintiff has standing, the justiciability requirement is satisfied.  *See Dept. of*

10  *Commerce v. U.S. House of Reps.*, 525 U.S. 316, 330 (1999) (presence of one plaintiff with

11  standing assures that controversy before court is justiciable); *Village of Arlington Heights v.*

12  *Metro. Housing Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977) (same).  If a single class

13  representative has standing, "there remains no further separate class standing requirement in the

14  constitutional sense."  1A. Conte & H. Newberg, *Newberg on Class Actions* § 2.5, p. 75 (4th ed.

15  2002) (summarizing cases).  Thus, to establish standing, the Court need only satisfy itself—at the

16  appropriate time—that at least *one* of the named Plaintiffs had his or her communications

17  intercepted, and that at least one had his or her call records turned over to the Government.

18         Further, as recognized in *Hepting,* the courts are to adopt flexible procedures to decide

19  cases involving state secrets.  439 F. Supp. 2d at 1011.[28]  If such procedures may be used to

20  adjudicate the case on the merits, *a fortiori*, they can be used to determine whether at least one of

21  the Plaintiffs has been subjected to surveillance of her communications contents and/or records.

22         Contrary to the Government's argument, confirming that at least one of the Plaintiffs has

23  standing need not reveal anything of consequence which is not already a matter of public record.

24  The Master Complaint names 99 Plaintiffs.  *See* MCC ¶¶ 8, 24-117.  They reside in 26 states and

25  the District of Columbia.  *Id*.  They are from large metropolitan areas, and small towns.  *Id*.

---

26  [28] *See Halpern v. United States*, 258 F.2d 36, 43 (2d Cir. 1958) (encouraging "flexible procedure"
    of *in camera* trial); *Loral Corp. v. McDonnell Douglas Corp.*, 558 F.2d 1130 (2d Cir. 1977) (jury

27  demand properly stricken to preserve confidentiality of classified material); *Spock*, 464 F. Supp.
    at 520 (endorsing "procedures to safeguard state secrets during this litigation"); *see also infra* at

28  Part VI, discussion of 50 U.S.C. § 1806(f) procedures.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   Obviously, Verizon already knows (or can determine) which of these Plaintiffs had their

2   communications intercepted and/or their call records turned over (likely all of them).  At the

3   appropriate time, Verizon can be ordered to identify those Plaintiffs to the Court *ex parte* and *in*

4   *camera*.  The Court need only satisfy *itself* that the threshold requirement of standing is satisfied;

5   to the extent there is any secrecy concern, it need not identify *which* Plaintiffs satisfy it, or how

6   many.

7          As set forth above, the existence of the challenged programs, MCI's participation in the

8   call records program, and Verizon's denial of its own participation are matters of public record.

9   Confirming that one or more of 99 geographically dispersed and demographically diverse

10  Plaintiffs were swept up in these programs would provide a would-be terrorist with no useful

11  information.[29]  Accordingly, dismissing the case on such a non-substantive ground "would

12  sacrifice liberty for no apparent enhancement of security."  *Hepting*, 439 F. Supp. 2d at 995.

13  **IV.    THE *TOTTEN/TENET* BAR DOES NOT APPLY.**

14         In *Hepting*, this Court rejected the government's contention that the action was barred by

15  the Supreme Court's decisions in *Totten v. United States*, 92 U.S. 105 (1875) and *Tenet v. Doe*,

16  544 U.S. 1, 3 (2005).  It held, first, that *Totten* is based on principles of equitable estoppel:  one

17  who agrees to spy for the government gives up the right to sue to enforce that agreement because

18  it embodies an implicit promise not to reveal its existence.  *Hepting,* 439 F. Supp. 2d at 991.  The

19  *Totten* principle does not apply to third parties, such as the plaintiffs in *Hepting*—or to the

20  Plaintiffs here.  *Id.*  Second, the Court held that the *Totten*/*Tenet* bar does not apply where "[the

21  carrier] and the government have for all practical purposes already disclosed that [the carrier]

22  assists the government in monitoring communication content."  *Id.* at 991-92.  As discussed

23  above, Verizon and MCI's relationship to the content and records programs have already been

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

---

[29] Indeed, if necessary to render a finding of standing even more inscrutable, Plaintiffs can amend the complaint to add a number of additional class representatives identified only as "Does," and provide only their names and telephone numbers to the Court and Verizon *in camera*.  *See, e.g., Does I through XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068, 1070 (9th Cir. 2000) ("a party may preserve his or her anonymity in judicial proceedings . . . when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity;" "Article III's standing requirement does not prevent a court from allowing plaintiffs to proceed anonymously.").

