TAB 4



S. REP. 99-541                                                    Page 1
S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541, 1986 U.S.C.C.A.N. 3555)**

P.L. 99-508, **3555 ELECTRONIC COMMUNICATIONS PRIVACY ACT OF 1986
DATES OF CONSIDERATION AND PASSAGE
House June 23, October 2, 1986
Senate October 1, 1986
House Report (Judiciary Committee) No. 99-647,
June 19, 1986 [To accompany H.R. 4952]
Senate Report (Judiciary Committee) No. 99-541,
Oct. 17, 1986 [To accompany S. 2575]
Cong. Record Vol. 132 (1986)
The House bill was passed in lieu of the Senate bill after amending its
language to contain much of the text of the Senate bill.  The Senate Report is
set out below.

SENATE REPORT NO. 99-541
October 17, 1986

**\*1** The Committee on the Judiciary, to which was referred the bill (S. 2575) having
considered the same, reports favorably thereon with an amendment in the nature of a
substitute and recommends that the bill, as amended, do pass.

I.  PURPOSE

The Electronic Communications Privacy Act amends title III of the Omnibus Crime
Control and Safe Streets Act of 1968--the Federal wiretap law--to protect against
the unauthorized interception of electronic communications.  The bill amends the
1968 law to update and clarify Federal privacy protections and standards in light of
dramatic changes in new computer and telecommunications technologies.

When the Framers of the Constitution acted to guard against the arbitrary use of
Government power to maintain surveillance over citizens, there were limited methods
of intrusion into the 'houses, **\*2** papers, and effects' protected by the fourth
amendment.  During the intervening 200 years, development of new methods of commu-
nication and devices for surveillance has expanded dramatically the opportunity for
such intrusions.

The telephone is the most obvious example.  Its widespread use made it technolo-
gically possible to intercept the communications of **3556 citizens without entering
homes or other private places.  When the issue of Government wiretapping first came
before the Supreme Court in Olmstead v. United States, 277 U.S. 438 (1928), the
Court held that wiretapping did not violate the fourth amendment, since there was no
searching, no seizure of anything tangible, and no physical trespass.

Today, the Olmstead case is often remembered more for Justice Brandeis' prescient
dissent than for its holding.  Justice Brandeis predicted:

Ways may some day be developed by which the Government, without removing papers
from secret drawers, can reproduce them in court, and by which it will be enabled to
expose to a jury the most intimate occurrences of the home . . .  Can it be that the
Constitution affords no protection against such invasions of individual security?

Forty years later, the Supreme Court accepted Justice Brandeis' logic in  Katz v.

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541,  1986 U.S.C.C.A.N. 3555)**

United States, 389 U.S. 347 (1967), holding that the fourth amendment applies to
Government interception of a telephone conversation.  At the same time, the Court
extended fourth amendment protection to electronic eavesdropping on oral conversa-
tions in Berger v. New York, 388 U.S. 41 (1967).

   Congress responded in a comprehensive fashion by authorizing Government intercep-
tion, under carefully subscribed circumstances in title III of the Omnibus Crime
Control and Safe Streets Act of 1968, 18 U.S.C. 2510 et seq. Title III is the
primary law protecting the security and privacy of business and personal communica-
tions in the United States today.  Its regimen for protecting the privacy of voice
communications is expressly limited to the unauthorized aural interception of wire
or oral communications.  It only applies where the contents of a communication can
be overheard and understood by the human ear.  See United States v. New York Tele-
phone Company, 434 U.S. 159, 167 [FN1] (1977).  Furthermore, existing title III ap-
plies only to interceptions of communications sent via common carriers.  18 U.S.C.
2510(10).

   As Senator Leahy said when he introduced S. 2575 with Senator Mathias, the exist-
ing law is 'hopelessly out of date.' Congressional Record, June 19, 1986.  It has
not kept pace with the development of communications and computer technology.  Nor
has it kept pace with changes in the structure of the telecommunications industry.

   Today we have large-scale electronic mail operations, computer-to-computer data
transmissions, cellular and cordless telephones, paging devices, and video telecon-
ferencing. [FN2]  A phone call can be carried by wire, by microwave or fiber optics.
It can be transmitted in the form of digitized voice, data or video. Since the di-
vestiture of *3 AT&T and deregulation, many different companies, not just common
carriers, offer a wide variety of telephone and other communications services.  It
does not make sense that a phone call transmitted via common carrier is protected by
the current federal **3557 wiretap statute, while the same phone call transmitted
via a private telephone network such as those used by many major U.S. corporations
today, would not be covered by the statute.

   These tremendous advances in telecommunications and computer technologies have
carried with them comparable technological advances in surveillance devices and
techniques.  Electronic hardware making it possible for overzealous law enforcement
agencies, industrial spies and private parties to intercept the personal or propri-
etary communications of others are readily available in the American market today.

   Title I of the Electronic Communications Privacy Act addresses the interception of
wire, oral and electronic communications.  It amends existing chapter 119 of title
18 to bring it in line with technological developments and changes in the structure
of the telecommunications industry.

   The Committee also recognizes that computers are used extensively today for the
storage and processing of information. With the advent of computerized recordkeeping
systems, Americans have lost the ability to lock away a great deal of personal and
business information.  For example, physicians and hospitals maintain medical files
in offsite data banks, businesses of all sizes transmit their records to remote com-
puters to obtain sophisticated data processing services.  These services as well as
the providers of electronic mail create electronic copies of private correspondence
for later reference. This information is processed for the benefit of the user but
often it is maintained for approximately 3 months to ensure system integrity.  For

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the person or business whose records are involved, the privacy or proprietary interest in that information should not change.  Nevertheless, because it is subject to control by a third party computer operator, the information may be subject to no constitutional privacy protection.  See United States v. Miller, 425 U.S. 435 [FN3] (1976) (customer has no standing to contest disclosure of his bank records).  Thus, the information may be open to possible wrongful use and public disclosure by law enforcement authorities as well as unauthorized private parties.  The provider of these services can do little under current law to resist unauthorized access to communications.

Title II of S. 2575 addresses access to stored wire and electronic communications and transactional records.  It is modeled after the Right to Financial Privacy Act, 12 U.S.C. 3401 et seq. to protect privacy interests in personal and proprietary information, while protecting the Government's legitimate law enforcement needs.

Title III of the bill addresses pen registers and trap and trace devices.

## II.  HISTORY

In 1984, Senator Leahy asked the Attorney General whether he believed interceptions of electronic mail and computer-to-computer communications were covered by the Federal wiretap law.  The **\*3558 \*4** Criminal Division of the Justice Department responded that Federal law protects electronic communications against unauthorized acquisition only where a reasonable expectation of privacy exists.  Underscoring the need for this legislation, the Department concluded:

In this rapidly developing area of communications which range from cellular non-wire telephone connections to microwave-fed computer terminals, distinctions such as [whether there does or does not exist a reasonable expectation of privacy] are not always clear or obvious.

Senator Leahy's letter and the Justice Department's response mark the beginning of this legislation.  The Subcommittee on Patents, Copyrights and Trademarks chaired by Senator Mathias, held hearings in the 98th Congress. See, Hearings before the Subcommittee on Patents, Copyrights and Trademarks of the Committee on the Judiciary on Privacy and Electronic Communications, September 12, 1984, S. Hrg. 98-1266.

The product of that hearing and subsequent discussions with the Department of Justice and private groups interested in promoting communications privacy, while protecting legitimate law enforcement needs and promoting technological innovation, was S. 1667, the Electronic Communications Privacy Act of 1985. Senators Leahy and Mathias introduced that bill on September 19, 1985.  On the same day, Congressmen Kastenmeier and Moorhead, the Chairman and Ranking Minority Member of the House Judiciary Subcommittee on Courts, Civil Liberties and the Administration of Justice introduced an identical bill, H.R. 3378.

In October 1985, the Office of Technology Assessment issued a report entitled 'Electronic Surveillance and Civil Liberties.'  That study concluded that current legal protections for electronic mail are 'weak, ambiguous, or non-existent,' and that 'electronic mail remains legally as well as technically vulnerable to unauthorized surveillance.'  'Federal Government Information Technology: Electronic Surveillance and Civil Liberties' (Washington, D.C.: U.S. Congress, Office of Technology Assessment, OTA-CIT-293, October 1985).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Subcommittee on Patents, Copyrights and Trademarks held a hearing on S. 1667 on November 13, 1985. Testimony was received from interested individuals and groups, including representatives of the telephone industry, the electronic mail industry, and the software and service industries. Representatives of the Department of Justice presented their views, and the subcommittee also received testimony from the American Civil Liberties Union and elicited technical information from the Institute of Electrical and Electronics Engineers.

As a result of those hearings, S. 1667 was superseded by a new bill to reflect the concerns raised by some of these groups, particularly the Department of Justice and radio hobbyists. On June 19, 1986, Senator Leahy, joined by Senator Mathias, introduced S. 2575.

On August 12, 1986, the Judiciary Committee Subcommittee on Patents, Copyrights and Trademarks favorably reported S. 2575, as amended, to the full Committee by voice vote.

**\*\*3559 \*5** On September 19, 1986, Senators Leahy and Mathias and Chairman Thurmond offered an amendment in the nature of a substitute to S. 2575. The Committee voted unanimously to favorably report the Electronic Communications Privacy Act of 1986, as amended, to the full Senate.

### III.  STATEMENT

A letter sent by first class mail is afforded a high level of protection against unauthorized opening by a combination of constitutional provisions, case law, and U.S. Postal Service statutes and regulations. Voice communications transmitted via common carrier are protected by title III of the Omnibus Crime Control and Safe Streets Act of 1968.

But there are no comparable Federal statutory standards to protect the privacy and security of communications transmitted by new noncommon carrier communications services or new forms of telecommunications and computer technology. The is so, even though American citizens and American businesses are using these new forms of technology in lieu of, or side-by-side with, first class mail and common carrier telephone services.

This gap results in legal uncertainty. It may unnecessarily discourage potential customers from using innovative communications systems. It probably encourages unauthorized users to obtain access to communications to which they are not a party. It may discourage American businesses from developing new innovative forms of telecommunications and computer technology. The lack of clear standards may expose law enforcement officers to liability and may endanger the admissibility of evidence.

Most importantly, the law must advance with the technology to ensure the continued vitality of the fourth amendment. Privacy cannot be left to depend solely on physical protection, or it will gradually erode as technology advances. Congress must act to protect the privacy of our citizens. If we do not, we will promote the gradual erosion of this precious right.

The Committee believes that S. 2575, te Electronic Communications Privacy Act of 1986, represents a fair balance between the privacy expectations of American citizens and the legitimate needs of law enforcement agencies.

The Justice Department strongly supports S. 2575 because it strengthens the cur-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541,  1986 U.S.C.C.A.N. 3555)**

rent wiretap law from a law enforcement perspective.  Specifically, it expands the
the list of felonies for which a voice wiretap order may be issued and the list of
Justice Department officials who may apply for a court order to place a wiretap.
The bill also includes provisions making it easier for law enforcement officials to
deal with a target who repeatedly changes telephones to thwart interception of his
communications and creates criminal penalties for those who notify a target of a
wiretap in order to obstruct it.  These provisions will be particularly helpful to
the Justice Department in its fight against drug trafficking.

   The organizations and individual corporations named below also support the prin-
ciples embodied in the legislation.

   Organizations:  Electronic Mail Assoc.; ADAPSO; Telocator Network of America; Cel-
lular Telecommunications Industry Assoc.; **3560 *6 ACLU; National Association of
Manufacturers (NAM); U.S. Chamber of Commerce; National Association of Broadcasters
(NAB); National Cable Television Assoc. (NCTA); National Association of Business &
Educational Radio (NABER); CBEMA; U.S. Telephone Assoc.; Videotext Industry Assoc.;
Information Industry Assoc.; Electronic Funds Transfer Assoc.; Radio and Television
News Directors Assoc.; Association of American Railroads; Institute of Electrical
and Electronics Engineers (IEEE); Direct Marketing Association; Utilities Telecommu-
nications Council; and Associated Credit Bureaus, Inc.

   Corporations:  AT&T; General Electric; IBM; GTE; EDS; ITT; MCI; CBS; ABC; NBC;
Tandy Corp. (Radio Shack); Trintex; Equifax; TRW; Source Telecomputing Corporation;
Chase Manhattan Bank; Motorola; Ameritech; Bell Atlantic; Bell South; Southwestern
Bell; NYNEX; Pacific Telesis; US West; and Associated Credit Services, Inc.

   A few points in the development of the Electronic Communications Privacy Act of
1986 should be noted here.  After Senators Leahy and Mathias introduced the bill in
June 1986, S. 2575 was referred to the Subcommittee on Patents, Copyrights and
Trademarks.  During the subcommittee markup session held on August 12, 1986, the
bill was further amended to clarify certain provisions.

   At the request of the FCC, in response to the recent Captain Midnight incident, in
which an individual in Florida interfered with the transmission of an HBO program
being relayed by satellite, the subcommittee included in the bill language to ad-
dress deliberate or malicious interference with satellite transmissions.  It also
added to title III of the bill related to installation and use of pen registers,
procedural requirements for orders to use 'trap and trace' devices.

   In order to underscore that the inadvertent receipt of a protected communica-
tion is not a crime, the subcommittee changed the state of mind requirement under
title III of the Omnibus Crime Control and Safe Streets Act of 1968 from 'willful'
to 'intentional.'  This change in the law addresses the concerns of radio scanners
that in the course of scanning radio frequencies in order to receive public commu-
nications, one could inadvertently tune through a protected communication like a
cellular telephone call. This provision makes clear that the inadvertent intercep-
tion of a protected communication is not unlawful under this Act.

   During subcommittee consideration, Senators Laxalt, Grassley, DeConcini and
Simpson expressed concerns about the bill's penalty structure for the interception
of certain satellite transmissions by home viewers.  Senators Leahy and Mathias
agreed that those concerns would be addressed during Committee consideration of the
Electronic Communications Privacy Act.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541, 1986 U.S.C.C.A.N. 3555)**

The Leahy-Mathias-Thurmond substitute for S. 2575, which was offered when the full
Committee considered this legislation, incorporated an amendment offered by Senator
Grassley. Senators Laxalt, McConnell, Simpson and Denton cosponsored Senator Grass-
ley's amendment.

Senator Grassley's amendment modifies the criminal penalties and civil liability
provisions of chapter 119 of title 18 of the United States Code so that there is a
two-track, tiered penalty structure for home viewing of private satellite transmis-
sions when the conduct **7 **3561 is not for a tortious or illegal purpose or for
purposes of direct or indirect commercial advantage or private commercial gain.

In a public action, under the Grassley amendment, a first offender would be sub-
ject to a suit by the Government for injunctive relief. If injunctive relief is
granted, one who violates the injunction would be subject to the full panoply of en-
forcement mechanisms within the court's existing authority, including criminal and
civil contempt. Second and subsequent offenses carry a mandatory $50 civil fine for
each violation. The term 'violation' in this context refers to each viewing of a
private video communication.

In a private civil action, a person harmed by the private viewing of such a satel-
lite communication may sue for damages. If the defendant has not previously been
enjoined in a government action as described above, and has not previously been
found liable in a civil suit, the plaintiff may recover the greater of his actual
damages or statutory damages of $50 to $500. A second offender (one who has been
found liable in a prior private civil action or one who has been enjoined in a gov-
ernment suit) is subject to liability for the greater of actual damages or statutory
damages of $100 to $1,000. Third and subsequent offenders are subject to the bill's
full civil penalties.

The Grassley amendment also takes outside the penalty provisions of the Electronic
Communications Privacy Act, the interception of a satellite transmission via audio
subcarrier if the transmission is intended for redistribution to facilities open to
the public, provided that the conduct is not for the purpose of direct or indirect
commercial advantage or private financial gain. Audio subcarriers intended for re-
distribution to the public include those for redistribution by broadcast stations
and cable and like facilities. They also include those for redistributions to
buildings open to the public like hospitals and office buildings that pump in music
which has been transmitted via subcarrier. As specified in the substitute, this au-
dio subcarrier exclusion does not apply to data transmissions or telephone calls.

The substitute amendment also incorporated Senator Simon's amendment. Senator Si-
mon had expressed concern that the Electronic Communications Privacy Act's penalties
were too severe for the first offender, who without an unlawful or financial pur-
pose, intercepts a cellular telephone call or certain radio communications related
to news-gathering.

Senator Simon's amendment reduces the penalty for such an interception of an unen-
crypted, unscrambled cellular telephone call to a $500 criminal fine. Unencrypted,
unscrambled radio communications transmitted on frequencies allocated under subpart
D of part 74 of the FCC rules are treated like private satellite video communica-
tions are under Senator Grassley's amendment.

Scanning enthusiasts have argued to the Committee that the mere monitoring of cel-
lular telephone calls should not be illegal. That argument ignores three important

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541,  1986 U.S.C.C.A.N. 3555)**

realities.  First, Congress, in passing the 1968 wiretap law already made willful
monitoring of such telephone calls illegal when at least part of the conversation is
carried by wire.  Second, unlike many signals which are more commonly scanned, the
design of the cellular telephone system makes the intentional monitoring of specific
calls more difficult because**8 **3562** they are handed off among cells. The Committee
is not convinced that these arguments overcome the need for protection of privacy
interests.

It has been suggested that the Federal Communications Commission consider labeling
requirements on cellular telephones, radio scanning equipment and private satellite
video communications.  The Commission might consider the feasibility of requiring
that cellular telephones be labeled to indicate that cellular calls are radio-based
communications, and as such, portions of the communication may be intercepted by
available scanning equipment and of requiring that scanning equipment be labeled to
indicate that the intentional interception of protected communications could be a
Federal criminal violation.  Finally, the Commission might consider the feasibility
of requiring those who transmit private satellite video communications to periodic-
ally transmit a crawl across the bottom of the screen indicating that such communic-
ations are protected.

## IV.  GLOSSARY

For reference, some of the new telecommunications and computer technologies re-
ferred to in the Electronic Communications Privacy Act of 1986 and this report are
described briefly below.  Treatment of these and other technologies under current
law is discussed in the House Report to its companion measure, H.R. 4952.  See House
Report 99-647.

## ELECTRONIC MAIL

Electronic mail is a form of communication by which private correspondence is
transmitted over public and private telephone lines.  In its most common form, mes-
sages are typed into a computer terminal, and then transmitted over telephone lines
to a recipient computer operated by an electronic mail company.  If the intended ad-
dressee subscribes to the service, the message is stored by the company's computer
'mail box' until the subscriber calls the company to retrieve its mail, which is
then routed over the telephone system to the recipient's computer.  If the addressee
is not a subscriber to the service, the electronic mail company can put the message
onto paper and then deposit it in the normal postal system.

Electronic mail systems may be available for public use or may be proprietary,
such as systems operated by private companies for internal correspondence.

## COMPUTER-TO-COMPUTER COMMUNICATIONS

Common computer-to-computer communications include the transmission of financial
records or funds transfers among financial institutions, medical records between
hospitals and/or physicians' offices, and the transmission of proprietary data among
the various offices of a company.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
(Cite as: S. REP. 99-541,  1986 U.S.C.C.A.N. 3555)

### ELECTRONIC BULLETIN BOARDS

  Electronic 'bulletin boards' are communications networks created by computer users
for the transfer of information among computers. *9 **3563 These may take the form
of proprietary systems or they may be noncommercial systems operating among computer
users who share special interests.  These noncommercial systems may involve fees
covering operating costs and may require special 'passwords' which restrict entry to
the system. These bulletin boards may be public or semi-public in nature, depending
on the degree of privacy sought by users, operators or organizers of such systems.

### MICROWAVE

  Microwave consists of extremely high frequency radio waves transmitted point-
to-point on line-of-sight paths between antennas located on towers or building tops
(in terrestrial microwave systems) and between satellites and earth station 'dish'
antennas (in satellite-based systems).

### CELLULAR TELEPHONES

  In 1981 the Federal Communications Commission approved the use of cellular tele-
phone services.  This technology uses both radio transmission and wire to make 'port-
able' telephone service available in a car, a briefcase, or in rural areas not
reached by telephone wire.
  In a cellular radiotelephone system, large service areas are divided into honey-
comb-shaped segments or 'cells'--each of which is equipped with a low-power trans-
mitter or base station which can receive and radiate messages within its parameters.
When a caller dials a number on a cellular telephone, a transceiver sends signals
over the air on a radio frequency to a cell site. From there the signal travels over
phone lines or a microwave to a computerized mobile telephone switching office
('MTSO') or station.  The MTSO automatically and inaudibly switches the conversation
from one base station and one frequency to another as the portable telephone, typic-
ally in a motor vehicle, moves from cell to cell.
  Cellular technology, because it is more complex, is more difficult to intercept
than traditional mobile telephones; it is, however, more accessible than microwave
transmissions.  Cellular telephone calls can be intercepted by either sophisticated
scanners designed for that purpose, or by regular radio scanners modified to inter-
cept cellular calls.

### CORDLESS TELEPHONES

  A cordless telephone consists of a handset and a base unit wired to a landline and
a household/business electrical current.  A communication is transmitted from the
handset to the base unit by AM or FM radio signals.  From the base unit the commu-
nication is transmitted over wire, the same as a regular telephone call.  The radio
portions of these telephone calls can be intercepted with relative ease using stand-
ard AM radios.

### ELECTRONIC PAGERS

                    © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541,  1986 U.S.C.C.A.N. 3555)**


   Electronic pagers are radio activated devises through which a user is notified of
another's attempt to contact the carrier of the portable paging unit.  These are in
wide use among persons who are away from their homes or offices--or, more precisely,
away from **3564 *10** telephones or two-way radios--yet still need to be reachable by
others.
   Pagers take on one of three basic forms:  'tone only,' 'display' and 'tone and
voice pagers.'  The 'tone only' device emits a 'beep' or other signal to inform the
user that a message is waiting, and where that message can be retrieved by the
user's making a phone call to a predetermined number (usually an office or answering
service).  'Display' pagers are equipped with screens that can display visual mes-
sages, usually the telephone number of the person seeking to reach the person being
paged.  The party seeking to make contact with the user is instructed to provide a
message, usually by pushing the buttons of a touch-tone telephone; this message is
stored by the paging company's computer until it can be transmitted to the user's
pager, where the message can then be read directly by the user, obviating the need
for the user to make a telephone call to retrieve the message.  The most sophistic-
ated type of pager is the 'tone and voice' model.  It can receive a spoken message
that the paging company's computer has taken from the party seeking to contact the
unit's user.  After the beep tone is made, the device 'repeats' the recorded mes-
sage.  This requires that a radio signal containing voice communications be sent
from the paging company's base to the mobile unit.

                      PEN REGISTERS/TRAP AND TRACE DEVICES

   Pen registers are devices that record the telephone numbers to which calls have
been placed from a particular telephone.  These capture no part of an actual tele-
phone conversation, but merely the electronic switching signals that connect two
telephones.  The same holds true for trap and trace devices, which record the num-
bers of telephones from which calls have been placed to a particular telephone.

                    ELECTRONIC TRACKING DEVICES (TRANSPONDERS)

   These are one-way radio communication devices that emit a signal on a specific ra-
dio frequency.  This signal can be received by special tracking equipment, and al-
lows the user to trace the geographical location of the transponder.  Such 'homing'
devices are used by law enforcement personnel to keep track of the physical where-
abouts of the sending unit, which might be placed in an automobile, on a person, or
in some other item.

                           REMOVE COMPUTER SERVICES

   In the age of rapid computerization, a basic choice has faced the users of com-
puter technology.  That is, whether to process data inhouse on the user's own com-
puter or on someone else's equipment. Over the years, remote computer service com-
panies have developed to provide sophisticated and convenient computing services to
subscribers and customers from remote facilities.  Today businesses of all sizes-
-hospitals, banks and many others--use remote computing services for computer pro-

                 © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541,  1986 U.S.C.C.A.N. 3555)**

cessing.  This processing can be done with the customer or subscriber using the fa-
cilities of the remote computing service in essentially a time-sharing arrangement,
or it can be accomplished by the service provider on the basis of information **3565
*11 supplied by the subscriber or customer.  Data is most often transmitted between
these services and their customers by means of electronic communications.

## V.  SECTION-BY-SECTION ANALYSIS

   Section 1 provides that the short title of the bill is the 'Electronic Communica-
tions Privacy Act of 1986.'

### TITLE I--INTERCEPTION OF COMMUNICATIONS AND RELATED MATTERS

   Under current law, the interception of wire and oral communications are governed
by chapter 119 of title 18 (18 U.S.C. 2510 et seq.).  Title I of the Electronic Com-
munications Privacy Act expands chapter 119 to take into account modern advances in
electronic telecommunications and computer technology.

Section 101--Federal penalties for the interception of communications

   Definitions for terms used in chapter 119 and new chapter 121 of title 18 are set
out in section 101 of the bill.  This section also describes conduct which is not
unlawful under this Act and modifies the penalties set out in existing section 2511
of title 18.  It provides that the remedies in chapter 119 are the exclusive stat-
utory remedies for violations of this chapter.  Technical amendments to chapter 119
are also included in Section 101 of the bill.

Subsection 101(a)--Definitions

   Subsection 101(a) of the Electronic Communications Privacy Act sets out the defin-
itions and amendments to definitions used in chapter 119 and new chapter 121 of
title 18.  Paragraph 101(a)(1) amends the definition of the term 'wire communica-
tion' in subsection 2510(1) of title 18.
   Subparagraph (A) amends that definition to include aural transfers.  As defined in
proposed subsection 2510(18) of title 18, 'aural transfers' are those which include
the human voice at any point between and including the points of origin and recep-
tion.
   Subparagraph (B) specifies that the use of wire, cable or other similar connec-
tions for the transmission of communications includes the use of such connections in
a switching station.  This subparagraph makes clear that cellular communications-
-whether they are between two cellular telephones or between a cellular telephone
and a 'land line' telephone--are included in the definition of 'wire communications'
and are covered by the statute.  As noted below, the bill distinguishes between
cordless and cellular telephones.
   Recognizing that since deregulation and the divestiture of AT&T, many different
companies, not just common carriers, offer and use telephone and other communica-
tions services, subparagraph (C) deletes from the definition of 'wire communication'
the requirement that communications must be transmitted via common carrier to be
covered by the federal wiretap statute.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

   Subparagraph (D) specifies that wire, cable or similar connections furnished or
operated by any person engaged in providing or operating such facilities for the
transmission of 'communications **3566 *12 affecting interstate or foreign com-
merce,' are within the definition of a 'wire communication.' This language recog-
nizes that private networks and intra-company communications systems are common
today and brings them within the protection of the statute. However, that language
is not meant to suggest that the Electronic Communications Privacy Act applies to
interceptions made outside the territorial United States.  Like the Omnibus Crime
Control and Safe Streets Act of 1968 which it revises, the Electronic Communications
Privacy Act regulates only those interceptions conducted within the territorial
United States.

   The Senate Judiciary Committee's Subcommittee on Patents, Copyrights and Trade-
marks amended subparagraph (D) to specify that wire communications in storage like
voice mail, remain wire communications, and are protected accordingly.

   The combined effect of subparagraphs (A) through (D) is to clarify that the term
'wire communication' means the transfer of a communication which includes the human
voice at some point.  The transfer must be made in whole or in part through the use
of communication transmission facilities by the aid of wire, cable, or other like
connection, including fiber optics.  The facilities may be furnished or operated by
any person engaged in providing or operating such facilities for the transmission of
interstate or foreign communications or he may provide or operate those facilities
for the transmission of communications affecting interstate or foreign commerce.

   Thus, a wire communication encompasses the whole of a voice telephone transmission
even if part of the transmission is carried by fiber optic cable or by radio--as in
the case of cellular telephones and long distance satellite or micowave facilities.
The conversion of a voice signal to digital form for purposes of transmission does
not render the communication non-wire.  The term 'wire communication' includes ex-
isting telephone service, and digitized communications to the extent that they con-
tain the human voice at the point of origin, receiption, or some point in between. A
private telephone system established by a company whose activities affect interstate
commerce, would also be covered.

   It should be noted that an improperly mechanical reading of the phrase 'in whole
or in part * * * by the aid of wire * * *' could sweep in virtually all voice commu-
nications made with the aid of any electronic equipment, inasmuch as virtually all
such equipment includes in its assembly some length of wire or the equivalent.  The
quoted is intended to refer to wire that carries the communication to a significant
extent from the point of origin to the point of reception, even in the same build-
ing.  It does not refer to wire that is found inside the terminal equipment at
either end of the communication.

   Subparagraph (D) specifies that the term 'wire communication' does not include the
radio portion of a cordless telephone communication transmitted between the cordless
handset and the base unit.  Because communications made on some cordless telephones
can be intercepted easily with readily available technologies, such as an AM radio,
it would be inappropriate to make the interception of such a communication a crimin-
al offense.  The wire portion of a cordless communication remains fully covered,
however.

   **3567 *13 Section 101(a)(2) of the Electronic Communications Privacy Act amends

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the definition of 'oral communication' in current section 2510(2) of title 18 to ex-
clude electronic communications.  There have been cases involving radio communica-
tions in which the court having determined that the radio communication was not a
wire communication then analyzes it in privacy terms to determine if it is an oral
communication.  The bill rejects that analysis by excluding electronic communica-
tions from the definition of oral communications.

An oral communication is an utterance by a person under circumstances exhibiting
an expectation that the communication is not subject to interception, under circum-
stances justifying such an expectation.  In essence, an oral communication is one
carried by sound waves, not by an electronic medium.

Section 101(a)(3) of the Electronic Communications Privacy Act amends the defini-
tion of the term 'intercept' in current section 2510(4) of title 18 to cover elec-
tronic communications.  The definition of 'intercept' under current law is retained
with respect to wire and oral communications except that the term 'or other' is in-
serted after 'aural.'  This amendment clarifies that it is illegal to intercept the
non-voice portion of a wire communication.  For example, it is illegal to intercept
the data or digitized portion of a voice communication.

Subsection 101(a)(4) of the Electronic Communications Privacy Act amends existing
section 2510(5) of title 18 to clarify that telephone equipment provided by the user
and connected to the facilities of a service provider is not an 'electronic, mechan-
ical or other device,' provided that it is used in the ordinary course of the user's
business.

The Committee notes that proposed section 2510's definition of an  'electronic,
mechanical or other device' includes any combination of parts designed or intended
for use in converting those parts into such a device or apparatus and from which
such a device or apparatus may be readily assembled. The Committee also notes that
section 2512, as amended by the Electronic Communications Privacy Act, prohibits the
manufacture, distribution, possession, and advertising only of devices primarily
useful for surreptitious interception.

Subsection 101(a)(5) of the Electronic Communications Privacy Act amends current
section 2510(8) of title 18 to exclude from the definition of the term 'contents,'
the identity of the parties or the existence of the communication.  It thus distin-
guishes between the substance, purport or meaning of the communication and the ex-
istence of the communication or transactional records about it.

The Supreme Court has clearly indicated that the use of pen registers does not vi-
olate either chapter 119 of title 18 or the fourth amendment. Subsection 101(a)(5)
of this legislation makes that policy clear.  It should be read in conjunction with
Title III of the Electronic Communications Privacy Act which adds new chapter 206 on
pen registers and trap and trace devices to title 18. Subsection 101(a)(5) of the
bill does not affect the installation or use of pen registers under the Foreign In-
telligence Surveillance Act (FISA), 50 U.S.C. 1801 et. seq.  Similarly, the omission
of a conforming amendment to the definition of 'contents' in section 705 of **3568
*14 title 47 is not intended to affect the current law under that section with re-
spect to pen registers. The use of pen registers has been found not to violate sec-
tion 705. See Hodge v. Mountains Tel. & Telegraph Co., 555 F.2d 254 (9th Cir. 1977).

Subsection 101(a)(6) of the Electronic Communications Privacy Act adds to section
2510 of title 18 definitions for the terms 'electronic communication,' 'electronic

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541,  1986 U.S.C.C.A.N. 3555)**

communications system,' 'electronic communication service,' 'readily accessible to
the general public,' 'electronic storage,' and 'aural transfer.'

An 'electronic communication' is defined in proposed subsection 2510(12) of  title
18 as 'any transfer of signs, signals, writing, images, sounds, data, or intelli-
gence of any nature transmitted in whole or in part by a wire, radio, electromagnet-
ic, photoelectronic or a photooptical system that affects foreign or interstate com-
merce.'  The following are explicitly excluded from the definition:  (A) the radio
portion of a cordless telephone communication transmitted between the cordless phone
handset and the base unit; (B) any wire or oral communication; (C) any communication
made through a tone-only paging device; (D) any communication from a tracking
device.

As a general rule, a communication is an electronic communication protected by the
federal wiretap law if it is not carried by sound waves and cannot fairly be charac-
terized as containing the human voice.  Communications consisting solely of data,
for example, and all communications transmitted only by radio are electronic commu-
nications.  This term also includes electronic mail, digitized transmissions, and
video teleconferences.  Although radio communications are within the scope of the
Act, the provisions of the Electronic Communications Privacy Act directed specific-
ally to radio do not affect the applicability of section 705 of the Communications
Act of 1934, as amended, to actions by members of the public.

Under proposed subsection 2510(13), the term 'user' is defined as any person or
entity who (A) uses an electronic communication service and (B) is duly authorized
by the service provider to do so.

An 'electronic communication system' is defined in proposed subsection 2510(14).
Such a system encompasses any wire, radio, electromagnetic, photooptical or photo-
electronic facilities for the transmission of electronic communications as well as
any computer facilities or related electronic equipment for the electronic storage
of such communications.

An 'electronic communication service' is defined in proposed subsection 2510(15)
of title 18 as a service which provides its users the ability to send or to receive
wire or electronic communications.  Such services can be provided through the same
facilities.  Existing telephone companies and electronic mail companies are pro-
viders of electronic communication services. Other services like remote computing
services may also provide electronic communication services.

Radio communications 'readily accessible to the general public' are defined in
proposed subsection 2510(16).  Radio communications are considered readily access-
ible to the general public unless they fit into one of five specified categories.

**3569 *15** As described below, subsection 101(b) of the Electronic Communications
Privacy Act provides an exception to the general prohibitions on interception for
electronic communications which are configured to be readily accessible to the gen-
eral public.  Thus, the radio communications specified in proposed subsection
2510(16) are afforded privacy protections under this legislation unless another ex-
ception applies.

As specified in paragraph (A) of proposed subsection 2510(16), scrambled or en-
crypted radio communications are not readily accessible to the general public.  The
terms are used in their technical sense.  To 'encrypt' or to 'scramble' means to
convert the signal into unintelligible form by means intended to protect the con-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541,  1986 U.S.C.C.A.N. 3555)**

tents of a communication from unintended recipients.  Methods which merely change
the form of a plaintext message, e.g., a device which converts an analog signal to a
digital stream, does not provide 'encryption' within the meaning of this bill.  Nor
does the use of a word code, no matter how sophisticated, amount to scrambling or
encryption.  Examples of scrambling techniques which are currently available include
the data encryption standard (DES).

  As specified in paragraph (B) radio communications transmitted through modulation
techniques whose essential parameters have been withheld from the public in order to
preserve the privacy of the communication are not readily accessible to the general
public. This paragraph (B) refers to spread spectrum radio communications. Spread
spectrum technology usually involves the transmission of a signal on different fre-
quencies where the receiving station must possess the necessary algorythm in order
to reassemble the signal.

  As specified in paragraph (C) of proposed subsection 2510(16) of title 18, radio
communications carried on a subcarrier or other signal subsidiary to a radio trans-
mission are protected by the Electronic Communications Privacy Act. This category
includes, for example, data and background music services carried on FM subcarriers.
It also includes data carried on the Vertical Blanking Interval (VBI) of a televi-
sion signal.

  Radio communications transmitted over a system provided by a common carrier are
not readily accessible to the general public with one exception.  That exception is
for tone-only paging systems.  As a result of that exception, the interception of
tone-only paging system transmissions will not be prohibited by this law.  However,
the unauthorized interception of a display paging system, which involves the trans-
mission of alphanumeric characters over the radio, carried by a common carrier, is
illegal.

  As specified in proposed paragraph (E), radio communications transmitted on fre-
quencies allocated under parts 25 and 94 and subparts D, E, an F of part 74 of the
FCC rules are protected by the Electronic Communications Privacy Act. These commu-
nications include satellite communications, auxiliary broadcast services and private
microwave services, each of which routinely carries private business or personal
communications.  Two-way voice radio communications made on frequencies shared with
services outside part 74 are expressly excluded from this category of protected com-
munications.

  **\*\*3570 \*16** The liability incurred under chapter 119 for the interception of the
communications described in proposed paragraph 2510(16(E) may be limited.  Section
101(b) of the Electronic Communications Privacy Act sets out exceptions from liabil-
ity under this Act with respect to electronic communications and section 101(d) es-
tablishes the penalty structure for violations of this Act.

  The term 'electronic storage' is defined in proposed subsection 2510(7) of title
18.  Electronic storage means (A) the temporary, intermediate storage of a wire or
electronic communication incidental to its transmission as well as (B) the storage
of such communication by an electronic communications service for backup protection.
The term covers storage within the random access memory of a computer as well as
storage in any other form including storage of magnetic tapes, disks or other media.
Thus, for example, section 2701's prohibitions against unauthorized access to wire
or electronic communications while they are in electronic storage would prohibit un-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

authorized access to such a communication while it is stored on magnetic tape or
disk. The section 2701 prohibitions similarly would apply to information held on
magnetic tape or disk pursuant to an agreement to provide remote computing services.

   The last new definition in subsection 101(a)(6) of the Electronic Communications
Privacy Act is the definition of an 'aural transfer' in proposed subsection
2510(18). An aural transfer means any transfer containing the human voice at any
point between and including the points of origin and reception. Under this defini-
tion, voice messages transferred over a paging system are protected. It is intended
that computer-generated or otherwise artificial voices are not included in this
definition and thus will not be part of a 'wire communication.' They would,
however, be part of an 'electronic communication.'

   It is important to recognize that a transaction may consist, in part, of both
electronic communications and wire or oral communications as those terms are defined
in section 2510 of title 18, as amended by the Electronic Communications Privacy
Act. Accordingly, different aspects of the same communication might be characterized
differently. For example, the transmission of data over the telephone is an elec-
tronic communication. If the parties use the line to speak to one another between
data transmissions, those communications would be wire communications. At the same
time, for a person overhearing one end of the telephone conversation by listening in
on the oral utterances of one of the parties, those utterances are oral communica-
tions.

   Although this bill does not address questions of the application of title III
standards to video surveillance and only deals with the interception of closed cir-
cuit television communications to a limited extent, closed circuit television commu-
nications do provide another example of the importance of, and the interrelationship
between, the definitions contained in this legislation. If a person or entity trans-
mits a closed circuit television picture of a meeting using wires, microwaves or an-
other method of transmission, the transmission itself would be an electronic commu-
nication. Interception of the picture at any point without either consent or a court
order would be a violation of the statute. By contrast, if law enforcement offi-
cials were to install their own cameras and create their own **3571 *17 closed cir-
cuit television picture of a meeting, the capturing of the video images would not be
an interception under the statute because there would be no interception of the con-
tents of an electronic communication. Intercepting the audio portion of the meeting
would be an interception of an oral communication, and the statute would apply to
that portion.

Section 101(b)--Exceptions with respect to electronic communications

   Subsection 2511(1) of title 18 of the United States Code sets out prohibitions
against the interception, disclosure and use of wire or oral communications. Sub-
section 2511(2) specifies conduct which is not unlawful under chapter 119 of title
18.

   Subsection 101(b) of the Electronic Communications Privacy Act amends Subsection
2511(2). Paragraph 101(b), consistent with other provisions of this legislation,
deletes references to common carriers. It thus clarifies that any service provider
who discloses the existence of an interception or surveillance or the device used to
accomplish the interception or surveillance would be liable for civil damages under

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541,  1986 U.S.C.C.A.N. 3555)**


Section 2520 of title 18.
   Paragraph 101(b)(2) of the Electronic Communications Privacy Act amends  section
2511(2)(d) of title 18 by striking out 'or for the purpose of committing any other
injurious act'.  Under current Federal law it is permissible for one party to con-
sent to the interception of a conversation unless that interception is for illegal,
tortious or other injurious purposes such as blackmail.  In numerous court cases the
term 'other injurious purposes' has been misconstrued.  Most troubling of these
cases have been attempts by parties to chill the exercise of first amendment rights
through the use of civil remedies under this chapter.  For example, in Boddie v.
American Broadcasting Co., 731 F.2d 333 (6th Cir. 1984), the plaintiff, whose con-
versations were recorded by a journalist, sued.  Despite the consent of the reporter
who was a party to the conversation, the plaintiff claimed that the recording of the
conversation was illegal because it was done for an improper purpose, to embarrass
her.  While the appeals court decision in Boddie merely sent the case back for fur-
ther factual development, it is clear from the facts of the case that the term 'im-
proper purpose' is overly broad and vague. The court's opinion suggests that if the
network intended to cause 'insult and injury' to plaintiff Boddie, she might be en-
titled to recover.  This interpretation of the statute places a stumbling block in
the path of even the most scrupulous journalist.  Many news stories have been
brought to light by recording a conversation with the consent of only one of the
parties involved-- often the journalist himself.  Many news stories are embarrassing
to someone. The present wording of section 2511(2)(d) not only provides such a per-
son with a right to bring suit, but it also makes the actions of the journalist a
potential criminal offense under section 2511, even if the interception was made in
the ordinary course of responsible news-gathering activities and not for the purpose
of committing a criminal act or a tort.  Such a threat is inconsistent with the
guarantees of the first amendment.  Inasmuch as chapter 119 as amended by the Elec-
tronic Communications Privacy Act continues to prohibit interceptions made for the
purpose of committing either a **3572 *18 crime or a tort (including defamation),
the public will be afforded ample portection against improper or unscrupulous inter-
ception.
   Subsection 101(b)(3) of the Electronic Communications Privacy Act amends section
2511(2)(f) of title 18 to clarify that nothing in chapter 119 as amended or in pro-
posed chapter 121 affects existing legal authority for U.S. Government foreign in-
telligence activities involving foreign electronic communications systems.  The pro-
vision neither enhances nor diminishes existing authority for such activities; it
simply preserves the status quo.  It does not provide authority for the conduct of
any intelligence activity.
   Further the Senate expects that the practice of providing to the House and Senate
Intelligence Committees proposed changes in relevant executive branch procedures and
regulations governing the conduct of intelligence activities, including those in-
volving electronic surveillance, physical searches, and the minimization of informa-
tion collected concerning U.S. persons will be continued.  As in the past, the Sen-
ate expects that any relevant changes in these procedures and regulations will be
provided to the Senate and House Intelligence Committees prior to their taking ef-
fect.
   Finally, since Congress last addressed the issue of privacy communications in a

comprehensive fashion, the technologies of communication and interception have
changed dramatically, and are expected to continue to do so.  These factors have
raised serious issues about the protection of the privacy interests of U.S. cit-
izens, which are of great concern to the Senate and to the American people.  For
this reason, the Senate wishes to emphasize the obligation of the heads of intelli-
gence agencies to continue to keep the Select Committee on Intelligence fully and
currently informed of all intelligence activities pursuant to title V of the Nation-
al Security Act of 1947.

   Subsection 101(b)(4) of the Electronic Communications Privacy Act amends  section
2511(2)(g) of title 18 of the United States Code.  It sets out new exemptions from
criminal liability applicable to the technologies which this legislation adds to the
privacy protections of the federal wiretap law. Proposed section 2511(2)(g) provides
that it shall not be unlawful under chapters 119 or 121 of title 18 for any person
to engage in the conduct described in its five subparagraphs.

   Under proposed section 2311(2)(g)(i), it is permissible to intercept electronic
communications made through an electronic communication system configured so that
the communication is 'readily accessible to the general public.'  That term is
defined with respect to radio communications in proposed section 210(16) of title
18.  The term 'configure' is intended to establish an objective standard of design
configuration for determining whether a system receives privacy protection.

   Under this provision, it would not be unlawful to intercept subcarrier and UBI
communications that are transmitted for the use of the general public. Such 'public'
communications would include the stereo subcarrier used in FM broadcasting or data
carried on the VBI to provide closed-captioning of TV programming for the hearing-
impaired.

   Under proposed section 2511(g)(ii) it is permissible to intercept any radio commu-
nication which is transmitted (I) by any station **3573 *19 for the use of the gen-
eral public, or that relate to ships, aircraft, vehicles or persons in distress;
(II) by any government, law enforcement, civil defense, private land mobile or pub-
lic safety communications system (including police and fire), that is readily ac-
cessible to the general public; (III) by a station operating on an authorized fre-
quency within the bands allocated to amateur, citizens band or general mobile radio
services; or (IV) by any marine or aeronautical communications system.

   Traditionally, these radio communications have been free from prohibitions on mere
interception.  Amateur radio communications, including those utilizing telephone in-
terconnect or amateur radio computer linked message systems are certainly not those
to which this legislation is aimed.  All amateur radio communications conducted on
radio frequencies allocated to the Amateur Radio Services are exempt from this
bill's prohibitions against the interception of electronic communications.

   Radio services readily accessible to the general public are exempt from this act's
prohibitions against interception by the generic exception contained in proposed
paragraph 2511(2)(g)(i).

   Proposed section 1511(2)(g)(iii) addresses conduct which is either prohibited or
permitted by the Communications Act of 1934, as amended.  Under clause (I) of sub-
paragraph (iii) it is not unlawful under chapter 119 or 121 of title 18 for any per-
son to engage in conduct prohibited by section 633 of the Communications Act of 1934
relating to cable piracy.  If an individual violates the criminal prohibitions in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

section 633 of the Communications Act, he cannot also be charged under chapters 119
or 121 of title 18.

   Clause (II) exempts from the prohibitions on interception contained in this Act
conduct which is excepted from section 705(a) of the Communications Act by virtue of
section 705(b) of that Act. Thus, if conduct is permitted under section 705(b) of
the Communications Act, engaging in that conduct would not be a crime under chapters
119 or 121 of title 18, as amended by the Electronic Communications Privacy Act.
Determination of whether conduct is permitted under section 705(b) must, of course,
be the result of an examination of the statute, relevant legislative history, exist-
ing court interpretations and constructions given the statute by appropriate federal
regulatory entities.

   Proposed section 2511(2)(g)(iv) of title 18 exempts from the criminal prohibition
contained in chapters 119 and 121 of that title, the interception of any wire or
electronic communication the transmission of which is causing harmful interference
to any lawfully operating station, to the extent necessary to identify the source of
such interference.

   Finally, proposed section 2511(2)(g)(v) exempts interceptions of radio communica-
tion by other users of the same frequency when such communication is made through a
system that utilizes frequencies monitored by individuals engaged in the provision
or use of such a system. This exemption clarifies that it is not unlawful for users
of the same frequency, who must listen to be sure a channel is clear before using
it, to do so. The exception applies to users of common and non-common carrier sys-
tems, but does not apply if the communication is scrambled or encrypted.

   **\*3574 \*20** Subsection 101(b)(4) of the Electronic Communications Privacy Act
amends subsection 2511(2) of title 18 to add a new paragraph (h) to that subsection.
Proposed subparagraph (i) of paragraph (h) clarifies that the use of pen registers
and trap and trace devices are not regulated by chapter 119 of title 18. The use of
those devices will be regulated by new chapter 206 of title 18 as amended by the
Electronic Communications Privacy Act.

   Subparagraph (ii) of paragraph (h) states that no violation of this chapter occurs
if a provider of wire or electronic communication service records the fact that a
communication was initiated or completed in order to protect such provider, another
provider furnishing service toward the completion of the wire or electronic commu-
nication or a user of that service, from fraudulent, unlawful or abusive use of such
a service. This provision permits the electronic and wire communication providers
to protect themselves and their customers.

Subsection 101(c)--Technical and conforming amendments

   Subsection (c) sets out technical and conforming amendments to chapter 119 of
title 18. Paragraph (c)(1) adds 'electronic communication' in appropriate places
throughout the chapter. Paragraph (c)(2) amends the heading of the chapter. Para-
graph (c)(3) amends the table of chapters to add electronic communications to the
table. Paragraphs (4), (5), (6), (7), and (8) of subsection 101(c) of the Electron-
ic Communications Privacy Act make appropriate technical amendments to delete the
term 'common carrier' and substitute in its place 'provider of wire or electronic
communication.'

   Section 2511(2)(a)(i), as amended, specifies that it is not unlawful for the em-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ployees of providers of wire or electronic communication services to intercept, dis-
close or use customer communications in the normal course of employment while en-
gaged in any activity which is a necessary incident to the rendition of the service
or to the protection of the rights or property of the provider, except that a pro-
vider of wire communication service to the public shall not utilize service ob-
serving or random monitoring except for mechanical or service quality checks.

In applying the second clause only to wire communications, this provision reflects
an important technical distinction between electronic communications and traditional
voice telephone service. The provider of electronic communications services may have
to monitor a stream of transmissions in order to properly route, terminate, and oth-
erwise manage the individual messages they contain. These monitoring functions,
which may be necessary to the provision of an electronic communication service, do
not involve humans listening in on voice conversations. Accordingly, they are not
prohibited. In contrast, the traditional limits on service 'observing' and random
'monitoring' do refer to human aural interceptions and are retained with respect to
voice or 'wire' communications.

Subsection 101(d)--Penalties modification

Subsection 101(d) of the Electronic Communications Privacy Act modifies the gener-
al penalty structure for violations of this chapter. It sets out proposed subsec-
tions (4) and (5) of section 2511 of title 18. Subsection (4) sets out the criminal
penalties for violations **3575 *21 of subsection 2511(1). Subsection (5) outlines
the injunctive relief available to the federal government in the case of specified
conduct related to private satellite video communications that are not scrambled or
encrypted and to communications transmitted on frequencies allocated under subpart D
of part 74 of the FCC rules that are not scrambled or encrypted.

The general rule as set out in proposed paragraph 2511(4)(a) is that a violation
is punishable as a 5-year felony. Unless one of the exceptions in proposed subsec-
tion 2511(4)(b) or subsection 2511(5) applies, a person violating section 2511(1)
will be liable for a fine under this chapter, imprisonment up to 5 years, or both.
The fines under the chapter are set by section 3623 of title 18. That section
provides for a different maximum fine level for felonies or misdemeanors resulting
in death. Individual defendants can be fined up to $250,000 and organizations can
be fined up to $500,000.

As stated in proposed paragraph 2511(14)(b), the first exception to the general
rule that violations are 5-year felonies, applies to unscrambled, unencrypted radio
communications provided that the conduct is a first offense and is not for a tor-
tious or illegal purpose or purposes of direct or indirect commercial advantage or
private financial gain. If the radio communication is scrambled or encrypted, if
the person violating the statute has been found guilty of a prior offense, or if his
conduct was for one of the enumerated bad purposes, the conduct remains punishable
as a 5-year felony.

As stated in subparagraph (ii) of proposed paragraph 2511(4)(b), for first offend-
ers whose conduct was not for one of the enumerated bad purposes, if the communica-
tion is not scrambled or encrypted and it is the radio portion of a cellular tele-
phone, public land mobile radio service or paging service communication, then the
violator will be subject to a $500 criminal fine. Otherwise, as stated in clause (i)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of proposed paragraph 2511(4)(b), the conduct is punishable as a one-year misdemeanor with fines of up to $100,000, 18 U.S.C. 3623, unless the conduct is that described in subsection (5).

It should be noted that the exceptions set out in proposed paragraph 2511(4)(b) apply only to radio communications. The interception of 'wire' communications remain punishable as five-year felonies. The interception of the wire portion of a cellular telephone call, for example, is a five-year felony.

Proposed paragraph 2511(4)(c) decriminalizes certain conduct unless it is for the purposes of direct or indirect commercial advantage or private financial gain. The terms 'direct or indirect commercial advantage or private financial gain' are intended to have the same meaning as those terms have when they are used in 47 U.S.C. 705(b).

This exception from the criminal provisions of the Electronic Communications Privacy Act applies to the interception of an unencrypted, unscrambled satellite transmission that is transmitted (i) to a broadcasting station for purposes of retransmission to the general public; or (ii) as an audio subcarrier intended for redistribution to facilities open to the public, but not including data transmissions or telephone calls. The conduct described in subparagraphs (i) and (ii) is not an offense under this chapter and is not subject to civil liability under this chapter.

**\*\*3576 \*22** Subparagraph (i) decriminalizes the interception of 'network feeds' under title 18. Such conduct will be governed exclusively by section 705 of the Communications Act (47 U.S.C. 705).

Subparagraph (ii) descriminalizes the interception of material transmitted as an audio subcarrier provided that the information is intended for redistribution to facilities open to the public. Audio subcarriers intended for redistribution to facilities open to the public include those for redistribution by broadcast stations, cable TV systems and like facilities. They also include those for redistribution to buildings open to the public, and thus, it would not be unlawful to intercept music transmitted via an audio subcarrier if it is intended for redistribution to buildings like hospitals and office buildings which pump music into their lobbies and other public areas.

Subparagraph (ii) does not apply to data transmissions or telephone calls. The interception of those transmissions, like the interception of transmissions made for the enumerated bad purposes, would be punishable as 5-year felonies.

The private viewing of satellite cable programming, network feeds and certain audio subcarriers will continue to be governed exclusively by section 705 of the Communications Act of 1934, as amended, and not by chapter 119 of title 18 of the United States Code.

A new government action for injunctive relief is set out in proposed subsection 2511(5) of title 18. This new subsection was created to underscore that this public injunctive action is distinct from the criminal penalties set out in subsection (4).

Its exceptions apply only if the communication is not scrambled or encrypted and the conduct is not for one of the enumerated bad purposes. Clause (A) refers to the private or home viewing of a private satellite video communication. With regard to the home viewing of private satellite video communications, for purposes of this provision and proposed section 2520, the Committee views as scrambling that type of multiplexing [FN4] in which the audio and video portions of a communication are

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541,  1986 U.S.C.C.A.N. 3555)**

split, requiring special equipment to reassemble the whole communication (generally
a videoteleconference) before it can be received in intelligible form.  Clause (B)
refers to radio communications transmitted on frequencies allocated under subpart D
of part 74 of the FCC rules.

   Under proposed clause 2511(5)(a)(ii)(A), if the violation is a first offense and
the person has not previously been found liable in a private civil action under sec-
tion 2520 of title 18, the government may sue for appropriate injunctive relief.
Under proposed clause (B) if the violation is a second or subsequent offense or the
person has previously been found liable under section 2520, he shall be subject to a
mandatory $500 civil fine.

   Proposed paragraph (b) of subsection 2511(5) clarifies that the court may use any
means within its existing authority, including civil or criminal contempt, to en-
force an injunction issued to an individual under this subsection. Paragraph (b)
also requires that the court impose a civil fine of $500 or more for each violation
of such **3577 *23 an injunction. The term 'violation' in this context refers to
each viewing of a private video communication and to each reception of a part 74 D
radio communication.

Subsection 101(e)--Exclusivity of remedies with respect to electronic communications

   Subsection 101(e) of the Electronic Communications Privacy Act amends subsection
2518(10) of title 18 to add a paragraph (c) which provides that with respect to the
interception of electronic communications, the remedies and sanctions described in
this chapter are the only judicial remedies and sanctions available for nonconstitu-
tional violations of this chapter involving such communications.  In the event that
there is a violation of law of a constitutional magnitude, the court involved in a
subsequent trial will apply the existing Constitutional law with respect to the ex-
clusionary rule.

   The purpose of this provision is to underscore that, as a result of discussions
with the Justice Department, the Electronic Communications Privacy Act does not ap-
ply the statutory exclusionary rule contained in title III of the Omnibus Crime Con-
trol and Safe Streets Act of 1968 to the interception of electronic communications.

   Similarly, the Electronic Communications Privacy Act does not amend the Communica-
tions Act of 1934.  Conduct in violation of that statute, will continue to be gov-
erned by that statute.

Subsection 101(f)--State of mind

   Subsection 101(f) of the Electronic Communications Privacy Act changes the state
of mind required to violate section 2511 or section 2512 of title 18 of the United
States Code from 'willful' to 'intentional.'  The purpose of this amendment is to
underscore that inadvertent interceptions are not crimes under the Electronic Commu-
nications Privacy Act.

   As used in the Electronic Communications Privacy Act, the term 'intentional' is
narrower than the dictionary definition of 'intentional.'  'Intentional' means more
than that one voluntarily engaged in conduct or caused a result. Such conduct or the
causing of the result must have been the person's conscious objective.  An 'inten-
tional' state of mind means that one's state of mind is intentional as to one's con-

                    © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

duct or the result of one's conduct if such conduct or result is one's conscious ob-
jective.  The intentional state of mind is applicable only to conduct and results.
Since one has no control over the existence of circumstances, one cannot 'intend'
them.

  As indicated in the Judiciary Committee's report to accompany the Criminal Code
Reform Act of 1981 (S. 1630):

    The highest degree of culpability is present if a person engages in conduct (or
causes a result) intentionally, that is, 'if it is his conscious objective or desire
to engage in the conduct (or cause the result).'  A common means to describe conduct
as intentional, or to say that one causes the result intentionally, is to state that
it is done or accomplished 'on purpose.'

    **3578 *24** The term 'intentional' is not meant to connote the existence of a
motive.  Liability for intentionally engaging in prohibited conduct is not dependent
on an assessment of the merit of the motive that led the person to disregard the
law. (Emphasis in original; citation omitted.) Report of the Committee on the Judi-
ciary, United States Senate, to accompany S. 1630, Criminal Code Reform Act of 1981,
Report 97-307 at 67.

  The Committee went on to point out that people who steal because they like to or
to get more money or to feed the poor, like Robin Hood, all commit the same crime.
Id.  The word 'intentional' describes the mental attitude associated with an act
that is being done on purpose.  It does not suggest that the act was committed for a
particular evil purpose.

  At this point, it is important to note that the crime of interception under the
Electronic Communications Privacy Act consists of the intentional acquisition of the
contents of a wire, electronic or oral, communication through the use of any elec-
tronic, mechanical, or other device.  Some groups which engage in testing were con-
cerned that the picking up of the contents of a communication incident to those
tests might be considered a crime under title III as amended by the Electronic Com-
munications Privacy Act.

  They then sought exemptions from liability under proposed paragraph 2511(2)(g).
The Subcommittee on Patents, Copyrights and Trademarks rejected this approach solely
because it feared application of the principle of statutory construction of 'ex-
pressio unius, est exclusio alterius' would encourage courts to treat similar tests
as unlawful.

  For example, since the early 1960s, motor vehicle manufacturers and others have
been committed to voluntary actions to make their products 'good citizens' in the
electromagnetic environment.  That commitment has fostered the development of test
procedures and programs resulting in systems to help ensure that the electromagnetic
energy radiated from equipment such as motor vehicles, agricultural and construction
machinery, engines for transportation, marine, industrial and consumer applications,
electronic equipment and components of the foregoing do not interfere with signals
carrying video, voice or data transmissions. Personal, business and entertainment
radio, television, digital data communications, and radio navigation services are
examples of services benefited by such test procedures and programs.

  The equipment for measuring the test procedures and technical specifications by
which electromagnetic radiation from motor vehicles typically includes an antenna
for picking up electromagnetic energy radiated from the vehicle, and a radio receiv-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541,  1986 U.S.C.C.A.N. 3555)**

er for scanning the frequency range from 20 or 30 to 1,000 MHz to determine the
field strength of all emissions in that range which the antenna picks up.

   The antenna picks up not only the electromagnetic emissions from the equipment be-
ing tested, but also any other signals present at the antenna location.  Indeed, to
be able to quantify the strength of the emissions to be measured, even though addi-
tional signals are present at the frequency on which the measurement is being made,
**\*\*3579 \*25** the procedures and programs specify initial measurement of these addi-
tional signals.  Of course, any radio service operating in the scanned frequency
range will be picked up and its field strength measured during both the baseline and
the vehicle tests. Although occasionally a speaker will be used to verify that a ra-
dio service is indeed producing a high field strength reading, in virtually all of
the testing there is not attempt to ascertain the substance, purport or meaning of
the signal.

   Similar equipment and procedures are used to measure electromagnetic radiation
emitted by computing devices.  In addition, the operation of electronic equipment,
and devices equipped with electronic controls, may be susceptible to disruption by
electromagnetic radiation impinging on such equipment or devices.  For example, the
operation of electronic engine controls, electronic speed controls, and anti-lock
brake systems employing electronic controls, and even the operation of heart pace-
makers, are potentially susceptible to disruption by strong electromagnetic radi-
ation.

   To help design equipment and devices which are resistant to such disruption, such
equipment and devices customarily are irradiated during their development with elec-
tromagnetic engery at a variety of radio frequencies, and the effects, if any, of
such irradiation on their operation are observed.  To avoid interference with ongo-
ing radio services, it is essential that the test engineer, before turning on the
radio transmitter used for such irradiation, listen on the transmitter frequency to
ascertain that there is no other signal on that frequency with which the test trans-
mission might interfere.

   In addition, both the EPA and the FCC have pointed out that Federal agencies and
state and local governments are currently addressing the problem of potentially ex-
cessive public exposure to radio frequency (RF) radiation emitted by various kinds
of equipment.  Testing solely to determine the source of, or to measure, RF emis-
sions in order to comply with or to establish or enforce applicable federal, state
or local standards limiting human exposure to RF radiation is not prohibited by the
Electronic Communications Privacy Act.

   This legislation was never intended to outlaw such testing, conducted in the or-
dinary course of the tester's business or regulatory activities.  However, if one
who obtained information in the course of such a test went beyond the procedures of
the test to use any information obtained through the testing process, he could viol-
ate this statute.


Section 102--Requirements for certain disclosures


   Section 102 of this legislation amends section 2511 of title 18 of the United
States Code to add a new criminal prohibition on disclosure of electronic communica-
tions.  It adds a new subsection (3) to section 2511. This amendment includes the
term 'to the public.'  The Government is included as part of the public.  Thus, FTS

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541,  1986 U.S.C.C.A.N. 3555)**

services are covered.

The language in paragraph (a) of proposed subsection 2511(3) of title 18 provides
that a person or entity providing an electronic communication service to the public
shall not intentionally divulge the contents of any communication (other than one to
such person **3580 *26 or entity, or an agent thereof) while in transmission on that
service to any person or entity other than an addressee or intended recipient of
such communication or the agent of such addressee or intended recipient.

Proposed paragraph (b) of new subsection 2511(3) of title 18 sets out exceptions
to paragraph (a)'s criminal prohibition on disclosure.  Providers of electronic com-
munication services to the public are permitted to divulge the contents of any such
communication (i) as otherwise authorized in section 2511(2)(a) or 2517 or title 18;
(ii) with the lawful consent of the originator or any addressee or intended recipi-
ent; (iii) to any person employed or authorized, or whose facilities are used, to
forward such communication to its destination, or (iv) which were inadvertently ob-
tained by the service provider and which appear to pertain to the commission of a
crime if such divulgence is made to a law enforcement agency.

The exceptions to the divulgence bar are relatively straightforward.  Providers
should be permitted to divulge under other provisions of the chapter.  To be con-
sistent with the one party consent exception found in the chapter, a similar excep-
tion is appropriate here.  It is also logical to provide an exception with respect
to activities necessary and intrinsic to the communication activity.  Therefore, it
is necessary to exempt communication intermediaries.

Finally, if an electronic communications service provider inadvertently obtains
the contents of a communication during transmission and the communication appears to
relate to the commission of a crime, divulgence is permitted when such divulgence is
made to a law enforcement agency.  If the provider purposefully sets out to monitor
conversations to ascertain whether criminal activity has occurred, this exception
would not apply.

Section 103--Recovery of civil damages

Section 103 of the Electronic Communications Privacy Act amends existing  section
2520 of title 18 of the United States Code to incorporate violations involving in-
terception, disclosure or intentional use of wire, oral, or electronic communica-
tions.

Proposed subsection 2520(a) of title 18 authorizes the commencement of a civil
suit.  There is one exception.  A civil action will not lie where the requirements
of section 2511(2)(a)(ii) of title 18 are met.  With regard to that exception, the
Committee intends that the following procedural standards will apply:

(1)  The complaint must allege that a wire or electronic communications service
provider (or one of its employees):  (a) disclosed the existence of a wiretap; (b)
acted without a facially valid court order or certification; (c) acted beyond the
scope of a court order or certification or (d) acted on bad faith.  Acting in bad
faith would include failing to read the order or collusion.  If the complaint fails
to make any of these allegations, the defendant can move to dismiss the complaint
for failure to state a claim upon which relief can be granted.

(2)  If during the course of pretrial discovery the plaintiff's claim provides
baseless, the defendant can move for summary judgment.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541,  1986 U.S.C.C.A.N. 3555)**

(3)  If the court denies the summary judgment motion, the case goes to tri-
al.  At the close of the plaintiff's case, the defendant**\*27 \*\*3581** again can move
for dismissal. If that motion is denied, the defendant then has the opportunity to
present to the jury its section 2520 good faith defense.

The plaintiff may bring a civil action under section 2520 whether or not the de-
fendant has been subject to a criminal prosecution for the acts complained of, but
in the absence of such prosecution and conviction, it is the plaintiff's burden to
establish that the requirements of this section are met.

Proposed subsection 2520(b) indicates that appropriate relief in a civil action
can include:  (1) preliminary and other equitable or declaratory relief as may be
appropriate; (2) damages under subsection (c) and punitive damages in appropriate
cases; and (3) a reasonable attorney's fee and other reasonable litigation costs.

Proposed subsection 2520(c) provides a method for the computation of damages.  The
general rule is set out in paragraph (2) of subsection (c).  The court may assess
damages consisting of whichever is the greater of (A) the sum of the plaintiff's ac-
tual damages and any profits the violator made as a result of the violation; or (B)
statutory damages of whichever is the greater of $100 a day or $10,000.

An exception from that general rule is set out in proposed paragraph (1) of sub-
section 2520(c).  This exception applies if the violation consists of the private or
home viewing of an unencrypted or unscrambled private satellite video communication
or if the communication is an unencrypted or unscrambled radio communication that is
transmitted on frequencies allocated under subpart D of part 74 of the FCC rules,
and the conduct is not for one of the enumerated bad purposes.

Under subparagraph (A), if the violator has not previously been enjoined in a gov-
ernment action under subsection 2511(5) and has not been found liable in a prior
civil action, the court shall assess the greater of the sum of the plaintiff's actu-
al damages or statutory damages of $50 to $500.  Under subparagraph (B), if the vi-
olator is a second offender (one who has been found liable in a prior private civil
action under section 2520 or one who has been enjoined in a government suit), the
court shall assess the greater of the sum of the plaintiff's actual damages or stat-
utory damages of $100 to $1000. Third and subsequent offenders are subject to the
bill's full civil penalties as described in the general rule set out in proposed
paragraph 2520(c)(2).

Subsection 2520(d) provides a good faith defense for those who comply with court
orders or warrants, grand jury subpoenas, legislative or statutory authorizations,
or a request of an investigative or law enforcement officer under section 2518(7) of
title 17 concerning emergency situations.  As used in this subsection, the term
'good faith' includes the receipt of a facially valid court order.  The fact that
the provider of a wire or electronic communication service received a facially valid
court order means that the provider would be entitled to a dismissal of a civil ac-
tion upon a showing that he acted within the scope of that order.

Proposed subsection 2520(e) sets out the statute of limitations for actions
brought under this section.  Actions may not be commenced more than 2 years after
the date on which the claimant first has a reasonable opportunity to discover the
violation.

**\*\*3582 \*28** Section 104--Certain approvals by justice department officials

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

  Section 104 of the Electronic Communications Privacy Act amends section 2516(1) of
title 18 of the United States Code to add to the list of Federal officials who may
make applications for court orders under chapter 119. Under this amendment, the list
of officials who may be specially designated by the Attorney General to authorize
applications will include any acting Assistant Attorney General, or any Deputy As-
sistant Attorney General in the Criminal Division.  The addition of an acting As-
sistant Attorney General is not meant to imply rejection in any other context of the
well-established principle that an acting official ordinarily possesses all the leg-
al powers of the official for whom he is acting, but to clarify the law under this
statute.
  As indicated in proposed subsection 111(c) of the Electronic Comunications Privacy
Act, this section 104 shall take effect on the date of enactment.

Section 105--Addition of offenses to crimes for which interception is authorized

  Section 105 of the Electronic Communications Privacy Act amends existing  section
2516 of title 18 to add to the list of felonies for which a wiretap or bugging order
may be obtained under chapter 119. It also adds a new subsection (3) to section 2516
which addresses applications and orders for interceptions of electronic communica-
tions.

Subsection 105(a)--Offenses for which wire and oral interceptions are authorized

  Subsection 105(a) of the legislation amends subsection 2516(1) of title 18 by
adding to the list of predicate felonies for which an application for a wiretapping
or bugging order may be made.  Those crimes are set out in the bill.

Subsection 105(b)--Offenses for which interception of electronic communication are
authorized

  Subsection 105(b) of the Electronic Communications Privacy Act amends  section
2516 to authorize the Government to apply for a court order authorizing or approving
the interception of an electronic communication by an investigative or law enforce-
ment officer when an interception may provide or has provided evidence of a Federal
felony.  Thus, for non-wire, non-oral electronic communications, a different and
less restrictive list of crimes can be used to justify an application for intercep-
tion.
  The Department of Justice has advised the Committee on the Judiciary that for the
three years which follow the date of enactment of this legislation, this authority
will only be exercised pursuant to the approval of the same level of officials as
those involved in the approval of applications for wire interceptions.  In addition
to this voluntary regulatory limitation, the Department of Justice has committed it-
self to submitting to the relevant congressional committees any proposed changes in
these regulations at least 90 days in advance of any change.

**3583 *29 Section 106--Applications, orders, and implementation of orders

  Section 106 of the Electronic Communications Privacy Act amends section 2518 of
title 18 of the United States Code.  This section addresses the implementation of

                 © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

interception orders, reimbursement for providers who assist law enforcement agencies
in carrying out an interception order and minimization requirements.  Subsection
106(d) of the legislation permits law enforcement agencies to request an order for a
'roving tap' under certain limited circumstances.

Telephone companies have, as a matter of practice, provided information and tech-
nical assistance to law enforcement officials in connection with lawfully authorized
wiretaps.  They have steadfastly maintained, however, an important distinction
between such technical assistance and any active participation in the wiretap it-
self.

Section 2518(4) of title 18 is a codification of the cooperative working relation-
ship that exists between telephone companies and law enforcement officials.  This
section anticipates that these government officials will, and should, seek the co-
operation of telephone companies in accomplishing telephone line interceptions.

Nevertheless, telephone company customers have a reasonable expectation, tradi-
tionally enhanced by telephone company practices and policies, that their company
will not become in effect, a branch of Government law enforcement. Accordingly,
while technical assistance is provided and paid for, the Committee wishes to make
clear that Section 2518(4) is not intended to authorize and should not be construed
as authorizing, issuance of an order for land line telephone company assistance
which either requires a company to actually accomplish or perform a wiretap or re-
quires that law enforcement wiretap activity take place on land line telephone com-
pany premises.

The Committee understands that some cellular service providers may have cooperated
with law enforcement officials to establish wiretap connections on the cellular ser-
vice provider's premises. The Committee does not intend to alter this specific form
of assistance.

The Committee understands that the practice followed with regard to land line
telephones is that telephone company employees do not perform the wiretap itself,
and that telephone company premises are not used for wiretap activity. This proced-
ure is accepted by both company and law enforcement officials.  The Committee does
not expect any departure from current practice.

To ensure that the practice does not change, absent a compelling need appropri-
ately addressed to Congress, the Committee expects the Justice Department to include
in its United States Attorneys Manual a statement that no enforcement agency or of-
ficial shall attempt to compel any telephone company employee to perform any
wiretap, or attempt to compel any such company to make its premises available for
wiretap activity.  Any proposed amendment to that language should be reported to the
Committee well in advance of dissemination so that the Committee has sufficient op-
portunity to assess both the extent of which such proposed language comports with
its view of the scope of section 2518(4) as expressed **3584 *30 above and the ex-
tent to which any amendment of section 2518(4) to permit a change in prevailing
practice may be warranted by subsequent and compelling changes in technology or oth-
er circumstances.

Subsection 106(a)--Place of authorized interception

Subsection 106(a) of the Electronic Communications Privacy Act amends subsection
2518(3) of title 18.  It provides, that in the case of a mobile interception device,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a court can authorize an order within its jurisdiction and outside its jurisdiction
but within the United States.  This provision applies to both a listening device in-
stalled in a vehicle and to a tap placed on a cellular or other telephone instrument
installed in a vehicle.

   In most cases, courts will authorize the installation of a device and the device
will be installed within the court's jurisdiction, but the suspect will subsequently
move outside that jurisdiction.  In certain cases, however, a device authorized for
installation in an automobile may be authorized in one district and the vehicle
might be moved to another district prior to installation.  Subsection 106(a) of the
bill permits installation in the district to which the vehicle has been moved.

   Nothing in this subsection affects the current law with regard to the use of such
devices outside the United States.

Subsection 106(b)--Reimbursement

   Subsection 106(b) of the Electronic Communications Privacy Act establishes that
service providers that provide assistance to the agency carrying out an interception
order may be compensated for reasonable expenses incurred in providing such facilit-
ies or assistance.  This is designed to permit reimbursement at an amount appropri-
ate to the work required.  In most cases, a flat or general rate will be appropri-
ate, but this change in the existing law will permit flexibility by authorizing re-
imbursement at a higher level in unusual cases.

Subsection 106(c)--Minimization

   This subsection makes two changes in section 2518(5) of title 18.  Under existing
law, no section 2518 interception order may extend longer than 30 days.  Paragraph
(1) of subsection 106(c) provides a rule for establishing when the 30 days to in-
stall a tap or a bug begins to run.  Under this rule, the 30- day time period com-
mences on the earlier of the day on which the officer first begins to conduct the
interception, or 10 days after the order is entered.

   Paragraph (2) of this subsection of the Electronic Communications Privacy Act
provides a special minimization rule for intercepted communications that are in code
or in a foreign language.  If an expert in that foreign language or code is not
reasonably available during that interception period, minimization may be accom-
plished as soon as practicable after the interception.  In this regard, it is con-
templated that the translator or decoder will listen to the tapes of an interception
and make available to the investigators the minimized portions preserving the rest
for possible court perusal later.

   **3585 *31 Paragraph (2) also provides that the monitoring of interceptions under
this chapter may be conducted in whole or in part by Government personnel, or by in-
dividuals operating under contract with the Government, as long as such personnel
are acting under the supervision of an investigative or law enforcement officer au-
thorized to conduct the interception.  This change, which was sought by the Federal
Bureau of Investigation, is designed to free field agents from the relatively
routine activity of monitoring interceptions so that they can engage in other law
enforcement activities.

   The Committee recognizes that although the statutory standards for minimizing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

wire, oral, and electronic communications are the same under proposed subsection
2518(5), the technology used to either transmit or intercept an electronic message
such as electronic mail or a computer data transmission ordinarily will not make it
possible to shut down the interception and taping or recording equipment simultan-
eously in order to minimize in the same manner as with a wire interception.  It is
impossible to 'listen' to a computer and determine when to stop listening and minim-
ize as it is possible to do in listening to a telephone conversation.  For instance,
a page displayed on a screen during a computer transmission might have five para-
graphs of which the second and third are relevant to the investigation and the oth-
ers are not.  The printing technology is such that the whole page including the ir-
relevant paragraphs, would have to be printed and read, before anything can be done
about minimization.

   Thus, minimization for computer transmissions would require a somewhat different
procedure than that used to minimize a telephone call.  Common sense would dictate,
and it is the Committee's intention, that the minimization should be conducted by
the initial law enforcement officials who review the transcript.  Those officials
would delete all non-relevant materials and disseminate to other officials only that
information which is relevant to the investigation.


Subsection 106(d)--Roving taps

   This subsection of the Electronic Communications Privacy Act adds a new subsection
(11) to section 2518 of title 18.  Under current law, the application and the order
for a bug or tap must indicate the 'particular' facility or place in which the in-
terception is to occur.  Subsection 106(d) of this legislation sets out new rules
for the specificity required in the description of the place where the interceptions
of wire and oral communications are to occur.  The Committee finds such a provision
necessary to cover circumstances under which law enforcement officials may not know,
until shortly before the communication, which telephone line will be used by the
person under surveillance.  Telephone companies assist law enforcement officials by
providing cable and pair information, or leased line facilities when requested and
feasible: this is the information which will be provided to law enforcement for rov-
ing taps.

   In the case of both oral and wire communications, only a limited list of Federal
officials can apply for a special order seeking relief under this provision.

   With regard to 'oral' communications, as set out in paragraph (a) of proposal sub-
section 2518(11), an application for a special **3586 *32 order must contain a full
and complete statement as to why the ordinary specification requirements are not
practical.  The application must also identify the person committing the offense and
whose communications are to be intercepted.  The judge must find that the ordinary
specification rules are not practical. Situations where ordinary specification rules
would not be practical would include those where a suspect moves from room to room
in a hotel to avoid a bug or where a suspect sets up a meeting with another suspect
on a beach or a field.  In such situations, the order would indicate authority to
follow the suspect and engage in the interception once the targeted conversation oc-
curs.

   The rule with respect to 'wire communications' is somewhat similar.  As indicated
in paragraph (b), the application must show that the person committing the offense

                © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

has a purpose to thwart interception by changing facilities.  In these cases, the
court must find that the applicant has shown that such a purpose has been evidenced
by the suspect.  An example of a situation which would meet this test would be an
alleged terrorist who went from phone booth to phone booth numerous times to avoid
interception.  A person whose telephone calls were intercepted who said that he or
she was planning on moving from phone to phone or to pay phones to avoid detection
also would have demonstrated that purpose.

Proposed subsection 2518(12) of title 18 provides, with respect to both  'wire'
and 'oral' communications, that where the federal government has been successful in
obtaining a relaxed specificity order, it cannot begin the interception until the
facilities or place from which the communication is to be intercepted is ascertained
by the person implementing the interception order.  In other words, the actual in-
terception could not begin until the suspect begins or evidences an intention to be-
gin a conversation.

It would be improper to use this expanded specificity order to tap a series of
telephones, intercept all conversations over such phones and then minimize the con-
versations collected as a result. This provision puts the burden on the investiga-
tion agency to ascertain when the interception is to take place.

The Subcommittee on Patents, Copyrights and Trademarks added a provision to pro-
posed subsection 2518(12) allowing a service provider to move the court to modify or
quash the order on the grounds that it cannot provide assistance in a timely or
reasonable manner.  As indicated, on notice to the Government, the court must decide
such a motion expeditiously.

This provision recognizes that a telephone company may not be able to respond in-
stantaneously to an eleventh hour target line designation.  It is designed to ac-
count for the practicalities of telephone company response time, the number of
phones that may be covered by the order, and the geographic area of the target lines
that may be used by the person under surveillance.

The Committee intends that the court look to several factors in considering wheth-
er to issue an order pursuant to proposed paragraph (11)(b). The request for the or-
der, and the order itself, should specify a reasonably limited geographic area, the
number of phones (and phone numbers) if known, to be intercepted--so as not to
render telephone company cooperation technically infeasible--and the time within
which the interception is to be accomplished. The **3587 *33 failure to make such
specifications in the request and/or in the order may be considered evidence of un-
reasonableness or untimeliness by a court acting upon a telephone company motion
made pursuant to proposed subsection (12).

The Committee also expects law enforcement officials to continue the current prac-
tice of consulting with telephone company employees regarding the details of imple-
mentation (such as phone numbers and the specific locations of the telephones) in
advance of the time any order for interception is sought.

Finally, subsection 106(d) of the Electronic Communications Privacy Act provides
that reports to the Administrative Office of the United States Courts under current
section 2519 of title 18 on the kind of order or extension applied for include
whether or not the order was one applied for under the relaxed specifity provisions
of subsection 2518(11).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Section 107--Intelligence activities

   Subsection (a) of this section of the bill clarifies that the amendments made in
subsection 102(b) of the bill do not provide any new authority for intelligence
activities but only represent an exemption from the coverage of this chapter and
chapter 121 of title 18 for activities that are otherwise lawful.

   Subsection (b) of this section of the bill exempts communications security monit-
oring activities of the Federal Government otherwise in accordance with U.S. law and
undertaken in accordance with procedures approved by the Attorney General from cov-
erage under chapter 119 or 121 of title 18.  This subsection provides no new author-
ity for such activities.

   Specifically this subsection exempts from the coverage of this act the lawful
activities of Federal agencies intended to intercept encrypted or other official
communications for communications security purposes.  Communications security meas-
ures are protective measures taken to deny unauthorized persons information derived
from U.S. Government telecommunications and to ensure the authenticity of such com-
munications.  Communications security protection is the application of security
measures to electrical systems generating, handling, proceeding, or using informa-
tion the loss of which could adversely affect the national interest.  Monitoring of
security measures and security protection includes the intentional interception of
executive branch official communications, including the communications of certain
Government contractors, to provide technical material for analysis to determine the
degree of security being provided to these transmissions.  In addition, the inter-
ception, by authorized Federal agencies, of radio communications between foreign
powers or agents as defined by the Foreign Intelligence Surveillance Act of 1978,
and the accessing of electronic communications systems used exclusively by a foreign
power as defined by the Foreign Intelligence Surveillance Act of 1978, are exempted
from coverage of this act by this subsection of the bill.

Section 108--Mobile tracking devices

   Subsection (a) of this section of the bill adds a new section to  chapter 205 of
title 18.  This new code section provides that if a court is empowered a to issue a
warrant or other order for the installation **34 **3588 of a mobile tracking device,
and the tracking of the object or person on which the device is installed, such war-
rant remains valid even if the device is moved outside the jurisdiction of the
court, even outside the jurisdiction of the United States, provided that the device
was installed within the jurisdiction of the court, in conformity with the court or-
der. This clarification does not effect current legal standards for the issuance of
such an order.

   A tracking device is defined as an electronic or mechanical device which permits
the tracking of the movement of a person or object.

   Subsection (b) adds a new section 3117, 'Mobile tracking devices' to the table of
contents of chapter 205.

Section 109--Warning subject of surveillance

   The section amends section 2232 of title 18 by adding at the end a new subsection.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Proposed subsection 2232(c) adds two new offenses to title 18. First, it makes it a criminal act punishable by a fine under this title and/or imprisonment for not more than 5 years to warn any person that a Federal agency or law enforcement officer has been authorized or has sought authorization under chapter 119 of title 18 to intercept a wire, oral, or electronic communication. Second, the proposed subsection provides the same penalties for warning anyone that a Federal officer has been authorized or has applied for authorization to conduct electronic surveillance under the provisions of the Foreign Intelligence Surveillance Act.

The elements of both new crimes are the same. It is required that the defendant have knowledge that the Federal law enforcement or investigative officer has been authorized or has applied for an interception order. The defendant need not know that such an application was made under a particular chapter of federal law, rather, only that such application or order was made under federal law. The defendant must engage in conduct of giving notice of the possible interception to any person who was or is the target of the interception. Finally, the defendants action must have been undertaken with the specific intent to obstruct, impede or prevent the interception. The offense also includes an attempt to engage in the offense.

Section 110--Injunctive remedy

This section of the act sets out a proposed section 2521 of title 18. Section 2521 adds to the existing criminal and civil remedies available for violations of this chapter by authorizing the Attorney General to seek an injunction to prevent felony level violations of this chapter. Section 2521 also provides that preliminary relief can be granted to prevent a continuing and substantial injury to the United States or to any person for whose protection the action is brought. Actions under section 2521 are governed by the Federal Rules of Civil Procedure, except that when an indication has been returned against the respondent, discovery is governed by the Federal Rules of Criminal Procedure.

**\*\*3589 \*35** Section 111--Effective date

Subsection (a) provides that in general the amendments made by this act are effective 90 days after enactment, and that the act applies only with respect to court orders or extensions made after the effective date. Thus existing court orders would not be affected by these changes and on-going investigations would not be hindered, but any extension of an existing court order made 90 days after passage would be governed by these new provision.

Subsection (b) provides a special rule for the effective date in the case of state authorizations of interceptions. This special effective date rule is necessary because the provisions of chapter 119 of title 18 supersede state laws with respect to electronic communications. Under chapter 119, the states must enact statutes which are at least as restrictive as the provisions of chapter 119 before they can authorize their state courts to issue interception orders. Because of the substantial changes made by this act it is appropriate to grant the states sufficient time to modify their laws. This special effective date rule gives the states two years to amend their laws to meet the new requirements of chapter 119.

Subsection (c) provides that section 104 of the act is effective upon enactment.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Section 104 modifies Justice Department procedures for approval of requests under
this chapter, since section 104 is designed to alleviate management difficulties at
the Department of Justice there is no reason to delay implementation of these
changes.

    TITLE II--STORED WIRE AND ELECTRONIC COMMUNICATIONS AND TRANSACTIONAL RECORDS
                                      ACCESS

Section 201--Title 18 amendment

   This section amends title 18 by adding at the end thereof a new chapter 121 con-
sisting of ten new sections.  These sections are discussed below.

New section 2701--Unlawful access to stored communications

   Subsection (a) of this new section creates a criminal offense for either inten-
tionally accessing, without authorization, a facility through which an electronic
communication service is provided, or for intentionally exceeding the authorization
for accessing that facility.  Subsection 2701, also provides that the offender must
obtain, alter, or prevent authorized access to a wire or electronic communication
while it is in electronic storage in such an electronic storage system in order to
commit a violation under the subsection. The term 'electronic storage' is defined in
section 2510(17) of title 18 and includes both temporary, intermediate storage of a
wire or electronic communication incidental to the transmission of the message, and
any storage of such a communication by the electronic communication service for pur-
poses of backup protection of the communication.
   This provision addresses the growing problem of unauthorized persons deliberately
gaining access to, and sometimes tampering with, electronic or wire communications
that are not intended to be available to the public.
   **3590 *36 This subsection does not prevent broad authorizations to the general
public to access such a facility.  The bill does not for example hinder the develop-
ment or use of 'electronic bulletin boards' or other similar services where the
availability of information about the service, and the readily accessible nature of
the service are widely known and the service does not require any special access
code or warning to indicate that the information is private.  To access a communica-
tion in such a public system is not a violation of the Act, since the general public
has been 'authorized' to do so by the facility provider.
   However, the offense of intentionally exceeding an authorization to access a com-
puter facility would apply both to public and private aspects of a system.  For ex-
ample, a computer mail facility authorizes a subscriber to access information in
their portion of the facilities storage.  Accessing the storage of other subscribers
without specific authorization to do so would be a violation of this provision.
Similarly, a member of the general public authorized to access the public portion of
a computer facility would violate this section by intentionally exceeding that au-
thorization and accessing the private portions of the facility.
   Subsection (b) of this new section provides punishment for violation of subsection
(a).  A distinction is drawn between offenses committed for purposes of commercial
advantage, malicious destruction or damage, or for private commercial gain and all

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

other types of violation.  If the offense is committed for private or commercial
gain or for malicious destruction the subsection provides a fine of not more than
$250,000 or imprisonment for not more than one year, or both, for a first offender.
Second and subsequent offenders are subject to the same fine provision but a jail
term up to two years can be imposed for such violations.  In all other cases the
fine is limited to not more than $5,000 and imprisonment for not more than 6 months
or both.

  Subsection (c) of this new section provides exceptions to the violations contained
in subsection (a).  It is not a violation of subsection (a) if the conduct was au-
thorized by the person or entity providing the wire or communications service, or if
the conduct was authorized by the user of that service with respect to communica-
tions of or intended for that user or if the conduct is authorized by new sections
2703, 2704, or 2518 or title 18.

New section 2702--Disclosure of contents

  Proposed section 2702 is divided between electronic communication services and re-
mote computing services.  The restrictions on the service provider are the same in
each instance. However, as described below, there is different treatment for elec-
tronic communication service providers and remote computing services with regard to
government access.

  Subsection (a) of this new section prohibits the provider of an electronic commu-
nications service or the provider of a remote computing service from knowingly di-
vulging the contents of any communication.  The 'contents' of a communication has
the same meaning in this section as it has in subsection 2510(8) of title 18 or the
United States Code as amended by section 101(a)(5) of this Act.  The requirement
that a violator must 'knowingly' divulge the contents **37 **3591 is intended to make
clear that 'reckless' or 'negligent' conduct is not sufficient to constitute a viol-
ation of this section.  Subsection (b) of this section provides exceptions to this
general rule of non-disclosure.

  The application of new code section 2702(a) generally prohibits the provider of a
wire or electronic communication service to the public from knowingly divulging the
contents of any communication while in electronic storage by that service to any
person other than the addressee or intended recipient. Similarly, section 2511(3) of
title 18, as amended by this Act, prohibits such a provider from divulging the con-
tents of a communication while it is in transmission.  Neither provision, however,
nor any other provision in the Act, is intended to affect any other provision of
federal law that prohibits the disclosure of information on the basis of the content
of the information, such as the Fair Credit Reporting Act.

  The application of sections 2701(a) and 2511(3) is limited to providers of wire or
electronic communications services.  There are instances, however, in which a person
or entity both acts as a provider of such services and also offers other services to
the public.  In some such situations, the bill may allow disclosure while another
federal requirement, applicable to the person or entity in another of its roles,
prohibits disclosure.  The Committee intends that such instances be analyzed as
though the communication services and the other services were provided by distinct
entities. Where a combined entity in its non-provider role would not be allowed to
disclose, the appropriate outcome would be non-disclosure.

                 © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

   Subsection (b) of this new section provides exceptions to the general rule of
nondisclosure provided in subsection (a). These exceptions permit disclosure: (1)
to the addressee or intended recipient of the communication or the authorized agent
of such addressee or intended recipient; (2) in conformity with a court order issued
pursuant to the procedures in section 2516 of title 18; or in the course of normal
business practice as defined in section 2511(2)(a) of this title; or to the govern-
ment under procedures of new section 2703; (3) with the lawful consent of the sender
or the addressee or an intended recipient of such communication or with the consent
of the subscriber in the case of a remote computing service; (4) to a person em-
ployed or authorized or whose facilities are used to forward the communication to
its ultimate destination; (5) as necessary in order to render the service or to pro-
tect the rights or property of the provider of the service: of (6) to a law en-
forcement agency, if the contents were inadvertently obtained by the service pro-
vider and appear to pertain to the commission of a crime.

   The exceptions to the general rule of nondisclosure provided in subsection (b)
fall into three categories. The first category are those disclosures which are au-
thorized by either the sender or receiver of the message. Either the sender or the
receiver can directly or through authorized agents authorize further disclosures of
the contents of their electronic communication. The second category are disclosures
which are necessary for the efficient operation of the communications system. Such
business procedures are included in the section 2511(2)(a) exemption as well the ex-
emptions of this subsection relating to the disclosure of the message to forwarding
facilities and the exemption for service provider activities designed to **3592 *38
protect the system and perform the service. The third category are disclosures to
the government. In this area there are two types of disclosures. Those pursuant to
a court order under the procedures of sections 2516 and 2703 and those disclosures
undertaken at the initiative of the service provider in the exceptional circum-
stances when the provider has become aware of the contents of a message that relate
to ongoing criminal activity.

New section 2703.--Requirements for governmental access

   Subsection (a) of section 2703 provides requirements for the government to obtain
the contents of an electronic communication that has been in electronic storage for
180 days or less. A government entity can only gain access to the contents of such
an electronic communication pursuant to a warrant issued under the Federal Rules of
Criminal Procedure or an equivalent State warrant.

   Subsection (b) of section 2703 provides that for electronic communications that
are maintained by a remote computing service and that have been in storage in an
electronic communication service for more than 180 days the Government can gain ac-
cess in several ways. If the Government wishes to obtain the contents of a communic-
ation without the required notice to the subscriber then the governmental entity
must obtain a warrant issued under the Federal Rules of Criminal Procedure or an
equivalent State warrant. With prior notice from the government entity to the sub-
scriber or customer, the entity may obtain the contents of the electronic communica-
tion either by using an administrative subpoena authorized by a Federal or State
statute or a Federal or State grand jury subpoena or obtain a court order pursuant
to subsection (d) of this section. In addition, the required notice may be delayed

                  © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pursuant to the requirements of section 2705 of title 18 as provided in the Act.

Subsection (b) of new section 2703 of title 18 is made applicable to all electronic communications held or maintained by the service provider on behalf of a customer or subscriber and received by means of electronic transmission as well as electronic communications in storage or computer processing if the provider is not authorized to access the contents of any communications for purposes other than storage or computer processing.

Subsection (c) provides for access to records or other information pertaining to a subscriber to or customer of an electronic communications or remote computer service, not including the content of electronic communications.  This section permits the provider of the service to divulge, in the normal course of business, such information as customer lists and payments to anyone except a Government agency.  It should be noted that the information involved is information about the customer's use of the service not the content of the customer's communications.

A provider of electronic communication service or remote computing service must disclose information pertaining to a subscriber or customer, but not the contents of any communications of that customer, to a Government entity only when the Government entity either (i) uses an administrative subpoena authorized by a Federal or State statute, or a Federal or State grand jury subpoena; (ii) obtains a warrant issued under the Federal Rules of Criminal Procedure or an equivalent state warrant; (iii) obtains a court **3593 *39 order for such disclosure under subsection (d) of this section; or (iv) has obtained the consent of the subscriber.  A Government entity which receives customer records pursuant to one of these four alternatives is not required to provide notice to the subscriber or customer that it has requested or obtained this information.

Subsection (d) provides that orders requiring access by a Government entity to the contents of a wire or electronic communication or to the records or other information sought shall issue only if the governmental entity shows there is reason to believe the contents of the wire or electronic communication, or the records or other information sought, are relevant to a legitimate law enforcement inquiry.  This section provides no authority for the issuance of a state subpoena that is prohibited under the law of such state.

This subsection also permits the provider of the communications or remote computing service to move to quash or modify any other issued under this section if the information or records requested are unusually voluminous or compliance with the order would cause an undue burden on the provider.  This specific standing for the service provider to contest an overly broad order is intended to protect the service provider from unduly burdensome requirements and to permit an impartial judicial officer to evaluate the appropriateness of the government's request.

Subsection (e)--No cause of action against a provider disclosing information under this chapter.

This subsection of the proposed new section provides a defense for the service provider, its employees and officers, from suits arising because of its disclosure of information pursuant to a warrant or other court order issued under this chapter.

New section 2704--Backup preservation

Subsection (a) of proposed section 2704 of title 18 provides that a Government en-

tity may include in its subpoena or court order obtained pursuant to the provisions
of new section 2703(b)(2) a requirement that the service provider create and main-
tain a duplicate copy of the contents of the electronic communications sought in or-
der to preserve those communications.  Without notifying the customer or subscriber,
the service provider must create such a duplicate copy as soon as practicable and
confirm to the Government entity that the duplicate file has been created.  In all
cases the service provider must create such a duplicate file within two business
days after receipt by that provider of the subpoena or court order directing that
such a duplicate file be created.

   Paragraph (2) of this new subsection requires the Government entity to give notice
to the subscriber or customer that such a duplicate file has been created and has
been ordered to be provided to the Government.  This notification to the customer or
subscriber must be given within three days of the receipt of confirmation from the
service provider (as required by subsection (a) above) that the duplicate file has
been created, unless the Government agency has obtained permission to delay such no-
tification pursuant to proposed subsection 2705(a).

   Paragraph (3) also prohibits the service provider from destroying the backup copy
until the information has been delivered to the Government entity or any proceed-
ings, including all appeals, concerning **\*40 \*\*3594** the Government's subpoena or
court order have been resolved, whichever is later.  The service provider is re-
quired to comply with the order and release the copy to the requesting Government
entity no sooner than fourteen days after the Government entity has notified the
subscriber or customer that it is seeking this information.

   Paragraph (4) provides that the service provider should release the information to
the Government only if the service provider has not received notice from its sub-
scriber or customer that the subscriber or customer has challenged the Government's
request and if the service provider has not itself challenged the request of the
Government entity.

   Finally, paragraph (5) provides that when a Government entity seeks to require the
creation of the backrup or duplicate copy under this subsection and the governmental
entity further determines that notification under section 2703 of this title of the
existence of the subpoena or court order may result in destruction of or tampering
with the evidence this later determination is not subject to challenge either by the
subscriber or customer or by the service provider.

   While this subtitle provides the subscriber or customer, and in some circumstances
the service provider a right to challenge the necessity for or scope of a court or-
der, neither this section or any other section of this Act provides grounds to chal-
lenge the determination of the Government agency that no notification is to be given
to the subscriber or customer of the mere creation of the duplicate file.  The file
is created and maintained by the service provider solely for the purpose of assuring
that potential evidence is not tampered with or destroyed.  Keeping the fact of the
creation of this file secret does not harm any privacy interest since there are ad-
equate safeguards included in the bill and in this chapter to control the actual re-
lease of the duplicate file to the Government agency.

   Subsection (b) of proposed section 2704 provides a procedure for challenges to a
court order by the subscriber or customer.  The subscriber or customer whose records
are sought can within 14 days after notification by the Government under subsection

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541,  1986 U.S.C.C.A.N. 3555)**

(a)(2) of this section file a motion to quash such subpoena or vacate such court or-
der in an appropriate State or Federal court. The subscriber or customer challenging
the subpoena or order must serve a copy of the motion on the governmental entity and
provide written notice to the service provider that such a challenge has been initi-
ated.

The subsection further provides that the application or motion must state that the
applicant is the customer or subscriber to the service from which the contents of
electronic communications maintained for him have been sought and state the reasons
for believing that the records sought are not relevant to a legitimate law enforce-
ment inquiry or state that there has not been substantial compliance with the provi-
sions of this chapter in some other respect.

The service required by this subsection shall be made upon the governmental entity
by delivering or mailing by registered or certified mail a copy of the papers to the
person, or office, or department specified in the notice which the customer has re-
ceived pursuant to this chapter.  The term 'delivery' in this subsection has **3595
*41 the meaning given that term in the Federal Rules of Civil Procedure.

If a court determines that the customer or subscriber has complied with the re-
quirements for such a motion including the requirements of 'dlivery' to the Govern-
ment entity, then the court shall order the Government entity to file a sworn re-
sponse to the motion or application.  Such response may be in camera if the govern-
mental entity includes in its response the reasons which make such an in camera re-
view appropriate.  If the motion and response provide insufficient information for
the court to make a determination, the court may conduct such additional proceedings
as it deems appropriate.  Any additional proceedings and a decision on the challenge
shall occur as rapidly as feasible, i.e. within 7 calendar days in all but the most
unusual circumstances.

The subsection also provides that the court shall enforce the process if it finds
that the applicant challenging the order or application is not the subscriber or
customer for whom the records are maintained or if it finds that the law enforcement
inquiry is legitimate and that the communications sought are relevant to that in-
quiry.  If the court finds that the customer or subscriber challenging the order or
application is the subscriber or customer for whom the records are maintained and
that the records are not relevant to a legitimate law enforcement inquiry or that
there has not been substantial compliance with the provisions of this chapter in
some other respect, then the court shall order the process quashed.

Finally, the subsection provides that a court order denying a motion or applica-
tion under section 2704 shall not be deemed a final order and no interlocutory ap-
peal may be taken by the customer or subscriber from such a denial.

In the event that there is no indictment then the person whose records are in-
volved may move for the return of the records. Obviously, nothing precludes a cus-
tomer or subscriber who is later the subject of a criminal proceeding from raising
these issues again subject to the sanctions limitation of section 2708 of title 18.

New section 2705--Delayed notice

This proposed section provides procedures and requirements for implementation for
a delay of notice to the customer or subscriber that his records are being sought or
have been provided to a government entity.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

   Subsection (a) of this section 2705 provides that when a Government entity seeks
or obtains access to the contents of an electronic communication by application for
a court order notification can be delayed for an initial period of up to 90 days, if
the Government entity requests such a delay and the court determines that there is
reason to believe that the notification of the existence of the court order may have
an adverse result as described in this subsection.  Where an administrative subpoena
authorized by a Federal or State statute or a Federal or State grand jury subpoena
is obtained, a delay of notification for a period of not more than 90 days can be
obtained upon the execution of a written certification of a supervisory official
that there is reason to believe that notification of the existence of the subpoena
may have an adverse result.
   **3596 *42 For purposes of a delay of notification, an adverse result is defined
as (A) endangering the life or physical safety of an individual; (B) flight from
prosecution; (C) destruction of or tampering with evidence; (D) intimidating of po-
tential witnesses; or (E) otherwise seriously jeopardizing an investigation or un-
duly delaying a trial.
   In the case of an administrative or grand jury subpoena, the governmental entity
is required to maintain a true copy of the required certification, and the certific-
ation can only be given by a 'supervisory official'.  The subsection defines such an
official as the investigative agent in charge of an agency's headquarters or region-
al office, or the assistant to such an agent or the equivalent, or the chief prosec-
uting attorney or the first assistant prosecuting attorney of an agency's headquar-
ters or regional office, or the equivalent.
   The subsection also provides that extensions of the delay period for not more than
90 days each may be granted by the court upon application or by certification by the
government agency provided the requirements of subsection (b) of section 2705 are
met for each extension.
   When the delay period, including any extensions thereof, as provided in this sub-
section and subsection (b), has expired the governmental entity must serve upon, or
deliver by registered or first-class mail to the customer or subscriber, a copy of
the process or request together with notice that states the nature of the law en-
forcement inquiry and informs the customer or subscriber: (i) that the information
maintained for such customer or subscriber by the service provider was supplied or
requested by the Government agency and stating the date on which the information was
supplied or requested; (ii) that notification to the customer of this action was
delayed; (iii) what Government entity or court made the certification or determina-
tion that notification could be delayed; and (iv) which provision or provisions of
this chapter allowed the delay.
   Subsection (b) provides that if a governmental entity has delayed notice or has
not been required to give notice under the provisions of section 2703, then the gov-
ernmental entity may also apply to the court for an order commanding a provider of
electronic communications service or remote computing service to whom a warrant,
subpoena, or court order is directed, not to notify any peson of the existence of
the warrant, subpoena, or court order. The court is required to enter such an order
to prevent disclosure by the service provider if notification of the existence of
the warrant, subpoena, or court order will result in any of the five adverse results
listed in this subsection.  The entity must apply to a court for preclusion under

this subsection, even if the underlying process--an administrative subpoena, for ex-
ample--does not require a court order.

New section 2706--Cost reimbursement

   This proposed section provides that when a governmental entity obtains the con-
tents of communications, records or other information under the authority of sec-
tions 2702, 2703, or 2704, it shall pay to the person or entity assembling or
providing the information a fee for reimbursement for the reasonably necessary dir-
ect costs.  The section provides an exception to this general rule with regard to
records or other information maintained by a communications **3597 *43 common carri-
er that relate to telephone toll records and telephone listings obtained under sec-
tion 2703.  No fee is normally required for access to such records. However, the
court may order a payment if the court determines the information required is unusu-
ally voluminous.  The amount of the fee provided in this subsection is to be mutu-
ally agreed upon by the governmental entity and the person or entity providing the
information.  If they are unable to reach an agreement, the court which issued the
order for production of the information, or the court before which a criminal pro-
secution relating to the information would be brought if no court order was issued,
is empowered to determine a reasonable fee.

New section 2707--Civil action

   Subsection (a) of this proposed section provides that, except as provided in sec-
tion 2703(e), any provider of electronic communication service, subscriber, or cus-
tomer of such service aggrieved by any violation of this new chapter may recover
from any person or entity--including governmental entities--who knowingly or inten-
tionally violated this chapter.
   Under subsection (b), appropriate relief in a civil action under this title in-
cludes:  (1) such preliminary, declaratory, or other equitable relief as may be ap-
propriate; (2) damages under the section including the sum of actual damages
suffered by the plaintiff and any profits made by the violator as the result of the
violation as provided in (c) with minimum statutory damages of $1,000; and (3) reas-
onable attorney's fees and other reasonable litigation costs.
   The section also provides a defense to an action under this chapter.  If the de-
fendant's action was based on a good faith reliance on a court order or warrant, a
grand jury subpoena, a legislative or statutory authorization; or a request of an
investigative or law enforcement officer under section 2518(7) of this title, or if
it was based on a good faith determination that section 1511(3) of this title per-
mitted the conduct complained of, then this good faith reliance or determination is
a complete defense to any civil or criminal action brought under this chapter or un-
der any other law.
   This new section also provides that any action under this section must be com-
menced not later than 2 years after the date upon which the claimant first dis-
covered or had a reasonable opportunity to discover that a violation had occurred.

New section 2708--Exclusivity of remedies

   The remedies and sanctions provided in this chapter are the only judicially avail-

able remedies and sanctions for nonconstitutional violations of the chapter.

New section 2709.--Counterintelligence access to telephone toll and transactional
records

    Section 2709 provides for FBI counterintelligence access to telephone toll and
transactional records. This provision is substantially the same as language re-
cently reported by the Intelligence Committee as section 503 of the Intelligence Au-
thorization Act for Fical Year 1987. There are two differences. The first is that
section 2709 applies not only to FBI requests for telephone subscriber information
and toll billing information, but also to FBI requests **3598 *44 for electronic
communication transactional records. This ensures that the FBI has the necessary
authority with regard to subscriber information and toll billing information with
respect to electronic communication services other than ordinary telephone service.
    Section 2709 is a carefully balanced provision that remedies the defect in current
law that the FBI cannot gain access on a mandatory basis to telephone toll records
maintained by communications common carriers, for counterintelligence purposes. As
a result, especially in states where public regulatory bodies have created obstacles
to providing such access, the FBI has been prevented from obtaining these records,
which are highly important to the successful investigation of counterintelligence
cases.
    The second difference concerns the standard that the FBI must meet before it can
require a common carrier or service provider to supply the requested records. Sec-
tion 2709 requires a certification by a designated FBI official that the information
sought is relevant to an authorized foreign counterintelligence investigation and
that there are specific and articulable facts giving reason to believe that the per-
son or entity to whom the information sought pertains a foreign power or an agent of
a foreign power as defined in section 101 of the Foreign Intelligence Surveillance
Act of 1978. Section 503 of the Intelligence Authorization Act for Fiscal Year 1987,
as reported by the Intelligence Committee, contains a slightly different 'reason to
believe' standard requiring specific and articulable facts giving reason to believe
that the target 'is or may be' a foreign power or an agent of a foreign power.
    Subsection 2709(a) of this proposed section provides that a wire or electronic
communication service provider must comply with a request for subscriber information
and toll billing records in its custody or possession made by the Director of the
Federal Bureau of Investigation under subsection (b) of this section. It should be
noted that this applies only to transactional records, not to the content of the
electronic messages of a customer or subscriber.
    Subsection 2709(b) provides that in order for the requirement to provide informa-
tion in subsection (a) of this section to apply, the Director of the Federal Bureau
of Investigation, or a specific person within the Bureau designated for this purpose
by the Director, must certify in writing to the wire or electronic communication
service provider that (1) the information sought is relevant to an authorized for-
eign counterintelligence investigation; and (2) that there are specific, articulable
facts giving reason to believe that the person or entity to whom the information
sought pertains is a foreign power or an agent of a foreign power as defined in sec-
tion 101 of the Foreign Intelligence Surveillance Act.
    The House Judiciary Committee report on the Electronic Communications Privacy Act

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of 1986 does not discuss the meaning of the 'reason to believe' standard in section
2709.  It is essential, therefore, to clarify the intent of the Senate with respect
to this item.

   The 'reason to believe' requirement in section 2709 is intended to be substan-
tially less stringent than the requirement of 'probable cause.'  It is intended that
the application of the 'reason to believe' requirement will be determined by a seni-
or FBI official at the level of Deputy Assistant Director or above.  It is intended
that **3599 *45 in applying the 'reason to believe' standard to a specific case, the
FBI official may take into account any facts or circumstances that a prudent invest-
igator would consider, so long as there is an objective, factual basis of the de-
termination.

   The Senate Select Committee on Intelligence has informed the Judiciary Committee
that the language contained in the bill would not significantly affect the applica-
tion of the current FBI investigative standard in this area. Further discussion of
the investigatory standard in particular cases is contained in the reports of the
Senate Select Committee on Intelligence and the House Permanent Select Committee on
Intelligence on FY 87 Intelligence Authorization Act (S. 2477 and H.R. 4759).

   Subsection 2709(c) prohibits a service provider, or any officer, employee, or
agent of the service provider from disclosing to any person that the Federal Bureau
of Investigation has sought or obtained access to information or records under this
section.

   Subsection 2709(d) permits the Federal Bureau of Investigation to disseminate such
information only in conformance with guidelines approved by the Attorney General for
foreign intelligence and foreign counterintelligence investigations.  If the inform-
ation is to be disseminated to another federal agency, it can only be disseminated
if the information is clearly relevant to the authorized responsibilities of such
agency.

   Subsection 2709(e) further requires that on a semiannual basis the Director of the
Federal Bureau of Investigation fully inform the Permanent Select Committee on In-
telligence of the House of Representatives and the Select Committee on Intelligence
of the Senate concerning all requests made by the Bureau under subsection 2709(b).

New section 2710--Definitions for chapter

   Terms used in section 2510 retain the definitions given to each term by that sec-
tion.  The term 'remote computing service' is defined to mean the provision to the
public of computer storage, or computer processing services by means of an electron-
ic communications system.

   This section also provides for the change in the table of chapters of  title 18 of
the United States Code by adding chapter 121 to the table.

Section 202--Effective date

   This section provides that the amendments made by Title II of the bill shall be
effective 90 days after the date of enactment.  It further provides that changes
made by this title that apply to conduct pursuant to court order or extension, apply
only with respect to court orders or extensions made after the effective date of the
title.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541,  1986 U.S.C.C.A.N. 3555)**

TITLE III--PEN REGISTERS AND TRAP AND TRACE DEVICES

   Title III of the Electronic Communications Privacy Act proposes to add a new
chapter 206 to title 18 of the United States Code. This chapter will govern the use,
application and issuance of orders for pen registers and trap and trace devices.
Those terms are defined **3600 *46 in proposed section 3126 of title 18. Briefly, a
pen register is a device which can be attached to a telephone line for the purpose
of decoding and recording the numbers dialed from that line.  A trap and trace
device is used to identify the originating number of an incoming wire or electronic
communication.  These devices do not identify or record the contents of the commun-
ciation.

Section 301--Pen registers and trap and trace devices

   Subsection 301(a) of the Electronic Communications Privacy Act sets out the six
proposed sections of title 18 governing pen registers and trap and trace devices.

New section 3121--General prohibition on use of pen registers and trap and trace
devices

   Subsection (a) of proposed section 3121 of title 18 contains a general prohibition
against the installation or use of a pen register or trap and trace device without a
court order.  Such a court order may be obtained under section 3123 of title 18 or
under the Foreign Intelligence Surveillance Act (FISA).
   Proposed subsection 3121(b) contains exceptions to subsection (a)'s general pro-
hibition against the use of pen registers and trap and trace devices.  Providers of
electronic or wire communication services may use pen registers or trap and trace
devices if one of three conditions are met.  The provider may use a pen register or
trap and trace device (1) if it relates to the operation, maintenance, and testing
of a wire or electronic communication service, or to the protection of the rights or
property of such provider, or to the protection of users of that service from abuse
or unlawful use of the service; (2) to record the fact that a wire or electronic
communication was initiated or completed in order to protect the provider, another
provider furnishing service toward completion, or a user of that service from fraud-
ulent, unlawful or abusive use of service; or (3) where the consent of the user has
been obtained.
   Proposed subsection 3121(c) imposes a penalty for a knowing violation of subsec-
tion (a).  The penalty is a fine under this title, imprisonment for up to 1 year, or
both.

New section 3122--Applications

   Proposed section 3122 of title 18 sets out the procedures for applying for a court
order for a pen register or trap and trace device.  Under subsection (a), a govern-
ment attorney may apply for an order, or the extension of an order, authorizing or
approving the installation and use of a pen register or trap and trace device. Such
order must be made in writing under oath or affirmation to a court of competent jur-
isdiction.
   Proposed paragraph 3122(a)(2) contains parallel provisions for state investigative

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541,  1986 U.S.C.C.A.N. 3555)**

or law enforcement officers.  The phrase 'Unless prohibited by state law,' makes
clear that this law does not preempt any existing state law regulating the installa-
tion and use of pen registers or trap and trace devices by state officials.  To the
extent that state law currently provides that a pen register or trap and trace
device may only be installed or used by a state official based on some other, higher
standard of proof, that law will continue in effect with respect to such officials.

**\*\*3601 \*47** Proposed subsection 3122(b) of title 18 sets out the contents required
in an application for a court order for a pen register or a trap and trace device.
The application must include the identity of the applicant and the law enforcement
agency conducting the investigation.  Also, the applicant must certify that the in-
formation likely to be obtained is relevant to an ongoing criminal investigation be-
ing conducted by the agency.

New section 3123--Issuance of orders

   Subsection (a) of proposed section 3123 provides that, upon application, a court
shall issue an ex parte order authorizing the installation and use of a pen register
or trap and trace device within its jurisdiction.  To issue an order, the court must
first be satisfied that the information sought is relevent to an ongoing criminal
investigation.  This provision does not envision an independent judicial review of
whether the application meets the relevance standard, rather the court needs only to
review the completeness of the certification submitted.

   Proposed paragraph 3123(b)(1) describes the contents of the order authorizing the
use or installation of a pen register or trap and trace device.  The order shall
specify (A) the identity, if known, of the person whose telephone line will receive
the pen register; (B) the identity, if known, of the person who is under criminal
investigation; (C) the number and, if known, location of the telephone line and, in
the case of a trap and trace device, the geographic limits of the order; and (D) a
statement of the offense to which the information likely to be obtained relates.

   Under proposed paragraph 3123(b)(2), the order, upon request of the applicant,
shall direct a third party to furnish information, facilities, and technical assist-
ance necessary to install the pen register or trap and trace device.  This provision
of the order relating to cooperation is intended to codify the existing informal
practice of cooperation between telephone companies and the Department of Justice.

   Under proposed subsection 3123(c), the time period of authorization of installa-
tion and use of a pen register or a trap and trace device is 60 days, with possible
extensions of 60 days. An extension may be granted upon application for a section
3122 order. The same judicial findings required by subsection 3123(a) are also re-
quired.

   Proposed subsection 3123(d) provides that an order authorizing or approving the
installation and use of a pen register or trap and trace device shall direct that
the order be sealed, until otherwise ordered by the court.  In addition, the order
shall bar the disclosure of the existence of the pen register or trap and trace
device and the disclosure of an investigation to the listed subscriber or to any
other unauthorized person unless or until otherwise directed by the court.  Inten-
tional violations of the non-disclosure provisions may be, in appropriate circum-
stances, punishable as contempt.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

New section 3124--Assistance in installation and use

   Proposed subsection 3124(a) provides that upon the request of an authorized per-
son, a wire or electronic communication service provider, landlord, custodian, or
other person shall furnish such requester **\*48 \*\*3602** with all information, facil-
ities, and technical assistance necessary to effectuate the pen register order unob-
trusively and with a minimum of interference. The Committee assumes that the current
practice of law enforcement officials installing and maintaining pen registers will
continue.
   For trap and trace devices, proposed subsection 3124(b) provides that upon request
of a government attorney or law enforcement officer authorized to receive the res-
ults, a wire or electronic communication service provider, landlord, custodian or
other person shall promptly install the trap and trace device and furnish the re-
quester all additional information, facilities and technical assistance, including
installation and operation of the device unobtrusively and with a minimum of inter-
ference with services, provided that the installation and service is ordered under
section 3123(b).  This provision also requires that the results be furnished to the
law enforcement officer designated by the court, at reasonable intervals, during
regular business hours for the duration of the order, unless the court orders other-
wise.
   Proposed subsection 3124(c) provides reasonable compenation for those providing
facilities and assistance under this section.  This compensation provision is
modeled after that which applies under section 2518 of title 18 and subsection
106(b) of this bill.  It is intended to be interpreted and implemented in a similar
fashion.
   Proposed subsection 3124(d) provides that no cause of action shall lie in any
court against a wire or electronic communication service provider, its officers,
agents, employees or other specified persons for providing information, assistance
or facilities in accordance with the terms of a chapter 206 court order.
   Proposed subsection 3124(e) establishes a good faith defense against any civil or
criminal action brought under chapter 206 or any other law.

New section 3125--Reports

   Under a current order of the Attorney General, statistics concerning pen registers
are compiled.  Proposed section 3125 requires that this information be reformulated
and submitted to the appropriate committees of Congress.  It also extends such re-
porting requirements to trap and trace devices.
   Specifically, proposed section 3125 requires that the Attorney General annually
report to Congress on the number of pen register and trap and trace device orders
applied for by law enforcement agencies of the Department of Justice.  The Committee
requests that these reports include information as to the nature of the offenses for
which the pen registers and trap and trace devices are being used.

New section 3126--Definitions

   Proposed section 3126 contains definitions for this chapter. The terms  'wire com-
munication,' 'electronic communication,' and 'electronic communication service' have

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the same meanings as in section 2510 of title 18.  The term 'court of competent jur-
isdiction' means (A) a district court of the United States (including a magistrate
of such court) or a U.S. Court of Appeals; or (B) a state court **3603 *49 of gener-
al criminal jurisdiction authorized to enter pen register or trap and trace orders.

   As indicated in proposed section 3126(3), the term 'pen register' means a device
which records or decodes electronic or other impulses which identify the numbers
dialed or otherwise transmitted for purposes of routing telephone calls, with re-
spect to wire communications, on the telephone line to which such device is at-
tached.  Pen registers do not record the contents of a communication.  They record
only the telephone numbers dialed.

   Devices used by a provider or customer or wire or electronic communication service
incident to billing or cost accounting, or for any other similar purposes in the or-
dinary course of business are excluded from the definition of a pen register.  Thus,
devices that many companies and firms use to record billable time for their clients'
accounts are outside this bill's prohibitions against the installation and use of
pen registers.

   Trap and trace devices are defined in proposed subsection 3126(4).  A 'trap and
trace device' is a device which captures the incoming electronic or other impulses
which identify the originating number of an incoming wire or electronic communica-
tion.  Trap and trace devices do not record the contents of communications.

   The term 'attorney for the government' has the meaning given to that term by the
Federal Rules of Criminal Procedure.  The term 'State' means a State, the District
of Columbia, Puerto Rico, and any other possession or territory of the United
States.

   Subsection 301(b) of the bill contains a clerical amendment to the table of
chapters.


Section 302--Effective date

   Section 302 of the bill contains the effective date for Title III of the Electron-
ic Communications Privacy Act.  Subsection (a) provides that as a general rule,
Title III of the bill shall take effect 90 days after enactment. In the case of con-
duct pursuant to a court order or extension, these amendments apply only with re-
spect to court orders or extensions made after this title takes effect. Subsection
302(b) of the bill contains special rules which, in essence, give states two years
to bring their laws into conformity with the Electronic Communications Privacy Act's
amendments to Federal law.


Section 303--Interference with the operation of a satellite

   This section of the bill adds a new section to chapter 65 of title 18, United
States Code.


New section 1367--Interference with the operation of a satellite

   Subsection (a) of this proposed section provides that anyone who, without the au-
thority of the satellite operator, intentionally or maliciously interferes with the
authorized operation of a satellite or obstructs or hinders any satellite transmis-
sion, including both the transmission from the ground to the satellite and the

                    © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541,  1986 U.S.C.C.A.N. 3555)**

transmission from the satellite to the ground (commonly known as the up-link and the
down-link respectively) is subjected to criminal penalties including a fine of up to
$250,000, imprisonment for not more than 10 years, or both.  The subsection does not
prohibit any actions by **3604 *50 the authorized satellite operator which are de-
signed to protect the satellite from unauthorized use.

Subsection (b) of this new section makes it clear that the criminal act described
in subsection (a) does not include any lawfully authorized investigative, protect-
ive, or intelligence activity of a law enforcement or intelligence agency of the
United States.  This subsection does not provide any new authority for such activit-
ies.

Finally, this section of the bill provides that the table of sections for  chapter
65 of title 18 is amended to include the new section 1367.

                        VI.  AGENCY VIEWS

On June 25, 1986 and July 29, 1986, the Committee received the following letters
from the Department of Justice.

    U.S. DEPARTMENT OF JUSTICE,

    OFFICE OF LEGISLATIVE AND INTERGOVERNMENTAL AFFAIRS,

    Washington, DC, June 25, 1986.

Hon. STROM THURMOND,
Chairman, Committee on the Judiciary, U.S. Senate, Washington, DC.
DEAR MR. CHAIRMAN:  This letter is to advise you of the Department of Justice's
position with regard to S. 2575, the Electronic Communications Privacy Act of 1986.
This bill, which is identical to H.R. 4952 as recently passed by the House of Rep-
resentatives, makes important changes to the existing wiretap statutes and fills
gaps in current laws by creating provisions to regulate interception of and access
to new forms of electronic communication such as data transmissions.

The Department of Justice has worked intensively on this legislation over the past
several weeks with the staff of the Subcommittee on Patents, Copyrights and Trade-
marks, as well as with interested representatives of industry and civil liberties
groups. While initial versions of this legislation did not in our view adequately
safeguard legitimate and vital law enforcement and national security needs for ac-
cess to communications, as a result of the negotiations that have occurred the bill
has been substantially modified to accommodate our concerns.  In our judgment the
bill as presently drafted fairly balances the interests of privacy and law enforce-
ment and its enactment would represent a major accomplishment of the 99th Congress,
holding forth the promise of significant benefits for business, privacy, and law en-
forcement alike.

Accordingly, the Department of Justice strongly supports the enactment of  S.
2575.

Sincerely,
    JOHN R. BOLTON,

                © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541, 1986 U.S.C.C.A.N. 3555)**

Assistant Attorney General.

**\*\*3605 \*51** U.S. DEPARTMENT OF JUSTICE,

OFFIE OF LEGISLATIVE AND

INTERGOVERNMENTAL AFFAIRS,

Washington, DC, 20530 July 29, 1986.

Hon. STROM THURMOND,
Chairman, Committee on the Judiciary, U.S. Senate, Washington, DC.
   DEAR MR. CHAIRMAN: This is with further reference to my letter of June 25, 1986,
expressing support for S. 2575, the Electronic Communications Privacy Act of 1986.
A copy of my earlier letter is enclosed for ready reference.
   We continue to believe that this measure is a well balanced one which, in addition
to modernizing the 1968 electronic surveillance law, also benefits both law enforce-
ment and individual privacy by clarifying many aspects of this highly complex area
of the law. As the 99th Congress is rapidly drawing to a close, we sincerely hope
that the Senate will act on S. 2575 at an early date.
   We would deeply appreciate your consideration of S. 2575 and, if possible, your
formal co-sponsorship of the bill. Having your name on the bill would, we believe,
be most helpful in efforts to process this important legislation this year.

Sincerely,
     JOHN R. BOLTON,

     Assistant Attorney General.

                    VII.  COST ESTIMATE

   U.S. CONGRESS,

   CONGRESSIONAL BUDGET OFFICE,

   Washington, DC, September 23, 1986.

Hon. STROM THURMOND,
Chairman, Committee on the Judiciary, U.S. Senate, Washington, DC.
   DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed S. 2575, the
Electronic Communications Privacy Act of 1986, as ordered reported by the Senate
Committee on the Judiciary, September 19, 1986. CBO estimates that enactment of
this legislation would result in no significant cost to the federal government and
in no cost to state or local governments.
   S. 2575 would make a number of amendments to Title 18 of the U.S. Code concerning
access to electric communications. Title I of the bill would establish penalties
for the unlawful interception or disclosure of electronic communications, provide
for the recovery of civil damages for persons whose communications are intercepted,
disclosed or used in violation of this provision, and modify procedures for govern-
ment interception of communications. Title II would create specific penalties for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

unlawful access to stored wire and electronic communications, while Title III would establish a general prohibition on the use of pen registers.  These titles would mandate specific procedures for access to stored communications and use of pen registers by government entities, and Title II would allow for civil actions.

**\*\*3606 \*52** S. 2575 would require government entities to compensate private parties assembling or providing information concerning stored electronic communications, or assisting in the installation and use of a pen register.  Because such compensation is currently provided in Department of Justice (DOJ) investigations, CBO does not expect the these provisions would result in any significant additional cost to the federal government.

Based on information from the DOJ, we do not expect that enactment of this bill would result in a significant change in the government's law enforcement practices or expenditures.  S. 2575 would specifically authorize law enforcement efforts the DOJ is currently undertaking with other authority.

If you wish further details on this estimate, we will be pleased to provide them.

With best wishes,

Sincerely,

    JAMES BLUM

    (for Rudolph G. Penner, Director).

### VIII.   REGULATORY IMPACT STATEMENT

In compliance with paragraph 11(b) of Rule XXVI of the Standing Rules of the Senate, the Committee has concluded that no significant additional regulatory impact would be incurred in carrying out the provisions of this legislation. After due consideration, the Committee concluded that the changes in existing law contained in the bill will not increase or diminish any present regulatory responsibilities of the U.S. Department of Justice or any other department or agency affected by the legislation.

### IX.   VOTE OF COMMITTEE

On August 12, 1986, the Subcommittee on Patents, Copyrights, and Trademarks, with a quorum present, reported S. 2575, with an amendment in the nature of a substitute, to the Committee on the Judiciary by voice vote.  On September 19, 1986, the Judiciary Committee adopted two further changes in the bill as reported by the Subcommittee.  The Judiciary Committee, with a quorum present, and without objection heard, approved the amendment in the nature of a substitute.  The Committee then favorably reported S. 2575, as amended, by unanimous consent.

FN1.  98 S.Ct. 364, 54 L.Ed.2d 376.

FN2.  These new forms of telecommunications and computer technology are described in the Glossary below.

FN3.  96 S.Ct. 1619, 48 L.Ed.2d 71.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 99-541, S. Rep. No. 541, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N.
3555, 1986 WL 31929 (Leg.Hist.)
**(Cite as: S. REP. 99-541,  1986 U.S.C.C.A.N. 3555)**

  FN4  Multiplexing refers to the transmission of communications by means of modula-
tion techniques whose essential parameters have been withheld from the public.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 5


S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**

P.L. 95-511, FOREIGN INTELLIGENCE SURVEILLANCE ACT OF 1978

SEE PAGE 92 STAT. 1783

SENATE REPORT (JUDICIARY COMMITTEE) NO. 95-604 (I AND II),

NOV. 15, 1977 (TO ACCOMPANY S. 1566)

SENATE REPORT (INTELLIGENCE COMMITTEE) NO. 95-701,

MAR. 14, 1978 (TO ACCOMPANY S. 1566)

HOUSE REPORT (INTELLIGENCE COMMITTEE) NO.  95-1283,

JUNE 8, 1978 (TO ACCOMPANY H.R. 7308)

HOUSE CONFERENCE REPORT NO. 95-1720,

OCT. 5, 1978 (TO ACCOMPANY S. 1566)

CONG. RECORD VOL. 124 (1978)

DATES OF CONSIDERATION AND PASSAGE

SENATE APRIL 20, OCTOBER 9, 1978

HOUSE SEPTEMBER 7, OCTOBER 12, 1978

THE SENATE BILL WAS PASSED IN LIEU OF THE HOUSE BILL.  THE SENATE REPORTS (THIS
PAGE, P. 3970, P. 3973) AND THE HOUSE CONFERENCE REPORT (P. 4048) ARE SET OUT.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED MATERIAL.  EACH
COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

SENATE REPORT NO. 95-604(I)

NOV. 15, 1977

**\*1 \*\*3904** THE COMMITTEE ON THE JUDICIARY, TO WHICH WAS REFERRED THE BILL (S. 1566)
TO AMEND TITLE 18, U.S.C.  TO AUTHORIZE APPLICATIONS FOR A COURT ORDER APPROVING THE
USE OF ELECTRONIC SURVEILLANCE TO OBTAIN FOREIGN INTELLIGENCE INFORMATION, HAVING
CONSIDERED THE SAME, REPORTS FAVORABLY THEREON WITH AMENDMENTS AND RECOMMENDS THAT
THE BILL, AS AMENDED, DO PASS.

\*          \*          \*          \*

**\*3** PURPOSE OF AMENDMENTS

THE AMENDMENTS TO S. 1566 ARE DESIGNED TO CLARIFY AND MAKE MORE EXPLICIT THE STAT-
UTORY INTENT, AS WELL AS TO PROVIDE FURTHER SAFEGUARDS FOR INDIVIDUALS SUBJECTED TO
ELECTRONIC SURVEILLANCE PURSUANT TO THIS NEW CHAPTER.  CERTAIN AMENDMENTS ARE ALSO
DESIGNED TO PROVIDE A DETAILED PROCEDURE FOR CHALLENGING SUCH SURVEILLANCE, AND ANY
EVIDENCE DERIVED THEREFROM, DURING THE COURSE OF A FORMAL PROCEEDING.

FINALLY, THE REPORTED BILL ADDS AN AMENDMENT TO CHAPTER 119 OF TITLE 18, U.S.C.
(TITLE III OF THE OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1968, PUBLIC LAW
90-351, SECTION 802).  THIS LATTER AMENDMENT IS TECHNICAL AND CONFORMING IN NATURE
AND IS DESIGNED TO INTEGRATE CERTAIN PROVISIONS OF CHAPTERS 119 AND 120.  A MORE DE-
TAILED EXPLANATION OF THE INDIVIDUAL AMENDMENTS IS CONTAINED IN THE SECTION-
BY-SECTION ANALYSIS OF THIS REPORT.

**\*\*3905** HISTORY OF THE BILL

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**


   THE 'FOREIGN INTELLIGENCE SURVEILLANCE ACT OF 1977', S. 1566, WAS INTRODUCED BY
SENATOR KENNEDY ON MAY 18, 1977 TO PROVIDE A STATUTORY PROCEDURE FOR THE AUTHORIZA-
TION OF APPLICATIONS FOR A COURT ORDER APPROVING THE USE OF ELECTRONIC SURVEILLANCE
TO OBTAIN FOREIGN INTELLIGENCE INFORMATION.  THE BILL, COSPONSORED BY SEVEN OTHER
SENATORS (MR. BAYH, MR. EASTLAND, MR. INOUYE, MR. MCCLELLAN, MR. MATHIAS, MR. NELSON
AND MR. THURMOND), WAS REFERRED TO AND CONSIDERED BY THE COMMITTEE ON THE JUDICIARY.
   S. 1566 HAS ITS ORIGIN IN S. 3197, 'THE FOREIGN INTELLIGENCE SURVEILLANCE ACT OF
1976', 94TH CONG. 2D SESS. (1976).  THAT LEGISLATION, ALSO INTRODUCED BY SENATOR
KENNEDY WITH BROAD, BIPARTISAN SUPPORT, INCLUDING THAT OF THE FORD ADMINISTRATION,
WAS THE SUBJECT OF SENATE HEARINGS BY BOTH THE SUBCOMMITTEE ON CRIMINAL LAWS AND
PROCEDURES OF THE COMMITTEE ON THE JUDICIARY AND THE SELECT COMMITTEE ON INTELLI-
GENCE. S. 3197 WAS REPORTED FAVORABLY BY BOTH SENATE COMMITTEES **4** BY A COMBINED
VOTE OF 24 AYES TO 2 NAYS, BUT THE SESSION ENDED BEFORE THE FULL SENATE COULD ACT ON
THE LEGISLATION.
   S. 1566 PICKS UP WHERE S. 3197 LEFT OFF.  FOLLOWING THE INTRODUCTION OF THE MEAS-
URE, TWO DAYS OF HEARINGS WERE HELD BY THE SUBCOMMITTEE ON CRIMINAL LAWS AND PROCED-
URES, CHAIRED BY SENATOR KENNEDY AT THE REQUEST OF SENATOR MCCLELLAN.  EIGHT WIT-
NESSES TESTIFIED, AND A NUMBER OF OTHER INDIVIDUALS SUBMITTED STATEMENTS FOR THE
HEARING RECORD.  AMONG THOSE TESTIFYING WERE ATTORNEY GENERAL GRIFFIN B. BELL; DIR-
ECTOR OF THE FBI, CLARENCE KELLEY; DIRECTOR OF THE CENTRAL INTELLIGENCE AGENCY,
STANSFIELD TURNER; SECRETARY OF DEFENSE HAROLD BROWN; JOHN SHATTUCK OF THE AMERICAN
CIVIL LIBERTIES UNION; AND MORTON H. HALPERIN OF THE CENTER FOR NATIONAL SECURITY
STUDIES.
   BROAD-BASED SUPPORT WAS VOICED FOR S. 1566 THROUGHOUT THE HEARING, WITH THE ADMIN-
ISTRATION INDICATING ITS SUPPORT OF THE BILL.
   S. 1566 AS REPORTED, HOWEVER, HAS BEEN AMENDED IN RELATIVE MINOR RESPECTS TO RE-
SPOND TO THE CONSTRUCTIVE CRITICISMS AND SUGGESTIONS ELICITED IN THE HEARINGS.  AS
AMENDED, THE BILL WAS APPROVED BY THE SUBCOMMITTEE ON CRIMINAL LAWS AND PROCEDURES
WITH A UNANIMOUS RECOMMENDATION FOR FAVORABLE ACTION.

                          POSITION OF THE ADMINISTRATION

   THE ADMINISTRATION SUPPORTS THE ENACTMENT OF S. 1566 AND HAS SUPPORTED ITS SWIFT
PASSAGE.  AS ATTORNEY GENERAL BELL STATED IN TESTIFYING IN FAVOR OF THE BILL:
   I BELIEVE THIS BILL IS REMARKABLE NOT ONLY IN THE WAY IT HAS BEEN DEVELOPED, BUT
ALSO IN THE FACT THAT FOR THE FIRST TIME IN OUR SOCIETY THE CLANDESTINE INTELLIGENCE
ACTIVITIES OF OUR GOVERNMENT SHALL BE SUBJECT TO THE REGULATION AND RECEIVE THE POS-
ITIVE AUTHORITY OF A PUBLIC LAW FOR ALL TO INSPECT.  PRESIDENT CARTER STATED IT VERY
WELL IN ANNOUNCING THIS BILL WHEN HE SAID THAT 'ONE OF THE MOST DIFFICULT TASKS IN A
FREE SOCIETY LIKE OUR OWN IS THE CORRELATION BETWEEN ADEQUATE INTELLIGENCE TO GUAR-
ANTEE OUR NATION'S SECURITY ON THE ONE HAND, AND THE PRESERVATION OF BASIC HUMAN
RIGHTS ON THE OTHER.'  IT IS A VERY DELICATE **3906** BALANCE TO STRIKE, BUT ONE WHICH
IS NECESSARY IN OUR SOCIETY, AND A BALANCE WHICH CANNOT BE ACHIEVED BY SACRIFICING
EITHER OUR NATION'S SECURITY OR OUR CIVIL LIBERTIES.  IN MY VIEW THIS BILL STRIKES
THE BALANCE, SACRIFICES NEITHER OUR SECURITY NOR OUR CIVIL LIBERTIES, AND ASSURES
THAT THE ABUSES OF THE PAST WILL REMAIN IN THE PAST AND THAT THE DEDICATED AND PAT-
RIOTIC MEN AND WOMEN WHO SERVE THIS COUNTRY IN INTELLIGENCE POSITIONS, OFTEN UNDER

                    © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SUBSTANTIAL HARDSHIPS AND EVEN DANGER, WILL HAVE THE AFFIRMATION OF CONGRESS THAT
THEIR ACTIVITIES ARE PROPER AND NECESSARY.  [FN1]

GENERAL STATEMENT

I. SUMMARY OF THE LEGISLATION

THE BILL REPORTED BY THE JUDICIARY COMMITTEE AMENDS TITLE 18, U.S.C.  BY ADDING A
NEW CHAPTER AFTER CHAPTER 119, ENTITLED **5** 'ELECTRONIC SURVEILLANCE WITHIN THE
UNITED STATES FOR FOREIGN INTELLIGENCE PURPOSES.'  THE PURPOSE OF THE BILL IS TO
PROVIDE A PROCEDURE UNDER WHICH THE ATTORNEY GENERAL CAN OBTAIN A JUDICIAL WARRANT
AUTHORIZING THE USE OF ELECTRONIC SURVEILLANCE IN THE UNITED STATES FOR FOREIGN IN-
TELLIGENCE PURPOSES.  IF ENACTED, THIS LEGISLATION WOULD REQUIRE A JUDICIAL WARRANT
AUTHORIZING THE FOLLOWING FOR FOREIGN INTELLIGENCE PURPOSES:
(A) THE ACQUISITION OF A WIRE OR RADIO COMMUNICATION SENT TO OR FROM THE UNITED
STATES BY INTENTIONALLY TARGETING A KNOWN UNITED STATES PERSON IN THE UNITED STATES
UNDER CIRCUMSTANCES IN WHICH THE PERSON HAS A REASONABLE EXPECTATION OF PRIVACY AND
A WARRANT WOULD BE REQUIRED FOR LAW ENFORCEMENT PURPOSES.
(B) A WIRETAP IN THE UNITED STATES TO INTERCEPT A WIRE COMMUNICATION, SUCH AS A
TELEPHONE OR TELEGRAM COMMUNICATION;
(C) THE ACQUISITION OF A PRIVATE RADIO TRANSMISSION IN WHICH ALL OF THE COMMUNIC-
ANTS ARE LOCATED WITHIN THE UNITED STATES; OR
(D) THE USE IN THE UNITED STATES OF ANY ELECTRONIC, MECHANICAL OR OTHER SURVEIL-
LANCE DEVICE TO ACQUIRE INFORMATION OTHER THAN A WIRE COMMUNICATION OR RADIO COMMU-
NICATION UNDER CIRCUMSTANCES IN WHICH THE PERSON HAS A REASONABLE EXPECTATION OF
PRIVACY AND A WARRANT WOULD BE REQUIRED FOR LAW ENFORCEMENT PURPOSES.
S. 1566 AUTHORIZES THE CHIEF JUSTICE OF THE UNITED STATES TO DESIGNATE SEVEN DIS-
TRICT COURT JUDGES, ANY ONE OF WHOM MAY HEAR APPLICATIONS FOR AND GRANT ORDERS AP-
PROVING ELECTRONIC SURVEILLANCE FOR FOREIGN INTELLIGENCE PURPOSES.  THE BILL FURTHER
PROVIDES THAT THE CHIEF JUSTICE SHALL DESIGNATE THREE JUDGES FROM THE UNITED STATES
DISTRICT COURTS OR COURTS OF APPEALS TO SIT AS A SPECIAL COURT OF APPEALS TO HEAR
APPEALS BY THE UNITED STATES FROM DENIALS OF APPLICATIONS MADE BY ANY ONE OF THE
SEVEN DISTRICT COURT JUDGES. THE UNITED STATES MAY FURTHER APPEAL FROM THIS SPECIAL
COURT TO THE SUPREME COURT.
UNDER S. 1566, A JUDGE MAY ISSUE A WARRANT AUTHORIZING ELECTRONIC SURVEILLANCE
WITHIN THE UNITED STATES ONLY IF HE FINDS THAT:  THE PRESIDENT HAS AUTHORIZED THE
ATTORNEY GENERAL TO APPROVE APPLICATIONS FOR **3907** SUCH ELECTRONIC SURVEILLANCE;
THE APPLICATION HAS BEEN APPROVED BY THE ATTORNEY GENERAL; ON THE BASIS OF THE FACTS
SUBMITTED TO THE COURT, THERE IS PROBABLY CAUSE TO BELIEVE THAT THE TARGET OF THE
SURVEILLANCE IS A FOREIGN POWER OR AN AGENT OF A FOREIGN POWER; THE PLACE AT WHICH
THE SURVEILLANCE IS DIRECTED IS BEING USED OR ABOUT TO BE USED BY THAT FOREIGN POWER
OR AGENT; MINIMIZATION PROCEDURES TO BE FOLLOWED ARE REASONABLY DESIGNED TO MINIMIZE
THE ACQUISITION AND RETENTION OF INFORMATION RELATING TO AMERICANS THAT IS NOT FOR-
EIGN INTELLIGENCE INFORMATION; EXECUTIVE CERTIFICATION THAT THE INFORMATION SOUGHT
IS FOREIGN INTELLIGENCE INFORMATION WHICH CANNOT REASONABLY BE OBTAINED BY NORMAL
INVESTIGATIVE TECHNIQUES; AND, IF THE TARGET OF THE SURVEILLANCE IS A UNITED STATES
PERSON, SUCH CERTIFICATION IS NOT CLEARLY ERRONEOUS.  THE ORDER MAY APPROVE THE

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)


ELECTRONIC SURVEILLANCE FOR NO LONGER THAN 90 DAYS WITH RESPECT TO ALL NATURAL PER-
SONS AND SOME FOREIGN POWERS, BUT EXTENSIONS OF UP TO 90 DAYS MAY BE GRANTED UPON AN
APPLICATION AND AFTER THE SAME FINDINGS AS REQUIRED FOR THE ORIGINAL ORDER.  WITH
RESPECT TO OFFICIAL 'FOREIGN POWERS', AS DEFINED IN THE LEGISLATION, THE APPROVAL
MAY BE FOR AS LONG AS ONE YEAR.

   IN THE EVENT THAT AN EMERGENCY ARISES AND RESORT TO A COURT IS NOT POSSIBLE, THE
ATTORNEY GENERAL IS AUTHORIZED TO APPROVE ELECTRONIC **6** SURVEILLANCE. SUCH AN EMER-
GENCY SURVEILLANCE CANNOT CONTINUE FOR MORE THAN 24 HOURS WITHOUT A JUDGE'S APPROV-
AL; A JUDGE MUST BE IMMEDIATELY NOTIFIED OF THE EMERGENCY SURVEILLANCE; AND AN AP-
PLICATION MUST BE MADE TO THE JUDGE WITHIN 24 HOURS OF APPROVAL OF THAT EMERGENCY
SURVEILLANCE.

   THE BILL WOULD LIMIT THE USE OF INFORMATION CONCERNING UNITED STATES CITIZENS AND
LAWFUL RESIDENT ALIENS ACQUIRED FROM ELECTRONIC SURVEILLANCES TO MATTERS PROPERLY
RELATED TO FOREIGN INTELLIGENCE AND THE ENFORCEMENT OF CRIMINAL LAW.  NO INFORMATION
OBTAINED FROM AN ELECTRONIC SURVEILLANCE COULD BE USED OR DISCLOSED AGAINST ANY PER-
SON EXCEPT FOR LAWFUL PURPOSES.  A JUDGE MAY ORDER THE NOTIFICATION OF A PERSON UN-
DER ELECTRONIC SURVEILLANCE IF AN EMERGENCY SURVEILLANCE WAS AUTHORIZED BUT SUB-
SEQUENTLY DISAPPROVED BY A JUDGE.

   S. 1566 PROVIDES FOR ANNUAL REPORTS BY THE ATTORNEY GENERAL TO THE CONGRESS AND
THE ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS CONTAINING STATISTICAL INFORM-
ATION RELATING TO SURVEILLANCES DURING THE PRECEDING YEAR.

   THE BILL DOES NOT PROVIDE STATUTORY AUTHORIZATION FOR THE USE OF ANY TECHNIQUE
OTHER THAN ELECTRONIC SURVEILLANCE, AND, COMBINED WITH CHAPTER 119 OF TITLE 18, IT
CONSTITUTES THE EXCLUSIVE MEANS BY WHICH ELECTRONIC SURVEILLANCE, AS DEFINED, AND
THE INTERCEPTION OF DOMESTIC WIRE AND ORAL COMMUNICATIONS MAY BE CONDUCTED; THE BILL
RECOGNIZES NO INHERENT POWER OF THE PRESIDENT IN THIS AREA.

   IN THREE MAJOR RESPECTS S. 1566 INCREASES THE PROTECTIONS FOR UNITED STATES CIT-
IZENS AND LAWFUL RESIDENT ALIENS OVER THOSE CONTAINED IN S. 3197. FIRST, THE DEFINI-
TION OF ELECTRONIC SURVEILLANCE HAS BEEN EXPANDED TO INCLUDE THE TARGETING OF UNITED
STATES PERSONS IN THEIR INTERNATIONAL COMMUNICATIONS. THIS IS SPECIFICALLY AIMED AT
ELIMINATING ONE OF THE ABUSES IDENTIFIED BY THE SENATE SELECT COMMITTEE TO STUDY
GOVERNMENTAL OPERATIONS WITH RESPECT TO INTELLIGENCE ACTIVITIES AND LARGELY IMPLE-
MENTS ONE OF THAT COMMITTEE'S RECOMMENDATIONS.  (BOOK II, INTELLIGENCE ACTIVITIES
AND THE RIGHTS OF AMERICANS, S. REPT. 94-755, 94TH CONG., 2D SESS. 309 (1976).)
SECOND, WHEN A UNITED STATES CITIZEN **3908** OR LAWFUL RESIDENT ALIEN IS THE TARGET
OF AN ELECTRONIC SURVEILLANCE, THE JUDGE IS REQUIRED TO REVIEW THE EXECUTIVE BRANCH
CERTIFICATION TO DETERMINE IF IT IS CLEARLY ERRONEOUS.  NO REVIEW OF THE CERTIFICA-
TION WAS ALLOWED IN S. 3197.  FINALLY, S. 1566 SPELLS OUT THAT THE EXECUTIVE CANNOT
ENGAGE IN ELECTRONIC SURVEILLANCE WITHIN THE UNITED STATES WITHOUT A PRIOR JUDICIAL
WARRANT.  THIS IS ACCOMPLISHED BY REPEALING THE SO-CALLED EXECUTIVE 'INHERENT POWER'
DISCLAIMER CLAUSE CURRENTLY FOUND IN SECTION 2511 (3) OF TITLE 18, UNITED STATES
CODE. S. 1566 PROVIDES INSTEAD THAT ITS STATUTORY PROCEDURES (AND THOSE FOUND IN
CHAPTER 119 OF TITLE 18) 'SHALL BE THE EXCLUSIVE MEANS' FOR CONDUCTING ELECTRONIC
SURVEILLANCE, AS DEFINED IN THE LEGISLATION, IN THE UNITED STATES.  THE HIGHLY CON-
TROVERSIAL DISCLAIMER HAS OFTEN BEEN CITED AS EVIDENCE OF A CONGRESSIONAL RATIFICA-
TION OF THE PRESIDENT'S INHERENT CONSTITUTIONAL POWER TO ENGAGE IN ELECTRONIC SUR-
VEILLANCE IN ORDER TO OBTAIN FOREIGN INTELLIGENCE INFORMATION ESSENTIAL TO THE NA-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TIONAL SECURITY. DESPITE THE ADMONITION OF THE SUPREME COURT THAT THE LANGUAGE OF
THE DISCLAIMER WAS 'NEUTRAL'  AND DID NOT REFLECT ANY SUCH CONGRESSIONAL RECOGNITION
OF INHERENT POWER, THE SECTION HAS BEEN A MAJOR SOURCE OF CONTROVERSY.  BY REPEALING
**\*7** SECTION 2511(3) AND EXPRESSLY STATING THAT THE STATUTORY WARRANT PROCEDURES
SPELLED OUT IN THE LAW MUST BE FOLLOWED IN CONDUCTING ELECTRONIC SURVEILLANCE IN THE
UNITED STATES, THIS LEGISLATION ENDS THE EIGHT-YEAR DEBATE OVER THE MEANING AND
SCOPE OF THE INHERENT POWER DISCLAIMER CLAUSE.

### II.  STATEMENT OF NEED

   THE FEDERAL GOVERNMENT HAS NEVER ENACTED LEGISLATION TO REGULATE THE USE OF ELEC-
TRONIC SURVEILLANCE WITHIN THE UNITED STATES FOR FOREIGN INTELLIGENCE PURPOSES.  AL-
THOUGH EFFORTS HAVE BEEN MADE IN RECENT YEARS BY SENATOR PHILIP A. HART TO CIRCUM-
SCRIBE THE POWER OF THE EXECUTIVE BRANCH TO ENGAGE IN SUCH SURVEILLANCE, AND THE
SENATE CAME VERY CLOSE TO ENACTING SUCH LEGISLATION DURING THE 94TH CONGRESS, THE
FACT REMAINS THAT SUCH EFFORTS HAVE NEVER BEEN SUCCESSFUL.  [FN2]  THE HEARINGS HELD
THIS YEAR ON S. 1566 WERE THE SIXTH SET OF HEARINGS ON WARRANTLESS WIRE-TAPPING IN
AS MANY YEARS. [FN3] THE COMMITTEE BELIEVES THAT S. 1566 IS A MEASURE WHICH CAN SUC-
CESSFULLY BREAK THIS IMPASSE AND PROVIDE EFFECTIVE, REASONABLE SAFEGUARDS TO ENSURE
ACCOUNTABILITY AND PREVENT IMPROPER SURVEILLANCE. S. 1566 GOES A LONG WAY IN STRIK-
ING A FAIR AND JUST BALANCE BETWEEN PROTECTION OF NATIONAL SECURITY AND PROTECTION
OF PERSONAL LIBERTIES.  IT IS A RECOGNITION BY BOTH THE EXECUTIVE BRANCH AND THE
CONGRESS THAT THE STATUTORY RULE OF LAW MUST PREVAIL IN THE AREA OF FOREIGN INTELLI-
GENCE SURVEILLANCE.
   THE NEED FOR SUCH STATUTORY SAFEGUARDS HAS BECOME APPARENT IN RECENT YEARS.  THIS
LEGISLATION IS IN LARGE MEASURE A RESPONSE TO THE REVELATIONS THAT WARRANTLESS ELEC-
TRONIC SURVEILLANCE IN THE NAME OF NATIONAL SECURITY HAS BEEN SERIOUSLY ABUSED.
THESE ABUSES WERE INITIALLY ILLUMINATED IN 1973 DURING THE INVESTIGATION OF THE WA-
TERGATE BREAK-IN.  SINCE THAT TIME, HOWEVER, THE SENATE SELECT COMMITTEE TO STUDY
GOVERNMENT OPERATIONS WITH RESPECT TO INTELLIGENCE ACTIVITIES, CHAIRED BY SENATOR
CHURCH (HEREAFTER REFERRED TO AS THE CHURCH COMMITTEE), HAS CONCLUDED THAT EVERY
PRESIDENT SINCE FRANKLIN D. ROOSEVELT ASSERTED THE AUTHORITY TO AUTHORIZE WARRANT-
LESS ELECTRONIC SURVEILLANCE AND EXERCISED THAT AUTHORITY.  WHILE THE NUMBER OF IL-
LEGAL OR IMPROPER **\*\*3909** NATIONAL SECURITY TAPS AND BUGS CONDUCTED DURING THE NIXON
ADMINISTRATION MAY HAVE EXCEEDED THOSE IN PREVIOUS ADMINISTRATIONS, THE SURVEIL-
LANCES WERE REGRETTABLY BY NO MEANS ATYPICAL.  IN SUMMARIZING ITS **\*8** CONCLUSION THAT
SURVEILLANCE WAS 'OFTEN CONDUCTED BY ILLEGAL OR IMPROPER MEANS,' THE CHURCH COMMIT-
TEE WROTE:
   SINCE THE 1930'S, INTELLIGENCE AGENCIES HAVE FREQUENTLY WIRETAPPED AND BUGGED
AMERICAN CITIZENS WITHOUT THE BENEFIT OF JUDICIAL WARRANT . . . . . (PAST SUBJECTS
OF THESE SURVEILLANCES HAVE INCLUDED A UNITED STATES CONGRESSMAN, CONGRESSIONAL
STAFF MEMBER, JOURNALISTS AND NEWSMEN, AND NUMEROUS INDIVIDUALS AND GROUPS WHO EN-
GAGED IN NO CRIMINAL ACTIVITY AND WHO POSED NO GENUINE THREAT TO THE NATIONAL SECUR-
ITY, SUCH AS TWO WHITE HOUSE DOMESTIC AFFAIRS ADVISERS AND AN ANTI-VIETNAM WAR
PROTEST GROUP. (VOL. 2, P.12)

                    *         *         *         *

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

THE APPLICATION OF VAGUE AND ELASTIC STANDARDS FOR WIRETAPPING AND BUGGING HAS
RESULTED IN ELECTRONIC SURVEILLANCES WHICH, BY ANY OBJECTIVE MEASURE, WERE IMPROPER
AND SERIOUSLY INFRINGED THE FOURTH AMENDMENT RIGHTS OF BOTH THE TARGETS AND THOSE
WITH WHOM THE TARGETS COMMUNICATED.  THE INHERENTLY INTRUSIVE NATURE OF ELECTRONIC
SURVEILLANCE, MOREOVER, HAS ENABLED THE GOVERNMENT TO GENERATE VAST AMOUNTS OF IN-
FORMATION-- UNRELATED TO ANY LEGITIMATE GOVERNMENT INTEREST-- ABOUT THE PERSONAL AND
POLITICAL LIVES OF AMERICAN CITIZENS.  THE COLLECTION OF THIS TYPE OF INFORMATION
HAS, IN TURN, RAISED THE DANGER OF ITS USE FOR PARTISAN POLITICAL AND OTHER IMPROPER
ENDS BY SENIOR ADMINISTRATION OFFICIALS. (VOL. 3, P. 32.)

ALSO FORMIDABLE-- ALTHOUGH INCALCULABLE-- IS THE 'CHILLING EFFECT  '  WHICH WAR-
RANTLESS ELECTRONIC SURVEILLANCE MAY HAVE ON THE CONSTITUTIONAL RIGHTS OF THOSE WHO
WERE NOT TARGETS OF THE SURVEILLANCE, BUT WHO PERCEIVED THEMSELVES, WHETHER REASON-
ABLY OR UNREASONABLY, AS POTENTIAL TARGETS.  OUR BILL OF RIGHTS IS CONCERNED NOT
ONLY WITH DIRECT INFRINGEMENTS ON CONSTITUTIONAL RIGHTS, BUT ALSO WITH GOVERNMENT
ACTIVITIES WHICH EFFECTIVELY INHIBIT THE EXERCISE OF THESE RIGHTS.  THE EXERCISE OF
POLITICAL FREEDOM DEPENDS IN LARGE MEASURE ON CITIZENS' UNDERSTANDING THAT THEY WILL
BE ABLE TO BE PUBLICLY ACTIVE AND DISSENT **3910 FROM OFFICIAL POLICY, WITHIN LAWFUL
LIMITS, WITHOUT HAVING TO SACRIFICE THE EXPECTATION OF PRIVACY THAT THEY RIGHTFULLY
HOLD.  ARBITRARY OR UNCONTROLLED USE OF WARRANTLESS ELECTRONIC SURVEILLANCE CAN VI-
OLATE THAT UNDERSTANDING AND IMPAIR THAT PUBLIC CONFIDENCE SO NECESSARY TO AN UNIN-
HIBITED POLITICAL LIFE.

S. 1566 IS DESIGNED, THEREFORE, TO CURB THE PRACTICE BY WHICH THE EXECUTIVE BRANCH
MAY CONDUCT WARRANTLESS ELECTRONIC SURVEILLANCE ON ITS OWN UNILATERAL DETERMINATION
THAT NATIONAL SECURITY JUSTIFIES IT.  AT THE SAME TIME, HOWEVER, THIS LEGISLATION
DOES NOT PROHIBIT THE LEGITIMATE USE OF ELECTRONIC SURVEILLANCE TO OBTAIN FOREIGN
INTELLIGENCE INFORMATION.  AS THE CHURCH COMMITTEE POINTED OUT:

ELECTRONIC SURVEILLANCE TECHNIQUES HAVE UNDERSTANDABLY ENABLED THESE AGENCIES TO
OBTAIN VALUABLE INFORMATION RELEVANT TO THEIR LEGITIMATE INTELLIGENCE MISSIONS.  USE
OF THESE TECHNIQUES HAS PROVIDED THE GOVERNMENT WITH VITAL INTELLIGENCE, WHICH WOULD
BE DIFFICULT TO ACQUIRE THROUGH OTHER MEANS, ABOUT THE ACTIVITIES AND INTENTIONS OF
FOREIGN POWERS AND HAS **9 PROVIDED IMPORTANT LEADS IN COUNTERESPIONAGE CASES.  (VOL.
2, P. 274)

SAFEGUARDING NATIONAL SECURITY AGAINST THE INTELLIGENCE ACTIVITIES OF FOREIGN
AGENTS REMAINS A VITALLY IMPORTANT GOVERNMENT PURPOSE.  FEW WOULD DISPUTE THE FACT
THAT WE LIVE IN A DANGEROUS WORLD IN WHICH HOSTILE INTELLIGENCE ACTIVITIES IN THIS
COUNTRY ARE STILL CARRIED ON TO OUR DETRIMENT.

STRIKING A SOUND BALANCE BETWEEN THE NEED FOR SUCH SURVEILLANCE AND THE PROTECTION
OF CIVIL LIBERTIES LIES AT THE HEART OF S. 1566. AS SENATOR KENNEDY STATED IN INTRO-
DUCING S. 1566:

THE COMPLEXITY OF THE PROBLEM MUST NOT BE UNDERESTIMATED. ELECTRONIC SURVEILLANCE
CAN BE A USEFUL TOOL FOR THE GOVERNMENT'S GATHERING OF CERTAIN KINDS OF INFORMATION;
YET, IF ABUSED, IT CAN ALSO CONSTITUTE A PARTICULARLY INDISCRIMINATE AND PENETRATING
INVASION OF THE PRIVACY OF OUR CITIZENS.  MY OBJECTIVE OVER THE PAST SIX YEARS HAS
BEEN TO REACH SOME KIND OF FAIR BALANCE THAT WILL PROTECT THE SECURITY OF THE UNITED
STATES WITHOUT INFRINGING ON OUR CITIZENS' HUMAN LIBERTIES AND RIGHTS.  [FN4]

THE COMMITTEE BELIEVES THAT THE EXECUTIVE BRANCH OF GOVERNMENT SHOULD HAVE, UNDER
PROPER CIRCUMSTANCES AND WITH APPROPRIATE SAFEGUARDS, AUTHORITY TO ACQUIRE IMPORTANT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FOREIGN INTELLIGENCE INFORMATION BY MEANS OF ELECTRONIC SURVEILLANCE.  THE COMMITTEE
ALSO BELIEVES THAT THE PAST RECORD AND THE STATE OF THE LAW IN THE AREA MAKE IT DE-
SIRABLE THAT THE EXECUTIVE BRANCH NOT BE THE SOLE OR FINAL ARBITER OF WHEN SUCH
PROPER CIRCUMSTANCES EXIST. S. 1566 IS DESIGNED TO PERMIT THE GOVERNMENT TO GATHER
NECESSARY FOREIGN INTELLIGENCE INFORMATION BY MEANS OF ELECTRONIC SURVEILLANCE BUT
UNDER LIMITATIONS AND ACCORDING TO PROCEDURAL GUIDELINES WHICH WILL BETTER SAFEGUARD
THE RIGHTS OF INDIVIDUALS.

III.  BACKGROUND

  THE BIPARTISAN CONGRESSIONAL SUPPORT FOR S. 1566 AND THE CONSTRUCTIVE COOPERATION
OF THE EXECUTIVE BRANCH TOWARD THE LEGISLATION SIGNIFIES A CONSTRUCTIVE CHANGE IN
THE ONGOING DEBATE OVER ELECTRONIC SURVEILLANCE.  **3911 THAT DEBATE HAS CENTERED
AROUND THE POWER OF THE PRESIDENT TO ACQUIRE INFORMATION NECESSARY FOR THE NATIONAL
SECURITY AND THE CONSTITUTIONALITY OF WARRANTLESS ELECTRONIC SURVEILLANCE.  THIS IS
NOT SURPRISING SINGE THE UNITED STATES SUPREME COURT HAS NEVER EXPRESSLY DECIDED THE
ISSUE OF WHETHER THE PRESIDENT HAS CONSTITUTIONAL AUTHORITY TO AUTHORIZE WARRANTLESS
ELECTRONIC SURVEILLANCE IN CASES CONCERNING FOREIGN INTELLIGENCE. WHETHER THE PRES-
IDENT HAS SO-CALLED 'INHERENT POWER' TO ENGAGE IN OR AUTHORIZE WARRANTLESS ELECTRON-
IC SURVEILLANCE AND, IF SUCH POWER EXISTS, WHAT LIMITATIONS, IF ANY, RESTRICT THE
SCOPE OF THAT POWER, ARE ISSUES WHICH HAVE TROUBLED CONSTITUTIONAL SCHOLARS FOR DEC-
ADES.
  THE HISTORY OF WARRANTLESS ELECTRONIC SURVEILLANCE OFFERS SUPPORT TO BOTH PRO-
PONENTS AND CRITICS OF THE CONCEPT OF 'INHERENT POWER' AND CLEARLY HIGHLIGHTS THE
NEED FOR PASSAGE OF S. 1566.
  IN 1928 THE SUPREME COURT IN OLMSTEAD V. UNITED STATES [FN5] HELD THAT WIRETAPPING
WAS NOT WITHIN THE COVERAGE OF THE FOURTH AMENDMENT. *10 THREE YEARS LATER, ATTORNEY
GENERAL WILLIAM D. MITCHELL AUTHORIZED TELEPHONE WIRETAPPING, UPON THE PERSONAL AP-
PROVAL OF BUREAU CHIEFS, OF SYNDICATED BOOTLEGGERS AND IN 'EXCEPTIONAL CASES WHERE
THE CRIMES ARE SUBSTANTIAL AND SERIOUS, AND THE NECESSITY IS GREAT AND (THE BUREAU
CHIEF AND THE ASSISTANT ATTORNEY GENERAL) ARE SATISFIED THAT THE PERSONS WHOSE WIRES
ARE TO BE TAPPED ARE OF THE CRIMINAL TYPE.' THESE GENERAL GUIDELINES GOVERNED THE
DEPARTMENT'S PRACTICE THROUGH THE THIRTIES AND TELEPHONE WIRETAPPING WAS CONSIDERED
TO BE AN IMPORTANT LAW ENFORCEMENT TOOL.  [FN6]
  CONGRESS PLACED THE FIRST RESTRICTIONS ON WIRETAPPING IN THE FEDERAL COMMUNICA-
TIONS ACT OF 1934, WHICH MADE IT A CRIME FOR ANY PERSON 'TO INTERCEPT AND DIVULGE OR
PUBLISH THE CONTENTS OF WIRE AND RADIO COMMUNICATIONS.'  [FN7] THE SUPREME COURT
CONSTRUED THIS SECTION TO APPLY TO FEDERAL AGENTS AND HELD THAT EVIDENCE OBTAINED
FROM THE INTERCEPTION OF WIRE AND RADIO COMMUNICATIONS, AND THE FRUITS OF THAT EVID-
ENCE, WERE INADMISSIBLE IN COURT.  [FN8] HOWEVER, THE JUSTICE DEPARTMENT DID NOT IN-
TERPRET THE FEDERAL COMMUNICATIONS ACT OR THE NARDONE DECISION AS PROHIBITING THE
INTERCEPTION OF WIRE COMMUNICATIONS PER SE; RATHER ONLY THE INTERCEPTION AND DIVUL-
GENCE OF THEIR CONTENTS OUTSIDE THE FEDERAL ESTABLISHMENT WAS CONSIDERED TO BE UN-
LAWFUL.  THUS, THE JUSTICE DEPARTMENT FOUND CONTINUED AUTHORITY FOR ITS NATIONAL SE-
CURITY WIRETAPS.
  IN 1940, PRESIDENT ROOSEVELT ISSUED A MEMORANDUM TO THE ATTORNEY GENERAL STATING
HIS VIEW THAT ELECTRONIC SURVEILLANCE WOULD BE PROPER UNDER THE CONSTITUTION WHERE

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**


'GRAVE MATTERS INVOLVING DEFENSE OF THE NATION' WERE INVOLVED.  THE PRESIDENT AU-
THORIZED AND DIRECTED THE ATTORNEY GENERAL 'TO SECURE INFORMATION BY LISTENING
DEVICES (DIRECTED AT) THE CONVERSATION OR OTHER COMMUNICATIONS OF PERSONS SUSPECTED
OF SUBVERSIVE ACTIVITIES AGAINST THE GOVERNMENT OF THE UNITED STATES, INCLUDING SUS-
PECTED SPIES.'  THE ATTORNEY GENERAL WAS REQUESTED 'TO LIMIT THESE INVESTIGATIONS SO
CONDUCTED TO A MINIMUM AND TO LIMIT THEM INSOFAR AS POSSIBLE AS TO ALIENS.'  [FN9]

    THIS PRACTICE WAS CONTINUED IN SUCCESSIVE ADMINISTRATIONS.  IN 1946, ATTORNEY GEN-
ERAL TOM C. CLARK SENT PRESIDENT TRUMAN A LETTER INFORMING HIM OF PRESIDENT
ROOSEVELT'S DIRECTIVE.  CLARK'S MEMORANDUM, **3912 HOWEVER, OMITTED THE PORTION OF
PRESIDENT ROOSEVELT'S DIRECTIVE LIMITING WIRETAPS 'INSOFAR AS POSSIBLE TO ALIENS.'
INSTEAD, HE RECOMMENDED THAT THE DIRECTIVE 'BE CONTINUED IN FORCE' IN VIEW OF THE
'INCREASE IN SUBVERSIVE ACTIVITIES' AND 'A VERY SUBSTANTIAL INCREASE IN CRIME.'
PRESIDENT TRUMAN APPROVED.  [FN10]

    **11 IN THE EARLY FIFTIES, HOWEVER, ATTORNEY GENERAL J. HOWARD MCGRATH TOOK THE PO-
SITION THAT HE WOULD NOT APPROVE OR AUTHORIZE THE INSTALLATION OF MICROPHONE SUR-
VEILLANCES BY MEANS OF TRESPASS.  THIS POLICY WAS QUICKLY REVERSED BY ATTORNEY GEN-
ERAL HERBERT BROWNELL IN 1954 IN A SWEEPING MEMORANDUM TO FBI DIRECTOR HOOVER IN-
STRUCTING HIM THAT THE BUREAU WAS INDEED AUTHORIZED TO CONDUCT SUCH TRESPASSORY SUR-
VEILLANCES REGARDLESS OF THE FACT OF SURREPTITIOUS ENTRY, AND WITHOUT THE NEED TO
FIRST ACQUIRE THE ATTORNEY GENERAL'S AUTHORIZATION.  SUCH SURVEILLANCE WAS SIMPLY
AUTHORIZED WHENEVER THE BUREAU CONCLUDED THAT THE 'NATIONAL INTEREST' SO REQUIRED.
THE BROWNELL MEMORANDUM IS INSTRUCTIVE:

    IT IS MY OPINION THAT THE DEPARTMENT SHOULD ADOPT THAT INTERPRETATION WHICH WILL
PERMIT MICROPHONE COVERAGE BY THE FBI IN A MANNER MOST CONDUCIVE TO OUR NATIONAL IN-
TEREST.  I RECOGNIZE THAT FOR THE FBI TO FULFILL SECURITY AND THE NATIONAL INTEREST
ARE PARAMOUNT; AND, THEREFORE, MAY COMPEL THE UNRESTRICTED USE OF THIS TECHNIQUE IN
THE NATIONAL INTEREST.  [FN11]

    FROM THE RELATIVELY LIMITED AUTHORIZATION OF WARRANTLESS ELECTRONIC SURVEILLANCE
UNDER PRESIDENT ROOSEVELT, THEN, THE MANDATE FOR THE FBI WAS QUICKLY EXPANDED TO THE
POINT WHERE THE ONLY CRITERION WAS THE FBI'S SUBJECTIVE JUDGMENT THAT THE 'NATIONAL
INTEREST' REQUIRED THE ELECTRONIC SURVEILLANCE.

    THE PRACTICE OF THE BUREAU DURING THE FIFTIES WAS ALSO DESCRIBED IN A MEMORANDUM
FROM DIRECTOR HOOVER TO THE DEPUTY ATTORNEY GENERAL ON MAY 4, 1961:

    (IN THE INTERNAL SECURITY FIELD, WE ARE UTILIZING MICROPHONE SURVEILLANCES ON A
RESTRICTED BASIS EVEN THOUGH TRESPASS IS NECESSARY TO ASSIST IN UNCOVERING THE
ACTIVITIES OF SOVIET INTELLIGENCE AGENTS AND COMMUNIST PARTY LEADERS.  IN THE IN-
TERESTS OF NATIONAL SAFETY, MICROPHONE SURVEILLANCES ARE ALSO UTILIZED ON A RESTRIC-
TED BASIS, EVEN THOUGH TRESPASS IS NECESSARY, IN UNCOVERING MAJOR CRIMINAL ACTIVIT-
IES.  WE ARE USING SUCH COVERAGE **3913 IN CONNECTION WITH OUR INVESTIGATIONS OF THE
CLANDESTINE ACTIVITIES OF TOP HOODLUMS AND ORGANIZED CRIME.  FROM AN INTELLIGENCE
STANDPOINT, THIS INVESTIGATIVE TECHNIQUE HAS PRODUCED RESULTS OBTAINED IS TREATED IN
THE SAME MANNER AS INFORMATION OBTAINED FROM WIRETAPS, THAT IS, NOT FROM THE STAND-
POINT OF EVIDENTIARY VALUE BUT FOR INTELLIGENCE PURPOSES.  [FN12]

    THE POLICY OF THE DEPARTMENT OF JUSTICE WAS STATED PUBLICLY IN 1966 BY THE SOLI-
CITOR GENERAL IN A SUPPLEMENTAL BRIEF TO THE SUPREME COURT IN BLACK V. UNITED
STATES.  [FN13]  REFERRING TO THE GENERAL DELEGATION OF AUTHORITY BY ATTORNEYS GEN-
ERAL TO THE DIRECTOR OF THE BUREAU, THE SOLICITOR STATED:

                    © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

AN EXCEPTION TO THE GENERAL DELEGATION OF AUTHORITY HAS BEEN PRESCRIBED, SINCE
1940, FOR THE INTERCEPTION OF WIRE COMMUNICATIONS, **\*12** WHICH (IN ADDITION TO BEING
LIMITED TO MATTERS INVOLVING NATIONAL SECURITY OR DANGER TO HUMAN LIFE) HAS REQUIRED
THE SPECIFIC AUTHORIZATION OF THE ATTORNEY GENERAL IN EACH INSTANCE.  NO SIMILAR
PROCEDURE EXISTED UNTIL 1965 WITH RESPECT TO THE USE OF DEVICES SUCH AS THOSE IN-
VOLVED IN THE INSTANT CASE, ALTHOUGH RECORDS OF ORAL AND WRITTEN COMMUNICATIONS
WITHIN THE DEPARTMENT OF JUSTICE REFLECT CONCERN BY ATTORNEYS GENERAL AND THE DIR-
ECTOR OF THE FEDERAL BUREAU OF INVESTIGATION THAT THE USE OF LISTENING DEVICES BY
AGENTS OF THE GOVERNMENT SHOULD BE CONFINED TO A STRICTLY LIMITED CATEGORY OF SITU-
ATIONS.

UNDER DEPARTMENTAL PRACTICE IN EFFECT FOR A PERIOD OF YEARS PRIOR TO 1963, AND
CONTINUING UNTIL 1965, THE DIRECTOR OF THE FEDERAL BUREAU OF INVESTIGATION WAS GIVEN
AUTHORITY TO APPROVE THE INSTALLATION OF DEVICES SUCH AS THAT IN QUESTION FOR INTEL-
LIGENCE (AND NOT EVIDENTIARY) PURPOSES WHICH REQUIRED IN THE INTERESTS OF INTERNAL
SECURITY OR NATIONAL SAFETY, INCLUDING ORGANIZED CRIME, KIDNAPPINGS AND MATTERS
WHEREIN HUMAN LIFE MIGHT BE AT STAKE . . . .

PRESENT DEPARTMENTAL PRACTICE, ADOPTED IN JULY 1965 IN CONFORMITY WITH THE
POLICIES DECLARED BY THE PRESIDENT ON JUNE 30, 1965, FOR THE ENTIRE FEDERAL ESTAB-
LISHMENT, PROHIBITS THE USE OF SUCH LISTENING DEVICES (AS WELL AS THE INTERCEPTION
OF TELEPHONE AND OTHER WIRE COMMUNICATIONS) IN ALL INSTANCES OTHER THAN THOSE IN-
VOLVING THE COLLECTION OF INTELLIGENCE AFFECTING THE NATIONAL SECURITY.  THE SPECIF-
IC AUTHORIZATION OF THE ATTORNEY GENERAL MUST BE OBTAINED IN EACH INSTANCE WHEN THIS
EXCEPTION IS INVOKED.

IN KATZ V. UNITED STATES, 389 U.S. 347 (1967) [FN14], THE SUPREME COURT FINALLY
DISCARDED THE OLMSTEAD DOCTRINE AND HELD THAT THE FOURTH AMENDMENT'S WARRANT PROVI-
SION DID APPLY TO ELECTRONIC SURVEILLANCE.  THE COURT EXPLICITLY DECLINED, HOWEVER,
TO EXTEND ITS HOLDING TO CASES 'INVOLVING THE NATIONAL SECURITY.'  389 U.S. AT 358,
N. 23.  THE NEXT YEAR, **\*\*3914** CONGRESS FOLLOWED SUIT:  RESPONDING TO THE KATZ CASE,
CONGRESS ENACTED THE OMNIBUS CRIME CONTROL AND SAFE STREETS ACT (18 U.S.C. SECTIONS
2510-2520).  [FN15] TITLE III OF THAT ACT ESTABLISHED A PROCEDURE FOR THE JUDICIAL
AUTHORIZATION OF ELECTRONIC SURVEILLANCE FOR THE INVESTIGATION AND PREVENTION OF
SPECIFIED TYPES OF SERIOUS CRIMES AND THE USE OF THE PRODUCT OF SUCH SURVEILLANCE BY
PERSONS OTHER THAN DULY AUTHORIZED LAW ENFORCEMENT OFFICERS, PERSONNEL OF THE FEDER-
AL COMMUNICATIONS COMMISSION, OR COMMUNICATION COMMON CARRIERS MONITORING COMMUNICA-
TIONS IN THE NORMAL COURSE OF THEIR EMPLOYMENT.

TITLE III, HOWEVER, DISCLAIMED ANY INTENTION OF LEGISLATING IN THE NATIONAL SECUR-
ITY AREA.  THE ACT CONTAINED A PROVISO IN SECTION 2511 (3) STATING:

NOTHING CONTAINED IN THIS CHAPTER OR IN SECTION 605 OF THE COMMUNICATIONS ACT OF
1934 (48 STAT. 1143; 47 U.S.C. 605) SHALL LIMIT THE CONSTITUTIONAL POWER OF THE
PRESIDENT TO TAKE SUCH MEASURES AS HE DEEMS NECESSARY TO PROTECT THE NATION **\*13**
AGAINST ACTUAL OR POTENTIAL ATTACK OR OTHER HOSTILE ACTS OF A FOREIGN POWER, TO OB-
TAIN FOREIGN INTELLIGENCE INFORMATION DEEMED ESSENTIAL TO THE SECURITY OF THE UNITED
STATES, OR TO PROTECT NATIONAL SECURITY INFORMATION AGAINST FOREIGN INTELLIGENCE
ACTIVITIES.  NOR SHALL ANYTHING CONTAINED IN THIS CHAPTER BE DEEMED TO LIMIT THE
CONSTITUTIONAL POWER OF THE PRESIDENT TO TAKE SUCH MEASURES AS HE DEEMS NECESSARY TO
PROTECT THE UNITED STATES AGAINST THE OVERTHROW OF THE GOVERNMENT BY FORCE OR OTHER
CLEAR AND PRESENT DANGER TO THE STRUCTURE OR EXISTENCE OF THE GOVERNMENT.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

AGAINST THIS BACKGROUND THE SUPREME COURT DECIDED THE KEITH [FN16]  CASE IN 1972.
WHILE THE ISSUE WAS NARROWLY DRAWN-- 'THE DELICATE QUESTION OF THE PRESIDENT'S
POWER, ACTING THROUGH THE ATTORNEY GENERAL, TO AUTHORIZE ELECTRONIC SURVEILLANCE IN
INTERNAL SECURITY MATTERS WITHOUT PRIOR JUDICIAL APPROVAL' (407 U.S. AT 301)-- THE
COURT'S OPINION INEVITABLY SHED SOME LIGHT ON THE DEEPER PROBLEM OF BALANCING CON-
FLICTING INTERESTS IN NATIONAL SECURITY CASES (407 U.S., AT 320-321):

  1.  THE COURT TOOK NOTICE OF THE LONG-STANDING JUSTICE DEPARTMENT POLICY OF WAR-
RANTLESS ELECTRONIC SURVEILLANCE.  IT ALSO RECOGNIZED THE 'ELEMENTARY TRUTH ' THAT
'UNLESS GOVERNMENT SAFEGUARDS ITS OWN CAPACITY TO FUNCTION AND TO PRESERVE THE SE-
CURITY OF ITS PEOPLE, SOCIETY ITSELF COULD BECOME SO DISORDERED THAT ALL RIGHTS AND
LIBERTIES WOULD BE ENDANGERED.' [FN17]

  2.  IN BALANCING THE CONSTITUTIONAL RIGHTS INVOLVED AGAINST THE GOVERNMENTAL OB-
JECTIVES, THE COURT NOTED THE 'CONVERGENCE OF FIRST AND FOURTH AMENDMENT VALUES NOT
ORDINARILY PRESENT IN CASES OF 'ORDINARY'  CRIME.' [FN18]  THE COURT WENT ON TO
POSE THE ISSUE: 'IF THE LEGITIMATE NEED OF THE GOVERNMENT TO SAFEGUARD DOMESTIC SE-
CURITY REQUIRES THE USE OF ELECTRONIC SURVEILLANCE THE QUESTION IS WHETHER THE NEEDS
OF CITIZENS FOR PRIVACY AND FREE EXPRESSION MAY NOT BE BETTER PROTECTED BY REQUIRING
A WARRANT BEFORE SUCH SURVEILLANCE IS UNDERTAKEN.  WE MUST ALSO ASK WHETHER A WAR-
RANT REQUIREMENT WOULD UNDULY FRUSTRATE THE EFFORTS OF **3915 GOVERNMENT TO PROTECT
ITSELF FROM ACTS OF SUBVERSION AND OVERTHROW DIRECTED AGAINST IT.' [FN19]

  3.  IN CONCLUDING THAT A WARRANT WAS REQUIRED IN DOMESTIC SECURITY SURVEILLANCE
CASES, THE COURT EMPHASIZED THE TRADITIONAL REASONS FOR REQUIRING A WARRANT:  [FN20]

  THESE FOURTH AMENDMENT FREEDOMS CANNOT PROPERLY BE GUARANTEED IF DOMESTIC SECURITY
SURVEILLANCES MAY BE CONDUCTED SOLELY WITHIN THE DISCRETION OF THE EXECUTIVE BRANCH.
THE FOURTH AMENDMENT DOES NOT CONTEMPLATE THE EXECUTIVE OFFICERS OF GOVERNMENT AS
NEUTRAL AND DISINTERESTED MAGISTRATES.  THEIR DUTY AND RESPONSIBILITY ARE TO ENFORCE
THE LAWS, TO INVESTIGATE, AND TO PROSECUTE. * * * BUT THOSE CHARGED WITH THIS IN-
VESTIGATIVE AND PROSECUTORIAL DUTY SHOULD NOT BE THE SOLE JUDGES OF WHEN TO UTILIZE
CONSTITUTIONALLY SENSITIVE MEANS IN PURSUING THEIR TASKS.  THE HISTORICAL JUDGMENT,
WHICH THE FOURTH AMENDMENT ACCEPTS, IS THAT UNREVIEWED EXECUTIVE DISCRETION MAY
YIELD TOO READILY TO PRESSURES TO OBTAIN INCRIMINATING EVIDENCE AND OVERLOOK POTEN-
TIAL INVASIONS OF PRIVACY AND PROTECTED SPEECH.

  *14 4.  THE COURT THEN WENT ON TO CONSIDER AND REJECT THE GOVERNMENT'S ARGUMENT
THAT THE DISCLOSURE OF INFORMATION IN A WARRANT APPLICATION POSED THE SERIOUS DANGER
OF LEAKS AND THE GOVERNMENT'S ARGUMENT THAT 'INTERNAL SECURITY MATTERS ARE TOO
SUBTLE AND COMPLEX FOR JUDICIAL EVALUATION.' [FN21]  THE COURT OBSERVED THAT
'(COURTS REGULARLY DEAL WITH THE MOST DIFFICULT ISSUES OF OUR SOCIETY.  THERE IS NO
REASON TO BELIEVE THAT FEDERAL JUDGES WILL BE INSENSITIVE TO OR UNCOMPREHENDING OF
THE ISSUES INVOLVED IN DOMESTIC SECURITY CASES. ' [FN22]  AS TO THE SECRECY CLAIM,
THE COURT OBSERVED THE '(THE INVESTIGATION OF CRIMINAL ACTIVITY HAS LONG INVOLVED
IMPARTING SENSITIVE INFORMATION TO JUDICIAL OFFICERS WHO HAVE RESPECTED THE CONFID-
ENTIALITIES INVOLVED.' [FN23]

  5.  FINALLY, THE COURT REJECTED THE DISTINCTION, STRESSED BY THE GOVERNMENT,
BETWEEN SURVEILLANCE FOR LAW ENFORCEMENT PURPOSES AND SURVEILLANCE DESIGNED TO OB-
TAIN INTELLIGENCE RELATING TO DOMESTIC THREATS TO NATIONAL SECURITY.  THE COURT RE-
SPONDED THAT OFFICIAL SURVEILLANCE, WHETHER ITS PURPOSE IS CRIMINAL INVESTIGATION OR
ONGOING INTELLIGENCE GATHERING, RISKS INFRINGEMENT OF CONSTITUTIONALLY PROTECTED

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**


PRIVACY AND SPEECH.

   HOWEVER, THE COURT EMPHASIZED THAT 'THIS CASE INVOLVED ONLY THE DOMESTIC ASPECTS
OF NATIONAL SECURITY.  WE HAVE NOT ADDRESSED, AND EXPRESSED NO OPINION AS TO, THE
ISSUES WHICH MAY BE INVOLVED WITH RESPECT TO ACTIVITIES OF FOREIGN POWERS OR THEIR
AGENTS.'  [FN24]

   AND, IN CONSTRUING THE EFFECT OF THE TITLE III PRESIDENTIAL DISCLAIMER THE COURT
WROTE:  [FN25]

   SECTION 2511 (3) CERTAINLY CONFERS NO POWER, AS THE LANGUAGE IS WHOLLY INAPPROPRI-
ATE FOR SUCH A PURPOSE.  IT MERELY PROVIDES THAT THE ACT SHALL NOT BE INTERPRETED TO
LIMIT OR DISTURB SUCH POWER AS THE PRESIDENT MAY HAVE UNDER THE CONSTITUTION.  IN
SHORT, CONGRESS SIMPLY LEFT PRESIDENTIAL POWERS WHERE IT FOUND THEM . . . . (WE
THEREFORE THINK THE CONCLUSION INESCAPABLE **3916 THAT CONGRESS ONLY INTENDED TO
MAKE CLEAR THAT THE ACT SIMPLY DID NOT LEGISLATE WITH RESPECT TO NATIONAL SECURITY
SURVEILLANCES.

   SINCE THE KEITH CASE, THREE CIRCUIT COURTS OF APPEALS HAVE ADDRESSED THE QUESTION
THE SUPREME COURT RESERVED.  THE FIFTH CIRCUIT IN UNITED STATES V. BROWN, 484 F.2D
418 (5TH CIR. 1973), CERT. DENIED, 415 U.S. 960 (1974), UPHELD THE LEGALITY OF A
SURVEILLANCE IN WHICH THE DEFENDANT, AN AMERICAN CITIZEN, WAS INCIDENTALLY OVERHEARD
AS A RESULT OF A WARRANTLESS WIRETAP AUTHORIZED BY THE ATTORNEY GENERAL FOR FOREIGN
INTELLIGENCE PURPOSES.  THE COURT FOUND THAT ON THE BASIS OF 'THE PRESIDENT'S CON-
STITUTIONAL DUTY TO ACT FOR THE UNITED STATES IN THE FIELD OF FOREIGN AFFAIRS, AND
HIS INHERENT POWER TO PROTECT NATIONAL SECURITY IN THE CONDUCT OF FOREIGN AFFAIRS .
. . THE PRESIDENT MAY CONSTITUTIONALLY AUTHORIZE WARRANTLESS WIRETAPS FOR THE PUR-
POSE OF GATHERING FOREIGN INTELLIGENCE.'  [FN26]

   IN UNITED STATES V. BUTENKO, 494 F.2D 593 (3D CIR. 1974) (EN BANC), CERT. DENIED
SUB NOM. IVANOV V. UNITED STATES, 419 U.S. 881 (1974), THE THIRD CIRCUIT SIMILARLY
HELD THAT ELECTRONIC SURVEILLANCE CONDUCTED **15 WITHOUT A WARRANT WOULD BE LAWFUL SO
LONG AS THE PRIMARY PURPOSE WAS TO OBTAIN FOREIGN INTELLIGENCE INFORMATION.  THE
COURT FOUND THAT SUCH SURVEILLANCE WOULD BE REASONABLE UNDER THE FOURTH AMENDMENT
WITHOUT A WARRANT EVEN THOUGH IT MIGHT INVOLVE THE OVERHEARING OF CONVERSATIONS.

   HOWEVER, IN ZWEIBON V. MITCHELL, 516 F.2D 594 (D.C. CIR. 1975), CERT. DENIED, 425
U.S. 944 (1976) [FN27]  THE CIRCUIT COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA,
IN THE COURSE OF AN OPINION REQUIRING THAT A WARRANT MUST BE OBTAINED BEFORE A
WIRETAP IS INSTALLED ON A DOMESTIC ORGANIZATION THAT IS NEITHER THE AGENT OF, NOR
ACTING IN COLLABORATION WITH, A FOREIGN POWER, QUESTIONED WHETHER ANY NATIONAL SE-
CURITY EXCEPTION TO THE WARRANT REQUIREMENT WOULD BE CONSTITUTIONALLY PERMISSIBLE.

   ALTHOUGH THE HOLDING OF ZWEIBON WAS LIMITED TO THE CASE OF A DOMESTIC ORGANIZATION
WITHOUT TIES TO A FOREIGN POWER, THE PLURALITY OPINION OF THE COURT-- IN LEGAL ANA-
LYSIS CLOSELY PATTERNED ON KEITH-- CONCLUDED 'THAT AN ANALYSIS OF THE POLICIES IM-
PLICATED BY FOREIGN SECURITY SURVEILLANCE INDICATES THAT, ABSENT EXIGENT CIRCUM-
STANCES, ALL WARRANTLESS ELECTRONIC SURVEILLANCE IS UNREASONABLE AND THEREFORE UN-
CONSTITUTIONAL.'  [FN28]

   THUS, AFTER ALMOST 50 YEARS OF CASE LAW DEALING WITH THE SUBJECT OF WARRANTLESS
ELECTRONIC SURVEILLANCE, AND DESPITE THE PRACTICE OF WARRANTLESS FOREIGN INTELLI-
GENCE SURVEILLANCE SANCTIONED AND ENGAGED IN BY NINE ADMINISTRATIONS, CONSTITUTIONAL
LIMITS ON THE PRESIDENT'S POWERS TO ORDER SUCH SURVEILLANCES REMAINS AN OPEN QUES-
TION.  THIS LEGISLATION WOULD PROVIDE THE SECURE FRAMEWORK BY WHICH THE EXECUTIVE

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

BRANCH MAY CONDUCT LEGITIMATE ELECTRONIC SURVEILLANCE FOR FOREIGN INTELLIGENCE PUR-
POSES WITHIN THE CONTEXT OF THIS NATION'S COMMITMENT TO PRIVACY AND INDIVIDUAL
RIGHTS.

### IV.   CONCLUSION

S. 1566 WOULD ALTER THE CURRENT DEBATE ARISING OUT OF THE UNCERTAINTY OF THE
PRESENT LAW BY COMPLETING AN EXCLUSIVE CHARTER FOR THE CONDUCT **3917 OF ELECTRONIC
SURVEILLANCE IN THE UNITED STATES.   IT WOULD RELEGATE TO THE PAST THE WIRE-TAPPING
ABUSES BROUGHT TO LIGHT DURING THE COMMITTEE HEARINGS BY PROVIDING, FOR THE FIRST
TIME, EFFECTIVE SUBSTANTIVE AND PROCEDURAL STATUTORY CONTROLS OVER FOREIGN INTELLI-
GENCE ELECTRONIC SURVEILLANCE.  [FN29]

*16 THE BASIS FOR THIS LEGISLATION IS THE UNDERSTANDING-- CONCURRED IN BY THE AT-
TORNEY GENERAL-- THAT EVEN IF THE PRESIDENT HAS AN 'INHERENT ' CONSTITUTIONAL POWER
TO AUTHORIZE WARRANTLESS SURVEILLANCE FOR FOREIGN INTELLIGENCE PURPOSES, CONGRESS
,AS THE POWER TO REGULATE THE EXERCISE OF THIS AUTHORITY BY LEGISLATING A REASONABLE
WARRANT PROCEDURE GOVERNING FOREIGN INTELLIGENCE SURVEILLANCE.  [FN30]

THE BILL PROVIDES EXTERNAL AND INTERNAL CHECKS ON THE EXECUTIVE.  THE EXTERNAL
CHECK IS FOUND IN THE JUDICIAL WARRANT PROCEDURE WHICH REQUIRES THE EXECUTIVE BRANCH
TO SECURE A WARRANT BEFORE ENGAGING IN ELECTRONIC SURVEILLANCE FOR PURPOSES OF OB-
TAINING FOREIGN INTELLIGENCE INFORMATION.  SUCH SURVEILLANCE WOULD BE LIMITED TO A
'FOREIGN POWER' AND 'AGENT OF A FOREIGN POWER.' UNITED STATES CITIZENS AND LAWFUL
RESIDENT ALIENS COULD BE TARGETS OF ELECTRONIC SURVEILLANCE ONLY IF THEY ARE:  (1)
KNOWINGLY ENGAGED IN 'CLANDESTINE INTELLIGENCE ACTIVITIES WHICH INVOLVE OR WILL IN-
VOLVE A VIOLATION' OF THE CRIMINAL LAW; (2) KNOWINGLY ENGAGED IN ACTIVITIES 'THAT
INVOLVE OR WILL INVOLVE SABOTAGE OR TERRORISM FOR OR ON BEHALF OF A FOREIGN POWER';
OR (3) 'PURSUANT TO THE DIRECTION OF AN INTELLIGENCE SERVICE OR INTELLIGENCE NETWORK
OF A FOREIGN POWER' ARE KNOWINGLY OR SECRETLY COLLECTING OR TRANSMITTING FOREIGN IN-
TELLIGENCE IN A MANNER HARMFUL TO THE SECURITY OF THE UNITED STATES.  ALL OTHER PER-
SONS-- SUCH AS ILLEGAL ALIENS OR FOREIGN VISITORS-- COULD ALSO BE TARGETS IF THEY
ARE:  (1) EITHER OFFICERS OR EMPLOYEES OF A FOREIGN POWER; OR (2) ARE 'KNOWINGLY EN-
GAGING IN CLANDESTINE INTELLIGENCE ACTIVITIES FOR OR ON BEHALF OF A FOREIGN POWER
UNDER CIRCUMSTANCES WHICH INDICATE THAT SUCH ACTIVITIES WOULD BE HARMFUL TO THE SE-
CURITY OF THE UNITED STATES.' FOR SUCH SURVEILLANCE TO BE UNDERTAKEN, A JUDICIAL
WARRANT MUST BE SECURED ON THE BASIS OF A SHOWING OF 'PROBABLE CAUSE' THAT THE TAR-
GET IS A 'FOREIGN POWER' OR AN 'AGENT OF A FOREIGN POWER.'  THUS THE COURTS FOR THE
FIRST TIME WILL ULTIMATELY RULE ON WHETHER SUCH FOREIGN INTELLIGENCE SURVEILLANCE
SHOULD OCCUR.

**3918 BEFORE A WARRANT CAN BE REQUESTED, A DESIGNATED EXECUTIVE BRANCH OFFICIAL
MUST FIRST CERTIFY IN WRITING TO THE COURT THAT THE INFORMATION SOUGHT TO BE OB-
TAINED IS 'FOREIGN INTELLIGENCE INFORMATION' AS DEFINED, AND THAT THE PURPOSE OF
THE SURVEILLANCE IS TO OBTAIN SUCH INFORMATION.  MOREOVER THE ATTORNEY GENERAL IS
REQUIRED TO MAKE A FINDING THAT THE REQUIREMENTS FOR A WARRANT APPLICATION HAVE BEEN
MET BEFORE HE AUTHORIZES THE APPLICATION. THESE PROVISIONS PROVIDE AN INTERNAL CHECK
ON APPLICATIONS FOR ELECTRONIC SURVEILLANCE BY ESTABLISHING A METHOD OF WRITTEN AC-
COUNTABILITY WITHIN THE EXECUTIVE BRANCH.

OTHER PROCEDURAL SAFEGUARDS ASSURE THAT THE GOVERNMENT WILL NOT ENGAGE IN ILLEGIT-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**


IMATE EAVESDROPPING OR MISUSE OF INFORMATION SO ACQUIRED.  THE BILL REQUIRES THAT
EACH ORDER INCLUDE A DETAILED PROCEDURE TO MINIMIZE THE EXTRANEOUS OR IRRELEVANT IN-
FORMATION THAT MIGHT OTHERWISE BE OBTAINED; INFORMATION ACQUIRED CONCERNING UNITED
STATES CITIZENS OR LAWFUL RESIDENT ALIENS CAN BE USED AND DISCLOSED ONLY FOR FOREIGN
INTELLIGENCE PURPOSES OR IN CONNECTION WITH THE ENFORCEMENT OF THE CRIMINAL LAW;
EVEN IF THE TARGET IS NOT A UNITED STATES CITIZEN OR LAWFUL RESIDENT ALIEN INFORMA-
TION ACQUIRED CAN ONLY BE USED FOR 'LAWFUL PURPOSES'; DETAILED PROVISIONS SAFEGUARD
THE RIGHT OF THE CRIMINAL DEFENDANT TO CHALLENGE THE VALIDITY AND PROPRIETY OF THE
SURVEILLANCE; **\*17** IF THE TARGET IS AN INDIVIDUAL OR SPECIFIED TYPES OF FOREIGN
POWERS THE APPLICATION FOR A WARRANT MUST STATE THE MEANS BY WHICH THE SURVEILLANCE
WILL BE EFFECTED; WHEN THE TARGET IS AN 'OFFICIAL' FOREIGN POWER, AS DEFINED, THE
APPLICATION MUST STILL DESIGNATE THE TYPE OF ELECTRONIC SURVEILLANCE TO BE USED AND
WHETHER OR NOT PHYSICAL ENTRY WILL BE USED TO EFFECT THE SURVEILLANCE; FINALLY, THE
ATTORNEY GENERAL IS REQUIRED TO TRANSMIT TO THE CONGRESS ANNUALLY CERTAIN STATISTICS
CONCERNING THE SURVEILLANCES ENGAGED IN DURING THE PRECEDING YEAR.

   MOST IMPORTANTLY, THE DISCLAIMER IN 18 U.S.C. SEC. 2511(3) IS REPLACED BY PROVI-
SIONS THAT ASSURE THAT THIS BILL, TOGETHER WITH CHAPTER 119, WILL BE THE EXCLUSIVE
MEANS BY WHICH ELECTRONIC SURVEILLANCE COVERED BY THIS BILL, AND THE INTERCEPTION OF
WIRE AND ORAL COMMUNICATIONS, MAY BE CONDUCTED.

   A DIFFICULT ISSUE POSED DURING COMMITTEE DELIBERATIONS WAS WHETHER FOREIGN INTEL-
LIGENCE ELECTRONIC SURVEILLANCE SHOULD BE LIMITED TO SITUATIONS INVOLVING THE COM-
MISSION OF A CRIME.  S. 1566 PROVIDES FOUR LIMITED SITUATIONS IN WHICH NATURAL PER-
SONS MAY BE MADE THE TARGET OF AN ELECTRONIC SURVEILLANCE WITHOUT A PROBABLY CAUSE
SHOWING OF CRIMINAL ACTIVITY.  THE FIRST AND LEAST PROBLEMATIC INVOLVES PERSONS WHO
ARE NEITHER CITIZENS NOR PERMANENT RESIDENT ALIENS BUT WHO ARE OFFICERS OR EMPLOYEES
OF A 'FOREIGN POWER'.  THIS PROVISION IS PRIMARILY DESIGNED TO COVER FOREIGNERS WHO
ARE EMPLOYED IN DIPLOMATIC AND CONSULAR OFFICES IN THE UNITED STATES.  IT IS UN-
CHANGED FROM THE PROVISIONS IN S. 3197.

   THE SECOND SITUATION, WHICH CONSTITUTES A MAJOR CHANGE FROM S. 3197, INVOLVES AN
ALIEN (OTHER THAN AN ALIEN WHO HAS BEEN ADMITTED FOR PERMANENT RESIDENT) WHO 'KNOW-
INGLY ENGAGES IN CLANDESTINE INTELLIGENCE ACTIVITIES FOR OR ON BEHALF OF A FOREIGN
POWER UNDER CIRCUMSTANCES WHICH INDICATE THAT SUCH ACTIVITIES WOULD BE HARMFUL TO
THE SECURITY OF THE UNITED STATES.'  S. 3197 MADE NO SUCH DISTINCTION BETWEEN ALIENS
**\*\*3919** AND UNITED STATES CITIZENS IN THE APPLICATION OF THE NONCRIMINAL STANDARD.
S. 1566, HOWEVER, BROADENS THE NONCRIMINAL STANDARD OF S. 3197 IN CASES INVOLVING
NONRESIDENT ALIENS.

   THE THIRD SITUATION INVOLVES A UNITED STATES CITIZEN OR PERMANENT RESIDENT ALIEN
WHO, 'PURSUANT TO THE DIRECTION OF AN INTELLIGENCE SERVICE OR INTELLIGENCE NETWORK
OF A FOREIGN POWER, KNOWINGLY COLLECTS OR TRANSMITS INFORMATION OR MATERIAL TO AN
INTELLIGENCE SERVICE OR INTELLIGENCE NETWORK OF A FOREIGN POWER IN A MANNER INTENDED
TO CONCEAL THE NATURE OF SUCH INFORMATION OR MATERIAL OR THE FACT OF SUCH TRANSMIS-
SION OR COLLECTION, UNDER CIRCUMSTANCES WHICH INDICATE THE TRANSMISSION OF SUCH IN-
FORMATION OR MATERIAL WOULD BE HARMFUL TO THE SECURITY OF THE UNITED STATES, OR THAT
LACK OF KNOWLEDGE BY THE UNITED STATES OF SUCH COLLECTION OR TRANSMISSION WOULD BE
HARMFUL TO THE SECURITY OF THE UNITED STATES.'  THIS STANDARD WAS ALSO PRESENT IN S.
3197 EXCEPT FOR THE ADDITION OF 'COLLECTION' TO THE ACTIVITIES WHICH WOULD JUSTIFY
SURVEILLANCE.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**


THE LAST SITUATION, AND THE ONE MOST DISTURBING TO SOME MEMBERS OF THE COMMITTEE,
IS THE CHANGE FROM S. 3197 ALLOWING ELECTRONIC SURVEILLANCE OF ONE WHO CONSPIRES
WITH OR AIDS OR ABETS ANOTHER ENGAGED IN THE NONCRIMINAL ACTIVITIES DESCRIBED IN THE
SECOND AND THIRD SITUATIONS.  WHILE THE COMMITTEE FEELS THIS IS JUSTIFIED, IT SHOULD
BE EMPHASIZED THAT THE AIDER OR ABETTER CANNOT BE AN UNKNOWING DUPE.  THE BILL RE-
QUIRES **18** THAT HE KNOW THAT THE PERSON HE IS AIDING IS ENGAGED IN THE DESCRIBED
ACTIVITIES.

S. 3197 DID NOT EXTEND THE DOCTRINE OF CONSPIRACY TO THE NON-CRIMINAL STANDARD.
THUS, INSOFAR AS S. 1566 LOOSENS THE LANGUAGE OF THE NONCRIMINAL STANDARD FOR CER-
TAIN ALIENS, AND PERMITS THE APPLICATION OF CONSPIRACY TO THAT STANDARD IN ALL
CASES, THE BILL POSED PROBLEMS TO SOME MEMBERS OF THE COMMITTEE.

ALTHOUGH THERE IS PRECEDENT FOR DEPARTING FROM A STRICT CRIMINAL STANDARD IN THE
ISSUANCE OF SEARCH WARRANTS DEEMED COMPATIBLE WITH THE FOURTH AMENDMENT, SEE E.G.,
CAMARA V. MUNICIPAL COURT, 387 U.S. 523 (1967) [FN31], ALMEIDA-SANCHEZ V. UNITED
STATES, 413 U.S. 266 [FN32] (1973); CF. UNITED STATES V. MARTINEZ-FUERTE, 428 U.S.
543 (1976), [FN33] (NO WARRANT REQUIRED AT ALL), THOSE DECISIONS DID NOT INVOLVE
NATIONAL SECURITY SURVEILLANCE.  IT SHOULD ALSO BE POINTED OUT, HOWEVER, THAT IN THE
KEITH CASE, SUPRA, THE SUPREME COURT NOTED THAT THE REASONS FOR DOMESTIC SECURITY
SURVEILLANCE MAY DIFFER FROM THOSE JUSTIFYING SURVEILLANCE FOR DOMESTIC CRIMES AND
THAT, ACCORDINGLY, 'DIFFERENT STANDARDS MAY BE COMPATIBLE WITH THE FOURTH AMENDMENT
IF THEY ARE REASONABLE BOTH IN RELATION TO THE LEGITIMATE NEEDS OF GOVERNMENT FOR
INTELLIGENCE INFORMATION AND THE PROTECTED RIGHTS OF OUR CITIZENS.  FOR THE WARRANT
APPLICATION MAY VARY ACCORDING TO THE GOVERNMENTAL INTEREST TO BE ENFORCED AND THE
NATURE OF CITIZENS RIGHTS DESERVING PROTECTION.' [FN34]  AS INDICATED IN THE SEC-
TION-BY-SECTION ANALYSIS, THIS DEPARTURE FROM THE GENERAL PRINCIPLE THAT SUCH SUR-
VEILLANCE MUST BE LINKED TO CRIMINAL ACTIVITY IS INTENDED TO BE A NARROW, CIRCUM-
SCRIBED ONE, REFLECTING THE DEEP CONCERN OF THE COMMITTEE.  THIS BILL AUTHORIZES
ELECTRONIC SURVEILLANCE IN A LIMITED NUMBER OF NON-CRIMINAL SITUATIONS ONLY UNDER
THE TWIN SAFEGUARDS OF AN INDEPENDENT REVIEW BY A NEUTRAL JUDGE AND HIS APPLICATION
OF A 'PROBABLE CAUSE STANDARD'.

IT IS IMPORTANT TO NOTE THAT THE COMMITTEE'S FAVORABLE RECOMMENDATION OF THIS LE-
GISLATION IN NO WAY REFLECTS ANY JUDGMENT THAT IT WOULD **3920** ALSO BE APPROPRIATE
TO DEPART FROM THE STANDARD OF CRIMINAL ACTIVITY AS THE BASIS FOR USING OTHER IN-
TRUSIVE INVESTIGATIVE TECHNIQUES.  THE BILL DOES NOT IMPLIEDLY AUTHORIZE DEPARTURE
FROM THE STANDARD OF CRIMINALITY IN OTHER ASPECTS OF NATIONAL SECURITY INVESTIGA-
TIONS OR INTELLIGENCE COLLECTION DIRECTED AT AMERICANS WITHOUT THE SAFEGUARDS OF JU-
DICIAL REVIEW AND PROBABLE CAUSE.  IT REMAINS TO DETERMINE, IN FASHIONING A CHARTER
FOR THE USE OF INFORMANTS, PHYSICAL SURVEILLANCE AND OTHER INVESTIGATIVE PROCEDURES,
WHETHER THE DEPARTURE FROM A CRIMINAL STANDARD IS AN ACCEPTABLE BASIS FOR INVESTIG-
ATING UNITED STATES CITIZENS ON GROUNDS OF NATIONAL SECURITY.

CONFORMING AMENDMENTS IN S. 1566 INTEGRATE EXISTING ELECTRONIC SURVEILLANCE PROVI-
SIONS IN TITLE III OF THE OMNIBUS CRIME CONTROL AND SAFE STREETS ACT WITH THE NEW
PROVISIONS OF THE BILL.


SECTION-BY-SECTION ANALYSIS


SECTION 1 OF THE BILL PROVIDES THAT THE ACT MAY BE CITED AS THE 'FOREIGN INTELLI-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

GENCE SURVEILLANCE ACT OF 1977'.
  SECTION 2 OF THE BILL AMENDS TITLE 18, U.S.C.  BY ADDING A NEW CHAPTER 120 COM-
POSED OF SECTIONS 2521-2527 AS FOLLOWS:

                         **\*19** SECTION 2521

  SUBSECTION (A) PROVIDES THAT EXCEPT FOR THOSE TERMS SPECIFICALLY DEFINED IN THIS
SECTION THE DEFINITIONS OF CHAPTER 119, RELATING TO THE INTERCEPTION OF WIRE AND OR-
AL COMMUNICATIONS, APPLY TO THIS CHAPTER AS WELL.

                         A. 'FOREIGN POWER'

  SUBSECTION (B) (1) DEFINES 'FOREIGN POWER' IN SIX SEPARATE WAYS:
  (1) 'A FOREIGN GOVERNMENT OR ANY COMPONENT THEREOF, WHETHER OR NOT RECOGNIZED BY
THE UNITED STATES.'  THIS CATEGORY WOULD INCLUDE FOREIGN EMBASSIES AND CONSULATES
AND SIMILAR 'OFFICIAL' FOREIGN GOVERNMENTAL ESTABLISHMENTS WHICH ARE LOCATED IN THE
UNITED STATES.
  (2) 'A FACTION OF A FOREIGN NATION OR NATIONS, NOT SUBSTANTIALLY COMPOSED OF PER-
MANENT RESIDENT ALIENS OR CITIZENS OF THE UNITED STATES.'  THIS CATEGORY IS INTENDED
TO INCLUDE FACTIONS OF A FOREIGN NATION OR NATIONS WHICH ARE IN A CONTEST FOR POWER
OVER, OR CONTROL OF THE TERRITORY OF, A FOREIGN NATION OR NATIONS.  THE FACTION MUST
BE FOREIGN-BASED AND CONTROLLED FROM ABROAD. SPECIFICALLY EXCLUDED FROM THIS CAT-
EGORY IS ANY FACTION OF A FOREIGN GOVERNMENT OR GOVERNMENT WHICH IS SUBSTANTIALLY
COMPOSED OF PERMANENT RESIDENT ALIENS OR CITIZENS OF THE UNITED STATES.
  (3) 'AN ENTITY, WHICH IS OPENLY ACKNOWLEDGED BY A FOREIGN GOVERNMENT OR GOVERN-
MENTS TO BE DIRECTED AND CONTROLLED BY SUCH FOREIGN GOVERNMENT OR GOVERNMENTS.'
THIS IS A CATEGORY WHICH WAS NOT SPECIFICALLY DELINEATED IN S. 3197.  CERTAIN
CHANGES HAVE BEEN MADE IN THE S. 3197 WARRANT REQUIREMENTS WITH RESPECT TO SPECIFIC
FOREIGN POWERS WHICH GENERALLY REQUIRE LESS INFORMATION TO BE GIVEN TO THE JUDGE AND
ALLOW THE SURVEILLANCE TO BE CONTINUED FOR A LONGER PERIOD OF TIME WITHOUT THE NEED
FOR REAUTHORIZATION. THIS DECISION TO TREAT CERTAIN **\*\*3921** 'FOREIGN POWERS' DIFFER-
ENTLY IN TERMS OF WARRANT REQUIREMENTS WAS MADE AT THE INSISTENCE OF THE ADMINISTRA-
TION.  THE COMMITTEE IS SATISFIED, HOWEVER, THAT THE DISTINCTION IS SUFFICIENTLY
LIMITED SO AS NOT TO POSE ANY THREAT OF ABUSE.  THUS, IT IS ONLY WITH RESPECT TO 'EN-
TITIES' OPENLY ACKNOWLEDGED BY A FOREIGN GOVERNMENT TO BE DIRECTED AND CONTROLLED BY
SUCH FOREIGN GOVERNMENT-- THOSE WHICH ARE CLEARLY ARMS OF A GOVERNMENT OR GOVERN-
MENTS AND NOT PRIVATELY CONTROLLED-- THAT ARE SUBJECT TO THE EXTENDED WARRANTS GRAN-
TED ON A LESSER SHOWING.  SUCH 'OFFICIAL' ENTITIES ARE TREATED IN THE SAME MANNER AS
THE GOVERNMENT THEY SERVE.
  (4) 'A FOREIGN-BASED TERRORIST GROUP.'  THIS CATEGORY REFERS TO A FOREIGN-BASED
GROUP WHOSE ACTIVITIES INVOLVE 'TERRORISM', AS DEFINED.  THE COMMITTEE RECOGNIZES
THAT MANY INTERNATIONAL TERRORIST GROUPS HAVE MEMBERS FROM VARIOUS NATIONS, AND MAY
NOT IN FACT HAVE ANY CLEARLY DEFINABLE 'BASE. '  NEVERTHELESS, UNDER THIS DEFINITION
THE GROUP MUST BE 'FOREIGN-BASED;' THAT IS, IT MUST NOT BE BASED IN THE UNITED
STATES, ALTHOUGH IT MAY CARRY OUT TERRORIST ACTS IN THIS COUNTRY.  IT IS THE COMMIT-
TEE'S BELIEF THAT A DOMESTIC TERRORIST GROUP SHOULD BE SUBJECTED TO ELECTRONIC SUR-
VEILLANCE ONLY PURSUANT TO TITLE III.  WHERE, HOWEVER, A GROUP IS NOT DOMESTICALLY
BASED, BUT DERIVES STRENGTH AND REFUGE BY ORGANIZING, PLANNING, AND PREPARING ITS

                  © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TERRORIST ACTIVITIES OUTSIDE THE JURISDICTION OF THE UNITED STATES, THEN THAT GROUP
IS A LEGITIMATE TARGET FOR INTELLIGENCE SURVEILLANCE UNDER THIS BILL NO MATTER WHAT
THE CITIZENSHIP OF ITS MEMBERS.

  **\*20** (5) 'A FOREIGN-BASED POLITICAL ORGANIZATION, NOT SUBSTANTIALLY COMPOSED OF
PERMANENT RESIDENT ALIENS OR CITIZENS OF THE UNITED STATES.'  THIS CATEGORY IS IN-
TENDED TO INCLUDE, FOR EXAMPLE, THOSE FOREIGN POLITICAL PARTIES WHICH ARE MERE IN-
STRUMENTALITIES OF A FOREIGN GOVERNMENT AND WHICH ARE NOT SUBSTANTIALLY COMPOSED OF
AMERICANS.  THIS CATEGORY CLEARLY DOES NOT INCLUDE ORGANIZATIONS COMPRISED OF AMER-
ICANS OF GREEK, IRISH, JEWISH, CHINESE OR OTHER EXTRACTION, WHO HAVE JOINED TOGETHER
OUT OF INTEREST IN OR CONCERN FOR THE COUNTRY OF THEIR ETHNIC ORIGIN.

  (6) 'AN ENTITY, WHICH IS DIRECTED AND CONTROLLED BY A FOREIGN GOVERNMENT OR GOV-
ERNMENTS.'  THIS CATEGORY, FOUND VERBATIM IN S. 3197, WOULD INCLUDE AN ENTITY WHICH
APPEARS TO BE A LEGITIMATE COMMERCIAL ESTABLISHMENT BUT WHICH IS ACTUALLY BEING
UTILIZED BY A FOREIGN GOVERNMENT AS A COVER FOR ESPIONAGE ACTIVITIES.  A LAW FIRM,
PUBLIC RELATIONS FIRM, OR OTHER LEGITIMATE CONCERN WHICH MERELY REPRESENTS A FOREIGN
GOVERNMENT OR ITS INTERESTS IS NOT, BY DEFINITION, AN ENTITY UNDER THIS CATEGORY.
THE QUESTION OF WHETHER A GROUP, COMMERCIAL ENTERPRISE, OR ORGANIZATION COMES WITHIN
THE SCOPE OF THIS DEFINITION IS ONE FOR THE COURT TO DETERMINE ON THE BASIS OF A
PROBABLE CAUSE STANDARD.

                      B. 'AGENT OF A FOREIGN POWER'

  SUBSECTION (B)(2) DEFINES AN 'AGENT OF A FOREIGN POWER' IN TWO SEPARATE WAYS.
SUBPARAGRAPH (A)(I) INCLUDES OFFICERS OR EMPLOYEES OF FOREIGN POWERS WHO ARE NOT
UNITED STATES CITIZENS OR ALIENS LAWFULLY ADMITTED FOR PERMANENT RESIDENCE.  THE
DEFINITION IS FRAMED IN THIS WAY BECAUSE IT IS PRESUMED THAT NONRESIDENT ALIENS WHO
ARE OFFICERS OR EMPLOYEES OF A FOREIGN POWER ARE LIKELY SOURCES OF FOREIGN INTELLI-
GENCE INFORMATION.  GIVEN THE TENUOUS RELATIONSHIP OF FOREIGN OFFICERS OR EMPLOYEES
WITH THE UNITED STATES AND THEIR CLOSE RELATIONSHIP WITH A FOREIGN **\*\*3922** POWER,
THIS STANDARD IS CONSIDERED BY THE COMMITTEE TO BE REASONABLE IN LIGHT OF THE GOV-
ERNMENT'S LEGITIMATE NEED FOR FOREIGN INTELLIGENCE INFORMATION AND THE NATURE OF THE
INTERESTS UPON WHICH THE SEARCH WOULD INTRUDE.  THE REFERENCE TO EMPLOYEES OF A FOR-
EIGN POWER IS MEANT TO INCLUDE THOSE PERSONS WHO HAVE A NORMAL EMPLOYEE-EMPLOYER RE-
LATIONSHIP. [FN35] THE SUBPARAGRAPH IS NOT INTENDED TO ENCOMPASS SUCH FOREIGN VISIT-
ORS AS PROFESSORS, LECTURERS, EXCHANGE STUDENTS, PERFORMERS, OR ATHLETES, EVEN IF
THEY ARE RECEIVING REMUNERATION OR EXPENSES FROM THEIR HOME GOVERNMENT IN SUCH CAPA-
CITY.

  SUBPARAGRAPHS (A)(II), (III) AND (B) OF SUBSECTION (B) (2) COMPRISE THE SECOND
DEFINITION OF 'AGENT OF A FOREIGN POWER.'  THEY DEFINE AN AGENT IN TERMS OF THE
ACTIVITIES IN WHICH HE IS ENGAGED FOR OR ON BEHALF OF A FOREIGN POWER.

  SUBPARAGRAPH (A)(II) DEFINES AN AGENT OF A FOREIGN POWER AS A PERSON WHO IS NOT A
CITIZEN OR RESIDENT ALIEN OF THE UNITED STATES WHO 'KNOWINGLY ENGAGES IN CLANDESTINE
INTELLIGENCE ACTIVITIES FOR OR ON BEHALF OF A FOREIGN POWER UNDER CIRCUMSTANCES
WHICH INDICATE THAT **\*21** SUCH ACTIVITIES WOULD BE HARMFUL TO THE UNITED STATES.'
THIS CATEGORY COULD POTENTIALLY INCLUDE ILLEGAL ALIENS, FOREIGN TERRORISTS, EXCHANGE
VISITORS, FOREIGN BUSINESSMEN, FOREIGN STUDENTS, AND FOREIGN SEAMEN.  WHILE IT IS
EXPECTED THAT IN MOST CASES SUCH FOREIGNERS WOULD, EVEN UNDER THIS STANDARD, BE VI-

          © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

OLATING UNITED STATES CRIMINAL LAWS, AND WOULD CERTAINLY BE SUBJECT TO DEPORTATION
(SEE, E.G., 8 U.S.C. SEC. 1251(A) (7)), THERE IS NO SPECIFIC REQUIREMENT THAT THE
ACTIVITY PROVIDING THE JUSTIFICATION FOR THE SURVEILLANCE CONSTITUTE A FEDERAL
CRIME.  THIS SEPARATE NON-CRIMINAL STANDARD FOR FOREIGNERS IS A SIGNIFICANT CHANGE
FROM S. 3197. IN FAVORABLY REPORTING S. 3197 DURING THE 94TH CONGRESS, THE COMMITTEE
ACCEPTED THE NEED FOR A NARROWER NONCRIMINAL STANDARD APPLICABLE TO ALL PERSONS
WITHIN THE UNITED STATES.  S. 1566, HOWEVER, WHILE RETAINING THE S. 3197 NONCRIMINAL
STANDARD LARGELY INTACT FOR UNITED STATES CITIZENS AND LAWFUL RESIDENT ALIENS, AL-
TERS IT SUBSTANTIALLY WHEN OTHER PERSONS-- NOT UNITED STATES CITIZENS OR RESIDENT
ALIENS-- ARE THE TARGETS OF THE SURVEILLANCE.

FOR EXAMPLE, NO REFERENCE IS MADE TO THE REQUIREMENT OF 'DIRECTION' FROM A FOR-
EIGN POWER'S 'INTELLIGENCE SERVICE OR INTELLIGENCE NETWORK', NOR IS THERE ANY RE-
QUIREMENT OF 'COLLECTION' OR 'TRANSMISSION' IN A SECRET MANNER.  BECAUSE IT ELIMIN-
ATES SUCH REQUIREMENTS WHEN FOREIGN VISITORS-- AND ONLY WHEN FOREIGN VISITORS-- ARE
INVOLVED, THE BILL HAS BEEN CRITICIZED BY SOME MEMBERS OF THE COMMITTEE.  THE FOURTH
AMENDMENT TO THE CONSTITUTION SPEAKS IN TERMS OF PROTECTING ALL 'PERSONS'-- NOT JUST
UNITED UNITED STATES CITIZENS AND LAW RESIDENT ALIENS-- YET THE BILL ESTABLISHES A
DIFFERENT STANDARD FOR ILLEGAL ALIENS AND FOREIGN VISITORS.

PROPONENTS OF THE CHANGE, HOWEVER, POINT OUT THAT WHERE THERE ARE COMPELLING CON-
SIDERATIONS OF NATIONAL SECURITY, ALIENAGE DISTINCTIONS **3923 ARE CLEARLY LAWFUL.
[FN36]  THE DIRECTOR OF THE FBI TESTIFIED IN SUPPORT OF THE DIFFERENT STANDARD.  HE
POINTED OUT THAT LARGE NUMBERS OF TEMPORARY ALIENS VISIT THE UNITED STATES AND THAT
MANY OF THESE ALIENS ARE WORKING FOR FOREIGN INTELLIGENCE NETWORKS. THE SELECT COM-
MITTEE ON INTELLIGENCE ACTIVITIES SIMILARLY IDENTIFIED THE PROBLEM, POINTING OUT
THAT ONE QUARTER OF THE SOVIET EXCHANGE STUDENTS COMING TO THE UNITED STATES IN A
TEN-YEAR PERIOD WERE FOUND TO BE INTELLIGENCE OFFICERS.  [FN37]  THIS COMMITTEE IS
AWARE THAT LESS INTRUSIVE INVESTIGATIVE TECHNIQUES MAY NOT BE ABLE TO OBTAIN SUFFI-
CIENT INFORMATION ABOUT PERSONS VISITING HERE ONLY FOR A LIMITED TIME:  THE ADDI-
TIONAL SHOWING REQUIRED FOR UNITED STATES CITIZENS AND PERMANENT RESIDENT ALIENS,
THEREFORE, MAY SIMPLY NOT BE POSSIBLE.  WEIGHING THESE FINDINGS, RECOMMENDATIONS,
AND CONSIDERATIONS, AS WELL AS THE RECOGNIZED, BIPARTISAN GOAL OF ENACTING STATUTORY
SAFEGUARDS IN THIS AREA, THE COMMITTEE HAS CONCLUDED THAT THIS DISTINCTION BETWEEN
UNITED STATES CITIZENS, LAWFUL RESIDENT ALIENS AND OTHER ALIENS SHOULD BE PERMITTED.

IT IS CLEAR, HOWEVER, THAT THIS STANDARD-- UNLIKE THAT IN SUBPARAGRAPH (A)(I)-- IS
NOT ONE WHICH ALLOWS SURVEILLANCE ON THE BASIS OF THE ALIEN'S STATUS PER SE.  THE
ALIEN MUST BE ENGAGED IN 'CLANDESTINE INTELLIGENCE ACTIVITIES' FOR OR ON BEHALF OF A
FOREIGN POWER, AND WHILE THESE CLANDESTINE ACTIVITIES NEED NOT INVOLVE CRIMINAL VI-
OLATIONS (AS THEY MUST FOR UNITED STATES CITIZENS AND PERMANENT RESIDENT ALIENS),
THEY MUST BE OCCURRING UNDER CIRCUMSTANCES WHICH INDICATE THAT THE ACTIVITIES **22
WOULD BE HARMFUL TO THE SECURITY OF THE UNITED STATES.  ADDITIONALLY, OF COURSE, THE
DETERMINATION THAT SUFFICIENT JUSTIFICATION EXISTS TO CONDUCT ELECTRONIC SURVEIL-
LANCE OF A FOREIGN VISITOR OR A NONRESIDENT ALIEN WILL BE MADE BY A JUDGE, AND NOT A
MEMBER OF THE EXECUTIVE BRANCH.

SUBPARAGRAPH (B) (I) IS UNCHANGED FROM THE COMPARABLE PROVISION S. 3197 AND ALLOWS
SURVEILLANCE OF ANY PERSON, INCLUDING A UNITED STATES CITIZEN OR PERMANENT RESIDENT
ALIEN, WHO IS KNOWINGLY ENGAGED IN CLANDESTINE INTELLIGENCE ACTIVITIES FOR OR ON BE-
HALF OF A FOREIGN POWER, WHICH ACTIVITIES INVOLVE OR WILL INVOLVE A VIOLATION OF THE

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**

CRIMINAL STATUTES OF THE UNITED STATES.  UNDER THIS STANDARD THE PERSON TO BE SUR-
VEILLED MUST BE SHOWN TO HAVE A KNOWING AND SUBSTANTIAL CONNECTION WITH THE FOREIGN
POWER FOR WHOM HE IS WORKING.  THERE MUST BE A PRINCIPAL-AGENT RELATIONSHIP UNDER
WHICH THE ALLEGED AGENT HAS UNDERTAKEN TO PROVIDE SERVICES FOR HIS FOREIGN PRINCIP-
AL.  THE AGENT MUST ALSO BE KNOWINGLY ENGAGED IN 'CLANDESTINE INTELLIGENCE ACTIVIT-
IES'  WHICH INVOLVE OR WILL INVOLVE VIOLATIONS OF FEDERAL CRIMINAL LAW.  IT IS ANTI-
CIPATED THAT MOST OF THE PERSONS SURVEILLED UNDER THIS SECTION WILL BE VIOLATING THE
CRIMINAL ESPIONAGE LAWS (TITLE 18, U.S. CODE, SECTIONS 792-799, 951; TITLE 42, U.S.
CODE, SECTION 2272-2278B; AND TITLE 50, U.S. CODE, SECTION 855).

                    C. 'CLANDESTINE INTELLIGENCE ACTIVITIES'

   THE TERM 'CLANDESTINE INTELLIGENCE ACTIVITIES' AS USED IN THE BILL IS DIRECTED
PRIMARILY TOWARD THOSE TRADITIONAL ACTIVITIES ASSOCIATED WITH **3924 'SPYING,' THAT
IS GATHERING INFORMATION IN A CLANDESTINE MANNER OR CONDUCTING COVERT OPERATIONS FOR
A FOREIGN POWER.
   IN ADDITION TO THOSE ACTIVITIES WHICH FALL WITHIN THE SUBSTANTIVE STATUTORY CRIMES
OF SPYING ARE ACTIVITIES DIRECTLY RELATED TO SPYING WHICH ARE CRIMINAL WITHIN THE
MEANING OF THE CONSPIRACY, ATTEMPT, AND AIDING AND ABETTING STATUTES.  EXAMPLES
WOULD INCLUDE MAINTAINING A 'SAFEHOUSE' FOR SECRET MEETINGS, SERVICING 'LETTER
DROPS' OR 'DEAD DROPS' TO FACILITATE COVERT TRANSMISSION OF INSTRUCTIONS OR INFORMA-
TION, RECRUITING NEW AGENTS, OR INFILTRATING AND EX-FILTRATING AGENTS UNDER DEEP
COVER TO AND FROM THE UNITED STATES.
   IN ADDITION TO CONVENTIONAL 'SPYING,' THAT IS, THE GATHERING OF INFORMATION, THE
INTELLIGENCE AGENCIES OF FOREIGN POWERS ALSO ENGAGE IN COVERT ACTION DESIGNED TO IN-
FLUENCE EVENTS IN THIS COUNTRY. UNDER SUBPARAGRAPH (B) (I), IF SUCH POLITICAL ACTION
IS COVERT, INVOLVES A VIOLATION OF FEDERAL CRIMINAL LAW, SUCH AS THE BRIBERY OF A
PUBLIC OFFICIAL, AND IS UNDERTAKEN DIRECTLY ON BEHALF OF A FOREIGN POWER, IT WOULD
BE ENCOMPASSED BY THIS SUBPARAGRAPH.  THE BILL DOES NOT AUTHORIZE ELECTRONIC SUR-
VEILLANCE WHEN THE ACTIVITIES, EVEN THOUGH NOT PUBLIC AND CONDUCTED FOR A FOREIGN
POWER, INVOLVE LAWFUL ACTS SUCH AS LOBBYING OR THE USE OF CONFIDENTIAL CONTACTS TO
INFLUENCE PUBLIC OFFICIALS, DIRECTLY OR INDIRECTLY, THROUGH THE DISSEMINATION OF IN-
FORMATION.  INDIVIDUALS EXERCISING THEIR RIGHT TO LOBBY PUBLIC OFFICIALS OR TO EN-
GAGE IN POLITICAL DISSENT FROM OFFICIAL POLICY MAY WELL BE IN CONTACT WITH REPRES-
ENTATIVES OF FOREIGN GOVERNMENTS AND GROUPS WHEN THE ISSUES CONCERN FOREIGN AFFAIRS
OR INTERNATIONAL ECONOMIC MATTERS.
   THEY MUST CONTINUE TO BE FREE TO COMMUNICATE ABOUT SUCH ISSUES AND TO OBTAIN IN-
FORMATION OR EXCHANGE VIEWS WITH REPRESENTATIVES OF FOREIGN GOVERNMENTS OR WITH FOR-
EIGN GROUPS, FREE FROM ANY FEAR THAT *23 SUCH CONTACT MIGHT TRIGGER THE COGERNMENT'S
POWER TO CONDUCT ELECTRONIC SURVEILLANCE.  THE INTENT OF THE BILL IS TO EXCLUDE FROM
THE DEFINITION OF 'CLANDESTINE INTELLIGENCE ACTIVITIES' ANY ACTIVITY WHICH INVOLVES
THE LAWFUL EXERCISE OF FIRST AMENDMENT RIGHTS OF SPEECH, PETITION, ASSEMBLY, AND AS-
SOCIATION.  IN NO EVENT MAY LAWFUL POLITICAL ACTIVITY WITHIN THE AMBIT OF THE PRO-
TECTIONS AFFORDED BY THE FIRST AMENDMENT BE THE BASIS, OR FORM ANY PART OF THE
BASIS, FOR FINDING THAT ANY INDIVIDUAL IS ENGAGED IN 'CLANDESTINE INTELLIGENCE
ACTIVITIES.'  AS A COROLLARY, EVEN THE LAWFUL GATHERING OF INFORMATION DONE IN A
CONFIDENTIAL MANNER WHICH IS A PART OF LAWFUL POLITICAL ACTIVITY-- SUCH AS GATHERING

                    © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

'INTELLIGENCE' ABOUT THE POLITICAL STRENGTH AND PLANS OF PROPONENTS OR OPPONENTS OF
A PARTICULAR POLICY-- WOULD NOT CONSTITUTE 'CLANDESTINE INTELLIGENCE ACTIVITY' UNDER
THIS SECTION, WHERE SUCH INFORMATION GATHERING IS A NORMAL ANCILLARY PART OF LOBBY-
ING, ORGANIZING POLITICAL PROTEST, AND OTHER POLITICAL ACTIVITY PROTECTED BY THE
FIRST AMENDMENT.  CLANDESTINE COLLECTION OF INFORMATION REGARDING THE BUSINESS PLANS
OR TRADE SECRETS OF AN AMERICAN COMPANY WHICH MERELY MIGHT PROVIDE A COMPETITIVE AD-
VANTAGE TO FOREIGN FIRMS, FOR EXAMPLE, IN BIDDING ON A CONTRACT WITH A THIRD COUNTRY
WOULD ALSO NOT BE 'CLANDESTINE INTELLIGENCE ACTIVITY' UNDER SUBSECTION (B)(I) UNLESS
THE FOREIGN DISCLOSURE OF SUCH FINANCIAL OR BUSINESS INFORMATION INVOLVED OR WOULD
INVOLVE A VIOLATION OF FEDERAL CRIMINAL LAW.  CLASSIFIED INFORMATION HELD BY PRIVATE
FIRMS IS COVERED IN THIS WAY.

    AND, IN THE CASE OF AN ORGANIZATION WHOSE LEADERS ARE ENGAGED IN CLANDESTINE IN-
TELLIGENCE ACTIVITY, SUCH ACTIVITY CANNOT BE ATTRIBUTED TO **3925 EVERY MEMBER OF
THE GROUP.  THERE MUST BE PROBABLE CAUSE THAT A PARTICULAR MEMBER IS HIMSELF ENGAGED
IN SUCH ACTIVITY, OR IS CONSPIRING WITH OR KNOWINGLY AIDING AND ABETTING THOSE WHO
ARE, BEFORE ELECTRONIC SURVEILLANCE DIRECTED AGAINST HIM MAY BE AUTHORIZED UNDER
THIS CHAPTER.

    WHATEVER THE NATURE OF THE ACTIVITY IN QUESTION, THERE MUST BE A CLANDESTINE AS-
PECT.  THE STATUTE REQUIRES THAT THE ALLEGED FOREIGN AGENT NOT ONLY BE WORKING FOR
OR ON BEHALF OF A FOREIGN POWER OR ITS AGENT, BUT ALSO, AS A SEPARATE REQUIREMENT,
THAT HE BE ENGAGED IN CLANDESTINE INTELLIGENCE ACTIVITY.

    THERE MUST ALSO BE AN EFFORT TO OBTAIN INFORMATION WHICH IS BEING KEPT SECRET AND
IS NOT GENERALLY AVAILABLE TO THE PUBLIC, OR NOT AVAILABLE TO THE GENERAL PUBLIC.
THEREFORE, THE COLLECTION, FOR WHATEVER PURPOSE, OF INFORMATION WITHIN THE PUBLIC
DOMAIN SUCH AS THAT CONTAINED IN BOOKS, MAGAZINES, SCIENTIFIC JOURNALS, OR NEWSPA-
PERS WOULD NEVER CONSTITUTE 'CLANDESTINE INTELLIGENCE ACTIVITY.' [FN38]

    FINALLY, THE WORD 'INVOLVE' AS USED IN SUBPARAGRAPH (B)(I) IS NOT INTENDED TO EN-
COMPASS ANY INDIVIDUALS WHO ARE NOT ACTUALLY ENGAGED IN A VIOLATION OF FEDERAL LAW.
IT IS INTENDED TO ENCOMPASS A VIOLATION OF FEDERAL LAW WHICH IS AN INTEGRAL PART OF
THE CLANDESTINE INTELLIGENCE ACTIVITY EVEN THOUGH THE CLANDESTINE INTELLIGENCE
ACTIVITY ITSELF **24 MIGHT FALL BETWEEN THE CRACKS OF THE ESPIONAGE LAWS.  FOR IN-
STANCE, FOREIGN INTELLIGENCE AGENTS MIGHT BE COLLECTING SENSITIVE INDUSTRIAL OR
TECHNOLOGICAL INFORMATION.  WHILE THIS COLLECTION MAY NOT VIOLATE THE ESPIONAGE
LAWS, THE AGENTS MAY HAVE TO TRANSPORT THE MATERIAL ACROSS STATE LINES, THEREBY VI-
OLATING FEDERAL LAWS WHICH PROSCRIBE THE INTERSTATE TRANSPORTATION OF STOLEN PROP-
ERTY.  THE PHRASE 'WILL INVOLVE ', WHICH ALSO APPEARS IN THIS SUBPARAGRAPH, IS LIKE-
WISE IN NO WAY INTENDED TO DIMINISH OR DILUTE THE NATURE OF THE CRIMINAL ACTIVITY TO
BE ESTABLISHED.  ITS ONLY PURPOSE IS TO PERMIT ELECTRONIC SURVEILLANCE AT SOME POINT
PRIOR TO THE TIME WHEN THE ACTUAL CRIME SOUGHT TO BE PREVENTED, FOR EXAMPLE THE AC-
TUAL PASSAGE OF CLASSIFIED DOCUMENTS, ACTUALLY OCCURS.  THE COMMITTEE RECOGNIZES
THAT AN ARGUMENT CAN BE MADE THAT A PERSON COULD BE SURVEILLED FOR AN INORDINATE
PERIOD OF TIME.  THAT IS CLEARLY NOT THE INTENTION.  INDEED, EVEN UPON AN ASSERTION
BY THE GOVERNMENT THAT AN INFORMATION HAS CLAIMED THAT SOMEONE HAS BEEN INSTRUCTED
BY A FOREIGN POWER TO GO INTO 'DEEP COVER'  FOR SEVERAL YEARS BEFORE ACTUALLY COM-
MENCING HIS ESPIONAGE ACTIVITIES, SUCH FACTS WOULD NOT NECESSARILY BE ENCOMPASSED BY
THE IMMEDIACY OF THE PHRASE 'WILL INVOLVE.'  UNDER THE EXTENSION PROVISIONS OF SEC-
TION 2525(C), DISCUSSED INFRA, THE JUDGE CAN INSIST ON EXAMINING THE FRUITS OF ANY

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EARLIER SURVEILLANCE WHEN IT IS NECESSARY TO DETERMINE WHETHER THERE IS PROBABLE
CAUSE TO BELIEVE THAT THE INDIVIDUAL WILL BE INVOLVED IN CLANDESTINE INTELLIGENCE
ACTIVITIES.

   **\*3926** SUBPARAGRAPH (B)(II) INCLUDES ANY PERSON WHO KNOWINGLY ENGAGED IN ACTIVIT-
IES THAT INVOLVE OR WILL INVOLVE SABOTAGE OR TERRORISM FOR OR ON BEHALF OF A FOREIGN
POWER.  THE TERMS 'SABOTAGE' AND 'TERRORISM' ARE DEFINED AND REQUIRE A SHOWING OF
CRIMINAL ACTIVITY. AGAIN, THE NATURE OF THE KNOWLEDGE AND AGENCY RELATIONSHIP ARE
THE SAME AS REQUIRED UNDER SUBPARAGRAPH (B)(I).  IN NO EVENT MAY MERE SYMPATHY FOR,
IDENTITY OF INTEREST WITH, OR VOCAL SUPPORT FOR THE GOALS OF A FOREIGN GROUP, EVEN A
FOREIGN TERRORIST GROUP, BE SUFFICIENT. THE TERMS 'INVOLVE' AND 'WILL INVOLVE' ARE
INTENDED TO ENCOMPASS ACTIVITIES DIRECTLY SUPPORTIVE OF SOME ACT OF TERRORISM, E.G.,
THE PURCHASE OR SURREPTITIOUS IMPORTATION INTO THE UNITED STATES OF EXPLOSIVES FOR
USE IN A TERRORIST INCIDENT, OR THE PLANNING FOR AN ASSASSINATION.

                        D. THE NONCRIMINAL STANDARD

   SUBPARAGRAPH (B)(III) IS THE SO-CALLED NON-CRIMINAL STANDARD APPLICABLE TO UNITED
STATES CITIZENS AND RESIDENT ALIENS.  THE ONLY SUBSTANTIVE CHANGE FROM THE SIMILAR
PROVISION IN S. 3197 IS THE INCLUSION-- AT THE ADMINISTRATION'S REQUEST-- OF 'COLLEC-
TION' AMONG THE ACTIVITIES JUSTIFYING THE SURVEILLANCE. THIS CHANGE MAKES SENSE.
ACTUAL TRANSMISSION OF INFORMATION TO A FOREIGN INTELLIGENCE SERVICE MAY NOT YET BE
COMPLETED OR MAY NOT BE DETECTED, YET, GIVEN THE OTHER CRITERIA UNDER THIS SUBPARA-
GRAPH, COLLECTION ALONE SHOULD BE SUFFICIENT TO JUSTIFY THE SURVEILLANCE.

   DURING THE COURSE OF THE HEARINGS ON S. 1566, TESTIMONY WAS ELICITED FROM VARIOUS
WITNESSES AS TO THE PRECISE CONTOURS OF THE NONCRIMINAL STANDARD.  ALL WITNESSES
AGREED THAT THE PHRASE WOULD, WITH LIMITED EXCEPTION FOR CERTAIN ACTIVITY, REFER TO
ACTIVITY CONSTITUTING A FEDERAL OR STATE CRIME.  ON THE BASIS OF TESTIMONY OF, AND
DISCUSSIONS WITH, THE **\*25** DEPARTMENT OF JUSTICE, THE COMMITTEE AGREED TO INCLUDE
LANGUAGE COVERING CERTAIN NARROWLY CIRCUMSCRIBED INTELLIGENCE ACTIVITIES CLOSELY RE-
LATED TO CRIMINAL ESPIONAGE BUT NOT PRESENTLY CONSTITUTING AN OFFENSE UNDER FEDERAL
LAW.  SUCH A DECISION WAS MADE DESPITE SERIOUS RESERVATIONS VOICED BY VARIOUS MEM-
BERS OF THE COMMITTEE. IN INTRODUCING S. 1566, SENATOR KENNEDY STATED THAT HE HAD
'NEVER BEEN ALTOGETHER SATISFIED WITH THE EXPLANATIONS OFFERED BY THE DEPARTMENT OF
JUSTICE AS TO WHY A NONCRIMINAL STANDARD IS NECESSARY AT ALL.' [FN39]  THIS VIEW
CONTINUES TO BE SHARED BY MANY COMMITTEE MEMBERS.  HOWEVER, FOR VARIOUS REASONS--
PERHAPS THE MOST IMPORTANT BEING THE DESIRE OF THE COMMITTEE TO AT LONG LAST ENACT
IMPORTANT STATUTORY SAFEGUARDS IN THIS AREA AND TO AVOID THE ACRIMONY OF PAST FRUIT-
LESS EFFORTS-- THE COMMITTEE HAS AGAIN AGREED TO INCLUDE IN S. 1566 A NARROW, CARE-
FULLY CIRCUMSCRIBED, NONCRIMINAL STANDARD.  THE ADMINISTRATION HAS AGREED, HOWEVER,
TO DRAFT A REVISION OF THE ESPIONAGE LAWS WHICH MIGHT ENABLE THIS NARROW NONCRIMINAL
STANDARD TO BE REPEALED. [FN40]  IN THE INTERIM, THE COMMITTEE BELIEVES THAT THIS
SUBPARAGRAPH CONTAINS STANDARDS SUFFICIENTLY STRINGENT AS TO BE INCAPABLE OF ABUSE.

   ALTHOUGH THE ADMINISTRATION IS COMMITTED TO USING THE CRIMINAL STANDARDS WHEREVER
POSSIBLE, THERE ARE SEVERAL SITUATIONS WHERE THIS SUBPARAGRAPH MAY BE NECESSARY.
FOR EXAMPLE, THE SITUATION WHERE THE INFORMATION BEING COLLECTED OR TRANSMITTED IS
NOT 'INFORMATION RELATING TO THE NATIONAL DEFENSE,' AS DEFINED BY THE COURTS.  GORIN
V. UNITED STATES, 312 U.S. 19 (1941), [FN41]  UNITED STATES V. HEINE, 151 F.2D 813

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**


(2D CIR. 1945) (L. HAND, J.), CERT. DENIED, 328 U.S. 833 (1946). [FN42] **\*3927** THE
EXAMPLE IS ALSO CITED WHERE FEDERAL AGENTS HAVE WITNESSED A SERIES OF 'MEETS' OR
'DROPS ' BETWEEN A HOSTILE FOREIGN INTELLIGENCE OFFICER AND A CITIZEN, INFORMATION
IS BEING PASSED, BUT THE FEDERAL AGENTS HAVE BEEN UNABLE TO DETERMINE PRECISELY WHAT
INFORMATION IS BEING TRANSMITTED.  A THIRD EXAMPLE REFERRED TO IS WHERE PERSONALLY
DAMAGING INFORMATION IS BEING GATHERED ABOUT PERSONS FOR PURPOSES OF BLACKMAILING
THEM INTO BECOMING FOREIGN AGENTS.  THIS MAY OR MAY NOT BE A CRIME, DEPENDING ON
WHETHER THE TECHNICAL REQUIREMENTS OF THE BLACKMAIL OR EXTORTION STATUTES HAVE BEEN
SATISFIED, BUT THE NATIONAL SECURITY COULD BE THREATENED, AND ELECTRONIC SURVEIL-
LANCE MAY ENABLE THE GOVERNMENT TO PROTECT THE VICTIM FROM SUCH ATTEMPTS.  ANOTHER
EXAMPLE IS WHERE A FOREIGN INTELLIGENCE SERVICE IS TARGETING THE INSTALLATIONS OR
PERSONNEL OF A FOREIGN GOVERNMENT IN THE UNITED STATES.  THERE STILL MUST BE A NEXUS
TO OUR NATIONAL SECURITY, BUT SUCH NEXUS MAY WELL EXIST WHERE THE FOREIGN GOVERNMENT
IS AN ALLY OF THE UNITED STATES AND A COMPROMISE OF THE FORMER'S SECRETS TO AN AD-
VERSARY NATION MAY ENDANGER OUR OWN SECURITY.  [FN43]

BECAUSE OF THIS RANGE OF CASES, WHICH MAY OR MAY NOT FALL WITHIN THE AMBIT OF THE
ESPIONAGE LAWS, BUT DO INVOLVE AMERICANS WORKING FOR A FOREIGN INTELLIGENCE SERVICE
UNDER CIRCUMSTANCES DANGEROUS TO THE NATIONAL SECURITY, THE COMMITTEE HAS CHOSEN TO
INCLUDE THIS LIMITED NONCRIMINAL STANDARD FOR AMERICANS.  THE BILL PERMITS, IN THIS
SUBPARAGRAPH, **\*26** THE SURVEILLANCE OF ANY PERSON IF THE GOVERNMENT CAN ESTABLISH
THAT THERE IS PROBABLE CAUSE TO BELIEVE THAT:

(1) SAID PERSON WAS ACTING PURSUANT TO THE DIRECTION OF A FOREIGN INTELLIGENCE
SERVICE;

(2) SAID PERSON WAS KNOWINGLY EITHER COLLECTING OR TRANSMITTING INFORMATION OR MA-
TERIAL TO A FOREIGN INTELLIGENCE SERVICE IN A MANNER INTENDED TO CONCEAL EITHER THE
NATURE OF THE INFORMATION OR MATERIAL OR THE FACT IT WAS BEING COLLECTED OR TRANS-
MITTED; AND

(3) THE CIRCUMSTANCES INDICATE THAT THE TRANSMISSION OF THE INFORMATION OR MATERI-
AL WOULD HARM THE SECURITY OF THE UNITED STATES, OR THAT LACK OF KNOWLEDGE BY THE
UNITED STATES GOVERNMENT ABOUT WHAT IS BEING TRANSMITTED WOULD HARM THE SECURITY OF
THE UNITED STATES.

E. 'PURSUANT TO THE DIRECTION OF AN INTELLIGENCE SERVICE OR INTELLIGENCE
NETWORK OF A FOREIGN POWER'

PERHAPS THE MOST IMPORTANT PHRASE IN THE SUBPARAGRAPH IS THE REQUIREMENT THAT THE
TARGET OF THE SURVEILLANCE BE ACTING 'PURSUANT TO THE DIRECTION OF AN INTELLIGENCE
SERVICE OR INTELLIGENCE NETWORK OF A FOREIGN POWER.'  THIS LANGUAGE MEANS THAT A
PERSON MUST BE ACTING UNDER THE DIRECTION AND CONTROL OF SUCH POWER.

**\*3928** THERE MUST BE A PRINCIPAL-AGENCY RELATIONSHIP UNDER WHICH THE ALLEGED AGENT
HAS UNDERTAKEN TO DO THE BIDDING OF HIS FOREIGN PRINCIPAL.  THIS SUBPARAGRAPH,
THEREFORE, WOULD NOT AUTHORIZE ELECTRONIC SURVEILLANCE OF UNITED STATES CITIZENS OR
PERMANENT RESIDENT ALIENS, WHATEVER THE NATURE OF THEIR ALLEGED ACTIVITIES, UNLESS
THERE WAS PROBABLE CAUSE TO BELIEVE THEY ARE ACTING PURSUANT TO THE DIRECTION OF A
FOREIGN INTELLIGENCE SERVICE OR NETWORK.  IT DOES NOT AUTHORIZE ELECTRONIC SURVEIL-
LANCE UNDER ANY CIRCUMSTANCES FOR THE CLASS OF INDIVIDUALS INCLUDED BY THE SUPREME
COURT WITHIN THE SCOPE OF THE KEITH DECISION REQUIRING JUDICIAL WARRANTS FOR ALLEGED

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**


THREATS TO SECURITY OF A DOMESTIC NATURE.  IT IS THE INTENT OF THIS REQUIREMENT THAT
EVEN IF THERE IS SOME SUBSTANTIAL CONTACT BETWEEN DOMESTIC GROUPS OR INDIVIDUAL CIT-
IZENS AND A FOREIGN POWER, AS DEFINED IN THIS BILL, NO ELECTRONIC SURVEILLANCE UNDER
THIS SUBPARAGRAPH MAY BE AUTHORIZED UNLESS THE AMERICAN IS UNDER THIS SUBPARAGRAPH
MAY BE AUTHORIZED UNLESS THE AMERICAN IS ACTING UNDER THE DIRECTION OF AN INTELLI-
GENCE SERVICE OF A FOREIGN POWER.

   FOR EXAMPLE, AMERICANS OF GREEK, JEWISH, IRISH, OR CHINESE EXTRACTION LEGITIMATELY
MAY SEEK TO INFLUENCE UNITED STATES POLICY TOWARD THE COUNTRY OF THEIR ETHNIC ORI-
GIN.  IN THE PROCESS, SUCH AMERICANS ARE LIKELY TO BE IN COMMUNICATION WITH REPRES-
ENTATIVES OF THE GOVERNMENTS OF THOSE COUNTRIES IN ORDER TO LEARN ABOUT PARTICULAR
SITUATIONS OR PROBLEMS.  IF AN AMERICAN FORMULATES LOBBYING EFFORTS IN PART ON THE
BASIS OF SUCH ADVICE OR SUGGESTIONS HE COULD, IN ONE SENSE, BE SAID TO BE FOLLOWING
THE 'DIRECTION' OF A FOREIGN POWER.  BUT THIS SUBPARAGRAPH REQUIRES THAT THE AGENT
ACT PURSUANT TO THE 'DIRECTION OF INTELLIGENCE SERVICE OR NETWORK OF A FOREIGN
POWER'.  THUS, SUCH 'DIRECTION' FROM PERSONNEL OF A FOREIGN POWER WHICH ARE NOT CON-
NECTED WITH AN INTELLIGENCE SERVICE OR NETWORK WOULD NOT BE A BASIS FOR ELECTRONIC
SURVEILLANCE UNDER THIS SUBPARAGRAPH.  THERE WOULD HAVE TO BE ADDITIONAL INFORMATION
SPECIFICALLY INDICATING THE AMERICANS HAD UNDERTAKEN **27 TO DO THE BIDDING OF AN IN-
TELLIGENCE SERVICE OR NETWORK, OR ITS AGENTS, RATHER THAN MERELY ACTING BECAUSE OF
AN AFFINITY FOR THE SAME CONCERNS AS THAT FOREIGN POWER.  THE KEY LEGAL DOCTRINE IS
THAT OF AGENCY; MUTUAL GOALS OR COMMON CONCERNS ARE NOT SUFFICIENT.

   ANOTHER EXAMPLE OF AMERICANS HAVING CONTACT WITH FOREIGN POWERS IS THE CASE OF
AMERICANS WHO WERE ACTIVE IN THE PROTEST AGAINST UNITED STATES INVOLVEMENT IN VIET-
NAM.  SOME OF THEM MAY HAVE ATTENDED INTERNATIONAL CONFERENCES AT WHICH THERE WERE
REPRESENTATIVES OF FOREIGN POWERS, AS DEFINED IN THE BILL, OR MAY HAVE BEEN DIRECTLY
IN COMMUNICATION WITH FOREIGN GOVERNMENTS CONCERNING THIS ISSUE.  THERE MAY HAVE
BEEN AN EXCHANGE OF INFORMATION ABOUT ACTIVITIES PROTESTING THE VIETNAM WAR.  BUT IF
THERE MERELY HAD BEEN EVIDENCE THAT AN AMERICAN WAS COORDINATING THE DATES OF
PLANNED PEACE DEMONSTRATIONS IN THE UNITED STATES TO COINCIDE WITH SIMILAR ACTIVIT-
IES ABROAD IN ORDER TO MAXIMIZE WORLDWIDE PUBLIC ATTENTION, THAT WOULD NOT HAVE SUF-
FICED TO FIND PROBABLE CAUSE THAT THE AMERICAN WAS ACTING UNDER THE DIRECTION OF A
FOREIGN INTELLIGENCE SERVICE AS REQUIRED BY THIS SUBPARAGRAPH. ADDITIONAL EVIDENCE
WOULD HAVE BEEN REQUIRED INDICATING THAT THE AMERICAN HAD UNDERTAKEN TO FOLLOW THE
INSTRUCTION OF A FOREIGN INTELLIGENCE SERVICE OR NETWORK, RATHER THAN SIMPLY TRYING
TO COORDINATE HIS INDEPENDENT EFFORT WITH RELATED ACTIVITIES ABROAD.

   FOR BOTH OF THESE TWO ILLUSTRATIONS, IT SHOULD BE EMPHASIZED THAT EVEN IF THERE
WAS PROBABLE CAUSE TO BELIEVE AN AMERICAN WAS ACTING PURSUANT TO THE DIRECTION OF A
FOREIGN INTELLIGENCE SERVICE, THE COURT **3929 WOULD ALSO HAVE TO FIND PROBABLE
CAUSE TO BELIEVE THAT THE AMERICAN WAS ENGAGED IN THE SECRET COLLECTION OR TRANSMIS-
SION OF INFORMATION OR MATERIAL TO A FOREIGN POWER.  THIS IS A SEPARATE AND DISTINCT
REQUIREMENT.

   FURTHER, AN ORGANIZATION SUBSTANTIALLY COMPOSED OF AMERICANS, WHETHER RESIDING IN
THE UNITED STATES OR ABROAD, WOULD NOT COME WITHIN THE DEFINITION OF ACTING PURSUANT
TO THE DIRECTION OF A FOREIGN INTELLIGENCE SERVICE MERELY BECAUSE IT WAS PART OF A
WORLDWIDE CONFEDERATION OF NATIONAL ORGANIZATIONS. EVEN IF A DOMESTIC ORGANIZATION
WERE FOUND TO BE ACTING THROUGH ITS LEADERS AT THE DIRECTION OF A FOREIGN INTELLI-
GENCE SERVICE, AN INDIVIDUAL'S MERE MEMBERSHIP IN THAT ORGANIZATION, WITHOUT MORE

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**


INFORMATION ABOUT HIS OWN UNDERTAKING TO DO SO, WOULD NOT CONSTITUTE PROBABLE CAUSE
TO BELIEVE THAT THAT PARTICULAR MEMBER WAS ACTING PURSUANT TO THE DIRECTION OF A
FOREIGN INTELLIGENCE SERVICE FOR PURPOSES OF THIS SUBPARAGRAPH.

   FINALLY, IT IS NECESSARY THAT THE PERSON BE AWARE HE IS ACTING ON BEHALF OF A FOR-
EIGN POWER.  AN AMERICAN MIGHT BE SECRETLY COLLECTING INFORMATION ABOUT IMPORTANT
TECHNOLOGY, FOR EXAMPLE, AND HAVE BEEN MISLED INTO THE BELIEF HE WAS ACTING FOR A
RESEARCH INSTITUTE OR A MULTINATIONAL CORPORATION.  THEREFORE IT WOULD NOT SUFFICE
TO ESTABLISH PROBABLE CAUSE THAT THE AMERICAN IS, IN FACT, ENGAGED IN A COVERT
ACTIVITY AT THE DIRECTION OF A FOREIGN POWER; THE GOVERNMENT MUST ESTABLISH PROBABLE
CAUSE THAT THE AMERICAN KNOWS HIS EFFORTS ARE ON BEHALF OF A FOREIGN POWER'S INTEL-
LIGENCE ACTIVITIES.

   IT ALSO FOLLOWS, OF COURSE, THAT EVIDENCE A FOREIGN POWER IS TRYING TO RECRUIT AN
AMERICAN AS AN AGENT DOES NOT SUFFICE TO ESTABLISH PROBABLE CAUSE TO BELIEVE HE HAS
AGREED TO DO THE FOREIGN POWER'S BIDDING AND IS ENGAGED ON ITS BEHALF.  BEFORE ELEC-
TRONIC SURVEILLANCE COULD BE DIRECTED **\*28** AGAINST THE AMERICAN, THE COURT WOULD HAVE
TO FIND PROBABLE CAUSE THAT THE AMERICAN HAD RESPONDED POSITIVELY TO THE RECRUITMENT
EFFORT AND IT IS NOW ACTING AS A MEMBER OF THAT POWER'S INTELLIGENCE NETWORK.

   IN APPLYING THESE VARIOUS TESTS, THE JUDGE IS EXPECTED TO TAKE ALL THE KNOWN CIR-
CUMSTANCES INTO ACCOUNT, E.G., WHO THE AMERICAN IS, WHERE HE IS EMPLOYED, WHETHER HE
HAS ACCESS TO CLASSIFIED OR OTHER SENSITIVE INFORMATION, THE NATURE OF THE CLANDES-
TINE MEETINGS (WHETHER IT IS MERELY IN AN OUT-OF-THE-WAY RESTAURANT AS OPPOSED TO A
HIDDEN LOCATION IN A DISTANT CITY), THE METHOD OF TRANSMISSION (HANDING OVER A
SEALED ENVELOPE IN A PUBLIC PLACE, AS OPPOSED TO USING A 'DROP'), AND WHETHER THERE
ARE ANY OTHER REASONABLE EXPLANATIONS FOR THE BEHAVIOR.  IT IS CLEAR, MOREOVER, THAT
THE CIRCUMSTANCES MUST NOT MERELY BE SUSPICIOUS, BUT MUST BE SUFFICIENT SUPPORT FOR
A FINDING OF PROBABLE CAUSE THAT THE SECURITY OF THE UNITED STATES WOULD BE HARMED.

   THIS SUBPARAGRAPH ALSO RECOGNIZES THAT THERE ARE CERTAIN RARE SITUATIONS WHERE,
FOR EXAMPLE, A CITIZEN WHO HAS ACCESS TO CLASSIFIED INFORMATION IS CLANDESTINELY
MEETING WITH A KNOWN INTELLIGENCE OFFICER OF A HOSTILE FOREIGN POWER, AND IT IS,
THEREFORE, ESSENTIAL THAT THE UNITED STATES FIND OUT WHAT IS TRANSPIRING BETWEEN
THEM.  IN SUCH A RARE CASE, LACK OF KNOWLEDGE BY THE U.S. GOVERNMENT ABOUT WHAT IS
BEING TRANSMITTED MIGHT, BY DEFINITION, HARM THE SECURITY OF THE UNITED STATES.  IN
SUCH A SITUATION, IF THE JUDGE CONCLUDES THAT THERE IS PROBABLE CAUSE TO BELIEVE
THAT SUCH 'LACK OF KNOWLEDGE WOULD BE HARMFUL TO THE SECURITY OF THE UNITED STATES,'
AN AMERICAN COULD ALSO BE TARGETED.

   **\*\*3930** THE COMMITTEE EMPHASIZES THAT THIS NARROW INCLUSION FOR ELECTRONIC SURVEIL-
LANCE WITHOUT PROBABLE CAUSE TO BELIEVE THAT THE TARGETS ARE ENGAGED IN CRIMINAL
ACTIVITY IS, OF COURSE, NOT INTENDED TO PROVIDE A BOOTSTRAP FOR EVEN BROADER AUTHOR-
ITY TO INVESTIGATE NONCRIMINAL ACTIVITY OF AMERICANS ABSENT THE SAFEGUARDS IN THIS
BILL.  THE COMMITTEE EMPHASIZES THAT S. 1566 ESTABLISHES A LEGISLATIVE SCHEME TO
DEAL ONLY WITH ELECTRONIC SURVEILLANCE; THE USE OF OTHER INVESTIGATIVE TECHNIQUES DO
NOT FALL WITHIN THE SCOPE OF THIS BILL.


                          F. 'CONSPIRES OR AIDS AND ABETS'


   SUBPARAGRAPHS (A)(III) AND (B)(IV) ARE PROVISIONS WHICH ALLOW ELECTRONIC SURVEIL-
LANCE OF PERSONS WHO KNOWINGLY CONSPIRE WITH OR AID OR ABET PERSONS WHO COULD OTHER-

                    © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

WISE BE SUBJECTED TO ELECTRONIC SURVEILLANCE UNDER THE PROVISIONS DISCUSSED ABOVE.
INSOFAR AS THE DOCTRINES OF CONSPIRACY AND AIDING AND ABETTING HAVE BEEN MADE AP-
PLICABLE TO THE NONCRIMINAL STANDARDS OF S. 1566-- A CHANGE FROM S. 3197-- SOME MEM-
BERS OF THE COMMITTEE ARE CONCERNED.  THEY FEEL THAT THE SAFEGUARDS AND PROTECTIONS
FOUND IN THE NARROW, CAREFULLY CIRCUMSCRIBED LANGUAGE OF THE NONCRIMINAL STANDARDS
(ESPECIALLY IN THE NONCRIMINAL STANDARD APPLICABLE TO UNITED STATES CITIZENS) CAN BE
ABUSED THROUGH THE USE OF THE CONSPIRACY AND AIDING AND ABETTING LANGUAGE.

   UNDER (A)(III) NON-RESIDENT ALIENS CAN BE SUBJECTED TO ELECTRONIC SURVEILLANCE BY
CONSPIRING WITH OR AIDING OR ABETTING ANOTHER NON-RESIDENT ALIEN, KNOWING THAT PER-
SON IS ENGAGED IN CLANDESTINE INTELLIGENCE ACTIVITIES FOR OR ON BEHALF OF A FOREIGN
POWER.  UNDER (B) (IV) A PERSON CAN BE SUBJECTED TO ELECTRONIC SURVEILLANCE IF HE
CONSPIRES WITH OR AIDS OR ABETS A PERSON KNOWING THAT PERSON IS ENGAGED IN THE
ACTIVITIES DESCRIBED IN SUBPARAGRAPHS (B) (I) THROUGH (III).  UNDER **29 BOTH
(A)(III) AND (B)(IV) THE GOVERNMENT WOULD HAVE TO ESTABLISH PROBABLE CAUSE THAT THE
PROSPECTIVE TARGET KNEW BOTH THAT THE PERSON WITH WHOM HE WAS CONSPIRING OR WHOM HE
WAS AIDING OR ABETTING WAS ENGAGING IN THE DESCRIBED ACTIVITIES AS AN AGENT OF A
FOREIGN POWER AND THAT HIS OWN CONDUCT WAS ASSISTING OR FURTHERING SUCH ACTIVITY.
THE KNOWLEDGE REQUIREMENT IS THEREFORE APPLICABLE TO BOTH THE STATUS OF THE PERSON
BEING AIDED BY THE PROPOSED SUBJECT OF THE SURVEILLANCE AND THE NATURE OF THE ACTIV-
ITY BEING PROMOTED.  THE INNOCENT DUPE WHO UNWITTINGLY AIDS A FOREIGN INTELLIGENCE
OFFICER CANNOT BE TARGETED UNDER THIS PROVISION.  [FN44]

   AN ILLUSTRATION OF THE 'KNOWING' REQUIREMENT IS PROVIDED BY THE CASE OF DR. MARTIN
LUTHER KING.  DR. KING WAS SUBJECTED TO ELECTRONIC SURVEILLANCE ON 'NATIONAL SECUR-
ITY GROUNDS' WHEN HE CONTINUED TO ASSOCIATE WITH TWO ADVISERS WHOM THE GOVERNMENT
HAD APPRISED HIM WERE SUSPECTED OF BEING AMERICAN COMMUNIST PARTY MEMBERS AND, BY
IMPLICATION, AGENTS OF A FOREIGN POWER.  DR. KING'S MERE CONTINUED ASSOCIATION AND
CONSULTATION WITH THOSE ADVISERS, DESPITE THE GOVERNMENT'S WARNINGS WOULD CLEARLY
NOT HAVE BEEN A SUFFICIENT BASIS UNDER THIS BILL TO TARGET DR. KING AS THE SUBJECT
OF ELECTRONIC SURVEILLANCE.

   INDEED, EVEN IF THERE HAD BEEN PROBABLE CAUSE TO BELIEVE THAT THE ADVISERS ALLEGED
TO BE COMMUNISTS WERE ENGAGED IN CRIMINAL CLANDESTINE INTELLIGENCE ACTIVITY FOR A
FOREIGN POWER WITHIN THE MEANING OF THIS SECTION, AND EVEN IF THERE WERE PROBABLE
CAUSE TO BELIEVE DR. KING WAS AWARE THEY WERE ACTING FOR A FOREIGN POWER, IT WOULD
ALSO HAVE BEEN NECESSARY UNDER THIS BILL TO ESTABLISH PROBABLE CAUSE THAT **3931 DR.
KING WAS KNOWINGLY ENGAGED IN FURTHERING HIS ADVISERS' CRIMINAL CLANDESTINE INTELLI-
GENCE ACTIVITIES.  ABSENT ONE OR MORE OF THESE REQUIRED SHOWINGS, KING COULD NOT
HAVE BEEN FOUND TO BE ONE WHO KNOWINGLY AIDS OR ABETS A FOREIGN AGENT.  [FN45]

   SUBSECTION (B)(3) DEFINES 'TERRORISM' AS CRIMINAL ACTIVITIES WHICH ARE VIOLENT OR
DANGEROUS TO HUMAN LIFE.  THE PURPOSE OF THE ACTIVITIES MUST BE EITHER THE FORCEFUL
INTIMIDATION OF THE CIVILIAN POPULATION, THE INTIMIDATION OF NATIONAL LEADERS IN OR-
DER TO FORCE A SIGNIFICANT CHANGE IN GOVERNMENTAL POLICY, OR THE AFFECTING OF GOV-
ERNMENTAL CONDUCT BY ASSASSINATION OR KIDNAPING.  EXAMPLES OF SUCH ACTIVITIES WOULD
BE THE DETONATION OF BOMBS IN A METROPOLITAN AREA, THE KIDNAPPING OF A HIGH-RANKING
GOVERNMENT OFFICIAL, THE HIJACKING OF AN AIRPLANE IN A DELIBERATE AND ARTICULATED
EFFORT TO FORCE THE GOVERNMENT TO RELEASE A CERTAIN CLASS OF PRISONERS OR TO SUSPEND
AID TO A PARTICULAR FOREIGN *30 COUNTRY, OR THE DELIBERATE ASSASSINATION OF PERSONS
TO STRIKE FEAR INTO OTHERS TO DETER THEM FROM EXERCISING THEIR RIGHTS.

SUBSECTION (B)(4) DEFINES 'SABOTAGE' AS ACTIVITIES WHICH WOULD CONSTITUTE CRIMES
UNDER CHAPTER 105 OF TITLE 18, U.S.C.  IF CONDUCTED AGAINST THE UNITED STATES.  IN
S. 3197 ONLY ACTUAL VIOLATIONS OF CHAPTER 105 WERE INCLUDED IN THE DEFINITION OF
SABOTAGE.  BUT BY ITS TERMS, CHAPTER 105 MAKES CRIMINAL ONLY ACTS OF SABOTAGE
AGAINST UNITED STATES GOVERNMENT FACILITIES.  S. 1566 HAS EXPANDED THE DEFINITION OF
SABOTAGE TO INCLUDE SIMILAR ACTS WHEN COMMITTED AGAINST A STATE OR SABOTAGE TO IN-
CLUDE SIMILAR ACTS WHEN COMMITTED AGAINST A STATE OR ANOTHER NATION'S FACILITIES AND
MATERIALS RELATING TO DEFENSE.  THUS, SABOTAGE DIRECTED AGAINST STATE AND LOCAL PO-
LICE FACILITIES AND EQUIPMENT, OR AGAINST THE DEFENSE FACILITIES OF FOREIGN NATIONS,
WOULD CONSTITUTE SABOTAGE UNDER THIS DEFINITION.  [FN46]  OF COURSE, ELECTRONIC SUR-
VEILLANCE UNDER THIS CHAPTER COULD BE UNDERTAKEN ONLY IF SUCH SABOTAGE WAS KNOWINGLY
CONDUCTED FOR OR ON BEHALF OF A FOREIGN POWER AND WAS RELATED TO FOREIGN INTELLI-
GENCE AS DEFINED.  THE COMMITTEE AGREES WITH THE ADMINISTRATION THAT WHERE PERSONS
ARE KNOWINGLY ENGAGED IN SABOTAGE OF STATE OR FOREIGN FACILITIES FOR OR ON BEHALF OF
A FOREIGN POWER, SUCH PERSONS SHOULD BE SUBJECTED TO FOREIGN INTELLIGENCE ELECTRONIC
SURVEILLANCE IN THIS COUNTRY EVEN BEFORE THERE IS PROBABLE CAUSE TO BELIEVE THAT
THEY WILL ENGAGE IN SABOTAGE AGAINST FEDERAL FACILITIES.

### G. 'FOREIGN INTELLIGENCE INFORMATION'

SUBSECTION (B)(5) DEFINES 'FOREIGN INTELLIGENCE INFORMATION' TO INCLUDE FIVE TYPES
OF INFORMATION, WHICH NOT MUTUALLY EXCLUSIVE, **3932 TEND TO BE DISTINGUISHABLE.
SUBPARAGRAPH (A) OF THIS SUBSECTION IS DEFINED AS INFORMATION DEEMED NECESSARY FOR
THE UNITED STATES TO PROTECT ITSELF AGAINST ACTUAL OR POTENTIAL ATTACK OR OTHER SIM-
ILARLY GRAVE HOSTILE ACTS OF FOREIGN POWER OR ITS AGENTS.  THIS CATEGORY IS INTENDED
TO ENCOMPASS INFORMATION WHICH RELATES TO FOREIGN MILITARY CAPABILITIES AND INTEN-
TIONS, AS WELL AS ACTS OF FORCE OR AGGRESSION WHICH WOULD HAVE SERIOUS ADVERSE CON-
SEQUENCES TO THE NATIONAL SECURITY OF THE UNITED STATES.  THE TERM 'HOSTILE ACTS'
MUST BE READ IN THE CONTEXT OF THE SUBPARAGRAPH WHICH IS KEYED TO ACTUAL OR POTEN-
TIAL ATTACK ON THE UNITED STATES.  THUS, ONLY THE MOST 'GRAVE' TYPES OF 'HOSTILE
ACTS' WOULD BE ENVISIONED AS FALLING WITHIN THIS PROVISION.  [FN47]
SUBPARAGRAPH (B) OF THIS SUBSECTION INCLUDES INFORMATION WHICH BECAUSE OF ITS IM-
PORTANCE IS DEEMED ESSENTIAL (I) TO THE NATIONAL DEFENSE OR THE SECURITY OF THE NA-
TION OR (II) TO THE CONDUCT OF THE FOREIGN AFFAIRS OF THE UNITED STATES. THIS SUB-
PARAGRAPH ALSO REQUIRES THAT THE INFORMATION SOUGHT INVOLVE 'INFORMATION WITH RE-
SPECT TO FOREIGN POWERS OR TERRITORIES', AND WOULD THEREFORE NOT INCLUDE INFORMATION
ABOUT **31 THE VIEWS OR PLANNED STATEMENTS OR ACTIVITIES OF MEMBERS OF CONGRESS, EX-
ECUTIVE BRANCH OFFICIALS, OR PRIVATE CITIZENS CONCERNING THE FOREIGN AFFAIRS OF THE
UNITED STATES.
IT IS ANTICIPATED THAT THE TYPES OF 'FOREIGN INTELLIGENCE INFORMATION  ' DEFINED
IN SUBPARAGRAPHS (A) AND (B) WILL BE THE TYPES MOST OFTEN SOUGHT WHEN AN ELECTRONIC
SURVEILLANCE IS INSTITUTED AGAINST A FOREIGN POWER AS DEFINED IN SECTION 2521
(B)(1)(A), (B), (C), AND (E), OR AGAINST MOST FOREIGN AGENTS AS DEFINED IN SECTION
2521 (B) (2) (A)(I).
SUBPARAGRAPH (C) OF THIS SUBSECTION INCLUDES INFORMATION WHICH IS DEEMED NECESSARY
FOR THE UNITED STATES TO PROTECT INFORMATION WHICH IS DEEMED NECESSARY FOR THE
UNITED STATES TO PROTECT AGAINST TERRORISM BY A FOREIGN POWER OR FOREIGN AGENT.  IT

IS ANTICIPATED THAT THE TYPE OF INFORMATION DESCRIBED IN THIS SUBPARAGRAPH WILL BE
THE TYPE SOUGHT WHEN AN ELECTRONIC SURVEILLANCE IS INSTITUTED AGAINST THE TYPE OF
FOREIGN POWER DEFINED IN SECTION 2521 (B)(1)(D), OR AGAINST THE TYPE OF FOREIGN
AGENT DEFINED IN SECTION 2521 (B)(2)(B)(II).

SUBPARAGRAPH (D) OF THIS SUBSECTION INCLUDES INFORMATION WHICH IS DEEMED NECESSARY
TO THE ABILITY OF THE UNITED STATES TO PROTECT AGAINST SABOTAGE BY A FOREIGN POWER
OR FOREIGN AGENT.

SUBPARAGRAPH (E) OF THIS SUBSECTION INCLUDES INFORMATION WHICH IS DEEMED NECESSARY
TO THE ABILITY OF THE UNITED STATES TO PROTECT AGAINST THE CLANDESTINE INTELLIGENCE
ACTIVITIES OF AN INTELLIGENCE SERVICE OR NETWORK OF A FOREIGN POWER OR A FOREIGN
AGENT.  THIS SUBPARAGRAPH ENCOMPASSES CLASSIC COUNTERINTELLIGENCE INFORMATION; THAT
IS, INFORMATION DEEMED NECESSARY TO THE NATION'S ABILITY TO DISCOVER AND PROTECT
AGAINST THE ACTIVITIES OF CLANDESTINE INTELLIGENCE SERVICES OF FOREIGN **3933 POWERS
IN THE UNITED STATES.  THIS SUBSECTION IS NOT INTENDED TO ENCOMPASS INFORMATION
SOUGHT ABOUT DISSIDENT POLITICAL ACTIVITY BY UNITED STATES CITIZENS ALLEGEDLY 'NECES-
SARY' TO DETERMINE THE NATURE AND EXTENT OF ANY POSSIBLE INVOLVEMENT IN THOSE ACTIV-
ITIES BY THE INTELLIGENCE SERVICES OF FOREIGN POWERS.  SUCH A DRAGNET APPROACH TO
COUNTERINTELLIGENCE HAS BEEN THE BASIS FOR PAST IMPROPER INVESTIGATIONS OF CITIZENS
AND IS NOT INTENDED TO BE INCLUDED AS A PERMISSIBLE AVENUE OF 'FOREIGN INTELLIGENCE'
COLLECTION UNDER THIS SUBPARAGRAPH.  NOR DOES THIS SUBPARAGRAPH INCLUDE EFFORTS TO
PREVENT 'NEWS LEAKS' OR TO PREVENT PUBLICATION OF SUCH LEAKED INFORMATION IN THE
AMERICAN PRESS, UNLESS THERE IS REASON TO BELIEVE THAT SUCH PUBLICATION IS ITSELF
BEING DONE BY AN AGENT OF A FOREIGN INTELLIGENCE SERVICE AND THAT SUCH PUBLICATION
WOULD HARM THE NATIONAL SECURITY.

MOST IMPORTANTLY, ALL FIVE SUBPARAGRAPHS SET OUT STANDARDS ESTABLISHING A NEXUS
BETWEEN THE INFORMATION SOUGHT AND THE DESIRED END. SUBPARAGRAPH (B) REQUIRES THAT
THE INFORMATION SOUGHT BE 'ESSENTIAL' WHILE THE OTHER SUBPARAGRAPHS ESTABLISH A
STANDARD OF 'NECESSARY.'

WHERE THE TERM 'NECESSARY' IS USED, THE COMMITTEE INTENDS TO REQUIRE MORE THAN A
SHOWING THAT THE INFORMATION WOULD BE USEFUL OR CONVENIENT.  WHEN THE TERM 'ESSEN-
TIAL' IS USED, THE COMMITTEE INTENDS TO REQUIRE A SHOWING THAT THE INFORMATION IS
IMPORTANT AND REQUIRED BUT NOT THAT IT IS OF UTMOST IMPORTANCE OR INDISPENSABLE.

THE USE OF THESE STANDARDS IS INTENDED BY THE COMMITTEE TO MANDATE THAT A SIGNI-
FICANT DEGREE OF NEED BE DEMONSTRATED BY THOSE SEEKING THE SURVEILLANCE. FOR EX-
AMPLE, IT IS OFTEN CONTENDED THAT THE INTELLIGENCE ANALYST, IF NOT THE POLICYMAKER
HIMSELF, MUST HAVE EVERY POSSIBLE BIT OF INFORMATION ABOUT A SUBJECT BECAUSE IT
MIGHT PROVE AN IMPORTANT PIECE OF THE LARGER PICTURE.  IN THAT SENSE, ANY INFORMA-
TION RELATING TO **32 THE SPECIFIED PURPOSES MIGHT BE CALLED 'NECESSARY' BUT SUCH A
READING IS CLEARLY NOT INTENDED.

'ESSENTIAL' IS USED IN SUBPARAGRAPH (B) BECAUSE OF THE MORE AMORPHOUS NATURE OF
THE INFORMATION WHICH CAN BE ACQUIRED UNDER THIS SUBPARAGRAPH.  WHILE SUBPARAGRAPH
(A) DEALS WITH POSITIVE FOREIGN INTELLIGENCE INVOLVING ACTUAL OR POTENTIAL ATTACK OR
COMPARABLE HOSTILE ACTS AND SUBPARAGRAPHS (C), (D), AND (E) COVER TERRORIST, SABOT-
AGE, AND COUNTERINTELLIGENCE INFORMATION, SUBPARAGRAPH (B) POTENTIALLY BRINGS WITHIN
THE DEFINITION OF FOREIGN INTELLIGENCE INFORMATION A BROADER RANGE OF MATERIAL DEAL-
ING WITH THE NATIONAL DEFENSE AND FOREIGN AFFAIRS OF THE UNITED STATES.

IN ADDITION, INFORMATION ABOUT A UNITED STATES CITIZEN'S PRIVATE AFFAIRS SHALL NOT

BE DEEMED 'FOREIGN INTELLIGENCE INFORMATION' UNLESS IT DIRECTLY RELATES TO HIS
ACTIVITIES ON BEHALF OF A FOREIGN POWER.  THIS INTEREST IS ACHIEVED BY INCLUDING IN
EACH SUBSECTION OF THE FOREIGN INTELLIGENCE DEFINITION THE REQUIREMENT THAT THE IN-
FORMATION SOUGHT ACTUALLY 'RELATES TO' THE TYPE OF INFORMATION DEEMED NECESSARY OR
ESSENTIAL.  FOR EXAMPLE, THE GOVERNMENT COULD NOT SEEK PURELY PERSONAL INFORMATION
ABOUT A UNITED STATES CITIZEN OR PERMANENT RESIDENT ALIEN, WHO IS A SUSPECTED SPY,
UPON A THEORY THAT IT MIGHT LEARN SOMETHING WHICH WOULD BE 'COMPROMISING.' INSTEAD,
THE BILL MAKES CLEAR THAT THE ONLY INFORMATION ABOUT UNITED STATES CITIZENS OR PER-
MANENT RESIDENT ALIENS WHICH MAY BE SOUGHT MUST NOT ONLY BE NECESSARY TO THE ABILITY
OF ALIENS WHICH MAY BE SOUGHT MUST NOT ONLY BE NECESSARY TO THE ABILITY OF THE U.S.
TO PROTECT AGAINST CLANDESTINE INTELLIGENCE ACTIVITIES, BUT MUST ALSO 'RELATE TO'
THE ACTIVITIES THEMSELVES.  THIS RESTRICTION MIGHT NOT **3934 ALWAYS BE FULLY AP-
PLICABLE TO AGENTS OF FOREIGN POWERS AS DEFINED IN SECTION 2521(B)(2)(A)(I), BECAUSE
INFORMATION ABOUT THEIR PRIVATE LIVES MAY ITSELF BE FOREIGN INTELLIGENCE INFORMA-
TION.  FOR EXAMPLE, SUCH INFORMATION MIGHT IDENTIFY THEIR TRUE STATUS OR REVEAL THE
INTENTIONS OR ACTIVITIES OF THE FOREIGN POWER OF WHICH THEY ARE OFFICERS OR EMPLOY-
EES.

### H. 'ELECTRONIC SURVEILLANCE'

   PARAGRAPH (6) DEFINES 'ELECTRONIC SURVEILLANCE' TO INCLUDE FOUR SEPARATE TYPES OF
ACTIVITIES.
   SUBPARAGRAPH (A) MAKES A MAJOR IMPROVEMENT OVER THE LANGUAGE OF S. 3917 BY PRO-
TECTING UNITED STATES CITIZENS AND RESIDENT ALIENS IN THE UNITED STATES FROM BEING
TARGETED IN THEIR INTERNATIONAL COMMUNICATIONS WITHOUT A JUDICIAL WARRANT NO MATTER
WHERE THE SURVEILLANCE IS BEING CARRIED OUT.  UNDER S. 3197 SUCH TARGETING DID NOT
FALL WITHIN THE CONFINES OF THE BILL; THIS PROVISION IS, THEREFORE, A SIGNIFICANT
EXTENSION OF THE PROTECTIONS AFFORDED UNITED STATES CITIZENS AND LAWFUL RESIDENT
ALIENS.  THE SUBPARAGRAPH SPECIFICALLY BRINGS WITHIN THE PROCEDURES OF S. 1566 THE
ACQUISITION OF THE CONTENTS OF A WIRE OR RADIO COMMUNICATION OF UNITED STATES CIT-
IZENS AND PERMANENT RESIDENT ALIENS IN THE UNITED STATES BY INTENTIONALLY TARGETING
THAT PARTICULAR, KNOWN UNITED STATES CITIZEN OR RESIDENT ALIEN, UNDER CIRCUMSTANCES
IN WHICH A PERSON HAS A REASONABLE EXPECTATION OF PRIVACY AND A WARRANT WOULD BE RE-
QUIRED FOR LAW ENFORCEMENT PURPOSES.  THUS, FOR EXAMPLE, THE 'WATCH-LISTING' ACTIV-
ITIES OF THE NATIONAL SECURITY AGENCY, IF DIRECTED AGAINST UNITED STATES CITIZENS IN
THE UNITED STATES, WOULD REQUIRE A WARRANT UNDER THIS REGULATION.
   **33 SUBPARAGRAPH (B) INCLUDES THE ACQUISITION, BY AN ELECTRONIC, MECHANICAL, OR
OTHER SURVEILLANCE DEVICE, OF THE CONTENTS OF A WIRE COMMUNICATION WITHOUT THE CON-
SENT OF ANY PARTY THERETO WHEN SUCH ACQUISITION OCCURS IN THE UNITED STATES WHILE
THE COMMUNICATION IS BEING TRANSMITTED BY WIRE.  AS THIS SUBDEFINITION MAKES CLEAR,
THE LOCATION OF THE PARTIES TO THE WIRE COMMUNICATION IS IMMATERIAL IF THE ACQUISI-
TION OCCURS WITHIN THE UNITED STATES. THUS, EITHER A WHOLLY DOMESTIC TELEPHONE CALL
OR AN INTERNATIONAL TELEPHONE CALL CAN BE THE SUBJECT OF ELECTRONIC SURVEILLANCE UN-
DER THIS SUBDEFINITION IF THE ACQUISITION OF THE CONTENT OF THE CALL TAKES PLACE IN
THIS COUNTRY AND IF SUCH ACQUISITION OCCURS 'WHILE THE COMMUNICATION IS BEING TRANS-
MITTED BY WIRE.'  THIS SECOND QUALIFIER IS NECESSARY BECAUSE THE DEFINITION OF 'WIRE
COMMUNICATION' UNDER 18 U.S.C. 2510(1) INCLUDES ANY COMMUNICATION 'MADE IN WHOLE OR

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN PART' THROUGH WIRE FACILITIES. BECAUSE MOST TELEPHONIC AND TELEGRAPHIC COMMUNIC-
ATIONS ARE TRANSMITTED AT LEAST IN PART BY MICROWAVE RADIO TRANSMISSIONS, SUBDEFINI-
TION (B) IS MEANT TO APPLY ONLY TO THOSE SURVEILLANCE PRACTICES WHICH ARE EFFECTED
BY TAPPING INTO THE WIRE OVER WHICH THE COMMUNICATION IS BEING TRANSMITTED. THE IN-
TERCEPTION OF THE MICROWAVE RADIO TRANSMISSION IS MEANT TO BE COVERED BY SUBDEFINI-
TION (C) IF THE SENDER AND ALL INTENDED RECIPIENTS ARE LOCATED WITHIN THE UNITED
STATES, OR BY SUBDEFINITION (A) IF IT IS DONE THROUGH THE TARGETING OF A UNITED
STATES CITIZEN OR RESIDENT ALIEN IN THE UNITED STATES.

SUBPARAGRAPH (C) INCLUDES THE INTENTIONAL ACQUISITION BY AN ELECTRONIC, MECHANIC-
AL, OR OTHER SURVEILLANCE DEVICE OF THE CONTENTS OF A RADIO COMMUNICATION, WITHOUT
THE CONSENT OF ANY PARTY THERETO, MADE WITH A REASONABLE EXPECTATION OF PRIVACY AND
UNDER CIRCUMSTANCES **3935 WHERE A WARRANT WOULD BE REQUIRED FOR LAW ENFORCEMENT
PURPOSES, WHERE BOTH THE SENDER AND ALL INTENDED RECIPIENTS ARE LOCATED WITHIN THE
UNITED STATES, I.E., A TOTALLY DOMESTIC RADIO COMMUNICATION. THIS PART OF THE
DEFINITION WOULD REACH NOT ONLY THE ACQUISITION OF COMMUNICATIONS' BY MEANS OF IN-
TERCEPTING THE RADIO TRANSMITTED PORTION OF THOSE COMMUNICATIONS WITHIN THE UNITED
STATES. THE TERRITORIAL LIMITS OF THIS SUBDEFINITION ARE NOT DEPENDENT ON THE POINT
OF ACQUISITION, AS IS THE CASE WITH SUBDEFINITION (B), BUT ON THE LOCATIONS OF THE
COMMUNICANTS. THUS, THE ACQUISITION OF RADIO COMMUNICATIONS OUTSIDE THE TERRITORIAL
LIMITS OF THE UNITED STATES WOULD BE COVERED IF ALL OF THE COMMUNICANTS WERE LOCATED
WITHIN THE UNITED STATES. ONLY ACQUISITION OF THOSE DOMESTIC RADIO COMMUNICATIONS
MADE WITH A REASONABLE EXPECTATION OF PRIVACY WHERE A WARRANT WOULD BE REQUIRED FOR
LAW ENFORCEMENT PURPOSES WOULD BE INCLUDED IN THE TERM 'ELECTRONIC SURVEILLANCE.'
THIS WOULD EXCLUDE, FOR EXAMPLE, COMMERCIAL BROADCASTS, AS WELL AS HAM RADIO AND
CITIZEN BAND RADIO BROADCASTS (CF. 47 U.S.C. SECTION 605); UNITED V. HALL, 488 F.2D
193 (9TH CIR. 1973).

ONLY 'INTENTIONAL' ACQUISITIONS OF DOMESTIC COMMUNICATIONS ARE WITHIN THIS SUB-
DEFINITION BECAUSE, BY THEIR VERY NATURE, RADIO TRANSMISSIONS MAY BE INTERCEPTED
ANYWHERE IN THE WORLD, EVEN THOUGH THE SENDER AND ALL INTENDED RECIPIENTS ARE IN THE
UNITED STATES. THUS, INTELLIGENCE COLLECTION MAY BE TARGETED AGAINST FOREIGN OR IN-
TERNATIONAL COMMUNICATIONS BUT ACCIDENTLY AND UNINTENTIONALLY ACQUIRE COMMUNICATIONS
INTENDED TO BE TOTALLY DOMESTIC. IT IS THE COMMITTEE'S UNDERSTANDING *34 THAT THESE
COMMUNICATIONS ARE IMMEDIATELY DESTROYED. ABSENT THE WORD 'INTENTIONAL', HOWEVER,
THESE ACCIDENTAL INTERCEPTIONS, EVEN IF THE CONTENTS ARE IMMEDIATELY DESTROYED,
COULD LEAVE THESE AGENCIES OPEN TO CIVIL OR CRIMINAL LIABILITY FOR FAILING TO SECURE
A JUDICIAL WARRANT.

THE EFFECT OF SUBPARAGRAPHS (A), (B) AND (C) OF SECTION 2521 (B)(6), THEREFORE, IS
TO INCLUDE WITHIN THE TERM 'ELECTRONIC SURVEILLANCE' THE NONCONSENSUAL ACQUISITION
OF ALL DOMESTIC RADIO COMMUNICATIONS MADE WITH A REASONABLE EXPECTATION OF PRIVACY,
THE NONCONSENSUAL ACQUISITION WITHIN THE UNITED STATES OF ALL WIRE COMMUNICATIONS,
AS DEFINED IN 18 U.S.C. SECTION 2510(1), EXCEPT THOSE INTERNATIONAL WIRE COMMUNICA-
TIONS WHICH ARE ACQUIRED BY INTERCEPTING THE RADIO TRANSMITTED PORTIONS OF THE COM-
MUNICATIONS, AND THE TARGETING OF PARTICULAR UNITED STATES CITIZENS OR RESIDENT ALI-
ENS IN THE UNITED STATES IN ORDER TO ACQUIRE INTERNATIONAL COMMUNICATIONS MADE WITH
A REASONABLE EXPECTATION OF PRIVACY.

THE REASON FOR EXCEPTING FROM THE DEFINITION OF 'ELECTRONIC SURVEILLANCE' THE AC-
QUISITION OF INTERNATIONAL RADIO TRANSMISSIONS, INCLUDING INTERNATIONAL WIRE COMMU-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

NICATIONS WHEN ACQUIRED BY INTERCEPTING RADIO TRANSMISSIONS WHEN NOT ACCOMPLISHED BY
TARGETING A PARTICULAR UNITED STATES PERSON IN THE UNITED STATES, IS TO EXEMPT FROM
THE PROCEDURES OF THE BILL CERTAIN SIGNALS INTELLIGENCE ACTIVITIES OF THE NATIONAL
SECURITY AGENCY.

ALTHOUGH IT IS DESIRABLE TO DEVELOP LEGISLATIVE CONTROLS IN THIS AREA, THE COMMIT-
TEE HAS CONCLUDED THAT THESE PRACTICES ARE SUFFICIENTLY DIFFERENT FROM TRADITIONAL
ELECTRONIC SURVEILLANCE TECHNIQUES, BOTH CONCEPTUALLY AND TECHNOLOGICALLY, THAT, EX-
CEPT WHEN THEY TARGET PARTICULAR UNITED STATES CITIZENS OR RESIDENT ALIENS IN THE
UNITED STATES, THEY **3936 SHOULD BE CONSIDERED SEPARATELY BY THE CONGRESS.  [FN48]
THE FACT THAT THIS BILL DOES NOT BRING THESE ACTIVITIES WITHIN ITS PURVIEW, HOWEVER,
SHOULD NOT BE VIEWED AS CONGRESSIONAL AUTHORIZATION OF SUCH ACTIVITIES.  THIS COM-
MITTEE MERELY RECOGNIZES THAT THIS PARTICULAR SIGNALS INTELLIGENCE ACTIVITY IS NOT
COVERED BY THE PROCEDURES OUTLINED IN THIS BILL.  IN ANY CASE, THE REQUIREMENTS OF
THE FOURTH AMENDMENT WOULD, OF COURSE, CONTINUE TO APPLY TO THIS TYPE OF COMMUNICA-
TIONS INTELLIGENCE ACTIVITY.  [FN49]

SUBPARAGRAPH (D) BRINGS WITHIN THE DEFINITION OF 'ELECTRONIC SURVEILLANCE  ' THE
ACQUISITION OF INFORMATION, NOT TRANSMITTED AS A WIRE COMMUNICATION OR RADIO COMMU-
NICATION, BY THE INSTALLATION OR USE OF AN ELECTRONIC, MECHANICAL, OR OTHER SURVEIL-
LANCE DEVICE FOR MONITORING IN THE UNITED STATES UNDER CIRCUMSTANCES IN WHICH A PER-
SON HAS A REASONABLE EXPECTATION OF PRIVACY AND A WARRANT WOULD BE REQUIRED FOR LAW
ENFORCEMENT PURPOSES.  THIS IS INTENDED TO INCLUDE THE ACQUISITION OF ORAL COMMUNIC-
ATIONS MADE BY A PERSON EXHIBITING AN EXPECTATION THAT SUCH UTTERANCES ARE NOT SUB-
JECT TO ACQUISITION, UNDER CIRCUMSTANCES *35 JUSTIFYING SUCH EXPECTATION.  IN ADDI-
TION, IT IS MEANT TO INCLUDE THE INSTALLATION OF BEEPERS AND 'TRANSPONDERS,' IF A
WARRANT WOULD BE REQUIRED IN THE ORDINARY CRIMINAL CONTEXT.  UNITED STATES V.
HOLMES, 537 F.2D 227 (5TH CIR. 1976).  IT COULD ALSO INCLUDE MINIATURIZED TELEVISION
CAMERAS AND OTHER SOPHISTICATED DEVICES NOT AIMED MERELY AT COMMUNICATIONS.

THIS PART OF THE DEFINITION IS MEANT TO BE BROADLY INCLUSIVE, BECAUSE THE EFFECT
OF INCLUDING A PARTICULAR MEANS OF SURVEILLANCE IS NOT TO PROHIBIT IT BUT TO SUBJECT
IT TO JUDICIAL OVERSIGHT.  IT IS NOT MEANT TO INCLUDE, HOWEVER, THE ACQUISITION OF
THOSE INTERNATIONAL RADIO TRANSMISSIONS OR INTERNATIONAL WIRE COMMUNICATIONS, WHEN
ACQUIRED BY INTERCEPTING RADIO TRANSMISSIONS, WHICH ARE NOT ACQUIRED BY TARGETING A
PARTICULAR UNITED STATES PERSON IN THE UNITED STATES.  NOR, AS EARLIER INDICATED, IS
IT MEANT TO REQUIRE A COURT ORDER IN ANY CASE WHERE A SEARCH WARRANT WOULD NOT BE
REQUIRED IN AN ORDINARY CRIMINAL CONTEXT.

IT HAS BEEN HELD, FOR EXAMPLE, THAT FOURTH AMENDMENT PROTECTIONS DO NOT EXTEND TO
ACTIVITIES UNDERTAKEN IN THE OPEN WHERE A PARTICIPANT COULD REASONABLY ANTICIPATE
THAT HIS ACTIVITIES MIGHT BE OBSERVED.  [FN50]  BUT TWO PERSONS IN A PUBLIC PARK,
FAR FROM ANY STRANGER, WOULD NOT REASONABLY ANTICIPATE THAT THEIR CONVERSATIONS
COULD BE OVERHEARD FROM AFAR THROUGH A DIRECTIONAL MICROPHONE, AND SO WOULD RETAIN
THEIR RIGHT OF PRIVACY.  OF COURSE, LAW ENFORCEMENT OFFICIALS MAY, IF THEY WISH,
CONTINUE TO OBTAIN AN ORDINARY SEARCH WARRANT OR CHAPTER 119 COURT ORDER IF THE
FACTS AND CIRCUMSTANCES SO JUSTIFY IT.

THE DEFINITION OF 'ELECTRONIC SURVEILLANCE' COMPRISING THE INTERCEPTION OF WIRE
COMMUNICATIONS AND RADIO TRANSMISSIONS HAS AN EXPLICIT EXCEPTION WHERE ANY PARTY HAS
CONSENTED TO THE INTERCEPTION.  THIS IS INTENDED TO PERPETUATE THE EXISTING LAW RE-
GARDING CONSENSUAL INTERCEPTIONS **3937 FOUND IN 18 U.S.C. SECTION 2511 (2)(C) AND

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE CASE LAW INTERPRETING 47 U.S.C. SECTION 605. [FN51] WHETHER CONSENT MAY BE
INFERRED IN A PARTICULAR CASE WILL DEPEND ON THE FACTS AND CIRCUMSTANCES.

THAT PART OF THE DEFINITION OF 'ELECTRONIC SURVEILLANCE' REGARDING THE INSTALLA-
TION OF A DEVICE REQUIRES THAT THE ACQUISITION OF INFORMATION BE UNDER CIRCUMSTANCES
IN WHICH A PERSON HAS A CONSTITUTIONALLY PROTECTED RIGHT OF PRIVACY.  THERE IS NO
SUCH RIGHT IN THOSE SITUATIONS WHERE THE INTERCEPTION IS CONSENTED TO BY AT LEAST
ONE PARTY TO THE CONVERSATION.  FOR INSTANCE, A BODY MICROPHONE PLACED ON AN INFORM-
ER WITH HIS CONSENT IS AN INSTALLATION OF A DEVICE TO ACQUIRE INFORMATION, BUT A
PERSON SPEAKING TO THE INFORMER HAS NO JUSTIFIABLE EXPECTATION THAT THE INFORMER
WILL NOT REPEAT, RECORD, OR EVEN TRANSMIT BY A MINIATURE TRANSMITTER WHAT THE PERSON
VOLUNTARILY TELLS THE INFORMER.  BY TELLING THE INFORMER SOMETHING, THE PERSON HAS,
WITH RESPECT TO THAT INFORMATION, SURRENDERED HIS EXPECTATION OF PRIVACY VIS-A-VIS
THE INFORMER.  SUCH A SITUATION IS NOT, OF COURSE, LIMITED TO BODY MICROPHONES.
TELEPHONE CONVERSATIONS TO WHICH ONE OF THE PARTIES HAS CONSENTED AND MICROPHONES
INSTALLED WITH CONSENT WOULD BE FUNCTIONALLY EQUIVALENT.  WHAT IS IMPORTANT IS THE
CONSENT.  SO LONG AS ONE PARTY TO THE CONVERSATION HAS CONSENTED TO THE SURVEIL-
LANCE, THE OTHER PARTY HAS NO JUSTIFIABLE **36 EXPECTATION OF PRIVACY IN THAT WHICH
HE VOLUNTARILY REVEALS TO THE PARTY WHO HAS CONSENTED TO THE SURVEILLANCE.  [FN52]

THUS THE ABSENCE OF A REASONABLE EXPECTATION OF PRIVACY WHERE ONE PARTY CONSENTS
TO THE SURVEILLANCE IS THE EQUIVALENT OF THE EXPLICIT CONSENT PROVISION IN 18 U.S.C.
SECTION 2511(2)(C).

### I. 'ATTORNEY GENERAL'

PARAGRAPH (7) DEFINES 'ATTORNEY GENERAL' TO MEAN THE ATTORNEY GENERAL OF THE
UNITED STATES, THE ACTING ATTORNEY GENERAL, OR THE DEPUTY ATTORNEY GENERAL. UNDER S.
3197 ONLY THE ATTORNEY GENERAL OR THE ACTING ATTORNEY GENERAL COULD APPROVE AN AP-
PLICATION.  THE ADMINISTRATION HAD URGED THE COMMITTEE TO PERMIT A SPECIALLY DESIG-
NATED ASSISTANT ATTORNEY GENERAL TO APPROVE AN APPLICATION FOR SURVEILLANCE.  THE
ADMINISTRATION CITES AS THE REASON FOR THE DELEGATION OF THIS AUTHORITY TO A SPE-
CIALLY DESIGNATED ASSISTANT ATTORNEY GENERAL THE NEED TO LESSEN THE ADMINISTRATIVE
BURDEN OF THE ATTORNEY GENERAL WHICH WOULD BE PERPETUATED EVEN AFTER THIS BILL HAS
ESTABLISHED THE SAFEGUARDS OF A JUDICIAL WARRANT PROCEDURE.  [FN53]

SOME MEMBERS OF THE COMMITTEE WERE TROUBLED THAT THE DELEGATION OF THIS AUTHORITY
AS SUGGESTED BY THE ADMINISTRATION WOULD NOT PROVIDE THE RIGHT CONTROL AND OBJECTIVE
METHODS THAT SHOULD BE REQUIRED IN THE FOREIGN INTELLIGENCE AREA.  THESE COMMITTEE
MEMBERS DISTINGUISH TITLE III APPLICATIONS, FOR WHICH AUTHORITY MAY BE DELEGATED, BY
POINTING OUT THAT:  (1) SUCH APPLICATIONS ARE MADE IN CONJUNCTION WITH SPECIFIC
CRIMINAL INVESTIGATIONS AND ARE, THEREFORE, MORE CAPABLE OF OBJECTIVE DETERMINATION;
AND (2) THAT WHEN IT COMES TO FOREIGN INTELLIGENCE ELECTRONIC SURVEILLANCE IT IS
MORE LIKELY THAT THE HEADS OF VARIOUS AGENCIES, SUCH AS THE SECRETARY OF DEFENSE OR
THE DIRECTOR OF THE FBI, WILL INTERCEDE DIRECTLY IN THE APPLICATION PROCESS, THUS
PLACING MORE **3938 PRESSURE ON THE ATTORNEY GENERAL'S DESIGNATE TO APPROVE THE WAR-
RANT REQUEST. THESE COMMITTEE MEMBERS BELIEVE THAT, IN THE LAST ANALYSIS, ONLY THE
ATTORNEY GENERAL COULD WITHSTAND SUCH OFFICIAL PRESSURE AND DECIDE THE ISSUE IN AN
OBJECTIVE MANNER.

SENATOR KENNEDY MAINTAINED DURING THE HEARINGS ON S. 1566 THAT SINCE ADMINISTRAT-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IVE INCONVENIENCE WAS NOT CITED BY THE FORD ADMINISTRATION AS A REASON FOR DELEGAT-
ING AUTHORITY TO REVIEW THE APPLICATIONS, THE PRESENT DEPARTMENT OF JUSTICE SHOULD
NOT DEPART FROM THE PREVIOUS ADMINISTRATION'S COMMITMENT.  [FN54]

   WITH THE ASSURANCE OF ATTORNEY GENERAL BELL IN HIS TESTIMONY DURING THE HEARINGS
ON S. 1566 THAT HE WOULD PERSONALLY CONTINUE TO APPROVE APPLICATIONS UNDER THE BILL
UNTIL STANDARDS OF REVIEW HAVE BEEN WELL ESTABLISHED, [FN55]  THE COMMITTEE ADOPTED
A MODIFIED VERSION OF THE ADMINISTRATION'S PROPOSAL.  IT PROVIDES AUTHORITY FOR THE
ATTORNEY GENERAL (OR THE ACTING ATTORNEY GENERAL) OR THE DEPUTY ATTORNEY GENERAL--
RATHER THAN A SPECIALLY DESIGNATED ASSISTANT ATTORNEY GENERAL-- TO APPROVE APPLICA-
TIONS FOR AN ELECTRONIC SURVEILLANCE ORDER UNDER THIS CHAPTER.

                        **\*37** J. 'MINIMIZATION'

   PARAGRAPH (8) DEALS WITH 'MINIMIZATION', I.E., PROCEDURES WHICH ARE DESIGNED TO
LIMIT THE ACQUISITION, RETENTION, AND DISSEMINATION OF INFORMATION THAT IS NOT FOR-
EIGN INTELLIGENCE INFORMATION AND WHICH RELATES TO UNITED STATES CITIZENS OR PERMAN-
ENT RESIDENT ALIENS.  THE PARAGRAPH DEFINES 'MINIMIZATION PROCEDURES' AS PROCEDURES
REASONABLY DESIGNED TO MINIMIZE THE ACQUISITION AND RETENTION, AND PROHIBIT THE DIS-
SEMINATION, EXCEPT AS PROVIDED IN SUBSECTIONS 2526 (A) AND (B), OF ANY INFORMATION
CONCERNING UNITED STATES PERSONS NOT RELATED TO FOREIGN INTELLIGENCE.  SPECIFICALLY,
INFORMATION CONCERNING AMERICANS MUST BE RELATED TO THE ABILITY OF THE UNITED STATES
TO PROTECT ITSELF AGAINST ACTUAL OR POTENTIAL ATTACK OR OTHER GRAVE HOSTILE ACTS OF
A FOREIGN POWER OR AGENT OF A FOREIGN POWER, TO PROVIDE FOR THE NATIONAL DEFENSE OR
SECURITY OF THE NATION, TO PROVIDE FOR THE CONDUCT OF THE FOREIGN AFFAIRS OF THE
UNITED STATES, TO PROTECT AGAINST TERRORISM OR SABOTAGE BY FOREIGN POWERS OR THEIR
AGENTS, OR TO PROTECT AGAINST THE CLANDESTINE INTELLIGENCE ACTIVITIES OF A FOREIGN
INTELLIGENCE SERVICE OR AN AGENT OF A FOREIGN POWER.

   THE MINIMIZATION REQUIREMENT OF THIS PARAGRAPH IS MEANT GENERALLY TO PARALLEL THE
MINIMIZATION PROVISION IN EXISTING LAW. (18 U.S.C. 2518 (5)) AS THE COURTS HAVE
NOTED IN CONSTRUING THAT SECTION, 'IT IS . . . OBVIOUS THAT NO ELECTRONIC SURVEIL-
LANCE CAN BE SO CONDUCTED THAT INNOCENT CONVERSATIONS CAN BE TOTALLY ELIMINATED.'
[FN56]  IN ASSESSING THE MINIMIZATION EFFORT, THE COURT'S ROLE IS TO DETERMINE
WHETHER 'ON THE WHOLE, THE AGENTS HAVE SHOWN A HIGH REGARD FOR THE RIGHT OF PRIVACY
AND HAVE DONE ALL THEY REASONABLY COULD TO AVOID UNNECESSARY INTRUSION.'  [FN57]
ABSENT A CHARGE THAT THE MINIMIZATION PROCEDURES HAVE BEEN COMPLETELY DISREGARDED,
THE TEST OF COMPLIANCE IS 'WHETHER A GOOD FAITH EFFORT TO MINIMIZE WAS ATTEMPTED.'
[FN58]

   **\*\*3939** AMONG THE FACTORS TO BE CONSIDERED IN EVALUATING THE REASONABLENESS OF THE
AGENTS' CONDUCT WILL BE THE SCOPE OF THE ENTERPRISE UNDER INVESTIGATION, THE LOCA-
TION AND OPERATION OF THE SUBJECT TELEPHONE (OR MICROPHONE), THE GOVERNMENT'S EX-
PECTATIONS OF THE CHARACTER OF AND PARTIES TO THE CALLS, THE DEGREE OF JUDICIAL SU-
PERVISION, AND THE LENGTH OR BREVITY OF THE MONITORED CONVERSATIONS.  [FN59]  MINIM-
IZATION PROCEDURES MAY DIFFER FROM CASE TO CASE DEPENDING ON THE NATURE OF THE
AGENCY RELATIONSHIP, THE INDIVIDUALS USING THE FACILITIES OR PLACE TO BE SURVEILLED,
THE TYPE OF FOREIGN INTELLIGENCE INFORMATION SOUGHT, AND OTHER SIMILAR FACTORS.
MINIMIZATION PROCEDURES MIGHT ALSO INCLUDE RESTRICTIONS ON THE USE OF SURVEILLANCE
TO TIMES WHEN FOREIGN INTELLIGENCE INFORMATION IS LIKELY TO BE OBTAINED, DIRECTIONS

             © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**


THAT THE SURVEILLANCE CEASE IF IT DOES NOT PRODUCE RESULTS OF THE SPECIFIED TYPE,
REQUIREMENTS THAT CONVERSATIONS NOT INVOLVING THE NAMED TARGET BE DELETED FROM THE
RECORDS AT AN APPROPRIATE TIME, AND OTHER REQUIREMENTS SPECIFIED BY THE JUDGE.  FOR
EXAMPLE, IF A CITIZEN OR PERMANENT RESIDENT ALIEN WERE USING FACILITIES OF A FOREIGN
**\*38** AGENT THAT WERE THE TARGET OF THE SURVEILLANCE, THE GOVERNMENT WOULD BE REQUIRED
TO MINIMIZE THE ACQUISITION AND RETENTION OF ANY INFORMATION THAT DID NOT RELATE TO
FOREIGN INTELLIGENCE INFORMATION.

THE DEFINITION OF MINIMIZATION SPEAKS IN TERMS OF ACQUISTION, RETENTION AND DIS-
SEMINATION.

BY MINIMIZING ACQUISITION THE COMMITTEE ENVISIONS, FOR EXAMPLE, THAT IN A GIVEN
CASE, WHERE A IS THE TARGET OF A WIRETAP, AFTER DETERMINING THAT A'S WIFE IS NOT EN-
GAGED WITH HIM IN CLANDESTINE INTELLIGENCE ACTIVITIES, THE INTERCEPTION OF HER CALLS
ON THE TAPPED PHONE, TO WHICH A WAS NOT A PARTY, WOULD BE DISCONTINUED AS SOON AS IT
WAS REALIZED THAT SHE RATHER THAN A WAS THE PARTY.  IN OTHER CASES, HOWEVER, PRIMAR-
ILY FOR SOPHISTICATED TECHNOLOGICAL REASONS, IT MAY NOT BE POSSIBLE TO AVOID ACQUIR-
ING ALL CONVERSATIONS.  IN THESE SITUATIONS MINIMIZING RETENTION AND DISSEMINATION
BECOMES MORE IMPORTANT.  BY MINIMIZING RETENTION, THE COMMITTEE INTENDS THAT INFORM-
ATION ACQUIRED, WHICH DOES NOT RELATE TO THE APPROVED PURPOSES JUSTIFYING THE WAR-
RANT, BE DESTROYED. FOR EXAMPLE, AFTER DETERMINING THAT A'S WIFE IS NOT ENGAGED WITH
HER HUSBAND IN CLANDESTINE INTELLIGENCE ACTIVITIES, HER COMMUNICATIONS, ACQUIRED AND
RETAINED IN ORDER TO MAKE THIS DETERMINATION, WOULD BE DESTROYED.  INDEED, EVEN A'S
COMMUNICATIONS WHICH ARE NOT RELEVANT TO HIS CLANDESTINE INTELLIGENCE ACTIVITIES
SHOULD BE DESTROYED.  IN CERTAIN CASES DESTRUCTION WOULD TAKE PLACE ALMOST IMMEDI-
ATELY WHILE IN OTHER CASES THE INFORMATION MIGHT BE RETAINED FOR A REASONABLE PERIOD
IN ORDER TO DETERMINE WHETHER IT DID INDEED RELATE TO ONE OF THE APPROVED PURPOSES.
PROCEDURES GOVERNING MINIMIZATION-- PARTICULARLY HOW LONG INFORMATION SHOULD BE RE-
TAINED AND HOW IT SHOULD BE DESTROYED ONCE IT IS DEEMED IRRELEVANT-- ARE TO BE FASH-
IONED BY THE COURT AND ARE, OF COURSE, SUBJECT TO JUDICIAL SUPERVISION.

THE COMMITTEE AMENDMENT TO THE MINIMIZATION DEFINITION MAKES EXPLICIT THE INTENT
THAT INFORMATION NOT RELATED TO AN APPROVED PURPOSE NOT BE DISSEMINATED.  THE ONLY
EXCEPTIONS TO THIS PROHIBITION RECOGNIZED **\*\*3940** BY THE COMMITTEE ARE FOR ONE OF THE
PURPOSES AUTHORIZED IN SECTION 2521(B)(8), OR FOR THE ENFORCEMENT OF THE CRIMINAL
LAW UNDER THE PROVISIONS OF SECTION 2526(A) AND (B).  UNDER THE DISSEMINATION
PHRASE, INFORMATION BEING HELD TO DETERMINE RELEVANCY WOULD NOT BE DISSEMINATED UN-
TIL THE DETERMINATION WAS MADE (OR WOULD ONLY BE DISSEMINATED TO THOSE WHO COULD DE-
TERMINE ITS RELEVANCY.) IT COULD ALSO MEAN THAT, EVEN WITH RESPECT TO INFORMATION
RELEVANT TO AN APPROVED PURPOSE, DISSEMINATION WOULD BE RESTRICTED TO THOSE OFFI-
CIALS WITH A NEED FOR SUCH INFORMATION. AND, AGAIN, THE JUDGE, IN FASHIONING THE
MINIMIZATION ORDER, COULD PLACE SPECIFIC RESTRICTIONS ON THE RETRIEVAL OF SUCH IN-
FORMATION.

IN SHORT, THE COMMITTEE BELIEVES THAT THE DEFINITION OF MINIMIZATION PROCEDURES
AUTHORIZES AND REQUIRES THAT INFORMATION CONCERNING AMERICAN CITIZENS AND LAWFUL
RESIDENT ALIENS BE HANDLED IN SUCH A WAY AS TO ASSURE THAT IT CANNOT BE USED FOR ANY
OTHER PURPOSE.  SOME HAVE SUGGESTED THAT THE STATUTORY DEFINITION IS TOO GENERAL.
THE COMMITTEE RECOGNIZES, HOWEVER, THAT MINIMIZATION REQUIREMENTS MUST DIFFER FROM
CASE TO CASE AND THAT MINIMIZATION RESTRICTIONS WHICH ARE APPROPRIATE FOR SOME SUR-
VEILLANCES WOULD BE INAPPROPRIATE FOR OTHERS.  A CERTAIN FLEXIBILITY IN THE STATUTE

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IS, THEREFORE, NECESSARY WITH CAREFUL JUDICIAL SCRUTINY OF A **\*39** PARTICULAR APPLICA-
TION THE BEST PROTECTION AGAINST ABUSE.  BUT THE DEFINITION DOES NOT GIVE CARTE
BLANCHE TO THE JUDGE.  IT REQUIRES THAT THE PROCEDURES BE DESIGNED TO LIMIT THE AC-
QUISITION, RETENTION, AND DISSEMINATION OF INFORMATION CONCERNING AMERICAN CITIZENS
AND LAWFUL RESIDENT ALIENS TO THAT INFORMATION WHICH IS RELATED TO ONE OF THE AP-
PROVED PURPOSES; IN ADDITION, THE PROCEDURES MUST PROVIDE THAT THE INFORMATION OB-
TAINED BY THE SURVEILLANCE WILL NOT BE USED FOR AN UNRELATED PURPOSE (OTHER THAN FOR
ENFORCEMENT OF THE CRIMINAL LAW, SEE SECTION 2526(A), INFRA).

OF COURSE, MINIMIZATION ONLY APPLIES TO INFORMATION KNOWN TO CONCERN UNITED STATES
PERSONS.  WHERE COMMUNICATIONS ARE ENCODED OR OTHERWISE NOT PROCESSED SO THE CON-
TENTS OF A COMMUNICATION ARE NOT KNOWN, IT WOULD NOT BE POSSIBLE TO MINIMIZE THE AC-
QUISITION, RETENTION AND DISSEMINATION OF INFORMATION CONCERNING UNITED STATES PER-
SONS.  NEVERTHELESS, THE MINIMIZATION PROCEDURES CAN BE STRUCTURED TO APPLY TO OTHER
AGENCIES OF THE GOVERNMENT, SO THAT IF AN AGENCY DIFFERENT FROM THE INTERCEPTING
AGENCY DECODES OR PROCESSES THE COMMUNICATION, IT COULD BE REQUIRED TO MINIMIZE THE
RETENTION AND PROHIBIT THE DISSEMINATION OF INFORMATION THEREIN CONCERNING UNITED
STATES PERSONS.

IT SHOULD BE NOTED THAT THIS PROVISION CONTAINS ONE SIGNIFICANT CHANGE FROM THE
MINIMIZATION PROVISIONS IN CHAPTER 119.  SECTION 2518(8)(A) REQUIRES THAT ALL INTER-
CEPTIONS BE RECORDED, IF POSSIBLE, AND THAT THE TAPES NOT BE EDITED OR DESTROYED FOR
TEN YEARS.  IN A CRIMINAL CONTEXT THE MAINTENANCE OF SUCH TAPES AND FILES UNDER
COURT SEAL ENSURES THAT THE INTERCEPTIONS WILL BE RETAINED IN THEIR ORIGINAL STATE
SO THAT WHEN CRIMINAL PROSECUTIONS ARE UNDERTAKEN IT IS CLEAR THAT THE EVIDENCE IS
INTACT AND HAS NOT BEEN TAMPERED WITH.  ALTHOUGH THERE MAY BE CASES IN WHICH INFORM-
ATION ACQUIRED FROM A FOREIGN INTELLIGENCE SURVEILLANCE WILL BE USED AS EVIDENCE OF
A CRIME, THESE CASES ARE EXPECTED TO BE RELATIVELY FEW IN NUMBER, UNLIKE TITLE III
INTERCEPTIONS THE VERY PURPOSE OF WHICH IS TO OBTAIN EVIDENCE OF CRIMINAL ACTIVITY.
THE COMMITTEE BELIEVES THAT IN LIGHT OF THE RELATIVELY FEW CASES IN WHICH INFORMA-
TION **\*\*3941** ACQUIRED UNDER THIS CHAPTER MAY BE USED AS EVIDENCE, THE BETTER PRACTICE
IS TO ALLOW THE DESTRUCTION OF INFORMATION THAT IS NOT FOREIGN INTELLIGENCE INFORMA-
TION OR EVIDENCE OF CRIMINAL ACTIVITY.  THIS COURSE WILL MORE EFFECTIVELY SAFEGUARD
THE PRIVACY OF INDIVIDUALS, ENSURING THAT IRRELEVANT INFORMATION WILL NOT BE FILED.
THE COMMITTEE BELIEVES THAT EXISTING CRIMINAL STATUTES RELATING TO OBSTRUCTION OF
JUSTICE WILL DEFER ANY EFFORTS TO TAMPER WITH EVIDENCE ACQUIRED UNDER THIS CHAPTER.
SUCH DESTRUCTION SHOULD OCCUR, OF COURSE, ONLY PURSUANT TO PROCEDURES APPROVED BY
THE COURT.  DESTRUCTION INSURES THAT THE INFORMATION CANNOT BE USED TO 'TAINT' A
CIVIL OR CRIMINAL PROCEEDING; ACCORDINGLY, THERE IS NO REQUIREMENT TO INDEX, FOR
PURPOSES OF 18 U.S.C. SEC. 3504, INTERCEPTIONS WHICH ARE DESTROYED.

THE COMMITTEE IS CONCERNED THAT THE SURVEILLANCE AUTHORIZED UNDER THIS CHAPTER NOT
RESULT IN THE ACQUISITION AND RETENTION OF INFORMATION WHICH WOULD ADVERSELY AFFECT
THE EXERCISE OF FIRST AMENDMENT RIGHTS.  NOR SHOULD ANY DISSEMINATION OF THE INFORM-
ATION OBTAINED SO AFFECT THOSE RIGHTS.  SUCH ABUSES OCCURRED WITH DISTRESSING FRE-
QUENCY IN THE PAST.  INFORMATION RELATING TO THE LAWFUL POLITICAL ACTIVITY OF AMER-
ICAN CITIZENS OR RESIDENT ALIENS IS, BY DEFINITION, NOT FOREIGN INTELLIGENCE INFORM-
ATION AND MAY NOT BE ACQUIRED, RETAINED, OR DISSEMINATED UNDER THE PROVISIONS OF
THIS LEGISLATION.

**\*40** IN ADDITION TO THE GENERAL MINIMIZATION REQUIREMENTS DISCUSSED ABOVE, THERE

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**


ARE TWO SPECIFIC REQUIREMENTS AIMED AT PARTICULAR TYPES OF SURVEILLANCE.

THE FIRST REQUIRES THAT APPROPRIATE STEPS BE TAKEN TO PREVENT FOREIGN INTELLIGENCE INFORMATION, WHICH RELATES SOLELY TO THE CONDUCT OF FOREIGN AFFAIRS, FROM BEING MAINTAINED IN A WAY THAT WOULD PERMIT RETRIEVAL BY REFERENCE TO THE NAME OF A UNITED STATES CITIZEN OR LAWFUL RESIDENT ALIEN WHO IS A PARTY TO THE INTERCEPTED COMMUNICATION.  THIS REQUIREMENT IS INTENDED TO STRIKE A BALANCE BETWEEN INDIVIDUAL RIGHTS AND GOVERNMENT NEEDS IN THE DELICATE SITUATION WHERE AMERICAN CITIZENS ARE OVERHEARD IN CONVERSATIONS WHICH CONTAIN INFORMATION SOLELY RELATED TO THE CONDUCT OF FOREIGN AFFAIRS.

IN A HYPOTHETICAL CASE, FOR EXAMPLE, AN AMBASSADOR FROM AN IMPORTANT NEUTRAL NA-TION, SPEAKING TO A UNITED STATES SENATOR, TELLS THE SENATOR THAT HIS COUNTRY HAS BEEN SECRETLY APPROACHED BY A FOREIGN NATION CONCERNING A PLANNED ATTACK ON THE UNITED STATES. ASSUMING THAT THE SURVEILLANCE WAS INITIATED AGAINST THE AMBASSADOR AND APPROVED IN ACCORDANCE WITH THE PROCEDURES OF THIS CHAPTER, THERE SHOULD BE NO DOUBT THAT THE INFORMATION COULD BE RETAINED AND USED BECAUSE OF ITS IMPORTANCE AND RELATIONSHIP 'TO THE ABILITY OF THE UNITED STATES TO PROTECT ITSELF AGAINST ACTUAL OR POTENTIAL ATTACK.'  AT THE SAME TIME, HOWEVER, THE CONSTITUTIONAL RIGHTS OF SPEECH, ASSOCIATION, AND PRIVACY OF THE SENATOR ARE IMPLICATED.  HE IS PLAINLY NOT THE TARGET OF THE SURVEILLANCE, NOR COULD HE BE, SINCE HE IS NOT THE 'AGENT OF A FOREIGN POWER.'  STILL HE IS OVERHEARD.  THE FUNCTIONING OF DEMOCRATIC GOVERNMENT CAN BE IMPAIRED IF ITS REPRESENTATIVES ARE DETERRED FROM DISCUSSING IMPORTANT ISSUES WITH REPRESENTATIVES OF OTHER COUNTRIES FOR FEAR THAT THEIR CONVERSATIONS WILL BE OVERHEARD AND RETAINED.

THERE IS NO PERFECT SOLUTION TO THE PROBLEM.  AS LONG AS THE SURVEILLANCE WAS IN-STITUTED LAWFULLY, THE SENATOR'S CONVERSATION MAY BE OVERHEARD.  GIVEN THE SUBJECT MATTER OF THE CONVERSATION, IT SHOULD NOT BE EXCLUDED BY MINIMIZATION PROCEDURES. IF THE SUBJECT MATTER IS FOREIGN **3942 INTELLIGENCE INFORMATION, THE INFORMATION SHOULD BE RETAINED.  THE ALTERNATIVE-- A BLANKET RULE DEPRIVING THE GOVERNMENT OF THE RIGHT TO RETAIN FOREIGN INTELLIGENCE INFORMATION, REGARDLESS OF ITS IMPORTANCE, BECAUSE AN AMERICAN CITIZEN WAS INCIDENTALLY OVERHEARD-- IS UNACCEPTABLE.  SIMIL-ARLY, IT WOULD NOT BE ADVISABLE TO OBLIGATE THE GOVERNMENT TO RENDER THE CONVERSA-TION SENSELESS BY DELETING ALL PORTIONS OF THE STATEMENTS IN THE CONVERSATION MADE BY THE SENATOR.

THE COMMITTEE BELIEVES, HOWEVER, THAT EVERY EFFORT SHOULD BE MADE TO MINIMIZE THE 'CHILLING EFFECT' THAT RETENTION OF SUCH CONVERSATIONS OF AMERICANS WILL HAVE.  NO FILE SHOULD BE STARTED OR MAINTAINED UNDER THE NAME OF THE AMERICAN CITIZEN WHEN THE INFORMATION RELATES SOLELY TO THE CONDUCT OF FOREIGN AFFAIRS.

THE SECOND REQUIREMENT PROVIDES SPECIAL PROTECTIONS FOR PERMANENT RESIDENT ALIENS AND CITIZENS OF THE UNITED STATES WHO ARE EMPLOYED BY AN ENTITY CONTROLLED AND DIR-ECTED BY A FOREIGN GOVERNMENT OF GOVERNMENTS, WHICH IS THE TARGET OF ELECTRONIC SUR-VEILLANCE AND WHICH IS NOT SUBSTANTIALLY COMPOSED OF OFFICERS OR EMPLOYEES OF A FOR-EIGN GOVERNMENT OR INDIVIDUALS WHO ARE AGENTS OF A FOREIGN POWER AS DEFINED IN SEC-TION 2521(B)(2)(B).  IN SUCH CASES, THE GOVERNMENT MUST, IN ADDITION **41 TO THE GEN-ERAL PROCEDURES REQUIRED BY THIS PARAGRAPH PRESENT A STATEMENT OF PROCEDURES TO PRE-VENT THE ACQUISITION, RETENTION, AND DISSEMINATION OF COMMUNICATIONS OF PERMANENT RESIDENT ALIENS AND UNITED STATES CITIZENS WHO ARE NOT OFFICERS OR EXECUTIVES OF THE ENTITY RESPONSIBLE FOR ACTIVITIES WHICH INVOLVE FOREIGN INTELLIGENCE INFORMATION.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

K. 'UNITED STATES PERSON'

SECTION 2521(B)(9) DEFINES A 'UNITED STATES PERSON' TO INCLUDE A CITIZEN OF THE
UNITED STATES, AN ALIEN LAWFULLY ADMITTED FOR PERMANENT RESIDENCE, AN UNINCORPORATED
ASSOCIATION OF WHICH A SUBSTANTIAL NUMBER OF MEMBERS ARE CITIZENS OF THE UNITED
STATES OR PERMANENT RESIDENT ALIENS, AND A CORPORATION INCORPORATED IN THE UNITED
STATES, BUT NOT INCLUDING CORPORATIONS OR ASSOCIATIONS WHICH ARE 'FOREIGN POWERS.'
THIS DEFINITION IS NOW TO S. 1566 SINCE S. 3197 MADE NO DISTINCTION IN ITS PROVI-
SIONS BETWEEN DIFFERENT TYPES OF 'PERSONS.' AS ALREADY INDICATED, THIS NEW SECTION
HAS PROVEN TROUBLESOME. AS SENATOR KENNEDY STATED WHEN HE INTRODUCED S. 1566:

ANOTHER MAJOR QUESTION MARK CONCERNING THE BILL INVOLVING THE DECISION OF THE
JUSTICE DEPARTMENT TO GRANT LESS PROTECTIONS AND SAFEGUARDS TO ILLEGAL ALIENS OR
FOREIGN VISITORS. THIS DISQUIETING FEATURE OF THE BILL WAS ABSENT FROM S. 3197.
WHEN IT COMES TO ILLEGAL ALIENS OR FOREIGN VISITORS TODAY'S LEGISLATION PROVIDES AN
EXPANDED NONCRIMINAL STANDARD, DOES NOT ALLOW THE COURT TO LOOK BEHIND THE EXECUTIVE
BRANCH CERTIFICATION AND ALLOWS THE GOVERNMENT TO USE THE INFORMATION OBTAINED AS A
RESULT OF THE SURVEILLANCE FOR WHATEVER PURPOSE IT DEEMS NECESSARY. THE FOURTH
AMENDMENT OF THE CONSTITUTION SPEAKS IN TERMS OF PROTECTING ALL 'PERSONS'-- NOT JUST
AMERICAN CITIZENS AND LAWFUL RESIDENT ALIENS-- AND TO THE EXTENT THAT THIS BILL ES-
TABLISHING DIFFERENT STANDARDS AND PROCEDURES FOR ILLEGAL ALIENS AND TEMPORARY FOR-
EIGN VISITORS, IT IS OPEN TO CRITICISM. [FN60]

**\*\*3943** PROPONENTS OF THE CHANGE CORRECTLY POINT OUT, HOWEVER, THAT THIS NEW DIS-
TINCTION IN S. 1566 IS, IN LARGE PART, THE RESULT OF AN ADMINISTRATION DECISION TO
CONFER ADDITIONAL STATUTORY PROTECTIONS, OVER AND ABOVE THOSE FOUND IN S. 3197, FOR
AMERICAN CITIZENS AND LAWFUL RESIDENT ALIENS. THUS, FOR EXAMPLE, IN CASES INVOLVING
AMERICAN CITIZENS OR LAWFUL RESIDENT ALIENS S. 1566 ALLOWS THE COURT TO LOOK BEHIND
THE EXECUTIVE BRANCH CERTIFICATION AND ALSO EXPANDS THE DEFINITION OF ELECTRONIC
SURVEILLANCE. THE COMMITTEE RECOGNIZES THESE DISTINCT IMPROVEMENTS OVER S. 3197 AND
IS AWARE OF THE ADMINISTRATION'S RELUCTANCE TO EXTEND THESE SAFEGUARDS ACROSS THE
BOARD TO ALL PERSONS.

THE TERM 'MEMBERS' WITH RESPECT TO UNINCORPORATED ASSOCIATIONS IS NOT INTENDED, OF
COURSE, TO BE LIMITED TO FORMAL, CARD-CARRYING MEMBERS. FOR INSTANCE, AN UNINCOR-
PORATED COMMERCIAL ESTABLISHMENT'S EMPLOYEES WOULD BE MEMBERS UNDER THIS DEFINITION.
CORPORATIONS OR GROUPS WHICH ARE WITHIN THE DEFINITIONS OF A FOREIGN POWER IN SEC-
TION 2521(B)(1) (C), (D), OR (F) WOULD CONTINUE TO BE FOREIGN POWERS NOTWITHSTANDING
INCORPORATION IN THE UNITED STATES OR THE PRESENCE OF A SUBSTANTIAL NUMBER OF AMER-
ICAN MEMBERS.

**\*42** SECTION 2521(B)(10) OFFERS A NEW DEFINITION OF 'UNITED STATES' FOR GEOGRAPHIC
PURPOSES. EVIDENCE PUBLICIZED LAST YEAR OF CIA BUGGING IN MICRONESIA LED THE ADMIN-
ISTRATION TO PROPOSE THIS CHANGE WHICH MAKES EXPLICIT THAT S. 1566 COVERS ELECTRONIC
SURVEILLANCE IN ALL AREAS UNDER THE TERRITORIAL SOVEREIGNTY OF THE UNITED STATES
(THE UNITED STATES AND ITS TERRITORIES) AS WELL AS THE CANAL ZONE AND MICRONESIA.
THE TERM 'TERRITORIAL SOVEREIGNTY' DOES NOT INCLUDE UNITED STATES EMBASSIES, MILI-
TARY BASES AND OTHER INSTALLATIONS ABROAD. THE COMMONWEALTH OF THE NORTHERN MARIANAS
IS INTENDED TO BE COVERED BY THIS DEFINITION AFTER ITS SEVERANCE FROM THE TRUST TER-
RITORY OF THE PACIFIC ISLANDS. THE REMAINDER OF THE TRUST TERRITORY OF THE PACIFIC
ISLANDS IS INTENDED TO BE COVERED SO LONG AS THE TRUST IS IN EFFECT AND THEREAFTER

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)

ONLY IF THE POLITICAL STATUS AGREEMENTS WITH THE UNITED STATES PROVIDE FOR TERRIT-
ORIAL SOVEREIGNTY OF THE UNITED STATES IN A MANNER SIMILAR TO THAT OF THE NORTHERN
MARIANA ISLANDS, PUERTO RICO OR GUAM.

## SECTION 2522

SECTION 2522 AUTHORIZES THE SUBMISSION OF APPLICATIONS TO A JUDGE FOR A COURT OR-
DER APPROVING THE USE OF ELECTRONIC SURVEILLANCE UNDER THIS CHAPTER. APPLICATIONS
MAY BE SUBMITTED ONLY IF THE PRESIDENT HAS, BY PRIOR WRITTEN AUTHORIZATION, EM-
POWERED THE ATTORNEY GENERAL TO APPROVE THE SUBMISSION.  THIS SECTION DOES NOT RE-
QUIRE THE PRESIDENT TO AUTHORIZE EACH SPECIFIC APPLICATION; HE MAY AUTHORIZE THE AT-
TORNEY GENERAL GENERALLY TO SEEK APPLICATIONS UNDER THIS CHAPTER OR UPON SUCH TERMS
AND CONDITIONS AS THE PRESIDENT WISHES SO LONG AS THE TERMS AND CONDITIONS ARE CON-
SISTENT WITH THIS CHAPTER.

## SECTION 2523

SUBSECTION (A) PROVIDES FOR THE PUBLIC DESIGNATION BY THE CHIEF JUSTICE OF SEVEN
UNITED STATES DISTRICT COURT JUDGES, ANY ONE OF WHOM MAY HEAR APPLICATIONS AND GRANT
ORDERS UNDER THIS CHAPTER. EACH JUDGE SHALL HAVE NATIONWIDE JURISDICTION, AND THE
COMMITTEE CONTEMPLATES THAT THERE WILL BE SOME GEOGRAPHIC DISPERSION AMONG THEM.
**3944 THE SUBSECTION PROVIDES THAT NONE OF THE DESIGNATED JUDGES SHALL HAVE JUR-
ISDICTION TO HEAR AN APPLICATION FOR ELECTRONIC SURVEILLANCE IF THAT SAME APPLICA-
TION HAS BEEN PREVIOUSLY DENIED BY ANOTHER OF THE DESIGNATED DISTRICT JUDGES.  THIS
PROVISION IS INTENDED TO MAKE CLEAR THAT IF THE GOVERNMENT DESIRES TO PURSUE AN AP-
PLICATION AFTER A DENIAL, IT MUST SEEK REVIEW IN THE SPECIAL COURT OF REVIEW ESTAB-
LISHED IN SUBSECTION (B); IT CANNOT APPLY TO ANOTHER DISTRICT JUDGE.  OBVIOUSLY,
WHERE ONE JUDGE HAS ASKED FOR ADDITIONAL INFORMATION BEFORE APPROVING AN APPLICA-
TION, AND THAT JUDGE IS UNAVAILABLE WHEN THE GOVERNMENT COMES FORWARD WITH SUCH AD-
DITIONAL INFORMATION, THE GOVERNMENT MAY SEEK APPROVAL FROM ANOTHER JUDGE. IT WOULD,
HOWEVER, HAVE TO INFORM THE SECOND JUDGE ABOUT THE FIRST APPLICATION (SEE SECTION
2524(A)(9), INFRA).
SIMILARLY, WHERE AN APPLICATION IS MADE AND THEN WITHDRAWN, PERHAPS BECAUSE OF A
CHANGE IN CIRCUMSTANCES MAKES THE ELECTRONIC SURVEILLANCE NO LONGER TECHNICALLY
FEASIBLE, THE GOVERNMENT MAY SEEK APPROVAL FROM ANOTHER JUDGE IF THE APPLICATION IS
SUBSEQUENTLY REINSTATED.
THE SUBSECTION FURTHER PROVIDES THAT A DESIGNATED DISTRICT JUDGE WHO DENIES AN AP-
PLICATION FOR ELECTRONIC SURVEILLANCE SHALL PROVIDE A COMPLETE WRITTEN STATEMENT OF
THE REASONS FOR THE DENIAL, AND, IF THE *43 GOVERNMENT SEEKS REVIEW OF THE DECISION,
FORWARD THAT STATEMENT AND OTHER DOCUMENTS COMPRISING THE RECORD TO THE SPECIAL
COURT OF REVIEW.  THIS ENSURES THAT THE SPECIAL COURT OF REVIEW WILL HAVE THE FULL
RECORD OF THE PROCEEDINGS OF THE DISTRICT COURT IN REVIEWING THE CASE.
SUBSECTION (B) PROVIDES FOR THE PUBLIC DESIGNATION BY THE CHIEF JUSTICE OF THREE
JUDGES FROM THE FEDERAL COURTS OF APPEALS OR DISTRICT COURTS WHO SHALL SIT TOGETHER
AS A SPECIAL COURT OF REVIEW HAVING JURISDICTION TO REVIEW DENIALS OF APPLICATIONS
MADE TO THE INDIVIDUAL JUDGES DESIGNATED IN SUBSECTION (A). ONE OF THE THREE IS TO
BE PUBLICLY DESIGNATED AS THE PRESIDING JUDGE.  IF THE SPECIAL COURT OF REVIEW DE-
TERMINES THAT AN APPLICATION WAS PROPERLY DENIED, IT SHALL PROVIDE A WRITTEN STATE-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

MENT FOR A WRIT OF CERTIORARI, FORWARD THE COMPLETE RECORD TO THE SUPREME COURT,
WHICH WILL HAVE JURISDICTION TO REVIEW THE DECISION.

SUBSECTION (C) PROVIDES FOR THE EXPEDITIOUS HANDLING OF ALL PROCEEDINGS UNDER THIS
CHAPTER AND ALSO STATES THAT THE CHIEF JUSTICE, IN CONSULTATION WITH THE ATTORNEY
GENERAL AND THE DIRECTOR OF CENTRAL INTELLIGENCE, SHALL ESTABLISH SECURITY MEASURES
UNDER WHICH APPLICATIONS MADE AND ORDERS GRANTED SHALL BE MAINTAINED.  THE COMMITTEE
CONTEMPLATES THAT THE RECORD OF APPLICATIONS MADE, INFORMATION PROVIDED, AND ORDERS
GRANTED BY THE SEVERAL JUDGES DESIGNATED UNDER THIS CHAPTER SHALL BE MAINTAINED IN
SUCH A WAY THAT THE JUDGES DESIGNATED UNDER THIS CHAPTER SHALL HAVE ACCESS TO THE
RECORDS OF ACTIONS TAKEN BY THE OTHER JUDGES SIMILARLY DESIGNATED.

### SECTION 2524

THIS SECTION IS PATTERNED AFTER 18 U.S.C. SECTION 2518 (1) AND (2), AND SPECIFIES
WHAT INFORMATION MUST BE INCLUDED IN THE APPLICATION.  APPLICATIONS MUST BE MADE IN
WRITING AND UNDER OATH OR AFFIRMATION BY A FEDERAL OFFICER.  IF THE OFFICER MAKING
THE APPLICATION IS UNABLE TO VERIFY PERSONALLY THE ACCURACY OF THE INFORMATION OR
REPRESENTATIONS UPON WHICH THE APPLICATION IS BASED, THE APPLICATION MUST ALSO IN-
CLUDE **\*3945** AFFIDAVITS BY INVESTIGATIVE OR OTHER OFFICERS WHO ARE ABLE TO PROVIDE
SUCH PERSONAL VERIFICATION. THUS, FOR EXAMPLE, IF THE APPLICANT WAS AN ATTORNEY IN
THE DEPARTMENT OF JUSTICE WHO HAD NOT PERSONALLY GATHERED THE INFORMATION CONTAINED
IN THE APPLICATION, IT WOULD BE NECESSARY THAT THE APPLICATION ALSO CONTAIN AN AFFI-
DAVIT BY THE INVESTIGATING OFFICER PERSONALLY ATTESTING TO THE STATUS AND RELIABIL-
ITY OF ANY INFORMANTS OR OTHER COVERT SOURCES OF INFORMATION.  BY THIS MEANS THE
SOURCE OF ALL INFORMATION CONTAINED IN THE APPLICATION AND ITS ACCURACY WILL HAVE
BEEN SWORN TO BY A NAMED OFFICIAL OF THE UNITED STATES GOVERNMENT AND A CHAIN OF RE-
SPONSIBILITY ESTABLISHED FOR JUDICIAL REVIEW.

EACH APPLICATION MUST BE APPROVED BY THE ATTORNEY GENERAL, WHO MAY GRANT SUCH AP-
PROVAL IF HE FINDS THAT THE APPROPRIATE PROCEDURES HAVE BEEN FOLLOWED.  THE ATTORNEY
GENERAL SHALL ALSO STATE IN WRITING HIS BELIEF THAT THE FACTS AND CIRCUMSTANCES RE-
LIED UPON FOR THE APPLICATION WOULD JUSTIFY A JUDICIAL FINDING OF PROBABLE CAUSE
THAT THE TARGET IS AN AGENT OF A FOREIGN POWER AND THAT THE FACILITIES OR PLACE AT
WHICH THE ELECTRONIC SURVEILLANCE IS DIRECTED ARE BEING USED, OR ABOUT TO BE USED,
BY AN AGENT OF A FOREIGN POWER, AND THAT ALL OTHER STATUTORY CRITERIA HAVE BEEN MET.
IN ADDITION, THE ATTORNEY GENERAL MUST PERSONALLY BE SATISFIED THAT THE CERTIFICA-
TION HAS BEEN MADE PURSUANT TO STATUTORY REQUIREMENTS.

**\*44** PARAGRAPH (1) OF SUBSECTION (A) REQUIRES THAT THE APPLICATION IDENTIFY THE
FEDERAL OFFICER MAKING THE APPLICATION; THAT IS, THE NAME OF THE PERSON WHO ACTUALLY
PRESENTS THE APPLICATION TO THE JUDGE.

PARAGRAPH (2) REQUIRES THAT THE APPLICATION CONTAIN EVIDENCE OF THE AUTHORITY OF
THE APPLICANT TO MAKE THIS APPLICATION.  THIS WOULD CONSIST OF THE PRESIDENTIAL AU-
THORIZATION TO THE ATTORNEY GENERAL AND THE ATTORNEY GENERAL'S APPROVAL OF THE PAR-
TICULAR APPLICATION.

PARAGRAPH (3) REQUIRES THE IDENTITY OR DESCRIPTION OF THE PERSON WHO IS THE TARGET
OF THE ELECTRONIC SURVEILLANCE.  THE WORD 'PERSON' IS USED IN ITS JURIDICAL SENSE TO
MEAN THE INDIVIDUAL OR ENTITY THAT IS THE TARGET OF THE SURVEILLANCE.  HOWEVER, CARE
MUST BE TAKEN IN FRAMING THE ORDER AUTHORIZING SUCH SURVEILLANCE (AND MINIMIZATION

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PROCEDURES) THAT SURVEILLANCE AGAINST ONE INDIVIDUAL DOES NOT LEAD TO THE INTERCEP-
TION OF COMMUNICATIONS OF AN ENTIRE GROUP OR ORGANIZATION OF UNITED STATES CITIZENS,
THUS VIOLATING CONSTITUTIONAL RIGHTS OF ASSOCIATION AND PRIVACY.

PARAGRAPH (4) REQUIRES A STATEMENT OF THE FACTS AND CIRCUMSTANCES JUSTIFYING THE
APPLICANT'S BELIEF THAT THE TARGET OF THE ELECTRONIC SURVEILLANCE IS A FOREIGN POWER
OR AN AGENT OF A FOREIGN POWER AND THAT THE FACILITIES OR PLACE AT WHICH THE SUR-
VEILLANCE IS DIRECTED ARE BEING USED OR ARE ABOUT TO BE USED BY THAT POWER OR AGENT.
THESE REQUIREMENTS PARALLEL EXISTING LAW.  (18 U.S.C. 2518(1)(B)(II) AND (IV)).

PARAGRAPH (5) REQUIRES A STATEMENT OF THE PROPOSED MINIMIZATION PROCEDURES.

THE STATEMENT OF PROCEDURES REQUIRED UNDER THIS PARAGRAPH SHOULD BE FULL AND COM-
PLETE AND SUBJECT TO THE CLOSEST JUDICIAL SCRUTINY. THESE PROCEDURES MAY DIFFER FROM
CASE TO CASE, DEPENDING ON THE TYPE OF FOREIGN AGENT INVOLVED, THE INDIVIDUALS USING
THE FACILITIES OR PLACE TO BE SURVEILLED, THE TYPE OF FOREIGN INTELLIGENCE INFORMA-
TION SOUGHT, AND OTHER SIMILAR FACTORS.  MINIMIZATION PROCEDURES SHOULD NORMALLY IN-
CLUDE SUCH ELEMENTS AS METHODS TO AVOID THE ACQUISITION OF IRRELEVANT INFORMATION AT
THE TIME OF INTERCEPT, RESTRICTIONS ON THE USE OF SURVEILLANCE **3946 TO TIMES WHEN
FOREIGN INTELLIGENCE INFORMATION IS LIKELY TO BE OBTAINED, AND REQUIREMENTS FOR DE-
LETION OF INFORMATION OBTAINED WHICH IS NOT FOREIGN INTELLIGENCE INFORMATION.

FOR EXAMPLE STEPS SHOULD BE TAKEN TO PREVENT UNNECESSARY INVASION OF THE PRIVACY
OF A TARGET'S FAMILY CAUSED BY A TWENTY-FOUR HOUR TAP ON THE FAMILY PHONE WHEN IT IS
KNOWN THAT THE TARGET IS OUT OF TOWN OR AT THE OFFICE. SIMILARLY, CONVERSATIONS UN-
RELATED TO FOREIGN INTELLIGENCE SHOULD NOT BE RETAINED OR, OF COURSE, DISSEMINATED.

PARAGRAPH (6) CALLS FOR A FACTUAL DESCRIPTION OF THE NATURE OF THE INFORMATION
SOUGHT BY THE ELECTRONIC SURVEILLANCE, EXCEPT WHERE THE SURVEILLANCE IS OF A FOREIGN
POWER DEFINED IN SECTION 2521 (B)(1) (A), (B), OR (C).  THE DESCRIPTION SHOULD BE AS
SPECIFIC AS POSSIBLE AND SUFFICIENTLY DETAILED SO AS TO STATE CLEARLY WHAT THE GOV-
ERNMENT SEEKS.  A SIMPLE DESIGNATION OF WHICH SUBDEFINITION OF 'FOREIGN INTELLIGENCE
INFORMATION' IS INVOLVED WILL NOT SUFFICE.

SUCH A DESCRIPTION IS NOTE REQUIRED WHERE A TARGET IS ONE OF THE 'OFFICIAL  ' FOR-
EIGN POWERS DEFINED IN SECTION 2521 (B)(1)(A), (B), OR (C).  WHERE THESE TYPES OF
POWERS ARE THE TARGETS, A DESIGNATION OF A PARTICULAR SUBCATEGORY OF THE DEFINITION
OF 'FOREIGN INTELLIGENCE INFORMATION' WILL SUFFICE.  THE REASON FOR THIS DISTINCTION
IS, THAT WITH RESPECT *45 TO SUCH 'OFFICIAL' TARGETS, THE SENSITIVITY OF THE SUR-
VEILLANCE IS GREATLY MULTIPLIED WHILE THE RISK OF A FRUITLESS SURVEILLANCE WHICH
WILL NOT OBTAIN ANY FOREIGN INTELLIGENCE INFORMATION IS GREATLY REDUCED.  THEREFORE
THE ADMINISTRATION MAINTAINS THAT SUCH APPLICATIONS SHOULD NOT REQUIRE AS MUCH DE-
TAILED INFORMATION TO BE PRESENTED AS IN CASES INVOLVING AMERICAN CITIZENS OR OTHER
INDIVIDUAL TARGETS.

PARAGRAPH (7) REQUIRES A CERTIFICATION OR CERTIFICATIONS BY THE THE ASSISTANT TO
THE PRESIDENT FOR NATIONAL SECURITY AFFAIRS OR BY AN APPROPRIATE EXECUTIVE OFFICIAL
APPOINTED BY THE PRESIDENT WITH THE ADVICE AND CONSENT OF THE SENATE. THE CERTIFICA-
TION WOULD BE MADE BY THE OFFICIAL HAVING ULTIMATE RESPONSIBILITY FOR THE COLLECTION
OF THE INFORMATION-- NORMALLY THE ASSISTANT TO THE PRESIDENT FOR NATIONAL SECURITY
AFFAIRS, THE DIRECTOR OF THE CENTRAL INTELLIGENCE AGENCY, THE DIRECTOR OF THE FEDER-
AL BUREAU OF INVESTIGATION, OR THE SECRETARY OF DEFENSE-- OR SUCH OTHER OFFICER, AP-
POINTED WITH THE ADVICE AND CONSENT OF THE SENATE, WHO HAS FULL KNOWLEDGE OF THE
CASE.  THE POSSIBILITY OF ADDITIONAL CERTIFICATIONS IS PROVIDED TO INSURE THAT A DE-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**


TAILED AND COMPLETE CERTIFICATION IS PRESENTED TO THE JUDGE.

   THE CERTIFICATION SHALL STATE THAT THE INFORMATION SOUGHT IS FOREIGN INTELLIGENCE
INFORMATION, THAT THE PURPOSE OF THE SURVEILLANCE IS TO OBTAIN FOREIGN INTELLIGENCE
INFORMATION, AND THAT SUCH INFORMATION CANNOT FEASIBLY BE OBTAINED BY NORMAL INVEST-
IGATIVE TECHNIQUES.  IT SHALL INCLUDE A DESIGNATION OF WHAT TYPE OF FOREIGN INTELLI-
GENCE INFORMATION IS SOUGHT AND WHERE THE TARGET IS NOT A FOREIGN POWER AS DEFINED
IN SECTION 2521 (B)(1) (A), (B), OR (C) A REASONED STATEMENT OF THE BASIS FOR CERTI-
FYING THAT THE INFORMATION SOUGHT IS FOREIGN INTELLIGENCE INFORMATION AND THAT SUCH
INFORMATION CANNOT FEASIBLY BE OBTAINED BY OTHER INVESTIGATIVE TECHNIQUES.

   THE REQUIREMENT THAT THE INFORMATION SOUGHT BE 'FOREIGN INTELLIGENCE INFORMATION'
IS DESIGNED TO INSURE THAT A HIGH-LEVEL OFFICIAL WITH RESPONSIBILITY IN THE AREA OF
NATIONAL SECURITY, WILL REVIEW AND, WHERE THE TARGET IS NOT A FOREIGN POWER AS
DEFINED IN SECTION 2521 (B) **3947 (1) (A), (B) OR (C), EXPLAIN THE EXECUTIVE BRANCH
DETERMINATION THAT THE INFORMATION SOUGHT IS IN FACT FOREIGN INTELLIGENCE INFORMA-
TION.  THE REQUIREMENT THAT THIS JUDGEMENT BE EXPLAINED IS TO ENSURE THAT THOSE MAK-
ING CERTIFICATIONS CAREFULLY CONSIDER THE CASES BEFORE THEM AND AVOID THE TEMPTATION
TO SIMPLY SIGN OFF ON CERTIFICATIONS WHICH CONSIST LARGELY OF BOILERPLATE LANGUAGE.
THE COMMITTEE DOES NOT INTEND THAT THE CERTIFICATION BE VAGUE GENERALIZATIONS OR
STANDARDIZED ASSERTIONS.  THE DESIGNATED OFFICIAL MUST SIMILARLY EXPLAIN THAT THE
PURPOSE OF THE SURVEILLANCE IS TO OBTAIN THE DESCRIBED FOREIGN INTELLIGENCE INFORMA-
TION. THIS REQUIREMENT IS DESIGNED TO PREVENT THE PRACTICE OF TARGETING ONE INDI-
VIDUAL FOR ELECTRONIC SURVEILLANCE WHEN THE TRUE PURPOSE OF THE SURVEILLANCE IS TO
GATHER INFORMATION ABOUT ANOTHER INDIVIDUAL.  IT IS ALSO DESIGNED TO MAKE EXPLICIT
THAT THE SOLE PURPOSE OF SUCH SURVEILLANCE IS TO SECURE FOREIGN INTELLIGENCE INFORM-
ATION AND NOT TO OBTAIN INFORMATION FOR ANY OTHER PURPOSE.  THE DESIGNATED OFFICIAL
MUST SIMILARLY EXPLAIN IN HIS AFFIDAVIT WHY THE INFORMATION CANNOT BE OBTAINED
THROUGH LESS INTRUSIVE TECHNIQUES.  THIS REQUIREMENT IS PARTICULARLY IMPORTANT IN
THOSE CASES WHEN UNITED STATES CITIZENS OR RESIDENT ALIENS ARE THE TARGET OF THE
SURVEILLANCE.

   **46 FINALLY, WHERE THE TARGET OF THE SURVEILLANCE IS ONE OF THE SPECIAL CLASS OF
'OFFICIAL' FOREIGN POWERS (DEFINED IN SECTIONS 2521(B)(1)(A), (B) OR (C)), THE CER-
TIFICATION SHALL INCLUDE A STATEMENT OF THE PERIOD OF TIME FOR WHICH THE SURVEIL-
LANCE IS REQUIRED.  WITH RESPECT TO SURVEILLANCES OF THIS SPECIAL CLASS OF FOREIGN
POWERS, THIS STATEMENT IS PLACED IN THE CERTIFICATION SINCE THE REVIEWING COURT DOES
NOT HAVE THE POWER TO CONTROL THE LENGTH OF THE SURVEILLANCE WITHIN THE 90-DAY PERI-
OD OTHERWISE APPLICABLE IN THE BILL.  THIS PROVISION-- A MAJOR CHANGE FROM THE
BLANKET 90-DAY LIMITATION IN S. 3197-- HAS BEEN CRITICIZED BY SOME MEMBERS OF THE
COMMITTEE WHO OBJECT TO THE LIKELIHOOD OF LENGTHY, ONGOING WIRETAPS BEING CONDUCTED
WITHOUT ADEQUATE JUDICIAL SUPERVISION.

   PARAGRAPH (8) REQUIRES THE APPLICATION TO CONTAIN A STATEMENT OF THE MEANS BY
WHICH THE SURVEILLANCE WILL BE EFFECTED WHERE IT IS NOT TARGETED AGAINST THE SPECIAL
CLASS OF FOREIGN POWERS.  UNLIKE S.3197, WHERE THE TARGET IS ONE OF THE SPECIAL
CLASSES OF FOREIGN POWERS LISTED IN SECTION 2521 (B) (1) (A), (B), OR (C), THE AD-
MINISTRATION HAS INSISTED THAT ONLY A DESIGNATION OF THE TYPE OF SURVEILLANCE AC-
CORDING TO THE CATEGORIES OF THE DEFINITION OF ELECTRONIC SURVEILLANCE BE REQUIRED.
IT WILL GENERALLY BE SUFFICIENT IN SUCH CASES IF THE APPLICATION MERELY INDICATES
WHETHER THE INFORMATION WILL BE ACQUIRED BY MEANS OF A WIRETAP, A MICROPHONE IN-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

STALLATION, THE INTERCEPTION OF A RADIO SIGNAL OR SOME OTHER MEANS.  THE ADMINISTRA-
TION MAINTAINS THAT LESS SPECIFICITY IN DESCRIBING THE MEANS OF THE SURVEILLANCE IS
REQUIRED FOR THE SPECIAL CLASS OF FOREIGN POWERS BECAUSE OF THE EXTREME IMPORTANCE
AND SENSITIVITY OF THE INFORMATION SOUGHT.  HOWEVER, IF SUCH A SURVEILLANCE REQUIRES
PHYSICAL ENTRY OF THE PROPERTY OF A NON-CONSENTING PERSON, A STATEMENT TO THAT EF-
FECT IS REQUIRED.  [FN61]

    PARAGRAPH (9) PARALLELS 18 U.S.C. SECTION 2518 (1)(E) AND REQUIRES A STATEMENT
CONCERNING ALL PREVIOUS APPLICATIONS DEALING WITH THE SAME PERSONS, FACILITIES, OR
PLACES AND THE DISPOSITION OF EACH SUCH PREVIOUS APPLICATION.

    **3948 PARAGRAPH (10) PARALLELS 18 U.S.C. SECTION 2518 (1)(D) AND REQUIRES A
STATEMENT AS TO THE PERIOD OF TIME FOR WHICH THE SURVEILLANCE IS NECESSARY IN THOSE
CASES WHERE THE SPECIAL CLASS OF FOREIGN POWERS IS NOT THE TARGET.  IF THE SURVEIL-
LANCE ORDER IS NOT TO TERMINATE AUTOMATICALLY WHEN THE PARTICULAR INFORMATION SOUGHT
HAS BEEN OBTAINED, THE APPLICANT MUST PROVIDE ADDITIONAL FACTS SUPPORTING HIS BELIEF
THAT ADDITIONAL INFORMATION OF THE SAME TYPE WILL BE OBTAINED THEREAFTER.

    SUBSECTION (B) ALLOWS THE ATTORNEY GENERAL TO REQUIRE OTHER EXECUTIVE OFFICERS TO
PROVIDE INFORMATION TO SUPPORT THE APPLICATION.

    SUBSECTION (C) ENABLES THE JUDGE TO REQUIRE THE APPLICANT TO FURNISH FURTHER IN-
FORMATION AS MAY BE NECESSARY TO MAKE THE REQUIRED DETERMINATIONS.  IT PARALLELS EX-
ISTING LAW, 18 U.S.C. SECTION 2518(2).  SUCH ADDITIONAL **47 PROFFERS WOULD, OF
COURSE, BE MADE PART OF THE RECORD AND WOULD BE SUBJECT TO THE SECURITY SAFEGUARDS
APPLIED TO THE APPLICATION AND ORDER.


                              SECTION 2525


    SUBSECTION (A) OF THIS SECTION IS PATTERNED AFTER 18 U.S.C. SECTION 2518(3) AND
SPECIFIES THE FINDINGS THE JUDGE MUST MAKE BEFORE HE GRANTS AN ORDER APPROVING THE
USE OF ELECTRONIC SURVEILLANCE FOR FOREIGN INTELLIGENCE PURPOSES.  WHILE THE ISSU-
ANCE OF AN ORDER IS MANDATORY IF THE JUDGE FINDS THAT ALL OF THE REQUIREMENTS OF
THIS SECTION ARE MET, THE JUDGE HAS THE DISCRETIONARY POWER TO MODIFY THE ORDER
SOUGHT, SUCH AS WITH REGARD TO THE PERIOD OF AUTHORIZATION (EXCEPT WHERE THE SPECIAL
CLASS OF FOREIGN POWERS IS THE TARGET) OR THE MINIMIZATION PROCEDURES TO BE FOL-
LOWED.

    PARAGRAPH (1) OF THIS SUBSECTION REQUIRES THE JUDGE TO FIND THAT THE PRESIDENT HAS
AUTHORIZED THE ATTORNEY GENERAL TO APPROVE SUCH APPLICATIONS.

    PARAGRAPH (2) REQUIRES THE JUDGE TO FIND THAT THE ATTORNEY GENERAL HAS APPROVED
THE APPLICATION BEING SUBMITTED AND THAT THE APPLICATION HAS BEEN MADE BY A FEDERAL
OFFICER.

    PARAGRAPH (3) REQUIRES A FINDING THAT THERE IS 'PROBABLE CAUSE' TO BELIEVE THAT
THE TARGET OF THE ELECTRONIC SURVEILLANCE IS A FOREIGN POWER OR AN AGENT OF A FOR-
EIGN POWER AND THAT THE FACILITIES OR PLACE AT WHICH THE SURVEILLANCE IS DIRECTED
ARE BEING USED OR ARE ABOUT TO BE USED BY THAT POWER OR AGENT.

    IN DETERMINING WHETHER PROBABLE CAUSE EXISTS UNDER THIS SECTION, THE COURT MUST
CONSIDER THE SAME REQUISITE ELEMENTS WHICH GOVERN SUCH DETERMINATIONS IN THE TRADI-
TIONAL CRIMINAL CONTEXT.  SUCH ELEMENTS INCLUDE, FOR EXAMPLE, THE ISSUE OF ANY IN-
FORMANT'S RELIABILITY, THE CIRCUMSTANCES UNDER WHICH THE INFORMANT WAS ABLE TO LEARN
ABOUT THE ALLEGED ACTIVITY OF THE INDIVIDUAL WHO IS THE SUBJECT OF THE WARRANT, THE

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**


LENGTH OF TIME WHICH HAS PASSED SINCE THE INFORMATION RELIED UPON WAS **\*\*3949** AC-
QUIRED, AND THE DEGREE TO WHICH INFORMATION CORROBORATING AN INFORMANT MUST RELATE
TO THE ESSENTIAL CONDUCT ON WHICH THE APPLICATION IS PREMISED AND NOT MERELY TO IN-
CIDENTAL DETAILS.

   IN ADDITION, IN ORDER TO FIND 'PROBABLE CAUSE' TO BELIEVE THE SUBJECT OF THE SUR-
VEILLANCE IS AN 'AGENT OF A FOREIGN POWER' UNDER SUBSECTION 2521(B) (2)(A)(II),
(III), OR (B), THE JUDGE MUST, OF COURSE, FIND THAT THE GOVERNMENT HAS ESTABLISHED
PROBABLE CAUSE THAT EACH AND EVERY ELEMENT OF THAT STATUS EXISTS.  FOR EXAMPLE, IF A
UNITED STATES CITIZEN OR RESIDENT ALIEN IS ALLEGED TO BE ACTING ON BEHALF OF A FOR-
EIGN ENTITY, THE JUDGE MUST FIRST FIND PROBABLE CAUSE TO BELIEVE THAT THE ENTITY IS
A 'FOREIGN POWER' AS DEFINED IN SECTION 2521.  THERE MUST ALSO BE PROBABLE CAUSE TO
BELIEVE THE PERSON IS ACTING FOR OR ON BEHALF OF THAT FOREIGN POWER AND PROBABLE
CAUSE TO BELIEVE THAT THE EFFORTS UNDERTAKEN BY THE PERSON ON BEHALF OF THE FOREIGN
POWER CONSTITUTE SABOTAGE, TERRORISM OR OTHER PROSCRIBED ACTIVITIES AS DEFINED IN
SECTION 2521.

   SIMILAR FINDINGS OF PROBABLE CAUSE ARE REQUIRED FOR EACH ELEMENT NECESSARY TO ES-
TABLISH THAT A UNITED STATES CITIZEN IS CONSPIRING WITH OR AIDING AND ABETTING
SOMEONE ENGAGED IN SABOTAGE, TERRORISM, OR CLANDESTINE INTELLIGENCE ACTIVITIES AT
THE DIRECTION OF A FOREIGN POWER.

   A JUDICIAL DETERMINATION THAT A PERSON IS AN AGENT OF A FOREIGN POWER AS DEFINED
IN SECTION 2521(B) (2) (B) (III) REQUIRES OTHER FINDINGS: **\*48** THAT THE PERSON IS
ACTING PURSUANT TO THE DIRECTION OF A FOREIGN INTELLIGENCE SERVICE OR NETWORK; THAT
THE PERSON IS KNOWINGLY COLLECTING OR TRANSMITTING INFORMATION OR MATERIAL TO THAT
SERVICE OR NETWORK IN A COVERT MANNER; AND THAT THE CIRCUMSTANCES SURROUNDING THE
ACTIVITY TAKEN TOGETHER ARE SO COMPELLING THAT THEY INDICATE THAT THE INFORMATION OR
MATERIAL TRANSMITTED TO THE NETWORK HARM THE SECURITY OF THE UNITED STATES, OR THAT
LACK OF KNOWLEDGE OF THE COLLECTION OR TRANSMISSION WOULD HARM OUR NATIONAL SECUR-
ITY.  THUS, THE NATURE OF THE ACTIVITY, ITS RELATIONSHIP TO THE NATIONAL SECURITY,
AND THE STATUS OF THE TARGET ARE ALL VITAL TO THE JUDICIAL DETERMINATION.  THE RE-
QUIRED FINDING MUST BE MADE BY THE JUDGE, ON THE BASIS OF THE INFORMATION AND EX-
PLANATION PROVIDED BY THE GOVERNMENT.  IN ORDER TO DETERMINE WHETHER THE REQUISITE
PROBABLE CAUSE HAS BEEN ESTABLISHED, THE JUDGE MAY REQUEST SUCH ADDITIONAL INFORMA-
TION AS IS NECESSARY IN LIGHT OF THE FACTS AND CIRCUMSTANCES TO MAKE THE REQUIRED
DETERMINATION.

   PARAGRAPH (4) REQUIRES THE JUDGE TO FIND THAT THE PROCEDURES DESCRIBED IN THE AP-
PLICATION TO MINIMIZE THE ACQUISITION, RETENTION, AND DISSEMINATION OF CERTAIN IN-
FORMATION OR COMMUNICATIONS RELATING TO UNITED STATES CITIZENS OR LAWFUL RESIDENT
ALIENS FIT THE DEFINITION OF MINIMIZATION PROCEDURES.  THE COMMITTEE CONTEMPLATES
THAT THE COURT WOULD GIVE THESE PROCEDURES MOST CAREFUL CONSIDERATION.  IF IT IS NOT
CONVINCED THAT THEY WILL BE EFFECTIVE, THE APPLICATION SHOULD BE DENIED OR THE PRO-
CEDURES MODIFIED.  THE COMMITTEE REALIZES THAT TOTAL MINIMIZATION MAY NOT BE POS-
SIBLE. THEREFORE, THE BILL'S REQUIREMENT IS PHRASED IN TERMS OF MINIMIZATION PROCED-
URES BEING 'REASONABLY DESIGNED.'  THUS, FOR EXAMPLE, WHERE IRRELEVANT INFORMATION
CANNOT BE ERASED FROM PART OF A TAPE.  IN ADDITION, WHERE IT CANNOT IMMEDIATELY BE
DETERMINED WHETHER A CERTAIN PIECE OF INFORMATION IS IRRELEVANT, MINIMIZATION PRO-
CEDURES SHOULD REQUIRE THAT WITHIN A SPECIFIED TIME SUCH A DETERMINATION BE MADE AND
THE IRRELEVANT MATTER EXPUNGED.

                      © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*\*3950** PARAGRAPH (5) REQUIRES THAT THE JUDGES FIND THAT THE APPLICATION CONTAINS
THE DESCRIPTION AND CERTIFICATION OR CERTIFICATIONS SPECIFIED IN SECTION 2524(A)(7).
IF THE APPLICATION MEETS THE REQUIREMENT OF THOSE SECTIONS, THE COURT IS NOT PERMIT-
TED TO SUBSTITUTE ITS JUDGMENT OF THOSE SECTIONS, THE COURT IS NOT PERMITTED TO SUB-
STITUTE ITS JUDGMENT FOR THAT OF THE EXECUTIVE BRANCH OFFICIALS, EXCEPT WHERE A
UNITED STATES PERSON IS THE TARGET OF A SURVEILLANCE.  IN SUCH A CASE, THE JUDGE
MUST REVIEW THE CERTIFICATIONS TO DETERMINE WHETHER THEY ARE CLEARLY ERRONEOUS. THIS
AUTHORITY OF THE COURT TO 'LOOK BEHIND' THE CERTIFICATIONS AND REJECT THEM IF
'CLEARLY ERRONEOUS' IS RECOGNIZED BY THE COMMITTEE AS A MAJOR IMPROVEMENT OVER S.
3197 (WHICH DID NOT PROVIDE FOR ANY JUDICIAL REVIEW OF THE CERTIFICATIONS.) THE
'CLEARLY ERRONEOUS ' STANDARD OF REVIEW IS NOT, OF COURSE, COMPARABLE TO A PROBABLE
CAUSE FINDING BY THE JUDGE.  NEVERTHELESS, S. 1566 DOES NOT PROVIDE A WORKABLE PRO-
CEDURE FOR JUDICIAL REVIEW (AND POSSIBLE REJECTION) OF EXECUTIVE BRANCH CERTIFICA-
TIONS.

DESPITE THE FACT THAT THE COURT IS NOT ALLOWED TO 'LOOK BEHIND' THE CERTIFICATION
IN CASES NOT INVOLVING UNITED STATES PERSONS THERE ARE SEVERAL CHECKS AGAINST THE
POSSIBILITY OF ARBITRARY EXECUTIVE ACTION.  FIRST, THE COURT, NOT THE EXECUTIVE
BRANCH, MAKES THE FINDING OF WHETHER PROBABLE CAUSE EXISTS THAT THE TARGET OF SUR-
VEILLANCE IS A FOREIGN POWER OR ITS AGENT.  IT IS THE FINDING THAT CONSTITUTES A
FUNDAMENTAL **\*49** SAFEGUARD FOR THE CIVIL LIBERTIES OF THE INDIVIDUAL.  IT IS ALSO AN
EFFECTIVE EXTERNAL CONTROL ON ARBITRARY EXECUTIVE ACTION.  SECOND, THE CERTIFICATION
PROCEDURE ASSURES WRITTEN ACCOUNTABILITY WITHIN THE EXECUTIVE BRANCH FOR THE DE-
CISION MADE TO ENGAGE IN SUCH SURVEILLANCE.  THIS CONSTITUTES AN INTERNAL CHECK ON
EXECUTIVE BRANCH ARBITRARINESS.

MOREOVER, IT SHOULD BE NOTED THAT IF THE DESCRIPTION AND CERTIFICATION DO NOT
FULLY COMPLY WITH SECTIONS 2524(A) (7), THEY CAN AND MUST BE REJECTED BY THE COURT.
THUS, THE COURT COULD INVALIDATE THE CERTIFICATION IF IT WERE NOT PROPERLY SIGNED BY
THE PRESIDENT'S DESIGNEE, DID NOT DESIGNATE THE TYPE OF INFORMATION SOUGHT, OR DID
NOT STATE THAT THE INFORMATION SOUGHT IS FOREIGN INTELLIGENCE INFORMATION, THAT THE
PURPOSE OF THE SURVEILLANCE IS TO OBTAIN FOREIGN INTELLIGENCE INFORMATION, AND THAT
SUCH INFORMATION CANNOT FEASIBLY BE OBTAINED BY NORMAL INVESTIGATIVE TECHNIQUES.
FURTHER, IF THE CERTIFICATION DID NOT PRESENT AN EXPLANATION OF WHY THE INFORMATION
SOUGHT IS FOREIGN INTELLIGENCE INFORMATION WHICH CANNOT BE OBTAINED THROUGH NORMAL
INVESTIGATIVE TECHNIQUES, THE JUDGE COULD (IF SURVEILLANCE WAS NOT TARGETED AGAINST
THE SPECIAL CLASS OF FOREIGN POWERS) REJECT THE APPLICATION OR DEFER APPROVAL UNTIL
AN ADEQUATE CERTIFICATION WAS SUPPLIED.

SUBSECTION (B) SPECIFIES WHAT THE ORDER APPROVING THE ELECTRONIC SURVEILLANCE MUST
CONTAIN.  IT MUST INCLUDE THE IDENTITY OR A DESCRIPTION OF THE PERSON OR PERSONS
TARGETED BY THE ELECTRONIC SURVEILLANCE.  THE ORDER MUST SPECIFY THE PLACE OR FACIL-
ITIES AGAINST WHICH THE SURVEILLANCE IS DIRECTED.  THE ORDER MUST ALSO SPECIFY THE
TYPE OF INFORMATION SOUGHT, OR WHERE THE SPECIAL CLASS OF FOREIGN POWERS IS THE TAR-
GET, A SPECIFIC DEFINITION OF 'FOREIGN INTELLIGENCE INFORMATION.'  THESE REQUIRE-
MENTS ARE DESIGNED TO SATISFY THE FOURTH AMENDMENT'S REQUIREMENTS THAT WARRANTS DE-
SCRIBE WITH PARTICULARITY AND SPECIFICITY THE PERSON, PLACE, AND OBJECTS TO BE
SEARCHED OR SEIZED.  THE ORDER MUST, IN ADDITION TO THE FOURTH AMENDMENT'S REQUIRE-
MENTS, SPECIFY THE MEANS BY WHICH THE SURVEILLANCE WILL BE EFFECTED (WHERE THE TAR-
GET IS ONE OF THE SPECIAL **\*\*3951** CLASS OF FOREIGN POWERS, HOWEVER, ONLY A SPECIFIC

DEFINITION OF 'ELECTRONIC SURVEILLANCE' IS REQUIRED).  IN ADDITION, THE ORDER MUST
SPECIFY THE PERIOD OF TIME DURING WHICH THE SURVEILLANCE IS APPROVED.

THE ORDER SHALL DIRECT THAT MINIMIZATION PROCEDURES WILL BE FOLLOWED.  IT IS IN-
TENDED THAT THE COURT SHALL MONITOR COMPLIANCE WITH THE MINIMIZATION PROCEDURES IN
MUCH THE SAME WAY AS HAS BEEN DONE PURSUANT TO CHAPTER 119.  FAILURE TO ABIDE BY THE
MINIMIZATION PROCEDURES MAY BE TREATED AS CONTEMPT OF COURT.

THE ORDER MAY ALSO DIRECT THAT A COMMON CARRIER, LANDLORD, CUSTODIAN, CONTRACTOR
OR OTHER SPECIFIED PERSON FURNISH INFORMATION, FACILITIES OR TECHNICAL ASSISTANCE
NECESSARY TO ACCOMPLISH THE ELECTRONIC SURVEILLANCE SUCCESSFULLY AND WITH A MINIMUM
OF INTERFERENCE TO THE SERVICES PROVIDED BY SUCH PERSON TO THE TARGET OF THE SUR-
VEILLANCE.  IF THIS IS DONE, THE COURT SHALL DIRECT THAT THE PERSON RENDERING THE
ASSISTANCE MAINTAIN UNDER SECURITY PROCEDURES APPROVED BY THE ATTORNEY GENERAL AND
THE DIRECTOR OF THE CENTRAL INTELLIGENCE AGENCY ANY RECORDS CONCERNING THE SURVEIL-
LANCE WHICH THE PERSON WISHES TO RETAIN.  IF THE JUDGE DIRECTS SUCH ASSISTANCE, HE
SHALL ALSO DIRECT THAT THE APPLICANT COMPENSATE THE PERSON FOR SUCH ASSISTANCE.
THESE PROVISIONS GENERALLY PARALLEL 18 U.S.C. 2518(4).

THIS DIRECTIVE PROVISION MUST BE READ IN CONJUNCTION WITH THE BILL'S CONFORMING
AMENDMENT TO 18 U.S.C. 2511(2) (A)(II), CONTAINED IN **50 SECTION 4(B) OF THIS BILL.
THAT AMENDMENT REQUIRES THAT BEFORE A COMMUNICATION COMMON CARRIER OR ITS AGENT
PROVIDES SUCH INFORMATION, FACILITIES OR TECHNICAL ASSISTANCE TO AN INVESTIGATIVE OR
LAW ENFORCEMENT OFFICER, THAT OFFICER IS REQUIRED TO FURNISH TO THE CARRIER EITHER
AN ORDER SIGNED BY THE AUTHORIZING JUDGE CERTIFYING THAT A COURT ORDER DIRECTING
SUCH ASSISTANCE HAS BEEN ISSUED OR, IN THE CASE OF SURVEILLANCE UNDERTAKEN UNDER
CHAPTER 119 OR 120 IN WHICH A PRIOR ORDER IS NOT REQUIRED, SUCH AS AN EMERGENCY SUR-
VEILLANCE, A CERTIFICATION UNDER OATH BY THE OFFICER REQUESTING THE ASSISTANCE THAT
THE APPLICABLE STATUTORY REQUIREMENTS HAVE BEEN MET.

SUBSECTION (C) ALLOWS AN ORDER APPROVING ELECTRONIC SURVEILLANCE UNDER THIS
CHAPTER AGAINST ANY PERSON OR ENTITY OTHER THAN A SPECIAL FOREIGN POWER AS DEFINED
IN SECTION 2521 (B) (1) (A), (B), OR (C) TO BE EFFECTIVE FOR THE PERIOD NECESSARY TO
ACHIEVE ITS PURPOSES OR FOR 90 DAYS, WHICHEVER IS LESS.  IN THE COMMITTEE'S VIEW 90
DAYS IS THE MAXIMUM LENGTH OF TIME DURING WHICH A SURVEILLANCE OF THESE PERSONS OR
ENTITIES FOR FOREIGN INTELLIGENCE PURPOSES SHOULD CONTINUE WITHOUT NEW JUDICIAL
SCRUTINY.  THIS PERIOD OF TIME IS NOT AS LONG AS SOME HAVE WISHED BUT LONGER THAN
OTHERS DESIRED.  IT IS CONSIDERED TO BE A REASONABLE CONDITION IN THE FOREIGN INTEL-
LIGENCE CONTEXT.  [FN62]

WHEN THE SPECIAL CLASS OF 'OFFICIAL' FOREIGN POWERS IS TARGETED, HOWEVER, THE SUR-
VEILLANCE MAY LAST AS LONG AS ONE YEAR.  MOREOVER, THE EXECUTIVE DETERMINES THE NE-
CESSARY LENGTH OF THE SURVEILLANCE OF THESE SPECIAL FOREIGN POWERS (NOT TO EXCEED
ONE YEAR WITHOUT RE-AUTHORIZATION), AND THIS DETERMINATION IS NOT SUBJECT TO THE
COURT'S REVIEW OR APPROVAL.  AS ALREADY INDICATED, THIS IS A SUBSTANTIAL CHANGE FROM
S. 3197 WHICH HAS PROVOKED WIDESPREAD CRITICISM FROM SOME MEMBERS OF THE COMMITTEE.
THE ADMINISTRATION, HOWEVER, OFFERS CONSIDERABLE ARGUMENTS FOR THE CHANGE:  FIRST,
THE DETERMINATION THAT AN ENTITY IS WITHIN THE DEFINITION OF SECTION 2521(B) (1)
(A), (B), (C) IS NOT LIKELY TO BE ERRONEOUS.  UNLIKE A PERSON SUSPECTED OF BEING A
FOREIGN **3952 AGENT, WHETHER AN ENTITY FITS ONE OF THE THREE SPECIAL CLASSES OF
FOREIGN POWERS-- SUCH AS A FOREIGN EMBASSY OR CONSULATE-- WILL USUALLY BE SELF-
EVIDENT. SECOND, THE LIKELIHOOD OF OBTAINING VALUABLE FOREIGN INTELLIGENCE INFORMA-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**

TION FROM THESE ENTITIES IS VERY HIGH.  THIRD, SURVEILLANCE AGAINST SUCH OFFICIAL
POWERS, BECAUSE OF THEIR CONTINUING PRESENCE IN THE UNITED STATES, IS LIKELY TO BE
REQUIRED FOR MUCH LONGER PERIODS OF TIME.  ALTHOUGH SUCH SURVEILLANCE COULD BE AC-
COMPLISHED BY SUCCESSIVE 90 DAY COURT RENEWALS, THE ADMINISTRATION CITES THE GENERA-
TION OF FOUR TIMES THE AMOUNT OF REQUIRED PAPERWORK WITH THE ATTENDANT INCREASED
POSSIBILITY OF A COMPROMISE AS WELL AS THE ADMINISTRATIVE BURDEN WHICH WOULD RESULT,
AS REASONS FOR EXEMPTING THESE FOREIGN POWERS FROM THE 90 DAY LIMITATION.  GIVEN
THESE CONSIDERATIONS AND THE UNIQUE STATUS OF THE TARGETS INVOLVED, THE ADMINISTRA-
TION FEELS THAT ONE YEAR IS NOT AN EXCESSIVE PERIOD OF TIME.

  OTHERS DISAGREE, MAINTAINING THAT EXCESSIVE PAPERWORK AND ADMINISTRATIVE INCON-
VENIENCE ARE NOT SUFFICIENT REASONS TO EXTEND SUCH SURVEILLANCE TO AS LONG AS ONE
YEAR WITHOUT JUDICIAL APPROVAL (AND WITH THE POSSIBILITY THAT THE ATTORNEY GENERAL
WILL NOT EVEN PERSONALLY BE REVIEWING THE FOREIGN POWER WARRANT APPLICATION). NEVER-
THELESS, THE **51 COMMITTEE HAS ACCEDED TO THE ADMINISTRATION'S POSITION AND HAS
GRANTED THE CHANGE FROM S. 3197 IN THE LIMITED SITUATION OF SPECIAL FOREIGN POWERS
AS DEFINED IN SECTION 2521 (B)(1) (A), (B), OR (C).

  IN COMING TO THIS CONCLUSION, HOWEVER, THE COMMITTEE EMPHASIZES THAT, IN ORDER FOR
UNITED STATES CITIZENS TO BE ADEQUATELY PROTECTED IN SUCH CASES, THIS PROVISION MUST
NOT BE INTERPRETED TO BAR JUDICIAL REVIEW OF THE EFFECTIVENESS OF THE MINIMIZATION
PROCEDURES.  UNITED STATES CITIZENS MAY BE OVERHEARD TALKING TO EMPLOYEES OF SUCH A
'SPECIAL' FOREIGN POWER.  AS ALREADY INDICATED, THE COURT HAS THE POWER TO REVIEW
MINIMIZATION DURING THE COURSE OF THE SURVEILLANCE AS IT DOES NOW UNDER CHAPTER 119.
THIS APPLIES REGARDLESS OF THE TYPE OF TARGET AND REMAINS AN IMPORTANT PROTECTION.

  AS UNDER CHAPTER 119, EXTENSIONS OF AN ORDER MAY BE SOUGHT AND GRANTED ON THE SAME
BASIS AS THE ORIGINAL ORDER.  A NEW APPLICATION, INCLUDING A NEW CERTIFICATION PUR-
SUANT TO SECTION 2524 (A) (7), WOULD THEREFORE BE REQUIRED, UPDATING THE INFORMATION
PREVIOUSLY PROVIDED.  BEFORE THE EXTENSION SHOULD BE GRANTED, HOWEVER, THE COURT
WOULD AGAIN HAVE TO FIND PROBABLE CAUSE THAT THE TARGET IS A FOREIGN POWER OR ITS
AGENT.  TO AID THE JUDGE IN MAKING THIS DETERMINATION ANEW, IT IS EXPECTED THAT THE
COURT WOULD EVALUATE THE SUCCESS OR FAILURE OF ANY PREVIOUS SURVEILLANCES AND THE
FACTS AND CIRCUMSTANCES SURROUNDING SUCH SURVEILLANCE.  THE COURT, HOWEVER, IN CON-
SIDERING A RENEWAL INVOLVING A FOREIGN POWER AS DEFINED IN SECTION 2521 (B)(1) (A),
(B), OR (C), CANNOT ORDER THE GOVERNMENT TO SUBMIT ANY INFORMATION ACTUALLY OBTAINED
AS A RESULT OF THE ORIGINAL SURVEILLANCE OR PREVIOUS EXTENSION.  THIS CHARGE FROM S.
3197 WAS MADE AT THE REQUEST OF THE ADMINISTRATION AND REFLECTS ITS CONCERN WITH THE
SENSITIVE NATURE OF THE INFORMATION OBTAINED FROM SPECIAL FOREIGN POWERS.

  SUBSECTION (D) AUTHORIZES THE ATTORNEY GENERAL TO APPROVE AN EMERGENCY ELECTRONIC
SURVEILLANCE PRIOR TO JUDICIAL AUTHORIZATION UNDER CERTAIN LIMITED CIRCUMSTANCES.
FIRST, THE ATTORNEY GENERAL MUST DETERMINE **3953 THAT AN EMERGENCY SITUATION EXISTS
WHICH REQUIRES THE EMPLOYMENT OF ELECTRONIC SURVEILLANCE BEFORE AN ORDER AUTHORIZING
SUCH SURVEILLANCE CAN WITH DUE DILIGENCE BE OBTAINED.  IN ADDITION, THE FACTUAL
BASIS FOR THE ISSUANCE OF AN ORDER UNDER THIS CHAPTER MUST BE PRESENT.

  THE PROCEDURES UNDER WHICH SUCH AN EMERGENCY SURVEILLANCE IS AUTHORIZED ARE CON-
SIDERABLY STRICTER THAN THOSE OF THE COMPARABLE PROVISION IN CHAPTER 119, 18 U.S.C.
SECTION 2518 (7).  FIRST, ONLY THE ATTORNEY GENERAL (AS DEFINED) MAY AUTHORIZE SUCH
EMERGENCY SURVEILLANCE, WHEREAS IN 18 U.S.C. SECTION 2518(7) THE ATTORNEY GENERAL
MAY DESIGNATE 'ANY INVESTIGATIVE OR LAW ENFORCEMENT OFFICER ' TO AUTHORIZE EMERGENCY

INTERCEPTIONS UNDER THAT SUBSECTION.  SECOND, THE ATTORNEY GENERAL OR HIS DESIGNEE
MUST CONTEMPORANEOUSLY NOTIFY ONE OF THE DESIGNATED JUDGES THAT AN EMERGENCY SUR-
VEILLANCE HAS BEEN AUTHORIZED.  THERE IS NO COMPARABLE REQUIREMENT IN 18 U.S.C. SEC-
TION 2518 (7).  THIRD, AN APPLICATION FOR AN ORDER APPROVING THE SURVEILLANCE MUST
BE MADE TO THAT JUDGE WITHIN 24 HOURS; 18 U.S.C. SECTION 2518(7).  THIRD, AN APPLIC-
ATION FOR AN ORDER APPROVING THE SURVEILLANCE MUST BE MADE TO THAT JUDGE WITHIN 24
HOURS; 18 U.S.C. SECTION 2518(7) REQUIRES THE APPLICATION TO BE MADE WITHIN 48
HOURS.  FOURTH, THE EMERGENCY SURVEILLANCE CANNOT CONTINUE BEYOND 24 HOURS WITHOUT
THE ISSUANCE OF AN ORDER; UNDER 18 U.S.C. SECTION 2418(7) THE EMERGENCY SURVEILLANCE
MAY CONTINUE INDEFINITELY UNTIL THE JUDGE DENIES THE APPLICATION.  FIFTH, THE ATTOR-
NEY GENERAL MUST ORDER THAT MINIMIZATION PROCEDURES REQUIRED **\*52** BY THIS CHAPTER FOR
THE ISSUANCE OF A JUDICIAL ORDER BE FOLLOWED DURING THE PERIOD OF THE EMERGENCY SUR-
VEILLANCE.  THERE IS NO COMPARABLE PROVISION UNDER 18 U.S.C. SECTION 2518(7).  THIS
LAST PROVISION IS DESIGNED TO ENSURE THAT AS MUCH AS POSSIBLE BE DONE TO ELIMINATE
THE ACQUISITION, RETENTION AND DISSEMINATION OF INFORMATION WHICH IS NOT FOREIGN IN-
TELLIGENCE INFORMATION.  THE COMMITTEE'S INTENT IS TO PLACE THE ATTORNEY GENERAL IN
THE ROLE OF THE COURT DURING THE 24 HOUR EMERGENCY PERIOD.  HE MUST EXAMINE THE MIN-
IMIZATION PROCEDURES AS THE COURT WOULD NORMALLY DO UNDER PARAGRAPH (A)(4) OF THIS
SECTION, AND ORDER THAT THE APPROPRIATE PROCEDURES BE FOLLOWED JUST AS IF HE WERE
THE COURT GRANTING A JUDICIAL ORDER.

 THE COMMITTEE WISHES TO EMPHASIZE THAT THE APPLICATION MUST BE MADE FOR JUDICIAL
APPROVAL EVEN IF THE SURVEILLANCE IS TERMINATED WITHIN THE TWENTY-FOUR HOUR PERIOD
AND REGARDLESS OF WHETHER THE INFORMATION SOUGHT IS OBTAINED. THIS REQUIREMENT EN-
SURES THAT ALL EMERGENCY SURVEILLANCE INITIATED PURSUANT TO THIS CHAPTER WILL RE-
CEIVE JUDICIAL REVIEW AND THAT JUDICIAL APPROVAL OR DENIAL WILL BE FORTHCOMING NUNC
PRO TUNC.  THUS, THE TERMINATION OF AN EMERGENCY SURVEILLANCE BEFORE THE EXPIRATION
OF THE TWENTY-FOUR HOUR PERIOD SHALL NOT BE A BASIS FOR THE COURT FAILING TO ENTER
AN ORDER APPROVING OR DISAPPROVING THE SUBSEQUENT APPLICATION.  IT IS NECESSARY FOR
BOTH THE DEPARTMENT OF JUSTICE AND CONGRESSIONAL OVERSIGHT COMMITTEES TO HAVE AVAIL-
ABLE A COMPLETE RECORD BOTH OF THE BASES FOR SUCH EMERGENCY SURVEILLANCE AUTHORIZA-
TION AND OF THE JUDICIAL DETERMINATIONS OF THEIR LEGALITY UNDER THE STATUTORY STAND-
ARD.

 THIS PROVISION FOR EMERGENCY AUTHORIZATION OF SURVEILLANCE BY THE ATTORNEY GENERAL
MAY NOT BE UTILIZED PENDING AN APPEAL UNDER SECTION 2523, FOLLOWING THE DENIAL OF AN
APPLICATION FOR A JUDICIAL ORDER.  UNDER SUCH CIRCUMSTANCES, THE ATTORNEY GENERAL
COULD NOT REASONABLY DETERMINE THAT 'THE FACTUAL BASIS FOR THE ISSUANCE OF AN ORDER
UNDER THIS CHAPTER TO APPROVE SUCH SURVEILLANCE EXISTS, ' AS REQUIRED BY THIS SUB-
SECTION.

 **\*\*3954** IF THE APPLICATION IS SUBSEQUENTLY DENIED, OR IF THE SURVEILLANCE IS TER-
MINATED WITHOUT AN ORDER EVENTUALLY BEING SOUGHT (WHICH, AS ALREADY INDICATED, WOULD
CONSTITUTE AN UNLAWFUL ACT UNDER THIS SUBSECTION), NO INFORMATION OBTAINED OR EVID-
ENCE DERIVED FROM THE SURVEILLANCE SHALL BE RECEIVED, USED OR DISCLOSED BY THE GOV-
ERNMENT IN ANY TRIAL HEARING OR OTHER PROCEEDING BEFORE ANY COURT, GRAND JURY, DE-
PARTMENT, OFFICE, AGENCY, REGULATORY BODY, LEGISLATIVE COMMITTEE OR OTHER FEDERAL,
STATE OR LOCAL AUTHORITY. THIS EXCLUSIONARY PROVISION IS DESIGNED TO BE ABSOLUTE.

 A DENIAL OF THE APPLICATION MAY BE REVIEWED IN THE SAME MANNER AS A DENIAL OF AN
ORIGINAL APPLICATION UNDER SECTION 2523.

                    © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SECTION 2526

   THIS SECTION SETS FORTH THE PERMISSIBLE USES WHICH MAY BE MADE OF INFORMATION AC-
QUIRED BY MEANS OF ELECTRONIC SURVEILLANCE CONDUCTED PURSUANT TO THIS CHAPTER.  THE
FACT THAT EFFECTIVE MINIMIZATION MAY BE MORE DIFFICULT IN THE FOREIGN INTELLIGENCE
AREA THAN IN THE MORE TRADITIONAL CRIMINAL AREA, AND THAT THIS CHAPTER CONTAINS CER-
TAIN LESS RESTRICTIVE PROCEDURES THAN DOES CHAPTER 119 (FOR EXAMPLE, 90 DAYS OF SUR-
VEILLANCE PER ORDER RATHER THAN 30 DAYS), MANDATES THAT THE USES TO BE MADE OF THE
INFORMATION ACQUIRED BY MEANS OF THIS CHAPTER BE CAREFULLY **53 RESTRICTED. THIS SEC-
TION, THEREFORE, PLACES MORE STRINGENT RESTRICTIONS ON USE AND DISSEMINATION THAN
DOES THE CORRESPONDING PROVISION OF TITLE III, 18 U.S.C. 2517.  THE EXTENT TO WHICH
THE GOVERNMENT SHOULD BE REQUIRED TO SURRENDER TO THE PARTIES IN A CRIMINAL TRIAL
THE UNDERLYING DOCUMENTATION USED TO JUSTIFY ELECTRONIC SURVEILLANCE RAISES DELICATE
PROBLEMS AND COMPETING INTERESTS.  ON THE ONE HAND, BROAD RIGHTS OF ACCESS TO THE
DOCUMENTATION AND SUBSEQUENT INTELLIGENCE INFORMATION CAN THREATEN THE SECRECY NE-
CESSARY TO EFFECTIVE INTELLIGENCE PRACTICES.  HOWEVER, THE DEFENDANT'S CONSTITUTION-
AL GUARANTEE OF A FAIR TRIAL COULD SERIOUSLY BE UNDERCUT IF HE IS DENIED THE MATERI-
ALS NEEDED TO PRESENT A PROPER DEFENSE. THE COMMITTEE BELIEVES THAT A JUST, EFFECT-
IVE BALANCE HAS BEEN STRUCK IN THIS SECTION.
   SUBSECTION (A) REQUIRES THAT INFORMATION CONCERNING UNITED STATES PERSONS ACQUIRED
FROM ELECTRONIC SURVEILLANCE CONDUCTED PURSUANT TO THIS CHAPTER MAY BE USED BY FED-
ERAL OFFICERS AND EMPLOYEES ONLY FOR PURPOSES RELATING TO THE ABILITY OF THE UNITED
STATES TO PROTECT ITSELF AGAINST ACTUAL OR POTENTIAL ATTACK OR OTHER GRAVE HOSTILE
ACTS OF A FOREIGN POWER OR FOREIGN AGENT; TO PROVIDE FOR THE NATIONAL DEFENSE OR SE-
CURITY OF THE NATION; TO PROVIDE FOR THE CONDUCT OF FOREIGN AFFAIRS; TO PROTECT
AGAINST THE TERRORIST OR SABOTAGE ACTIVITIES OF A FOREIGN POWER OR AN AGENT OF A
FOREIGN POWER; TO PROTECT AGAINST THE CLANDESTINE INTELLIGENCE ACTIVITIES OF AN IN-
TELLIGENCE SERVICE OR NETWORK OF A FOREIGN POWER OR AN AGENT OF A FOREIGN POWER; OR
FOR THE ENFORCEMENT OF THE CRIMINAL LAW.  THUS THE LAWFUL USES OF FOREIGN INTELLI-
GENCE INFORMATION CONCERNING UNITED STATES CITIZENS AND RESIDENT ALIENS GATHERED
PURSUANT TO THIS CHAPTER ARE CAREFULLY RESTRICTED TO ACTUAL FOREIGN INTELLIGENCE
PURPOSES AND THE ENFORCEMENT OF THE CRIMINAL LAW.
   A MAJOR CHANGE FROM S. 3197 HAS, HOWEVER, BEEN MADE IN THIS SECTION AT THE INSIST-
ENCE OF THE ADMINISTRATION.  WHEREAS IN S. 3197 THIS SECTION APPLIED TO ALL PERSONS,
WHETHER OR NOT THEY WERE AMERICAN CITIZENS, S. 1566 LIMITS THE PROTECTIONS OF SEC-
TION 2526(A) TO UNITED STATES PERSONS.  INFORMATION CONCERNING NON-UNITED STATES
PERSONS **3955 (WHO INDEED MAY BE FOREIGNERS NOT EVEN IN THE UNITED STATES) IS NOT
SUBJECT TO THE SAME RESTRICTIONS AS INFORMATION CONCERNING UNITED STATES PERSONS.
FOR EXAMPLE, THE INFORMATION OBTAINED MIGHT BE USED TO DEPORT AN ILLEGAL ALIEN EVEN
THOUGH SUCH USE OF THE INFORMATION IS NOT FOR FOREIGN INTELLIGENCE PURPOSES AND IS
NOT FOR THE PURPOSE OF ENFORCING THE CRIMINAL LAW.
   THIS DIFFERENTIATION BETWEEN UNITED STATES PERSONS AND OTHER PERSONS WAS SUFFI-
CIENTLY TROUBLESOME TO THE COMMITTEE TO RESULT IN AN IMPORTANT AMENDMENT TO SECTION
2526(A).  BY LIMITING THE SUBSECTION TO UNITED STATES PERSONS, THE POSSIBILITY EXIS-
TED THAT INFORMATION OBTAINED BY SURVEILLANCE COULD BE USED IN A VARIETY OF ILLEGAL
WAYS AGAINST, FOR EXAMPLE, FOREIGN VISITORS AND STUDENTS. THE COMMITTEE HAS AMENDED
THIS SUBSECTION TO MAKE CLEAR THAT NO INFORMATION ACQUIRED PURSUANT TO THIS CHAPTER

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

MAY BE USED OR DISCLOSED FOR OTHER THAN 'LAWFUL PURPOSES'.  THE COMMITTEE DOES NOT
INTEND NOR DOES THE BILL PERMIT THAT INFORMATION GATHERED ABOUT A FOREIGN VISITOR BE
USED TO BLACKMAIL HIM INTO BECOMING AN AGENT AGAINST HIS COUNTRY.  S. 1566, AS
AMENDED, NOW REQUIRES THAT IN THOSE CASES WHERE THE GOVERNMENT WISHES TO USE FOREIGN
INTELLIGENCE INFORMATION AGAINST NON-UNITED STATES PERSONS, BEYOND THE SPECIFIC PUR-
POSES LISTED IN SECTION 2526(A), IT DO SO IN A LAWFUL MANNER AND FOR LAWFUL PUR-
POSES.

   **\*54** THERE IS NO SPECIFIC RESTRICTION IN THE BILL AS TO WHOM FEDERAL OFFICERS MAY
DISCLOSE INFORMATION CONCERNING UNITED STATES PERSONS ACQUIRED PURSUANT TO THIS
CHAPTER (ALTHOUGH SPECIFIC MINIMIZATION PROCEDURES MIGHT REQUIRE SPECIFIC RESTRIC-
TIONS IN PARTICULAR CASES).  FIRST, THE COMMITTEE BELIEVES THAT DISSEMINATION SHOULD
BE PERMITTED TO STATE AND LOCAL LAW ENFORCEMENT OFFICIALS. IF FEDERAL AGENTS MONIT-
ORING A FOREIGN INTELLIGENCE SURVEILLANCE AUTHORIZED UNDER THIS CHAPTER WERE TO
OVERHEAR INFORMATION RELATING TO A VIOLATION OF STATE CRIMINAL LAW, SUCH AS HOM-
ICIDE, THE AGENTS COULD HARDLY BE EXPECTED TO CONCEAL SUCH INFORMATION FROM THE AP-
PROPRIATE LOCAL OFFICIALS.  SECOND, THE COMMITTEE CAN CONCEIVE OF SITUATIONS WHERE
DISCLOSURE SHOULD BE MADE OUTSIDE OF GOVERNMENT CHANNELS.  FOR EXAMPLE, FEDERAL
AGENTS MAY LEARN OF A TERRORIST PLOT TO KIDNAP A BUSINESS EXECUTIVE.  CERTAINLY IN
SUCH CASES THEY SHOULD BE PERMITTED TO DISCLOSE SUCH INFORMATION TO THE EXECUTIVE
AND HIS COMPANY IN ORDER TO PROVIDE FOR THE EXECUTIVE'S SECURITY.  FINALLY, THE COM-
MITTEE BELIEVES THAT FOREIGN INTELLIGENCE INFORMATION RELATING TO CRIMES, ESPIONAGE
ACTIVITIES, OR THE ACTS AND INTENTIONS OF FOREIGN POWERS MAY, IN SOME CIRCUMSTANCES,
BE APPROPRIATELY DISSEMINATED TO COOPERATING INTELLIGENCE SERVICES OF OTHER NATIONS.
SO LONG AS ALL THE PROCEDURES OF THIS CHAPTER ARE FOLLOWED BY THE FEDERAL OFFICERS,
INCLUDING MINIMIZATION AND THE LIMITATIONS ON DISSEMINATION, THIS COOPERATIVE RELA-
TIONSHIP SHOULD NOT BE TERMINATED BY A BLANKET PROHIBITION ON DISSEMINATION TO FOR-
EIGN INTELLIGENCE SERVICES.  THE COMMITTEE WISHES TO STRESS, HOWEVER, THAT ANY SUCH
DISSEMINATION BE CAREFULLY REVIEWED TO ENSURE THAT THERE IS A SUFFICIENT REASON WHY
DISCLOSURE TO FOREIGN INTELLIGENCE SERVICES IS IN THE INTERESTS OF THE UNITED
STATES.

   DISCLOSURE, IN COMPELLING CIRCUMSTANCES, TO LOCAL OFFICIALS FOR THE PURPOSE OF EN-
FORCING THE CRIMINAL LAW, AND TO FOREIGN INTELLIGENCE SERVICES UNDER THE CIRCUM-
STANCES DESCRIBED ABOVE ARE GENERALLY THE ONLY EXCEPTIONS TO THE RULE THAT DISSEMIN-
ATION SHOULD BE LIMITED TO FEDERAL OFFICIALS.

   **\*\*3956** IT IS RECOGNIZED THAT THESE STRICT REQUIREMENTS ONLY APPLY TO INFORMATION
KNOWN TO CONCERN UNITED STATES PERSONS.  WHERE THE INFORMATION IN THE COMMUNICATION
IS ENCODED OR OTHERWISE NOT KNOWN TO CONCERN UNITED STATES PERSONS, ONLY THE RE-
QUIREMENT THAT THE INFORMATION BE DISCLOSED FOR LAWFUL PURPOSES APPLIES.  THERE IS
NO REQUIREMENT THAT BEFORE DISCLOSURE CAN BE MADE INFORMATION BE DECODED OR OTHER-
WISE PROCESSED TO DETERMINE WHETHER INFORMATION CONCERNING UNITED STATES PERSONS IS
INDEED PRESENT.  OF COURSE, THE RESTRICTIONS ON USE AND DISCLOSURE APPLY TO THE EN-
TIRE GOVERNMENT, SO THAT IF ANY AGENCY RECEIVED CODED INFORMATION FROM THE INTER-
CEPTING AGENCY, WERE IT TO BREAK THE CODE, THE LIMITATIONS ON USE AND DISCLOSURE
WOULD APPLY TO IT.

   SECTION 2526(A) ALSO STATES THAT FOREIGN INTELLIGENCE INFORMATION OBTAINED MAY BE
USED TO ENFORCE THE CRIMINAL LAW 'IF ITS USE OUTWEIGHS THE POSSIBLE HARM TO THE NA-
TIONAL SECURITY.'  THIS NEW LANGUAGE, WHICH DID NOT APPEAR IN S. 3197, STATES THE

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**


OBVIOUS.  THE DEPARTMENT OF JUSTICE ALWAYS HAS THE OPTION OF DECIDING WHETHER TO
PROCEED WITH A CRIMINAL PROSECUTION OR FOREGO IT IN THE INTERESTS OF NATIONAL SECUR-
ITY.  FOR EXAMPLE, THE DEPARTMENT OF JUSTICE MAY DECLINE TO PROSECUTE RATHER THAN
DISCLOSE THE NAMES OF IMPORTANT WITNESSES AND KEY INFORMANTS.  WHETHER TO GO FORWARD
WITH A CRIMINAL PROSECUTION REMAINS IN **55 THE EXCLUSIVE HANDS OF THE EXECUTIVE
BRANCH AND NOTHING IN SECTION 2526(A) CHANGES THAT FACT.

THIS SUBSECTION ALSO NOTES THAT NO OTHERWISE PRIVILEGED COMMUNICATION OBTAINED IN
ACCORDANCE WITH OR IN VIOLATION OF THIS CHAPTER SHALL LOSE ITS PRIVILEGED CHARACTER.
THIS PROVISION IS IDENTICAL TO 18 U.S.C.2517(4) AND IS DESIGNED, LIKE ITS TITLE III
PREDECESSOR, TO CHANGE EXISTING LAW AS TO THE SCOPE AND EXISTENCE OF PRIVILEGED COM-
MUNICATIONS ONLY TO THE EXTENT THAT IT PROVIDES THAT OTHERWISE PRIVILEGED COMMUNICA-
TIONS DO NOT LOSE THEIR PRIVILEGED CHARACTER BECAUSE THEY ARE INTERCEPTED BY A PER-
SON NOT A PARTY TO THE CONVERSATION.

SUBSECTION (B) MUST BE READ IN CONJUNCTION WITH THE MINIMIZATION REQUIREMENTS OF
SECTION 2521 (B) (8) AND WITH THE PRECEDING SUBSECTION (A).  AS PREVIOUSLY NOTED,
THE MINIMIZATION PROCEDURES MANDATED BY THE COURT ARE DESIGNED TO RESTRICT THE AC-
QUISITION OF INFORMATION OBTAINED BY MEANS OF ELECTRONIC SURVEILLANCE TO INFORMATION
RELATED TO FOREIGN INTELLIGENCE.  HOWEVER, EVEN THE MOST THOROUGH MINIMIZATION EF-
FORTS MAY RESULT IN THE ACQUISITION OF SOME INFORMATION WHICH IS NOT FOREIGN INTEL-
LIGENCE INFORMATION.  THIS SUBSECTION STATES THAT SUCH INCIDENTALLY ACQUIRED INFORM-
ATION WHICH IS EVIDENCE OF A CRIME MAY BE RETAINED AND DISCLOSED FOR LAW ENFORCEMENT
PURPOSES.  SUCH DISCLOSURE WOULD, OF COURSE, BE RESTRICTED BY THE PROVISIONS OF SUB-
SECTION (A).

THE REQUIREMENT THAT SUCH CRIMINAL EVIDENCE BE ACQUIRED INCIDENTALLY LOGICALLY
CONNOTES THAT IT MUST BE ACQUIRED LAWFULLY. THIS REQUIRES THAT THERE BE A GOOD FAITH
EFFORT TO MINIMIZE.  [FN63]

THUS FOR EXAMPLE, IF MONITORING AGENTS CHOOSE TO DISREGARD THE MINIMIZATION STAND-
ARDS AND THEREBY ACQUIRE EVIDENCE OF A CRIME AGAINST AN OVERHEARD PARTY WHOSE CON-
VERSATION PROPERLY SHOULD HAVE BEEN MINIMIZED, THAT EVIDENCE WOULD BE ACQUIRED IN
VIOLATION OF THIS CHAPTER AND WOULD PROPERLY BE SUPPRESSED IF OFFERED AT ANY OFFI-
CIAL PROCEEDING.

DISCLOSURE FOR LAW ENFORCEMENT PURPOSES MUST BE ACCOMPANIED BY A STATEMENT THAT
SUCH EVIDENCE, OR ANY INFORMATION DERIVED THEREFROM, **3957 MAY ONLY BE USED IN A
CRIMINAL PROCEEDING WITH THE ADVANCE AUTHORIZATION OF THE ATTORNEY GENERAL.  THIS
PROVISION IS DESIGNED TO ELIMINATE CIRCUMSTANCES IN WHICH A LOCAL PROSECUTOR HAS NO
KNOWLEDGE THAT EVIDENCE WAS OBTAINED THROUGH FOREIGN INTELLIGENCE ELECTRONIC SUR-
VEILLANCE.  IN GRANTING APPROVAL OF THE USE OF THE EVIDENCE THE ATTORNEY GENERAL
WOULD ALERT THE PROSECUTOR TO THE SURVEILLANCE AND HE, IN TURN, WOULD ALERT THE
COURT IN ACCORDANCE WITH SUBSECTION (C).

SUBSECTIONS (C), (D) AND (E) SET FORTH THE PROCEDURES UNDER THE BILL WHEREBY IN-
FORMATION ACQUIRED BY MEANS OF ELECTRONIC SURVEILLANCE MAY BE RECEIVED IN EVIDENCE
OR OTHERWISE USED OR DISCLOSED IN ANY TRIAL, HEARING OR OTHER FEDERAL OR STATE PRO-
CEEDING.  ALTHOUGH THE PRIMARY PURPOSE OF ELECTRONIC SURVEILLANCE CONDUCTED PURSUANT
TO THIS CHAPTER WILL NOT BE THE GATHERING OF CRIMINAL EVIDENCE, IT IS CONTEMPLATED
THAT SUCH EVIDENCE WILL BE ACQUIRED AND THIS SUBSECTION AND THE SUCCEEDING ONE ES-
TABLISH THE PROCEDURAL MECHANISMS BY WHICH SUCH INFORMATION MAY BE USED IN FORMAL
PROCEEDINGS.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

 AT THE OUTSET THE COMMITTEE RECOGNIZES THAT NOTHING IN SUBSECTION (C) ABROGATES
THE RIGHTS AFFORDED A CRIMINAL DEFENDANT UNDER BRADY V. **56** MARYLAND, [FN64]  AND
THE JENCKS ACT. [FN65]  THESE LEGAL PRINCIPLES INHERE IN ANY SUCH PROCEEDING AND ARE
WHOLLY CONSISTENT WITH THE PROCEDURES DETAILED HERE.  FURTHERMORE, NOTHING CONTAINED
IN THIS SECTION IS INTENDED TO ALTER THE TRADITIONAL PRINCIPLE THAT THE GOVERNMENT
CANNOT USE MATERIAL AT TRIAL AGAINST A CRIMINAL DEFENDANT, AND THEN WITHHOLD FROM
HIM SUCH MATERIAL AT TRIAL.  [FN66]

 SUBSECTION (C) STATES THAT NO INFORMATION ACQUIRED PURSUANT TO THIS CHAPTER MAY BE
USED UNLESS, PRIOR TO THE TRIAL, HEARING, OR OTHER PROCEEDING, OR AT A REASONABLE
TIME PRIOR TO AN EFFORT TO DISCLOSE THE INFORMATION OR SUBMIT IT IN EVIDENCE, THE
GOVERNMENT NOTIFIES THE COURT THAT SUCH INFORMATION WAS ACQUIRED BY MEANS OF ELEC-
TRONIC SURVEILLANCE CONDUCTED PURSUANT TO THIS CHAPTER.  THIS PROVISION HAS BEEN
BROADENED IN S. 1566 OVER ITS COUNTERPART IN S. 3197 BY INCLUDING NONJUDICIAL PRO-
CEEDINGS.  IN INSTANCES IN WHICH THE GOVERNMENT INTENDS TO DISCLOSE SURVEILLANCE IN-
FORMATION IN SUCH A NON-JUDICIAL FORUM, SUBSECTION (C) WOULD REQUIRE THAT THE UNITED
STATES DISTRICT COURT IN THE DISTRICT IN WHICH THE DISCLOSURE IS TO TAKE PLACE BE
NOTIFIED OF THE PROPOSED DISCLOSURE OR USE.

 SUBSECTION (D) PARALLELS 18 U.S.C. 2518(10)(A) AND PROVIDES A SEPARATE STATUTORY
VEHICLE BY WHICH A PERSON WHO HAS BEEN A SUBJECT OF ELECTRONIC SURVEILLANCE AND
AGAINST WHOM EVIDENCE DERIVED THEREFROM IS TO BE OR HAS BEEN INTRODUCED OR OTHERWISE
USED OR DISCLOSED IN ANY TRIAL, HEARING OR PROCEEDING MAY MOVE TO SUPPRESS THE CON-
TENTS OF ANY COMMUNICATION ACQUIRED BY, OR EVIDENCE DERIVED FROM, SUCH ELECTRONIC
SURVEILLANCE.  THE GROUNDS FOR SUCH A MOTION WOULD BE THAT (A) THE COMMUNICATION WAS
UNLAWFULLY ACQUIRED, OR (B) THE SURVEILLANCE WAS NOT MADE IN CONFORMITY WITH THE OR-
DER OF AUTHORIZATION OR APPROVAL.

 THE 'SUBJECT' OF ELECTRONIC SURVEILLANCE MEANS AN INDIVIDUAL WHO WAS A PARTY TO
THE INTERCEPTED COMMUNICATION OR WAS A PERSON AGAINST WHOM THE INTERCEPTION WAS DIR-
ECTED.  THUS THE WORD IS DEFINED TO COINCIDE WITH THE DEFINITION OF 'AGGRIEVED PER-
SON' IN SECTION 2510 OF TITLE III.  [FN67]

**\*3958** ONE SITUATION IN WHICH SUCH A MOTION MIGHT BE PRESENTED WOULD BE THAT IN
WHICH THE COURT ORDERS DISCLOSED TO THE PARTY THE COURT ORDER AND ACCOMPANYING AP-
PLICATION UNDER SUBSECTION (E) PRIOR TO RULING ON THE LEGALITY OF THE SURVEILLANCE.
SUCH MOTION WOULD ALSO BE APPROPRIATE, HOWEVER, EVEN AFTER THE COURT'S FINDING OF
LEGALITY IF, IN SUBSEQUENT TRIAL TESTIMONY, A GOVERNMENT WITNESS PROVIDES EVIDENCE
THAT THE ELECTRONIC SURVEILLANCE MAY HAVE BEEN AUTHORIZED OR CONDUCTED IN VIOLATION
OF THE COURT ORDER.  THE MOST COMMON CIRCUMSTANCE IN WHICH SUCH A MOTION MIGHT BE
APPROPRIATE WOULD BE A SITUATION IN WHICH A DEFENDANT QUERIES THE GOVERNMENT UNDER
18 U.S.C. 3504 AND DISCOVERS THAT HE HAS BEEN INTERCEPTED BY ELECTRONIC SURVEILLANCE
EVEN BEFORE THE GOVERNMENT HAS DECIDED WHETHER EVIDENCE DERIVED FROM THAT SURVEIL-
LANCE WILL BE USED IN THE PRESENTATION OF ITS CASE.  IN THIS INSTANCE, UNDER THE AP-
PROPRIATE FACTUAL CIRCUMSTANCES, THE DEFENDANT MIGHT MOVE TO SUPPRESS SUCH EVIDENCE
UNDER THIS SUBSECTION EVEN WITHOUT HAVING SEEN ANY OF THE UNDERLYING DOCUMENTATION.

**\*57** A MOTION UNDER THIS SUBSECTION SHALL BE MADE BEFORE THE TRIAL, HEARING, OR
PROCEEDING UNLESS THERE WAS NO OPPORTUNITY TO MAKE SUCH MOTION OR THE MOVANT WAS NOT
AWARE OF THE GROUNDS FOR THE MOTION, THE ONLY CHANGE IN SUBSECTION (D) FROM S. 3197
IS TO REMOVE AS A SEPARATE, INDEPENDENT BASIS FOR SUPPRESSION THE FACT THAT THE OR-
DER WAS INSUFFICIENT ON ITS FACE.  THIS IS NOT A SUBSTANTIVE CHANGE, HOWEVER, SINCE

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**


COMMUNICATIONS ACQUIRED PURSUANT TO AN ORDER INSUFFICIENT ON ITS FACE WOULD BE UN-
LAWFULLY ACQUIRED AND THEREFORE SUBJECT TO SUPPRESSION UNDER PARAGRAPH (1).

   SUBSECTION (E) STATES IN DETAIL THE PROCEDURE THE COURT SHALL FOLLOW WHEN IT RE-
CEIVES A NOTIFICATION UNDER SUBSECTION (C) OR A SUPPRESSION MOTION IS FILED UNDER
SUBSECTION (D).  THIS PROCEDURE APPLIES, FOR EXAMPLE, WHENEVER AN INDIVIDUAL MAKES A
MOTION PURSUANT TO SUBSECTION (D) OR 18 U.S.C. 3504, OR ANY OTHER STATUTE OR RULE OF
THE UNITED STATES TO DISCOVER, OBTAIN OR SUPPRESS EVIDENCE OR INFORMATION OBTAINED
OR DERIVED FROM ELECTRONIC SURVEILLANCE CONDUCTED PURSUANT TO THIS CHAPTER (FOR EX-
AMPLE, RULE 12 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE).  ALTHOUGH A NUMBER OF
DIFFERENT PROCEDURES MIGHT BE USED TO ATTACK THE LEGALITY OF THE SURVEILLANCE, IT IS
THIS PROCEDURE 'NOTWITHSTANDING ANY OTHER LAW' THAT MUST BE USED TO RESOLVE THE
QUESTION.  THE COMMITTEE WISHES TO MAKE VERY CLEAR THAT THE PROCEDURES SET OUT IN
SUBSECTION (E) APPLY WHATEVER THE UNDERLYING RULE OR STATUTE REFERRED TO IN THE MO-
TION. THIS IS NECESSARY TO PREVENT THE CAREFULLY DRAWN PROCEDURES IN SUBSECTION (E)
FROM BEING BYPASSED BY THE INVENTIVE LITIGANT USING A NEW STATUTE, RULE OR JUDICIAL
CONSTRUCTION.

   THE SPECIAL PROCEDURES IN SUBSECTION (E) CANNOT BE INVOKED UNTIL THEY ARE
TRIGGERED BY A GOVERNMENT AFFIDAVIT THAT DISCLOSURE OR AN ADVERSARY HEARING WOULD
HARM THE NATIONAL SECURITY OF THE UNITED STATES.  IF NO SUCH ASSERTION IS MADE, THE
COMMITTEE ENVISIONS THAT MANDATORY DISCLOSURE OF THE APPLICATION AND ORDER, AND DIS-
CRETIONARY DISCLOSURE OF OTHER SURVEILLANCE MATERIALS, WOULD BE MADE TO THE DEFEND-
ANT, AS IS REQUIRED UNDER TITLE III.  [FN68]  WHEN THE PROCEDURE IS SO TRIGGERED,
HOWEVER, THE GOVERNMENT MUST MAKE AVAILABLE TO THE COURT **3959 A COPY OF THE COURT
ORDER AND ACCOMPANYING APPLICATION UPON WHICH THE SURVEILLANCE WAS BASED.

   THE COURT MUST THEN CONDUCT AN EX PARTE, IN CAMERA INSPECTION OF THESE MATERIALS
AS WELL AS ANY OTHER DOCUMENTS WHICH THE GOVERNMENT MAY BE ORDERED TO PROVIDE, TO
DETERMINE WHETHER THE SURVEILLANCE WAS AUTHORIZED AND CONDUCTED IN A MANNER WHICH
DID NOT VIOLATE ANY CONSTITUTIONAL OR STATUTORY RIGHT OF THE PERSON AGAINST WHOM THE
EVIDENCE IS SOUGHT TO BE INTRODUCED.  THE SUBSECTION FURTHER PROVIDES THAT IN MAKING
SUCH A DETERMINATION, THE COURT MAY ORDER DISCLOSED TO THE PERSON AGAINST WHOM THE
EVIDENCE IS TO BE INTRODUCED THE COURT ORDER OR ACCOMPANYING APPLICATION, OR POR-
TIONS THEREOF, OR OTHER MATERIALS RELATING TO THE SURVEILLANCE, ONLY IF IT FINDS
THAT SUCH DISCLOSURE IS NECESSARY TO MAKE AN ACCURATE DETERMINATION OF THE LEGALITY
OF THE SURVEILLANCE.  THUS, THIS SUBSECTION DEALS WITH THE PROCEDURE TO BE FOLLOWED
BY THE TRIAL COURT IN DETERMINING THE LEGALITY (OR ILLEGALITY) OF THE SURVEILLANCE.

   THE QUESTION OF HOW TO DETERMINE THE LEGALITY OF AN ELECTRONIC SURVEILLANCE CON-
DUCTED FOR FOREIGN INTELLIGENCE PURPOSES HAS NEVER BEEN *58 DECIDED BY THE SUPREME
COURT.  AS JUSTICE STEWART NOTED IN HIS CONCURRING OPINION IN GIORDANO V. UNITED
STATES, 'MOREOVER, WE DID NOT IN ALDERMAN, BUTENKO OR IVANOV, AND WE DO NOT TODAY,
SPECIFY THE PROCEDURE THAT THE DISTRICT COURTS ARE TO FOLLOW IN MAKING THIS PRELIM-
INARY DETERMINATION (OF LEGALITY.)'  394 U.S.C. 310, 314 (1968); SEE ALSO
TAGLIANETTI V. UNITED STATES, 394 U.S. 316 (1968).  [FN69] THE COMMITTEE VIEWS THE
PROCEDURES SET FORTH IN THIS SUBSECTION AS STRIKING A REASONABLE BALANCE BETWEEN AN
ENTIRELY IN CAMERA PROCEEDING WHICH MIGHT ADVERSELY AFFECT THE DEFENDANT'S ABILITY
TO DEFEND HIMSELF, AND MANDATORY DISCLOSURE, WHICH MIGHT OCCASIONALLY RESULT IN THE
WHOLESALE REVELATION OF SENSITIVE FOREIGN INTELLIGENCE INFORMATION.

   THE DECISION WHETHER IT IS NECESSARY TO ORDER DISCLOSURE TO A PERSON IS FOR THE

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

COURT TO MAKE AFTER REVIEWING THE UNDERLYING DOCUMENTATION AND DETERMINING ITS
VOLUME, SCOPE AND COMPLEXITY.  THE COMMITTEE HAS NOTED THE REASONED DISCUSSION OF
THESE MATTERS IN THE OPINION OF THE COURT IN UNITED STATES V. BUTENKO, SUPRA.
THERE, THE COURT, FACED WITH THE DIFFICULT PROBLEM OF DETERMINING WHAT STANDARD TO
FOLLOW IN BALANCING NATIONAL SECURITY INTERESTS WITH THE RIGHT TO A FAIR TRIAL
STATED:

THE DISTINGUISHED DISTRICT COURT JUDGE REVIEWED IN CAMERA THE RECORDS OF THE
WIRETAPS AT ISSUE HERE BEFORE HOLDING THE SURVEILLANCES TO BE LEGAL . . . SINCE THE
QUESTION CONFRONTING THE DISTRICT COURT AS TO THE SECOND SET OF INTERCEPTIONS WAS
THE LEGALITY OF THE TAPS, NOT THE EXISTENCE OF TAINTED EVIDENCE, IT WAS WITHIN HIS
DISCRETION TO GRANT OR TO DENY IVANOV'S REQUEST FOR DISCLOSURE AND A HEARING.  THE
EXERCISE OF THIS DISCRETION IS TO BE GUIDED BY AN EVALUATION OF THE COMPLEXITY OF
THE FACTORS TO BE CONSIDERED BY THE COURT AND BY THE LIKELIHOOD THAT ADVERSARY
PRESENTATION WOULD SUBSTANTIALLY PROMOTE A MORE ACCURATE DECISION. (494 F.2D AT 607)

THUS, IN SOME CASES, THE COURT WILL LIKELY BE ABLE TO DETERMINE THE LEGALITY OF
THE SURVEILLANCE WITHOUT ANY DISCLOSURE TO THE DEFENDANT.

**\*\*3960** IN OTHER CASES, HOWEVER, THE QUESTION MAY BE MORE COMPLEX BECAUSE OF, FOR
EXAMPLE, INDICATIONS OF POSSIBLE MISREPRESENTATION OF FACT, VAGUE IDENTIFICATION OF
THE PERSONS TO BE SURVEILLED OR SURVEILLANCE RECORDS WHICH INCLUDES A SIGNIFICANT
AMOUNT OF NONFOREIGN INTELLIGENCE INFORMATION, CALLING INTO QUESTION COMPLIANCE WITH
THE MINIMIZATION STANDARDS CONTAINED IN THE ORDER. IN SUCH CASES, THE COMMITTEE CON-
TEMPLATES THAT THE COURT WILL LIKELY DECIDE TO ORDER DISCLOSURE TO THE DEFENDANT, IN
WHOLE OR IN PART SINCE SUCH DISCLOSURE 'IS NECESSARY TO MAKE AN ACCURATE DETERMINA-
TION OF THE LEGALITY OF THE SURVEILLANCE.'  [FN70]

CASES MAY ARISE, OF COURSE, WHERE THE COURT BELIEVES THAT DISCLOSURE IS NECESSARY
TO MAKE AN ACCURATE DETERMINATION OF LEGALITY, BUT THE GOVERNMENT ARGUES THAT TO DO
SO, EVEN GIVEN THE COURT'S BROAD DISCRETIONARY POWER TO EXCISE CERTAIN SENSITIVE
PORTIONS, WOULD DAMAGE THE NATIONAL SECURITY.  IN SUCH SITUATIONS THE GOVERNMENT
MUST CHOOSE-- EITHER DISCLOSE THE MATERIAL OR FOREGO THE USE OF THE SURVEILLANCE-
BASED EVIDENCE.  INDEED, IF THE GOVERNMENT OBJECTS TO THE DISCLOSURE, THUS PREVENT-
ING A PROPER ADJUDICATION OF LEGALITY, THE PROSECUTION WOULD **\*59** PROBABLY HAVE TO BE
DISMISSED, AND, WHERE THE COURT DETERMINES THAT THE SURVEILLANCE WAS UNLAWFULLY AU-
THORIZED OR CONDUCTED, THE COURT WOULD, 'IN ACCORDANCE WITH THE REQUIREMENTS OF
LAW,' SUPPRESS THAT EVIDENCE WHICH WAS UNLAWFULLY OBTAINED.  [FN71]

WHERE THE COURT DETERMINES THAT THE SURVEILLANCE WAS LAWFULLY AUTHORIZED AND CON-
DUCTED, IT WOULD, OF COURSE, DENY ANY MOTION TO SUPPRESS.  IN ADDITION, THE COMMIT-
TEE EMPHASIZES THAT, ONCE A JUDICIAL DETERMINATION IS MADE THAT THE SURVEILLANCE WAS
LAWFUL, A MOTION FOR DISCOVERY OF EVIDENCE MUST BE DENIED UNLESS DISCLOSURE OR DIS-
COVERY IS REQUIRED BY THE REQUIREMENTS OF DUE PROCESS.

SUBSECTION (F) PROVIDES FOR NOTICE TO BE SERVED ON UNITED STATES CITIZENS AND PER-
MANENT RESIDENT ALIENS WHO WERE TARGETS OF AN EMERGENCY SURVEILLANCE AND, IN THE
JUDGE'S DISCRETION, ON OTHER CITIZENS AND RESIDENT ALIENS WHO ARE INCIDENTALLY OVER-
HEARD, WHERE A JUDGE DENIES AN APPLICATION FOR AN ORDER APPROVING AN EMERGENCY ELEC-
TRONIC SURVEILLANCE.  SUCH NOTICE SHALL BE LIMITED TO THE FACT THAT AN APPLICATION
WAS MADE, THE PERIOD OF THE EMERGENCY SURVEILLANCE, AND THE FACT THAT DURING THE
PERIOD INFORMATION WAS OR WAS NOT OBTAINED.  THIS NOTICE MAY BE POSTPONED FOR A
PERIOD OF UP TO NINETY DAYS UPON A SHOWING OF GOOD CAUSE TO THE JUDGE. THEREAFTER

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

THE JUDGE MAY FOREGO THE REQUIREMENT OF NOTICE UPON A SECOND SHOWING OF GOOD CAUSE.

THE FACT WHICH TRIGGERS THE NOTICE REQUIREMENT-- THE FAILURE TO OBTAIN APPROVAL OF AN EMERGENCY SURVEILLANCE-- NEED NOT BE BASED ON A DETERMINATION BY THE COURT THAT THE TARGET IS NOT AN AGENT OF A FOREIGN POWER ENGAGED IN CLANDESTINE INTELLIGENCE ACTIVITIES, SABOTAGE, OR TERRORIST ACTIVITIES OR A PERSON AIDING SUCH AGENT. FAILURE TO SECURE A WARRANT COULD BE BASED ON A NUMBER OF OTHER FACTORS, SUCH AS AN IMPROPER CERTIFICATION. A REQUIREMENT OF NOTICE IN ALL CASES WOULD HAVE THE POTENTIAL OF COMPROMISING THE FACT THAT THE GOVERNMENT HAD FOCUSED AN INVESTIGATION ON THE TAR- GET. EVEN WHERE THE TARGET IS NOT, IN FACT, AN AGENT OF A FOREIGN POWER, GIVEN NO- TICE TO THE PERSON MAY RESULT IN COMPROMISING AN ON-GOING FOREIGN INTELLIGENCE IN- VESTIGATION BECAUSE **3961 OF THE LOGICAL INFERENCES A FOREIGN INTELLIGENCE SERVICE MIGHT DRAW FROM THE TARGETING OF THE INDIVIDUAL. FOR THESE REASONS, THE GOVERNMENT *60 IS GIVEN THE OPPORTUNITY TO PRESENT ITS CASE TO THE JUDGE FOR INITIALLY POSTPON- ING NOTICE. AFTER NINETY DAYS, DURING WHICH TIME THE GOVERNMENT MAY BE ABLE TO GATHER MORE FACTS, THE GOVERNMENT MAY SEEK THE ELIMINATION OF THE NOTICE REQUIREMENT ALTOGETHER.

IT IS THE INTENT OF THE COMMITTEE THAT IF THE GOVERNMENT CAN INITIALLY SHOW THAT THERE IS A REASON TO BELIEVE THAT NOTICE MIGHT COMPROMISE AN ONGOING INVESTIGATION, OR CONFIDENTIAL SOURCES OR METHODS, NOTICE SHOULD BE POSTPONED. THEREAFTER, IF THE GOVERNMENT CAN SHOW A LIKELIHOOD THAT NOTICE WOULD COMPROMISE AN ONGOING INVESTIGA- TION, OR CONFIDENTIAL SOURCES OR METHODS, NOTICE SHOULD NOT BE GIVEN.

SECTION 2527

SECTION 2527 REQUIRES THE SUBMISSION OF ANNUAL REPORTS TO BOTH THE CONGRESS AND THE ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS CONTAINING STATISTICAL INFORM- ATION RELATING TO ELECTRONIC SURVEILLANCE UNDER THIS CHAPTER. SPECIFICALLY, THE RE- PORTS MUST INCLUDE THE TOTAL NUMBER OF APPLICATIONS MADE FOR ORDERS AND EXTENSIONS AND THE TOTAL NUMBER OF ORDERS OR EXTENSIONS GRANTED, MODIFIED, AND DENIED. THE STATISTICS IN THESE REPORTS SHOULD PRESENT A QUANTITATIVE INDICATION OF THE EXTENT TO WHICH SURVEILLANCE UNDER THIS CHAPTER IS USED.

THE REQUIREMENTS IN S. 3197 FOR THE PUBLIC REPORTING OF CERTAIN ADDITIONAL STAT- ISTICS HAVE BEEN ALTERED DUE TO THE INTRODUCTION IN S. 1566 OF TWO DIFFERENT TYPES OF WARRANT (CREATING A 90 DAY WARRANT FOR ONE CLASS OF TARGET, AND A ONE YEAR WAR- RANT FOR 'OFFICIAL' FOREIGN POWERS). THE REPORTING REQUIREMENTS IN S. 3197, IF REENACTED VERBATIM IN S. 1566, WOULD OBVIOUSLY GIVE FOREIGN INTELLIGENCE NETWORKS SIGNIFICANT INFORMATION CONCERNING THE NUMBER AND DURATION OF SURVEILLANCES OF 'OFFI- CIAL' FOREIGN POWERS. CHANGES HAVE BEEN MADE, THEREFORE, IN THE PUBLIC REPORTING REQUIREMENTS OF S. 3197 SO AS TO AVOID THE COMPROMISING OF SENSITIVE INFORMATION.

THE STATISTICS REPORTED PURSUANT TO THIS SECTION WILL PROVIDE A BASIS FOR FURTHER INQUIRY BY APPROPRIATE OVERSIGHT COMMITTEES OF THE CONGRESS.

**3962 SUCH CONGRESSIONAL OVERSIGHT IS PARTICULARLY IMPORTANT IN MONITORING THE OPERATION OF THIS STATUTE. BY ITS VERY NATURE FOREIGN INTELLIGENCE SURVEILLANCE MUST BE CONDUCTED IN SECRET. THIS BILL REFLECTS THE NEED FOR SUCH SECRECY; JUDICIAL REVIEW IS LIMITED TO A SELECT PANEL AND ROUTINE NOTICE TO THE TARGET IS AVOIDED. IN ADDITION, UNLIKE THE STATUTORY SCHEME IN TITLE III, IT IS NOT CONTEMPLATED THAT MOST ELECTRONIC SURVEILLANCE CONDUCTED PURSUANT TO THIS CHAPTER WILL RESULT IN CRIMINAL

PROSECUTION.

FOR THESE REASONS, THE COMMITTEE BELIEVES IT IMPORTANT THAT CONGRESSIONAL OVER-
SIGHT PLAY AN IMPORTANT ROLE IN THE PROPER IMPLEMENTATION OF THE STATUTE. IN THAT
REGARD SECTION 2527 MUST BE READ IN THE CONTEXT OF OTHER CONGRESSIONAL ENACTMENTS
MANDATING INTELLIGENCE OVERSIGHT. [FN72] THIS COMMITTEE CONTEMPLATES THAT THE DE-
PARTMENT OF JUSTICE AND INTELLIGENCE AGENCIES WILL PROVIDE SUCH INFORMATION TO THOSE
COMMITTEES AS IS REQUIRED BY THEIR INDEPENDENT OVERSIGHT MANDATE.  INDEED, IT IS EX-
PECTED THAT SOME FORM OF CONGRESSIONAL OVERSIGHT WILL BE WRITTEN INTO S. 1566 ITSELF
BY THE SENATE INTELLIGENCE COMMITTEE WHEN THE BILL IS REFERRED TO THAT COMMITTEE.
SUCH OVERSIGHT **61** WOULD BE SERIOUSLY HAMPERED IF CONGRESSIONAL COMMITTEES WERE
DENIED ACCESS TO THE INFORMATION FOUND IN THE APPLICATION RECORD, SUCH AS THE UNDER-
LYING AFFIDAVITS AND DOCUMENTATION, REQUESTS FOR EXTENSIONS, THE APPEAL RECORD, OR-
DERS AND DECISIONS OF THE COURT.

IN ADDITION, IN THE EXERCISE OF ITS OVERSIGHT FUNCTION, THE SENATE COMMITTEE ON
THE JUDICIARY SHALL CONSULT WITH MEMBERS OF THE DEPARTMENT OF JUSTICE AND THE INTEL-
LIGENCE COMMUNITY CONCERNING THE PROPER IMPLEMENTATION OF THE ACT.

SECTION 3

SECTION 3 DELAYS THE EFFECTIVE DATE OF THE ACT UNTIL 90 DAYS FOLLOWING THE DESIG-
NATION OF THE FIRST JUDGE PURSUANT TO SECTION 2523 OF THIS CHAPTER.  THE PURPOSE OF
THIS DELAY IS TO ALLOW TIME FOR THE DEVELOPMENT OF THE APPLICATIONS REQUIRED UNDER
THIS BILL AND OF SECURITY MEASURES GOVERNING THE SUBMISSION OF THESE APPLICATIONS TO
THE COURTS.  THE 90 DAY DELAY WILL ALSO PREVENT THE SITUATION WHERE ONE JUDGE WILL
BE FORCED TO HANDLE ALL OF THE APPLICATIONS.

CONFORMING AMENDMENTS

SECTION 4 SERVES THE IMPORTANT PURPOSE OF INTEGRATING THE NEW CHAPTER 120 WITH THE
CURRENT ELECTRONIC SURVEILLANCE LAW FOUND IN CHAPTER 119 OF TITLE 18, UNITED STATES
CODE.  VARIOUS PROVISIONS OF CHAPTER 119 ARE APPLICABLE TO THE ELECTRONIC SURVEIL-
LANCE ENGAGED IN UNDER THE NEW BILL AND THE CONFORMING AMENDMENTS IN THIS SECTION OF
S. 1566 ARE DESIGNED TO MAKE CHANGES REFLECTING THIS FACT.  IN ADDITION, WHERE CER-
TAIN PROVISIONS OF CHAPTER 119 SHOULD NOT ENCOMPASS THE SURVEILLANCE PROCEDURES IN
S. 1566, CONFORMING AMENDMENTS SO LIMIT SUCH SECTIONS:

(A)(1) AND (2).  THESE AMENDMENTS ARE DESIGNED TO ESTABLISH THE SAME CRIMINAL PEN-
ALTIES FOR VIOLATIONS OF THIS CHAPTER AS APPLY TO VIOLATIONS OF CHAPTER 119.  AS
AMENDED, THESE SECTIONS WILL MAKE IT A CRIMINAL OFFENSE TO ENGAGE IN ELECTRONIC SUR-
VEILLANCE EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN CHAPTERS 119 AND 120.  THIS
AMENDMENT ALSO **3963** PROVIDES, HOWEVER, THAT 'WITH RESPECT TO TECHNIQUES USED BY
LAW ENFORCEMENT OFFICERS' WHICH DO NOT INVOLVE THE ACTUAL INTERCEPTION OF WIRE OR
ORAL COMMUNICATIONS, YET DO FALL WITHIN THE LITERAL DEFINITION OF ELECTRONIC SUR-
VEILLANCE IN CHAPTER 120-- SUCH AS THE USE OF A PEN REGISTER-- THE PROCEDURES OF
CHAPTER 120 DO NOT APPLY.  IN SUCH CASES CRIMINAL PENALTIES WILL NOT ATTACH SIMPLY
BECAUSE THE GOVERNMENT FAILS TO FOLLOW THE PROCEDURES IN CHAPTER 120 (SUCH PENALTIES
MAY, OF COURSE, ATTACH IF THE SURVEILLANCE IS COMMENCED WITHOUT A SEARCH WARRANT OR
IN VIOLATION OF A COURT ORDER.) IN ALL CASES INVOLVING ELECTRONIC SURVEILLANCE FOR
THE PURPOSE OF OBTAINING FOREIGN INTELLIGENCE INFORMATION, HOWEVER, THE PROHIBITIONS

OF 18 U.S.C. 2511 WOULD APPLY.

   (A)(3), (4), (5), AND (6).  THESE AMENDMENTS MAKE CLEAR THAT THE PROHIBITIONS IN
CHAPTER 119 CONCERNING DISCLOSURE AND USE OF INFORMATION, OBTAINED THROUGH THE IN-
TERCEPTION OF WIRE OR ORAL COMMUNICATIONS IN SECTIONS 2511(1)(C) AND (D), ALSO APPLY
TO DISCLOSURE AND USE OF INFORMATION OBTAINED THROUGH ELECTRONIC SURVEILLANCE AS
DEFINED IN CHAPTER 120.

   THE STATUTE CALLS FOR A FINE OF NOT MORE THAN $10,000 OR IMPRISONMENT FOR NOT MORE
THAN FIVE YEARS, OR BOTH, FOR EACH VIOLATION.

   **\*62** (B)(1) THIS AMENDMENT ADDS RADIO COMMUNICATION TO WIRE COMMUNICATION AND EX-
TENDS THE MEANING OF INTERCEPT TO INCLUDE 'OR OTHERWISE ACQUIRE' IN SECTION
2511(2)(A)(I), WHICH PERMITS COMMUNICATION COMMON CARRIERS TO ENGAGE IN CERTAIN
ACTIVITIES.

   (B)(2) THIS AMENDMENT, WHEN READ IN CONJUNCTION WITH SECTION 2525(B)(2)(B), MAKES
EXPLICIT THE FACT THAT A COURT ORDER OBTAINED UNDER CHAPTER 120 MAY DIRECT AN OF-
FICER, EMPLOYEE OR AGENT OF A COMMUNICATION COMMON CARRIER TO PROVIDE CERTAIN AS-
SISTANCE TO THE GOVERNMENT AGENTS IMPLEMENTING THE ORDER.  THE NATURE AND SCOPE OF
SUCH ASSISTANCE IS INTENDED TO BE IDENTICAL TO THAT WHICH MAY BE DIRECTED UNDER SEC-
TION 2518(4)(E) OF CHAPTER 119.  THE AMENDMENT FURTHER PROVIDES THAT BEFORE THE CAR-
RIER MAY PROVIDE SUCH INFORMATION OR ASSISTANCE, WHETHER UNDER CHAPTER 119 OR 120,
THE GOVERNMENT AGENT MUST FURNISH THE CARRIER WITH AN ORDER SIGNED BY THE COURT (BUT
NOT NECESSARILY THE SAME ORDER AS AUTHORIZES THE ACTUAL SURVEILLANCE) IF AN ORDER
HAS BEEN ACQUIRED, OR A SWORN STATEMENT BY THE AGENT THAT ALL STATUTORY REQUIREMENTS
HAVE BEEN MET IF THE SURVEILLANCE IS BEING CONDUCTED PURSUANT TO THE PROVISIONS OF
SECTION 2518(7) OF CHAPTER 119 OR SECTIONS 2525(D) OF CHAPTER 120.  THE DOCUMENT SO
FURNISHED MUST ALSO SET FORTH THE PERIOD OF TIME FOR WHICH THE SURVEILLANCE IS AU-
THORIZED AND A DESCRIPTION OF THE FACILITIES FROM WHICH THE COMMUNICATION IS TO BE
INTERCEPTED.  ANY VIOLATION OF THIS SUBSECTION BY A CARRIER OR ITS REPRESENTATIVE
WILL RENDER THE CARRIER LIABLE FOR THE CIVIL DAMAGES PROVIDED FOR IN SECTION 2520,
SUBJECT, OF COURSE, TO THE GOOD FAITH RELIANCE DEFENSE CONTAINED THEREIN.

   (C)(1) THIS AMENDMENT MAKES EXPLICIT THAT AN EMPLOYEE OF THE FEDERAL COMMUNICA-
TIONS COMMISSION MAY ENGAGE IN ELECTRONIC SURVEILLANCE AS WELL AS INTERCEPT A WIRE
OR ORAL COMMUNICATION IN THE DISCHARGE OF MONITORING RESPONSIBILITIES EXERCISED BY
THE COMMISSION.

   (C)(2) THIS AMENDMENT MAKES CLEAR THAT IT IS LEGAL TO ENGAGE IN ELECTRONIC SUR-
VEILLANCE, AS WELL AS INTERCEPT A WIRE OR ORAL COMMUNICATION, IF A PARTY CONSENTS.

   (C)(3) THIS AMENDMENT:  (1) PROVIDES STATUTORY AUTHORIZATION FOR THE GOVERNMENT TO
CONDUCT TESTS OF EQUIPMENT WHICH MAY RESULT IN **\*\*3964** ELECTRONIC SURVEILLANCE AS
DEFINED IN SECTION 2521(B)(6); (2) AUTHORIZES THE CONDUCT OF 'SWEEPS' TO DISCOVER
ILLEGAL TAPS AND BUGS, WHICH 'SWEEPS' MAY RESULT IN 'ELECTRONIC SURVEILLANCE' AS
DEFINED IN SECTION 2521 (B)(6); AND (3), MAKES EXPLICIT THAT CHAPTER 119 AND 120 ARE
THE 'EXCLUSIVE MEANS BY WHICH ELECTRONIC SURVEILLANCE, AS DEFINED IN SECTION
2521(B)(6) OF CHAPTER 120, AND THE INTERCEPTION OF DOMESTIC WIRE AND ORAL COMMUNICA-
TIONS MAY BE CONDUCTED.'

   ALL TESTS CONDUCTED PURSUANT TO THIS PROVISION MUST BE IN THE NORMAL COURSE OF OF-
FICIAL BUSINESS BY THE GOVERNMENT AGENT CONDUCTING THE TEST AND MUST BE DESIGNED
SOLELY FOR DETERMINING THE CAPABILITY OF EQUIPMENT USED FOR FOREIGN INTELLIGENCE
GATHERING PURPOSES.  IN ADDITION, THE TEST PERIOD SHALL BE LIMITED TO THAT NECESSARY

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TO DETERMINE SUCH CAPABILITY AND SHALL IN NO INSTANCE EXCEED NINETY DAYS WITHOUT THE
EXPRESS APPROVAL OF THE ATTORNEY GENERAL.  THE CONTENTS OF ANY COMMUNICATION AC-
QUIRED AS A RESULT OF THE TEST SHALL BE DISCLOSED ONLY TO THOSE OFFICIALS CONDUCTING
THE TEST AND SHALL BE USED AND RETAINED BY THEM ONLY FOR THE PURPOSE OF THE TEST.
AT THE COMPLETION OF THE TESTING PERIOD, THE CONTENT SO ACQUIRED SHALL BE DESTROYED.

   **\*63** THE COMMITTEE CONTEMPLATES THAT IN ALL CASES SUCH TESTING WILL BE APPROVED BY
A SENIOR OFFICIAL PRIOR TO THE COMMENCEMENT OF THE TESTING PERIOD.

   'SWEEPS' TO DISCOVER THE EXISTENCE AND CAPABILITY OF ELECTRONIC SURVEILLANCE
EQUIPMENT IN VIOLATION OF 18 U.S.C. SECTION 2511 OR 47 U.S.C. SECTION 605 DO NOT
HAVE A SPECIFIC TIME LIMIT, BUT ARE LIMITED IN TIME TO THAT 'NECESSARY TO DETERMINE
THE EXISTENCE AND CAPABILITY OF SUCH EQUIPMENT'.

   THE DEPARTMENT OF DEFENSE, IN A LETTER TO THE COMMITTEE, HAS CHARACTERIZED THESE
ACTIVITIES AS FOLLOWS:

   THESE ACTIVITIES, COMMONLY CALLED TECHNICAL SURVEILLANCE COUNTERMEASURES SURVEYS,
ARE FOR THE PURPOSE OF DETERMINING IF A PARTICULAR SENSITIVE AREA HAS BEEN PENET-
RATED BY ELECTRONIC SURVEILLANCE DEVICES INSTALLED BY A FOREIGN POWER OR OTHER HOS-
TILE FORCES.  IN SOME CASES, THESE SURVEYS ARE CONDUCTED ON A CONTINUOUS BASIS.
SINCE THESE ACTIVITIES ARE STRICTLY DEFENSIVE IN NATURE AND ARE FOR THE SOLE PURPOSE
OF DETECTING AND NEUTRALIZING THE ILLEGAL EFFORTS OF HOSTILE POWERS, A TIME LIMIT
DOES NOT SEEM APPROPRIATE.

   INFORMATION ACQUIRED PURSUANT TO SUCH 'SWEEPS' MAY BE USED ONLY TO ENFORCE
CHAPTER 119 OR SECTION 605 OF THE COMMUNICATIONS ACT OF 1934 OR TO PROTECT INFORMA-
TION FROM BEING SUBJECT TO UNLAWFUL ELECTRONIC SURVEILLANCE. THE PROVISION IS NOT AN
AUTHORIZATION TO TARGET A PERSON KNOWN TO BE, OR SUSPECTED OF, ENGAGING IN UNLAWFUL
ELECTRONIC SURVEILLANCE, EVEN WHERE THE PURPOSE IS TO DETERMINE THE EXISTENCE AND
CAPABILITY OF THAT PERSON'S ELECTRONIC SURVEILLANCE EQUIPMENT.  IF THE PERSON EN-
GAGED IN THE UNLAWFUL ELECTRONIC SURVEILLANCE IS AN AGENT OF A FOREIGN POWER, HE
SHOULD BE TARGETED UNDER THE APPLICABLE PROVISIONS OF CHAPTER 120.  THIS PROVISION
IS DESIGNED TO CONFER STATUTORY AUTHORITY ON THE GOVERNMENT'S EFFORT TO LOCATE AND
ANALYZE UNLAWFUL ELECTRONIC SURVEILLANCE ACTIVITY.

   A NEW PARAGRAPH (F) IS ADDED TO SECTION 2511(2) BY THIS CONFORMING AMENDMENT,
WHICH MUST BE READ IN CONJUNCTION WITH THE CONFORMING AMENDMENT CONTAINED IN PARA-
GRAPH (D) WHICH REPEALS SECTION **\*\*3965** 2511(3) OF TITLE 18, U.S.C.  THE SO-CALLED
'NATIONAL SECURITY DISCLAIMER' OF TITLE III OF THE 1968 OMNIBUS CRIME CONTROL AND
SAFE STREETS ACT.  THE EFFECT OF THESE TWO CONFORMING AMENDMENTS IS TO ESTABLISH
CHAPTER 120 AS THE EXCLUSIVE CONGRESSIONAL STATEMENT ON THE QUESTION OF THE EXECUT-
IVE'S POWER TO ORDER ELECTRONIC SURVEILLANCE.

   THIS NEW PARAGRAPH STATES THAT NOTHING IN CHAPTER 119 OR SECTION 605 OF THE COMMU-
NICATIONS ACT OF 1934 SHALL BE DEEMED TO AFFECT THE ACQUISITION OF FOREIGN INTELLI-
GENCE INFORMATION BY A MEANS OTHER THAN ELECTRONIC SURVEILLANCE, AS DEFINED IN
CHAPTER 120.  THE PURPOSE OF THIS PREFATORY PHRASE IS TWOFOLD.  FIRST, IT SETS FORTH
THE SECTIONS OF THE U.S.C. WHICH REGULATE THE PROCEDURES BY WHICH ELECTRONIC SUR-
VEILLANCE MAY BE CONDUCTED WITHIN THE UNITED STATES AND THE STATUTORY CONTROLS FOR
THE USE AND DISSEMINATION OF INFORMATION SO ACQUIRED.  IF ENACTED, THIS CHAPTER WILL
CONSTITUTE THE SOLE AND EXCLUSIVE STATUTORY AUTHORITY UNDER WHICH ELECTRONIC SUR-
VEILLANCE OF A FOREIGN POWER OR ITS AGENT TO OBTAIN FOREIGN INTELLIGENCE INFORMATION
MAY BE CONDUCTED WITHIN THE UNITED STATES. IT WILL COMPLEMENT CHAPTER 119, WHICH

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DEALS WITH ELECTRONIC SURVEILLANCE FOR LAW ENFORCEMENT PURPOSES AND SECTION **64** 605
OF THE COMMUNICATIONS ACT OF 1934, AS AMENDED, WHICH RESTRICTS THE DISSEMINATION OF
CERTAIN INFORMATION TRANSMITTED BY WIRE OR RADIO.  SECOND, THE LANGUAGE OF THIS
AMENDMENT EXEMPTS FROM SECTION 605 AND CHAPTER 119 FOREIGN INTELLIGENCE GATHERING BY
MEANS OF AN ELECTRONIC, MECHANICAL OR OTHER SURVEILLANCE DEVICE IF THE ACQUISITION
DOES NOT COME WITHIN THE DEFINITION OF 'ELECTRONIC SURVEILLANCE ' CONTAINED IN SEC-
TION 2521(B)(6).  SPECIFICALLY, THIS PROVISION IS DESIGNED TO MAKE CLEAR THAT THE
LEGISLATION DOES NOT DEAL WITH INTERNATIONAL SIGNALS INTELLIGENCE ACTIVITIES AS CUR-
RENTLY ENGAGED IN BY THE NATIONAL SECURITY AGENCY AND ELECTRONIC SURVEILLANCE CON-
DUCTED OUTSIDE THE UNITED STATES.  AS TO METHODS OF ACQUISITION WHICH COME WITHIN
THE DEFINITION OF 'ELECTRONIC SURVEILLANCE' IN THIS BILL, THE CONGRESS HAS DECLARED
THAT THIS STATUTE, NOT ANY CLAIMED PRESIDENTIAL POWER, CONTROLS.

   THE ACTIVITIES OF THE NATIONAL SECURITY AGENCY POSE PARTICULARLY DIFFICULT CONCEP-
TUAL AND TECHNICAL PROBLEMS WHICH ARE NOT DEALT WITH IN THIS LEGISLATION.  ALTHOUGH
MANY ON THE COMMITTEE ARE OF THE OPINION THAT IT IS DESIRABLE TO ENACT LEGISLATIVE
SAFEGUARDS FOR SUCH ACTIVITY, THE COMMITTEE ADOPTS THE VIEW EXPRESSED BY THE ATTOR-
NEY GENERAL DURING THE HEARINGS THAT ENACTING STATUTORY CONTROLS TO REGULATE THE NA-
TIONAL SECURITY AGENCY AND THE SURVEILLANCE OF AMERICANS ABROAD RAISES PROBLEMS BEST
LEFT TO SEPARATE LEGISLATION.  [FN73]  THIS LANGUAGE INSURES THAT CERTAIN ELECTRONIC
SURVEILLANCE ACTIVITIES TARGETED AGAINST INTERNATIONAL COMMUNICATIONS FOR FOREIGN
INTELLIGENCE PURPOSES WILL NOT BE PROHIBITED ABSOLUTELY DURING THE INTERIM PERIOD
WHEN THESE ACTIVITIES ARE NOT REGULATED BY CHAPTER 120 AND CHARTERS FOR INTELLIGENCE
AGENCIES AND LEGISLATION REGULATING INTERNATIONAL ELECTRONIC SURVEILLANCE HAVE NOT
YET BEEN DEVELOPED.

   PARAGRAPH (F) CONTINUES BY STATING THAT WITH RESPECT TO ELECTRONIC SURVEILLANCE,
AS DEFINED IN SECTION 2521(B)(6), AND THE INTERCEPTION OF DOMESTIC WIRE AND ORAL
COMMUNICATIONS, THE PROCEDURES OF CHAPTER 119 AND CHAPTER 120 SHALL BE THE 'EXCLUS-
IVE MEANS BY WHICH ELECTRONIC SURVEILLANCE . . . MAY BE . . . CONDUCTED.'  THIS
STATEMENT PUTS TO REST THE NOTION THAT CONGRESS RECOGNIZES AN INHERENT PRESIDENTIAL
POWER TO CONDUCT SUCH SURVEILLANCES IN THE UNITED STATES OUTSIDE OF THE PROCEDURES
CONTAINED IN CHAPTERS 119 AND 120.

   **\*\*3966** IT IS CLEAR THAT THE SUPREME COURT HAS RECOGNIZED THAT CONGRESS MAY LEGIS-
LATE IN AREAS, WHERE, ABSENT SUCH LEGISLATION, A CONSTITUTIONAL POWER OF THE EXECUT-
IVE MAY BE FOUND TO EXIST. YOUNGSTOWN SHEET AND TUBE V. SAWYER, 343 U.S. 579 (1952).
[FN74] IN THAT LANDMARK CASE THE SUPREME COURT REJECTED PRESIDENT TRUMAN'S ARGUMENT
THAT HE HAD INHERENT CONSTITUTIONAL AUTHORITY TO SEIZE THE STEEL MILLS TO PREVENT
STRIKES AND INSURE CONTINUED STEEL PRODUCTION NEEDED FOR THE WAR EFFORT.  THE DE-
CISION WAS INFLUENCED IN LARGE MEASURE BY THE FACT THAT CONGRESS, BY PASSING THE
TAFT-HARTLEY ACT, HAD EXPLICITLY REJECTED SEIZURE OF THE STEEL MILLS AND ENACTED A
LEGISLATIVE ALTERNATIVE TO CURB LABOR UNREST.  IN HIS CONCURRING OPINION JUSTICE
JACKSON WROTE:

   WHEN A PRESIDENT TAKES MEASURES INCOMPATIBLE WITH THE EXPRESS OR IMPLIED WILL OF
CONGRESS, HIS POWERS IS AT THE LOWEST EBB, FOR THEN HE CAN RELY ONLY UPON HIS OWN
CONSTITUTIONAL POWER MINUS ANY CONSTITUTIONAL POWER OF CONGRESS OVER THE **65** MATTER.
COURTS CAN SUSTAIN EXCLUSIVE PRESIDENTIAL CONTROL IN SUCH A CASE ONLY BY DISABLING
THE CONGRESS FROM ACTING UPON THE SUBJECT.  (343 U.S. AT 637.)

   (D) THIS AMENDMENT REPEALS SECTION 2511(3) OF CHAPTER 119 ELIMINATING ANY CONGRES-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SIONAL RECOGNITION OR SUGGESTION OF INHERENT PRESIDENTIAL POWER WITH RESPECT TO
ELECTRONIC SURVEILLANCE.

(E) THIS AMENDMENT BRINGS ANY ELECTRONIC SURVEILLANCE AS DEFINED IN CHAPTER 120
UNDER THE SAME STATUTORY EXCLUSIONARY RULE AS APPLIES TO CHAPTER 119. THIS SECTION
IMPOSES AN EVIDENTIARY SANCTION FOR FAILURE TO COMPLY WITH THE PROVISIONS OF THE
CHAPTER. IT MAKES EXPLICIT THAT NOT ONLY IS THE COMMUNICATION ITSELF EXCLUDED BUT
ALSO ANY INFORMATION OBTAINED FROM ELECTRONIC SURVEILLANCE.

(F) THIS AMENDMENT MAKES EXPLICIT THAT THE REQUIREMENTS FOR AN APPLICATION ENUMER-
ATED IN SUBSECTION 2518(1) APPLY ONLY TO SURVEILLANCE CONDUCTED PURSUANT TO CHAPTER
119, SINCE CHAPTER 120 CONTAINS ITS OWN REQUIREMENTS.

(G) THIS AMENDMENT MAKES EXPLICIT THAT THE NECESSARY ELEMENTS ON AN ORDER SET
FORTH IN SUBSECTION 2518(4) APPLY ONLY TO SURVEILLANCE CONDUCTED PURSUANT TO CHAPTER
119, SINCE CHAPTER 120 CONTAINS ITS OWN REQUIREMENTS.

(H) THIS AMENDMENT MAKES EXPLICIT THAT THE PROCEDURES FOR DISCLOSURE OF THE AP-
PLICATION AND ACCOMPANYING APPLICATION UNDER THIS SUBSECTION APPLY ONLY TO SURVEIL-
LANCES CONDUCTED PURSUANT TO CHAPTER 119, SINCE CHAPTER 120 CONTAINS ITS OWN RE-
QUIREMENTS.

(I) THIS AMENDMENT MAKES EXPLICIT THAT THE PROVISION FOR A STATUTORY SUPPRESSION
MOTION CONTAINED IN THIS SUBSECTION APPLIES ONLY TO SURVEILLANCES CONDUCTED PURSUANT
TO CHAPTER 119, SINCE CHAPTER 120 CONTAINS ITS OWN REQUIREMENTS.

(J) THIS AMENDMENT MAKES EXPLICIT THAT THE REPORTING REQUIREMENTS OF THE ADMINIS-
TRATIVE OFFICE OF THE UNITED STATES COURTS CONTAINED IN THIS SUBSECTION APPLY ONLY
TO SURVEILLANCES CONDUCTED PURSUANT TO CHAPTER 119 SINCE CHAPTER 120 CONTAINS ITS
OWN REQUIREMENTS.

**\*\*3967** (K) THESE AMENDMENTS ARE DESIGNED TO AUTHORIZE THE RECOVERY OF CIVIL DAM-
AGES FOR VIOLATIONS OF CHAPTER 120 IN THE SAME MANNER AND AMOUNTS AS ALREADY
PROVIDED FOR VIOLATIONS OF CHAPTER 119. THE ONLY CATEGORY OF INDIVIDUALS WHO WOULD
BE EXEMPTED FROM THE PROVISIONS OF THIS SECTION ARE FOREIGN POWERS AND AGENTS OF A
FOREIGN POWER AS DEFINED IN SECTION 2521(B)(1) AND (B)(2)(A) OF CHAPTER 120.

### COST ESTIMATE OF CONGRESSIONAL BUDGET OFFICE

OCTOBER 13, 1977.
HON. JAMES O. EASTLAND
CHAIRMAN, COMMITTEE ON THE JUDICIARY,
U.S. SENATE, WASHINGTON, D.C.
DEAR MR. CHAIRMAN: PURSUANT TO SECTION 403 OF THE CONGRESSIONAL BUDGET ACT OF
1974, THE CONGRESSIONAL BUDGET OFFICE HAS REVIEW S. 1566, THE FOREIGN INTELLIGENCE
SURVEILLANCE ACT OF 1977, AS ORDERED REPORTED BY THE SENATE COMMITTEE ON THE JUDI-
CIARY, OCTOBER 5, 1977.
BASED ON THIS REVIEW, IT APPEARS THAT NO ADDITIONAL COST TO THE GOVERNMENT WOULD
BE INCURRED AS A RESULT OF ENACTMENT OF THIS BILL.
SINCERELY,
ALICE M.RIVLIN, DIRECTOR.

<center>*          *          *          *</center>

### **\*82** MINORITY VIEWS OF SENATOR JAMES ABOUREZK

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

AFTER GIVING CAREFUL CONSIDERATION TO S. 1566, THE FOREIGN INTELLIGENCE SURVEIL-
LANCE ACT OF 1977, I HAVE RELUCTANTLY DECIDED THAT I CANNOT SUPPORT THIS LEGISLATION
IN ITS PRESENT FORM.

I HAVE REACHED THIS DECISION WITH GREAT HESITANCY, BECAUSE I ENDORSE THE GOALS OF
S. 1566-- TO BRING ELECTRONIC SURVEILLANCE FOR FOREIGN INTELLIGENCE PURPOSES UNDER
THE RULE OF LAW AND TO PUT TO REST ONCE AND FOR ALL THE MYTH OF SOME 'INHERENT EXEC-
UTIVE POWER' WHICH, IT HAS BEEN ALLEGED, SUPERSEDED THE CLEAR MANDATE OF THE FOURTH
AMENDMENT TO THE CONSTITUTION.

AS TO THE LATTER POINT, S. 1566 IS CLEARLY SUPERIOR TO S. 3197, ITS PREDECESSOR
FROM THE 94TH CONGRESS.  FOR YEARS, CONGRESS HAS STRUGGLED WITH THE QUESTION OF A
SUPPOSED INHERENT PRESIDENTIAL POWER IN THE FOREIGN INTELLIGENCE SPHERE.  EVERY RE-
CENT ADMINISTRATION HAS CLAIMED SUCH A POWER AND CONGRESS EXPLICITLY RECOGNIZED THE
POSSIBILITY OF SUCH AN INHERENT POWER WHEN IT INCORPORATED THE 'NATIONAL SECURITY
DISCLAIMER' IN TITLE III OF THE OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1968.
[FN75]

WHEN THE FORD ADMINISTRATION PROPOSED LEGISLATION TO COVER FOREIGN INTELLIGENCE
ELECTRONIC SURVEILLANCE IN 1976, IT NEVERTHELESS SOUGHT TO RETAIN SOME VESTIGE OF
THIS INHERENT POWER. ALTHOUGH THE JUDICIARY COMMITTEE SUBSTANTIALLY AMENDED THE
'PRESIDENTIAL POWER' SECTION OF S. 3197, THE BILL AS REPORTED BY THE COMMITTEE LAST
YEAR DID REFLECT THE DEMAND OF THE FORD ADMINISTRATION THAT THE PROPOSED LEGISLATION
NOT COMPLETELY FORECLOSE THE POSSIBILITY OF THE PRESIDENT EXERCISING THIS SUPPOSED
'CONSTITUTIONAL POWER' IN A NARROW RANGE OF EXCEPTIONAL CIRCUMSTANCES.  AS WAS NOTED
AT THAT TIME:

IT IS WORTH EMPHASIZING, AS THE CONGRESSIONAL REPORT INDICATES, THAT SECTION 2528
DOES NOT CONSTITUTE EITHER A CONFERRAL **3968 OR A RECOGNITION OF ANY PRESIDENTIAL
POWER TO CONDUCT WARRANTLESS ELECTRONIC SURVEILLANCE FOR FOREIGN NATIONAL SECURITY
PURPOSES. SECTION 2528 SIMPLY DISCLAIMS CONGRESSIONAL INTENT TO MANDATE THE BILL'S
WARRANT PROCEDURES IN TWO POSSIBLE SITUATIONS INVOLVING SURVEILLANCE BY ELECTRONIC,
MECHANICAL OR OTHER TECHNICAL DEVICES.

*        *        *        *

GIVEN THEIR EXCLUSION FROM THE WARRANT REQUIREMENT OF THIS LEGISLATION, THE PRES-
IDENT MAY ULTIMATELY BE FOUND TO HAVE POWER TO AUTHORIZE EACH OF THESE KINDS OF SUR-
VEILLANCE WITHOUT JUDICIAL WARRANT.  BUT EVEN IF SUCH WARRANTLESS SURVEILLANCES WERE
CONSTITUTIONAL IN THE ABSENCE OF CONGRESSIONAL ACTION, CONGRESS COULD IMPOSE A SIM-
ILAR WARRANT PROCEDURE AS THE REQUIRED MODE OF CONDUCTING THEM, JUST AS THIS BILL
MANDATES **83 PROCEDURES FOR THE FORMS OF SURVEILLANCE IT COVERS.  FOR NOW, HOWEVER,
S. 3197 DEFERS THE EXERCISE OF CONGRESSIONAL POWER IN REGARD TO THESE ADDITIONAL
AREAS OF INTELLIGENCE GATHERING.

*        *        *        *

IN THIS SUBSECTION, S. 3197 STOPS SHORT OF ASSERTING THE REGULATORY POWER OF CON-
GRESS TO ITS FULLEST EXTENT.  [FN76]

I AM PLEASED TO NOTE THAT THE JUDICIARY COMMITTEE HAS, THIS YEAR, ASSERTED ITS
POWER TO THE FULLEST EXTENT AS REGARDS ELECTRONIC SURVEILLANCE WITHIN THE UNITED

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

STATES.  THE COMMITTEE HAS ADOPTED STATUTORY LANGUAGE, WITH THE FULL SUPPORT OF THE
CARTER ADMINISTRATION, WHICH MAKES IT CLEAR THAT, IF ENACTED, THE CONGRESS DOES NOT
RECOGNIZE ANY CLAIM OF INHERENT EXECUTIVE POWER TO ENGAGE IN ELECTRONIC SURVEILLANCE
WITHIN THE UNITED STATES AND THAT S. 1566 AND TITLE III OF THE 1968 ACT REPRESENT
'THE EXCLUSIVE MEANS' BY WHICH SUCH ACTIVITIES CAN BE CONDUCTED.

I REGARD THIS AS A VERY POSITIVE ACTION AND COMMEND PRESIDENT CARTER AND ATTORNEY
GENERAL BELL FOR THEIR FARSIGHTED EFFORTS IN THIS REGARD.

THIS IS NOT THE ONLY IMPROVEMENT WHICH S. 1566 MAKES OVER S. 3197.  AS THE COMMIT-
TEE REPORTS POINTS OUT, THIS YEAR'S BILL ALSO BRINGS WITHIN ITS SCOPE CERTAIN TAR-
GETING ACTIVITIES OF THE NATIONAL SECURITY AGENCY WHICH WERE NOT COVERED BY S. 3197.
IT ALSO ALLOWS FOR A LIMITED DEGREE OF JUDICIAL REVIEW OF THE EXECUTIVE CERTIFICA-
TIONS RELATING TO UNITED STATES CITIZENS AND RESIDENT ALIENS.

AGAIN, I BELIEVE THAT THE COMMITTEE HAS ACTED WISELY IN ADOPTING THESE IMPROVE-
MENTS TO THE LEGISLATION.

YET DESPITE THESE POSITIVE FEATURES, I BELIEVE THAT S. 1566 IS FATALLY DEFECTIVE
IN ONE IMPORTANT RESPECT.  IT IS THE INCLUSION OF THIS FLAWED PROVISION THAT PRE-
VENTS ME FROM SUPPORTING THE FOREIGN INTELLIGENCE SURVEILLANCE ACT.

I AM REFERRING, OF COURSE, TO THE SO-CALLED, NONCRIMINAL STANDARD CONTAINED IN
SUBSECTION 2521(B)(2)(B)(III).

FOR THE SECOND YEAR IN A ROW, THE JUSTICE DEPARTMENT HAS PREVAILED ON THE COMMIT-
TEE TO INCLUDE IN THIS LEGISLATION A PROVISION THAT WOULD ALLOW U.S. CITIZENS AND
RESIDENT ALIENS WHO WERE NOT VIOLATING ANY FEDERAL LAW TO BE TARGETED FOR FOREIGN
INTELLIGENCE ELECTRONIC SURVEILLANCE.  THIS YEAR'S PROVISION IS, IN FACT, SLIGHTLY
BROADER THAN THE ONE **3969 FINALLY ADOPTED BY THE SENATE INTELLIGENCE COMMITTEE
LAST YEAR IN THAT 'COLLECTION' ACTIVITIES HAVE BEEN ADDED TO THE DEFINITION IN S.
1566.

DURING THE COMMITTEE HEARINGS ON THE BILL, I QUESTIONED THE ATTORNEY GENERAL
CLOSELY ABOUT THE NEED FOR THIS NONCRIMINAL STANDARD.  IN ADDITION, IN RESPONSE TO A
WRITTEN INQUIRY HE SUPPLIED ME WITH SIX HYPOTHETICAL CASES WHICH, HE ASSERTED, POIN-
TED UP THE NECESSITY OF THIS PROVISIONS.  [FN77]

AFTER CAREFULLY REVIEWING BOTH THE ORAL TESTIMONY AND WRITTEN SUBMISSIONS ON THE
QUESTION, HOWEVER, I HAVE NOT BEEN CONVINCED THAT THIS CONTROVERSIAL PROVISION IS
NECESSARY, WISE, OR, MOST IMPORTANTLY, CONSISTENT WITH THE CONSTITUTION.

**84 LET ME MAKE IT CLEAR THAT MY OPPOSITION DOES NOT STEM FROM A BELIEF THAT THIS
NONCRIMINAL STANDARD IS OVERLY BROAD.  NOR DO I BELIEVE THAT ITS INCLUSION WILL RES-
ULT IN THE WHOLESOME ABUSES OF ELECTRONIC SURVEILLANCE THAT HAVE OCCURRED IN THE
PAST.

IT IS CLEAR FROM ANY FAIR READING OF SUBSECTION 2521(B)(2)(B)(III) THAT IT HAS
BEEN DRAFTED AS NARROWLY AS POSSIBLE.

YET, THE FACT REMAINS THAT THIS PROVISION IS IN DIRECT CONFLICT WITH MY BELIEF
THAT THE 4TH AMENDMENT REQUIRES A SHOWING OF PROBABLE CAUSE THAT A CRIMINAL OFFENSE
HAS BEEN, OR IS ABOUT TO BE, COMMITTED BEFORE AN AMERICAN CITIZEN CAN BE SUBJECTED
TO THE PERVASIVE TYPE OF SEARCH WHICH ELECTRONIC SURVEILLANCE ENTAILS.  I BELIEVE,
AS THE CHURCH COMMITTEE FOUND, THAT 'AS A MATTER OF PRINCIPLE . . . AN AMERICAN
OUGHT NOT TO BE TARGETED FOR SURVEILLANCE UNLESS THERE IS PROBABLE CAUSE TO BELIEVE
THAT HE MAY VIOLATE THE LAW. '  [FN78]

EXPOSING AMERICANS TO SUCH RISK SHOULD BE LIMITED TO SITUATIONS WHERE THE ALLEGED

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ACTIVITY IS SUFFICIENTLY HARMFUL TO THE NATIONAL SECURITY TO HAVE BEEN MADE A FEDER-
AL OFFENSE.

IT WAS PRINCIPALLY THIS PROVISION WHICH PREVENTED ME FROM SUPPORTING S. 1566 IN
THE JUDICIARY COMMITTEE.  I BELIEVE THAT THERE IS SOME CAUSE FOR HOPE, HOWEVER, THAT
BEFORE THIS BILL IS SCHEDULED FOR ACTION BY THE FULL SENATE, SOME COMPROMISE MAY BE
REACHED ON THIS ISSUE.

ATTORNEY GENERAL BELL HAS ALREADY INDICATED THAT THE JUSTICE DEPARTMENT INTENDS TO
PROPOSE STATUTORY REVISIONS TO THE ESPIONAGE LAW INTENDED TO COVER THOSE TYPES OF
INTELLIGENCE ACTIVITIES WHICH ARE DESIGNED TO BE COVERED BY THE NON-CRIMINAL STAND-
ARD OF S. 1566. IF THIS SIGNED TO BE COVERED BY THE NON-CRIMINAL STANDARD OF S.
1566.  IF THIS WERE DONE, OF COURSE, THERE WOULD BE NO NEED FOR SUBSECTION
2511(B)(2)(B)(III).

A MORE LIKELY SHORT-TERM SOLUTION, HOWEVER, MIGHT INVOLVE REVISING THAT PROVISION
OF THE BILL SO THAT IT PROVIDES THE FLEXIBILITY NEEDED BY OUR INTELLIGENCE AGENCIES
WHILE AT THE SAME TIME PROTECTING THE CONSTITUTIONAL LIBERTIES OF OUR CITIZENS.

I BELIEVE THAT SUCH A FORMULATION-- SOME MIDDLE GROUND WHICH WILL SERVE BOTH PUR-
POSES-- CAN BE FOUND.

FOR MY PART, I INTEND TO WORK TOWARD THAT END.  AT THE COMMITTEE MARKUP OF  S.
1566 ON OCTOBER 5, I WITHDREW MY AMENDMENT TO STRIKE THE NONCRIMINAL STANDARD IN OR-
DER TO PROVIDE A MORE NEUTRAL FRAMEWORK FOR CONTINUED DISCUSSIONS WITH REPRESENTAT-
IVES OF THE JUSTICE **3970 DEPARTMENT ON THIS MATTER.  IT IS MY HOPE THAT THE ATTOR-
NEY GENERAL WILL BE RESPONSIVE TO THIS INVITATION AND WILL JOIN US IN ATTEMPTING TO
REACH SOME ACCOMMODATION ON THIS DIFFICULT AND IMPORTANT ISSUE.

FN1   HEARING BEFORE THE SUBCOMMITTEE ON CRIMINAL LAWS AND PROCEDURES OF THE SEN-
ATE COMMITTEE ON THE JUDICIARY, FOREIGN INTELLIGENCE SURVEILLANCE ACT OF 1977, 95TH
CONG., 1ST SESS., P. 13 (1977) (HEREINAFTER CITED AS 'SENATE JUDICIARY HEARINGS').

FN2   SEE, E.G., S. 3197.  FOREIGN INTELLIGENCE SURVEILLANCE ACT OF 1976, 94TH
CONG., 2D SESS. (1976); S. 743.  NATIONAL SECURITY SURVEILLANCE ACT OF 1975, 94TH
CONG., 1ST SESS. (1975):  S. 2820, SURVEILLANCE PRACTICES AND PROCEDURES ACT OF
1973, 93RD CONG., 1ST SESS. (1973):  S. 4062.  FREEDOM FROM SURVEILLANCE ACT OF
1974, 93RD CONG., 2D SESS. (1974).

FN3   SEE, E.G., HEARINGS BEFORE THE SUBCOMMITTEE ON CRIMINAL LAWS AND PROCEDURES
OF THE SENATE COMMITTEE ON THE JUDICIARY, FOREIGN INTELLIGENCE SURVEILLANCE ACT OF
1976, 94TH CONG., 2D SESS. (1976); SENATE SELECT COMMITTEE ON INTELLIGENCE, FOREIGN
INTELLIGENCE SURVEILLANCE ACT OF 1976, 94TH CONG., 2D SESS. (1976); SUBCOMMITTEE ON
SURVEILLANCE OF THE SENATE COMMITTEE ON FOREIGN RELATIONS AND THE SUBCOMMITTEE ON
ADMINISTRATIVE PRACTICE AND PROCEDURE OF THE SENATE COMMITTEE ON THE JUDICIARY, WAR-
RANTLESS WIRETAPPING AND ELECTRONIC SURVEILLANCE, 94TH CONG., 1ST SESS. (1975);
JOINT HEARINGS BEFORE THE SUBCOMMITTEE ON ADMINISTRATIVE PRACTICE AND PROCEDURE AND
THE SUBCOMMITTEE ON CONSTITUTIONAL RIGHTS OF THE SENATE COMMITTEE ON THE JUDICIARY,
WARRANTLESS WIRETAPPING AND ELECTRONIC SURVEILLANCE, 93D CONG., 2D SESS. (1974);
HEARINGS BEFORE THE SUBCOMMITTEE ON ADMINISTRATIVE PRACTICE AND PROCEDURE OF THE
SENATE COMMITTEE ON THE JUDICIARY, WARRANTLESS WIRETAPPING, 92D CONG., 2D SESS.
(1972).  IN THE JOINT REPORT OF THE SUBCOMMITTEES ON SURVEILLANCE AND ADMINISTRATIVE
PRACTICE AND PROCEDURE ISSUED IN 1975, FINDINGS WERE MADE THAT 'THERE ARE NOT AD-

**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**


EQUATE WRITTEN STANDARDS OR CRITERIA WITHIN THE EXECUTIVE BRANCH TO GOVERN THE WAR-
RANTLESS ELECTRONIC SURVEILLANCE OF EITHER AMERICANS OR FOREIGNERS.  THERE IS A GAP
IN THE STATUTES, THE CASE, AND IN ADMINISTRATIVE REGULATION ON THE USE OF WARRANT-
LESS WIRETAPS OR BUGS BY EXECUTIVE BRANCH AGENCIES FOR ALLEGED 'NATIONAL SECURITY'
PURPOSES.'

   FN4   123 CONG. REC. S7857 (DAILY ED., MAY 18, 1977).

   FN5   277 U.S. 438, 48 S.CT. 564, 72 L.ED.944.

   FN6   THE HISTORY OF THE PRACTICE OF THE DEPARTMENT OF JUSTICE WHICH FOLLOWS IN
THIS REPORT IS DERIVED FROM ATTORNEY GENERAL EDWARD H. LEVI'S TESTIMONY BEFORE THE
CHURCH COMMITTEE ON NOVEMBER 6, 1975 AND THE FINAL REPORT OF THAT COMMITTEE.  THE
RELEVANT PORTIONS OF THE REPORT INCLUDE BOOK I, FOREIGN AND MILITARY INTELLIGENCE,
CHAPTER IX, 'COUNTERINTELLIGENCE;' BOOK II, INTELLIGENCE ACTIVITIES AND THE RIGHTS
OF AMERICANS, CHAPTER II.  'THE GROWTH OF DOMESTIC INTELLIGENCE,'  FINDING C, 'EX-
CESSIVE USE OF INTRUSIVE TECHNIQUES,' AND FINDING E, 'POLITICAL ABUSE OF INTELLI-
GENCE INFORMATION'; BOOK III, SUPPLEMENTARY DETAILED STAFF REPORTS ON INTELLIGENCE
ACTIVITIES AND THE RIGHTS OF AMERICANS, 'DR. MARTIN LUTHER KING, JR., CASE STUDY,'
'WARRANTLESS FBI ELECTRONIC SURVEILLANCE.'  WARRANTLESS SURREPTITIOUS ENTRIES,'  'DO-
MESTIC CIA AND FBI MAIL OPENING,' NATIONAL SECURITY AGENCY SURVEILLANCE AFFECTING
AMERICANS,' AND 'NATIONAL SECURITY, CIVIL LIBERTIES, AND THE COLLECTION OF INTELLI-
GENCE:  A REPORT ON THE HUSTON PLAN'; BOOK IV, SUPPLEMENTARY DETAILED STAFF REPORTS
ON FOREIGN AND MILITARY INTELLIGENCE, 'INTELLIGENCE AND TECHNOLOGY.'

   FN7   47 U.S.C. 605 (1964 ED.), 48 STAT. 1103.

   FN8   NARDONE V. UNITED STATES, 302 U.S. 379, 58 S.CT. 275, 82 L.ED. 314  (1937);
308 U.S. 338, 60 S.CT. 266, 84 L.ED. 307 (1939).

   FN9   III CHURCH COMMITTEE 297.

   FN10   II CHURCH COMMITTEE 60.  IN 1950, AIDES TO PRESIDENT TRUMAN DISCOVERED
CLARK'S INCOMPLETE QUOTATION, AND THE PRESIDENT CONSIDERED RETURNING TO THE TERMS OF
THE ORIGINAL 1940 AUTHORIZATION.  HOWEVER, THE 1946 DIRECTIVE WAS NEVER RESCINDED.

   FN11   III CHURCH COMMITTEE 297.

   FN12   III CHURCH COMMITTEE 297.

   FN13   385 U.S. 26, 87 S.CT. 190, 17 L.ED.2D 26, ON REMAND 282 F.SUPP. 35 (1966).

   FN14   88 S.CT. 507, 19 L.ED.2D 576.

   FN15   SEE ALSO, S. REPT. 1097, SENATE COMMITTEE ON THE JUDICIARY, OMNIBUS CRIME
CONTROL AND SAFE STREETS ACT OF 1967; 90TH CONG., 2D SESS. (1968).

   FN16   UNITED STATES V. UNITED STATES DISTRICT COURT, 407 U.S. 297, 92 S.CT. 2125,
32 L.ED.2D 752 (1972).

   FN17   407 U.S., AT 312.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH CONG., 1ST SESS. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**

    FN18    407 U.S., AT 313.

    FN19    407 U.S., AT 315.

    FN20    407 U.S., AT 316-317.

    FN21    407 U.S., AT 320.

    FN22    407 U.S., AT 320.

    FN23    407 U.S., AT 320-321.

    FN24    407 U.S., AT 321-322.

    FN25    407 U.S., AT 303, 306.

    FN26    484 F.2D AT 426.

    FN27    96 S.CT. 1684, 48 L.ED.2D 187.

    FN28    516 F.2D AT 613-614.  NEITHER BROWN NOR BUTENKO PROVIDE A SYSTEMATIC ANA-
LYSIS OF THE PROBLEM WITHIN THE FRAMEWORK INDICATED BY THE SUPREME COURT DECISION IN
KEITH, I.E., WHETHER THE REQUIREMENT OF A WARRANT WOULD UNDULY FRUSTRATE THE EXER-
CISE OF THE PRESIDENT'S RESPONSIBILITY IN THE AREA OF NATIONAL SECURITY.  THE
COURT'S OPINION IN BROWN SIMPLY CONFIRMED THE PRESIDENT'S INHERENT POWER TO AUTHOR-
IZE FOREIGN INTELLIGENCE COLLECTION THROUGH, AMONG OTHER THINGS, ELECTRONIC SURVEIL-
LANCE WITHOUT A WARRANT.  THE BUTENKO OPINION OFFERS A SIGHTLY MORE EXTENSIVE ANA-
LYSIS OF THE PROBLEM.  ON THE OTHER HAND, THE ZWEIBON OPINION, INSOFAR AS IT CON-
SIDERED AND REJECTED THE ARGUMENTS FOR THE EXISTENCE OF AN INHERENT POWER BY APPLY-
ING THE ANALYTICAL FRAMEWORK USED BY THE SUPREME COURT IN KEITH, WAS A PLURALITY
OPINION.

    FN29    THE CHURCH COMMITTEE CONCLUDED THAT, IN MANY CASES, SURVEILLANCE WAS BASED
ON THE BELIEF THAT GROUPS OR INDIVIDUALS WERE DIRECTED, FINANCED OR OTHERWISE CON-
TROLLED BY A HOSTILE FOREIGN POWER.  SOME OF THE SURVEILLANCES WERE DIRECTED AGAINST
CITIZENS OR ORGANIZATIONS WHOSE ACTIVITIES, WHILE NOT NECESSARILY VIOLENT, WERE
THOUGHT TO BE SUFFICIENTLY SUBVERSIVE TO POSE A DANGER TO THE SECURITY OF THE COUN-
TRY.  (III, PP. 316-317.) HOWEVER, FROM THIS 'SUBVERSIVE ACTIVITIES' STANDARD IT
WAS, ACCORDING TO THE COMMITTEE, RELATIVELY EASY TO JUSTIFY AND ORDER ELECTRONIC
SURVEILLANCE AGAINST AMERICAN CITIZENS AND ORGANIZATIONS, NOT PRIMARILY BECAUSE OF
THEIR OWN ACTIVITIES, BUT BECAUSE THEY WERE BELIEVED TO BE ADVERSELY INFLUENCED,
WHETHER CONSCIOUSLY OR NOT, BY PERSONS ACTING UNDER THE DIRECTION OF FOREIGN
POWER.  THE ELECTRONIC SURVEILLANCE OF MARTIN LUTHER KING WAS JUSTIFIED NOT BECAUSE
KING HIMSELF POSED ANY THREAT TO NATIONAL SECURITY, BUT BECAUSE OF THE POSSIBILITY
THAT TWO OF KING'S ADVISERS WERE ASSOCIATED WITH THE COMMUNIST PARTY.  (III, P.
318.) THE INFINITE ELASTICITY OF THE 'NATIONAL SECURITY' CRITERIA UNRESTRAINED BY
ANY JUDICIAL OR EXTERNAL CHECK, HAS BEEN DRAMATICALLY UNDERSCORED IN RECENT YEARS BY
A SERIES OF SURVEILLANCES DIRECTED AGAINST GOVERNMENT EMPLOYEES AND JOURNALISTS FOR
THE AVOWED PURPOSES OF IDENTIFYING THE SOURCES OF 'LEAKS' OF CLASSIFIED INFORMATION.
(III, P. 321.)

                    © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)

**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**

FN30   CF. SEE YOUNGSTOWN SHEET & TUBE CO. V. SAWYER, 343 U.S. 579, 72 S.CT. 863,
96 L.ED. 1153 (1952) (JACKSON, J. CONCURRING).

FN31   87 S.CT. 1727, 18 L.ED.2D 930.

FN32   93 S.CT. 2535, 37 L.ED.2D 596.

FN33   96 S.CT. 3074, 49 L.ED.2D 1116.

FN34   407 U.S. AT 322; SEE ALSO, ZWEIBON V. MITCHELL, 516 F.2D AT 669.

FN35   THIS BILL IS NOT INTENDED, OF COURSE, TO REPEAL OR ABROGATE THE VIENNA CON-
VENTION ON DIPLOMATIC RELATIONS, WHICH WAS RATIFIED BY THE SENATE AND CAME INTO EF-
FECT IN THE UNITED STATES ON DECEMBER 13, 1972.  THE CONVENTION PROVIDES THAT DIPLO-
MATIC AGENTS, THEIR RESIDENCES (ARTICLE 30(1)), AND THEIR MISSIONS (ARTICLE 22 (1)
AND (3)), AS WELL AS THEIR OFFICIAL CORRESPONDENCE (ARTICLE 27(2) AND 30(2)), ARE
'INVIOLABLE.'  THE OBLIGATIONS OF THE CONVENTION ARE RECIPROCAL; WHEN ANOTHER NATION
HAS FAILED TO MAINTAIN THE INVIOLABILITY OF AMERICAN DIPLOMATIC COMMUNICATIONS, THIS
COUNTRY IS FREE UNDER INTERNATIONAL LAW TO ACT SIMILARLY TOWARDS REPRESENTATIVES OF
THAT NATION (ARTICLE 47 (2A)). THE BILL DOES NOT AFFECT NOR DOES THE COMMITTEE IN-
TEND TO AFFECT, THE LEGAL INTERPRETATIONS OF THE VIENNA CONVENTION UNDER WHICH THE
EXECUTIVE BRANCH HAS MADE THOSE TREATY OBLIGATIONS EFFECTIVE WITHIN THE UNITED
STATES.

FN36   SEE, E.G., HAMPTON V. MOW SUN WONG, 426 U.S. 88, 115, 96 S.CT. 1895, 48
L.ED.2D 495 (1976).

FN37   BOOK I, AT 163-164.

FN38   IT SHOULD BE NOTED THAT EVEN FAILING TO COMPLY FULLY WITH THE FOREIGN
AGENTS REGISTRATION ACT (22 U.S.C. 611, ET SEQ.) IN AND OF ITSELF IS NOT INTENDED TO
BE CLANDESTINE INTELLIGENCE ACTIVITY MERELY BECAUSE THE AGENT SEEKS TO LOBBY CON-
GRESS OR INFLUENCE PUBLIC OPINION ON MATTERS RELATING TO THE NATIONAL DEFENSE OR
FOREIGN AFFAIRS.  IF, HOWEVER, FOREIGN INTELLIGENCE SERVICES HIDE BEHIND THE COVER
OF SOME PERSON OR ORGANIZATION IN ORDER TO INFLUENCE AMERICAN POLITICAL EVENTS AND
DECEIVE AMERICANS INTO BELIEVING THAT THE OPINIONS OR INFLUENCE IS OF DOMESTIC ORI-
GIN AND INITIATIVE AND SUCH DECEPTION IS WILLFULLY MAINTAINED IN VIOLATION OF THE
FOREIGN AGENTS REGISTRATION ACT, THEN ELECTRONIC SURVEILLANCE MIGHT BE JUSTIFIED UN-
DER SUBSECTION (B) (I) OF S. 1566 IF ALL THE OTHER STATUTORY CRITERIA WERE MET.

FN39   123 CONG. REC. S7857 (DAILY ED., MAY 18, 1977).

FN40   SENATE JUDICIARY HEARINGS, TESTIMONY OF ATTORNEY GENERAL GRIFFIN BELL, PP
12-46 (JUNE 13, 1977).

FN41   61 S.CT. 429, 85 L.ED. 488.

FN42   66 S.CT. 975, 90 L.ED. 1608.

FN43   OF COURSE, NOTHING IN THIS SUBPARAGRAPH WOULD ALLOW ELECTRONIC SURVEILLANCE

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**


OF THOSE ENGAGED IN PROTESTS DEMONSTRATIONS, OR OTHER SUCH LAWFUL ACTIVITY DIRECTED
AGAINST A THIRD COUNTRY, EVEN IF CARRIED OUT AT THE DIRECTION OF A FOREIGN POWER.

   FN44   IN THE CASE OF A PERSON ALLEGED TO BE KNOWINGLY AIDING OR ABETTING THOSE
ENGAGED IN TERRORIST ACTIVITIES ON BEHALF OF A FOREIGN POWER, SUCH A PERSON MIGHT BE
ASSISTING A GROUP ENGAGED IN BOTH LAWFUL POLITICAL ACTIVITY AND UNLAWFUL TERRORIST
ACTS.  IN SUCH A CASE, IT WOULD BE NECESSARY TO ESTABLISH PROBABLE CAUSE THAT THE
INDIVIDUAL WAS AWARE OF THE TERRORIST ACTIVITIES UNDERTAKEN BY THE GROUP AND WAS
KNOWINGLY FURTHERING THEM, AND NOT MERELY THAT HE WAS AWARE OF AND FURTHERING THEIR
LAWFUL ACTIVITY.

   FN45   MERE MEMBERSHIP IN THE UNITED STATES COMMUNIST PARTY IS NOT SUFFICIENT UN-
DER THIS BILL TO ESTABLISH PROBABLE CAUSE THAT A PERSON IS ACTING UNDER THE DIREC-
TION AND CONTROL OF A FOREIGN POWER OR THAT HE IS ENGAGED IN CLANDESTINE INTELLI-
GENCE ACTIVITIES. MOREOVER, EVEN IF ADDITIONAL INFORMATION ESTABLISHED PROBABLE
CAUSE TO BELIEVE SOME MEMBERS OF THE PARTY WERE ACTING UNDER THE DIRECTION AND CON-
TROL OF A FOREIGN POWER, NEITHER EFFORTS TO COLLECT INFORMATION ABOUT THE PLANS AND
PROGRAM OF THE CIVIL RIGHTS MOVEMENT OR OTHER POLITICAL PROTESTS, NOR EFFORTS TO
STIMULATE OR SHAPE THEM WOULD CONSTITUTE CLANDESTINE INTELLIGENCE ACTIVITY WITHIN
THIS SECTION.  GATHERING INFORMATION ABOUT THE MOVEMENT WOULD NEITHER BE CRIMINAL
ESPIONAGE NOR THE KIND OF ECONOMIC OR TECHNICAL INFORMATION RELATING TO THE NATIONAL
SECURITY WHOSE COLLECTION MIGHT SATISFY THE NONCRIMINAL STANDARD.  SIMILARLY, SINCE
THE CIVIL RIGHTS PROTEST MOVEMENT ITSELF INVOLVED CONSTITUTIONALLY PROTECTED RIGHTS
OF ASSOCIATION, SPEECH AND PETITION FOR REDRESS OF GRIEVANCES, EFFORTS BY A FOREIGN
POWER TO INVOLVE ITSELF IN SUCH A MOVEMENT ARE INTENDED TO BE SPECIFICALLY EXCLUDED
FROM THE DEFINITION OF CLANDESTINE INTELLIGENCE ACTIVITY.

   FN46   UNDER 18 U.S.C. 956, IT IS A FEDERAL CRIME FOR PERSONS WITHIN THE UNITED
STATES TO CONSPIRE TO INJURE OR DESTROY PROPERTY LOCATED IN AND OWNED BY A FOREIGN
GOVERNMENT.

   FN47   IN TESTIFYING LAST YEAR IN THE HOUSE HEARINGS ON S. 3197, ATTORNEY GENERAL
LEVI CONFIRMED THIS INTERPRETATION: 'MR. KASTENMEIER.  HOW DO YOU UNDERSTAND THE
TERM OTHER HOSTILE ACTS OF A FOREIGN POWER?  IS THERE ENOUGH PRECEDENT OR OTHER LAN-
GUAGE SO THAT WE UNDERSTAND PRECISELY WHAT THE HOSTILE ACTS CONSTITUTE, WHETHER A
CRITICISM OF OUR PARTICIPATION IN THE VIETNAM WAR WOULD BE A HOSTILE ACT?  OR AT-
TEMPTING TO BOARD AN AMERICAN SHIP ON THE HIGH SEAS IS A MORE CLASSICAL CASE.  HOW
BROAD IS THE HOSTILE ACTS? 'ATTORNEY GENERAL LEVI.  I CERTAINLY WOULDN'T THINK THAT
HOSTILE ACTS INVOLVED CRITICISM.  I WOULD ASSUME-- I DON'T KNOW THAT WE CAN GET A
BETTER DEFINITION. BUT IT DOES AFTER ALL SAY, 'AGAINST ACTUAL OR POTENTIAL ATTACK OR
OTHER HOSTILE ACTS.'  SO THAT IT IS THE ACTUAL OR POTENTIAL ATTACK WHICH REALLY
GIVES THE FLAVOR TO WHAT IS MEANT. 'MR. KASTENMEIER.  IN OTHER WORDS, IT MUST BE
SEEN IN A BROADER CONTEXT, AND THEREFORE BE MUCH MORE LIMITED? 'ATTORNEY GENERAL
LEVI. I WOULD THINK SO.'  (HOUSE HEARINGS 10-11, EMPHASIS ADDED.)

   FN48   THE NATURE OF NATIONAL SECURITY AGENCY ACTIVITIES, THE PURPOSES OF SUCH
ACTIVITIES AND THE TECHNOLOGICAL PROBLEMS ASSOCIATED WITH SUCH ACTIVITIES HAVE BEEN
CAREFULLY DOCUMENTED BY THE CHURCH COMMITTEE IN VOL. III, PATES 733 ET SEQ. SEE

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 95-604(I), S. Rep. No. 604(I), 95TH Cong., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)
**(Cite as: S. REP. 95-604(I),  1978 U.S.C.C.A.N. 3904)**

ALSO, II CHURCH COMMITTEE 58-60, 108 AND 308-311.

FN49   THE COMMITTEE NOTES WITH APPROVAL, HOWEVER, THAT BROADSCALE ELECTRONIC SUR-
VEILLANCE OF AMERICAN CITIZENS WHILE ABROAD HAS BEEN LIMITED IN PART BY BOTH THE
PRESIDENT'S EXECUTIVE ORDER APPLICABLE TO THE FOREIGN INTELLIGENCE AGENCIES AND DE-
PARTMENT OF JUSTICE DIRECTIVES TO THE INTELLIGENCE COMMUNITY.  SEE EXECUTIVE ORDER
NO. 11905, FEBRUARY 18, 1976; TESTIMONY OF ATTORNEY GENERAL EDWARD H. LEVI BEFORE
THE CHURCH COMMITTEE, NOVEMBER 6, 1975, P. 15.  THUS, THE SURVEILLANCE OF JOURNAL-
ISTS, SUCH AS IN THE JOSEPH KRAFT CASE, WOULD BE PROHIBITED.

FN50   AIR POLLUTION VARIANCE BOARD V. WESTERN ALFALFA CORP., 416 U.S. 861, 94
S.CT. 2114, 40 L.ED.2D 607 (1974).

FN51   LOPEZ V. UNITED STATES, 373 U.S. 427, 83 S.CT. 1381, 10 L.ED.2D 462 (1963);
RATHBUN V. UNITED STATES, 355 U.S. 197 (1957).

FN52   UNITED STATES V. WHITE, 401 U.S. 745, 91 S.CT. 1122, 28 L.ED.2D 453 (1971).

FN53   SENATE JUDICIARY HEARINGS, TESTIMONY OF ATTORNEY GENERAL BELL, PP. 18- 19
(JUNE 13, 1977).

FN54   SENATE JUDICIARY HEARINGS, PP. 18-20.

FN55   SENATE JUDICIARY HEARINGS, TESTIMONY OF ATTORNEY GENERAL BELL, P. 20  (JUNE
13, 1977).

FN56   UNITED STATES V. BYNUM, 485 F.2D 490, 500 (2ND CIR. 1973), CERT. DENIED 423
U.S. 1005 (1974).

FN57   UNITED STATES V. TORTORELLO, 480 F.2D 764, (2ND CIR.), CERT. DENIED 414
U.S. 886 (1973).

FN58   UNITED STATES V. ARMOCIDA, 515 F.2D 29, 44 (3D CIR. 1975).

FN59   UNITED STATES V. ARMOCIDA, SUPRA:  UNITED STATES V. JAMES, 494 F.2D 1007
(D.C. CIR. 1974), CERT. DENIED 419 U.S. 1020 (1975); UNITED STATES V. BYNUM, SUPRA.

FN60   CONGRESSIONAL RECORD S7857 (DAILY ED. MAY 18, 1977).

FN61   SOME MEMBERS OF THE COMMITTEE HAVE EXPRESSED CONCERN THAT THE FAILURE OF S.
1566 TO REQUIRE A STATEMENT OF MEANS IN CASES INVOLVING THE SPECIAL CLASS OF FOREIGN
POWERS IS PART OF A DISQUIETING PATTERN, A PATTERN THAT RESULTS IN LESS OVERSIGHT OF
WARRANT APPLICATIONS BY BOTH THE DEPARTMENT OF JUSTICE AND THE JUDICIARY.  THUS, IN-
SOFAR AS (1) THE ATTORNEY GENERAL CAN DELEGATE HIS AUTHORITY TO REVIEW WARRANT AP-
PLICATIONS (2521(B) (7), SUPRA), (2) THE COURT HAS NO SUPERVISORY ROLE OVER THE
LENGTH OF SURVEILLANCE OF 'OFFICIAL' FOREIGN POWERS (2524(A) (7) (F), SUPRA), AND
(3) THE GOVERNMENT NEED NOT GIVE A STATEMENT OF THE MEANS BY WHICH THE SURVEILLANCE
OF 'OFFICIAL' FOREIGN POWERS WILL BE EFFECTED, THERE IS OBVIOUSLY A MARKED LESSENING
OF THE STATUTORY SAFEGUARDS FOUND IN S. 3197.  THE OPPORTUNITY FOR ABUSE OBVIOUSLY
INCREASES. SOME MEMBERS OF THE COMMITTEE HAVE GONE ALONG WITH THESE CHANGES WITH THE

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

GREATEST RELUCTANCE AND ONLY BECAUSE THEY VIEW S. 1566-- IN ITS ENTIRETY-- AS A MA-
JOR IMPROVEMENT OVER EXISTING LAW.

   FN62   UNITED STATES V. UNITED STATES DISTRICT COURT, 407 U.S. 297 AT 323, 92
S.CT. 2125, 32 L.ED.2D 752 (1972).

   FN63   UNITED STATES V. ARMOCIDA, 515 F.2D 29 (3RD CIR. 1975).

   FN64   373 U.S. 83, 83 S.CT. 1194, 10 L.ED.2D 215 (1963).

   FN65   18 U.S.C. 3500 ET SEQ.

   FN66   UNITED STATES V. ANDOLSCHEK, 142 F.2D 503 (2ND CIR. 1944).

   FN67   SEE ALSO, ALDERMAN V. UNITED STATES, 394 U.S. 165 (1967).

   FN68   18 U.S.C. 2518 (9) AND (10).

   FN69   89 S.CT. 1099, 22 L.ED.2D 302.

   FN70   CF. ALDERMAN V. UNITED STATES, 394 U.S. 165, 182 N. 14 (1968); TAGLIANETTI
V. UNITED STATES, SUPRA AT 317.

   FN71   THE COMMITTEE HAS DELIBERATELY CHOSEN THE GENERAL PHRASE 'IN ACCORDANCE
WITH THE REQUIREMENTS OF LAW' TO AVOID DEALING WITH THE VERY COMPLEX PROBLEM OF WHAT
PROCEDURES ARE TO BE FOLLOWED IN THOSE CASES WHERE THE TRIAL COURT DETERMINES THAT
THE SURVEILLANCE WAS EITHER UNLAWFULLY AUTHORIZED OR CONDUCTED OR THE GOVERNMENT'S
REFUSAL TO DISCLOSE THE UNDERLYING DOCUMENTATION TO THE DEFENDANT PREVENTS THE COURT
FROM MAKING THAT DETERMINATION.  THE EVIDENCE OBTAINED WOULD NOT, OF COURSE, BE AD-
MISSIBLE DURING THE TRIAL.  BUT BEYOND THIS IS THE QUESTION OF WHETHER, IN THE CASE
OF AN ILLEGAL SURVEILLANCE, THE GOVERNMENT IS CONSTITUTIONALLY MANDATED TO SURRENDER
TO THE DEFENDANT ALL THE RECORDS OF THE SURVEILLANCE IN ITS POSSESSION IN ORDER FOR
THE DEFENDANT TO MAKE AN INTELLIGENT MOTION ON THE QUESTION OF TAINT.  THE SUPREME
COURT OPINION IN ALDERMAN V. UNITED STATES, SUPRA, CLEARLY ANSWERS THIS QUESTION IN
THE AFFIRMATIVE.  IN THE ALDERMAN CASE, THE COURT HELD THAT, ONCE A DEFENDANT CLAIM-
ING EVIDENCE AGAINST HIM WAS THE FRUIT OF UNCONSTITUTIONAL ELECTRONIC SURVEILLANCE
HAS ESTABLISHED THE ILLEGALITY OF SUCH SURVEILLANCE (AND HIS 'STANDING' TO OBJECT),
HE MUST BE GIVEN CONFIDENTIAL MATERIALS IN THE GOVERNMENT'S CONTENTION THAT THE TRI-
AL COURT COULD BE PERMITTED TO SCREEN THE FILES IN CAMERA AND GIVE THE DEFENDANT
ONLY MATERIAL WHICH WAS 'ARGUABLY RELEVANT' TO HIS CLAIM, SAYING SUCH SCREENING
WOULD BE SUFFICIENTLY SUBJECT TO ERROR TO INTERFERE WITH THE EFFECTIVENESS OF AD-
VERSARY LITIGATION OF THE QUESTION OF 'TAINT.' ALDERMAN, HOWEVER, WAS A PRE-TITLE
III CASE (WHICH, IN SECTION 2518(10)(A) CONFERS DISCRETION ON THE COURT TO DEAL WITH
THE ISSUE OF 'TAINT' IN 'THE INTEREST OF JUSTICE') AND BOTH THIS COMMITTEE AND THE
DEPARTMENT OF JUSTICE HAVE MAINTAINED THAT ALDERMAN WAS AN EXERCISE OF THE SUPREME
COURT'S SUPERVISORY JURISDICTION OVER THE LOWER FEDERAL COURTS AND NOT A CONSTITU-
TIONAL INTERPRETATION.  SENATE COMMITTEE ON THE JUDICIARY, S. REPT. 91-617, ORGAN-
IZED CRIME CONTROL ACT OF 1970, 91ST CONG., 2D SESS., 64-70 (1970).  HOWEVER, THE
SUPREME COURT HAS REFUSED TO RECONSIDER THE ALDERMAN RULE AND, IN FACT, REASSERTED
ITS VALIDITY IN ITS KEITH DECISION.  (UNITED STATES V. UNITED STATES DISTRICT COURT,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SUPRA, AT 393.)

  FN72   SEE, E.G., S. RES. 400, 95TH CONG., 2D SESS. (1976).

  FN73   FOR A DISCUSSION OF NSA ACTIVITIES AND PROPOSED LEGISLATIVE CONTROLS, SEE
II CHURCH COMMITTEE 58-60, 108 AND 308-311.  THE PROBLEMS POSED BY ELECTRONIC SUR-
VEILLANCE OF AMERICANS OVERSEAS CAN BE FOUND AT PAGES 305 AND 306; SEE, ALSO III
CHURCH COMMITTEE 733, ET SEQ.

  FN74   72 S.CT. 863, 96 L.ED. 1153.

  FN75   18 U.S.C. 2511(3).

  FN76   REPT. 94-1035, 'SENATE COMMITTEE ON THE JUDICIARY.  FOREIGN INTELLIGENCE
SURVEILLANCE ACT OF 1976.  ADDITIONAL VIEWS OF SENATORS ABOUREZK, HART AND MATHIAS,'
94TH CONG., 2D SESS., 76 (1976).

  FN77   AS AN APPENDIX, I HAVE ATTACHED BOTH THE JUSTICE DEPARTMENT'S HYPOTHETICALS
AND AN ANALYSIS OF EACH PREPARED BY THE WASHINGTON OFFICE OF THE AMERICAN CIVIL
LIBERTIES UNION.

  FN78   REPORT 94-755 'SENATE SELECT COMMITTEE TO STUDY GOVERNMENTAL OPERATIONS
WITH RESPECT TO INTELLIGENCE ACTIVITIES, FINAL REPORT, BOOK II, INTELLIGENCE ACTIV-
ITIES AND THE RIGHTS OF AMERICANS,' 94TH CONGRESS, 2D SESSION, 325 (1976).

(Note:  1.  PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE
DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS,
ARE OMITTED.  OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS:  *****.
        2.  TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD SEARCH
USING THE PUBLIC LAW NUMBER, e.g., TO(99-495))

 S. REP. 95-604(I), S. Rep. No. 604(I), 95TH CONG., 1ST Sess. 1977, 1978
U.S.C.C.A.N. 3904, 1977 WL 9632 (Leg.Hist.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 6



147 Cong.Rec. S10365-02                                          Page 1
147 Cong. Rec. S10365-02, 2001 WL 1188632 (Cong.Rec.)
**(Cite as: 147 Cong. Rec. S10365-02)**

Congressional Record --- Senate
Proceedings and Debates of the 107th Congress, First Session
Tuesday, October 9, 2001

**\*S10365** THE UNITING AND STRENGTHENING AMERICA ACT OF 2001

Mr. LEAHY.

Madam President, last Thursday, October 4, I was pleased to introduce with the
Majority Leader, Senator

Daschle, and the Chairmen of the Banking and Intelligence Committees, as well as
the Minority Leader, Senator

Lott, and Senator

Hatch and Senator

Shelby, the United and Strengthening America, or USA Act. This is not the bill
that I, or any of the sponsors, would have written if compromise was unnecessary.
Nor is the bill the administration initially proposed and the Attorney General de-
livered to us on September 19, at a meeting in the Capitol.

We were able to refine and supplement the administration's original proposal in a
number of ways. The administration accepted a number of the practical steps I had
originally proposed on September 19 to improve our security on the Northern Border,
assist our Federal, State and local law enforcement officers and provide compensa-
tion to the victims of terrorist acts and to the public safety officers who gave
their lives to protect ours. This USA Act also provides important checks on the pro-
posed expansion of government powers that were not contained in the Attorney Gener-
al's initial proposal.

In negotiations with the administration, I have done my best to strike a **\*S10366**
reasonable balance between the need to address the threat of terrorism, which we all
keenly feel at the present time, and the need to protect our constitutional
freedoms. Despite my misgivings, I have acquiesced in some of the administration's
proposals because it is important to preserve national unity in this time of crisis
and to move the legislative process forward.

The result of our labors still leaves room for improvement. Even after the Senate
passes judgment on this bill, the debate will not be finished. We will have to con-
sider the important judgments made by the House Judiciary Committee in the version
of the legislation making its way through the House. Moreover, I predict that some
of these provisions will face difficult tests in the courts and that we in Congress
will have to revisit these issues at some time in the future when, as we all de-
voutly hope, the present crisis has passed. I also intend as Chairman of the Judi-
ciary Committee to exercise careful oversight of how the Department of Justice, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FBI and other executive branch agencies are using the newly-expanded powers that this bill will give them.

The negotiations on this bill have not been easy. Within days of the September 11 attacks, I instructed my staff to begin work on legislation to address security needs on the Northern Border, the needs of victims and State and local law enforcement, and criminal law improvements. A week after the attack, on September 19, the Attorney General and I exchanged the outlines of the legislative proposals and pledged to work together towards our shared goal of putting tools in the hands of law enforcement that would help prevent another terrorist attack.

Let me be clear: No one can guarantee that Americans will be free from the threat of future terrorist attacks, and to suggest that this legislation-or any legislation-would or could provide such a guarantee would be a false promise. I will not engage in such false promises, and those in the administration who make such assertions do a disservice to the American people.

I have also heard claims that if certain powers had been previously authorized by the Congress, we could somehow have prevented the September 11 attacks. Given this rhetoric it may be instructive to review efforts that were made a few years ago in the Senate to provide law enforcement with greater tools to conduct surveillance of terrorists and terrorist organizations. In May 1995, Senator

Lieberman offered an amendment to the bill that became the Antiterrorism and Effective Death Penalty Act of 1996 that would have expanded the Government's authority to conduct emergency wiretaps to cases of domestic or international terrorism and added a definition of domestic terrorism to include violent or illegal acts apparently intended to "intimidate, or coerce the civilian population." The consensus, bipartisan bill that we consider today contains a very similar definition of domestic terrorism.

In 1995, however, a motion to table Senator

Lieberman's amendment was agreed to in a largely party-line vote, with Republicans voting against the measure. In fact, then Senator Ashcroft voted to table that amendment, and my good friend from Utah, Senator

Hatch, spoke against it and opined, "I do not think we should expand the wiretap laws any further." I recall Senator HATCH's concern then that "We must ensure that in our response to recent terrorist acts, we do not destroy the freedoms that we cherish." I have worked very hard to maintain that balance in negotiations concerning the current legislation.

Following the exchange on September 19 of our legislative proposals, we have worked over the last two weeks around the clock with the administration to put together the best legislative package we could. I share the administration's goal of providing promptly the legal tools necessary to deal with the current terrorist threat. While some have complained publicly that the negotiations have gone on for too long, the issues involved are of great importance, and we will have to live with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

147 Cong.Rec. S10365-02                                           Page 3

147 Cong. Rec. S10365-02, 2001 WL 1188632 (Cong.Rec.)

**(Cite as: 147 Cong. Rec. S10365-02)**

the laws we enact for a long time to come. Demands for action are irresponsible when the road-map is pointed in the wrong direction. As Ben Franklin once noted, "if we surrender our liberty in the name of security, we shall have neither."

Moreover, our ability to make rapid progress was impeded because the negotiations with the administration did not progress in a straight line. On several key issues that are of particular concern to me, we had reached an agreement with the administration on Sunday, September 30. Unfortunately, within two days, the administration announced that it was reneging on the deal. I appreciate the complex task of considering the concerns and missions of multiple federal agencies, and that sometimes agreements must be modified as their implications are scrutinized by affected agencies. When agreements made by the administration must be withdrawn and negotiations on resolved issues reopened, those in the administration who blame the Congress for delay with what the New York Times described last week as "scurrilous remarks," do not help the process move forward.

We have expedited the legislative process in the Judiciary Committee to consider the administration's proposals. In daily news conferences, the Attorney General has referred to the need for such prompt consideration. I commend him for making the time to appear before the Judiciary Committee at a hearing September 25 to respond to questions that Members from both parties have about the administration's initial legislative proposals. I also thank the Attorney General for extending the hour and a half he was able to make in his schedule for the hearing for another fifteen minutes so that Senator

Feinstein and Senator

Specter were able to ask questions before his departure. I regret that the Attorney General did not have the time to respond to questions from all the Members of the Committee either on September 25 or last week, but again thank him for the attention he promised to give to the written questions Members submitted about the legislation. We have not received answers to those written questions yet, but I will make them a part of the hearing record whenever they are sent.

The Chairman of the Constitution Subcommittee, Senator FEINGOLD, also held an important hearing on October 3 on the civil liberties ramifications of the expanded surveillance powers requested by the administration. I thank him for his assistance in illuminating these critical issues for the Senate.

Rule 14: To accede to the administration's request for prompt consideration of this legislation, the leaders decided to hold the USA Act at the desk rather than refer the bill to the committee for markup, as is regular practice. Senator

Hatch specifically urged that this occur, and I support this decision. Indeed, when the Senate considered the anti-terrorism act in 1995 after the Oklahoma City bombing, we bypassed committee in order to deal with the legislation more promptly on the floor.

Given the expedited process that we have used to move this bill, I will take more

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

time than usual to detail its provisions.

The heart of every American aches for those who died or have been injured because
of the tragic terrorist attacks in New York, Virginia, and Pennsylvania on September
11. Even now, we cannot assess the full measure of this attack in terms of human
lives, but we know that the number of casualties is extraordinarily high.

Congress acted swiftly to help the victims of September 11. Within 10 days, we
passed legislation to establish a Victims Compensations Program, which will provide
fair compensation to those most affected by this national tragedy. I am proud of our
work on that legislation, which will expedite payments to thousands of Americans
whose lives were so suddenly shattered.

But now more than ever, we should remember the tens of thousands of Americans
whose needs are not being met-the victims of crimes that have not made the national
headlines. Just one day before the events that have so transformed our nation, I
came before this body to express my concern that we were not doing more for crime
victims. I noted that the pace of victims legislation had slowed, and that many op-
portunities for progress had been squandered. I suggested that this year, we had a
golden opportunity to make significant progress in this area by passing S.783, the
Leahy-Kennedy Crime Victims Assistance Act of 2001.

I am pleased, therefore, that the antiterrorism package now before the **S10367**
Senate contains substantial portions of S.783 aimed at refining the Victims of Crime
Act of 1984, VOCA, and improving the manner in which the Crime Victims Fund is man-
aged and preserved. Most significantly, section 621 of the USA Act will eliminate
the cap on VOCA spending, which has prevented more than $700 million in fund depos-
its from reaching victims and supporting essential services.

Congress has capped spending from the fund for the last two fiscal years, and
President Bush has proposed a third cap for fiscal year 2002. These limits on VOCA
spending have created a growing sense of confusion and unease by many of those con-
cerned about the future of the Fund.

We should not be imposing artificial caps on VOCA spending while substantial un-
met needs continue to exist. Section 621 of the USA Act replaces the cap with a
self-regulating system that will ensure stability and protection of Fund assets,
while allowing more money to be distributed to the States for victim compensation
and assistance.

Other provisions included from S. 783 will also make an immediate difference in
the lives of victims, including victims of terrorism. Shortly after the Oklahoma
City bombing, I proposed and the Congress adopted the Victims of Terrorism Act of
1995. This legislation authorized the Office for Victims of Crime (OVC) to set aside
an emergency reserve of up to $50 million as part of the Crime Victims Fund. The
emergency reserve was intended to serve as a "rainy day" fund to supplement compens-
ation and assistance grants to States to provide emergency relief in the wake of an
act of terrorism or mass violence that might otherwise overwhelm the resources of a
State's crime victim compensation program and crime victim assistance services. Last

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

147 Cong.Rec. S10365-02                                    Page 5

147 Cong. Rec. S10365-02, 2001 WL 1188632 (Cong.Rec.)

**(Cite as: 147 Cong. Rec. S10365-02)**

month's disaster created vast needs that have all but depleted the reserve. Section 621 of the USA Act authorizes OVC to replenish the reserve with up to $50 million, and streamlines the mechanism for replenishment in future years.

Another critical provision of the USA Act will enable OVC to provide more immediate and effective assistance to victims of terrorism and mass violence occurring within the United States. I proposed this measure last year as an amendment to the Justice for Victims of Terrorism Act, but was compelled to drop it to achieve bipartisan consensus. I am pleased that we are finally getting it done this year.

These and other VOCA reforms in the USA Act are long overdue. Yet, I regret that we are not doing more. In my view, we should pass the Crime Victims Assistance Act in its entirety. In addition to the provisions that are included in today's antiterrorism package, this legislation provides for comprehensive reform of Federal law to establish enhanced rights and protections for victims of Federal crime. It also proposes several programs to help States provide better assistance for victims of State crimes.

I also regret that we have not done more for other victims of recent terrorist attacks. While all Americans are numbed by the heinous acts of September 11, we should not forget the victims of the 1998 Embassy bombings in East Africa. Eleven Americans and many Kenyan and Tanzanian nationals employed by the United States lost their lives in that tragic incident. It is my understanding that compensation to the families of these victims has in many instances fallen short. It is my hope that OVC will use a portion of the newly replenished reserve fund to remedy any inequity in the way that these individuals have been treated.

Hate Crimes: We cannot speak of the victims of the September 11 without also noting that Arab-Americans and Muslims in this country have become the targets of hate crimes, harassment, and intimidation. I applaud the President for speaking out against and condemning such acts, and visiting a mosque to demonstrate by action that all religions are embraced in this country. I also commend the FBI Director for his periodic reports on the number of hate crime incidents against Arab-American and Muslims that the FBI is aggressively investigating and making clear that this conduct is taken seriously and will be punished.

The USA Act contains, in section 102, a sense of the Congress that crimes and discrimination against Arab and Muslim Americans are condemned. Many of us would like to do more, and finally enact effective hate crimes legislation, but the administration has asked that the debate on that legislation be postponed. One of my greatest regrets regarding the negotiations in this bill was the objections that prevented the Local Law Enforcement Enhancement Act, S. 625, from being included in the USA Act.

The administration's initial proposal was entirely focused on Federal law enforcement. Yet, we must remember that State and local law enforcement officers have critical roles to play in preventing and investigating terrorist acts. I am pleased that the USA Act we consider today recognizes this fact.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

As a former State prosecutor, I know that State and local law enforcement officers are often the first responders to a crime. On September 11, the Nation saw that the first on the scene were the heroic firefighters, police officers and emergency personnel in New York City. These New York public safety officers, many of whom gave the ultimate sacrifice, remind us of how important it is to support our State and local law enforcement partners. The USA Act provides three critical measures of Federal support for our State and local law enforcement officers in the war against terrorism.

First, we streamline and expedite the Public Safety Officers' Benefits application process for family members of fire fighters, police officers and rescue workers who perish or suffer a disabling injury in connection with prevention, investigation, rescue or recovery efforts related to a future terrorist attack.

The Public Safety Officers' Benefits Program provides benefits for each of the families of law enforcement officers, firefighters, and emergency response crew members who are killed or disabled in the line of duty. Current regulations, however, require the families of public safety officers who have fallen in the line of duty to go through a cumbersome and time-consuming application process. In the face of our national fight against terrorism, it is important that we provide a quick process to support the families of brave Americans who selflessly give their lives so that others might live before, during and after a terrorist attack.

This provision builds on the new law championed by Senator CLINTON, Senator

Schumer and Congressman NADLER to speed the benefit payment process for families of public safety officers killed in the line of duty in New York City, Virginia, and Western Pennsylvania, on September 11.

Second, we have raised the total amount of Public Safety Officers' Benefit Program payments from approximately $150,000 to $250,000. This provision retroactively goes into effect to provide much-needed relief for the families of the brave men and women who sacrificed their own lives for their fellow Americans during the year. Although this increase in benefits can never replace a family's tragic loss, it is the right thing to do for the families of our fallen heroes. I want to thank Senator

Biden and Senator

Hatch for their bipartisan leadership on this provision.

Third, we expand the Department of Justice Regional Information Sharing Systems Program to promote information sharing among Federal, State and local law enforcement agencies to investigate and prosecute terrorist conspiracies and activities and authorize a doubling of funding for this year and next year. The RISS Secure Intranet is a nationwide law enforcement network that already allows secure communications among the more than 5,700 Federal, State and local law enforcement agencies. Effective communication is key to effective law enforcement efforts and will be essential in our national fight against terrorism.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The RISS program enables its member agencies to send secure, encrypted communica-
tions-whether within just one agency or from one agency to another. Federal agen-
cies, such as the FBI, do not have this capability, but recognize the need for it.
Indeed, on September 11, 2001, immediately after the terrorist attacks, FBI
Headquarters called RISS officials to request "Smartgate" cards and readers to se-
cure their communications systems. The FBI agency in Philadelphia called soon after
to request more Smartgate cards and readers as well. **\*S10368**

The Regional Information Sharing Systems Program is a proven success that we need
to expand to improve secure information sharing among Federal, State and local law
enforcement agencies to coordinate their counter-terrorism efforts.

Our State and local law enforcement partners welcome the challenge to join in our
national mission to combat terrorism. We cannot ask State and local law enforcement
officers to assume these new national responsibilities without also providing new
Federal support. The USA Act provides the necessary Federal support for our State
and local law enforcement officers to serve as full partners in our fight against
terrorism.

I am deeply troubled by continuing reports that information is not being shared
with state local law enforcement. In particular, the testimony of Baltimore Police
Chief Ed Norris before the House Government Reform Committee last week highlighted
the current problem.

The unfolding facts about how the terrorists who committed the September 11 at-
tack were able to enter this country without difficulty are chilling. Since the at-
tacks many have pointed to our northern border as vulnerable to the entry of future
terrorists. This is not surprising when a simple review of the numbers shows that
the northern border has been routinely short-changed in personnel. While the number
of Border Patrol agents along the southern border has increased over the last few
years to over 8,000, the number at the northern border has remained the same as a
decade ago at 300. This remains true despite the fact that Admad Ressam, the Algeri-
an who planned to blow up the Los Angeles International Airport in 1999, and who has
been linked to those involved in the September 11 attacks, chose to enter the United
States at our northern border. It will remain an inviting target until we dramatic-
ally improve our security.

The USA Act includes my proposals to provide the substantial and long overdue as-
sistance for our law enforcement and border control efforts along the Northern Bor-
der. My home State of Vermont has seen huge increases in Customs and INS activity
since the signing of NAFTA. The number of people coming through our borders has ris-
en steeply over the years, but our staff and our resources have not.

I proposed-and this legislation authorizes in section 402-tripling the number of
Border Patrol, INS inspectors, and Customs Service employees in each of the States
along the 4,000-mile Northern Border. I was gratified when 22 Senators-Democrats and
Republicans-wrote to the President supporting such an increase, and I am pleased
that the administration agreed that this critical law enforcement improvement should
be included in the bill. Senators CANTWELL and SCHUMER in the Committee and Senators

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

MURRAY and DORGAN have been especially strong advocates of these provisions and I thank them for their leadership. In addition, the USA Act, in section 401, author-izes the Attorney General to waive the FTE cap on INS personnel in order to address the national security needs of the United States on the northern border. Now more than ever, we must patrol our border vigilantly and prevent those who wish America harm from gaining entry. At the same time, we must work with the Canadians to allow speedy crossing to legitimate visitors and foster the continued growth of trade which is beneficial to both countries.

In addition to providing for more personnel, this bill also includes, in section 402(4), my proposal to provide $100 million in funding for both the INS and the Cus-toms Service to improve the technology used to monitor the Northern Border and to purchase additional equipment. The bill also includes, in section 403(c), an import-ant provision from Senator

Cantwell directing the Attorney General, in consultation with other agencies, to develop a technical standard for identifying electronically the identity of persons applying for visas or seeking to enter the United States. In short, this bill provides a comprehensive high-tech boost for the security of our nation.

This bill also includes important proposals to enhance data sharing. The bill, in section 403, directs the Attorney General and the FBI Director to give the State De-partment and INS access to the criminal history information in the FBI's National Crime Information Center, NCIC, database, as the administration and I both proposed. The Attorney General is directed to report back to the Congress in two years on pro-gress in implementing this requirement. We have also adopted the administration's language, in section 413, to make it easier for the State Department to share in-formation with foreign governments for aid in terrorist investigations.

The USA Act contains a number of provisions intended to improve and update the federal criminal code to address better the nature of terrorist activity, assist the FBI in translating foreign language information collected, and ensure that federal prosecutors are unhindered by conflicting local rules of conduct to get the job done. I will mention just a few of these provisions.

FBI Translators: The truth certainly seems self-evident that all the best sur-veillance techniques in the world will not help this country defend itself from ter-rorist attack if the information cannot be understood in a timely fashion. Indeed, within days of September 11, the FBI Director issued an employment ad on national TV by calling upon those who speak Arabic to apply for a job as an FBI translator. This is a dire situation that needs attention. I am therefore gratified that the administra-tion accepted my proposal, in section 205, to waive any federal personnel re-quirements and limitations imposed by any other law in order to expedite the hiring of translators at the FBI.

This bill also directs the FBI Director to establish such security requirements as are necessary for the personnel employed as translators. We know the effort to recruit translators has a high priority, and the Congress should provide all pos-sible support. Therefore, the bill calls on the Attorney General to report to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Judiciary Committees on the number of translators employed by the Justice Depart-
ment, any legal or practical impediments to using translators employed by other Fed-
eral, State, or local agencies, on a full, part-time, or shared basis; and the needs
of the FBI for specific translation services in certain languages, and recommenda-
tions for meeting those needs.

Federal Crime of Terrorism: The administration's initial proposal assembled a
laundry list of more than 40 Federal crimes ranging from computer hacking to mali-
cious mischief to the use of weapons of mass destruction, and designated them as
"Federal terrorism offenses," regardless of the circumstances under which they were
committed. For example, a teenager who spammed the NASA website and, as a result,
recklessly caused damage, would be deemed to have committed this new "terrorism" of-
fense. Under the administration's proposal, the consequences of this designation
were severe. Crimes on the list would carry no statute of limitations. The maximum
penalties would shoot up to life imprisonment, and those released earlier would be
subject to a lifetime of supervised release. Moreover, anyone who harbored a person
whom he had " reasonable grounds to suspect" had committed, or was about to commit,
a " Federal terrorism offense"-whether it was the Taliban or the mother of my hypo-
thetical teenage computer hacker-would be subject to stiff criminal penalties. I
worked closely with the administration to ensure that the definition of "terrorism"
in the USA Act fit the crime.

First, we have trimmed the list of crimes that may be considered as terrorism
predicates in section 808 of the bill. This shorter, more focused list, to be codi-
fied at 18 U.S.C. s2332(g)(5)(B), more closely reflects the sorts of offenses com-
mitted by terrorists.

Second, we have provided, in section 810, that the current 8-year limitations
period for this new set of offenses will remain in place, except where the commis-
sion of the offense resulted in, or created a risk of, death or serious bodily in-
jury.

Third, rather than make an across-the-board, one-size-fits-all increase of the
penalties for every offense on the list, without regard to the severity of the of-
fense, we have made, in section 811, more measured increases in maximum penalties
where appropriate, including life imprisonment or lifetime supervised release in
cases in which the **\*S10369** offense resulted in death. We have also added, in section
812, conspiracy provisions to a few criminal statutes where appropriate, with penal-
ties equal to the penalties for the object offense, up to life imprisonment.

Finally, we have more carefully defined the new crime of harboring terrorists in
section 804, so that it applies only to those harboring people who have committed,
or are about to commit, the most serious of Federal terrorism-related crimes, such
as the use of weapons of mass destruction. Moreover, it is not enough that the de-
fendant had "reasonable grounds to suspect" that the person he was harboring had
committed, or was about to commit, such a crime; the Government must prove that the
defendant knew or had "reasonable grounds to believe" that this was so.

McDade Fix: The massive investigation underway into who was responsible for and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

assisted in carrying out the September 11 attacks stretches across State and nation-
al boundaries. While the scope of the tragedy is unsurpassed, the disregard for
State and national borders of this criminal conspiracy is not unusual. Federal in-
vestigative officers and prosecutors often must follow leads and conduct investiga-
tions outside their assigned jurisdictions. At the end of the 105th Congress, a leg-
al impediment to such multi-jurisdiction investigations was slipped into the omnibus
appropriations bill, over the objection at the time of every member of the Senate
Judiciary Committee.

I have spoken many times over the past two years of the problems caused by the
so-called McDade law, 28 U.S.C. s530B. According to the Justice Department, the
McDade law has delayed important criminal investigations, prevented the use of ef-
fective and traditionally-accepted investigative techniques, and served as the basis
of litigation to interfere with legitimate federal prosecutions. At a time when we
need Federal law enforcement authorities to move quickly to catch those responsible
for the September 11 attacks, and to prevent further attacks on our country, we can
no longer tolerate the drag on Federal investigations and prosecutions caused by
this ill-considered legislation.

On September 19, I introduced S. 1437, the Professional Standards for Government
Attorneys Act of 2001, along with Senators HATCH and WYDEN. This bill proposes to
modify the McDade law by establishing a set of rules that clarify the professional
standards applicable to government attorneys. I am delighted that the administration
recognized the importance of S. 1437 for improving Federal law enforcement and com-
bating terrorism, and agreed to its inclusion as section 501 of the USA Act.

The first part of section 501 embodies the traditional understanding that when
lawyers handle cases before a Federal court, they should be subject to the Federal
court's standards of professional responsibility, and not to the possibly inconsist-
ent standards of other jurisdictions. By incorporating this ordinary choice-of-law
principle, the bill preserves the Federal courts' traditional authority to oversee
the professional conduct of Federal trial lawyers, including Federal prosecutors. It
thus avoids the uncertainties presented by the McDade law, which potentially sub-
jects Federal prosecutors to State laws, rules of criminal procedure, and judicial
decisions which differ from existing Federal law.

Another part of section 501 specifically addresses the situation in Oregon, where
a State court ruling has seriously impeded the ability of Federal agents to engage
in undercover operations and other covert activities. See In re Gatti, 330 Or. 517
(2000). Such activities are legitimate and essential crime-fighting tools. The Pro-
fessional Standards for Government Attorneys Act ensures that these tools will be
available to combat terrorism.

Finally, section 501 addresses the most pressing contemporary question of govern-
ment attorney ethics-namely, the question of which rule should govern government at-
torneys' communications with represented persons. It asks the Judicial Conference of
the United States to submit to the Supreme Court a proposed uniform national rule to
govern this area of professional conduct, and to study the need for additional na-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tional rules to govern other areas in which the proliferation of local rules may in-
terfere with effective Federal law enforcement. The Rules Enabling Act process is
the ideal one for developing such rules, both because the Federal judiciary tradi-
tionally is responsible for overseeing the conduct of lawyers in Federal court pro-
ceedings, and because this process would best provide the Supreme Court an opportun-
ity fully to consider and objectively to weigh all relevant considerations.

The problems posed to Federal law enforcement investigations and prosecutions by
the McDade law are real and urgent. The Professional Standards for Government Attor-
neys Act provides a reasonable and measured alternative: It preserves the tradition-
al role of the State courts in regulating the conduct of attorneys licensed to prac-
tice before them, while ensuring that Federal prosecutors and law enforcement agents
will be able to use traditional Federal investigative techniques. We need to pass
this corrective legislation before more cases are compromised.

Terrorist Attacks Against Mass Transportation Systems: Another provision of the
USA Act that was not included in the administration's initial proposal is section
801, which targets acts of terrorism and other violence against mass transportation
systems. Just last week, a Greyhound bus crashed in Tennessee after a deranged pas-
senger slit the driver's throat and then grabbed the steering wheel, forcing the bus
into the oncoming traffic. Six people were killed in the crash. Because there are
currently no Federal laws addressing terrorism of mass transportation systems,
however, there may be no Federal jurisdiction over such a case, even if it were com-
mitted by suspected terrorists. Clearly, there is an urgent need for strong criminal
legislation to deter attacks against mass transportation systems. Section 801 will
fill this gap.

Cybercrime: The Computer Fraud and Abuse Act, 18 U.S.C. section 1030, is the
primary Federal criminal statute prohibiting computer frauds and hacking. I worked
with Senator

Hatch in the last Congress to make improvements to this law in the Internet Se-
curity Act, which passed the Senate as part of another bill. Our work is included in
section 815 of the USA Act. This section would amend the statute to clarify the ap-
propriate scope of federal jurisdiction. First, the bill adds a definition of "loss"
to cover any reasonable cost to the victim in responding to a computer hacker. Cal-
culation of loss is important both in determining whether the $5,000 jurisdictional
hurdle in the statute is met, and, at sentencing, in calculating the appropriate
guideline range and restitution amount.

Second, the bill amends the definition of "protected computer," to include quali-
fied computers even when they are physically located outside of the United States.
This clarification will preserve the ability of the United States to assist in in-
ternational hacking cases.

Finally, this section eliminates the current directive to the Sentencing Commis-
sion requiring that all violations, including misdemeanor violations, of certain
provisions of the Computer Fraud and Abuse Act be punished with a term of imprison-
ment of at least 6 months.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Biological Weapons: Borrowing from a bill introduced in the last Congress by Senator

Biden, the USA Act contains a provision in section 802 to strengthen our Federal laws relating to the threat of biological weapons. Current law prohibits the possession, development, or acquisition of biological agents or toxins "for use as a weapon." This section amends the definition of "for use as a weapon" to include all situations in which it can be proven that the defendant had any purpose other than a peaceful purpose. This will enhance the Government's ability to prosecute suspected terrorists in possession of biological agents or toxins, and conform the scope of the criminal offense in 18 U.S.C. section 175 more closely to the related forfeiture provision in 18 U.S.C. section 176. This section also contains a new statute, 18 U.S.C. section 175b, which generally makes it an offense for certain restricted persons, including non-resident aliens from countries that support international terrorism, to possess a listed biological agent or toxin. **\*S10370**

Of greater consequence, section 802 defines another additional offense, punishable by up to 10 years in prison, of possessing a biological agent, toxin, or delivery system "of a type or in a quantity that, under the circumstances," is not reasonably justified by a peaceful purpose. As originally proposed by the administration, this provision specifically stated that knowledge of whether the type or quantity of the agent or toxin was reasonably justified was not an element of the offense. Thus, although the burden of proof is always on the government, every person who possesses a biological agent, toxin, or delivery system was at some level of risk. I am pleased that the administration agreed to drop this portion of the provision.

Nevertheless, I remain troubled by the subjectivity of the substantive standard for violation of this new criminal prohibition, and question whether it provides sufficient notice under the Constitution. I also share the concerns of the American Society for Microbiology and the Association of American Universities that this provision will have a chilling effect upon legitimate scientific inquiry that offsets any benefit in protecting against terrorism. While we have tried to prevent against this by creating an explicit exclusion for "bona fide research," this provision may yet prove unworkable, unconstitutional, or both. I urge the Justice Department and the research community to work together on substitute language that would provide prosecutors with a more workable tool.

Secret Service Jurisdiction: Two sections of the USA Act were added at the request of the United States Secret Service, with the support of the administration. I was pleased to accommodate the Secret Service by including these provisions in the bill to expand Electronic Crimes Task Forces and to clarify the authority of the Secret Service to investigate computer crimes.

The Secret Service is committed to the development of new tools to combat the growing areas of financial crime, computer fraud, and cyberterrorism. Recognizing a need for law enforcement, private industry and academia to pool their resources, skills and vision to combat criminal elements in cyberspace, the Secret Service cre-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ated the New York Electronic Crimes Task Force, NYECTF. This highly successful model
is comprised of over 250 individual members, including 50 different Federal, State
and local law enforcement agencies, 100 private companies, and 9 universities. Since
its inception in 1995, the NYECTF has successfully investigated a range of financial
and electronic crimes, including credit card fraud, identity theft, bank fraud, com-
puter systems intrusions, and e-mail threats against protectees of the Secret Ser-
vice. Section 105 of the USA Act authorizes the Secret Service to develop similar
task forces in cities and regions across the country where critical infrastructure
may be vulnerable to attacks from terrorists or other cyber-criminals.

Section 507 of the USA Act gives the Secret Service concurrent jurisdiction to
investigate offenses under 18 U.S.C. section 1030, relating to fraud and related
activity in connection with computers. Prior to the 1996 amendments to the Computer
Fraud and Abuse Act, the Secret Service was authorized to investigate any and all
violations of section 1030, pursuant to an agreement between the Secretary of Treas-
ury and the Attorney General. The 1996 amendments, however, concentrated Secret Ser-
vice jurisdiction on certain specified subsections of section 1030. The current
amendment would return full jurisdiction to the Secret Service and would allow the
Justice and Treasury Departments to decide on the appropriate work-sharing balance
between the two. This will enable the Secret Service to investigate a wide range of
potential White House network intrusions, as well as intrusions into remote sites,
outside of the White House, that could impact the safety and security of its pro-
tectees, and to continue its missions to protect the Nation's critical infrastruc-
ture and financial payment systems.

Counter-terrorism Fund: The USA Act also authorizes, for the first time, a
counter-terrorism fund in the Treasury of the United States to reimburse Justice De-
partment for any costs incurred in connection with the fight against terrorism.

Specifically, this counter-terrorism fund will : one, reestablish an office or
facility that has been damaged as the result of any domestic or international ter-
rorism incident; two, provide support to counter, investigate, or prosecute domestic
or international terrorism, including paying rewards in connection with these activ-
ities; three, conduct terrorism threat assessments of Federal agencies; and four,
for costs incurred in connection with detaining individuals in foreign countries who
are accused of acts of terrorism in violation of United States law.

I first authored this counter-terrorism fund in the S. 1319, the 21st Century De-
partment of Justice Appropriations Authorization Act, which Senator

Hatch and I introduced in August.

The USA Act provides enhanced surveillance procedures for the investigation of
terrorism and other crimes. The challenge before us has been to strike a reasonable
balance to protect both security and the liberties of our people. In some respects,
the changes made are appropriate and important ones to update surveillance and in-
vestigative procedures in light of new technology and experience with current law.
Yet, in other respects, I have deep concerns that we may be increasing surveillance
powers and the sharing of criminal justice information without adequate checks on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

how information may be handled and without adequate accountability in the form of
judicial review.

The bill contains a number of sensible proposals that should be not be controver-
sial.

Wiretap Predicates: For example, sections 201 and 202 of the USA Act would add to
the list of crimes that may be used as predicates for wiretaps certain offenses
which are specifically tailored to the terrorist threat. In addition to crimes that
relate directly to terrorism, the list would include crimes of computer fraud and
abuse which are committed by terrorists to support and advance their illegal object-
ives.

FISA Roving Wiretaps: The bill, in section 206, would authorize the use of roving
wiretaps in the course of a foreign intelligence investigation and brings FISA into
line with criminal procedures that allow surveillance to follow a person, rather
than requiring a separate court order identifying each telephone company or other
communication common carrier whose assistance is needed. This is a matter on which
the Attorney General and I reached early agreement. This is the kind of change that
has a compelling justification, because it recognizes the ease with which targets of
investigations can evade surveillance by changing phones. In fact, the original rov-
ing wiretap authority for use in criminal investigations was enacted as part of the
Electronic Communications Privacy Act, ECPA, in 1986. I was proud to be the primary
Senate sponsor of that earlier law.

Paralleling the statutory rules applicable to criminal investigations, the formu-
lation I originally proposed made clear that this roving wiretap authority must be
requested in the application before the FISA court was authorized to order such rov-
ing surveillance authority. Indeed, the administration agrees that the FISA court
may not grant such authority sua sponte. Nevertheless, we have accepted the adminis-
tration's formulation of the new roving wiretap authority, which requires the FISA
court to make a finding that the actions of the person whose communications are to
be intercepted could have the effect of thwarting the identification of a specified
facility or place. While no amendment is made to the statutory directions for what
must be included in the application for a FISA electronic surveillance order, these
applications should include the necessary information to support the FISA court's
finding that roving wiretap authority is warranted.

Search Warrants: The USA Act, in section 219, authorizes nationwide service of
search warrants in terrorism investigations. This will allow the judge who is most
familiar with the developments in a fast-breaking and complex terrorism investiga-
tion to make determinations of probable cause, no matter where the property to be
searched is located. This will not only save time by avoiding having to bring up-
to-speed another judge in another jurisdiction where the property is located, but
also **\*S10371** serves privacy and fourth amendment interests in ensuring that the most
knowledgeable judge makes the determination of probable cause. The bill, in section
209, also authorizes voice mail messages to be seized on the authority of a probable
cause search warrant rather than through the more burdensome and time-consuming pro-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cess of a wiretap.

Electronic Records: The bill updates the laws pertaining to electronic records in three primary ways. First, in section 210, the bill authorizes the nationwide service of subpoenas for subscriber information and expands the list of items subject to subpoena to include the means and source of payment for the service.

Second, in section 211, the bill equalizes the standard for law enforcement access to cable subscriber records on the same basis as other electronic records. The Cable Communications Policy Act, passed in 1984 to regulate various aspects of the cable television industry, did not take into account the changes in technology that have occurred over the last 15 years. Cable television companies now often provide Internet access and telephone service in addition to television programming. This amendment clarifies that a cable company must comply with the laws governing the interception and disclosure of wire and electronic communications just like any other telephone company or Internet service provider. The amendments would retain current standards that govern the release of customer records for television programming.

Finally, the bill, in section 212, permits, but does not require, an electronic communications service to disclose the contents of and subscriber information about communications in emergencies involving the immediate danger of death or serious physical injury. Under current law, if an ISP's customer receives an e-mail death threat from another customer of the same ISP, and the victim provides a copy of the communication to the ISP, the ISP is limited in what actions it may take. On one hand, the ISP may disclose the contents of the forwarded communication to law enforcement, or to any other third party as it sees fit. See 18 U.S.C. section 2702(b)(3). On the other hand, current law does not expressly authorize the ISP to voluntarily provide law enforcement with the identity, home address, and other subscriber information of the user making the threat. See 18 U.S.C. section 2703(c)(1)(B),(C), permitting disclosure to government entities only in response to legal process. In those cases where the risk of death or injury is imminent, the law should not require providers to sit idly by. This voluntary disclosure, however, in no way creates an affirmative obligation to review customer communications in search of such imminent dangers.

Also, under existing law, a provider even one providing services to the public may disclose the contents of a customer's communications-to law enforcement or anyone else-in order to protect its rights or property. See 18 U.S.C. section 2702(b)(5). However, the current statute does not expressly permit a provider voluntarily to disclose non-content records, such as a subscriber's login records, to law enforcement for purposes of self-protection. See 18 U.S.C. Section 2703(c)(1)(B). Yet the right to disclose the content of communications necessarily implies the less intrusive ability to disclose non-content records. Cf. United States v. Auler, 539 F.2d 642, 646 n.9, 7th Cir. 1976, phone company's authority to monitor and disclose conversations to protect against fraud necessarily implies right to commit lesser invasion of using, and disclosing fruits of, pen register device, citing United States v. Freeman, 524 F.2d 337, 341, 7th Cir. 1975. Moreover, as a practical matter providers must have the right to disclose the facts surrounding attacks on their

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

systems. When a telephone carrier is defrauded by a subscriber, or when an ISP's au-
thorized user launches a network intrusion against his own ISP, the provider must
have the legal ability to report the complete details of the crime to law enforce-
ment. The bill clarifies that service providers have the statutory authority to make
such disclosures.

Pen Registers: There is consensus that the existing legal procedures for pen re-
gister and trap-and-trace authority are antiquated and need to be updated. I have
been proposing ways to update the pen register and trap and trace statutes for sev-
eral years, but not necessarily in the same ways as the administration initially
proposed. In fact, in 1998, I introduced with then-Senator Ashcroft, the E-PRIVACY
Act, S. 2067, which proposed changes in the pen register laws. In 1999, I introduced
the E-RIGHTS Act, S. 934, also with proposals to update the pen register laws.

Again, in the last Congress, I introduced the Internet Security Act, S. 2430, on
April 13, 2000, that proposed: one, changing the pen register and trap and trace
device law to give nationwide effect to pen register and trap and trace orders ob-
tained by Government attorneys and obviate the need to obtain identical orders in
multiple Federal jurisdictions; two, clarifying that such devices can be used for
computer transmissions to obtain electronic addresses, not just on telephone lines;
and three, as a guard against abuse, providing for meaningful judicial review of
government attorney applications for pen registers and trap and trace devices.

As the outline of my earlier legislation suggests, I have long supported modern-
izing the pen register and trap and trace device laws by modifying the statutory
language to cover the use of these orders on computer transmissions; to remove the
jurisdictional limits on service of these orders; and to update the judicial review
procedure, which, unlike any other area in criminal procedure, bars the exercise of
judicial discretion in reviewing the justification for the order. The USA Act, in
section 216, updates the pen register and trap and trace laws only in two out of
three respects I believe are important, and without allowing meaningful judicial re-
view. Yet, we were able to improve the administration's initial proposal, which
suffered from the same problems as the provision that was hastily taken up and
passed by the Senate, by voice vote, on September, 13, 2001, as an amendment to the
Commerce Justice State Appropriations Act.

Nationwide Service: The existing legal procedures for pen register and trap-
and-trace authority require service of individual orders for installation of pen re-
gister or trap and trace device on the service providers that carried the targeted
communications. Deregulation of the telecommunications industry has had the con-
sequence that one communication may be carried by multiple providers. For example, a
telephone call may be carried by a competitive local exchange carrier, which passes
it at a switch to a local Bell Operating Company, which passes it to a long distance
carrier, which hands it to an incumbent local exchange carrier elsewhere in the
U.S., which in turn may finally hand it to a cellular carrier. If these carriers do
not pass source information with each call, identifying that source may require com-
pelling information from a host of providers located throughout the country.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Under present law, a court may only authorize the installation of a pen register
or trap device "within the jurisdiction of the court." As a result, when one pro-
vider indicates that the source of a communication is a carrier in another district,
a second order may be necessary. The Department of Justice has advised, for example,
that in 1996, a hacker, who later turned out to be launching his attacks from a for-
eign country, extensively penetrated computers belonging to the Department of De-
fense. This hacker was dialing into a computer at Harvard University and used this
computer as an intermediate staging point in an effort to conceal his location and
identity. Investigators obtained a trap and trace order instructing the phone com-
pany, Nynex, to trace these calls, but Nynex could only report that the communica-
tions were coming to it from a long-distance carrier, MCI. Investigators then ap-
plied for a court order to obtain the connection information from MCI, but since the
hacker was no longer actually using the connection, MCI could not identify its
source. Only if the investigators could have served MCI with a trap and trace order
while the hacker was actively on-line could they have successfully traced back and
located him.

In another example provided by the Department of Justice, investigators **\*S10372**
encountered similar difficulties in attempting to track Kevin Mitnick, a criminal
who continued to hack into computers attached to the Internet despite the fact that
he was on supervised release for a prior computer crime conviction. The FBI attemp-
ted to trace these electronic communications while they were in progress. In order
to evade arrest, however, Mitnick moved around the country and used cloned cellular
phones and other evasive techniques. His hacking attacks would often pass through
one of two cellular carriers, a local phone company, and then two Internet service
providers. In this situation, where investigators and service providers had to act
quickly to trace Mitnick in the act of hacking, only many repeated attempts-ac-
companied by an order to each service provider-finally produced success. Fortu-
nately, Mitnick was such a persistent hacker that he gave law enforcement many
chances to complete the trace.

This duplicative process of obtaining a separate order for each link in the com-
munications chain can be quite time-consuming, and it serves no useful purpose since
the original court has already authorized the trace. Moreover, a second or third or-
der addressed to a particular carrier that carried part of a prior communication may
prove useless during the next attack: in computer intrusion cases, for example, the
target may use an entirely different path, i.e., utilize a different set of interme-
diate providers, for his or her subsequent activity.

The bill would modify the pen register and trap and trace statutes to allow for
nationwide service of a single order for installation of these devices, without the
necessity of returning to court for each new carrier. I support this change.

Second, the language of the existing statute is hopelessly out of date and speaks
of a pen register or trap and trace "device" being "attached" to a telephone "line."
However, the rapid computerization of the telephone system has changed the tracing
process. No longer are such functions normally accomplished by physical hardware
components attached to telephone lines. Instead, these functions are typically per-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

formed by computerized collection and retention of call routing information passing
through a communications system.

The statute's definition of a "pen register" as a "device" that is " attached" to
a particular "telephone line" is particularly obsolete when applied to the wireless
portion of a cellular phone call, which has no line to which anything can be at-
tached. While courts have authorized pen register orders for wireless phones based
on the notion of obtaining access to a " virtual line," updating the law to keep
pace with current technology is a better course.

Moreover, the statute is ill-equipped to facilitate the tracing of communications
that take place over the Internet. For example, the pen register definition refers
to telephone "numbers" rather than the broader concept of a user's communications
account. Although pen register and trap orders have been obtained for activity on
computer networks, Internet service providers have challenged the application of the
statute to electronic communications, frustrating legitimate investigations. I have
long supported updating the statute by removing words such as "numbers . . . dialed"
that do not apply to the way that pen/trap devices are used and to clarify the stat-
ute's proper application to tracing communications in an electronic environment, but
in a manner that is technology neutral and does not capture the content of communic-
ations. That being said, I have been concerned about the FBI and Justice Depart-
ment's insistence over the past few years that the pen/trap devices statutes be up-
dated with broad, undefined terms that continue to flame concerns that these laws
will be used to intercept private communications content.

The administration's initial pen/trap device proposal added the terms " routing"
and "addressing" to the definitions describing the information that was authorized
for interception on the low relevance standard under these laws. The administration
and the Department of Justice flatly rejected my suggestion that these terms be
defined to respond to concerns that the new terms might encompass matter considered
content, which may be captured only upon a showing of probable cause, not the mere
relevancy of the pen/trap statute. Instead, the administration agreed that the
definition should expressly exclude the use of pen/trap devices to intercept "con-
tent," which is broadly defined in 18 U.S.C. 2510(8).

While this is an improvement, the FBI and Justice Department are short-sighted in
their refusal to define these terms. We should be clear about the consequence of not
providing definitions for these new terms in the pen/trap device statutes. These
terms will be defined, if not by the Congress, then by the courts in the context of
criminal cases where pen/trap devices have been used and challenged by defendants.
If a court determines that a pen register has captured "content," which the FBI ad-
mits such devices do, in violation of the Fourth Amendment, suppression may be
ordered, not only of the pen register evidence by any other evidence derived from
it. We are leaving the courts with little or no guidance of what is covered by "ad-
dressing" or " routing."

The USA Act also requires the government to use reasonably available technology
that limits the interceptions under the pen/trap device laws "so as not to include

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the contents of any wire or electronic communications." This limitation on the tech-
nology used by the government to execute pen/trap orders is important since, as the
FBI advised me June, 2000, pen register devices "do capture all electronic impulses
transmitted by the facility on which they are attached, including such impulses
transmitted after a phone call is connected to the called party." The impulses made
after the call is connected could reflect the electronic banking transactions a
caller makes, or the electronic ordering from a catalogue that a customer makes over
the telephone, or the electronic ordering of a prescription drug.

This transactional data intercepted after the call is connected is " content." As
the Justice Department explained in May, 1998 in a letter to House Judiciary Commit-
tee Chairman Henry Hyde, "the retrieval of the electronic impulses that a caller ne-
cessarily generated in attempting to direct the phone call' does not constitute a
"search" requiring probable cause since "no part of the substantive information
transmitted after the caller had reached the called party" is obtained. But the
Justice Department made clear that "all of the information transmitted after a phone
call is connected to the called party . . . is substantive in nature. These elec-
tronic impulses are the ' contents' of the call: They are not used to direct or pro-
cess the call, but instead convey certain messages to the recipient."

When I added the direction on use of reasonably available technology, codified as
18 U.S.C. 3121(c), to the pen register statute as part of the Communications Assist-
ance for Law Enforcement Act, CALEA, in 1994, I recognized that these devices col-
lected content and that such collection was unconstitutional on the mere relevance
standard. Nevertheless, the FBI advised me in June 2000, that pen register devices
for telephone services "continue to operate as they have for decades" and that
"there has been no change . . . that would better restrict the recording or decoding
of electronic or other impulses to the dialing and signaling information utilized in
call processing." Perhaps, if there were meaningful judicial review and accountabil-
ity, the FBI would take the statutory direction more seriously and actually imple-
ment it.

Judicial Review: Due in significant part to the fact that pen/trap devices in use
today collect "content," I have sought in legislation introduced over the past few
years to update and modify the judicial review procedure for pen register and trap
and trace devices. Existing law requires an attorney for the Government to certify
that the information likely to be obtained by the installation of a pen register or
trap and trace device will be relevant to an ongoing criminal investigation. The
court is required to issue an order upon seeing the prosecutor's certification. The
court is not authorized to look behind the certification to evaluate the judgement
of the prosecutor.

I have urged that government attorneys be required to include facts about their
investigations in their applications for pen/trap orders and allow **\*S10373** courts to
grant such orders only where the facts support the relevancy of the information
likely to be obtained by the orders. This is not a change in the applicable stand-
ard, which would remain the very low relevancy standard. Instead, this change would
simply allow the court to evaluate the facts presented by a prosecutor, and, if it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

147 Cong.Rec. S10365-02                                    Page 20

147 Cong. Rec. S10365-02, 2001 WL 1188632 (Cong.Rec.)
**(Cite as: 147 Cong. Rec. S10365-02)**

finds that the facts support the Government's assertion that the information to be collected will be relevant, issue the order. Although this change will place an additional burden on law enforcement, it will allow the courts a greater ability to assure that government attorneys are using such orders properly.

Some have called this change a "roll-back" in the statute, as if the concept of allowing meaningful judicial review was an extreme position. To the contrary, this is a change that the Clinton administration supported in legislation transmitted to the Congress last year. This is a change that the House Judiciary Committee also supported last year. In the Electronic Communications Privacy Act, H.R. 5018, that Committee proposed that before a pen/trap device "could be ordered installed, the government must first demonstrate to an independent judge that 'specific and articulable facts reasonably indicate that a crime has been, is being, or will be committed, and information likely to be obtained by such installation and use . . . is relevant to an investigation of that crime."' Report 106-932, 106th Cong. 2d Sess., Oct. 4, 2000, p. 13. Unfortunately, the Bush administration has taken a contrary position and has rejected this change in the judicial review process.

Computer Trespasser: Currently, an owner or operator of a computer that is accessed by a hacker as a means for the hacker to reach a third computer, cannot simply consent to law enforcement monitoring of the computer. Instead, because the owner or operator is not technically a party to the communication, law enforcement needs wiretap authorization under Title III to conduct such monitoring. I have long been interested in closing this loophole. Indeed, when I asked about this problem, the FBI explained to me in June, 2000, that:

This anomaly in the law creates an untenable situation whereby providers are sometimes forced to sit idly by as they witness hackers enter and, in some situations, destroy or damage their systems and networks while law enforcement begins the detailed process of seeking court authorization to assist them. In the real world, the situation is akin to a homeowner being forced to helplessly watch a burglar or vandal while police seek a search warrant to enter the dwelling.

I therefore introduced as part of the Internet Security Act, S. 2430, in 2000, an exception to the wiretap statute that would explicitly permit such monitoring without a wiretap if prior consent is obtained from the person whose computer is being hacked through and used to send "harmful interference to a lawfully operating computer system."

The administration initially proposed a different formulation of the exception that would have allowed an owner/operator of any computer connected to the Internet to consent to FBI wiretapping of any user who violated a workplace computer use policy or online service term of service and was thereby an "unauthorized" user. The administration's proposal was not limited to computer hacking offenses under 18 U.S.C. 1030 or to conduct that caused harm to a computer or computer system. The administration rejected these refinements to their proposed wiretap exception, but did agree, in section 217 of the USA Act, to limit the authority for wiretapping with the consent of the owner/operator to communications of unauthorized users without an

existing subscriber or other contractual relationship with the owner/operator.

Sharing Criminal Justice Information: The USA Act will make significant changes in the sharing of confidential criminal justice information with various Federal agencies. For those of us who have been concerned about the leaks from the FBI that can irreparably damage reputations of innocent people and frustrate investigations by alerting suspects to flee or destroy material evidence, the administration's insistence on the broadest authority to disseminate such information, without any judicial check, is disturbing. Nonetheless, I believe we have improved the administration's initial proposal in responsible ways. Only time will tell whether the improvements we were able to reach agreement on are sufficient.

At the outset, we should be clear that current law allows the sharing of confidential criminal justice information, but with close court supervision. Federal Rule of Criminal Procedure 6(e) provides that matters occurring before a grand jury may be disclosed only to an attorney for the government, such other government personnel as are necessary to assist the attorney and another grand jury. Further disclosure is also allowed as specifically authorized by a court.

Similarly, section 2517 of title 18, United States Code provides that wiretap evidence may be disclosed in testimony during official proceedings and to investigative or law enforcement officers to the extent appropriate to the proper performance of their official duties. In addition, the wiretap law allows disclosure of wiretap evidence "relating to offenses other than specified in the order" when authorized or approved by a judge. Indeed, just last year, the Justice Department assured us that "law enforcement agencies have authority under current law to share title III information regarding terrorism with intelligence agencies when the information is of overriding importance to the national security." Letter from Robert Raben, Assistant Attorney General, September 28, 2000.

For this reason, and others, the Justice Department at the time opposed an amendment proposed by Senators KYL and FEINSTEIN to S. 2507, the " Intelligence Authorization Act for fiscal year 2001 that would have allowed the sharing of foreign intelligence and counterintelligence information collected from wiretaps with the intelligence community." I deferred to the Justice Department on this issue and sought changes in the proposed amendment to address the Department's concern that this provision was not only unnecessary but also "could have significant implications for prosecutions and the discovery process in litigation," "raises significant issues regarding the sharing with intelligence agencies of information collected about United States persons" and jeopardized "the need to protect equities relating to ongoing criminal investigations." In the end, the amendment was revised to address the Justice Department's concerns and passed the Senate as a free-standing bill, S. S. 3205, the Counterterrorism Act of 2000. The House took no action on this legislation.

Disclosure of Wiretap Information: The administration initially proposed adding a sweeping provision to the wiretap statute that broadened the definition of an "investigative or law enforcement officer" who may receive disclosures of information

obtained through wiretaps to include Federal law enforcement, intelligence, national
security, national defense, protective and immigration personnel and the President
and Vice President. This proposal troubled me because information intercepted by a
wiretap has enormous potential to infringe upon the privacy rights of innocent
people, including people who are not even suspected of a crime and merely happen to
speak on the telephone with the targets of an investigation. For this reason, the
authority to disclose information obtained through a wiretap has always been care-
fully circumscribed in law.

While I recognize that appropriate officials in the executive branch of govern-
ment should have access to wiretap information that is important to combating ter-
rorism or protecting the national security, I proposed allowing such disclosures
where specifically authorized by a court order. Further, with respect to information
relating to terrorism, I proposed allowing the disclosure without a court order as
long as the judge who authorized the wiretap was notified as soon as practicable
after the fact. This would have provided a check against abuses of the disclosure
authority by providing for review by a neutral judicial official. At the same time,
there was a little likelihood that a judge would deny any requests for disclosure in
cases where it was warranted.

On Sunday, September 30, the administration agreed to my proposal, but within two
days, it backed away from its agreement. I remain concerned that the resulting pro-
vision will allow the unprecedented, widespread disclosure **\*S10374** of this highly
sensitive information without any notification to or review by the court that au-
thorizes and supervises the wiretap. This is clearly an area where our committee
will have to exercise close oversight to make sure that the newly-minted disclosure
authority is not being abused.

The administration offered three reasons for reneging on the original deal.
First, they claimed that the involvement of the court would inhibit Federal invest-
igators and attorneys from disclosing information needed by intelligence and nation-
al security officials. Second, they said the courts might not have adequate security
and therefore should not be told that information was disclosed for intelligence or
national security purposes. And third, they said the President's constitutional
powers under Article II give him authority to get whatever foreign intelligence he
needs to exercise his national security responsibilities.

I believe these concerns are unfounded. Federal investigators and attorneys will
recognize the need to disclose information relevant to terrorism investigations.
Courts can be trusted to keep secrets and recognize the needs of the President.

Current law requires that such information be used only for law enforcement pur-
pose. This provides an assurance that highly intrusive invasions of privacy are con-
fined to the purpose for which they have been approved by a court, based on probable
cause, as required by the Fourth Amendment. Current law calls for minimization pro-
cedures to ensure that the surveillance does not gather information about private
and personal conduct and conversations that are not relevant to the criminal invest-
igation.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

When the administration reneged on the agreement regarding court supervision, we turned to other safeguards and were more successful in changing other questionable features of the administration's bill. The administration accepted my proposal to strike the term "national security" from the description of wiretap information that may be shared throughout the executive branch and replace it with "foreign intelligence" information. This change is important in clarifying what information may be disclosed because the term " foreign intelligence" is specifically defined by statute whereas "national security" is not.

Moreover, the rubric of "national security" has been used to justify some particularly unsavory activities by the government in the past. We must have at least some assurance that we are not embarked on a course that will lead to a repetition of these abuses because the statute will now more clearly define what type of information is subject to disclosure. In addition, Federal officials who receive the information may use it only as necessary to the conduct of their official duties. Therefore, any disclosure or use outside the conduct of their official duties remains subject to all limitations applicable to their retention and dissemination of information of the type of information received. This includes the Privacy Act, the criminal penalties for unauthorized disclosure of electronic surveillance information under chapter 119 of title 18, and the contempt penalties for unauthorized disclosure of grand jury information. In addition, the Attorney General must establish procedures for the handling of information that identifies a United States person, such as the restrictions on retention and dissemination of foreign intelligence and counterintelligence information pertaining to United States persons currently in effect under Executive Order 12333.

While these safeguards do not fully substitute for court supervision, they can provide some assurance against misuse of the private, personal, and business information about Americans that is acquired in the course of criminal investigations and that may flow more widely in the intelligence, defense, and national security worlds.

Disclosure of Grand Jury Information: The wiretap statute was not the only provision in which the administration sought broader authority to disclose highly sensitive investigative information. It also proposed broadening Rule 6(e) of the Federal Rules of Criminal Procedure to allow the disclosure of information relating to terrorism and national security obtained from grand jury proceedings to a broad range of officials in the executive branch of government. As with wiretaps, few would disagree that information learned in a criminal investigation that is necessary to combating terrorism or protecting the national security ought to be shared with the appropriate intelligence and national security officials. The question is how best to regulate and limit such disclosures so as not to compromise the important policies of secrecy and confidentiality that have long applied to grand jury proceedings.

I proposed that we require judicial review of requests to disclose terrorism and foreign intelligence information to officials in the executive branch beyond those already authorized to receive such disclosures. Once again, the administration agreed to my proposal on Sunday, September 30, but reneged within two days. As a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

result, the bill does not provide for any judicial supervision of the new authoriza-
tion for dissemination of grand jury information throughout the executive branch.
The bill does contain the safeguards that I have discussed with respect to law en-
forcement wiretap information. However, as with the new wiretap disclosure author-
ity, I am troubled by this issue and plan to exercise the close oversight of the Ju-
diciary Committee to make sure it is not being abused.

Foreign Intelligence Information Sharing: The administration also sought a provi-
sion that would allow the sharing of foreign intelligence information throughout the
executive branch of the government notwithstanding any current legal prohibition
that may prevent or limit its disclosure. I have resisted this proposal more
strongly than anything else that still remains in the bill. What concerns me is that
it is not clear what existing prohibitions this provision would affect beyond the
grand jury secrecy rule and the wiretap statute, which are already covered by other
provisions in the bill. Even the administration, which wrote this provision, has not
been able to provide a fully satisfactory explanation of its scope.

If there are specific laws that the administration believes impede the necessary
sharing of information on terrorism and foreign intelligence within the executive
branch, we should address those problems through legislation that is narrowly tar-
geted to those statutes. Tacking on a blunderbuss provision whose scope we do not
fully understand can only lead to consequences that we cannot foresee. Further, I am
concerned that such legislation, broadly authorizing the secret sharing of intelli-
gence information throughout the executive branch, will fuel the unwarranted fears
and dark conspiracy theories of Americans who do not trust their government. This
was another provision on which the administration reneged on its agreement with me;
it agreed to drop it on September 30, but resurrected it within two days, insisting
that it remain in the bill. I have been able to mitigate its potential for abuse
somewhat by adding the same safeguards that apply to disclosure of law enforcement
wiretap and grand jury information.

"Sneak and Peek" Search Warrants: Another issue that has caused me serious con-
cern relates to the administration's proposal for so-called "sneak and peek" search
warrants. The House Judiciary Committee dropped this proposal entirely from its ver-
sion of the legislation. Normally, when law enforcement officers execute a search
warrant, they must leave a copy of the warrant and a receipt for all property seized
at the premises searched. Thus, even if the search occurs when the owner of the
premises is not present, the owner will receive notice that the premises have been
lawfully searched pursuant to a warrant rather than, for example, burglarized.

Two circuit courts of appeal, the Second and the Ninth Circuits, have recognized
a limited exception to this requirement. When specifically authorized by the issuing
judge or magistrate, the officers may delay providing notice of the search to avoid
compromising an ongoing investigation or for some other good reason. However, this
authority has been carefully circumscribed.

First, the Second and Ninth Circuit cases have dealt only with situations where
the officers search a premises without seizing any tangible property. As the Second

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Circuit explained, such **\*S10375** searches are "less intrusive than a conventional
search with physical seizure because the latter deprives the owner not only of pri-
vacy but also of the use of his property." United States v. Villegas, 899 F.2d 1324,
1337 (2d Cir. 1990).

Second, the cases have required that the officers seeking the warrant must show
good reason for the delay. Finally, while the courts have allowed notice of the
search may be delayed, it must be provided within a reasonable period thereafter,
which should generally be no more than seven days. The reasons for these careful
limitations were spelled out succinctly by Judge Sneed of the Ninth Circuit: "The
mere thought of strangers walking through and visually examining the center of our
privacy interest, our home, arouses our passion for freedom as does nothing else.
That passion, the true source of the Fourth Amendment, demands that surreptitious
entries be closely circumscribed." See United States v. Freitas, 800 F.2d 1451, 1456
(9th Cir. 1986).

The administration's original proposal would have ignored some of the key limita-
tions created by the caselaw for sneak and peek search warrants. First, it would
have broadly authorized officers not only to conduct surreptitious searches, but
also to secretly seize any type of property without any additional showing of neces-
sity. This type of warrant, which has never been addressed by a published decision
of a federal appellate court, has been referred to in a law review article written
by an FBI agent as a "sneak and steal" warrant. See K. Corr, "Sneaky But Lawful: The
Use of Sneak and Peek Search Warrants," 43 U. Kan. L. Rev. 1103, 1113 (1995).
Second, the proposal would simply have adopted the procedural requirements of 18
U.S.C. section 2705 for providing delayed notice of a wiretap. Among other things,
this would have extended the permissible period of delay to a maximum of 90 days,
instead of the presumptive seven-day period provided by the caselaw on sneak and
peek warrants.

I was able to make significant improvements in the administration's original pro-
posal that will help to ensure that the government's authority to obtain sneak and
peek warrants is not abused. First, the provision that is now in section 213 of the
bill prohibits the government from seizing any tangible property or any wire or
electronic communication or stored electronic information unless it makes a showing
of reasonable necessity for the seizure. Thus, in contrast to the administration's
original proposal, the presumption is that the warrant will authorize only a search
unless the government can make a specific showing of additional need for a seizure.
Second, the provision now requires that notice be given within a reasonable time of
the execution of the warrant rather than giving a blanket authorization for up to a
90-day delay. What constitutes a reasonable time, of course, will depend upon the
circumstances of the particular case. But I would expect courts to be guided by the
teachings of the Second and the Ninth Circuits that, in the ordinary case, a reason-
able time is no more than seven days.

Several changes in the Foreign Intelligence Surveillance Act, FISA, are designed
to clarify technical aspects of the statutory framework and take account of experi-
ence in practical implementation. These changes are not controversial, and they will

facilitate the collection of intelligence for counterterrorism and counterintelli-
gence purposes. Other changes are more significant and required careful evaluation
and revision of the administration's proposals.

The USA Act, in section 207, changes the duration of electronic surveillance un-
der FISA in cases of an agent of a foreign power, other than a United States per-
sons, who acts in the United States as an officer or employee of a foreign power or
as a member of an international terrorist group. Current law limits court orders in
these cases to 90 days, the same duration as for United States persons. Experience
indicates, however, that after the initial period has confirmed probable cause that
the foreign national meets the statutory standard, court orders are renewed re-
peatedly and the 90-day renewal becomes an unnecessary procedural for investigators
taxed with far more pressing duties.

The administration proposed that the period of electronic surveillance be changed
from 90 days to one year in these cases. This proposal did not ensure adequate re-
view after the initial stage to ensure that the probable cause determination re-
mained justified over time. Therefore, the bill changes the initial period of the
surveillance 90 to 120 days and changes the period for extensions from 90 days to
one year. The initial 120-day period provides for a review of the results of the
surveillance or search directed at an individual before one-year extensions are re-
quested. These changes do not affect surveillance of a United States person.

The bill also changes the period for execution of an order for physical search
under FISA from 45 to 90 days. This change applies to United States persons as well
as foreign nationals. Experience since physical search authority was added to FISA
in 1994 indicates that 45 days is frequently not long enough to plan and carry out a
covert physical search. There is no change in the restrictions which provide that
United States persons may not be the targets of search or surveillance under FISA
unless a judge finds probable cause to believe that they are agents of foreign
powers who engage in specified international terrorist, sabotage, or clandestine in-
telligence activities that may involve a violation of the criminal statutes of the
United States.

The bill, in section 208, seeks to ensure that the special court established un-
der FISA has sufficient judges to handle the workload. While changing the duration
of orders and extensions will reduce the number of cases in some categories, the
bill retains the court's role in pen register and trap and trace cases and expands
the court's responsibility for issuing orders for records and other tangible items
needed for counterintelligence and counter terrorism investigations. Upon reviewing
the court's requirements, the administration requested an increase in the number of
Federal district judges designated for the court from seven to 11 of whom no less
than 3 shall reside within 20 miles of the District of Columbia. The latter provi-
sion ensures that more than one judge is available to handle cases on short notice
and reduces the need to invoke the alternative of Attorney General approval under
the emergency authorities in FISA.

Other changes in FISA and related national security laws are more controversial.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In several areas, the bill reflects a serious effort to accommodate the requests for
expanded surveillance authority with the need for safeguards against misuse, espe-
cially the gathering of intelligence about the lawful political or commercial activ-
ities of Americans. One of the most difficult issues was whether to eliminate the
existing statutory "agent of a foreign power" standards for surveillance and invest-
igative techniques that raise important privacy concerns, but not at the level that
the Supreme Court has held to require a court order and a probable cause finding un-
der the fourth amendment. These include pen register and trap and trace devices, ac-
cess to business records and other tangible items held by third parties, and access
to records that have statutory privacy protection. The latter include telephone,
bank, and credit records.

The "agent of a foreign power" standard in existing law was designed to ensure
that the FBI and other intelligence agencies do not use these surveillance and in-
vestigative methods to investigate the lawful activities of Americans in the name of
an undefined authority to collect foreign intelligence or counterintelligence in-
formation. The law has required a showing of reasonable suspicion, less than prob-
able cause, to believe that a United States person is an "agent of a foreign power"
engaged in international terrorism or clandestine intelligence activities.

However, the "agent of a foreign power" standard is more stringent than the
standard under comparable criminal law enforcement procedures which require only a
showing of relevance to a criminal investigation. The FBI's experience under exist-
ing laws since they were enacted at various time over the past 15 years has been
that, in practice, the requirement to show reasonable suspicion that a person is an
"agent of a foreign power" has been almost as burdensome as the **\*S10376** requirement
to show probable cause required by the fourth amendment for more intrusive tech-
niques. The FBI has made a clear case that a relevance standard is appropriate for
counterintelligence and counterterrorism investigations, as well as for criminal in-
vestigations.

The challenge, then, was to define those investigations. The alternative proposed
by the administration was to cover any investigation to obtain foreign intelligence
information. This was extremely broad, because the definition includes any informa-
tion with respect to a foreign power that relates to, and if concerning a United
States person is necessary to, the national defense or the security of the United
States or the conduct of the foreign affairs of the United States. This goes far
beyond FBI counterintelligence and counterterrorism requirements. Instead, the bill
requires that use of the surveillance technique or access to the records be relevant
to an investigation to protect against international terrorism or clandestine intel-
ligence activities.

In addition, an investigation of a United States person may not be based solely
on activities protected by the first amendment. This framework applies to pen re-
gisters and trap and trace under section 215, access to records and other items un-
der section 215, and the national security authorities for access to telephone,
bank, and credit records under section 506. Lawful political dissent and protest by
American citizens against the government may not be the basis for FBI counterintel-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ligence and counterterrorism investigations under these provisions.

A separate issue for pen registers and trap and trace under FISA is whether the court should have the discretion to make the decision on relevance. The administration has insisted on a certification process. I discussed this issue as it comes up in the criminal procedures for pen registers and trap and trace under title 18, and my concerns apply to the FISA procedures as well.

The most controversial change in FISA requested by the administration was the proposal to allow surveillance and search when "a purpose" is to obtain foreign intelligence information. Current law requires that the secret procedures and different probable cause standards under FISA be used only if a high-level executive official certifies that "the purpose" is to obtain foreign intelligence formation. The administration's aim was to allow FISA surveillance and search for law enforcement purposes, so long as there was at least some element of a foreign intelligence purpose. This proposal raised constitutional concerns, which were addressed in a legal opinion provided by the Justice Department, which I insert in the record at the end of my statement.

The Justice Department opinion did not defend the constitutionality of the original proposal. Instead, it addressed a suggestion made by Senator

Feinstein to the Attorney General at the Judiciary Committee hearing to change "the purpose" to "a significant purpose." No matter what statutory change is made even the Department concedes that the court's may impose a constitutional requirement of "primary purpose" based on the appellate court decisions upholding FISA against constitutional challenges over the past 20 years.

Section 218 of the bill adopts "significant purpose," and it will be up to the courts to determine how far law enforcement agencies may use FISA for criminal investigation and prosecution beyond the scope of the statutory definition of "foreign intelligence information."

In addition, I proposed and the administration agreed to an additional provision in Section 505 that clarifies the boundaries for consultation and coordination between officials who conduct FISA search and surveillance and Federal law enforcement officials including prosecutors. Such consultation and coordination is authorized for the enforcement of laws that protect against international terrorism, clandestine intelligence activities of foreign agents, and other grave foreign threats to the nation. Protection against these foreign-based threats by any lawful means is within the scope of the definition of "foreign intelligence information," and the use of FISA to gather evidence for the enforcement of these laws was contemplated in the enactment of FISA. The Justice Department's opinion cites relevant legislative history from the Senate Intelligence Committee's report in 1978, and there is comparable language in the House report.

The administration initially proposed that the Attorney General be authorized to detain any alien indefinitely upon certification of suspicion to links to terrorist activities or organizations. Under close questioning by both Senator

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Kennedy and Senator

Specter at the Committee hearing on September 25, the Attorney General said that his proposal was intended only to allow the Government to hold an alien suspected of terrorist activity while deportation proceedings were ongoing. In response to a question by Sen. SPECTER, the Attorney General said: "Our intention is to be able to detain individuals who are the subject of deportation proceedings on other grounds, to detain them as if they were the subject of deportation proceedings on terrorism." The Justice Department however continued to insist on broader authority, including the power to detain even if the alien was found not to be deportable.

I remain concerned about the provision, in section 412, but I believe that it is has been improved from the original proposal offered by the administration. Specifically, the Justice Department must now charge an alien with an immigration or criminal violation within seven days of taking custody, and the merits of the Attorney General's certification of an alien under this section is subject to judicial review. Moreover, the Attorney General can only delegate this power to the Commissioner of the INS, ensuring greater accountability and preventing the certification decision from being made by low-level officials. Nonetheless, I would have preferred that this provision not be included, and I would urge the Attorney General and his successors to employ great discretion in using this new power.

In addition, the administration initially proposed a sweeping definition of terrorist activity and new powers for the Secretary of State to certify an organization as a terrorist organization for purposes of immigration law. We were able to work with the administration to refine this definition to limit its application to individuals with innocent contacts to non-certified organizations. We also limited the retroactive effect of these new definitions. If an alien solicited funds or membership, or provided material support for an organization that was not certified at that time by the Secretary of State, the alien will have the opportunity to show that he did not know and should have known that his action would further the organizations terrorist activity. This is a substantially more protective than the administration's proposal, which by its terms, would have empowered INS to deport someone who raised money for the African National Congress. Throughout our negotiations on these issues, Senator

Kennedy provided steadfast help. Although neither of us are pleased with the final product, it is far better than it would have been without his leadership.

I was disappointed that the administration's initial proposal authorizing the President to impose unilateral food and medical sanctions would have undermined a law we passed last year with overwhelming bipartisan support.

Under that law, the President already has full authority to impose unilateral food and medicine sanctions during this crisis because of two exceptions built into the law that apply to our current situation. Nevertheless, the administration sought to undo this law and obtain virtually unlimited authority in the future to impose food and medicine embargoes, without making any effort for a multi-lateral approach in cooperation with other nations. Absent such a multi-lateral approach, other na-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tions would be free to step in immediately and take over business from American
firms and farmers that they are unilaterally barred from pursuing.

Over 30 farm and export groups, including the American Farm Bureau Federation,
the Grocery Manufacturers of America, the National Farmers Union, and the U.S. Dairy
Export Council, wrote to me and explained that the administration proposal would
"not achieve its intended policy goal." **\*S10377**

I worked with Senator

Enzi, and other Senators, on substitute language to give the administration the
tools it needs in this crisis. This substitute has been carefully crafted to avoid
needlessly hurting American farmers in the future, yet it will assure that the
United States can engage in effective multilateral sanctions.

This bipartisan agreement limits the authority in the bill to existing laws and
executive orders, which give the President full authority regarding this conflict,
and grants authority for the President to restrict exports of agricultural products,
medicine or medical devices. I continue to agree with then-Senator Ashcroft, who ar-
gued in 1999 that unilateral U.S. food and medicine sanctions simply do not work
when he introduced the "Food and Medicine for the World Act." As recently as October
2000, then-Senator Ashcroft pointed out how broad, unilateral embargoes of food or
medicine are often counterproductive. Many Republican and Democratic Senators made
it clear just last year that the U.S. should work with other countries on food and
medical sanctions so that the sanctions will be effective in hurting our enemies,
instead of just hurting the U.S. I am glad that with Senator

Enzi's help, we were able to make changes in the trade sanctions provision to
both protect our farmers and help the President during this crisis.

I have done my best under the circumstances to confine the amendment demands to
those matters that are consensus legal improvements. I concede that my efforts have
not been completely successful and there are a number of provisions on which the ad-
ministration has insisted with which I disagree. Frankly, the agreement that was
made September 30, 2001 would have led to a better balanced bill. I could not stop
the administration from reneging on the agreement any more than I could have sped
the process to reconstitute this bill in the aftermath of those breaches.

In these times we need to work together to face the challenges of international
terrorism. I have sought to do so in good faith.

147 Cong. Rec. S10365-02, 2001 WL 1188632 (Cong.Rec.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 7

## FOREIGN INTELLIGENCE SURVEILLANCE ACT OF 1978

JUNE 8, 1978.—Ordered to be printed

Mr. BOLAND, from the Permanent Select Committee on Intelligence, submitted the following

# REPORT

together with

## SUPPLEMENTAL, ADDITIONAL, AND DISSENTING VIEWS

[To accompany H.R. 7308 which on November 4, 1977, was referred jointly to the Committee on the Judiciary and the Permanent Select Committee on Intelligence]

The Permanent Select Committee on Intelligence, to whom was referred the bill (H.R. 7308) to amend title 18, United States Code, to authorize applications for a court order approving the use of electronic surveillance to obtain foreign intelligence information, having considered the same, report favorably thereon with amendments and recommend that the bill as amended do pass.

### AMENDMENTS

Strike all after the enacting clause and insert in lieu thereof:

That this act may be cited as the "Foreign Intelligence Surveillance Act of 1978".

### TABLE OF CONTENTS

TITLE I—ELECTRONIC SURVEILLANCE WITHIN THE UNITED STATES FOR FOREIGN INTELLIGENCE PURPOSES

Sec. 101. Definitions.
Sec. 102. Authorization for electronic surveillance for foreign intelligence purposes.
Sec. 103. Special courts.
Sec. 104. Application for an order.
Sec. 105. Issuance of an order.
Sec. 106. Use of information.
Sec. 107. Report of electronic surveillance.
Sec. 108. Congressional oversight.
Sec. 109. Penalties.
Sec. 110. Civil liability.

TITLE II—CONFORMING AMENDMENTS

Sec. 201. Amendments to chapter 119 of title 18, United States Code.

TITLE III—EFFECTIVE DATE

Sec. 301. Effective date.

*Section 110*

This section imposes civil liability for violations of section 109(a)(1) and section 109(a)(2), and authorizes an "aggrieved person", as defined in section 101(k), to recover actual damages, punitive damages, and reasonable attorney's fees and costs. Since the civil cause of action only arises in connection with a violation of the criminal provision, the statutory good faith defense, though applicable, does not have to be restated. Although included in the definition of "aggrieved person", foreign powers and non-U.S. persons who act in the United States as officers or employees of foreign powers would be prohibited from bringing actions under section 110.

The agent of a foreign power exclusion of section 110 is narrower than the corresponding provision of H.R. 7308, as introduced. The exclusion only applies to those who come within the definition of agent of a foreign power because they act in the United States as an officer, member or employee of a foreign power, see section 110(b)(1)(A). The foreign visitors covered by the second part of the definition, see section 110(b)(1)(B) would have a cause of action under the provision. The original bill excluded both of these classes of agents of a foreign power. The committee believes that the lesser exclusion is more appropriate. As regards the first category those barred from the civil remedy will be primarily those persons who are themselves immune from criminal or civil liability because of their diplomatic status. In regard to the second category it is difficult to see what would be gained by denying the civil remedy in practical terms. In proving that the exclusion applied the Government would more than likely be forced to make the same showing that it would make in proving that the surveillance was lawful.

### TITLE II

Title II contains the conforming amendments necessary to integrate the Foreign Intelligence Surveillance Act into the existing provisions of chapter 119 of title 18. In adopting its other amendments, one of the committee's purposes has been to produce legislation that can be read and understood (and thus complied with) easily, without excessive cross reference to other statutes. Thus, for example, the committee has expanded the definition section and provided the bill with its own criminal and civil liability and testing and countermeasures provisions. As a result, most of the conforming amendments contained in H.R. 7308, as introduced, have been eliminated.

*Section 201(a)*

This provision rewrites existing section 2511(2)(a)(ii) of title 18, United States Code, which states that "it shall not be unlawful under this chapter" for a communications common carrier to assist law enforcement and investigative officers in performing surveillance activities pursuant to title 18. Section 201(a) would restate this provision in terms of an authorization, rather than an exemption from criminality, and would include "landlords, custodians, or other persons" in the authorization, extend its scope to cover foreign intelligence electronic surveillance, require the Government to provide a copy of the

99

ction 109 (a)
d person", as
unitive dam-
ie civil cause
the criminal
able, does not
of "aggrieved
n the United
be prohibited

) is narrower
roduced. The
definition of
ted States as
, see section
cond part of
use of action
these classes
hat the lesser
itegory those
persons who
y because of
it is difficult
y in practical
nment would
that it would

y to integrate
ing provisions
ments, one of
tion that can
asily, without
example, the
vided the bill
and counter-
ming amend-
eliminated.

ii) of title 18,
nlawful under
assist law en-
eillance activi-
this provision
from criminal-
er persons" in
telligence elec-
a copy of the

Attorney General certification or portions of the court order and other information to the person rendering assistance, relieve such person from all civil liability for actions in conformance with the court order or certification, and prohibit such person from divulging the existence of a surveillance or the device involved (unless required by legal process and after notice has been given to the Attorney General or oppropriate state official).[53]

Section 2511(2) (a) (ii) was added to chapter 119 in 1970 in response to the telephone company's refusal to provide assistance to officers engaged in court ordered wiretaps on the theory that such assistance would constitute a violation of the Communications Act of 1934 and chapter 119, At the same time, section 2518(4) (e) was added, authorizing the judge issuing the warrant to order a "communication common carrier, landlord, custodian, or other person" to provide assistance. The committee has made the two provisions consistent in terms of those who are authorized to provide assistance and those whom a judge can order to provide assistance.

The provision prohibiting the disclosure of the existence of a surveillance or the surveillance technique was added by the committee. It is necessary in light of the practice of some telephone companies to inform customers who request a line check that there is a wiretap on their phone, whether or not the tap was lawfully authorized.

Where a court order is required to initiate a surveillance, a copy of the order must be provided to the party providing assistance. Where a court order is not required, a copy of the relevant Attorney General certificate must be provided. Examples of the latter would be emergency surveillances under section 105(e), surveillances conducted under the special circumstances of section 102(a), and surveillances conducted pursuant to the testing, counter-measures and training provisions of section 105(f).

Requiring the court order or certification to be presented before the assistance is rendered serves two purposes. It places an additional obstacle in the path of unauthorized surveillance activity, and, coupled with the provision relieving the third party from liability if the order or certification is complied with, it provides full protection to such third parties. In the past, phone companies have been subjected to civil suits for rendering assistance to the Government, whether or not a court order was involved. The committee provision is intended to hold harmless the phone company and others so long as the assistance is in accordance with the terms of the order or certification, even if the surveillance is later found to be unlawful.

The court order or certification must indicate the period of time during which the provision of information, facilities or technical assistance is authorized and must specify the information, facilities or technical assistance required. These requirements are more detailed than the corresponding provision of H.R. 7308, as introduced. They will eliminate any doubts the party providing assistance might harbor concerning what is required of him and what are the limits of his authority.

---

[53] The notice provision is intended to provide sufficient time for the Government to intervene to quash a subpoena or otherwise take legal action to prevent disclosure if it so desires.

A further change from H.R. 7308, as introduced, is contained in the provision empowering the specified third parties to provide assistance to "persons authorized by law to intercept wire or oral communications or to conduct electronic surveillance . . .". H.R. 7308, as introduced, would not have changed the existing language of chapter 119, which authorizes third party assistance to "law enforcement or investigative officers." The latter phrase is a defined term in chapter 119 and is not appropriate to designate those who will conduct electronic surveillance under the Foreign Intelligence Surveillance Act of 1978.

The language selected by the committee is intended to include only those individuals empowered by chapter 119 to intercept wire or oral communications for law enforcement purposes and those empowered by the Foreign Intelligence Surveillance Act of 1978 to engage in electronic surveillance for foreign intelligence purposes, and should not be subject to any broader interpretation.

*Section 201(b)*

This provision adds two subsections to section 2511(2) of title 18.

New subsection (e) makes explicit that the criminal penalties of chapter 119 of title 18 and the prohibitions of the Communications Act of 1934 do not apply to those engaging in electronic surveillance pursuant to title I of the Foreign Intelligence Surveillance Act.

New subsection (f) must be read in conjunction with the conforming amendment contained in section 201(c) which repeals section 2511(3) of title 18. The effect of these two conforming amendments is to establish the Foreign Intelligence Surveillance Act as the exclusive legislative statement on the question of the Executive's power to order electronic surveillance.

Subsection (f) begins by stating that nothing contained in chapter 119 or section 605 of the Communications Act of 1934, shall be deemed to affect the acquisition of foreign intelligence information from international or foreign communications by a means other than electronic surveillance, as defined in the Foreign Intelligence Surveillance Act of 1978.

This provision is designed to make clear that the legislation does not deal with certain international signals intelligence activities currently engaged in by the National Security Agency and electronic surveillance conducted outside the United States.

The second part of new subsection (f) is a directive to Government officials. It states that with respect to the interception of domestic wire and oral communications, and to electronic surveillance, as defined in section 101(f), the procedures of chapter 119 and of the Foreign Intelligence Surveillance Act of 1978 shall be the exclusive means by which such activities may be conducted.[54]

[54] As noted earlier, the use of pen registers and similar devices for law enforcement purposes is not covered by chapter 119 or this Act and new subsection (f) is not intended to prohibit it. Rather, because of the criminal defense provision of section 109(b)(1), the "procedures" referred to in subsection (f) include acquiring a court order for such activity. It is the Committee's intent that neither this nor any other provision of the legislation have any effect on the holding in *United States* v. *New York Telephone*, —— U.S. —— (1977), 46 LW 4033 that rule 41 of the Federal Rules of Criminal Procedure empowers federal judges to authorize the installation of pen registers for law enforcement purposes.

TAB 8

## ELECTRONIC COMMUNICATIONS PRIVACY ACT OF 1986

JUNE 19, 1986.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. KASTENMEIER, from the Committee on the Judiciary, submitted the following

# REPORT

[To accompany H.R. 4952]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 4952) to amend title 18, United States Code, with respect to the interception of certain communications, other forms of surveillance, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

SECTION 1. SHORT TITLE.

This Act may be cited as the "Electronic Communications Privacy Act of 1986".

### TITLE I—INTERCEPTION OF COMMUNICATIONS AND RELATED MATTERS

SEC. 101. FEDERAL PENALTIES FOR THE INTERCEPTION OF COMMUNICATIONS.

(a) DEFINITIONS.—(1) Section 2510(1) of title 18, United States Code, is amended—

(A) by striking out "any communication" and inserting "any aural transfer" in lieu thereof;

(B) by inserting "(including the use of such connection in a switching station)" after "reception".

(C) by striking out "as a common carrier" and

(D) by inserting before the semicolon at the end the following: "or communications affecting interstate or foreign commerce, but such term does not include the radio portion of a cordless telephone communication that is transmitted between the cordless telephone handset and the base unit".

(2) Section 2510(2) of title 18, United States Code, is amended by inserting before the semicolon at the end the following: ", but such term does not include any electronic communication".

(3) Section 2510(4) of title 18, United States Code, is amended—

(A) by inserting "or other" after "aural"; and

61–068 O

17

:odes electron-
wise transmit-
to which such
by a provider
lent to billing,

ven such term

erto Rico, and

itle 18 of the
o chapter 205

.......... 3121".

ıd the amend-
enactment of
or extension,
ıis title takes

y pen register
to the amend-
such amend-
g on the date

State law re-
v as amended

there was no searching, no seizure of anything tangible, and no physical trespass.[1]

But the *Olmstead* case is remembered not only for its holding but for the prescient dissent of Mr. Justice Brandeis, who predicted:

> Ways may some day be developed by which the Government, without removing papers from secret drawers, can reproduce them in court, and by which it will be enabled to expose to a jury the most intimate occurrences of the home . . . Can it be that the Constitution affords no protection against such invasions of individual security? [2]

Forty years later, the Supreme Court accepted the logic of Justice Brandeis in *Katz* v. *United States,* 389 U.S. 347 (1967), holding that the Fourth Amendment applies to government interception of a telephone conversation. At the same time, the Court extended Fourth Amendment protection to electronic eavesdropping on oral conversations in *Berger* v. *New York,* 388 U.S. 41 (1967).

Congress responded in a comprehensive fashion by authorizing government interception, under carefully subscribed circumstances, in Title III of the Omnibus Crime Control and Safe Streets Act of 1968,[3] which has come to be known as the Wiretap Act. That legislation protected two common types of communication—telephone conversations and face-to-face oral communications—against electronic eavesdropping. Specifically, the law barred the interception of wire communications over a common carrier unless an appropriate court order had been obtained.[4] Further, it limited the concept of interception to the "aural acquisition" of the contents of a communication.[5] "Oral communications" were protected only in circumstances where there is a reasonable expectation of privacy.[6]

### NATURE OF THE PROBLEM

the United
:ronic com-
electronic
to provide
ral law en-
ıw enforce-
nd to ease
: communi-

Although it is still not twenty years old, the Wiretap Act was written in different technological and regulatory era. Communications were almost exclusively in the form of transmission of the human voice over common carrier networks. Moreover, the contents of a traditional telephone call disappeared once the words transmitted were spoken and there were no records kept. Consequently the law primarily protects against the aural interception of the human voice over common carrier networks.

against the
llance over
ıe "houses,
nt. During
of commu-
amatically

The legislation did not attempt to address the interception of text, digital or machine communication.[7] This statutory framework appears to leave unprotected an important sector of the new communications technologies.

spread use
ıications of
When the
ə Supreme
Court held
ıent, since

Many communications today are carried on or through systems which are not common carriers. Electronic mail, videotex and similar services are not common carrier services. Under existing law

---

[1] Olmstead v. United States, 277 U.S. 438, 464 (1927). *Compare,* Dow Chemical Co. v. United States, — U.S. — (May 19, 1986) (aerial photography by government without a warrant does not violate Fourth Amendment); California v. Ciraolo, — U.S. — (May 19, 1986) (same).
[2] 277 U.S. at 474 (Brandeis, J., dissenting).
[3] 18 U.S.C. 2510 *et seq.* hereinafter "Wiretap Act."
[4] 18 U.S.C. 2511.
[5] 18 U.S.C. 2510.
[6] *Id.*
[7] Sen. Rep. No. 1097, 90th Cong., 2d Sess. 90, hereinafter "1968 Senate Report."

the interception of these services or the disclosure of the contents of messages over these services are probably not regulated or restricted. Moreover, totally private systems are rapidly being developed by private companies for their own use. It is not uncommon for businesses now not to use the local telephone comapny in some instances the long distance companies in the creation of voice and data networks. Since these networks are private they are not covered by existing Federal law. In addition, data is transmitted over tradional telephone services as well as by these services. Since data, unlike the human voice, cannot be aurally intercepted, it is also largely unregulated and unrestricted under present law.

Today, we have large-scale electronic mail operations, cellular and cordless telephones, paging devices, miniaturized transmitters for radio surveillance, and a dazzling array of digitized information networks which were little more than concepts two decades ago. Unfortunately, the same technologies that hold such promise for the future also enhance the risk that our communications will be intercepted by either private parties or the government.

In 1984 the Federal government engaged in more telephone surveillance and wiretapping than in any year since 1973.[8] Moreover, according to a recent study by the Office of Technology Assessment, Federal agencies are planning to use or already use radio scanners (20 agencies), cellular telephone interception (6 agencies), tracking devices (15 agencies), pen registers (14 agencies), and electronic mail interceptions (6 agencies).[9]

This increased use of a variety of electronic surveillance devices alone is not cause for alarm. There are instances when a particular electronic surveillance technique is justified in a criminal investigation. Congress has recognized this by permitting—under carefully limited circumstance under the Wiretap Act—the tapping of telephone calls or the bugging of rooms. However, despite efforts by both Congress[10] and the courts,[11] legal protection against the unreasonable use of newer surveillance techniques has not kept pace with technology.

The statutory deficiency in Title III with respect to non-voice communications has been criticized by commentators, Congressional experts, and most recently by both the General Accounting Office and the Office of Technology Assessment.[12] The danger is eloquently pointed out by Professor Richard Posner (now United States Circuit Court Judge):

In the a
tion tha
ance bet
mous po
quences
. . . a pr

This legal
areas. First,
form using
obtain acces
Lack of clea
to liability[1]

But most i
cy of our ci
right.[17] Priv
tion, or it w
al legal prot
the Fourth A

The Comr
tween the pi
of law enford

TELECOM

When Cor
calls were t
technologies
implicitly re
ried "in wh
minority of
jority comb
microwave.

*a. Microwar*

Microwav
transmitted
located on
tems) and t
satellite-bas
wave porti

---

[8] Administrative Office of the United States Courts, *Report on Application for Orders Authorizing or Approving the Interception of Wire or Oral Communications (Wiretap Report) for the Period January 1, 1984 to December 31, 1984.*

[9] Office of Technology Assessment, U.S. Cong., ELECTRONIC SURVEILLANCE AND CIVIL LIBERTIES (1985), hereinafter "OTA Report."

[10] *E.g.*, The Wiretap Act, *supra* note 3; Foreign Intelligence Surveillance Act, 50 U.S.C. 101 *et seq.*; Right to Financial Privacy Act, 12 U.S.C. 3401 *et seq.*

[11] *E.g.*, United States v. Torres, 751 F.2d 875 (7th Cir. 1984), *cert. den'd*, —U.S.—, 105 S.Ct. 1853 (1985). (court has authority to issue warrant permitting video surveillance); Katz v. United States, 389 U.S., 347 (1967), (Fourth Amendment applies to government wiretapping of telephone conversation); Berger v. New York, 388 U.S. 41 (1967) (Fourth Amendment applies to electronic eavesdropping on oral conversation).

[12] *See generally, Electronic Communications Privacy Act of 1985: Hearings on H.R. 3378 Before the Subcomm. on Courts, Civil Liberties, and the Admin. of Justice of the House Comm. on the Judiciary*, 99th Cong., 1st and 2d Sess., hereinafter "House Hearings." *See also* Burnham, *Experts Study Effect on Law of Latest Electronic Services*, N.Y. Times, Mar. 18, 1985 (reporting on study by ACLU Project on Privacy and Technology).

[13] Posner, *Pri*
[14] House hear
*et al.*)
[15] *See* Malley
[16] 18 U.S.C. 2
[17] According
threats to their
New England T
[18] *See* Dow C
[19] For recent
Mikva, *How W*
(1983); Fisher, *
[20] T. Harring

he contents
llated or re-
being devel-
uncommon
pny in some
of voice and
are not cov-
mitted over
vices. Since
cepted, it is
law.
ns, cellular
ransmitters
information
ecades ago.
promise for
ions will be

ephone sur-
³ Moreover,
ogy Assess-
y use radio
6 agencies),
i), and elec-

nce devices
ι particular
nal investi-
ler careful-
tapping of
e efforts by
nst the un-
; kept pace

ι non-voice
ongression-
Accounting
danger is
ow United

*Orders Author-
Report) for the*

CIVIL LIBERTIES

0 U.S.C. 101 *et*

S.—, 105 S.Ct.
Katz v. United
ng of telephone
es to electronic

*R. 3378 Before
Comm. on the*
Burnham, *Ex-
5 (reporting on*

> In the absence of market discipline, there is no presump-
> tion that the government will strike an appropriate bal-
> ance between disclosure and confidentiality. And the enor-
> mous power of the government makes the potential conse-
> quences of its snooping far more ominous than those of
> . . . a private individual or firm.[13]

This legal uncertainty poses potential problems in a number of areas. First, it may unnecessarily discourage potential customers form using such systems, and encourage unauthorized users to obtain access to communications to which they are not party.[14] Lack of clear standards may also expose law enforcement officers to liability [15] and endanger the admissibility of evidence.[16]

But most important, if Congress does not act to protect the privacy of our citizens, we may see the gradual erosion of a precious right.[17] Privacy cannot be left to depend solely on physical protection, or it will gradually erode as technology advances.[18] Additional legal protection is necessary to ensure the continued vitality of the Fourth Amendment.[19]

The Committee believes the bill represents a fair balance between the privacy expectations of citizens and the legitimate needs of law enforcement.

## TELECOMMUNICATIONS TECHNOLOGIES UNDER CURRENT LAW

### RADIO TELEPHONES

When Congress passed the Wiretap Act in 1968, most telephone calls were transmitted as they always had been—by wire. Other technologies, however, were already on the horizon, an inevitability implicitly recognized by Congress in protecting telephone calls carried "in whole or in part" over wire. 18 U.S.C. 2510. Today, only a minority of telephone calls are made through wire alone; the majority combine wire with some form of radio technology, usually microwave.

#### a. Microwave

Microwave consists of extremely high frequency radio waves transmitted point-to-point on line-of-sight paths between antennas located on towers or building tops (in terrestrial microwave systems) and between satellites and earth station "dish" antennas (in satellite-based systems). Like most radio transmissions, the microwave portion of a telephone call is vulnerable to interception.[20]

---

[13] Posner, *Privacy in the Supreme Court,* 1979 Sup. Ct. Rev. 173, 176 (1979).
[14] House hearings, *supra* note 12 (testimony of P. Walker, P. Quigley, P. Nugent, J. Stanton *et al.*)
[15] *See* Malley v. Briggs, —U.S.— (84–1586, Mar. 5, 1986), 54 U.S.L.W. 4243 (Mar. 5, 1986).
[16] 18 U.S.C. 2515.
[17] According to a recent poll, 77 percent of Americans are concerned about technology's threats to their personal privacy. Louis Harris & Associates, *The Road After 1984,* Southern New England Telephone (1984).
[18] *See* Dow Chemical v. United States, —— US. —— (May 19, 1984) (Powell, J. dissenting).
[19] For recent explorations on the capacity of Congress to interpret the Constitution, *see* Mikva, *How Well Does Congress Support and Defend the Constitution?,* 61 N.C. L. Rev. 587 (1983); Fisher, *Constitutional Interpretation by Members of Congress,* 63 N.C. L. Rev. 707 (1985).
[20] T. Harrington and B. Cooper, THE HIDDEN SIGNALS ON SATELLITE TV (1984).

Subsection (c) of proposed section 2701 provides that this section does not apply with respect to conduct which is authorized by: (1) the provider of the service; (2) the user of the service; or (3) the provisions of sections 2703 or 2704 of this new chapter.

*Proposed section 2702* provides general prohibitions on the disclosure of contents. This proposed section provides that a person or entity providing electronic communication services to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service. This prohibition is similar to that found in chapter 119 with respect to the divulgence of a wire or electronic communication during transmission. The term knowingly means that the defendant was aware of the nature of the conduct, aware of or possessing a firm belief in the existence of the requisite circumstances and an awareness of or a firm belief about the substantial certainty of the result. The conduct in question is the act of disclosure. The result is that the contents have been provided to another person or entity. The circumstances involved are that the person involved provides electronic communication services to the public and that the contents relate to a wire or electronic communication. Knowledge as to a circumstance includes willful blindness, *Model Penal Code* section 2.02. Comment at 129–30 (Tent. Draft No. 4, 1955); *United States* v. *Jewell,* 532 F.2d 697 (9th Cir.), *cert. denied,* 426 U.S. 951 (1976). The concept of "knowingly" does not include, however, "reckless" or "negligent" conduct. *See* House Report 96–1396 at 33–34 (for a definition of terms). This provision is aimed at proscribing the disclosure of stored wire and electronic communications. Subsection (b) contains the exceptions to this general rule.

Subsection (a)(2) of proposed section 2702 provides that a person or entity providing remote computing services to the public shall not knowingly divulge the contents of any communication which is carried or maintained on that service if certain conditions are met. The term "contents" as used in section 2702 is intended to encompass the substance, purport, effect or meaning of the communication. Under this interpretation, a service provider is allowed to divulge mailing lists that identify persons fitting broad demographic criteria. Unless otherwise authorized, service providers may not divulge to third parties information that profiles the activities of individual subscribers through the divulgence of the contents of a communication. The first condition is that the affected communication must be on behalf of and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from) a subscriber or customer of such service. The second condition is that the affected communication be solely for the purpose of providing storage or computer processing services to such subscriber or customer, so long as the provider is *not* authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing. The prohibitions of this subsection are also modified by the exceptions in subsection (b).

Section 2702(a) protects communications "received by means of electronic transmission from * * * a subscriber or customer of such service" and kept "solely for the purpose of providing storage or

computer p
* * *." In
sender—a u
dressee's ac
message is
2701(c). Som
message, ch
at a later ti
sage in stor
or user fro
storage, and
ered by sect

Section 27
tronic comm
ing the cont
by that serv
recipient of
intended re
ed, prohibits
munication
nor any oth
provision of
on the basi
Credit Repo

The appli
viders of wi
stances, how
er of such s
some such s
federal requ
of its roles,
instances be
the other se
bined entity
close, the a

One exar
Credit Rep
stances und
tain inform
consumer r
electronic
might prov
ing the sto
2511(3) hav
agency, and
limitations

Section 2
service to t
communica
and receiv
ceived by
customer c
purpose of
This provi

his section
ized by: (1)
(3) the pro-

the disclo-
person or
the public
contents of
rvice. This
respect to
ring trans-
was aware
m belief in
eness of or
t. The con-
at the con-
he circum-
electronic
ents relate
a circum-
ction 2.02.
l States v.
(1976). The
eckless" or
(for a def-
the disclo-
section (b)

it a person
ublic shall
n which is
s are met.
to encom-
ommunica-
owed to di-
mographic
nay not di-
rities of in-
tents of a
ommunica-
electronic-
ocessing of
ssion from)
ondition is
ose of pro-
subscriber
access the
viding any
ne prohibi-
ons in sub-

means of
ner of such
storage or

computer processing services to such subscriber or customer * * *." In the case of either electronic mail or voice mail, the sender—a user of the service—has necessarily authorized the addressee's access to the message. The addressee's acquisition of the message is therefore clearly within the contemplation of section 2701(c). Sometimes the addressee, having requested and received a message, chooses to leave it in storage on the service for re-access at a later time. The Committee intends that, in leaving the message in storage, the addressee should be considered the subscriber or user from whom the system received the communication for storage, and that such communication should continue to be covered by section 2702(a)(2).

Section 2702(a) generally prohibits the provider of a wire or electronic communication service to the public from knowingly divulging the contents of any communication while in electronic storage by that service to any person other than the addressee or intended recipient of such communication, or an agent of such addressee or intended recipient. Similarly, section 2511(3) of title 18, as amended, prohibits such a provider from divulging the contents of a communication while it is in transmission. Neither provision, however, nor any other provision in the Act, is intended to affect any other provision of federal law that prohibits the disclosure of information on the basis of the content of the information, such as the Fair Credit Reporting Act.

The application of sections 2701(a) and 2511(3) is limited to providers of wire or electronic communications services. There are instances, however, in which a person or entity both acts as a provider of such services and also offers other services to the public. In some such situations, the bill may allow disclosure while another federal requirement, applicable to the person or entity in another of its roles, prohibits disclosure. The Committee intends that such instances be analyzed as though the communication services and the other services were provided by distinct entities. Where a combined entity in its non-provider role would not be allowed to disclose, the appropriate outcome would be non-disclosure.

One example of such an instance could arise under the Fair Credit Reporting Act, 15 U.S.C. 1681b, which limits the circumstances under which consumer reporting agencies may disclose certain information relating to consumers. An entity may perform a consumer reporting agency function, and may also provide wire or electronic communication services to the public. Such an entity might provide itself with electronic communication services, including the storage of data relating to consumers. Sections 2701(a) and 2511(3) have no effect on the entity's role as a consumer reporting agency, and in that role the entity must comply with the disclosure limitations of the Fair Credit Reporting Act.

Section 2702(a)(2) prohibits the provider of a remote computing service to the public from knowingly divulging the contents of any communication carried or maintained on the service on behalf of, and received by means of (or created from communications received by means of) electronic transmission from a subscriber or customer of the service, and carried or maintained solely for the purpose of providing such service to the subscriber or customer. This provision reflects the rapidly growing importance of informa-

tion storage and processing to the Nation's commerce. Today, the subject matter of commerce increasingly is information in electronic form and the processing of information itself has become a major industry. The secure storage of electronic information has thus become as important to the commercial system as the protection of paper records. Accordingly, where an electronic communication is transmitted by a subscriber or customer to such a service, and is stored on the subscriber's behalf solely for the purpose of providing storage or computer processing services to the subscriber, the Committee intends that the communication—together with the products of any processing that the service performs for the customer—remain available only to the subscriber and to the persons he designates, with certain exceptions enumerated in Section 2702(b).

Section 2702 specifies that a person or entity providing wire or electronic communication service to the public may divulge the contents of a communication while in electronic storage by that service with the lawful consent of the originator or any addressee or intended recipient of such communication. The Committee emphasizes that "lawful consent," in this context, need not take the form of a formal written document of consent. A grant of consent electronically would protect the service provider from liability for disclosure under Section 2702. Under various circumstances, consent might be inferred to have arisen from a course of dealing between the service provider and the customer or subscriber—*e.g.,* where a history of transactions between the parties offers a basis for a reasonable understanding that a consent to disclosure attaches to a particular class of communications. Consent may also flow from a user having had a reasonable basis for knowing that disclosure or use may be made with respect to a communication, and having taken action that evidences acquiescence to such disclosure or use—*e.g.,* continued use of such an electronic communication system. Another type of implied consent might be inferred from the very nature of the electronic transaction. For example, a subscriber who places a communication on a computer "electronic bulletin board," with a reasonable basis for knowing that such communications are freely made available to the public, should be considered to have given consent to the disclosure or use of the communication. If conditions governing disclosure or use are spelled out in the rules of an electronic communication service, and those rules are available to users or in contracts for the provision of such services, it would be appropriate to imply consent on the part of a user to disclosures or uses consistent with those rules.

Section 2702(a) specifies that a person or entity providing a wire or electronic communication service or remote computing services to the public shall not knowingly divulge the contents of any communication while in electronic storage by that service to any person or entity other than the addressee or intended recipient of such communication or an agent of such addressee or intended recipient. Under Section 2702(b), disclosure to any other person requires the consent of the originator or any addressee or intended recipient of the communication. Under some circumstances, however, a customer of or subscriber to a wire or electronic communication service may place a communication on the service without specifying an addressee. The Committee intends, in that situation,

that the comm
service provid
dressee may c
other person, a
dressee, may (
tion.

A person m
for purposes c
fied by name
the members
bulletin board
all members c
ternatively, tc
particular top
vider would r
reasonably be

Subsection
ceptions to th
section (a). Tl
addressee or
thereof. Secti
nection with
limitations ap
vulgence aut
or this chapt
consent of th
scriber in th
tion is to per
ing the com
mits divulge
ices or to the
the services.
rights as int
theft of serv
provider to c
vulge all st
the originat
gence is to
tion author
contents of
appear to p
intended to
stored com
qualify as i

*Proposed*
the govern
storage and
2703 contai

Subsectic
before the
voice wire
age. As a
rant. The
storage su

Today, the
n electron-
ne a major
ι has thus
otection of
nication is
ice, and is
? providing
, the Com-
the prod-
ustomer—
s he desig-
2(b).

ιg wire or
ivulge the
;e by that
 addressee
nittee em-
t take the
of consent
ability for
nces, con-
ealing be-
iber—*e.g.*,
rs a basis
losure at-
may also
wing that
anication,
ich disclo-
mmunica-
 inferred
kample, a
electronic
hat such
should be
se of the
 use are
vice, and
provision
it on the
ules.

ιg a wire
· services
any com-
? to any
ipient of
ended re-
erson re-
intended
s, howev-
imunica-
 without
ituation,

that the communication at a minimum be deemed addressed to the service provider for purposes of Section 2702(b). Because an addressee may consent to the disclosure of a communication to any other person, a service provider or system operator, as imputed addressee, may disclose the contents of an unaddressed communication.

A person may be an "intended recipient" of a communication, for purposes of Section 2702, even if he is not individually identified by name or otherwise. A communication may be addressed to the members of a group, for example. In the case of an electronic bulletin board, for instance, a communication might be directed to all members of a previously formed "special interest group" or, alternatively, to all members of the public who are interested in a particular topic of discussion. In such an instance, the service provider would not be liable for disclosure to any person who might reasonably be considered to fall in the class of intended recipients.

Subsection (b) of proposed section 2702 provides six distinct exceptions to the general limitations on divulgence contained in subsection (a). The first exception is with respect to divulgence to an addressee or intended recipient of a communication or an agent thereof. Section 2702(b) which places limits on disclosure. In connection with disclosures made pursuant to section 2702(b)(4), these limitations apply along the agent claim, the second exception is divulgence authorized by statutory provisions in either chapter 119 or this chapter. The third exception is divulgence with the lawful consent of the originator, addressee, or intended recipient (or subscriber in the case of remote computer service). The fourth exception is to permit divulgence to a person who is involved in forwarding the communication to its destination. The fifth exception permits divulgence necessarily incident to the rendition of such services or to the protection of the rights or property of the provider of the services. The terms "rights" and "property" here refer to such rights as intellectual property rights, the right to be free from the theft of services. The term is not intended to be read as to permit a provider to contract with an unauthorized party an obligation to divulge all stored messages, without notice to or any consent from the originator of the message, and then to claim that such divulgence is to protect the rights in such a contract. The sixth exception authorizes the divulgence to a law enforcement agency if the contents of the communication were inadvertently obtained and appear to pertain to the commission of a crime. This exception is intended to be read narrowly. A systematic practice of reviewing stored communications to look for evidence of a crime could not qualify as inadvertent.

*Proposed section 2703* contains the procedural requirements for the government to obtain access to electronic communications in storage and transactional records relating thereto. Proposed section 2703 contains four subsections.

Subsection (a) sets forth the requirements which must be met before the government may obtain access to the contents of a non-voice wire communication or an electronic communication in storage. As a general rule the government must obtain a search warrant. The contents of the voice portion of a wire communication in storage such as with "voice mail" may not be obtained under this

TAB 9

# INTELLIGENCE ACTIVITIES
## SENATE RESOLUTION 21

# HEARINGS
### BEFORE THE
## SELECT COMMITTEE TO STUDY
## GOVERNMENTAL OPERATIONS WITH
## RESPECT TO INTELLIGENCE ACTIVITIES
#### OF THE
## UNITED STATES SENATE
### NINETY-FOURTH CONGRESS
#### FIRST SESSION

## VOLUME 2

### HUSTON PLAN
SEPTEMBER 23, 24, AND 25, 1975



Printed for the use of the Select Committee To Study Governmental
Operations With Respect to Intelligence Activities

U.S. GOVERNMENT PRINTING OFFICE

62-885 O          WASHINGTON : 1976

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402 - Price $4.00

6

Mr. SCHWARZ. Now, in saying Bureau personnel on the committee, do you mean Mr. Sullivan and Mr. Brennan?

Mr. HUSTON. Yes.

Mr. SCHWARZ. What was your understanding of why they believed Mr. Hoover might resist the proposals?

Mr. HUSTON. I think they were concerned that Mr. Hoover would not appreciate anyone outside the Bureau commenting upon the way in which the Bureau conducted its domestic intelligence operations.

Mr. SCHWARZ. So your understanding was that Mr. Hoover's subordinates themselves felt that the restraints which were being placed upon the intelligence agencies were excessive on the one hand, but felt that Mr. Hoover, for bureaucratic or personal pride reasons, would not agree with any proposals to change or eliminate those restraints. Is that right?

Mr. HUSTON. Well, I think it went beyond restraints. I think it went to the entire purpose of the report, particularly to the recommendation for a continuing, permanent, interagency committee.

Mr. SCHWARZ. Did you have a view as to what they thought Mr. Hoover's attitude would be toward that part of the report dealing with restraints?

Mr. HUSTON. Well, I think their attitude was that he would be opposed to any change whatsoever in the way in which the Bureau was operating.

Mr. SCHWARZ. Whereas they favored changing the restraints which they thought were inhibiting the Bureau's ability to collect intelligence on American citizens?

Mr. HUSTON. That was certainly my impression; yes.

Mr. SCHWARZ. That was clearly your impression?

Mr. HUSTON. Yes; it was.

Mr. SCHWARZ. The document which is exhibit 1 [1] is entitled "Special Report, Interagency Committee on Intelligence, (Ad Hoc), Chairman, J. Edgar Hoover, June 1970." Was this document signed by the four intelligence community directors?

Mr. HUSTON. I do not have exhibit 1, but I will assume that it is.

The CHAIRMAN. Well, let us get you the exhibit.

Mr. SCHWARZ. In any event, are you aware that certain footnotes were affixed reflecting Mr. Hoover's disagreement with certain language in the reports?

Mr. HUSTON. Yes.

Mr. SCHWARZ. When were Mr. Hoover's footnotes affixed? Were they affixed before the three other Directors approved, or were they affixed after the three other Directors approved?

Mr. HUSTON. After.

Mr. SCHWARZ. So Admiral Gayler, Director Helms and General Bennett approved the report prior to any footnotes that Mr. Hoover inserted; is that correct?

Mr. HUSTON. Yes.

Mr. SCHWARZ. All right. Now, have you seen exhibit 1?

Mr. HUSTON. Yes.

Mr. SCHWARZ. Is that the document which was approved by the four Directors?

Mr. HUSTON. Yes, with the deletions that are——

[1] See p. 141.

TAB 10

*Electronic Surveillance and Civil Liberties*

October 1985

NTIS order #PB86-123239



Recommended Citation:

*Federal Government Information Technology: Electronic Surveillance and Civil Liberties* (Washington, DC: U.S. Congress, Office of Technology Assessment, OTA-CIT-293, October 1985).

Library of Congress Catalog Card Number 85-600609

For sale by the Superintendent of Documents
U.S. Government Printing Office, Washington, DC *20402*

# Foreword

Public policy on the use of information technology to electronically monitor individual movements, actions, and communications has been based on a careful balancing of the civil liberty versus law enforcement or investigative interests. New technologies—such as data transmission, electronic mail, cellular and cordless telephones, and miniature cameras-have outstripped the existing statutory framework for balancing these interests.

The primary technical focus of this report is on technological developments in the basic communication and information infrastructure of the United States that present new or changed opportunities for and vulnerabilities to electronic surveillance, not on the details of specific surveillance devices. The primary policy focus is on domestic law enforcement and investigative applications, not on foreign intelligence and counterintelligence applications.

Thus, this report addresses four major areas: 1) technological developments relevant to electronic surveillance; 2) current and prospective Federal agency use of surveillance technologies; 3) the interaction of technology and public law in the area of electronic surveillance, with special attention to the balancing of civil liberty and investigative interests; and 4) policy options that warrant congressional consideration, including the amendment of existing public law to eliminate gaps and ambiguities in current legal protections.

Conducted at the request of the House Committee on the Judiciary, Subcommittee on Courts, Civil Liberties, and the Administration of Justice, and the Senate Committee on Governmental Affairs, this report is one component of the OTA assessment of "Federal Government Information Technology: Congressional Oversight and Civil Liberties. Other topics covered in the assessment include: information technology management, planning, procurement, and security; computer crime; computer matching and privacy; electronic dissemination of Government information; and computer-based decision support, modeling, and Government foresight. These will be published under separate cover.

In preparing this report on electronic surveillance, OTA has drawn on working papers developed by OTA staff and contractors, the comments of participants at an OTA workshop on this topic, and the results of an OTA Federal Agency Data Request that was completed by over 140 agency components. The draft of this report was reviewed by the OTA project advisory panel, officials from the U.S. Department of Justice, and a broad spectrum of interested individuals from the governmental, academic, private industry, and civil liberty communities.

OTA appreciates the participation of the advisory panelists, workshop participants, external reviewers, Federal agency officials, and others who helped bring this report to fruition. The report itself, however, is solely the responsibility of OTA, not of those who so ably advised and assisted us in its preparation.

JOHN H. GIBBONS
*Director*

# Electronic Surveillance and Civil Liberties Advisory Panel

Theodore J. Lowi, *Chairman*
Professor of Political Science, Cornell University

Arthur G. Anderson
IBM Corp. (Ret.)

Jerry J. Berman
Legislative Counsel
American Civil Liberties Union

R. H. Bogumil
Past President
IEEE Society on Social Implications of
    Technology

James W. Carey
Dean, College of Communications
University of Illinois

Melvin Day
Vice President
Research Publications

Joseph W. Duncan
Corporate Economist
The Dun & Bradstreet Corp.

William H. Dutton
Associate Professor of Communications
    and Public Administration
Annenberg School of Communications
University of Southern California

David H. Flaherty
Professor of History and Law
University of Western Ontario

Carl Hammer
Sperry Corp. (Ret.)

Starr Roxanne Hiltz
Professor of Sociology
Upsala College

John C. Lautsch
Chairman, Computer Law Division
American Bar Association

Edward F. Madigan
Office of State Finance
State of Oklahoma

Marilyn Gell Mason
Director
Atlanta Public Library

William Joe Skinner
Corporate Vice President
Electronic Data Systems Corp.

Terril J. Steichen
President
New Perspectives Group, Ltd.

George B. Trubow
Director, Center for Information
    Technology and Privacy Law
The John Marshall Law School

Susan Welch
Professor and Chairperson
Department of Political Science
University of Nebraska

Alan F. Westin
Professor of Public Law and Government
Columbia University

Langdon Winner
Associate Professor of Political Science
Rensselaer Polytechnic Institute

Congressional Agency Participants

Robert L. Chartrand
Senior Specialist
Congressional Research Service

Robert D. Harris
Deputy Assistant Director for
    Budget Analysis
Congressional Budget Office

Kenneth W. Hunter
Senior Associate Director for
    Program Information
U.S. General Accounting Office

NOTE: OTA appreciates and is grateful for the valuable assistance and thoughtful critiques provided by these advisory panel members. The views expressed in this OTA report, however, are the sole responsibility of the Office of Technology Assessment.

# OTA Electronic Surveillance and Civil Liberties Project Staff

**John Andelin,** *Assistant Director, OTA*
*Science, Information, and Natural Resources Division*

**Frederick W. Weingarten,** *Communication and Information Technologies*
*Program Manager*

## Project Staff

**Fred B. Wood,** *Project Director*
**Jean E. Smith,** *Assistant Project Director*
**Priscilla M. Regan,** *Principal Author and Analyst*
**Jim Dray,** *Research Analyst*
**Jennifer Nelson,** *Research Assistant*

## Administrative Staff

**Elizabeth A. Emanuel,** *Administrative Assistant*
**Shirley Gayheart,** *Secretary*
**Audrey Newman,** *Secretary*
**Renee Lloyd,** *Secretary*
**Patricia Keville,** *Clerical Assistant*

## Contractor

**Herman Schwartz,** *The American University*

# OTA Electronic Surveillance and Civil Liberties Workshop

Stanley S. Arkin
Attorney

Peter Benitez
New York County District Attorney's
Office

Kier Boyd
Deputy Assistant Director
Technical Services Division
Federal Bureau of Investigation

James C. Carr
U.S. Magistrate

Floyd Clarke
Deputy Assistant Director
Criminal Division
Federal Bureau of Investigation

Russell Cestare
Chief of Liaison and Communication
Financial Investigations Division
U.S. Customs Service

Ronald C. Farm
Chief, Counterintelligence Operations
U.S. Department of the Army

Richard Gerstein
Partner
Bailey, Gerstein, Rashkind & Dresnick

Morton H. Halperin
Director
American Civil Liberties Union

Frederick D. Hess
Head, Office of Enforcement Operations
Criminal Division
U.S. Department of Justice

Mary Lawton
Counsel, Office of Intelligence and
Policy Review
U.S. Department of Justice

Frederick B. Lothrop
Analyst/Project Manager
PSC, Inc.

Paul Lyon
Chief of Special Operations
Bureau of Alcohol, Tobaco and Firearms
U.S. Department of the Treasury

Gary Marx
Professor, Department of Urban Studies
and Planning
Massachusetts Institute of Technology

Ronald S. Plesser
Attorney
Blum, Nash & Railsback

Christopher Pyle
Professor, Political Science Department
Mount Holyoke College

James B. Rule
Professor, Department of Sociology
State University of New York at
Stony Brook

Herman Schwartz
Professor of Law
The American University

L. Britt Snider
Director, Counterintelligence and
Security Policy
Office of the Secretary of Defense

Other Reviewers

Michael Cavanagh
Electronic Mail Association

Charles Miller
American Telephone & Telegraph Co.

David Peyton
Information Industry Association

Barbara Philips
Telocator Network of America

Harold Relyea
Congressional Research Service

# Contents

Chapter        Page

1. Summary . . . . . . . . . . . . . . . . . . . . . . 3

2. Introduction and Overview . . . . . . . . 9
 Summary . . . . . . . . . . . . . . . . 9
 Introduction . . . . . . 11
 Background. . . . ..., . . . 12
  Technology and Use. . . . 12
  Policy . . . . . . . . . . . . . . . 15
 Findings and Policy Implications 21
 Appendix 2A: Key Supreme Court
  Decisions on Electronic
  Surveillance . . . . . . 24
 Appendix 2B: Key Statutes Relevant
  to Electronic Surveillance . 25

3. Telephone Surveillance . . . . . . . . . . . . 29
 Summary. . . . . . . . 29
 Introduction . . . . . . . . . . . . . . . . 30
 Background, ,,....... . . . 31
 Findings and Policy Implications . 34

4. Electronic Mail Surveillance . . . . . . . . 45
 Summary. . . . . . . . 45
 Introduction . . . . . . 45
 Background. ., ,,... . . . . . 46
 Findings and Policy Implications . . 48

5. Other Surveillance Issues . . . . . . . . . . 55
 Summary. . . . . . . . . 55
  Electronic Physical Surveillance. 55
  Electronic Visual Surveillance. 55
  Data Base Surveillance . 56
 Part I: Electronic Physical
  Surveillance  ..., . 57
  Introduction . . 57
  Background . . . . . . . . . . . . . . 57
  Findings and Policy Implications. 59

Chapter        Page

 Part II: Electronic Visual
  Surveillance ... .,,, ,,,,. 62
  Introduction . ..., ,,,,, ,,,,, 62
  Background . ..., . . . . ,,,,, ,, 63
  Findings and Policy Implications, 64
 Part III: DataBase Surveillance. . . 67
  Introduction . . . . . . . 67
  Background.  ..., . . . ., 68
  Findings and Policy Implications. 70

## List of Tables

Table No.        Page

1. Categories of Surveillance
 Technology ., . . . . . . . . . . . . . . . . 13
2. Categories of Behavior Subject
 to Electronic Surveillance . . . . . . . . . . 13
3. Top Fifteen Agency Components Using
 Electronic Surveillance Technology ., 14
4. Electronic Surveillance Technology:
 Current and Planned Agency Use . . . 15
5. Agency Components Indicating
 the Largest Projected Use of Electronic
 Surveillance Technology . . . . . . . . . . . 15
6. Dimensions for Balancing Civil
 Liberty Interest v. Government
 Investigative Interest . . . . . . 22
7. Treasuray Enforcement Communication
 System/Border Enforcement
 System Users . . . . . . . . 69
8. Source of Treasury Enforcement
 Communication System/Border
 Enforcement System Records. ..., 69
9. Selected INS Computerized
 Record Systems . . . . . . . . . . . . . . . . 70

# Chapter 1

# Summary

# Summary

In the last 20 years, there has been a virtual revolution in the technology relevant to electronic surveillance. Advances in electronics, semiconductors, computers, imaging, data bases, and related technologies have greatly increased the technical options for surveillance activities. Closed circuit television, electronic beepers and sensors, and advanced pen registers are being used to monitor many aspects of individual behavior. Additionally, new electronic technologies in use by individuals, such as cordless phones, electronic mail, and pagers, can be easily monitored for investigative, competitive, or personal reasons.

The existing statutory framework and judicial interpretations thereof do not adequately cover new electronic surveillance applications. The fourth amendment–which protects "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures' '—was written at a time when people conducted their affairs in a simple, direct, and personalized fashion. Telephones, credit cards, computers, and cameras did not exist. Although the principle of the fourth amendment is timeless, its application has not kept abreast of current technologies.

The major public law addressing electronic surveillance is Title III of the Omnibus Crime Control and Safe Streets Act of 1968 which was designed to protect the privacy of wire and oral communications. At the time Congress passed this act, electronic surveillance was limited primarily to simple telephone taps and concealed microphones (bugs). Since then, the basic communications infrastructure in the United States has been in rapid technological change. For example, satellite communication systems and digital switching and transmission technology are becoming pervasive, along with other easily intercepted technical applications such as cellular mobile radio, cordless

telephones, electronic mail, computer conferencing, and electronic bulletin boards. Continued advances in computer-communications technology such as the Integrated Services Digital Network (ISDN), now close to implementation, are likely to present additional new opportunities for electronic surveillance.[1]

The law has not kept pace with these technological changes. The courts have, on several occasions, asked Congress to give guidance. Most recently, U.S. Circuit Court Judge Richard Posner, in a case involving the use of video surveillance in a law enforcement investigation, said:

> . . . we would think it a very good thing if Congress responded to the issues discussed in this opinion by amending Title III to bring television surveillance within its scope . . . judges are not authorized to amend statutes even to bring them up to date.

In legislating the appropriate uses of electronic surveillance, Congress attempts to strike a balance between civil liberties—especially those embodied in the first, fourth, and fifth amendments to the U.S. Constitution–and the needs of domestic law enforcement and investigative authorities for electronic surveillance in fighting crime, particularly white-collar and organized crime, and generally for drug, gambling, and racketeering investigations.'

Law enforcement and investigative agencies, at least at the Federal level, are making significant use of electronic surveillance techniques and are planning to use many new techniques. Based on a review of available reports

---

[1]ISDN permits the transmission of voice, video, and data signals as needed over a common multi-purpose communications network,

[2]Note: This study did not review technology or policy issues concerning foreign intelligence and counterintelligence applications of electronic surveillance.

and the results of its Federal Agency Data Request,[3] OTA found that:

- The number of Federal court-approved bugs and wiretaps in 1984 was the highest ever.
- About 25 percent of Federal agency components responding (35 out of 142) indicated some current and/or planned use of various electronic surveillance technologies, including, but not limited to, the following:
  —closed circuit television (29 agencies);
  —night vision systems (22);
  —miniature transmitters (21);
  —electronic beepers and sensors (15);
  —telephone taps, recorders, and pen registers (14);
  —computer usage monitoring (6);
  —electronic mail monitoring or interception (6);
  —cellular radio interception (5);
  –pattern recognition systems (4); and
  —satellite interception (4).
- About 25 percent of Federal agency components responding (36 out of 142) report use of computerized record systems for law enforcement, investigative, or intelligence purposes:
  —agencies reported a total of 85 computerized systems with, collectively, about 288 million records on 114 million persons;[4]
  —examples of four such systems that could be used in part for data base surveillance purposes are the:
    1. National Crime Information Center (FBI),
    2. Treasury Enforcement Communications System (Treasury),
    3. Anti-Smuggling Information System (Immigration and Naturalization Service–INS), and
    4. National Automated Immigration Lookout System (INS).

—none of the 85 system operators provided the requested statistics on record quality (completeness and accuracy). Most do not maintain such statistics.

After conducting a review of the technology and policy history of electronic surveillance, OTA found that:

- The contents of phone conversations that are transmitted in digital form or calls made on cellular or cordless phones are not clearly protected by existing statutes.
- Data communications between computers and digital transmission of video and graphic images are not protected by existing statutes.
- There are several stages at which the contents of electronic mail messages could be intercepted: 1) at the terminal or in the electronic files of the sender, 2) while being communicated, 3) in the electronic mailbox of the receiver, 4) when printed into hardcopy, and 5) when retained in the files of the electronic mail company or provider for administrative purposes. Existing law offers little or no protection at most of these stages.
- Legislated policy on electronic physical surveillance (e.g., pagers and beepers) and electronic visual surveillance (e.g., closed circuit TV and concealed cameras) is ambiguous or nonexistent.
- Legislated policy on data base surveillance (e.g., monitoring of transactions on computerized record systems and data communication linkages) is unclear.
- There is no immediate technological answer to protection against most electronic surveillance, although there are emerging techniques to protect communication systems from misuse or eavesdropping (e.g., low-cost data encryption).[5]

OTA identified a range of policy options for congressional consideration:

- Congress could do nothing and leave policymaking up to the development of case

---

[3] The data request was sent to all major components within the 13 cabinet-level agencies and to 20 selected independent agencies. Due to the unclassified focus of this study, two Department of Defense components–the National Security Agency and Defense Intelligence Agency–along with the Central Intelligence Agency were excluded from the data request.

[4] Extent of multiple records on the same person is unknown.

[5] Technical options are being addressed in a separate OTA study on "New Communications Technology: Implications for Privacy and Security, " expected to be published in winter 1986/87.

law and administrative discretion. However, this would lead to continued uncertainty and confusion regarding the privacy accorded phone calls, electronic mail, data communication, and the like, and ignores judicial requests for clarification in areas such as electronic visual surveillance.

● Congress could bring new electronic technologies and services clearly within the purview of Title III of the Omnibus Crime Control and Safe Streets Act, for example by:

  – treating all telephone calls similarly with respect to the extent of protection against unauthorized interception, whether analog or digital, cellular or cordless, radio or wire;

  – legislating statutory protections against unauthorized interception of data communication;

  – legislating a level of protection across all stages of the electronic mail process so that electronic mail is afforded the same degree of protection as is presently provided for conventional first class mail;

  – subjecting electronic visual surveillance to a standard of protection similar to or even higher than that which currently exists under Title 111 for bugging and wiretapping.

● Congress also could set up new mechanisms for control and oversight of Federal data base surveillance, for example by:

– requiring congressional approval of specific Federal data base surveillance applications (e.g., by statutory amendment or approval of House and Senate authorizing committees);

– establishing a data protection board to administer and oversee general statutory standards for creating and using data bases for purposes of surveillance.

Ž Congress also could amend the Computer Fraud and Abuse Act of 1984 to cover interstate computer crime.

– This option, not detailed here, could provide additional legal protection against unauthorized penetration (whether for surveillance or other reasons, e.g., theft or fraud) of computer systems.⁵

Chapters 2 through 5 of this report provide technical and policy analyses relevant to proposed legislation on electronic surveillance and civil liberties, such as the "Electronic Communications Privacy Act of 1985' and the "Video Surveillance Act of 1985.'"

'See the computer crime chapter of the forthcoming OTA report on "Federal Government Information Technology: Key Trends and Policy Issues" for discussion.

⁷H.R. 3378 introduced by Rep. Robert Kastenmeier and S. 1667 introduced by Sen. Patrick Leahy. See U.S. Congress, House of Representatives, *Congressional Record,* Extension of Remarks, Sept. 19, 1985, p. E-4 128; and U.S. Congress, Senate, *Congressional Record,* Sept. 19, 1985, p. S-11 795.

'11. R. 3455 introduced by Representative Kastenmeier. See U.S. Congress, House of Representatives, *Congressional Record,* Extension of Remarks, Sept. 30, 1985, p. I+; -4269.

**Chapter 2**
# Introduction and Overview

# Introduction and Overview

## SUMMARY

Electronic surveillance is the epitome of the two-edged sword of technology for many Americans. Public opinion polls evidence considerable concern about possible excessive and abusive use of electronic surveillance by the Government (and others), and show support for strong safeguards and protections to tightly control the use of such technology. But, at the same time, the public is concerned about crime—especially violent crime—and supports the appropriate use of technology to combat and prevent crime and bring offenders to justice. [1]

Until the past 10 years or so, the balancing of these concerns was relatively straightforward from a technological perspective. Electronic surveillance was limited primarily to audio surveillance devices such as telephone taps and concealed microphones ("bugs"). Now, however, technological developments have significantly expanded the range of electronic surveillance options. These include miniaturized transmitters for audio surveillance, lightweight compact television cameras for video surveillance, improved night vision cameras and viewing devices, and a rapidly growing array of computer-based surveillance techniques. In addition, most forms of electronic communication—whether via wire, coaxial cable, microwave, satellite, or even fiber optics—can be monitored if one has the time, money, and technical expertise. Encryption–the only technological countermeasure thought at this time to be generally effective—is still too expensive and cumbersome for widespread application,

although costs are declining and ease of use is improving.

The primary purpose of electronic surveillance is to monitor the behavior of individuals, including individual movements, actions, communications, emotions, and/or various combinations thereof, as well as the movement of property or objects. Some uses of electronic surveillance devices may infringe on the protections afforded by the first, fourth, and fifth amendments to the U.S. Constitution and various public laws.

This chapter surveys the Federal Government's use of electronic surveillance and outlines a framework for the analysis of electronic surveillance issues.

Based on a review of available reports and the results of its Federal Agency Data Request, OTA found that:

- The extent of use of electronic surveillance by the private sector is unknown.
- The number of Federal and State court-approved wiretaps and bugs reported in 1984 was the highest since 1973.
- The number of Federal court-approved bugs and wiretaps in 1984 was the highest ever.
- According to early reports, an average of about 25 percent of intercepted communications in 1984 were reported to be incriminating in nature, with 2,393 persons arrested as a result of electronic surveillance.
- About 25 percent of Federal agency components responding to the OTA Federal Data Request indicated some use of electronic surveillance. [2]

---

[1] See Alan F. Westin," Public and Group Attitudes Toward Information Policies and Boundaries for Criminal Justice, " in U.S. Department of Justice, Bureau of Justice Statistics, *Information Policy and Crime Control Strategies,* Proceedings of a BJSSEARCH Conference, July 1984, pp. 32-46; and William H.Dutton and Robert G. Meadow, "Public Perspectives on Government Information Technology: A Review of Survey Research on Privacy.Civil Liberties, and the Democratic Process, ' OTA contractor report, January 1985.

[2] Due to the unclassified focus of this study, two Department of Defense components—the National Security Agency and Defense Intelligence Agency-along with the Central Intelligence Agency were excluded from the data request.

9

– Federal agency use is concentrated in components of the Departments of Justice, Treasury, Defense, Agriculture, and Interior.

— The Drug Enforcement Administration and Federal Bureau of Investigation (Justice), U.S. Customs Service (Treasury), and Air Force Office of Special Investigations (Defense) use the greatest number of different types of electronic surveillance technologies.

— The FBI, which currently uses nine different types of surveillance technologies, has plans to use eight additional types of technologies.

A thorough review of the technology and policy history of electronic surveillance led OTA to conclude that:

- The existing statutory framework and judicial interpretations thereof do not adequately cover new and emerging electronic surveillance technologies. Indeed, the courts have asked Congress for guidance on the new technologies.
- There is no immediate technological answer to protection against most electronic surveillance, although there are emerging techniques to protect communication systems from misuse or eavesdropping (e.g., low-cost data encryption).
- Despite a lack of coordination in electronic surveillance policymaking among the three branches of Government and the ad hoc nature of that policy, there are seven general components that are found in existing policies, be they legislative, executive, or judicial:

  1. a way of checking on the discretion of the Government agent in the field;
  z. a listing of the crimes and circumstances for which a particular type of electronic surveillance is considered appropriate;
  3. a standard to indicate at what stage in an investigation the use of a particular surveillance technique is appropriate;
  4 a justification for the need to use a particular surveillance technique;
  5 an account of how the scope of the surveillance will be minimized;
  6 a requirement to give notice after the fact to the subject of the surveillance; and
  7. remedies and sanctions, including a statutory exclusionary rule or a civil remedy.

- In setting electronic surveillance policy, Congress, the executive branch, and the courts, implicitly or explicitly, balance the societal interest in maintaining civil liberties protections for the individual against the societal interest in successful Government investigations. Based on an evaluation of previous policy formulation, policymakers, more or less consciously, have looked to certain dimensions in determining this balance.

- In determining the civil liberty interest with respect to electronic surveillance, policymakers look to five dimensions—the nature of information, the nature of the place or communication, the scope of the surveillance, the surreptitiousness of surveillance, and the pre-electronic analogy of the surveillance technique or device.

- In determining the Government's interest, policymakers have used three dimensions to evaluate the need for using an electronic surveillance technique or device-the purpose of the investigation, the degree of individualized suspicion, and the effectiveness of the electronic device as an investigatory tool compared to nonelectronic options.

This policy framework is applied in the following chapters to specific types of electronic surveillance technology.

# INTRODUCTION

The capabilities for surveillance-the observation and monitoring of individual or group behavior including communication-are greatly expanded and enhanced with the use of technological devices. For example, technology makes it more efficient and less conspicuous to track movements, to hear conversations, to know the details of financial and other personal transactions, and to combine information from diverse sources into a composite file.

New surveillance tools are technically more difficult to detect, of higher reliability and sensitivity, speedier in processing time, less costly, more flexible and adaptable, and easier to conceal because of miniaturization and remote control. Current R&D will produce devices with increased surveillance capabilities, e.g., computer speech recognition and speaker identification, fiber optics, and expert systems.

Many electronic devices are currently available for monitoring individual or group behavior. For example, phone conversations might be overheard, records of phone numbers dialed might be accessed, movements at home and in the workplace might be video-recorded, and movements outside the home or workplace, even in the dark, could be observed. In addition, bank and credit records could be examined electronically to determine financial habits and general movements, and conversations in a public place could be recorded by a parabolic microphone. Further, it is possible that actions might be evaluated by computer to determine whether they match any profiles or have a pattern, that electronic mail communication might be accessed and read, that the movements of physical objects such as a car might be tracked by a beeper, and that a new friend or local taxi driver might be wired for sound.

From a law enforcement and investigative standpoint, the potential benefits offered through new electronic technologies may be substantial-e. g., the development of more accurate and complete information on suspects, the possible reduction in time and manpower required for case investigation, and the expansion of the options for preventing and deterring crimes. From a societal perspective, the possible benefits are also important–including the potential to increase one's sense of physical security in the home and on the streets, improve the capability to know when someone is in need of assistance, strengthen efforts to prevent the sale of illegal substances, and enhance the protection of citizens and Government officials from terrorist actions.

However, while providing increased security, the use of sophisticated technologies for surveillance purposes also presents possible dangers to society.' Over time, the cumulative effect of widespread surveillance for law enforcement, intelligence, or other investigatory purposes could change the climate and fabric of society in fundamental ways. For example, how will hotlines that encourage people to anonymously report potentially damaging information and one-party consent to the monitoring of conversations affect the level of trust in our society? Will private space and anonymity be preserved when individuals increasingly must make private information widely available, e.g., to banks, medical clinics, and credit agencies, in order to carry on everyday activities? How will informality and spontaneity in communications and behavior be affected as more personal activities are "on the record' or "in view?"

But most importantly for the purposes of this study, the use of electronic surveillance devices may infringe on the protections afforded in the first amendment (freedom of speech and press, and the right to peaceably assemble and to petition the Government for a redress of grievances), fourth amendment (unreasonable searches and seizures), and fifth amendment (protection against self-incrimination). The use of such devices may also conflict with procedural and substantive protections in specific statutes, e.g., Title III of the

---

'Gary T. Marx. "The New Surveillance. " *Technology Review.* vol. 88, No. 4. M ay June 1985, pp. 42-48.

1968 Omnibus Crime Control and Safe Streets Act, the Privacy Act of 1974, the Foreign Intelligence Surveillance Act of 1978, the Electronic Funds Transfer Act of 1978, and the Cable Communications Policy Act of 1984.

Many innovations in electronic surveillance technology have outstripped constitutional and statutory protections, leaving areas in which there is currently no legal protection against, or controls on the use of, new surveillance devices. In 1928, Justice Louis Brandeis, in his dissenting opinion in Olmstead v. *United States,* warned that:

> Subtler and more far reaching means of invading privacy have become available to the Government . . . the progress of science in furnishing the Government with means of espionage is not likely to stop with wiretapping. Ways may some day be developed by which the Government. without removing papers from secret drawers, can reproduce them in court, and by which it will be enabled to expose to a jury the most intimate occurrences of the home.[3]

Although use of some surveillance techniques requires a court order, many do not require any authorized approval and some are not even covered by judicial interpretation of the fourth amendment prohibition on unreasonable searches and seizures. Additionally, the privacy and procedural rights of those subject to surveillance may also be violated, since their activities may be monitored even though no criminal suspicion has attached to them. Finally, given the unobtrusive nature of sur-

veillance activities, it may be difficult to detect when one's rights have been violated.

The use of electronic surveillance devices may result in more efficient law enforcement. Their use may be required in part by the use of more evasive and sophisticated devices by those suspected of engaging in criminal activities. Yet, the cumulative impact of the increased use of surveillance, with or without a court order, is an important consideration for any society that prides itself on limited government and individual freedom.

The key policy issue is to determine the appropriate balance between the civil liberty interests and the intelligence, law enforcement, or other governmental interests involved. In some circumstances, the law enforcement interest will be great enough to outweigh the civil liberty interest. In other circumstances, the reverse will be the case. Policy, be it judicial, legislative, or administrative, seeks to define the parameters for this balancing process.

James Madison addressed this basic dilemma of democratic governments in *Federalist #51:*

> If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: You must first enable the Government to control the governed; and in the next place, oblige it to control itself.

---

'*Olmstead v. United States,* 277 U.S. 438, 473-474 (1928).

# BACKGROUND

## Technology and Use

For much of the 20th century, electronic surveillance technology was limited primarily to audio surveillance devices such as telephone taps and concealed microphones ("bugs"). In the late 1960s, however, technological developments began to significantly expand the range of electronic surveillance options. These

included miniaturized transmitters for audio surveillance, lightweight compact television cameras for video surveillance, improved night vision cameras and viewing devices, and the first computer-based surveillance techniques. In the 1970s, congressional attention focused on electronic surveillance, partly due to the use of surveillance technologies during the Civil Rights Movement and in Watergate, but also

due to a perception of a growing application of such technology in various sectors of society. Table 1 presents a list of categories and types of surveillance technology as developed by the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary in 1976.

The primary purpose of electronic surveillance technology is to monitor the behavior of individuals. As illustrated in table 2, electronic devices can be used to monitor individual movements, actions, communications, emotions, and/or various combinations thereof.

It appears that many of the electronic surveillance technologies identified in table 1 were not widely used in 1976, partly because the underlying media of communication (e.g., elec-

#### Table 1.—Categories of Surveillance Technology

1. Electronic *eavesdropping technology* (audio survei l lance)
   . radiating devices and receivers (e g , miniaturized transmitters)
   . nonradiating devices (e g., wired surveillance systems, Including telephone taps and concealed microphones)
   ● tape recorders
2 Optical/imaging technology (visual surveillance)
   ● photographic techniques
   ● television (closed circuit and cable)
   . night vision devices (use image intensifier to view objects under low light)
   ● satellite based
3. Computers and *re/ated technologies* (data surveillance)
   ● microcomputers —decentralization of machines and distributed processing
   Ž computer networks
   ● software (e. g., expert systems)
   ● pattern recognition systems
4. *Sensor technology*
   ● magnetic sensors
   ● seismic sensors
   . infrared sensors
   ● strain sensors
   ● electromagnetic sensors
5 Other devices and technologies
   ● citizen band radios
   . vehicle location systems
   ● machine-readable magnetic strips
   ●s polygraph
   ● voice stress analyzer
   ● voice recognition
   ● laser interception
   Ž cellular radio

SOURCE Based on the framework developed by the Senate Judiciary Commit tee s Subcommittee on Constitut ion al Ri g hts thitsreport *Surveillance Technology — 1976* seepp 29 37)

#### Table 2.—Categories of Behavior Subject to Electronic Surveillance

1. Movements—where someone Is. Individuals can be tracked electronically via beepers as well as by monitoring computerized transactional accounts in real time
2. Actions-what someone is doing or has done. Electronic devices to monitor action include: monitoring of keystrokes o n computer terminals, monitoring of telephone numbers called with pen registers, cable TV monitoring, monitoring of financial and commercial computerized accounts. and accessing computerlzed law enforcement or investlgatory systems.
3. Communications—what someone is saying or writing. and hearing or receiving. Two-way electronic communications can be intercepted whether the means be analog or digi - tal communication via wired telephones, communication via cordless or cellular phones, or digital electronic mail communication. Two-way nonelectronic communication can be intercepted via a variety of m microphone devices and other transmitters.
4. *Actions* and communications —the details of what some one is doing or saying Electronic visual surveillance, generally accompanied by audio surveillance, can monitor the actions and communications of individuals i n both private and public places, in daylight or darkness
5. Emotions —the psychological and physiological reactions to circumstances. Polygraph testing, voice stress analyzers, breath analyzers, and brain wave analyzers attempt to determine an Individual's reactions.

SOURCE Offi ce of Technology Assessm ent

tronic mail and cellular radio) were not in wide service. However, there is no authoritative information on the full extent of their use.

In the private sector (not involving the Government), the FBI notes that the number of reported incidents of illegal interception of private sector communications declined from 524 in 1981 to 392 in 1984.[5] However, it is likely that only a small fraction of total incidents occurring are reported, and it is probable that many forms of private sector electronic surveillance go undetected, and if detected, go unreported.

Statistics on Government use of some electronic surveillance techniques, primarily telephone wiretaps and hidden microphones, are collected and published by the Administrative Office of the U.S. Courts. The April 1985 report indicates that in 1984, Federal and State judges approved 801 out of 802 requests for electronic surveillance-289 by Federal judges

---
[5] John Horgan. "Thwarting the Information Thieves." *IEEE Spectrum,* July 1985. p. 32. which cites the source as FBI spokesperson William Carter.

and 512 by State judges. The 1984 combined total of 801 was the highest since 1973. The 1984 Federal total of 289 was the highest ever, with the prior peak year being 1971. Overall, the number of State electronic surveillance orders has slowly declined since 1973, while Federal surveillance orders declined from 1971 to 1977, remained about constant from 1977 to 1980, and increased from 1981 to the present. The number of electronic interceptions authorized by Federal courts in 1984 is almost triple the 1981 level.'

In general, the reported electronic surveillance is used primarily in narcotics and gambling cases; in 1974 gambling was first and narcotics second, and in 1984 the order was reversed. The reported cost of electronic surveillance has increased dramatically, from about $8,000 each in 1974 to about $45,000 each in 1984. An average of about 25 percent of intercepted communications in 1984 was reported to be incriminating in nature, with 2,393 persons arrested as a result of electronic surveillance and about 27 percent of those convicted.[7] The figures for arrests and convictions are necessarily incomplete because of the time involved in concluding a Federal criminal case.

Because of the general lack of information on Federal use of electronic surveillance, questions on this topic were included in the OTA Federal Agency Data Request sent to the 13 cabinet-level departments and 20 selected independent agencies. Of 142 agency components responding, 35 or about 25 percent reported some current use of electronic surveillance technology for monitoring the movement, activity, conversation, or information pertaining to individuals or agencies in which the agency has an investigative, law enforcement, and/or intelligence interest. Of these 35 agency components, the top 15 agencies reporting use of the largest number of electronic surveillance technologies are listed in table 3. (Note that the Central Intelligence Agency,

---

'Administrative Office of the United States Courts, *Report on Applications for Orders Authorizing or Approving the Interception of Wire or Oral Communications,* for Calendar 1984, Washington, DC, April 1985, pp. 3, 6, 21.

'Ibid., pp. 6, 7, 21.

**Table 3.—Top Fifteen Agency Components Using Electronic Surveillance Technology**

| Agency[a] | Number of technologies currently used |
|---|---|
| Drug Enforcement Administration (DOJ) | 10 |
| Federal Bureau of Investigation (DOJ) | 9 |
| U.S. Customs Service (Treasury) | 9 |
| U.S. Air Force (DOD) | 9 |
| National Park Service (DOI) | 8 |
| Internal Revenue Service (Treasury) | 7 |
| Criminal Division (DOJ) | 7 |
| U.S. Forest Service (USDA) | 7 |
| Inspector General (USDA) | 7 |
| Agricultural Stabilization and Conservation Service (USDA) | 7 |
| U.S. Army (DOD) | 6 |
| Fish and Wildlife Service (DOI) | 6 |
| U.S. Marshals Service (DOJ) | 6 |
| U.S. Mint (Treasury) | 6 |
| Bureau of Alcohol, Tobacco and Firearms (Treasury) | 6 |

[a]The Central Intelligence Agency National Security Agency, and Defense Intelligence Agency were excluded due to the unclassified focus of this study

SOURCE Office of Technology Assessment

National Security Agency, and Defense Intelligence Agency were excluded from the data request. )

Use of specific technologies varied widely, with use of closed circuit television, night vision systems, radio scanners, and miniature transmitters indicated by many agencies that conduct electronic surveillance, and use of telephone taps, vehicle location systems (e.g., beepers), sensors, and pen registers indicated by a smaller but still significant number of agencies. The other technologies are used by relatively few or very few agencies. Actual results of the OTA Data Request are summarized in table 4. Out of the 35 agencies indicating some electronic surveillance activity, the FBI and DOD Inspector General's Office indicated the largest planned expansion in use of electronic surveillance technologies (see table 5).

The technical literature suggests that most forms of electronic communication can be intercepted, although it may be difficult and costly. The cost of equipment needed to intercept microwave telephone circuits has been estimated at about $40,000, but it can be done relatively easily and without the awareness of

**Table 4.—Electronic Surveillance Technology:
Current and Planned Agency Use**

| Technology | Number of agency components reporting | | |
| --- | --- | --- | --- |
| | Current use | Planned use | Total |
| Closed circuit television . . . . | 25 | 4 | 29 |
| Night vision systems ... . . . . | 21 | 1 | 22 |
| Miniature transmitters . . . . | 19 | 2 | 21 |
| Radio receivers (scanners) . . | 19 | 1 | 20 |
| Vehicle location systems (e. g., electronic beepers) . . . | 13 | 2 | 15 |
| Sensors (e. g., electromagnetic, electronic, acoustic) . . . . | 12 | 3 | 15 |
| Telephone taps and recorders . | 13 | 1 | 14 |
| Pen registers ., . . . . . . . . . . . . | 11 | 3 | 14 |
| Telephone usage monitoring . . . | 7 | 3 | 10 |
| Computer usage monitoring . . . | 4 | 2 | 6 |
| Electronic mail monitoring or interception . . . . . . . . . | 1 | 5 | 6 |
| Cellular radio interception . . . . . | 3 | 2 | 5 |
| Pattern recognition systems . . . | 2 | 2 | 4 |
| Satellite interception . . . . . . . | 1 | 3 | 4 |
| Expert systems/artificial intelligence . . . . . . . | 0 | 3 | 3 |
| Voice recognition ., . . . . . | 0 | 3 | 3 |
| Satellite-based visual surveillance systems . | 1 | 1 | 2 |
| Microwave interception . . . | 1 | 1 | 2 |
| Fiber optic interception . ... | 0 | 1 | 1 |

SOURCE-Office of Technology Assessment

**Table 5.—Agency Components Indicating the Largest
Projected Use of Electronic Surveillance Technologies**

| Agency | Number of current plus planned technologies |
| --- | --- |
| Federal Bureau of Investigation (DOJ) . . . . | 17 |
| Office of the Inspector General (DOD), . | 13 |
| Drug Enforcement Administration (DOJ) | 11 |
| U.S. Customs (Treasury) . ... . . . . . . . . . | 10 |
| U.S. Air Force (DOD) . . . . . . . . . . . . . . . . . | 9 |
| National Park Service (DOI) ... . . . . | 9 |
| Internal Revenue Service (Treasury) . . . | 9 |
| Office of the Inspector General (USDA) | 9 |
| Agricultural Stabilization and Conservation Service (USDA) . . . . . . . . | 9 |

SOURCE Off Ice of Technology Assessment

the network owner. Some believe that even fiber optic circuits can be tapped (but with difficulty), although this technology is so new that reliable information is scarce. The major electronic countermeasures include radiation shielding of electronic equipment (to prevent eavesdropping of signals given off by such equipment), spread-spectrum transmission, and encryption. Many technical experts believe that encryption is the only sure way to "protect any form of electronic communications end-to-end. "[89]

## Policy

The history of electronic surveillance policy significantly involves all three branches of Government: the judiciary, Congress, and the executive branch. Key activities and policy actions are highlighted below.

### Judicial

The courts have had a significant role in interpreting the Constitution and various statutes as they apply to electronic surveillance.

Constitutional questions regarding the legitimacy of the use of electronic surveillance devices under specific circumstances most often turn on an interpretation of fourth amendment protections. The fourth amendment provides that:

> The right of people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The critical triggering phrase of the fourth amendment is "searches and seizures. " If there is no search or seizure, then official behavior is not covered by the fourth amendment, and it need not be reasonable, based on probable cause, or carried out pursuant to a warrant. Although there may be statutory protections that require certain conduct, an individual does not have fourth amendment protections unless there is a search and seizure. The secondary triggering phrase of the fourth amendment is "unreasonable." Even if official conduct is regarded as a search or seizure, there is no invasion of fourth amendment pro-

[8] Horgan, op. cit., pp. 30, 31, 33, 34, 38.
[9] For further discussion of technical vulnerabilities and related security measures, see the forthcoming OTA study on "New Communications Technology: Implications for Privacy and Security" expected to be published in winter 1986/87.

tections if the conduct is reasonable. Determination of reasonableness depends on the judicial balancing of the individual interest, generally regarded as a privacy interest, against the governmental interest, including law and order, national security, internal security, and the proper administration of the laws. Reasonableness generally entails a predicate of probable cause and, with many exceptions, the issuance of a warrant.

The meaning and scope of the fourth amendment have involved judicial construction of these key phrases. Definition of "searches" has come to be a crazy patchwork quilt, depending partly on whether the search involves a person's body or home, partly on how public the activity is, partly on the degree of invasion or intrusiveness involved in conducting the search, partly on the facts of the case under consideration, and partly on who is on the Court.[10]

Searches using some form of electronic monitoring at first posed difficult problems for the Court because the searches did not comport with traditional definitions of a search-they did not involve physical trespassing and were often conducted in a public place. Until 1967, electronic monitoring of conversations was not regarded as a search under the fourth amendment[11] In the landmark case of Katz v. United States (1967), the Court ruled that wiretapping was a search under the fourth amendment. As is often the result of landmark cases, subsequent legal analysis and judicial construction have raised more questions than the case first resolved. This is especially true with respect to the two phrases most important for subsequent legal decisions–a "reasonable expectation of privacy"[12] and "the fourth amendment protects people, not places. "[13]

Following Katz, judicial determination of whether a "search or seizure' '-has occurred depends on whether or not the individual has a "reasonable expectation of privacy" in the area or activity under surveillance. In determining whether or not an individual has such an expectation, the Supreme Court has adopted as its test the two-part formulation from Justice Harlan's concurring opinion:

. first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable. "[14]

The subjective part of the test focuses attention on the means the individual employs to protect his or her privacy, e.g., closing the door of a phone booth or closing curtains. Additionally, the assumption of risk that the individual appears to take is considered in determining the individual's actual expectation of privacy. Under assumption of risk, an individual is presumed to assume the risk that another party to a conversation or activity may consent to a search. This assumption of risk prevails even if the consenting party is an informer or undercover agent. "

The objective part of the test looks to what society regards as a reasonable expectation of privacy. Yet, it requires this without specifying an objective referent. Is "society" today's opinion polls, longstanding norms and traditions, a reasonable person, or the knowledge that people have in common? The result of the objective part of the test is that the Court has implicitly constructed a continuum of circumstances under which society would regard an individual as having a reasonable expectation

---

[10]For summary of Supreme Court rulings see: Anthony G. Amsterdam, "Perspectives on the Fourth Amendment, " 58 *Minnesota Law Review 349 (1974);* and Peter Goldberger, "Consent, Expectation of Privacy, and the Meaning of 'Searches' in the Fourth Amendment, " 75 *The Journal of Criminal Law and Criminology 319 ( 1984).*

"*See* app. 2A for summary of relevant Supreme Court opinions.

[12]*Katz v. United States,* 389 U.S. 347, 360 (1967).

[13]Id. at 351.

[14]Id. at 361.

[15]See the "false friends cases' '– United *States v. White,* 401 U.S. 745 (1971), *Hoffa v. United States, 385* U.S. 293 (1966), and *Lopez v. United States, 373* U.S. 427 (1967). In *White* the Court ruled that agents can be wired for sound and still be covered by the assumption of risk, reasoning that the risk did not increase materially simply because the informers were transmitting the conversation electronically. See also: Eric F. Saunders, "Electronic Eavesdropping and the Right to Privacy, " 52 *Boston University Law Review 831 (1973).* Smith v. Maryland, 442 U.S. 735 (1979) and *United States v. Knotts, 103 S.* Ct. 1081 (1983) suggest that an individual forfeits his expectation of privacy by risking the possibility that his activities will be revealed to the police.

of privacy. The continuum ranges from public places ("open fields, " "in plain view, " "public highway"), in which there is no objective expectation of privacy except in unusual circumstances, to the inside of one's home with the windows and curtains shut and the door bolted, in which there is an objective expectation of privacy. The objective expectation of privacy along the continuum (shopping centers, motels, offices, automobiles, and yards) depends on judicial interpretation. Recently, the Court has modified the objective element, referring to it as a "legitimate' expectation of privacy. "

The second important component of Katz is the holding that "the fourth amendment protects people, not places. " The question of what protection the fourth amendment offers people remains unanswered, and defining the scope of such protection still necessitates reference to places. Moreover, the distinction between "people" and "places" has raised the question of whether the fourth amendment still protects property interests, or whether it now protects only more personal interests. The issue of the protection afforded people as distinct from that afforded places has become more significant with the growth of third-party recordkeepers, e.g., banks. The thrust of the Court opinion in Katz seemed to represent an expansion, not a replacement, of the existing fourth amendment protections:

> The amendment protects individual privacy against certain kinds of governmental intrusion, but its protections go further, and often have nothing to do with privacy at all.[17]

" First used by Justice Powell in *Couch v United States*, 409 U.S. 322 (1973) in rejecting a fourth amendment objection to an IRS summons and later used by Powell in *United States v. Miller*, 425 U.S. 435 (1976). In *Rakas v. Illinois*, 439 [J. S. 128 (1978), Justice Rehnquist referred to expectations of privacy "which the law recognizes as 'legitimate, " This modification gives the objective part of the test a positive law, rather than societal expectation, meaning. This has practical as well as theoretical importance in that the courts would not ask whether society would regard an expectation of privacy in a particular case as reasonable, but would instead examine the laws to determine expectation. Although this would require less subjective analysis by the courts, it seems to assume that the laws are correct and need not be evaluated against fundamental law, i, e., the fourth amendment. See Goldberger, op. cit,, and Gerald G. Ashdown. "The Fourth Amendment and the ' Legitimate Expectation of Privacy, ' " 34 *Vanderbilt law Review* 1289 (19811.

[17] *Katz v. United States*, 389 [J. S. 347, 350 (1967).

It has been argued that, based on Katz, analysis of privacy interests should replace the more traditional property analysis when the Government uses nonphysical methods of search and where relevant privacy interests do not have physical characteristics. The property aspect is viewed as still important because it gives specificity and concreteness to fourth amendment analysis.[18] Yet, in some recent rulings the Court has treated privacy as the only interest protected by the fourth amendment.[19] This implies a further narrowing of fourth amendment protection, both because property interests are not considered and because of the problems of defining privacy. As one legal commentator, concerned with the influx of new surveillance dev'ices, noted:

> Confusion over the fourth amendment status of the beeper is unavoidable so long as privacy remains the central theoretical focus of fourth amendment analysis. Privacy, like most concepts of fundamental value, is a relative, indeterminate concept that is not *easily*. converted into a workable legal stand and.[20]

In evaluating the appropriateness of the use of electronic surveillance technologies by Government officials, the courts have worked within the framework established by *Katz. By analogy* to traditional surveillance devices, the courts have attempted to determine whether or not individuals have a "reasonable expectation of privacy. " This becomes more difficult as surveillance devices become more technologically sophisticated because the analogy is often more remote and hence less convincing. The courts have generally continued to consider the place in which a surveillance device is located or the place that a device is monitoring. The courts generally have adopted the more expansive interpretation of Katz and have not abandoned higher levels of protection for certain places, e.g., homes and yards.

Yet, the Katz framework has not offered the courts sufficient policy guidance to deal with the range and uses of new surveillance tech-

"Note, "Tracking *Katz:* Beepers, Privacy and the Fourth Amendment," 86 *Yale Law Journal*, pp 1461, 1479-80 (1977).

[19] Ashdown, op. cit., p. 1321.

[20] Note, *Yale Law Journal*, op. cit., p. 1477.

nologies. "Reasonable expectation of privacy" is an inherently nebulous phrase and, despite 20 years of judicial application, predicting its meaning in a new context is difficult. Determining whether a place is sufficiently private to offer protection against official surveillance is more and more difficult as the public sphere of activities encroaches on what was once deemed private.

Thus, the courts have, on several occasions, asked Congress to legislate in the area of electronic surveillance technology." Most *recently,* Judge Richard Posner, in a case involving the use of video surveillance, said:

> We would think it a very good thing if Congress responded to the issues discussed in this opinion by amending Title III [of the 1968 Omnibus Crime Control and Safe Streets Act] to bring television surveillance within its scope. [22]

## Congressional [23]

Congress did not play an active or effective role in surveillance policy until 1968. Prior to that time, the only legislation affecting official use of surveillance technology was unintended. In 1934, Congress remodified the Radio Act of 1927 as the Communications Act. Section 605 of the 1934 Act provided that "No person not being authorized by the sender shall intercept any communication and divulge . . . the contents. " There was no specific legislative history for this section and it appears that the 1934 bill was not intended to change existing law.[24] This was the interpretation until 1938 when the Supreme Court, in *Nardone v. United States,* 302 U.S. 379, ruled that Section 605 prohibited all telephone wiretapping, even when done by Federal Government officers. In response, bills passed both houses of Congress allowing wiretapping under certain

—., ——

[21]See, for example, *United States* v. *U.S. District Court (Keith), 407* U.S. 297 (1972) in which the court suggested that Congress should devise a scheme for foreign intelligence.

[22]*United States v. Torres,* No. 84-1077, p. 19 (7th Cir., Dec. 19, 1984).

[23]Material in this section is derived in large part from Herman Schwartz, "Surveillance: Historical Policy Review, " OTA contractor paper, March 1985.

[24]See: S. Rep. No. 781, 73 Cong., 2d sess. 11 (1934).

circumstances and with certain procedural requirements. But the session ended before the conference committee could resolve a difference between the two bills-the House bill explicitly criminalized unauthorized official surveillance.[25]

Despite Congress's failure to overrule *Nardone* by legislation, wiretapping continued because the Justice Department construed Section 605 as not prohibiting wiretapping itself, but only the interception and subsequent divulgence outside the Federal establishment. Additionally, the President issued an Executive order to allow wiretapping for national security purposes.

In the immediate post-war period, numerous bills authorizing electronic surveillance were introduced, but none was enacted into law. Starting in 1960, electronic surveillance became a major public issue and congressional activity became more focused and purposeful. The target was organized crime, a major priority of the Kennedy Administration.

The first major congressional action regarding surveillance was Title III of the Omnibus Crime Control and Safe Streets Act of 1968. Because it has served as a model for controlling Government surveillance, analysis of the statute is necessary.

The basic legislative history document, S. Rep. No. 1097, 90th Cong., 3d sess. (1968), describes the purpose of the statute as follows:

> ITlhe U.S. Supreme Court, on June 12,1967, handed down the decision in *Berger v. New York,* 388 U.S. 41, which declared unconstitutional the New York State statute authorizing electronic eavesdropping (bugging) by law enforcement officers in investigating certain types of crimes. The Court held that the New York statute, on its face, failed to meet certain constitutional standards. In the course of the opinion, the Court delineated the constitutional criteria that electronic surveillance legislation should contain. Title III was drafted to meet these standards and to conform with *Katz v. United States,* 389 U.S. 347 (1967).

—

[25]See: S. Rep. No. 1790, 75th Cong., 3d sess. 3 (1983).

Title 111 has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized. "

The problem the statute was designed to solve was seen as a combination of "tremendous scientific and technological developments that have taken place in the last century [that] have made possible today the widespread use and abuse of electronic surveillance techniques, and "a body of law [that] from the point of view of privacy or justice [i.e., law enforcement] is . . . totally unsatisfactory."[27] The preamble to Title III reflects these aims: 1) to obtain evidence of "certain major types of offenses, and to cope with "organized criminals and 2) to safeguard the privacy of innocent persons and to provide "assurances that the interception is justified and that the information obtained thereby will not be misused.

In order to achieve these purposes, the statute provides that electronic surveillance of conversations is prohibited, upon pain of a substantial jail sentence and fine, except for: 1 ) law enforcement surveillance under a court order; 2) certain telephone company monitoring to ensure adequate services or to protect company property; 3) surveillance of a conversation where one participant consents to the surveillance; and 4) surveillance covered by the Foreign Intelligence Surveillance Act of 1978 (as Title 111 was later amended). Law enforcement surveillance must meet certain procedural requirements, which include:

1. an application for a court order approved by a high-ranking prosecutor (not by a policeman);
2. surveillance only for one of the crimes specified in Title III (the list was expanded in the early 1970s and again in October 1984 in the Comprehensive Crime Control Act);
3. probable cause to believe that a crime has occurred, the target of the surveillance is involved, and the evidence of that crime will be obtained by the surveillance;
4. a statement indicating that other investigative procedures are ineffective; and
5. an effort to minimize the interception.

A judge must pass on the application and may issue the order, and any extensions, if it meets the statutory requirements. Shortly after the surveillance ends, notice of the surveillance must be given to some or all of the people affected, as the judge decides, unless the judge agrees to postpone the notice. Illegally obtained evidence may not be used in any official proceedings, and a suit for damages may be brought for illegal surveillance, though a very strong good faith defense is allowed. In addition, the manufacture, distribution, possession, and advertising of devices for electronic surveillance for nonpublic use are prohibited.

There was little discussion of electronic surveillance by State officials during the legislative debates. Nevertheless, §2516(2) of Title III gives State officials wiretapping authority, if a State passes legislation modeled on the Federal act, for the investigation of:

... murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marijuana or other dangerous drugs, or other crime dangerous to life, limb or property and punishable by imprisonment for more than one year . . . or any conspiracy to commit any of the foregoing offenses.

As of December 31, 1984, some 29 States and the District of Columbia have authorized their law enforcement officials to wiretap, though the State statutes differ in various ways.

On its face, Title III covers the interception of only conversations that are capable of be-

---

[26] Id. at 66. Three definitions in Title 11 I are important in determining the scope of the act:

1 *wire communication* means any communication made in w hole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign commu nications,

2 *oral communication* me ans any oral communication uttered by a person exhibiting an expectation that such communication is not subject to Interception under circumstances justifying such expectation; and

3 *intercept* means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device (Section 251() of Title 111 )

[27] Id. at 67, 69.

ing heard by the human ear; data transmission, the video part of videotaping, pen registers, and other forms of communication are not covered. [28] The statute also permits interception for official purposes where one of the parties to the conversation has consented to the interception; private interceptions where one party consents are also exempt from the statutory ban unless the interception is for a criminal, "injurious," or tortious purpose. Evidence obtained in violation of the statute is excluded from all judicial or administrative proceedings, but only someone whose privacy was invaded can challenge the evidence.

The other major statute regulating the use of surveillance devices by Government officials is the Foreign Intelligence Surveillance Act of 1978 (FISA). This act establishes legal standards and procedures for the use of electronic surveillance in collecting foreign intelligence and counter-intelligence within the United States. This was the first legislative authorization for foreign intelligence wiretapping and other forms of electronic surveillance. [29] The scope of this act is broader than Title III. FISA defines electronic surveillance broadly to include four categories: 1) *wiretaps,* including not only voice communications but also teleprinter, telegraph, facsimile, and digital communications; 2) *radio intercepts; 3) monitoring devices,* which may include microphone eavesdropping, surreptitious closed circuit television (CCTV) monitoring, transmitters that track movements of vehicles, and other techniques; and 4) *watch listing.* However, the application of FISA protection in the latter three categories is limited to those circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes. [30] The act created the Foreign Intelligence Surveillance Court, composed of seven Federal District Judges, to review and approve surveillance capable of monitoring U.S. persons (defined as U.S. citizens, lawfully ad-

mitted permanent resident aliens, and domestic organizations or corporations that are not openly acknowledged to be directed and controlled by foreign governments) in the United States. The procedural requirements of FISA apply only to electronic surveillance for foreign intelligence purposes, but the criminal penalties appear to apply more broadly to include law enforcement surveillance. [31]

There are a number of other statutes that place controls on the procedures and techniques of Government surveillance depending on the type of information that is being sought, e.g., the Privacy Act of 1974, the Right to Financial Privacy Act of 1978, the Electronic Funds Transfer Act of 1980, the Privacy Protection Act of 1980, and the Cable Communications Policy Act of 1984. (See appendix 2B for a summary of these statutes.)

Executive

Because of ambiguities in existing laws, executive officials have issued orders and guidelines to clarify the application of specific statutes or protections under particular circumstances or with respect to certain technological devices. Clarification of the scope and intent of FISA can be found in a number of Executive orders. [32]

In the absence of statutory or judicial guidance in the use of electronic surveillance for law enforcement and intelligence purposes, the Department of Justice (DOJ) generally issues policy guidelines that are regarded as requirements on agents of DOJ bureaus (FBI, Immigration and Naturalization Service, and Drug Enforcement Administration), and are usually considered as advisory by other agencies engaged in surveillance activities (e.g., Customs, Bureau of Alcohol, Tobacco and Firearms, IRS). For example, DOJ has issued policy guidelines for the use of electronic

---

[28] See S. Rep. No. 1097 at 90 (pen registers, etc., not included).
[29] See S. Rep. No, 98-660, "The Foreign Intelligence Surveillance Act of 1978: The First Five Years, " p. 1.
[30] Id. at 4.

[31] See Mar. 9, 1984 letter from John Keeney of the U.S. Department of Justice to U.S. Senator Patrick Leahy.
[32] See, e.g., Executive Order No. 12036, "United States Intelligence Activities, " Jan. 24, 1978 and updated as Executive Order No. 12333 on Dec. 4, 1981; also Executive Order No. 12139, "Exercise of Certain Authority Regarding Electronic Surveillance, " May 23, 1979.

visual surveillance and the use of pen registers. Such guidelines are issued to ensure that there are adequate procedural and substantive protections for individuals who are subject to surveillance, and that, therefore, information that is gathered through such surveillance will not be excluded as evidence in court,

# FINDINGS AND POLICY IMPLICATIONS

1. The existing statutory framework and judicial interpretations thereof do not adequately cover new electronic surveillance technologies. Indeed, some courts have asked Congress for guidance on the new technologies,

See preceding discussion of policy history and background.

2. Despite a lack of coordination in electronic surveillance policymaking among the three branches of Government and the ad hoc nature of that policy, there are seven general components that are found in existing policies, be they legislative, executive, or judicial. Although the specifics of these components will vary given the different types of electronic surveillance being used, the general model is the same.

The first component of surveillance policies is a way of checking on the discretion of the Government agent in the field over whether to institute such surveillance. This can range from a field supervisor's approval to department-level approval to a U.S. Attorney's approval to a judicial warrant. The critical distinction in terms of level of approval necessary is whether the executive branch agency is responsible for authorizing the electronic surveillance or whether judicial approval is also necessary. In terms of checking agent discretion, judicial approval obviously represents a higher standard.

The second component is a listing of the crimes or circumstances for which a particular type of electronic surveillance is considered appropriate. Title 111 is a good example of this, as is the Foreign Intelligence Surveillance Act. In some situations, the list maybe quite broad but the principle remains. Crimes are categorized as misdemeanors and felonies with classes within each group. Electronic surveillance is generally only used for investigations of major felonies. Circumstances are often defined in terms of the governmental interest in pursuing the investigation. There is an implicit ranking of the importance of governmental interests for which surveillance devices are employed—national security, domestic security, law enforcement, and the proper administration of Government programs.

The third component of surveillance policies is some standard to indicate the degree of confidence about alleged criminal behavior that is necessary before the use of a particular surveillance technique is appropriate. This involves a showing of the evidence that has been accumulated to date, and a showing that the target of surveillance will provide additional evidence. The standard may range from probable cause, to reasonable suspicion, to reason to believe, to no need for any showing of evidence.

The fourth component is some justification for the need to use a particular surveillance technique or device. Generally, this requires a showing that more traditional forms of surveillance have failed, and some explanation as to how the surveillance technique under discussion will secure the necessary information.

The fifth component of surveillance policies is a requirement for an account of how the scope of the surveillance will be minimized to the particular party or parties under investigation and to those activities that seem criminally related.

The sixth component is the requirement that the individual be given some notice after the fact that he or she has been subject to surveillance, except in circumstances where notice would jeopardize an investigation or national security interests. There is no provision for notice in FISA, unless the party is being prosecuted.

The seventh component is a statement of the sanctions that apply if evidence is not collected in conformity with the requirements of the statute. An example of this is the exclusionary rule. Additionally, some statutes contain penalties for investigative agents who violate the statute, thus providing the individual with a civil remedy.

3. In applying the major components of electronic surveillance policy, the legislature, executive agency, or court, implicitly or explicitly, uses a framework for analysis. This framework involves balancing the societal interest in maintaining civil liberties protections for the individual against the societal interest in successful Government investigations. Based on an evaluation of previous policy formulation, it appears that policy makers, more or less consciously, have looked at certain dimensions in determining this balance.

Table 6 outlines the dimensions of the civil liberty interest v. the Government investigative interest found in existing electronic surveillance policy.

The dimensions of a civil liberty interest provide, to some extent, indicators for a "reasonable expectation of privacy" (Katz test) and the level of intrusiveness of the surveillance technology. In general, the more intrusive the technology, the more it violates "expectations of privacy' and the greater the threat to civil liberties. This has been an accepted principle since surveillance technologies were first used. Prior to Katz, the fourth amendment was interpreted to mean that "unreasonable" searches required physical intrusion into a constitutionally protected area. Following *Katz,* the physical trespass requirement was dropped. The Court has implicitly, if not often explicitly, continued to consider the intrusiveness of a search in determining its reasonableness, but intrusion is more broadly construed to go beyond mere physical trespass.

The difficulty in using intrusiveness as a principle by which to evaluate an "expectation of privacy" and the appropriateness of using a particular surveillance device is that no criteria have yet been explicitly formulated to determine intrusiveness. Instead, the facts of in-

**Table 6.—Dimensions for Balancing Civil Liberty Interest v. Government Investigative Interest**

Civil liberty *interest:*
1. *Nature of information:* The more personal or intimate the information that is to be gathered about a target, the more intrusive the surveillance technique and the greater the threat to civil liberties.
2. *Nature of p/ace communication.'* The more "private" the area or type of communication to be placed under surveillance, the more intrusive the surveillance and the greater the threat to civil liberties
3. *Scope of surveillance:* The more people and activities that are subject to surveillance, the more intrusive the surveillance and the greater the threat to civil liberties.
4. Surreptitiousness *of surveillance.'* The less likely it is for the individual to be aware of the surveillance and the harder it is for the individual to detect it, the greater the threat to civil liberties.
5. *Pre-electronlc analogy:* Pre-electronic analogies are often considered in determining intrusivenes', but with widely varying interpretations.

*Government investigative intersert:*
1. *Purpose of investigation:* Importance ranked as follows: national security, domestic security, law enforcement, and the proper administration of Government programs,
2. *Degree of individualized suspicion.* The lower the level of suspicion, the harder it is to justify the use of surveillance devices.
3. *Relative effectiveness:* More traditional investigative techniques should be used and proven ineffective before using technologically sophisticated techniques.

SOURCE Off Ice of Technology Assessment

dividual cases seem to be determinative. Yet, based on court rulings, congressional statutes, and executive orders, it is possible to isolate five dimensions that are important in determining the level of intrusiveness and the civil liberties interest that warrants protection.

The first dimension is the nature of the information (content) that can be acquired. The more personal or intimate the information that is gathered, the more intrusive the surveillance technique and the greater the threat to civil liberties. Although ambiguous or incomplete information poses a threat to civil liberties, a surveillance technique that gathers more detailed information is generally regarded as more intrusive than one that gathers less detailed information. As a way of evaluating the specificity of information, the categorization of types of behavior that may be subject to surveillance (and illustrative surveillance technologies) may be useful (see table 2). Under this scheme, a surveillance technique that gathers information on movements would be

regarded as less intrusive than one that gathers information on actions and communication.

The second dimension is the "public" or "private" nature of the area (place) or communication to be placed under surveillance. The fourth amendment explicitly protects persons, houses, papers, and effects. The difficulty is that these can be more private or less private depending on where they are kept or who else is given access to them, Homes, phone conversations, and first class mail have traditionally been regarded as "private." In general, the more "private" the area or communication, the more intrusive the surveillance and the greater the threat to civil liberties.

The third dimension is the scope of the surveillance or the extent to which the surveillance covers persons not specifically under surveillance.[33] The importance of this principle is reflected in the minimization requirements of Title III and FISA. The broader the net cast, the more intrusive the surveillance and the greater the threat to civil liberties.

The fourth dimension is the surreptitiousness of the surveillance or the individual's ability to detect whether he or she is the target of surveillance. This ability to detect involves both the likelihood that the individual will be aware of the surveillance and also his or her ability to locate the source. This dimension is reflected in the concept of assumption of risk, which has been used as a justification for one-party consent to surveillance. It is also reflected in the lower standards for physical surveillance because it is assumed that an individual can easily monitor whether or not someone is following him or her. The harder it is for the individual' to detect the surveillance, the greater the threat to civil liberties.

The final factor that policymakers often consider in evaluating the civil liberty threat of an electronic surveillance device is the pre-

electronic analogy of the surveillance technique. This focuses attention on a historical measure of privacy that provides a standard for preserving a certain level of privacy. Analogies are made to policy choices for a pre-electronic era. For example, what kinds of communications have traditionally been protected, i.e., first class mail and phone calls, and what modern communications are their counterparts? Two policy difficulties are presented by this factor. The first is that different people see different analogies. The second is that the intrusiveness of a pre-electronic device and its electronic counterpart is not always correspondent.

In evaluating the legitimacy of the Government's use of surveillance devices, three dimensions are considered. The first is the purpose of the investigation (the governmental interest). There is an implicit ranking of the importance of governmental interests for which investigations are carried out—national security, domestic security, law enforcement, and the proper administration of Government programs. The nature of the governmental interest determines the level of judicial or administrative control, both initially and at specified review stages. With respect to the use of electronic surveillance, the importance of the governmental interest is always considered, but is not determinative of the level of surveillance. The law enforcement interest is broadest, but most well developed in statute, e.g., Title III categories of crimes for which eavesdropping may be used. The national security and domestic security purposes have constitutionally allowed Government officials the greatest discretion in determining whether surveillance should be used. The rules for administrative searches are fairly well developed in statutes, but standards for the use of electronic surveillance often are not included.

The second dimension is the degree of individualized suspicion. In general, the earlier in the investigation the harder it is to justify the use of surveillance devices. This is so because it may be difficult to document that criminality is involved and that the target of

[33]See Donald L. Doerenberg," 'The Right of the People': Reconciling Collective and Individual Interests Under the Fourth Amendment, " 58 New York University Law Review 259 (1983), who distinguishes the following possible targets of a search—all citizens, categories or classes of individuals, or a selected individual.

the surveillance is involved or can provide evidence. Traditionally, the standard for the Government's need to know varies depending on what it already knows. In theory, the more the Government knows, the less likely that it is engaging in a fishing expedition. If the Government has probable cause to believe that someone is implicated in a crime or terrorist activity, then it has a need to know more than if it had only a reasonable suspicion or reason to believe that someone was involved.

The third dimension is the relative effectiveness of electronic surveillance compared to other means that are available to secure the same information. In existing policies, the assumption is that there should be a demonstration that more traditional investigative techniques have been used and proven ineffective before using technologically sophisticated electronic techniques. An analysis of the effectiveness of the surveillance technology or device is important in determining the legitimacy of its use. If more accurate and complete evidence can be gathered through the use of an electronic surveillance device than through pre-electronic means, then serious consideration will be given to its use.

The following chapters describe a number of new electronic surveillance devices and techniques that have been made possible by technological advances and analyze their policy implications using the framework developed in this chapter.

## APPENDIX 2A: KEY SUPREME COURT DECISIONS ON ELECTRONIC SURVEILLANCE

*Olmstead v. United States,* 277 U.S. 438 (1928) —a 5-4 decision ruling that neither the fourth nor fifth amendments to the Constitution applied to wiretapping. The fourth amendment did not apply because: there was no trespass; its protection is limited to material effects, not to intangibles like speech; and there was no protection for voice communication projected outside the house. The fifth amendment did not apply because there was no evidence of compulsion to talk over the phone and because the fourth was not first violated. Brandeis argued in his dissent that the fourth amendment protected a right to privacy, and stated:

Moreover, "in the application of a Constitution, our contemplation cannot be only of what has been, but of what may be. " The progress of science in furnishing the Government with means of espionage is not likely to stop with wiretapping. Ways may some day be developed by which the Government, without removing papers from secret drawers, can reproduce them in court, and by which it will be enabled to expose to a jury the most intimate occurrences of the home. Advances in the psychic and related science may bring means of exploring unexpressed beliefs, thoughts and emotions. . . Can it be that the Constitution affords no protection against such invasions of individual security?

Public reaction to the decision was negative; bills were introduced in Congress, but none passed.

*Nardone v. United States, 302* U.S. 379 (1937)– Court ruled that Section 605 prohibited telephone wiretapping by anyone, including Federal Government officers. Decision was criticized as "judicial legislation. " Bills were introduced in Congress to allow wiretapping under certain circumstances, but none passed. Evidence indicates that wiretapping continued at the time despite decision.

*Berger v. New York,* 388 U.S. 41 (1967)–Court declared the New York wiretapping statute unconstitutional because it was not particular enough in describing the crime, or "the place to be searched, " or the "persons or things to be seized" as specifically required by the fourth amendment.

*Katz v. United States, 389* U.S. 347 (1967)– Court overruled *Olmstead,* thus bringing wiretapping under the fourth amendment. The Court developed a general formula to determine whether an investigative technique conflicts with the fourth amendment–does the individual evidence an expectation of privacy and is the expectation of privacy "one that society is prepared to recognize as 'reasonable?' " The Court's criteria for valid surveillance involved a warrant, particularization and probable cause requirements for suspect, crime, phone, and time.

*United States v. U.S. District Court for the Eastern District of Michigan, 407* U.S. 297 (1972)– Court prohibited unauthorized electronic surveil-

lance to gather intelligence for domestic security purposes, holding that:

> . . . prior judicial approval is required for the type of domestic security surveillance involved in this case and that such approval may be made in accordance with such reasonable standards as the Congress may prescribe.

*United States v. Miller,* 425 U.S. 435 (1976)– Court ruled that a bank customer's financial record is the property of the bank, and thus he or she has no legitimate "expectation of privacy" in these records.

*United States v. New York Telephone Co., 434* U.S. 159 (1977)–Court held that to be covered by Title III, a communication must be capable of being overheard.

*Smith v. Maryland,* 442 U.S. 735 (1979)–Court held that the use of a pen register did not violate the fourth amendment.

*United States v. Knotts, 103 S.* Ct. 1081 (1983) –Court held that the *warrantless* monitoring of a beeper is not a search and seizure under the fourth amendment because there is no reasonable expectation of privacy as the movements tracked are public.

*United States v. Karo,* 104 S. Ct. 3296 (1984)– Court held that using a beeper to trail a container into a house and "to keep in touch with it inside the house" did violate the fourth amendment.

# APPENDIX 2B: KEY STATUTES RELEVANT TO ELECTRONIC SURVEILLANCE

*Section* 605 *of the Communications Act of 1934* provided that "No person not being authorized by the sender shall intercept any communication and divulge . . . the contents . . ."

*Title III of the 1968 Omnibus Crime Control and Safe Streets Act* is designed to protect the privacy of wire and oral communications and also to allow evidence to be obtained for "certain types of major offenses. " Law enforcement electronic surveillance of conversations is thus prohibited except under a court order, which a judge may issue after being convinced that the following procedural requirements have been met:

1. application by a high-ranking prosecutor;
2. surveillance for one of the crimes specified in Title III;
3. probable cause to believe that a crime has occurred, that the target of the surveillance is involved, and that the evidence of that crime will be obtained by the surveillance;
4. a statement indicating that other investigative procedures are ineffective; and
5. an effort to minimize the interception.

*Crime Control Act of 1973* requires-that State criminal justice information systems, developed with Federal funds, be protected by measures to ensure the privacy and security of information.

*Privacy Act of* 1974 requires agencies to comply with fair information practices in their handling of personal information, including the following: records must be necessary, lawful, current, and accurate; records must be used only for pur-

pose collected except with an individual's consent or where exempted; no record of an individual's exercise of first amendment rights is to be kept unless authorized by statute; information cannot be sold or rented for mailing list use. The following are exempted: CIA records; records maintained by law enforcement agencies; Secret Service records; Federal testing materials; etc.

*Foreign Intelligence Surveillance Act of 1978* establishes legal standards and procedures for the use of electronic surveillance to collect foreign intelligence and counter-intelligence within the United States. This was the first legislative authorization for wiretapping and other forms of electronic surveillance (including radio intercepts, microphone eavesdropping, closed circuit television, beepers, and other monitoring techniques). It created the Foreign Intelligence Surveillance Court, composed of seven Federal District Judges, to review and approve surveillance capable of monitoring U.S. persons (defined as U.S. citizens, lawfully admitted permanent resident aliens, and domestic organizations or corporations that are not openly acknowledged to be directed and controlled by foreign governments) in the United States. The procedural requirements of FISA apply only to electronic surveillance for foreign intelligence purposes, but the criminal penalties appear to apply more broadly to include law enforcement surveillance.

*Right to Financial Privacy Act of 1978* provides bank customers with some privacy regarding their

records held by banks and other financial institutions, and provides procedures whereby Federal agencies can gain access to such records.

*Electronic Funds Transfer Act of 1980* provides that any institution providing EFT or other bank services must notify its customers about third-party access to customer accounts.

*Privacy Protection Act of 1980* prohibits Government agents from conducting unannounced searches of press offices and files if no one in the press room is suspected of a crime.

*Cable Communications Policy Act of 1984* requires the cable service to inform the subscriber of: the nature of personally identifiable information collected and the nature of the use of such information; the disclosures that may be made of such information; the period during which such information will be maintained; and the times during which an individual may access such information. Also places restrictions on the cable services' collection and disclosures of such information. The act creates a subscriber right to privacy against Government surveillance.

# Telephone Surveillance

# Telephone Surveillance

## SUMMARY

The public generally expects that telephone conversations are private, and that electronic surveillance of telephone calls (sometimes known as wiretapping or eavesdropping) is illegal, except in very narrowly circumscribed law enforcement and national security investigations. But technological innovations now make it easier to electronically monitor both the content of phone calls and phone transactions (e.g., number called, time, and place called). Furthermore, the new telephone technology was not envisioned when current legal protections were enacted, and thus the statutory protection against telephone surveillance is weak, ambiguous, or nonexistent.

After reviewing and assessing relevant technological developments and the statutory framework, OTA found that:

- A host of new information technologies has revolutionized the telephone system since 1968—the last time Congress passed major legislation (Title III of the Omnibus Crime Control and Safe Streets Act) that covered telephone surveillance by law enforcement agencies and private parties.
- Significant new technologies include digital transmission (whereby many phone calls are converted from analog to digital form for transmission) and cellular and cordless phones, as well as the increased use of telephones for electronic transmission of data.
- Deregulation of the telephone industry, the proliferation of common carriers, and the growth of private (as opposed to common carrier) telephone companies also raise questions as to the applicability of existing legal protections for telephone privacy.
- The contents of phone conversations that are transmitted in digital form or made

on cellular or cordless phones are *not* clearly protected by existing statutory and constitutional prohibitions on the interception of phone calls.
- Interception of the content of phone calls represents a substantial threat to civil liberties, but also a significant benefit to investigative authorities. This balancing is reflected in the standards and procedures presently embodied in Title III for such interception.
- New information technologies–e.g., advanced pen registers and automatic billing equipment—have also greatly increased the ability to collect and access transactional information about telephone calls (e.g., the numbers and places called).
- Transactional information is also *not* clearly protected under existing statutes and judicial precedents.

OTA identified three major options for congressional consideration with respect to policy on interception of the content of telephone calls:

- treat all calls similarly with respect to the extent of protection against unauthorized interception, i.e., extend Title III of the Omnibus Crime Control and Safe Streets Act to cover all phone calls-whether analog, digital, cellular, or cordless-and both voice and data communications;
- formulate special policies for specific telephone technologies; and
- do nothing and leave policymaking up to the development of case law depending on individual circumstances.

OTA also concluded that the deregulatory and market trends toward private telephone systems and hybrid common carrier-private systems indicate the need for congressional review of applicable provisions of the Commu-

nications Act of 1934 and Federal Communications Commission regulations, as well as Title III of the Omnibus Crime Control Act, with respect to telephone privacy protection.

Finally, OTA concluded that at present there is no feasible and cost-effective technological method to provide universal protection against telephone surveillance. A separate OTA study is examining future technical trends and safeguards against misuse as well as issues and options relevant to monitoring of transactional-as contrasted with content—information. *

—————
*See the separate OTA study on "New Communications Technology: Implications for Privacy and Security, " expected to be published in winter 1986/87.

## INTRODUCTION

Most phone users have assumed a high degree of confidentiality for their phone calls. This has been especially true as private lines and improved connections replaced party lines and broken connections. In some respects, the technology has brought more assurances for the protection of the privacy of phone calls than did the law. However, this is now changing. Four technological innovations in phone service—digital transmission, new types of phones, new phone networks, and the ability to easily collect detailed information on phone usage—make it easier both to overhear the content of phone calls and also to monitor phone transactions. The law has not yet addressed these innovations, thus leaving gaps between the privacy that people expect and the privacy that they are assured.

With the conventional telephone, phone calls were transmitted in analog form across wire lines. Today, an increasing percentage of phone calls are converted from analog to digital form and then transmitted. Transmission may be over wire, but is often via microwave radio and satellite systems and, increasingly, via fiber optic transmission facilities. Statutes prohibiting wiretapping, primarily Title III of the Omnibus Crime Control and Safe Streets Act, were written to regulate the interception of oral communications transmitted in whole or in part by wire.

Additionally, new phones are making use, in whole or in part, of radio communications. Cellular or mobile phones use radio to transmit messages between a phone and a switching center, while cordless phones use radio to carry messages between the phone base station and the cordless phone handset. Section 605 of the 1934 Communications Act prohibits interception of radio communications. However, it does not protect phone calls because the courts have ruled that Congress intended Title III to be the exclusive remedy with respect to telephone interceptions.

Another growing gap in the protection afforded phone calls is between common carrier calls and private network calls. Legislation has addressed the former, while the latter have not been given any legal protection. Thus, the privacy of the content of digitized phone calls, cellular and cordless phone calls, and private carrier calls may not be afforded protection against interception by either Government officials or private parties.

Moreover, technological changes make it far easier today to monitor phone transactions. Pen registers are devices by which Government officials or private parties can monitor the numbers dialed on a given line. Presently, a court order is not necessary to install a pen register under Title III or the fourth amendment, but is required under the Foreign Intelligence Surveillance Act. Increasingly, computerized telecommunications switching equipment can collect and store information on the numbers dialed and length of phone calls. This information may be kept for billing and administrative purposes, but it also has monitoring capabilities. As automatic call accounting becomes widespread, pen registers will become unnecessary. A detailed historical record of long-distance and sometimes lo-

cal phone calls is now kept for perhaps 3 months by phone companies and can be accessed by Government officials with a subpoena. However, if a phone system is wholly or in part private, then this calling information is legally available to Government officials without a subpoena.

Before analyzing in detail the policy issues presented by these gaps in the protection for the content of phone calls and the record of phone transactions, a brief review of the history and background of technology and policy regarding wiretapping will be presented.

## BACKGROUND'

Telegraph and telephone tapping by both private citizens and public officials began soon after the telegraph and telephone were invented. Some States tried to deal with telephone tapping either through their trespass statutes or by expanding early laws barring telegraph interceptions. However, the legality of Government surveillance under these statutes was usually unclear because there was no rule excluding illegally obtained evidence. By 1927, despite questions about the scope of coverage, some 28 States had made wiretapping a crime. '

Federal concern about wiretapping first surfaced in 1918 when the Federal Government began regulating the telephone system, but the concern was primarily for "the protection of the government and the property of the telephone and telegraph companies while under governmental control. "³The Government barred tapping of, or interference with, telephone and telegraph messages, if the tap was done "without authority. " This legislation expired in 1919. Civil liberties concerns first became important in the early 1920s, when wiretapping was used by the Department of Justice in its raids against aliens.' At this time, there were also reports that the phones

and offices of members of Congress had been eavesdropped on.

In 1924, Attorney General Harlan Fiske Stone banned wiretapping by the Department of Justice, including the Bureau of Investigation (the FBI's predecessor). This effort at administrative control was only partially successful. The order bound only the Department of Justice and not the Treasury, which had jurisdiction over Prohibition enforcement, the law enforcement area that came to rely most on electronic surveillance. Prohibition agents continued to wiretap, even though the Treasury Department purported to be officially opposed to wiretapping.⁵

The Treasury's wiretapping ultimately brought the matter to the courts in *Olmstead v. United States,* 277 U.S. 438 (1928). The Court, in a *5-4* opinion by Chief Justice Taft, ruled that neither the fourth nor fifth amendments to the Constitution provided protection against wiretapping. ⁶The public reaction to the *Olmstead* decision was largely and strongly negative.' Immediately after *Olmstead* was decided, bills were proposed in Congress to ban wiretapping.'

'Material in this section is based in part on Herman Schwartz, "Surveillance: Historical Policy Review, " contractor paper prepared for OTA, March 1985.

²See *amicus* brief for the telephone companies in *Olmstead v.United States,* 277 U.S. 438 {1928).

³H. R. Rep. No. 800, 65th Cong.. 2d sess.( 1918), reprinted in *Wiretapping, Eavesdropping and the Bill of Rights,* Hearings Before the Subcommittee on Constitutional Rights of the Senate Judiciary Committee, Part 4, Appendix to Part 3, 86th Cong.. 1st sess. 792 ( 1959) ('' 1914-1959 Leg. Hist. ").

'Alan Westin,*TheWire-tapping Problem,* 52 *Columbia Law Review 164, 172* n. 35 (1952).

⁵Walter F. Murphy, *Wiretapping on Trial: A Case Study in the Judicial Process (New* York: Random House, 1965), p. 13.

'The Court gave three reasons why the fourth amendment was not implicated: 1 ) officials had not trespassed onto *Olmstead* property; 2) the amendment did not apply to intangibles like speech, but only to material "effects"; and 3) there was no protection for voice communications projected outside the house, Justice Holmes wrote a short dissent, condemning the agents' conduct as "dirty business. " Justice Brandeis wrote the main dissent in which he disagreed with the majority's reading of the precedents, its very narrow view of the fourth amendment, and its willingness to countenance criminal activity by the Government. 1914-59 Leg. Hist. 770-73.

'Murphy, op. cit., p. 125.

'1914-59 Leg. Hist. 881-83.

In 1934, Congress remodified the Radio Act of 1927, which was itself a recodification of legislation going back to 1912. Section 605 of the 1934 Act provided that:

> No person not being authorized by the sender shall intercept any communication and divulge . . . the contents . . .

There was no specific legislative history for this section and it appears that the 1934 bill was not intended to change existing law.[9] Apparently no one thought Congress had taken an important step in dealing with electronic surveillance.

It thus came as a surprise to many when the Supreme Court in 1938 ruled that Section 605 prohibited all telephone wiretapping, even when done by Federal Government officers.[10] In 1957, the Court ruled that this applied to State officers as well.[11] The Nardone decision was generally criticized both in 1938 and later as "judicial legislation. "[12]

Congressional response to Nardone was swift, but did not result in legislation. This time, bills were introduced to allow wiretapping, provided that the head of a department believed a felony had been or was about to be committed by two or more people. Congressional concern about organized crime was one of the two primary reasons for authorizing electronic surveillance, the other being national security. Bills allowing wiretapping passed both houses, but the session ended before the conference committee could resolve a difference between the two bills-the House bill explicitly criminalized unauthorized official surveillance.[13] The ease with which both Houses passed bills allowing Federal surveillance might lead one to think legislation was

imminent. But this did not happen, even though, despite the *Nardone* decision, the Federal Government and State officials continued to wiretap.[14]

During and after World War II, the FBI engaged in large amounts of electronic surveillance. Between 1940 and 1960, the FBI installed over 7,000 national security surveillances, with 519 taps and 186 bugs in 1945 alone; and the Treasury Department installed over 10,000 taps during 1934 to 1948. Other Federal agencies, like the military, also engaged in tapping and bugging. On the local level, the New York City police installed thousands of taps each year (e.g., 3,588 in 1953-54), mostly in morals and bookmaking investigations; studies by Samuel Dash and others have documented widespread tapping elsewhere.[15]

The tapping and bugging targeted many people who might not normally appear to be appropriate targets, a situation that continued at least into the 1960s. In 1941, for example, the Los Angeles Chamber of Commerce was tapped, on the authority of Attorney General Francis Biddle. Presidential aides and others were similarly tapped. The most complete information on these practices, as developed by the Church Committee, relates to FBI surveillances in the post-1960 period when Dr. Martin Luther King, Jr., Congressman Harold Cooley, journalists, and many others were put under electronic surveillance.[16]

At this time, questions were also being raised concerning the effectiveness of electronic surveillance and of judicial protections, as well as the persistent use of electronic surveillance in State law enforcement for minor crimes.[17] There was also much documentation

[9] See S. Rep. No. 781, 73d Cong., 2d sess. 11 (1934), reprinted in 1914-59 Leg. History 895; Report of the National Commission for the Review of Federal and State Laws Relating to Wiretapping and Electronic Surveillance 35 (1976).

[10] *Nardone v. United States,* 302 U.S. 379 (1937).

[11] *Benanti v. United States,* 355 U.S. 96 (1957).

[12] Report of the National Commission for the Review of Federal and State Laws Relating to Wiretapping and Electronic Surveillance, *Electronic Surveillance* (Washington, DC: NWC, 1976), p. 35.

[13] S. Rep. No. 1790, 75th Cong., 3d sess. 3 (1938), reprinted in 1914-59 Leg. Hist. 961; Murphy, op. cit., p. 135.

[14] See generally Samuel Dash, Richard F. Schwartz, and Robert E. Knowlton, *The Eavesdroppers (New* York: DeCapo, 1959). Ibid.; and Herman Schwartz, *Taps, Bugs, and Fooling the People (New* York: Field Foundation, 1977).

[16] See U.S. Congress, Senate Select Committee to Study Governmental Operations With Respect to Intelligence Activities, *Supplementary Detailed Reports on Intelligence Activities,* vol. III, 94th Cong., 2d sess. (Washington, DC: U.S. Government Printing Office, 1976).

[17] See Wiretapping Hearings before Subcommittee No. 5. U.S. House of Representatives Judiciary Committee, 84 Cong.,1st sess. 53, 67 (1955), ("1955 Hearings"), 194, 347, 359.

of illegal private wiretapping, by private detectives and others for industrial espionage and in domestic relations matters, and of the ineffectiveness of either Federal or State law to cope with this.

Competing pressures continued throughout the 1960s. The President's Commission on Law Enforcement and the Administration of Justice issued a report in 1967, and near the top of its priorities was organized crime. While it did not explicitly recommend the use of wiretapping, a majority of the Commission members did so. The American Bar Association proposed a statute that became the model for legislation permitting wiretapping that was ultimately enacted in 1968. Because of this activity, the arguments for wiretapping were repeatedly being made and given consideration. For example, Professor G. Robert Blakey, the chief draftsman of the ABA report and proposals and also of the 1968 Wiretap Act, told a congressional committee in 1967:

> The normal criminal situation deals with an incident, a murder, a rape, or a robbery, probably committed by one person. The criminal investigation normally moves from the known crime toward the unknown criminal. This is a sharp contrast to the type of procedures you must use in the investigation of organized crime. Here in many situations you have known criminals but unknown crimes.
> So it is necessary to subject the known criminals to surveillance, that is, to monitor their activities. It is necessary to identify their criminal and noncriminal associates; and their areas of operation, both legal and illegal. Strategic intelligence attempts to paint this broad, overall picture of the criminal's activities in order that an investigator can ultimately move in with a specific criminal investigation and prosecution. [18]

The pressures, however, were not all one-sided. In the mid-1960s, illegal tapping and bugging by the FBI, IRS, and others came to light when FBI bugs were accidentally discovered in a Las Vegas gambler's office and in

Washington's Sheraton-Carlton Hotel and lawyer-client conversations were overheard. This led to a series of court-ordered revelations of illegal Federal surveillance involving some 50 or more cases. As a result, in 1965 President Lyndon B. Johnson ordered an end to all electronic surveillance except in national security cases. [19]

During this period, the Supreme Court overruled *Olmstead* in *Katz v. United States, 389 U.S. 347 (1967).* The *Katz* decision set out both a general formula for the interests protected by the fourth amendment and specific criteria for a statute authorizing law enforcement wiretapping. [20] The Court's specific criteria for a valid surveillance involved the conventional magistrate's warrant, and the equally conventional probable cause requirements applied to a specific telephone, for a specific need and crime, to the specific suspect conversations and the specific time during which he spoke. The Court also stressed that *prior* notice to the suspect of the interception was unnecessary, and indicated that notice after the interception was constitutionally acceptable. These requirements were drawn from previous related cases and from conventional fourth amendment principles.

All these factors, plus a growing concern about crime, came together to break the 30-year impasse since *Nardone* and produced Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §2500ff, which authorizes telephone tapping and microphone surveillance by Federal and State officials, if antecedent judicial approval is obtained. [21] Other than the Foreign Intelligence Surveillance Act in 1978, there has been no significant legislative action since that time, despite a virtual revolution in technology.

---

[18]"Hearings on *Controlling Crime Through More Effective Law Enforcement* before the Subcommittee on Criminal Law and Procedures of the Senate Judiciary Committee, 90th Cong., 2d sess. 957-58 (196i'1,

[19]III Church Comm. **298-300.**

[20]*Katz* expressly excluded national security surveillance from its discussion. See 389 U.S. at **n.** 21,

[21]See ch. **2** for a detailed analysis of the statute.

# FINDINGS AND POLICY IMPLICATIONS

1. A host of new information technologies has revolutionized the telephone system since 1968—the last time Congress passed major legislation on telephone surveillance by law enforcement agencies and private parties. These technologies include digital transmission and cellular and cordless phones.

Each of the major technological developments affecting the telephone system is discussed briefly below.

Digital Transmission.—Initially, the phone system carried only analog signals over telephone wires. Much of the telephone system in the United States, and especially overseas, is heavily dependent on analog systems, at least for part of a phone call. Increasingly, however, analog voice signals are digitized. The phone system of the future will carry digitized information (voice, data, and image) across wires, optical fibers, microwave radios, and satellite links. The evolution of digital communications, as well as the digital switching devices that enable the system to function smoothly, is beginning to provide expanded services to customers.

The computing and telecommunications industries worldwide are gradually evolving toward a new system, the Integrated Services Digital Network (ISDN), which will allow the transmission of data, voice, image, and video over the same digital system worldwide. The future trend is toward a wholly digitized, efficient, and integrated phone system.[22] Some predict that, in the future, the microphones and speakers in the telephone handset will be the only analog components of the system.[23]

Legal or illegal interception and interpretation of digital signals is not significantly more difficult than for analog signals; the interceptor just needs a coder-decoder and knowledge of the modulation scheme. Digitization of phone calls, thus, does not offer more protec-

tion for the content of the call. Transmission over fiber optic lines may offer more protection against illegall interception, to the extent that the operating company can more easily tell when the line has been broken into and where along the line the break has occurred.[24]

Cellular Phones.—The cellular telephone is a technological innovation in providing quality mobile phone service to a large number of customers over an expansive geographic area. The basic technology was first developed at AT&T Bell Labs in the 1950s, and the necessary computer and switching technologies were developed in the 1960s. The critical development was a system that reused frequency spectrum by dividing a service area into "cells." Each cell contains a base station that serves as a radio transmit-receive-switching station. Cellular mobile phone calls are relayed by radio to the base station, which is hooked up to the mobile phone switching office computer. The switching office then routes calls to other base stations or to the telephone network via similar routes. If the call is to another cellular phone it is relayed to the appropriate cell site transmitter. If the party called is using a conventional wire-line phone, then the switching office computer routes it through the telephone system to the receiver.[25]

In 1982, the Federal Communications Commission (FCC) accepted applications for cellular license systems. It received 196 applications for the top 30 markets. The FCC decided to license two types of competitors, a tele-

---

[22]William Stallings, "The Integrated Services Digital Network, " *Datamation,* Dec. 1, 1984, pp. 68-70.

[23]John G. Posa, "Phone Net Going Digital, " *High Technology,* May 1983, p. 41.

[24]For trend in fiber optic systems, see Les C. Gunderson and Donald B. Keck. "optical Fibers: Where Light Outperforms Electronics, " *Technology Review,* May/June 1983, pp. 33-44; Soichi Kobayashi and Tatsuya Kimura, "Semiconductor Optical Amplifiers, " *IEEE Spectrum,* May 1984, pp. 26-33; Jeff Hecht, "Outlook Brightens for Semiconductor Lasers, " *High Technology,* January 1984, pp. 43-50; and Donald B. Keck, "Single-mode Fibers Outperform Multimode Cables, " *IEEE Spectrum,* March 1983, pp. 30-37.

[25]For good descriptions of the technology involved see: Duane L. Huff, "Cellular Radio, " *Technology Review,* November/December 1983, pp. 53-62; George R. Cooper and Ray W. Nettleton, "Cellular Mobile Technology: The Great Multiplier, " *IEEE Spectrum,* June 1983, pp. 30-37; and Television Digest, Inc., *Cellular Radio–Birth of an Industry, 1983.*

phone company and a radio communications company, in each area. Subsequently, the FCC received almost 400 applications to provide service in the 30 next largest markets and 567 applications to provide service for the next 30 markets. [26]

Market analysts expect that the demand for cellular service will be large-driven by people who want to communicate while on the move. Cellular phones provide quality communications, and the current high cost will decrease. Some predict that the cost will drop to $500 per phone within 5 years. [27] Service charges started out around $150 per month, but are dropping fast. [28] The technology on which cellular phones are based is capable of providing additional services, e.g., data terminals and printers in a briefcase; public cellular phones on trains, buses, and planes; answering and message services; dictation services; and automatic callback. [29] In addition, encryption devices to protect privacy are now available.

Development of the radiotelephone system has been under way and may be available soon, subject to FCC approval. This system does not need an elaborate transmitter system and would be cheaper than a cellular phone. Radiotelephones can work either as a telephone or as a car-to-car radio. Although radiotelephones have a limited range, users can subscribe to a repeater service that picks up weak signals and rebroadcasts them. Radiotelephones (as well as cellular radios) are subject to eavesdropping. In addition, police scanners that can listen in on personal radiotelephone conversations are now on the market. [30]

Cordless Phones. —The cordless telephone is designed to meet a perceived consumer interest in being able to talk on the phone while walking around the house or in the yard. With the cordless phone, oral messages are no longer transmitted from the receiver to the

network via a line, but instead are transmitted between receiver and base station via radio. These transmissions can be picked up accidentally on a home or car radio, and also can be intercepted easily by someone who wants to eavesdrop.

Companies marketing cordless phones and the FCC are well aware of the difficulty in ensuring the privacy of cordless phone calls. The FCC now requires that such phones be labeled with a warning that the conversation may be accidentally overheard. One reason cited for the lack of market interest in cordless phones is that customers desire privacy for their phone calls.

Private Carriers.–Until deregulation of the telephone industry, the market was dominated by common carriers that offered telecommunications services to any potential customer. Because of regulatory restrictions, capital investment requirements, and economies of scale, it was very difficult for an individual or company to set up a phone system. However, deregulation coupled with technological advances now make it possible to set up private telecommunications systems, which serve a specific business or a predetermined group of customers. Parties can also lease dedicated lines from the telephone company or private providers, form local area networks (LANS), and purchase private branch exchanges (PBXs). This variety of phone systems is not reflected in current laws that speak primarily to common carrier systems.

2. The contents of phone conversations that are transmitted in digital form or that are conducted on cellular phones or cordless phones are not clearly protected by existing statutory and constitutional prohibitions on the interception of phone calls.

The major statute prohibiting unauthorized interception of phone calls, Title III of the Omnibus Crime Control and Safe Streets Act, was written at a time when phone calls were transmitted in analog form, over wires maintained by common carriers. The technological changes discussed above have raised a series of questions about the scope of Title III and the possible need for new legislation. The present le-

— . . —.—

[26] Huff, op. cit., pp. 59-60.
[27] Television Digest, Inc., op. cit., p. B-8.
[28] Huff, op. cit., p. 60.
[29] huff, op. cit., p. 61.
[30] Benn Kobb and Lee Greathouse, "Car Radiotelephones Get Personal, " *High Technology*, November 1984. pp. 18-21.

gal status of these new technologies is outlined below.

Digital/Data Communications. -Title III covers only the "aural acquisition" of an oral or wire communication, not the acquisition of communication in digitized form or data communications. Recent court rulings have not expanded the scope of Title III to cover digital or data communications. In *United States v. New York Telephone Co.,* 434 U.S. 159 (1977), the Supreme Court held that to be covered by Title III, a communication must be capable of being overheard. In 1978, the Fourth Circuit in *United States v. Seidlitz, 589* F.2d 152, ruled that nonaural communications were not protected by Title III.

Although it is clear that Title III does not cover data communication,[31] there has been some discussion whether Title III would cover phone conversations that are being transmitted in digital form.[32] Most interested parties, e.g., AT&T and the ACLU, now appear satisfied that conversations that are transmitted in digital form are covered by Title III because the interception is still aural and therefore covered by the statute. The Justice Department's position is similar, i.e., the analog-digital distinction is not important and that Title III applies to all phone conversations carried over the wires. Title III focuses not on the method by which communication is transmitted, but on the type of acquisition of that information. Since the Government's interception is aural, it does not matter for Title III purposes whether the transmission was analog or digital or by some other means. However, the courts have not ruled on the coverage of phone conversations carried in digital form and clarification by statute would avoid future legal misinterpretations.

The Foreign Intelligence Surveillance Act of 1978 (FISA) does require a court order for interception of digital conversations. Phone conversations being transmitted in digital form would be protected against unauthorized surveillance if the interception was for intelligence purposes. FISA does not cover law enforcement surveillance.

Section 605 of the Communications Act of 1934 does not provide any protection against unauthorized acquisition of digital wire communications because the courts have ruled that Congress intended Title III to be the exclusive remedy with respect to telephone interceptions.[33]

Attempts to afford legal protection against the interception of digital or data communications through statutes that prohibit theft are likely to be futile because it is difficult to calculate or prove the informational value taken from the person whose communication is intercepted.

If no statute covers the interception of digital phone conversations, there may still be constitutional protection in the fourth amendment's "expectation of privacy" against unreasonable searches and seizures.

Cellular Telephones. –The issue of whether the interception of cellular phone calls comes under any existing statute, and thus requires some form of court order, has not yet come to the courts. In *United States v. Hall, 488* F.2d 193 (9th Cir. 1973), the Ninth Circuit Court held that Title III protects any communication that is transmitted in part by wire. The Court ruled that a telephone call from a mobile telephone to a landline telephone is protected by the statute, but that a phone call from a mobile telephone to another mobile tele phone is not. The Court characterized this as "an absurd result, " but one required by the statute. Based on the reasoning of the courts in other cases involving radio transmissions (cordless telephones and beepers), Title III and FISA would not apply because the communication was not a wire transmission, and Section 605 would not apply both because of Title III preemption and because cellular telephones use radio, not wire, transmissions. The posi-

---

[31] In ch. 4, *Electronic Mail Surveillance,* more detailed attention will be given to data communication.

[32] David Burnham, "Loophole in Law Raises Concern About Privacy in Computer Age, " *New York Times,* Dec. 19, 1984, p. A-1.

[33] See: *Watkins v. L. M. Barry& Co., 704* F.2d 577 (5th Cir. 1983) and *United States v. Hall,* 488 F.2d 193 (9th Cir. 1973).

tion of the Justice Department is to secure a Title III warrant before interception because one cannot tell whether the receiver is on a land-line phone and hence using telephone wires.

Cordless Telephones.–The status of the protection afforded communication over cordless phones from unauthorized interception is not clear. Two State courts have ruled on the question. In 1984, the Supreme Court of Kansas, in *Kansas v. Howard, 679* P.2d 197, held that the user of a cordless telephone had no fourth amendment "expectation of privacy" and that interception of such communication does not violate Title III. The Court did not address the question of the expectation of privacy of the other party to the conversation. The Rhode Island Supreme Court has recently handed down a similar ruling in *Rhode Island v. Delaurier, 488* A.2d 688 (R.I. 1985). The Justice Department position is that investigatory authorities should get a Title III warrant before intercepting conversations carried over a cordless telephone. It may be important to note that in many instances the information resulted not from the Government actively listening to cordless phone calls, but from neighbors who picked it up on an FM radio dial and turned the information over to Government authorities.

Private Carriers.–Communications carried over private carrier communications systems are not "wire" communications under Title III. In addition, the AT&T consent decree may remove the regional holding companies from the category of common carrier engaged in interstate commerce as defined by Title III, and thus remove these companies from Title III coverage." Given the market trend toward private carrier systems and combination common-private systems, the implications of the current legislative distinction need to be explored for Title III, Sections 605 and 705(a) of the Communications Act, and FCC regulations.

3. Interception of the content of phone calls represents a substantial threat to civil liberties, but also a significant potential benefit to investigative authorities. This is reflected in the standards and procedures presently embodied in Title III for such interception.

The following discussion uses the framework developed in chapter 2 (see table 6). In terms of the nature of the information acquired, the content of intercepted digitized phone communications is quite specific, detailed, complete, and often of a personal nature. The nature of the information that can be acquired does not vary with the system of transmission, the phone used, or the phone network.

The "private" v. "public" nature of the phone call does not differ at all based on the system of transmission or the phone network employed. It does differ somewhat according to the phone used, in that cellular and cordless phones using radio transmissions are inherently more vulnerable to interception, and thus more public. However, because a communication may be more readily overheard does not necessarily mean that investigative authorities should be able to intercept it with less authorization than for other calls.

The scope of surveillance is the same regardless of the system of transmission, phone used, or phone network employed. In any case, all parties to a phone call are generally overheard.

It is virtually impossible for an individual to detect whether or not the content of a phone call is being intercepted when the interception involves passive reception over the air signals. Again, this is true regardless of the system of transmission, phone used, or phone network employed.

The pre-electronic analogy will most likely be to analog transmission of phone calls made on conventional phones via a common carrier. Such calls are accorded a high level of protection against interception as reflected in Title III.

The governmental investigative interest in intercepting the content of phone calls is quite high. Knowledge of the content of phone calls

---

"Bruce E. Fein, "Regulating the Interception and Disclosure of Wire, Radio and Oral Communication: A Case Study of Federal Statutory Antiquation, 22 *Harvard Journal on Legislation* 47, 69 (1985).

would be useful for any type of investigation, at any level of suspicion, and with or without more traditional techniques. As there is a history of policy in this area, extension of protection could arguably be consistent with what now exists.

4. OTA has identified three major options for congressional consideration with respect to policy on interception of the content of telephone calls: a) treat all phone calls similarly from the perspective of the extent of protection against unauthorized interception, i.e., extend Title 111 to cover all phone calls whether analog, digital, cellular, or cordless; b) formulate specific policies depending on the technological constraints and possibilities; and c) do nothing and leave the development of case law to determine policy, depending on individual circumstances.

Each of these options is discussed below in terms of the dimensions developed in chapter 2 (see table 6).

Option A.–The basic rationale for treating all phone calls similarly is that a phone call is a phone call. Therefore, regardless of the system of transmission (digital or analog, wire, satellite, microwave, or fiber optics), the phone used (conventional, cordless, or cellular), and the phone system employed (common carrier or private), phone conversations would be accorded the same protection.

There are two advantages to this approach. The first is that both individuals and investigative authorities would know their rights and responsibilities. A clear policy would disadvantage no one. The second is that the policy incorporates a standard that endures beyond technological changes. If a new type of phone is invented, or a new system for transmission of phone calls, the legal status would be clear to manufacturing companies, customers, investigative authorities, and the courts. Future confusion would be avoided.

Another strong argument for treating all phone calls similarly is that they have been accorded a historical expectation of privacy. Administrative and legislative actions prior to passage of Title III, experience with Title

III, and public opinion over time are all supportive of protection for the privacy of phone calls. The analogy here is quite direct.

With respect to the governmental investigative interest involved and the stage of investigation at which it would be appropriate to allow interception, the standards developed in Title III for law enforcement and in FISA for intelligence purposes could be used for all phone calls. The standards for interception of phone calls for purposes of the proper administration of Government programs have not been formulated and are in need of legislative attention.

Option B.–The advantage of formulating specific policy depending on the technology involved is that policy would directly address the peculiarities of each technological situation. Policy would be precise. However, this option has three disadvantages. First, there will necessarily be a period in which there is no policy and in which the temptation will be to wait and see how the technology develops and what marketing is successful. Second, Congress will repeatedly be asked to deal with similar issues on which it will have to build individual hearing records and a separate consensus. Third, if Congress does not act quickly enough, the courts will be called on to set policy.

If this option were chosen, the standards relevant to each technology appear to be as follows:

Digital/Data Communications. -Based on the nature of the technology, the policy principles that exist in case law and legislation, and the investigative practice to date, there appears to be no reason to treat phone communications transmitted in digital form differently from those transmitted in analog form. The preponderance of evidence indicates that data communications are also in need of statutory protection against unauthorized interception. The Senate Judiciary Committee's Subcommittee on Patents, Copyrights and Trademarks held hearings on this issue on September 12, 1984. Witnesses from the Justice Department,

AT&T, and the Cellular Communications Industry Association stated the need to develop legislation protecting data communications.

The easiest and most direct policy alternative may be to amend Title III to include data communication. In October 1984, Representative Robert Kastenmeier introduced the Electronic Surveillance Act of 1984, which extended Title III definition of "intercept to include the nonaural acquisition of the contents of such communications. The Kastenmeier bill was reintroduced in the U.S. House of Representatives in September 1985 as the Electronic Communications Privacy Act of 1985 (H.R. 3378). A similar bill (S. 1667) was introduced in the U.S. Senate by Senator Patrick Leahy.

Additionally, it should be noted that computer crime legislation may also affect the security of data and data communications against unauthorized interception.

Cellular and Cordless Phones.– In designing policy for cellular and cordless phones, three separate issues need to be addressed. First, should the content of cellular and cordless phone calls be accorded a lower level of protection because the technology makes it easier to overhear such calls? If the answer is yes, then a standard based on the governmental investigative interest in intercepting such communications and the stage of the investigation needs to be fashioned.

The second issue is whether the caller and receiver should be accorded the same protection. The party using the cellular or cordless phone may know that the conversation can more easily be overheard. The other party most probably assumes that the conversation is via a conventional phone and that the usual protections apply, although under the concepts of one-party consent and assumption of risk, it is possible that the other party may not have a fourth amendment expectation of privacy. The Supreme Court's ruling in *United States v. White, 401* U.S. *745 (197),* that such practices as governmental encouragement and exploitation of misplaced personal confidence does not implicate the fourth amendment's guarantees would also appear to support this. In the Kansas cordless telephone case, the Court held that the user of a cordless phone has no expectation of privacy, but did not discuss the expectation of the other party. Under traditional principles of equity, it is necessary that the expectation of privacy for both parties be established and known in advance.

A third issue relates to the tracking potential of cellular phones. By monitoring the switching of cellular phone calls from one frequency to another, the cellular carrier can determine the location of individuals placing and receiving calls. Moreover, some companies record this information in a computer for billing purposes. At this time, precise locations cannot be determined because the cell sizes are large, but as cellular phones become more popular, cell sizes will be reduced allowing more precise tracking.[35]

The issue of tracking individuals by monitoring cellular phone calls could be dealt with by requiring investigative authorities to get a court order before getting such records from the cellular company. The standards for governmental investigative interest and stage of investigation at which this is considered appropriate would need to be addressed in legislation. Additionally, the legislation could require the cellular carrier to inform potential customers of its policies with respect to customer privacy. The model for such legislation could be the Cable Communications Policy Act.

Private Carriers.-The trend toward private carriers and combined common and private carrier systems throughout the telecommunications field indicates that the legal distinction between common and private carriers may no longer be valid. It appears that the distinction is based on a market configuration that is now outdated. Congress could enact legislation that applies equally to common, private, and hybrid communication systems.

---

"Robert L. Corn, "The Privacy Issue. " *Telocator,* September 1984.

Option C.—To do nothing and leave case law development to determine policy, depending on individual cases, has two serious disadvantages. The first is that, given the universal use of the phone system as a means of communication, lack of clear policy could lead to continued uncertainty and confusion as to the privacy accorded phone calls. The second is that major telecommunications changes are now occurring, and a belated response from Congress could detract from industry stability and growth.

5. New information technologies have also greatly increased the ability to collect and access transactional information about telephone calls, for example, the numbers and places dialed.

Because of the technological sophistication of the phone system, information on the numbers dialed and length of phone calls exists in real time and is stored for billing and administrative purposes. Access to this information makes it possible to determine patterns and interconnections in phone transactions.

Pen Registers.-Pen registers are devices that are attached to a telephone line to record the dialed pulses based on equipment that senses changes in magnetic energy. With a rotary phone call, a very sensitive radio receiver some distance from the wire can also pick up the pulses. Deciphering the numbers dialed by touch-tone phones is somewhat more difficult because the magnetic energy is weaker. Induction coils attached directly to the wire can pick up the signals, but radio receivers cannot.

Pen registers can pick up the number dialed and the length of the phone call. With a reverse phone book, one can then determine the party that was called. In order to install a pen register, one needs the cooperation of the phone company. Each pen register costs about $4,000 to install and monitor, depending on the length of time it is installed.

Automatic Billing Equipment.–With computer-controlled electronic switching systems, it is not necessary to use a pen register to determine calls dialed. Instead, the switch controller can automatically collect information on all calls, toll and flat rate. This can be done for both online data (real time) and for billing purposes. The information is retained on tape and can be accessed when needed.

6. Transactional information about phone calls (e.g., numbers and places dialed) is not clearly protected under existing statutes and judicial precedents on surveillance. Yet access to such information represents a significant threat to civil liberties and a significant potential benefit to investigators.

Title III was directed at the interception of the substance of phone calls and did not address the question of interception of numbers dialed. Transactional information is becoming more valuable as more of it is available and can be cross-referenced.

Pen Registers.–Given the present Supreme Court interpretation of Title III, Government officials do not need a Title III warrant to install pen registers. In 1977, the Court ruled in a 5-4 decision in *United States v. New York Telephone Co.,* 434 U.S. 159, that the FBI did not need a Title 111 warrant to use pen registers because the pen register intercepted nonaural communications and because the legislative history of Title III indicated that Congress intended to exclude pen registers.

Given the present Supreme Court interpretation of the scope of the fourth amendment, an individual cannot claim an expectation of privacy that numbers dialed will remain free from Government interception. The Court reached this ruling in *Smith v. Maryland,* 442 U.S. 735 (1979), in which it argued that Smith assumed the risk that the phone company might reveal all the numbers he dialed.

According to the Justice Department, the Foreign Intelligence Surveillance Act requires that law enforcement officers obtain a court order before using a pen register.[36] The Justice Department currently requires its investigative departments to obtain a court order before installing a pen register. However, the

[36]John Keeney of the U.S. Department of Justice, Statement Before the Subcommittee on Patents, Copyrights and Trademarks of the Senate Judiciary Committee, Sept. 12, 1984.

court order does not require evidence of a link to illegal activities and does not require judicial review of the reasons for the pen register. Its purpose is to secure the cooperation of the telephone company. The court order generally authorizes the pen register for 30 days. Other Federal agencies appear to follow the Justice Department's guidance on this matter.

Automatic Billing Information.—The information that the telephone company retains for billing purposes and the information that is sent to customers on their bills is currently available to investigative authorities if the company chooses to cooperate in relinquishing the information. The telephone company's position has been that it will not release information without a court order or subpoena. Based on the Court's ruling in United *States v.. Miller,* 425 U.S. 435 ( 1976), it is difficult to see how an individual could successfully argue that he or she had a privacy interest or property right in this information.

Investigative authorities can generally get billing information from the phone company with a court order or a grand jury subpoena, which does not require probable cause. Recently, the Federal Government announced a plan to monitor long-distance telephone transactions from Federal offices with computer software that can be programmed to select specific information, e.g., phone calls to Dial-a-Joke, Sports Highlights, and Reno, and phone calls over a certain duration or at certain times of the day. The President's Council on Integrity and Efficiency is carrying out this program to reduce the Federal phone bill by discouraging and detecting abuse. " Some have criticized this program because of the possibility that phone calls to congressional offices and news reporters may be monitored as well.

Civil Liberties v. Governmental Interests. In terms of the dimensions introduced in chapter 2 to determine the threat to civil liberties from a particular surveillance technique, the

nature of phone transactional information is less personal than the content of phone calls and may, therefore, deserve a lower level of protection. The nature of the information will vary depending on whether it is real-time information, in which case the present location of both parties is also divulged, or historical information. The former would appear to warrant more protection as it is more specific.

With respect to the public or private nature of the communication, transactional information is never considered public information, but rather is proprietary information. Clearly, the phone company needs to keep this information for billing purposes, but this does not put the information in the public realm. The protection accorded transactional information may be less than information that is kept in the home, but it is arguably deserving of a high level of protection.

The scope of surveillance that results from monitoring phone transactions is quite broad in that all phone conversations made are picked up by a pen register or recorded by the phone company. It would be difficult to minimize the scope of the monitoring, unless investigative authorities knew ahead of time the numbers they were interested in or the most likely times that relevant calls would be made,

It is very difficult at present for individuals to detect that their phone transactions are being monitored by investigative authorities. In fact, in order to learn of such monitoring, they would be dependent on the phone company or the Government. It would be fairly easy to give individuals notice of the circumstances under which phone transactional information would be sought and the uses that might be made of it.

In terms of pre-electronic analogies, such transactional information was generally not kept, not kept in detail, and/or not kept in a form that could be easily retrieved. It was, therefore, considered by individuals to be free from monitoring, The closest historical analogy to the monitoring of transactional information for surveillance purposes may be the use of mail covers.

---

See: William Safire, "Thanks for Calling," *New York Times,* Mar. 7, 1985; and Elizabeth Tucker, "U.S. to Eye All Federal Phone Calls," *Washington Post,* Mar. 9, 1985.

Information on phone transactions is potentially of great interest to investigative authorities. The Justice Department and other investigative agencies use such information primarily in the initial investigation of a case to determine whether activities of an implicating nature are occurring. Real-time information on phone transactions is also valuable in determining the location of parties, and is, therefore, valuable at any stage of an investigation. There are no traditional techniques for obtaining this information. A related OTA study on "New Communications Technology: Implications for Privacy and Security" is exploring telephone monitoring issues and policy options in greater depth.

# Electronic Mail Surveillance

# Electronic Mail Surveillance

## SUMMARY

The public expects and is provided with a high standard of protection against unauthorized opening of first-class letter mail when in paper form and delivered by the U.S. Postal Service. Constitutional provisions, case law, and postal statutes and regulations collectively provide such protection. However, when mail is sent in electronic form, the existing protections are weak, ambiguous, or nonexistent.

Electronic mail is a relatively recent marriage of computer and communications technology that makes it possible to send, transmit, and receive mail in electronic form. If desired, the electronic output can be printed out in hardcopy and delivered by the USPS or private carrier. But electronic mail also permits terminal-to-terminal communication where the message is never in paper form. Various private companies now offer electronic mail services.

OTA found that there are several discrete stages at which an electronic mail message could be intercepted and its contents divulged to an unintended receiver:

1. at the terminal or in the electronic files of the sender,
2. while being communicated,
3. in the electronic mailbox of the receiver,
4. when printed into hardcopy before mailing, and
5. when retained in the files of the electronic mail company for administrative purposes.

At each of these stages, OTA found that technological protections vary. Some, like encryption, are still perceived as relatively costly and difficult, though becoming less so. Existing law offers little protection. Portions of the Communications Act of 1934, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Postal Reorganization Act of 1970, and Foreign Intelligence Surveillance Act of 1978 may apply to some portions of the electronic mail process. But overall, electronic mail remains legally as well as technically vulnerable to unauthorized surveillance.

The interception of electronic mail at any stage involves a high level of intrusiveness and a significant threat to civil liberties. The investigative value of intercepting electronic mail will vary. But, traditionally, paper mail has been afforded a high level of protection from interception.

OTA identified three policy options available to Congress:

1. legislate a high level of protection across all stages of the electronic mail process so that electronic mail is afforded the same degree of protection as is presently provided for conventional first class mail;
2. legislate different levels of protection at different electronic mail stages; and
3. do nothing at present, pending further technical and case law developments.

## INTRODUCTION

Written communications that are sent between two parties via first class mail receive a high standard of protection against unauthorized opening. This has been well established by both case law, 13x *Parte Jackson* (1877),[1] and postal statutes and regulations.

More and more often, however, substantive communications between two or more parties are not written and sealed in an envelope, but are being typed into a computer system and sent by means of telecommunications. The merging of computers and telecommunica-

---

[1] Upheld the requirement of search warrants as a condition for opening sealed mail. Applied fourth amendment protections on that class of mail for which customers pay a certain rate to send in a sealed envelope or package.

tions opens up many possibilities for faster, cheaper, and more accurate communications. However, it also raises many questions about privacy and the security of such communications against unintentional or intentional tampering.

When electronic mail is being transmitted in data form across wires, it does not come under the purview of either Title III of the Omnibus Crime Control and Safe Streets Act of 1968, which prohibits only aural interception, or Section 605 of the Communications Act of 1934, which prohibits interception of radio transmissions. Interception of digital messages for purposes of learning the contents or altering them is prohibited by the criminal provisions of the Foreign Intelligence Surveillance Act (FISA); however, the scope of such

prohibitions is unclear. When electronic mail is in the computer memory of the sender or receiver, there are presently no specific Federal laws prohibiting acquisition of that information, although theft laws may apply as might the Computer Fraud and Abuse Act of 1984 with respect to Federal computers. Moreover, it can be argued that an individual would have a fourth amendment expectation of privacy against Government access to the message. If the message was printed into hardcopy and mailed, then the postal statutes should protect the confidentiality of the message. If the electronic mail company retains a copy of the message for administrative or backup purposes, the individual may have no legal recourse to protect the information from additional access.

# BACKGROUND

During the last few years, electronic mail began to develop a significant commercial market. It is expected that market popularity will increase as competition brings prices down and more services and improvements in existing services, especially in the connections between personal computers and electronic mail systems, are offered.[2] The main attraction of electronic mail is that it reduces, if not eliminates, time that is spent in exchanging information over the phone or via the U.S. Postal Service or a courier service. The current advantage is that electronic mail eliminates telephone tag. With time, however, the major part of the electronic mail market may be substantive messages, e.g., documents and working papers that would normally be sent through the traditional mail system. Informal messages that would normally be conveyed via phone calls may, in the long run, account for a smaller part of the market.[3]

There are currently a number of providers in the electronic mail marketplace. The U.S. Postal Service (USPS) was an early entrant into the electronic mail market offering two services: E-COM (Electronic Computer-Originated Mail), which was aimed at the domestic business market; and INTELPOST (International Electronic Post), which provides high-speed facsimile service by satellite between the United States and Europe. E-COM has been terminated, and INTELPOST, while still operating, is little used.[4]

Commercial ventures in the electronic mail market have proven more successful and more varied. MCI is now one of the largest electronic mail companies offering both direct computer-to-computer messaging and mixed systems that combine electronic input and transmission with hardcopy output and delivery. One reason MCI can offer inexpensive ef-

[2] See EMMS Newsletter, May 1, 1985, p. 1.

[3] David Roman and Stan Writen, "Electronic Mail: Faster Than a Speeding Bulletin," Computer Decisions, July 1984, vol. 16, No. 9, pp. 146-160.

[4] See James Bovard, "Zapped by Electronic Mail," Across the Board, June 1985, p. 42; House Committee on Government Operations, "Postal Service Electronic Mail: The Price Still Isn't Right," House Rep. No. 98-552, 1983; and House Committee on Government Operations, "INTELPOST: A Postal Service Failure in International Electronic Mail," House Rep. No. 98-675, 1984.

ficient services is that it owns a low-cost, long-distance telephone network.[5] In the spring of 1984, Federal Express entered the electronic mail market with its Zapmail service which provides 2-hour delivery of facsimile copies for up to five pages of text. ITT has targeted its DIALCOM services, including computer-to-computer electronic mail, telex, telegram and courier delivery, into large corporations and the Federal Government. The White House, for example, uses DIALCOM for electronic mail communications with some 22 Federal agencies. GTE Telemail has also been successful in the corporate marketplace. The Source and CompuServe provide an array of computer information services, including electronic mail and various electronic bulletin boards.

As generally used, electronic mail refers to messages that are sent between computer terminals via telephone lines.[6] This does not merely include terminal-to-terminal systems, but also can be interpreted to encompass telegraph, telex, teletext, facsimile, voice mail, and mixed systems that electronically transmit messages, some of which may be subsequently delivered by the postal system or a courier service. A brief description of each of these is presented below:

. Telegraph: A system that transmits one-way electronic messages along circuits within a network of central and branch telegraph offices, where the electronic messages are translated by the receiving operator into typed messages that are hand delivered or telephoned to the recipient.

● Telex: Commonly used for international communications, this telegraph exchange system consists of: a teletypewriter terminal to translate and interpret messages into code; special telegraph circuits designed to carry the code; and a teleprinter to print the communication. Each subscriber is individually issued his or her own telex line and number that a caller dials to send messages that are keyed into

the teletypewriter terminal. The message is then transmitted to the receiver's automatic teleprinter. For international telex communications, satellite channels or transoceanic submarine cables are used.

Current Telex systems, such as the "InfoMaster," can offer delayed message delivery and a multiple address message system, while "FYI News Service" subscribers can receive general news, financial, market, and weather-related bulletins.

● Teletext: This communication system delivers text and graphic messages sequentially in one direction over a television broadcast signal or cable which are then received by a display terminal, like a television set. The receiving terminal exhibits the message on the display screen, and can store or delete the message after viewing. Similar systems that can receive as well as send messages (e.g., home banking or shopping) are known as videotex.

● *Facsimile:* Unlike the telex, this system converts a page of text or images into data. Once the input data is scanned and translated into code, ordinary telephone lines can carry the transmission to a recipient's terminal to be decoded and printed for hardcopy distribution. As an added feature, some facsimile machines, such as the "FaxPak," offer store-and-forward capability.

A typical facsimile system can transmit a page in 4 to 6 minutes, while more advanced systems can transmit the same amount of information in a few seconds.

● *Voice Mail:* Voice mail is a computer-based system designed to digitize voice from an analog signal for the purposes of relaying short messages or instructions. Like a sophisticated digital phone-answering machine, messages can be stored and forwarded, edited, retrieved, or distributed to a list of users. Future systems are being designed to incorporate options such as voice to text conversion.

● *Electronic Mail:* This computer-based message system can be divided into two categories. In the first, an electronic message is transmitted between two or more

[5] See Bovard, op. cit., p. 46; and Lawrence J. Magid, "Electronically Yours, " *PC World,* June 1984, pp. 48-54.
[6] Bovard. op. cit., p. 42.

terminals and remains in an electronic format. In the second, the message is transmitted electronically, but then converted to a hardcopy format to be delivered by traditional mail or courier service. To use a typical electronic mail system, a personal identifier number, password, the recipient's account number, and message are keyed into a terminal. This information is transmitted to a central computer and stored for viewing at the recipient's convenience. Electronic mail systems can send, receive, file, recall, edit, and store textual or graphic messages.

• *Electronic Bulletin Board:* An electronic bulletin board is an electronic mail service (or the equivalent computer-based information service) with a public or private electronic mailbox that is accessible to several persons. A public bulletin board usually is open to many or all subscribers and/or persons with a general password. A private bulletin board is limited to persons with special passwords.

The emergence of electronic mail has raised a number of policy issues, for example: what standards should be used so that competing electronic mail systems can be compatible;

should regulations for common carrier systems and private systems be the same or different; and what range of services can or should electronic mail systems offer?[7] Such issues concerning market structure, services, and regulation are beyond the scope of this report. However, issues concerning the security and privacy of electronic mail systems are germane to this study. Indeed, some believe security and privacy issues are critical to the widespread acceptance of electronic mail as a communications medium. The contents of electronic mail communications are of interest to the same parties that are interested in the contents of first-class mail communications. Thus, Government officials might be interested in accessing or maintaining surveillance of electronic mail messages for investigative purposes. Private parties might be interested in electronic mail surveillance for various competitive, personal, and/or criminal purposes.

---

[7]For discussion of telecommunications and industry structure issues see Raymond R. Panko, "Electronic Mail, " *Datamation,* vol. 30, No. 16, Oct. 1, 1984, pp. 118-122; Robert E. Kahn, Albert Vezza, and Alexander P. Roth (eds.), *Electronic Mail and Message Systems–Technical and Policy Perspectives* (Arlington, VA: American Federation of Information Processing Societies, 198 1); and issues of *EMMS Newsletter.*

## FINDINGS AND POLICY IMPLICATIONS

1. There are at least five discrete stages at which an electronic mail message could be intercepted and its contents divulged to an unintended receiver: at the terminal or in the electronic files of the sender, while being communicated, in the electronic mailbox of the receiver, when printed into hardcopy, and when retained in the files of the electronic mail company for administrative purposes. Existing law offers little protection.

From a policy perspective, the laws that might be extended or drafted will vary by these five stages because of the historical development of telecommunications and privacy law. Moreover, the technological protections that are available will also depend on the stage of the communications process. Therefore,

each stage needs to be analyzed separately to discern policy problems and policy options."

Terminal or Electronic Files of Sender.–At this stage, messages could be intercepted by accessing the computer system of the sender for purposes of reading the message or altering its content. In the case of interception by Government officials, the individual would probably be successful in arguing that he or she had a fourth amendment expectation of privacy in the contents of computer files. Although these are not "papers" in the traditional sense, they are arguably the computer-age equivalent. They are also stored within a

---

[8]See *ACLU Focus Paper on Electronic Mail,* Jan. 29, 1985, for a similar discussion.

computer file that belongs to the individual, perhaps not in a tangible property sense, but at least in an intangible one, depending on the storage arrangement. If the computer was at home, the individual's expectation of privacy would be greater than if it was an office computer, but use of passwords and access codes would indicate that the individual took precautions at the office to ensure an expectation of privacy. The fourth amendment status of messages held in the computer file of the sender could be clarified by statute. The FBI reported that on the occasions where it has had to acquire information from a data bank, it secured a search warrant as it would have done before going into a residence looking for information.[9]

In the case of private parties accessing electronic mail in the terminal of the sender, there is no specific statute that would protect the confidentiality of the message. At this time, State laws probably offer more protection than Federal laws. Theft laws might apply under some circumstances, although these are framed in terms of physical breaking and entering, and in terms of tangible property. Computer crime laws may also offer some protection against unauthorized private access.

There are also some technical measures that can be adopted to protect the contents of a computer file. Sophisticated password and/or key systems can be used to deter unauthorized access. Audit trails can be developed to detect unauthorized access. Although such systems may not be foolproof, their use will give additional legal weight to someone arguing that their computer mail files are expected to be private.

In Transmission.—At this stage, messages can be intercepted by tapping into the wire over which the message is being sent, breaking into the fiber optic cable, or intercepting satellite or microwave signals. Regardless of the technology used to transmit electronic mail messages, existing law offers little protection against unauthorized interception. Title III of the Omnibus Crime Control and Safe Streets Act would not require Government of-

ficials to get a court order before setting up a tap because electronic mail is sent in digital form. Voice mail may be protected under Title III, depending on the interpretation accorded aural communication. (See chapter 3 on telephone surveillance.) Section 605 of the Communications Act of 1934 would not apply unless the electronic mail was being communicated via radio signals, which is rarely the case. Additionally, the purviews of Title III and Section 605 are limited to common carrier communications. Electronic mail systems that use private carriers, e.g., internal company mail systems, would not come under either act. The criminal penalties of the Foreign Intelligence Surveillance Act may prevent Government officials from intercepting digital communications, but it is unclear if these penalties apply to interceptions other than for foreign intelligence purposes.

Again, there are some technical measures that can be used to protect the integrity of a message during transmission. The message can be encrypted using the data encryption standard (DES) or some other code that scrambles or packages the message in a way that makes it difficult to decipher. However, encryption has been expensive and time-consuming on both ends, although costs are dropping.

In the Electronic Mailbox of the Receiver.—At this stage, messages can be intercepted by breaking into the computer terminal of the receiver, if the receiver has one that is used as an electronic mailbox, or into the computer terminal of the electronic mail company where an individual has rented his or her mailbox. In either case, the individual should have a fourth amendment expectation of privacy against Government interception. This expectation will be higher if the mailbox is in the individual's *own* computer terminal, but because renting implies property rights the expectation should also apply if the mailbox is held on the company's terminal. Protection against private party interception would depend on the coverage of theft laws and computer crime laws.

When Printed Into Hardcopy Before Mailing.—Once mailed, the contents of the enve-

lope would receive the same protections that are accorded first class mail. However, there would be no legal protection for the message during the time it was being printed out and before it was put into the envelope. During this time the individual would be dependent on the policy of the electronic mail company and the discretion of its employees.

When Retained by the Electronic Mail Company for Administrative Purposes.-All electronic mail companies retain a copy of the message both for billing purposes and as a convenience in case the customer loses the message. Based on the reasoning in *United States v. Miller, 425* U.S. 435 (1976), where the Court ruled that records of financial transactions, including copies of personal checks, were the property of the bank and that an individual had no legal rights with respect to such records, it is possible that an individual would not have a legal basis from which to challenge an electronic mail company's disclosure of the contents of messages or records of messages sent.

The issue of the privacy of personal information retained by a third party is not unique to electronic mail. It is important to note, however, that access to the administrative files of electronic mail companies can reveal a great deal of information about an individual-the substance of communications, the record of persons communicated with, and the locations of sender and receiver.

The question of the legal status of electronic mail information retained by the company is presently before the courts in a case in which the Government subpoenaed transactional and substantive records of The Source (Source Telecomputing Co.) related to M.V.S. Associates, Inc., Elite Fleet, Inc., and/or Leo Radosta. Leaving aside the questions of the possibly excessive breadth of the subpoenas, the legal question appears to turn on whether The Source is merely the temporary custodian of records, in which case an individual can use fifth amendment protections to prevent disclosure.'" Regardless of what the courts may

—.. . ., —---
[10]See: *Couch v. United States, 409* U.S. 322 (1973) and *Bellis v. United States, 417* U.S. 85 (1975).

decide based on the facts in this case, the issue requires attention.

2. The interception of electronic mail at any stage involves a high level of intrusiveness and a significant threat to civil liberties. The investigative value of intercepting electronic mail will vary. But traditionally, paper mail has been afforded a high level of protection from interception.

In order to determine the implications for civil liberties of intercepting electronic mail and the governmental interest in such interception, the electronic mail process as a whole needs to be evaluated in terms of the dimensions developed in chapter 2 (see table 6). This will aid in determining if there is a level of protection against interception that should be guaranteed, regardless of the stage in the process at which the message maybe intercepted.

In terms of the nature of the information, electronic mail surveillance can include both the content of specific exchanges of information, and transactional information concerning the time of the communication and location of the parties. Both types of information may be of a personal nature.

Electronic mail communications generally are intended to be private communications be tween two parties or among a specified group. The technology employed will allow different degrees of privacy, i.e., personal computer to personal computer communications are inherently more private than electronic mail company to hardcopy delivery communications. Despite the variations in technology, electronic mail communications (including private electronic bulletin boards) usually are intended for private consumption, with the notable exception of public electronic bulletin boards that are open to a broad range of subscribers or users.

In terms of the scope of surveillance, interception of electronic mail communications can be quite broad depending on the extent to which electronic mail is used by a particular individual. Interception of a large volume of electronic mail communications may well be construed as a fishing expedition.

It is very difficult for an individual to determine if electronic mail has been intercepted, regardless of the stage at which it is intercepted. While in the terminal of the sender or mailbox of the receiver, audit trails and passwords can help in detecting interceptions or attempted interceptions. While being communicated via the telecommunications system, it is virtually impossible for the individual to detect interception. If someone attempts to intercept the message while it is physically being mailed, the post office might detect such an attempt and, if so, might inform the individual. The individual's ability to detect interception of mail while it is retained in the files of the electronic mail company will likewise de penal on the cooperation of the company.

The pre-electronic analogy for electronic mail is probably quite direct—first class mail. Traditionally, first class mail has been accorded a high level of protection from interception.

The governmental interest in intercepting electronic mail will, of course, vary based on the purpose of the investigation, the degree of suspicion, and whether or not other means have been attempted to secure similar information. However, given the high threat to civil liberties posed by interception of electronic mail, it appears that the governmental interest in interception would have to be quite compelling.

3. OTA identified three policy options that are available to Congress. The first would be to legislate a similar level of protection across all stages of the electronic mail process. The second option would be to accord different protections according to perceived differential impacts on civil liberties at particular stages. The third option would be to do nothing.

These three policy options are briefly discussed below.

Option A.–Based on the analogy to conventional first class mail and the level of intrusiveness that interception of electronic mail entails, Congress could provide the same degree of protection for electronic mail that it presently provides for conventional first class

mail. Using this as an operating assumption, Congress would need to pass legislation that included the following:

- Prohibition on unauthorized access to an individual's computer file or individual's electronic mailbox unless a court order has been obtained. Two levels of court order may be appropriate. For purposes of intercepting the contents of a file, a court order could be obtained for national security, domestic security, and law enforcement purposes if there is probable cause to believe the individual is implicated in illegal activity. For purposes of determining the transactions the individual engaged in, the requirements for a court order could be the same as for a mail cover (monitoring the names and addresses on the outside of the envelope). The same standards would apply regardless of whether the mailbox was in a personal computer or held by an electronic mail company.

- Prohibition on unauthorized interception of data communication. Although the analogy is still to first class mail, the vehicle for protection is more likely an amendment to Title 11 I that would protect all data communications transmitted over wire.

- Establish the rights of the individual and responsibilities of the company when information is retained by the electronic mail company. The "Subscriber Privacy' provisions of the Cable Communications Policy Act of 1984 may serve as a model. Although it is premature to judge the effectiveness of the "Subscriber Privacy" provisions of this act, comments on the enforcement scheme are in order. In general, the subscriber is dependent on the cable company for information regarding the potential conflicts between the company's practices and the individual's privacy. For example, the company is to inform the subscriber of the uses and disclosure of personally identifiable information. Practically speaking, this may just mean that at the time the individual signs

the contract, he or she is given a sheet of paper containing the company's general policies. The individual may or may not understand, or even read, the information.

The act does place restrictions on the cable company's collection and disclosure of personally identifiable information, but the restrictions are very vague. For example, "A cable operator may disclose such information if the disclosure is necessary to render, or conduct a legitimate business activity related to a cable service or other service provided by the cable operator to the subscriber. " From a surveillance standpoint, the act does require a Government entity to obtain a court order for access to personally identifiable information. The court order must offer evidence that the subscriber "is reasonably suspected of engaging in criminal activity and that the information sought would be material evidence in the case. The individual must be given "the opportunity to appear and contest such entity's claim. "

Option B.—Under this option, Congress could decide that stages one and three (the terminal of sender and electronic mailbox of receiver) should be accorded more protection because they involve places that are more Private and because it would be harder for individuals to detect interceptions unless they were maintaining fairly secure personal computing systems. Congress may not want to take any specific action with respect to the second stage (transmission), but leave it to the resolution of the aural limitation in Title III. Likewise, with respect to interception of information held by the electronic mail company, Congress may wish to treat, in a systematic fashion, all personal information held by third parties.

Option C.–Congress could continue to do nothing at this time and watch the development of the electronic mail market and evaluate case law development. However, there are costs in pursuing this option. The market developments seem clear and the time appears ripe for policy guidance before rights and responsibilities become more confused. Additionally, because of the number of stages at which electronic mail can be intercepted and the range of governmental interests in intercepting electronic mail, the case law development will most likely be very specific to the issues raised in particular cases, and will fall short of a national policy.

# Other Surveillance Issues: Electronic Physical, Electronic Visual, and Electronic Data Base Surveillance

# Other Surveillance Issues

## SUMMARY

### Electronic Physical Surveillance

Maintaining physical surveillance of individuals is, traditionally, one of the most expensive and risky surveillance techniques used by law enforcement agencies and others. Portable telecommunications devices are now offering a viable substitute in many cases. For example, electronic beepers emit a radio signal that can be monitored in order to track the movements of a car or piece of property to which a beeper is attached. Also, electronic pagers—increasingly used by busy executives, repair personnel, doctors, and the like-can be intercepted to reveal information that may be useful in determining the subject's location and activity.

OTA found that Federal investigative authorities are making extensive use of beepers for conducting electronic physical surveillance of persons and goods, but limited use of paging monitors. OTA also found that legislated policy on beepers and pagers is ambiguous and incomplete, although the U.S. Department of Justice believes that at least some beeper and pager surveillance applications require a search warrant under judicial interpretations of fourth amendment protections.

Based on criteria used to determine the threat to civil liberties-nature of information, nature of place or communication, scope of surveillance, surreptitiousness of surveillance, and pre-electronic analogy-electronic physical surveillance appears to fall somewhere in the middle. The investigative and law enforcement interest appears to be significant-especially for beepers.

OTA identified three options for congressional consideration: 1) legislate one policy for all forms of electronic physical surveillance; 2) formulate separate policies for beepers and pagers; or 3) do nothing at this time.

### Electronic Visual Surveillance

Electronic visual surveillance through the use of cameras is an alternative to physical surveillance. In the past, however, the size, cost, and technical requirements of cameras have limited their effectiveness and usefulness. But the latest generation of cameras is smaller, cheaper, and easier to operate. There already is a significant level of video surveillance of public places, such as the use of closed circuit TV in banks, building lobbies, retail stores, and the like. In addition, video surveillance of private places is used for investigative and law enforcement purposes.

OTA found that electronic visual surveillance-whether in public or private places—is not covered by current Federal law, including Title III of the Omnibus Crime Control and Safe Streets Act. The U.S. Department of Justice does voluntarily comply with some provisions of Title III. Even under Department of Justice guidelines, electronic visual surveillance of private places is considered legitimate and does not require a warrant if one party has consented to the surveillance, even if that party is an undercover agent or informer.

Electronic visual surveillance appears to pose a substantial threat to civil liberties, especially if conducted in private places and with audio surveillance. The law enforcement interest varies depending on the stage of investigation.

OTA identified five congressional policy options for addressing visual surveillance:

- legislate that such surveillance is prohibited as an unreasonable search under the fourth amendment;
- subject electronic visual surveillance to a higher standard than currently exists

under Title III for bugging and wiretapping;
- treat electronic visual surveillance in the same way as electronic audio surveillance;
- apply a lower standard; and
- do nothing.

### Data Base Surveillance

As computerized record systems and data communication linkages become widespread, the potential for computer-based surveillance of the movements and activities of individuals also increases. Various Federal agencies already maintain computerized record systems that could be used as part of a data base surveillance network. Four examples of such systems are: the National Crime Information Center (FBI), Treasury Enforcement Communications System (Treasury), Anti-Smuggling Information System (Immigration and Naturalization Service—INS), and National Automated Immigration Lookout System (INS).

Federal agencies believe that these and other systems are essential to carrying out their authorized responsibilities. However, the systems could include files on any definable category or type of persons, and could be interconnected with numerous other computerized systems.

Based on the results of the Federal Agency Data Request, OTA identified 85 computerized record systems used for law enforcement, investigative, and/or intelligence purposes with, collectively, about 288 million records on 114 million persons. The Departments of Justice and Defense have by far the largest number of systems and records. None of the agencies responding provided statistics on record quality.

Based on a review of technology and policy developments, OTA found that:

- It is technically feasible to have an interconnected electronic network of Federal criminal justice, other civilian, and perhaps even military record systems that would monitor many individual transactions with the Federal Government and be the equivalent of a national data base surveillance system.
- The legal and statutory framework for national computer-based surveillance systems is unclear.
- A central policy issue with respect to computer-based surveillance systems is designing and implementing a mechanism to simultaneously: 1) identify and authorize those applications that have a substantial law enforcement or intelligence value; 2) minimize any adverse impacts on individual rights from authorized use of the systems; and 3) protect against unauthorized and/or expanded use of the systems and the substantial impacts on constitutional rights that might result. Establishment of a data protection board is one option that warrants consideration.
- Other available options, not necessarily mutually exclusive with establishing a data protection board, include: placing data base surveillance applications under Title III of the Omnibus Crime Control Act; requiring congressional approval of specific data base surveillance systems (e.g., by statutory amendment or approval of House and Senate authorizing committees); establishing general statutory standards for surveillance applications; strengthening Office of Management and Budget (OMB) and/or agency oversight roles with respect to data base surveillance; and maintaining the status quo.

# PART I: ELECTRONIC PHYSICAL SURVEILLANCE

## Introduction

In the past, physical surveillance has generally required around-the-clock agents with backups at various points and has entailed a high risk of detection by the party under surveillance. Monitoring by portable telecommunications devices, or tracking devices, provides a much less conspicuous way of following the physical activities of an individual, a car, or an item, Monitoring by portable telecommunications devices is relatively risk-free in terms of detection. Physical surveillance can be more efficient with the use of portable telecommunications devices. However, electronic tracking may cost more because surveillance can be carried out for a longer period and because of the staff necessary to monitor the information received.

Electronic physical surveillance does raise questions about the rights of individuals under surveillance and the responsibilities of investigative agencies. The availability of new electronic physical surveillance devices to law enforcement agencies is likely to have significant effects on the investigative process. Before the invention of such devices, it was generally assumed that an individual who was engaged in illegal activity was suspicious and was, therefore, aware that someone might be watching. It was also assumed that governmental agents would not invest the resources to watch someone unless they were quite certain that criminal activity would take place. Therefore, it was not thought necessary to legislate restrictions on investigative physical surveillance.

However, these assumptions can no longer be made in an environment that has been changed so dramatically by portable telecommunications devices. It is now easy to attach a beeper to a car or item and follow its move-

ments. Pagers also offer opportunities for monitoring activities. Interception of information destined for pagers that can receive numeric or alphanumeric data could be revealing about the recipient's location or activities. While simple tone-only pagers offer no real surveillance potential, more sophisticated pagers with the ability to receive messages are likely to become commonplace in the next few years. Future paging technology may also be able to function as an electronic mail or data communications terminal. Because of these technological changes, it is necessary to consider whether legislative action is needed to determine when such devices can or should be used for monitoring purposes.

## Background

Before analyzing policy issues and policy options, a brief review of the technological development and potential of portable telecommunications devices will be presented to provide a context for the policy discussion.

### Pagers

Electronic paging became a possibility in 1949 when the Federal Communications Commission (FCC) allocated three bands of radio frequencies for mobile communications. Those licensed to use these frequencies were considered radio common carriers. Electronic paging did not become popular until the 1960s when the FCC allocated more frequencies, and doctors and traveling salespeople began to use them to stay in touch with the office. In the 1980s, the use of electronic pagers expanded as lawmakers, lobbyists, repair personnel, business executives, and parents began to realize their potential as a means to stay in touch. The number of pagers in use has grown significantly and is expected to increase. In

1976, there were an estimated 424,000 pagers; in 1982, an estimated 2.2 million.[1] Arthur D. Little, Inc., expects that by 1990, 10 million people will carry personal mobile message machines.[2] Arthur D. Little anticipates that public systems will carry 80 percent of paging traffic, and private systems 20 percent.[3]

A number of pagers are available today, and others are in the development stages.[4] Tone-only pagers, which beep or vibrate to inform the wearer to call in, are still the most popular. There are also tone-voice pagers that give the wearer a 12-second voice message. A newly marketed pager uses a 10- or 12-digit liquid crystal to display messages. Such pagers could be used to convey information to the wearer, ranging from phone numbers to stock information to a patient's medical history to a coded message. A device that is presently being developed is the voice-retrieval system for paging. With this pager, the caller's voice message is stored digitally and is retrieved when the subscriber is ready to receive the message. The voice message is broadcast over a regular FM signal or an FM subcarrier signal, as is the case for cellular phones. Another pager in development that is thought to have great market potential is the alphanumeric pager, which displays alphabetical as well as numerical information. Some companies are developing pagers that could print hard copy, thus transforming pagers into pocket data terminals.

As the technology develops, the cost of pagers and the subscription fees are dropping. The size and attractiveness of pagers are also adding to their marketability .-Moreover, the FCC is taking action to expand the market for pagers. Recent FCC decisions will more than quadruple the frequency spectrum available for paging. More paging channels have been allocated to the Private Carrier Paging Service, and paging can also be provided now over FM subcarriers.[5]

A potentially significant effect of recent FCC decisions is the creation of regional and national paging networks. In January 1982, the FCC allocated new frequencies in the 900 MHz band to radio common carriers to develop local and wide-area paging. In May 1982, the FCC set aside one channel at 900 MHz for nationwide paging and two channnels for either regional or national paging, depending on consumer interest. In May 1983, the FCC made all three channels available for nationwide paging. In April 1984, the FCC, on the basis of a lottery, awarded licenses for these three channels. It is expected that a nationwide paging network will be in full operation in 1986.[6] The nationwide networking systems will use satellites and terrestrial phone systems to transmit signals.[7]

Paging radio technology also has enabled the development of automatic vehicle location (AVL) systems. By using the Long Range Navigation system (LORAN-C) of the Department of Transportation, it is possible to locate vehicles based on radio signals sent from the vehicle, to a transmitter, to a base station. With the use of an intelligent modem, information on the location of the vehicle can be communicated to a central points

### Beepers

Beepers, also known as "bumper beepers" or "bird dogs, " are electronic transmitters that generate a series of pulses and are used as a tracking device, frequently by law enforce ment agencies for covert operations. A series of pulses is transmitted every 2 seconds. Beepers are about 4 inches long and 2 inches

[1] Penny Pagano, "Thousands Heed Beeps From Pagers, " *The Los Angeles Times,* Oct. 20, 1984.

[2] Nell Henderson, "Beepers **Said to Link Legions of Area's Workaholics,** " *The Washington Post*, Oct. 22, 1984.

[3] Telocator Members Told That Paging to Prosper in the Future." *Telocator Network of America Bulletin,* Sept. 28, 1984.

[4] For a more detailed description of the various pagers and the technology involved see: John G. Posa, "Radio Pagers Expand Horizons, " *High Technology,* March 1983, pp. 44-47, and "Special Report– RCC, " *Broadcasting,* Oct. 4, 1982.

[5] "Telocator Members Told that Paging to Prosper in the Future. " op. cit.

"Nationwide Paging, " Information sheet distributed by Telocator Network of America.

[6] " F.C.C. Moves Toward National Paging System, " *The New York Times,* Aug. 20, 1984.

[7] "Bob Jane, *"The 'Landsmart' AVI. System, " *Telocator*. August 1983.

wide with a thickness of three-fourths of an inch. Three U-shaped magnets on the bottom of the beeper are covered by a metal "keeper plate" which is sheathed over the magnets when not in use. The metal plate is removed and magnets exposed to attach the beeper to a bumper, underneath a dashboard, or to any metal protrusions. Cars, ships, trucks, and metal containers can be tracked using beepers.

Self-contained batteries supply the power source for beeper transmissions. A remote receiver is used to pick up signals. This receiver can be located in a car, an airplane, or a helicopter, From the air, a helicopter traveling 6,000 feet above the ground can pick up signals within a 250-mile diameter. From the ground in a metropolitan area, a vehicle can pick up signals within a distance of approximately 1 mile.

The beeper receiver can pick up three types of information, The first is directional information that determines the position of a vehicle and the direction it is heading. The second indicates whether a vehicle is stationary or moving. The third involves the relative distance to the vehicle being tracked.

The FCC sets regulations on beeper frequency levels, power ratings, and the like and is involved in the authorization and licensing process for law enforcement use of beepers. The results of the OTA Federal Agency Data Request indicated that 13 Federal agency components currently use beepers, with two other agency components planning such use.

## Findings and Policy Implications

1. OTA found that Federal investigative authorities are making extensive use of beepers for conducting electronic physical surveillance of persons and goods, but limited use of paging monitors. Legislated policy for beepers and pagers is ambiguous and incomplete.

The OTA Federal Agency Data Request and discussions with representatives of the Departments of Justice, Treasury, and Defense indicate that investigative authorities are making extensive use of portable telecommunications devices in conducting physical surveillance of persons or goods. Beepers are often attached to vehicles or goods, e.g., shipments of guns, drugs, or materials used in the manufacture of illegal substances. Monitoring of paging devices is not yet a major surveillance technique, in part because they are not thought to be used extensively by persons engaged in illegal activities, except for drug dealers,' and because the geographic range of use is narrow. Both of these features are presently changing. Paging devices would clearly meet the needs of anyone who was trying to make connections to buy or sell goods, or to indicate that a meeting was to take place. Once investigative authorities perceive that paging devices are being used in this way, there will be interest in monitoring them. The development of a nationwide paging system will also make paging devices more attractive to a variety of customers, and also to investigative authorities as a way of monitoring long-distance movements and transactions.

## Pagers

Presently, there is no formal executive, legislative, or judicial policy with respect to the interception of pagers for investigative purposes. According to the Justice Department, the protections afforded pagers depend on the type of pager. The interception of "tonal pagers, " emitting only a sound, does not require either a warrant or court order. Title III does not apply because it is not an aural communication; the Foreign Intelligence Surveillance Act (FISA) does not apply because paging is not a data communication. The interception of a display pager is not covered by Title III because it is not an aural interception, but would be covered by FISA because it conveys information in digital form. The Department of Justice's policy is that interception of tonal pagers involves a sufficient invasion of privacy that a court order should be secured prior to interception. Additionally, the Department of Justice believes that users of display pagers have a reasonable expectation of privacy based on the fourth amendment,

'Interview with Maureen Killian, Department of Justice, Sept. 4, 19H5.

and that a search warrant should be obtained under Rule 41 of the Federal Rules of Criminal Procedure. The interception of "tone and voice pagers" would, the Justice Department believes, require a Title III warrant because aural communication is involved.[10]

### Beepers

The use of beepers for surveillance purposes has been the subject of two Supreme Court cases. In *United States v. Knotts, 103 S.* Ct. 1081 (1983), the Court ruled that the warrantless monitoring of a beeper was not a search or seizure under the fourth amendment, because there was no reasonable expectation of privacy as the movements being tracked were all public. A year later, in *United States v. Karo, 104 S.* Ct. 3296 (1984), the Court ruled that using a beeper to trail a container into a house and to keep in touch with it inside the house did violate the fourth amendment. The Court found a legitimate expectation of privacy in the house, and what it considered an equally legitimate expectation of privacy that anything coming into a house would do so without a Government surveillance device. The Justice Department policy on the use of beepers follows the Supreme Court's holding, i.e., a warrant is required if a beeper is potentially going to invade someone's privacy. The Department of Justice advises agents to get a warrant for any use of beepers beyond use on a car.[11]

2. Based on the dimensions used to determine the threat to civil liberties as introduced in chapter 2, electronic physical surveillance falls somewhere in the middle. The governmental investigative interest appears to be significant—especially for the use of beepers.

The nature of the information obtained by electronic physical surveillance depends on the device used. The information divulged by portable telecommunications devices varies with the device. Beepers only yield limited informa-

tion on the location and movements of individuals, cars, or items. Voice pagers and display pagers disclose the content of a message, however brief and cryptic the message might be. Beepers and tonal pagers do not disclose the number of individuals in a location or the activities in which they are engaged.

Electronic physical surveillance does not discriminate between public and private areas, and can be considered intrusive when it allows the monitoring of movements in private areas. Investigative agents who are conducting the monitoring can minimize the intrusion by turning off their devices when parties or objects enter private places.

Electronic physical surveillance casts a narrow net in that it does not involve people who are not specifically under surveillance, unless they are passengers in a car.

It is difficult for an individual to determine whether a beeper has been attached to a car or article. Beepers are easily concealed because of their size. Some may be detected with a metal detector or other sensor; however, one would have to be looking for a beeper in order to find it. It is almost impossible for an individual to detect whether a signal or message that has been transmitted to a pager has been intercepted. It would be relatively easy to warn individuals who subscribe to paging services that the signals and messages received can be monitored by others.

The closest pre-electronic analogy to electronic physical surveillance of public places is physical surveillance on foot or by automobile, while the analogy to surveillance inside private premises is to police undercover work. There has been limited restriction on the use of undercover agents. If they are too aggressive, their case may be dismissed because of entrapment. In general, undercover agents have not been considered an infringement on one's expectation of privacy because an individual is thought to assume the risk of his or her involvement with others. Congress has recently been considering whether such a risk is realistic or if there needs to be some guidance for the types of roles or relationships in which un-

[10] See John Keeney, U.S. Department of Justice, Statement Before the Subcommittee on Patents, Copyrights and Trademarks of the Senate Judiciary Committee, Sept. 12, 1984.

[11] Remarks, Fred Hess, Criminal Division, U.S. Department of Justice, OTA Workshop, May 17, 1985.

dercover agents can engage. Although police undercover work is the closest historical analogy, it may not apply in the same way to electronic physical surveillance because it is based on the assumption of risk. It would be difficult to argue that one assumes the risk that one's movements are always being monitored by a beeper. It would not be as difficult to assume that, if one was carrying a pager, one's activities may be monitored. However, use of pagers may decline if this assumption were widely held.

The governmental interest in using electronic physical surveillance will once again vary with the purpose of the investigation, the degree of suspicion, and whether or not other means have been attempted to secure similar information. Use of beepers and interception of pagers occur in all types of investigations, although they are probably used most often in law enforcement investigations. Electronic physical surveillance is used at all stages of an investigation, but is probably most useful in building a record for probable cause. Electronic physical surveillance is more effective and may be less costly than techniques that are less technologically sophisticated.

The accountability of authorities for use of electronic physical surveillance devices is generally fairly low. They are considered tools of routine investigative use, and can usually be authorized by the agent in the field. If a question of privacy invasion is raised by the use of surveillance devices, then authorization should be obtained from agency headquarters. It is possible to build in a method of accountability, such as authorization by a bureau head for a limited period of time with review and reauthorization possible, and standards of accountability based on the stage of investigation and governmental interest.

*3.* OTA identified three options for congressional consideration with respect to policy on electronic physical surveillance: a) fashion one policy for all forms of electronic physical surveillance; b) design separate policies for beepers and pagers; and c) do nothing at this time.

**Option** A.–Fashioning a policy for all forms of electronic physical surveillance is an attractive option in that it is not dependent on specific technological devices and, therefore, will set standards and principles for the future as well as the present. However, given the differences in types of portable telecommunications devices and the different ways in which they are used, it may be difficult to design a comprehensive policy for this area.

Option B.—Although pagers and beepers are similar in that they allow more efficient and less detectable surveillance of physical movements, from a policy perspective they are markedly different in that a beeper needs to be attached by investigative authorities, while a pager is used by an individual. This contributes to the degree of suspicion that an individual has about the possibility of being monitored. People who carry pagers can be made aware of the potential for surveillance that these devices allow. The possibility that one's movements may be monitored by a beeper is more remote for most people. Because of differences in the active involvement of investigative authorities and in the possible awareness of targets of surveillance, it may be necessary to treat beepers and pagers separately. At this time, the differences in the type of information that can be gathered by monitoring beepers and pagers would also seem to dictate separate legislation for each.

It may also be necessary to treat pagers in a discriminate fashion depending on the amount of information that the pager receives. This option would be consistent with the present policy opinion of the Department of Justice.

Option C.–Congress could wait to act until the technology progresses, especially in terms of the development of a nationwide paging network. In formulating legislation for the proper boundaries on police undercover work, Congress may want to consider the parallels between traditional physical surveillance and electronic physical surveillance and design policy that is consistent for both.

# PART II: ELECTRONIC VISUAL SURVEILLANCE

## Introduction

As cameras have become smaller and easier to activate from a distance, they have become more attractive as a tool for watching people and recording their activities. The evidence that can be obtained from electronic visual surveillance, especially if accompanied by audio surveillance, is as complete as investigative authorities could expect. But there are questions about the intrusive nature of electronic visual surveillance, and the circumstances under which its use is appropriate. Electronic visual surveillance, more than any other form of electronic surveillance, reminds people of the specter of Big Brother watching at all times and in all places.

There is presently a great deal of electronic visual surveillance of public places. Banks have cameras running continuously to monitor both the interior teller counters and also the outside automatic teller machine areas. Airports use electronic visual surveillance in a number of places to ensure the security of the passengers and equipment. Many large department stores, as well as all-night convenience stores, use electronic visual surveillance to deter and detect shoplifting and to compile a visual record of activity. Many cities use closed circuit television to survey street corners in high crime areas, subway platforms, and entrances to public buildings. The Federal Government uses electronic visual surveillance at various Federal buildings to monitor people coming and going. Some employers, especially factory owners and those who maintain large clerical pools, use electronic visual surveillance to monitor the activities of workers.

The motivation for this electronic visual surveillance is a heightened concern for security; the result is that people are becoming more and more accustomed to being watched as they carry out their public life. As cameras become smaller, and easier to install and to monitor, their attractiveness as a means of monitoring activities in private places becomes greater. Previously, one could take ac-

tions to ensure an expectation of privacy in a private place, e.g., locking the doors and closing the curtains. But, in the absence of legal standards, the only effective barriers against electronic visual surveillance are the limitations of the technology and such limitations are few.

Electronic visual surveillance of public places is not specifically addressed by Federal statutes, although the assumption is that it is legitimate. Electronic visual surveillance of private places is not presently addressed by Federal laws. The Department of Justice has developed policy guidelines on the use of electronic visual surveillance in private places. These guidelines are regarded as requirements for Department of Justice bureaus (FBI, INS, and DEA) and advisory for other Federal investigatory agencies (Bureau of Alcohol, Tobacco and Firearms and Customs). Electronic visual surveillance of private places where one party has consented to the surveillance, even if that party is an undercover agent or informer, is assumed to be legitimate. The Supreme Court has not ruled on the many questions that are raised by using electronic visual surveillance. For example, if Government agents wish to observe private behavior with the assistance of video cameras or closed-circuit TV, must they get a court order as they would for the use of electronic eavesdropping equipment? Can a court, without specific statutory authority, give authorization for new types of searches or does this overstep the legitimate boundaries of judicial policymaking?

No one has accurate data on the extent of the use of visual surveillance, but there is general agreement inside and outside the investigative community that it is increasing. The Department of Justice has indicated that it has used electronic visual surveillance 18 times in the past year for investigative purposes. Other Federal agencies, such as Treasury and Defense, use video surveillance routinely to monitor the traffic at ports of entry or at buildings containing sensitive materials.

The ease with which video surveillance of private places can be used is in dispute. Some argue that the installation and changing of film make its use prohibitive unless there is easy access to the building or room on a regular basis. For example, video surveillance was used successfully in monitoring the activities of the FALN group in Chicago,[12] but the group met in a "safe house" and thus it was easy for law enforcement agents to gain access. Others argue that the miniaturization of cameras and the use of film that is triggered by activity make it easy to install and maintain video equipment. In support, they cite numerous technological developments and an R&D trend that indicates cameras and film will become more attractive for investigative purposes.

Electronic visual surveillance of private places is most often used when one party consents to the surveillance and can either install and monitor the camera or make it possible for others to do so. Under this circumstance, no Title III warrant or judicial intervention is necessary. However, such enhancement of what an undercover agent or informer can witness and testify to may be significantly more intrusive than an agent acting alone, and on that basis might be required to have some form of judicial authorization.

## Background

Before analyzing policy issues and policy options, a review of electronic visual surveillance developments will be presented to provide a context for the policy discussion.

The early literature on modern surveillance techniques warned of the great potential offered by hidden television and video cameras.[13] In the 1960s, this was viewed as a threat rather than a reality because the size and sophistication of cameras made it difficult to install, conceal, and maintain them for surveil-

lance purposes. A number of developments have eliminated such problems.[14]

Miniature television cameras equipped with a "charge-coupled device' rather than the traditional bulky television tubes are widely available at reasonable prices. Closed-circuit cameras also make use of this technology and thus can be easily installed. Technological advances have refined the sensor in the charge-coupled device and have made it even smaller and more powerful. It is predicted that miniature cameras will soon be on the market. These cameras could be concealed in anything from a briefcase, to a lamp, to a plant. It would thus be easy for an agent who has even brief access to an area under surveillance to install a miniature camera, leave, and return later to retrieve the film.

Fiber optics also permits the concealment of small cameras with the lens located at the surveillance site and the camera located at a distance. This is possible because of a "light pipe, " a bundle of thin, transparent fibers, which conducts light and visual images from a lens to a camera. With these devices, an agent need only enter the premises once, to install the lens; film changing and retrieval can be done at a distance.

Low light level television technology makes it possible to see in the dark. Such devices have been used in several cities to detect street crime. Infrared television cameras also make it possible to see in the dark by detecting infrared radiation with a camera that *is* sensitive to such radiation or by detecting infrared radiation and converting it to electrical images. The systems can then produce a detailed black and white picture.

The major advance in the area of visual technology in the 1980s is the development of machine vision systems. Such systems combine video and computer technologies to allow computerized analysis of what is being captured

---

[12]See *United States v. Torres* ( No. 84-1077, decided Dec. 19, 1984).

[13]See: Alan Westin, *Privacy and Freedom* (New York: A theneum, 1967) and Samuel Dash, R. F, Schwartz and Robert Knowlton, *The Eavesdroppers* (New York: Da Cape, 1959).

[14]For a review of the technologies available in the mid-1970s see: David P, Hodges, "Electronic Visual Surveillance and the Fourth Amendment: The Arrival of Big Brother'?" 3 *Hastings Constitutional Law Quarterly* 261(1976).

on the camera. Both the computer hardware, which allows the system to rapidly scan and pick up the coordinates that define the outline of images, [15] and the software, which is derived from artificial intelligence research and enables images to be scanned in relation to pre-programmed patterns, 'G are important to the effectiveness of machine vision systems. Such systems have been used primarily in industry to perform a number of labor-intensive inspection tasks, including: identifying shapes, measuring distances, gauging sizes, determining orientation, quantifying motion, and detecting surface shading.[17]

Although the major market for machine vision systems is thought to be factories, there are other areas in which labor-intensive analysis of films could be done by these systems. '8 One is in defense for verification of treaties or evaluation of reconnaissance films from satellites. [19] Another is in the investigative area where films that are captured through electronic visual surveillance are then analyzed by machine vision systems to differentiate the segments of the film that are relevant to an investigation from those that are not. Use of machine vision systems would drastically reduce what is presently a very labor-intensive part of electronic visual surveillance, and thus might make it more attractive.

### Findings and Policy Implications

1. OTA found that electronic visual surveillance is not currently covered by Title III of the Omnibus Crime Control and Safe Streets Act. The U.S. Department of Justice voluntarily complies with some Title III provisions. Some judges have asked for, congressional clarification.

"Marsha Johnston Fisher, "Micro-Based 'Roving' Eye Sifts Motion, " *MIS Week.* Nov. 14, 1984, pp. 1, 42.

¹⁶ Paul Kinnuean. "Machines That See, " *Technology},* April 1983, pp. 30-36.

'-tJohn Meyer.''Vision Systems: Technology of the Future at Work Today, " *Computerworld,* May 27, 1985, p. 13.

¹⁸ See: Edith Myhers, "Machines That See, " *Datamation, Nov.* 1983, pp. 90-103, and ''Machine Vision Merges With Process Imaging, " *Electronic Market Trends,* February 1985, pp. 17-19.

"Da\ 'id Hafemeister,''Advances In Verification Technology, " Bulletin of the Atomic Scientists, January 1985, pp. 35-40.

The courts have upheld the use of video surveillance for law enforcement purposes in a number of cases. In evaluating the appropriateness of video surveillance, judges have considered the place under surveillance, the evidence already accumulated, and the warrant process used.

In 1981, the Court of Appeals of New York, in *People v. Teicher, 439 N.Y. S.* 2d 846, upheld the use of video surveillance in a case where a dentist was charged with sexually abusing his patients. The judge ruled that the warrant authorizing video surveillance was valid because probable cause was clearly established by the affidavit, the warrant described the place to be searched and things to be seized, the warrant explicitly provided that surveillance be conducted in such a way as to minimize coverage of activities not related to specified crimes, and the warrant gave evidence that there were no less intrusive means for obtaining needed evidence.

In 1981, the Michigan Court of Appeals in *People v. Dezek,* 308 N.W. 2d 652, ruled that a warrant for video surveillance of a restroom in a highway rest area where homosexual activity was suspected was invalid because it did not limit the search to precise and discriminate circumstances.

In December 1984, the Seventh Circuit Court of Appeals handed down the major decision to date on the question of video surveillance, *United States v. Torres.* At issue was the FBI's video surveillance of the Puerto Rican nationalist group FALN for more than 130 hours over 6 months. The Seventh Circuit, in an opinion authored by Judge Richard Posner, held that the courts could authorize electronic video surveillance if they followed the requirements of the fourth amendment's warrant clause, i.e., "no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. " In this case, the Government asked for the warrants in conjunction with its application for Title III eavesdropping warrants and followed the Title III requirements. The Court held that:

A warrant for video surveillance that complies with those provisions that Congress put into Title III in order to implement the fourth amendment ought to satisfy the fourth amendment's requirement of particularity as applied to such surveillance.[20]

The Court went onto state that it did not suggest that compliance with Title III was necessarily required, but said that "we would think it a very good thing if Congress responded to the issues discussed in this opinion by amending Title III to bring television surveillance within its scope. "[21] It is important to note that Judge Posner did not include all of the Title III requirements, i.e., the exclusionary rule, the limitations on which Federal officials could make an application, limits on the severity of the crimes that could be involved, and limits on State and local use.[22]

The Department of Justice policy is to require a warrant analogous to a Title III warrant for electronic visual surveillance that is not in a public place or that is conducted in a nonconsensual situation. The policy is the result of a desire to have evidence as clean as possible, and the view that it is better to get a warrant "just in case" rather than have a judge rule the results of electronic visual surveillance inadmissible at a later date. The Department of the Treasury reports that it follows the Department of Justice guidelines for use of electronic visual surveillance.[23]

Although the present Department of Justice guidelines require a warrant analogous to a Title III warrant for electronic visual surveillance, the Attorney General has delegated the authority to authorize television surveillance to a responsible official within the Criminal Division who may authorize the surveillance if he or she:

... concludes that the proposed surveillance would not intrude on the subject's justifiable expectation of privacy . . . If such official concludes-that the surveillance would infringe on

the subject's justifiable expectations of privacy, he shall initiate proceedings to obtain a judicial warrant.[24]

In the case of electronic visual surveillance of public places or places to which the public has unrestricted access, the head of each Department of Justice investigative division has responsibility for issuing guidelines for that division.

In 1984, Representative Robert Kastenmeier introduced the Electronic Surveillance Act of 1984 which, in part, would bring video surveillance under the Title III warrant requirements. In this bill, video surveillance is defined as "the recording of visual images of individuals by television, film, videotape, or other similar method, in a location not open to the general public and without the consent of that individual. "[25] In September 1985, Congressman Kastenmeier introduced a separate bill, the Video Surveillance Act of 1985 that deals exclusively with video surveillance.[26] Other electronic surveillance activities are covered in the Electronic Communications Privacy Act of 1985, also introduced in September 1985.[27]

2. Electronic visual surveillance appears to pose a substantial threat to civil liberties, especially if conducted in private places and with audio (as well as video). The governmental interest varies depending on the stage of the investigation in which electronic visual surveillance is to be used.[28]

Before examining specific policy options, it is useful to examine the policy implications of electronic visual surveillance in light of the principles that appear to have guided surveillance policy to date. Based on the dimensions introduced in chapter 2, electronic visual surveillance, especially when used in conjunction

[20] ['United *States v. Torres,* No. 84-1077, p. 17 (7th Cir., Dec. 19, 1984).
[21] Id, at 19.
['] Remarks made at OTA Workshop, May 17, 1985.
['] Remarks made at OTA Workshop, May 17, 1985.

"Department of Justice, Order No. 985-82, "Delegation of Authority to Authorize Television Surveillance. "
[25] H.R. 6343, sec. 8, 3117, c.
[26] See H.R. 3455, Video Surveillance Act of 1985 and U.S. Congress, House of Representatives, Congressional *Record,* Extension of Remarks, Sept. 30, 1985, p. E-4269.
[27] See H.R. 3378 and S. 1667, Electronic Communications Privacy Act of 1985; U.S. Congress, House of Representatives, *Congressional Record,* Extension of Remarks, Sept. 19, 1985, p. E-4128; and U.S. Congress, Senate, Congressional *Record,* Sept. 19, 1985, p. S-11795.

with audio surveillance, poses a great, if not the greatest, threat to civil liberties.

The nature of the information that is gained with electronic visual surveillance is very personal. The information is quite complete, including the content of movements, facial expressions, and nonverbal communications, as well as conversations if audio is used.

Video surveillance can be usefully applied to surveillance of any area. The present controversy is focused on the surveillance of private places. Electronic video surveillance is capable of penetrating the most private places, where curtains are drawn and doors are locked, without leaving a trail.

The scope of a video or closed circuit TV camera is broad. All persons and activities that come in camera range will be filmed. Depending on the area under surveillance, it is likely that a number of people unrelated to the investigation will be covered. In this case, the more private the area to be monitored, the narrower the scope of the surveillance. The scope of the surveillance might be minimized by the use of machine vision systems that could scan the film for the targets of the surveillance or for certain types of motions.

Given the miniaturization of video and TV cameras, it is very difficult for an individual to detect electronic visual surveillance. Again, one would have to suspect that he or she was the target of an investigation and would have to look carefully to locate a hidden camera. Additionally, the present policy of allowing electronic visual surveillance without a warrant if one party has consented raises very serious questions about how the concept of assumption of risk is applied.

The historical analogy would be to undercover agents, although the use of video surveillance is much more powerful in terms of detail and unimpeachability. While the testimony of an agent or informer could always be questioned and needs corroboration, the film would probably be accepted. It is always possible, however, to edit a film to make it more incriminating and some editing may not be detectable.

The governmental interest in using electronic visual surveillance will vary. Video surveillance would be useful in investigations for any purpose, but, given the threats to civil liberties involved, would probably be difficult to justify for investigations to ensure the proper administration of Government programs and investigations of minor felonies and misdemeanors. Given the difficulties of installing and monitoring and the need to have certain basic information, electronic visual surveillance will most likely be used when there is a high level of suspicion. As it is such an intrusive form of surveillance, it would be very hard to justify its use during the early stages of an investigation. Although electronic visual surveillance is more effective and less costly than less technologically sophisticated techniques, the threat to civil liberties involved would seem to require that other techniques be tried first.

The present rules on the accountability of authorities using electronic visual surveillance are not clear. The Department of Justice guidelines appear to leave officials in the Criminal Division some discretion, in that they have to determine if the surveillance would violate an expectation of privacy and hence require a court warrant. Also unclear is the definition of a public place.

3. OTA identified five policy options for addressing electronic visual surveillance—ranging from prohibiting such surveillance as unconstitutional to doing nothing. In formulating policy, the issues of consensual v. nonconsensual visual surveillance and surveillance of public v. private places need to be given careful consideration.

The five policy options are discussed below.

Option A.–The first option is to legislate a prohibition on electronic visual surveillance be cause Congress considers it an unreasonable search under the fourth amendment. The basis for choosing this policy option might be the assumption or belief that electronic visual surveillance is an inherently unacceptable form of surveillance because: 1) the information it secures is so complete and specific; 2) it can pick up the most private activities in hereto-

fore private places; 3) it captures the activities of people not under investigation; 4) it captures the unrelated activities of the targets; 5) it is very difficult to detect, and 6) its pre-electronic analogy, i.e., undercover agents, is also regarded as intrusive.

Option B.—The second policy option is to regard electronic visual surveillance as more intrusive and invasive than eavesdropping, but not unacceptable in all circumstances. The legislative option then would be to subject electronic visual surveillance to higher authorization standards than exist for bugging and wiretapping under Title III. This option would be especially applicable in four areas. First, new minimization standards or a new concept to restrict the scope of the invasion, in terms of both place and content, might be developed. Additionally, the list of crimes and circumstances for which electronic visual surveillance is considered appropriate might be developed independently of the list for wiretapping. Third, the use of video surveillance might be restricted to only very sensitive and important types of investigations. Lastly, documented exhaustion of other techniques might be required.

**Option** C.–The third policy option would be to treat electronic visual surveillance in the same way as electronic audio surveillance. The advantages of this are that visual surveillance is generally conducted with audio surveillance so that only one warrant would be necessary, and that Title III is a known and tested procedure. The disadvantage is that the use of both audio and video may pose a greater risk to civil liberties.

Option D.–The fourth policy option would be to apply a lower standard to electronic visual surveillance than to eavesdropping. This would be hard to justify, given the principles that appear to govern the use of surveillance. It could only be justified if video surveillance were being used alone.

Option E.–The fifth option would be to do nothing. The disadvantage of this option is that both Judge Posner's request to Congress to deal with the issue and the questions raised with the existing Department of Justice guidelines would remain unanswered in terms of legislated policy.

# PART III: DATA BASE SURVEILLANCE

## Introduction

A significant implication of widespread computerized record systems and data communication linkages is the increased potential for computer-based surveillance of the movements and activities of individuals.

In modern society, most persons leave a trail of transactions with various institutions—governmental, retail, financial, educational, professional, criminal justice, and others. Before the widespread use of computer-communication systems, linking various kinds of transactions was very difficult, if not impossible, since transactions were paper based and the cost of matching or linking paper records

was prohibitive. In addition, the time delay inherent in paper linkages would negate much of the potential surveillance value.

Computer-based record systems and electronic linkages make it possible to overcome the cost and time barriers associated with paper systems. In theory, the technology permits the instantaneous linkage of a large number of record systems that would capture and consolidate, for example, gasoline credit card transactions, telephone calls, retail credit card transactions, bank card transactions, and transactions with Government agencies. Thus, electronic linkages could be used to conduct surveillance of individuals who are of investigative, law enforcement, and/or intelligence

interest to the Government. This assumes, of course, that the Government agencies would have electronic access to transactional record information.

## Background

One example of a Federal computerized record system that could be used for surveillance purposes is the FBI's National Crimes Information Center. NCIC maintains an "electronic bulletin board" of, among other things, wanted persons, missing persons, and persons with criminal history records. Law enforcement and criminal justice agencies make electronic inquiries to the bulletin board to ascertain whether particular individuals are listed as wanted or missing or have a prior criminal record.[28] The process of making inquiries about specific persons also generates information about the location and movement of these individuals and, indirectly by followup with the inquiring officials, more detailed information about the nature of a person's activities at a given point in time.

NCIC is, in effect, a computer-based system for locating persons who are listed as wanted or missing or have a prior criminal record. Until 1982, with one exception, NCIC was not used for intelligence purposes, that is, for locating individuals not having a formal warrant outstanding and/or a formal criminal record. The one exception was during the the early 1970s, when the FBI made very limited use of NCIC to keep track of, for example, bank robbery suspects. The objective here was "to enable law enforcement agencies to locate, through NCIC, individuals being sought for law enforcement purposes who did not meet the criteria for inclusion in the NCIC wanted person file. "[29] In other words, NCIC was being used to track individuals who had not been formally charged with a crime and did not

have an outstanding warrant for a Federal offense or other extraditable felony or misdemeanor offense.

The early 1970s (actually April 1971 to February 1974) pilot project had not been authorized by Congress. From then until 1982, the FBI rejected all requests or proposals for intelligence use of NCIC. However, in 1982 the Department of Justice and FBI approved a U.S. Secret Service proposal to establish an NCIC file on persons judged to represent a potential threat to Secret Service protectees. That Secret Service file is now fully operational, and includes the names of about 125 persons judged by the Secret Service to represent substantial threats. Apparently, according to FBI Director William Webster, the file has been quite useful in helping the Secret Service to keep track of (i.e., maintain surveillance on) the location and movement of a significant number of these persons.[30]

During the past 2 years, several other proposals for intelligence use of NCIC have been discussed, although none has been approved. For example, suggestions have been made to add new NCIC files on white-collar crime suspects and suspected organized crime associates.

Beyond this, the already existing electronic linkages between NCIC and other Federal law enforcement communication systems (e.g., the Treasury Enforcement Communication System, or TECS) easily could be extended to other Federal criminal justice record systems and even to Federal noncriminal justice record systems.

TECS is a good example of the extensive electronic linkages already in place. TECS includes a wide range of information on persons that are suspected of or wanted for violations of U.S. Customs or related laws, including persons suspected of or wanted for thefts from international commerce, and persons with outstanding Federal or State warrants. TECS includes the same kind of information on sus-

[28]For further discussion of NCIC, see OTA, *Assessment of Alternatives for a National Computerized Criminal History System*, October 1982.

'Letter from Harold R. Tyler, Jr., Deputy Attorney General, U.S. Department of Justice, to Senator John Tunney, Chairman, Subcommittee on Constitutional Rights, Committee on the Judiciary, U.S. Senate, Oct. 29, 1975.

[30]Statement of William Webster, FBI Director, at Oct. 17, 1984, NCIC Advisory Policy Board Meeting.

pects that has proven so controversial when proposed for NCIC. Of course, TECS is not accessible on-line to tens of thousands of State and local law enforcement and criminal justice agencies, as is NCIC. Nonetheless, TECS is accessible to numerous Federal agencies (plus two foreign agencies), as indicated in table 7.

The so-called Border Enforcement System is the major component of TECS. Computerized information from this system is used, among other things, to: assist U.S. Customs and the Immigration and Naturalization Service personnel screen persons and property entering and exiting the United States; alert Customs and INS officers to potentially dangerous persons or situations; provide investigative data to Customs or other agency law enforcement or intelligence officers; and aid in the exchange of data with other Federal, State, or local law enforcement agencies.

As of May 1, 1985, the TECS Border Enforcement System included computerized records on over 2 million persons. Table 8 gives the distribution of the record sources.

One of the TECS users and record sources is INS. INS, in turn, has its own extensive computerized law enforcement, investigative, and intelligence systems, with records on, collectively, several tens of millions of persons. Highlights of several of the INS computerized record systems are presented in table 9.

Again, two of these systems–Anti-Smuggling Information System and National Automated

**Table 7.—Treasury Enforcement Communication System/ Border Enforcement ,System Users**

- U.S. Customs Service
- Bureau of Alcohol, Tobacco and Firearms
- Immigration and Naturalization Service
- Federal Bureau of Investigation
- U S. Marshals Service
- Interpol (International Police Organization)
- Drug Enforcement Administration
- El Paso Intelligence Center
- Internal Revenue Service
- U.S. Coast Guard
- U.S. Department of State
- National Narcotics Border Interdiction System
- Royal Canadian Mounted Police

SOURCC U S Customs

**Table 8.—Source of Treasury Enforcement Communication System/Border Enforcement System Records**

| Source | Number of records |
|---|---|
| U.S. Customs Service. . ., | 897,963 |
| Immigration and Naturalization Service . . . . . . . . . . . ... . . | 32,828 |
| National Narcotics Border Interdiction System . . . ... | 959 |
| National Crime Information Center . . . | 220,693 |
| U.S. Coast Guard . . . . . . . . . . . . . . | 2 |
| Internal Revenue Service Inspection . . | 6,102 |
| Internal Revenue Service Criminal Investigation. . . . . . . . . ... . . | 100,692 |
| Drug Enforcement Administration . | 114,387 |
| Bureau of Alcohol, Tobacco and Firearms . . . . . . . . . . . . . | 712,720 |
| Royal Canadian Mounted Police . . | 22,022 |
| U.S. Department of State. . . . . . . | 19,721 |
| Interpol ., . . . . . . . . . . . . . . | 49,699 |
| Total | 2,177,788 records |
| | (on 2,153,888 person) |

SOURCE  U  S  Customs  as of May  1  1985

Immigration Lookout System—include information on suspected as well as known violators. And one of the major purposes of these two systems is to monitor the movements of suspected violators.

Other Federal agencies maintain similar computerized record systems. Based on the results of the Federal Agency Data Request, OTA identified 85 computerized record systems operated by Federal agencies for law enforcement, investigative, and/or intelligence purposes. Out of 142 agency components responding, 36 (or 25 percent) reported the use of at least one such computerized system. Collectively, the 85 systems include about 288 million records on about 114 million persons. (Note that some systems may overlap with multiple records on the same persons, and some agencies did not know or did not provide the number of records and persons per system. Nonetheless, the overall results provide the most complete accounting of such systems to date.) The Departments of Justice and Defense have by far the largest number of systems and records. Justice reports 15 systems with, collectively, about 241 million records on 87 million persons. Defense reports 18 systems with about 29 million records on 22 million persons.

Table 9.—Selected INS Computerized Record Systems

| Name of record system | Contents | Number of records | Number of persons |
|---|---|---|---|
| Anti-Smuggling Information System (ASIS) . | Known or suspected alien smuggling operations | 750,000 | unknown |
| Central Index System (CIS) . . . . . . . . . . . . . . . | All aliens and naturalized citizens except temporary visitors | 152,000,000 | 21,000,000 |
| Non-Immigrant Information System (NIIS) . . | .All temporary visitors to U.S. | 24,000,000 | 24,000,000 |
| Student School System (STSC) . . . . . . . . . . . | All foreign students and schools they attend | 750,000* | 687,000 |
| National Automated Immigration Lookout System (NAILS) . . . . . . . . . . . . . . . . . . . . . . . | Known or suspected violators of INS laws and other Federal statutes | 40,000 | 40,000 |

%87,000 persons plus 18,500 schools

SOURCE Immigration and Natural ization Service, based on June 1985 response to OTA Federal Agency Data Request

OTA also asked agencies for any statistics on record quality (completeness and accuracy) for such systems. No such statistics were provided by any of the 142 agency components responding. The four specific examples noted earlier illustrate the already extensive development of computerized data base systems operated by Federal agencies for law enforcement, investigative, and/or intelligence purposes. Federal agencies believe that these systems are essential to carrying out their authorized responsibilities. However, the systems are capable of including files on any definable category or type of persons, and are capable of interconnection with numerous other computerized systems. As a result, these systems (and others like them) provide the technical infrastructure of a data base surveillance system.

## Findings and Policy Implications

1. It is technically feasible to have an interconnected electronic network of Federal criminal justice, **other civilian, and perhaps even military record systems that would monitor many individual transactions with the Federal Government and be the equivalent of a national data base surveillance system.**

For example, the current Secret Service file on NCIC could be extended so that the list of dangerous persons would be checked against not only NCIC wanted person and criminal history inquiries, but also social security, food stamp, and other kinds of inquiries or record transactions that would indicate the location or activities of listed persons. This scenario could be further extended to include travel and credit card transactions and the like.

Of course, these are hypothetical examples at this point in time, but serve to demonstrate the vast technical potential for computer-based surveillance inherent in record linkages among computerized systems. These kinds of potential applications raise numerous issues, ranging from whether the application would be cost effective and serve a significant, useful, and lawful criminal justice purpose to the possible implications for civil and constitutional rights.

For example, first amendment rights could be violated to the extent a national computer-based surveillance system was used to monitor the lawful and peaceful activities or associations of citizens or if it were to have the effect of discouraging such activities or associations. Fourth amendment rights could be violated if the surveillance amounted to an unreasonable search and seizure of personal information. And, as a final example, fifth amendment rights to due process could be violated if such surveillance was conducted without first establishing probable cause or reasonable suspicion and without serving advance notice on the subject individual.

The possible civil liberties implications would need to be balanced against the Government's interest in, for example, enforcing public laws, maintaining social order, and protecting the national security. Thus, the trade-offs could, indeed, be difficult to balance.

2. The legal and statutory framework for national computer-based surveillance systems is unclear.

The systems would appear to be subject to the Privacy Act and perhaps other statutes, depending on the purpose. Law enforcement investigative record systems are exempt from key elements of the Privacy Act, but other record systems would have to establish that surveillance use is a routine use under the Privacy Act, and all such systems would have to publish notices in the Federal Register and withstand the inevitable congressional scrutiny. This would appear to be quite difficult to do, although computer matching was defined as a routine use, apparently with relatively little difficulty. On the other hand, if the surveillance was directed at, say, foreign terrorist activity, the system might fall under Foreign Intelligence Surveillance Act and be subject to little or no public scrutiny. Data base surveillance does not appear to fall under Title III of the Omnibus Crime Control and Safe Streets Act since there would be no "aural" acquisition.

3. A central policy issue with respect to computer-based surveillance systems is designing and implementing a mechanism to simultaneously: 1) identify and authorize those applications that have a substantial law enforcement or intelligence value; 2) minimize any adverse impacts on individual rights from authorized and/or expanded use of the systems and the substantial impacts on constitutional rights that might result. Establishment of a data protection board is one option that warrants consideration.

One policy option that has been proposed from time to time in the United States and has been implemented in other countries is a data protection board. Such a board was proposed in the 1970s with respect to NCIC, and in particular the computerized criminal history **(CCH)** program As early as September 1970, OMB recommended the establishment of a strong "policy control board' that would report directly to the U.S. Attorney General. The board was to include officials from the FBI, the Law Enforcement Assistance Administration (LEAA), and the States, and rep-

resent all elements of the criminal justice community. Comprehensive legislative proposals developed in 1974 included an independent Federal Information Systems Board that was to be responsible for the operation and regulation of a national CCH system. On a broader level, several European countries have established independent data protection boards or authorities that have some oversight authority over law enforcement and intelligence systems, as well as a wide range of privacy-related systems (e.g., social services, health, and education).

The institutional placement of such a board or authority would be important. If it were to be a new board within an existing department, its power might be too dependent on that of the department and its character shaped by that department. Additionally, the department might well have interests that might conflict or interfere with the responsibilities of the board. If it were to be a board reporting to the President, it would have added stature and potential influence, but it might easily be politicized, and its visibility and stature might well change with changes in administrations. If the board were to report to Congress, either directly or through a special joint committee, it would be independent of the executive agencies that have stakes in personal information collection and use. It might be less open to partisan uses, but the board might become too removed from the realities of agency operations.

The responsibilities of such a board or authority are also important. Should the board's jurisdiction be limited to some surveillance applications, all surveillance applications, all law enforcement/intelligence uses, privacy-related applications, and so forth? The broader the responsibilities, the larger the necessary size and budget of the board, or, in the absence of adequate resources, the greater the work overload. On the other hand, a broad mandate may be necessary to gain the necessary political support, thus contributing to a better overall understanding of agency technologies and practices and resulting in more effective oversight and better decisions.

Other questions include the size and composition of the board, process of appointments, scope of authority, and extent of decisionmaking v. advisory, research, and/or information clearinghouse responsibilities.

4. Other available options, not necessarily mutually exclusive with establishing a data protection board, include: placing data base surveillance applications under Title III of the Omnibus Crime Control Act; requiring congressional approval of specific data base surveillance systems (e.g., by statutory amendment or approval of House and Senate authorizing committees); establishing general statutory standards for surveillance applications; maintaining the status quo; and strengthening OMB and/or agency roles with respect to data base surveillance.

One congressional option would be to amend Title III, making data base surveillance subject to the Title III procedural and balancing requirements. Another legislative option would be to amend the enabling statutes of the various individual computerized systems that are or could be used for surveillance purposes (or enact specific enabling statutes where none exist) to require that new surveillance applica- tions must be approved by Congress. The strongest (and most difficult) form of approval would be to require an act of Congress in the form of a further amendment to the enabling statute. Short of that, formal approval of the relevant House and Senate authorizing committees could be required. Alternatively, agencies could be required to give the authorizing committees 60 to 90 or 120 days' formal advance notice, so that an investigation could be conducted and oversight hearings held, if desired.

As an alternative or complement to such congressional notice and/or approval options, OMB'S role could be strengthened by setting up a separate, statutory office within OMB and mandating a minimum staff. However, some of OMB'S other responsibilities may conflict, and it is unclear that such an office located in OMB would or could provide effective oversight. There is also the option of establishing agency staff in the data protection area and/or assigning new responsibilities to the Privacy Officers and/or Inspector General offices.

TAB 11

## AMERICA'S SYSTEM OF CRIMINAL JUSTICE

The system of criminal justice America uses to deal with those crimes it cannot prevent and those criminals it cannot deter is not a monolithic, or even a consistent, system. It was not designed or built in one piece at one time. Its philosophic core is that a person may be punished by the Government if, and only if, it has been proved by an impartial and deliberate process that he has violated a specific law. Around that core layer upon layer of institutions and procedures, some carefully constructed and some improvised, some inspired by principle and some by expediency, have accumulated. Parts of the system magistrates' courts, trial by jury, bail are of great antiquity.

Other parts juvenile courts, probation and parole, professional policemen are relatively new. The entire system represents an adaptation of the English common law to America's peculiar structure of government, which allows each local community to construct institutions that fill its special needs. Every village, town, county, city, and State has its own criminal justice system, and there is a Federal one as well. All of them operate somewhat alike. No two of them operate precisely alike.

Any criminal justice system is an apparatus society uses to enforce the standards of conduct necessary to protect individuals and the community. It operates by apprehending, prosecuting, convicting, and sentencing those members of the community who violate the basic rules of group existence. The action taken against lawbreakers is designed to serve three purposes beyond the immediately punitive one. It removes dangerous people from the community; it deters others from criminal behavior; and it gives society an opportunity to attempt to transform lawbreakers into law-abiding citizens. What most significantly distinguishes the system of one country from that of another is the extent and the form of the protection it offers individuals in the process of determining guilt and imposing punishment. Our system of justice deliberately sacrifices much in efficiency and even in effectiveness in order to preserve local autonomy and to protect the individual. Sometimes it may seem to sacrifice too much. For example, the American system was not designed with Cosa Nostra-type criminal organizations in mind, and it has been notably unsuccessful to date in preventing such organizations from preying on society.

The criminal justice system has three separately organized parts the police, the courts, and corrections and each has distinct tasks. However, these parts are by no means independent of each other. What each one does and how it does it has a direct effect on the work of the others. The courts must deal, and can only deal, with those whom the police arrest; the business of corrections is with those delivered to it by the courts. How successfully corrections reforms convicts determines whether they will once again become police business and influences the sentences the judges pass; police activities are subject to court scrutiny and are often determined by court decisions. And so reforming or reorganizing any part or procedure of the system changes other parts or procedures. Furthermore, the criminal process, the method by which the system deals with individual cases, is not a hodgepodge of random actions. It is rather a

continuum an orderly progression of events some of which, like arrest and trial, are highly visible and some of which, though of great importance, occur out of public view. A study of the system must begin by examining it as a whole.

\* \* \*

The popular, or even the lawbook, theory of everyday criminal process oversimplifies in some respects and over-complicates in others what usually happens. That theory is that when an infraction of the law occurs, a policeman finds, if he can, the probable offender, arrests him and brings him promptly before a magistrate. If the offense is minor, the magistrate disposes of it forthwith; if it is serious, he holds the defendant for further action and admits him to bail. The case then is turned over to a prosecuting attorney who charges the defendant with a specific statutory crime. This charge is subject to review by a judge at a preliminary hearing of the evidence and in many places if the offense charged is a felony, by a grand jury that can dismiss the charge, or affirm it by delivering it to a judge in the form of an indictment. If the defendant pleads "not guilty" to the charge he comes to trial; the facts of his care are marshaled by prosecuting and defense attorneys and presented, under the supervision of a judge, through witnesses, to a jury. If the jury finds the defendant guilty, he is sentenced by the judge to a term in prison, where a systematic attempt to convert him into a law-abiding citizen is made, or to a term of probation, under which he is permitted to live in the community as long as he behaves himself.

Some cases do proceed much like that, especially those involving offenses that are generally considered "major": serious acts of violence or thefts of large amounts of property. However, not all major cases follow this course, and, in any event, the bulk of the daily business of the criminal justice system consists of offenses that are not major breaches of the peace, crimes of vice, petty thefts, assaults arising from domestic or street-corner or barroom disputes. These and most other cases are disposed of in much less formal and much less deliberate ways.

The theory of the juvenile court is that it is a "helping" social agency, designed to prescribe carefully individualized treatment to young people in trouble, and that its procedures are therefore nonadversary. Here again there is, in most places, a considerable difference between theory and practice. Many juvenile proceedings are no more individualized and no more therapeutic than adult ones.

What has evidently happened is that the transformation of America from a relatively relaxed rural society into a tumultuous urban one has presented the criminal justice system in the cities with a volume of cases too large to handle by traditional methods. One result of heavy caseloads is highly visible in city courts, which process many cases with excessive haste and many others with excessive slowness. In the interest of both of effectiveness and of fairness to individuals, justice should be swift and certain; too often in city courts today it is, instead, hasty or faltering. Invisibly, the pressure of numbers has effected a series of adventitious changes in the criminal process. Informal shortcuts have been used. The decision making process has often become routinized. Throughout the system the importance of individual judgment and discretion, as distinguished from stated rules and procedures, has increased. In effect, much decision making is being done on an administrative rather than on a judicial basis. Thus, an examination of how the criminal justice system works and a consideration of the changes needed to make it more effective and fair must focus on the extent to which invisible, administrative procedures depart from visible, traditional ones, and on the desirability of that departure.

## THE POLICE

At the very beginning of the process or, more properly, before the process begins at all something happens that is scarcely discussed in lawbooks and is seldom recognized by the public: law enforcement policy is made by the policeman. For policemen cannot and do not arrest all the offenders they encounter. It is doubtful that they arrest most of them. A criminal code, in practice, is not a set of specific instructions to policemen but a more or less rough map of the territory in which policemen work. How an individual policeman moves around that territory depends largely on his personal discretion.

That a policeman's duties compel him to exercise personal discretion many times every day is evident. Crime does not look the same on the street as it does in a legislative chamber. How much noise or profanity makes conduct "disorderly" within the meaning of the law? When must a quarrel be treated as a criminal assault: at the first threat or at the first shove or at the first blow, or after blood is drawn, or when a serious injury is inflicted? How suspicious must conduct be before there is "probable cause," the constitutional basis for an arrest? Every policeman, however complete or sketchy his education, is an interpreter of the law.

Every policeman, too, is an arbiter of social values, for he meets situation after situation in which invoking criminal sanctions is a questionable line of action. It is obvious that a boy throwing rocks at a school's windows is committing the statutory offense of vandalism, but it is often not at all obvious whether a policeman will better serve the interests of the community and of the boy by taking the boy home to his parents or by arresting him. Who are the boy's parents? Can they control him? Is he a frequent offender who has responded badly to leniency? Is vandalism so epidemic in the neighborhood that he should be made a cautionary example? With juveniles especially, the police exercise great discretion.

Finally, the manner in which a policeman works is influenced by practical matters: the legal strength of the available evidence, the willingness of victims to press charges and of witnesses to testify, the temper of the community, the time and information at the policeman's disposal. Much is at stake in how the policeman exercises this discretion. If he judges conduct not suspicious enough to justify intervention, the chance to prevent a robbery, rape, or murder may be lost. If he overestimates the seriousness of a situation or his actions are controlled by panic or prejudice, he may hurt or kill someone unnecessarily. His actions may even touch off a riot.

## THE MAGISTRATE

In direct contrast to the policeman, the magistrate before whom a suspect is first brought usually exercises less discretion than the law allows him. He is entitled to inquire into the facts of the case, into whether there are grounds for holding the accused. He seldom does. He seldom can. The more promptly an arrested suspect is brought into magistrate's court, the less likelihood there is that much information about the arrest other than the arresting officer's statement will be available to the magistrate. Moreover many magistrates, especially in big cities, have such congested calendars that it is almost impossible for them to subject any case but an extraordinary one to prolonged scrutiny.

In practice the most important things, by far, that a magistrate does are to set the amount of a defendant's bail and in some jurisdictions to appoint counsel. Too seldom does either action get the careful attention it deserves. In many cases the magistrate accepts a waiver of counsel without insuring that the suspect knows the significance of legal representation.

Bail is a device to free an untried defendant and at the same time make sure he appears for trial. That is the sole stated legal purpose in America. The Eighth Amendment to the Constitution declares that it must not be "excessive." Appellate courts have declared that not just the seriousness of the charge against the defendant, but the suspect's personal, family, and employment situation, as they bear on the likelihood of his appearance, must be weighed before the amount of his bail is fixed. Yet more magistrates than not set bail according to standard rates: so and so many dollars for such and such an offense.

The persistence of money bail can best be explained not by its stated purpose but by the belief of police, prosecutors, and courts that the best way to keep a defendant from committing more crimes before trial is to set bail so high that he cannot obtain his release.

## THE PROSECUTOR

The key administrative officer in the processing of cases is the prosecutor. Theoretically the examination of the evidence against a defendant by a judge at a preliminary hearing, and its reexamination by a grand jury, are important parts of the process. Practically they seldom are because a prosecutor seldom has any difficulty in making a prima facie case against a defendant. In fact most defendants waive their rights to preliminary hearings and much more often than not grand juries indict precisely as prosecutors ask them to. The prosecutor wields almost undisputed sway over the pretrial progress of most cases. He decides whether to press a case or drop it. He determines the specific charge against a defendant. When the charge is reduced, as it is in as many as two-thirds of all cases in some cities, the prosecutor is usually the official who reduces it.

In the informal, noncriminal, nonadversary juvenile justice system there are no "magistrates" or "prosecutors" or "charges," or, in most instances, defense counsel. An arrested youth is brought before an intake officer who is likely to be a social worker or, in smaller communities, before a judge. On the basis of an informal inquiry into the facts and circumstances that led to the arrest, and of an interview with the youth himself, the intake officer or the judge decides whether or not a case should be the subject of formal court proceedings. If he decides it should be, he draws up a petition, describing the case. In very few places is bail a part of the juvenile system; a youth whose case is referred to court is either sent home with orders to reappear on a certain date, or remanded to custody. This decision, too, is made by the screening official. Thus, though these officials work in a quite different environment and according to quite different procedures from magistrates and prosecutors, they in fact exercise the same kind of discretionary control over what happens before the facts of a case are adjudicated.

## THE PLEA AND THE SENTENCE

When the prosecutor reduces a charge it is ordinarily because there has been "plea bargaining" between him and a defense attorney. The issue at stake is how much the prosecutor will reduce his original charge or how lenient a sentence he will recommend, in return for a plea of guilty. There is no way of judging how many bargains reflect the prosecutor's belief that a lesser charge or sentence is justified and how many result from the fact that there may be in the system at any one time ten times as many cases as there are prosecutors or judges or courtrooms to handle them, should every one come to trial. In form, a plea bargain can be anything from a series of careful conferences to a hurried consultation in a courthouse corridor. In content it can be anything from a conscientious exploration of the facts and dispositional alternatives available and appropriate to a defendant, to a perfunctory deal. If the interests of a defendant are to be

properly protected while his fate is being thus invisibly determined, he obviously needs just as good legal representation as the kind he needs at a public trial. Whether or not plea bargaining is a fair and effective method of disposing of criminal cases depends heavily on whether or not defendants are provided early with competent and conscientious counsel.

Plea bargaining is not only an invisible procedure but, in some jurisdictions, a theoretically unsanctioned one. In order to satisfy the court record, a defendant, his attorney, and the prosecutor will at the time of sentencing often ritually state to a judge that no bargain has been made. Plea bargaining may be a useful procedure, especially in congested urban jurisdictions, but neither the dignity of the law, nor the quality of justice, nor the protection of society from dangerous criminals is enhanced by its being conducted covertly.

In the juvenile system there is, of course, no plea bargaining in the sense described above. However, the entire juvenile process can involve extra-judicial negotiations about disposition. Furthermore, the entire juvenile process is by design invisible. Though intended to be helpful, the authority exercised often is coercive; juveniles, no less than adults, may need representation by counsel.

An enormously consequential kind of decision is the sentencing decision of a judge. The law recognizes the importance of fitting sentences to individual defendants by giving judges, in most instances, considerable latitude. For example the * * * New York Penal Code, which [went] into effect in autumn of 1967, empowers a judge to impose upon a man convicted of armed robbery any sentence between a 5-year term of probation and a 25-year term in prison. Even when a judge has presided over a trial during which the facts of a case have been carefully set forth and has been given a probation report that carefully discusses a defendant's character, background, and problems, he cannot find it easy to choose a sentence. In perhaps nine-tenths of all cases there is no trial; the defendants are self-confessedly guilty.

In the lower or misdemeanor courts, the courts that process most criminal cases, probation reports are a rarity. Under such circumstances judges have little to go on and many sentences are bound to be based on conjecture or intuition. When a sentence is part of a plea bargain, which an overworked judge ratifies perfunctorily, it may not even be his conjecture or intuition on which the sentence is based, but a prosecutor's or a defense counsel's. But perhaps the greatest lack judges suffer from when they pass sentence is not time or information, but correctional alternatives. Some lower courts do not have any probation officers, and in almost every court the caseloads of probation officers are so heavy that a sentence of probation means, in fact, releasing an offender into the community with almost no supervision. Few States have a sufficient variety of correctional institutions or treatment programs to inspire judges with the confidence that sentences will lead to rehabilitation.

## CORRECTIONS

The correctional apparatus to which guilty defendants are delivered is in every respect the most isolated part of the criminal justice system. Much of it is physically isolated; its institutions usually have thick walls and locked doors, and often they are situated in rural areas, remote from the courts where the institutions' inmates were tried and from the communities where they lived. The correctional apparatus is isolated in the sense that its officials do not have everyday working relationships with officials from the system's other branches, like those that commonly exist between policemen and prosecutors, or prosecutors and judges. It is isolated in the sense that what it does with, to, or for the people under its supervision is seldom governed by any but the

most broadly written statutes, and is almost never scrutinized by appellate courts. Finally, it is isolated from the public partly by its invisibility and physical remoteness; partly by the inherent lack of drama in most of its activities, but perhaps most importantly by the fact that the correctional apparatus is often used or misused by both the criminal justice system and the public as a rug under which disturbing problems and people can be swept.

The most striking fact about the correctional apparatus today is that, although the rehabilitation of criminals is presumably its major purpose, the custody of criminals is actually its major task. On any given day there are well over a million people being "corrected" in America, two-thirds of them on probation or parole and one-third of them in prisons or jails. However, prisons and jails are where four-fifths of correctional money is spent and where nine-tenths of correctional employees work. Furthermore, fewer than one-fifth of the people who work in State prisons and local jails have jobs that are not essentially either custodial or administrative in character. Many jails have nothing but custodial and administrative personnel. Of course many jails are crowded with defendants who have not been able to furnish bail and who are not considered by the law to be appropriate objects of rehabilitation because it has not yet been determined that they are criminals who need it.

What this emphasis on custody means in practice is that the enormous potential of the correctional apparatus for making creative decisions about its treatment of convicts is largely unfulfilled. This is true not only of offenders in custody but of offenders on probation and parole. Most authorities agree that while probationers and parolees need varying degrees and kinds of supervision, an average of no more than 35 cases per officer is necessary for effective attention; 97 percent of all officers handling adults have larger caseloads than that. In the juvenile correctional system the situation is somewhat better. Juvenile institutions, which typically are training schools, have a higher proportion of treatment personnel and juvenile probation and parole officers generally have lighter caseloads. However, these comparatively rich resources are very far from being sufficiently rich.

Except for sentencing, no decision in the criminal process has more impact on the convicted offender than the parole decision, which determines how much of his maximum sentence a prisoner must serve. This again is an invisible administrative decision that is seldom open to attack or subject to review. It is made by parole board members who are often political appointees. Many are skilled and conscientious, but they generally are able to spend no more than a few minutes on a case. Parole decisions that are made in haste and on the basis of insufficient information, in the absence of the parole machinery that can provide good supervision, are necessarily imperfect decisions. And since there is virtually no appeal from them, they can be made arbitrarily or discriminatorily. Just as carefully formulated and clearly stated law enforcement policies would help policemen, charge policies would help prosecutors and sentencing policies would help judges, so parole policies would help parole boards perform their delicate and important duties.

In sum, America's system of criminal justice is overcrowded and overworked, undermanned, underfinanced, and very often misunderstood. It needs more information and more knowledge. it needs more technical resources. It needs more coordination among its many parts. It needs more public support. It needs the help of community programs and institutions in dealing with offenders and potential offenders. It needs, above all, the willingness to reexamine old ways of doing things, to reform itself, to experiment, to run risks, to date. It needs vision.

TAB 12

FOCUS - 1 of 1 DOCUMENT


Copyright 2006 The Federal News Service, Inc.
Federal News Service


September 29, 2006 Friday


**SECTION:** PRESS CONFERENCE OR SPEECH

**LENGTH:** 5071 words

**HEADLINE:** PANEL IV OF A HEARING OF THE SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS OF THE HOUSE COMMERCE AND ENERGY COMMITTEE

 SUBJECT: INTERNET DATA BROKERS AND PRETEXTING: WHO HAS ACCESS TO YOUR PRIVATE RECORDS?

 CHAIRED BY: REPRESENTATIVE ED WHITFIELD (R-KY)

 WITNESSES: JOEL WINSTON, ASSOCIATE DIRECTOR, DIVISION OF PRIVACY AND IDENTITY PROTECTION BUREAU OF CONSUMER PROTECTION, FEDERAL TRADE COMMISSION; KRIS ANNE MONTEITH, CHIEF, ENFORCEMENT BUREAU, FEDERAL COMMUNICATIONS COMMISSION

 LOCATION: 2123 RAYBURN HOUSE OFFICE BUILDING, WASHINGTON, D.C.

**BODY:**

    REP. WHITFIELD:  And at this time I would like to call the fourth and last panel of witnesses, and that is Mr. Joel Winston, associate director, Division of Privacy and Identity Protection, Bureau of Consumer Protection, Federal Trade Commission; and Ms. Kris Monteith, chief, Enforcement Bureau at the Federal Communications Commission.

    And thank you all for being with us today.

    As you all know, this is the Oversight and Investigation Subcommittee.  We take testimony under oath, and I'm assuming, Mr. Winston, that you and Ms. Monteith do not have any difficulty with that.  So if you would please stand and raise your right hand. (Witnesses are sworn in.)

    I'm assuming you do not have legal counsel today, so -- Ms. Monteith, if you would -- you're recognized for five minutes for your opening statement.

    MS. MONTEITH:  Thank you very much, Chairman Whitfield, and members of the subcommittee.

    I appreciate the opportunity to speak with you today about the ongoing investigation of the Federal Communications Commission into the issue of the unauthorized disclosure of consumers' call records. As FCC Chairman Martin testified before the full Committee on Energy and Commerce in February, the commission is deeply concerned about this issue and is taking a number of steps to address it.

    First, we are investigating data brokers to determine how they are gaining access to confidential call records. Second, we are investigating telecommunications carriers to ensure that they are fully meeting their obligations under the law.  And third, we have initiated a rule-making proceeding to determine what additional rules the commission

should adopt to further protect consumers.

Since we initiated our investigation in the summer of 2000, we have issued subpoenas to over 30 data brokers, seeking details regarding their methods of obtaining phone record information. We issued citations to those data brokers who failed to fully respond to our subpoenas, a notice of apparent liability against one of these companies for its continued failure to respond adequately, and referred the matter to the Department of Justice for enforcement.

Although the data brokers almost universally denied any wrongdoing, our investigations reveal that data brokers routinely engage in pretexting often by impersonating the account holder or a telephone company employee. Data brokers are also obtaining access to consumers' accounts online by overcoming carrier status security protocols, and we have seen some limited instances of carrier employee misconduct. We also have focused our attention on the practices of telecommunications carriers to determine whether they have implemented safeguards that are adequate to secure the privacy of consumers' confidential data.

The commission's Enforcement Bureau has had numerous meetings with the major wire line and wireless providers to discuss efforts they have undertaken to protect customer call data. The commission has also issued formal letters of inquiry to these carriers. These letters require the carriers to document their customer data security procedures, detail employee access to call records, identify security problems and breaches, and address any changes they have made in response to the data broker issue. We have also issued supplemental letters of inquiry to the largest carriers, and our in-depth analysis is ongoing.

Most recently, we issued letters of inquiry to a number of carriers, asking for information related to whether any CPNI was disclosed without authorization in connection with Hewlett-Packard's activities.

In January we issued a public notice requiring all telecommunications carriers to submit their most recent annual certificates attesting to compliance with the commission's CPNI rules. As a result of our investigations into carrier compliance with the annual certification requirement, we issued three notices of apparent liability for failure to comply with these important rules. We have reached consent decrees on CPNI issues with two of these carriers, totaling $650,000.

Sir, in the course of our investigations, we have learned that several carriers have taken further steps to protect the privacy of customer account information. These steps include using better security and authentication measures with respect to online accounts, notifying customers of the password or account changes, and greater monitoring of employee activities to detect breaches of corporate policies.

Lastly, the commission initiated a proceeding to determine what additional rules it should adopt to further protect consumers' telephone records from unauthorized disclosure. The notice of proposed rule-making, which grants a petition filed by the Electronic Privacy Information Center, seeks comment on five proposals to address the unlawful and fraudulent release of CPNI. These include customer- set passwords, audit trails, encryptions, limiting data retention, and notice procedures to the customer on release of CPNI data. The record in this proceeding closed in June. Chairman Martin intends to bring an order before the full commission for its consideration this fall.

In conclusion, the disclosure of consumers' private calling records represents a significant invasion of personal privacy. The commission is acting to eliminate the troubling practice and give American consumers the privacy protections they expect. We look forward to working collaboratively with the members of this subcommittee, other members of Congress, our colleagues at Federal Trade Commission, and other law enforcement authorities to ensure that consumers' personal phone records remain confidential.

Thank you for the opportunity to testify, and I would be pleased to respond to your questions.

REP. WHITFIELD: Thank you, Ms. Monteith.

PANEL IV OF A HEARING OF THE SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS OF THE
HOUSE COMMERCE AND ENERGY COMMITTEE SUBJECT: INTERNET DATA BROKERS AND
PRETEXTING: WHO HAS ACCESS TO YOUR PRIVATE RECOR

Mr. Winston, you're recognized for five minutes.

MR. WINSTON:  Good afternoon, Mr. Chairman, and members of the subcommittee.  I appreciate your invitation
to appear today to discuss the privacy and security of telephone records.  Although my written statement is that of the
commission, my oral testimony and responses to questions reflect my own views and not necessarily those of the
commission or any individual commissioner.

Protecting the privacy and security of consumers' sensitive personal information is one of the commission's highest
priorities. And we've addressed this issue on many fronts, ranging from spam and spyware to data security and identity
theft.  Today I will discuss the FTC's recent enforcement efforts against those who use fraud or other illegal means to
obtain consumers' telephone call records and other confidential information.  I will also provide some comments on
possible legislation to stop this troubling practice.

On May 1st of this year, the commission filed lawsuits in federal courts across the country against five companies
and their principals for allegedly selling consumer call records that were obtained through fraud.  The complaints charge
that these practices violate Section 5 of the Federal Trade Commission Act, which prohibits unfair or deceptive
practices.

In each of these cases, the defendants advertised on their websites that they could obtain confidential customer
phone records from telephone carriers for fees ranging from $65 to $180.  What we have since learned is that the data
brokers like these often rely upon third parties to carry out the actual pretexting.  Four of these five cases are pending in
court.  In the fifth case, we will be releasing next week a settlement with the defendants that contains both injunctive
and monetary relief.  In addition to these cases, FTC staff continues to aggressively pursue investigations of both
pretexters and the data brokers who purchase their services for resale.  We've been aided in these efforts by the FCC,
state law enforcement, and several telephone carriers.  Although many purveyors of consumer telephone records seem
to have gotten the message and have moved on to other lines of work, there's still much work left for us to do.

The commission has been aggressive in prosecuting those who pretext and sell financial records as well as
telephone records.  We filed our first case in 1999 against a company that offered to provide consumers' bank account
numbers and balances to anybody for a fee.  As you know, Congress later enacted the Gramm-Leach-Bliley Act, which
expressly prohibits pretexting for financial records.  And the FTC has followed up with more than a dozen cases.  But
pursuing the fraudsters is only part of the solution.  It is equally important to send a message to the business community
that it has a legal obligation to protect sensitive consumer information.  Now the commission has conveyed this
message in many ways but most directly through 13 data security cases we brought over the past few years against such
prominent companies as Microsoft, Tower Records, ChoicePoint, and DSW Shoe Warehouse.

I would like to turn briefly to the subject of legislation.  Of course earlier this year, the full committee approved
H.R. 4943, a bill that would ban pretexting to obtain phone records and would authorize the FTC to bring civil actions
against violators.  The commission believes that a civil law that specifically prohibits telephone record pretexting would
be useful in clarifying the illegality of this practice.

In addition, I would recommend that any such legislation address three issues.  First, the law should apply not only
to pretexters but to those who solicit their services when they know, or should know, that fraudulent means are being
employed.  Second, if the law provides  for FTC enforcement, it should grant the commission the power to seek civil
penalties against violators, a remedy that the FTC does not currently have in cases like this.  In this area, penalties
generally are the most effective civil remedy.  Third, Congress should consider an appropriately tailored exception for
law enforcement.

I would also note that our investigations have revealed that some sites offering pretexting services are registered to
foreign addresses.  This underscores the importance of the commission's previous recommendation that Congress enact
cross-border fraud legislation.  This proposal, called the U.S. Safe Web Act, would overcome many of the existing

obstacles to information sharing in cross-border investigations.

Again, thank you for the opportunity to testify today. We look forward to working with the subcommittee and its staff on this very important issue, and I'd be happy to answer any questions you may have.

REP. WHITFIELD: Well, thank you, Mr. Winston, and we certainly appreciate the work you all are doing at FTC and at the FCC on this issue, and for taking time to be with us today.

I would like to just clarify for myself this seemingly confusion over the enforcement rights of the FTC on this issue, and specifically as it relates to Section 5, because you made the comment that in this legislation -- any legislation hopefully would maker it clear about civil penalties, and I thought that you had authority to issue -- to have civil penalties today on pretexting. But could you elaborate on the existing law as it is today?

MR. WINSTON: Certainly. We have civil penalty authority for certain kinds of cases and certain circumstances. We do not have civil penalty authority for violations of Section 5, such as the sorts of pretexting violations that we've brought cases against. We also don't have civil penalty authority under the Gramm-Leach-Bliley Act. So in cases such as these, we're limited to remedies that are injunctive. In some cases, we can require companies to give back their ill-gotten profits, but we do not have penalty authority.

REP. WHITFIELD: Okay, so the four out of five lawsuits that are still pending in court right now, there's no civil penalties involved in those at all?

MR. WINSTON: Correct. We are seeking, again, return of ill- gotten profits. But in cases like this, having a penalty authority is, frankly, much more effective.

REP. WHITFIELD: Okay. Okay.

And Ms. Monteith, you had mentioned in your testimony that you -- the FCC has recently issued three notices of apparent liability for forfeiture under Section 222 of the Communications Act, and that some companies were fined a total of $650,000 dollars. Could you elaborate on this a little bit? And specifically, what is this apparent liability for forfeiture?

MS. MONTEITH: The notice of apparent liability for forfeiture is the first public type of enforcement action that the commission takes in response to an investigation and an internal finding of a violation of our rules or the law. And this requires the company to respond to us and demonstrate to us in its response that it has or has not violated the law. In these particular cases, the notices of apparent liability were filed for violations of our annual certificate requirement, requiring the company to keep in place an annual certificate signed by a corporate officer that attests to their compliance with our rules.

REP. WHITFIELD: And so -- that was the only violation, the not filing the certificate in a timely manner? Is that right?

MS. MONTEITH: Yes, thus far. We have ongoing investigations of other aspects of the CPNI rule, but to date --

REP: WHITFIELD: Yeah.

MS. MONTEITH: -- those --

REP. WHITFIELD: Well, how many carrier certificates are filed each year?

MS. MONTEITH: The certificates heretofore have not been required to be filed with the commission. But in January, we issued a public notice upon inspecting several certificates and ascertaining that there may be some compliance issues. We required all of the carriers to file their certifications with us. We have over 2,000 certificates on

PANEL IV OF A HEARING OF THE SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS OF THE HOUSE COMMERCE AND ENERGY COMMITTEE SUBJECT: INTERNET DATA BROKERS AND PRETEXTING: WHO HAS ACCESS TO YOUR PRIVATE RECOR

file that we're in the process of our reviewing.

REP. WHITFIELD:  Mm-hmm.  And how did you determine the $650,000 figure?  How was that determined?  In -- (inaudible) --

MS. MONTEITH:  The commission has discretion in terms of its forfeitures to determine the amount of forfeiture.  Here, we thought that the type of violation was very significant, involving personal information, privacy types of rights, and issued forfeitures accordingly.

REP. WHITFIELD:  Now, Mr. Winston, you talked about 4943, and you talked about four points necessary to really make this law effective from your perspective.  Do you all support 4943, or have you taken a position on it?

MR. WINSTON:  The commission has not taken a formal position, but 4943 contains the elements that --

REP. WHITFIELD:  All four.

MR. WINSTON:  -- I identified.  Well, the three elements.  What it does not have, obviously, is the cross-border fraud aspect.  But in terms of penalties and other authority, it delivers what we need.

REP. WHITFIELD:  Okay.

I yield back the balance of my time and recognize Mr. Stupak.

REP. BART STUPAK (D-MI):  Thank you.

Ms. Monteith, you're currently undertaking the antitrust review of the proposed merger between AT&T and Bell South.  And earlier, the FCC fined AT&T for failing to have adequate consumer protection safeguards in place.  Do you think it would be reasonable in light of the hearings we've had the last few days for the commission to condition approval of that merger on a clear and effective policy by the company that protects consumers' privacy from pretexters or other fraudulent methods for breaching customers' privacy?

MS. MONTEITH:  With all due respect, Mr. Stupak, I'm not involved in the merger that is pending before the commission.

 I would be happy to take that question back to the folks that are, and have them look at it.

REP. STUPAK:  Okay.  Would you have them get back with us in writing then, if you would, on that question?

Can I ask you this question?  The -- our bill there, the Rhett- Scarlett-Butler -- was that it, what you're calling it?  Whatever you're calling it now -- H.R. 4943.  If we -- has the FCC taken a position on that?  Are they supportive of the bill?

MS. MONTEITH:  We have not taken a position on it, but Chairman Martin has been very clear that he does endorse and in his testimony testified that he would support actions to prohibit -- to ban outright the pretexting and the sale of consumers' phone records.

REP. STUPAK:  In his statements, has he had any suggestions how we could approve it, like Mr. Winston said there was one part there we should look at a little closer?

MS. MONTEITH:  The legislation?

REP. STUPAK:  Yes.

MS. MONTEITH:  No, he has not.

PANEL IV OF A HEARING OF THE SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS OF THE
HOUSE COMMERCE AND ENERGY COMMITTEE SUBJECT: INTERNET DATA BROKERS AND
PRETEXTING: WHO HAS ACCESS TO YOUR PRIVATE RECOR

REP. STUPAK:  Okay, okay.

I believe you mentioned that on pretexting, of course, you said that it's either customers or people posing as customers or telephone company employees that are involved in the pretexting.  How often is it, if you can give me a percentage, is it customer -- I mean, excuse me, telephone company employees?  Is that -- in the complaints you've had, is that fairly often, or --

MS. MONTEITH:  Where we don't know -- I don't have those figures in front of me.  I think, you know, the responses that we've gotten from the companies that we've investigated --

REP. STUPAK:  Right.

MS. MONTEITH:  -- have indicated that it's both.  But I couldn't tell you, you know, on balance ---

REP. STUPAK:  Equal or --

MS. MONTEITH:  I really do not have that information.

REP. STUPAK:  Okay.

Mr. Winston, could you add anything to that on company employees or individuals posing as customers?  Do you got kind of a sense?  Is it equal, more, less, one or the other?

MR. WINSTON:  We don't have any data, but the sense I've gotten is that it's more people posing as customers and calling rather some sort of insider fraud.

REP. STUPAK:  Okay.

Your FTC issued a report -- I think it was dated January 31st, 2001; you mentioned it on page 7 of your testimony -- in which, just by surfing the 'Net, you found more than a thousand websites and a review of more than 500 advertisement and print identifying firms offering to conduct searches for customers' financial data.  Has this -- have you gone back and done any more searching?  That was like five years ago.  Has it increased, decreased?  Can you give us any sense of that?

MR. WINSTON:  We do periodically go back and search and monitor, and I think both in the case of financial pretexting and telephone record pretexting, the numbers of perpetrators have gone down substantially.  Now how much of that is people actually abandoning the business versus going underground is hard to tell, but just looking at the websites, most of them have disappeared.

REP. STUPAK:  Okay.

In your settlements -- I asked a question of the earlier panel, what about the victims of the identity theft, or that were pretexted? Is there any of that financial settlement that goes to the victims, the individuals?  I notice you had ChoicePoint where you're going to settle for like $10 million, and I thought maybe $5 million may go to individuals who've been pretexted?

MR. WINSTON:  Yes.  In cases where we've found tangible consumer harm like being a victim of identity theft, we've tried to give money back to consumers who were the victims.  In the ChoicePoint case, we'll be returning $5 million to those consumers.  In the pretexting cases, we have not come up with away of actually getting money back to people and having them be able to kind of quantify what their harm was.  Instead, we focused on taking the profits away from the companies that engaged in it.  I think that's, you know, the most effective deterrent, although again, if we had penalty authority, I think we could get substantially more money.

PANEL IV OF A HEARING OF THE SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS OF THE
HOUSE COMMERCE AND ENERGY COMMITTEE SUBJECT: INTERNET DATA BROKERS AND
PRETEXTING: WHO HAS ACCESS TO YOUR PRIVATE RECOR

REP. STUPAK:  So without the FTC stepping in on behalf of the American consumer, there'd be no way, really, of -- there's no cause of action, then, for the American people to recover their damages.

MR. WINSTON:  Well, I think there may well be private causes of action --

REP. STUPAK:  But nothing statutorily under pretexting.

MR. WINSTON:  Nothing statutorily that I'm aware of.

REP. STUPAK:  Okay.

Do you think there should be a separate remedy provision or something for consumers or families in H.R. 4943?

MR. WINSTON:  That's something worth considering.  One issue that we've been thinking about is whether victims of identity theft should have the opportunity to get restitution from the perpetrators for the time they spend in repairing the damage.  So in the identity theft situation, we're looking at the analogue.  Is there a way of allowing victims to recover from perpetrators?  The same sort of thing might work here as well.

REP. STUPAK:  Let me ask this question, if you can answer it.  We mentioned a 2001 study you did where you had a thousand websites and 500 advertisement and practically 200 firms that offered to obtain and sell asset or bank account information to third parties, and you said that has -- that number has gone down since you've been -- stepped up the enforcement actions, or gone underground.  As we've seen in our child pornography hearings, a lot of times they'll go offshore to other countries or set up multiple sites that do it.  Are you finding that same thing here with pretexting?

MR. WINSTON:  Yes.  We've discovered, as I mentioned earlier, that some of these pretexers, some of these data brokers are associated with foreign criminal rings or other foreigners.  And our ability to cooperate with the foreign authorities to go after these people is really hampered by existing law, and that's why the U.S. Safe Web Act is so critical to allowing us to be more effective.

REP. STUPAK:  In your position, have you seen any other countries who've addressed this more aggressively -- pretexting and the problem of obtaining false information -- in a different way or manner that would be helpful to us as a committee to --

MR. WINSTON:  I'm not aware of that.  I suspect that law enforcement in the United States is probably about the most effective in the world at this point.

REP. STUPAK:  I have no further questions, Mr. Chairman.

Thank you both for your testimony.

REP. WHITFIELD:  Thank you, Mr. Stupak.

The chair recognizes Mr. Walden for 10 minutes.

REP. GREG WALDEN (R-OR):  Thank you very much, Mr. Chairman.  And I don't know that I'm going to take the full 10 minutes, but I do have a couple of questions.

What have you seen in terms of changes in data broker activity? What have you noticed, since all this has been in the public?

MR. WINSTON:  Well, I think -- again, there's been some movement to at least stop the most blatant practices, which, even as recently as several months ago, we were seeing advertisements on the Internet saying, "We can get anybody's telephone records --

PANEL IV OF A HEARING OF THE SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS OF THE
HOUSE COMMERCE AND ENERGY COMMITTEE SUBJECT: INTERNET DATA BROKERS AND
PRETEXTING: WHO HAS ACCESS TO YOUR PRIVATE RECOR

REP. WALDEN:  Right.

MR. WINSTON:  -- we can get Social Security numbers; we can get account information; we can get credit card
statements for" --

REP. WALDEN:  And they could.

MR. WINSTON:  And in some cases they could; in some cases they were engaged in false advertising --

REP. WALDEN:  Yeah, that's true.

MR. WINSTON:  -- which is its own problem.

REP. WALDEN:  (Laughs.)

MR. WINSTON:  But that seems to have really if not dried up at least dissipated to a substantial extent.  What we
need to learn, and our investigations are continuing, is are these people really gone, or are they just being more subtle
and more careful about what they say?

REP. WALDEN:  Did the lawsuits you filed recently involve pretexting directly?

MR. WINSTON:  In each of the cases, I believe the ones who actually engage in the pretexting were not the people
who were advertising and selling the records.  I think as in the Hewlett- Packard case --

REP. WALDEN:  There was kind of a middle person?

MR. WINSTON:  There was a middleman.  But yes, we believe in each case there was pretexting that went on.

REP. WALDEN:  And what have you been learning about pretexting in the course of these recent investigations?
What should we know we don't already -- haven't already heard about?

MR. WINSTON:  Well, you probably already have heard about how ingenious these criminals are.  And despite all
of the protections that the phone companies may have put in place, ultimately it's social engineering.  It's a matter of
somebody convincing somebody else to give up records that they shouldn't.  And they've got a lot of different
techniques that they've used.  We've learned about some of those.  But ultimately they've been successful.

REP. WALDEN:  What -- you've heard the testimony by -- from the panel of telephone folks, and you probably
observed what we went  through yesterday with HP.  What's your counsel to phone companies? What should they be
doing they're not doing, or haven't thought about doing?  And what about the consumers?

MR. WINSTON:  Well, from the consumers' standpoint, it's a little frustrating because ultimately they can't prevent
their records from being released.

REP. WALDEN:  How?

MR. WINSTON:  I think putting a password on is important.  It's not foolproof, but it's important.  Also, consumers
need to be aware of the possibility that they themselves might get pretexted.

REP. WALDEN:  Right.

MR. WINSTON:  We seen instances where the pretexters will call the consumer and pose as the phone company or
someone else and get their information; phishing is the common term for it.

REP. WALDEN:  Sure.

PANEL IV OF A HEARING OF THE SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS OF THE
HOUSE COMMERCE AND ENERGY COMMITTEE SUBJECT: INTERNET DATA BROKERS AND
PRETEXTING: WHO HAS ACCESS TO YOUR PRIVATE RECOR

MR. WINSTON:  So we've been trying very hard to educate the public to not give up that information themselves.

REP. WALDEN:  What is the next scam on the horizon?  What do you see that you're beginning to see little rays of light that are out there we need to be aware of, consumers need to be aware of?

MR. WINSTON:  Wow, there's so many.  (Laughs.)  I don't know where to begin.

REP. WALDEN:  You mean we've got -- we're going to have lot of opportunities to get together here with other players?

MR. WINSTON:  I plan on remaining gainfully employed for quite a while.

I think, more broadly, what we're seeing is this kind of seamy cottage industry of information brokers.  And it's not just phone records anymore.  It's not just financial records.  It's --

REP. WALDEN:  What is it?

MR. WINSTON:  It's Social Security numbers.  It's any kind of information that you might have that you don't want other people to get.  There are people out there on the Internet who are selling it. And it's something that we've been trying very hard to get a handle on.  As our economy becomes more high-tech, so do the criminals and --

REP. WALDEN:  Should phone companies -- phone carriers be using Social Security numbers?

MR. WINSTON:  Well, phone companies typically -- if you want to open a phone account --

REP. WALDEN:  Right.

MR. WINSTON:  -- the first thing they're going to do is pull your credit report.  In order to pull your credit report, you've got to give them your Social Security number.

REP. WALDEN:  Right.

MR. WINSTON:  So to that extent, yes, the phone companies need your Social Security number.

REP. WALDEN:  But should they be using that as part of their data?

MR. WINSTON:  Well, if it's --

REP. WALDEN:  For authentication purposes?

MR. WINSTON:  One thing we're looking at in -- there's a governmentwide task force right now on identity theft that President Bush set up back in May, and I've been serving on that.  And one of the things we've been looking at is, are there gratuitous, unnecessary uses of Social Security numbers both in government and in the private sector?  And the answer is yes.  There are a lot of people who are using Social Security numbers --

REP. WALDEN:  So is that what consumers should look at first is minimize the use of your Social Security -- is that the most important number we should keep secure?

MR. WINSTON:  Absolutely.  You know, 42 million Medicare cards in this country that consumers have have their Social Security number on it, and they carry it around in their wallet.  I mean, that's just a recipe for disaster.

REP. WALDEN:  What about when all this moves offshore?  You know, we wrestle in this committee and the telecom subcommittee I'm on with dealing with issues involving the Internet.  And then you say, "Okay, we can do that here, but how do we get at it when it's offshore?"  In this context, what are you seeing in terms of foreign involvement

PANEL IV OF A HEARING OF THE SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS OF THE HOUSE COMMERCE AND ENERGY COMMITTEE SUBJECT: INTERNET DATA BROKERS AND PRETEXTING: WHO HAS ACCESS TO YOUR PRIVATE RECOR

and our ability to get at it?  Are we just going to drive this whole problem offshore and out of reach?

MR. WINSTON:  Yeah, I think that's a good point, and a real concern.  Certainly in the identity theft area,  more and more we're seeing, mainly out of Eastern Europe, organized criminal rings that are hiring people to get this information and then selling it, and -- (inaudible) -- problem.

REP. WALDEN:  So in -- how do -- would one way to be -- one way to get at it be that when we engage in treaties and trade agreements that somehow we also lock down provisions to protect consumers and their identity?

MR. WINSTON:  Absolutely.  And a lot of that work is ongoing, and again it's part of --

REP. WALDEN:  Do we do that now?

MR. WINSTON:  We do some of that now, and as part of our task force, we're going to be pushing for additional opportunities to do that.

REP. WALDEN:  Okay.

And Ms. Monteith, are carriers better protecting their CPNI?

MS. MONTEITH:  I think we have seen as a result of our investigations that carriers are moving to take some additional safeguards, yes, certainly with respect to the kinds of information they have acquired for access to accounts. We heard today that carriers are moving to not give information out over the telephone --

REP. WALDEN:  Right.

MS. MONTEITH:  -- those kinds of things, yes.

REP. WALDEN:  Okay.

Well, I really appreciate your assistance to our efforts today. I appreciate your comments, your answers to our questions, and that of the other panelists who have been willing to actually talk to us. We've -- I think -- are we batting 50-50 on panelists invited who talk versus panelists invited who have decided not to talk?

REP. WHITFIELD:  It's about 50-50.

REP. WALDEN:  Yeah, okay.  (Laughs.)

Well, thank you all very much.

Mr. Chairman, I yield back the remainder of my time.

REP. WHITFIELD:  We've had so many hearings on pretexting.  We've given some thought to just going out and taking somebody by random and bringing them in and talk to them about it.  But we genuinely do thank you all for being here and for your -- the work you're doing in this area, and for your testimony.  And you all are dismissed, and we look forward to continue working with you.

Without objection, we're certainly going to enter into the record our document book, which we have not done yet. And so with that, this hearing is adjourned, and thank you all so much.  (Sounds gavel.)

**LOAD-DATE:** October 3, 2006