06-36083

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

―――――――――――

AL-HARAMAIN ISLAMIC FOUNDATION, INC., et al.,

*Plaintiffs and Appellees,*

*vs.*

GEORGE W. BUSH, President of the United States, et al.,

*Defendants and Appellants.*

―――――――――――

# BRIEF OF APPELLEES

―――――――――――

**EISENBERG AND HANCOCK, LLP**
**JON B. EISENBERG** (CSB No. 88278)
**WILLIAM N. HANCOCK** (CSB No. 104501)
1970 BROADWAY, SUITE 1200
OAKLAND, CALIFORNIA 94612
(510) 452-2581 • FAX: (510) 452-3277

**LISA R. JASKOL** (CSB No. 138769)
610 S. ARDMORE AVENUE
LOS ANGELES, CALIFORNIA 90005
(213) 385-2977 • FAX: (213) 385-9089

**STEVEN GOLDBERG** (OSB No. 75134)
RIVER PARK CENTER, SUITE 300
205 SE SPOKANE STREET
PORTLAND, OREGON 97202
(503) 445-4622 • FAX: (503) 238-7501

**THOMAS H. NELSON** (OSB No. 78315 )
**ZAHA S. HASSAN** (OSB No. 97062)
**THOMAS H. NELSON & ASSOCIATES**
P.O. BOX 1211
24525 E. WELCHES ROAD
WELCHES, OREGON 97067
(503) 662-3123 • FAX: (503) 622-1438

**J. ASHLEE ALBIES** (OSB No.05184)
**LAW OFFICES OF J. ASHLEE ALBIES**
RIVER PARK CENTER, SUITE 300
205 SE SPOKANE STREET
PORTLAND, OREGON 97202
(503) 963-3751 • FAX: (503) 238-7501

ATTORNEYS FOR PLAINTIFFS AND APPELLEES
**AL-HARAMAIN ISLAMIC FOUNDATION, INC.,**
**WENDELL BELEW, and ASIM GHAFOOR**

**CORPORATE DISCLOSURE STATEMENT**

The undersigned counsel for appellees states that appellee Al-Haramain Islamic

Foundation, Inc is an Oregon corporation, with no parent or subsidiary, and that no

publicly-held company owns 10 percent or more of Al-Haramain's stock

July 3, 2007                          By _____
                                           Jon B  Eisenberg

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.    The FISA Context . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    II.    The TSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    III.    Plaintiffs' Surveillance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    I.    The Al-Haramain Complaint and Sealed Filing . . . . . . . . . . . . . . 10

    II.    The State Secrets Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    III.    The Pretrial Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    IV.    The District Court's Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    V.    Subsequent Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    I.    THE SUBJECT MATTER OF THIS CASE IS NOT A STATE
        SECRET . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A.     The TSP Is Not A State Secret . . . . . . . . . . . . . . . . . . . . . . . . . 21

B.     Plaintiffs' Unlawful Surveillance Is Not A Secret
To Them . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     1.     Because of the Document's Disclosure, Plaintiffs
Know They Were Surveilled . . . . . . . . . . . . . . . . . . . . 22

     2.     Defendants Have Failed to Sustain Their Burden of
Proving that Plaintiffs Were Surveilled Other Than
Under the TSP in Violation of FISA . . . . . . . . . . . . . . 23

     3.     Plaintiffs' Knowledge of Their Surveillance Means
This Case Can be Litigated Without any Disclosure
That Threatens National Security. . . . . . . . . . . . . . . . 28

     4.     The Document Itself Demonstrates That Plaintiffs
Were Subjected to Surveillance in Violation of FISA  31

C.     Adjudication in the Manner Prescribed by the District
Court Will Not Threaten National Security. . . . . . . . . . . . . 33

II.     PLAINTIFFS' STANDING IS ADJUDICABLE . . . . . . . . . . . . . . . 35

A.     The Determination Of Plaintiffs' Standing Does Not
Require Any Disclosure Of State Secrets . . . . . . . . . . . . . . 35

B.     The Issue Of Plaintiffs' Standing Is Not Moot . . . . . . . . . . . 36

C.     Sovereign Immunity Does Not Deprive Plaintiffs Of
Standing To Obtain Damages . . . . . . . . . . . . . . . . . . . . . . . 38

D.     The District Court's Ruling Precluding Discovery of
Ongoing Surveillance is Not a Basis For Concluding
That Plaintiffs Lack Standing . . . . . . . . . . . . . . . . . . . . . . . 42

III. THE MERITS OF THIS CASE CAN BE ADJUDICATED
WITHOUT THREATENING NATIONAL SECURITY . . . . . . . . . . . . . . 43

    A.   A Decision on the Merits Does Not Require Disclosure of
Secret Facts About the TSP or Defendants' Motives For It . . . . . . . 43

    B.   Defendants' Own Conduct Demonstrates That the Purely
Legal Merits Issues Can Be Decided Without Disclosure of
State Secrets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

IV. PLAINTIFFS' FISA CAUSE OF ACTION IS GOVERNED BY FISA,
NOT THE STATE SECRETS PRIVILEGE . . . . . . . . . . . . . . . . . . . . . . . . 48

    A.   FISA Supplants the State Secrets Privilege in FISA Litigation . . . . 48

        1.   FISA Speaks Directly to Protection of National Security
in FISA Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        2.   FISA Section 1806(f) Speaks Directly to Rules
of Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

        3.   FISA Section 1810 Speaks Directly Against
Outright Dismissal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    B.   The President Lacks Inherent Power to Disregard FISA's
Supplanting of the State Secrets Privilege . . . . . . . . . . . . . . . . . . . . . 57

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

STATEMENT OF RELATED CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

CERTIFICATION OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

ADDENDUM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . a

# TABLE OF AUTHORITIES

## Cases

Page

Abraham v. County of Greenville
    237 F.3d 386 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

ACLU v. NSA
    438 F.Supp.2d 754 (E.D. Mich. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 22

Adams v. City of Battle Creek
    250 F.3d 980 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Al-Haramain Islamic Found., Inc. v. Bush
    451 F.Supp.2d 1215 (D. Or. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Burgos v. Milton
    709 F.2d 1 (1st Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Butz v. Economou
    438 U.S. 478 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Callejo v. Bancomer, S.A.
    764 F.2d 1101 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Campbell v. United States
    365 U.S. 85 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

County of Oneida v. Oneida Indian Nation
    470 U.S. 226 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Detroit Free Press v. Ashcroft
    303 F.3d 681 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Dickerson v. United States
    530 U.S. 428 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Doe v. Tenet
329 F.3d 1135 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 63

DTM Research, L.L.C. v. AT&T Corp.
245 F.3d 327 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Ellsberg v. Mitchell
709 F.2d 51 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 63

Fitzgerald v. Penthouse Int'l, Ltd.
776 F.2d 1236 (4th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.
528 U.S. 167 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Gilbert v. DaGrossa
756 F.2d 1455 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Halkin v. Helms (Halkin II)
690 F.2d 977 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Halpern v. U.S.
258 F.2d 36 (2d Cir. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Hamdan v. Rumsfeld
126 S.Ct. 2749 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61

Hamdi v. Rumsfeld
542 U.S. 507 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Hepting v. AT&T Corp.
439 F.Supp.2d 974 (N.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Honig v. Doe
484 U.S. 305 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

In re Pharmatrak, Inc.
329 F.3d 9 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

In re United States
872 F.2d 472 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

ITSI TV Productions, Inc. v. Agricultural Associations
3 F.3d 1289 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Jabara v. Kelley
75 F.R.D. 475 (E.D. Mich. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Jabara v. Webster
691 F.2d 272 (6th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Kasza v. Browner
133 F.3d 1159 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . 11, 12, 14, 21, 50, 61

Kentucky v. Graham
473 U.S. 159 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Lane v. Pena
518 U.S. 187 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Molerio v. FBI
749 F.2d 815 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Multi Denominational Ministry of Cannabis and Rastafari, Inc. v. Gonzales
474 F.Supp.2d 1133 (N.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Organizacion JD Ltda.v. U.S. Dept. of Justice
18 F.3d 91 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Rochon v. Gonzales
438 F.3d 1211 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Salazar v. Heckler
    787 F.2d 527 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

State of Nevada v. Hicks
    196 F.3d 1020 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Super Tire Engineering Co. v. McCorkle
    416 U.S. 115 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Tenet v. Doe
    544 U.S. 1 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 30

Terkel v. AT&T Corp.
    441 F.Supp.2d 899 (N.D. Ill. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Totten v. United States
    92 U.S. 105 (1875) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

United States v. Denver & Rio Grande Railroad Company
    191 U.S. 84 (1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Lake
    709 F.2d 43 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

United States v. Nixon
    418 U.S. 683 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

United States v. Reynolds
    345 U.S. 1 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

United States v. Stanley
    483 U.S. 229 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

United States v. Texas
    507 U.S. 529 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

United States v. United States District Court (Keith)
    407 U.S. 297 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Will v. Michigan Dept. of State Police
    491 U.S. 58 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Youngstown Sheet and Tube Co. v. Sawyer
    343 U.S. 579 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Z Channel Ltd. v. Home Box Office
    931 F.2d 1338 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## Statutes and Rules

115 Stat. 1394, §314(a)(2)(B) (Dec. 28, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 46

18 U.S.C. § 2511 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

18 U.S.C. § 2707 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

18 U.S.C. § 2712 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

28 U.S.C. § 1292(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

35 U.S.C. § 181 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

42 U.S.C. § 2000e-16(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

50 U.S.C. § 402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

50 U.S.C. § 1801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

50 U.S.C. § 1801(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

50 U.S.C. § 1801(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

50 U.S.C. § 1801(f)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

50 U.S.C. § 1801(f)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

50 U.S.C. § 1801(f)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

50 U.S.C. § 1801(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

50 U.S.C. § 1801(m) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40, 41

50 U.S.C. § 1802(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

50 U.S.C. § 1805(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

50 U.S.C. § 1805(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

50 U.S.C. § 1805(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

50 U.S.C. § 1806(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

50 U.S.C. § 1806(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

50 U.S.C. § 1809 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 45

50 U.S.C. § 1809(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

50 U.S.C. § 1809(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

50 U.S.C. § 1810 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

50 U.S.C. § 1811 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

50 U.S.C. § 1825(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

50 U.S.C. § 1845(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Federal Rules of Civil Procedure

Rule 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Rule 56(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## Miscellaneous

H. Conf. Rep. No. 95-1720
(1978), *reprinted in* 1978 U.S.C.C.A.N. 4063 . . . . . . . . . . . . . . . . . . 53, 60

H. Rep. No. 95-1283(I) (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

S. Rep. No. 95-604(I) (1977), reprinted in 1978 U.S.C.C.A.N. 3904 . . . . . . . . . . 4

S. Rep. No. 95-701 (1978), reprinted in 1978 U.S.C.C.A.N. 3973 . . . . . . . . . . . 52

Attorney General Alberto Gonzales and General Michael Hayden
Press Briefing (Dec. 19, 2005), *available at* http://www.whitehouse.
gov/news/releases/2005/12/print/20051219-1.html. . . . . . . . . . . . . . . . . 7

FISA Annual Reports to Congress 1979-2006
*available at* http://www.fas.org/irp/agency/doj/fisa/#rept . . . . . . . . . . . . . 5

General Michael Hayden
Address to the National Press Club (Jan. 23, 2006),
*available at* http://www.dni.gov/speeches/20060123_speech.htm. . . . . . . . 7

J. Risen
Administration Pulls Back on Surveillance Agreement, N.Y. Times
(May 2, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

J. Risen & E. Lichtblau
Bush Lets U.S. Spy on Callers Without Courts, N.Y. Times
(Dec. 16, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Transcript of Hearing
  Senate Judiciary Committee (May 15, 2007) at 9-10, 32, 50,
  *available at* http://gulcfac.typepad.com/georgetown_university_law/
  files/comey.transcript.pdf. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

U.S. Department of Justice
  *Legal Authorities Supporting the Activities of the National
  Security Agency Described By the President* (Jan. 19, 2006),
  *available at* http://www.usdoj.gov/opa/whitepaperonnsa
  legalauthorities.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Wartime Executive Power and the NSA's Surveillance Authority:
  Hearing Before the Senate Judiciary Comm.*, 109th Cong. (2006),
  *available on* Westlaw at 2006 WL 270364 (F.D.C.H.) . . . . . . . . . . . . . . . . 7

Written Questions to James B. Comey Submitted by Senator Patrick Leahy
  May 22, 2007, at 2, 4, *available at* http://blog.wired.com/27
  bstroke6/files/070515_us_attnys_iv_hearing_comey_answers_
  to_leahy1.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

**INTRODUCTION**

The soul of American government is transparency – openness in the affairs of its three constitutional branches. Secret government intrusions on personal privacy are inimical to our democracy. "A government operating in the shadow of secrecy stands in complete opposition to the society envisioned by the Framers of our Constitution." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 710 (6th Cir. 2002).

