Shayana Kadidal
Michael Ratner
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY  10012-2317
Phone: (212) 614-6438
Fax: (212) 614-6499
Email: kadidal@ccr-ny.org

David Cole
c/o Georgetown University Law Center
600 New Jersey Avenue, N.W.
Washington, D.C.  20001
Phone: (202) 662-9078

Michael Avery
J. Ashlee Albies
NATIONAL LAWYERS GUILD
c/o Suffolk Law School
120 Tremont Street
Boston, MA  02108
Phone: (617) 573-8551

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE NATIONAL SECURITY AGENCY TELECOMMUNICATIONS RECORDS LITIGATION | **No. M:06-cv-01791-VRW** |
| This Document Relates Only to:<br>*Center for Constitutional Rights v. Bush*,<br>(Case No. 07-1115) | **PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS in** ***Center for Constitutional Rights v. Bush (07-1115)*** |

Judge: Hon. Vaughn R. Walker
Date: August 9, 2007
Time: 2 p.m.
Courtroom: 6, 17th Floor

**TABLE OF CONTENTS**

**INTRODUCTION** ...............................................................................................1

**I. THIS CASE IS NOT MOOT** ........................................................................2

**II. PLAINTIFFS HAVE STANDING TO SUE BASED ON THEIR WELL-FOUNDED FEAR THAT THEIR COMMUNICATIONS HAVE BEEN AND WILL BE SUBJECT TO NSA WARRANTLESS SURVEILLANCE** ..............................10

A. Plaintiffs have established injury-in-fact ..................................................12

B. Plaintiffs have established causation ........................................................16

C. Fourth Amendment first principles further establish injury ...................19

D. Plaintiffs have shown the Program constitutes "electronic surveillance" under FISA ..........23

E. Plaintiffs' APA claims are actionable ......................................................25

**CONCLUSION** ................................................................................................26

## INTRODUCTION

This supplemental brief addresses two developments that post-date the original briefs filed in this matter. First, the government argues that because President Bush claimed to have terminated the NSA's warrantless wiretapping program in January of this year, this challenge is now moot. Second, on July 6, 2007, a divided panel of the Sixth Circuit concluded that plaintiffs in another case challenging the NSA surveillance program lacked standing to bring that challenge. *ACLU v. NSA*, 2007 WL 1952370 (6th Cir. Jul. 6, 2007). In this brief, we demonstrate that this case is not moot, because Defendants have repeatedly asserted the right to reinstate the NSA program at any point, and therefore cannot meet the heavy burden of establishing mootness through voluntary cessation of challenged conduct. We also show that the two Sixth Circuit judges who separately concluded that the *ACLU* plaintiffs lacked standing fundamentally misconstrued the relevant precedents, which establish that a well-founded fear of being subjected to harmful government conduct is sufficient to establish standing, particularly where, as here, the targeted threat of such conduct does as much injury as the illegal conduct itself.

The government is at pains to keep the courts from addressing the legality of the President's surveillance program. We have addressed the merits at length in our previous briefs and urge this Court for the reasons set forth therein to issue a declaratory judgment and an injunction forbidding the President and the NSA from engaging in further illegal surveillance. Given that plaintiffs have alleged serious irreparable harm, this litigation has been permitted to go on far too long without a resolution. Plaintiffs filed their motion for summary judgment on March 9, 2006 and the matter was argued before the district court in New York on September 5, 2006. Where a President engages in unconstitutional actions that are also clearly proscribed by specific statutes, the judicial branch has a constitutional duty to act promptly to declare that such conduct is in violation of law and to enjoin it. *See Marbury v. Madison*, 5 U.S. 137 (1803).

## I.    THIS CASE IS NOT MOOT

Long after this case was filed, and shortly before a similar case was to be argued before the Sixth Circuit Court of Appeals, the government announced that President Bush would not reauthorize the NSA warrantless wiretapping program, because the government had succeeded in obtaining an order under the Foreign Intelligence Surveillance Act allowing similar surveillance to be conducted under that Act.   The government contends that as a result, this challenge to the NSA's warrantless surveillance program is moot.  That argument, however, fails, because defendants cannot meet the heavy burden of demonstrating that the NSA program will not be reinstituted in the future.

A party may not evade judicial review of questionable conduct by voluntarily ceasing such conduct during review. *See, e.g., City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000) (quoting *City of Mesquite*, 455 U.S. at 289.).  Otherwise, a party would be free to resume the conduct after a challenge was dismissed as moot, *id.* at 189, as "courts would be compelled to leave 'the defendant free to return to his old ways,'" *United States v. Concentrated Phosphate Export Assn., Inc.*, 393 U.S. 199, 203 (1968) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)).

To guard against such intentional avoidance of judicial review, the party asserting mootness bears the "'heavy burden of persuading' the court that the challenged conduct cannot reasonably be expected to start up again." *Id.* (quoting *United States v. Concentrated Phosphate Export Assn., Inc.*, 393 U.S. 199, 203 (1968)). The "stringent" burden on a party asserting mootness is to show that "subsequent events made it absolutely clear that the alleged wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *Concentrated Phosphate*, 393 U.S. at 203); *Laidlaw*,

528 U.S. at 190 ("formidable burden"); *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, No. 05-908, Slip Op. at 11, 2007 WL 1836531 at *10 (U.S. June 28, 2007) ("heavy burden").

The government cannot possibly meet this heavy burden, given its continued insistence that the NSA Program was and continues to be entirely legal, that the President may reauthorize it in the event that the FISA court orders are not renewed,[1] and that he may indeed opt out of the regime created by the new FISA orders at any time he pleases. The government insists it has both the right and the duty to carry out such warrantless surveillance whenever circumstances demand it.

Administration officials still adamantly insist that the Program challenged in this lawsuit, one that took place outside of the FISA Court's "supervision," "guidelines and rules,"[2] was perfectly legal and remains so. Attorney General Gonzales testified before Congress that "[w]e believed, and believe today, that what the President is doing is lawful" and that his "belief is ... that the actions taken by this administration, by this President, were lawful in the past." Hearing before the Senate Judiciary Committee on Department of Justice Oversight (January 18, 2007) (available on LEXIS) at 25, 29.[3]

Indeed, notwithstanding the government's implication that the Program is no longer in effect because it was allowed to lapse without being reauthorized,[4] the government asserts the right to carry out surveillance under the terms of the Program challenged in this lawsuit *at any time. See* Press Briefing, Jan. 17, 2007 (Q: "...the President has always argued that—I mean, [that] he has the

---

[1]      In *Parents Involved*, the Supreme Court last week relied on the facts that the Seattle School District, a governmental body, "vigorously defends the constitutionality" of the school assignment program it had ceased using, "and nowhere suggests that if this litigation is resolved in its favor it will not resume" the challenged practice. *Parents Involved*, Slip Op. at 10-11. Both factors are present here. It is thus anything but clear that the government's wrongful conduct "could not reasonably be expected to recur." *Id.* at 11.

[2]      *See* Tony Snow, White House Press Briefing, Jan. 17, 2007 (described *infra*, page 7).

[3]      *See also* Letter from Attorney General Alberto Gonzales to Senators Leahy and Specter, Jan. 17, 2007 ["Gonzales Letter"], available at http://graphics8.nytimes.com/packages/pdf/politics/20060117gonzales_Letter.pdf, at ¶3 ("as we have previously explained, the Terrorist Surveillance Program fully complies with the law").

