1  PETER D. KEISLER
   Assistant Attorney General, Civil Division
2  CARL J. NICHOLS
   Deputy Assistant Attorney General
3  DOUGLAS N. LETTER
   Terrorism Litigation Counsel
4  JOSEPH H. HUNT
   Director, Federal Programs Branch
5  ANTHONY J. COPPOLINO
   Special Litigation Counsel
6  Email: tony.coppolino@usdoj.gov
   ANDREW H. TANNENBAUM
7  Trial Attorney
   Email: andrew.tannenbaum@usdoj.gov
8  U.S. Department of Justice
   Civil Division, Federal Programs Branch
9  20 Massachusetts Avenue, NW, Rm. 6102
   Washington, D.C. 20001
10 Phone: (202) 514-4782/(202) 514-4263
   Fax:    (202) 616-8460
11 *Attorneys for Defendants*

12          **UNITED STATES DISTRICT COURT**

13          **NORTHERN DISTRICT OF CALIFORNIA**

14          **SAN FRANCISCO DIVISION**

15

16 IN RE NATIONAL SECURITY AGENCY )   No. M:06-cv-01791-VRW
   TELECOMMUNICATIONS RECORDS )
17 LITIGATION )                       **DEFENDANTS' SUPPLEMENTAL**
                                      **REPLY MEMORANDUM IN SUPPORT**
   _____ )   **OF MOTION TO DISMISS OR FOR**
18                                 )   **SUMMARY JUDGMENT IN** *Center for*
                                   )   *Constitutional Rights v. Bush (07-1115)*
19 This Document Relates Only To:  )
                                   )
20 *Center for Constitutional Rights v. Bush,* ) Judge:      Hon. Vaughn R. Walker
   (Case No. 07-1115)              )   Date:       August 9, 2007
                                   )   Time:       2 p.m.
21                                 )   Courtroom:  6, 17th Floor
                                   )
22 _____ )

23

24

25

26

27

28

---

**Defendants' Supplemental Reply Memorandum** (M:06-CV-1791-VRW)
*Center for Constitutional Rights v. Bush* (07-CV-1115-VRW)

Dockets.Justia.com

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.  THE COURT LACKED JURISDICTION WHEN THIS CASE
    COMMENCED; IT LACKS JURISDICTION NOW THAT THE
    CHALLENGED ACTIVITY IS NO LONGER OPERATIVE;
    AND ANY FACTS NEEDED TO ADJUDICATE THE QUESTION
    ARE PROPERLY PROTECTED UNDER THE STATE SECRETS
    PRIVILEGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  Plaintiffs' Alleged Chill Injury Has Always Been
        Constitutionally Insufficient to Establish Standing . . . . . . . . . . . . . . . . . . . . . . 4

    B.  The Authority on Which Plaintiffs Rely is Inapposite . . . . . . . . . . . . . . . . . . . 8

    C.  Plaintiffs' Alleged Chill Injury Is Particularly Unfounded
        Where Communications With al Qaeda Suspects Are Subject
        to Other Surveillance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    D.  Where the TSP Is No longer Operative, Plaintiffs' Alleged
        Chill Injury Is All the More Unfounded . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    E.  Plaintiffs Could Not Establish Standing as a Factual Matter in
        Light of the State Secrets Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II. THIS CASE COULD ALSO BE DISMISSED AS MOOT, AND ANY
    FACTUAL DISPUTE AS TO MOOTNESS COULD NOT BE
    ADJUDICATED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Defendants' Supplemental Reply Memorandum** (M:06-CV-1791-VRW)
*Center for Constitutional Rights v. Bush* (07-CV-1115-VRW)

-i-

# TABLE OF AUTHORITIES

*American Civil Liberties Union v. National Security Agency,*
   __F. 3d __, 2007 WL 1952370 (6th Cir. July 6, 2007) . . . . . . . . . . . . . . . . . . . . . . passim

*Baggett v. Bullit,* 377 U.S. 360 (1964), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Baird v. State Bar of Arizona,* 401 U.S. 1 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Chemical Producers & Distributors Ass'n v. Helliker*, 463 F.3d 871 (9th Cir. 2006) . . . . . . . 18

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 12

*Clarke v. United States*, 915 F.2d 699 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. —, 126 S. Ct. 1854 (2006) . . . . . . . . . . . . . . . . 16

*Friends of the Earth v. Laidlaw*, 528 U.S. 167 (2000) . . . . . . . . . . . . . . . . . . . . . . . 3, 9, 10

*Halkin v. Helms*, 598 F.2d 1 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Halkin v. Helms*, 690 F.2d 977, 1002 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Keyishian v. Board of Regents*, 385 U.S. 589 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Laird v. Tatum*, 408 U.S. 1 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Lamont v. Postmaster*, 381 U.S. 301 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 9, 10

*Lewis v. Casey*, 518 U.S. 343 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . 5, 12, 13

*Mitchell v. Ellsberg*, 709 F.2d 51 (D.C. Cir. 1983), *cert. denied,* 465 U.S. 1038 (1984) . . . . . . 16

*Meese v. Keene*, 481 U .S. 465 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*O'Shea v. Littleton*, 414 U.S. 488 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Ozonoff v. Berzak*, 744 F.2d 224 (1st Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Presbyterian Church v. United States,* 870 F.2d 518 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . 8

*Rizzo v. Goode*, 423 U.S. 362 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Steffel v. Thompson*, 415 U.S. 452, 475 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Tatum v. Laird*, 444 F.2d 947 (D.C. Cir. 1971), *reversed*, 408 U.S. 1 (1972) . . . . . . . . . . . . . . 6

*United Presbyterian Church v. Reagan,* 738 F.2d 1375 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . 7

*United States Postal Serv. v. Gregory*, 534 U.S. 1 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Defendants' Supplemental Reply Memorandum** (M:06-CV-1791-VRW)
*Center for Constitutional Rights v. Bush* (07-CV-1115-VRW)

-ii-

*Valley Forge Christian Coll. v. Ams. United for Separation of*
    *Church & State, Inc* ., 454 U.S. 464 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 12

