IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE:                                          MDL Docket No 06-1791 VRW
NATIONAL SECURITY AGENCY
TELECOMMUNICATIONS RECORDS                      ORDER
LITIGATION

This Document Relates To:
07-1187, 07-1242, 07-1323,
07-1324, 07-1326, 07-1396
_____/

          The government seeks to enjoin state officials in

Missouri, Maine, New Jersey, Connecticut and Vermont from

investigating various telecommunication carriers concerning their

alleged disclosure of customer telephone records to the National

Security Agency (NSA) based on the Supremacy Clause of the United

States Constitution, the foreign affairs power of the federal

government and the state secrets privilege.

          Before these cases were transferred to this court by the

Judicial Panel on Multidistrict Litigation (JPML) on February 15,

2007, the government and various defendants filed cross motions for

dismissal and summary judgment.  With the exception of reply briefs

in the Connecticut and Vermont cases, these motions were fully

briefed prior to transfer.  The court's scheduling order directed

the parties to complete briefing in the Connecticut and Vermont

cases and permitted the government and state officials to submit

consolidated briefs addressing Ninth Circuit law and other issues

not previously briefed.  Doc #219.

United States District Court
For the Northern District of California

The government seeks summary judgment on the ground that the states' investigations are barred by the Supremacy Clause and the foreign affairs power of the federal government and because of the state secrets privilege. As will presently be explained, the first two grounds of the government's motion fail. Due to the pending appeal in Hepting v AT&T, the court will not at this time reach the third basis of the government's motion, the state secrets privilege. The result then is that the government's summary judgment motion is DENIED WITHOUT PREJUDICE to its renewal following the Ninth Circuit's decision in Hepting. Hence, the state officials' motions are rendered moot at this point. What follows will explain why the first grounds upon which the government seeks to proceed do not stand up.

I

On February 15, 2007, the JPML transferred six cases (the "state cases") pursuant to MDL 1791: United States v Rabner, et al, 07-1324; United States v Gaw, et al, 07-1242; United States v Adams, et al, 07-1323; United States v Palermino, et al, 07-1326; United States v Volz, et al, 07-1396; and Clayton, et al v AT&T Communications of the Southwest, Inc, et al, 07-1187. Doc #165. The state cases arise out of attempts by state officials to compel various telecommunication carriers to release information concerning their alleged disclosure of customer telephone records to the National Security Agency (NSA). Before addressing the present motions, the court provides a brief summary of the factual background of each of the cases.

//

United States District Court
For the Northern District of California

Clayton v AT&T, 07-1187, arises out of investigative subpoenas issued to AT&T by two commissioners of the Missouri Public Service Commission (MoPSC) regarding information it allegedly disclosed to the NSA.  Doc #1, Ex A.  These subpoenas seek, for example,

> (1) Any order, subpoena or directive of any court, tribunal or administrative agency or office whatsoever, directing or demanding the release of customer proprietary information relating to Missouri customers;
>
> (2) The number of Missouri customers, if any, whose calling records have been delivered or otherwise disclosed to the [NSA]; and
>
> (3) The nature or type of information disclosed to the NSA, including telephone number, subscriber name and address, social security numbers, calling patterns, calling history, billing information, credit card information, internet data and the like.

Doc #299, Ex A, tab 3.

Because the commissioners considered AT&T's response to be inadequate, they moved pursuant to Missouri law to compel AT&T to comply with the investigation in Missouri state court.  AT&T then removed the case to the United States District Court for the Western District of Missouri.  Shortly thereafter, the government initiated a separate Missouri action, United States v Gaw, 07-1242, on July 26, 2006, seeking declaratory and injunctive relief against the MoPSC and AT&T.

The Maine case, United States v Adams, 07-1323, began after Maine citizens petitioned the Maine Public Utilities Commission (MePUC) to investigate whether Verizon had shared its customers' records with the NSA.  Verizon submitted two press releases in response on May 12 and May 16, 2006, stating that (1)

3

the NSA never requested customer records and (2) if a government
agency requested its customer records, Verizon would disclose them
only when authorized by law.  Doc #1, ¶ 40.  On August 9, 2006,
MePUC ordered Verizon to affirm under oath that its press releases
were accurate.  Id, ¶¶ 41-42; Doc #299, Ex A, tab 5.  MePUC has <u>not</u>
asked for any additional information from Verizon.  See Doc #299,
Ex A, tab 5.  On August 21, 2006, the government sued in the United
States District Court for the District of Maine to enjoin the MePUC
from pursuing this inquiry.  On February 8, 2007, Judge Woodcock
preliminarily enjoined MePUC from enforcing the order.  See <u>United
States v Adams</u>, 473 F Supp 2d 108 (D Me 2007).

The New Jersey case, <u>United States v Rabner</u>, 07-1324,
stems from the New Jersey Attorney General's investigation into
whether telecommunication carriers disclosed to the NSA telephone
call history data of New Jersey subscribers.  Doc #1, ¶34.  The New
Jersey Attorney General issued *subpoenas duces tecum* pursuant to
New Jersey consumer protection law to ten carriers doing business
in New Jersey.  These subpoenas include the following requests:

> (1) All orders, subpoenas and warrants issued by or on
> behalf of any unit or officer of the Executive
> Branch of the Federal Government and provided to
> [the carriers] concerning any demand or request to
> provide telephone call history data to the NSA;
>
> (2) All documents concerning an identification of
> customers * * * whose telephone call history data
> was provided * * * to the NSA; of the persons whose
> data was provided to the NSA; and
>
> (3) All documents concerning any communication between
> [the carriers] and the NSA * * * concerning the
> provision of telephone call history data to the
> NSA.

Doc #299, Ex A, tab 1.  In response to these subpoenas, the
government sued the New Jersey Attorney General in the United

4

States District Court for the District of New Jersey.  Doc #1-1.

