1   Laurence F. Pulgram (CSB No. 115163)
    lpulgram@fenwick.com
2   Candace Morey (CSB No. 233081)
    cmorey@fenwick.com
3   FENWICK & WEST LLP
    555 California Street, 12th Floor
4   San Francisco, CA 94104
    Telephone:    (415) 875-2300
5   Facsimile:    (415) 281-1350

6   Ann Brick (CSB No. 65296)
    abrick@aclunc.org
7   AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF NORTHERN CALIFORNIA
8   39 Drumm Street
    San Francisco, CA 94111
9   Telephone: (415) 621-2493
    Facsimile: (4150 255-8437
10
    Attorneys for Plaintiffs in
11  Dennis P. Riordan, *et al.*
                                                Vincent I. Parrett (CSB No. 237563)
12                                              vparrett@motleyrice.com
    Barry R. Himmelstein (CSB No. 157736)       MOTLEY RICE LLC
13  bhimmelstein@lchb.com                       28 Bridgeside Boulevard
    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP   P. O. Box 1792
14  275 Battery Street, 30th Floor              Mount Pleasant, SC 29465
    San Francisco, CA 94111-3339                Telephone: (843) 216-9000
15  Telephone: 415-956-1000                     Facsimile: (843) 216-9440
    Facsimile: 415-956-1008
16                                              Interim Class Counsel for
    Interim Class Counsel for MCI Class         Verizon Class

17              UNITED STATES DISTRICT COURT

18             NORTHERN DISTRICT OF CALIFORNIA

19                SAN FRANCISCO DIVISION

| 20 | IN RE: | MDL No. 06-1791 VRW |
|---|---|---|
| 21 | NATIONAL SECURITY AGENCY TELECOMMUNICATIONS RECORDS | **PLAINTIFFS' SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE AND** |
| 22 | LITIGATION, | **SUPPLEMENTAL AUTHORITIES FOR THE MOTIONS TO DISMISS OR, IN THE** |
| 23 | This Document Relates To: | **ALTERNATIVE, FOR SUMMARY JUDGMENT BY THE UNITED STATES** |
| 24 | (1) All Class Actions Against MCI and Verizon Defendants in the Master MCI and | **OF AMERICA AND VERIZON** |
| 25 | Verizon Consolidated Complaint, Dkt. 125; (2) *Bready v. Verizon Maryland* (06-6313); | Date:      August 30, 2007 |
| 26 | (3) *Chulsky v. Cellco Partnership & Verizon Communications Inc.* (06-6570); and | Time:      2:00 p.m. Courtroom: 6, 17th Floor |
| 27 | (4) *Riordan v. Verizon Communications Inc.* (06-3574) | Judge:     Hon. Vaughn R. Walker |
| 28 | | |

Dockets.Justia.com

Jennifer L. Kelly (CSB No. 193416)
jkelly@fenwick.com
Aaron K. Perzanowski (CSB No. 244921)
aperzanowski@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone:    (415) 875-2300
Facsimile:    (415) 281-1350

Peter J. Eliasberg (CSB No. 189110)
peliasberg@aclu-sc.org
Peter Bibring (CSB No. 223981)
pbibring@aclu-sc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1616 Beverly Boulevard
Los Angeles, CA 90026
Telephone: (213) 977-9500
Facsimile: (213) 250-3919

Nicole A. Ozer (CSB No. 228643)
nozer@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (4150 255-8437

Attorneys for Plaintiffs in
Dennis P. Riordan, *et al.*

Elizabeth Cabraser (CSB No. 83151)
ecabraser@lchb.com
Eric B. Fastiff (CSB No. 182260)
efastiff@lchb.com
Allison Elgart (CSB No. 241901)
aelgart@lchb.com
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: 415-956-1000
Facsimile: 415-956-1008 (fax)

Interim Class Counsel for MCI Class

Joshua Graeme Whitaker
(Appearing pursuant to MDL Rule 1.4 [U.S.
Dist. Ct. for the Dist. of Md. Bar No. 16457])
joshuawhitaker@griffinwhitaker.com
Edward Nelson Griffin
(Appearing pursuant to MDL Rule 1.4 [U.S.
Dist. Ct. for the Dist. of Md. Bar No. 16435])
edwardgriffin@griffinwhitaker.com
GRIFFIN WHITAKER LLP
8730 Georgia Avenue Suite LL100
Silver Spring, MD 20910
Telephone: (301) 587-3345
Facsimile: (888) 367-0383

Attorneys for Plaintiffs
Christopher Bready, *et al.*

Ronald L. Motley
rmotley@motleyrice.com
Jodi W. Flowers
jflowers@motleyrice.com
Don Migliori
dmigliori@motleyrice.com
Justin B. Kaplan
jkaplan@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Boulevard
P. O. Box 1792
Mount Pleasant, SC 29465
Telephone: (843) 216-9000
Facsimile: (843) 216-9440

Interim Class Counsel for
Verizon Class

David H. Sternlieb
dsternlieb@shapirosternlieb.com
Gary S. Shapiro
gshapiro@shapirosternlieb.com
(Appearing pursuant to MDL Rule 1.4) (U.S.
Dist. Ct. for the Dist. of N.J.)
SHAPIRO & STERNLIEB, LLC
Attorneys At Law
800 Tennent Road
Manalapan, New Jersey 07726
Telephone: (732) 617-8050
Facsimile: (732) 617-8060

Counsel for
Plaintiffs Glen Chulsky, *et al.*

# INTRODUCTION

Plaintiffs have requested leave to submit this Supplemental Request for Judicial Notice and Supplemental Authorities for the limited purpose of addressing new factual and legal developments after the filing of Plaintiffs' Joint Opposition to the Government's Motion to Dismiss ("Opposition") on June 22, 2007. As this Court predicted in *Hepting v. AT&T Corp.*, 439 F. Supp. 2d 974, 1001 (N.D. Cal. 2006), active and ongoing Congressional investigations have spurred additional revelations concerning the programs at issue in this litigation. The Sixth and D.C. Circuits have issued important decisions, which the United States and Verizon have addressed in their reply papers, but Plaintiffs have not previously had the opportunity to address.

## I. ADDITIONAL FACTUAL DEVELOPMENTS SUBJECT TO JUDICIAL NOTICE.

Public statements offered by the Attorney General, the Director of National Intelligence ("DNI"), and a ranking member of the House Select Committee on Intelligence have confirmed the existence of additional surveillance activities conducted by the National Security Agency beyond the so-called Terrorist Surveillance Program ("TSP"), as well as the participation of telecommunications operators in those activities. Plaintiffs request that this Court take judicial notice of these public statements, all of which further undermine the Government's assertion that the state secrets privilege mandates dismissal of this litigation at the outset.[1]

According to the Government, Plaintiffs' claims are barred because "no public facts

---

[1] Under Federal Rule of Evidence 201, facts "not subject to reasonable dispute in that" they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" are judicially noticeable. Fed. Rule Evid. 201(b). When such notice is "requested by a party and [the court is] supplied with the necessary information," it is mandatory. Fed. Rule Evid. 201(d).

The facts recounted here, because they are public statements made by the Attorney General, the Director of National Intelligence, the Director of the Federal Bureau of Investigation, and a ranking member of the House Select Committee on Intelligence, are "not subject to reasonable dispute." Each of these facts is easily verifiable on the basis of the attached public documents created by or reflecting the statements of those officials. *See* Exhibits A-D. Many courts have taken judicial notice of similar information. *See, e.g.*, *Texas & Pac. Ry. Co. v. Pottorff*, 291 U.S. 245, 254 n. 4, 78 L. Ed. 777, 54 S. Ct. 416 (1933), *amended on other grounds*, 291 U.S. 649, 54 S. Ct. 525 (1934) (official reports put forth by the Comptroller of the Currency); *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 (9th Cir. 1999) (information contained in news articles); *Del Puerto Water Dist. v. United States Bureau of Reclamation*, 271 F.Supp.2d 1224, 1234 (E.D. Cal. 2003) (Senate and House Reports); *Wietschner v. Monterey Pasta Co.*, 294 F.Supp.2d 1102, 1108 (N.D. Cal. 2003) (press releases issued by the Securities and Exchange Commission).

provide any basis to conclude that … the Government could not accomplish the alleged surveillance on its own," Gov't Opening Brief at 32. However, recent disclosures by the Attorney General and Ranking Member Pete Hoekstra now confirm the participation of telecommunications companies in the NSA's surveillance activities.

On July 24, 2007, testifying under oath before Congress on the Department of Justice's proposal to amend the Foreign Intelligence Surveillance Act, Attorney General Alberto Gonzales stated as follows:

> **[SENATOR] FEINGOLD**: You state in your testimony that the administration has transmitted to Congress a proposal to modernize the Foreign Intelligence Surveillance Act. And yet your department still refuses to share with this committee and with the Intelligence Committee basic information about the evolution of the department's legal justifications for the illegal wiretapping program from 2001 to the present.
>
> And your legislative proposal contains a provision that would grant blanket immunity to individuals who cooperate with the government for participating in certain unidentified intelligence activities.
>
> How can you come to Congress with a straight face and ask for this immunity provision, yet at the same time refuse to tell most members of Congress what they would be granting immunity for?
>
> **[ATTORNEY GENERAL] GONZALES**: Well, of course, we have provided briefings to the Intel Committees.
>
> And, again, we don't think -- you know, <u>we went to companies for help. They provided help in trying to protect this country</u>. And we think that's appropriate for the Congress to consider.

Exhibit A, at 50 (emphasis added).

Two weeks later, Representative Pete Hoekstra, the ranking Republican on the House Select Committee on Intelligence and a member of the so-called "Gang of Eight," confirmed that telecommunications carriers were the "companies" that assisted in these surveillance activities and for whom legislative immunity was being sought. Appearing on the Fox News television program "The Journal Editorial Report," Representative Hoekstra stated as follows:

> **[Editorial Page Editor and Vice President of the Wall Street Journal, Paul] Gigot**: All right, I understand there's another issue here of telephone company liability. That is, for a while the telephone companies cooperated with the National Security

Administration in helping with these wiretaps. But after the program was exposed, some of them said, *Wait, for legal liability we're going to reduce our cooperation or perhaps not cooperate at all.* Is this liability protection something the administration wants, and are Democrats resisting?

**[Representative Peter] Hoekstra**: Absolutely. <u>It's something that our communications companies need. These are companies who were doing the patriotic thing. They were helping the U.S. government, the American people, get the information that we believe we needed to keep us safe. They voluntarily participated, and now that the program is exposed, they've been open to all kinds of lawsuits.</u> You know, Congress is not stepping in to protect them.

Exhibit B at 2-3 (italics and bold in original, underline emphasis added). Representative Hoekstra's public statement—issued in the context of attempting to advance the Administration's legislative agenda—not only verified that telecommunications providers assisted the Government in its surveillance efforts, but strongly suggested that those companies are the very providers now facing litigation before this Court.

These admissions confirm that the telecommunications carriers voluntarily "helped" in the programs at issue. Coupled with the evidence of Verizon/MCI's participation presented in Plaintiffs' Opposition —which provided far greater substantiation than was available for AT&T in *Hepting*—there is no basis upon which to find that the entire subject of this litigation is a state secret.

Recent disclosures also negate the Government's argument that no surveillance beyond the TSP has been acknowledged. In an effort to clarify apparent contradictions in the sworn testimony offered by the Attorney General on July 24, 2007 concerning the highly-publicized visit to his predecessor in the hospital, both the Attorney General himself and Director of National Intelligence John M. McConnell sent explanatory letters to senior members of the Senate Judiciary Committee.

In a letter to Senator Arlen Specter, Director of National Intelligence John M. McConnell wrote:

Shortly after 9/11, the President authorized the National Security Agency to undertake ***various intelligence activities*** designed to protect the United States from further terrorist attack. … ***One particular aspect of these activities, and nothing more, was publicly acknowledged by the President*** and described in December 2005, following an unauthorized disclosure. … the

Administration first used the term "Terrorist Surveillance Program" to refer specifically to that particular activity the President had publicly described in December 2005.

Exhibit C (emphasis added).

Shortly thereafter, the Attorney General sent a similar letter to Senate Judiciary Committee Chair Patrick J. Leahy. The Attorney General confirmed that "the President authorized the NSA to undertake a number of highly classified intelligence activities … in one executive order." Exhibit D at 1. The term "Terrorist Surveillance Program" was subsequently used not to describe the entire intelligence program, but rather only those aspects of the NSA's activities publicly disclosed by the President in December of 2005, targeting al Qaeda and known affiliates. *Id.* According to the Attorney General, the legality of the non-TSP intelligence activities authorized by the President was a matter of "very serious disagreement." *Id.* at 2.

In his July 26, 2007 testimony before the House Judiciary Committee concerning the Ashcroft hospital visit, FBI Director Mueller confirmed that "the discussion was on a national – an NSA program that has been much discussed . . . ." Exhibit F at 18.[2] As the disagreement with Attorney General Ashcroft apparently did *not* concern the TSP (according to Attorney General Gonzales), and as the records collection program alleged by Plaintiffs is only *other* "NSA program that has been much discussed," these additional disclosures leave no doubt that the NSA's surveillance activities went well beyond the TSP, and included, at a minimum, the telecommunications records collection program alleged by Plaintiffs.

---

[2] The full colloquy was as follows:

> JACKSON LEE: Could I just say, did you have an understanding that the discussion was on TSP?
>
> MUELLER: I had an understanding that the discussion was on a -- a(n) NSA program, yes.
>
> JACKSON LEE: I guess we use "TSP," we use warrantless wiretapping, so would I be comfortable in saying that those were the items that were part of the discussion?
>
> MUELLER: I -- the discussion was on a national -- an NSA program that has been much discussed, yes.

Exhibit F at 18.

## II. PLAINTIFFS' CLAIMS ARE NOT BASED ON CHILLED SPEECH CAUSED BY AN APPREHENSION OF TARGETED SURVEILLANCE.

In *ACLU v. NSA*, 2007 WL 1952370, *68 (6th Cir. July 6, 2007), the Sixth Circuit vacated a district court ruling enjoining the TSP and remanded the case for dismissal due to a lack of standing. While Plaintiffs respectfully suggest that the dissent authored by Judge Gilman provided a more thoughtful analysis of the standing issue, *see id*. at *38-59 (Gilman, J. dissenting), the claims brought by Plaintiffs in the instant action are readily distinguishable from those before the Sixth Circuit, even under the majority's analysis.

First, the plaintiffs in *ACLU* based their claims solely on the targeted TSP as revealed by the President. *Id.* at *1-3. They did not allege or offer evidence tending to demonstrate any broader surveillance activities by the NSA.[3] They claimed that their rights were violated by a program that purportedly engaged only in targeted surveillance, but they could not demonstrate that they were themselves targeted. As the basis for standing, they alleged that their communications were "chilled" by a "well founded belief" that they might become targeted—an injury the majority found insufficient. *Id.* at * 34. They did not allege or seek to prove that their own communications or communications records had actually been intercepted or disclosed.

Here, by contrast, Plaintiffs' claims rely on allegations of dragnet surveillance activities that fall outside of the targeted surveillance that the President's public description of the TSP acknowledged. Further, the existence of these broader activities, as described above, recently has been reconfirmed by the Attorney General and the DNI. Plaintiffs' standing claim here relies not on an assertion of a chill in their communications, but rather on the actual injury suffered when their private communications or communications records were intercepted or disclosed—an injury that they allege they necessarily have suffered because the dragnet as alleged has swept in all Verizon/MCI customers. The existence of such a program supports Plaintiffs' assertion of injury when their own communications and communications records were diverted, intercepted, and disclosed by Defendants. The same could not be said with respect to a TSP targeted at

---

[3] Thus, the majority opinion noted that just three facts about the NSA's activities in the TSP— "(1) it eavesdrops, (2) without warrants, (3) on international telephone and email communications in which at least one of the parties is a suspected al Queda affiliate" "constitute all the evidence in the record relating to the NSA's conduct under the TSP." *Id.* *3, 4.

unknown individuals in *ACLU*.

Second, unlike this case, the plaintiffs in *ACLU* did not seek any discovery to attempt to prove their allegations. To the contrary, in that case the plaintiffs accepted the government's position that the invocation of the state secrets doctrine precluded presentation of facts. Plaintiffs declined, on the record, an offer of potential remand for additional fact finding, claiming that their injuries were clear and undisputed in the record. *Id.* at *3 & n. 3. Accordingly, the Sixth Circuit "declined to inquire, *sua sponte*, into the propriety of the NSA's invocation of the privilege." *Id.* Its decision was limited to whether or not publicly available information was sufficient to sustain a claim, without examining the potential availability or impact of other evidence. *Id.*

By contrast, in the present case Plaintiffs vigorously dispute the Government's assertion that the privilege bars consideration of additional factual matters beyond the President's incomplete recitation of the scope of the government's surveillance activities. Thus, whereas the *ACLU* plaintiffs had themselves *sought* summary judgment without discovery, Plaintiffs in the present case have not waived their right to discovery or presentation of additional evidence.

Finally, the Government errs in its assertion that the Sixth Circuit's summary affirmance of the trial court's dismissal of "data mining" claims supports dismissal of the call records claims here. Gov't Reply Brief at 4. The Government's assertion that the data mining claims "were in all respects the same as Plaintiffs' call records claims here" (*id.*) is unsupported by its citation to the Sixth Circuit's decision, or by the district court record. *See ACLU v. NSA*, 438 F. Supp. 2d 754, 782 (E.D. Mich. 2006) (dismissing without explanation of scope of allegations).

The majority opinion made clear that the dismissal of the "data mining" claims were the result of the *ACLU* plaintiffs' failure to allege any distinct injury resulting from the alleged surveillance activity. *See* 2007 WL 1952370 at *34 ("the plaintiffs allege no separate injury in connection with the alleged data-mining aspect of the TSP"). The data mining claims apparently suffered from the same failures described above, none of which apply to Plaintiffs' call records claims. Here, Plaintiffs allege that their call records were in fact disclosed through surveillance activities that extend beyond the disclosed scope of the TSP.

Given the fundamental distinctions between the theory asserted in *ACLU v. NSA* and the

nature of the claims at issue here, as well as the different procedural posture, the Sixth Circuit's opinion does not undermine Plaintiffs' ability ultimately to prove standing in this action.

## III. DISMISSAL ON STATE SECRETS GROUNDS REQUIRES A "VALID PRIVILEGED DEFENSE," NOT MERELY IDENTIFICATION OF POTENTIAL DEFENSES TO WHICH STATE SECRETS APPLY.

The Government's Reply Brief also addresses the D.C. Circuit's recent opinion in *In re Sealed Case*, 2007 WL 2067029 (D.C. Cir. Released July 20, 2007). *See* Gov't Reply Brief at 28 n. 18. That decision reversed the district court's dismissal, on state secrets grounds, as to one defendant in a *Bivens* action alleging a wiretap violating Plaintiff's Fourth Amendment rights.

The D.C. Circuit held, in part, that a defendant cannot obtain dismissal pursuant to the state secrets privilege merely by asserting "any plausible or colorable defense" that might implicate state secret information. *Id*. at *9. Defenses based on conjecture are insufficient. *Id*. at *10 ("allowing the mere prospect of a privileged defense to thwart a citizen's efforts to vindicate his or her constitutional rights would run afoul of the Supreme Court's caution against precluding review of constitutional claims, and against broadly interpreting evidentiary privileges….") (internal citations omitted). Instead, dismissal requires a showing establishing a "valid privileged defense." *Id*. Dismissal is appropriate only "when the district court determines from appropriately tailored *in camera* review of the privileged record that the truthful state of affairs would deny a defendant a valid defense that would likely cause a trier to reach an erroneous result." *Id.* at *10 (internal citations omitted); *see also id.* at *12 (dismissal requires that "the defendant proffer[] a valid defense that the district court verifies upon its review of state secrets evidence…."). Absent such a valid defense, "the result is simply that the evidence is unavailable, as though a witness had died, and the case will proceed accordingly, with no consequences save those resulting form the loss of evidence." *Id.* at *4 (quoting *Ellsberg* v. *Mitchell*, 709 F. 2d 51, 64 & n. 56 (D.C. Cir. 1983) *cert. denied* 465 U.S. 1038 (1984)).

As the D.C. Circuit understood, to hold otherwise would "impose a presumption that the defendant has a valid defense that is obscured by the privilege." *Id.* at *9. Such a presumption would prove "manifestly unfair" because it would "invariably shift the burdens of proof, something the courts may not do under the auspices of privilege." *Id.*

On August 13, 2007, at its annual convention, the American Bar Association House of Delegates formally adopted Resolution 116A and the accompanying Report, which likewise holds that "a court should not dismiss an action based on the state secrets privilege if it finds that the plaintiff is able to prove a *prima facie* case, unless the court also finds, following *in camera* review, that the defendant is unable to assert a *valid* defense with non-privileged evidence . . . ." Exhibit E at 11 (emphasis added).[4]

*In re Sealed Case* entirely answers the assertions, by both the Government and Verizon, that potential defenses implicating the state secrets issues require dismissal at this time. *See e.g.*, Gov't Reply Brief at 37, Verizon Reply Brief at 37-38 (hypothesizing possible defenses of good faith, emergency, court or executive authorization, etc.). Thus, Verizon's assertion that "such facts might be helpful to defendants' case if they existed, but have been rendered unavailable by the state secrets privilege" (Verizon Opening Brief at 5) is entirely insufficient under *In re Sealed Case*. Unless this Court is satisfied, after the review of secret evidence, that the asserted defense is valid and meritorious, dismissal is inappropriate.

## CONCLUSION

For the reasons set forth above, and in conjunction with those detailed in Plaintiffs' Joint Opposition, this Court should take judicial notice of the requested materials and deny the Motion to Dismiss or For Summary Judgment by the United States, and should deny Verizon's Motions to Dismiss insofar as they rely upon the state secrets privilege or related doctrines.

---

[4] Exhibit E contains both the ABA Recommendation, which is currently available only in redline form, and the corresponding Report. The Report, which represents the carefully considered recommendations of the ABA House of Delegates, contains a number of specific recommendations for procedures to safeguard national security without unduly compromising litigants' access to the courts. While Plaintiffs do not necessarily endorse all of these recommendations, Plaintiffs commend the document to the Court for its consideration in wrestling with these procedural issues.

Dated: August 20, 2007

Respectfully,

FENWICK & WEST LLP

By: _____/s/ Laurence F. Pulgram_____
　　　　　Laurence F. Pulgram

Attorneys for Plaintiffs
Dennis P. Riordan, *et al.*

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA

By: _____/s/ Ann Brick_____
　　　　　　　Ann Brick

Attorneys for Plaintiffs
Dennis P. Riordan, *et al.*

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP

By: _____/s/ Barry R. Himmelstein_____
　　　　　Barry R. Himmelstein

Interim Class Counsel for MCI Class

MOTLEY RICE LLC

By: _____/s/ Vincent I. Parrett_____
　　　　　　Vincent I. Parrett

Interim Class Counsel for Verizon Class

GRIFFIN WHITAKER LLP

By: _____/s/ Joshua Graeme Whitaker_____
　　　　　Joshua Graeme Whitaker

Attorneys for Plaintiffs
Christopher Bready, *et al.*

SHAPIRO & STERNLIEB, LLC

By:  /s/ David H. Sternlieb
_____
            David H. Sternlieb

Attorneys for Plaintiffs
Glen Chulsky, *et al.*

Pursuant to General Order 45, Part X-B, the filer attests that concurrence in the filing of this document has been obtained from Laurence F. Pulgram, Ann Brick, Vincent I. Parrett, Joshua Graeme Whitaker, and David H. Sternlieb.

# EXHIBIT A

4 of 580 DOCUMENTS

Copyright 2007 Congressional Quarterly, Inc. All Rights Reserved. CQ Transcriptions
"All materials herein are protected by United States copyright law and may not be
reproduced, distributed, transmitted, displayed, published or broadcast without the prior
written permission of CQ Transcriptions. You may not alter or remove any trademark,
copyright or other notice from copies of the content."

July 24, 2007 Tuesday

**TYPE:** COMMITTEE HEARING

**LENGTH:** 33599 words

**COMMITTEE:** SENATE JUDICIARY COMMITTEE

**HEADLINE:** SEN. PATRICK J. LEAHY HOLDS A HEARING ON OVERSIGHT OF THE U.S. DEPARTMENT
OF JUSTICE

**SPEAKER:**
SEN. PATRICK J. LEAHY, CHAIRMAN

**LOCATION:** WASHINGTON, D.C.

**WITNESSES:**

ATTORNEY GENERAL ALBERTO R. GONZALES

**BODY:**


U.S. SENATE JUDICIARY COMMITTEE HOLDS A HEARING ON
OVERSIGHT OF THE DEPARTMENT OF JUSTICE

JULY 24, 2007

SPEAKERS:
SEN. PATRICK J. LEAHY, D-VT.
CHAIRMAN
SEN. EDWARD M. KENNEDY, D-MASS.
SEN. JOSEPH R. BIDEN JR., D-DEL.
SEN. HERB KOHL, D-WIS.
SEN. DIANNE FEINSTEIN, D-CALIF.
SEN. RUSS FEINGOLD, D-WIS.
SEN. CHARLES E. SCHUMER, D-N.Y.
SEN. RICHARD J. DURBIN, D-ILL.
SEN. SHELDON WHITEHOUSE, D-R.I.
SEN. BENJAMIN L. CARDIN, D-MD.

Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

SEN. ARLEN SPECTER, R-PA.
RANKING MEMBER
SEN. ORRIN G. HATCH, R-UTAH
SEN. CHARLES E. GRASSLEY, R-IOWA
SEN. JON KYL, R-ARIZ.
SEN. JEFF SESSIONS, R-ALA.
SEN. LINDSEY GRAHAM, R-S.C.
SEN. JOHN CORNYN, R-TEXAS
SEN. SAM BROWNBACK, R-KAN.
SEN. TOM COBURN, R-OKLA.


*

LEAHY: Good morning.

I'd ask those who are standing in the back to show courtesy to the people who are -- who stood in line to be here to sit down. Everybody is welcome here who's here.  But I would expect all those who are in here for the hearing to respect the rights of everybody who's here and to not stand and block those who are trying to watch the proceedings and have a right to be here.

Three months ago, when Attorney General Gonzales last appeared before this committee, I said that the Department of Justice was experiencing a crisis of leadership perhaps unrivaled during its history.  Unfortunately, the crisis has not abated.  Until there is independence and transparency and accountability, the crises will continue.

The attorney general's lost the confidence of the Congress and the American people.  But through oversight we hope to restore balance and accountability to the executive branch.

The Department of Justice must be restored to being worthy of its name.  It should not be reduced to another political arm of the White House; it was never intended to be that.  Trust and confidence of the American people in federal law enforcement must be restored.

With the department shrouded in scandal, the deputy attorney general's announced his resignation.  The nominee to become associate attorney general requested that his nomination be withdrawn, rather than testify under oath at a confirmation hearing.  The attorney general's chief of staff, the deputy attorney general's chief of staff, the department's White House liaison and the White House political director have all resigned, as have others.

I would joke that the last one out the door should turn out the lights, but the Department of Justice is too important for that.  We need to shine more light there, not less.

LEAHY: Investigation into the firing for partisan purposes of United States attorneys who had been appointed by this president, along with an ever-growing series of controversies and scandals, have revealed an administration driven by a vision of an all-powerful executive over our constitutional system of checks and balances, one that values loyalty over judgment, secrecy over openness and ideology over competence.

The accumulated and essentially uncontroverted evidence is that political considerations factored into the unprecedented firing of at least nine United States attorneys last year.  Testimony and documents show that the list was compiled based on input from the highest political ranks in the White House, that senior officials were apparently focused on the political impact of federal prosecutions and whether federal prosecutors were doing enough to bring partisan voter fraud and corruption cases, and that the reasons given for these firings were contrived as part of a cover-up.

What the White House stonewalling is preventing is conclusive evidence for who made the decision to fire these federal prosecutors. We know from the testimony that it was not the president. Everyone who's testified has said that he was not involved. None of the senior officials at the Department of Justice could testify how people were added to the list or the real reasons that people were included among the federal prosecutors to be replaced. Indeed, the evidence we've been able to collect points to Karl Rove and the political operatives at the White House.

The stonewalling by the White House raises the question, what is it that the White House is so desperate to hide?

The White House has asserted blanket claims of executive privilege despite officials' contention that the president was not involved. They refuse to provide any factual basis for their blanket claims, have instructed former White House officials not to testify about what they know and then instructed Harriet Miers to refuse even to appear as required by a House Judiciary Committee subpoena.

Now, anonymous officials are claiming that the statutory mechanism to test White House assertions of executive privilege no longer govern. In essence, the White House asserts its claim of privilege is the final word, the Congress may not review it and, of course, there's no court dare review it. Here again, this White House claims to be above the law.

My oath, unlike those who have apparently sworn their allegiance to the president, is to the United States Constitution. I believe in checks and balances and in the rule of law.

Despite the stonewalling and obstruction, we've learned that Todd Graves, U.S. attorney in the Western District of Missouri, was fired after he expressed reservations about a lawsuit that would have stripped many African-American voters from the rolls in Missouri. When the attorney general replaced Mr. Graves with Bradley Schlozman, the person pushing the lawsuit, that case was filed and ultimately, of course, was thrown out of court.

LEAHY: Once in place in Missouri, though, Mr. Schlozman also brought indictments on the eve of a closely contested election, despite a Justice Department policy -- longstanding policy not to do so.

This is what happens when a responsible prosecutor is replaced by one considered a, quote, "loyal Bushie," for partisan political purposes.

Mr. Schlozman also bragged about hiring ideological soul-mates.

Monica Goodling, likewise, admitted crossing the line when she used a political litmus test for career prosecutors and immigration judges.

And rather than keep federal law enforcement above politics, this administration is more intent on placing its actions above the law.

The attorney general admitted recently in a video for Justice employees that injecting politics into the department's hiring is unacceptable. But is he committed to corrective action and rooting out the partisanship in federal law enforcement?

His lack of independence and tendency to act as if he were the president's lawyer rather than the attorney general of the United States makes that doubtful.

From the infamous torture memo to Mr. Gonzales' attempt to prevail on a hospitalized Attorney General Ashcroft to certify an illegal eavesdropping program to the recent opinion seeking to justify Harriet Miers' contemptuous refusal to appear before the House Judiciary Committee, the Justice Department has been reduced to the role of an enabler for this administration.

What we need instead is genuine accountability and real independence.

Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

We learned earlier this year of systematic misuse and abuse of national security letters, a powerful tool for the government to obtain personal information without the approval of a court or a prosecutor.

The attorney general has said he had no inkling of these or other problems with vastly expanded investigative powers.  But now we know otherwise.  Recent documents obtained through the Freedom of Information Act lawsuits and reported in The Washington Post indicate that the attorney general was receiving reports in 2005 and 2006 of violations in connection with the Patriot Act and abuses of national security letters.

Yet, when the attorney general testified under oath before the Senate Select Committee on Intelligence in April 2005, he said that the track record established over the past three years has demonstrated the effectiveness of the safeguards of civil liberties put in place when the act was passed.

Earlier this month, in response to written questions I sent to the attorney general about when he first learned of problems with national security letters, he once again failed to mention these reports of problems.

LEAHY: Only with the openness and honesty that brings true accountability will the department begin to move forward and correct the problems of the last few years.

Instead we have leadership at the Department of Justice who, when expressions of concerns and admissions of mistakes were made, only follow public revelations, and amount to regrets, really, not that mistakes and excesses were made but apparently regrets that somebody found out about those excesses.

In the wake of growing reports of abuses of national security letters, the attorney general announced a new internal program.  This supposed self-examination, with no involvement by the courts, no reports to Congress, no other outside check, essentially translates to "trust us."

Well, with a history of civil liberty abuses and cover-ups, this administration has squandered our trust.  I am not willing to accept a simple statement of "trust us." I don't trust you.

Early Internal Revenue reviews, like the Intelligence Oversight Board and the Privacy and Civil Liberties Oversight Board have been ineffective and inactive, failing to take action on the violations reported to them.  Only with a real check from outside on the executive branch could we have any confidence that abuses will be curbed and balance restored.

And the tragic dimension of the ongoing crisis of leadership at the Justice Department is the undermining of good people and the crucial work that the department does.

Thousands of honest, hardworking prosecutors and agents and other civil servants labor every day to detect and prevent crime, uncover corruption, promote equality and justice, and keep all Americans safe from terrorism.

LEAHY: But sadly, prosecutions will now be questioned as politically motivated.  Evidence will be suspected of having been obtained in violation of laws and civil liberties.

Once the government shows a disregard for the independence of the justice system and the rule of law, it's very hard to restore the people's faith.  And it's going to be very hard to restore my trust in what is going on.

This committee will do its best to try to restore independence, accountability and commitment to the rule of law to the operations of the Justice Department.  That is something that both Republicans and Democrats can agree on.

Senator Specter?

SPECTER: Thank you, Mr. Chairman.

Attorney General Gonzales, I direct the remarks in my opening statement to you.

Your photo appears in the morning press with the caption, "I accept full responsibility." Let me suggest to you that that is not enough.  The question is whether the Department of Justice is functioning as it must in order to protect the vital interests of the American people.

Next to the Department of Defense, the Department of Justice has the major responsibility for protecting American security: investigation of terrorism, dealing with drug sales, dealing with organized crime, violent crime.  And the issues relating to the resignations of the U.S. attorneys has placed a very heavy cloud over the department.  There is evidence of low morale -- very low morale, lack of credibility -- candidly, your personable credibility.

The department is dysfunctional, as so many items have arisen where there is a substantial basis to conclude that there's a preoccupation with the investigation on the resignations of the attorneys.

And I have asked you, both formally in this room and in our private conversations, to give us an explanation as to why each one of these U.S. attorneys was asked to resign, and that has not been done.

We have sought an accommodation to question the remaining witnesses, and I believe that the administration has not had any significant degree of flexibility in trying to work it out with congressional oversight.

I believe we're prepared to concede that there won't be an oath, because there are penalties otherwise; prepared to concede that they could be in private, although they ought to be public, it's the public's business; prepared to concede that both houses wouldn't have to engage in the questioning of these witnesses, that a representative group from the House Judiciary Committee and the Senate Judiciary Committee -- bipartisan, bicameral -- would do the questioning.

SPECTER: But not to have a transcript, I think is patently unreasonable.

But I'm prepared even to do that, if we could get on with this matter, reserving the right for Congress to come back if the informal interviews are unsatisfactory, then to proceed with our authorities under subpoenas.  And we were met with a response, "No, if you question these witnesses under our unilateral terms, you can't come back later."

Well, that's simply going too far.  I do not believe that the Congress has the right to give up our power.  We cannot delegate them, we cannot abrogate them.  They are our responsibilities.  And we cannot give them up as part of an arrangement with the administration.

And now we have a very remarkable turn of events. We now have the indication -- announcement that the administration will preclude the U.S. attorney from the District of Columbia from pursuing a contempt citation.

SPECTER: Now, if that forecloses a determination of whether executive privilege has been properly imposed, then the president in that manner can stymie congressional oversight by simply saying there is executive privilege.  Since we can't take it to the court, the president's word stands and the constitutional authority and responsibility for congressional oversight is gone.

Now, that is carrying this controversy to really an incredible level.  If that is to happen, the president can run the government as he chooses, answer no questions, say it's executive privilege.  You can't go to court, and the president's word stands.

Now, we've been exploring some alternatives.  And I'll be asking you about them.

The attorney general has the authority to appoint a special prosecutor.  You're recused, but somebody else could do it.  You're recused because you know all of the principals.  You have a conflict of interest.

SPECTER: Your recusal is understandable.

But doesn't the president have an identical conflict of interest?

Can the president foreclose the Congress for moving ahead and making an effort at having a judicial determination as to the propriety of the claim of executive privilege?

We also have the alternative of convening the Senate and having a contempt citation and trying it in the Senate. That might be productive.

We could use the precedent of the Alcee Hastings impeachment proceeding, where a committee took over. We had it in this room. I was the vice chairman. Senator Bingaman was the chairman. So we wouldn't take up the full time of the sentiment (sic) in moving for a contempt citation.

But we're going to have to move ahead on that, Mr. Attorney General.

We have so many items that every week a new issue arises. And I sent you letters advising you that we would be pursuing these matters at this hearing.

One is on the legality for the terrorist surveillance program.

You said categorically there has not been any serious disagreement about the program. And yet we know from former Deputy Attorney General James Comey exactly the opposite is true.

This is what he testified. When you and the chief of staff went to extract from then-Attorney General Ashcroft, who was in the hospital under sedation, approval of the program, Mr. Comey, quote: "I was very upset. I was angry. I thought I had just witnessed an effort to take advantage of a very sick man."

I'll be asking you about that, giving you a chance to explain that, although it bedevils me to see any conceivable explanation for your saying "No disagreement," and you're going to the hospital of the attorney general, who's no longer in power -- he's delegated his authority -- and seek to extract approval from him.

SPECTER: It seems to me that it is just decimating, Mr. Attorney General, as to both your judgment and your credibility.

But that's not all. The list goes on and on.

I wrote to you about the death penalty case, where U.S. attorney Paul Charlton could only get five to 10 minutes of the time of the deputy attorney general, who talked to you. You wouldn't talk to him. We'll give you a chance to explain that.

The Patriot Act: You testified repeatedly, no problems. And there's a wealth of information about very serious incidents.

And then this OxyContin case, which has reached the newspapers, where there was malicious, deliberate falsification of the medicine -- people died.

Is your department functioning? Do you review these matters? How many matters are there which do not come to our attention because you don't tell us and the newspapers don't disclose them?

Thank you, Mr. Chairman.

LEAHY: Thank you very much.

And I might mention Senator Specter has requested a hearing on OxyContin. And I think he's absolutely right on

that.

We will have one, at your request.

Mr. Attorney General, please stand and raise your right hand. Do you solemnly swear that the testimony you will give at this time will be the truth, the whole truth, and nothing but the truth, so help you God?

GONZALES: I do.

LEAHY: Go ahead, Mr. Attorney General.

GONZALES: Thank you, Mr. Chairman.

LEAHY: I should note before you start that there will be a series of votes around 10:20 and I'll consult with Senator Specter how best to continue during that time. At most, we will try to limit the break.

Go ahead.

GONZALES: I understand, Mr. Chairman.

I do have the great pleasure to work with over 100,000 dedicated public servants at the Department of Justice. I admire the dedication to pursue justice for all Americans.

GONZALES: The department's many accomplishments are, in reality, their accomplishments. As attorney general, I have worked with these fine men and women to keep our country safe from terrorists, our neighborhoods safe from violent crime and our children safe from predators. As my written statement explains in more detail, when it comes to keeping our neighborhoods safe and protecting our children, the department has made great progress.

In my brief remarks this morning, I want to focus on the department's number one priority, keeping our country safe from terrorists and the urgent need, quite frankly, for more help from Congress in this fight.

As the recent National Intelligence Estimate has -- as well as the attempted car bombings in London and Scotland demonstrate, the threat posed to America and its allies by Al Qaida and other terrorist groups remains very strong.

To respond effectively to this threat, it is imperative that Congress modernize the Foreign Intelligence Surveillance Act of 1978, known as FISA. Doing so is critically important to intelligence gathering, and it really just makes plain sense.

When Congress drafted FISA in 1978, it defined the statute's key provisions in terms of telecommunications technologies that existed at that time. As we all know, there have been sweeping changes in the way that we communicate since FISA became law and these changes have had unintended consequences on FISA's operation.

For example, without any change in FISA, technological advancements have actually made it more difficult to conduct surveillance on suspected terrorists and other subjects of foreign intelligence surveillance overseas.

In April, at the request of the Senate Select Committee on Intelligence, the director of national intelligence transmitted a comprehensive FISA modernization proposal to Congress. The proposal builds upon thoughtful (ph) bills introduced during the last Congress, and the bill would accomplish several key objectives. Most importantly, the administration's proposal restores FISA's original focus on protecting the privacy of U.S. persons in the United States.

FISA generally should apply when conducting surveillance on those in the United States, but it should not apply when our intelligence community targets persons overseas. Indeed, it was advancements in technology and not any policy decision of Congress that resulted in wide-scale application of FISA and its requirement to go to court to

overseas targets.

This unintended consequence has clogged the FISA process and, quite frankly, hurts national security and civil liberties.

GONZALES: As amended, FISA's scope would focus on the subject of the surveillance and the subject's location, rather than on the means by which the subject transmits a communication or the location where the government intercepts the communication.

FISA would become technology-neutral. Its scope would no longer be affected by changes in communications technologies.

The bill would also fill a gap in current law by permitting the government to direct communications companies to assist in the conduct of lawful communications intelligence activities that do not constitute, quote, "electronic surveillance" under FISA.

This is a critical provision that is a necessary companion to any change in FISA's scope.

Importantly, the administration's proposal would provide a robust process of judicial review for companies that wish to challenge these directives.

The administration's proposal would also provide protections from liability to companies that are alleged to have assisted the government in the wake of the September 11th terrorist attacks.

The bill also streamlines the FISA application process to make FISA more efficient, while at the same time ensuring that the FISA Court has the information it needs to make the probable cause findings required.

Finally, the administration's proposal would amend the statutory definition of an agent of a foreign power to ensure that it includes groups who are engaged in international proliferation of weapons of mass destruction or who possess or who are expected to transmit or receive foreign intelligence information while in the United States.

FISA modernization is critically important and we urge the Senate to reform this critical statute as soon as possible.

I am hopeful that this is an area that we can work together with the Congress and this committee. I think we can find common ground on the central principles underpinning the administration's proposal and in particular on the fact that we should not extent FISA's protections to terrorist suspects located overseas.

We already have had several helpful sessions with the Intelligence Committees in the Senate and House on this issue. We look forward to continuing to work with the Senate and this committee on this important endeavor.

Thank you, Mr. Chairman.

LEAHY: Thank you, Mr. Attorney General. And your full statement, of course, will be made part of the record.

We have documents that we have not in answer to a request made by this and other committees, but obtained through Freedom of Information Act lawsuits. They indicate that you received reports in 2005 and 2006 of violations in connection with the Patriot Act, abuses of national security letters. The violations apparently included unauthorized surveillance, illegal searches and improper collection of data.

LEAHY: But when you testified before the Senate Select Committee on Intelligence in April of 2005, you sought to create the impression that Americans' civil liberties and privacies were being effectively safeguarded and respected.

And you said, and I quote, "The track record established over the past three years has demonstrated the

effectiveness of the safeguards of civil liberties put in place when the act was passed."

Then I sent you written questions.  And earlier this month, you responded about when you first learned of problems with national security letters.  But in those responses, you didn't mention these earlier reports of problems.

So my question is this.  As you know, I've written a number of these questions to you in advance so that you will be able to answer.  Would you like to revise or correct your April 2005 testimony to the Senate Select Committee on Intelligence, which was misleading, or your July 6, 2007, response to this committee's written questions, related?

You care to revise either of them?

GONZALES: Thank you for the question, Mr. Chairman.

And I can understand the confusion of concern about my prior statements, which, of course, were made in connection with the discussions about reauthorization of the Patriot Act, and were also made in the context of the I.G.'s investigation of abuses under the Patriot Act, exercising his authority under the Patriot Act to investigate abuses.

And my comments reflect -- are similar to comments made by the director of the FBI...

LEAHY: I don't care if they're similar to anybody else.  They're your comments that I'm concerned about.  I'm not concerned about somebody else's comments.  I'm concerned about yours.  They seemed contradictory.

GONZALES: And my comments reflected the understanding, on my part, Mr. Chairman, that IOB violations -- which is what I want to refer to these, as IOB violations, referrals or violations made to the Intelligence Oversight Board -- that these do not reflect, as a general matter, intentional abuses of the Patriot Act.

LEAHY: Are you saying they're not abuses if they're not committed without malice?  Is that what you're saying?

GONZALES: That's not what I'm saying.

(CROSSTALK)

GONZALES: Obviously, they're very, very -- and every such abuse, because it does constitute abuse, is in fact referred to the IOB and also is in fact referred to the Inspection Division at the FBI.

Now, the good news is that when the referral occurs, there is an examination and appropriate action is taken.

The other bit of good news is, as I have directed, that each IOB referral to the FBI will also be made simultaneously to the National Security Division.  And the National Security Division is going to study these IOBs, make a semiannual report to me, and identify whether or not there are any trends there that we identify.

LEAHY: Well, let me ask you about that.  Because I understand that approximately 500 -- and if you want to go back and elaborate on your answer, I will certainly give you time, because I don't think you've answered the question I asked.

LEAHY: But you keep talking about the Intelligence Oversight Board.  These things are referred to it.

I understand that approximately 500 incidents are annually referred to the Intelligence Oversight Board, but the general counsel of the FBI hasn't received a single response from the board.  I mean, I thought I was the only one that didn't get responses, but apparently 500 a year you don't get back a single response.  The board has not sent forward a single report of potentially unlawful intelligence activities.  But you talk about oversight system and report to that same board.

Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

I mean, I -- you know, is this, "Oh, gosh, we have a problem. We won't tell anybody about it. We'll send it to somebody who will file it away and nothing will ever be heard again, so therefore we have no problems"? It's almost an Alice in Wonderland situation.

GONZALES: I think you've misunderstood my response, Mr. Chairman.

What I said, or certainly intended to say, was the fact that it's referred to the IOB doesn't mean that it stops there. It is also sent to the Inspections Division and appropriate action is taken.

We've also instituted another check by involving the National Security Division so that they can also identify any trends and make suggestions in policies or training so that we can address these kinds of issues.

LEAHY: In April 2005, when you said, "The track record established in the past three years demonstrates the effectiveness of the safeguards" -- that there, basically there hadn't been any violations, was that correct or not? Had there been violations?

GONZALES: What I can say is...

LEAHY: Three years before you testified, had there been any violations?

GONZALES: The violations...

LEAHY: Yes or no?

GONZALES: A violation of IOB may not be a violation of the Patriot Act. In fact, the inspector general, I think, has indicated that.

And, Mr. Chairman, my view and the views of other leadership in the department is in fact when we're talking about abuses of the Patriot Act, we're talking about intentional, deliberate misuse of the Patriot Act, not when some agent writes down the wrong phone number in a national security letter.

And, of course, whenever a mistake like that happens, of course we address it and appropriate action is taken.

LEAHY: Such as?

GONZALES: We institute training for -- additional training. It's a question of providing additional guidance, providing additional training or disciplinary action against the agent.

LEAHY: Well, (inaudible) ask you this. We have 93 United States attorneys. Only 70 have been confirmed by the Senate. Any idea when we're going to get -- six have just been sent up -- when we're going to get the 17 remaining ones?

GONZALES: We are working as hard as we can with the White House and with members of Congress so that we can go through the vetting process, evaluation process, so we can make recommendations to the president.

The full intent is that, as I've committed to this committee, is that we are going to have Senate-confirmed U.S. attorneys in these positions.

LEAHY: I would hope so, because you tried to do that backdoor thing you got inserted into the law. And the Congress has repealed that because of revulsion (ph) of the use of it. The president signed that.

My last question is this: As you know, if either the Senate or House finds somebody in contempt, they have to refer it to the U.S. attorney for the District of Columbia, who has to then not necessarily prosecute, but at least present the

contempt citation to a grand jury to determine whether criminal charges are appropriate.

LEAHY: Last week, the administration said that the U.S. attorney wouldn't be allowed to carry out that.

So my question to you is, if a house of Congress certified a contempt citation against former or current officials for failing to appear or comply with a congressional subpoena, would you permit the U.S. attorney to carry out the law and refer the matter to a grand jury, as required by 2 USC 194, and, therefore, fulfill the constitutional duty to faithfully execute the law, or would you block the execution of the law?

GONZALES: Mr. Chairman, your question relates to an ongoing controversy which I am recused from.  I can't -- I'm not going to answer that question.

LEAHY: Is there anybody left in the Department of Justice who could answer the question?

GONZALES: Of course there is.

LEAHY: Who?

GONZALES: With respect to these kind of decisions...

LEAHY: Who?

GONZALES: ... will be made by the solicitor general.

LEAHY: Well, then we may ask him whether on this refusal to prosecute that the administration talked about, whether that extends to the executive branch lying to Congress,or perjury or destruction of evidence or obstruction of justice.  Because, Mr. Attorney General, those are going to be real issues.  They're not going to be -- they're not going to be just debating points.

Thank you.

Senator Specter?

SPECTER: Let me move quickly through a series of questions -- there's a lot to cover -- starting with the issue that Mr. Comey raises.

You said, quote, "There has not been any serious disagreement about the program."

Mr. Comey's testimony was that Mr. Gonzales began to discuss why they were there, to seek approval, and he then says, quote, "I was very upset.  I was angry.  I thought I had just witnessed an effort to take advantage of a very sick man."

SPECTER: First of all, Mr. Attorney General, what credibility is left for you when you say there's no disagreement and you're party to going to the hospital to see Attorney General Ashcroft under sedation to try to get him to approve the program?

GONZALES: The disagreement that occurred, and the reason for the visit to the hospital, Senator, was about other intelligence activities.  It was not about the terrorist surveillance program that the president announced to the American people.

Now, I would like the opportunity...

SPECTER: Mr. Attorney General, do you expect us to believe that?

GONZALES: Well, may I have the opportunity to talk about another very important meeting in connection with the hospital visit that puts it into context?

It was an emergency meeting in the White House Situation Room that afternoon. It involved senior members of the administration and the bipartisan leadership of the Congress, both House and Senate, as well as the bipartisan leadership of the House and Senate Intel Committees, the gang of eight.

The purpose of that meeting was for the White House to advise the Congress that Mr. Comey had advised us that he could not approve the continuation of vitally important intelligence activities despite the repeated approvals during the past two years of the same activities.

SPECTER: OK.

Assuming you're leveling with us on this occasion...

(CROSSTALK)

SPECTER: No, I want to move to the point about how can you get approval from Ashcroft for anything when he's under sedation and incapacitated -- for anything.

GONZALES: May I continue the story, Senator?

SPECTER: No, I want you to answer my question.

GONZALES: Senator, obviously there was concern about General Ashcroft's condition.

GONZALES: And we would not have sought nor did we intend to get any approval from General Ashcroft if in fact he wasn't fully competent to make that decision.

But General -- there are no rules governing whether or not General Ashcroft can decide, "I'm feeling well enough to make this decision."

SPECTER: But, Attorney General Gonzales, he had already given up his authority as attorney general.

(CROSSTALK)

SPECTER: ... was no longer attorney general.

GONZALES: And he could always reclaim that.

There are no rules...

SPECTER: While he's in the hospital under sedation?

(LAUGHTER)

GONZALES: Again, we didn't know -- we knew, of course, that he was ill, that he'd had surgery...

SPECTER: Not making any progress here. Let me go to another topic.

(LAUGHTER)

Attorney General, I wouldn't -- and I'd like to have a lot of time, but I've got three minutes and 43 seconds left, and seven topics to cover with you.

Mr. Attorney General, do you think constitutional government in the United States can survive if the president has the unilateral authority to reject congressional inquiries on grounds of executive privilege and the president then acts to bar the Congress from getting a judicial determination as to whether that executive privilege is properly invoked?

GONZALES: Senator, you're asking me a question that is related to an ongoing controversy which I am recused -- I will say the president's tried very hard...

SPECTER: Oh, no, no.  I'm not asking you a question about something you're recused.  I'm asking you a question about constitutional law.

GONZALES: You're asking me a question that's related to an ongoing controversy.

SPECTER: I'm asking you whether you can have a constitutional government with the Congress exercising its constitutional authority for oversight if when the president claims executive privilege, the president then forecloses the Congress from getting a judicial determination of it.  That's a constitutional law question.

GONZALES: Senator, both the Congress and the president have constitutional authorities.  Sometimes they clash. In most cases, accommodations are reached.  In very rare instances, they sometimes litigate it in the courts.

SPECTER: Would you focus on my question for just a minute, please?

GONZALES: Senator, I'm not going to answer this question, because it does relate to an ongoing controversy in which I am recused.

(BOOING)

LEAHY: I would note, please, we'll have decorum in here.

Senator Specter has a right to ask all the questions he has.  The attorney general has a right to be heard.  I have indicated to Senator Specter especially that I'm taking some of his time in saying this, so he has extra time.

But, please, let us continue without comments.

SPECTER: I'm not going to pursue that question, Mr. Attorney General, because I see it's hopeless.  It's got nothing to do with your recusal.

You're the attorney general, and you're also a lawyer.  And we're dealing with a very fundamental controversy, where the president is exerting executive authority under executive privilege and the Congress is exerting constitutional authority for oversight.  And we're trying to take it to court.

The court decides when that conflict exists.  It's got nothing to do with, necessarily, the U.S. attorneys who were asked to resign.

Let me move ahead to another subject, see if I get an answer here.

You have a conflict of interest on the matter involving the resignations of the U.S. attorneys.

GONZALES: Yes.  I'm recused for that.

SPECTER: Does the president have a conflict of interest in deciding whether or not to allow a contempt citation to go forward to a former White House counsel, Harriet Miers?

GONZALES: Senator, I am not going to answer that question. Again, you're talking about -- asking me questions about a matter in which I am recused.  I'm not going to answer that question.

SPECTER: Well, let's see if somehow, somewhere, we can find a question you'll answer.

(LAUGHTER)

How about the death penalty case?  I wrote you about this.

Had a man who was convicted of murder.  The victim's body was never recovered. There was no forensic evidence directly linking the defendant to the victim's death.  The U.S. attorney, a man named Paul Charlton, contacted your office and said, "I don't think this is a proper case for the death penalty."

SPECTER: Deputy Attorney General Paul McNulty had a conversation with Mr. Charlton and had a conversation with you.  And then McNulty's chief of staff, Mike Ellston, called Charlton.  And this is Charlton's testimony: "Ellston indicated that McNulty had spoken to the attorney general and that McNulty wanted me to be aware of two things; first, that McNulty had spent a significant amount of time on this issue with the attorney general, perhaps as much as five or 10 minutes."

Is that accurate, factually?  Will you answer a question as to a fact, as to whether you talked to McNulty about this case for as much as five or 10 minutes?

GONZALES: I have no specific recollection as to this particular case.

But I can tell you, we have a very detailed process, where hours are spent by lawyers, including the U.S. attorney, our capital case review unit, who then make recommendations to the deputy attorney general...

SPECTER: I'm not interested in that.  I'm interested in an answer to my question.  If you don't know, if you don't remember...

GONZALES: I don't -- I don't...

SPECTER: Wait a minute.  I'm not finished asking you a question.

If you don't know or you don't remember what happened when you stood on a decision to have a man executed -- that's what you're saying.

GONZALES: I have no specific recollection about the amount of time that I talked with Paul McNulty on this particular issue.

SPECTER: Well, would you disagree with McNulty that it was five to 10 minutes?

GONZALES: I can't agree with that if I don't recall, Senator.

SPECTER: OK, you can't agree with it.  I didn't ask you that.  I asked you if you disagreed with it.

GONZALES: I can't agree or disagree with it.

SPECTER: Would you say that five to 10 minutes would be a, quote, "significant amount of time" for you to spend on a case involving the death penalty?

GONZALES: It would depend on the circumstances of the case and the recommendations coming up and the facts.  Those would all dictate how much time I would spend, personally, on a particular case.

Because we have a very extensive review process within the department, where hours are spent analyzing what is the appropriate course of action for the department...

SPECTER: Well, Mr. Attorney General, I'm not totally unfamiliar with this sort of thing. When I was district attorney of Philadelphia, I had 500 homicides a year. I didn't allow any assistant to ask for the death penalty that I hadn't personally approved. And when I asked for the death penalty, I remembered the case.

Thank you, Mr. Chairman.

LEAHY: Thank you very much.

Senator Kohl?

KOHL: Thank you, Mr. Chairman.

Mr. Attorney General, the detention center at Guantanamo Bay continues to harm our image around the world. There's growing consensus on this. Secretary of Defense Robert Gates told the House Committee, quote, "I came to this job thinking that Guantanamo Bay should be closed."

KOHL: According to press reports, Secretary of State Rice has also supported efforts within the administration to close Guantanamo.

And former Secretary of State Colin Powell said, quote, "If it was up to me, I would close Guantanamo -- not tomorrow, but this afternoon."

Last year even the president himself recognized that Guantanamo has been the focus of international criticism and he said, I quote, "I'd like to, quote, 'close Guantanamo.'"

Recent press reports have disclosed that efforts are under way in the administration to do that. According to the New York Times, however, these efforts, quote, "were rejected after Attorney General Gonzales and some other government lawyers expressed strong objections."

So where are you on this? Do you think that we should close Guantanamo?

GONZALES: I wish we could close Guantanamo. I'm with everyone else: We should close Guantanamo.

However, a need remains -- and there are legitimate questions about what do you do with these individuals?

I guess we could turn them loose, Senator, and they could end up fighting against us again. We could bring them into the United States, although I understand the Senate recently rejected that overwhelmingly.

Bringing them into the United States raises some serious legal issues. And as the attorney general, my job was to make sure that all the policy-makers were aware that there were serious legal issues that would arise if in fact they were brought into the United States.

But if your question is, would I support closing Guantanamo? Absolutely, but not at the risk of the lives of our men and women who are fighting overseas and not at the risk of the national security of our country.

KOHL: But we can put them into the American justice system, an American justice system that you know has worked very effectively even with respect to dealing with terrorists and members of Al Qaida. There are ways in which we can restrict classified information, important information.

So if you support closing Guantanamo, then why don't you put into motion the kinds of things that will result in just that?

GONZALES: Senator, I do believe there are legitimate risks involved in bringing people into the United States and

putting them into our system, quite frankly.

KOHL: What are the risks?

GONZALES: Let's say that the evidence that we have is not evidence that we want to compromise in order to bring someone to trial. Once they're into the United States, if they come from a country where if we send them back they may be tortured, they will have the right to ask for asylum. And so we may not have the ability to either hold them or to throw them out of the United States, and we have to let them go.

And so those are, sort of, the nightmare scenarios that we worry about in bringing people into the United States.

KOHL: Are you saying, therefore, that you do not support closing Guantanamo?

GONZALES: I support closing Guantanamo, Senator, but I think we need to do it with our eyes wide open.

I think we probably will come to the Congress and ask for legislation in order to ensure that we can protect this country.

KOHL: Why don't we do that?

GONZALES: That is certainly something that is of serious discussion and debate within the administration.

KOHL: So you may in fact decide to close Guantanamo and come to Congress for authorization.

GONZALES: Again, there's been no decision made by the president. My judgment is the president, like you, wants to close Guantanamo, but, like you, he doesn't want to do so if it means jeopardizing the security of our country.

And so, we're trying to work through these. And you're right, it will ultimately, in my judgment, require additional consultation with the Congress.

KOHL: Mr. Attorney General, consumers today, as you know, are suffering from near-record high gas prices, and most of this is due to the high price of crude oil.

Despite this, the administration has threatened to veto our NOPEC legislation, which would enable the Justice Department, and only the Justice Department, to sue OPEC member nations for violating U.S. antitrust law when they conspire to fix the price of oil, which they do.

This bill passed both the House and the Senate with overwhelming margins. Under this bill, the Justice Department, and only the Justice Department, could institute this kind of a proceeding. So why do you not want this authority?

GONZALES: I think cartels are bad, and we ought to prosecute them and go after them.

GONZALES: I agree with that.

The question is whether or not going after this cartel in this way, through litigation, is the right approach, because you implicate questions of sovereignty and state action. And, you know, it calls into question the fact that, you know, we have a presence overseas and does that mean that either the American government or American businesses are going to be subject to litigation and the jurisdiction of other countries overseas?

I think that that's a concern that we have is the downstream impact, or the result, the impetus that's going to arise as a result of this legislation.

And we think that a better approach is to continue to try to work through this through the Department of Energy

Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

and the Department of State, through diplomatic means.

And that's the concern that we have, Senator.

Again, cartels are bad.  We'd like to deal with it.  I just -- we're concerned that this may not be the best approach.

KOHL: But you don't have to use it.  Because you don't -- you know that the only way in which the legislation can be effected is through the president and the Department of Justice.  So if you think it's legislation that should not be used, so you won't use it.

GONZALES: But once Congress passes the legislation and puts it on the books, what's going to be the response of another country who sees this action taken by the Congress?  And are they going to take some kind of action in response to simply the legislation passing?

It's hard to predict.  I would simply urge the Congress to consider giving the Department of State and the Department of Energy additional time to try to work through this.

KOHL: Mr. Attorney General, since our last oversight hearing, it seems that very little has improved at the Justice Department.  And many of the people in senior positions have resigned, as you know. And according to press reports, these positions have not been filled, in many cases because people have turned down these jobs.  The American public has lost confidence in you according to recent polls. Morale at the Justice Department remains low.  The integrity of the

Office of the Attorney General as an institution is obviously more important, I'm sure you would agree, than the person sitting in it.  In other words, Mr. Attorney General, this cannot be just all about you.

And so, would you please explain to us why the administration of justice and the American people would not be better served by somebody sitting in the office who does not have all of the problems that you possess with respect to believability, credibility, confidence, trust? What keeps you in the job, Mr. Attorney General?

GONZALES: That's a very good question, Senator.

Ultimately I have to decide whether or not it would be better for me to leave or just stay and try to fix the problems. I've decided to stay and fix the problems.  And that's what -- and that's what I have been doing.

You talked about vacancies.  We're at a time in the administration where there are going to be vacancies in agencies. It's just natural.

Obviously there have been changes in personnel at the leadership of the department.  In many ways, that is a good thing.  We've just identified a new interim deputy attorney general who's a career prosecutor.  I think he'll do a great job.

GONZALES: I've got a chief of staff who's also a United States attorney.

And so we've got -- we're bringing in good, experienced people into these positions, because we want to address the question about lack of leadership.  I think we have some strong leadership in the Department of Justice.

We've changed policies.  We've been made aware of some issues relating to some of our policies, with respect to hiring immigration judges, with respect to the honors program, with respect to hiring assistant United States attorneys, with respect to hiring in Civil Rights Division.  And so we've implemented policies to address each and every one of these.

We've also worked very hard to improve communication; not just with the U.S. attorney community, but also with respect to every employee at the Department of Justice.

I think the way you measure morale is you measure output.  And I think if you look at the output at the department these past six months, it's been outstanding.

Sure, we've had to deal with these issues.  They're my responsibility, and I've accepted responsibility for it.  But the wonderful career people at the department continue doing their job day in and day out, and justice is being served in this country.

KOHL: Thank you very much.

Thank you, Mr. Chairman.

LEAHY: Thank you.

Senator Hatch?

HATCH: Thank you, Mr. Chairman.

Well, I want to make it clear that having gone there -- one of the earliest ones to go there -- I do not agree with closing Guantanamo.  The big issue is, even if we did, what do we do with them?  What's the alternative?  I've heard a lot of the senators around here bemoaning the fact they sure don't want these terrorists in their state.  The fact of the matter is, it's a separate place where they can be contained and appropriately so.

So I'm opposed to it, closing Guantanamo.  I think it's ridiculous.  I think the arguments have been ridiculous.  And I hope you will consider changing your mind on that, because I just think it's wrong.

But now, you may not have had -- having said that, I just thought I'd make that point.

You may not have had a full opportunity to explain what happened the day of your hospital visit to Attorney General Ashcroft.  So if you would, please finish your description of those events so we can all understand just what happened there.

GONZALES: The meeting that I was referring to occurred on the afternoon of March 10th, just hours before Andy Card and I went to the hospital.

GONZALES: And the purpose of that meeting was to advise the gang of eight, the leadership of the Congress, that Mr. Comey had informed us that he would not approve the continuation of a very important intelligence activity despite the fact the department had repeatedly approved those activities over a period of over two years.

We informed the leadership that Mr. Comey felt the president did not have the authority to authorize these activities, and we were there asking for help, to ask for emergency legislation.

HATCH: Was Mr. Comey there during those two years?

GONZALES: He was not there during the entire time, no, sir.

HATCH: How much of that time?

GONZALES: I can't recall now, Senator, when Jim Comey became the deputy attorney general.

The consensus in the room from the congressional leadership is that we should continue the activities, at least for now, despite the objections of Mr. Comey.

There was also consensus that it would be very, very difficult to obtain legislation without compromising this program, but that we should look for a way ahead.

Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

It is for this reason that within a matter of hours Andy Card and I went to the hospital.  We felt it important that the attorney general knew about the views and the recommendations of the congressional leadership, that as a former member of Congress and as someone who had authorized these activities for over two years that it might be important for him to hear this information.

That was the reason that Mr. Card and I went to the hospital.

Obviously, we were concerned about the condition of General Ashcroft.  We obviously knew he had been ill and had surgery.  And we never had any intent to ask anything of him if we did not feel that he was competent.

When we got there, I will just say that Mr. Ashcroft did most of the talking.  We were there maybe five minutes -- five to six minutes.

Mr. Ashcroft talked about the legal issues in a lucid form, as I've heard him talk about legal issues in the White House.  But at the end of his description of the legal issues, he said, "I'm not making this decision.  The deputy attorney general is."

And so Andy Card and I thanked him.  We told him that we would continue working with the deputy attorney general and we left.

And so I just wanted to put in context for this committee and the American people why Mr. Card and I went. It's because we had an emergency meeting in the White House Situation Room, where the congressional leadership had told us, "Continue going forward with this very important intelligence activity."

I might also add...

HATCH: That was the gang of eight, you're saying.

GONZALES: Pardon me?

HATCH: That was the gang of eight.

GONZALES: This was the gang of eight.

HATCH: The two leaders in the House, the two leaders in the Senate, the two leaders of the Intelligence Committee in the House and the two leaders of the Intelligence Committee in the Senate, right?

GONZALES: That is correct.

I might also add...

HATCH: Democrats and Republicans?

GONZALES: Democrats and Republicans.

I might also add that the urgency was is that the authorities in question were set to expire the very next day.

HATCH: Right.

GONZALES: And the president believed this was a very important activity, as did the congressional leadership.  In fact, the very next morning we had the Madrid bombings.  And so that puts in perspective the context of the environment that we were operating under.  And these are the reasons why we went to the hospital on the evening of March 10th.

Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

HATCH: Well, thank you, sir.

The administration's made proposals to modernize FISA, of course, and is working with the Judiciary Committee to ensure that appropriate staff members have the necessary information about the terrorist surveillance plans of the administration.

However, some members of the committee have stated that they will not consider any legislation in this area until they receive additional information about the TSP. I do find this logic somewhat questionable, since this very committee not only considered but passed three different bills dealing with FISA modernization during the last Congress.

How do you view the decision to not discuss FISA modernization? Of all issues, isn't this one in which increased attention and expediency is paramount?

GONZALES: This is the most important legislative agenda item for the Department of Justice, FISA modernization.

The threats exist against the United States and we believe that FISA, while it's been a valuable tool, also has made it more difficult to engage in electronic surveillance of foreign targets overseas. We don't believe that was ever the intent of FISA.

It's a policy question. The Congress has to decide, do they want the department and the agency -- NSA, the FBI, the Department of Justice -- utilizing our resources, our agents, our analysts, our lawyers in order to make a probable cause determination and then present it to a judge in connection with a foreign terrorist who's located outside the United States?

GONZALES: Is that what the Congress wants us to do? Because if they do, we'll continue to do it, but I think it's a legitimate question to ask. Is that the right policy for the United States today?

HATCH: You've been accused of wanting to install interim U.S. attorneys to serve indefinitely without Senate confirmation. I don't think there's ever been any evidence for that, but then some accusations could be more useful than they are true.

Since you were first asked about this more than a year-and-a-half ago, you said that it is your intention to have a Senate-confirmed appointee to these positions.

Now, I raise this point to point out that we continue to see nominations to the U.S. attorney positions of men and women who have been serving in an interim capacity. This is exactly what you said the administration intended to do, if I recall it correctly. We've seen this recently in Nebraska, Puerto Rico and elsewhere.

Now, is that your continued commitment: to have Senate-confirmed U.S. attorneys in each jurisdiction?

GONZALES: It is. I believe that U.S. attorneys, quite frankly, are stronger in dealing with other law enforcement counterparts at the federal, state and local level. And it's also, I think, vitally important with respect to the deputy attorney general.

We have, I think, a very strong interim -- we will have soon a very strong interim deputy attorney general, but my intention and hope is that we have someone who is considered and confirmed by the Senate soon.

HATCH: Well, thank you.

Thank you, Mr. Chairman.

LEAHY: Are you saying that the interim attorney general who has served as an interim U.S. attorney in two different places -- his name was never sent up for confirmation for that -- his name will now probably be sent up here for confirmation for something?

GONZALES: His name -- well, I'm not saying that his name will be sent up for confirmation. After the White House has completed its very thorough background investigation and interviews of candidates, the intention is to send up someone for consideration by the Senate to confirm as the deputy attorney general.

LEAHY: He's interim, having been an interim U.S. attorney general in two different jurisdictions?

GONZALES: He is the -- he will be interim as soon as Mr. McNulty leaves.

LEAHY: Thought I'd ask. And you said that -- you spoke of how important it is to you -- to have this committee look at updates for FISA. Have you ever taking even 30 seconds or a minute to call me and tell me that? I mean, I just heard this from you for the first time here. You know, I have a listed telephone number.

GONZALES: I'm sorry. I lost my transmission.

LEAHY: You just said to Senator Hatch that it's extraordinarily important for you that this committee consider updates on FISA laws. Have you ever said that to me? Have you ever picked up the phone and called me or told me that?

GONZALES: Senator, I would be surprised if that hasn't been communicated in a letter, and certainly, it's been communicated to your staff in terms of the importance of FISA modernization.

LEAHY: I have a listed telephone number. Feel free to call anytime.

Senator Feinstein -- if it is that important to you.

FEINSTEIN: Thank you very much, Mr. Chairman.

Mr. Attorney General, I've sat here and listened particularly to the opening comment of the chairman and the ranking member, and in my time in the Senate, I have never heard comments quite like that coming from both sides of the aisle. And then I listened to your response, which was nonresponsive which went into something about FISA, unrelated to anything that had been said.

I don't think you understand what's happening in the Department of Justice, the diminution of credibility, integrity. It's almost as if the walls were actually crumbling on this huge department.

FEINSTEIN: And I listen to you. And nothing gets answered directly. Everything is obfuscated.

You can't tell me that you went up to see Mr. Comey for any other reason other than to reverse his decision about the terrorist surveillance program. That's clearly the only reason you would go to see the attorney general in intensive care.

GONZALES: May I respond to that?

FEINSTEIN: Yes, you may.

GONZALES: OK. You're right. This is an extraordinary event. But we were confronting extraordinary circumstances where we had been advised that something that the department had authorized for two years, they would no longer continue to approve.

We'd just been advised by the congressional leadership: Go forward anyway. And we felt it important that the attorney general, General Ashcroft, was aware of those facts.

Clearly, if we had been confident and understood the facts and was inclined to do so, yes, we would have asked him to reverse the DAG's position. But...

FEINSTEIN: Well, then, why would he have said Mr. Comey is in charge, if you hadn't asked him?

GONZALES: I don't understand the question.

FEINSTEIN: Well, clearly you asked him the question, because James Comey testified to us that...

GONZALES: My recollection, Senator, is -- and, of course, this happened some time ago and people's recollections are going to differ. My recollection is that Mr. Ashcroft did most of the talking. At the end, my recollection is, he said, "I've been told it would be improvident for me to sign. But that doesn't matter, because I'm no longer the attorney general."

FEINSTEIN: OK. All right.

GONZALES: And once he said that, Secretary Card and I didn't press him. We said thank you, and we left.

FEINSTEIN: OK.

GONZALES: But, again, we went there because we thought it important for him to know where the congressional leadership was on this. We didn't know whether or not he knew of Mr. Comey's position and, if he did know, whether or not he agreed with it.

FEINSTEIN: All right. I think we've taken care of this.

What I'd like to establish, once and for all, is who put the names on the list to fire what are now nine U.S. attorneys.

Since you were here last, we've had a number of your top staff appear before us. Kyle Sampson, your former chief of staff, said, "I was the aggregator of input that came in from different sources."

Paul McNulty said it was presented to me as here is the idea and here are the names of individuals that are being identified.

Jim Comey said, "I was not aware there was any kind of process going on."

FEINSTEIN: Bill Mercer said, "I didn't understand there was a list. I didn't keep a list."

Mike Battle: "A decision was made to compile a list. It was made by someone. I had no input. Nobody asked for my input."

Will Moschella: "Since I was not part of that process, I don't have firsthand knowledge."

Mike Ellston: "Kyle asked me to give him my thoughts, give him a draft list. I said, sure. I didn't actually do it. I was very busy."

Who approved those names?

GONZALES: I ultimately approved the list of recommendations that were submitted to me. I accept responsibility.

FEINSTEIN: And how many names did you approve for firing?

GONZALES: I think, on the list that was presented...

FEINSTEIN: Oh, no -- total.  How many names have you approved for firing?

GONZALES: You mean total, for cause, not for cause?

I'd have to get back to you on that.

FEINSTEIN: There were seven on December 7.

GONZALES: Seven on December 7.

FEINSTEIN: We're now up to nine that we know about.  How many -- this is important -- how many U.S. attorneys did you approve to be summarily fired?

GONZALES: Senator, there may have been others.  I would be happy to get back to you with that kind of information about who has left. But I don't know the answer to your question.  But I can certainly find out.

FEINSTEIN: You don't know, after all we've been through, the hearing after hearing after hearing?

GONZALES: Well, in connection with this review process that Mr. Sampson was coordinating, what was presented to me was a list of seven individuals, on December 7.  And so those are the seven that I accepted the recommendation to ask for resignation.

FEINSTEIN: That's right.  But those were the ones that were called on December 7 and told to leave by January 15.

GONZALES: Yes.

FEINSTEIN: There were others also asked to resign.

GONZALES: Yes.

FEINSTEIN: And I'm asking what the total number were.

GONZALES: Well, certainly, Mr. Cummins was asked to leave.  Mr. Graves was asked to leave.  I'm not aware, sitting here today, of any other U.S. attorney who was asked to leave, except there were some instances where people were asked to leave, quite frankly, because there was legitimate cause.

FEINSTEIN: So you're saying these were asked to leave because the cause was not legitimate?

GONZALES: I'm not saying -- no, what I'm saying is wrongdoing, misconduct.  There may been some -- in fact, I'm sure there were others...

FEINSTEIN: What kind of misconduct?

GONZALES: Well, for -- and I'm not suggesting any of this conduct happened, but, for example, an inappropriate relationship, taking action where you have a direct conflict of interest, to help out a buddy, making a -- you know, those kinds of -- something like that, I would say, would constitute misconduct.  And there...

FEINSTEIN: Were those specific things involved in any U.S. attorney that was terminated?

LEAHY: Good question.

GONZALES: No.  With respect to the seven and with respect to Mr. Cummins and with respect to Mr. Graves, I

am not aware that -- certainly, it wasn't, in my mind, a problem or basis to accept the recommendation that they be asked to leave.

FEINSTEIN: All right.  Let me go to something else.  You, of course, recognize these books, "The Federal Prosecution of Election Offenses." In prior hearings, we had the 1995 edition.

FEINSTEIN: Since May of this year, there is now a new edition. I'd like to read to you what has been dropped from the earlier edition.

The first thing that's been removed is this: "The Justice Department generally does not favor prosecution of isolated fraudulent voting transactions.  This is based in part on constitutional issues that arise when federal jurisdiction is asserted in matters having only a minimal impact on the integrity of the voting process." This was removed in this new edition.

The second thing: "The Justice Department must refrain from any conduct which has the possibility of affecting the election itself." This is weakened on page 92.  This language is removed.  "Federal prosecutors and investigators should be extremely careful to not conduct overt investigations during the pre-election period of while the election is under way." Removed.

Then a sentence that's underlined in the '95 edition, which states thus: "Most, if not all, investigations of an alleged election crime must await the end of the election to which the allegation relates." It was removed in this new edition.

Weakened was this language: "It should also be kept in mind that any investigation undertaken during the final stages of a political contest may cause the investigation itself to become a campaign issue."

Why was it necessary to remove this language in this new edition in the Federal Prosecution of Election Offenses rules?

GONZALES: Senator, I don't -- sitting here today, I don't know the answer to that question.  I would like to find out, because I am certainly committed to ensuring that we're smart in the way that we do investigations and prosecutions and we do in a way that doesn't intimidate voters, that doesn't chill potential voters from coming out and voting on Election Day.

So I would like the opportunity to look into this and respond back to you.

FEINSTEIN: Appreciate it.  It becomes more relevant because two and possibly three of the fired U.S. attorneys were fired because they didn't bring those small cases that might affect an election.

And therefore, when one looks at this book now, sees a new book coming out in May '07 that deletes the very things that these U.S. attorneys were told to follow, something's rotten in Denmark.

GONZALES: Thank you for the opportunity for me to look into that.

FEINSTEIN: I appreciate that.

Thank you very much. My time is up.

LEAHY: Thank you.

Thank you very much, Senator Feinstein.

Senator Kyl?

KYL: Thank you, Mr. Chairman.

Mr. Attorney General, as I understand it -- and I'm going to ask you to correct me if I'm wrong, to your knowledge -- the administration position on Guantanamo Bay is that, while it would be nice if we didn't have the need for it and we'd like to be able to close it, we can't because the terrorists who represent a threat to the United States need to be held somewhere and there are no better alternatives.

KYL: Almost nobody wants them in the United States.  You can't just let them go.  Sending them to foreign countries is problematic, among other reasons for the reasons you discussed.

Is that your understanding?  And, if not, what is your understanding?

GONZALES: Yes.

KYL: Do you have any different reasons for desiring to close Gitmo, for example, because to your knowledge or suspicion, is there anything going on down there that might be a violation of either U.S. law or applicable treaties or conventions?

GONZALES: Quite the contrary.  I think if people who have gone down there in this body, from the House, other countries, have come away favorably impressed with what's going on down there.

KYL: I just want to associate myself with the remarks of Senator Hatch.  It would be nice if we didn't have to have any prisons for that matter.  And it would certainly be good if we didn't have to have a place for these threats to America.  But they do have to be held somewhere, and I know of no better alternative than where they're being held right now.

Let me ask you this question about a matter that you know I'm very interested in -- and as a matter of fact in a related, potentially related, matter, there is a scandal now brewing with regard to the National Basketball Association.

Sports entities, in particularly the NFL, major league baseball, basketball, the NCAA -- amateur athletics, have for a long time been concerned about Internet betting, which is illegal under most state laws and we have our federal laws as well.

You have -- and you're aware that on October 13th the president signed into law the Unlawful Internet Gambling Enforcement Act to augment enforcement efforts by targeting offshore gambling operations that are not readily subject to U.S. prosecution.

KYL: There are additional, existing laws -- the Federal Wire Act and money laundering laws that can be and have been used to go after these Internet gambling operators.

I realize that you can't comment on any existing cases, but I'd like for you to just express to the committee generally what your views are with respect to the department's intentions with respect to going after these illegal Internet gambling operations.

GONZALES: Thank you, Senator.  I appreciate your leadership on this issue.

We do believe it's a serious issue because, when you talk about Internet gambling, it's highly-addictive.  Quite frankly, I think it affects our youth.  I think it can be tied to money laundering and fraud, and we think it's tied to organized crime.

There are existing laws on the books, and we can and do enforce those laws.  There are challenges because of the existing laws, challenges because, much of the time, the evidence is offshore.  We may have difficulty in getting the evidence.  Also, because it involves another country, there are sometimes serious issues of extradition.

So we appreciate the additional tools of this Unlawful Internet Gambling Act which bans certain financial payments to support Internet Gambling.

And, as you know, Treasury and the Federal Reserve have primary responsibility for the issuance of these regulations after consulting with the Department of Justice. We've provided input, and so my understanding is that those regs are moving forward.

KYL: The regs -- the proposed regs have been made public. My question really was a broader one. You have engaged in prosecutions under other laws as well, and I was simply giving you an opportunity to express your intentions to continue to enforce all of these laws to the extent that they need to be enforced.

GONZALES: We certainly intend to do that, and you have my commitment, Senator.

KYL: Incidentally, I may have not been clear in my reference to the NBA. I'm not suggesting that there's evidence of illegal Internet gambling with respect to that, but simply wanted to point out that these sports depend on the public's view that they are unadulterated, that they're clean, that they are not being affected by illegal forces.

And that's why they're so supportive of this legislation, to make sure that illegal Internet gambling does not, in any way, intrude into those sports. And I think Americans have a right to have that assurance.

Mr. Attorney General, the FBI is facing a mounting caseload of applications from foreign nationals seeking to enter the United States or to adjust status. The FBI, of course, does background checks, but there is a huge backlog, as you know.

What technologies or resources can Congress secure for the FBI to ensure that's it's able to timely process applications without compromising the safety and security of the American people?

GONZALES: This is a problem that I have discussed with the director. You're talking about background checks, individuals from other countries. It does take us a long time in some cases, because of the fact it requires us to get information and records from other countries.

I know that the director is focused on trying to get additional resources, additional individuals, maybe contract work out to helping in this endeavor. And so he's also looking at new computer system technology, taking advantage of technology...

KYL: Let me just interrupt because of the time.

There's a huge backlog. It shouldn't exist. Do we need to provide additional resources, Congress?

GONZALES: I don't know whether or not additional resources are required from the Congress. I do know that additional resources within the bureau have to be focused on this issue. And it may be -- the director may come to me and say, "Well, if we do that, we're not going to be able to protect America from terrorism the way we ought to be in other areas."

And so I don't know the answer to that. But certainly more resources are necessary. We may already have the resources within the bureau. I suspect the director will say no.

KYL: We need to know if there's something else we can do, because you cannot compromise security and we cannot tolerate the long backlogs that currently exist. So something needs to give here. And if it is that we need more resources, Congress needs to be advised.

Let me quickly, while I have just a second, ask one final question. A U.S. Customs and Border Protection -- DHS reports that 16 percent of foreign nationals apprehended illegally crossing the southern border have criminal histories.

That's about 140,000 individuals in the year 2005.

And if that's not alarming enough, DOJ and the GAO indicate that criminal aliens in the U.S. are re-arrested on an average of six to eight times per offender, which puts a huge strain on both federal, state and local law enforcement officers, prosecutors, courts and our jails.

Is the Department of Justice undertaking any initiatives with DHS to proactively identify and prosecute and remove criminal aliens? And, here again, is there any authority or resource that Congress needs to provide to DOJ to assist in the prosecution of these criminal aliens?

GONZALES: I think that, quite candidly, Senator, if you were to talk to my board of U.S. attorneys, they would say we need more resources. And so, we're always looking at ways to try to find those resources within the existing budget.

Obviously the president has to consider a number of priorities with respect to the budget that he submits to the Congress. And the Congress, of course, ultimately makes the decision as to where those priorities should come out.

But we're having to be smart. We're trying to have -- to be more efficient. But it does present or has presented some challenges for us.

KYL: In effect -- Mr. Chairman, could I just do one follow-up question?

In effect, are you saying...

LEAHY: Go ahead.

KYL: ... you understand the president's budget priorities and needs all across the government but, if more resources could be made available to you, you could certainly take advantage of them, could certainly use them?

GONZALES: We certainly would put them to good use.

LEAHY: Of course, you're also aware that the president said if we put any money in there beyond what he's asked for, he'll veto the bill?

Senator Cardin?

CARDIN: Thank you very much, Mr. Chairman.

General Gonzales, I want to return to the U.S. attorney issue, because I think there is a great deal of concern and a lot of questions that have not been answered, and I want to give you a chance to do that.

You have offered conflicting testimonies as to who was responsible for the firing of the U.S. attorneys. We still don't know. And Senator Feinstein's questions really weren't answered. We don't know who was responsible for a particular name ending up being fired.

So let me just go over the U.S. attorneys who were fired and the concern that I think Americans have that your commitment to make sure the Department of Justice is not politicized is exactly what happened with the U.S. attorneys that were fired.

Mr. Iglesias was involved in New Mexico as U.S. attorney investigating certain Democratic -- Democrats. The prominent Republicans were very unhappy with the timing of that investigation, which I think has now become public. So there was a concern that the U.S. attorney wasn't doing what the local political establishment -- Republican establishment -- wanted.

In Nevada, there was an investigation of the Republican governor by the U.S. attorney, which certainly didn't make the local political establishment happy.

In Arizona, there was an investigation of two Republican members of Congress, which was not happy with the local Republican establishment in Arizona.

In Arkansas, there was an investigation by Mr. Cummings in regards to a Republican governor that was creating a lot of controversy.

In California, with Ms. Lam, there was the indictment and conviction of Duke Cunningham, but then the expansion of that investigation, which had Republicans concerned.

CARDIN: In Washington, the U.S. attorney declined to intervene in a disputed gubernatorial election, which angered the local Republican establishment.

And then, of course, Mr. Graves in Missouri -- we've already talked about the voter fraud investigations and the fact that the local political establishment was unhappy with that.

Here we have an unprecedented removal of U.S. attorneys without a change in party in the White House. And we look at those who were removed and find, in almost all cases, they were involved in highly visible political issues that were unpopular to the Republican establishment.

What is one to think?

And we don't have the answers from the White House. We don't have the answers from you. And we're having a very difficult time getting the information without the exertion of executive privilege.

So where do we go, in our -- what comfort can you give me that, in fact, these U.S. attorneys were fired for legitimate reasons and not because of political considerations, which all of us agree would be outrageous and wrong, if not illegal.

GONZALES: Well, Senator, I have already said repeatedly that I did not accept these recommendations with the understanding that this was to punish or interfere with an investigation for purely partisan reasons.

I accept responsibility for this. Senator Feinstein asked me: Who put the names on the list?

Quite frankly, I'm assuming this committee has talked to everyone involved in putting those names on the list and has asked that question.

CARDIN: But you haven't talked to the people in the White House?

GONZALES: I did not put the names on the list. I accepted the recommendations. There were some names on the list, the recommendations made to me, that didn't surprise me, based upon my -- what I'd heard of performance during my tenure as attorney general.

But no one, as far as I know, placed anyone on the list -- and I certainly did not accept the recommendation -- in order to punish someone because they -- they -- they...

CARDIN: But you don't know who put the names on the list?

At least, haven't quite figured out who put the names on the list...

GONZALES: That is correct.

CARDIN: So how do you know someone didn't put the names on the list because of partisan political...

GONZALES: Based on what I know, Senator -- that's what I know. You've had the opportunity, I think, to talk to everyone involved, or ask questions of those involved, more so than I.

The Office of Inspector General and OPR -- they're doing an investigation as well, to try to find out exactly how these names got on the list.

CARDIN: Let me move on to a second issue that troubles me, from your testimony today. And that is, you have talked about your visit to the hospital, the preliminary meetings with the leadership in Congress.

Those meetings are not public meetings, are they?

GONZALES: Well, what do you mean, with Congress?

CARDIN: With the gang of eight?

GONZALES: Well, I'm not sure that this meeting has been talked about, although I'm told this meeting has been -- information about the existence of this meeting has been transmitted to the Congress, I think, in a communication from the administration.

CARDIN: When you briefed the leadership of Congress and the leadership on the Intelligence Committee, are those briefings done in open session?

When you seek their advice, are they in open session?

GONZALES: No.

CARDIN: And are those proceedings kept confidential?

GONZALES: In most cases...

CARDIN: And the advice that the Congress gives you at those meetings are not released or made public?

GONZALES: In most cases, that is true.

CARDIN: And I would just suggest to you, to the extent that there is importance of confidence in working with the congressional leadership, the president's using the executive privilege to not make information available to Congress, it seems to me that you're being very selective in what information you're making available publicly.

GONZALES: Senator, I believe it's important, when people question and wonder what in the world were Andy Card and I doing going to the hospital, that it be placed in the appropriate context.

CARDIN: You're exactly right. And we want the appropriate context of the firing of the U.S. attorneys. We're entitled -- we have a responsibility to get that information.

CARDIN: And the White House -- when Sara Taylor testified, she was very clear about being able to give information that was self- serving to the White House but when we're trying to get independent information, we can't get it.

Do you understand our frustration?

GONZALES: I do understand your frustration.

CARDIN: Let me just -- I have only a few seconds left. I want to make sure I cover this last point, which is the hiring in the U.S. attorney's office.

And I very much appreciate your statement in your prepared testimony where you say, "There is no place for political considerations in the hiring of our career employees or in the administration of justice." You further assert that you plan to remain in office to fix the problem. I'm pleased that you acknowledge a problem.

We had a hearing in the Judiciary Committee with the Civil Rights Division in which the way career attorneys are now hired has been changed. It used to be that there was a -- career attorneys that reviewed those applications and made recommendations for the hiring of U.S. attorneys for the Civil Rights Division. That was taken over by political appointees.

I hope in your efforts to fix the problem that you will go back to a nonpartisan environment for selecting the career attorneys in the Department of Justice. We've had testimony here from Monica Goodling and others about White House interference and political interference that crosses the line.

And I hope as part of your efforts to fix the problem that you'll remove the political appointees from making certain recommendations or standards on bringing in career attorneys or firing or removing or repositioning career attorneys.

GONZALES: Thank you, Senator. I think we have taken those kinds of steps.

CARDIN: Thank you, Mr. Chairman.

LEAHY: Thank you.

Senator Grassley was actually the first one here, but is, like all of us, juggling more than one committee assignment. I'll recognize him now.

GRASSLEY: Thank you.

I was sharing my time with the Finance Committee.

Mr. Chairman, I have a list of outstanding requests and documents and information from the FBI, and I'm going to ask that this be put in the record and I'm going to refer to it.

LEAHY: Without objection, all the material will be part of the record.

And also without objection, opening statements by various senators who have asked be put in the record will be placed in the record as though read.

GRASSLEY: Thank you.

Mr. Attorney General, the request for documents and information relate to the oversight involving Special Agent Jane Turner, Special Agent Cecilia Woods, the Amerask (ph) investigation and e-mails relating to exigent letters that we detailed in the national security letters report.

I continue to wait for these responses, some of them months overdue. And as the FBI is a component of the Department of Justice and I'm doing it here at this hearing, to ask if you would personally ensure the prompt delivery of all information requested.

GONZALES: I'll personally assure you of the prompt delivery of the appropriate information requested.

GRASSLEY: I want to refer to the False Claims Act and its use in Iraq contracting.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON OVERSIGHT OF THE U.S. DEPARTMENT OF JUSTICE CQ Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

GRASSLEY: I am referring to a Boston Globe, June 20th, 2007, entitled, "Justice Department Opts Out of Whistleblower Suits, Cases Alleged Fraud in Iraq Contract."

The article noted that the department declined to intervene in 10 false claims act -- whistleblower cases raising allegations of fraud, waste and abuse in contracts during reconstruction in Iraq.

Further, the article states that the department has only reached two civil settlements with contractors in Iraq, totalling $6.10 million. Congress has appropriated hundreds of billions of dollars to fund our troops and to support contractors as well as reconstruction projects, so I find it hard to believe that only $6.10 million has been lost to fraud and abuse by government contractors.

For instance, in government programs such as Medicaid, we know that fraud in program is around 5 percent and maybe higher. It's hard to imagine that fraud in Iraq would be less, but I'll leave the numbers to experts.

In addition, April 19th, 2006, a Wall Street Journal quotes critics of the department as saying, "The current administration's use of judicial seal of False Claims Act cases is unprecedented. Its critics argue that the department is using the judicial seal as a means to mask the true extent of possible fraud in Iraq."

So, General Gonzales, how many -- I want to ask -- well, let me ask a couple of questions at a time. I've got six questions in this series.

How many False Claims Act cases alleging fraud in Iraq has the department joined since 2003?

GONZALES: I think the answer to that -- I think there were 26, but I'd like to confirm that if I can. I think that's in the neighborhood.

GRASSLEY: OK.

Is the Boston Globe article accurate in stating that the department has declined intervention in 10 false claims cases alleging contract fraud in Iraq, and if so, why?

GONZALES: I don't know if that number is correct. But I will tell you, of course, the fact that we make -- we decline doesn't mean that we don't follow the case. We still remain the real party in interest, and so we closely monitor these cases. And we may decide to intervene at a later point in time. We may decide to file an amicus to protect the interest of the United States.

And so the fact that we have declined doesn't mean that we're not going to get involved in any way going forward.

GRASSLEY: Well, for the public and Chuck Grassley, it seems to me that declination of intervention does signal an unwillingness to pursue Iraq contracting fraud cases.

GONZALES: No, what it means is that we have to look at the cases and decide is there now, at this time, a judgment that we can prosecute these cases.

We have been very, very successful in those cases where we decide to join, because we evaluate the cases carefully and we think, "OK, there's something there. We can win this case."

In those cases where we don't join, the relator (ph) doesn't fare nearly as well, because they are taking on cases that are very, very difficult and they can't prove them. And so, we're trying to be smart in utilizing the resources that we have and prosecuting those cases where we think the evidence will support the charge.

GRASSLEY: OK.

Are there currently any FCA cases under seal relating to Iraq fraud contracting?

GONZALES: I believe the answer to that is yes, because, again, these are difficult cases and it takes us a period of time -- sometimes people would argue too long -- to decide whether or not we're going to intervene and join the case.

GRASSLEY: Let me ask you lastly on this point: How do you respond to the criticism outlawed -- outlined in the Wall Street Journal article? Is the department trying to escape accountability by using the seal as a shield? That's what was stated.

GONZALES: No. Far from it.

In fact, we want to expose fraud and mismanagement and waste, quite frankly, I think. And we have a special obligation at the department. If people are going to contract with the United States, they ought to be held to the highest standard.

And so, again, we use it as a way to protect the interests of the United States in litigation.

GRASSLEY: I want to go to the United States DRC, Inc. v. Custer Battles.

February 17th, 2005, I wrote you regarding this case, urging the department to comply with the request of district judge to file a brief on the issue of whether the Coalition Provisional Authority -- I'm going to refer to that as CPA -- was a government entity under the False Claims Act.

GRASSLEY: On April the 1st, 2005, the department filed a brief stating the government's position that knowingly false claims presented to the CPA by Custer Battles, if proven, would violate the False Claims Act.

The department also stated that, notwithstanding the brief, they declined to intervene with the whistleblowers.

Ultimately, the jury found Custer Battles violated the FCA and should return $10 million to the U.S. government. However, the judge overturned the verdict and dismissed the case, finding that the plainees (ph) failed to prove the false claims were actually submitted to the government. The department has filed a brief supporting the whistleblowers' position on appeal to the Fourth Circuit.

Why did the department decline to intervene in district court, yet continue to support to support the appellate litigation?

And lastly, is the department concerned that failing to intervene at an earlier time may lead to decisions that are detrimental to the False Claims Act?

GONZALES: It is a pending case, Senator, so I'm limited about what I can say.

But going back to a response to an earlier question, the fact that we don't intervene at the initial stages -- I mean, that we don't follow the case and we do have the opportunity, like we see in this case, of filing an amicus in the Fourth Circuit in order to protect the interests of the United States.

And so clearly, when we make a decision not to intervene, that doesn't mean that the interests of the United States are going to be jeopardized downstream. We do have the opportunity to file something to ensure that the interests of the United States are protected.

As to the individual decision, as to why we didn't get involved in the case in the first place, I don't have an answer to you but I'd be happy to go back and look at it.

GONZALES: If there's something we could provide to you, I'd be happy to do so.

GRASSLEY: I would like to have you provide that in writing.

Thank you, Mr. Chairman.

LEAHY: Thank you very much.

The attorney general has asked if we might take a brief break, and I should have asked for that before.  But, yes, we'll stand in recess briefly.

GONZALES: Thank you, Mr. Chairman.

PROTESTER: Fire him. (OFF-MIKE)

LEAHY: You know, we're going to have quiet.  We're going to have quiet in this committee room.

PROTESTER: (OFF-MIKE)

LEAHY: We're also going to have people stop blocking -- stop blocking others who are here.  And, in one instance, I have been told of a person who was here who was harassed because somebody else wanted her seat.  There will be none of that, or I will have the police remove those doing it.

Just want to make it clear.

(RECESS)

LEAHY: I have been advised that the vote originally scheduled on the Senate floor will be somewhat later; probably in about an hour there'll be a couple votes.  I'm hoping we can finish the first round before then.

And, Senator Whitehouse, you're now recognized.

WHITEHOUSE: Thank you, Mr. Chairman.

Mr. Gonzales, just before our little break, you indicated, in describing your reason for visiting the stricken attorney general in his hospital room was to alert him to the change in the Department of Justice view of the program at issue.

And you testified that Attorney General Ashcroft -- and these are the words that I wrote down -- quote, "Authorized these activities for over two years."

Is it your testimony, under oath, that Attorney General Ashcroft was read into and authorized the program at issue for two years prior to your visit to him in that hospital?

GONZALES: I want to be very careful here, because it's fairly complicated.

What I can say is I'm referring to intelligence activities that existed for a period of over two years and what we were asking the Department of Justice to do was -- which they had approved and what we...

WHITEHOUSE: "They had approved" I guess is the point that I'm getting at.

GONZALES: General Ashcroft, yes.

WHITEHOUSE: You're saying that Attorney General Ashcroft...

GONZALES: Yes.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON OVERSIGHT OF THE U.S. DEPARTMENT OF JUSTICE CQ
Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

WHITEHOUSE: ... had authorized this program for over two years prior to that day...

GONZALES: General Ashcroft had authorized these very important intelligence activities for a period of two years.  We had gone -- we had gone to the deputy attorney general and asked him to reauthorize these same activities.

But there are facts here, and I want to be fair to everyone involved.  They're complicated.  And we have had discussions in the Intel Committees about this issue.  I'll try to be as forthcoming as we can.

Let me just say I believe everyone acted in good faith here.  All the lawyers worked as hard as they could to try to find a way forward, the right solution.

But, yes.  I mean, the view was is that these activities had been authorized.

GONZALES: We informed...

WHITEHOUSE: By Attorney General Ashcroft?

GONZALES: By Attorney General Ashcroft.  But there are additional facts here that -- I want to be fair.  And it's complicated, but...

WHITEHOUSE: I'm just trying to nail that one fact down. I'm not trying to...

GONZALES: Well, I'm not sure that I...

(CROSSTALK)

GONZALES: I'm not sure I can give you complete comfort -- I'm not sure I want to give you complete comfort on that point, out of fairness to others involved in what happened here.

I want to be very fair to them.  But what I'm -- what we are talking about...

WHITEHOUSE: (inaudible) different question.

LEAHY: Why not just be fair to the truth?

Just be fair to the truth and answer the question.

(APPLAUSE)

WHITEHOUSE: Was Attorney General Ashcroft read into, and did he approve the program at issue from its inception?

GONZALES: General Ashcroft was read into these activities, and did approve these activities...

WHITEHOUSE: Beginning when?

GONZALES: From the very beginning.  I believe, from the very beginning.

WHITEHOUSE: All right.

GONZALES: But, well...

WHITEHOUSE: I'm sorry?  My question...

(CROSSTALK)

GONZALES: Again, it's very complicated.  And I want to be fair to General Ashcroft and others involved in this.  And it's hard to describe this in this open setting.  We've tried to be -- we've tried to discuss -- we have discussed in the Intel Committees, in terms of exactly what happened here.

But I can't get into the fine details, quite frankly, because I want to be fair to General Ashcroft.

WHITEHOUSE: And I think it's also important that people know whether or not a program was run with or without the approval of the Department of Justice but without the knowledge and approval of the attorney general of the United States, if that was ever the case.

GONZALES: We believe we had the approval of the attorney general of the United States for a period of two years.

WHITEHOUSE: For a period of two years?

GONZALES: That is what...

(CROSSTALK)

WHITEHOUSE: Also from the inception of the program?

GONZALES: From the very -- from the inception, we believed that we had the approval of the attorney general of the United States for these activities, these particular activities.

WHITEHOUSE: Would that be reflected in any document?

GONZALES: Yes, it would.

WHITEHOUSE: We'll pursue the document later.

When you went into the attorney general's room at the hospital that night, what document did you have in your hand?

GONZALES: I had in my possession a document to reauthorize the program.

WHITEHOUSE: Where is it now?

GONZALES: I'm assuming the document is at the White House. It was a White House document.

WHITEHOUSE: And it would be covered by presidential records laws?

GONZALES: It is a White House document.

WHITEHOUSE: Director Mueller was involved that evening.  Do you consider Director Mueller to be reasonable, sober and level-headed?

GONZALES: Yes.

WHITEHOUSE: He's a former deputy attorney general, former United States attorney?

GONZALES: Yes.

WHITEHOUSE: Why would he tell FBI agents not to allow you and Andy Card to throw the acting attorney general out of the attorney general's hospital room?

GONZALES: I don't know that he did that, and I can't respond to your question.  I'm not Director Mueller.

WHITEHOUSE: But we have direct testimony that he did.  You can't -- is there any series of events that led up to this that would so provoke him...

GONZALES: I wasn't aware of that comment until I read Mr. Comey's testimony.

WHITEHOUSE: Is there some background to this that would help elaborate why he would have that feeling?

I mean, when the FBI director considers you so nefarious that FBI agents had to be ordered not to leave you alone with the stricken attorney general, that's a fairly serious challenge.

GONZALES: Well, again, I'm not sure that the director knew at the time of the meeting and a conversation that we had had with the congressional leaders.

We were -- again, we were there following an emergency meeting in the White House Situation Room with the gang of eight, who said, "Despite the recommendation of the attorney general, go forward with very important intelligence activities for now and we'll see about moving forward some legislation." And that was important information that led us to go to the hospital room.

The director, I'm quite confident, did not have that information when he made those statements, if he made those statements.

WHITEHOUSE: Is it awkward to supervise the FBI after this piece of history has come out, that the director didn't feel comfortable leaving you alone with the attorney general?

GONZALES: I can't speak for the director's feelings about me. But I still have a great deal of confidence and admiration and respect for Bob Mueller.

WHITEHOUSE: Separate topic: Will you allow the White House to direct United States attorneys how to conduct litigation to which the White House is itself a party?

GONZALES: Would I...

WHITEHOUSE: Would you allow the White House to direct United States attorneys how to conduct litigation to which the White House is a party?

GONZALES: I don't believe so.

Again, you're asking me a hypothetical.  But my reaction to that is no.

WHITEHOUSE: Is there any matter -- any matter that the Department of Justice is involved in in which you would allow the Department of Justice to agree to the investigative terms set by the White House for this committee: no transcript, closed-door interviews, one round of questions only and then nevermore?

WHITEHOUSE: Is there any matter in the department's jurisdiction where you would allow your lawyers to subject themselves to that kind of a restriction in doing their duties?

GONZALES: You know I can't answer that question.

I mean, I don't know.  There may be a matter, but I don't know. I don't know.

WHITEHOUSE: Can you think of one...

GONZALES: Again, I mean, I could probably think of one, so...

WHITEHOUSE: ... where you would allow your lawyers to be subject to those restrictions?

GONZALES: Senator, again, you're asking me is it possible? I'd say virtually anything is possible. But, obviously, that's something we'd have to look at.

WHITEHOUSE: My time has expired, Mr. Chairman.

LEAHY: Thank you very much, Senator Whitehouse.

Senator Sessions?

SESSIONS: Thank you, Mr. Chairman.

Mr. Attorney General, on the question Senator Feinstein asked you about the voting rights changes, some of those are probably changes that need to be done, but they're very -- they're, I would say, controversial, within the group of people that practice in that area of the law.

I'm curious as to your statement saying that you were not aware of that.

As to those policies, who signs off on that and who approved a policy that significantly, at least in certain specific areas, alters the policies of the Department of Justice if you don't?

GONZALES: It would be the deputy attorney general, who is the chief operating officer of the department. And so in some -- certain cases, it would be certain policies that would be adopted by the deputy attorney generals. In other cases, depending on what we're talking about, it would be something that I would approve of.

SESSIONS: Is that a delegated in -- the policy for the voting rights section of the Department of Justice, something you've delegated to the deputy attorney general?

GONZALES: I can't answer that question, Senator, but I would be happy to give you that answer.

SESSIONS: Well, I think it's something the attorney general should do.

SESSIONS: I think that's a significant policy. There were several responsibilities I think you have. And to set major policy decisions ultimately should be your responsibility.

GONZALES: And I believe that that would be my responsibility, but I just want to confirm that with you.

SESSIONS: Mr. Attorney General, with regard to some of the immigration questions that we're facing, there's so many matters that are within the jurisdiction of the Department of Justice. The effectiveness of our immigration enforcement policies depend on good policies within the Department of Justice.

And I was recently reminded of a serious problem we have with regard to aliens who have been convicted of crimes in the United States. Mr. Harley Lappin, director of the Federal Bureau of Prisons, recently told us and this committee within the last year, I believe, that 27 percent of the federal prison population is foreign-born.

We have laws that I think authorize the removal from our country of persons who are convicted of crimes immediately upon the completion of their sentence, as I recall the statutes.

I would note the article by Michelle Malkin (ph) quoting some of the examples we've had here, where Mr. Adhahn was convicted of -- relating to his involvement in the kidnapping and murder of 12-year- old Zina Linnik in Tacoma, Washington, on July 4th.

SESSIONS: He had been convicted, apparently, of incest in 1990 and had sexually assaulted his 16-year-old relative, got that pleaded down to second-degree rape.

Two years later, he was convicted of intimidation with a dangerous weapon, and the law calls for -- says that anyone convicted of a weapons offense is deportable. But he wasn't deported, and that's how, apparently, this murder occurred.

Another instance was Mwenda Murithi, arrested 27 times without deportation before being arrested in the shooting death of a 13-year- old innocent bystander, Schanna Gayden, last month in Illinois.

So I guess I'm asking you about this whole policy, whether or not you have taken a lead to see that it's carried out. Do you believe it should be systematically and regularly carried out? And if there are any statutory weaknesses, do you have any suggestions about how they should be improved?

GONZALES: I think it should be carried out.

I am aware that probably the level of cooperation that exists between the department and DHS on this issue is not as good as it should be, Senator.

What I would like to do is have the opportunity -- maybe have a conversation with Secretary Chertoff -- to see whether or not we can do something to improve the situation.

Legislation may not be necessary, but, obviously, it may turn out to be the case that we may need to have some help from Congress.

SESSIONS: As I understand, the Department of Homeland Security I.G. estimated last year that half of the 650,000 foreign-born inmates in prisons and jails won't be removed because they say that, quote, "Does not have the resources to identify, detain and remove them."

Is that true?

GONZALES: I've heard that as a possible complaint or challenge. That very well may be the case.

Again, what I'd like to do is have the opportunity to sit down with Secretary Chertoff. I have not spoken with the secretary about this particular issue. I would be happy to do so.

And if there is something that would be helpful from the Congress, I'd like to have the opportunity to talk to you about.

SESSIONS: Well, I hope that you would, because I think that's a major issue here. People are concerned when we pass laws in Congress and then our law enforcement officials don't enforce them and don't execute them and leaving criminals in the United States in large numbers.

Now, I understand there are a number of prisons that do not participate in the institutional removal program. Do you think it would be beneficial to expand this program to all federal prisons?

GONZALES: I can see very good arguments why that would make sense. And I plan on speaking with Harley Lappin, the director, and see what the status is and the challenges that exist with respect to implementing in all the prisons.

SESSIONS: I understand there's a pilot program ongoing, I believe maybe in El Paso, in which persons who enter the country illegally, in violation of our laws, are being prosecuted before they're deported. And as a result there's been a significant reduction in the number of people attempting to enter that area of the border.

Is that true?  And what are your plans to consider expanding that?

GONZALES: It is true.

It requires the cooperation of the judge, quite frankly.  And so I've had -- we've had discussions with judges along the border to see whether or not they would be agreeable to such a process.

And so we'd like to expand it. There are challenges.  And, again, it does require the cooperation of the judge.

SESSIONS: Well, I would hope that the judges would cooperate.

I mean, they don't get to decide who gets charged.  They don't get to make the deciding function.  Their responsibility is to enforce -- to give a fair trial to whoever is brought before them by the prosecutor.  Isn't that right?

GONZALES: Yes, but they will insist on certain processes, that it follow certain timetables.  And so unless a judge is willing to agree to an expedited process in the manner that we're seeing with respect to this particular judge, it can present some challenges for us.

SESSIONS: Well, I understand it's worked well.  I think it's something that ought to be replicated.  And I would expect that federal judges, if they understand the national interest in seeing that laws get enforced, would cooperate.

I hope that you will pursue that. Will you pursue that?

GONZALES: We'll certainly do that, yes.

SESSIONS: I wrote you a letter in April.  My time is out, I'll just briefly...

LEAHY: Go ahead and finish your question, Senator.

SESSIONS: ... in April, asking for a response regarding prosecution of criminal immigration cases.

Two questions that -- you gave me a response to one of my questions -- but two questions that were unanswered were these: I asked what the official policy of each district office was in determining whether to prosecute immigration-related violations; and, two, the declination rate for immigration cases referred to each southwest border district by the Department of Homeland Security, with an explanation as to some of the reasons given for that decision.

We've not yet received response from that.  Will you give me a response to that?

GONZALES: If I can.

The second one may require information from the Department of Homeland Security.  But, I mean, if we can provide the information, we'll certainly try to do so.

SESSIONS: Thank you, Mr. Chairman.

LEAHY: Thank you.

On my list, the next senator to question would be Senator Schumer.

SESSIONS: Can I ask one quick question?  I hate...

LEAHY: Go ahead, Senator Sessions.  Feel free.

SESSIONS: Thank you, Mr. Chairman.  You're most gracious.

Senators Salazar, Cornyn, Pryor and I, former attorney generals, have introduced legislation again to reduce some of the crack penalties and alter the balance between crack and powder cocaine. Has the Department of Justice taken a position on that as of this year?

SESSIONS: And will you?

GONZALES: Well, we think -- be happy to have continued dialogue with you.

Personally, as I sit here today, I'd say that where we're at today is certainly reasonable. We think crack is more dangerous. It's related to, I think, addiction more quickly. It's more related to more dangerous crimes. The effects of it, I think, are more dangerous. So from a law enforcement perspective, it makes sense to have the kind of sentences that exist today.

But what we're -- obviously, have a great deal of respect for all...

SESSIONS: I think it's time to review that.

(CROSSTALK)

GONZALES: And we'd be happy to review it.

LEAHY: I might note that I think it's...

SESSIONS: Past time.

LEAHY: ... long past time to review it. There's more and more a growing feeling that crack cocaine carries the highest penalties. It's also the people you're apt to see in the poorer neighborhoods.

Powder cocaine, which is in some of the board rooms and some of the yachts and some of the Hollywood parties of others who have a lot more money to hire lawyers and everything else, that gets a lower penalty.

But be that as it may, that will be time. We will have hearings on that. I've told the senator from Alabama we will look into this issue. I think it's long past looking into. I know the Sentencing Commission has worked hard on it, and we will want an answer for the Department of Justice on its position.

I started to say the order on our side will be Senator Schumer, Senator Durbin, Senator Feingold, Senator Kennedy and Senator Biden. And, of course, we'll interpose Republican senators if they come, but so far, we've heard from all of the Republican senators who have showed up today.

Senator Schumer?

SCHUMER: Well, thank you, Mr. Chairman.

And thank you, Mr. Attorney General.

SCHUMER: I'd like to just pick up where Senator Specter left off, about the TSP program. Just a few preliminaries.

First, I take it that there was just one program that the president confirmed in 2005. There was not more than one.

GONZALES: He confirmed one, yes, intelligence activity. Yes, one program.

SCHUMER: Thank you. OK.

Now, you -- and you've repeatedly referred to the, quote, "program," that the president confirmed in December 2005.  Let me just -- I'm going to put up a chart here.

Here's what you said before this committee on February 6th of 2006.  You said, quote, "There has not been any serious disagreement about the program the president has confirmed.  With respect to what the president has confirmed, I do not believe that these DOJ officials that you were identifying had concerns about this program."

This was in reference to a question I asked you, "Was there any dissent here?" This was before Comey came to testify.  It was in February.  But we had some thoughts that maybe that happened.

And now, of course, we know from Jim Comey that virtually the entire leadership of the Justice Department was prepared to resign over concerns about a classified program.  Disagreement doesn't get more serious than that.

And what program was the ruckus all about?  And this is the important point here.

At your press conference on June the 5th, it was precisely the program that you testified had caused no serious dissent.  You said, "Mr. Comey's testimony" -- and he only testified once -- "related to a highly classified program which the president confirmed to the American people some time ago."

SCHUMER: Those are your words, sir.

So please help us understand how you didn't mislead the committee.

You just admitted to me there was only one program that the president confirmed in December of 2005.  I asked you, "Was there dissent?" You said no.

Now you're saying -- you said in a letter to me there was -- well, there was -- there was dissent over other intelligence activities.  But your June 5th statement confirms that what Comey was testifying about, because he had then testified, was the very program, sir -- the very program that you said there was no dissent to.

How can you say you haven't deceived the committee?

GONZALES: Well, I stand by what I said to the committee.  This press conference is one that I would like to look at the question, I would like to look at my response.

SCHUMER: OK, we're going to bring it up to you right now, sir. OK?

(CROSSTALK)

GONZALES: Good.

SCHUMER: These are your words, right?  You don't deny that these are your words.  This was a public press conference.

GONZALES: I'm told that in fact here in the press conference I did misspeak, but I also went back and clarified it with the reporter.

SCHUMER: You did misspeak?

GONZALES: Yes.  But I went back and clarified it with the reporter...

SCHUMER: When was that?  And which -- what was the reporter's name?

GONZALES: At The Washington Post two days later.

(CROSSTALK)

GONZALES: Dan Egan (ph) was the reporter.

SCHUMER: OK. Well, we'll want to go follow up with him.

But the bottom line is this: You just admitted there was just one program that the president confirmed in December...

GONZALES: The president...

SCHUMER: ... just one.  Is that correct, sir?

GONZALES: The president talked about a set of activities...

SCHUMER: No, I am just asking you a yes-or-no simple question, just as Senator Specter has.  And just like Senator Specter and others here, I'd like to get an answer to that question.

You just said there was one program.  Are you backing off that now?

GONZALES: The president...

SCHUMER: Was there one program or was there not that the president confirmed?

GONZALES: The president confirmed the existence of one set of intelligence activities.

SCHUMER: Fine.

Now let's go over it again, sir, because I think this shows clear as could be that you're not being straightforward with this committee; that you're deceiving us.

You then -- then you said in testimony to this committee in response to a question that I asked, "There has not been any disagreement about the program the president confirmed."

Then Jim Comey comes and talks about not just mild dissent, but dissent that shook the Justice Department to the rafters.

SCHUMER: And here, on June 5th, you say that Comey was testifying about the program the president confirmed.

You, sir...

GONZALES: And I've already said...

SCHUMER: Sir.

GONZALES: ... I have clarified my statement on June 5th.  Mr. Comey was talking about a disagreement that existed with respect to other intelligence activities.

SCHUMER: How can we -- this is constant, sir, in all due respect with you.  You constantly make statements that are clear on their face that you're deceiving the committee. And then you go back and say, "Well, I corrected the record two days later."

How can we trust your leadership when the basic facts about serious questions that have been in the spotlight, you just constantly change the story, seemingly to fit your needs to wiggle out of being caught, frankly, telling mistruths?

Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

It's clear here.  It's clear.  One program.  That's what you just said to me.  That's what locks this in.  Because before that, you were, sort of, alluding -- in your letter to me on May 17th, you said, "Well, there was one program," -- you said there was the program, TSP, and then there were other intelligence activities.

GONZALES: That's correct.

SCHUMER: You wanted us to go away and say, "Well, maybe it was other" -- wait a second, sir.  Wait a second.

GONZALES: And the disagreements related to other intelligence activities.

SCHUMER: I'll let you speak in a minute, but this is serious, because you're getting right close to the edge right here.

You just said there was just one program -- just one.  So the letter, which was, sort of, intended to deceive, but doesn't directly do so, because there are other intelligence activities, gets you off the hook, but you just put yourself right back on here.

GONZALES: I clarified my statement two days later with the reporter.

SCHUMER: What did you say to the reporter?

GONZALES: I did not speak directly to the reporter.

SCHUMER: Oh, wait a second -- you did not.

(LAUGHTER)

OK.  What did your spokesperson say to the reporter?

GONZALES: I don't know.  But I told the spokesperson to go back and clarify my statement...

SCHUMER: Well, wait a minute, sir.  Sir, with all due respect -- and if I could have some order here, Mr. Chairman -- in all due respect, you're just saying, "Well, it was clarified with the reporter," and you don't even know what he said.  You don't even know what the clarification is.

Sir, how can you say that you should stay on as attorney general when we go through exercise like this, where you're bobbing and weaving and ducking to avoid admitting that you deceived the committee? And now you don't even know.

I'll give you another chance: You're hanging your hat on the fact that you clarified the statement two days later. You're now telling us that is was a spokesperson who did it.  What did that spokesperson say?

Tell me now, how do you clarify this?

GONZALES: I don't know, but I'll find out and get back to you.

SCHUMER: How do you clarify this?  This is serious, because it looks like you've deceived us.

GONZALES: Well...

LEAHY: In your own words, how would you clarify it?

SCHUMER: How would you clarify it?  You don't need to -- if you, sir...

GONZALES: What I would -- what I would say -- let me answer the question.

SCHUMER: If you want to be attorney general, you should be able to clarify it yourself, right now, and not leave it to a spokesperson who you don't know what he said.

Tell me how you clarify it.

GONZALES: Mr. Comey's testimony about the hospital visit was about other intelligence activities -- disagreement over other intelligence activities.

GONZALES: That's how we'd clarify it.

SCHUMER: That is not what Mr. Comey says.  That is not what the people in the room say.

GONZALES: That's how we clarify it.

SCHUMER: Explain that again, because it still doesn't add up.

(CROSSTALK)

SCHUMER: You said there's one program the president confirmed.

Are you saying Mr. Comey didn't disagree with the program that the president confirmed in December?

GONZALES: What I'm saying is...

SCHUMER: That's what you're saying here.

GONZALES: ... the disagreement which Mr. Comey testified about was about other intelligence activities.

SCHUMER: Mr. Chairman, I think we have to pursue this at some point.  Because this is -- I've never heard anything quite like this.

LEAHY: Could I ask, if I might, you said you made a clarification to some -- to a reporter.  This is such a significant and major point.  Did you ever offer such a clarification to either Senator Specter or myself?

GONZALES: You mean in terms of what was said at the press conference?

LEAHY: Yes.

GONZALES: I don't believe so.  But I think my correspondence and testimony is accurate.  The statement at the press conference was not accurate, and I corrected it.  That was corrected.

SCHUMER: But, Mr. Chairman, if I might, now what the attorney general is saying the way this is clarified is that Jim Comey was not talking about the program the president...

LEAHY: I'm going to ask for a review of the transcript, both of what Mr. Comey said...

SCHUMER: Everyone knows that's not true.

LEAHY: ... and what Mr. Gonzales said.  There's a discrepancy here in sworn testimony.  We're going to have to ask who's telling the truth, who's not.

Mr. Durbin?  Senator Durbin?

SEN. PATRICK J. LEAHY HOLDS A HEARING ON OVERSIGHT OF THE U.S. DEPARTMENT OF JUSTICE CQ
Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

SCHUMER: Thank you, Mr. Chairman.

DURBIN: Thank you, Mr. Chairman.

Thank you, Mr. Attorney General.

There are many controversial issues that have been raised in this hearing: warrantless wiretapping, the political dismissal of U.S. attorneys and the like.  I think that this administration and your tenure as attorney general will be haunted in history by another issue, and that's the issue of torture.

DURBIN: It is the reason I couldn't vote for your confirmation, the role that you played as counsel to the president in saying that we as a nation did not have to follow the torture statute and the provisions of the Geneva Conventions.

Now, last Friday, President Bush signed an executive order interpreting Common Article 3 of the Geneva Conventions for the purposes of CIA secret detention and interrogation techniques.

The executive order rejected your earlier position and acknowledges that the CIA must follow applicable law, including Common Article 3 of the Geneva Conventions, the torture statute and the McCain torture amendment, which I was happy to cosponsor.

Do you now agree that Common Article 3 applies to all detainees held by the United States?

GONZALES: What I can say is is that certainly Common Article 3 applies to all detainees held by the United States in our conflict with Al Qaida.

DURBIN: In -- I'm sorry, what's...

GONZALES: In our conflict with Al Qaida, yes.

DURBIN: Well, I'm worried about the qualification at the end. Are you suggesting that other terrorist conflicts are not covered by Common Article 3 in terms of the treatment of detainees?

GONZALES: Sir, you know, we have to look at the words of Common Article 3.

The Supreme Court rendered a decision about the application of Common Article 3 with respect to our conflict with Al Qaida only.  And so -- I believe, if I recall correctly.

If that were the case, if there were a different kind of conflict that on its face isn't covered by Common Article 3, then obviously we would not be legally bound by Common Article 3, although I think the president has said we're going to treat people humanely, nonetheless.

DURBIN: So let me get into a specific here.

Last year, the highest-ranking attorneys in each of the four military services -- Army, Navy, Air Force and Marines -- the judge advocates general, testified before this committee.  And I sent them follow-up questions asking their opinion about specific abusive interrogation techniques that this administration has reportedly authorized.

I received their responses this morning.

And, Mr. Chairman, I ask consent that those responses be made a part of the record.

LEAHY: They will be made part of the record.

DURBIN: Mr. Attorney General, the opinion of the judge advocates general was unanimous. They all agreed that

SEN. PATRICK J. LEAHY HOLDS A HEARING ON OVERSIGHT OF THE U.S. DEPARTMENT OF JUSTICE CQ
Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

the following interrogation techniques violate Common Article 3 of the Geneva Conventions -- and there are five -- painful stress positions, threatening detainees with dogs, forced nudity, waterboarding and mock execution.

Do you agree?

GONZALES: Senator, I'm not going to get in a public discussion here about possible techniques that may be used by the CIA to protect our country.

What I can say is the executive order lays out a very careful framework to ensure that those agents working for the CIA trying to get information about the next attack do so in a way that is consistent with our legal obligations.

And so, again, without commenting on specific techniques, we understand what the rules of the road are.

DURBIN: Mr. Attorney General, do you know what you are saying to the world about the United States when you refuse to acknowledge that these techniques are beyond the law, beyond the tradition of America?

DURBIN: These judge advocates general have a responsibility as well. They have been explicit and unanimous. The problem with your statement, Mr. Attorney General, is that you are leaving room for the possibility that you disagree with them.

GONZALES: And, of course, those in the military are subject to the Army Field Manual. It's a standard of conduct that is way above Common Article 3. And so they come at it from a different perspective, quite frankly, Senator.

And, again, I wish I could talk in more detail about specific actions, but I cannot do that in an open setting.

DURBIN: But let me just ask you to consider this for a moment.

Aside from the impact of what you've just said on America's reputation in the world, aside from the fact that we have ample record that you have disagreed with the use of Geneva Convention standards and have pushed the torture issue beyond where the courts and the congress would take it, would it be legal for a foreign government to subject a United States citizen to these so-called enhanced interrogation techniques which I just read?

GONZALES: Would it be legal for the United States government to subject...

DURBIN: No, for a foreign government...

GONZALES: For a foreign government.

DURBIN: ... to subject a United States citizen to the five -- any of the five interrogation techniques which I read to you?

GONZALES: Well, again, Senator, we would take the position if you're talking about an American soldier who fights pursuant to the rules of the Geneva Convention...

DURBIN: No, no, no. That's a different story. That's a uniformed person. I'm talking about a U.S. citizen.

GONZALES: Would it be legal under their laws? Would it be legal under international standards? What do you mean by, "Would it be legal?"

We obviously would demand humane treatment and treatment for our U.S. citizens consistent with international legal obligations.

DURBIN: And would you put...

GONZALES: And that's what this president expects of those of us who work in this government.

DURBIN: And do you believe these techniques which I have read to you would be beyond the laws and the international standards if they were used against an American citizen?

GONZALES: Senator, you're asking me to answer a question which, I think, may provide insight into activities that the CIA may be involved with in the future.

DURBIN: No, I'm asking you a hypothetical question. Any time we get close to a specific issue, an investigation, you recuse yourself.

GONZALES: Every time you...

DURBIN: Now, I'm asking you for a general observation.

Mr. Attorney General, the point I'm making to you is if you cannot be explicit about the standards of conduct and the values of this country when it comes to the use of torture, you create an ambiguity which, unfortunately, reflects badly on America around the world, and invites those who would take American citizens as captives and detainees to also suggest, "Well, there's an ambiguity. We can go a little forth than perhaps international law allows."

GONZALES: Well, what's prohibited would be grave breaches which are set forth...

DURBIN: What about these five specifics?

GONZALES: ... in the Military Commissions Act.

There's also violations of the DTA, which would be violation of the cruel, inhumane, degrading standard, which is tied to our constitutional standards of shocking the conscience.

And then there are prohibited actions which would be covered by the president's executive order. And, again, it would depend on circumstances, quite frankly.

DURBIN: Well, that's the kind of ambiguity which allows many people to conclude that you personally and this administration, whether by signing statements or Bybee memos, are really trying to leave a little opening in a door for the United States to engage in conduct which we condemn around the world.

The last question I want to ask is this. The latest national intelligence estimate suggests that Al Qaida's stronger today than they were on 9/11. It suggests, as we all know, that Obama -- or Osama bin Laden -- excuse me -- is still at large. And it suggests that Guantanamo has become a symbol of injustice around the world.

Can you explain to me, why five years after the Guantanamo detention situation has been created, there still has been -- hasn't been a single conviction of any of these detainees or combatants for any wrongdoing?

GONZALES: It's not for lack of trying on the government's part, Senator, it's because...

DURBIN: Could be lack of competence.

GONZALES: ... these individuals have been provided process and they're taking advantage of that process.

GONZALES: And I don't begrudge them for it, for hiring good lawyers and defending their interests in the courts.

And so we're slugging it out in the courts.

And, you know, I'd like to get all these issues resolved. I'd like to bring all these individuals to justice. So we're

doing our best, but we're doing it in a way that reflects the reality that these individuals have the opportunity and the means to go into court to contest what we're doing.

DURBIN: I would suggest five years ago Senator Specter and I proposed legislation to create military commissions which we thought would have given you that opportunity, and the administration was not receptive.

Thank you, sir.

LEAHY: As I recall, I was among those who joined with you on that proposal.

It was almost an arrogant rejection of our proposal. Basically the White House -- you were then White House counsel -- said, well, you know better; we don't need it. And rejected it out of hand. Of course, when the Supreme Court came down -- a Republican-dominated Supreme Court came down, said you were wrong, we were right, but we've wasted years, which I think was Senator Durbin's point.

Senator Feingold?

FEINGOLD: Thank you, Mr. Chairman.

I will be shortly introducing a resolution to censure the president and senior members of his administration for undermining the rule of law.

From authorizing an illegal wiretapping program to claiming the power to detain U.S. citizens indefinitely without charging them, I think this administration has shown disdain for the Constitution and the laws of the land.

You have played a central role in that effort, so I'd like to give you an opportunity to defend your actions.

With respect to the NSA's illegal wiretapping program, last year in hearings before this committee and the House Judiciary Committee, you stated that, quote, "There has not been any serious disagreement about the program that the president has confirmed," unquote, that any disagreement that did occur, quote, "did not deal with the program that I am here testifying about today," unquote and that, quote, "The disagreement that existed does not relate to the program the president confirmed in December to the American people," unquote.

FEINGOLD: Two months ago, you sent a letter to me and other members of this committee defending that testimony and asserting that it remains accurate. And I believe you said that again today.

Now, as you probably know, I'm a member of the Intelligence Committee. And therefore, I'm one of the members of this committee who has been briefed on the NSA wiretapping program and other sensitive intelligence programs.

I've had the opportunity to review the classified matters at issue here. And I believe that your testimony was misleading, at best.

I am prevented from elaborating in this setting, but I intend to send you a classified letter explaining why I have come to that conclusion.

Mr. Attorney General, the integrity of the congressional testimony of the highest law enforcement official in this country is an extremely important matter. I'd therefore ask that after reviewing that letter, you provide clarification in a classified setting.

But also please consider how you can address this issue publicly to dispel the doubts about your veracity that this episode has raised.

Will you agree to do that?

GONZALES: I certainly would endeavor to do that, Senator.

I guess I'm very surprised at your conclusion that I may have been misleading, if, in fact, you understood the briefings in the Intel Committees, quite frankly.

I find your statement surprising, so I look forward to your correspondence.

FEINGOLD: I look forward to your -- the information in the classified setting and to your public attempts to set this straight. And I strongly disagree with your analysis of how somebody would come down as to whether you were misleading.

And, in fact, I'm appalled in addition by your efforts today to try to shift responsibility for the effort to strong-arm Attorney General Ashcroft.

First, given your history of misleading this committee, I don't know why we should trust your account of the situation.

Secondly, unless you're talking about a covert action, the limited gang of eight briefing itself was a violation of the National Security Act.

And, third, it was you, Mr. Attorney General, who visited the hospital to try to strong-arm a sick man who had temporarily relinquished his responsibility. You -- you are responsible for those actions.

PROTESTER: You are shameful!

FEINGOLD: At your confirmation hearing in January, 2005, I asked you whether the president has the power to authorize warrantless wiretapping under the theories of the torture memo, and you called my question, quote, "hypothetical," unquote, when you knew full well -- full well -- that this had been going on for years.

You could have spoken to me after the hearing and told me that there was something I should know that you couldn't explain in open session, but you did not.

Then, during your campaign to reauthorize the Patriot Act, you told Congress that there were no abuses of that law that we needed to worry about, even though you had documents showing there had actually been problems with the Patriot Act and other surveillance authorities.

FEINGOLD: Then again last year you came to this committee and told us that there had not been any serious disagreement about the warrantless wiretapping program the president confirmed in late 2005, a statement I believe was misleading at best.

In every case you somehow managed to come up with some convoluted theory for why your statement was technically accurate. When you look at all these incidents together, it's hard to see anything but a pattern of intentionally misleading Congress again and again.

Shouldn't the attorney general of the United States meet a higher standard?

GONZALES: The attorney general of the United States should try to meet the highest standard. And I have tried to meet that standard, Senator.

FEINGOLD: Do you feel you've met that standard?

GONZALES: Obviously, there have been instances where I have not met that standard, and I've tried to correct that.

When those standards have not been met, I've tried to make amends and try to clarify to the committee and to the American people about statements that I've made.

FEINGOLD: You state in your testimony that the administration has transmitted to Congress a proposal to modernize the Foreign Intelligence Surveillance Act. And yet your department still refuses to share with this committee and with the Intelligence Committee basic information about the evolution of the department's legal justifications for the illegal wiretapping program from 2001 to the present.

And your legislative proposal contains a provision that would grant blanket immunity to individuals who cooperate with the government for participating in certain unidentified intelligence activities.

How can you come to Congress with a straight face and ask for this immunity provision, yet at the same time refuse to tell most members of Congress what they would be granting immunity for?

GONZALES: Well, of course, we have provided briefings to the Intel Committees.

And, again, we don't think -- you know, we went to companies for help. They provided help in trying to protect this country. And we think that's appropriate for the Congress to consider.

FEINGOLD: But I'm asking you how you can say that in light of the fact that most members of the Congress won't even be told what they're being granted immunity for.

GONZALES: Well, again, we have provided what is in the judgment of the administration the appropriate briefings to the Congress about these activities.

FEINGOLD: I don't think that cuts it for most people who are going to be voting on this.

Do you agree that the potential liability of private entities for failing to follow the law is an important part of the enforcement of our privacy laws?

GONZALES: If I understand your question, yes.

FEINGOLD: I'm not asking whether you think there was an illegal activity in any particular instance. I'm asking you whether you think private liability is an important part of the enforcement scheme of our privacy laws.

GONZALES: I think as a general matter that would be true, yes.

FEINGOLD: Thank you, Mr. Chairman.

LEAHY: Thank you.

And Senator Kennedy?

KENNEDY: Thank you.

Thank very much, Mr. Chairman. Thank you.

Welcome, General.

Just to come back for a moment or two on the issue of torture, as you are aware the executive order has been published. It was published on July 20th, 2007.

Did the department review the executive order...

GONZALES: Yes.

KENNEDY: ... (inaudible) put out?

GONZALES: As a matter of custom we would do that, yes.

KENNEDY: OK.

And did you produce any memoranda or any other documents assessing the legality of the order?

GONZALES: Senator, I don't know.

We certainly provided advice, yes, about the order.  I can't tell you whether or not we provided a legal document...

(CROSSTALK)

KENNEDY: Can you make those available to the committee?  Can you make those available about the department's analysis of...

GONZALES: I will take that back and see what we can do, Senator.

KENNEDY: In the particular document, at paragraph E, it mentions certain activities by definition that violate human decency.  It specifies those.

It says in paragraph E, "outrageous acts of personal abuse, done for the purpose of humiliating or degrading the individual in a manner so serious that any reasonable person, considering the circumstances, would deem the acts to be beyond the bounds of human decency."

Then it specifically prohibits certain activities.  Certain activities are prohibited in the executive order.

KENNEDY: It says, "such as sexual or sexual indecent acts undertaken for the purposes of humiliation." Those are prohibited. It says, "forcing the individual to perform sexual acts or to pose sexually." Those are prohibited. "Threatening the individual or sexual mutilation, or using the individual as a human shield," those are prohibited.  "Acts intended to denigrate the religion, religious practices or religious option," they are prohibited.

So the question is, why aren't you willing -- if those are prohibited, why aren't you willing to prohibit the other kinds of activities that were outlined earlier in terms of the waterboarding, in terms of stress, dogs, nudity, mock executions?

GONZALES: Senator...

KENNEDY: If you prohibit these activities, why don't you prohibit those?

GONZALES: Senator, there are certain activities that are clearly beyond the pale and that everyone would agree should be prohibited. And so, obviously, the president is very, very supportive of those actions that are identified by its terms in the executive order.

There are certain other activities where it is not so clear, Senator.  And, again, it's for those reasons that I can't discuss them in the public...

KENNEDY: Well, the only point -- and it's been made superbly by my colleague, Senator Durbin -- what you're basically saying to this committee and the rest of the world that these acts which are mentioned in the executive are prohibited, but these other activities -- the five other activities which have been the subject of a good deal of our own hearings and we talked about your confirmation problems -- are not.  They don't rise to the point where they are

prohibited.

GONZALES: I'm not saying that they're not. What I'm saying is...

KENNEDY: But they weren't of sufficient importance to list them as you did list these activities.

GONZALES: I wouldn't say it's importance. But clearly, these activities are ones that are clearly beyond the pale, and everyone agrees the United States government should not be engaged in.

With respect to whether or not other activities should be prohibited, that'll be determined based upon the parameters set forth in the executive order and for the director of the CIA to make sure that certain standards are met before authorizing any activity that -- to ensure that it complies with the requirements of the order.

KENNEDY: This past Sunday, Admiral McConnell was on "Meet the Press," and he was asked about some of these activities. He indicated that he was not going to comment specifically on them.

Is it lawful to leave the threat of torturing hanging out there?

GONZALES: No.

KENNEDY: Is the threat of torture violation of the Geneva?

GONZALES: Well, of course, the president said we're not going to torture. We're bound by both the international law -- we don't engage in torture.

So I'm not sure -- I don't think we've left the threat out there. We have said we're not going to engage in torture.

KENNEDY: OK.

Well, the point that -- the point that has been mentioned here about these five items which the -- Admiral McConnell indicated in response to a question that he wasn't going to comment on, the question is is whether that's extreme psychological harm; whether the threat, the fact that you won't indicate that those are off the table poses a violation of the Geneva Convention.

Let me go to another issue.

This morning a newspaper had this story on the front page: "The Diplomats Received Political Briefings -- Diplomats Received Political Briefings." They were done, evidently, at the Peace Corps -- the Peace Corps.

Now, we've already had some 15 federal agencies and departments were subject to briefing by Karl Rove's political office at the White House. These briefings focused on the key electoral contests.

There's an additional story and pictures inside the newspaper.

And according to The Post today, even diplomats and the Peace Corps have been given briefings that went so far as to identify Democrats targeted for defeat in 2008.

Has Karl Rove or anyone from his office given similar briefings to the leadership in the Department of Justice?

GONZALES: Not that I'm aware of.

KENNEDY: Well, you would know if he had.

GONZALES: I would think so. But I don't believe so, sir.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON OVERSIGHT OF THE U.S. DEPARTMENT OF JUSTICE CQ
Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

KENNEDY: And is it your legal opinion that these briefings given in the Peace Corps which target the Democrats for defeat, is that consistent with the Hatch Act? Is that a violation of the Hatch Act?

GONZALES: I don't know. I haven't studied this article and I'm not aware of what happened in the briefings. I certainly wouldn't rely upon the article in making...

KENNEDY: Well, it raises serious questions, does it not?

GONZALES: ... reaching a conclusion as to whether or not...

KENNEDY: You're going to look into it?

GONZALES: We'll look to see whether or not there's something there.

KENNEDY: Whether it's a violation, whether they in these briefings were targeting on government property to these officials in the Peace Corps -- going in the Peace Corps that they should be -- Democrats should be defeated in the next election.

GONZALES: Let me try to get more information about this.

(CROSSTALK)

KENNEDY: Well, if this story is true, would it appear to you -- then would it be a violation?

GONZALES: Again, Senator, I would like to have the opportunity to find out what happened.

KENNEDY: Let me go quickly in the last seconds to the Civil Rights Division in the Justice Department.

We had the -- Wan Kim, who was here, asked about the number of voting discrimination against African-American based on race. The Bush administration has filed only two voting rights cases on race discrimination against -- and it took until 2006 to file these.

They found time to clear Tom DeLay's Texas redistricting and the Georgia photo ID; just two cases on this.

(CROSSTALK)

KENNEDY: ... voting rights against African-Americans, two cases; dramatically less than the previous administration.

Do you think that this really reflects what's happening out there in terms of voter discrimination against African-Americans?

GONZALES: No, I still believe we have a problem and we have an obligation to try to address it.

I read with great interest the testimony -- I think it was Dr. Norton -- and the panel that followed Mr. Kim's testimony, in terms of the allegation that the numbers across the board are down. And I questioned Mr. Kim about that, and we talked about the numbers and the cases.

And so I think the person that testified was either mistaken or just -- I mean, just plain wrong.

And so we have provided a lot of information to this committee about the successes of the Civil Rights Division. And I can tell you, sir, I am firmly committed to protecting the civil rights of all Americans.

KENNEDY: My time is up, Mr. Chairman. I'd like to just provide information to the -- at this point in the

Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

(inaudible).

LEAHY: Thank you.

And I would expect an answer to the question on the Hatch Act that Senator Kennedy spoke about.

When Monica Goodling testified under oath before the House Judiciary Committee, she crossed the line with the unprecedented vetting of potential career hires for political allegiances throughout the department, including apparently for career assistant U.S. attorney positions. I'm not talking about political positions, but for career ones.

She testified under oath that she crossed the line.

Were you aware that Ms. Goodling was doing so?

GONZALES: That she was crossing the line?  No.

LEAHY: Were you aware that she was asking about political allegiances in vetting career Justice Department?

GONZALES: I don't recall being aware of that.  If I'd been aware of that, that would have been troubling to me.

LEAHY: Do you know whether other officials at the White House were aware she was doing that?

GONZALES: Not that I'm aware.

Let me just mention I'm aware -- and I think I became aware after the U.S. attorneys were asked to resign -- there was an issue that I became aware of where Ms. Goodling apparently asked a potential career hire into the D.C. U.S. attorney's office improper questions.

So at some point I did become aware of that.  But otherwise I can't recall being aware of other instances where she may have asked improper questions.

LEAHY: So when you consider, recommend or approve candidates for appointment to career positions at the department, do you ever consider their political party affiliation or ideology or membership in nonprofit organizations or demonstrated loyalty to the president or any of those matters?

GONZALES: Did I?  No.

LEAHY: Do you ever?

GONZALES: Do I ever?  No.

LEAHY: Do you know whether anybody else in the department does that?

GONZALES: Well, again, apparently, based upon the testimony, it appears that Ms. Goodling, as she testified, may have cross the line.

LEAHY: Have you made it clear that people cannot do that?

GONZALES: Yes.  We have now revised policies both with respect to immigration judges, with respect to Civil Rights Division, with respect to career assistant United States attorneys, with respect to the honors programs. We've changed our policies to make it clear.

LEAHY: Do you make that clear, that nobody at the White House can do that either?

GONZALES: In terms of?

LEAHY: Those hires.

GONZALES: I don't know whether or not I have not communicated with the White House about that, no.

LEAHY: It might not be a bad idea.

(LAUGHTER)

They also have -- they're also in the book. Feel free to contact them.

You testified to both the Senate and House Judiciary Committee that you didn't speak with anyone involved in the firings of the U.S. attorneys about that process because you didn't want to interfere with the investigation.

LEAHY: But on May 23rd, Monica Goodling testified under oath before the House Judiciary Committee that she had an uncomfortable conversation with before shortly before she left the department during which you outlined your recollection of what happened and asked for her reaction.

Which one of you is telling the truth?

GONZALES: I did have that conversation with her in the context of trying to console and reassure an emotionally distraught woman that she had done something wrong. And I tried to reassure her, as far as I knew, no one had done anything intentionally wrong. And that was the basis of the conversation that I had.

She came to my office -- this was March 15th, just days after this really became a big story. And she came in and she was emotionally distraught and...

LEAHY: But, you know, we sent you written questions on this yesterday -- so on the eve of this, we got answers and no place in there did you make reference to that.

So it's your statement now that she did come and you did talk with her?

GONZALES: Again, we had the conversation for the purpose of -- I had a -- my conversation with her, she was seeking to get a transfer. I was simply trying to console this very emotionally distraught woman.

LEAHY: You did say that, in your estimation, nothing wrong was ever done?

GONZALES: It was my -- and I might add, Mr. Chairman, that I had committed to you that we would make these people available as witnesses, that the department would be forthcoming in turning over documents. As far as I knew, nothing had -- improper, nothing illegal had happened here.

LEAHY: So your earlier testimony was wrong.

GONZALES: Senator, I wouldn't say that it was wrong.

What I want to do is put it in context that, again, my conversation with her was not to shape her testimony. My conversation with her was to simply reassure her that as far as I knew no one had done anything intentionally wrong here.

Mr. Sampson had just resigned. She reported to Mr. Sampson. And I think she was confused and I think needed reassurance.

LEAHY: Let me ask you about just how the department is administered. You said you do administer it, and I

understand that.

In 2003, Congress unanimously -- unanimously -- passed the Hometown Heroes Act. This would extend federal survivor benefits to the families of firefighters and police officers, emergency workers that have a heart attack or a stroke in the line of duty.

And more than three and a half years after that, the Justice Department used its regulatory authority to shift the burden of proof from the government to the families.

So there's been 260 applications. You approved only 14 claims out of those 260, denied 47 others. People are really concerned. It seems like a stall. It took three years to write the regulation. Nothing gets approved.

Now let me just give you one example of what your department denied.

You denied benefits to a U.S. Forest Service firefighter in Arizona. He was standing closer than I am to you behind a fireline with a shovel in his hand, working to contain that. And your department said, well, they couldn't determine whether he was engaged in strenuous activity at the time of his heart attack.

I don't know what you consider strenuous activity, but I think if I was standing this close to a fireline with a shovel in my hand trying to contain a forest fire, I would certainly could consider it more strenuous than my normal day's activities.

What are you going to do to knock down some these kind of bureaucratic delays? This is picayune, petty. And it's wrong to the families of some very, very brave people.

And it makes many of us who feel -- many, in both parties, feel the president may have signed this law. He may not have put a signing statement in, which he often does to ignore the law. But, by God, he's going to make sure the bureaucracy ignores it.

What are you going to do to clear that up?

GONZALES: Thank you for that question, Senator.

You're right. It's taken us too long, and I apologize to the families.

There are two reasons for the delay. One is, of course, the regulations, which took us much too long -- three years. Part of the fact is that we wanted to consult the medical community and with law enforcement to ensure that we had the right regulatory framework in place. But it still took us too long.

GONZALES: The second area of delay is the actual processing of claims, and we have to do a better job of...

LEAHY: Clear it up, clear it up...

GONZALES: That's what I've said, yes, sir. I agree.

LEAHY: Report back to Senator Specter and I on that, please.

Senator Specter?

SPECTER: Thank you, Mr. Chairman.

Attorney General Gonzales, does Solicitor General Paul Clement now have the unquestioned authority to appoint a special prosecutor since you and the deputy attorney general are recused?

GONZALES: It would be his decision, yes.

SPECTER: Just to be abundantly clear, so that if a request were made to him to appoint special prosecutor to handle the contempt proceedings arising out of this entire matter, it would be his decision?

GONZALES: Yes.

SPECTER: His sole decision?

GONZALES: I would not be involved with it; neither would the deputy attorney general.

SPECTER: Or nobody else would be involved in it, because it's the attorney general's responsibility under the statute?

GONZALES: Ultimately, he would make the decision, yes, sir.

SPECTER: Going back to the question about your credibility on whether there was dissent within the administration as to the terrorist surveillance program, was there any distinction between the terrorist surveillance program in existence on March 10th, when you and the chief of staff went to see Attorney General Ashcroft, contrasted with the terrorist surveillance program which President Bush made public in December of 2005?

GONZALES: Senator, this is a question that I should answer in a classified setting, quite frankly, because now you're asking me to hint or talk -- to hint about our operational activities. And I'd be happy to answer that question, but in a classified setting.

SPECTER: Well, if you won't answer that question, my suggestion to you, Attorney General Gonzales, is that you review this transcript very, very carefully. I do not find your testimony credible, candidly.

When I look at the issue of credibility, it is my judgment that when Mr. Comey was testifying he was talking about the terrorist surveillance program and that inference arises in a number of ways, principally because it was such an important matter that led you and the chief of staff to Ashcroft's hospital room.

When you say that you were going to get Ashcroft's approval on another intelligence matter, it's strains credulity that it would be other than the foremost program to go to his hospital room when he's under sedation. And when you testified here this morning earlier that you were looking to see if Attorney General Ashcroft had sufficient capacity to answer the question as to the -- as to his giving his approval, the man was under sedation.

SPECTER: It just -- all the attendant circumstances make it appear, lead to the inference that we're dealing with the terrorist surveillance program.

So my suggestion to you is that you review your testimony very carefully. The chairman's already said that the committee's going to review your testimony very carefully to see if your credibility has been breached to the point of being actionable.

I'd asked you about the case involving United States Attorney Charlton. Are you aware of the fact that with respect to the defendant for whom you're seeking the death penalty, Jose Rios, that the testimony against him was mostly from addicts and drug dealers?

GONZALES: Sitting here today, I have no specific recollection of that. No, sir.

SPECTER: Well...

GONZALES: But again, this is an ongoing case, Senator. And we're going to try to make this case in the courts.

Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

And so the more criticism there is of the government's position, the harder it's going to be for the United States government to prevail in court. And I would just simply urge that we try not to criticize the government's position in this case in connection with an ongoing matter.

SPECTER: Well, I disagree with you categorically. I think the government's position ought to be reevaluated.

SPECTER: I do not know whether it's a proper case for the death penalty or not sitting here. But I do know that if you spent only five to 10 minutes on it, you haven't made a reflected, mature, sensible judgment on that. The procedures haven't been followed.

I also know that when the U.S. attorney who handles the case makes a request to the attorney general, he's one man and you're another man. You're dealing with the death penalty for a third man.

But you owe the process more than five to 10 minutes or you ought to be in the position to say to this committee, "It wasn't five to 10 minutes. I don't function that way. I don't make the decision on the death penalty in five to 10 minutes."

But you can't say that because you don't know. So what I would say to you to try to simplify is, go back and take another look at this case.

GONZALES: I will do that.

SPECTER: And I'd also suggest to you that you go back and take a look at all the other cases where you have pressed for the death penalty, especially the ones where your United States attorneys have recommended against it.

Well, time is almost up and we're about to have a vote. We are having a vote, but let me cover one more subject very briefly, and that is the issue on OxyContin.

This is a matter, Attorney General Gonzales, where your department entered into a plea agreement with the Purdue Frederick Company, where scores of people died as a result of OxyContin abuse, and even a greater number became addicted.

And the situation arose where there was an acknowledgment where there was an intense to mislead. Now, that is -- that constitutes malice. Reckless disregard for the life of somebody else would support a common law prosecution for murder in second degree.

Now, the question is: Why does the Department of Justice enter into a plea agreement for a fine?

SPECTER: No jail times. The cost of doing business. The only way to deter white collar crime is if there is a penalty involved, if people go to jail who acknowledge that they deliberately misled to sell a product.

What was the reason for that?

GONZALES: Senator, it was the considered judgment of the prosecutor that it would be -- he was not confident that the evidence would support the intent, the individual intent or malice of the corporate executives, and that he took advantage of the statute passed by Congress to hold these individuals liable without having to show intent. And, as a consequence, they're paying $30 million in fines.

This was a very difficult and very complex case. And so I think that the prosecutors here looked at the evidence...

SPECTER: How many deaths were there?

GONZALES: I can't answer that question.

SPECTER: Would you answer it?  Did you review this case?

GONZALES: I did not review this case.

SPECTER: Do you know much money is involved for this corporation to sell this product?

GONZALES: I don't know the answer to that question.

SPECTER: $30 million may be a cheap license.

GONZALES: Well, the $600 million for the company.

SPECTER: $600 million may be a slightly more expensive cheap license.

LEAHY: Are you finished?

SPECTER: Well, I'm not finished, but I'll conclude.

Thank you.

LEAHY: I'm not trying to cut him off, but I just -- we have to vote in about four or five minutes after this, so we will recess for 20 minutes.

We will recess for 20 minutes so Senator Schumer can vote. Senator...

PROTESTER: Oh, we'll wait!

LEAHY: Ssshhhhhh!

SCHUMER: He's voted.  I have.

LEAHY: We won't have to recess unless the attorney general wants a break.  I'll turn the gavel over to Senator Whitehouse.

WHITEHOUSE: Thank you, Mr. Chairman.

WHITEHOUSE: Mr. Gonzales, let me just follow up briefly on what Senator Feingold was saying, because I'm also a member of both committees.  And I have to tell you, I have the exact same perception that he does.

And that is that if there is a kernel of truth in what you've said about the program which we can't discuss but we know it to be the program at issue in your hospital visit to the attorney general, the path to that kernel of truth is so convoluted and is so contrary to the plain import of what you said, that I, really, at this point have no choice but to believe that you intended to deceive us and to lead us or mislead us away from the dispute that the deputy attorney general subsequently brought to our attention.

So you may act as if he's behaving, you know, in a crazy way to even think this, but at least count two of us and take it seriously.

When we first spoke sometime ago, we talked about communications about cases between your office and the White House.

In that context, let me ask you, sort of, a background question or a context question.

And that is if you want an independent Department of Justice, one that is protected from improper political

Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

influence, as you're assaying the different places from which improper political influence might come to affect the Department of Justice, what do you think would be the locus most presenting that risk?

GONZALES: I'm sorry Senator.  I don't understand the question.

WHITEHOUSE: Well, if you're setting up barriers, for instance -- administrative barriers, to protect the department from improper influence, where would you be looking to have the department -- I mean, the Boy Scouts of America, not a major risk, wouldn't you say?

GONZALES: Of course.

WHITEHOUSE: Mayors, city councils around the country, not probably a major risk.

GONZALES: We'd be concerned, of course -- I think where you're leading -- trying to lead me to is the White House.

WHITEHOUSE: Isn't the White House the number one locus of general concern that's persisted through many administrations as to where political influence coming into the Department of Justice improperly is going to come from?

GONZALES: Obviously, that would be certainly a key source of concern.

WHITEHOUSE: The key -- the key, right?

GONZALES: Probably the key source of concern.

WHITEHOUSE: OK.

And in response to that, as we discussed in the last hearing -- I'd like to remind you there was the 1994 letter from Janet Reno to Lloyd Cutler.

And in response to that concern, which we agree is a very real one, the letter announced -- and I believe that the letter -- I wasn't here at the time, but I believe the letter was actually reduced to writing at the direction and instigation of then-Judiciary Chairman Orrin Hatch, who saw this as a significant concern.

And the letter said this: "Initial communications between the White House and the Justice Department regarding any pending department investigation or criminal or civil case should involve only the White House counsel or deputy counsel (or the president or vice president) and the attorney general or deputy or associate attorney general" -- seven people.

As you'll recall, I showed you a graph of what had been done since.

And in response to that, you seemed to agree that I had a somewhat legitimate concern that I was pursuing.  You said -- and this is from your transcript -- "I remain concerned as attorney general in terms of making sure that communications from the White House and the Department of Justice remain in the appropriate channels."

You further said, "I agree with you, it is important to you to try to limit the communications about specific criminal cases between the counsel's office and the Department of Justice."

You specifically said, "I think the safeguards that you're referring to I think are very, very important."

WHITEHOUSE: And then you said, "I, like you, am concerned about the level of contacts in ensuring that the communications from the White House and the Department of Justice occur at the appropriate -- within the appropriate

Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

channels."

GONZALES: Channels.

WHITEHOUSE: Now, I then showed you the letter that Attorney General -- the memorandum that Attorney General Ashcroft prepared. And that's the document that, sort of, kicked open the door from seven to hundreds of people to be involved and have discussions about ongoing criminal/civil investigative matters. And that's what led to our discussion about all of this.

Now, you've had some time to think about this. You've indicated desire to clean up the mess at the department. I would like to bring to your attention a May 4th, 2006, memorandum that is a subsequent document to the Ashcroft memorandum. This one is signed by you.

Here's what concerns me. In the Ashcroft memorandum, which was a subject of concern before, at the very, very end of the Ashcroft memorandum, as you'll remember, there was that paragraph under asterisks that changes the whole memorandum in front of it.

It says, "Notwithstanding any procedures, limitations set forth above, the attorney general may communicate directly with the president, vice president, counsel to the president, assistant to the president for national security affairs, and various others." And then it provides who the staff members can consult with: "directly with officials and staff of the Office of President, Office of the Vice President, Office of the Counsel to the president, National Security Council" and so forth.

Now, I took the position that that was pretty much kicking down a very important door that had protected the department from political influence, but I see in your May 4th, 2006, memorandum a number of things that concern me even more.

The first is at the bottom of the first page where there is an asterisked footnote, which says at the bottom, "For convenience, the executive functions of the vice presidency are referred to in this document as the Office of the Vice President or OVP, and the provisions of this memorandum that apply with respect to communications with the EOP" -- Executive Office of the President, I assume that is -- "will apply in parallel fashion to communications with the Office of the Vice President."

WHITEHOUSE: Let me ask you first, what on Earth business does the Office of the Vice President have in the internal workings of the Department of Justice with respect to criminal investigations, civil investigations, ongoing matters?

GONZALES: As a general matter, I would say that that's a good question.

(LAUGHTER)

WHITEHOUSE: Why is it here then?

GONZALES: I'd have to go back and look at this.

WHITEHOUSE: I'd like to know where this came from and how that addition was made.

Then, if you look at the very back, the very last paragraph, once again there's a final paragraph set off by asterisks that pretty much undercuts everything that was said in the previous enumerated paragraphs.

And here, you can see the difference. It's almost identical with the previous memorandum, only it adds some things: "Notwithstanding any procedure or limitations set forth above, the attorney general may communicate directly with the president, vice president" -- so far, same as the Ashcroft memorandum. Then you add, "their chiefs of staff,

Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

counsel to the president," then you add "or vice president."

Somebody took the trouble to write in "counsel to the vice president" and provide that individual access to ongoing criminal investigations, ongoing civil investigations and ongoing other investigative matters.

GONZALES: Which -- I don't know whether or not that, in fact, has happened, so I want to -- I want to (inaudible)...

WHITEHOUSE: Part of what we do around here is to prevent things from happening.

GONZALES: Exactly, exactly.

WHITEHOUSE: And when you kick down doors, you invite people to do it whether or not it's been done.

GONZALES: And I agree.

WHITEHOUSE: OK.

GONZALES: And on its face, I must say, sitting here, I'm troubled by this.

WHITEHOUSE: Yes.

GONZALES: I will say...

WHITEHOUSE: And if you can continue -- just let me finish, because we're not done with the paragraph.

GONZALES: All right.

WHITEHOUSE: If you go further on down, what was the staff of the Office of the President has become the staff of the White House Office and the entire Office of Management and Budget has been thrown in.

So you come here today with, I think, to put it mildly, highly diminished credibility, asserting to us that you want to bring -- to restore the Department of Justice.

And yet here, where there is something that you could do about it, since our past discussion, nothing has been done, the memo that has your signature makes it worse, and we've agreed that this connection between the White House and the Department of Justice is the most dangerous one from a point of view of the potential for the infiltration of political influence into the department.

How, in the light of all those facts, can I give you any credibility for being serious about the promises you've made that you intend to clean up the mess you've made?

GONZALES: Well, because we have taken -- I've taken several steps to clean up, to address some of the mistakes that have been made, Senator.

I can say that I have directed my staff to try to understand what happened with respect to the Ashcroft memo, what was the genesis of it. And in fact, we went back and talked to a former member of the Ashcroft leadership team to understand what was the basis of the change? What caused this to happen? And so we have been looking at this issue because I am concerned about it.

And with respect to this memo, quite frankly, I'd have to look at it. And I would be concerned about inappropriate access to ongoing investigations. And it's something that -- if that's encouraged by this kind of memorandum, I think it's something that we ought to rethink.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON OVERSIGHT OF THE U.S. DEPARTMENT OF JUSTICE CQ
Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

WHITEHOUSE: I would just mention to you that Senator Leahy and I, the chairman and I, have a piece of legislation that would restrict the department back to the original seven unless a notification were made to this committee about other contacts that were actually made.

WHITEHOUSE: And I hope you'll consider that and support it as well.

It is very difficult at this point to take seriously your promises, however well you might mean them subjectively, to restore the Department of Justice.  There are a lot of people here who love it, there are a lot of people here who think very highly of it.

Everywhere I go, I find, you know, increased concern about it. People that I used to work with, people who are friends and family of people who work in the Department of Justice right now.

We have seven U.S. attorneys or more dismissed.  You have the Deputy Attorney General McNulty gone, Acting Associate Attorney General Mercer gone, your chief of staff Kyle Sampson gone, White House Liaison Monica Goodling gone, chief of staff to Deputy Attorney General Michael Ellston gone, Director of EOUSA Mike Battle gone.

And in addition to hearing it wherever I go, you get things like the recent op-ed in the Denver Post written by an active USA.

"As a longtime attorney at the U.S. Department of Justice, I can honestly say that I have never been as ashamed of the department and government that I serve as I am at this time.

"The public record now plainly demonstrates that both the DOJ and the government as a whole have been thoroughly politicized in a manner that is inappropriate, unethical and indeed unlawful."

WHITEHOUSE: "In more than a quarter of a century at the Department of Justice, I have never before seen such consistent and marked disrespect on the part of the highest-ranking government policymakers for both law and ethics.

"I realize that this constitutionally protected statement subjects me to a substantial risk of unlawful reprisal from extremely ruthless people who have repeatedly taken such action in the past. But I am confident that I'm speaking on behalf of countless thousands of honorable public servants at Justice and elsewhere who take their responsibilities seriously and share these views and some things must be said, whatever the risk."

As you know, this is not an isolated feeling.  And I just -- I don't know how you can say that you can help solve the problem.  It appears to a lot of people that you, sir, are in fact the problem.

GONZALES: Senator, I think that's a -- I understand that statement.  I disagree.  I think the morale at the department I think is good if you look at the output.  Clearly, the U.S. attorney situation has not been helpful to the morale of the department.  But with respect to the mistakes that have been identified, we have taken steps to address them.

GONZALES: The fact that there's been a change in the personnel, some people would say that's a good thing.  It's good we have these changes.  It's good these people have left.

Some people, like Mike Battle, you cite in that list, Mike was planning on leaving and leaving because of personal reasons that had nothing to do with any of this.  It's unfair to include him in this.

And so, I am working as hard as I can to work with the members of this committee to make improvements in the Department of Justice.

Responding to Senator Feinstein's earlier comment about how, after hearing the opening statements of Senator Leahy and Senator Specter, why I would talk about FISA, the reason I would is because I'm focused on doing the work

SEN. PATRICK J. LEAHY HOLDS A HEARING ON OVERSIGHT OF THE U.S. DEPARTMENT OF JUSTICE CQ
Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

of the people in this country, who care most about making sure the country's safe from terrorism, who care most about making sure their neighborhood's are safe from gangs and drugs and violent crime, and who care most about that their children are protected from predators.

That's what I'm primarily focused on.  But I'm also, at the same time, trying to address these problems.  I feel that's my obligation as attorney general.

WHITEHOUSE: Senator Cardin?

CARDIN: Thank you.

I want to just raise one -- come back to the concerns I have about selective release of information.

Our responsibility is to do the oversight to make sure that things are done according to law, that you're held accountable, and that we carry our responsibilities as a legislative branch of government.  We need a complete record in order to do that.  And my concern is we get selective release of information.

And today you released some information concerning the congressional advice to you in regards to an intelligence briefing at the White House.  My understanding is that the details of those types of briefings are classified information that can be released by the president.

You released information concerning the advice given to you by the congressmen who are there, the senators who were there.  We don't know who was there, we don't have those details.  We're not entitled to the details if I understand correctly the ground rules for these types of briefings.

So can you just -- first of all was a conscientious decision made to release that information by the White House?

GONZALES: I had -- no, there was no approval by the White House.

Listen.  People make statements about my conduct in connection with the hospital visit.

GONZALES: And I think it's important for the American people and for this committee to understand the context of that visit.

CARDIN: I agree with you completely.  But we should have all the information.  We should have all the information with the White House. We should be able to have independent review of all the information. For example, can we get the details of that briefing supplied to this committee?

GONZALES: Senator, you're asking me questions that really touch upon White House equities, and that will be a decision made at the White House, a decision that I won't -- in most cases, will not be able to control.

CARDIN: This committee has gotten selective information.  The same thing happened with Sara Taylor when she was here.  She told us information.  She said, "I can't tell you anything about my conversations with the White House because we have executive presidential privilege, but however, I can tell you things that I think make us look good."

GONZALES: Senator, I don't know if that's to be the case or not. My understanding appeared to have been...

CARDIN: review the testimony.

GONZALES: ... that Ms. Taylor was trying to be as helpful to the committee as she could, but there were certain lines which she was...

CARDIN: The problem is, she sees it helpful when she can advance the cause of the White House.  She doesn't

think it's helpful giving us objective information to make our own judgments.

GONZALES: Senator...

CARDIN: Same thing about your -- we need to get a complete record, and we're going to get a complete record and courts will ultimately make these judgments. But I just question -- we're trying to find out the details of what happened at the hospital, and you give us some information about a briefing. And we don't have the rest of it.

I just think it puts us in a very difficult position. You may not have intended that to be the case but I would certainly think that the attorney general of the United States would want to make sure that this committee had a complete record and that we don't have to take just selective information in making judgments.

GONZALES: It was certainly my intent to make sure the committee had a more complete record than the testimony that's been provided, in terms of what happened during that period in...

CARDIN: But you didn't clear your testimony about that briefing with anyone in the White House? That was your judgment, to talk about the briefing?

GONZALES: The White House was advised that this was what I was going to be talking about. I did not seek their approval, and nor did I get guidance in terms of what to say.

WHITEHOUSE: Thank you. I don't believe that -- let me just find out whether the chairman wants the hearing to continue or we are all right to recess.

Oh, the committee will stand in brief recess. My understanding is other senators will be returning.

(RECESS)

LEAHY: The audience will be in order, and the committee be back in order.

For those who have spent much time watching Senate procedures, we know that we sometimes get interrupted by votes, and I am trying to (inaudible) this hearing to a conclusion, although I expressed my appreciation both to the majority leader and to Senator Kennedy for dealing the votes as long as they could.

Senator Schumer has asked for a little bit more time, and I will yield to Senator Schumer. And if there is -- if there are no other questions, we'll then conclude this hearing.

Of course, all senators have the right to submit questions for the record, and the witness has the right, of course, to look at the record, and should he want to change or amplify any answers, he can.

I'll be looking at that transcript. He may want to look at it very, very carefully.

GONZALES: I will look at it very carefully, Mr. Chairman.

LEAHY: I would recommend you look at it extremely carefully.

Senator Schumer?

SCHUMER: Thank you, Mr. Chairman. I appreciate your waiting for the votes.

I have just a few quick questions that I hope you'll be able to answer quickly and concisely.

First, Mr. Attorney General, at the time you went to Mr. Ashcroft's hospital bed, did you know that power had been transferred to Jim Comey?

GONZALES: I think there were newspaper accounts, and the fact that Mr. Comey was the acting attorney general is probably something that I knew of.

SCHUMER: Probably you know of it?

GONZALES: Well, again sitting here today, I can't tell you, yes, absolutely I knew.  But let me make an important point here.  The fact the transfer had -- let's assume the transfer had occurred.

There's no governing legal principle that says that Mr. Ashcroft, if he decided he felt better, could decide, "I'm feeling better and I could make this decision and I'm going to make this decision." But to answer your question, I'm...

SCHUMER: But you believe you knew?  That's how -- is that a fair characterization?

GONZALES: I would say that -- let's just assume that I knew but, again, I'm not sure that's the main point.

SCHUMER: And at the time you went to Mr. Ashcroft's hospital bed -- you touched on this -- what was your understanding of Mr. Ashcroft's authority?

GONZALES: My understanding -- sitting here today, my understanding is that -- the main focus was -- is that Mr. Comey would be making the decision with respect to this matter.

SCHUMER: All right.  When you went to the hospital room, what was your understanding of Mr. Ashcroft's condition?

GONZALES: I don't know if I can recall exactly my understanding. I suspect it was that, of course, he was sick, had had surgery.  I may have understood that he was in intensive care.  I may have -- from newspaper accounts, may have understood, in fact, that he had problems with his pancreas or gallstones or something...

SCHUMER: Did you know that all visitors had been barred by his wife because of how ill he was?

GONZALES: I don't know if I knew that.  Subsequently, I've certainly been made aware of the fact that she was being very, very careful in terms of who could visit with him and who could speak with him.

SCHUMER: The facts have come out that all visitors were barred by her.  OK.

Next, do you have documents in your possession reflecting the transfer of power or authority from Ashcroft to Comey?

GONZALES: I do have them now, yes.

SCHUMER: You didn't have them then?

GONZALES: I don't recall having -- personally having them. There is some question, as I understand it, about whether they came to the White House and who at the White House had them.  But, again, I'll just...

SCHUMER: Counsel -- wouldn't the counsel have gotten such documents?

GONZALES: I would think so, yes.

SCHUMER: So you probably had them.  Is that -- would that be fair?

GONZALES: I would say that they may have come in.  I have no recollection of that, Senator.

SCHUMER: Could you go through your records and produce for this committee any documents in your possession

at that time or in your offices -- the Office of Council's possession at the time?

GONZALES: I'd be happy to take that back and see if that can be done.

SCHUMER: Why couldn't it be done?

GONZALES: Well, I don't know, Senator.  If we can do it, we'll produce it.

SCHUMER: OK.  Could you give them to our committee by Friday?

GONZALES: We'll certainly do our best.

SCHUMER: Thank you.  Did you discuss classified information in front of Mrs. Ashcroft, who did not have a security clearance?

GONZALES: It's my recollection that the answer to that question is no.  General Ashcroft did virtually all of the talking, and he did all the talking with respect to the legal issues.  I can't, sitting here today -- I don't believe that he disclosed classified information in the hospital room.

SCHUMER: OK.  Let me ask you this.  Who sent you to the hospital?

GONZALES: Senator, what I can say is we'd had a very important meeting at the White House over one of the most...

SCHUMER: I didn't ask that.  I didn't ask...

GONZALES: Well...

SCHUMER: You've discussed the meeting...

GONZALES: I'm answering your question, Senator...

SCHUMER: Who sent you?

GONZALES: ... if I could.

SCHUMER: Did anyone tell you to go?

GONZALES: It was one of the most important programs for the United States.  It was important -- had been authorized by the president.

I'll just say that the chief of staff to the president of the United States and the counsel to the president of the United States went to the hospital on behalf of the president of the United States.

SCHUMER: Did the president ask you to go?

GONZALES: We were there on behalf of the president of the United States.

SCHUMER: I didn't ask you that.

GONZALES: I understand...

SCHUMER: Did the president ask you to go?

GONZALES: Senator, we were there on behalf of the president of the United States.

SCHUMER: Why can't you answer that question?

GONZALES: That's the answer that I can give you, Senator.

SCHUMER: Well, can you explain to me why you can't answer it directly?

GONZALES: Senator, again, we were there on an important program for this president, on behalf of the president of the United States.

SCHUMER: Did you talk to the president about it beforehand?

GONZALES: Senator, obviously, there were a lot of discussions that happened during that period of time. This involved one of the president's premier programs...

SCHUMER: I understand. But, sir, you're before this committee. You are before this committee. You're supposed to answer questions. You've not claimed any privilege. I don't think there is any here. And I asked you a question. And you refuse to answer it.

GONZALES: Senator, if...

SCHUMER: Why?

GONZALES: I'll go back -- if I can answer the question, I will answer the question...

SCHUMER: I know. But could you tell me why you can't answer this question?

GONZALES: Senator, because, again, this relates to activities that existed when I was in the White House. And because of that, with respect to your specific questions, I will go back and see whether or not I can answer the question.

SCHUMER: Did the vice president send you?

GONZALES: Senator, we were there on behalf of the president.

SCHUMER: Did you talk to the vice president about it?

GONZALES: We were there on behalf of the president.

SCHUMER: You will not answer that question as well. Is that correct?

GONZALES: We were there on behalf of -- if I can -- I'd be happy to take back your question. If we can respond to it, we will.

SCHUMER: OK. Now, you kept referring to this meeting of the gang of eight. Did any member of the gang of eight direct you to go to Ashcroft's hospital bed?

GONZALES: Oh, no. In fact...

SCHUMER: Was there any discussion...

GONZALES: No. I'm not sure that they knew that we went.

SCHUMER: So they had no knowledge you were doing that?

GONZALES: I'll put it this way. I did not tell them that we are going to do it.

SCHUMER: OK.  Did every member of the gang of eight know that Comey, Ashcroft, Mueller and others were prepared to resign over the program?

GONZALES: Well, first of all, I'm not aware that that's true, that the statement is true.  But in terms of -- I'm not sure that we got into discussions about any resignations.  The discussion centered on the fact that Mr. Comey was unwilling to authorize the continuation of this very important intelligence activity, and that we were there to seek help from the Congress for legislation.

SCHUMER: Understood.  But you didn't -- did they know that there was dissent within the administration on this, within the Justice Department?

GONZALES: I was pretty clear, quite frankly, in making sure that they understood that the deputy attorney general did not believe that the president had the authority to authorize these activities.

I tried to paint -- I didn't want to be accused of, in any way, not presenting, in the most forceful way that I could, the disagreement that existed.  And so I -- yes, I think that they understood that there was serious dissent.

SCHUMER: OK.  But you testified to us that you didn't believe there was serious dissent on the program that the president authorized.  And now you're saying they knew of the dissent and you didn't?

GONZALES: The dissent related to other intelligence activities. The dissent was not about the terrorist surveillance program that the president confirmed and...

SCHUMER: So if we asked eight who were there, they would say that's the case, either -- would they say that?

Would they say it was not about the TSP, that it was about other issues?

I thought you just testified that you brought them to talk about that issue because you needed legislation.  Now you're saying...

GONZALES: I can't tell you what they would say if you asked them a question, Senator.  I'm just telling what I recall.

SCHUMER: Wait, sir.  We're going back to the -- we're back in the same conundrum as always, where it just doesn't seem that you're leveling here with the American people or the committee.

GONZALES: I don't see how it could be more clear.

SCHUMER: You said, sir -- sir, you said that they knew that there was dissent.  But when you testified before us, you said there has not been any serious disagreement.  And it's about the same program. It's about the same exact program.  You said the president authorized only one before.

And the discussion -- you see, it defies credulity to believe that the discussion with Attorney General Ashcroft or with this group of eight, which we can check on -- and I hope we will, Mr. Chairman; that will be yours and Senator Specter's prerogative -- was about nothing other than the TSP.

And if it was about the TSP, you're dissembling to this committee.  Now was it about the TSP or not, the discussion on the eighth?

GONZALES: The disagreement on the 10th was about other intelligence activities.

SCHUMER: Not about the TSP, yes or no?

GONZALES: The disagreement and the reason we had to go to the hospital had to do with other intelligence activities.

SCHUMER: Not the TSP?

Come on. If you say it's about "other," that implies not. Now say it or not.

(LAUGHTER)

GONZALES: It was not. It was about other intelligence activities.

SCHUMER: Was it about the TSP? Yes or no, please?

That's vital to whether you're telling the truth to this committee.

GONZALES: It was about other intelligence activities.

(PROTESTER SHOUTS OFF-MIKE)

SCHUMER: OK. All right, let me ask you this. Did they gang of eight have access to the Office of Legal Counsel opinions expressing concerns about the program's legality?

Did they know that the Justice Department office in charge of saying whether this program was legal or not had said it's not?

GONZALES: In essence, what they understood was that the Department of Justice, Mr. Comey, was unwilling to approve the continuation...

SCHUMER: I know that.

GONZALES: ... of these intelligence activities.

SCHUMER: Did they have any access -- you're having a discussion here, you're asking them -- you're asking them to approve new legislation. Don't you think it would be extremely logical and fair to tell them that the Office of Legal Counsel disagreed?

GONZALES: I think it would be equally logical for them to assume that if the deputy attorney general took that position, that perhaps the Office of Legal Counsel might also have that same position.

SCHUMER: All right. Just one -- I know chairman wants to wrap up, and I appreciate that. Just one other quick question here.

Senator Leahy -- Chairman Leahy and Senator Specter and I have discussed some idea -- they would have to go ahead with this -- of having the special prosecutor, Patrick Fitzgerald, come testify before the committee.

Now, just last week, on July 17th, the department made available to the committee Texas U.S. Attorney Johnny Sutton, who's in exact same position as Fitzgerald is. In other words, Sutton testified at length about the case about Border Agents Ramos and Compean. In that case, as in this, the trial is over. In that case, as is this, their appeals are pending. Mr. Sutton testified about issues that will not affect the appeal.

So my question to you is, should this committee -- and that decision is not mine -- but should this committee, and given the public interest in this case, wish to bring Patrick Fitzgerald before us, would you have any objection?

GONZALES: Senator, you know, I'm recused from Mr. Fitzgerald's investigation and so I'm not sure that I'd be in a

Transcriptions"All materials herein are protected by United States copyright law and may not be reproduced,

position to say one way or the other.

SCHUMER: Who would make that decision?

GONZALES: It would be the deputy attorney general.

SCHUMER: So the acting deputy attorney general would make that decision?

GONZALES: No, the deputy attorney general. Paul McNulty...

SCHUMER: Paul McNulty. OK. But you are not going to opine whether that would be OK?

GONZALES: I don't believe so. Again, I was recused from that investigation.

SCHUMER: OK.

Thank you, Mr. Chairman.

LEAHY: Senator Specter?

SPECTER: Just a few concluding comments.

Attorney General Gonzales, I would ask you to take a close look at the functioning of your department or perhaps consult with others to give you an objective view as to what is happening.

The consensus appears to be that the morale is at an all-time low from what has happened. The U.S. attorneys around the country don't know when the next shoe is going to drop, although perhaps replacements or requests for resignations have been tempered or slowed down or perhaps even eliminated because of the focus of this committee's inquiry.

But I would ask you to take a look at that morale issue.

GONZALES: I will do so.

SPECTER: And then I'd ask you to take a look at how the department is functioning generally. I mentioned the OxyContin case only because it received a lot of newspaper publicity.

SPECTER: And the case involving the homicide where you asked for the death penalty also received a lot of publicity.

But it looks to me candidly, Attorney General Gonzales, as if the department's dysfunctional. When you have many people killed and many people addicted from a dangerous drug, where there is malicious misleading of the consumers, that constitutes malice. That's criminal conduct.

And the profits that are made from these drugs are in the billions. So when you have even $600 million -- I don't know all the details and this committee can't possibly run your department. We can't possibly run your department. And I know you're recused technically, but you're still the attorney general.

And we really ought to reach an accommodation with the administration on finishing up this investigation. And I think you would obviously be as anxious to have it finished as anyone, perhaps more so. And we've made concessions to what the president has proposed and I wrote to White House counsel -- you're not White House counsel anymore -- and talked to Mr. Fielding about a meeting where Chairman Conyers, Chairman Leahy and I might talk to the president.

I find dealing with the president when you move above the levels of bureaucracy to be able to come to conclusions

and come to judgments.  And the transcript issue seems to me fundamental.  I don't know why any witness would want to appear before a committee on an informal basis and not have a transcript so that someone might contend at a later time that a false official statement was made which carries the same penalty as perjury, five years.  I don't know why anyone would want that.  But if they insist on it, I'd even take that.

I think that John Conyers and Pat Leahy and Chuck Schumer and Arlen Specter and others could find out a lot of information even on an informal basis.  But I won't give up the Senate's right to pursue a subpoena if we feel it necessary.  We cannot delegate that.

I think back to the great attorneys general in our history: Edmund Randolph, Washington's attorney general; Harlan Fiske Stone, later chief justice of the Supreme Court; Robert Jackson, FDR's attorney general -- still citing his opinions on a wide variety of subjects.  And I would just ask you to consider the interests of the Department of Justice and the interests of the American people because your department, next to the Department of Defense, is the most important department in the government.

Thank you, Mr. Chairman.

LEAHY: Thank you, Senator Specter.

I find this frustrating.  I have a lot more questions.  I find it so difficult to get answers that I'm not going -- I may or may not submit them for the record.

But I think the tragic thing here is the ongoing crisis -- in the ongoing crisis of leadership of the Justice Department is the undermining of good people and the crucial work the department does. There are thousands of honest, hard-working prosecutors and civil servants.  They work every day.  They deter crime or prevent crime or uncover crime.

I know in my years as a prosecutor the admiration I had for them.

LEAHY: I've work with them for decades since, both Republican and Democrat administrations.  With these -- I speak of the professionals, the career people.  I've never had any one of them say anything to me that indicates one way or the other what their political leanings are.  I've just gotten straightforward answers.

But you say morale is good.  It is not.  I'm not trying to put words in your mouth.  Let me just say this.  You've come here seeking our trust.  Frankly, Mr. Attorney General, you've lost mine.  You've lost mine.  And this is something I've never -- this is something I've never said to any cabinet member before, even some of whom I've disagreed with greatly.

I hope you can regain the trust of the hard-working men and women who are at the department.  They deserve better.  You know, once the government shows a disregard for the independence of the justice system and the rule of law, it's very hard to restore people's faith.

Any prosecutor will tell you, when they go into court, what they carry with them is the credibility of their office.  If that credibility is lost, it's an uphill battle the whole way through.

I know this committee will do its best to try to restore independence and accountability and commitment to the rule of law to the operations of the Justice Department.  I know I'll be joined by a lot of senators, Republican and Democratic, in that.  I take no pleasure in saying this, but I'm seriously, gravely disappointed.

Thank you.

If you wish to say something -- then we stand adjourned.

(PROTESTERS SHOUTING)

END

**NOTES:**

[????] - Indicates Speaker Unknown

  [--] - Indicates could not make out what was being said.[off mike] - Indicates could not make out what was being said.

**LOAD-DATE:** July 24, 2007

# EXHIBIT B

WSJ.com **OpinionJournal**
*from* THE WALL STREET JOURNAL *Editorial Page*

**Subscribe to Political Diary**
for just $3.95 per month

| CONTENTS | ON THE EDITORIAL PAGE | READER RESPONSES | TASTE | BOOKSTORE |

CONTENTS
ON THE EDITORIAL PAGE
◆ Today's Featured Article
◆ Hot Topic
◆ Also on WSJ.com
◆ International Opinion
BEST OF THE WEB TODAY
E-MAIL SUBSCRIPTIONS
◆ Political Diary
◆ Free Updates
JOHN FUND ON THE TRAIL
PEGGY NOONAN
OPINIONJOURNAL FEDERATION
◆ Featured Article
◆ Poll Watch
THE JOURNAL EDITORIAL REPORT
ELECTORAL COLLEGE CALCULATOR
POETRY FOR THE WAR
READER RESPONSES
OUR FAVORITE SITES
ARCHIVES
TASTE
LEISURE & ARTS
FIVE BEST
COLUMNISTS
◆ Pete du Pont
◆ Daniel Henninger
◆ Bret Stephens
◆ Kim Strassel
RSS FEED
ABOUT US
◆ Our Philosophy
◆ Who We Are
◆ Terms & Conditions
◆ Privacy Policy
◆ Contact Us
◆ How to Subscribe
◆ How to Advertise
◆ Op-Ed Guidelines


Search

GO

Wall Steet Journal
Online Subscribers
GO DIRECTLY TO

Select a Page

**THE JOURNAL EDITORIAL REPORT**

# Lack of Intelligence

Congress dawdles on terrorist wiretapping. Plus pro sports scandals.

*Monday, August 6, 2007 12:01 a.m. EDT*



August 8, 2007
5:43pm EDT
RESPOND TO THIS ARTICLE
READ RESPONSES
E-MAIL THIS TO A FRIEND
PRINT FRIENDLY FORMAT
ARCHIVE

**Paul Gigot:** This week on "The Journal Editorial Report," as concerns of a new terror attack in the U.S. grow, our ability to track al Qaeda suspects has become far less effective. How partisan politics has gutted one of our best tools in the war on terror. And summer of shame: Barry Bonds slugs his way to a new homerun record, the FBI investigates point shaving in the NBA, and the Tour de France is roiled by doping charges yet again. Whatever happened to ethics in sports? Our panel weighs in after these headlines.

* * *

**Gigot:** Welcome to "The Journal Editorial Report." I'm Paul Gigot. Amid growing concern that al Qaeda is plotting another attack on U.S. soil, members of Congress debated the future of President Bush's terrorist surveillance program. The centerpiece of the program, the warrantless wiretapping of suspected terrorists, has been gutted in recent months after the president bowed to Democratic demands to require a warrant for the wiretaps of even foreign suspects. Our sources tell us that the program is just one-third as effective as it used to be.

House Intelligence Committee Chairman Silvestre Reyes did not respond to our requests for an interview. But here with us is Michigan Congressman Pete Hoekstra, the ranking Republican on the House Select Committee on Intelligence. He joins me now from Capitol Hill.

Welcome, Congressman.

**Hoekstra:** Hi, Paul.

**Gigot:** I think most Americans figure that the U.S. government is doing everything it can to pursue al Qaeda in this war on terror. But in the case of this intelligence program, we really are not. Why not, and what are we missing?

**Hoekstra:** Well we're missing a significant quantity of information. The answer is--why not?-


THE WALL STREET JOURNAL
Sponsored By...
Before You
**Open**
That Nest Egg...

**Order Custom Reprint Solutions**
**Click Here For Details**
DOWJONES

YOUR COMPANY INFORMATION HERE!

**VIEWPOINT**

[The American Spectator](#)
The voice of the true conservative -- Ben Stein, the Washington Prowler and R. Emmett Tyrrell, Jr.

[Keep Our Markets Free](#)
Investing commentary from a conservative perspective.

[Newt Gingrich - Free](#)
Sign up for free email delivery of Newt's weekly newsletter - Winning the Future

[Mutual Fund Lemon List](#)
1,400+ Funds to banish from your portfolio now!

[Ann Coulter Weekly Column](#)
Ann's scathing commentary sent straight to your inbox every week Free!

[Operation 5 Million Cups Supports the Troops](#)
See how you can help the company delivering coffee to front lines

[SuccessFactors](#)
Employee Performance Management solutions for companies of all sizes.

[Security Cameras](#)

**WSJ.com Network**

[Wall Street Journal](#)
[CareerJournal](#)
[CollegeJournal](#)
[RealEstateJournal](#)
[StartupJournal](#)
[WSJbooks](#)
[CareerJournalAsia](#)
[CareerJournalEurope](#)
[MarketWatch](#)











[Security Cameras](#)

[Car Donation](#)

[Hotels France](#)

[Home Security](#)
Protect your home and your privacy, with the company
that lets you be in control.

[Wall Street Careers](#)

[$100k+ job search](#)

Advertisement

-is that the Democrats have imposed on our National Security Agency--our national security intelligence community--outlandish requirements as to what they need to do to be able to try to get information from terrorists or even countries like North Korea, Syria and Iran.

Very simply, it says if you want to tap a phone line of a suspected al Qaeda terrorist who might be in Pakistan calling into Iraq, and, you know, you think that the best place to perhaps intercept that phone call might be somewhere near a U.S. facility or U.S. geographically, you need to go to a U.S. court and you need to establish probable cause. You need to get a warrant to be able to listen to terrorist XYZ in Pakistan. It's absolutely outrageous.

**Gigot:** Congressman, I've always understood foreign-to-foreign contacts--that is, a terrorist in Pakistan calling another one in Pakistan--did not require a warrant by a U.S. court. Why now we would require that warrant?

**Hoekstra:** The reason we require that, or that some people believe we now require that warrant and that's what they want to put into the law even more clearly, is the way that we collect information. Technology has changed dramatically from when the FISA law went into effect in 1978. The law never kept pace with technology. Right now you try to steal light off of different cables rather than trying to grab stuff out of the air. So that change in technology has required that for the kind of information that's most important to us, real-time collection of information, now requires a warrant.

**Gigot:** So just so our viewers understand, because of modern technology and fiber optics, packet switching, some of these foreign-to-foreign communications actually go through United States telephone switches. And that's why people say this is now, even these foreign-to-foreign contacts are so-called domestic intercepts. Is that how you understand how technology works?

**Hoekstra:** That's a pretty good explanation of how technology works today in 2007. Exactly.

**Gigot:** OK, so President Bush in 2001, after 9/11, authorized this program. It worked for a while until it was exposed--without encumbrance until it was exposed in late 2005. And this January, he put--the president made the decision to put this program under the jurisdiction of the FISA court, requiring these warrants. And that's why we've had this reduction--is one of the reasons we've had the reduction in the effectiveness of the program. Was that presidential decision in retrospect a mistake?

**Hoekstra:** I think as you take a look at what's happening right now and what the directory of national intelligence says is that we're missing significant gaps. We've got significant gaps. Yeah, I think it was a bad decision. But you also have to go back to 2001, Paul. The president didn't authorize this program. He maybe put his name on the piece of paper--

**Gigot:** He approved it.

**Hoekstra:** He approved it, but he did it in consultation with the leadership of the Republicans and Democrats in the House and the Senate, and at that point this time, they all said this is exactly what we need to do and we don't think we should go to Congress to get the legislative changes, because if we go to Congress to update the law, then our enemies will know what we are trying to do. And the most important thing here is that we keep this program secret so we don't tip off al Qaeda what our capabilities are. Of course, that was all blown when the New York Times blew, you know, exposed the program.

**Gigot:** All right, I understand there's another issue here of telephone company liability. That is, for a while the telephone companies cooperated with the National Security Administration in helping with these wiretaps. But after the program was exposed, some of them said, *Wait, for legal liability we're going to reduce our cooperation or perhaps not cooperate at all.* Is this liability protection something the administration wants, and are Democrats resisting?

**Hoekstra:** Absolutely. It's something that our communications companies need. These are companies who were doing the patriotic thing. They were helping the U.S. government, the

American people, get the information that we believe we needed to keep us safe. They voluntarily participated, and now that the program is exposed, they've been open to all kinds of lawsuits. You know, Congress is not stepping in to protect them.

They now need to go back and take a look at protecting the equities of their shareholders, their customers and their employees. And it's kind of like they're reconsidering their decision to help the federal government, to help our intelligence community voluntarily, because we're not willing to provide them with the protection that they need from these frivolous lawsuits that are out there. So yeah, they have to--they have to do what's in the best interest of their companies.

**Gigot:** All right. You've--you're a Republican. What's your advice to President Bush to get this off the dime and get this done?

**Hoekstra:** I think the president's going to do it, and hopefully he'll be successful. He's going to need to demand that Congress stay in session, not go home for its August recess, until he and the intelligence community are given the tools that are necessary to keep our troops in Iraq and Americans at home safe.

**Gigot:** All right, Congressman Peter Hoekstra. Thanks very much for being here.

**Hoekstra:** Hey, great. Thank you.

**Gigot:** Much more on the future of the terrorist surveillance program when we come back. Also ahead, doping, gambling, dog fighting--news from the sports world just keeps getting worse, leaving some fans wondering what role, if any, ethics still play. I'll ask our panel when "The Journal Editorial Report" continues.

---

**Gigot:** We're back with more on the future of the terrorist surveillance program. Joining the panel this week, Wall Street Journal columnist and editorial page deputy editor Dan Henninger, editorial features editor Rob Pollock and in Washington, columnist Kim Strassel.

Kim, you've been covering this story. If as, you heard Congressman Hoekstra, the damage to U.S. intelligence is as severe as he says--and I think he's right about that; that's what our sources tell us--why isn't the president shouting this fact from the rooftops to get this fixed?

**Strassel:** It's a huge question. He talked about it in his radio address last weekend. But that isn't very high-profile. And he should be doing what Congressman Hoekstra said, which is he should be telling Congress they shouldn't be allowed to leave until they fix it and really setting up a confrontation. Because it's a huge deal. I think one reason they haven't is the administration is worried about being accused of playing politics with an intelligence tool, except for that they're not the ones that started this.

**Gigot:** But is it also maybe the White House's worry that since the president made this decision in January, to put this program underneath--under the FISA court jurisdiction, and the damage has been done as a result of that, that he's partly responsible for this problem, Rob.

**Pollock:** Well look, if he wants to be gutsy about it, he doesn't have to tell Congress "You can't leave until this is fixed." He can say, "I made the decision to put the program under the FISA law. I am now making the decision to take it back out from under the FISA law, and I'm going to reassert the authority that all presidents before me have asserted to listen to our enemies during wartime without a warrant."

**Gigot:** But that will take care of the problem that the courts have imposed on this by demanding warrants in advance. That doesn't take care of the issue of phone company liability, however. As I understand it, that's also a very big problem. Because, Kim, I gather without the cooperation of these telephone companies, the program just isn't going to be as effective.

**Strassel:** No, that one-third number that we talked about in the opening of the show--it's only one-third as effective--that is this large part, or significant part, because phone companies are struggling with the decision to help with this. And one of the things that the administration requested this week--they said, *Please, give us foreign-to-foreign ability and also let us have liability protection for companies going forward. Just forget about what's happened in the past; just let us do it going forward, so we can make sure we have their cooperation.* Democrats are balking at even doing that.

**Gigot:** They're not giving protection at all to--retroactive liability protection which means that

they could be on the hook for billions of dollars of liability for, in good patriotic faith, cooperating with this after 9/11.

**Strassel:** This is remarkable too. You have to think about this. This is Democrats kowtowing to a special interest group, their trial lawyer community, and putting national-security interests after that. That should be very concerning.

**Henninger:** Well, look, Paul, we've put a lot of detail about what's going on here on the table. I agree with Rob that the president should force the issue so he has the opportunity to explain to the American people what's going on. They're in the dark. They're sitting there thinking, *Oh, this is about wiretapping ordinary Americans.* There is much more going on here than simply that issue. For instance, the Democrats have said, in their proposal, that we could only wiretap they call as "known foreign terrorists" versus "foreign targets," which is what the administration--that's a crucial distinction.

**Gigot:** Explain that distinction.

**Henninger:** The Democrats are saying "known foreign terrorists"--in other words, terrorists we have already identified, as opposed to people we suspect could be engaged in terror, including state actors in places like Syria and South Korea. The president needs to explain this to the American people.

**Gigot:** Terrorists aren't the only enemy of the United States. You have state actors. You have people in North Korea, for example, North Korean spies we might want to listen to. And that's why the NSA, the National Security Administration, and the director of national intelligence wants to be able to wiretap these people who are so-called foreign targets. But that turns out to be a big dispute in these negotiations.

Kim, the administration earlier put on--they wanted to make a permanent fix. Put this into law, make it permanent, so that the next president of the United States wouldn't have to deal with this controversy. Now they've reduced that request to only a six-month temporary fix, as I understand it. Is that right?

**Strassel:** Yes. And what is remarkable is that Democrats aren't agreeing to do this. You know, one of the things that's disturbing here is they are so focused on the moment at embarrassing the president over this wiretapping program. And Dan talked about the important thing here, which is, they've been out there for the last year saying--two years, saying, *This is about wiretapping ordinary Americans.* Well, it's not. This particular fix and these things that we're trying to deal with at the moment are not about that. I happen to think that that also has been overblown anyway. But this is not what people are talking about. And they are not being honest with everyone about what this current fix is and they don't know quite how to walk back from this political situation they're in now.

**Gigot:** Well, you're a good libertarian, Rob, typically. If there was a known call from Pakistan to, say, Detroit by--a terrorist call, a known terrorist, Zawahiri, say, from Pakistan to Detroit, do you think that should be--require a court wiretap?

**Pollock:** Absolutely not. The critical distinction here is not where the call originates and where it ends. The critical distinction is what is the purpose of the wiretap. Is it a wiretap for criminal purposes in the United States, or is it a wiretap for intelligence purposes as part of the war on terror? Every administration, Democratic and Republican, has always held to the position that the president has the inherent authority to conduct warrantless taps for intelligence purposes pretty much wherever.

**Gigot:** Do you trust Dick Cheney with that kind of power, Rob?

**Pollock:** I do, because the powerful disincentive--

**Gigot:** Let me put it other words: Do you trust President Hillary Rodham Clinton with that kind of power?

**Pollock:** I do. I think the most powerful disincentive to abuse is not some kind of court issuing a warrant or not issuing a warrant. It's the fear of exposure later on. No president wants to be remembered as--

**Gigot:** J. Edgar Hoover.

**Pollock:** J. Edgar Hoover. Right.

**Gigot:** Or Richard Nixon.

**Pollock:** Yeah. That is the disincentive. No one wants to go down as someone who spied on their domestic political enemies. It's not going to happen.

**Gigot:** All right. Still to come, from doping to dog fighting, Barry Bonds to Michael Vick, our panel looks at the breakdown of ethics in sports.

------◇------

**Gigot:** It's been a rough summer for sports fans. Barry Bonds's assault on the homerun record continues--controversial assault--as the Tour de France is roiled once again by doping allegations. The NBA is facing a point-shaving scandal, and NFL star Michael Vick has been indicted on federal charges in a bizarre dog-fighting ring.

We're back with Dan Henninger, Rob Pollock and Kim Strassel, and also joining us from Washington is Wall Street Journal editorial board member Steve Moore.

Steve, I know you and your sons are big sports fans. What does it tell us about society when sports are dirtier than politics?

**Moore:** Well, you know, we have seen all these scandals lately, Paul, but there's good news. There are some true heroes in sports. This past weekend, we saw Tony Gwynn and Cal Ripken being inducted in the baseball Hall of Fame--two of the real great icons of the game.

I am going to do something, though. I am going to defend Barry Bonds. Look, Barry Bonds probably has been using steroids. But let's face it, Major League Baseball never made it illegal. Other Major League hitters, like Sammy Sosa and Mark McGwire in that era, were using steroids too. The point is that Barry Bonds has been a real joy to watch over the last 10 years. You throw the guy a strike, he hits it out of the park: That's what fans want to see.

**Gigot:** All right, Dan, Steve laid down a marker: Steroids in baseball, great.

**Henninger:** Yeah, well, it sounds as though we're getting pretty close to turning sports into a videogame. I mean, let's just pump all these guys full of steroids and turn them into robots. No, I think there is a problem here, including the other things you describe, like the Tour de France. I believe that professional sports has gotten so big that a lot of these athletes begin to believe that the sort of marketing campaigns and the fame the media attaches to them, and they just become larger than life, and they forget simple things like right and wrong, and they get obsessed with winning because of the prizes that sports puts in front of them. They just become completely confused about what's the right thing to do and what's the wrong thing to do.

**Moore:** Hey Dan, don't you think, though, it's a bit hypocritical for Major League Baseball to say, *Oh, we are not really that excited; Bud Selig might go to the game*? But they turned a blind eye to this. So you got to blame some of the pro sports franchises as well.

**Henninger:** And you know why they turned a blind eye to it, Steve, it's because the Tour de France put in a strong dope-testing program, and when they did, all their problems came to the surface. And now they've been described as a sport with a big problem. That's why baseball and basketball won't do it, because they don't want to be perceived as a sport that's just riven with this kind of problem.

**Gigot:** Well, it's true. I didn't pay any attention to the Tour de France this year. I mean, it was like you didn't know whether you were watching actual athletes or "I, Robot."

**Henninger:** Yeah, you try to do the right thing and you get punished.

**Strassel:** Hey, but look, the other problem is because of--I'll lay it out: people like Steve, who basically say, *I'm willing to go see this stuff. I love Barry Bonds no matter whether he used steroids or not.* And so what incentive is there for all of these guys to crack down?

**Gigot:** One reason we admire athletes is because of their discipline and their ability to push limits and do things that normal human beings can't. At least that's one of the reasons I admire athletes, because I can't do those things. So if suddenly it's all better living through chemistry, why should we watch athletes? Why should we admire them the way we do, Rob?

**Pollock:** Well, I don't know. Maybe you can make a distinction between sort of your brute force sports, like football, to a certain degree baseball when it comes to hitting, and sports that

require more skill, like soccer and perhaps even ice hockey that sort of normal people play that there would be no reason to get 'roided up to do, and maybe the fans, if they decide they don't like drugs in sports, will move over to the other venues.

**Moore:** Let's not forget, Paul, that some of the sports figures we've idolized in the past--I mean, I wonder what Dan would say to this. Babe Ruth, the greatest athlete maybe in America in the last 100 years, this guy was a boozer and a womanizer. What about him?

**Henninger:** Yeah but we used to have like one problem a year. Now we've got five problems a week.

**Strassel:** Look, another aspect to this, though, is it's not just the reputation and what this does to sports, but it's also the message that these guys send to young kids, and there's a health aspect to this too. You're looking at a high school kid who thinks, *Well, can I get a college scholarship?* and maybe he'll decide to use steroids. What's that going to do to him down the road in terms of a health problem? There are bigger societal issues with steroid use.

**Gigot:** Let's change the--

**Moore:** Kim, you know--

**Gigot:** Go ahead, Steve.

**Moore:** I was just going to say one quick thing. Kim makes a good point, and one of the things I really liked about Cal Ripken's speech last week at the Hall of Fame is he said, *We are role models for kids whether we like it or not.* And that's all the more reason that these athletes really should clean up their act.

**Gigot:** All right, Steve. The NFL commissioner has said that Michael Vick should not attend training camp. Do you think he ought to be suspended for the season or until this case is settled in court?

**Moore:** What about the principle of innocent until proven guilty?

**Gigot:** So you say no, he ought to be able to play and no problem at all. Is that what you're saying?

**Moore:** Well I'm just of a mixed mind because the guy has not been convicted of anything, and he's still--

**Pollock:** I'm sorry, but I don't think it is incumbent upon a professional sports league to wait for the verdict of a court. You know, we're not putting a guy in prison here.

**Gigot:** So they can discipline their sport whenever they want?

**Pollock:** Absolutely.

**Gigot:** Some of the description in the indictment--I grant you, Steve, innocence until proven guilty is important--but a couple of the people who are also indicted have already copped a plea, and the description of details in the indictment are pretty horrific.

**Moore:** No, I agree with that, and when you look at what's at stake for the sport, I think Dan's point is exactly right, that there's been a real stain on these professional sports and the danger is that although it's been putting people in the seats when you have people hitting homeruns, that if people get so disgusted with it, you know what, they're going to turn away from pro sports.

**Gigot:** Steve, what would it take for you to get disgusted by basketball?

**Strassel:** That's what I want to know.

**Gigot:** All right, thanks, Steve.

We have to take one more break. When we come back, our "Hits and Misses" of the week.

---

**Gigot:** Winners and losers, picks and pans, "Hits and Misses." It's our way of calling attention to the best and the worst of the week.

Item one, a big miss for Congress as it heads into its August recess--Dan?

**Henninger:** A mammoth miss to Congress. You know, the Wall Street Journal just produced a poll in which it said that something like two-thirds of the American people think the American economy is in a recession. That's a fairly mysterious figure since there's growth in the American economy. But perhaps they've been looking at the 20% approval of Congress and the economic policies they've been producing.

Let go through the list: There are more tax-increase proposals on the table than one can count; there must be five or six. Both the House and Senate committees have proposed antitrade policies against China, with the Senate opening the door to antidumping policies against China. Third, the trade agreements with South Korea, Colombia and Peru have all been put on hold. Now if this economy suddenly stalls, I think the reason is that Reid and Pelosi have flooded the tank.

**Gigot:** All right, Dan, thanks.

Next, a hit for Barack Obama. Kim?

**Strassel:** Poor Barack Obama. He has just been shelled right, left and center this week for his comments that as president, he would put U.S. troops in Pakistan to take on al Qaeda. I can make the argument this is one of the few times talking about foreign policy that Mr. Obama deserves some applause.

Look, if you're looking at the Democratic debate so far, it's been kind of dispiriting. Most of the contenders have been in a race to see who can be most pacifist and do the least amount to fight the terror threat. And Barack Obama has been in there as well, unfortunately. He still doesn't understand Iraq is the central battlefield in the war on terror. But should at least get credit for being one of the only ones who comes out and says he would be willing to use force somewhere. And in addition to that, I think it's good news that he is telling those Democratic primary voters that the next president, no matter whether it's President Bush or a Republican or a Democrat, is probably going to have to use troops somewhere, and at least he's telling us where he would.

**Gigot:** All right, Kim, thanks.

Finally something Steve Moore and Eliot Spitzer can agree on. Steve?

**Moore:** Kudos to Eliot Spitzer for legalizing ticket scalping. This means now when you buy a ticket or you want to resell a ticket for a sporting event or a concert, you can do it legally. Forty states are looking at doing this. It means there are no longer going to be long lines to go to sporting events. And the most interesting thing about that is that Eliot Spitzer said, when asked why he's doing this, he said, *I want to give the free market a try.* Paul, wouldn't it be wonderful if he did that in other areas of the economy as well?

**Gigot:** All right, Steve. What's the most you've ever paid for a ticket for a sporting event?

**Moore:** I paid $50 last week to go to the bleachers for a Cubs game. It used to cost me a buck to sit in the bleachers.

**Gigot:** You paid too much, Steve. I'm a Brewers fan.

All right, that's it for this week's edition of "The Journal Editorial Report." Thanks to Dan Henninger, Rob Pollock, Kim Strassel and Steve Moore. I'm Paul Gigot. Thanks to you for watching. I hope to see you right here next week.

---

RESPOND TO THIS ARTICLE    READ RESPONSES    E-MAIL THIS TO A FRIEND    PRINT FRIENDLY FORMAT

HOME    TOP OF PAGE    ARCHIVE

SUBSCRIBE TO THE WALL STREET JOURNAL ONLINE OR TAKE A TOUR

SIGN UP TODAY FOR FREE MARKETWATCH MEMBERSHIP

ADVERTISERS LINKS  |  WHAT'S THIS?

**Contact us if you have mesothelioma.**
We can help you and your family.

# EXHIBIT C

July 31, 2007

The Honorable Arlen Specter
Ranking Member
Committee on the Judiciary
United States Senate
Washington, D.C. 20510

Dear Senator Specter:

I write in response to your request at our meeting of yesterday.

Shortly after 9/11, the President authorized the National Security Agency to undertake various intelligence activities designed to protect the United States from further terrorist attack. A number of these intelligence activities were authorized in one order, which was reauthorized by the President approximately every 45 days, with certain modifications. The details of the activities changed in certain respects over time and I understand from the Department of Justice these activities rested on different legal bases.

One particular aspect of these activities, and nothing more, was publicly acknowledged by the President and described in December 2005, following an unauthorized disclosure. The particular aspect of these activities that the President publicly described was limited to the targeting for interception without a court order of international communications of al Qaeda and affiliated terrorist organizations coming into or going out of the United States. I understand that in early 2006, as part of the public debate that followed the President's acknowledgment, the Administration first used the term "Terrorist Surveillance Program" to refer specifically to that particular activity the President had publicly described in December 2005. This is the only aspect of the NSA activities that can be discussed publicly because it is the only aspect of those various activities whose existence has been officially acknowledged. (It remains the case that the operational details even of the activity acknowledged and described by the President have not been made public and cannot be disclosed without harming national security.) I understand that the phrase "Terrorist Surveillance Program" was not used prior to 2006 to refer to the activities authorized by the President.

I hope that this information is helpful to you.

Sincerely,

J.M. McConnell

cc:     The Honorable Patrick J. Leahy

# EXHIBIT D



# The Attorney General

Washington, D.C.

**August 1, 2007**

The Honorable Patrick J. Leahy
Chairman
Committee on the Judiciary
United States Senate
Washington, D.C. 20510

Dear Chairman Leahy:

I write in response to your invitation to supplement the transcript of my Senate Judiciary Committee appearance of July 24, 2007. I am deeply concerned with suggestions that my testimony was misleading, and am determined to address any such impression.

I have attached for the record a copy of the July 31, 2007 letter from the Director of National Intelligence ("DNI"), which provides important context for any public discussion of the matters at issue here. First, shortly after 9/11, the President authorized the NSA to undertake a number of highly classified intelligence activities. Second, although the legal bases for these activities varied, all of them were authorized in one presidential order, which was reauthorized approximately every 45 days. Third, before December 2005, the term "Terrorist Surveillance Program" was not used to refer to these activities, collectively or otherwise. It was only in early 2006, as part of the public debate that followed the unauthorized disclosure and the President's acknowledgment of one aspect of the NSA activities, that the term Terrorist Surveillance Program was first used.

At my July 24th public hearing, the Judiciary Committee asked questions about sensitive intelligence matters. In my public testimony, including on July 24th, I have tried to provide frank answers without disclosing classified information. I was discussing only that particular aspect of the NSA activities that the President has publicly acknowledged, and that we have called the Terrorist Surveillance Program, as defined in the DNI's letter. I recognize that the use of the term "Terrorist Surveillance Program" and my shorthand reference to the "program" publicly "described by the President" may have created confusion, particularly for those who are knowledgeable about the NSA activities authorized in the presidential order described by the DNI, and who may be accustomed to thinking of them or referring to them together as a single NSA "program."

In March 2004, when the presidential order was set to expire, the Department of Justice, under Acting Attorney General James Comey, refused to give its approval to the reauthorization of the order because of concerns about the legal basis of certain of these NSA activities. As I testified, however, I recall that there was not a serious disagreement between the Department and the White House in March 2004 about whether there was a legal basis for the particular activity later called the Terrorist Surveillance Program. That is not to say that the legal issues raised by the Terrorist Surveillance Program were insubstantial; it was an extraordinary activity that

presented novel and difficult issues and was, as I understand, the subject of intense deliberations within the Department. In the spring of 2004, after a thorough reexamination of all these activities, Mr. Comey and the Office of Legal Counsel ultimately agreed that the President could direct the NSA to intercept international communications without a court order where the interceptions were targeted at al Qaeda or its affiliates. Other aspects of the NSA activities referenced in the DNI's letter did precipitate very serious disagreement. The nature of these disagreements has been the subject of oversight by the Intelligence Committees, including a closed hearing before the House Permanent Select Committee on Intelligence at which I recently testified.

I hope this explanation is helpful to the Committee's understanding of my testimony. Please understand, however, that I remain bound not to reveal classified information and therefore cannot discuss in this public letter all of the details that may be helpful to a full understanding of these matters. If you continue to have questions, the Department would be pleased to arrange a briefing for you at your convenience in the appropriate, classified, forum.

Sincerely,

Alberto R. Gonzales

cc:    The Honorable Arlen Specter

# EXHIBIT E

# Revised 116A

Aug. 13, 2007

**Revised recommendation adopted by voice, as revised**

## AMERICAN BAR ASSOCIATION

### SECTION OF INDIVIDUAL RIGHTS AND RESPONSIBILITIES

### REPORT TO THE HOUSE OF DELEGATES

### <u>RECOMMENDATION</u>

RESOLVED, That the American Bar Association ~~urges~~ <u>supports procedures and standards designed to ensure</u> that ~~courts make every effort to avoid dismissing a civil action~~ <u>whenever possible, federal civil cases are not dismissed</u> based <u>solely</u> on the state secrets privilege; and

FURTHER RESOLVED, That in <u>furtherance of this objective the American Bar Association urges Congress to enact legislation governing federal</u> civil cases implicating the state secrets privilege ~~courts should~~ <u>(including cases in which the government is an original party or an intervenor) that</u>:

 a. Permit<u>s</u> the government to plead the privilege in its answer to particular allegations in the complaint without admitting or denying those allegations, and ~~draw no~~ <u>without having</u> adverse inferences <u>drawn</u> against the government for doing so;

 ~~b. Defer ruling on a motion to dismiss until after the completion of discovery if facts relevant to the motion are subject to a claim of privilege;~~

 b. Require<u>s</u> the government to ~~submit~~ <u>provide a full and complete explanation of its privilege claim and to make available</u> for *in camera* review the evidence the government claims is subject to the privilege;

 c. ~~Deem~~ <u>Requires a judicial assessment of the legitimacy of the government's privilege claims and deems</u> ~~as privileged only~~ ~~that~~ evidence privileged only if ~~the disclosure of which~~ the court <u>finds, based on specific facts, that the government has reasonably determined that disclosure of the evidence would be</u> ~~is reasonably likely to be~~ significantly detrimental or injurious to the national defense or to cause substantial injury to the diplomatic relations of the United States;

 d. Permit<u>s</u> the discovery of non-privileged evidence that may tend to prove the plaintiff's claim or the defendant's defense, provided that such evidence can be effectively segregated from privileged evidence, and ~~employ,~~ where appropriate, <u>provides for</u> protective orders, *in camera* hearings, <u>special masters to assist</u> (including when the claim of privilege

1

# Revised 116A

involves voluminous records), or other measures where necessary to protect the government's legitimate national security interests; and

e.    Requires the government to produce a non-privileged substitute for privileged evidence, consisting of a summary of the privileged evidence, a redacted version of the evidence with privileged information redacted, or a statement admitting relevant facts that the privileged evidence would tend to prove, provided that:

    (i)    The court finds that tThe evidence is essential to prove a claim or defense in the case;

    (ii)    The court finds that it is possible, without revealed privileged evidence, for the government to produce a substitute that provides a substantially equivalent opportunity to litigate the claim or defense as would the privileged evidence; and

    (iii)    In cases in which the government is a party asserting a claim or defense that implicates the privilege, the government is given the opportunity to elect between producing the non-privileged substitute and conceding the claim or defense to which the privileged evidence pertains; and

f.    Provides that a ruling on a motion to dismiss, or for summary judgment, based on the state secrets privilege be deferred until the parties complete discovery of facts relevant to the motion and the court resolves any privilege claims asserted as to those facts under the procedures described above, except when the court finds that there is no credibly basis for disputing that the state secrets claim inevitably will require dismissal;

# Revised 116A

~~FURTHER RESOLVED, That after taking these steps and reviewing evidence proffered by both parties, the court should not dismiss an action based on the state secrets privilege~~

g. Provides that, after the court takes these steps and reviews evidence proffered by both parties, judgment for the defendant  based on the state secrets privilege is denied if the court finds that the plaintiff is able to prove a prima facie case with non-privileged evidence (including non-privileged evidence from sources outside the U.S. government), unless the court also finds, following *in camera* review, that the defendant's ability to defend against the plaintiff's case would be substantially impaired because the defendant is unable to present specific privileged evidence; and

~~FURTHER RESOLVED, That the American Bar Association urges Congress to enact legislation consistent with these procedures.~~

h. Entitles the government to take an expedited interlocutory appeal from a district court decision authorizing the disclosure of evidence subject to a claim under the state secrets privilege, imposing sanctions for nondisclosure of such evidence, or refusing a protective order to prevent disclosure of such evidence.

(Deletions struck through; additions underlined)

**REPORT**

## I.   INTRODUCTION

The state secrets privilege is a common law evidentiary privilege that shields sensitive national security information from disclosure in litigation. The government is the only party that can assert the privilege, and application of the privilege can result in dismissal of civil litigation. For this reason, it is critically important that courts act as an independent check on the government when it asserts the state secrets privilege, and that courts conduct a meaningful review of the evidence that the government claims must remain secret because it is subject to the privilege. This proposed policy is designed to promote that meaningful, independent review. It seeks to protect both the private litigant's access to critical evidence, including evidence necessary to obtain redress for constitutional violations and other wrongful conduct, and critically important national security interests, which if not protected could put the nation at grave risk.

The proposed policy does this by guiding courts to take steps to avoid dismissing civil actions when the state secrets privilege is asserted, while nonetheless recognizing that in limited circumstances, the privilege will require dismissal. The proposed policy relates only to civil cases because the government has typically asserted the state secrets privilege only in civil litigation, and because the congress already has enacted legislation balancing the competing interests concerning disclosure and non-disclosure of classified information in criminal cases. *See* 18 U.S.C. App. III (2006) (classified information procedures act). The proposed policy borrows concepts and procedures from that legislation but does not address evidentiary issues in criminal cases, which have unique constitutional concerns that do not arise in civil cases. *See infra* section III.B.6.

In addition, the proposed policy focuses on cases brought by private parties alleging wrongful conduct by the government or by private parties acting in concert with the government, because that is the type of litigation in which tension between civil liberties and national security most frequently arises. In such cases, the government is either the defendant or an intervenor that asserts the privilege in a suit between private parties involving sensitive national security information. Several provisions of the policy would, however, also apply as well to cases in which the government is the plaintiff, because it is possible that the government could assert the privilege in that procedural posture as well.

There is important opportunity, through this policy, to bring uniformity to a significant issue on which courts have adopted divergent approaches. Some courts have strictly scrutinized the government's privilege claims, while others have been more deferential to the government. The House of Delegates should adopt the policy, because the ABA is in a unique position to recommend ways to unify the procedures and substantive standards that courts use to adjudicate claims under the state secrets privilege.

## II.   THE *REYNOLDS* DECISION

Although the state secrets privilege has received significant attention since the terrorist attacks of September 11, 2001, its roots reach back to the beginning of the Republic. *See United*

*States v. Burr*, 25 F. Cas. 30, 37 (C.C.D. Va. 1807) (ruling on Aaron Burr's subpoena for documents over President Jefferson's objection that they "contain[ed] material which ought not to be disclosed"). The government rarely invoked the privilege until after World War II. Then in 1953, the Supreme Court issued the seminal decision *United States v. Reynolds*, 345 U.S. 1 (1953), which addressed the scope of the privilege and the procedures for asserting and evaluating privilege claims.

*Reynolds* was a Federal Tort Claims Act suit arising out of the crash of a B-29 aircraft that was on a mission to test secret electronic equipment. Three civilian passengers died in the crash, and their widows sued the United States for damages. When the plaintiffs attempted to obtain the Air Force's accident investigation report in discovery, the government objected, and the Secretary of the Air Force filed a formal Claim of Privilege, which stated that "the aircraft in question, together with the personnel on board, were engaged in a highly secret mission of the Air Force." *Reynolds*, 345 U.S. at 4. To support its privilege claim, the government filed an affidavit of the Air Force Judge Advocate General, which claimed that the report could not be produced "without seriously hampering national security, flying safety and the development of highly technical and secret military equipment." *Id*. at 5. Suggesting an alternative to the accident report, the government offered to produce the three surviving crew members for testimony as to all matters except those of a "classified nature." *Id*.

The district court ordered the government to produce the accident report for the court's review. The government refused to produce the report, and the district court ruled that the facts on the issue of negligence would be taken as established in the plaintiffs' favor. The court of appeals affirmed. The Supreme Court then reversed, holding that the privilege claim was valid, and that the government did not need to produce the accident report. *Id*. at 5, 12.

A.      <u>The Scope of the Privilege</u>

In *Reynolds*, the Supreme Court characterized the privilege under review as a "privilege against revealing military secrets, . . . which is well established in the law of evidence." *Id*. at 6-7. The Court stated that the privilege applies if "there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged." *Id*. at 10. In addition, the Court held that if the privilege applies, no countervailing interests can require disclosure; "even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake." *Id*. at 11.

B.      <u>Procedures for Asserting and Evaluating Privilege Claims</u>

*Reynolds* made clear that "[t]he privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party." *Id*. at 7 (footnotes omitted). The *Reynolds* Court also emphasized that the state secrets privilege "is not to be lightly invoked," specifying procedures that the government must follow to assert the privilege: the "head of the department which has control over the matter" must file a "formal claim of privilege" based on "actual personal consideration by that officer." *Id*. at 7-8.

In addition, *Reynolds* confirmed that the court has sole authority to determine whether the privilege applies. *Id*. at 8 ("[t]he Court itself must determine whether the circumstances are appropriate for the claim of privilege"). However, the Court also wrestled with how to evaluate privilege claims "without forcing a disclosure of the very thing the privilege is designed to protect." *Id*. The Court recognized that "[j]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers" but would "not go so far as to say that the court may automatically require a complete disclosure to the judge before the claim of privilege will be accepted in any case." *Id*. at 9-10. Applying a "formula of compromise," the Court concluded that the private party's "showing of necessity" should determine the depth of the court's scrutiny, such that "[w]here there is a strong showing of necessity, the claim of privilege should not be lightly accepted." *Id*. at 9-11. Because it decided that the *Reynolds* plaintiffs made "a dubious showing of necessity," the Court upheld the government's privilege claim without even reviewing the accident report. *Id*. at 11. This approach was consistent with the Court's statement that there are circumstances in which "the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers." *Id*. at 10.

### C.    Segregation of Privileged and Non-Privileged Evidence

In *Reynolds*, the Court decided that the plaintiffs' showing of "necessity was greatly minimized by an available alternative, which might have given respondents the evidence to make out their case without forcing a showdown on the claim of privilege." *Id*. at 11. That alternative was the government's offer to make the surviving crewmen available for examination. Furthermore, in the Court's view, there was nothing to suggest that the secret electronic equipment being tested on the flight had a causal connection to the accident. As a result, the Court concluded "it should be possible for [the plaintiffs] to adduce the essential facts as to causation without resort to material touching upon military secrets." *Id*. The Court remanded the case to allow the plaintiffs to attempt to prove their case without the privileged evidence. *Reynolds* therefore supports the principle that in cases implicating the state secrets privilege, the courts should attempt to segregate privileged from non-privileged evidence, to allow litigation to proceed with non-privileged evidence.

### III.    THE STATE SECRETS PRIVILEGE SHOULD BE APPLIED IN A MANNER THAT PROTECTS THE RIGHTS AND CIVIL LIBERTIES OF PRIVATE PARTIES TO THE FULLEST EXTENT POSSIBLE WITHOUT COMPROMISING LEGITIMATE NATIONAL SECURITY INTERESTS

### A.    The Courts Should Make Every Effort to Avoid Dismissing a Civil Action Based on the State Secrets Privilege

As a general rule, private plaintiffs should be able to seek judicial remedies for injuries caused by unconstitutional actions and other government wrongs. However, in a narrow class of cases, some courts have dismissed civil actions against the government based on the state secrets privilege, on the ground that the litigation would inevitably require disclosure of sensitive national security information. *See, e.g., El-Masri v. United States*, 479 F.3d 296 (4th Cir. 2007). Such dismissals prejudice the interests of private plaintiffs, denying them any forum to litigate

their claims against the government even if egregious government misconduct is involved. By dismissing civil actions on these grounds, courts also may abdicate their responsibility under the constitutional system of checks and balances to review and reverse Executive Branch excesses. The state secrets privilege also can bar private plaintiffs from pursuing claims against private party defendants linked to the government through contractual or other relationships. In such cases, the government may intervene and assert the state secrets privilege to prevent discovery of sensitive government information. Dismissal of such cases based on the state secrets privilege also unfairly denies the plaintiff the opportunity to a day in court. Accordingly, the central premise of this proposed ABA policy is that the courts should act as a meaningful check on the government's assertion of the privilege, and make every effort to avoid dismissing a civil action based on the state secrets privilege.

In recent decisions justifying dismissal based on the state secrets privilege, courts have relied on two Supreme Court cases holding that claims for breach of a secret espionage contract must be dismissed at the pleadings stage, because there is simply no way for the case to proceed without divulging the secret espionage relationship. *See Totten v. United States*, 92 U.S. 105, 107 (1875) (affirming dismissal of claim by alleged Civil War spy for breach of espionage agreement, because trial would "inevitably lead to the disclosures of matters which the law itself regards as confidential"); *Tenet v. Doe*, 544 U.S. 1 (2005) (affirming dismissal of claims by alleged Cold War spies for breach of covert espionage agreements). However, the ground for dismissal in *Totten* and *Tenet* was *justiciability*, not the state secrets evidentiary privilege. As the Court explained in *Tenet*, "lawsuits premised on alleged espionage agreements are altogether forbidden." *Tenet*, 544 U.S. at 9. The Court distinguished this "categorical . . . bar" from "the balancing of the state secrets evidentiary privilege," in which particular pieces of evidence are evaluated in "*in camera* judicial proceedings." *Id*. at 9-11. To emphasize this distinction, the Court noted that lawsuits arising from secret espionage agreements must be dismissed even if the state secrets privilege does not apply: "[t]he possibility that a suit may proceed and an espionage relationship may be revealed, if the state secrets privilege is found not to apply, is unacceptable." *Id*. at 11.

Although *Totten* and *Tenet* relate to justiciability of "the distinct class of cases that depend upon clandestine spy relationships," 544 U.S. at 10, some lower courts have relied on *Totten* and *Tenet* to dismiss other types of cases at the pleadings stage, on the ground that the entire subject matter of litigation is protected by the state secrets privilege. *See El-Masri*, 479 F.3d at 308, 313; *see also Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d 1236, 1243-44 (4th Cir. 1985). This proposed ABA policy urges that cases should not be dismissed based on the state secrets privilege, except as a very last resort, and recommends a non-exhaustive list of procedures to accomplish that goal. *Fitzgerald*, 776 F.2d at 1244 (dismissal at pleadings stage is appropriate "[o]nly when no amount of effort and care on the part of the court . . . will safeguard privileged material").

**B.** **The Courts Should Evaluate Privilege Claims in a Manner
That Protects Legitimate National Security Interests While
Permitting Litigation to Proceed With Non-Privileged Evidence**

**1.** **The Government Should be Allowed to Plead the State
Secrets Privilege Without Having Adverse Inferences Drawn**

To meet the policy's objective of avoiding dismissal, a court should make every effort to permit a case to proceed past the pleadings stage and into the discovery period, when the court can evaluate particular privilege claims as to specific evidence. In recent cases brought against the government, the government has sought dismissal at the pleadings stage of a case based on the state secrets privilege, arguing that the complaint cannot be answered without confirming or denying facts that would expose state secrets. *See, e.g.*, *El-Masri*, 479 F.3d at 301. The proposed policy would allow a case to proceed past the pleadings stage and protect the government's legitimate national security concerns at the same time, by permitting the government to plead the state secrets privilege in its answer, in response to particular allegations of a complaint. The proposed policy further provides that no adverse inferences would be drawn against the government for asserting the privilege in this manner.

This part of the proposed policy derives from current federal practice governing a defendant's invocation of the Fifth Amendment privilege against self-incrimination in civil proceedings. When the civil defendant asserts the Fifth Amendment privilege in an answer to a complaint, he neither admits nor denies the allegations in the complaint. *See Nat'l Acceptance Co. of Am. v. Bathalter*, 705 F.2d 924, 931-32 (7th Cir. 1983). The same should be true if the government asserts the state secrets privilege in its answer, under circumstances in which the government claims that confirming or denying facts in the complaint would reveal state secrets. However, the government should not be penalized for asserting the privilege by having adverse inferences drawn, as could be the case when the civil defendant asserts the Fifth Amendment privilege. That is because if the state secrets privilege does apply, the government's interest in nondisclosure is so compelling. *See Reynolds*, 345 U.S. at 11 ("even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake").

**2.** **Courts Should Defer Ruling on a Motion
to Dismiss Until Discovery is Complete if Facts
Relevant to the Motion are Subject to a Claim of Privilege**

The proposed policy also seeks to avoid premature dismissals by providing that courts should defer ruling on a motion to dismiss until discovery is complete if facts relating to the motion are subject to a claim of privilege. This provision of the policy relies on Rule 12(a)(4)(A) of the Federal Rules of Civil Procedure, which authorizes the court to "postpone[ ] its disposition" of a motion to dismiss "until the trial on the merits." Fed. R. Civ. P. 12(a)(4)(A).

This part of the proposed policy is intended to address cases in which the government intervenes to seek dismissal of a case brought by a private party against a private defendant, on the ground that the private defendant cannot answer the complaint without revealing state

secrets. *See, e.g.*, *Terkel v. AT&T Corp.*, 441 F. Supp. 2d 899, 920 (N.D. Ill. 2006); *Hepting v. AT&T Corp.* 439 F. Supp. 2d 974, 979 (N.D. Cal. 2006). In such a case, the ruling on the motion to dismiss would be postponed until after the court evaluates particular discovery requests and permits discovery of non-privileged evidence. Under these circumstances, the complaint would not need to be answered until after the court rules on the motion at the time of trial. *See* Fed. R. Civ. P. 12(a)(4)(A).

This provision of the policy also recognizes that in many cases involving the state secrets privilege, the plaintiff will challenge government actions (or related private party actions) that may be clandestine, so that the plaintiff may not initially have access to the evidence necessary to prove that those actions caused the plaintiff injury. The plaintiff's standing to sue turns in part on establishing that the defendant caused such injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Accordingly, in the interests of fairness, the proposed policy would require that if facts relevant to standing are subject to a claim of privilege, the court should defer ruling on any motion to dismiss based on standing until discovery is complete, so that the plaintiff has a legitimate opportunity to gather non-privileged evidence necessary to prove standing.

A complaint that meets the minimal pleading standards of the Federal Rules of Civil Procedure should not be dismissed for lack of standing at the pleadings stage. It is well established that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan*, 504 U.S. at 561. Accordingly, if the government or related private party defendant wishes to challenge the plaintiff's standing in a case with a properly pleaded complaint, it should do so on summary judgment or at trial. If the defendant moves for summary judgment on standing grounds, the court should follow the procedure set forth in Rule 56(f) of the Federal Rules of Civil Procedure and "order a continuance to permit . . . discovery to be had," so that the plaintiff may seek sufficient evidence to attempt to oppose the motion. Fed. R. Civ. P. 56(f); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986) (noting summary judgment should be refused where the nonmoving party has not had the opportunity to discover information that is essential to its opposition); *Burlington N. Santa Fe R.R. Co. v. The Assiniboine and Sioux Tribes of the Fort Peck Reservation*, 323 F.3d 767, 773-74 (9th Cir. 2003) ("Where . . . a summary judgment motion is filed so early in the litigation, before a party has had any realistic opportunity to pursue discovery relating to its theory of the case, district courts should grant any Rule 56(f) motion fairly freely. . . . [e]specially where . . . documentation or witness testimony may exist that is dispositive of a pivotal question . . . ."). Then, after discovery is complete, and any non-privileged evidence pertinent to standing has been produced, the court should adjudicate the summary judgment motion. If factual disputes preclude summary judgment, the court should resolve standing at trial on the merits. *See Lujan*, 504 U.S. at 561.

### 3. Courts Should Require the Government to Justify Any Assertion of the Privilege With an *In Camera* Submission of Evidence

Under the proposed policy, the government would be required to justify any assertion of the state secrets privilege with an *in camera* submission of evidence. It is well settled that it is the court's responsibility to determine whether the privilege applies. *Reynolds*, 345 U.S. at 8; *Ellsberg v. Mitchell*, 709 F.2d 51, 57-59 (D.C. Cir. 1983); *Terkel*, 441 F. Supp. 2d at 908-09. In

addition, the government has the burden to prove that the privilege applies.  *See El-Masri*, 479 F.3d at 305.  The court cannot determine whether the government has met its burden in a vacuum – only an *in camera* submission of evidence will permit a thorough evaluation of the government's privilege claims.

This part of the proposed policy challenges the Supreme Court's suggestion, in *Reynolds*, that there are some situations in which the privileged evidence is so sensitive that there should be no "examination of the evidence, even by the judge alone, in chambers."  *Reynolds*, 345 U.S. at 10.  Commentators have properly criticized that suggestion as an abdication of judicial responsibility.  *See* Louis Fisher, *In the Name of National Security: Unchecked Presidential Power and the* Reynolds *Case*, 253-62 (University Press of Kansas) (2006); Scott Shane, *Invoking Secrets Privilege Becomes a More Popular Legal Tactic by U.S.*, N.Y. Times, June 4, 2006, at 32, *available at* 2006 WLNR 9560648.  In addition, the federal courts' role in assessing classified information has evolved substantially since *Reynolds*.  As explained in more detail below, the federal courts review and analyze classified information in criminal cases, under the Classified Information Procedures Act, 18 U.S.C. App. III.  Furthermore, Congress has provided that any U.S. district court is authorized to hold an *in camera* hearing to review challenges to the legality of electronic surveillance, in cases involving classified information.  *See* 50 U.S.C. § 1806(f) (2006).  Department of Defense regulations also now expressly acknowledge that members of the federal judiciary do not need security clearances and "may be granted access to DoD classified information to the extent necessary to adjudicate cases being heard before these individual courts." 32 C.F.R. § 154.16(d)(5) (2006).  The federal courts' increasing familiarity with review and evaluation of classified information justifies departing from the *Reynolds* Court's reluctance to require *in camera* review in all cases raising the state secrets privilege.

Furthermore, the facts of the *Reynolds* case itself demonstrate that courts should not uphold a privilege claim without conducting an *in camera* review of the evidence alleged to be privileged.  A recent review of the (now declassified) accident report withheld as privileged in *Reynolds* – which the court never reviewed *in camera* – shows that the government's privilege claim was baseless, because the report contained no sensitive national security information.  The report's only mention of classified information was a reference about the removal of top-secret equipment from the crash site.  Barry Siegel, *The Secret of the B-29*, L.A. Times, Apr. 19, 2004, at 1, *available at* 2004 WLNR 19772466.  In addition, the accident investigation report contained evidence of the government's negligence – an admission that "[t]he aircraft [was] not considered to have been safe for flight" – that would have supported the plaintiffs' claims.  Barry Siegel, *The Secret of the B-29*, L.A. Times, Apr. 18, 2004, at 1, *available at* 2004 WLNR 19770961.  There is every reason to believe that if the *Reynolds* Court had reviewed the accident report *in camera*, the government's privilege claim would have been rejected.

An *in camera* examination of evidence alleged to be privileged enables the court to probe the government's privilege claim and decrease the possibility of abuses, such as the abuse that appears to have occurred in the *Reynolds* case.  In addition, numerous courts have followed the practice.  *See, e.g.*, *Kasza v. Browner*, 133 F.3d 1159, 1169-70 (9th Cir. 1998); *Ellsberg*, 709 F.2d at 56, 59; *Halkin v. Helms*, 598 F.2d 1, 7-8, 9 (D.C. Cir. 1978).  The proposed policy properly requires the government to make such submissions in all cases in which it asserts the state secrets privilege.

### 4. The Privilege Should be Based on a Reasonable Likelihood that Disclosure Would Harm National Security or Diplomatic Relations

The proposed policy would require courts to deem privileged only evidence the disclosure of which the court finds is reasonably likely to be significantly detrimental or injurious to the national defense or reasonably likely to cause substantial injury to the diplomatic relations of the United States. The policy recognizes that since the Supreme Court's decision in *Reynolds*, which established the privilege in cases in which disclosure of military secrets is at risk, subsequent decisions have extended the privilege to cases in which diplomatic secrets are at risk. *See, e.g.*, *United States v. Nixon*, 418 U.S. 683, 706 (1974).

The standard proposed in the policy is a modification of drafts by the Advisory Committee for Federal Rules of Evidence that would have codified the state secrets privilege in a Federal Rule of Evidence 509. (Congress ultimately rejected Fed. R. Evid. 509 and other evidentiary privilege rules submitted contemporaneously in favor of Fed. R. Evid. 501, which recognizes common law evidentiary privileges but does not mention the state secrets privilege.) Under the proposed ABA policy, a reasonable likelihood of "significant injury" must be shown to trigger the privilege when national defense secrets are at risk and a reasonable likelihood of the more exacting "substantial injury" must be shown to trigger the privilege when diplomatic relations are at stake. The reference in the proposed policy to "diplomatic relations" as opposed to "international relations" is intended to further limit the circumstances in which the privilege can be claimed, and with the more exacting "substantial injury" requirement, to ensure that the privilege cannot be claimed when disclosure of evidence would do little more than embarrass the government.

The reasonableness standard is intended to give the courts sufficient flexibility to decide what information is subject to the privilege, informed by the arguments of the Executive Branch, which has substantial expertise in the injury to national defense or diplomatic relations that could result from disclosure of the information, and also informed by the arguments of the plaintiff.

### 5. Courts Should Permit Discovery of Non-Privileged Evidence Under Flexible Procedures Designed to Protect the Government's Legitimate National Security Interests

The proposed policy also would permit discovery of non-privileged evidence, to the extent that it can effectively be segregated from privileged evidence, and employ protective orders, *in camera* hearings, and other procedures where necessary to protect the government's legitimate national security interests. If the state secrets privilege applies to some evidence in a case, the "court must consider whether and how the case may proceed in light of the privilege." *Fitzgerald*, 776 F.2d at 1243. Disentanglement of privileged and non-privileged evidence is the most effective way to balance the interests of the private party against the government's interest in protecting national security secrets. And flexible procedures that permit access to non-privileged evidence need not compromise national security – "[o]ften, through creativity and care, [the] unfairness [of the state secrets privilege] can be minimized through the use of procedures which will protect the privilege and yet allow the merits of the controversy to be decided in some form." *Id.* at 1238 n. 3.

### 6. Courts Should Require the Government, Where Possible, to Produce a Non-Privileged Substitute for Privileged Evidence That is Essential to Prove a Claim or Defense

The proposed policy also would require the government, where possible, to produce a non-privileged substitute for privileged evidence that is essential to prove a claim or defense in the litigation. In cases in which it is possible to generate such a substitute, and the government is a party asserting a claim or defense that implicates the privilege, the proposed policy would require the government to elect between producing the substitute and conceding the claim or defense to which the privileged evidence relates. The standard the evidentiary substitute would need to meet would be less exacting than the standard applicable to criminal cases under the Classified Information Procedures Act.

In a criminal case, the defendant has Fifth and Sixth Amendment rights to have the prosecution's evidence presented at trial. *See Nixon*, 418 U.S. at 711. These rights present difficulties for the government in prosecutions involving classified evidence that the government does not wish to disclose. In many criminal cases, the government produces non-classified substitutes for classified evidence, so that the prosecution may proceed at a public trial at the same time that the secrecy of the classified information is maintained. *See, e.g.*, *United States v. Libby*, 467 F. Supp. 2d 20, 30-32 (D.D.C. 2006) (government's proposed substitutions of unclassified evidence for classified evidence were sufficient to provide defendant with substantially the same ability to make his defense). The Classified Information Procedures Act ("CIPA"), 18 U.S.C. App. III, governs production of such evidentiary substitutes, which can be in the form of "a statement admitting relevant facts that the specific classified information would tend to prove" (*id.* § 6(c)(1)(A)) or a "summary of the specific classified information" (*id.* § 6(c)(1)(B)). CIPA also permits introduction of redacted documents into evidence to protect classified information. *Id.* § 8(b). Furthermore, under the CIPA procedures, the government is required to elect between producing non-privileged substitutes for classified evidence essential to the defense and having the court dismiss the indictment or make other rulings adverse to the prosecution's case. *Id.* § 6(e)(2).

CIPA (and the Fifth and Sixth Amendment principles underlying CIPA) do not apply in civil cases and therefore do not require the government to make a similar election when invoking the state secrets privilege to bar production of evidence in a civil case. *See Reynolds*, 345 U.S. at 12 (noting that the government's obligation to produce evidence or let the criminal defendant "go free" does not apply in a civil case). However, it is apparent from criminal cases that government can, in many circumstances, produce non-classified substitutes for sensitive national security information, thereby permitting litigation to proceed in a public forum while simultaneously protecting national security. In these criminal cases, it is in the government's interest to produce such substitutes, because the alternative would be to dismiss the charges to which the evidence relates. It would be contrary to the interests of justice if the government were *able* to produce analogous substitutes in a civil case without compromising national security, but did not do so purely as a litigation tactic, to avoid liability for claims asserted by a private plaintiff. *See, e.g.*, Reynolds Holding, *A Double Standard on State Secrets?*, Time, March 19, 2007.

Accordingly, this proposed policy would require that in cases in which it is possible to produce an adequate non-privileged substitute for evidence subject to the state secrets privilege, the government would be required to do so. In cases in which the government is a party asserting a claim or defense implicating the privilege, the government would be required to elect between producing that substitute and conceding the claim or defense to which the evidence applies. By requiring that election only when the substitute is "possible," the policy recognizes that there will be some civil cases (just as there are some criminal cases) in which the government will not be able to produce an evidentiary substitute without improperly revealing sensitive national security information; under such circumstances, the policy would not require the government to produce a substitute or risk conceding the claim or defense to which the evidence applies.

The proposed policy also addresses the adequacy of the non-privileged evidentiary substitute, requiring that it must provide a "substantially equivalent opportunity" to litigate a claim or defense as would the privileged evidence. This standard is intended to be sufficiently exacting to encourage the government to provide substituted evidence that will be as complete as possible and useful to the other party (or parties) to the litigation, but less stringent than the standard imposed under CIPA. CIPA requires that the substitute "will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." 18 U.S.C. App. III § 6(c)(1). The lesser standard incorporated into the proposed policy recognizes that the Fifth and Sixth Amendment interests underlying CIPA do not apply in a civil case.

Finally, the proposed policy follows CIPA in providing that the form of the substitute would be a summary of the evidence, a redacted version of the evidence, or a statement admitting relevant facts that the privileged evidence would tend to prove. *See* 18 U.S.C. App. III §§ 6(c)(1)(A), 6(c)(1)(B), 8(b). This portion of the proposed policy follows the suggestions of some courts that CIPA should serve as guidance in civil cases involving the state secrets privilege. *See Fitzgerald*, 776 F.2d at 1244 (referring to CIPA as possible template for balancing competing interests in civil context).

**7.      Courts Should Not Dismiss Cases Based on the State
Secrets Privilege Unless At Least One of the Parties
Cannot Fairly Litigate With Non-Privileged Evidence**

The proposed policy also provides that after taking the steps described above to permit litigation to proceed with non-privileged evidence, and such other steps as the court may deem appropriate to accomplish the same goal, the case should proceed to trial unless at least one of the parties cannot fairly litigate with non-privileged evidence. In particular, a court should not dismiss an action based on the state secrets privilege if it finds that the plaintiff is able to prove a *prima facie* case, unless the court also finds, following *in camera* review, that the defendant is unable to assert a valid defense with non-privileged evidence (including the non-privileged evidentiary substitutes described above). The review envisioned by this policy would involve evidentiary proffers scrutinized by the court. If the court finds that the plaintiff can prove a *prima facie* case with non-privileged evidence (including that obtained from sources outside the

government), and that the defendant's ability to defend against the plaintiff's case would not be substantially impaired because the defendant is unable to present specific, privileged evidence, the case would proceed to a trial on the merits. Following that rule, courts will satisfy the essential premise of the proposed policy, by making every effort to avoid dismissing a civil action based on the state secrets privilege.

## IV.    <u>CONCLUSION</u>

The ABA House of Delegates should adopt the proposed policy to encourage meaningful judicial review of assertions of the state secrets privilege. Absent that review, there is a risk that the government would effectively judge its own claim that information necessary to prove a plaintiff's case must be kept secret because disclosure would harm national defense or diplomatic relations of the United States. Adoption of the proposed policy would help ensure that the state secrets privilege is applied in a manner that protects the rights and civil liberties of private parties to the fullest extent possible without compromising legitimate national security interests.

Respectfully submitted,

Robert E. Stein, Chair
Section of Individual Rights and Responsibilities

August 2007

**116A**

<u>**GENERAL INFORMATION FORM**</u>

Submitting Entities:   Section of Individual Rights and Responsibilities

Submitted by:       Robert E. Stein, Chair
                      Section of Individual Rights and Responsibilities

1.     <u>Summary of Recommendation</u>

The recommendation addresses the proper application of the state secrets privilege, which is a common law evidentiary privilege that shields sensitive national security information from disclosure in litigation. The central premise of the recommendation is that courts should make every effort to permit litigation implicating the privilege to proceed to the merits, instead of dismissing cases on the ground that national security information could be divulged. The recommendation sets forth various procedures that courts should follow to protect privileged information while permitting litigation to proceed to the merits, with nonprivileged information.

2.     <u>Approval by Submitting Entity</u>

The Council of the Section of Individual Rights and Responsibilities approved the filing of this Report with Recommendation in principle on April 16, 2007, during its spring meeting in Washington, D. C. The Executive Committee approved the filing of this Report with Recommendation on May 7, 2007.

3.     <u>Has This or a Similar Recommendation Been Submitted to the House of Delegates Board of Governors Previously?</u>

<u>No.</u>

4.     <u>What Existing Association Policies Are Relevant to This Recommendation and Would They Be Affected by Its Adoption?</u>

None.

5.     <u>What Urgency Exists That Requires Action at This Meeting of the House?</u>

Legislative proposals addressing a limited application of the state secrets privilege are currently pending in Congress. In addition, litigation addressing the state secrets privilege could reach the U.S. Supreme Court during its October 2007 term. Action at

this meeting of the House would permit the Association to be an active participant in deliberations regarding this issue.

6.  <u>Status of Legislation</u>

    Two bills with state secrets provisions have both passed the House of Representatives but have not yet been considered by the full Senate. Both relate to circumstances in which the government invokes the state secrets privilege in cases involving whistleblowers who claim that adverse employment actions have been taken against them on account of protected disclosures they have made. Those provisions are Section 10 of H.R. 985, the Whistleblower Protection Enhancement Act, and Section 112 of H.R. 1401, the Rail and Public Transportation Security Act of 2007. Some members of Congress have expressed an interest in pursuing broader legislation to address the state secrets privilege.

7.  <u>Cost to the Association (both direct and indirect costs)</u>

    Adoption of this Recommendation would result only in minor indirect costs associated with Governmental Affairs and Section staff time devoted to the policy subject matter as part of the staff members' overall substantive responsibilities.

8.  <u>Disclosure of Interest</u>

    There are no known conflicts of interest.

9.  <u>Referrals</u>

    By copy of this form, the Report with Recommendation will be referred to the following additional entities, including all Sections and Divisions:

    Section of Administrative Law and Regulatory Practice
    Criminal Justice Section
    General Practice, Solo and Small Firm Section
    Government and Public Sector Lawyers Division
    Section of International Law
    Section of Litigation
    Section of State and Local Government Law
    Tort and Insurance Practice Section
    Judicial Division
    Law Student Division
    Senior Lawyers Division
    Young Lawyers Division
    ABA Task Force on Enemy Combatants
    ABA Standing Committee on Law and National Security
    American Immigration Lawyers Association
    Hispanic National Bar Association

National Asian Pacific American Bar Association
National Association of Women Judges
National Association of Women Lawyers
National Bar Association Inc.
National Legal Aid and Defender Association

10. <u>Contact Persons (prior to meeting)</u>

Dan Jarcho, Co-Chair
Coordinating Committee on National Security and Civil Liberties
ABA Section of Individual Rights and Responsibilities
McKenna Long & Aldridge LLP
1900 K St NW, Ste 100
Washington, DC 20006-1102
Tel : 202/496-7500
Fax : 202/496-7756
E-mail : [djarcho@mckennalong.com](mailto:djarcho@mckennalong.com)

Greg Nojeim, Co-Chair
Coordinating Committee on National Security and Civil Liberties
ABA Section of Individual Rights and Responsibilities
Center for Democracy and Technology
1634 Eye Street NW #1100
Washington DC, 20006
Tel.: 202/637-9800
Fax: 202/637-0968
E-mail: gnojeim@cdt.org

Tanya N. Terrell, Director
ABA Section of Individual Rights and Responsibilities
740 15th St., NW
Washington, DC   20005
Tel: 202/662-1030
Fax: 202/662-1031
E-mail: terrellt@staff.abanet.org

<u>Contact Person (who will present the report to the House)</u>

C. Elisia Frazier, Delegate
ABA Section of Individual Rights and Responsibilities
114 Grand View Dr.
Pooler, GA  31322
Tel.: 912/450-3695
Cell: 912/695-0261
Email:  cef1938@hargray.com

Richard M. Macias, Delegate
Richard Macias & Associates
2741 Prewett Street
P. O. Box 31569
Los Angeles, CA   90031-0569
Tel.: 323/224-3906
Fax: 323/225-4485
Cell: 323/428-8799
E-mail: rmmacias@aol.com

12.    Contact Person Regarding Amendments to this Recommendation

C. Elisia Frazier, Delegate
ABA Section of Individual Rights and Responsibilities
114 Grand View Dr.
Pooler, GA  31322
Tel.: 912/450-3695
Cell: 912/695-0261
Email:  cef1938@hargray.com

Richard M. Macias, Delegate
Richard Macias & Associates
2741 Prewett Street
P. O. Box 31569
Los Angeles, CA   90031-0569
Tel.: 323/224-3906
Fax: 323/225-4485
Cell: 323/428-8799
E-mail: rmmacias@aol.com

# EXHIBIT F

Copyright 2007 Federal News Service, Inc.
All Rights Reserved
Federal News Service

July 26, 2007 Thursday

**SECTION:** CAPITOL HILL HEARING

**LENGTH:** 23610 words

**HEADLINE:** HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY;
SUBJECT: FBI OVERSIGHT;
CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI);
WITNESS: ROBERT MUELLER, DIRECTOR, FBI;
LOCATION: 2141 RAYBURN HOUSE OFFICE BUILDING, WASHINGTON, D.C.

**BODY:**

   HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY SUBJECT: FBI OVERSIGHT CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI) WITNESS: ROBERT MUELLER, DIRECTOR, FBI LOCATION: 2141 RAYBURN HOUSE OFFICE BUILDING, WASHINGTON, D.C. TIME: 1:34 P.M. EDT DATE: THURSDAY, JULY 26, 2007

   REP. CONYERS:  (Sounds gavel.)  Good afternoon.  The committee will come to order.

   Today's hearing is on the Federal Bureau of Investigation, and our sole witness today is Robert Mueller, III, director of the Federal Bureau of Investigation, whom we welcome to the committee hearing.

   The Federal Bureau of Investigation is the linchpin of the nation's law enforcement efforts.  We have granted the bureau significant powers:  the ability to initiate investigation to conduct surveillance on our citizens and to combat crime and, more recently, terrorism.  And with those powers goes responsibility and accountability to respect citizens' civil rights and civil liberties, to testify fully and forthrightly to Congress.

   There are thousands of men and women in the FBI who put their lives on the line for us every day while doing their utmost to ensure the rights of the people are fully respected.  It's a difficult balancing act, and the FBI's history is replete with instances where the bureau has crossed the line, and sometimes that abuse has risen to the very top.  We saw it going back in history with the notorious COINTELPRO investigation into political activities in the `50s and `60s.  We saw it when the FBI sought to wiretap and harass Martin Luther King, Jr. and the files of groups such as the NAACP.  It's no understatement to say that the shadow of J. Edgar Hoover still haunts the Federal Bureau of Investigation.

   The stakes are even higher today than they were then because after the tragedy of September 11th, Congress passed new laws transferring even greater powers to the Federal Bureau of Investigation under the Patriot Act at the same time the department relaxed regulations that had been in place for decades to check the FBI's powers.  We also granted the bureau significant funding increases.

   Now, the FBI has had notable successes, and under Mr. Mueller's leadership has been able to begin the process of modernizing and retooling itself.

   This week, they seized more than $500 million worth of counterfeited goods in China.

   The bureau has also had some unfortunate failures that include the so-called national security letter program, and several months ago we learned that FBI agents had routinely used national security letters without proper authorization and outside of statutory and regulatory requirements.  We learned of the FBI misuse of so-called exigent letters in nonemergency situations; in other words, the FBI claims that there was an emergency simply to bypass the national security letter requirement.

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION: 2141 RAYBURN HOUSE OFFICE BUI

Five months later, I have yet to learn of a single FBI agent or employee being disciplined. Five months later, we have no concrete guarantees that this won't happen again. And five months later, we still have no reform of the whistle-blower process.

We all appreciate the need for increased powers to combat terrorism. We in Congress have the job of making sure that these powers are not abused, and if they are, we have the further job of reining in those powers as appropriate by oversight and if necessary by statute. And so it's in that spirit that we are conducting this hearing, and I hope that we will be able to work cooperatively with this director and head of the FBI to ensure that we are striking that difficult and proper balance between security and liberty.

I'm pleased now to recognize Lamar Smith, the ranking member of the Judiciary Committee from Texas, for his opening comments.

REP. LAMAR S. SMITH (R-TX): Thank you, Mr. Chairman.

Like you, Mr. Chairman, I welcome today's witness, Director Mueller, and I want to thank him for his dedication and commitment to the mission of the FBI, which plays such an integral role in protecting the lives of the American people.

Certainly Director Mueller deserves credit for his efforts to successfully prevent another terrorist attack since 9/11. The FBI recently has thwarted two intended terrorist attacks, one at Fort Dix Army Base, and one at JFK International Airport. As the recent National Intelligence Estimate has indicated, though, our nation is still at risk. We must continue to wage the war against terrorism at home and abroad.

On another subject, last March the committee reviewed the inspector general's audit at the FBI's use of national security letters. In that audit, the IG raised concerns regarding the FBI's use of such letters. The problem was with enforcement of the law, not the law itself. The FBI has conducted an internal audit of NSL files, prepared and disbursed specific guidelines for the use of NSL authority to its 56 field offices and established an Office of Compliance to ensure that its practices adhere to federal laws and regulations.

A few days ago, the Justice Department and the FBI announced new measures to enhance national security oversight and compliance. DOJ created a dedicated Oversight Section within the National Security Division; the FBI created a new Office of Integrity and Compliance. These new oversight programs will help ensure that national security investigations are conducted in a manner consistent with the nation's laws, regulations and policies, including those designed to protect the privacy interests and civil liberties of U.S. citizens.

It's worthwhile to remember that no evidence suggests that anyone at the FBI intended to violate the law or internal policy governing the use of NSLs. FBI agents acted in good faith and sought to comply with the law, even as they worked under severe time constraints and with an urgent desire to stop terrorist activities.

As the inspector general reported, NSLs are a critical tool in fighting terrorism and keeping our country safe. To do their job, the FBI must collect important information about suspected terrorists and spies.

The FBI has combatted terrorism while continuing to fight against other, more traditional forms of crime, such as gang violence, white- collar fraud schemes, cybercrime, child pornography, drug trafficking and intellectual property crime too.

Director Mueller, thank you for all the good work that the FBI has done for all good Americans. We appreciate your being here.

REP. CONYERS: Thank you, Mr. Smith.

Robert Mueller III, director of the Federal Bureau of Investigation, has held his post since September 4th, 2001. He has a long and distinguished career in public service. Between Princeton and University of Virginia Law School, he served as an officer in the Marines and was heavily decorated. He has been an assistant United States attorney in San Francisco, in Boston, and in Washington, D.C. He served as assistant attorney general for the Criminal Division in the early '90s, and he returned to San Francisco in 1998 as United States attorney. In between that, he's managed two stints in private practice as a partner at two prominent Boston firms.

He was called back from San Francisco to Washington in early 2001 to be acting deputy attorney general, where he served until assuming his current post.

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION: 2141 RAYBURN HOUSE OFFICE BUI

We have his statement, which will be included in the record, and we welcome him to proceed with his commentary.

MR. MUELLER:  Thank you, Chairman Conyers, Representative Smith and other members of the committee. Thank you for having me here today.

When I was sworn in nearly six years ago, we were keenly aware not only of the successes of the bureau but also of the need to address a number of management and administrative challenges facing the bureau.

However, the terrorist attacks of September 11th, coupled with emerging terrorist and criminal threats brought on by globalization and advances in technology, required far more changes than we ever anticipated prior to September 11th.  And today the FBI is a stronger organization, committed to protecting the American people from both terrorism and traditional crime, while upholding the Constitution and protecting civil liberties.

Today I want to give you a brief sense of the FBI's current priorities, the changes we have made to meet our mission, and some of the challenges we are facing.

After September 11th, the FBI's priorities shifted dramatically. Today our top three priorities -- counterterrorism, counterintelligence and cybersecurity -- relate to the national security.  And to that end, we have made a number of changes in the bureau, both in structure and in the way we do business.

The FBI's top priority is and will continue to be the prevention of another terrorist attack.

Since September 11th, we have made significant progress and had notable successes in the war against terror.  We have doubled the number of intelligence analysts on board and tripled the number of linguists. We have set up Field Intelligence Groups in each of our 56 field offices, tripled the number of Joint Terrorism Task Forces from 33 to over 100, in which we combine the resources and expertise of the FBI, the intelligence community, and state and local law enforcement officers.  And today intelligence is woven through every FBI program and every operation.

And as has been pointed out, we have successfully broken up terrorist plots across the country, whether it be Lackawanna, New York; Portland, Oregon; Torrance, California; Chicago; and recently the potential attacks on Fort Dix and the JFK plot.

Our second priority is counterintelligence, protecting our nation's most sensitive secrets from those who would do us harm and who would strike at our economic well-being.  We reach out to businesses and universities.  We join forces with other intelligence community members and we work closely with the military and others to safeguard our secrets.

Our third priority in the post-9/11 world is the ever-evolving cybercrime threat.  Our foreign adversaries and competitors can remotely observe, target, acquire and exploit our information to their advantage.  Terrorists now recruit, train and plan attacks on the Internet.  Sexual predators prowl chat rooms for young victims.  Spies sell intellectual property and state secrets to the highest bidder. Hackers, who used to shut down servers around the world for bragging rights may now be linked to criminal and terrorist organizations.

Many traditional crimes, from money laundering and fraud to identity theft and organized crime, have migrated online.  The FBI's cyber division, created five years ago, uses highly trained investigators to address these threats.  And we effectively partner with government and industry through our sponsorship of InfraGard, a public and private alliance of over 20,000 individual members.

And while Americans are justifiably concerned about terrorism, it is crime in their communities that often directly touches their lives. With limited resources, the FBI must target those criminal threats against which we have the most substantial and lasting impact, and I want to emphasize five areas.

First, public corruption:  In the past two years alone, we have convicted over 1,500 federal, state and local officials, and recovered hundreds of millions in fines and restitution.

Civil rights:  In recent years, we have expanded our civil rights program beyond police brutality and hate crimes to include the Civil Rights Cold Case Initiative and human trafficking issues.

Transnational organized crime continues to evolve with advances in globalization and technology, and we will continue our international commitments to this threat.

White collar crime, including corporate, securities, commodities, investment, mortgage and health care fraud, continued to adversely affect our nation's economy and contributes to a number of victims, and we will continue our efforts to maintain public confidence in our country's economic institutions.  Another area I might mention is our Hurricane

Fraud Initiative addressing contract and procurement fraud in the Gulf Coast region in the aftermath of Hurricanes Katrina and Rita.

Violent crime, especially violent gangs: Gangs are a nationwide plague no longer limited to our largest cities, and the FBI works to combat this pervasive threat through our Safe Streets Task Forces, which have grown nearly threefold since 2001, and we are combating violent crime through other partnerships and task forces. Some of our Safe Streets and Safe Trails Task Forces are dedicated to other violent crime, from kidnappings to extortions to major Interstate theft to assaults and murder in Indian country.

Finally, allow me to conclude by bringing you up to date on two issues about which I know you have particular concern, one of which has already been mentioned, and that is national security letters.

In response to the Department of Justice inspector general's report concerning our use of national security letters, the bureau is in the process of implementing numerous reforms in which, I believe, your staff members have been continuously briefed. These reforms will ensure that we comply fully with both the letter and the spirit of the authorities entrusted to us. We are identifying and rectifying errors in our use of NSLs. We have changed the approval process to include review of all NSL requests by FBI attorneys. We have and are retraining agents and supervisors on how and when to use NSLs.

Within the FBI itself, we have established the Office of Integrity and Compliance reporting directly to the FBI's deputy director. While many major corporations have compliance divisions, few, if any, government agencies have a department-wide program to internally monitor compliance. And given the complex nature and important nature of our mission, as well as the number of rules and guidelines and laws to which we are subject, such a program is an imperative, and we have put it in place.

And finally, in response, Mr. Chairman, to one of your issues in terms of accountability, we are conducting an investigation with the inspector general in the lead into the use of the exigent letters, and my expectation is, as a result of that investigation, we will take whatever steps are necessary to hold persons accountable. That investigation is pushing forward rapidly, but it is still ongoing.

And second, in recent years we have made major improvements to the FBI's outdated information technology systems. We have installed thousands of state-of-the-art computers and secure and global networks. We are also in the process of implementing Sentinel to help the FBI manage information and provide enhanced information sharing, search and analytical capabilities. In June, we successfully implemented the first phase of Sentinel and are currently working on the development and deployment of the next set of capabilities.

Mr. Chairman, let me conclude by saying that the FBI was created nearly 100 years ago to address crime crossing state boundaries. Threats we now face are global, and technology is moving more quickly than any of us could have foreseen just 10 years ago. We must continue to protect the security of our nation while upholding the civil rights guaranteed by the Constitution.

And I speak to special agents upon their graduation from the FBI Academy. I remind each one that it is not enough to prevent foreign countries from stealing our secrets, we must prevent that from happening while still upholding the rule of law. It is not enough just to stop the terrorists, we must stop him while maintaining his civil liberties. It is not enough to catch the criminal, we must catch him while respecting his civil rights.

Mr. Chairman, Representative Smith and members of the committee, I appreciate the opportunity to testify this afternoon and look forward to answering your questions.

REP. CONYERS: Thank you for your testimony, which will accompany your written statement.

I wanted to begin with the anthrax investigation, which we can't get any information about, but yet the Senate apparently got a briefing on it.

And we have Richard Hurtling, acting assistant attorney general, wrote Congressman Rush Holt saying that we can't give you any information or a briefing in the House. Is there any way we can overcome this difference of views?

MR. MUELLER: I would be happy to discuss with the Department of Justice the possibility of providing some form of briefing with regard to what is happening in the anthrax investigation. It is an ongoing investigation, and quite obviously, we have some concerns that it be maintained in a -- the confidentiality be maintained. But in the meantime,

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION: 2141 RAYBURN HOUSE OFFICE BUI

I'll discuss with the department a mechanism whereby we can give you a briefing as to what we're doing, the number of agents on the case and some of the aspects of the case that would not compromise the ongoing investigation.

REP. CONYERS: Thank you.

Now, the National Security Letters. The inspector general's report said that of -- the 143,074 requests between 2003 and 2005 involved information on U.S. citizens, most of them presumably innocent. And there are those in the Congress that begin to question the continued giving of the FBI this broad NSL authority in light of the findings, not only from the inspector general's report but from the FBI's own internal audit, that the bureau has systemic difficulties in limiting National Security Letters to appropriate uses.

Your comments, please.

MR. MUELLER: First of all, let me say I absolutely understand the concern from the IG's report. A couple of preliminary points to make, and that is that the inspector general did not find any intentional activity or actions by FBI agents to circumvent and obtain records to which they were not entitled. And in almost every case, the FBI was entitled to the records that were obtained.

One of the concerns I think is raised is the fact that there are so many and that they are U.S. citizens. And I would give you perhaps a hypothetical that would explain the necessity for the use of that tool. We will upon occasion have investigations such as we had overseas this last few weeks where in the United Kingdom there were a couple of cars left outside a nightclub with the expectation they'd explode. There was a terrorist attack in Scotland. And a year ago, if you recall, there were a group of individuals in the United Kingdom who were arrested, intending to bring on board liquid explosives on a number of planes and blow them up.

Either international investigations or domestic investigations -- we will find, in the course of those investigations, telephone numbers that they have utilized and be passed to us by British authorities, e- mail addresses and other identifiers of communication. If we have individuals in the United States who are in contact with individuals who are part of a terrorist cell overseas, it is incumbent upon us to determine whether or not they are contacting people in the United States who may be terrorists, may be part of that group, or to determine that they are not persons part of that group. In order to get those records, we use national security letters.

The standard needs to be relevance to our investigation. It is important that we track down every possible lead to individuals in the United States who might be undertaking terrorist attacks. It is not something that we did; we did not have the tools prior to September 11th. It is fair to say that to the extent that we have been in some ways successful in preventing terrorist attacks since September 11th, it is attributable to the tools that have been given to us under the Patriot Act.

Let me finish by saying that what we did not have in place which we should have had in place is a compliance program to assure that the procedures we had were being followed across the field and that our databases were accurate and up to date. We did not have that; we have put that into place. And my hope and expectation is that with all of the changes we have made, we will never again face the problem that we faced in the last few months on items such as national security letters.

REP. CONYERS: Well, I have more questions of course, but my time's expired, and I'll yield to Lamar Smith.

REP. SMITH: Thank you, Mr. Chairman.

Director Mueller, when the American people think of the FBI, I think they think of your two worthy missions -- one, to reduce violent crime, and two, to deter terrorist attacks, and I'd like to ask you about the latter.

To what extent is al Qaeda trying to get agents into the United States? Are you seeing an increase in activity or a decrease in activity? And also, to what extent is the FBI able to break up cells or deter those types of activities?

MR. MUELLER: Well, as the recently released National -- or the National Intelligence report -- the NIE indicates, that for the next three years, we face a threat of terrorist attack. In part, it is attributable to the understanding of persons affiliated and associated with al Qaeda, that it is important to try to find individuals who can circumvent our border security and come into the United States much the way the 19 hijackers did prior did September 11th. They have, since September 11th, not for one instant given up the hope and the efforts to try to infiltrate persons into the United States to undertake attacks.

REP. SMITH: You're saying we need to strengthen our immigration laws and our border security, then?

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION: 2141 RAYBURN HOUSE OFFICE BUI

MR. MUELLER: We continue -- we have and we need to continue to do so. We also need to understand that it's not just stopping individuals at the borders, but that once individuals are in, we have to identify those individuals who may have come in with the intent of undertaking an attack -- or, as important, individuals within the country who have been radicalized, by the Internet or otherwise, are perhaps American citizens or perhaps recent immigrants, but come together, self-radicalized, with the expectation of being able to undertake a terrorist attack.

So it's not just border security but it also is our ability to develop sources, to have trip wires out, to identify individuals who may already be in the United States, or others who are coming in the United States who may be part of an effort to undertake a terrorist attack.

REP. SMITH: Director Mueller, how many individuals in the United States have you suspected of either intending to commit a terrorist act or had the potential to commit a terrorist attack that you have deterred, stopped, arrested or otherwise prevented from doing so?

MR. MUELLER: Well, certainly --

REP. SMITH: Is it --

MR. MUELLER: I hate to get into numbers, particularly in an open forum. I can tell you that over -- since September 11th, we have had thousands of investigations into persons in some way associated with terrorists, various Sunni or even Shi'a terrorist groups. And there also are levels of participation. There is funding, there is recruiting, there is radicalization, all pieces of the terrorist puzzle, in addition to those who provide support or those who are going to undertake a terrorist attack. And we have to address that across the board, and have.

REP. SMITH: Right. Let me ask you a question about internal policy at the FBI that affects, I think, most of your personnel. What have been the success or lack of success involved with the five years up-or-out policy? I think that was implemented a couple of years ago.

MR. MUELLER: In 2004 we determined that we needed to change the way we develop leadership to encourage and push forward, give incentives to the best in the bureau to raise to the top. We decided that 2004, indicated we'd start the process two years later, in 2006, giving individuals an opportunity to adjust their career moves.

It was -- the purpose of this was to use the supervisor's position as the first step in career-building and to encourage persons to become assistant special agents in charge. It has had that effect. We have many more people seeking to move up the career ladder within the FBI.

REP. SMITH: So it's been a success.

Let me squeeze in one more last question, on a different subject. What have been the main obstacles to the states' providing accurate information to you all for the instant background check?

MR. MUELLER: It is not -- well, there are obvious examples, such as what happened with West Virginia, in terms of the medical and the psychiatric records. That is an obvious example.

There are other areas where, because of the lack of technology in particular states, it's difficult for the information to be dumped into or -- be given to us or to be adequately queried. I'd have to get back to you more of the specifics on that.

REP. SMITH: Okay. If you can get back to me on the --

MR. MUELLER: I'll be happy to do that.

REP. SMITH: -- that would be great. Thank you.

Thank you, Mr. Chairman.

REP. CONYERS: Thank you.

The chairman of the Constitution Committee, Jerry Nadler of New York.

REP. JERROLD NADLER (D-NY): Thank you, Mr. Chairman.

Director Mueller, the IG reported that the number of requests for NSLs from 2003 to 2005 was over 143,000. About half of those concerned U.S. persons.

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY:
REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION:
2141 RAYBURN HOUSE OFFICE BUI

He also reports that the number of terror-related convictions the inspector general was able to confirm stemming from the 143,000 persons information that was collected through NSLs was one. Doesn't that sound a little unbalanced?

MR. MUELLER: Yeah, I would have to go back and look at that. Quite clearly national security letters have figured in a number of terrorist investigations, disruptions and prosecutions.

REP. NADLER: Substantially more than one?

MR. MUELLER: Yes.

REP. NADLER: Because the IG reports that there was one conviction that stemmed from those 143,000 people.

MR. MUELLER: I'd have to go back and look at that statement. I didn't focus on that but I can assure you that there -- national security letters have focused in any number of investigations. Any time you have an investigation such as this Operation Overt where individuals are trying to get on planes in the U.K., we will have efforts to immediately determine whether or not we have a threat here. If you have a JFK plot, the recent plot against Fort Dix, I can assure you that --

REP. NADLER: Well, all right, let me go further.

The IG also discovered that the subscriber information for approximately 11,100 phone accounts wash attained with only nine NSLs. Doesn't this -- nine NSLs produced 11,000 phone accounts.

MR. MUELLER: Yeah, I'd have to get back to you on that.

REP. NADLER: All right, because, well, that's what the IG -- it's in the IG's report. And my question is, that ratio sort of implies a fishing expedition, or at least not a very focused investigations.

MR. MUELLER: I'm not going to disagree with you in terms of the perception. I'd have to get back to you as to the circumstances under which -- number one, what the IG was referring to, and the circumstances that he is referring --

REP. NADLER: Okay, in the June 1st, 2007 draft guidelines on the issuance of NSLs, on page three, there's a discussion of e-mail and what is content and therefore cannot be obtained by an NSL. But that discussion is redacted. So my question is, do you consider the body of the text of an e-mail to be content?

MR. MUELLER: Yes, both, if you're talking about the body of an e-mail, I would --

REP. NADLER: That's content as far as you --

MR. MUELLER: That is content. Let me just -- (off mike) --

REP. NADLER: And therefore cannot be obtained.

MR. MUELLER: Yes, the content.

REP. NADLER: And therefore cannot be obtained by any NSL?

MR. MUELLER: That's correct.

REP. NADLER: And the body -- all right, the subject line of the e-mail?

MR. MUELLER: I'd have to make certain and then get back to you. I believe that's content as well.

REP. NADLER: Okay, now on page 109 of the inspector general's report, it's reported that agents are accessing, quote, "NSL information about parties two or three steps removed from their subjects without determining if these contacts reveal serious connections," closed-quote. Doesn't this violate even the relevance standard for issuing NSLs?

MR. MUELLER: Again, I'd have to go -- it may. I do not believe it necessarily does. (Off mike) -- determine the circumstances of a particular investigation.

REP. NADLER: Well, and if it doesn't, would that not imply that the relevance standard is a little too low?

MR. MUELLER: Again, I think you would -- you'd have to look at the circumstances. I don't think you could make a basic conclusion on that statement alone. You would have to look at the circumstances. Because there may well be indications that this person is part of a community and may refer --

REP. NADLER: All right, let me switch topics.

MR. MUELLER:  Mm-hmm.  (In affirmative.)

REP. NADLER:  In the revisions to Section 505 that were made by the Patriot Act, the new standard was that in order to get an NSL, you simply had to assert that it is relevant to an ongoing investigation with respect to terrorism.

MR. MUELLER:  Yes.

REP. NADLER:  The old standard was that in order to get an NSL, you had to assert specific and articuable (sic) facts, giving reason to believe that the information the records sought by the letter pertained to a foreign power, an agent of foreign power, or terrorist.

Now, why shouldn't we go back to that?

MR. MUELLER:  Because it would absolutely hobble us --

REP. NADLER:  How so?

MR. MUELLER:  -- in terms of our -- our ability to do it because you need information to make that finding that the person is an agent of a foreign power.  The only way to get the information to make that finding is to obtain records in which there is a limited, limited privacy right, such as subscriber records, until you make that finding.  And to put that finding at the front, it -- (inaudible ) --

REP. NADLER:  (Off mike) --

MR. MUELLER:  -- of getting -- if I could just finish --

REP. NADLER:  Yeah.

MR. MUELLER:  -- it would preclude us from doing exactly what I said we need to do.  When we get telephone numbers from a U.K. plot, we do not know whether the person's contact in the United States are terrorists or not.  With that standard, we would not be able to follow up on that information we got from our counterparts overseas.

REP. NADLER:  I yield back.

REP. CONYERS:  Thank you.

The former chairman of Judiciary Committee, Jim Sensenbrenner, from Wisconsin.

REP. JAMES SENSENBRENNER (R-WI):  Thank you very much, Mr. Chairman.

First, Director Mueller, let me say I appreciate your meeting with me yesterday relative to the audit of the Milwaukee FBI Office on privacy violations, and while I understand that the audit is not finalized and it would be premature to talk about the substance of that, I'd like to ask you to send me a copy of the finalized audit once it is available.

Can you do that?

MR. MUELLER:  I will look and see if we can, yes.

REP. SENSENBRENNER:  Okay.

Now, relative to national security letters, am I correct in understanding that the Justice Department and the FBI had national security letter authority long before the Patriot Act, specifically since 1986?

MR. MUELLER:  Correct.

REP. SENSENBRENNER:  The national security letters were not new at the time the Patriot Act was signed by the president in October 2001.

MR. MUELLER:  Also true.

REP. SENSENBRENNER:  Am I also correct in understanding that national security letters under the revised standard cannot be used for a garden variety criminal investigation that does not involve terrorism or espionage?

MR. MUELLER:  Yes, sir.

REP. SENSENBRENNER:  So my question is, is what kind of safeguards were there in the FBI to prevent NSLs from being used for the non-terrorism and non-espionage investigations?

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY:
REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION:
2141 RAYBURN HOUSE OFFICE BUI

MR. MUELLER:  The safeguards we had were -- in essence, the agent had to do a write-up of the basis for the NSL that would support the national security itself, and then it would have to be approved by the special agent in charge.

What we have put into place since we realized that this was not always happening appropriately is we've required now that before a special agent in charge signs off on a national security letter, that special agent -- the lawyer in the office go through the national security letter to assure that it is appropriately being issued and that there is the appropriate underlying investigation supporting the issuance of national security letter.

We also have put into place -- and it is being piloted as we speak; it went -- the pilot started this week -- a new database software program, and we've started piloting it in the Washington, D.C. Field Office, which requires certain information to be filled into particular blanks before that national security letter will be issued, which will assure that we have the appropriate approvals, but will assure that we have the appropriate count to forward to Congress as well.

REP. SENSENBRENNER:  Have you had any experience to make sure that these new guidelines are working and preventing National Security Letters from being issued when they're not supposed to be issued?

MR. MUELLER:  Well, in the wake of the IG's report, we took approximately 200 agents and others and did an audit of all of our offices to see where we were.  In the wake of that, if there was an office that had a particular problem, we have addressed it.  We are continuously in the process of training and putting out the guidance -- the guidance, I think somebody had a copy of the draft guidance.  We had run our draft guidance past privacy and civil rights organizations to have -- get input on that policy.  We've issued that policy.  And I know the inspector general is looking at the ability of our initiatives to address the problem and will be reporting to Congress in December.  But my expectation is that he will find that we have taken the steps necessary to assure that this does not happen.

REP. SENSENBRENNER:  As the author of the Patriot Act and the author of the Patriot Act reauthorization, which did put some restrictions on NSLs about a year and a quarter ago, let me say that I am very concerned that NSL -- the controversy on NSLs is bringing down certain support for the Patriot Act even though the bells and whistles and traps to prevent NSL abuse have nothing to do with the Patriot Act, because the NSLs were authorized, I believe, in the law that was authored by the Patriot Act's principal critic in the Senate, Senate Leahy.

Some -- I guess people have a much lesser attention span or institutional memory on the other side of the Capitol than over here.  But I can say that in 2006, this committee did a lot to fix up some of the gaps that Senator Leahy had in the NSL law of 1986.

And my time is up.

MR. MUELLER:  Let me just say that I testified before both bodies, sir, and -- (chuckles) -- I understand what you're saying. (Laughter.)    But will not comment.  (Laughter.)

SEN. CONYERS:  Careful.

MR. MUELLER:  That's what I'm -- no, it's -- I have a very good relationship with the other body.

SEN. CONYERS:  The chairman of the Subcommittee on Crime, Bobby Scott of Virginia.

REP. ROBERT C. "BOBBY" SCOTT (D-VA):  Thank you.  Thank you, Mr. Chairman.

Mr. Mueller, you mentioned linguistics as a skill set that's needed at the FBI.  Does the diversity in employment within the FBI reflect the need to get persons with the cultural knowledge, sensitivity and linguistics?

MR. MUELLER:  Yes, sir.

REP. SCOTT:  (Do you have enough ?) people of different backgrounds?

MR. MUELLER:  Yes, sir.

REP. SCOTT:  Could we get the breakdown -- diversity breakdown at the FBI?  If you could provide that --

MR. MUELLER:  Absolutely.

REP. SCOTT:  -- of your employees.

MR. MUELLER:  We'd had previous testimony that there was virtually nothing that you can get with a no-warrant NSL that you couldn't get by going through FISA.  Is that right?

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION: 2141 RAYBURN HOUSE OFFICE BUI

MR. MUELLER: That's wrong. No, we're limited in what we can get under NSLs. There are broader categories of records we certainly can get going through the FISA Court under 215.

REP. SCOTT: You can get more out of FISA than you can get with an NSL?

MR. MUELLER: Yes.

REP. SCOTT: Then remind me why we need -- and then you can get an emergency, after-the-fact warrant under FISA?

MR. MUELLER: Yes.

REP. SCOTT: So why do we need to do this without a warrant?

MR. MUELLER: Because we need to react quickly to terrorist threats, we need the capability of immediately, when we get information on individuals who may want to communicate with others -- we need to get that information, and we need to get the information, say, on a number -- 10, 15, 20 numbers. If we make an arrest someplace and we find an address book, and the numbers that are in that address book are of other terrorists, we have to know with whom that terrorist is communicating, and we need to get that information quickly. And we cannot take the time, in my mind, to go through that which is necessary, to have the court review the paperwork in order to get that information.

REP. SCOTT: Now, isn't there an after-the-fact procedure where you can go get the information and then later get around to the paperwork?

MR. MUELLER: That's true. But the paperwork -- the court proceeding to get a FISA, where you are seeking the right to intercept the content, the conversations of an individual is generally a quarter of an inch thick. It requires the certification by me, the certification by the attorney general, an affidavit by an agent, and it is -- to require that in order to get the information on a subscriber would be an inordinate burden and would hobble us, as I've said before, in our ability to swiftly react to the threat of terrorism.

REP. SCOTT: Well, wait a minute. I thought you said you could already swiftly react, go get the information, and then do the paperwork when you get around to it.

MR. MUELLER: Right. We would be -- the paperwork would inundate us. I've given you some examples of what we do in terms of needing the subscriber information, the e-mail information and the like. And we do it countlessly, day in and day out.

REP. SCOTT: The advantage of a warrant is that you -- it's a(n) ex parte proceeding -- only one side is represented, so you can't possibly lose the case -- but the idea of the fact that you just have to explain to somebody what you're doing kind of has a little check and balance to it that you don't have when you just go on your own -- get what you want.

MR. MUELLER: Well, there are, in my mind, several checks and balances -- internal checks and balances in the --

REP. SCOTT: (Laughs.) I'm sorry. But some of us look at checks and balances as one branch of government looking over another branch of government. An employee of the executive branch checking with a subordinate does not constitute, in my mind, a check and balance.

MR. MUELLER: I was going to go on to say also, the Department of Justice, the Inspector General's Office, under the original Patriot Act and revisions to the Patriot Act, is looking at our processes and procedures, and ultimately as well the checks and balances from Congress, the other branch of government.

In my mind, where the intrusion into privacy is somewhat limited when it comes to toll records and the like, the necessity for going through the FISA process is much reduced in the same way in the criminal sphere where a grand jury subpoena is issued on a relevant standard. But if there is more -- a more dramatic incursion into the privacy rights in terms of a Title III and the like, you go to a court.

REP. SCOTT: In the past, the department has seen the requirement of proving force and fraud as a major obstacle to their efforts to investigate and prosecute cases of domestic human trafficking.

To address the problem, as you know, we recently increased the penalties from 10 to 20 years under the Mann act, so that the department can pursue domestic traffic cases, and also changed the standard to remove the provision that you had to prove force, fraud and coercion.

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION: 2141 RAYBURN HOUSE OFFICE BUI

Since increasing the relevant penalties, what has the FBI done to bring about more investigations in this case, and how has the FBI used the more relaxed standards to -- for prosecution purposes? And what services are available for the victims?

MR. MUELLER: I would have to get back to on the specifics tied into that statutory change, if you'll allow me.

REP. SCOTT: (Off mike) -- another question while the chairman wasn't looking, but apparently -- (laughter).

Well, I have one -- let me just ask one other quick question, and that is, you know that Internet gambling is illegal in the -- running an Internet gambling operation is illegal in the United States. Is there any way that you can effectively prohibit Internet gambling by people in the United States on the Internet? And if not, would it make better sense to legalize and tax it and regulate it?

MR. MUELLER: I have not really looked or thought long and hard about it. But I would probably be averse to legalizing it, for a variety of reasons. They are difficult to prosecute, because they can go offshore so quickly. And with the ubiquitous nature of the Internet, it is often difficult, with anonymizers and the like, to track down individuals who are running offshore gambling organizations in the United States, although we endeavor to do so.

REP. CONYERS: The chair recognizes the distinguished gentleman from California, Elton Gallegly.

REP. ELTON GALLEGLY (R-CA): Thank you very much, Mr. Chairman.

I'd like to thank the gentleman from North Carolina for letting me speak out of order. And I'll try to be brief, because I have another commitment.

Director Mueller, as of April of this year, there's a backlog of 636,000-plus illegal alien absconders. And that number has doubled since the last report five years ago. Clearly many of these folks have an objective to do great harm to our nation. Many others are here strictly for economic reasons.

Clearly I understand that your -- under your leadership as the director, you've have probably more challenges and -- of significant magnitude than any director in history. That -- and I know that one of the most difficult jobs in any administrator's life is establishing priorities.

But could you tell me if and what the FBI is doing to identify and apprehend illegal alien absconders?

MR. MUELLER: It generally does not fall within our bailiwick.

We certainly help the Department of Homeland Security and its various agencies where we can. And I know that Homeland Security and Mike Chertoff have programs to address that particular issue. But our support is secondary support where we can give it.

REP. GALLEGLY: Appreciate that.

An issue that we have heard a lot about lately, FISA, the Foreign Intelligence Surveillance Act, and we know the administration has recently asked Congress to modernize this act. Could you give us a very brief summary of why you feel that that's so important?

MR. MUELLER: Generally speaking, as I adverted to in my opening remarks, the digitization, the ability of persons to communicate in a variety of ways through digital networks, whether it be Skype, voice over IP, otherwise, the ability of persons to utilize communication capabilities across international lines has grown immensely over the years, and the statutory framework has not kept up with it. It goes without saying that, as was shown on September 11th, we face threats from overseas that we never thought we would face prior to that happening, because of the oceans on both sides of us, but with internationalization, we have to be astute and flexible in understanding that those who wish to do us harm from overseas can quickly cross borders with the click of a mouse or come into the country.

One of the things we absolutely need to do is, to the extent possible, understand that we have to use all of our resources on persons who are not U.S. citizens in foreign countries to obtain information with regard to their communications traffic. With a United States citizen in the United States, there should be a different mechanism. We all agree. The FISA modernization statute that we have sought from Congress will upgrade those capabilities and allow us to do in some sense that which we were able to do before technology, when we were using the old technology, but have been barred from using given the provisions of the FISA statute.

But we have to recognize that the division between information from outside the country -- the division of that information from outside the country to the information inside the country has to be broken down. There has to be integration. There has to be use of full capabilities, particularly when it comes to non-U.S. persons.

REP. GALLEGLY: Thank you, Mr. Director. I --

REP. CONYERS: Would the gentleman -- are you finished?

REP. GALLEGLY: I just want to make a 15-second summary. It's clear, I think, to most of us that in order to get to the core of organizations like al Qaeda, who have absolute modernized, technological telecommunications ability, is to penetrate through the network. And without this modernization, I would -- I think we all know that it's going to be very difficult to penetrate that outside network to get to the core.

I thank you very much. I thank the gentleman for letting me speak out of turn.

REP. CONYERS: Would the gentleman yield to me --

REP. GALLEGLY: Certainly.

REP. CONYERS: -- the balance of his time? Thanks, Elton.

REP. GALLEGLY: Thank you very much, Mr. Chairman.

REP. CONYERS: Since we're not likely to have a second round, I just wanted to get in some of the -- two issues in Dearborn, Michigan, in which we have the largest concentration of Muslims and Arabs of anywhere in the country. And we've had two charities in Dearborn that have been -- had their accounts suspended and they're under investigation. And individual bank accounts of people of Arab descent have been summarily discontinued by their banks. And I need to have your -- the FBI assist us in understanding where all this is going, since these two charities enjoyed a pretty good reputation in the general public.

MR. MUELLER: Mr. Chairman, I think I'm sure you understand that whatever actions were taken were taken -- at least by the law enforcement authorities -- were taken with the approval certainly of the U.S. attorney, and in most cases, I would believe, the courts.

With regard to independent actions of banks, that is something I'm not aware of and would be happy to look into. But whatever action's been taken on these charities, I think you will find, have been taken as a result of appropriate legal process.

REP. CONYERS: Did you know in 2004, October, and it was reported in the papers, Homeland Security -- ICE, the Immigration and Customs Enforcement section -- and the FBI were knocking on doors in the October before the November elections, that apparently gave many of those citizens in that area the impression that they were being intimidated about the voting process.

MR. MUELLER: No, sir, I have -- that's the first I've ever heard of that.

I have not heard a complaint about that. And I can assure you that at no time have we in the bureau in any way sought to intimidate an individual from exercising their constitutional right to vote. And if you wish to pass on the specifics to me, I will certainly look into that.

REP. CONYERS: I'll get the information to you.

MR. MUELLER: Does not sound like that is something that we would engage in at all.

REP. CONYERS: Thank you.

The chair recognizes the ranking member of the Patent -- oh, I'm sorry. Mr. Watt is next. The chair recognizes the distinguished gentleman from North Carolina, Mel Watt.

REP. MEL WATT (D-NC): Thank you, Mr. Chairman. I thought you had elevated me to some position that I didn't hold there for a little bit. (Laughter.)

Mr. Director, one of the concerns that I'm hearing expressed to me by a number of people is that traditional law enforcement is being compromised by our over-emphasis on -- not over-emphasis. I guess you can't over-emphasize. But we're paying so much attention to terrorism and that prospect that your traditional law enforcement, and the 2005 FBI Uniform Crime Report suggests that most if not all the major traditional criteria are up crime-wise and despite that that

the FBI violent crime investigations are down by 60 percent. Respond briefly to that if you can. I don't want you to respond to it too long because I've got another, whole other question that I need to ask you to respond to.

MR. MUELLER: We have had to reprioritize after September 11th, moving agents from criminal cases over to counterterrorism and counterintelligence. We are not doing as many drug cases; we are not doing as many smaller white-collar criminal cases as we've done before; we are not doing as many bank robberies as we've done before. We've had to focus -- what we have done is build up --

REP. WATT: So the concern that people are expressing is correct, then, that you have shifted.

MR. MUELLER: Well, yes, but we have also grown our Safe Streets Task Forces to address crime. And my own view is that we are most effective when we leverage our relationships with state and local law enforcement. And so we are doing -- out of those, we have far more task forces than we've had in the past and we're focusing on violent crime. But we could always use more resources to address that.

REP. WATT: The statistics don't seem to bear out that this task force process is working as effectively as the other process. But that -- I just wanted to make sure that we got that on the record.

I want to ask you about the testimony of Mr. Comey and ask you if you can verify or give us your description of what occurred at the hospital or leading up to the hospital visit that has become so famous. Mr. Comey says that he phoned you and you agreed to meet him at the hospital and that you ordered the FBI agents on Mr. Ashcroft's security detail not to evict the acting attorney general from the hospital room. And can you just give us -- I won't program what he said. I'd rather hear what you have to say about that whole sequence of events.

MR. MUELLER: I don't dispute what Mr. Comey said in terms of receiving a call requesting my going to the hospital and alerting persons that Mr. Comey wanted to be present during any conversations that were had with the attorney general.

REP. WATT: And he further says that the president met with you and after that meeting, you emerged to inform Mr. Comey that the president had authorized the changes in the program that had been sought by the Justice Department.

Do you confirm that that's correct?

MR. MUELLER: I don't dispute -- I don't dispute what Mr. Comey says.

REP. WATT: Okay.

What do you make of that whole episode?

MR. MUELLER: I'm -- I'm -- unfortunately, Congressman, I don't think it appropriate to speculate. I can answer questions as to what happened to the extent that I'm able to, but beyond that, I'd be happy to answer any further questions -- (off mike) --

REP. WATT: Will you -- well, can you confirm that you and some of your agents were prepared to resign because of -- leading up to controversy?

MR. MUELLER: Again, I'm uncomfortable getting into conversations I had with individuals because I do believe that individuals are entitled to my unfettered thoughts --

REP. WATT: Can you confirm that you had some serious reservations about the warrantless wiretapping program that kind of led up to this?

MR. MUELLER: Yes.

REP. WATT: Okay.

I thank the chairman, and I yield back.

REP. CONYERS: Thank you.

Now, Howard Coble of -- (short pause) -- South Carolina? --

REP. HOWARD COBLE (R-NC): North.

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION: 2141 RAYBURN HOUSE OFFICE BUI

REP. CONYERS:  -- North Carolina, former chairman of the Patent and Copyright Committee, now the ranking member, is recognized.

REP. COBLE:  Thank you, Mr. Chairman.  Mr. Mueller, good to have you with us.  Thank you for your years of public service.

I'm going to ask you a provincial question.  Tobacco being prominent in my state, have there been recent arrests regarding the trafficking of counterfeit cigarettes by terrorist groups?

MR. MUELLER:  I would have to check on the recency.  There was one notable case from several years ago with Hezbollah in which I know cigarettes were being shipped from North Carolina to, if I'm not mistaken, it was Detroit, and there was substantial prosecution.  I would have to check to determine whether any additional prosecution since then.

REP. COBLE:  I'd like to know that, if you could, Mr. Mueller.

MR. MUELLER:  Happy to get that.

REP. COBLE:  Mr. Mueller, we're all aware of several recent high- profile public corruption arrests and prosecutions of federal officials.  How significant a problem, in your opinion, is public corruption in state and local governments?  And does the FBI pursue these cases as well?

MR. MUELLER:  It's hard to compare times.  I actually think the incidence of public corruption is probably less so now than it was, say, 10 or 15 years ago.  I do believe, however, that there -- it is and should be one of the main, if not the principal priority, that it is currently the principal priority of the FBI to identify and ferret out public corruption wherever it occurs.  We have had, as I indicated, in the last two years over 1,500 convictions of federal, state and local officials who have abused the trust, and to the extent that that happens, it undercuts the core of democracy.

And so, for us it is a substantial priority, and I can say that there's enough work to keep us busy for a long time.

REP. COBLE:  Mr. Mueller, recent reports have highlighted the growing problem of Chinese espionage efforts.  Describe the nature of that threat if you can and the FBI's role in this area.

MR. MUELLER:  I could probably say more in a classified setting.  I could say there is a substantial concern.  China is stealing our secrets in an effort to leap ahead in terms of its military technology, but also the economic capability of China.  It is a substantial threat that we are addressing in the sense of putting -- building our program to address this threat, and beyond that, I'd feel uncomfortable saying more in this open setting.

REP. COBLE:  I can appreciate that.  Perhaps we could get subsequent information on that.

MR. MUELLER:  Yes, sir.

REP. COBLE:  Mr. Director, let me ask you this.  The recent rise in violent crime does not appear to be uniform across the country.

Cities, for example, like Los Angeles and New York actually experienced a reduced crime rate.  To what do you attribute this disparity?

MR. MUELLER:  Well, there are probably a number of factors.  A number of people are trying to wrestle with what contributes to the uptick in crime in particular cities and not others.  I do believe that the police departments in both New York and Los Angeles have been on the cutting edge of devising new ways to address violent crime, but there are also a number of factors probably outside the control of police departments to address it.

When we -- in response to one of Mr. Scott's questions with regard to the use of task forces, in Los Angeles we have, over the last six months, come together on a task force with the Los Angeles Police Department, the San Francisco Sheriff's Office, a number of other federal agencies to address gang violence.  And there has been a substantial reduction in gang violence in Los Angeles as a result of the joint efforts in that task force.  So it's not just us, but it's the other federal agencies coming together to target.  And when we do so, we are effective.

REP. COBLE:  Let me try one more question before the red light illuminates.  Recent terrorist plots were thwarted at Fort Dix Army Base and JFK International Airport.  What role did the FBI play in those matters?

MR. MUELLER:  We, along with the Joint Terrorism Task Forces in each of those communities, were responsible for the investigation and the arrests that were made as a result of that investigation.  It was the combined efforts of the

bureau with the state and local law enforcement and other federal partners on Joint Terrorism Task Forces who were responsible for both of those successes.

REP. COBLE:  Thank you, sir.

I yield back, Mr. Chairman.

REP. CONYERS:  Thank you.

REP. COBLE:  And, Mr. Chairman, I beat the red light.

REP. CONYERS:  That's never happened before.

REP. COBLE:  Oh, I think it has.  (Laughter.)

REP. CONYERS:  Maybe.

The chair is pleased to recognize the chair of the Immigration Subcommittee of Judiciary, the gentlelady from California, Zoe Lofgren.

REP. ZOE LOFGREN (D-CA):  Thank you, Mr. Chairman, and, Director, it's good to see you.

I have strong concerns about many of the issues that have already been raised.  But I think as they are being handled well by my colleagues, I'd like to ask about something that has not yet been attended to, and that is the role of the FBI in checking the names of immigration beneficiaries for any concern that they might pose.

I have a strong concern about the delays that have been encountered for a portion of this.  I understand that 85 percent of the names are cleared electronically right away, and that of the remaining 15 (percent), 95 percent of those are usually cleared within one week's time.  The problem is the 5 percent remaining.  And I have situations, cases in my office -- and I hear from other members all the time -- where people have been waiting for as long as five years for an answer.  And I am aware of situations now where companies who have a valued employee are going to court, getting mandamus orders to the FBI just to produce an answer.  And I have been told -- and I guess this is a question, not a statement -- that the FBI is now 10,000 behind on the mandamus-ordered name checks.

Can you tell me what you're doing to get this speeded up?  What needs to be done?  Is it additional resources?  Is it computer technology?  What do we need to do to fix this, Director?

MR. MUELLER:  Let me give you just a wee bit of background in terms of where we are.

Back in 2002, the Citizenship and Immigration Service gave us 2.7 million names to run through -- to check not just on that name but any references to an individual in any of our files, which put us way behind the curve in doing that.

We have a -- (off mike) -- concern on the problems.  We have been working with DHS.  We have been working with OPM.  For instance, OPM gave us 30 contractors to address their backlog.

We -- it is a combination of personnel, but it will take a period of time to get (some ?) additional contractors on.  It is a question of money, in order to pay them, to do this.  And lastly it's a function as well of computerizing the documents and putting them in digital form, so that searches can be done -- (off mike).

REP. LOFGREN:  So these are paper files, sir?

MR. MUELLER:  They are.

REP. LOFGREN:  My goodness.

MR. MUELLER:  And they are paper files around the country.  And the problem is that we have files going back -- I don't want to say we've got them back to when we started in 1908, but we have some files that probably are of that vintage.  And quite clearly they wouldn't come underneath that --

REP. LOFGREN:  But presumably those files would not be relevant today.

MR. MUELLER:  They would not.  And what we have tried to do is triage in terms of seeing if there are ways to expedite it by cutting out categories of files that are need to look at.

We're also talking with DHS in terms of changing the requirements in terms of looking at all references. So we're looking at it from a variety of perspectives, understanding that there are a number of people out there that are very frustrated that they cannot get their citizenship and that Congress in particular is frustrated at this backlog. But we're doing what we can.

REP. LOFGREN: Well, I am -- I'm concerned on two levels: one, that perfectly honest, honorable people -- and if way less than 1 percent ever have anything negative come out -- but if you're waiting for five minutes -- five years, the 1 percent is out there in America and unknown to us. So that's a concern from security, and it's also a concern from the process not working well.

Let me ask you about your computer system, because it strikes me that not only is this a problem for the orderly administration of the immigration and citizenship laws, but just in terms of law enforcement, if you've got paper files.

Your Virtual Case --

MR. MUELLER: Virtual Case File --

REP. LOFGREN: -- File -- that was $170 million. Was that right?

MR. MUELLER: Well, the Virtual Case File -- yes.

REP. LOFGREN: And did we get anything of value out of it?

MR. MUELLER: Yes, we did, but not as much as we should have out of that. And several years ago we decided to go another route, and the Sentinel program that we put into place for four stages -- we successfully completed, as I indicated at the outset, first phase of Sentinel this last June.

REP. LOFGREN: Well, when that is done, will the searches be digitized, prospectively?

MR. MUELLER: Yes. And as we go through the process now, we are -- every time we do a search, we digitize the information.

REP. LOFGREN: Okay.

MR. MUELLER: But there's still miles of records out there, miles of records out there, that have not been digitized.

REP. LOFGREN: I'd just -- I know my time is up, but I would suggest that, you know, it's always hard to have a record-keeping function compete with personnel in the field and the like. Yet I would think that that ought to be one of the highest budget priorities for you to have, to digitize all those records -- you know, just swarm it -- and it will give power to your agents in ways that would -- will far exceed the funding necessary to do that in six months' time.

MR. MUELLER: Well, we have a new facility that we are building out in Winchester. We've had the funding for it. It is going into place. It will be one of the most modern records-handling facilities in the country. And we started doing this almost three years ago, maybe even four years ago, understanding that we have to bring ourselves into the modern era and that we have to digitize just about everything. The problem is, we have miles and -- upon miles and miles of files, and it is a question of resources and bringing -- (off mike) -- technology.

In the next year, my expectation is that we will leap ahead with our new facility out in Virginia.

REP. LOFGREN: I see my time has expired.

Thank you, Mr. Chairman.

REP. CONYERS: Thank you.

The distinguished gentleman from Cincinnati, Ohio, Steve Chabot.

REP. STEVE CHABOT (R-OH): Thank you very much, Mr. Chairman.

Thanks for being here today, Mr. Mueller. Several members of this committee have an interest in ensuring that the contracting opportunities available in the Federal Prison Industries, which is set forth in Section 4124 and Title 18, are protected. And as I'm sure you know, the FBI is Federal Prison Industries' largest customer, comprising 35 percent of the Federal Prison Industries' annual revenue. In fact, in response to our urging, the attorney general issued a memoran-

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION: 2141 RAYBURN OFFICE BUI

dum last October to all the department's components, including the FBI of course, directing them to comply with their legal obligations under the federal acquisition regulations, and again including the FBI.

Unfortunately this directive hasn't settled the issue because over the last few months, we have received ongoing accounts of FBI officials circumventing this directive and their legal obligations to contract work out to the Federal Prison Industries. In a briefing provided on March 27th of this year by FBI Deputy Assistant Director Joe Ford, Congressman Bobby Scott, who was here -- he's right here now -- Congressman Scott and I were assured that while three contracts that should have been outsourced to the Federal Prison Industries were not, steps had been taken to prevent this situation from reoccurring. Yet we continue to hear accounts of non-compliance, in fact, defiance, as recently as last week.

Is there something that you can assure us that you will do to look into this matter and make sure that the FBI is meeting its legal obligations so that contracts that are supposed to go to Federal Prison Industries will? Because as we know, the people that are behind bars -- most of them are going to come out some day, and it makes sense to give them job skills and something to do. It's safer for the guards and those sorts of things.

So could you respond, please?

MR. MUELLER: Surely.

I don't purport in any way to be an expert in the area of contract formulation. But I have been aware of this issue and believe that we are following the law. Now again, I'd have to go back and study it even more, but my expectation is that I'll also find there's a responsibility to -- for competition as -- under the statutory requirements.

And it's the -- not the conflict but how you coordinate the responsibility to let competitive contracts along with the desire to provide to the Bureau of Prisons, the business, that creates the issue. But I can tell you and assure you that we are trying to comply with the statutes, to the letter of the statute. And I'd be happy to get back to you and review that more personally and see if there's some issue there that I am missing.

REP. CHABOT: Thank you. I would appreciate that if you could get back to me and also Congressman Scott as well. There was -- it was accepted. I think they essentially agreed that the three contracts should have been -- weren't let out. They would do better, and apparently there's still a problem. So if you would look into that, we would greatly appreciate it.

The other matter I'd like to mention -- in 2000, the FBI extended DNA testing to locate missing persons and identify unidentified human remains, and established the national Missing Persons DNA Database to store this information. How effective has this database been in locating and identifying missing persons and unidentified human remains?

And how does the FBI's database interact with the Center for Human Identification located at the University of North Texas?

Last month, the administration announced a creation of yet another new database called NamUs, which creates a central reporting system for unidentified remains. How will the FBI's database interface with this new database, and what additional resources are needed? Or can the resources that are in place be streamlined to truly assist families who are searching for loved ones? We had a particularly -- my interest in this came from a woman, Deborah Colberson (sp); her daughter Carrie (sp) was murdered, and they've never found the remains, unfortunately. And this is a fairly common occurrence, and to get some closure to the families it's certainly helpful. And there are thousands of cases where these unidentified remains are literally in a coroner's office or somewhere, maybe in another state.

And so if you could respond, I'd appreciate it.

MR. MUELLER: I -- I -- the database we established for missing persons was, I think, an outgrowth of the development of the mitochondrial DNA capabilities, and in terms of its success, I periodically hear anecdotal stories that -- of successes they have had, but I would have to get back to you on the statistics. I am not certain about our intersection with the group at the University of North Texas. I'd have to get back to you on that.

Quite clearly, the developments we've had in DNA over the last number of years have transformed in some sense the criminal justice system in giving us positive identifications of individuals, whether it be persons who were subsequently successfully prosecuted, but also missing persons. It also has served to exculpate a number of people.

As the use of DNA grows, we are short of resources, we are backlogged, and it is something -- whether it be for the missing persons database or to more effectively and efficiently process requests for DNA examinations -- it is some-

thing where we're going to need substantial resources in the future. My belief is the federal system we have that integrates the state systems is working over all very well.

REP. CHABOT: Thank you very much. I think my time's expired, Mr. Chairman. Thank you.

REP. CONYERS: Thank you.

I'm pleased to recognize the indefatigable gentlelady from Houston, Texas, Sheila Jackson Lee.

REP. SHEILA JACKSON LEE (D-TX): Chairman, welcome to -- Mr. Mueller, thank you very much. Mr. Chairman, let me thank you for creating a very important -- for expanding on the very important role of this committee, and that is oversight. And we welcome you, Mr. Mueller. I know that we visited before and you've missed some times. We hope you're well. Thank you for that.

I have three questions. My time is very, very short, and I think in the spirit of oversight, we have some very, very important questions to focus on that address a line of questioning that we've addressed over the past couple of weeks.

It is March 10th when General Ashcroft was in the hospital, and you got a call from Jim Comey concerned about a meeting that Mr. Gonzales was going to have with the chief of staff of the White House. And it seems as if you dispatched your FBI details so that Mr. Comey would not be evicted from the room at the time. This was in the -- from the room of General Ashcroft, and I might say that all of us were wishing him well at that time and certainly expressed our concern.

But he was going there, General Gonzales, to talk about the TSP, warrantless wiretapping, which was fueling at that time. And it's a concern so that we can get the record straight about what happened. And Mr. Comey was -- as he arrived, he expressed a number of concerns about what this meeting was going to be about.

So my question to you, first of all, did you ever speak with either Mr. Gonzales or Mr. Card while they were at the hospital?

MR. MUELLER: No, ma'am.

REP. JACKSON LEE: And if you did not do that, did any of your agents speak to those individuals?

MR. MUELLER: I don't believe so. We -- I arrived at the hospital after Mr. Gonzales and Mr. Card had left.

REP. JACKSON LEE: The discussion -- and I don't know if you did arrive -- did you have an opportunity to talk to General Ashcroft, or did he discuss what was discussed in the meeting with Attorney General Gonzales and the chief of staff?

MR. MUELLER: I did have a brief discussion with Attorney General Ashcroft.

REP. JACKSON LEE: I'm sorry?

MR. MUELLER: I did have a brief discussion with Attorney General Ashcroft after I arrived.

REP. JACKSON LEE: And did he indicate the details of the conversation?

MR. MUELLER: I prefer not to get into conversations that I've had with the attorney general. At the time, I -- again, he was entitled to expect that our conversations --

REP. JACKSON LEE: And I respect that. Could I just say, did you have an understanding that the discussion was on TSP?

MR. MUELLER: I had an understanding the discussion was on a -- a(n) NSA program, yes.

REP. JACKSON LEE: I guess we use "TSP," we use warrantless wiretapping, so would I be comfortable in saying that those were the items that were part of the discussion?

MR. MUELLER: I -- the discussion was on a national -- an NSA program that has been much discussed, yes.

REP. JACKSON LEE: Well, I appreciate that.

And do you then later remember what might have occurred? We know that there was a meeting back at the White House that night. Again, all of us were interested. It was raising debate in the United States Congress. Do you remember what happened at the meeting at the White House that night?

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION: 2141 RAYBURN HOUSE OFFICE BUI

MR. MUELLER:  I was not present at the White House that night.

REP. JACKSON LEE:  And would you have any recollection or after- recollection through staff whether TSP was discussed?

MR. MUELLER:  Well, I was not present at the meeting that Mr. Comey testified to having later that night at the White House.  I do believe it related to a national security program -- or national -- NSA program, I should say.

REP. JACKSON LEE:  And let me just be clear, because I'm saying this to you.  Is it your understanding that General Gonzales was at the hospital and visited then -- or former General Ashcroft, along with the chief of staff, Andy Card?

MR. MUELLER:  Yes.

REP. JACKSON LEE:  Is it your understanding that they did have a meeting?

MR. MUELLER:  Yes.

REP. JACKSON LEE:  And so as we listen to General Gonzales's testimony, I believe under oath, regarding that, his statement, if I might just indicate, that -- in a question posed to him:  "And if it was about the TSP, you're dissembling to this committee, now was it about TSP or not, the discussion on the 10th" -- I think this says the 8th -- I think the transcript is incorrect.  This was a question posed by Senator Schumer.  I'd ask -- let me -- the answer was, "The disagreement on the 10th was about other intelligence activities.  The question specifically was, was it about TFP or not?"  And the answer -- was about other intelligence activity.

It appears from our discussion here today that the discussion was certainly more focused than what General Gonzales has offered to the United States Senate.

Can you --

MR. MUELLER:  I'd like -- is that a question, ma'am?

REP. JACKSON LEE:  Yes, it is.

MR. MUELLER:  I really can't comment on what Judge Gonzales was thinking or saying.  I can tell you what I understood at the time.

REP. JACKSON LEE:  I think -- we appreciate your recollection, and I will just follow up -- just finish, Mr. Chairman, if I may, to say that General -- I had a series of questions about hate crimes and about that watch list.

I would only say to you on the watch list, there are many people hurting, as my colleague said, while others may be going free.  I'd like to get a report back on the watch list, because I -- I will speak for the Texas Medical Center, and researchers and scientists are on that list, and it's very destructive, among others.

My last point is, Mr. Chairman, is that we like your priorities on terrorism, but if I may just show this.  We have no action on hate crimes and racial violence.  That's where we are in the investigation of those, and so I would appreciate a quick answer or a letter back of why we are so low.  And I'd welcome the letter if the chairman does not indulge me at this point.

MR. MUELLER:  Well, if I may comment on the last point.  The addressing of hate crimes, the addressing of civil rights abuses is our number two priority.  But I would look at that figure in terms of what it represents and actual investigations we've undertaken. Because for a substantial period of time, we would open cases to report that which has happened in a particular community as opposed to a thorough investigation.  And I will absolutely get back to you, but I do not believe that those statistics reflect what we've done in terms of hate crimes or civil rights abuses.

REP. JACKSON LEE:  Thank you very much, Mr. Chairman.  I want to pursue in committee the conflicting testimony of General Gonzales.

REP. CONYERS:  The gentlelady's time has expired.

REP. JACKSON LEE:  Thank you very much.  I yield back.

REP. CONYERS:  I'd like to recommend that there will be questions coming to the director from members that he will be able to respond to.

I'm pleased now to recognize Dan Lungren, the distinguished gentleman from California.

REP. DANIEL E. LUNGREN (R-CA): Thank you very much, Mr. Chairman.

Mr. Mueller, let me try and go back to the FISA warrants versus the NSLs, just so we make sure that the record is correct, because you said you can get more out of FISA warrants than you get in an NSL, leading to the suggestion that you don't need FISA -- you don't NSLs because you have FISA warrants. But as I understand your testimony, you use the NSLs in some ways in preparation to be able to get a FISA warrant because the NSLs give you noncontent material, and you may not have the basis to go after the more extensive information absent that which you would get through the NSL. Is that correct?

MR. MUELLER: Correct.

REP. LUNGREN: So that the NSL is an essential, investigative, enabling tool that you use at the very beginning, particularly in time-sensitive situations such as evidence of an impending terrorist plot. Is that correct?

MR. MUELLER: Exactly.

REP. LUNGREN: Thank you.

MR. MUELLER: Thank you, sir.

REP. LUNGREN: Now, the NSLs are extremely important. You've said that. And one of the concerns I have had and some other members of this committee who have supported you on the NSLs and supported the continuation of the NSLs is the failures in the bureau to do it properly, that which was revealed in the inspector general's report.

And when we were probing on this, it became evident that at some of the bureau offices, there wasn't the proper understanding of what was required.

And so the question we asked was, why didn't that information go from the general counsel down to your lawyers at the office level? And we were told that the lawyers at the office level, branch level, actually work for the SAC, not for the general counsel. So the question becomes, does that make good sense, to continue to that sort of focused direction? Would it not make more sense to have those lawyers have a direct responsibility to the general counsel's office?

MR. MUELLER: That is an issue that we are still looking at. But in the meantime, the -- what we have done is to put the -- each lawyer in each of our field offices in the NSL process by procedure. And we have also indicated that they have an independent responsibility beyond the office and beyond the SAC to the Office of General Counsel in carrying out the responsibilities with regard to the -- well, the responsibilities on NSLs and their responsibilities in their particular office.

Now whether we go and change the line from a dotted line to a solid black line is something we're still looking at, and there are downsides to doing that.

REP. LUNGREN: Well, from -- I know there would be downsides to it, but let me just ask you this. Who has greater effect on their potential advancement in the FBI, the general counsel or the SAC in the office in which they now work?

MR. MUELLER: I would have to say the SAC.

REP. LUNGREN: And doesn't that create somewhat of a conflict from independent judgment for the counsel to the SAC, where the SAC is saying, "I want these NSLs" and you've told us that the system didn't work -- would not that be perhaps one of the reasons why it didn't work?

MR. MUELLER: I think that it was perhaps one of the reasons that it did not work. But I would not say that that was the main reason that it did not work. The general counsel in a particular office or the legal counsel in a particular office was not put into that process in a way that gave them the independence and the capability to do it.

REP. LUNGREN: Okay.

MR. MUELLER: And so I have not totally ruled out changing it. It's something we';re looking at. But in the meantime, we've taken steps to make certain that we address that particular issue.

REP. LUNGREN: I appreciate that.

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION: 2141 RAYBURN HOUSE OFFICE BUI

Now let me say that I happen to think that you have been one that has worked very, very hard and very effectively to change somewhat of the culture of the FBI, with the new obligations that is -- that are imposed on it.

At the same time, we have to deal with some certain continuing difficulties with the FBI. And the order of the court that came down in the United States District Court for the District of Massachusetts today, with $101 million damage against the FBI for the misconduct in the handling of confidential informants, where -- if you read the summary, it's astounding. I never thought I would see that about the FBI. I never thought I would see four people framed, three of them sentenced to death, one to life imprisonment.

The three did not receive a death sentence because it was later changed to life. A conspiracy to keep them in jail for three decades, findings by the court that are absolutely astounding.

Now, this happened back in 1968, in the 1960 time frame, but it is almost the beginning of my understanding of the difficulty with handling confidential informants and the continued problems that ensued with the department as exposed by the report of the inspector general just a year ago.

Can you tell us now whether we are going to continue to need to pursue legislation, which I would grant you that Mr. Delahunt and I have sponsored for some time, which is pretty tough legislation with criminal sanctions in it? Or is there some movement in the bureau to come up with absolute standards, a certification that they are being followed with some teeth in it so that there are disciplinary actions taken against those, whether they're supervisors, SACs, whether they are agents, for violating the policy, which, if you look at the inspector general's report, it suggested that, I believe, 87 percent of the cases the CIs were not being followed in accordance with the promulgations that you had put out?

MR. MUELLER: Let me make a distinction between two aspects of what you discuss.

The first -- and what your statute addresses -- is the failure to inform state and local law enforcement unauthorized illegal activity by informants handled by the FBI, and your statute does address the FBI and no other agency.

REP. LUNGREN: Actually, it is -- it's confined to violent felony offenses.

MR. MUELLER: Right.

And the second aspect of it is the disclosure of exculpatory information that the FBI might have to an individual who is being prosecuted in the state and local level.

In the wake of what happened in Boston in the late 1990s, substantial attention was given to redoing the guidelines with regard to handling informants. It is mandated today that if we know -- and by "we," the FBI -- know of violent activity or actually any illegal activity of an informant that comes within the bailiwick of state and local prosecutors, we are to tell the United States attorney, and the U.S. attorney is then mandated with us to provide that information to state and local authorities. Likewise, with the discovery of exculpatory information in our files relating to a prosecution of state and local law enforcement, we are mandated to inform the U.S. attorney, and then with the U.S. attorney to provide that information.

There is an oversight panel that has both FBI and Department of Justice personnel on it. In every office now we have a human source coordinator; we have a quarterly review of all of our sources by supervisors to determine if there has been any unauthorized criminal activity or exculpatory information, and that is followed up by inspections.

And I would suggest -- I would be happy to give you a further briefing on what this -- what we have put in place to address what I agree is a very difficult problem. I do not believe that the statute is the answer. I think it covers -- it is too broad, and it will have a chilling effect on our ability to develop sources and to address terrorist attacks, to address public corruption, to address -- as you well know being a prosecutor and Mr. Delahunt being a prosecutor, in order to effectively undertake these investigations, you have to utilize sources. We have to do a better job in assuring that we do not have another debacle such as we had in Boston, and we have put into place the mechanisms to do so.

REP. LUNGREN: I thank you for that response, and I would say that, on my behalf -- Mr. Delahunt and I know Mr. Scott has talked with me about this as well -- we probably need to get a briefing at the very least, a closed door briefing, on this with you at an early date.

I thank the chairman.

REP. CONYERS: The chair recognizes the other prosecutor, Bill Delahunt from Massachusetts.

REP. WILLIAM DELAHUNT (D-MA):  I thank the gentleman for yielding, and I will pursue the same line of questioning that my friend from California initiated.

But before I do, you indicated, Director Mueller, that you're going to get back to us.

I think I heard that several times and I would suggest that's very positive.  You also indicated you've testified before both bodies, and yet I have no recollection that you have testified before the House Judiciary Committee until this moment.  But you can check with your staff and advise me if I'm incorrect.

MR. MUELLER:  No, this is the first time I've testified before this House committee.

REP. DELAHUNT:  This is the committee of jurisdiction.  We've had a number of concerns about the FBI, not just dealing with NSLs or confidential informants.  I daresay it would have been very beneficial for the members of this panel to hear your concerns in a public venue regarding the Terrorist Surveillance Program, because this is too important simply to have a briefing behind closed doors.  I would suggest that it's important to educate and inform the American public in full measure as to what we are doing.

The legislation that Mr. Lungren and I have been discussing is not -- should not be viewed as an effort to punish or embarrass the FBI.  To the contrary, I view it as an effort to help the FBI restore its credibility with the American people.  I don't know if you've had an opportunity to read the decision by Judge Gertner today.

MR. MUELLER:  I have not.

REP. DELAHUNT:  It's embarrassing.  It is scathing.  Let me just read one excerpt:  The issue is not about failure to produce exculpatory evidence but procuring convictions by misrepresentation, not letting perjured testimony proceed uncorrected but facilitating it.

With all due respect to internal reviews, audits, inspector generals, in a democracy, I -- my understanding of checks and balances is as the founders foresaw it.  And that is having an independent branch of government review what the executive is doing.  It's not just the responsibility of the judicial branch to protect individual freedoms and civil liberties but it's our responsibility as well.

However having said all that, I'm glad to hear that we are now going to have a Bureau of Compliance where these kind of issues will be monitored.  I daresay it's late in coming, with all due respect. And while my friend, the former attorney general of California, mentions that this happened in the '60s, you and I know that this has been a problem of decades, including the 1990s.

We saw this decision now.  There is a former FBI agent that is currently indicted for murder awaiting trial in the state of Florida. Another former FBI agent that appeared at the bench that you're sitting at -- Paul H. Rico or H. Paul Rico was indicted for murder before he died.  This is the kind of behavior that really undermines the confidence of the people in the integrity of the FBI.

And talking about guidelines, we've had guidelines.  We've had guidelines for the past four decades, commencing with the former attorney general (Levi ?).  It's a question of whether they're going to be complied with.  I've reached the conclusion that we need legislation in an effort to once and for all put an end to these embarrassing moments not just for the bureau, not just for the Department of Justice, but for the government that the American people support when they go to the polls every two years.

Any comment?

MR. MUELLER:  Yes, I do.  You and I both come from a background where this was a substantial issue.  It is an episode that redounds to the detriment of the bureau, without a question of a doubt.  But I would suggest to you that is isolated, is isolated in the past, and we have put into place guidelines and procedures --

REP. DELAHUNT:  With all due respect, Mr. Director, you know there was a district attorney in Brooklyn that received information that was very comparable.  I don't know even what's happened to that particular case, but there were former FBI agents that were indicted in that matter as well, and the similarities are striking.

MR. MUELLER:  I cannot disagree with you on these instances, but day in and day out over the years, FBI agents have undertaken investigations and done them lawfully, they've done them successfully. And we've made -- I would absolutely agree with you that we have to assure that these incidents do not repeat themselves, because it does undercut the credibility and the work of the 99 percent of the bureau that are out there day in and day out doing their job.

REP. DELAHUNT:  Thank you, Mr. -- and I hope  to see you here -- I hope in the future you adjust your schedule so that we can see you on a more frequent basis and have more ample -- and opportunities to exchange views, to work in a cooperative fashion and not wait for six years to see you again.

REP. CONYERS:  Well, we can correct that by inviting him more. (Laughter.)

MR. MUELLER:  Let me just say, Congressman, I'd be happy to come up and sit down informally with you and go through whatever issues you have periodically.  And I'm also, quite obviously, looking forward to being here again.

REP. DELAHUNT:  It's good to hear that, Mr. Mueller.  (Laughter.)

REP. CONYERS:  The chair is pleased now to recognize the chairman of one of our subcommittees, Randy Forbes of Virginia.  Ranking member, not chairman.

REP. RANDY FORBES (R-VA):  Thank you, Mr. Chairman.

Mr. Director, thank you for being here.  And I'm to ask you to shift gears a little bit and talk about criminal gang activity in the country if you could.  And just to lay the groundwork for that, on April 20, 2005, the FBI assistant director, Chris Swecker, testified before the House International Relations Subcommittee on Western Affairs regarding the FBI's efforts to combat criminal gangs.

And during his testimony he stated that there is some evidence of an increased level of sophistication and some indications of a hierarchy of leadership, and cliques throughout the country often follow the lead of the Los Angeles-based cliques, and there are reports of Los Angeles-based members traveling throughout the United States for the purpose of recruiting new members, establishing new cliques and taking over existing Latino gangs and instilling discipline through violence and intimidation.

And yesterday, The Washington Times reported on a recent Army intelligence assessment that identifies MS-13 as an organization that can function its networks with extensive transnational linkages. Furthermore, their internal functions include recruiting, logistics, attacks, intelligence and activities, including murders, drugs, extortions and others.

And my questions for you, are these -- do you agree with this upgraded assessment?  How many members of MS-13 do you think we might have in the United States or internationally?  How sophisticated are their operations?  What kind of threat are they posing to us at this particular point in time?

MR. MUELLER:  First of all, I agree with the assessment.  There are many thousands of persons associated with MS-13 in the United States and Guatemala, in Mexico, in quite obviously El Salvador and several other countries.  And the threat is not just limited to Los Angeles but is limited throughout the United States.  One of the benefits of developing an intelligence capability within the bureau is to better identify those areas within the United States that currently have a presence of MS-13, identify those areas in the United States that do not have a presence of MS-13 and make certain they do not have a presence of MS-13.

We have a task force, MS-13 Task Force with a number of participants from various agencies that address this across not only the different state borders within the United States but transnationally.  Approximately a year ago, there were some 600 MS-13 individuals who were arrested not only in the United States but in El Salvador and Guatemala, Mexico -- I think it may have been Dominican Republic -- Honduras in a coordinated takedown.

With a gang such as this that crosses borders, it takes the -- it is a function of globalization, a different type of globalization which requires us to work cooperatively and build allegiances and alliances with our counterparts overseas if we are to effectively address what I would call a scourge of gang activity.

As I mentioned -- I would finish by saying that we have been somewhat successful recently in a joint task force operating out of Los Angeles to address violent crime with MS-13 and the 18 street gangs there.

REP. FORBES:  And if I could follow up on that -- and I know you did have that success; you mentioned it earlier -- how important are the joint task force capability to be able to pull down the gang networks that you're seeing, especially the national connectivity that we're beginning to see with MS-13?

MR. MUELLER:  Yeah, my belief is task forces are tremendously important, and that it's tremendously important that state and local law enforcement authorities be funded to support task forces.  The funding constraints on state and local law enforcement have been somewhat substantial over the last years.  We ask them to participate in Joint Terror-

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION: 2141 RAYBURN HOUSE OFFICE BUI

ism Task Forces to join with us in addressing the threat of terrorism; they ask us to participate with them to address what is most on their mind, which often is violent crime and quite often violent crime at the hands of gangs.

And the funding for both us as well as state and local enforcement to address this must be provided if we are to make a dent in violent crime activity, violent gang activity in the United States.

REP. FORBES: Last question. And you may -- if you don't have this statistic, if you could just get back to us with it -- do you have any idea about the percentage of members of, let's say, MS-13 -- because that's in the news lately -- who might be here illegally?

MR. MUELLER: I do not. I would have get back to you.

REP. FORBES: Okay.

MR. MUELLER: But there is a fairly -- well, I'd really have to get back to you on that. I don't want to talk off the cuff.

REP. FORBES: We've had testimony that it could be 60 and 80 percent, but if you could just see what your statistics -- then get back --

MR. MUELLER: Will do.

REP. FORBES: Thank you, Mr. Director.

And, Mr. Chairman, I yield back.

REP. CONYERS: Thank you very much, Mr. Forbes.

The chair is pleased to recognize the gentleman from Tennessee, Mr. Steve Cohen.

REP. STEVE COHEN (D-TN): Thank you, Mr. Chairman.

I know we've gone over two or three times of this night that General Ashcroft was in the hospital, but I'm curious. It was said that -- Mr. Comey said that he called you, and you called your agents and said that Mr. Comey was not to be removed from the room. Why did you feel that there was a -- might be an attempt to remove him from the room?

MR. MUELLER: It was based on my conversation with Mr. Comey in which he indicated he had a concern that he would not be participating in discussions in which he felt he should be participating as the acting attorney general.

REP. COHEN: And there -- were there FBI agents at the room protecting General Ashcroft?

MR. MUELLER: Yes. He had a detail of FBI agents throughout his tenure.

REP. COHEN: All right. And so he was concerned that Mr. Card and Mr. Gonzales or Judge Gonzales was -- were going to -- not going to include him in the conversation. Is that correct?

MR. MUELLER: All I can tell you is what I learned from him.

REP. COHEN: So he believed that?

MR. MUELLER: Yes.

REP. COHEN: Why did you rush there?

MR. MUELLER: He requested that I be there to determine that went on. You'd have to ask Mr. Comey why he had me there. I did go at his request. He was the attorney general at the time.

REP. COHEN: So you went there, and when you were there, he said at one point that you had a brief and memorable conversation -- a brief, memorable exchange with the attorney general. Do you -- how memorable was that?

MR. MUELLER: Well, I had a conversation with him. I couldn't recite to you word for word what that conversation was. I do remember being there.

REP. COHEN: Just tell us the gist of the memorable conversation.

MR. MUELLER: There was a conversation, yes.

REP. COHEN: What was the gist of it, sir?

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION: 2141 RAYBURN HOUSE OFFICE BUI

MR. MUELLER:  I guess it covered very generally what had happened in the moments before.

REP. COHEN:  And what had happened in the moments before?

MR. MUELLER:  Well, again, I resist getting into conversations I -- the specifics of conversations I have, because I do think the attorney general then, the attorney general now and others have -- are entitled to keep those conversations between themselves.

REP. COHEN:  They may be entitled to, but are you entitled to it? He's no longer the attorney general.  So at this point, he's not the attorney general.

MR. MUELLER:  I'd have --

REP. COHEN:  I'm asking you to tell us what the conversation was. I don't think there's a privilege.

MR. MUELLER:  Excuse me just one second.

REP. COHEN:  Sidebar.

(Off-mike conferrals.)

MR. MUELLER:  There -- the discussion was that there had been a prior discussion about an NSA program and that the attorney general deferred to Mr. Comey as the person to make whatever decision was to be made.

REP. COHEN:  And he had confidence in Mr. Comey, I take it?

MR. MUELLER:  Yes.

REP. COHEN:  Okay.

At some point or another, I think you told maybe Mr. Watt that you felt that there were problems with some of the operations there, the wiretaps.

MR. MUELLER:  At a point in time in conversations with Mr. Comey, I had -- understand the Department of Justice had some concerns about the legality of an NSA program.  That affected the FBI in the sense that we received pieces of information from the NSA.

My purpose was to determine that whatever we did as the bureau in handling that was done according to the directive and the appropriate directive of the Department of Justice.  So my concern was to assure that whatever activity we undertook as a result of the information we received was done appropriately and legally.

At some point in time, he expressed concern about the legality of it.

REP. COHEN:  And because of that concern, at some point did you express to Mr. Watt -- I was believe that was correct -- earlier that you considered resignation?

MR. MUELLER:  I don't believe I expressed that.  I did not dispute what Mr. Comey had said, but again, I -- in this area, I would say that I should not get into the conversations I had with individuals.

REP. COHEN:  Well, this wouldn't be a conversation.  I go back to -- Mr. Comey's testimony to the Senate was about resignations, and Mr. Schumer asked, "Was one of those people that might have resigned Director -- the director?"  And he said, "I believe so.  You'd have to ask him, but I believe so."

So I'm not asking you about a conversation with Mr. Comey.  I'm asking you:  Was he correct?

Or better yet, were you that person?

MR. MUELLER:  Well, I was that person to whom he refers, yes.

REP. COHEN:  And were you considering resigning?  You don't have to relay the conversation.  This is just your own mind.  Did you --

MR. MUELLER:  I understand why I cannot say that I do not dispute what Mr. Comey says because Mr. Comey says ask Mr. Mueller.  I will tell you that I don't believe that it's appropriate for me to get into conversations that I've had with principals on that issue.

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY:
REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION:
2141 RAYBURN HOUSE OFFICE BUI

REP. COHEN:  And I don't want a conversation.  I want what's in your psyche, what was in your -- did you con-sider it yourself?  That's not a conversation, that's a state of mind.

MR. MUELLER:  Well, to the extent that I follow through on the state of mind, then it is a conversation.  I -- again, I would resist getting into that conversation.

REP. COHEN:  My time is almost up.  If I could have 30 more seconds, Mr. Chairman?  (No audible response.)

And I'd just like to ask this, you made a comment about some task force is doing a great job in reducing crime in New York and Los Angeles.  I'm from Memphis.  We have a serious crime problem there.  Is there any plans to have any task forces there, street task forces or additional personnel to help us with our criminal -- our crime problem?

MR. MUELLER:  I'm quite confident we have at least one, if not more, Safe Streets Task Forces within -- in Ten-nessee, in particular in Memphis, and I would get you back -- I'll get back to you on that.

REP. COHEN:  No matter how many it is, I want one more. (Laughter.)  And I want to compliment you on your Tennessee -- whatever it was called that got some public officials.  That was good work that y'all did.

MR. MUELLER:  Thank you.  But if we go along with your request, I've got a number of seats up here that would -- probably making the same request.  I'm always happy to accommodate with more resources.

REP. COHEN:  Memphis is a great city -- thank you, Mr. Chairman.

REP. CONYERS:  Mr. Franks is now recognized for the usual amount of time.

MR. MUELLER:  Can you excuse me just one second if I could?  (No audible response.)  (Short pause.)

Thank you.  Thank you very much.

REP. TRENT FRANKS (R-AZ):  Well, thank you, Mr. Chairman, and thank you, Director Mueller, for being here. I know that -- you know, a lot of people have good ideas about how things should be done, but the guy that has to turn these good ideas into reality has always got the biggest challenge.  And I appreciate you so much for kind of standing there between the malevolent and the innocent as you do, and I know it's a tremendous responsibility.

Director Mueller, I have said many times that I think that the jihadists' ideology that we face is the most dangerous ideology that we've dealt with in the nation's history.  And I know that half the problem is knowing where the dangers are coming from.  If we knew where every terrorist exactly was today, we could probably solve this problem in a month.  But knowing where they are is critical, and I understand that that's one of your biggest challenges.

That said, I have also believed that the president has the constitutional authority to -- we've given him the job to hunt down, ferret out and kill terrorists, and as commander in chief, under the Constitution, he has that authority as well. And it occurs to me, if he has the authority to hunt down, ferret out and kill terrorists, that he also has the authority to listen to them on the telephone before he proceeds.

And I know there's been an incredible amount of discussion going around the Terrorist Surveillance Program.  But given the fact that it's now under FISA, can you tell us is it working, is it something that is an effective tool, notwith-standing the fact that probably every terrorist in the galaxy knows about the conversations that we have now?

MR. MUELLER:  Well, I think probably my answer would have to come in some form of classified setting.

But generally I can say that leads we have received from an NSA program have been helpful in the war on terror, yes.

REP. FRANKS:  The administration has recently submitted proposals to reform FISA.  And do you think that those reforms are necessary and that they will help you do your job?

MR. MUELLER:  Yes.  It would help not just the FBI, but operating together with NSA, the CIA, the DIA, all of whom -- all of us share the same responsibility to protect the homeland.  And what is proposed in the revision of the FISA statute would help all of us.

REP. FRANKS:  Well, without touching on anything that could be of a disadvantage to the country, what do you consider your greatest concern, the greatest gap that you have in terms of being able to assess and predict or prevent the terrorist challenge that we face in the homeland itself?

MR. MUELLER: I think we have made substantial strides since September 11th in terms of breaking down the walls between the various entities in the intelligence community. We do a far more -- a far better job not only within the United States but ourselves as an intelligence community, and I consider us an intelligence community, working together with our counterparts overseas.

The gaps come, I believe, in -- and it's gaps that I believe that my counterparts at the CIA or ODNI would also focus upon, and that is the threats of terrorists having the opportunity to train, to plan, to coordinate in a sanctuary around the world, whether it be in Waziristan or the Horn of Africa or elsewhere, and we cannot let that happen.

Secondly, it's important to understand that al Qaeda is intent on attacking in the United States and finding ways to infiltrate individuals in the United States, often through countries that do not have the same stringent controls that we have at the borders. And those are the biggest concerns, I think, to the intelligence community as a whole in terms of the threat that we face from al Qaeda from outside.

Internally I think we have done a very good job in building up our joint terrorism task forces and enlisting the cooperation and input and assistance and expertise of state and local law enforcement. We have to remain vigilant. We have to remain on guard. And as we get further away from September 11th, my greatest concern is that we become complacent and that we do not pick up on that which would alert us to the possibility of a group in the United States who are going to undertake an attack.

And lastly I would say, as I've iterated before, that advances in communications and advances in technology are putting us behind the curve in our ability to identify and to intercept communications on those who would do us harm. And so the statutory changes are necessary, but also the funding to keep us on the cutting edge of technology so that we can intercept individuals' communications who wish to do us harm, requires both -- not just both, but the administration, Congress, as well as the various telecommunication carriers working together to try to fill that gap.

REP. FRANKS: Well, thank you, Mr. Chairman. The light's red.

REP. CONYERS: You're more than welcome.

The chair is pleased to welcome a recent edition to the committee, Ms. Betty Sutton of Ohio.

REP. BETTY SUTTON (D-OH): I thank the chairman.

Dr. Mueller, thank you for being here to shed some light on the bureau's operations. There are so many topics, and I share my colleague's wishes that you return often so we can delve into a lot of them deeper.

At this moment I'd just like to talk to you a little bit about something we haven't discussed, the whistleblower protections. We've had some problems in the bureau, and actually they reflect upon some of the facets -- the consequences that Mr. Delahunt, the distinguished gentleman, points out, and it emphasizes the importance that we have proper whistleblower protection, not just because governmental employees need to have that safeguard, but it's also a matter of ensuring that our national security and the integrity of the agency is intact.

I know that you've given personal assurances in the past that you were going to take action to ensure that whistleblowers would be protected, but we know that there's been a culture within the FBI through some years where that just hasn't been the case. So I'd like to just for a moment go through a couple of those instances, and then you can share with me how things have changed so that their plight would have changed and outcomes would be different.

In 2001, Coleen Rowley claims that she was blocked at every turn from pursuing her concerns about 911 co-conspirator -- I'm sorry, Moussaoui. In a statement you issued in a response to that case, you stated that there's no room for the types of problems and attitudes that could inhibit our efforts.

In 2002 -- you're familiar with John Roberts's case. He blew the whistle on several senior FBI officials, all of whom were subsequently promoted and some of whom received bonuses. And of course, the inspector general subsequently issues a report endorsing John Roberts's findings of wrongdoing within the agency and concluded that the FBI suffered and still suffers from a strong perception that a double standard exists within the FBI with regard to the treatment of senior officials versus lower level employees. And of course, he was humiliated because of coming forward with evidence of wrongdoing.

And we're all familiar with Sibel Edmonds, a former translator with the FBI, who did work for the counterterrorism program, who was fired after reporting serious problems in the bureau's Translation Services department. And of course when she sought recourse, she was completely blocked after the bureau invoked the State Secrets Privilege.

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION: 2141 RAYBURN HOUSE OFFICE BUI

So my question to you is, what have you done specifically to make sure that moving forward, not redressing those cases but moving forward, that these things shall not happen and the chilling effect that these -- this culture produces and the consequences beyond that are no longer being felt?

MR. MUELLER: Well, initially I had a outside panel come in and look at how we were handling OPR, how we were handling our response to incidents of misconduct, including those that would be set out by whistleblowers, and we have changed our procedures. One of the -- every year, at least every year, I've set out statements about I will not put up with retaliation for persons who bring to our attention that which should be brought to our attention. Whenever that occurs it is immediately referred to the inspector general so the inspector can do an independent investigation. And I have followed the recommendations of the inspector general as to what steps should be taken when retaliation has been found, all the way up to the SES levels. So I believe, both through statements as well as actions, the message has gone out that we will not put up with retaliation for those who bring to our attention those matters that should be brought to our attention.

REP. SUTTON: Well, could you be more specific in the changes that have been implemented?

MR. MUELLER: I can get back to you and specifically. But I think the biggest change is the ability and putting in place the mechanisms to assure an independent investigation of allegations of retaliation for whistleblower activities and/or a willingness to follow up immediately with the results of the independent investigation, which has been done by the inspector general.

REP. SUTTON: Okay, Director, but let's say that that fails and we have a situation where -- like Sibel Edmonds. How does her plight change?

How does she deal with the invocation of the State Secrets Privilege? How does she have any recourse?

MR. MUELLER: Well, I can't get into the rationale behind asserting the State Secrets Privilege in that particular case. It's a matter that was sealed by the court. But in that case as well, the case was investigated independently, and actions that were necessary to be taken as a result of that investigation as to individuals and the FBI have been taken.

REP. SUTTON: Mr. Chairman, if I just may -- but with respect to somebody facing the same situation, they would face the same outcome. Is that correct?

MR. MUELLER: It depends on the circumstances of the case.

REP. SUTTON: Okay, thank you.

REP. CONYERS: Before I recognize Judge Gohmert, could we -- could you yield just for a -- one very brief comment from Bill Delahunt?

Thank you very much.

REP. LOUIE GOHMERT (R-TX): Is that going to be part of my time or we just yield --

REP. WILLIAM D. DELAHUNT (D-MA): Well, I hope so, Mr. Gohmert.

REP. CONYERS: Really. (Laughter.) But I appreciate you yielding.

REP. DELAHUNT: Just a quick question, Director. And I would direct your attention to the FBI presence early on at the base in Guantanamo. There were a number of reports indicating that the bureau expressed its concerns about interrogation methods. Can you just tell us when those concerns were expressed to the appropriate agencies?

MR. MUELLER: It would depend on particular concerns. In the wake of the -- what occurred in Iraq, we undertook a review of those concerns. And in the months subsequent to that -- Abu Ghraib -- we had sent to the military what information we had with regard to specific concerns and specific incidents as opposed to generalized concerns as to the type of interrogation techniques that were being used and those techniques that changed over a period of time.

REP. DELAHUNT: Thank you.

REP. CONYERS: Thank you.

Judge Gohmert?

REP. GOHMERT: Thank you. And, Mr. Chairman, for the record, I guess I'm the "other" other prosecutor from 30 years ago.

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION: 2141 RAYBURN HOUSE OFFICE BUI

But anyway -- and I do want to applaud the tone of this hearing. Director Mueller, I don't know if you've seen some of the hearings from other administrative officials, but sometimes voices had been raised, yellings occurred, accusations flying, and I can't help but wonder if maybe people had heard about that story of the guy calling the FBI office, demanded to talk to somebody in authority, getting him, telling him his name, just blowing hard about how -- all the things evil and wrong with the FBI, and then finishing by saying, "And I demand to know, do you have a file on me?" And they responded, "Well, we sure do now."  (Laughter.)

So I don't know if that's why the tone is down like it is.  But in any event, I do -- seriously, I do believe this probably is the most difficult time in our nation's history since the War of 1812 to protect our homeland, and you have been serving during that time.  And I know you care every bit as deeply about the safety and future of our country as I do; I know that.  And I know people here all have that concern.  It doesn't mean we can't have disagreements on how we go about securing that safety.

Many of us fought and pushed to make sure that the Justice Department had the tools they needed in the Patriot Act.

I wanted to sunset some things to be sure we had accountability in future administrations, and we got some to some extent.

But I would like to go back to something that apparently you wanted to address early on and brought up, and that's -- back right after the NSL disclosure and abuses by the inspector general's report, there was a press conference in which I understood you to say, "I should have made sure that the people in the field working on these NSLs had the experience and training they needed not to abuse the process."  And frankly, I agree with that, and I do believe that the five-year-up-or-out policy has been one of the things that's been an impediment to having that experience in training, where we have lost numerous experienced well-trained people.

And I applaud your efforts.  I love it when people have innovative ideas about how to proceed with management. But giving incentives to rise to the top, as you've indicated, giving individuals a chance to move to the top or seeking to move up the career ladder, I applaud that except this isn't Army, and I know you know that.  But it takes time to develop those relationships that allow joint task forces to work between the law enforcement.  I've seen it for the last 30 years very personally.  It takes time to develop respect and trust and credibility and a good working relationship not only with task force, with confidential informants, and actually, it helps to have years of experience.  When I first got out of law school and became a prosecutor, I would not have agreed to this.  But I see in hindsight I needed that DA looking over my shoulder because I was aggressive, I was competitive, and it's important not to lose sight of the fact that justice is the end result.

And I'm curious, do you know how many experienced FBI agents have chosen not to move up after five years, but to move out or down?

MR. MUELLER:  I do know that -- I'd have to get you the specific figures.

And let me tell you, if I might respond, that it was one of the more difficult decisions I had to make because there was -- you had to balance the scales.  I think the program is beneficial to the institution as a whole in terms --

REP. GOHMERT:  And that goes without saying.  I know you wouldn't have put it in place if you didn't.

MR. MUELLER:  And I absolutely acknowledge we have lost through retirement some very, very experienced agents --

REP. GOHMERT:  Who wouldn't have retired otherwise.

MR. MUELLER:  Who would not have retired otherwise.  And we have -- I understood this was going to be a consequence.  We also have had agents step down who are very good supervisors, and my hope and expectation is those that are taking their place are very experienced as well and build up that experience during the time.  And we have seen the results of increased movement through the upper ranks, and I've had a number of assistant -- ASACs, assistant special agents in charge, come up to me and say, "I wouldn't have moved absent this policy.  I hated it, I thought it would never go into effect, but now I'm ASAC, and I am -- I actually have benefited from it."

Let me say one other thing, if I could, in regard to these individuals and supervisors who have been and are the backbone of the bureau.  I am supportive of pension retention, additional funds to provide --

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION: 2141 RAYBURN HOUSE OFFICE BUI

REP. GOHMERT:  Okay, well, the pension retention idea goes beyond my scope.  I'm concerned about the NSLs and those kind of things, and we can get into that later.

But my time is so short.

Mr. Delahunt had mentioned earlier that, you know, it's not just the judiciary that protect us.  With my background, I thought that would.  I thought judiciary protection was adequate.  And then you start to seeing the abuses J. Edgar Hoover had, and you start realizing there is some information that is gleaned, never intended to be introduced in court.  And when you see that, you realize judicial protection is not enough; we do need all the checks and balances, including oversight from the Congress.

And so I appreciate your willingness to work with us in the future, but I also hope it'll be done, and that you will look into efforts at even  intimidation when oversight has been attempted by people -- like when Mike Rogers wanted to talk with somebody -- former FBI agent from Michigan wanted to talk to somebody from FBI, he asked to talk to a su-pervisor, came back to his office for the appointment and found his old office had been run out, and they said -- well, they were having to do a sweep, they said, before you can talk.

And he knew that there was nothing confidential to be discussed and tried to come into own office, was not al-lowed.  He said it looked like, from the reflection, when he tried to open his own office, that his contents of his office were being videotaped, but he couldn't be certain.  And he knew, as a former FBI agent, he hadn't seen that before.

But anyway -- and then also, after -- and I'm sure the chairman --

MR. MUELLER:  Well, can I respond to that, sir?  Just to say that I will look into that incident, but we don't do that type of thing.  I will look into what you're alluding to, but we do not --

REP. GOHMERT:  Well, I appreciate your saying that, but I really don't think Mike Rogers lied to me.  And so I would not say he lied about that.

But then also, right after -- some people felt like the raid on William Jefferson's office and people that were con-cerned about that were defending William Jefferson.  They weren't.  There was a concern here in this body that there was an intimidation moving forward and that by raiding his office -- it wasn't about William Jefferson, because, as I understand, those documents may have already been secured by other means -- but nonetheless, that it -- and this may not have been your sense at all, but from this side, it appeared that there was a lot of intimidation going on.

And then when Dennis Hastert proposed objections or posed objections, then it was leaked by someone in Justice that he was investigation and that's why he was concerned.  And then he demanded to know:  Am I really a target?  And the official answer was no, you're not.  And then the next day it was in the national press that two people had acknowl-edged, yeah, they said that as the official answer, but it really wasn't.

And then -- I never heard this -- somebody told me -- one of the other members of Congress -- so I don't know, and I wanted to ask you directly -- that that same week, with all this back and forth going on and the concerns about the power struggles between the branches, that you had made a statement that you may need to add 400 people to investi-gate corruption in Washington, which, if it were said, would actually sound like more intimidation.

I don't know.  I didn't -- never heard it, couldn't find it.  It was written -- did you ever say anything like that?

MR. MUELLER:  No, sir, I'd not.

REP. GOHMERT:  Okay.  Thank you.

MR. MUELLER:  And I will tell you that the search of Congress was done out of a great deal -- after a great deal of reflection at the Department of Justice and in the White House.  It certainly was in no way to intimidate.  It was done in the belief that, as part of an ongoing investigation, records were necessary to that investigation. And I can assure you that the last thing on anybody's mind was intending to intimidate Congress.  It was just to do our job as we saw it in pursuing that investigation.

REP. GOHMERT:  No, I'm just saying that was an appearance.  And do you know whether or not --

REP. CONYERS:  The gentleman's time is almost over.

REP. GOHMERT:  All right.  This will be my final -- do you know whether or not those documents, copies of those documents had already been secured and were secured, perhaps by the ethics committee here?

MR. MUELLER:  I do not believe that to be the case.

REP. GOHMERT:  You do not believe but --

MR. MUELLER:  I do not believe that to be the case.

REP. GOHMERT:  But you do not know for sure?

MR. MUELLER:  I would have to go -- but I do not believe that to be the case at all.

REP. GOHMERT:  All right.  Thank you.  And I do appreciate the chairman's flexibility.

And Mr. Mueller, I do thank you for coming up there and visiting with you.  I think this helps us to have a better relationship.  Thank you.

MR. MUELLER:  Thank you, sir.

REP. CONYERS:  The chair recognizes yet another prosecutor, the gentleman from Alabama, Mr. Artur Davis.

REP. ARTUR DAVIS (D-AL):  Thank you, Chairman Conyers.

Mr. Mueller, I didn't know that my friend from Texas was going to be the first witness to beat you up today.  That's news to those of us on this side.

Let me, in the time that I have, go back to something that we've obviously talked about a lot today, and it's the circumstances around the March 10th visit from the attorney general to -- then-White House Counsel Gonzales's office to Mr. Ashcroft, then the attorney general.

And I'll preface it by saying I know you feel that we've plowed over this ground a lot today.  We're doing it for an obvious reason. There have been serious questions raised about whether the current attorney general was candid and truthful in his testimony to the United States Senate.  And I know that you, if you had an opinion of that, would not venture it to us, but it's important and we have some obligation to try to elicit facts around it as much as we can.  So in that spirit, let me try to fill in some of the gaps some of my colleagues may have left today.

What did you understand John Ashcroft's condition to be on March 10th, 2004?

MR. MUELLER:  He was -- had gone through a difficult operation and was being closely monitored in the hospital.

REP. A. DAVIS:  Had you been in touch with him in the interim between March 10th and his operation?

MR. MUELLER:  No.  The operation preceding March 10th?

REP. A. DAVIS:  Yes, that's right.

MR. MUELLER:  No, I had not.

REP. A. DAVIS:  That's right.

MR. MUELLER:  I had not.

REP. A. DAVIS:  Did you understand him to be in condition to receive visitors --

MR. MUELLER:  I did not --

REP. A. DAVIS:  -- on any serious matters?

MR. MUELLER:  I did not (no/know ?).

REP. A. DAVIS:  Had you felt anything was pressing enough for you to get in touch with him during that time frame?

MR. MUELLER:  No.

REP. A. DAVIS:  Were you surprised when you received the phone call from Mr. Comey indicating that there was going to be this visit to Mr. Ashcroft by Gonzales and Card?

MR. MUELLER:  It was out of the ordinary.

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION: 2141 RAYBURN HOUSE OFFICE BUI

REP. A. DAVIS:  And was one of the reasons it was out of the ordinary because you didn't understand Mr. Ashcroft to be in condition to receive visitors on serious matters?

MR. MUELLER:  No.  It's -- it was the request from Mr. Comey that was out of the ordinary.

REP. A. DAVIS:  What was out of the ordinary?

MR. MUELLER:  To be requested to come to the hospital at that particular time, at -- early in the evening.

REP. A. DAVIS:  And I think you've testified or there has been testimony from Mr. Comey that he asked you to have a conversation with FBI agents and to instruct them not to remove him from the room?  Is that  essentially accurate testimony on Mr. Comey's part?

MR. MUELLER:  I have no dispute with -- (Mr. Comey says ?) in that regard.

REP. A. DAVIS:  Right.

MR. MUELLER:  My own recollection is somewhat unformed.

REP. A. DAVIS:  Well, do you remember -- that certainly strikes me as  unusual.  You're the FBI director; a senior official calls you and says, "Make sure that I'm not evicted from the room," and I'm sure that must have  struck you as being an unusual request, didn't it?

MR. MUELLER:  Yes.

REP. A. DAVIS:  Did you take notes and memorialize your conversation with Mr. Comey at that point?

MR. MUELLER:  I don't -- no, at that point I did not.

REP. A. DAVIS:  At some point did you memorialize your conversations regarding this visit with Mr. Comey?

MR. MUELLER:  I may have.  Yes.

REP. A. DAVIS:  Do you still have those notes?

MR. MUELLER:  Yes.

REP. A. DAVIS:  And are they available to the committee if the committee were to ask for them?

MR. MUELLER:  I would have to get back to you on that.

REP. A. DAVIS:  Can you think of a reason or a privilege that would prevent the committee from receiving these notes?

MR. MUELLER:  Deliberative, but I'd have to get back to you on that.

REP. A. DAVIS:  Well, but as we sit here, can you think of any privilege that would preclude the committee?

MR. MUELLER:  Deliberative.

REP. A. DAVIS:  Okay.  That's your answer.

Let me move forward.

I think you've indicated that you did not encounter Mr. Gonzales or Mr. Card at the hospital.  Is that right?

MR. MUELLER:  Correct.

REP. A. DAVIS:  But you did speak with Mr. Ashcroft after the conversation that he had with Mr. Card and Mr. Gonzales.  Is that right?

MR. MUELLER:  I did.

REP. A. DAVIS:  Did you make any -- I'll let the bell go off -- did you -- (buzzer sounds) -- I want you to hear me, so I let the bell go off -- did you make any notes regarding your conversation with Mr. Ashcroft?

MR. MUELLER:  Yes.

REP. A. DAVIS:  And do you still have those notes in your possession?

MR. MUELLER:  Yes.

REP. A. DAVIS:  Can you think of any reason why those notes should not be disposed to the committee?

MR. MUELLER:  The same response that I gave before in response to your earlier question --

REP. A. DAVIS:  Now, why -- (buzzer sounds) -- I'm going to let that stop again; this is an important question -- tell me why you decided to make notes of your conversation with Mr. Ashcroft.

MR. MUELLER:  It was out of the ordinary.

REP. A. DAVIS:  What was out of the ordinary, Mr. Mueller?

MR. MUELLER:  Being asked to go to the hospital and be present at that time.

REP. A. DAVIS:  Did you share those notes with anyone in the administration?

MR. MUELLER:  No.

REP. A. DAVIS:  With whom have you shared them with prior to today?

MR. MUELLER:  My counsel.

REP. A. DAVIS:  Counsel --

MR. MUELLER:  Office of General Counsel.

REP. A. DAVIS:  Okay.  Is that the only individual, the Office of General Counsel?

MR. MUELLER:  Yes -- well, there may have been persons in my immediate staff, but --

REP. A. DAVIS:  Have you made any other notes or memorandum regarding the March 10th visit that you've characterized as unusual?

MR. MUELLER:  No.

REP. A. DAVIS:  Do you know if any notes or memorandum were made regarding the visit itself?  I understand you didn't make them, as you weren't there.  But regarding the visit by Mr. Card and Mr. Gonzales to Mr. Ashcroft, do you know if there was any note taker present?

MR. MUELLER:  I do not know --

REP. A. DAVIS:  Have you attempted to inquire if there -- I'm sorry.  Did you finish your answer?  I'm sorry.

MR. MUELLER:  I was going to anticipate your next question as I have not seen any such notes.

REP. A. DAVIS:  Okay.  And --

REP. CONYERS:  I hate to tell the gentleman this, but with two other members and the vote on, we're now really --

REP. A. DAVIS:  If you'd just indulge me 10 seconds, Mr. Chairman.  I would ask the committee to take note of Mr. Mueller's very candid statement to us that he does have notes regarding this very important conversation.  And I would ask that Senate to certainly be aware of it, and I would certainly ask this committee and our colleagues in the Senate to make a formal inquiry to obtain those notes.

Thank you for being candid, Mr. Mueller.

REP. CONYERS:  Thank you very much.

The chair recognizes the gentlelady from Florida, Debbie Wasserman Schultz.

REP. DEBBIE WASSERMAN SCHULTZ (D-FL):  Thank you, Mr. Chairman.

Director Mueller, I'm going to change the subject and ask some questions related to Internet -- the Internet and the ICAC Task Forces.

As you know, the Internet has facilitated an explosion of child exploitation, and Department of Justice officials testified before the Energy and Commerce Committee in the last Congress that there are hundreds of thousands of individuals trafficking in child pornography in the United States.  Everyone that I have talked to, from Mark Lunsford in

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION: 2141 RAYBURN HOUSE OFFICE BUI

Florida -- who was Jessica Lunsford's father -- Marc Klaas, Polly Klaas's father in California and a number of other parents who have formed the Surviving Parents Coalition to the National Association to Protect Children -- everyone tells me that this problem is only getting worse and not better.

So let me be clear -- these are images and videos of children being sexually abused, including depictions of rape and sexual penetration. These are crime scene photos. A 2005 study by the Department of Justice determined that 83 percent of child pornography possessors had images of children as young as 6, while another 19 percent of possessors had images of infants and toddlers.

Flint Waters, who is the director of the Wyoming Internet Crimes Against Children Task Force, ICAC, and who is widely recognized as the nation's top investigator, recently examined one of 15 networks where peer-to-peer file sharing exchanges occurred. By extrapolating local cases nationwide, he estimates conservatively that there are 485,000 known individuals -- 485,000 known individuals engaging in trafficking child pornography in the United States.

That's half-a-million people right here in the U.S. trading these criminal images online and spreading them around the world. The Wyoming ICAC learned that there have been more than 1.2 million unique Internet Protocol addresses that have engaged in child pornography tracking since 2004, 1.2 million IP addresses that we know for a fact are trading in criminal child pornography.

Do you know, Director Mueller, that -- what percentage of these cases are presently being investigated by the FBI or other branches of federal law enforcement? I'll in the interest of time answer it for you because I know. It's two percent -- two percent.

That figure alone is appalling. But when you consider one more statistic that's all the more chilling, we know that 30 percent of the offenders identified by the ICAC databases are typically associated with local victims. These are children who are being violated from within their daily circle of trust. That would mean that there are 145,000 offenders, exploiting children in their local areas, who could be arrested by local law enforcement right now if law enforcement established different priorities or asked for the funds they needed to eradicate this problem.

Director Mueller, do you know how many FBI agents are dedicated to white collar crime? I'll answer that one for you too -- 2,342 agents, 2,342 agents. And do you know how many agents are dedicated to child exploitation? 242 -- 242 for child exploitation, 2,342 for white collar crime.

In the interest of time, I will speed my testimony but I'm sponsoring legislation which will also be sponsored by Senator Biden that will authorize a billion dollars that would build the largest law enforcement effort dedicated to the protection of children. I'm really not sure -- and what I'd like you to respond to is why the FBI has not made child exploitation a bigger priority. And why have you not asked for more help from this Congress?

MR. MUELLER: I can tell you that child exploitation is a substantial priority. Our Innocent Images undertaking has grown over the years, even though we've had other priorities such as counterterrorism and counterintelligence. To the extent that I can obtain additional resources, and we have put in over the years for additional resources, to the extent that I can obtain additional resources to address child pornography and support the ICACs, I of course would be willing to do so.

The -- I do believe the ICACs around the country are that mechanism that leverages our capability in working with state and local law enforcement to address this problem. You can give us tremendous number of resources, but they would be inadequate to address this problem alone. And again, I share your concern; I share your desire to utilize everything we have at the federal level to address this problem. Again, it is a question of trying to maintain those resources we have and augment them when there are other competing priorities.

REP. WASSERMAN SCHULTZ: But I just want to share with you that I have a deep concern about the FBI and the Department of Justice's priorities when you have 2,342 white collar criminal investigators and only 242 investigators for child exploitation. And I would hope that the FBI and that you would commit to working with me and Senator Biden and the other members that are deeply concerned about reordering the priorities of the Department of Justice and the FBI to make sure we can go after the people who are really harming the most vulnerable population, and that's our children.

MR. MUELLER: I'd be happy to work with you.

REP. WASSERMAN SCHULTZ: Thank you very much.

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION: 2141 RAYBURN HOUSE OFFICE BUI

REP. CONYERS:  Thank you.

The chair recognizes our last member to ask questions, the gentleman from Minnesota, Mr. Keith Ellison.

REP. KEITH ELLISON (D-MN):  Mr. Director, thanks for being here today.

In the past several weeks, I've been in a lot of events for members of the Muslim and Arab community, and there have been several of them where I've seen people from the FBI who were there, who spoke, who interacted with community.  I thought that was a good thing.  I want to commend you and encourage you to continue to do that.

Can we talk about other things that the FBI is doing right now to try to build better relationships within those communities at this time?

MR. MUELLER:  Well, we've -- as you pointed out, we have substantial outreach in every one of our 56 field offices, and special agents in charge since September 11th have been directed to attend mosques, attend dinners, attend congregations of Muslim Americans, Arab Americans, Sikh Americans in order to share basically what we do and our concern not only about the contributions of that community to protect the United States against another attack, but addressing hate crimes which also are a substantial concern in the wake of September 11th.  And we take any allegation of a hate crime against a Muslim as extremely serious and undercutting the democracy in which we live.

I meet periodically with the national leaders of the Muslim communities.  We have established a mechanism whereby when we do make an arrest and it does happen to be Muslims, that we have a dialogue immediately so that there is an understanding of what supports that arrest and allowing leaders of the Muslim community to explain to the flock what we are doing.

Part of our outreach is also through citizens academies in which we will have Muslim leaders participate in citizens academies, which are several continuous weeks of, I would say, training by the FBI as to what we do and how we do it, the constraints under which we do it. And I will say almost to a one the persons who go through the citizens academies come out with a much better understanding about what we do, how we do it and our concerns about the civil rights of all populations in the United States.  Those are just a few of the areas in which we operate.

I will tell you that the participation in the Muslim community in terms of trying to prevent another terrorist attack from September 11th has been terrific, and --

REP. ELLISON:  Do you agree, then, that the American Muslim community stands foursquare with the American people in working to prevent any kind of further extremist violence?

MR. MUELLER:  Absolutely.  And the worst thing for the Muslim community would be another attack such as September 11th, and I think members and leaders of the Muslim community recognize that.

REP. ELLISON:  You think they're doing their good part?

MR. MUELLER:  I do, but there's always -- there is always more to be done, and -- in all communities.  The need to be vigilant to self- radicalization is important, and when you see persons or individuals in whatever community whom you think present a concern, it's important that one take action.

I am always remembered -- reminded of the -- on the airline flying from Paris to Florida the shoe-bomber, and it was an alert flight attendant who fixed on the fact that there was something unusual when he was lighting a match and saved the lives of hundreds of people.

REP. ELLISON:  (Inaudible.)

MR. MUELLER:  Now, that did not happen to be a Muslim flight attendant, but nonetheless we have had that same type of --

REP. ELLISON:  I'm sorry, Director.

MR. MUELLER:  -- (inaudible) -- with the Muslim community.

REP. ELLISON:  Forgive me for my interruption.  It's just the time that makes me have to do that.

But, you know, there were recently a couple of -- some arrests in Detroit, the Detroit area, Dearborn, that, you know, may well have been justified, I don't have any view on that, but what the residual impact was is that some charities had -- were notified by the banks that they were working with that their relationship was going to be terminated.

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY; SUBJECT: FBI OVERSIGHT; CHAIRED BY: REPRESENTATIVE JOHN CONYERS (D-MI); WITNESS: ROBERT MUELLER, DIRECTOR, FBI; LOCATION: 2141 RAYBURN HOUSE OFFICE BUI

Are you at all concerned about how third parties out in the community, such as banks and others, might react when it's gotten into the public arena that there's been some law enforcement activity in a certain community?  You understand what I'm getting at?

MR. MUELLER:  Yes.  And yes, I am concerned, but on the other hand, we have our job to do.  When we have the evidence and we have the imperative to move ahead, we have to.

REP. ELLISON:  Right.

MR. MUELLER:  There will be residual effects.  I'm not saying there will not be. and that is of some concern.  But --

REP. ELLISON:  And can the FBI do anything to help mitigate those residual effects?  I mean, is that something that you regard as something that is important in terms of continuing to pursue your -- your program to build better, stronger relationships?

MR. MUELLER:  Yes.  And the mitigation goes to what I was saying before in terms of developing relationships and understanding of how the FBI operates -- when we do searches, it's at the behest of a judge who has approved a search warrant -- so there is greater understanding of the parameters within which we operate, as well as our mission and how we undertake it.

REP. ELLISON:  Do you ever send communications to banks or any groups like that to say that, look, you know, we haven't found anything, these people are -- you know, you might not want to take adverse action against them, because our investigation has not turned up anything against them?

MR. MUELLER:  Generally, we cannot and do not do that, given the confidentiality of our investigations.  But to the extent that we can mitigate such adverse consequences within the constraints of what we can do investigatively, we would try to do.  And much of it is building up the relationships and the rapport --

REP. ELLISON:  Yeah.  Is there anything you can do to --

MR. MUELLER:  -- (inaudible).

REP. ELLISON:  Is there anything you can do to help remove that cloud of suspicion that would inevitably hang over a group where there may have been some investigative action that is found not to be fruitful?

MR. MUELLER:  Ultimately, if we've taken action, generally there is an indictment or some other action.  It may be a forfeiture action, like in which the courts address it.  And the facts that triggered the enforcement  action come through and are -- become transparent in the judicial process.

REP. ELLISON:  Yeah, but sometime there's no further action. There might be just a couple of guys in black suits and ties that knock on the door, that causes a certain amount of fear and suspicion, or maybe there is some -- a search warrant served, but then there's no further action after that.  The community continues to wonder what's up with those guys.

MR. MUELLER:  Well, there is -- and again, it's usually up to the U.S. attorney -- there is a capability of indicating to a defense attorney that the client is no longer either a target or a subject of an investigation.  That goes generally to -- that kind of letter goes to a defense attorney.

REP. CONYERS:  The gentleman's time has expired.

It's been a long day, Director Mueller, but it's been a very fruitful day.  We will keep the record open for five legislative days for questions to go to you and for our members to add additional material.

And we think that this first hearing with the head of the FBI is one that will get us together more frequently in the future.  We thank you for your patience and cooperation with the committee.

MR. MUELLER:  Thank you, sir.

REP. CONYERS:  And with that, the hearing is adjourned.  (Strikes gavel.)

**LOAD-DATE:** July 27, 2007