1   Elizabeth Cabraser (CSB No. 83151)         Laurence F. Pulgram (CSB No. 115163)
    ecabraser@lchb.com                         lpulgram@fenwick.com
2   Barry R. Himmelstein (CSB No. 157736)      Candace Morey (CSB No. 233081)
    bhimmelstein@lchb.com                      cmorey@fenwick.com
3   Eric B. Fastiff (CSB No. 182260)           FENWICK & WEST LLP
    efastiff@lchb.com                          555 California Street, 12th Floor
4   Allison Elgart (CSB No. 241901)            San Francisco, CA 94104
    aelgart@lchb.com                           Telephone:    (415) 875-2300
5   LIEFF, CABRASER, HEIMANN &                 Facsimile:    (415) 281-1350
    BERNSTEIN, LLP
6   275 Battery Street, 30th Floor
    San Francisco, CA 94111-3339
7   Telephone:  415-956-1000
    Facsimile:  415-956-1008
8
    Interim Class Counsel for MCI Class
9
    Vincent I. Parrett (CSB No. 237563)        Ann Brick (CSB No. 65296)
10  vparrett@motleyrice.com                    abrick@aclunc.org
    MOTLEY RICE LLC                            AMERICAN CIVIL LIBERTIES UNION
11  28 Bridgeside Boulevard                    FOUNDATION OF NORTHERN CALIFORNIA
    P. O. Box 1792                             39 Drumm Street
12  Mount Pleasant, SC  29465                  San Francisco, CA  94111
    Telephone:  (843) 216-9000                 Telephone:  (415) 621-2493
13  Facsimile:   (843) 216-9440                Facsimile:  (4150 255-8437
14  Interim Class Counsel for Verizon Class    Attorneys for Plaintiffs Dennis P. Riordan, *et al.*

15                       UNITED STATES DISTRICT COURT

16                     NORTHERN DISTRICT OF CALIFORNIA

17                          SAN FRANCISCO DIVISION

18

19  IN RE:                                     MDL No. 06-1791 VRW

20  NATIONAL SECURITY AGENCY                   **PLAINTIFFS' SECOND SUPPLEMENTAL**
    TELECOMMUNICATIONS RECORDS                 **REQUEST FOR JUDICIAL NOTICE FOR**
21  LITIGATION,                                **THE MOTIONS TO DISMISS OR, IN THE**
                                               **ALTERNATIVE, FOR SUMMARY**
22  This Document Relates To:                  **JUDGMENT BY THE UNITED STATES**
                                               **OF AMERICA AND VERIZON**
23  (1) All Class Actions Against MCI and
    Verizon Defendants in the Master MCI and   Date:       August 30, 2007
24  Verizon Consolidated Complaint, Dkt. 125;  Time:       2:00 p.m.
    (2) *Bready v. Verizon Maryland* (06-6313); Courtroom:  6, 17th Floor
25  (3) *Chulsky v. Cellco Partnership & Verizon* Judge:    Hon. Vaughn R. Walker
    *Communications Inc.* (06-6570); and
26  (4) *Riordan v. Verizon Communications Inc.*
    (06-3574)
27

