**Jon B. Eisenberg, California Bar No. 88278** (jon@eandhlaw.com)
**William N. Hancock, California Bar No. 104501** (bill@eandhlaw.com)
**Eisenberg & Hancock LLP**
1970 Broadway, Suite 1200 • Oakland, CA 94612
510.452.258l – Fax 510.452.3277

**Steven Goldberg, Oregon Bar No. 75134** (steven@stevengoldberglaw.com)
River Park Center, Suite 300 • 205 SE Spokane St.• Portland, OR 97202
503.445.4622 – Fax 503.238.7501

**Thomas H. Nelson, Oregon Bar No. 78315** (nelson@thnelson.com)
P.O. Box 1211, 24525 E. Welches Road • Welches, OR 97067
503.622.3123 - Fax: 503.622.1438

**Zaha S. Hassan, California Bar No. 184696** (zahahassan@comcast.net)
8101 N.E. Parkway Drive, Suite F-2 • Vancouver, WA 98662
360.213.9737 - Fax 866.399.5575

**J. Ashlee Albies, Oregon Bar No. 05184** (ashlee@sstcr.com)
**Steenson, Schumann, Tewksbury, Creighton and Rose, PC**
815 S.W. Second Ave., Suite 500 • Portland, OR 97204
503.221.1792 – Fax 503.223.1516

**Lisa R. Jaskol, California Bar No. 138769** (ljaskol@earthlink.net)
610 S. Ardmore Ave.• Los Angeles, CA 90005
213.385.2977 – Fax 213.385.9089

**Attorneys for Plaintiffs Al-Haramain Islamic Foundation, Inc., Wendell Belew and Asim Ghafoor**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NATIONAL SECURITY AGENCY TELECOMMUNICATIONS RECORDS LITIGATION | ) ) ) ) |
| | MDL Docket No. 06-1791 VRW |
| | **April 23, 2008; 10:00 a.m.** |
| This Document Relates Solely To: | ) ) |
| | **MEMORANDUM IN OPPOSITION TO DEFENDANTS' SECOND MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT** |
| *Al-Haramain Islamic Foundation, Inc., et al. v. Bush, et al.* (C07-CV-0109-VRW) | ) ) ) ) ) |
| | *Al-Haramain Islamic Foundation, Inc., et al., v. Bush, et al.* |

MEMORANDUM IN OPPOSITION TO DEFENDANTS' SECOND MOTION TO DISMISS, ETC.
MDL DOCKET NO. 06-1791 VRW

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      The FISA Context . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     The Warrantless Surveillance Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    Plaintiffs' Surveillance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.      The Al-Haramain Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.     The State Secrets Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.    The Pretrial Motions and the Oregon District Court's Decision . . . . . . . . . . . . . . . . . . . . . 7

IV.     The Ninth Circuit's Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.      FISA PREEMPTS THE COMMON LAW STATE SECRETS PRIVILEGE. . . . . . . . . . 8

        A.      FISA Strikes a Balance Between Protecting National Security and Safeguarding
                Civil Liberties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        B.      The State Secrets Privilege is a Rule of Federal Common Law That Congress
                May Preempt With a Comprehensive Regulatory Program . . . . . . . . . . . . . . . . . . 9

        C.      FISA's Comprehensive Regulatory Program Speaks Directly to Protection of
                National Security in FISA Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                1.      FISA Section 1806(f) Speaks Directly to Security Procedures and
                        Rules of Disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                2.      FISA Section 1810 Speaks Directly Against Outright Dismissal . . . . . . . 14

        D.      FISA Section 1806(f) is Not Limited to "Acknowledged" Surveillance . . . . . . . . 15

II.     EVEN IF THE STATE SECRETS PRIVILEGE IS CONSTITUTIONALLY BASED, FISA
        STILL PREEMPTS THE PRIVILEGE THROUGH CONGRESS'S EXERCISE
        OF CONCURRENT CONSTITUTIONAL AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . 18

        A.      Congress Has Constitutional Authority to Regulate Protection of State Secrets . . 18

        B.      The President Lacks Inherent Power to Disregard Congressional Preemption
                of the State Secrets Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III.    THE NINTH CIRCUIT DID NOT PRECLUDE ADJUDICATION OF THE FACT OF
        PLAINTIFFS' SURVEILLANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

IV.     DEFENDANTS PREMATURELY ASSERT SOVEREIGN IMMUNITY, WHICH IN
        ANY EVENT DOES NOT BAR THIS ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**CASES**

*ACLU Foundation v. Barr*, 952 F.2d 457 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Adams v. City of Battle Creek*, 250 F.3d 980 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Adarand Constructors, Inc. v. Slater*, 528 U.S. 216 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Afroyim v. Rusk*, 387 U.S. 253 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Al-Haramain Islamic Foundation, Inc. v. Bush*, 451 F. Supp.2d 1215 (D. Ore. 2006) . . . . . . . 7, 12

*Al-Haramain Islamic Foundation, Inc. v. Bush*, 507 F.3d 1190 (9th Cir. 2007) . . . . 7, 9, 11, 20, 23

*Asmar v. U.S. Dept. of Treasury*, 680 F.Supp. 248 (E.D. Mich. 1987) . . . . . . . . . . . . . . . . . . . . . 25

*Buckley v. Valeo*, 424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Burgos v. Milton*, 709 F.2d 1 (1st Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Butz v. Economou*, 438 U.S. 478 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Campbell v. United States*, 365 U.S. 85 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Clinton v. Jones*, 520 U.S. 681 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*County of Oneida v. Oneida Indian Nation*, 470 U.S. 226 (1985) . . . . . . . . . . . . . . . . . . . . . . . 11

*Dickerson v. United States*, 530 U.S. 428 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000) 27

*Gilbert v. DaGrossa*, 756 F.2d 1455 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Halkins v. Helms*, 690 F.2d 977 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Halpern v. U.S.*, 258 F.2d 36 (2d Cir. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21, 22

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934) . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re United States*, 872 F.2d 472 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*ITSI TV Productions, Inc. v. Agricultural Associations*, 3 F.3d 1289 (9th Cir. 1993 . . . . . . . . . 18

*Kasza v. Browner*, 133 F.3d 1159 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9, 11

*Kentucky v,. Graham*, 473 U.S. 159 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Lane v. Pena*, 518 U.S. 187 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Milwaukee v. Illinois*, 451 U.S. 304 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Mistretta v. United States*, 488 U.S. 361 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Monarch Assur. P.L.C. v. U.S.*, 244 F.3d 1356 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Multi Denominational Ministry of Cannabis and Rastafari, Inc. v. Gonzales*, 474 F. Supp.2d 1133 (N.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Organizacion JD Ltda. v. U.S. Dept. of Justice,* 18 F.3d 91 (2d Cir. 1994) . . . . . . . . . . . . . . . . 25

*Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Salazar v. Heckler*, 787 F.2d 527 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*SD Warren Co. v. Maine Board of Environmental Protection*, 547 U.S. 370 (2006) . . . . . . . . . . 16

*Shelton v. United States*, 404 F.2d 1292 (D.C. Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Tenet v. Doe,* 544 U.S. 1 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Denver & Rio Grande Railroad Company*, 191 U.S. 84 (1903) . . . . . . . . . . . . 18

*United States v. Nixon,* 418 U.S. 683 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 22

*United States v. Reynolds*, 345 U.S. 1 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10

*Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579 (1952) . . . . . . . . . . . . 2, 18, 20, 21, 22

*Zucherbraun v. General Dynamics* Corp., 935 F.2d 544 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . 10

# CONSTITUTION, STATUTES AND RULES

U.S. Const., art. I, § 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

10 U.S.C. § 801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

18 U.S.C. § 2520(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 24

18 U.S.C. § 2707(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 25

18 U.S.C. § 2712(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 26

18 U.S.C. § 2712(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

28 U.S.C. § 1292(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

35 U.S.C. § 181 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

42 U.S.C. § 2000e-16(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

47 U.S.C. § 605(e)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

50 U.S.C. § 1801(f)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

50 U.S.C. § 1801(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

50 U.S.C. § 1801(m) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 26

50 U.S.C. § 1806(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

50 U.S.C. § 1806(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

50 U.S.C. § 1806(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

50 U.S.C. § 1806(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

50 U.S.C. § 1806(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

50 U.S.C. § 1809 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 24

50 U.S.C. § 1810 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

50 U.S.C. § 1825(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

50 U.S.C. § 1845(a) ........................................................ 26

Fed. R. Civ. P. 4(m) ....................................................... 27

Fed. R. Evid. 501 notes of Committee on the Judiciary ............................... 10

## OTHER AUTHORITIES

BLACK'S LAW DICTIONARY 1084 (7th ed. 1999) ...................................... 16

Excerpt from Press Conference of the President (Dec. 19, 2005) .......................... 5

124 CONG. REC. 10,903-04 (1978) .............................................. 11, 14

H. CONF. REP. NO. 95-1720 (1978) ........................................ 9, 13, 14, 21

H. REP. NO. 95-1283(I) (1978) ................................................. 2, 13

Letter from Attorney General Alberto R. Gonzales to Senator Patrick Leahy (Jan. 17, 2007) . . . 27

National Security Agency Act of 1959 .......................................... 17

S. REP. NO. 95-604(I) (1977) ............................................. 2, 9, 13

S. REP. NO. 95-701 (1978) .................................................. 13

THE FEDERALIST NO. 47 (James Madison) ........................................ 22

U.S. Dept. of Justice, *Legal Authorities Supporting the Activities of the National Security Agency
Described by the President* (Jan. 19, 2006) ...................................... 3, 19

This lawsuit challenges defendants' warrantless electronic surveillance of Al-Haramain Islamic Foundation, Inc. and two of its lawyers, Wendell Belew and Asim Ghafoor. The United States Court of Appeals for the Ninth Circuit has remanded the case to this Court for a determination whether the Foreign Intelligence Surveillance Act (FISA) preempts the state secrets privilege. If FISA preempts the privilege, this Court can proceed to determine plaintiffs' standing and, thereafter, the merits of this lawsuit.

