**Jon B. Eisenberg, California Bar No. 88278** (jon@eandhlaw.com)
**William N. Hancock, California Bar No. 104501** (bill@eandhlaw.com)
**Eisenberg & Hancock LLP**
1970 Broadway, Suite 1200 • Oakland, CA 94612
510.452.258l – Fax 510.452.3277

**Steven Goldberg, Oregon Bar No. 75134** (steven@stevengoldberglaw.com)
River Park Center, Suite 300 • 205 SE Spokane St.• Portland, OR 97202
503.445.4622 – Fax 503.238.7501

**Thomas H. Nelson, Oregon Bar No. 78315** (nelson@thnelson.com)
P.O. Box 1211, 24525 E. Welches Road • Welches, OR 97067
503.622.3123 - Fax: 503.622.1438

**Zaha S. Hassan, California Bar No. 184696** (zahahassan@comcast.net)
8101 N.E. Parkway Drive, Suite F-2 • Vancouver, WA 98662
360.213.9737 - Fax 866.399.5575

**J. Ashlee Albies, Oregon Bar No. 05184** (ashlee@sstcr.com)
**Steenson, Schumann, Tewksbury, Creighton and Rose, PC**
815 S.W. Second Ave., Suite 500 • Portland, OR 97204
503.221.1792 – Fax 503.223.1516

**Lisa R. Jaskol, California Bar No. 138769** (ljaskol@earthlink.net)
610 S. Ardmore Ave.• Los Angeles, CA 90005
213.385.2977 – Fax 213.385.9089

Attorneys for Al-Haramain Islamic Foundation, Inc., Wendell Belew and Asim Ghafoor

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **IN RE NATIONAL SECURITY AGENCY TELECOMMUNICATIONS RECORDS LITIGATION** <br><br> This Document Relates Solely To: <br><br> *Al-Haramain Islamic Foundation, Inc., et al. v. Bush, et al.* (C07-CV-0109-VRW) <br><br> **AL-HARAMAIN ISLAMIC FOUNDATION, INC., an Oregon Nonprofit Corporation; WENDELL BELEW, a U.S. Citizen and Attorney at Law; ASIM GHAFOOR, a U.S. Citizen and Attorney at Law,** <br><br> Plaintiffs, <br><br> vs. <br><br> **GEORGE W. BUSH, President of the United States; NATIONAL SECURITY** | MDL Docket No. 06-1791 <br><br> **FIRST AMENDED COMPLAINT** <br><br> (Violations of Foreign Intelligence Surveillance Act, Separation of Powers, Fourth Amendment, First Amendment, Sixth Amendment, and International Covenant on Civil and Political Rights) |

| | |
|---|---|
| **AGENCY and KEITH B. ALEXANDER, its Director; OFFICE OF FOREIGN ASSETS CONTROL, an office of the United States Treasury, and ADAM J. SZUBIN, its Director; FEDERAL BUREAU OF INVESTIGATION and ROBERT S. MUELLER III, its Director, in his official and personal capacities.** <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) |

## INTRODUCTION

1. This is an action for damages and injunctive relief concerning an illegal and unconstitutional program of electronic surveillance of United States citizens and entities. This action also seeks to enjoin the use of evidence obtained through this surveillance in proceedings in which defendant Office of Foreign Assets Control (OFAC) has designated plaintiff Al-Haramain Islamic Foundation, Inc. ("Al-Haramain Oregon") as a terrorist organization.

2. Defendants have engaged in electronic surveillance of plaintiffs without court orders, in violation of clear statutory mandates provided in the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. §§ 1801-62, and provisions of the United States Constitution.

3. Defendants have used illegal surveillance to harm plaintiffs as set forth more specifically in the body of this Complaint.

## PARTIES

4. Plaintiff Al-Haramain Oregon is an Oregon nonprofit corporation whose headquarters were established in Ashland, Oregon. Plaintiff Al-Haramain Oregon currently owns real property in Springfield, Missouri. Plaintiff Al-Haramain Oregon formerly owned real property in Ashland, Oregon. Defendant OFAC has sold the Ashland property at auction and has frozen the proceeds of the sale.

5. Plaintiff Wendell Belew is a citizen of the United States and an attorney at law who has had business and other relationships with plaintiff Al-Haramain Oregon.

6. Plaintiff Asim Ghafoor is a citizen of the United States and an attorney at law who has had business and other relationships with plaintiff Al-Haramain Oregon.

