1  CINDY COHN                          HARVEY GROSSMAN
   LEE TIEN                            ADAM SCHWARTZ
2  KURT OPSAHL                         ROGER BALDWIN FOUNDATION OF ACLU
   KEVIN S. BANKSTON                   180 North Michigan Avenue
3  CORYNNE MCSHERRY                    Suite 2300
   JAMES S. TYRE                       Chicago, IL 60601
4  ELECTRONIC FRONTIER FOUNDATION      Telephone: (312) 201-9740
   454 Shotwell Street                 Facsimile: (312) 201-9760
5  San Francisco, CA 94110
   Telephone: (415) 436-9333           Counsel For AT&T Class Plaintiffs And
6  Facsimile: (415) 436-9993           Co-Lead Coordinating Counsel

7  Counsel For AT&T Class Plaintiffs And   ARAM ANTARAMIAN
   Co-Lead Coordinating Counsel            LAW OFFICE OF ARAM ANTARAMIAN
8                                          1714 Blake Street
   RICHARD R. WIEBE                        Berkeley, CA 94703
9  LAW OFFICE OF RICHARD R. WIEBE          Telephone: (510) 841-2369
   425 California Street, Suite 2025
10 San Francisco, CA 94104                 Counsel For AT&T Class Plaintiffs
   Telephone: (415) 433-3200
11 Facsimile: (415) 433-6382               [Additional Counsel on Last Page]

12 Counsel for AT&T Class Plaintiffs

13
                     UNITED STATES DISTRICT COURT
14
                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
15
                         SAN FRANCISCO DIVISION
16

17 IN RE NATIONAL SECURITY            )  MDL Docket No. 06-1791 VRW
   TELECOMMUNICATIONS RECORDS         )
18 LITIGATION, MDL No. 1791           )  **MDL PLAINTIFFS' OPPOSITION TO**
                                      )  **MOTION OF THE UNITED STATES**
19 This Document Relates To: All Cases Except:  ) **SEEKING TO APPLY 50 U.S.C. § 1885a TO**
   *Al-Haramain Islamic Foundation, Inc. v. Bush,*  ) **DISMISS THESE ACTIONS**
20 No. 07-0109; *Center for Constitutional Rights v.*  )
   *Bush*, No. 07-1115; *Guzzi v. Bush*, No. 06-  )  Date:       December 2, 2008
21 06225; *Shubert v. Bush*, No. 07-0693; *Clayton v.*  )  Time:       10:00 a.m.
   *AT&T Commc'ns of the Southwest*, No. 07-1187;  )  Courtroom:  6, 17th Floor
22 *U.S. v. Adams*, No. 07-1323; *U.S. v. Clayton*, No.  )  Judge:      The Hon. Vaughn R. Walker
   07-1242; *U.S. v. Palermino*, No. 07-1326; *U.S. v.*  )
23 *Rabner*, No. 07-1324; *U.S. v. Volz*, No. 07-1396  )
                                      )
24 ─────────────────────────────────  )

25

26

27

28

─────────────────────────────────────────────────────────
No. M-06-01791-VRW   MDL PLAINTIFFS' OPPOSITION TO
                     MOTION OF THE UNITED STATES SEEKING TO APPLY 50 U.S.C.
                     § 1885a TO DISMISS THESE ACTIONS

# TABLE OF CONTENTS

I.   CONGRESS LACKS THE POWER TO ELIMINATE PLAINTIFFS' CONSTITUTIONAL CLAIMS BY STATUTE ........................................................... 2

   A.   Congress Cannot Deny Completely Any Remedy For Plaintiffs' First And Fourth Amendment Claims ............................................................ 2

   B.   Neither Congress Nor the Executive May Act As The Final Arbiter Of What The First And Fourth Amendments Require .............................................. 6

     1.   The Fourth and First Amendment Jurisprudence Governing These Cases Is Well-Established .................................................................. 7

     2.   The Judicial Interpretations Of The Constitution In *Keith* And Similar Cases Are Controlling, And May Not Be Nullified Or Superseded By The Actions Of The Other Branches ...................................................................... 8

     3.   The Attorney General's Certifications Under Section 802 Seek To Nullify The Supreme Court's And This Court's Constitutional Decisions ........................ 9

II.  SECTION 802 VIOLATES THE SEPARATION OF POWERS BY GIVING THE EXECUTIVE UNLIMITED DISCRETION TO CHANGE THE LAW GOVERNING THESE LAWSUITS AND BY USURPING THE COURT'S POWER TO INDEPENDENTLY DETERMINE THE FACTS ................................................. 13

   A.   Section 802 Unconstitutionally Abdicates To The Executive The Core Legislative Power Of Changing The Law Governing These Actions ............. 13

     1.   Section 802 Delegates To The Executive The Power To Change Existing Law In Violation Of The Lawmaking Procedures Of Article I, Section 7 ............ 13

     2.   Section 802 Violates The Nondelegation Doctrine Because It Delegates Lawmaking To The Executive Without Any "Intelligible Principle" ............... 19

   B.   Section 802 Violates The Separation Of Powers By Permitting The Other Branches To Dictate To The Judicial Branch The Outcome In Individual Cases ........ 20

III. SECTION 802 IS UNCONSTITUTIONAL BECAUSE IT VIOLATES PLAINTIFFS' RIGHT TO DUE PROCESS ...................................................... 22

   A.   Plaintiffs' Causes Of Action Are Property And Liberty Interests Protected By The Due Process Clause ................................................ 22

   B.   Section 802(a) Violates Due Process By Denying Plaintiffs A *De novo* Decision By An Unbiased Judge ................................................... 23

   C.   Section 802(c) Violates Due Process By Denying Plaintiffs Meaningful Notice Of The Government's Basis For Seeking Dismissal And A Meaningful Opportunity To Oppose The Government's Arguments And Evidence ........................... 27

IV.  THE SECRECY PROVISIONS OF SECTION 802 VIOLATE THE FIRST AMENDMENT AND ARTICLE III ................................................. 31

-ii-

**V. EVEN IF SECTION 802 WERE CONSTITUTIONAL, THE GOVERNMENT HAS FAILED TO CARRY ITS BURDEN OF JUSTIFYING DISMISSAL UNDER SECTION 802** ........................................................................................................................ **36**

   A.  THE COURT MUST REVIEW THE ENTIRE RECORD ............................................... 36

   B.  THERE IS NOT SUBSTANTIAL EVIDENCE IN SUPPORT OF DISMISSAL .................................. 39

      1.  There Is Not Substantial Evidence Supporting Dismissal Under Section 802(a)(5) ........ 39

      2.  Dismissal Under Section 802(a)(4) Is Improper Because There Is Not Substantial Evidence That The Dragnet Surveillance Was Designed To Detect Or Prevent A Terrorist Attack Against The United States ............................................................................................ 43

      3.  There Is Not Substantial Evidence Supporting Dismissal Under Any Other Provision Of Section 802(a) ............................................................................................................... 46

   C.  THE ATTORNEY GENERAL'S ACTIONS MUST ALSO SATISFY THE APA ............................. 48

   D.  PLAINTIFFS ARE ENTITLED TO DISCOVERY TO REBUT THE GOVERNMENT'S SHOWING ....... 49

No. M-06-01791-VRW    MDL PLAINTIFFS' OPPOSITION TO
MOTION OF THE UNITED STATES SEEKING TO APPLY 50 U.S.C.
§ 1885a TO DISMISS THESE ACTIONS

# TABLE OF AUTHORITIES

**CASES**

*Alpha Epsilon Phi Tau v. City of Berkeley*, 114 F.3d 840 (9th Cir. 1997) .................................... 24

*American Fed'n of Gov't Employees Local 1 v. Stone*, 502 F.3d 1027 (9th Cir. 2007) .................... 3

*American-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045 (9th Cir. 1995)................ 29, 30

*Ass'n for Reduction of Violence v. Hall*, 734 F.2d 63 (1st Cir. 1984)........................................ 30

*Associated Press v. U.S. Dist. Ct.*, 705 F.2d 1143 (9th Cir. 1983)................................................. 32

*Bane v. Spencer*, 393 F.2d 108 (1st Cir. 1968)........................................................................... 30

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) .................................................................... 8

*Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001) .................................................. 8

*Bell v. Hood*, 327 U.S. 678 (1946) .............................................................................................. 3

*Berger v. New York*, 388 U.S. 41 (1967) ..........................................................................7, 8, 41

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) .......... 4, 5

*Boumediene v. Bush*, 533 U.S. ___, 128 S.Ct. 2229 (2008) ...............................................passim

*Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667 (1986)............................................ 4

*Brock v. Roadway Express, Inc.*, 481 U.S. 252 (1987) .............................................................. 28

*Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165 (6th Cir. 1983)........................... 32

*Butterworth v. Smith*, 494 U.S. 624 (1990)............................................................................... 36

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971) ............................................. 37

*City of Boerne v. Flores*, 521 U.S. 507 (1997).......................................................................... 8, 9

*Clements v. Airport Auth. of Washoe County*, 69 F.3d 321 (9th Cir. 1995) .............................. 23

*Cleveland Bd. of Edu. v. Loudermill*, 470 U.S. 532 (1985) ....................................................... 28

*Clinton v. City of New York*, 524 U.S. 417 (1998) .............................................................passim

*Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602 (1993).......23, 24, 25, 26

*Cooper v. Aaron*, 358 U.S. 1 (1958)........................................................................................... 8

*Crowell v. Benson*, 285 U.S. 22 (1932) ............................................................................... 13, 21

*Dickerson v. United States*, 530 U.S. 428 (2000).................................................................. 9, 13

*Doe v. Ashcroft*, 334 F.Supp.2d 471 (S.D.N.Y 2004) ............................................................... 35

-iv-

1    *Doe v. Gonzales*, 386 F.Supp.2d 66 (D. Conn. 2005) ............................................... 35

2    *Doe v. Gonzales*, 449 F.3d 415 (2d Cir. 2006)................................................................ 35

3    *Doe v. Gonzales,* 500 F.Supp.2d 379 (S.D.N.Y. 2007) ........................................... 36, 47

4    *Duncan v. La.*, 391 U.S. 145 (1968) ................................................................................. 22

5    *Ecology Center v. Castaneda*, 426 F.3d 1144 (9th Cir. 2005)................................20, 21, 22

6    *Ex parte Milligan*, 71 U.S. 2 (1866) ................................................................................... 6

7    *Flores-Miramontes v. I.N.S.*, 212 F.3d 1133 (9th Cir. 2000) .............................................. 5

8    *Freedman v. Maryland*, 380 U.S. 51 (1965) ..................................................................... 34

9    *George v. Carusone*, 849 F.Supp. 159 (D. Conn. 1994).................................................... 41

10   *Gilmore v. California*, 220 F.3d 987 (9th Cir. 2000)........................................................... 9

11   *Globe Newspapers v. Superior Court*, 457 U.S. 596 (1982) ............................................ 33

12   *Goldberg v. Kelly*, 397 U.S. 254 (1970) ...........................................................23, 28, 29, 30

13   *Goss v. Lopez*, 419 U.S. 565 (1975) ................................................................................ 29

14   *Greenya v. George Washington Univ.*, 512 F.2d 556 (D.C. Cir. 1975) ............................... 4

15   *Grove Fresh Distrib. v. Everfresh Juice Co.*, 24 F.3d 893 (7th Cir. 1994) ................... 32, 33

16   *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) .................................................................passim

17   *Hartford Courant Co. v. Am. Lawyer Media, Inc.*, 380 F.3d 83 (2d Cir. 2004 ) .............. 32

18   *Hartman v. Moore*, 547 U.S. 250 (2006) ........................................................................... 4

19   *Hepting v. AT&T Corp.*, 439 F.Supp.2d 974 (N.D. Cal. 2006).................................passim

20   *Hornsby v. Allen*, 326 F.2d 605 (5th Cir. 1964) ............................................................... 29

21   *I.N.S. v. Chadha*, 462 U.S. 919 (1983) .......................................................................14, 15

22   *I.N.S. v. St. Cyr*, 533 U.S. 289 (2001) ............................................................................... 5

23   *In Matter of Application of U.S. For an Order Authorizing the Installation and Use of a Pen*
     *Register and a Trap & Trace Device on E-Mail Account,* 416 F.Supp.2d 13 (D.D.C. 2006) ..... 42

24

25   *In re Application of  U.S. for an Order Authorizing the Use of a Pen Register & Trap,* 396
     F.Supp.2d 45, 48 (D. Mass. 2005)..................................................................................... 42

26   *In re Cont'l Ill. Sec. Lit.*, 732 F.2d 1302 (7th Cir. 1984) ................................................... 32

27   *In re Murchison*, 349 U.S. 133 (1955) .............................................................................. 23

28   *In re Washington Post*, 8 (4th Cir. 1986) .......................................................................... 34

-v-

No. M-06-01791-VRW    MDL Plaintiffs' Opposition To
                          Motion Of The United States Seeking To Apply 50 U.S.C.
                           § 1885a To Dismiss These Actions

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607 (1980).................................. 19

*Jacobson v. Rose*, 592 F.2d 515 (9th Cir. 1978) .................................................. 41

*Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221 (1986) ........................ 48

*Katz v. U.S.*, 389 U.S. 347 (1967)................................................................ 7, 41

*Kenneally v. Lungren*, 967 F.2d 329 (9th Cir. 1992)............................................ 24

*Kinoy v. Mitchell*, 67 F.R.D. 1 (S.D.N.Y. 1975) ................................................ 30

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ......................................... 22, 31

*Lynn v. Regents of Univ. of Cal.*, 656 F.2d 1337 (9th Cir. 1981) ............................. 28, 29

*Marbury v. Madison*, 5 U.S. 137, 163 (1803) .............................................passim

*Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892)......................................14, 15, 16, 19

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980) .............................................. 25

*Mayfield v. U.S.*, 504 F.Supp.2d 1023 (D. Or. 2007) ......................................... 11

*Metropolitan Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise*, 501 U.S. 252 (1991) ................................................................................. 19

*Miranda v. Arizona*, 384 U.S. 436 (1966)...................................................... 9

*Mistretta v. U.S.*, 488 U.S. 361 (1989) ...................................................... 20

*Morgan v. United States*, 304 U.S. 1 (1938) ................................................. 28

*Nat'l Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521 (10th Cir. 1994)...................... 4

*NBC Subsidiary (KNBC-TV), Inc. v. Super. Ct.*, 20 Cal.4th 1178 (1999) ........................ 33

*Pacemaker Diagnostic Clinic, Inc. v. Instromedix, Inc.*, 725 F.2d 537 (9th Cir. 1984)................. 22

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) ........................................... 20

*Penny v. Sullivan*, 2 F.3d 953 (9th Cir. 1993) .............................................. 36

*Pub. Power Council v. Johnson*, 674 F.2d 791 (9th Cir. 1982) ................................. 37

*Publicker Indus. v. Cohen*, 733 F.2d 1059 (3d Cir. 1984) .................................... 32

*Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429 (1992)................................18, 20, 21

*Rushford v. New Yorker Magazine*, 846 F.2d 249 (4th Cir. 1988) ........................... 32, 33

*Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194 (9th Cir. 2008) ................................. 26

*San Jose Mercury News v. U.S. Dist. Ct.*, 187 F.3d 1096  (9th Cir 1999)...................... 33

-vi-

1  *Sanders v. Robert Bosch Corp.*, 38 F.3d 736 (4th Cir. 1994) ...................................... 41

2  *Save Our Valley v. Sound Transit*, 335 F.3d 932 (9th Cir. 2003) .............................. 14

3  *Sousa v. Callahan*, 143 F.3d 1240 (9th Cir. 1998) .................................................. 36

4  *Stivers v. Pierce* 71 F.3d 732 (9th Cir. 1995) .......................................................... 24

5  *Swann v. Charlotte-Mecklenburg Bd. of Edu.*, 402 U.S. 1 (1971) ............................... 3

6  *Thompson v. U.S. Dept. of Labor,* 885 F.2d 551 (9th Cir. 1989) ............................. 37

7  *Thornhill v. Alabama*, 310 U.S. 88 (1940) .................................................................. 8

8  *Touby v. United States*, 500 U.S. 160 (1991) ........................................................ 19

9  *Trudeau v. F.T.C.*, 456 F.3d 178 (D.C. Cir. 2006) .................................................. 3

10  *Tulsa Prof'l Collection Services, Inc. v. Pope*, 485 U.S. 478 (1988) ...................... 22

11  *U.S. v. Carpenter*, 526 F.3d 1237 (9th Cir. 2008) .................................................. 48

