KARI E. HONG (CA SBN 220252)
Law Offices of Kari E. Hong
1300 Clay Street, Suite 600
Oakland, CA 94612
Telephone: 510.384.4524
Facsimile: 510.228.0344
Email: kari@honglawfirm.com

AZIZ HUQ (NY SBN 4079877) (*Pro Hac Vice*)[1]
Brennan Center for Justice at NYU School of Law
161 Avenue of the Americas, 12th Floor
New York, NY 10013
T: 212.998.6289
F: 212.995.4550
Email: aziz.huq@nyu.edu

*Attorneys for Amicus Curiae*
*Brennan Center for Justice*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE NATIONAL SECURITY AGENCY TELECOMMUNICATIONS RECORDS LITIGATION, MDL No. 1791 | MDL Docket No 06-1791 VRW |

This Document Relates To All Cases Except:

*Al-Haramain Islamic Foundation, Inc. v. Bush*, No. 07-0109; *Center for Constitutional Rights v. Bush*, No. 07-1115; *Guzzi v. Bush*, No. 06-06225; *Shubert v. Bush*, No. 07-0693; *Clayton v. AT&T Commc'ns of the Southwest*, No. 07-1187; *U. S. v. Adams*, No. 07-1323; *U. S. v. Clayton*, No. 07-1242; *U. S. v. Palermino*, No. 07-1326; *U. S. v. Rabner*, No. 07-1324; *U. S. v. Volz*, No. 07-1396

**BRIEF AMICUS CURIAE**

**IN OPPOSITION TO THE GOVERNMENT'S MOTION TO DISMISS**

---

[1] Application for *Pro Hac Vice* Admission is pending.

Dockets.Justia.com

# TABLE OF CONTENTS

Table of Contents ..................................................................................................... i

Table of Authorities ................................................................................................ i

Interests of Amicus ................................................................................................ 1

Summary of Argument ........................................................................................... 1

Argument .............................................................................................................. 2

I.    The Government's Interpretation Of § 802 As Ground For Immediate Dismissal Violates The Separation Of Powers. ................................................ 3

    A.  Section 802 Violates *Klein's* Rejection Of Congressionally Enacted Rules Of Decision. ......................................................................... 4

    B.  Section 802 Implicates The Same Separation-Of-Powers Concerns That Led The Supreme Court To Announce *Klein*'s Rule. ...................... 7

II.   This Court, If It Does Not Invalidate § 802, Should Interpret That Provision To Maximize Judicial Review. ..................................................... 10

    A.  The Government's Reading Of § 802's Limited Scope Of Review Raises Serious Separation-Of-Powers Problems. ...................................... 11

    B.  The Government's National Security Arguments Do Not Render Searching Review Inappropriate. .......................................................... 14

Conclusion .......................................................................................................... 16

# TABLE OF AUTHORITIES

## Cases

*Bowen v. Mich. Acad. of Family Physicians,*
    476 U.S. 667 (1986) .................................................................................... 13

*Capistrano Unified Sch. Dist. v. Wartenberg,*
    59 F.3d 884 (9th Cir. 1995) ........................................................................ 13

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991) ........................................................................................ 3

*Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n,*
    961 F.2d 667 (7th Cir. 1992) ..................................................................... 10

*Dickinson v. Zurko,*
    527 U.S. 150 (U.S. 1999) ............................................................................ 12

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
　　485 U.S. 568 (1988)........................................................................... 13

*Fletcher v. Peck,*
　　10 U.S. (6 Cranch) 87 (1810) ......................................................... 3, 5

*Gray v. First Winthrop Corp.,*
　　989 F.2d 1564 (9th Cir. 1993) .............................................................. 5

*Gutierrez de Martinez v. Lamagno,*
　　515 U.S. 417 (1995)...................................................... 2, 11, 12, 13

*Hayburn's Case,*
　　10 U.S. (2 Dall.) 409 (1792)............................................................. 11

*In re Consolidated U.S. Atmospheric Testing Litig.,*
　　820 F.2d 982 (9th Cir. 1987) ................................................................ 7

*In re Murchison,*
　　349 U.S. 133 (1955)........................................................................... 12

*Landgraf v. USI Film Products,*
　　511 U.S. 244 (1994).............................................................................. 5

*Little v. Barreme,*
　　6 U.S. (2 Cranch) 170 (1804) ............................................................ 15

*Loving v. United States,*
　　517 U.S. 748 (1996) ............................................................................. 3

*Miller v. French,*
　　530 U.S. 327 (2000).......................................................................... 2, 5

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.,*
　　458 U.S. 50 (1982).............................................................................. 2

*O'Shea v. Littleton,*
　　414 U.S. 488 (1974).......................................................................... 14

*Parhat v. Gates,*
　　532 F.3d 834 (D.C. Cir. 2008) ......................................................... 15

