1  LAFAYETTE & KUMAGAI LLP
   SUSAN T. KUMAGAI  #127667
2  100 Spear Street #600
   San Francisco, CA  94105
3  Telephone: (415) 357-4600
   Facsimile: (415) 357-4605
4  Email: skumagai@lkclaw.com

5  HOWARD M. WASSERMAN (*Pro Hac Vice* Application Pending)
   Florida International University College of Law
6  University Park, RDB 2065
   Miami, Florida 33199
7  Telephone: (305) 348-7482
   Facsimile: (786) 417-2433
8  Email: howard.wasserman@fiu.edu

9  Attorneys for Amici Curiae Law Professors Steven G. Calabresi,
   Don Doernberg, Richard D. Freer, Stephen B. Presser,
10 Robert J. Pushaw, Ronald D. Rotunda, Stephen F. Smith,
   Michael E. Solimine, William W. Van Alstyne, and
11 Howard M. Wasserman

12

13                        UNITED STATES DISTRICT COURT
14                        NORTHERN DISTRICT OF CALIFORNIA
15                             SAN FRANCISCO DIVISION
16

17 |                                               | MDL Dkt. No. 06-1791-VRW |

In re:

18 NATIONAL SECURITY AGENCY
19 TELECOMMUNICATIONS RECORDS
   LITIGATION
20

**BRIEF OF AMICI CURIAE LAW PROFESSORS IN SUPPORT OF (1) THE CONSTITUTIONALITY OF § 802 OF THE FOREIGN INTELLIGENCE SURVEILLANCE ACT OF 1978 AMENDMENTS ACT OF 2008, AND (2) THE MOTION OF THE UNITED STATES TO DISMISS (Dkt. 469)**

22

23 This Document Relates To All Cases Except:
   *Al-Haramain Islamic Foundation, Inc. v. Bush*
24 (07-109)*; Center for Constitutional Rights v.
   Bush* (07-01115); *Guzzi v. Bush* (06-6225);
25 *Shubert v. Bush* (07-693); *Clayton v. AT&T
   Commc'ns of the Southwest* (07-1187); *United
26 States v. Adams* (07-01323*)*; *United States v.
   Clayton* (07-01242); *United States v.
27 Palermino* (07-1326); *United States v. Rabner*
   (07-01324); *United States v. Volz* (07-01396)

Date:      December 1, 2008
Time:      10 am
Courtroom: 6, 17th Floor
Judge:     Hon. Vaughn R. Walker

28

Brief of Amici Curiae Law Professors in Supp. Govt's Mot. to Dismiss
MDL No. 06-1791-VRW

Dockets.Justia.com

**Table of Contents**

I. INTEREST OF AMICI ..................................................................................................1

II. ARGUMENT ...............................................................................................................1

    A. *United States v. Klein* is a product of a unique, and uniquely pathological, period in American history and politics and has not been used to invalidate any federal legislation..............................................2

    B. *Klein* stands for three principal limitations on congressional power, but § 802 does not violate any of them, being instead a basic example of long-accepted exercises of Congress' legislative authority ........................5

        1. *Klein* prohibits Congress or the Executive from establishing a rule of decision in a pending case, although Congress can amend applicable substantive law, which § 802 does by granting providers an affirmative defense .........................................5

        2. *Klein* prohibits Congress from telling courts how to resolve particular cases, but § 802 does nothing more than permissibly create new legal consequences once the court, in its independent judgment, has found certain facts............................7

        3. Congress cannot tell the courts the meaning to give constitutional provisions, but § 802 merely creates a statutory immunity against civil liability, a permissible exercise of congressional power to control the availability of judicial remedies, even for constitutional claims .........................................10

    C. Congress frequently enacts similar legislation, which courts have upheld against a *Klein* challenge, and to invalidate § 802 would mark a dramatic limitation on Congress' legislative authority.............................14

III. CONCLUSION ...........................................................................................................17

**Table of Authorities**

Cases

Anderson v. Creighton
    483 U.S. 635 (1987) .................................................................................................. 12

Apache Survival Coalition v. United States
    21 F.3d 895 (9th Cir. 1994) ........................................................................................ 7

Bogan v. Scott-Harris
    523 U.S. 44 (1998) .................................................................................................... 10

Buckley v. Fitzsimmons
    509 U.S. 259 (1993) .................................................................................................. 10

City of Boerne v. Flores
    521 U.S. 507 (1997) .................................................................................................... 9

City of New York v. Beretta U.S.A. Corp.
    524 F.3d 384 (2d Cir. 2008) ............................................................................... 4, 13

Cook Inlet Treaty Tribes v. Shalala
    166 F.3d 986 (9th Cir. 1999) ...................................................................................... 4

