Pages 1 - 92

United States District Court

Northern District of California

Before The Honorable Vaughn R. Walker

```
In re: NSA                    )
Telecommunications Records    )
Litigation,                   )
                              )
                              )    No. MDL 06-1791 VRW
                              )
                              )    Related To:
                              )
                              )    No. C06-0672 VRW
                              )
_____)
```

San Francisco, California
Tuesday, December 2, 2008

**Reporter's Transcript Of Proceedings**

**Appearances**:

For Plaintiff:           Pillsbury Winthrop
                       50 Fremont Street
                       San Francisco, California  94105
             By:   **Bruce A. Ericson, Esquire**
                     **Marc H. Axelbaum, Esquire**

                       Electronic Frontier Foundation
                       454 Shotwell Street
                       San Francisco, California  94110
             By:   **Cindy Ann Cohn, Esquire**
                     **Kurt Opsahl, Esquire**
                     **Kevin Stuart Bankston, Esquire**
                     **James Samuel Tyre, Esquire**

(Appearances continued on next page.)

**Reported By:**        *Sahar McVickar, RPR, CSR No. 12963*
                     *Official Reporter, U.S. District Court*
                     *For the Northern District of California*

(Computerized Transcription By Eclipse)

Dockets.Justia.com

1    **Appearances, continued:**

2    For Plaintiff:                Law Office of Richard Roy Wiebe
                                   425 California Street
3                                  San Francisco, California  94104
                          **By:  Richard Roy Wiebe, Esquire**
4
                                   Law Office of Lee Tien
5                                  1452 Curtis Street
                                   Berkeley, California  94702
6                         **By:  Lee Tien, Esquire**

7                                  Law Office of Aram Antaramian
                                   1714 Blake Street
8                                  Berkeley, California  94703
                          **By:  Aram Vazken Antaramian, Esquire**
9
                                   American Civil Liberties
10                                 Union of Illinois
                                   180 North Michigan Avenue, Suite 2300
11                                 Chicago, Illinois  60601
                          **By:  Harvey M. Grossman, Esquire**
12                                **Ann Brick, Esquire**

13                                 Lieff, Cabraser,
                                   Heimann & Bernstein, LLP
14                                 Embarcadero Center West
                                   275 Battery Street, 30th Floor
15                                 San Francisco, California  94111
                          **By:  Barry R. Himmelstein, Esquire**
16
     For Defendant:                United States Department of Justice
17                                 Federal Programs Branch/Civil Division
                                   20 Massachusetts Avenue NW
18                                 Washington, DC  20530
                          **By:  Carl J. Nichols, Esquire**
19                                **Anthony J. Coppolino, Esquire**

20                                 Williams & Connolly, LLP
                                   725 Twelfth Street NW
21                                 Washington, DC  20005
                          **By:  John G. Kester, Esquire**
22                                **George Hicks, Esquire**

23                                 Sidley Austin, LLP
                                   1501 K Street, Nw
24                                 Washington, DC  20005
                          **By:  Eric A. Shumsky, Esquire**
25   ///

1   **<u>Appearances, continued:</u>**

2   For Defendant:          Wilmer Cutler Pickering
                            Hale and Door, LLP
3                           1875 Pennsylvania Avenue, NW
                            Washington, DC  20006
4                    **By:  Brian M. Boynton, Esquire**
                          **Randolph D. Moss, Esquire**
5

6

7                           **---o0o---**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **December 2, 2008**                 **10:00 a.m.** |

1    **December 2, 2008**                                      **10:00 a.m.**

2                           **P R O C E E D I N G S**

3            **THE CLERK:**  Calling case MDL No. 06-1791, In re:

4    NSA Telecommunications Records Litigation.

5            And this relates to 06-0672, Hepting versus AT&T and

6    telecom carrier cases.

7            Counsel, you can start your appearances, please.

8            **MR. WIEBE:**  Good morning, Your Honor.

9            Richard Wiebe for the plaintiffs.  And with me at

10   counsel table are Kurt Opsahl --

11           **MR. OPSAHL:**  Good morning, Your Honor.

12           **MR. WIEBE:**  Kevin Bankston.

13           **MR. BANKSTON:**  Good morning, Your Honor.

14           **MR. WIEBE:**  Cindy Cohn.

15           **MS. COHN:**  Good morning, Your Honor.

16           **MR. WIEBE:**  Ann Brick.

17           **MS. BRICK:**  Good morning, Your Honor.

18           **MR. WIEBE:**  And Harvey Grossman.

19           **MR. GROSSMAN:**  Good morning, Your Honor.

20           **THE COURT:**  Very well.  Good morning, Mr. Wiebe.

21           **MR. NICHOLS:**  Good morning, Your Honor.

22           Carl Nichols from the Department of Justice on

23   behalf of the United States.

24           **MR. BERENSON:**  Brad Berenson, Sidley Austin, on

25   behalf of the AT&T, BellSouth and Cingular defendants.

1            **MR. MOSS:**  Good morning, Your Honor.

2            Randy Moss on behalf of Verizon.  And with me is my

3    colleague, Brian Boynton.

4            **MR. BOYNTON:**  Good morning, Your Honor.

5            **THE COURT:**  Let's -- Oh, all right, Mr. Moss, yes.

6            **MR. MOSS:**  Thank you, Your Honor.

7            **MR. SHUMSKY:**  Good morning.

8            Eric Shumsky with Sidley Austin, also with the AT&T

9    BellSouth and Cingular defendants.  Good morning.

10           **MR. KESTER:**  Good morning.

11           John Kester from Williams & Connolly representing

12   Sprint Nextel.

13           Your Honor, I would like to introduce my colleague,

14   George Hicks, who is new to the case and will be here this

15   morning.

16           **THE COURT:**  Very well, good morning.

17           **MR. ERICSON:**  Good morning, Your Honor.

18           Bruce Ericson and Mark Axelbaum of Pillsbury

19   Winthrop Shaw Pittman on behalf of the AT&T, BellSouth, and

20   Cingular defendants.

21           **THE COURT:**  Very well.

22           **MR. COPPOLINO:**  Good morning, Your Honor.

23           Anthony Coppolino for the Department of Justice for

24   the United States.

25           **THE COURT:**  Very well, Mr. Coppolino.

1          Well, counsel, I'm going to start with

2    Mr. Coppolino, but first let me tell you that I have not read

3    the classified certification.  I concluded that I would attempt

4    to see if the public filings would be sufficient to provide

5    guidance to the Court as to how the action should come out, or,

6    at least, this motion should come out, and, if possible, to

7    make a determination without relying upon the classified

8    certification, then I'd proceed in that fashion.

9          If I conclude that that is not possible, then I'll

10   have to decide exactly what to do with that particular

11   document.  But, you should know, at the outset, that what has

12   been filed in the public record is all that I've seen in

13   connection with the present motions, and nothing else.

14         Now, late yesterday afternoon we sent out to you a

15   series of questions; I hope you've had a chance to review

16   those.  Those are not an exhaustive list of all the questions

17   that are on my mind, but I thought it might be helpful to give

18   you some guidance of some of the questions that I do have in my

19   mind.

20         I don't particularly want go through those one by

21   one and have you address them step -- each one at a time, but

22   these are certainly issues that are on my mind.  And, I hope

23   that that will be helpful to you in framing your argument.

24         Now, let me turn, first, to the moving party.

25         And Mr. Coppolino, are you or Mr. Nichols going to

1    argue?

2            **MR. NICHOLS:**  I am.

3            **THE COURT:**  All right, Mr. Nichols.

4            **MR. NICHOLS:**  Thank you, Your Honor.  Carl Nichols

5    on behalf of the United States.

6            What we thought we would do is I would take the lead

7    this morning; it is our motion.  Plaintiffs, obviously, will

8    have an opportunity to respond.  And then, the telecom

9    defendants, if they had anything they might wish to add, we

10   thought that would be more appropriately left for rebuttal, if

11   at all.

12           And, of course, we did receive those questions, Your

13   Honor, and I will certainly endeavor to answer them as I go

14   through my argument this morning.

15           Your Honor, Section 802(a) of the FISA Amendments

16   Act of 2008 reflects Congress' considered policy judgment

17   reached after extensive legislative process involving

18   considerable oversight, inquiry, and debate.

19           **THE COURT:**  Well, let me ask you right at the

20   beginning here:  Now, we are going to have a new Attorney

21   General in a relatively short period of time who may or may not

22   take the same position as the present Attorney General; why

23   shouldn't I just wait to see what the new Attorney General does

24   with this issue?

25           **MR. NICHOLS:**  I think, right now, you have before

 1  you a certification and a live motion to dismiss or for summary

 2  judgment based on that certification.  I think, as this case

 3  presently exists, there is a live motion to dismiss.

 4          I think if, for example, the Attorney General later

 5  were to withdraw the motion to dismiss or for summary judgment,

 6  then that would be a time where, of course, you would not be

 7  deciding it.  But, I don't think it would be appropriate at

 8  this time to wait, Your Honor.

 9          **THE COURT:**  Well, let's assume the Attorney General

10  takes a different position, in whole or in part, from this; by

11  that time, there may be a decision out.  And, I gather from the

12  statute whatever I decide is going to the Court of Appeals.

13          **MR. NICHOLS:**  That's probably the case, Your Honor.

14  I don't speak for the plaintiffs, obviously, on whether they

15  would appeal a grant of our motion, but it's, you know, not a

16  crazy assumption to believe they would take it up to the Ninth

17  Circuit.

18          **THE COURT:**  Well, there is a provision in the

19  statute which --

20          **MR. NICHOLS:**  -- which allows interlocutory appeals,

21  that is for sure.  Of course, that would be an interlocutory

22  appeal if there is a dismissal.  But, if you were to not grant

23  our motion to dismiss, that interlocutory appeal provision

24  would kick in; at that point, the Attorney General would be

25  presented with the determination of whether to continue to

1    press the positions that we are pressing now.

2            So, I think as this litigation progresses, it's

3    absolutely the case that the next administration will consider

4    whether, and to what extent, to continue taking the positions

5    we've taken.

6            Having said that, I think it's quite clear that the

7    positions we are taking are very well-founded.  The standard

8    for the Department of Justice to decline, for example, to

9    defend the constitutionality of a federal statute is a very

10   high.  The department rarely, if ever, declines to defend the

11   constitutionality of federal statutes.  And, I think that

12   this --

13           *THE COURT:*  Well, the interlocutory appeal provision

14   provides that the Court of Appeals shall have jurisdiction of

15   interlocutory orders granting or denied, so --

16           *MR. NICHOLS:*  It's a bit of an odd way to phrase it

17   because a grant of a motion to dismiss is a final judgment,

18   generally, and so it wouldn't be interlocutory, and the

19   plaintiffs would be able to appeal normally.

20           I think Congress is being very careful, here, to say

21   if you were denied a motion to dismiss you can take that up --

22   either grant a motion to dismiss, which really is a final

23   judgment and the plaintiffs could take it up.

24           I think there's no question under 802(f) that

25   whichever way Your Honor goes on the motion to dismiss, the

1  parties could appeal that determination.  And, my point is, at

2  that point, for example, if Your Honor were to either grant the

3  motion to dismiss or deny the motion to dismiss in December,

4  January, February, if there is an appeal, the next

5  administration will, of course, have to decide whether and to

6  what extent it is going to continue to press the exact same

7  arguments that we are making here.

8        The corollary point that I was also making, Your

9  Honor, is particularly on the constitutional arguments, there

10  is a very high bar for the Department of Justice to not defend

11  the constitutionality of federal statutes, as you know.  And,

12  we think that this statute is so within the heartland of a

13  plainly constitutional statute, plainly constitutional exercise

14  of Congress' Article 1 authority, that it would be very, very

15  unlikely for any future Department of Justice to decline to

16  defend the constitutionality of this statute.

17        And that's because, Your Honor --

18        **THE COURT:**  Well, let's take that up for a moment.

19  And, we may come back to this issue of interlocutory appeals,

20  but you characterize this statute as "within the heartland";

21  well, what other statute is there that's quite like this

22  statute?

23        **MR. NICHOLS:**  Well, I realize --

24        **THE COURT:**  Are you telling me there is another

25  statute that has all the features that this statute does?

1          **MR. NICHOLS:**  I think your question, too, reflects

2     that -- that --

3          **THE COURT:**  Well, one of these questions

4     certainly --

5          **MR. NICHOLS:**  Yes.

6          **THE COURT:**  -- does that.

7          **MR. NICHOLS:**  But, I think it's important to

8     separate out the various things that the statute does and the

9     various constitutional arguments that plaintiffs are making

10    because --

11         **THE COURT:**  Before you do that, tell me what statute

12    is analogous to this one.

13         **MR. NICHOLS:**  I don't think that there is a

14    perfectly analogous statute that precisely has every single

15    element of this statute.

16         **THE COURT:**  So, this statute is kind of sui generis,

17    is it?

18         **MR. NICHOLS:**  I think it's Congress' response to a

19    sui generis set of cases where post-911, which is a sui generis

20    event, there are lawsuits, attack on the homeland by

21    terrorists, after which the Government has to engage in a

22    variety of activities to defend and protect the homeland;

23    lawsuits that then are brought against private parties for

24    allegedly participating with the United States, and then, in

25    which the Government asserts the State Secrets privilege.

