Pages 1 - 64

United States District Court

Northern District of California

Before The Honorable Vaughn R. Walker

In re: NSA                     )
Telecommunications Records     )
Litigation                     )
                               )
                               )          MDL No. 06-1791 VRW
                               )
                               )            Related To
                               )
_____    )          C07-0109 VRW
                               )
                                   San Francisco, California
                                   Tuesday, December 2, 2008

**Reporter's Transcript Of Proceedings**

**Appearances**:

For Plaintiff:            Eisenberg And Hancock, LLP
                          1970 Broadway, Suite 1200
                          Oakland, California  94612
                 By:  **Jon B. Eisenberg, Esquire**
                      **William Hancock, Esquire**


                          Steenson, Schumann, Tewksbury
                          Creighton & Rose
                          815 S.W. Second Avenue, Suite 500
                          Portland, Oregon  97204
                 By:  **Ashlee Albies, Esquire**

                          Law Office of Steven Goldberg
                          River Park Center, Suite 300
                          205 S.E. Spokane Street
                          Portland, Oregon  97202
                 By:  **Steven Goldberg, Esquire**

(Appearances continued on next page.)


Reported By:          *Sahar McVickar, RPR, CSR No. 12963*
                      *Official Reporter, U.S. District Court*
                      *For the Northern District of California*

Dockets.Justia.com

1    **Appearances, continued:**

2    For Defendant:            United States Department of Justice
                               Federal Programs Branch
3                              Civil Division
                               20 Massachusetts Avenue, NW
4                              Washington, DC  20530
                          By:  Anthony Coppolino, Esquire
5                              Carl J. Nichols, Esquire
                               Alex Haas, Esquire
6                              Tim

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Tuesday**, **December** **2**, **2008**                                    **2:00 p.m.**

## P R O C E E D I N G S

        *THE CLERK:*  Calling MDL 06-1791, In re: NSA Telecommunications Records Litigation.

        This hearing this afternoon is related to case No. 07-0109, Al-Haramain Foundation versus George Bush, et al.

        Appearances, Counsel.

        *MR. EISENBERG:*  Jon B. Eisenberg.

        I have with me today Steven Goldberg, Ashlee Albies and William Hancock for Al-Haramain Islamic Foundation Wendell Belew and Asim Ghafoor.

        *THE COURT:*  Very well, good afternoon, Mr. Eisenberg.

        *MR. EISENBERG:*  Good afternoon.

        *MR. COPPOLINO:*  Good afternoon, Your Honor.

        Anthony Coppolino with the Department of Justice for the defendants.

        With me at counsel table, Carl Nichols with the Justice Department, Alex Haas, with the Justice Department, and Tim Stinson of the National Security Agency Office in --

        *THE COURT:*  I missed the name of the second gentleman.

        *MR. COPPOLINO:*  Alex Haas.

        *THE COURT:*  I'm sorry?

        *MR. COPPOLINO:*  Alex Haas, H-a-a-s.

```
1              THE COURT:  Very well, thank you.

2              Well, we have cross-motions, so I suppose I could

3    turn to either one of you.

4              MR. EISENBERG:  Your Honor, I'm prepared to go

5    first, unless Mr. Coppolini (sic) prefers, Your Honor --

6    Coppolino.  Excuse me.

7              THE COURT:  Well --

8              MR. EISENBERG:  You're the judge, Your Honor.

9              THE COURT:  Oh, I'm aware of that.

10                         (Laughter.)

11             THE COURT:  Let's start with Mr. Coppolino.

12             MR. COPPOLINO:  Thank you, Your Honor.

13             THE COURT:  We have a lot more meat on these bones

14   of this complaint, do we not, Mr. Coppolino, than we had in the

15   initial complaint?

16             MR. COPPOLINO:  I don't agree, Your Honor, in, fact,

17   I think --

18             THE COURT:  Why not?

19             MR. COPPOLINO:  Well, I think, in fact, that all of

20   the public evidence that they have cited under any standard of

21   review, any standard of evidence, does not amount to complying

22   with your July 2nd decision in establishing that they are

23   aggrieved under the FISA, under Section 18 --

24             THE COURT:  All right, tell me what they would have

25   to establish to establish aggrieved-person status.
```

1          **MR. COPPOLINO:**  Well, first of all, I'd start with

2    the quotation from your decision that it would need -- they

3    would need independent evidence establishing that they were, in

4    fact --

5          **THE COURT:**  And what do you perceive that to be?

6          **MR. COPPOLINO:**  Well, what I perceive it to be is

7    evidence that they couldn't possibly muster because ultimately

8    in the --

9          **THE COURT:**  Well, what you are telling me is it's

10   impossible to achieve aggrieved person's status; surely, that

11   can't be what the law is, Mr. Coppolino.

12         **MR. COPPOLINO:**  In this instance it is, Your Honor.

13   Let me explain.

14         The issue of aggrieved person under FISA, as we have

15   argued to the Court, is one that cannot be discovered under the

16   FISA itself.  And, as you indicated in your July 2nd decision,

17   it is one that would have to be established first before you

18   can proceed under the FISA.

19         As we have also indicated to the court previously,

20   whether or not an individual has been subject to surveillance

21   is information that is exclusively held by the Government and

22   unless officially confirmed or denied by the Government are

23   facts that cannot be established.

24         That was, of course --

25         **THE COURT:**  You are saying this is entirely within

1    the province of the Government to disclose or not to disclose.

2            **MR. COPPOLINO:**  Your Honor, I believe that's

3    correct, and let me explain why.

4            Under the FISA, for example, when the Government and

5    provide notice and acknowledge surveillance, we believe that

6    the proper circumstance in which that occurs is when the

7    Government intends to use surveillance evidence against someone

8    in a proceeding, and, in the course of that, chooses to

9    acknowledge that, as it must, in a criminal proceeding.

10           **THE COURT:**  Isn't that all ground that we plowed --

11           **MR. COPPOLINO:**  Yes.

12           **THE COURT:**  Back this summer, and the Court

13   determined that that was not it -- was not correct?

14           **MR. COPPOLINO:**  Actually, well, to some extent we

15   plowed some of the ground.  But, let me step back for a moment

16   and say that the one key issue that, I think, the Court did

17   agree with us on, among the issues that you decided on

18   July 2nd, and we did not prevail on several points, in

19   particular, the FISA preemption issue and other jurisdictional

20   issues, but the one issue that it appeared to us, at least,

21   that you had agreed with us on, is a litigant cannot use

22   section 1806(f) of the FISA to establish they are aggrieved.

23           **THE COURT:**  Where do you get that?

24           **MR. COPPOLINO:**  From your decision.

25           **THE COURT:**  Yeah, but where?

1          **MR. COPPOLINO:**  You want me to cite the page?

2          **THE COURT:**  Sure.

3          **MR. COPPOLINO:**  Well, let me just grab the decision,

4     Your Honor.

5          I mean, I can find you the page, but I'm quite

6     confident you held that a person must first establish that they

7     are aggrieved.

8          **THE COURT:**  Let's -- tell me what you are relying on

9     in the order -- let's see --

10          **MR. COPPOLINO:**  Let me look at my brief, because I

11     know I've quoted it in my brief, Your Honor.

12          All right.

13          **THE COURT:**  Just exactly where do you see that?

14          **MR. COPPOLINO:**  Well -- yeah, my quotation in my

15     brief, I'm sure it's -- I think it's correct, is at 1134 and

16     -35 of your decision at 564 F.Supp. 2d 1109.

17          **THE COURT:**  1134.

18          **MR. COPPOLINO:**  Yeah, here it is, Your Honor.

19          I'm looking at 1134:  "The Court parts company with

20     plaintiffs, however, with regard to what an individual must

21     show to establish being aggrieved for Section 1806(f) purposes

22     and, consequently, the availability of Section 1806(f) to

23     plaintiffs, in this case, in its current posture.

24          "As the Court reads Section 1806(f), a litigant must

25     first establish himself as an aggrieved person before seeking

to make a motion or request to discover or obtain applications or orders or other materials related to electronic surveillance."

I think the biggest crux of the dispute that we are having in this round of motions is what were the plaintiffs required to do under the Court's July 2nd order?  And, our view is that they were required to establish their standing, consistent with Article 3 the Constitution, and then secondly, if the plaintiffs -- if you agreed with the plaintiff's posture that that issue could be kicked down the road further, and that their standing could be adjudicated under 1806(f) itself, which is what their position is, their position is that Article 3 standing be adjudicated under 1806(f), where does that leave us?

**THE COURT:**  But, you made a representation of what you thought the Court held, and you pointed to this provision in the order, and it doesn't stand for that proposition, Mr. Coppolino.

**MR. COPPOLINO:**  Well, Your Honor, I'm not quite sure why you don't think it stands for the proposition, but let me tell you why I think it stands for the proposition, and what the point of disagreement has been between the parties to this point.

Establishing whether or not you are aggrieved under the FISA is a concept of standing, something you referred to in

1  your decision itself.  If you can establish that you are

2  aggrieved and have standing to proceed --

3        THE COURT:  There is nothing in this order that says

4  only the Government, only the Government's disclosure is what

5  can establish aggrieved-person status.

