SIDLEY AUSTIN LLP
David W. Carpenter*
Bradford A. Berenson*
David L. Lawson*
Edward R. McNicholas*
Eric A. Shumsky #206164
1501 K Street, N.W.
Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8711
bberenson@sidley.com

WILMER CUTLER PICKERING
HALE AND DORR LLP
Randolph D. Moss*
Samir C. Jain # 181572
Brian M. Boynton # 222193
Catherine M.A. Carroll*
1875 Pennsylvania Ave, N.W.
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
randolph.moss@wilmerhale.com

WILLIAMS & CONNOLLY
LLP
Brendan V. Sullivan, Jr. *
John G. Kester
Gilbert Greenman
725 Twelfth Street, N.W.
Washington, DC 20005
Tel.: (202) 434-5000
Fax: (202) 434-5029
jkester@wc.com

Attorneys for the Sprint Defendants

PILLSBURY WINTHROP
SHAW PITTMAN LLP
Bruce A. Ericson #76342
Jacob R. Sorensen #209134
Marc H. Axelbaum #209855
50 Fremont Street
Post Office Box 7880
San Francisco, CA 94120
Tel.: (415) 983-1000
Fax: (415) 983-1200
bruce.ericson@pillsburylaw.com

MUNGER, TOLLES & OLSON
LLP
Henry Weissmann # 132418
Susan R. Szabo # 155315
Aimee A. Feinberg # 223309
355 South Grand Avenue
35th Floor
Los Angeles, CA 90071
Tel.: (213) 683-9100
Fax: (213) 683-5150
henry.weissmann@mto.com

* admitted pro hac vice

Attorneys for AT&T Corp.

Attorneys for the Verizon Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

IN RE:

NATIONAL SECURITY AGENCY
TELECOMMUNICATIONS RE-
CORDS LITIGATION

This Document Relates To All Cases
Except:

*Al-Haramain Islamic Foundation, Inc. v.
Bush, No. 07-00109; Center for Consti-
tutional Rights v. Bush, No. 07-01115;
Guzzi v. Bush, No. 06-06225; Shubert v.
Bush, No. 07-00693; Clayton v. AT&T
Commc'ns of the Southwest, No. 07-
01187; United States v. Adams, No. 07-
01323; United States v. Clayton, No. 07-
01242; United States v. Palermino, No.
07-01326; United States v. Rabner, No.
07-01324; United States v. Volz, No. 07-
01396*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

MDL NO. 06-1791 VRW

**SUPPLEMENTAL BRIEF OF TELE-
COMMUNICATIONS CARRIER DEFEN-
DANTS IN SUPPORT OF THE UNITED
STATES' MOTION TO DISMISS OR, IN
THE ALTERNATIVE, FOR SUMMARY
JUDGMENT [Dkt. 559]**

Courtroom:   6, 17th Floor
Judge:        Hon. Vaughn R. Walker

# TABLE OF CONTENTS

TABLE OF CONTENTS………………………………………………………………..i

INTRODUCTION AND SUMMARY…………………………………………………..1

I.     THE NONDELEGATION DOCTRINE IS INAPPOSITE BECAUSE§ 802
       DOES NOT AUTHORIZE THE ATTORNEY GENERAL TO MAKE LAW………………3

II.    ALTERNATIVELY, § 802 PROVIDES THE REQUISITE
      INTELLIGIBLE PRINCIPLE…………………………………………………………...8

      A.    Section 802 Satisfies The Intelligible-Principle Requirement Because
           It Conditions The Attorney General's Discretion To File A Certification
           Upon Specific Findings Of Fact……………………………………………………9

      B.    Any Discretion Exercised By The Attorney General In Deciding
           Whether To File Certifications Is Further Constrained By § 802's
           Core Purpose Of Protecting National Security, And The Context In
           Which § 802 Was Promulgated……………………………………………………...11

      C.    These Considerations Are Clearly Sufficient To Satisfy
           The Intelligible-Principle Requirement When, As Here,
           Congress Has Delegated Power To The Executive In An Area
           In Which It Enjoys Independent Constitutional Authority…………………………..13

III.   IF NECESSARY TO AVOID A CONSTITUTIONAL QUESTION,
       THE COURT SHOULD INTERPRET § 802 AS REQUIRING
       THE ATTORNEY GENERAL TO FILE A CERTIFICATION UPON
       FINDING THAT THE REQUIREMENTS OF § 802(A) ARE MET………………………14

CONCLUSION………………………………………………………………...............17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES**

Cases

*A.L.A. Schechter Poultry Corp. v. United States,*
   295 U.S. 495 (1935)...................................................................................*passim*

*American Power & Light Co. v. SEC,*
   329 U.S. 90 (1946)...............................................................................5, 6, 11

*Bateson v. Geisse,*
   857 F.2d 1300 (9th Cir. 1988) .........................................................................6

*Buckley v. Valeo,*
   424 U.S. 1 (1976)............................................................................................7

*Carcieri v. Kempthorne,* 497 F.3d 15 (1st Cir. 2007) (en banc), *rev'd in part on other*
   *grounds,* 2009 WL 436679 (Feb. 24, 2009) ..........................................................12

*Clark v. Martinez,*
   543 U.S. 371 (2005)......................................................................................15

*Crowell v. Benson,*
   285 U.S. 22 (1932).........................................................................................15

*Currin v. Wallace,* 306 U.S. 1 (1939) ......................................................................6

*Defenders of Wildlife v. Chertoff,*
   527 F. Supp. 2d 119 (D.D.C. 2007) ...............................................................10

*Department of the Navy v. Egan,*
   484 U.S. 518 (1988)......................................................................................14

*Duncan v. Walker,*
   533 U.S. 167 (2001)......................................................................................16

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,*
   485 U.S. 568 (1988)......................................................................................15

*Federal Energy Admin. v. Algonquin SNG, Inc.,*
   426 U.S. 548 (1976).................................................................................*passim*

*Field v. Clark,*
   143 U.S. 649 (1892).................................................................................5, 6, 11

*Freedom to Travel Campaign v. Newcomb,*
   82 F.3d 1431 (9th Cir. 1996) .................................................................10, 13, 14

*Heckler v. Chaney,*
   470 U.S. 821 (1985).........................................................................................4

*J.W. Hampton, Jr., & Co. v. United States,*
     276 U.S. 394 (1928) ........................................................................................*passim*

*Knauff v. Shaughnessy,*
     338 U.S. 537 (1950) ..........................................................................................4, 6, 14

*Lichter v. United States,*  334 U.S. 742 (1948) ......................................................6, 11

*Loving v. United States,*
     517 U.S. 748 (1995) ........................................................................................3, 6, 8, 13

