1   CINDY COHN (SBN 145997)              HARVEY GROSSMAN
    cindy@eff.org                       ADAM SCHWARTZ
2   LEE TIEN                            ROGER BALDWIN FOUNDATION OF
    KURT OPSAHL                         ACLU
3   KEVIN S. BANKSTON                   180 North Michigan Avenue
    CORYNNE MCSHERRY                    Suite 2300
4   JAMES S. TYRE                       Chicago, IL 60601
    ELECTRONIC FRONTIER FOUNDATION      Telephone:  (312) 201-9740
5   454 Shotwell Street                 Facsimile:  (312) 201-9760
    San Francisco, CA 94110
6   Telephone:  (415) 436-9333          Counsel For AT&T Class Plaintiffs And
    Facsimile:  (415) 436-9993          Co-Lead Coordinating Counsel
7
    Counsel For AT&T Class Plaintiffs And   ANN BRICK
8   Co-Lead Coordinating Counsel        AMERICAN CIVIL LIBERTIES UNION
                                        FOUNDATION OF NORTHERN
9   RICHARD R. WIEBE (SBN 121156)       CALIFORNIA
    LAW OFFICE OF RICHARD R. WIEBE      39 Drumm Street
10  425 California Street, Suite 2025   San Francisco, CA 94111
    San Francisco, CA 94104            Telephone: (415) 621-2493
11  Telephone:  (415) 433-3200          Facsimile:  (415) 255-8437

12  Counsel for AT&T Class Plaintiffs   Counsel for Plaintiffs in *Campbell v. AT&T* and
                                        *Riordan v. Verizon Communications Inc.*
13  ARAM ANTARAMIAN
    LAW OFFICE OF ARAM ANTARAMIAN
14  1714 Blake Street
    Berkeley, CA 94703                  [Additional Counsel on Last Page]
15  Telephone: (510) 841-2369

16  Counsel For AT&T Class Plaintiffs

17

18              UNITED STATES DISTRICT COURT

19          FOR THE NORTHERN DISTRICT OF CALIFORNIA

20                 SAN FRANCISCO DIVISION

21  IN RE NATIONAL SECURITY AGENCY          )   MDL Docket No. 06-1791 VRW
    TELECOMMUNICATIONS RECORDS              )
    LITIGATION, MDL No. 1791                )   **MDL PLAINTIFFS'**
22                                          )   **SUPPLEMENTAL BRIEF**
                                            )   **OPPOSING THE MOTION OF**
23  This Document Relates To:  All Cases Except:  )  **THE UNITED STATES SEEKING**
    *Al-Haramain Islamic Foundation, Inc. v. Bush*,  )  **SUMMARY JUDGMENT UNDER**
24  No. 07-0109; *Center for Constitutional Rights v.*  )  **50 U.S.C. § 1885a, PURSUANT TO THE**
    *Bush*, No. 07-1115; *Guzzi v. Bush*, No. 06-  )  **COURT'S FEBRUARY 11, 2009**
25  06225; *Shubert v. Bush*, No. 07-0693; *Clayton v.*  )  **SUPPLEMENTAL BRIEFING ORDER**
    *AT&T Commc'ns of the Southwest*, No. 07-1187; )
26  *U.S. v. Adams*, No. 07-1323; *U.S. v. Clayton*, No. )
    07-1242; *U.S. v. Palermino*, No. 07-1326; *U.S. v.* )  Courtroom:  6, 17th Floor
27  *Rabner*, No. 07-1324; *U.S. v. Volz*, No. 07-1396; )  Judge:      The Hon. Vaughn R. Walker
    *McMurray v. Verizon Communications, Inc.* No.  )
28  09-0131                                 )
                                            )

Dockets.Justia.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................................................iii

INTRODUCTION ..............................................................................................................1

ARGUMENT .....................................................................................................................1

I.  Section 802 Is Unconstitutional Because It Does Not Contain Any Intelligible Principle Governing The Attorney General's Exercise Of His Discretion .................................1

    A.  Congress Created An Unprecedented Statute Unambiguously Granting The Attorney General The Power To Change The Law Governing Private Lawsuits Without Limiting Or Guiding His Discretion .................................................................................3

    B.  In Section 802, Congress Unconstitutionally Abdicated Its Legislative Power To The Attorney General ...............................................................................................3

        1.  The Non-Delegation Doctrine Protects the Separation of Powers..........................3

        2.  Unlike the Usual Nondelegation Case, Congress Here Provided No Guidance to the Attorney General .............................................................................4

II. Section 802 Cannot Be Saved From Unconstitutionality........................................9

    A.  Section 802 Cannot Plausibly Be Construed To Impose Limitations On The Discretionary Power To Change Law That It Grants The Attorney General ...................................9

        1.  Section 802 Does Not Mandate That the Attorney General Examine or Certify All Cases Falling Within Subsections (a)(1)-(5)...........................................9

        2.  Congress Knows How to Draft a Statutory Mandate..............................11

        3.  Subsections (a)(1)-(5) Do Not Provide Guidance to The Attorney General............13

        4.  The Canon of Constitutional Avoidance Does Not Permit A Court To Rewrite Section 802 To Supply The Standards And Intelligible Principle That Congress Omitted....................................................................................................14

        5.  Legislative History Cannot Be Used To Rewrite Congress' Unambiguous Grant Of Unlimited Discretion To The Attorney General.....................................15

    B.  The Attorney General's Exercise Of His Discretion To File A Certification In These Actions Cannot Cure Congress' Failure To Impose Any Standard Or Intelligible Principle ....................................................................................................18

III.  Section 802 Is Also An Unconstitutional Delegation Because The Discretionary Power Granted To The Attorney General Is The Nondelegable Power To Change Previously-Enacted Law......................................................................................18

CONCLUSION ................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Alabama v. Bozeman*, 533 U.S. 146 (2001) ................................................................... 11

*Almendarez-Torres v. United States*, 523 U.S. 224 (1998) ........................................... 14

*Bd. of Governors of the Federal Reserve Bd. v Dimension Finance Corp.*, 474 U.S. 361 (1986) .. 16

*BedRoc Ltd., LLC v. United States*, 541 U.S. 176 (2004) ............................................. 15

*City of New York v. Beretta*, 524 F.3d 384 (2d Cir. 2008) ..................................... 10, 11

*Clark v. Martinez*, 543 U.S. 371 (2005) .................................................................. 1, 14

*Clinton v. City of New York*, 524 U.S. 417 (1998) ............................................ 5, 8, 18, 19

*Connecticut National Bank v. Germain*, 503 U.S. 249 (1992) ...................................... 15

*Currin v. Wallace*, 306 U.S. 1 (1939) ............................................................................ 6

*Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d 119 (D.D.C. 2007) ......................... 8

*Ecology Center v. Castaneda*, 426 F.3d 1144 (9th Cir. 2005) ..................................... 11

*FCC v. NextWave Personal Communications, Inc.*, 537 U.S. 293 (2003) ...................... 11

