1 | MICHAEL F. HERTZ
Acting Assistant Attorney General
2 | DOUGLAS N. LETTER
Terrorism Litigation Counsel
3 | JOSEPH H. HUNT
Director, Federal Programs Branch
4 | VINCENT M. GARVEY
Deputy Branch Director
5 | ANTHONY J. COPPOLINO
Special Litigation Counsel
6 | ALEXANDER K. HAAS (SBN 220932)
Trial Attorney
7 | U.S. Department of Justice
Civil Division, Federal Programs Branch
8 | 20 Massachusetts Avenue, NW
Washington, D.C. 20530
9 | Phone: (202) 305-9334—Fax: (202) 305-3138
*Attorneys for the United States of America*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE NATIONAL SECURITY AGENCY TELECOMMUNICATIONS RECORDS LITIGATION | **No. M:06-cv-01791-VRW** |
| This Document Relates To: | **UNITED STATES' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| *United States v. Rabner, et al.* (07-1324); *United States v. Gaw, et al.* (07-1242); *United States v. Adams, et al.* (07-1323); *United States v. Palermino, et al.* (07-1326); *United States v. Volz, et al.* (07-1396); *Clayton, et al. v. AT&T Communications of the Southwest, Inc., et al.* (07-1187) | Date: May 7, 2009<br>Time: 10:30 a.m.<br>Courtroom: 6, 17th Floor<br><br>Chief Judge Vaughn R. Walker |

---

**United States' Reply in Support of Motion for Summary Judgment (MDL No. 06-CV-1791-VRW)**

# TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      I.      SECTION 803 DOES NOT VIOLATE THE TENTH AMENDMENT OR PRINCIPLES OF STATE SOVEREIGNTY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      II.     DESPITE THE STATES' CLAIMS TO THE CONTRARY, CONGRESS CLEARLY INTENDED THAT SECTION 803 APPLY IN THESE CASES TO PREEMPT THESE STATES' INVESTIGATIONS AND PROCEEDINGS. . . . . 8

      III.    SUMMARY JUDGMENT SHOULD BE GRANTED FOR THE UNITED STATES IN THE *CLAYTON* ACTION AS WELL.. . . . . . . . . . . . . . . . . . . . . . . 13

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

# TABLE OF AUTHORITIES

**CASES** **Page(s)**

*Alden v. Maine*, 527 U.S. 706 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Arkansas Electric Coop. Corp. v. Arkansas Pub. Serv. Comm'n.*, 461 U.S. 375 (1983). . . . . . . 6

*Biggs v. Wilson*, 1 F.3d 1537 (9th Cir. 1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Cipollone v. Liggett Group*, 505 U.S. 504 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*City of New York v. FCC*, 486 U.S. 57 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*CSX Transp. Inc. v. Easterwood*, 507 U.S. 568 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*FERC v. Mississippi*, 456 U.S. 742 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5

*Free v. Bland*, 369 U.S. 663 (1962).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985). . . . . . . . . . . . . . . . . . . 2, 6, 7

*Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861 (2000).. . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Gregory v. Ashcroft*, 501 U.S. 452 (1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Hawaiian Tel. Co. v. Pub. Util. Comm. of State of Hawaii*, 827 F.2d 1264 (9th Cir. 1987) . . . . . 6

*Hines v. Davidowitz*, 312 U.S. 52 (1941). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264 (1981). . . . . . . . . . 3, 4, 5

*Jones v. Rath Packing Co.*, 430 U.S. 519 (1977).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Montalvo v. Spirit Airlines*, 508 F.3d 464 (9th Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Morales v. Trans World Airlines*, 504 U.S. 374 (1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Murphy v. Waterfront*, 378 U.S. 52 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*New York v. United States*, 505 U.S. 144 (1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 4

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350 (1989).. . . . . . . . . . . . 6

*Okla. ex rel. Okla. Dep't of Pub. Safety v. United States*, 161 F.3d 1266 (10th Cir. 1998). . . . . 4

*Printz v. United States*, 521 U.S. 898 (1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5

*Reno v. Condon*, 528 U.S. 141 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Shaw v. Delta Airlines*, 463 U.S. 85 (1983).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*South Carolina v. Baker*, 485 U.S. 505 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Southwest Ctr. for Biological Diversity v. Berg*, 268 F.3d 810 (9th Cir. 2001). . . . . . . . . . . . 14

*Testa v. Katt*, 330 U.S. 386 (1947). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Uhm v. Humana Inc.*, 540 F.3d 390 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Ullmann v. United States*, 350 U.S. 422 (1956).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Alisal Water Corp.*, 370 F.3d 915 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . 14

