Pages  1 - 71

United States District Court

Northern District of California

Before The Honorable Vaughn R. Walker

| | | |
|---|---|---|
| In re: National Security | ) | |
| Agency Telecommunications | ) | No. MDL 06-1791 VRW |
| Records Litigation, | ) | |
| | ) | And Related Cases: |
| Plaintiff. | ) | |
| | ) | C07-1324 VRW |
| | ) | C07-1242 VRW |
| | ) | C07-1323 VRW |
| _____ | ) | C07-1326 VRW |
| | | C07-1396 VRW |
| | | C07-1187 VRW |

San Francisco, California
Thursday, May 7, 2009

**Reporter's Transcript Of Proceedings**

**Appearances**:

For the U.S.
Department of
Justice:                     United States Department of Justice
                             Civil Division
                             20 Massachusetts Avenue, N.W. Room 6102
                             Washington, DC  20530
               **By:  Anthony Joseph Coppolino, Esquire**
                     **Alexander Kenneth Haas, Esquire**

For the AT&T
Entities:                    Pillsbury Winthrop Shaw Pittman, LLP
                             50 Fremont Street
                             Post Office Box 7880
                             San Francisco, California  94120
               **By:  Bruce A. Ericson, Esquire**

(Appearances continued on next page.)

**Reported By:         *Sahar McVickar, RPR, CSR No. 12963***
                     ***Official Reporter, U.S. District Court***
                     ***For the Northern District of California***

***Sahar McVickar, C.S.R. No. 12963, RPR***
***Official Court Reporter, U.S. District Court***
***(415) 626-6060***

**Appearances, continued:**

```
For the
AT&T Entities:          Sidley Austin, LLP
                        1501 K Street, N.W.
                        Washington, DC  20005
                By:  Eric Alan Shumsky, Esquire


For the
Verizon Entities:       Wilmer Hale
                        1117 California Avenue
                        Palo Alto, California  94304
                By:  Samir Chandra Jain, Esquire


For the Nextel
West Corporation:       Williams & Connolly, LLP
                        725 12th Street, N.W.
                        Washington, DC  20005
                By:  John G. Kester, Esquire


For Qwest
Communications
International, Inc.:     Hogan & Hartson, LLP
                        555 13th Street, N.W.
                        Washington, DC  20004
                By:  Chris Zaetta, Esquire


For the Maine           Maine Attorney General's Office
Attorney General:       6 State House Station
                        Augusta, Maine  04333
                By:  Christopher C. Taub, Esquire


For the
Connecticut
Department of Public
Utility Control:        Connecticut Attorney General's Office
                        10 Franklin Square
                        New Britain, Connecticut  06051
                By:  Tatiana Damianova Eirmann, Esquire


For the Missouri
Public Service
Commission:             Missouri Public Service Commission
                        200 Madison Street
                        Post Office Box 360
                        Jefferson City, Missouri  65102
                By:  Jennifer Leigh Heintz, Esquire
                     Eric Dearmont, Esquire
///
```

**Appearances, continued:**

```
For James Volz,
et al.:                  Vermont Attorney General's Office
                         109 State Street
                         Montpelier, Vermont  05609
                 By:  Michael Nicholas Donofrio, Esquire


For Stuart Rabner,
et al.:                  New Jersey Office of the
                         Attorney General
                         RJ Hughes Justice Complex
                         P.O. Box 112
                         Trenton, New Jersey  08625
                 By:  Megan Lewis, Esquire
                      (Appearing telephonically)
For Intervenors
Christopher Branson
and David L. Cowie:      MCLU Foundation
                         401 Cumberland Avenue, Suite 105
                         Portland, Maine  04101
                 By:  Zachary Lee Heiden, Esquire
                      John Patterson, Esquire
                      (Appearing telephonically)
```

---o0o---

```
 1   Thursday, May 7, 2009                          10:30 a.m.

 2                      P R O C E E D I N G S

 3              THE CLERK:  Calling MDL No. 06-1791, in re: National

 4   Security Agency Telecommunication Records Litigation.

 5              And this hearing relates to 07-1324, United States

 6   versus Rabner 07-1242; United States versus Gaw, 07-1323;

 7   United States versus Adams, 07-1326; United States versus

 8   Palermino, 07-1396; United States versus Volz, and 07-1187,

 9   Clayton versus AT&T Communications of the Southwest, et al.

10              Appearances, counsel, please.

11              MR. COPPOLINO:  Good morning, Your Honor.

12              Anthony Coppolino, Department of Justice, for the

13   United States.

14              THE COURT:  Good morning, Mr. Coppolino.

15              MR. JAIN:  Good morning, Your Honor.

16              Samir Jain at Wilmer Hale for Verizon.

17              THE COURT:  Very well, good morning.

18              MR. KESTER:  Good morning, Your Honor.

19              John Kester from Williams and Connolly for Sprint

20   Nextel.

21              THE COURT:  Mr. Kester.

22              MR. ERICSON:  Good morning, Your Honor.

23              Bruce Ericson from Pillsbury for the AT&T entities.

24              THE COURT:  Mr. Ericson.

25              MR. SHUMSKY:  Good morning, Your Honor.
```

```
 1              Eric Shumsky, Sidley Austin, also for the AT&T
 2    entities.
 3              THE COURT:  Good morning.
 4              MR. HAAS:  Good morning, Your Honor.
 5              Alex Haas for the United States.
 6              THE COURT:  Good morning.
 7              MR. ZAETTA:  Good morning, Your Honor.
 8              Chris Zaetta from Hogan & Hartson for the Qwest
 9    Communications entities.
10              THE COURT:  Good morning.
11              MR. TAUB:  Good morning, Your Honor.
12              I'm Christopher Taub from the Maine Attorney
13    General's Office.  I'm here for the Maine Public Utilities
14    Commission.
15              THE COURT:  And you are appearing in the Reishus
16    case?
17              MR. TAUB:  I'm appearing -- I'm sorry?
18              THE COURT:  Isn't that the name of your --
19              MR. TAUB:  It's the United States versus Adams,
20    07-1323.
21              THE COURT:  Isn't -- isn't Reishus also from Maine?
22              MR. TAUB:  I'm sorry?
23              THE COURT:  Ahh, it's the same case.
24              MR. TAUB:  Yes.  The executive -- the members of the
25    PUC have changed.
```

1          **THE COURT:**  I see.

2          **MR. TAUB:**  So the current chairman is

3  Sharon Reishus.

4          **THE COURT:**  I see, there's been a change in

5  personnel in May; is that it?

6          **MR. TAUB:**  Yes, yes.

7          **THE COURT:**  All right.

8          **MR. TAUB:**  That's correct, Your Honor.

9          **THE COURT:**  All right.

10         So we call that the Adams case now, do we?

11         **MR. TAUB:**  Well, I guess technically, Your Honor, we

12  should call it the Reishus, R-e-i-s-h-u-s.  Mr. Adams is no

13  longer with the PUC, so by operation of the rules we should

14  substitute Ms. Reishus.

15         **THE COURT:**  Reishus, is that how --

16         **MR. TAUB:**  Yes, yes.

17         **THE COURT:**  All right, fine.

18         **MS. EIRMANN:**  Good morning, Your Honor.

19         Tatiana Eirmann, Assistant Attorney General from

20  Connecticut.  And I represent the Department of Public

21  Utilities --

22         **THE COURT:**  And that's the --

23         **MS. EIRMANN:**  That is United States versus

24  Palermino.  And it's 07-1326.

25         **THE COURT:**  Palermino.

1           *MS. EIRMANN:*  No change there.

2           *THE COURT:*  All right, fine, thank you.

3           *MS. EIRMANN:*  Thank you, Your Honor.

4           *MS. HEINTZ:*  Thank you, Your Honor.

5           Jennifer Heintz of the Missouri Public Service

6   Commission.  And I represent the parties in 1187 and 1242.  And

7   just to be clear with the record, in case number 1242, we refer

8   to that as the Gaw case; Commissioner Gaw is no longer with the

9   Commission, and Commissioner Clayton is in this case as the

10  named plaintiff, or the named party now as well.

11          *THE COURT:*  So, we are going to call this the

12  Clayton case -- or cases, actually two cases, right?

13          *MS. HEINTZ:*  Two cases.

14          *THE COURT:*  Right, the Clayton cases, all right.

15          *MS. HEINTZ:*  Thank you.

16          *MR. DEARMONT:*  Good morning, Your Honor.

17          Eric Dearmont on behalf of the Missouri Public

18  Service Commission representing the parties in 1242 and 1187.

19          *THE COURT:*  All right, that's the Clayton case.

20          Now we have a couple of folks on the telephone.

21          *MR. DENOFRIO:*  Yes, good morning, Your Honor.

22          Can you hear me?

23          *THE COURT:*  Yes.

24          *MR. DENOFRIO:*  *(Telephonically:)*  This is

25  Michael Donofrio in Montpelier, Vermont.  I'm representing the

```
 1   parties in 07-1396, United States versus Volz.

 2              THE COURT:  Very well, Mr. Donofrio.

 3              How about New Jersey; has New Jersey checked in?

 4                     (No response.)

 5              THE CLERK:  Ms. Lewis?

 6              MS. LEWIS:  (Telephonically:)  Good morning, Your

 7   Honor.

 8              This is Megan Lewis.  I'm appearing on behalf of the

 9   New Jersey Attorney General in United States versus Rabner.

10              THE COURT:  Very well, good morning.

11              MS. LEWIS:  Good morning.

12              THE COURT:  And perhaps afternoon where you are.

13              MR. HEIDEN:  Good morning, Your Honor.

14              This is Zachary Heiden appearing on behalf of the

15   intervenor defendants, James Douglas Cowie, et al, in United

16   States versus Reishus, et al.

17              THE COURT:  Very well, Mr. Heiden.

18              MR. HEIDEN:  Good morning, Your Honor.

19              THE COURT:  And is Mr. Patterson also with you?

20                     (No response.)

21              THE CLERK:  Mr. Patterson?

22              MR. PATTERSON:  Yes, good morning.

23              This is John Patterson also from Portland, Maine,

24   appearing with Mr. Heiden on behalf of intervenors in United

25   States versus Reishus.
```

1          **THE COURT:**  All right.

2          I think those are all the appearance, are they not?

3  Any others?

4                    **(No response.)**

5          **THE COURT:**  Well Mr. Coppolino, are you going to

6  lead off?

7          **MR. COPPOLINO:**  Thank you, Your Honor.

8          **THE COURT:**  I gather the answer is yes?

9          **MR. COPPOLINO:**  I'd be happy to.  And these are, I

10 believe, our motions.

