IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE:                                    MDL Docket No 06-1791 VRW

NATIONAL SECURITY AGENCY                  ORDER
TELECOMMUNICATIONS RECORDS
LITIGATION

_____

This Document Relates To All Cases
Except:

Al-Haramain Islamic Foundation, Inc v
Bush, No C 07-0109; Center for
Constitutional Rights v Bush, No C
07-1115; Guzzi v Bush, No C 06-6225;
Shubert v Bush, No C 07-0693; Clayton
et al v AT&T Communications of the
Southwest, Inc, et al, C 07-1187;
United States v Clayton, C 07-1242;
United States v Reishus, C 07-1323;
United States v Farber, C 07-1324;
United States v Palermino, et al,
C 07-1326; United States v Volz, et
al, C 07-1396
_____/

        The United States has moved to dismiss "all claims

against the electronic communication service providers" in the

cases in this multidistrict litigation (MDL) matter brought by

individuals against telecommunications companies.  Doc #469 at 23.

The single ground for dismissal in the government's motion is

section 802 of FISA, part of the FISA Amendments Act of 2008, Pub L

No 110-261, 122 Stat 2436 (FISAAA), enacted July 10, 2008 and

codified at 50 USC § 1885a.  In response to the government's motion

to dismiss, plaintiffs, alleged to be customers of the various telecommunications companies named as defendants in these actions, have advanced a variety of constitutional challenges to the provisions of FISAAA upon which the government relies in seeking dismissal.  Doc #483.  For the reasons presented herein, these challenges must be rejected and the government's motion to dismiss GRANTED.

I

A

In December 2005, news agencies began reporting that President George W Bush had ordered the National Security Agency (NSA) to conduct eavesdropping of some portion of telecommunications in the United States without warrants and that the NSA had obtained the cooperation of telecommunications companies to tap into a significant portion of the companies' telephone and e-mail traffic, both domestic and international. See, e g, James Risen and Eric Lichtblau, Bush Lets US Spy on Callers Without Courts, NY Times (Dec 16, 2005).  In January 2006, the first of dozens of lawsuits by customers of telecommunications companies were filed alleging various causes of action related to such cooperation with the NSA in warrantless wiretapping of customers' communications.  See, e g, Hepting v AT&T Corp, C 06-0672 VRW (ND Cal filed January 31, 2006).  Several such cases were originally venued in the Northern District of California; others were filed in federal district courts throughout the United States. The cases typically alleged federal constitutional and statutory violations as well as causes of action based on state law such as

United States District Court

For the Northern District of California

breach of contract, breach of warranty, violation of privacy and unfair business practices.

        The course of the <u>Hepting</u> case before the establishment of the MDL for these cases is illustrative for purposes of summarizing the procedural history of these cases.  The United States moved to intervene in the case and simultaneously to dismiss it, asserting the state secrets privilege (SSP) and arguing, in essence, that the SSP required immediate dismissal because no further progress in the litigation was possible without compromising national security.  C 06-0672 VRW Doc ##122-125.  The telecommunications company defendants in the case also moved to dismiss on other grounds.  C 06-0672 VRW Doc #86.  On July 20, 2006 the court denied the motions to dismiss and certified its order for an interlocutory appeal pursuant to 28 USC § 1292(b).  <u>Hepting v AT&T Corp</u>, 439 F Supp 2d 974 (ND Cal 2006).  The court denied the United States' request for a stay of proceedings pending appeal.

        On August 9, 2006, the Judicial Panel on Multidistrict Litigation ordered all cases arising from the alleged warrantless wiretapping program by the NSA transferred to the Northern District of California and consolidated before the undersigned judge.

        On January 5, 2007, the court ordered the plaintiffs in the cases brought against telecommunications company defendants to prepare, serve and file master consolidated complaints for each telecommunications company defendant.  See master consolidated complaints at Doc #123 (T-Mobile and related companies), Doc #124 (Sprint and related companies), Doc #125 (MCI & Verizon companies), Doc #126 (Bellsouth) and Doc #455 (Cingular & ATT Mobility companies).  Unlike the remaining cases in this MDL matter, no

government entities were named as defendants in these actions; rather, the United States made itself a party by intervening in these actions in order to obtain a posture from which to seek their dismissal.

On July 7, 2008, after months of election-year legislative exertion that received considerable press coverage, Congress enacted FISAAA. The new law included an immunity provision for the benefit of telecommunications companies that would be triggered if and when the Attorney General of the United States certified certain facts to the relevant United States district court.

On September 19, 2008, the United States filed its motion to dismiss all claims against telecommunications company defendants in these cases, including the pending master consolidated complaints. The two categories of cases not targeted for dismissal in the United States' instant motion to dismiss are those brought against governmental entities (<u>Al-Haramain Islamic Foundation, Inc v Bush</u>, No C 07-0109; <u>Center for Constitutional Rights v Bush</u>, No C 07-1115; <u>Guzzi v Bush</u>, No C 06-6225; <u>Shubert v Bush</u>, No C 07-0693) and those brought by the United States against state attorneys general (<u>United States v Clayton</u>, C 07-01242; <u>United States v Palermino</u>, C 07-01326; <u>United States v Farber</u>, C 07-01324; <u>United States v Reishus</u>, C 07-01323; <u>United States v Volz</u>, C0 7-01396; <u>Clayton v ATT</u>, C 07-01187). The latter six actions by the United States against states are the subject of a separate motion for summary judgment brought under section 803 of FISAAA, 50 USC § 1885b (Doc #536) and a separate order by the court.

\\

**4**

**B**

2   FISAAA contains four titles.  The government's motion

3  rests on a provision of Title II, which bears the heading

4  "Protections for Electronic Communication Service Providers" and

5  contains section 802, concerning "procedures for implementing

6  statutory defenses under [FISA]."[1]

7   Section 802(a) contains the new immunity provision upon

8  which the United States relies in seeking dismissal:

> (a) REQUIREMENT FOR CERTIFICATION. — Notwithstanding
> any other provision of law, a civil action may not lie
> or be maintained in a Federal or State court against any
> person for providing assistance to an element of the
> intelligence community, and shall be promptly dismissed,
> if the Attorney General certifies to the district court
> of the United States in which such action is pending
> that —
>
>> (1) any assistance by that person was provided
>> pursuant to an order of the court established under
>> section 103(a) directing such assistance;
>>
>> (2) any assistance by that person was provided
>> pursuant to a certification in writing under
>> section 2511(2)(a)(ii)(B) or 2709(b) of title 18,
>> United States Code;
>>
>> (3) any assistance by that person was provided
>> pursuant to a directive under section 102(a)(4),
>> 105B(e), as added by section 2 of the Protect
>> America Act of 2007 (Public Law 110-55), or 702(h)
>> directing such assistance;
>>
>> (4) in the case of a covered civil action, the
>> assistance alleged to have been provided by the
>> electronic communication service provider was —
>>
>>> (A) in connection with an intelligence activity
>>> involving communications that was —
>>>
>>>> (i) authorized by the President during the
>>>> period beginning on September 11, 2001, and
>>>> ending on January 17, 2007; and

---

[1] This provision is codified at 50 USC § 1885 (definitions), 50 USC § 1885a (procedures for implementing statutory defenses), 50 USC § 1885b (preemption) and 50 USC § 1885c (reporting).

**(ii) designed to detect or prevent a terrorist attack, or activities in preparation for a terrorist attack, against the United States; and**

**(B) the subject of a written request or directive, or a series of written requests or directives, from the Attorney General or the head of an element of the intelligence community (or the deputy of such person) to the electronic communication service provider indicating that the activity was ——**

**(i) authorized by the President; and**

**(ii) determined to be lawful; or**

**(5) the person did not provide the alleged assistance.**

The government has submitted a public certification by former Attorney General Michael Mukasey which includes the following statement: "I hereby certify that the claims asserted in the civil actions pending in these consolidated proceedings brought against electronic communication service providers fall within at least one provision contained in Section 802(a)." Doc #469-3 at 2. In addition, the government has submitted classified certifications (Doc #470) in support of its motion.

