Pages 1 - 71

United States District Court

Northern District of California

Before The Honorable Vaughn R. Walker

| | | |
|---|---|---|
| In re: National Security Agency Telecommunications Records Litigation, | ) | No. MDL 06-1791 VRW |
| | ) | And Related Cases: |
| Plaintiff. | ) | |
| | ) | C07-1324 VRW |
| | ) | C07-1242 VRW |
| | ) | C07-1323 VRW |
| ______________________________ | ) | C07-1326 VRW |
| | | C07-1396 VRW |
| | | C07-1187 VRW |

San Francisco, California
Thursday, May 7, 2009

**Reporter's Transcript Of Proceedings**

**Appearances**:

For the U.S. Department of Justice:
United States Department of Justice
Civil Division
20 Massachusetts Avenue, N.W. Room 6102
Washington, DC 20530
**By: Anthony Joseph Coppolino, Esquire**
**Alexander Kenneth Haas, Esquire**

For the AT&T Entities:
Pillsbury Winthrop Shaw Pittman, LLP
50 Fremont Street
Post Office Box 7880
San Francisco, California 94120
**By: Bruce A. Ericson, Esquire**

(Appearances continued on next page.)

***Reported By:*** ***Sahar McVickar, RPR, CSR No. 12963***
***Official Reporter, U.S. District Court***
***For the Northern District of California***



Dockets.Justia.com

**Appearances, continued:**

| | |
|---|---|
| For the AT&T Entities: | Sidley Austin, LLP<br>1501 K Street, N.W.<br>Washington, DC 20005 |
| **By:** | **Eric Alan Shumsky, Esquire** |
| For the Verizon Entities: | Wilmer Hale<br>1117 California Avenue<br>Palo Alto, California 94304 |
| **By:** | **Samir Chandra Jain, Esquire** |
| For the Nextel West Corporation: | Williams & Connolly, LLP<br>725 12th Street, N.W.<br>Washington, DC 20005 |
| **By:** | **John G. Kester, Esquire** |
| For Qwest Communications International, Inc.: | Hogan & Hartson, LLP<br>555 13th Street, N.W.<br>Washington, DC 20004 |
| **By:** | **Chris Zaetta, Esquire** |
| For the Maine Attorney General: | Maine Attorney General's Office<br>6 State House Station<br>Augusta, Maine 04333 |
| **By:** | **Christopher C. Taub, Esquire** |
| For the Connecticut Department of Public Utility Control: | Connecticut Attorney General's Office<br>10 Franklin Square<br>New Britain, Connecticut 06051 |
| **By:** | **Tatiana Damianova Eirmann, Esquire** |
| For the Missouri Public Service Commission: | Missouri Public Service Commission<br>200 Madison Street<br>Post Office Box 360<br>Jefferson City, Missouri 65102 |
| **By:** | **Jennifer Leigh Heintz, Esquire**<br>**Eric Dearmont, Esquire** |

///

**Appearances, continued:**

For James Volz, et al.: Vermont Attorney General's Office
109 State Street
Montpelier, Vermont 05609
**By: Michael Nicholas Donofrio, Esquire**

For Stuart Rabner, et al.: New Jersey Office of the Attorney General
RJ Hughes Justice Complex
P.O. Box 112
Trenton, New Jersey 08625
**By: Megan Lewis, Esquire**
**(Appearing telephonically)**

For Intervenors Christopher Branson and David L. Cowie: MCLU Foundation
401 Cumberland Avenue, Suite 105
Portland, Maine 04101
**By: Zachary Lee Heiden, Esquire**
**John Patterson, Esquire**
**(Appearing telephonically)**

**---o0o---**

**Thursday**, **May** **7**, **2009** **10:30 a.m.**

**P R O C E E D I N G S**

***THE CLERK:*** Calling MDL No. 06-1791, in re: National Security Agency Telecommunication Records Litigation.

And this hearing relates to 07-1324, United States versus Rabner 07-1242; United States versus Gaw, 07-1323; United States versus Adams, 07-1326; United States versus Palermino, 07-1396; United States versus Volz, and 07-1187, Clayton versus AT&T Communications of the Southwest, et al.

Appearances, counsel, please.

***MR. COPPOLINO:*** Good morning, Your Honor.

Anthony Coppolino, Department of Justice, for the United States.

***THE COURT:*** Good morning, Mr. Coppolino.

***MR. JAIN:*** Good morning, Your Honor.

Samir Jain at Wilmer Hale for Verizon.

***THE COURT:*** Very well, good morning.

***MR. KESTER:*** Good morning, Your Honor.

John Kester from Williams and Connolly for Sprint Nextel.

***THE COURT:*** Mr. Kester.

***MR. ERICSON:*** Good morning, Your Honor.

Bruce Ericson from Pillsbury for the AT&T entities.

***THE COURT:*** Mr. Ericson.

***MR. SHUMSKY:*** Good morning, Your Honor.

Eric Shumsky, Sidley Austin, also for the AT&T entities.

***THE COURT:*** Good morning.

***MR. HAAS:*** Good morning, Your Honor.

Alex Haas for the United States.

***THE COURT:*** Good morning.

***MR. ZAETTA:*** Good morning, Your Honor.

Chris Zaetta from Hogan & Hartson for the Qwest Communications entities.

***THE COURT:*** Good morning.

***MR. TAUB:*** Good morning, Your Honor.

I'm Christopher Taub from the Maine Attorney General's Office. I'm here for the Maine Public Utilities Commission.

***THE COURT:*** And you are appearing in the Reishus case?

***MR. TAUB:*** I'm appearing -- I'm sorry?

***THE COURT:*** Isn't that the name of your --

***MR. TAUB:*** It's the United States versus Adams, 07-1323.

***THE COURT:*** Isn't -- isn't Reishus also from Maine?

***MR. TAUB:*** I'm sorry?

***THE COURT:*** Ahh, it's the same case.

***MR. TAUB:*** Yes. The executive -- the members of the PUC have changed.

***THE COURT:*** I see.

***MR. TAUB:*** So the current chairman is Sharon Reishus.

***THE COURT:*** I see, there's been a change in personnel in May; is that it?

***MR. TAUB:*** Yes, yes.

***THE COURT:*** All right.

***MR. TAUB:*** That's correct, Your Honor.

***THE COURT:*** All right.

So we call that the Adams case now, do we?

***MR. TAUB:*** Well, I guess technically, Your Honor, we should call it the Reishus, R-e-i-s-h-u-s. Mr. Adams is no longer with the PUC, so by operation of the rules we should substitute Ms. Reishus.

***THE COURT:*** Reishus, is that how --

***MR. TAUB:*** Yes, yes.

***THE COURT:*** All right, fine.

***MS. EIRMANN:*** Good morning, Your Honor.

Tatiana Eirmann, Assistant Attorney General from Connecticut. And I represent the Department of Public Utilities --

***THE COURT:*** And that's the --

***MS. EIRMANN:*** That is United States versus Palermino. And it's 07-1326.

***THE COURT:*** Palermino.

***MS. EIRMANN:*** No change there.

***THE COURT:*** All right, fine, thank you.

***MS. EIRMANN:*** Thank you, Your Honor.

***MS. HEINTZ:*** Thank you, Your Honor.

Jennifer Heintz of the Missouri Public Service Commission. And I represent the parties in 1187 and 1242. And just to be clear with the record, in case number 1242, we refer to that as the Gaw case; Commissioner Gaw is no longer with the Commission, and Commissioner Clayton is in this case as the named plaintiff, or the named party now as well.

***THE COURT:*** So, we are going to call this the Clayton case -- or cases, actually two cases, right?

***MS. HEINTZ:*** Two cases.

***THE COURT:*** Right, the Clayton cases, all right.

***MS. HEINTZ:*** Thank you.

***MR. DEARMONT:*** Good morning, Your Honor.

Eric Dearmont on behalf of the Missouri Public Service Commission representing the parties in 1242 and 1187.

***THE COURT:*** All right, that's the Clayton case.

Now we have a couple of folks on the telephone.

***MR. DENOFRIO:*** Yes, good morning, Your Honor.

Can you hear me?

***THE COURT:*** Yes.

***MR. DENOFRIO:*** *(Telephonically:)* This is Michael Donofrio in Montpelier, Vermont. I'm representing the

parties in 07-1396, United States versus Volz.

***THE COURT:*** Very well, Mr. Donofrio.

How about New Jersey; has New Jersey checked in?

**(No response.)**

***THE CLERK:*** Ms. Lewis?

***MS. LEWIS:*** *(Telephonically:)* Good morning, Your Honor.

This is Megan Lewis. I'm appearing on behalf of the New Jersey Attorney General in United States versus Rabner.

***THE COURT:*** Very well, good morning.

***MS. LEWIS:*** Good morning.

***THE COURT:*** And perhaps afternoon where you are.

***MR. HEIDEN:*** Good morning, Your Honor.

This is Zachary Heiden appearing on behalf of the intervenor defendants, James Douglas Cowie, et al, in United States versus Reishus, et al.

