**Jon B. Eisenberg, California Bar No. 88278** (jon@eandhlaw.com)
**William N. Hancock, California Bar No. 104501** (bill@eandhlaw.com)
**Eisenberg & Hancock LLP**
1970 Broadway, Suite 1200 • Oakland, CA 94612
510.452.2581 – Fax 510.452.3277

**Steven Goldberg, Oregon Bar No. 75134** (steven@stevengoldberglaw.com)
River Park Center, Suite 300 • 205 SE Spokane St.• Portland, OR 97202
503.445-4622 – Fax 503.238.7501

**Thomas H. Nelson, Oregon Bar No. 78315** (nelson@thnelson.com)
P.O. Box 1211, 24525 E. Welches Road • Welches, OR 97067
503.622.3123 - Fax: 503.622.1438

**Zaha S. Hassan, California Bar No. 184696** (zahahassan@comcast.net)
8101 N.E. Parkway Drive, Suite F-2.• Vancouver, WA 98662
360.213.9737 - Fax 866.399.5575

**J. Ashlee Albies, Oregon Bar No. 05184** (ashlee@sstcr.com)
**Steenson, Schumann, Tewksbury, Creighton and Rose, PC**
815 S.W. Second Ave., Suite 500 • Portland, OR 97204
503.221.1792 – Fax 503.223.1516

**Lisa R. Jaskol, California Bar No. 138769** (ljaskol@earthlink.net)
610 S. Ardmore Ave.• Los Angeles, CA 90005
213.385.2977 – Fax 213.385.9089

**Attorneys for Plaintiffs Al-Haramain Islamic Foundation, Inc., Wendell Belew and Asim Ghafoor**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **IN RE NATIONAL SECURITY AGENCY TELECOMMUNICATIONS RECORDS LITIGATION** | ) MDL Docket No. 06-1791 VRW |
| This Document Relates Solely To: | ) **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| *Al-Haramain Islamic Foundation, Inc., et al. v. Obama, et al.* (C07-CV-0109-VRW) | ) Date: Tuesday, September 1, 2009<br>) Time: 10:00 a.m.<br>) Court: Courtroom 6, 17th Floor<br>) Honorable Vaughn R. Walker |
| **AL-HARAMAIN ISLAMIC FOUNDATION, INC., et al.,**<br>Plaintiffs,<br>vs. | ) |
| **BARACK H. OBAMA, President of the United States, et al.,**<br>Defendants. | ) |



Dockets.Justia.com

## TABLE OF CONTENTS


NOTICE OF MOTION . . . . . 1

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . 1

INTRODUCTION . . . . . 1

STATEMENT OF ISSUES . . . . . 2

STATEMENT OF RELEVANT FACTS . . . . . 2

A. Public admissions that defendants conducted warrantless electronic surveillance . . . . . 2

B. Public evidence that defendants knew the warrantless surveillance program was unlawful yet continued it for several weeks in 2004 without DOJ certification . . . . . 3

C. Public evidence that in February 2004 defendants began investigating Al-Haramain for possible crimes relating to currency reporting and tax laws . . . . . 4

D. Public evidence that the FBI regularly used classified information produced by the warrantless surveillance program . . . . . 4

E. The telephone conversations where plaintiffs discussed Ghafoor's representation of persons linked with Osama bin-Laden . . . . . 5

F. Public evidence that defendants used classified documents in the 2004 investigation of Al-Haramain . . . . . 6

G. FBI Deputy Director Pistole's public admission that the FBI used surveillance in the 2004 investigation of Al-Haramain . . . . . 7

H. The inference that defendants used electronic surveillance of plaintiffs to declare links between Al-Haramain and Osama bin-Laden . . . . . 7

I. The public evidence that plaintiffs' surveillance was electronic . . . . . 8

J. Other public evidence supporting the inference of electronic surveillance . . . . . 8

ARGUMENT . . . . . 9

I. RULE 56(c) AUTHORIZES PARTIAL SUMMARY JUDGMENT OF LIABILITY ON PLAINTIFFS' CLAIMS . . . . . 9

II. PARTIAL SUMMARY JUDGMENT MAY BE GRANTED ON A PRIMA FACIE SHOWING, BY A PREPONDERANCE OF CIRCUMSTANTIAL AND DIRECT EVIDENCE, THAT RAISES A REASONABLE INFERENCE OF THE ESSENTIAL FACTS . . . . . 10

III. NON-CLASSIFIED EVIDENCE ESTABLISHES A PRIMA FACIE CASE OF PLAINTIFFS' WARRANTLESS ELECTRONIC SURVEILLANCE AND THUS THEIR ARTICLE III STANDING . . . . . 11

A. The FBI has publicly admitted that defendants used surveillance in the 2004 investigation of Al-Haramain . . . . . 11

B. Direct and circumstantial evidence raises a compelling inference that the 2004 surveillance of Al-Haramain included Belew's and Ghafoor's international telecommunications with al-Buthi . . . . . 11

C. Public statements by government officials demonstrate the probability that the 2004 surveillance was electronic . . . . . 13

D. Defendants have the burden of proving there was a warrant for the surveillance . . . . . 14

E. Circumstantial evidence raises a compelling inference that there was no warrant for the surveillance . . . . . 15

F. This court's ruling that plaintiffs have alleged prima facie evidence of their aggrieved person status means they are entitled to summary judgment of Article III standing unless defendants present contrary evidence that demonstrates a genuine issue of material fact . . . . . 16

IV. PLAINTIFFS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT OF LIABILITY ON THE MERITS . . . . . 16

A. FISA prescribes the exclusive means for conducting foreign intelligence electronic surveillance . . . . . 16

B. The President may not disregard the requirements of FISA based on the 2001 Authorization for Use of Military Force (AUMF) . . . . . 17

1. Nothing in the AUMF trumps FISA. . . . . . 17

2. President Obama and members of his administration agree that nothing in the AUMF trumps FISA . . . . . 21

C. The President may not disregard the requirements of FISA based on inherent presidential power . . . . . 21

1. No inherent presidential power trumps FISA . . . . . 21

2. President Obama and members of his administration agree that no inherent presidential power trumps FISA . . . . . 26

D. Both judges who have addressed the merits in other TSP litigation agree that the TSP was unlawful . . . . . 28

E. FISA is not an unconstitutional intrusion on executive power . . . . . 29

F. Absent a genuine issue of material fact regarding plaintiffs' arguments on the merits, plaintiffs are entitled to a judgment of liability as a matter of law . . . . . 31

V. IF DEFENDANTS SUBMIT CLASSIFIED EVIDENCE IN OPPOSITION TO THIS MOTION, THE COURT SHOULD STRIKE THE EVIDENCE *SUA SPONTE* IF THE COURT DEEMS IT IRRELEVANT TO STANDING AND LIABILITY . . . . . . . . . . . . . . . . 31

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

# TABLE OF AUTHORITIES

Page

## CASES

*ACLU v. NSA*
493 F.3d 644 (6th Cir. 2007) ........ 8, 10, 28, 29

*ACLU v. NSA*
438 F.Supp.2d 754 (E.D. Mich. 2006) ........ 28

*American Nurses' Ass'n v. Illinois*
783 F.2d 716 (7th Cir. 1986) ........ 9

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ........ 10

*Buckley v. Valeo*
424 U.S. 1 (1976) ........ 25

*Campbell v. United States*
365 U.S. 85 (1961) ........ 14, 15

*Clinton v. Jones*
520 U.S. 681 (1997) ........ 25

*F.T.C. v. Gill*
265 F.3d 944 (9th Cir. 2001) ........ 10

*Far Out Productions, Inc. v. Oskar*
247 F.3d 986 (9th Cir. 2001) ........ 10

*Gonzales v. Oregon*
546 U.S. 243 (2006) ........ 19

*Hamdan v. Rumsfeld*
548 U.S. 557 (2006) ........ 20, 24, 26

*Hamdi v. Rumsfeld*
542 U.S. 507 (2004) ........ 18, 23

*Home Building & Loan Ass'n v. Blaisdell*
290 U.S. 398 (1934) ........ 25

*Horphag Research Ltd. v. Garcia*
475 F.3d 1029 (9th Cir. 2007) ........ 10

*In re Sealed Case*
494 F.3d 139 (D.C. Cir. 2007) ........ 10

*In re Sealed Case*
310 F.3d 717 (For. Int. Surv. Ct. 2002) ........ 29

*J.E.M. Ag. Supply, Inc. v. Pioneeer Hi-Bred Int'l, Inc.*
534 U.S. 124 (2001) ........ 19

*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992) . . . . . . . . . . 14

*Mistretta v. United States*
488 U.S. 361 (1989) . . . . . . . . . . 23

*Morales v. TWA, Inc.*
504 U.S. 374 (1992) . . . . . . . . . . 19

*National Communications Assn. v. AT & T Corp.*
238 F.3d 124 (2d Cir. 2001) . . . . . . . . . . 14

*Pacific Fruit Express Co. v. Akron, Canton & Youngstown R. R. Co.*
524 F.2d 1025 (9th Cir. 1975) . . . . . . . . . . 9

*Plaut v. Spendthrift Farm, Inc.*
514 U.S. 211 (1995) . . . . . . . . . . 25

*Public Citizen v. U.S. Dept. of Justice*
491 U.S. 440 (1989) . . . . . . . . . . 25

*Santiago v. Nogueras*
214 U.S. 260 (1909) . . . . . . . . . . 30

*Schaffer v. Weast*
546 U.S. 49 (2005) . . . . . . . . . . 14, 15

*United States v. Andonian*
735 F. Supp. 1469 (C.D. Cal. 1990) . . . . . . . . . . 23

*United States v. Brown*
484 F.2d 418 (5th Cir. 1973) . . . . . . . . . . 29

*United States v. Butenko*
494 F.2d 593 (3d Cir. 1974) . . . . . . . . . . 29

*United States v. Denver & Rio Grande Railroad Company*
191 U.S. 84 (1903) . . . . . . . . . . 14

*United States v. Morton*
400 F.Supp.2d 871 (E.D. Va. 2005) . . . . . . . . . . 14

*United States v. New York, N.H. & H.R. Co.*
355 U.S. 253 (1957) . . . . . . . . . . 15

