# EXHIBIT A



Dockets.Justia.com

THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH

CLICK HERE TO PRINT




For Immediate Release
Office of the Press Secretary
December 17, 2005

# President's Radio Address
The Roosevelt Room

- In Focus: Homeland Security
- En Español



VIDEO Multimedia

President's Remarks
view

10:06 A.M. EST

THE PRESIDENT: Good morning.

As President, I took an oath to defend the Constitution, and I have no greater responsibility than to protect our people, our freedom, and our way of life. On September the 11th, 2001, our freedom and way of life came under attack by brutal enemies who killed nearly 3,000 innocent Americans. We're fighting these enemies across the world. Yet in this first war of the 21st century, one of the most critical battlefronts is the home front. And since September the 11th, we've been on the offensive against the terrorists plotting within our borders.



One of the first actions we took to protect America after our nation was attacked was to ask Congress to pass the Patriot Act. The Patriot Act tore down the legal and bureaucratic wall that kept law enforcement and intelligence authorities from sharing vital information about terrorist threats. And the Patriot Act allowed federal investigators to pursue terrorists with tools they already used against other criminals. Congress passed this law with a large, bipartisan majority, including a vote of 98-1 in the United States Senate.

Since then, America's law enforcement personnel have used this critical law to prosecute terrorist operatives and supporters, and to break up terrorist cells in New York, Oregon, Virginia, California, Texas and Ohio. The Patriot Act has accomplished exactly what it was designed to do: it has protected American liberty and saved American lives.

Yet key provisions of this law are set to expire in two weeks. The terrorist threat to our country will not expire in two weeks. The terrorists want to attack America again, and inflict even greater damage than they did on September the 11th. Congress has a responsibility to ensure that law enforcement and intelligence officials have the tools they need to protect the American people.

The House of Representatives passed reauthorization of the Patriot Act. Yet a minority of senators filibustered to block the renewal of the Patriot Act when it came up for a vote yesterday. That decision is irresponsible, and it endangers the lives of our citizens. The senators who are filibustering must stop their delaying tactics, and the Senate must vote to reauthorize the Patriot Act. In the war on terror, we cannot afford to be without this law for a single moment.

To fight the war on terror, I am using authority vested in me by Congress, including the Joint Authorization for Use

of Military Force, which passed overwhelmingly in the first week after September the 11th. I'm also using constitutional authority vested in me as Commander-in-Chief.

In the weeks following the terrorist attacks on our nation, I authorized the National Security Agency, consistent with U.S. law and the Constitution, to intercept the international communications of people with known links to al Qaeda and related terrorist organizations. Before we intercept these communications, the government must have information that establishes a clear link to these terrorist networks.

This is a highly classified program that is crucial to our national security. Its purpose is to detect and prevent terrorist attacks against the United States, our friends and allies. Yesterday the existence of this secret program was revealed in media reports, after being improperly provided to news organizations. As a result, our enemies have learned information they should not have, and the unauthorized disclosure of this effort damages our national security and puts our citizens at risk. Revealing classified information is illegal, alerts our enemies, and endangers our country.

As the 9/11 Commission pointed out, it was clear that terrorists inside the United States were communicating with terrorists abroad before the September the 11th attacks, and the commission criticized our nation's inability to uncover links between terrorists here at home and terrorists abroad. Two of the terrorist hijackers who flew a jet into the Pentagon, Nawaf al Hamzi and Khalid al Mihdhar, communicated while they were in the United States to other members of al Qaeda who were overseas. But we didn't know they were here, until it was too late.

The authorization I gave the National Security Agency after September the 11th helped address that problem in a way that is fully consistent with my constitutional responsibilities and authorities. The activities I have authorized make it more likely that killers like these 9/11 hijackers will be identified and located in time. And the activities conducted under this authorization have helped detect and prevent possible terrorist attacks in the United States and abroad.

ARCHIVES

**Radio Address**

- 2006
- 2005
- 2004
- 2003
- 2002
- 2001

**Radio Interviews**

- 2005
- 2004

The activities I authorized are reviewed approximately every 45 days. Each review is based on a fresh intelligence assessment of terrorist threats to the continuity of our government and the threat of catastrophic damage to our homeland. During each assessment, previous activities under the authorization are reviewed. The review includes approval by our nation's top legal officials, including the Attorney General and the Counsel to the President. I have reauthorized this program more than 30 times since the September the 11th attacks, and I intend to do so for as long as our nation faces a continuing threat from al Qaeda and related groups.

The NSA's activities under this authorization are thoroughly reviewed by the Justice Department and NSA's top legal officials, including NSA's general counsel and inspector general. Leaders in Congress have been briefed more than a dozen times on this authorization and the activities conducted under it. Intelligence officials involved in this activity also receive extensive training to ensure they perform their duties consistent with the letter and intent of the authorization.

This authorization is a vital tool in our war against the terrorists. It is critical to saving American lives. The American people expect me to do everything in my power under our laws and Constitution to protect them and their civil liberties. And that is exactly what I will continue to do, so long as I'm the President of the United States.

Thank you.

END 10:13 A.M. EST

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2005/12/20051217.html

CLICK HERE TO PRINT

003

# EXHIBIT B

THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH

CLICK HERE TO PRINT

For Immediate Release
Office of the Press Secretary
December 19, 2005

# Press Conference of the President
The East Room

en Español



VIDEO Multimedia

President's Remarks

view

10:32 A.M. EST

THE PRESIDENT: Welcome. Please be seated. Thanks.

Last night I addressed the nation about our strategy for victory in Iraq, and the historic elections that took place in the country last week. In a nation that once lived by the whims of a brutal dictator, the Iraqi people now enjoy constitutionally protected freedoms, and their leaders now derive their powers from the consent of the government. Millions of Iraqis are looking forward to a future with hope and optimism.



The Iraqi people still face many challenges. This is the first time the Iraqis are forming a government under their new constitution. The Iraqi constitution requires a two-thirds vote of the parliament for certain top officials. So the formation of the new government will take time as Iraqis work to build consensus. And once the new Iraqi government assumes office, Iraq's new leaders will face many important decisions on issues such as security and reconstruction, economic reform and national unity. The work ahead will require the patience of the Iraqi people and the patience and support of America and our coalition partners.

As I said last night, this election does not mean the end of violence, but it is the beginning of something new: a constitutional democracy at the heart of the Middle East. And we will keep working toward our goal of a democratic Iraq that can govern and self-sustain itself and defend itself.

Our mission in Iraq is critical in the victory in the global war on terror. After our country was attacked on September the 11th and nearly 3,000 lives were lost, I vowed to do everything within my power to bring justice to those who were responsible. I also pledged to the American people to do everything within my power to prevent this from happening again. What we quickly learned was that al Qaeda was not a conventional enemy. Some lived in our cities and communities, and communicated from here in America to plot and plan with bin Laden's lieutenants in Afghanistan, Pakistan and elsewhere. Then they boarded our airplanes and launched the worst attack on our country in our nation's history.

This new threat required us to think and act differently. And as the 9/11 Commission pointed out, to prevent this from happening again, we need to connect the dots before the enemy attacks, not after. And we need to recognize that dealing with al Qaeda is not simply a matter of law enforcement; it requires defending the country against an enemy that declared war against the United States of America.

As President and Commander-in-Chief, I have the constitutional responsibility and the constitutional authority to protect our country. Article II of the Constitution gives me that responsibility and the authority necessary to fulfill it. And after September the 11th, the United States Congress also granted me additional authority to use military force against al Qaeda.

