# EXHIBIT DD



Dockets.Justia.com

**United States Senate Committee on the Judiciary**
**Subcommittee on the Constitution**
**Hearing on "Restoring the Rule of Law"**
**September 16, 2008**

**Joint Statement of**

David J. Barron
Professor of Law
Harvard Law School

Walter E. Dellinger
Visiting Professor of Law
Harvard Law School
Partner, O'Melveny & Myers, LLP

Dawn E. Johnsen
Professor of Law and Ira C. Batman Faculty Fellow
Indiana University School of Law-Bloomington

Neil J. Kinkopf
Professor of Law
Georgia State University College of Law

Martin S. Lederman
Associate Professor of Law
Georgetown University Law Center

Trevor W. Morrison
Professor of Law
Columbia Law School

Christopher H. Schroeder
Charles S. Murphy Professor of Law and Public Policy Studies
Duke University School of Law

We are professors of law and former attorneys in the Justice Department's Office of Legal Counsel (OLC). We wish to commend the Subcommittee for holding this hearing on the rule of law. As former OLC attorneys we have seen firsthand the ways in which this principle has protected fundamental liberties and promoted the proper functioning of government. Adherence to rule of law principles, moreover, has ensured that a President's rightful assertion of constitutional authorities is not undermined by doubts about the Executive Branch's commitment to the separation of powers. We are deeply concerned by actions in the past few years that have eroded the force of this vital principle.

While no Administration has been perfect, for almost all of our history Presidents from all political parties have demonstrated a fundamental commitment to the principle of obedience to statutory and constitutional limits on executive power. That is, until now. Recent secret abuses of power and extravagant claims of unilateral authority have called seriously into question the Executive Branch's willingness to adhere to lawful limits on executive authority. The resulting crisis of legitimacy makes urgent the need for reforms to promote the rule of law throughout the federal government. In our testimony, we will focus upon ways to promote adherence to the law within the Justice Department, and particularly at OLC.

The fundamental precept that no one, not even the President, is above the law is enshrined in the Take Care Clause, which provides that "the President shall take Care that the Laws be faithfully executed."[1] Rarely has any President directly challenged the principle that the President must obey the law. President Nixon came close with his extraordinary assertion that, "when the President does it, that means it is not illegal."[2] The current Administration's challenge to the rule of law has been more subtle, and for that reason may prove more difficult to redress. That simply makes it even more imperative that we do all we can to understand and respond to this challenge

In our system, the Constitution, of course, is the supreme law of the land. Congress at times may enact statutes that violate the Constitution, and the courts possess the clear authority to declare such statutes invalid and unenforceable. In some rare circumstances, the President's duty to faithfully execute the laws counsels him to decline to enforce an unconstitutional statute even absent a judicial order. And under the system of separated powers, one way a statute can be unconstitutional is if it unduly impinges on powers that the Constitution assigns to the President. Whether it is appropriate in any given circumstances for the President to decline to enforce a statute he believes to be unconstitutional involves a complicated calculation, about which previous Administrations and past practice offer much guidance.[3] At least one predicate is

---

[1] U.S. CONST. art. II, , § 3.

[2] *Excerpts from Interview with Nixon about Domestic Effects of Indochina War*, N.Y. TIMES, May 20, 1977, at A16 (interview by David Frost).

[3] *See* Walter E. Dellinger, *Presidential Authority to Decline to Execute Unconstitutional* Statutes, 18 Op. Off. Legal Counsel 199 (1994); Benjamin R. Civiletti, *The Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation*, 4A Op. Off. Legal Counsel 55 (1980); David Barron, *Constitutionalism in the Shadow of Doctrine: The President's Non-Enforcement Power*, 63 LAW &



47

absolutely clear: to comply with the rule of law, in order to reach a sound conclusion that a statute unduly impinges on the President's powers, the scope of the President's powers must be correctly stated. Under this Administration, lawyers in the Executive Branch have wildly misinterpreted what the Constitution says about the extent of presidential authority, and as a result the President has erroneously claimed the authority to disregard laws that he is obligated to follow.

