1  **Jon B. Eisenberg, California Bar No. 88278** (jon@eandhlaw.com)
   **William N. Hancock, California Bar No. 104501** (bill@eandhlaw.com)
2  **Eisenberg & Hancock LLP**
   1970 Broadway, Suite 1200 • Oakland, CA  94612
3  510.452.2581 – Fax 510.452.3277

4  **Steven Goldberg, Oregon Bar No. 75134** (steven@stevengoldberglaw.com)
   River Park Center, Suite 300 • 205 SE Spokane St.• Portland, OR 97202
5  503.445-4622 – Fax 503.238.7501

6  **Thomas H. Nelson, Oregon Bar No. 78315** (nelson@thnelson.com)
   P.O. Box 1211, 24525 E. Welches Road • Welches, OR 97067
7  503.622.3123 - Fax: 503.622.1438

8  **Zaha S. Hassan, California Bar No. 184696** (zahahassan@comcast.net)
   P.O. Box 1168• Lake Oswego, OR 97034
9  360.213.9737 - Fax 866.399.5575

10 **J. Ashlee Albies, Oregon Bar No. 05184** (ashlee@sstcr.com)
   **Steenson, Schumann, Tewksbury, Creighton and Rose, PC**
11 815 S.W. Second Ave., Suite 500 • Portland, OR 97204
   503.221.1792 – Fax 503.223.1516
12
   **Lisa R. Jaskol, California Bar No. 138769** (ljaskol@earthlink.net)
13 610 S. Ardmore Ave.• Los Angeles, CA 90005
   213.385.2977 – Fax 213.385.9089
14

15 Attorneys for Plaintiffs Al-Haramain Islamic Foundation, Inc., Wendell Belew and Asim Ghafoor

16          **IN THE UNITED STATES DISTRICT COURT**
            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
17

| | |
|---|---|
| 18 **IN RE NATIONAL SECURITY AGENCY TELECOMMUNICATIONS RECORDS LITIGATION** | ) MDL Docket No. 06-1791 VRW )<br>) |
| 19 | ) **PLAINTIFFS' MEMORANDUM OF** |
| 20 <u>This Document Relates Solely To:</u> | ) **POINTS AND AUTHORITIES IN SUPPORT**<br>) **OF CLAIM FOR PUNITIVE DAMAGES** |
| 21 *Al-Haramain Islamic Foundation, Inc., et al. v. Obama, et al.* (C07-CV-0109-VRW) | )<br>) |
| 22 **AL-HARAMAIN ISLAMIC FOUNDATION, INC., et al.,** | )<br>) |
| 23 | ) |
| 24                    Plaintiffs,<br>        vs. | )<br>) |
| 25 **BARACK H. OBAMA, President of the United States, et al.,** | )<br>) |
| 26 | ) |
| 27                    Defendants. | ) |

28

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   THE EVIDENCE IN THE RECORD SUPPORTING PUNITIVE DAMAGES . . . . . . 1

    A.   The evidence demonstrates at least 204 days of warrantless electronic
    surveillance, from February 19, 2004 through September 9, 2004 . . . . . . . . . . . 1

    B.   February 19, 2004 through March 9, 2004: plaintiffs are surveilled while
    the DOJ repeatedly advises the White House that the TSP lacks
    constitutional support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.   March 10, 2004: White House officials attempt to pressure the gravely ill
    Attorney General to recertify the TSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    D.   March 11, 2004 through May 5, 2004: the TSP continues without the
    DOJ's recertification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    E.   May 6, 2004 through September 9, 2004: the TSP continues under the
    DOJ's newly-concocted AUMF justification . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.  THE LEGAL STANDARDS FOR ASSESSING PUNITIVE DAMAGES . . . . . . . . . . 7

    A.   Punitive damages are authorized by FISA section 1810(b) . . . . . . . . . . . . . . . 7

    B.   Punitive damages may be awarded for conduct that was malicious,
    oppressive, or in reckless disregard of the plaintiffs' rights . . . . . . . . . . . . . . 8

    C.   In determining the amount of punitive damages to award, the Court should
    consider three guideposts: the degree of reprehensibility of defendants'
    conduct, the disparity between the compensatory and punitive damages,
    and the difference between the punitive damages and civil or criminal
    penalties that could be imposed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    D.   Single-digit multipliers are likely to comport with due process . . . . . . . . . . . 10

III. WHY THIS COURT SHOULD AWARD PUNITIVE DAMAGES . . . . . . . . . . . . . . 11

    A.   Defendants' conduct was oppressive and in reckless disregard of the plaintiffs'
    rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.   Defendants' conduct was especially reprehensible . . . . . . . . . . . . . . . . . . . . . . 12

        1.   This lawbreaking by members of the Executive Branch,
        including the President himself, was of considerable
        dimension . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2.   The lawbreaking was repetitive, spanning a five-year period . . . . . . . . 14

        3.   Defendants continued the surveillance even while they
        knew or suspected that it was unlawful . . . . . . . . . . . . . . . . . . . . . . . . . 14

4.      The lawbreaking featured one of the most egregious acts of affirmative misconduct in recent presidential history – the White House's attempt to pressure the gravely ill Attorney General to recertify the TSP ................................... 14

C.      The compensatory damages are modest in amount ..................... 15

D.      The lawbreaking is a felony punishable by a $10,000 fine and/or five years imprisonment ...................................................... 15

IV.     *CY PRES* DISTRIBUTION ................................................ 16

CONCLUSION ................................................................ 16

1

**TABLE OF AUTHORITIES**

**Page**

2

**CASES**

3

4 *BMW of North America, Inc. v. Gore*
517 U.S. 559 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 13, 14, 15

5 *CGB Occupational Therapy, Inc. v. RHA Health Services, Inc.*
499 F.3d 184 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

6

7 *Dang v. Cross*
422 F.3d 800 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

8 *In re "Agent Orange" Product Liability Litigation*
818 F.2d 179 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

