MICHAEL F. HERTZ
Deputy Assistant Attorney General
DOUGLAS N. LETTER
Terrorism Litigation Counsel
JOSEPH H. HUNT
Director, Federal Programs Branch
VINCENT M. GARVEY
Deputy Branch Director
ANTHONY J. COPPOLINO
Special Litigation Counsel
MARCIA BERMAN
Senior Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Rm. 6102
Washington, D.C. 20001
Phone: (202) 514-4782—Fax: (202) 616-8460

*Attorneys for the Defendants*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE NATIONAL SECURITY AGENCY TELECOMMUNICATIONS RECORDS LITIGATION <br><br> <u>This Document Solely Relates To:</u> <br><br> *Al-Haramain Islamic Foundation et al.* <br>   *v. Obama, et al.*  (07-cv-109-VRW) | No. M:06-CV-01791-VRW <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' REQUEST FOR PUNITIVE DAMAGES** <br><br> Date:        (*No Hearing Set*) <br> Time: <br> Courtroom:    6, 17th Floor <br><br> Chief Judge Vaughn R. Walker |

1

<u>TABLE OF CONTENTS</u>

2  INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4  I.      FISA SECTION 1810 DOES NOT WAIVE SOVEREIGN IMMUNITY TO
           AUTHORIZE PUNITIVE DAMAGES AGAINST THE UNITED STATES . . . . . . . . 1

5

6  II.     ALTERNATIVELY, NO BASIS EXISTS TO AWARD PUNITIVE DAMAGES
           TO PLAINTIFFS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7          A.     Plaintiffs Present No Evidence Showing That Punitive Damages
                  Should be Awarded Based on Conduct Directed at Them  . . . . . . . . . . . . . . . . . 11

8

9          B.     Plaintiffs' Evidence of A Dispute Within the Executive Branch
                  Does Not Support an Award of Punitive Damages  . . . . . . . . . . . . . . . . . . . . . . 14

10         C.     The Standards for Determining Whether An Amount of Punitive
                  Damages Complies With Due Process Also Do Not Support the Entry

11                of Any Award Here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

12  CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

### CASES

*Al-Haramain Islamic Foundation, Inc. v. Bush,*
    507 F.3d 1190 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Al-Haramain Islamic Foundation Inc. v. United States Dep't. of the Treasury,*
    585 F. Supp. 2d 1233 (D. Or. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Al-Haramain Islamic Foundation Inc. v. United States Dep't. of the Treasury,*
    2009 WL 3756363 (D. Or. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*BMW of North America v. Gore,*
    517 U.S. 559 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 17, 18

*CGB Occupational Therapy, Inc. V. RHA Health Services, Inc.,*
    499 F.3d 184 (3rd Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*City of Newport v. Fact Concerts, Inc.,*
    453 U.S. 247 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Dep't of the Army v. Blue Fox, Inc.,*
    525 U.S. 255 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Dep't of Energy v. Ohio,*
    503 U.S. 607 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 6

*FDIC v. Meyer,*
    510 U.S. 471 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Gilbert v. DaGrossa,*
    756 F.2d 1455 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*In re National Security Agency Telecommunications Records Litigation,*
    564 F. Supp. 2d 1109 (N.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Kehoe v. Fidelity Federal Bank & Trust,*
    421 F.3d 1209 (11th Cir. 2005), *cert. denied*, 547 U.S. 1051 (2006) . . . . . . . . . . . . . . . . . 9

*Kolstad v. American Dental Association,*
    527 U.S. 526 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

*Lane v. Pena,*
    518 U.S. 187 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Lehman v. Nakshian,*
    453 U.S. 156 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Library of Congress v. Shaw,*
    478 U.S. 310 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Missouri Pac. R.R. v. Ault,*
    256 U.S. 554 (1921) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4

*Molzof v. United States,*
502 U.S. 301 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Monell v. New York City Dept. of Social Services,*
436 U.S. 658 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Philip Morris USA v. Williams,*
549 U.S. 346 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Pierson v. Ray,*
386 U.S. 547 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Pichler v. Unite,*
228 F.R.D. 230 (E.D. Pa. 2005), *aff'd,* 542 F.3d 380 (3rd Cir. 2008),
*cert. denied,* 129 S.Ct. 1662 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Pit River Home & Agr. Co-op. Ass'n v. United States,*
30 F.3d 1088 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Planned Parenthood of the Columbia/Willamette Inc. v. American Coalition of Life Activists,*
422 F.3d 949 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Protectus Alpha Navigation Co. Ltd v. North Pacific Grain Growers,*
767 F.2d 1379 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Siddiqui v. United States,*
359 F.3d 1200 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Sierra Club v. Whitman,*
268 F.3d 898 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Smith v. Wade,* 461 U.S. 30 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9, 10

*State Farm Mutual Automobile Insurance Co. v. Campbell,*
538 U.S. 408 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 17, 18, 19

*United States v. John Hancock Mut. Life Ins. Co.,*
364 U.S. 301 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Lewis County,*
175 F.3d 671 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-3

*United States v. Nordic Village, Inc.,*
503 U.S. 30 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4

*United States v. Sherwood,*
312 U.S. 584 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Testan,*
424 U.S. 392 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Vermont Agency of Natural Resources v. United States ex rel Stevens,*
529 U.S. 765 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*West v. Federal Aviation Admin.*,
  830 F.2d 1044 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*White v. Ford Motor Co.*,
  500 F.3d 963 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## STATUTORY LAW

18 U.S.C. § 2712(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18 U.S.C. § 2712(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

26 U.S.C. § 7431 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

26 U.S.C. § 7431(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

26 U.S.C. § 7431(c)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

26 U.S.C. § 7431(c)(1)(B)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

26 U.S.C. § 7431(c)(1)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

28 U.S.C. § 2674 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

33 U.S.C. § 1251 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. § 6901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. §1981a(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 9, 10

50 U.S.C. § 1801(m) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

50 U.S.C. § 1806(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

50 U.S.C. § 1809 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

50 U.S.C. § 1809(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

50 U.S.C. §1810 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

50 U.S.C. §1810(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

50 U.S.C. §1810 (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

50 U.S.C. § 1825(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

50 U.S.C. § 1845(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**REGULATIONS**

31 C.F.R. §§ 594.201(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

31 C.F.R. §§ 594.202(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**OTHER AUTHORITY**

1 T. Sedgwick, Measure of Damages §§ 366, 368 (8th ed. 1891)  . . . . . . . . . . . . . . . . . . . . . 10

2 J. Sutherland, Law of Damages § 390 (3d ed. 1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

C. McCormick, Law of Damages 280 (1935)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Prosser, the Law of Torts, § 2 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**INTRODUCTION**

