1   Shayana Kadidal
    CENTER FOR CONSTITUTIONAL RIGHTS
2   666 Broadway, 7th Floor
    New York, NY 10012-2317
3   Phone: (212) 614-6438
    Fax: (212) 614-6499
4   Email: kadidal@ccr-ny.org

5   *Attorney for Plaintiffs*

6

7

8                  **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
9                    **SAN FRANCISCO DIVISION**

10  ————————————————————————————|

11  IN RE NATIONAL SECURITY AGENCY        |   **No. 3:06-md-01791-VRW**
    TELECOMMUNICATIONS RECORDS            |
12  LITIGATION                            |   **PLAINTIFFS'**
    ————————————————————————————|   **MEMORANDUM IN SUPPORT OF**
13                                        |   **MOTION FOR SUMMARY**
    This Document Relates Only to:        |   **JUDGMENT AND IN**
14  *Center for Constitutional Rights v. Obama*[*],  |   **OPPOSITION TO DEFENDANTS'**
    (Case No. 07-cv-1115-VRW)             |   **MOTION TO DISMISS**
15  ————————————————————————————|   in
                                          |   ***Center for Constitutional Rights v.***
16                                        |   ***Obama (07-1115)***

17                                            Judge: Hon. Vaughn R. Walker
                                              Date: *(no hearing set)*
18                                            Time:
                                              Courtroom: 6, 17th Floor

19

20

21

22

23

24

25

26

27  ————————————————
    [*]     The current President (and each other current occupant of an official defendant's post) is
28  automatically substituted in this official capacity suit pursuant to Fed. R. Civ. Proc. 25(d)(1).

**TABLE OF CONTENTS**

Introduction ............................................................................................................... 1

I.   Standing ............................................................................................................ 3

II.  Remedial Power: Expungement .......................................................................... 9

III. Remedial Power: Disclosure ............................................................................. 12

IV. The government's general objections to plaintiffs' standing ................................ 15

V.  State secrets privilege ...................................................................................... 20

   1.  Actual surveillance is not necessary to establish standing in chilling-effect cases ........... 20

   2.  Public disclosure is not essential to remedy the injury here .............................. 21

   3.  The government has not alluded to any valid defense
      that could justify invocation of the privilege,
      nor identified specific items of evidence required for any such defense .......................... 25

   4.  The privilege should be interpreted to preserve the separation of powers,
      particularly where Congress has criminalized certain executive conduct ....................... 28

Conclusion ............................................................................................................. 29

1

**TABLE OF AUTHORITIES**

2 *ACLU v. NSA*, 493 F.3d 644 (6th Cir. 2007) ...................................................................16

3 *ACLU v. NSA*, 438 F. Supp. 2d 754 (E.D. Mich. 2006) ................................................. 1

4 *Al-Haramain Islamic Foundation, Inc. v. Bush*, 507 F.3d 1190 (9th Cir. 2007) ...................12, 20

5 *Al-Haramain Islamic Foundation, Inc. v. Bush*,
564 F. Supp. 2d 1109 (N.D. Cal. 2008)............................................. 1, 12-14, 20-21, 27

6
7 *Al-Haramain Islamic Foundation, Inc. v. Bush*,
595 F. Supp. 2d 1077 (N.D. Cal. 2009).....................................................13, 14, 19, 22

8 *Al-Haramain Islamic Foundation, Inc. v. Obama*,
2010 U.S. Dist. LEXIS 31287 (N.D. Cal. Mar. 31, 2010) .........................................1

9
*Allen v. Wright*, 468 U.S. 737 (1984). ..................................................................19-20

10
*Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144 (D.D.C. 1976) ......................18

11
*Chastain v. Kelley*, 510 F.2d 1232 (D.C. Cir. 1975) ..................................................... 9

12
*Church of Scientology v. United States*, 506 U.S. 9 (1992) .....................................8, 12

13
*Cutshall v. Sundquist*, 193 F.3d 466 (6th Cir. 1999) ................................................8, 10

14
*Doe v. United States Air Force*, 812 F.2d 738 (D.C. Cir. 1987) ..................................10

15
*El Masri v. Tenet*, 437 F. Supp. 2d 530 (E.D. Va. 2006) .............................................28

16
*Fendler v. United States Bureau of Prisons*, 846 F.2d 550 (9th Cir. 1988) .............9-10

17
*Fendler v. United States Parole Com.*, 774 F.2d 975 (9th Cir. 1985)....................10-11

18
*FTC v. Compagnie De Saint-Gobain-Pont-A-Moussan*,
19 636 F.2d 1300 (D.C. Cir. 1980)....................................................................................9

20 *Graham v. Jones*, 709 F. Supp. 969 (D. Or. 1989)........................................................8

21 *Halkin v. Helms* (*Halkin II*), 690 F.2d 977 (D.C. Cir. 1982) ...........................16-18, 29

22 *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006)...........................................................25-27

23 *Hepting v. AT&T Corp.*, 439 F. Supp. 2d 974 (N.D. Cal. 2006).....................20, 25, 29

24 *Hobson v. Wilson*, 737 F.2d 1 (D.C. Cir. 1984) ...........................................................9

25 *In re Sealed Case*, 494 F.3d 139 (D.C. Cir. 2007) ......................................................25

26 *In re United States,* 872 F.2d 472 (D.C. Cir. 1989) ....................................................25

27 *Jabara v. Kelley*, 476 F. Supp. 561 (E.D. Mich. 1979), *vacated on other grounds
sub nom. Jabara v. Webster*, 691 F.2d 272 (6th Cir. 1982) .......................................18

28

*Jewel v. United States*, 2010 U.S. Dist. LEXIS 5110 (N.D. Cal. Jan. 21, 2010) ..................18-19

*Kastigar v. United States*, 406 U.S. 441 (1972) .........................................................................28

*Kasza v. Browner*, 133 F.3d 1159 (9th Cir. 1998) .......................................................................25

*Laird v. Tatum*, 408 U.S. 1 (1972) ...............................................................................15, 17-18

*Little v. Barreme*, 6 U.S. 170 (1804) ..........................................................................................27

*Mayfield v. United States*, 599 F.3d 964 (9th Cir. 2010)..............................................................9

*Meese v. Keene*, 481 U.S. 465 (1987) ...............................................................................6-8, 16

*Menard v. Mitchell*, 430 F.2d 486 (D.C. Cir. 1970).....................................................................13

*Menard v. Saxbe*, 498 F.2d 1017 (D.C. Cir. 1974)...............................................................8, 10

*Mohammed v. Jeppesen Dataplan*, Inc., 579 F.3d 943 (9th Cir. 2009),
*vacated, en banc pending* .........................................................................................................20

*Nat'l Lawyers Guild v. Att'y General*, 96 F.R.D. 390 (S.D.N.Y. 1982) ......................................25

*Norman-Bloodsaw v. Lawrence Berkeley Lab*., 135 F.3d 1260 (9th Cir. 1998) ........................8-9

*Paton v. LaPrade,* 524 F.2d 862 (3rd Cir. 1975) ................................................................8, 10-11

*Peters v. Hobby*, 349 U.S. 331 (1955) ...................................................................................9-10

*Philadelphia Yearly Meeting of the Religious Soc'y of Friends v. Tate*,
519 F.2d 1335 (3d Cir. 1975) ......................................................................................................18

*Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989) .....................13, 16

*Reuber v. United States*, 750 F.2d 1039 (D.C. Cir. 1984)............................................................9

*Riggs v. Albuquerque*, 916 F.2d 582 (10th Cir. 1990) ..........................................................18, 20

*Sullivan v. Murphy*, 478 F.2d 938 (D.C. Cir. 1973),
*cert. denied,* 414 U.S. 880 .....................................................................................................11-12

*Turkmen v. Ashcroft*, No. 02-CV-2307, 2006 U.S. Dist. LEXIS 40675
(E.D.N.Y. May 30, 2006) (Gold, M.J.) ....................................................................................22-23

*Turkmen v. Ashcroft*, No. 02-CV-2307, 2006 U.S. Dist. LEXIS 95913
(E.D.N.Y. Oct. 3, 2006) (Gleeson, U.S.D.J.) ............................................................................23-24

Order, Doc. # 573, *Turkmen v. Ashcroft*, No. 02-CV-2307
(E.D.N.Y. Dec. 6, 2006) (Gleeson, U.S.D.J.) ...............................................................................24

*United Presbyterian Church v. Reagan*, 557 F. Supp. 61 (D.D.C. 1982) ...................................16

*United Presbyterian Church v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984) .........................16-17, 29

*United States v. Smith*, 940 F.2d 395 (9th Cir. 1991).................................................................11

1  *United States v. Zolin*, 491 U.S. 554 (1989) ................................................................29

2  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ..................................27

3  **STATUTES, REGULATIONS AND RULES**

4  5 U.S.C. § 702 ................................................................................................................13

5  28 U.S.C. § 2202 ............................................................................................................10

6  50 U.S.C. § 1806(f) ........................................................................................................13

7  Authorization to Use Military Force, Pub. L. 107-40, 115 Stat. 224 (Sep. 18, 2001) ................25

8  Federal Rule of Criminal Procedure 41(g) ....................................................................10

9  **TREATISES AND LAW REVIEWS**

10  Shayana Kadidal, *Does Congress Have the Power to Limit the President's Conduct
    of Detentions, Interrogations, and Surveillance in the Context of War?*,
11  11 N.Y.C.L. Rev. 23 (2007) ......................................................................................26-27

12  Saikrishna Prakash, *The Separation and Overlap of War and Military Powers*,
    87 Tex. L. Rev. 299 (2008) ............................................................................................26
13
    26 WRIGHT & GRAHAM, FEDERAL PRACTICE & PROCEDURE § 5671 (2D ED. 1992) ......................28
14
    **BRIEFS, PLEADINGS AND TRANSCRIPTS**
15
16  Amici Curiae Mem. of MDL Plaintiffs (Doc. # 440 in No. 3:06-md-1791) ............................14-21

17  Brief for Appellees, *Wilner v. NSA*, No. 08-4726-cv (2d Cir. Jan. 30, 2009) .............................14

18  Complaint, *United Presbyterian Church v. Reagan*,
    Civil Action No. 82-1824 (D.D.C. Jun. 30, 1982) ....................................................................17

19  Petition for a Writ of Certiorari, *Wilner v. NSA*, No. 09-1192
    (U.S. filed Mar. 30, 2010) .........................................................................................................1-2
20
21  Supplemental Brief of the United States, Appendix A: Comparison of FISA and Title III,
    *In re Sealed Case*, No. 02-001 (FIS Ct. of Review filed Sep. 25, 2002) ........................................18

22  Transcript of Oral Argument, *CCR v. Bush*, No. 06-cv-313 (S.D.N.Y. Sept. 5, 2006) ..........16, 18

23  Transcript of Oral Argument, *CCR v. Bush*, No. 07-cv-1115 (N.D. Cal. Aug. 7, 2007) ..............16

24  Transcript, *Al-Haramain Islamic Found., Inc. v. United States Dep't of the Treasury*,
    CV-07-1155 (D. Or. Apr. 14, 2008) ..........................................................................................2
25
26
27
28