1  disclosed.  Both of the Court's rulings in *Hepting* were correct, and both apply with equal force

2  here.

3  **A.      *Totten/Tenet* Only Bars Spies from Suing the Government to Enforce**
         **Their Espionage Contracts.**

4

5  In *Hepting*, this Court concluded that *Totten* is based on a rule of estoppel that applies

6  only in the context of suits against the government by its spies.  *Hepting*, 439 F. Supp at 991.

7  That conclusion is fully supported by the Supreme Court's decision in *Totten*.

8  *Totten* was an action against the government by the administrator of the estate of a former

9  Civil War spy, seeking to enforce his secret espionage contract.  The Court held the suit could not

10  be maintained, because the contract contained an implicit promise never to reveal its existence:

11      Both employer and agent must have understood that the lips of the other were to be
       for ever sealed respecting the relation of either to the matter.  This *condition of the*

12      *engagement was implied* from the nature of the employment, and is implied in all
       secret employments of the government in time of war. . . . The secrecy which such

13      contracts impose precludes any action for their enforcement.

14  *Totten,* 92 U.S. at 106-07 (emphasis added).

15  This Court's interpretation of *Totten* is reinforced by the Supreme Court's recent decision

16  in *Tenet v. Doe*,  544 U.S. 1, which repeatedly characterizes *Totten* in terms of the estoppel that

17  prevents suits against the government by its former spies:  "*Totten's* core concern . . . [is]

18  preventing the existence of the *plaintiff's* relationship with the Government from being revealed,"

19  *id*. at 10 (emphasis added); "*Totten's* . . . holding [is] that lawsuits premised on alleged espionage

20  agreements are altogether forbidden,"  *id.* at 9; "the longstanding rule, announced more than a

21  century ago in *Totten*, prohibiting suits against the Government based on covert espionage

22  agreements,"  *id*. at 3; "the very essence of the alleged contract [in *Totten*] . . . was that it was

23  secret, and had to remain so: [¶] . . . [¶]  Thus, we thought it entirely incompatible with the nature

24  of such a contract that a former spy could bring suit to enforce it," *id.* at 7-8; "[n]o matter the

25  clothing in which alleged *spies* dress their claims, *Totten* precludes judicial review in cases such

26  as respondents' *where success depends upon the existence of their secret espionage relationship*

27  *with the Government*."  *Id.* at 8 (emphasis added).  In sum, Chief Justice Rehnquist left no doubt

28  in *Tenet* that "only" in a case "filed by an alleged former spy" is "*Totten's* core concern

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   implicated:  preventing the existence of the plaintiff's relationship with the Government from

2   being revealed."  *Id.* at 10.[30]

3         This Court's interpretation of *Totten* is supported by two cases decided since *Hepting*.  *See*

4   *ACLU v. NSA*, 438 F. Supp. 2d at 763; *Terkel*, 441 F. Supp. 2d at 907-08.  Finding "that it would

5   be particularly inappropriate to apply *Totten* to this case," *Terkel* explained:

6         The plaintiffs in *Totten* and *Tenet* had entered contracts that they knew were a

7         secret, but they nonetheless attempted to bring lawsuits to obtain the benefit of
      their bargain.  In contrast, the plaintiffs in this case were not parties to the alleged
      contract nor did they agree to its terms; rather, they claim that the performance of

8         an alleged contract entered into by others would violate their statutory rights.

9   *Terkel*, 441 F. Supp. 2d at 907.  Likewise, the court in *ACLU v. NSA* held:

10        This [*Totten/Tenet*] rule should not be applied to the instant case, however, since

11        the rule applies to actions where there is a secret espionage relationship between
      the Plaintiff and the Government.  It is undisputed that Plaintiffs' do not claim to
      be parties to a secret espionage relationship with Defendants.  Accordingly, the

12        court finds the *Totten/Tenet* rule is not applicable to the instant case.

13  438 F. Supp. 2d at 763 (internal citations omitted).

14        The Supreme Court's decision in *Weinberger v. Catholic Action of Hawaii/Peace Educ.*

15  *Project*, 454 U.S. 139 (1981), is not to the contrary.  *Weinberger* was decided on the basis of an

16  exemption under FOIA, *not* the *Totten/Tenet* bar.  The Court held that because FOIA governs the

17  public disclosure requirements of the National Environmental Policy Act ("NEPA"), and because

18  FOIA Exemption 1 bars disclosure of classified materials, the Navy was excused from disclosures

19  relating to a classified nuclear weapons facility.  *Id.* at 145.