The shadow of secrecy, however, is precisely where defendants want to hide this litigation, where it would quietly die without a judicial determination whether the President of the United States has broken the law by conducting warrantless electronic surveillance in violation of the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. §1801 *et seq.*

In this action, three victims of the federal government's post-9/11 warrantless electronic surveillance program allege violations of FISA and various provisions of the United States Constitution. This action is unique among all the pending lawsuits challenging the warrantless surveillance program in that it is the only one where the plaintiffs possess proof that they were actual targets of warrantless surveillance and on that basis have standing to sue. They know that because one of the defendants accidentally disclosed a document – hereinafter referred to as "the Document" – filed under seal with the district court, which proves that plaintiffs were surveilled.

Defendants asked the district court to prohibit plaintiffs from using the Document to establish their standing and requested outright dismissal of the action pursuant to the "state secrets privilege" – an extraordinary and rarely-invoked doctrine which, in its most extreme form, allows outright dismissal where litigation would require a disclosure of state secrets which jeopardizes national security.  In a narrowly-crafted ruling, the district court refused to dismiss the action and allowed plaintiffs to file *in camera* affidavits attesting to the contents of the Document in order to demonstrate their standing.

In this interlocutory appeal, defendants contend this case cannot be litigated without the government confirming or denying something defendants claim must be kept secret – whether plaintiffs were surveilled.  The fatal flaw in defendants' reasoning is the fact plaintiffs *already know* they were surveilled.  The government supplied the proof when it accidently disclosed the Document.

The pivotal issue in this appeal is not whether this lawsuit should be dismissed to ensure the secrecy of plaintiffs' surveillance.  It is no longer a secret.  The pivotal issue is whether plaintiffs should be permitted to refer to the Document to demonstrate their standing.  If plaintiffs are allowed to do so, the federal courts can adjudicate this case on its merits – which defendants rightly fear will result in a determination that their warrantless surveillance program was unlawful.

# STATEMENT OF JURISDICTION

Plaintiffs agree with defendants' statement of this Court's jurisdiction.

# STATEMENT OF THE ISSUES

**I.**     Does the state secrets privilege require outright dismissal of this action on the ground national security would be threatened by this litigation because (1) its very subject matter, the President's program of warrantless domestic electronic surveillance, is a state secret, or (2) plaintiffs' surveillance, which was accidentally disclosed to them, is a state secret?

**II.**     Is the adjudication of plaintiffs' standing precluded by the state secrets privilege, mootness, or sovereign immunity?

**III.**     Can the merits of this action be adjudicated without a disclosure of secrets that threatens national security?

**IV.**     Do provisions in FISA authorizing a private cause of action for unlawful surveillance and prescribing procedures for judicial determination of national security concerns supplant the state secrets privilege in FISA litigation?

# STATEMENT OF FACTS

## I.     The FISA Context

Congress enacted FISA in 1978 as a response to past instances of abusive warrantless wiretapping by the National Security Agency (NSA) and the Central

Intelligence Agency (CIA). *See* H. Rep. No. 95-1283(I), at 21-22 (1978); S. Rep. No. 95-604(I), at 6 (1977), *reprinted in* 1978 U.S.C.C.A.N. 3904, 1308. FISA provides a framework for the domestic use of electronic surveillance to acquire foreign intelligence information. 50 U.S.C. § 1801(e)(1). FISA requires the government to obtain a court order – that is, a warrant – in order to conduct electronic surveillance of a "United States person," meaning a citizen, resident alien or association of such persons. 50 U.S.C. § 1801(i). A judge of the Foreign Intelligence Surveillance Court (FISC) may issue the warrant upon a finding of "probable cause to believe that . . . the target of the electronic surveillance is a foreign power or an agent of a foreign power." 50 U.S.C. § 1805(a)(3).

There are three narrow exceptions to FISA's warrant requirement:

- The Attorney General may authorize emergency warrantless surveillance for up to 72 hours if necessary to get information "before an order authorizing such surveillance can with due diligence be obtained." 50 U.S.C. § 1805(f)(1).

- The Attorney General may authorize warrantless electronic surveillance for up to one year upon certification that the surveillance is directed only

4

at communications "between or among foreign powers" or non-spoken

technical intelligence "from property or premises under the open and

exclusive control of a foreign power."  50 U.S.C. § 1802(a)(1)(A).

•      The President may authorize warrantless electronic surveillance "for a

period not to exceed fifteen calendar days following a declaration of war

by the Congress."  50 U.S.C. § 1811.

None of these exceptions applies here.  The President's warrantless electronic

surveillance program has taken place entirely outside the framework of FISA.

FISA warrants are freely granted.  Department of Justice (DOJ) statistics

indicate that, between 1978 and 2006, the government submitted some 23,000

surveillance applications to the FISC, which denied only five of those applications.

*See* FISA Annual Reports to Congress 1979-2006, *available at*

http://www.fas.org/irp/agency/doj/fisa/#rept.

FISA imposes criminal penalties for its violation, making it an offense to

"engage[] in electronic surveillance under color of law except as authorized by

statute."  50 U.S.C. § 1809(a)(1).  The offense "is punishable by a fine of not more

than $10,000 or imprisonment for not more than five years, or both."  50 U.S.C.

§ 1809(c).  FISA also imposes civil liability for its violation.  Victims of unlawful electronic surveillance "shall have a cause of action against any person who committed such violation" and "shall be entitled to recover" actual damages, punitive damages, and reasonable attorney's fees and costs.  50 U.S.C. § 1810.

## II.    The TSP

Shortly after the terrorist attacks of September 11, 2001, President Bush authorized the so-called "Terrorist Surveillance Program" (TSP) – a secret program for the NSA to engage in warrantless electronic surveillance of international communications into and out of the United States where the NSA believed that one of the participants was affiliated with or working in support of al-Qaeda.  *See* ER 567.  President Bush regularly re-authorized the TSP at 45-day intervals upon written certifications by the DOJ, *see* ER 571 (except in one instance in March 2004, *see infra* at 8-9), until January 2007, when – at least for the time being – the TSP purportedly was suspended, *see* ER 571, 588-98.

Under the TSP, the NSA intercepted electronic communications for collection, retention and dissemination – without a FISA warrant and without probable cause to believe a crime had been committed – based solely on the NSA's belief that one of the participants was affiliated with or working in support of al-Qaeda.  The surveillance occurred upon a decision by an NSA employee and approval by an NSA

shift supervisor. *See* Attorney General Alberto Gonzales and General Michael Hayden, Press Briefing (Dec. 19, 2005), *available at* http://www.whitehouse.gov/ news/releases/2005/12/print/20051219-1.html (Gonzales and Hayden Briefing); General Michael Hayden, Address to the National Press Club (Jan. 23, 2006), *available at* http://www.dni.gov/speeches/20060123_speech.htm (Hayden Press Club); *Wartime Executive Power and the NSA's Surveillance Authority: Hearing Before the Senate Judiciary Comm.*, 109th Cong. (2006), *available on* Westlaw at 2006 WL 270364 (F.D.C.H.).

The program did not comply with the requirements of FISA. According to General Michael Hayden, it was conducted "in lieu of" FISA, was "more aggressive" than FISA, and was "a bit softer than FISA." *See* Gonzales and Hayden Briefing; Hayden Press Club. Yet, Attorney General Alberto Gonzales has admitted that, "in terms of legal authorities," FISA "requires a court order before engaging in this kind of surveillance." *See* Gonzales and Hayden Briefing**.**

The TSP's existence was publicly revealed for the first time by the New York Times on December 16, 2005. *See* J. Risen & E. Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, N.Y. Times (Dec. 16, 2005.) In a subsequent presidential radio address, at a press conference held by Attorney General Gonzales, and in a 42-

page "White Paper" the DOJ has issued, defendants have publicly admitted the TSP's existence. *See* ER 567, 571.

Testimony by Deputy Attorney General James B. Comey before the Senate Judiciary Committee on May 15, 2007, along with Comey's follow-up response to written questions, has also revealed the following: As of early March 2004, Comey and former Attorney General John Ashcroft had determined that the TSP was unlawful. *See* Transcript of Hearing, Senate Judiciary Committee (May 15, 2007) at 9-10, 32, 50, *available at* http://gulcfac.typepad.com/georgetown_university_law/ files/comey.transcript.pdf (Transcript of Hearing). During a meeting at the White House on March 9, 2004 – two days before the DOJ's next 45-day written re-certification was due – Comey conveyed this conclusion to Vice-President Dick Cheney and members of his and the President's staffs, telling them the DOJ would not re-certify the TSP. *See* Transcript of Hearing at 10, 28; Written Questions to Comey Submitted by Senator Patrick Leahy, May 22, 2007, at 2, 4, *available at* http://blog.wired.com/27bstroke6/files/070515_us_attnys_iv_hearing_comey_ans wers_to_leahy1.pdf (Written Questions). On March 10, 2004, while Ashcroft was hospitalized, two White House officials went to Ashcroft's bedside and attempted to obtain the written re-certification from Ashcroft, but he refused. *See* Transcript of Hearing at 10-13. Thereafter, changes to the TSP were devised, and several weeks

later the DOJ re-certified the program. *See id.* at 41-42. Nevertheless, despite the Attorney General's advice that the TSP as then constituted was unlawful, the President did not direct Comey or the director of the Federal Bureau of Investigation (FBI) to discontinue or suspend any portion of the program. Instead, the program went ahead without the DOJ's re-certification for a period of several weeks – the precise time when the plaintiffs in the present case were subjected to surveillance. *See id.* at 31; Written Questions at 4.

### III. Plaintiffs' Surveillance

In February 2004, defendant Office of Foreign Assets Control (OFAC) temporarily froze the assets of plaintiff Al-Haramain Islamic Foundation, Inc., pending a proceeding to determine whether to declare Al-Haramain a "Specially Designated Global Terrorist" organization. ER 511, 513-17. On August 20, 2004, in the course of that proceeding, the OFAC produced a group of unclassified materials to Al-Haramain counsel Lynne Bernabei, who gave copies to five other Al-Haramain lawyers, including plaintiffs Wendell Belew and Asim Ghafoor, and to Al-Haramain directors Soliman al-Buthi and Pirouz Sedaghaty. ER 518-20, 535-36, 539, 542.

Also included in this production – evidently by accident – was the Document, bearing an extremely high top secret classification. ER 518, 524. In late August

2004, the FBI was notified of the Document's inadvertent disclosure. ER 518, 523.

In mid-October 2004, FBI agents retrieved copies of the Document from all counsel.

ER 519-22, 525, 536-38, 539-40, 542-43. The FBI did not, however, contact Al-

Buthi or Sedaghaty, who were living overseas at the time. ER 520.

The New York Times's subsequent disclosure of the TSP's existence caused

Al-Haramain's counsel to realize that the Document was proof that, in March and

April of 2004, Al-Haramain and its attorneys had been subjected to warrantless

surveillance in violation of FISA.