[4]      *See, e.g.*, Snow Press Briefing (Snow: "I don't know exactly how the handoff works .... I don't know at what point this takes effect.").

3

ability, he has the authority not to ... use FISA to get authority" ... White House Spokesman Snow: "Yes, and he still believes that."); Gov't Reply Br. in Support of Supplemental Submissions, *ACLU v. NSA*, Nos. 06-2095, 06-2140 (6th Cir. Jan. 30, 2007) at 5 ("the president has not disavowed his authority to reauthorize the TSP in the event that the FISA court orders are not renewed."); *Hearing On The Foreign Intelligence Surveillance Modernization Act of 2007*, Senate Intelligence Committee (May 1, 2007) (Sen. Feingold: "Can each of you assure the American people ... that there is not and will not be any more surveillance in which the FISA process is side-stepped based on arguments that the president has independent authority under Article II or the authorization of the use of military force?" / DNI Michael McConnell: "Sir, the president's authority under Article II is—are in the Constitution. So if the president chose to exercise Article II authority, that would be the president's call.").

In fact the government has repeatedly claimed that the President not only has the right to carry out such surveillance outside of FISA under the proper circumstances, but that he has the *duty* to do so. *See, e.g.*, Defs. Reply in Suppt. of MTD, Dkt. 68, at 37, 36 (factual context of Program would show why "normal FISA process would not be sufficient and would therefore intrude on the President's *responsibility* to protect the nation"; "the President's most basic duty is to protect the nation from attack" (emphasis added)); Appellant's Br. [corrected unclassified version], *ACLU v. NSA*, Nos.06-2095, 06-2140 (6th Cir. Oct. 16, 2006), at 46 ("If FISA were construed to bar the TSP, it would be an unconstitutional encroachment on the Executive's constitutional authority (and duty) to gather foreign intelligence....").

Nowhere in its brief does the government come close to stating that it will not resurrect the Program, assuming it has not done so already. In several colloquies before the Sixth Circuit, the government agreed with the Court that it could in fact opt out of the FISA court orders at any time, or indeed conduct surveillance outside of FISA even while the FISA Court orders were in effect.

*See ACLU v. NSA*, Slip Op. at 52 (Gilman, J., dissenting); Audio File of Argument[5] at 18'45" (Judge Gillman: "But [you can] opt out of the FISA regime whenever you decide to, couldn't you? The FISA court hasn't restrained you from doing that." Coppolino: "That's absolutely true, Your Honor..."); Audio File at 19'53" (Judge Batchelder: "Those aren't the only possibilities. I mean, the possibility also exists, theoretically, at least, that the FISA court would be perfectly willing to reauthorize but that the Executive would nevertheless decide to conduct some surveillance outside the FISA court jurisdiction and parameters." Coppolino: "That is true, Your Honor. That is a hypothetical possibility..."). Attorney General Gonzales' letter to Senators Leahy and Specter indicates that only *after* determining that the FISA Court orders "allow the necessary speed and agility" did the President decide he would comply with them by allowing the Program's authorization to lapse. Gonzales Letter at ¶3.[6] In every respect, then, it appears that the decision to let the NSA Program's authorization lapse was matter of executive grace, and that any decision to revive it may be taken at any time as matter of executive discretion.

Rather than attempting to meet the heavy burden imposed by the voluntary cessation cases, the government argues that this is not a voluntary cessation case at all—because it "has not terminated its conduct in response to Plaintiffs' suit; instead it worked with the FISA Court to obtain authorization for surveillance activities that now supplant the TSP." Gov't Supp. Br. at 13 lines 13-15. This argument is not supported by the factual history of this matter, which we recount briefly below.

---

[5] An audio file of the argument is available at http://www.eff.org/legal/cases/att/ACLUappealargument.mp3 or http://www.ca6.uscourts.gov/internet/06_2095/06_2095.mp3

[6] On January 22, plaintiffs in *ACLU v. NSA* asked the government to stipulate that it would comply with the district court injunction in that case, *see* 438 F. Supp. 2d 754, 782 (E.D. Mich. 2006), which prohibits electronic surveillance in contravention of FISA. The government refused, stating that "the district court's injunction is not only unprecedented but entirely unfounded," and thereby confirming that it continues to regard FISA's injunction that it constitutes the "exclusive means" for carrying out electronic surveillance as an optional commandment, to be obeyed only at the grace of the President. *See* Pl.-Appellee's Resp. to Defs. Supp. Br., *ACLU v. NSA* (Jan. 26, 2007), Ex. B.

In January 2006, the President claimed that it was not "possible to conduct this program under the old law"[7]—FISA—and in May of 2006 Defendants in this action asserted that:

> the President has determined that the current threat to the United States demands that signals intelligence be carried out with a speed and methodology that cannot be achieved by seeking judicial approval through the traditional FISA process ... but evidence demonstrating why this is so cannot be disclosed without causing grave harm to national security.
> [REDACTED TEXT]
> The foregoing evidence would show that, in a wartime situation, in which swift and decisive action in collecting intelligence may spell the difference between a thwarted attack and another 3,000 or more deaths, the President's decision to cede control over this vital intelligence collection effort to the potential delays and uncertainties of a judicial process is well-supported and constitutional.

Defs. Mem. in Suppt. of MTD, Dkt. 31,[8] at 38.

However, on January 17, 2007, two weeks[9] before scheduled oral argument in the Sixth Circuit in the first challenge to the NSA program's legality to reach the Courts of Appeals,[10] the administration claims it did in fact "cede control" over the Program to the Foreign Intelligence Surveillance Court. According to Attorney General Gonzales, a single FISC Judge issued a number of orders:

> authorizing the Government to target for collection international communications into or out of the United States where there is probable cause to believe that one of the communicants is a member or agent of al Qaeda or an associated terrorist organization. As a result of these orders, any electronic surveillance that was occurring as a part of the Terrorist Surveillance Program will now be conducted subject to the approval of the Foreign Intelligence Surveillance Court.

Gonzales Letter at ¶ 1.Because the new FISA surveillance regime "allow[s] the necessary speed

---

[7]    *See* http://www.whitehouse.gov/news/releases/2006/01/20060126.html

[8]    All references to docket numbers ("Dkt.") in this brief are to docket numbers assigned to filings in the Southern District of New York case, No. 06-cv-313.

[9]    Although Defendants imply that the timing was coincidental, claiming two years were consumed in the application and approval of the orders, they have never broken down how much of the two years was spent on musing over the form of the application and how long the application spent before the judge before it was approved, making it quite possible that the applications were submitted shortly before their approval. *See* Gonzales Letter ("it took considerable time and work for the Government to develop the approach that was proposed to the Court and for the Judge on the FISC to consider and approve these orders."); Tony Snow, White House Press Briefing, Jan. 17, 2007 (dating to 2005 "*the thought* that perhaps one ought to see if it was possible" to seek FISA approval, but failing to specify when application to the FISA court was made (emphasis added)); Press Phone Briefing by Senior DOJ Officials, Jan. 17, 2007, http://www.tpmmuckraker.com/archives/002361.php ("These orders, however, are orders that have taken a long time to put together, to work on. They're orders that take advantage of use of the use of the FISA statute and developments in the law .... before the FISA court.").