<u>U.S. CONSTITUTION</u>

U.S. Const. art II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

U.S. Const. art. III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 17

<u>EXECUTIVE ORDERS AND STATUTORY PROVISIONS</u>

Executive Order 12333, 46 Fed. Reg. 59941 (Dec. 4, 1981) . . . . . . . . . . . . . . . . . . . . . . . . . 11

Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . 1

50 U.S.C. § 1801(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

50 U.S.C. § 1801(f) (1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

50 U.S.C. § 1801(f) (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

50 U.S.C. § 1801(f)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

50 U.S.C. § 1801(f)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

50 U.S.C. § 1801(h)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

50 U.S.C. § 1806(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Defendants' Supplemental Reply Memorandum** (M:06-CV-1791-VRW)
*Center for Constitutional Rights v. Bush* (07-CV-1115-VRW)

-iii-

Plaintiffs are asking the Court to order the President to never again authorize a surveillance activity that, it is undisputed, is no longer being conducted. Plaintiffs seek this relief because they "fear" the President might some day reauthorize such surveillance outside of the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801, *et seq*. ("FISA"), and that they might be subject to such future surveillance if they represent suspected terrorists whose communications might fall within the scope of any such renewed surveillance. It would be an extraordinary and impermissible exercise of Article III jurisdiction for the Court to decide the significant constitutional questions that this case raised when the Terrorist Surveillance Program ("TSP") was operative, including whether to constrain the President's authority to protect national security in the face of unknown future threats. Federal courts do not sit to issue advisory opinions on hypothetical questions; that is especially true where extraordinary constitutional questions concerning the separation of powers are presented.

Granting prospective relief against hypothetical future actions is all the more unfounded where Plaintiffs have never adequately alleged that the TSP ever caused them the type of personal and cognizable harm required to have invoked the Court's jurisdiction in the first place. And, at this stage, the mere fact that the Executive Branch believes the President has authority to undertake foreign intelligence surveillance (as several courts have recognized) in no way indicates that Plaintiffs are personally threatened with the kind of concrete and imminent future harm needed to have standing to seek prospective relief.

Moreover, even if Plaintiffs' *allegations* of injury were sufficient as a matter of pleading, the question now before the Court on summary judgement is whether Plaintiffs have met or could meet their burden of proving that they are presently suffering an immediate and concrete harm from the now-inoperative TSP. The fact that the TSP is no longer operative, without more, precludes such a showing, and if any more facts are needed to adjudicate Plaintiffs' standing— such as whether Plaintiffs ever were subject to the TSP or face an imminent threat of future injury from its recurrence—those facts are properly protected by the state secrets privilege.

The Court of Appeals for the Sixth Circuit recently confirmed that plaintiffs in the

---

identical circumstance presented here lack standing to challenge the TSP. *See American Civil Liberties Union v. National Security Agency*, __F.3d __, 2007 WL 1952370 (6th Cir. July 6, 2007) (hereafter "*ACLU*"). There, the judges in the majority—Judges Batchelder and Gibbons— agreed with two central points Defendants make here. Judge Batchelder concluded that the plaintiffs' allegation of chill injury in support of their First Amendment claim is insufficient under *Laird v. Tatum*, 408 U.S. 1 (1972), *see ACLU*, 2007 WL 1952730 at **8-21, while Judge Gibbons held that "[t]he disposition of all the plaintiffs' claims depends upon the single fact that the plaintiffs have failed to provide evidence that they are personally subject to the TSP" in response to the Government's summary judgment motion, and concluded that "the plaintiffs are ultimately prevented from establishing standing because of the state secrets privilege." *See id.* at *34, *38. For either reason, and because any alleged chill from the now inoperative TSP is even more speculative and could not be proven, this case should be dismissed. Finally, as Defendants have previously demonstrated, even if these substantial jurisdictional obstacles could be overcome, state secrets would still be need to decide the merits of this case.

## ARGUMENT

**I.     THE COURT LACKED JURISDICTION WHEN THIS CASE COMMENCED; IT LACKS JURISDICTION NOW THAT THE CHALLENGED ACTIVITY IS NO LONGER OPERATIVE; AND ANY FACTS NEEDED TO ADJUDICATE THE QUESTION ARE PROPERLY PROTECTED UNDER THE STATE SECRETS PRIVILEGE.**

Plaintiffs' Supplemental Memorandum makes clear that the primary ground on which they seek to establish their standing in this case is an alleged "chill" injury caused by their reaction to the existence of the TSP. *See* Compl. ¶¶ 43. They aver that they "face a credible threat of surveillance," and that this "has an effect on their constitutionally protected activities." Pls. Supp. at 12; *see also id.* at 15 (Plaintiffs allege they have "reasonable fears" resulting from government action). Plaintiffs' alleged chill injury is based not only on their own fear of the TSP, but also on the alleged chill imposed by the TSP on their clients. *Id.* at 11. And, now that the TSP is inoperative, Plaintiffs claim that they still are chilled by the possibility of its recurrence because the Executive Branch holds to its position that the program was lawful and the President has authority to authorize foreign intelligence surveillance. Established principles

of law preclude finding that Plaintiffs have standing based on these allegations.[1]

First, in contrast to the cases on which Plaintiffs rely, where it was undisputed that the challenged conduct actually applied to the plaintiffs, here Plaintiffs' claims are based on speculation that their communications were subject to interception under the TSP and their own fear of any such surveillance. Such allegations of harm fall squarely within the kind of subjective apprehension of surveillance rejected in *Laird* as a basis for standing.

Second, termination of the TSP negates any possible chilling effect on Plaintiffs; since the TSP is not currently being conducted, Plaintiffs cannot plausibly claim that it presently chills them. The mere fact that the Executive Branch continues to assert that the President has the constitutional authority to engage in foreign intelligence surveillance and, thus, the mere *possibility* that the Executive Branch might someday consider conducting surveillance *like* the TSP, in no way establishes the kind of concrete and imminent future harm required for standing to obtain prospective relief.