United States v Palermino, 07-1324, arises from a complaint filed by the American Civil Liberties Union of Connecticut (ACLU) requesting that the Connecticut Department of Public Utility Control (CtDPUC) investigate whether the local carriers violated Connecticut law.  In response, the CtDPUC initiated an administrative proceeding and pursued the requested investigation.  After the CtDPUC denied the carriers' motions to dismiss, ACLU filed its first set of interrogatories to each of the carriers, seeking information concerning potential illegal disclosure of customer records, such as the following:

> (1) Did AT&T have any published privacy policy or policies concerning customer information and/or records in effect between September 11, 2001, and August 10, 2006?
>
> (2) To the extent that any published privacy policy referenced in your response [above] changed during the relevant period, explain the specific terms that changed, when the changes occurred, and the reasons for the change.
>
> (3) Without providing any details about the purpose(s) or target(s) of any investigation(s) or operations(s), at any time during the relevant period has AT&T ever received [a court order or a request under 18 USC § 2709, I e, a "national security letter"] seeking disclosure of customer information and/or records?

Doc #299, Ex A, tab 4.  On September 6, 2006, the government sued in the United States District Court for the District of Connecticut.

In United States v Volz, 07-1396, the commissioner of the Vermont Department of Public Service (VtDPS) propounded information requests under Vermont law, 30 VSA § 206, to AT&T and Verizon concerning their conduct and policies vis-à-vis the NSA.   07-1396,

5

Doc #1, Ex C.  After AT&T and Verizon failed to comply with the request, VtDPS petitioned the Vermont Public Service Board (VtPSB) to open investigations of the carriers, Id, ¶¶ 33-34, and eventually ordered the carriers to respond.  Id, ¶ 37 & Ex I.  This prompted the government to bring suit to enjoin VtPSB in the District Court of Vermont.

The parties' cross motions for summary judgment concern three issues:  whether the state officials' investigations (1) violate the Supremacy Clause by regulating directly or discriminating against the federal government or conflicting with an affirmative command of Congress; (2) impinge on the foreign affairs power of the federal government; or (3) run afoul of the state secrets privilege.

In reviewing a summary judgment motion, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v Liberty Lobby, Inc, 477 US 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. And the burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp v Catrett, 477 US 317, 322-23 (1986).  When the moving party has the burden of proof on an issue, the party's showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.  Calderone v United States, 799 F2d 254,

258-59 (6th Cir 1986).  Summary judgment is granted only if the moving party is entitled to judgment as a matter of law.  FRCP 56©.

The nonmoving party may not simply rely on the pleadings, however, but must produce significant probative evidence supporting its claim that a genuine issue of material fact exists.  TW Elec Serv v Pacific Electrical Contractors Ass'n, 809 F2d 626, 630 (9th Cir 1987).  The evidence presented by the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson, 477 US at 255.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id at 249.

                                    II

The court takes up jurisdictional issues first. In these suits, the government seeks both declaratory and injunctive relief, including: (1) a declaration that state investigations are invalid under and preemted by the Supremacy Clause; and (2) an order enjoining the state officials from investigating the carriers relating to their alleged disclosure of records to the NSA.  These pleadings suffice to confer federal question jurisdiction under 28 USC §§ 1331 and 1345.

It is well-established that the federal courts have jurisdiction under 28 USC § 1331 over a preemption claim seeking injunctive and declaratory relief.  See, e g, Verizon Md, Inc v Pub Serv Comm'n of Md, 535 US 635, 641-43 (2002).  In Shaw v Delta Air Lines, Inc, 463 US 85, 96 & n14 (1983), the Supreme Court held:
//

> A plaintiff who seeks injunctive relief from state
> regulation, on the ground that such regulation is
> preempted by a federal statute which, by virtue of
> the Supremacy Clause of the Constitution, must
> prevail, thus presents a federal question which the
> federal courts have jurisdiction under 28 USC §
> 1331 to resolve.

See also <u>Bud Antle, Inc v Barbosa</u>, 45 F3d 1261, 1362 (9th Cir 1994) ("Even in the absence of an explicit statutory provision establishing a cause of action, a private party may ordinarily seek declaratory and injunctive relief against state action on the basis of federal preemption."); <u>United States v Morros</u>, 268 F3d 695, 702-03 (9th Cir 2001), citing <u>Bell v Hood</u>, 327 US 678, 681-82 (1946) (conferring federal question jurisdiction for claims by government that seek relief "directly under the Constitution or laws of the United States" in challenging the actions of state officials under the Supremacy Clause); Richard H Fallon, et al, <u>Hart and Wechler's The Federal Courts and the Federal System</u> 903 (5th ed 2003).

An alternative ground for federal question jurisdiction is furnished by 28 USC § 1345, which "provides the district courts with original jurisdiction of all civil actions commenced by the United States," thereby creating "independent subject matter jurisdiction." <u>Morros</u>, 268 F3d at 702-03. Accordingly, the court finds that jurisdiction lies in federal court under 28 USC §§ 1331 and 1345.

A second hurdle to reaching the merits in these cases is that the government lacks an express cause of action. The government describes three means of remedying this omission, one of which the court can easily dispense with. The government errs in arguing that the existence of jurisdiction itself gives rise to a cause of action. It is firmly established by the Supreme Court

that the vesting of jurisdiction does not in and of itself give rise to a cause of action. <u>Texas Industries, Inc v Radcliff Materials, Inc</u>, 451 US 630, 640-41 (1981). Nor do the statutes relied on for jurisdiction create substantive causes of action. Hence, to secure a cause of action for these suits, the government must look elsewhere.

One option for establishing a cause of action lies with an obscure line of cases culminating in <u>In re Debs</u>, 158 US 564 (1895), which permit the government to sue to vindicate its sovereign interests even when not authorized by statute. See also <u>Dugan v United States</u>, 16 US 172 (1818); <u>United States v Tingey</u>, 30 US 115 (1831); <u>Cotton v United States</u>, 52 US 229 (1851); <u>Jessup v United States</u>, 106 US 147 (1882). <u>Debs</u> involved an attempt by the federal government to enjoin the Pullman labor strike of 1894. 158 US at 577. The Court upheld the propriety of the injunction, proclaiming that

> [e]very government, entrusted, by the very terms of
> its being, with powers and duties to be exercised
> and discharged for the general welfare, has a right
> to apply to its own courts for any proper assistance
> in the exercise of the one and the discharge of the
> other * * *.