28

Dockets.Justia.com

| | | |
|---|---|---|
| 1 | Peter J. Eliasberg (CSB No. 189110) | Joshua Graeme Whitaker |
| | peliasberg@aclu-sc.org | (Appearing pursuant to MDL Rule 1.4 [U.S. Dist. |
| 2 | Peter Bibring (CSB No. 223981) | Ct. for the Dist. of Md. Bar No. 16457]) |
| | pbibring@aclu-sc.org | joshuawhitaker@griffinwhitaker.com |
| 3 | AMERICAN CIVIL LIBERTIES UNION | Edward Nelson Griffin |
| | FOUNDATION OF SOUTHERN | (Appearing pursuant to MDL Rule 1.4 [U.S. Dist. |
| 4 | CALIFORNIA | Ct. for the Dist. of Md. Bar No. 16435]) |
| | 1616 Beverly Boulevard | edwardgriffin@griffinwhitaker.com |
| 5 | Los Angeles, CA 90026 | GRIFFIN WHITAKER LLP |
| | Telephone: (213) 977-9500 | 8730 Georgia Avenue Suite LL100 |
| 6 | Facsimile: (213) 250-3919 | Silver Spring, MD 20910 |
| | | Telephone: (301) 587-3345 |
| 7 | | Facsimile: (888) 367-0383 |
| 8 | | Attorneys for Plaintiffs Christopher Bready, *et al*. |
| 9 | Jennifer L. Kelly (CSB No. 193416) | Ronald L. Motley |
| | jkelly@fenwick.com | rmotley@motleyrice.com |
| 10 | Aaron K. Perzanowski (CSB No. 244921) | Jodi W. Flowers |
| | aperzanowski@fenwick.com | jflowers@motleyrice.com |
| 11 | FENWICK & WEST LLP | Don Migliori |
| | 555 California Street, 12th Floor | dmigliori@motleyrice.com |
| 12 | San Francisco, CA 94104 | Justin B. Kaplan |
| | Telephone: (415) 875-2300 | jkaplan@motleyrice.com |
| 13 | Facsimile: (415) 281-1350 | MOTLEY RICE LLC |
| | | 28 Bridgeside Blvd., P. O. Box 1792 |
| 14 | | Mount Pleasant, SC 29465 |
| | | Telephone: (843) 216-9000 |
| 15 | | Facsimile: (843) 216-9440 |
| 16 | | Interim Class Counsel for Verizon Class |
| 17 | Nicole A. Ozer (CSB No. 228643) | David H. Sternlieb |
| | nozer@aclunc.org | dsternlieb@shapirosternlieb.com |
| 18 | AMERICAN CIVIL LIBERTIES UNION | Gary S. Shapiro |
| | FOUNDATION OF NORTHERN | gshapiro@shapirosternlieb.com |
| 19 | CALIFORNIA | (Appearing pursuant to MDL Rule 1.4) (U.S. Dist. |
| | 39 Drumm Street | Ct. for the Dist. of N.J.) |
| 20 | San Francisco, CA 94111 | SHAPIRO & STERNLIEB, LLC |
| | Telephone: (415) 621-2493 | Attorneys At Law |
| 21 | Facsimile: (4150 255-8437 | 800 Tennent Road |
| | | Manalapan, New Jersey 07726 |
| 22 | Attorneys for Plaintiffs in | Telephone: (732) 617-8050 |
| | Dennis P. Riordan, *et al*. | Facsimile: (732) 617-8060 |
| 23 | | |
| | | Counsel for Plaintiffs Glen Chulsky, *et al*. |
| 24 | | |

25        Plaintiffs respectfully request, pursuant to Federal Rule of Evidence 201 and the

26 inherent authority of the Court, that the Court take judicial notice of the admission made by the

27 Director of National Intelligence ("DNI"), during an interview with the El Paso Times newspaper

28 published on August 22, 2007, that the telecommunications companies sued in this litigation "had

assisted" the National Security Agency ("NSA") with respect to the challenged surveillance programs.[1]

During an interview with Chris Roberts of the *El Paso Times* published on August 22, 2007, DNI McConnell said:

> [U]nder the president's program, the terrorist surveillance program, **the private sector had assisted us**. Because if you're going to get access you've got to have a partner and **they were being sued**. Now if you play out the suits at the value they're claimed, it would bankrupt **these companies**.

Exhibit E, at p. 2 (emphasis added).[2]

Plaintiffs have already sought judicial notice of the Attorney General's recent testimony admitting that "companies" assisted the Government, and of the recent statement by Michigan Congressman Peter Hoekstra, the ranking Republican on the House Select Committee on Intelligence, that the "communications companies" who were helping the Government are the very same companies facing the lawsuits in this MDL proceeding. In the statement at issue, the nation's top intelligence official, the DNI, now admits that the companies currently being sued "had assisted" in the Government's warrantless surveillance and interception activities. Taken in context, it is clear that the DNI is referencing the defendant telecommunications companies in this MDL proceeding, into which all such pending cases have been transferred. *See In re: Sealed Case*, __ F.3d __, 2007 WL 2067029, *7 and *9 (D.C. Cir. July 20, 2007) (holding that circumstantial evidence and inferences therefrom are sufficient to make a prima facie case).