FISA was enacted to curb governmental abuses of modern electronic surveillance capabilities by requiring a warrant for the sort of eavesdropping to which plaintiffs were subjected. FISA created an exclusive statutory framework for the domestic use of electronic surveillance to acquire foreign intelligence information – and for litigating claims of unlawful surveillance – in order to prevent the Executive Branch from unnecessarily intruding on civil liberties in the name of national security.

FISA strikes a balance between two potentially competing interests – protecting national security and safeguarding civil liberties – by authorizing the courts to adjudicate claims of unlawful surveillance within the protective framework of *ex parte* and *in camera* proceedings. In contrast, the state secrets privilege – which permits exclusion of evidence from litigation or, in rare instances, outright dismissal of a lawsuit when the government successfully asserts national security concerns – abides no such balancing of interests, at the expense of civil liberties. FISA's protective framework for litigating claims of unlawful surveillance preempts the state secrets privilege by embracing the balancing of interests that the state secrets privilege eschews.

Preemption also results from the prescription of a private right of action for FISA violations, which is wholly inconsistent with the state secrets privilege – for, absent such preemption, the government could evade private lawsuits at will, making the private right completely illusory. Congress cannot possibly have envisioned use of the state secrets privilege to subvert FISA's statutory scheme for challenging unlawful surveillance.

Defendants claim the state secrets privilege is rooted in the Constitution, and thus any effort by Congress to preempt the privilege is constitutionally suspect. The Ninth Circuit has said otherwise: The privilege is one of federal common law. As such, it is subject to congressional preemption with

a comprehensive regulatory scheme like FISA. And even if the privilege is constitutionally based, that just means the President and Congress have concurrent constitutional authority to regulate protection of state secrets. According to the formulation set forth in *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579 (1952) for determining the parameters of such concurrent authority under our Constitution's separation of powers and its system of checks and balances, Congress can preempt the privilege, even if it is constitutionally based, by enacting legislation like FISA that puts presidential power at its lowest ebb.

Defendants claim the President has inherent power to disregard FISA entirely, but the *Youngstown* formulation forecloses that claim. The President does *not* have inherent power to ignore FISA. Congress having passed – and the 39th President having signed – laws regulating electronic surveillance and prescribing security procedures for litigating claims of unlawful surveillance, the 43rd President must follow those laws.

The protective statutory framework for FISA litigation enables this lawsuit to go forward, with ample safeguards to protect national security, so that this Court can proceed to decide the merits of this case.

## FACTUAL BACKGROUND

### I. The FISA Context

Congress enacted FISA in 1978 as a response to past instances of abusive warrantless wiretapping by the National Security Agency (NSA) and the Central Intelligence Agency (CIA). *See* H. REP. NO. 95-1283(I), at 21-22 (1978), Decl. of Jon B. Eisenberg, Ex. E; S. REP. NO. 95-604(I), at 7-8 (1977), Decl. of Jon B. Eisenberg, Ex. F.[1/] FISA provides an exclusive framework for the domestic use of electronic surveillance to acquire foreign intelligence information. *See* H. REP. NO. 95-1283(I), *supra*, at 22 (FISA prescribes "the exclusive means by which electronic surveillance, as defined, could be used for foreign intelligence purposes"), Decl. of Jon B. Eisenberg, Ex. E; S. REP. NO. 95-604(I), *supra*, at 6 (FISA, combined with the Omnibus Crime Control and Safe Streets Act of 1968, "constitutes the exclusive means by which electronic surveillance, as defined, . . . may be conducted;

---

[1/] All citations to the "Decl. of Jon B. Eisenberg" are to the declaration and exhibits filed simultaneously with this memorandum.

1   the bill recognizes no inherent power of the President in this area"), Decl. of Jon B. Eisenberg, Ex. F.

2   With narrow exceptions not applicable here, FISA requires the government to obtain a court

3   order – that is, a warrant – in order to conduct electronic surveillance of a "United States person,"

4   meaning a citizen, resident alien or association of such persons.  50 U.S.C. § 1801(i).  FISA imposes

5   criminal penalties for its violation, making it an offense to "engage[] in electronic surveillance under

6   color of law except as authorized by statute."  50 U.S.C. § 1809(a)(1).  FISA also imposes civil

7   liability for its violation.  Victims of unlawful electronic surveillance "shall have a cause of action

8   against any person who committed such violation" and "shall be entitled to recover" actual damages,

9   punitive damages, and reasonable attorney's fees and costs.  50 U.S.C. § 1810.

10  **II.      The Warrantless Surveillance Program**

11  Shortly after the terrorist attacks of September 11, 2001, President Bush authorized a secret

12  program for the NSA to engage in warrantless electronic surveillance of international communications

13  into and out of the United States where the NSA believed that one of the participants was affiliated

14  with or working in support of al-Qaeda.  President Bush regularly re-authorized the warrantless

15  surveillance program at 45-day intervals upon written certifications by the Department of Justice

16  (DOJ) until January 2007, when the program purportedly was suspended.  The warrantless surveillance

17  program did not comply with the requirements of FISA.  In a 42-page "White Paper" the DOJ issued

18  in January 2006, defendants have publicly asserted their legal justifications for the program.  *See* U.S.

19  Dept. of Justice, *Legal Authorities Supporting the Activities of the National Security Agency Described*

20  *by the President* (Jan. 19, 2006), *available at* http://www.usdoj.gov/opa/whitepaperonnsalegalauthoriti

21  es.pdf, Decl. of Jon B. Eisenberg, Ex. A at 11-12, 34.

22  As of early March 2004, former Attorney General John Ashcroft and former Deputy Attorney

23  General James B. Comey had determined that the warrantless surveillance program was unlawful.

24  Decl. of Jon B. Eisenberg, Ex. A at 11-12, 33-34.  During a meeting at the White House on March 9,

25  2004 – two days before the DOJ's next 45-day written re-certification was due – Comey conveyed this

26  conclusion to Vice-President Dick Cheney and members of his and the President's staffs, telling them

27  the DOJ would not re-certify the program.  *Id.*, Ex. A at 11-12, 31, Ex. B at 2, 4.  The Director of the

28  //

Federal Bureau of Investigation (FBI), Robert S. Mueller III – one of the defendants in this case – also harbored what he called "serious reservations" about the program's legality. *Id.*, Ex. C at 27. On March 10, 2004, while Ashcroft was hospitalized, two White House officials went to Ashcroft's bedside and attempted to obtain the written re-certification from Ashcroft, but he refused. *Id.*, Ex. A at 10, 14. Nevertheless, despite the advice that the warrantless surveillance program as then constituted was unlawful, the President did not direct Comey or the FBI to discontinue or suspend any portion of the program. Instead, the program went ahead without the DOJ's re-certification for a period of several weeks – the precise time when the plaintiffs in the present case were subjected to surveillance. *Id.*, Ex. A at 27-28, 32-33, 43, Ex. B at 4.

## III. Plaintiffs' Surveillance

In February 2004, defendant Office of Foreign Assets Control (OFAC) temporarily froze the assets of plaintiff Al-Haramain Islamic Foundation, Inc., pending a proceeding to determine whether to declare Al-Haramain a "Specially Designated Global Terrorist" organization. Decl. of Barbara C. Hammerle ¶ 4.[2] On August 20, 2004, in the course of that proceeding, OFAC produced a group of unclassified materials to Al-Haramain counsel Lynne Bernabei, who gave copies to five other Al-Haramain lawyers, including plaintiffs Wendell Belew and Asim Ghafoor, and to Al-Haramain directors Soliman al-Buthi and Pirouz Sedaghaty. Decl. of Frances R. Hourihan ¶¶ 3-8; Decl. of Lynne Bernabei ¶¶ 4-6; Decl. of Wendell Belew ¶ 4; Decl. of Asim Ghafoor ¶ 4.