7. Defendant George W. Bush is President of the United States.

8. Defendant National Security Agency (NSA) is an agency of the United States.

9. Defendant Keith B. Alexander is Director of defendant NSA.

10. Defendant OFAC is an office of the Department of the Treasury of the United States.

11. Defendant Adam J. Szubin is Director of OFAC.

12. Defendant Federal Bureau of Investigation (FBI) is a federal police and intelligence agency.

13. Defendant Robert S. Mueller III is Director of the FBI and was Director at all times relevant to this Amended Complaint. Defendant Mueller is being sued in his official and personal capacities.

## JURISDICTION AND VENUE

14. This court has jurisdiction under 28 U.S.C. § 1331.

15. Plaintiffs filed this action in the United States District Court for the District of Oregon, a proper venue because (a) one of the plaintiffs is an Oregon corporation that owned real property in Oregon and (b) defendants' actions caused harm in Oregon. The Judicial Panel on Multidistrict Litigation transferred this action to the United States District Court for the Northern District of California on December 15, 2006, as part of *In re National Security Agency Telecommunications Records Litigation*, MDL Docket No. 06-1791-VRW.

## STATEMENT OF FACTS

16. Shortly after the terrorist attacks of September 11, 2001, defendants commenced a program of warrantless electronic surveillance of international telecommunications, intercepting them domestically from routing stations located within the United States.

17. The warrantless surveillance program did not comply with the requirements of FISA.

18. Current and former employees and representatives of the United States government have made the following public statements about the nature of the warrantless surveillance program:

    a. In a radio address on December 17, 2005, defendant Bush stated that the warrantless surveillance program intercepted "international communications of people with known links to Al Qaida [sic] and related terrorist organizations."

b. During a press conference on December 19, 2005, defendant Bush stated that the warrantless surveillance program encompasses "those that are known al Qaeda ties and/or affiliates [sic]."

c. During the press conference of December 19, 2005, defendant Bush further stated that "we must be able to act fast and to detect these conversations" and the warrantless surveillance program "enables us to move faster and quicker" than under FISA and provides "the ability to move quickly to detect."

d. In a press briefing on December 19, 2005, Attorney General Alberto Gonzales publicly stated that, under the warrantless surveillance program, the executive branch conducted warrantless electronic surveillance outside the structure of FISA where "one party to the communication is outside the United States" and "we have a reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda."

e. On December 19, 2005, in written answers to questions from the Senate Judiciary Committee, defendant Alexander publicly stated that, under the warrantless surveillance program, the executive branch conducted warrantless electronic surveillance outside the structure of FISA "where one party is outside the United States and there are reasonable grounds to believe that at least one party is a member or agent of al Qaeda or an affiliated terrorist organization."

f. A "White Paper" issued by the Department of Justice on January 19, 2006, stated that under the warrantless surveillance program the President authorized the NSA "to intercept international communications into and out of the United States of persons linked to al Qaeda or related terrorist organizations."

g. On January 10, 2007 former Deputy Assistant Attorney General John Yoo stated on National Public Radio that under the warrantless surveillance program "the National Security Agency intercepts communications from abroad coming into the United States where someone on the calls is a suspected member of Al Qaeda," and that the surveillance occurred without "individualized suspicion."

19. On May 15, 2007, in testimony before the Senate Judiciary Committee, and on May 22,

2007, in written answers to follow-up questions by Senator Patrick Leahy, former Deputy Attorney General James B. Comey stated as follows:

  a. As of early March of 2004, Comey and Attorney General John Ashcroft had determined that the warrantless surveillance program was unlawful.

  b. During a meeting at the White House on March 9, 2004, two days before the Department of Justice's next 45-day written re-certification of the program was due, Comey told Vice-President Dick Cheney and members of his and defendant Bush's staffs that the Department of Justice had concluded that the warrantless surveillance program was unlawful and that the Department of Justice would not re-certify the program.

  c. On March 10, 2004, while Ashcroft was hospitalized, two White House officials went to Ashcroft's bedside and attempted to obtain the written certification from Ashcroft, but he refused.

  d. Despite the advice that the warrantless surveillance program as then constituted was unlawful, defendant Bush did not direct Comey or the FBI to discontinue or suspend any portion of the program.

  e.. On March 11, 2004, the Department of Justice's certification of the warrantless surveillance program lapsed without re-certification.

  f. The warrantless surveillance program continued to operate without the Department of Justice's re-certification for a period of several weeks following March 11, 2004.

  g. On or about March 10, 2004, several high government officials, among them defendant Mueller, threatened to resign because of concerns about the legality of the warrantless surveillance program.