12  *U.S. v. Forrester*, 495 F.3d 1041 (9th Cir. 2007) .................................................. 42

13  *U.S. v. Klein*, 80 U.S. 128 (1872) ............................................................................. 20

14  *U.S. v. Luong*, 471 F.3d 1107 (9th Cir. 2006) ........................................................ 40

15  *U.S. v. Moussaoui*, 65 Fed.Appx. 881 (4th Cir. 2003) ............................................ 34

16  *U.S. v. Rodriguez*, 968 F.2d 130 (2d Cir. 1992) .................................................... 41

17  *U.S. v. Sioux Nation of Indians*, 448 U.S. 371 (1980) .......................................... 20

18  *U.S. v. U. S. Dist. Ct. (Keith)*, 407 U.S. 297 (1972) .....................................passim

19  *U.S. v. Dalpiaz*, 527 F.2d 548 (6th Cir. 1975)................................................. 44, 45

20  *U.S. v. Fredman*, 833 F.2d 837 (9th Cir. 1987) .................................................... 44

21  *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474 (1951)............................... 26, 36

22  *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 501 (1982)............ 45

23  *Webster v. Doe*, 486 U.S. 592 (1988) ................................................................. 4, 5

24  *West Ohio Gas Co. v. Public Utilities Commission (No. 1),* 294 U.S. 63 (1935) .......................... 28

25  *Westmoreland v. C.B.S.*, 752 F.2d 16 (2d Cir. 1984) .......................................... 32

26  *White v. Lee*, 227 F.3d 1214 (9th Cir. 2000) ........................................................... 4

27  *Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001)............................. 14, 19

28  *Yakus v. United States*, 321 U.S. 414 (1944) .................................................. 19, 20

-vii-

1    *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ................................................. 14

2    **STATUTES**

3    18 U.S.C. § 2510 ...................................................................................................... 13

4    18 U.S.C. § 2510(4) .................................................................................................. 45

5    18 U.S.C. § 2510(8) .................................................................................................. 47

6    18 U.S.C. § 2511(2)(a)(ii)(B) ............................................................................ 12, 52

7    18 U.S.C. § 2520 ................................................................................................ 17, 19

8    18 U.S.C. § 2707 ................................................................................................ 17, 19

9    18 U.S.C. § 2709(b) ........................................................................................... 52, 53

10   18 U.S.C. § 2709(c) ........................................................................................... 40, 41

11   26 U.S.C. § 5845(f) .................................................................................................. 50

12   28 U.S.C. § 1331 ........................................................................................................ 3

13   47 U.S.C. § 605 ............................................................................................. 17, 19, 34

14   5 U.S.C. § 551 ......................................................................................................... 54

15   5 U.S.C. § 704 ......................................................................................................... 54

16   5 U.S.C. § 706 .................................................................................................... 54, 55

17   50 U.S.C. § 1801(a)(4) ............................................................................................ 51

18   50 U.S.C. § 1801(f)(2) ............................................................................................ 45

19   50 U.S.C. § 1801(n) ................................................................................................ 48

20   50 U.S.C. § 1802(a)(1)(A) ...................................................................................... 53

21   50 U.S.C. § 1802(a)(4) ............................................................................................ 53

22   50 U.S.C. § 1803(a) ................................................................................................. 52

23   50 U.S.C. § 1805b(a) .............................................................................................. 54

24   50 U.S.C. § 1805b(e) .............................................................................................. 53

25   50 U.S.C. § 1806(f) ................................................................................................. 56

26   50 U.S.C. § 1810 ............................................................................................... 17, 19

27   50 U.S.C. § 1881a(a) .............................................................................................. 54

28   50 U.S.C. § 1885a(a) ......................................................................................... 11, 45

-viii-

50 U.S.C. § 1885a(a)(1) ................................................................. 52

50 U.S.C. § 1885a(a)(2) ................................................................. 52

50 U.S.C. § 1885a(a)(3) ................................................................. 53

50 U.S.C. § 1885a(a)(4) ............................................................ 49, 51

50 U.S.C. § 1885a(b)(1) ............................................................ 12, 24

50 U.S.C. § 1885a(b)(2) ................................................................. 43

50 U.S.C. § 1885a(c) ............................................................ 35, 38, 43

50 U.S.C. § 1885a(d) ............................................................ 35, 38, 56

50 USC § 1881a(h) ....................................................................... 53

**CONSTITUTIONAL PROVISIONS**

Art. I, § 9 ................................................................................. 6

Art. I, §7 ............................................................................ 16, 19

**RULES**

Fed. R. Civ. Proc. 12(d) ................................................................ 55

Fed. R. Civ. Proc. 56(f) ................................................................ 55

-ix-

**INTRODUCTION**

That the nation's leading telecommunications carriers have been assisting the United States Government in warrantless, dragnet surveillance of their customers is an open secret—much more open than secret. The Administration itself has revealed much about this surveillance in public and in congressional testimony, as have many former Administration officials. Other pieces of the puzzle have been disclosed by members of Congress, as well as numerous other named and unnamed sources who participated in the surveillance, and by this country's most respected newspapers and reporters in a multitude of news stories and books. Still other pieces have been documented by Mark Klein, a former AT&T employee whose evidence has been analyzed and confirmed by expert J. Scott Marcus.

The question now before this Court is whether Congress can empower the Executive to exclude the Judiciary from considering the lawfulness of the telecommunications carriers' role in the Executive's well-documented program of warrantless surveillance and, if so, whether the novel and unprecedented scheme set up by section 802 of the Foreign Intelligence Surveillance Act constitutionally accomplishes this exclusion. At stake are the privacy rights of every American who trusts and uses the communication facilities of AT&T, MCI, Verizon, BellSouth, Cingular, or Sprint to transmit their most private and important thoughts. But also at stake is something equally fundamental—the role of the Judiciary in the constitutional structure of our government. For if Congress can give the Executive the power to exclude the Judiciary from considering the constitutional claims of millions of Americans, can abdicate to the Executive the authority to change the law applicable in specific litigation, and can prevent the Judiciary from making an independent determination of the facts and law in specific litigation, then the Judiciary will no longer be functioning as a co-equal branch of government.

Plaintiffs' opposition first addresses the constitutional defects of section 802. It explains that Congress cannot deny absolutely any judicial remedy for plaintiffs' constitutional claims, for those claims arise directly under the Constitution and are outside the power of Congress to extinguish. It next explains that the standardless discretion given to the Attorney General under section 802, which permits him to change the law applicable to these actions, or not, for any reason whatsoever, violates

-1-

the presentment and bicameralism provisions of Article I, section 7 of the Constitution, under which only Congress and not the Executive can change the law, as well as the nondelegation doctrine. In addition, by binding this Court to the factual findings of the Attorney General, section 802 unconstitutionally permits the executive and legislative branches to intrude upon the adjudicatory processes of the Judiciary. The opposition then lays out the reasons why the dismissal scheme of section 802 violates due process: Plaintiffs never receive an impartial hearing before an unbiased adjudicator free to make *de novo* determinations of fact and law; plaintiffs also are deprived of meaningful notice and a meaningful opportunity to be heard by the secret evidence provisions of section 802. The secret evidence and secret judicial opinion provisions of section 802 also violate the First Amendment.

Plaintiffs' opposition then examines why, even if section 802 were constitutional, the Attorney General has failed to met his evidentiary burden under the statute to sustain dismissal of these actions. Most of the Attorney General's evidence is inadmissible, as explained in plaintiffs' accompanying evidentiary objections. The meager weight of whatever remains is overcome by plaintiffs' evidence in opposition, summarized in plaintiffs' accompanying Federal Rule of Evidence section 1006 summary. When the entire record, stripped of the Attorney General's inadmissible evidence, is considered, it becomes clear that the Attorney General cannot carry his burden under any of the five grounds for dismissal set forth in section 802(a).

## ARGUMENT

**I.     Congress Lacks The Power To Eliminate Plaintiffs' Constitutional Claims By Statute**

**A.     Congress Cannot Deny Completely Any Remedy For Plaintiffs' First And Fourth Amendment Claims**

It is a fundamental and inextinguishable feature of our constitutional structure that there must be a judicial remedy available to provide relief to those who are injured by unconstitutional executive action. *Marbury v. Madison*, 5 U.S. 137, 163 (1803) ("The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury."). Yet by invoking section 802, the Attorney General purports to do precisely that: to deny plaintiffs any judicial remedy whatsoever, federal or state, for their constitutional

-2-

claims of First and Fourth Amendment violations.[1]

As Chief Justice Marshall's opinion in *Marbury* explains, the necessity of a judicial remedy for invasions of individual rights flows inexorably from the Judiciary's essential constitutional function in enforcing the constitutional limitations that circumscribe the actions of the Executive and the lLegislature. *Marbury*, 5 U.S. at 176-78. The Constitution "establish[es] certain limits not to be transcended by [the executive and legislative] departments." *Id.* at 176. The only way those constitutional limits can "confine the persons on whom they are imposed," *id.*, is if there is a judicial remedy available to enforce those limits. It is for that reason that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Id.* at 177. If Congress or the Executive is permitted to abolish every avenue of judicial relief for a constitutional violation, the Judiciary cannot perform this essential function. "To hold the political branches have the power to switch the Constitution on or off at will . . . [would] lead[] to a regime in which Congress and the President, not this Court, say 'what the law is.' " *Boumediene v. Bush*, 533 U.S. ___, 128 S.Ct. 2229, 2259 (2008).

Among the "limits not to be transcended" that the Constitution establishes are those set forth in the First and Fourth Amendments. Because of the rule of judicial redressability of constitutional violations, federal courts have the power to grant equitable relief for violations of these constitutional rights. " 'The power of the federal courts to grant equitable relief for constitutional violations has long been established.' " *American Fed'n of Gov't Employees Local 1 v. Stone*, 502 F.3d 1027, 1038 (9th Cir. 2007). " '[T]he court's power to enjoin unconstitutional acts by the government . . . is inherent in the Constitution itself[.]' " *Trudeau v. F.T.C.*, 456 F.3d 178, 190 n.22 (D.C. Cir. 2006) (ellipsis original); *see also Swann v. Charlotte-Mecklenburg Bd. of Edu.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("And it is established practice for this Court to

---

[1] Plaintiffs have stated constitutional claims under the First and Fourth Amendments seeking equitable relief and damages for warrantless dragnet surveillance of electronic communications and records. The Court has jurisdiction over plaintiffs' claims under 28 U.S.C. § 1331, which grants "jurisdiction over all actions arising under the Constitution." Section 802 does not purport to limit or restrict the Court's jurisdiction over claims arising under the Constitution.

-3-

sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution."); *Greenya v. George Washington Univ.*, 512 F.2d 556, 562 n.3 (D.C. Cir. 1975) ("If the Constitution creates a right, privilege, or immunity, it of necessity gives the proper party a claim for equitable relief if he can prevail on the merits.").

Courts also have the power to award damages for Fourth Amendment violations, *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 396 (1971), and for First Amendment violations that chill speech, *White v. Lee*, 227 F.3d 1214, 1239 (9th Cir. 2000); *see also Hartman v. Moore*, 547 U.S. 250, 254 n.2, 256 (2006) (*Bivens* remedy available for First Amendment violations); *Nat'l Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521, 1531 & n.4 (10th Cir. 1994) (same). In recognizing that the Constitution directly provides a monetary remedy for Fourth Amendment violations, the Supreme Court in *Bivens* relied upon *Marbury's* rule of judicial redressability. *Bivens*, 403 U.S. at 397. The Court in *Bivens* expressly linked the limits imposed by the Fourth Amendment to the necessity of a judicial remedy for enforcing those limits. The Court held that the Fourth Amendment "guarantees to citizens of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority. And 'where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.' " *Id.* at 392.

It is because of the rule of judicial redressability of constitutional violations that the Supreme Court has regularly warned that a " 'serious constitutional question' . . . would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988); *see also Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 681, n.12 (1986) (endorsing the view that " '[All] agree that Congress cannot bar all remedies for enforcing federal constitutional rights' "). In this same vein, the *Bivens* Court, in recognizing a damages remedy arising directly from the Constitution, noted that the remedy could be limited or precluded by Congress only if Congress created a substitute remedy that was "equally effective." 430 U.S. at 397. Because of the necessity of judicial redress for constitutional claims, the high court has consistently striven to find some avenue for judicial review of constitutional claims even when statutes appear to foreclose review. In *Webster*, for example, the Supreme Court held that the

-4-

constitutional claims of a terminated CIA employee were not prohibited by the National Security Act, notwithstanding that the statute expressly prohibited judicial review of an agency director's termination of employees.[2]  486 U.S. at 603-04; *see also I.N.S. v. St. Cyr*, 533 U.S. 289, 311, 314 (2001); *Flores-Miramontes v. I.N.S.*, 212 F.3d 1133, 1136, 1138 (9th Cir. 2000) (at 1136: "If he cannot raise [his constitutional claims] in any other federal court, then we must address them here in order to preserve a forum for them.").

When, however, Congress and the Executive have left open no path for adequate judicial review of constitutional claims, the Court has not hesitated to strike down the obstructions to judicial review the political branches have erected.  The Supreme Court did so just last term in *Boumediene v. Bush*, when it affirmed that Guantanamo detainees have the right to full judicial adjudication of their constitutional claims notwithstanding the attempts of Congress and the Executive to keep those claims out of court.  At issue in *Boumediene* were the Military Commissions Act (MCA) and the Detainee Treatment Act (DTA), in which Congress prohibited *habeas corpus* review of the legality of the detention of the detainees.  The Court held that the detainees were entitled to some form of judicial review of their constitutional claims.  128 S.Ct. at 2262.  The question then became whether the DTA's judicial review provision was an adequate substitute for *habeas corpus*.  *Id.* at 2262, 2266.  The DTA's narrow judicial review provision among other things forbade the courts from conducting any independent fact-finding, "limiting the scope of their collateral review to a record that may not be accurate or complete."  *Id.* at 2272-73.  The Supreme Court held that because of the restrictions on judicial review, the DTA was not an adequate substitute for habeas.  *Id.* at 2274, 2276.  Similar to its analysis in *Bivens*, the Court in *Boumediene* concluded that because Congress had not provided an "adequate and effective substitute" remedy in the DTA's restricted judicial

---

[2] In rejecting the government's argument for dismissal in *Webster*, the Supreme Court held that the constitutional claims must be allowed despite recognizing "the extraordinary needs of the CIA for confidentiality and the protection of its methods, sources, and mission."  486 U.S. at 604.  The Court expressly recognized that district courts could be trusted to control discovery and balance the challenger's need for proof against the government's need for secrecy.  *Id.*  Thus, national security needs are not a sufficient basis to deny a judicial remedy for constitutional claims.

-5-

review provisions, *habeas corpus* remained available to review the detainees' constitutional claims.[3] *Id.* at 2274-76.

Here, as in *Boumediene*, Congress has refused to provide any alternative forum or remedy for plaintiffs' constitutional claims. Section 802 instead attempts to give the Attorney General the power to deny plaintiffs any judicial forum, federal or state, for their constitutional claims regardless of the merits of those claims through the filing of a certification and a puppet show of judicial involvement. This procedure is constitutionally invalid because it violates the rule of *adequate and effective* judicial redressability of constitutional violations.

The First and Fourth Amendments are essential bulwarks sheltering individual liberty against the aggrandizement of executive power. To permit the massive constitutional violations that have occurred here to go unreviewed and unremedied would be to wreak havoc with our constitutional structure and allow the invasion of the rights of millions over more than seven years to go unchecked. The only possible response to the government's attempt to use section 802 to foreclose litigation of plaintiffs' constitutional claims is the one that Chief Justice Marshall gave over 200 years ago: "The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." *Marbury*, 5 U.S. at 163.

**B.    Neither Congress Nor the Executive May Act As The Final Arbiter Of What The First And Fourth Amendments Require**

Neither the Attorney General nor Congress may rewrite the First or Fourth Amendments, or nullify the Judiciary's interpretations of those amendments. Yet that is precisely what section 802(a)

---

[3] Notably, *habeas corpus* is a limited exception to the rule of judicial redressability of constitutional violations because the Constitution itself provides that under narrow circumstances Congress can suspend the writ. *See* Const. Art. I, § 9, cl. 2; *Ex parte Milligan*, 71 U.S. 2, 125 (1866) ("Not one of these [constitutional] safeguards can the President, or Congress, or the Judiciary disturb, except the one concerning the writ of *habeas corpus*."). Yet, as *Boumediene* confirmed, if Congress fails to hew precisely to the requirements of the Suspension Clause, any attempt by it to entirely foreclose judicial relief for an unconstitutional detention fails because the rule of judicial redressability for constitutional violations then applies. Surely, then, if judicial redressability of constitutional violations cannot be foreclosed under an express exception in the Constitution except where the terms of the exception are adhered to strictly, it cannot be foreclosed in plaintiffs' actions where the Constitution makes no exception whatsoever.