*Plaut v. Spendthrift Farm, Inc.,*
　　514 U.S. 211 (1995).......................................................................... 3, 5

*Robertson v. Seattle Audubon Soc'y,*
　　503 U.S. 429 (1992)........................................................................... 5, 6

*Sprint Commc'ns Co. v. APCC Servs., Inc.,*
　　128 S. Ct. 2531 (2008) ...................................................................... 14

*Talbot v. Seeman,*
　　5 U.S. (1 Cranch) 1 (1801) ............................................................... 15

*United States v. F.S.J.*,
    265 F.3d 764 (9th Cir. 2001) ............................................................ 12

*United States v. Hudson*,
    11 U.S. (7 Cranch) 32 (1812) ............................................................ 3

*United States v. Klein*,
    80 U.S. (13 Wall.) 128 (1871) .................................................... passim

*United States v. Nourse*,
    34 U.S. (9 Pet.) 8 (1835) ................................................................ 12

*United States v. Padelford*,
    76 U.S. (9 Wall.) 531 (1869) ............................................................ 4

*United States v. Sioux Nation of Indians*,
    448 U.S. 371 (1980) ............................................................ 4, 5, 7, 8

*Wilson v. United States*,
    4 Ct. Cl. 559 (1869) ........................................................................ 4

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579(1952) ...................................................................... 15

**Statutes**

50 U.S.C. § 1881a .............................................................................. 16

50 U.S.C. § 1881b .............................................................................. 16

50 U.S.C. § 1885a .......................................................................... 1, 10

Abandoned and Captured Property Act, 12 Stat. 820 ............................ 4

Act of July 12, 1870, ch. 251, 16 Stat 230 ........................................... 4

Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2680 (codified at 10 U.S.C. § 801 note) ....................................................... 15

FISA Amendments Act of 2008, Pub. L. No. 110-261, 122 Stat. 2467 ................ 1

Foreign Intelligence Surveillance Act of 1978, § 802 ...................... passim

Westfall Act, 28 U.S.C. § 2679(d)(1) ................................................. 11

**Legislative History**

S. Rep. No. 110-209 (2007 ................................................................. 9

1 Annals of Cong. 457 (Joseph Gales ed., 1834) .............................. 11

154 Cong. Rec. S179 (daily ed. Jan. 23, 2008) ................................ 14

154 Cong. Rec. H5743 (daily ed. June 20, 2008) ................. 6, 8, 9, 14

154 Cong. Rec. S6082 (daily ed. June 24, 2008) .............................. 7, 8

154 Cong. Rec. S6097 (daily ed. June 25, 2008) ................................ 9

154 Cong. Rec. S6470 (daily ed. July 9, 2008) ............................ 7, 8, 9

**Other Authorities**

Fletcher, *Atomic Bomb Testing and the Warner Amendment: A Violation of the Separation of Powers*, 65 Wash. L. Rev. 285 (1990) ......................................................................... 4

Lichtblau & Shane, *Companies Seeking Immunity Donate to Senator*, N.Y. Times, Oct. 23, 2007 ......................................................................................................... 10

Sager, Klein*'s First Principle: A Proposed Solution*, 86 Geo. L. J. 2525 (1998) ........................ 8

Snider, *Recollections from the Church Committee's Investigation of NSA,* Stud. in Intelligence, Winter 1999-2000, at 43-51 ......................................................................... 16

The Federalist No. 78 (Alexander Hamilton) (Isaac Kramnick, ed., 1987) ................................ 11

## INTERESTS OF AMICUS

Amicus the Brennan Center for Justice at New York University School of Law ("Brennan Center") is a non-partisan public policy and law institute that focuses on fundamental issues of democracy and justice. Our work ranges from voting rights to redistricting reform, from access to the courts to presidential power in the fight against terrorism. We are concerned with the dangers that national security policy, including the use of new information technologies, poses to privacy and other constitutional liberties. The Brennan Center focuses on preserving the Separation of Powers, which the Framers intended as a bulwark against violations of Americans' freedoms.

Amicus submits this brief in support of plaintiffs' opposition to the government's motion to dismiss to aid this Court's consideration of the novel and complex separation-of-powers questions raised by section 802 of the Foreign Intelligence Surveillance Act. *See* Pub. L. No. 110-261, 122 Stat. 2467, tit. II, § 201 (2008) (codified at 50 U.S.C. § 1885a) ("§ 802").

Based on our expertise and scholarship about the Separation of Powers, we respectfully urge this Court to deny the government's motion to dismiss. Section 802, as applied to these pending cases, violates the Separation of Powers because it creates a fictional veneer of judicial review. Alternatively, we urge the Court to construe § 802 in a way that ensures the plenary, adversarial testing of the Attorney General's certification that Article III requires.