Crater v. Galaza
    491 F.3d 1119 (9th Cir. 2007) ......................................................................... 4, 6, 12

Evans v. Thompson
    518 F.3d 1 (1st Cir. 2008) ............................................................................... 4, 7, 12

Gray v. First Winthrop Corp.
    989 F. 2d 1564 (9th Cir. 1993) ................................................................................... 5

Harlow v. Fitzgerald
    457 U.S. 800 (1982) .................................................................................................. 12

Herman & MacLean v. Huddleston
    459 U.S. 375 (1983) .................................................................................................... 8

Lindh v. Murphy
    96 F.3d 856 (7th Cir. 1996), rev'd 521 U.S. 320 (1997) ..................................... 7, 12

Miller v. French
    530 U.S. 327 (2000) ............................................................................................... 4, 7

NAACP v. AcuSport, Inc.
    271 F. Supp. 2d 435 (E.D.N.Y. 2003) ..................................................................... 13

National Coalition to Save Our Mall v. Norton
    269 F.3d 1092 (D.C. Cir. 2001) ............................................................................ 3, 4

Pelman ex rel. v. McDonald's Corp.
    396 F.3d 508 (2d Cir. 2005) ..................................................................................... 14

| | | |
|---|---|---|
| Pierson v. Ray | | |
| | 386 U.S. 547 (1967) | 11 |
| Plaut v. Spendthrift Farm, Inc. | | |
| | 514 U.S. 211 (1995) | 3, 4, 5 |
| Robertson v. Seattle Audubon Soc. | | |
| | 503 U.S. 429 (1992) | passim |
| Saucier v. Katz | | |
| | 533 U.S. 194 (2001) | 10 |
| Steadman v. SEC | | |
| | 450 U.S. 91 (1981 | 8 |
| Stump v. Sparkman | | |
| | 435 U.S. 349 (1978) | 10 |
| United States v. Klein | | |
| | 80 U.S. 128 (1871) | passim |
| United States v. Padelford | | |
| | 76 U.S. 531 (1869) | 3 |
| United States v. Sioux Nation of Indians | | |
| | 448 U.S. 371 (1980) | 9 |

## Statutes and Codes

| | |
|---|---|
| 15 U.S.C. §§ 7901(a)(3), 7901(a)(4), 7901(a)(7), 7901(b)(4), 7901(b)(2), 7901(b)(3), 7902(a), 7902(b), 7903(5)(A) | 13, 14 |
| 28 U.S.C. § 2254(d)(1) | 11, 12 |
| 42 U.S.C. § 1983 | 11 |
| Foreign Intelligence Surveillance Act of 1978 Amendments Act of 2008, Pub. L. 100-261, § 802 (2008) | passim |
| Personal Responsibility in Food Consumption Act of 2005, H.R. 554, 109th Cong. (2005) | 14 |
| Protection of Lawful Commerce in Arms Act of 2005 ("PLCAA"), Pub. L. No. 109-92, 119 Stat. 2095 (2005), codified at 15 U.S.C. § 7901, et seq. | 13, 14 |

## Other Authorities

| | |
|---|---|
| Lawrence G. Sager, Klein's First Principle: A Proposed Solution, 86 Geo. L.J. 2525, 2525 (1998) | 4, 10 |
| Martin H. Redish & Christopher R. Pudelski, Legislative Deception, Separation of Powers, and the Democratic Process: Harnessing the Political Theory of United States v. Klein, 100 Nw. U. L. Rev. 437, 437-38 (2006) | 4, 9 |

- iii -Brief of Amici Curiae Law Professors in Supp. Govt's Mot. to Dismiss
MDL No. 06-1791-VRW

## I. INTEREST OF AMICI

Amici are law professors and scholars in constitutional law, federal courts, civil procedure, and legal history and have taught and written about the constitutional separation-of-powers issues raised in this case related to the decision of the United States Supreme Court in *United States v. Klein*, 80 U.S. 128 (1871). Amici represent a range of broadly divergent political and ideological views as to the policy, wisdom and justice of the congressional decision to grant immunity to the telecommunications company defendants. But signatories agree that there is no constitutional defect in the statute. Whether Congress should have granted this immunity, amici believe Congress possesses the constitutional power to do so.