1   There aren't very many cases like that.

2         Congress then undertakes a very robust oversight

3   legislative process and decides the appropriate way to deal

4   with these cases is to create a statute that does two things:

5   First, substantively, it creates a set of defenses or

6   immunities -- actually, I don't think it really matters how you

7   look at them, what is important is that Congress says no cause

8   of action shall lie against a telecommunications carrier if one

9   or more of the provisions of Section 802(a) are met.  Consider

10  that to be a substantive change.

11        Congress also decides that it needs to create a

12  procedural mechanism for allowing the Court to review whether

13  those circumstances are met while also protecting national

14  security.  And so, what it does in the remainder of Section 802

15  is it authorizes the Attorney General to disclose to this Court

16  ex parte and in camera information establishing that those

17  prohibitions of 802 are met and allows this Court to review

18  that information, ex parte and in camera, and make a

19  determination, based on your view of that information, whether

20  or not those provisions are met.

21        THE COURT:  It does something -- 802 does something

22  more than that, doesn't it?  It allows the Attorney General to

23  tell the Court whether the requirements of 802(a) are met or

24  not met, because we have a paragraph, or sub-paragraph 5 of

25  802(a), in which the Attorney General can tell the Court the

1   person did not provide the alleged assistance.

2           **MR. NICHOLS:**  Yes.

3           **THE COURT:**  Now, what, in essence, that does is to

4   give the Attorney General carte blanche to immunize anyone who,

5   in his judgment or view, should be immunized from possible

6   liability here.

7           **MR. NICHOLS:**  I don't think that's right, Your

8   Honor.  And, I think it's important to step back and think

9   about why --

10          **THE COURT:**  Why do we have this provision in there?

11  What does this provision do?

12          **MR. NICHOLS:**  802(a)(5) was designed for the

13  following problem:  If you don't have a provision in the

14  statute that gives the Attorney General the option of

15  certifying that one of five things is true, one of which is

16  non-participation, non-assistance, then the situation you would

17  have had, if you only had 802(a)1 through 4, is, if the

18  Attorney General certified that a particular claim fell within

19  802(a)1 through 4, that certification itself would confirm both

20  the fact of the activity, whatever the underlying activity is,

21  and the fact of participation by the carrier.

22          So, you needed to have 802(a)5 in there, so that

23  when the Attorney General certifies, on the public record, that

24  one of the provisions of 802(a)1 through 5 has been met, that

25  certification on the public record doesn't confirm or deny an

1   activity or participation by a particular carrier.  It's a very

2   important part of this statutory scheme, Your Honor.

3           I mean, put differently, if, for example, there was

4   a lawsuit against telecom company A for activity Y, and the

5   Attorney General -- and that activity had occurred, and it was

6   pursuant to one of the provisions set forth in 1 through 4,

7   call it a FISA court order, but there you had no (a)(5), the

8   only way the Attorney General could certify publicly would be

9   to say, I hereby certify that (a)(1) through (a)(4), one of

10  those provisions is met.

11          That certification would necessarily carry with it

12  the implication that the alleged activity had occurred because

13  that has to be true of (a)(1) through (4), and that the

14  assistance had been granted by the telecom carrier.  So, the

15  Attorney General would be forced to invoke the certification

16  procedures, but, in doing so, risk disclosing the fact of

17  assistance and the fact of an activity.

18          *THE COURT:*  But (5) could also be invoked in a

19  situation in which there had been no request for assistance, in

20  a situation in which no assistance had been rendered, and,

21  presumably, in a situation in which (a)(1) through (4) existed

22  for part of the activity, but not for other activity.

23          *MR. NICHOLS:*  I'm -- look, let me -- I think I

24  understand where you're going with this, but let me just --

25          *THE COURT:*  Well, all right, let me --

1          *MR. NICHOLS:*  Yeah.

2          *THE COURT:*  -- ask it another way.

3          *MR. NICHOLS:*  Yeah.

4          *THE COURT:*  -- or other aspect of the question:

5   (a)(1) through (4) provides immunity to a carrier or to a

6   person, a person who has provided assistance, but the person

7   afforded immunity under (a)(5) need not have done anything.

8   So, in essence, the Government is providing immunity to

9   somebody who has provided no assistance to the Government.

10          *MR. NICHOLS:*  That's right.

11          *THE COURT:*  Now, what kind of precedent is there for

12  providing a governmental immunity to a party that has

13  essentially done nothing to earn it?

14          *MR. NICHOLS:*  Well, it's not that they haven't done

15  anything to earn it, it's actually that they haven't done

16  anything to create liability in the first place.

17          I think that's reflected in one of your questions,

18  which is, if you invoke (a)(5) for a carrier that did nothing,

19  which is by definition when (a)(5) applies, provided no

20  assistance, plaintiffs have no claim to start with.

21          But let me back up to your question, and that's the

22  following:  Imagine an allegation against Your Honor or a

23  prosecutor that alleges that you took some act that harmed some

24  individual, and let's assume, again, that you didn't actually

25  take that act:  You still have absolute immunity, assuming the

1    allegations are that it was done in a judicial role.  Same with

2    a prosecutor.  So, immunities kick in a lot of times regardless

3    of whether or not you actually engaged in the activity alleged

4    by the plaintiff.

5              Here, (a)(5) only kicks in if the Attorney General

6    certifies under oath, in writing, that the telecom company

7    that's been sued and is alleged to have provided assistance to

8    the Government did not, in fact, provide the assistance.

9              That is about the clearest time that you would want

10   a defense or an immunity to kick in, because they would not

11   have been line in the first place and absent this procedural

12   mechanism for ensuring that a lawsuit like that does not get

13   litigated.

14             Go back to my hypothetical, for example:  Let's

15   assume now that plaintiff alleges that telecom company A

16   provided assistance to the Government of kind B and it actually

17   didn't occur; normally, the Government would have to say

18   publicly either we don't engage in that activity, people may

19   think we engage in that activity, people may think that we have

20   that capability, but we don't engage in that activity, or we do

21   engage in the activity, but we don't do it with that carrier.

22   Well, disclosing that information harms national security, as

23   we've said throughout this litigation, because you are

24   identifying activities that the Government can or cannot do, or

25   capabilities that the Government does or does not have, and the

1 partners that the Government does or does not have.

2   And, what this provision allows, in that

3 hypothetical soup, is for the Government to say we certify that

4 one of the provisions, (a)(1) through (a)(5) is met here, and,

5 in the classified submission, to make clear to Your Honor that

6 it's (a)(5) because the activity or the assistance did not

7 occur.

8   And so, (a)(5) is an integral part of this because

9 it precludes the Government from having to invoke these

10 protections in a way that discloses more information on the

11 public record than currently exists.

12   **THE COURT:** And, what is the substantial evidence

13 that the Attorney General has to present that (a)(5) has been

14 satisfied?

15   **MR. NICHOLS:** I think it's a sworn declaration from

16 the nation's senior legal official that the activity didn't

17 occur, or the assistance was not provided. And, I think that

18 is -- if and when you review our classified submission, you

19 would see that the Attorney General goes into great detail in

20 explaining what did or did not happen, what carriers may or may

21 not have provided assistance. All of that is in a sworn

22 declaration, under penalty of perjury. I think that's enough.

23   If Your Honor thinks more is necessary, in some

24 respects this is proving a negative, and one way to tend to

25 prove that a negative is true is to talk about what did happen.

1   And so, what we've tried to do in our classified certification,

2   and I know you haven't reviewed it and I can't say very much

3   about it on the public record, is to both give you sworn

4   testimony about what did not occur and then sworn testimony

5   about what did occur, the implication of which is we've given

6   you the entire picture, and so, therefore, there is substantial

7   evidence about non-participation.

8           And, I certainly think that under any relevant

9   standard that might apply, the Attorney General's

10  certification, in this case, establishes beyond any doubt

11  either that as to those carriers for which an (a)(5)

12  certification has been made in the classified declaration that

13  there was not such assistance as to whatever allegation we are

14  talking about, and, as to those who may have provided

15  assistance, that the assistance was provided pursuant to a

16  request, in writing, of the kinds delineated in (a)(1) through

17  (a)(4).

18          So, I understand Your Honor's questions about

19  (a)(5), but, I think it is both -- the least problematic of

20  these provisions, because if a carrier didn't provide

21  assistance at all, the plaintiffs have no claim.

22          **THE COURT:**  There's no need for immunity, is there?

23          **MR. NICHOLS:**  Well, but that assumes that this is an

24  immunity.  I mean, one could also look at it as it's a defense;

25  we didn't do it, but it's something that can't be said on the

public record, because of harm in national security because we
don't want to be confirming or denying whether activities
happened or not or assistance happened or not.  So (a)(5) is
both the least problematic of the provisions, but it's also a
very integral part of this procedural framework.

THE COURT:  I don't know how helpful it is to try to
pigeonhole this provision as an immunity or a defense, but, it
really does resemble an immunity much more than an affirmative
defense, does it not?

MR. NICHOLS:  Well, I mean, I think in some respects
that is a bit of semantics because there are immunities that
end up looking a lot like defenses.  I mean, one asserts
qualified immunity as a defense to a suit.  On the other hand,
there are other immunities that I would consider to be more
absolute, absolute judicial immunity, which is more of an
immunity from suit.  Maybe it's a little bit less like a
defense.

Either way, I think the operative question is how
does the statute operate?  The statute says no cause of action
shall lie against the carrier if one of the provisions of
Section 802(a) is met.  Whether you consider that a defense, or
whether you consider it immunity, I don't think it's relevant
for any of the constitutional issues that have you have before
you.  That statute operates to preclude civil actions and civil
liability against carriers if the statute has been met and, of

1    course, if the statute is constitutional.

2         Umm, part of your question in -- in Question No. 2

3    -- gets to the issue of the statute that precludes

4    constitutional claims against carriers, and I think that's

5    plaintiff's lead argument in their briefs, and I would like to

6    spend a little bit of time on that question.

7         It is the case that if the statute applies, it would

8    preclude claims against the telecom carriers that allege Bivens

9    damages actions, for example.  But, we think that's perfectly

10   constitutional and within Congress' Article 1 power to do so

11   for one very important reason:  And, another question that Your

12   Honor has asked recognized, this statute leaves entirely

13   unaffected the claims:  Bivens claims, injunctive relief

14   claims, declaratory relief claims against the Government and

15   Government officials.

16        Your Honor has a whole set of cases:  The Jewel

17   case, the Al-Haramain case, the CCR case, the Schubert case,

18   where plaintiff are pursuing claims against the Government and

19   Government officials; those claims are entirely unaffected by

20   the statute.  All Congress has said is no constitutional claims

21   against private entities.

22        Now, the plaintiffs come back and say that's

23   unconstitutional, but I think it's quite plain Congress has

24   that authority.  And, one need look no further than the cases

25   where the Supreme Court has declined to recognize Bivens

1   remedies, even against Government employees, by implication

2   from Congressional statutes.

3         Part of the Bivens analysis and whether you are

4   going to recognize a Bivens damages action against a federal

5   employee is to look at whether Congress had an intent to

6   foreclose a Bivens damages action; well, you know, embedded in

7   that analysis is the notion that Congress can effect or strip

8   away Bivens remedies, even by implication.

9         But, this statute isn't implication, this is an

10   express Congressional determination that you shouldn't have

11   constitutional claims litigated against telecom companies, but

12   you should have constitutional claims litigated against the

13   Government.  And, I think under any relevant analysis of the

14   case law, that is plainly within Congress' Article 1 power.

15         **THE COURT:**  That does sound like an immunity,

16   doesn't it?

17         **MR. NICHOLS:**  Again, I'm happy to describe it as

18   immunity or a defense.  I think it's just as relevant to talk

19   about what the statute does; it operates to foreclose all

20   claims, statutory common law, or constitutional, against the

21   carriers.  But, however one describes it, immunity or defense

22   or some other articulated standard, it's wholly constitutional

23   for Congress to have decided to make that policy judgment where

24   the Government remains a viable defendant under a statute that

25   doesn't affect claims against the Government.

1          **THE COURT:**  Are you suggesting that if the

2    Government had not left the claims against it intact, then the

3    statute could not be constitutional?

4          **MR. NICHOLS:**  I think you would have a very

5    different statute if, for example, Congress said you can't ever

6    bring an injunctive relief constitutional claim against any

7    party relating to these cases.  I think the Supreme Court would

8    be very wary of a statute that foreclosed any constitutional

9    claims against any party for injunctive relief because I think

10   there is a -- there is some line of authority for the

11   proposition that at least injunctive relief is necessary to

12   pursue constitutional claims.

13          Of course, in -- **Larson** and other cases make clear

14   that the Government can pursue such injunctive relief against

15   the Government.  And, I think the statute that foreclosed that

16   kind of relief against the Government would have significant

17   constitutional concerns that are clearly not present here,

18   because those claims remain completely unaffected by the

19   statute.

20          Your Honor, you -- you also asked a question about

21   retroactivity.  The statute is retroactive in the sense that it

22   does have an effect on claims litigating alleged past conduct.