6        MR. COPPOLINO:  I didn't say --

7        THE COURT:  There is nothing here that says that,

8  Mr. Coppolino.

9        MR. COPPOLINO:  I didn't say that; you said that.

10        THE COURT:  That is exactly what you are saying.

11        MR. COPPOLINO:  No, I said that you could --

12        THE COURT:  That is exactly what you're saying.

13        MR. COPPOLINO:  I beg to differ, Your Honor.

14        What I am saying --

15        THE COURT:  Well, then, are you withdrawing the

16  position that I understood you to make?

17        MR. COPPOLINO:  I -- here is my position.  They had

18  to establish with public evidence --

19        THE COURT:  "With public evidence": it doesn't to

20  have come from the Government, though.

21        MR. COPPOLINO:  I didn't say it had to come from the

22  Government.

23        THE COURT:  Mr. Coppolino, if that is not what you

24  meant, then would you make clear that that's not what you

25  meant.

1          **MR. COPPOLINO:**  I didn't -- look, what I was trying

2      to say to Your Honor was the public evidence could not possibly

3      establish, in fact, whether or not they were subject to

4      surveillance.

5          **THE COURT:**  Mr. Coppolino, you told me a moment ago

6      that this evidence could only come from an admission or denial

7      by the Government.

8          **MR. COPPOLINO:**  I don't believe I'm saying something

9      that is inconsistent.  Let me try to explain.

10         Their evidence that they have stitched together, in

11     our judgment, does not establish --

12         **THE COURT:**  But, that's a different proposition,

13     Mr. Coppolino.

14         **MR. COPPOLINO:**  And you asked, could there ever be

15     public evidence that would establish whether or not someone

16     was --

17         **THE COURT:**  And, as I understood you to say, there

18     never could be.

19         **MR. COPPOLINO:**  Absent an admission by the

20     Government, there could not be.

21         The reason for that, Your Honor --

22         **THE COURT:**  Well, it's not -- that doesn't make any

23     sense, Mr. Coppolino.

24         **MR. COPPOLINO:**  Well, Your Honor --

25         **THE COURT:**  That is an unreasonable position for you

1  to be taking.

2  **MR. COPPOLINO:** Not only do I think it is
3  reasonable, it was a position that was upheld by the Court of
4  Appeals in this case. The Court of Appeals upheld --

5  **THE COURT:** That is not -- that's certainly not what
6  I understood the Court of Appeals to say.

7  **MR. COPPOLINO:** Well, Your Honor, let me just say,
8  we asserted the State Secrets Privilege over whether or not the
9  plaintiffs were subject to the alleged surveillance, and, in
10  particular, over the sealed document. And, the Court of
11  Appeals upheld that and concluded that that information was
12  properly withheld as privileged.

13  **THE COURT:** But, they also left open the possibility
14  of preemption of the State Secrets privilege, and that is the
15  issue that they remanded.

16  **MR. COPPOLINO:** I understand that.

17  **THE COURT:** And, that's the issue that we decided.

18  **MR. COPPOLINO:** I understand.

19  **THE COURT:** And so, State Secrets is not in the case
20  for purposes of this motion, Mr. Coppolino.

21  **MR. COPPOLINO:** That, I don't agree with, Your
22  Honor.

23  The Court, in our view, cannot proceed
24  inconsistently with the State Secrets privilege because the
25  Ninth Circuit held that whether or not plaintiffs were subject

1    to alleged surveillance, if that was disclosed, would harm the

2    national security.  And, I don't think in remanding the

3    question of whether 1806(f) of the FISA --

4         **THE COURT:**  What do you think the Court of Appeals

5    was doing, just asking the Court for an advisory opinion with

6    respect to whether or not there is preemption?

7         **MR. COPPOLINO:**  I think --

8         **THE COURT:**  You think they set us on this course as

9    some kind of a hollow exercise?  Is that what you think this is

10    all about?

11         **MR. COPPOLINO:**  I don't think that that's what this

12    is about, Your Honor.  I think that Courts of Appeals typically

13    remand legal questions to district courts for consideration in

14    the first instance.

15         **THE COURT:**  And if that didn't make any difference,

16    why would they remand the issue to us?

17         **MR. COPPOLINO:**  Well, typically, they want district

18    courts to pass on important legal questions before they do.

19    But, the District Court still has to take cognizance of the

20    ruling that they had issued in remanding the case.  And, a

21    critical factor in that ruling was to uphold to State Secrets

22    Privilege.

23         Now, I am not trying to re-litigate your question on

24    preemption, because I had understood your decision on July 2nd

25    to indicate that whether they had standing based on public

1   evidence would have to be established, based on public

2   evidence, before Section 1806(f) could be invoked.  And their

3   position in their motion -- in their opposition to our motion

4   and their own motion, is that they should be allowed to

5   adjudicate Article 3 standing under Section 1806(f) and using

6   the sealed document, exactly contrary, as we saw it, to what

7   you ruled.

8           But, even if you differ with that, and you felt that

9   your ruling allowed them to use Section 1806(f) to establish

10  their standing, in our view contrary to law, because Section

11  1806(f) is not a mechanism to discover whether or not a party

12  is subject to surveillance.  That's not how it's written;

13  that's not how it's intended; that is not how it has been

14  applied by the various courts.

15          And so, my point to you is two-fold, Your Honor:  We

16  believe they have not produced evidence that you required them

17  to produce under your decision under any standard; however, if

18  you are inclined, in some way, to find that the case should go

19  forward and allow them to continue to adjudicate Article 3

20  standing under section 1806, it would lead us nowhere, because

21  our position is that, as a matter of law, and we thought you

22  had agreed with at least this proposition, that provision

23  doesn't allow a party to discover whether they have been

24  subject to surveillance, and that's exactly what they seek to

25  do.

1    And so, in the course of these motions, there are

2 two or three issues that have been raised, some legal, some

3 factual.  The legal questions that the plaintiffs have

4 attempted to raise include whether there is some sort of

5 difference between standing under Section 1806(f) and Article 3

6 standing.  And, the answer to that question, as I think we

7 detailed in our briefs, is that there is no difference.

8    The concept of aggrieved status under 1806(f) is

9 Article 3 standing.  That is made clear, in particular, by the

10 Supreme Court's decision in **_Rakus versus Illinois_**, which

11 considered a question very similar to what the Supreme Court

12 had previously considered in **_Alderman_** in deciding what the term

13 "aggrieved" means.  And the Court, in **_Alderman_**, and then in

14 **_Rakus_**, said aggrieved means that you have a personal injury

15 under the Fourth Amendment.  You must have a personal injury in

16 order to have standing to bring a Fourth Amendment claim.

17    **_Rakus versus Illinois_**, in particular, made the point

18 that that involves a question of Article 3 standing.  It's not

19 just simply some separate statutory analysis on which you would

20 determine whether a statute is satisfied first.  You have to

21 determine whether there is Article 3 standing, that is what

22 aggrieved means.

23    In particular, in subsequent cases, the Supreme

24 Court made clear, particularly the **_Steel Company_** case, that

25 Article 3 standing must be decided first before any assessment

1 of whether a statutory provision might also provide a cause of

2 action or a basis of standing.

3          THE COURT:  You are talking about the *Sawyer* case?

4          MR. COPPOLINO:  I was talking about the *Steel*

5 *Company*, Your Honor.

6          THE COURT:  Ahh.

7          MR. COPPOLINO:  *Steel Company* versus -- I've got the

8 -- *versus Citizens for a Better Environment*.

9          The plaintiffs actually cited a case in their papers

10 which is very instructive, a case called *Alliance for*

11 *Environmental Renewal*, a Second Circuit case.  And they cited

12 it for the proposition that statutory standing may be

13 adjudicated first, so long as Article 3 standing is adequately

14 pled.  That is what they cited that case for.  That is not what

15 the case held, however.

16          In that case, the Second Circuit reversed and

17 vacated a District Court decision which attempted to determine

18 whether or not a plaintiff had standing under a statutory

19 provision before deciding the Article 3 standing issue.

20          And that was consistent within *Steel Company*, in

21 which the Supreme Court stressed that Article 3 standing be

22 decided before any decision the Court would make related to the

23 merits.

24          Now, the plaintiffs' argument is that their motion

25 to proceed under Section 1806(f) is a non-dispositive merits

motion. We disagree. Even though their intention is to
address a standing question, what the line of authority that
I'm citing points out is that when a court -- before a Court
construes an issue of statutory law that bears upon the case,
including whether a particular claim falls within the zone of
interest of the -- whether plaintiff's claim falls within the
zone of interest of a statute, the Court must first decide the
Article 3 standing question before attempting to address the
legal merits of whether -- a legal question of whether a
statutory provision applies. Otherwise, absent Article 3
standing, the Court is engaging in hypothetical jurisdiction,
which was specifically rejected in ***Steel Company***, where the
Supreme Court said don't decide hypothetical questions about
whether a statute applies until you've established your Article
3 standing.

       Now, the plaintiffs don't deny that Article 3
standing has to be decided. Their argument is -- in fact, and
they don't actually even argue that their public evidence
satisfies Article 3 standing. They concede, as I read their
papers, that as far as the public record goes --

       ***THE COURT:*** And what would establish, in your view,
Article 3 standing?

       ***MR. COPPOLINO:*** In our view?

       ***THE COURT:*** In this context.

       ***MR. COPPOLINO:*** Your Honor, what would establish

1 Article 3 standing, the only way to confirm in a manner that is

2 probative and dispositive whether or not someone has been

3 subject to surveillance, where the Government has protected

4 that information, is for the Government to acknowledge it.