*Michigan Gambling Opposition v. Kempthorne,*
     525 F.3d 23 (D.C. Cir. 2008) ............................................................................10, 12

*Mistretta v. United States,*  488 U.S. 361 (1989) ....................................................6, 15

*Mullaney v. Hess,*
     189 F.2d 417 (9th Cir. 1951) ....................................................................................16

*National Broadcasting Co. v. United States,*
     319 U.S. 190 (1943) ..................................................................................................1, 6

*New York Cent. Sec. Corp. v. United States,*
     287 U.S. 12 (1932) ..................................................................................................1, 10

*Owens v. Republic of Sudan,*
     531 F.3d 884 (D.C. Cir. 2008) ................................................................................7, 11

*Panama Refining Co. v. Ryan,*
     293 U.S. 388 (1935) .........................................................................................*passim*

*Rust v. Sullivan,*
     500 U.S. 173 (1991) ....................................................................................................17

*South Dakota v. Dep't of Interior,*
     69 F.3d 878 (8th Cir. 1995), *vacated by Dep't of Interior v. South Dakota*, 519 U.S. 919
     (1996), *and repudiated by South Dakota v. Dep't of Interior,*
     423 F.3d 790 (8th Cir. 2005) ...............................................................................1, 12

*Springer v. Philippine Islands,*
     277 U.S. 189 (1928) ....................................................................................................5

*Sunshine Anthracite Coal Co. v. Adkins,*
     310 U.S. 381 (1940) ....................................................................................................7

*TOMAC v. Norton,*
     433 F.3d 852 (D.C. Cir. 2006) ..............................................................................2, 12

*Touby v. United States,*
     500 U.S. 160 (1991) ..........................................................................................3, 6, 10

*United States ex rel. Madden v. General Dynamics Corp.*,
   4 F.3d 827 (9th Cir. 1993) .................................................................................17

*United States Sugar Equalization Bd., Inc. v. P. De Ronde & Co.*,
   7 F.2d 981 (3d Cir. 1925) ..................................................................................16

*United States v. Allen*,
   160 F.3d 1096 (6th Cir. 1998) .............................................................................4

*United States v. Curtiss-Wright Export Corp.*,  299 U.S. 304 (1936) ................................6, 10, 14

*United States v. Gurrola-Garcia*,
   547 F.2d 1075 (9th Cir. 1976) ...........................................................................14

*United States v. LSL Biotech.*,
   379 F.3d 672 (9th Cir. 2004) .............................................................................16

*United States v. X-Citement Videos, Inc.*,
   513 U.S. 64 (1994) .............................................................................................15

*Whitman v. Am. Trucking Ass'ns, Inc.*,
   531 U.S. 457 (2001) ....................................................................................*passim*

*Wileman Bros. & Elliott, Inc. v. Espy*,
   58 F.3d 1367 (9th Cir. 1995), *rev'd on other grounds,* 521 U.S. 457 (1997) ........................12

*Yakus v. United States*,
   321 U.S. 414 (1943) ...........................................................................5, 6, 10, 13

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ...................................................................................15, 17

*Zemel v. Rusk*,  381 U.S. 1 (1965) ................................................................6, 14


**STATUTES**

5 U.S.C. § 515(a) ...................................................................................................4

5 U.S.C. § 701(a)(2) ..............................................................................................4

5 U.S.C. § 2680(e) .................................................................................................4

21 U.S.C. § 811(h)(1) ...........................................................................................10

28 U.S.C. § 516 .....................................................................................................7

28 U.S.C. § 526(a) .................................................................................................4

31 U.S.C. § 3730(a)(2) ...........................................................................................4

FISA Amendments Act of 2008, Pub. L. No. 110-261, 122 Stat. 2436 ...................................1, 2, 3

**LEGISLATIVE HISTORY**

S. Rep. 110-209 .........................................................................................................2, 3, 12, 13, 16

v

# INTRODUCTION AND SUMMARY

This Court has sought supplemental briefing on whether § 802 of the Foreign Intelligence Surveillance Act (added by the FISA Amendments Act of 2008 (FISAAA), Pub. L. No. 110-261, 122 Stat. 2436) constitutes an unconstitutional delegation of legislative power to the Executive Branch. *See* Order (Feb. 11, 2009), Dkt. 559. For the reasons set forth below and in our opening brief (Dkt. 508 at 10–14), it does not.

Only twice in our Nation's history has the Supreme Court struck down a statute as an impermissible delegation of legislative authority to the Executive Branch, both times in 1935. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935). We have found only one court of appeals ever to have done so, and its decision was vacated and the statute subsequently upheld. *See South Dakota v. Dep't of Interior*, 69 F.3d 878 (8th Cir. 1995), *vacated by* 519 U.S. 919 (1996), *and repudiated by* 423 F.3d 790 (8th Cir. 2005). This is with good reason.

The nondelegation doctrine operates within a narrow domain: It does not apply at all unless Congress has sought to delegate legislative power, such as the power to engage in certain rulemaking. Here, no legislative power is at issue. Section 802 merely calls for the Attorney General to invoke a statutory immunity by presenting facts to the Court in a particular case, not to promulgate a prospective, generally applicable rule. Such an action does not involve legislative power or implicate the nondelegation doctrine.

Moreover, even when the nondelegation doctrine does apply, its demands are modest: A statute is constitutional so long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). Courts reject nondelegation challenges when, as here, the Executive Branch's exercise of discretion operates within a limited field or is cabined by the application of congressionally determined criteria. Courts uniformly have rejected nondelegation challenges to statutes that provide such minimal guidance as that the official should act "in the public interest," or to prevent impairment of "national security." *E.g., National Broadcasting Co. v. United States*, 319 U.S. 190, 225–26 (1943); *New York Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24–

25 (1932); *Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 559 (1976). This requirement is even more relaxed in areas of traditional executive authority, such as national security and foreign affairs.

The requisite intelligible principle is present here. Section 802(a) specifies in detail the criteria that must be satisfied for the Attorney General to file a certification. These criteria provide all the congressional guidance that is needed to sustain the law, which applies only in the narrow domain of lawsuits alleging the "provi[sion of] assistance to an element of the intelligence community." FISAAA § 802(a). These criteria are sufficient even if the Attorney General has discretion regarding whether to file a certification if the criteria are met. Scores of laws similarly *authorize*, but do not *compel*, executive action upon the satisfaction of designated statutory criteria. And numerous cases—including at least four decisions by the Supreme Court—have upheld laws of this type against nondelegation challenges.