*George Moore Ice Cream Co. v. Rose*, 289 U.S. 373 (1933) ....................................... 14

*Hepting v. AT&T Corp.*, 439 F. Supp. 2d 974 (N.D. Cal. 2006) .................................... 6

*ICC v. New York, N. H. & H. R. Co.*, 287 U.S. 178 (1932) ........................................ 17

*In re Consolidated United States Atmospheric Testing Litigation v. Livermore Labs*, 820 F.2d 982 (9th Cir. 1987) .......................................................................................... 12

*In re National Security Agency Telecommunications Records Litigation*, 564 F. Supp. 2d 1109 (N.D. Cal. 2008) ...................................................................................... 6

*Int'l Union UAW v. OSHA*, 938 F.2d 1310 (D.C. Cir. 1991) ......................................... 4

*International Brotherhood of Elec. Workers, Local Union No. 474, AFL-CIO v. NLRB*, 814 F.2d 697 (1987) ............................................................................................... 13

*J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928) .................................. 2

*Jones v. United States*, 137 U.S. 202 (1890) ................................................................ 8

*Lamie v. United States Trustee*, 540 U.S. 526 (2004) ................................................. 16

-iii-

No. M-06-01791-VRW    MDL PLAINTIFFS' SUPPLEMENTAL BRIEF PURSUANT TO THE
COURT'S FEBRUARY 11, 2009 SUPPLEMENTAL BRIEFING ORDER

*Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998) ............................ 11

*Loving v. United States*, 517 U.S. 748, 771 (1996) ........................................................1, 7, 15

*Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892)...........................................1, 4, 5, 8

*Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise*, 501 U.S. 252 (1991) .... 19

*Mistretta v. United States*, 488 U.S. 361 (1989) .............................................................. 2, 5

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) ............................................. 17

*Owens v. Republic of the Sudan*, 531 F.3d 884 (D.C. Cir. 2008)................................................ 7, 8

*Panama Canal Co. v. Grace Line, Inc.*, 356 U.S. 309 (1958) ...................................................... 17

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) ........................................................... 3

*Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206 (1998) .............................................. 14

*Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429 (1992).......................................................... 11

*Rodriguez v United States*, 480 U.S. 522 (1987)..................................................................... 16

*Shannon v. United States*, 512 U.S. 573 (1994) ...................................................................... 13

*Touby v. United States*, 500 U.S. 160 (1991) ......................................................... 2, 4, 5

*U.S. v. Frank*, 956 F.2d 872 (9th Cir. 1991) .......................................................................... 13

*United States v. Locke*, 471 U.S. 84 (1985) ........................................................................... 14

*United States v. Robel*, 389 U.S. 258 (1967)........................................................................... 3

*United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989) ................................................. 16

*United States. v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483 (2001) ...................................... 14

*Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001)....................................................passim

*Wilbur v. United States*, 281 U.S. 206 (1930)........................................................................ 17

*Yakus v. United States*, 321 U.S. 414 (1944) .............................................................1, 2, 3, 17

**Statutes**

15 U.S.C. § 7902................................................................................................................ 11

21 U.S.C. § 811(c) ............................................................................................................. 5

21 U.S.C. § 811(h)(1) ......................................................................................................... 4

-iv-

No. M-06-01791-VRW     MDL PLAINTIFFS' SUPPLEMENTAL BRIEF PURSUANT TO THE
COURT'S FEBRUARY 11, 2009 SUPPLEMENTAL BRIEFING ORDER

21 U.S.C. § 811(h)(3) .................................................................................... 5

21 U.S.C. § 812(b)(1) .................................................................................... 5

22 U.S.C. § 2371(a) ....................................................................................... 7

22 U.S.C. § 2656f(a)(1)(B) ........................................................................... 7

22 U.S.C. § 2656f(a)(2) ................................................................................. 7

22 U.S.C. § 2656f(b)(2) ................................................................................. 7

22 U.S.C. § 2656f(b)(3) ................................................................................. 7

22 U.S.C. § 2656f(d)(5) ................................................................................. 7

28 U.S.C. § 2679 ........................................................................................... 12

28 U.S.C. former § 1605(a)(7) ...................................................................... 8

50 U.S.C, App. § 2405(j)(5) ........................................................................... 7

50 U.S.C. § 1885a ..................................................................................passim

50 U.S.C. § 2783(b)(2) ................................................................................. 12

50 U.S.C. § 2783(c) ...................................................................................... 12

50 U.S.C. App. § 2405(j)(1)(A) ..................................................................... 7

-v-

No. M-06-01791-VRW     MDL Plaintiffs' Supplemental Brief Pursuant To The
                        Court's February 11, 2009 Supplemental Briefing Order

# INTRODUCTION

The Court has requested supplemental briefing from the parties on whether section 802 of the Foreign Intelligence Surveillance Act of 1978 ("FISA"), codified at 50 U.S.C. § 1885a, is an unconstitutional delegation of Congress' legislative powers. (February 11, 2009, Order (Dkt. 559)).

Section 802 is a *sui generis* statute. Using unambiguous terms, Congress abdicated to the Attorney General its power to change the law governing these actions without providing any standard or intelligible principle to govern the Attorney General's exercise of this power. Section 802 grants complete discretion to the Attorney General: first to decide whether or not to investigate a case; and, second, to decide whether to grant or deny an immunity certification that effectively determines the fate of the meritorious constitutional and statutory privacy claims of millions of Americans. Not only is the Attorney General under no obligation to exercise his discretion, the statute "provide[s] literally no guidance for the exercise of discretion." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 474 (2001). Because section 802 lacks any standard or intelligible principle for the Attorney General to follow, "it [is] impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." *Yakus*, 321 U.S. at 426.

No amount of wishful thinking or argument from the government or the carriers can change this unambiguous, though unconstitutional, meaning of section 802. The lack of guidance is plain on the face of the statute, creating no basis for resort to interpretations that would rewrite the statute, the legislative history, or the doctrine of constitutional avoidance. Because Congress improperly granted its legislative power to the Attorney General, giving him standardless discretion to change the existing law governing these lawsuits, section 802 violates the nondelegation doctrine and the statute must be held unconstitutional.

# ARGUMENT

## I. Section 802 Is Unconstitutional Because It Does Not Contain Any Intelligible Principle Governing The Attorney General's Exercise Of His Discretion

The Supreme Court has held that, for Congress to validly confer decisionmaking authority upon the Executive, it must impose an "intelligible principle" to which the Executive must

-1-

conform:

> In a delegation challenge, the constitutional question is whether the statute has delegated legislative power to the agency. Article I, § 1, of the Constitution vests 'all legislative Powers herein granted . . . in a Congress of the United States.' This text permits no delegation of those powers, and so we repeatedly have said that when Congress confers decisionmaking authority upon agencies Congress must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'

*Whitman,* 531 U.S. at 472-73 (citations omitted).