*United States v. Pink*, 315 U.S. 203 (1942). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Washington State Grange v. Washington State Republican Party*, 128 S. Ct. 1184 (2008). . . . . . 6

**STATUTES**

50 U.S.C. § 1885b. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**OTHER AUTHORITIES**

U.S. Const., Art. VI, cl. 2.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

U.S. Const. amend X. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

S. Rep. 110-209 (accompanying S. 2248, Foreign Intelligence Surveillance Act of 1978 Amendments Act of 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 8, 9

154 Cong. Rec. S6097-08 (Statement of Sen. Rockefeller).. . . . . . . . . . . . . . . . . . . . . . 1, 8, 9

# INTRODUCTION

Congress enacted Section 803 of the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. § 1885b, to ensure that States would "not be involved in regulating the relationship between electronic communication service providers and the intelligence community." S. Rep. 110-209 at 14 (accompanying S. 2248, Foreign Intelligence Surveillance Act of 1978 Amendments Act of 2007) (hereafter "SSCI Report"), attached as Exh. A; *see also* 154 Cong. Rec. S6097-08, 6129 (Statement of Sen. Rockefeller). Citing the very cases before this Court, Congress found that a number of state regulatory commissions have sought to investigate the alleged cooperation by state regulated carriers with U.S. intelligence agencies. SSCI Report at 7-8, 13, 26. In response, Congress amended the FISA to restrict the circumstances in which States may exercise their regulatory authority over electronic communications service providers by expressly prohibiting States from delving into whether those carriers provided alleged assistance to an element of the Intelligence Community. Section 803 provides, *inter alia*, that: "No State shall have authority to—(1) conduct an investigation into an electronic communication service provider's alleged assistance to an element of the intelligence community; (2) require through regulation or any other means the disclosure of information about an electronic communication service provider's alleged assistance to an element of the intelligence community." *See* 50 U.S.C. § 1885b(a)(1)-(2). Section 803 expressly and unambiguously preempts the authority of State Officials in the above-captioned actions to undertake the state investigations at issue in this litigation. Section 803 clearly applies here and entitles the United States to summary judgment.

The State Officials oppose summary judgment for two reasons. First, they argue that Section 803 violates principles of state sovereignty and the Tenth Amendment. Second, selectively citing certain examples of what they seek from the carriers, the State Officials claim that their investigations are not preempted by Section 803. Neither argument has any merit. Contrary to the State Officials' contention, Supreme Court precedent establishes that there is no infringement of state sovereignty or encroachment on Tenth Amendment interests where Congress directly preempts state law in an area that is plainly within the constitutional powers of Congress and the Federal Government. Moreover, the State Officials' alternative contention— that, even if Section 803 presents no constitutional concern, their investigations do not fall within

Section 803—cannot withstand scrutiny; even a cursory review of the undisputed record in these cases establishes that these investigations fall squarely within and are preempted by Section 803.

## ARGUMENT

### I. SECTION 803 DOES NOT VIOLATE THE TENTH AMENDMENT OR PRINCIPLES OF STATE SOVEREIGNTY.

The State Officials do not dispute that Section 803 is an express statutory preemption on their investigations, but contend that it is an "unconstitutional encroachment on state sovereignty" reflected in the Tenth Amendment. *See* State Opp. at 4-5, n.3. They assert that Section 803 violates general Constitutional principles recognizing that states are independent sovereign entities, *see id.* at 5-6, and specifically intrudes on the states' traditional authority to regulate intrastate matters involving telecommunications carriers and the privacy of their citizens, *see id.* at 7-8. These arguments misrepresent Tenth Amendment jurisprudence, as well as the nature of the state actions at issue and the authority of Congress to protect the interests of the Federal Government.

The Tenth Amendment's reservation of power to the states does not apply to powers "delegated to the United States by the Constitution." *See* U.S. Const. amend X; *New York v. United States*, 505 U.S. 144, 155-56 (1992). "'The States unquestionably do retai[n] a significant measure of sovereign authority . . . to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government.'" *New York*, 505 U.S. at 156 (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 549 (1985)). Thus, the question is not whether states are sovereign entities, but whether Congress had authority to enact Section 803 to preempt the state investigative actions at issue. That is undoubtedly the case. The Constitution vests in the Federal Government power over the national security and foreign affairs of the United States. *See United States v. Pink*, 315 U.S. 203, 233 (1942) ("Power over external affairs is not shared by the States; it is invested in the national government exclusively."); *see also Murphy v. Waterfront*, 378 U.S. 52, 76 n.16 (1964) ("the paramount federal 'authority in safeguarding national security' justifies 'the restriction it has placed on the exercise of state power'"); *Ullmann v. United States*, 350 U.S. 422, 435-36 (1956). Section 803 of the FISA, on its face, seeks to foreclose state investigations into the alleged

involvement of telecommunication carriers in alleged federal intelligence matters and, thus, that provision regulates in an area that is entrusted by the Constitution to the Federal Government.