11         **THE COURT:**  It is your motion.

12         Now, tell me, what do you want me to do?

13         **MR. COPPOLINO:**  Well, Your Honor, I would like to

14 ask you to enter summary judgment for the United States.

15         **THE COURT:**  Well, I understand that, but exactly

16 what would you like that summary judgment to say?

17         **MR. COPPOLINO:**  I think that the summary judgment

18 should say that the Congress has preempted the investigations

19 that are at issue in this litigation pursuant to Section 803 of

20 the FISA and that, accordingly, they cannot proceed, and

21 summary judgment is entered for the United States on those

22 grounds.

23         **THE COURT:**  Well, you're asking for declaratory and

24 injunctive relief.

25         **MR. COPPOLINO:**  That's correct.

1        **THE COURT:**  All right, now, precisely what do you

2    want that declaration and injunction to say?

3        **MR. COPPOLINO:**  That -- well --

4        **THE COURT:**  I mean, a nice broad statement that

5    Section 803 is not unconstitutional I'm sure would be

6    satisfying, but that only gets you so far, doesn't it?

7        **MR. COPPOLINO:**  Understood.

8        What I think the injunction -- the declaratory and

9    injunctive relief should state, Your Honor, is that each of the

10   state proceedings at issue all concern an investigation by

11   state authorities of alleged federal intelligence activities

12   and fall squarely within the terms of Section 803 of the FISA.

13       Congress has, pursuant to its constitutional powers,

14   expressly preempted those investigations and that, therefore --

15   that -- that -- that exercise of authority by Congress is -- is

16   constitutional in response to the plaintiff's -- I'm sorry, the

17   defendant's Tenth Amendment challenge, and that, therefore, I

18   declare that the statute is -- is constitutional, that it

19   preempts those proceedings, and that they are hereby enjoined

20   in accordance with the statute.

21       **THE COURT:**  Well, now, exactly how do we apply that?

22   Let's assume I give you exactly what you've asked for and

23   suggested that the Court should issue, our friends from

24   Connecticut, your colleagues from Connecticut, say that what

25   they are seeking to ascertain is whether the carriers have

1   published privacy policies concerning customer information.

2           Now, surely, that kind of an inquiry would not be

3   foreclosed by Section 803, would it?

4           **MR. COPPOLINO:**  Your Honor, let me answer the

5   question this way, because this is really the nub of, I think,

6   their argument.  They don't seem to contest the Tenth Amendment

7   issue anymore, and so we are simply down to whether or not

8   Section 803 forecloses, as they put it, "some aspects" of their

9   investigation.

10          Now, I would like to address each of the states and

11  deal with Connecticut first, since you raised it, but the

12  bottom line is, if there is no jurisdiction to consider the

13  complaint, there ought to be no jurisdiction to consider an

14  interrogatory that was -- that was raised under the complaint.

15          Um, the avowed purpose of each of these

16  investigations from the complaints that were filed, either by

17  public entities or by the Government's themselves, or the

18  subpoenas that have been issued, have been clearly directed at

19  investigating alleged federal intelligence activities, and

20  Congress has barred that.

21          Now, the record on that point could not be clearer.

22  All five investigations began for that reason, and all five

23  continue for that reason, and all five are preempted.  And

24  Section 803 makes that clear.

25          **THE COURT:**  Well, let's assume that's true, and

1  let's assume that the states really are trying to poke around

2  in this area of intelligence-gathering activity by the Federal

3  Government but in the course of doing so they ask questions

4  that are not otherwise foreclosed by Section 803.

5          MR. COPPOLINO:  How do you deal with that?

6          THE COURT:  That's exactly my question.

7          MR. COPPOLINO:  Well --

8          THE COURT:  How do I deal with that?

9          MR. COPPOLINO:  First of all, I don't think that

10  that type of parsing by interrogatory is something that is

11  contemplated or permitted under Section 803.  And, in fact, I

12  think that would be even far more intrusive an injection of the

13  Court into the oversight of the Government's activities, and it

14  would retain sort of an ongoing jurisdiction to police whether

15  particular interrogatories are preempted when it is clear that

16  Congress has, in fact, preempted the -- you know, the -- the

17  very investigation.

18          Now, if you enter summary judgment, as I have

19  suggested, what -- in accordance with the statute, that

20  judgment, as well as the statute, draw a very bright line, that

21  you cannot investigate any alleged federal intelligence

22  activities.  It would be clear to the states; it would be clear

23  to the carriers.

24          Now, at that point, if in the future there is an

25  inquiry that the states wish to make that does not concern an

1   alleged federal intelligence activity, there is nothing that

2   would be an obstacle to that.  And, if a question arose in a

3   future case, it could be dealt with in a future case.

4         **THE COURT:**  And you think I'm not going to get some

5   inquiries down the road about whether these investigations or

6   other investigations may not run afoul of --

7         **MR. COPPOLINO:**  Well --

8         **THE COURT:**  -- the rather broadly -- broadly phrased

9   injunction that you are seeking?

10        **MR. COPPOLINO:**  Well, it's certainly a possibility,

11  but, on the other hand, though, where that line is clearly

12  drawn, that where you say, in accordance with Congress'

13  directive, that any inquiry cannot get into any alleged federal

14  intelligence activity, that is, per se, excluded.  The states

15  would know that, and they would know that with respect to

16  whatever response they are going to get to whatever question

17  from the -- from the carriers.

18        But let me go back a step further, Your Honor, on

19  this issue of whether or not there is some potential carve-out

20  here.  And I don't really intend to get too deeply in the

21  weeds, but let me just make the following point.

22        **THE COURT:**  You don't intend to?

23        **MR. COPPOLINO:**  Get too deeply in the weeds on all

24  of their arguments about interrogatories, because I think, in

25  fact, if you take this state by state, the bottom line is that

1   all that is left in every one of these states, um, is the -- an

2   investigation into national security activities, not

3   non-national security activities.

4           Either there are no non-national security activities

5   at issue, or they have already been dealt with by the carriers

6   in their responses to the states or what the state thinks is

7   not covered in some of these interrogatories we think is, in

8   fact, covered.

9           Now, New Jersey doesn't even make this argument.

10  They make no effort to suggest that any of their inquiries do

11  not go to the NSA's alleged activities.

12          Missouri does attempt to draw a distinct, but, on

13  the face of their request, a testimony subpoena and a document

14  subpoena, it's clear that Missouri is seeking information

15  regarded to alleged NSA activities.

16          With respect to Connecticut, this is not just simply

17  an issue of public privacy policies.  As I think Mr. Nichols

18  pointed out last time we were here two years ago, if that were

19  the case, if that were are all that were at issue in

20  Connecticut, there would be no case because those matters --

21  those items are available publicly.  And if the state of

22  Connecticut is here to say that's all we want, public privacy

23  policies, that is not something that is in any way affected by

24  the statute.

25          But, at the same time, the rest of their

1    investigation, virtually everything else in their

2    investigation, contrary to what they argued, does, in fact, go

3    to the subject of their complaint, which is alleged federal

4    intelligence activities.

5            There -- there isn't just one interrogatory in

6    Connecticut; there are 30 subparts of interrogatories from the

7    ACLU.  And, in addition to that, the State Department of Public

8    Utilities has themself *(sic)* issued interrogatories which

9    expressly go to alleged NSA activities.

10           What they are arguing is not that that is not at

11   issue, but that it is not the, quote, "exclusive focus," but,

12   in fact, when all of those interrogatories are directed at

13   obtaining evidence to prove the allegation in the complaint

14   that is at issue in that case.

15           And the mere fact that some of them don't say the

16   National Security Agency is irrelevant, they are all directed

17   at obtaining information about whether or not there has been a

18   alleged federal intelligence activity that has occurred in

19   those states.  And, by the way, all of those interrogatories

20   define Government entity to include the NSA.

21           *THE COURT:*  Where do I find those interrogatories?

22           *MR. COPPOLINO:*  I know that they have been filed in

23   the record, Your Honor.  This is Connecticut, let me see if I

24   have a docket cite here.

25           *THE COURT:*  Okay.

1          **MR. COPPOLINO:** I have it as docket -- this is the

2   ACLU, Docket 1-4, which was an exhibit to our complaint in this

3   case, but perhaps we could track down the exact citation.

4          I'm not actually sure that the Connecticut

5   department interrogatories are in the record here, but they are

6   similar interrogatories that the state of Connecticut itself

7   has served.

8          **THE COURT:** It's always helpful to have what we are

9   talking about in the record.

10          **MR. COPPOLINO:** I understand, Your Honor. And these

11   are, at least in the case of Connecticut and Vermont, fairly

12   voluminous records. And the parties have selectively excerpted

13   them. And the ACLU interrogatories were the particular excerpt

14   that were put in this record from the Connecticut proceeding.

15          **THE COURT:** Well, I always appreciate being spared

16   of interrogatories, but it might be handy to have them.

17          **MR. COPPOLINO:** Yeah, it was Tab 1 to the

18   Government's -- the Government's motion for summary judgment.

19          **THE COURT:** Okay.

20          **MR. COPPOLINO:** Your Honor, I have an extra copy, if

21   I could just hand it up to the Court.

22          **(Handing up exhibits.)**

23          **THE COURT:** This is -- oh, I see, thank you.

24          **MR. COPPOLINO:** Those were exhibits that we

25   attached. And the underlying summary judgment materials that

1   were filed before the transfer would also be in the -- in the

2   record of the Court, Document 536-2.

3           **THE COURT:**  536-2, okay.

4           **MR. COPPOLINO:**  So, Your Honor, just to briefly

5   reiterate, I think it would be not appropriate to try to go

6   interrogatory by interrogatory, but even if you did, all of

7   these interrogatories, whether they identify the NSA as at

8   issue or not, all of them are directed towards proving the

9   allegations in the complaint.

10          And further, they are all -- they are also directed

11  at allegations that generally concern the Federal Government,

12  including the issuance of national security letters, all of

13  which would fall within the scope of the preemption of Section

14  803 of the FISA.

15          And even to the extent that they did not, Congress

16  properly legislated on the basis of finding that particular

17  investigations that are underway must be preempted and based on

18  the -- because of the subject matter of those investigations.

19  And I think that has to be the broad focus of the Court, is the

20  subject of what the states are inquiring into, not whether one

21  particular subpart of 30 or 40 interrogatories presents no

22  particular concern.

23          And I could continue to -- if you want to address

24  some of the other state issues, Your Honor.

25          **THE COURT:**  All right, well, go ahead.  I know you

1    want to address the more general issues.