Section 802(b)(1) sets out the standard for judicial review of a certification: "A certification under subsection (a) shall be given effect unless the court finds that such certification is not supported by substantial evidence provided to the court pursuant to this section." The statute does not define "substantial evidence," so courts presumably are to employ definitions of that standard articulated in other contexts. The United States, for example, cites a social security case, McCarthy v Apfel, 221 F3d 1119, 1125 (9th Cir 2000) (Doc #469 at 22), which defines the substantial evidence standard as "such relevant evidence as a reasonable mind might, upon consideration of the

entire record, accept as adequate to support a conclusion."  The
substantial evidence standard appears to have been in use for
nearly a century in federal courts in a form closely resembling
that in use today.  In 1912, the Supreme Court applied the standard
in <u>Int Com Comm v Union Pacific RR</u>, 222 US 541, 548 ("not that its
decision * * * can be supported by a mere scintilla of proof, but
the courts will not examine the facts further than to determine
whether there was substantial evidence to sustain the order"); see
also <u>Edison Co v Labor Board</u>, 305 US 197, 229 (1938) ("Substantial
evidence is more than a mere scintilla.  It means such relevant
evidence as a reasonable mind might accept as adequate to support a
conclusion.")

Section 802(c) specifies the manner in which the court is
to deal with classified information.  If the Attorney General files
an unsworn statement under penalty of perjury that disclosure of
the certification and related materials would harm the national
security, the court is obligated under section 802(c) to do two
things: (1) review the certification and any supplemental materials
in camera and ex parte; and (2) limit public disclosure concerning
such certification and the supplemental materials, including any
public order following such in camera and ex parte review, to a
statement whether the case is dismissed and a description of the
legal standards that govern the order, without disclosing the
specific subparagraph within subsection (a) that is the basis for
the certification.

Section 802(d) provides, regarding the role of the
parties, that any plaintiff or defendant in a civil action may
submit to the court "any relevant court order, certification,

**7**

written request, or directive" for review and "shall be permitted to participate in the briefing or argument of any legal issue in a judicial proceeding conducted pursuant to this section, but only to the extent that such participation does not require the disclosure of classified information to such party." It also requires the court to review any relevant classified information in camera and ex parte and to issue orders or parts of orders that "would reveal classified information" in camera and ex parte and maintain them under seal.

C

The United States and the telecommunications company defendants quote extensively from the October 26, 2007 report of the Senate Select Committee on Intelligence to accompany Senate Bill 2248 (SSCI Report), S Rep No 110-209, 110th Cong, 1st Sess (2007). Doc #469 & 508, passim; SSCI report docketed at #469-2. Senate Bill 2248 was the original Senate bill that, together with the House bill (H 3773), resulted in the compromise legislation that ultimately passed both houses on July 8, 2008 (H 6304). <u>See</u> FISA Amendments of 2008, HR 6304, Section-by-section Analysis and Explanation by Senator John D Rockefeller IV, Chairman of the Select Committee on Intelligence. Doc #469-2 at 51.

The SSCI Report included among the committee's recommendations for legislation amending FISA that "narrowly circumscribed civil immunity should be afforded to companies that may have participated in the President's program based on written requests or directives that asserted the program was determined to be lawful." Doc #469-2 at 4. The SSCI Report included a lengthy

summary of the instant MDL cases, leaving no room for doubt that these cases were the intended target of the new immunity provision:

### BACKGROUND ON PENDING LITIGATION

#### CIVIL SUITS AGAINST ELECTRONIC COMMUNICATION SERVICE PROVIDERS

After the media reported the existence of a surveillance program in December of 2005, lawsuits were filed against a variety of electronic communication service providers for their alleged participation in the program reported in the media.  As of the date of this Committee report, more than forty lawsuits relating to that reported surveillance program had been transferred to a district court in the Northern District of California by the Judicial Panel on Multidistrict Litigation.

The lawsuits allege that electronic communication service providers assisted the federal government in intercepting phone and internet communications of people within the United States, for the purpose of both analyzing the content of particular communications and searching millions of communications for patterns of interest.  Some of the lawsuits against the providers seek to enjoin the providers from furnishing records to the intelligence community.  Other suits seek damages for alleged statutory and constitutional violations from the alleged provision of records to the intelligence community.  Collectively, these suits seek hundreds of billions of dollars in damages from electronic communication service providers.

The Government intervened in a number of these suits to assert the state secrets privilege over particular facts, including whether the companies being sued assisted the Government.  The Government also sought to dismiss the suits on state secrets grounds, arguing that the very subject matter of the lawsuits is a state secret. Ultimately, this Government assertion of the state secrets privilege seeks to preclude judicial review of whether, and pursuant to what authorities, any particular provider assisted the Government.

Although the Government has sought to dismiss these suits, the future outcome of this litigation is uncertain.  Even if these suits are ultimately dismissed on state secrets or other grounds, litigation is likely to be protracted, with any additional disclosures resulting in renewed applications to the court to allow litigation to proceed.

* * *

\\

**SUITS AGAINST THE GOVERNMENT**

> In addition to the lawsuits involving telecommunications
> providers, a small number of lawsuits were filed directly
> against the Government challenging the President's
> surveillance program.  These suits allege that the
> President's program violated the Constitution and numerous
> statutory provisions, including the exclusivity provisions
> of the Foreign Intelligence Surveillance Act.  These cases
> are at a variety of different stages of district court and
> appellate review.  Nothing in this bill is intended to
> affect these suits against the Government or individual
> Government officials.

Id at 8-9.[2]


## II

FISAAA's section 802 appears to be <u>sui generis</u> among immunity laws: it creates a retroactive immunity for past, completed acts committed by private parties acting in concert with governmental entities that allegedly violated constitutional rights. The immunity can only be activated by the executive branch of government and may not be invoked by its beneficiaries.  Section 802 also contains an unusual temporal limitation confining its immunity protections to suits arising from actions authorized by the president between September 11, 2001 and January 7, 2007.  The government contends that section 802 is valid and enforceable and fully applicable to all the cases in the MDL brought by individuals against telecommunications companies.  The government now invokes section 802's procedures in seeking dismissal of these actions.

----

[2]  The SSCI report also contained (at 8-9) several paragraphs describing the suits by the United States seeking to enjoin investigations by state attorneys general into alleged warrantless wiretapping activities conducted with the cooperation of telecommunications companies.  These suits, referred to in Part I A above, are part of this MDL and are addressed separately.

In opposing the motion to dismiss, plaintiffs advance a number of challenges to the constitutionality of section 802, asserting that constitutional defects make the statute unenforceable.  These challenges are properly presented and considered in the context of the instant motion to dismiss and are addressed on their merits in this order.  In the alternative, plaintiffs contend that section 802 is not applicable to, or does not require dismissal of, the cases against the telecommunications company defendants.

A

The court turns first to plaintiffs' argument, for which they cite <u>Marbury v Madison</u>, 5 US 137 (1803), and <u>Boumediene v Bush</u>, 553 US ___, 128 S Ct 2229 (2008), that Congress and the executive branch have improperly taken actions that leave no path open for adequate judicial review of plaintiffs' constitutional claims. Plaintiffs assert that in enacting FISAAA, Congress has "refused to provide any alternative forum or remedy" for their constitutional claims.  Doc #483 at 11-15.  The United States and the telecommunications company defendants counter that while suits against telecommunications companies are foreclosed, neither the statute nor the government's actions prevent plaintiffs from seeking redress for their constitutional claims against the government actors and entities.  Doc #520 at 12.  Lest any further reassurance be necessary, the SSCI report states: "The committee does not intend for [section 802] to apply to, or in any way affect, pending or future suits against the Government as to the legality of the President's program."  Doc #469-2 at 9.