***THE COURT:*** Very well, Mr. Heiden.

***MR. HEIDEN:*** Good morning, Your Honor.

***THE COURT:*** And is Mr. Patterson also with you?

**(No response.)**

***THE CLERK:*** Mr. Patterson?

***MR. PATTERSON:*** Yes, good morning.

This is John Patterson also from Portland, Maine, appearing with Mr. Heiden on behalf of intervenors in United States versus Reishus.

***THE COURT:*** All right.

I think those are all the appearance, are they not? Any others?

**(No response.)**

***THE COURT:*** Well Mr. Coppolino, are you going to lead off?

***MR. COPPOLINO:*** Thank you, Your Honor.

***THE COURT:*** I gather the answer is yes?

***MR. COPPOLINO:*** I'd be happy to. And these are, I believe, our motions.

***THE COURT:*** It is your motion.

Now, tell me, what do you want me to do?

***MR. COPPOLINO:*** Well, Your Honor, I would like to ask you to enter summary judgment for the United States.

***THE COURT:*** Well, I understand that, but exactly what would you like that summary judgment to say?

***MR. COPPOLINO:*** I think that the summary judgment should say that the Congress has preempted the investigations that are at issue in this litigation pursuant to Section 803 of the FISA and that, accordingly, they cannot proceed, and summary judgment is entered for the United States on those grounds.

***THE COURT:*** Well, you're asking for declaratory and injunctive relief.

***MR. COPPOLINO:*** That's correct.

***THE COURT:*** All right, now, precisely what do you want that declaration and injunction to say?

***MR. COPPOLINO:*** That -- well --

***THE COURT:*** I mean, a nice broad statement that Section 803 is not unconstitutional I'm sure would be satisfying, but that only gets you so far, doesn't it?

***MR. COPPOLINO:*** Understood.

What I think the injunction -- the declaratory and injunctive relief should state, Your Honor, is that each of the state proceedings at issue all concern an investigation by state authorities of alleged federal intelligence activities and fall squarely within the terms of Section 803 of the FISA.

Congress has, pursuant to its constitutional powers, expressly preempted those investigations and that, therefore -- that -- that -- that exercise of authority by Congress is -- is constitutional in response to the plaintiff's -- I'm sorry, the defendant's Tenth Amendment challenge, and that, therefore, I declare that the statute is -- is constitutional, that it preempts those proceedings, and that they are hereby enjoined in accordance with the statute.

***THE COURT:*** Well, now, exactly how do we apply that? Let's assume I give you exactly what you've asked for and suggested that the Court should issue, our friends from Connecticut, your colleagues from Connecticut, say that what they are seeking to ascertain is whether the carriers have

published privacy policies concerning customer information.

Now, surely, that kind of an inquiry would not be foreclosed by Section 803, would it?

***MR. COPPOLINO:*** Your Honor, let me answer the question this way, because this is really the nub of, I think, their argument. They don't seem to contest the Tenth Amendment issue anymore, and so we are simply down to whether or not Section 803 forecloses, as they put it, "some aspects" of their investigation.

Now, I would like to address each of the states and deal with Connecticut first, since you raised it, but the bottom line is, if there is no jurisdiction to consider the complaint, there ought to be no jurisdiction to consider an interrogatory that was -- that was raised under the complaint.

Um, the avowed purpose of each of these investigations from the complaints that were filed, either by public entities or by the Government's themselves, or the subpoenas that have been issued, have been clearly directed at investigating alleged federal intelligence activities, and Congress has barred that.

Now, the record on that point could not be clearer. All five investigations began for that reason, and all five continue for that reason, and all five are preempted. And Section 803 makes that clear.

***THE COURT:*** Well, let's assume that's true, and

let's assume that the states really are trying to poke around in this area of intelligence-gathering activity by the Federal Government but in the course of doing so they ask questions that are not otherwise foreclosed by Section 803.

***MR. COPPOLINO:*** How do you deal with that?

***THE COURT:*** That's exactly my question.

***MR. COPPOLINO:*** Well --

***THE COURT:*** How do I deal with that?

***MR. COPPOLINO:*** First of all, I don't think that that type of parsing by interrogatory is something that is contemplated or permitted under Section 803. And, in fact, I think that would be even far more intrusive an injection of the Court into the oversight of the Government's activities, and it would retain sort of an ongoing jurisdiction to police whether particular interrogatories are preempted when it is clear that Congress has, in fact, preempted the -- you know, the -- the very investigation.

Now, if you enter summary judgment, as I have suggested, what -- in accordance with the statute, that judgment, as well as the statute, draw a very bright line, that you cannot investigate any alleged federal intelligence activities. It would be clear to the states; it would be clear to the carriers.

Now, at that point, if in the future there is an inquiry that the states wish to make that does not concern an

alleged federal intelligence activity, there is nothing that would be an obstacle to that. And, if a question arose in a future case, it could be dealt with in a future case.

***THE COURT:*** And you think I'm not going to get some inquiries down the road about whether these investigations or other investigations may not run afoul of --

***MR. COPPOLINO:*** Well --

***THE COURT:*** -- the rather broadly -- broadly phrased injunction that you are seeking?

***MR. COPPOLINO:*** Well, it's certainly a possibility, but, on the other hand, though, where that line is clearly drawn, that where you say, in accordance with Congress' directive, that any inquiry cannot get into any alleged federal intelligence activity, that is, per se, excluded. The states would know that, and they would know that with respect to whatever response they are going to get to whatever question from the -- from the carriers.

But let me go back a step further, Your Honor, on this issue of whether or not there is some potential carve-out here. And I don't really intend to get too deeply in the weeds, but let me just make the following point.

***THE COURT:*** You don't intend to?

***MR. COPPOLINO:*** Get too deeply in the weeds on all of their arguments about interrogatories, because I think, in fact, if you take this state by state, the bottom line is that

all that is left in every one of these states, um, is the -- an investigation into national security activities, not non-national security activities.

Either there are no non-national security activities at issue, or they have already been dealt with by the carriers in their responses to the states or what the state thinks is not covered in some of these interrogatories we think is, in fact, covered.

Now, New Jersey doesn't even make this argument. They make no effort to suggest that any of their inquiries do not go to the NSA's alleged activities.

Missouri does attempt to draw a distinct, but, on the face of their request, a testimony subpoena and a document subpoena, it's clear that Missouri is seeking information regarded to alleged NSA activities.

With respect to Connecticut, this is not just simply an issue of public privacy policies. As I think Mr. Nichols pointed out last time we were here two years ago, if that were the case, if that were are all that were at issue in Connecticut, there would be no case because those matters -- those items are available publicly. And if the state of Connecticut is here to say that's all we want, public privacy policies, that is not something that is in any way affected by the statute.

But, at the same time, the rest of their

investigation, virtually everything else in their investigation, contrary to what they argued, does, in fact, go to the subject of their complaint, which is alleged federal intelligence activities.

There -- there isn't just one interrogatory in Connecticut; there are 30 subparts of interrogatories from the ACLU. And, in addition to that, the State Department of Public Utilities has themself *(sic)* issued interrogatories which expressly go to alleged NSA activities.

What they are arguing is not that that is not at issue, but that it is not the, quote, "exclusive focus," but, in fact, when all of those interrogatories are directed at obtaining evidence to prove the allegation in the complaint that is at issue in that case.

And the mere fact that some of them don't say the National Security Agency is irrelevant, they are all directed at obtaining information about whether or not there has been a alleged federal intelligence activity that has occurred in those states. And, by the way, all of those interrogatories define Government entity to include the NSA.

***THE COURT:*** Where do I find those interrogatories?

***MR. COPPOLINO:*** I know that they have been filed in the record, Your Honor. This is Connecticut, let me see if I have a docket cite here.

***THE COURT:*** Okay.

***MR. COPPOLINO:*** I have it as docket -- this is the ACLU, Docket 1-4, which was an exhibit to our complaint in this case, but perhaps we could track down the exact citation.

I'm not actually sure that the Connecticut department interrogatories are in the record here, but they are similar interrogatories that the state of Connecticut itself has served.

***THE COURT:*** It's always helpful to have what we are talking about in the record.

***MR. COPPOLINO:*** I understand, Your Honor. And these are, at least in the case of Connecticut and Vermont, fairly voluminous records. And the parties have selectively excerpted them. And the ACLU interrogatories were the particular excerpt that were put in this record from the Connecticut proceeding.

***THE COURT:*** Well, I always appreciate being spared of interrogatories, but it might be handy to have them.

***MR. COPPOLINO:*** Yeah, it was Tab 1 to the Government's -- the Government's motion for summary judgment.

***THE COURT:*** Okay.

***MR. COPPOLINO:*** Your Honor, I have an extra copy, if I could just hand it up to the Court.

**(Handing up exhibits.)**

***THE COURT:*** This is -- oh, I see, thank you.

***MR. COPPOLINO:*** Those were exhibits that we attached. And the underlying summary judgment materials that

were filed before the transfer would also be in the -- in the record of the Court, Document 536-2.

***THE COURT:*** 536-2, okay.

***MR. COPPOLINO:*** So, Your Honor, just to briefly reiterate, I think it would be not appropriate to try to go interrogatory by interrogatory, but even if you did, all of these interrogatories, whether they identify the NSA as at issue or not, all of them are directed towards proving the allegations in the complaint.