*United States v. Nixon*
418 U.S. 683 (1974) . . . . . . . . . . 25

*United States v. Truong Dinh Hung*
629 F.2d 908 (4th Cir. 1980) . . . . . . . . . . 29

*U.S. Postal Serv. Bd. of Governors v. Aikens*
460 U.S. 711 (1983) . . . . . . . . . . 10

*Youngstown Sheet and Tube Co. v. Sawyer*
343 U.S. 579 (1952) . . . . . . . . . . 22, 23, 25, 30

## STATUTES AND RULES

10 U.S.C. § 801 . . . . . . . . 20

18 U.S.C. § 2510 . . . . . . . . 17

18 U.S.C. § 2511(f) . . . . . . . . 17, 19, 23

18 U.S.C. §§ 2340-2340A . . . . . . . . 30

50 U.S.C. § 1801(f)(2) . . . . . . . . 8, 13

50 U.S.C. § 1805(a)(3) . . . . . . . . 18

50 U.S.C. § 1805(e) . . . . . . . . 18

50 U.S.C. § 1806(f) . . . . . . . . 16

50 U.S.C. § 1806(h) . . . . . . . . 32

50 U.S.C. § 1809(a)(1) . . . . . . . . 17, 19

50 U.S.C. § 1810 . . . . . . . . 1, 2, 31, 32

Federal Rules of Civil Procedure, Rule 56 . . . . . . . . 9

Federal Rules of Evidence, Rule 402 . . . . . . . . 32

FISA Amendments Act of 2008, Pub. L. No. 110-261 . . . . . . . . 8

Pub. L. No. 107-40 (Sept. 18, 2001). . . . . . . . . 17, 19, 20

115 Stat. 272 (Oct. 26, 2001) . . . . . . . . 18

115 Stat. 1394 (Dec. 28, 2001) . . . . . . . . 18

## MISCELLANEOUS

Brief for Amici Curiae Center for National Security Studies and the Constitution Project, *ACLU v. NSA*, 493 F.3d 644 (6th Cir. 2007), 2006 WL 4055623. . . . . . . . . 21, 26, 27

Cong. Rec., 107th Cong., 1st Sess., Oct. 1, 2001. . . . . . . . . 20

Tom Daschle, *Power We Didn't Grant*, WASH. POST, Dec. 23, 2005. . . . . . . . . 20

THE FEDERALIST NO. 47 (James Madison). . . . . . . . . 25

H. Conf. Rep. No. 95-1720 (1978). . . . . . . . . 23

H. Rep. No. 95-1283(I) (1978). . . . . . . . . 17, 19

*Hearing Before Senate Judiciary Comm. on Nomination of Eric Holder to be Attorney General*, 110th Cong. (2009) *available at* http://www.nytimes.com/2009/01/16/us/politics/16text-holder.html?pagewanted=30 . . . . . . . . 27

*Hearing Before Senate Select Intelligence Comm. on Nomination of David Kris to be Assistant Attorney General in Justice Department's National Security Division*, 110th Cong. (2009), CQ Congressional Transcripts, Congressional Hearings (March 10, 2009) . . . . . 27, 28

Eric Holder, Address at the Annual Convention of the American Constitution Society (June 13, 2008), *available at* http://www.acslaw.org/node/6720 . . . . . 28

Dawn E. Johnsen, *What's a President To Do? The Constitution In the Wake of Bush Administration Abuses*, 88 Boston U. L. Rev. 395 (2008). . . . . 26

Elena Kagan, Address to Cadets at the United States Military Academy at West Point (Oct. 17, 2007) *available at* http://judiciary.senate.gov/nominations/ElenaKagan/upload/Kagan-Question-13d-Part-1.pdf. . . . . 26

Neal Katyal & Richard Caplan, *The Surprisingly Stronger Case For the Legality of the NSA Surveillance Program: The FDR Precedent*, 60 Stan L. Rev. 1023 (2008). . . . 21, 26

Posting of David Kris to balkin.blogspot, http://balkin.blogspot.com/kris.fisa.pdf (Jan. 25, 2006). . . . . 21

Eric Lichtblau & Adam Liptak, *Bush and His Senior Aides Press On in Legal Defense for Wiretapping Program*, N.Y. TIMES, Jan. 28 2006. . . . . 30

S. Rep. No. 95-604(I) (1977). . . . . 23, 24

Charlie Savage, *Barack Obama's Q&A,* BOSTON GLOBE, Dec. 20, 2007. . . . . 21, 27, 30

9J WIGMORE, EVIDENCE § 2486 (Chadbourn rev. ed. 1981). . . . . 14

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on Tuesday, September 1, 2009, at 10:00 a.m., before the Honorable Vaughn R. Walker, United States District Chief Judge, in Courtroom 6, 17th Floor, 450 Golden Gate Avenue, San Francisco, California, the plaintiffs in *Al-Haramain Islamic Foundation, Inc. v. Obama* (07-CV-109-VRW) will move and hereby do move the Court, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, for partial summary judgment.

This motion seeks a partial summary judgment determining plaintiffs' Article III standing and defendants' liability under the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. section 1810.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

> *"Warrantless surveillance of American citizens, in defiance of FISA, is unlawful and unconstitutional."*
>
> President Barack Obama, December 20, 2007

> *"We owe the American people a reckoning."*
>
> Attorney General Eric Holder, June 13, 2008

This lawsuit challenges the federal government's warrantless electronic surveillance of plaintiffs Al-Haramain Islamic Foundation, Inc. and two of its lawyers, plaintiffs Wendell Belew and Asim Ghafoor. By this motion, plaintiffs seek this Court's determination of plaintiffs' Article III standing and defendants' liability under FISA's civil liability provision, 50 U.S.C. section 1810.

With this motion, plaintiffs submit non-classified evidence that this Court has already determined constitutes prima facie proof that plaintiffs were subjected to electronic surveillance within the meaning of FISA. Defendants have the burden of proving the existence of a FISA warrant

for that surveillance. Unless, in opposition to this motion, defendants demonstrate a genuine issue of material fact with regard to plaintiffs' electronic surveillance, or prove the existence of a FISA warrant, plaintiffs will be entitled to a summary determination that they were subjected to warrantless electronic surveillance and thus have Article III standing.

On the question of defendants' liability under section 1810, there cannot be a genuine issue of material fact, because the liability issues require no fact-finding at all, but are purely legal in nature: May the President disregard the requirements of FISA based on Congress's 2001 Authorization for Use of Military Force? May the President disregard the requirements of FISA based on inherent presidential power? Is FISA an unconstitutional intrusion on presidential power? These issues are wholly amenable to resolution by summary judgment. The time has come for this Court to address them, and to decide the overarching constitutional question presented by President George W. Bush's program of warrantless electronic surveillance: May the President of the United States break the law in the name of national security?

## STATEMENT OF ISSUES

1. Does non-classified evidence demonstrate plaintiffs' warrantless electronic surveillance and thus their Article III standing?

2. May the President disregard the requirements of FISA based on the 2001 Authorization for Use of Military Force or inherent presidential power?

## STATEMENT OF RELEVANT FACTS

### A. Public admissions that defendants conducted warrantless electronic surveillance.

Shortly after the terrorist attacks of September 11, 2001, the Bush administration commenced its so-called "Terrorist Surveillance Program" (TSP) of warrantless electronic surveillance of international telecommunications, intercepting them domestically from routing stations located within the United States. President Bush, defendant Keith B. Alexander, former Attorney General Alberto Gonzales, former Deputy Assistant Attorney General John Yoo, and the Department of Justice (DOJ) have each made public statements admitting that, under the program, President Bush authorized the National Security Agency (NSA) to intercept, without court orders, international communications into and out of the United States of persons believed to be "a member of,"

"affiliated with," "linked to," "a member of an organization affiliated with," or "working in support of" al-Qaeda. *See* Decl. of Jon B. Eisenberg, exhs. A at 3, B at 6, C at 8, D at 11, E at 13, F at 16. Gonzales admitted that FISA "requires a court order before engaging in this kind of surveillance." *Id.*, exh. C at 8. Former CIA director Michael Hayden admitted that the TSP was used "in lieu" of FISA. *Id.*, exh. C at 8b.

**B. Public evidence that defendants knew the warrantless surveillance program was unlawful yet continued it for several weeks in 2004 without DOJ certification.**

On May 15, 2007, in testimony before the Senate Judiciary Committee, and on May 22, 2007, in written answers to follow-up questions by Senator Patrick Leahy, former Deputy Attorney General James B. Comey made the following statements demonstrating that defendants knew the warrantless surveillance program was unlawful yet continued it for several weeks in 2004 without the DOJ's approval:

- As of early March of 2004, Comey and Attorney General John Ashcroft had determined that the program was unlawful. *See id.*, exh. G at 20-21, 29.
- During a meeting at the White House on March 9, 2004, two days before the DOJ's periodic written certification of the program was due, Comey told Vice-President Dick Cheney and members of his and President Bush's staffs that the DOJ had concluded that the program was unlawful and that the DOJ would not re-certify it. *See id.*, exhs. G at 20-21, 26, 28-29, H at 33, 35.
- On March 10, 2004, while Ashcroft was hospitalized, two White House officials went to Ashcroft's bedside and attempted to obtain the written certification from Ashcroft, but he refused. *See id.*, exh. G at 19, 23.
- Despite the advice that the program as then constituted was unlawful, President Bush did not direct Comey or the FBI to discontinue or suspend any portion of the program. *See id.*, exh. G at 24-25, 27, 30.
- On March 11, 2004, the DOJ's certification of the program lapsed without the DOJ's re-certification. *See id.*, exh. G at 27, 30.
- The program continued to operate without the DOJ's certification for a period of several weeks following March 11, 2004. *See id.*, exhs. G at 27-28, 30, H at 35.

On July 26, 2007, defendant Robert S. Mueller III testified before the House Judiciary Committee that prior to the incident at Ashcroft's bedside, Mueller had "serious reservations about the warrantless wiretapping program," and that at or near the time of the incident, during conversations between Comey and defendant Mueller, Comey "expressed concern about the legality of it." *See id.*, exh. I at 39, 40.