But it happened. And it happened because the Iraqis want to live in a free society. And what's important about this election is that Iraq will become an ally in the war on terror, and Iraq will serve as a beacon for what is possible; a beacon of freedom in a part of the world that is desperate for freedom and liberty. And as I say in my speeches, a free Iraq will serve as such an optimistic and hopeful example for reformers from Tehran to Damascus. And that's an important part of a strategy to help lay the foundation of peace for generations.

John.

Q Thank you, Mr. President. So many questions, so little time.

THE PRESIDENT: Well, keep your question short, then. (Laughter.)

Q I'll do my best, sir. But, sir, you've shown a remarkable spirit of candor in the last couple of weeks in your conversation and speeches about Iraq. And I'm wondering if, in that spirit, I might ask you a question that you didn't seem to have an answer for the last time you were asked, and that is, what would you say is the biggest mistake you've made during your presidency, and what have you learned from it?

THE PRESIDENT: Answering Dickerson's question. No, I -- the last time those questions were asked, I really felt like it was an attempt for me to say it was a mistake to go into Iraq. And it wasn't a mistake to go into Iraq. It was the right decision to make.

I think that, John, there's going to be a lot of analysis done on the decisions on the ground in Iraq. For example, I'm fully aware that some have said it was a mistake not to put enough troops there immediately -- or more troops. I made my decision based upon the recommendations of Tommy Franks, and I still think it was the right decision to make. But history will judge.

I said the other day that a mistake was trying to train a civilian defense force and an Iraqi army at the same time, but not giving the civilian defense force enough training and tools necessary to be able to battle a group of thugs and killers. And so we adjusted.

And the point I'm trying to make to the American people in this, as you said, candid dialogue -- I hope I've been candid all along; but in the candid dialogue -- is to say, we're constantly changing our tactics to meet the changing tactics of an enemy. And that's important for our citizens to understand.

Thank you. Kelly.

Q Thank you, Mr. President. If you believe that present law needs to be faster, more agile concerning the surveillance of conversations from someone in the United States to someone outside the country --

THE PRESIDENT: Right.

Q -- why, in the four years since 9/11, has your administration not sought to get changes in the law instead of bypassing it, as some of your critics have said?

THE PRESIDENT: I appreciate that. First, I want to make clear to the people listening that this program is limited in nature to those that are known al Qaeda ties and/or affiliates. That's important. So it's a program that's limited, and you brought up something that I want to stress, and that is, is that these calls are not intercepted within the country. They are from outside the country to in the country, or vice versa. So in other words, this is not a -- if you're calling from Houston to L.A., that call is not monitored. And if there was ever any need to monitor, there would be a process to do that.

I think I've got the authority to move forward, Kelly. I mean, this is what -- and the Attorney General was out briefing this morning about why it's legal to make the decisions I'm making. I can fully understand why members of Congress are expressing concerns about civil liberties. I know that. And it's -- I share the same concerns. I want to make sure the American people understand, however, that we have an obligation to protect you, and we're doing that and, at the same time, protecting your civil liberties.

006

# EXHIBIT C

the White House
President George W. Bush

Click to Print this document

For Immediate Release
Office of the Press Secretary
December 19, 2005

# Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence

James S. Brady Briefing Room

8:30 A.M. EST

MR. McCLELLAN: Good morning, everybody. I've got with me the Attorney General and General Hayden here this morning to brief you on the legal issues surrounding the NSA authorization and take whatever questions you have for them on that. The Attorney General will open with some comments and then they'll be glad to take your questions.

And with that, I'll turn it over to General Gonzales.

ATTORNEY GENERAL GONZALES: Thanks, Scott.

The President confirmed the existence of a highly classified program on Saturday. The program remains highly classified; there are many operational aspects of the program that have still not been disclosed and we want to protect that because those aspects of the program are very, very important to protect the national security of this country. So I'm only going to be talking about the legal underpinnings for what has been disclosed by the President.

The President has authorized a program to engage in electronic surveillance of a particular kind, and this would be the intercepts of contents of communications where one of the -- one party to the communication is outside the United States. And this is a very important point -- people are running around saying that the United States is somehow spying on American citizens calling their neighbors. Very, very important to understand that one party to the communication has to be outside the United States.

Another very important point to remember is that we have to have a reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda. We view these authorities as authorities to confront the enemy in which the United States is at war with -- and that is al Qaeda and those who are supporting or affiliated with al Qaeda.

What we're trying to do is learn of communications, back and forth, from within the United States to overseas with members of al Qaeda. And that's what this program is about.

Now, in terms of legal authorities, the Foreign Intelligence Surveillance Act provides -- requires a court order before engaging in this kind of surveillance that I've just discussed and the President announced on Saturday, unless there is somehow -- there is -- unless otherwise authorized by statute or by Congress. That's what the law requires. Our position is, is that the authorization to use force, which was passed by the Congress in the days following September 11th, constitutes that other authorization, that other statute by Congress, to engage in this kind of signals intelligence.

Now, that -- one might argue, now, wait a minute, there's nothing in the authorization to use force that specifically mentions electronic surveillance. Let me take you back to a case that the Supreme Court reviewed this past -- in 2004, the Hamdi decision. As you remember, in that case, Mr. Hamdi was a U.S. citizen who was contesting his detention by the United States government. What he said was that there is a statute, he said, that specifically prohibits the detention of American citizens without permission, an act by Congress -- and he's right, 18 USC 4001a requires that the United States government cannot detain an American citizen except by an act of

Congress.

We took the position -- the United States government took the position that Congress had authorized that detention in the authorization to use force, even though the authorization to use force never mentions the word "detention." And the Supreme Court, a plurality written by Justice O'Connor agreed. She said, it was clear and unmistakable that the Congress had authorized the detention of an American citizen captured on the battlefield as an enemy combatant for the remainder -- the duration of the hostilities. So even though the authorization to use force did not mention the word, "detention," she felt that detention of enemy soldiers captured on the battlefield was a fundamental incident of waging war, and therefore, had been authorized by Congress when they used the words, "authorize the President to use all necessary and appropriate force."

For the same reason, we believe signals intelligence is even more a fundamental incident of war, and we believe has been authorized by the Congress. And even though signals intelligence is not mentioned in the authorization to use force, we believe that the Court would apply the same reasoning to recognize the authorization by Congress to engage in this kind of electronic surveillance.

I might also add that we also believe the President has the inherent authority under the Constitution, as Commander-in-Chief, to engage in this kind of activity. Signals intelligence has been a fundamental aspect of waging war since the Civil War, where we intercepted telegraphs, obviously, during the world wars, as we intercepted telegrams in and out of the United States. Signals intelligence is very important for the United States government to know what the enemy is doing, to know what the enemy is about to do. It is a fundamental incident of war, as Justice O'Connor talked about in the Hamdi decision. We believe that -- and those two authorities exist to allow, permit the United States government to engage in this kind of surveillance.

The President, of course, is very concerned about the protection of civil liberties, and that's why we've got strict parameters, strict guidelines in place out at NSA to ensure that the program is operating in a way that is consistent with the President's directives. And, again, the authorization by the President is only to engage in surveillance of communications where one party is outside the United States, and where we have a reasonable basis to conclude that one of the parties of the communication is either a member of al Qaeda or affiliated with al Qaeda.

Mike, do you want to -- have anything to add?

GENERAL HAYDEN: I'd just add, in terms of what we do globally with regard to signals intelligence, which is a critical part of defending the nation, there are probably no communications more important to what it is we're trying to do to defend the nation; no communication is more important for that purpose than those communications that involve al Qaeda, and one end of which is inside the homeland, one end of which is inside the United States. Our purpose here is to detect and prevent attacks. And the program in this regard has been successful.

Q General, are you able to say how many Americans were caught in this surveillance?