A second danger to the rule of law arises when, instead of directly challenging a statutory restriction on the President's powers as unconstitutional, the Executive Branch relies on constitutional concerns about the statute to justify a strained interpretation of the statute so that it no longer means what Congress said. The canon of constitutional avoidance instructs that when a statute can fairly be interpreted in two different ways, one of which would violate the Constitution (or would raise a serious constitutional concern) and one of which would not, the statute should be interpreted to avoid the constitutional problem. Courts often employ this sound rule of statutory interpretation. The Bush Administration, however, has repeatedly misused and abused the avoidance canon, twisting the meaning of statutes beyond recognition.[4] This second danger to the rule of law is related to the first. Because the Bush Administration endorses such an expansive and erroneous interpretation of the President's exclusive powers, its lawyers have raised constitutional objections to statutes with unprecedented frequency. The result is that reasonable and permissible statutory regulations of the Executive Branch are misconstrued, contorted, or even eliminated, all in the name of avoiding constitutional concerns that actually flow from an implausible view of the Constitution.

When the secret Torture Memo of August 1, 2002[5] became public, it provided a vivid – indeed, a shocking – example of the harm that could be done by the invocation of indefensibly sweeping constitutional claims of presidential authority to defy the law and by the perverse twisting of statutory language. A federal law makes it a crime for anyone acting under the color of law to engage in torture outside the United States. OLC nevertheless concluded that this federal law, which implements our treaty obligations under the Convention against Torture, could not operate to prohibit the President from ordering the use of torture in interrogating enemy combatants.[6] First, the memo used the

---

CONTEMP. PROBS. 61 (2000); Dawn E. Johnsen, *Presidential Non-Enforcement of Constitutionally Objectionable Statutes*, 63 LAW & CONTEMP. PROBS. 7 (2000)...

[4] *See generally* Trevor W. Morrison, *Constitutional Avoidance in the Executive Branch*, 106 COLUM. L. REV. 1189 (2006).

[5] Memorandum from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, to Alberto R. Gonzales, Counsel to the President, *Standards of Conduct for Interrogation under 18 U.S.C. 2340-2340A* (Aug. 1, 2002), *available at* http://www.washingtonpost.com/wp-srv/nation/documents/dojinterrogationmemo20020801.pdf..

[6] Although this memo was later rescinded, the Bush Administration has not repudiated this constitutional conclusion or the legal rationale on which it was based. Moreover, as we discuss below, the rationale found in the Torture Memo has been deployed in a number of memos that the Justice Department has not rescinded. And it also formed the basis for the ultimate conclusion of the Administration's most comprehensive war powers opinion, one that OLC has officially published. *See* Memorandum from John C. Yoo, Deputy Ass't Att'y Gen., Office of Legal Counsel, to Timothy Flanigan, Deputy Counsel to the President, *The President's Constitutional Authority to Conduct Military Operations against Terrorists and Nations Supporting Them* (Sept. 25, 2001), *available at* http://www.usdoj.gov/olc/warpowers925.htm.

canon of constitutional avoidance to suggest that the statute's unambiguous and unqualified prohibition on torture by all government personnel simply "does not apply to the President's detention and interrogation of enemy combatants pursuant to his Commander-in-Chief authority."[7] Second, and alternatively, the memo concluded that if the statute cannot be read to exclude persons acting under Presidential orders – a meaning that the words cannot support -- and instead must be understood to cover interrogations ordered by the President, then it is unconstitutional. On both points, the memo's reasoning is premised on such a broad conception of the President's authority as Commander in Chief that it would allow the President to ignore virtually any statute that regulates the military or the conduct of war. The memo also never even acknowledges that the Constitution explicitly assigns to Congress significant authority relevant to regulating the military, the conduct of war, or the nature of interrogations.[8] The Administration's interpretation of the constitutional distribution of war powers has no support in judicial precedent. Former OLC head Jack Goldsmith observed that the Torture Memo, and other memoranda authored to support the Administration's counterterrorism activities, "were deeply flawed: sloppily reasoned, overbroad, and incautious in asserting extraordinary constitutional authorities on behalf of the President. I was astonished, and immensely worried, to discover that some of our most important counterterrorism policies rested on severely damaged legal foundations."[9]

Not only is the theory of presidential power found in the Torture Memo unjustified, but OLC also betrayed its proper role in arriving at its conclusions. Instead of enforcing valid legal constraints within the Executive Branch, OLC seems to have allowed its interpretation of applicable laws to be infected by its outsized view of the President's power to disregard limitations on his authority to do whatever he thought necessary. As a result, the memorandum reads more like a one-sided justification for conferring legal immunity than as a sober assessment of the actual state of the law.