9

10 *In re National Security Agency Telecommunications Records Litigation*
564 F.Supp.2d 1109 (N.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 4, 7, 13

11 *In re National Security Agency Telecommunications Records Litigation*
___ F.Supp.2d ___, 2010 WL 1244349 (N.D. Cal. 2010) . . . . . . . . . . . . 2, 13

12

13 *Mathias v. Accor Econ. Lodging, Inc.*
347 F.3d 672 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15, 16

14 *Philip Morris USA v. Williams*
549 U.S. 346 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

15

16 *Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists*
422 F.3d 949 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

17 *Siddiqui v. United States*
359 F.3d 1200 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18

19 *Six (6) Mexican Workers v. Arizona Citris Growers*
904 F.2d 1301 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

20 *Smith v. Wade*
461 U.S. 30 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

21

22 *State Farm Mutual Automobile Insurance Co. v. Campbell*
538 U.S. 408 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 14, 15

23 *United States v. Nixon*
418 U.S. 683 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

24

25 *White v. Ford Motor Co.*
500 F.3d 963 (9th Cir. (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

26 *Youngstown Sheet and Tube Co. v. Sawyer*
343 U.S. 579 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

27

28  //

**STATUTES AND RULES**

26 U.S.C. § 7431 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

42 U.S.C. § 1981a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

50 U.S.C. § 1801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

50 U.S.C. § 1809 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

50 U.S.C. § 1810 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 8, 11

50 U.S.C. § 1811 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**MISCELLANEOUS**

FISA Annual Reports to Congress 1979-2009, *available at*
    http://www.fas.org/irp/agency/doj/fisa/#rept . . . . . . . . . . . . . . . . . . . . 13

JACK GOLDSMITH, THE TERROR PRESIDENCY 181 (2007). . . . . . . . . . . . . . . . . . . . . . . . 4

*Hearing on FBI Oversight Before the H. Comm. on the Judiciary*, 110th Cong.
    (July 26, 2007) (testimony of Robert S. Mueller III) . . . . . . . . . . . . . . . . 4

*Hearing on the U.S. Attorney Firings Before the S. Comm. on the Judiciary*, 110th Cong.
    (May 15, 2007) (testimony of James B. Comey) . . . . . . . . . . . . . . . . 3, 5, 6, 14

Elena Kagan, Address to Cadets at the United States Military Academy at West Point
    (Oct. 17, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

Model Civ. Jury Instr. 9th Cir. 5.5 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

OFFICES OF INSPECTORS GENERAL, UNCLASSIFIED REPORT ON THE
    PRESIDENT'S SURVEILLANCE PROGRAM (July 10, 2009) . . . . . . . . . . . . 2, 3, 4, 5, 6, 7, 14

*Written Questions to Former Deputy Attorney General James B. Comey*, 110th Cong.
    (May 22, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 6

# INTRODUCTION

This Court has found defendants civilly liable to plaintiffs under the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. § 1810, for eavesdropping on their telephone conversations without a FISA warrant. Plaintiffs have submitted a proposed form of judgment seeking, for each plaintiff, compensatory damages in the sum of $20,400 and punitive damages in the sum of $183,600. On April 19, 2010, the Court ordered that "[t]o substantiate their request for an award of punitive damages, plaintiffs must file a memorandum of points and authorities that identifies the applicable legal standard and the evidence in the record that plaintiffs contend will support an award of punitive damages." Dkt. #118. This memorandum is submitted pursuant to that order.

The case for awarding punitive damages here is substantial and compelling. Defendants abused the extraordinary power of the Executive Branch by committing unlawful electronic surveillance of the plaintiffs with full knowledge of, and in flagrant disregard for, determinations by top officials in the Department of Justice (DOJ) that the surveillance lacked constitutional or other legal support. Defendants sought to put themselves above the law, in the manner of a monarch. That is a profound abuse of America's trust. It calls for strong medicine.

# ARGUMENT

## I.

## THE EVIDENCE IN THE RECORD SUPPORTING PUNITIVE DAMAGES

**A.    The evidence demonstrates at least 204 days of warrantless electronic surveillance, from February 19, 2004 through September 9, 2004.**

At the hearing of September 23, 2009, *see* Dkt. #114 at 21-25, plaintiffs' counsel explained how the evidence in the record demonstrates at least 204 days[1] of plaintiffs' warrantless electronic surveillance, as follows:

Defendants announced the investigation of Al-Haramain Islamic Foundation, Inc. (AHIF) on February 19, 2004. The investigation culminated in AHIF's designation as a Specially Designated Global Terrorist (SDGT) organization on September 9, 2004, where defendants asserted

---

[1]    At the time of the hearing, plaintiffs' counsel, ever mathematically challenged, miscalculated the period as 202 days. *See* Dkt. #114 at 24. The correct number is 204 days.

that AHIF had "direct links" to Osama bin-Laden based on warrantless electronic surveillance of telephone conversations in which the participants made reference to individuals associated with Osama bin-Laden. It is reasonable to infer from this evidence that defendants conducted plaintiffs' surveillance continuously throughout the investigation period.[2] One would expect no less diligence from our Nation's intelligence community. Any calculation of a period of surveillance less than those 204 days would have to assume either an absurd scenario in which defendants somehow managed to eavesdrop on the plaintiffs only on the very days when they made reference to individuals associated with Osama bin-Laden, or such implausible incompetence by the investigators that they ceased their surveillance at the first mention of those individuals.