Pursuant to the Court's Order of April 19, 2010 (Dkts. 724/118[1/]), Defendants hereby respond to Plaintiffs' Memorandum of Points and Authorities in Support of [Plaintiffs'] Claim for Punitive Damages. *See* Dkts. 729/122 (hereafter "Pls. Mem.").   As set forth below, even assuming, *arguendo*, that Section 110 of the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. §1810 (hereafter "Section 1810"), authorizes a cause of action against the United States, Congress has not taken the extraordinary step of waiving sovereign immunity from an award of *punitive* damages against the Government.  Alternatively, if the Court finds that Section 1810 authorizes punitive damages against the United States, plaintiffs' claim for such damages is meritless.

**ARGUMENT**

**I.     FISA SECTION 1810 DOES NOT WAIVE SOVEREIGN IMMUNITY TO AUTHORIZE PUNITIVE DAMAGES AGAINST THE UNITED STATES.**

Plaintiffs contend that the Court's prior determination that FISA Section 1810 authorizes a cause of action against the United States, *see In re National Security Agency Telecommunications Records Litigation*, 564 F. Supp. 2d 1109, 1124-25 (N.D. Cal. 2008), "applies equally" to a finding that punitive damages are available against the United States under this provision.  *See* Pls. Mem. (Dkts. 729/122) at 12-13.  The Government respectfully disagrees. The Court can and should find, consistent with its prior decision, that Section 1810—which under the court's prior ruling would apply to government and non-government parties alike—does not authorize an award of punitive damages against the Government.[2/]  The Court's

---

[1] The two docket citations are to the MDL docket (M: 06-1791-VRW) and the docket in this case (C: 07-109-VRW) respectfully.  Page citations to docket entries are to the page numbers in the running headers created by the court's ECF system.

[2] The Government continues to reserve its position that Section 1810 does not waive sovereign immunity to any extent.  *See* Memorandum of Points and Authorities in Support of Defendants' Second Motion to Dismiss or for Summary Judgment (Dkts. 432/17) at 18-22; Defendants' Reply in Support of Defendants' Second Motion to Dismiss or for Summary Judgment (Dkts. 446/29) at 9-12.  But the Court need not revisit that decision to find that punitive damages have not been authorized against the Government.

---

**Defendants' Opposition to Plaintiffs' Request for Punitive Damages**
*Al-Haramain v. Obama* **(07-cv-109-VRW) (MDL 06-cv-1791-VRW)**

prior determination did not address the distinct question of punitive damages.  As set forth below, the Court should find that the entry of such damages against the Government is not authorized by Section 1810.

It is settled that a claim against the United States must be based on an express waiver of sovereign immunity.  *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34 (1992); *FDIC v. Meyer*, 510 U.S. 471, 476 (1994) (waivers of sovereign immunity must be express and unequivocal); *Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992) (same); *see also Sierra Club v. Whitman*, 268 F.3d 898, 901 (9th Cir. 2001); *Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985).  The burden of showing an unequivocal waiver of immunity lies with the party who seeks to bring suit against the federal government.  *West v. Federal Aviation Admin.*, 830 F.2d 1044, 1046 (9th Cir. 1987).  Because "sovereign immunity is a jurisdictional defect, . . . [it] may be asserted by the parties at any time . . . ."  *Pit River Home & Agr. Co-op. Ass'n v. United States*, 30 F.3d 1088, 1100 (9th Cir. 1994).

The sovereign immunity of the United States encompasses not only immunity from suit, but also the authority to establish the terms upon which suit may proceed.  *See, e.g., Lehman v. Nakshian*, 453 U.S. 156, 160 (1981); *United States v. Testan*, 424 U.S. 392, 399 (1976) ("It has long been established, of course, that the United States, as sovereign, 'is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'") (*quoting United States v. Sherwood*, 312 U.S. 584, 586 (1941)).  Accordingly, even where the United States has generally waived its sovereign immunity from suit, the availability of particular terms of relief depend upon an additional express and particularized waiver by Congress.  *See, e.g., Nordic Vill*age, 503 U.S. at 34-37 (monetary claims unavailable); *Library of Congress v. Shaw*, 478 U.S. 310, 318-319 (1986) (Title VII's general waiver of immunity does not authorize interest); *Lehman*, 453 U.S. at 160 (jury trial unavailable); *see also United States v. John Hancock Mut. Life Ins. Co*., 364 U.S. 301, 308 (1960) (despite the general waiver of immunity from suit in 28 U.S.C. 2410, "the United States is not subject to local statutes of limitations"); *see also United States v. Lewis County*, 175

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

F.3d 671, 676-678 (9th Cir. 1999) (holding that where a federal statute partially waives sovereign immunity of the federal government from state taxation, the scope of that waiver did not extend to interest and penalties).  Any "limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." *Lehman*, 453 U.S. at 161; *see also Dep't of the Army v. Blue Fox, Inc*., 525 U.S. 255, 261 (1999) (a statutory waiver must "be strictly construed, in terms of its scope, in favor of the sovereign"); *Lane v. Pena*, 518 U.S. 187, 192 (1996) (same).

Even where a statutory cause of action authorizes suit against the United States, courts must consider separately the question of whether or to what extent that statute authorizes the entry of punitive remedies against the Government.  *See Dep't of Energy, supra,* 503 U.S. at 611-628; *Siddiqui v. United States*, 359 F.3d 1200, 1203-04 (9th Cir. 2004).   In *Dep't of Energy*, the Supreme Court held that the federal government was not subject to punitive liability in the form of civil fines imposed by a State for past violations of the Clean Water Act, 33 U.S.C. § 1251 *et seq*., and Resource Conservation and Recovery Act. 42 U.S.C. § 6901 *et seq*.   In the Clean Water Act, Congress had waived the government's immunity from suit and authorized monetary "sanction[s]" against the federal government as "civil penalties" for violating the Act's federal-facilities provisions.  503 U.S. at 615, 620-627.  The Court held, however, that the explicit waiver of sovereign immunity from monetary "sanctions," and Congress's use of "a seemingly expansive phrase like 'civil penalties arising under federal law,'" were not enough to prevent application of the "rule of narrow construction" for waivers of sovereign immunity.  *Id.* at 626-627.  To the contrary, application of that traditional rule led the Court to "take[] the waiver no further than" authorizing fines as sanctions to assure the government's prospective compliance.  *Id.* at 627.  The Court acknowledged the "unresolved tension" in the statutory scheme, which suggested that punitive sanctions may have been intended by Congress, but held that "under our rules"—with which "congressional familiarity" is presumed —"that tension is resolved by the requirement that any statement of waiver be unequivocal" and narrowly construed to favor the sovereign.  *Id.* at 615, 626-627.  *See also Missouri Pac. R.R. v. Ault*, 256

U.S. 554, 563-564 (1921) (applying principles of sovereign immunity, the Court construed the scope of a waiver of immunity for damages to be limited to compensatory damages, and not to include additional "double damages" for delayed payment).