1    **MISCELLANEOUS**

2    *Electronic Surveillance for National Security Purposes,*
     *Hearings Before the Subcomms. on Criminal Laws and Procedures and*
3    *Constitutional Rights of the S. Comm. on the Judiciary,*
     93rd Cong. (1974) ). ..................................................................................................24
4
     *Foreign Intelligence Surveillance Act of 1977, Hearings on S. 1566*
5    *Before the Subcomm. on Criminal Laws and Procedures of the*
     *S. Comm. on the Judiciary,* 95th Cong. (1977) ......................................................24-25
6
     Attorney General Eric Holder, *Policies and Procedures*
7    *Governing Invocation of the State Secrets Privilege*
     (Doc. # 38-3, *Shubert v. United States,* Case No. 3:07-cv-693)....................................28
8
     H.R. Rep. No. 95-1283 (1978). ......................................................................................24
9
     Legal Authorities Supporting the Activities of the National Security Agency
10   as Described by the President (Jan. 19, 2006) ("White Paper"),
     *available at* http://www.justice.gov/opa/whitepaperonnsalegalauthorities.pdf ...........26
11
     Carol D. Leonnig, *Secret Court's Judges Were Warned About NSA Spy Data,*
12   WASH. POST (Feb. 9, 2006) ...........................................................................................6
13   William E. Moschella, *Responses to Joint Questions from House Judiciary Committee*
     *Minority Members* (Mar. 24, 2006),
14   *available at* http://www.fas.org/irp/agency/doj/fisa/doj032406.pdf.................................2
15   NSA Inspector General,
     Unclassified Report On The President's Surveillance Program,
16   *available at* www.dni.gov/reports/report_071309.pdf .........................................1, 28
17   S. Rep. No. 94-1035 ......................................................................................................24
18   Philip Shenon, *Lawyers Fear Monitoring in Cases on Terrorism,*
     N.Y. TIMES, Apr. 28, 2008 .....................................................................................2, 15
19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

It is useful to begin with what is *not* at issue in this case. As this Court has recognized, Congress occupied the field of electronic surveillance with FISA. *Al-Haramain Islamic Foundation, Inc. v. Bush*, 564 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008). Congress made the wiretapping statutes the "'exclusive means by which electronic surveillance … may be conducted,'" and made it a crime to violate these prohibitions.[1] Nonetheless, the NSA engaged in a secret program of surveillance, aimed at international electronic communications with one end in the United States where one party has some unspecified link to terrorist organizations, in violation of FISA. As set forth in plaintiffs' prior summary judgment papers,[2] the executive eventually confessed that this surveillance took place without any warrant or judicial order, and without probable cause of criminal activity or that one party is an "agent of a foreign power."[3] The Program concededly involved surveillance regulated by FISA,[4] but without any form of judicial authorization or judicially supervised-minimization procedures in place.

In short, the NSA Program[5] was illegal—not just *ultra vires* but *criminally* illegal.[6] At least until the passage of new statutory authorities in August 2007, the prior administration made rhetorical efforts to defend the legality of the original Program.[7] With the change in administration, the government has expressly refused to take a position on the legality of the Program in a FOIA action seeking access to records of surveillance for some of these same plaintiffs,[8] and in its motion

---

[1]    Memorandum in Support of Plaintiffs' Motion for Summary Judgment (Mar. 9, 2006), Doc. # 16-3 ("SJ Mot."), at 3-4 (quoting 18 U.S.C. § 2511(2)(f)).

[2]    This Court has not ruled on the parties' prior summary judgment motions.

[3]    *See id.* at 7-8.

[4]    *Id.* at 9 (quoting Attorney General Alberto Gonzales).

[5]    As the Inspectors' General "Unclassified Report on the President's Surveillance Program," *available at* www.dni.gov/reports/report_071309.pdf (IG Report) and many other sources make clear, the term "Terrorist Surveillance Program" was a euphemism concocted after the fact by the Executive in December 2005 to conceal from the American people the true scope of the unlawful surveillance activities the Executive was conducting. *See* IG Report at 1-2, 5-6, 36-37. There never was any operational program called the Terrorist Surveillance Program.

[6]    No court to reach the merits has found differently. *See ACLU v. NSA*, 438 F. Supp. 2d 754 (E.D. Mich. 2006) (later overturned on standing grounds); *Al-Haramain Islamic Foundation, Inc. v. Obama*, 2010 U.S. Dist. LEXIS 31287 (N.D. Cal. Mar. 31, 2010).

[7]    *See* Supplemental Mem. in Opp. to Defs' Mot. to Dismiss in Support of Pls' Mot. for Summary Judgment (Jul. 10, 2007), Doc. # 13 ("Supp. Br.") at 3-9.

[8]    *See* Petition for a Writ of Certiorari, *Wilner v. NSA*, No. 09-1192 (U.S. filed Mar. 30, 2010) at 11 ("At oral argument [in the Second Circuit on Oct. 9, 2009], the Government refused to make any argument in defense of the legality of the NSA Program, stating '[w]e take no position on the

to dismiss and for summary judgment (Doc. # 39, "Gov't Br."), the government now makes no attempt whatsoever to defend the legality of the program.

Notwithstanding the constitutionally-based requirement (codified in both FISA and Title III) of minimization to protect privileged conversations, lawyers have every reason to believe that attorney-client communications have been intercepted by the program. The executive has acknowledged (in a submission to Congress) that attorneys are not categorically excluded from the definitions of surveillance targets under the NSA Program, *see* Assistant Attorney General William E. Moschella, *Responses to Joint Questions from House Judiciary Committee Minority Members* (Mar. 24, 2006), ¶45, *available at* http://www.fas.org/irp/agency/doj/fisa/doj032406.pdf (last visited Jul. 24, 2010), and argued that it had a right to target them. Philip Shenon, *Lawyers Fear Monitoring in Cases on Terrorism*, N.Y. TIMES, Apr. 28, 2008, at A14. More than a year after the supposed deactivation of the Program, *The New York Times* reported that "[t]he Justice Department does not deny that the government has monitored phone calls and e-mail exchanges between lawyers and their clients as part of its terrorism investigations in the United States and overseas." *Id*. The *Times* interviewed two senior Department of Justice officials who admitted that "they knew of ... a handful of terrorism cases ... in which the government might have monitored lawyer-client conversations." *Id*. Although the government refuses to officially confirm whether it has actually eavesdropped on lawyers, *see id*. (quoting Transcript, *Al-Haramain Islamic Found., Inc. v. United States Dep't of the Treasury*, CV-07-1155, at 31 (D. Or. Apr. 14, 2008)), this Court has granted summary judgment in a case alleging warrantless surveillance of phone calls between U.S. attorneys and their clients. *Al-Haramain*, 2010 U.S. Dist. LEXIS 31287 at *54-*59.

Plaintiffs are the Center for Constitutional Rights and its lawyers and legal staff, who were, during the active span of the NSA Program, engaged in litigation challenging other unlawful conduct by the same administration that carried out this criminally unlawful surveillance. Plaintiffs filed suit a few weeks after the executive acknowledged the Program's existence and sought equitable relief from the harm that the program caused to our constitutionally-protected interest in en-

---

merits of the [legality of the] TSP.'"), *available at* http://ccrjustice.org/files/Wilner%20v%20 NSA%20-%20cert%20petition%20-%20FINAL.pdf.

1    gaging in litigation and communicating with clients, witnesses, fellow counsel and other litigation

2    participants. Because there is no longer any controversy over whether the Program was illegal,

3    plaintiffs are entitled to equitable relief as long as there is relief that can remedy our continuing

4    injuries from the illegal surveillance. There is, as set forth below.

5

6    **I.      Standing**

7           Plaintiffs' original Summary Judgment motion (filed March 9, 2006) was premised on the

8    notion that the NSA Program was ongoing and based on the threat the Program posed to plaintiffs'

9    international electronic communications. In order to resolve those claims, which are still pending,[9]

10   this Court should demand a representation from the executive that it has renounced the right to

11   operate the NSA Program as described in plaintiffs' earlier summary judgment papers. If it fails to

12   do so, plaintiffs' earlier claims are not moot for the reasons stated in plaintiffs' supplemental brief

13   to this Court in 2007, and plaintiffs are entitled to a declaratory judgment that continued operation

14   of the Program is in fact illegal and appropriate injunctive relief. *See* Supp. Br. (Doc. # 13) at 2-10

15   (addressing government's mootness arguments).

16          Assuming for present purposes that the government provides such a representation,[10] plain-

17   tiffs' original complaint in this matter also includes the following prayers for relief, requesting that

18   the Court:

19          (b.) Order that Defendants disclose to Plaintiffs all unlawful surveillance of Plain-
            tiffs' communications carried out pursuant to the program;

20

21          (c.) Order that all Defendants turn over to Plaintiffs all information and records in
            their possession relating to Plaintiffs that were acquired through the warrantless sur-
22          veillance program or were the fruit of surveillance under the program, and subse-
            quently destroy any such information and records in Defendants' possession; [and]
23          …

24          (e.) Award such other relief as the Court may deem just and proper.

25   Even assuming the NSA Program challenged in plaintiffs' original summary judgment papers were

26   no longer in active operation with respect to continuing interception of communications, and there

27   ───────────────────
     [9]      *See* Order, Doc. # 27 (Mar. 31, 2008) (terminating only plaintiffs' Motion for Leave to File
28   Supplemental Complaint (Doc. # 19)).
     [10]     *Cf.* Gov't Br. at 1 (Program "was terminated three years ago," and "no longer exists").

were no risk of the executive reviving the Program, the relief set forth above is necessary to rem-

edy the harms set forth in plaintiffs' summary judgment papers. Specifically, the Court should or-

der the government to destroy all surveillance data, derivative materials, and fruits thereof relating

to surveillance of plaintiffs, and should order disclosure—which may take many forms, not neces-

sarily limited to public disclosure, *see* Part V.2, *infra*—of the fact of surveillance to plaintiffs.

In contesting plaintiffs' standing (Gov't Br. at 7-13), the government says nothing new or

specifically tailored to the disclosure and disgorgement claims because those claims are essentially

equivalent for standing purposes to plaintiffs' ongoing interception claims. The chill generated by

the NSA Program resulted not just in a change in "methods of communication" (Gov't Br. at 13)

but a change in plaintiffs' ability to litigate their cases most effectively and an effect on third par-

ties (making them less likely to want to communicate or litigate with us). While the most obvious

costs of the change in communications practices motivated by the existence of the Program were

the expenses of "making personal visits to persons located overseas and taking other such precau-

tions,"[11] plaintiffs also cited the need to "forego some communications altogether, and reserve oth-

ers for in-person visits or other secure means of communication" and noted that the "need to com-

municate by these less-efficient means often means that communications have to be delayed, and

these delays in turn add to delays in securing relief for clients."[12] In other words, the potential

breach of confidentiality was a complication that made it more difficult to litigate efficiently.