20        *Weinberger* mentions *Totten* only once, in the decision's penultimate paragraph, simply as

21  another example of a case in which national security concerns defeated the plaintiff's claims:

22        ***In other circumstances****, we have held that 'public policy forbids the maintenance*

23        of any suit in a court of justice, the trial of which would inevitably lead to the
      disclosure of matters which the law itself regards as confidential, and respecting

24        which it will not allow the confidence to be violated.'

25  [30] The Government misquotes *Tenet* in arguing that the Supreme Court in *Tenet* held *Totten* "was

26  not so limited" as to bar only claims by spies.  Gov. Brief at 29.  To the contrary, *Tenet*'s "not so
limited" statement referred to its rejection of the Court of Appeal's holding that the bar reached

27  only *breach of contract* causes of action, in favor of a rule that the bar also reached any cause of
action for due process, equitable estoppel, or other theories in which "alleged spies dress their

28  claims."  544 U.S. at 8.  What matters for purposes of the *Totten/Tenet* rule is whether the claim
arises out of "the plaintiffs' relationship with the government."  *Id.* at 10.

PLAINTIFFS' JOINT OPPOSITION TO
GOVERNMENT'S MOTION TO DISMISS      -44-       MDL NO. 06-1791 VRW

1  *Id*. at 146-47 (quoting *Totten*, 92 U.S. at 107) (emphasis added).[31]

2     Finally, the Fourth Circuit's decision in *El-Masri*, 479 F.3d 296, is a decision applying the

3  state secrets privilege, not the *Totten/Tenet* bar.  In contrast to the state secrets privilege, *El-Masri*

4  explained that *"Totten* has come to primarily represent a somewhat narrower principle—a

5  categorical bar on actions to enforce secret contracts for espionage."  *Id*. at 306; *see also id*.

6  at 309 (referring to the *Totten/Tenet* bar as "establishing [an] absolute bar to enforcement of

7  confidential agreement to conduct espionage").  Because the *Totten* bar and state secrets privilege

8  share a purpose to protect against disclosure of secret national security information, it is not

9  surprising that *Totten* is often cited in state secrets cases as indicative of the significance and

10  judicial recognition of that objective.  But as this Court rightly recognized in *Hepting*, that similar

11  purpose does not conflate these two distinct doctrines.[32]

12     Like the plaintiffs in *Hepting*, the Plaintiffs in these cases "made no agreement with the

13  government and are not bound by any implied covenant of secrecy."  *Hepting*, 439 F. Supp. 2d at

14  991.  Accordingly, the *Totten/Tenet* bar has no application here.

15  **B.    Verizon's Public and Admitted Assistance to Government Surveillance Is Not a "Secret" that the *Totten/Tenet* Bar Protects.**

17     As noted in *Hepting*, and as the Supreme Court in *Tenet* confirmed, the *Totten* bar has no

18  application where the existence of an intelligence relationship is publicly known and admitted by

19  the Government.  *Hepting*, 438 F. Supp. 2d at 991-92.  The court in *Tenet* was quite explicit:

20     [T]here is an obvious difference, for purposes of *Totten*, between a suit brought by
21     an acknowledged (though covert) employee of the CIA and one filed by an alleged

22  [31] Not surprisingly, the *Tenet* Court also does not describe *Weinberger* as applying the *Totten* bar; it simply alludes to *Weinberger's* citation of *Totten* as evidence of *Totten*'s continuing validity. 544 U.S. at 9.

24  [32] The Government argues for an unwarranted extension of *Totten* under which a contractor's public disclosure cannot be considered in determining whether or not his contract remains a state secret when challenged by a third party.  Gov. Brief at 19 n.9 and 30-31.  This argument errs by conflating the two doctrines.  The rule of *Totten* is merely that a spy cannot sue based on a secret relationship, it does not require a court to ignore a contractor's reliable public disclosures in an action to enforce a third party's privacy rights.  The argument is also senseless from a policy perspective:  while allowing a spy to sue "would invite attempts to undermine the privilege by mere assertions of knowledge by an interested party," (*Hepting*, 439 F. Supp. 2d at 990), the *opposite* is true in this case, as confirmed by Verizon and MCI of their participation in the programs could expose them to *liability*.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

former spy.  Only in the latter scenario is *Totten's* core concern implicated: preventing the existence of the plaintiff's relationship with the Government from being revealed.