## STATEMENT OF THE CASE

### I.     The *Al-Haramain* Complaint and Sealed Filing

On February 28, 2006, Al-Haramain, Belew and Ghafoor filed a complaint in

the United States District Court for the District of Oregon alleging a private cause of

action under FISA. The complaint also alleges violations of the constitutional

separation of powers, the First, Fourth and Sixth Amendments, and the International

Covenant on Civil and Political Rights. ER 501-508.

The complaint alleges that defendants "have engaged in electronic surveillance

of plaintiffs without court orders." ER 502. Specifically, the complaint alleges that

in March and April 2004, the NSA targeted and engaged in electronic surveillance

of attorney-client communications between a director or officer of Al-Haramain and

its attorneys Belew and Ghafoor without obtaining a warrant or otherwise complying with FISA, and that in May 2004 the NSA gave logs of those surveilled communications to the OFAC. ER 503-04.

Along with the complaint, plaintiffs filed a copy of the Document under seal with the district court in order to establish the fact of their surveillance and thus their standing as "aggrieved" persons to assert a private cause of action under FISA. The Document is currently being held in San Francisco in a highly secure repository called a "sensitive compartmented information facility" (SCIF).

## II.    The State Secrets Privilege

Defendants have responded to this lawsuit by invoking the state secrets privilege, which – where applicable – allows the government to refuse discovery of classified information that constitutes a military or state secret. *United States v. Reynolds*, 345 U.S. 1, 6, 10 (1953).

In *Kasza v. Browner*, 133 F.3d 1159, 1165 (9th Cir. 1998), this Court explained the state secrets privilege as follows:  The state secrets privilege is "a common law evidentiary privilege."  It "allows the government to deny discovery of military secrets" which, in the interest of national security, should not be divulged. *Id.* "Once the privilege is properly invoked and the court is satisfied as to the danger of divulging state secrets, the privilege is absolute." *Id.* at 1166.  The government can

invoke the privilege with regard to "particular evidence," so that the privileged evidence "is completely removed from the case," which then "goes forward based on evidence not covered by the privilege." *Id.* Further, if the "very subject matter of the action" is a state secret, the court must "dismiss the plaintiff's action." *Id.*

Outright dismissal, however, has been called a "drastic remedy," *Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d 1236, 1242 (4th Cir. 1985), and "draconian," *In re United States*, 872 F.2d 472, 477 (D.C. Cir. 1989). Most cases implicating the state secrets privilege proceed upon removal of the privileged evidence from the case. *See, e.g., DTM Research, L.L.C. v. AT&T Corp.* 245 F.3d 327, 334 (4th Cir. 2001); *Ellsberg v. Mitchell*, 709 F.2d 51, 66-70 (D.C. Cir. 1983); *Jabara v. Webster*, 691 F.2d 272 (6th Cir. 1982). Outright dismissal is appropriate "[o]nly when no amount of effort and care on the part of the court and the parties will safeguard privileged material." *Fitzgerald*, 776 F.2d at 1244.

This Court has counseled against excessive judicial deference to executive assertion of the state secrets privilege as a basis for the extreme measure of outright dismissal: "State secrets privilege law prescribes that courts must be sure that claims of paramount national security interest are presented in the manner that has been devised best to assure their validity and must consider whether there are alternatives to outright dismissal that could provide whatever assurances of secrecy are necessary.

That counterweight role has been reserved for the judiciary. We must fulfill it with precision and care, lest we encourage . . . executive overreaching . . . ." *Doe v. Tenet*, 329 F.3d 1135, 1146 (9th Cir. 2003), *overruled on another point in Tenet v. Doe*, 544 U.S. 1 (2005).[1]

This Court's vision of the judiciary's duty to scrutinize an assertion of the state secrets privilege is fully in accord with *Reynolds*, which said that "[j]udicial control over the evidence in a [state secrets privilege] case cannot be abdicated to the caprice of executive officers." *Reynolds*, 345 U.S. at 9-10. Many other courts have made similar pronouncements. *See, e.g., In re United States*, 872 F.2d 472, 475 (D.C. Cir. 1989) ("court must not merely unthinkingly ratify the executive's assertion of absolute privilege, lest it inappropriately abandon its important judicial role"); *Molerio v. FBI*, 749 F.2d 815, 822 (D.C. Cir. 1984) ("To some degree at least, the validity of the government's assertion must be judicially assessed."); *Jabara v. Kelley*, 75 F.R.D. 475, 484 (E.D. Mich. 1977) (it is "the courts, and not the executive

---

[1]

    The Supreme Court reversed this Court in *Tenet* because it applied the balancing analysis of the state secrets privilege to an action that the Supreme Court held was categorically barred by a rule prohibiting lawsuits against the government based on covert espionage agreements, 544 U.S. at 10, not because of any error in this Court's pronouncements regarding state secrets privilege analysis.

officer claiming the privilege, who must determine whether the claim is based on valid concerns").

Thus, "before approving the application of the privilege, the district court must be convinced . . . that there is a 'reasonable danger' that military or national secrets will be revealed . . . . [T]he greater the party's need for the evidence, the more deeply a court must probe to see whether state secrets are in fact at risk." *Doe v. Tenet*, 329 F.3d at 1152. "[P]articularly where constitutional claims are at issue, the *Reynolds* inquiry requires courts to make every effort to ascertain whether the claims in question can be adjudicated while protecting the national security interests asserted." *Id.* at 1153.

Further, in adjudicating a claim of privilege, the district court must assess the plausibility of allegations that national security is jeopardized. "[T]he more plausible and substantial the government's allegations of danger to national security, in the context of all the circumstances surrounding the case, the more deferential should be the judge's inquiry into the foundations and scope of the claim." *Ellsberg*, 709 F.2d at 59. Conversely, the less plausible the allegation of danger to national security, the less deferential is the court's adjudication. This plausibility assessment is essential to the court's determination whether the court is "satisfied as to the danger of divulging state secrets." *Kasza*, 133 F.3d at 1166.

## III.  The Pretrial Motions

Defendants filed a motion for dismissal of this action, or alternatively for summary judgment, based on the state secrets privilege.  ER 546-48.  They also filed a motion to bar plaintiffs from having access to the Document, which by then had been transferred to a SCIF.  *See* Motion to Prevent Plaintiffs' Access to the Sealed Classified Document (Docket No. 39).

At a hearing on August 29, 2006, the district court judge proposed a compromise concerning plaintiffs' use of and access to the Document to establish their standing to sue  – that plaintiffs and/or their counsel be permitted to file declarations *in camera* describing what they had seen in the Document.  RT 8/29/06 at 27.  The judge suggested, "what about preparing a declaration based on memory? There is nothing in the law that requires them to purge their memory."  *Id.* at 42. Defendants' counsel flatly rejected the proposal.  *Id.* at 42-43.  Plaintiffs' counsel, however, embraced it, describing it as "a solution to our access problem."  *Id.* at 57. Plaintiffs' counsel said, "All we are looking for is at this point in the proceeding to be able to point to that document and say, 'This shows our standing,' so that we get past the standing obstacle to a decision on the merits."  *Id.* at 58.  The judge and plaintiffs' counsel also proposed other procedures such as redaction of any sensitive information in the Document, stipulation to ultimate facts, or protective orders, but

defense counsel rejected those proposals, too.  *See* RT 8/29/06 12, 29-30, 83-84; ER 578.

## IV.  The District Court's Decision.

On September 7, 2006, the district court issued its opinion.  *Al-Haramain Islamic Found., Inc. v. Bush*, 451 F.Supp.2d 1215 (D. Or. 2006); *see* ER 564.  The court declined to dismiss the action or grant summary judgment, holding as follows:

- • Because of "official statements and publications" by the President, the Attorney General, and the DOJ, "the existence of the Surveillance Program is not a secret, the subjects of the program are not a secret, and the general method of the program – including that it is warrantless – is not a secret."  ER 571.

- • Because of the inadvertent disclosure of the sealed document, "it is not a secret to plaintiffs whether their communications have been intercepted."  ER 572.

- • As a result, "where plaintiffs know whether their communications have been intercepted, no harm to the national security would occur if

plaintiffs are able to prove the general point that they were subject to surveillance as revealed in the Sealed Document," and "there is no reasonable danger that the national security would be harmed if it is confirmed or denied that plaintiffs were subject to surveillance." ER 573.

The court granted defendants' motion to bar plaintiffs from having access to the Document itself, "in that plaintiffs may not have physical control over the entire document." ER 578. However, the judge adopted the compromise he had proposed at the hearing, saying he "will permit plaintiffs to file *in camera* any affidavits attesting to the contents of the document from their memories to support their standing in this case and to make a *prima facie* case." *Id.* The court narrowly restricted its state secrets ruling to a single item of evidence – the Document itself. The court ruled *only* that plaintiffs may refer to the Document, from memory, because "if plaintiffs are able to prove what they allege – that the Sealed Document demonstrates they were under surveillance – no state secrets that would harm national security would be disclosed." ER 574.

## V. Subsequent Proceedings

The district court certified its decision for interlocutory appeal pursuant to 28 U.S.C. section 1292(b). ER 582. On September 20, 2006, defendants petitioned this Court for acceptance of the interlocutory appeal. On December 21, 2006, the Court granted the petition. ER 586. On April 16, 2007, the Court ordered this appeal consolidated with the interlocutory appeals in *Hepting v. AT&T Corp.* and *Hepting v. United States*. ER 599-601.

Meanwhile, proceedings were under way before the Judicial Panel on Multidistrict Litigation for transfer of this action to the Northern District of California. The transfer was finalized on December 15, 2006. ER 583-85.

Before the transfer, on October 30, 2006, plaintiffs filed a motion in the district court for partial summary judgment of liability, *see* Fed. R. Civ. P. 56(c), or, alternatively, for partial summary adjudication of specific issues within claims, *see* Fed. R. Civ. P. 56(d). *See* Motion for Partial Summary Judgment etc. (Docket No. 85). By that motion, plaintiffs seek an adjudication that defendants' publicly-asserted justifications for violating FISA are legally meritless. Along with the motion, pursuant to the district court's ruling, plaintiffs filed, under seal, affidavits describing the Document from memory in order to demonstrate standing. Two days later, on November 1, 2006, the district court ordered deferral of further briefing on the motion

for partial summary judgment or adjudication pending the decision on transfer. *See* RT 11/1/06 at 17. After the transfer, the transferee district court restored the briefing schedule and set the motion for oral argument, but this Court issued a stay of further proceedings on the motion during the pendency of this appeal.

## SUMMARY OF ARGUMENT

I.     The state secrets privilege does not require outright dismissal of this action on the ground its very subject matter is a state secret. Because of official public disclosures about the TSP, it is no longer a secret to the American public. Similarly, because of the Document's disclosure to plaintiffs, their surveillance is no longer a secret to them. Defendants bear the burden of proving any facts peculiarly within defendants' exclusive knowledge that would indicate plaintiffs were surveilled other than under the TSP in violation of FISA, and defendants have failed to sustain that burden. This case can be litigated without any disclosure of the TSP's operational details that might threaten national security.

II.     The adjudication of plaintiffs' standing is not precluded by the state secrets privilege, mootness, or sovereign immunity. The procedure prescribed by the district court for adjudicating standing – permitting plaintiffs to file *in camera* affidavits describing the Document from memory – enables the court to adjudicate standing without putting state secrets at risk. The purported suspension of the TSP

does not moot the issue of plaintiffs' standing to obtain prospective relief, because there is a danger that the TSP might be revived in the future. The doctrine of sovereign immunity does not deprive plaintiffs of standing to obtain damages for FISA violations.

**III.** The merits of this action can be adjudicated without threatening national security. A decision on the merits does not require disclosure of any secret facts about the TSP's operational details or defendants' motives for the TSP. Defendants' own conduct – extensively arguing the merits issues publicly in the DOJ's "White Paper" on the TSP and in defendants' brief in this appeal – demonstrates that the purely legal merits issues can be decided without disclosure of state secrets.