[10]    *ACLU v. NSA*, Nos. 06-2095, 06-2140 (6th Cir., argued Jan 31, 2007).

and agility while providing substantial"—though unspecified—"advantages," the "President has determined not to reauthorize the Terrorist Surveillance Program when the current authorization expires," whenever that may be.

According to the government, the Program continues, but under unspecified forms of oversight and limiting regulations imposed by the FISA court. White House Press Secretary Tony Snow announced that "the program *pretty much* continues," but

> [t]he FISA Court has published the rules under which such activities may be conducted. ... the program continues, but it continues under the rules that have been laid out by the [C]ourt.

Tony Snow, White House Press Briefing, Jan. 17, 2007 (available at http://www.whitehouse.gov/news/releases/2007/01/print/20070117-5.html). Snow added that the Program would now "proceed with the ... supervision of the FISC" under "guidelines and rules" issued by the Court in situations "'[w]here there is probable cause to believe that one of the communicants is a member or agent of al Qaeda or an associate terrorist organization.'" *Id.* (misquoting Gonzales Letter).

While the government claims it sought to develop the new approach as far back as "the Spring of 2005—well before the first press account disclosing"[11] the Program's existence (although well after the administration was aware that the *New York Times* knew of the Program and might someday disclose it[12]), it nowhere indicates precisely when application was made to the FISA court.[13] The only explanation offered for the suspect timing of the orders was that the "orders are innovative, they are complex, and it took considerable time and work for the Government to develop the approach that was proposed to the Court and for the Judge on the FISC to consider and approve these orders."[14]

---

[11]    Gonzales Letter at ¶2.
[12]    *See* Byron Calame, *Eavesdropping and the Election: An Answer on the Question of Timing*, *New York Times* (Aug. 13, 2006).
[13]    *See* footnote 2, *supra*.
[14]    Gonzales Letter at ¶2.

Given this history, it is clear that the government is not simply responding to the fact that "[a]n independent judicial body—the FISA Court—has now acted to provide additional and sufficient legal authority for the activity that Plaintiffs challenged." Gov't Supp. Br. at 13 lines 12-13. On the contrary, the government itself had to affirmatively seek the FISA orders it now invokes.[15] Under the terms of the FISA statute it will have to seek periodic renewals of these orders, and in fact likely has already been forced to do so.[16] Under those same terms, any FISA orders are subject to minimization requirements.[17] Only after determining that the new FISC orders "allow the necessary speed and agility" did the President decide he would not reauthorize the NSA Program, Gonzales Letter at ¶3; *cf.* Gov't Supp Br. at 13 lines 22-24. That decision to rely on the orders rather than revert to judicially-unsupervised surveillance is subject to reconsideration at any time, as the government has repeatedly acknowledged. In addition, the FISA orders are by definition temporary in duration, as required by statute and by the constitution. *See* 50 U.S.C. § 1805(e)(1) ("An order issued under this section may approve an electronic surveillance for the period necessary to achieve its purpose, or for ninety days, whichever is less," with exceptions allowing lengthier surveillance of communications between foreign powers and from premises of

---

[15]    *See* Audio File of Oral Argument at 18'11", *ACLU v. NSA* (Coppolino: "it's certainly true that the government applied in accordance with the FISA process").

[16]    FISA orders generally are capped in duration at 90 days or less. *See* 50 U.S.C. § 1805(e)(1).

[17]    The absence of *judicially-supervised* minimization measures from the NSA Program gives the lie to the government's argument that it has not in fact ceased its previous conduct. The government's argument that no cessation has occurred is predicated on the notion that the basic surveillance conduct it is carrying out has not changed—that it is still carrying out an *identical* program of surveillance—and that the FISA court orders simply provide an "additional" legal basis for the previous conduct. But the FISA statute mandates that minimization measures be implemented in every FISC order. *See* 50 U.S.C. § 1801(h) (defining required "minimization" procedures); § 1804(a)(5) (application must set forth "proposed minimization procedures"); § 1805(a)(4) (minimization procedures in any FISA order must meet requirements of § 1801(h)); *see also id.* § 1806(a) ("[n]o otherwise privileged communication obtained in accordance with, or in violation of, the provisions of this subchapter shall lose its privileged character"). These statutory minimization provisions were created by Congress to implement the *constitutional* particularity requirement for wiretapping warrants. *See* Pls' Opp. to MTD, Dkt. 56, at 11 n.8; *cf. Berger v. United States*, 388 U.S. 41, 55-60 (1967) (setting forth constitutional concerns underlying modern minimization requirement). By definition, any surveillance compliant with any valid orders lawfully issued by the FISA court must be implemented with judicially-supervised minimization in place. Whatever the precise content of the FISA orders, then, the surveillance activities the government is undertaking pursuant to the new orders are necessarily different than those that came before.

foreign powers (*e.g.* embassies) pursuant to § 1802(a)(1)); Pls. Opp. to MTD, Dkt. 56, at 12 (citing authority re. constitutional dimension of ongoing judicial oversight over time). Given the government's insistence that both the NSA Program and FISA orders remain secret, Plaintiffs, those who communicate with Plaintiffs, and the public will have no way of knowing whether and when the FISA orders expire or the President reauthorizes non-FISA surveillance.[18]

Because its voluntary cessation argument has no merit, the government sets up a strawman to attack by focusing on the "capable of repetition, yet evading review" exception to mootness and eliding the distinction between it and voluntary cessation. In so doing, the government attempts to flip its "heavy burden" of showing that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," *Laidlaw*, 528 U.S. at 189-90 (quotation marks omitted), and attempts to put the burden on Plaintiffs to "'demonstrate[ the] probability' that the same controversy will recur involving the same party.'" Gov't Supp. Br. at 14 lines 19-20. This gets it exactly backwards. Under the voluntary cessation doctrine it is the government[19] that must show that the conduct could not reasonably be expected to recur.

---

[18] The government argues in a footnote that this court should invoke the prudential mootness doctrine, allowing courts to dismiss suits "not actually moot, [but] so attenuated that considerations of prudence and comity for coordinate branches of government counsel [the] court to stay its hand and to withhold relief it has the power to grant." Gov't Supp. Br. at 15 n.10 (citing *Chamber of Commerce v. DOE*, 627 F.2d 289, 291 (D.C. Cir. 1980) (per curiam)). Given Defendants' repeated assertions that the NSA Program was entirely legal, that the President may reauthorize it in the event that the FISA court orders are not renewed, or indeed opt out of the FISA regime whenever he pleases, this case is clearly anything but "attenuated." The Supreme Court has stated that, in considering whether to utilize equitable power to enjoin future violations, a court should consider whether there exists "some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *W.T. Grant*, 345 U.S. at 633. Obviously, for reasons cited above, such a danger is very much present here.

In contrast, in three of the four cases cited by the government, the challenged activity was unlikely to recur. *See Greenbaum v. EPA*, 370 F.3d 527, 534-35 (6th Cir. 2004); *Chamber of Commerce*, 627 F.2d at 292; *Ali v. Cangemi*, 419 F.3d 722, 724 (8th Cir. 2005). In the fourth, *Southern Utah Wilderness Alliance v. Smith*, the court found it lacked Article III standing, which of course leaves the question of *prudential* mootness moot. *See* 110 F.3d 724, 728 (10th Cir. 1997). Lack of redressability was also an issue in *Greenbaum*, 370 F.3d at 534, and in *Ali*, 419 F.3d at 724.