Third, even if Plaintiffs' *allegations* of injury were sufficient, critical facts needed to adjudicate the jurisdictional issues in this case (standing and mootness) are covered by the state secrets privilege in order to protect vital intelligence sources and methods. These facts include whether Plaintiffs were subject to surveillance under the TSP, as well as operational facts about the program needed to litigate whether Plaintiffs' fear of being subject to the program was reasonable. In addition, facts concerning why and how the TSP has been supplanted by Foreign Intelligence Surveillance Court ("FISA Court") action would be needed to address the likelihood that the program may recur, which is relevant to both standing for prospective relief and mootness.[2]

---

[1] Plaintiffs do not argue that they have standing based on any actual interception of their communications and could not prove such an allegation in light of the state secrets privilege.

[2] Defendants address the standing issue first because, if the Plaintiffs could not establish standing from the outset, and have no standing for prospective relief where the TSP is no longer operative, there is no need to consider whether the case is moot. *See Friends of the Earth v. Laidlaw*, 528 U.S. 167, 180 (2000); *ACLU*, 2007 WL 1952370, at *2, n.4. Conversely, if the case is not moot, Plaintiffs still must have standing to proceed.

## A.   Plaintiffs' Alleged Chill Injury Has Always Been Constitutionally Insufficient to Establish Standing.

Plaintiffs' alleged chill injury falls squarely within the holding of *Laird v. Tatum, supra*, where, as here, the plaintiffs challenged the existence of a surveillance program, *see Laird*, 408 U.S. at 9, which they alleged "exercises a present inhibiting effect on their full expression and utilization of their First Amendment rights." *Id*. at 10.  The Supreme Court in *Laird* framed the issue as "whether the jurisdiction of a federal court can be invoked by a complainant who alleges that the exercise of his First Amendment rights is being chilled by the existence, without more, of a governmental investigative and data gathering activity."  *Laird*, 408 U.S. at 10.  The Court discussed prior cases in which it had found that a constitutional violation may arise from the deterrent or chilling effect of governmental regulation, but concluded that in none of those cases "did the chilling effect arise merely from the individual's knowledge that a government agency was engaged in certain activities . . . ."  *Id.* at 11.[3]  The Court then applied the "'established principle that to entitle a private individual to invoke the judicial power to determine that validity of executive or legislative action he must show that he has sustained, or is immediately in danger of sustaining, a direct injury as a result of that action . . . .'"  *Id.* at 13 (citation omitted).  The Court held that the plaintiffs in *Laird* "do not meet this test" because "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm[.]"  *Id.* at 13-14.

Plaintiffs' effort to distinguish *Laird*, and their criticism of Judge Batchelder's analysis in *ACLU* on this issue, is unavailing.  They first take issue with the proposition that *Laird* requires that government action be "regulatory, proscriptive, or compulsory" in order to establish injury-in-fact on a chilling effect theory of standing.  *See* Pls. Supp. at 12.  But *Laird* itself uses these

---

[3]  *Laird* discusses *Baird v. State Bar of Arizona*, 401 U.S. 1 (1971), which involved denial of a bar membership for refusing to answer question about communist party; and *Keyishian v. Board of Regents*, 385 U.S. 589 (1967), which involved discharge from employment due to political acts; and *Lamont v. Postmaster*, 381 U.S. 301 (1965), which involved denial of delivery for communist propaganda mail; and *Baggett v. Bullitt,* 377 U.S. 360 (1964), which involved the requirement of an oath as condition of employment). *See* 408 U.S. at 11-12.

terms to describe cases in which a chilling injury was found, *see* 408 U.S. at 11-12, and goes on to apply that standard in holding that the plaintiffs in *Laird* lacked standing. *See id.* at 13 (holding that "these decisions" have not eroded the requirement that a plaintiff must show direct injury as a result of the challenged action and cannot merely allege subjective chill caused by the existence of the program). Thus, in analyzing whether a chill injury could establish standing, the Court in *Laird* looked to whether a proscriptive governmental action was applied to the plaintiffs.[4]

But even if a plaintiff could establish standing for a First Amendment claim based on a "chill" injury in the absence of regulatory or proscriptive action that applies to the plaintiff, Plaintiffs still lack standing here. *Laird* and other cases firmly establish that to have Article III standing a plaintiff must be able to establish that he or she has sustained or is immediately in danger of sustaining a direct injury from the challenged action, *see Laird*, 408 U.S. at 13, and cannot make that showing from a speculative fear that the challenged action might apply to him or her. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc* ., 454 U.S. 464, 472 (1982); *City of Los Angeles v. Lyons,* 461 U.S. 95, 101-02 (1983). Notably, Judge Gibbons specifically declined to decide in *ACLU* whether regulatory or proscriptive action is required to have standing for a First Amendment claim based on an alleged chill injury, *see ACLU*, 2007 WL 1952370, at *38 n.3, but nonetheless concluded that standing requires proof that the challenged governmental activity actually has been applied to the plaintiffs. *See id.* at *34-37.

On this issue—whether they must show that they were actually subject to the TSP—

---

[4] Plaintiffs' assertion that Judge Lynch agreed with their position on this particular issue is suspect. *See* Pls. Supp. at 12, n. 24. Putting aide whether a judge's questions and comments at argument can be relied on as a definitive reflection of the judge's views, in the exchange where Judge Lynch said "I'm with you on that," he explained: "That is, I don't think that this case can be governed or any case can be governed by taking some phrase, whichever side it favors, out of *Laird* and saying, there's the rule, now we plug in three facts and we get an answer. But what I'm really trying to get at is, what was the problem in *Laird*? . . . ."). *See CCR* Trans. (9/5/06) at 27:3-8 (Dkt. No. 12, Item # 14) (07-CV-1115).

1  Plaintiffs contend that, in contrast to the plaintiffs in *Laird*,[5] their fears are "*objectively*

2  *reasonable*," and that they can point to something "more" than a chill injury allegedly caused by

3  the TSP—namely injuries to their professional activities caused by the added burdens of

4  communicating securely with their clients.  Specifically, Plaintiffs argue that their

5  communications "fall squarely within the terms of the policy, as described by the government,"

6  and that they are ethically required to undertake burdensome "countermeasures" in response to

7  the threat of the TSP.  *See* Pls. Supp. at 15.  This argument is wrong for two reasons: (i) the

8  allegation that they fall within the surveillance activity is based on conjecture; and (ii) without

9  establishing that the challenged governmental conduct actually applied to them, Plaintiffs'

10  alleged harms are no more than self-imposed injuries.