In spite of the Court's high-flying rhetoric, the <u>Debs</u> doctrine has seldom been invoked in the century-plus since its inception. "[R]elatively little has been made of this broad authorization to sue because in most instances, the federal government has sued pursuant to federal statutes and not based on its inherent interest in protecting its citizens." Erwin Chemerinksy, <u>Federal Jurisdiction</u>, § 2.3 (Aspen 2003).

//

United States District Court

For the Northern District of California

The contours of the doctrine enunciated in <u>Debs</u> remain unclear, not least due to the vague guidance offered by the <u>Debs</u> Court.

> [I]t is not the province of the government to interfere in any mere matter of private controversy between individuals, or to use its great powers to enforce the rights of one against another, yet, whenever the wrongs complained of are such as affect the public at large, and are in respect of matters which by the Constitution are entrusted to the care of the Nation, and concerning which the Nation owes the duty to all the citizens of securing to them their common rights, then the mere fact that the government has no pecuniary interest in the controversy is not sufficient to exclude it from the courts, or prevent it from taking measures therein to fully discharge those constitutional duties.

<u>Debs</u>, 158 US at 586.

Under its most expansive reading, <u>Debs</u> authorizes the government to sue without statutory authorization whenever the alleged violations "affect the public at large." 158 US at 586. Such a broad mandate has led the government to invoke <u>Debs</u> in varied circumstances, including in suits to enforce immunity of the armed forces from certain state taxes, see <u>United States v Arlington County</u>, 326 F2d 929 (4th Cir 1964), to enforce civil rights under the Commerce Clause, see <u>United States v Jackson</u>, 318 F2d 1 (5th Cir 1963), and to enjoin sellers from obtaining default judgments without proper service of process, see <u>United States v Brand Jewelers, Inc</u>, 318 F Supp 1293 (SDNY 1970). Most relevant here, the government has succeeded in invoking this doctrine in disputes over interference with national security. <u>United States v Marchetti</u>, 466 F2d 1309 (4th Cir 1972) (protection of contractual rights in addition to national security interest). See also <u>United States v Mattson</u>, 600 F2d 1295, 1298 (9th Cir 1979) ("Where

10

interference with national security has been at issue, courts have also relied on the doctrine to reach the merits of the controversy.")

The state officials draw the court's attention to Justice Black's concurring opinion in <u>New York Times Co v United States</u>, 403 US 713, 718 (1971), which gives reason for restraint in applying <u>Debs</u>.  Justice Black cautioned that invocation of <u>Debs</u> invites the government — that is, the executive branch — to exceed its constitutional grant to ensure that the laws are faithfully executed.

> It would, however, be utterly inconsistent with the concept of separation of powers for this Court to use its power of contempt to prevent behavior that Congress has specifically declined to prohibit. * * * The Constitution provides that Congress shall make laws, the President execute laws, and courts interpret laws.  It did not provide for government by injunction in which the courts and the Executive branch can 'make laws' without regard to the action of Congress.  It may be more convenient for the Executive Branch if it need only convince a judge to prohibit conduct rather than ask the Congress to pass a law, and it may be more convenient to enforce a contempt order than to seek a criminal conviction in a jury trial.  Moreover, it may be considered politically wise to get a court to share the responsibility for arresting those who the Executive Branch has probable cause to believe are violating the law.  But convenience and political considerations of the moment do not justify a basic departure from the principles of our system of government.

403 US 713, 718 (1971) (citations omitted).

In view of these separation of powers concerns, the court agrees with the state officials that mere incantation of "sovereign interests" does not suffice under <u>Debs</u> to generate a cause of action.  But even a narrow construction of <u>Debs</u> cannot prevent the doctrine's application here.  Although the state officials insist

United States District Court

For the Northern District of California

1   on casting these investigations as garden variety

2   telecommunications regulation, it cannot be gainsaid that the

3   officials' efforts bear particularly on the government's national

4   security interests.  Whatever the boundaries of the <u>Debs</u>, the court

5   is confident that these suits fall well within its borders.  See

6   <u>Mattson</u>, 600 F2d at 1298 ("Where interference with national

7   security has been at issue, courts have also relied on the doctrine

8   to reach the merits of the controversy.").  <u>Debs</u> is thus properly

9   invoked by the government in these cases.

10          As an alternative to relying on <u>Debs</u>, the government

11  asserts that the Supremacy Clause of the Constitution creates an

12  implied right of action to enjoin state regulations that are

13  preempted by a federal statutory or constitutional provision.  The

14  Supreme Court implicitly supported such a right in <u>Pharmaceutical</u>

15  <u>Research and Manufacturers of America v Walsh</u>, 538 US 644 (2003).

16  Plaintiffs in that case argued – without a cause of action – that a

17  state regulation was preempted by Medicaid, a federal Spending

18  Clause statute.  Only two Justices declined to reach the merits of

19  plaintiff's claim for reason that no claim was stated.  The

20  remaining Justices — a plurality of four and three in dissent —

21  proceeded to the merits without pause, tacitly deciding that an

22  implied claim was stated for preemption.

23          The DC Circuit relied on <u>Walsh</u> in rejecting a state

24  agency's contention that plaintiffs "have no private right of

25  action for injunctive relief against the state" based on the

26  preemptive force of a federal statute.  <u>Pharmaceutical Research and</u>

27  <u>Manufacturers of America v Thompson</u>, 362 F3d 819 (DC Cir 2004).

28  "By addressing the merits of the parties' arguments without mention

12

United States District Court

For the Northern District of California

of any jurisdictional flaw," the court explained, "seven Justices appear to have *sub silentio* found no flaw." 362 F3d at 819 n3. See also <u>Planned Parenthood v Sanchez</u>, 403 F3d 324 (5th Cir 2005).