---

[1] Under Federal Rule of Evidence 201, facts "not subject to reasonable dispute in that" they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" are judicially noticeable. Fed. Rule Evid. 201(b). When such notice is "requested by a party and [the court is] supplied with the necessary information," it is mandatory. Fed. Rule Evid. 201(d). The public statements made by the Director of National Intelligence are "not subject to reasonable dispute" and easily verifiable on the basis of the attached transcript reflecting the statements. *See* Exhibit E (Exhibits A-D are the subject of a prior Supplemental Request for Judicial Notice, Docket No. 356). *See, e.g., Texas & Pac. Ry. Co. v. Pottorff*, 291 U.S. 245, 254 n. 4, 78 L. Ed. 777, 54 S. Ct. 416 (1933), *amended on other grounds*, 291 U.S. 649, 54 S. Ct. 525 (1934) (official reports put forth by the Comptroller of the Currency); *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 (9th Cir. 1999) (information contained in news articles); *Del Puerto Water Dist. v. United States Bureau of Reclamation*, 271 F.Supp.2d 1224, 1234 (E.D. Cal. 2003) (Senate and House Reports); *Wietschner v. Monterey Pasta Co.*, 294 F.Supp.2d 1102, 1108 (N.D. Cal. 2003) (press releases issued by the Securities and Exchange Commission).

[2] Transcript available at <http://www.elpasotimes.com/news/ci_6685679>.

The DNI's recent statements contrast sharply with his declaration filed in this action which, at paragraph 13, reads:

> Second, by alleging that the Verizon Defendants have assisted the NSA with various alleged intelligence activities, Plaintiffs in these cases put directly at issue **whether or not the NSA has conducted particular intelligence activities** and whether or not it has done so **with the secret help of a private entity.** The disclosure of any information that would tend to confirm or deny these allegations and, in particular, an alleged classified intelligence relationship between the NSA and MCI/Verizon, would cause exceptionally grave harm to the national security.

(Emphasis added.)

Dated: August 27, 2007    Respectfully,

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

By:＿＿＿＿＿＿ /s/ Barry R. Himmelstein ＿＿＿＿＿
＿＿＿＿＿＿ Barry R. Himmelsetin

Class Counsel for MCI Class
FENWICK & WEST LLP

By:＿＿ /s/ Laurence F. Pulgram ＿＿＿＿＿＿＿
＿＿＿＿＿ Laurence F. Pulgram

Attorneys for Plaintiffs Dennis P. Riordan, *et al.*

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF NORTHERN CALIFORNIA

By:＿＿ /s/ Ann Brick ＿＿＿＿＿＿＿＿＿＿＿
＿＿＿＿＿ Ann Brick

Attorneys for Plaintiffs Dennis P. Riordan, *et al.*

MOTLEY RICE LLC

By:＿＿ /s/ Vincent I. Parrett ＿＿＿＿＿＿＿＿＿
＿＿＿＿＿ Vincent I. Parrett

Interim Class Counsel for Verizon Class

GRIFFIN WHITAKER LLP


By:____/s/ Joshua Graeme Whitaker_____
                Joshua Graeme Whitaker

Attorneys for Plaintiffs Christopher Bready, *et al.*

SHAPIRO & STERNLIEB, LLC


By:____/s/ David H. Sternlieb_____
                David H. Sternlieb

Attorneys for Plaintiffs Glen Chulsky, *et al.*

# EXHIBIT E

# Transcript: Debate on the foreign intelligence surveillance act

By Chris Roberts / ©El Paso Times
El Paso Times

Article Launched:08/22/2007 01:05:57 AM MDT

The following is the transcript of a question and answer session with National Intelligence Director Mike McConnell.

Question: How much has President Bush or members of his administration formed your response to the FISA debate?

Answer: Not at all. When I came back in, remember my previous assignment was director of the NSA, so this was an area I have known a little bit about. So I came back in. I was nominated the first week of January. The administration had made a decision to put the terrorist surveillance program into the FISA court. I think that happened the 7th of Jan. So as I come in the door and I'm prepping for the hearings, this sort of all happened. So the first thing I want to know is what's this program and what's the background and I was pretty surprised at what I learned. First off, the issue was the technology had changed and we had worked ourselves into a position that we were focusing on foreign terrorist communications, and this was a terrorist foreigner in a foreign country. The issue was international communications are on a wire so all of a sudden we were in a position because of the wording in the law that we had to have a warrant to do that. So the most important thing to capture is that it's a foreigner in a foreign country, required to get a warrant. Now if it were wireless, we would not be required to get a warrant. Plus we were limited in what we were doing to terrorism only and the last time I checked we had a mission called foreign intelligence, which should be construed to mean anything of a foreign intelligence interest, North Korea, China, Russia, Syria, weapons of mass destruction proliferation, military development and it goes on and on and on. So when I engaged with the administration, I said we've gotten ourselves into a position here where we need to clarify, so the FISA issue had been debated and legislation had been passed in the house in 2006, did not pass the Senate. Two bills were introduced in the Senate, I don't know if it was co-sponsorship or two different bills, but Sen. (Dianne Feinstein, D-Calif.) had a bill and Sen. Specter had a bill and it may have been the same bill, I don't know, but the point is a lot of debate, a lot of dialogue. So, it was submitted to the FISA court and the first ruling in the FISA court was what we needed to do we could do with an approval process that was at a summary level and that was OK, we stayed in business and we're doing our mission. Well in the FISA process, you may or may not be aware …