Also included in this production – evidently by accident – was a document (hereafter "the Document") bearing an extremely high top secret classification. Decl. of Frances R. Hourihan ¶ 4; Suppl. Decl. of Frances R. Hourihan ¶¶ 4-5. In late August 2004, the FBI was notified of the Document's inadvertent disclosure. Decl. of Frances R. Hourihan ¶ 3; Suppl. Decl. of Frances R. Hourihan ¶ 3. In mid-October 2004, FBI agents retrieved copies of the Document from all counsel. Decl. of Frances R. Hourihan ¶ 7; Suppl. Decl. of Frances R. Hourihan ¶ 7; Decl. of Lynne Bernabei ¶ 9; Decl. of Wendell Belew ¶¶ 5-6, Decl. of Asim Ghafoor ¶¶ 5-7. The FBI did not, however, contact

---

[2] The declarations of Barbara C. Hammerle, Frances R. Hourihan, Lynne Bernabei, Wendell Belew, and Asim Ghafoor cited in this memorandum are on file with this Court, having been filed in connection with prior proceedings.

Al-Buthi or Sedaghaty, who were living overseas at the time. Decl. of Frances R. Hourihan ¶ 8. The Document demonstrates that, in March and April of 2004 – during the period when the Attorney General and other high governmental officials had determined that the warrantless surveillance program was unlawful yet it went forward without certification – Al-Haramain and its attorneys were subjected to warrantless electronic surveillance in violation of FISA.

Testimony by Director of National Intelligence Mike McConnell and NSA Director Keith Alexander before the Senate Select Committee on Intelligence has confirmed that plaintiffs' surveillance was within the scope of FISA's requirement of a warrant. One of FISA's definitions of the types of "electronic surveillance" that invoke the warrant requirement is "the acquisition . . . of the contents of any wire communication to or from a person in the United States . . . *if such acquisition occurs in the United States . . . .*" 50 U.S.C. § 1801(f)(2) (emphasis added). McConnell and Alexander explained that, because of technological innovations since FISA's inception, communications between persons located inside and outside the United States are now transmitted over wire, and the interception of such communications occurs *in the United States*. Decl. of Jon B. Eisenberg, Ex. D at 7-9, 22-23. Thus, according to McConnell, "when seeking to monitor foreign persons suspected of involvement in terrorist activity who are physically located in foreign countries, the intelligence community is required under today's FISA [50 U.S.C. § 1801(f)(2)] to obtain a court order to conduct surveillance." *Id.*, Ex. D at 9. The communications at issue in this case occurred between persons located inside and outside the United States. Those communications thus were "electronic surveillance" within the scope of FISA.

The applicability of section 1801(f)(2) to this case was previously obscured by President Bush's assertion on December 19, 2005 – now known to be untrue – that "these calls are not intercepted within the country." *See* Excerpt from Press Conference of the President (Dec. 19, 2005), *available at* http://www.whitehouse.gov/news/releases/2005/12/20051219-2.html, Decl. of Jon B. Eisenberg, Ex. J.

//

//

//

**STATEMENT OF THE CASE**

**I.  The *Al-Haramain* Complaint**

On February 28, 2006, plaintiffs Al-Haramain, Belew and Ghafoor filed a complaint in the

United States District Court for the District of Oregon alleging a private cause of action under FISA.

The complaint also alleges violations of the constitutional separation of powers, the First, Fourth and

Sixth Amendments, and the International Covenant on Civil and Political Rights.

The complaint alleges that defendants "have engaged in electronic surveillance of plaintiffs

without court orders." Compl. ¶ 2. Specifically, the complaint alleges that in March and April 2004,

the NSA targeted and engaged in electronic surveillance of attorney-client communications between

a director or officer of Al-Haramain and its attorneys Belew and Ghafoor without obtaining a warrant

or otherwise complying with FISA, and that in May 2004 the NSA gave logs of those surveilled

communications to OFAC. *Id.*, ¶¶ 19-20. Along with the complaint, plaintiffs filed a copy of the

Document under seal with the Oregon district court in order to establish the fact of their surveillance

and thus their standing as "aggrieved" persons to assert a private cause of action under FISA.

**II.  The State Secrets Privilege**

Defendants responded to this lawsuit by invoking the state secrets privilege, which – where

applicable – allows the government to refuse discovery of classified information that poses a risk to

national security if publicly disclosed. *United States v. Reynolds*, 345 U.S. 1, 6, 10 (1953). In *Kasza*

*v. Browner*, 133 F.3d 1159, 1165 (9th Cir. 1998), the Ninth Circuit explained the state secrets privilege

as follows: The state secrets privilege is "a common law evidentiary privilege." *Id.* It "allows the

government to deny discovery of military secrets" which, in the interest of national security, should

not be divulged. *Id.* "Once the privilege is properly invoked and the court is satisfied as to the danger

of divulging state secrets, the privilege is absolute." *Id.* at 1165-66. The government can invoke the

privilege with regard to "particular evidence," so that the privileged evidence "is completely removed

from the case," which then "goes forward based on evidence not covered by the privilege." *Id.*

Further, if the "very subject matter of the action" is a state secret, the court must "dismiss the

plaintiff's action." *Id.*

//

### III.     The Pretrial Motions and the Oregon District Court's Decision

Defendants filed a motion for dismissal of this action, or alternatively for summary judgment, based on the state secrets privilege. They also filed a motion to bar plaintiffs from having access to the Document. Plaintiffs responded that (1) FISA section 1806(f) preempts the state secrets privilege and vests the district court with authority to permit use of the Document under secure conditions to determine plaintiffs' standing, and (2) even if the state secrets privilege applies here, it does not require dismissal of this lawsuit.

In an opinion filed September 7, 2006, the Oregon district court declined to dismiss the action or grant summary judgment based on the state secrets privilege, concluding that the warrantless surveillance program is no longer a secret to the general public and, because of the Document's inadvertent disclosure, "it is not a secret to plaintiffs whether their communications have been intercepted." *Al-Haramain Islamic Foundation, Inc. v. Bush*, 451 F. Supp.2d 1215, 1222-23 (D. Ore. 2006). Instead, the judge said he would "permit plaintiffs to file *in camera* any affidavits attesting to the contents of the document from their memories to support their standing in this case and to make a *prima facie* case." *Id.* at 1229.

The Oregon district court did not decide the issue whether FISA preempts the state secrets privilege, saying "I decline to reach this very difficult question at this time, which involves whether Congress preempted what the government asserts is a constitutionally-based privilege." *Id.* at 1231. The court noted, however, that defendants' arguments against preemption "would nullify FISA's private remedy and would be contrary to the plain language of Section 1806(f)." *Id.*

### IV.     The Ninth Circuit's Decision

The Ninth Circuit granted defendants' request to permit an interlocutory appeal pursuant to 28 U.S.C. section 1292(b). Thereafter, the Judicial Panel on Multidistrict Litigation transferred the action to this Court. On November 16, 2007, the Ninth Circuit reversed the Oregon district court's decision and ordered the case remanded to this Court for further proceedings. *Al-Haramain Islamic Foundation, Inc. v. Bush*, 507 F.3d 1190 (9th Cir. 2007). The Ninth Circuit held that the Oregon district court properly determined the warrantless surveillance program is no longer a state secret, but that the district court erred in permitting the plaintiffs to establish their standing by filing affidavits

describing the Document from memory, because the Document is a state secret and the district court's ruling was an improper "back door around" the state secrets privilege.  *Id.* at 1193.

The Ninth Circuit did not decide whether FISA preempts the state secrets privilege.  Noting that this issue has now become "central to Al-Haramain's ability to proceed with this lawsuit," *id.* at 1205-06, the Ninth Circuit said: "Rather than consider the issue for the first time on appeal, we remand to the district court to consider whether FISA preempts the state secrets privilege and for any proceedings collateral to that determination."  *Id.* at 1206.[3/]

**ARGUMENT**

**I.     FISA PREEMPTS THE COMMON LAW STATE SECRETS PRIVILEGE.**

**A.     FISA Strikes a Balance Between Protecting National Security and Safeguarding Civil Liberties.**

We begin with the issue that the Ninth Circuit remanded for this Court's decision: whether FISA preempts the state secrets privilege.  The answer is that FISA preempts the privilege via two statutory provisions: FISA section 1810, which prescribes the private cause of action, and FISA section 1806(f), which prescribes security procedures for FISA litigation.