 20. On July 26, 2007, defendant Mueller testified before the House Judiciary Committee as follows:

  a. Prior to the incident at Ashcroft's bedside described in paragraph 19(c) above, Mueller had "serious reservations about the warrantless wiretapping program."

  b. At or near the time of the incident at Ashcroft's bedside described in paragraph 19(c) above, during conversations between Comey and defendant Mueller, Comey "expressed

concerns about the legality of the program."

21. On January 17, 2007, Attorney General Gonzales announced in a letter to Senators Patrick Leahy and Arlen Specter that the President "has determined not to authorize the Terrorist Surveillance Program when the current authorization expires." The letter further stated, however, that despite the program's suspension it "fully complies with the law."

22. On May 1, 2007, in testimony before the Senate Intelligence Committee, Director of National Intelligence Michael McConnell refused to assure Senator Russ Feingold that defendants would not in the future conduct warrantless electronic surveillance outside the structure of FISA, saying "that would be the President's call."

23. As a result of, among other things, the public statements by Attorney General Gonzales and Director of National Intelligence McConnell described in paragraphs 21 and 22 above, it is not clear that defendants' unlawful behavior could not reasonably be expected to recur.

24. On August 1, 2002, Treasury Department Deputy Secretary Kenneth W. Dam testified before the Senate Committee on Banking, Housing and Urban Affairs, Subcommittee on International Trade and Finance, as follows:

    a. In October of 2001, the Treasury Department created "Operation Green Quest" to track financing of terrorist activities, especially by charitable organizations.

    b. Among the targets of Operation Green Quest were foreign branches of Al-Haramain Islamic Foundation, which was headquartered in Saudi Arabia.

25. On March 4, 2004, FBI Counterterrorism Division Acting Assistant Director Gary M. Bald testified before the Senate Caucus on International Narcotics Control as follows:

    a. In April of 2002, the FBI created its Terrorist Financing Operations Section (TFOS) in order to combine the FBI's expertise in conducting complex criminal financial investigations with advanced technologies and to develop cooperation and coordination among law enforcement and intelligence agencies.

    b. On May 13, 2003, through a Memorandum of Understanding between the Department of Justice and the Department of Homeland Security, the FBI was designated as the lead agency to investigate terrorist financing, and the TFOS replaced Operation Green Quest.

  c. The TFOS subsequently participated in joint operations with the Treasury Department to investigate potential terrorist-related financial transactions. With the cooperation of domestic and foreign intelligence agencies, the TFOS acquired, analyzed and disseminated classified electronic intelligence data produced by advanced foreign intelligence technologies, including telecommunications data from sources in government and private industry.

  d. The TFOS took over the investigation of Al-Haramain Islamic Foundation "pertaining to terrorist financing."

  e. On February 18, 2004, the FBI executed a search warrant on plaintiff Al-Haramain Oregon's office in Ashland, Oregon.

  f. The TFOS provided operational support, including document and data analysis, in the investigation of plaintiff Al-Haramain Oregon.

26. In his Senate testimony of March 4, 2004, Bald made no mention of purported links between plaintiff Al-Haramain Oregon and Osama bin-Laden.

27. On September 25, 2003, FBI Deputy Director (at that time Counterterrorism Division Assistant Director) John S. Pistole testified before the Senate Committee on Banking, Housing and Urban Affairs that the TFOS "has access to data and information" from "the Intelligence Community" and has "[t]he ability to access and obtain this type of information in a time sensitive and urgent manner."

28. On June 16, 2004, OFAC Director R. Richard Newcomb testified before the House Financial Services Subcommittee on Oversight and Investigations that in conducting investigations of terrorist financing, OFAC officers use "classified . . . information sources."

29. On July 26, 2007, defendant Mueller testified before the House Judiciary Committee that in 2004 the FBI, under his direction, undertook activity using information produced by the NSA through the warrantless surveillance program.

30. In a press release issued on February 19, 2004, the Treasury Department announced that OFAC had blocked plaintiff Al-Haramain Oregon's assets pending an investigation of possible crimes relating to currency reporting and tax laws.