-6-

purports to do.  In enacting section 802(a), Congress has unconstitutionally attempted to make itself

and the executive branch the final arbiters of what the First and Fourth Amendments require.

     **1.**    **The Fourth and First Amendment Jurisprudence Governing These Cases Is Well-Established**

Warrantless dragnet surveillance of domestic communications violates the Fourth

Amendment.  *See U.S. v. U.S. Dist. Ct. (Keith)*, 407 U.S. 297, 312-13 (1972) ("the Fourth

Amendment . . . shields private speech from unreasonable surveillance"); *Katz v. U.S.*, 389 U.S. 347,

352 (1967); *Berger v. New York*, 388 U.S. 41, 55 (1967).  As this Court stated in *Hepting*:

> In . . . *Keith*, the Supreme Court held that the Fourth Amendment does not permit
> warrantless wiretaps to track domestic threats to national security, *id.* at 321,
> reaffirmed the 'necessity of obtaining a warrant in the surveillance of crimes
> unrelated to the national security interest,' *id*. at 308, and did not pass judgment 'on
> the scope of the President's surveillance power with respect to the activities of
> foreign powers, within or without this country,' *id.*  Because the alleged
> dragnet here encompasses the communications of 'all or substantially all of the
> communications transmitted through AT&T's key domestic telecommunications
> facilities,' it cannot reasonably be said that the program as alleged is limited to
> tracking foreign powers.  Accordingly, AT&T's alleged actions here violate the
> constitutional rights clearly established in *Keith*.  Moreover, because 'the very
> action in question has previously been held unlawful,' AT&T cannot seriously
> contend that a reasonable entity in its position could have believed that the alleged
> domestic dragnet was legal.

*Hepting v. AT&T Corp.*, 439 F.Supp.2d 974, 1010 (N.D. Cal. 2006) (parentheses and brackets

omitted).

The *Keith* Court specifically rejected a scheme that left to the Executive the decision

whether to wiretap:  "[T]hose charged with this investigative and prosecutorial duty should not be

the sole judges of when to utilize constitutionally sensitive means in pursuing their tasks.  The

historical judgment, which the Fourth Amendment accepts, is that unreviewed executive

discretion may yield too readily to pressures to obtain incriminating evidence and overlook

potential invasions of privacy and protected speech."  *Keith*, 407 U.S. at 317.  Nor is limited after-

the-fact judicial review, as proposed by the government in *Keith,* a permissible alternative to

compliance with the Fourth Amendment.  "The Fourth Amendment contemplates a prior judicial

judgment, not the risk that executive discretion may be reasonably exercised.  This judicial role

accords with our basic constitutional doctrine that individual freedoms will best be preserved

-7-

through a separation of powers and division of functions among the different branches and levels of Government." *Id.; see also Berger*, 388 U.S. at 55.

Warrantless government surveillance not only violates the Fourth Amendment, it also implicates First Amendment rights: "The price of lawful public dissent must not be a dread of subjection to an unchecked surveillance power. Nor must the fear of unauthorized official eavesdropping deter vigorous citizen dissent and discussion of Government action in private conversation." *Keith*, 407 U.S. at 313. Thus, the Supreme Court long has recognized the chilling effect of government surveillance on private speech. *Id.; see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963) ("It is characteristic of the freedoms of expression in general that they are vulnerable to gravely damaging yet barely visible encroachments."). The danger to speech from unauthorized official surveillance parallels the danger of official censorship, which lies "not merely in the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence." *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).

> **2.  The Judicial Interpretations Of The Constitution In *Keith* And Similar Cases Are Controlling, And May Not Be Nullified Or Superseded By The Actions Of The Other Branches**

It is the Judiciary's duty "to interpret the Constitution in a case or controversy." *City of Boerne v. Flores*, 521 U.S. 507, 524 (1997); *see also Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 365 (2001) (affirming "the long-settled principle that it is the responsibility of [the Supreme] Court, not Congress, to define the substance of constitutional guarantees"). This principle of judicial supremacy in constitutional interpretation follows from 200 years of precedent establishing that the Supreme Court's constitutional interpretations are "the supreme law of the land." *Cooper v. Aaron*, 358 U.S. 1, 18 (1958).

Once the Judiciary has spoken, as it has here, the other branches may not take actions that have the effect of nullifying the Judiciary's constitutional interpretation and superseding it with their own, different judgment. *Boerne* is illustrative. There, Congress passed a law requiring states to exempt religious believers from neutral laws of general applicability, even though the Supreme Court had ruled that the First Amendment's Free Exercise Clause permitted states to require such compliance. The Supreme Court held that Congress could not do so because the statute "attempt[ed]

-8-

a substantive change in constitutional protections." *Boerne*, 521 U.S. at 532. "When the political branches of the Government act against the background of a judicial interpretation of the Constitution already issued, it must be understood that in later cases and controversies the Court will treat its precedents with the respect due them under settled principles . . . ." *Id.* at 536.

Similarly, in *Dickerson v. U.S.*, 530 U.S. 428 (2000), the Supreme Court struck down a statute that attempted to dispense with the requirement set forth in *Miranda v. Arizona*, 384 U.S. 436 (1966), that suspects be warned that their admissions could be used against them: "Congress may not legislatively supersede our decisions interpreting and applying the Constitution." 530 U.S. at 437; *see also Gilmore v. California*, 220 F.3d 987, 1002-03 (9th Cir. 2000) (holding that Congress was free to change the procedural standards for prison cases by statute, but it could not "declare whether certain prison conditions violate the Eighth Amendment's prohibition against cruel and unusual punishment" and could not enact "restrictions on the [constitutional] remedy [that] prevent vindication of the right"). Congress can no more mandate dismissal of plaintiffs' Fourth and First Amendment claims in these cases than it could mandate how the Free Exercise Clause should be applied in *Boerne* or how the Fifth Amendment should be applied in *Dickerson*.

### 3. The Attorney General's Certifications Under Section 802 Seek To Nullify The Supreme Court's And This Court's Constitutional Decisions

The effect of the Attorney General's certifications under section 802 is to "make a substantive change in the governing law," *Boerne*, 521 U.S. at 519, and to "legislatively supersede [judicial] decisions interpreting and applying the Constitution." *Dickerson*, 530 U.S. at 437. Under section 802, those who collaborate with the executive branch no longer need comply with the Supreme Court's decisions in *Keith* and other cases interpreting the First and Fourth Amendments. Instead, the Attorney General can establish a different standard of conduct for surveillance of communications content and records: The government need provide only one of the four types of pieces of paper listed in subsection (a)(1) through (a)(4) of section 802 (as codified at 50 U.S.C. §§ 1885a(a)(1-4), regardless of whether the surveillance or the piece of paper purporting to authorize it actually complies with the First and Fourth Amendments, including the warrant and probable cause requirements.

-9-

Section 802(a) authorizes the government to seek dismissal of any civil action against any person for "providing assistance to an element of the intelligence community" if the Attorney General makes a certification to the district court that one of the following five circumstances is true:

> (1)  any assistance by that person was provided pursuant to an order of the court established under section 103(a) directing such assistance;
>
> (2)  any assistance by that person was provided pursuant to a certification in writing under section 2511(2)(a)(ii)(B) or 2709(b) of title 18, United States Code;
>
> (3)  any assistance by that person was provided pursuant to a directive under section 102(a)(4), 105B(e), as added by section 2 of the Protect America Act of 2007 (Public Law 110-55) or 702(h) directing such assistance;
>
> (4)  in the case of a covered civil action, the assistance alleged to have been provided by the electronic communication service provider was–
>
> > (A)  in connection with an intelligence activity involving communication that was—
> >
> > > (i) authorized by the President during the period beginning on September 11, 2001 and ending on January 17, 2007; and
> > >
> > > (ii) designed to detect or prevent a terrorist attack, or activities in preparation for a terrorist attack, against the United States; and
> >
> > (B)  the subject of a written request or directive, or a series of written requests or directives, from the Attorney General . . . to the electronic communication service provider indicating that the activity was—
> >
> > > (i) authorized by the President; and
> > >
> > > (ii) determined to be lawful; or
>
> (5)  the person did not provide the alleged assistance.

50 U.S.C. § 1885a(a).

The Attorney General has certified a portion of the communications content claims under subsection (a)(5) (Dkt. No. 469-3 at 5:7-21).  The Attorney General has not made public which of the five possible grounds his certification of the communication records claims rests upon.  Dkt. No. 469-3 at 6:8-18.

None of section 802(a)'s provisions meet the Fourth Amendment requirements imposed by the Court in *Keith* and similar decisions, nor could they validly authorize the activities at issue in these actions.  The evidence shows a warrantless domestic surveillance program involving the dragnet acquisition of communications (including both content and non-content information) by surveillance devices, as well as the disclosure of communications records (the "Program" of

-10-

warrantless domestic surveillance).  Quite simply, no statutory authority that authorizes years-long, ongoing, warrantless interception of ordinary Americans' daily communications and communications records could *ever* comply with constitutional requirements.  To the extent that section 802 purports to do this, it is unconstitutional.

Under subsection (a)(4), for example, the Attorney General need only certify that the surveillance was "the subject of a written request or directive . . . from the Attorney General or the head of an element of the intelligence community . . . [and] was (i) authorized by the President; and (ii) determined to be lawful."  Section 802(b)(1), codified at 50 U.S.C. § 1885a(b)(1), then requires the court to dismiss the claims, *regardless of whether plaintiffs have shown a Fourth Amendment violation*, so long as there is "substantial evidence" that the defendant *was advised* that the surveillance "was . . . determined to be lawful."  The "determiner" of lawfulness who lurks in that passive construction is plainly not a member of the Judiciary, as *Keith* requires, but seemingly could have been anyone.  Subsection (a)(4) thus fails to meet *Keith's* constitutional standards because it does not require any prior judicial review and issuance of a warrant before the surveillance occurs.

Nor do subsections (a)(1) through (a)(3) meet *Keith's* constitutional standards.  All are statutory defenses that fail to require prior issuance of a warrant based on probable cause, and (a)(2) and (a)(3) are merely certification that other statutory provisions were followed.  This Court has already recognized prior to the enactment of section 802 that constitutional claims cannot be barred by statutory defenses:  "it is doubtful whether plaintiffs' *constitutional* claim would be barred by a valid certification under section 2511(2)(a)(ii)."  *Hepting*, 439 F.Supp.2d at 995 (emphasis original).[4]

The Attorney General's certification under subsection (a)(5) for a portion of the content claims seeks to evade the constitutional provisions of *Keith* in a different way, by artificially narrowing and thereby mischaracterizing plaintiffs' allegations so that it can then attempt to deny them.  Specifically the Attorney General denies only:  "Dragnet collection of the **content** of

---

[4] *See also Mayfield v. United States,* 504 F.Supp.2d 1023 (D. Or. 2007), where the court held that several FISA provisions, as amended by the USA Patriot Act, violate the Fourth Amendment in part for failing to meet the probable cause requirement.

-11-

'millions of communications made or received by people inside the United States' *for the purpose of analyzing those communications through key word searches to obtain information about possible terrorist attacks.*" Dkt. No. 469-3 at 4:5-8 (underlining and bolding in original; italics added).

This denial misconstrues plaintiffs' allegations, which are not limited to the interception of communications content *for the purpose of* conducting "key word searches," or *for the purpose of* obtaining "information about possible terrorist attacks." *See Hepting* FAC ¶¶ 41-47; *Verizon* Compl. ¶¶ 167-168, 173-176; *BellSouth* Compl. ¶¶ 66-67, 72-75; *Cingular* FAC ¶¶ 55-56, 61-64; and *Sprint* Compl. ¶¶ 46-47, 52-55 (alleging carriers' assistance in content dragnet, without description of government's use of content post-acquisition); *see also Hepting* FAC ¶¶ 78-109; *Verizon* Compl. ¶¶ 228-234, 242-262; *BellSouth* Compl. ¶¶ 127-132, 140-160; *Cingular* FAC ¶¶ 118-123, 131-151; and *Sprint* Compl. ¶¶ 100-105, 113-133 (stating claims for violation of Constitution, FISA, and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* ("Title III"), without description of government's use of content post-acquisition). That plaintiffs' complaints additionally allege that the government is conducting key word searches on the acquired content is— as this Court has already recognized—ultimately irrelevant to plaintiffs' claims, which center on the *defendants'* conduct. *See Hepting*, 439 F.Supp.2d at 999.

More important, the failure of the Attorney General to define the phrase "collection of content" indicates that he may be subsuming within his certification a dangerous new interpretation of the Constitution and the surveillance statutes: that, even where the government uses surveillance devices to acquire the communications of millions of individuals as part of a suspicionless dragnet, there is no government search or seizure of communications content—nor any "intercept" or "electronic surveillance" under Title III or FISA, respectively—unless and until those contents are processed by the government's computers, or made available for use by a human analyst. *See* FRE 1006 Summary of Voluminous Evidence ("Summary") at p. 18-19 (under Department of Defense regulations, information is only considered to be "collected" after it has been "received for use by an employee of a DoD intelligence component," and "[d]ata acquired by electronic means is 'collected' only when it has been processed into intelligible form."); *see also* Summary, Section IV (evidence providing factual context for government statements about the Program).

-12-

Plaintiffs strongly disagree, for the reasons stated in section V below, with any contention that Title III, FISA, or the Constitution fail to reach the wholesale acquisition of communications content and only protect those communications that are scanned for particular key words or selected for review by a human. But under section 802, this critical and unprecedented question of constitutional and statutory interpretation is left to the Attorney General.

Thus, section 802 runs directly counter to the Fourth Amendment's requirement that surveillance requires prior judicial scrutiny by a neutral and detached magistrate. *Keith*, 407 U.S. at 317, 320. Instead, it grants the Executive the power to compel dismissal of constitutional claims without any judicial determination, either before or after the surveillance, of the facts as to what surveillance is actually occurring or of the constitutionality of the surveillance.

Although the Constitution requires the Judiciary to determine "all questions, both of fact and law, necessary to the performance of that supreme function" of "enforc[ing] constitutional rights" (*Crowell v. Benson*, 285 U.S. 22, 60 (1932)), section 802 requires the dismissal of constitutional claims even where there has been a constitutional violation. In that regard, section 802 bears an uncanny resemblance to the surveillance regime the Executive proposed in *Keith* and the Supreme Court rejected as unconstitutional: " ' 'extremely limited' post-surveillance judicial review" in lieu of the constitutionally required "prior judicial judgment" and issuance of a warrant based on probable cause. 407 U.S. at 317-18. The Court held this proposal failed to satisfy the constitutional requirement for an "independent [judicial] check upon executive discretion." *Id.* As the Executive impermissibly sought to do in *Keith,* section 802 impermissibly seeks to "legislatively supersede [the Court's] decisions interpreting and applying the Constitution." *Dickerson*, 530 U.S. at 437.

**II.     Section 802 Violates The Separation Of Powers By Giving The Executive Unlimited Discretion To Change The Law Governing These Lawsuits And By Usurping The Court's Power To Independently Determine The Facts**

> **A.     Section 802 Unconstitutionally Abdicates To The Executive The Core Legislative Power Of Changing The Law Governing These Actions**

> > **1.     Section 802 Delegates To The Executive The Power To Change Existing Law In Violation Of The Lawmaking Procedures Of Article I, Section 7**

The separation of powers "serves not only to make Government accountable but also to

-13-

secure individual liberty." *Boumediene*, 128 S.Ct. at 2246. The principles of separation of powers are as familiar as they are fundamental. One of these is the exclusivity of Congress's power to make law. "[I]t is an elementary principle of constitutional law that lawmaking is the province of Congress." *Save Our Valley v. Sound Transit*, 335 F.3d 932, 937 (9th Cir. 2003). "Article I, § 1, of the Constitution vests 'all legislative Powers herein granted . . . in a Congress of the United States.' This text permits no delegation of those powers . . . ." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 472 (2001).

Congress's exclusive power to make law cannot be shared with the Executive. "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952), quoted with approval in *I.N.S. v. Chadha*, 462 U.S. 919, 954 n.16 (1983). "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). "That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892).