## SUMMARY OF ARGUMENT

Section 802 is an almost unprecedented, and fundamentally disingenuous, assault on the Article III judiciary's independence and integrity. In § 802, Congress has singled out a handful of disfavored cases—suits against telecoms for illegal aid to the National Security Agency. It has instructed courts to dismiss these if the Attorney General certified to certain facts. But Congress did *not* change the underlying substantive law: Defendants' alleged conduct remains illegal, and is still a basis for liability absent Attorney General certification. As a result, § 802 fosters an

appearance of independent judicial scrutiny while directing courts to ignore the underlying law and to dismiss conclusively certain cases. Such commandeering of a coequal branch undermines the judiciary's independence and violates the Separation of Powers.

While affirming Congress's power to change retroactively federal law to effect pending cases, the Supreme Court has cautioned persistently that Congress cannot impose a "rule of decision" that interferes with the essential independence of Article III courts. *United States v. Klein*, 80 U.S. (13 Wall.) 128, 146 (1871). The *Klein* rule has special force when—as here— Congress picks out specific cases and then tampers with the mechanisms of adjudication in order to achieve a result beneficial to the government.

Even if this Court does not invalidate § 802 under *Klein*, the Separation of Powers demands that the Attorney General's § 802 certification be subjected to stringent, adversarial testing. Federal courts' Article III power to adjudicate cases and controversies must be exercised independently. According to the government, though, § 802 operates by allowing the Attorney General to file a document that plaintiffs cannot read and to make claims about the factual bases for dismissal that plaintiffs have no effective chance to examine or contest. Leaving this Court only such "rubber-stamp work," *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 429 (1995), this view of § 802 raises serious constitutional concerns. It should be rejected in favor of a vigorous adversarial process to scrutinize the facts behind the Attorney General's certification.

## ARGUMENT

The Constitution creates "three distinct Branches, each to exercise one of the governmental powers recognized by the Framers as inherently distinct." *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 57 (1982). It therefore "prohibits one branch from encroaching on the central prerogatives of another." *Miller v. French*, 530 U.S. 327, 341 (2000);

*accord Loving v. United States*, 517 U.S. 748, 757 (1996) ("[T]he separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties.").

Congress is therefore forbidden from imposing rules on the federal courts "in a manner repugnant to the text, structure, and traditions of Article III." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995); *see also United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812) ("Certain implied powers must necessarily result to our Courts of justice from the nature of their institution."). "Article III courts, as an independent and coequal Branch of Government, derive from the Constitution itself, once they have been created and their jurisdiction established, the authority to do what courts have traditionally done in order to accomplish their assigned tasks." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 58 (1991) (Scalia, J., dissenting). The Constitution makes it "the peculiar province of the legislature to prescribe general rules for the government of society." *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 136 (1810) (Marshall, C.J.). "[T]he application of those rules to individuals in society would seem to be the duty of other departments." *Id.* Section 802, however, violates these principles in two distinct ways.

## I.   The Government's Interpretation Of § 802 As Ground For Immediate Dismissal Violates The Separation Of Powers.

Section 802 first threatens the Separation of Powers because Congress has singled out certain cases, and in practical effect ordered the courts to decide those cases in a manner favorable to the government. It has tried to accomplish this without changing the underlying substantive law or otherwise taking political accountability for what it aims to do. The result is an illegitimate "rule of decision" that seeks to suborn the courts into a threadbare imitation of independent review. *Klein*, 80 U.S. at 146. While the rule of *Klein* has been applied sparingly—Congress does not meddle with a coordinate branch's essential functioning often—it is consistently reaffirmed by the Supreme Court. Section 802, moreover, is that *rara avis* bearing all the signature traits the *Klein* Court flagged as danger signs: a legislative branch singling out

disfavored litigants in pending cases and trying to deny them relief by restricting the traditional independence of the federal courts so as to obtain results the government wants.

A.      **Section 802 Violates *Klein's* Rejection Of Congressionally Enacted Rules Of Decision.**

The Supreme Court first articulated the constitutional bar on "rules of decision" in *United States v. Klein*. 80 U.S. at 128. That case involved the executor of the estate of a Confederate sympathizer (Klein), who sought to recover property seized during the Civil War under the Abandoned and Captured Property Act. This law afforded relief to property holders who proved they had "never given any aid or comfort" to the Confederacy. 12 Stat. 820; *see generally United States v. Sioux Nation of Indians*, 448 U.S. 371, 402-04 (1980) (explaining *Klein*'s facts). The Court of Claims concluded that any person who had received a presidential pardon was also entitled to recover property under the terms of the statute. *Wilson v. United States*, 4 Ct. Cl. 559 (1869); *accord United States v. Padelford*, 76 U.S. (9 Wall.) 531 (1869).