## II. ARGUMENT

In § 802 of the Foreign Intelligence Surveillance Act of 1978 Amendments Act of 2008, Pub. L. 100-261 (2008) ("the Act"), Congress granted statutory immunity from civil liability to private telecommunications companies for any constitutional, statutory, or common-law violations committed while engaging in certain surveillance activities at the request of the President of the United States for national security purposes. The statute prohibits civil actions in federal or state court against electronic communications service providers for providing "assistance to an element of the intelligence community." § 802(a). Any action filed must be dismissed if the Attorney General of the United States certifies to the court that the defendant provider acted in connection with a presidentially authorized surveillance program in place between September 11, 2001 and January 17, 2007, designed to prevent or protect against a terrorist attack on the United States, § 802(a)(4)(A), and the defendant provider acted on written guarantee from the Attorney General or head of a portion of the intelligence community that the surveillance had been authorized by the President of the United States and had been determined by the President to be lawful. § 802(a)(4)(B).[1] The law permits the court to review the Attorney General's certification to

---

[1] The statute identifies other facts that the Attorney General can certify to defeat civil
(continued…)

ensure that it is supported by "substantial evidence provided to the court," § 802(b)(1), including any written requests or directives sent to the provider. § 802(b)(2).

Plaintiffs challenge this immunity on, *inter alia*, separation-of-powers grounds. Of particular interest to amici is the argument that § 802 "invades the core Article III powers of the Court," usurping courts' independent adjudicative authority and vesting unlimited and unreviewable discretion in the Attorney General to dictate government-preferred judicial outcomes, solely on the department head's pronouncement of the statutory facts. (MDL Plaintiffs' Opposition at 18-19; Amicus Brennan Center Brief at 3). This argument is grounded, explicitly or implicitly, on the Supreme Court's 1871 decision in *United States v. Klein*, 80 U.S. 128 (1871), a unique and historically and contextually limited precedent which, in more than 130 years, has never been used to invalidate a piece of federal legislation.

This court should join the chorus of courts rejecting *Klein* challenges to federal legislation and uphold § 802 as a valid exercise of congressional authority.

**A.** ***United States v. Klein* is a product of a unique, and uniquely pathological, period in American history and politics and has not been used to invalidate any federal legislation.**

*United States v. Klein* is a product of its time—the Civil War and its immediate aftermath—and a unique set of constitutional pathologies. Congress had established procedures through which individuals claiming ownership in abandoned or confiscated Confederate property that had been sold by the United States could recover proceeds in the Court of Claims on a showing of ownership and continued loyalty to the Union. *Klein*, 80 U.S. at 131, 138-39. President Lincoln had granted full pardons to all who had engaged in rebellion, conditioned on their taking and keeping a prescribed oath to support the Union, the Constitution, and all acts and proclamations regarding slaves. *Id.* at 131-32, 139-40.

---

(…continued)
actions, including that the defendant provider did not, in fact, provide assistance to an element of the intelligence community. § 802(a)(5).

1     But property claimants also had begun using pardons to establish loyalty.[2] In *United States*

2 *v. Padelford*, 76 U.S. 531 (1869), the Supreme Court accepted that approach, finding that

3 the pardon rendered the claimant continually loyal, innocent in law as though he never had

4 participated in or supported the rebellion, and purged his property of whatever offense he

5 had committed. *Klein*, 80 U.S. at 143 (citing *Padelford*).

6     In direct response to *Padelford* and while the appeal in *Klein* (in which the claimant

7 successfully used a pardon to prove loyalty in the Court of Claims) was pending, Congress

8 included in an appropriations bill a proviso establishing that acceptance of a pardon was to

9 be evidence that the claimant had, in fact, been disloyal to the United States, and could not

10 be used to establish loyalty or entitlement to recover proceeds on confiscated property.

11 *Klein*, 80 U.S. at 144.

12     The *Klein* Court invalidated the proviso and its purported limits on the Court's

13 appellate jurisdiction. First, the Court held that that the proviso only withheld jurisdiction

14 "as a means to an end" of denying to presidential pardons the constitutional effect that the

15 Court adjudged them to have in *Padelford*. *Klein*, 80 U.S. at 145. Congress impermissibly

16 prescribed a rule of decision to the courts in a pending case, requiring the courts to resolve

17 cases in a particular way, in favor of the government and against the claimant, whenever the

18 claim of entitlement to proceeds was based on a pardon. *Id.* at 146. Second, the proviso

19 impaired the effect of a presidential pardon, altering its meaning, infringing the

20 constitutional power of the Executive. *Id.* at 147-48. More problematically, Congress

21 directed the court to be instrumental in the impairment of the pardon. *Id.* at 148.