23   But, under all the relevant Supreme Court cases and Ninth

24   Circuit cases applying **Klein** and **Plout**, it's quite clear that

25   this Court constitutionally may apply pending law, the current

law embodied in the statute to claims that have not yet gone to final judgment.

If the plaintiffs had a judgment that had gone final, and all appeals had been exhausted, and the like, there would be a ***Plout*** problem, potentially. But, that's not what we have here. You have a live case in which all the cases make clear you apply the current law which is embodied in 802.

Umm, finally, Your Honor, you talked about, or your second question talked about the Attorney General's discretion, and we talked about that a fair amount already in the context of 802(a)(5), and I think it's important to remember where 802(a)(5) fits into the entire scheme, but this notion, that the plaintiffs suggests, that the Attorney General is exercising legislative power in derogation of Article 1 by submitting to you the facts the support the contention that 802(a) applies is, I think, quite wrong.

The Attorney General is not exercising legislative power here. Congress has changed the law. It's a duly enacted statute by presentment signed by the president exactly how the constitution has to work. Nothing the Attorney General can do would eliminate a provision of the statute, as in the ***Line Item Veto*** case, or otherwise make a statute, not otherwise exist or have a force of law.

The law is, as Congress has said, it is -- all the Attorney General is doing here is exercising a traditional

1   Executive Branch function of giving the Court information which

2   is within its control to satisfy the standards of 802(a).  The

3   Attorney General, in that sense, is acting very much like a

4   prosecutor typically does.  There is discretion in bringing

5   cases.

6           And, to the extent that Your Honor wanted to look

7   for an analog where acts by the Executive Branch can affect the

8   law in pending cases between other parties in a way that might

9   require dismissal, I suggest that the Court might want to look

10  at head-of-state immunity cases, diplomatic immunity cases,

11  where cases pending between private individuals are very much

12  affected by the Executive Branch's determination that one of

13  the parties is immune, either because of head of state or has

14  some sort of diplomatic immunity.

15          Whether or not to assert that immunity is well

16  within the discretion of the Executive Branch and, frankly, is

17  unreviewable, unlike what we have here, where the Attorney

18  General is presenting information to the Court, but under

19  Section 802(b) and the rest of Section 802, the Court plays a

20  role in reviewing whether the Attorney General has established

21  facts sufficient to show that 802 applies.

22          So, if anything, this case is much less problematic

23  or does not raise any constitutional concerns because it's

24  actually more within the heartland of what Congress can do,

25  than, for example, those head of state cases.

1          Those are really plaintiff's core Separation of

2     Powers arguments.  And, unless Your Honor has more questions

3     about them, I'd be happy to turn to their due process argument.

4          **THE COURT:**  All right.

5          **MR. NICHOLS:**  Their due process argument really

6     turns on, I think, the confluence of two things:  One is the

7     facts that we can submit.  Congress has made clear that we can

8     submit to Your Honor, ex parte and in camera, and Your Honor

9     can review, ex parte and in camera, and rely on the information

10    we provided to you in making determinations information

11    establishing that Section 802(a) has been met.

12          Plaintiffs say that violates due process, but their

13    reply brief, or sur-reply brief, ignores the various cases that

14    we and the telecom companies have cited in the IEEPA and AEDPA

15    contexts that say it's not a violation of due process to submit

16    in camera ex parte classified information for merits

17    determinations.

18          So, there is a long line of cases permitting ex

19    parte in camera review as constitutional under the due process

20    clause.  But those cases are, if anything, harder for the

21    Government than this one.  In those cases, the interest

22    asserted by the group that's been designated under the statute

23    are very, very -- I mean, they are choate property or liberty

24    interests.  A blocking order, under one of those statutes,

25    blocks funds, prohibits people from traveling, prohibits others

1 from providing material support to an organization.  It has all

2 sorts of effects on liberty and property interests.

3   In contrast here, plaintiffs, at best, have what the

4 Ninth Circuit has recognized as a very inchoate interest in a

5 cause of action that is dependent on, among other things,

6 Congressional statutes, how a case might be litigated.  And

7 unless and until there is a final judgment, they don't have a

8 true choate property interest in a cause of action.

9   So, on the one side of the Matthews balancing test,

10 the due process balancing test, you have property interests

11 which are much less important, I would say, than the property

12 interest at issue in the IEPA context.

13   On the other side of the balance you have the same

14 concern, which is the harm to national security from disclosing

15 this information publicly.  There is a ton of case law, Your

16 Honor, recognizing that probably the primarily Government

17 interest is protecting the national security.  And, what

18 Congress did here is recognize that it wanted to allow some

19 judicial review of the certification, but it wanted to do so in

20 a way that protected national security.  And, as our briefs, I

21 think, establish, Congress struck the appropriate balance.

22   Plaintiffs' other argument is that the substantial

23 evidence standard either is a **_Klein_** problem, and we think

24 that's quite clearly wrong.  Under **_Klein_**, the one thing that

25 Congress can't do is it can't direct Your Honor to make

1   specific findings of fact.  There is no question that under the

2   statute you are not required to make specific findings of fact,

3   you have to review the classified submission, public

4   submission, public briefs, to determine whether the provisions

5   of section 802(a) have been satisfied.

6          Plaintiff's other argument is the substantial

7   evidence is standard, is too deferential, and there is a risk

8   of deprivation of -- or an error by Your Honor because of the

9   deference that you to have give, or the lower standard of proof

10  that has to be met here.  And, I think there are a couple of

11  points to make, Your Honor.

12         The first is, obviously, substantial evidence

13  standard has a long history.  It's been long recognized that

14  courts reviewing evidence under the substantial evidence

15  standard do not act in derogation of judicial duties.  There is

16  no due process violation inherent in the substantial evidence

17  standard.

18         The second point is, there are very good reasons to

19  have the substantial evidence standard here.  As one of your

20  questions indicated, under section 802(a)(4), one of the

21  showings that the Attorney General must make is that the

22  assistance was in connection with an intelligence activity that

23  was designed to detect or prevent a terrorist attack.  So,

24  assuming that the Attorney General has certified some of the

25  alleged assistance here as falling within 802(a)(4), and I say

1    "assuming," because the Attorney General has not said publicly

2    whether that is a provision on which he relies, but if he were

3    to make an 802(a)(4) certification in this case, he would have

4    to establish that the alleged assistance was in connection with

5    an intelligence activity of the United States that was designed

6    to detect or prevent a terrorist attack.

7         But, that is exactly the kind of Executive Branch

8    determination that courts typically give the utmost deference

9    to, either in the State Secrets context or other contexts.  And

10   so Congress was quite right, I think, to include the

11   substantial evidence standard.

12        I don't think it would be appropriate for this Court

13   to look back and second-guess the Executive Branch's

14   determination in 2001, 2002, 2003, that a particular activity

15   might have been designed to protect or detect -- prevent or

16   detect against terrorist attacks.  So, I think the substantial

17   evidence standard here quite plainly fits within due process.

18        There is a related point, Your Honor, and I think

19   plaintiffs, because they realize that substantial evidence is

20   constitutional, they say, but wait a second, this is a

21   different case.  That may be true in some cases, but here the

22   Attorney General has an actual bias.

23            THE COURT:  An actual what, sir?

24            MR. NICHOLS:  Bias, b-i-a-s.

25        And, they don't actually point to anything

1  establishing an actual bias, what they point to is alleged

2  institutional biases that the Attorney General took policy

3  positions on the appropriateness of legislation, and,

4  therefore, when he submits facts to Your Honor, he has a bias

5  in favor of certain facts.  I think the case law is quite clear

6  that such institutional bias claims don't work.  The Ninth

7  Circuit and the Supreme Court has made clear that the

8  touchstone of bias, even in an adjudicative setting, is

9  financial or personal interest.  Plaintiffs acknowledge that

10 the Attorney General doesn't have a personal or financial

11 interest in these cases, and so that bias argument, I think,

12 fails, Your Honor.

13         If I could mention just two things, and then I'd be

14 happy to hear other questions.  And I also want to make sure

15 that I've answered all your -- the questions that you gave us.

16 Plaintiff's view of discovery is quite remarkable.  Plaintiffs

17 say we should be permitted to test the Attorney General's

18 certification of highly classified national security

19 information by deposing this Attorney General, the former

20 Attorney General, Secretary Chertoff, and a whole host of

21 incredibly senior-ranking Government officials; that argument

22 is so plainly inconsistent with the statute.

23         What Congress wanted to do here was to create a

24 mechanism whereby Your Honor receives certain information,

25 information delineated in the statute to determine whether the

provisions of Section 802(a) have been met. It did not

authorize discovery. And, it expressly authorized Your Honor

to review the information contained in the Government's

submission.

Your Honor, I think it's important to remember that

this was, in some respects, a response to these cases.

Congress recognized that these cases created a risk, a harm to

national security, and a risk of harm to whatever relationships

may have existed between the United States and

telecommunication carriers.

Now, what Congress did is it created a focused

immunity, a focused defense, whatever one wants to call it

embodied in 802(a). It then created a very robust, but still

protective of national security procedure in 802(b) and the

rest to ensure that this Court had more of a role in reviewing

the certification than the Court would have had under the State

Secrets privilege, which is where these cases, as you know,

were headed.

THE COURT: The statute isn't quite that limited, is

it? It speaks about assistance; it can be any kind of

assistance by a person. It doesn't have to be a

telecommunication carrier.

MR. NICHOLS: Well, it defines "person" as

telecommunication carrier or their landlords. That is in the

definitional aspect of Section 802 -- sorry, Section 801. So

the section, is, in fact, limited to telecommunications

carriers, their affiliates, and their landlords.

       So the statute is directed at --

       **THE COURT:**  And a whole host of others that are

defined in the section.

       **MR. NICHOLS:**  Well, but they all are related to a

telecommunications carrier.  And, I think the goal there was to

ensure that, on the one hand, you ensured that

telecommunication carriers had the benefit of 802(a), but some

affiliate of AT&T or some executive of AT&T wasn't left

hanging, so they defined the term to include any possible

person affiliated with a telecom carrier.

       **THE COURT:**  "Other person who may be authorized or

required to furnish assistance," and so on and so forth.  It's

-- it's awfully broad.

       **MR. NICHOLS:**  Your Honor, I disagree in that

respect.  I think Congress' intent was to make this statute

about telecommunications providers, but they wanted to make

sure the definition wasn't so narrow that one couldn't certify

that an affiliate or, you know, a senior vice president of a

company or a member of the board wasn't subject to dismissal

because of the certification.

       So, I actually do think that the immunity, whether

it's 1 through 4 or 5, and whether you describe it as immunity

or defense, is, in fact, quite narrow, and is well within

1   Congress' Article 1 powers.

2          But, I think it's also important to recognize that

3   that's the substantive provision.  And then, the question is

4   whether Congress appropriately balanced the various competing

5   interests in creating the procedure that you have to follow in

6   applying the Act.  I do think it's important to keep those two

7   parts of the statute separate, and I think both parts are

8   plainly constitutional.

9          Umm, Your Honor, that's a question of whether the

10  statute is constitutional.  Obviously, we think it is for all

11  these reasons.  If you agree, of course, then there is the

12  question of whether the Attorney General's certification

13  establishes that the provision of 802(a)(5) have been met,

14  essentially the application of those standards to the Attorney

15  General's classified certification.

16          I recognize Your Honor hasn't reviewed that yet.  I

17  think you may for the reasons we discussed, and I think when

18  you do you will see --

19          **THE COURT:**  So what do you think the next step is?

20          **MR. NICHOLS:**  I think the next step is for Your

21  Honor to review the classified certification because you have

22  determined it would be appropriate to do so, consistent with

23  due process and authorized by Congress, to review that

24  certification and any supporting materials that we may have

25  provided in connection with that certification, as delineated

1  by Section 802, that there are certain things that authorize

2  the Court to review in connection with the certification;

3  review the materials that we have provided to the Court, and,

4  in my view, when the Court reviews those materials, it will see

5  that there is no doubt that the Attorney General certification

6  establishes beyond any doubt that the certifications that he

7  makes in there are supported by substantial evidence, a

8  preponderance, whatever standard one wants to pick, that the

9  certification establishes that the provisions of 802(a) have

10 been met.

11         **THE COURT:**  And what do I do if I conclude that

12 there is not substantial evidence?

13         **MR. NICHOLS:**  If you conclude there is not

14 substantial evidence, as we suggested in our brief, we think

15 the appropriate course is for Your Honor to come back to us to

16 ask questions of us as to why --

17         **THE COURT:**  Ex parte?

18         **MR. NICHOLS:**  Yes, if it involves classified

19 information.

20         Congress made quite clear in multiple provisions in

21 this statute that the one thing that could not occur is the

22 disclosure of classified information to the plaintiffs.  I

23 think it would be completely appropriate, and the Court should

24 give notice to the other side that it was asking questions.

25 That's exactly what Judge Canelli did in the **_Terkel_** case, which

1    is an early State Secrets case that was paralleling the Hepting

2    case.  Judge Canelli in the State Secrets context gave notice

3    to the plaintiffs that he had some questions for us, he asked

4    some questions of us --

5            **THE COURT:**  And did he specify what those questions

6    were?