5         ***THE COURT:*** Right back where we were a few minutes

6 ago.

7         ***MR. COPPOLINO:*** Well, we're right back to where we

8 were with our State Secrets Privilege assertion, which was

9 successfully -- which we successfully litigated in the Ninth

10 Circuit.

11         And a point I would like to make about that is --

12         ***THE COURT:*** You certainly overread that decision in

13 the Ninth Circuit Mr. Coppolino.

14         If -- if what -- if that were true, we wouldn't be

15 here.

16         ***MR. COPPOLINO:*** I don't agree, Your Honor. And, I

17 don't believe I'm overreading it. I mean, I think, quite

18 clearly, the Ninth Circuit said we uphold the State Secrets

19 privilege; we exclude that document; we protect whether or not

20 the plaintiffs have been --

21         ***THE COURT:*** Well, then, tell me what this exercise

22 is all about.

23         ***MR. COPPOLINO:*** The exercise --

24         ***THE COURT:*** Why are we here? If that position is

25 correct, what was the purpose of the remand? What was the

1   purpose of going into FISA preemption?

2           MR. COPPOLINO:  Well, Your Honor, it certainly

3   conceivable that the Ninth Circuit could have decided the FISA

4   preemption issue, but they wanted the District Court to pass on

5   it first.

6           THE COURT:  Why did they even have to decide it?

7   Under your theory, the State Secrets issue just took care of

8   everything.

9           MR. COPPOLINO:  Well, the issue of FISA preemption

10  is an issue that was raised by the plaintiffs in the case.

11          THE COURT:  And did they have to -- if the Court of

12  Appeals had held that the State Secrets Privilege precluded

13  this litigation, there was no need to take up FISA preemption,

14  there was no need to go into these issues, and there was

15  certainly no need for the remand.

16          MR. COPPOLINO:  Your Honor, if a Court of Appeals

17  believes that a party has raised an alternative ground that

18  ought to be considered, it can remand the question for it to be

19  considered by the District Court.  It does not mean, however,

20  in remanding the question --

21          THE COURT:  In the context of issues of this kind,

22  where, if the Court of Appeals was persuaded that the issues

23  were of such sensitivity that the State Secrets Privilege

24  should be invoked, essentially, to end the litigation, that

25  they would have sent us on this frolic and detour of

1    determining FISA preemption and everything that follows?

2          **MR. COPPOLINO:** Your Honor, I don't think it's, to

3    me, a novel concept, that a Court of Appeals will decide an

4    issue that it chooses to decide, and then, if a litigant says,

5    well, there is another issue in the case, and the Court of

6    Appeals says, look --

7          **THE COURT:** And, if the first issue is dispositive,

8    why waste everybody's time with the second issue?

9          **MR. COPPOLINO:** Well, you know, maybe they --

10          **THE COURT:** I know, maybe you think the Ninth

11    Circuit is really strange, Mr. Coppolino.

12               **(Laughter.)**

13          **THE COURT:** And, sometimes, we think it's strange,

14    but that seems like a very peculiar interpretation to give to

15    the Ninth Circuit's decision.

16          **MR. COPPOLINO:** It's really not an interpretation;

17    I'm just simply pointing to what they did.

18          They upheld the State Secrets Privilege; they said

19    that the plaintiffs cannot establish standing based on the

20    State Secrets Privilege.  Then, they said the plaintiffs think

21    that this statutory law preempts the privilege.  We -- the

22    District Court didn't pass on it.  Let the District Court

23    decide that question.

24          Now, because if the District Court found that it did

25    not preempt the privilege, case over.  If the District Court

1    found that it did preempt the privilege, the case may not be

2    over, but that puts us to where we are in this round of

3    motions.

4           And, in your July 2nd decision, in which you held

5    that the privilege was preempted by the FISA, you didn't hold

6    that you could use Section 1806(f), as we read your opinion, to

7    establish in the first instance whether you're subject to

8    surveillance.

9           Now, the plaintiffs argument at this point is, well,

10   the issue of standing should be bifurcated, that for now all

11   you should consider is whether they have established the

12   statutory requirements of an aggrieved person and then consider

13   Article 3 standing second. And my point to you is that it is

14   one inquiry, it is an Article 3 inquiry. We have put it at

15   issue in our motion. We have challenged the sufficiency of

16   their evidence, and we have argued --

17          *THE COURT:* All right.

18          Why is their evidence insufficient? Let's just talk

19   about the specifics.

20          *MR. COPPOLINO:* Their evidence is insufficient to

21   establish Article 3 standing, as a factual matter, because the

22   law is clear under *Lujan* and other cases in which the Supreme

23   Court has described the standards for Article 3 standing, that

24   you cannot rely on speculation and conjuncture in order to

25   establish an actual personal injury. You must bear your burden

1    of proof to show that.

2            **THE COURT:**  It's not speculation.  Most of what they

3    allege in the complaint is publicly acknowledged activity by

4    the Government.

5            **MR. COPPOLINO:**  It's the conclusion, Your Honor,

6    that you would draw from that.  They have cited a disparate

7    series of facts, and then from that seek to reach a conclusion

8    which is wholly speculative.

9            **THE COURT:**  Inferences are not unknown in this

10   business, Mr. Coppolino.

11           **MR. COPPOLINO:**  Oh, I very much know that they are

12   not unknown, Your Honor.  But, if you look at their case cites

13   on the issue of reasonable inferences --

14           **THE COURT:**  Forget the case cites.  Let's talk about

15   the facts that they allege.

16           **MR. COPPOLINO:**  I'm sorry, you had asked about the

17   issue of inferences, and what I just want to point out on the

18   inference point is that the standard for determining whether

19   you can draw a reasonable inference from facts is quite similar

20   to the standard for Article 3 standing.

21           And, the Court said, in the case that they cited,

22   ***Daniels Versus Twin Oaks Nursing Home***:  "An inference is not

23   reasonable if it's only a guess or a possibility, for such an

24   inference is not based on evidence, but is pure speculation or

25   conjuncture.  Reasonable inferences cannot be speculation or

1 conjuncture, and the Court cannot fill in gaps in the evidence

2 by creating new facts."

3          **THE COURT:**  Why are these unreasonable inferences to

4 draw from the facts?

5          **MR. COPPOLINO:**  The unreasonable inference to draw

6 is that the string of evidence that they cited establishes as a

7 factual matter, not as an issue of allegation, but as a factual

8 matter that they were subject to the alleged surveillance in

9 March and April of 2004 under the Terrorist Surveillance

10 Program, or even established whether they were subject to any

11 electronic surveillance at all.

12          They cite, essentially three to four facts, and this

13 is in more detail in our papers, but viewed individually or as

14 a whole, they cite the fact that the Terrorist Surveillance

15 Program was targeted at Al-Qaeda communications, that the

16 Al-Haramain organization was designated for providing support

17 to Al-Qaeda; that the plaintiffs -- that an initial designation

18 of Al-Haramain referred to them as a terrorist-supporting

19 organization, but that a subsequent designation referred to its

20 direct links to Osama bin Laden; and that, in between, they

21 allege that they had a phone call with one of the directors of

22 Al-Haramain, and, in that call, there were references made to

23 associates of Bin Laden.

24          From that they conclude that the basis for the

25 designation in September 2004, which referred to links to Bin

Laden, was their phone call; that is completely speculative. There is no proof of that.

They also cite the fact that the Treasury Department relied on classified information in their -- in their designation determination, but that doesn't prove that that was surveillance of the plaintiffs.

And they also refer, and I want to just get this on the table, they also refer to a speech by the FBI director -- by the deputy director of the FBI, which indicated that, in his investigation of Al-Haramain, which started in 2000, surveillance was among the tools used as a part of the FBI's probe of that organization.

And, from all that, the plaintiff say, "This establishes that we were the ones who were subject to surveillance," and this is what the designation was based on.

**THE COURT:** Well, I agree, he didn't use the term "electronic surveillance," at least as I read the speech, but he did speak about surveillance.

**MR. COPPOLINO:** He referred to surveillance as "one among many investigative tools in an investigation, which the FBI began in the year 2000."

And, they actually never cited the whole passage. I put it in my brief. And it talked about how, in the year 2000, the FBI discovered connections between Al-Haramain and Al-Qaeda and began an investigation. And they looked at various bits of

1    information, but, among the things they tracked down were

2    financial contributions between Al-Haramain and the Chechnyan

3    Mujahideen to support Al-Qaeda fighters in Chechnya.

4           And he went on to discuss how financial evidence was

5    very important in this investigation.  And he says, "We relied

6    on financial information in cooperation with financial

7    institutions for the predication and fulfillment of the

8    investigation."  Because we also relied on other tools, in that

9    process, but nowhere in the statement is it established when,

10   against whom, or how any electronic surveillance, if it was,

11   indeed, electronic surveillance, any surveillance was directed.

12   It certainly doesn't establish that it was directed at these

13   plaintiffs.

14          And, as a matter of a factual adjudication of

15   standing, it couldn't possibly stand for -- as evidence that

16   these folks were, in fact, subject to the alleged surveillance.

17          *THE COURT:*  Under your reading of the law, is there

18   any way that a plaintiff can establish standing, either

19   statutory or Article 3 standing, other than to have evidence

20   that provides a lead pipe cinch proof that there was electronic

21   surveillance?

22          *MR. COPPOLINO:*  You know, Your Honor, it's unwise to

23   say there would never be a circumstance --

24          *THE COURT:*  Well, that seems to be what you're

25   saying.