Moreover, the modest guidance required from Congress need not be explicit in the statutory text; a court must consider "the 'purpose of the Act, its factual background, and the statutory context.'" *TOMAC v. Norton*, 433 F.3d 852, 866 (D.C. Cir. 2006) (*quoting American Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946)). Here in particular, we know for certain the motivating purposes that Congress embodied in § 802. Congress embarked on two years of study and debate of the circumstances under which litigation against telecommunications providers alleged to have assisted the government should proceed—*including this litigation in particular*. It ultimately concluded that granting immunity to companies that either did not provide the assistance alleged, or provided any assistance in good faith, would enhance the nation's security by ensuring that private parties cooperate in intelligence activities in the future, and by preventing the disclosure of classified information. *See* S. Rep. No. 110–209, at 9-12 (2007). This statutory purpose and the context in which § 802 was adopted—in which Congress anticipated that the Attorney General would file certifications in these very lawsuits—provide further guidance still.

If, however, the Court concludes that § 802 is constitutionally doubtful, any such doubt should be remedied by interpreting the statute as *requiring* the Attorney General to issue a certification if he determines the statutory criteria are satisfied. The statute is silent as to whether the Attor-

2

ney General is required to file a certification when the specified prerequisites are met; it specifies the consequences that follow "if" the Attorney General issues a certification, *see* FISAAA § 802(a), but does not expressly state whether the Attorney General may or must issue a certification upon making the relevant findings. The statute does, however, make clear that the Attorney General has not just authorities but "duties" under the provision, *see id.* § 802(e), and case law holds that in some circumstances even apparently discretionary actions must be taken if necessary to vindicate the rights of the public or third parties. Interpreting § 802 to require the Attorney General to file a certification if he determines the criteria of § 802(a) are met is thus a permissible construction of the provision, which must be adopted if necessary to avoid constitutional doubt.

## I.     THE NONDELEGATION DOCTRINE IS INAPPOSITE BECAUSE § 802 DOES NOT AUTHORIZE THE ATTORNEY GENERAL TO MAKE LAW

Article I of the Constitution vests in Congress "[a]ll legislative powers herein granted." "From this language the Court has derived the nondelegation doctrine: that Congress may not constitutionally delegate its legislative power to another branch of Government." *Touby v. United States*, 500 U.S. 160, 165 (1991). As the text of Article I and the Supreme Court's formulation of the doctrine make clear, the nondelegation doctrine does not apply every time Congress confers *any* power on another branch, but only when Congress attempts to delegate *legislative* power. *See, e.g.*, *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001) ("In a delegation challenge, the constitutional question is whether the statute has delegated *legislative* power to the agency." (emphasis added)); *Loving v. United States*, 517 U.S. 748, 758 (1995) ("The fundamental precept of the delegation doctrine is that the *lawmaking* function belongs to Congress . . . and may not be conveyed to another branch or entity . . . ." (emphasis added)); *J.W. Hampton*, 276 U.S. at 406 ("[I]t is a breach of the national fundamental law if Congress gives up its *legislative* power and transfers it to the President, or to the Judicial branch." (emphasis added)).

Accordingly, "the first step in assessing whether a statute delegates legislative power is to determine what authority the statute confers." *Whitman*, 531 U.S. at 465. If Congress vests an agency with quasi-legislative power, such as the power to engage in rulemaking, it must "lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed

Supplemental Brief of Telecommunications Carrier Defendants                    MDL No. 06:1791-VRW

to conform." *J.W. Hampton*, 276 U.S. at 409.[1]  When, by contrast, Congress merely authorizes an agency to take executive, administrative, or other nonlegislative action, the nondelegation doctrine is inapposite and Congress need not provide an intelligible principle.  *See, e.g.*, *United States v. Allen*, 160 F.3d 1096, 1108 (6th Cir. 1998) ("[T]his case does not involve a delegation of legislative authority; thus, the 'intelligible principle' language . . . is not relevant."); *see also Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("[T]here is no question of inappropriate delegation of legislative power" when "Congress . . . is implementing an inherent executive power.").

There are innumerable statutes that authorize purely executive or administrative action without providing criteria that cabin the agency's discretion.[2]  Indeed, it long has been understood that Congress may commit certain decisions to the discretion of an administrative agency.  The Administrative Procedure Act, for example, precludes judicial review when "agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  An action is committed to agency discretion by law if the statute authorizing the action "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  But if the nondelegation doctrine always required Congress to supply an intelligible principle, even when authorizing wholly nonlegislative action, then every statute that triggers § 701(a)(2)—which applies when there exist "no judicially manageable standards . . . for judging how and when an agency should exercise its discretion," *Heckler*, 470 U.S. at 830—would be unconstitutional.  No court ever has suggested such a novel rule, which would cut a swath through the United States Code.

Under these settled principles, the nondelegation doctrine has no application here because § 802 does not confer anything resembling legislative power on the Attorney General.  "Legislative

---

[1] This is because when Congress "lay[s] down . . . an intelligible principle," the "legislative action is not a forbidden delegation of legislative power," *J.W. Hampton*, 276 U.S. at 409, since the legislative power has been retained by Congress and the Executive merely is executing Congress's will at Congress's direction.

[2] For just a few examples, see 5 U.S.C. § 515(a) ("[t]he Attorney General . . . may . . . conduct any kind of legal proceeding . . . which United States attorneys are authorized by law to conduct"); 5 U.S.C. § 2680(e) ("[t]he Attorney General may compromise or settle any claim asserted" in a tort suit against a government employee); 28 U.S.C. § 526(a) ("[t]he Attorney General may investigate the official acts, records, and accounts" of specified federal officers); 31 U.S.C. § 3730(a)(2) ("[t]he Government may elect to intervene and proceed with" a private relator's False Claims Act suit).

4

power . . . is the authority to make laws." *Springer v. Philippine Islands*, 277 U.S. 189, 202 (1928). As the Supreme Court has explained, "[t]he true distinction . . . is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made." *Field v. Clark*, 143 U.S. 649, 693-94 (1892) (internal quotation marks omitted). The core of Congress's legislative power is the power to promulgate binding rules of law. *See Yakus v. United States*, 321 U.S. 414, 424 (1943) ("The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct."). And the purpose of the nondelegation doctrine is to ensure that when Congress delegates rulemaking or other quasi-legislative authority, it "clearly delineates the general policy, the public agency which is to apply it, and the boundaries of th[e] delegated authority." *American Power & Light,* 329 U.S. at 105.