The intelligible-principle rule seeks to enforce the understanding that Congress may not delegate the power to make laws and so may delegate no more than the authority to set policies and rules that implement its statutes. *Loving v. United States*, 517 U.S. 748, 771 (1996) (citing *Marshall Field & Co. v. Clark*, 143 U.S. 649, 693-694 (1892)). "It does not suffice to say that Congress announced its will to delegate certain authority. Congress as a general rule must also 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.' " *Loving*, 517 U.S. at 771 (quoting *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928) and citing *Touby v. United States*, 500 U.S. 160, 165 (1991)).

In *Yakus*, the Supreme Court set out the following test of whether an unconstitutional delegation of legislative power has occurred:

> [T]he only concern of courts is to ascertain whether the will of Congress has been obeyed. This depends not upon the breadth of the definition of the facts or conditions which the administrative officer is to find but upon the determination whether the definition sufficiently marks the field within which the Administrator is to act so that it may be known whether he has kept within it in compliance with the legislative will.

*Yakus*, 321 U.S. at 425. The Court continued: "Only if we could say that there is an *absence of standards* for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed, would we be justified in overriding its choice of means for effecting its declared purpose . . . ." *Id*. at 426 (emphasis added)

*Yakus* thus makes clear that section 802 must state an "intelligible principle" that imposes limits on the Executive's discretion and that provides a judicially administrable standard that courts can use to decide whether the Executive has obeyed the limits imposed on its discretion. *Accord Touby*, 500 U.S. at 168; *Mistretta v. United States*, 488 U.S. 361, 379 (1989).

-2-

**A.    Congress Created An Unprecedented Statute Unambiguously Granting The Attorney General The Power To Change The Law Governing Private Lawsuits Without Limiting Or Guiding His Discretion**

"[T]he first step in assessing whether a statute delegates legislative power is to determine what authority the statute confers." *Whitman*, 531 U.S. at 465. Section 802 does not require the Attorney General to do anything and it provides no standards for him in choosing whether to do something or why.

First, the Attorney General is not required to examine whether any "civil action . . . against any person for providing assistance to an element of the intelligence community" (§ 802(a)) falls within the class of cases listed in subsections (a)(1)-(5). Second, even if he does examine a lawsuit and determines that it is eligible under subsections (a)(1)-(5), he need not file a certification. The statute says only that "*if* the Attorney General certifies," then the "civil action may not lie or be maintained . . . and shall be promptly dismissed." § 802(a) (emphasis added). That phrase, "*if* the Attorney General certifies," refers to an event that is wholly within the Attorney General's power. Missing from the plain text of section 802 is any set of criteria or standards to guide and limit the Attorney General's discretion. He can examine, or refuse to examine, any particular civil action; he can file or choose not to file a section 802(a) certification for any reason or for no reason at all. Congress "provided literally no guidance for the exercise of discretion" by the Attorney General under section 802. *Whitman*, 531 U.S. at 474.

**B.    In Section 802, Congress Unconstitutionally Abdicated Its Legislative Power To The Attorney General**

**1.    The Non-Delegation Doctrine Protects the Separation of Powers**

The "absence of standards" governing the Attorney General's discretion creates the situation that the *Yakus* court cautioned against: this Court cannot determine whether or not, in a particular instance, "the will of Congress has been obeyed" because Congress did not state its will "by legislative act." *J.W. Hampton*, 276 U.S. at 409. Instead, the former Attorney General exercised *his* will when he filed his certification, and he filed it for whatever reasons he chose.

The requirement that Congress express its will in statutory language is not a mere formality. It goes to the heart of the nondelegation doctrine: requiring Congress, not the Executive, to make

-3-

the basic policy decisions about which laws apply and to whom. Under section 802, "Congress left the matter to the [Attorney General] without standard or rule, to be dealt with as he pleased." *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 418 (1935).

Limits on delegations of power, by preventing Congress from handing over its lawmaking power to the Executive without any limits, foster the political processes that hold Congress accountable for fundamental policy choices. Open-ended delegations are objectionable because they unconstitutionally permit responsibility for making fundamental policy choices to pass out of the hands of Congress and thereby undermine this electoral check. "[F]ormulation of policy is a legislature's primary responsibility, entrusted to it by the electorate, and to the extent Congress delegates authority under indefinite standards, this policy making function is passed on to other agencies, often not answerable or responsive to the same degree to the people." *United States v. Robel,* 389 U.S. 258, 276 (1967) (Brennan, J., concurring).

Standardless delegations also allow the Executive to aggrandize power. The Attorney General's unlimited discretion allows him to withhold filing a certification for an eligible defendant in order to make a deal or to punish, or to conceal past Executive law-breaking or crimes committed by specific government offficials. Such unrestrained latitude "leaves opportunities for dangerous favoritism." *Int'l Union UAW v. OSHA*, 938 F.2d 1310, 1318 (D.C. Cir. 1991).

> **2.** **Unlike the Usual Nondelegation Case, Congress Here Provided No Guidance to the Attorney General**

This case is unlike the usual nondelegation case, where Congress stated a principle in the statutory text and the question is whether the principle stated in the statutory text is intelligible. Here, Congress was completely silent. In *Whitman*, *Touby*, and *Field*, for example, Congress stated principles in the relevant statutes that the Executive was to apply in deciding whether and how to use the power delegated by Congress. In *Whitman*, Congress delegated power to the Environmental Protection Agency to set air pollution standards that: were "requisite to protect the public health"; were "based on [scientific air quality] criteria" "accurately reflect[ing] the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air, in varying

-4-

quantities"; and "allow[ed] an adequate margin of safety." *Whitman*, 531 U.S. at 465-66, 472-73, 475-76 (statutory citations omitted).

In *Touby*, Congress also gave detailed instructions on how the discretionary power it granted was to be exercised. *Touby*, 500 U.S. at 163. The statute at issue permits the Attorney General to temporarily add a drug to the schedule of controlled substances only if he "finds that the scheduling of a substance in schedule I on a temporary basis is necessary to avoid an imminent hazard to the public safety." 21 U.S.C. § 811(h)(1). In deciding whether there is an "imminent hazard to the public safety" justifying adding a drug to the schedule, "the Attorney General shall be required to consider" the factors of the drug's "history and current pattern of abuse," "the scope, duration, and significance of abuse," "what, if any, risk there is to the public health," "actual abuse, diversion from legitimate channels, and clandestine importation, manufacture, or distribution." 21 U.S.C. § 811(h)(3) (incorporating by reference factors (4), (5), and (6) of 21 U.S.C. § 811(c)). *Touby*, 500 U.S. at 166. In addition, the Attorney General was required to decide whether the drug "has a high potential for abuse," whether it "has no currently accepted medical use in treatment in the United States," and whether "there is a lack of accepted safety for use of the drug . . . under medical supervision." 21 U.S.C. § 812(b)(1); *Touby*, 500 U.S. at 166-67.