It is irrelevant that states have also some authority over intrastate carrier activities. Where Congress acts pursuant to its constitutional authority, it may preempt state law or action, and that Federal law governs the actions of state officials pursuant to the Supremacy Clause. U.S. Const., Art. VI, cl. 2; *see New York*, 505 U.S. at 160, 168. The State Officials do not claim that Congress lacked any constitutional authority to enact Section 803. Indeed, it is indisputable that, even outside the national security context, Congress has authority to regulate telecommunication carriers acting in interstate commerce and to preempt state and local standards governing such activities. *See City of New York v. FCC*, 486 U.S. 57, 65-70 (1988). Once Congress has acted pursuant to powers entrusted by the Constitution to the Federal Government, no authority is reserved in the states under the Tenth Amendment and state sovereign actions are preempted by Federal law. *See FERC v. Mississippi*, 456 U.S. 742, 758-59 (1982) (No Tenth Amendment issue is presented where Congress has authority to displace state regulation, even where this serves to "'curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important.'") (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 290 (1981)).

Also meritless is the State Officials' contention that Section 803 constitutes the type of impermissible violation of state sovereignty invalidated in cases such as *New York v. United States*, *supra*, and *Printz v. United States*, 521 U.S. 898 (1997). *See* State Opp. at 5-9. Neither decision limits Congress' authority to preempt state law entirely or in part. Rather, *New York* and *Printz* simply hold that the federal government cannot "commandeer" state legislative processes or conscript state executive officials to enact or administer a federal program.

In *New York*, the Court struck down certain provisions of the Low-Level Radioactive Waste Policy Amendments Act of 1985 that required the states to choose between providing for the disposal of all low-level radioactive waste generated within the state and taking title to that waste. The Court concluded that "[e]ither way, 'the Act commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program[.]'" 505 U.S. at 176 (quoting *Hodel*, 452 U.S. at 288). Similarly, in *Printz*, the Court applied the

holding and rationale of *New York* to strike down interim provisions of the Brady Handgun Violence Prevention Act that required local officers to conduct background checks on handgun purchasers. The Court found the case governed by its holding "in *New York* that Congress cannot compel the States to enact or enforce a federal regulatory program." *See Printz*, 521 U.S. at 935. The defect of the statutes at issue in *New York* and *Printz* was that they compelled state officials to affirmatively carry out federal regulatory programs. *See id.* at 926-28.

Section 803, in contrast, does not require States to enact legislation, or commandeer state officials to enforce federal law—indeed, it does not require the States to do *anything*. *See Reno v. Condon*, 528 U.S. 141, 151 (2000). Rather, Congress has preempted state law to foreclose states from investigating or demanding disclosure of information related to "alleged assistance to an element of the intelligence community." *See* 50 U.S.C. § 1885b(a)(1)-(2). The State Officials' contention that this "distinction" between Section 803 and the statutes invalidated in *New York* and *Printz* "is of no constitutional significance," State Opp. at 8, is clearly wrong; in fact, the distinction is critical. Tenth Amendment concerns arise where Congress seeks to require the states to regulate or to enforce federal regulations, but not where Congress exercises its authority to regulate matters directly and preempt state law. *See New York*, 505 U.S. at 178; *see also Okla. ex rel. Okla. Dep't of Pub. Safety v. United States*, 161 F.3d 1266, 1269-72 (10th Cir. 1998) ("the Court has yet to hold that a federal law, which directly regulates state activity and necessitates some state legislative or administrative action to achieve compliance, amounts to unconstitutional "commandeering."). This case falls squarely within the principle that federal law may displace state regulation even though this serves to "curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important" *Hodel*, 452 U.S. at 290, and it would be a "radical departure" to hold otherwise. *See id.* at 292.

*Printz* confirmed a related principle, enunciated in *FERC*, that Congress may condition the states' continued regulation in a preemptible field on the states' compliance with affirmative obligations imposed by federal law. In *Printz*, the Court reaffirmed that the rule against commandeering is not violated when Congress "impose[s] preconditions to continued state regulation of an otherwise pre-empted field . . . ." 521 U.S. at 929; *see FERC*, 456 U.S. at 765 (upholding federal requirement because it simply placed a condition on "continued state

involvement in a pre-emptible area . . . .").[1] By limiting the grounds of legitimate state inquiry to exclude alleged assistance to elements of the Intelligence Community, Section 803 simply imposes an important condition on state involvement in a pre-emptible area and thus is clearly permissible.