2              **MR. COPPOLINO:**  Well, I think -- I think that with

3    -- so again, I think with respect to Connecticut, the bottom

4    line is that notwithstanding their argument that there are some

5    things that are not within the scope, I think that's just

6    simply not an accurate characterization of what they seek, and

7    it's not an accurate characterization of their investigation.

8              The state of Maine actually does not make the

9    argument that their requests don't concern alleged federal

10   intelligence matters; they make somewhat of a different

11   argument.  Because there is no question that like the others,

12   their inquiry was focused at whether or not the carriers that

13   do business in Maine cooperated with the NSA, Maine's argument

14   is somewhat different; they argue that they are actually not

15   investigating anything yet, that they are still deciding

16   whether to investigate.

17             And, with respect to my friends from Maine, I think

18   that is a semantical distinction that really is irrelevant

19   here.  Maine has demanded that Verizon respond under oath,

20   under penalty of perjury and sanction of state law, regarding

21   the very subject area that Congress has preempted.  And so I

22   don't think, first of all, that could properly be characterized

23   as not an investigation.  Again, that is semantical because,

24   without question, the subject area that they are seeking to

25   investigate falls within what Congress has preempted.

1    They have demanded that Veri -- they have issued not

2    only requests that Verizon answer certain information and

3    directed them to, in fact, they went so far as to issue a

4    contempt subpoena and ordered a hearing that Verizon be held in

5    contempt, which the Government had to successfully enjoin.

6    The statements that they seek from Verizon are

7    purportedly derived from a press release Verizon issued about

8    the allegations.  In fact, when you look at them closely, they

9    actually misquote Verizon's press release at least in three or

10   four instances.

11   But, regardless, what they are actually seeking to

12   do is working off of a public statement, demand sworn testimony

13   under state investigative procedures on topics that squarely

14   fall within Section 803 and have demanded that Verizon answer

15   under penalty of perjury and sanction.

16   Furthermore, if you look at what they ask Verizon to

17   do, it's not simply affirming the truth of a press release,

18   they are asking Verizon to make affirmative representations as

19   to how it will deal with the United States Government in the

20   future by requiring Verizon, and again, under penalty of

21   sanction of state law, that it will only do certain things.

22   And that's expressly preempted by Section 803 itself, which

23   forecloses a state from imposing any administrative sanction on

24   a carrier for its alleged assistance to a member of the

25   intelligence community.

1          I think, in that respect, the Maine inquiry is worse

2     than the others, because it actually seeks to, in effect,

3     enjoin Verizon from doing certain things as a matter of state

4     law, and it is not simply seeking to affirm the content of a

5     press release.

6          And, in any event, unlike the argument that

7     Connecticut may make that there are some interrogatories that

8     aren't relevant to alleged federal intelligence activities, the

9     Maine inquiry is 100 percent within the scope of Section 803.

10         And the last state I'll mention is Vermont.  And I

11    saved Vermont for last because I think, in some respects, their

12    sur-reply was the most misleading.  As with all of the other

13    states, Vermont opened an investigation that unambiguously

14    concerned alleged NSA activities.  They denied a motion to

15    dismiss.  They said that they are going to probe every issue,

16    that the Government, in effect, would have to come and stop us,

17    and so we did file suit.  And Vermont stood down for a bit of

18    time.

19         In 2007, Vermont tried to limit the scope of their

20    investigation, and that was the order that the state of Vermont

21    attached to their sur-reply.  But, a couple of things about

22    that.  First of all, that order does not purport to halt any

23    investigation into alleged federal intelligence activities,

24    what it does is it bifurcates Vermont's inquiry and says first

25    we'll inquire about some non-national security matters, and

1   then, secondly, we'll await further developments regarding

2   Federal Court proceedings, and particularly the State Secrets

3   Privilege, and that will broaden the scope of our inquiry and

4   continue.  So, at a bare minimum, you have to understand with

5   respect to Vermont that they have not simply limited their

6   investigation to non-national security matters.

7            Now, here is the rest of the story that was not in

8   the sur-reply.  In fact, pursuant to the order, which was

9   supposedly limited to non-national security matters in Vermont,

10  new interrogatories were issued and they were responded to.  So

11  the non-national security issues were addressed by -- by

12  Verizon and by AT&T in the state of Vermont.

13           Then -- this is where it gets even more

14  interesting -- Section 803 is enacted, and the Vermont Public

15  Service Board asks the parties how it should proceed.  And

16  unfortunately, this is another one that is not in the record,

17  but I do have a copy I can hand up.

18           The Vermont Department of Public Service, which is

19  not the board, but it is the representative of the people of

20  Vermont before the board, as I understand it, it's the

21  statutory representative of the public before the board, and it

22  supervises all public laws related to telephone and utility

23  services in Vermont, the Vermont Department of Public Services,

24  having reviewed these interrogatory responses by AT&T and the

25  NS -- and Verizon, in August of last year wrote a letter to the

1  board, and it said we have reviewed all of the responses by

2  AT&T and Verizon, and we have -- all of its

3  non-security-related disclosures of customer information were

4  likely -- were likely -- and that those response and those

5  disclosures of customer related information were likely

6  compliant with Vermont law, and that based on AT&T's and

7  Verizon's reading of the limited order issued by the Vermont

8  board that focused on non-national security matters, the

9  Vermont Deposit of Public Service concluded that they have

10 produced all of the information that responds to that order.

11            And, in fact --

12            **THE COURT:**  Who's produced that information?

13            **MR. COPPOLINO:**  AT&T and Verizon.

14            And so the board went to say as a result, it doesn't

15 believe there is any basis to continue to investigation of AT&T

16 and Verizon disclosures in this matter.

17            Now, that is a recommendation to the Public Service

18 Board.  They are not -- I don't think they are bound by that,

19 but you have the Vermont Department of Public Service saying

20 that insofar as non-national security related inquiries are

21 concerned, Verizon and AT&T have complied.  So that is not at

22 issue, as far as we can tell, in Vermont.

23            What's at issue in Vermont is the issue before this

24 Court, which is whether Congress can properly preempt the non

25 -- the national security side of this investigation, whether

1    section 803 is constitutional, and whether part 2 of the

2    Vermont inquiry can go forward.

3           And, Your Honor, I can hand up the Vermont Public

4    Service letter, if it would please the Court.  We can add it to

5    --

6           Can I just have --

7           There were two letters, Your Honor, one for Verizon

8    and one for AT&T.

9           **THE COURT:**  I'm going to ask that you submit those

10   in the docket --

11          **MR. COPPOLINO:**  Yes, I will, Your Honor.

12          **THE COURT:**  -- so that they obtain a docket number

13   and a position in the record before these documents can be

14   established, all right?

15          **MR. COPPOLINO:**  So, I think, just to summarize, Your

16   Honor, insofar as the states are now relying on an argument

17   that there are avenues that they could still be going down, in

18   virtually -- in all of the states I think that is not true.

19          In the case of Vermont, that avenue has been

20   exhausted, and all that is left, in our judgment, based on the

21   record, are national security-related inquiries preempted by

22   Section 803.

23          Likewise, in Maine, all of their activities concern

24   what the subject of the -- the Section 803 New Jersey and

25   Missouri as well.  And the focus of the Connecticut complaint

1    is that inquiry as well.  And, so far as I can tell, having

2    looked at every single one of the interrogatories in

3    Connecticut, the only one that doesn't appear to concern or

4    that doesn't appear to be directly related to the scope of

5    Section 803 concerns public-privacy policies -- public-privacy

6    policies.

7            But, you know, we asked these states before -- once

8    Section 803 was enacted, we called the states, and we had a

9    conference call, and we said why does this case have to go

10   forward?  Don't you see that you are preempted in these

11   investigations?  And they said, we'll get back to you.

12           And then we tried again and said it what is left to

13   this case?  And by the very fact that they continue to litigate

14   over the lawfulness of Section 803 and what it seeks to

15   preempt, it's apparent to us, at least, that that is a road

16   they do want to go down, they want the statute struck down, and

17   they want to have the right to go to into the subject matter of

18   the investigations that Congress has preempted.

19           Your Honor, I want to just close by saying there is

20   a great quote in the Supreme Court's case, **_Garcia versus San_**

21   **_Antonio Metropolitan Transit Authority_**, which concerned an

22   effort by Congress to impose labor standards on the local

23   Government.  And the Supreme Court said in that case, which

24   involved the Tenth Amendment issue, that, "states must find

25   their protection from federal regulation through the natural

1   political process, not through judicially defined spheres of

2   unregulated state action."

3          What the states are asking you to do is to try to

4   somehow define a judicially defined sphere of unregulated state

5   action, but Congress has acted pursuant to its lawful authority

6   that had been reserved to the United States under the

7   Constitution.  It's express preemption is clear.  And that

8   should be the end of the case.

9          I thank the Court unless you have any further

10  questions.

11         **THE COURT:**  All right.

12         Do the carriers wish to be heard before I turn to

13  the states?

14         **MR. SHUMSKY:**  No, Your Honor, unless there are any

15  particular questions that the Court has --

16         **THE COURT REPORTER:**  State your name.

17         **MR. SHUMSKY:**  I'm sorry.

18         Any Eric Shumsky for the AT&T entities.

19         No, Your Honor, unless there are any particular

20  questions that you have relating to the carriers.

21         **THE COURT:**  Very well.

22         Mr. Kester?

23         **MR. KESTER:**  Same answer.

24         **THE COURT:**  Mr. Kester, you are surely not going to

25  pass up an opportunity to say something.

1          **MR. KESTER:**  Your Honor, I'm going to let the cup

2      pass at this motion moment.  I think we are -- Sprint is a

3      party only in the New Jersey case, which is, I think

4      Mr. Coppolino indicated, the cleanest case of all, anyway.  And

5      I don't have anything at this time to add to what he said.

6          **THE COURT:**  I see, all right, but New Jersey may

7      prompt a thought; is that the observation?

8          **MR. KESTER:**  We'll see what happens, Your Honor.

9          **THE COURT:**  All right, we'll see what happens, okay.

10          Who wants to lead off?  We have heard a good deal

11      about --

12          **MR. TAUB:**  Chris Taub for the Maine Public Utilities

13      Commission.

14          **THE COURT:**  All right.

15          As Maine goes, so does the nation, they used to say.

16          **MR. TAUB:**  Good morning, Your Honor.

17          If I may, I would like to start by trying to

18      convince the Court that Section 803 actually is an

19      unconstitutional exercise of Congress' powers.

20          **THE COURT:**  All right, let's start there.

21          **MR. TAUB:**  Okay.

22          **THE COURT:**  That's a pretty big task.