The court agrees with the United States and the telecommunications company defendants on this point: plaintiffs retain a means of redressing the harms alleged in their complaints by proceeding against governmental actors and entities who are, after all, the primary actors in the alleged wiretapping activities. Indeed, the same plaintiffs who brought the <u>Hepting v AT&T</u> lawsuit (C 06-0672 VRW) are now actively prosecuting those claims in a separate suit filed in September 2008 against government defendants before the undersigned judge. <u>Jewell v United States</u>, C 08-4373 VRW, filed September 18, 2008. <u>Jewell</u> thus joins several other cases in this MDL which seek relief only against government defendants. <u>Al-Haramain Islamic Foundation, Inc v Bush</u>, No C 07-0109; <u>Center for Constitutional Rights v Bush</u>, No C 07-1115; <u>Guzzi v Bush</u>, No C 06-6225; <u>Shubert v Bush</u>, No C 07-0693. Plaintiffs' argument that section 802 violates constitutional principles by leaving plaintiffs no recourse for alleged violations of their constitutional rights is therefore without merit.

B

Among their constitutional arguments, plaintiffs advance three based on the separation-of-powers principle. They argue that Congress has usurped the judicial function, has violated a principle of law prohibiting Congress from dictating to the judiciary specific outcomes in particular cases and has impermissibly delegated law-making power to the executive branch. The court addresses these three arguments in turn.

\\

\\

Plaintiffs assert that section 802(a) impermissibly attempts to "make [Congress] and the executive branch the final arbiters of what the First and Fourth Amendments require," citing <u>United States v United States District Court (Keith)</u>, 407 US 297 (1972), as requiring "prior judicial scrutiny by a neutral and detached magistrate." Doc #483 at 15-22. Specifically, plaintiffs argue that "the other branches [of government] may not take actions that have the effect of nullifying the Judiciary's constitutional interpretation and superseding it with their own, different judgment," id at 17, and assert that "[u]nder section 802, those who collaborate with the executive branch no longer need comply with the Supreme Court's decisions in <u>Keith</u> and other cases interpreting the First and Fourth Amendments." Id at 18.

The court finds no merit in this argument. Congress has created in section 802 a "focused immunity" for private entities who assisted the government with activities that allegedly violated plaintiffs' constitutional rights. In so doing, Congress has not interpreted the Constitution or affected plaintiffs' underlying constitutional rights. Moreover, plaintiffs' alarm about prospective disregard for the Constitution by private entities is largely misplaced given that the immunity for warrantless electronic surveillance under section 802(a)(4) is not available for actions authorized by the president after January 17, 2007, before FISAAA became law.

\\

\\

\\

United States District Court

For the Northern District of California

Plaintiffs argue that Congress, in enacting section 802, impermissibly directed the judiciary to adjudicate these pending cases in a particular way, thus running afoul of the doctrine first set forth in United States v Klein, 80 US (13 Wall) 128 (1872), a case in which the United States Supreme Court refused to give effect to a statute that was said to "prescribe rules of decision to the Judicial Department of the government in cases pending before it." Id at 146.

In Klein, the executor of the estate of a person who had been sympathetic to the Confederate cause sought return of government-seized property under the Abandoned and Captured Property Act, a 1863 statute that provided for return of property or its proceeds to its original owner "on proof that he had never given aid or comfort to the rebellion." Id at 139. In December 1863, the President issued a proclamation granting a full pardon, including the restoration of property rights, to those who took an oath to support the Union. Id at 131-32. In 1869, the Supreme Court affirmed a return of property under the Act because the proclamation had "cured [the claimant's] participation in the rebellion." United States v Padelford, 76 US 531, 542 (1869). But the following year, Congress enacted legislation declaring that pardons did not restore property rights and requiring courts to treat pardons as conclusive proof of disloyalty to the Union. See Klein, 80 US at 136-44.

The Supreme Court refused in Klein to give effect to Congress' requirement that the Court view pardons of evidence of disloyalty, as the requirement prevented the Court from giving "the effect to evidence which, in its own judgment, such evidence should

have."  Id at 147.  The Court delicately noted: "We must think that
Congress has inadvertently passed the limit which separates the
legislative from the judicial power."  Id.  The Supreme Court
contrasted the circumstances presented in <u>Klein</u> with those in
<u>Pennsylvania v Wheeling Bridge Co</u>, 54 US 518 (1851), in which
Congress had deemed the eponymous bridge a "post road" to avoid the
consequences of a condemnation action against it as a "bridge."  The
Supreme Court upheld the new law because "[n]o arbitrary rule of
decision was prescribed * * * but the court was left to apply its
ordinary rules to the new circumstances created by the act."  <u>Klein</u>,
80 US at 146-47.

        The rather oblique discussion in <u>Klein</u> has benefitted from
elaboration by twentieth-century court decisions, discussed below,
to become of some practical use to courts.  Subsequent decisions
note that <u>Klein</u> contains two central ideas: legislation that creates
new circumstances does not prescribe a rule of decision but
legislation that prevents courts from determining the effects of
evidence may do so.  These concepts are easier to articulate than to
apply.  Two amici curiae have submitted briefs to the court on
opposite sides of the question whether section 802 runs afoul of
<u>Klein</u>.  Doc ##501, 507.

        More than a century later, a unanimous Supreme Court
illuminated the scope of <u>Klein</u> to some degree in <u>Robertson v Seattle
Audubon Society</u>, 503 US 429 (1992).  In response to litigation
challenging proposed timber harvesting in national forests, Congress
had enacted the Northwest Timber Compromise in which subsection 318
(b)(6)(A) of the Department of the Interior and Related Agencies
Appropriations Act of 1990, 103 Stat 745, "popularly known as the

Northwest Timber Compromise," 503 US at 433, provided that

> management of areas according to subsections (b)(3) and
> (b)(5) of this section on the thirteen national forests
> in Oregon and Washington and Bureau of Land Management
> lands in western Oregon known to contain northern
> spotted owls is adequate consideration for the purpose
> of meeting the statutory requirements that are the basis
> for the consolidated cases captioned <u>Seattle Audubon
> Society et al, v F Dale Robertson</u>, Civil No 89-160 and
> <u>Washington Contract Loggers Assoc et al v F Dale
> Robertson</u>, Civil No 89-99 * * * and the case <u>Portland
> Audubon Society et al v Manuel Lujan, Jr,</u> Civil No 87-
> 1160-FR.

In response to motions to dismiss based on the new statute,
plaintiffs argued that the above-quoted provision violated Article
III of the Constitution.  Id at 436.  The district courts upheld the
statute and dismissed the respective lawsuits, but the Ninth Circuit
(on consolidated appeals) reversed, holding that the compromise
violated the separation-of-powers principle under <u>Klein</u> because "the
first sentence of § 318(b)(6)(A) 'does not, by its plain language,
repeal or amend the environmental laws underlying this litigation,'
but rather 'directs the court to reach a specific result and make
certain factual findings under existing law in connection with two
[pending] cases.'"  Id.

        The Supreme Court reversed, holding that "subsection
(b)(6)(A) compelled changes in law, not findings or results under
old law" because "under subsection (b)(6)(A), the agencies could
satisfy their MBTA obligations in either of two ways:  by managing
their lands so as neither to 'kill' nor 'take' any northern spotted
owl within the meaning of § 2, or by managing their lands so as not
to violate the prohibitions of subsections (b)(3) and (b)(5)."  Id
at 438.  The Supreme Court did not directly address the Ninth
Circuit's reading of <u>Klein</u> in <u>Robertson</u>.  Instead, it reversed on

the grounds that the statute amended applicable law, thus passing constitutional muster.  Id.

The Supreme Court further developed the connection between Robertson and Klein in Plaut v Spendthrift Farm, Inc, 514 US 211 (1995): "Whatever the precise scope of Klein * * * later decisions have made clear that its prohibition does not take hold when Congress 'amend[s] applicable law.'"  Id at 218, citing Robertson, 503 US at 441.  Plaut thus sets forth the principle that a statute that amends applicable law, even if it is meant to determine the outcome of pending litigation, does not violate the separation-of-powers principle.  And under Robertson, Congress amends applicable law when it creates a new method to satisfy existing statutory requirements, i e, when "compliance with certain new law constituted compliance with certain old law."  Robertson, 503 US at 440.