And further, they are all -- they are also directed at allegations that generally concern the Federal Government, including the issuance of national security letters, all of which would fall within the scope of the preemption of Section 803 of the FISA.

And even to the extent that they did not, Congress properly legislated on the basis of finding that particular investigations that are underway must be preempted and based on the -- because of the subject matter of those investigations. And I think that has to be the broad focus of the Court, is the subject of what the states are inquiring into, not whether one particular subpart of 30 or 40 interrogatories presents no particular concern.

And I could continue to -- if you want to address some of the other state issues, Your Honor.

***THE COURT:*** All right, well, go ahead. I know you

want to address the more general issues.

***MR. COPPOLINO:*** Well, I think -- I think that with -- so again, I think with respect to Connecticut, the bottom line is that notwithstanding their argument that there are some things that are not within the scope, I think that's just simply not an accurate characterization of what they seek, and it's not an accurate characterization of their investigation.

The state of Maine actually does not make the argument that their requests don't concern alleged federal intelligence matters; they make somewhat of a different argument. Because there is no question that like the others, their inquiry was focused at whether or not the carriers that do business in Maine cooperated with the NSA, Maine's argument is somewhat different; they argue that they are actually not investigating anything yet, that they are still deciding whether to investigate.

And, with respect to my friends from Maine, I think that is a semantical distinction that really is irrelevant here. Maine has demanded that Verizon respond under oath, under penalty of perjury and sanction of state law, regarding the very subject area that Congress has preempted. And so I don't think, first of all, that could properly be characterized as not an investigation. Again, that is semantical because, without question, the subject area that they are seeking to investigate falls within what Congress has preempted.

They have demanded that Veri -- they have issued not only requests that Verizon answer certain information and directed them to, in fact, they went so far as to issue a contempt subpoena and ordered a hearing that Verizon be held in contempt, which the Government had to successfully enjoin.

The statements that they seek from Verizon are purportedly derived from a press release Verizon issued about the allegations. In fact, when you look at them closely, they actually misquote Verizon's press release at least in three or four instances.

But, regardless, what they are actually seeking to do is working off of a public statement, demand sworn testimony under state investigative procedures on topics that squarely fall within Section 803 and have demanded that Verizon answer under penalty of perjury and sanction.

Furthermore, if you look at what they ask Verizon to do, it's not simply affirming the truth of a press release, they are asking Verizon to make affirmative representations as to how it will deal with the United States Government in the future by requiring Verizon, and again, under penalty of sanction of state law, that it will only do certain things. And that's expressly preempted by Section 803 itself, which forecloses a state from imposing any administrative sanction on a carrier for its alleged assistance to a member of the intelligence community.

I think, in that respect, the Maine inquiry is worse than the others, because it actually seeks to, in effect, enjoin Verizon from doing certain things as a matter of state law, and it is not simply seeking to affirm the content of a press release.

And, in any event, unlike the argument that Connecticut may make that there are some interrogatories that aren't relevant to alleged federal intelligence activities, the Maine inquiry is 100 percent within the scope of Section 803.

And the last state I'll mention is Vermont. And I saved Vermont for last because I think, in some respects, their sur-reply was the most misleading. As with all of the other states, Vermont opened an investigation that unambiguously concerned alleged NSA activities. They denied a motion to dismiss. They said that they are going to probe every issue, that the Government, in effect, would have to come and stop us, and so we did file suit. And Vermont stood down for a bit of time.

In 2007, Vermont tried to limit the scope of their investigation, and that was the order that the state of Vermont attached to their sur-reply. But, a couple of things about that. First of all, that order does not purport to halt any investigation into alleged federal intelligence activities, what it does is it bifurcates Vermont's inquiry and says first we'll inquire about some non-national security matters, and

then, secondly, we'll await further developments regarding Federal Court proceedings, and particularly the State Secrets Privilege, and that will broaden the scope of our inquiry and continue. So, at a bare minimum, you have to understand with respect to Vermont that they have not simply limited their investigation to non-national security matters.

Now, here is the rest of the story that was not in the sur-reply. In fact, pursuant to the order, which was supposedly limited to non-national security matters in Vermont, new interrogatories were issued and they were responded to. So the non-national security issues were addressed by -- by Verizon and by AT&T in the state of Vermont.

Then -- this is where it gets even more interesting -- Section 803 is enacted, and the Vermont Public Service Board asks the parties how it should proceed. And unfortunately, this is another one that is not in the record, but I do have a copy I can hand up.

The Vermont Department of Public Service, which is not the board, but it is the representative of the people of Vermont before the board, as I understand it, it's the statutory representative of the public before the board, and it supervises all public laws related to telephone and utility services in Vermont, the Vermont Department of Public Services, having reviewed these interrogatory responses by AT&T and the NS -- and Verizon, in August of last year wrote a letter to the

board, and it said we have reviewed all of the responses by AT&T and Verizon, and we have -- all of its non-security-related disclosures of customer information were likely -- were likely -- and that those response and those disclosures of customer related information were likely compliant with Vermont law, and that based on AT&T's and Verizon's reading of the limited order issued by the Vermont board that focused on non-national security matters, the Vermont Deposit of Public Service concluded that they have produced all of the information that responds to that order.

And, in fact --

***THE COURT:*** Who's produced that information?

***MR. COPPOLINO:*** AT&T and Verizon.

And so the board went to say as a result, it doesn't believe there is any basis to continue to investigation of AT&T and Verizon disclosures in this matter.

Now, that is a recommendation to the Public Service Board. They are not -- I don't think they are bound by that, but you have the Vermont Department of Public Service saying that insofar as non-national security related inquiries are concerned, Verizon and AT&T have complied. So that is not at issue, as far as we can tell, in Vermont.

What's at issue in Vermont is the issue before this Court, which is whether Congress can properly preempt the non -- the national security side of this investigation, whether

section 803 is constitutional, and whether part 2 of the Vermont inquiry can go forward.

And, Your Honor, I can hand up the Vermont Public Service letter, if it would please the Court. We can add it to --

Can I just have --

There were two letters, Your Honor, one for Verizon and one for AT&T.

***THE COURT:*** I'm going to ask that you submit those in the docket --

***MR. COPPOLINO:*** Yes, I will, Your Honor.

***THE COURT:*** -- so that they obtain a docket number and a position in the record before these documents can be established, all right?

***MR. COPPOLINO:*** So, I think, just to summarize, Your Honor, insofar as the states are now relying on an argument that there are avenues that they could still be going down, in virtually -- in all of the states I think that is not true.

In the case of Vermont, that avenue has been exhausted, and all that is left, in our judgment, based on the record, are national security-related inquiries preempted by Section 803.

Likewise, in Maine, all of their activities concern what the subject of the -- the Section 803 New Jersey and Missouri as well. And the focus of the Connecticut complaint

is that inquiry as well. And, so far as I can tell, having looked at every single one of the interrogatories in Connecticut, the only one that doesn't appear to concern or that doesn't appear to be directly related to the scope of Section 803 concerns public-privacy policies -- public-privacy policies.

But, you know, we asked these states before -- once Section 803 was enacted, we called the states, and we had a conference call, and we said why does this case have to go forward? Don't you see that you are preempted in these investigations? And they said, we'll get back to you.

And then we tried again and said it what is left to this case? And by the very fact that they continue to litigate over the lawfulness of Section 803 and what it seeks to preempt, it's apparent to us, at least, that that is a road they do want to go down, they want the statute struck down, and they want to have the right to go to into the subject matter of the investigations that Congress has preempted.

Your Honor, I want to just close by saying there is a great quote in the Supreme Court's case, ***Garcia versus San Antonio Metropolitan Transit Authority***, which concerned an effort by Congress to impose labor standards on the local Government. And the Supreme Court said in that case, which involved the Tenth Amendment issue, that, "states must find their protection from federal regulation through the natural

political process, not through judicially defined spheres of unregulated state action."

What the states are asking you to do is to try to somehow define a judicially defined sphere of unregulated state action, but Congress has acted pursuant to its lawful authority that had been reserved to the United States under the Constitution. It's express preemption is clear. And that should be the end of the case.

I thank the Court unless you have any further questions.

***THE COURT:*** All right.

Do the carriers wish to be heard before I turn to the states?

***MR. SHUMSKY:*** No, Your Honor, unless there are any particular questions that the Court has --

***THE COURT REPORTER:*** State your name.

***MR. SHUMSKY:*** I'm sorry.

Any Eric Shumsky for the AT&T entities.

No, Your Honor, unless there are any particular questions that you have relating to the carriers.

***THE COURT:*** Very well.

Mr. Kester?

***MR. KESTER:*** Same answer.

***THE COURT:*** Mr. Kester, you are surely not going to pass up an opportunity to say something.

***MR. KESTER:*** Your Honor, I'm going to let the cup pass at this motion moment. I think we are -- Sprint is a party only in the New Jersey case, which is, I think Mr. Coppolino indicated, the cleanest case of all, anyway. And I don't have anything at this time to add to what he said.

***THE COURT:*** I see, all right, but New Jersey may prompt a thought; is that the observation?

***MR. KESTER:*** We'll see what happens, Your Honor.

***THE COURT:*** All right, we'll see what happens, okay.

Who wants to lead off? We have heard a good deal about --

***MR. TAUB:*** Chris Taub for the Maine Public Utilities Commission.

***THE COURT:*** All right.

As Maine goes, so does the nation, they used to say.