**C. Public evidence that in February 2004 defendants began investigating Al-Haramain for possible crimes relating to currency reporting and tax laws.**

On March 4, 2004, FBI Counterterrorism Division Acting Assistant Director Gary M. Bald testified before the Senate Caucus on International Narcotics Control that in February 2004 defendants began investigating plaintiff Al-Haramain for possible terrorist financing, saying the following:

- The FBI's Terrorist Financing Operations Section (TFOS) participates in joint operations with the Treasury Department to investigate potential terrorist-related financial transactions. *See id.*, exh. J at 43, 45-46.

- The TFOS investigated Al-Haramain "pertaining to terrorist financing." *See id.*, exh. J at 46, 48.

- In February of 2004, the FBI executed a search warrant on Al-Haramain's office in Ashland, Oregon. *See id.*, exh. J at 48.

- The TFOS provided operational support, including document and data analysis, in a subsequent investigation of Al-Haramain. *See id.*, exh. J at 48.

In a press release issued on February 19, 2004, the Treasury Department announced that OFAC had blocked Al-Haramain's assets pending an investigation of possible crimes relating to currency reporting and tax laws. *See id.*, exh. K at 54.

**D. Public evidence that the FBI regularly used classified information produced by the warrantless surveillance program.**

On September 25, 2003, FBI Deputy Director (at that time Counterterrorism Division Assistant Director) John S. Pistole testified before the Senate Committee on Banking, Housing and Urban Affairs that the TFOS "has access to data and information" from "the Intelligence Community." *See id.*, exh. L at 59. On June 16, 2004, OFAC Director R. Richard Newcomb

testified before the House Financial Services Subcommittee on Oversight and Investigations that in conducting investigations of terrorist financing, OFAC officers use "classified . . . information sources." *See id.*, exh. M at 68. On July 26, 2007, defendant Mueller testified before the House Judiciary Committee that in 2004 the FBI, under his direction, undertook activity using information produced by the NSA through the warrantless surveillance program. *See id.*, exh. I at 40, 41.

**E. The telephone conversations where plaintiffs discussed Ghafoor's representation of persons linked with Osama bin-Laden.**

During the period immediately following the blocking of Al-Haramain's assets on February 19, 2004, plaintiff Belew spoke over the telephone with one of Al-Haramain's directors, Soliman al-Buthi, on the following dates: March 10, 11 and 25, April 16, May 13, 22 and 26, and June 1, 2 and 10, 2004. *See* Decl. of Wendell Belew, ¶ 3. Plaintiff Ghafoor spoke over the telephone with al-Buthi approximately daily from February 19 through February 29, 2004 and approximately weekly thereafter. *See* Decl. of Asim Ghafoor, ¶ 3. Belew and Ghafoor were located in Washington D.C.; al-Buthi was located in Riyadh, Saudi Arabia. *See* Decl. of Wendell Belew, ¶ 3, Decl. of Asim Ghafoor, ¶ 3. The telephone number that Belew used was 202-255-3808; the telephone numbers that Ghafoor used were 202-390-5390, 202-497-2219 and 703-421-7303; the telephone numbers that al-Buthi used were 96655457679, 966506414004 and 966505457679. *See* Decl. of Wendell Belew, ¶ 3, Decl. of Asim Ghafoor, ¶ 3.

Al-Haramain and al-Buthi had been named among multiple defendants in *Burnett v. Al Baraka Investment and Development Corporation,* a lawsuit filed against Saudi Arabian entities and citizens on behalf of victims of the terrorist attacks of September 11, 2001. Al-Buthi was attempting to coordinate the defense of individuals named in the *Burnett* lawsuit and the payment of their legal fees. Al-Buthi contacted some of those individuals and urged them to obtain legal representation to prevent entry of default judgments against them. Ghafoor undertook to represent several of the individuals whom al-Buthi contacted. *See* Decl. of Asim Ghafoor, ¶ 4. Belew undertook to provide legal services in connection with the formation and operation of a lobbying organization for Islamic charities, the Friends of Charities Association (FOCA). *See* Decl. of Wendell Belew, ¶ 4.

Wholly independent of any classified written documentation, including the Sealed Document filed at the outset of this action, Belew and Ghafoor recall the substance of their telephone

conversations with al-Buthi as follows:

- In the telephone conversations between Belew and al-Buthi, the parties discussed issues relating to the operation of FOCA, including the payment of FOCA's attorney fees to Belew and others. *See* Decl. of Wendell Belew, ¶ 5.

- In the telephone conversations between Ghafoor and al-Buthi, al-Buthi mentioned by name numerous defendants whom Ghafoor had undertaken to represent in the *Burnett* lawsuit filed on behalf of the September 11 victims. One of the names al-Buthi mentioned was Mohammad Jamal Khalifa, who was married to one of Osama bin-Laden's sisters. Two other names al-Buthi mentioned were Safar al-Hawali and Salman al-Auda, clerics whom Osama bin-Laden claimed had inspired him. *See* Decl. of Asim Ghafoor, ¶ 5.

- In the telephone conversations between Ghafoor and al-Buthi, the parties also discussed issues relating to payment of Ghafoor's legal fees as defense counsel in the *Burnett* lawsuit. *See id.,* ¶ 6.

### F. Public evidence that defendants used classified documents in the 2004 investigation of Al-Haramain.

Public evidence demonstrates that defendants used classified documents in the 2004 investigation of Al-Haramain. In a letter to Al-Haramain's lawyer Lynne Bernabei dated April 23, 2004, OFAC Director Newcomb stated that OFAC was considering designating Al-Haramain as a Specially Designated Global Terrorist (SDGT) organization based on unclassified information "and on classified documents that are not authorized for public disclosure." *See* Decl. of Jon B. Eisenberg, exh. N at 70. In a follow-up letter to Bernabei dated July 23, 2004, Newcomb reiterated that OFAC was considering "classified information not being provided to you" in determining whether to designate Al-Haramain as an SDGT organization. *See id.*, exh. O at 72.

On September 9, 2004, OFAC declared Al-Haramain to be an SDGT organization. *See id.*, exh. P at 74. In a public declaration filed in the present litigation dated May 10, 2006, FBI Special Agent Frances R. Hourihan said the Sealed Document "was related to the terrorist designation" of Al-Haramain. *See id.*, exh. Q at 77-78. In a letter to Al-Haramain's attorneys Lynne Bernabei and Thomas Nelson dated February 6, 2008, OFAC confirmed its "use of classified information" in the 2004 investigation. *See id.*, exh. R at 83, 85.

**G. FBI Deputy Director Pistole's public admission that the FBI used surveillance in the 2004 investigation of Al-Haramain.**

On October 22, 2007, in a speech at a conference of the American Bankers Association and American Bar Association on money laundering, the text of which appears on the FBI's official Internet website, FBI Deputy Director Pistole stated that the FBI "used . . . surveillance" in connection with the 2004 investigation of Al-Haramain. *See id.*, exh. S at 92. In this speech, Pistole further stated that, although the FBI used surveillance in the investigation, "it was the financial evidence" provided by financial institutions "that provided justification for [Al-Haramain's] *initial* designation" on February 19, 2004. *See id.* (emphasis added).

Pistole's public admission that the FBI used surveillance in the Al-Haramain investigation contradicts defendants' prior assertion in their Brief for Appellants filed in the Ninth Circuit Court of Appeals in this litigation on June 6, 2007, that the government "could neither confirm nor deny whether plaintiffs had been surveilled under the TSP or any other intelligence-gathering program." *See id.*, exh. T at 98. With Pistole's speech and its posting on the FBI's website, the FBI has publicly confirmed that plaintiffs were surveilled.

**H. The inference that defendants used electronic surveillance of plaintiffs to declare links between Al-Haramain and Osama bin-Laden.**

In a press release issued on September 9, 2004 – the day OFAC declared Al-Haramain to be an SDGT organization – the Treasury Department stated that the Al-Haramain investigation had shown "direct links between the U.S. branch [of Al-Haramain] and Usama bin Laden." *See id.*, exh. P at 74. This press release was the first instance of a public claim of purported links between Al-Haramain and Osama bin-Laden. The earlier press release of February 19, 2004, announcing the blocking of Al-Haramain's assets, did not mention Osama bin-Laden or al-Qaeda. *See id.*, exh. K at 54.

In a document filed in *United States v. Sedaghaty*, No. CR 05-60008-01 on August 21, 2007, the United States Attorney for the District of Oregon referred to the February 19, 2004 order blocking Al-Haramain's assets as a "preliminary designation" and referred to the September 9, 2004 order declaring Al-Haramain to be an SDGT as "a formal designation." *See* Decl. of Jon B. Eisenberg, exh. U at 102. Thus, in the government's own words, the assets-blocking order was

"preliminary" (or, as Pistole put it in his speech, "initial") and the subsequent SDGT designation was "formal."

The timing of Belew's and Ghafoor's 2004 telephone conversations with al-Buthi, in which they discussed persons linked with Osama-bin Laden during the period between Al-Haramain's preliminary assets-blocking order and the formal SDGT designation, along with Pistole's admission that the FBI surveilled Al-Haramain during this period, raise a compelling inference that defendants conducted electronic surveillance of those telephone conversations and then relied on that surveillance to declare links between Al-Haramain and Osama bin-Laden and issue the formal SDGT designation.

**I. The public evidence that plaintiffs' surveillance was electronic.**

FISA defines "electronic surveillance" in pertinent part as "the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire communication to or from a person in the United States, without the consent of any party thereto, if such acquisition occurs in the United States." 50 U.S.C. § 1801(f)(2). Defendant Alexander, former CIA Director Michael Hayden, former Director of National Intelligence Michael McConnell, and former Assistant Attorney General Kenneth Wainstein have testified in various Senate and House committees that "[m]ost" telecommunications between the United States and abroad are transmitted by wire through routing stations located within the United States, from which the NSA intercepts such communications, so that their interception required a FISA warrant prior to the FISA Amendments Act of 2008, Pub. L. No. 110-261. *See* Decl. of Jon B. Eisenberg, exhs. V at 106, W at 111-114, X at 118, 120. This testimony demonstrates the probability that the 2004 telecommunications between al-Buthi and plaintiffs Belew and Ghafoor were wire communications intercepted within the United States, so that their interception was "electronic surveillance" within the meaning of FISA.