ATTORNEY GENERAL GONZALES: I'm not -- I can't get into the specific numbers because that information remains classified. Again, this is not a situation where -- of domestic spying. To the extent that there is a moderate and heavy communication involving an American citizen, it would be a communication where the other end of the call is outside the United States and where we believe that either the American citizen or the person outside the United States is somehow affiliated with al Qaeda.

Q General, can you tell us why you don't choose to go to the FISA court?

ATTORNEY GENERAL GONZALES: Well, we continue to go to the FISA court and obtain orders. It is a very important tool that we continue to utilize. Our position is that we are not legally required to do, in this particular case, because the law requires that we -- FISA requires that we get a court order, unless authorized by a statute, and we believe that authorization has occurred.

The operators out at NSA tell me that we don't have the speed and the agility that we need, in all circumstances, to deal with this new kind of enemy. You have to remember that FISA was passed by the Congress in 1978. There have been tremendous advances in technology --

Q But it's been kind of retroactively, hasn't it?

ATTORNEY GENERAL GONZALES: -- since then. Pardon me?

Q It's been done retroactively before, hasn't it?

ATTORNEY GENERAL GONZALES: What do you mean, "retroactively"?

Q You just go ahead and then you apply for the FISA clearance, because it's damn near automatic.

ATTORNEY GENERAL GONZALES: If we -- but there are standards that have to be met, obviously, and you're right, there is a procedure where we -- an emergency procedure that allows us to make a decision to authorize -- to utilize FISA, and then we go to the court and get confirmation of that authority.

But, again, FISA is very important in the war on terror, but it doesn't provide the speed and the agility that we need in all circumstances to deal with this new kind of threat.

Q But what -- go ahead.

GENERAL HAYDEN: Let me just add to the response to the last question. As the Attorney General says, FISA is very important, we make full use of FISA. But if you picture what FISA was designed to do, FISA is designed to handle the needs in the nation in two broad categories: there's a law enforcement aspect of it; and the other aspect is the continued collection of foreign intelligence. I don't think anyone could claim that FISA was envisaged as a tool to cover armed enemy combatants in preparation for attacks inside the United States. And that's what this authorization under the President is designed to help us do.

Q Have you identified armed enemy combatants, through this program, in the United States?

GENERAL HAYDEN: This program has been successful in detecting and preventing attacks inside the United States.

Q General Hayden, I know you're not going to talk about specifics about that, and you say it's been successful. But would it have been as successful -- can you unequivocally say that something has been stopped or there was an imminent attack or you got information through this that you could not have gotten through going to the court?

GENERAL HAYDEN: I can say unequivocally, all right, that we have got information through this program that would not otherwise have been available.

Q Through the court? Because of the speed that you got it?

GENERAL HAYDEN: Yes, because of the speed, because of the procedures, because of the processes and requirements set up in the FISA process, I can say unequivocally that we have used this program in lieu of that and this program has been successful.

Q But one of the things that concerns people is the slippery slope. If you said you absolutely need this program, you have to do it quickly -- then if you have someone you suspect being a member of al Qaeda, and they're in the United States, and there is a phone call between two people in the United States, why not use that, then, if it's so important? Why not go that route? Why not go further?

GENERAL HAYDEN: Across the board, there is a judgment that we all have to make -- and I made this speech a day or two after 9/11 to the NSA workforce -- I said, free peoples always have to judge where they want to be on that spectrum between security and liberty; that there will be great pressures on us after those attacks to move our national banner down in the direction of security. What I said to the NSA workforce is, our job is to keep Americans free by making Americans feel safe again. That's been the mission of the National Security Agency since the day after the attack, is when I talked -- two days after the attack is when I said that to the workforce.

ATTORNEY GENERAL GONZALES: I'm not confirming the existence of opinions or the non-existence of opinions. I've offered up today our legal analysis of the authorities of this President.

Q Sir, can you explain, please, the specific inadequacies in FISA that have prevented you from sort of going through the normal channels?

GENERAL HAYDEN: One, the whole key here is agility. And let me re-trace some grounds I tried to suggest earlier. FISA was built for persistence. FISA was built for long-term coverage against known agents of an enemy power. And the purpose involved in each of those -- in those cases was either for a long-term law enforcement purpose or a long-term intelligence purpose.

This program isn't for that. This is to detect and prevent. And here the key is not so much persistence as it is agility. It's a quicker trigger. It's a subtly softer trigger. And the intrusion into privacy -- the intrusion into privacy is significantly less. It's only international calls. The period of time in which we do this is, in most cases, far less than that which would be gained by getting a court order. And our purpose here, our sole purpose is to detect and prevent.

Again, I make the point, what we are talking about here are communications we have every reason to believe are al Qaeda communications, one end of which is in the United States. And I don't think any of us would want any inefficiencies in our coverage of those kinds of communications, above all. And that's what this program allows us to do -- it allows us to be as agile as operationally required to cover these targets.

Q But how does FISA --

GENERAL HAYDEN: FISA involves the process -- FISA involves marshaling arguments; FISA involves looping paperwork around, even in the case of emergency authorizations from the Attorney General. And beyond that, it's a little -- it's difficult for me to get into further discussions as to why this is more optimized under this process without, frankly, revealing too much about what it is we do and why and how we do it.

Q If FISA didn't work, why didn't you seek a new statute that allowed something like this legally?

ATTORNEY GENERAL GONZALES: That question was asked earlier. We've had discussions with members of Congress, certain members of Congress, about whether or not we could get an amendment to FISA, and we were advised that that was not likely to be -- that was not something we could likely get, certainly not without jeopardizing the existence of the program, and therefore, killing the program. And that -- and so a decision was made that because we felt that the authorities were there, that we should continue moving forward with this program.

Q And who determined that these targets were al Qaeda? Did you wiretap them?

GENERAL HAYDEN: The judgment is made by the operational work force at the National Security Agency using the information available to them at the time, and the standard that they apply -- and it's a two-person standard that must be signed off by a shift supervisor, and carefully recorded as to what created the operational imperative to cover any target, but particularly with regard to those inside the United States.

Q So a shift supervisor is now making decisions that a FISA judge would normally make? I just want to make sure I understand. Is that what you're saying?

GENERAL HAYDEN: What we're trying to do is to use the approach we have used globally against al Qaeda, the operational necessity to cover targets. And the reason I emphasize that this is done at the operational level is to remove any question in your mind that this is in any way politically influenced. This is done to chase those who would do harm to the United States.

Q Building on that, during --

Q Thank you, General. Roughly when did those conversations occur with members of Congress?

# EXHIBIT D

UNCLASSIFIED

NATIONAL SECURITY AGENCY
CENTRAL SECURITY SERVICE
FORT GEORGE G. MEADE, MARYLAND 20755-6000

19 December 2006

Honorable Arlen Specter
Chairman
Committee on the Judiciary
United States Senate
224 Dirksen Senate Office Building
Washington, DC 20510

Dear Mr. Chairman:

Enclosed please find responses to your 6 September 2006 letter regarding follow-up questions from my testimony at the "FISA for the 21st Century" hearing.

If you have any questions, please call me or Michael Lawrence, Director of Legislative Affairs.

V/R

KEITH B. ALEXANDER
Lieutenant General, U.S. Army
Director, NSA

Encl:
a/s

UNCLASSIFIED

**Senator Edward M. Kennedy**
**FISA for the 21st Century**
**Wednesday, July 26, 2006**
**Questions for Lt. General Keith B. Alexander**

1. In a White House press briefing on December 19, 2005, Attorney General Gonzales said that the standard for beginning surveillance on an individual under the NSA warrantless wiretapping program is "a *reasonable basis* to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda." Similarly, in a session with *The San Diego Union-Tribune*, published on February 5, 2006, General Hayden said that the constitutional standard under the Fourth Amendment is "*reasonableness*," ignoring the probable cause provision of the Fourth Amendment.