The Torture Memo was by no means an isolated incident. Indeed, the highly inflated view of presidential power contained in the Torture Memo appears to have informed a vast array of the legal advice given during the Bush Administration. OLC, for example, issued a memo asserting that the President may initiate a full-scale, long-term war even if Congress has not declared or otherwise authorized it, and even if it is prohibited by the War Powers Resolution.[10] Similarly, the Justice Department issued a memo — which no official seems to have been willing to sign — arguing implausibly that FISA does not apply to the President's Terrorist Surveillance Program and, further, that FISA would be unconstitutional if it did apply to limit this program.[11] In another memo dealing with

---

[7] *See* Memorandum from Jay S. Bybee, *supra* note 5, at 34-35.

[8] Congress has broad authority in this area. It is authorized, *inter alia*, to define and punish offenses against the laws of nations, U.S. CONST., art. I, § 8, cl. 10, and to make rules for the government and regulation of the land and naval forces, *id.*, cl. 14.

[9] JACK GOLDSMITH, THE TERROR PRESIDENCY: LAW AND JUDGMENT INSIDE THE BUSH ADMINISTRATION 10 (2007).

[10] Memorandum from John C. Yoo, *supra* note 6.

[11] Memorandum from U.S. Department of Justice, *Legal Authorities Supporting the Activities of the National Security Agency Described by the President* 35 (Jan. 19, 2006)("Indeed, if an interpretation of

torture and numerous other statutory limits on interrogation, issued in March 2003 but released just this past March, OLC repeated the extreme theories of presidential power it had voiced in the original Torture Memo.[12] The Administration only released each of these memos years after it began to disregard the statutes in question, in response to leaks about the memos or the underlying programs.

The Bush Administration's practice with respect to signing statements offers many additional examples of just how expansively it views presidential power. President Bush, like Presidents of both parties before him, has used signing statements to express his view that certain provisions of a new law are unconstitutional. In the first six years of the Bush Administration, the President issued 223 objections citing his commander-in-chief power or his authority over foreign affairs. These objections were raised against statutes addressing a wide variety of issues, from personnel matters[13] to the use of torture.[14] The common element shared by a great many of the statements is that the alleged constitutional concern was based on an unjustifiably far-reaching and preclusive view of the President's commander-in-chief authority. Moreover, this overreaching was not limited to the areas of foreign and military affairs. An erroneous, expansive view of presidential power was imported to domestic matters under the heading of the unitary executive theory. During his first six years in office, President Bush issued signing statements objecting to 363 new provisions of law on this ground alone. Yet in many instances, the statute in question raised no discernible constitutional problem and the President's objection was either unsupported or unsupportable.

Without regard to who wins the upcoming presidential election, we recommend that the next Administration make three commitments. First, the next President should promote a reasonable view of presidential power that is grounded in the Constitution's text and structure as well as settled judicial and political-branch precedents. Second, the next President should commit to greater openness and the accountability that goes with it. Third, the next President should commit to respecting important structural safeguards that

---

FISA that allows the President to conduct the NSA activities were not "fairly possible," FISA would be unconstitutional as applied in the context of this congressionally authorized armed conflict.").

[12] Memorandum from John C. Yoo, Deputy Assistant Att'y Gen., to William J. Haynes, Gen. Counsel, department of Defense, *Military Interrogation of Alien Unlawful Combatants Held Outside the United States*, (Mar. 14, 2003), *available at* http://www.fas.org/irp/agency/doj/olc-interrogation.pdf.

[13] Consider, for example, a provision limiting the number of government relations personnel employed in the Department of Defense. President Bush contended that this limitation would raise serious constitutional questions relating to his authority as commander in chief. Yet, the statement did not specify the nature of those objections and it is difficult to imagine what they might have been, other than the implausibly exaggerated view of the President's commander-in-chief power expressed in the Torture Memo. Statement on Signing The Department of Defense and Emergency Supplemental Appropriations for Recovery from and Response to Terrorist Attacks on the United States Act 2002, 38 WEEKLY COMP. PRES. DOCS. 46 (Jan. 10, 2002).