It is also reasonable to assume – indeed, it seems indisputable – that plaintiffs' electronic surveillance continued after the SDGT designation, beyond the 204-day investigation period. But the 2009 report of the Offices of Inspectors General, submitted in support of plaintiffs' motion for partial summary judgment, indicates that the so-called Terrorist Surveillance Program (TSP) was "transitioned" to FISA authorization "over a two-year period," after which the TSP was discontinued on February 1, 2007. *See* OFFICES OF INSPECTORS GENERAL, UNCLASSIFIED REPORT ON THE PRESIDENT'S SURVEILLANCE PROGRAM (July 10, 2009) [hereinafter INSPECTORS GENERAL REPORT], Suppl. Decl. of Jon B. Eisenberg, Dkt. #104-2 at 35.[3] That means the "transitioning" began in early 2005, which means it is possible that electronic surveillance of the plaintiffs from early 2005 onward was FISA authorized. For this reason, plaintiffs restrict their damages period to the 204 days of AHIF's investigation ending with the SDGT designation, which indisputably preceded the TSP's transitioning to FISA.

---

[2] If defendants wish to attempt to rebut this reasonable inference with contrary evidence, they can present any such evidence (upon which plaintiffs may wish to conduct discovery) under secure conditions as prescribed by FISA section 1806(f). However, defendants have already foregone the opportunity to proceed under section 1806(f). *See In re National Security Agency Telecommunications Records Litigation*, ___ F.Supp.2d ___, 2010 WL 1244349 at *14 (N.D. Cal. (2010).

[3] All page number citations in this memorandum for documents filed with the Court are to the page numbers in the running headers created by the ECF system.

The key item of evidence in the record supporting punitive damages is the 2009 Inspectors General Report. Other evidence includes oral testimony and written statements by former Deputy Attorney General James B. Comey before the Senate Judiciary Committee in May 2007. *See Hearing on the U.S. Attorney Firings Before the S. Comm. on the Judiciary*, 110th Cong. (May 15, 2007) [hereinafter *Comey Testimony*] (testimony of James B. Comey), Decl. of Jon B. Eisenberg, Dkt. #99-2 at 20-33; *Written Questions to Former Deputy Attorney General James B. Comey*, 110th Cong. (May 22, 2007) [hereinafter *Comey Written Statements*], Decl. of Jon B. Eisenberg, Dkt. #99-2 at 34-39.

**B.     February 19, 2004 through March 9, 2004: plaintiffs are surveilled while the DOJ repeatedly advises the White House that the TSP lacks constitutional support.**

We begin our analysis of the record evidence with the period February 19, 2004, when defendants announced AHIF's investigation, through March 9, 2004, the day before the DOJ's recertification of the TSP was set to expire.

The 2009 Inspectors General report describes how, after Jack Goldsmith was appointed Assistant Attorney General for the Office of Legal Counsel (OLC) in October 2003, he and another DOJ official, Patrick Philbin, determined that the TSP lacked constitutional support. The report explains that the initial OLC memorandum advocating the TSP's legality, issued by former Deputy Assistant Attorney General John Yoo on November 2, 2001, asserted that the President has inherent constitutional power to conduct warrantless electronic surveillance during wartime, but in late 2003 and early 2004 Yoo's successors at OLC concluded that his analysis was fundamentally flawed. INSPECTORS GENERAL REPORT, *supra* at 16-17. The report explains:

> Yoo did not address the section of FISA that creates an explicit exemption from the requirement to obtain a judicial warrant for 15 days following a congressional declaration of war. See 50 U.S.C. § 1811. Yoo's successors in OLC criticized this omission in Yoo's memorandum because they believed that by including this provision in FISA Congress arguably had demonstrated an explicit intention to restrict the government's authority to conduct electronic surveillance during wartime.

INSPECTORS GENERAL REPORT, *supra* at 17. The report adds that Yoo "omitted any discussion of *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)," and that Justice Jackson's formulation in *Youngstown* for determining the extent of presidential power "was an important factor in OLC's subsequent reevaluation of Yoo's opinions." INSPECTORS GENERAL REPORT, *supra* at 18.

1   Goldsmith later described the White House's approach as follows: "After 9/11 they and other top

2   officials in the administration dealt with FISA the way they dealt with other laws they didn't like:

3   they blew through them in secret based on flimsy legal opinions that they guarded closely so no one

4   could question the legal basis for the operations." JACK GOLDSMITH, THE TERROR PRESIDENCY 181

5   (2007).[4/]

6          In December 2003, Goldsmith and Philbin met with White House Counsel Alberto Gonzales

7   and Counsel to the Vice-President David Addington "to express their growing concerns about the

8   legal underpinnings of the program." INSPECTORS GENERAL REPORT, *supra* at 25.  In late January

9   2004, Comey was briefed and agreed with those concerns.  *Id.*  On March 1, 2004, Comey advised

10  defendant Robert S. Mueller III of those concerns.  *Id.* n. 14; *see also Hearing on FBI Oversight*

11  *Before the H. Comm. on the Judiciary*, 110thCong. (July 26, 2007) [hereinafter *Mueller Testimony*]

12  (testimony of Robert S. Mueller III), Decl. of Jon B. Eisenberg, Dkt. #99-2 at 43.  This caused

13  Mueller to have "some serious reservations about the warrantless wiretapping program." *Mueller*

14  *Testimony, supra* at 42.

15         On March 6, 2004, and again on March 7, 2004, Goldsmith and Philbin met with Gonzales

16  and Addington at the White House and "conveyed their conclusions." INSPECTORS GENERAL

17  REPORT, *supra* at 27.  On March 9, 2004, "Goldsmith told Gonzales he could not agree to

18  recommend" another 45-day DOJ recertification of the President's surveillance program, which was

19  set to expire on March 11, 2004, "because aspects of the program lacked legal support." *Id.*  Later

20  that day, in a meeting at the White House attended by Comey, Goldsmith and Philbin, Comey

21  advised Vice-President Dick Cheney and members of his and President Bush's staffs that he

22  (Comey) "could not support reauthorizing certain intelligence activities unless they were modified,"

23  _____

24  [4/]      This Court has previously agreed that "the authority to protect national security information
   is neither exclusive nor absolute in the executive branch.  When Congress acts to contravene the
25  President's authority, federal courts must give effect to what Congress has required." *In re National*
   *Security Agency Telecommunications Records Litigation*, 564 F.Supp.2d 1109, 1121 (N.D. Cal.
26  2008).  "Congress appears clearly to have intended to – and did – establish the exclusive means for
   foreign intelligence surveillance activities to be conducted.  Whatever power the executive may
27  otherwise have had in this regard, FISA limits the power of the executive branch to conduct such
28  activities . . . ." *Id.*

but "the White House officials said they could not agree to that modification." *Id.* at 27-28; *see also* *Comey Testimony supra* at 23-24, 29, 31-32; *Comey Written Statements, supra* at 36, 38. As Comey put it in his Senate testimony: "Our legal analysis was that we couldn't find an adequate legal basis for aspects of this matter. And for that reason, I couldn't certify to its legality." *Comey Testimony, supra* at 32.