Similarly, in *Siddiqui*, the Ninth Circuit considered whether 26 U.S.C. § 7431, which expressly authorizes "actual damages" plus punitive damages against the United States for the unauthorized disclosure of tax return information, authorized an award of punitive damages absent proof of any actual damages.[3]/ *See* 359 F.3d at 1203.  Thus, "the scope of the waiver of sovereign immunity" with respect to the statutory authorization of punitive damages was at issue, *i.e.*, whether proof of actual damages is always necessary to obtain any punitive damages. *See id.* The court held that, "[b]ecause the award of damages under § 7431 is allowed only pursuant to an express waiver of the Government's sovereign immunity, ambiguity as to whether § 7431(c)(1)(B) authorizes a punitive damages award absent proof of actual damages must be resolved in favor of the Government." *Id.* at 1204 (citing *Nordic Village*, 503 U.S. at 34).  The court also held that "when two contrary interpretations with respect to the proper scope of a statutory waiver of sovereign immunity are supportable, courts should not read the ambiguous portion of the statute to find a waiver." *Id.*   And because the interpretations of both parties were plausible, the court held that "Congress has not plainly waived the Government's sovereign

---

[3] Section 7341(a)(1) authorizes a cause of action "against the United States" . . . "if any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer. . . ."  *See* 26 U.S.C. § 7431(a)(1).  Section 7431(c) authorizes damages for such violations, providing in pertinent part, that: "In any action brought under subsection (a), upon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the sum of–(1) the greater of (A) $1,000 for each act of unauthorized inspection or disclosure of a return or return information with respect to which such defendant is found liable, or (B) the sum of-

(i) the actual damages sustained by the plaintiff as a result of such unauthorized inspection or disclosure, plus

(ii) in the case of willful inspection or disclosure or an inspection or disclosure which is the result of gross negligence, punitive damages . . .

*See* 26 U.S.C. § 7431(c) (also authorizing fees and costs).

immunity by clearly authorizing punitive damages without proof of actual damages." *Id.*

*Siddiqui* demonstrates that, even where punitive damages are expressly authorized, the scope of that authorization presents a question of sovereign immunity. Indeed, the Ninth Circuit undertook a sovereign immunity analysis in *Siddiqui* even where it was clear that the statute authorized punitive damages against the United States in certain circumstances, in order to determine whether that waiver extended unambiguously to those circumstances in which no actual damages were shown. The court held it did not. *See* 359 F.3d at 1203-04. Here, where the court has found that Section 1810 authorizes a cause of action against the United States, the question presented is whether that waiver extends to the particular remedy of punitive damages.

FISA Section 1810 establishes a cause of action against "persons" who violate Section 1809 of the FISA,[4] and authorizes the imposition of actual, liquidated, and punitive damages.[5] The FISA defines "person" to mean "any individual, *including* any officer or employee of the Federal Government, or any group, entity, association, corporation, or foreign power." *See* 50 U.S.C. § 1801(m). Thus, even assuming Section 1810 authorizes a cause of action against the Government, the statute applies to non-governmental defendants as well, and the distinct

---

[4] 50 U.S.C. § 1809(a) provides that a "person is guilty of an offense if he intentionally (1) engages in electronic surveillance under color of law except as authorized by statute; or (2) discloses or uses information obtained under color of law by electronic surveillance, knowing or having reason to know that that information was obtained through electronic surveillance not authorized by statute."

[5] 50 U.S.C. § 1810 provides in pertinent part: "An aggrieved person, other than a foreign power or an agent of a foreign power, as defined in section 1801(a) or (b)(1)(A) of this title, respectively, who has been subjected to an electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of section 1809 of this title shall have a cause of action against any person who committed such violation and shall be entitled to recover--

(a) actual damages, but not less than liquidated damages of $1,000 or $100 per day for each day of violation, whichever is greater;

(b) punitive damages; and

(c) reasonable attorney's fees and other investigation and litigation costs reasonably incurred.

---

sovereign immunity issue presented at this stage is whether Congress clearly authorized punitive damages against the United States or just against non-governmental defendants.

Plaintiffs contend the Court's finding that Section 1810's authorization of suit "against any person" includes the United States applies equally to Section 1810(a) and (b), which respectively authorize actual or liquidated damages and punitive damages.  We disagree.  The question at hand is not whether the term "person" in Section 1810 authorizes suit against the United States, but whether that authorization specifically encompasses the remedy of punitive damages.  *See Department of Energy*, *supra*, 503 U.S. at 615-619 (even where "persons" subject to suit expressly include "the United States," the availability of a punitive remedy is a separate question).  Plaintiffs' position that Section 1810 authorizes punitive damages against the Government runs up against the basic "presumption against imposition of punitive damages on governmental entities."  *Vermont Agency of Natural Resources v. United States ex rel Stevens*, 529 U.S. 765, 784-85 (2000) (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 262-63 (1981)).

In *City of Newport*, the Supreme Court considered whether a municipal government was subject to punitive damages under 42 U.S.C. § 1983.  The court had previously determined that a municipal government was a "person" within the meaning of that statute.  *See* 453 U.S. at 249 (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978)).  But, in *City of Newport*, the court rejected the imposition of punitive damages against a municipal government under Section 1983.  The Court noted that, at the time Section 1983 was enacted, "the immunity of a municipal corporation from punitive damages at common law was not open to serious question."  453 U.S. at 259.  Accordingly, given that this immunity was well established, the Court "proceed[ed] on the familiar assumption that 'Congress would have specifically so provided had it wished to abolish the doctrine.'"  *Id*. at 263 (citing *Pierson v. Ray*, 386 U.S. 547, 555 (1967)).  The Court went on to observe that, because punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor and deter similar conduct, such an award against a governmental entity makes little sense.