Even four years ago, the "added expense and effort" created by the risk of surveillance un-

der the Program was not just that of changing communications patterns, but also the burden im-

posed by the need to take stock of the scope of the potential breach of confidentiality—for in-

stance, plaintiffs were compelled by their professional responsibilities "to review and analyze all

past international communications (back through late 2001 when the Program began) that may

have involved sensitive matters in order to evaluate whether confidences may have been breached

by Defendants' illegal surveillance and whether measures ought to be taken in response."[13] CCR

---

[11]   Plaintiffs' Opposition to Defendants' Motion to Dismiss (Jun. 30, 2006), Doc. # 16-5 ("MTD Opp.") at 4-5.
[12]   *Id*. at 4.
[13]   *Id*. at 5.

staffers must still be vigilant to the risk that the confidentiality of *past* privileged communications relevant to *current-day litigation decisions* was breached,[14] and conform their current communications and litigation practices accordingly. Until the air is cleared by assurances that the government does not possess records of their confidential communications seized unlawfully under the Program, that injury will continue.[15]

In many respects, there is little to distinguish the risk of injury posed by ongoing surveillance of CCR's communications from the risk posed by past surveillance of conversations with individuals we still work with, where the government has retained records of the content of those communications. In light of the fact that records of such prior communications may be available to the government, responsible attorneys would still maintain caution in continuing those lines of conversation with potential litigation participants (witnesses, potential class members, overseas counsel, etc.). Those third parties might sensibly be hesitant to communicate freely with CCR staffers even absent a risk of current unlawful interception. Moreover, there is a tremendous risk posed by the fact that the government may have access to aspects of CCR's litigation strategy. That risk must be accounted for in any consideration of the future path any potentially-affected case may take, including settlement; ultimately, this can only hinder the ability of CCR to litigate such cases.

The risk that the government has retained records of prior NSA Program surveillance of CCR's communications creates a current risk that third parties who communicated with us previously will now be less willing to do so, knowing that the government may have been listening in on those earlier calls. "One of the foreseeable professional injuries to Plaintiffs is that other individuals—potential clients and professional contacts vital to their work—will no longer be willing to provide Plaintiffs with the information they need to engage in civil and human rights advocacy because of fear of the NSA Program." MTD Opp. (Doc. # 16-5) at 10. Plaintiffs cited one such example specifically, describing the reluctance of a potential class member to continue communi-

---

[14] Again, under FISA or any other *constitutional* statutory surveillance scheme, such communications would ordinarily have been subject to judicially-supervised minimization requirements protecting privileged communications. *See* note 37, *infra*.

[15] As a result, various attorneys felt "compelled by their professional responsibilities to move for disclosure" relating to surveillance, either thru FOIA or resort to the judges in their cases. *Id.* at 4.

cating electronically with a CCR staff attorney (*see* Meeropol Aff. (Doc. # 16-8) at ¶17). The class action in question remains active, and it would be perfectly reasonable for that particular potential class member, or others who were warned about the possibility of surveillance when they communicated with us while the Program was active, *id.* at ¶16, to remain wary of communicating with us (electronically or otherwise), or participating in litigation, given that the confidentiality of past communications cannot be assured.

Lawyers routinely take great care to maintain secrecy in identifying and investigating potential clients and defense witnesses. The government's continued retention of NSA Program intercepts has the effect of informing every such otherwise-confidential source of information who we spoke to while the Program was active that the United States government may be aware of their identity and the substance of their communications with CCR. Add the complicating factor that such potential clients, relatives of clients, fact and expert witnesses, and foreign counsel are located overseas—at times in countries with close intelligence relationships with the United States and lesser respect for human rights norms than we profess. Uncertainty about the confidentiality of past communications with CCR can be expected to have a foreseeable (and perfectly reasonable) effect on the behavior of such third parties that in turn causes concrete harm to CCR's First Amendment interest in litigating against the government, in precisely the same way that the "propaganda" label that would have been attached to films Barry Keene intended to screen would have risked diminishing his reputation among members of the voting public in *Meese v. Keene*. *See* MTD Opp. (Doc. # 16-5) at 6-7.[16]

The converse is also true: any responsible attorney would have to conform their behavior to account for the possibility that potential clients and witnesses might be tainted by the possibility of

---

[16]    Third parties could reasonably fear a wide variety of consequences as a result of government possession of the contents of past communications with CCR staff: they would be subject to the ongoing risk that NSA will share such information with foreign government officials in the future, even if it does not disclose criminal activity (*e.g.* that a potential client was engaged in prodemocratic political organizing in opposition to a dictatorial foreign government), and may fear that that information is more likely to be shared if they stay in touch with CCR; they may fear the use of such privileged conversations in seeking authority for otherwise-lawful warrant orders, with good reason given that this was reported to have happened, *see* Carol D. Leonnig, *Secret Court's Judges Were Warned About NSA Spy Data*, WASH. POST (Feb. 9, 2006) (reporting reaction of Chief FISC Judge Kollar-Kotelly to revelations of use of NSA Program surveillance in FISA applications), *etc.*

past government interception and retention of their communications with CCR. If the government

has access to intercepted work-product communications with persons who we communicated with

while the Program was active, CCR will have to exercise caution going forward in using such indi-

viduals in litigation, whether by putting them on the stand, broaching certain subjects during testi-

mony, or even using them (as clients or witnesses) in litigation at all. In short, the risk that records

are retained from the NSA's non-judicially-minimized interceptions means we must take steps to

ensure the government does not gain a litigation advantage from access to aspects of our litigation

strategy, and that need for caution interferes with our ability to construct a case under the ordinary

assumptions of confidentiality that underpin our adversary system of justice.

It is, of course, difficult to be specific about these kinds of vulnerabilities without knowing

precisely what the government may know as a result of its unlawful surveillance. But seeking such

knowledge is the point of this lawsuit. Clearly some duty to investigate breaches of confidentiality

is an ethical obligation, as much as the duty to warn clients of the possibility of surveillance. *See,

e.g.*, SJ Mot. (Doc. # 16-3) at 10-11 (describing professional imperative upon plaintiffs in this case

to "evaluate whether confidences may have been breached by Defendants' illegal surveillance and

whether measures ought to be taken in response"); MTD Opp. (Doc. # 16-5) at 5-6 (same); Affir-

mation of Prof. Steven Gillers (Doc. # 16-6) at ¶10 ("Intercepted communications may be exploited

to the disadvantage of clients with no one the wiser. … [W]hether intercepted communications are

or are not ever used to the disadvantage of a client or otherwise is irrelevant. CCR has a duty to

protect its clients' secrets and confidences regardless of the use to which an interceptor may put the

information. It is disclosure itself that is the evil against which lawyers must protect clients, regard-

less of any additional consequences of the disclosure"). Plaintiffs are under a professional impera-

tive to ensure that the government does not gain a litigation advantage from having access to confi-

dential information about potential witnesses and litigation strategy, and simple caution cannot

repair the injury entirely, only ameliorate it.[17] Nonetheless, as in *Keene*, 481 U.S. at 475, "the need

---

[17]     Again, it is difficult to be specific about these kinds of vulnerabilities without knowing
what the government may know as a result of surveillance.

to take … affirmative steps" to mitigate the risk of harm (including bringing this case) is itself sufficient injury for standing purposes.

In short, it requires little imagination to see the continued risk of harm posed by the profoundly intrusive surveillance the NSA carried out with abandon for at least 5 years to the attorneys and legal staff who are plaintiffs in this matter. There is no logical basis for the idea that plaintiffs' need for termination of surveillance was somehow greater during the Program's pendency than their need for disclosure and destruction of records today.

\* \* \*

Courts have recognized the continued maintenance of information in government records as an injury sufficient to underlie standing in many contexts. *See, e.g.*, *Church of Scientology v. United States*, 506 U.S. 9, 12-13 (1992) (even post-compliance, plaintiff maintained standing to challenge IRS's retention of records turned over in response to subpoena); *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1275 (9th Cir. 1998) ("Even if the continued storage, against plaintiffs' wishes, of intimate medical information that was allegedly taken from them by unconstitutional means does not itself constitute a violation of law, it is clearly an ongoing 'effect' of the allegedly unconstitutional and discriminatory testing, and expungement of the test results would be an appropriate remedy for the alleged violation.").[18] Courts have, of course, recognized that the harm posed by retention of *derivative* materials is sufficient to ground injury-in-fact as

---

[18]   *See also Cutshall v. Sundquist*, 193 F.3d 466 (6th Cir. 1999), (convicted sex offender withstood standing challenge to his claim that notification provisions of a registration statute were unconstitutional, even though his registration information had never been made public; "status as a convicted sex offender … arguably results in an injury because he faces a specific threat of being subject to the release of registry information every day."); *Paton v. LaPrade*, 524 F.2d 862 (3rd Cir. 1975) ("Paton has alleged sufficient injury to have standing to seek the expungement of her file. Paton charges that her file possibly could endanger her future educational and employment opportunities. … As the district court aptly observed, 'the existence of (the) records may at a later time become a detriment to her.' The threat that the file poses is analogous to the dangers inherent in the maintenance of arrest files. In a case challenging the maintenance of arrest records, the plaintiff, as here, 'cannot point with mathematical certainty to the exact consequences of his criminal file' but it '(is) clear that he has alleged a "cognizable legal injury."' The maintenance of such records results in 'injuries and dangers' that are 'plain enough.'"); *Menard v. Saxbe*, 498 F.2d 1017, 1023 (D.C. Cir. 1974) ("Although Menard cannot point with mathematical certainty to the exact consequences of his criminal file, we think it clear that he has alleged a 'cognizable legal injury.'"); *Graham v. Jones*, 709 F. Supp. 969, 974 (D. Or. 1989) (suspected gang members had standing to challenge police policy of retaining photos of them because retention put them "at risk of future police harassment.").

well. *Mayfield v. United States*, 599 F.3d 964, 971 (9th Cir. 2010) ("the district court concluded that Mayfield 'continue[s] to suffer a present, on-going injury due to the government's continued retention of derivative material from the FISA seizure.' …. We agree"); *FTC v. Compagnie De Saint-Gobain-Pont-A-Moussan*, 636 F.2d 1300, 1327 (D.C. Cir. 1980) (ordering the FTC to return improperly subpoenaed documents, and that all "notes, extracts, or other records derived from such documents be destroyed.").