544 U.S. at 10.[33]  Here, as set forth in detail above, the Government and Verizon have already disclosed that Verizon/MCI helps the Government in surveillance of communications content and records.  *See supra* pp. 11-13.

This Court has already concluded that public admissions by the Government and telecommunications providers confirm the existence of a widespread NSA program to intercept and monitor American's communications without warrants.  *See Hepting*, 439 F. Supp. 2d 987-89, 992; *see also supra* pp. 2-4.  In turn, MCI plays a critical roll in the long distance and international calling infrastructure targeted under the NSA programs.  *See* Ex. FF at 1.

Further, as set out in detail in the Statement of Facts, on-the-record statements by the Executive Branch, members of Congress who are fully briefed on it, and representatives of Verizon and Qwest, have all confirmed the existence of the records program.  *See supra* pp. 5-9.  Verizon has tacitly admitted MCI's participation in the records program, *see* Ex. BB at 1, and takes responsibility for participation by the MCI entities in that program.  More generally, the FBI's General Counsel, Valerie Caproni, has publicly stated that the federal government has entered into contracts for Verizon and MCI to provide access to customer toll billing information "very quickly."  Ex. HH at 45.  In light of these and other facts described above, Verizon's and MCI's "assistance in national security surveillance is hardly the kind of 'secret' that the *Totten* bar and the state secrets privilege were intended to protect."  *Hepting*, 439 F. Supp. 2d at 993.

## V.   STATUTORY PRIVILEGES DO NOT BAR DISCOVERY INTO VERIZON'S AND MCI'S ACTIONS, AND IN ANY EVENT, DISMISSAL AT THIS STAGE WOULD NOT BE WARRANTED.

Courts, including this one in *Hepting*, have unanimously held that the two statutory privileges asserted by the NSA do not warrant dismissal in cases exactly analogous to this one.  Likewise, dismissal of Plaintiffs' claims against Verizon and MCI is not warranted, because

---

[33] *See also*, *Tenet*, 544 U.S. at 10 n.5 (explaining that "the fact that the plaintiff in *Webster* kept his *identity* secret did not mean that the employment *relationship* between him and the CIA was not known and admitted by the CIA," hence the *Totten* bar did not apply as that relationship had already been revealed) (emphasis in original).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

"[n]either of these [statutory privileges] by their terms requires the court to dismiss this action and it would be premature for the court to do so at this time." *Hepting*, 439 F. Supp. 2d at 998.

As a threshold matter, the two statutory privileges asserted by the Government do not bar Plaintiffs' claims, which seek discovery from Verizon and MCI, not the federal government. Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-1(i)(1), does not apply because Plaintiffs do not seek disclosure of information from the NSA, DNI, or any other governmental agency—they seek discovery only from Verizon and MCI. *See Terkel*, 441 F. Supp. 2d at 906 (holding on analogous facts involving AT&T that "*section 102A(i)(1) does not by itself bar prosecution in this case*"). Indeed, the statute is relevant "only in that it instructs the Director of National Intelligence to take measures that are available to prevent disclosure regarding intelligence sources and methods—for example, by asserting the state secrets privilege." *Id.* That has been done.[34]

For similar reasons, dismissal is also not warranted under Section 6 of the National Security Agency Act of 1959. 50 U.S.C. § 402. Section 6 relates generally to the authority of the NSA to withhold certain information from public disclosure. It is trumped here by the more specifically drawn Foreign Intelligence Surveillance Act ("FISA") statute, codified at 50 U.S.C. sections 1806(f), 1845(f), and 2511(2)(a)(ii)(B). These detailed provisions apply by their terms to electronic surveillance, the subject of this case, whereas Section 6 relates only generally, allowing the NSA to prevent disclosure of information about the "organization or [] function of the National Security Agency." 50 U.S.C. § 402 note. Accordingly, these later and more specific Congressional enactments prevail over Section 6. *See Edmond v. United States*, 520 U.S. 651, 657 (1997) (specific statutory provision governs when in conflict with general one); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("[A] specific policy embodied in a later federal statute should control our construction of the [earlier] statute, even though it has not been expressly amended.") This is particularly true where, as here, "the scope of the earlier

---

[34] Moreover, disclosure of the information Plaintiffs seek (to the extent not already disclosed) is authorized by Congress under the more specific provisions of FISA at 50 U.S.C. sections 1806(f), 1845(f). By contrast, section 102A(i)(1) operates to prevent only *unauthorized disclosures* of information. 50 U.S.C. § 403-1(i)(1).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   statute is broad but the subsequent statutes more specifically address the topic at hand.")