**IV.** Plaintiffs' FISA cause of action is governed by FISA, not the state secrets privilege. Provisions in FISA authorizing a private cause of action for unlawful surveillance and prescribing procedures for judicial determination of national security concerns supplant the state secrets privilege in FISA litigation. Because of the constitutional separation of powers, the President lacks inherent power to disregard FISA's supplanting of the state secrets privilege.

# ARGUMENT

## I.
## THE SUBJECT MATTER OF THIS CASE IS NOT A STATE SECRET.

### A.     The TSP is Not a State Secret.

The first argument in defendants' brief – indeed, their central theme – is that

the state secrets privilege compels outright dismissal of this lawsuit because "the very

subject matter of this suit is a state secret that cannot be litigated."   Brief of

Appellants (hereinafter "BOA") 17.

The entire American public, however, now knows about the TSP, thanks to the

New York Times story in December 2005 exposing the program and the

government's subsequent aggressive public relations campaign attempting to justify

the program.   Thus, it can hardly be said that "the very subject matter" of this action

is a state secret.   *Kasza*, 133 F.3d at 1166.   As the district court said, because of

"official statements and publications" by the President, the Attorney General, and the

DOJ, "the existence of the Surveillance Program is not a secret, the subjects of the

program are not a secret, and the general method of the program – including that it

is warrantless – is not a secret."   ER 571.   And now, thanks to the recent Senate

Judiciary Committee testimony by former Deputy Attorney General Comey, we know

that at least some of the Al-Haramain surveillance occurred at a time when the TSP

continued unabated without DOJ certification and despite the DOJ's admonitions to White House officials that the TSP as then constituted was unlawful.

Three other district courts have agreed – as everyone must – that the TSP's existence is no longer a state secret. *See Hepting v. AT&T Corp.*, 439 F.Supp.2d 974, 992-93 (N.D. Cal. 2006) ("the government has publicly admitted the existence of a 'terrorist surveillance program,'" and thus "the very subject matter of this action is not a 'secret' for purposes of the state secrets privilege"); *Terkel v. AT&T Corp.*, 441 F.Supp.2d 899, 913 (N.D. Ill. 2006) ("public admissions by the government about the specific activity at issue ought to be sufficient to overcome a later assertion of the state secrets privilege"); *ACLU v. NSA*, 438 F.Supp.2d 754, 765 (E.D. Mich. 2006) ("As the Government has on many occasions confirmed" the existence of the TSP, "the state secrets privilege does not apply to this information"). There is no room for dispute here.

## B.   Plaintiffs' Unlawful Surveillance is Not a Secret to Them.

### 1.   Because of the Document's Disclosure, Plaintiffs Know They Were Surveilled.

Defendants say "disclosure of information tending to confirm or deny" whether plaintiffs have been surveilled "would pose a grave threat to national security." BOA 11. The absurdity of this proposition lies in the simple fact that plaintiffs *already*

*know* they were targeted for surveillance. Because of the OFAC's accidental disclosure of the Document, plaintiffs have seen incontrovertible proof of their surveillance.

As the district court said, "it is not a secret to plaintiffs whether their communications have been intercepted." ER 572. Thus, "where plaintiffs know whether their communications have been intercepted, no harm to the national security would occur if plaintiffs are able to prove the general point that they were subject to surveillance as revealed in the Sealed Document," and "there is no reasonable danger that the national security would be harmed if it is confirmed or denied that plaintiffs were subject to surveillance." ER 573.

> **2. Defendants Have Failed to Sustain Their Burden of Proving that Plaintiffs Were Surveilled *Other* Than Under the TSP in Violation of FISA.**

Defendants challenge the district court's reasoning on the ground plaintiffs purportedly do not have "sufficient information or context" to know *for certain* that they were subjected to warrantless electronic surveillance under the TSP. BOA 19-20. Defendants suggest that, contrary to what the Document indicates, as a factual matter there "might" have been FISA warrants for plaintiffs' surveillance, *see* BOA 20-21, or defendants "could" have learned of plaintiffs' communications "without surveilling the plaintiffs themselves," *see* BOA 22.

Any such facts, however, are peculiarly within defendants' exclusive knowledge. Consequently, the burden shifts to defendants to prove that they had FISA warrants or that they learned of plaintiffs' communications by means other than surveilling the plaintiffs. *See, e.g., Campbell v. United States*, 365 U.S. 85, 96 (1961) ("the ordinary rule . . . does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary"); *ITSI TV Productions, Inc. v. Agricultural Associations*, 3 F.3d 1289, 1292 (9th Cir. 1993). Where, as here, "the subject matter of a negative averment lies peculiarly within the knowledge of the other party, the averment is taken as true unless disproved by that party." *United States v. Denver & Rio Grande Railroad Company*, 191 U.S. 84, 92 (1903) (quotation marks omitted).

Defendants have not sustained their burden of proof. Nothing in any of their public filings in the district court substantiates their suggestions on appeal that they might have intercepted plaintiffs' communications other than pursuant to the TSP. Moreover, it is evident that the same is true of defendants' secret *ex parte* and *in camera* filings in the district court. If defendants truly had FISA warrants or learned of plaintiffs' communications other than by surveilling the plaintiffs, surely defendants would have told the district court in their secret filings, and the court would have dismissed this lawsuit without wasting anyone's time any further. The

fact that the district court did *not* dismiss the lawsuit demonstrates that there is no substance to defendants' suggestions.[2/]

Defendants also suggest that perhaps plaintiffs' surveillance did not constitute electronic surveillance as defined by FISA. *See* BOA 23-24. This suggestion, too, is meritless.

FISA prescribes four discrete definitions of the types of "electronic surveillance" to which FISA applies:

- "the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire or radio communication sent by or intended to be received by a particular, known United States person who is in the United States, if the contents are acquired by intentionally targeting that United States person . . . ." 50 U.S.C. § 1801(f)(1).

---

[2/]

Defendants say plaintiffs' counsel conceded in oral argument below "that they would need *discovery* to attempt to prove that they had been subjected to warrantless surveillance." BOA 8, emphasis added. This characterization of counsel's comments is inaccurate. What happened was that counsel asserted defendants' failure to prove the existence of FISA warrants and then *added* that "the simple way" of learning whether there were FISA warrants was through discovery. RT 8/24/06 at 60. Counsel did not mean to suggest that discovery is *essential* to resolving the issue whether there were FISA warrants. Discovery is one way of resolving the issue, but it is not the *only* way. Another way is to hold defendants to their burden of proof.

- "the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire communication to or from a person in the United States, without the consent of any party thereto, if such acquisition occurs in the United States . . . ."  50 U.S.C. § 1801(f)(2).

- "the intentional acquisition by an electronic, mechanical, or other surveillance device of the contents of any radio communication . . . if both the sender and all intended recipients are located within the United States . . . ."  50 U.S.C. § 1801(f)(3).

- "the installation or use of an electronic, mechanical, or other surveillance device in the United States for monitoring to acquire information, other than from a wire or radio communication . . . ."  50 U.S.C. § 1801(f)(4).

Defendants' brief italicizes the words "in the United States" when quoting each of these definitions.  *See* BOA 23.  Evidently defendants mean to suggest it is possible that the surveillance revealed by the Document might have targeted someone who was not in the United States and/or occurred outside the United States.  But

plaintiffs Belew and Ghafoor were United States persons in Washington D.C., and plaintiff Al-Haramain, as an Oregon corporation, was a United States person in Oregon. Thus, whether the target was Belew, Ghafoor, or Al-Haramain (through one of its officers or directors, such as al-Buthi), all three were "in the United States" as prescribed by section 1801(f)(1). On this basis alone, defendants have failed in their efforts to evade the statutory definitions of electronic surveillance.

Moreover, once again defendants bear the burden of proving what they suggest – that they did not target anyone or acquire any communications in the United States – because such facts are peculiarly within defendants' exclusive knowledge. Evidently defendants failed to sustain this burden of proof below, just as they failed to show that there were FISA warrants or that defendants learned of plaintiffs' communications by means other than by surveilling them. If it were really true that defendants did not conduct electronic surveillance of plaintiffs as defined by FISA, surely defendants would have demonstrated that fact below in one of their secret filings. Plainly they have not done so – evidently because they *cannot* do so.

Defendants likely will contend in their reply brief that outright dismissal is required because they cannot sustain their burden of proof without effectively revealing state secrets to the public, in that any disposition in favor of defendants other than outright dismissal – e.g., on the ground there were FISA warrants or there

was no electronic surveillance as defined by FISA – would jeopardize national security by confirming such facts. But FISA section 1810, by prescribing a private cause of action, contemplates precisely these sorts of factual adjudications. The presence or absence of FISA warrants or electronic surveillance as defined by FISA can hardly be a state secret when FISA authorizes litigation to determine such facts. Again, such factual determinations do not require any disclosure concerning the operational details of the surveillance. And if, as plaintiffs contend, FISA supplants the state secrets privilege, *see infra* at 48-57, then FISA section 1806(f) provides an effective procedure – *ex parte* and *in camera* review –for meeting national security concerns while determining whether there is any substance to defendants' suggestions. *See infra* at 51-54.

### 3. Plaintiffs' Knowledge of Their Surveillance Means This Case Can be Litigated Without any Disclosure That Threatens National Security.

Defendants contend plaintiffs' knowledge of their surveillance is inconsequential because "confirmation or denial of such surveillance to the *public at large* would harm national security." BOA 26 (emphasis in original). But according to the unclassified declaration of John Negroponte, one of the harms from disclosing targets of foreign intelligence surveillance is as follows: "If an individual knows or suspects he is a target of U.S. intelligence activities, he would naturally tend to alter

his behavior to take new precautions against surveillance, thereby compromising valuable intelligence collection." ER 554. Because of the OFAC's accidental disclosure of the Document, any harm to national security has already been done, because plaintiffs would naturally tend to alter their behavior to take precautions against the surveillance of which they have learned. That is why the district court ruled as it did. *See* ER 572 ("Those individuals can be presumed to have already changed their behavior as a result of any information they learned from reading the Sealed Document.").

Defendants assert another harm described by Negroponte – that "confirming or denying whether a particular person is subject to surveillance would tend to reveal intelligence information, sources, and methods that are at issue in the surveillance, thus compromising those methods and severely undermining surveillance activities in general." ER 554. But the determination whether defendants violated FISA does not require disclosure of anything other than the fact of plaintiffs' warrantless electronic surveillance as revealed by the Document. For example, in *United States v. United States District Court (Keith)*, 407 U.S. 297, 315-21 (1972), the Supreme Court did not have to delve into the details of how the FBI was conducting domestic intelligence surveillance in order to determine whether it was unlawful. There is no need for further disclosure of any secret "information, sources, and methods," ER

554, to determine the merits issues in this case, which are purely legal – whether inherent presidential power or the 2001 Authorization for Use of Military Force (AUMF) trumps FISA.

Defendants also contend plaintiffs' knowledge of their surveillance is inconsequential in light of *Tenet v. Doe*, 544 U.S. 1 (2005) and *Totten v. United States*, 92 U.S. 105 (1875), where lawsuits against the government based on covert espionage agreements were dismissed even though, as defendants put it, "the alleged spies in *Tenet* and *Totten* had direct knowledge of facts supporting their espionage contract claims for compensation from the Government." BOA 27. But *Tenet* and *Totten* were not state secrets cases. Those actions were dismissed because of a categorical bar against certain types of claims – a "broader holding that lawsuits premised on alleged espionage agreements are altogether forbidden," *Tenet v. Doe*, 544 U.S. at 1, 9 – not because of the state secrets privilege. Because the categorical bar of *Tenet* and *Totten* is "more sweeping" than the state secrets privilege, *id.*, it is entirely consistent for disclosure to extinguish a state secrets claim where it would not permit enforcement of an espionage agreement. It is a distortion of *Tenet* and *Totten* to rely on their categorical bar against lawsuits based on covert espionage agreements as a basis for evading judicial review of a widespread program of warrantless electronic surveillance in violation of congressional legislation.