[19] In a supplemental reply brief submitted the day before oral argument in the Sixth Circuit, the government argued that ordinary voluntary cessation principles should not be applied by federal courts against other branches of the federal government, for to do so would "impute ... manipulative conduct to a coordinate branch of government, or ... apply against that branch a doctrine that appears to rest on the likelihood of a manipulative purpose," *Clarke v. United States*, 915 F.2d 699, 705 (D.C. Cir. 1990) (en banc) (dicta). The government appears to have abandoned that argument here.

In any event, the language in *Clarke* is dicta. The Court said it "need not decide the issue" because the

9

The government cannot do so here. Facts in the public record compel the conclusion that the government has altered its behavior—by seeking (and presumably renewing) approvals from the FISA Court and choosing to operate under the strictures imposed by that court—and thereby has temporarily voluntarily ceased its offending activity. Yet in statement after statement administration officials have maintained that they have the right and the duty to reinstitute the warrantless surveillance program at any time, even while the new FISA court orders remain in effect. The Program thus hangs over the heads of Plaintiffs in exactly the same manner as it did after the President's initial announcement of December 17, 2005. The threat posed by such judicially-unsupervised surveillance, and the consequent harm from the measures Plaintiffs must take to protect the confidentiality of their communications, is precisely what underlies Plaintiffs' claims to standing in this case.

## II.   PLAINTIFFS HAVE STANDING TO SUE BASED ON THEIR WELL-FOUNDED FEAR THAT THEIR COMMUNICATIONS HAVE BEEN AND WILL BE SUBJECT TO NSA WARRANTLESS SURVEILLANCE

On July 6, a divided panel of the Sixth Circuit held that plaintiffs in a similar challenge to the NSA Program lacked standing to bring that challenge. The Sixth Circuit's analysis, however, is fundamentally flawed, for many of the reasons already set forth in Plaintiffs' initial briefs.[20] The

---

challenged Act of Congress had been set to expire on a date certain that had been established well before the litigation ever commenced; thus the Court found no "voluntary" cessation had occurred during the pendency of the litigation. It is self-evidently *speculative* dicta at that ("it would seem inappropriate" to impute bad faith to another branch, *id.*). It is therefore not the law in the D.C. circuit, and it has not been adopted by either the Second or Ninth Circuits. (In the *ACLU* litigation the government cited only one other D.C. Circuit case, *National Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 352 (D.C. Cir. 1997), which invokes *Clarke* in a vacatur analysis.)

Moreover, *Clarke*'s dictum is poorly considered. Its reasoning could equally apply to any branch of government, including state or local entities, yet the Supreme Court has frequently applied the exception to such governmental bodies. Diplomatic comity concerns for embarrassing branches of foreign governments are not implicated here. And the Framers certainly believed that each coordinate branch of the federal government would be well advised to impute bad faith to the others.

Finally, the timing of the administration's public announcement of these FISA orders (orders *whose very existence would ordinarily be kept secret*), just before the first appellate consideration of the NSA Program's legality, gives every indication that it was intended to preempt appellate review in the Sixth Circuit.

[20]   Plaintiffs' standing arguments are set forth (primarily) in Pls. Opp. to MTD, Dkt. 56, at 2-13, 32-33, and Pls. Reply in Suppt. of Summary Judgment, Dkt. 74, at 1-8, and in the oral argument before Judge Lynch, Oral Arg. Tr. at 16-37, 52-53.

Sixth Circuit primarily concluded that unless plaintiffs could show that they were currently subject to NSA surveillance, they could not have standing to challenge the program. But that conclusion is contrary to binding precedent in this Court, is predicated on a fundamental misunderstanding of the nature of plaintiffs' injuries, and is in any event not binding here.

The Sixth Circuit decision resulted in three separate opinions; therefore no one opinion constitutes the opinion of the court. Nonetheless Judges Batchelder and Gibbons both seem to have predicated their conclusion on a determination that one must actually prove that one is subject to illegal surveillance in order to challenge that surveillance. That reasoning is not compelled by any Supreme Court case, and is directly contrary to precedent in this Court. In *United Presbyterian Chruch (USA) v. United States*, 870 F.2d 518 (9th Cir. 1989), this Court held that a church had standing to challenge an INS surveillance program on the ground that the threat of surveillance targeted at the church had chilled congregants from participating in the church's services and activities. *Id.* at 522. As Plaintiffs have already argued, *see* Pls. Opp. to MTD, Dkt. 56, 4 n.2 and 7-8, Plaintiffs here are in an analogous position. Like the church's congregants, Plaintiffs' clients are chilled from participating with CCR in its litigation challenging various aspects of the government's "war on terror" initiatives. In addition, Plaintiffs themselves, as attorneys subject to ethical duties, are unable to communicate freely by phone or email with persons overseas, including their own clients, who the government believes fit within the terms of the NSA program. Under *United Presbyterian Church*, Plaintiffs have standing to sue, and while that case may not have been binding on the Sixth Circuit, it is controlling here.[21]

---

[21]    Judge Batchelder sought to distinguish *UPC* on the ground that the church invoked "organizational standing." Slip Op. at 16-17. But she offers no rationale for that purported distinction. It makes no sense, for the constitutional requirements of standing apply equally to individuals and organizations. And even if it made any sense as a logical matter, Plaintiff CCR is an organizational Plaintiff and has alleged harm to itself. *See* Pls. Opp. to MTD, Dkt. 56, at 4 n.2; Goodman Affirmation, Dkt. 9, at ¶ 19 ("In short, we have had to divert staff time and organizational resources away from core mission tasks in order to respond to the NSA Program"). Contrast *ACLU v. NSA*, Slip Op. at 17, 17 n.28 ("None of the plaintiffs have alleged any 'organizational injury' in the present context").

## A. Plaintiffs have established injury-in-fact

Judge Batchelder also argues that *Laird v. Tatum*, 408 U.S. 1 (1972), requires that government action be "regulatory, prescriptive, or compulsory" in order to establish injury-in-fact on a chilling-effect theory of standing (Slip. Op. at 12-16). This argument was previously raised by the government in our case,[22] and is thoroughly addressed in Plaintiffs' Summary Judgment Reply (Dkt. 74) at pages 1-4. The notion that the "challenged exercise of government power [must be] regulatory, proscriptive, or compulsory in nature" comes from a section of the *Laird* opinion where the court was merely cataloging older cases, 408 U.S. at 11; the Court goes on from there to discuss the many other factors in the case at hand that were dispositive—primarily the fact that plaintiffs were not actually chilled,[23] and the nebulous nature of plaintiffs fear that the government might in the future do something illegal with the otherwise lawfully-gathered information it was accumulating. Judge Batchelder's reading of this language from *Laird* is directly refuted[24] by *United Presbyterian Church*, 870 F.2d at 522 (rejecting argument that government intrusion must reach the level of "'coercive action'" before standing may be found in chill cases).

Just as *United Presbyterian Church* fatally undermines the central contention of Judge Batchelder's standing analysis, it undermines the central holding of Judge Gibbons' as well. *United Presbyterian Church* read *Laird* to permit standing where, as here, plaintiffs face a credible threat of surveillance and it has an effect on their constitutionally protected activities. *See* 870 F.2d at 522-23. The linchpin of Judge Gibbons' opinion was the notion that plaintiffs cannot establish

---

[22]    *See* Defs. Br. in Suppt. of MTD, Dkt. 31, at 19, 22 n.9; Defs. Reply in Suppt. of MTD, Dkt. 68, at 4-7.