11  First, Plaintiffs' assertion that their communications "fall squarely within the terms" of

12  the TSP is not an "objective" conclusion.  Rather, Plaintiffs are *assuming* that their

13  communications fall within the TSP based on a limited public description that the program is

14  directed at international communications where one participant is reasonably believed to be a

15  member or agent of al Qaeda or an al Qaeda affiliated terrorist organization.  *See* Defs. MSJ

16  Mem. at 1.  But Plaintiffs simply do not know if they were subject to TSP surveillance.  As

17  Judge Batchelder observed, plaintiffs' allegation of injury rests on "the *possibility*" that their

18

19         [5] Plaintiffs' related contention that the plaintiffs in *Laird* were "not actually chilled," *see*

20  Pls. Supp. at 12, n. 23, is inaccurate and misses a key distinction.  The Supreme Court did
   observe in a footnote that the plaintiffs in *Laird* "cast considerable doubt" on their own alleged

21  chill, based in part on statements from their counsel that his clients were not "cowed and chilled"
   but "they've come into Court" to represent others.  *See* 408 U.S. at 14, n. 7; *Tatum v. Laird*, 444

22  F.2d 947, 959 (D.C. Cir. 1971) (MacKinnon, J. concurring in part and dissenting in part).  Based
   on this the Supreme Court noted that "*if* respondents themselves are not chilled, but seek only to

23  represent" others they believe are chilled, they clearly lack a personal stake in the outcome.  *See*
   408 U.S. at 14, n. 7.  But the Court went on to decide the *legal claim* made by plaintiffs in

24  *Laird*—namely, whether the allegations of a subjective chill are an adequate substitute for a
   claim of specific present objective harm or a threat of specific future— and that is the same

25  claim raised here.  Moreover, the Court of Appeals in *Laird* observed that the "record shows that
   most if not all the appellants and/or the organizations of which they are members *have been the*

26  *subject* of Army surveillance reports and their names have appeared in Army records," *id.* at 956

27  (emphasis added).  Thus, unlike Plaintiffs here, the *Laird* plaintiffs were in a position to allege

28  that their chill injury was based in part on past surveillance of them.

overseas contacts will be subjected to the TSP, and thus the "alternative possibility remains that the NSA might *not* be intercepting, and might *never* actually intercept, any communications by any of the plaintiffs named in this lawsuit." *ACLU*, 2007 WL 1952730 at *5 (emphasis in original). This is what makes Plaintiffs' allegations conjectural.

It is not enough for Plaintiffs to allege that the TSP was directed at al Qaeda and that some of Plaintiffs' clients are suspected of having al Qaeda ties. The plaintiffs in *Laird* also alleged that they fell within the terms of the surveillance as described by the government and were inhibited by the program. Indeed, as noted above, there was evidence in the *Laird* record that some of the plaintiffs there had been identified in the government surveillance files at issue. *See* note 4, *supra*. But *Laird* held that the plaintiffs nonetheless lacked standing, and cases applying *Laird* have rejected standing based on the notion that a group of plaintiffs are more likely to be subject to surveillance. As the D.C. Circuit stated in *United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1380 (D.C. Cir. 1984):

> Even if it were conceded that these factors place the plaintiffs at greater risk than the public at large, that would still fall far short of the "genuine threat" required to support this theory of standing, . . . as opposed to mere "speculative" harm, . . . . *It must be borne in mind that this order does not direct intelligence-gathering activities against all persons who could conceivably come within its scope, but merely authorizes them.*

*Id.* (citations omitted) (emphasis added); *see also Halkin v. Helms*, 690 F.2d 977, 1002 n. 89 (D.C. Cir. 1982); *ACLU*, 2007 WL 1952370, at *36 (Gibbons, J. concurring) ("There is no relevant factual difference between the *United Presbyterian Church* plaintiffs, whose activities the D.C. Circuit conceded made them more likely to be subject to surveillance, *id.*, and the attorney-plaintiffs in this case, whose representations of 'exactly the types of clients' targeted by the TSP make them more likely to be targeted by the TSP.").[6]

Second, the notion that a plaintiff can overcome *Laird* by pointing to self-imposed harms

---

[6] It should be noted that Plaintiffs allege they are chilled from communicating not only with clients who are possible al Qaeda suspects, including detainees at Guantanamo Bay Naval Station, *see* Compl. ¶¶ 36-39, but also more broadly with "other individuals in relation to these cases," including family members of their clients, cooperating counsel, potential witnesses, officials of foreign governments, and human rights lawyers. *See id.* ¶¶ 36-38, 44.

turns that case on its head.  The "more" required by *Laird* to establish standing means that a plaintiff must show, not speculate, that the *government* has done something more to them.  For example, in *Ozonoff v. Berzak*, 744 F.2d 224 (1st Cir. 1984), a case on which Plaintiffs rely, the First Circuit (through then-Judge Breyer) analyzed what the Court in *Laird* meant by requiring "more" than an alleged chill, and held that the "more" in that case was that the *government* had imposed a requirement on the plaintiff to submit to a loyalty investigation as a condition of seeking employment.  *See Orzonoff*, 744 F.2d at 229; *see also ACLU*, 2007 WL 1952730, at *9 (Batchelder, J.) (by "something 'more'" the *Laird* Court did not mean "more subjective injury or other injuries that derive from the chilled speech").  In other words, the plaintiff in *Ozonoff* knew and could establish that he had actually been subject to the challenged conduct.  Absent such a requirement, litigants could evade *Laird's* constitutional standing limitations merely through artful pleading by claiming not only that speech was chilled but by citing self-imposed countermeasures taken in response.  Indeed, in *Laird*, the Court rejected precisely the same injury as Plaintiffs allege here—a "present inhibiting effect" on their speech, *see* 408 U.S. at 10.

**B.    The Authority on Which Plaintiffs Rely is Inapposite.**

The principal cases on which Plaintiffs rely in their Supplemental Memorandum do not support their position.  If anything, they illustrate why Plaintiffs lack standing.