The court concurs with the DC Circuit's reasoning. By entertaining federal preemption suits, see e g, <u>Walsh</u>, 538 US 644, <u>Verizon Maryland, Inc</u>, 535 US 635 (2002), the Supreme Court has cleared the path for parties to seek declaratory and injunctive relief against state action on the basis of federal preemption alone. This implied cause of action, in conjunction with the proper invocation of <u>Debs</u>, provides two grounds for the government to proceed in these cases.

Even if the government has jurisdiction and a cause of action, several state officials urge this court to abstain from exercising jurisdiction over these suits pursuant to the <u>Younger v Harris</u>, 401 US 37 27 (1971), line of cases, which hold that principles of comity and federalism require federal courts to abstain from enjoining pending state proceedings. See also <u>Ohio Civil Rights Comm'n v Dayton Christian Schools, Inc</u>, 477 US 619, 627 (1986) (extending the <u>Younger</u> doctrine to certain state administrative proceedings, so long as those proceedings are "judicial in nature").

In the Ninth Circuit, however, the federal government may bypass the <u>Younger</u> hurdle when it acts as a litigant. See <u>United States v Morros</u>, 268 F3d 695 (9th Cir 2001). According to the <u>Morros</u> court, if the federal government seeks relief against a state or its officers, it makes little sense to hew to the principles of comity and federalism that animate <u>Younger</u> because "the state and federal governments are in direct conflict before

13

they arrive at the federal courthouse," rendering futile "any attempt to avoid a federal-state conflict." Id (citing United States v Composite State Bd of Medical Examiners, 656 F2d 131, 136 (5th Cir 1981). The Ninth Circuit's reasoning in Morros undoubtedly applies here. The possibility of avoiding "unnecessary conflict between state and federal governments," Composite State, 656 F2d at 136, faded long before these cases arrived to this court. Because such a conflict inheres in these cases, Younger abstention is inapplicable.

The court finally turns to the argument advanced in three of these cases that no case or controversy exists because the state officials have not attempted to enforce its statutes and regulations against the carriers. Ripeness is one of the four justiciability doctrines that stem from the Article III limitation of the federal judicial power to cases or controversies. Accordingly, "whether a claim is ripe for adjudication goes to a court's subject matter jurisdiction * * *." St Clair v City of Chico, 880 F2d 199, 201 (9th Cir 1989), quoted in Schwarzer et al, Federal Civil Procedure Before Trial § 2:178 (1997). The standard to be applied in determining if there is a case or controversy ripe for resolution is whether there is "a reasonable threat of prosecution for conduct allegedly protected by the Constitution." Ohio Civil Rights Comm'n v Dayton Christian Schools, 477 US 619, 626 n1 (1986).

Because the state officials have made plain their intention to subject the carriers to investigation, the court agrees with the government that the carriers face a reasonable threat of prosecution and thus there is before the court a ripe

case or controversy. Cf <u>Public Utilities Comm'n v United States</u>, 355 US 534, 538 (1958) (allowing preenforcement review of a state regulation that required common carriers to receive state pre-approval before offering reduced shipping rates to the United States where the state had "plainly indicated an intent to enforce the Act"); see also <u>Mobil Oil Corp v Virginia</u>, 940 F2d 73, 76 (4th Cir 1991) (allowing preenforcement review of amendments to the Virginia Petroleum Products Franchise Act, which an oil company claimed were preempted, even though Virginia had not specifically indicated that it intended to enforce that statute against plaintiffs, because the Virginia "Attorney General [had] not * * * disclaimed any intention of exercising her enforcement authority").

### III

Turning to the merits, these cases concern whether the state laws underlying the investigations run afoul of the Supremacy Clause, the federal foreign affairs power or state secrets privilege. State law may violate the Supremacy Clause in two ways: the law may regulate directly or discriminate against the government, see <u>McCulloch v Maryland</u>, 4 Wheat 316, 425-437 (1819), or the law may conflict with an affirmative command of Congress, see <u>Gibbons v Ogden</u>, 9 Wheat 1, 211 (1824); see also <u>Hillsborough County v Automated Medical Laboratories, Inc</u>, 471 US 707, 712-713 (1985). The government's attack on the investigations relies on both grounds of invalidity.

//

//

//

A

It is a fundamental principle of our law "that the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective States, and cannot be controlled by them."  <u>McCulloch v Maryland</u>, 4 Wheat 316, 426 (1819).  From this principle is derived the corollary that "the activities of the Federal Government are free from regulation by any state."  <u>Hancock v Train</u>, 426 US 167, 178 (1976).  As Justice Holmes observed in <u>Johnson v Maryland</u>, 254 US 51, 57 (1920):

> [T]he immunity of the instruments of the United States from state control in the performance of their duties extends to a requirement that they desist from performance until they satisfy a state officer upon examination that they are competent for a necessary part of them.

The doctrine that embodies these principles – termed intergovernmental immunity — prevents state laws from regulating directly or discriminating against the federal government.

The Supreme Court's modern-day treatment of the intergovernmental immunity doctrine has been marked by restraint, making plain the doctrine has no application here.  Although the pertinent state disclosure orders, Doc #299, Ex A, relate to federal government activities, they do not regulate the government directly; indeed, they impose no duty on the government.  See <u>United States v New Mexico</u>, 455 US 720 (1982).  The Court upheld analogous regulations in <u>North Dakota v United States</u>, 495 US 423, 437 (1990), which involved laws requiring out-of-state shippers of alcohol to file monthly reports and to affix a label to each bottle of liquor sold to federal military enclaves.  Id at 426.  The Court

16

reasoned that because the laws operated on suppliers, not the government, "[t]here is no claim * * *, nor could there be, that North Dakota regulates the Federal Government directly." Id at 436-37. That conclusion leaves no doubt that the state investigations operate on the carriers alone.