Q: When you say summary level, do you mean the FISA court?

A: The FISA court. The FISA court ruled presented the program to them and they said the program is what you say it is and it's appropriate and it's legitimate, it's not an issue and was had approval. But the FISA process has a renewal. It comes up every so many days and there are 11 FISA judges. So the second judge looked at the same data and said well wait a minute I interpret the law, which is the FISA law, differently. And it came down to, if it's on a wire and it's foreign in a foreign country, you have to have a warrant and so we found ourselves in a position of actually losing ground because it was the first review was less capability, we got a stay and that took us to the 31st of May. After the 31st of May we were in extremis because now we have significantly less capability. And meantime, the community, before I came back, had been working on a National Intelligence Estimate on terrorist threat to the homeland. And the key elements of the terrorist threat to the homeland, there were four key elements, a resilient determined adversary with senior leadership willing to die for the cause, requiring a place to train and develop, think of it as safe haven, they had discovered that in the border area between Pakistan and Afghanistan. Now the Pakistani government is pushing and pressing and attempting to do something about it, but by and large they have areas of safe haven. So leadership that can adapt, safe haven, intermediate leadership, these are think of them as trainers, facilitators, operational control guys. And the fourth part is recruits. They have them, they've taken them. This area is referred to as the FATA, federally administered tribal areas, they have the recruits and now the objective is to get them into the United States for mass casualties to conduct terrorist operations to achieve mass casualties. All of those four parts have been carried out except the fourth. They have em, but they haven't been successful. One of the major tools for us to keep them out is the FISA program, a significant tool and we're going the wrong direction. So, for me it was extremis to start talking not only to the administration, but to members of the hill. So from June until the bill was passed, I think I talked to probably 260 members, senators and congressmen. We submitted the bill in April, had an open hearing 1 May, we had a closed hearing in May, I don't remember the exact date.

Chairman (U.S. Rep. Silvestre Reyes, D-Texas) had two hearings and I had a chance to brief the judiciary committee in the house, the intelligence committee in the house and I just mentioned the Senate, did not brief the full judiciary committee in the Senate, but I did meet with Sen. (Patrick Leahy, D-Vt.) and Sen. (Arlen Specter, R-Pa.), and I did have an opportunity on the Senate side, they have a tradition there of every quarter they invite the director of national intelligence in to talk to them update them on topics of interest. And that happened in (June 27). Well what they wanted to hear about was Iraq and Afghanistan and for whatever reason, I'm giving them my review and they ask questions in the order in which they arrive in the room. The second question was on FISA, so it gave me an opportunity to, here I am worrying about this problem and I have 41 senators and I said several things. The current threat is increasing, I'm worried about it. Our capability is decreasing and let me explain the problem.

Q: Can't you get the warrant after the fact?

A: The issue is volume and time. Think about foreign intelligence. What it presented me with an opportunity is to make the case for something current, but what I was really also trying to put a strong emphasis on is the need to do foreign intelligence in any context. My argument was that the intelligence community should not be restricted when we are conducting foreign surveillance against a foreigner in a foreign country, just by dint of the fact that it happened to touch a wire. We haven't done that in wireless for years.

Q: So you end up with people tied up doing paperwork?

A: It takes about 200 man hours to do one telephone number. Think about it from the judges standpoint. Well, is this foreign intelligence? Well how do you know it's foreign intelligence? Well what does Abdul calling Mohammed mean, and how do I interpret that? So, it's a very complex process, so now, I've got people speaking Urdu and Farsi and, you know, whatever, Arabic, pull them off the line have them go through this process to justify what it is they know and why and so on. And now you've got to write it all up and it goes through the signature process, take it through (the Justice Department), and take it down to the FISA court. So all that process is about 200 man hours for one number. We're going backwards, we couldn't keep up. So the issue was …

Q: How many calls? Thousands?