FISA's legislative history demonstrates Congress's intent to strike a balance between two potentially competing interests – protecting national security and safeguarding civil liberties.  Enacted in the wake of governmental abuses of modern surveillance techniques, FISA is intended to restore that balance by (1) prescribing an exclusive framework for the domestic use of electronic surveillance to acquire foreign intelligence information, and (2) specifying the judiciary's role in approving proposed surveillance and determining the legality of past surveillance.  After extensive deliberation and debate, Congress concluded that protection of civil liberties requires comprehensive judicial oversight of electronic surveillance conducted in the name of national security, as a check against documented overreaching by the Executive Branch.  A 1978 House Conference Report explained that section 1806(f) "adequately protects the rights of the aggrieved person" and at the same time "ensures

---

[3/]     The remanded issue is a pure question of law.  Defendants, however, have lodged *in camera* and *ex parte* a secret "Classified Supplemental Memorandum" in support of their second dismissal motion.  Absent some legitimate justification (which is difficult to imagine) for filing a secret argument on a pure question of law, plaintiffs object to this secret filing.

adequate protection of national security interests." H. Conf. Rep. No. 95-1720, at 32 (1978), Decl. of Jon B. Eisenberg, Ex. G. Similarly, a Senate Judiciary Committee report called section 1806(f) "a reasonable balance between an entirely in camera proceeding . . . and mandatory disclosure, which might occasionally result in the wholesale revelation of sensitive foreign intelligence information." S. Rep. No. 95-604(I), *supra*, at 58, Decl. of Jon B. Eisenberg, Ex. F.

In this respect, FISA departs from the state secrets privilege, where the rule of outright dismissal precludes any balancing of competing interests. *See Halkins v. Helms*, 690 F.2d 977, 997 n.71 (D.C. Cir. 1982) ("the state secrets privilege, being absolute, requires no such balancing"). Section 1806(f), in contrast, embraces such balancing – and thereby preempts the state secrets privilege – by prescribing a procedure whereby the courts can safeguard civil liberties by adjudicating claims of unlawful surveillance yet protect national security by considering sensitive information *ex parte* and *in camera*.

**B.    The State Secrets Privilege is a Rule of Federal Common Law That Congress May Preempt With a Comprehensive Regulatory Program.**

The threshold question is whether the state secrets privilege arises from the Constitution or from federal common law. This question is important because the Supreme Court has prescribed a special standard for determining preemption of federal common law, which differs from the standard that would apply if the state secrets privilege were constitutionally based. The standard for "determining if federal statutory law governs a question previously the subject of federal common law" does not require "evidence of a clear and manifest purpose" to preempt – as does the standard for determining whether federal law preempts state law. *Milwaukee v. Illinois*, 451 U.S. 304, 316-17 (1981). Rather, a federal statutory scheme can preempt federal common law, even without explicit evidence of a clear and manifest purpose to do so, if Congress has "*occupied the field* through the establishment of a *comprehensive regulatory program*." *Id.* at 317 (emphasis added).

The Ninth Circuit has now implicitly resolved the question whether the state secrets privilege is one of federal common law  or is constitutionally based: Once again, as in *Kasza*, the Ninth Circuit has plainly described the privilege as "a common law evidentiary privilege." *Al-Haramain*, 507 F.3d at 1196; *accord*, *Kasza*, 133 F.3d at 1167 ("the state secrets privilege is an evidentiary privilege rooted

in federal common law"); *Monarch Assur. P.L.C. v. U.S.*, 244 F.3d 1356, 1358 (Fed. Cir. 2001) ("common-law state secrets privilege"); *Zuckerbraun v. General Dynamics Corp.*, 935 F.2d 544, 546 (2d Cir. 1991) ("common law evidentiary rule"); *In re United States*, 872 F.2d 472, 474 (D.C. Cir. 1989) (same). That description is consistent with *Reynolds*, which said the privilege is "well established in the *law of evidence*," 345 U.S. at 6-7 (emphasis added), not in constitutional law. *See also* Fed R. Evid. 501 notes of Committee on the Judiciary, H. Rep. No. 93-650 (describing "secrets of state" privilege as one of nine "nonconstitutional privileges" the Supreme Court submitted to Congress).

In this respect, the state secrets privilege differs from executive privilege, which the Supreme Court has suggested is "inextricably rooted in the separation of powers under the Constitution." *United States v. Nixon*, 418 U.S. 683, 708 (1974). The Supreme Court has never said that the state secrets privilege is similarly rooted in the constitutional separation of powers. Defendants rely on *Nixon* for the proposition that "the state secrets privilege derives from the President's authority under Article II of the Constitution to protect national security," Defs.' Second Mo. To Dismiss etc. at 13, but *Nixon* held nothing of the sort. *Nixon* did not adjudicate any issues regarding the state secrets privilege.

As a federal common law privilege, the state secrets privilege may be displaced by statute. *Dickerson v. United States*, 530 U.S. 428, 437 (2000) ("Congress retains the ultimate authority to modify or set aside any judicially created rules of evidence and procedure that are not required by the Constitution"); *see also Tenet v. Doe*, 544 U.S. 1, 11 (2005) (Stevens, concurring) ("Congress can modify the federal common-law rule"). And the privilege, as one of federal common law, may be preempted by a "comprehensive regulatory program" like FISA. *Milwaukee v. Illinois*, 451 U.S. at 317. In *Milwaukee v. Illinois*, a statutory scheme regulating interstate water pollution preempted federal common law on nuisance abatement, even without any mention of the federal common law in legislative history, because "[t]he establishment of such a self-consciously comprehensive program by Congress . . . strongly suggests that there is no room for courts to attempt to improve on that program with federal common law." *Id.* at 319. Similarly here, FISA preempts the state secrets privilege by occupying the entire field of foreign intelligence surveillance with a comprehensive

regulatory program that includes a warrant requirement and secure procedures for adjudicating civil actions for FISA violations. As Senator Gaylord A. Nelson (one of FISA's co-sponsors) explained during floor debate, FISA "[a]long with the existing statute dealing with criminal wiretaps . . . *blankets the field*." 124 Cong. Rec. 10,903-04 (1978) (emphasis added.) As the Ninth Circuit put it, FISA "provides a *detailed regime* to determine whether surveillance 'was lawfully authorized and conducted.'" *Al-Haramain*, 507 F.3d at 1205 (emphasis added).

Thus, it is inconsequential that, as defendants argue, FISA's "legislative history does not even mention the state secrets privilege." Defs.' Second Mo. To Dismiss etc. at 19. It may be true that FISA's legislative history does not explicitly mention the state secrets privilege by name, but Congress plainly intended to create a comprehensive regulatory program that includes a statutory scheme for challenging unlawful surveillance. And if the privilege is one of federal common law, then it is preempted by this comprehensive regulatory program.

**C.** **FISA's Comprehensive Regulatory Program Speaks Directly to Protection of National Security in FISA Litigation.**

The specific preemption inquiry is whether FISA's comprehensive regulatory program "'"[speaks] *directly* to [the] question" otherwise answered by federal common law.'" *Kasza,* 133 F.3d at 1167 (emphasis in original) (quoting *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 236-37 (1985)). The question, simply put, is whether FISA speaks directly to protection of national security in FISA litigation. Two sub-issues are presented: (1) Does FISA speak directly to security procedures and rules of disclosure that are otherwise prescribed by the state secrets privilege? (2) Does FISA speak directly to the rule of outright dismissal that is otherwise prescribed by the state secrets privilege? The answer in both instances is *yes*.

**1.** **FISA Section 1806(f) Speaks Directly to Security Procedures and Rules of Disclosure.**

On the first sub-issue, FISA section 1806(f) speaks directly to security procedures and rules of disclosure by prescribing rules for judicial determination and protection of national security concerns where, as here, a private cause of action is alleged under FISA section 1810. This regime speaks directly to use and disclosure that would otherwise be governed by the state secrets privilege. It speaks directly to secure use of the Document in the present case to demonstrate plaintiffs' standing.

And its application "notwithstanding any other law," 50 U.S.C. § 1806(f), means the state secrets privilege is preempted.

Plaintiffs invoked section 1806(f)'s security regime by opposing defendants' motion to bar plaintiffs from having access to the Document. Section 1806(f) authorizes this Court to review the Document *in camera* and *ex parte* to determine plaintiffs' standing. Further, section 1806(f) authorizes this Court, in its discretion, to give plaintiffs access to the Document under appropriate security procedures and protective orders – e.g., redaction of sensitive information from the Document – for purposes of counsel's discussion of the Document in subsequent argument before this Court on the issue of standing. *See* 50 U.S.C. § 1806(f) (court may disclose to aggrieved parties underlying documentation "under appropriate security procedures and protective orders . . . where such disclosure is necessary to make an accurate determination of the legality of the surveillance").