31. The Treasury Department's press release of February 19, 2004, made no mention of

purported links between plaintiff Al-Haramain Oregon and Osama bin-Laden.

32. During the period of time immediately following the blocking of plaintiff Al-Haramain Oregon's assets on February 19, 2004, plaintiff Belew spoke over the telephone with one of Al-Haramain Oregon's directors, Soliman al-Buthi, on the following dates: March 10, 11 and 25, April 16, May 13, 22 and 26, and June 1, 2 and 10, 2004. Belew was located in Washington D.C.; al-Buthi was located in Riyadh, Saudi Arabia. The telephone number that Belew used was 202-255-3808. The telephone numbers that al-Buthi used were 96655457679, 96656414004 and 966505457679.

33. During the period of time immediately following the blocking of plaintiff Al-Haramain Oregon's assets on February 19, 2004, plaintiff Ghafoor spoke over the telephone with al-Buthi approximately daily from February 19 through February 29, 2004 and approximately weekly thereafter. Ghafoor was located in Washington D.C.; al-Buthi was located in Riyadh, Saudi Arabia. The telephone numbers that Ghafoor used were 202-390-5390 and 202-497-2219. The telephone numbers that al-Buthi used were 966505457679 and 96656414004.

34. Plaintiff Al-Haramain Oregon and al-Buthi had been named among multiple defendants in *Burnett, et al. v. Al Baraka Investment and Development Corporation, et al.*, a lawsuit filed against Saudi Arabian entities and citizens on behalf of victims of the terrorist attacks of September 11, 2001. Al-Buthi was attempting to coordinate the defense of individuals named in the *Burnett* lawsuit and the payment of their legal fees. Al-Buthi contacted some of those individuals and urged them to obtain legal representation to prevent entry of default judgments against them. Ghafoor undertook to represent several of the individuals whom al-Buthi contacted. Belew undertook to provide legal services in connection with the formation and operation of a lobbying organization for Islamic charities, the Friends of Charities Association (FOCA).

35. Wholly independent of any classified written documentation, including the sealed document that was filed simultaneously with the initial complaint in this action, plaintiffs Belew and Ghafoor recall the substance of the telephone conversations described in paragraphs 32 and 33 above that took place during the several weeks following March 11, 2004, when the warrantless surveillance program continued to operate without the Department of Justice's re-certification as described in paragraph 19 above, as follows:

a. In the telephone conversations between Belew and al-Buthi, the parties discussed issues relating to the operation of FOCA, including the form and content of bills for payment of FOCA's attorney fees to Belew and others. On one occasion, they discussed the fact that a check to Belew from FOCA could not be negotiated because it lacked part of its routing code.

b. In the telephone conversations between Ghafoor and al-Buthi, al-Buthi mentioned by name numerous defendants whom Ghafoor had undertaken to represent in the *Burnett* lawsuit filed on behalf of the September 11 victims.

c. One of the names al-Buthi mentioned in the telephone conversations with Ghafoor was Mohammad Jamal Khalifa, who was married to one of Osama bin-Laden's sisters.

d. Two other names al-Buthi mentioned in the telephone conversations with Ghafoor were Safar al-Hawali and Salman al-Auda, clerics whom Osama bin-Laden claimed had inspired him.

e. In the telephone conversations between Ghafoor and al-Buthi, the parties also discussed issues relating to payment of Ghafoor's legal fees as defense counsel in the *Burnett* lawsuit, including the following: who would pay the fees; replenishment of Ghafoor's retainer; the possibility of using a credit card to pay the legal fees; and a system for payment of the fees by check, whereby clients would make payments to al-Buthi, who would deposit those payments in his personal bank account and then send cashier's checks to Ghafoor.

36. In a letter to plaintiff Al-Haramain Oregon's lawyer Lynne Bernabei dated April 23, 2004, OFAC Director Newcomb stated that OFAC was considering designating plaintiff Al-Haramain Oregon as a Specially Designated Global Terrorist (SDGT) organization based on unclassified information "and on classified documents that are not authorized for public disclosure."

37. In a follow-up letter to Bernabei dated July 23, 2004, Newcomb reiterated that OFAC was considering "classified information not being provided to you" in determining whether to designate plaintiff Al-Haramain Oregon as an SDGT organization.