One means by which the Constitution enforces the exclusivity of Congress's lawmaking power is by the mandatory procedures for the enactment and repeal of statutes set forth in Article I, section 7, which include bicameral passage and presentment. The Supreme Court applied the black-letter constitutional limitations imposed by Article I, section 7 in *Clinton*. At issue in *Clinton* was a statute that gave the President unlimited discretion to exercise a line-item veto, thereby depriving the portion of the appropriations statute containing the vetoed appropriation of any " 'legal force or effect,' " although the rest of the statute remained effective. *Clinton*, 524 U.S. at 438. The Court held that "cancellations [of appropriations] pursuant to the Line Item Veto Act are the functional equivalent of partial repeals of Acts of Congress that fail to satisfy Article I, §7." *Id*. at 444.

The *Clinton* Court contrasted the unconstitutional line-item veto statute with the tariff suspension statute found constitutional in *Marshall Field & Co. v. Clark*. The statute in *Field* was constitutional because by it Congress compelled the President to suspend certain tariffs upon the

-14-

occurrence of certain triggering facts; once the facts occurred, he had no discretion whether to suspend the tariffs. "[W]hen enacting the statutes discussed in *Field*, Congress itself made the decision to suspend or repeal the particular provisions at issue upon the occurrence of particular events subsequent to enactment, and it left only the determination of whether such events occurred up to the President. The Line Item Veto Act authorizes the President himself to effect the repeal of laws, for his own policy reasons, without observing the procedures set out in Article I, § 7. The fact that Congress intended such a result is of no moment." *Clinton*, 524 U.S. at 445; *accord, I.N.S. v. Chadha*, 462 U.S. at 954 ("Amendment and repeal of statutes, no less than enactment, must conform with Art. I.").

Here, section 802 violates the lawmaking procedures of Article I, section 7 because the Executive and not Congress is changing the law applicable to these actions. This is not a typical delegation case in which Congress has given the Executive a blank slate to fill in and the question is whether Congress has adequately instructed the Executive in how to fill in the blanks. Instead, as in *Clinton*, Congress has given the Executive a slate Congress has already written upon, with discretion to erase the slate but with no direction on whether or not to erase it. Whatever freedom Congress possesses to let the Executive make rules on matters to which it has not spoken, on matters on which Congress has spoken it cannot delegate the power to amend or repeal its words to the Executive, as *Clinton* holds.

Section 802 itself does not change one comma of the causes of action that plaintiffs have sued upon. The day after the President signed the FISA Amendments Act of 2008 (FISAAA"), those causes of action remained the same and continued to apply to these actions in exactly the same manner in which they had applied the day before the President signed FISAAA. In the words of the government and the defendants: "Nothing in the Act requires the Attorney General to exercise his discretion to make the authorized certifications, and until he actually decides to invoke the procedures authorized by Congress, the Act would have no impact on this litigation." Dkt. No. 466 at 22 n.16. Thus, *Congress* has not changed the law governing plaintiffs' causes of action.

Instead, it is the Attorney General who has changed the law. By the act of filing certifications in this Court, the Attorney General has purported to amend the statutes governing

-15-

plaintiffs' actions long after Congress enacted FISAAA and the President signed it. The statutory provisions governing plaintiffs' federal statutory causes of action are different today than they were the day before the Attorney General filed these certifications. For these plaintiffs and defendants and these lawsuits only, 50 U.S.C. § 1810, 18 U.S.C. §§ 2520, 2707, and 47 U.S.C. § 605 no longer impose any liability. The same holds true for the constitutional and state law causes of action on which plaintiffs have sued; for these plaintiffs and defendants and these lawsuits only, those causes of action no longer impose any liability.

In particular, section 802 purports to give the Attorney General two stages of utterly standardless and unreviewable discretion in deciding whether to change the law governing these actions. First, it is entirely up to the Attorney General whether or not to make a determination of whether a civil action falls within one of the five categories set forth in section 802. The Attorney General has no duty to undertake this determination; there is no basis to compel him to do so, and no remedy if he fails to do so. There is no standard that the Attorney General need or can apply in deciding whether to make this determination.

Second, if the Attorney General does make a determination that a civil action falls within one of the five categories set forth in section 802, it is entirely up to the Attorney General whether or not to submit a certification of that determination to this court. The Attorney General has no duty to submit a certification once he has made such a determination; there is no basis to compel him to do so, and no remedy if he fails to do so. There is no standard that the Attorney General need apply in deciding whether to submit a certification. He may submit a certification in all, some, or none of the actions that he determines fall within one of the five categories set forth in section 802.

Section 802 lacks the crucial limits on Executive discretion that were present in the tariff statute at issue in *Field*, just as the unconstitutional line-item veto statute in *Clinton* lacked those same limits. The *Clinton* Court identified three such limits. First, in *Field*, "the exercise of the [tariff] suspension power was contingent upon a condition that did not exist when the Tariff Act was passed." *Clinton*, 524 U.S. at 443. Here, the five circumstances listed in section 802(a) are all ones that existed at the time section 802 was enacted if they existed at all, and thus were ones that Congress could have acted upon in FISAAA itself by directly changing the law governing these

-16-

actions.  *See id.* (President's exercise of power under unconstitutional line-item veto statute

"necessarily was based on the same conditions that Congress evaluated when it passed those

statutes").  Like the line-item veto statute in *Clinton*, the Attorney General's dismissal power does

not require that a future contingency come into existence before it is triggered.

    "Second, under the Tariff Act, when the President determined that the contingency had

arisen, he had a duty to suspend . . . ."  *Clinton*, 524 U.S. at 443.  Here, in contrast, the Attorney

General has no duty to file a certification even if he determines that one of the five circumstances set

forth in section 802(a) exists.  Although the Attorney General must determine that one of the five

circumstances exists before he can file a certification and force the dismissal of an action, the

determination does not qualify or limit his discretion in deciding whether or not to file a

certification.  The unconstitutional line-item veto statute in *Clinton* likewise required the President to

make three determinations before canceling an appropriation, but those determinations did not limit

his discretion:  "[W]hile it is true that the President was required by the Act to make three

determinations before he canceled a provision, . . . those determinations did not qualify his discretion

to cancel or not to cancel."  *Id.* at 443-44.

    "Finally, whenever the President suspended an exemption under the Tariff Act, he was

executing the policy that Congress had embodied in the statute."  *Clinton*, 524 U.S. at 444.  In

deciding to file certifications and force the dismissal of these actions, the Attorney General is not

executing a policy decision made by Congress that the law governing these actions should be

changed and that these actions should be dismissed.  Instead, as was the President in *Clinton*, the

Attorney General here has made a decision that Congress refused to make to change the law

governing these actions and to force the dismissal of these actions.  *Id.* at 444 (describing the

unconstitutional line-item veto statute:  "In contrast, whenever the President cancels an item of new

direct spending or a limited tax benefit he is rejecting the policy judgment made by Congress and

relying on his own policy judgment.").  In making that decision, the Attorney General is executing

core legislative power, not executive power.

    Section 802 violates the Article I, section 7 procedures for making changes to existing

statutes because it authorizes the Attorney General "himself to effect the repeal of laws, for his own

-17-

policy reasons, without observing the procedures set out in Article I, § 7." *Clinton*, 524 U.S. at 445. Like the line-item veto statute in *Clinton*, section 802 permits the Executive to change the existing statutes that otherwise apply to these actions by repealing the application of 50 U.S.C. § 1810, 18 U.S.C. §§ 2520, 2707, and 47 U.S.C. § 605 to these actions and preempting the application of state law to these actions without the presentment and approval of that decision by a majority vote of each house of Congress. Once the Attorney General files a certification, he has changed the law governing these actions. "The fact that Congress intended such a result is of no moment." *Id.* at 445. Section 802 could only be valid under Article I, section 7 if "Congress itself made the decision to suspend or repeal the particular provisions at issue." *Id.* Because "Congress itself" made no such decision, section 802 is unconstitutional.

Section 802 is a far different statute than the one at issue in *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 438-39 (1992). In that case, Congress itself had made the decision that certain timber sales should be subject to a different legal standard than the standard that federal environmental laws otherwise imposed, and it enacted a statute that unconditionally said so. *See id.* (noting "the imperative tone of the provision, by which Congress 'determined and directed' that compliance with two new provisions would constitute compliance with five old ones;" "what Congress directed—to agencies and courts alike—was a change in law, not specific results under old law"). It, and not the Executive, made the decision to change the law. Because it was Congress that changed the law, as the Constitution requires, and because Congress had left the application of the new law entirely to the courts, the change in law was constitutional. *Id.* at 439. Here, by contrast, Congress avoided the ultimate decision of whether to change the law applicable to these actions, instead unconstitutionally depositing its legislative powers into the hands of the Attorney General unconstrained by any limiting principle.

Ultimately, in enacting FISAAA Congress ducked the legislative policy decision of whether or not to change the federal and state statutes creating plaintiffs' causes of action. Instead, it sought to shift that decision to the Executive, surrendering without limitation its exclusive legislative powers to change the previously-enacted statutes governing these actions between private parties.

-18-

" 'Rather than turning the task over to its agent, if the Legislative Branch decides to act with conclusive effect, it must do so . . . through enactment by both Houses and presentment to the President.' " *Metropolitan Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise*, 501 U.S. 252, 274 n.19 (1991). "In short, when Congress '[takes] action that has the purpose and effect of altering the legal rights, duties, and relations of persons . . . outside the Legislative Branch,' it must take that action by the procedures authorized in the Constitution." *Id.* at 276. Congress failed to do so here, and section 802 accordingly is unconstitutional.

> **2.  Section 802 Violates The Nondelegation Doctrine Because It Delegates Lawmaking To The Executive Without Any "Intelligible Principle"**

Congress's exclusive lawmaking power also gives rise to "the nondelegation doctrine: that Congress may not constitutionally delegate its legislative power to another branch of Government. 'The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government.' " *Touby v. United States*, 500 U.S. 160, 165 (1991).

Under the nondelegation doctrine, prohibited "lawmaking" by the Executive occurs when the Executive is given *carte blanche* to determine what is or is not the law, without any limitation imposed by Congress with which the Executive must conform: "[W]e repeatedly have said that when Congress confers decisionmaking authority upon agencies Congress must lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *Whitman*, 531 U.S. at 472 (internal quotation marks omitted; second alteration original); *see also Marshall Field & Co. v. Clark*, 143 U.S. at 693-94 ("The true distinction . . . is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law." (internal quotation marks omitted)).

Congress fails to provide an intelligible principle if "it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." *Yakus v. U.S.*, 321 U.S. 414, 426 (1944). This "ensures that courts charged with reviewing the exercise of delegated legislative discretion will be able to test that exercise against ascertainable standards." *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 686 (1980) (Rehnquist, J., concurring).

-19-

Section 802 violates the nondelegation doctrine because Congress has given the Attorney General its power to change the law applicable to these actions without imposing any intelligible principle governing whether or not the Attorney General should exercise that power.  The Attorney General has unlimited and standardless discretion in deciding whether to file a certification and force the dismissal of a pending action, or whether instead to refrain from doing so.  When, as here, the Attorney General does file a certification, "it [is] impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed," *Yakus*, 321 U.S. at 426, because Congress never resolved what its will was with respect to whether these actions should continue or be dismissed.  Congress "failed to articulate any policy or standard that would serve to confine the discretion of the authorities to whom Congress had delegated power." *Mistretta v. U.S.*, 488 U.S. 361, 374 n. 7 (1989).  "The Congress left the matter to the [Attorney General] without standard or rule, to be dealt with as he pleased." *Panama Refining Co. v. Ryan*, 293 U.S. 388, 418 (1935).  Section 802 is unconstitutional for this reason as well.

**B.    Section 802 Violates The Separation Of Powers By Permitting The Other Branches To Dictate To The Judicial Branch The Outcome In Individual Cases**

Independently, section 802 violates the separation of powers because it permits the Executive to dictate that the Judiciary dismiss these actions without allowing the Judiciary to make an independent determination of the facts on which the dismissal is based.

Under *Robertson*, Congress may not "direct any particular findings of fact or applications of law, old or new, to fact." *Robertson*, 503 U.S. at 438; *Ecology Center v. Castaneda*, 426 F.3d 1144, 1149-50 (9th Cir. 2005); *see also U.S. v. Klein*, 80 U.S. 128, 146 (1872) (Congress may not "prescribe a rule for the decision of a cause in a particular way"); *U.S. v. Sioux Nation of Indians*, 448 U.S. 371, 392, 404 (1980) (statute is unconstitutional if it "prescribe[s] a rule of decision in a case pending before the courts, and d[oes] so in a manner that require[s] the courts to decide a controversy in the Government's favor").  The prohibition against directing the courts to make particular findings of fact or particular applications of law to fact applies equally to the Executive as it does to Congress.  The intrusion upon the core Article III functions of the Judiciary is the same regardless of whether the intrusion originates with Congress or with the Executive.

-20-

*Robertson* and *Ecology Center* were both actions where the plaintiffs had brought procedural challenges to government timber sales, contending that the government had not followed certain statutory procedures in conducting the sales. While the actions were pending, Congress changed the statutory procedures applicable to the challenged sales, without changing the procedures for timber sales generally. In both cases, Congress's action was constitutional because, while it had changed the applicable law, it did not "direct any particular findings of fact or applications of law, old or new, to fact." *Robertson*, 503 U.S. at 438; *accord*, *Ecology Center*, 426 F.3d at 1149-50.

In *Ecology Center*, the Ninth Circuit particularly emphasized that, although the applicable law had changed, the district court retained plenary authority to find the facts *de novo* and then apply those facts to determine whether the new law was satisfied. The new law permitted timber sales so long as 10% of the project area to be logged was preserved as old growth timber, and the district court retained the power to engage in independent fact-finding to determine whether the 10% criterion was satisfied: "Nothing in § 407 directs particular findings of fact or the application of old or new law to fact. Section 407 does not direct that the district court find that 10% old growth exists, but instead declares that the statutory requirements for timber sales are met if there exists 10% old growth in the areas projected for logging. Under § 407, it is still the district court that determines whether there is 10% old growth on the project areas at issue." *Ecology Center*, 426 F.3d at 1149; *see also Crowell*, 285 U.S. at 60 ("In cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of that supreme function.").

Here, section 802 violates the separation of powers and invades the core Article III powers of the Court because it forbids the Court from engaging in independent fact-finding. Instead, it is the Attorney General, not the Court, who determines whether "the statutory requirements . . . are met" for dismissal. *Ecology Center*, 426 F.3d at 1149. The Court must defer to the Attorney General's findings of fact, which it may review only under the "substantial evidence" standard of review. 50 U.S.C. § 1885a(b)(1). The Attorney General's certification, when coupled with the "substantial evidence" standard of review, is an unconstitutional attempt to "direct . . . particular findings of fact," *Robertson*, 503 U.S. at 438; *Ecology Center*, 426 F.3d at 1149-50, and thereby compel the

-21-

Court to dismiss these actions. "If the essential, constitutional role of the judiciary is to be maintained, there must be both the appearance and the reality of control by Article III judges over the interpretation, declaration, and application of federal law. The required control must be more than simple appellate review." *Pacemaker Diagnostic Clinic, Inc. v. Instromedix, Inc.*, 725 F.2d 537, 544 (9th Cir. 1984) (Kennedy, J.; en banc) (citations omitted).

**III.    Section 802 Is Unconstitutional Because It Violates Plaintiffs' Right To Due Process**

    **A.    Plaintiffs' Causes Of Action Are Property And Liberty Interests Protected By The Due Process Clause**

Plaintiffs have a liberty interest in their constitutional right to be free from unreasonable searches and seizures and their constitutional right to free speech. *Duncan v. La.*, 391 U.S. 145, 148 (1968) (due process protects First and Fourth Amendment liberty interests). Plaintiffs cannot be deprived of these constitutional liberties without due process.

In addition, a cause of action, even before it is reduced to a final judgment, is a property interest protected by the Due Process Clause: "[A] cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982); *see also Tulsa Prof'l Collection Services, Inc. v. Pope*, 485 U.S. 478, 485 (1988) ("Appellant's claim, therefore, is properly considered a protected property interest."). "[T]he 'property' component of the Fifth Amendment's Due Process Clause . . . impose[s] 'constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause.' " *Logan v. Zimmerman Brush*, 455 U.S. at 429. Thus, plaintiffs' constitutional claims, federal statutory claims, and state law claims are all property interests protected by due process.

"For more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner. These essential constitutional promises may not be eroded." *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (plurality opinion; internal quotation marks and citations omitted).