Enraged by the courts' treatment of pardoned disloyals, Congress added a proviso to an appropriations bill stating, *inter alia*, that no presidential pardon or amnesty was to be admissible as proof of loyalty under the Abandoned and Captured Property Act. *See* William A. Fletcher, *Atomic Bomb Testing and the Warner Amendment: A Violation of the Separation of Powers*, 65 Wash. L. Rev. 285, 314-15 & nn.155-57 (1990) (noting Congress's intent to have Klein's particular suit dismissed). This proviso became law after Klein won in the Court of Claims but before his appeal reached the Supreme Court. *See* Act of July 12, 1870, ch. 251, 16 Stat. 230, 235.

But the Supreme Court in *Klein* refused to give effect to the proviso. It held instead that "the proviso was unconstitutional in two respects," one of which is relevant here. *Sioux Nation*, 448 U.S. at 404. Not only did the proviso effectively nullify a presidential pardon, it also

"prescribed a rule of decision in a case pending before the courts, and did so in a manner that required the courts to decide a controversy in the Government's favor." *Id.*; *see* Fletcher, *supra*, at 315 n.158 (*Klein*'s Separation of Powers conclusion is a separate holding). Chief Justice Chase explained that the proviso "passed the limit which separates the legislative from the judicial power" because it "required [the court] to ascertain the existence of certain facts and thereupon to declare that its jurisdiction … has ceased." *Klein*, 80 U.S. at 146-47.

After *Klein*, federal courts have clarified and explained the prohibition on "rules of decision" in ways that make it clear that § 802 violates the Constitution. Under our Separation of Powers, Congress is allowed to change underlying substantive law governing primary conduct, even if this change alters the legal consequences of past conduct in pending cases. *See Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 438-39 (1992); *Gray v. First Winthrop Corp.*, 989 F.2d 1564, 1568 (9th Cir. 1993) (Separation of Powers is violated where Congress directs certain outcomes in pending litigation without changing underlying law); *see also Landgraf v. USI Film Products*, 511 U.S. 244, 277 (1994) (authorizing, in some instances, retroactive law).

Hence, in *Robertson*, Congress amended environmental laws regulating timber cultivation in old-growth forests in the Pacific Northwest, thus altering retroactively the legal consequences of past conduct. Under the amended law, "compliance with certain new law constituted compliance with certain old law." 503 U.S. at 440. The *Robertson* Court carefully explained that it was a "change in law, not specific results under old law" that Congress had permissibly mandated. *Id.* at 439.[2]

---

[2] In addition, when Congress makes a "change in the law," it can also alter the terms of prospective or ongoing injunctive relief without violating *Klein*. *Miller*, 530 U.S. at 348-49. Further, Congress is allowed to waive—but not necessarily to create—defenses to liability in pending suits against the government. *Sioux Nation*, 448 U.S. at 395-98. Neither of these exceptions is at issue here.

But while Congress can change underlying law, "the legislature cannot . . . indirectly control the action of the courts, by requiring of them a construction of the law according to its own views." *Plaut*, 534 U.S. at 225 (quoting approvingly T. Cooley, *Constitutional Limitations* 94-95 (1868)). Congress, in other words, cannot forego the political costs of changing the law by manipulating the inner functioning of federal courts to attain the results it wants in particular pending cases.

Section 802 violates the *Klein* rule by mandating "specific results under old law" without making a "change in law." *Robertson*, 503 U.S. at 439. Section 802 does not change the substantive law with respect to past conduct so that "compliance with certain new law constitute[s] compliance with certain old law." *Id.* at 440. A simple counterfactual illustrates this: If a new Attorney General were to decline to interpose certification against any defendant for pre-2008 conduct, that defendant could not invoke § 802 to claim that their conduct did not violate the law. If the plaintiffs' allegations are correct, in other words, defendants did break the law—even after the enactment of § 802.

Of particular constitutional concern is § 802(a)(4), which likely applies to some or all of the pending cases. This provision is clearly designed to achieve a certain litigation result in the absence of any change in the legality of the acts at issue. In § 802(a)(4), Congress keyed dismissal to a finding of seven specific and enumerated facts. Like the proviso in *Klein*, Congress directed that certain factual findings would divest the court of the power to adjudicate the case, thus securing victory for one side in the litigation. Without changing the underlying substantive law, Congress thus attempted to dictate the suit's outcome.