22     *Klein* remains good law, although, given its language and unique historical context,

23 it stands as an opaque precedent. Courts, *see Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211,

24 218 (1995) (expressing uncertainty as to the "precise scope of *Klein*"); *National Coalition*

25 *to Save Our Mall v. Norton*, 269 F.3d 1092, 1096 (D.C. Cir. 2001) ("*Klein*'s exact meaning

---

[2] Congress, unhappy with this use of the pardon power, ultimately repealed the statutory authorization of presidential pardons with respect to abandoned and confiscated property. *Klein*, 80 U.S. at 132.

is far from clear."), and commentators, *see* Martin H. Redish & Christopher R. Pudelski, *Legislative Deception, Separation of Powers, and the Democratic Process: Harnessing the Political Theory of* United States v. Klein, 100 Nw. U. L. REV. 437, 437-38 (2006); Lawrence G. Sager, Klein*'s First Principle: A Proposed Solution*, 86 GEO. L.J. 2525, 2525 (1998), have described the uncertainty surrounding *Klein*'s precise constitutional propositions. But courts have recognized the case's historical and contextual limitations, reflected in the fact that the Supreme Court and the courts of appeals have rejected every *Klein* challenge and upheld a range of federal legislation against *Klein*-based arguments. *See* Sager, *supra*, at 2525; *see, e.g.*, *Miller v. French*, 530 U.S. 327, 349 (2000) (upholding legislation altering standards for staying and dissolving injunctions); *Robertson v. Seattle Audubon Soc.*, 503 U.S. 429, 441 (1992) (upholding legislation altering statutory scheme governing treatment of Spotted Owl habitat); *Crater v. Galaza*, 491 F.3d 1119, 1128 (9th Cir. 2007) (upholding legislation altering standards for granting habeas corpus petitions); *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 991 (9th Cir. 1999) (upholding legislation altering statutory scheme governing provision of medical services to Native American Tribes); *see also City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 395-96 (2d Cir. 2008) (upholding statute requiring dismissal of public-nuisance and negligence lawsuits against gun manufacturers and sellers); *Evans v. Thompson*, 518 F.3d 1, 11 (1st Cir. 2008) (upholding legislation altering standards for granting habeas corpus petitions); *Save Our Mall*, 269 F.3d at 1096-97 (upholding legislation altering procedures governing building of monuments on National Mall).[3]

The unique historical scope and nature of *Klein*, combined with its inapplicability to every piece of congressional legislation that courts have considered, leads to the conclusion

---

[3] Even in *Plaut v. Spendthrift Farms*, 514 U.S. 211 (1995), where the Court did strike down a federal statute on separation-of-powers grounds, because the law impermissibly reopened final judgments, the Court expressly rejected the argument that the statute violated *Klein*. 514 U.S. at 219. There can be no suggestion that § 802 reopens final judgments, so *Plaut* is inapplicable.

- 4 -                            Brief of Amici Curiae in Supp. Govt's Mot. to Dismiss
                                                              MDL No. 06-1791-VRW

that § 802 is a valid exercise of Congress' substantive lawmaking authority. This court should join the unanimous chorus of courts rejecting *Klein* separation-of-powers challenges to federal legislation.

**B.   *Klein* stands for three principal limitations on congressional power, but § 802 does not violate any of them, being instead a basic example of long-accepted exercises of Congress' legislative authority.**

Notwithstanding judicial insistence on *Klein*'s lack of clarity, *see Save Our Mall*, 269 F.3d at 1096, we actually can identify three clear and definite principles that, individually or in combination, comprise the "*Klein* doctrine": 1) Congress cannot establish a rule of decision in a pending case; 2) Congress cannot dictate to courts what facts to find or how to resolve legal and factual disputes; and 3) Congress cannot dictate to courts how to interpret the Constitution.

Section 802 does none of these. Rather, it fits within accepted congressional controls of substantive federal law, such as those statutes upheld against other *Klein* challenges.

**1.   *Klein* prohibits Congress or the Executive from establishing a rule of decision in a pending case, although Congress can amend applicable substantive law, which § 802 does by granting providers an affirmative defense.**

*Klein* speaks of Congress being prohibited from dictating to the federal courts a rule of decision in a pending case. *Klein*, 80 U.S. at 146-47. But this cannot literally be true, because Congress always creates rules of decision for the courts when it enacts enforceable substantive law. The Court subsequently clarified that this principle does not prohibit Congress from amending applicable substantive law. *Plaut*, 514 U.S. at 219; *Robertson*, 503 U.S. at 441. And Congress can make any change retroactive and applicable to pending cases. *Gray v. First Winthrop Corp.*, 989 F. 2d 1564, 1570 (9th Cir. 1993). The Ninth Circuit thus understands *Robertson* as indicating "a high degree of judicial tolerance for an act of Congress that is intended to affect litigation so long as it changes the underlying substantive law in any detectable way." *Id.* at 1569-70.

Amicus Brennan Center ("Brennan Center") argues that § 802 violates *Klein* because it does not amend substantive law in a way that renders the providers' past primary conduct newly lawful. Amicus argues that, if the Attorney General refused to provide a certification in a given case, a provider's conduct would remain unlawful under controlling law. (Brennan Center Brief at 5-6; MDL Plaintiffs' Opposition at 16).