7            **MR. NICHOLS:**  He did not specify what the questions

8    were, because to specify what the questions were would have

9    been to disclose classified information.

10           So, he gave notice he was asking the questions, he

11   then asked those questions of the Government.  They are the

12   kinds of questions that one could ask without revealing

13   classified information, so it was quite appropriate, in our

14   view, that he did that ex parte and in camera.

15           The Government responded to those questions.  We

16   actually had a bit of a back and forth about those questions,

17   and he, ultimately, as you know, granted the motion to dismiss

18   based on the Government's assertion of the State Secrets

19   privilege.

20           My view, our view, Your Honor, is that dialogue will

21   not be necessary here because the Attorney General's

22   certification is robust and establishes beyond any doubt that

23   the certification establishes Section 802(a) applies here.

24   But, if you don't agree for some reason, we think that the

25   course that Judge Canelli took in **_Terkle_** is the appropriate

1   one, which is to come back to us, ask questions, give notice to

2   the other side that you are doing so, but, of course, not

3   disclose to the other side the questions you are asking because

4   that would be to disclose classified information.

5          If you have questions, of course, like the questions

6   you asked today that go more to legal issues there would be no

7   problem providing the other side with that, but, to the extent

8   that they are bound up in classified information, we think it

9   would be inappropriate to disclose those to the other side.

10         If Your Honor has no further questions -- I hope

11  I've answered all these questions.  If not, I will try to do so

12  later in the hearing, if appropriate.

13         *THE COURT:*  Thank you, Mr. Nichols.

14         Mr. Wiebe, are you going to be arguing for the

15  plaintiffs?

16         *MR. WIEBE:*  Yes, I am, Your Honor.

17         *THE COURT:*  All right.

18         *MR. WIEBE:*  Good morning, Your Honor.

19         I would like to begin where Mr. Nichols ended up,

20  and that's with the due process flaws of this statute.  As Your

21  Honor knows, we have pointed out numerous constitutional flaws

22  with Section 802, and one of the most fundamental is the due

23  process violation of that statute.  Under that statute,

24  plaintiffs never get the opportunity for a de novo adversary

25  hearing, either before the Attorney General or before this

1  Court.

2          We never got to see the secret evidence arrayed

3  against us --

4          **THE COURT:**  Well, Mr. Nichols tells me that that's

5  not unprecedented, that in the situations which he just

6  described, that's the way this process works, and it's still

7  considered due process.

8          **MR. WIEBE:**  I don't believe that's correct.  I think

9  if you look at -- at the situations where the substantial

10 evidence test is applied, uniformly, you'll find that there has

11 always been a prior de novo adversary adjudication.

12         For example --

13         **THE COURT:**  What do you mean --

14         **MR. WIEBE:**  I mean --

15         **THE COURT:**  -- de novo?

16         **MR. WIEBE:**  A case where the party against whom the

17 decision is being made has the opportunity to present evidence

18 to the decision maker, to see the evidence presented against

19 the party.

20         For example, one of the situations they rely on is

21 court review of administrative proceedings, including

22 administrative proceedings designating terrorist organizations;

23 well, in those situations there is an administrative -- before

24 it gets to court, there is a prior administrative proceeding,

25 the person has notice of it, they have the opportunity to

1  present evidence to the administrator, and that administrator

2  then makes a determination.

3      Here, we have no notice of the Attorney General's

4  decision; we have no opportunity to present evidence contesting

5  it.  So, that was not an adversary adjudication.

6      When it gets to court here, it's not a de novo

7  adversary adjudication because this Court's hands are tied by

8  the substantial evidence standard, which is a differential

9  standard of review, not a standard of proof.

10      So, this Court, even if it were to come to a

11  different decision reviewing the evidence de novo, is,

12  nonetheless, bound by the Attorney General's determination so

13  long as there's more than a mere scintilla with less than a

14  preponderance of evidence supporting it.

15      So I think that's what really distinguishes --

16      **THE COURT:**  Well, but isn't that the appropriate

17  testing situation like this, where the determination is one

18  that is not one typically committed to a judicial body, but to

19  an executive body?

20      **MR. WIEBE:**  I think -- I don't believe that's

21  correct, Your Honor.  The decision whether or not to dismiss

22  pending litigation is one that's always submitted to --

23      **THE COURT:**  Well, but the underlying issue is

24  whether or not the assistance described in 802 has been

25  provided and, whether or not there was reason to believe that

1   the various provisions, particularly A through 4, were

2   satisfied in providing that assistance.

3           That really is something that resembles a review of

4   an administrative or executive kind of decision much more than

5   a typical fact finding that a court does.

6           **MR. WIEBE:**  Again, Your Honor, I think you'll find

7   that in those reviews, administrative decisions, there's been a

8   prior de novo determination.  I think that's what **Concrete Pipe**

9   illustrates, one of the cases we cite in our decision that --

10          **THE COURT:**  Tell me about that case.

11          **MR. WIEBE:**  Yeah.  That was a case, an ERISA case

12  where the ERISA trustee made a benefit determination, and it

13  then went to an arbitrator.  And the issue was, is the -- is

14  the arbitrator bound by the trustee's determination?  And the

15  Court held, no, the arbitrator isn't and, under due process,

16  can't be, because the arbitrator was a biased adjudicator and

17  hadn't -- hadn't provided an unbiased de novo adversary

18  adjudication of the matter.

19          And the same is true here.  Here we've got a

20  situation where the Attorney General is a biased decision

21  maker.  And, contrary to what Mr. Nichols has said, he was not

22  merely opining on the abstract proposition of whether, in

23  general, immunity for telecom carriers was appropriate.  He was

24  saying these very cases, our very cases, should be dismissed,

25  and we cite to that in our summary of evidence and in our

1   briefs. And we never received that de novo adjudication,

2   adversary adjudication. And, at some point, that's got to --

3   that's got to exist.

4         **THE COURT:** What are the -- what are the facts that

5   must be shown to satisfy this substantial evidence standard in

6   802? One of the questions that I posed, I didn't discuss this

7   with Mr. Nickels, perhaps I should have, is whether that

8   substantial evidence standard is the same under 802(a),

9   particularly (a)(4), as under Section 1804 of Title 50, which

10   is the FISA provision.

11         **MR. WIEBE:** Yes, Your Honor.

12         **THE COURT:** What -- what is the standard that -- or

13   the facts that need to be shown to satisfy the substantial

14   evidence standard under 802(a)(4).

15         **MR. WIEBE:** Okay.

16         **THE COURT:** Are they the same as 1804?

17         **MR. WIEBE:** No, Your Honor, I don't believe so.

18         **THE COURT:** Why not?

19         **MR. WIEBE:** 1804 is an instance of what I was

20   referring to, a court making a de novo determination. The

21   Attorney General submits, and is required to submit, extensive

22   detailed very specific evidence about the proposed

23   surveillance, the target of the surveillance, the minimization

24   procedures, if there's more than one surveillance device,

25   additional requirements kick in. Very detailed. And that's --

1    that's the Attorney General's initial burden.

2           But then, it's the court, the FISA court, that has

3    the power to make an independent de novo determination of

4    whether that evidence has satisfied the probable cause

5    standard.

6           Here -- and that's what Congress does when it wants

7    to make a serious attempt to protect the privacy of Americans,

8    to honor constitutional rights and enforce those constitutional

9    rights.

10          Here, I think it's really too much to try to pack in

11   all that -- very specific requirements into Section 1802.  Part

12   of it is that this Court is bound by standard of review; it's

13   not free to make de novo determinations.

14          The additional part is -- is that the whole purpose

15   of 802, especially A, 4, is not to authorize or immunize only

16   surveillance, which would have been legal, had they gone to the

17   FISA court; it's, rather, to immunize untargeted mass

18   warrantless surveillance.  And, I think that's a fundamental

19   different purpose from the purpose that Congress had in 804 --

20   I'm sorry, 1804.

21          **THE COURT:**  1804, yeah.

22          Well, let me -- let me switch the ground, if you

23   don't mind.

24          **MR. WIEBE:**  Certainly, Your Honor.

25          **THE COURT:**  What's the harm here to the plaintiffs?

1    The plaintiffs still have a remedy against the Government, it

2    just, under this statute the plaintiffs are not able to go

3    against the telecommunications carriers and all of the

4    individuals that are mentioned in 1801 -- I'm sorry, 801.

5            In other words, the Government has assumed the

6    liability, if there is any, for any of these unconstitutional

7    or unlawful acts, and so, the plaintiffs are going to be made

8    whole if they have, in fact, been damaged.  So what's the harm?

9            *MR. WIEBE:*  First of all, Your Honor, Your Honor has

10   -- has described what I think it would be a substitution

11   statute, and -- in which the Government would step into the

12   shoes of the carriers, and that's not at all what 802 is.

13           *THE COURT:*  Well --

14           *MR. WIEBE:*  The Government is not assuming the

15   liability of the carriers.  Any action the plaintiffs were to

16   bring against the Government would be subject to all the

17   defenses and immunities the Government itself possesses.

18           But, I think there's a more fundamental reason why

19   it's absolutely crucial that these --

20           *THE COURT:*  Well, are you saying that the Government

21   would have some immunities or defenses which would not be

22   available to the telecommunications carriers in the event this

23   statute were not in play?

24           *MR. WIEBE:*  Certainly, different immunities and

25   defenses.

1      **THE COURT:**  And, immunities which would cut off

2   relief that the plaintiffs would otherwise be able to obtain;

3   is that what you're saying?

4      **MR. WIEBE:**  It will certainly -- I think the crucial

5   factor is, we will not be able to obtain relief directly

6   against the carriers because they are no longer the parties.

7   And I think that's --

8      **THE COURT:**  But, will you not be able to obtain all

9   the relief that you would be entitled to obtain against the

10  carriers, but you would be going against the Government

11  instead.

12     **MR. WIEBE:**  I don't think that that's an adequate

13  substitute, and let me explain why, Your Honor.  It has to do

14  with the special nature of electronic surveillance.

15       Now, unlike many other constitutional violations,

16  where the participation of a private party is not necessary or

17  essential to the commission of the constitutional violations,

18  with respect to electronic surveillance, it's different.  The

19  participation of the carriers is essential in order to complete

20  the constitutional violation.  Without their participation and

21  cooperation, it can't happen.

22       The carriers are the gatekeepers.  Without their

23  participation, it just isn't going to go forward.  And that's

24  why it's important that, in order to protect the privacy of

25  Americans, there be a remedy directly against the carriers.

1          What we've seen is that this is an administration

2     that has probably boasted that its Article 2 powers are

3     preeminent, that it's not bound by the other branches in

4     conducting surveillance.  It disregarded Congress' commands in

5     FISA for many years; there is no guarantee that it would obey

6     the commands of the Judicial Branch.  And, I think that, in

7     fact, a remedy against the carriers would be much more

8     efficacious than a remedy against --

9          **THE COURT:**  Well, but that's a policy argument, and

10     that's argument you should have been making in Congress.

11     Congress made a determination that that was not in the national

12     interest and gave us this statute.

13          **MR. WIEBE:**  In fact, Your Honor --

14          **THE COURT:**  I'm the wrong person to be making that

15     argument to.  Talk to Senator Feinstein.

16          **MR. WIEBE:**  Well, your question, Your Honor, was,

17     was there harm to us, and that's the answer I was -- that's

18     question I was answering by giving that answer and explaining

19     that there is a harm, there is a difference to losing our

20     claims against the carriers.

21          I'd also, with respect, like to disagree with the

22     notion that Mr. Nichols had advanced, that this is really

23     Congress' determination.  And this gets to our Separation of

24     Powers argument.

25          And, I think that, as the Court has pointed out,

1    this is a very sui generis statute.  And, the only branch that

2    has the power to kill our statutory claims is the branch that

3    created them, Congress.  Congress didn't do that here.  If

4    Congress had done that here, they would have passed a statute

5    like the gun manufacturers' liability statute that the parties

6    brief in the -- both the carriers in the Government brief and

7    we quote in our reply brief.

8         **THE COURT:**  Is this the --

9         **MR. WIEBE:**  It's 15 U.S.C. 7902.

10        **THE COURT:**  The statute that was cited by the law

11   professors, the Protection of Lawful Commerce Act?

12        **MR. WIEBE:**  Yes, it was also cited by the amicii

13   professors.

14        **THE COURT:**  Right.

15        **MR. WIEBE:**  And, it's also addressed in a Second

16   Circuit decision in ***City of New York versus Beretta*** case.

17        And that's a case where Congress did make the

18   decision, we want to get rid of these causes of action, and the

19   statute says it very baldly:  Qualified civil liability action,

20   which is an action against a gun manufacturer, may not be

21   brought in any Federal or State Court.  Congress could have

22   done that here, it didn't.  Congress, instead --

23        **THE COURT:**  You wouldn't have liked that any better

24   than this statute.

25             **(Laughter.)**

1          **MR. WIEBE:**  We wouldn't have liked it any better,

2     but it would have -- it doesn't present the same constitutional

3     flaw under Article 1, Section 7, that this one does.

4          **THE COURT:**  Well, I haven't really read this case.