1          **MR. COPPOLINO:**  Well, let me finish my sentence.

2          You're asking me, would there ever, never in the

3   history of litigation ever be a circumstance where somebody

4   could establish that they were, in fact, subject to

5   surveillance.

6          **THE COURT:**  But, don't you have to be in a position

7   to provide the Court with what a plaintiff could do to

8   establish aggrieved-person status and to contrast that with

9   what the plaintiffs here have not done?

10          **MR. COPPOLINO:**  Well, Your Honor, it's not our

11  burden, it's not the Government's burden to establish standing

12  or to demonstrate what would establish standing, and

13  particularly where -- and let me set this as kind of important

14  context.

15          Foreign electronic intelligence surveillance is a

16  matter of an intelligence source and method and is something

17  that the Government preserves secrecy of in order to protect

18  its intelligence sources and methods when conducting foreign

19  intelligence surveillance.

20          The Ninth Circuit recognized that national security

21  interests are implicated by whether or not you have surveilled

22  somebody, when, and how.  They found our privilege assertion

23  exceptionally well documented, and they upheld it.

24          They even upheld it as to the document that had been

25  inadvertently disclosed.  And they accepted our representations

1 that even continued access to that document by the plaintiffs

2 and disclosure of that document would compromise the national

3 security of the United States.

4 That's the foundation in which the Court has to

5 consider this question of whether or not and how somebody could

6 establish foreign intelligence electronic surveillance, because

7 it is not something that the Government reveals, and it is

8 something that the courts, conversely, have recognized in

9 numerous cases, ought to be protected in order to protect the

10 national security interests of the country because to disclose

11 it would reveal various intelligence sources and methods such

12 as who were you targeting, who were you not targeting, when

13 were you targeting them, if you were, how were you targeting

14 them, and what methods were you using, and so on, all of which

15 would reveal a raft of foreign intelligence trade craft that

16 the Government protects in the interest of national security.

17 If I were, here, arguing in the first instance that

18 this information was -- ought to be protected, and that issue

19 hadn't been decided, this case might be in a different posture.

20 But, where the issue has been decided favorably to the

21 Government and where the Ninth Circuit held by a three-nothing

22 decision, in that first panel, that this information needs to

23 be protected in the interest of national security, that is

24 certainly something that the Court has to take account of. And

25 frankly, I thought you had taken account of it in your decision

1    because your decision said, look, the Ninth Circuit said to

2    exclude the sealed document; I'm not going to let you use the

3    sealed document to establish your standing.

4              The Government argues that you can't --

5              **THE COURT:**  Isn't the question here whether the

6    plaintiffs have done that without using the sealed document?

7              **MR. COPPOLINO:**  In our view, no, Your Honor, but,

8    you know --

9              **THE COURT:**  I beg your pardon?  Did you say no?

10             **MR. COPPOLINO:**  I said in our view, they have not

11   established --

12             **THE COURT:**  But that's test, isn't it?

13             **MR. COPPOLINO:**  Pardon me?

14             **THE COURT:**  That is the test, isn't it?  That is the

15   test they have to meet?

16             **MR. COPPOLINO:**  In my view, they have to establish

17   that they have been subject to the alleged surveillance.

18             **THE COURT:**  Without using the sealed document.

19             **MR. COPPOLINO:**  Without using the sealed document

20   and without relying on evidence that is speculative and

21   conjectural.

22             Look, I concede that's hard.  We won the privilege

23   assertion, which specifically protected whether or not they

24   were subject to surveillance.  Now, the Ninth Circuit agreed

25   that should be protected.  And, in those circumstances, it is

1  going to be hard for plaintiffs, if not impossible, to

2  establish that.  But, there is a reason for that, there is a

3  reason for the need to protect such information.  The Ninth

4  Circuit certainly agreed with us on that.

5           And frankly, Your Honor, where a -- where a Court of

6  Appeals has held that the very inquiry as to whether or not

7  somebody has been subject to surveillance, it needs to be

8  protected for national security reasons.  We don't think it's

9  appropriate for a District Court to be attempting to adjudicate

10 that question, even supposedly with public evidence.  The Court

11 of Appeals has already said, look, national security would be

12 harmed if you confirmed whether or not they were subject to the

13 alleged surveillance.

14          So, one might inquire, why we embarked on this

15 inquiry under Section 1806(f) if, in fact, the only possible

16 result would be precisely as plaintiffs have demanded:

17 disclosure of information that's been properly protected in

18 order to protect national security?

19          And the Ninth Circuit has said disclosure of the

20 information, quote, "would undermine the Government's

21 intelligence capabilities and compromise national security."

22          In our view, it can't possibly be a reasonable

23 construction of statutory law to allow that to happen or to

24 undertake a proceeding that would allow that to happen.

25          Now, again, even though we disagreed with your

1   overall decision on whether the FISA preempts the State Secrets

2   Privilege, we did agree, at least, we thought with what your

3   decision was, that, at least, you can't use the provision

4   itself to establish whether you are subject to surveillance.

5          Now the plaintiffs protest, they say that's not what

6   we are seeking to do.  They say we want to establish Article 3

7   standing under Section 1806(f), but we already know that we

8   were subject to surveillance.  That is going to be

9   Mr. Eisenberg's argument.  We already know, so therefore, there

10  is no harm if you adjudicate Article 3 standing under section

11  1806(f).

12         Leaving aside what we thought was your ruling that

13  that's not how you use that provision, and leaving aside the

14  legal question as to whether or not, in fact, you can use the

15  provision for that purpose, which we think you can't, their

16  argument is that they already know what the facts are simply

17  cannot be credited.  They cannot possibly know the range of

18  facts that we put at issue in our privilege assertion and the

19  national security concerns that are at stake.  They cannot

20  possibly know what we presented to the Court.

21         Their argument that they already know is based on

22  their own reading of what that document must mean, which is,

23  itself, an act of conjecture, and would require the Government

24  to confirm to deny or to explain as we have, actually, to the

25  Court ex parte, what the document is and what it means and what

1    it indicates.

2         And they, in fact, don't rest on the assertion that

3    they already know what has occurred.  They have demanded that

4    the burden of proof on standing be shifted under Section

5    1806(f) to the Government, and that the Government seek to

6    disprove their standing by disclosing information that we have

7    successfully protected, under the privilege, including --

8         **THE COURT:**  But the Court of Appeals provided

9    exactly that, Mr. Coppolino.

10         I'm looking exactly at the last page of the Court of

11    Appeals opinion, and it states in reference to FISA: "The

12    statute, unlike the common law State Secrets Privilege,

13    provides a detailed regime to determine whether surveillance

14    was lawfully authorized and conducted.  As an alternative

15    argument, Al-Haramain posits that FISA preempts the State

16    Secrets privilege."

17         Skipping a couple of lines:  "Now, however, the FISA

18    issue remains central to Al-Haramain's ability to proceed with

19    this lawsuit."

20         **MR. COPPOLINO:**  But, they didn't decide the FISA

21    issue.

22         **THE COURT:**  They didn't decide whether the FISA

23    allowed Al-Haramain to proceed, and they remanded that issue.

24    But, they wouldn't have left that issue open if, in fact, the

25    position that you've been contending were the position that

they were taking.  They did not simply foreclose the litigation
on the basis of the State secrets privilege.  There is no other
way to read that Court of Appeals opinion.

        **MR. COPPOLINO:**  Your Honor, two points.  One is, I
don't think they decided the FISA preemption issue. You decided
it in the first instance in the District Court.

        **THE COURT:**  That's correct; they didn't.  And there
was --

        **MR. COPPOLINO:**  And second point, they didn't decide
that the State Secrets Privilege would, in any event, foreclose
further litigation, but they didn't decide the other, either.

        And so, if we were back in front of the Court of
Appeals and said, well, Judge Walker ruled that the FISA
preempted the State Secrets privilege, and that legal question
has been passed on by the District Court, the Government
disagrees; what is your view on this legal question now?
Because if the FISA were to destroy the State Secrets
Privilege, then, the very information, the disclosure of which
you said would harm national security, would be disclosed.

        And the question presented would be has Judge Walker
correctly interpreted Section 1806(f) of the FISA to preempt
the privilege?  Has he correctly ruled that the issue -- that
national security could be compromised under FISA Section
1806(f), and that Congress intended that that privileged
information be --

1    **THE COURT:** It's quite conceivable that information

2    that might otherwise be shielded from discovery by the State

3    Secrets Privilege would be disclosed if, in fact, FISA

4    preempts the State Secrets Privilege.

5    **MR. COPPOLINO:** Well, but that's the ultimate issue

6    that we are facing in this case.

7    And, when I got up and I said I think we are running

8    out of road here in which to litigate this, we understand your

9    rule, but we have prevailed on a privilege assertion that

10   protects this information. And our only position to you, now,

11   is not to re-litigate your preemption issue, but to point out

12   that that issue is now having an actual impact in this case if

13   you go forward.

14   And our -- because before you said FISA preempts the

15   privilege, but you dismissed their case subject to establishing

16   standing -- with public evidence. And, if they failed to do

17   that --

18   **THE COURT:** No, and on the ground that they, in the

19   prior complaint, had not established aggrieved-person status,

20   which they are required to under FISA.

21   **MR. COPPOLINO:** Right. And, if they fail to do

22   that, if you are not satisfied with the evidence that they

23   failed to establish their Article 3 standing, the case is

24   dismissed and there is no FISA preemption issue.