The rule that Congress may not delegate its "legislative power" is well illustrated by the only two cases in which the Supreme Court has invalidated legislation as an unconstitutional delegation of legislative authority to the Executive Branch. In *Panama Refining*, the Supreme Court struck down § 9(c) of the National Industrial Recovery Act, which authorized the President by executive order to prohibit interstate and international transportation of oil, and made it a criminal offense to violate such an order. 293 U.S. at 406. The Court observed that § 9(c) "purport[ed] to authorize the President to pass a prohibitory law" and that "the question whether that transportation shall be prohibited by law is obviously one of legislative policy." *Id*. at 414-15. Because Congress provided *no* policy or standard to constrain the President's discretion whether and in what circumstances to exercise this lawmaking power, the Court concluded that Congress had "commit[ted] to the President the functions of a legislature rather than those of an executive or administrative officer executing a declared legislative policy." *Id*. at 387-88. For similar reasons, the Court in *Schechter Poultry* struck down § 3(a) of the same statute, which purported to give the President boundless authority to approve "codes of fair competition" for trades and industries. 295 U.S. at 521–22. The Court emphasized that the President's authority under § 3(a) "involve[d] the coercive exercise of the law-making power" because "[t]he codes of fair competition which the statute attempt[ed] to authorize [were]

5

codes of laws," violations of which were "punishable as crimes." *Id.* at 495. Because "the discretion of the President in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country, [was] virtually unfettered," the Court concluded that "the code-making authority thus conferred [was] an unconstitutional delegation of legislative power." *Id.* at 541–42.

The Attorney General's authority to file a certification under § 802 does not remotely resemble the legislative power that Congress sought to confer upon the President in *Panama Refining* and *Schechter*. Unlike the statutes at issue in those cases, § 802 does not authorize the Attorney General to make law. In filing a certification in a particular case, the Attorney General does not promulgate generally applicable rules of law or otherwise enact binding legislative standards. Rather, § 802 confers on the Attorney General authority to advise a court of the existence or nonexistence of certain facts related to the operation or non-operation of certain alleged programs. This is a quintessentially executive, not policymaking, function. *Cf. Bateson v. Geisse*, 857 F.2d 1300, 1304 (9th Cir. 1988) (decision held to be "executive, rather than legislative" where it "neither applied to the general community, nor involved the promulgation of legislative policy as a defined and binding rule of conduct").[3]

It is for this same reason that, as we explained in our opening brief (Dkt. 508 at 10–12),

---

[3] Nor, in this respect, does § 802 resemble even the statutes that have been *un*successfully challenged on nondelegation grounds. The nondelegation question arose in those cases because the underlying statutes, unlike § 802, delegated rulemaking power. *See Whitman*, 531 U.S. 457 (statute authorizing EPA to promulgate national ambient air quality standards); *Loving*, 517 U.S. 748 (statute authorizing President to define aggravating circumstances for imposition of the death penalty in courts-martial); *Touby*, 500 U.S. 160 (statute authorizing Attorney General to add drugs to schedule of prohibited substances); *Mistretta v. United States*, 488 U.S. 361 (1989) (statute authorizing Sentencing Commission to promulgate Sentencing Guidelines); *Algonquin SNG*, 426 U.S. 548 (statute authorizing President to impose quotas and license fees on imported oil); *Zemel v. Rusk*, 381 U.S. 1 (1965) (statute authorizing President to prescribe rules governing issuance of passports); *Knauff*, 338 U.S. 537 (statute authorizing President to prescribe rules governing entry and departure of aliens in wartime); *Lichter v. United States*, 334 U.S. 742 (1948) (statute authorizing agencies to define "excessive profits"); *American Power & Light Co.*, 329 U.S. 90 (statute authorizing SEC to regulate the structure of holding-company systems); *Yakus*, 321 U.S. 414 (statute authorizing price administrator to promulgate regulations fixing commodity prices); *National Broad. Co.*, 319 U.S. 190 (statute authorizing FCC to regulate airwaves); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936) (statute authorizing President to prescribe rules governing the sale of arms); *J.W. Hampton*, 276 U.S. 394 (statute authorizing President to increase or decrease trade duties); *Currin v. Wallace*, 306 U.S. 1 (1939) (statute authorizing Secretary of Agriculture to prescribe standards for sale of tobacco at auction markets); *Field*, 143 U.S. 649 (statute authorizing President to promulgate orders imposing trade duties on imports).

6

Plaintiffs miss the mark when they argue that the Attorney General exercises legislative power because he "chang[es] the law applicable to these actions." (Dkt. 482 at 15). It was Congress that altered the rules governing Plaintiffs' claims by creating a new form of immunity, and it was Congress that made the broad-gauged judgment regarding the circumstances in which carriers should be immune from certain types of allegations. *See Owens v. Republic of Sudan*, 531 F.3d 884, 889 (D.C. Cir. 2008). Whether to file a certification in a particular case, by contrast, is not a question of legislative policy. In filing a certification, the Attorney General neither creates new law nor repeals existing law; he merely invokes the new rule Congress created. Section 802's title, "Procedures for Implementing Statutory Defenses," illustrates the point. Congress created the "statutory defenses," and § 802 prescribes how those defenses may be "implement[ed]" by the Court, the Attorney General, and the parties to the litigation. The Attorney General's role under the statute is limited to determining whether the criteria of § 802(a) are satisfied and, in appropriate circumstances, presenting the relevant facts to the Court. The decision whether to file a § 802 certification with a court in pending litigation in which the United States is an interested party is a basic executive function. *Cf.* 28 U.S.C. § 516 ("Except as otherwise authorized by law, the conduct of litigation in which the United States . . . is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General."). In this sense, the Attorney General's authority under § 802 is similar to a decision to invoke a defense or immunity in litigation, a function courts long have recognized as quintessentially executive. *See generally Buckley v. Valeo*, 424 U.S. 1, 140 (1976) ("conducting civil litigation in the courts of the United States for vindicating public rights" is a function that "may be discharged only by persons who are 'Officers of the United States' within the language of [Article II, § 2, cl. 2]"). Because § 802 "[does] not in any real sense invest the [Attorney General] with the power of legislation," *J.W. Hampton*, 276 U.S. at 410, but instead authorizes him only to take traditionally executive action, the nondelegation doctrine is inapplicable and there is no requirement of an intelligible principle. *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940) ("Since law-making is not entrusted to the industry, this statutory scheme is unquestionably valid.").