The tariff suspension statute in *Field* also imposed detailed conditions upon the exercise of the delegated power. It compelled the President to suspend certain tariffs upon the occurrence of certain triggering facts (i.e., when another country raised its tariffs on the same product); once those facts occurred, he had no discretion whether to suspend the tariffs. "[W]hen enacting the statutes discussed in *Field*, Congress itself made the decision to suspend or repeal the particular [tariff] provisions at issue upon the occurrence of particular events subsequent to enactment, and it left only the determination of whether such events occurred up to the President." *Clinton v. City of New York*, 524 U.S. 417, 445 (1998).[1]

Moreover, *Whitman*, *Touby*, and *Field* are all cases in which Congress provided a standard

---

[1] *See also Mistretta*, 488 U.S. at 374-79 (Supreme Court upheld delegation of the task of developing sentencing guidelines to the United States Sentencing Commission because Congress provided the Commission with highly specific and detailed guidance).

by which the Executive was to investigate and act on facts not then known to Congress. *See*, *e.g.*, *Clinton*, 524 U.S. at 443 (in *Field*), "the exercise of the [tariff] suspension power was contingent upon a condition that did not exist when the Tariff Act was passed"). Whatever justification there may be for delegation under a broad and general standard when the facts upon which the Executive is to act have not come into existence at the time Congress legislates, that justification is absent here, where the surveillance has now been ongoing for many years. The Senate Select Committee on Intelligence reported that the facts concerning the carriers' surveillance at the behest of the government were known to it before section 802 was drafted, yet Congress imposed no standard at all, not even an extremely broad one, to govern the Attorney General's discretion.

The Attorney General's role under section 802 is neither the filling of interstitial gaps nor the identification of triggering contingencies, but rather changing the existing law that would otherwise govern these cases. [2]

Nor can the standardless delegation of section 802 be justified, as the carriers suggest (Carriers' Br. at 3-6), by reference to cases involving the President's exercise of inherent constitutional power over foreign relations with other nations or his inherent power to regulate and control the military forces. First, despite the efforts of the government and the carriers to blur the difference, the President's inherent powers over foreign relations and the military do not extend to

_____

[2] *Currin v. Wallace*, 306 U.S. 1 (1939) (Carriers' Br. at 12, 13), also is not applicable to the nondelegation question here. In that case, Congress had created a rule requiring tobacco grading inspections for growers at certain tobacco auction markets; it made the inspection requirement applicable to a particular auction market only if two-thirds of the tobacco growers using that market who would be subject to the inspection requirement voted in favor of the requirement in a referendum. The Supreme Court held that the referendum provision was not an unconstitutional delegation of legislative power to the growers. "Here it is Congress that exercises its legislative authority in making the regulation and in prescribing the conditions of its application. The required favorable vote upon the referendum is one of these conditions." *Id*. at 16. As to the delegation to the Secretary of Agriculture of the power to investigate and establish the standards for grading tobacco, the Court found that Congress had adequately specified the principles under which the Secretary was to act: "Congress has set forth its policy for the establishment of standards for tobacco according to type, grade, size, condition, and other determinable characteristics. The provision that the Secretary shall make the necessary investigations to that end and fix the standards according to kind and quality is plainly appropriate and conforms to familiar legislative practice . . . ." *Id*. at 16-17.

the warrantless dragnet electronic surveillance and interception within the United States of the domestic communications of millions of American citizens who have no connection to any foreign power. The President has no inherent constitutional authority to conduct such activities, as this Court has held, *Hepting v. AT&T Corp.*, 439 F. Supp.2d 974, 1006 (N.D. Cal. 2006); *see also In re Nat'l Security Agency Telecom. Records Litig.*, 564 F. Supp.2d 1109, 1121 (N.D. Cal. 2008), nor to order the courts to terminate litigation challenging such activities.[3]

Second, even in foreign relations and military cases, Congress can and has set standards for the exercise of executive discretion. In *Loving*, for instance, Congress had expressly delegated to the President the authority to establish rules for courts martial and to set limitations on the penalties for military crimes. The Supreme Court approved the President's exercise of this delegated power for the purpose of defining capital sentencing aggravating factors in crimes committed by military service members, given the President's constitutional authority as Commander in Chief to establish and supervise military discipline and courts martial. It noted that "the same limitations on delegation do not apply 'where the entity exercising the delegated authority itself possesses independent [constitutional] authority over the subject matter.' " *Loving*, 517 U.S. at 772. "The delegated duty, then, is interlinked with duties already assigned . . . by express terms of the Constitution . . . ." *Id*. This narrow exception has no application here, for the President and the Attorney General have no independent authority "already assigned . . . by express terms of the Constitution" to abolish causes of action between private citizens or to conduct warrantless surveillance outside the bounds of the Fourth Amendment and statute.

For similar reasons, *Owens v. Republic of the Sudan*, 531 F.3d 884, 890 (D.C. Cir. 2008), upon which the carriers rely (Carriers' Br. at 11), has no application here. There were a number of statutes in play in *Owens* that required the Secretary of State to make an annual factual determination of which countries supported terrorist groups—a determination within the Executive's inherent constitutional authority over foreign relations. Congress then established the

---

[3] Indeed, inability of the executive to dismiss these cases on its own authority shows that the power granted by section 802 is not an executive power.

-7-

consequences of such a finding through multiple pieces of legislation. Thus, under different sets of statutes involved in *Owens*, the Secretary of State must apply detailed statutory standards to fulfill a mandatory duty to prepare an annual report identifying, for any "known international terrorist group," every country that supports that terrorist group or allows its territory to be used by a terrorist group. 22 U.S.C. § 2656f(a)(2), (b)(3) and 22 U.S.C. § 2656f(a)(1)(B), (b)(2), & (d)(5), respectively. She then has the duty to curtail exports and restrict foreign aid to that she determines have repeatedly provided support for acts of terrorism. 50 U.S.C. app. § 2405(j)(1)(A), (j)(5); 22 U.S.C. § 2371(a).

The statute at issue in *Owens* involved a further, collateral consequence arising out of the Secretary's determination that a given country was a state-supporter of terrorism: that country could not seek the dismissal of civil actions against it on the basis of sovereign immunity for terrorism-related causes of action. 28 U.S.C. § 1605(a)(7) (repealed 2008)); *Owens*, 531 F.3d at 888. The statute operates automatically once the Secretary makes a terrorism determination; the waiver of sovereign immunity does not depend upon the Secretary's submitting the determination to the court, and the Secretary has no discretion over whether or not the determination should have collateral jurisdictional consequences. *Owens*, 531 F.3d at 888.