The State Officials' related contention that Section 803 violates sovereign state police powers to "regulate the Carriers and protect their citizens' privacy" or other "traditional functions," *see* State Opp. at 7-8, is likewise meritless. "The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail."[2] *Free v. Bland*, 369 U.S. 663, 666 (1962). Moreover, the State Officials' argument would raise clear constitutional conflicts whenever federal law affects so-called "traditional functions" of state governments. The Supreme Court "long ago rejected the suggestion that Congress invades areas reserved to the States by the Tenth Amendment simply because it exercises its authority under the Commerce Clause [or other constitutional authority] in a manner that displaces the States' exercise of their police powers." *Hodel*, 452 U.S. at 291. Thus, for example, the Ninth Circuit has invalidated

---

[1] The *Printz* Court also reaffirmed another principle from *FERC*—that the rule against commandeering is not violated when a statute "require[s] state administrative agencies to apply federal law while acting in a judicial capacity." *Printz*, 521 U.S. at 929 & n.14. In *FERC*, the Court reviewed the Public Utility Regulatory Policies Act of 1978 ("PURPA") that required local regulatory authorities to implement federal rules, a requirement that the local authorities could satisfy by adjudicating disputes arising under the federal act. 456 U.S. at 760. The Court found the validity of that statutory requirement to be controlled by *Testa v. Katt*, 330 U.S. 386 (1947), which had established that state courts of competent jurisdiction are not free to close their doors to claims arising under federal law. The *FERC* Court found that state administrative decision makers who form part of the state's adjudicatory machinery are bound, like state judges, to apply federal law. *FERC*, 456 U.S. at 759-61. "Any other conclusion would allow the States to disregard both the preeminent position held by federal law throughout the nation . . . and the congressional determination that the federal rights granted by PURPA can appropriately be enforced through state adjudicatory machinery." *Id.* at 761.

[2] Even if, in some cases, there might be a presumption against preemption when Congress regulates in areas affecting certain state police powers, it would not apply here. The Ninth Circuit has held that such a presumption does not apply in the field of telecommunications —let alone the national security field at issue—because of "the long history of federal presence." *See Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003).

state regulatory orders on preemption grounds, even where traditional police powers are concerned, despite the undisputed "authority of a state [Public Utility Commission] to establish a reasonable rate of return for utilities within its jurisdiction" because of conflict with federal prerogatives. *See Hawaiian Tel. Co. v. Pub. Util. Comm. of State of Hawaii*, 827 F.2d 1264, 1275-77 (9th Cir. 1987) (preemption of state rate order upheld).[3]

Finally, the State Officials make a series of related arguments premised on the states' perceived deficiencies with the scope of Section 803, such as that it is overbroad, a concept relevant to First Amendment jurisprudence, *see* State Opp. at 10-11, or that Congress could have drafted Section 803 with more "safeguards" like those found in Section 802,[4] *see id.* at 12-13, or that Section 803 should have struck a different "balance" between state and federal law, *see id.* at 14. The State Officials cite no authority for any such proposition applicable to statutory preemption analysis. Rather, when Congress acts pursuant to its constitutional powers, the states' interests are protected by "the built-in restraints that our system provides through state participation in federal government action," not by "judicially created limitations on federal power." *Garcia*, 469 U.S. at 550-52, 556. In any event, Section 803 strikes a narrow balance between Federal and State authority by caring out a limited area where the states cannot regulate

---

[3] Even the few preemption cases cited by the State Officials, *see* State Opp. at 7, do not aid their argument. *Arkansas Electric Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375 (1983), held only that the federal laws at issue in that case did not preempt state regulation of the utility market, not that Congress could not preempt such state regulation. *Id.* at 385-90. Rather, the Court noted that had Congress, or a federal agency, concluded that state regulation was inconsistent with federal policy, such federal action "would *of course* preempt any further exercise of jurisdiction" by state regulators. *Id.* at 390 (emphasis added). Moreover, *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350 (1989), held only that state interests were *not* weighty enough for a federal court to be required to abstain from a preemption challenge to a state regulation of a utility.