23          **MR. TAUB:**  To the extent the Mr. Coppolino suggested

24      that some of the states have abandoned that argument, the other

25      states can speak for themselves, but I think it's -- I'm pretty

1  safe in saying that no state has abandoned the argument that

2  Section 803 is an unconstitutional exercise.

3          **THE COURT:**  And you are telling me by no means has

4  Maine done so.

5          **MR. TAUB:**  And, certainly, Maine does not drop that

6  argument.

7          Just last week, Your Honor, the Ninth Circuit in the

8  ***Mohamed Versus Jeppesen Data Plan*** case, the Ninth Circuit

9  reaffirmed a principle that the Supreme Court before has -- has

10 talked about, and that principle is that the constitutional

11 design of separating the powers of the Federal Government into

12 three branches is intended to guard against one branch

13 encroaching impermissibly on individual liberties.  And so the

14 three branches --

15         **THE COURT:**  Well, but that case didn't involve

16 federal state relations, did it?

17         **MR. TAUB:**  It didn't, Your Honor, but I think that

18 there is one statement from that decision that is applicable

19 here, and I'll explain why.

20         The Court said that separation of powers concerns

21 take on an especially important role in the context of secret

22 executive conduct.  Now, admittedly, Your Honor is absolutely

23 correct that that case did not involved a conflict between

24 State and Federal Government, but the same principle about the

25 separation of powers is also at play in the Constitutional

1  design of dividing up sovereign powers into the State

2  Governments and the Federal Government.

3         And in -- in the **_Gregory versus Ashcroft_** case, the

4  Supreme Court said that, "the Constitutionally mandated balance

5  of power between the states and the Federal Government was

6  adopted by the framers to ensure the protection of our

7  fundamental liberties."

8         And, I believe, the Court, in **_Printz versus United_**

9  **_States_**, repeated that.  So, we really have sort of two

10 structural protections here, we have the three branches of the

11 Federal Government providing checks and balances, and then we

12 have the State Government and the Federal Government providing

13 a check and balance.

14        **THE COURT:**  Well, I'm not familiar with the first

15 case you mentioned, but **_Printz_** was a case in which the Federal

16 Government imposed obligations on the state to carry out

17 federal policy; now, that's not the situation here, is it?

18        **MR. TAUB:**  That is true, Your Honor, that that is

19 not the same situation, but I think why **_Printz_** is relevant is

20 -- is not so much because of the kind of action that the

21 Federal Government was trying to require of the states, but the

22 reasoning behind the eventual holding of the decision.

23        And -- I think what's important to take away from

24 these cases is that -- is that by preventing the Federal

25 Government from -- from encroaching on the sovereignty of the

1    states, we are allowing the states to provide a check against

2    -- against the Federal Government's encroachment on individual

3    liberties, just like the three branches do within the Federal

4    Government.

5              **THE COURT:**  Well, there is no question, is there,

6    that the Federal Government has exclusive authority to deal

7    with national security issues, and that is not a matter that

8    has traditionally been done by the states or is deemed to be

9    appropriate for state action.  This is clearly a matter that

10   that has been reserved to the Federal Government, and we all

11   accede to that; isn't that true?

12             **MR. TAUB:**  Yes, Your Honor, we would.

13             **THE COURT:**  And this is an effort, Section 803 is an

14   effort, is it not, by Congress to protect the exclusive

15   authority of the Federal Government in national security

16   intelligence matters?

17             **MR. TAUB:**  Well, I think that's where at least Maine

18   would disagree, Your Honor.

19             **THE COURT:**  How so?

20             **MR. TAUB:**  Well, I think -- first -- first, I think

21   what we need to make clear is that there is a difference

22   between the Federal Government preempting state laws and the

23   State Government instead deciding not to preempt state laws,

24   but tell the states that they can't enforce their non-preempted

25   laws.

1          And so, sort of the comparison or the analogy that I

2    would make is if Congress had said, had passed a law saying,

3    umm, whenever phone carriers are asked for records from the NSA

4    they may provide them to the NSA, and any state privacy laws to

5    the contrary are hereby preempted.  That, it seems to me, would

6    be -- would be -- at least it would be permissible in the sense

7    of there wouldn't be an encroachment on the state's sovereignty

8    because congress certainly may preempt state laws that conflict

9    with federal laws.

10         **THE COURT:**  Well, but isn't that what this provision

11   does?  Isn't that what Section 803 does?

12         **MR. TAUB:**  No, Your Honor, it doesn't.  There is

13   nothing in 803 that preempts any state law.  You don't see any

14   language in there saying the state privacy laws relating to

15   phone carriers are preempted, or we're preempting state laws

16   that conflict with the following.

17         All you see in 803 is just a thou-shalt-not command

18   to the states, thou shalt not investigate phone carriers'

19   participation with -- with -- with the NSA.

20         **THE COURT:**  Well, it states:  "No states shall have

21   the authority to require through regulation or any other means

22   the disclosure of information about electronic communication

23   service providers' alleged assistance to an element of the

24   intelligence community or to impose an administrative sanction

25   or to commence a civil action."

1            It doesn't say thou shalt not pass a law, but it's

2    pretty clear that this provision is directed to an

3    investigation or regulation or administrative sanction as part

4    of an effort by the states to determine what, if anything,

5    telecommunication carriers have done to cooperate with the

6    gathering of national intelligence.

7            **MR. TAUB:**  Well, Your Honor, I think there is a

8    distinction.  I mean, this a very unusual provision in a

9    federal law.  And I'm frankly not aware of any situation where

10   Congress has simply said to states you may not enforce this

11   law.  There are certainly numerous cases where they have

12   preempted state laws.

13           And what I'd like to do is direct the Court to

14   **New York versus the United States**, which is the case involving

15   radioactive waste.

16           **THE COURT:**  Before you get to that, and I want to

17   hear you on that, but in a sense, aren't you arguing that this

18   provision, this preemptive provision, is narrower than a

19   provision which Congress could enact?

20           You admit that Congress could forbid the states from

21   enacting laws dealing with national intelligence, the gathering

22   of national intelligence, but Section 803 does not do so.

23   Section 803 simply prohibits an investigation or the imposition

24   of sanctions, or these other measures that are expressly set

25   forth, so isn't this actually a narrower preemption than the

1    preemption that you contend the Federal Government could

2    impose?

3            **MR. TAUB:**  Ironically, Your Honor, it is.  And I

4    think that actually demonstrates what their problem is here.

5            **THE COURT:**  How so?

6            **MR. TAUB:**  Well, if Congress wanted to sort of take

7    the most sweeping position, which would be we are going to

8    completely preempt state regulation of interstate phone

9    carriers, I'm not an expert on that area of the law, but my

10   guess is that would is certainly be within Congress' power.

11   And that would be the most broad-sweeping kind of preemption

12   that Congress could do.

13           Alternatively, Congress could have taken the

14   approach that Your Honor suggested, but the problem with that,

15   and this is why the **New York versus United States** case is

16   relevant, is it comes down to an issue of accountability and

17   checks on, on the federal power.

18           And what I'd like to do is just read a passage from

19   the New York case and then explain why that's relevant here.

20   And what the Court said is that, you know, if the citizens of

21   New York don't want to deal with radioactive waste, then they

22   can elect their state officials, who are going to sort of

23   legislate according to the desires of New York citizens.

24           And then what the Court said is, "that view," in

25   other words, the view that we are not going to regulate

1   radioactive waste, "can always be preempted under the Supremacy

2   Clause if it is contrary to the national view, but in such a

3   case, it is the Federal Government that makes the decision in

4   full view of the public, and it will be federal officials that

5   suffer the consequences if the decision turns out to be

6   detrimental or unpopular."

7           And then the Court went on to say, "accountability

8   is thus diminished when, due to federal coercion, elected state

9   officials cannot regulate in accordance with the views of the

10  local electorate in matters not preempted by federal

11  regulation."

12          And so what We understand the Court to be saying is

13  that if Congress had passed a law such as I proposed earlier,

14  which is phone carriers may turn over records to the NSA

15  whenever the NSA asks for it, then that would be a matter that

16  the public can -- can weigh in on.  It's a transparent process.

17  And if the Court thinks that is bad public policy or it's a

18  violation of a constitutional provision to have a law like

19  that, then the public knows who is responsible and they can

20  address Congress on that.

21          So we actually think it would be much less a

22  violation of state sovereignty for Congress to have sort of

23  taken the ball and passed a law that governs what the

24  relationship is going to be between phone companies and the

25  NSA.

1    **THE COURT:**  What you're saying, if I understand you,

2    is that the problem with the statute is that although Congress

3    could swallow whole this area of activity by the states, this

4    provision is unconstitutional because all Congress has done is

5    nibble around at the edges of this activity.

6    **MR. TAUB:**  What we're saying, Your Honor, is if

7    Congress wants to decide whether or not the public has a right

8    to -- to know what's happening with their phone records, then

9    Congress should -- should legislate and then the people can

10   address Congress.

11   What this has done is it's put the states in a

12   position -- for instance Mr. Cowie from Maine complained that

13   he thought his phone records were being turned over to the NSA

14   in violation of the Constitution, and he asked the Maine Public

15   Utilities Commission to investigate it.  If this law is valid,

16   we have to tell Mr. Cowie, even though our privacy laws are

17   there and even though Congress has not preempted them, we can't

18   do what you ask.

19   I think what the New York court was concerned with,

20   and we also cited a dissent from the Second Circuit, Judge

21   Cardamone in the **Clearing House** case, which is now up on cert,

22   both Judge Cardamone and the Supreme Court recognized that

23   there is a fundamental difference there, because it's one thing

24   for Congress to enter the field and declare the policy, it's

25   another thing to sort of make the states be the brunt of the

```
1   public criticism when it's not the states at fault.
2                THE COURT:  How is the state going to be criticized
3   for not investigating an activity which Congress has said thou
4   shalt not investigate?
5                MR. TAUB:  Well, I think for the same reason that
6   the New York versus U.S. Supreme Court was concerned:  The
7   Court didn't think it would be enough for New York officials to
8   tell the public, look, we're sorry that we can't deal with
9   radioactive waste the way we want to, but Congress is telling
10  us what to.
11               THE COURT:  Not unusual for Government officials to
12  say, oh, this is not my responsibility.
13                         (Laughter.)
14               THE COURT:  They do that all the time.
15               MR. TAUB:  Well, Your Honor, we respectfully submit
16  there is a fundamental distinction here.
17               And another -- well, I think if Congress wants to --
18  I'm repeating myself, and I apologize.  But --
19               THE COURT:  That's all right, I didn't understand
20  you the first time.
21                         (Laughter.)
22               MR. TAUB:  But again, if Congress wants to pass a
23  law saying when and how phone records are going to be shared
24  with the NSA, then let Congress do that and let the public
25  weigh in on the matter.  But what Congress should not be
```

1    allowed to do is to violate the state sovereignty by saying to

2    a state, even though your law is still valid and on the books,

3    we're not going to let you enforce it.  We think that's a

4    fundamental difference.