In Ecology Center v Castaneda, 426 F3d 1144 (2005), the Ninth Circuit applied Robertson and Klein to facts like those in Robertson: with litigation pending, Congress had enacted a forest-specific management act which changed the criteria for approving timber sales.  Id at 1149.  The Ninth Circuit held that the Act changed the underlying law because it did not "direct particular findings of fact or the application of old or new law to fact" but still left to the district court the role of determining whether the new criteria were met.  Id.  Ecology Center noted that a separation-of-powers problem appears where "Congress has impermissibly directed certain findings in pending litigation, without changing any underlying law."  Id at 1148, quoting Robertson, 503 US at 429.  See also Gray v First Winthrop Corp, 989 F2d 1564, 1569-70 (9th Cir 1993) ("Robertson indicates a high degree of judicial tolerance for

17

an act of Congress that is intended to affect litigation so long as
it changes the underlying substantive law in any detectable way.").

The court reads <u>Klein</u>, <u>Plaut</u>, <u>Robertson</u> and <u>Ecology Center</u>
to mean that the court's inquiry must be whether Congress has, in
enacting section 802, directed certain findings of fact in pending
litigation or, instead, changed the underlying law.

One amicus argues that Congress has not changed the
underlying substantive law; the other argues that it has.  The
former contends that if the Attorney General were to decline to
submit a certification under section 802, telecommunication
companies would remain liable under old law and that this somehow
means Congress has not changed the underlying law.  Doc #501 at 6.
The latter amicus argues that section 802 does not amend the
substantive federal law that provides plaintiffs' claim of right but
rather creates an affirmative defense that changes applicable law in
a detectable way by altering the overall substantive legal landscape
pertinent to the subject matter at issue.  Doc #507 at 10.

The court agrees with the view that section 802 amends
substantive federal law.  The Attorney General's role is examined in
detail in the next section; for the reasons stated therein, the
Attorney General does not have the authority to "change the law" or
legislate under section 802.  The court does not agree, however,
with the characterization of the substantive change in law as the
creation of an affirmative defense; rather, as already noted,
section 802 creates an immunity, albeit one that is activated in an
unusual way.

Plaintiffs, meanwhile, contend that section 802 is
unconstitutional under the principles articulated in <u>Klein</u> because

18

"section 802 * * * forbids the Court from engaging in independent fact-finding," Doc #483 at 30, and "section 802 violates the separation of powers because it permits the Executive to dictate that the Judiciary dismiss these actions without allowing the Judiciary to make an independent determination of the facts on which the dismissal is based." Doc #483 at 29. The United States counters that "it is the Court that 'finds' whether the Attorney General's certification is supported by substantial evidence provided under Section 802 and, thus, whether dismissal will be granted." Doc #520 at 17. Plaintiffs nonetheless contend that a "substantial evidence" standard of review of the Attorney General's certification, i e, his fact-finding, is "an unconstitutional attempt to direct * * * particular findings of fact," citing Robertson, 503 US at 438. Doc #483 at 30.

One amicus also argues that Congress, in enacting section 802, acted in a self-interested manner by "hiding unconstitutional and unlawful conduct" and "hop[ing] for dismissal behind a facade of judicial process" because of "intensive lobbying," "targeted fundraising efforts" and "contributions" and that this somehow makes section 802 unconstitutional. Doc #501 at 12-15. But the court's role is limited to examining the product of the legislative process to determine whether it accords with Constitutional rules for the exercise of legislative power, not to second-guess that process.

In enacting section 802, Congress created a new, narrowly-drawn and "focused" immunity within FISA, thus changing the underlying law in a "detectable way." Gray, 989 F2d at 1570. The statute, moreover, provides a judicial role, albeit a limited one, in determining whether the Attorney General's certifications meet

the criteria for the new immunity created by section 802; it does not direct the court to make specified findings.  The court may reject the Attorney General's certification and refuse to dismiss a given case if, in the court's judgment, the certification is not supported by substantial evidence.  Accordingly, the court finds that section 802 does not violate the separation-of-powers principle examined in Klein.

3

Plaintiffs assert that section 802(a) violates the "nondelegation doctrine" under which Congress may not delegate law-making power to the executive branch, citing Youngstown Sheet and Tube Co v Sawyer, 343 US 579, 587 (1952).  Doc #483 at 22-23. Plaintiffs also quote Marshall Field & Co v Clark, 143 US 649, 692 (1892), the seminal case in which the Supreme Court wrote: "That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution."  This is the most serious of plaintiffs' challenges.

Plaintiffs specifically assert, somewhat confusingly, that Congress "has not changed the law governing plaintiffs' causes of action," but, rather, "[b]y the act of filing certifications in this Court, the Attorney General has purported to amend the statutes governing plaintiffs' actions long after Congress enacted FISAAA and the President signed it."  Doc #483 at 24-25.  As the court understands plaintiffs' contention, section 802(a) specifies a good many things that the Attorney General must do should he choose to seek dismissal of a "covered civil action," but it does not actually

direct the Attorney General to take any steps up to and including filing certifications, nor does it appear to establish any basis for his exercise of discretion in determining whether to do so in a particular case.

Notwithstanding the non-delegation doctrine's sweeping prohibition on delegations of law-making power, congressional delegations of law-making authority to administrative agencies are commonplace and those agencies create enormous bodies of law including, but not limited to, the entire Code of Federal Regulations. One treatise comments thusly about the current status of the non-delegation doctrine: "The real law is pretty close to acceptance of any delegation of authority," but "the doctrine's theoretical foundation is very sound and scholars continue to argue about a more robust nondelegation doctrine." 33 Charles A Wright, <u>Federal Practice and Procedure</u> § 8365 at 264-65 (Thomson/West 2006). Id at 265. There are, in short, limits to what Congress may permissibly delegate to the executive branch, although the courts are rarely called on to enforce those limits. In 1928, Chief Justice Taft wrote, in an opinion upholding the power of Congress to delegate to the executive the authority to adjust import tariffs:

> If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power. If it is thought wise to vary the customs duties according to changing conditions of production at home and abroad, it may authorize the Chief Executive to carry out this purpose, with the advisory assistance of a Tariff Commission appointed under congressional authority.

<u>Hampton & Co v United States</u>, 276 US 394, 409 (1928). Chief Justice Taft's "intelligible principle" test became the guiding principle

for non-delegation challenges and, indeed, remains so.  See <u>Whitman</u> <u>v American Trucking Assns, Inc</u>, 531 US 457, 487 (2001)(Thomas, dissenting)("this Court since 1928 has treated the 'intelligible principle' requirement as the only constitutional limit on congressional grants of power to administrative agencies * * *").

Congressional enactments during the 1930s and 1940s prompted a number of non-delegation challenges; in just two of them, the Supreme Court determined that Congress had delegated too much legislative authority.  <u>Panama Refining Co v Ryan</u>, 293 US 388, 430 (1935)(statute authorizing regulation of interstate and foreign commerce in petroleum invalid because "the Congress has declared no policy, has established no standard, has laid down no rule.  There is no requirement, no definition of circumstances and conditions in which the transportation is to be allowed or prohibited.") <u>Schechter Corp v United States</u>, 295 US 495 (1935) (statute authorizing the President, upon application by "one or more trade or industrial associations or groups," to approve a code of fair competition for that trade or industry, violations of which were subject to criminal penalties, invalid).  It is tempting to view <u>Panama Refining</u> and <u>Schechter</u> as akin to twin blips on an otherwise flatlined electrocardiogram for the non-delegation doctrine, given that no other statute has been invalidated by the courts on this ground before or since.  See generally <u>Mistretta v United States</u>, 488 US 372, 373-74 (1989).  The telecommunications company defendants have certainly pressed this view (see, for example, Doc #508 at 22).  But the federal courts have been presented with non-delegation challenges with regularity thereafter and they are no rarity in the contemporary period.