***MR. TAUB:*** Good morning, Your Honor.

If I may, I would like to start by trying to convince the Court that Section 803 actually is an unconstitutional exercise of Congress' powers.

***THE COURT:*** All right, let's start there.

***MR. TAUB:*** Okay.

***THE COURT:*** That's a pretty big task.

***MR. TAUB:*** To the extent the Mr. Coppolino suggested that some of the states have abandoned that argument, the other states can speak for themselves, but I think it's -- I'm pretty

safe in saying that no state has abandoned the argument that Section 803 is an unconstitutional exercise.

***THE COURT:*** And you are telling me by no means has Maine done so.

***MR. TAUB:*** And, certainly, Maine does not drop that argument.

Just last week, Your Honor, the Ninth Circuit in the ***Mohamed Versus Jeppesen Data Plan*** case, the Ninth Circuit reaffirmed a principle that the Supreme Court before has -- has talked about, and that principle is that the constitutional design of separating the powers of the Federal Government into three branches is intended to guard against one branch encroaching impermissibly on individual liberties. And so the three branches --

***THE COURT:*** Well, but that case didn't involve federal state relations, did it?

***MR. TAUB:*** It didn't, Your Honor, but I think that there is one statement from that decision that is applicable here, and I'll explain why.

The Court said that separation of powers concerns take on an especially important role in the context of secret executive conduct. Now, admittedly, Your Honor is absolutely correct that that case did not involved a conflict between State and Federal Government, but the same principle about the separation of powers is also at play in the Constitutional

design of dividing up sovereign powers into the State Governments and the Federal Government.

And in -- in the ***Gregory versus Ashcroft*** case, the Supreme Court said that, "the Constitutionally mandated balance of power between the states and the Federal Government was adopted by the framers to ensure the protection of our fundamental liberties."

And, I believe, the Court, in ***Printz versus United States***, repeated that. So, we really have sort of two structural protections here, we have the three branches of the Federal Government providing checks and balances, and then we have the State Government and the Federal Government providing a check and balance.

***THE COURT:*** Well, I'm not familiar with the first case you mentioned, but ***Printz*** was a case in which the Federal Government imposed obligations on the state to carry out federal policy; now, that's not the situation here, is it?

***MR. TAUB:*** That is true, Your Honor, that that is not the same situation, but I think why ***Printz*** is relevant is -- is not so much because of the kind of action that the Federal Government was trying to require of the states, but the reasoning behind the eventual holding of the decision.

And -- I think what's important to take away from these cases is that -- is that by preventing the Federal Government from -- from encroaching on the sovereignty of the

states, we are allowing the states to provide a check against -- against the Federal Government's encroachment on individual liberties, just like the three branches do within the Federal Government.

***THE COURT:*** Well, there is no question, is there, that the Federal Government has exclusive authority to deal with national security issues, and that is not a matter that has traditionally been done by the states or is deemed to be appropriate for state action. This is clearly a matter that that has been reserved to the Federal Government, and we all accede to that; isn't that true?

***MR. TAUB:*** Yes, Your Honor, we would.

***THE COURT:*** And this is an effort, Section 803 is an effort, is it not, by Congress to protect the exclusive authority of the Federal Government in national security intelligence matters?

***MR. TAUB:*** Well, I think that's where at least Maine would disagree, Your Honor.

***THE COURT:*** How so?

***MR. TAUB:*** Well, I think -- first -- first, I think what we need to make clear is that there is a difference between the Federal Government preempting state laws and the State Government instead deciding not to preempt state laws, but tell the states that they can't enforce their non-preempted laws.

And so, sort of the comparison or the analogy that I would make is if Congress had said, had passed a law saying, umm, whenever phone carriers are asked for records from the NSA they may provide them to the NSA, and any state privacy laws to the contrary are hereby preempted. That, it seems to me, would be -- would be -- at least it would be permissible in the sense of there wouldn't be an encroachment on the state's sovereignty because congress certainly may preempt state laws that conflict with federal laws.

***THE COURT:*** Well, but isn't that what this provision does? Isn't that what Section 803 does?

***MR. TAUB:*** No, Your Honor, it doesn't. There is nothing in 803 that preempts any state law. You don't see any language in there saying the state privacy laws relating to phone carriers are preempted, or we're preempting state laws that conflict with the following.

All you see in 803 is just a thou-shalt-not command to the states, thou shalt not investigate phone carriers' participation with -- with -- with the NSA.

***THE COURT:*** Well, it states: "No states shall have the authority to require through regulation or any other means the disclosure of information about electronic communication service providers' alleged assistance to an element of the intelligence community or to impose an administrative sanction or to commence a civil action."

It doesn't say thou shalt not pass a law, but it's pretty clear that this provision is directed to an investigation or regulation or administrative sanction as part of an effort by the states to determine what, if anything, telecommunication carriers have done to cooperate with the gathering of national intelligence.

***MR. TAUB:*** Well, Your Honor, I think there is a distinction. I mean, this a very unusual provision in a federal law. And I'm frankly not aware of any situation where Congress has simply said to states you may not enforce this law. There are certainly numerous cases where they have preempted state laws.

And what I'd like to do is direct the Court to ***New York versus the United States***, which is the case involving radioactive waste.

***THE COURT:*** Before you get to that, and I want to hear you on that, but in a sense, aren't you arguing that this provision, this preemptive provision, is narrower than a provision which Congress could enact?

You admit that Congress could forbid the states from enacting laws dealing with national intelligence, the gathering of national intelligence, but Section 803 does not do so. Section 803 simply prohibits an investigation or the imposition of sanctions, or these other measures that are expressly set forth, so isn't this actually a narrower preemption than the

preemption that you contend the Federal Government could impose?

***MR. TAUB:*** Ironically, Your Honor, it is. And I think that actually demonstrates what their problem is here.

***THE COURT:*** How so?

***MR. TAUB:*** Well, if Congress wanted to sort of take the most sweeping position, which would be we are going to completely preempt state regulation of interstate phone carriers, I'm not an expert on that area of the law, but my guess is that would is certainly be within Congress' power. And that would be the most broad-sweeping kind of preemption that Congress could do.

Alternatively, Congress could have taken the approach that Your Honor suggested, but the problem with that, and this is why the ***New York versus United States*** case is relevant, is it comes down to an issue of accountability and checks on, on the federal power.

And what I'd like to do is just read a passage from the New York case and then explain why that's relevant here. And what the Court said is that, you know, if the citizens of New York don't want to deal with radioactive waste, then they can elect their state officials, who are going to sort of legislate according to the desires of New York citizens.

And then what the Court said is, "that view," in other words, the view that we are not going to regulate

radioactive waste, "can always be preempted under the Supremacy Clause if it is contrary to the national view, but in such a case, it is the Federal Government that makes the decision in full view of the public, and it will be federal officials that suffer the consequences if the decision turns out to be detrimental or unpopular."

And then the Court went on to say, "accountability is thus diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate in matters not preempted by federal regulation."

And so what We understand the Court to be saying is that if Congress had passed a law such as I proposed earlier, which is phone carriers may turn over records to the NSA whenever the NSA asks for it, then that would be a matter that the public can -- can weigh in on.  It's a transparent process. And if the Court thinks that is bad public policy or it's a violation of a constitutional provision to have a law like that, then the public knows who is responsible and they can address Congress on that.

So we actually think it would be much less a violation of state sovereignty for Congress to have sort of taken the ball and passed a law that governs what the relationship is going to be between phone companies and the NSA.

***THE COURT:*** What you're saying, if I understand you, is that the problem with the statute is that although Congress could swallow whole this area of activity by the states, this provision is unconstitutional because all Congress has done is nibble around at the edges of this activity.

***MR. TAUB:*** What we're saying, Your Honor, is if Congress wants to decide whether or not the public has a right to -- to know what's happening with their phone records, then Congress should -- should legislate and then the people can address Congress.

What this has done is it's put the states in a position -- for instance Mr. Cowie from Maine complained that he thought his phone records were being turned over to the NSA in violation of the Constitution, and he asked the Maine Public Utilities Commission to investigate it. If this law is valid, we have to tell Mr. Cowie, even though our privacy laws are there and even though Congress has not preempted them, we can't do what you ask.

I think what the New York court was concerned with, and we also cited a dissent from the Second Circuit, Judge Cardamone in the ***Clearing House*** case, which is now up on cert, both Judge Cardamone and the Supreme Court recognized that there is a fundamental difference there, because it's one thing for Congress to enter the field and declare the policy, it's another thing to sort of make the states be the brunt of the

public criticism when it's not the states at fault.

***THE COURT:*** How is the state going to be criticized for not investigating an activity which Congress has said thou shalt not investigate?

***MR. TAUB:*** Well, I think for the same reason that the ***New York versus U.S. Supreme Court*** was concerned: The Court didn't think it would be enough for New York officials to tell the public, look, we're sorry that we can't deal with radioactive waste the way we want to, but Congress is telling us what to.