**J. Other public evidence supporting the inference of electronic surveillance.**

Other public evidence that supports the inference of plaintiffs' electronic surveillance includes the following:

- On June 12, 2006, during a district court hearing in *ACLU v. NSA*, 493 F.3d 644 (6th Cir. 2007), Department of Justice Special Litigation Counsel Anthony Coppolino told the

district judge that "attorneys who would represent terrorist clients . . . come closer to being in the ballpark with the terrorist surveillance program." *See* Decl. of Jon B. Eisenberg, exh. Y at 123-24. In defendants' Brief for Appellants filed in the Ninth Circuit Court, defendants described plaintiffs Al-Haramain, Belew and Ghafoor as "a terrorist organization, and two lawyers affiliated with Al-Haramain." *See id.*, exh. T at 97.

- Prior to 2004, defendants had conducted electronic surveillance of al-Buthi as revealed by a memorandum dated February 6, 2008, to defendant Adam J. Szubin from Treasury Department Office of Intelligence and Analysis Deputy Assistant Secretary Howard Mendelsohn. The memorandum states that on February 1, 2003, the United States government conducted electronic surveillance of several telephone conversations between al-Buthi and Ali al-Timimi, and that these incidents of surveillance were publicly disclosed during al-Timimi's 2005 trial for allegedly soliciting persons to levy war against the United States. *See id.*, exh. Z at 130-131.

Given defendants' perception of Belew and Ghafoor as attorneys who "represent" and are "affiliated with" purported terrorists, along with defendants' admitted electronic surveillance of al-Buthi in the al-Timimi case, the electronic surveillance of Belew, Ghafoor and al-Buthi asserted in the present case should surprise nobody.

## ARGUMENT

### I. RULE 56(c) AUTHORIZES PARTIAL SUMMARY JUDGMENT OF LIABILITY ON PLAINTIFFS' CLAIMS.

Under Rule 56 of the Federal Rules of Civil Procedure, a party may move for summary judgment "upon all or *any part*" of a claim. Fed. R. Civ. P. 56(a) (emphasis added). The "any part" phrase in Rule 56(a) authorizes what is commonly called "partial summary judgment." *See, e.g., American Nurses' Ass'n v. Illinois*, 783 F.2d 716, 729 (7th Cir. 1986).

One form of partial summary judgment is on the issue of *liability*. A partial summary judgment of liability is authorized by Rule 56(d)(2), which states that summary judgment "may be rendered on liability alone." Fed. R. Civ. P. 56(d)(2). In such instances, the case proceeds to trial solely on the quantum of damages. *See, e.g., Pacific Fruit Express Co. v. Akron, Canton & Youngstown R. R. Co.*, 524 F.2d 1025, 1029-30 (9th Cir. 1975).

## II. PARTIAL SUMMARY JUDGMENT MAY BE GRANTED ON A PRIMA FACIE SHOWING, BY A PREPONDERANCE OF CIRCUMSTANTIAL AND DIRECT EVIDENCE, THAT RAISES A REASONABLE INFERENCE OF THE ESSENTIAL FACTS.

On this motion for partial summary judgment, the Court must determine whether there is a "genuine issue as to any material fact" and whether plaintiffs are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Plaintiffs, as the moving parties, bear the initial burden of demonstrating the absence of a genuine issue of material fact, but need not disprove defendants' case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Plaintiffs' burden is to establish "a prima facie case for summary judgment." *F.T.C. v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001). Once plaintiffs meet this burden, the burden shifts to defendants to set forth specific facts showing that there is a genuine issue for trial. *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007). If defendants fail to make that showing, then plaintiffs are entitled to judgment as a matter of law. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

A prima facie showing of electronic surveillance can be made with *circumstantial evidence*. "Although [the plaintiff's] case is premised on circumstantial evidence, '[a]s in any lawsuit, the plaintiff may prove his case by direct or circumstantial evidence.'" *In re Sealed Case*, 494 F.3d 139, 147 (D.C. Cir. 2007) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983)). The prima facie showing is sufficient if it raises a *reasonable inference* of electronic surveillance. *Id.* (plaintiff was able to present unprivileged evidence "that creates an inference" of eavesdropping, evidence from which a jury could "reasonably infer that eavesdropping had occurred."). And the prima facie showing can be made on a *preponderance of the evidence*. *Cf. ACLU v. NSA*, 493 F.3d at 674-75 (plaintiffs failed to demonstrate standing because "[t]he evidence establishes only a *possibility* – not a *probability* or certainty – that these communications might be intercepted" (second emphasis added)).

We now demonstrate how the non-classified evidence presented in support of this motion for partial summary judgment establishes a prima facie case, by a preponderance of circumstantial and direct evidence, showing the facts essential to plaintiffs' Article III standing – that they were subjected to *surveillance*, that the surveillance was *electronic*, and that the electronic surveillance was *warrantless*.

## III. NON-CLASSIFIED EVIDENCE ESTABLISHES A PRIMA FACIE CASE OF PLAINTIFFS' WARRANTLESS ELECTRONIC SURVEILLANCE AND THUS THEIR ARTICLE III STANDING.

### A. The FBI has publicly admitted that defendants used surveillance in the 2004 investigation of Al-Haramain.

Since the outset of this litigation in February of 2006, the public record has become replete with evidence of plaintiffs' surveillance in 2004. Much of this evidence is circumstantial, but not all of it: In October of 2007, the FBI publicly *admitted* – via Deputy Director Pistole's speech and its posting on the FBI's website – that defendants used surveillance in the 2004 investigation of Al-Haramain. *See supra* at 7.

So much for defendants' prior insistence in the Ninth Circuit that it is a state secret, vital to the Nation's security, "whether plaintiffs had been surveilled under the TSP or any other intelligence-gathering program." *See* Decl. of Jon B. Eisenberg, exh. T at 98, *supra* at 7. Despite telling the judiciary they cannot confirm or deny plaintiffs' surveillance without endangering national security, defendants subsequently touted that very surveillance to the public at large.

Now we know, via Pistole's admission, that defendants used surveillance in the 2004 investigation of Al-Haramain. But Pistole did not tell us *what* was surveilled. For that piece of the puzzle we must turn to other evidence.

### B. Direct and circumstantial evidence raises a compelling inference that the 2004 surveillance of Al-Haramain included Belew's and Ghafoor's international telecommunications with al-Buthi.

Evidence made public since the inception of this litigation makes the case – not just prima facie, but compelling – that the surveillance Pistole admitted included Belew's and Ghafoor's 2004 telephone conversations with al-Buthi, where they discussed Ghafoor's representation of persons linked with Osama bin-Laden and the payment of Belew's and Ghafoor's legal fees.

Here is what we know from public statements by defendants and other government officials, and from the declarations filed by Belew and Ghafoor in support of this motion, about the warrantless surveillance program and events during the 2004 investigation of Al-Haramain:

- Under the program, defendants surveilled international telecommunications of persons believed to be "linked" or "affiliated" with al-Qaeda. *See supra* at 2-3.

- For several weeks starting on March 11, 2004, defendants conducted the program without DOJ certification and despite the Attorney General's advice that it was unlawful as then constituted. *See supra* at 3.

- Upon the "preliminary designation" order blocking Al-Haramain's assets on February 19, 2004, defendants announced in a press release that they had begun investigating Al-Haramain, mentioning only possible crimes relating to currency and tax laws – with no mention of Osama bin-Laden or al-Qaeda. *See supra* at 4, 7.

- During this investigation, defendants used classified information produced by the intelligence community, and at that time the FBI was using information produced by the NSA under the warrantless surveillance program. *See supra* at 4-5, 6.

- In the midst of the investigation, in March and April of 2004, Belew and Ghafoor participated in international telecommunications where they discussed Ghafoor's representation of Al-Haramain and several persons linked with Osama bin-Laden. *See supra* at 5-6.

- Subsequently, on September 9, 2004, upon Al-Haramain's "formal designation" as an SDGT organization, defendants declared publicly that the investigation had shown "direct links" between Al-Haramain and Osama bin-Laden – the first instance of a claim of such links. *See supra* at 7.

This unclassified evidence raises the following inference: Defendants surveilled *Belew's and Ghafoor's international telecommunications with al-Buthi in March and April of 2004*, relying on that surveillance to issue the formal designation of Al-Haramain as an SDGT organization based on purported "direct links" with Osama bin-Laden. A fact-finder could reasonably infer from this evidence that the surveillance Pistole admitted included plaintiffs' international telecommunications. That inference is not just reasonable, it is compelling.

Other public evidence strengthens that inference even more. In the Ninth Circuit, defendants described Belew and Ghafoor as lawyers who are "affiliated with" a "terrorist organization." *See supra* at 9. Mr. Coppolino has said that "attorneys who would represent terrorist clients . . . come closer to being in the ballpark with the terrorist surveillance program." *See supra* at 8-9. Can it be any wonder that Belew's and Ghafoor's international telecommunications would be surveilled under

a program that targeted persons the government perceived as "affiliated with" al-Qaeda and lawyers who represented so-called "terrorist clients"? Defendants have publicly admitted in the al-Timimi prosecution that they surveilled al-Buthi prior to 2004. *See supra* at 9. Can it be any wonder that they continued to surveil him in 2004?

### C. Public statements by government officials demonstrate the probability that the 2004 surveillance was electronic.

The electronic nature of plaintiffs' surveillance is demonstrated by the public statements of defendant Alexander, former CIA Director Michael Hayden, former Director of National Intelligence Michael McConnell, and former Assistant Attorney General Kenneth Wainstein concerning how telecommunications between the United States and abroad are transmitted and intercepted: "Most" are transmitted by wire through routing stations located within the United States from which they are intercepted. *See supra* at 8. Their acquisition is thus "electronic" under FISA's definition of electronic surveillance as the acquisition of a "wire communication . . . if such acquisition occurs in the United States." 50 U.S.C. § 1801(f)(2).

These public statements do not indicate that *all* international telecommunications are transmitted by wire. But that is not necessary for plaintiffs to make the case that their 2004 surveillance was electronic. The case need only be made by a *preponderance of the evidence*, which means a *probability* – not a certainty – that plaintiffs' international telecommunications were transmitted by wire and were intercepted domestically. If that is how *most* international telecommunications are transmitted and intercepted, then it is probable that is how *plaintiffs'* international telecommunications were transmitted and intercepted. That, too, is a compelling inference from public statements.[1/]

---

1/ If defendants had any evidence rebutting the inference that plaintiffs' international telecommunications were transmitted by wire and were intercepted domestically, such evidence would be within defendants' peculiar knowledge, and thus the burden would shift to defendants to prove that plaintiffs' surveillance was not electronic within the meaning of FISA. *See infra* at 14-15.