   However, as General Hayden told the Senate Judiciary Committee on July 26, 2006, "There is a *probable cause* standard, before any communication is intercepted, that one or both communicants is, again, to a probable cause standard, associated with al Qaeda."

1a. Is the standard used by the NSA reasonableness or probable cause, in determining the targets for wiretapping under the NSA's warrantless wiretapping program? Has the standard ever changed from "probable cause" at any time, for any reasonable period, since September 11th?

ANSWER: (U) The Department of Justice is in a better position to discuss the "probable cause" standard. Nevertheless, the Terrorist Surveillance Program is narrowly tailored to target for interception only communications where one party is outside the United States and there are reasonable grounds to believe that at least one party is a member or agent of al Qaeda or an affiliated terrorist organization. The Program has consistently employed this standard. The "reasonable grounds to believe" standard is synonymous with "probable cause." *See, e.g., Maryland v. Pringle*, 540 U.S. 366, 371 (2003) ("We have stated . . . that '[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt.'") (internal quotation omitted).

2. The bill negotiated between Senator Specter and the Administration would allow authorization of a spying program targeted not just at members of al Qaeda but at anyone "reasonably believed to have communication with or be associated with" *any* foreign powers or their agents engaged in terrorism preparations. This broad standard could sweep in thousands of innocent Americans who are unaware that someone in the federal government has determined that they are "associated with" a person the government considers to be a terrorist.

Question:

2a. What is the justification for a standard that is even broader than the current standard, which requires probable cause that one person involved in the communication is directly "affiliated with al Qaeda" or "associated with al Qaeda" [The standard most recently

# EXHIBIT E

PROVIDED BY
FindLaw
WWW.FINDLAW.COM

U.S. Department of Justice

*Washington, D.C. 20530*

January 19, 2006

# LEGAL AUTHORITIES SUPPORTING THE ACTIVITIES OF THE NATIONAL SECURITY AGENCY DESCRIBED BY THE PRESIDENT

As the President has explained, since shortly after the attacks of September 11, 2001, he has authorized the National Security Agency ("NSA") to intercept international communications into and out of the United States of persons linked to al Qaeda or related terrorist organizations. The purpose of these intercepts is to establish an early warning system to detect and prevent another catastrophic terrorist attack on the United States. This paper addresses, in an unclassified form, the legal basis for the NSA activities described by the President ("NSA activities").

## SUMMARY

On September 11, 2001, the al Qaeda terrorist network launched the deadliest foreign attack on American soil in history. Al Qaeda's leadership repeatedly has pledged to attack the United States again at a time of its choosing, and these terrorist organizations continue to pose a grave threat to the United States. In response to the September 11th attacks and the continuing threat, the President, with broad congressional approval, has acted to protect the Nation from another terrorist attack. In the immediate aftermath of September 11th, the President promised that "[w]e will direct every resource at our command—every means of diplomacy, every tool of intelligence, every tool of law enforcement, every financial influence, and every weapon of war—to the destruction of and to the defeat of the global terrorist network." President Bush Address to a Joint Session of Congress (Sept. 20, 2001). The NSA activities are an indispensable aspect of this defense of the Nation. By targeting the international communications into and out of the United States of persons reasonably believed to be linked to al Qaeda, these activities provide the United States with an early warning system to help avert the next attack. For the following reasons, the NSA activities are lawful and consistent with civil liberties.

The NSA activities are supported by the President's well-recognized inherent constitutional authority as Commander in Chief and sole organ for the Nation in foreign affairs to conduct warrantless surveillance of enemy forces for intelligence purposes to detect and disrupt armed attacks on the United States. The President has the chief responsibility under the Constitution to protect America from attack, and the Constitution gives the President the authority necessary to fulfill that solemn responsibility. The President has made clear that he will exercise all authority available to him, consistent with the Constitution, to protect the people of the United States.

# EXHIBIT F

# SPYING ON THE HOME FRONT

FRONTLINE



## INTERVIEW John Yoo



**John Yoo** was the deputy assistant attorney general in the Justice Department's Office of Legal Counsel from 2001 to 2003. During that time Yoo helped draft the Patriot Act and was reportedly an author of the legal basis for the NSA domestic surveillance program. He does not deny his involvement in that project. This is the edited transcript of an interview conducted on Jan. 10, 2007.

### HIGHLIGHTS

- Why fighting terrorism requires more military and surveillance authority on U.S. soil
- How broader surveillance efforts help find terrorists
- Why couldn't the NSA program have been run through FISA?
- Did the president violate the FISA law?

**... Most people have never heard of the Office of Legal Counsel in the Justice Department. ... What is its power? What is its function?**

Its power is to interpret the Constitution and federal laws on behalf of the president and the attorney general. This is extremely important in peacetime, but in wartime it's of the utmost importance, because war, just by its nature, expands the power of the presidency and expands the power of the national government as a whole. Most of the things that happen in wartime have never come up for a decision by the courts, so it's really the attorney general, the Justice Department and the president who have had the primary role throughout our history of interpreting the powers of the president, the powers of the government in war.

**point your guns.**

Right. I mean, you wouldn't say you're authorized to shoot the gun, but we're not going to allow you to figure out where to point it. The whole point of authorization is not just to use force, but all the ancillary powers that we have traditionally used as a nation to effectively do that. One of those is gathering intelligence. Another one is detaining members of the enemy that we capture.

**And gathering intelligence then means gathering intelligence at home as well as abroad.**

I think that's right. Again, if you're going to gather intelligence and follow members of Al Qaeda outside the United States, you don't want to make the United States some kind of safe haven where once they cross the borders into our country it actually becomes harder to find them and track them down. That would be perverse; exactly the reverse kind of powers that you want our government to have when it's fighting especially this kind of enemy, which tries to infiltrate our borders and launch surprise attacks.

**[What were you trying to get done with the Patriot Act?]**

Well, one thing is to make clear it's war and that the power of the president in wartime has been activated. The second thing we wanted to do was to figure out what problems had there been in the way the government was doing business that had allowed Al Qaeda to succeed and to try to remove those barriers, obviously consistent with the Constitution. The Patriot Act was an effort to do that, to pull down self-imposed restraints which weren't legally required or were unnecessary that had hamstrung our government from being able to track down and defeat Al Qaeda terrorist cells in our country.

**Now, at the same time you were working with the White House and others in expanding the potential for the use of the National Security Agency [NSA] to gather intelligence. That right?**

I can't go farther than what's been released publicly. As the White House has said, the National Security Agency intercepts communications from abroad coming into the country where someone on the calls is a suspected member of Al Qaeda. The press has reported and I haven't denied that I worked on the legal authorization for those programs.

**This would be the legal authorization for the warrantless eavesdropping.**

Right.

016

# EXHIBIT G

**TRANSCRIPT**

May 15, 2007

COMMITTEE HEARING

SEN. PATRICK J. LEAHY
CHAIRMAN

SENATE JUDICIARY COMMITTEE
WASHINGTON, D.C.

SEN. PATRICK J. LEAHY HOLDS A HEARING ON THE U.S. ATTORNEY FIRINGS

CQ Transcriptions, LLC
1255 22nd Street N.W.
Washington, D.C. 20037
Transcript/Programming: Tel. 301-731-1728
Sales: Tel. 202-419-8500 ext 599
sales@cq.com
www.cq.com

Copyright 2007 CQ Transcriptions, LLC
All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions. You may not alter or remove any trademark, copyright or other notice from copies of the content.

the political needs of the president's party.

Before we get to the other issues, I want to go back to an incident from the time that Mr. Gonzales served as White House counsel.