[14] Consider, for example, the signing statement objecting to the McCain Amendment prohibiting military personnel from engaging in cruel, inhuman, or degrading treatment of detainees. President Bush asserted that this prohibition could violate his commander-in-chief power and strongly indicated that the judiciary had no authority to enforce it. Statement on Signing the Department of Defense, Emergency Supplemental Appropriation to Address Hurricanes in the Gulf of Mexico and Pandemic Influenza Act 2006, 41 WEEKLY COMP. PRES. DOCS. 1918 (Dec. 30, 2005).

check against presidential aggrandizement. Within each of these categories, we recommend a number of more specific steps.

**1. A Well-Founded View of Presidential Power.** To advance the first commitment, the next President should initiate a process to ensure that the new Administration withdraws and repudiates the reasoning of memoranda and opinions that overstate the President's constitutional powers and that minimize those of Congress and the courts. We have not conducted a comprehensive review of OLC opinions, nor could we as many are classified or otherwise inaccessible. Thus, we cannot offer an exhaustive list of the opinions that should be withdrawn. We do believe, however, that the list should include the Torture Memos,[15] the DOJ Whitepaper on the Terrorist Surveillance Program,[16] and the September 25, 2001 opinion on war powers.[17]

The next President should also affirmatively adopt a view of presidential power that recognizes the roles and authorities of all three co-equal branches and that takes account of settled judicial precedent. We believe that a model the next President should seriously consider adopting is "The Constitutional Separation of Powers between the President and Congress."[18] Setting forth the principles that will govern the determination of questions of presidential power will provide a constraint against the sort of result-oriented advice-giving that proved so problematic in instances such as the Torture Memo.

**2. Openness and Accountability.** To advance the commitment to openness and accountability, we offer several recommendations. OLC should review its procedures for releasing opinions and publicly release guidelines that will govern publication decisions. The goal of the review should be to make sure that OLC's memoranda and opinions are made available to the public to the maximum extent possible consistent with the legitimate confidentiality interests of the Executive Branch.[19]

Congress, the Courts, and the public are unable to check against abuses of executive power if they do not know about them. In this regard, the experience of the past eight years is instructive. It was only years later and due to leaked information that we learned of highly consequential opinions advising that the Executive Branch was not bound to comply with statutory limits on its power, including opinions relating to the treatment of detainees, the President's domestic surveillance program, and the use of secret prisons overseas for detention and interrogation.

---

[15] Jay S. Bybee, *supra* note 5; Memorandum from John C. Yoo, *supra* note 12.
[16] U.S. Department of Justice, *supra* note 11.
[17] Memorandum from John C. Yoo, *supra* note 6.
[18] 20 Op. Off. Legal Counsel 124 (May 7, 1996).
[19] This recommendation is discussed more fully in the document appended to this testimony, Principles to Guide the Office of Legal Counsel. Some of us have addressed this issue in previously submitted testimony. *See From the Department of Justice to Guantanamo Bay: Administration Lawyers and Administration Interrogation Rules, Part III Before Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the H. Comm. on the Judiciary*, 105th Cong. (forthcoming 2008) (statement of Christopher H. Schroeder), 2008 WL 2537928; *Secret Law and the Threat to Democratic and Accountable Government Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary*, 105th Cong. (forthcoming 2008) (statement of Dawn E. Johnsen), 2008 WL 1923041.

The review of OLC disclosure procedures should place special emphasis on the importance of releasing legal memoranda and opinions that conclude that statutory constraints on the Executive Branch do not apply because they are unconstitutional or will be interpreted as inapplicable by means of the avoidance canon. The Bush Administration has frequently misused this canon to resist compliance with a wide array of statutory obligations. Congress can potentially remedy such misinterpretations by amending the relevant statute to make it expressly and absolutely clear that the statute applies where the Executive Branch has said it does not. But that cannot happen if Congress is not told of the executive's interpretation in the first place.[20] Federal law already requires the Justice Department to report any instance in which it declines to defend the constitutionality of a law or does not enforce the law because of a view that it is unconstitutional.[21] The statute does not cover invocations of the avoidance canon, which has become a significant loophole over the past eight years. As a result, we do not know what laws the Administration is refusing to enforce and our ability to hold the government accountable is impaired. We strongly urge Congress to enact a law to require the Justice Department to report instances in which it employs the avoidance canon or other recently misused canons of statutory construction to yield a conclusion that a law does not apply to the Executive Branch or need not be executed. We would particularly commend to Congress's consideration "The OLC Reporting Act of 2008," to be introduced by Senator Feingold.[22]