Thus, during the period February 19, 2004 through March 9, 2004, defendants conducted plaintiffs' warrantless electronic surveillance with full knowledge of, and in flagrant disregard for, the DOJ's repeated advice to top White House officials that the TSP lacked constitutional support.

## C.   March 10, 2004: White House officials attempt to pressure the gravely ill Attorney General to recertify the TSP.

On March 10, 2004, President Bush instructed Gonzales and Andrew Card (Chief of Staff to the President) to go to George Washington University Hospital to speak with Attorney General John Ashcroft, who was in the intensive care unit recovering from surgery for severe gallstone pancreatitis. INSPECTORS GENERAL REPORT, *supra* at 26, 29. Around 7:00 p.m. that evening, Comey, who was serving as Acting Attorney General during Ashcroft's illness, learned that Gonzales and Card were on their way to the hospital to see Ashcroft. *Id.* at 29-30. In his Senate testimony, Comey described the drama that unfolded:

Comey telephoned his chief of staff and "told him to get as many of my people as possible to the hospital immediately." *Comey Testimony, supra* at 25. He also contacted Mueller, who said "'I'll meet you at the hospital right now.'" *Id.* Comey's security detail rushed Comey to the hospital, where he "got out of the car and ran up – literally ran up the stairs." *Id.* He was concerned that, "given how ill I knew the Attorney General was, that there might be an effort to ask him to overrule me when he was in no condition to do that." *Id.* Comey "raced to the hospital room," where Ashcroft was lying in his bed, gravely ill, the room darkened, his wife by his side. *Id.* Comey "immediately began speaking to [Ashcroft,] trying to orient him as to time and place, and try[ing] to see if he could focus on what was happening, and it wasn't clear . . . that he could. He seemed pretty bad off." *Id.*; *see also* INSPECTORS GENERAL REPORT, *supra* at 29-30.

//

Goldsmith and Philbin arrived shortly thereafter, and the three advised Ashcroft "not to sign anything." INSPECTORS GENERAL REPORT, *supra* at 30. Moments later, Gonzales and Card arrived. *Id.* Gonzales asked Ashcroft how he was feeling, and Ashcroft replied, "Not well." *Id.* Gonzales then attempted to get Ashcroft to sign a document recertifying the President's surveillance activities. *Id.*; *see also Comey Testimony, supra* at 26; *Comey Written Statements, supra* at 37. At that point, Ashcroft "stunned" Comey: "He lifted his head off the pillow and in very strong terms expressed his view of the matter, rich in both substance and fact," refused to sign the document, "and then laid his head back down on the pillow, seem[ing] spent." *Comey Testimony, supra* at 26. Gonzales and Card then left the room. INSPECTORS GENERAL REPORT, *supra* at 30. Moments later, Mueller arrived, finding Ashcroft "'feeble, barely articulate, clearly stressed.'" *Id.*

In his Senate testimony, Comey described this incident as "probably the most difficult time in my entire professional life." *Comey Testimony, supra* at 22. The conduct of Gonzales and Card "troubled [him] greatly." *Id.* Goldsmith told the DOJ's Inspector General that he found the incident "shameful." INSPECTORS GENERAL REPORT, *supra* at 32.

**D.     March 11, 2004 through May 5, 2004: the TSP continues without the DOJ's recertification.**

On March 11, 2004 – the day after Attorney General Ashcroft's sickbed refusal to recertify the President's surveillance program – Gonzales himself purported to recertify it, upon which President Bush authorized its continuation without the DOJ's recertification. INSPECTORS GENERAL REPORT, *supra* at 31. The TSP continued unabated. *Id.*

Thus, as of March 11, 2004, defendants continued their unlawful surveillance of the plaintiffs, not only in flagrant disregard for the DOJ's determination that the TSP lacked constitutional support, but now without even the DOJ's recertification.

The enormity of this misconduct was thereafter brought into stark relief when Comey, Goldsmith, Mueller, and other DOJ and FBI officials nearly resigned in protest. *Id.* at 32-33. But despite their concerns about the TSP's illegality, neither Comey, nor Goldsmith, nor Mueller did anything to halt its continued operation. *Id.* Instead, Goldsmith went to work trying to devise a new legal justification for it. *Id.* at 33-34.

**E.** **May 6, 2004 through September 9, 2004: the TSP continues under the DOJ's newly-concocted AUMF justification.**

On May 6, 2004 – the deadline for the next DOJ recertification of the President's surveillance program – Goldsmith and Philbin completed an OLC legal memorandum asserting the Authorization for Use of Military Force Against Terrorists (AUMF), issued by Congress on September 18, 2001, as a new legal justification for the TSP. INSPECTORS GENERAL REPORT, *supra* at 34. The remainder of the 204 days of plaintiffs' proven warrantless electronic surveillance took place based on the AUMF justification.

Plaintiffs' memorandum of points and authorities in support of their motion for partial summary judgment explains why the AUMF justification is as meritless as the constitutional justification that preceded it. *See* Plaintiffs' Motion for Partial Summary Judgment, Dkt. #99 at 25-29. In opposing partial summary judgment, defendants failed to address the AUMF justification's lack of merit. As explained in plaintiffs' reply memorandum, that failure effectively concedes the point. *See* Plaintiffs' Reply To Government Defs.' Oppo. To Pls.' Motion For Partial Sum. Jmt, Dkt. #104 at 6-7.