Regarding the retribution rationale, the Court in *City of Newport* concluded that "it remains true that an award of punitive damages against a municipality "punishes" only the taxpayers, who took no part in the commission of the tort." 453 U.S. at 267. "Neither reason nor justice suggests that such retribution be visited upon the shoulders of blameless or unknowing taxpayers." *Id.* "Damages awarded for *punitive* purposes, therefore, are not sensibly assessed against the governmental entity itself." *Id.* The Court in *City of Newport* also found that awarding punitive damages against a governmental entity would not serve the objective of deterring future misconduct. *See* 453 U.S. at 268-270. The Court observed that there "is no reason to suppose that corrective action, such as the discharge of offending officials who were appointed and the public excoriation of those who were elected, will not occur unless punitive damages are awarded against the municipality. *Id.* at 269. *City of Newport* thus makes clear that, absent an express statutory authorization, punitive damages should not be imposed on a governmental entity. This holding applies with equal force to the United States and underscores that, even if the United States is deemed to be a "person" subject to liability under Section 1810 of the FISA, a strong presumption against the imposition of punitive damages applies absent unambiguous authorization of such damages against the United States.

Notably, as discussed below, plaintiffs also encourage the Court to look to the law on awarding punitive damages under Section 1983, but not under *City of Newport*, which they fail to cite or address. Rather, plaintiffs suggest that *Smith v. Wade*, 461 U.S. 30 (1983), is applicable here. But in *Smith,* the court permitted an award of punitive damages against state officials in their individual capacities, not against state governments. *City of Newport* definitively precludes such an award against the Government here.[6]

Plaintiffs' contention that Congress must expressly forbid or exclude an award of punitive damages against the Government, *see* Pls. Mem. (Dkts. 729/122) at 13, wrongly inverts

---

[6] *City of Newport* also seriously undercuts plaintiffs' assertion that there is "no authority" as to whether governmental entities may be considered "persons" under the Due Process Clause for purposes of awarding punitive damages. *See* Pls. Mem. (Dkts. 729/122) at 14 n.5.

the immunity rule.  While Congress may decide to specify that punitive damages do not apply to the United States, particularly where a statutory remedy expressly applies to both the United States and other non-government parties, *see, e.g.*, 42 U.S.C. § 1981a(b)(1), the law remains that sovereign immunity must be expressly waived—not expressly reserved.  Thus, the failure of Congress to exclude the United States from the punitive damages remedy in Section 1810 is neither dispositive nor relevant.[7/]

Indeed, a superior indication that Congress did not intend to impose punitive damages against the Government for FISA violations may be found in 18 U.S.C. § 2712(a).  In Section 2712(a), Congress indisputably authorized suit against "the United States" for violations of specific provisions of the FISA, but did *not* authorize punitive damages against the United States.  *See* 18 U.S.C. § 2712(a) (authorizing "civil actions against the United States" for "actual damages" not less than $10,000 (and litigation costs) for willful violations of sections 106(a), 305(a), and 405(a) of the FISA, 50 U.S.C. §§ 1806(a), 1825(a), and 1845(a)).  The FISA sections listed in Section 2712 provide (respectively) that information obtained through electronic surveillance, physical searches, or pen register trap and trace devices may be used and disclosed only for lawful purposes (and, where applicable, in accord with certain minimization procedures).  Section 2712(b) requires litigants seeking to bring a cause of action under that section to follow administrative procedures under the Federal Tort Claims Act.[8/]  This statutory scheme demonstrates that, where Congress unambiguously intended to authorize suit against the United States for FISA violations, it did not authorize punitive damages.  Under plaintiffs' theory, in contrast, the Court must conclude that Congress intended to create two separate remedies for "use and disclosure" violations—one (in Section 2712) providing solely for actual damages "against the United States" and requiring exhaustion of administrative remedies, and

---

[7]  Also, Congress may not have expressly excluded the United States from punitive damages under Section 1810 because, as the Government contends, that provision does not authorize a cause of action against the United States.

[8]  The FTCA also does not authorize punitive damages against the United States.  *See* 28 U.S.C. § 2674.

another (in Section 1810) that purportedly imposes far more significant punitive damages on the Government, without any exhaustion, on the theory that the term "person" subjects the United States to this remedy.  The contrast between these statutory provisions weighs strongly against any finding that Section 1810 authorizes punitive damages against the United States.

In sum, where the scope of any waiver of sovereign immunity must be express, even as to particular terms and conditions of a remedy against the United States, and where there is a presumption against the imposition of punitive damages against the Government, the Court should conclude that FISA Section 1810 does not authorize punitive damages against the United States.

## II.   **ALTERNATIVELY**, **NO BASIS EXISTS TO AWARD PUNITIVE DAMAGES TO PLAINTIFFS.**

Assuming, *arguendo*, the Court finds that punitive damages may be awarded against the United States under Section 1810, it should find that there is no basis in law or fact to award any such damages here.  In contrast to other statutory provisions, Section 1810 does not provide any standard governing the determination of whether punitive damages should be awarded,[9] and it appears that no court has applied Section 1810 to award damages or opined at to what standard would be applicable here.[10]  Plaintiffs seek to import the standard for awarding punitive damages against state officials in their individual capacities under 42 U.S.C. § 1983.  *See* Pls. Mem. (Dkts. 729/122) at 13-14 (citing *Smith v. Wade*, 461 U.S. 30 (1983)).  Assuming, *arguendo*, the *Smith* standard applies to an award of punitive damages under FISA Section 1810, plaintiffs have

---

[9]  *See* 26 U.S.C. § 7431(a)(1)(B)(i),(ii) (authorizing actual damages against the United States as a result of such unauthorized inspection or disclosure of tax returns "plus (ii) in the case of a willful inspection or disclosure or an inspection or disclosure which is the result of gross negligence, punitive damages . . ."); *see also* 42 U.S.C. § 1981a(b)(1) (authorizing punitive damages against employers in Title VII discrimination actions, "other than a government, government agency, or political subdivision" if the complaining party demonstrates that the respondent engaged in a discriminatory practice "with malice or with reckless indifference to the federally protected rights of an aggrieved individual.").