## II.      Remedial Power: Expungement

As defendants acknowledge, Gov't Br. at 21-23, federal courts have inherent Article III powers to order expungement. That is especially so where the remedy of expungement is essential to prevent corruption of the litigation process and the attendant undermining of the separation of powers. "Federal courts have the equitable power 'to order the expungement of Government records where necessary to vindicate rights secured by the Constitution or by statute,'" *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1275 (9th Cir. 1998) (quoting *Chastain v. Kelley*, 510 F.2d 1232, 1235 (D.C. Cir. 1975));[19] the government concedes as much. *See* Gov't Br. at 22 (quoting *Fendler v. United States Bureau of Prisons*, 846 F.2d 550, 554 (9th Cir. 1988) (same)). "Since the power to order expungement is, however, only an instance of the general power of the federal courts to fashion appropriate remedies to protect important legal rights," it is not confined to cases involving criminal records. *Chastain*, 510 F.2d at 1235 (footnote omitted). "Expungement, no less than any other equitable remedy, is one over which the trial judge exercises considerable discretion. It is a versatile tool: expungement of only some records, from some Government files, may be enough, as may the placing of restrictions on how the information contained in the records may be used." *Id.* at 1236; *see also Peters v. Hobby*, 349 U.S. 331, 349 (1955) (af-

---

[19]      "It is equally well-established that expungement of records is, in proper circumstances, a proper remedy in an action brought directly under the Constitution," *Hobson v. Wilson*, 737 F.2d 1, 65 (D.C. Cir. 1984), "regardless of whether or not the plaintiff may also have a *Bivens* action for damages." *Reuber v. United States*, 750 F.2d 1039, 1061 (D.C. Cir. 1984).

firming expungement of disloyalty finding originating from what concurrence called "a broad, far-reaching espionage program," *id*. at 350 (Black, J., concurring)).[20]

Federal courts have accordingly invoked their inherent powers as justification for expungement orders without seeking to tie the power to impose the remedy to the source of the underlying claim. *Menard v. Saxbe*, 498 F.2d 1017, 1023 (D.C. Cir. 1974) ("The judicial remedy of expungement is inherent and is not dependent on express statutory provision, and it exists to vindicate substantial rights provided by statute as well as by organic law," citing *United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967)); *Paton v. LaPrade,* 524 F.2d 862 (3rd Cir. 1975); *cf. Cutshall v. Sundquist*, 193 F.3d 466, 471 (6th Cir. 1999). Moreover, Congress has acknowledged that federal courts have the power to order any relief appropriate pursuant to a declaratory judgment. *See* 28 U.S.C. § 2202 ("Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."); *Doe v. United States Air Force*, 812 F.2d 738, 740-41 (D.C. Cir. 1987) (expungement as an adjunct to declaratory relief might be appropriate in response to Fourth Amendment violation).[21]

The government's only offered defense to the inherent judicial power argument is that the continued maintenance of any records of the criminally illegal government surveillance here does not pose a "real and immediate threat" to plaintiffs. Gov't Br. at 22-23 (quoting *Fendler*). But in the two *Fendler* cases the government cites for that proposition, the plaintiff failed to show that expungement was "necessary" at all. *See Fendler v. United States Bureau of Prisons*, 846 F.2d at 554 (rejecting expungement of presentence report for convict already on parole, in part because he could challenge its inaccuracies in future criminal proceeding if it were ever used in a way that harmed him; plaintiff thus failed to "show that expungement is necessary"); *Fendler v. United*

---

[20]   *Cf.* Federal Rule of Criminal Procedure 41(g) ("Motion to Return Property"), Advisory Committee Note on 1989 Amendments ("In some circumstances … equitable considerations might justify an order requiring the government to return or destroy all copies of records that it has seized.").

[21]   The government claims that FISA does not authorize declaratory relief, Gov't Br. at 21-22, but plaintiffs have plead their First Cause of Action as a claim under FISA and the APA. (Plaintiffs have denominated their other three claims as direct claims under the First and Fourth Amendments and the Separation of Powers. Relief under the Court's inherent powers is appropriate to all four.)

*States Parole Com.*, 774 F.2d 975, 979 (9th Cir. 1985) (same: habeas process adequate and available for correction; expungement remedy therefore "is not necessary to vindicate [plaintiff's rights").[22] None of the cases cited involve plaintiffs challenging widespread, serious constitutional violations that threaten to undermine the political process, the integrity of litigation, and the separation of powers on the scale of the NSA Program.

In contrast to the commonplace cases seeking expungement of individual arrest or criminal records, the instant case challenges a massive program of criminally unlawful surveillance by the government. It was brought by attorneys involved in litigating against that same government over other illegal and embarrassing conduct, often evincing executive incompetence. The existence of such surveillance makes it extraordinarily difficult to litigate effectively against other illegal activity of the previous administration (which, apparently, is something the current administration is perfectly at ease with). Courts faced with government practices that pose a risk to the integrity of the political process have asked simply whether the expungement is "necessary and appropriate in order to preserve basic legal rights." *Sullivan v. Murphy*, 478 F.2d 938, 968 (D.C. Cir. 1973); *see also Menard v. Saxbe*, 498 F.2d 1017, 1023 n.13 (D.C. Cir. 1974) (citing *inter alia* arrest records cases involving politically-motivated arrests). Courts asked to expunge information gathered in violation of law should weigh that illegality heavily. *Cf. Paton v. LaPrade*, 524 F.2d 862, 869 (3d Cir. 1975) (reviewing expungement order by applying balancing test weighing "adverse nature of the information," "the legality of the methods by which the information was compiled, the existence of statutes authorizing the compilation and maintenance, and prohibiting the destruction, of the records, and the value of the records to the Government.").

Notably, destruction/expungement could be ordered without any "disclosure" (in camera, and possibly ex parte, or otherwise) of whether or not surveillance occurred in the first place.[23] The

---

[22] The government also cites the relatively trivial *United States v. Smith*, 940 F.2d 395, 396 (9th Cir. 1991) (per curiam), summarily reversing a district court's expungement of a minor criminal infraction primarily because the convict sought to reenlist in the military, a goal which the district court had found "laudable."

[23] Destruction is not the only option that could satisfy plaintiffs' interests here. *Cf. Sullivan v. Murphy*, 478 F.2d 938, 973 (D.C. Cir. 1973), *cert. denied*, 414 U.S. 880 ("It may be, however, that measures short of physically destroying the records in question will prove adequate to assure complete and effective relief. For example, an order placing the original documents under seal and prohibiting disclosure of their contents, except upon further order of the District Court … may provide

government claims that "balancing the relevant interests [for purposes of determining whether expungement is appropriate] would require disclosure of whether or not plaintiffs were in fact subject to surveillance … and what [such surveillance records] might indicate," Gov't Br. at 23. Again, that defies credulity: illegal, warrantless, non-minimized surveillance of attorneys is *per se* harmful and there is no plausible argument that such records should ever be retained, regardless of whether this Court also orders some form of disclosure of those records.[24]

Nothing in FISA stands in the way of the destruction of such surveillance records. As this Court has noted, FISA expressly contemplated destruction of surveillance records, "the idea being that to allow destruction [of records] would better protect the privacy of individuals surveilled than to require preservation" (in contrast to Title III). *Al-Haramain*, 564 F. Supp. 2d at 1131; *id.* at 1126-27. Moreover, the government has admitted that when NSA violated its own rules with respect to targeting criteria of the "TSP," it destroyed the content of the intercept (but did preserve a record of the violation). *See Al-Haramain v. Bush*, 507 F.3d 1190, 1199 (9th Cir. 2007) (quoting General Hayden).

## III.    Remedial Power: Disclosure

This Court has determined that "FISA preempts or displaces the state secrets privilege … in cases within the reach of its provisions." *Al-Haramain*, 564 F. Supp. 2d at 1124. As plaintiffs have long argued, *see* MTD Opp. (Doc. # 16-5) at 28-29, the privilege courts have recognized is a common-law evidentiary rule subject to abrogation by statute, and FISA itself contains language that

---

a remedy reasonably equivalent to expungement in terms of protection of plaintiffs' rights."); *Church of Scientology v. United States*, 506 U.S. 9, 13 n.6 (1992).

In a similar vein, should this Court order expungement from government files without some form of disclosure (to the court, to other judges, or to the plaintiffs), it might be appropriate to order a set kept in storage unavailable to the government ("quarantined" as we say in our proposed order) for the purposes of the historical record (pending eventual declassification of the Program).

[24] To the extent the records are inseparably commingled with information from other intelligence sources, courts have held that the government bears the hardship created by the impossibility of separation. *See, e.g.*, *Sullivan v. Murphy*, 478 F.2d 938, 970 (D.C. Cir. 1973).

To the extent that the government argues that it may be futile to destroy records since the court cannot erase the memories of intelligence officials who first heard the intercepts in question, the Supreme Court has considered and rejected this argument, finding the "partial" remedy of destruction of records sufficient to undergird standing. *See Church of Scientology v. United States*, 506 U.S. 9, 12-13, 13 n.6 (1992).

---

1  makes clear that federal judges have authority to look past executive secrecy determinations and

2  examine underlying evidence. So, to the extent the government claims that the privilege forecloses

3  identification and examination of specific items of evidence required to fully set forth a valid legal

4  defense, *see* Part V.3, *infra*, that argument is foreclosed by FISA.

5     As to remedy,[25] once the Court has established the illegality of the NSA Program, plaintiffs

6  believe the inherent equitable powers of the Court enable it to order disclosure of records of sur-

7  veillance in any of the manners proposed below, Part V.2, *infra*. This Court has already decided, in

8  the context of the *damages* action in *Al-Haramain* (where the state secrets privilege was applied

9  preliminarily to a single item of evidence apparently necessary to establish both liability and the

10  scope of liability for purposes of damages, *see* 595 F. Supp. 2d at 1089), that FISA § 1806(f) pre-

11  empts the privilege and permits disclosure, at least to the Court, of such evidence when necessary

12  to determine liability and damages in civil damages cases. Section 1806(f) provides in pertinent

13  part:

> whenever *any motion or request* is made by an aggrieved person pursuant to any
> other statute or rule of the United States or any State before any court … of the
> United States … to discover or obtain applications or orders or other *materials re-
> lating to electronic surveillance* … the United States district court … shall, *notwith-
> standing any other law*, if the Attorney General files an affidavit under oath that
> disclosure or an adversary hearing would harm the national security of the United
> States, *review in camera and ex parte* … such other materials relating to the surveil-
> lance as may be necessary to *determine whether the surveillance of the aggrieved
> person was lawfully authorized and conducted*. In making this determination, *the
> court may disclose to the aggrieved person*, under appropriate security procedures
> and protective orders, portions of *the application, order, or other materials* relating
> to the surveillance *only* where such disclosure is *necessary to make an accurate de-
> termination of the legality* of the surveillance.

21  50 U.S.C. § 1806(f) (emphasis added). As the reconciliation history of the House and Senate ver-

22  sions of this language makes clear, *see* Amici Curiae Mem. of MDL Plaintiffs (Doc. # 440 in No.

23  ───────────

[25]   Defendants claim (Gov't Br. at 20) that there is no authority for the equitable relief plain-
tiffs seek here. Sovereign immunity is not an issue in this case, which seeks only equitable relief
against defendants in their official capacities. Plaintiffs' claims are denominated as direct constitu-
tional claims with the exception of claim 1, the FISA claim, which is also denominated as a claim
under the Administrative Procedure Act, 5 U.S.C. § 702. Courts have recognized surveillance
without legal authority as agency action outside of law for purposes of waving sovereign immunity
for relief "other than money damages." *See, e.g., Presbyterian Church (USA)*, 870 F.2d at 523-26
(reversing on availability of declaratory and injunctive relief); *cf. Menard v. Mitchell*, 430 F.2d
486, 494-95 (D.C. Cir. 1970) ("discretion" to maintain arrest records in FBI files "assuming it ex-
ists, may not be without limit."); *see also* Supp. Br. (Doc. # 13) at 25-26. Alternatively, such a
waiver is implicit in FISA. *See Al-Haramain*, 564 F. Supp. 2d at 1124-25.