2   (quotation and citation omitted).

3       Even if the two statutory privileges asserted here could block discovery of certain

4   information from Verizon and MCI, dismissal of Plaintiffs' action is unwarranted at this juncture.

5   Each court that has considered motions to dismiss similar claims brought by plaintiffs challenging

6   the surveillance programs, including this Court, has held that the statutory privileges do not

7   mandate dismissal at the outset of the case, before any discovery.  Rather, the courts have

8   properly endorsed a step-by-step application of the privilege as to *particular evidence* as the case

9   progresses.  *See Hepting*, 439 F. Supp. 2d at 998 (noting that "[n]either of these provisions by

10  their terms requires the court to dismiss this action").[35]

11      The cases cited by the Government are distinguishable in that they applied the statutory

12  privileges to requests for documents or information *directly from the NSA or other federal*

13  *agencies* under FOIA.  These cases held only that information sought from the NSA or CIA was

14  shielded from disclosure under exemptions to FOIA based on section 6 and/or 102A(i)(1).[36]  They

15  cannot be extended from the limited FOIA context to support the Government's broader

16  proposition that Sections 6 and 102A(i)(1) prohibit all disclosure of "intelligence-related

17  information" generally in civil electronic surveillance cases.  Again, such disclosure and

18  discovery is instead governed by the FISA statutes.

19

20

21

---

22  [35]  *See also Al-Haramain*, 451 F. Supp. 2d at 1227 ("[t]he statutory privileges at issue here do not
    direct the dismissal of this action"; endorsing application of the privileges to specific evidence);
23  *Terkel*, 441 F. Supp. 2d at 905-06 (noting skepticism that section 6 could "allow the federal
    government to conceal information regarding blatantly illegal or unconstitutional activities simply
24  by assigning these activities to the NSA" and denying dismissal under section 102A(i)(1)).

25  [36]  *See e.g., People for the Am. Way Found. v. NSA Cent. Sec. Serv.*, 462 F. Supp. 2d 21 (D.D.C.
    2006) (documents withheld by NSA were shielded from FOIA disclosure under Section 6 as a
26  statutory exemption); *CIA v. Sims*, 471 U.S. 159, 177 (1985) (Director of CIA authorized to
    withhold information under FOIA exemptions); *Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990)
27  (same for FOIA requests to CIA and FBI).  *Terkel*, 441 F. Supp. 2d at 905, distinguished the
    Government's other section 6 cases on the same ground.  The remaining case cited by the
28  Government, *Snepp v. United States*, 444 U.S. 507 (1980), does not relate to the statutory
    privileges asserted here.

PLAINTIFFS' JOINT OPPOSITION TO
GOVERNMENT'S MOTION TO DISMISS            -48-                    MDL NO. 06-1791 VRW

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**VI.   EVEN IF THE SUBJECT MATTER WERE SECRET, THE EXECUTIVE CANNOT IGNORE EXPLICIT PROCEDURES CONGRESS ESTABLISHED FOR REVIEW OF THE REQUESTED INFORMATION.**

Even if the Government somehow could establish its claim to the state secrets privilege, Congress has foreclosed any threshold dismissal on state secrets grounds by establishing specific procedures for judicial review and, if necessary, appropriate limited disclosure of secret information relating to electronic surveillance.  Congress, in the proper exercise of its authority, has declared that FISA is the exclusive means for conducting electronic surveillance and that § 1806(f) provides the exclusive procedure by which claims of state secrets are to be examined and adjudicated in the context of foreign intelligence surveillance.  The Executive is not free to disregard this clear congressional mandate.

**A.   Congress May Properly Limit Executive Authority by Statute.**

The Executive may not ignore a statute lawfully created by Congress.  *See*, *e.g.*, *United States v. Nixon*, 418 U.S. 683, 715 (1974) (the President is not "above the law").  This principle is rooted in the "doctrine of the separation of powers [] adopted by the Convention of 1787." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S, 579, 629 (1952) (Douglas, J., concurring) (quoting *Myers v. United States*, 272 U.S. 52, 293 (1926) (Brandeis, J., dissenting)).  This "central judgment of the Framers of the Constitution … is essential to the preservation of liberty" precisely because it "preclude[s] the exercise of arbitrary power" by any one of the three coequal branches of the Federal government.  *Mistretta v. United States*, 488 U.S. 361, 380 (1989); *Youngstown*, 343 U.S at 629; *see also Hamdan*, 126 S. Ct. at 2800 ("Concentration of power puts personal liberty in peril of arbitrary action by officials, an incursion the Constitution's three-part system is designed to avoid.") (Kennedy, J., concurring).