## 4.    The Document Itself Demonstrates That Plaintiffs Were Subjected to Surveillance in Violation of FISA.

Independent of defendants' failure to sustain their burden of proving facts within their exclusive knowledge, the substance of the Document itself demonstrates that plaintiffs were subjected to warrantless electronic surveillance in violation of FISA.

The very circumstances of plaintiffs' surveillance as revealed by the Document, along with defendants' own allegations in this litigation, amount to a prima facie case that plaintiffs were surveilled under the TSP.  Plaintiffs' complaint alleges that the NSA surveilled them in March and April of 2004.  ER 503.  **[REDACTED TEXT; SEE SEALED SUPPLEMENTAL BRIEF OF APPELLEES]**[3/]  Defendants' brief

---

[3/]

Plaintiffs' counsel prepared and filed the Sealed Supplemental Brief of Appellees under highly unusual and objectionable restrictions imposed by the government.  Under the direction and supervision of a security officer employed by the DOJ, and on the instructions of defense counsel Andrew H. Tannenbaum, two of plaintiffs' attorneys – Jon B. Eisenberg and Steven Goldberg – were designated as the only counsel who would be permitted to draft the Sealed Supplemental Brief of Appellees.  A third attorney – Thomas H. Nelson – was specifically forbidden from participating in the drafting.   Counsel were required to prepare the brief in the San Francisco U.S. Attorney's Office on a computer supplied by defendants; counsel were forbidden from preparing any prior notes for the drafting; and counsel were not allowed to retain a copy of the brief after they prepared it. (And evidently Nelson and the rest of plaintiffs' counsel will not be permitted to see what Eisenberg and Goldberg drafted.)   Counsel's understanding is that the security officer will give copies of the Sealed Supplemental Brief of Appellees to defense counsel and the three judges assigned to decide this appeal, but no one else – not even the judges' staff –

describes the TSP as a program in which, commencing shortly after September 11, 2001 and continuing through January 2007, the NSA targeted "persons linked to al Qaeda" for warrantless electronic surveillance. BOA 4. Defendants' brief describes plaintiffs as "a terrorist organization and two lawyers affiliated with it," BOA 2, and describes Al-Haramain specifically as having "ties with al Qaeda and Osama bin Laden," BOA 5. Thus, plaintiffs purportedly were precisely the sorts of persons whom the TSP targeted; they were surveilled by the government agency that conducted the TSP; and they were surveilled during the life span of the TSP. There can be no reasonable doubt that they were surveilled under the TSP.

Additionally, the substance of the Document indicates that – contrary to defendants' suggestions – plaintiffs themselves were surveilled and there were no FISA warrants for the surveillance. **[REDACTED TEXT; SEE SEALED SUPPLEMENTAL BRIEF OF APPELLEES]**

In short, the substance of the Document itself demonstrates there is no merit to any of defendants' suggestions that plaintiffs' surveillance might have or could have been lawful.

---

will be permitted to see it. Thus, the playing field in this case is hardly level. Defendants are privy to plaintiffs' secret filings – which were prepared under defendants' auspices and control – yet plaintiffs are not privy to defendants' secret filings.

## C.    Adjudication in the Manner Prescribed by the District Court Will Not Threaten National Security.

Defendants insist that the procedure prescribed by the district court for adjudicating plaintiffs' standing – permitting plaintiffs "to file *in camera* any affidavits attesting to the contents of the [D]ocument from their memories," ER 578 – is inadequate to protect national security for the following reason:

> If plaintiffs were able to recall the contents of the Sealed Document perfectly, their evidence would constitute a mental photocopy of the privileged material.  And if plaintiffs' recollection were imperfect, the accuracy of their evidence could be evaluated – or rebutted – only by referring back to the actual contents of the document.

BOA 25-26.  According to defendants, in either case secret information "would improperly be made the subject of evidentiary proceedings" because "the probative nature of plaintiffs' evidence would have to be assessed in the broader, highly classified context of foreign intelligence gathering."  BOA 26.

But defendants fail to explain *why* there is any need for "evidentiary proceedings" to assess plaintiffs' memories of the Document "in the broader, highly classified context of foreign intelligence gathering."  *Id.*  In truth, there is no such need.  The district court (like this Court) has access to the Document itself, and thus can determine, without an evidentiary proceeding, whether plaintiffs' memories of the document are accurate, simply by reviewing the Document *in camera*.

As for defendants' concern that plaintiffs' accurate recall of the Document "would constitute a mental photocopy" of "privileged material," BOA 25, the district court addressed this point when commenting "[t]here is nothing in the law that requires [plaintiffs] to purge their memory." RT 8/29/06 at 42. Defendants now seem to be suggesting that the government can *effectively* purge plaintiffs' memory by invoking the state secrets privilege to prevent plaintiffs from proving their standing by saying what they know. That notion is worthy of Franz Kafka.

Defendants contend that even if the procedure prescribed by the district court is "otherwise permissible," a *decision* by the district court that plaintiffs have standing "would reveal state secrets" by indicating "that they had been subjected to warrantless surveillance under the TSP." BOA 29-30. But a finding of standing cannot possibly threaten national security now that the Document has been disclosed to plaintiffs. Plaintiffs have already had the opportunity to alter their behavior in light of the disclosure, and the finding of standing does not require any further disclosure of any secret information, sources, and methods of intelligence gathering.

And if it were really true, as defendants contend, that the plaintiffs are "a terrorist organization and two lawyers affiliated with it," BOA 2, and that Al-Haramain has "ties with al Qaeda and Osama bin Laden," BOA 5 (charges plaintiffs deny), then plaintiffs' electronic surveillance should hardly come as a surprise to

anyone.  As surely as there was a TSP, it had to have targeted someone.  A judicial

determination that the TSP *actually did* target particular persons who defendants

claim have ties to al-Qaeda and Osama bin Laden can hardly be a surprising

revelation that might harm national security.

The only surprise is that defendants conducted plaintiffs' surveillance without

FISA warrants, which they surely could have obtained if only they had asked.

Defendants chose instead to arrogate power that Congress, through FISA, squelched

in 1978.  Defendants did not violate FISA because they *had* to; they violated FISA

because they *wanted* to.

## II.
## PLAINTIFFS' STANDING IS ADJUDICABLE.

### A.    The Determination of Plaintiffs' Standing Does Not Require any Disclosure of State Secrets.

Defendants next assert several reasons why plaintiffs' standing purportedly is

not adjudicable.  Their first claim is that plaintiffs cannot demonstrate the fact of their

surveillance "without recourse to information protected by the state secrets privilege."

BOA 31.  But the fact of plaintiffs' surveillance can be established simply by

reference to the Document and the sealed affidavits filed in support of plaintiffs'

motion for partial summary judgment or adjudication – which poses no threat to

national security. There is no need for recourse to any secret information that plaintiffs have not already seen.

Defendants rely on *Halkin v. Helms (Halkin II)*, 690 F.2d 977 (D.C. Cir. 1982), quoting its holding that in that case the plaintiffs' "*inability to adduce proof* of actual acquisition of their communications" made them "incapable of making the showing necessary to establish their standing to seek relief." *Id.* at 998 (emphasis added); *see* BOA 32-33. But in the present case, unlike in *Halkin II*, the plaintiffs *have* adduced proof of their actual surveillance – the Document. That distinction makes *Halkin II* inapposite.

## B.    The Issue of Plaintiffs' Standing is Not Moot.

Defendants contend the purported suspension of the TSP in January 2007 "renders plaintiffs' claim for prospective relief moot and eliminates any standing." BOA 36. This contention is meritless for three reasons.

First, voluntary cessation of challenged conduct does not create mootness unless "subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quotation marks omitted). It is defendants' burden to persuade this Court that the TSP cannot reasonably be expected to be revived at some future date. *Id.* Defendants have not

even attempted to sustain that burden. Indeed, the Director of National Intelligence recently refused to assure the Senate Intelligence Committee that the TSP would not be revived, continuing to insist that the President may lawfully conduct warrantless electronic surveillance outside the structure of FISA. *See* J. Risen, *Administration Pulls Back on Surveillance Agreement*, NY. Times (May 2, 2007). Evidently the President is contemplating revival of the TSP if he is able to evade a judicial determination of its legality.

Second, plaintiffs seek declaratory relief in addition to injunctive relief. *See* ER 507. If, as seems apparent, the TSP might be revived at some future date, then declaratory relief might be appropriate in this case, even if an injunction were not. The district court has a duty to decide "the appropriateness and the merits of the declaratory request irrespective of . . . the propriety of the issuance of the injunction." *See Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 121 (1974) (internal citations omitted). A case or controversy exists for purposes of declaratory relief when the challenged activity "is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may be a substantial adverse effect on the interests of the petitioning parties." *Id.* at 122. The TSP's brooding presence, even if suspended for the time being, casts a pall on the liberty interests of not just the plaintiffs, but all Americans.

Third, plaintiffs seek *damages* in addition to injunctive and declaratory relief. *See* ER 507. In such instances, cessation of the challenged conduct does not result in mootness, because damages remain recoverable even if injunctive and declaratory relief is no longer necessary. *Z Channel Ltd. v. Home Box Office*, 931 F.2d 1338, 1341 (9th Cir. 1991).

## C. Sovereign Immunity Does Not Deprive Plaintiffs of Standing to Obtain Damages.

Defendants contend federal sovereign immunity deprives plaintiffs of standing to obtain damages because FISA does not waive such immunity. *See* BOA 36-37. That contention, too, is meritless.

At the outset, we note that the issue of federal sovereign immunity is not yet properly before this Court, for two reasons. First, this Court's jurisdiction in this interlocutory appeal is limited to the issues addressed in the opinion certified for appeal, *United States v. Stanley*, 483 U.S. 669, 677 (1987), which does not address sovereign immunity. Second, sovereign immunity is an affirmative defense, *see State of Nevada v. Hicks*, 196 F.3d 1020, 1029, n. 12 (9th Cir. 1999), and as such must be pleaded, *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1112, n. 10 (5th Cir. 1985). Defendants have not yet filed an answer to plaintiffs' complaint and thus have not yet put the affirmative defense of sovereign immunity at issue.

If this Court nevertheless addresses sovereign immunity at this time, the Court should conclude that sovereign immunity does not deprive plaintiffs of standing to obtain damages. The rule for waiver of federal sovereign immunity is that the waiver "must be unequivocally expressed in statutory text." *Lane v. Pena,* 518 U.S. 187, 192 (1996). Lawsuits for damages against federal employees in their official capacities "cannot be maintained unless Congress has explicitly waived the sovereign immunity of the United States." *Multi Denominational Ministry of Cannabis and Rastafari, Inc. v. Gonzales*, 474 F.Supp.2d 1133, 1140 (N.D. Cal. 2007). FISA explicitly and unequivocally waives sovereign immunity via section 1810, which prescribes a cause of action for damages against any "person" who commits unlawful electronic surveillance in violation of section 1809, and section 1801(m), which defines a "person" as including "any officer or employee of the Federal Government." 50 U.S.C. § 1801(m).