[23]    Judge Batchelder seems to have missed this point about *Laird*. *Cf.* Slip Op. at 12 ("The plaintiffs in *Laird* were political activists and the speech chilled was political speech."); *cf. Tatum v. Laird*, 444 F.2d 947, 959 (D.C. Cir. 1971) (MacKinnon, J., concurring in part) ("In the hearing before the trial judge, counsel admitted that in the facts upon which they based their complaint the named plaintiffs were not aggrieved by the acts of the appellees: 'Our Plaintiffs this morning, for example, are not people, obviously, who are cowed and chilled...'"); Pls. Opp. to MTD, Dkt. 56, at 7 n.4 (same).

[24]    *See also Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1096 (10th Cir. 2006) (en banc) (McConnell, J.) (cited in Pls. SJ Reply, Dkt. 74, at 1-2). Moreover, at oral argument in the Southern District of New York, Judge Lynch agreed that this was clearly not the holding of *Laird*, *see* Oral Arg. Tr. 27 line 3 ("THE COURT: I'm with you

standing unless they are "clearly subject to conduct of the defendant about which the plaintiffs complained." Slip. Op. at 38. But in *United Presbyterian Church*, the Ninth Circuit granted standing to seek prospective relief on the basis of the effect that the reasonable fear of future surveillance would have on plaintiffs, as here. Thus, the central rationales of both Judge Gibbons and Judge Batchelder cannot stand in this Court, because they cannot be squared with the binding precedent of *United Presbyterian Church*.

Judge Gibbons relies on *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), for the proposition that fear of being subjected to a future injury is insufficient to ground standing to sue. But that clearly overreads *Lyons*. The Court in *Lyons* held only that where a citizen was subjected in the past to a chokehold that was admittedly wholly unauthorized and violated city policy, he lacked standing to sue for prospective relief because it was speculative that plaintiff would again engage in activity that caused the police to stop him, and that the police would again engage in action directly contrary to city policy. The Court expressly noted that it would be different if the police were acting pursuant to city policy, because then the likelihood of future injury would be far less speculative. *Id*. at 106 n.7. Here, the President himself authorized the NSA Program; it was not the isolated act of a rogue NSA officer. Moreover, the Program is targeted at precisely the kinds of individuals that Plaintiffs communicate with regularly in connection with their litigation. And unlike in *Lyons*, there is no need for Plaintiffs to violate the law to be subjected to this policy. Accordingly, *Lyons* supports Plaintiffs' standing here. If the City of Los Angeles had a stated policy of targeting black motorists for chokeholds, Mr. Lyons would plainly have had standing to challenge that policy. Here, the administration put in place a formal policy to target international communications with persons they deem to have some connection to al Qaeda or affiliated groups.

---

on that."), and Judge Gibbons' *ACLU* opinion expresses extreme skepticism about Judge Batchelder's reading, see Slip Op. at 39 n.3.

Because Plaintiffs' clients and witnesses fall directly within the targeted terms of the government's program, they have standing to challenge the program.

Standing for prospective relief always requires proof of the threat of future injury, and past injury is relevant only to the extent that it may make it more reasonable to infer a likelihood of future injury. But *Lyons* stands squarely for the proposition that past injury is not sufficient; a reasonable threat of future injury is required to establish standing. Thus, the Sixth Circuit's focus on whether plaintiffs had been subject to actual (past) surveillance was misguided, as their claim for prospective relief required instead an assessment of whether future injury was sufficiently likely. This type of assessment is familiar to courts determining standing to litigate pre-enforcement challenges to criminal statutes affecting protected speech. *See, e.g.*, *California Pro-Life Council v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003) ("particularly in the First Amendment-protected speech context, the Supreme Court has dispensed with rigid standing requirements ... [but] the self-censorship door to standing does not open for every plaintiff. The potential Plaintiff must have 'an actual and well-founded fear that the law will be enforced against [him or her].'" (citation omitted)); *id.* (pre-enforcement First Amendment plaintiff "'need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute. Not if it clearly fails to cover his conduct, of course. But if it arguably covers it ... there is standing.'" (quoting *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003))). Even outside of the First Amendment context, the Supreme Court has time and again stated that the threat of future injury can underlie standing. *See, e.g.*, *Lyons*, 461 U.S. at 101-02. Future injury is by definition contingent, regardless of what past injuries have taken place. It will always require a court's judgment to determine which fears of future injury are reasonable and which are not. It cannot be the law that, as a hard-and-fast rule, past surveillance is necessary to underlie a claim for relief against the threat of future unlawful surveillance.

Both Judge Batchelder's and Judge Gibbons' opinions suffer from the same basic flaw: a desire to turn the standing inquiry into a formulaic analysis. But the Supreme Court's standing cases have consistently been anything but formulaic.[25] Much of the mischief has been wrought by *Laird*'s cautionary language that "subjective chill, without more" should not be the basis for standing. *Laird* and subsequent chilling effect cases show a concern about the "objectivity" of two elements of the standing analysis: first, that the fear causing plaintiffs to be deterred from acting should be *objectively reasonable*; and second, that the harm asserted be something tangible—what is referred to as "concrete harm" in the many post-*Laird* Supreme Court pronouncements on standing—and therefore objective in that sense. *See* Oral Arg. Tr. at 27-28. Where either the fear or the harm are overly subjective, *Laird* applies. But where plaintiffs can produce evidence of the objective reasonableness of their fears resulting from government action, and can also point to consequent objective harm (such as the "professional" harm[26] asserted here, and relied on by the *Keene*[27] and *United Presbyterian Church* courts), they have established a sufficient basis for standing. Plaintiffs have done so here: their overseas communications fall squarely within the terms of the policy, as described by the government, and Plaintiffs are obligated by very specific professional ethical responsibilities to take countermeasures in response to the threat.

---

[25] *See Allen v. Wright*, 468 U.S. 737, 751-52 (1984) ("absence of precise definitions ... hardly leaves courts at sea in applying the law of standing").

[26] Judge Batchelder's opinion also claims that to hold that "professional injury" can constitute the something "more" (above and beyond a "subjective chill") supposedly required by *Laird* demeans the First Amendment "as it would effectively value commercial speech above political speech and protect the former and not the latter." Slip Op. at 13. This overlooks the particular nature of the professional activity at issue in this case and in the ACLU case: public interest litigation. As Plaintiffs here have been careful to point out from the outset of this case, the First Amendment recognizes not just Plaintiffs' expressive "interest in communicating with their clients" and others, but also "the important political and expressive nature of litigation" and "protects vigorous advocacy .... of lawful ends." *See* Pls. Opp. to MTD, Dkt. 56, at 4 (quoting *Lehnert* and *NAACP v. Button*). The professional injury suffered by Plaintiffs here is the equivalent of a restraint on political speech, and their interest deserving of the highest level of constitutional protection.

[27] *See Meese v. Keene*, 481 U.S. 465, 473 (1987).

**B. Plaintiffs have established causation**

The government argues that Plaintiffs' communications with "al Qaeda suspects" cannot be chilled by the existence of a program of warrantless surveillance because "any reasonable person" would assume such conversations would be subject to surveillance by lawful means. *See* Gov't Suppl. Br. at 10 line 21.[28] Judge Batchelder agreed with this reasoning. But it is plainly wrong.