Plaintiffs rely heavily on *Presbyterian Church v. United States*, 870 F.2d 518 (9th Cir. 1989), but there is a critical difference between that case and this one: standing in *Presbyterian Church* was predicated on the fact that the government had actually "entered the churches wearing 'body bugs' and surreptitiously recorded church services."  *See id.* at 520.  Thus, plaintiffs' alleged injury—the loss of congregants—was alleged to result from *actual* surveillance that occurred inside the church.[7]  This is a plain example of a case in which the plaintiffs alleged something "more" than a fear of surveillance.  In this case, by contrast,

---

[7] The covert surveillance of the plaintiff churches in *Presbyterian Church* became a matter of public record during related criminal trials of individuals INS was investigating.  *See* 870 F.2d at 520.  *Presbyterian Church* could be considered a case that involved *direct* injury caused by surveillance that actually occurred.

Plaintiffs merely speculate that they were subject to the challenged surveillance activity.

*Meese v. Keene*, 481 U .S. 465 (1987), is likewise distinguishable. In *Keene*, the plaintiff (a state legislator) challenged statutory provisions that required him to register, report, and disclose the fact that he was engaging in propaganda if he showed certain foreign films. *See* 481 U.S. at 469. Because those provisions actually applied to the plaintiff and directly regulated his conduct, the Supreme Court held that the harm to plaintiff's personal, political, and professional reputation constituted injury in fact. *Id.* at 472. Again, this is the type of injury that *Laird* recognized was something "more" than a subjective fear because the plaintiff "was subject to a regulatory statute that directly and expressly" applied to him. *ACLU*, 2007 WL 1952370, at *12 (Batchelder, J.) (discussing *Keene*, 481 U.S. at 472-74); *see also Laird*, 408 U.S. at 11-12 (discussing *Lamont v. Postmaster*, 381 U.S. 301 (1965), where standing was found because the challenged regulation required plaintiff to affirmatively request mail delivery of propaganda).[8]

Plaintiffs' reliance on *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.,* 528 U.S. 167 (2000), is also misplaced. Plaintiffs in *Laidlaw* were found to have standing to challenge a company's discharge of pollutants into a river because they lived nearby and the discharge "curtail[ed] their recreational use of that waterway and would subject them to other economic and aesthetic harms." *Id.* at 184. There was no dispute in *Laidlaw* that the defendant had in fact discharged pollutants into the river, and the Supreme Court's conclusion as to the reasonableness of plaintiffs allegation of injury was based on this actual conduct. As Judge Gibbons observed, Plaintiffs' view would "transform[] the holding in *Laidlaw*, under which the plaintiffs who were *in fact subject to defendant's conduct* had standing because they reasonably feared harm from that conduct, into a much broader proposition, under which plaintiffs may establish standing by showing merely that they possess a reasonable *fear of being subject to defendant's allegedly harmful conduct*." *ACLU*, 2007 WL 1952370, at *35 (emphasis in

---

[8] The fact that harm to Keene's reputation would result from the reaction of third parties—his constituents to his screening propaganda on behalf of a foreign power—does not support standing in this case, since this harm was caused by the fact that the statutory requirements undisputably applied to Keene's conduct.

original); *see also id.* at *32 (Batchelder, J.) (*Laidlaw* involved "a concrete, actual injury based on the plaintiffs' showing that the defendant's unlawful discharge of pollutants into a particular river was ongoing and may reasonably have caused nearby residents to curtail their use of that waterway.").[9]

### C. Plaintiffs' Alleged Chill Injury Is Particularly Unfounded Where Communications With al Qaeda Suspects Are Subject to Other Surveillance.

A final issue concerning Plaintiffs' allegation of a chill injury should be addressed. Judge Batchelder's opinion recognizes that Plaintiffs' alleged chill injury is insufficient because any reasonable person would presume that communications with individuals who may be associated with al Qaeda would be subject to surveillance. *See* Pls. Supp. at 16-19. Plaintiffs' only response on this point is that "[t]here is a substantial difference between risks posed by wholly unregulated executive surveillance, and the risk that one may be subjected to FISA surveillance," because FISA surveillance requires a showing of probable cause and compliance with statutory minimization procedures concerning attorney client-communications. *See* Pls. Supp. at 16-17. This is a false dichotomy. As Defendants have pointed out previously,[10] the potential means of obtaining intelligence of al Qaeda communications are not limited to FISA surveillance, on the one hand, and "wholly unregulated executive surveillance" under the TSP on the other. FISA requirements apply only to "electronic surveillance," which is a carefully defined term focusing on certain surveillance activities in the United States or involving a United States person in the United States. *See* 50 U.S.C. § 1801(f).[11] Intelligence agencies of the

---

[9] As Judge Gibbons noted in *ACLU*, this is not to say that a plaintiff lacks standing until a defendant has acted. *ACLU*, 2007 WL 1952370, at *34 n. 2. A "genuine threat" of enforcement of a policy against a plaintiff who is demonstrably subject to that policy supports standing. *Id.* (citing *Steffel v. Thompson*, 415 U.S. 452, 475 (1974)). But that authority does not apply where a plaintiff merely fears that he is subject to the policy that may be enforced. *See id.*

[10] *See* Defs. Supp. at 10-11; Defs. MSJ Mem. at 23-24; Defs. MSJ Reply at 8-9.

[11] The FISA definition of electronic surveillance encompasses the interception of the content of wire or radio communications that are either sent or received by a particular known and intentionally targeted United States person in the United States; or to or from a person in the

United States, including the NSA, are authorized by the President to collect foreign intelligence information and may do so through means other than electronic surveillance subject to the FISA. *See* Executive Order 12333, 46 Fed. Reg. 59941 (Dec. 4, 1981), 1981 WL 76054 (authorizing the United States intelligence community to collect foreign intelligence information, including the signals intelligence activities of the National Security Agency).  Thus, for example, as authorized by E.O. 12333, the NSA may undertake surveillance activities overseas that do not fall within the FISA definition of electronic surveillance.  Plaintiffs' clients may also be subject to surveillance by foreign governments.  Accordingly, FISA surveillance is not the only way to acquire the content of communications other than through the TSP, and it is therefore unfounded for Plaintiffs to contend that any "chill" in their communications with al Qaeda suspects results solely from the existence of the TSP (or the threat of future surveillance if the TSP recurs).