Nor can it be said that the investigations "discriminate against the federal government or those with whom it deals." North Dakota v United States, 495 US 423, 437 (1990). The nondiscrimination rule prevents states from meddling with federal government activities indirectly by singling out for regulation those who deal with the government. This rule does not, however, oblige special treatment. A "[s]tate does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." Washington v United States, 460 US 536, 544-45 n10 (1983). Applying these principles, the Court has required that regulations be imposed equally on all similarly situated constituents of a state and not based on a constituent's status as a government contractor or supplier. See United States v County of Fresno, 429 US 452, 462-464 (1977).

The nondiscrimination analysis should not "look to the most narrow provision addressing the Government or those with whom it deals. A state provision that appears to treat the Government differently on the most specific level of analysis may, in its broader regulatory context, not be discriminatory." North Dakota, 495 US at 438. The asserted laws at issue here regulate equally all public utilities, making no distinction based on the government's involvement. Although the present investigation, in

17

targeting alleged disclosure of call records to the NSA, may "appear[] to treat the government differently," the regulatory regime as whole treats any unauthorized disclosure the same. These neutral state laws regulating the carriers "are but normal incidents of the organization within the same territory of two governments." North Dakota, 495 US at 435, citing Helvering v Gerhardt, 304 US 405, 422 (1938).

The government presents an impressive patchwork of dicta in support of its theory, but none of the cases it cites pertains to the present facts. Hancock v Train, 426 US 167, 174 (1976), for example, concerns a state attorney general's efforts to require the United States Army, the Tennessee Valley Authority and the Atomic Energy Commission to obtain state air pollution permits for facilities on federal installations. The Hancock Court found decisive the fact that the regulations "place[d] a prohibition on the federal government" — a feature absent here. Both Mayo v United States, 319 US 441, 447 (1943), and City of Los Angeles v United States, 355 F Supp 461, 464 (CF Cal 1972), prove equally unavailing for the government. In both cases, plaintiffs sought to exact fees directly from a government entity. Again, no equivalent interplay between the public utilities and the federal government exists here.

In sum, because the investigations neither regulate directly nor discriminate against the federal government, the investigations do not violate the doctrine of intergovernmental immunity.

//

//

The court turns to the government's preemption argument. By virtue of the Supremacy Clause, it is a "fundamental principle of the Constitution * * * that Congress has the power to preempt state law." <u>Crosby v Nat'l Foreign Trade Council</u>, 530 US 363, 372 (2000) (citing US Const, Art VI, cl 2). The Supreme Court cautions, however, that "despite the variety of these opportunities for federal preeminence, we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of preemption with the starting presumption that Congress does not intend to supplant state law." <u>New York State Conference of Blue Cross & Blue Shield Plans v Travelers Insurance Co</u>, 514 US 645, 654 (1995). Accordingly, "the purpose of Congress is the ultimate touchstone" of any preemption analysis. <u>Cipollone v Liggett Group</u>, 505 US 504, 516 (1992) (citation omitted).

State law must yield to federal law in three situations. First, state law may be preempted if Congress has expressly so provided. <u>Gade v National Solid Wastes Mgm't Ass'n</u>, 505 US 88 (1992). Second, under field preemption, "[i]f Congress evidences an intent to occupy a given field, any state law falling within that field is preempted." <u>Silkwood v Kerr-McGee Corp</u>, 464 US 238, 248 (1984) (citing <u>Fidelity Federal Savings & Loan Ass'n v de la Cuesta</u>, 458 US 141, 153 (1982)). Finally, under conflict preemption, "[i]f Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law * * * or where the state law stands as an obstacle to

the accomplishment of the full purposes and objectives of Congress." Id (citing <u>Florida Lime & Avocado Growers, Inc v Paul</u>, 373 US 132, 142-43 (1963) and <u>Hines v Davidowitz</u>, 312 US 52, 67 (1941)). The government contends that express, field and conflict preemption apply to the state investigations.

1

State law is preempted insofar as Congress has expressly stated its intent to supersede state law. <u>Shaw v Delta Air Lines, Inc</u>, 463 US 85, 95-98 (1983). The task of statutory construction of an expressed preemption clause "must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." <u>CSX Transportation, Inc v Easterwood</u>, 507 US 658, 664 (1993). If Congress intends to alter the usual constitutional balance between the states and the federal government, it must make its intention to do so unmistakably clear in the language of the statute. <u>Rice v Santa Fe Elevator Corp</u>, 331 US 218, 230 (1947). The plain statement rule, as applied to expressed preemption, "is nothing more than an acknowledgment that the states retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." <u>Gregory v Ashcroft</u>, 501 US 452, 461.

Little more than a paragraph in the briefing is devoted to the contention that federal law — namely, the Stored Communications Act ("SCA"), 18 USC § 2701 et seq — preempts expressly the state laws at issue here. The SCA, which was enacted as part of the Electronic Communications Privacy Act of 1986 ("ECPA"), Pub L No 99-508, 100 Stat 1848 (1986), regulates

20

disclosure of non-content "record[s] or other information pertaining to a subscriber."  18 USC § 2702©.  Relevant to the issue of preemption, the SCA specifies that "[t]he remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter."  Id § 2708.

As the court concluded in its order denying remand in Riordan, 06-3574, and Campbell, 06-3596, section 2708 of the SCA serves a limited purpose:  to prevent criminal defendants from suppressing evidence based on electronic communications or customer records obtained in violation of ECPA's provisions.  Doc #130 at 6.  The government gives no reason to revisit this issue.  Accordingly, the court concludes that federal law does not expressly preempt the states laws at issue here.

2

Even if a federal statute does not expressly preempt state law, it may do so by implication.  Field preemption is found if the federal so thoroughly regulates a legislative field that Congress intended it to be occupied exclusively by the federal government.  Freightliner Corp v Myrick, 514 US 280, 287 (1995).  If a "scheme of federal regulation * * * [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or if an Act of Congress "touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," field preemption exists.  English v General Electric Co, 496 US 72, 79 (1990); Rice, 331 US at 230.  Because Congress

left room for state regulation of public utilities and their consumers' privacy, field preemption fails.