A: Don't want to go there. Just think, lots. Too many. Now the second part of the issue was under the president's program, the terrorist surveillance program, the private sector had assisted us. Because if you're going to get access you've got to have a partner and they were being sued. Now if you play out the suits at the value they're claimed, it would bankrupt these companies. So my position was we have to provide liability protection to these private sector entities. So that was part of the request. So we went through that and we argued it. Some wanted to limit us to terrorism. My argument was, wait a minute, why would I want to limit it to terrorism. It may be that terrorists are achieving weapons of mass destruction, the only way I would know that is if I'm doing foreign intelligence by who might be providing a weapon of mass destruction.

Q: And this is still all foreign to foreign communication?

A: All foreign to foreign. So, in the final analysis, I was after three points, no warrant for a foreigner overseas, a foreign intelligence target located overseas, liability protection for the private sector and the third point was we must be required to have a warrant for surveillance against a U.S. person. And when I say U.S. person I want to make sure you capture what that means. That does not mean citizen. That means a foreigner, who is here, we still have to have a warrant because he's here. My view is that that's the right check and balances and it's the right protection for the country and lets us still do our mission for protection of the country. And we're trying to fend off foreign threats.

Q: So are you satisfied with it the way it is now?

A: I am. The issue that we did not address, which has to be addressed is the liability protection for the private sector now is proscriptive, meaning going forward. We've got a retroactive problem. When I went through and briefed the various senators and congressmen, the issue was alright, look, we don't want to work that right now, it's too hard because we want to find out about some issues of the past. So what I recommended to the administration is, 'Let's take that off the table for now and take it up when Congress reconvenes in September.'

Q: With an eye toward the six-month review?

A: No, the retroactive liability protection has got to be addressed.

Q: And that's not in the current law?

A: It is not. Now people have said that I negotiated in bad faith, or I did not keep my word or whatever…

Q: That you had an agenda that you weren't honest about.

A: I'll give you the facts from my point of view. When I checked on board I had my discussion with the president. I'm an apolitical figure. I'm not a Republican, I'm not a Democrat. I have voted for both. My job is as a professional to try to do this job the best way I can in terms of, from the intelligence community, protect the nation. So I made my argument that we should have the ability to do surveillance the same way we've done it for the past 50 years and not be inhibited when it's a foreigner in a foreign country. The president's guidance to me early in the process, was, 'You've got the experience. I trust your judgement. You make the right call. There's no pressure from anybody here to tell you how to do it. He did that early. He revisited with me in June. He did it again in July and he said it publicly on Friday before the bill was passed. We were at the FBI, it's an annual thing, we go to the FBI and do a homeland security kind of update. So he came out at noon and said, 'I'm requesting that Congress pass this bill. It's essential. Do it before you go on recess. I'm depending on Mike McConnell's recommendations. And that was the total sum and substance of the guidance and the involvement from the White House with regard to how I should make the call. Now, as we negotiated, we started with 66 pages, were trying to get everything cleaned up at once. When I reduced it to my three points, we went from 66 pages to 11. Now, this is a very, very complex bill. I had a team of 20 lawyers working. You can change a word in a paragraph and end up with some major catastrophe down in paragraph 27, subsection 2c, to shut yourself down, you'll be out of business. So when we send up our 11 pages, we had a lot of help in making sure we got it just right so it would come back and we'd say wait a minute we can't live with this or one of the lawyers would say, 'Wait we tried that, it won't work, here's the problem.' So we kept going back and forth, so we sent up a version like Monday, we sent up a version on Wednesday, we sent up a version on Thursday. The House leadership, or the Democratic leadership on Thursday took that bill and we talked about it. And my response was there are some things I can't live with in this bill and they said alright we're going to fix them. Now, here's the issue. I never then had a chance to read it for the fix because, again, it's so complex, if you change a word or phrase, or even a paragraph reference, you can cause unintended …

Q: You have to make sure it's all consistent?

A: Right. So I can't agree to it until it's in writing and my 20 lawyers, who have been doing this for two years, can work through it. So in the final analysis, I was put in the position of making a call on something I hadn't read. So when it came down to crunch time, we got a copy and it had some of the offending language back in it. So I said, 'I can't support it.' And it played out in the House the way it played out in the House. Meantime on the Senate side, there were two versions being looked at. The Wednesday version and the Thursday version. And one side took one version and the other side took the other version. The Thursday version, we had some help, and I didn't get a chance to review it. So now, it's Friday night, the Senate's voting. They were having their debate and I still had not had a chance to review it. So, I walked over, I was up visiting some senators trying to explain some of the background. So I walked over to the chamber and as I walked into the office just off the chamber, it's the vice president's office, somebody gave me a copy. So I looked at the version and said, 'Can't do it. The same language was back in there.'