This case is unusual in that the aggrieved parties are plaintiffs in a civil action rather than defendants in a criminal action, and the Attorney General never filed the prescribed affidavit. But nothing in section 1806(f) restricts its application to either circumstance. By its plain language, section 1806(f) applies whenever a "request is made by an aggrieved person . . . to . . . obtain materials relating to electronic surveillance . . . ." That language is more than broad enough to encompass the plaintiffs here, to the extent they sought access to the Document. That is why the Oregon district court concluded that defendants' arguments against preemption "would be contrary to the plain language of Section 1806(f)." *Al-Haramain*, 451 F. Supp.2d at 1231.[4/]

Moreover, Congress envisioned the statute's application in civil actions and/or where, as here,

---

[4/]    Defendants contend section 1806(f) applies only to electronic surveillance undertaken pursuant to FISA because of the presence of the phrase "under this chapter" in section 1806(f). *See* Defs.' Second Mo. To Dismiss etc. at 17 n.16 (also citing similar language elsewhere in section 1806). But that phrase modifies only section 1806(f)'s provision regarding motions and requests "to discover, obtain, or suppress evidence or information *obtained or derived from* electronic surveillance." 50 U.S.C. § 1806(f) (emphasis added). Plaintiffs rely not on that provision, but on section 1806(f)'s entirely separate provision regarding motions and requests "to discover or obtain applications or orders or other materials *relating to* electronic surveillance," 50 U.S.C. § 1806(f) (emphasis added), which includes no "under this chapter" restriction. Indeed, if section 1806(f) applied only to surveillance that was lawfully undertaken pursuant to FISA, then the statute's provisions for determining whether surveillance was "lawfully authorized and conducted," 50 U.S.C. § 1806(f), would be meaningless, because the statute would apply only to lawful surveillance.

the Attorney General does not file an affidavit asserting harm to national security.  The 1978 House Conference Report expressed agreement among the members of Congress "that an in camera and ex parte proceeding is appropriate for determining the lawfulness of electronic surveillance in both criminal *and civil cases*."  H. CONF. REP. NO. 95-1720, *supra*, at 32 (emphasis added), Decl. of Jon B. Eisenberg, Ex. G.  And a 1978 Senate Intelligence Committee report stated that where "no such assertion is made [in an Attorney General's affidavit] the Committee envisions that mandatory disclosure of the application and order, and discretionary disclosure of other surveillance materials, would be available to the [aggrieved party]."  S. REP. NO. 95-701, at 63 (1978), Decl. of Jon B. Eisenberg, Ex. H; *accord*, S. REP. NO. 95-604(I), *supra*, at 57, Decl. of Jon B. Eisenberg, Ex. F.  FISA gives the President a choice between unrestricted disclosure and an Attorney General's affidavit – not a choice between unrestricted disclosure and invocation of the state secrets privilege as an end run around an Attorney General's affidavit.

FISA's legislative history evinces congressional intent to displace the state secrets privilege with the regime prescribed by section 1806(f).  The 1978 House Conference Report declared that "an *in camera* and *ex parte* proceeding is appropriate for determining the lawfulness of electronic surveillance[.]"  H. REP. NO. 95-1720, *supra*, at 32, Decl. of Jon B. Eisenberg, Ex. G.  The Senate Judiciary Committee said with regard to section 1806(f) that when the legality of surveillance is at issue, "it is this procedure 'notwithstanding any other law' that must be used to resolve the question."  S. REP. NO. 96-604(I), *supra*, at 57, Decl. of Jon B. Eisenberg, Ex. F; *accord*, S. REP. NO. 95-701, *supra*, at 63, Decl. of Jon B. Eisenberg, Ex. H; H. REP. NO. 95-1283(I), *supra*, at 91, Decl. of Jon B. Eisenberg, Ex. E.

More broadly, FISA's legislative history demonstrates that FISA was meant to curb unfettered electronic surveillance by the Executive Branch via "an exclusive charter for the conduct of electronic surveillance in the United States" and "effective substantive and procedural controls" which "regulate the exercise" of presidential authority to conduct foreign intelligence electronic surveillance.  S. REP. NO. 96-604(I), *supra*, at 15-16, Decl. of Jon B. Eisenberg, Ex. F; *accord*, H. REP. NO. 95-1283(I), *supra*, at 24 ("Congress has the power to regulate the conduct of such surveillance by legislating a reasonable procedure, which then becomes the exclusive means by which surveillance may be

conducted"), Decl. of Jon B. Eisenberg, Ex. E.  Senator Nelson explained that FISA is intended to "represent the sole authority for national security electronic surveillance in the United States" and "insures executive accountability," which "is a striking departure from the pattern of the past in which 'deniability' was often built into the system to insure that responsibility for intelligence abuses could not be traced . . . ."  124 CONG. REC. 10,903-04 (1978).  Thus, FISA departs from the state secrets privilege by replacing its absolute rule of outright dismissal – in effect, deniability by silence – with statutory provisions for protecting national security while holding the Executive Branch accountable for intelligence abuses.

In short, the security regime prescribed by section 1806(f) applies in this case *notwithstanding the state secrets privilege*.  Congress having determined (and the 39th President having agreed) that section 1806(f) adequately ensures protection of national security, *see* H. CONF. REP. No. 95-1720, *supra*, at 32, Decl. of Jon B. Eisenberg, Ex. G, the rules of disclosure prescribed by the state secrets privilege become superfluous in FISA litigation.

### 2.    FISA Section 1810 Speaks Directly Against Outright Dismissal.

On the second sub-issue – whether FISA speaks directly to the rule of outright dismissal within the state secrets privilege – FISA section 1810, by prescribing a private right of action for FISA violations despite the otherwise secret nature of FISA proceedings, plainly displaces the rule of outright dismissal, which is wholly inconsistent with the very notion of a private FISA action.  If section 1810 did *not* displace the rule of outright dismissal, then Congress's prescription of a private FISA action would be meaningless, for the President would be able to evade any private FISA action merely by invoking the state secrets privilege.[5]

The situation here is analogous to *Halpern v. U.S.*, 258 F.2d 36 (2d Cir. 1958), a lawsuit arising under the Invention Secrecy Act, 35 U.S.C. § 181, which allowed the patent office to withhold a patent grant for inventions implicating national security, but also allowed inventors to sue for compensation if a patent was denied.  When the plaintiff was denied a patent and sued for compensation, the

---

[5]    The same is true of other private causes of action prescribed for unlawful electronic surveillance.  *See, e.g.,* 18 U.S.C. § 2520(a); 18 U.S.C. § 2707(a); 47 U.S.C. § 605(e)(3)(A).  Each of those private rights would be meaningless if they could be subverted merely by invocation of the state secrets privilege.

government invoked the state secrets privilege. The Second Circuit rejected the assertion of the privilege because "the trial of cases involving patent applications placed under a secrecy order will always involve matters within the scope of this privilege," and "[u]nless Congress has created rights which are completely illusory, existing only at the mercy of government officials, the Act must be viewed as waiving the privilege . . . dependent upon the availability and adequacy of other methods of protecting the overriding interest of national security during the course of a trial." *Halpern*, 258 F.2d at 43.

Similarly here, a private FISA action generally involves matters that normally would be within the scope of the state secrets privilege. *Id.* Unless section 1810 creates "rights which are completely illusory, existing only at the mercy of government officials," *id.*, FISA must be viewed as preempting the state secrets privilege, vesting courts with the power to ensure national security with *in camera* and *ex parte* review plus "appropriate security procedures and protective orders." 50 U.S.C. §1806(f).

**D.     FISA Section 1806(f) is Not Limited to "Acknowledged" Surveillance.**

Defendants contend section 1806(f) cannot preempt the state secrets privilege because the statute applies only "where the Government has *acknowledged* the existence of electronic surveillance." Defs.' Second Mo. To Dismiss etc. at 2 (emphasis added); *see also id.* at 13, 17. Generally speaking, section 1806(f) is invoked in four circumstances: (1) when the government gives notice under section 1806(c)-(d) that it intends to use surveillance-based information against a defendant, (2) when a defendant moves under section 1806(e) to suppress surveillance-based information, (3) when an aggrieved person makes a "motion or request" to "to discover or obtain applications or orders or other materials relating to electronic surveillance," and (4) when an aggrieved person makes a "motion or request" to "discover, obtain, or suppress evidence or information obtained or derived from electronic surveillance under this chapter." 50 U.S.C. § 1806(f). According to defendants, "each of the circumstances in which Section 1806(f) applies is premised on the fact that electronic surveillance has already been acknowledged by the Government." Defs' Second Mo. To Dismiss etc. at 17.

Defendants are wrong. Admittedly, the first two circumstances necessarily involve acknowledged surveillance, because the government seeks to use surveillance-based information in

a proceeding the government has initiated.  But the third circumstance – which is the circumstance of the present case – is *not* necessarily restricted to government-initiated proceedings but can include civil actions initiated *against* the government under FISA section 1810.  (The same is true of the fourth circumstance.)  Nothing in section 1806(f) expressly or impliedly injects a requirement in the third circumstance that the governmental must "acknowledge" the challenged surveillance for section 1806(f) to be invoked.  Such language simply is not there.  And if defendants truly mean to suggest that section 1806(f) is restricted to government-initiated proceedings, they are wrong in light of 18 U.S.C. § 2712(b)(4), which makes the security procedures set forth in section 1806(f) applicable to lawsuits that are prosecuted *against* the government under 18 U.S.C. § 2712(a).