38. On September 9, 2004, OFAC declared plaintiff Al-Haramain Oregon to be an SDGT organization.

39. In a press release issued on September 9, 2004, the Treasury Department stated that the

investigation of plaintiff Al-Haramain Oregon showed "direct links between the U.S. branch [of Al-Haramain] and Usama bin Laden."

40. The Treasury Department's press release of September 9, 2004, was the first instance of a public claim of purported links between plaintiff Al-Haramain Oregon and Osama bin-Laden.

41. In a public declaration filed in this litigation, dated May 10, 2006, FBI Special Agent Frances R. Hourihan stated that a classified document "was related to the terrorist designation" of plaintiff Al-Haramain Oregon.

42. On October 22, 2007, in a speech at a conference of the American Bankers Association and American Bar Association on money laundering, the text of which appears on the FBI's official Internet website, FBI Deputy Director Pistole stated that the FBI "used . . . surveillance" in connection with defendant OFAC's 2004 investigation of plaintiff Al-Haramain Oregon.

43. In FBI Deputy Director Pistole's speech of October 22, 2007, he further stated that, although the FBI used surveillance in connection with defendant OFAC's 2004 investigation of plaintiff Al-Haramain Oregon, "it was the financial evidence" provided by financial institutions "that provided justification for the initial designation" of plaintiff Al-Haramain Oregon.

44. In a document filed in *United States v. Sedaghaty*, No. CR 05-600008-1 on August 21, 2007, the United States Attorney for the District of Oregon referred to the February 19, 2004 order blocking plaintiff Al-Haramain Oregon's assets as a "preliminary designation of AHIF-US" and referred to the September 9, 2004 order declaring plaintiff Al-Haramain Oregon to be an SDGT as "a formal designation of AHIF-US."

45. The October 22, 2007 speech referenced in paragraphs 42 and 43 above and the document referenced in paragraph 44 above together demonstrate that defendant OFAC relied primarily on evidence provided by financial institutions and not on surveillance evidence to issue the February 19, 2004 assets-blocking order against plaintiff Al-Haramain Oregon, which FBI Deputy Director Pistole called "an initial designation" and the United States Attorney called "a preliminary designation," and then relied on surveillance evidence to issue the September 9, 2004 SDGT designation, which the United States Attorney called "a formal designation."

46. The October 22, 2007 speech referenced in paragraphs 42 and 43 above, in which FBI

Deputy Direcctor Pistole stated that the FBI "used . . . surveillance" in connection with defendant OFAC's 2004 investigation of plaintiff Al-Haramain Oregon, contradicts and supersedes (1) defendants' prior assertion in their Brief for Appellants filed in the Ninth Circuit Court of Appeals in this litigation on June 6, 2007 that the government "could neither confirm nor deny whether plaintiffs had been surveilled under the TSP or any other intelligence-gathering program," and (2) defendants' prior assertion in their Reply Brief for Appellants filed in the Ninth Circuit on July 20, 2007 that "plaintiffs do *not* know whether they have been surveilled, much less whether they have been surveilled under the TSP" (original italics). Through this speech and its posting on defendant FBI's official Internet website, defendant FBI has now confirmed to plaintiffs and the public at large that plaintiffs were surveilled.

47. In a letter to plaintiff Al-Haramain Oregon's attorneys Lynne Bernabei and Thomas Nelson dated February 6, 2008, OFAC confirmed its "use of classified information" in the Al-Haramain Oregon investigation.

48. The following public statements by government officials demonstrate that the telecommunications between al-Buthi and plaintiffs Belew and Ghafoor described in paragraphs 32 and 33 above were wire communications and were intercepted by defendants within the United States:

    a. On July 26, 2006, defendant Alexander and CIA Director Michael Hayden testified before the Senate Judiciary Committee that telecommunications between the United States and abroad pass through routing stations located within the United States from which the NSA intercepts such telecommunications.

    b. On May 1, 2007, Director of National Intelligence McConnell testified before the Senate Select Intelligence Committee that interception of surveilled electronic communications between the United States and abroad occurs within the United States and thus requires a warrant under FISA.

    c. On September 20, 2007, McConnell testified before the House Select Intelligence Committee that "[t]oday . . . [m]ost international communications are on a wire, fiber optical cable," and "on a wire, in the United States, equals a warrant requirement [under FISA] even if it was against a foreign person located overseas."

d. On September 20, 2007, Assistant Attorney General Kenneth Wainstein testified before the House Select Intelligence Committee that "[a]s a result of the revolutions in telecommunications technology over the last 29 years, much of the international communications traffic is now conducted over fiber optic cables which qualify as wire communications under the [FISA] statute."

e. On August 2, 2007, House Minority Leader John Boehner acknowledged on a Fox News broadcast that the NSA would be required to obtain a FISA warrant to conduct electronic surveillance of international telecommunications which are intercepted from routing stations located in New York and California.