-22-

### B. Section 802(a) Violates Due Process By Denying Plaintiffs A *De novo* Decision By An Unbiased Judge

"[D]ue process requires a 'neutral and detached judge in the first instance' . . . ." *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 617 (1993). "A biased proceeding is not a procedurally adequate one. At a minimum, Due Process requires a hearing before an impartial tribunal." *Clements v. Airport Auth. of Washoe County*, 69 F.3d 321, 333 (9th Cir. 1995); *see also In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases."); *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970) ("Of course, an impartial decision maker is essential."). "This impartial tribunal requirement applies in both civil and criminal cases" as well as in "administrative adjudications, in order to protect the 'independent constitutional interest in fair adjudicative procedure.'" *Clements*, 69 F.3d at 333.

In particular, a proceeding does not satisfy due process if, as is true here, it is structured so that a biased decisionmaker makes an initial decision that a later, unbiased decisionmaker is forbidden from reviewing *de novo* but instead must accept under a deferential standard of review. *See Concrete Pipe*, 508 U.S. at 619-20, 626, 629-30.

Instead, due process requires that plaintiffs receive in the first instance a hearing before an impartial adjudicator empowered to receive evidence and argument and to decide all the facts and law relevant to the deprivation of their property interests. Under section 802, that never occurs. The Attorney General decides whether the statutory circumstances are met and whether to file a certification, but he is biased, gives no notice, and conducts no hearing or adjudication. Thus, the Attorney General's decisionmaking is not a proceeding that satisfies due process. This Court gives notice and conducts hearings and is unbiased, but is deprived by section 802's "substantial evidence" standard of the power to adjudicate *de novo* the relevant facts and law. By forcing this Court to defer to the determinations of the Attorney General, a biased decisionmaker who conducts no adjudication, under a "substantial evidence" standard of appellate review, section 802 unconstitutionally deprives plaintiffs of a full hearing *de novo* before a neutral and detached judge in the first instance. *Concrete Pipe*, 508 U.S. at 626.

The Attorney General's decisionmaking does not provide due process for two reasons. First,

-23-

in deciding whether any of the five statutory circumstances exist and, if so, whether to file a certification to cause the dismissal of an action, the Attorney General does not conduct an adjudication. He does not provide notice, conduct an adversary proceeding, receive evidence and argument from opposing parties, or determine facts and render a decision on the basis of the evidence and argument so received. The Attorney General performs none of these adjudicatory functions: "He is not a judge. He performs no judicial or quasi-judicial functions. He hears no witnesses and rules on no disputed factual or legal questions." *Concrete Pipe*, 508 U.S. at 619.

In addition to failing to conduct an adjudication, the Attorney General also is not an impartial and disinterested decisionmaker. As the Summary at pp. 58-59 demonstrates, his office and duties create a structural bias because he is an advisor to the Administration and is counsel to the United States, a party intervenor to this lawsuit. *See Concrete Pipe*, 508 U.S. at 618 (bias presumed from decisionmaker's "statutory role and fiduciary obligation"). Both his policymaking duties and his ethical duties to his client give the Attorney General a very strong motive to rule in a way that would aid the Administration's policies. "[E]ven if the decisionmaker does not stand to gain personally, due process may also be offended where the decisionmaker, because of his institutional responsibilities, would have 'so strong a motive' to rule in a way that would aid the institution." *Alpha Epsilon Phi Tau v. City of Berkeley*, 114 F.3d 840, 844 (9th Cir. 1997).

Second, as the Summary at pp. 59-61 also demonstrates, the Attorney General has an actual bias in this matter and has prejudged it. Even before section 802 was drafted, he made no secret of his desire that plaintiffs' lawsuits be dismissed by whatever means necessary, telling Congress it was "simply the right thing to do" and is "the fair and just result." Summary p. 60. The Attorney General's statements show that he " 'has prejudged, or reasonably appears to have prejudged, an issue.' " *Kenneally v. Lungren*, 967 F.2d 329, 333 (9th Cir. 1992); *accord, Stivers v. Pierce,* 71 F.3d 732, 741 (9th Cir. 1995). These statements show that he intends to use section 802 to benefit the Administration and defendants. There is nothing surprising about the Attorney General acting on his own biases and to the benefit of his client and the carrier defendants. But it deprives the government of any argument that his determination that the statutory circumstances exist and that these actions should be dismissed are adjudications by a neutral decisionmaker that satisfy due process.

Because the Attorney General's decisionmaking does not provide plaintiffs with the process due them before they are deprived of their property and liberty interests, due process would be satisfied here only if section 802 provided for a *de novo* adjudication by this Court of the facts and law relevant to a dismissal under that section. Section 802, however, prohibits a *de novo* adjudication by this Court and so violates due process.

"Where an initial determination is made by a party acting in an enforcement capacity [*i.e.*, a party who is not free from bias and who does not hold a constitutionally adequate hearing], due process may be satisfied by providing for a neutral adjudicator to 'conduct a *de novo* review of all factual and legal issues.' " *Concrete Pipe*, 508 U.S. at 618. In *Concrete Pipe*, as here, the initial decision was made by a biased decisionmaker, the trustee of an ERISA plan. The trustee, like the Attorney General here, was "not required to hold a hearing, to examine witnesses, or to adjudicate the disputes of contending parties on matters of fact or law." *Id.* at 620. Only because there was a subsequent hearing *de novo* before an arbitrator who was not bound in any way by the trustee's decision and who was empowered to receive evidence and make factual and legal determinations *de novo* did the scheme satisfy due process. *Id.* at 619-20, 626, 629-30. So, too, in *Marshall v. Jerrico, Inc.*, the bias of an administrative decisionmaker was not a due process deprivation only because there was a subsequent *de novo* hearing before an administrative law judge who was not bound by the administrator's decision. 446 U.S. 238, 247-48 & n.9 (1980).

Thus, absent a trial *de novo*, using the findings of a biased decisionmaker who conducted no adjudication as the basis for depriving a person of a property or liberty interest means that the person is "deprived thereby of the impartial adjudication in the first instance to which [he or she] is entitled under the Due Process Clause." *Concrete Pipe*, 508 U.S. at 626. Here, the Attorney General is a presumptively and actually biased decisionmaker. Unlike *Concrete Pipe*, however, under section 802 there is never an adjudication before an unbiased adjudicator that has the power to determine facts and law in the first instance.

Instead, section 802(b)(1) compels this Court to give effect to the Attorney General's certification unless the "certification is not supported by substantial evidence." 50 U.S.C. § 1885a(b)(1). This is a deferential appellate standard of review, not a standard of proof for a trial

-25-

*de novo*.[5] " 'Substantial evidence is more than a mere scintilla, but less than a preponderance.' " *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). Section 802 requires this Court to uphold the Attorney General's "choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951).

Section 802 thus denies plaintiffs due process because it denies them a neutral and disinterested decisionmaker to decide whether plaintiffs should be deprived of their property interests. *Hamdi* involved a similar attempt to limit due process by imposing on the trial court an appellate "some evidence" standard of review, rather than a standard of proof, in reviewing Executive decisions to detain citizens as enemy combatants. 542 U.S. at 527-28 (plurality opinion). The Supreme Court noted that because the "some evidence" standard is "a standard of review, not . . . a standard of proof. . . . it primarily has been employed by courts in examining an administrative record developed after an adversarial proceeding." *Id.* at 537 (plurality opinion). It concluded that "[t]his standard therefore is ill suited to the situation in which a habeas petitioner has received no prior proceedings before any tribunal and had no prior opportunity to rebut the Executive's factual assertions before a neutral decisionmaker." *Id.* Instead, the Court held that the petitioner had a right to notice of the facts the government claimed supported its position and a fair opportunity to rebut those factual in a *de novo* hearing before a neutral decisionmaker. *Id.* at 535-538 (plurality opinion), 553 (Souter and Ginsburg, JJ., concurring in the judgment; petitioner "entitled at a minimum to notice of the Government's claimed factual basis for holding him, and to a fair chance to rebut it

---

[5] As the Supreme Court said in *Concrete Pipe*, a standard of review is "customarily used to describe, not a degree of certainty that some fact has been proven in the first instance, but a degree of certainty that a factfinder in the first instance made a mistake in concluding that a fact had been proven under the applicable standard of proof. . . . [A] standard[] of review [is] . . . applied by reviewing courts to determinations of fact made at trial by courts that have made those determinations in an adjudicatory capacity (unlike the trustees here)." 508 U.S. at 622-23. "Substantial evidence" is such a standard of review. By contrast, a "burden or standard of proof before a trier of fact in the first instance" requires that "[b]efore any such burden can be satisfied in the first instance, the factfinder must evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty." *Id.* at 622.

-26-

MDL Plaintiffs' Opposition To
Motion Of The United States Seeking To Apply 50 U.S.C.
§ 1885a To Dismiss These Actions

before a neutral decisionmaker"); *see also id.* at 573 (Scalia, J., dissenting; due process entitled petitioner to full criminal trial). Like section 802, the government's scheme in *Hamdi* failed to provide due process because it combined an initial decision by a biased decisionmaker who held no hearing with subsequent court review of the decision under a deferential standard of appellate review rather than a trial *de novo*.[6]

### C. Section 802(c) Violates Due Process By Denying Plaintiffs Meaningful Notice Of The Government's Basis For Seeking Dismissal And A Meaningful Opportunity To Oppose The Government's Arguments And Evidence

Section 802(c) provides that if the Attorney General files a declaration stating that "disclosure of a certification made pursuant to subsection (a) or the supplemental materials provided pursuant to subsection (b) or (d) would harm the national security of the United States," the Court is required to review the certification and supplemental materials *in camera* and *ex parte*, and is not allowed to state the basis for its decision in its public opinion. 50 U.S.C. § 1885a(c). The Attorney General has invoked the secrecy provisions of section 802(c) here, thereby seeking to have the Court dismiss plaintiffs' actions while keeping secret from plaintiffs the supporting factual basis and legal grounds for the certifications. These secrecy provisions violate due process.

---

[6] *Boumediene* similarly found that the failure to permit independent judicial fact-finding when reviewing an executive determination was constitutionally defective. The DTA provided for executive, not judicial, proceedings to determine the legality of a detainee's detention; in these executive proceedings, there were "no limits on the admission of hearsay evidence" by the government, the detainee had only "limited means to find or present evidence to challenge the Government's case against him," and was denied access to the government's classified evidence. 128 S.Ct. at 2269. The DTA's narrow judicial review provision forbade judicial review of the legality of the detention and permitted the courts to determine only whether the executive proceedings complied with procedures established by the Secretary of Defense and whether those procedures were lawful. *Id.* at 2265. The courts were forbidden to conduct any independent fact-finding, "limiting the scope of their collateral review to a record that may not be accurate or complete." *Id.* at 2272-73.

Also instructive is the analysis of the dissenting justices in *Boumediene*, who concluded that, under the dissent's broader reading of the DTA, Guantanamo detainees received due process in the judicial review proceedings only because at that stage the detainee personally received a summary of the classified evidence against them and their counsel had full access to the government's classified evidence, and because they had the opportunity for a *de novo* determination of all questions of fact and law before an Article III court. *Id.* at 2284-85, 2287-89, 2293 (dissenting opinion of Roberts, C.J., joined by Scalia, Thomas, and Alito, JJ.). All of these basic procedural rights granted to alien detainees suspected of being enemy combatants, however, are denied to plaintiffs here.

-27-

Due process requires that before plaintiffs are deprived of their protected interests they must receive adequate and meaningful notice of the factual and legal basis on which the government seeks dismissal. "[T]he right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner." *Hamdi*, 542 U.S. at 533. Meaningful notice requires both "notice of the . . . allegations" and "notice of the substance of the relevant supporting evidence." *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 264 (1987); *accord*, *Hamdi*, 542 U.S. at 533 (due process requires "notice of the factual basis" supporting the government's position); *Cleveland Bd. of Edu. v. Loudermill*, 470 U.S. 532, 546 (1985) (due process requires "notice of the charges" and "an explanation of the . . . evidence"). This is the constitutional minimum.

The due process guarantee of an opportunity to be heard likewise is not meaningful where the arguments and evidence opposing a party are kept entirely secret. The reason that due process requires that "the evidence used to prove the Government's case must be disclosed to the individual [is] so that he has an opportunity to show that it is untrue." *Goldberg v. Kelly*, 397 U.S. at 270. "The right to a hearing embraces not only the right to present evidence but also a reasonable opportunity to know the claims of the opposing party and to meet them. The right to submit argument implies that opportunity; otherwise the right may be but a barren one." *Morgan v. U.S.*, 304 U.S. 1, 18 (1938); *see also West Ohio Gas Co. v. Public Utilities Commission (No. 1),* 294 U.S. 63, 69 (1935) ("A hearing is not judicial, at least in any adequate sense, unless the evidence can be known."); *Lynn v. Regents of Univ. of Cal.*, 656 F.2d 1337, 1346 (9th Cir. 1981) (A decision based on *ex parte* evidence offends "principles of due process upon which our judicial system depends to resolve disputes fairly and accurately.").

Sections 802(c) violates due process by denying plaintiffs any meaningful notice or opportunity to be heard in opposition to the government's motion. Because of the Attorney General's invocation of section 802(c), plaintiffs have not received meaningful notice of the factual and legal grounds on which the government seeks dismissal or of the evidence relevant to those grounds, and have thereby been deprived of a meaningful opportunity to be heard. While plaintiffs have notice *that* the government has sought dismissal, this notice is meaningless because, with the exception of the government's artful and qualified denial of a communications content dragnet, the

-28-

government refuses to inform plaintiffs of the specific subsection of 802(a) under which dismissal is sought, the factual grounds supporting dismissal, or the evidence submitted in support of dismissal (or even whether any supporting evidence has been submitted to the Court). Forcing plaintiffs to guess at which subsection of section 802(a) the government has put in issue and to speculate about what evidence the government may have submitted makes the opportunity to be heard meaningless.

Due process requires more than the chance to shadow-box with the government. Our adversarial system is based upon "vigorous and informed argument" which is impossible "without disclosure to the parties of the evidence submitted to the court." *Lynn*, 656 F.2d at 1346. "Fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights. Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *Goss v. Lopez*, 419 U.S. 565, 580 (1975) (ellipsis, brackets, and internal quotation marks omitted). Even the most "rudimentary" conception of due process requires that the party facing a deprivation receive an "explanation of the evidence the authorities have." *Id.* at 581. This is true whether the deprivation is a few days' suspension from high school, as in *Goss*, or the indefinite deprivation of liberty faced by a citizen imprisoned as an enemy combatant, as in *Hamdi*.

In addition, "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. at 269; *accord*, *Hornsby v. Allen*, 326 F.2d 605, 608 (5th Cir. 1964) ("[I]t is not proper to admit *ex parte* evidence, given by witnesses not under oath and not subject to cross-examination by the opposing party.").

These principles apply equally in cases like this one where the government seeks to use classified or secret information to its litigation advantage to obtain a decision in its favor. In *American-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045 (9th Cir. 1995), the Ninth Circuit held that use of undisclosed classified information in alien legalization proceedings violates due process. *Id.* at 1070. The court concluded that the "use of undisclosed information in adjudications should be presumptively unconstitutional" "[b]ecause of the danger of injustice when decisions lack

-29-

the procedural safeguards that form the core of constitutional due process." *Id.* The court distinguished the state secrets privilege, noting that in such cases "the information is simply unavailable and may not be used by either side." *Id.* By contrast, in the case before it, as here, "the Government does not seek to shield state information from disclosure . . . ; instead, it seeks to use secret information as a sword against the" opposing party. *Id.*

Likewise, in *Kinoy v. Mitchell*, 67 F.R.D. 1 (S.D.N.Y. 1975), the government filed a summary judgment motion supported by *in camera* exhibits of allegedly secret information; it "request[ed] the Court to determine, *inter alia*, whether certain electronic surveillance concerned foreign rather than domestic security, the constitutionality of this warrantless foreign security wiretapping, the retroactive applicability of the *Keith* decision, and the nonexistence of any communication of the contents of the interceptions which would constitute a violation of 47 U.S.C. § 605." *Id.* at 15. The court denied summary judgment, concluding that "such a course is wholly unacceptable. Our system of justice does not encompass *ex parte* determinations on the merits of cases in civil litigation." *Id.; accord, Ass'n for Reduction of Violence v. Hall*, 734 F.2d 63, 67 (1st Cir. 1984); *Bane v. Spencer*, 393 F.2d 108, 109 (1st Cir. 1968) ("defendant should not be able to use the [*ex parte* evidence] as a sword to seek summary judgment and at the same time blind plaintiff so that he cannot counter"). So, too, here, due process prohibits any procedure by which plaintiffs' claims are dismissed without any notice of government's legal arguments and supporting evidence and without any meaningful opportunity to be heard in opposition to the government's argument and evidence and to cross-examine the government's witnesses.