The legislative history of § 802 confirms that Congress did not intend to legalize past conduct that had previously been illicit. *See, e.g.,* 154 Cong. Rec. H5743, H5756 (daily ed. June 20, 2008) (statement of Rep. Conyers) ("[Section 802] does not imply that such surveillance was

lawful or that the Congress as a whole believes that the service providers acted lawfully in providing assistance."). Legislators assumed that it was not appropriate to change the law, but debated whether it was appropriate to eliminate federal courts' ability to ascertain whether the law was violated. *Compare, e.g.*, 154 Cong. Rec. S6082, S6083 (daily ed. June 24, 2008) (statement of Sen. Dodd) ("Under the legislation before us, the district court would simply decide whether or not the telecommunication companies received documentation. . . . But that's not the question. . . . The question is, 'were their actions legal?'"), *with, e.g.*, 154 Cong. Rec. S6470, S6470 (daily ed. July 9, 2008) (statement of Sen. Bond) ("It is entirely appropriate for this Congress to end this litigation and not entrust this matter any further to the courts with respect to the liability of particular participants in the program.").

In declining to change the underlying law, § 802 diverges dramatically from other statutes previously challenged unsuccessfully on *Klein* grounds. Unlike those other laws, § 802 has not "substitute[d] remedies but [left] the application of the rules of law, including any defenses, for judicial determination." *In re Consol. U.S. Atmospheric Testing Litig.*, 820 F.2d 982, 992 (9th Cir. 1987). Instead, it attempts to "control [the court's] ultimate decision" in a way that oversteps the legislative role and strikes at the heart of judicial independence. *Sioux Nation*, 448 U.S. at 405. Section 802 hence "passe[s] the limit which separates the legislative from the judicial power," like the 1870 proviso at issue in *Klein*, by reaching into the adjudicative process to alter litigation outcomes *without* any change to the underlying law. *Klein*, 80 U.S. at 147.

**B. Section 802 Implicates The Same Separation-Of-Powers Concerns That Led The Supreme Court To Announce *Klein*'s Rule.**

Section 802 also implicates the same underlying constitutional concerns that animated *Klein*. In both cases, Congress stepped into ongoing litigation to "decide the controversy at issue in the Government's own favor." *Sioux Nation*, 448 U.S. at 405. Here, it did so at the prompting of government officials whose alleged misconduct would be revealed by litigation, and private

firms implicated in (and liable for) that misconduct. In both cases, Congress engaged in a legislative shell game, evading accountability for its actions by seeming to punt matters to the courts even as it worked to ensure dismissal by making the outcome of judicial review a foregone conclusion.

The Court has indicated that separation-of-powers concerns are at their peak when the political branches act in a self-interested manner. Congressional "attempt[s] to decide the controversy at issue in the Government's own favor" are especially suspect. *Sioux Nation*, 448 U.S. at 405; *accord Klein*, 80 U.S. at 147. Both the legislature and the White House that pushed for § 802's adoption had powerful self-interested reasons to stop these suits: hiding unconstitutional and unlawful conduct at the highest levels of government behind a patina of judicial scrutiny. Members of the Senate Select Committee on Intelligence ("SSCI")—some of whom had been briefed on the surveillance program before its existence was publicized—joined members of the Bush Administration in touting the indispensability of retroactive immunity. *See, e.g.*, 154 Cong. Rec. H5743, H5756-57 (daily ed. June 20, 2008) (statement of Rep. Smith) (introducing into the record Administration letter in support of the bill and its immunity provision); 154 Cong. Rec. S6470, S6475 (daily ed. July 9, 2008) (statement of SSCI Chair Sen. Rockefeller) (urging passage of the bill). In other words, the officials responsible for allegedly illegal actions joined with those who failed to prevent that illegality to ensure that the public would remain in the dark about what their elected officials had done. *See* 154 Cong. Rec. S6082, S6087 (daily ed. June 24, 2008) (statement of Sen. Dodd) (noting that the original proposal for immunity provided protection not just for "the telecoms, but everyone involved in the wiretapping program. In their original proposal, that is, they wanted to immunize themselves.").

Section 802 also contravenes basic principles of constitutional democracy. Supporters of the legislation hoped that § 802 would "conscript the judiciary in a constitutional charade" by

giving the outward impression, but not the substance, of independent judicial review, thereby avoiding public accountability. Lawrence G. Sager, Klein*'s First Principle: A Proposed Solution*, 86 Geo. L.J. 2525, 2528 (1998). Even after the bill had been amended to include the existing certification mechanism, therefore, proponents and detractors alike continued to refer to § 802 in congressional debates as the "immunity provision" or as "liability protection." *See, e.g.*, 154 Cong. Rec. H5743, H5768 (daily ed. June 20, 2008) (statement of Rep. Pelosi); 154 Cong. Rec. S6097, S6108 (daily ed. June 25, 2008) (statement of Sen. Feingold); 154 Cong. Rec. S6097, S6125 (daily ed. June 25, 2008) (statement of Sen. Hatch); 154 Cong. Rec. S6470, S6472 (daily ed. July 9, 2008) (statement of Sen. Feinstein); *id.* at S6471 (statement of Sen. Bond); *id.* at S6473 (statement of Sen. Biden); *id.* at S6474 (statement of Sen. Byrd); *id.* at S6475 (statement of Sen. Clinton); *id.* (statement of Sen. Rockefeller). This legislative history leaves no room for doubt that the Congress who voted for § 802, as well as the White House that signed it into law, hoped for dismissal behind a façade of judicial process.