It is true that, unlike laws previously upheld against a *Klein* challenge, § 802 does not amend the substantive federal law that provides plaintiffs' claim of right. Rather, § 802 provides an affirmative defense, which establishes a legal bar to liability even if the defendant's underlying conduct was unlawful under the substantive law under which the claim is brought. But it is immaterial for *Klein* purposes whether Congress amended the law providing the cause of action or added a new affirmative defense as a shield against that law. Either approach changes applicable law in a "detectable way" by altering the overall substantive legal landscape on a subject matter, resulting in the potential rejection of claims that might have succeeded under the previous substantive legal landscape. The counter-factual argument about an unasserted certification reflects the uncontroversial proposition that, if an affirmative defense is not raised, the defendant may be liable under the substantive law providing the claim of right.

**2. *Klein* prohibits Congress from telling courts how to resolve particular cases but § 802 does nothing more than permissibly create new legal consequences once the court, in its independent judgment, has found certain facts.**

*Klein* stands for the proposition that Congress, or the Executive acting pursuant to a congressional delegation, cannot tell courts what facts to find, what conclusions to draw from facts, how to apply law to fact, or how to resolve specific cases. *Robertson*, 503 U.S. at 438. Plaintiffs argue a version of this principle, suggesting that § 802 allows the Executive to dictate when a claim should be dismissed, stripping the judiciary of its essential and inherent power to make independent determinations of facts.

It is true that "Congress may not predetermine the results in any given case." *Crater v. Galaza*, 491 F.3d 1119, 1128 (9th Cir. 2007). The problem in *Klein* was that the proviso

forbade the Court to "give the effect to evidence which, in its own judgment, such evidence should have" and "directed [the Court] to give it an effect precisely contrary." *Id.* at 147. But the Court in *Miller v. French*, 530 U.S. 327 (2000), distinguished the *Klein* proviso from constitutionally valid laws in which Congress attaches new legal consequences to a court's independent application of a new legal standard. *Miller*, 530 U.S. at 349. "Congress cannot tell courts how to decide a particular case, but it may make rules that affect classes of cases." *Evans v. Thompson*, 518 F.3d 1, 11 (1st Cir. 2008) (quoting *Lindh v. Murphy*, 96 F.3d 856, 872 (7th Cir. 1996), *rev'd* 521 U.S. 320 (1997)).

Section 802 establishes a new legal landscape for a class of cases—a new affirmative defense means a provider cannot be liable for engaging in intelligence- and national-security-related surveillance activities conducted in a certain time period on written presidential request and written presidential guarantee of legality. Proof of those circumstances is made by the Attorney General's certification, which must be supported by substantial evidence. Section 802 does not instruct courts what facts to find; courts exercise independent judgment in finding whether the facts supporting the provider's defense have been established through the certification and the substantial evidence offered in support of the certification.[4] It only dictates the legal consequence - dismissal of the action - once the court has, on its independent judgment, found certain facts and applied those facts to the law in a given case.

Critically, establishing a new legal standard does not, without more, imply an instruction to the court to apply that standard in any particular way or to find that the new standard was or was not satisfied in a given case. *Robertson*, 503 U.S. at 439; *Apache Survival Coalition v. United States*, 21 F.3d 895, 902 (9th Cir. 1994). Absent an express command to the courts as to how to apply a new legal rule to a set of facts, this principle of *Klein* is not violated.

---

[4] Amici take no position on the validity of § 802 if there were no allowance for judicial review and courts were required to accept the Attorney General's word that there had been a presidential request.

1         Plaintiffs specifically object to § 802(b)'s judicial review provision. They argue it
2 requires the court to accept the Attorney General certification so long as it is supported by
3 substantial evidence, § 802(b)(1), thus granting to the Executive the power to find facts and
4 determine whether the statutory requirements have been met. (MDL Plaintiffs' Brief at 21).
5 This, they argue, strips courts of independent decision making authority granted to them by
6 Article III.

7         But this argument over-emphasizes the formal mechanism of the immunity defense
8 while ignoring its practical operation. The Attorney General's certification merely
9 introduces the affirmative defense into the litigation. The statute then requires the court to
10 decide whether there is substantial evidence in support of the certification—in other words,
11 to determine whether there is substantial evidence establishing the elements of the statutory
12 immunity defense. The court decides those facts independently and in the exercise of its
13 own judgment by examining evidence beyond the certification, including written requests
14 and directives sent to the provider. *See* § 802(b)(2). Only if the court finds the elemental
15 facts supported by substantial evidence beyond the certification will it dismiss the action.

16         In effect, § 802(b) does impose a different, lower standard of proof for the
17 affirmative defense. A defendant-provider need only present to the court substantial
18 evidence (rather than, for example, the ordinary preponderance) in support of the statutory
19 elements to obtain dismissal. But Congress unquestionably has the power to establish and
20 alter the standard of proof applicable to claims and defenses created by federal statute. *See*
21 *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389 (1983) (citing *Steadman v. SEC*, 450
22 U.S. 91, 95 (1981)). There can be no separation-of-powers objection to this practical effect
23 of § 802.