5     I've glanced at it and glanced at the statute, but that's all.

6     But, this statute appears to go even further than, say, than

7     the statute that we're dealing with here, doesn't it?

8          **MR. WIEBE:**  The significance of that statute is,

9     that's Congress clearly and unequivocally changing the law,

10    making the policy determination that cases should go -- should

11    not go forward.  That's not what we have here.  Here, Congress

12    has said these cases are out there, we don't know what to do

13    about it.

14          **THE COURT:**  And you're saying --

15          **MR. WIEBE:**  And they punted it to the Attorney

16    General.

17          Sorry.

18          **THE COURT:**  What you're saying is Congress, in this

19    statute, is dictating to the Judicial Branch how the Judicial

20    Branch must decide these cases; is that your point?

21          **MR. WIEBE:**  In the gun manufacturers', Your Honor?

22          **THE COURT:**  No, in this case.

23          **MR. WIEBE:**  No, that Congress is giving the Attorney

24    General the power to dictate to this Court whether or not these

25    cases should go forward.

1          The day after this statute was passed our -- our

2     cases continued to be governed by the law that existed the day

3     before it was passed.  And, they would continue to be governed

4     by that today had the Attorney General not filed a

5     certification.

6          The Attorney General had no duty, under the statute,

7     to investigate whether any of the five conditions in (a)(1)

8     through (a)(5) exist.  Even if he does investigate and does

9     determine that one of those circumstances exists, he has no

10    duty to file a certification, no standard to apply to decide

11    whether or not to file a certification, absolute unreviewed,

12    uncabinned, standardless discretion.

13         And this is Congress saying we don't know what to

14    do, Attorney General, you make up the law, you decide whether

15    our existing laws should apply to these cases or that they

16    should be repealed with respect to these cases and new laws

17    should apply.

18         **THE COURT:**  Well, how would the statute, in your

19    view, have been less problematic if Congress had dictated to

20    the Attorney General that he must file the certification called

21    for in 802(a)?

22         **MR. WIEBE:**  It would -- I'm not sure that would cure

23    it entirely, but it would be less problematic, in the sense

24    that Congress would be making the decision; Congress would be

25    making the law.

1          Here, it's -- it's like the statute in **_Clinton_**, Your

2    Honor.  Now, in that case -- that's the line item veto case.

3          **_THE COURT:_**  Right.

4          **_MR. WIEBE:_**  And the Supreme Court there had -- one

5    of the arguments made by the Government in defense of the line

6    item veto statute was this is no different than any other

7    typical executive discretion case.  And they held up the

8    statute in **_Marshall Field v. Clark_** which was a tariff

9    suspension statute where the president, upon the determination

10   of three conditions, was to suspend the tariff.

11          And -- and the Government said the line item veto is

12   no different; you know, the president has to make certain

13   determinations before he can veto, and then, once he does, the

14   veto takes effect.

15          The grounds that it distinguished the field from the

16   veto statute on first was the executive was not acting on a

17   future contingency, that is, this was -- it was not a situation

18   where Congress had said we don't know what's going to happen in

19   the future, the only way to address this is by giving the

20   executive discretion.

21          In the line item veto case, the Court said, no, it's

22   -- it's no different, what -- what Congress knew is no

23   different than what the president knew at the time.  That's

24   exactly the situation here:  Congress knew the facts that the

25   Attorney General knows.  This is dealing with already completed

1    surveillance, not what might happen in the future.

2             So, there is not the requirement of future

3    contingency, which saved the statute in **_Field_** and was lacking

4    in **_Clinton_**.

5             The second factor, and -- was that even if -- under

6    the line item veto statute, even if the president determined

7    that the preconditions for exercising the veto existed, he had

8    no duty to actually exercise the veto.  That's exactly the same

9    here.  As I said, even if the Attorney General determines that

10   factors (a)(1) -- one of the factors of (a)(1) through (a)(5)

11   exists, he has no duty to file a certification.

12            And, the third one was they said, well, still, the

13   -- what -- what the Attorney General really is doing is just

14   exercising the -- the policy of Congress.  And, they said, well

15   -- the Court said, well, that was true in the tariff statute,

16   but it's not true here, because --

17                     **(Cell phone rings.)**

18        **MR. WIEBE:**  -- Congress had existing law and had --

19                 **(Cell phone continues to ring.)**

20        **MR. WIEBE:**  I'm sorry, Your Honor.

21        And had --

22                 **(Cell phone continues to ring.)**

23        **MR. WIEBE:**  -- had changed.

24                   **(Cell phone still ringing.)**

25        **MR. WIEBE:**  I'm sorry, Your Honor.

1          **(Co-counsel silences cell phone.)**

2          ***MR. WIEBE:***  Congress had changed the existing law.

3    And the Court said, no, it's -- it's not a situation where the

4    law had -- had --

5          **(Pause in the proceedings.)**

6          ***MR. WIEBE:***  It's not a situation where Congress had

7    made the policy determination, but one where it had deferred it

8    to the Attorney General.  And, I think that's exactly the

9    situation here: Congress has not said to the Attorney General,

10   if X is the case, do Y.  It's -- it says, X has already

11   happened, the surveillance has already happened, we don't know

12   what to do about it, you decide whether or not there should be

13   liability for it.  So it's not gap-filling by the executive

14   addressing a future situation that Congress wasn't able to

15   anticipate.

16         ***THE COURT:***  So you're -- all right, so it's a

17   delegation of legislative authority that you think is

18   problematic?

19         ***MR. WIEBE:***  More than a delegation, really, an

20   abdication of the law-making power and the fact that Congress

21   hadn't made the law here is -- is really the problem under --

22   under Article 1, Section 7.

23         ***THE COURT:***  All right.

24         Well, let's move on to some other topics that you

25   want to talk about.

1          **MR. WIEBE:**  Yes, Your Honor.

2          **THE COURT:**  You've talked about due process; you've

3     talked about delegation, let's take up the issue of substantial

4     evidence.

5          In your view, assume for the moment that I conclude

6     that the statute is constitutional, and I follow Mr. Nichols'

7     advice, to look at the Attorney General's certification; what

8     should I look for, in your view?  What should I apply as the

9     test to determine whether the substantial evidence requirement

10    of this statute has been met?

11         I know this is your fall-back position, but I'm sure

12    you have it.

13         **MR. WIEBE:**  Yes.

14         Well, I think it depends on the -- on the various

15    certifications.  For example, the Government has certified

16    under subsection (a)(5) that there was no content surveillance

17    at all, and we've put in evidence throughout this case,

18    beginning in the very early days, with the Klein and Marcus

19    declarations, Your Honor, showing that there -- there is

20    evidence of dragnet content surveillance.

21         **THE COURT:**  Well, isn't there a problem with (a)(5)

22    in that, the Attorney General can, essentially, immunize a

23    person, as defined in the statute, a person who did not provide

24    assistance, a person who was not requested to provide

25    assistance?  Isn't that a problematic feature of this statute?

1        **MR. WIEBE:**  I think it is.  And I think it is

2  especially --

3        **THE COURT:**  How is it problematic?

4        **MR. WIEBE:**  It's problematic, Your Honor, because it

5  -- and this is something that I -- that I believe Your Honor

6  pointed out in your questions, is that it allows (a)(5) to be

7  used as a shield for persons who may have done some of the

8  alleged conduct, but not others.  For example, if you have an

9  action alleging both content and records surveillance, both

10  content and records surveillance, and the carrier did one but

11  not the other, presumably, the Government could assert (a)(5)

12  and say, well, not everything that was alleged, occurred, and

13  therefore, they didn't do precisely what was alleged.

14        Or, if the time period alleged varies from what was

15  -- from what actually occurred, I think Your Honor pointed this

16  out as the ability of (a)(5) to kind of serve as a camouflage

17  or smoke screen for cases where some surveillance occurred, but

18  it doesn't precisely match the allegations of the complaint.

19        And so, I think that's one respect in which it's --

20  it's problematic, but, I think, it also illustrates, really,

21  the boundlessness of it, not just under (a)(5), but under --

22  under all -- all the sections in that, again, the Attorney

23  General has unlimited discretion, even when the circumstance

24  exists to pick and choose whether or not to immunize anyone.

25  And it's -- so, I think that that's certainly problematic.

1          The --

2          **THE COURT:**  All right, perhaps you can wrap up?

3          **MR. WIEBE:**  Yes, Your Honor.

4          In our briefs, we explain the ways in which the

5    secrecy provisions violate not only the due process provisions,

6    but also the First Amendment, and I think that's a fundamental

7    and independent flaw in this statute.  And under -- under both

8    provisions, I think it's crucial to recognize that the Court's

9    control over whether or not information should be secret has

10   been taken out of the Court's hands.

11         And, the ordinary situation, and the situation that

12   certainly the First Amendment requires, is that the Court have

13   the power to apply the strict scrutiny test, to weigh the

14   Government's interest and find out whether or not it's a

15   compelling interest.  If it is a compelling interest with

16   respect to that particular bit of information, then decide

17   whether or not the Government has used the least restrictive

18   means to do it.  And, this statute takes all that power out of

19   the Court's hands, and does it perpetually.

20         As we cite the **Doe versus Powers** and **Doe versus**

21   **Ashcroft** cases, that is just a fundamental First Amendment

22   violation.

23         **THE COURT:**  Is there any sunset provision for this

24   statute?

25         **MR. WIEBE:**  There is not, Your Honor.

1          **THE COURT:**  All right.

2          **MR. WIEBE:**  If I can just point out one last point

3    on the difference between the Government cases and the carrier

4    cases?

5          **THE COURT:**  Sure.

6          **MR. WIEBE:**  Is that there are a number of statutes

7    which are specific only to the carriers and not to the

8    Government, where we have no cause of action against the

9    Government at all under 18 U.S.C. 2702; 18 U.S.C. 2511(3)(a);

10   47 U.S.C. 605; and 47 U.S.C. 222.

11         **THE COURT:**  Spell that out a little.

12         **MR. WIEBE:**  Yes.

13         **THE COURT:**  All these numbers begin to run together

14   after a while.

15                    **(Laughter.)**

16         **MR. WIEBE:**  Yes.

17         Your Honor, this again gets back to the point, I was

18   making earlier, about the carriers being the essential

19   gatekeepers.  And, that's something that Congress has

20   recognized, not just with the creation of FISA, but going back

21   to the 1930's, when it enacted 47 U.S.C. 605.

22         **THE COURT:**  What is that?

23         **MR. WIEBE:**  That's a statute which prohibits a

24   communications carrier from divulging or disclosing

25   communications that it's carrying to others.

```
 1              And, these other statutory provisions are similar;
 2    they prohibit disclosure, either of content or communications
 3    or of records of communications.
 4              THE COURT:  All right.
 5              MR. WIEBE:  And Congress has historically recognized
 6    that the only effective regime of protecting privacy,
 7    protecting constitutional rights, is one in which the carriers
 8    are directly liable for violating that.  And, that's the only
 9    system that works.
10              THE COURT:  All right.
11              MR. WIEBE:  Thank you, Your Honor.
12              THE COURT:  Ms. Cohn, if I gave you five minutes,
13    would you care to amplify any particular point that Mr. Wiebe
14    has made?
15              MS. COHN:  I don't think so, Your Honor.  I guess
16    the only thing that I would add is that I think that
17    Mr. Nichols' explanation of what should happen next kind of
18    amplifies the due process and secrecy problems here.
19              THE COURT:  How so?
20              MS. COHN:  Well, essentially, what he is suggesting
21    is an ongoing secret process where you do your best, I think,
22    to try to play us, where there is not really an adversarial
23    process, there is a process where they continue in dialogue
24    with you making secret submissions in response to your
25    questions.  And this all happens with, I guess, at best, us
```

1  getting notice that the conversation is going on.  But, that

2  doesn't really help me.

3          **THE COURT:**  Isn't that what the statute

4  contemplates?

5          **MS. COHN:**  I think that that is one of the reasons

6  the statute is problematic, Your Honor.  I think that's why it

7  is a due process problem --

8          **THE COURT:**  Okay, now --

9          **MS. COHN:**  -- is that it contemplates, essentially,

10  you know, some kind of a secret process that we don't have any

11  access to and, frankly, that you don't control.

12          I think there is a second problem here.  There are

13  statutes that give you the discretion to decide that, say,

14  there is classified information here and that you're going to

15  decide which information we, as plaintiffs, or I have, to get

16  cleared counsel, get to see.

17          **THE COURT:**  Well, we are dealing --

18          **MS. COHN:**  That's different than the statute.

19          **THE COURT:**  Hold on, hold on.

20          We are dealing with classified information.

21          **MS. COHN:**  Some of the information is classified,

22  but it's not clear to me that all of it is.

23          **THE COURT:**  Oh, as long as some of it is classified

24  that's all it takes, isn't it?

25          In any event, you are dealing with classified

1    information, and you have to concede, do you not, there is a

2    legitimate Government interest in keeping some information

3    about some Government activities secret?

4              **MS. COHN:**  Absolutely.  Absolutely, but --

5              **THE COURT:**  And so, how do you deal with a situation

6    where some of that information is necessary for the Court to

7    decide a case that is pending before it?