25   On the other hand, if you were to find that the case

should proceed, either because they have established such
standing under the public evidence, or because you would allow
them to attempt to adjudicate the issues under 1806(f), that is
the point where the rubber hits the road, so to speak, on this
preemption issue because at stake for the Government --

    **MR. COPPOLINO:** Let me finish this point, Your
Honor.

    At stake for the Government, at that point in the
litigation, would be whether we proceed down the road of a
procedure which, A, we don't think applies, but B, that we
believe would inherently risk or require the disclosure of
information that was protected by the Ninth Circuit.

    Now, the plaintiffs, their position is simple:
privilege preempted, give us the document, shift the burden,
make the Government disclose privileged information.  If that's
right, the only prudent thing to do at that point is to say,
look, I can't implement a statutory provision that might
destroy a privilege that the Government prevailed on, which can
lead to the disclosure of information that the Ninth Circuit
said would harm national security without having that
fundamental legal question reviewed before the privilege is
destroyed.

    You know, there was a recent Ninth Circuit case on
the issue of, I think, information that was in a plea agreement
called **_Coppley_**, **_Coppley Press_**, and Judge Kozinski made the

1    point that once the secret information is out, it's over.  You

2    have lost the fundamental essentials to protect that

3    information.  And so, if you were to proceed down a road that

4    would risk or require the disclosure of the information that we

5    protected, you would be destroying our privilege before --

6    privilege upheld before the Ninth Circuit's ruled on whether or

7    not Section 1806(f) preempts the privilege or even applies --

8         **THE COURT:**  Well, all you're saying is that if -- if

9    I require the disclosure of the sealed documents, you are going

10   to seek a writ, period.  I'm hardly surprised at that,

11   Mr. Coppolino.

12        **MR. COPPOLINO:**  Well, Your Honor, depending on what

13   you would rule, there could be various alternatives for further

14   review.  We suggested that, were you inclined to proceed,

15   certification would be a more appropriate option, because at

16   that point -- you know, I think it would be appropriate because

17   you would recognized that this is a difficult and complicated

18   question, that going down the road could compromise the

19   privilege, and it ought to be reviewed.

20        **THE COURT:**  I do recognize this is a difficult and

21   complicated issue, Mr. Coppolino.

22        And, excuse me for getting short-tempered with you,

23   but I don't think that your interpretation of the Court of

24   Appeals' opinion and the position that you have been taking in

25   your briefs and here is really one that is consistent with the

1   -- with the mandate that the Court of Appeals has given to this

2   Court and has asked the Government to litigate.

3           I think you're doing not the best service that could

4   be done for the Government in the way that you've handled this

5   issue.

6           **MR. COPPOLINO:**  Your Honor, I don't -- with respect,

7   I think that the Ninth Circuit opinion doesn't prejudge the

8   question of preemption.

9           **THE COURT:**  Oh, it doesn't prejudge it.

10          **MR. COPPOLINO:**  It doesn't prejudge it.

11          **THE COURT:**  I quite agree with you on that.

12          **MR. COPPOLINO:**  And nor does it suggest that it

13  would be appropriate to reach a particular outcome in this

14  lawsuit.

15          **THE COURT:**  Well, but what I'm going to ask you one

16  more time to do, without vituperation, to take me through the

17  allegations that the plaintiffs have made in their complaints

18  and tell me why these allegations, these facts, do not

19  reasonably establish that the plaintiffs are aggrieved persons.

20          **RIGHT3:**  Because, Your Honor, the issue as to

21  whether or not they are aggrieved is -- under FISA is whether

22  they have been the target of or subject to electronic

23  surveillance.  Now, this evidence that they have put forward on

24  the public record doesn't establish that.  It's an inference

25  that they would seek to draw, a speculative inference, which is

1  not consistent with their own authority, that based on certain

2  factors it is established factually that they have, in fact,

3  been subject to surveillance.

4          And those factors that they cite are that the TSP

5  targeted Al-Qaeda; Al-Haramain was designated as a terrorist

6  organization; they spoke with someone on the phone that

7  mentioned Osama bin Laden.  The designation referred to Bin

8  Laden.  It is speculation, Your Honor.  It is attempting to say

9  A plus B plus C must equal that we were the ones who were

10  subject to surveillance; the surveillance evidence was used to

11  designate Al-Haramain.

12          **THE COURT:**  Why isn't this a reasonable inference to

13  draw?

14          **MR. COPPOLINO:**  It's not a reasonable inference

15  because there is no basis to prove -- there is no proof that

16  what they are saying actually occurred, that it is simply

17  conjectural to say that because we had a phone conversation in

18  which Bin Laden was mentioned, that must have been the basis

19  for the designation, that because the FBI referred to

20  surveillance, at some point in its investigation of

21  Al-Haramain, it must have been surveillance of us.

22          They are missing the most fundamental element of

23  proof, that any reference to surveillance necessarily was a

24  reference to surveillance of them, fundamental proof that that

25  -- what actually, in fact, happened was that their phone

1   conversation was intercepted; it was used as a basis for

2   designation.

3           I don't know how else I can put it more clearly than

4   to say, Your Honor, that this is speculation.  It is

5   conjecture; it is not evidence.  And, that is not sufficient

6   under Article 3.

7           As a factual matter, a Court of Appeals looking at

8   this would say, well, look, sure, the TSP targeted Al-Qaeda,

9   and, yes, Al-Haramain was designated as supporting terrorism

10  and Bin Laden, but where do you get from that -- and, yes, the

11  FBI director referred to surveillance, but where do you get

12  from that these plaintiffs were subject to the surveillance

13  that is challenged, in this case, under a particular authority

14  at a particular time?  How is that proof of that?

15          The answer is, it's not.  And that is because only

16  to Government knows what happened here, whether they were

17  subject to surveillance, under what authority, at what time.

18  And having protected that information --

19          **THE COURT:**  Now we're back to the Government, aren't

20  we?

21          **MR. COPPOLINO:**  Well, we're back to the fact that

22  the Government's ability to protect that information in order

23  to protect intelligent sources and methods was upheld by the

24  Court of Appeals.

25          So, look, to wrap up, really just a two-fold

1  argument:  Article 3 standing equals aggrieved status.  You

2  have to establish that first.  And, in fact, you have to

3  establish it before you construe the statutory provision.  In

4  our view, their evidence doesn't satisfy Article 3.

5           **THE COURT:**  All right.

6           **MR. COPPOLINO:**  Ultimately, you'll make that call

7  but we don't think --

8           **THE COURT:**  Mr. Eisenberg?

9           **MR. EISENBERG:**  Good afternoon, Your Honor.

10          Actually, I didn't come here today intending to

11  speak about what we already know.  I came here today to speak

12  about what the law is, and what we believe we have shown.  I'd

13  like to start with the latter, what we believe we have shown.

14          What do we have to show?  My understanding is three

15  things:  There was surveillance, the surveillance was of these

16  plaintiffs, and it was electronic.  That's what Section 1801(k)

17  of FISA says an aggrieved party consists of.

18          A subject of -- pardon me.  A subject of --

19          **THE COURT:**  Well, your opponent says all this is

20  just a web, a tissue of inference and speculation.

21          **MR. EISENBERG:**  Right.  So, let me talk about what

22  we have.

23          **THE COURT:**  Why isn't that correct?

24          **MR. EISENBERG:**  Well, if I may go through step by

25  step?

1          First of the three points we must show,

2    surveillance:  Deputy Director Pistole has said that there was

3    surveillance.

4          *THE COURT:*  He said "surveillance"; he didn't say

5    electronic surveillance, did he?

6          *MR. EISENBERG:*  That's correct.  He only gave us the

7    first piece of puzzle.

8          *THE COURT:*  So, it can just as well be some guy in a

9    trench coat following these folks around.

10          *MR. EISENBERG:*  So far, with Deputy Director

11    Pistole, all we have is surveillance.  But, we also have

12    surveillance in 2004.  Mr. Coppolino has said, well, they were

13    investigating Al-Haramain since 2000.  That is not what

14    Mr. Pistole was talking about.  Here is what he said, he said,

15    "yes, we used other tools, like records checks, surveillance,

16    and interviews of various subjects, but it was the financial

17    evidence that provided justification for the initial

18    designation and then the criminal charges."

19          *THE COURT:*  Let's see, you are referring to --

20          *MR. EISENBERG:*  I'm sorry, his speech in October of

21    2007.

22          *THE COURT:*  Alright, and your --

23          *MR. EISENBERG:*  This is page 92 of my declaration.

24          *THE COURT:*  Okay, I've got it.

25          *MR. EISENBERG:*  It's the last underlined paragraph.

1          "Yes, we used other investigative tools, like

2    records checks, surveillance, and interviews of various

3    subjects, but it was the financial evidence that provided

4    justification for the initial designation and then the criminal

5    charges."

6          Now, when he says "the initial designation," what

7    he's talking about is the February 2004 assets-freezing order.

8    That's what the Government means when they talk about the

9    initial designation.

10          That's what he was thanking these bankers for, the

11   financial evidence.  He was saying we also used surveillance in

12   2004, as part of the 2004 investigation of Al-Haramain.  Now,

13   we don't know what it was, we don't know who he surveilled, who

14   the Government surveilled.