7

## II. ALTERNATIVELY, § 802 PROVIDES THE REQUISITE INTELLIGIBLE PRINCIPLE

Even if the nondelegation doctrine did apply here, it would be satisfied because § 802 provides more than enough guidance to the Attorney General. The requirement of an intelligible principle is rarely an obstacle. Not once since 1935 has the Supreme Court found an intelligible principle lacking, and to our knowledge, no finding of a nondelegation violation by a federal court of appeals during that entire span has been sustained. As the Supreme Court has emphasized, it has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Whitman*, 531 U.S. at 474–75 (internal quotation marks omitted). Thus, the intelligible-principle requirement does not require Congress to impose detailed restrictions on an agency's discretion. To the contrary, even the most general principles suffices. Since *Panama Refining* and *Schechter*, the Supreme Court has "upheld, without exception, delegations under standards phrased in sweeping terms." *Loving*, 517 U.S. at 771. These include "various statutes authorizing regulation in the 'public interest.'" *Whitman*, 531 U.S. at 474 (citing *National Broad. Co.*, 319 U.S. at 225–26; *New York Cent. Sec. Corp.*, 287 U.S. at 24–25). Similarly, the Court found an intelligible principle in a statute authorizing the President to impose quotas and fees on imports as he deemed necessary to ensure that they did not "threaten to impair national security." *Algonquin SNG*, 426 U.S. at 559.

The already lenient requirements of the nondelegation doctrine are further relaxed when, as here, the agency's discretion operates in a narrow field. *Whitman*, 531 U.S. at 475 ("[T]he degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred"). Indeed, if the field of discretion is sufficiently narrow, or if the area is one in which the Executive has traditionally exercised independent authority, Congress need not provide *any* guidance. *See id*. ("Congress need not provide *any* direction to the EPA regarding the manner in which it is to define 'country elevators'" (emphasis added)); *Loving*, 517 U.S. at 773 (Congress could delegate power to the President to prescribe aggravating factors for imposition of the death penalty in courts-martial "*without further guidance*" (emphasis added)). Section 802, which authorizes the Attorney General to act only within a tightly circumscribed domain in which the President has traditionally exercised independent constitutional authority, easily satisfies the intelligible-principle re-

8

1  quirement.

**A.     Section 802 Satisfies The Intelligible-Principle Requirement Because It Condi-
2           tions The Attorney General's Discretion To File A Certification Upon Specific
3           Findings Of Fact**

4       The fact that the Attorney General may file a certification only upon finding that one of

5  § 802(a)'s factual predicates exists itself satisfies the nondelegation doctrine.  By imposing this pre-

6  condition to filing a certification, Congress provided an intelligible principle to which the Attorney

7  General is directed to conform:  He cannot file a certification unless he makes the necessary factual

8  finding.  It therefore is not the case that § 802 provides "literally no guidance for the exercise of dis-

9  cretion."  *Whitman*, 531 U.S. at 474.  That Congress specifically and narrowly defined the circum-

10 stances in which the Attorney General may act, and required him to make a specific factual finding

11 as a prerequisite to filing a certification, renders this case utterly unlike *Panama Refining*, in which

12 the Court held the statute infirm in part because it provided "no definition of circumstances and con-

13 ditions" in which the President was authorized to exercise the delegated power, 293 U.S. at 430, and

14 because it did "not require any finding by the President as a condition of his action," *id*. at 415.

15      Any remaining discretion the Attorney General may retain whether to file a certification op-

16 erates in a very narrow field—the limited universe of lawsuits alleging provision of assistance to the

17 intelligence community by a particular category of defendants in which one of § 802(a)'s factual

18 prerequisites is met.  Accordingly, this case is poles apart from *Schechter*, in which the findings that

19 conditioned the President's power did not meaningfully narrow the field of his discretion, but in-

20 stead left him with a "wide field of legislative possibilities," to the point that he had essentially "un-

21 fettered discretion to make whatever laws he [thought] may be needed or advisable for the rehabili-

22 tation and expansion of trade or industry."  295 U.S. at 537–38; *see also Whitman*, 531 U.S. at 474

23 (*Schechter* was a case in which Congress "conferred authority to regulate the entire economy on the

24 basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'").

25      Congress thus sufficiently cabined the Attorney General's discretion by conditioning his

26 power to file a certification upon specific findings of fact.  If Congress were required to further con-

27 strain the Attorney General's discretion to file a certification even after having found a predicate

28 fact, scores of statutes would be invalid.  Congress routinely authorizes agencies to take discretion-

9

ary action upon finding that a specified standard has been met, without specifying the factors that the agency must consider in deciding whether to act. There are countless such statutes, of which we have provided a small sampling in Appendix A to this brief. For instance, the Controlled Substances Act provides that the Attorney General "may" temporarily add a drug to the schedule of prohibited substances if he first finds that doing so is "necessary to avoid an imminent hazard to the public safety." 21 U.S.C. § 811(h)(1). Just as here, the statute specifies the factors the Attorney General must consider in making the predicate determination, *see id*. § 811(h)(3), but it does not separately constrain the Attorney General's discretion to decline to schedule a substance after having made the predicate findings. Yet in *Touby*, the Supreme Court quickly rejected a nondelegation challenge to this regime: "[O]ne could not plausibly argue that [the] 'imminent hazard to the public safety' standard"—structurally analogous here to the predicate factual determination FISAAA specifies in § 802(a)(1)-(5)—"is not an intelligible principle." 500 U.S. at 165.

As in *Touby*, courts routinely reject nondelegation challenges to statutes that merely authorize—not command—action upon determination that certain prerequisites have been met. *See Yakus*, 321 U.S. 414 (upholding statute conferring discretionary authority on price administrator to impose price ceilings upon making specified finding); *Curtiss-Wright*, 299 U.S. 304 (upholding statute conferring discretionary authority on President to ban sale of arms to countries upon making specified finding); *New York Centr. Secs. Corp.*, 287 U.S. 12 (upholding statute conferring discretionary authority on ICC to approve acquisition of a railroad upon making specified finding); *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431 (9th Cir. 1996) (upholding statute conferring discretionary authority on President to renew embargoes upon making specified finding); *Michigan Gambling Opposition v. Kempthorne*, 525 F.3d 23, 30–33 (D.C. Cir. 2008) (upholding statute conferring discretionary authority on Secretary of Interior to acquire land for Native Americans); *Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d 119 (D.D.C. 2007) (upholding statute conferring discretionary authority on Secretary of Homeland Security to waive applicable legal requirements upon making specified finding).