As the D.C. Circuit noted in *Owens*, the statute at issue there was similar to the tariff suspension statute in *Field* that compelled the President to suspend certain tariffs upon the occurrence of certain triggering facts. *Owens*, 531 F.3d at 891-92. So, too, in *Owens*, Congress decided to create an exception to the law governing sovereign immunity to other countries upon the occurrence of triggering events, namely that a country repeatedly provided support for international terrorism. Similar to the Supreme Court's analysis in *Loving*, the *Owens* court further noted that designating a country as terrorism supporter falls with the Executive's inherent constitutional authority over foreign relations and held that this was an additional ground supporting Congress' delegation. *Owens*, 531 F.3d at 891-93. [4]

---

[4] *Jones v. United States*, 137 U.S. 202 (1890), another case cited by the carriers (Carriers' Brief at 12 n.18), also involved the foreign relations power. In *Jones*, the President was delegated the power to declare certain islands as "appertaining" to the United States if they met the
*(footnote continued on following page)*

-8-

In section 802, by contrast, the Attorney General not only makes factual determinations if he chooses regarding a carrier's assistance to the intelligence community, but also possesses the unilateral authority to confer immunity as he chooses. The authority to confer or deny immunity in a civil action between U.S. citizens cannot be accurately characterized as having anything to do with the Executive's inherent constitutional authority over foreign relations or any other power set forth in Article II to the U.S. Constitution.

## II.    Section 802 Cannot Be Saved From Unconstitutionality

### A.    Section 802 Cannot Plausibly Be Construed To Impose Limitations On The Discretionary Power To Change Law That It Grants The Attorney General

#### 1.    Section 802 Does Not Mandate That the Attorney General Examine or Certify All Cases Falling Within Subsections (a)(1)-(5)

In an attempt to avoid the nondelegation problem, the Carriers and the Government now contend that the statute creates a mandate on the Attorney General. Yet when section 802 was first enacted, the government and the carriers agreed that the Attorney General has absolute discretion, and that his filing a certification changes the law governing these lawsuits between private parties.

---

*(footnote continued from preceding page)*
congressionally-mandated standard of being a guano island and not possessed by any other country; under the statute, such a determination automatically extended federal criminal jurisdiction to the island. *See Jones*, 137 U.S. at 209-11; *Owens*, 531 F.3d at 892. *Jones*, moreover, was not a delegation case but instead held that the executive determination of sovereignty was a nonjusticiable political question. *Jones,* 137 U.S. at 212.

This is also not a case where Congress has given the Executive the power to waive procedural steps Congress has otherwise imposed on executive action, as it did in the statute at issue in *Defenders of Wildlife v. Chertoff*, 527 F. Supp.2d 119 (D.D.C. 2007). In that case, Congress had mandated that the Secretary of Homeland Security build a border fence by a statutory deadline of December 31, 2008; it had also given the Secretary discretion to waive procedural steps Congress had imposed by other statutes, such as the environmental impact statement requirement of the National Environmental Policy Act. *Id*. at 121. However, unlike here, Congress constrained the Secretary's discretion: "In order to exercise the waiver authority . . . , Congress has required the Secretary to determine if the waiver is 'necessary to ensure expeditious construction of the barriers and roads . . . .' " *Id*. at 127. In addition, that case, unlike this one, involved the Executive's inherent foreign relations power to secure the borders and control entry into the United States. *Id*. at 129. Finally, allowing the Executive to waive procedural steps before carrying out an unequivocal mandate from Congress is far different from section 802, where Congress intentionally refrained from deciding whether to change the law governing actions falling within subsections (a)(1)-(5).

-9-

Jt. Case Mgmt. Stmt. (Dkt. 466) at 21:3-5 ("Congress left the issue of whether and when to file a certification to the discretion of the Attorney General"); *id.* at 22 n.16 ("Nothing in the Act requires the Attorney General to exercise his discretion to make the authorized certifications, and until he actually decides to invoke the procedures authorized by Congress, the Act would have no impact on this litigation").

Once plaintiffs pointed out that the standardless discretion of section 802 violates the nondelegation doctrine, however, the government and the carriers reversed course. In their briefs filed on November 5, 2008, they claimed that section 802 mandates the dismissal of every case falling within (a)(1)-(5) and gave the Attorney General no discretion at all to withhold a certification in such cases. Gov't Reply (Dkt. 520) at 1:7-10 ("Congress concluded that those companies [i.e., the carrier defendants here] should not face further litigation if they provided such assistance pursuant to a court order or a written certification, directive, or request from a senior government official, or did not provide the alleged assistance"); *id.* at 9:10-13 ("Congress . . . made it clear that dismissal was *required* where provider assistance or non-assistance satisfied the conditions in Section 802(a)") (emphasis added).[5]

The carriers also contend that Congress imposed a mandatory, nondiscretionary duty upon the Attorney General to file a certification in every case falling within subsections (a)(1)-(5). They assert that section 802 created mandatory "new immunity defenses that apply *generally* to claims

---

[5] The government is still not entirely consistent in its view that section 802 requires the dismissal of every case falling within subsections (a)(1)-(5). At one point, it concedes that "the Attorney General is not *required* to make the certification" (Gov't Reply at 11:12-14) and that doing so "constitutes an exercise of executive discretion" (*id.* at 11:14-15), characterizing it as the discretion to present evidence that would otherwise be subject to the state secrets privilege. *See also id.* at 11:26-27 ("if the Attorney General had exercised his discretion not to invoke Section 802 in this litigation"). While plaintiffs appreciate the concession that filing pursuant to section 802 waives the state secrets privilege, if the government means to argue that section 802 requires the dismissal of every lawsuit falling under subsections (a)(1)-(5), whether or not the Attorney General files a certification, and that a certification is only one of several possible means of producing evidence showing that a lawsuit falls within subsections (a)(1)-(5), that argument is foreclosed by the unequivocal language of section 802. Dismissal under section 802 is authorized only "if the Attorney General certifies to the district court." § 802(a). When a court dismisses an action under section 802, it is the "certification under subsection (a)" that is being "given effect." § 802(b)(1). No certification, no dismissal.

-10-

of unlawful electronic surveillance against a specified class of private defendants" and "*whenever* § 802's requirements are met, whether here or in another case years from now.*" Carriers' Br. (Dkt. 508) at 9:2-3; 9:5-6 (emphasis added). They add: "Congress . . . imposed on the Attorney General the responsibility to determine when evidence exists that would satisfy the statutory standards and to submit that evidence to a court.*" *Id*. at 2:9-11. Yet none of this is reflected in the statute's text, and the government and the carriers have never even attempted any reasoned exegesis of the text of section 802 that would demonstrate it imposes any mandatory duty.[6]

### 2.  Congress Knows How to Draft a Statutory Mandate

Congress most certainly knows how to draft statutory language mandating the unconditional dismissal of lawsuits, either by category or individually. *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 395 (2d Cir. 2008), for example, upheld a statute directing the dismissal of an entire category of lawsuits: those brought against gun manufacturers. That statute provides:

> (a)  In general. A qualified civil liability action may not be brought in any Federal or State court.
>
> (b)  Dismissal of pending actions. A qualified civil liability action that is pending on the date of enactment of this Act *shall* be immediately dismissed by the court in which the action was brought or is currently pending.