[4] The hypothetical situations that could arise if electronic communication service providers were to attempt any abuse of Section 803 by claiming that an inquiry involves an element of the Intelligence Community, *see* State Opp. at 11, do not merit any different result. Here, no such hypothetical is at issue. Moreover, outside of the First Amendment context, courts cannot facially invalidate an Act of Congress based on some hypothetical possibility. *See Washington State Grange v. Washington State Republican Party*, 128 S. Ct. 1184, 1190-91 (2008).

electronic communications service providers—when they seek information from or attempt to investigate alleged federal intelligence activities. *See* SSCI Report at 13 (expressing Congress' desire to "protect[] . . . the federal government's ability to conduct intelligence activities without interference by state investigations"). That the State Officials disagree with the balance Congress struck does not render Section 803 unconstitutional. *See Garcia*, 469 U.S. at 556; *South Carolina v. Baker*, 485 U.S. 505, 512 (1988).[5] Section 803 is constitutional and, as we now show, applies here.

## II. DESPITE THE STATES' CLAIMS TO THE CONTRARY, CONGRESS CLEARLY INTENDED THAT SECTION 803 APPLY IN THESE CASES TO PREEMPT THESE STATES' INVESTIGATIONS AND PROCEEDINGS.

In deciding whether a federal law preempts a state statute or action, a court's task is to "ascertain Congress' intent in enacting the federal statute at issue." *Shaw v. Delta Airlines*, 463 U.S. 85, 95 (1983). "'Pre-emption may be either express or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Id.* (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)); *see also Morales v. Trans World Airlines*, 504 U.S. 374, 383 (1992). Because Section 803 is an express preemption provision, the "'task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Uhm v. Humana Inc.*, 540 F.3d 390, 983 (9th Cir. 2008) (quoting *CSX Transp. Inc. v. Easterwood*, 507 U.S. 568, 664 (1993)). The Court may then look to the "object and policy" of the provision. *Montalvo v. Spirit Airlines*, 508 F.3d 464, 474 (9th Cir. 2007) (citations omitted). The intent of Congress is the "ultimate touchstone of every preemption

---

[5] Rather than simply relying on Tenth Amendment jurisprudence, the States also appear to raise a more general structural federalism challenge to Section 803—for example by citing Eleventh Amendment cases. That argument fails as well. Cases such as *Gregory v. Ashcroft*, 501 U.S. 452 (1991) and *Alden v. Maine*, 527 U.S. 706 (1999), stand for the proposition that, where Congress seeks to impose limits on state authority, either through preemption of state law or through the waiver of state sovereign immunity, Congress must follow the clear statement rule and make its intentions express. *See Biggs v. Wilson*, 1 F.3d 1537, 1543-44 (9th Cir. 1993) (finding no Tenth Amendment violation where Congress preempted state law by applying the FLSA to state employees). But there is no freestanding limitation on Congress' authority where Congress speaks clearly to limit a states' ability to regulate, as it has done with Section 803 to limit state power. Section 803 implicates no Tenth Amendment or state sovereignty concerns.

case." *Id.*

The State Officials argue that, even if Section 803 is constitutional, their investigations may continue in some fashion under this provision. *See* State Opp. at 14-17. This contention not only ignores the plain language and intent of Section 803, it relies on cherry picking certain examples of information encompassed by the States' investigations. There is no question that Section 803 expressly preempts investigations by state authorities of alleged assistance by electronic communications service providers to elements of the intelligence community, *see* 50 U.S.C. § 1885b, and that it applies here. Section 803 was added specifically to "address[]" the instant investigations in "that a number of state regulatory commissions have or might begin to investigate cooperation by state regulated carriers with U.S. intelligence agencies." SSCI Report at 24. In enacting what would become Section 803, the Senate Select Committee on Intelligence specifically referenced these cases, noting that the United States "filed suit seeking to enjoin state officials in five states from further investigation of electronic communication service providers for their alleged disclosure of customer telephone records to the National Security Agency," and this Court's July 2007 decision "that these state investigations were not preempted by either the Supremacy Clause or the foreign affairs power of the federal government." *Id.* at 7-8. Moreover, making many of the arguments they reiterate here, the States at issue here provided testimony as to why Section 803 was inappropriate and unnecessary. *See* States' Joint Statement to the Senate Judiciary Committee (attached hereto as Exh. B), *available at* http://www.maine.gov/tools/whatsnew/index.php?topic=AGOffice_Cases &id=46975&v=article (last visited Apr. 8, 2009).