5                THE COURT:  Well, Congress is not saying by Section

6    803 that Maine statutes with respect to the privacy of

7    telephone resources is unconstitutional; that is certainly not,

8    as I gather, Congress' intention in Section 803.  But what it

9    is saying is that the application of those laws to gather

10   information about what, if anything, telecommunication carriers

11   have done to respond to a National Security Agency request is

12   an inappropriate application of those laws.  Surely Congress

13   has the authority to make that kind of a declaration, doesn't

14   it?

15               MR. TAUB:  We -- we do not think that Congress has

16   the authority under the Constitution to tell a state that its

17   non-preempted laws cannot be enforced.

18               Another analogy I could make is that --

19               THE COURT:  Have you got an analogy where a

20   non-preempted law has been held to be something that Congress

21   cannot preempt?

22               MR. TAUB:  Well, if I understand your question --

23               THE COURT:  Can you give me an example that I can --

24               MR. TAUB:  Well, I'm sorry could you repeat --

25               THE COURT:  -- get my mind around?

1          **MR. TAUB:**  Could you repeat the question?

2          **THE COURT:**  Well, I'm asking you, can you give me an

3    example of where a court, perhaps the Supreme Court of the

4    United States, has said that a non-preempted state law cannot

5    be preempted in its particular enforcement?

6          **MR. TAUB:**  Your Honor --

7          **THE COURT:**  That's the point you're making, I

8    believe.

9          **MR. TAUB:**  Yes, yes.  And the best we can do, Your

10   Honor -- and, first of all, I think the reason we can't come up

11   with examples is because -- is not because the argument we are

12   making is extraordinary, but it's because what Congress did

13   here is extraordinary.

14          Frankly, I'm not aware of situations where Congress

15   has ever done something like this before.  The closest thing

16   that -- that we can find, and I'm hoping this will one day be a

17   Supreme Court decision because it is on cert now, is in the

18   **_Clearing House_** case.

19          And in that case, under -- under a federal agency's

20   interpretation of federal law, New York was -- was prohibited

21   from investigating whether banks had violated state

22   anti-discrimination laws.

23          And Judge Cardamone -- Cardamone made the point that

24   that's something that is not a permissible encroachment on

25   state sovereignty, that Congress cannot say to a state, we are

1    not going to preempt your laws, but we're going to stop you

2    from enforcing them.

3           And so I would -- and I understand that it's a

4    dissent, but we think that the *Clearing House* case, the dissent

5    in the *Clearing House* case is directly on point.

6           Now, the majority in that case never really even

7    addressed the issue, but what we think that Judge Cardamone had

8    it exactly right, and that there is a fundamental difference

9    between preempting state law and telling a state you can't

10   enforce your non-preempted law.  That is the only judicial

11   precedent that we can find for Your Honor.

12          *THE COURT:*  A dissent.

13          *MR. TAUB:*  A dissent which, crossing our fingers,

14   might turn out to make it way into the majority in the Supreme

15   Court.

16          *THE COURT:*  Okay.

17          *MR. TAUB:*  well, Your Honor, unless you have any

18   other questions about sort of our sovereignty -- well, one

19   other point I would like to make about our sovereignty argument

20   is that -- is that even if Congress can preempt a state from

21   enforcing its non-preempted laws, we think that Congress has to

22   do it in sort of a very narrow way without unduly interfering

23   with the state's ability to carry out its -- its sovereign

24   functions.

25          *THE COURT:*  Well, okay, that kind goes to the first

1    question I asked you; isn't this pretty narrow?  Isn't Section

2    803, in fact, quite a narrow statute, as it prohibits only

3    certain enumerated activities?

4         *MR. TAUB:*  Well, Your Honor, no.  We would compare

5    it to Section 802, where -- where Congress didn't say, you

6    know, actions against phone companies alleging improper

7    disclosure to the NSA are hereby preempted.  It set up a

8    process so that a court can be involved to find out whether

9    there is really a good faith basis for insulating the phone

10   companies from those kinds of cases.

11        *THE COURT:*  But didn't Congress include that

12   provision in Section 803?

13        *MR. TAUB:*  Not in 803, Your Honor.  In 803, Congress

14   is just saying flatly to states, you are hereby preempted.

15   There is no -- there is no role for the Federal Court.

16        *THE COURT:*  It states:  "The district courts of the

17   United States shall have jurisdiction over any civil action

18   brought by the United States to enforce the provisions of this

19   section."

20        *MR. TAUB:*  Right, but -- but they's no -- unlike

21   802, there is no suggestion that the Court is going to be able

22   to look at sort of the individual factors; in other words, is

23   this investigation really going to disclose information that

24   shouldn't be disclosed?

25        *THE COURT:*  Ahh, well, but --

1          **MR. TAUB:**  Balancing --

2          **THE COURT:**  That was my question to Mr. Coppolino,

3    precisely what of the investigation of the various states here,

4    or investigations of the various states, is he seeking an order

5    of this Court to prohibit?  I was trying to get down to the

6    nitty gritty of what it is that he is asking me to do.

7          And so, why isn't that an appropriate inquiry?

8    Doesn't that suggest that, in fact, this preemptive provision

9    is, indeed, quite narrow, maybe even surgically narrow, and,

10   therefore, does not run afoul of state sovereignty in any

11   material way?

12         **MR. TAUB:**  Well, certainly, under the DOJ's

13   interpretation this is not surgical.  I mean, I heard

14   Mr. Coppolino say that even an interrogatory that asks for

15   copies of privacy policies is preempted under this because it's

16   sort of some kind of inquiry that is part of a broader

17   proceeding that might touch upon areas that are preempted.  So,

18   no, we don't think this is surgical at all.

19         I think this is a club that is just going to, under

20   the DOJ's interpretation, it's going to preempt all kinds of

21   investigations that, frankly, we don't think Congress ever

22   intended to preempt.

23         **THE COURT:**  Well, what do I do with this situation:

24   Let's assume that the state's inquiry is one that is

25   appropriate and is not expressly foreclosed by Section 803, but

1   is in the context of an investigation concerning the carrier's

2   cooperation with the National Security Agency and gathering

3   national intelligence and is, therefore, within the preemptive

4   provisions of Section 803; so what do I do with an innocuous

5   question that is part of an offending investigation?

6          MR. TAUB:  Frankly, Your Honor, I think that the

7   Court has to -- has to parse through the individual inquiries

8   and decide which -- which inquiries are covered by 803 and

9   which aren't.  I don't see anything in this law that suggests

10   that simply because a particular inquiry is part of some

11   broader proceeding the individual inquiry is precluded.

12          And it would really elevate form over substance

13   because, to take Connecticut's example, if the Court enjoined

14   in this proceeding, all Connecticut would have to do is start

15   over and just ask a narrower set of inquiries, and then we'll

16   be back in court arguing about whether or not these new

17   inquiries are seeking information that the states are preempted

18   from asking for.  So, I don't think it's as simple as just

19   striking down every single inquiry because it's part of some

20   bigger umbrella.

21          THE COURT:  Somebody at some point might ask why

22   does the state want this information?

23          MR. TAUB:  Let me turn to Maine, if I may.

24          THE COURT:  All right.

25          MR. TAUB:  Mr. Coppolino suggested that, you know,

1   semantics are meaningless, and I respectfully disagree with

2   that.   I think that when Congress uses particular words, those

3   words mean something.   And I think we have to carefully look at

4   the words to figure out what Congress was trying to do.

5           I think the other thing that is important to keep in

6   mind is that I think that the DOJ in their brief has suggested

7   that there is no presumption against preemption here because --

8   because Congress has historically been involved in this

9   particular field.   And I think even just recently the Supreme

10  Court has rejected that.

11          The Supreme Court has said that when a law intrudes

12  upon a particular sort of classic state function, it doesn't

13  matter how extensively the Federal Government has regulated

14  that, you are still going to give a presumption against

15  preemption because that is the way to ensure -- and I think

16  it's sort of based on the assumption that Congress does not

17  cavalierly intrude on state sovereignty, so we are going to

18  very narrowly construe a statute to avoid preemption whenever

19  possible.

20          And I think in Maine's case, first of all, why is

21  Maine doing what it's doing?   Maine had a request to open an

22  investigation, and Verizon, in response to that request, filed

23  a brief with the PUC in which they attached two press releases.

24  And in their brief, they simply referred to the press releases

25  and basically said see what we've said in our press release,

```
 1   and for these reasons we don't think you should open an
 2   investigation.
 3            Now, the PUC is essentially a court in a situation
 4   like this.  And the PUC didn't feel that it's appropriate for
 5   them to base their decision on a couple of press releases that
 6   are attached to one of their filings.  The analogy I would make
 7   is if a witness got up in front of this Court and said, I'm not
 8   going to testify under oath, but instead I would like you to
 9   submit this press release that I issued last week, I don't
10   think that the Court would stand for that.  And the PUC is not
11   standing for it either.
12            When someone makes a statement to the PUC which is
13   clearly intended to influence the PUC and to get the PUC to
14   make a decision, the PUC's position is that that statement
15   should have some sort of indicia of reliability.  And so, all
16   we have asked Verizon to do is to simply state under oath that
17   their statements are true.
18            Now, this is the second time that I've heard the DOJ
19   claim that we have misquoted the statements and I have yet to
20   hear from them exactly how we misquoted the statements.  I have
21   gone through -- we asked Verizon to verify nine states, and I
22   have gone through each of those nine statements, and, except
23   for minor changes, instead of saying we have never disclosed
24   records, we said Verizon has never disclosed records.
25            I don't see any misquoting or in any way going
```

1    beyond what they said in their press release.  We have very

2    narrowly asked them to just affirm nine specific statements

3    that they made in their press release so that essentially the

4    filing in the PUC is complete and the PUC has some indicia of

5    reliability, and the PUC can then decide what it wants to do

6    next.  What it might do next is initiate an investigation, in

7    which case it would fall within the terms of 803, although we

8    think that 803 is unlawful.  Or, it might decide not to

9    initiate an investigation.

10            I think another thing that the DOJ has done which is

11    a little disingenuous is it suggested that Congress

12    specifically intended to preempt what Maine is doing.  And I've

13    gone through the legislative history, and I may have missed

14    something, but I don't see any indication that Congress

15    necessarily thought what Maine was doing was preempted.