1    In reviewing a statute against a nondelegation challenge

2  to an act of Congress, "the only concern of courts is to ascertain

3  whether the will of Congress has been obeyed."  <u>Yakus v United</u>

4  <u>States</u>, 321 US 414, 425 (1944).  In <u>Mistretta</u>, the Court upheld the

5  Sentencing Reform Act of 1984 (as amended, 18 USC § 3551 et seq and

6  28 USC §§ 991-98), which created the United States Sentencing

7  Commission and authorized the Sentencing Guidelines.  In finding the

8  statute a proper exercise of congressional authority, the Supreme

9  Court reaffirmed Chief Justice Taft's "intelligible principle" test

10  as the touchstone for determining non-delegation challenges to

11  congressional enactments and quoted <u>American Power & Light Co v SEC</u>,

12  329 US 90, 105 (1946) thusly: "This Court has deemed it

13  'constitutionally sufficient if Congress clearly delineates the

14  general policy, the public agency which is to apply it, and the

15  boundaries of this delegated authority.'"  488 US at 373.

16    The Court's <u>Mistretta</u> opinion identified in the Sentencing

17  Reform Act of 1984 three "goals," four "purposes," the prescription

18  of a specific tool for the Sentencing Commission to use in carrying

19  out its responsibilities —— the sentencing "ranges" later embodied

20  in the Sentencing Guidelines —— seven "factors" to be considered in

21  the formulation of offense categories and "[i]n addition to these

22  overarching constraints * * * even more detailed guidance to the

23  Commission about categories of offenses and offender

24  characteristics" such as recidivism, multiple offenses and other

25  aggravating and mitigating factors.  488 US at 377.  The Court held

26  that the statutory scheme had set forth "more than merely an

27  'intelligible principle' or minimum standards" and quoted with

28  approval from the district court's opinion in <u>United States v</u>

23

United States District Court

For the Northern District of California

<u>Chambless</u>, 680 F Supp 793, 796 (ED La 1988): "The statute outlines
the policies which prompted establishment of the Commission,
explains what the Commission should do and how it should do it, and
sets out specific directives to govern particular situations." 488
US at 379.

In this century, the Supreme Court considered a non-
delegation challenge in <u>Whitman v American Trucking Assns</u>, 531 US
457 (2001), this time to the Environmental Protection Agency's
National Ambient Air Quality Standards. The DC Circuit had
determined that section 109(b)(1) of the Clean Air Act, under which
the standards were promulgated, lacked an "intelligible principle"
to guide the agency's exercise of authority. The Supreme Court
reversed, finding that § 109(b)(1)'s directive to the EPA to
establish an air quality standard at a level "requisite to protect
public health from the adverse effects of the pollutant in the
ambient air" was "well within the outer limits of our nondelegation
precedents." Id at 473-74.

In considering the instant motion, the court regarded the
nondelegation challenge to section 802 as substantial enough to
warrant additional briefing. Doc ##559, 571-573. The nondelegation
problem presented in the instant cases is different from that in the
above-referenced authorities in that section 802 contains no charge
or directive, timetable and/or criteria for the Attorney General's
exercise of discretion, a point the United States admits: "Congress
left the issue of whether and when to file a certification to the
discretion of the Attorney General." Doc #466 at 22. The statute
does not explicitly confine the Attorney General's authority in any
manner or, indeed, offer any direction to the Attorney General other

24

United States District Court
For the Northern District of California

than to prohibit him from delegating his "authority and duties" under section 802 to anyone other than the Deputy Attorney General (§ 802(g)). Rather, the statute's commands are directed to the courts and to the parties. Yet the Attorney General's action triggers the dramatic consequence of dismissal of a number of lawsuits seeking substantial damages against the telecommunications company defendants.

The United States' primary argument in its supplemental brief is that section 802 does not delegate legislative power, but rather "permit[s], but do[es] not require, the Attorney General to certify facts to a court, triggering consequences determined by Congress." Doc #572 at 7. Therefore, the United States asserts, "the non-delegation doctrine and its 'intelligible principle' standard are simply inapplicable." Id. Like plaintiffs, they cite <u>Marshall Field & Co v Clark</u>, but contend that section 802 is like the tariff law upheld in that case. They point to that opinion's emphasis on "factfinding" as a permissible delegation to the executive branch:

> The proper distinction * * * was this: "The legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the law-making power, and must therefore be a subject of inquiry and determination outside of the halls of legislation."

143 US 649, 694 (1892). The United States contends that section 802 is like other statutes "that permit, but do not require, the Attorney General to certify facts to a court, triggering consequences determined by Congress." Doc #572 at 7.

25

The United States cites the following specific examples: 28 USC § 2679(d) (when Attorney General certifies that a defendant federal employee was acting within the scope of his office or employment in a civil action, United States "shall be substituted" as the party defendant); 18 USC § 5032 (unless the Attorney General "after investigation" certifies facts to the United States district court, juveniles may not be prosecuted in the United States courts); 28 USC § 1605(g)(1)(A) (upon request of the Attorney General together with certification that a discovery order would significantly interfere with a criminal case or national security operation, court "shall stay" discovery against the United States); Classified Information Procedures Act § 6(a), 18 USC App 3 (authorizing the Attorney General to certify that a public hearing regarding use of classified information may result in disclosure of such information, automatically triggering an in camera hearing). Doc #572 at 7-8 n 2.

The telecommunications company defendants similarly contend that section 802 provides only for the certification of facts by the executive branch that then triggers consequences determined by Congress, and not delegated legislative or rulemaking activity. They contend that the Attorney General's authority under section 802 is similar to that of the Secretary of State recently upheld by the DC Circuit in Owens v Republic of the Sudan, 531 F3d 884 (DC Cir 2008). But in Owens, the court considered a challenge on vagueness grounds to a congressional charge to the Secretary of State in 50 USC App § 2405(j)(1)(A) authorizing her to label a country a "state sponsor of terrorism" and found the terms at issue "intelligible" under Whitman. 531 F3d at 893.

The telecommunications company defendants also rely on a New Deal-era case, <u>Currin v Wallace</u>, 306 US 1 (1939), in which the Supreme Court upheld the Tobacco Inspection Act of August 23, 1935, which provided for the Secretary of Agriculture to inspect and certify tobacco for sale, but only in markets in which two-thirds of the growers had voted in favor of such action in a special referendum.  Id at 6.  The telecommunications company defendants characterize the congressional grant to the executive branch in <u>Currin</u> as turning "not only upon discretionary factual determinations by the Executive, but also upon the favorable vote of <u>private citizens</u>."  Doc #508 at 22.  But defendants misread <u>Currin</u> in describing the Secretary of Agriculture's factual determinations as "discretionary."  The Court rejected just such a characterization of the Act: "We find no unfettered discretion lodged with the administrative officer. * * * [T]he Secretary acts merely as an administrative agent in conducting the referendum.  The provision for the suspension of a designated market * * * sets forth definite as well as reasonable criteria."  306 US at 17.  The Court was untroubled by the Act's provision for referenda, observing that the predication of executive action on the outcome of a vote had been upheld in <u>Hampton & Co</u>.  Id at 16.

In these and other examples advanced in support of section 802, the statute at issue undeniably contains a charge to the executive branch which is challenged as insufficiently clear or restrictive; section 802 contains no such charge.

As a secondary argument, the United States asserts that an intelligible principle governing the Attorney General's exercise of discretion can be discerned in section 802, pointing to the narrow

United States District Court

For the Northern District of California

scope of cases in which the Attorney General is authorized to act under section 802 as defined in the five conditions set forth in subsections (a)(1)-(a)(5).  While there is no question that the criteria for certification are narrowly-drawn, the lack of a charge to the Attorney General remains a problem that the United States does not directly acknowledge.  The United States contends, however, that legislative history may be used to supply an intelligible principle.  This requires putting aside the usually applicable canon that statutory language alone controls a court's interpretation absent ambiguity.  <u>Lamie v United States Trustee</u>, 540 US 526, 534 (2004).  For its contention, the United States accurately cites a footnote in <u>Mistretta</u>:

> [The] legislative history, together with Congress'
> directive that the Commission begin its consideration
> of the sentencing ranges by ascertaining the average
> sentence imposed in each category in the past, and
> Congress' explicit requirement that the Commission
> consult with authorities in the field of criminal
> sentencing provide a factual background and statutory
> context that give content to the mandate of the
> Commission.