***THE COURT:*** Not unusual for Government officials to say, oh, this is not my responsibility.

**(Laughter.)**

***THE COURT:*** They do that all the time.

***MR. TAUB:*** Well, Your Honor, we respectfully submit there is a fundamental distinction here.

And another -- well, I think if Congress wants to -- I'm repeating myself, and I apologize. But --

***THE COURT:*** That's all right, I didn't understand you the first time.

**(Laughter.)**

***MR. TAUB:*** But again, if Congress wants to pass a law saying when and how phone records are going to be shared with the NSA, then let Congress do that and let the public weigh in on the matter. But what Congress should not be

allowed to do is to violate the state sovereignty by saying to a state, even though your law is still valid and on the books, we're not going to let you enforce it. We think that's a fundamental difference.

***THE COURT:*** Well, Congress is not saying by Section 803 that Maine statutes with respect to the privacy of telephone resources is unconstitutional; that is certainly not, as I gather, Congress' intention in Section 803. But what it is saying is that the application of those laws to gather information about what, if anything, telecommunication carriers have done to respond to a National Security Agency request is an inappropriate application of those laws. Surely Congress has the authority to make that kind of a declaration, doesn't it?

***MR. TAUB:*** We -- we do not think that Congress has the authority under the Constitution to tell a state that its non-preempted laws cannot be enforced.

Another analogy I could make is that --

***THE COURT:*** Have you got an analogy where a non-preempted law has been held to be something that Congress cannot preempt?

***MR. TAUB:*** Well, if I understand your question --

***THE COURT:*** Can you give me an example that I can --

***MR. TAUB:*** Well, I'm sorry could you repeat --

***THE COURT:*** -- get my mind around?

***MR. TAUB:*** Could you repeat the question?

***THE COURT:*** Well, I'm asking you, can you give me an example of where a court, perhaps the Supreme Court of the United States, has said that a non-preempted state law cannot be preempted in its particular enforcement?

***MR. TAUB:*** Your Honor --

***THE COURT:*** That's the point you're making, I believe.

***MR. TAUB:*** Yes, yes. And the best we can do, Your Honor -- and, first of all, I think the reason we can't come up with examples is because -- is not because the argument we are making is extraordinary, but it's because what Congress did here is extraordinary.

Frankly, I'm not aware of situations where Congress has ever done something like this before. The closest thing that -- that we can find, and I'm hoping this will one day be a Supreme Court decision because it is on cert now, is in the ***Clearing House*** case.

And in that case, under -- under a federal agency's interpretation of federal law, New York was -- was prohibited from investigating whether banks had violated state anti-discrimination laws.

And Judge Cardamone -- Cardamone made the point that that's something that is not a permissible encroachment on state sovereignty, that Congress cannot say to a state, we are

not going to preempt your laws, but we're going to stop you from enforcing them.

And so I would -- and I understand that it's a dissent, but we think that the ***Clearing House*** case, the dissent in the ***Clearing House*** case is directly on point.

Now, the majority in that case never really even addressed the issue, but what we think that Judge Cardamone had it exactly right, and that there is a fundamental difference between preempting state law and telling a state you can't enforce your non-preempted law. That is the only judicial precedent that we can find for Your Honor.

***THE COURT:*** A dissent.

***MR. TAUB:*** A dissent which, crossing our fingers, might turn out to make it way into the majority in the Supreme Court.

***THE COURT:*** Okay.

***MR. TAUB:*** well, Your Honor, unless you have any other questions about sort of our sovereignty -- well, one other point I would like to make about our sovereignty argument is that -- is that even if Congress can preempt a state from enforcing its non-preempted laws, we think that Congress has to do it in sort of a very narrow way without unduly interfering with the state's ability to carry out its -- its sovereign functions.

***THE COURT:*** Well, okay, that kind goes to the first

question I asked you; isn't this pretty narrow? Isn't Section 803, in fact, quite a narrow statute, as it prohibits only certain enumerated activities?

***MR. TAUB:*** Well, Your Honor, no. We would compare it to Section 802, where -- where Congress didn't say, you know, actions against phone companies alleging improper disclosure to the NSA are hereby preempted. It set up a process so that a court can be involved to find out whether there is really a good faith basis for insulating the phone companies from those kinds of cases.

***THE COURT:*** But didn't Congress include that provision in Section 803?

***MR. TAUB:*** Not in 803, Your Honor. In 803, Congress is just saying flatly to states, you are hereby preempted. There is no -- there is no role for the Federal Court.

***THE COURT:*** It states: "The district courts of the United States shall have jurisdiction over any civil action brought by the United States to enforce the provisions of this section."

***MR. TAUB:*** Right, but -- but they's no -- unlike 802, there is no suggestion that the Court is going to be able to look at sort of the individual factors; in other words, is this investigation really going to disclose information that shouldn't be disclosed?

***THE COURT:*** Ahh, well, but --

***MR. TAUB:*** Balancing --

***THE COURT:*** That was my question to Mr. Coppolino, precisely what of the investigation of the various states here, or investigations of the various states, is he seeking an order of this Court to prohibit? I was trying to get down to the nitty gritty of what it is that he is asking me to do.

And so, why isn't that an appropriate inquiry? Doesn't that suggest that, in fact, this preemptive provision is, indeed, quite narrow, maybe even surgically narrow, and, therefore, does not run afoul of state sovereignty in any material way?

***MR. TAUB:*** Well, certainly, under the DOJ's interpretation this is not surgical. I mean, I heard Mr. Coppolino say that even an interrogatory that asks for copies of privacy policies is preempted under this because it's sort of some kind of inquiry that is part of a broader proceeding that might touch upon areas that are preempted. So, no, we don't think this is surgical at all.

I think this is a club that is just going to, under the DOJ's interpretation, it's going to preempt all kinds of investigations that, frankly, we don't think Congress ever intended to preempt.

***THE COURT:*** Well, what do I do with this situation: Let's assume that the state's inquiry is one that is appropriate and is not expressly foreclosed by Section 803, but

is in the context of an investigation concerning the carrier's cooperation with the National Security Agency and gathering national intelligence and is, therefore, within the preemptive provisions of Section 803; so what do I do with an innocuous question that is part of an offending investigation?

***MR. TAUB:*** Frankly, Your Honor, I think that the Court has to -- has to parse through the individual inquiries and decide which -- which inquiries are covered by 803 and which aren't. I don't see anything in this law that suggests that simply because a particular inquiry is part of some broader proceeding the individual inquiry is precluded.

And it would really elevate form over substance because, to take Connecticut's example, if the Court enjoined in this proceeding, all Connecticut would have to do is start over and just ask a narrower set of inquiries, and then we'll be back in court arguing about whether or not these new inquiries are seeking information that the states are preempted from asking for. So, I don't think it's as simple as just striking down every single inquiry because it's part of some bigger umbrella.

***THE COURT:*** Somebody at some point might ask why does the state want this information?

***MR. TAUB:*** Let me turn to Maine, if I may.

***THE COURT:*** All right.

***MR. TAUB:*** Mr. Coppolino suggested that, you know,

semantics are meaningless, and I respectfully disagree with that. I think that when Congress uses particular words, those words mean something. And I think we have to carefully look at the words to figure out what Congress was trying to do.

I think the other thing that is important to keep in mind is that I think that the DOJ in their brief has suggested that there is no presumption against preemption here because -- because Congress has historically been involved in this particular field. And I think even just recently the Supreme Court has rejected that.

The Supreme Court has said that when a law intrudes upon a particular sort of classic state function, it doesn't matter how extensively the Federal Government has regulated that, you are still going to give a presumption against preemption because that is the way to ensure -- and I think it's sort of based on the assumption that Congress does not cavalierly intrude on state sovereignty, so we are going to very narrowly construe a statute to avoid preemption whenever possible.

And I think in Maine's case, first of all, why is Maine doing what it's doing? Maine had a request to open an investigation, and Verizon, in response to that request, filed a brief with the PUC in which they attached two press releases. And in their brief, they simply referred to the press releases and basically said see what we've said in our press release,

and for these reasons we don't think you should open an investigation.

Now, the PUC is essentially a court in a situation like this. And the PUC didn't feel that it's appropriate for them to base their decision on a couple of press releases that are attached to one of their filings. The analogy I would make is if a witness got up in front of this Court and said, I'm not going to testify under oath, but instead I would like you to submit this press release that I issued last week, I don't think that the Court would stand for that. And the PUC is not standing for it either.

When someone makes a statement to the PUC which is clearly intended to influence the PUC and to get the PUC to make a decision, the PUC's position is that that statement should have some sort of indicia of reliability. And so, all we have asked Verizon to do is to simply state under oath that their statements are true.

Now, this is the second time that I've heard the DOJ claim that we have misquoted the statements and I have yet to hear from them exactly how we misquoted the statements. I have gone through -- we asked Verizon to verify nine states, and I have gone through each of those nine statements, and, except for minor changes, instead of saying we have never disclosed records, we said Verizon has never disclosed records.

I don't see any misquoting or in any way going

beyond what they said in their press release. We have very narrowly asked them to just affirm nine specific statements that they made in their press release so that essentially the filing in the PUC is complete and the PUC has some indicia of reliability, and the PUC can then decide what it wants to do next. What it might do next is initiate an investigation, in which case it would fall within the terms of 803, although we think that 803 is unlawful. Or, it might decide not to initiate an investigation.