**D. Defendants have the burden of proving there was a warrant for the surveillance.**

The remaining question is whether plaintiffs' electronic surveillance was authorized by a warrant obtained pursuant to the provisions of FISA. Whether there was such a warrant, however, is a matter peculiarly within defendants' knowledge. Consequently, the burden shifts to defendants to prove the existence of a FISA warrant. *See, e.g., Campbell v. United States*, 365 U.S. 85, 96 (1961) ("the ordinary rule . . . does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary"); *National Communications Assn. v. AT & T Corp.*, 238 F.3d 124, 130 (2d Cir. 2001) ("all else being equal, the burden is better placed on the party with easier access to relevant information"); 9 J WIGMORE, EVIDENCE § 2486, at 290 (J. Chadbourn rev. ed. 1981) ("the burden of proving a fact is said to be put on the party who presumably has peculiar means of knowledge" (emphasis deleted)).

Where, as here, a "plaintiff's case depends upon the establishment of a negative" that "'lies peculiarly within the knowledge of the other party,'" the negative averment "'is taken as true unless disproved by that party.'" *United States v. Denver & Rio Grande Railroad Company*, 191 U.S. 84, 92 (1903). "When the opposite party must, from the nature of the case, himself be in possession of full and plenary proof to disprove the negative averment, and the other party is not in possession of such proof, then it is manifestly just and reasonable that the other party which is in possession of the proof should be required to adduce it; or, upon his failure to do so, we must presume it does not exist, which of itself establishes a negative." *Id.*; *accord, United States v. Morton*, 400 F. Supp.2d 871, 879 (E.D. Va. 2005).

The Supreme Court made clear in *Schaffer v. Weast*, 546 U.S. 49 (2005), that the burden of proving Article III standing is no different than the ordinary burden of proof with its burden-shifting exceptions. In *Schaffer*, after observing that "the *ordinary default rule* [is] that plaintiffs bear the risk of failing to prove their claims," the Court described "numerous . . . areas" where "we have presumed or held that the default rule applies." *Id.* at 56-57 (emphasis added). One of the "areas" the Court enumerated is Article III standing: The Court cited *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), where Article III standing was at issue, as an example where the "ordinary default rule" applies. *Schaffer* at 57. The Court went on to explain that "[t]he ordinary default rule, of

course, admits of exceptions." *Id.* One of those exceptions is that "'[t]he ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary.'" *Id.* at 60 (quoting *United States v. New York, N.H. & H.R. Co.*, 355 U.S. 253, 256 n. 5 (1957)); *accord, e.g., Campbell*, 365 U.S. at 96. Thus, according to *Schaffer*, the burden of proving Article III standing is just one manifestation of the "ordinary default rule," *Schaffer* at 56, which "admits of exceptions," *id.* at 57, and which "'does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary,'" *id.* at 60.

Defendants have not sustained their burden of proving the existence of a FISA warrant in any of their previous public filings in this case, and evidently defendants have not done so in any of their *ex parte* and *in camera* filings. Unless they do so now in opposition to this motion and produce proof of a FISA warrant for plaintiffs' electronic surveillance, this Court should conclude that the electronic surveillance was warrantless.

**E. Circumstantial evidence raises a compelling inference that there was no warrant for the surveillance.**

Even without the shifted burden of proof, the very circumstances of this case and the nature of the TSP raise a reasonable inference that there was no FISA warrant for plaintiffs' electronic surveillance. Defendants have charged plaintiffs with having links to al-Qaeda, putting plaintiffs squarely within the scope of the TSP, which targeted for warrantless surveillance persons and entities suspected of links to al-Qaeda. *See supra* at 2-3, 7. It would be surprising if defendants had *not* conducted TSP surveillance of persons thought to have links to al-Qaeda.

Moreover, the surveillance of Belew's and Ghafoor's international telecommunications with al-Buthi occurred in March and April of 2004, which was during the several-week period when the DOJ refused to "certify" the TSP as lawful and defendant Mueller worried that the TSP was unlawful. *See supra* at 3, 5-6. If the DOJ and Mueller thought the TSP was unlawful in March and April of 2004 (which it was, and so remained even after the DOJ's so-called "re-certification," which could not ameliorate the illegality), then any surveillance within the scope of the TSP – which inferentially includes plaintiffs' surveillance – was certainly warrantless.

Again, the inference that there was no FISA warrant for plaintiffs' surveillance is not just reasonable, it is compelling.

### F. This Court's ruling that plaintiffs have alleged prima facie evidence of their aggrieved person status means they are entitled to summary judgment of Article III standing unless defendants present contrary evidence that demonstrates a genuine issue of material fact.

The evidence presented in support of this motion for partial summary judgment is the same evidence that plaintiffs alleged in their first amended complaint, Dkt. #35, and presented in support of their successful Motion Pursuant To 50 U.S.C. § 1806(f) To Discover Or Obtain Material Relating To Electronic Surveillance, Dkt. #46. In the order of January 5, 2009, the Court ruled that this evidence as alleged in the first amended complaint constitutes prima facie proof of plaintiffs' "aggrieved person" status under section 1806(f) – i.e., that plaintiffs were subjected to electronic surveillance within the meaning of FISA. *See* Dkt. #57 at 13-14, 18.

This prima facie evidence of plaintiffs' electronic surveillance, along with the shifting of the burden to defendants to prove the existence of a FISA warrant, has the effect of imposing on defendants the burden of showing a genuine issue of material fact with regard to plaintiffs' warrantless electronic surveillance and consequent Article III standing. Unless defendants present conflicting evidence in opposition to this motion which rebuts plaintiffs' evidence, plaintiffs will be entitled to a summary judgment of Article III standing, and this Court can proceed to decide the merits of this lawsuit.[2/]

## IV. PLAINTIFFS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT OF LIABILITY ON THE MERITS.

### A. FISA prescribes the exclusive means for conducting foreign intelligence electronic surveillance.

We begin our discussion on the merits of this lawsuit with an unremarkable proposition: FISA prescribes the exclusive means by which the Executive Branch may conduct foreign intelligence electronic surveillance. Congress so provided in Title III of the Omnibus Crime Control

---

[2/] In the order of June 5, 2009, the Court ordered plaintiffs to "base their [summary judgment] motion on non-classified evidence." Dkt. #96 at 1-2. Accordingly, this motion is based entirely on non-classified evidence. Should the Court conclude that additional evidence is needed to support a partial summary judgment determining plaintiffs' Article III standing, plaintiffs wish to reserve the right to file another motion for partial summary judgment based on classified as well as non-classified evidence.

and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* (governing electronic surveillance for criminal law enforcement), which states that FISA and Title III "shall be the *exclusive* means by which electronic surveillance . . . may be conducted." 18 U.S.C. § 2511(f) (emphasis added). And Congress further so provided in FISA itself, which states that a person is guilty of violating FISA if the person "engages in electronic surveillance under color of law *except as authorized by statute.*" 50 U.S.C. § 1809(a)(1). FISA's legislative history explains that the phrase "except as authorized by statute" refers to Title III "and this title," meaning FISA. H. Rep. No. 95-1283(I), at 96 (1978).

With FISA's exclusivity established as an unassailable premise, the question becomes whether FISA's exclusivity is trumped by some other legislative or constitutional authority. The answer, as we next demonstrate, is no.

### B. The President may not disregard the requirements of FISA based on the 2001 Authorization for Use of Military Force (AUMF).

#### 1. Nothing in the AUMF trumps FISA.

A "White Paper" issued by the DOJ on January 29, 2006, presents the Bush administration's claims of legal authority purportedly trumping FISA's exclusivity and authorizing the TSP. *See* Decl. of Jon B. Eisenberg, exh. AA at 134-75. It remains to be seen whether, in opposition to this motion for partial summary judgment, President Obama embraces the White Paper's claims.

One of the White Paper's two principal claims is that FISA is trumped by the Authorization for Use of Military Force Against Terrorists (AUMF) issued by Congress on September 18, 2001. The AUMF states: "The President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determined planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." Pub. L. No. 107-40 (Sept. 18, 2001). The White Paper argues that because FISA makes it a crime to conduct electronic surveillance "except as authorized by statute," 50 U.S.C. § 1809(a)(1), and because the AUMF is a statute, the AUMF trumps FISA. *See* Decl. of Jon B. Eisenberg, exh. AA at 143-50. There are at least six fatal flaws in this argument.

*First*, even if a statute like the AUMF could in theory trump FISA, the AUMF itself does not. The White Paper theorizes that, because the Supreme Court has interpreted the AUMF's phrase "necessary and appropriate force" as authorizing detention of enemy combatants captured on a battlefield abroad as a "fundamental incident of waging war," *Hamdi v. Rumsfeld*, 542 U.S. 507, 519 (2004), the AUMF should similarly be interpreted as authorizing warrantless domestic electronic surveillance as a fundamental incident of war. *See* Decl. of Jon B. Eisenberg, exh. AA at 145-50. But *Hamdi* was limited to incidents of war *on the battlefield*, authorizing detention of persons who were "part of or supporting forces hostile to the United States or coalition partners *in Afghanistan and who engaged in an armed conflict against the United States there*." 542 U.S. at 516 (emphasis added). *Hamdi* affords no excuse for warrantless domestic electronic surveillance off the battlefield and outside the framework of FISA. Indeed, *Hamdi* itself admonished that "a state of war is not a blank check when it comes to the rights of the Nation's citizens." *Id.* at 536. And, given FISA's provisions for court-ordered electronic surveillance upon a simple showing of probable cause to believe a target is a foreign power or agent thereof, 50 U.S.C. § 1805(a)(3), and for emergency warrantless surveillance, 50 U.S.C. § 1805(e), the TSP could hardly be considered "necessary" or "appropriate" within the meaning of the AUMF.