There have been media reports describing a dramatic visit by Alberto Gonzales and Chief of Staff Andrew Card to the hospital bed of John Ashcroft in March 2004, after you, as acting attorney general, decided not to authorize a classified program.

First, can you confirm that a night-time hospital visit took place?

COMEY: Yes, I can.

SCHUMER: OK.

Can you remember the date and the day?

COMEY: Yes, sir, very well. It was Wednesday, March the 10th, 2004.

SCHUMER: And how do you remember that date so well?

COMEY: This was a very memorable period in my life; probably the most difficult time in my entire professional life. And that night was probably the most difficult night of my professional life. So it's not something I'd forget.

SCHUMER: Were you present when Alberto Gonzales visited Attorney General Ashcroft's bedside?

COMEY: Yes.

SCHUMER: And am I correct that the conduct of Mr. Gonzales and Mr. Card on that evening troubled you greatly?

COMEY: Yes.

SCHUMER: OK.

Let me go back and take it from the top.

You rushed to the hospital that evening. Why?

COMEY: I'm only hesitating because I need to explain why.

SCHUMER: Please. I'll give you all the time you need, sir.

COMEY: I've actually thought quite a bit over the last three years about how I would answer that question if it was ever asked, because I assumed that at some point I would have to testify about it.

The one thing I'm not going to do and be very, very careful about is, because this involved a classified program, I'm not going to get anywhere near classified information. I also am very leery of, and will not, reveal the content of advice I gave as a lawyer, the deliberations I engaged in. I think it's very important for the Department of Justice that someone who held my position not do that.

SCHUMER: In terms of privilege.

COMEY: Yes, sir.

SCHUMER: Understood.

COMEY: Subject to that, I -- and I'm uncomfortable talking about this...

SCHUMER: I understand.

COMEY: ... but I'll answer the question.

I -- to understand what happened that night, I, kind of, got to back up about a week.

SCHUMER: Please.

COMEY: In the early part of 2004, the Department of Justice was engaged -- the Office of Legal Counsel, under my supervision -- in a reevaluation both factually and legally of a particular classified program. And it was a program that was renewed on a regular basis, and required signature by the attorney general certifying to its legality.

And the -- and I remember the precise date. The program had to be renewed by March the 11th, which was a Thursday, of 2004. And we were engaged in a very intensive reevaluation of the matter.

And a week before that March 11th deadline, I had a private meeting with the attorney general for an hour, just the two of us, and

I laid out for him what we had learned and what our analysis was in this particular matter.

And at the end of that hour-long private session, he and I agreed on a course of action. And within hours he was stricken and taken very, very ill...

SCHUMER: (inaudible) You thought something was wrong with how it was being operated or administered or overseen.

COMEY: We had -- yes. We had concerns as to our ability to certify its legality, which was our obligation for the program to be renewed.

The attorney general was taken that very afternoon to George Washington Hospital, where he went into intensive care and remained there for over a week. And I became the acting attorney general.

And over the next week -- particularly the following week, on Tuesday -- we communicated to the relevant parties at the White House and elsewhere our decision that as acting attorney general I would not certify the program as to its legality and explained our reasoning in detail, which I will not go into here. Nor am I confirming it's any particular program.

That was Tuesday that we communicated that.

COMEY: The next day was Wednesday, March the 10th, the night of the hospital incident. And I was headed home at about 8 o'clock that evening, my security detail was driving me. And I remember exactly where I was -- on Constitution Avenue -- and got a call from Attorney General Ashcroft's chief of staff telling me that he had gotten a call...

SCHUMER: What's his name?

COMEY: David Ayers.

That he had gotten a call from Mrs. Ashcroft from the hospital. She had banned all visitors and all phone calls. So I hadn't seen him or talked to him because he was very ill.

And Mrs. Ashcroft reported that a call had come through, and that as a result of that call Mr. Card and Mr. Gonzales were on their way to the hospital to see Mr. Ashcroft.

SCHUMER: Do you have any idea who that call was from?

COMEY: I have some recollection that the call was from the president himself, but I don't know that for sure. It came from the White House. And it came through and the call was taken in the hospital.

So I hung up the phone, immediately called my chief of staff, told him to get as many of my people as possible to the hospital immediately. I hung up, called Director Mueller and -- with whom I'd been discussing this particular matter and had been a great help to me over that week -- and told him what was happening. He said, "I'll meet you at the hospital right now."

Told my security detail that I needed to get to George Washington Hospital immediately. They turned on the emergency equipment and drove very quickly to the hospital.

I got out of the car and ran up -- literally ran up the stairs with my security detail.

SCHUMER: What was your concern? You were in obviously a huge hurry.

COMEY: I was concerned that, given how ill I knew the attorney general was, that there might be an effort to ask him to overrule me when he was in no condition to do that.

SCHUMER: Right, OK.

COMEY: I was worried about him, frankly.

And so I raced to the hospital room, entered. And Mrs. Ashcroft was standing by the hospital bed, Mr. Ashcroft was lying down in the bed, the room was darkened. And I immediately began speaking to him, trying to orient him as to time and place, and try to see if he could focus on what was happening, and it wasn't clear to me that he could. He seemed pretty bad off.

SCHUMER: At that point it was you, Mrs. Ashcroft and the attorney general and maybe medical personnel in the room. No other Justice Department or government officials.

COMEY: Just the three of us at that point.

I tried to see if I could help him get oriented. As I said, it

wasn't clear that I had succeeded.

I went out in the hallway. Spoke to Director Mueller by phone. He was on his way. I handed the phone to the head of the security detail and Director Mueller instructed the FBI agents present not to allow me to be removed from the room under any circumstances. And I went back in the room.

I was shortly joined by the head of the Office of Legal Counsel assistant attorney general, Jack Goldsmith, and a senior staffer of mine who had worked on this matter, an associate deputy attorney general.

So the three of us Justice Department people went in the room. I sat down...

SCHUMER: Just give us the names of the two other people.

COMEY: Jack Goldsmith, who was the assistant attorney general, and Patrick Philbin, who was associate deputy attorney general.

I sat down in an armchair by the head of the attorney general's bed. The two other Justice Department people stood behind me. And Mrs. Ashcroft stood by the bed holding her husband's arm. And we waited.

And it was only a matter of minutes that the door opened and in walked Mr. Gonzales, carrying an envelope, and Mr. Card. They came over and stood by the bed. They greeted the attorney general very briefly. And then Mr. Gonzales began to discuss why they were there -- to seek his approval for a matter, and explained what the matter was -- which I will not do.

And Attorney General Ashcroft then stunned me. He lifted his head off the pillow and in very strong terms expressed his view of the matter, rich in both substance and fact, which stunned me -- drawn from the hour-long meeting we'd had a week earlier -- and in very strong terms expressed himself, and then laid his head back down on the pillow, seemed spent, and said to them, "But that doesn't matter, because I'm not the attorney general."

SCHUMER: But he expressed his reluctance or he would not sign the statement that they -- give the authorization that they had asked, is that right?

COMEY: Yes.

COMEY: Correct.

SPECTER: Well, how about what the president himself told you?

COMEY: I don't want to get into what -- the reason I hesitate, Senator Specter, is the right thing was done here, in part -- in large part because the president let somebody like me and Bob Mueller meet with him alone.

And if I talk about that meeting, I worry that the next president who encounters this is not going to let the next me get close to them to talk about something this important.

So I'm -- I want to be very careful that I don't talk about what the president and I talked about.

I met with the president. We had a full and frank discussion, very informed. He was very focused.

Then Director Mueller met with the president alone. I wasn't there.

Director Mueller carried to me the president's direction that we do what the Department of Justice wanted done to put this on a sound legal footing.