The next President should also commit to review the Executive Branch's practice in asserting privileges, including executive privilege. The presidential communications privilege is, according to the Supreme Court, a legitimate constitutional privilege rooted in the separation of powers.[23] Nevertheless, this privilege is not absolute and judicial precedent as well as long Executive Branch and congressional practice recognize that the President's constitutional interest must be balanced against Congress's legitimate interests in conducting investigations and oversight.[24] The next President should commit that, when disputes over privilege arise, the executive will seek to resolve them through good faith negotiation and meaningful accommodation. This negotiation and accommodation process must include recognition by the Executive Branch of the legitimate claims to information that the Congress does have in its legislative, oversight and investigatory functions. In a recent and highly relevant case, Judge Bates authored a helpful discussion of Congress' legitimate interests in information, which in our judgment is largely correct.[25]

The next Administration should review the grounds and procedures for invoking the state secrets privilege. In recent years, the Executive Branch has increasingly used this

---

[20] *See* Morrison, *supra* note 4, at 1237-39.
[21] 28 U.S.C. § 530D (2008).
[22] We also recommend consideration of similar legislation that we understand Rep. Brad Miller plans to introduce in the House of Representatives.
[23] United States v. Nixon, 418 U.S. 683 (1974).
[24] *See, e.g.*, United States v. Am. Tel. & Telegraph Co., 567 F.2d 121 (D.C. Cir. 1977); Senate Select Committee v. Nixon, 498 F.2d 725 (D.C. Cir. 1974).
[25] *See* Committee on the Judiciary, U.S. House of Representatives v. Miers, 558 F. Supp. 2d 53 (D.D.C. 2008).

privilege as a categorical bar to litigation and as a shield to avoid scrutiny of legally questionable executive programs, such as the Terrorist Surveillance Program.[26] The next President should commit to invoking this privilege only where national security interests (rather than the interest in avoiding embarrassment or judicial scrutiny) truly require it.

In addition, the next Attorney General should reverse the presumption against disclosure of information in response to a Freedom of Information Act (FOIA) request. On October 12, 2001, Attorney General John Ashcroft issued a new Department of Justice Freedom of Information Act Policy Memorandum to the heads of all federal departments and agencies.[27] This memorandum reversed the existing presumption in favor of disclosure and instructed agencies that, in making discretionary FOIA decisions, they should consider the values behind the exemptions – emphasizing interests such as national security and privacy – that militate against disclosure.[28] This presumption against disclosure prevents accountability on a broad range of government decisions and actions. To maintain secrecy where there is not a clear reason or threat of harm to the national interest undermines both the reality and public perception that government decisionmaking comports with the rule of law.

**3. Structural Safeguards against Abuse of Power.** To advance the third commitment to enhance structural safeguards, we suggest that the President instruct the Attorney General to pay particular attention to the procedures of OLC. Together with a number of our former colleagues, we have written a set of guidelines that OLC should follow in order to best effectuate its role.[29] We have appended these guidelines to this testimony, and with one exception, we will not elaborate further on those guidelines here. We would like to highlight the first of the principles, which counsels that:

*When providing legal advice to guide contemplated executive branch action, OLC should provide an accurate and honest appraisal of applicable law, even if that advice will constrain the administration's pursuit of desired policies. The advocacy model of lawyering, in which lawyers craft merely plausible legal arguments to support their clients' desired actions, inadequately promotes the President's constitutional obligation to ensure the legality of executive action.*

We do not want to be misunderstood. Although we do not believe that OLC should act as an advocate as described above, we do believe that OLC can and should play the role of honest adjudicator of legal questions even while serving as close legal advisor to the Attorney General and the President. It is OLC's duty to give the President its best appraisal of what the law allows and forbids, even if this means informing the President