## II.

## THE LEGAL STANDARDS FOR ASSESSING PUNITIVE DAMAGES

**A.** **Punitive damages are authorized by FISA section 1810(b).**

FISA section 1810 expressly authorizes the recovery, from "any person" who has violated FISA, of "actual damages, but not less than liquidated damages of $1,000 or $100 per day for each day of violation, whichever is greater," 50 U.S.C. § 1810(a), *and* "punitive damages," *id.* § 1810(b). FISA defines "person" as "any individual, including *any officer or employee of the Federal Government*, or any person, entity, association, corporation, or foreign power." 50 U.S.C. § 1801(m) (emphasis added). This Court has ruled that because FISA "directs its prohibitions to 'Federal officers and employees,'" FISA section 1810 waives sovereign immunity. *In re National Security Telecommunications Records Litigation*, 564 F.Supp.2d at 1125. By parity of reasoning, that ruling applies equally to actual/liquidated damages under section 1810(a) *and* punitive damages under section 1810(b), for both are authorized "against any person," 50 U.S.C. § 1810, which includes "any

officer or employee of the Federal Government," 50 U.S.C. § 1801(m).

In this respect, FISA section 1810 differs from, for example, 42 U.S.C. section 1981a, which expressly *forbids* a recovery of punitive damages against the United States in an action for intentional employment discrimination, by stating: "A complaining party may recover punitive damages under this section against a respondent (other than government, government agency or political subdivision) . . . ." 42 U.S.C. § 1981a(b)(1).   Congress knows how to preclude such recovery, as in the manner of 42 U.S.C. section 1981a.   In contrast, FISA section 1810 contains no such preclusion.

Likewise, FISA section 1810 differs from 26 U.S.C. section 7431(c)(1), which provides that in an action for damages for unauthorized disclosures of tax information, the defendant shall be liable for the greater of $1,000, *id.* § 7431(c)(1)(A), *or* "actual damages . . . plus . . . punitive damages," *id.* §7431(c)(1)(B).  In *Siddiqui v. United States*, 359 F.3d 1200, 1203-04 (9th Cir. 2004), the court held that although section 7431(c)(1)(B) plainly authorizes "actual damages . . . plus . . . punitive damages," section 7431(c)(1)(A) does *not* plainly authorize punitive damages where the statutory $1,000 minimum is assessed without actual damages, and thus the statute "precludes punitive damages against the United States absent proof of actual damages." *Siddiqui*, 359 F.3d at 1204.   In contrast, FISA section 1810 plainly states that punitive damages may be assessed in *both* situations – where the court awards actual damages *and* where the court awards "liquidated damages of $1,000 or $100 per day for each day of violation."  50 U.S.C. § 1810(a) & (b).

**B.     Punitive damages may be awarded for conduct that was malicious, oppressive, or in reckless disregard of the plaintiffs' rights.**

Although section 1810(b) prescribes plaintiffs' entitlement to punitive damages, the statute offers no guidance as to the specific standard a court is to apply when deciding whether to award such damages in a particular case.   An appropriate analogy is to damage actions filed under 42 U.S.C. §1983 against government officials for depriving persons of federally-secured rights.  In such actions, the Supreme Court has looked to the common law, concluding that punitive damages may be awarded when the defendant's conduct was malicious or involved "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983); *see*

1   *also Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005). "Conduct is in reckless disregard of the

2   plaintiff's rights if, under the circumstances, it reflects complete indifference to the plaintiff's safety

3   or rights, or if the defendant acts in the face of a perceived risk that its actions will violate the

4   plaintiff's rights under federal law." Model Civ. Jury Instr. 9th Cir. 5.5 (2008).

5       Punitive damages are also appropriate if the defendants' conduct was oppressive – that is,

6   "'if done in a manner which injures or damages or otherwise violates the rights of another person

7   with unnecessary harshness or severity as by misuse or abuse of authority or power or by taking

8   advantage of some weakness or disability or the misfortunes of another person.'" *Dang*, 422 F.3d

9   at 809 (internal citations omitted).

10   **C.   In determining the amount of punitive damages to award, the Court should consider
11   three guideposts: the degree of reprehensibility of defendants' conduct, the disparity
     between the compensatory and punitive damages, and the difference between the
     punitive damages and civil or criminal penalties that could be imposed.**

12       In *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 562 (1996), the Supreme Court held

13   that an award of punitive damages violates constitutional due process requirements if the award is

14   "grossly excessive." The Court described three "guideposts" for judges to consider in ensuring that

15   the amount of a punitive damages award comports with due process. *Id.* at 574-75. The Court

16   elaborated on these guideposts in *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538

17   U.S. 408 (2003).[5]

18       First, the judge considers "the degree of reprehensibility of the defendant's conduct." *Gore*,

19   517 U.S. at 575. This guidepost is "[p]erhaps the most important indicium of the reasonableness of

20   a punitive damages award." *Id.* Punitive damages should reflect the "enormity" of the offense. *Id.*

21   "[E]vidence that a defendant has repeatedly engaged in prohibited conduct while knowing or

---

24   [5]   *Gore* explained: "Elementary notions of fairness enshrined in our constitutional jurisprudence
25   dictate that a person receive fair notice not only of the conduct that will subject him to punishment,
     but also of the severity of the penalty that a State may impose." *Gore*, 517 U.S. at 574. Assuming
26   *arguendo* that the federal government defendants here may be considered "persons" within the
     meaning of *Gore*, we address the *Gore* guideposts in this memorandum. We have not, however,
27   found any legal authority on point, and thus it appears to be an open question whether *Gore* and *State
     Farm* apply to lawsuits against the federal government. Arguably, then, this Court is not constrained
28   by constitutional due process concerns in assessing punitive damages here.

suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Id.* at 576-77. Punitive damages can be supported by evidence that "the conduct involved repeated actions" rather than being "an isolated incident." *State Farm*, 538 U.S. at 419. Support for punitive damages is also provide by evidence of "deliberate . . . acts of affirmative misconduct." *Gore*, 517 U.S. at 579. In general, "punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm*, 538 U.S. at 419.