[10]  *See Kehoe v. Fidelity Federal Bank & Trust,* 421 F.3d 1209, 1216 n.7 (11th Cir. 2005) (locating no guiding case authority interpreting the relevant remedial language of 50 U.S.C. § 1810), *cert. denied*, 547 U.S. 1051 (2006); *Pichler v. Unite*, 228 F.R.D. 230, 246 and n. 32 (E.D. Pa. 2005) (same), *aff'd*, 542 F.3d 380 (3rd Cir. 2008), *cert. denied*, 129 S.Ct. 1662 (2009).

failed to establish their right to such damages.[11]

The Supreme Court concluded in *Smith* that "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  461 U.S. at 56.  While the *Smith* Court determined that it was unnecessary to show actual malice to qualify for a punitive award under Section 1983, *see id.* at 45-48, "its intent standard, at a minimum, required recklessness in its subjective form" by the defendant.  *Kolstad v. American Dental Association*, 527 U.S. 526, 535-36 (1999).  That is, under the *Smith* standard, the defendant must possess "'subjective consciousness'" of a risk of injury or illegality and a "'criminal indifference to civil obligations.'" *Id.* at 536 (citing *Smith*, 461 U.S. at 37, n. 6, 41) (other citations omitted); *see also Kolstad*, 527 U.S. at 538 ("Most often . . . eligibility for punitive awards is characterized in terms of a defendant's motive or intent" and the justification "lies in the evil intent of the defendant," "bad motive," and "a positive element of conscious wrongdoing is always required.") (citing 1 T. Sedgwick, Measure of Damages §§ 366, 368 at 526 (8th ed. 1891); 2 J. Sutherland, Law of Damages § 390 at 1079 (3d ed. 1903); C. McCormick, Law of Damages 280 (1935)).

In addition, punitive damages "are never awarded as a matter of right, no matter how egregious the defendant's conduct."  *Smith*, 461 U.S. at 52.  Rather, the finder of fact must determine that the evidence satisfies the requisite standard <u>and</u> make a "discretionary moral judgment" that the defendant's conduct merits such an award.  *Id.*; *see Molzof v. United States*, 502 U.S. 301, 308 (1992) (punitive damages "embodies an element of the defendants' conduct that must be proved before such damages are awarded").  Such damages must "serve the purpose

---

[11]  As explained above, while punitive damages have been awarded in Section 1983 actions against individual state officials, the Supreme Court held in *City of Newport* that such damages could not be awarded against municipal governments. *See* 453 U.S. 254-270.  Thus, plaintiffs would apply to the United States a standard for determining whether punitive damages should be awarded that does not apply to local governments alleged to have violated rights secured by the Constitution.  This underscores that there is no waiver of sovereign immunity here for punitive damages.

'of punishing the defendant, of teaching him not to do it again, and of deterring others from following his example.'"  *Protectus Alpha Navigation Co. Ltd v. North Pacific Grain Growers*, 767 F.2d 1379, 1385 (9th Cir. 1985) (quoting Prosser, the Law of Torts, § 2, at 9 (1971)); *see also State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 416 (2003) (punitive damages serve broader non-compensatory function "aimed at deterrence and retribution"); *see also id*. at 417 (punitive damages "serve the same purposes as criminal penalties"); *accord BMW of North America v. Gore*, 517 U.S. 559, 568 (1996) (punitive damages serve a State's legitimate interest in punishing unlawful conduct and deterring its repetition).

Assuming the foregoing standards apply to an award of punitive damages against the United States under FISA Section 1810, plaintiffs have failed to demonstrate that an award of such damages here would be proper.

### A.    Plaintiffs Present No Evidence Showing That Punitive Damages Should be Awarded Based on Conduct Directed at Them.

In support of their claim for punitive damages, plaintiffs rely upon a purported internal disagreement within the Executive Branch concerning the legality of the Terrorist Surveillance Program around March 2004—at the time plaintiffs claim they were subjected to warrantless surveillance under that program.  We address below the inadequacy of this evidence to justify punitive damages, but note first that the inquiry here is whether any unlawful surveillance *of plaintiffs* warrants punitive damages.  The Supreme Court has made clear that an award of punitive damages must be based on evidence of actual harm against the particular plaintiffs in the case at hand.  *See Philip Morris USA v. Williams*, 549 U.S. 346, 353-55 (2007); *accord White v. Ford Motor Co.*, 500 F.3d 963, 971-72 (9th Cir. 2007).  Plaintiffs thus must demonstrate why any conduct directed at them warrants punitive damages.  General evidence that the lawfulness of the TSP may have been in dispute is insufficient for awarding punitive damages here.[12]

---

[12]  While "actual evidence" of harm to nonparties can "help show" that the challenged conduct was "particularly reprehensible," *Philip Morris*, 549 U.S. at 355, a court may not use punitive damages "to punish a defendant directly on account of harms it is alleged to have visited on nonparties."  Plaintiffs have not (and cannot) presented any evidence of "actual harm" to any

**Defendants' Opposition to Plaintiffs' Request for Punitive Damages**
*Al-Haramain v. Obama* **(07-cv-109-VRW) (MDL 06-cv-1791-VRW)**                    -11-

In its liability determination, the Court found that plaintiffs had made a *prima facie* case that they were subject to warrantless surveillance that had not been adequately rebutted by the Government. *See* March 31, 2010 Decision and Order (Dkts. 721/115) at 35-41, ¶¶ 1-16.  The Court found that plaintiffs Belew and Ghafoor had telephone conversations starting in February 2004 with Soliman Al-Buthe, a foreign national of Saudi Arabia who was an officer of the Al-Haramain Islamic Foundation of Saudi Arabia (hereafter "AHIF") and of the Al-Haramain Islamic Foundation of Oregon (hereafter "AHIF-Oregon").  *See id.* at 38-39, ¶¶8-11.  The Court cited evidence that Mr. Al-Buthe had been intercepted speaking with another individual, Ali al-Timimi, and inferred that a productive wiretap of Mr. al-Timimi "would have led to separate electronic surveillance of Al-Buthe beginning in early 2003" and that "this inference lends credence to the allegations of Belew and Ghafoor that their conversations with [Al-Buthe] in 2004 were wiretapped."  *See id.* at 31-33.  The Court also cited public evidence that in October 2001, the Treasury Department began to track the financing of terrorist activities, and one of the targets were the foreign branches of the Saudi Arabia-based Al-Haramain Islamic Foundation. *See id.* at 35, ¶ 2.  The Court also cited evidence that, in April 2002, the FBI created a Terrorist Financing Operations Section ("TFOS") that investigated potential terrorist-related financial transactions, and that the TFOS took over the investigation of Al-Haramain Islamic Foundation pertaining to terrorist financing.  *See id.* at 36 ¶ 3.  In addition, the Court cited the public version of a memorandum prepared by the Office of Foreign Assets Control ("OFAC") concerning the re-designation of AHIF-Oregon and Mr. Al-Buthe, *see id.* at 41,¶ 16 (citing Eisenberg Exh. Z, Dkt. 657-4/99-4), which indicates that, in March 2000, Mr. Al-Buthe was involved in the withdrawal of $150,000 in funds AHIF-Oregon's bank account that OFAC determined was transmitted to the Chechen mujahideen.  *See* Eisenberg Exh. Z, Dkt. 657-4/99-4 at 34, 35, 36.