3:06-md-1791) at 11-13, this language applies in both civil and criminal cases, as this Court has already decided in *Al-Haramain*, 564 F. Supp. 2d at 1133-34. Plaintiffs therefore believe this Court could use the § 1806(f) procedure to govern the remedial phase of this case.[26]

The government argues that the state secrets privilege affects not just the liability determination and the ability to grant the disclosure remedy, but the more preliminary inquiry into standing. For the reasons set forth in Part IV, *infra*, actual evidence of surveillance is not necessary to establish plaintiffs' standing. However, to the extent that this Court accepts the government's argument, § 1806(f) could govern additional proceedings to resolve the standing inquiry. *See Al-Haramain*, 564 F. Supp. 2d at 1133-34 ("The court disagrees with defendants' proposed limitation of section 1806(f) to cases in which the government has acknowledged the surveillance at issue."). In that event, plaintiffs should be allowed to proceed if they can show a colorable basis for belief that they were subjected to electronic surveillance under the Program. *See* MDL Plaintiffs' Amicus (Doc. # 440 in No. 3:06-md-1791) at 14-17. Moreover, to the extent this Court believes plaintiffs must instead marshal evidence sufficient to generate a prima facie case of actual surveillance (*see Al-Haramain*, 564 F. Supp. 2d at 1134-35; 595 F. Supp. 2d at 1084-87), in order to be considered "aggrieved persons" for purposes of this § 1806(f) inquiry, plaintiffs should be allowed to make that showing with circumstantial evidence and reasonable inferences therefrom. *See id*. at 1085 ("'[plaintiff] does not have to plead and prove his entire case to establish standing and to trigger the government's responsibility to affirm or deny.'" (quoting *United States v. Alter*, 482 F.2d 1016, 1026 (9th Cir. 1973))).

---

[26]     The government suggests that FOIA is "the proper vehicle for plaintiffs' disclosure request," and that plaintiffs are somehow trying to "circumvent the FOIA" with their instant disclosure demand. Gov't Br. at 23. FOIA is a disclosure statute which strikes a balance between harms and benefits of open disclosure of information to the general public. There is no reason to think that that same policy balancing should apply to the determination to investigate and expunge criminally illegal surveillance in violation of the separation of powers, as happened here. That is especially so given that alternatives to full, public disclosure exist here. Moreover, FOIA does not take into account the identity of the requester (and thus cannot accord weight to the special harms posed by surveillance of attorneys), nor, according to the government, does FOIA account for the illegality of surveillance in considering whether Exemptions 1 and 3 apply to exclude surveillance records from disclosure. *See* Brief for Appellees, *Wilner v. NSA*, No. 08-4726-cv (2d Cir. Jan. 30, 2009) at 29, 32-37.

Indeed, plaintiffs have already shown the following: they are part of a small group of attorneys litigating cases involving persons the executive suspects (often without basis) of involvement with terrorism; their international communications in the course of litigating these cases fit the announced criteria for NSA Program intercepts; the government has conspicuously disdained to offer assurances that privileged communications with attorneys were outside the scope of the program in the face of direct questioning about the subject from Congress (*see supra* page 2), and government officials have told the media that attorney-client calls were intercepted[27] (which *Al-Haramain* now appears to prove was the case); and finally, FISA had been an effective and permissive tool for the government since its enactment,[28] rendering it suspect that the government would route around it, unless the motivation for doing so were illicit and unconstitutional—*e.g.* a desire to conduct non-judicially minimized surveillance of attorney communications.

## IV.   The government's general objections to plaintiffs' standing

The government repeats (Gov't Br. at 5-13) many of its previous arguments against standing for injuries premised on the chilling effect of the NSA Program. Plaintiffs have responded to those arguments at length elsewhere and incorporate those arguments here. *See* MTD Opp. (Doc. # 16-5) at 2-13; SJ Reply (Doc. # 16-10) at 1-8; Supp. Br. (Doc. # 13) at 10-25. To summarize, *Laird v. Tatum* and subsequent chilling-effect cases show a concern about the "objectivity" of two elements of the analysis: First, that the fear causing plaintiffs to be deterred from acting should be "objectively reasonable"; and second, that the harm asserted be something tangible—something objective in that sense, beyond mere psychological injury or the like, but instead what is referred to as "concrete harm" in many subsequent Supreme Court pronouncements on standing.[29] *Laird* emphatically does *not* stand for the proposition that courts will refuse to entertain standing based on any injury where the most proximate cause is the action of the plaintiffs themselves[30] or the fore-

---

[27]   Shenon, *Lawyers Fear Monitoring in Cases on Terrorism*, N.Y. Times, *supra* page 2 ("'It's not as if we're targeting the lawyer for surveillance. It's not like we're eager to violate lawyer-client privilege. The lawyer is just one of the people whose calls from the suspect are being swept up.'")

[28]   *See* SJ Mot. (Doc. # 16-3) at 19-21, 28-30.

[29]   *See* Supp. Br. (Doc. # 13) at 15.

[30]   *Cf.* Gov't Br. at 10 (characterizing injuries as "'self-imposed'").

seeable voluntary reactions of third parties (*see, e.g.*, *Meese v. Keene*), or is based on any contingent injury (including by definition all future injury or risk of harm).

The government again tries to limit the universe of viable chilling effect cases to those where a plaintiff is "'regulated, constrained, or compelled directly by the government's own actions, instead of by his or her own subjective chill.'" Gov't Br. at 9 (quoting *ACLU v. NSA*, 493 F.3d 644, 661 (6th Cir. 2007) (opinion of Batchelder, J.));[31] *see id.* at 7-10. The government made this argument before Judge Lynch in the Southern District of New York and plaintiffs' responded to it in their SJ Reply (Doc. # 16-10) at 1-4. Transfer of the instant case to this district settled the issue, for in the Ninth Circuit, *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 522 (9th Cir. 1989) controls the question, definitively rejecting the notion that government action must reach the level of "'coercive action'" before standing may be found in chilling effect cases.

The crux of the government's position on standing is that only evidence of actual surveillance is sufficient to underlie standing—even when the government has acknowledged conducting a massive surveillance program in bald violation of an act of Congress. The paradox of that position is neatly illustrated by the government's reliance on the D.C. Circuit cases *Halkin v. Helms* and *United Presbyterian Church v. Reagan*. Both cases were distinguished at length during the oral argument before Judge Lynch. *See* Tr. of Oral Argument, *CCR v. Bush*, No. 06-cv-313 (S.D.N.Y. Sept. 5, 2006) at 32-37; *see also* Tr. of Oral Argument, *CCR v. Bush*, No. 07-cv-1115 (N.D. Cal. Aug. 7, 2007) at 46-50; MTD Opp. (Doc. # 16-5) at 32-34.

*United Presbyterian Church v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984) (*UPC*) was a challenge to a 1981 executive order that set forth procedures for the division of labor between the FBI and other foreign intelligence agencies in carrying out surveillance. The Order is reproduced in Judge Scalia's opinion; although it makes no mention of the authority for such surveillance, it seems on its face that most of it related to operational procedures for agencies seeking FISA warrants. Nowhere does the Order set forth any warrantless wiretapping procedures, and in fact it was ostensibly designed to *eliminate* illegal surveillance (in the wake of the Church Committee (*see,*

---

[31]    Plaintiffs' extensive response to the Sixth Circuit opinions in *ACLU v. NSA* is given in their Supp Br. (Doc. # 13) at 10-26.

*e.g.*, 738 F.2d at 1382 n.3). While plaintiffs claimed they experienced chilling effects from the fact that the order might govern the process for making them targets under FISA, they made absolutely no claim against FISA itself. The only allegations of illegality they made related to government actions *prior* to the Order that their claims were directed at, as the District Court opinion makes clear.[32] Nor were the *UPC* plaintiffs a group especially vulnerable to warrantless surveillance because of the risk of legally-recognized communications privileges being violated, as in the instant case.[33] Plaintiffs' failure there was not that they did not show they were *actual targets* of an illegal program. Rather, they failed to make *any plausible claim of illegality*, no less any other showing of being affected by the practices at issue. Like the *Laird* plaintiffs, the *UPC* plaintiffs were worried about how a lawful system might be put to unlawful uses against them in the future.

*Halkin v. Helms* (*Halkin II*), 690 F.2d 977 (D.C. Cir. 1982), the final chapter in litigation that had been drawn out for years, similarly lacked allegations of illegality or special vulnerability to harm. By the time of the *Halkin II* opinion, the only claims that remained were that plaintiffs' international communications might be intercepted under some not-yet-extant successor to the NSA's MINARET program[34] because their names might be put on watchlists and passed on to NSA by other agencies. The only prospective claims (for equitable relief) in *Halkin II* related to such future submission of watchlists to the NSA. *Id.* at 997. The D.C. Circuit held that mere forwarding of watchlists from one agency to another could not be a Fourth Amendment violation, and that plaintiffs could not prove that anything *illegal* happened after the forwarding. In *Halkin II*

---

[32]  *See United Presbyterian Church v. Reagan*, 557 F. Supp. 61, 63 (D.D.C. 1982) ("Plaintiffs in this case have failed to allege any such redressable concrete injury attributable to Executive Order 12333. They allege 'fear' and 'concern' that they 'may be targeted' for intelligence-gathering activities, but introduce no evidence to support their claim—beyond allegations that some of the plaintiffs had been subject to possibly illegal surveillance for past activities, in the past before the Order was promulgated. Nor do they make any allegations to support the assumption that any intelligence-gathering activities that may take place pursuant to the Order in the future will be illegal. Plaintiff has conceded at oral argument that much of the activity authorized by the Order is well within the strictures of the Constitution and laws of the United States.")

[33]  The UPC plaintiff group were political and religious activists, journalists, and academics. The original complaint in the National Archives does not indicate that there were any attorneys in the group; although apparently one individual plaintiff (Severina Rivera) was in fact an attorney, the complaint makes absolutely no mention of that fact. *See* Complaint, *UPC v. Reagan*, Civil Action No. 82-1824 (D.D.C. Jun. 30, 1982), at ¶¶ 60-61.

[34]  Under project MINARET, NSA intercepted electronic communications of US Citizens whose names were on watchlists and passed those intercepts on to the FBI, DOD, *etc.*

1    there was also no claim that the plaintiffs were *especially vulnerable* to harm from the existence of

2    a surveillance program in the same way that plaintiffs in our case are (e.g., the difficulty of *func-*

3    *tioning as attorneys* because of the complained-of watchlisting). *See id.* at 998 n.78 (plaintiffs

4    "cannot demonstrate any injury – past, present, or future" from watchlisting).