In recognition of this deliberate allocation of authority, the Court has long understood that "Presidential powers are not fixed but fluctuate, depending upon their disjunction or conjunction with those of Congress."  *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb."  *Id.* at 637.  National security concerns cannot abrogate this fundamental

1    precept of our system of government.[37]

2           Congressional limitations on the prerogative of the Executive are particularly apt with

3    respect to common law evidentiary privileges, such as the state secrets privilege. *See Dickerson*

4    *v. United States*, 530 U.S. 428, 437 (2000) ("Congress retains the ultimate authority to modify or

5    set aside any judicially created rules of evidence and procedure that are not required by the

6    Constitution.") (citation omitted); *United States v. Fell*, 360 F.3d 135, 145 (2d Cir. 2004) (subject

7    only to the Constitution, "Congress has the ability to set forth rules of evidence in federal trial.").

8    As both the Second and Ninth Circuits have recognized, Congress may, through statute, alter the

9    contours of the state secrets privilege. *See Halpern*, 258 F.2d at 43 (holding that the creation of a

10   private cause of action that necessarily implicated secret information waived the privilege);

11   *Kasza*, 133 F.3d at 1167 (where Congress "speaks directly to the question otherwise answered by

12   federal common law"—including procedures for state secrets—the judgment of Congress binds

13   both the Executive and the Courts) (internal citation and alterations omitted); *see also Tenet*, 544

14   U.S. at 11 (where "the national interest would be well served . . . Congress can modify the federal

15   common-law rule announced in *Totten*") (Stevens, J., concurring).  As the next section

16   demonstrates, Congress has directly addressed the procedures for handling confidential

17   information in exactly the present situation; hence its rules must be respected, and no dismissal

18   may occur at the outset, before application of those rules to the evidence at hand.

19        **B.    FISA's Well-Defined Procedures Govern Secret Information Relating
                   to Electronic Surveillance.**
20

21          In 1978, the United States Senate Select Committee to Study Governmental Operations

22   with Respect to Intelligence Activities, known informally as the "Church Committee," concluded

23   "that warrantless electronic surveillance in the name of national security ha[d] been seriously

24   ─────────────────────

25   [37] *See Hamdi*, 542 U.S. at 536 (plurality) ("Whatever power the United States Constitution
     envisions for the Executive in its exchanges with other nations or with enemy organizations in
     times of conflict, it most assuredly envisions a role for all three branches when individual liberties
26   are at stake."); *Hamdan*, 126 S. Ct. at 2774 n.23 ("Whether or not the President has independent
     power, absent Congressional authorization . . . he may not disregard limitations that Congress has,
27   in proper exercise of its own war powers, placed on his powers."); *Home Bldg. & Loan Ass'n v.
     Blaisdell*, 290 U.S. 398, 425-26 (1934) ("Emergency does not increase granted power or remove
28   or diminish the restrictions imposed upon power granted or reserved . . . .").

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    abused." S. Rep. No. 95-604(I) at 7-8, (1978) *reprinted in* 1978 U.S.C.C.A.N. 3904, 3908.  In

2    response, Congress endeavored "to curb the practice by which the executive branch may conduct

3    warrantless electronic surveillance on its own unilateral determination that national security

4    justifies it." *Id.*  The result of these efforts was the Foreign Intelligence Surveillance Act of 1978,

5    "a precisely drawn legislative charter," S. Rep. No. 94-755(II), at 309 (1976), intended to

6    "regulate the exercise of [presidential] authority" over intelligence surveillance.  S. Rep. No. 95-

7    604(I), at 16 (1978) *reprinted in* 1978 U.S.C.C.A.N. 3904, 3916.