Defendants contend these provisions do not waive sovereign immunity because FISA's definition of "person" does not include "the United States." *See* BOA 37. This definition, however, expressly includes federal officers and employees, against whom an action in their official capacities "is considered a suit against the United States." *Multi Denominational Ministry,* 474 F.Supp.2d at 1140; *accord*, *Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985); *Burgos v. Milton*,

709 F.2d 1, 2 (1st Cir. 1983). By prescribing civil damages liability for FISA

violations by federal officers or employees – and hence the United States – FISA

waives federal sovereign immunity. *Cf. Salazar v. Heckler*, 787 F.2d 527, 529 (10th

Cir. 1986) (Title VII of Civil Rights Act of 1974, which authorizes civil actions for

employment discrimination by specifying "the head" of an offending federal entity

as defendant, *see* 42 U.S.C. § 2000e-16(c), waives sovereign immunity despite failure

to specify "the United States"); *accord*, *Rochon v. Gonzales*, 438 F.3d 1211, 1215-16

(D.C. Cir. 2006).[4/]

FISA also waives sovereign immunity via its definition of "person" in section

1801(m) as including any "entity," *without excepting "the United States"* – as do, for

example, provisions of the Electronic Communications Privacy Act (ECPA). *See* 18

U.S.C. § 2511(2)(a)(ii) (authorizing cause of action against a "person or entity, other

than the United States"); §2707(a) (same); *see also Organizacion JD Ltda.v. U.S.*

*Dept. of Justice*, 18 F.3d 91, 94 (2d Cir. 1994) ("entity" in former ECPA provision

--------

[4/]

     In contrast, 42 U.S.C. section 1983 does not waive federal sovereign immunity
in civil rights actions by authorizing an action against a "person," because there is no
reason in section 1983 to depart from the "common usage" of the term "person" as
not including the sovereign. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58,
64 (1989). FISA differs from section 1983 by giving "person" a special *legal*
definition – including "any officer or employee of the Federal Government" and "any
group, entity, association, corporation, or foreign power," 50 U.S.C. § 1801(m) –
which transcends common usage.

defining "person" subject to civil liability "must be taken to mean governmental entity"); *accord, e.g., Adams v. City of Battle Creek*, 250 F.3d 980, 985 (6th Cir. 2001). Had Congress meant to except "the United States" from the scope of the word "entity" in section 1801(m), Congress could have done so in the manner of ECPA.

Moreover, even if defendants could invoke sovereign immunity in their official capacities, they cannot do so in their personal capacities. *See Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985); *Butz v. Economou*, 438 U.S. 478, 501 (1978). Plaintiffs' complaint may be characterized as alleging both official and personal capacity liability. *See Graham*, 473 U.S. at 167, n. 14 (where complaint does not specify whether defendants are sued in official or personal capacities or both, course of proceedings typically will indicate nature of liability sought to be imposed). And to the extent defendants are being sued in their personal capacities, they could enjoy only qualified immunity, which does not apply if they "discharge their duties in a way that is known to them to violate the United States Constitution or in a manner that they should know transgresses a clearly established constitutional rule." *Butz*, 438 U.S. at 507. Given that at least some of plaintiffs' surveillance occurred at a time

when the TSP continued unabated without DOJ certification and despite admonitions that it was unlawful, *see supra* at 8-9, defendants cannot claim qualified immunity.[5]

### D. The District Court's Ruling Precluding Discovery of Ongoing Surveillance is Not a Basis For Concluding That Plaintiffs Lack Standing.

Defendants also contend plaintiffs lack standing to obtain prospective relief because of the district court's ruling precluding discovery of ongoing surveillance other than that revealed by the Document. BOA 35. The judge reasoned, however, that "*based on the record as it stands now*, forcing the government to confirm or deny whether plaintiffs' communications . . . continue to be intercepted . . . would create a reasonable danger that national security would be harmed by the disclosure of state secrets" and "*might jeopardize the success of the [TSP] if it is legal.*" ER 573

---

[5]

Defendants also contend "plaintiffs have not exhausted their administrative remedies, as required by 18 U.S.C. 2712(b)(1)." BOA 37. Section 2712(b)(1) requires presentation of a claim under the Federal Tort Claims Act before commencement of an action "under this section." Plaintiffs' FISA cause of action, however, is not under section 2712; it is under FISA section 1810. Section 2712(a) authorizes a civil action for, among other things, violating FISA sections 1806(a), 1825(a), and 1845(a); but section 2712(a) does *not* include FISA section 1810, which independently prescribes a civil action and does *not* require any exhaustion of administrative remedies. And even if section 2712's exhaustion requirement applied here, compliance would be excused because, given defendants' stubborn resistance to the very notion that they must comply with FISA, a Federal Tort Claims Act demand plainly would have been futile. *See, e.g., Honig v. Doe*, 484 U.S. 305, 326-27 (1988).

(emphasis added). The record has since changed, in that the TSP purportedly was suspended in January 2007. If that is true, and if the suspension is permanent, then discovery of ongoing surveillance will not jeopardize the success of the TSP, since it no longer exists. (And, of course, if the suspension is *not* permanent, then it cannot moot this appeal.)

In light of this change in the posture of this case, if this Court allows litigation to go forward, the district court might, upon reconsideration, decide to permit discovery of ongoing surveillance on the ground the record has changed and there is no longer any danger of jeopardizing the TSP's success. For this reason, the discovery ruling is not a basis for concluding that plaintiffs lack standing to obtain prospective relief.

## III.
## THE MERITS OF THIS CASE CAN BE ADJUDICATED WITHOUT THREATENING NATIONAL SECURITY.

### A. A Decision on the Merits Does Not Require Disclosure of Secret Facts About the TSP or Defendants' Motives For It.

Defendants contend that, like the issue of standing, the two merits issues in this case – whether inherent presidential power or the AUMF trumps FISA – cannot be litigated without disclosure of state secrets concerning "the means, methods, and subjects of surveillance under the TSP." BOA 37-38. This contention should

likewise be rejected. The merits issues are purely legal. Once the fact of plaintiffs' warrantless electronic surveillance is established for purposes of standing – which itself does not require disclosure of any secret information about the operational details of the TSP – all that remains for the judiciary to do is to decide whether defendants' expansive vision of presidential power comports with the Constitution.

The first merits issue – whether the President has inherent constitutional power to disregard federal legislation like FISA in the name of national security – invokes a purely legal separation-of-powers analysis under Justice Robert Jackson's formulation in *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 635-37 (1952) for determining the extent of presidential power depending on the presence or absence of congressional action. There is no need to disclose specific facts concerning operational details of the TSP for the courts to decide whether the Constitution allows the President to disregard FISA. Plaintiffs' pending motion for partial summary judgment or adjudication fully argues this issue without any need for disclosure of state secrets. *See* Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment etc. (Docket No. 87).

The second merits issue – whether the TSP is within the scope of the AUMF – invokes a purely legal analysis of the AUMF itself, judicial decisions interpreting the AUMF, the legislative history of FISA, and rules of statutory construction.

Again, plaintiffs' pending motion for partial summary judgment or adjudication fully argues these points without any need for disclosure of state secrets. *See id.*

Defendants also contend the merits issues cannot be litigated without disclosing secret facts concerning defendants' justifications for the TSP – specifically, "the nature of the al Qaeda threat" and "the need for speed and flexibility in conducting surveillance beyond that traditionally available under the FISA." BOA 41. Such facts, however, need not be disclosed here, for they pertain only to defendants' *motives* for violating FISA and thus are irrelevant to the litigation. The ultimate issue to be decided is whether defendants "intentionally" engaged in warrantless electronic surveillance. *See* 50 U.S.C. §§1809-1810. The justifications for defendants' conduct – that is, defendants' motives – are irrelevant to the issue of their intent. *See, e.g., United States v. Lake*, 709 F.2d 43, 45 (11th Cir. 1983).

For example, in *Abraham v. County of Greenville*, 237 F.3d 386, 390-91 (4th Cir. 2001) – an action for electronic surveillance in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, which governs electronic surveillance for criminal law enforcement – the Fourth Circuit held that a violation of Title III cannot be excused by the defendant's "good faith." And in *In re Pharmatrak, Inc.*, 329 F.3d 9, 23 (1st Cir. 2003) – an action for interception of electronic communications in violation of ECPA – the First Circuit noted that

"liability for intentionally engaging in prohibited conduct does not turn on an assessment of the merit of a party's motive."

Similarly here, the nature of the al-Qaeda threat and the purported need for speed and flexibility in electronic surveillance as the motives for the TSP are irrelevant to the question whether defendants intentionally violated FISA. Defendants' attempt to justify their conduct is reminiscent of the proverbial plea of "guilty with an explanation." The "explanation" is irrelevant to the determination of guilt.

Defendants also invoke the "special needs" exception to the Fourth Amendment's warrant requirement, which defendants claim authorizes the TSP because of the purported need for speed and flexibility in electronic surveillance. *See* BOA 40-41. But Congress addressed that need shortly after the terrorist attacks of 2001 by increasing the period during which the Attorney General may authorize emergency warrantless surveillance, *see* 50 U.S.C. §1805(f), from 24 hours to 72 hours. *See* 115 Stat. 1394, §314(a)(2)(B) (Dec. 28, 2001). If defendants feel they need more time to get a warrant – or should not have to get a warrant at all – they need to persuade Congress, not the judiciary, to change the law further.

**B.     Defendants' Own Conduct Demonstrates That the Purely Legal Merits Issues Can Be Decided Without Disclosure of State Secrets.**

Defendants' brief sets forth their principal arguments on the merits of this case, contending that the President has power to conduct domestic warrantless electronic surveillance for foreign intelligence purposes outside the structure of FISA.  In a discussion replete with citation of legal authorities, defendants argue, among other things, that (1) "the President has inherent constitutional authority to conduct warrantless surveillance of communications involving foreign powers such as al Qaeda and its agents," (2) "even in peacetime, the President has inherent constitutional authority to conduct warrantless surveillance of foreign powers within or without the United States," (3) "Congress may not 'impede the President's ability to perform his constitutional duty,'" and (4) this purported presidential power is "reinforced" by the AUMF.  BOA 39, 43, 44.  Defendants freely make these arguments without any need to reveal state secrets.

Moreover, in January 2006, the DOJ publicly presented these arguments in far greater detail in its 42-page White Paper explaining defendants' legal theories in support of the TSP – again, without any need to reveal state secrets.  *See* U.S. Department of Justice, *Legal Authorities Supporting the Activities of the National Security Agency Described By the President* (Jan. 19, 2006), *available at* http://www.

usdoj.gov/opa/whitepaperonnsalegalauthorities.pdf. Plainly, defendants believe they can try the merits issues in the court of public opinion without revealing state secrets. If that is true, then defendants certainly can do so in a court of law.

Defendants' brief blows hot and cold, arguing the merits of defendants' expansive claim to presidential power yet insisting at the same time that the merits issues cannot be decided without revealing state secrets concerning "the program at issue and the threat it is designed to address." BOA 44. But defendants cannot have it both ways. If they can argue the merits issues without revealing state secrets – and plainly they think they can, given their arguments in the White Paper and in briefing before this Court – then defendants cannot reasonably invoke the state secrets privilege as a basis for evading a judicial determination of the merits.

## IV.
## PLAINTIFFS' FISA CAUSE OF ACTION IS GOVERNED BY FISA, NOT THE STATE SECRETS PRIVILEGE.

### A.    FISA Supplants the State Secrets Privilege in FISA Litigation.

#### 1.    FISA Speaks Directly to Protection of National Security in FISA Litigation.

This appeal also presents a fundamental issue that defendants' brief does not address, even though the issue was raised below – whether the protection of national security in FISA litigation is governed by FISA rather than the state secrets

privilege.[6/]  The answer is *yes*.  Where, as here, a plaintiff alleges a private cause of action under FISA for unlawful electronic surveillance, the state secrets privilege is supplanted by FISA.  Consequently, this Court need not adjudicate defendants' state secret privilege claims, but should assess defendants' concerns about national security according to the dictates of FISA.

FISA supplants the state secrets privilege via two statutory provisions:  FISA section 1810, which prescribes the private cause of action, and FISA section 1806(f), which provides that in FISA litigation, when the executive claims that disclosure of materials relating to electronic surveillance would jeopardize national security, the courts may review the materials "in camera and ex parte . . . as may be necessary to determine" the legality of the surveillance, and may "disclose to the aggrieved person, under appropriate security procedures and protective orders," any material that "is necessary to make an accurate determination of the legality of the surveillance." These provisions supplant the state secrets privilege by (1) authorizing civil lawsuits for unlawful electronic surveillance despite the otherwise secret nature of FISA

---

[6/]
    The district court declined to reach this issue.  *See* ER 580.

proceedings, and (2) prescribing statutory procedures for judicial determination and protection of national security concerns in FISA litigation.