There is a substantial difference between the risks posed by wholly unregulated executive surveillance, and the risk that one may be subjected to FISA surveillance. First, conversations would be subject to FISA surveillance *only* if the government could produce the requisite probable cause before a court. While the government *claims* several of our clients are al Qaeda members,[29] the executive does not reach the statutory or constitutional threshold for probable cause by simply claiming someone is a member of al Qaeda. It must adduce evidence before a court to do so.[30]

Second, and most importantly, under FISA surveillance schemes, "attorneys could trust (and reassure their clients) that their privileged communications would remain confidential because any information intercepted under the standard lawful procedures was subject to" judicially-supervised minimization requirements designed "to protect privileged information." Pls. Opp. to MTD, Dkt. 56, at 11; *see also* Pls. Reply in Suppt. of Summary Judgment, Dkt. 74, at 5. As Judge Gilman put it, "[i]f the TSP did not exist, the attorney-plaintiffs would be protected by FISA's minimization procedures and would have no reason to cease telephone or email communications with their international clients and contacts." *ACLU v. NSA* (6th Cir. Jul. 6, 2007), Slip Op. at 50.

---

[28] Plaintiffs first responded to this argument in their Reply in Suppt. of Summary Judgment, Dkt. 74, at 5-6; *see also* Oral Arg. Tr. at 16-18.

[29] *See* Oral Arg. Tr. at 16-18.

[30] And that, remarkably, is what it has failed to do in a large number of our clients' cases. To use just one example, the government contends that it need never produce before a federal court any evidence of criminal wrongdoing on the part of CCR client Maher Arar in order to defeat his civil claims. Plaintiffs believe that the government holds this position precisely because it cannot produce such evidence. The government has not rescinded its claim that Arar is a member of al Qaeda, despite the fact that an exhaustive Canadian government commission of inquiry absolutely cleared him of any connection whatsoever with terrorism. No "reasonable person" would believe that probable cause could be adduced against Arar, yet the executive believes he would be a legitimate target for surveillance under the NSA Program.

16

So long as the threat of warrantless executive surveillance hangs over Plaintiffs' heads, that is no longer the case.

The minimization provisions of FISA are specifically designed to protect privileged communications, as Judge Gilman discusses in his dissenting opinion in *ACLU v. NSA*, Slip Op. at 43, 50-51. Plaintiffs aver that the minimization protections afforded by the statutory scheme, as compared to a completely unregulated program conducted entirely at the whim of the executive branch, are significant to them and their clients, and the government has offered no evidence to the contrary. The fact that minimization requirements under statutory schemes serve to prevent interception and retention of privileged communications is simply glossed over in Judge Batchelder's opinion. *See* Slip Op. at 20.[31]

As to the related redressability element, Judge Batchelder claims:

> The only way to redress the injury would be to enjoin all wiretaps, even those for which warrants are issued and for which full prior notice is given to the parties being tapped. Only then would the plaintiffs be relieved of their fear that their contacts are likely under surveillance, the contacts be relieved of their fear of surveillance, and the parties be able to "freely engage in conversations and correspond via email without concern."

Slip Op. at 22. But that misses the point; an injunction against the NSA program would eliminate Plaintiffs' well-founded fear of *unlawful* surveillance, and subject them only to the much less substantial risk that they might be subjected to lawful, regulated surveillance, protected by judicial

---

[31]    Judge Batchelder's opinion essentially argues that plaintiffs should take comfort from what they do not know about the NSA Program. For instance, she states that plaintiffs have no basis "to presume that the information collected by the NSA ... will be used or disclosed for any purpose other than national security," Slip Op. at 20, when government officials have asserted that NSA Program intelligence was utilized against terrorism-charge defendants Yassin Aref, Mohammed Hossein, and Iyman Faris. *See* Lowell Bergman et al., *Spy Agency Data After Sept. 11 Led F.B.I. to Dead Ends*, New York Times (Jan. 17, 2006).

    She also claims that there is no indication that NSA is not "complying with, or even exceeding, FISA's" minimization requirements. Slip Op. at 20; *cf.* Defs. MTD Reply, Dkt. 68, at 9. This of course misses the point that an essential part of the protection provided by minimization requirements is the fact that they are *judicially supervised and enforced*. *See* Pls. Opp. to MTD, Dkt. 56, at 11-12, 11 n.8; Pls. SJ Reply, Dkt. 74, at 5. The government admits judges are not involved at all in the Program; thus, by definition, meaningful minimization meeting constitutional standards is absent. Moreover, the *Al Haramain* case apparently centers on a document indicating surveillance of an attorney-client communication, a fact widely reported by the press that belies the notion that minimization is applied by the Program. That information was shared by NSA with OFAC, which accidentally disclosed it—something which refutes Judge Batchelder's notion that NSA may not be disclosing "information collected ... under the TSP to anyone for any purpose," Slip Op. at 21 n.31.

oversight and statutory minimization requirements.[32] To suggest that that is not a redressable injury is to suggest that FISA serves no purpose in protecting privacy.

Similarly, Defendants claim that "any electronic surveillance that Plaintiffs are now challenging is now being conducted subject to the approval of the FISA Court," and thus "there is no likelihood" that Plaintiffs claimed injuries will be redressed by the relief Plaintiffs seek. Gov't Suppl. Br. at 10 n.8. But as noted above, the government continues to assert a right to carry out surveillance beyond that authorized by FISA, and it is that surveillance that Plaintiffs seek protection from. It is well established that "a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." *Larsen v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis in original) (quoted in Pls. Opp. to MTD, Dkt. 56, at 12-13).

In addition, Judge Batchelder appears to miss the distinction between the probable cause requirement under FISA and the "reasonable basis" standard (described in Pls. Br. in Support of SJ, Dkt. 6, at 8[33]) the administration claims it applies in the NSA Program:

> the NSA is interested only in [intercepting those communications where] ... the NSA has a "reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda." It is reasonable to assume that the FISA Court would authorize the interception of this type of communication, *see* 50 U.S.C. § 1805, and keeping this likelihood in mind, the issuance of FISA warrants would not relieve any of the plaintiffs' fears of being overheard[.]

Slip Op. at 21. As we put it earlier, "[a] communication with an individual the executive merely suspects of a link to terrorism, without evidence sufficient to reach the requisite threshold for

---

[32]     Precisely because it is reasonable to fear lawless behavior, courts have generally recognized that the unlawfulness of a challenged government practice bears substantial weight in assessing the reasonableness of plaintiffs' fears in a chilling-effect standing analysis. *See* Pls. Opp. to MTD, Dkt. 56, at 9-10 (citing cases); contrast *Laird*.

[33]     "NSA intercepts communications when the agency has, in its own judgment, merely a '*reasonable basis to conclude* that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda.'" Pls. Br. in Support of SJ, Dkt. 6, at 8

cause, will not be subject to surveillance under FISA, but will be subject to surveillance under the NSA Program." Pls. Reply in Suppt. of Summary Judgment, at 5. Moreover, under FISA it is not sufficient that "the NSA has" a basis for the belief that cause sufficient to justify surveillance exists; an independent Article III judge must make the requisite finding—another obvious point underlying the reasonableness of plaintiffs' fears that is assumed away by Judge Batchelder's opinion.