Second, the notion that Plaintiffs and their clients are chilled solely by the threat of TSP surveillance is purely a conjectural argument and, we submit, an implausible one.  As Judge Batchelder observed, to the extent surveillance causes a "chill" injury, it is the result of the *surveillance*, not whether it was authorized by a warrant.

> A wiretap is always "secret"—that is its very purpose-and because of this secrecy, neither the plaintiffs nor their overseas contacts would know, with or without a warrant, whether their communications were being tapped. Therefore, the NSA's secret possession of a warrant would have no more effect on the subjective willingness or unwillingness of these parties to "freely engage in conversations and correspond via email," [. . .] than would the secret absence of that warrant. . . .

*ACLU*, 2007 WL 1952370, at *16 (citation omitted).  Plaintiffs should have been aware of the various non-TSP ways in which communications with their clients can be intercepted—including under FISA, or through possible overseas surveillance under E.O. 12333, or by foreign governments.  To claim a chill from just the TSP but not these other methods is not credible.

United States that is acquired in the United States. *See* 50 U.S.C. § 1801(f) (1), (2).  The definition also encompasses the acquisition of the content of radio communications as to which there is a reasonable expectation of privacy and where both the sender and all recipients are in the United States, *id.* § 1801(f)(3), as well as the installation of a device in the United States to acquire non wire or radio communications where there is a reasonable expectation of privacy, *id.* § 1801(f)(4).

Finally, Plaintiffs' contention that "attorneys could trust (and reassure their clients) that their privileged communications would remain confidential" because of FISA minimization procedures, Pls. Supp. at 16, is again a matter of conjecture. FISA itself does not preclude the Government from intercepting such communications nor from disseminating them in all circumstances. FISA requires that "[n]o otherwise privileged communications obtained in accordance with, or in violation of, the provisions of this subchapter shall lose its privileged status." *See* 50 U.S.C. § 1806(a). But FISA's definition of minimization procedures allows for the retention and dissemination of information that is evidence of a crime which has been, is being, or about to be committed and that is to be retained and disseminated for law enforcement purposes, *see* 50 U.S.C. § 1801(h)(3), and whether a particular communication is in fact privileged may depend on an after-the-fact assessment by a court.

Thus, a person subject to surveillance will not know: (i) whether he is being surveilled; (ii) whether he is being surveilled under FISA; and (iii) if he is under FISA surveillance, whether minimization procedures will actually result in the suppression of privileged communications beforehand. In these circumstances, the notion that one form of surveillance of potentially privileged communications should chill Plaintiffs more than another is, at best, speculative. Certainly, Plaintiffs offer no *evidence* on which to justifiably conclude that it is their overseas clients' fear of the absence of judicial supervision in the United States over possible surveillance that causes them to be reluctant to communicate with Plaintiffs, as opposed to a general fear of surveillance. *See ACLU*, 2007 WL 1952370, at *16 (Batchelder, J.).

**D.     Where the TSP Is No longer Operative, Plaintiffs' Alleged Chill Injury is All the More Unfounded.**

Plaintiffs' allegations of a chill injury are even more unfounded where, as here, the challenged activity is no longer operative. As noted, well-established law provides that Plaintiffs must demonstrate that they have sustained, or are immediately in danger of sustaining, injury from the challenged action. *Lujan*, 504 U.S. at 560; *Valley Forge*, 454 U.S. at 472; *Lyons*, 461 U.S. at 101-02; *see also Laird*, 408 U.S. at 13. An alleged injury must be "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lyons*, 461 U.S. at 101-02. Even where a plaintiff alleges

that his rights were violated in past incidents, he lacks standing to obtain prospective injunctive relief absent a "real and immediate threat" that he will suffer the same injury in the future. *Id.* at 105. "[P]ast wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *Id.* at 103 (citing *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) & *Rizzo v. Goode*, 423 U.S. 362, 372 (1976)). This "imminence requirement ensures that courts do not entertain suits based on speculative or hypothetical harms." *Lujan*, 504 U.S. at 564.

Thus, apart from whether their fear of surveillance under the TSP was conjectural and insufficient to support standing when the program was operative, Plaintiffs' claim that they presently face an imminent threat of future harm falls well short of the constitutional minimum. Plaintiffs do not contend that the TSP is ongoing. Instead, they assert only that it may recur because the Government continues to maintain that the TSP was lawful and the President has authority to direct foreign intelligence surveillance. *See* Pls. Supp. at 3-4. But these statements of the Executive Branch's position on principles of constitutional law simply cannot support a finding of any threat of imminent future injury in order to invoke the Court's jurisdiction. Plaintiffs' allegation of a chill injury has gone from fear that an existing policy might be applied to them, to fear that a prior policy might recur and then might be applicable to them.[12]

The situation now presented by this case is therefore analogous to that in *Lyons*, where the Supreme Court held that a plaintiff lacked standing to seek an injunction against future enforcement of a police choke-hold policy because he could not credibly allege that he faced a realistic threat of future injury from the policy despite having been subjected to a chokehold in the past. *See Lyons*, 461 U.S. at 108 n. 8 ("[t]he reasonableness of Lyons' fear is dependent upon the likelihood of a recurrence of the allegedly unlawful conduct . . . and] [i]t is the reality of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions."). Indeed, if anything, Plaintiffs' standing claims here are even weaker than in

---

[12] Notably, *Laird* itself involved a challenge to the "present existence" of a surveillance system. *See* 408 U.S. at 9. That is no longer the case here.

*Lyons*, since the plaintiff in *Lyons* at least knew, and could show, that the challenged conduct had been applied to him.