        As discussed in the court's remand order, see Doc #130 at 7, the preemptive force of the Foreign Intelligence Surveillance Act ("FISA") is undercut by the statute's language that contemplates state court litigation concerning illegal surveillance.  For example, section 1806(f), in pertinent part, provides procedures for consideration of the propriety of FISA orders "[w]herever * * * any motion or request is made by an aggrieved person pursuant to any other statute or rule of * * * any state before any court or other authority of * * * any state to discover or obtain applications or orders of other materials relating to electronic surveillance * * * ."  50 USC 1806(f).  The statutory exemption in 1861(e) also implies the availability of civil claims with respect to the production of records.  It provides that a "person who, in good faith, produces tangible things under an order pursuant to this section shall not be liable to any other person for such production."  50 USC 1861(e).  FISA thus contemplates that, in the absence of a government order for the business records under 50 USC 1861(a)(1), injured parties will have causes of action and remedies under other provisions of state and federal law.

        These provisions in FISA suggest that Congress did not intend to foreclose state involvement in the area of surveillance regulation.  As such, it cannot be said that the scheme of federal regulation here is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."  English, 496 US at 79.

Finally, state action is preempted to the extent it actually conflicts with federal statutes, regulations or the Constitution. <u>Barnett Bank of Marion County, NA v Nelson</u>, 517 US 25, 31 (1996). Conflict preemption is found if it is "impossible for a private party to comply with both state and federal requirements" or if state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." <u>Freightliner Corp v Myrick</u> 514 US 280, 287 (1995); <u>Geier v American Honda Motor Co</u>, 529 US 861, 873 (2000).

In support of conflict preemption, the government relies chiefly on two statutory privileges, first citing to section 6 of the National Security Agency Act of 1959, 50 USC § 402 note 6, which provides:

> [N]othing in this act or <u>any other law</u> * * * shall be construed to require the disclosure of the organization or any function of the National Security Agency, of any information with respect to the activities thereof, or of the names, titles, salaries, or number of persons employed by such agency. 50 USC § 402, n6, sec 6(a) (emphasis added).

The government also relies on 50 USC § 403-1(i)(1), which states, "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." The overarching issue is whether compliance with both federal and state regulations is a physical impossibility or whether the state investigations "stand[] as an obstacle to the accomplishment of the full purposes and objectives of Congress." <u>Silkwood</u>, 464 US at 248. For reasons discussed below, the court finds that neither of these provisions compels preemption.

//

United States District Court
For the Northern District of California

Compliance with both federal and state regulations is not a physical impossibility, at least in view of "the circumstances of [the] particular case." <u>Florida Lime & Avocado Growers, Inc v Paul</u>, 373 US 132, 142-43 (1963). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." <u>Crosby v National Foreign Trade Council</u>, 530 US 363, 373 (2000)

> For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished -- if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect -- the state law must yield to the regulation of Congress within the sphere of its delegated power.

<u>Crosby</u>, 530 US at 373 (citing <u>Savage v Jones</u>, 225 US 501, 533 (1912).

Applying this standard, the court cannot conclude that the state investigations will inevitably conflict with federal law. In <u>Hepting</u>, 06-672, the government argued that the information covered by the section 6 statutory privilege is "at least co-extensive with the assertion of the state secrets privilege by the DNI." 06-672, Doc #124 at 14. Insofar as section 6 proscribes disclosure that would otherwise fall within the state secrets privilege, no conflict exists, as the government may intervene and assert the state secrets privilege in any of these proceedings. A conflict may arise, however, to the extent the state officials seek information covered by section 6 that lies outside the scope of the state secrets privilege. The court doubts whether any of the these

investigations would engender such a conflict, especially given the government's insistence that *all* information sought by the state officials implicates the state secrets privilege. Regardless, it would be inappropriate for the court to rule on the scope of this possible conflict in the abstract. See <u>Time Warner Entm't Co, LP v FCC</u>, 56 F3d 151, 195 (DC Cir 1995) ("[W]hether a state regulation unavoidably conflicts with national interests is an issue incapable of resolution in the abstract.").

Under the obstruction strand of conflict preemption, state law is preempted to the extent it actually interferes with the "methods by which the federal statute was designed to reach [its] goal." <u>Int'l Paper Co v Ouellette</u>, 479 US 481, 494 (1987); <u>Verizon North, Inc v Strand</u>, 309 F3d 935, 940 (6th Cir 2002). In making this determination, courts "consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." <u>Jones v Rath Packing Co</u>, 430 US 519, 526 (1977); <u>Time Warner</u>, 56 F3d at 195 ("[W]hether a state regulation unavoidably conflicts with national interests is an issue incapable of resolution in the abstract.") (quoting <u>Alascom, Inc v FCC</u>, 727 F2d 1212, 1220 (DC Cir 1984)). Hence, obstruction preemption focuses on both the objective of the federal law and the method chosen by Congress to effectuate that objective, taking into account the law's text, application, history and interpretation.

To support obstruction, the government avers that any litigation touching upon the statutory privileges must *ipso facto* obstruct Congress' purpose. But such a view misapprehends the federal law's purpose by ignoring the bulk of Congress's activity in this realm. For example, inquiry into activity not sanctioned

by the Pen Register Act, 18 USC § 3121, or FISA, falls outside of section 6's ambit.  The Pen Register Act provides that "no person may install or use a pen register or a trap and trace device without first obtaining a court order under section 3123 of this title [18 USCS § 3123] or under the [FISA]."  18 USC § 3121(a).  Similarly, FISA requires an application under oath attesting to eleven qualifying conditions, including the purpose of the investigation, and the persons to be investigated, as well as that the information likely to be obtained is foreign intelligence information not concerning a "United States person."  50 USC § 1804(a)(1) to (11).  Both of these statutes counter the government's myopic view of federal law in this area.