Q: What was it?

A: Just let me leave it, not too much detail, there were things with regard to our authorities some language around minimization. So it put us in an untenable position. So then I had another version to take a look at, which was our Wednesday version, which basically was unchanged. So I said, well certainly, I'm going to support that Wednesday version. So that's what I said and the vote happened in the Senate and that was on Friday. So now it rolled to the House on Saturday. They took up the bill, they had a spirited debate, my name was invoked several times, not in a favorable light in some cases. (laughs) And they took a vote and it passed 226 to 182, I think. So it's law. The president signed it on Sunday and here we are.

Q: That's far from unanimous. There's obviously going to be more debate on this.

A: There are a couple of issues to just be sensitive to. There's a claim of reverse targeting. Now what that means is we would target somebody in a foreign country who is calling into the United States and our intent is to not go after the bad guy, but to listen to somebody in the United States. That's not legal, it's, it would be a breach of the Fourth Amendment. You can go to jail for that sort of thing. And If a foreign bad guy is calling into the United States, if there's a need to have a warrant, for the person in the United States, you just get a warrant. And so if a terrorist calls in and it's another terrorist, I think the American public would want us to do surveillance of that U.S. person in this case. So we would just get a warrant and do that. It's a manageable thing. On the U.S. persons side it's 100 or less. And then the foreign side, it's in the thousands. Now there's a sense that we're doing massive data mining. In fact, what we're doing

is surgical. A telephone number is surgical. So, if you know what number, you can select it out. So that's, we've got a lot of territory to make up with people believing that we're doing things we're not doing.

Q: Even if it's perception, how do you deal with that? You have to do public relations, I assume.

A: Well, one of the things you do is you talk to reporters. And you give them the facts the best you can. Now part of this is a classified world. The fact we're doing it this way means that some Americans are going to die, because we do this mission unknown to the bad guys because they're using a process that we can exploit and the more we talk about it, the more they will go with an alternative means and when they go to an alternative means, remember what I said, a significant portion of what we do, this is not just threats against the United States, this is war in Afghanistan and Iraq.

Q: So you're saying that the reporting and the debate in Congress means that some Americans are going to die?

A. That's what I mean. Because we have made it so public. We used to do these things very differently, but for whatever reason, you know, it's a democratic process and sunshine's a good thing. We need to have the debate. The reason that the FISA law was passed in 1978 was an arrangement was worked out between the Congress and the administration, we did not want to allow this community to conduct surveillance, electronic surveillance, of Americans for foreign intelligence unless you had a warrant, so that was required. So there was no warrant required for a foreign target in a foreign land. And so we are trying to get back to what was the intention of '78. Now because of the claim, counterclaim, mistrust, suspicion, the only way you could make any progress was to have this debate in an open way.

Q. So you don't think there was an alternative way to do this?

A. There may have been an alternative way, but we are where are ...

Q. A better way, I should say.

A. All of my briefs initially were very classified. But it became apparent that we were not going to be able to carry the day if we don't talk to more people.

Q. Some might say that's the price you pay for living in a free society. Do you think that this is necessary that these Americans die?

A. We could have gotten there a different way. We conducted intelligence since World War II and we've maintained a sensitivity as far as sources and methods. It's basically a sources and methods argument. If you don't protect sources and methods then those you target will choose alternative means, different paths. As it is today al-Qaida in Iraq is targeting Americans, specifically the coalition. There are activities supported by other nations to import electronic, or explosively formed projectiles, to do these roadside attacks and what we know about that is often out of very sensitive sources and methods. So the more public it is, then they take it away from us. So that's the tradeoff.

## DIVERSITY IN THE INTELLIGENCE COMMUNITY

Q: I wanted to ask you about the diversity question. This has major ramifications here, we have this center of excellence program that's recruiting high school kids, many of whom wouldn't qualify if first generation American citizens weren't allowed.

A: So you agree with me?

Q: It does sound like something that would benefit this area that would also allow you to get people from here who are bicultural and have an openness to seeing things ...