A close reading of section 1806(f) drives the point home.  Within the context of this case, the statute states in pertinent part: "Whenever any . . . request is made by an aggrieved person . . . to obtain . . . materials relating to electronic surveillance . . . the United States district court . . . shall . . . review in camera and ex parte the . . . materials . . . as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted . . . ."  50 U.S.C. § 1806(f).  The present case invokes this language because plaintiffs, by opposing defendants' motion to bar plaintiffs from having access to the Document, have made a request to obtain material relating to electronic surveillance – the Document, which plaintiffs have already seen – for use in demonstrating their standing to prosecute a civil action under FISA section 1810.  Upon plaintiffs' request, section 1806(f) expressly authorizes this Court to review the Document *in camera* and *ex parte* in the course of determining whether plaintiffs were surveilled unlawfully.  One searches in vain for anything in the statute that says this language applies only if the government "acknowledges" the surveillance or in government-initiated proceedings.[6]

---

[6]     Absent anything in the language of section 1806(f) that supports the interpretation defendants urge, they seek refuge in the canon of statutory construction *noscitur a sociis*.  *See* Defs.' Second Mo. To Dismiss etc. at 18 n.17.  This canon – in English, "it is known by its associates" – counsels that "the meaning of an unclear word or phrase should be determined by the words immediately surrounding it."  BLACK'S LAW DICTIONARY 1084 (7th ed. 1999).  The canon, however, is invoked only where statutory language is *unclear*.  *Id.*  Nothing in the language of section 1806(f) is unclear. *See generally S.D. Warren Co. v. Maine Board of Environmental Protection*, 547 U.S. 370, 380 (2006) (rejecting assertion of *noscitur a sociis*  because "uncritical use of interpretative rules is

Defendants argue that a request to obtain material relating to electronic surveillance is necessarily "predicated on *disclosed* surveillance," Defs.' Second Mo. To Dismiss etc. at 17 (emphasis added), because of the statute's requirement that the request be "made by an aggrieved party." 50 U.S.C. § 1806(f). Whether defendants are right about this is beside the point here, because plaintiffs' surveillance *was* disclosed to them, albeit inadvertently. Surveilled plaintiffs in a civil action under section 1810 certainly know they are aggrieved if the surveillance is disclosed to them, regardless of how the disclosure occurs. That is the situation here. Defendants wrongly equate *disclosure* with *acknowledgment*. The two are not the same thing. Disclosure can be accidental, without being acknowledged. The present case demonstrates this: Even though defendants refuse to acknowledge the fact of plaintiffs' surveillance, it was nevertheless disclosed to them when OFAC accidently gave the Document to Al-Haramain counsel Lynne Bernabei.

Thus, plaintiffs do not advance, and this Court need not reach, the "radical theory" of which defendants warn – that section 1806(f) might allow "litigants in any case to discover *whether* they are even subject to any surveillance." Defs.' Second Mo. To Dismiss etc. at 18 (emphasis in original); see also *id.* at 19 ("this very lawsuit is effectively an effort to compel the Government to provide notice of whether or not alleged surveillance has occurred"). Nor, as defendants claim, *id.* at 18-19, does this case invoke *ACLU Foundation v. Barr*, 952 F.2d 457 (D.C. Cir. 1991), which observed that the government "has no duty to reveal ongoing foreign intelligence surveillance," *id.* at 468 n.13, and cannot be "forced to admit or deny such allegations," *id.* at 468. Plaintiffs do not seek any revelation or admission by defendants as to *whether* plaintiffs were subjected to surveillance. The Document demonstrates that they *were*. This Court need only read the Document to know that. Plaintiffs seek no disclosure at all. Thus, the anti-disclosure provision of the National Security Agency Act of 1959, on which defendants also rely, *see* Defs.' Second Mo. To Dismiss etc. at 21-22, is irrelevant here.

In short, plaintiffs seek to use what has already been disclosed to them – the Document itself

---

especially risky in making sense of a complicated statute . . . where technical definitions are worked out with great effort in the legislative process").

– to establish their standing to obtain an adjudication whether their surveillance was unlawful.[7/]

## II. EVEN IF THE STATE SECRETS PRIVILEGE IS CONSTITUTIONALLY BASED, FISA STILL PREEMPTS THE PRIVILEGE THROUGH CONGRESS'S EXERCISE OF CONCURRENT CONSTITUTIONAL AUTHORITY.

### A. Congress Has Constitutional Authority to Regulate Protection of State Secrets.

If this Court determines – despite the Ninth Circuit's pronouncement – that the state secrets privilege *is* constitutionally based, then different legal standards are invoked for determining the question of preemption, because that means the President and Congress have *concurrent* constitutional authority over protection of state secrets. The presence of such concurrent constitutional authority invokes the standards set forth in *Youngstown Sheet and Tube Co.*, 343 U.S. 579 – commonly called the *Steel Seizure Case* – for determining the parameters of such authority according to our Constitution's separation of powers and its system of checks and balance.

The threshold question is whether Congress has constitutional authority to regulate protection of state secrets. The answer is *yes*. Congress's authority to do so has multiple roots in the following powers prescribed by Article I, Section 8 of the Constitution:

- to "provide for the . . . general welfare of the United States." *Id.*, cl. 1.

- to "constitute tribunals inferior to the Supreme Court." *Id.*, cl. 9.

- to "make all laws which shall be necessary and proper for carrying into execution the foregoing powers." *Id.*, cl. 18.

---

[7/] Defendants insist that plaintiffs' counsel "conceded" in oral argument before the Oregon district court that "plaintiffs do not 'already know' whether they were subject to alleged warrantless surveillance under the TSP in 2004." Defs.' Second Mo. To Dismiss etc. at 23 n.20. But counsel was merely addressing the question whether plaintiffs' surveillance was *warrantless*, at an early stage in this litigation when a discovery motion was pending. Within the context of that pending discovery motion, counsel pointed out that "the simple" way of determining the warrantless nature of the surveillance would be through discovery. Tr., 8/29/06, at 60. Counsel did not mean to suggest that discovery was *essential* to establish the warrantless nature of the surveillance. As this litigation has subsequently unfolded, we have demonstrated in public and sealed filings how the Document and other materials show the warrantless nature of the surveillance, and that, as a matter of law, because the nature of the surveillance is peculiarly within defendants' exclusive knowledge, the burden shifts to defendants to prove the surveillance was *not* warrantless. *See, e.g., Campbell v. United States*, 365 U.S. 85, 96 (1961); *United States v. Denver & Rio Grande Railroad Company*, 191 U.S. 84, 92 (1903); *ITSI TV Productions, Inc. v. Agricultural Associations*, 3 F.3d 1289, 1292 (9th Cir. 1993).

Further, to the extent defendants might claim that the state secrets privilege is rooted in the President's Article II authority as commander-in-chief of the Army and Navy, such authority is subject to Congress's Article I power to "make rules for the government and regulation of the land and naval forces." *Id.*, cl. 14; *see Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2773 (2006).

Congressional power to regulate protection of state secrets is also rooted in Article III, Section 2 of the Constitution, which subjects the jurisdiction of the federal courts to "such regulations as the Congress shall make." *Id.*, cl. 2. The Constitution also invests Congress with broad authority "to deal with foreign affairs," *Afroyim v. Rusk*, 387 U.S. 253, 256 (1967), and "to legislate to protect civil and individual liberties," *Shelton v. United States*, 404 F.2d 1292, 1298 n.17 (D.C. Cir. 1968).

Congress's constitutional authority to regulate protection of state secrets is multi-faceted. If there is any constitutional underpinning for the state secrets privilege, it is checked and balanced by concurrent congressional constitutional authority.

## B. The President Lacks Inherent Power to Disregard Congressional Preemption of the State Secrets Privilege.

Defendants claim that if the state secrets privilege is constitutionally based, any effort by Congress to preempt the privilege would "raise serious constitutional concerns." Defs.' Second Mo. To Dismiss etc. at 14. Without expressly saying so, defendants are asserting a theory of "inherent" presidential power set forth in the White Paper issued by the DOJ in January 2006, which claims the President has constitutional authority to disregard FISA in the name of national security. *See* Decl. of Jon B. Eisenberg, Ex. I at 6-10. Defendants are wrong. Even if the privilege is constitutionally based, that just means the President and Congress have concurrent constitutional authority over protection of state secrets. And where Congress has exercised its concurrent authority – here, by displacing the state secrets privilege in FISA litigation – the President does *not* have inherent power to disregard Congress.

Justice Robert Jackson's concurring opinion in the *Steel Seizure Case* prescribed a formulation for determining the extent of presidential power where Congress and the President share concurrent constitutional authority. Justice Jackson observed that the Constitution "enjoins upon its branches separateness but interdependence, autonomy but reciprocity. Presidential powers are not fixed but

fluctuate, depending upon their disjunction or conjunction with those of Congress." 343 U.S. at 635. Thus, the extent of presidential power frequently depends on the presence or absence of congressional action:

- "When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Id.*

- "When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." *Id.* at 637.