49. On June 12, 2006, during a district court hearing in *American Civil Liberties Union v. National Security Agency*, 493 F.3d 644 (6th Cir. 2007), Department of Justice Special Litigation Counsel Anthony Coppolino told the district judge that "attorneys who would represent terrorist clients . . . come closer to being in the ballpark with the terrorist surveillance program."

50. In a brief defendants filed in the Ninth Circuit Court of Appeals in this case on June 6, 2007, defendants described plaintiffs Al-Haramain Oregon, Belew and Ghafoor as "a terrorist organization and two lawyers affiliated with it."

51. Prior to 2004, defendants had conducted electronic surveillance of al-Buthi as revealed by a memorandum dated February 6, 2008, to defendant Szubin from Treasury Department Office of Intelligence and Analysis Deputy Assistant Secretary Howard Mendelsohn, which states the following:

a. On February 1, 2003, the United States government conducted electronic surveillance of four telephone conversations between al-Buthi and Ali al-Timimi.

b. These four incidents of surveillance were publicly disclosed during al-Timimi's 2005 trial for allegedly soliciting persons to levy war against the United States.

52. With regard to the telephone conversations described in paragraph 35 above, in which plaintiff Ghafoor and al-Buthi discussed Ghafoor's legal representation, in the *Burnett* lawsuit, of a brother-in-law of Osama bin-Laden and clerics who had inspired Osama bin-Laden, as well as payment of Ghafoor's legal fees, and plaintiff Belew and al-Buthi discussed bills for and payment of FOCA's attorney fees:

1    a.    Defendants conducted electronic surveillance of those telephone conversations within the meaning of FISA, 50 U.S.C. § 1801(f)(2), which defines "electronic surveillance" in pertinent part as "the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire communication to or from a person in the United States, without the consent of any party thereto, if such acquisition occurs in the United States."

   b.    Defendants did not obtain a court order (i.e., a warrant) pursuant to FISA authorizing such electronic surveillance and did not otherwise follow the procedures prescribed by FISA.

   c.    Defendants did not give plaintiffs notice of or obtain their consent to the surveillance.

   d.    Defendant OFAC relied on its purported understanding of what the surveillance disclosed to declare that plaintiff Al-Haramain Oregon had links to Osama bin-Laden and the financing of terrorism.

   e.    Defendant OFAC relied on its purported understanding of what the surveillance disclosed to formally declare plaintiff Al-Haramain Oregon an SDGT organization.

   f.    Plaintiffs Al-Haramain Oregon, Belew and Ghafoor are aggrieved persons within the meaning of FISA, 50 U.S.C. § 1801(k), which defines "aggrieved person" in pertinent part as a "person whose communications or activities were subject to electronic surveillance."

53.   Plaintiff Al-Haramain Oregon's SDGT designation has resulted in severe financial hardship and other harm to plaintiff Al-Haramain Oregon.

54.   As a result of defendants' actions, plaintiff Al-Haramain Oregon has been irreparably damaged insofar as its assets have been frozen, preventing it from engaging in the charitable and humanitarian efforts for which it was organized.

55.   As a result of defendants' actions, plaintiffs Belew and Ghafoor have been irreparably damaged insofar as their abilities to represent their clients have been hindered and interfered with, and have been chilled, by defendants' illegal and unconstitutional actions.

56.   All of the factual allegations in paragraphs 16 through 55 above are based on non-classified evidence.

## FIRST CLAIM FOR RELIEF

### (Foreign Intelligence Surveillance Act)

57. Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

58. Defendants' engagement in electronic surveillance to monitor conversations between and among plaintiffs without obtaining prior court authorization, and defendants' subsequent use of the information obtained against plaintiffs, is in violation of the civil and criminal provisions of FISA. As a result, all evidence obtained by this illegal surveillance must be suppressed pursuant to 50 USC § 1806(g). Further, plaintiffs are entitled to liquidated and punitive damages pursuant to 50 USC § 1810.