Finally, the Attorney General's use of section 802(c) to censor the contents of the order this Court will issue deciding the government's section 802 motion also violates due process. The Court's decision on the motion "must rest solely on the legal rules and evidence adduced. To demonstrate compliance with this elementary requirement, the decision maker should state the reasons for his determination and indicate the evidence he relied on." *Goldberg v. Kelly*, 397 U.S. at 271 (internal citations omitted). The restrictions on disclosure of the reasoning and evidence on which the Court's decision rests violate due process by preventing plaintiffs from effectively

-30-

challenging here or on appeal the validity of the decision.[7]

**IV.    The Secrecy Provisions Of Section 802 Violate The First Amendment And Article III**

Section 802(c) grants the Attorney General the unreviewable right, which he has exercised, to require that his certification and supporting evidence be maintained and reviewed *in camera* and *ex parte* and to censor any reference to the contents of that evidence from this Court's order deciding the motion to dismiss.  *See* 50 U.S.C. § 1885a(c).  Section 802(d) mandates similar restrictions with respect to classified information without even requiring an invocation by the Attorney General.  This secrecy is not subject to judicial control or review but is imposed on the Court by Congress and the Attorney General.[8]  50 U.S.C. § 1885a(d).

The perpetual ban of subsections (c) and (d) on the disclosure of the certification and supporting materials violates the First Amendment right of access to documents in a civil proceeding

---

[7] The change in law caused by the Attorney General's filing of the certifications is a separate and independent due process violation.  Ordinarily, when Congress makes a change in law affecting a property interest in a statutorily-created cause of action, no due process question arises because the legislative process is the process that is due in the circumstances.  A legislature "remains free to create substantive defenses or immunities for use in adjudication—or to eliminate its statutorily created causes of action altogether," because "the legislative determination provides all the process that is due."  *Logan v. Zimmerman Brush*, 455 U.S. at 430.

This case is different because it is the Executive, in the person of the Attorney General, and not Congress that has made the change in law that deprives plaintiffs of their protected property interests in their federal statutory claims.  Because the Attorney General's decision to change the law governing plaintiffs' federal statutory causes of action by deciding to file certifications with this Court is not a decision made by Congress, that decision is valid only if the Attorney General satisfies the fundamentals of due process by providing plaintiffs with notice and an opportunity to be heard before deciding to file the certifications with this Court.

"While the legislature may elect not to confer a property interest, . . . it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards. . . . The adequacy of statutory procedures for deprivation of a statutorily created property interest must be analyzed in constitutional terms."  *Id.* at 432 (internal quotation marks and brackets omitted).  Here, the statutory procedures that authorize the Attorney General to deprive plaintiffs of their property by changing the law applicable to their cases violate due process because plaintiffs receive no notice or opportunity to be heard before the Attorney General makes his determination that one of the five statutory circumstances exists or before he makes his decision to file the certifications with this Court.

[8] Nevertheless, the evidence shows that at least some undisclosed information about the Program is not classified.  *See* Summary at pp. 43-44 (Alberto Gonzales' notes on March 10, 2004, meeting with congressional leaders about the Program is mostly unclassified) and p. 44 (John Ashcroft's March 10, 2004, discussion of concerns about the legality of the Program was not classified).

-31-

as well as violating Article III.  Under the First Amendment, only a court, and not the Attorney General or Congress, can determine whether under the "strict scrutiny" test there is a compelling governmental interest justifying a ban on public access to documents in a civil case and whether a disclosure ban is the least restrictive means of protecting that interest.  Article III similarly requires that courts and not the Executive or Congress make these determinations.  Under subsections (c) and (d), however, those determinations are made by the Attorney General and Congress, rather than the Court, thereby violating both the First Amendment and Article III.  In addition, these nondisclosure provisions also fail to satisfy the First Amendment's strict scrutiny test because they are perpetual as well as unreviewable.  Even if there is at the present time a compelling interest in a ban on disclosure, the perpetual ban of subsections (c) and (d) is not the least restrictive means of achieving that interest because the ban can never be revisited or lifted in the future after the interest in secrecy is dissipated.

There is a First Amendment right of access to civil proceedings and to documents filed in those proceedings.  *See Grove Fresh Distrib. v. Everfresh Juice Co.*, 24 F.3d 893, 897-98 (7th Cir. 1994) (First Amendment right of access in civil proceedings to documents where "the court has relied on them or . . . the litigants have offered them as evidentiary support"); *Rushford v. New Yorker Magazine*, 846 F.2d 249, 253 (4th Cir. 1988) ("the more rigorous First Amendment standard should also apply to documents filed in connection with a summary judgment motion in a civil case"); *Westmoreland v. C.B.S.*, 752 F.2d 16, 23 (2d Cir. 1984) ("the First Amendment does secure to the public and to the press a right of access to civil proceedings"); *Publicker Indus. v. Cohen*, 733 F.2d 1059, 1070 (3d Cir. 1984) ("the 'First Amendment embraces a right of access to [civil] trials'"); *In re Cont'l Ill. Sec. Lit.*, 732 F.2d 1302, 1308 (7th Cir. 1984) (right of access to both civil and criminal proceedings is of "constitutional magnitude"); *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1178 (6th Cir. 1983) (vacating the district court's sealing of all documents filed in a civil case based on First Amendment and common law right of access); *see also Hartford Courant Co. v. Am. Lawyer Media, Inc.*, 380 F.3d 83, 91-96 (2d Cir. 2004 ) (right of access to criminal and civil proceedings necessarily encompasses right of access to docket sheets); *Associated Press v. U.S. Dist. Ct.*, 705 F.2d 1143, 1145 (9th Cir. 1983) (right of access to criminal proceedings

-32-

encompasses documents); *NBC Subsidiary (KNBC-TV), Inc. v. Super. Ct.*, 20 Cal.4th 1178, 1212 (1999) ("in general, the First Amendment provides a right of access to ordinary civil trials and proceedings, [and] that constitutional standards governing closure of trial proceedings apply in the civil setting").[9]

Restrictions on the First Amendment right of access to judicial proceedings and documents are subject to strict scrutiny. *See, e.g., Globe Newspapers v. Superior Court*, 457 U.S. 596, 606-07 (1982) (criminal proceedings); *Grove Fresh*, 24 F.3d at 897 (civil proceedings); *Rushford*, 846 F.2d at 253 (civil proceedings). To satisfy that standard, the government must show that "the denial of access is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Rushford*, 846 F.2d at 253. The public's interest in access to documents is at its height in the case of documents relating to a dispositive motion, for if the motion is granted those documents become the substitute for the public trial that would otherwise occur and the basis for the court's decision on the merits. *See id.* at 252 ("Because summary judgment adjudicates substantive rights and serves as a substitute for a trial, we fail to see the difference between a trial and the situation before us now.").

Subsections (c) and (d) of section 802 violate both the First Amendment and Article III by denying the Court the ability to determine whether the disclosure ban satisfies the strict scrutiny test. Subsection (c) forbids the Court from disclosing to the public—including in the Court's order resolving the motion to dismiss—any information concerning the Attorney General's certification and the supplemental materials supporting that certification upon the Attorney General's assertion that disclosure "would harm the national security of the United States." 50 U.S.C. § 1885a(c). This provision is unconstitutional because it strips the Court of its authority to determine whether the Attorney General's asserted basis for secrecy "is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspapers*, 457 U.S. at 607. Subsection (d), codified at 50 U.S.C. § 1885a(d), which forbids disclosure of classified information submitted in

---

[9] Because the Ninth Circuit has found there is a common-law right of access to documents in civil proceedings, it has never reached the question of whether the First Amendment also provides right of access to documents in civil proceedings. *San Jose Mercury News v. U.S. Dist. Ct.*, 187 F.3d 1096, 1102 (9th Cir 1999).

support of the government's motion, is unconstitutional because it deprives the Court of the power to determine whether the disclosure ban is supported by a compelling interest and is narrowly tailored.

Subsections (c) and (d) improperly substitute executive and congressional determinations that nondisclosure is required for a judicial inquiry into whether nondisclosure is justified under the First Amendment. *See In re Washington Post,* 807 F.2d 383, 393 (4th Cir. 1986) (district court improperly relied on statute to justify sealing document on national security grounds without engaging in necessary First Amendment inquiry; "[t]he district court may not simply assume that Congress has struck the correct constitutional balance"). Even in matters involving national security, this Court has the right and duty to "independently determine whether, and to what extent, the proceedings and documents must be kept under seal." *U.S. v. Moussaoui*, 65 Fed.Appx. 881, 886-887 (4th Cir. 2003) (rejecting "Government argu[ment] that the question of whether the public is entitled to access to the pleadings and argument in this case is answered, in the negative, by [the Classified Information Procedures Act]"). "A blind acceptance by the courts of the government's insistence on the need for secrecy, without notice to others, without argument, and without a statement of reasons, would impermissibly compromise the independence of the judiciary . . . ." *In re Washington Post* Co., 807 F.2d at 392. By stripping the Court of its authority to determine whether the government has shown a compelling interest in secrecy that cannot be satisfied by less restrictive means, subsections (c) and (d) violate the constitutional requirement that judges, not members of the executive branch or Congress, determine whether there are grounds for banning the disclosure of evidence submitted in a judicial proceeding sufficient to satisfy the First Amendment. *See Freedman v. Maryland*, 380 U.S. 51, 58 (1965) (First Amendment requires that determination of whether speech is protected be made by a court, not the executive branch). This unbridled discretion is especially suspect in light of the evidence showing that the government's repeated assertions of "grave harm to the national security" are not credible. *See* Summary, Section IV(D).

Stripping the Court of its authority to determine whether a disclosure ban is permissible under the First Amendment also violates Article III. That is so because it is the province of the Judiciary, not the executive or legislative branch to determine what the Constitution requires. *See Marbury*, 5 U.S. at 177.

-34-

Subsections (c) and (d) violate the First Amendment for a second, independent reason:  they fail to satisfy the strict scrutiny test's narrow tailoring requirement.  The effect of the disclosure ban is to prevent the public from knowing—*for all time*—the content of the Attorney General's certification and the supplemental materials provided with the certification because the Court is prohibited from including that information in its order.  Instead, the Court is permitted to provide only a bare-bones explanation of its decision, shorn of its reasoning and of whatever dispositive facts are included in the certification and supporting materials.  Nothing in the statute requires the government in the future to inform the Court when disclosure of the censored information would no longer harm the national security or permits the Court to disclose the information at any time in the future if the Court concludes that there is no longer a compelling reason to limit public access.  By restricting the public from ever learning this information, the statute is not narrowly tailored because it presumes without any foundation that for all time disclosure of this information will harm national security.

Two decisions addressing a similar nondisclosure statute support this conclusion.  In *Doe v. Ashcroft*, 334 F.Supp.2d 471 (S.D.N.Y 2004) and *Doe v. Gonzales*, 386 F.Supp.2d 66 (D. Conn. 2005), district courts addressed challenges to former 18 U.S.C. § 2709(c), which prohibited a telecommunications carrier receiving a National Security Letter (NSL) subpoenaing customer records from ever publicly disclosing that it had received such a letter.  One district court held that the provision was unconstitutional and the second reasoned at the preliminary injunction stage that the provision was likely unconstitutional.  Both courts concluded the perpetual ban on disclosure was not narrowly tailored to advance the government's interest in secrecy because it would continue even after the disclosure of the information would cease to harm national security, and that the ban was therefore unconstitutional.  *Doe v. Gonzales*, 386 F.Supp.2d at 79-80; *Doe v. Ashcroft*, 334 F.Supp.2d at 519-20 ("[A]n unlimited government warrant to conceal, effectively a form of secrecy *per se*, has no place in our open society.").  Although on appeal the Second Circuit vacated and remanded *Doe v. Gonzales* and dismissed as moot *Doe v. Ashcroft* because Congress had subsequently removed the perpetual nondisclosure ban from the statute, the reasoning of those decisions remains correct and compelling.  *Doe v. Gonzales*, 449 F.3d 415, 422 (2d Cir. 2006) ("A

-35-

permanent ban on disclosure on speech seems highly unlikely to survive the test of strict scrutiny, one where the government must show that the statute is narrowly tailored to meet a compelling government interest.") (Cardamone, J, concurring); *see also Butterworth v. Smith*, 494 U.S. 624, 632-33 (1990) (government may not permanently ban disclosure of grand jury testimony after jury is discharged and its interest in secrecy ends).

Similar analysis applies here. Subsections (c) and (d) are not narrowly tailored and are therefore unconstitutional because they impose a perpetual ban on the information the Court may disclose, even if revealing the information would no longer harm national security.

For each of the foregoing reasons, subsections (c) and (d) are unconstitutional. Furthermore, it is evident that Congress would not have enacted the rest of section 802 without subsections (c) and (d). *See* Govt. Mo. at 11-12. Accordingly, those provisions are not severable, and the entirety of sections 802 is unconstitutional. *See Doe v. Gonzales,* 500 F.Supp.2d 379, 421 (S.D.N.Y. 2007) (finding unconstitutional the revised gag order provision of the current NSL statute, 18 U.S.C. § 2709(c), and striking down the entire statute because the gag order provision was not severable).

**V.    Even If Section 802 Were Constitutional, The Government Has Failed To Carry Its Burden Of Justifying Dismissal Under Section 802**

   **A.    The Court Must Review The Entire Record**

Under the "substantial evidence" standard, the Attorney General's certification "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998). Rather, the Court must "consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Attorney General]'s conclusion." *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). The Court must "tak[e] into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Universal Camera*, 340 U.S. at 487. The government agrees that the Court must " 'consider[] the entire record.' " Govt. Mo. at 15:2.

The Ninth Circuit has held that "the whole administrative record" that the court is to consider on a substantial evidence review "is not necessarily those documents that the agency has compiled and submitted as 'the' administrative record," but rather, "all documents and materials directly or

-36-

1 *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's

2 position." *Thompson v. U.S. Dept. of Labor,* 885 F.2d 551, 555 (9th Cir. 1989).

3 Accordingly, the Court must review *all* of the information considered by the Attorney

4 General, including the entire record of evidence provided in this litigation (as well as other public

5 and private information that was before the Attorney General in making his determination). This

6 also includes any information the Attorney General considered but has withheld from the Court. In

7 *Thompson*, the Ninth Circuit held that letters that were not before the administrative law judge (ALJ)

8 in a formal hearing, but which were indirectly considered by the ALJ when he approved a particular

9 order, and which were submitted by the plaintiff to the agency on a motion for reconsideration, were

10 part of the administrative record. "These materials were considered by the Secretary, either directly

11 or indirectly . . . and consequently are properly part of the administrative record. Accordingly, this

12 court can consider these letters in determining whether the Secretary's decision was . . . unsupported

13 by substantial evidence." *Thompson*, 885 F.2d at 555-56; *accord*, *Pub. Power Council v. Johnson*,

14 674 F.2d 791, 794 (9th Cir. 1982) ("This exception arises when it appears the agency has relied on

15 documents or materials not included in the record. . . . in order to provide a record of all documents

16 and materials directly or indirectly considered by the agency decisionmakers.").

17 Additional testimony or discovery may also be necessary in order to fully understand the

18 factors considered by, and the reasoning of, the decisionmaker. For example, in *Citizens to Preserve*

19 *Overton Park v. Volpe,* 401 U.S. 402, 420 (1971), the Supreme Court stated that "since the bare

20 record may not disclose the factors that were considered or the Secretary's construction of the

21 evidence it may be necessary for the District Court to require some explanation." The Court

22 therefore stated that the district court could "require the administrative officials who participated in

23 the decision to give testimony explaining their action." *Id.* Thus, if the Attorney General has not

24 provided an adequate explanation of his actions, this Court can obtain the information necessary to

25 make judicial review effective and to reach a just result: "When there is 'such a failure to explain

26 administrative action as to frustrate effective judicial review,' the court may 'obtain from the agency,

27 either through affidavits or testimony, such additional explanations of the reasons for the agency

28 decision as may prove necessary.' " *Pub. Power Council*, 674 F.2d at 793-94.

-37-

These principles are especially critical in these actions where the record is secret. Unless they are applied rigorously, the government will be able to restrict the evidence it presents to the Court to only a limited subset of secret evidence cherry-picked by the government for the elements most favorable to upholding its decision.