In particular, the check-the-secret-box approach of § 802(a)(4) was understood *ab initio* as a sham. Its text was crafted specifically to match the past conduct that Congress *knew* had taken place. *E.g.*, S. Rep. No. 110-209, at 9 (2007) (describing contents of directives provided to telecommunications carriers by the government in terms that correspond to § 802(a)(4)). Many in Congress understood that keying dismissal to the facts enumerated in § 802 would result in a largely Potemkin process. *See, e.g.*, 154 Cong. Rec. H5743, H5760 (daily ed. June 20, 2008) (statement of Rep. Lofgren) ("These provisions turn the judiciary into the administration's rubber stamp."); 154 Cong. Rec. H5743, H5762 (daily ed. June 20, 2008) (statement of Rep. Nadler) ("This bill is a fig leaf granting blanket immunity . . . for possibly illegal acts without allowing the courts to consider the facts or the law.").

Congress had another reason to hide the true aim of its actions here. Section 802 was the product of intensive lobbying by a small, powerful interest group that was able to achieve great leverage to the detriment of a widely dispersed public, whose privacy interests have been compromised. Courts recognize that the legislative fruit of special-interest lobbying should be viewed with "with beady eyes and green eyeshades." *Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 671-72 (7th Cir. 1992). Defendants in this very litigation targeted fundraising efforts at lawmakers critical to the immunity provision's passage, such as SSCI Chair John D. Rockefeller. Eric Lichtblau & Scott Shane, *Phone Companies Seeking Immunity Gave to Senator*, N.Y. Times, Oct. 23, 2007, at A22. These lobbying efforts included fundraisers as well as private meetings with lawmakers. *Id.* (noting that Sen. Rockefeller's contributions from AT&T and Verizon totaled $4,050 between 2002 and 2006 but rose to $42,850 between March and June of 2007). Given pervasive public dissatisfaction with interest-group favors, it is hardly surprising Congress sought to hide its gift to a powerful interest group from public scrutiny.

But the Constitution prohibits legislative commandeering of the coequal federal judiciary in this misleading way. Jurisdiction, once granted, cannot be manipulated to give the appearance without the substance of judicial review, thereby allowing Congress to dictate outcomes favorable to the government in pending suits. In light of the legislative history and the manifest intent of the provision, the Court should therefore hold that § 802 violates the Separation of Powers.

## II. This Court, If It Does Not Invalidate § 802, Should Interpret That Provision To Maximize Judicial Review.

If this Court does not invalidate § 802 as unconstitutional under *Klein*'s separation-of-powers rule, it should nonetheless construe that provision in tandem with the "substantial evidence" standard of 50 U.S.C. § 1885a(b)(1) to maximize the scope of meaningful and adversarial judicial review of the factual bases for the Attorney General's September 19, 2008,

certification. The Supreme Court has instructed federal courts to engage in vigorous and careful review of executive actions lest the judiciary be reduced to a mere rubber stamp. This is so notwithstanding government expressions of concern about national security.

### A. The Government's Reading Of § 802's Limited Scope Of Review Raises Serious Separation-Of-Powers Problems.

The Framers tasked federal courts with "guard[ing] the Constitution and the rights of individuals from the effects of those ill humors which the arts of designing men, or the influence of particular conjunctures, sometimes disseminate among the people themselves. . . ." The Federalist No. 78, at 440 (Alexander Hamilton) (Isaac Kramnick ed., 1987). As James Madison explained when he presented the Bill of Rights to the Congress:

> If [these rights] are incorporated into the constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the legislative or executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the constitution by the declaration of rights.

1 Annals of Cong. 457 (Joseph Gales ed., 1834).

When Congress deprives the federal courts of a meaningful review role, it raises serious separation-of-powers concerns. The Supreme Court identified the constitutional implications at issue in such instances in *Gutierrez de Martinez v. Lamagno*. The *Gutierrez de Martinez* Court held that the Constitution demands that federal courts have the authority to review the Attorney General's scope-of-employment certifications under the Westfall Act, 28 U.S.C. § 2679(d)(1). 515 U.S. at 420. The Court explained that to allow the Attorney General to make certifications without independent judicial inquiry "would cast Article III judges in the role of petty functionaries, persons required to enter as a court judgment an executive officer's decision, but stripped of capacity to evaluate independently whether the executive's decision is correct." *Gutierrez de Martinez*, 515 U.S. at 426. The Court has also declined to allow executive-branch

correction or control of final judgments. *See Hayburn's Case*, 10 U.S. (2 Dall.) 409 (1792). *Gutierrez de Martinez* simply extended this prohibition to executive efforts to game a case from the inside.