24         Finally, it is beside the point that members of Congress who voted for § 802, and
25 President Bush in signing it into law, "hoped" that the amended law would result in
26 dismissal of the pending lawsuits (Brennan Center Brief at 9). A retroactive change in law
27 necessarily reflects congressional "hope" that cases will be resolved differently under the
28 amended law than they might have been under prior law—that is why Congress changed

the law.  In *Robertson*, Congress amended the laws governing treatment of Spotted Owl habitats, making it easier to satisfy the legal requirements for logging, obviously with the "hope" that claims seeking to stop logging would fail under the new law and logging could proceed, even if such claims might have succeeded under the prior law.  *Robertson*, 503 U.S. at 438-39.  Similarly, in *United States v. Sioux Nation of Indians*, 448 U.S. 371, 390-91 (1980), new law ordered courts to review claims to tribal land claims without regard to any defense of *res judicata*.  Congress presumably changed the law to ensure a full determination of the merits of the tribal claims, a result potentially different than would have obtained if *res judicata*, and thus the effects of prior judicial outcomes, remained in effect.

Congressional "hope" for particular outcomes under the substantive law it enacts, where the law is applied by courts exercising independent judgment, cannot be confused with a congressional command to the courts to apply the law in a particular way or to reach particular outcomes in particular cases.  *Klein* only prohibits the latter.

**3. Congress cannot tell the courts the meaning to give constitutional provisions, but § 802 merely creates a statutory immunity against civil liability, a permissible exercise of congressional power to control the availability of judicial remedies, even for constitutional claims.**

A third principle of separation of powers is that Congress cannot dictate to the federal courts the meaning of a constitutional provision or tell the federal courts how to interpret and apply the Constitution.  *See City of Boerne v. Flores*, 521 U.S. 507, 535-36 (1997).  This principle was implicated in *Klein*.  Although the specific problem there was that the proviso infringed on the executive power by impairing the effect of a pardon, *Klein*, 80 U.S. at 147, the Court also spoke of limits on the legislature changing the constitutional effect of a pardon and of directing the courts to be instrumental to that end.  *Id.* at 148; Redish, *supra*, at 444.  This principle can be generalized to a prohibition on Congress, or the Executive via delegation, compelling courts to decide constitutional questions in a way contrary to what a court's best independent constitutional judgment tells it the Constitution

means. Sager, *supra* at 2525.

Plaintiffs implicitly assert this principle in two respects: First, in arguing that § 802 improperly would "deny plaintiffs any judicial remedy whatsoever, federal or state, for their constitutional claims," (MDL Plaintiffs' Opposition at 2-3), and second, in arguing that the provision improperly delegates to the Attorney General the power to redefine the meaning of constitutional provisions, such as the Fourth Amendment's prohibition against unreasonable searches and seizures and the First Amendment's protection of the freedom of speech. (MDL Plaintiffs' Opposition at 6).

But § 802 does not dictate, or purport to dictate, to courts how to understand, interpret, or apply the Constitution. It merely limits a court's power to provide a judicial remedy for any constitutional violations found. Section 802 does not compel the court to announce a legal understanding of the Constitution different from what its independent judicial analysis dictates. In fact, § 802 obviates the need for the court to engage in any constitutional interpretation, because the sub-constitutional affirmative defense precludes provider liability regardless of whether the providers in fact violated the Constitution.

Section 802's affirmative defense is analogous to the official immunities that limit or entirely prevent civil liability of government officials for constitutional violations. *See, e.g.*, *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (qualified executive immunity); *Bogan v. Scott-Harris*, 523 U.S. 44, 48-49 (1998) (absolute legislative immunity); *Buckley v. Fitzsimmons*, 509 U.S. 259, 268-69 (1993) (absolute prosecutorial immunity); *Stump v. Sparkman*, 435 U.S. 349, 355-56 (1978) (absolute judicial immunity). These immunities protect government defendants from liability despite, and regardless of, whether the plaintiffs' constitutional rights were violated. These defenses are a long-accepted part of the scheme of constitutional litigation, never questioned on *Klein* grounds. And it ignores their existence and effect to argue, as Plaintiffs do, that the similar immunity in § 802 is unconstitutional as either a denial of a judicial remedy or as executive re-definition of the Constitution.