8              **MS. COHN:**  Well, I think, you know, the FISA law,

9    provision 1806(f), is a model that does this, where -- I'm sure

10   you are going to be hearing a lot about that statute this

11   afternoon -- but, that is the provision in the FISA law that

12   provides you with the ability to request information and then

13   to decide which of this information should come to us.  It's

14   your ability to do it.

15             802 takes a different tact.  802 basically gives the

16   Attorney General the ability to gag you and takes away your

17   discretion to decide, you know, this isn't secret, this doesn't

18   deserve the level of protection --

19             **THE COURT:**  If that's --

20             **MS. COHN:**  You see, in the course of this case --

21             **THE COURT:**  If that's the determination, if I look

22   at that certification and say, well, wait a minute, this can't

23   possibly be secret, then hasn't the Attorney General failed to

24   meet the substantial evidence standard which the statute

25   requires?

1    *MS. COHN:*  I'm not sure that the secrecy

2    determination goes to substantial evidence.  I guess you could

3    take the position that, if it's not really secret, then you're

4    not going to consider it as evidence, and, therefore, they've

5    failed in their burden.  But, I wasn't thinking of those two

6    things as connected.

7            I mean, whether the evidence is substantial, to me

8    seems to be a separate consideration to whether it is or is not

9    appropriately secret.  I didn't read the statute that way.

10           I guess you could interpret it that way.

11                        **(Laughter.)**

12   *MS. COHN:*  But, my thought was -- I guess I was

13   reading the question of whether the evidence was substantial or

14   not to be --

15           *THE COURT:*  Well, it's --

16   *MS. COHN:*  -- kind of independent from whether the

17   information that they are submitting to you, or not submitting

18   to you, is appropriately made secret.

19           You know, for instance, Your Honor, the Klein and

20   Marcus evidence that we have submitted to you long ago, which

21   is still our core evidence that what we say is happening is

22   happening, and the Government has now said under (a)(5) that

23   what we say is happening isn't actually happening, so you have

24   a fundamental decision here, none of that is classified, none

25   of it's secret, the Government has admitted that.

1      So, I submit that there is a lot of information

2  about what the Government is and isn't doing that is not

3  classified, but that my determination, or even your

4  determination, of which of this information should be -- remain

5  secret and which should not, would be different than that that

6  the Attorney General would take because he wants to win.

7      **THE COURT:**  Is there any amplification on what the

8  substantial evidence standard is in this statute other than the

9  use of the term in 802 -- let's see, 802(b)(1)?

10     **MS. COHN:**  I -- I don't think there is any clear

11 information.  I mean, we looked to similar --

12     **THE COURT:**  Well --

13     **MS. COHN:**  -- statutes.

14     **THE COURT:**  Is there any information in the statute?

15     **MS. COHN:**  I believe that there -- there -- I mean,

16 I don't think that the statute itself has anything, but I do

17 need to check with my colleagues on this.

18     **THE COURT:**  Go ahead, go ahead.

19     **MS. COHN:**  I have, unfortunately, been in trial for

20 the last five weeks.

21     **THE COURT:**  Well, then, you ought to be well

22 sharpened for a dialogue with a judge.

23            **(Laughter.)**

24            **(Counsel confer.)**

25     **MS. COHN:**  My colleagues confirm my view, which is

1   there isn't anything in the statute to give you guidance about

2   what substantial evidence means here.

3           **THE COURT:**  Okay, then, to what do I look to

4   determine what substantial evidence means in this statute?

5           **MS. COHN:**  Yeah, I think the case law is the place

6   to look.

7           And, you know, we --

8           **THE COURT:**  Well --

9           **MS. COHN:**  The particular cases --

10          **THE COURT:**  There is a lot of case law on

11  substantial evidence.

12          **MS. COHN:**  There is, Your Honor.

13          We think that Congress is attempting to do something

14  they can't do, which is to require you to not look at the

15  Attorney General, to basically defer to the Attorney General as

16  if he was another fact finder in front of an adjudicatory

17  process.  And plainly, that that is not what happened here.

18  The Attorney General has a position; they have stated their

19  position.

20          But, for you to be limited in your review of the

21  Attorney General's determination as if he was some sort of an

22  agency fact finder or a lower court finding -- finding of fact,

23  I think would be tremendously wrong.

24          **THE COURT:**  Yeah, but that's not how the statute is

25  structured, is it?  It's not that the Attorney General is

acting in an adjudicatory function, he is simply providing

evidence to the Court.

      **MS. COHN:** And if the --

      **THE COURT:** The Court is determining whether or not

that evidence is substantial.

      **MS. COHN:** But substantial evidence in this context

does appear to require you to give a -- to use the more than a

scintilla, you know, formulation that we use for a substantial

evidence review rather than giving you the right to review the

evidence for yourself and make the decision, the fundamental

decision, about whether there is sufficient evidence here for

us to win or us to lose.

      I think it is trying to -- the statute is trying to,

I think improperly, to turn you into a version of the appellate

review over what the Attorney General does as opposed to your

proper role as a District Court, as the fundamental fact

finder.

      I think it's easiest to see in (a)(5): I mean,

whether something did or didn't happen is a classic role for

the Court to decide. Litigants come into you, they say oh, I

paid him; no, I didn't. It's not, you know -- the Executive

Branch doesn't come in and say, well, yes, actually, he did pay

them, and you give that substantial evidence review.

      The situation here is, I think, Congress is

improperly trying to introduce role of the judiciary as a

1 fundamental fact finder here.

2        **THE COURT:**  They do that all the time, don't they?

3              **(Laughter.)**

4        **MS. COHN:**  Well, certainly not on questions of

5 constitutional facts, and -- which obviously the constitutional

6 claims are at issue here.

7        **THE COURT:**  We are a court of limited jurisdiction,

8 and Congress can tell us we don't have any jurisdiction in

9 certain kinds of cases --

10        **MS. COHN:**  They certainly can.

11        **THE COURT:**  They do it all the time.

12        **MS. COHN:**  They do it all the time, Your Honor.  And

13 sometimes that's a good thing, and sometimes it may not be.

14 But, in this particular instance, where there are

15 constitutional claims at issue, the role of the Court -- you

16 know, what the statute does is fundamentally different than

17 just changing the underlying law.  What this statute does is

18 improperly -- Congress didn't change the underlying law,

19 Congress instead empowered the Attorney General to change the

20 underlying law and then, I think, presented a fig leaf to the

21 courts to say, well, and you can look over what they do, and if

22 it's supported by substantial evidence, you must dismiss case.

23        **THE COURT:**  One last question to you.  What's the

24 harm?  You still have your claim against the Government.  The

25 Government has -- well, until recently, we all thought the

1   Government had more money than the telecommunication carriers.

2   I'm not too sure --

3               **(Laughter.)**

4           **THE COURT:**  -- that that remains the case.  But, in

5   any event, you do have a defendant, and a deep-pocket one, so

6   what's the harm?

7           **MS. COHN:**  Well, Your Honor, I mean, to a certain

8   extent, I need to echo my colleague, Mr. Wiebe, and maybe I can

9   add a little something:  We have a right to an injunction

10  against the phone companies because they are in the unique

11  position of the gatekeeper of the privacy of the millions of

12  Americans.  This is as old as -- I mean, the Telecommunications

13  Act statute was passed in the 30's, that creates an independent

14  duty in the phone companies to protect people's privacy.

15          And that's an important value; it's one that the

16  courts have recognized and that Congress has recognized.  And,

17  you know, this is not a situation where the Government is

18  stepping into the shoes of the phone companies and defending on

19  the raft of statutes that set up duties for the phone companies

20  separate from the Government.  This is a situation where we

21  always had claims against the Government.  We chose a defendant

22  here, and we chose the defendants for, I think, quite, you

23  know, reasonable reasons.

24          The thicket of immunities that the Government has is

25  different than the defenses that the carriers have.  I -- I

1 find it a bit strange to find that situation arises in which

2 our choice of defendant is not being honored by this particular

3 statute or, that we should be told that it's okay, because, you

4 know, you may have sued company A, but it's okay because you

5 can still sue company B.  We don't really allow a choice of

6 defendant here.

7      **THE COURT:**  That's not unusual.  You can't sue a

8 judge for a decision the judges makes in the course of

9 performing judicial duties.  There are qualified immunities

10 that attach to police officers; there are immunities of all

11 kinds that are supported by very sound public policy

12 justifications.

13      **MS. COHN:**  Well --

14      **THE COURT:**  And, isn't that what Congress has done

15 here?

16      **MS. COHN:**  I don't think so.  Congress considered --

17 and believe me, I would tell you that all the arguments that

18 you have cited today that we should make to Congress are ones

19 that we did, and including Congress considering substitution

20 statute.  This was a provision that was considered, and

21 Congress didn't choose to go that road.  Congress didn't choose

22 to have the Government step into the shoes of the phone

23 companies.  If they did, then I think your question would be a

24 very fair one to ask because in that particular instance the

25 Government would be essentially assuming the duties of the

1   carriers.

2           But here, the Government is not assuming the duties

3   of the carriers.  They are not waving any of their immunities.

4   They are not taking the part of the defendant in a

5   Telecommunications Act statute.  There are statutory damages

6   under these provisions that are not available against the

7   Government.

8           And so, we -- you know, the remedies will change.

9   And, you know, how much they will change and what they will

10  look like against the Government, I think it's a little early

11  to tell.  But, they are certainly going to be different,

12  because there are at least five statutes that we sued under

13  that we are not going to be able to sue the Government under

14  now, all of which have some form of a remedy provision, again,

15  most of which are statutory damages, because Congress has

16  traditionally recognized that privacy is a difficult thing to

17  put a number on and instead has put in statutory damages.

18          But the remedies will change, and, I think they will

19  change dramatically if we are in a position where the cases

20  against the Government are the only ones that go forward.  And,

21  I think the questions of the various Government immunities will

22  be a thicket that we are going to have to make our way through

23  on.

24          You know, I'm not here to tell you that my other

25  case, Jewel, is going to lose, because I think we will win in

1    that situation, too.  But, there is a reason that we sued the

2    phone companies first.

3            **THE COURT:**  All right, don't let me forget about

4    Jewel, I want to talk about that at the end of these

5    proceedings.

6            **MS. COHN:**  I'd be happy to do so.

7            **THE COURT:**  All right, now, I want to hear from the

8    telecommunication folks who wanted a rebuttal function.  Who's

9    going to do that, Mr. Berenson?

10           **MR. BERENSON:**  Your Honor, I'm going to address very

11    briefly some of the Separation of Powers issue.  I think

12    Mr. Moss will deal with any remaining due process issues.

13           But we would be happy, both of us, to defer to

14    Mr. Nichols.  Looks like he may have a short rebuttal he wanted

15    to do first, if that's all right with you.

16           We'll do it in whatever order the Court prefers, but

17    I just want to make clear that I don't want to stand in

18    Mr. Nichols' way.

19           **THE COURT:**  Well, I can understand under the

20    circumstances why you don't want to interfere with the

21    Government's presentation here.

22                    **(Laughter.)**

23           **THE COURT:**  All right, Mr. Nichols, you're up.

24           **MR. NICHOLS:**  I really have just a few points, Your

25    Honor.

1          You asked at the beginning about whether you should

2     wait for the new administration, and --

3          **THE COURT:**  Have a different answer to the question

4     now?

5                        **(Laughter.)**

6          **MR. NICHOLS:**  No, I don't have a different answer,

7     but I did want to point you to Congress' judgment on this

8     issue, which is --

9          **THE COURT:**  Okay.

10          **MR. NICHOLS:**  -- in section 802(a), which says a

11    civil action may not lie or be maintained and shall be promptly

12    dismissed if the Attorney General certifies to the District

13    Court.  And, I think Congress' choice of those words is

14    instructive here.

15          You asked what the next step should be if you were

16    to conclude that the statute was constitutional, what you

17    should do next, and there, I wanted to point you to Section

18    802(c), which says if the Attorney General files a declaration

19    that disclosure would harm national security, the Court shall

20    review such certification and the supplemental materials in

21    camera and ex parte.

22          So, on those two questions, I think Congress has

23    mapped out what the Court should do; it should promptly dismiss

24    the cases if it believes the certification establishes that

25    802(a) has been satisfied, and it shall review the classified

1    certification in making that determination.

2            Your Honor, the only other thing I wanted to address

3    was this notion of the interplay between 802(a) and cases

4    against the carriers and then cases against Government, because

5    I think the discussion confused, a little bit, plaintiff's

6    claim here.  Plaintiff's argument is that the problem with the

7    statute is not that it forecloses statutory or common law

8    claims against the carriers, their argument, and this is, you

9    know, heading one of their brief, is that it forecloses a very

10   specific set of claims, constitutional claims against the

11   carriers.

12           Those kinds of claims, constitutional claims against

13   the Government, are exactly the kinds of claims they remain

14   free to pursue against the Government.  They aren't different

15   claims; they are Bivens, injunctive relief and declaratory

16   judgment relief claims against the Government --

17           **THE COURT:**  Well, but would they reach conduct with

18   the telecommunications carriers?  For example, the plaintiffs

19   may be able to get injunctive relief against the

20   telecommunications carriers that would circumscribe what the

21   carriers can do; is that relief possible in an action against

22   the Government?