15          For that, we must turn to evidence that is

16   circumstantial, that raises a reasonable inference.  And here

17   is that evidence.  This is all public record in accordance with

18   the charge the Court gave us on July 2nd.  First, the FBI was

19   investigating Al-Haramain Islamic Foundation, Inc. of Oregon in

20   2004.  The FBI agent Gary Bald testified to that in public.

21          Next:  The FBI used the so-called Terrorist

22   Surveillance Program in 2004.  They employed warrantless

23   surveillance in pursuit of their goals.  Director Muller

24   testified to that effect before Congress.

25          Next:  In February of 2004, the Department of

1   Treasury issued its initial designation of Al-Haramain.  This

2   was the assets-freezing order.  And that is at page, if I may,

3   of my declaration, page 54, February 19, 2004.  And it said

4   that, "we are looking into possible violations of the currency

5   reporting and tax return laws."

6          I'm sorry; I'll let Your Honor catch up with me.

7          Page 54.

8          THE COURT:  This is Exhibit K, I believe.

9          Yes?

10         MR. EISENBERG:  Exhibit K, page 54, the middle of

11  the page:

12         The suspected crimes -- they are looking into

13  crimes, that's what they're investigating.  "The suspected

14  crimes relate to possible violations of the currency reporting

15  and tax return laws."  That's what they say they are looking

16  for.  Doesn't say anything about Osama bin Laden there.  It's a

17  criminal investigation.

18         Now, shortly after this public announcement of an

19  investigation, of an initial designation, two of the plaintiffs

20  in this case, Wendell Belew and Asim Ghafoor, had a series of

21  phone conversations, not just one, as Mr. Coppolino has

22  suggested, but a series of telephone conversations, many,

23  throughout March and April of 2004. In order --

24         THE COURT:  Where is that alleged?

25         MR. EISENBERG:  These are the declarations -- pardon

1    me a second, Your Honor.

2              Two separate declarations we have filed in

3    connection with our 1806(f) motion:  One by Wendell Belew and

4    the other by Asim Ghafoor.  And they were filed the same day as

5    our initial motion in this case.  And I'm afraid I don't have

6    the date of that with me.

7              Can anyone help me?  No?

8              Well, Your Honor, I can tell you what they said.

9              THE COURT:  Well, let's find them.

10             MR. EISENBERG:  Okay.

11             About the same time as my declaration with all those

12   exhibits.

13             THE COURT:  Okay.

14             Is that in the same binder?

15             MR. EISENBERG:  Was that question directed to me,

16   Your Honor?

17             THE COURT:  Yes.

18             MR. EISENBERG:  The same binder?  I presume.  All

19   these were filed the same day.  Our 1806 motion, four

20   declarations, one of which was quite thick, that had all the

21   exhibits, that's my declaration.

22             THE COURT:  Yes.

23             MR. EISENBERG:  And then three more declarations,

24   one by Ghafoor, one by Belew and one by Shayana Kadidal.

25             THE COURT:  I've got it.

1       **MR. EISENBERG:**  Okay.

2       **THE COURT:**  Go ahead.

3       **MR. EISENBERG:**  Let's turn to Ghafoor's declaration.

4  I think that will be exemplary of what I'm talking about here.

5       Paragraph 5:  "During my telephone conversations" --

6  now, let me back up and say what Mr. Coppolino is saying,

7  essentially, big deal, so there was one phone call where

8  somebody mentioned Osama bin Laden; that doesn't quite explain

9  what really happened here.

10      Your Honor are you with me at paragraph 5?

11      **THE COURT:**  No, go ahead.

12      **MR. EISENBERG:**  Okay.

13      "During my telephone conversations with Al-Buthi

14  described in paragraph 3 above, Al Buthi mentioned by name

15  numerous defendants whom I had undertaken to represent in the

16  Burnett lawsuit filed on behalf of the September 11 victims."

17  Now, mind you, Ghafoor was already representing Al-Haramain in

18  that lawsuit.  Let me go on.

19      "One of the names Al-Buthi mentioned was

20  Mohammed Jamal Khalifa, who was married to one of Osama bin

21  Laden's sisters.  Two other names Al-Buthi mentioned were

22  Safar Al Hawali and Soliman Al-Auda, clerics who Osama bin

23  Laden claimed had inspired him."

24      So, these were not just phone calls where somebody

25  mentioned Osama bin Laden, these were phone calls where

1  Al-Haramain's lawyer was discussing his simultaneous

2  representation of Osama bin Laden's brother-in-law and two

3  clerics who Osama bin Laden looked up to.  That is what appears

4  to be the links with Osama bin Laden that the Government

5  mentioned several months later in 2004.

6        Your Honor, shall I wait a minute?  I see you're --

7        **THE COURT:**  Um-hmm.  I'm looking for something else.

8  Go ahead.

9        **MR. EISENBERG:**  Okay.  All right.

10        So, these phone conversations took place in March

11  and April of 2004, discussions of Ghafoor simultaneous

12  representation of Al-Haramain Islamic Foundation, Inc., and

13  Osama bin Laden's brother-in-law and clerics he admired.

14        Several months later, September 2004, the Treasury

15  Department, in OFAC, issued their formal designation of

16  Al-Haramain Islamic Foundation as a specifically designated

17  terrorist organization.

18        Now we have something new:  In this announcement, in

19  this press release, you remember the one in February, the

20  initial designation talked about crimes, possible violations of

21  currency reporting and tax return laws; now look at the

22  September 9th, 2004 formal designation, that would be page 74.

23  I don't know the exhibit number.  I'm sorry.

24        **THE COURT:**  I've got it.

25        **MR. EISENBERG:**  The investigation we announced back

1  in February, the middle of the page, the investigation shows

2  direct links between the U.S. branch and Osama bin Laden.  In

3  addition, the affidavit alleges the U.S. branch of Al-Haramain

4  foundation, AFH, criminally violated tax laws and engaged in

5  other money laundering offenses.

6          So now we have the crimes mentioned in the February

7  initial designation, but we have something new here, we have

8  links, direct links with Osama bin Laden.

9          That's something new, and that raises a powerful

10  inference.  Let me remind you, Your Honor, that the defendants

11  have already said, in public, many times they use classified

12  evidence in the investigation of Al-Haramain during 2004.  And

13  just two weeks ago, Judge King, in Oregon, ruled in the

14  delisting proceeding that there is no evidence in the public

15  record of any links between Al-Haramain and Osama bin Laden.

16          What we do with all this is something that juries do

17  all the time and judges, as triers of fact, do all the time.

18  Mr. Coppolino calls it "stitching together inferences"; I call

19  it drawing reasonable inferences from circumstantial evidence.

20  And the reasonable inference I draw from this is that the

21  surveillance that Deputy Director Pistole admitted last October

22  included the electronic surveillance of the March and

23  April 2004 phone calls between Belew and Ghafoor and Al-Buthi,

24  and was used for the formal designation in September.

25          Now, is that unreasonable?  Let me give you an

1   analogy, the sort of thing you see all the time in criminal

2   prosecutions.  Let's say the Bank of America down the street

3   was robbed of $5000, in hundred-dollar bills, by a robber

4   wearing a red hooded sweatshirt; two minutes later, two blocks

5   away, the defendant is apprehended wearing a red hooded

6   sweatshirt, carrying $5000 in hundred-dollar bills.  Now, even

7   without direct proof that he was a robber, it's reasonable to

8   infer from circumstantial evidence that he was the robber.  It

9   happens all the time.  Likewise here, I believe it is

10  reasonable to infer, even without direct proof, that there was

11  surveillance of these conversations in March and April of 2004.

12          *THE COURT:*  Well, then, aren't you agreeing with

13  Mr. Coppolino that basically you are relying upon inferences to

14  be drawn from this collection of facts that you put together?

15          *MR. EISENBERG:*  Of course we are.

16          *THE COURT:*  And, how does that square with the

17  obligation to establish that you are an aggrieved person, or

18  your client is an aggrieved person?

19          *MR. EISENBERG:*  Because circumstantial evidence and

20  reasonable inferences are relied upon daily in courtrooms

21  across the country.  It's part of the process.  I believe, as

22  Your Honor put it, "inferences are not unknown in this

23  business."  That is certainly true.

24          I'm an appellate lawyer.  I don't often appear in a

25  trial court, I wait until the battle is over, and as

```
1    Judge Ira Brown used to say, "come out and shoot the wounded."

2              I'm accustomed to looking at a record and asking

3    myself, will this evidence support the judgment?  Is there

4    sufficient evidence here?  And, part of that rule, the

5    substantial evidence rule, is what's called the rule of

6    conflicting inferences.  If two conflicting inferences may be

7    drawn from the evidence, reasonable inferences, the Court of

8    Appeal, in the federal courts the Court of Appeals, will draw

9    the inference that the trier of fact drew.  That's all we are

10   asking for here.

11             Sure, it's reasonable to -- well, is it reasonable

12   to infer that Pistole was talking about trench-coat

13   surveillance?  Actually, I don't think it is at this point.

14   But, even if it were, even if it were, it's at least equally

15   reasonable to infer that these telephone conversations were

16   surveilled, and that's enough to go to a jury.  And that's

17   enough to sustain a jury verdict in a criminal case on appeal.

18             THE COURT:  Let's assume you're right, and assume I

19   agree with you.

20             MR. EISENBERG:  Okay.

21             THE COURT:  What do we do next?  How do we take the

22   next step?

23             MR. EISENBERG:  What do we do next?

24             THE COURT:  In compliance with the FISA statute and

25   the obvious sensitivity of the information that may be
```

1    contained in the sealed document.