For purposes of applying the nondelegation doctrine, therefore, it does not matter whether the Attorney General is *required* or merely *authorized* to file a certification upon finding that a fac-

10

MDL No. 06:1791-VRW

tual predicate exists. Plaintiffs have relied on *Field* to argue that when Congress delegates authority to the Executive to take certain action upon making specified factual findings—which they characterize as "changing the law"—the delegation is permissible only if the findings trigger a mandatory duty to act. (Dkt. 483 at 14–17). As an initial matter, the Attorney General's findings under § 802 do not change the law. They do not, for instance, enact a prospective, generally applicable legal requirement in any way analogous to the tariff requirements triggered by the President's findings in *Field*. *See supra* at 6–7; Dkt. 508 at 10–12. Like numerous other statutes, they do nothing more than trigger application of the rule Congress enacted. *See Owens*, 531 F.3d at 891 ("The Supreme Court has consistently upheld delegations, such as the one here, that predicate the operation of a statute upon some Executive Branch factfinding."); *supra* at 4 & n.2, 10, app. A. More fundamentally, *Field* held that the mandatory duty in that case was a *sufficient* condition, not a *necessary* one. *See* 143 U.S. at 693. *Field* did not hold that the only way to adequately constrain an agency's discretion is to make the Executive's duty to act mandatory; nor has any other case done so. Indeed, as explained above, numerous cases have upheld statutes conferring discretionary authority on an Executive branch official. *See supra* at 9–10. *Field* itself observed that "[h]alf the statutes on our books . . . depend[] on the discretion of some person or persons to whom is confided the duty of determining whether the proper occasion exists for executing them. But it cannot be said that the exercise of such discretion is the making of the law." *Id.* at 694. Such a conclusion here would be a radical departure from decades' worth of settled jurisprudence.

**B.** **Any Discretion Exercised By The Attorney General In Deciding Whether To File Certifications Is Further Constrained By § 802's Core Purpose Of Protecting National Security, And The Context In Which § 802 Was Promulgated**

The core purpose of § 802(a) and the context in which Congress enacted it further cabin any discretion the Attorney General might have in deciding whether to file a certification. The Supreme Court has long recognized that, in discerning whether Congress has provided an "intelligible principle," courts should look beyond the plain language of the statute to "the purpose of the Act, its factual background and the statutory context.'" *Lichter v. United States*, 334 U.S. 742, 785 (1948) (quoting *American Power & Light Co.*, 329 U.S. at 104–05). *Lichter* and *American Power & Light* endorsed consideration of a statute's purpose even at a time "when the nondelegation doctrine actu-

11

ally had some vitality." *Wileman Bros. & Elliott, Inc. v. Espy*, 58 F.3d 1367, 1384 (9th Cir. 1995), *rev'd on other grounds,* 521 U.S. 457 (1997). This approach continues to guide the courts' nondelegation inquiry today. *See, e.g., TOMAC*, 433 F.3d at 866. For example, in a series of cases, courts have rejected nondelegation challenges to the Indian Reorganization Act ("IRA"), a statute that on its face appears to embody a standardless "tautology" that the Secretary of the Interior may acquire real property interests "for the purpose of providing land for Indians." *Michigan Gambling Opposition*, 525 F.3d at 30-31. In so doing, these courts have derived the necessary "intelligible principle" from the statute's "purpose," "structure," and "broader factual context." *Id.* at 31–32.[4]

Here, any discretion the Attorney General might have in deciding whether to file a certification is cabined by Congress's purpose of protecting national security, which was critical to the immunity provision in two principal ways. First, Congress sought to address the concern that "without retroactive immunity, the private sector might be unwilling to cooperate with lawful Government requests in the future without unnecessary court involvement and protracted litigation." S. Rep. 110-209, at 10. It observed that the "possible reduction in intelligence" that could result from this delay is simply unacceptable for the safety of our Nation." *Id.* Congress thus concluded that it was appropriate to "exten[d] immunity" to electronic communication service providers that acted, if at all, "on a good faith belief that the President's program, and their assistance, was lawful." *Id.* at 9. Second, Congress recognized that "the identities of persons or entities who provide assistance to the intelligence community are properly protected as sources and methods of intelligence." *Id.* at 11. It therefore enacted a procedure that "allows a court to review a certification as to whether an individual either assisted the Government pursuant to a lawful statutory requirement or did not assist the Government, even when public disclosure of such facts would harm the national security." *Id.* at 12.

These key legislative objectives guide any exercise of discretion by the Attorney General in executing the immunity provision. And in so doing, they establish a substantive standard that is

---

[4] *See also Carcieri v. Kempthorne*, 497 F.3d 15, 42 (1st Cir. 2007) (en banc) ("[T]he historical context of the IRA is important."), *rev'd in part on other grounds*, 2009 WL 436679 (Feb. 24, 2009); *South Dakota v. Dep't of Interior*, 423 F.3d 790, 799 (8th Cir. 2005) ("[W]e conclude that an intelligible principle exists in the statutory phrase 'for the purpose of providing land for Indians' when it is viewed in the statutory and historical context of the IRA.").

plainly sufficient, when combined with the text, to satisfy the nondelegation doctrine. As noted above, in *Algonquin SNG* the Supreme Court upheld a statute authorizing the President to impose quotas and fees on imports as he deemed necessary to ensure that they did not "threaten to impair national security." 426 U.S. at 548. The Supreme Court also has upheld delegations that broadly authorize agencies to act in the "public interest," *American Trucking Ass'n*, 531 U.S. at 474, and in *Freedom to Travel*, the Ninth Circuit rejected a nondelegation challenge to a statute that permits the President to extend the embargo on trade with Cuba merely if doing so is "in the *national interest* of the United States," 82 F.3d at 1437-38 (emphasis added); *see also supra* at 8.

Moreover, with respect to the Attorney General's exercise of discretion in these cases, there can be no doubt that "the will of Congress has been obeyed." *Yakus*, 321 U.S. at 425. It was this very litigation that focused Congress's attention on the broader policy question of whether and when litigation should proceed in cases alleging the provision of assistance to the intelligence community, and so these are the paradigmatic cases in which we know that a certification would achieve the purposes of the Act. Indeed, Congress contemplated that certifications would be filed in these cases. *See* S. Rep. No. 110-209, at 7 (citing the "more than forty lawsuits relating to [the media] reported surveillance program [that] had been transferred to a district court in the Northern District of California"); *id.* at 22; *see also* Letter from Attorney General Mukasey and Director of National Intelligence McConnell to Harry Reid at 1 (June 26, 2008) (attached as Ex. 74, Dkt. 489). Under these circumstances, it is wholly implausible to contend that the Attorney General had insufficient guidance from Congress.