15 U.S.C. § 7902 (emphasis added).

Congress did not grant any discretion in section 7902. Instead, Congress "set[] forth a new legal standard to be applied to *all* actions." *Beretta*, 524 F.3d at 395 (emphasis added).   Congress used the word "shall" to convey that its command was mandatory.  "The word 'shall' is ordinarily 'the language of command.' " *Alabama v. Bozeman*, 533 U.S. 146, 153 (2001) (*some internal*

---

[6] The assertion that in section 802 Congress mandated the certification and dismissal of every case falling within subsections (a)(1)-(5) permeates the carriers' brief:  "Congress expressed its policy judgment that no suits should lie against carriers in certain carefully defined circumstances" (Carrier's Brief at 13:12-13); "These immunities apply to pending or future cases brought against providers based upon alleged past, present, or future conduct (or the absence thereof) that meets the statutory standards." (*id*. at 1:17-18); "Section 802 specifies circumstances under which Congress concluded that it is contrary to the national interest to allow certain litigation against a defined class of defendants." (*id*. at 8:7-8).

-11-

quotation marks omitted); *see e.g. Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("The mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion.").

If Congress had intended section 802 to be a mandatory rule of dismissal, it could have easily structured section 802 as it structured section 7902, mandating that it apply to every civil action falling within the class of cases defined by subsections (a)(1)-(5). *FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 302 (2003) (when Congress has intended to create exceptions to bankruptcy law requirements, "it has done so clearly and expressly"). For example, Congress could have said that in any civil action against any person for providing assistance to an element of the intelligence community, the Attorney General "shall" determine whether one of the circumstances set forth in subsections (a)(1)-(5) exists and, if so, "shall" file a certification. Congress did not do so, however. The juxtaposition of Congress' use of the mandatory "shall" and the wholly discretion "if" in section 802 is striking: "a civil action . . . *shall* be dismissed, *if* the Attorney General certifies . . ." (emphasis added).[7]

On occasion, Congress has been even more specific in changing the law applicable to pending lawsuits. In the statutes at issue in *Robertson v. Seattle Audubon Society*, 503 U.S. 429, 434-35, 440 (1992) and *Ecology Center v. Castaneda*, 426 F.3d 1144, 1147 (9th Cir. 2005), Congress identified by case number the specific cases that were subject to its mandatory directives changing the law. Congress did not follow this path in section 802 either.

Section 802 is unambiguous, providing no "directive, timetable and/or criteria for the Attorney General's exercise of discretion." February 11, 2009, Order at 3:13-14. Congress did not require the Attorney General to file a certification in every unlawful surveillance action falling with subsections (a)(1)-(5), or even in a subset of those actions.[8]

---

[7] Of course, Plaintiffs do not concede that such rewritten a statute would otherwise pass constitutional muster. *See e.g. infra* at page 15.

[8] Contrary to the suggestions of the government and the carriers, the Westfall Act (28 U.S.C. § 2679, a portion of the Federal Tort Claims Act) and the Atomic Testing Liability Act (50 U.S.C. § 2783, the statute at issue in *In re Consol. United States Atmospheric Testing Litig. v. Livermore Labs*, 820 F.2d 982 (9th Cir. 1987)) are also mandatory bars to litigation, and fundamentally *(footnote continued on following page)*

-12-

### 3. Subsections (a)(1)-(5) Do Not Provide Guidance to The Attorney General

Somewhat inconsistently with its argument that section 802 imposes a mandatory duty upon the Attorney General to certify every case falling within section 802, the government also contends that subsections (a)(1)-(5) operate as an intelligible principle limiting the Attorney General's discretion in deciding whether or not to file a certification. Gov't Reply at 12:22-13:4. Subsections (a)(1)-(5), however, do not serve this function. Rather, the subsections merely identify the universe of cases that qualify for a possible certification and identify the circumstances under which the Court is to dismiss the actions if the certification passes muster under 802(b). But they are utterly silent, imposing no limits and providing no guidance, on the exercise of the Attorney General's discretion either to investigate a particular case or to issue a certification. Even if the (a)(1)-(5) factors are present, the Attorney General may decide *not* to certify, and the statute contains no guidance for the Attorney General in that decision. Indeed, former Attorney General Mukasey's certification does not say that he applied any standard or principle whatsoever in deciding whether or not to file his certification, a crippling omission if the statute actually requires compliance with any standard or principle.

---

*(footnote continued from preceding page)*

different than section 802. To the extent that they utilize certifications, they do so as a procedural mechanism to allow claims to continue more smoothly against different defendants, rather than to terminate civil actions entirely. The Westfall Act in section 2679 (b)(1) unconditionally bars any lawsuit against a federal employee acting within the scope of employment. The bar is absolute and unconditional, and is not dependent on Attorney General discretion or the filing of a certification. The certification under section 2679(d) by the Attorney General simply triggers substitution of the United States as a party and removal, if necessary. But the certification is not itself the bar on litigation. Additionally, section 2679(d)(3) provides a mechanism for an employee to seek a certification from the court if the Attorney General refuses to do so. Thus the Attorney General's does not even have unfettered discretion as to substitution and removal. The Atomic Testing Liability Act, which has never been subject to a nondelegation challenge, is very similar to the Westfall Act. It permits the plaintiff to sue the United States directly, 50 U.S.C. §2783(b)(1), but unconditionally bars tort suits against government contractors arising out of atomic testing. 50 U.S.C. § 2783(b)(2) ("The remedies [against the United States] referred to in paragraph (1) shall be exclusive of any other civil action or proceeding for the purpose of determining civil liability arising from any act or omission of the contractor without regard to when the act or omission occurred."). Its certification procedures simply provide a mechanism for substitution and removal. 50 U.S.C. § 2783(c). Thus, section 802, and the discretionary power it grants the Attorney General to decide whether to bar these lawsuits completely, is unique and unprecedented.

-13-

The government must meet a higher burden in its attempts to satisfy the intelligible principle standard. As the Supreme Court has explained, "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 475 (requiring "substantial guidance" in cases of national scope). Here, the power to choose whether to bar meritorious constitutional and statutory claims of millions of ordinary Americans is truly extraordinary. Assuming for the sake of argument that the government could unearth some vague form of guidance from the statute, though none is written into the text, any such guidance would not be sufficient unless this Court determined the guidance was substantial. Moreover, the government must show not only guidance on when to file a certification, but guidance on when *not* to file, i.e. guidance that will allow this Court to ascertain whether the will of Congress has been obeyed when no certification is filed.

4.      **The Canon of Constitutional Avoidance Does Not Permit A Court To Rewrite Section 802 To Supply The Standards And Intelligible Principle That Congress Omitted**

The canon of constitutional avoidance is a rule for choosing among plausible interpretations of ambiguous statutory text, not a tool for adding statutory terms where no ambiguity exists. "[T]he canon of constitutional avoidance has no application in the absence of statutory ambiguity." *United States. v. Oakland Cannabis Buyers' Coop*, 532 U.S. 483, 494 (2001); *accord*, *Pennsylvania Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 212 (1998) (canon does not apply where statute not ambiguous). As the Court's February 11, 2009, order correctly notes, this means that "[t]he canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as *a means of choosing between them*." *Clark v. Martinez*, 543 U.S. 371, 385 (2005) (emphasis original); *see also id*. at 381 (canon "is a tool for choosing between competing *plausible* interpretations of a statutory text"(emphasis added)); *Whitman*, 531 U.S. at 471 ("No matter how severe the constitutional doubt, courts may choose only between *reasonably available* interpretations of a text." (emphasis added)). Thus, the canon of constitutional avoidance does not apply where, as here, "the interpretative circumstances point significantly in one direction." *Almendarez-Torres v. United States*, 523 U.S. 224, 238 (1998).