But Congress disagreed, noting in particular the "uncertain[ty]" of "further protracted proceedings" in these cases. *See* SSCI Report at 7-8. Congress concluded that the preemption of state authority was the only way to protect the United States' alleged intelligence activities from state regulators. *See id.* at 12 (noting that "although states play an important role in regulating electronic communication service providers, they should not be involved in regulating the relationship between electronic communication service providers and the intelligence community" through their investigatory powers); *see also* 154 Cong. Rec. S6097-08, 6129 (Statement of Sen. Rockefeller). Section 803 therefore "provides for the protection, by way of preemption, of the federal government's ability to conduct intelligence activities without

interference by state investigations" and "preempts these state investigations by prohibiting them." SSCI Report at 13; *see also* 154 Cong. Rec. S6097-08, 6135. Congress' ultimate purpose is evident: To halt the inquiries now being undertaken by the State Officials.

To escape the express reach of Section 803, the State Officials fundamentally misstate the scope of the investigations at issue in this litigation. The record is clear that, in May 2006, after press reports concerning the carriers alleged provision of records to the NSA, the State Officials opened investigations or other inquiries against the carriers allegedly involved and sought to probe this very alleged activity. In some cases, the State Officials did this on their own initiative by issuing subpoenas or other discovery demands to the carrier defendants inquiring about the carriers' alleged involvement with the Intelligence Community and expressly referencing the "NSA" by name. In other cases, citizens, interest groups, or other state investigators prompted state regulators with complaints that specifically referenced allegations that the carrier defendants assisted the NSA. But all of these inquiries concern allegations that carriers assisted the NSA in the alleged collection of communication records.

The fact that some particular items requested—such as privacy policies—may not, in themselves, reveal whether an alleged intelligence relationship existed is irrelevant. The purpose and focus of the inquiries was whether the carriers allegedly assisted the NSA in an alleged program for the collection of communication records. Section 803 precludes efforts by states to investigate or seek the disclosure of information related to alleged intelligence activities in order to "protect[] . . . the federal government's ability to conduct intelligence activities without interference by state investigations," SSCI Report at 13; that is precisely what the State Officials are undertaking. Each of the specific examples cited by the State Officials, *see* State Opp. at 16-17, of inquiries that supposedly have "nothing to do" with alleged NSA activities are in fact part of an inquiry seeking to disclose that very information.

*Connecticut*. In May 2006, the ACLU filed a complaint based on media reports of the alleged NSA records program seeking an investigation into whether the carriers "disclosed customer information of their customers in Connecticut to the National Security Agency" and alleging violations of state law. *See* Exh. C, attached hereto (ACLU Compl. in Connecticut). Connecticut Officials have themselves described these proceedings as an investigation into

whether the carriers "may have violated Connecticut law by providing customer proprietary network information (CPNI) to the National Security Agency (NSA) without warrants, court orders, subpoenas or subscriber permission." *See* Exh. D at 1, attached hereto (Apr. 25, 2007 Order Denying Motion to Dismiss). All of the cited requests relate to proving the truth of these allegations. Indeed, far from being unrelated to alleged NSA intelligence, Connecticut specifically demands the disclosure of policies related to disclosures of customer information "when not compelled to do so by subpoena, warrant, court order, or National Security letter," *see* State Opp. at 16—the precise allegation in the ACLU Complaint concerning alleged NSA records collection from the carriers.

*Vermont*. Like Connecticut, the ACLU in Vermont made similar allegations after citing similar media reports and requested answers from carriers about whether those reports were true and whether carriers "did indeed disclose customer information to the NSA." *See* Exh. E at 3, attached hereto (ACLU Compl. in Vermont). The Vermont information requests specifically seek information concerning whether the carriers "disclosed or delivered to the National Security Agency ("NSA") the phone call records of any [] customers in Vermont" and numerous other questions concerning allegations that the carrier provided records "to the NSA." *See* Exh. A, Tab 2, to USG Mtn (Dkt. 536), Nos. 1, 2, 7, 8. These requests seek precise details concerning this allegation, including the "format," "reporting intervals," number of customers allegedly involved, number of occasions such disclosures were allegedly made, what information was contained in records allegedly disclosed, what communication service are allegedly at issue, what authority existed for the alleged disclosure, and what equipment was used to accomplish the alleged disclosure. *See id.* The Vermont Department of Public Service cited the lack of full responses to these information requests concerning the "alleged disclosure of customer information to the National Security Agency" as the basis for seeking to open an investigation. *See* Exh. F, attached hereto (Vermont DPS Petition to open investigation). The Vermont Officials have likewise acknowledged that their investigation "w[as] commenced to examine whether [the carrier] had violated Vermont utility standards by directly or indirectly providing customer record information to the National Security Agency ("NSA") or other federal or state agencies ("NSA Customer Records Program")." *See* Exh. G at 3, attached hereto (Sept. 18, 2006 Order of