16            And, in fact, I think it might be the reverse.

17    Because one -- one thing I saw in the Senate report, and I

18    think when the DOJ quoted this, they used some ellipses, and it

19    sort of ended up taking out part of the quote that I think is

20    relevant, but, in the Senate report, Congress said that the

21    purpose of 803, or that Congress said that 803 was added to

22    address investigations that a number of state regulatory

23    commissions have or might begin to investigate.

24            So it's quite possible, Your Honor, that what

25    Congress was saying is that if at some point Maine decides to

1   initiate an investigation, we intend to preempt that.  But I

2   don't see anything in the Senate report or anywhere else that

3   suggests that Congress believed that by simply asking Verizon

4   to affirm statements it had already made that that -- that that

5   should be preempted.

6              And then, going back to the language of 803 itself,

7   which Mr. Coppolino seems to think we shouldn't really worry

8   about the individual words that were used, but I think we

9   should, respectfully, the statute talks about investigations,

10  and it's clear the PUC has not initiated an investigation.  We

11  are just trying to decide at this point whether to initiate an

12  investigation.  And we are not seeking disclosure of anything,

13  we are just seeking for affirmation of statements that were

14  already made.

15             *THE COURT:*  You are just mulling over the subject;

16  is that it?

17             *MR. TAUB:*  I'm sorry, Your Honor?

18             *THE COURT:*  You're just mulling over the subject.

19             *MR. TAUB:*  That's exactly true.

20             And I think what this shows is that the PUC is being

21  respectful of the federal interest here.  And, certainly, we

22  could have immediately opened an investigation and demanded all

23  kind of information from Verizon, but we didn't.  We asked

24  Verizon for a response, and we decided that once we got that

25  response we would decide what comes next.

1           **THE COURT:**  All right, very well.

2           Well, what comes next is New Jersey.

3           **MS. EIRMANN:**  Thank you, Your Honor.  Connecticut.

4           **THE COURT:**  Connecticut, Connecticut.

5           **MS. LEWIS:**  Hello?

6                       **(No response.)**

7           **MS. EIRMANN:**  Good morning, Your Honor.

8           Tatiana Eirmann, Assistant Attorney General for the

9     Connecticut Department of Public Utility Control.  It's a

10    privilege to be again before the Court, Your Honor.

11          I'm not going to rehash the legal arguments that

12    were so eloquently presented.  We support them.  We signed the

13    joint brief and the sur-reply, but I would like to focus Your

14    Honor on the distinction between the Connecticut case and the

15    rest of the administrative proceedings.

16          Before I do that, I would like to set the record

17    straight -- set the record right:  Connecticut DPUC never

18    issued interrogatories to Verizon or to AT&T.  The

19    investigation was initiated on behalf of the Connecticut ACLU.

20    And the interrogatories issued by ACLU were directed to Verizon

21    and to AT&T.

22          Each set of interrogatories contained 12 questions.

23    They are identical for both AT&T and Verizon, not 30 some

24    questions.  The sub-questions, of course, I believe the

25    Government is considering main questions, but they were to be

1    responded only if the answer to the main one was "yes."

2              Of those 12 questions, I respectfully submit, Your

3    Honor, that only four maybe preempted by 803.  All of the other

4    questions are innocuous, generally, in nature.  Not one of them

5    specifically mentions NSA or FBI or CIA.  They directed to AT&T

6    or Verizon in requesting whether they unlawfully disclosed

7    customer records to private parties, other governmental

8    entities, which means both state and federal, and to, for

9    instance, personnel.

10             *THE COURT:*  Can I really credit that argument?

11   Isn't -- what appear to be innocuous questions as you put it,

12   that is, questions that don't mention the NSA or intelligence

13   gathering or the CIA, or any of these other elements of the

14   intelligence community, as the statute refers to it, but

15   nonetheless, all of these questions are in the context of

16   inquiries and an investigation about whether the

17   telecommunication carriers have provided information to the

18   intelligence community.  So what do I do with what you

19   characterize as an innocuous question, which is wrapped around

20   or wrapped within --

21             *MS. EIRMANN:*  Within.

22             *THE COURT:*  -- an investigation that is prohibited

23   by Section 803?

24             *MS. EIRMANN:*  I would recommend, Your Honor, on

25   behalf of the state of Connecticut, that Your Honor parses

1    through the interrogatories and dismiss those which Your Honor

2    considers and we concede that some of them are indeed reference

3    to it.

4              I don't believe that the Congress probably could

5    preempt an entire planet, so to speak, of investigations.

6    Under the preamble, that they are somewhat related or even a

7    minute part of it is related to national security.  I believe

8    that, as the Court suggested, perhaps the intention was to

9    carve out narrowly only certain questions in our case, certain

10   interrogatories, which do allege assistance with NSA, and those

11   particular interrogatories don't --

12             **THE COURT:**  Well --

13        **MS. EIRMANN:**  Or most of them don't.

14             **THE COURT:**  Let me ask the question of you that I

15   asked Mr. Taub, and that is, why is Connecticut interested in

16   this information?

17        **MS. EIRMANN:**  Your Honor, we have laws, generally

18   applicable laws to all telephone companies, all public service

19   companies, to regulate them in the public interest.

20             **THE COURT:**  Well, but isn't it true that these

21   inquiries were precipitated by the disclosure that the

22   Government, through the National Security Agency and the other

23   elements of the intelligence community had enlisted the

24   cooperation of telecommunications carriers?

25             **MS. EIRMANN:**  It is true, Your Honor.  I'm not

 1   suggesting that we would not have -- though I'm truly not

 2   suggesting that we would not have, on our own, without the

 3   ACLU, complained, have undertaken any kind of inquiry.  It may

 4   not have been formulated in the same way as the ACLU presented

 5   its interrogatories, but I'm pretty certain that under our

 6   state laws we had an obligation to check at least if the

 7   companies have such policies.

 8            THE COURT:  Okay.

 9            Now, what's the problem with a statute that

10   preserves the Federal Government's exclusive role in connection

11   with intelligence gathering for national security purposes?  It

12   is true that these inquiries under 803, if it's to be applied

13   literally, cannot be pursued by the states, but there is

14   nothing that prevents the citizens of Connecticut or Maine or

15   New Jersey or Missouri or anywhere else to apply to national

16   legislators for remedial legislation, to apply to Federal

17   Governmental officials concerning this subject matter.

18            What's the prejudice to the state of Connecticut in

19   strictly applying Section 803?

20            MS. EIRMANN:  Well, it's -- I would go back to the

21   general argument you make.  It's -- the prejudice is our

22   sovereignty is taken away in that sense.  We -- after the

23   investigation, Connecticut Legislature passed law which governs

24   particularly the subject of procurement of telephone records.

25   And in that law we carved out an exception for telephone

1  companies which have any dealings with the national Government.

2          In other words, under state law, if telephone

3  companies have -- submit an affidavit to the DPUC that they

4  have acted in good faith, or reasonably, the inquiry would stop

5  there.  So, the citizens of Connecticut appealed to the state

6  Government for redress of this problem with disclosure of

7  records, and the Legislature responded accordingly and actually

8  protected also the telephone companies.

9          So, at least in Connecticut, I don't see why we need

10  803 since Connecticut law already has an exception to the

11  prohibition of disclosure when telephone companies can

12  reasonably --

13          *THE COURT:*  Well, but there is nothing that forbids

14  the citizens of Connecticut from applying to the national

15  Government for redress.

16          *MS. EIRMANN:*  Well, our two Senators actually did,

17  but it didn't help.  Our Senators did vote against it, but it

18  didn't help, I said.

19          *THE COURT:*  Oh, all right.

20          *MS. EIRMANN:*  The Connecticut voters responded

21  accordingly.

22          *THE COURT:*  That's the problem with a national

23  Government.

24          *MS. EIRMANN:*  Yes, indeed.

25          *THE COURT:*  But we all live with that in lots of

1    different ways, don't we?

2         And surely, there is an interest here in national

3    security that extends beyond the boundaries of the great state

4    of Connecticut.

5         **MS. EIRMANN:** It -- there is, Your Honor, we are not

6    suggesting there isn't.

7         Our point is that the inquiry we have initiated is

8    narrow enough to escape the full-blown provision of 803. And

9    we think Your Honor has the authority to precisely do that.

10        **THE COURT:** All right.

11        **MS. EIRMANN:** Thank you, Your Honor.

12        **THE COURT:** Thank you very much.

13        You are speaking on behalf of Missouri.

14        **MS. HEINTZ:** Yes, Your Honor.

15        Jennifer Heintz on behalf of Missouri parties. And

16   I'm very pleased to be making my first appearance before you.

17        **THE COURT:** Well, you wrote a very good brief --

18        **MS. HEINTZ:** Thank you.

19        **THE COURT:** So, you are off to a good start.

20        **MS. HEINTZ:** Thanks.

21        I don't want to go over the same grounds that the

22   lawyers from Connecticut and Maine have already covered. I

23   really don't have a lot of arguments with respect to the 1242

24   case unless Your Honor has questions for me, which I'm happy to

25   answer.

1           **THE COURT:**  All right.

2           **MS. HEINTZ:**  I would, however, like to talk about

3     the 1187 case, what I call the Clayton case, as opposed to the

4     case brought by the Government, which I still call the Gaw

5     case.

6           **THE COURT:**  Ah-hah, okay.

7           **MS. HEINTZ:**  That is 1242.

8           **THE COURT:**  How does that case differ from the

9     others?

10          **MS. HEINTZ:**  Well, I would remind the Court that

11    that is sort the outlier state case.  This is the one state

12    case wherein the state official is the plaintiff; the

13    defendants are the carriers.  The United States is not actually

14    a party in case No. 1187; they have never intervened.

15          And the statute that they cite as their authority to

16    be here and to present argument and to be entitled to summary

17    judgment in this case is 28 U.S.C. 517.

18          I have been unable to find any case under 28,517,

19    wherein the United States was granted a dispositive motion

20    without being made a party.  And given that --

21          **THE COURT:**  Well, isn't that --

22          **MS. HEINTZ:**  Yes?

23          **THE COURT:**  Well, isn't that just a formalism here?

24          **MS. HEINTZ:**  I don't think so, Your Honor, because

25    under 1187, if the Clayton plaintiff in that case is treated

1   like the plaintiffs in the private carriers cases, and I know

2   that 802 has been briefed and argued before you, and I

3   certainly don't want to concede any arguments that have been

4   made in section 802, but, if the plaintiff -- I'm sorry, my

5   client in 1187 is treated like the plaintiffs in those cases

6   that would mean my client would be entitled to the safeguards

7   of 802 which are not present in Section 803.  The AG

8   certification, the review by this Court of the evidence in

9   support of that certification, our right to participate and our

10  appellate rights, all of those things would benefit my client

11  under section 802 if 802 is found to be constitutional.