488 US at 376.  As noted above, however, the Court determined in <u>Mistretta</u> that the statute itself met the <u>Yakus</u> standard while section 802 does not appear to do so.  Nonetheless, the quoted language from <u>Mistretta</u> plainly authorizes courts to consult the legislative history in construing the scope of a congressional authorization or mandate to an executive agency, even absent ambiguity in the statute.  See also <u>Owens</u>, 531 F3d at 890:

> When we review statutes for an intelligible principle
> that limits the authority delegated to a branch outside
> the legislature, we do not confine ourselves to the
> isolated phrase in question, but utilize all the tools
> of statutory construction, including the statutory
> context and, when appropriate, the factual background
> of the statute to determine whether the statute

**provides the bounded discretion that the Constitution requires.**

**The United States does not contend that the legislative history should be read to confer a mandatory duty on the Attorney General to prepare certifications for all telecommunications company defendants for which it is possible to do so. (Indeed, while the telecommunications company defendants urge such an interpretation, the United States specifically declines to join in or endorse that argument. Doc #572 at 17 n 9.) Rather, the United States contends that a discretionary authorization to act, as opposed to a mandate to do so, "to protect intelligence gathering ability and national security information," Doc #572 at 11, can be found in the legislative history of section 802 and that this is sufficient to withstand plaintiffs' nondelegation challenge.**

**The United States describes section 802 as "strikingly similar to the grant of authority to the Attorney General" upheld by the Supreme Court in <u>Touby v United States</u>, 500 US 160 (1991). In <u>Touby</u>, the Court considered a challenge to § 201(h) of the Controlled Substances Act, 21 USC § 811(h), under which the Attorney General may schedule a substance on a temporary basis when doing so is "necessary to avoid an imminent hazard to the public safety." But petitioners in <u>Touby</u> had conceded that this language constituted an "intelligible principle" and unsuccessfully challenged the provision on other grounds. 500 US at 163. The United States pushes the analogy to <u>Touby</u> too far when it asserts that section 802 "authorizes the Attorney General to act to protect intelligence gathering ability and national security information." Doc #572 at 11. The quoted standard in <u>Touby</u> was explicit in the statute; the**

**United States District Court**
For the Northern District of California

proffered standard for section 802 is absent from the statute. At
best, something of the kind may be gleaned from the legislative
history of section 802, but the United States does not cite anything
from the legislative history that directly states the proposition
the United States would have the court accept as Congress' charge to
the Attorney General. <u>Touby</u>, therefore, is not helpful here.

The telecommunications company defendants argue that the
court can and should construe section 802 to contain a tacit mandate
requiring the Attorney General to file certifications in all
possible cases (e g, "Congress * * * imposed on the Attorney General
the responsibility to determine when evidence exists that would
satisfy the statutory standards and to submit that evidence to the a
court," Doc #508 at 2). The court is not aware of any precedent for
such a reading and, on the contrary, finds the absence of such a
charge striking in the context of FISAAA as a whole.

Congress could have made the authorization for the
executive branch to certify facts pursuant to an explicit charge to
the agency in question. An example of this type of statute is 50
USC App § 2405(i), which provides that special licensing
requirements come into play for exports to countries for which the
Secretary of State has made specific determinations of a factual
nature (e g, "The government of such country has repeatedly provided
support for acts of international terrorism"); but the authority is
in furtherance of a charge from Congress spelled out elsewhere in
the same act:

> In order to carry out [enumerated policies], the
> President may prohibit or curtail the exportation of []
> goods, technology or other information * * * to the
> extent necessary to further significantly the foreign
> policy of the United States or to fulfill its declared
> international obligations

1   and the subsection lists the specific executive branch agencies
2   authorized to carry out the charge.  50 USC App § 2405(a)(1).

3           Congress could in this manner have included language in
4   section 802 specifically directing the Attorney General to undertake
5   review and to submit to the court the specified certifications.  The
6   absence of a congressional charge to the Attorney General in section
7   802 is all the more surprising for the fact that numerous other
8   provisions of FISAAA contain directives to the Attorney General and
9   other agency heads: section 702(a) authorizes the Attorney General
10  and the Director of National Intelligence to target "persons
11  reasonably believed to be located outside the United States";
12  section 702(g) requires the Attorney General and the Director of
13  National Intelligence to complete written certifications prior to
14  implementing a § 702(a) authorization; section 702(l)(3) requires
15  the "head of each element of the intelligence community" to complete
16  specified annual reviews; section 707(a) requires the Attorney
17  General to provide a semiannual report to congressional committees;
18  section 105(a) authorizes the Attorney General to authorize
19  emergency employment of electronic surveillance under specified
20  circumstances; section 301 requires Inspectors General of Department
21  of Justice, Office of Director of National Intelligence, National
22  Security Agency, Department of Defense and other inspectors general
23  to provide interim reports to Congress within sixty days.  The court
24  agrees with plaintiffs (Doc #573 at 22) that in light of the many
25  other provisions in FISAAA requiring the Attorney General to perform
26  a range of tasks, construing section 802 to contain a mandate to the
27  Attorney General would be especially inappropriate.
28  \\

Finally, the telecommunications company defendants argue essentially "no harm, no foul" regarding the statute's lack of standards governing the Attorney General's discretion to submit or not submit a certification: "That the Attorney General might exercise discretion as to whether to tender a certification is * * * purely conjectural —— he has done so here —— and not a matter of constitutional significance." Doc #508 at 22. The court is not persuaded that a constitutional defect in a statute can be cured by the executive's zealous execution of that statute. See Whitman, 531 US at 472 ("We have never suggested that an agency can cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute"). The statute's language, legislative history and context must be susceptible of a constitutionally adequate interpretation.

After carefully considering all the briefing, the court concludes that while the nondelegation challenge presents a close question, section 802, properly construed, does not violate the constitutional separation of powers. From the foregoing discussion, the court now distills the following salient points in determining that section 802 is not an unconstitutional delegation by the legislative branch to the executive branch.

Section 802 is not a broad delegation of authority to an administrative agency like the Clean Air Act or the Sentencing Reform Act; rather, its subject matter is intentionally narrow or "focused" in scope. "[T]he degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." Whitman, 531 US at 475. While section 802 does not contain a directive to the Attorney General, the United

States and the telecommunications company defendants correctly point out that no form of rulemaking is at issue, a fact that limits the potential harm from a vaguely-defined delegation of authority. As the DC Circuit noted in Owens, "the shared responsibilities of the Legislative and Executive Branches in foreign relations may permit a wider range of delegations than in other areas," 531 F3d at 893. The same can be said of the roles of these two branches in the instant cases, where matters pertaining to national security are concerned. The legislative history provides enough context and content to provide definition for the Attorney General's scope of authority even in the absence of a specific charge to carry out. The Attorney General is not required to file certifications but is authorized to do so. The SSCI report makes clear that Congress wanted to immunize telecommunications companies in these actions. "[G]athering and presenting [] facts" (Doc #572 at 7) to the court is a reasonable reading of the Attorney General's role under section 802 and appears authorized by Marshall Field & Co v Clark and other authorities.

Accordingly, the court concludes that section 802 does not suffer from the constitutional infirmity of excessive delegation to the Attorney General.

C

Plaintiffs next advance arguments under the Due Process Clause of the Fifth Amendment, specifically: (1) their causes of action for violations of the First and Fourth Amendments are property interests protected by the Due Process Clause and that section 802 deprives them of their right to notice and an

opportunity to be heard before a "neutral and detached judge in the first instance" (Doc #483 at 32-36); and (2) the secrecy provisions allowing for certifications and supporting documentation to be submitted in camera and ex parte violates due process by depriving them of "meaningful notice" of the government's basis for seeking dismissal and a "meaningful opportunity to oppose the government's arguments and evidence" (Doc #483 at 36-39). The court addresses these two arguments in turn.