I think another thing that the DOJ has done which is a little disingenuous is it suggested that Congress specifically intended to preempt what Maine is doing. And I've gone through the legislative history, and I may have missed something, but I don't see any indication that Congress necessarily thought what Maine was doing was preempted.

And, in fact, I think it might be the reverse. Because one -- one thing I saw in the Senate report, and I think when the DOJ quoted this, they used some ellipses, and it sort of ended up taking out part of the quote that I think is relevant, but, in the Senate report, Congress said that the purpose of 803, or that Congress said that 803 was added to address investigations that a number of state regulatory commissions have or might begin to investigate.

So it's quite possible, Your Honor, that what Congress was saying is that if at some point Maine decides to

initiate an investigation, we intend to preempt that. But I don't see anything in the Senate report or anywhere else that suggests that Congress believed that by simply asking Verizon to affirm statements it had already made that that -- that that should be preempted.

And then, going back to the language of 803 itself, which Mr. Coppolino seems to think we shouldn't really worry about the individual words that were used, but I think we should, respectfully, the statute talks about investigations, and it's clear the PUC has not initiated an investigation. We are just trying to decide at this point whether to initiate an investigation. And we are not seeking disclosure of anything, we are just seeking for affirmation of statements that were already made.

***THE COURT:*** You are just mulling over the subject; is that it?

***MR. TAUB:*** I'm sorry, Your Honor?

***THE COURT:*** You're just mulling over the subject.

***MR. TAUB:*** That's exactly true.

And I think what this shows is that the PUC is being respectful of the federal interest here. And, certainly, we could have immediately opened an investigation and demanded all kind of information from Verizon, but we didn't. We asked Verizon for a response, and we decided that once we got that response we would decide what comes next.

***THE COURT:*** All right, very well.

Well, what comes next is New Jersey.

***MS. EIRMANN:*** Thank you, Your Honor. Connecticut.

***THE COURT:*** Connecticut, Connecticut.

***MS. LEWIS:*** Hello?

**(No response.)**

***MS. EIRMANN:*** Good morning, Your Honor.

Tatiana Eirmann, Assistant Attorney General for the Connecticut Department of Public Utility Control. It's a privilege to be again before the Court, Your Honor.

I'm not going to rehash the legal arguments that were so eloquently presented. We support them. We signed the joint brief and the sur-reply, but I would like to focus Your Honor on the distinction between the Connecticut case and the rest of the administrative proceedings.

Before I do that, I would like to set the record straight -- set the record right: Connecticut DPUC never issued interrogatories to Verizon or to AT&T. The investigation was initiated on behalf of the Connecticut ACLU. And the interrogatories issued by ACLU were directed to Verizon and to AT&T.

Each set of interrogatories contained 12 questions. They are identical for both AT&T and Verizon, not 30 some questions. The sub-questions, of course, I believe the Government is considering main questions, but they were to be

responded only if the answer to the main one was "yes."

Of those 12 questions, I respectfully submit, Your Honor, that only four maybe preempted by 803. All of the other questions are innocuous, generally, in nature. Not one of them specifically mentions NSA or FBI or CIA. They directed to AT&T or Verizon in requesting whether they unlawfully disclosed customer records to private parties, other governmental entities, which means both state and federal, and to, for instance, personnel.

***THE COURT:*** Can I really credit that argument? Isn't -- what appear to be innocuous questions as you put it, that is, questions that don't mention the NSA or intelligence gathering or the CIA, or any of these other elements of the intelligence community, as the statute refers to it, but nonetheless, all of these questions are in the context of inquiries and an investigation about whether the telecommunication carriers have provided information to the intelligence community. So what do I do with what you characterize as an innocuous question, which is wrapped around or wrapped within --

***MS. EIRMANN:*** Within.

***THE COURT:*** -- an investigation that is prohibited by Section 803?

***MS. EIRMANN:*** I would recommend, Your Honor, on behalf of the state of Connecticut, that Your Honor parses

through the interrogatories and dismiss those which Your Honor considers and we concede that some of them are indeed reference to it.

I don't believe that the Congress probably could preempt an entire planet, so to speak, of investigations. Under the preamble, that they are somewhat related or even a minute part of it is related to national security. I believe that, as the Court suggested, perhaps the intention was to carve out narrowly only certain questions in our case, certain interrogatories, which do allege assistance with NSA, and those particular interrogatories don't --

***THE COURT:*** Well --

***MS. EIRMANN:*** Or most of them don't.

***THE COURT:*** Let me ask the question of you that I asked Mr. Taub, and that is, why is Connecticut interested in this information?

***MS. EIRMANN:*** Your Honor, we have laws, generally applicable laws to all telephone companies, all public service companies, to regulate them in the public interest.

***THE COURT:*** Well, but isn't it true that these inquiries were precipitated by the disclosure that the Government, through the National Security Agency and the other elements of the intelligence community had enlisted the cooperation of telecommunications carriers?

***MS. EIRMANN:*** It is true, Your Honor. I'm not

suggesting that we would not have -- though I'm truly not suggesting that we would not have, on our own, without the ACLU, complained, have undertaken any kind of inquiry. It may not have been formulated in the same way as the ACLU presented its interrogatories, but I'm pretty certain that under our state laws we had an obligation to check at least if the companies have such policies.

***THE COURT:*** Okay.

Now, what's the problem with a statute that preserves the Federal Government's exclusive role in connection with intelligence gathering for national security purposes? It is true that these inquiries under 803, if it's to be applied literally, cannot be pursued by the states, but there is nothing that prevents the citizens of Connecticut or Maine or New Jersey or Missouri or anywhere else to apply to national legislators for remedial legislation, to apply to Federal Governmental officials concerning this subject matter.

What's the prejudice to the state of Connecticut in strictly applying Section 803?

***MS. EIRMANN:*** Well, it's -- I would go back to the general argument you make. It's -- the prejudice is our sovereignty is taken away in that sense. We -- after the investigation, Connecticut Legislature passed law which governs particularly the subject of procurement of telephone records. And in that law we carved out an exception for telephone

companies which have any dealings with the national Government.

In other words, under state law, if telephone companies have -- submit an affidavit to the DPUC that they have acted in good faith, or reasonably, the inquiry would stop there. So, the citizens of Connecticut appealed to the state Government for redress of this problem with disclosure of records, and the Legislature responded accordingly and actually protected also the telephone companies.

So, at least in Connecticut, I don't see why we need 803 since Connecticut law already has an exception to the prohibition of disclosure when telephone companies can reasonably --

***THE COURT:*** Well, but there is nothing that forbids the citizens of Connecticut from applying to the national Government for redress.

***MS. EIRMANN:*** Well, our two Senators actually did, but it didn't help. Our Senators did vote against it, but it didn't help, I said.

***THE COURT:*** Oh, all right.

***MS. EIRMANN:*** The Connecticut voters responded accordingly.

***THE COURT:*** That's the problem with a national Government.

***MS. EIRMANN:*** Yes, indeed.

***THE COURT:*** But we all live with that in lots of

different ways, don't we?

And surely, there is an interest here in national security that extends beyond the boundaries of the great state of Connecticut.

***MS. EIRMANN:*** It -- there is, Your Honor, we are not suggesting there isn't.

Our point is that the inquiry we have initiated is narrow enough to escape the full-blown provision of 803. And we think Your Honor has the authority to precisely do that.

***THE COURT:*** All right.

***MS. EIRMANN:*** Thank you, Your Honor.

***THE COURT:*** Thank you very much.

You are speaking on behalf of Missouri.

***MS. HEINTZ:*** Yes, Your Honor.

Jennifer Heintz on behalf of Missouri parties. And I'm very pleased to be making my first appearance before you.

***THE COURT:*** Well, you wrote a very good brief --

***MS. HEINTZ:*** Thank you.

***THE COURT:*** So, you are off to a good start.

***MS. HEINTZ:*** Thanks.

I don't want to go over the same grounds that the lawyers from Connecticut and Maine have already covered. I really don't have a lot of arguments with respect to the 1242 case unless Your Honor has questions for me, which I'm happy to answer.

***THE COURT:*** All right.

***MS. HEINTZ:*** I would, however, like to talk about the 1187 case, what I call the Clayton case, as opposed to the case brought by the Government, which I still call the Gaw case.

***THE COURT:*** Ah-hah, okay.

***MS. HEINTZ:*** That is 1242.

***THE COURT:*** How does that case differ from the others?

***MS. HEINTZ:*** Well, I would remind the Court that that is sort the outlier state case. This is the one state case wherein the state official is the plaintiff; the defendants are the carriers. The United States is not actually a party in case No. 1187; they have never intervened.

And the statute that they cite as their authority to be here and to present argument and to be entitled to summary judgment in this case is 28 U.S.C. 517.