*Second*, post-9/11 Congressional amendments to FISA demonstrate that Congress never intended to authorize foreign intelligence electronic surveillance outside the framework of FISA. Congress has amended FISA to accommodate post-9/11 needs – e.g., by deleting a former requirement for certification that the primary purpose of a surveillance is to gather foreign intelligence information, 115 Stat. 272, §§ 206-108, 214-218, 504, 1003 (Oct. 26, 2001), and by increasing from 24 hours to 72 hours and subsequently to seven days the period during which FISA permits emergency warrantless surveillance, 115 Stat. 1394, § 314(a)(2)(B) (Dec. 28, 2001) (increase to 72 hours), 50 U.S.C. § 1805(e)(1)(D) (increase in 2008 to seven days). Yet Congress has never amended FISA to delete its warrant provisions, thus confirming that those provisions are intended to remain fully operational in governing foreign intelligence electronic surveillance. And there would have been no need for these amendments *at all* if the AUMF had already given defendants unlimited power to conduct warrantless foreign intelligence surveillance.

*Third*, the legislative history of FISA demonstrates that section 1809(a)(1)'s disclaimer of criminal liability for electronic surveillance "as authorized by statute" was intended to refer only to two statutory schemes – FISA itself and Title III of the Omnibus Crime Control and Safe Streets Act of 1968. As the House Permanent Select Committee on Intelligence explained in a 1978 report on FISA, section 1809(a)(1) makes it a crime to engage in electronic surveillance "except as specifically authorized *in chapter 119 of title III* [of the Omnibus Crime Control and Safe Streets Act of 1968] *and this title*." H. Rep. No. 95-1283(I), *supra*, at 96 (emphasis added). Thus, the phrase "as authorized by statute" does not refer to statutes *other* than FISA and Title III, such as the AUMF. The White Paper's contrary construction of section 1809(a)(1) contradicts the statutory prescription that FISA and Title III "shall be the *exclusive* means by which electronic surveillance . . . may be conducted." 18 U.S.C. § 2511(f) (emphasis added).

*Fourth*, the White Paper's reading of the AUMF runs afoul of the "commonplace of statutory construction that the specific governs the general." *Morales v. TWA, Inc.*, 504 U.S. 374, 384 (1992). The AUMF only generally authorizes "all necessary and appropriate force" against the perpetrators of the 9/11 attacks, Pub. L. No. 107-40, *supra*, without even mentioning foreign intelligence surveillance. In contrast, FISA specifically commands that FISA and Title III "shall be the exclusive means by which electronic surveillance . . . may be conducted." 18 U.S.C. § 2511(f). The specific provisions of FISA, which are aimed precisely at the conduct challenged here, cannot be trumped by the general provisions of the AUMF. Congress '"does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes." *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (citation and internal quotation marks omitted).

*Fifth*, the White Paper's reading of the AUMF also runs afoul of the rule of statutory construction disfavoring repeals by implication, which can be established only by "overwhelming evidence" that Congress intended the repeal. *J.E.M. Ag. Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 137 (2001). There is no such evidence here. To the contrary, Congress's post-9/11 amendments to FISA without deleting its warrant provisions plainly demonstrate intent *not* to repeal those provisions. And, indeed, former Attorney General Gonzales publicly admitted that Congress,

if asked, would not have changed FISA's warrant provisions after 9/11, saying at a December 2005 press conference that "[w]e've had discussions with members of Congress . . . about whether or not we could get an amendment to FISA [to authorize warrantless electronic surveillance], and we were advised that that was not likely to be – that was not something we could likely get, certainly not without jeopardizing the existence of the program, and therefore, killing the program." Decl. of Jon B. Eisenberg, exh. C at 8c.

*Sixth*, even if *Hamdi v. Rumsfeld* is interpreted so expansively as to bring domestic electronic surveillance within the AUMF, the TSP still violated FISA because the program exceeded the AUMF's scope. The AUMF authorizes military force against *the perpetrators of the 9/11 terrorist attacks* – specifically, those who "planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons . . . ." Pub. L. No. 107-40, *supra*. In contrast, the TSP, as described in the White Paper, swept more broadly to include anyone who was currently "linked to al Qaeda or related terrorist organizations," regardless of whether such persons had anything to do with the 9/11 terrorist attacks or al-Qaeda itself. *See* Decl. of Jon B. Eisenberg, exh. AA at 134. This is a distinction with a difference, because Congress rejected an initial White House draft of the AUMF which would have granted the President power to reach beyond the 9/11 perpetrators and al-Qaeda to the domestic sphere by more broadly authorizing him "to deter and pre-empt any future acts of terrorism or aggression against the United States." *See* Cong. Rec., 107th Cong., 1st sess., Oct. 1, 2001, at S9949-50; Tom Daschle, *Power We Didn't Grant*, WASH. POST, Dec. 23, 2005, at A21.

The Supreme Court's decision in *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), indicates that defendants' assertion of the AUMF as trumping FISA is meritless. In *Hamdan*, the Court held that military commissions established to try Guantanamo Bay detainees violated the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 801, which prescribed a structure and procedures for trying the detainees. The Court said "there is nothing in the text or legislative history of the AUMF even hinting that Congress intended to expand or alter the authorization set forth in . . . the UCMJ." *Hamdan*, 548 U.S. at 594. Similarly here, FISA prescribes a structure and procedures for conducting foreign intelligence electronic surveillance, and there is nothing in the text or legislative history of

the AUMF suggesting it was intended to trump FISA.

#### 2. President Obama and members of his administration agree that nothing in the AUMF trumps FISA.

Not even members of President Obama's administration are convinced by the White Paper's AUMF arguments. Principal Deputy Solicitor General Neal Katyal has called the White Paper's AUMF arguments "ludicrous," "incoherent[]," "implausible," and the "FISA-AUMF jig." Neal Katyal & Richard Caplan, *The Surprisingly Stronger Case For the Legality of the NSA Surveillance Program: The FDR Precedent*, 60 Stan. L. Rev. 1023, 1065-66 (2008).[3/] Assistant Attorney General David Kris has written: "I do not think that Congress can be said to have authorized the NSA surveillance" through the AUMF. Posting of David Kris to balkin.blogspot, http://balkin.blogspot.com/kris.fisa.pdf (Jan. 25, 2006). Associate Deputy Attorney General Donald B. Verrilli, Jr. has concluded that the AUMF "neither explicitly nor implicitly supersedes FISA's warrant requirements." Brief for Amici Curiae Center for National Security Studies and the Constitution Project, *ACLU v. NSA*, 493 F.3d 644 (6th Cir. 2007), 2006 WL 4055623, *2.

Indeed, President Obama himself has evidently rejected the White Paper's AUMF arguments, stating flatly: "Warrantless surveillance of American citizens, in defiance of FISA, is unlawful and unconstitutional." Charlie Savage, *Barack Obama's Q&A*, BOSTON GLOBE, Dec. 20, 2007.

There is no room for doubt on this point: Nothing in the AUMF trumps FISA.

### C. The President may not disregard the requirements of FISA based on inherent presidential power.

#### 1. No inherent presidential power trumps FISA.

The White Paper's other principal claim is a radically expansive theory of presidential "inherent power" to conduct foreign intelligence warrantless electronic surveillance. *See* Decl. of Jon B. Eisenberg, exh. AA at 139-43. This argument, too, is fatally flawed, for it is contrary to the constitutional separation of powers.

---

[3/] Katyal and Caplan posit a historical precedent for the TSP, based on wartime wiretapping by the administration of Franklin Delano Roosevelt, but they conclude that "it does not do enough to convince us of the legality of today's program," Katyal & Caplan, *supra* at 1027, and "we ultimately reject the [FDR] defense," *id.* at 1067.

In *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579 (1952) – commonly called the *Steel Seizure Case* – Justice Robert Jackson's concurring opinion prescribed a formulation for determining the extent of presidential power according to our Constitution's separation of powers and its system of checks and balances. Justice Jackson observed that the Constitution "enjoins upon its branches separateness but interdependence, autonomy but reciprocity. Presidential powers are not fixed but fluctuate, depending upon their disjunction or conjunction with those of Congress." *Id.* at 635. Thus, the extent of presidential power frequently depends on the presence or absence of congressional action:

> - "When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Id.* at 635-37.
>
> - "When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." *Id.* at 637.
>
> - "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* at 637.

This formulation is not tossed aside in times of war. "Whatever power the United States Constitution envisions for the Executive in exchanges with other nations or with enemy

organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake." *Hamdi*, 542 U.S. at 536. "[T]he greatest security against tyranny . . . lies not in a hermetic division among the Branches, but in a carefully crafted system of checked and balanced power within each Branch." *Mistretta v. United States*, 488 U.S. 361, 381 (1989).

Here, presidential power is at its "lowest ebb" because Congress has expressly prohibited electronic surveillance outside the framework of FISA and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, by making FISA and Title III "the *exclusive means* by which electronic surveillance . . . may be conducted." 18 U.S.C. § 2511(f) (emphasis added). This provision, added to Title III when FISA was enacted, replaced a pre-1978 provision, former 18 U.S.C. § 2511(3), which had stated that the President retained power "to obtain foreign intelligence information deemed essential to the security of the United States." *See* S. Rep. No. 95-604(I), at 64 (1977).

By repealing the former provision ceding foreign intelligence surveillance power to the President and replacing it with a provision making FISA and Title III the exclusive means for domestic electronic surveillance, Congress restricted the President's exercise of the inherent power the White Paper claims. The 39th President of the United States agreed to that restriction by signing FISA into law. "The President's ability to unfurl the banner of foreign affairs and use it to cloak sweeping investigative activities was brought to an end." *United States v. Andonian*, 735 F. Supp. 1469, 1474 (C.D. Cal. 1990), *aff'd and remanded on other grounds*, 29 F.3d 634 (9th Cir. 1994). "The exclusivity clause makes it impossible for the President to 'opt-out' of the [FISA] legislative scheme by retreating to his 'inherent' Executive sovereignty over foreign affairs." *Id.* As Justice Felix Frankfurter observed in his concurring opinion in the *Steel Seizure Case*, "[t]o find authority so explicitly withheld [by Congress] is not merely to disregard in a particular instance the clear will of Congress. It is to disrespect the whole legislative process and the constitutional division of authority between President and Congress." 343 U.S. at 609.