SPECTER: So you met first with the president alone for 15 minutes?

COMEY: Yes, sir.

SPECTER: And then Director Mueller met separately with the president for 15 minutes?

COMEY: I don't remember exactly how long it was. It was about the same length as my meeting. I went down and waited for him, as he...

SPECTER: And then Director Mueller, as you've testified, said to you, the president told Director Mueller to tell you to do what the Department of Justice thought was right?

COMEY: Correct.

SPECTER: Well -- but you won't say whether the president told you to do what the Department of Justice said was right?

COMEY: Yes, I...

SPECTER: You're not slicing hair. There's no hair there.

COMEY: You're a good examiner.

And that...

SPECTER: Well, thank you.

COMEY: Yes. I -- the president and I -- I don't think the conversation was finished. We discussed the matter in some detail. And then I urged him to talk to Bob Mueller about it.

And I don't know the content of Director Mueller's communication with him, except that Director Mueller -- the president didn't give me that -- I can answer that question.

The president didn't give me that direction at the end of our 15 minutes.

SPECTER: He did not?

COMEY: He did not. Instead, he said, "I'll talk to Director Mueller," as I had suggested.

Director Mueller came and met with him, then Director Mueller came to me and said that, "The president told me that the Department of Justice should get this where it wants to be, to do what the department thinks is right."

And I took that mandate and set about to do that, and accomplished that.

SPECTER: I thought you testified, in response to Senator Schumer's questions, that after meeting with the president for 15 minutes, he told you to do what you thought was right.

COMEY: If I did, I misspoke, because that direction came from the president to Director Mueller to me.

SPECTER: Well, when you had the discussions with Chief of Staff Card, what did he say to you by way of trying to pressure you, if, in fact, he did try to pressure you, to give the requisite certification?

SPECTER: Addington?

COMEY: Mr. Addington. The vice president told me that he disagreed. I don't remember any other White House officials telling me they disagreed.

SPECTER: OK. So you've got Card, Gonzales, Vice President Cheney and Addington who told you they disagreed with you.

COMEY: Yes, sir.

SPECTER: Did the vice president threaten you?

COMEY: No, sir.

SPECTER: Did Addington threaten you?

COMEY: No, sir.

SPECTER: So all these people told you they disagreed with you?

Well, why in this context, when they say they disagreed with you and you're standing by your judgment, would you consider resigning? You were acting attorney general. They could fire you if they wanted to. The president could replace you. But why consider resigning?

You had faced up to Card and Gonzales and Vice President Cheney and Addington, had a difference of opinion. You were the acting attorney general, and that was that. Why consider resigning?

COMEY: Not because of the way I was treated but because I didn't believe that as the chief law enforcement officer in the country I could stay when they had gone ahead and done something that I had said I could find no legal basis for.

SPECTER: When they said you could find no legal basis for?

COMEY: I had reached a conclusion that I could not certify as...

SPECTER: Well, all right, so you could not certify it, so you did not certify it.

But why resign? You're standing up to those men. You're not going to certify it. You're the acting attorney general. That's that.

COMEY: Well, a key fact is that they went ahead and did it without -- the program was reauthorized without my signature and without the Department of Justice. And so I believed that I couldn't stay...

SPECTER: Was the program reauthorized without the requisite certification by the attorney general or acting attorney general?

COMEY: Yes.

SPECTER: So it went forward illegally.

COMEY: Well, that's a complicated question. It went forward without certification from the Department of Justice as to its legality.

SPECTER: But the certification by the Department of Justice as to legality was indispensable as a matter of law for the program to go forward, correct?

COMEY: I believed so.

SPECTER: Then it was going forward illegally.

COMEY: Well, the only reason I hesitate is that I'm no presidential scholar.

But if a determination was made by the head of the executive branch that some conduct was appropriate, that determination -- and lawful -- that determination was binding upon me, even though I was the acting attorney general, as I understand the law.

And so, I either had to go along with that or leave. And I believed that I couldn't stay -- and I think others felt this way as well -- that given that something was going forward that we had said we could not certify as to its legality.

SPECTER: Well, I can understand why you would feel compelled to resign in that context, once there had been made a decision by the executive branch, presumably by the president or by the president, because he was personally involved in the conversations, that you would resign because something was going forward which was illegal.

The point that I'm trying to determine here is that it was going forward even though it was illegal.

COMEY: And I know I sound like I'm splitting hairs, but...

SPECTER: No, I don't think there's a hair there.

COMEY: Well, something was going forward without the Department of Justice's certification as to its legality. It's a very complicated matter, and I'm not going to go into what the program was or what the dimensions of the program...

SPECTER: Well, you don't have to.

If the certification by the Department of Justice as to legality is required as a matter of law, and that is not done, and the program goes forward, it's illegal. How can you -- how can you contest that, Mr. Comey?

COMEY: The reason I hesitate is I don't know that the Department of Justice's certification was required by statute -- in fact, it was not, as far as I know -- or by regulation, but that it was the practice in this particular program, when it was renewed, that the attorney general sign off as to its legality.

There was a signature line for that. And that was the signature line on which was adopted for me, as the acting attorney general, and that I would not sign.

So it wasn't going forward in violation of any -- so far as I know -- statutory requirement that I sign off. But it was going forward even though I had communicated, "I cannot approve this as to its legality."

And given that, I just -- I couldn't, in good conscience, stay.

SPECTER: Well, Mr. Comey, on a matter of this importance, didn't you feel it necessary to find out if there was a statute which required your certification or a regulation which required your certification or something more than just a custom?

COMEY: Yes, Senator. And I...

SPECTER: Did you make that determination?

COMEY: Yes, and I may have understated my knowledge. I'm quite certain that there wasn't a statute or regulation that required it, but that it was the way in which this matter had operated since the

beginning.

I don't -- I think the administration had sought the Department of Justice, the attorney general's certification as to form and legality, but that I didn't know, and still don't know, the source for that required in statute or regulation.

SPECTER: OK. Then it wasn't illegal.

COMEY: That's why I hesitated when you used the word "illegal."

SPECTER: Well, well, OK.

Now I want your legal judgment. You are not testifying that it was illegal. Now, as you've explained that there's no statute or regulation, but only a matter of custom, the conclusion is that even though it violated custom, it is not illegal.

It's not illegal to violate custom, is it?

COMEY: Not so far as I'm aware.

SPECTER: OK. So what the administration, executive branch of the president, did was not illegal.

COMEY: I'm not saying -- again, that's why I kept avoiding using that term. I had not reached a conclusion that it was.

The only conclusion I reached is that I could not, after a whole lot of hard work, find an adequate legal basis for the program.

SPECTER: OK.

Well, now I understand why you didn't say it was illegal. What I don't understand is why you now won't say it was legal.

COMEY: Well, I suppose there's an argument -- as I said, I'm not a presidential scholar -- that because the head of the executive branch determined that it was appropriate to do, that that meant for purposes of those in the executive branch it was legal.

I disagreed with that conclusion. Our legal analysis was that we couldn't find an adequate legal basis for aspects of this matter. And for that reason, I couldn't certify it to its legality.

SPECTER: OK.

FEINSTEIN: I'm not asking you to. I'm asking you, what piece of paper did you have to sign?

COMEY: It was a signature line on a presidential order.

FEINSTEIN: OK. All right.

And you said that the program was later changed so that it could be signed. But it went ahead at that time without your certification on it.

COMEY: Yes.

FEINSTEIN: And what was the elapsed period of time from that meeting, the denial of DOJ to certify the program and the time when it was essentially certified?

COMEY: It was reauthorized on Thursday, March the 11th, without the department's -- without my signature, without the department's approval.