---

[26] *See, e.g.*, Al-Haramain Islamic Found. v. Bush, 507 F.3d 1190 (9th Cir. 2007); ACLU v. Nat'l Sec. Agency, 498 F.3d 644 (6th Cir. 2007).
[27] Memorandum from U.S. Dep't. of Justice, Office of Info. and Privacy (Oct. 12, 2001), available at www.usdoj.gov/oip/foiapost/2001foiapost19.htm.
[28] *See The Ashcroft Memo*, COALITION OF JOURNALISTS FOR OPEN GOVERNMENT http://www.cjog.net/background_the_ashcroft_memo.html.
[29] Dawn E. Johnsen, *Faithfully Executing the Laws: Internal Legal Constraints on Executive Power*, 54 UCLA L. REV. 1559 app. at 1603-11 (2007).

that some proposed course of action would be illegal. In order for OLC to play this role effectively, however, the President must have confidence that OLC is willing to assist the President in advancing his or her policy objectives in a legally permissible manner. If this confidence is lacking, there is a real risk that on important matters the President will go elsewhere for legal counsel. The roles of presidential advisor and honest, neutral arbiter of legal questions, then, are not mutually exclusive, but mutually reinforcing.

It is also important to see the failure of OLC in the current Administration to live up to its proper role – including its willingness to operate as an advocate and to offer thinly plausible, or even implausible, legal justifications for the President's policy goals – in the broader context of attempts to politicize the Department of Justice more generally. Congress has held hearings, and the Inspector General and Office of Professional Responsibility have issued a number of reports, with more forthcoming, on these activities. There have been troubling revelations that partisanship played a role in hiring decisions for career attorneys and for immigration law judges, and also indications that the decision to fire United States Attorneys was influenced, at least in part, by a design to encourage partisan-influenced prosecution decisions.[30] If our commitment to the rule of law has any meaning, these abuses cannot be tolerated. The next President should instruct the Attorney General to adopt measures to ensure that nothing similar ever happens again and that Justice Department decisions taken in the future are free of any lingering taint of partisanship.

Public confidence in the impartial administration of justice must be restored. It is not sufficient that the President and Attorney General themselves be satisfied that they have addressed the problem. Their efforts must be considered credible on bipartisan and interbranch bases.

* * * * *

Executive Branch lawyers play a critical role in ensuring that the government adheres to the rule of law. To address past abuses and restore the Department of Justice's integrity and credibility, we urge the next President and Attorney General to undertake the various recommendations that we have laid out above. Our recommendations also reflect our appreciation of the important role that OLC plays in safeguarding those presidential powers that rest on secure constitutional foundations. Indeed, one of the reasons to correct the abuses of the current Administration is to ensure that the President and his lawyers do not operate under clouds of suspicion and skepticism when they do their duty and defend executive authority in appropriate circumstances. The next Administration, whoever heads it, will no doubt engage in controversial assertions of executive power.

---

[30] OFFICE OF THE INSPECTOR GEN. & OFFICE OF PROF'L RESPONSIBILITY, U.S. DEP'T OF JUSTICE, AN INVESTIGATION OF ALLEGATIONS OF POLITICIZED HIRING BY MONICA GOODLING AND OTHER STAFF IN THE OFFICE OF THE ATTORNEY GENERAL (July 28, 2008); OFFICE OF THE INSPECTOR GEN. & OFFICE OF PROF'L RESPONSIBILITY, U.S. DEP'T OF JUSTICE, AN INVESTIGATION OF ALLEGATIONS OF POLITICIZED HIRING IN THE DEPARTMENT OF JUSTICE HONORS PROGRAM AND SUMMER LAW INTERN PROGRAM (June 24, 2008). These reports are available at http://www.usdoj.gov/opr/index.html. For a discussion of the adverse effects of the politicized hiring of immigration law judges, see Charlie Savage, *Vetted Judges More Likely to Reject Asylum Bids*, N.Y. TIMES (Aug. 23, 2008).

These assertions should not be alarming from the standpoint of the rule of law if they are made openly and accountably, are based on well-supported constitutional interpretations, and emerge from a process that respects the structural checks against abuse of power.