Second, the judge considers "the disparity between the harm or potential harm suffered" and the proposed punitive damages award. *Gore*, 517 U.S. at 575. Stated another way, this guidepost focuses on the proposed punitive damages award and "its ratio to the actual harm inflicted." *Id.* at 580. "[L]ow awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Id.* at 582. In contrast, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425.

Third, the judge considers the difference between the punitive damages and "civil or criminal penalties that could be imposed for comparable misconduct." *Gore*, 517 U.S. at 583. Judges should accord substantial deference to legislative judgments, via imposition of civil or criminal penalties, concerning the severity of the misconduct. *Id.* In particular, the existence of a criminal penalty "has a bearing on the seriousness" of the misconduct. *State Farm*, 538 U.S. at 428. "When used to determine the dollar amount of the award, however, the criminal penalty has less utility." *Id.*

**D.     Single-digit multipliers are likely to comport with due process.**

A nine-to-one ratio of punitive to compensatory damages is generally considered to be the upper limit on punitive damages for purposes of satisfying due process concerns. "Single-digit multipliers are more likely to comport with due process . . . ." *State Farm*, 538 U.S. at 425. Courts have widely read this to mean that punitive damages awards exceeding a nine-to-one ratio are, for the most part, constitutionally suspect. *See, e.g., Planned Parenthood of Columbia/Willamette, Inc.*

1   *v. American Coalition of Life Activists*, 422 F.3d 949, 962-63 (9th Cir. 2005).

2   Nevertheless, "in cases where there are insignificant economic damages but the behavior was

3   particularly egregious, the single-digit ratio may not be a good proxy for constitutionality." *Id.* at

4   962. Thus, for example, in *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003),

5   the court upheld a 37.2-to-one punitive damages award – with punitive damages of $186,000 and

6   compensatory damages of $5,000 – because "[t]he defendant's behavior was outrageous but the

7   compensable harm done was slight and at the same time difficult to quantify because a large element

8   of it was emotional." *See also supra* p. 9, note 5.

9                                        III.

10   **WHY THIS COURT SHOULD AWARD PUNITIVE DAMAGES**

11   **A.    Defendants' conduct was oppressive and in reckless disregard of the plaintiffs' rights.**

12   There are two separate and independent grounds for awarding plaintiffs punitive damages

13   under FISA section 1810(b).

14   First, defendants conducted plaintiffs' unlawful surveillance in reckless disregard of their

15   rights, having acted "in the face of a perceived risk" that the surveillance would "violate the

16   plaintiff's rights under federal law." Model Civ. Jury Instr. 9th Cir. 5.5 (2008). From February 19,

17   2004 through March 10, 2004, defendants surveilled the plaintiffs with full knowledge of, and in

18   flagrant disregard for, the DOJ's conclusion that the TSP lacked constitutional or other legal support.

19   Knowing the DOJ's conclusion, defendants surely perceived the risk that their actions violated FISA.

20   From March 11, 2004 through May 5, 2004, defendants continued to surveil the plaintiffs without

21   even the DOJ's recertification of the TSP, compounding the perception of the risk.

22   Even during the period May 6, 2004 through September 9, 2004, after Goldsmith and Philbin

23   concocted the AUMF justification, defendants must have still perceived the risk that the TSP

24   violated FISA, because no reasonable lawyer could have been convinced by the AUMF justification.

25   Top government attorneys in President Obama's administration, including Principal Deputy Solicitor

26   General Neal Katyal, Assistant Attorney General David Kris, and Associate Deputy Attorney

27   General Donald B. Verrilli, Jr., agree that nothing in the AUMF trumps FISA, saying so in public

28   statements ranging from sober analysis to outright ridicule. *See* Plaintiffs' Motion for Partial

1   Summary Judgment, Dkt. #99 at 29.  Defendants wisely made no effort to defend the AUMF

2   justification in their opposition to plaintiffs' motion for partial summary judgment.  It is indefensible.

3          Second, plaintiffs' unlawful surveillance was oppressive in that it occurred "by misuse or

4   abuse of authority or power."  *Dang*, 422 F.3d at 809-10.  The authority and power of the President

5   of the United States is vast, profound, and conferred by the trust of the American people.  There can

6   be no greater misuse and abuse of that authority and power – no greater betrayal of America's trust

7   – than to turn it against the American people by using it to violate their federally-secured rights.

8   That is oppressiveness by any definition.

9   **B.     Defendants' conduct was especially reprehensible.**

10          **1.     This lawbreaking by members of the Executive Branch, including the President
                     himself, was of considerable dimension.**

11          We now address the *Gore* guideposts for ensuring that the amount of a punitive damages

12  award comports with due process.   Starting with the "reprehensibility" guidepost, we find

13  government conduct that was especially reprehensible.

14          This case involves government misconduct of historic proportions.  The President of the

15  United States, the National Security Agency (NSA), the Federal Bureau of Investigation (FBI), the

16  Office of Foreign Assets Control (OFAC) and their Directors committed multiple *felonies* by

17  repeatedly violating FISA, 50 U.S.C. § 1809 – in this case, and by committing warrantless electronic

18  surveillance of countless other victims whose identities remain cloaked in secrecy.  *See Philip*

19  *Morris USA v. Williams*, 549 U.S. 346, 355 (2007) (although punitive damages may not be used "to

20  punish a defendant directly" for harm to nonparties, "harm to nonparties can help to show that the

21  conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so

22  was particularly reprehensible"); *accord, White v. Ford Motor Co.*, 500 F.3d 963, 972 (9th Cir.