In separate litigation concerning the re-designation of AHIF-Oregon as a specially designated global terrorist, the unclassified administrative record indicates, *inter alia*, that AHIF

---

nonparties and, in any event, must demonstrate why any conduct directed at them warrants punitive damages.

of Saudi Arabia, the headquarters of AHIF-Oregon, provided support for the al Qaida network, and that various terrorist organizations designated by the United States received funding from AHIF and used AHIF as a front for fundraising and operational activities. *See Al-Haramain Islamic Foundation Inc. v. United States Dep't of the Treasury*, 585 F. Supp. 2d 1233, 1241 (D. Or. 2008) (appeal pending).[13/] Such activities by AHIF included planning attacks against the U.S. Embassies in Kenya and Tanzania in 1998, and providing financial assistance to the entity that bombed a nightclub in Bali in 2002. *Id*. at 1241. In addition, the unclassified record in that case indicates that, as far back as 1999, a senior AHIF official was involved in directing a Bangladeshi national to conduct surveillance on U.S. consulates in India for potential terrorist attacks. *Id*. When the Bangladeshi national was arrested in 1999, he was carrying explosives and detonators to attack U.S. diplomatic missions in India. *Id.* In addition, the record of that case indicates that an AHIF branch in Pakistan supported the Taliban before it was removed from power. *Id.*

The unclassified administrative record in *AHIF v. Dep't of the Treasury* further indicates that Mr. Al-Buthe was an official of AHIF and one of the founders and officers of AHIF-Oregon. *Id*. at 1242. In upholding the re-designation of AHIF-Oregon, the court found that "there is substantial evidence of Al-Buthe's ownership or control over AHIF-Oregon up to AHIF-Oregon's redesignation." *Id.* at 1251. The court also found "sufficient evidence in the administrative record to support OFAC's conclusion that AHIF supported [Specially Designated Global Terrorists] and terrorist activities, and that Mr. Al-Buthe participated as a senior AHIF official." *Id*. at 1252. The court also found that the record "contains substantial evidence to support OFAC's reasonable belief that AHIF provided financial, material, technological and other support to SDGTs and to support OFAC's decision to block the assets of branch offices deemed a threat to the interests of the United States." *Id.* In support of this conclusion, the court cited in particular the March 2000 transaction in which Mr. Al-Buthe transferred funds from

---

[13] *See also Al-Haramain Islamic Foundation Inc. v. United States Dep't. of the Treasury*, 2009 WL 3756363 (D. Or. 2009) (entering final judgment).

1   AHIF-Oregon to the Chechen mujahideen. *Id.* at 1243, 1252. The court concluded that "the

2   combination of circumstances surrounding Al-Buthe's personal delivery of over $150,000 to

3   AHIF from AHIF-Oregon's hank account could reasonably be construed by OFAC as evidence

4   of financial support for terrorist activities." *Id.* at 1252.[14/]

5       Thus, assuming *arguendo* any surveillance occurred here, the phone conversations

6   between plaintiffs Belew and Ghafoor in 2004 and Mr. Al-Buthe, which were placed at issue at

7   the liability stage, involved a foreign national officer of a world-wide organization found to have

8   supported terrorism specifically against U.S. targets as early as 1999 and 2000. The other

9   plaintiff here, AHIF-Oregon, is the local chapter of AHIF that also has been found to have

10  supported designated terrorist organizations and activities. Accordingly, the question here is

11  whether punitive damages should be imposed on the United States for purportedly undertaking

12  foreign intelligence surveillance in violation of the FISA of a foreign-based organization, and

13  foreign national located outside the United States, found to have supported designated terrorist

14  organizations and activities. Although the Court found that unlawful surveillance occurred, the

15  circumstances surrounding the purported surveillance cannot be "shown to be motivated by evil

16  motive or intent," or "reckless or callous indifference to the federally protected rights of others,"

17  or "criminal indifference to civil obligations." *See Kolstad*, 527 U.S. at 535-36. Thus, an award

18  of punitive damages would not be appropriate in this case.

19  **B.    Plaintiffs' Evidence of a Dispute Within the Executive Branch Does
         Not Support an Award of Punitive Damages.**

20      Assuming that plaintiffs' evidence of a purported dispute within the Executive Branch

21  concerning the Terrorist Surveillance Program is relevant here, it likewise does not support the

22  imposition of punitive damages.

23      As a threshold matter, the Court should not impose punitive damages because the

24  evidence on which plaintiffs rely refers to additional classified details that cannot be disclosed in

25  order to adjudicate the question of punitive damages. Specifically, the public Inspector

26  _____

27      [14] The Court's determination was not based on any evidence contained in the so-called
    Sealed Document. *See AHIF v. Dep't of the Treasury*, 585 F. Supp. 2d at 1247, n. 7.