5         Seen as chilling effect cases, *Halkin* and *United Presbyterian Church* fail both halves of the

6    *Laird* test, first because plaintiffs made no allegations of gross illegality that would have rendered

7    it objectively reasonable to fear the surveillance,[35] and second because plaintiffs failed to allege

8    that they experienced concrete, objective harm or that they were especially vulnerable to harm (*e.g.*

9    that they were attorneys whose communications were subject to legal privilege). The two cases do

10   not establish a blanket rule that persons chilled by a surveillance program must assert that they

11   were targets of the surveillance in order to maintain standing, even in the D.C. Circuit where they

12   are binding, and there is certainly no such rule in the Ninth Circuit.

13        Plaintiffs' claims do not present a "generalized grievance" for two reasons: (1) minimiza-

14   tion creates special fears for attorneys[36] (as opposed to other persons whose privileges against sur-

15   veillance have not been constitutionalized[37]); (2) the program here creates special risk of surveil-

16   lance for the small subset of attorneys who routinely engage in electronic communications that fit

17   the profile of calls and emails subject to the NSA Program. *Cf. Jewel v. United States*, 2010 U.S.

18   Dist. LEXIS 5110 (N.D. Cal. Jan. 21, 2010) (dismissing for failure to "allege[] an injury that is

19   sufficiently particular to those plaintiffs or to a distinct group to which those plaintiffs belong").

20   _____

21   [35]      This threshold determination that there is a plausible claim of illegality is important because
     it shapes how reasonable the fear of the government action is. As plaintiffs here noted in their
22   MTD Opp. (Doc. # 16-5) at 9-10, cases like *Berlin Democratic Club, Jabara, Riggs v Albuquer-*
     *que*, and *Philadelphia Society of Friends* all hold that substantial claims of illegality can be a major
23   factor in finding standing based on chilling effect. Simply put, it is more "objectively" reasonable
     (under *Laird*) to fear injury from *patently lawless* actions that the government admits having car-
24   ried out.
     [36]      The lack of judicially-supervised minimization, recording and retention of privileged con-
25   versations under the NSA Program makes surveillance of privileged conversations a risk not pre-
     sent with FISA surveillance. On the importance of minimization to plaintiffs' standing claims, *see*
26   Supp. Br. (Doc. # 13) at 16-18; MTD Opp. (Doc. # 16-5) at 11-12; SJ Reply (Doc. # 16-10) at 5-6;
     Tr. of Oral Argument, *CCR v. Bush*, No. 06-cv-313 (S.D.N.Y. Sept. 5, 2006) at 16-18.
27   [37]      The government has conceded before the Foreign Intelligence Surveillance Court of Re-
     view in *In re Sealed Case* that courts have constitutionalized the minimization requirement. *See*
28   Supplemental Brief of the United States, Appendix A: Comparison of FISA and Title III, *In re*
     *Sealed Case*, No. 02-001 (FIS Ct. of Review filed Sep. 25, 2002) at 1 n.1.

1   While "'[t]he courts do not want to be viewed as a panacea for all of society's ills,'" *id*. at *21,

2   surely the threat to the separation of powers posed by executive surveillance in violation of clear

3   Congressional criminal sanctions, affecting attorneys engaged in the task of ensuring executive

4   accountability by bringing claims before the judiciary, is one worthy of special attention from the

5   federal courts.

6        There is nothing formulaic about standing analysis. Rather, courts have decided these cases

7   by asking if the injury is real, looking beyond word formulae and rough analogies to cases past to

8   ask whether the policies underlying the standing requirement are being served. Those policies in-

9   clude preserving the separation of powers—by avoiding advisory opinions, on the one hand, but

10  also by not refraining from refereeing between the political branches when there is no alternative to

11  doing so, and by preserving individual rights against the government. That is particularly important

12  when the courts are called on to ensure the continuing vitality of public-interest litigation of consti-

13  tutional issues, which is the very interest plaintiffs claim injury to. Nor would recognizing the

14  standing of these plaintiffs "'open a floodgate of litigation'" (*Al-Haramain*, 595 F. Supp. 2d at

15  1084 (quoting government brief); here, plaintiffs have very specific claims of vulnerability to the

16  harm complained of, and belong to a very narrow class of persons capable of making such claims

17  (lawyers routinely litigating international terrorism cases). Courts have also been concerned to en-

18  sure zealous advocacy by only hearing genuinely adverse controversies; surely, four years and 370

19  pages of briefing into this litigation, that interest has been satisfied here.

20       Ultimately the flaw in the government's highly-constrained view of the causality require-

21  ment is to assume that the standing inquiry in a chilling-effect case like this can ever be addressed

22  algebraically. There will always be an element of judgment involved in a finding of causation in a

23  case involving allegations of chilling effect. As the Supreme Court put it in *Allen v. Wright*:

24       Determining standing in a particular case may be facilitated by clarifying principles
         or even clear rules developed in prior cases. Typically, however, the standing in-
25       quiry requires careful judicial examination of a complaint's allegations to ascertain
         whether the particular plaintiff is entitled to an adjudication of the particular claims
26       asserted. Is the injury too abstract, or otherwise not appropriate, to be considered ju-
         dicially cognizable? Is the line of causation between the illegal conduct and injury
27       too attenuated? Is the prospect of obtaining relief from the injury as a result of a fa-
         vorable ruling too speculative?
28

1  *Allen*, 468 U.S. 737, 752 (1984). None of that is the case here.

2

3  **V.    State secrets privilege**

4          The government's prior claim that the very subject matter of this litigation—the NSA Pro-

5  gram—constitutes a state secret has since been disposed of by the Ninth Circuit, *see Al-Haramain*,

6  507 F.3d at 1200 ("the government's many attempts to assuage citizens' fears [by describing the

7  Program publicly]… now doom the government's assertion that the very subject matter of this liti-

8  gation, the existence of a warrantless surveillance program, is barred by the state secrets privi-

9  lege"); *see also Hepting v. AT&T Corp*., 439 F. Supp. 2d 974, 991 (N.D. Cal. 2006) (distinguishing

10  surveillance contract cases such as *Totten*); *cf. Mohammed v. Jeppesen Dataplan*, *Inc*., 579 F.3d

11  943, 954-55 (9th Cir. 2009) (same), *vacated, en banc pending*.[38] That leaves two remaining lines of

12  argument for the government: first, that the state secrets privilege makes it impossible for plaintiffs

13  to confirm that they were actually surveilled (supposedly affecting both standing and remedy), and

14  second, that the privilege denies the government evidence relevant to specific legal defenses.

15

16  **1.    Actual surveillance is not necessary to establish standing in chilling-effect cases**

17          As noted earlier, see Part IV, supra, there is no reason to believe disclosure of actual sur-

18  veillance is categorically necessary to establish standing in chilling effect cases.[39] The govern-

19  ment's argument is, as this court noted, a circular one, *Al-Haramain*, 564 F. Supp. 2d at 1124, es-

20  pecially ironic in light of the fact that this Court has held, correctly, that FISA preempts the state

21  secrets privilege:

22          Given the possibility that the executive branch might again engage in warrantless
           surveillance and then assert national security secrecy in order to mask its conduct,
23          Congress [in passing FISA] intended for the executive branch to relinquish its near-
           total control over whether *the fact of unlawful surveillance* could be protected as a
24          secret.

25  ─────────────────────
26  [38]    Plaintiffs preserve their prior arguments in response to the government's position, *see, e.g*.,
        MTD Opp. (Doc. # 16-5) at 13-31 and more specifically at 21-27.
27  [39]    The Tenth Circuit reversed a dismissal on standing grounds in a case where a number of
        plaintiffs (including attorneys) brought suit without knowing whether or not they were targets of
28      the surveillance in question. *See Riggs v. Albuquerque*, 916 F.2d 582 (10th Cir. 1990) (cited in
        MTD Opp. (Doc. # 16-5) at 8-9).

*Al-Haramain*, 564 F. Supp. 2d at 1123. This Court has already rejected the government's "proposed limitation of section 1806(f) to cases in which the government has acknowledged the surveillance at issue." 564 F. Supp. 2d at 1133-34; *see also* Amicus Br. of MDL Plaintiffs (Doc. # 440 in No. 3:06-md-1791) at 13-14.

### 2.     Public disclosure is not essential to remedy the injury here

Just as actual knowledge of the fact of surveillance is not necessary to establish standing, full, public disclosure of the fact of surveillance might not be necessary to remedy the injuries claimed here. As plaintiffs noted in their first round of state secrets briefing in this case, MTD Opp. (Doc. # 16-5) at 48-49, lower courts have been

> admonished … to use "creativity and care" to devise "procedures which would protect the privilege and yet allow the merits of the controversy to be decided in some form." *Fitzgerald* [*v. Penthouse Int'l*], 776 F.2d [1236,] 1238 n.3 [(4th Cir. 1985)]. Thus, courts faced with privilege claims have stated that, if necessary, the Court can "delve more deeply than it might ordinarily into marshalling the evidence on both sides" in order to protect potentially sensitive information. *Irish People*, 684 F.2d at 955; *Ellsberg*, 709 F.2d at 69 (directing in camera review of evidence); *Heine*, 399 F.2d at 791 (same). The Court itself, after examination of the evidence, may make "representative findings of fact from the files" and provide summaries of the information, in a manner that would not compromise the privilege. *Irish People*, 684 F.2d at 954. The Court could even pose questions about the merits to the government. [*United States v. Ehrlichman*, 376 F. Supp. 29, 32 n.1 (D.D.C. 1974) ("courts have broad authority to inquire into national security matters so long as proper safeguards are applied to avoid unwarranted disclosures"); *see also In re United States*, 872 F.2d at 480 (upon rejecting a premature privilege claim noting its "confidence that [the district court could] police the litigation so as not to compromise national security.").]
>
> Other courts have suggested that an appropriate alternative to dismissal merely on the basis of the privilege—but as a last resort—is in camera examination of the [sensitive] evidence …, and a determination on the merits. In *Molerio*, for example, the court evaluated the privileged and non-privileged evidence and resolved the claims on the merits. *See* 749 F.2d at 825; *see also Halpern*, 258 F.2d at 41. In *Ellsberg*, after holding that the government could not use the state secrets privilege to avoid its burden to prove that the warrantless surveillance at issue fit into the warrant exception, the court suggested that such questions of law could, if necessary, easily "be resolved by the trial judge through the use of appropriate in camera procedures." 709 F.2d at 69. Courts have been particularly "willing to order in camera inspection where there has been a suggestion of illegality by the government." 26 WRIGHT & GRAHAM, FEDERAL PRACTICE & PROCEDURE § 5671 (2d ed. 1992) at 734 (citing *ACLU v. Brown*, 619 F.2d 1170, 1173 (7th Cir. 1980) (en banc)). The *Ellsberg* court emphasized that "this procedure should be used only as a last resort," because "[e]x parte, in camera resolution of dispositive issues should be avoided whenever possible." 709 F.2d at 69 n.78; *but see* WRIGHT & GRAHAM § 5671 at 734 ("many of [the countervailing arguments against in camera proceedings] would be

resolved or weakened if courts did not automatically assume that every in camera hearing had to be ex parte as well.").[]

    While some of these alternatives are extreme, any alternative would be preferable to the dismissal of this case and the elimination of any possibility of resolution on the merits of Plaintiffs' targeted wiretapping claims. "Only where no amount of effort and care on the part of the court and the parties will safeguard privileged material is dismissal [on state secrets grounds] warranted." *Fitzgerald*, 776 F.2d at 1244.