8         With FISA, "Congress, in the proper exercise of its powers as an independent branch of

9    government . . . set limits on the President's authority." *Hamdan*, 126 S. Ct. at 2799 (Kennedy,

10    J., concurring).  FISA, like the statutes at issue in *Youngstown* and *Hamdan*, was the result of

11    "a deliberative and reflective process engaging both of the political branches." *Id.*; *see also*

12    *Youngstown*, 343 U.S. at 660 (Burton, J., concurring) ("The controlling fact here is that Congress,

13    within its constitutionally delegated power, has prescribed for the President specific procedures…

14    for his use in meeting the present type of emergency.").  The President, therefore, cannot

15    disregard the limitations that Congress, through FISA, has properly placed on executive power.

16         By prescribing the "exclusive means by which electronic surveillance . . . and the

17    interception of domestic . . . communications may be conducted," FISA and Title III displaced

18    pre-existing federal laws within their scope.  Pub. L. No. 95-511, 92 Stat. 1783, § 201 (1978),

19    codified as amended at 18 U.S.C. § 2511(2)(f).  This comprehensive overhaul of the federal law

20    of intelligence surveillance includes a number of private rights of action permitting "aggrieved

21    person[s]" civil recovery.  *See* 18 U.S.C. § 2520(a) (civil cause of action for interception of

22    communications in violation of Title III); 50 U.S.C. § 1810(a)(I) (same for electronic surveillance

23    in violation of FISA); 18 U.S.C. § 2707(a) (same for unlawful disclosures by communications

24    providers under SCA); 50 U.S.C. § 1809 (prohibiting "electronic surveillance under color of law

25    except as authorized by statute"); 47 U.S.C. § 605(e)(3)(A) (same for unlawful disclosures by

26    communications providers under Communication Act).

27         Congress, no doubt, understood when it created these private causes of action that lawsuits

28    involving foreign intelligence surveillance would frequently involve state secrets.  Certainly,

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Congress did not intend to "create[] rights which are completely illusory, existing only at the mercy of government officials." *Halpern*, 258 F.2d at 43. Precisely because it foresaw cases like those now facing this Court, Congress dictated a detailed procedure for courts to follow whenever the Government invokes the state secrets privilege in cases involving electronic surveillance. *See* 50 U.S.C. § 1806(f).

The five-step protocol outlined in § 1806(f) is as follows:

1. The court must await a "motion or request . . . by an aggrieved person . . . to discover or obtain . . . materials relating to electronic surveillance." 50 U.S.C. § 1806(f).

2. Following such a request, "the Attorney General [may] file[] an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States." *Id.*

3. Upon receipt of that affidavit, the "court . . . shall . . . review in camera and *ex parte*" any materials about the surveillance "as may be necessary [to allow the court] to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted." *Id.*

4. Based upon that submission, the court decides whether to "disclose to the aggrieved person" any "materials related to the surveillance"—a step that is permissible "only where such disclosure is necessary to make an accurate determination of the legality of the surveillance." *Id.*

5. Where disclosure to the plaintiff is necessary, the court discloses the materials subject to "appropriate security procedures and protective orders." *Id.*

This procedure applies, without qualification and "notwithstanding any other law," to discovery of any materials relating to "electronic surveillance," a term defined to encompass any "acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire communication . . . without the consent of any party thereto." *Id.*; 50 U.S.C. § 1801(f)(2); *see also* S. Rep. No. 95-604(I), at 57 (1978*) reprinted in* 1978 U.S.C.C.A.N. 3904, 3958 (procedures "apply whatever the underlying rule or statute referred to in [a party's] motion"). This protocol applies to claims in state or federal court, based on state as well as federal law. *Id. See also Riordan* Remand Order, 483 F. Supp. 2d at 940 (finding § 1806(f) "contemplate[s] state court litigation"). Likewise, it governs discovery not only of Verizon's and MCI's disclosures of communications content, but their divulgence of call records as well. 50 U.S.C. § 1806(f)

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  (applies to efforts to "discover or obtain . . . materials *relating to* electronic surveillance")

2  (emphasis added); 50 U.S.C. § 1801(f)(1) (defining "electronic surveillance" to include

3  acquisition of "contents of any wire or radio communication"); 50 U.S.C. § 1801(n) (defining

4  "contents" to include "any information concerning the *identity of the parties* to such

5  communication or the *existence* . . . of that communication.") (emphasis added).