"As the state secrets privilege is an evidentiary privilege rooted in federal common law, [citation], the relevant inquiry in deciding if [a statute] preempts the state secrets privilege 'is whether the statute "[speaks] *directly* to [the] question" otherwise answered by federal common law.'" *Kasza,* 133 F.3d at 1167, emphasis in original (quoting *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 236-37 (1985)).  There is a presumption favoring retention of the privilege "'except when a statutory purpose to the contrary is evident.'" *Id.* (quoting *United States v. Texas*, 507 U.S. 529, 534 (1952)).

Thus, the issue here is whether FISA speaks directly to the question of national security in FISA litigation.  Two sub-issues are presented: (1) Does FISA speak directly to rules of disclosure that are otherwise prescribed by the state secrets privilege?  (2) Does FISA speak directly to the rule of outright dismissal that is otherwise prescribed by the state secrets privilege?  The answer in both instances is *yes*.

### 2. FISA Section 1806(f) Speaks Directly to Rules of Disclosure.

On the first sub-issue, FISA section 1806(f) speaks directly to rules of disclosure by prescribing statutory procedures for judicial determination and protection of national security concerns where, as here, a private cause of action is alleged under FISA section 1810. Under section 1806(f), if the plaintiff seeks disclosure of any "materials relating to electronic surveillance," the following proceedings may ensue:

- The Attorney General may file "an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States." 50 U.S.C. § 1806(f).

- If the Attorney General files this affidavit, the court must review the materials "in camera and ex parte . . . as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted." *Id.*

•	In making this determination, the court "may disclose to the aggrieved person, under appropriate security procedures and protective orders," such portions of the materials as "is necessary to make an accurate determination of the legality of the surveillance." *Id.*

These procedures speak directly to disclosure that would otherwise be governed by the common law state secrets privilege.  Further, FISA's legislative history evinces congressional intent to supplant the state secrets privilege with these procedures.  As explained in a 1978 House Conference Report, the provision in section 1806(f) "for security measures and protective orders *ensures adequate protection* of national security interests."  H. Conf. Rep. No. 95-1720, at 31-32 (1978), *reprinted in* 1978 U.S.C.C.A.N. 4063 (emphasis added); *see also* S. Rep. No. 95-701 (1978), *reprinted in* 1978 U.S.C.C.A.N. 3973, 4032-33 (calling special discovery procedures "a reasonable balance between an entirely in camera proceeding . . . and mandatory disclosure, which might occasionally result in the wholesale revelation of sensitive foreign intelligence information").  Congress having determined that section 1806(f) adequately ensures protection of national security, the rules of disclosure prescribed by the state secrets privilege become superfluous in FISA litigation.

In the present case, plaintiffs in effect sought disclosure of the Document (which they had already seen), to them and them alone, by opposing defendants' motion to bar plaintiffs from having access to the Document in the SCIF. Under section 1806(f), the onus was on the Attorney General to file an affidavit asserting that such disclosure would harm national security. The Attorney General never did so, but the district court nevertheless refused the disclosure plaintiffs sought, opting instead for the compromise of allowing plaintiffs to demonstrate their standing by filing affidavits describing the document from memory. Thus, in effect, the court proceeded precisely as section 1806(f) envisions – despite the absence of an Attorney General affidavit – by avoiding unnecessary disclosure while anticipating an *in camera* and *ex parte* review of the Document as necessary to determine whether plaintiffs' surveillance was unlawful.

The procedure prescribed by section 1806(f) enabled the district court to protect national security while addressing any suggestions by defendants that there might have been FISA warrants for plaintiffs' surveillance, or that the Government could have learned of plaintiffs' communications other than by surveilling the plaintiffs, or that it is possible the surveillance revealed by the Document might have targeted someone who was not in the United States and/or occurred outside the United States. Had defendants made any effort to sustain their burden of proving

facts within their exclusive knowledge and substantiate their suggestions of what might have or could have been, the district court could have reviewed such proof *in camera* and *ex parte* (subject to disclosure to plaintiffs within the district court's discretion) as "necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted." 50 U.S.C. § 1806(f).

In the *Hepting* appeals, the Government insists that section 1806(f) applies only when "surveillance has already been disclosed." Reply Brief of United States in *Hepting* at 23. Even if that were true, however, plaintiffs' surveillance *was* disclosed to them, as a result of the OFAC's accidental production of the Document. By its plain language, section 1806(f) applies whenever a "request is made by an aggrieved person . . . to . . . obtain materials relating to electronic surveillance . . . ." That language is more than broad enough to encompass plaintiffs, to the extent they sought access to the SCIF-reposited Document.

As AT&T puts it in the *Hepting* appeals, section 1806(f) "is available to determine the legality of the surveillance of a *known* target, which *typically* occurs through a government admission." Reply Brief of AT&T in *Hepting* at 32 (first emphasis in original, second emphasis added). *Typical* is to be distinguished from *exclusive*. A government admission is the typical path to knowledge of surveillance, but it is not the exclusive path. Such knowledge can also be acquired – as here – by

government inadvertence. Nothing in the plain language of section 1806(f) restricts its application to the "typical" path of government admission.

In the *Hepting* appeals, the Government also relies on section 6 of the National Security Agency Act of 1959, which states that "nothing in this Act or any other law . . . shall be construed to require the *disclosure* . . . of any information with respect to the activities" of the NSA. 50 U.S.C. § 402 note (emphasis added); *see* Reply Brief of United States in *Hepting* at 22. But plaintiffs are not seeking to require "disclosure" of the fact of their surveillance. Such disclosure has already occurred, through the accidental production of the Document. Plaintiffs seek only to use the Document, via submission of *in camera* affidavits as prescribed by the district court, to establish their standing.

Finally, in the *Hepting* appeals, the Government urges a narrow construction of section 1806(f) as applying only in "Government-initiated proceedings." Reply Brief of United States in *Hepting* at 25. AT&T similarly urges a narrow construction of section 1806(f) as applying only when the Attorney General files an affidavit. *See* Reply Brief of AT&T in *Hepting* at 35. Both of these narrow constructions are contrary to the plain language of section 1806(f). Nothing in the statute restricts its application to government-initiated proceedings, and nothing restricts disclosure of electronic surveillance materials to situations where the Attorney General files an

affidavit. Rather, section 1806(f) says that *if* the Attorney General files an affidavit, the district court must review the materials *in camera* and *ex parte* – which means, conversely, that absent an Attorney General affidavit the district court may review the materials without such restriction.

### 3. FISA Section 1810 Speaks Directly Against Outright Dismissal.

On the second sub-issue – whether FISA speaks directly to the rule of outright dismissal within the state secrets privilege – FISA section 1810, by prescribing a private cause of action for FISA violations despite the otherwise secret nature of FISA proceedings, plainly displaces the rule of outright dismissal, which is wholly inconsistent with the very notion of a private FISA action. If section 1810 did *not* displace the rule of outright dismissal, then Congress's prescription of a private FISA action would be meaningless, for the President would be able to evade any private FISA action merely by invoking the state secrets privilege.

The situation here is analogous to *Halpern v. U.S.*, 258 F.2d 36 (2d Cir. 1958), a lawsuit arising under the Invention Secrecy Act, 35 U.S.C. §181 *et seq.*, which allowed the patent office to withhold a patent grant for inventions implicating national security, but also allowed inventors to sue for compensation if a patent was denied. When the plaintiff was denied a patent and sued for compensation, the

government invoked the state secrets privilege. The Second Circuit rejected the assertion of the privilege because "the trial of cases involving patent applications placed under a secrecy order will always involve matters within the scope of this privilege," and "[u]nless Congress has created rights which are completely illusory, existing only at the mercy of government officials, the Act must be viewed as waiving the privilege . . . dependent upon the availability and adequacy of other methods of protecting the overriding interest of national security during the course of a trial." *Id.* at 43.

Similarly here, a private FISA action generally involves matters that normally would be within the scope of the state secrets privilege. *Id.* Unless section 1810 creates "rights which are completely illusory, existing only at the mercy of government officials," *id.*, FISA must be viewed as supplanting the state secrets privilege, vesting courts with the power to ensure national security with "appropriate security procedures and protective orders." 50 U.S.C. §1806(f).

## B. The President Lacks Inherent Power to Disregard FISA's Supplanting of the State Secrets Privilege.

Because of the constitutional separation of powers, the President may not disregard section 1806(f)'s supplanting of the state secrets privilege – notwithstanding defendants' assertion that the President has inherent power to

disregard congressional legislation in the name of national security.  *See* BOA 39, 43.

In *Youngstown Sheet and Tube*, Justice Robert Jackson's concurring opinion set forth a formulation for determining the extent of presidential power according to our Constitution's system of checks and balances.  Justice Jackson observed that the Constitution "enjoins upon its branches separateness but interdependence, autonomy but reciprocity.  Presidential powers are not fixed but fluctuate, depending upon their disjunction or conjunction with those of Congress."  343 U.S. at 635.  Thus, the extent of presidential power frequently depends on the presence or absence of congressional action:

- "When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate."  *Id.* at 635.

- "When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have

concurrent authority, or in which its distribution is uncertain." *Id.* at 637.

- "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.*

This formulation is not tossed aside in times of war. "Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake." *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004). Hanging in the balance is "the equilibrium established by our constitutional system" between three separate but interdependent branches of government. *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring).

Here, presidential power is at its "lowest ebb" because Congress has expressly prescribed a protocol for the courts to follow when addressing executive claims of state secrecy in FISA litigation. "The controlling fact here is that Congress, within its constitutionally delegated power, has prescribed for the President specific

procedures . . . for his use in meeting the present type of emergency." *Youngstown*,

343 U.S. at 660 (Burton, J., concurring); *see also id.* at 662 (Clark, J., concurring)

("where Congress has laid down specific procedures to deal with the type of crisis

confronting the President, he must follow those procedures in meeting the crisis").

Legislative history indicates that, when enacting FISA, Congress intended to curtail

presidential power by prescribing statutory procedures for determining assertions of

state secrecy in FISA litigation. The House Conference Report on FISA said: "The

intent of the conferees is to apply the [lowest ebb] standard set forth in" the

*Youngstown* formulation. H. Conf. Rep. No. 95-1720, at 35.

The present litigation is not the first time that this President has made an

expansive claim of executive power as a basis for ignoring congressional legislation.

The President did so in *Hamdan v. Rumsfeld*, 126 S.Ct. 2749 (2006), which held that

military commissions established by the President to try Guantanamo Bay detainees

violated the Uniform Code of Military Justice (UCMJ). In rejecting an attempt to

evade the UCMJ based on a claim of unfettered presidential power, the Supreme

Court observed: "Whether or not the President has independent power, absent

congressional authorization, to convene military commissions, he may not disregard

limitations that Congress has, in proper exercise of its own war powers, placed on his

powers" through the UCMJ. *Id.* at 2774, n. 23. Likewise here, the President may not

disregard the limitations that Congress placed on executive power when it prescribed a protocol for the courts to follow when addressing executive claims of state secrecy in FISA litigation.

Justice Kennedy's concurring opinion in *Hamdan* further explained why presidential power did not trump the UCMJ: Through the UCMJ, "Congress, in the proper exercise of its powers as an independent branch of government . . . has . . . set limits on the President's authority." *Hamdan*, 126 S.Ct. at 2799 (Kennedy, J., concurring). *Hamdan* "is not a case, then, where the Executive can assert some unilateral authority to fill a void left by congressional inaction." *Id.* Under Justice Jackson's formulation in *Youngstown*, Congress had, by expressing its will in the UCMJ, put presidential power over the manner of trying the Guantanamo Bay detainees at "its lowest ebb." *Id.* at 2800. Similarly here, Congress has, by expressing its will in FISA, put presidential power to assert state secrecy in FISA litigation at its lowest ebb.

Defendants insist that the state secrets privilege is not just a "common law evidentiary privilege" as this Court has described it, *see Kasza*, 133 F.3d at 1165, but is also constitutionally based. *See* BOA 15. In fact, unlike executive privilege – which the Supreme Court has suggested is "inextricably rooted in the separation of powers under the Constitution," *United States v. Nixon*, 418 U.S. 683, 708 (1974) –

the state secrets privilege is a common law evidentiary rule that may generally be superseded, and the applicability of which may be regulated by statute. *See Dickerson v. United States*, 530 U.S. 428, 437 (2000) ("Congress retains the ultimate authority to modify or set aside any judicially created rules of evidence and procedure that are not required by the Constitution."). In any event, the *Youngstown* formulation reduces Presidential power to invoke state secrecy to its "lowest ebb" because of the Congressional prescription of a private cause of action for FISA violations, 50 U.S.C. § 1810, and FISA's prescription of procedures for protecting national security in FISA litigation, 50 U.S.C. § 1806(f).

## CONCLUSION

The disposition that defendants seek – outright dismissal of this lawsuit without a decision on the legality of the TSP – would effectively implement defendants' theory of inherent presidential power by *always* insulating that theory from judicial scrutiny. If it were true, as defendants urge, that the courts must defer blindly to executive assertion of the state secrets privilege, then defendants' claim of inherent presidential authority to disregard congressional legislation in the name of national security would become a *fait accompli*. As a practical matter, the President would be able to flout nearly *any* congressional legislation by proclaiming a national security justification and thereby preclude judicial review – thus transforming

defendants' theory of inherent presidential power into an effective reality. If the Supreme Court had allowed such a thing to happen in 1952, *Youngstown Sheet and Tube* would never have been adjudicated, and the checks-and-balances structure of American government might look very different today.

In fact, the law does *not* require blind deference to executive assertions of state secrecy. Rather, the courts must analyze such assertions "with precision and care." *Doe v. Tenet*, 329 F.3d at 1146. "[T]he greater the party's need for the evidence, the more deeply a court must probe to see whether state secrets are in fact at risk." *Id.* at 1152. The degree of judicial deference to be accorded the assertion of state secrecy depends on the plausibility of the claim of danger to national security. *Ellsberg*, 709 F.2d at 59.

Here, given the widespread public knowledge of the TSP's existence and plaintiffs' knowledge of their surveillance as revealed by the Document, defendants' claim of danger to national security is completely implausible. This litigation does not put state secrets at risk. The district court's order should be affirmed.

July 3, 2007

Respectfully submitted,

_Jon B. Eisenberg_

Jon B. Eisenberg
J. Ashlee Albies, Steven Goldberg,
Lisa R. Jaskol, William N. Hancock,
Zaha S. Hassan, & Thomas H. Nelson

Attorneys for Plaintiffs and Appellees
**Al-Haramain Islamic Foundation,
Inc., Wendell Belew, and Asim Ghafoor**

## STATEMENT OF RELATED CASES

This Court has consolidated this appeal with *Hepting v. AT&T Corp.*, No. 06-17132, and *Hepting v. United States*, No. 06-17137.

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed R App P 32(a)(7)(c) and Ninth Circuit Rule 32-1, I certify that the Brief of Appellees and the Sealed Supplemental Brief of Appellees are proportionately spaced, have a typeface of 14 points or more, and together contain a combined total of 13,965 words (13,566 words in the Brief of Appellees plus 399 additional redacted words in the Sealed Supplemental Brief of Appellees)

July 3, 2007

By _____
    Jon B. Eisenberg

# ADDENDUM

# ADDENDUM

## Foreign Intelligence Surveillance Act of 1978 (FISA)
## 50 U.S.C. § 1801 *et seq.*

### § 1801. Definitions

As used in this subchapter:

* * * * *

**(e)** "Foreign intelligence information" means--
**(1)** information that relates to, and if concerning a United States person is necessary to, the ability of the United States to protect against--
**(A)** actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;
**(B)** sabotage or international terrorism by a foreign power or an agent of a foreign power; or
**(C)** clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power; or
**(2)** information with respect to a foreign power or foreign territory that relates to, and if concerning a United States person is necessary to--
**(A)** the national defense or the security of the United States; or
**(B)** the conduct of the foreign affairs of the United States.

**(f)** "Electronic surveillance" means--
**(1)** the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire or radio communication sent by or intended to be received by a particular, known United States person who is in the United States, if the contents are acquired by intentionally targeting that United States person, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes;
**(2)** the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire communication to or from a person in the United States, without the consent of any party thereto, if such acquisition occurs in the United States, but does not include the acquisition of those communications of computer trespassers that would be permissible under section 2511(2)(I) of Title 18;

**(3)** the intentional acquisition by an electronic, mechanical, or other surveillance device of the contents of any radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes, and if both the sender and all intended recipients are located within the United States; or

**(4)** the installation or use of an electronic, mechanical, or other surveillance device in the United States for monitoring to acquire information, other than from a wire or radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes.

* * * * *

**(i)** "United States person" means a citizen of the United States, an alien lawfully admitted for permanent residence (as defined in section 1101(a)(2) of Title 8), an unincorporated association a substantial number of members of which are citizens of the United States or aliens lawfully admitted for permanent residence, or a corporation which is incorporated in the United States, but does not include a corporation or an association which is a foreign power, as defined in subsection (a)(1), (2), or (3) of this section.

* * * * *

**(m)** "Person" means any individual, including any officer or employee of the Federal Government, or any group, entity, association, corporation, or foreign power.

## § 1804. Applications for court orders

(a) Submission by Federal officer; approval of Attorney General; contents

Each application for an order approving electronic surveillance under this subchapter shall be made by a Federal officer in writing upon oath or affirmation to a judge having jurisdiction under section 1803 of this title. Each application shall require the approval of the Attorney General based upon his finding that it satisfies the criteria and requirements of such application as set forth in this

subchapter. It shall include--

**(1)** the identity of the Federal officer making the application;

**(2)** the authority conferred on the Attorney General by the President of the United States and the approval of the Attorney General to make the application;

**(3)** the identity, if known, or a description of the specific target of the electronic surveillance;

**(4)** a statement of the facts and circumstances relied upon by the applicant to justify his belief that--

**(A)** the target of the electronic surveillance is a foreign power or an agent of a foreign power; and

**(B)** each of the facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power;

**(5)** a statement of the proposed minimization procedures;

**(6)** a detailed description of the nature of the information sought and the type of communications or activities to be subjected to the surveillance;

**(7)** a certification or certifications by the Assistant to the President for National Security Affairs or an executive branch official or officials designated by the President from among those executive officers employed in the area of national security or defense and appointed by the President with the advice and consent of the Senate--

**(A)** that the certifying official deems the information sought to be foreign intelligence information;

**(B)** that a significant purpose of the surveillance is to obtain foreign intelligence information;

**(C)** that such information cannot reasonably be obtained by normal investigative techniques;

**(D)** that designates the type of foreign intelligence information being sought according to the categories described in section 1801(e) of this title; and

**(E)** including a statement of the basis for the certification that--

**(i)** the information sought is the type of foreign intelligence information designated; and

**(ii)** such information cannot reasonably be obtained by normal investigative techniques;

**(8)** a statement of the means by which the surveillance will be effected and a statement whether physical entry is required to effect the surveillance;

**(9)** a statement of the facts concerning all previous applications that have been made to any judge under this subchapter involving any of the persons, facilities, or places specified in the application, and the action taken on each previous application;

**(10)** a statement of the period of time for which the electronic surveillance is required to be maintained, and if the nature of the intelligence gathering is such that the approval of the use of electronic surveillance under this subchapter should

not automatically terminate when the described type of information has first been obtained, a description of facts supporting the belief that additional information of the same type will be obtained thereafter; and

**(11)** whenever more than one electronic, mechanical or other surveillance device is to be used with respect to a particular proposed electronic surveillance, the coverage of the devices involved and what minimization procedures apply to information acquired by each device.

\* \* \* \* \*

## § 1805. Issuance of order

(a) Necessary findings

Upon an application made pursuant to Section 1804 of this title, the judge shall enter an ex parte order as requested or as modified approving the electronic surveillance if he finds that--

**(1)** the President has authorized the Attorney General to approve applications for electronic surveillance for foreign intelligence information;

**(2)** the application has been made by a Federal officer and approved by the Attorney General;

**(3)** on the basis of the facts submitted by the applicant there is probable cause to believe that--

**(A)** the target of the electronic surveillance is a foreign power or an agent of a foreign power: *Provided*, That no United States person may be considered a foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States; and

**(B)** each of the facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power;

**(4)** the proposed minimization procedures meet the definition of minimization procedures under section 1801(h) of this title; and

**(5)** the application which has been filed contains all statements and certifications required by section 1804 of this title and, if the target is a United States person, the certification or certifications are not clearly erroneous on the basis of the statement

made under section 1804(a)(7)(E) of this title and any other information furnished under section 1804(d) of this title.

\* \* \* \* \*

## § 1806. Use of information

\* \* \* \* \*

(f) In camera and ex parte review by district court

Whenever a court or other authority is notified pursuant to subsection (c) or (d) of this section, or whenever a motion is made pursuant to subsection (e) of this section, or whenever any motion or request is made by an aggrieved person pursuant to any other statute or rule of the United States or any State before any court or other authority of the United States or any State to discover or obtain applications or orders or other materials relating to electronic surveillance or to discover, obtain, or suppress evidence or information obtained or derived from electronic surveillance under this chapter, the United States district court or, where the motion is made before another authority, the United States district court in the same district as the authority, shall, notwithstanding any other law, if the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States, review in camera and ex parte the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted. In making this determination, the court may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance only where such disclosure is necessary to make an accurate determination of the legality of the surveillance.

## § 1809. Criminal sanctions

(a) Prohibited activities

A person is guilty of an offense if he intentionally--

**(1)** engages in electronic surveillance under color of law except as authorized by statute; or
**(2)** discloses or uses information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized by statute.

* * * * *

(c) Penalties

An offense described in this section is punishable by a fine of not more than $10,000 or imprisonment for not more than five years, or both.

## § 1810. Civil liability

An aggrieved person, other than a foreign power or an agent of a foreign power, as defined in section 1801(a) or (b)(1)A) of this title, respectively, who has been subjected to an electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of section 1809 of this title shall have a cause of action against any person who committed such violation and shall be entitled to recover--

**(a)** actual damages, but not less than liquidated damages of $1,000 or $100 per day for each day of violation, whichever is greater;
**(b)** punitive damages; and
**(c)** reasonable attorney's fees and other investigation and litigation costs reasonably incurred.

# CERTIFICATE OF SERVICE

I hereby certify that I am over the age of 18 years, not a party to the cause. My business address is 180 Montgomery Street, Suite 2200, San Francisco, California 94104.

On July 3, 2007, I caused the foregoing document:

- **BRIEF OF APPELLEES**

to be served on:

Douglas N. Letter
Thomas M. Bondy
Anthony A. Yang
Attorneys, Appellate Staff
Civil Division, Room 7513
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
Telephone: (202) 514-3602
(Douglas.Letter@usdoj.gov; Thomas.Bondy@usdoj.gov; Anthony.Yang@usdoj.gov)

Charles F. Hinkle
Emilie K. Edling
Stoel Rives, LLP
900 SW Fifth Ave., Suite 2600
Portland, OR 97204
(cfhinkle@stoel.com; ekedling@stoel.com)

by delivering via electronic mail and Federal Express overnight delivery.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 3, 2007, at San Francisco, California.

Mary B. Cunniff