To argue that court supervision of surveillance, the probable cause, limited duration and minimization requirements, and the restrictions on use mandated by FISA are of no moment to private callers is to ignore the very purpose of FISA in the first place: to protect private communications from unconstrained government surveillance. No court can properly adopt these conclusions as a matter of law. Indeed, they were soundly rejected by the Supreme Court as long ago as *Katz v. United States,* 389 U.S. 347, 356-57 (1967):

> It is apparent that the agents in this case acted with restraint. Yet the inescapable fact is that this restraint was imposed by the agents themselves, not by a judicial officer. They were not required, before commencing the search, to present their estimate of probable cause for detached scrutiny by a neutral magistrate. They were not compelled, during the conduct of the search itself, to observe precise limits established in advance by a specific court order. Nor were they directed, after the search had been completed, to notify the authorizing magistrate in detail of all that had been seized. In the absence of such safeguards, this Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with that end.

**C. Fourth Amendment first principles further establish injury**

Judges Batchelder and Gibbons' analyses are also flawed as a conceptual matter because they fail to consider the interests protected by the First and Fourth Amendments that Plaintiffs seek to vindicate here. Judges Batchelder and Gibbons concluded that the *ACLU* plaintiffs lacked standing because in the absence of proof that their own conversations had been subject to

---

(quoting Gonzales); *see also id.* at 8 n.25 ("NSA intercepts calls 'we have a reasonable basis to believe involve Al Qaida or one of its affiliates'" (quoting Michael Hayden))

surveillance, the plaintiffs could not establish a sufficient injury. This conclusion fundamentally misapprehends the nature of the privacy protection provided by the Fourth Amendment and FISA, particularly in the case of privileged communications. A proper understanding of the privacy interests that are deserving of protection compels the conclusion that the Plaintiffs here (and for that matter the ACLU plaintiffs as well) have standing to challenge the NSA Surveillance Program.

The framers drafted the Fourth Amendment to protect privacy for the benefits that insuring a realm of private life brings. The development of personality that is possible when one is able to live unobserved by government watchers and the exchange of ideas and emotions that is possible when one can communicate with others without observation by government agents are examples of these benefits. The benefits of protecting privileged communications are familiar to all lawyers. The benefits accrue only where there is confidence that one's privacy is as protected as possible, as inviolate as the Constitution and laws permit. The particularity requirement, for example, is designed to limit government intrusions into private spaces (now understood to include conversations) and to permit searching or surveillance of conversations only where evidence or fruits of crime or unprivileged conversations with foreign agents will be discovered. Cognizant of these limitations, a free person is entitled to confidence that private spaces and communications that fall without the government's permitted zone of search and observation will remain private. In the context of this case, a substantial objective risk that privileged conversations with attorneys will be surveilled is sufficient to negate the benefits of the privilege.

This is why the scope of Fourth Amendment protections is based upon "reasonable expectations of privacy," *Katz v. United States,* 389 U.S. 347 (1967). It is noteworthy that this concept was first articulated in *Katz*, an electronic surveillance case. As the Court concluded in that seminal opinion, "a person in a telephone booth may *rely upon* the protection of the Fourth Amendment. One who occupies it, shuts the door behind him, and pays the toll that permits him to

place a call is surely *entitled to assume* that the words he utters into the mouthpiece will not be broadcast to the world." 389 U.S. at 352 (emphasis added). It is the ability to rely upon the protection of the Fourth Amendment, to assume that one is not being overheard, that is significant, because in the absence of that reliance, one cannot feel free to express private thoughts.

Judge Batchelder improperly assumes that the only cognizable injury that the Constitution and FISA protects is the use of overheard conversations to cause additional harm to the participants. *See, e.g.*, Slip Op. at 9 n. 14 ("even if the NSA, unbeknownst to the plaintiffs, did intercept a communication, there would be no tangible injury until the NSA disclosed the information (presumably in a manner demonstrating a direct injury to the plaintiffs or their contacts)."); *id*. at 13. This faulty analysis stems from thinking about the protections of the Fourth Amendment primarily in the context of the exclusionary rule.[34] Judge Batchelder, for example, argues that "traditional *post-hoc* remedies, such as the Exclusionary Rule or FISA's civil suit provision" would "adequately deter the use or dissemination" of information overheard during surveillance, and thus suggests that this eliminates any injury. Slip Op. at 20. This argument seems to suggest that only persons charged with crimes or who need to worry about the dissemination of information obtained by the government would suffer an injury as a result of surveillance. On the contrary, it is the very overhearing of the innocent conversation, the invasion of the privacy of the homes and papers of innocent persons, that is the principal concern of the Fourth Amendment. Judge Batchelder's analysis assumes that absent dissemination or the taking of some other adverse

---

[34] It also ignores the scope of the duty of confidentiality imposed on attorneys. *See, e.g.*, Affirmation of [Legal Ethics Expert] Prof. Stephen Gillers, Dkt. 58, at ¶10:

> It is no answer to say that suppression is available as a remedy for any improperly intercepted communication. CCR and its clients may never know which communications may have been intercepted. Intercepted communications may be exploited to the disadvantage of clients with no one the wiser. In any event, whether intercepted communications are or are not ever used to the disadvantage of a client or otherwise is irrelevant. CCR has a duty to protect its clients' secrets and confidences regardless of the use to which an interceptor may put the information. It is disclosure itself that is the evil against which lawyers must protect clients, regardless of any additional consequences of the disclosure.

action by the government against a person whose conversations have been subject to surveillance, it is as though a tree fell in the forest with no one to hear it. But someone (the NSA) has heard it; that is the initial harm caused by government surveillance—the intrusion on privacy. And the threat of such overhearing is enough, in the case of the conversations at issue here, where the Plaintiffs have ethical obligations to insure the privacy of communications, to destroy the value of the privacy the conversations should be entitled to.

This error results in a misreading of the Supreme Court's decision in *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167 (2000) by both Judges Batchelder and Gibbons. *Laidlaw* involved a polluted river. The Court found that plaintiffs had standing to challenge the pollution even though they were not using the river. The Court found that because the discharge of pollutants into the river was ongoing, the plaintiffs might reasonably have curtailed their use of the river in order to protect themselves from harm, and thus had standing to challenge the pollution.

Judge Batchelder takes from this that the plaintiffs in this case would have to prove that if they engaged in international calls while the NSA Surveillance Program was in effect, they would actually be overheard and would suffer some additional harm. As Judge Gilman points out, however, the Supreme Court in *Laidlaw* did not require proof that plaintiffs "were all equally likely to be affected by the pollutants, that the pollutants were evenly dispersed through the waterway, or that a plaintiff swimming in the river was more likely than a plaintiff canoeing on the river to be injured." Slip Op. at 46. Indeed, we would add that the Court did not even require evidence that a plaintiff entering the river would be harmed at all. It was merely the reasonable fear of harm if they entered the river that gave the plaintiffs standing.

In this case the stream of international telecommunications is the "river." Plaintiffs do not feel free to enter this stream, to engage in international telecommunications with their clients, witnesses and sources, because of a very reasonable fear of harm that if they do, their conversations

will be overheard. If that fear is reasonable—and under these facts it certainly is—that is all we have to show to establish standing.

Judge Batchelder's analysis is at its weakest when she argues that one can distinguish between the harm that causes plaintiffs to refrain from international communications (the consequences of being overheard) and the harm that results from refraining (the additional time and expense required of plaintiff attorneys to competently represent their clients, or the diminution of the quality of representation if they are unable to expend the additional resources necessary). Because plaintiffs cannot prove that they have been overheard, she concludes that they cannot establish the first type of harm. Judge Batchelder completely discounts the second type of harm as an injury in fact because it is only "incidental" to the alleged wrong. Slip Op. at 9. No authority is cited for this novel distinction. There is no doctrinal basis for rejecting as a relevant injury one that a plaintiff foreseeably sustains as a result of steps he takes to avoid a harmful condition caused by the defendant. That attorneys would avoid the stream of international communication with clients and witnesses once it is "polluted" by government watchers is foreseeable, indeed ethically required. The additional expense, or diminution in quality of representation, that results is not "incidental," whatever that may mean, but is proximately caused by the defendant's wrongdoing and certainly qualifies as an injury in fact.

**D. Plaintiffs have shown the Program constitutes "electronic surveillance" under FISA**

As to claims under FISA or its "exclusivity provision" (18 U.S.C. § 2511(2)(f)), Judge Batchelder's opinion argues that the *ACLU* plaintiffs "have not shown, and cannot show, that the NSA engages in activities satisfying the statutory definition of 'electronic surveillance' [they] cannot demonstrate that FISA does apply." Slip Op. at 32.[35] She bases this conclusion on the

---

[35] *See also* Slip Op. at 29 ("These factors raise a host of intricate issues, such as whether the NSA's wiretapping actually involves 'electronic surveillance' as defined in FISA...").

notion that "[t]he present record ... contains three facts about the TSP"—which she identifies as "the NSA (1) eavesdrops, (2) without warrants, (3) on international telephone and email communications in which at least one of the parties is reasonably suspected of al Qaeda ties"—and those three facts "offer[] no indication as to where the interception may occur or where any surveillance device is located. Nor do[ they] offer any basis to conclude that particular people located in the United States are being targeted." Slip Op. at 31 n.40; *id*. at 6 (three facts).

Judge Batchelder's argument is willfully blind to actual contents of the record. In both the *ACLU* case and the instant case, the record contains the following admission by Attorney General Gonzales:

> Now, in terms of legal authorities, the Foreign Intelligence Surveillance Act provides—requires a court order before engaging in this kind of surveillance that I've just discussed and the President announced on Saturday, unless there is somehow—there is—unless otherwise authorized by statute or by Congress. That's what the law requires.

*Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence*, Dec. 19, 2005 (quoted in Pls. SJ Brief, Dkt. 5, at 9)[36]; *see also* Oral Arg. Tr. at 84-85 (citing above). This is a clear admission, dating back to December 2005, that the surveillance carried out by the program was subject to the strictures of FISA—in other words, that it constituted "electronic surveillance" under FISA § 1801(f).

In any event, in the context of the recent admissions concerning the January 10th FISA orders and administration officials' claims that those orders authorize surveillance of the same sorts of communications as was carried out under the NSA Program, any claim that the Program did not constitute "electronic surveillance' subject to FISA would be nonsensical given that the FISC's jurisdiction extends only to authorizing electronic surveillance.[37] *See* 50 U.S.C. §§ 1803(a) (FISC

---

[36]     *See also* Press Briefing ("The President has authorized a program to engage in electronic surveillance"). The press briefing transcript is included in the record as an exhibit to Goodman Aff., Dkt. 9.
[37]     *Cf.* Slip Op. at 55-56 (Gilman, J. dissenting).

"shall have jurisdiction to hear applications for and grant orders approving electronic surveillance"); 1804(a); 1805(a),(c),(e).

With respect to the merits, Plaintiffs reject Judge Batchelder's plainly tortured interpretation of the statutory exclusivity provisions, which properly understood require all electronic surveillance to be conducted either under FISA or Title III. For the reasons that are well presented in Judge Gilman's dissenting opinion, Slip Op. at 55-56, it is clear that the statutory limitation was intended by Congress to limit the government's ability to conduct electronic surveillance to the means provided in the statutes.

**E. Plaintiffs' APA claims are actionable**

Judge Batchelder also ruled against the ACLU plaintiffs on their APA claims because she held that there had been no "agency action" that could be challenged under 5 U.S.C. § 702. The government has not made this argument and there is no basis in law for the conclusions reached by Judge Batchelder. The only authority cited by Judge Batchelder, *Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55 (2004), does not control the present case. That case involved a claim under 5 U.S.C. § 706, for the failure of an agency to act, and the Court held that there was no action legally required.

*Norton* relied upon *Lujan v. National Wildlife Federation*, 479 U.S. 871 (1990), for a judicial interpretation of what constitutes "agency action," which is defined by statute at 5 U.S.C. 551(13). *Lujan* makes clear that the present Plaintiffs have alleged agency action. In *Lujan*, the Court held that the "land withdrawal review program" of the Interior Department did not constitute "agency action" within the meaning of the statute. That description of a so-called program, however, was a generic one that referred to the "continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans." 497 U.S. at 890. Justice Scalia's opinion for the

Court analogized the "land withdrawal review program" to a "weapons procurement program" for the Defense Department or a "drug interdiction program" of the D.E.A., and concluded that it did not refer to any identifiable agency action. *Id.* What the plaintiffs attempted to challenge in *Lujan* was thus a much more amorphous collection of conduct than the very specific "Terrorist Surveillance Program" at issue in this case. Contrary to the suggestion by Judge Batchelder, the term Terrorist Surveillance Program was coined by the government and describes a very specific program that NSA adopted pursuant to the direction of the President. (Gov't. Suppl. Br. at 5; Gov't. Memorandum in Support of MTD, Dkt. 31, at 1-2). It is a discrete, circumscribed program adopted for a specific purpose and constitutes "agency action" within the meaning of 5 U.S.C. § 702.[38]

**CONCLUSION**

For the foregoing reasons, and based on the arguments in our previous submissions, Plaintiffs request that the Court deny Defendants' Motion to Dismiss and grant Plaintiffs' Motion for Summary Judgment, issue a declaratory judgment holding the NSA Surveillance Program unconstitutional and in violation of the Foreign Intelligence Surveillance Act, and enjoin Defendants from engaging in any further surveillance without complying with the procedures of the Foreign Intelligence Surveillance Act, or Title III where applicable.

Respectfully submitted,


_____/s/Shayana Kadidal_____
Shayana Kadidal
Michael Ratner
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012-2317
(212) 614-6438

---

[38]  As Justice Scalia noted in *Lujan*, a specific order or regulation applying to individual classification determinations and withdrawal revocations would have constituted agency action. 479 U.S. at 890, n. 2. That is what the TSP is with respect to decisions to intercept communications.

David Cole
(CCR Cooperating Counsel)
c/o Georgetown University Law Center
600 New Jersey Avenue, N.W.
Washington, D.C.  20001
(202) 662-9078

Michael Avery
J. Ashlee Albies
NATIONAL LAWYERS GUILD
c/o Suffolk Law School
120 Tremont Street
Boston, MA  02108
(617) 573-8551

*Attorneys for Plaintiffs*

July 9, 2007

## Certificate of Service

I, Shayana Kadidal, certify that on July 9, 2007 (PDT), I caused the foregoing Memorandum to be filed electronically on the ECF system and served via email on the counsel for defendants listed below.

Anthony J. Coppolino
Special Litigation Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Email: *tony.coppolino@usdoj.gov*

Dated: July 9, 2006

s/   Shayana Kadidal
Shayana Kadidal
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY  10012-2317