### E. Plaintiffs Could Not Establish Standing as a Factual Matter in Light of the State Secrets Privilege.

Assuming, *arguendo*, that Plaintiffs have *alleged* sufficient harm, they still would be obligated to *prove* they have been injured by the TSP and the possibility of its recurrence. That is, beyond whether Plaintiffs' chill allegations could survive Defendants' motion to dismiss, Plaintiffs now bear the burden to prove their standing, either in response to Defendants' pending motion for summary judgment or in support of their own. *Lujan*, 504 U.S. at 561. As Defendants have previously demonstrated, the facts Plaintiffs need to actually prove they were harmed by the TSP are properly subject to the state secrets privilege.[13] The mere fact, described on the public record, that the TSP sought to intercept al Qaeda communications is not sufficient to adjudicate, on summary judgment, whether the TSP could reasonably be found to have personally injured the Plaintiffs because it says nothing about how the TSP actually may have impacted these Plaintiffs. *See, e.g.*, *Laidlaw*, 528 U.S. at 175-76 (evidence established that polluter violated environmental standards for discharges into river).

The Government's privilege assertion extends to facts concerning whether or not Plaintiffs have been intercepted by NSA under the TSP, as well as facts concerning the operation of the TSP. Such information is necessary to adjudicate either Plaintiffs' allegation of direct surveillance, *see* Compl. ¶¶ 5, 43, or whether or not it is "objectively reasonable"—as Plaintiffs put it—to find that their alleged harms in fact resulted from the TSP. Both Judges Batchelder and Gibbons agreed that information covered by the state secrets privilege was needed for the *ACLU* plaintiffs, who asserted the same injuries as the Plaintiffs here, to establish standing. *See ACLU*, 2007 WL 1952370, at *38 (Gibbons, J.) and at *3, 5 n.13, 16, 17, 21 n.32, 23, 33

---

[13] *See* Defs. MSJ Mem. at 24-27; Public Declarations of John D. Negroponte, Director of National Intelligence, ¶ 12 and Maj. Gen. Richard J. Quirk, National Security Agency, ¶ 8; *In Camera, Ex Parte* Classified Memorandum of the United States; *In Camera, Ex Parte* Classified Declaration of John D. Negroponte, Director of National Intelligence; *In Camera, Ex Parte* Classified Declaration of Maj. Gen. Richard J. Quirk, National Security Agency.

(Batchelder, J.). Judge Batchelder observed in particular that any determination as to whether Plaintiffs' alleged chill was in fact "objectively reasonable" would require specific information about the mechanics of the TSP, such as the number of communications being intercepted, the percentage of the total that number represents, the actual selection and screening process, the actual retention, dissemination, and disclosure policy. *ACLU*, 2007 WL 1952370, at *5 n.13. Also among the fact issues that would be relevant to adjudicating Plaintiffs' chill theory when the TSP was operative include (but are not limited to):

     *      Were the Plaintiffs actually intercepted under the TSP and, if not, why not?

     *      Did the TSP target the Plaintiffs' clients and, if not, why not?

     *      Did the TSP target people related to or associated with individuals such as Plaintiffs' clients, including family members, witnesses, cooperating counsel, as Plaintiffs allege, *see* Compl. 36-39, 44, and if not, why not?

     *      How did the TSP operate to select a target for interception?

     *      How many individuals were targeted for interception under the TSP?

In simple terms, to understand whether a policy harms a particular plaintiff would require an exposition on how it worked. But here, evidence essential to adjudicating whether Plaintiffs reasonably should have feared being subject to the TSP is properly protected under the state secrets privilege. Whether the TSP had a narrow operational focus on particular al Qaeda targets such that it did not threaten CCR's communications with their clients, or indeed, whether the TSP's methodology might have captured some of Plaintiffs' communications, could not be disclosed without revealing operational intelligence methods. *See In Camera, Ex Parte* Negroponte and Quirk Declarations. Thus, the state secrets privilege protects from disclosure the very information that might demonstrate whether Plaintiffs' fears were reasonable or unfounded because doing so would disclose intelligence methods utilized under the TSP and reveal to al Qaeda whether or to what extent NSA has targeted or could target their communications.

Furthermore, now that the TSP is no longer operative, additional facts are necessary to evaluate Plaintiffs' allegation of a chill injury based on a possible future recurrence of the program, including (but not limited to):

\*       Why was the TSP supplanted in January 2007, what replaced it, and how does this compare to the prior TSP?

\*       Is there, under the circumstances, any basis to conclude that the TSP is likely to recur in light of the FISA Court Orders?

Plaintiffs concede that "[s]tanding for prospective relief *always requires proof* of the threat of future injury . . . ." Pls. Supp. at 14 (emphasis added). The sole assertion advanced by Plaintiffs in support of their claim of future injury is that the Executive Branch adheres to its view that the President has constitutional authority under Article II to authorize foreign intelligence surveillance. Again, even if this were a sufficient *allegation* of future harm, it is not remotely sufficient as a factual matter to *demonstrate* an imminent threat of future harm. Actually adjudicating whether or not Plaintiffs personally face an imminent threat of future injury from the recurrence of the TSP would require delving into the background of the matters protected by the state secrets privilege, including how the TSP operated before, whether it ever impacted Plaintiffs, what is occurring now in its place, and whether under these circumstances there is an imminent threat that the TSP would recur and threaten these particular Plaintiffs. *See* Defendants *In Camera, Ex Parte* Supplemental Memorandum.[14]

---

[14] "Standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358, n. 6 (1996), and Plaintiffs would have to prove standing for each of their separate non-First Amendment claims, *see DaimlerChrysler Corp. v. Cuno*, 547 U.S.___, 126 S. Ct. 1854, 1867 (2006). Defendants agree with Judge Batchelder that Fourth Amendment rights are *personal* rights which "'may be enforced only at the instance of one whose own protection was infringed by the search and seizure,'" *see ACLU*, 2007 WL 1952370, at **7 n.16, 21, and Plaintiffs could not demonstrate that their own communications have been intercepted. *See also* Defs. Mem. at 24-27; Defs. MSJ Reply at 9-10 (facts demonstrating the plaintiffs' communications were intercepted needed for Fourth Amendment claims under *Halkin v. Helms*, 598 F.2d 1, 9 (D.C. Cir. 1978), *Halkins II*, 690 F.2d at 997-1000, and *Mitchell v. Ellsberg*, 709 F.2d 51, 65 (D.C. Cir. 1983), *cert. denied,* 465 U.S. 1038 (1984). Plaintiffs' other statutory and constitutional claims would also require proof of a direct, personal injury caused by the challenged actions. Also, because prospective relief alone is sought, the lapse of the TSP negates any such relief as to these claims as well.

## II. THIS CASE COULD ALSO BE DISMISSED AS MOOT, AND ANY FACTUAL DISPUTE AS TO MOOTNESS COULD NOT BE ADJUDICATED.

In light of the foregoing, the Court need not reach the issue of mootness. Nonetheless, Defendants submit they have met their burden of demonstrating mootness because it is undisputed that the TSP has not been reauthorized and that any electronic surveillance that had occurred under the TSP is now being conducted subject to the approval of the FISA Court. *See* Dkt. 127-1 (MDL 1791) (Defendants' January 11, 2007 Notice to the Court). The standard Plaintiffs cite—that it be "absolutely clear" that the challenged policy will not recur, *see* Pls. Supp. at 2—applies to the applicability of the voluntary cessation doctrine, not the threshold question of mootness itself, and, as set forth below, such a showing could not be made without the disclosure of state secrets.

Defendants have not acceded to the Plaintiffs' position in this case, and the President's decision not to reauthorize the TSP was not a voluntary cessation of the challenged conduct. *See* Defs. Supp. at 13. Contrary to Plaintiffs' assertion, it would be inappropriate for the Court to impute "manipulative conduct" and "bad faith" to the Government's efforts to gain FISA Court approval for certain activities. *Clarke v. United States*, 915 F.2d 699, 705 (D.C. Cir. 1990) (*en banc*). *See* Pls. Supp. at 9-10, n.19. As we have explained, the Executive's decision to ensure that all three Branches supported the vital foreign intelligence activities at stake is not inappropriate and not inconsistent with its view that the TSP was lawful and in accordance with the President's authority.

The fact that the President has not disavowed his authority to reauthorize the TSP is also beside the point. The question is not whether the parties disagree about abstract questions of law (they do); it is whether the underlying controversy remains live (it does not). There is no rule that a party must disavow his legal position for Article III's mootness limitations to apply. Thus, the mere fact that the Executive Branch believes the President has constitutional authority to authorize foreign intelligence surveillance—something courts, including the FISA Court of Review, have recognized, *see* Defs. MSJ Mem. at 39-40—does not establish a continuing "live"

controversy between the parties but only the entirely speculative possibility of a future one.[15]

Also, "a presumption of regularity attaches to actions of Government agencies," *United States Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001), and where a coordinate Branch of Government has implemented an intervening change in legal authority, the voluntary cessation exception is "narrow" and generally has been held to apply only where it is "virtually certain" that the legislature will repeal the new law. *Chemical Producers & Distributors Ass'n v. Helliker*, 463 F.3d 871, 878 (9th Cir. 2006). There is no reason to give *less* credence to a court authorization than a legislative enactment for that purpose.

To the extent the Court finds that the lapse of the TSP is not sufficient grounds, by itself, to find the case moot, then proof of mootness, and whether there has been any voluntary cessation, or for that matter whether the TSP is likely to recur without review,[16] would obviously require facts that cannot be disclosed. Such facts would include how the TSP previously operated and, by comparison, the nature of the FISA Court action described in Defendants' classified submissions on the matter. *See* Defendants' Classified Supplemental Memorandum submitted for *ex parte*, *in camera* review. The mere public fact that the FISA Court has authorized certain surveillance activities in lieu of the TSP is not enough to establish voluntary cessation.

Finally, if there is any doubt as to whether the case is moot or whether Plaintiffs have established an immediate and personal threat of future harm to obtain prospective relief, it would contravene settled principles of constitutional avoidance to adjudicate the important legal questions presented by this case. Reinforcing that point is the fact that those questions may never again arise in their current posture. Even if a President determined in the future that the defense of the Nation required foreign intelligence surveillance without the FISA Court's involvement, the context could be materially different. Plaintiffs' sweeping contention that any

---

[15] Plaintiffs' assertion that the TSP "hangs over [their] heads . . . in exactly the same manner" as before, *see* Pls. Supp. at 10, is specious. It cannot possibly be the case that a lapsed surveillance program poses "exactly the same" threat as an operative one.

[16] Plaintiffs do not rely on this exception to the mootness doctrine. *See* Pls. Supp. at 9.

recurrence of the challenged surveillance outside of FISA would be invariably unlawful is wrong; the underlying facts and exigent circumstances could easily vary in the future if a similar dispute arose and, accordingly, it would be unwarranted to enter prospective relief as to possible action by a future President of the United States that may be necessary to protect the nation from a terrorist attack.[17]

### CONCLUSION

For the foregoing reasons, and for all the reasons stated in our prior public and *in camera, ex parte* classified submissions, Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, should be granted.

DATED: July 20, 2007                    Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General, Civil Division

CARL J. NICHOLS
Deputy Assistant Attorney General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

JOSEPH H. HUNT
Director, Federal Programs Branch

        */s/ Anthony J. Coppolino*
ANTHONY J. COPPOLINO
Special Litigation Counsel
tony.coppolino@usdoj.gov

        */s/ Andrew H. Tannenbaum*
ANDREW H. TANNENBAUM
Trial Attorney
andrew.tannenbaum@usdoj.gov

---

[17] Finally, while jurisdictional issues may predominate the Court's consideration now that the TSP has lapsed, Defendants reiterate in closing that the merits of Plaintiffs' claims cannot be resolved on the public record. As explained at length in Defendants' classified submissions, particular facts and circumstances concerning the operation of the Terrorist Surveillance Program and the threat it was designed to meet would be essential evidence to adjudicate the lawfulness of the TSP, but is properly protected by the state secrets privilege. Accordingly, if jurisdiction is found, Plaintiffs' motion for summary judgement cannot be adjudicated, and Defendants' motion to dismiss or for summary judgment must be granted due to the state secrets privilege. *See* Defs. MSJ Mem. at 51-52 and Defs. Reply at 50-54.

U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, D.C. 20001
Phone:   (202) 514-4782
              (202) 514-4263
Fax:        (202) 616-8460