In further support of its conflict-preemption argument, the government points to 18 USC § 798(a), a statute that makes it a crime to divulge improperly any classified information "concerning the communication intelligence activities of the United States."  18 USC § 798(a).  Because the disclosure under the subpoenas is not "authorized," such disclosures may violate federal law.  Yet the term "classified information" for purposes of 18 USC 798(a) means "information which, at the time of a violation of this section, is, for reasons of national security, specifically designated by a United States Government Agency for limited or restricted dissemination or distribution."  18 USC § 798(b).  And the government does not purport to have designated as classified the records at issue here; indeed, it has not acknowledged that the carriers even divulged records to the NSA.  As such, no conflict exists with 18 USC §798(a) until the government "specifically designate[s]" the records pertinent to the cases at bar.  Even if

the pertinent records fall under 18 USC § 798(a), the aforementioned statuary privileges — not to mention the state secrets privilege — furnish the government with more than enough protection against any conflict.

Finally, the government contends that presidential executive orders aimed at protecting national security information conflict with the state investigations. Executive orders, in and of themselves, do not preempt state law. Congress has the exclusive power to make laws necessary and proper to carry out the powers vested by the United States Constitution in the federal government. <u>Youngstown Sheet & Tube Co v Sawyer</u>, 343 US 579 (1952). Only when executive orders are necessary as a means of carrying out federal laws do they preempt state law. Cf <u>Fidelity Federal Sav & Loans Ass'n</u>, 458 US at 154 (administrative regulations may preempt state law when Congress has delegated that rule-making power).

Executive order 12,958 directs agencies to control strictly the classified information in their possession and to ensure that information is disclosed only when doing so is "clearly consistent with the interests of national security." 60 Fed Reg 19825. Similarly, executive order number 12,968 (60 Fed Reg 40245) establishes a security program for access to information by non-government employees and 36 CFR § 1222.42(b) requires that when "nonrecord material containing classified information is removed from the executive branch, it is protected under conditions equivalent to those required of executive branch agencies * * *."

The government attempted to explain why these orders are necessary as a means of carrying out federal laws, as required for

27

preemption, for the first time at oral argument. Without the benefit of briefing, however, it remains uncertain whether these executive orders amount to anything more than mere expressions of executive will. But even supported by an act of Congress, these orders cannot carry the day for the government. Again, no conflict inheres because for any information sought in violation of these orders the government may exercise its privileges, statutory or otherwise.

Accordingly, the government cannot show the requisite conflict because, based on the present record, the investigations do not require an act by the carriers that federal law or policy deems unlawful. Nor do the investigations pose an obstacle to the purposes and objectives of Congress. Should it occur that information sought by the states implicates the aforementioned executive orders but falls outside the state secrets privilege, the court will entertain a renewed motion from the government based on conflict preemption.

C

Even if no federal activity preempts the state laws at issue here, the state investigations are said to infringe on the foreign affairs power of the federal government under Zschernig v Miller, 389 US 429 (1968). The national government's exclusive authority to regulate the foreign affairs of the United States has long been recognized as a constitutional principle of broad scope. See United States v Pink, 315 US 203, 233 (1942) ("Power over external affairs is not shared by the States; it is vested in the national government exclusively."); Hines v Davidowitz, 312 US 52,

63 (1941). "It follows that all state action, whether or not consistent with current foreign policy, that distorts the allocation of responsibility to the national government for the conduct of American diplomacy is void as an unconstitutional infringement on an exclusively federal sphere of responsibility." Laurence H Tribe, <u>American Constitutional Law</u> § 4-5 at 656 (3d ed 2000).

This principle, which prohibits state action that unduly interferes with the federal government's authority over foreign affairs, derives from both the text and structure of the Constitution. The Constitution allocates power for external affairs to the legislative and executive branches of the national government and simultaneously prohibits the states from engaging in activities that might interfere with the national government's exercise of these powers. To be sure, no clause in the Constitution explicitly bestows a "foreign affairs power" to the federal government. See L Henkin, <u>Foreign Affairs and the United States Constitution</u> 14-15 (2d ed 1996). But a number of provisions, when read together, strongly imply that such authority was intended. See Harold G Maier, <u>Preemption of State Law: A Recommended Analysis</u>, 83 Am J Int'l L 832, 832 (1989) ("[N]either the Articles of Confederation nor the Constitution provided for a general foreign affairs power. Nonetheless, there was never any real question that the United States would act as a single nation in the world community.").

Specifically, the Constitution provides that Congress possesses the authority "to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense

and general Welfare of the United States," US Const art I, § 8, cl 1, "to regulate Commerce with foreign Nations," id, cl 3, and "to define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations," id, cl 10. Additionally Congress is granted the power "to declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water," id, cl 11, and the President is designated the "Commander in Chief of the Army and Navy of the United States," id, art II, § 2, cl 1.

With respect to the states, the Constitution directs that "no State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal" or, without the consent of Congress, "lay any Imposts or Duties on Imports or Exports" or "enter into any Agreement or Compact * * * with a foreign Power," or "engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." Id, § 1, cl 10.

These and other constitutional provisions evidence an intent on the part of the framers to grant paramount authority for foreign affairs to the political branches of the federal government, thereby necessitating the exclusion of intrusive efforts on the part of the states in foreign relations. The Supreme Court enshrined these principles in <u>Zschernig v Miller</u>, 389 US 429 (1968), in which the Court announced the foreign affairs doctrine that governs the cases at bar.

<u>Zschernig</u> involved an Oregon probate statute that conditioned the inheritance rights of an alien not residing in the United States on his ability to prove that American heirs would have a reciprocal right to inherit estates in the foreign country

and that he would receive payments from the Oregon estate "without confiscation, in whole or in part, by the governments of such foreign countries." Id at 430. The Supreme Court noted that it had earlier refused to invalidate a similar statute enacted by California "on its face" because that statute would have only "some incidental or indirect effect in foreign countries." Id at 432-33 (quoting Clark v Allen, 331 US 503, 517 (1947)). In Zschernig, however, the Court assessed "the manner of [the Oregon statute's] application" and observed that the law had compelled state courts to "launch[] inquiries into the type of governments that obtain in particular foreign nations." 389 US at 433. The Court noted, for example, that the statute triggered assessments of "the actual administration of foreign law" and "the credibility of foreign diplomatic statements." Id at 435. In short, the statute "seemed to make unavoidable judicial criticism of nations established on a more authoritarian basis than our own." Id at 440. Looking at these effects of the Oregon statute, the Court concluded that it was unconstitutional because it "affected international relations in a persistent and subtle way," had a "great potential for disruption or embarrassment" and triggered "more than 'some incidental or indirect effect in foreign countries.'" Id at 434-35, 440.

Zschernig thus stands for the proposition that states may legislate with respect to traditional state concerns, such as inheritance and property rights, even if the legislation has international implications, but such conduct is unconstitutional when it has more than an "incidental or indirect effect in foreign countries." Id at 440. As the First Circuit recently observed, under Zschernig, "there is a threshold level of involvement in and

31

impact on foreign affairs which the states may not exceed."
National Foreign Trade Council v Natsios, 181 F3d 38, 49-57 (1st
Cir 1999), aff'd on other grounds sub nom, Crosby v National
Foreign Trade Council, 530 US 363 (2000).

But Zschernig, and the foreign affairs power it
announced, has its limits.  Only a handful of state or local laws
have been struck down under Zschernig, and these laws have
typically singled out foreign nations for regulation.  See, e g,
Natsios, 181 F3d 38, 53 (finding that the Massachusetts Burma Law,
which restricted the ability of Massachusetts and its agencies from
purchasing goods or services from companies that did business with
Burma (Myanmar), was unconstitutional, in part, as a "threat to
[the] federal foreign affairs power"); Tayyari v New Mexico State
University, 495 F Supp 1365, 1376-79 (D NM 1980) (striking down a
university's policy designed to "rid the campus of Iranian
students" because it conflicted with a federal regulation and
"frustrated the exercise of the federal government's authority to
conduct the foreign relations of the United States"); Springfield
Rare Coin Galleries, Inc v Johnson, 115 Ill 2d 221 (Ill 1986)
(invalidating an Illinois statute that excluded South Africa from a
tax exemption as more than an "incidental" intrusion on the federal
government's foreign affairs power); Bethlehem Steel Corp v Board
of Commissions, 276 Cal App 2d 221 (1969) (invalidating a
California Buy American statute because it had "more than 'some
incidental or indirect effect in foreign countries' and * * * great
potential for disruption * * * .").

The Ninth Circuit's decision in Deutsch v Turner Corp,
324 F3d 692 (9th Cir 2003), sheds light on the present issues.

Deutsch affirmed this court's decision in In re World War II Era Japanese Forced Labor Litig, 164 F Supp 2d 1160 (ND Cal 2001), finding preemption of a California law that created a cause of action for victims of World War II slave labor. The Ninth Circuit stated that California had "sought to create its own resolution to a major issue arising out of the war – a remedy for wartime acts California's legislature believed had never been fairly resolved." Id at 712. Because the power to make and resolve war included the authority to resolve war claims, the California scheme was preempted by the federal scheme. Id at 714. As this court observed, the statute's terms and legislative history "demonstrate a purpose to influence foreign affairs directly" and "target[] particular countries," as "California intended the statute to send an explicit foreign relations message, rather than simply to address some local concern. In re WWII, 164 F Supp 2d at 1173, 1174.

In contrast to the law in Deutsch, none of the state laws the government seeks to preempt was enacted to influence foreign affairs. Nor can it be said that any state has attempted to "establish its own foreign policy." 389 US at 441. Instead, the laws underlying the state investigations are directed at more mundane, local concerns such as utility regulation and privacy, traditional realms of state power.

Nor is there a basis for concluding that the investigations of the carriers will have significant impact on the government's relations with any foreign nation. In this regard, Int'l Ass'n of Indep Tanker Owners v Locke, 148 F3d 1053, 1068 (9th Cir 1998), is instructive. The Ninth Circuit in Locke rejected out

33

of hand the argument that onerous regulations on oil tankers promulgated by the state of Washington were unconstitutional under Zschernig because the litigant "failed to demonstrate that, even if [those] regulations [had] some extraterritorial impact, that impact [was] more than 'incidental or indirect.'" Locke, 148 F3d at 1069 (quoting Zschernig, 389 US at 434). Akin to the regulations in Locke, the state investigations may have an effect on foreign affairs, but that effect is only incidental and indirect. See Zschernig, 389 US at 433.

D

Finally, the court takes up how the state secrets privilege bears on the state officials' investigations. The Director of the NSA, General Keith B Alexander, has concluded that permitting the investigations to proceed would interfere with the national security operations of the government. Doc #265, Ex A. Alexander's declaration explains that each of the "five of the state proceedings * * * seek, at a minimum, information regarding: (1) whether specific telecommunication carriers assisted the NSA with an alleged foreign intelligence program involving the disclosure of large quantities of records pertaining to customer communications; and (2) if such a program exists, the precise nature of the carriers' alleged involvement and details concerning the alleged NSA activities." Doc #265, Ex A, ¶ 16. According to Alexander, confirming or denying "allegations concerning intelligence activities, sources, methods, relationships, or targets" would harm national security in various ways. Id, ¶ 17.
//

In view of this court's analysis in <u>Hepting v AT&T Corp</u>, 439 F Supp 2d 974 (ND Cal 2006), the court notes — and the state officials acknowledge — that some of the information sought in these investigations may implicate the state secretes privilege. Conversely, some questions posed in these investigations fall outside the privilege's scope, a point the government conceded at oral argument. With further guidance from the Ninth Circuit, the court will be able to decide whether and to what extent the state investigations may proceed. Accordingly, the court declines to rule on the state secrets issue pending the Ninth Circuit's decision in <u>Hepting v AT&T Corp</u>.

IV

In sum, the government's summary judgment motion is DENIED WITHOUT PREJUDICE to its renewal following the Ninth Circuit's decision in <u>Hepting v AT&T</u>. The court also DENIES AS MOOT the state officials' motions for summary judgment. After the Ninth Circuit issues an order in <u>Hepting</u>, the parties may renotice their cross motions.

IT IS SO ORDERED.

VAUGHN R WALKER
United States District Chief Judge