A: You're talking about Hispanics?

Q: Yes.

A: Hispanics are probably the most under-represented group if you think of America, what the ethic makeup of America, Hispanics are the most under-represented group in my community. Now, that said, and should increase that Hispanic population and programs like this will do that. That's why the outreach. But also we need, particularly with the current problem of terrorism, we need to have speakers of Urdu and Farsi and Arabic and people from those cultures that understand the issues of tribes and clans and all the things that go with understanding that part of the world. Varying religions and so on. Because it is, it's almost impossible, I've had the chance to live in the Middle East for years, I've studied it for years, it's impossible to understand it without having some feel for the culture and so on. So while I'm all for increasing the diversity along the lines we talked about, I'm also very much in favor of first generation

Americans from the countries that are causing issues and problems.

Q: What is the status of that program.

A: It is not in statue. It is not in policy. It has been habit. So we've stated, as a matter of policy, that we're not going to abide by those habits.

Q: And that's already the case?

A: Yes, and are we making progress? Not fast enough, but we will make progress over time.

Q: How do you measure that?

A: Very simple, you get to measure what are you and where are you trying go and are you making progress. I wrestled with this years ago when I was NSA ....

Q: You don't want quotas, though?

A: Quotas are forbidden so we set goals. My way of thinking about it is what is your end state? Now some would say that federal governments should look like America, whatever that is. OK, that sounded like a reasonable metric, so I said, 'Alright, what does America look like?' So I got a bunch of numbers. I said, 'Alright, what do we look like?' and it didn't match, and as I just told you, the one place where there's the greatest mismatch is Hispanic. It's much closer, as matter of fact, people would be surprised how close it is across, at least my community among the other minorities. Now, that said, numbers don't necessarily equal positioning in the organization. So that's another feature we have to work on, is placement of women and minorities in leadership positions.

Q: So, you're quantifying that as well?

A: Yes.

TERRORIST ACTIVITY ON THE NATION'S SOUTHWEST BORDER

Q: There seems to be very little terrorist-related activity on the Southwest border, which is watched very closely because of the illegal immigration issue. Can you talk about why it's important to be alert here?

A: Let me go back to my NIE, those are unclassified key judgements, pull them down and look at them. You've got committed leadership. You've got a place to train. They've got trainers and they've got recruits. The key now is getting recruits in. So if the key is getting recruits in, if you're key is getting recruits in, how would you do that? And so, how would you do that?

Q: I'd go to the northern border where there's nobody watching.

A: And that's a path. Flying in is a path. Taking a ship in is a path. Coming up through the Mexican border is a path. Now are they doing it in great numbers, no. Because we're finding them and we're identifying them and we've got watch lists and we're keeping them at bay. There are numerous situations where people are alive today because we caught them (terrorists). And my point earlier, we catch them or we prevent them because we've got the sources and methods that lets us identify them and do something about it. And you know the more sources and methods are compromised, we have that problem.

Q: And in many cases we don't hear about them?

A: The vast majority you don't hear about. Remember, let me give you a way to think about this. If you've got an issue, you have three potential outcomes, only three. A diplomatic success, an operational success or an intelligence failure. Because all those diplomatic successes and operations successes where there's intelligence contribution, it's not an intelligence success. It's just part of the process. But if there's an intelligence failure ...

Q: Then you hear about it.

A: So, are terrorists coming across the Southwest border? Not in great numbers.

Q: There are some cases?

A: There are some. And would they use it as a path, given it was available to them? In time they will.

Q: If they're successful at it, then they'll probably repeat it.

A: Sure. There were a significant number of Iraqis who came across last year. Smuggled across illegally.

Q: Where was that?

A: Across the Southwest border.

Q: Can you give me anymore detail?

A: I probably could if I had my notebook. It's significant numbers. I'll have somebody get it for you. I don't remember what it is.

Q: The point is it went from a number to (triple) in a single year, because they figured it out. Now some we caught, some we didn't. The ones that get in, what are they going to do? They're going to write home. So, it's not rocket science, word will move around. There's a program now in South America, where you can, once you're in South American countries, you can move around in South America and Central America without a visa. So you get a forged passport in Lebanon or where ever that gets you to South America. Now, no visa, you can move around, and with you're forged passport, as a citizen of whatever, you could come across that border. So, what I'm highlighting is that something …

Q: Is this how it happened, the cases you're talking about?

A: Yes.

Close Window       Send To Printer