- "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.*

This formulation is not tossed aside in times of war. "Whatever power the United States Constitution envisions for the Executive in exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake." *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004). "[T]he greatest security against tyranny . . . lies not in a hermetic division among the Branches, but in a carefully crafted system of checked and balanced power within each Branch." *Mistretta v. United States*, 488 U.S. 361, 381 (1989). Hanging in the balance is "the equilibrium established by our constitutional system" between three separate but interdependent branches of government. *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring).

Here, presidential power is at its "lowest ebb" because section 1806(f) expressly prescribes a protocol for the courts to follow when addressing executive assertions of national security concerns in FISA litigation, in order to strike a balance between potentially competing interests in protecting national security and safeguarding civil liberties. As the Ninth Circuit in this case observed, "[t]he statute, unlike the common law state secrets privilege, provides a detailed regime to determine whether surveillance 'was lawfully authorized and conducted.'" *Al-Haramain*, 507 F.3d at 1205.

"The controlling fact here is that Congress, within its constitutionally delegated power, has prescribed for the President procedures . . . for his use in meeting the present type of emergency."

*Youngstown*, 343 U.S. at 660 (Burton, J., concurring); *see also id.* at 662 (Clark, J., concurring) ("where Congress has laid down specific procedures to deal with the type of crisis confronting the President, he must follow those procedures in meeting the crisis"). Legislative history indicates that, when enacting FISA, Congress intended to curtail presidential power by prescribing these statutory procedures for determining assertions of national security concerns in FISA litigation. The 1978 House Conference Report said: "The intent of the conferees is to apply the [lowest ebb] standard set forth in" the *Steel Seizure Case*. H. CONF. REP. NO. 95-1720, *supra*, at 35, Decl. of Jon B. Eisenberg, Ex. G.

The present situation is not the first time that this President has made an expansive claim of executive power as a basis for ignoring congressional legislation. The President did so in *Hamdan v. Rumsfeld, supra,* which held that military commissions established to try Guantanamo Bay detainees violated the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 801, which prescribed a structure and procedures for trying the detainees. In rejecting an attempt to evade the UCMJ based on a claim of unfettered presidential power, the Supreme Court observed: "Whether or not the President has independent power, absent congressional authorization to convene military commissions, he may not disregard limitations that Congress has, in proper exercise of its own war powers, placed on his powers" through the UCMJ. *Hamdan*, 126 S.Ct. at 2774 n.23. Likewise here, the President may not disregard limitations that Congress placed on executive power when it prescribed a protocol for the courts to follow when addressing executive assertions of national security concerns in FISA litigation.

Justice Kennedy's concurring opinion in *Hamdan* further explained why inherent Presidential power did not trump the UCMJ: Through the UCMJ, "Congress, in the proper exercise of its powers as an independent branch of government . . . has . . . set limits on the President's authority." *Id.* at 2799 (Kennedy, J., concurring). *Hamdan* "is not a case, then, where the Executive can assert some unilateral authority to fill a void left by congressional action." *Id.* Under Justice Jackson's formulation in the *Steel Seizure Case*, Congress had, by expressing its will in the UCMJ, put inherent presidential power over the manner of trying the Guantanamo Bay detainees at "its lowest ebb." *Id.* at 2800. Similarly here, Congress has, by expressing its will in FISA, put at "its lowest ebb" the President's power to evade responsibility for intelligence abuses by invoking the state secrets privilege.

"Where a statute provides the conditions for the exercise of governmental power, its requirements are the result of a deliberative and reflective process engaging both of the political branches. Respect for laws derived from the customary operation of the Executive and Legislative Branches gives some assurance of stability in time of crisis. The Constitution is best preserved by reliance on standards tested over time and insulated from the pressures of the moment." *Id.* at 2799. FISA, too, is the result of a deliberate and reflective process engaging both of the political branches. Its provisions cannot be trumped by a presidential power grab wholly at odds with the constitutional separation of powers. "The Framers 'built into the tripartate Federal Government . . . a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of another.'" *Clinton v. Jones*, 520 U.S. 681, 699 (1997) (quoting *Buckley v. Valeo*, 424 U.S. 1, 122 (1976)); *see* THE FEDERALIST NO. 47 (James Madison) ("The accumulation of all powers . . . in the same hands . . . may justly be pronounced the very definition of tyranny."). Under our system of government, the President is not free to ignore laws properly enacted by Congress. *See United States v. Nixon*, 418 U.S. at 715 (the President is not "above the law").

This is true even in times of war or emergency: "Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. . . . [E]ven the war power does not remove constitutional limitations safeguarding essential liberties." *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425-26 (1934). As Justice Jackson explained in the *Steel Seizure Case*, "emergency powers are consistent with free government only when their control is lodged elsewhere than in the Executive who exercises them. That is the safeguard that would be nullified by our adoption of the 'inherent powers' formula." 343 U.S. at 652.

In short, even if the state secrets privilege is constitutionally based, it is preempted by Congress's exercise, through FISA, of concurrent constitutional authority to regulate protection of state secrets, which puts presidential power at its lowest ebb.

## III. THE NINTH CIRCUIT DID NOT PRECLUDE ADJUDICATION OF THE FACT OF PLAINTIFFS' SURVEILLANCE.

Defendants insist this Court cannot adjudicate plaintiffs' standing because the Ninth Circuit purportedly has "found that harm to national security would result from disclosure of whether or not

plaintiffs were subject to alleged surveillance," Defs.' Second Mo. To Dismiss etc. at 2, and a determination that plaintiffs were surveilled would "thus cause the very harm to national security identified by the Court of Appeals," *id.* at 23. Defendants mischaracterize the Ninth Circuit's opinion. Here is what the opinion actually says: "[D]isclosure of *information* concerning the Sealed Document and the *means, sources and methods* of intelligence gathering in the context of this case would undermine the government's intelligence capabilities and compromise national security." *Al-Haramain*, 507 F.3d at 1204 (emphasis added). Thus, the opinion bars disclosure of *information* about the *means, sources and methods* of plaintiffs' surveillance – not the *mere fact* of their surveillance, which is all that will be litigated if this Court determines that FISA preempts the state secrets privilege.

As defendants correctly observe, the Ninth Circuit concluded that "information as to whether the government surveilled Al-Haramain," *id.* at 1203, and "data concerning surveillance," *id.* at 1205, are within the state secrets privilege. Defs.' Second Mo. To Dismiss etc. at 6. But that does not necessarily preclude adjudication of the fact of plaintiffs' surveillance. As the Ninth Circuit explained, it means only that "Al-Haramain cannot establish that it has standing, and its claims must be dismissed, *unless FISA preempts the state secrets privilege*." *Al-Haramain*, 507 F.3d at 1205 (emphasis added). Conversely, if FISA *does* preempt the privilege, plaintiffs *can* establish standing – i.e., this Court *can* adjudicate whether plaintiffs were surveilled.

Plaintiffs have consistently agreed that information concerning the means, sources and methods of the warrantless surveillance program should not be made public in this litigation. Plaintiffs seek only this Court's recognition of the mere fact of their surveillance for purposes of establishing their standing to sue under FISA section 1810. Plainly, the Ninth Circuit did not think such an adjudication would harm national security, or the court would not have remanded this case for a determination whether FISA preempts the state secrets privilege and thus enables plaintiffs "to proceed with this lawsuit." *Al-Haramain*, 507 F.3d at 1205-06.

The security procedures prescribed by section 1806(f) guard against the sort of harm to national security with which the Ninth Circuit was concerned. In contrast with the "all or nothing" approach of the state secrets privilege – where any threat of harm is met with the blunt instrument of outright dismissal – FISA opts for a balanced approach that ensures national security while at the same time

1    safeguarding civil liberties.

2    **IV.    DEFENDANTS PREMATURELY ASSERT SOVEREIGN IMMUNITY, WHICH IN
3          ANY EVENT DOES NOT BAR THIS ACTION.**

4          Defendants contend this Court cannot decide the issue that the Ninth Circuit has remanded for

5    decision – whether FISA preempts the state secrets privilege – without first deciding whether FISA

6    waives federal sovereign immunity.   Evidently the Ninth Circuit thought otherwise: Defendants

7    asserted federal sovereign immunity in the Ninth Circuit, *see* Br. for Appellants at 36-37, but the Ninth

8    Circuit ignored that assertion and said nothing about sovereign immunity in its opinion and remand

9    order.   Further, at the case management conference of February 7, 2008, this Court instructed the

10   parties to "proceed with further briefing of the preemption or the 1806(f) issue in *Al-Haramain* only,"

11   Tr., 2/7/08, at 43 – despite defense counsel's insistence that the Court must first address the "threshold

12   jurisdictional issue[]" of sovereign immunity which purportedly "would foreclose even reaching the

13   1806(f) issue at all," *id.* at 19-20.   As this Court observed at the hearing: "My job is to do what the

14   Court of Appeals tells me to do."   *Id.* at 19.   The Court of Appeals has told this Court to decide

15   whether FISA preempts the state secrets privilege.

16         If this Court nevertheless decides to address sovereign immunity at this time, the Court should

17   conclude that sovereign immunity does not deprive plaintiffs of their right to recover damages.   The

18   rule for waiver of federal sovereign immunity is that the waiver "must be unequivocally expressed in

19   statutory text."   *Lane v. Pena,* 518 U.S. 187, 192 (1996).   Lawsuits for damages against federal

20   employees in their official capacities "cannot be maintained unless Congress has explicitly waived the

21   sovereign immunity of the United States." *Multi Denominational Ministry of Cannabis and Rastafari,*

22   *Inc. v. Gonzales*, 474 F. Supp.2d 1133, 1140 (N.D. Cal. 2007).   FISA explicitly and unequivocally

23   waives federal sovereign immunity via section 1810, which prescribes a cause of action for damages

24   against any "person" who commits unlawful electronic surveillance in violation of section 1809, and

25   section 1801(m), which defines a "person" as including any "entity" and thus the United States.

26         The key point here is that section 1801(m) specifies "entity" *without excluding "the United*

27   *States"* – as do, for example, provisions of the Electronic Communications Privacy Act (ECPA).  *See*

28   18 U.S.C. § 2520(a) (authorizing cause of action against a "person or entity, other than the United

States"); § 2707(a) (same).  Had Congress meant to exclude "the United States" from the scope of "entity" in section 1801(m), Congress could have done so in the manner of ECPA.  Indeed, a majority of decisions construed a prior version of one of these ECPA provisions, which did *not* exclude "the United States," as *including* governmental entities.  *See, e.g., Adams v. City of Battle Creek*, 250 F.3d 980, 985 (6th Cir. 2001); *Organizacion JD Ltda. v. U.S. Dept. of Justice*, 18 F.3d 91, 94 (2d Cir. 1994).  Defendants do not mention those decisions, but instead rely on *Asmar v. U.S. Dept. of Treasury*, 680 F.Supp. 248, 250 (E.D. Mich. 1987), which opined that the former ECPA provision did *not* include government entities.  *See* Defs.' Second Mo. To Dismiss etc. at 11-12.  *Asmar*, however, stated the minority view, which the Ninth Circuit subsequently rejected.  *See Adams*, 250 F.3d at 985.

FISA also defines "person" as including "any officer or employee of the Federal Government." 50 U.S.C. § 1801(m).  An action against federal officers and employees in their official capacities "is considered a suit against the United States." *Multi Denominational Ministry,* 474 F. Supp.2d at 1140; *accord*, *Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985); *Burgos v. Milton*, 709 F.2d 1, 2 (1st Cir. 1983).  By prescribing civil liability for federal officers or employees – and hence the United States – FISA waives federal sovereign immunity separate and apart from the "entity" definition, despite the absence of any express specification of "the United States." *Cf. Salazar v. Heckler*, 787 F.2d 527, 529 (10th Cir. 1986) (Title VII of Civil Rights Act of 1974, which authorizes civil actions for employment discrimination by specifying "the head" of an offending federal entity as defendant, *see* 42 U.S.C. § 2000e-16(c), waives sovereign immunity despite failure to specify "the United States"); *accord*, *Rochon v. Gonzales*, 438 F.3d 1211, 1215-16 (D.C. Cir. 2006).  Defendants posit that the word "individual" at the outset of section 1801(m) means FISA authorizes civil actions against federal employees only in their individual capacities.  *See* Defs' Second Mo. To Dismiss etc. at 10.  But if "individual" in section 1801(m) modifies the subsequent phrase "any officer or employee of the Federal Government," then "individual" also must modify the subsequent phrase "any group, entity, association, corporation, or foreign power," and that surely cannot be so.[8/]

---

[8/]  In contrast, 42 U.S.C. section 1983 does not waive federal sovereign immunity in civil rights actions by authorizing an action against a "person," because there is no reason in section 1983 to depart from the "common usage" of the term "person" as not including the sovereign.  *See Will v.*

Defendants also argue that section 1810 does not waive sovereign immunity because it does not contain language similar to 18 U.S.C. § 2712(a), which expressly states that aggrieved persons may sue "the United States" for various statutory violations that include specified provisions of FISA other than section 1810. *See* Defs.' Second Mo. To Dismiss etc. at 10. But the comparison with section 2712(a) actually assists plaintiffs, not defendants. The three provisions of FISA as to which section 2712(a) waives sovereign immunity all prohibit certain activity by "Federal officers and employees." 50 U.S.C. §§ 1806(a), 1825(a) & 1845(a). By authorizing lawsuits against "the United States" for activity by "Federal officers and employees," section 2712(a) equates the two, reflecting the notion that a lawsuit against federal officers and employees in their official capacities – as to which section 1810 waives sovereign immunity via the definition of "person" in section 1801(m) as including "Federal officer and employees" – is considered a suit against the United States. Section 2712(a) states explicitly what sections 1801(m) and 1810 state necessarily.

Even if defendants could invoke sovereign immunity in their official capacities, they cannot do so in their personal capacities. *See Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985); *Butz v. Economou*, 438 U.S. 478, 501 (1978). Plaintiffs' complaint may be characterized as alleging both official and personal capacity liability. *See Graham*, 473 U.S. at 167 n.14 (where complaint does not specify whether defendants are sued in official or personal capacities or both, course of proceedings typically will indicate nature of liability sought to be imposed). And to the extent defendants are being sued in their personal capacities, they could enjoy only qualified immunity, which does not apply if they "discharge their duties in a way that is known to them to violate the United States Constitution or in a manner that they should know transgresses a clearly established constitutional rule." *Butz*, 438 U.S. at 507. Given that at least some of plaintiffs' surveillance occurred at a time when the warrantless surveillance program continued unabated without DOJ certification, despite former Attorney General Ashcroft's admonitions that the program was unlawful and defendant Mueller's "serious reservations"

---

*Michigan Dept. of State Police*, 491 U.S. 58, 64 (1989). FISA differs from section 1983 by giving "person" a special *legal* definition – including "any officer or employee of the Federal Government" and "any group, entity, association, corporation, or foreign power," 50 U.S.C. § 1801(m) – which transcends common usage.

about its legality, *see supra* at 3-4, defendants cannot claim qualified immunity.[9/]

As for defendants' claim that plaintiffs lack standing to obtain prospective relief because the warrantless surveillance program has ceased, *see* Defs.' Second Mo. To Dismiss etc. at 7, that argument is meritless because defendants have insisted that the President retains power to conduct warrantless electronic surveillance outside the framework of FISA. *See, e.g.,* Letter from Attorney General Alberto R. Gonzales to Senator Patrick Leahy (Jan. 17, 2007) (announcing suspension of warrantless surveillance program "[a]lthough, as we have previously explained, [it] fully complies with the law"), Decl. of Jon B. Eisenberg, Ex. K. This means defendants cannot sustain their "stringent" burden of making it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189-90 (2000). The "*heavy burden* of persuading" the court that the challenged conduct cannot reasonably be expected to recur "*lies with the party asserting mootness.*" *Adarand Constuctors, Inc. v. Slater*, 528 U.S. 216, 221-22 (2000) (emphasis in original); *accord, Friends of the Earth*, 528 U.S. at 189 ("formidable burden" rests with defendant).

Defendants should not be allowed to have it both ways, evading prospective relief by suspending the warrantless surveillance program while simultaneously claiming power to resume the program at any time. Absent any assurance by defendants that they will not resume their FISA violations, it is anything but clear that the misconduct could not reasonably be expected to recur. *See, e.g., City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 288-89 (vagueness challenge to ordinance repealed during litigation not moot because repeal "would not preclude [the city] from reenacting precisely the same language if the District Court's judgment were vacated").

//

//

//

---

[9/] Plaintiffs have not yet served the defendants individually. Defendants claim "it is far too late to cure that defect." Defs.' Second Mo. To Dismiss etc. at 9 n.8. Defendants are wrong. Upon a showing of "good cause for the failure," this Court may "extend the time for service for an appropriate period." Fed. R.Civ. P. 4(m). Plaintiffs shortly will request leave to serve the defendants individually upon an extension of the time for such service.

**CONCLUSION**

For the foregoing reasons, this Court should deny defendants' motion and proceed to determine plaintiffs' standing and, thereafter, the merits of this lawsuit.

DATED this 28th day of March, 2008.

/s/ Jon B. Eisenberg
Jon B. Eisenberg, Calif. Bar No. 88278
William N. Hancock, Calif. Bar No. 104501
Steven Goldberg, Ore. Bar No. 75134
Thomas H. Nelson, Oregon Bar. No. 78315
Zaha S. Hassan, Calif. Bar No. 184696
J. Ashlee Albies, Ore. Bar No. 05184
Lisa Jaskol, Calif. Bar No. 138769

Attorneys for Plaintiffs Al-Haramain Islamic Foundation, Inc., Wendell Belew, and Asim Ghafoor