## SECOND CLAIM FOR RELIEF

### (Separation of Powers)

59. Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

60. By carrying out their program of unlawful warrantless surveillance, defendants have acted in excess of the President's Article II authority (i) by failing to take care to execute the laws, and instead have violated those laws, (ii) by acting in contravention of clear statutory dictates in an area in which Congress has Article I authority to regulate, and (iii) by engaging in the conduct described above where Congress has specifically prohibited the President and other defendants from engaging in such conduct.

## THIRD CLAIM FOR RELIEF

### (Fourth Amendment Violations)

61. Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

62. Defendants have carried out unreasonable surveillance of plaintiffs' private telephone, email, and other electronic communications without probable cause or warrants in violation of the Fourth Amendment to the United States Constitution. Defendant Mueller is liable for this constitutional violation in both his official and personal capacities under *Bivens v. Six Unknown*

*Named Agents*, 403 U.S. 488 (1971).

## FOURTH CLAIM FOR RELIEF

### (First Amendment Violations)

63. Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

64. Defendants, by carrying out and/or asserting the right to carry out their program of unlawful warrantless surveillance, have impaired plaintiff Al-Haramain Oregon's ability to obtain legal advice, to join together for the purpose of legal and religious activity, to freely form attorney-client relationships, and to petition the government of the United States for redress of grievances, all of which are modes of expression and association protected under the First Amendment of the United States Constitution. Defendant Mueller is liable for this constitutional violation in both his official and personal capacities under *Bivens v. Six Unknown Named Agents*, 403 U.S. 488 (1971).

## FIFTH CLAIM FOR RELIEF

### (Sixth Amendment Violations)

65. Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

66. Defendants have carried out unreasonable surveillance of plaintiffs' private telephone, email, and other electronic communications without probable cause or warrants in violation of the Sixth Amendment to the United States Constitution. Defendant Mueller is liable for this constitutional violation in both his official and personal capacities under *Bivens v. Six Unknown Named Agents*, 403 U.S. 488 (1971).

## SIXTH CLAIM FOR RELIEF

### (Violation of International Covenant on Civil and Political Rights)

67. Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

68. On June 25, 2002, the United States Congress ratified the International Convention for the Suppression of the Financing of Terrorism ("Convention"). Article 17 of the Convention requires the United States to comply with international human rights law in "any measures" taken pursuant to

the Convention. One of the measures pursuant to the Convention is the International Covenant on Civil and Political Rights ("International Covenant") which guarantees the right to privacy. Article 17 of the International Covenant provides:

    a.    No one shall be subjected to arbitrary or unlawful interference with his privacy, family, home or correspondence, nor to unlawful attacks on his honour and reputation.

    b.    Everyone has the right to the protection of the law against such interference or attacks.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

1. Declare that defendants' warrantless surveillance of plaintiffs is unlawful and unconstitutional, and enjoin any such warrantless surveillance;

2. Order defendants to disclose to plaintiffs all unlawful surveillance of plaintiffs' communications carried out pursuant to the illegal program;

3. Order defendants to turn over to plaintiffs all information and records in their possession relating to plaintiffs that were acquired through the warrantless surveillance program or were the fruit of surveillance under the program, and subsequently destroy and make no further use of any such information and records in defendants' possession;

4. Order defendant OFAC to purge all information acquired from such program from its files as well as all fruits of such information and make no further use of any such information;

5. Award plaintiffs individually liquidated damages of $1,000 or $100 per day for each violation as specified in FISA;

6. Award plaintiffs individually punitive damages of $1,000,000;

7. Award costs, including an award of attorneys' fees under FISA;

8. Award costs, including an award of attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A);

9. Award such other relief as the Court may deem just and proper.

DATED this 29th day of July, 2008.

          /s/ Jon B. Eisenberg
Jon B. Eisenberg, Calif. Bar No. 88278
William N. Hancock, Calif. Bar No. 104501
Steven Goldberg, Ore. Bar No. 75134
Thomas H. Nelson, Oregon Bar No. 78315
Zaha S. Hassan, Calif. Bar No. 184696
J. Ashlee Albies, Ore. Bar No. 05184
Lisa Jaskol, Calif. Bar No. 138769

**Attorneys for Plaintiffs Al-Haramain Islamic Foundation, Inc., Wendell Belew, and Asim Ghafoor**