Although the Court must have a full understanding of the record that was before the Attorney General, that does not mean that whatever is in that record is admissible evidence that may be considered in weighing whether the Attorney General has carried his burden of demonstrating that substantial evidence supports his certification. To the contrary, since the Attorney General seeks summary judgment he may rely only on admissible evidence to carry his evidentiary burden.

The evidence the Attorney General relies upon is unreliable and inadmissible, as explained in plaintiffs' accompanying evidentiary objections (Dkt. No. 477). First, the Senate Select Committee on Intelligence Report is inadmissible hearsay, double hearsay, and triple hearsay. Second, the classified declarations of the Director of National Intelligence and the Director of the NSA are inadmissible because they are also hearsay not subject to party review or cross-examination. They are what section 802(b)(2) and 802(c) term "supplemental materials." 50 U.S.C. §§ 1885a(b)(2), 1885a(c). "Supplemental materials" are materials which the court "may examine," *id*. at 1885a(b)(2), and which the Attorney General may submit *ex parte* for *in camera* review, *id*. at 1885a(c). As evidence, however, "supplemental materials" are inadmissible and unreliable. This objection is not formulaic; Congress expressly distinguished between "substantial evidence," which the Court must find in support of the certification, and "supplemental materials" which the Court may merely "examine." That distinction rests on ancient principles of the law of evidence. The very purpose of the hearsay rule is to prevent the admission of evidence that is inherently untrustworthy because it is not subject to the adversarial process. Third, both the public and classified certifications of the Attorney General are inadmissible hearsay and do not qualify for any hearsay exception or as expert testimony.

In contrast, plaintiffs have presented voluminous evidence in opposition, including eyewitness testimony, documents, party admissions, statements against interest, and expert testimony, undermining any grounds for the Attorney General's certification. Plaintiffs' evidence in

-38-

opposition is summarized in plaintiffs' accompanying Federal Rule of Evidence 1006 summary. Plaintiffs' evidence demonstrates that, since October 2001, defendants have conducted dragnet surveillance of millions of Americans' domestic communications content and communications records at the behest of the government. Summary, Sections I-II, pp. 6-41. Defendants acquire the contents of Americans' communications from their networks and divert that entire communications stream to the government without any lawful authorization. *See* Summary, Section II, pp. 21-26, 33-37. Defendants similarly disclose to the government Americans' call detail records and other non-content records and information, again without any lawful authorization. *Id.*, pp. 26-33, 38-41.

In light of the weight of plaintiffs' evidence and the inadmissibility of evidence the Attorney General relies upon, the Attorney General cannot carry his burden of supporting his certification with substantial evidence that any of the five grounds for dismissal set forth in section 802(a) exist.

**B. There Is Not Substantial Evidence In Support Of Dismissal**

**1. There Is Not Substantial Evidence Supporting Dismissal Under Section 802(a)(5)**

The unrebutted record evidence of surveillance shows that there is no basis for dismissing these actions under subsection (a)(5) of section 802 on the ground that the alleged assistance was not provided by defendants to the government. The Attorney General has invoked subsection (a)(5), certifying that "because there was no . . . content-dragnet, no provider participated in that alleged activity." Dkt. No. 469-3 at 5:18-19. Yet, in making this denial, the Attorney General specifically identifies only a single paragraph from each complaint: "*Hepting* FAC ¶ 39; *Verizon* Compl. ¶ 165; *BellSouth* Compl. ¶ 64; *Cingular* Compl. ¶ 53; *Sprint* Compl. ¶ 44." *Id.* at 4:8-9. Accordingly, on the face of the public certification, the Attorney General has denied only the existence of a content dragnet "for *the purpose of* analyzing those communications through *key word searches* . . . ." *Id.* at 4:6-8 (emphasis added). Notably, the Attorney General's *only* certification as to "such alleged content-dragnet" is under section 802(a)(5).

The Attorney General's narrow certification under subsection (a)(5)—that the government is not conducting key word searches of the communications that it acquires—does not directly address, and indeed is irrelevant to, plaintiffs' core allegation concerning the content dragnet. That

-39-

allegation, supported by record evidence, is that surveillance devices are used to divert to the government the entirety of communications transiting through domestic telecommunications facilities. *See Hepting* FAC ¶¶ 41-47; *Verizon* Compl. ¶¶ 167-168, 173-176; *BellSouth* Compl. ¶¶ 66-67, 72-75; *Cingular* FAC ¶¶ 55-56, 61-64; and *Sprint* Compl. ¶¶ 46-47, 52-55 (alleging defendants' assistance in installation and use of surveillance devices at key facilities to acquire and disclose to the government the content of communications); *see also generally* Summary, Section II. As this Court has previously recognized, plaintiffs' claims do not turn on how the government handles that information after it is acquired, but instead "focus[] only on whether [defendants] intercepted and disclosed communications and communication records to the government," and "plaintiffs need not allege any facts regarding the government's conduct to state these claims." *Hepting*, 439 F.Supp.2d at 994, 999.

Indeed, the Attorney General's certification does not address at all the conduct that section 802 requires him to address, *i.e.*, the "assistance" provided *by* defendants *to* the government, *see* 50 U.S.C. § 1885a(a), and instead only addresses the government's purposes in obtaining that assistance. Accordingly, since the Attorney General has not made any certification *whatsoever* with respect to defendants' alleged assistance in the content dragnet that is the actual basis of plaintiffs' causes of action, those claims necessarily survive the Attorney General's limited certification.

Even if the Attorney General's limited denial of a content dragnet were true, the initial acquisition of communications content, regardless of whether there is subsequent key word scanning or other review of that content by the government, implicates the Fourth Amendment and the relevant statutes.

As an initial matter, the surveillance prohibited under both Title III and FISA is completed upon the "acquisition" of communications content by or through the use of a "device." 18 U.S.C. § 2510(4) (defining "intercept"); 50 U.S.C. § 1801(f)(2) (defining "electronic surveillance"). As the Ninth Circuit has held, the mere redirection of a communication, regardless of whether or how that communication is reviewed afterwards, is sufficient to establish a violation: "redirection presupposes interception," and when a communication is "captured or redirected in any way, an interception occurs at that time." *U.S. v. Luong*, 471 F.3d 1107, 1109 (9th Cir. 2006), quoting *U.S. v. Rodriguez*,

-40-

968 F.2d 130, 136 (2d Cir. 1992).[10]

Furthermore, this same conduct—acquisition of a communication by a device, with nothing more—also constitutes a search and seizure under the Fourth Amendment. The Supreme Court has repeatedly held that acquisition of a conversation via an eavesdropping device is a search and seizure of that conversation, without reference to whether it was actually listened to by government agents. *See Berger*, 388 U.S. at 59 (state's electronic eavesdropping statute gave "the officer a roving commission to 'seize' any and all conversations" in violation of Fourth Amendment); *Katz*, 389 U.S. at 353 (use of eavesdropping device to capture conversations constituted a "search and seizure"); *see also Hepting*, 439 F.Supp.2d at 1010 (holding that the alleged content dragnet violates the Fourth Amendment under *Keith*). Neither key word searches nor any other review by the government is necessary to establish the constitutional violation alleged by plaintiffs, therefore the Attorney General's denial of such conduct cannot dispose of plaintiffs' causes of action based on the Fourth Amendment.

Moreover, even if key word searching or some other review of communications content by the government were necessary to establish a violation of the Fourth Amendment or statute, the evidence shows that the government conducts computer searches of at least some content information, even if its limited denials of scanning or reviewing of the key words in a phone conversation or in the body of an email are credited.[11] The evidence demonstrates that the government uses sophisticated computers to analyze so-called "metadata" or "transactional" information—including email subject lines,[12] web addresses ("URLs")[13] and Internet search

---

[10] *See also U.S. v. Lewis*, 406 F.3d 11, 18 n.5 (1st Cir. 2005) (phone call intercepted when recorded, not when listened to); *Jacobson v. Rose*, 592 F.2d 515, 522 (9th Cir. 1978) (listening to recording of phone conversation not necessary to constitute an intercept); *Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 740 (4th Cir. 1994) (contents of phone call acquired when recorded); *George v. Carusone*, 849 F.Supp. 159, 163 (D. Conn. 1994) (same).

[11] Notably, in partially denying the existence of a "content-dragnet," the Attorney General fails to define the term "content." It may be helpful to the Court to review the evidence regarding the government's apparent view of the definition of content, which differs substantially from the legal definitions. *See* Summary at pp. 54-56; *compare* 18 U.S.C. § 2510(8) and 50 U.S.C. § 1801(n).

[12] The Department of Justice has previously admitted in its own electronic evidence manual that email subject lines reveal the contents of communications, and the courts have agreed. *See* Opsahl Decl., Vol. 4, Ex. 63 (Computer Crime and Intellectual Property Section, Criminal Division, U.S. *(footnote continued on following page)*

-41-

terms[14]—that include the "contents" of communications as defined by 18 U.S.C. § 2510(8). *See,*

*e.g.,* Summary at p. 55 ("The drift net collected the so-called metadata of domestic

communications—the web links we clicked, the numeric addresses of our computers, the 'to' and

'from' and 'subject lines' of our emails, the telephone numbers we dialed, the parties and times and

durations of our calls.").  Moreover, even if the government limited its analysis to routing and

addressing information such as phone numbers, Internet Protocol (IP) addresses and email addresses,

such information contains "contents" under FISA's definition of the term, which is significantly

broader than Title III's definition.  *See* 50 U.S.C. § 1801(n) (" 'Contents,' when used with respect to

a communication, includes *any information concerning the identity of the parties to such*

*communication* or the existence, substance, purport, or meaning of that communication."); Summary

at p. 29 ("The president's program uses information collected from phone companies.  The phone

companies keep their records.  They have a record.  And it shows what telephone number called

what other telephone number.").

      In sum, the Attorney General's certification under section 802(a)(5) as to the alleged content

dragnet simply does not reach the conduct actually alleged by plaintiffs; nor does his only remaining

---

*(footnote continued from preceding page)*

Department of Justice, Searching and Seizing Computers and Obtaining Electronic Evidence in
Criminal Investigations § III.C.3 (Jul. 2002) ("[t]he subject headers of e-mails are also contents"));
*see also In Matter of Application of U.S. For an Order Authorizing the Installation and Use of a
Pen Register and a Trap & Trace Device on E-Mail Account,* 416 F.Supp.2d 13, 17-18 (D.D.C.
2006) ("the stricture to avoid the contents of e-mail communications should be easy to comply with
so long as the…devices exclude all information relating to the subject line …."); *In re Application
of  U. S. for an Order Authorizing the Use of a Pen Register & Trap,* 396 F.Supp.2d 45, 48 (D.
Mass. 2005) ("information contained in the 'subject' would reveal the contents of the
communication….")

[13] *See U.S. v. Forrester,* 495 F.3d 1041, 1049 n.6 (9th Cir. 2007) ("Surveillance techniques that
enable the government to determine…the uniform resource locators ('URL') of the pages visited
might be more constitutionally problematic.  A URL…identifies the particular document within a
website that a person views and thus reveals much more information about the person's Internet
activity."); *see also* Opsahl Decl., Vol. 4, Ex. 64 (U.S. Department of Justice, United States
Attorney Manual § 9-7.500 (Sep. 2003) (prohibiting collection of URLs without prior consultation
with DOJ headquarters to determine whether the URLs sought will contain content or not)).

[14] *See In re Application of U. S. for an Order Authorizing the Use of a Pen Register & Trap,* 396
F.Supp.2d at 49 (a search phrase entered by a user of Google's search engine "would reveal
content—that is, it would reveal…information concerning the substance, purport or meaning of
that communication.") (internal quotation omitted).

-42-

certification as to plaintiffs' content claims, made in reference to the so-called "Terrorist Surveillance Program" or "TSP." As the Attorney General notes, "the plaintiffs do not appear to challenge the provider-defendants' alleged assistance to the NSA in the conduct of the publicly acknowledged TSP[,]" Dkt. No. 469-3 at 5:23-24, but he nevertheless asserts that "at least one" of the paragraphs of section 802(a) applies to that alleged assistance. *Id*. at 6:1-2. However, as the evidence shows, there is *no such thing* as a separate "Terrorist Surveillance Program." Summary at pp. 50-53. Rather, the "Terrorist Surveillance Program" is a marketing term, addressing one aspect of the broader program and nothing more, which was coined after the program was revealed to the public. Summary at pp. 52-53. Therefore, and as the Attorney General himself concedes, any certification regarding the so-called "TSP" is wholly irrelevant to the to the causes of action asserted in the complaints. And to the extent the Attorney General means to suggest that the alleged content dragnet was somehow a component of the "TSP," *i.e.*, the interception of "certain 'one-end' international communication to or from the United States that the Government reasonably believed involved a member or agent of al Qaeda or affiliated terrorist organization," Dkt. No. 469-3 at 5:9-12 (defining the "TSP"), the evidence demonstrates that the content dragnet acquired communications prior to any determination that the those communications crossed the border or involved persons linked to terrorists. Summary at pp. 16-21.

As for plaintiffs' claims regarding the defendants' disclosure of non-content communications records to the government, the Attorney General asserts that "at least one" paragraph of section 802(a) applies to those allegations, including the "possibility" of section 802(a)(5). Dkt. No. 469-3 at 6:9-14. To the extent that the classified version of the Attorney General's certification does in fact contend that section 802(a)(5) applies, plaintiffs' evidence demonstrates otherwise. Summary at pp. 26-33 (describing evidence of defendants' disclosure of communications records without lawful authorization).

> **2.  Dismissal Under Section 802(a)(4) Is Improper Because There Is Not Substantial Evidence That The Dragnet Surveillance Was Designed To Detect Or Prevent A Terrorist Attack Against The United States**

Dismissal under subsection (a)(4) requires that the Attorney General carry his burden of showing there is substantial evidence in the record as a whole proving that the "intelligence activity

-43-

involving communications" at issue was "*designed to* detect or prevent a terrorist attack, or activities in preparation for a terrorist attack, against the United States." 50 U.S.C. § 1885a(a)(4) (emphasis added). The Attorney General cannot do so because the Program is a massive warrantless dragnet designed not to detect a terrorist attack but to conduct suspicionless domestic surveillance of millions of Americans. Summary, Section I; *see also* Marcus Declaration (Hepting Dkt. No. 32).

"Design" means "to devise for a specific function or end." WEBSTER'S COLLEGIATE DICTIONARY 338 (11th ed. 2003). Accordingly, subsection (a)(4) requires the Attorney General to prove that the surveillance activities were devised for the specific function of detecting and preventing terrorist attacks on the United States (or activities in preparation for such an attack), not for some broader function, such as the wholesale suspicionless acquisition of the communications and communications records of millions of Americans. It is not sufficient simply to show that a few of the communications or records that were acquired may have been used subsequently to attempt to detect or prevent a terrorist attack. "Design" requires something more: an objective, purposeful, and specific correlation between ends and means. Dragnet surveillance cannot qualify as surveillance *designed to* detect or prevent a terrorist attack on the United States because its specific function or end is to collect everything, not to collect only communications and records connected to suspected terrorists. To hold otherwise would give no effect to the phrase "designed to," and would interpret subsection (a)(4) as if the "designed to" limitation were not there.

The construction of the term "designed" in other statutes also supports this understanding of the phrase "designed to." In *U.S. v. Fredman*, 833 F.2d 837, 838 (9th Cir. 1987), the Ninth Circuit considered whether commercial explosive components fell "within statutory definition of a 'destructive device,' defined as 'any combination of parts either designed or intended for use in converting' the same into a device similar to an explosive or incendiary bomb or grenade. 26 U.S.C. § 5845(f)." The court held: "We cannot conclude that the components are designed as a weapon, since it is admitted that the seized explosive components are designed for use as commercial blasting components." *Id.* at 838. In *U.S. v. Dalpiaz*, 527 F.2d 548, 551 (6th Cir. 1975), the court looked at a military projectile simulator device, built to recreate the experience of battlefield explosions for soldiers in training without the actual use of dangerous weaponry. The court distinguished between

-44-

design and intent, holding that " ' "designed" . . . refers to objective, physical structure or method of operation and not to intent or schemes of the possessor.' " *Id.* The defendant's intent in using the device thus was "irrelevant." *Id.* Similarly, in *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 501 (1982), the Supreme Court held that whether an item was "designed" for use with illegal drugs should be decided by looking to the item's "objective features." The Court on this basis distinguished items designed for use with illegal drugs from items of more general use that, although capable of use with illegal drugs, had a wide range of other uses: "It is also sufficiently clear that items which are principally used for nondrug purposes, such as ordinary pipes, are not 'designed for use' with illegal drugs," even though they are capable of that use. *Id.*

Thus, the objective features of the Program determine what it is designed to accomplish. If the objective, physical structure or method of operation of the Program is to conduct dragnet domestic surveillance, then it was not designed for the specific and far narrower purpose of detecting or preventing a terrorist attack on the United States, even if the Attorney General asserts an intent to use the acquired communications and records subsequently for that narrower purpose. An intelligence program whose objective features are the mass suspicionless acquisition of millions of communications and records is one designed to accomplish the function of dragnet domestic surveillance, not to accomplish the specific function of preventing terrorist attacks against the United States. Indeed, a government report has shown that "automated identification of terrorists through data mining" is not even "feasible as an objective." Summary at pp. 15-16.

Here, the objective features of the dragnet domestic surveillance that plaintiffs have demonstrated is occurring were not designed for the specific function of detecting or preventing a terrorist attack but for the broader purpose of acquiring as many communications and communications records as possible, regardless of whether those communications and records bear any connection to terrorism at all. As this Court has held, the dragnet domestic surveillance at issue in this litigation "cannot reasonably be said . . . [to be] limited to tracking foreign powers." *Hepting*, 439 F.Supp.2d at 1010. (A "foreign power" includes "a group engaged in international terrorism or activities in preparation therefor." 50 U.S.C. § 1801(a)(4).). Moreover, a "written request or directive" to a carrier setting forth nothing more than that the surveillance was "(i) authorized by the

-45-

President; and (ii) determined to be lawful" (50 U.S.C. § 1885a(a)(4)(B)) is not evidence that the Program's design satisfies subsection (a)(4). Nothing in those two assertions demonstrates that the Program was designed to acquire only communications and records of suspected terrorists, and was not designed for the mass, suspicionless acquisition of millions of communications and records. Thus, the wholesale dragnet domestic surveillance demonstrated by the evidence here is not a program that is "*designed* to detect or prevent a terrorist attack," and the government cannot rely on subsection (a)(4).

### 3. There Is Not Substantial Evidence Supporting Dismissal Under Any Other Provision Of Section 802(a)

There is no substantial evidence that would support dismissal under subsections (1), (2), or (3) of section 802(a). All of these subsections, for example, require that the surveillance have been conducted "pursuant to" one of several statutory authorizations. None of these statutory provisions, however, can override the constitutional limitations that the Fourth Amendment and *Keith* impose on surveillance. Thus, the government's suspicionless dragnet surveillance cannot be said to have been "pursuant to" any of these statutory authorizations.

In addition to this fundamental defect prohibiting certification of dragnet surveillance under any of subsections (1), (2), or (3), there are other bars to certification applicable to individual subsections. Subsection (1) requires that surveillance have been conducted pursuant to a FISA court order, *i.e.*, "an order of the court established under section 103(a) [50 U.S.C. § 1803(a)]." 50 U.S.C. § 1885a(a)(1). Yet it is undisputed that before January 17, 2007, the surveillance program was conducted without any FISA court order. If the dragnet surveillance is now being conducted pursuant to a FISA court order, *see* Summary at pp. 46-49 (summarizing evidence regarding the 2007 interactions with the FISA court), such an order would lack the individualized suspicion required by the Fourth Amendment and *Keith,* and would thus be unconstitutional.

Subsection (2) requires that the surveillance have been authorized pursuant to a certification under sections 2511(2)(a)(ii)(B) or 2709(b) of title 18. *See* 50 U.S.C. § 1885a(a)(2). With respect to assistance pursuant to section 2511(2)(a)(ii)(B), the Court has already held that that provision cannot be used to authorize dragnet surveillance that violates the Constitution. *Hepting*, 439 F.Supp.2d at

-46-

995.  Nor were the letters actually received by defendants certifications in writing under 18 U.S.C.

§ 2511(2)(a)(ii)(B).  Summary at p. 22.  They could not have been, since the government has

admitted that all statutory requirements had not been met and therefore could not have provided a

section 2511(2)(a)(ii)(B) certification.  Summary at pp. 7-11.  Indeed, concerns over the Program's

legality ran so high, about two dozen administration officials were on the verge of resignation in

March 2004.  Summary at pp. 41-45.

With respect to section 2709(b), the National Security Letter provision, that statute is

unconstitutional.  *Doe v. Gonzales,* 500 F.Supp.2d at 425.  Moreover, section 2709(b) only

authorizes requests for the specific "records" of "a person or entity" where those records are

"relevant to an authorized investigation" into international terrorism or intelligence activities, 18

U.S.C. § 2709(b)(1), and cannot reach the records—much less the communications content—of

millions of unidentified Americans with no connection to any terrorism or intelligence

investigation.[15]  Accordingly, no assistance could be properly certified as "provided pursuant to" the

National Security Letter authority.

Subsection (3), codified at 50 U.S.C. § 1885a(a)(3), requires that the surveillance have been

authorized pursuant to a directive under section 102(a)(4) of the original FISA (codified at 50 U.S.C.

§ 1802(a)(4)), section 105B(e) as temporarily added by the Protect America Act of 2007 (PAA)

(formerly codified at 50 U.S.C. § 1805b(e)), or section 702(h) as added by the FISAAA (newly

codified at 50 USC § 1881a(h)).  However, section 102 only authorizes surveillance that "is solely

directed at…means of communication used exclusively between foreign powers…[where] there is

no substantial likelihood that the surveillance will acquire the contents of any communication to

which a United States person is a party," 50 U.S.C. § 1802(a)(1)(A), and therefore is clearly

inapplicable to the surveillance of domestic communications facilities alleged here.  As for section

105B as added by the PAA, not only is it inapplicable to surveillance prior to August 2007 when the

PAA was enacted, but the government has admitted that none of the assistance alleged in the various

complaints was provided pursuant to a PAA directive.  Summary at p. 49.  Furthermore, PAA

---

[15] In addition, defendant Verizon has specifically denied providing the alleged assistance pursuant to the NSL statute.  Summary at pp. 40-41.

MDL PLAINTIFFS' OPPOSITION TO
MOTION OF THE UNITED STATES SEEKING TO APPLY 50 U.S.C.
§ 1885a TO DISMISS THESE ACTIONS

surveillance under section 105B is limited to the "acquisition of foreign intelligence information concerning persons reasonably believed to be outside the United States . . . ." 50 U.S.C. § 1805b(a). Similarly, the new section 702 of FISA as amended by the FISAAA only authorizes surveillance that "target[s] . . . persons reasonably believed to be located outside the United States . . . ." 50 U.S.C. § 1881a(a). On their faces, these limited authorizations under FISA, the PAA and the FISAAA cannot authorize the alleged dragnet interception of millions of ordinary Americans' domestic communications, nor would the Fourth Amendment allow it.

### C. The Attorney General's Actions Must Also Satisfy The APA

If the Court holds that Congress's delegation to the Attorney General of the power to make the factual determinations of subsections (a)(1) through (a)(5) and the power to file a certification is constitutional, then the Attorney General's exercise of these powers is reviewable under the Administrative Procedures Act (APA), 5 U.S.C. § 551 *et seq.* The Attorney General's filing of a certification under section 802(a) is final agency action under the APA, and thus is reviewable under 5 U.S.C. § 704. *See Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 230 (1986) (Commerce Secretary's decision not to certify Japan's violations of whale harvest quotas, which would have subjected it to statutory penalties, was reviewable under the APA); *U.S. v. Carpenter*, 526 F.3d 1237, 1241 (9th Cir. 2008) (Attorney General's decision to enter into litigation settlement agreement was reviewable under the APA; " 'Final actions of the Attorney General fall within the definition of agency action reviewable under the APA.' ").

Thus, in addition to reviewing the certifications under section 802(b) to determine whether they are supported by substantial evidence, the certifications and the Attorney General's decision to file them are subject to review under 5 U.S.C. § 706, including whether those actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory . . . authority[] or limitations," or "contrary to constitutional right, power, privilege, or immunity." This review is on the "whole record" before the Attorney General. 5 U.S.C. § 706.

For example, a certification invoking section 802(a)(4) must be reviewed to ensure (1) that the government actually sent written requests or directives to defendants, (2) that the requests or directives actually set forth the required statements, (3) that the determination that the surveillance

-48-

was lawful was reasonable and not based on an erroneous reading of law, and (4) that the Attorney General's decision to make a certification to the Court under section 802(a)(4) was not an abuse of discretion or otherwise improper (*e.g.*, was not done to cover up criminal or other unlawful conduct by government officials or by the carriers). A certification invoking section 802(a)(3) must be reviewed to ensure (1) that the government actually sent directives to defendants, (2) that the directives actually implicated the relevant statutes, (3) that the invocation of those statutes was reasonable and not based on an erroneous reading of law, and (4) that the Attorney General's decision to make a certification to the Court under section 802(a)(3) was not an abuse of discretion or otherwise improper.

### D. Plaintiffs Are Entitled To Discovery To Rebut The Government's Showing

Plaintiffs respectfully disagree with the Court's ruling that they are prohibited from seeking discovery to support their opposition to this motion. Under Federal Rule of Civil Procedure 26, plaintiffs are entitled to seek discovery of information relevant to any party's claim or defense. Moreover, since section 802 requires the government to submit extrinsic evidence to the court, and since in opposition plaintiffs cannot rest merely on the allegations of their complaints, the government's motion is necessarily a summary judgment motion. *See* Fed. R. Civ. P. 12(d). Accordingly, plaintiffs "must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id*. Rule 56(f) further provides that the Court may not decide the government's motion until it has provided plaintiffs with an opportunity to conduct discovery and obtain "facts essential to justify its opposition." Fed. R. Civ. P. 56(f) (providing for continuances of summary judgment motions "to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken"). Plaintiffs are submitting herewith a declaration invoking their Rule 56(f) discovery rights.

Nothing in FISAAA purports to eliminate or restrict the discovery authorized by the Federal Rules of Civil Procedure. Congress did not need to "permit" or "grant" discovery in FISAAA. Rule 26 already does that for FISAAA as it does for all other statutes. Instead, Congress needed to clearly and affirmatively deny discovery in FISAAA if it wanted to displace Federal Rule of Civil Procedure 26. Plainly, Congress did not do so. Moreover, as explained above, due process requires

-49-

1  plaintiffs have a full and fair opportunity to oppose dismissal of their lawsuit.

2       Moreover, section 802(d) authorizes the Court to review not just the Attorney General

3  certification and supplementary materials, but other classified information that is "relevant to the

4  proceeding:" "To the extent that classified information is relevant to the proceeding or would be

5  revealed in the determination of an issue, the court *shall* review such information *in camera* and *ex*

6  *parte*." 50 U.S.C. § 1885a(d) (emphasis added). This provision is consistent with 50 U.S.C.

7  § 1806(f), which by preempting the state secrets privilege likewise provides that courts are to decide

8  surveillance cases on the merits and are to do so by reviewing, under appropriate security

9  procedures, *all* relevant evidence, not just a limited subset of evidence cherry-picked by the

10  government, and are to provide access to that evidence, where necessary and under appropriate

11  security procedures, to counsel for the plaintiffs.

12       Finally, by submitting evidence with regard to the communications content and records

13  surveillance alleged by plaintiffs for the purpose of proving disputed facts regarding the surveillance,

14  the government has waived the state secrets privilege even in the absence of section 1806(f). It is a

15  basic principle of the law of evidentiary privileges that once a party introduces or selectively

16  discloses evidence protected by a privilege in order to prove a disputed fact or to gain some other

17  litigation advantage, it waives the privilege with respect to the subject of the disclosure.

18                                    **CONCLUSION**

19       For the foregoing reasons, the Court should deny the government's motion and hold that

20  section 802 is unconstitutional and cannot be used to dismiss plaintiffs' actions. Alternatively, the

21  Court should deny the government's motion on the ground that it has not met its burden of

22  presenting substantial evidence in support of its certifications.

23

24  DATED: October 16, 2008              Respectfully submitted,

25

26                                      _____/s/  Cindy A. Cohn_____

27  ROGER BALDWIN FOUNDATION OF          ELECTRONIC FRONTIER FOUNDATION
    ACLU                                 CINDY A. COHN, ESQ.
    HARVEY GROSSMAN                      LEE TIEN, ESQ.
28  ADAM SCHWARTZ                        KURT OPSAHL, ESQ.

                                    -50-

180 North Michigan Avenue
Suite 2300
Chicago, IL 60601
Telephone: (312) 201-9740
Facsimile: (312) 201-9760

COUNSEL FOR AT&T CLASS
PLAINTIFFS AND CO-CHAIR OF
PLAINTIFFS' EXECUTIVE COMMITTEE

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
ANN BRICK
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

COUNSEL FOR PLAINTIFFS IN
CAMPBELL v. AT&T AND RIORDAN v.
VERIZON COMMUNICATIONS INC.

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
PETER J. ELIASBERG
1313 West Eighth St.,
Los Angeles, CA 90026

Telephone: (213) 977-9500
Facsimile: (213) 977-5299

COUNSEL FOR PLAINTIFFS IN
CAMPBELL v. AT&T AND RIORDAN v.
VERIZON COMMUNICATIONS INC.

FENWICK & WEST LLP
LAURENCE F. PULGRAM
JENNIFER KELLY
CANDACE MOREY
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 875-2300
Facsimile: (415) 281-1350

COUNSEL FOR PLAINTIFFS IN
CAMPBELL v. AT&T AND RIORDAN v.
VERIZON COMMUNICATIONS INC.

KEVIN S. BANKSTON, ESQ.
CORYNNE MCSHERRY, ESQ.
JAMES S. TYRE, ESQ.
454 Shotwell Street
San Francisco, CA 94110
Telephone: (415) 436-9333 x108
Facsimile: (415) 436-9993

COUNSEL FOR
AT&T CLASS PLAINTIFFS AND
CO-CHAIR OF PLAINTIFFS' EXECUTIVE
COMMITTEE

LAW OFFICE OF RICHARD R. WIEBE
RICHARD R. WIEBE
425 California Street
Suite 2025
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

COUNSEL FOR AT&T CLASS PLAINTIFFS

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
ELIZABETH J. CABRASER
BARRY R. HIMMELSTEIN
ERIC B. FASTIFF
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

PLAINTIFFS' COUNSEL FOR MCI
SUBSCRIBER CLASS

LISKA, EXNICIOS & NUNGESSER
ATTORNEYS-AT-LAW
VAL PATRICK EXNICIOS
One Canal Place, Suite 2290
365 Canal Street
New Orleans, LA 70130
Telephone: (504) 410-9611
Facsimile: (504) 410-9937

PLAINTIFFS' COUNSEL FOR BELLSOUTH
SUBSCRIBER CLASS

-51-

MOTLEY RICE LLC
RONALD MOTLEY
DONALD MIGLIORI
JODI WESTBROOK FLOWERS
VINCENT I. PARRETT
28 Bridgeside Boulevard
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9000
Facsimile: (843) 216-9450

PLAINTIFFS' COUNSEL FOR VERIZON
SUBSCRIBER CLASS

THE MASON LAW FIRM, PC
GARY E. MASON
NICHOLAS A. MIGLIACCIO
1225 19th St., NW, Ste. 500
Washington, DC 20036
Telephone: (202) 429-2290
Facsimile: (202) 429-2294

PLAINTIFFS' COUNSEL FOR SPRINT
SUBSCRIBER CLASS

BRUCE I AFRAN, ESQ.
10 Braeburn Drive
Princeton, NJ 08540
609-924-2075

PLAINTIFFS' COUNSEL FOR
BELLSOUTH SUBSCRIBER CLASS

MAYER LAW GROUP LLC
CARL J. MAYER
66 Witherspoon Street, Suite 414
Princeton, New Jersey 08542
Telephone: (609) 921-8025
Facsimile: (609) 921-6964

PLAINTIFFS' COUNSEL FOR BELLSOUTH
SUBSCRIBER CLASS

THE LAW OFFICES OF STEVEN E.
SCHWARZ, ESQ.
STEVEN E. SCHWARZ
2461 W. Foster Ave., #1W
Chicago, IL 60625
Telephone: (773) 837-6134

PLAINTIFFS' COUNSEL FOR BELLSOUTH
SUBSCRIBER CLASS

KRISLOV & ASSOCIATES, LTD.
CLINTON A. KRISLOV
20 North Wacker Drive
Suite 1350
Chicago, IL 60606
Telephone: (312) 606-0500
Facsimile: (312) 606-0207

PLAINTIFFS' COUNSEL FOR BELLSOUTH
SUBSCRIBER CLASS

-52-