In addition to this judicial independence concern, the *Gutierrez de Martinez* Court explained that nonreviewability would "ru[n] up against a mainstay of our system of government"—that "'[n]o man is allowed to be a judge in his own cause.'" 515 U.S. at 428 (quoting The Federalist No. 10, at 124 (James Madison) (Isaac Kramnick ed., 1987)); *accord In re Murchison*, 349 U.S. 133, 136 (1955); *see also United States v. Nourse*, 34 U.S. (9 Pet.) 8, 28-29 (1835) (Marshall, C.J.) (finding the idea that Congress, in a case "between the government and individuals" might allow "a ministerial officer . . . at his discretion" to terminate the claim without alternative remedy an "anomaly"); *United States v. F.S.J.*, 265 F.3d 764, 771 (9th Cir. 2001) (noting that the *Gutierrez* principle has special force when there are incentives for an official to act in self-interested ways).

The government argues that the court's inquiry as to whether the minimal factual requirements that Congress *did* stipulate have been met is a *pro forma* exercise. According to the government, § 802 allows the Attorney General simply to file a document that plaintiffs cannot read supported by supplementary materials plaintiffs cannot examine, to seek dismissal on factual grounds that plaintiffs are not told, and to make assertions about the evidentiary basis for factual claims that plaintiffs have no effective chance to contest. Government's Mem. of P. & A. in Supp. of Mot. to Dismiss or for Summ. J. 14-16 ("Motion to Dismiss").

The government's reading of § 802 places the court in an "untenable position" by "instructing [it] automatically to enter a judgment pursuant to a decision the court has no authority to evaluate." *Gutierrez de Martinez* 515 U.S. at 430. It would render this Court a "petty functionar[y]" doing "rubber-stamp work." *Id.* at 426, 429. This not only conflicts with

the Constitution, it also contravenes settled understanding of the "substantial evidence" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 162 (U.S. 1999) (when reviewing agency decisions for substantial evidence, "the [Supreme] Court has stressed the importance of not simply rubber-stamping agency fact-finding").

Consider in this regard § 802(a)(4), which in effect instructs courts to discern whether defendants acted on good faith by securing a letter from the government that whatever surveillance they were facilitating was warranted. The government asks this Court to forego independent, adversarial inquiry into whether *in fact* the defendants provided only the kind of aid described in the certification, or whether *in fact* all of defendants' actions fit within § 802(a)(4)'s contours. It seeks to replace an adversarial process with blind deference to the government's untested *ipse dixit* even with respect to the limited factual requirements Congress has demanded.

This Court should avoid the clear constitutional problems raised by this narrow reading of § 802 by construing that provision to allow for robust and adversarial judicial review of the Attorney General's certification by thorough briefing and tailored discovery to ascertain the truth behind the government's pleadings. *See Gutierrez de Martinez*, 515 U.S. at 434 ("Because the statute is reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review and that mechanical judgments are not the kind federal courts are set up to render."); *accord Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). This constitutionally grounded canon of construction is reinforced here by the traditional "strong presumption that Congress intends judicial review." *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986).[3]

---

[3] Neither *Gutierrez de Martinez* nor this case involves on-the-record and adversarial agency adjudications. Where the process of executive decision-making itself contains procedural

(Footnote continues on next page.)

Reading § 802 to permit robust contestation of the facts underlying any certification preserves the necessary adversarial nature of an Article III proceeding. *See O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (The clash of adverse parties "sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions.") (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)); *accord Sprint Commc'ns Co., v. APCC Servs., Inc.*, 128 S. Ct. 2531, 2535 (2008). Accepting *in camera* and *ex parte* review of the Attorney General's certification without any fair opportunity for plaintiffs to contest the factual grounds for dismissal, by contrast, would yield any hearing a sham by eliminating plaintiffs' ability to participate meaningfully in the disposition of their claims.[4]

### B. The Government's National Security Arguments Do Not Render Searching Review Inappropriate.

The national security backdrop of this case does not militate against careful independent review of the evidence that supports an executive branch claim. In its motion to dismiss, the government underscores "Congress' fundamental policy judgment that burdensome litigation should not proceed against [defendants]" and urges that "such litigation risks serious harm to

---

(Footnote continued from previous page.)

safeguards that satisfy due process, including an unbiased decision-maker, the need for independent judicial scrutiny is less. *See generally Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995).

[4] Although many legislators recognized that the tailoring of § 802(a)(4) reduced the meaningful role of judges, they nonetheless pressed to ensure the meaningfulness of what role remained. *See* 154 Cong. Rec. S179, S192 (daily ed. Jan. 23, 2008) (statement of Sen. Cardin) ("[W]e should at least have the courts—the courts—make a judgment. . . . That decision shouldn't be made by the executive branch that asked [the telecommunications companies] for the information."); 154 Cong. Rec. H5743, H5756 (daily ed. June 20, 2008) (statement of Rep. Conyers) ("The Court will look to see if the Attorney General's certification is backed up with substantial evidence. That means not only the underlying directive and requests, but supplemental materials as well. . . . [A] bald assertion is not 'substantial evidence'—the Government will have to back up its claims to the Court's satisfaction."). These legislators knew that § 802(a)(4) had been crafted as an easy (albeit unconstitutional) road to dismissal, but secured a compromise that left plaintiffs at least the room to show that this easy road was unavailable in a given case.

national security" by discouraging future cooperation. Motion to Dismiss 1-2. These arguments, however, are at best overstated.

Even when national security is at stake, federal courts have long taken care to preserve a meaningful judicial role. Since the Founding, courts have declined to abdicate their reviewing function merely because the government has invoked a "national security" justification. *See, e.g.*, *Little v. Barreme*, 6 U.S. (2 Cranch) 170, 176-77 (1804); *Talbot v. Seeman*, 5 U.S. (1 Cranch) 1, 1 (1801). As Justice Jackson explained in his landmark concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*, "[n]o penance would ever expiate the sin against free government of holding that a President can escape control of executive powers by law through assuming his military role." 343 U.S. 579, 646 (1952) (Jackson, J., concurring).

In cases arising at the apogee of "war on terror" security-related concerns, the federal courts have resisted government suggestions to act as rubber stamps. Just four months ago, in *Parhat v. Gates*, the Court of Appeals for the District of Columbia interpreted the 2005 Detainee Treatment Act, Pub. L. No. 109-148, 119 Stat. 2680 (2005) (codified at 10 U.S.C. § 801 note), to allow the court to look behind the government's labeling of a detainee as a threat to national security and assess the supporting evidence. 532 F.3d 834 (D.C. Cir. 2008). The D.C. Circuit rebuffed government efforts to "sugges[t] that whatever the government says [to justify an allegedly battlefield detention decision] must be treated as true." *Id*. at 849. It also "reject[ed] the government's contention that it can prevail by submitting documents that read as if they were indictments or civil complaints." *Id*. at 850. Here, the government not only seeks to rely on anodyne and unrevealing affidavits from its own officials. It also seeks to hide those assertions from their litigation opponents so as to make it impossible to contest them effectively. *See* Motion to Dismiss 14-15.

Moreover, the government's argument here that future cooperation would be imperiled in the absence of immunity for the instant defendants is plainly deficient. Any concern over future cooperation is unfounded for two reasons. First, retroactive absolution for unlawful cooperation with intelligence-community overreaching has been considered and rejected—with no impairment to public-private intelligence cooperation—at least once before at the end of the 1970s. L. Britt Snider, *Recollections from the Church Committee's Investigation of NSA*, Stud. in Intelligence, Winter 1999-2000, at 43.

Second, in addition to the retroactive immunity offered by § 802, the 2008 FISA Amendment contains a prospective immunity provision. *See* 50 U.S.C. §§ 1881a, 1881b. Future conduct is thus shielded from liability by prospective provisions enacted in 2008. By contrast, the backward-looking § 802 has the practical effect of post hoc insurance against the consequences of past law-breaking. Like any open-ended insurance, § 802 creates a serious moral hazard problem by signaling to telecommunications providers that if they violated the law, they will be later forgiven. This signal undermines the Rule of Law without discernibly aiding the Nation's security.

## CONCLUSION

Amicus respectfully request that the Court deny the government's motion to dismiss and proceed to evidentiary proceedings in this litigation.

//

//

//

//

//

Dated: October 24, 2008                    Respectfully submitted,


                                            /s/ Kari E. Hong

                                           KARI E. HONG (CA SBN 220252)
                                           Law Offices of Kari E. Hong
                                           1300 Clay Street, Suite 600
                                           Oakland, CA 94612
                                           Telephone: 510.384.4524
                                           Facsimile: 510.228.0344
                                           Email: kari@honglawfirm.com

                                           AZIZ HUQ (NY SBN 4079877) (*Pro Hac Vice*)[5]
                                           Brennan Center for Justice at NYU School of Law
                                           161 Avenue of the Americas, 12th Floor
                                           New York, NY 10013
                                           T: 212.998.6289
                                           F: 212.995.4550
                                           E-mail: aziz.huq@nyu.edu

                                           *Attorneys for Amicus Curiae*
                                           *Brennan Center for Justice*

---

[5] Application for *Pro Hac Vice* Admission is pending.