Formally, of course, government official immunities are not congressional

creations; they are common law defenses that survived passage of the 42 U.S.C. § 1983 cause of action because Congress did not clearly indicate its intent to abrogate well-established existing common law rules. *See Buckley*, 509 U.S. at 267-68.[5] But implicit in this understanding of officer immunities is that Congress, had it intended and provided by statute, could have overridden them. It follows that Congress could take the lesser step of narrowing or expanding existing immunities or of providing new ones. In fact, Congress has done so; in 1996, it amended § 1983 to provide that judges enjoy immunity not only from liability for damages, as at common law, but also from injunctions. *See* 42 U.S.C. § 1983 ("[I]n any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."). These immunities all are sub-constitutional affirmative defenses, existing apart from the constitutional source of the plaintiff's claim of right, which defeat the plaintiff's claim and preclude judicial remedy, even if a constitutional violation has occurred.

The essential distinction between congressional attempts to dictate constitutional meaning and congressional attempts to control judicial remedies is at the heart of recent decisions, including from the Ninth Circuit, rejecting challenges to habeas corpus provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, a federal court cannot grant habeas relief for a constitutional violation committed in state criminal proceedings unless the state-court adjudication produced a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). The Ninth Circuit held that this provision comports with *Klein*'s required "distribution of constitutional authority."

---

[5] Section 1983 was enacted as § 1 of the Ku Klux Klan Act of 1871. The Court has held that, absent congressional statement, well-established nineteenth-century common law immunities survived passage of the statute. *See Buckley*, 509 U.S. at 268 ("Certain immunities were so well established in 1871, when § 1983 was enacted, that 'we presume that Congress would have specifically so provided had it wished to abolish' them.") (citing *Pierson v. Ray*, 386 U.S. 547, 554-55 (1967)).

1 | *Crater*, 491 F.3d at 1128.  Section 2254(d)(1) "did not instruct courts to discern or deny a
2 | constitutional violation," but "simply sets additional standards for granting relief in cases."
3 | *Id.* at 1127.  The statute did not restrict the power of federal courts to interpret the
4 | Constitution according to their best understanding of its meaning, but only established
5 | standards for what constitutional violations, if found, warranted federal habeas relief.  *Id.*
6 | (stating that regulating "relief is a far cry from limiting the interpretive power of the
7 | courts") (quoting *Lindh*, 96 F.3d at 872).  The First Circuit echoed that conclusion, stating
8 | that there "is a world of difference between telling a court how to decide a case given a
9 | certain set of facts and limiting the availability of relief *after* a judge independently
10 | determines the existence of a right and the reach of Supreme Court precedent." *Evans*, 518
11 | F.3d at 11.

The First Circuit explicitly recognized the connection between § 2254(d)(1) and executive qualified immunity, which prevents damages liability where the federal right found to have been violated was not clearly established at the time of the violation.  *Evans*, 518 F.3d at 9-10 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) and *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987)).  Both are sub-constitutional rules that shield government from judicial relief, even in the face of actual constitutional violations.

Section 802 establishes a similar limitation on the remedial power of the courts and achieves the same end as both § 2254(d)(1) and qualified immunity.  Section 802 prevents a court from imposing liability on service providers and from granting a remedy to plaintiffs, even where there has been a constitutional violation, where the court finds substantial evidence in support of the elements of the statutory immunity defense.  Given the similarity between § 802 and official immunities, the analogy between the AEDPA limits and qualified immunity recognized in *Evans* is significant.  If the limits on habeas relief do not violate *Klein* and separation of powers, as *Crater* holds, and if no court ever has suggested that analogous official immunities do so, it follows that § 802 also does not violate the separation of powers.

## C. Congress frequently enacts similar legislation, which courts have upheld against a *Klein* challenge, and to invalidate § 802 would mark a dramatic limitation on Congress' legislative authority.

Section 802 is of a piece with other legislation that Congress has enacted or considered in recent years. All create a federal statutory defense to liability against a class of claims brought under some substantive law and all are designed to protect substantial federal interests over which Congress has constitutional power to legislate and which Congress deems threatened by the ongoing litigation. If § 802 "invades the core Article III powers of the Court," (MDL Plaintiffs' Opposition at 20), and encroaches on the central prerogatives of the Court (Brennan Center Brief at 2), then so do many other congressional enactments and proposals.

Consider, for example, the Protection of Lawful Commerce in Arms Act of 2005 ("PLCAA"), Pub. L. No. 109-92, 119 Stat. 2095 (2005), *codified* at 15 U.S.C. § 7901, *et seq*. The PLCAA provides an affirmative defense against civil liability for a group of defendants (gun sellers, manufacturers, and trade associations) against a class of claims (primarily state-law claims based on injuries resulting from a third person's criminal or unlawful use of a firearm). *See* 15 U.S.C. § 7902(a), 7903(5)(A). It applies both prospectively to future claims and retroactively to pending civil actions, which must be dismissed. *See id.* § 7902(b). Congress was troubled by a series of state-law tort actions instituted by governments and private groups seeking to hold members of the gun industry liable for the harms caused by third-party gun violence and seeking to enjoin and abate manufacturers' and sellers' activities as a public nuisance. *See id.* § 7901(a)(3); *see, e.g.*, *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 389-91 (2d Cir. 2008); *NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435 (E.D.N.Y. 2003). Congress found that such lawsuits imposed an unreasonable burden on interstate commerce, 15 U.S.C. § 7901(a)(5), (a)(6); interfered with federal and state statutory schemes for the regulation of firearms, *id.* § 7901(a)(4); and threatened to violate rights under the Second and Fourteenth Amendments. *Id.* § 7901(a)(7). The expressly stated congressional purpose in enacting the law was to

prohibit such civil suits for the purpose of protecting interstate and foreign commerce, *id.* § 7901(b)(4), and citizens' Second Amendment rights. *Id.* § 7901(b)(2), (b)(3).[6] And Congress did it not by altering the substantive law that provided the plaintiffs' cause of action, something Congress was largely powerless to do because the claims were brought under state law, but by allowing defendants to interpose a federal affirmative defense barring liability, even if the underlying conduct did violate substantive state law.

The Second Circuit rejected a broad constitutional challenge to the PLCAA, including separation-of-powers arguments relating to *Klein*. The court held the law "permissibly sets forth a new legal standard to be applied to all actions." *City of New York*, 524 F.3d at 395-96.

Section 802 is structurally identical to the PLCAA. It was motivated by congressional concern over, and disapproval of, a class of lawsuits that threatened federal interests—constitutional claims against providers that, in the legislature's view, interfered with efforts by the intelligence community to protect national security by enlisting providers in necessary surveillance activities. It provides a class of defendants (electronic communications service providers) with an affirmative defense that defeats a particular class of claims (those based on assistance provided to elements of the federal intelligence community at presidential request and on presidential assurance of lawfulness) if the court finds, in its independent judgment, substantial evidence in support of the defense. And it does so not by changing the substantive law providing plaintiffs' claims of right, but by interposing an affirmative defense barring liability, regardless of whether the providers' conduct violated that substantive law.

The material similarity between § 802 and other common federal legislation

---

[6] Congress considered a substantially similar bill targeting state-law actions against the fast-food industry seeking to recover for health problems caused by the high fat content of fast food; the bill passed the House of Representatives in 2005, but died in the Senate. *See* Personal Responsibility in Food Consumption Act of 2005, H.R. 554, 109th Cong. (2005) (as passed by House of Representatives, October 19, 2005); *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005).

suggests that a decision by this court invalidating § 802 on *Klein* separation-of-powers grounds would impose far-reaching limitations on Congress' lawmaking authority. When combined with the fact, discussed *supra* Part A, that no federal statute has been rejected on *Klein* grounds other than the proviso in *Klein* itself, a judicial decision invalidating § 802 would mark a dramatic, historic, and unwarranted change in the separation-of-powers landscape and in the respective powers of Congress and the federal courts.

## III. CONCLUSION

Amici reiterate that their concern is not with the policy, wisdom or justice of § 802, a point about which the signatories might disagree among themselves. Rather, their concern is with an appropriate and properly limited understanding and application of *United States v. Klein* and the narrow, heretofore-never-applied, separation-of-powers constraints it imposes on Congress' lawmaking powers. Whatever principles *Klein* may stand for, they are not offended by the immunity defense provided in § 802, which should be upheld as a valid exercise of congressional power. To hold otherwise would be to severely curtail congressional authority and alter the balance of power between Congress and the judiciary.

Dated: November 5, 2008.

| LAFAYETTE & KUMAGAI LLP | HOWARD WASSERMAN |
|---|---|
| SUSAN T. KUMAGAI  #127667 | (*Pro Hac Vice* Application Pending) |
| 100 Spear Street #600 | Florida International University College of Law |
| San Francisco, CA  94105 | University Park, RDB 2065 |
| | Miami, Florida 33199 |
| By    /s/ Susan T. Kumagai | By    /s/ Howard Wasserman |
|       Susan T. Kumagai |       Howard Wasserman |

Attorneys for Amici Curiae Law Professors
Steven G. Calabresi, Don Doernberg, Richard D. Freer, Stephen B. Presser, Robert J. Pushaw, Ronald D. Rotunda, Stephen F. Smith, Michael E. Solimine, William W. Van Alstyne, Howard Wasserman

# **CERTIFICATE OF SERVICE**

I certify that a copy of this document was served electronically on November 5, 2008, on counsel of record in compliance with Federal Rule 5, Local Rule 5-6 and General Order 45, by use of the Court's ECF system.

       */s/ Susan T. Kumagai*
       SUSAN T. KUMAGAI