23           **MR. NICHOLS:**  I think, yes, because an injunction

24   could run to the Government that it couldn't seek relief from

25   the telecom carrier.  An injunction against the Government

either as to a particular activity or a particular set of
assistance from a telecom company would preclude the
assistance, just in the same way that an injunction running to
the telecom company would preclude the assistance.

It's really the flip side of the exact same coin, or
order.  So, I do think injunctive relief, would, if they get
it, afford them all the relief they would be entitled to.

**THE COURT:**  But you couldn't hold Mr. Berenson's
clients in contempt, in the way that you could in the event
that there were an injunction that lay against his client.

**MR. NICHOLS:**  No, but you could hold the Government
in contempt.  And, you know, we certainly -- there are -- a lot
of what the plaintiffs have said today assumes that the
Government would act in bad faith or might not pay a judgment,
if one occurred; I mean, if an injunction ran to the
Government, that certain activities were unlawful,
unconstitutional, and had to be enjoined, I don't see any
scenario in which the plaintiffs wouldn't be getting exactly
the same relief they would be getting where an injunction ran
to a telecom company that says don't provide that assistance.

The Government couldn't, when it received that
order, ask for the assistance from the telecom company.  They
would be enjoined from doing so under penalty of contempt
sanctions.

So, I think that the discussion about the carrier,

the statutory claims against the carriers not being, you know,
something that the plaintiffs can pursue against the Government
really doesn't address plaintiff's core argument here, which is
that these constitutional claims have been foreclosed.  And,
for the reasons I mentioned before, we think that that -- that
argument just doesn't work.

But, in any event, none of the cases suggest that
there is a problem with a policy judgment by Congress that, you
know, for good policy, national security, or other reasons,
that certain damages remedies wouldn't be available.  In the
Bivens context, the Supreme Court has recognized many times
that it will not recognize a Bivens damages remedy against the
Government, even though the result of that is that the
plaintiff doesn't get the full relief he is seeking.

That is essentially the plaintiff's argument here,
which is, if you dismiss these claims against the carriers, we
are not going to be able to pursue all of the statutory claims
for relief that we have against the carriers and not against
Government.

In addition, Your Honor, I think **_Atmospheric Testing_**
in the Ninth Circuit makes quite clear that there is no problem
with the regime where claims against private companies
essentially become claims against the Government and morph into
Federal Tort Claims Act suits, which are subject to a much
different set of defenses and doctrines than the underlying

common law or statutory claims that have been asserted against the private companies to start with.

So, I think all of those doctrines make it clear that what Congress has done here, which is to say that no claims against the telecom companies, but all claims against the Government remain unaffected by the statute altogether. That is plainly constitutional under the Separation of Powers.

**THE COURT:** All right.

**MR. NICHOLS:** Thank you.

Mr. Berenson.

**MR. BERENSON:** Mr. Nichols hit a number of points that I planned to, so I will try to keep this brief.

I wanted to just amplify on one of the points he made, near the end, about the scope of injunctive relief. It's important to bear in mind that with respect to constitutional claims, those are, by definition, claims against governmental actors.

Remedies against the true governmental actors would almost by definition have to be adequate because, according to the allegations, the private telecom carriers, if they are acting at all here, they are acting at the direction and behest of those governmental actors. And, if those governmental actors are prohibited from doing or ordering a certain thing that the Court finds to be unlawful, then -- then, by definition, that injunction would be effective to prevent the

telecom carriers from doing it because the Governmental actor
would never be able to get the order in the first place,
without being in contempt of court.

There is a principal agency relationship here for
the purposes of the effectiveness of injunctive relief.  And,
as Your Honor also is aware, under the normal rules for
injunctions, they often will expressly find parties acting in
concert with the principal party enjoined.

So, I don't think there's any question here but that
an injunctive remedy for any constitutional violation that
might be found, which runs against Government, would be fully
adequate to vindicate plaintiff's constitutional rights and
interests.  Indeed, in the **_Malesko_** case, the Supreme Court went
out of its way to note that injunctive relief against
governmental actors is, in fact, the principal way, under the
scheme of Separation of Powers and under the constitution, that
these kinds of rights are vindicated.

The only other two points I wanted to make, one is
just a point of correction with respect to the statutory
remedies.  I fully agree with Mr. Nichols that there are no
constitutional implications whatsoever for what may be done
with statutory remedies.  Congress obviously has plenary power
to tailor those remedies and those causes of action, eliminate
them altogether.  The only constitutional issue that even
arises is if a statute attempts to eliminate all constitutional

1  remedies for -- for something that would be a violation.

2          But, it is important, I think, for the Court to

3  understand that three of the five statutes if I was hearing

4  correctly, that the plaintiffs cited --

5          **THE COURT:**  You recognized those numbers, did you?

6                  **(Laughter.)**

7          **MR. NICHOLS:**  I did, most of them, anyway.

8          And three of the five actually do contain remedies

9  that run against either the Government itself or Government

10 officials for violation, which, I think, belies the claim of

11 this special gatekeeper function that is so woven into the

12 fabric of these -- of these statutes that no other alternative

13 remedial regime can be contemplated.

14         What you will see, if you look, is that there are

15 damages available directly against the Government under the

16 Stored Communications Act, Section 2712.  There are, as well,

17 damages available against governmental officials under Section

18 2520 of the Electronic Communications Privacy Act, and 2707 of

19 the Stored Communications Act for -- for intentional

20 violations.

21         And then, under FISA itself, governmental officials

22 are liable for misconduct.  Indeed, I think FISA recognizes

23 that to the extent there are misdeeds involving foreign

24 intelligence surveillance, they are more likely to be committed

25 by Government officials than anybody else, since that's an

1   intrinsically an inherently governmental function.  And that

2   you will find in Section 1810 of FISA.

3           Finally, I wanted to amplify, just a bit, on the

4   *Atmospheric Testing* case which Mr. Nichols mentioned in his

5   rebuttal argument.  The statute clearly is not of a variety

6   that finds lots and lots of precedents throughout history, but

7   I think I would somewhat take issue with the notion that it is

8   absolutely sui generis.  And the *Atmospheric Testing* case in

9   the Ninth Circuit from 1987 probably provides the best example,

10  or the closest analogy.  That was involving the Atomic Testing

11  Liability Act, which provided that the Government could file a

12  certification, remove and then substitute in any cases where a

13  private contractor was sued for injuries arising out of nuclear

14  testing.

15          It was entirely within the direction of the

16  Government whether to file that sort of certification.  The

17  statute covers all manner of claims, including constitutional

18  claims.  It applied to pending cases as well as future cases.

19          The only reason it's not an absolutely perfect

20  analogy is that the cases, the two cases I'm aware of in which

21  the constitutionality of the Atomic Liability Testing Act were

22  litigated and, in both cases upheld, did not themselves involve

23  constitutional claims.  So, the Court was not confronted with

24  the question of whether -- whether it was constitutional to

25  terminate the constitutional remedy against the private actors.

1    But, because of all of the additional authorities

2    that we have cited in our briefs, I think it's quite clear that

3    they can.  As long as remedies against the Government remain,

4    it is not necessary that those remedies be absolutely congruent

5    with the remedies that were available against the private

6    companies.  There is abundant authority in the Bivens context

7    and elsewhere for that proposition.

8    And nor is the scope of executive discretion in any

9    way a constitutional violation.  Indeed, in **_Field versus Clark_**

10   itself, which is, I would say, plaintiff's favorite case on the

11   question of executive discretion, the executive actually, in

12   practical terms, enjoyed every bit as much discretion as the

13   Attorney General does here, it just came as a slightly earlier

14   stage.

15   The standard that the executive had to apply

16   essentially was whether there were unequal and unreasonable

17   tariffs imposed by a foreign government.  Obviously, a

18   reasonable standard -- reasonableness standard allows

19   considerable discretion to the Executive Branch to decide when

20   it is, in fact, going to invoke the provisions of the Tariff

21   Act to retaliate.

22   Now, it's true that once the finding is made, then

23   there is an obligation to act, but whether the discretion

24   occurs at the point at which the Government is making the

25   finding or the point at which it is deciding whether to submit

1  a certification to the Court, I think, doesn't make any

2  difference, from a constitutional perspective.

3           **THE COURT:**  Very well.

4           **MR. NICHOLS:**  Thank you very much.

5           **THE COURT:**  Mr. Moss?

6           **MR. MOSS:**  Thank you, Your Honor.

7           The Court has had a number of -- asked a number of

8  questions about the substantial evidence standard and how that

9  applies here.

10          **THE COURT:**  Can you give us some help?

11          **MR. MOSS:**  I'm not sure I can provide complete help,

12  but I think I can provide some.

13          I think first of all, there is agreement among all

14  the parties that there was no adjudication between -- before

15  the agency.

16          **THE COURT:**  There's no what?

17          **MR. MOSS:**  No adjudication before the agency.  There

18  was not an adjudication which took place before the Attorney

19  General was then subject to review in this context, in the way

20  an administrative proceeding might take place, where there is

21  an APA review in front of the Court after there has been a

22  trial or proceeding before an agency.

23          I think the parties agree, as well, that there is at

24  least some additional evidence, and there may be disagreement

25  about how much and what type of additional evidence can be

1    submitted to this court.

2            **THE COURT REPORTER:**  You have --

3            **MR. MOSS:**  Too fast.  I'm sorry.

4            **THE COURT REPORTER:**  Thank you.

5            **MR. MOSS:**  So, I think that it's clear that what

6    this Court needs to do is look at the evidence that is

7    presented to it, and, in the context of looking at that

8    evidence, decide whether, in fact, the -- there is a sufficient

9    basis for the Attorney General's certification.

10           What substantial evidence means and how much

11   evidence is required there is a question that the Court may not

12   need to decide because if the Court looks at the certification

13   and any supporting materials submitted, and any other evidence

14   that the Court deems it appropriate to consider, and concludes

15   that whatever the standard is that applies, whatever

16   substantial evidence may mean here, that the Government has

17   carried its burden; the Attorney General has carried its burden

18   under the circumstances.  Then, the Court doesn't need to

19   decide with great specificity what substantial evidence means

20   in this particular statute.

21           And, I would submit that it is -- that phrase has

22   been given varying definitions and varying statutes and has a

23   number of different meanings they have applied in different

24   contexts.  But, as the Court of Appeals held in the **_Kaluna_**

25   case, at 192 F.3d 1188, in a similar sort of context, where the

Court was wrestling with whether a preponderance standard applied, or a clear and convincing standard applied, the Court said it doesn't matter because whichever standard applies, the case comes out the same way.

So if that is true here, then the Court need not ultimately wrestle with the question of what substantial evidence means in this context.

But, I'll tell you what we think it means.

**THE COURT:** Okay.

**MR. MOSS:** And what we think it means is that the Court is required to engage in independent review of the evidence, and that, in doing so, it should afford the same type of deference to the Executive Branch that is afforded in other contexts involving national security information and national security.

So, for example, in the FOIA context, there is a recent opinion from the Ninth Circuit where Judge Fisher, writing for the Court, said that, "Under FOIA, where the Court is called upon to assess whether there is an adequate basis for the Government's assertion of protection under the provisions of FOIA that allow exemptions for national security information and affidavits and materials are submitted to the Court that the Court should engage in meaningful, albeit restrained, review of the CIA's assertions."

You know, similarly, Your Honor, in the context of

1  State Secrets, the courts provide some deference to the

2  assertions of the Executive Branch.  There is a case called ***Day***

3  *(phonetic)* out of the Fourth Circuit -- pardon me, out of the

4  First Circuit -- which we cite in our brief, where the Court

5  talks about providing deference to the executive on matters

6  involving the military in evaluating Westfall certifications.

7  So we think that that's what Congress had in mind.  And that's

8  the way the substantial evidence standard ought to apply in

9  this context, assuming that it actually makes a difference.

10          ***THE COURT:***  Meaningful, but restrained review.

11          ***MR. MOSS:***  Yes, Your Honor.

12          ***THE COURT:***  Well, that certainly clears things up.

13                  **(Laughter.)**

14          ***MR. MOSS:***  I think, Your Honor, on that point, you

15  know, there are a whole host of cases where the Court of

16  Appeals and the Court's, generally, and the Supreme Court have

17  talked -- spoken about providing deference to the Executive

18  Branches.  It's not by any means an abdication of the judicial

19  review.  And we think that is what applies in the context.

20          The plaintiffs refer to the ***Concrete Pipe*** case, and

21  I just want to make one, I think, important point about that

22  case, which, I think, is a fundamental distinction between that

23  case and what's involved here.  In that case, there was

24  actually a financial interest of the trustee.  And what the

25  Supreme Court says is, "A trustee bears an unwavering duty of

1    complete loyalty to the beneficiary of the trust to the

2    exclusion of the interest of all other parties."  And, it also

3    went on and said that the trustee himself faced the threat of

4    personal liability for the breach of his fiduciary

5    responsibility, obligations, or duties.

6            And the courts have made absolutely clear that that

7    type of financial interest in a case is fundamentally different

8    from the type of policy interest or policy perspective that the

9    Attorney General might bring to this context.  And, in fact,

10   the more analogous or appropriate case is the **Withrow** case,

11   where the Court says that, in general, there is a presumption

12   of integrity and honesty among Government officials.

13           And, indeed, you know, the Supreme Court in the

14   **FTC versus Cement Institute** case said that even where members

15   of the Federal Trade Commission had publicly stated that the

16   challenged pricing at issue in that particular proceeding was

17   illegal that as long as their minds were not irrevocably closed

18   that there was not a due process problem in that context.

19           Just a couple of words, Your Honor, with respect to

20   the ex parte procedures that Congress provided for.  You know,

21   as has been previously noted, there are a number of other

22   contexts where courts have upheld against due process challenge

23   ex parte proceedings, cases in which the interests are

24   fundamentally different and more substantial than in this

25   context.

I mean, for example, under the Anti-terrorist and Effective Death Penalty Act, where someone can be determined to be a terrorist organization which bars them from entering the country, results in the blocking of all their assets and makes it an extremely serious crime for anyone to knowingly provide any material support for them, even in that context, the proceedings can be closed for national security reasons.

Here, I would submit that it's particularly appropriate. And the constitutional issues are diminimus because this is one of the rare circumstances where it's not simply the Executive Branch making a determination with respect to the need for secrecy, either operating under its inherent power or pursuant to a general statute, this is a context in which Congress considered these precise issues presented here. And, under the **_Youngstown_** framework, you have both the Congress and the Executive Branch coming together here and providing that closed proceedings are appropriate, ex parte proceedings are appropriate.

And, it's one that makes sense in this context, in particular, not just given the -- the nature of the national security information at issue, but also, this is a rare case, in which, it's the Government that knows what happened or what didn't happen, that has access to the relevant evidence. It's not like a case involving, you know, somebody who's picked up in Afghanistan, and, you know, thrown into prison, and the

1  Government says we have reason to think you've done something

2  about bad, and the person says tell me what it is so I can

3  clear it up and I can tell you why that is not the case.  You

4  know, maybe I had a conversation with that person, who was a

5  bad person, but I had a legitimate reason to have that

6  conversation.  Give me a chance to explain it, but I need to

7  know what that evidence is so I can do it.  That's not this

8  context.  This is a context in which the Government knows was

9  there a piece of paper?  Wasn't there a piece of paper?  And

10  present it to a court.  So, in that context, the risk of error

11  is diminished, and, therefore, any conceivable due process

12  issue is minimized.

13          **THE COURT:**  Thank you, Mr. Moss.

14          Now let's turn briefly, as we conclude, to the Jewel

15  case.

16          **MS. COHN:**  Your Honor, can I respond very briefly to

17  three --

18          **THE COURT:**  Well, since you are on your feet I'll

19  let you do that.  But, I want to talk to you about Jewel and

20  Mr. Nichols.

21          **MS. COHN:**  I'm happy to talk about Jewel, but if I

22  could just respond to three things that were said?

23          First, I think that the protestations that

24  injunctive relief against the Government would, you know, just

25  solve all the problems here and that we don't need injunctive

1 relief against the carriers as well, is somewhat woefully blind

2 of how we got here in the first place.

3    We got here in the first place because the

4 Government convinced the carriers to do something that was in

5 violation of FISA. That is why it's an immunity law, is

6 because, they -- clearly, the law was broken, here.

7    **THE COURT:** Well, let's assume that's correct.

8 Let's assume that's exactly what happened. Then why shouldn't

9 the Government be on the hook for any harm or damage that

10 resulted?

11    **MS. COHN:** Well, we are going to try to hold the

12 Government responsible as well, Your Honor, but it took two

13 parties violating the laws, and separate laws, in order to

14 commit this violation. And, we think that it's only right that

15 we should be allowed an injunctive relief against the carriers

16 for their separate behavior here.

17    You said that no reasonable carrier,

18 telecommunications carrier, in AT&T's position could have

19 thought that what was being asked to do was legal. This was

20 your ruling of, goodness, now, three years ago in July. That's

21 because, I think, you quite rightfully noted that the carriers

22 have an independent duty to protect their customers.

23    And I think that telling us now, after multiple

24 years of litigation and then going to the Congress to get

25 immunity for their violations of the law, in the past, that we

1 should sit back and it's okay, because an injunction against

2 the Government will protect the millions of Americans whose

3 privacy depends on these carriers keeping their promises of

4 confidentiality, isn't right, and it isn't what Congress did

5 here.

6    That leads me to my second point, which is a lot of

7 discussion about the ***Atmospheric Testing*** case.  That case is

8 about a substitution.  That is a situation in which Congress

9 affirmatively substituted the Government in for the private

10 carriers.

11    The claims didn't -- you know, the claims then

12 morphed, as I think Mr. Berenson said, into claims against the

13 Government, in that instance.  Well, our claims don't morph

14 into claims against the Government here, they are extinguished.

15 They die.  And the fact that we have a separate cause of action

16 against the Government I don't think makes this like

17 ***Atmospheric Testing***.

18    The other thing is that Congress -- there was no

19 certification -- there was no discretion in the ***Atmospheric***

20 ***Testing*** case for the Attorney General to decide that the

21 companies that engaged in ***Atmospheric Testing*** were off the hook

22 for claims against them.  It was an automatic provision, and it

23 goes back into the Separation of Powers and due process

24 argument that we have talked about here.

25    The law in ***Atmospheric Testing*** was very different;

1   it was the Government saying, okay, something bad may have

2   happened here, but we are going to take the heat for it and

3   stepping in affirmatively and making that mandatory, not giving

4   a branch of the Executive the ability to turn that off and on

5   at will.  This statutory scheme is very different.

6           And, I think, it's worth taking a look at that case.

7   And you can see the differences in what happened there.  And

8   you can see the differences in the position of the Government's

9   stepping into the shoes of the carriers and not.  2712 is one

10  of the statutes that I -- we mentioned to you, is -- provides

11  relief against the carriers; well, you can look at what would

12  happen if we are trying to bring a similar claim against the

13  Government.  Well, first of all, we have to comply with the

14  Federal Tort Claims Act, which has severe restrictions.

15          **THE COURT:**  Well, let's talk about that case.

16          **MS. COHN:**  Um-hmm.

17          **THE COURT:**  That case --

18          **MS. COHN:**  I know you've been wanting to, so --

19          **THE COURT:**  Yes, yes.

20          Why don't you just make that last point, and then

21  let's move on.

22          **MS. COHN:**  Okay.

23          I think that the only -- the only other question is

24  about substantial evidence.  And I think it's important to know

25  that the statute says that the certification has to be

1   supported by substantial evidence, not that Your Honor is

2   empowered to discern whether substantial evidence exists to

3   demonstrate that (a)(1), (a)(2), (a)(3), (a)(4), (a)(5) has

4   been met.

5        Congress very specifically created this -- the

6   review that you get to have is the review of the certification,

7   not the review of the activities of the carriers.  And, as we

8   mentioned in our briefs, we are quite concerned that the

9   carriers' activities may be quite different in practice or due

10  to some legal analysis or interpretation that is kind of

11  swallowed in the certification, than what the certification

12  indicates.

13       For instance -- let me see if I can be clear.  They

14  have said publicly that for the content claims, the claims that

15  Mr. Klein's evidence supports and Mr. Marcus' analysis

16  supports, that (a)(5) applies, that they are just not doing

17  what we say they are doing.  Well, there is a couple of

18  possible reasons for that.  One is that they are interpreting

19  what it is we are alleging as something different than what we

20  are actually alleging.  Two, is that their certification is

21  based on some legal interpretation of what it is they're doing

22  that is hiding the breadth of what's actually going on.

23       But, in any event, there is nothing in the

24  substantial evidence standard, at least that I can see, that

25  empowers you to require them to show you what they're actually

1　doing, as opposed to whether their certification says the

2　specific words that it needs to say.  And that's a -- that's a

3　troubling difference.

4　　　　　*THE COURT:*  All right.

5　　　　　Jewel.

6　　　　　*MS. COHN:*  Jewel.

7　　　　　*THE COURT:*  Mr. Nichols, I don't believe we have

8　anything that has occurred in the case other than relating it

9　to this litigation.

10　　　　　*MR. NICHOLS:*  I think that's right, Your Honor.  I

11　think the parties are in agreement that the Government's

12　response would be due no later than February 2nd.  I don't know

13　whether that stipulation has been filed -- oh, we have filed

14　that stipulation.  So, our response to the complaint is

15　currently due no later than February 2nd.

16　　　　　*THE COURT:*  All right.

17　　　　　And, let's see, we have -- we have a Rule 16

18　conference which was set when the case was filed; I don't

19　believe that's been vacated.  I wonder whether we really should

20　proceed with that Rule 16 conference, in view of the fact that

21　you are not going to be filing your response until the 2nd of

22　February.

23　　　　　*MR. NICHOLS:*  My view is that we shouldn't have the

24　conference, that we notice whatever motion or whatever step we

25　are going to take on or before February 2nd.  And then, the

first hearing we have in Jewel would be with respect to --
assuming there is a motion to dismiss or for summary judgment,
that we -- that be the first hearing you can conduct in that
case.

      ***THE COURT:*** Well, for planning purposes, what do you
think you are going to be doing, moving to dismiss?

      ***MR. NICHOLS:*** The would be my -- my best guess, Your
Honor.

      ***THE COURT:*** Then we might as well just not set a
Rule 16 conference.

      Do you agree with that, Ms. Cohn?

      ***MS. COHN:*** Yes, Your Honor.

      ***THE COURT:*** All right.

      ***MS. COHN:*** I would point out that part of the reason
for the delay is that we sued some individual Government
employees, and there was a process they had to go through to
get counsel. That took quite a while, and so, we were --

      ***THE COURT:*** We don't have appearances by those folks
yet.

      ***MS. COHN:*** No, but we do have representation from
the other department at the DOJ that represents the individual
people sued that -- anyway, it took them a while to get their
ducks in line, and we were trying to be accommodating, so that
is why the deadline has slipped out to where it has. But, I
think we have now reached agreement on the process. And I

1  agree that a Rule 16 conference doesn't seem to make much

2  sense.

3             **THE COURT:**  All right.

4             And the clerk has that scheduled for the 2nd of

5  February, do we?

6              **(Clerk confirming court calendar.)**

7             **MR. NICHOLS:**  That -- Your Honor, just to be clear,

8  February 2nd is the date -- it's the date no later than we will

9  be filing a motion to dismiss, assuming we do that.

10             **THE COURT:**  Ahh, that's your filing date.

11             **MR. NICHOLS:**  Excuse me?

12             **THE COURT:**  That's your filing date.

13             **MR. NICHOLS:**  Correct, correct.

14             **THE COURT:**  All right.

15             **MR. NICHOLS:**  When we file, we'll look to whatever

16  the next relevant date for an argument is thereafter, and we'll

17  notice it in accordance with the Local Rules.

18             **THE COURT:**  Why don't we pick a date?

19             **MR. NICHOLS:**  Sure.

20             For this part, I might have Mr. Coppolino stand up

21  because he is much more likely than I am to be the person

22  advocating on behalf of the Government, so his schedule is

23  going to be a lot more relevant than mine, Your Honor.

24             **THE COURT:**  How about March 26 for the hearing?

25             **MR. COPPOLINO:**  Your Honor, I don't have anything

1    scheduled for March 26.

2         **THE COURT:** Good. Good.

3         **MR. COPPOLINO:** If we do file a motion, we would

4    notice it for that day. And then, the rest of the schedule, I

5    think we can work with the -- the plaintiffs on the schedule

6    working back from that. And perhaps --

7         **THE COURT:** That will -- yeah, well, that should

8    give you -- if you file your motion on the 2nd of February, you

9    can adjust the briefing schedule. That will give you

10   significantly more time than you would have under the Local

11   Rules. You can distribute that in any way that looks fair and

12   reasonable. And if you can't work it out, well, I'll give you

13   some meaningful, but restrained review.

14              **(Laughter.).**

15        **THE COURT:** All right?

16        Thank you, very much, counsel.

17        **MR. BERENSON:** Your Honor, may I have just one

18   moment? I need to make clear on the record something that

19   Ms. Cohn said, in the interest of avoiding confusion, with

20   respect to my client.

21        I do not believe this Court has ever held that no

22   reasonable carrier in AT&T's position could have believed that

23   what it was asked to do, assuming it was asked to do anything,

24   was lawful. Your Honor's ruling was based solely on the

25   allegations of the complaint so that if AT&T had, in fact, been

1  asked to engage in a boundless content dragnet of the entire

2  population of the United States, that would have been the case.

3  But, there is nothing on the record to suggest that that, in

4  fact, happened or, indeed, that AT&T was asked to do anything

5  by the Government.  And, I just wanted to make that clear.

6          **THE COURT:**  All right, well, I think the record is

7  clear.

8          **MR. BERENSON:**  Thank you.

9          **THE COURT:**  Very well.

10              **(Proceedings adjourned at 12:03 p.m.)**

11

12                  **---o0o---**

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER


     I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


/s/ Sahar McVickar
_____

**Sahar McVickar**, RPR, CSR No. 12963

**December 8, 2008**