2         **MR. EISENBERG:**  Yeah.  We have only one thing for

3    guidance, and that's 1806(f).  No cases.  All right, so we have

4    to figure it out from the statute and maybe from analogous

5    cases -- I don't think we need to go to analogous cases, I

6    think the statute tells us what's next.

7         What's next is, first of all, the Attorney General,

8    if the Attorney General chooses, will file an affidavit stating

9    a disclosure of the document would harm national security.

10   And, by the way, let me hasten to add, we are not asking for

11   disclosure of the document, anything but.  That's not what we

12   are interesting in.  We've seen it; all we're asking is for

13   this Court to look at it.

14        All right, so assume the Attorney General files the

15   affidavit, that's in 1806(f); the next step is that this Court

16   reviews the document in secret as may be necessary to determine

17   whether the surveillance was unlawful.  And that is in this

18   incredibly convoluted paragraph, section (f), subsection (f) of

19   1806:  "Review in camera and ex parte the application order and

20   such other materials" -- which is what we are talking about

21   here, "other materials relating to the surveillance as may be

22   necessary to determine whether the surveillance of the

23   aggrieved person was lawfully authorized and conducted."

24        Now, "in the course of this Court reviewing the

25   document, in camera and ex parte, the Court has discretion, the

Court may disclose" -- there is the word "may" -- "may disclose
to the aggrieved person under a appropriate security procedures
and protective orders portions of the" -- skipping forward to
-- "other materials relating to the surveillance where such
disclosure is necessary" -- "only where such disclosure is
necessary to make an accurate determination of the legality of
the surveillance."

So, the question becomes this:  How should the Court
exercise its discretion to bring us into the process?

**THE COURT:**  I gather you agree you do not have to be
drawn into the process.

**MR. EISENBERG:**  The statute's discretionary; I agree
with you there.  We would like very much to be drawn into the
process because we have something to say in this case.  And
we've been hamstrung from day one, nearly three years ago, in
saying what we would like to say.

More than anything else, we just want to tell the
Court what the law is as we see it, and we've had trouble
arguing that because we haven't seen the arguments against us.

What we would like is access to the document: We
haven't seen it in nearly three years, under whatever security
procedures the Court might choose to impose.

We would like to file arguments with regard to
Article 3 standing, which we believe would then be litigated.
We would be willing to file those arguments in whatever manner

1    the Court wishes and to prepare them under the most protective

2    of conditions, prepared as we have prepared previous sealed

3    filings filed under seal.

4            We would also ask that we be given access to the

5    Government's responsive arguments because it is -- it has been

6    an interesting exercise for me, in the three years of this

7    litigation, for all of us on the Al-Haramain team, to respond

8    to arguments we haven't seen.  That's usually not how things

9    work.

10           Now, how can that be done?  Securely, we believe.

11   For example, if we were given, one of us, at least, perhaps a

12   group of us, security clearances by the Government, as was

13   given to Mr. Kadidal which is why we brought that in his

14   affidavit saying this is how I did it in the Guantanamo cases.

15   Took them six weeks.

16           Jonathan Turley, in the Al-Timimi case, was given a

17   security clearance so that he could review the Government's

18   filings and respond to them, and, again, under whatever

19   security procedures the Court deemed appropriate.

20           This litigation has gone on for three years.  This

21   document is still secret.  We have really been extremely

22   careful in how we have litigated this case.  And I think we've

23   -- we've got a track record of trustworthiness at this point.

24           I believe this case can be litigated without

25   compromising national security under the provisions of 1806(f)

1    because that's what Congress has said can be done.  Yes, it is

2    true, there has been no case in 30 years like this, but that is

3    because there has been no case in 30 years like this.

4          This has been remarkable, from the day that this

5    document was accidental produced, to the disclosure of the

6    program, to two-and-a-half years of disclosure that we have sat

7    by and watched up to today.

8          I'd like to address some of the law, now, that I

9    think -- I hope I've addressed the facts to Your Honor's

10   satisfaction.

11         Would you like more from me, or shall I move on?

12         **THE COURT:**  Move on.

13         **MR. EISENBERG:**  Move on, okay.

14         Mr. Coppolino mentioned the **_Rakas_** case, which

15   appears for the first time in his reply brief on his motion to

16   dismiss.  Mr. Coppolino cites **_Rakas versus Illinois_**, a U.S.

17   Supreme Court case, 1979, for the proposition that suppression

18   standing, standing to move to suppress under the Fourth

19   Amendment, is the same thing as Article 3 standing.  So,

20   certainly, 1806(f) standing must be the same thing as Article 3

21   standing.  Actually, quite surprisingly, the case says the

22   exact opposite.

23         439 U.S. at page 140, the Court says that a

24   suppression motion depends on the nature -- that the ability to

25   make a suppression motion depends on the nature of Fourth

1    Amendment rights as personal, not as a matter of Article 3

2    standing.  The Court said this:  "This aspect of the analysis

3    belongs more properly under the heading of substantive Fourth

4    Amendment doctrine than under the heading of standing."  Wow,

5    that case says exactly the opposite.  It says Fourth Amendment

6    standing is not Article 3 standing.

7              Mr. Coppolino says we must litigate Article 3

8    standing first before we litigate statutory standing under

9    1806(f).  That's not how I read **_Sinochem International Company_**

10   **_versus Malaysia International Shipping Corporation_**, a 2007 U.S.

11   Supreme Court case.  We cited it at page 2 of our reply on the

12   1806(f) motion.

13             This is what the U.S. Supreme Court said in that

14   case:  "A Federal Court generally may not rule on the merits of

15   a case without determining first that it has jurisdiction.

16   Jurisdiction is vital only if the Court proposes to issue a

17   judgment on the merits."  That's what can't happen before

18   Article 3 standing is determined, a judgment on the merits.  An

19   1806(f) motion is not a judgment on the merits; it's not

20   dispositive.

21             I sat at a recent federal case of **_Zafadzan versus_**

22   **_City of New York_** from just a few months ago, this is page 3 of

23   our reply on the 1806(f) motion:  "Non-dispositive matters, on

24   the other hand, may be addressed," end of the quote, prior to

25   an adjudication of jurisdiction.

1          So, no, in fact, the law really isn't that the

2    minute they raise an Article 3 standing issue we must litigate

3    it.  The law says it must be litigated before Your Honor

4    decides the merits.  Not even before Your Honor litigates the

5    merits.  You can even go to trial on the merits, as long as you

6    decided Article 3 standing before adjudicating the merits

7    constitutional requirements are satisfied.

8          One point, a minor point I haven't had a chance to

9    address yet because this crops up for the first time in the

10   Government's reply brief on their motion to dismiss, on this

11   motion to dismiss, and that is the matter of certified --

12   certifying FISA preemption issue for interlocutory appeal.  We

13   argued toward the end of our opposition to the motion to

14   dismiss that, at that time, it had been three-and-a-half months

15   since this Court's July 2nd ruling finding FISA preemption, and

16   there had been no motion to certify the case for an

17   interlocutory appeal.  It's now been five months.

18         The Government's response is we couldn't have done

19   that; we were the prevailing party in the July 2nd hearing, we

20   couldn't appeal -- the July 2nd order, excuse me.  We couldn't

21   appeal; actually, that's wrong, that's wrong.

22         The Government could have appealed the July 2nd

23   ruling on FISA preemption under either of two theories:  One

24   is -- arises from a case called ***Electrical Fittings Corporation***

25   ***versus Thomas and Betts Companies***, 307 U.S. 241 from 1930.  It

says that, "A prevailing party may seek reformation of the

decision on appeal if the decision was necessary to the

judgment and adjudicated a litigated issue." That's exactly

what the FISA preemption ruling was. That decision, July 2nd,

of July 2nd, was appealable by the Government for that purpose.

   **THE COURT:** Appealable or?

   **MR. EISENBERG:** It could have been appealed.

   **THE COURT:** As a matter of right?

   **MR. EISENBERG:** No, of course not.

   **THE COURT:** It would be under 1292 --

   **MR. EISENBERG:** Under 1292(b).

   Their argument was that we couldn't appeal under

1292(b) because this is not an appealable order. In any event,

we won. And what I'm saying is that they could have, they

could have asked for reformation as an interlocutory appeal

under 1292(b).

   They were the prevailing party, but something

happened in the July 2nd opinion that, obviously, from the

course of these proceedings the Government did not like at all.

They are very unhappy with Your Honor's finding of FISA

preemption. They could have sought an interlocutory appeal.

   They could have also sought an interlocutory appeal

on the ground that the decision might have served as collateral

estoppel in the Oregon delisting case. And, the decision for

that proposition is Ruvalcaba, R-u-v-a-l-c-a-b-a, versus City

1  of --

2           **THE COURT:**  Where are you going with this?

3           Is the argument that -- don't let me speculate,

4  where are you going with this?

5           **MR. EISENBERG:**  The only place I'm going is this:  I

6  think it's too late for them to ask for permission to appeal

7  their FISA preemption ruling of July 2nd.  It's been five

8  months now; they've waived it.  And let me add why I'm so

9  concerned about an interlocutory appeal.

10          We are coming on three years since we filed our

11  complaint in this case.  The **Steel Seizure** case, 1952, what

12  happened in that case was President Truman seized the steel

13  mills in an Executive Order dated April 8th, 1952.  The U.S.

14  Supreme Court issued its decision June 2nd, 1952.  Two months,

15  two months to litigate the case.  Three years is long enough.

16  I believe it's time to move forward on this -- on this case.

17          And with that, unless Your Honor as has any

18  questions, I'm prepared to step aside.

19          **THE COURT:**  Very well.  Thank you, Mr. Eisenberg.

20          **MR. EISENBERG:**  Thank you.

21          **MR. COPPOLINO:**  Your Honor, could I just have five

22  minutes?

23          **THE COURT:**  Yes, of course.

24          **MR. COPPOLINO:**  I want to go back and try to first

25  address the first point that you had raised, when I was up

56

1  earlier, as to why the Ninth Circuit would have remanded the
2  case under the circumstances.  And, I think, the answer lies in
3  the very outcome of the decision that you reached on July 2nd.
4       I think the reason that that remand made sense from
5  the point of view of the Ninth Circuit is that it left open the
6  possibility that you would find that FISA preempted the
7  privilege, that Section 1806(f) preempted the State Secrets
8  Privilege, and that they could use it to establish their
9  aggrieved status.
10      But, when you held that they had to establish their
11 aggrieved status without using Section 1806(f), then dismissal
12 of the case was possible, particularly if you didn't find that
13 they had established their standing before triggering that
14 provision, which we think would be the proper course.
15      And the result of that remand could have been, and
16 should be, in our view, disposition of the case without
17 reaching or without adjudicating fully the Section 1806(f)
18 issue.  In other words, the Ninth Circuit could have reached
19 the issue, but if it left it to you, there was still the
20 possibility that either you would not find preemption, or that
21 even if you did, you would find that the case could not
22 proceed, and they would not have had to address the issue,
23 which I think is one of the main issues a Court of Appeals
24 would be disinclined to consider a question in the first
25 instance before the District Court.

1    Second point I want to make:  One of the very first

2 things that Mr. Eisenberg said when he got up --

3    **THE COURT:**  So what do I make of that?  What do you

4 draw from that?

5    **MR. COPPOLINO:**  What I draw from that is that the

6 Ninth Circuit could well have surmised and assumed that even

7 with a remand of this issue the case could be disposed of on

8 any number of grounds before they ruled on the legal question

9 of preemption, and therefore, it would be premature for them to

10 do that.  You could have held there was no preemption, case

11 over.  You could have held there was preemption, and the case

12 might continue, except you held there was preemption, but they

13 still had to establish standing without using that provision,

14 and if they failed to do that, case over, preemption issue

15 never dispositive in the District Court.  And they didn't have

16 to reach it at that point.

17    It would have been premature for them to reach out

18 and decide the legal question, which may not have led to a

19 resolution of the case, in conflict with their ruling on the

20 State Secrets Privilege.  That is why I think a remand made

21 sense.

22    And, in fact, if you hold, as we believe you should,

23 that their evidence doesn't establish that they are either

24 aggrieved or Article 3 standing, that might be the end of it.

25 Now, they might appeal at that point, and they would appeal the

1  dismissal of the lawsuit.  But, it certainly establishes that

2  the Ninth Circuit didn't have to decide the preemption issue

3  before you did because the decision on that issue may not have

4  resolved the case in a manner that conflicted with the State

5  Secrets privilege.

6        Second point:  One of the very first things that

7  Mr. Eisenberg said a moment ago when he stood up is that the

8  plaintiffs would have to prove that there was surveillance,

9  that it was of these plaintiffs, and that it was electronic

10  surveillance, and they would also have to prove that it was

11  without a warrant.  He concedes they have to prove that to

12  establish their standing.

13        And then he ran through his litany of evidence, and

14  it's a judgment that you would have to make as to whether that

15  is sufficient.  Our argument is it simply doesn't establish the

16  standards for Article 3.

17        In the course of making his argument about what the

18  variation between the February '04 designation decision shows

19  when contrasted with September '04, he used phrases like this

20  is what appears to be the link between -- in designating

21  Al-Haramain in its association with Bin Laden, it appears to be

22  the surveillance, or the alleged surveillance of them.  That

23  itself is conjuncture.  He does not have any proof of that.  In

24  fact, the direct-link statement could be based on something

25  completely different.

1          It's simply speculation for them to say it was this

2    or it's reasonable to infer it was this when there is any

3    number of alternative possibilities that could have existed.

4          If a plaintiff could establish standing, factually,

5    under Article 3, under Section 1806(f) with this showing, then

6    any plaintiff can come in, try to stitch together some

7    inferences that don't actually show that they were subject to

8    surveillance, and obtain an adjudication under this provision.

9    It would be a radical expansion of how that provision was

10   intended to work.

11         Next point:  You asked, where do we go from here,

12   where would this lead to if you were to proceed?  Well, I think

13   the problem that we have been trying to communicate to the

14   Court is that recognizing that you think the privilege is

15   preempted, what is the consequence of that if you now go

16   forward?  Our view is that any further proceeding would

17   inherently risk or require the disclosure of the information we

18   successfully protected.  And so, therefore, the Court should

19   not proceed in that fashion until there is a determination as

20   to whether that procedure is appropriate.

21         Ultimately, you have to find that plaintiffs have

22   standing in order to apply Section 1806(f).  Even if you use

23   the provision to make that determination, you can't proceed

24   without jurisdiction.  Proceeding must -- will inherently mean

25   that you have found standing, that you have jurisdiction, and

that inherently discloses the very information that we successfully protected and that the Ninth Circuit said should be protected.

So, even if you proceed totally ex parte, you cannot ultimately protect the fact that you have exercised jurisdiction. And, since you can't exercise hypothetical jurisdiction, that inherently alone discloses that you have found whether or not these folks have been surveilled, as alleged, and that's -- let alone the things that they want: Securities clearances, access to the sealed document, none of which is consistent with the Ninth Circuit's opinion.

Let me just briefly address a couple of minor points. **_Rakas_**: I have not miscited **_Rakas_**. And I would call it to the Court's attention. The passage he cited was Justice Rehnquist is making a point that, in the Fourth Amendment context, the issue of whether someone has been personally subject to an alleged unreasonable search, and therefore has standing, he said you can decide that issue as a matter of Fourth Amendment law, but it's still an issue of standing, as well. He says: "It should be emphasized that nothing we say here" -- and what he is referring to is his decision that whether someone's personally aggrieved can be decided as part of substantive Fourth Amendment law -- "nothing we say here casts the least doubt on cases which recognize that as a general proposition the issue of standing involves two

1  inquiries, the first of which is whether a particular legal

2  right has" -- "whether the proponent of a particular legal

3  right has alleged injury in fact." And I cited this in my

4  brief.

5       So, what Justice Rehnquist is doing is saying for

6  Fourth Amendment violations you can merge the standing question

7  with the merits, but there still has to be Article 3 standing.

8       The cases that they cite are hardly worth spending

9  much time on. The **_Sinochem_** case, about how non-dispositive

10  motions can precede a determination of jurisdiction,

11  Justice Ginsberg, writing for the Court, was dealing with an

12  issue of forum non-convenience. And, the holding is very

13  narrow: she said when you have a clear-cut basis for dismissal

14  on forum non-convenience, you don't have to get into

15  adjudication on subject matter jurisdiction because the case is

16  going to be dismissed, anyway. In that instance, you can go

17  forward and just dismiss the case.

18       The **_Zavadzan_** case is even worse. It's a District

19  Court case out of the Eastern District of New York. And it was

20  a case where the Court allowed discovery in the face of a claim

21  that there had not been an exhaustion of remedies, which would

22  foreclose subject matter jurisdiction.

23       The District Court said by the time you issue this

24  ruling, the parties had exhausted their remedies. And he said

25  there is no need for me to dismiss this case now, they have

1  exhausted, we can go forward.

2        Last point I would make regarding appeal:  He

3  concedes that we would have had to seek a certification of

4  interlocutory appeal upon your decision, but that, obviously,

5  made no sense.  You dismissed their claim -- their complaint

6  subject to them establishing standing.  If they fail to

7  establish standing --

8        **THE COURT:**  Why couldn't you have field a 1292(b)?

9        **MR. COPPOLINO:**  We could have filed a motion to

10  certify the case.

11        **THE COURT:**  Right.

12        **MR. COPPOLINO:**  Had we done that, we would have

13  said, Judge Walker, certify the case, certify your decision in

14  which you just dismissed the complaint against us because we

15  think that the case goes forward.

16        **THE COURT:**  I gave the plaintiffs leave to amend; it

17  didn't end the case.

18        **MR. COPPOLINO:**  Right.  You gave them leave to amend

19  and required them to establish their standing.  It was pretty

20  apparent to us that taking it the next round and seeing if they

21  could establish their standing was the sensible thing to do,

22  and, at this point, if you felt the case ought to proceed, now

23  is the time where, as they say, the rubber hits the road and we

24  have to address this conflict between Section 1806(f) and the

25  State Secrets Privilege.  Now is the time you should certify

1  the case, if you have any intention of going forward.

2          Thank you, Judge Walker.

3          **THE COURT:**  Very well.

4          Thank you, counsel.

5               **(Proceedings adjourned at 3:23 p.m.)**

6

7                    **---o0o---**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF REPORTER</u>

I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


/s/ Sahar McVickar
_____

Sahar McVickar, RPR, CSR No. 12963

December 8, 2008