### C. These Considerations Are Clearly Sufficient To Satisfy The Intelligible-Principle Requirement When, As Here, Congress Has Delegated Power To The Executive In An Area In Which It Enjoys Independent Constitutional Authority

The principles derived from the statutory text, structure and purpose of § 802 would satisfy the nondelegation doctrine under any circumstances, but the constitutionality of § 802 is even more clear because the President's national-security powers are implicated. It is settled law that less is required by way of an intelligible principle when Congress delegates power in the areas of national security and foreign affairs, in which the Executive has independent constitutional authority. *E.g.*, *Loving*, 517 U.S. at 772 ("[T]he same limitations on delegation do not apply where the entity exer-

13

cising the delegated authority itself possesses independent authority over the subject matter." (internal quotation marks omitted)); *Zemel*, 381 U.S. at 17 ("Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in domestic areas.").[5]  Specifically, the President has independent constitutional authority "to classify and control access to information bearing on national security." *Department of the Navy v. Egan*, 484 U.S. 518, 527 (1988).  Whatever the metes and bounds of that authority as a general matter, what it means for nondelegation purposes is that Congress could appropriately leave the Attorney General with discretion to determine whether it is advisable to make particular filings that will generally include sensitive national-security information.  Simply put, because these cases involve national security and foreign affairs, Congress was authorized to legislate in the broadest of terms. *Cf. Knauff*, 338 U.S. at 544 (rejecting nondelegation challenge where "the Attorney General, exercising the discretion entrusted to him by Congress and the President, concluded upon the basis of confidential information that the public interest required that petitioner be denied the privilege of entry into the United States").

III.  **IF NECESSARY TO AVOID A CONSTITUTIONAL QUESTION, THE COURT SHOULD INTERPRET § 802 AS REQUIRING THE ATTORNEY GENERAL TO FILE A CERTIFICATION UPON FINDING THAT THE REQUIREMENTS OF § 802(A) ARE MET**

Plaintiffs' nondelegation argument is premised on a reading of § 802 that gives the Attorney General discretion whether to issue a certification after he has determined that the factual prerequisites are satisfied.  For the reasons explained above, there is no substantial constitutional question here that need affect the Court's interpretation of the statute.  *See Algonquin SNG*, 426 U.S. at 560 ("[W]e see no looming problem of improper delegation that should affect our reading of [the statute].").  If, however, the Court concludes that there is any serious doubt about the constitutionality of

---

[5] *See also Knauff*, 338 U.S. at 543 ("[B]ecause the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power."); *Curtiss-Wright*, 299 U.S. at 321 (emphasizing the "unwisdom of requiring Congress in this field of governmental power [foreign relations] to lay down narrowly definite standards by which the President is to be governed"); *Freedom to Travel Campaign*, 82 F.3d at 1438 ("Delegation of foreign affairs authority is given even broader deference than in the domestic arena."); *United States v. Gurrola-Garcia*, 547 F.2d 1075, 1078 (9th Cir. 1976) ("[T]he principle that Congress may delegate broad authority to the President in foreign affairs is clearly controlling law today.").

14

§ 802 under this reading of the statute, it can and must adopt a "fairly possible" construction of § 802 that would avoid any constitutional concern—namely, that § 802 *requires* the Attorney General to file a certification if he finds the factual predicates for certification.

It is a "cardinal principle of statutory interpretation" that when the constitutionality of a statute has been called into question, a court "must first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001); *see also Crowell v. Benson*, 285 U.S. 22, 62 (1932). "This approach not only reflects the prudential concern" against "needlessly confront[ing]" constitutional issues, *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988), but also "rest[s] on the reasonable presumption that Congress did not intend" the meaning "which raises serious constitutional doubt," *Clark v. Martinez*, 543 U.S. 371, 381 (2005). "It is therefore incumbent upon [the Court] to read the statute to eliminate those doubts so long as such a reading is not plainly contrary to the intent of Congress." *United States v. X-Citement Videos, Inc.*, 513 U.S. 64, 78 (1994). Courts cannot simply rewrite the plain meaning of statutes so that they "becom[e] inoperative when they approach constitutional limits," but they must adopt any "plausible" construction that would avoid a serious constitutional concern. *Clark*, 543 U.S. at 381, 384.[6]

Here, § 802(a) does not expressly state whether certification is mandatory or discretionary. It provides merely that a "civil action . . . shall be promptly dismissed, *if* the Attorney General certifies to the district court" that at least one of the five criteria in § 802(a) has been met (emphasis added). The Attorney General cannot submit a certification unless the standards of § 802(a) have been satisfied, and the word "if" simply reflects that these standards will not be met in every case. But nothing in the statute specifies whether the Attorney General may decline to certify after determining that a case is eligible for certification. The statute does not state, for instance, that the decision whether to certify is committed to the "discretion" of the Attorney General. Nor does the statute use permissive language, such as the word "may."

---

[6] Although an administrative agency may not avoid nondelegation issues by "declining to exercise" a portion of the power delegated to it, *see Whitman*, 531 U.S. at 472–473, the power of courts to avoid nondelegation questions by adopting a narrowing construction is well established, *see Mistretta*, 488 U.S. at 373 n.7.

15

While Section 802 also does not specify that certification is mandatory, what is critical for purposes of constitutional avoidance is that it fairly admits of that construction. Section 802(e) refers to the "authority and *duties* of the Attorney General" (emphasis added). The use of the word "duties" indicates that § 802 imposes some mandatory obligation on the Attorney General, but the statute does not expressly identify which of the tasks it describes are mandatory. This ambiguity could be resolved by reading § 802 as imposing on the Attorney General a "dut[y]" to certify if he finds the predicate facts, if it were necessary to construe the statute in this way in order to save its constitutionality. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (courts must "'give effect, if possible, to every clause and word of a statute'"); *United States v. LSL Biotech.*, 379 F.3d 672, 679 (9th Cir. 2004) (courts must "strive to avoid constructions that render words meaningless").

Interpreting § 802 to require certification when the Attorney General determines that the factual prerequisites are met finds further support in the longstanding rule that even expressly permissive language empowering a public official to act may impose a mandatory duty when the legislature intended the official to exercise that power in the public interest or for the benefit of a third party. In the seminal case of *Supervisors v. United States*, the Supreme Court held that "where power is given to public officers" and "the public interest or individual rights call for its exercise," "the language used, though permissive in form, is in fact peremptory." 71 U.S. 435, 446–447 (1866). "In all such cases, it is held that the intent of the legislature, which is the test, was not to devolve a mere discretion, but to impose 'a positive and absolute duty.'" *Id.* at 447. Thus, the Ninth Circuit has held that "[w]here the public interest or private right requires that a thing be done permissive language is generally construed as being mandatory." *Mullaney v. Hess*, 189 F.2d 417, 419–420 (9th Cir. 1951) (statute requiring Tax Commission to pay tax refund "if approved by the Attorney General and the Treasurer" was not discretionary; rather, "it becomes the duty of the Attorney General and the Treasurer to approve" the refund "if the requirements of the statute have been fully met"). As discussed above, Congress enacted § 802 to further the public interest of protecting national security. It also sought to protect the private right of carriers who either did not do what was alleged or acted in good faith. S. Rep. 110–209, at 9–12. *Supervisors* and its progeny therefore support a mandatory reading of the statute. *See also, e.g., United States Sugar Equalization Bd., Inc. v. P. De Ronde &*

16

*Co.*, 7 F.2d 981 (3d Cir. 1925) (where a company suffered a substantial loss as a result of actions taken at the behest and under the direction of the Department of Justice, Congress's grant of "authori[ty]" to pay compensation required payment, despite the absence of mandatory language).

Courts have not hesitated to apply constitutional avoidance to statutory language that is far more expressly permissive than § 802. The statute in *Zadvydas*, for instance, provided that aliens subject to removal within 90 days "*may* be detained beyond the removal period." 533 U.S. at 682 (emphasis added). The Court noted that "while 'may' suggests discretion, it does not necessarily suggest unlimited discretion." *Id.* at 697. "In that respect the word 'may' is ambiguous." *Id.* The statute was therefore subject to a narrowing construction that avoided the constitutional problem otherwise posed by indefinite detention. *Id.* at 689. In *United States v. Witkovich*, the Court likewise declined to adopt a "literal[]" reading of the phrase "as the Attorney General may deem fit and proper" because a narrower construction of the Attorney General's discretion would avoid "constitutional doubts." 353 U.S. 194, 195, 199 (1957). If the words "may" and "as the Attorney General may deem fit and proper" can be narrowly construed, then § 802(a) certainly can be.

To be sure, absent countervailing considerations, the broad discretion generally accorded the Executive Branch in matters of national security and foreign affairs might counsel in favor of interpreting § 802's ambiguous language as granting the Attorney General discretion. But because it is "fairly possible" for the Court to read § 802 as mandatory, the Court's "plain duty is to adopt" that construction if necessary to avoid a serious constitutional issue. *Rust v. Sullivan*, 500 U.S. 173, 190 (1991) (quoting *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J., concurring)); *see also United States ex rel. Madden v. General Dynamics Corp.*, 4 F.3d 827, 830 (9th Cir. 1993).[7]

## CONCLUSION

For the foregoing reasons and those stated in our opening brief (Dkt. 508 at 10–14), § 802 is not an unconstitutional delegation of legislative power to the Executive Branch.

---

[7] Under such a construction, the Attorney General should retain discretion to decide *when* in the course of litigation to file a certification if he has determined that the standards of § 802(a) are satisfied, and to decide whether to raise other defenses as an initial matter. But that sort of discretion is inherent in the executive function and would raise no conceivable nondelegation concern.

17

Respectfully submitted,

Dated:     February 25, 2009

SIDLEY AUSTIN LLP
David W. Carpenter     (pro hac vice)
Bradford A. Berenson  (pro hac vice)
David L. Lawson         (pro hac vice)
Edward R. McNicholas (pro hac vice)
Eric A. Shumsky          #206164
1501 K Street, N.W.
Washington, DC  20005
Tel: (202) 736-8010
Fax: (202) 736-8711
bberenson@sidley.com

By:  /s/ Bradford A. Berenson
_____
        Bradford A. Berenson

PILLSBURY WINTHROP SHAW
     PITTMAN LLP
Bruce A. Ericson         #76342
Jacob R. Sorensen       #209134
Marc H. Axelbaum       #209855
50 Fremont Street
Post Office Box 7880
San Francisco, CA  94120
Tel.: (415) 983-1000
Fax: (415) 983-1200
bruce.ericson@pillsburylaw.com

Attorneys for AT&T Corp.[8]

WILMER CUTLER PICKERING HALE
     AND DORR LLP
Randolph D. Moss       (pro hac vice)
Samir C. Jain            # 181572
Brian M. Boynton        # 222193
Catherine M.A. Carroll  (pro hac vice)
1875 Pennsylvania Ave, N.W.
Washington, DC  20006
Tel.:  (202) 663-6000
Fax:   (202) 663-6363
randolph.moss@wilmerhale.com

By:  /s/ Randolph D. Moss
_____
        Randolph D. Moss

_____

[8] The submission of this brief does not constitute a waiver of any defenses that may be available to the AT&T, BellSouth or Cingular defendants, including, but not limited to, lack of personal jurisdiction or insufficient service of process.  *See, e.g.*, AT&T Inc. Motion to Dismiss, No. 06-672 (Dkt. 79); Joint Case Management Statement, No. 06-1791 (Dkt. 61-1) at 51–52.

MUNGER, TOLLES & OLSON LLP
Henry Weissmann     # 132418
Susan R. Szabo      # 155315
Aimee A. Feinberg   # 223309
355 South Grand Avenue
35th Floor
Los Angeles, CA 90071
Tel.: (213) 683-9100
Fax: (213) 683-5150
henry.weissmann@mto.com

Attorneys for the Verizon Defendants[9]

WILLIAMS & CONNOLLY LLP
Brendan V. Sullivan, Jr.      (pro hac vice)
John G. Kester
Gilbert Greenman       (pro hac vice)
725 Twelfth Street, N.W.
Washington, DC 20005
Tel.: (202) 434-5000
Fax: (202) 434-5029
jkester@wc.com

By:  /s/ John G. Kester
_____
        John G. Kester

Attorneys for Sprint Defendants[10]

## DECLARATION PURSUANT TO GENERAL ORDER 45, § X.B

I, Marc H. Axelbaum, hereby declare pursuant to General Order 45, § X.B, that I have ob-

tained the concurrence in the filing of this document from the other signatories listed above.

I declare under penalty of perjury that the foregoing declaration is true and correct.

Executed on February 25, 2009, at San Francisco, California.

By:  /s/ Marc H. Axelbaum
_____
        Marc H. Axelbaum

Attorney for the AT&T Defendants

_____

[9] The submission of this brief is not a waiver of any defenses that may be available to the Verizon Defendants, including, but not limited to, lack of personal jurisdiction or insufficient service of process. *See, e.g.*, Verizon Communications Inc. and MCI, LLC Motion to Dismiss (Dkt. 268); Joint Case Management Statement, No. 06-1791 (Dkt. 61-1) at 51–52. Verizon Communications Inc. and MCI, LLC continue to contest that they are subject to personal jurisdiction in the cases at issue in their motion to dismiss for lack of personal jurisdiction (Dkt. 268).

[10] The submission of this brief is not a waiver of any defenses that may be available to the Sprint Defendants, including, but not limited to, lack of personal jurisdiction or insufficient service of process. *See, e.g.*, Joint Case Management Statement, No. 06-1791 (Dkt. 61-1) at 51–52.