-14-

1    As explained above, there is no statutory ambiguity in section 802, and thus the canon of

2    constitutional avoidance has no application here. No plausible construction of section 802 can

3    supply the intelligible principle that Congress omitted. While the government and the carriers will

4    doubtless strain to supply a principle out of the ether, courts "cannot press statutory construction

5    'to the point of disingenuous evasion' even to avoid a constitutional question." *United States v.*

6    *Locke*, 471 U.S. 84, 96 (1985) (quoting *George Moore Ice Cream Co. v. Rose*, 289 U.S. 373, 379

7    (1933)).

8         Moreover, the purpose of the canon of constitutional avoidance is to avoid the necessity of

9    adjudicating the constitutionality of a statute. *Clark*, 543 U.S. at 381 ("one of the canon's chief

10   justifications is that it allows courts to avoid the decision of constitutional questions"). Yet this

11   canon would not be served here, because construing section 802's conspicuous silence to contain

12   an intelligible principle would force this Court to confront section 802's myriad other

13   constitutional defects: the elimination of any judicial review of the constitutionality of the carriers'

14   conduct; the separation of powers problems arising from the intrusion upon the adjudicatory

15   processes of this Court by binding it to the factual findings of the Attorney General; the due

16   process violations arising from section 802's provisions for secret evidence never revealed to

17   plaintiffs and its denial to plaintiffs of an impartial hearing before an unbiased adjudicator free to

18   make *de novo* determinations of fact and law; and the First Amendment violations caused by

19   section 802's secrecy provisions. None of these defects would be avoided or cured even if the

20   Court were to divine some intelligible principle from Congress' silence.

21              **5.      Legislative History Cannot Be Used To Rewrite Congress'**
                          **Unambiguous Grant Of Unlimited Discretion To The Attorney General**
22

23        Given the unambiguous character of section 802's grant of unlimited discretion to the

24   Attorney General to decide whether or not to file a certification, there is no occasion to resort to

     legislative history or any other method of generating alternative interpretations.  The Supreme
25
     Court has instructed that "our longstanding precedents . . . permit resort to legislative history only
26
     when necessary to interpret ambiguous statutory text." *BedRoc Ltd., LLC v. United States*, 541 U.S.
27
     176, 187 (2004) (plurality opinion). Legislative history cannot supply missing text that the whole
28

-15-

Congress never voted upon or agreed to, and cannot be used to generate ambiguities out of text that is unambiguous.[9] Under the Constitution, Congress can express its will only in one way:  in the text of legislation that secures the assent of a majority of both houses. "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-254 (1992) (citations and internal quotation marks omitted).

These considerations are especially weighty here, where Congress said absolutely nothing about the Attorney General's discretion. The nondelegation doctrine's essential purposes are to promote legislative responsibility for society's basic policy choices and to preserve a carefully designed constitutional process for legislation—bicameralism and presentment. *Loving*, 517 U.S. at 757-758. These purposes are not served when courts "find" an "intelligible principle" in Congressional silence – the purest case of legislative irresponsibility. As the Supreme Court has observed:  "Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises. Invocation of the 'plain purpose' of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise." *Bd. of Governors of the Fed. Reserve Bd. v Dimension Fin. Corp.*, 474 U.S. 361, 374 (1986); *Rodriguez v United States*, 480 U.S. 522, 526 (1987) ("it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." (emphasis in original).

Put another way, construing silence to contain an "intelligible principle" intrudes on

---

[9] It will not be sufficient for the government to point to the sparse legislative history, because courts will not give "authoritative weight to a single passage of legislative history that is in no way anchored in the text of the statute." *Shannon v. United States*, 512 U.S. 573, 583 (1994).  Rather, the government must show some statutory text that provides an intelligible principle because " 'courts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point.' " *Id*. at 584 (quoting *Int'l Bhd. of Elec. Workers, Local Union No. 474, AFL-CIO v. NLRB*, 814 F.2d 697, 712 (1987) (emphasis omitted)); *accord, United States v. Frank*, 956 F.2d 872, 881-82 (9th Cir. 1991).

-16-

legislative prerogatives more severely than outright invalidation of an unconstitutional statute. Section 802 as written embodies a compromise among the House, the Senate, and the President. If the Court invalidates section 802, it returns matters to the pre-802 status quo—again, a compromise among political actors. If the Court instead construes section 802's silence to mean something, it may create a statute that would never have been enacted.

Accordingly, this Court must acknowledge Congress' intention to grant the Attorney General unlimited discretion ungoverned by any intelligible principle, and may not rewrite section 802 to supply an intelligible principle never voted on by Congress. "It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.' " *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004). Nor will doing so here " 'produce a result demonstrably at odds with the intentions of its drafters.'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 243 (1989).

Even if statutory silence could establish statutory ambiguity, however, it cannot create a mandatory duty. Because mandatory duties are judicially enforceable and deny any discretion to the Executive, they may not be created by ambiguous statutory language. Otherwise, courts would risk intruding upon the Executive by imposing upon it mandatory duties that Congress never intended and that the Executive could not temper with its discretion. This principle is long established, originating when mandatory duties were enforceable by mandamus: "Where a duty is not plainly prescribed, but is to be gathered by doubtful inference from statutes of uncertain meaning, 'it is regarded as involving the character of judgment or discretion,' " and the duty is not mandatory. *ICC v. New York, N. H. & H. R. Co.*, 287 U.S. 178, 204 (1932); *accord, Panama Canal Co. v. Grace Line, Inc.*, 356 U.S. 309, 318 (1958); *Wilbur v. United States*, 281 U.S. 206, 219 (1930). Even now, when lawsuits seeking to enforce a duty asserted to be mandatory now commonly proceed under the Administrative Procedure Act rather than in mandamus, the rule remains the same: A statute does not create a mandatory duty unless it sets forth "a specific, unequivocal command, the ordering of a precise, definite act about which an official had no discretion whatever." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (internal

-17-

quotation marks, brackets, ellipsis, and citation omitted).

Here, because section 802 contains no specific, unequivocal command to the Attorney General, nothing is "legally *required*" by it. *Id.*, at 63 (*emphasis original*). Even more simply, ambiguity can never amount to a specific, unequivocal command. Thus, any alternative interpretation of section 802 that creates an ambiguity as to its meaning is insufficient to support the government and the carriers' contention that Congress imposed a mandatory duty on the Attorney General to certify every lawsuit falling within subsections (a)(1)-(5).

**B.    The Attorney General's Exercise Of His Discretion To File A Certification In These Actions Cannot Cure Congress' Failure To Impose Any Standard Or Intelligible Principle**

The carriers have suggested that the mere fact that the former Attorney General has already exercised his discretion to file a certification in these actions cures Congress' failure to impose any standard or intelligible principle. Carriers' Br. at 13:16-17. This suggestion is meritless. Because Congress set no bounds, there is no way for a court to judge whether his exercise of discretion is in or out of bounds, and the fundamental *Yakus* problem remains.

As the Supreme Court has explained in firmly rejecting this argument: "We have never suggested that an agency can cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute. . . . The idea that an agency can cure an unconstitutionally standardless delegation of power by declining to exercise some of that power seems to us internally contradictory. The very choice of which portion of the power to exercise— that is to say, the prescription of the standard that Congress had omitted—would *itself* be an exercise of the forbidden legislative authority. Whether the statute delegates legislative power is a question for the courts, and an agency's voluntary self-denial has no bearing upon the answer." *Whitman*, 531 U.S. at 472-73 (*emphasis original*).

**III.    Section 802 Is Also An Unconstitutional Delegation Because The Discretionary Power Granted To The Attorney General Is The Nondelegable Power To Change Previously-Enacted Law**

For the reasons set forth above, section 802 is an unconstitutional delegation of legislative power because it lacks any standard or intelligible principle to which the Attorney General must

-18-

conform in deciding whether to file, or not to file, a certification. Independently, section 802 is also an unconstitutional delegation of legislative power because the discretionary power it grants is the power to change previously-enacted law. Under the lawmaking procedures mandated by Article I, section 7 of the Constitution, any change in previously enacted law must be enacted by Congress. *Clinton*, 524 U.S. at 445. Congress may not give the Executive the discretionary power to change law that Congress has previously enacted; Congress itself must make the decision to change the law. *Id*.

Plaintiffs have sued the carriers under previously-enacted statutes that applied to these actions until the Attorney General chose to nullify those statutes and change the law governing these actions by filing his certification. But for the Attorney General's decision to change the law, those previously-enacted statutes would still govern plaintiffs' actions.

It is the Attorney General's certification, not Congress' enactment of section 802, that deprives the statutes under which plaintiffs sued of any "legal force or effect" (*Clinton*, 524 U.S. at 438) as to their lawsuits. As the government and the carriers previously noted, until the Attorney General "actually decides to invoke the procedures authorized by Congress, the Act would have no impact on this litigation." Jt. Case Mgmt. Stmt. at 22, n.16. His decision to file a certification is thereby "the functional equivalent of partial repeals of Acts of Congress." *Clinton*, 524 U.S. at 444.

Section 802 thus authorizes the Attorney General "himself to effect the repeal of laws, for his own policy reasons, without observing the procedures set out in Article I, § 7. The fact that Congress intended such a result is of no moment." *Id.* at 445-46; *accord*, *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise*, 501 U.S. 252, 274 n.19 (1991) ("'Rather than turning the task over to its agent, if the Legislative Branch decides to act with conclusive effect, it must do so...through enactment by both Houses and presentment to the President.'"). For this additional reason, section 802 is an unconstitutional delegation of core legislative power that violates the lawmaking procedures of Article I, section 7. It is an attempt to delegate a power—the power to change previously-enacted law—that is inherently nondelegable.

-19-

**CONCLUSION**

For the foregoing reasons and those set forth in plaintiffs' previous briefs, the Court should deny the government's summary judgment motion and hold that section 802 is unconstitutional and cannot be used to dismiss plaintiffs' actions.

DATED: February 25, 2009                    Respectfully submitted,

                                            _____/s/__Cindy A. Cohn_____
                                            Cindy A. Cohn
                                            ELECTRONIC FRONTIER FOUNDATION

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
PETER J. ELIASBERG
1313 West Eighth St.
Los Angeles, CA 90026

Telephone: (213) 977-9500
Facsimile: (213) 977-5299

COUNSEL FOR PLAINTIFFS IN
*CAMPBELL v. AT&T* AND *RIORDAN v.
VERIZON COMMUNICATIONS INC.*

FENWICK & WEST LLP
LAURENCE F. PULGRAM
JENNIFER KELLY
CANDACE MOREY
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 875-2300
Facsimile: (415) 281-1350

COUNSEL FOR PLAINTIFFS IN
*CAMPBELL v. AT&T* AND *RIORDAN v.
VERIZON COMMUNICATIONS INC.*

MOTLEY RICE LLC
RONALD MOTLEY
DONALD MIGLIORI
JODI WESTBROOK FLOWERS
VINCENT I. PARRETT
28 Bridgeside Boulevard
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9000
Facsimile: (843) 216-9450

PLAINTIFFS' COUNSEL FOR VERIZON
SUBSCRIBER CLASS

THE MASON LAW FIRM, PC
GARY E. MASON
NICHOLAS A. MIGLIACCIO
1225 19th St., NW, Ste. 500
Washington, DC 20036
Telephone: (202) 429-2290
Facsimile: (202) 429-2294

PLAINTIFFS' COUNSEL FOR SPRINT
SUBSCRIBER CLASS

BRUCE I AFRAN, ESQ.
10 Braeburn Drive
Princeton, NJ 08540

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
ELIZABETH J. CABRASER
BARRY R. HIMMELSTEIN
ERIC B. FASTIFF
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

PLAINTIFFS' COUNSEL FOR MCI
SUBSCRIBER CLASS

LISKA, EXNICIOS & NUNGESSER
ATTORNEYS-AT-LAW
VAL PATRICK EXNICIOS
One Canal Place, Suite 2290
365 Canal Street
New Orleans, LA 70130
Telephone: (504) 410-9611
Facsimile: (504) 410-9937

PLAINTIFFS' COUNSEL FOR BELLSOUTH
SUBSCRIBER CLASS

MAYER LAW GROUP LLC
CARL J. MAYER
66 Witherspoon Street, Suite 414
Princeton, New Jersey 08542
Telephone: (609) 921-8025
Facsimile: (609) 921-6964

PLAINTIFFS' COUNSEL FOR BELLSOUTH
SUBSCRIBER CLASS

THE LAW OFFICES OF STEVEN E.
SCHWARZ, ESQ.
STEVEN E. SCHWARZ
2461 W. Foster Ave., #1W
Chicago, IL 60625
Telephone: (773) 837-6134

PLAINTIFFS' COUNSEL FOR BELLSOUTH
SUBSCRIBER CLASS

KRISLOV & ASSOCIATES, LTD.
CLINTON A. KRISLOV
20 North Wacker Drive
Suite 1350
Chicago, IL 60606
Telephone: (312) 606-0500
Facsimile: (312) 606-0207

PLAINTIFFS' COUNSEL FOR BELLSOUTH
SUBSCRIBER CLASS

-1-

609-924-2075

PLAINTIFFS' COUNSEL FOR
BELLSOUTH SUBSCRIBER CLASS