Vermont Denying Motion to Dismiss). Thus, the Vermont Officials' assertion that certain requests make no "explicit reference" to the NSA and, thus, are "outside the scope" of Section 803, *see* State Opp. at 16, is wrong, particularly as some of the requests they cite refer to "such disclosures" that, when read in context, could only refer to alleged "disclosures of . . . information to the NSA." *See* Exh. A, Tab 2, to USG Mtn (Dkt. 536), Nos. 8-12. The Vermont inquiry is unambiguously directed at alleged assistance by the carriers to the NSA.[6]

*Maine*. As with the other states, the Maine inquiry began when private parties brought complaints asking the Maine Officials to investigate "whether and to what extent [the carrier] cooperated" with the NSA and citing media reports of alleged NSA activities. *See* Exh. I, attached hereto (Excepts of Cowie Compl.). Maine Officials argue that their inquiry does not implicate Section 803 because they merely seek to confirm Verizon's public statements and thus do not seek disclosure at all and are not even conducting an investigation. But this characterization is disingenuous. The Maine Officials cannot dispute that their inquiry, on its face, puts at issue and seeks information concerning an alleged relationship between Verizon and the NSA related to alleged foreign intelligence activities. *See* Maine Order at 3. Moreover, Maine does not seek merely to confirm the truth of the press releases. Rather, its inquiry selectively removes statements from the press releases (at times misquoting or taking them out of context) and demands sworn testimony with respect to each individual topic—among others that Verizon confirm that: (i) it "was not asked by NSA to provide, nor did [it] provide, customer phone records from any of its businesses, or any call data from those records"; (ii) "[n]one of these companies . . . provided customer records or call data"; and (iii) it "did not provide to NSA customer records or call data, local or otherwise." *See* Maine Order, Exh. A, Tab 5 to USG Mtn (Dkt. 536). In short, working off of a public statement, Maine seeks to probe into the actual

---

[6] The Vermont Officials also fail to note that, in May 2006 Verizon answered the cited questions "exclud[ing] any information concerning its cooperation, if any, with the NSA and any similar intelligence gathering activities." *See* Exh. H at 4-8, attached hereto. Thus, if as Vermont contends that it is interested solely in matters outside the scope of Section 803, their inquiry would now be complete as to Verizon, but in fact has not been dropped. And the fact that these inquiries seek publicly available privacy policies provides no basis for them to probe into matters that Section 803 clearly forecloses.

facts on several specific topics. This demand for evidence under oath by a governing authority is plainly an investigation on a topic that is foreclosed by Section 803. There is an obvious difference between a private party voluntarily making a public statement without compulsion from state process, and being required to submit information under penalty of perjury and other sanction to state investigatory procedures. It is this investigation and compelled disclosure that Section 803 proscribes.

Moreover, through its process of seeking sworn affirmation of certain statements, Maine Officials seek to proscribe future conduct of the carrier. *See*, *e.g.*, Maine Order at 3 (demanding sworn affirmation, that in the future, the carrier "will provide customer information to a government agency only" under certain circumstances). By demanding that the carrier "affirm" under state law what it "will" and "will not" do in any dealings with the United States, the Maine Officials seek to bind it to a particular course of future conduct as a matter of state law and thereby to proscribe and limit the contours of the Federal Government's ability to work with that carrier. Thus, in addition to investigating and seeking disclosure information related to alleged assistance by the intelligence community, Maine Officials seek to "impose an administrative sanction" related to such allegations. *See* 50 U.S.C. § 1885b(a)(3).

*New Jersey's and Missouri's Subpoenas*. The New Jersey Officials make no effort at all to attempt to rehabilitate their inquiries. *See* State Opp. at 15-17. Twelve of the thirteen requests in the New Jersey subpoenas, issued May 17, 2006, shortly after the press reports referenced above, concern requests for information concerning the alleged "provision of Telephone Call History Data to the NSA." *See* Exh. A, Tab 1 to USG Mtn (Dkt. 536). Missouri references only one of its subpoenas and ignores the subpoena expressly referencing the NSA and demanding production of information concerning whether "calling records have been delivered or otherwise disclosed to the National Security Agency" and "nature or type of information disclosed to the NSA." Moreover, the carrier filed general objections seeking to exclude information concerning alleged NSA activities and any information confirming or denying the existence or non-existence of a relationship between the carrier and NSA. *See* Exh. J, attached hereto (carrier response to Missouri Officials). Missouri sought to compel disclosure of further information.

In sum, the State Officials' attempt to re-cast their investigations and articulate some state

interest or policy other than frustration of the federal objective is entirely baseless and does not evade preemption under Section 803. The clear target of the States' inquiries is the alleged provision of assistance to the NSA, which Section 803 preempts. The State Officials own brief describes Section 803 as precluding their "investigations into possible privacy violations by telecommunications companies" and "block[ing] states from even conducting factual inquiries *intended to uncover the truth regarding past events*." State Opp. at 1, 8 (emphasis added). Finally, none of the State Officials state that they would limit their inquiries to matters that clearly do not implicate national security activities. Rather, they still seek to reserve regulatory authority that the States do not possess in light of the express preemption of Section 803.[7]

### III. SUMMARY JUDGMENT SHOULD BE GRANTED FOR THE UNITED STATES IN THE *CLAYTON* ACTION AS WELL.

The Missouri Officials in *Clayton*—the same officials who are defendants in the *Gaw* case brought by the United States—also argue that the United States cannot seek summary judgment in *Clayton* without first intervening, and that any intervention by the United States would be limited to constitutional issues. *See Clayton* Opp. at 2-6. Missouri's procedural arguments are insubstantial. Formal intervention by the Government should not be necessary at

---

[7] Not only is express preemption under Section 803 applicable, but Section 803 also supports dismissal under the field and conflict preemption principles that United States previously advocated in these cases. First, Section 803 in particular, and the FISA Amendments Act of 2008 in general, is further evidence of Congress' intent to cover the field and thereby exclude state regulation in national security and intelligence matters, consistent with the statutes already cited by the United States, *see, e.g.*, USG Supp. Br. in State Cases at 8-9 & n.7 (Dkt. 265). Section 803 thus provides further evidence that Congress has "so thoroughly occupie[d] a legislative field as to make reasonable the inference that Congress left no room for the states to supplement it." *Cipollone v. Liggett Group*, 505 U.S. 504, 516 (1992) (plurality). Second, Section 803 is an additional statute the prohibits the disclosure of information concerning alleged intelligence activities to state regulators such as the ones already cited by the United States, *see, e.g.*, USG Supp. Br. in State Cases at 10-12 (Dkt. 265). Under these circumstances, permitting continued disclosures to state regulators under these circumstances would surely "stand[] as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Finally, our reliance on an express preemption theory, *see* USG Mtn at 3, n.5 (preserving our earlier preemption positions), does not preclude application of other bases of preemption. *See Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 869 (2000) (citing *Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995), for the proposition that an express preemption provision does not foreclose other bases of implied preemption).

this stage in *Clayton*, particularly given that the carrier defendants have moved for summary judgment. The United States has separately sued the Missouri Officials and seeks judgment against them pursuant to Section 803 in the *Gaw* case. That judgment would preclude any action by the Missouri Officials to enforce the subpoena at issue in the *Clayton* action. Also, the preemption question is purely legal, and the United States is authorized to present its position and represent its interests in the *Clayton* action pursuant to 28 U.S.C. § 517 without formal intervention. In the event the Court deems intervention to be necessary to dispose of the *Clayton* action, it can and should treat the Government's motion as one for intervention, and the Missouri Officials present no grounds for opposing any such intervention. The United States would meet all of the requirements of intervention under either part of Rule 24 of the Federal Rules of Civil Procedure, should the Court request such a motion, because: (i) this case remains in its initial stages as the Court considers whether the state investigations are preempted; (ii) Congress provided that the United States may enforce Section 803; and (iii) there is no prejudice to the *Clayton* parties as they have opposed all the arguments of the United States in the *Gaw* action, where they are parties.[8] *See Southwest Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 817 (9th Cir. 2001); *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004) ("the requirements for intervention are broadly interpreted in favor of intervention").

## CONCLUSION

For the foregoing reasons and those stated in our motion for summary judgment, the Court should enter judgment for the United States on the ground that Section 803 of the FISA, 50 U.S.C. § 1885b, preempts the States' investigations at issue in the above-captioned actions.

Dated: April 9, 2009

Respectfully Submitted,

MICHAEL F. HERTZ
Acting Assistant Attorney General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

JOSEPH H. HUNT

---

[8] Finally, the Missouri Officials' argument that our intervention would be limited to constitutional issues under 28 U.S.C. § 2403 is wrong and mistakes the basis for any intervention. Section 2403 only applies where that statute is the basis of intervention.

Director, Federal Programs Branch

VINCENT M. GARVEY
Deputy Branch Director

    */s/ Anthony J. Coppolino*
ANTHONY J. COPPOLINO
Special Litigation Counsel

    */s/ Alexander K. Haas*
ALEXANDER K. HAAS (SBN 220932)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Rm. 7142
Washington, D.C. 20001
Phone: (202) 305-9334—Fax: (202) 616-8460
Email: alexander.haas@usdoj.gov
*Attorneys for the United States of America*