12          And, if 803 is found to be unconstitutional, if 1187

13  is disposed of under that case, where 803 specifically says

14  that that section may be enforced by the United States bringing

15  a party -- or bringing a suit, well, they brought a suit, but

16  we still -- we already had a suit.  We are the only state with

17  two cases.

18          **THE COURT:**  I look at Section 803, and it begins by

19  stating, "no state shall have the authority," "no state shall

20  have the authority..."  So it doesn't depend -- foreclosing a

21  state's investigation here does not depend upon the United

22  States bringing an action or intervening to make itself a party

23  to an action to enjoin a state investigation.

24          **MS. HEINTZ:**  Well, let me clarify my position with

25  respect to that, too.

1              I'm not arguing that necessarily, even if the

2    Clayton case were considered under 802, we would be required,

3    or AT&T would be required to produce the documents that we have

4    asked for, but if Mr. Coppolino got his injunction and the

5    Clayton case was still treated under 802, we would not get the

6    documents that we originally requested, but we would get all

7    the procedural safeguards of the certification, and so forth,

8    that I just mentioned.

9              And, Your Honor after three years of litigation and

10   fighting this case very hard, that, to my client, having that

11   certification, that subject to review, is a much better result

12   than the empty-handed result we would get if we went solely

13   under Section 803.

14             THE COURT:  Now, let me ask you, since you're

15   talking about formal intervention, or lack of intervention by

16   the United States in the, what we'll call the Clayton action:

17   Have you filed a notice under Federal Rule -- Federal Civil

18   Rule 5.1?

19             MS. HEINTZ:  I have not.

20             THE COURT:  Are you not required to?

21                (Brief pause in the proceedings.)

22             MS. HEINTZ:  Well, Your Honor, I have to say that I

23   am not familiar with that rule off the top of my head.

24             THE COURT:  Okay.  Well, you're challenging the

25   constitutionality of Section 803, are you not?

1          *MS. HEINTZ:*  Yes.

2          Thank you.  Do you have any more questions for me?

3          *THE COURT:*  No.

4          *MS. HEINTZ:*  Okay.

5          Thank you, Your Honor.

6          *THE COURT:*  Thank you very much.

7          Are we going to hear from Vermont?

8          Mr. Donofrio?

9          *THE CLERK:*  Mr. Donofrio?

10         *MR. DENOFRIO:*  Can we you hear me?

11         *THE COURT:*  Yes.  And we are waiting to hear you,

12    Mr. Donofrio.  We not only can, but we are anxious to hear you.

13         *MR. DENOFRIO:*  And I also want to try not to cover

14    the ground that has already been covered by my colleagues who

15    are there in the courtroom with you.

16         *THE COURT:*  All right.

17         *MR. DENOFRIO:*  But I guess I'm going to a little bit

18    because I want to underscore one aspect of -- of our argument

19    that the statute is unconstitutional.  And it relates to a

20    couple of the questions that Your Honor has asked both of

21    Mr. Coppolino and of Mr. Taub.

22         I think part of the problem with this statute, from

23    a constitutional standpoint, is that it -- because of the way

24    it's constructed, it places a sort of an unworkable burden on

25    state officials to know in advance when an investigation or a

1   regulatory activity of some kind is going to touch on some, and

2   to use the words of the statute, "alleged assistance to an

3   element of the intelligence community.

4            Then, Your Honor asked the question early on along

5   the lines of, you know, what do we do with a situation where a

6   state is asking, you know, let's call them innocuous questions

7   along the lines of, you know, let's see your private policies,

8   or something like that, but within the scope of an

9   investigation that somehow it bumps up against national

10  security concerns, and I think, from a constitutional

11  standpoint, I think it's improper for the statute to place that

12  burden on state officials to somehow, in advance, sort of

13  divine, you know, how not to cross that line or to not act at

14  all.

15           So I think --

16           *THE COURT:*  Well, is that really --

17           *MR. DENOFRIO:*  That sort of echoes what has been

18  said, but maybe in a slightly different context.

19           *THE COURT:*  Well, let me ask you, Mr. Donofrio, is

20  that really a burden in this situation here anymore than it is

21  in a myriad of other ways in which a state --

22           *MR. DENOFRIO:*  Your Honor, I'm sorry, I missed part

23  of your question because there was a sound, I think, maybe

24  coming from one of the other phone lines.

25           *THE COURT:*  Yes.

1          Well, the question is whether this really is the

2     burden that you've described because state officials in myriads

3     of ways have to comply with federal law.  And the obligation is

4     on them all the time to familiarize themselves with the

5     requirements of federal law and to comply with them.

6          So, it's not at all unusual for a state official to

7     stop, look, and listen to what federal law is before

8     undertaking some action.  So, why is Section 803 any different

9     from thousands of other statutes in this regard?

10         **MR. DENOFRIO:**  Sure.  I guess I go back to

11    Mr. Taub's hypothetical, you know, the statute that says

12    something like, you know, if a carrier provides assistance to

13    an element of the intelligence community state privacy laws do

14    not apply.

15         I think there is a material difference between a

16    statute written that way and a state written like Section 803.

17    I think in the hypothetical it's almost self-executing.

18    It's -- the line is very clear:  Under Section 803, it's simply

19    saying you have no authority when what you are doing is going

20    to impact a provider's alleged assistance to an element of the

21    intelligence community.

22         And it's not clear to me how state officials would

23    know that a priori, and therefore, you know, make, under the

24    rubric of the statute, make a, quote/unquote, "correct

25    decision" about whether or not to commence a particular

1    investigation.

2            And let me just say that I recognize full well, to

3    go back to some of the comments that Mr. Coppolino made, the

4    initial information requests propounded by the Vermont Deposit

5    of Public Service back in 2006, many of them explicitly

6    reference the NSA.  And, I think that as -- I think what we've

7    scene in the Vermont proceeding is that as the proceeding has

8    evolved, the Department and the Public Service Board with input

9    from the Government and the carriers have, you know, walked the

10   line, so to speak, and redefined the scope of what the state

11   and the other parties in the proceeding could pursue in light

12   of both this Court's ruling and the general principle, which we

13   also don't quarrel with, that the Federal Government is the --

14   is the proper locus of authority over national security.

15           **THE COURT:**  Well, other than saying Section 803 was

16   rather clumsily drafted, that certainly doesn't distinguish it

17   from a host of other statutes.

18                      **(Laughter.)**

19           **THE COURT:**  But, that's hardly a ground to

20   invalidate it on constitutional grounds.

21           **MR. DENOFRIO:**  Well, I -- I hear what you're saying,

22   Your Honor.  I guess, as we have argued in the brief, when the

23   -- when the statute is a statute like this one that, you know,

24   sort of defines the boundary line between state and federal

25   sovereignty, I think that this level of clumsiness rises to a

1   constitutional dimension for the reasons that I've outlined in

2   terms of, you know, making it, unworkable for state officials

3   to -- to act lawfully within the bounds defined by Section 803.

4           So I guess, I guess I -- I mean, I certainly agree

5   that we have plenty of clumsily drafted statutes and that, in

6   and of itself, may not be a reason to invalidate one; I think

7   in this particular context, the way that Section 803 is drafted

8   presents real concerns.

9           *THE COURT:*  All right, very well.

10          Thank you, Mr. Donofrio.

11          *MR. DENOFRIO:*  Thank you, Your Honor.

12          *THE COURT:*  Do we want to hear from any of the other

13  lawyers representing the states or intervenors?

14          *MS. LEWIS:*  Your Honor, this is Megan Lewis from the

15  state of New Jersey.

16          *THE COURT:*  Yes, Ms. Lewis?

17          *MS. LEWIS:*  Yes.  I don't have anything else to add

18  and will rely on the arguments of my able colleagues from the

19  other states.

20          *THE COURT:*  Very well.  Thank you Mr. Lewis.

21          How about Mr. Heiden?

22          *MR. HEIDEN:*  Yes, Your Honor.

23          We also have nothing to add on behalf of our

24  intervenor clients.  The argument expressed by the other

25  defendants were, we think, more than -- more than enough and

1   are happy to answer any questions, should Your Honor have them.

2   But other than that, we are happy to pass on our oral argument.

3            **THE COURT:**  Very well.  Thank you, sir.

4                    **(Mr. Coppolino raising his hand.)**

5            **THE COURT:**  Mr. Coppolino is raising his hand, and

6   Mr. Kester is shifting in his chair, which may mean something.

7                    **(Laughter.)**

8            **MR. COPPOLINO:**  Your Honor, I appreciate your

9   patience.  I could sprint through a very fast few comments in

10  about five minutes.

11           **THE COURT:**  All right, let me look at my watch.

12           **MR. COPPOLINO:**  And you can get to your busy

13  afternoon schedule.

14           I guess -- I thought I'd knock out just the Missouri

15  response first on this Clayton case.  I think you were dead on:

16  their argument is a total formalism.  We sued them, and if they

17  are preempted under Section 803, then that would apply to the

18  Clayton case as well.

19           They don't get the section 802 proceedings because

20  that action, because that investigation is covered by Section

21  803.  There is actually a separate subsection of 803 that

22  specifically was written for the Missouri case, it's Section

23  803(4), that prohibits a state from commencing or maintaining a

24  civil action or other proceedings to enforce a requirement -- a

25  requirement that an electronic communication service provider

1   disclose information concerning alleged assistance to the

2   intelligence community.  That is the Clayton case, and it's

3   flatly preempted by Section 803.

4           Mr. Taub talked about some of the Tenth Amendment

5   issues, and I think you are all over those, but ***Printz*** and the

6   ***New York*** case obviously concerned a unique species of Tenth

7   Amendment problem that the Court has identified regarding the

8   effect, the intention to commandeer state officials literally

9   to do the job of the Federal Government, in one instance to

10  conduct Brady background checks.  That was, I think -- oh, was

11  that ***Printz***?

12          **THE COURT:**  Yeah, that was the ***Printz*** case.

13          **MR. COPPOLINO:**  Yeah.

14          And the New York case involved a directive by

15  Congress that states had to legislate a certain way; neither

16  circumstance is presented here.

17          All that the Tenth Amendment really provides is that

18  if there's a --

19          **THE COURT:**  Well, is that true?

20          **MR. COPPOLINO:**  I think it is true, Your Honor.

21          **THE COURT:**  Because take a look at (a)(2) of Section

22  803, it says, "the state shall have no authority to regulate or

23  to," and then the next section, "to impose an administrative

24  sanction"; isn't that, in essence, telling the state how it can

25  regulate or how it can exercise its administrative authority

1   under the state police power?

2           **MR. COPPOLINO:**  It does, but it doesn't run afoul of

3   the Tenth Amendment.  And it doesn't fall within **_Printz_** or **_New_**

4   **_York_** because, in those case,s, it involved -- those cases

5   involved a directive to state officials to do particular things

6   on behalf of the Federal Government.

7           **THE COURT:**  You are drawing a distinction between an

8   affirmative obligation and a prohibitory one.

9           **MR. COPPOLINO:**  I'm actually drawing a distinction

10  that was drawn in **_Printz_** and **_New York_** itself, where both cases

11  make the point that Congress can regulate directly in an area

12  that it has the authority to regulate.

13          And I just disagree with My friend, Mr. Taub, that

14  that this is not a direct regulation.  This is a direct

15  regulation which says the states cannot do a certain thing that

16  Congress has the authority to tell them that they cannot do,

17  such as investigate these activities.

18          **_Printz_** actually itself made the point that the

19  Congress may condition -- the Congress may condition the

20  state's continued regulation in a preemptable field on the

21  state's compliance with affirmative obligations imposed by

22  federal law.  And, it does not violate the Tenth Amendment

23  where the Congress imposes preconditions on the state's

24  continued regulation in an otherwise preempted field.  That is

25  the distinction that is drawn by **_Printz_** and **_New York_**.

1          The *Gregory* case is a completely different case

2     entirely where the Court, in that case, was looking at a

3     mandatory retirement age statute that was passed in the state

4     of Missouri.  And the question was whether it was -- it was

5     preempted by the federal law, the Age Discrimination Act.  And

6     only in that very unique context, the Court said, look, this

7     goes to whether or not states can determine the qualifications

8     for high office within their states.  And that was a matter

9     that was expressly reserved to the states under the Tenth

10    Amendment.

11         And so, in that unique context, which was emphasized

12    throughout the opinion, the Court said, simply, that there has

13    to be a plain-statement rule if Congress seeks to regulate in

14    that area.  And it didn't find a plain statement in the Age

15    Discrimination Act.  But here, of course, we have a very plain

16    statement as to Congress' intent to regulate.

17         The *Cuomo versus Clearing House* case which he cited,

18    which is up in the Supreme Court now, very major difference

19    between this case and that case, where he talks about so-called

20    enforcement preemption.  And the issue that the Supreme Court

21    is considering there is whether or not the Federal Government

22    can essentially tell the states: we will enforce your law.

23         Enforcement preemption, as that term is used,

24    applies when the Government seeks to take over the state's

25    administration of law in an area that the state already has the

1   authority to regulate.  That case involved nondiscriminatory

2   lending practices.  There is no dispute that the state has

3   coextensive authority in that area.  And the issue is whether

4   the Office of the Comptroller of the Currency can, by

5   regulation, tell the state government, we will enforce your

6   law.  This a case about whether the state has any authority in

7   the area, and Section 803 preempts that authority directly.

8   It's not a question of an enforcement preemption problem.

9           I guess a lot of the discussion talked about this

10  issue of what do you do in trying to parse the various requests

11  that are made?  And, I guess I would just say, Your Honor,

12  parsing, as I said in my opening comments, far more intrusive

13  than -- than what Congress has directed be -- occur which is --

14          **THE COURT:**  Well, what am I supposed to do here?  Am

15  I supposed to look at the inquiries that have been made by the

16  states, the investigation, and so forth, and where there is a

17  question that does not run afoul of an express prohibition of

18  Section 803, say, oh, well, the emanations from this

19  investigation or this inquiry touches upon something that is

20  prohibited by Section 803?

21          **MR. COPPOLINO:**  Right, I don't -- Congress --

22          **THE COURT:**  How am I supposed to make that

23  determination?

24          **MR. COPPOLINO:**  I don't think you should.  In fact,

25  Congress does not want you to make that determination.  But, I

1    do think there is a way out if you have that concern.

2            The unit of investigation, if you will, that

3    Congress has -- the investigation is kind of the subject unit

4    that Congress seeks to preempt.  Now, if within an

5    investigation a state is seeking something that does not

6    concern an alleged intelligence activity, that is something

7    that can be addressed at another time in another proceeding.

8            For example, the only thing that's come up in this

9    regard is privacy policies, public privacy policies, and those

10   are available.  And so far as I know, they may well have been

11   provided.  Every other question in this proceeding is directed

12   at proving the evidence in the complaint.

13           But, if you enter judgment for the Government and

14   you uphold Section 803, that would establish the clear line by

15   which the states and the carriers would proceed.  And it would

16   say, in the effect, to the carriers and to the states that any

17   response to any inquiry that the state may make in the future

18   regarding carrier policies within their states would exclude

19   alleged federal intelligence activities.

20           That's how the matter should proceed, not by this

21   Court or the Government monitoring 50 state PUC proceedings to

22   find out if a particular interrogatory did or did not run afoul

23   of Section 803.  Congress was not required to preempt by

24   interrogatory.  And, I think that would be a very serious

25   mistake, and it would be a huge burden on the United States, on

1  the courts, on the intelligence agencies, and on the carriers,

2  precisely the kind of burden that Congress is seeking to avoid

3  here.  These are hypothetical concerns that could be addressed

4  in further proceedings by the states that do not relate

5  whatsoever to alleged intelligence activities.

6          Your Honor, I think that's enough.  If you had any

7  particular questions, I could address them.

8          **THE COURT:**  That's fine.

9          **MR. COPPOLINO:**  I think you got the gist of our

10  arguments.

11          **THE COURT:**  I got the gist of it, yeah.

12          **MR. COPPOLINO:**  Thank you, very much, Your Honor.

13                  **(Mr. Kester rises.)**

14          **THE COURT:**  All right, Mr. Kester, I knew you

15  weren't going to get out of here without saying something.

16          **MR. KESTER:**  Good morning, Your Honor.

17          Well, actually, I would have guessed the other, but

18  I do feel I want to say a few things, basically because my

19  learned counsel from Maine, whom I listened to and whose

20  remarks, I gather, were adopted by counsel for the other

21  states, at different points I thought was describing a

22  constitution I don't recognize at all.  And I think we -- in

23  that discussion, we're forgetting some of the stakes at issue

24  here.

25          If, if federal power has any core central area in

1   which it is at its peak, surely it must be in the area of

2   national security.  And, if an action by the Federal Government

3   is joined in by the Article 2 authorities, the

4   commander-in-chief, the president, and emphatically by the

5   Congress, surely, legislation of that kind is entitled to the

6   greatest respect from the Article 3 authorities in our Federal

7   Government.

8          We are not dealing here with a national security

9   threat that some lawyer thought up hypothetically, what if this

10  happened, we have had enough horrendous demonstration of what

11  kinds of national security threats exist today, and the

12  Congress of the United States quite properly took that into

13  account.  The Congress of the United States was aware of these

14  very investigations when it passed this statute.  And the

15  Congress said: stop it.

16         Now, I think -- I think that counsel, in some of his

17  discussion, and I don't want to mischaracterize it because I

18  may not have understood it, I thought he was mixing up the

19  concept of separation of powers and the concept of federalism.

20  Now, separation of powers is how the different branches of the

21  Federal Government limit each other from overreaching.  And

22  here, as I said, the political branches of the Federal

23  Government are in one voice on what should happen here.

24         **THE COURT:**  So you're telling me I don't have much

25  choice.

1          **MR. KESTER:**  I'm saying, Your Honor, that you should

2     give great respect to that judgment, yes.

3          And the other thing is, the states were not intended

4     in our federal system to be a check on the foreign affairs,

5     national security, intelligence actions of the Federal

6     Government, that's not true.  The problem of the states

7     interfering with federal national security activities was one

8     of the things that tormented George Washington when he was

9     trying to fight the revolutionary war.  And it's one of the

10    reasons we have the constitution that we have, which was signed

11    partly to correct that.

12         There were some questions about examples of the

13    Federal Government limiting, preempting, getting -- prohibiting

14    small aspects of what would otherwise be legitimate state

15    activities.  And -- and each case is different, but, my

16    goodness, there are federal laws all over that get into the

17    tiniest aspects of state functioning.

18         I mean, look at the -- under different authorities

19    of Congress, the Commerce Clause, the Fourteenth Amendment,

20    look at the Voting Rights Act.  Look at the Commerce Clause

21    cases, I mean, going all the way back to cases like **_Gibbons and_**

22    **_Ogden_**, where there wasn't even a federal statute in addition to

23    it.  Just the very existence of the federal power itself kept

24    states from interfering with steamboats, said Chief Justice

25    Marshall.  The train links, mud guards, all of that sort of

1    things, state taxes that appear to be fair on their face, have

2    been struck down many times by the Supreme Court because they

3    were interfering with the federal authority.

4          And I think we could just find myriad cases of state

5    laws that appeared neutral, appeared innocent, that were struck

6    down by the federal courts with or without a federal statute

7    there because, whether intended to or not, they were too deeply

8    intruding on a federal function.

9          Now, just last, I was reminded of a -- of a comment

10   of Justice Holmes, who fought in the Civil War when this

11   country was under great stress and was falling apart, a civil

12   war that had sprung from partly the asserted Doctrine of

13   Nullification, which I was reminded today I think had its

14   origin, actually, in New England, but Justice Holmes --

15          *THE COURT:*  Lots things are emanating from New

16   England these days.

17          *MR. KESTER:*  That's true, Your Honor, that's true.

18          But Justice Holmes said that he did not think that

19   the Federal Union would crumble if the federal courts did not

20   have the power to declare acts of Congress unconstitutional,

21   but, he said, surely, the Union could not continue if federal

22   courts could not declare unconstitutional or unlawful certain

23   acts of the states, you know?

24          *THE COURT:*  Very well.

25          *MR. KESTER:*  Thank you.

1          **THE COURT:**   Thank you, Counsel.   I appreciate your

2    arguments, they were very helpful, indeed.

3          **THE CLERK:**   Thank you, Counsel.   The Court's in

4    recess.

5                    **(Proceedings adjourned at 12:11 p.m.)**

6

7                         **---oOo---**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### <u>CERTIFICATE OF REPORTER</u>

I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

<u>/s/ Sahar McVickar</u>

**Sahar McVickar**, RPR, CSR No. 12963

**Thursday, May 7, 2009**