1

Plaintiffs contend that the Fifth Amendment's Due Process Clause entitles them to notice and an opportunity to be heard before a "neutral and detached judge in the first instance" in a proceeding under section 802 seeking dismissal of their claims against the telecommunications company defendants. They argue further that the Attorney General's role makes section 802 constitutionally defective. Doc #483 at 32. Relying primarily on Concrete Pipe & Products v Construction Laborers Pension Trust, 508 US 602, 617 (1993), plaintiffs argue that section 802 creates a scheme in which a "biased decisionmaker [the Attorney General] makes an initial decision that a later, unbiased decisionmaker is forbidden from reviewing de novo but instead must accept under a deferential standard of review." Id. They contend, moreover, that Concrete Pipe requires de novo review in the face of an initial decision-maker's alleged bias.

Plaintiffs acknowledge that Congress "is free to create defenses or immunities to statutory causes of action" because the legislative process satisfies Due Process requirements. Doc #524 at

34

27 n 16.  They contend, however, that the Attorney General, not

Congress, has "changed the law governing plaintiffs' lawsuits."  Id.

As previously discussed in this order, Congress has

manifested its unequivocal intention to create an immunity that will

shield the telecommunications company defendants from liability in

these actions.  The Attorney General, in submitting the

certifications, is acting pursuant to and in accordance with that

congressional grant of authority, in effect, to administer the

newly-created immunity provision.  Plaintiffs acknowledge that

"Congress * * * is free to create defenses or immunities to

statutory causes of action because it is 'the legislative

determination [that] provides all the process that is due.'"  Doc

#524 at 27 n 16, quoting <u>Logan v Zimmerman Brush Co</u>, 455 US 422, 430

(1982).  With regard to section 802, Congress held hearings and

plaintiffs' counsel testified in opposition to the proposed immunity

legislation.  Doc #531 (RT, hearing held December 2, 2008) at 63.

To the extent that plaintiffs' due process argument rests on the

idea that the Attorney General has "changed the law" due to an

allegedly improper delegation of legislative authority, moreover,

the court rejected that particular challenge in the preceding

section.  This part of plaintiffs' due process argument is therefore

without merit.

2

Plaintiffs argue as a second Due Process challenge that

the secrecy provisions allowing for certifications and supporting

documentation to be submitted in camera and ex parte violates due

process.  They cite <u>Brock v Roadway Express, Inc</u>, 481 US 252, 264

(1987) and <u>Hamdi v Rumsfeld</u>, 542 US 507 (2004).  Those cases held that the constitutional requirement of meaningful opportunity to respond necessitates notice of the factual basis for the government's position, but neither opinion directly concerned evidence having national security implications.

The United States responds that courts have "uniformly" upheld laws and procedures providing for ex parte use of classified evidence because of the compelling state interest in protecting national security, citing recent cases from the Seventh and DC Circuits.

The parties' contrasting positions highlight the tension between the government's concern for national security and the civil litigant's due process rights.  While both interests are of great importance, the United States' argument prevails here.  Other statutes providing for ex parte, in camera procedures have withstood due process challenges in other contexts having national security implications.  For example, in <u>Holy Land Foundation for Relief & Development v Ashcroft</u>, 333 F3d 156, 164 (DC Cir 2003) the DC Circuit upheld the exclusion from an administrative proceeding of classified information, which was subject instead to ex parte, in camera review under 50 USC § 1702(c).  See also <u>Global Relief Foundation, Inc v O'Neill</u>, 315 F3d 748, 754 (7th Cir 2002)(also rejecting due process challenge to ex parte, in camera review procedures in 50 USC § 1702(c)); <u>People's Mojahedin Organization of Iran v Department of State</u>, 327 F3d 1238, 1242 (DC Cir 2003) (in camera, ex parte submissions of classified information in a designation proceeding under the Antiterrorism and Effective Death Penalty Act of 1996 did not violate due process, which requires

"only that process which is due under the circumstances of the case," specifically access to the unclassified portions of the administrative record); <u>National Council of Resistance v Department of State</u>, 251 F3d 192, 208 (DC Cir 2001)(in the process of designating a foreign terrorist organization under 8 USC § 1189, the Secretary of State could forego pre-designation notice to the organization "[u]pon an adequate showing to the court * * * where earlier notification would impinge upon the security and other foreign policy goals of the United States" without offending the Constitution).

Section 802(d) provides for parties to submit documents and briefs to the court in connection with a proceeding under section 802. Section 802 is not, therefore, a fully ex parte procedure in the sense that the process for securing a FISA warrant under 50 USC § 1804 or an arrest warrant in the criminal context is ex parte. Section 802 evinces a clear congressional intent that parties not have access to classified information. Given the special balancing that must take place when classified information is involved in a proceeding, the court is not prepared to hold that the Constitution requires more process than section 802 provides in the circumstances of this case.

D

Plaintiffs also contend that Congress' enactment of the secret filing and evidence provisions of section 802 violates a First Amendment right of access to documents in a civil proceeding because "only a court, and not the Attorney General or Congress," can apply strict scrutiny to a proposed ban on public access to

court records (Doc #483 at 40-45), and thereby also trenches on the authority of federal courts under Article III. Several news organizations (Associated Press, Los Angeles Times, San Jose Mercury News, USA Today) that have intervened in this lawsuit have joined in this part of plaintiffs' motion (Doc #523). Plaintiffs cite Globe Newspaper Co v Superior Court, 457 US 596, 606-07 (1982) for the proposition that the government's basis for secrecy must be "a compelling governmental interest * * * narrowly tailored to serve that interest." Doc #483 at 42.

The United States asserts, as it has throughout this litigation, that the executive branch is responsible for the protection and control of national security information, citing Department of the Navy v Egan, 484 US 518 (1988), and counters that "no First Amendment right exists to receive or disclose classified information in general, let alone the classified information filed in this court under express congressional authorization." Doc #520 at 28.

The United States further posits that the applicable Supreme Court rule is not Globe Newspaper, but that set forth in Press-Enterprise Co v Superior Court, 478 US 1 (1986), which, like Globe Newspaper, concerned records in criminal proceedings. Doc #520 at 29. Under the Press-Enterprise formulation, courts must consider whether the "particular proceeding in question passes [] tests of experience and logic," including "whether the place and process have historically been open to the press and general public" and "whether public access * * * plays a particularly significant positive role in the actual functioning of the process" in question. 478 US at 8-11. The United States also notes that the Ninth Circuit

United States District Court

For the Northern District of California

has never found a First Amendment right of access to civil judicial proceedings, a point plaintiffs have conceded.  Doc #520 at 28; Doc #483 at 42 n 10.

The court agrees with the United States that <u>Globe Newspaper</u> gives plaintiffs little ground to stand on in the instant context.  The majority opinion in <u>Globe Newspaper</u> mapped the contours of the constitutional right of access to <u>criminal trials</u> on the part of the press and general public announced in <u>Richmond Newspapers, Inc v Virginia</u>, 448 US 555 (1980).  The <u>Globe Newspaper</u> opinion discussed criminal proceedings specifically and noted that "features of the criminal justice system, emphasized in the various opinions in <u>Richmond Newspapers</u>, together serve to explain why a right of access to <u>criminal trials</u> in particular is properly afforded protection by the First Amendment."  457 US at 605.  Justice O'Connor's concurrence was at pains to state, moreover, "I interpret neither <u>Richmond Newspapers</u> nor the Court's decision today to carry any implications outside the context of criminal trials."  Id at 611.  This is neither a criminal proceeding nor a trial; <u>Globe Newspaper</u> therefore does not apply.

The court also agrees with the United States' reading of <u>Egan</u> in this context.  While "<u>Egan</u> recognizes that the authority to protect national security information is neither exclusive nor absolute in the executive branch," <u>In Re National Security Agency Telecommunications Litigation</u>, 564 F Supp 2d 1109, 1121 (ND Cal 2008), <u>Egan</u> observes that "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."  484 US at 530.  By enacting section 802, Congress has

specified that certain documents in these cases are to be reviewed ex parte and in camera.  The court is therefore more than usually reluctant to disturb the judgment of the executive branch on First Amendment grounds given this affirmative direction by the legislative branch, and especially so without any judicial precedent.

The idea that there is a presumptive right of public and press access to court proceedings as discussed in some of the cases plaintiffs cite (e g, <u>Grove Fresh Distributors, Inc v Everfresh Juice Co</u>, 24 F3d 893, 897 (7th Cir 1994)) as a common-law tradition and a tenet of good government seems uncontroversial, but plaintiffs' attempt to attach a strict scrutiny standard to limitations on access in the present context is not well-founded. It is fair to say that there is an equally uncontroversial presumption that the public and the press will <u>not</u> have access to court proceedings involving classified information.  The court concludes that Congress' resolution of these competing presumptions in section 802, a focused and narrowly-drawn enactment, does not offend the Constitution.

Plaintiffs raise two other, related, objections to subsections 802(c) and (d) based on the First Amendment in this part of their brief.  Subsection (d) requires the court to use ex parte, in camera procedures to prevent the disclosure of classified information.  Subsection (c) restricts public access to the certifications and/or supplemental materials filed pursuant to section 802 if the Attorney General files a sworn affidavit asserting that disclosure "would harm the national security of the United States."  This provision appears consistent with the

principles set forth in <u>Egan</u>; the court, accordingly, sees no basis for finding them constitutionally defective on First Amendment grounds.

**E**

Plaintiffs contend that the Attorney General's filing of a certification under section 802(a) is "a final agency action" that requires adherence to the rules for final agency actions under the Administrative Procedures Act (APA), 5 USC § 551 et seq, and that this in effect grafts additional standards of review onto the review procedures set forth in section 802 itself — standards allegedly not met here. Doc # 483 at 58-59. Specifically, plaintiffs assert that the court must review the "whole record" and determine whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory . . . authority[] or limitations," or "contrary to constitutional right, power, privilege, or immunity." Id, citing 5 USC § 706.

The United States does not argue that the Department of Justice is not an agency or that the filing of the certifications is not an action; rather, the United States counters that "section 802 and its express terms, including the procedures applicable to these proceedings, govern these cases," but cites no authority in support of the notion that section 802's procedures automatically displace those required by the APA. Doc #520 at 35. But because "the APA applies even if the enabling act does not mention it and the applicable procedural law is determined by the APA whether or not the enabling act incorporates that law" and "[e]ven if the enabling

41

**United States District Court**
For the Northern District of California

act provides procedures, the APA affects those requirements," 32 Charles A Wright & Charles H Koch, <u>Federal Practice and Procedure: Judicial Review</u> § 8135 at 94, more examination of this question is required.

Specific statutory procedures providing for judicial review of agency action apply in context, and the APA's general provisions fill in the interstices. 5 USC § 704 provides: "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." In <u>Bowen v Massachusetts</u>, 487 US 879, 903 (1988), the Supreme Court explained:

> § 704 * * * makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action. As Attorney General Clark put it the following year, § 704 "does not provide additional judicial remedies where the Congress has provided special and adequate review procedures."

Accord, <u>Edmonds Institute v United States Department of the Interior</u>, 383 F Supp 2d 105 (DDC 2005)("clear and simple remedy" offered by Freedom of Information Act sufficient, making separate action under APA unavailable). Section 802 contains highly detailed procedures for judicial review of the Attorney General's actions. "The fact that a suit is brought by the government * * * does not fundamentally change the nature of the review of the underlying administrative decision." 33 Wright & Koch, <u>Federal Practice</u> § 8300 at 46. Therefore, separate APA review is not available in these cases.

Regarding the scope of judicial review, 5 USC § 706 provides that the reviewing court "shall decide all relevant questions of law, interpret constitutional and statutory provisions,

and determine the meaning or applicability of the terms of an agency action."  The reviewing court must set aside "agency action, findings, and conclusions" it finds to meet one of six criteria: arbitrary, capricious, an abuse of discretion; contrary to constitutional right; in excess of statutory jurisdiction; without observance of procedure required by law; "unsupported by substantial evidence in a case subject to section 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute"; or unwarranted by the facts as determined pursuant to de novo review.  Section 802, in providing for review under the substantial evidence standard, appears consistent with section 706 of the APA and therefore may be understood to take the place of APA review.

In summary, plaintiffs' contention that the APA imposes requirements additional to section 802 is without merit.

F

Finally, plaintiffs make a series of arguments to the effect that, on the merits and putting alleged infirmities in section 802 aside, the Attorney General's certifications are inadequate under section 802's own terms to support dismissal of these actions.

Specifically, plaintiffs contend that: (1) substantial evidence cannot support dismissal under Section 802(a)(5) in that, whereas the Attorney General's public certifications state, inter alia, "because there was no content-dragnet, no provider participated in that alleged activity" (Doc #469-3 at 5), plaintiffs' evidence establishes that there was, in fact, dragnet-

type surveillance by one or more of the defendant telecommunications service providers (Doc # 483 at 48-52); (2) substantial evidence cannot support dismissal under section 802(a)(4) in that the alleged dragnet surveillance program could not have been "designed to detect or prevent a terrorist attack, or activities in preparation for a terrorist attack, against the United States," because its "objective features * * * were not designed for the specific function of detecting or preventing a terrorist attack but for the broader purpose of acquiring as many communications and communications records as possible, regardless of whether [they] bear any connection to terrorism at all," id at 54; and (3) substantial evidence cannot support dismissal under any of the first three subsections of section 802 because the constraints imposed by the Fourth Amendment as interpreted by <u>Keith</u>, 407 US 297, would not allow the alleged dragnet to be lawfully authorized under any of the five prongs of section 802(a)(1)-(5).

While plaintiffs have made a valiant effort to challenge the sufficiency of certifications they are barred by statute from reviewing, their contentions under section 802 are not sufficiently substantial to persuade the court that the intent of Congress in enacting the statute should be frustrated in this proceeding in which the court is required to apply the statute. The court has examined the Attorney General's submissions and has determined that he has met his burden under section 802(a). The court is prohibited by section 802(c)(2) from opining further. The United States' motion to dismiss must therefore be, and hereby is, GRANTED.

Because, however, section 802's immunity provision may only be invoked with regard to suits arising from actions authorized

44

United States District Court

For the Northern District of California

by the president between September 11, 2001 and January 7, 2007, the
dismissal is without prejudice.  On May 15, 2009, plaintiffs
submitted a "notice of new factual authorities in support of
plaintiffs' opposition to motion of the United States" to dismiss.
Doc #627.  In the notice, plaintiffs cite news articles published in
2009 reporting post-FISAAA warrantless electronic surveillance
activities by the NSA.  Plaintiffs argue that these articles
constitute "proof that the certification of former Attorney General
Michael Mukasey that is the sole basis for the government's pending
motion to dismiss is not supported by 'substantial evidence.'"  Doc
#627 at 3.  The court disagrees.  The court believes that the
Attorney General has adequately and properly invoked section 802's
immunity to the extent that the allegations of the master
consolidated complaints turn on actions authorized by the president
between September 11, 2001 and January 7, 2007.  The court also
believes, however, that plaintiffs are entitled to an opportunity to
amend their complaints if they are able, under the ever-more-
stringent pleading standards applicable in federal courts (see, e g,
Ashcroft v Iqbal, ___ US ___, 129 S Ct 1937 (2009)), to allege
causes of action not affected by the Attorney General's successful
invocation of section 802's immunity.

\\

\\

\\

\\

\\

\\

\\

For the aforestated reasons, the United States' motion to dismiss (Doc #469) is GRANTED.  Also for the reasons set forth herein, plaintiffs' hearsay objections to the SSCI report and to the public and classified declarations submitted by the United States (Doc #477) are OVERRULED; these documents are admissible for the purposes discussed herein.

Plaintiffs may amend the master consolidated complaints in a manner consistent with this order within thirty (30) days of the date of this order.

IT IS SO ORDERED.

VAUGHN R WALKER
United States District Chief Judge