I have been unable to find any case under 28,517, wherein the United States was granted a dispositive motion without being made a party. And given that --

***THE COURT:*** Well, isn't that --

***MS. HEINTZ:*** Yes?

***THE COURT:*** Well, isn't that just a formalism here?

***MS. HEINTZ:*** I don't think so, Your Honor, because under 1187, if the Clayton plaintiff in that case is treated

like the plaintiffs in the private carriers cases, and I know that 802 has been briefed and argued before you, and I certainly don't want to concede any arguments that have been made in section 802, but, if the plaintiff -- I'm sorry, my client in 1187 is treated like the plaintiffs in those cases that would mean my client would be entitled to the safeguards of 802 which are not present in Section 803. The AG certification, the review by this Court of the evidence in support of that certification, our right to participate and our appellate rights, all of those things would benefit my client under section 802 if 802 is found to be constitutional.

And, if 803 is found to be unconstitutional, if 1187 is disposed of under that case, where 803 specifically says that that section may be enforced by the United States bringing a party -- or bringing a suit, well, they brought a suit, but we still -- we already had a suit. We are the only state with two cases.

***THE COURT:*** I look at Section 803, and it begins by stating, "no state shall have the authority," "no state shall have the authority..." So it doesn't depend -- foreclosing a state's investigation here does not depend upon the United States bringing an action or intervening to make itself a party to an action to enjoin a state investigation.

***MS. HEINTZ:*** Well, let me clarify my position with respect to that, too.

I'm not arguing that necessarily, even if the Clayton case were considered under 802, we would be required, or AT&T would be required to produce the documents that we have asked for, but if Mr. Coppolino got his injunction and the Clayton case was still treated under 802, we would not get the documents that we originally requested, but we would get all the procedural safeguards of the certification, and so forth, that I just mentioned.

And, Your Honor after three years of litigation and fighting this case very hard, that, to my client, having that certification, that subject to review, is a much better result than the empty-handed result we would get if we went solely under Section 803.

***THE COURT:*** Now, let me ask you, since you're talking about formal intervention, or lack of intervention by the United States in the, what we'll call the Clayton action: Have you filed a notice under Federal Rule -- Federal Civil Rule 5.1?

***MS. HEINTZ:*** I have not.

***THE COURT:*** Are you not required to?

**(Brief pause in the proceedings.)**

***MS. HEINTZ:*** Well, Your Honor, I have to say that I am not familiar with that rule off the top of my head.

***THE COURT:*** Okay. Well, you're challenging the constitutionality of Section 803, are you not?

***MS. HEINTZ:*** Yes.

Thank you. Do you have any more questions for me?

***THE COURT:*** No.

***MS. HEINTZ:*** Okay.

Thank you, Your Honor.

***THE COURT:*** Thank you very much.

Are we going to hear from Vermont?

Mr. Donofrio?

***THE CLERK:*** Mr. Donofrio?

***MR. DENOFRIO:*** Can we you hear me?

***THE COURT:*** Yes. And we are waiting to hear you, Mr. Donofrio. We not only can, but we are anxious to hear you.

***MR. DENOFRIO:*** And I also want to try not to cover the ground that has already been covered by my colleagues who are there in the courtroom with you.

***THE COURT:*** All right.

***MR. DENOFRIO:*** But I guess I'm going to a little bit because I want to underscore one aspect of -- of our argument that the statute is unconstitutional. And it relates to a couple of the questions that Your Honor has asked both of Mr. Coppolino and of Mr. Taub.

I think part of the problem with this statute, from a constitutional standpoint, is that it -- because of the way it's constructed, it places a sort of an unworkable burden on state officials to know in advance when an investigation or a

regulatory activity of some kind is going to touch on some, and to use the words of the statute, "alleged assistance to an element of the intelligence community.

Then, Your Honor asked the question early on along the lines of, you know, what do we do with a situation where a state is asking, you know, let's call them innocuous questions along the lines of, you know, let's see your private policies, or something like that, but within the scope of an investigation that somehow it bumps up against national security concerns, and I think, from a constitutional standpoint, I think it's improper for the statute to place that burden on state officials to somehow, in advance, sort of divine, you know, how not to cross that line or to not act at all.

So I think --

***THE COURT:*** Well, is that really --

***MR. DENOFRIO:*** That sort of echoes what has been said, but maybe in a slightly different context.

***THE COURT:*** Well, let me ask you, Mr. Donofrio, is that really a burden in this situation here anymore than it is in a myriad of other ways in which a state --

***MR. DENOFRIO:*** Your Honor, I'm sorry, I missed part of your question because there was a sound, I think, maybe coming from one of the other phone lines.

***THE COURT:*** Yes.

Well, the question is whether this really is the burden that you've described because state officials in myriads of ways have to comply with federal law. And the obligation is on them all the time to familiarize themselves with the requirements of federal law and to comply with them.

So, it's not at all unusual for a state official to stop, look, and listen to what federal law is before undertaking some action. So, why is Section 803 any different from thousands of other statutes in this regard?

***MR. DENOFRIO:*** Sure. I guess I go back to Mr. Taub's hypothetical, you know, the statute that says something like, you know, if a carrier provides assistance to an element of the intelligence community state privacy laws do not apply.

I think there is a material difference between a statute written that way and a state written like Section 803. I think in the hypothetical it's almost self-executing. It's -- the line is very clear: Under Section 803, it's simply saying you have no authority when what you are doing is going to impact a provider's alleged assistance to an element of the intelligence community.

And it's not clear to me how state officials would know that a priori, and therefore, you know, make, under the rubric of the statute, make a, quote/unquote, "correct decision" about whether or not to commence a particular

investigation.

And let me just say that I recognize full well, to go back to some of the comments that Mr. Coppolino made, the initial information requests propounded by the Vermont Deposit of Public Service back in 2006, many of them explicitly reference the NSA. And, I think that as -- I think what we've scene in the Vermont proceeding is that as the proceeding has evolved, the Department and the Public Service Board with input from the Government and the carriers have, you know, walked the line, so to speak, and redefined the scope of what the state and the other parties in the proceeding could pursue in light of both this Court's ruling and the general principle, which we also don't quarrel with, that the Federal Government is the -- is the proper locus of authority over national security.

***THE COURT:*** Well, other than saying Section 803 was rather clumsily drafted, that certainly doesn't distinguish it from a host of other statutes.

**(Laughter.)**

***THE COURT:*** But, that's hardly a ground to invalidate it on constitutional grounds.

***MR. DENOFRIO:*** Well, I -- I hear what you're saying, Your Honor. I guess, as we have argued in the brief, when the -- when the statute is a statute like this one that, you know, sort of defines the boundary line between state and federal sovereignty, I think that this level of clumsiness rises to a

constitutional dimension for the reasons that I've outlined in terms of, you know, making it, unworkable for state officials to -- to act lawfully within the bounds defined by Section 803.

So I guess, I guess I -- I mean, I certainly agree that we have plenty of clumsily drafted statutes and that, in and of itself, may not be a reason to invalidate one; I think in this particular context, the way that Section 803 is drafted presents real concerns.

***THE COURT:*** All right, very well.

Thank you, Mr. Donofrio.

***MR. DENOFRIO:*** Thank you, Your Honor.

***THE COURT:*** Do we want to hear from any of the other lawyers representing the states or intervenors?

***MS. LEWIS:*** Your Honor, this is Megan Lewis from the state of New Jersey.

***THE COURT:*** Yes, Ms. Lewis?

***MS. LEWIS:*** Yes. I don't have anything else to add and will rely on the arguments of my able colleagues from the other states.

***THE COURT:*** Very well. Thank you Mr. Lewis.

How about Mr. Heiden?

***MR. HEIDEN:*** Yes, Your Honor.

We also have nothing to add on behalf of our intervenor clients. The argument expressed by the other defendants were, we think, more than -- more than enough and

are happy to answer any questions, should Your Honor have them. But other than that, we are happy to pass on our oral argument.

***THE COURT:*** Very well. Thank you, sir.

**(Mr. Coppolino raising his hand.)**

***THE COURT:*** Mr. Coppolino is raising his hand, and Mr. Kester is shifting in his chair, which may mean something.

**(Laughter.)**

***MR. COPPOLINO:*** Your Honor, I appreciate your patience. I could sprint through a very fast few comments in about five minutes.

***THE COURT:*** All right, let me look at my watch.

***MR. COPPOLINO:*** And you can get to your busy afternoon schedule.

I guess -- I thought I'd knock out just the Missouri response first on this Clayton case. I think you were dead on: their argument is a total formalism. We sued them, and if they are preempted under Section 803, then that would apply to the Clayton case as well.

They don't get the section 802 proceedings because that action, because that investigation is covered by Section 803. There is actually a separate subsection of 803 that specifically was written for the Missouri case, it's Section 803(4), that prohibits a state from commencing or maintaining a civil action or other proceedings to enforce a requirement -- a requirement that an electronic communication service provider

disclose information concerning alleged assistance to the intelligence community. That is the Clayton case, and it's flatly preempted by Section 803.

Mr. Taub talked about some of the Tenth Amendment issues, and I think you are all over those, but ***Printz*** and the ***New York*** case obviously concerned a unique species of Tenth Amendment problem that the Court has identified regarding the effect, the intention to commandeer state officials literally to do the job of the Federal Government, in one instance to conduct Brady background checks. That was, I think -- oh, was that ***Printz***?

***THE COURT:*** Yeah, that was the ***Printz*** case.

***MR. COPPOLINO:*** Yeah.

And the New York case involved a directive by Congress that states had to legislate a certain way; neither circumstance is presented here.

All that the Tenth Amendment really provides is that if there's a --

***THE COURT:*** Well, is that true?

***MR. COPPOLINO:*** I think it is true, Your Honor.

***THE COURT:*** Because take a look at (a)(2) of Section 803, it says, "the state shall have no authority to regulate or to," and then the next section, "to impose an administrative sanction"; isn't that, in essence, telling the state how it can regulate or how it can exercise its administrative authority

under the state police power?

***MR. COPPOLINO:*** It does, but it doesn't run afoul of the Tenth Amendment. And it doesn't fall within ***Printz*** or ***New York*** because, in those case,s, it involved -- those cases involved a directive to state officials to do particular things on behalf of the Federal Government.

***THE COURT:*** You are drawing a distinction between an affirmative obligation and a prohibitory one.

***MR. COPPOLINO:*** I'm actually drawing a distinction that was drawn in ***Printz*** and ***New York*** itself, where both cases make the point that Congress can regulate directly in an area that it has the authority to regulate.

And I just disagree with My friend, Mr. Taub, that that this is not a direct regulation. This is a direct regulation which says the states cannot do a certain thing that Congress has the authority to tell them that they cannot do, such as investigate these activities.

***Printz*** actually itself made the point that the Congress may condition -- the Congress may condition the state's continued regulation in a preemptable field on the state's compliance with affirmative obligations imposed by federal law. And, it does not violate the Tenth Amendment where the Congress imposes preconditions on the state's continued regulation in an otherwise preempted field. That is the distinction that is drawn by ***Printz*** and ***New York***.

The ***Gregory*** case is a completely different case entirely where the Court, in that case, was looking at a mandatory retirement age statute that was passed in the state of Missouri. And the question was whether it was -- it was preempted by the federal law, the Age Discrimination Act. And only in that very unique context, the Court said, look, this goes to whether or not states can determine the qualifications for high office within their states. And that was a matter that was expressly reserved to the states under the Tenth Amendment.

And so, in that unique context, which was emphasized throughout the opinion, the Court said, simply, that there has to be a plain-statement rule if Congress seeks to regulate in that area. And it didn't find a plain statement in the Age Discrimination Act. But here, of course, we have a very plain statement as to Congress' intent to regulate.

The ***Cuomo versus Clearing House*** case which he cited, which is up in the Supreme Court now, very major difference between this case and that case, where he talks about so-called enforcement preemption. And the issue that the Supreme Court is considering there is whether or not the Federal Government can essentially tell the states: we will enforce your law.

Enforcement preemption, as that term is used, applies when the Government seeks to take over the state's administration of law in an area that the state already has the

authority to regulate. That case involved nondiscriminatory lending practices. There is no dispute that the state has coextensive authority in that area. And the issue is whether the Office of the Comptroller of the Currency can, by regulation, tell the state government, we will enforce your law. This a case about whether the state has any authority in the area, and Section 803 preempts that authority directly. It's not a question of an enforcement preemption problem.

I guess a lot of the discussion talked about this issue of what do you do in trying to parse the various requests that are made? And, I guess I would just say, Your Honor, parsing, as I said in my opening comments, far more intrusive than -- than what Congress has directed be -- occur which is --

***THE COURT:*** Well, what am I supposed to do here? Am I supposed to look at the inquiries that have been made by the states, the investigation, and so forth, and where there is a question that does not run afoul of an express prohibition of Section 803, say, oh, well, the emanations from this investigation or this inquiry touches upon something that is prohibited by Section 803?

***MR. COPPOLINO:*** Right, I don't -- Congress --

***THE COURT:*** How am I supposed to make that determination?

***MR. COPPOLINO:*** I don't think you should. In fact, Congress does not want you to make that determination. But, I

do think there is a way out if you have that concern.

The unit of investigation, if you will, that Congress has -- the investigation is kind of the subject unit that Congress seeks to preempt. Now, if within an investigation a state is seeking something that does not concern an alleged intelligence activity, that is something that can be addressed at another time in another proceeding.

For example, the only thing that's come up in this regard is privacy policies, public privacy policies, and those are available. And so far as I know, they may well have been provided. Every other question in this proceeding is directed at proving the evidence in the complaint.

But, if you enter judgment for the Government and you uphold Section 803, that would establish the clear line by which the states and the carriers would proceed. And it would say, in the effect, to the carriers and to the states that any response to any inquiry that the state may make in the future regarding carrier policies within their states would exclude alleged federal intelligence activities.

That's how the matter should proceed, not by this Court or the Government monitoring 50 state PUC proceedings to find out if a particular interrogatory did or did not run afoul of Section 803. Congress was not required to preempt by interrogatory. And, I think that would be a very serious mistake, and it would be a huge burden on the United States, on

the courts, on the intelligence agencies, and on the carriers, precisely the kind of burden that Congress is seeking to avoid here. These are hypothetical concerns that could be addressed in further proceedings by the states that do not relate whatsoever to alleged intelligence activities.

Your Honor, I think that's enough. If you had any particular questions, I could address them.

***THE COURT:*** That's fine.

***MR. COPPOLINO:*** I think you got the gist of our arguments.

***THE COURT:*** I got the gist of it, yeah.

***MR. COPPOLINO:*** Thank you, very much, Your Honor.

**(Mr. Kester rises.)**

***THE COURT:*** All right, Mr. Kester, I knew you weren't going to get out of here without saying something.

***MR. KESTER:*** Good morning, Your Honor.

Well, actually, I would have guessed the other, but I do feel I want to say a few things, basically because my learned counsel from Maine, whom I listened to and whose remarks, I gather, were adopted by counsel for the other states, at different points I thought was describing a constitution I don't recognize at all. And I think we -- in that discussion, we're forgetting some of the stakes at issue here.

If, if federal power has any core central area in

which it is at its peak, surely it must be in the area of national security. And, if an action by the Federal Government is joined in by the Article 2 authorities, the commander-in-chief, the president, and emphatically by the Congress, surely, legislation of that kind is entitled to the greatest respect from the Article 3 authorities in our Federal Government.

We are not dealing here with a national security threat that some lawyer thought up hypothetically, what if this happened, we have had enough horrendous demonstration of what kinds of national security threats exist today, and the Congress of the United States quite properly took that into account. The Congress of the United States was aware of these very investigations when it passed this statute. And the Congress said: stop it.

Now, I think -- I think that counsel, in some of his discussion, and I don't want to mischaracterize it because I may not have understood it, I thought he was mixing up the concept of separation of powers and the concept of federalism. Now, separation of powers is how the different branches of the Federal Government limit each other from overreaching. And here, as I said, the political branches of the Federal Government are in one voice on what should happen here.

***THE COURT:*** So you're telling me I don't have much choice.

***MR. KESTER:*** I'm saying, Your Honor, that you should give great respect to that judgment, yes.

And the other thing is, the states were not intended in our federal system to be a check on the foreign affairs, national security, intelligence actions of the Federal Government, that's not true. The problem of the states interfering with federal national security activities was one of the things that tormented George Washington when he was trying to fight the revolutionary war. And it's one of the reasons we have the constitution that we have, which was signed partly to correct that.

There were some questions about examples of the Federal Government limiting, preempting, getting -- prohibiting small aspects of what would otherwise be legitimate state activities. And -- and each case is different, but, my goodness, there are federal laws all over that get into the tiniest aspects of state functioning.

I mean, look at the -- under different authorities of Congress, the Commerce Clause, the Fourteenth Amendment, look at the Voting Rights Act. Look at the Commerce Clause cases, I mean, going all the way back to cases like ***Gibbons and Ogden***, where there wasn't even a federal statute in addition to it. Just the very existence of the federal power itself kept states from interfering with steamboats, said Chief Justice Marshall. The train links, mud guards, all of that sort of

things, state taxes that appear to be fair on their face, have been struck down many times by the Supreme Court because they were interfering with the federal authority.

And I think we could just find myriad cases of state laws that appeared neutral, appeared innocent, that were struck down by the federal courts with or without a federal statute there because, whether intended to or not, they were too deeply intruding on a federal function.

Now, just last, I was reminded of a -- of a comment of Justice Holmes, who fought in the Civil War when this country was under great stress and was falling apart, a civil war that had sprung from partly the asserted Doctrine of Nullification, which I was reminded today I think had its origin, actually, in New England, but Justice Holmes --

***THE COURT:*** Lots things are emanating from New England these days.

***MR. KESTER:*** That's true, Your Honor, that's true.

But Justice Holmes said that he did not think that the Federal Union would crumble if the federal courts did not have the power to declare acts of Congress unconstitutional, but, he said, surely, the Union could not continue if federal courts could not declare unconstitutional or unlawful certain acts of the states, you know?

***THE COURT:*** Very well.

***MR. KESTER:*** Thank you.

***THE COURT:*** Thank you, Counsel. I appreciate your arguments, they were very helpful, indeed.

***THE CLERK:*** Thank you, Counsel. The Court's in recess.

**(Proceedings adjourned at 12:11 p.m.)**

**---o0o---**

## CERTIFICATE OF REPORTER

I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing. The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

**/s/ Sahar McVickar**

**Sahar McVickar, RPR, CSR No. 12963**

**Thursday, May 7, 2009**