Legislative history demonstrates that this curtailing of presidential power is precisely what Congress intended when enacting FISA. A House Conference Report on FISA said: "The intent of the conferees is to apply the [lowest ebb] standard set forth in" the *Steel Seizure Case*. H. Conf. Rep. No. 95-1720, at 35 (1978). The Senate Judiciary Committee said: "The basis for this legislation is

the understanding . . . that even if the President has an 'inherent' constitutional power to authorize warrantless surveillance for foreign intelligence purposes, Congress has the power to regulate the exercise of this authority by legislating a reasonable warrant procedure governing foreign intelligence surveillance." S. Rep. No. 95-604(I), *supra*, at 16.

In rejecting President Bush's attempt to evade the UCMJ based on a claim of inherent presidential power, the Supreme Court in *Hamdan v. Rumsfeld* observed: "Whether or not the President has independent power, absent congressional authorization to convene military commissions, he may not disregard limitations that Congress has, in proper exercise of its own war powers, placed on his powers" through the UCMJ. *Hamdan*, 548 U.S. at 593, n. 23. Likewise here, the President may not disregard limitations that Congress has placed on foreign intelligence surveillance through FISA.

Justice Kennedy's concurring opinion in *Hamdan* further explained why inherent Presidential power did not trump the UCMJ: Through the UCMJ, "Congress, in the proper exercise of its powers as an independent branch of government . . . has . . . set limits on the President's authority." *Id.* at 636-37 (Kennedy, J., concurring). *Hamdan* "is not a case, then, where the Executive can assert some unilateral authority to fill a void left by congressional inaction." *Id.* at 636. Under Justice Jackson's formulation in the *Steel Seizure Case*, Congress had, by expressing its will in the UCMJ, put inherent presidential power over the manner of trying the Guantanamo Bay detainees at "its lowest ebb." *Id.* at 639. Similarly here, Congress has, by expressing its will in FISA, put presidential power over authorization of foreign intelligence surveillance at its lowest ebb.

"Where a statute provides the conditions for the exercise of governmental power, its requirements are the result of a deliberative and reflective process engaging both of the political branches. Respect for laws derived from the customary operation of the Executive and Legislative Branches gives some assurance of stability in time of crisis. The Constitution is best preserved by reliance on standards tested over time and insulated from the pressures of the moment." *Id.* at 637. FISA, too, is the result of a deliberate and reflective process engaging both of the political branches, from its 1978 inception to its recent amendments. It cannot be trumped by a presidential power grab wholly at odds with the constitutional separation of powers.

The constitutional separation of powers is a check on precisely this sort of power grab. "The Framers 'built into the tripartate Federal Government . . . a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of another.'" *Clinton v. Jones*, 520 U.S. 681, 699 (1997) (quoting *Buckley v. Valeo*, 424 U.S. 1, 122 (1976)); *see* THE FEDERALIST NO. 47 (James Madison) ("The accumulation of all powers . . . in the same hands . . . may justly be pronounced the very definition of tyranny."). Under our system of government, the President is not free to ignore laws properly enacted by Congress. *See United States v. Nixon*, 418 U.S. 683, 715 (1974) (the President is not "above the law"). "It remains one of the vital functions of [the Supreme] Court to police with care the separation of the governing powers. . . . When structure fails, liberty is always in peril." *Public Citizen v. U.S. Dept. of Justice*, 491 U.S. 440, 468 (1989) (Kennedy, J., concurring).

This is true even in times of war or emergency: "Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. . . . [E]ven the war power does not remove constitutional limitations safeguarding essential liberties." *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425-26 (1934). As Justice Jackson explained in the *Steel Seizure Case*, "emergency powers are consistent with free government only when their control is lodged elsewhere than in the Executive who exercises them. That is the safeguard that would be nullified by our adoption of the 'inherent powers' formula." 343 U.S. at 652.

The White Paper's radically expansive vision of presidential power encroaches not only on Congress's legislative function, but also on the adjudicatory role of this Court, which reflects "the constitutional equilibrium created by the separation of the legislative power to make general law from the judicial power to apply that law in particular cases." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 224 (1995). The adjudicatory role of this Court in the present case includes deciding whether the Executive Branch violated FISA and the constitutional separation of powers by surveilling plaintiffs without a warrant. If the Executive Branch were free to ignore FISA in the name of national security, then the Executive Branch would also be free, at its unfettered discretion, to ignore *a judgment by this Court* of defendants' liability for violating FISA. That would not bode

well for the future of the constitutional separation of powers, for it would concentrate too much power in the President. "Concentration of power puts personal liberty in peril of arbitrary action by officials, an incursion the Constitution's three-part system is designed to avoid." *Hamdan*, 548 U.S. at 638 (Kennedy, J., concurring).

**2. President Obama and members of his administration agree that no inherent presidential power trumps FISA.**

Again, not even President Obama or members of his administration agree with the White Paper's radically expansive theory of inherent presidential power. Principal Deputy Solicitor General Neal Katyal has said: "Claims of 'inherent' power . . . fall flat given the fact that FISA has been enacted." Katyal & Caplan, *supra* at 1034. Solicitor General Elena Kagan has called the Bush administration's legal opinions justifying the TSP "expedient and unsupported," written by "lawyers who failed to respect the rule of law" and who do not understand that "the law and its precepts reign supreme, no matter how high and mighty the actor and no matter how urgent the problem." Elena Kagan, Address to Cadets at the United States Military Academy at West Point (Oct. 17, 2007), *available at* http://judiciary.senate.gov/nominations/ElenaKagan/upload/Kagan-Question-13d-Part-1.pdf. President Obama's nominee for Assistant Attorney General for the DOJ's Office of Legal Counsel, Dawn E. Johnsen, has written that the White Paper's inherent power theory is "extreme and implausible." Dawn E. Johnsen, *What's a President To Do? The Constitution In the Wake of Bush Administration Abuses*, 88 Boston U. L. Rev. 395, 405 (2008). Johnsen adds: "The Bush administration's 'unitary executive' and Commander-in-Chief theories, in my view, are clearly wrong and threaten both the constitutionally prescribed balance of powers and individual rights." *Id.* at 417.

In an amicus curiae brief filed in another TSP lawsuit, Associate Deputy Attorney General Donald B. Verrilli, Jr. (then co-chair of Jenner & Block's appellate and Supreme Court practice) compellingly debunked the Bush administration's inherent power theory, calling it "particularly dangerous because it comes at the expense of both Congress's and the judiciary's powers to defend the individual liberties of Americans." Brief for Amici Curiae Center for National Security Studies and the Constitution Project, *ACLU v. NSA*, 493 F.3d 644 (6th Cir. 2007), 2006 WL 4055623, *2. Verrilli said that in the *Steel Seizure Case* "the Supreme Court established that Congress can, even

during time of war, regulate the 'inherent power' of the President through duly enacted legislation. [Citation.] That is precisely what FISA does. In authorizing warrantless electronic surveillance in direct violation of FISA, the President is acting not only with power that is at its 'lowest ebb,' [citation], he is acting in violation of his constitutional duty to enforce the law as enacted by Congress, [citation]." *Id.* "Our Constitution was established to end – not enshrine – this kind of executive overreaching. . . . The NSA surveillance program upends the balance among the three branches of government, and thereby threatens bedrock liberties the constitution and the Bill of Rights are designed to protect." *Id.* at *14-15.[4/]

President Obama himself has acknowledged: "The Supreme Court has never held that the president has such [inherent] powers." Charlie Savage, *Barack Obama's Q&A*, BOSTON GLOBE, Dec. 20, 2007. President Obama expressly rejected the inherent power theory when he stated: "Warrantless surveillance of American citizens, in defiance of FISA, is unlawful and unconstitutional." *Id.*

Attorney General Eric Holder has embraced the view that FISA's exclusivity provision places presidential power at its "lowest ebb" within the meaning of Justice Jackson's formulation in the *Steel Seizure Case* for determining the extent of presidential power. *See Hearing Before Senate Judiciary Comm. on Nomination of Eric Holder to be Attorney General*, 110th Cong. (2009) *available at* http://www.nytimes.com/2009/01/16/us/politics/16text-holder.html?pagewanted=30 ("yes" answer to question whether "you see [the] FISA law as under Category 3" of Jackson's formulation). According to Holder, "it would be difficult to imagine . . . that the President would be acting in an appropriate way [through the TSP] given the Jackson construct." *Id.* Assistant Attorney General Kris agrees that FISA puts presidential power at its lowest ebb. *See Hearing Before Senate Select Intelligence Comm. on Nomination of David Kris to be Assistant Attorney General in Justice Department's National Security Division*, 110th Cong. (2009), CQ Congressional

---

4/ Associate Deputy Attorney General Verrilli's amicus curiae brief in *ACLU v. NSA* mirrors many of the same arguments plaintiffs set forth here regarding the White Paper's AUMF and inherent power theories – to such an extent that the brief compellingly supports a partial summary judgment of liability here. The brief is worth a read. A copy of it is attached as exhibit BB to the Declaration of Jon B. Eisenberg filed in support of this motion.

Transcripts, Congressional Hearings (March 10, 2009) at 17 ("yes" answer to question whether "any violation of FISA would be clearly in the third category of the Jackson test"). Kris adds: "I cannot think of any facts that would make the TSP constitutional in 2005 when it was revealed." *Id.*

Attorney General Holder eloquently repudiated the inherent power theory in a June 2008 speech condemning the TSP, stating:

- "[S]teps taken in the aftermath of 9/11 were both excessive and unlawful. Our government . . . approved secret [warrantless] electronic surveillance of American citizens . . . . These steps were wrong when they were initiated and they are wrong today. We owe the American people a reckoning."
- "I never thought that I would see that a president would act in direct defiance of federal law by authorizing warrantless NSA surveillance of American citizens. This disrespect for the rule of law is not only wrong, it is destructive in our struggle against terrorism."
- "We must utilize and enhance our intelligence collection capabilities to identify and root out terrorists, but we must also comply with the law. We must also comply with FISA." Eric Holder, Address at the Annual Convention of the American Constitution Society (June 13, 2008), *available at* http://www.acslaw.org/node/6720.

We could not have said it better ourselves.

### D. Both judges who have addressed the merits in other TSP litigation agree that the TSP was unlawful.

Two judges have addressed the merits of the White Paper's AUMF and inherent power theories – the district judge in *ACLU v. NSA*, 438 F.Supp.2d 754 (E.D. Mich. 2006), and a dissenting judge on appeal in that case, *ACLU v. NSA*, 493 F.3d 644 (6th Cir. 2007). Both judges rejected those theories and concluded that the TSP was unlawful.

In the district court, Judge Anna Diggs Taylor concluded that the AUMF "gives no support" to the defendants, 438 F.Supp.2d at 780, that "if the teachings of *Youngstown* are the law, the separation of powers doctrine has been violated," *id.* at 778, and that "[t]he argument that inherent powers justify the program here in litigation must fail," *id.* at 781. In the Court of Appeals, the majority ordered dismissal of the case for lack of standing without addressing the merits regarding the TSP's legality, but a dissenter, Judge Ronald Lee Gilman, concluded there was standing and

addressed the merits. Judge Gilman, too, rejected the AUMF and inherent power theories and concluded that the TSP was unlawful. 493 F.3d at 713-19. As Judge Gilman put it: "Once past [the standing] hurdle, the rest gets progressively easier. . . . [W]hen faced with the clear wording of FISA and Title III that these statutes provide the 'exclusive means' for the government to engage in electronic surveillance within the United States for foreign intelligence purposes, the conclusion becomes inescapable that the TSP was unlawful." *Id.* at 720.

Thus, the two judges who have addressed the merits of the White Paper's AUMF and inherent power theories have rejected those theories. This Court should do the same.

**E. FISA is not an unconstitutional intrusion on executive power.**

Finally, the White Paper suggests that if the TSP violates FISA, then FISA itself must be an unconstitutional intrusion on the President's Article II "commander in chief" role. The White Paper relies on an obscure bit of dictum in *In re Sealed Case*, 310 F.3d 717, 742 (For. Int. Surv. Ct. 2002), where the court described pre-FISA authority as saying "that the President did have inherent authority to conduct warrantless searches to obtain foreign intelligence information" and then commented "[w]e take for granted that the President does have that authority and, assuming that is so, FISA could not encroach on the President's constitutional power." *See* Decl. of Jon B. Eisenberg, exh. AA at 141, 163-64, 167-68.

But to say FISA cannot not encroach on presidential power is not to say FISA *categorically* does so. No judicial opinion – not even *In re Sealed Case* – has ever held so, and such a holding would run counter to Justice Jackson's prescription in the *Steel Seizure Case* for determining the extent of presidential power where, as here, Congress has acted in an area of concurrent legislative and executive authority. Plainly, the court in *In re Sealed Case* did not mean to say that *any* regulation of foreign intelligence gathering is an unconstitutional encroachment on presidential power, for the court held a portion of FISA constitutional in that very case. *See* 310 F.3d at 746.

The decision cited in *In re Sealed Case* for the proposition that the President has inherent authority to conduct warrantless foreign intelligence surveillance, *United States v. Truong Dinh Hung*, 629 F.2d 908 (4th Cir. 1980), addressed presidential power before FISA was enacted, as did two other pre-FISA decisions that mention inherent or implied presidential authority. *See United States v. Butenko*, 494 F.2d 593, 603 (3d Cir. 1974); *United States v. Brown*, 484 F.2d 418, 426 (5th

Cir. 1973). But according to Justice Jackson's prescription in the *Steel Seizure Case*, the President's authority was substantially changed by FISA. Before FISA, "in the absence of either a congressional grant or denial of authority," the President could "rely upon his own independent powers." *Steel Seizure Case*, 343 U.S. at 637. Now that Congress has taken action by enacting FISA, the President's power "is at its lowest ebb," and "he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* The opinion in *In re Sealed Case* cannot reasonably be construed to suggest, as the White Paper would have it, that FISA categorically encroaches on presidential power. The *Steel Seizure Case* says otherwise. The pre-FISA cases mentioning inherent presidential authority are eclipsed by FISA.

If the White Paper were right – that the President has *exclusive* constitutional authority over matters of national security to the exclusion of any legislation like FISA – then the Supreme Court would have held in *Hamdan v. Rumsfeld* that the UCMJ was unconstitutional; yet the Supreme Court held that inherent presidential power did *not* trump the UCMJ. Also unconstitutional would be legislation prohibiting torture, 18 U.S.C. §§ 2340-2340A; yet President Bush himself publicly conceded that "I don't think a President can order torture." *See* Eric Lichtblau & Adam Liptak, *Bush and His Senior Aides Press On in Legal Defense for Wiretapping Program*, N.Y. TIMES, Jan. 28 2006, at A13. President Obama has likewise proclaimed: "The President is not above the law, and the Commander-in-Chief power does not entitle him to use techniques that Congress has specifically banned as torture." Charlie Savage, *Barack Obama's Q&A*, BOSTON GLOBE, Dec. 20, 2007. Similarly, if the President has exclusive constitutional authority over matters of national security to the exclusion of congressional legislation, then statutes prescribing rules for governing occupied enemy territory would be unconstitutional; yet the Supreme Court held long ago that such statutes displaced presidential regulations that had governed such territory in the absence of legislation. *See Santiago v. Nogueras*, 214 U.S. 260, 265-55 (1909).

Ultimately, the *In re Sealed Case* dictum says nothing more about FISA than the general truism that Congress may not encroach on presidential power. Justice Jackson's opinion in the *Steel Seizure Case* provides the means for determining whether FISA *does* encroach on presidential power to the extent it requires warrants for foreign intelligence surveillance. Plainly it does not.

### F. Absent a genuine issue of material fact regarding plaintiffs' arguments on the merits, plaintiffs are entitled to a judgment of liability as a matter of law.

The liability issues in this case – whether FISA is trumped by the AUMF or inherent presidential power – are purely legal in nature, and their resolution requires no evidentiary submissions. Thus, there cannot be a genuine issue of material fact with regard to plaintiffs' arguments on the merits, because there are no factual issues at all. The liability issues are wholly amenable to resolution by partial summary judgment. Upon a summary determination that plaintiffs have Article III standing, the Court should proceed to summarily determine defendants' liability under 50 U.S.C. section 1810.[5]

## V. IF DEFENDANTS SUBMIT CLASSIFIED EVIDENCE IN OPPOSITION TO THIS MOTION, THE COURT SHOULD STRIKE THE EVIDENCE *SUA SPONTE* IF THE COURT DEEMS IT IRRELEVANT TO STANDING AND LIABILITY.

In the order of June 5, 2009, the Court stated that if defendants "rely upon the Sealed Document or other classified evidence in response" to this motion for partial summary judgment, "the court will enter a protective order and produce such classified evidence to those of plaintiffs' counsel who have obtained top secret/sensitive compartmented information clearances (Messrs. Eisenberg and Goldberg) for their review." Dkt. #96 at 2. Plaintiffs wish to propose some preliminary procedures in the event defendants submit classified evidence in response to this motion.

Plaintiffs ask that the Court first review any newly-submitted classified evidence *in camera* and *ex parte*, without giving Messrs. Eisenberg and Goldberg access to the evidence. If the purpose of defendants' submission of the evidence is to oppose summary judgment on plaintiffs' Article III standing, and the Court determines that the evidence is irrelevant to the factual issues pertaining to such standing – i.e., whether there was surveillance, whether the surveillance was electronic, and

---

5/ Because this Court has indicated its intent to adjudicate this motion for partial summary judgment only on plaintiffs' assertion of defendants' liability under 50 U.S.C. section 1810, this motion does not address the first amended complaint's allegations that plaintiffs' warrantless electronic surveillance violated the Fourth Amendment, the First Amendment, and the International Covenant on Civil and Political Rights. Nor does this motion address the personal liability of defendant Robert S. Mueller III, who, by agreement of the parties, has not yet made an appearance in this action.

whether the electronic surveillance was warrantless – plaintiffs propose that the Court strike the evidence *sua sponte* as inadmissible on the issue of Article III standing pursuant to Rule 402 of the Federal Rules of Evidence ("Evidence which is not relevant is not admissible."). If the purpose of defendants' submission of the evidence is to oppose summary judgment of liability on the merits, plaintiffs propose that the Court strike the evidence *sua sponte* as irrelevant, again pursuant to Rule 402, because the merits issues are purely legal and their resolution does not depend on any evidentiary showing. If the Court determines to strike the evidence *sua sponte*, there will be no need for Messrs. Eisenberg and Goldberg to have access to it and they will not seek such access.

If the Court does not strike the evidence *sua sponte*, we understand that the Court will proceed as prescribed in the order of June 5, 2009, by entering a protective order and producing the evidence to Messrs. Eisenberg and Goldberg for their review. In the event that occurs, there will be no need for the Court to order defendants to "disclose" the classified evidence to plaintiffs – and thus no need for an order "granting disclosure of applications, orders, or other materials relating to a surveillance" within the meaning of 50 U.S.C. § 1806(h) – because the evidence will be in the Court's files, and thus no such "disclosure" order will be necessary. Rather, the Court can simply issue the protective order and give Messrs. Eisenberg and Goldberg access to the evidence in the Court's files under the secure conditions prescribed by the protective order. In that way, the case can proceed expeditiously to what the Court described at the June 3, 2009 hearing as "a coherent conclusion" of the litigation in the district court "which would permit effective appellate review," avoiding the potential for another interlocutory detour to the Court of Appeals – which defendants claim a "disclosure" order would engender – in a posture where, as the Court put it, "the issues had not been sufficiently teed up at the trial court." Dkt. #95 at 26-27.

## CONCLUSION

For the foregoing reasons, this court should grant a partial summary judgment of plaintiffs' Article III standing and defendants' liability under 50 U.S.C. section 1810.

DATED this 9th day of July, 2009

/s/ Jon B. Eisenberg

Jon B. Eisenberg, Calif. Bar No. 88278
William N. Hancock, Calif. Bar No. 104501
Steven Goldberg, Ore. Bar No. 75134
Thomas H. Nelson, Oregon Bar. No. 78315
Zaha S. Hassan, Ore. Bar No. 97062
J. Ashlee Albies, Ore. Bar No. 05184
Lisa Jaskol, Calif. Bar No. 138769

**Attorneys for Plaintiffs Al-Haramain Islamic Foundation, Inc., Wendell Belew, and Asim Ghafoor**