And it was the next day -- so less than 24 hours later -- that we received the direction from the president to make it right.

And then we set about -- I don't remember exactly how long it was -- over the next few weeks making changes so that it accorded with our judgment about what could be certified as to legality.

And so it was really only that period from Thursday, when it was reauthorized, until I got the direction from the president the next day that it operated outside the Department of Justice's approval.

FEINSTEIN: For approximately two weeks?

COMEY: I don't remember exactly. It was two or three weeks I think that it took us to get the analysis done and make the changes that needed to be made.

FEINSTEIN: And then who signed for DOJ?

COMEY: It was either the attorney general, Ashcroft, or myself who signed. I may have signed that first one after the hospital incident.

FEINSTEIN: OK.

# EXHIBIT H

**Written Questions to**
**Former Deputy Attorney General James B. Comey**
**Submitted by Senator Patrick Leahy**
**May 22, 2007**

1. You testified that the Department of Justice ("DoJ") completed a factual and legal evaluation of "a particular classified program" in 2004, and this review was conducted by, among others, the Office of Legal Counsel ("OLC").

**a.** When was this review started?

**I believe some time in late fall 2003.**

**b.** Why was the review started? Was the review started at the request of any individual or entity? If so, who or what entity?

**I believe it was started at the initiative of Jack Goldsmith and Patrick Philbin.**

c. Who participated in the review? Other than OLC, did any other division, section, or unit at DoJ participate in the review?

**Goldsmith and Philbin were the principal participants, as I recall. I believe they were assisted from time to time by James Baker from the Office of Intelligence Policy and Review and my chief of staff, Chuck Rosenberg. There may have been other DOJ lawyers who assisted them.**

d. Did any individual or entity from outside DoJ participate in the review? Were there any individuals from the White House, the Department of Defense ("DoD"), or other federal agency who participated in the review? If so please identify those individuals and/or entities?

**I believe Goldsmith and Philbin coordinated their effort with lawyers in the intelligence community.**

e. Did the review assess the full duration of the classified program and, if not, what time frame was reviewed?

**The review focused on current operations during late 2003 and early 2004, and the legal basis for the program.**

f. As a result of the review, did any individual or entity at DoJ, or any other agency, prepare a legal opinion or memorandum related to the classified program, and, if so, who or what entity prepared the legal opinion or memorandum?

**OLC prepared legal memoranda concerning the matter, some of which would have been drafts. I also prepared at least one memorandum.**

g. Were the results of this review shared with the Federal Bureau of Investigation ("FBI"), and, if so, who at the FBI and when?

**It is my understanding that Goldsmith and Philbin discussed their work with officials from the General Counsel's office at the FBI, including the General Counsel, Valerie Caproni. I discussed the matter privately with FBI Director Mueller and FBI Deputy Director John Pistole.**

h. Other than the White House or individuals at the White House, were the results of this review shared with any individual, entity, or federal agency outside DoJ, and, if so, who or what entity and when?

**The matter was discussed with lawyers and non-lawyers in the intelligence community. I am uncomfortable going into more detail in an unclassified setting.**

2. In your testimony, you stated that the views of DoJ related to the classified program were communicated to the White House prior to the evening of March 10, 2004.

a. How were these views communicated to the White House? Please identify whether the communications were made orally, in writing, by electronic communication, or other means; and to whom and when the communications were made. Please identify if any of the documents responsive to Question 1 above were included in this communication.

**The views were communicated orally prior to March 10, 2004, including at a March 9 meeting I attended at the White House. I also believe that Goldsmith and Philbin had a variety of contacts with officials at the White House in the preceding weeks or months as the review was conducted. Those contacts may have involved their sharing written materials, but I am not sure. I recall sending one memorandum to the White House, after March 10, which I believe attached a memorandum written by Goldsmith.**

b. Without disclosing the substance of the classified program or any legal advice, did these views include the understanding that the Attorney General, or you as Acting Attorney General, would not certify the classified program?

**Yes.**

c. Did you or others at DoJ receive any response to these views from the White House? If so, please identify whether the responses were made orally, in writing, by electronic communication, or other means; and to whom and when was the response was made.

**I directly received oral responses during discussions at the White House on March 9, 2004. I know there were a variety of discussions in early 2004 in which I did not participate but that involved Jack Goldsmith and Patrick Philbin.**

d. Did the response include any legal opinion or memorandum from the White House, or any other federal agency related to the classified program? If so, please identify what individual(s) or entities prepared and reviewed the legal opinion or memorandum.

**I am not aware of any other such memorandum or legal opinion prior to March 10, 2004. Some time shortly after March 10, I received a memorandum from White House Counsel Gonzales.**

3. You testified that after you arrived at the George Washington Hospital in Washington, D.C., on the evening of March 10, 2004, White House Counsel Alberto Gonzales and White House Chief of Staff Andrew Card came to Attorney General John Ashcroft's hospital room and spoke to him relating to the authorization of a classified program.

a. Did any individual(s) come with Mr. Gonzales or Mr. Card to the hospital, and if so, who? Were those individuals present for the conversation between Mr. Ashcroft and Mr. Gonzales?

**I do not know with whom Mr. Gonzales and Mr. Card arrived; only the two of them entered the room.**

b. Upon arriving in the hospital room, did Mr. Gonzales say anything to you, either before or after his conversation with Mr. Ashcroft, and if so, what did he say?

**He did not speak to me at any time.**

c. Did Mr. Card speak to Mr. Ashcroft or you in the hospital room and if so, what did he say?

**Mr. Card did not speak to me. I believe he said, "Be well," to Attorney General Ashcroft as he turned to depart.**

d. To your knowledge, did Mr. Gonzales or Mr. Card consult with Mr. Ashcroft's physician or any medical staff prior to entering the hospital room?

**Not to my knowledge.**

e. In your presence, did Mr. Gonzales or Mr. Card ask Mr. Ashcroft questions to elicit his state of mind and/or medical condition prior to discussing their request for authorization of the classified program?

**I believe Mr. Gonzales began the conversation by asking, "How are you General?" to which the Attorney General replied, "Not well."**

f. To your knowledge, did Mr. Gonzales or Mr. Card take any steps to ensure that facts related to the classified program were not disclosed to individuals without proper clearances or an actual need to know who were present in the hospital room?

**Not to my knowledge.**

4. In your testimony, you stated that FBI Director Robert Mueller also arrived at the George Washington Hospital that night.

a. To your knowledge, did Mr. Mueller have any conversation with Mr. Gonzales or Mr. Card at the hospital that night? If so, what was that conversation?

**Not to my knowledge.**

b. In your testimony, you indicated that Mr. Mueller had a "memorable" exchange with Mr. Ashcroft after Mr. Gonzales and Mr. Card left. Please describe that exchange.

**It was a private conversation in which Mr. Mueller expressed his admiration for the Attorney General's conduct that evening.**

5. You testified that the President met with you privately, and then, at your urging, he also met with Mr. Mueller privately, on the morning of March 12, 2004 following your daily counter-terrorism briefing. After these discussions, you stated that the President indicated to Mr. Mueller that you were now authorized to make changes to the classified program in response to the Department of Justice's views.

a. Following your meetings, did the President direct you or Mr. Mueller to discontinue or suspend any portion of classified program immediately until the appropriate changes were made to bring it into legal compliance?

**No.**

b. How long did the classified program continue without legal certification from DoJ?

**I don't recall exactly, but believe it was approximately several weeks.**

6. You testified that you discussed DoJ's views on the classified program with Vice President Dick Chaney and members of his staff, including his Chief of Staff David Addington.

a. Where and when did those discussions take place?

**March 9, 2004 at the White House.**

b. Who else was present for those discussions?

**Jack Goldsmith, Patrick Philbin, Vice President Cheney, Mr. Addington, Mr. Card, Mr. Gonzales, and members of the intelligence community.**

c. If those discussions were on or before March 10, 2004, was the Vice President and/or his staff aware of DoJ's decision not to certify the classified program? If so, how were they aware?

**Yes. The Vice President was aware of DOJ's decision to not certify the program, because I had communicated this orally during a March 9 meeting. That meeting was a culmination of ongoing dialogue between DOJ and the White House.**

d. If those discussions were on or before March 10, 2004, was the Vice President and/or his staff aware of your intention to resign if the classified program was authorized without DoJ certification? If so, how were they aware?

**No. I had not made a decision to resign yet.**

e. To your knowledge, did the Vice President or his staff have any role in the decision to have Mr. Card and Mr. Gonzales visit Mr. Ashcroft in the hospital? If so, what role did they have and what is the source for your information?

**I have no knowledge about that.**

7. You testified that Mr. Philbin, who was with you in the hospital, was "blocked from promotion," as a result of the position taken by DoJ related to this classified program.

a. Did any individual or individuals from the White House have any input into his potential promotion at DoJ? If so who, and in relation to what promotion?

**Mr. Philbin was considered for principal Deputy Solicitor General after Paul Clement became Solicitor General. It was my understanding that the Vice President's office blocked that appointment.**

b. Who was involved in blocking Mr. Philbin's promotion, and what did they do?

**I understood that someone at the White House communicated to Attorney General Gonzales that the Vice President would oppose the appointment if the Attorney General pursued the matter. The Attorney General chose not to pursue it.**

8. When did the Administration first conclude that the Authorization for Use of Military Force ("AUMF") authorized warrantless electronic surveillance of the type involved in what the Administration has called the "terrorism surveillance program" or TSP? If you do not recall a specific date, please provide as close an approximation as is possible.

**I don't think it is appropriate for me to discuss legal advice by the Department of Justice or any particular classified program.**

9. What legal standard for intercepting communications was the National Security Agency ("NSA") applying in its warrentless electronic surveillance program before March 2004? Was it a "probably cause" standard? What standard was the NSA applying when the program was first authorized? What standard was applied after March 2004?

**I don't think it is appropriate for me to discuss legal advice by the Department of Justice or any particular classified program.**

10. Has the warrantless electronic surveillance program always required before authorizing interception of a communication that at least one party to the communication be located outside of the United States? If not, approximately when did this become a requirement?

**I don't think it is appropriate for me to discuss legal advice by the Department of Justice or any particular classified program.**

11. Has the warrantless electronic surveillance program always required before authorizing interception of a communication that at least one party to the communication be a member or agent of Al Queda or an affiliate terrorist organization? If not, approximately when did this become a requirement?

**I don't think it is appropriate for me to discuss legal advice by the Department of Justice or any particular classified program.**

# EXHIBIT I

HEARING OF THE HOUSE COMMITTEE ON THE JUDICIARY
SUBJECT: FBI OVERSIGHT
CHAIRED BY: REP. JOHN CONYERS
(D-MI)
WITNESS: ROBERT MUELLER,
DIRECTOR, FBI

2141 RAYBURN HOUSE OFFICE BUILDING, WASHINGTON, D.C.
1:34 P.M. EDT, THURSDAY, JULY 26, 2007

Copyright ©2007 by Federal News Service, Inc., Suite 500, 1000 Vermont Avenue, NW, Washington, DC, 20005, USA. Federal News Service, Inc. is a private firm not affiliated with the federal government.

your agents were prepared to resign because of -- leading up to controversy?

MR. MUELLER: Again, I'm uncomfortable getting into conversations I had with individuals because I do believe that individuals are entitled to my unfettered thoughts --

REP. WATT: Can you confirm that you had some serious reservations about the warrantless wiretapping program that kind of led up to this?

MR. MUELLER: Yes.

REP. WATT: Okay.

I thank the chairman, and I yield back.

REP. CONYERS: Thank you.

Now, Howard Coble of -- (short pause) -- South Carolina? --

REP. HOWARD COBLE (R-NC): North.

REP. CONYERS: -- North Carolina, former chairman of the Patent and Copyright Committee, now the ranking member, is recognized.

REP. COBLE: Thank you, Mr. Chairman. Mr. Mueller, good to have you with us. Thank you for your years of public service.

I'm going to ask you a provincial question. Tobacco being prominent in my state, have there been recent arrests regarding the trafficking of counterfeit cigarettes by terrorist groups?

MR. MUELLER: I would have to check on the recency. There was one notable case from several years ago with Hezbollah in which I know cigarettes were being shipped from North Carolina to, if I'm not mistaken, it was Detroit, and there was substantial prosecution. I would have to check to determine whether any additional prosecution since then.

(Off-mike conferrals.)

MR. MUELLER: There -- the discussion was that there had been a prior discussion about an NSA program and that the attorney general deferred to Mr. Comey as the person to make whatever decision was to be made.

REP. COHEN: And he had confidence in Mr. Comey, I take it?

MR. MUELLER: Yes.

REP. COHEN: Okay.

At some point or another, I think you told maybe Mr. Watt that you felt that there were problems with some of the operations there, the wiretaps.

MR. MUELLER: At a point in time in conversations with Mr. Comey, I had -- understand the Department of Justice had some concerns about the legality of an NSA program. That affected the FBI in the sense that we received pieces of information from the NSA.

My purpose was to determine that whatever we did as the bureau in handling that was done according to the directive and the appropriate directive of the Department of Justice. So my concern was to assure that whatever activity we undertook as a result of the information we received was done appropriately and legally.

At some point in time, he expressed concern about the legality of it.

REP. COHEN: And because of that concern, at some point did you express to Mr. Watt -- I was believe that was correct -- earlier that you considered resignation?

MR. MUELLER: I don't believe I expressed that. I did not dispute what Mr. Comey had said, but again, I -- in this area, I would say that I should not get into the conversations I had with individuals.

And I know there's been an incredible amount of discussion going around the Terrorist Surveillance Program. But given the fact that it's now under FISA, can you tell us is it working, is it something that is an effective tool, notwithstanding the fact that probably every terrorist in the galaxy knows about the conversations that we have now?

MR. MUELLER: Well, I think probably my answer would have to come in some form of classified setting.

But generally I can say that leads we have received from an NSA program have been helpful in the war on terror, yes.

REP. FRANKS: The administration has recently submitted proposals to reform FISA. And do you think that those reforms are necessary and that they will help you do your job?

MR. MUELLER: Yes. It would help not just the FBI, but operating together with NSA, the CIA, the DIA, all of whom -- all of us share the same responsibility to protect the homeland. And what is proposed in the revision of the FISA statute would help all of us.

REP. FRANKS: Well, without touching on anything that could be of a disadvantage to the country, what do you consider your greatest concern, the greatest gap that you have in terms of being able to assess and predict or prevent the terrorist challenge that we face in the homeland itself?

MR. MUELLER: I think we have made substantial strides since September 11th in terms of breaking down the walls between the various entities in the intelligence community. We do a far more -- a far better job not only within the United States but ourselves as an intelligence community, and I consider us an intelligence community, working together with our counterparts overseas.

The gaps come, I believe, in -- and it's gaps that I believe that my counterparts at the CIA or ODNI would also focus upon, and that is the threats of terrorists having the opportunity to train, to plan, to coordinate in a sanctuary around the world, whether it be in Waziristan or the Horn of Africa or elsewhere, and we cannot let that happen.

Secondly, it's important to understand that al Qaeda is intent on attacking in the United States and finding ways to infiltrate individuals in the United States, often through countries that do not have the same 041