23  2007).  By any measure, that misconduct was deeply reprehensible.  Under the American system of

24  government, no member of the Executive Branch – not even the President – is free to ignore laws

25  properly enacted by Congress.  *See United States v. Nixon*, 418 U.S. 683, 715 (1974) (the President

26  is not "above the law").  As so aptly put by Solicitor General Elena Kagan, "the law and its precepts

27  reign supreme, no matter how high and mighty the actor and no matter how urgent the problem."

28

1  Elena Kagan, Address to Cadets at the United States Military Academy at West Point (Oct. 17, 2007)

2  [hereinafter *Kagan West Point Speech*].   Kagan has spoken eloquently of "the necessity for

3  government officials, including the very highest governmental official, to live under the law, to defer

4  to its purposes, to bow to its demands." *Id.*

5      It is no small thing for a court to rule – as has this Court – that the forty-third President of the

6  United States engaged in misconduct for which Congress has prescribed criminal as well as civil

7  liability.  By making it a crime to violate FISA, Congress has determined that, given the Nation's

8  regrettable history of "unchecked domestic surveillance by the executive branch," *In re National*

9  *Security Agency Telecommunications Records Litigation*, 564 F.Supp.2d at 1115, domestic

10  warrantless electronic surveillance for foreign intelligence purposes is intrinsically reprehensible.

11  As the Supreme Court in *Gore* put it, this is an offense of "enormity." *Gore*, 517 U.S. at 575.

12      The enormity of the offense is exacerbated by the fact that it was entirely unnecessary.  FISA

13  warrants are freely granted.  Between 1978 and 2008, the government submitted some 27,000

14  surveillance applications to the Foreign Intelligence Surveillance Court (FISC), which denied only

15  ten of those applications.  *See* FISA Annual Reports to Congress 1979-2009, *available at*

16  http://www.fas.org/irp/agency/doj/fisa/#rept.  If defendants had applied for a FISA warrant in this

17  case, they surely would have gotten one.  Defendants did not violate FISA because they *had* to; they

18  violated FISA because they *wanted* to.[6]

19

20  [6]      Another element of reprehensibility can be "abusive litigation tactics" and "litigation
    misconduct" by the defendant.  *CGB Occupational Therapy, Inc. v. RHA Health Services, Inc.*, 499
21  F.3d 184, 195 & n. 7 (3d Cir. 2007).  This Court has found such misconduct here. *See In re National*
    *Security Agency Telecommunications Records Litigation*, 2010 WL 1244349 at *8 ("What followed
22  [the Court's order of January 5, 2009] were several months of which the defining feature was
    defendants' refusal to cooperate with the court's orders punctuated by their unsuccessful attempts
23  to obtain untimely appellate review."); *id.* ("Next, after the United States completed suitability
    determinations for two of plaintiffs' attorneys and found them suitable for top secret/secure
24  compartmented information ('TS/SCI') clearances, government officials in one or more defendant
    agencies, including Keith B. Alexander, refused to cooperate with the court's orders, asserting that
25  plaintiffs' attorneys did not 'need to know' the information that the court had determined plaintiffs
    attorneys would need in order to participate in the litigation."); *id.* at *14 ("In an impressive display
26  of argumentative acrobatics, . . . defendants contend, this is not a FISA case and defendants are
    therefore free to hide behind the SSP all facts that could help plaintiffs' case.  In so contending,
27  defendants take a flying leap and miss by a wide margin.").

28

2.      **The lawbreaking was repetitive, spanning a five-year period.**

Next, the defendants "repeatedly engaged in prohibited conduct," *Gore*, 517 U.S. at 576, specifically as to the plaintiffs and generally throughout the TSP's life-span. The defendants unlawfully surveilled the plaintiffs daily for at least 204 days – and probably more than that. The TSP itself existed for more than five years, from its inception shortly after the terrorist attacks of September 11, 2001 through its purported termination on February 1, 2007. The misconduct here "involved repeated actions" rather than an "isolated incident." *State Farm*, 538 U.S. at 419.

3.      **Defendants continued the surveillance even while they knew or suspected that it was unlawful.**

Another significant factor is that, during plaintiffs' proven 204 days of surveillance, defendants perpetuated the TSP "while knowing or suspecting" that it was unlawful. *Gore*, 517 U.S. at 576. They knew it on February 19, 2004, the first of those 204 days, when the DOJ had already advised the White House that the TSP lacked constitutional or other legal support. They knew it after the March 10, 2004 incident at Attorney General Ashcroft's hospital bedside, when they continued the TSP without the DOJ's recertification. And surely they suspected it even after May 6, 2004, when they concocted a new legal justification which no reasonable lawyer could swallow and no lawyer within the Obama administration has even attempted to defend.

4.      **The lawbreaking featured one of the most egregious acts of affirmative misconduct in recent presidential history – the White House's attempt to pressure the gravely ill Attorney General to recertify the TSP.**

Finally, we come to one of the most egregious "deliberate . . . acts of affirmative misconduct," *Gore*, 517 U.S. at 579, in recent presidential history, where top White House officials, dispatched by President Bush himself, attempted to pressure Attorney General Ashcroft into recertifying the President's surveillance program as Ashcroft lay gravely ill in a darkened hospital room. Make no mistake about it, this was ugly behavior – so ugly that it prompted threats of mass resignations within the DOJ and FBI. Goldsmith called the incident "shameful." INSPECTORS GENERAL REPORT, *supra* at 32. Comey said it "troubled me greatly." *Comey Testimony, supra* at 22. Solicitor General Kagan has described Gonzales as a "lawyer who attempts to pressure a sick and sedated man to declare something legal that he thought was not." *Kagan West Point Speech, supra*.

1    If ever there was a situation where egregious acts of misconduct call for substantial punitive

2    damages in order "to achieve punishment or deterrence," *State Farm*, 538 U.S. at 419, this is it.

3    **C.    The compensatory damages are modest in amount.**

4    Next, we turn to the second *Gore* guidepost, which focuses on the disparity between

5    compensatory and punitive damages – where "low awards of compensatory damages may properly

6    support a higher ratio than high compensatory awards, if, for example, a particularly egregious act

7    has resulted in only a small amount of economic damages." *Gore*, 517 U.S. at 582.  Plaintiffs'

8    statutorily-authorized liquidated compensatory damages – "$1,000 or $100 per day for each day of

9    violation, whichever is greater," 50 U.S.C. § 1810(a) – are modest at best.  No doubt that is why

10   Congress authorized  punitive damages for FISA violations – because "the actual harm inflicted,"

11   *Gore*, 517 U.S. at 580, is difficult to measure in dollars.  This is a situation where substantial punitive

12   damages are necessary because "[t]he defendant's behavior was outrageous but the compensable harm

13   done was slight and at the same time difficult to quantify . . . ." *Mathias*, 347 F.3d at 677.  The

14   statutory provision for modest compensatory liquidated damages here calls for a high-end multiplier.

15   **D.    The lawbreaking is a felony punishable by a $10,000 fine and/or five years**
         **imprisonment.**
16

17   Finally, we address the third *Gore* guidepost, which focuses on "civil or criminal penalties that

18   could be imposed for comparable misconduct." *Gore*, 517 U.S. at 583.  Here we find very substantial

19   criminal penalties.  A FISA violation is a felony punishable by a $10,000 fine and/or five years

20   imprisonment.  50 U.S.C. § 1809.  While that fact has "less utility" for determining the amount of

21   punitive damages to award, it "has a bearing on the seriousness" of the misconduct. *State Farm*, 538

22   U.S. at 428.  It tells us Congress has determined that when the Executive Branch flouts the will of the

23   Legislative Branch, abuses presidential power, and betrays the trust of the American people by

24   violating FISA, it is misconduct of the greatest severity, calling for a substantial punitive damages

25   award.

26   //

27   //

28   //

## IV.

### *CY PRES* DISTRIBUTION

In light of the fact that the government is currently holding AHIF's assets in a blocked account, if the Court awards punitive damages to AHIF, plaintiffs will propose, upon the rendition of judgment, that in lieu of a transfer of those damages (and likewise compensatory damages) into AHIF's blocked account the Court shall order their *cy pres* distribution to one or more other charitable organizations whose missions are "consistent with the nature of the underlying action." *In re "Agent Orange" Product Liability Litigation*, 818 F.2d 179, 186 (2d Cir. 1987); *see Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1307-09 (9th Cir. 1990).

### CONCLUSION

Plainly punitive damages should be awarded here. The only question is *how much*. The *Gore* guideposts all point to a high-end multiplier of nine-to-one, as set forth in plaintiffs' proposed judgment. Indeed, case law would support an even higher ratio, due to the extreme outrageousness of defendants' behavior as compared with the modest and difficult-to-quantify compensable harm done to the plaintiffs. *Mathias*, 347 F.3d at 677; *see also supra* p. 9, note 5. In any case, the award of punitive damages should be sufficient to fit the enormity of the illegal conduct challenged in this litigation and to deter future Presidents from putting themselves above the law.

DATED this 7th day of May, 2010

　　　　　　　　　　　　　　　/s/ Jon B. Eisenberg

Jon B. Eisenberg, Calif. Bar No. 88278
William N. Hancock, Calif. Bar No. 104501
Steven Goldberg, Ore. Bar No. 75134
Thomas H. Nelson, Oregon Bar. No. 78315
Zaha S. Hassan, Ore. Bar No. 97062
J. Ashlee Albies, Ore. Bar No. 05184
Lisa Jaskol, Calif. Bar No. 138769

**Attorneys for Plaintiffs Al-Haramain Islamic Foundation, Inc., Wendell Belew, and Asim Ghafoor**

1

## CERTIFICATE OF SERVICE

2  RE:    **In Re National Security Agency Telecommunications Records Litigation,**
          **MDL Docket No. 06-1791 VRW; and,**
3         **Al-Haramain Islamic Foundation, Inc., et al. v. Obama, et al.,**
          **Docket Number C07-CV-0109-VRW.**
4

5          I am a citizen of the United States and employed in the County of San Francisco, State of
   California.  I am over eighteen (18) years of age and not a party to the above-entitled action.  My
   business address is Eisenberg and Hancock, LLP, 180 Montgomery Street, Suite 2200, San Francisco,
6  CA, 94104. On the date set forth below, I served the following documents in the manner indicated
   on the below named parties and/or counsel of record:
7

       •  **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
8         **OF CLAIM FOR PUNITIVE DAMAGES**

9

10 ____   **Facsimile** transmission from (415) 544-0201 during normal business hours, complete and
          without error on the date indicated below, as evidenced by the report issued by the
          transmitting facsimile machine.
11

12 ____   **U.S. Mail**, with First Class postage prepaid and deposited in a sealed envelope at San
          Francisco, California.
13 XX     **By ECF:** I caused the aforementioned documents to be filed via the Electronic Case Filing
          (ECF) system in the United States District Court for the Northern District of California, on
14        all parties registered for e-filing in *In Re National Security Agency Telecommunications
          Records Litigation*, Docket Number M:06-cv-01791 VRW, and *Al-Haramain Islamic
15        Foundation, Inc., et al. v. Obama, et al.*, Docket Number C07-CV-0109-VRW.

16         I am readily familiar with the firm's practice for the collection and processing of
   correspondence for mailing with the United States Postal Service, and said correspondence would be
17 deposited with the United States Postal Service at San Francisco, California that same day in the
   ordinary course of business.
18
           I declare under penalty of perjury that the foregoing is true and correct. Executed on April 16,
19 2010 at San Francisco, California.

20
                                        _____/s/ Susan Neff_____
21                                       SUSAN NEFF

22

23

24

25

26

27

28