28  **Defendants' Opposition to Plaintiffs' Request for Punitive Damages**
    *Al-Haramain v. Obama* **(07-cv-109-VRW) (MDL 06-cv-1791-VRW)**                    -14-

Generals' Report and other evidence cited by plaintiffs indicates that the complete background pertaining to the disagreement within the Executive Branch in 2004 involves highly sensitive and still classified details. *See* Unclassified Inspector Generals' Report on the President's Surveillance Program (July 10, 2009) accompanying Suppl. Decl. of Jon B. Eisenberg (Dkt. 104-2) at 11 (hereafter "Public IG Rept."). Notably, the Public IG Report distinguishes between the "Terrorist Surveillance Program" publicly disclosed in December 2005, pursuant to which certain international communications were intercepted without a court order where there was a reasonable basis to conclude that one party to the communication was a member or agent of al-Qaeda or an affiliated organization, and "Other Intelligence Activities" that remain highly classified. *See* Public IG Rept. (Dkt. 104-2) at 10-11. The public report also indicates that the central concern at issue in the internal Executive Branch dispute of March 2004 that resulted in the visit to Attorney General Ashcroft's hospital room—on which plaintiffs place much weight (*see* Pls. Mem. Dkts. 729/122 at 10-11;19-20)—was related to the other still highly classified intelligence activities, not the Terrorist Surveillance Program that plaintiffs challenge in this case. *See* Public IG Rept. (Dkt. 104-2) at 25-30, 31 n.17, 33-34.[15/] A classified addendum to the IG report supports in greater detail the IG findings. *See id*. at 8.[16/]

Thus, in contrast to proceedings at the liability stage, where the Court ordered that plaintiffs may utilize solely publicly available evidence, plaintiffs seek to obtain punitive

---

[15] *See also* Public IG Rept. at 41-42 ("[T]his dispute—which resulted in the visit to Attorney General Ashcroft's hospital room by [White House Counsel] Gonzales and [White House Chief of Staff] Card concerned certain of the Other Intelligence Activities that were different from the communication interception activities that the President later publicly acknowledged as the Terrorist Surveillance Program, but that had been implemented through the same Presidential Authorizations."); *see also id*. at 42 (dispute about the TSP was "not the subject of the hospital room confrontation").

[16] The testimony of former Deputy Attorney General James Comey before the Senate Judiciary Committee ("SJC") on May 15, 2007, cited by plaintiffs, *see* Pls. Mem. (Dkts. 729/122) at 8-11, confirms the classified nature of the matter in dispute. *See* Exhibit G to Plaintiffs' Partial Motion for Summary Judgment, Dkt. 99-2 at 24 (hereafter "*Comey SJC Testimony*") (Mr. Comey testifies "Nor am I confirming it's any particular program."); *see also id*. at 31 (Mr. Comey testifies: "It's a very complicated matter, and I'm not going into what the program was or what the dimensions of the program . . .").

---

damages based on a report that includes a classified component that could negate, explain, or further address any inference plaintiffs seek to draw from the limited public version of the report. This demonstrates again that classified information is necessary to decide the issues in this case, including now the question of punitive damages. Defendants cannot fully address plaintiffs' reliance on information in the public version of the IG Report based on this incomplete record, and we object again (as we have throughout this case) to any use or disclosure of classified information to litigate the issues presented. In these circumstances, where the evidence on which plaintiffs rely implicates highly classified underlying information, that evidence should be excluded and an award of punitive damages rejected.[17]

Second, even if the Court considers solely the public version of the IG Report on which plaintiffs rely, it does not support plaintiffs' claim for punitive damages. As noted, the public report indicates that the central concern at issue in the March 2004 dispute on which plaintiffs place so much reliance was not the Terrorist Surveillance Program challenged in this case. *See* Public IG Rept. (Dkt. 104-2) at 25-30, 31 n.17, 33-34, 41-42. The Public IG Report also indicates that several Executive Branch officials, including then-Attorney General Ashcroft, then-Deputy Attorney General Comey, officials of the Office of Legal Counsel, and current FBI Director Mueller—against whom plaintiff seeks punitive damages in his official capacity—all sought to bring about change in the intelligence activities at issue. *See id*. at 24-33. The Public IG Report further indicates that President Bush, when informed of the dispute, directed FBI Director Mueller to gather the principals involved "to address the legal concerns so that the FBI could continue participating in the program." *Id.* at 33.[18] Finally, the Public IG Report indicates

---

[17] Moreover, the Court should not impose punitive damages because the Government declines to rebut plaintiffs' evidence by either disclosing that classified information or granting access to it by plaintiffs' counsel. A central dispute in this litigation has been whether the Government may properly protect highly classified information concerning intelligence matters or face the imposition of judgment and damages. The entry of damages as punishment for the Government's decision to protect national security information would be improper.

[18] *See Comey SJC Testimony* at 28 (Mr. Comey testified that "Director Mueller came to me and said that, "'The president told me that the Department of Justice should get this where it wants to be, to do what the department thinks is right.' And I took that mandate and set about to

1    that the matters in dispute, including the TSP, were subsequently authorized under orders of the

2    Foreign Intelligence Surveillance Court ("FISC").  *See id.* at 35-36.

3        Again, classified details concerning the matter cannot be disclosed.  But even assuming,

4    *arguendo*, that the discussion of the dispute within the Executive Branch in 2004 contained in

5    the *public* version of the IG report is relevant here, it does not support plaintiffs' claim for

6    punitive damages.

7        **C.    The Standards for Determining Whether An Amount of Punitive
              Damages Complies With Due Process Also Do Not Support the
              Entry of Any Award Here.**

8        Plaintiffs also brief at length whether the *amount* of punitive damages they seek would

9    comply with due process.  *See* Pls. Mem. (Dkts. 729/122) at 14-16;17-20.  In *BMW v. Gore*, the

10   Supreme Court "instructed courts reviewing punitive damages to consider three guideposts:

11   (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the

12   actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the

13   difference between the punitive damages awarded by the jury and the civil penalties authorized

14   or imposed in comparable cases.  *See* 517 U.S. at 574-75.  These determinations should not be

15   reached here, where there is no basis for an award at all.  Nonetheless, if the Court considers

16   these factors, they underscore that there is no basis for any award.

17       (1) *Alleged "Reprehensible" Conduct*:  "[T]he most important indicium of the

18   reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's

19   conduct." *Gore*, 517 U.S. at 575; *State Farm*, 538 U.S. at 419.  Courts must determine "the

20   reprehensibility of a defendant by considering whether: the harm caused was physical as

21   opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of

22   the health or safety of others; the target of the conduct had financial vulnerability; the conduct

23   involved repeated actions or was an isolated incident; and the harm was the result of intentional

24   malice, trickery, or deceit, or mere accident."  *State Farm*, 538 U.S. at 419 (citing *Gore*, 517

26   do that, and accomplished that.'"); *see also id.* at 33 (Mr. Comey testifies that changes were
27   made that "accorded with our judgment about what could be certified as to legality" within "two
     or three weeks.").

28   ───────────────────────────────────

U.S. at 576-577).[19]  "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect."  *State Farm*, 538 U.S. at 419.

Here, none of the *Gore* factors concerning the "degree of reprehensibility" are present, thus rendering "any award suspect."  The matter at hand concerns no physical harm to plaintiffs, nor an issue of plaintiffs' health and safety, nor any allegation that a person was targeted due to "financial vulnerability."  Plaintiffs' assertion that the conduct at issue "involved repeated actions" and was not "an isolated incident," *see* Pls. Mem. (Dkt. 729/122) at 19, is meritless. Authorization of the Terrorist Surveillance Program after the 9/11 attacks should not be viewed as a "repeated action" based on multiple number of days that the program was in existence. Plaintiffs themselves assume that the TSP's phase out began in 2005 (*see* Pls. Mem. Dkt. 729/122 at 7) and, as the United States advised the Court, any electronic surveillance that had been occurring under the TSP became subject to the authority of the FISA Court starting in January 2007.  *See* Dkt. 175; *see also* Public IG Rept. (Dkt. 104-2) at 36 (final TSP presidential authorization expired on February 1, 2007).  Thus, the TSP is properly viewed as a unique program that had a limited life and no longer exists.  Finally, for the reasons outlined above, there is no basis to award punitive damages for the alleged surveillance at issue here.

(2) *Criminal Penalties*:  The existence of criminal penalties for individuals who intentionally violate FISA Section 1809 also does not warrant the imposition of punitive damages here.  As the Supreme Court observed in *State Farm*, while "the existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action[,] [w]hen used to determine the dollar amount of the award, however, the criminal penalty has less utility."  538 U.S. at 428.  The court added that "Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened

---

[19]  *See, e.g. Planned Parenthood of the Columbia/Willamette Inc. v. American Coalition of Life Activists*, 422 F.3d 949, 957-959 (9th Cir. 2005) (applying *Gore* factors where defendants threatened physical violence to plaintiffs, expressed intent to harm, sought to impose economic harm, and engaged in repeated pattern of such actions).

protections of a criminal trial have been observed, including, of course, its higher standards of proof." *Id*. Punitive damages "are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award." *Id*.

(3) *Ratio of Compensatory to Punitive Damages*: Plaintiffs' contention that the ratio of the amount of punitive damages they seek to statutory liquidated damages complies with due process is also meritless. The Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula" and has declined to impose a "bright-line ratio" for the award of punitive damages. *State Farm*, 538 U.S. at 425. "The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *See id*. As we have shown, no such award would be proper here.

(4) *Alleged Litigation Misconduct*: Lastly, plaintiffs' contention that "abusive litigation tactics" and "litigation misconduct" occurred in this case and would also justify an award of punitive damages, *see* Pls. Mem. (Dkts. 729/122) at 18 n. 6, is also meritless. The Government submitted a lengthy response to the Court's Order to Show Cause of May 22, 2009 that addresses why sanctions should not have been entered in light of the Government's unwillingness to agree to a protective order under which plaintiffs' counsel would be granted access to classified information. *See* Government Defendants' Response to Court's Order to Show Cause Dated May 22, 2009, Dkts. 638/93 (May 29, 2009). The Government explained that the Court of Appeals has upheld the Government's "exceptionally-well documented" state secrets privilege assertion, *see id*. at 7, 25; that the Government at no point violated any order of the Court, *see id*. at 8-20; that the Court did not enter any order directing the disclosure of classified information to plaintiffs' counsel, nor a protective order governing the matter, and that sanctions based on the Government's unwillingness to agree to such an order would be improper, *see id*. at 20-24. The Court declined to enter any sanctions against the Government.

Also, a central dispute in this case has been whether the Government's successful privilege assertion has been preempted by the FISA, and the Government's actions since the

Court's ruling on that preemption issue have been directed at preserving its successful state secrets privilege assertion (which, under the Ninth Circuit's decision, would otherwise require dismissal of the case)[20] before any appellate review of the preemption question and other issues. Indeed, the Government first suggested that these issues be certified for interlocutory review in September 2008 in order to seek expeditious resolution of the key legal questions in this case. *See* Defendants' Third Motion to Dismiss and for Summary Judgment (Dkt. 475/49) at 32 n.15. No authority, or sound reasoning, supports the imposition of punitive damages based on the Government's unwillingness to voluntarily waive a successful state secrets privilege assertion prior to any appeal. Accordingly, plaintiffs' assertion of so-called "litigation misconduct" as an additional ground for an award of punitive damages is entirely without merit.[21]

## CONCLUSION

For the foregoing reasons, the Court should not award punitive damages to plaintiffs in this action.[22]

Dated: May 21, 2010                    Respectfully Submitted,

                                       MICHAEL F. HERTZ
                                       Deputy Assistant Attorney General

                                       DOUGLAS N. LETTER
                                       Terrorism Litigation Counsel

---

[20]  *See Al-Haramain Islamic Foundation, Inc. v. Bush*, 507 F.3d 1190, 1205 (9th Cir. 2007) (absent the excluded privileged information, "Al-Haramain cannot establish that it has standing, and its claims must be dismissed, unless FISA preempts the state secrets privilege.").

[21]  The Government's actions in this litigation do not remotely compare to the circumstances in the case on which plaintiffs rely. *See CGB Occupational Therapy, Inc. V. RHA Health Services, Inc.*, 499 F.3d 184, 194 (3rd Cir. 2007) (several years of pre-trial proceedings, two trials, initiation of collateral proceedings in other courts, "threats to keep the litigation going forever," against a small, financially vulnerable business); *see also id*. (no litigant is required to give up legitimate legal positions).

[22]  To the extent the Court remains inclined to award punitive damages to AHIF-Oregon, the *Cy Pres* doctrine invoked by plaintiffs, *see* Pls. Mem. (Dkts. 729/122) at 21, would not govern. Any damages awarded to AHIF-Oregon would constitute assets in which it has a property interest, and any transfer of that interest by court order to any party would still be subject to the blocking and licensing requirements under 31 C.F.R. §§ 594.201(a), 202(b).

JOSEPH H. HUNT
Director, Federal Programs Branch

VINCENT M. GARVEY
Deputy Branch Director

    *s/ Anthony J. Coppolino*
ANTHONY J. COPPOLINO
Special Litigation Counsel

    *s/ Marcia Berman*
MARCIA BERMAN
Senior Counsel

U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Rm. 6102
Washington, D.C. 20001
Phone: (202) 514-4782—Fax: (202) 616-8460

*Attorneys for the Defendants*