Fortunately, since the last time this case was argued before this Court, several counsel at CCR, including the undersigned, have acquired TOP SECRET//SENSITIVE COMPARTMENTED INFORMATION (TS//SCI) security clearance from the Justice Department in relation to our Guantánamo litigation (*see* MDL Doc. # 472-8), and have had over two years of experience with the protocols for handling such information. Counsel could thus assist the Court with review of any documents "disclosed" in camera. *Cf. Al-Haramain*, 595 F. Supp. 2d at 1089 (conducting "entire remaining course of this litigation … ex parte … would deprive plaintiffs of due process to an extent inconsistent with Congress's purpose in enacting FISA[]"); *id.* at 1089-90 (ordering government to process plaintiffs' counsel for TS//SCI clearance).

    In the alternative, the Court could receive the information ex parte in camera (in much the same way that the Court has treated the Sealed Document in *Al-Haramain*, *see* 595 F. Supp. 2d at 1089). Any number of processes could then take place, depending on what was disclosed. The Court could selectively (and confidentially) bring in cleared counsel—either the undersigned or plaintiffs who are counsel on individual cases that the disclosed surveillance records relate to, pursuant to appropriate conditions.[40] Alternately, this Court could inform the district judges handling other litigation matters to which disclosed surveillance was relevant, in order to allow those judges to decide on a further course of action—perhaps along the model of the certification Judges Gold and Gleeson required in *Turkmen v. Ashcroft*. Magistrate Judge Gold's initial ruling was noted in briefs in this case.[41] *See Turkmen v. Ashcroft*, No. 02-CV-2307, 2006 U.S. Dist. LEXIS 40675 at *20-*21 (E.D.N.Y. May 30, 2006) (Gold, M.J.) (rejecting blanket secrecy argument pressed by the

---

[40] *See* MTD Opp. (Doc. # 16-5) at 47 n.43 (citing cases describing sealing and protective orders and secure discovery locations, as well as use of special masters and in camera trials as means for dealing with sensitive information); *id.* at 48 n.44 (citing cases where counsel had or acquired clearances).
[41] Of course, there may not always be another case to which surveillance of attorney-client communications is relevant.

government, and ordering the government to disclose whether any conversations between plain-

tiffs' counsel (including a named plaintiff in this lawsuit) and their clients had been intercepted or

monitored by the government, including by the NSA, and stating "any claim that sensitive secrets

would be revealed by the government's disclosure of whether conversations between plaintiffs and

their counsel in [the] case were monitored is hard to fathom."). That order was subsequently modi-

fied by Judge Gleeson, whose analysis is worth quoting at length:

> it is a cardinal rule of litigation that one side may not eavesdrop on the other's privi-
> leged attorney-client communications. Litigation involving officials of the executive
> branch of government is no exception. I also agree with Judge Gold that, because of
> the unusual circumstances of this case, the plaintiffs' request for further assurance
> that the rule has not been violated in this case is reasonable. First, the government
> has claimed the authority—indeed, the necessity—to monitor suspected terrorists
> abroad making electronic communications into the United States, and to do so with-
> out any judicial oversight. Second, the plaintiffs were detained in the United States
> for months based on the government's suspicion that they were involved in terrorist
> activity.... [R]egardless whether the plaintiffs are actually involved in terrorist ac-
> tivity—they emphatically state that they are not—they have reason to believe that
> the government thinks they are, and that they are therefore being monitored when
> they call the United States.
>
> *   *   *
>
> I recognize that this case involves certain high-level officials [with intelli-
> gence responsibilities that may conflict with litigation resposibilities]. ... However,
> the vast majority of the government officials involved in these cases—lawyers for
> the Civil Division of the Department of Justice and defendants and witnesses from
> the Bureau of Prisons with knowledge relevant to the plaintiffs' remaining condi-
> tions-of-confinement claims—have no such duties and therefore no "need to know"
> whatever information the NSA may have gleaned from possible intercepts of the
> plaintiffs' attorney-client communications. ... For the government to say that these
> latter officials, whose duties do not include the gathering or analysis of foreign intel-
> ligence, have not lately been involved in the gathering or analysis of foreign intelli-
> gence, is a revelation our national security can easily withstand. Moreover, it would
> not reveal classified information to say that the Department of Justice has been
> scrupulous in walling off the government officials who are involved in this litigation
> from exposure to TSP surveillance or knowledge derived from such surveillance.
> The Department has rightfully espoused that procedure as its policy [during argu-
> ment on this motion in this proceeding], and the plaintiffs are entitled to the gov-
> ernment's representation that it has made good on it.
>
> ... [Accordingly,] defendants are directed to state, within 14 days of this or-
> der, whether any defendant, any likely witness or any member of the trial team
> (which includes all attorneys and support staff, and any supervisors or other indi-
> viduals who are providing guidance or advice or exercising decision-making author-
> ity in connection with the defense of these actions) has knowledge (or had knowl-
> edge in the past) of the substance of any intercepted confidential communications
> between the plaintiffs and their attorneys.
>
> In matters this important and sensitive, it seems to me prudent to take small
> steps. Accordingly, if in my judgment further action is warranted based on the in-
> formation in the *ex parte* submission, the defendants will be given *ex parte* notice
> and an opportunity to be heard *ex parte*.

1    As soon as practicable after the completion of my review, including my re-
view of any subsequent *ex parte* submission directed pursuant to the preceding
2    paragraph, the plaintiffs will be given either (1) assurance by the Court that the
United States' representation that no TSP intercepts of the plaintiffs will be used in
3    the defense of this action has been fully substantiated, or (2) notice of any remedial
action that has been taken and an opportunity to be heard as to the necessity of fur-
4    ther measures.

5    Order, Doc. # 455, *Turkmen v. Ashcroft*, No. 02-CV-2307 (E.D.N.Y. Oct. 3, 2006) (Gleeson,

6    U.S.D.J.) at 2-6; 2006 U.S. Dist. LEXIS 95913 at *8-*14. Notably, the government complied

7    rather than appealing. Judge Gleeson ultimately issued a public order[42] noting his satisfaction that

8    no "likely witness or … member of the trial team" in *Turkmen* had "knowledge … of the substance

9    of any intercepted confidential communications between the plaintiffs and their attorneys." *Id*. at 5.

10   The judiciary is perfectly well-suited to consider and decide these issues. Indeed, *Congress*

11   determined that the Judiciary was the appropriate branch to exercise oversight of electronic surveil-

12   lance. Both the House and the Senate considered the same arguments the government now raises

13   here: the Judiciary is ill-suited for this oversight role because of judges' alleged lack of experience

14   in matters of foreign policy and national security, and the national security will be harmed if secret

15   information pertaining to matters of national security is used in litigation, even in camera and ex

16   parte. *See*, *e.g.*, *Electronic Surveillance for National Security Purposes*, *Hearings Before the Sub-*

17   *comms. on Criminal Laws and Procedures and Constitutional Rights of the S. Comm. on the Judi-*

18   *ciary*, 93rd Cong., 255 (1974); H.R. Rep. No. 95-1283 at 25 (1978). These arguments were soundly

19   rejected by a strong majority in Congress. The legislative record is replete with expressions of

20   Congress' firm view that the government's need for secrecy in matters of national security simply

21   did *not* trump the need for judicial oversight of its electronic surveillance activities. *See* S. Rep. No.

22   94-1035 at 79 ("We believe that these same issues—secrecy and emergency, judicial competence

23   and purpose—do not call for any different result in the case of foreign intelligence collection

24   through electronic surveillance."); *Foreign Intelligence Surveillance Act of 1977, Hearings on S.*

25   *1566 Before the Subcomm. on Criminal Laws and Procedures of the S. Comm. on the Judiciary*,

26   95th Cong., at 2728 (1977) (Attorney General Bell asserting that "[t]he most leakproof branch of

27

28   _____
[42]    *See* Order, Doc. # 573, *Turkmen v. Ashcroft*, No. 02-CV-2307 (E.D.N.Y. Dec. 6, 2006) (Gleeson, U.S.D.J.).

1    the Government is the judiciary…. I have seen intelligence matters in the courts…. I have great

2    confidence in the courts," and Senator Orrin Hatch replying, "I do also.").

3    **3.      The government has not alluded to any valid defense that could justify invocation of**
4    **         the privilege, nor identified specific items of evidence required for any such defense**

5            As a general matter, this Court should not accept a generic, categorical assertion from the

6    government that it cannot defend this action without access to evidence protected by the state se-

7    crets privilege. Doing so would allow the government a back door to asserting the "very subject

8    matter" claims regarding the NSA Program that were rejected by the Ninth Circuit. Instead, defen-

9    dants here must be required to identify specific items of evidence that would be essential to specific

10   defenses. *Cf. Hepting*, 439 F. Supp. 2d at 994 (declining to dismiss on generic "evidence necessary

11   … to raise a valid defense" claim).[43] Moreover, the Ninth Circuit and others have adopted a re-

12   quirement that the asserted defense must be not merely hypothetical or colorable, but a *valid* de-

13   fense. *See Kasza v. Browner*, 133 F.3d 1159, 1166 (9th Cir. 1998); *In re Sealed Case*, 494 F.3d

14   139, 149 (D.C. Cir. 2007) (citing 2d, 5th and 6th Cir. cases and noting: "In other contexts, this

15   court has consistently equated 'valid' with meritorious and dispositive. … Simply put, a valid de-

16   fense' in a civil case 'prohibits recover[y]'"); *cf.* Gov't Br. at 16. That requirement obviously im-

17   plies a great deal of specificity.

18          The government has to our knowledge only proposed two defenses on the merits during the

19   course of this litigation. The first is the claim that the September 18, 2001 Authorization to Use

20   Military Force (AUMF) somehow authorized the executive to carry out surveillance in furtherance

21   of it within the field of electronic surveillance otherwise exclusively regulated by FISA and Title

22   III. That argument was rendered insupportable in the wake of the *Hamdan* decision. *See* MSJ Opp.

23   (Doc. # 16-5) at 34-36 ("The majority opinion in *Hamdan* stated that 'there is nothing in the text or

24   legislative history of the AUMF even hinting that Congress intended to expand or alter the authori-

25   zation set forth in Article 21 of the [Uniform Code of Military Justice].' [*Hamdan v. Rumsfeld*, 548

26   _____

27   [43]      *See also In re United States,* 872 F.2d 472, 478 (D.C. Cir. 1989) (rejecting categorical, pre-
         discovery privilege claim because "an item-by-item determination of privilege will amply accom-
         modate the Government's concerns"); *Nat'l Lawyers Guild v. Att'y General*, 96 F.R.D. 390, 403
28       (S.D.N.Y. 1982) (privilege must be asserted on document-by-document basis)

U.S. 557, 594 (2006)]…there is similarly 'nothing ... even hinting' at a Congressional intent to change [the FISA] scheme[, which is as comprehensive as the UCMJ scheme for military trials,] in the text or legislative history of the AUMF"); *id.* at 52.

The second defense suggested by earlier government papers consists in the idea that there is somehow an inherent and *exclusive* Article II presidential surveillance power (*i.e.* an area of surveillance power under *exclusive* control of the executive, not subject to Congressional restriction or regulation), the parameters of which the NSA Program might fit into—but that to explain how the NSA Program would fit into this box of exclusively executive surveillance powers would require explaining in detail the targeting criteria of the Program, at some level of detail that remains secret. *Cf.* Legal Authorities Supporting the Activities of the National Security Agency as Described by the President (Jan. 19, 2006) ("White Paper"), *available at* http://www.justice.gov/opa/whitepap-eronnsalegalauthorities.pdf, at 31, 35 (analogizing to supposedly-exclusive presidential power to direct troop movements in concluding that FISA would be unconstitutional if applied to prohibit program); *Al-Haramain*, 564 F. Supp. 2d at 1121 (describing government allusion to issue of FISA's constitutionality at oral argument). Whether or not the new administration still adheres to this idea, it lacks historical foundation.

As an initial matter, there is no presidential power that trumps the congressional power to regulate details of military conduct (including the conduct of the NSA, which is part of DOD). *See generally* Saikrishna Prakash, *The Separation and Overlap of War and Military Powers*, 87 Tex. L. Rev. 299, 350-51 (2008) (while it may seem reasonable to assert presidential autonomy over an exclusive field of military operations, "when we broaden the inquiry and use text, structure, and early history as guideposts, we see that this robust conception is mistaken. … early Congresses regularly regulated operations, deciding such mundane matters as training and tactics, and such vital questions as the type of war to fight and the men and material that could be used to wage war. Legislators apparently did not believe that the Constitution left all operational details to the sole discretion of the Commander in Chief … text, structure, and history suggest that when congressional and presidential rules clash, the former prevails"); *id.* at 386 (concluding that "the President lacks exclusive control over any military subject matter"); Shayana Kadidal, *Does Congress Have*

*the Power to Limit the President's Conduct of Detentions, Interrogations, and Surveillance in the Context of War?*, 11 N.Y.C.L. Rev. 23 (2007) (same); SJ Mot. (Doc. # 16-3) at 27; SJ Reply (Doc. # 16-10) at 13 n.17. Thus, the idea that such an uncheckable, exclusive executive war power can then be extended from tactical movements on the battlefield to the field of electronic surveillance fails at birth—because no such exclusive, unregulable power exists on the battlefield.

As the Supreme Court has recognized repeatedly, the war powers are "powers granted *jointly* to the President and Congress." *Hamdan v. Rumsfeld*, 548 U.S. 557, 591 (2006) (emphasis added). When Congress affirmatively exercises these powers, the Executive's power is at its "lowest ebb," in the classic tripartite formulation of *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring), where "[c]ourts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject," *id.* at 637-38. Throughout our history, the Supreme Court has reaffirmed Congress' power to "make Rules for the Government and Regulation" of the Executive's war powers. *See, e.g., Little v. Barreme*, 6 U.S. 170, 178-79 (1804) (because Congress had imposed limitations on searches and seizures by naval vessels during war, Executive could not authorize searches and seizures beyond the scope of what Congress authorized); *see also* SJ Mot. (Doc. # 16-3) at 21-28.

This Court has recognized that the "exclusive means" provision was intended to "'put[] to rest the notion that Congress recognizes an inherent Presidential power to conduct such surveillances in the United States outside of'" FISA and Title III. *Al-Haramain*, 564 F. Supp. 2d at 1116 (quoting SSCI report). Moreover, this Court has already rejected the notion that the President maintained some uncheckable Article II power to conduct surveillance in the field otherwise occupied by FISA:

> Congress appears clearly to have intended to—and did—establish the exclusive means for foreign intelligence surveillance activities to be conducted. Whatever power the executive may otherwise have had in this regard, FISA limits the power of the executive branch to conduct such activities and it limits the executive branch's authority to assert the state secrets privilege in response to challenges to the legality of its foreign intelligence surveillance activities.

*Al-Haramain*, 564 F. Supp. 2d at 1121. In other words, the argument that FISA is unconstitutional to the extent it trenches on this nebulous Article II surveillance power has already been foreclosed

by this Court. As far as counsel can determine, the Obama administration has not yet to date asserted such an argument (which appears to have first originated with a still-classified OLC memo authored by John Yoo, *see* IG Report at 13 ("'we do not believe that Congress may restrict the President's inherent constitutional powers'") (quoting Nov. 2, 2001 OLC memo)).[44] In any event, in order to claim that the state secrets privilege preempts the ability to present a defense to this action,[45] the government must clearly articulate a *valid* defense. Neither the AUMF nor the "exclusive executive power" argument qualifies.[46]

### 4.   The privilege should be interpreted to preserve the separation of powers, particularly where Congress has criminalized certain executive conduct

It bears repeating, four years after the initial shock of the government revelation of the NSA Program's existence, that this case deals with clearly criminal surveillance. The executive official defendants here have no defense on the merits to refute the criminal illegality of the Program that they are now even willing to allude to before this Court. The fact that that is so greatly reinforces the case for judicial inquiry into the fact *vel non* of surveillance—whether as part of the standing or the remedial inquiries here.

*Reynolds* models the privilege on the Fifth Amendment privilege, which is far from absolute, allowing disclosure to be forced in exchange for immunity from penalty.[47] That a procedure based on such a privilege has been invoked to halt *damages* cases—where Congress is always free to fund a remedy via private bill, past a veto if necessary[48]—is not as injurious to the separation of powers as a denial of injunctive relief here would be. We have already noted that "[c]ourts have

---

[44]     As a Senator, the President in fact voted in favor of the FISA Amendments Act, so such a position would be curious to say the least.

[45]     Notably, even if these were colorably valid defenses, other courts have managed to adjudicate questions about the constitutionality of surveillance authorities without encountering irremediable secrecy problems. *See* MSJ Opp. (Doc. # 16-5) at 30 n.33; SJ Reply (Doc. # 16-10) at 8-9 (each citing cases).

[46]     Indeed, defending a patently illegal program on the hypothetical notion that some unstated defense backed up by secret factual evidence exists comes perilously close to "defend[ing] an invocation of the privilege in order to … conceal violations of the law, " exactly what the new Holder Policy (Doc. # 38-3, *Shubert v. United States*, Case No. 3:07-cv-693) governing executive assertions of the privilege says the Justice Department will no longer do.

[47]     *See Kastigar v. United States*, 406 U.S. 441 (1972).

[48]     *Cf. El Masri v. Tenet*, 437 F. Supp. 2d 530, 541 (E.D. Va. 2006) (apparently suggesting such a remedy if plaintiff's allegations are true).

1   been particularly 'willing to order in camera inspection where there has been a suggestion of ille-

2   gality by the government.'" MTD Opp. (Doc. # 16-5) at 49 (quoting 26 WRIGHT & GRAHAM, FED-

3   ERAL PRACTICE & PROCEDURE § 5671 (2d ed. 1992) at 734 (citing *ACLU v. Brown*, 619 F.2d 1170,

4   1173 (7th Cir. 1980) (en banc))). In the context of the crime-fraud exception to the attorney-client

5   privilege, the Supreme Court has allowed the process of piercing the privilege to begin with a

6   prima facie showing that the information claimed as confidential was communicated in furtherance

7   of crime or fraud, and has expressly approved of *in camera* examination of allegedly privileged

8   materials. *See United States v. Zolin*, 491 U.S. 554 (1989).

9          Notably, neither of the main cases on which the government relies for its notion that proof

10  of actual surveillance is essential to chilling-effect standing contains any plausible allegation of

11  illegality (criminal or otherwise) of the challenged surveillance practices. *See* Part IV, *supra* (dis-

12  cussing *United Presbyterian Church* and *Halkin*); *cf. Hepting*, 439 F. Supp. 2d at 993-94 ("no case

13  dismissed because its 'very subject matter' was a state secret involved ongoing, widespread viola-

14  tions of individual constitutional rights, as plaintiffs allege here.").

15

16  **CONCLUSION**

17         In the wake of Watergate and decades of politically-motivated surveillance abuses, Con-

18  gress, expressing the will of the American people, passed FISA to ensure that electronic surveil-

19  lance would always be subject to a judicial check. The government today—four years and a presi-

20  dential election since the revelation of the Program's existence—refuses to defend the legality of

21  the NSA Program, with good reason. In the wake of FISA, there is no viable legal argument that

22  the Program was lawful—indeed, the only arguments of any sort remaining are that Congress cov-

23  ertly overturned FISA with the AUMF or that FISA itself is unconstitutional, neither of which the

24  government now appears willing to assert on the record, and neither of which is remotely defensi-

25  ble on the merits. This case thus raises the question of whether the state secrets privilege requires

26  the dismissal of an action challenging a program that the executive does not even contest was ille-

27  gal and criminal. Leaving this particular group of plaintiffs—civil rights attorneys litigating cases

28  challenging a vast array of unlawful executive policies originating in the same weeks after 9/11

1   that gave birth to the Program—without a remedy threatens to undermine the very judicial structure

2   on which every other aspect of the constitutional separation of powers and the rule of law depends.

3          There is absolutely nothing that would risk disclosure of official secrets to have the Court

4   order the government to destroy (or quarantine) all records of surveillance of plaintiffs under the

5   Program and report back to the Court certifying that it had done so. At a bare minimum, this Court

6   should order such relief. Nor would in camera disclosure, as proposed above, followed by appro-

7   priate, incremental remedial steps under the close control of this Court, harm the national security.

8   Indeed, both would vindicate the system of judicial review in which both this Court and plaintiffs

9   play a vital part.

10                                         Respectfully submitted,

11

12                                         _____/s/sdk_____
                                           Shayana Kadidal
13                                         CENTER FOR CONSTITUTIONAL RIGHTS
                                           666 Broadway, 7th Floor
14                                         New York, NY  10012-2317
                                           (212) 614-6438
15
                                           *Attorney for Plaintiffs*
16   July 29, 2010

17

18

19

20

21

22

23

24

25

26

27

28

1

**Certificate of Service**

2

     I, Shayana Kadidal, certify that on July 29, 2010 (PDT), I caused the foregoing Memoran-
3   dum to be filed electronically on the ECF system and served via email on the counsel for defen-
dants listed below.

4

5                           Anthony J. Coppolino
                            Special Litigation Counsel
6                           Marcia Berman
                           Senior Counsel
7                           United States Department of Justice
                           Civil Division, Federal Programs Branch
8                           P.O. Box 883
                           Washington, D.C. 20044
9                           Email: *tony.coppolino@usdoj.gov*
                           Email: *marcia.berman@usdoj.gov*

10

11   Dated: July 29, 2010

12                                _____/s/_____
                             Shayana Kadidal
13                           CENTER FOR CONSTITUTIONAL RIGHTS
                           666 Broadway, 7th Floor
14                           New York, NY  10012-2317

15

16

17

18

19

20

21

22

23

24

25

26

27

28