6      The procedures outlined in § 1806(f) apply regardless of whether the Government has

7  acknowledged the challenged surveillance. *Al-Haramain*, 451 F. Supp. 2d at 1231 ("To accept

8  the government's argument that Section 1806(f) is only applicable when the government intends

9  to use information against a party would nullify FISA's private remedy and would be contrary to

10  the plain language of Section 1806(f)."). Not only is the procedure outlined in § 1806(f)

11  applicable, Congress made this protocol the sole means by which the Executive can assert the

12  state secrets privilege over information related to electronic surveillance. When the legality of

13  surveillance is at issue, "it is this procedure 'notwithstanding any other law' that must be used to

14  resolve the question." S. Rep. No. 95-604(I), at 57 (1978) *reprinted in* 1978 U.S.C.C.A.N. 3904,

15  3958.

16      **C.**     **Dismissal on the Pleadings Is Impermissible Under § 1806(f).**

17      Rather than mandating dismissal as the Government urges here, the five-step protocol

18  established by Congress provides Plaintiffs with an opportunity to seek redress while guarding

19  against unnecessary disclosures of secret information. Section 1806(f) requires the court not to

20  dismiss claims involving secret surveillance information, but to review the secret material in

21  order to decide "whether the surveillance of the aggrieved person was lawfully authorized and

22  conducted" and, if necessary, disclose the material to the aggrieved party under appropriate

23  security procedures. *Id.*; *ACLU Found. of Southern Cal. v. Barr*, 952 F.2d 457, 465 (D.C. Cir.

24  1991). Because it contains no reference whatsoever to dismissal, on the pleadings or otherwise,

25  § 1806(f) serves as an unambiguous rejection of such premature termination of litigation in the

26  electronic surveillance context.

27      Where, as here, Congress has enacted legislation that evinces its "intent to replace the

28  government's evidentiary privilege to withhold sensitive information" with a different protocol,

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

the common law rules must yield to legislative constraints. *Kasza*, 133 F.3d at 1168. The Government cannot simply ignore limitations that Congress has, in proper exercise of its own authority, placed on the Executive's powers. *See, e.g.*, *Hamdan*, 126 S. Ct. at 2774 n.23; *Youngstown*, 343 U.S. at 645-46 (Jackson, J., concurring) (stating that the President's "command power . . . is subject to limitations consistent with a constitutional Republic whose law and policy-making branch is a representative Congress"). The Executive's interest in maintaining secrecy, regardless of its strength, must yield to the reasoned enactments of Congress. *See id.* By crafting an explicit statutory procedure for the invocation and adjudication of the state secrets privilege in the context of electronic surveillance, Congress has left the Executive devoid of authority to assert the privilege as, in essence, an immunity requiring dismissal of these actions.

In short, Congress may not only draw the line between personal liberty and national security, as it has in enacting FISA and the other statutes at issue; it may lay down a specific procedure for courts to employ to determine whether that line has been crossed. With FISA, Congress did just that.

## CONCLUSION

For the reasons set forth above, this Court should deny the Motion to Dismiss or For Summary Judgment by the United States, and should deny Verizon's Motions to Dismiss insofar as they rely upon the state secrets privilege or related doctrines.

Dated: June 22, 2007

Respectfully,

FENWICK & WEST LLP

By: _____/s/ Laurence F. Pulgram_____
              Laurence F. Pulgram

Attorneys for Plaintiffs
Dennis P. Riordan, *et al.*

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

2

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA

3

4

By: _____/s/ Ann Brick_____
                        Ann Brick

5

6

Attorneys for Plaintiffs
Dennis P. Riordan, *et al.*

7

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP

8

9

By: _____/s/ Barry R. Himmelstein_____
                        Barry R. Himmelstein

10

11

Interim Class Counsel for MCI Class

12

MOTLEY RICE LLC

13

By: _____/s/ Vincent I. Parrett_____
                        Vincent I. Parrett

14

15

Interim Class Counsel for Verizon Class

16

GRIFFIN WHITAKER LLP

17

18

By: _____/s/ Joshua Graeme Whitaker_____
                        Joshua Graeme Whitaker

19

20

Attorneys for Plaintiffs
Christopher Bready, *et al.*

21

SHAPIRO & STERNLIEB, LLC

22

23

By: _____/s/ David H. Sternlieb_____
                        David H. Sternlieb

24

25

Attorneys for Plaintiffs
Glen Chulsky, *et al.*

26

         Pursuant to General Order 45, Part X-B, the filer attests that concurrence in the filing of

27

this document has been obtained from Laurence F. Pulgram, Ann Brick, Barry R. Himmelstein,

28

Vincent I. Parrett, Joshua Graeme Whitaker, and David H. Sternlieb.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO