1   MICHAEL F. HERTZ
    Acting Assistant Attorney General
2   DOUGLAS N. LETTER
    Terrorism Litigation Counsel
3   JOSEPH H. HUNT
    Director, Federal Programs Branch
4   VINCENT M. GARVEY
    Deputy Branch Director
5   ANTHONY J. COPPOLINO
    Special Litigation Counsel
6   MARCIA BERMAN
    Senior Counsel
7   U.S. Department of Justice
    Civil Division, Federal Programs Branch
8   20 Massachusetts Avenue, NW, Rm. 6102
    Washington, D.C. 20001
9   Phone: (202) 514-4782  Fax: (202) 616-8460

10  *Attorneys for the Defendants*

11              **UNITED STATES DISTRICT COURT**

12              **NORTHERN DISTRICT OF CALIFORNIA**

13                  **SAN FRANCISCO DIVISION**

14  IN RE NATIONAL SECURITY AGENCY          )   **No. 3:06-md-01791-VRW**
15  TELECOMMUNICATIONS RECORDS              )
    LITIGATION                              )   **DEFENDANTS' REPLY**
16                                          )   **MEMORANDUM IN SUPPORT OF**
    _____     )   **THEIR RENEWED MOTION TO**
17                                          )   **DISMISS OR FOR SUMMARY**
    This Document Relates Only To:          )   **JUDGMENT, AND OPPOSITION**
18                                          )   **TO PLAINTIFFS' RENEWED**
    *Center for Constitutional Rights v. Obama*, )  **MOTION FOR SUMMARY**
19  (Case No. 07-1115)                      )   **JUDGMENT IN** *Center for*
                                            )   *Constitutional Rights v.*
20                                          )   *Obama (07-1115)*
                                            )
21  _____     )   Judge:      Hon. Vaughn R. Walker
                                                Date:       *(No Hearing Set)*
22                                              Time:
                                                Courtroom:  6, 17th Floor

23

24

25

26

27

28

# TABLE OF CONTENTS

**PAGES**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.      DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT
          ON PLAINTIFFS' FISA CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT
          ON PLAINTIFFS' FIRST AMENDMENT CLAIM . . . . . . . . . . . . . . . . . . . . . . 7

    III.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT
          ON PLAINTIFFS' FOURTH AMENDMENT AND
          SEPARATION OF POWERS CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    IV.    PLAINTIFFS HAVE NOT SHOWN THAT THEY FACE ANY
          REAL AND IMMEDIATE THREAT OF IRREPARABLE
          HARM TO JUSTIFY THEIR EXPUNGEMENT REQUEST . . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1

<u>**TABLE OF AUTHORITIES**</u>

2

<u>**CASES**</u>                                                                                <u>**PAGES**</u>

3

*ACLU v. Barr,*
   952 F.2d 457 (D.C. Cir. 1991) ...................................................................... 2

4

*ACLU v. NSA,*
5
   493 F.3d 644 (6th Cir. 2007), *cert. denied*, 552 U.S. 1179 (2008) . 2, 4, 12, 13, 14, 16, 18

6

*Al-Haramain Islamic Foundation, Inc. v. Bush,*
   595 F. Supp. 2d 1077 (N.D. Cal. 2009) ........................................................ 3

7

*Al-Haramain Islamic Foundation, Inc. v. Bush,*
8
   507 F.3d 1190 (9th Cir. 2007) ...................................................................... 4

9

*Al-Haramain Islamic Foundation, Inc. v. Bush,*
   564 F. Supp. 2d 1109 (N.D. Cal. 2008) ................................................. 2, 6, 7

10

*Al-Haramain Islamic Foundation v. Obama,*
11
   700 F. Supp. 2d 1182 (N.D. Cal. 2010) ............................................. 3, 4, 5, 6

12

*Al-Owhali v. Ashcroft,*
13
   279 F. Supp. 2d 13 (D.D.C. 2003) ..................................................... 4, 10, 11

14

*Church of Scientology of Calif. v. United States,*
   506 U.S. 9 (1992) ........................................................................................ 15

15

*Cutshall v. Sundquist,*
16
   193 F.3d 466 (6th Cir. 1999) ....................................................................... 15

17

*Doe v. United States Air Force,*
   812 F.2d 738 (D.C. Cir. 1987) ..................................................................... 21

18

*FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson,*
19
   636 F.2d 1300 (D.C. Cir. 1980) ................................................................... 15

20

*Fendler v. United States Bureau of Prisons,*
   846 F.2d 550 (9th Cir. 1988) ................................................................. 19, 20

21

*Fendler v. United States Parole Commission,*
22
   774 F.2d 975 (9th Cir. 1985) ....................................................................... 20

23

*Graham v. Jones,*
   709 F. Supp. 969 (D. Or. 1989) ................................................................... 15

24

*Halkin v. Helms,*
25
   690 F.2d 977 (D.C. Cir. 1982) ........................................................... 8, 12, 13

26

*Hepting v. AT&T,*
   439 F. Supp. 2d 974 (N.D. Cal. 2006) ........................................................... 4

27

28

*Illinois v. McArthur*,
    531 U.S. 326 (2001) ............................................................ 18

*Jabara v. Kelley*,
    476 F. Supp. 561 (E.D. Mich. 1979), *vacated on other grounds*, 691 F.2d
    272 (6th Cir. 1982) ............................................................ 16

*Laird v. Tatum*,
    408 U.S. 1 (1972) ................................................ 7, 8, 9, 12, 13, 15

*Mayfield v. United States*,
    599 F.3d 964 (9th Cir. 2010) .................................................. 14, 15

*Meese v. Keene*,
    481 U.S. 465 (1987) ............................................................ 8, 9

*Menard v. Saxbe*,
    498 F.2d 1017 (D.C. Cir. 1974) ................................................ 15, 20

*Mohammed v. Jeppeson*,
    - F.3d -, 2010 WL 3489913 (9th Cir. Sept. 8, 2010) ......................... 16, 17, 19

*Norman-Bloodsaw v. Lawrence Berkeley Lab.*,
    135 F.3d 1260 (9th Cir. 1998) .................................................. 15

*Paton v. La Prade*,
    524 F.2d 862 (3d Cir. 1975) .................................................. 15, 20, 21

*Presbyterian Church v. United States*,
    752 F. Supp. 1505 (D. Ariz. 1990) ............................................. 11

*Presbyterian Church v. United States*,
    870 F.2d 518 (9th Cir. 1989) ......................................... 1, 8, 9, 10, 11, 14

*Rakas v. Illinois*,
    439 U.S. 128 (1978) ........................................................... 18

*Reporters Committee for Freedom of the Press v. Am. Tel. & Tel. Co.*,
    593 F.2d 1030 (D.C. Cir. 1978) ................................................ 16

*Reuber v. United States*,
    750 F.2d 1039 (D.C. Cir. 1984) ................................................ 20

*Smith v. Brady*,
    972 F.2d 1095 (9th Cir. 1992) ................................................. 10

*Sullivan v. Murphy*,
    478 F.2d 938 (D.C. Cir. 1973) ................................................. 20

*Turkmen v. Ashcroft*,
    No. 02-cv-2307, 2006 WL 4483151 (E.D.N.Y. Oct. 3, 2006) ....................... 17

-iii-

*United Presbyterian Church v. Reagan*,
  738 F.2d 1375 (D.C. Cir. 1984) ........................................................ 4, 8, 12, 13

*United States v. Mayer*,
  503 F.3d 740 (9th Cir. 2007) ........................................................... 16

*United States v. Montoya de Hernandez*,
  473 U.S. 531 (1985) ......................................................................... 18

*United States v. Smith*,
  940 F.2d 395 (9th Cir. 1991) ........................................................... 19

*Vernon v. City of Los Angeles*,
  27 F.3d 1385 (9th Cir. 1994) ........................................................... 10

## FEDERAL STATUTES

5 U.S.C. § 702 ........................................................................................ 2

18 U.S.C. § 2520(b) ............................................................................... 2

18 U.S.C. § 2707(b) ............................................................................... 2

18 U.S.C. § 2712 ................................................................................ 2, 3

50 U.S.C. §§ 1801(k) ............................................................................. 3

50 U.S.C. § 1806(f) ................................................................................ 6

50 U.S.C. § 1809 .................................................................................... 3

50 U.S.C. § 1810 ................................................................................ 2, 3

## MISCELLANEOUS

Comment, *Laird v. Tatum: The Supreme Court and a First Amendment Challenge to Military Surveillance of Lawful Civilian Political Activity*, 1 Hofstra L. Rev. 244 (1973) ........... 12

Jonathan R. Siegel, Note, *Chilling Injuries as a Basis for Standing*, 98 Yale L.J. 905 (March 1989) ................................................................................ 12

1

## <u>INTRODUCTION</u>

2          Despite multiple opportunities, plaintiffs have come forth with no evidence, either direct

3   or circumstantial, that they were subjected to surveillance under the Terrorist Surveillance

4   Program ("TSP") challenged in this lawsuit.  They therefore have not shown that they are

5   "aggrieved persons" sufficient to prove a claim that the TSP violated the Foreign Intelligence

6   Surveillance Act ("FISA").  Defendants are entitled to summary judgment on plaintiffs' FISA

7   claim, and with their FISA claim out of the case, plaintiffs' heavy reliance on this Court's

8   previous FISA decisions, including its liability and state secrets preemption decisions in *Al-*

9   *Haramain*, falls flat.

10          All that remains is plaintiffs' First Amendment claim, which has been plaintiffs' primary

11  claim from the start.  Plaintiffs fail to provide any significant briefing on their Fourth

12  Amendment and Separation of Powers claims, so those have been abandoned.  Plaintiffs lack

13  standing to claim that the TSP violated their First Amendment rights.  Plaintiffs' theory of injury

14  is that the possibility that they were subjected to surveillance under the TSP chilled the exercise

15  of their First Amendment rights because they believed they needed to communicate by less

16  efficient means in order to reduce the risk of disclosure of their communications.  But plaintiffs'

17  concession that the exercise of their First Amendment rights was not chilled by any actual

18  surveillance of them or their clients under the TSP is fatal to their standing.  The cases in this

19  area, including the Ninth Circuit case that plaintiffs claim is controlling, *Presbyterian Church v.*

20  *United States*, 870 F.2d 518 (9th Cir. 1989), require that a plaintiff's First Amendment activity

21  was chilled by some actual surveillance, or other exercise of governmental power to which the

22  plaintiff was actually subjected, in order for the plaintiff to have standing to assert a First

23  Amendment chilling effects claim.

24          With no viable claims, and with the TSP no longer operational, plaintiffs are not entitled

25  to any relief, especially not the extraordinary disclosure and expungement relief they request.

26

27

28

**Defendants' Reply/Opp. Mem., Renewed Motions for Summary Judgment** (3:06-md-1791-VRW)
*Center for Constitutional Rights v. Obama* (07-CV-1115-VRW)

**ARGUMENT**

I.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
      PLAINTIFFS' FISA CLAIM.

At this point in this litigation, it is beyond peradventure that defendants are entitled to summary judgment on plaintiffs' FISA claim.  Plaintiffs have been given numerous opportunities to present evidence that they were actually subjected to surveillance under the TSP, in violation of FISA, and they have consistently failed to proffer any.  Accordingly, the Court should now grant defendants summary judgment on plaintiffs' FISA claim.  *See* Complaint at ¶¶ 45-46.

As an initial matter, FISA does not authorize declaratory and injunctive relief – the only relief that plaintiffs seek.  *See* Defs.' Renewed Motion to Dismiss or for Summary Judgment ("Defs.' Renewed MSJ") at 29 (Dkt. No. 39).  Plaintiffs have never sought monetary damages in this case, for any of their claims.  FISA, however, provides *only* for monetary damages, not declaratory or injunctive relief.  *See* 50 U.S.C. § 1810; *ACLU v. NSA*, 493 F.3d 644, 683 (6th Cir. 2007), *cert. denied*, 552 U.S. 1179 (2008); *ACLU v. Barr*, 952 F.2d 457, 470 (D.C. Cir. 1991).  *Compare* 50 U.S.C. § 1810 *with* 18 U.S.C. § 2520(b) (Wiretap Act cause of action authorizes "equitable relief as may be appropriate"); 18 U.S.C. § 2707(b) (same for Stored Communications Act).  Contrary to plaintiffs' suggestion, this Court did not hold otherwise in *Al-Haramain Islamic Foundation v. Bush*, 564 F. Supp. 2d 1109, 1124-25 (N.D. Cal. 2008).  Plaintiffs' Memorandum in Support of Motion for Summary Judgment and in Opposition to Defendants' Motion to Dismiss ("Pls.' Renewed MSJ") at 19 (Dkt. No. 47).  The Court merely held in that opinion that there is an implied waiver of sovereign immunity in section 1810 of FISA, but that of course only applies to the remedies provided by section 1810, which are limited to actual damages, punitive damages, and reasonable attorney's fee and litigation costs.[1]

Even if the relief plaintiffs seek is authorized by the Administrative Procedure Act, *see*

---

[1]  The Government reserves its position that section 1810 does not waive sovereign immunity.  18 U.S.C. § 2712 *does* waive sovereign immunity for certain claims, but only for actions against the United States "to recover money damages."

1  Pls.' Renewed MSJ at 16 n. 21, 19 n. 25 and 5 U.S.C. § 702, plaintiffs have not shown that they

2  are "aggrieved persons" under FISA.  As this Court has explained, "FISA affords civil remedies

3  to 'aggrieved persons' who can show they were subjected to warrantless domestic national

4  security surveillance."  *Al-Haramain Islamic Foundation, Inc. v. Obama*, 700 F. Supp. 2d 1182,

5  1183 (N.D. Cal. 2010).  *See also* 18 U.S.C. § 2712 ("Any person who is aggrieved . . . may

6  commence an action . . .); 50 U.S.C. § 1810 (providing that "[a]n aggrieved person . . . who has

7  been subjected to an electronic surveillance or about whom information obtained by electronic

8  surveillance of such person has been disclosed or used in violation of section 1809 of this title

9  shall have a cause of action against any person who committed such violation . . . .").[2]  To

10  establish that they are "aggrieved persons" under FISA, plaintiffs must set forth specific facts

11  establishing that they were the "target" of warrantless electronic surveillance or that their

12  communications were intercepted, and they were thus "subjected to" warrantless electronic

13  surveillance.  *See* 50 U.S.C. §§ 1801(k), 1810.  Plaintiffs have failed to present any evidence of

14  either circumstance.  Rather, their case is manifestly based on the *risk* that they and their clients

15  were subjected to surveillance under the TSP, and the actions that they took in response to that

16  perceived risk.  *See, e.g.*, Pls.' Renewed MSJ at 4-7.

17         Plaintiffs acknowledge that they have no direct proof that they were actually subjected to

18  surveillance, relying on "circumstantial evidence and reasonable inferences therefrom," citing

19  *Al-Haramain*, 595 F. Supp. 2d 1077, 1085 (N.D. Cal. 2009).  Pls.' Renewed MSJ at 20.

20  Plaintiffs' "circumstantial evidence" consists of the facts that their international communications

21  fell within the description of surveillance authorized by the TSP because they allegedly represent

22  individuals whom the Government has suspected of being linked to al Qaeda, and that the

_____

24         [2] Section 1809 of the FISA, on which plaintiffs' cause of action must be based,
25  establishes criminal sanctions against a person "who engages in electronic surveillance under
    color or law except as authorized by statute;" or who "discloses or uses information obtained
26  under color of law by electronic surveillance, knowing or having reason to know that the
27  information was obtained through electronic surveillance not authorized by statute."  50 U.S.C.
    § 1809.

**Defendants' Reply/Opp. Mem., Renewed Motions for Summary Judgment** (3:06-md-1791-VRW)
*Center for Constitutional Rights v. Obama* (07-CV-1115-VRW)                              3

1   Government has not categorically denied that any attorney-client communications were

2   intercepted under the TSP.  *See* Pls.' Renewed MSJ at 8, 21.  It is not reasonable to conclude

3   from these facts, taken individually or cumulatively, that plaintiffs were actually subjected to

4   surveillance under the TSP.  *See Al-Haramain*, 700 F. Supp. 2d at 1198.  The TSP included the

5   interception of communications where one party to the communication was located outside the

6   United States and the Government had a reasonable basis to conclude that one party to the

7   communication was a member or agent of al-Qaeda or an affiliated terrorist organization.  *See*

8   *Al-Haramain Islamic Foundation, Inc. v. Bush*, 507 F.3d 1190, 1192 (9th Cir. 2007); *ACLU*, 493

9   F.3d at 648; *Hepting v. AT&T*, 439 F. Supp. 2d 974, 987 (N.D. Cal. 2006).  The TSP merely

10  authorized the interception of these communications; it did not direct or require it with respect to

11  all communications within the scope of the TSP.  *See United Presbyterian Church v. Reagan*,

12  738 F.2d 1375, 1380 (D.C. Cir. 1984); *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 26-27 (D.D.C.

13  2003).  If "it [was] not sufficient for Al-Haramain to speculate that it might be subject to

14  surveillance under the TSP simply because it has been designated a 'Specially Designated

15  Global Terrorist," *see Al-Haramain*, 507 F.3d at 1205, then surely it is speculative to conclude

16  that the CCR plaintiffs were surveilled under the TSP simply because they represent individuals

17  who are suspected of being linked to al Qaeda.

18       Nor does the Government's refusal to rule out the surveillance of attorney-client

19  communications under the TSP, or even statements by Government officials arguably indicating

20  that some such surveillance occurred, bolster plaintiffs' argument.  The only reasonable

21  inference to be drawn from these facts is that *some* attorney-client communications may have

22  been surveilled under the TSP, not that *these plaintiffs'* communications were surveilled under

23  the TSP.  For instance, the quote from two unnamed Justice Department officials that they knew

24  of "only a handful of terrorism cases since the Sept. 11 attacks in which the government might

25  have monitored lawyer-client conversations," *see* Pls.' Renewed MSJ at 8, 21 (discussing Philip

26  Shenon, *Lawyers Fear Monitoring in Cases on Terrorism*, N.Y. Times, Apr. 28, 2008), does not

27

28

**Defendants' Reply/Opp. Mem., Renewed Motions for Summary Judgment** (3:06-md-1791-VRW)
*Center for Constitutional Rights v. Obama* (07-CV-1115-VRW)                                    4

1  reasonably suggest that these plaintiffs' attorney-client conversations were monitored.  Nor is

2  this Court's finding that communications between different attorneys and clients were surveilled

3  in *Al-Haramain* probative of whether the CCR plaintiffs' communications were surveilled under

4  the TSP.  Plaintiffs claim no relation to the *Al-Haramain* plaintiffs.

5      Plaintiffs' additional claim that they are "part of a small group of attorneys litigating

6  cases involving persons the executive suspects . . . of involvement with terrorism," Pls.'

7  Renewed MSJ at 21, is unsubstantiated and, in any event, irrelevant.  Plaintiffs do not argue that

8  the Government targeted lawyers for surveillance under the TSP; rather, their theory appears to

9  be that attorney-client communications were merely swept up along with other of the suspects'

10  calls.  *See* Pls.' Renewed MSJ at 8, 21 (discussing Philip Shenon, *Lawyers Fear Monitoring in*

11  *Cases on Terrorism*, N.Y. Times, Apr. 28, 2008).  As such, the size of the group of attorneys

12  litigating cases involving persons the Government suspects of involvement with terrorism has no

13  bearing on whether plaintiffs were actually surveilled under the TSP.  Similarly, plaintiffs' claim

14  that they were challenging "other unlawful conduct by the same administration" that carried out

15  the TSP, Pls.' Renewed MSJ at 8, is irrelevant because plaintiffs are not claiming that the

16  Government targeted lawyers under the TSP.

17      Plaintiffs' last piece of "circumstantial evidence" – that the government must have used

18  the TSP to intercept attorney-client communications because that's the only possible motivation

19  for circumventing the otherwise sufficient FISA regime (*see* Pls.' Renewed MSJ at 21) – should

20  not be credited.  The TSP was directed at al-Qaeda and affiliated groups.  Its operational details

21  remain secret.  Plaintiffs' speculation about the TSP's purposes is just that – speculation.

22  Moreover, like plaintiffs' other pieces of "circumstantial evidence," this one is untethered to

23  these particular plaintiffs.

24      Plaintiffs' "circumstantial evidence" is simply not comparable to that submitted by the

25  plaintiffs in *Al-Haramain*.  This Court held that the plaintiffs in that case submitted sufficient

26  nonclassified evidence to establish that they were "aggrieved persons" for purposes of their

27

28

1   FISA claim.  700 F. Supp. 2d at 1184.  While the Government disagrees that the plaintiffs in *Al-*

2   *Haramain* presented sufficient circumstantial evidence of standing, plaintiffs here do not even

3   come close to that showing.  Although the *Al-Haramain* plaintiffs also relied on public evidence

4   about the contours of the TSP, it was their evidence "pertaining directly to the government's

5   investigations of Al-Haramain" that was "a *sine qua non*, in the court's view, to establishing

6   their 'aggrieved person' status."  *Id*. at 1188.  In particular, the *Al-Haramain* plaintiffs submitted

7   sworn declarations attesting to the specifics and contents of telephone conversations, occurring

8   during a specific period of time, that they had with Soliman al-Buthi, a director of Al-Haramain

9   located in Saudi Arabia, in which the participants allegedly made reference to various

10   individuals associated with Osama bin-Laden.  A few months after these conversations, the

11   Government designated Al-Haramain as a Specially Designated Global Terrorist organization,

12   citing direct links between Al-Haramain and bin-Laden.  The FBI and the Treasury Department

13   had stated publicly that they relied on classified information, including "surveillance"

14   information, to designate Al-Haramain.  Also, in a separate criminal proceeding, the Government

15   had disclosed that it had intercepted communications between the defendant in that case and al-

16   Buthi.  *Id*. at 1189, 1198.  The Government disputes the sufficiency of the *Al-Haramain*

17   plaintiffs' evidence to establish their "aggrieved person" status, but it is clear in any event that

18   plaintiffs here have not marshaled comparable evidence suggesting that they were subjected to

19   surveillance under the TSP.

20       This Court in *Al-Haramain* also rejected the argument plaintiffs make here that to the

21   extent that evidence of actual surveillance is necessary to establish plaintiffs' "aggrieved person"

22   status for their FISA claim, 50 U.S.C. "§1806(f) could govern additional proceedings to resolve

23   the standing inquiry."  Pls.' Renewed MSJ at 20.  Contrary to plaintiffs' argument, the Court

24   ruled in *Al-Haramain* that plaintiffs "must first establish 'aggrieved person' status . . . and may

25   then bring a 'motion or request' under § 1806(f) . . . ."  564 F. Supp. 2d at 1134; *see also Al-*

26   *Haramain*, 700 F. Supp. 2d at 1187.

27

28

**Defendants' Reply/Opp. Mem., Renewed Motions for Summary Judgment** (3:06-md-1791-VRW)
*Center for Constitutional Rights v. Obama* (07-CV-1115-VRW)                              6

1       Plaintiffs have not established that they are "aggrieved persons" for purposes of their

2   FISA claim.  Accordingly, their FISA claim must fail.  Three important conclusions follow.

3   First, this Court's finding in *Al-Haramain* that the Government violated FISA is irrelevant to this

4   case.  Second, whether or not FISA provides any basis for ordering expungement, destruction, or

5   disclosure of any surveillance records is likewise irrelevant.  Third, this Court's determination

6   that "FISA preempts or displaces the state secrets privilege, but only in cases within the reach of

7   its provisions," *Al-Haramain*, 564 F. Supp. 2d at 1124, on which plaintiffs repeatedly rely,

8   applies only to plaintiffs' defunct FISA claim, not to plaintiffs' constitutional claims.  We

9   address plaintiffs' constitutional claims below.

10   **II.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
        PLAINTIFFS' FIRST AMENDMENT CLAIM.**

11

12       Plaintiffs' First Amendment constitutional claim also fails for the reason that it is not

13   based on any evidence that plaintiffs were actually subjected to surveillance under the TSP.

14   Plaintiffs base their standing for their First Amendment claim on the chilling effect that the TSP

15   allegedly had on their ability to efficiently represent their clients.  Plaintiffs are not claiming that

16   their First Amendment rights were violated by any actual surveillance of them or their clients

17   under the TSP and have essentially conceded that they have no proof of any such actual

18   surveillance.  Indeed, the premise of plaintiffs' request for disclosure to them of any surveillance

19   obtained under the TSP is that they need these records to determine whether their

20   communications have in fact been surveilled.  *See* Pls.' Renewed MSJ at 13.  Plaintiffs' claim is

21   instead that "the potential breach of confidentiality" arising from the possibility that plaintiffs'

22   communications could have been surveilled "was a complication that made it more difficult to

23   litigate efficiently."  Plaintiffs' belief that their communications may have been surveilled

24   chilled their First Amendment speech, the theory goes, because they felt the need to

25   communicate by less efficient means to reduce the risk of disclosure of client confidences.  *Id*. at

26   10.

27       The absence of any evidence of actual surveillance of plaintiffs is fatal to their standing

28

to assert their First Amendment claim.  In *Laird v. Tatum*, 408 U.S. 1 (1972), the seminal

surveillance-based chilling effects case, the Supreme Court held that the plaintiffs, who sought to

challenge the legality of a massive, comprehensive surveillance operation conducted by the

United States Army, may have suffered a subjective chill but did not allege a sufficiently

concrete, actual and imminent injury to confer standing.  The plaintiffs in *Laird* claimed that the

military's unauthorized surveillance of civilians' political activities chilled the exercise of their

First Amendment rights.  The alleged chill arose not from any actual surveillance of the

plaintiffs, but rather from the possibility that the plaintiffs were targets of the allegedly

unauthorized surveillance operation and from their fear that the Army would use the information

it had gathered against them at some time in the future, which was insufficient for standing

purposes.  *See id.* at 3 (plaintiffs' chilling effect was allegedly caused "not by any specific action

of the Army against them, but only by the existence and operation of the intelligence gathering

and distributing system"); *id*. at 13-14.  The Court acknowledged that governmental action that

does not directly prohibit the exercise of First Amendment rights may nonetheless have a

cognizable chilling effect on the exercise of those rights when some "regulatory, proscriptive, or

compulsory" exercise of governmental power, to which the plaintiff was actually "presently or

prospectively subject[ed]," chilled the plaintiff's First Amendment activity.  *Id*. at 11-12.

Consistent with *Laird*, courts require that a plaintiff was "presently or prospectively

subject[ed]" to some exercise of governmental power for a plaintiff to have standing to assert a

First Amendment chilling-effect claim.  *Id. See, e.g., Reagan*, 738 F.2d at 1378-80; *Halkin v.*

*Helms*, 690 F.2d 977, 1002 (D.C. Cir. 1982).  This was so in the two cases on which plaintiffs

principally rely, *Meese v. Keene*, 481 U.S. 465 (1987), and *Presbyterian Church v. United*

*States*, 870 F.2d 518 (9th Cir. 1989).  *Keene* did not involve surveillance, but rather was a

challenge by a political officeholder to the constitutionality of a statute that placed certain

registration, filing, and disclosure requirements on the distribution of expressive materials

deemed to be "political propaganda."  The plaintiff wanted to exhibit three Canadian films,

dealing with the subject of nuclear war and acid rain, that had been identified as political propaganda.  He demonstrated that the statutory characterization of the films as political propaganda deterred him from exhibiting them, and therefore chilled his speech, because exhibiting political propaganda would harm his political and professional reputation and his ability to get reelected.  The Court found that the plaintiff had standing, in accordance with *Laird*, because the films he wanted to exhibit had actually been designated political propaganda pursuant to the statute he was challenging, and it was that designation that threatened to harm his reputation and reelection prospects.  *Keene*, 481 U.S. at 473-74.  *See also Presbyterian Church*, 870 F.2d at 522 (explaining that finding of standing in *Keene* was based on fact that plaintiff "alleged that his constituency was 'influenced against him' *because of the propaganda classification*, and that it was therefore much more difficult for him to continue his political career.") (emphasis added).

Presbyterian Church was a surveillance case and also found standing based on an exercise of governmental power to which the plaintiffs were actually subjected.  *Laird*, 408 U.S. at 11.  The facts of *Presbyterian Church* are important, and it is only by mischaracterizing those facts that plaintiffs can claim that *Presbyterian Church* supports a finding of standing in this case.  As part of an undercover investigation by the Immigration and Naturalization Service ("INS") of a movement by clergy and lay people to aid refugees from El Salvador and Guatemala, known as the sanctuary movement, INS agents wearing "body bugs" infiltrated four Arizona churches.  The agents surreptitiously tape recorded several church services and Bible study classes.  The surveillance was conducted without search warrants or probable cause to believe that the surveillance would uncover evidence of criminal activity.  The covert surveillance was publicly revealed during the criminal prosecution of individuals involved with the sanctuary movement.  After this disclosure, the four churches that were surveilled brought suit claiming, *inter alia*, that the surveillance violated their First Amendment rights.

The court found that the plaintiffs had alleged actual injuries "*as the result of the INS'*

1   *conduct*.  For example, they alleged that *as a result of the surveillance of worship services*,

2   members have withdrawn from active participation in the churches, a bible study group has been

3   canceled for lack of participation, clergy time has been diverted from regular pastoral duties,

4   support for the churches has declined, and congregants have become reluctant to seek pastoral

5   counseling and are less open in prayers and confessions."  870 F.2d at 521-22 (emphasis added).

6   *See also Vernon v. City of Los Angeles*, 27 F.3d 1385, 1394 (9th Cir. 1994) (explaining that the

7   churches' alleged chilling-effect injury in *Presbyterian Church* was caused by the actual

8   surveillance of the churches); *Smith v. Brady*, 972 F.2d 1095, 1098 (9th Cir. 1992) ("We found

9   [in *Presbyterian Church*] that the claim that 'INS surveillance has chilled individual congregants

10  from attending worship services . . . to be a distinct and palpable injury . . . .'") (emphasis

11  deleted from original); *Al-Owhali*, 279 F. Supp. 2d at 27 (plaintiffs' First Amendment claim in

12  *Presbyterian Church* "was predicated on the fact that agents of the . . . INS had actually 'entered

13  the churches wearing body bugs and surreptitiously recorded church services.'  [*Presbyterian*

14  *Church*, 870 F.2d] at 520.  Under these circumstances, the Ninth Circuit held that the church had

15  standing to pursue its claims.").  Thus, *Presbyterian Church* too is consistent with *Laird*'s

16  teachings in that the challenge was to an exercise of governmental power to which the plaintiff

17  churches were actually subjected – the covert surveillance of the plaintiff churches by the INS –

18  and the plaintiff churches demonstrated that the surveillance had a concrete chilling effect on

19  their protected First Amendment activity.  *See Presbyterian Church*, 870 F.2d at 522.

20        Nowhere do plaintiffs acknowledge that the plaintiffs in *Presbyterian Church* were

21  actually surveilled or the significance of this fact to the court's finding of standing.  To the

22  contrary, they omit from their recitation of the facts of *Presbyterian Church* the key fact that the

23  plaintiff churches were the same four churches that were actually surveilled and suggest that,

24  analogous to the instant case, the plaintiff churches merely had reason to believe that they were

25  surveilled from the public disclosure of the INS' "surveillance program."  *See* Plaintiffs' Memo.

26  in Opposition to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment at

27

28

**Defendants' Reply/Opp. Mem., Renewed Motions for Summary Judgment** (3:06-md-1791-VRW)
*Center for Constitutional Rights v. Obama* (07-CV-1115-VRW)                                    10

15-16 (Dkt. No. 16-5) (incorporated into Pls.' Renewed MSJ at 21) ("In *Presbyterian Church*, . . . the INS had, without probable cause, sent agents wearing bugs to infiltrate churches associated with the Sanctuary movement.  The existence of the surveillance program was revealed to the public by subsequent criminal trials. . . .  Like the clergy members in *Presbyterian Church*, Plaintiffs have shown that the illegal surveillance program has forced them to divert time from other duties to implement communications safeguards and review past communications for possible breaches of confidentiality."); Plaintiffs' Supp. Memo. in Support of Plaintiffs' Motion for Summary Judgment and in Opp. to Defs' Motion to Dismiss at 13 (Dkt. No. 13) (incorporated into Pls.' Renewed MSJ at 21) (in *Presbyterian Church*, the court "held that a church had standing to challenge an INS surveillance program on the ground that the threat of surveillance targeted at the church had chilled congregants from participating in the church's services and activities. . . .  Plaintiffs here are in an analogous position."); *id*. at 15 (in *Presbyterian Church*, "the Ninth Circuit granted standing to seek prospective relief on the basis of the effect that the reasonable fear of future surveillance would have on plaintiffs, as here."). The actual facts of the case do not support plaintiffs' analogy and, instead, distinguish *Presbyterian Church* from plaintiffs' case.  *See Al-Owhali*, 279 F. Supp. 2d at 28 ("Thus, unlike the present case, the plaintiffs in . . . *Presbyterian [Church]* had suffered concrete harm as a result of the defendants' surveillance activities; they did not just allege that they were suffering a 'chilling effect' based on the potential of being monitored as the plaintiff asserts.").

Consequently, plaintiffs' attempts to analogize the alleged reluctance of third parties to communicate electronically with CCR to the reluctance of individual congregants to attend church services in *Presbyterian Church* also fails.  *See* Pls.' Renewed MSJ at 11-12. Importantly, the claim in *Presbyterian Church* was that *the INS surveillance* chilled individual congregants from attending worship services, and that this effect in turn interfered with the church's ability to carry out their ministries, thereby satisfying *Laird*'s requirement of the exercise of governmental power.  870 F.2d at 522.  *See also Presbyterian Church v. United*

1    *States*, 752 F. Supp. 1505, 1510 (D. Ariz. 1990) (on remand)  ("Plaintiffs' declarations establish

2    that their congregants have suffered distrust, withdrawal, and fear arising from the infiltration to

3    their churches.").  There is no comparable evidence here of governmental surveillance that has

4    chilled third parties from communicating with CCR, only the possibility of such surveillance.

5    Any claim of an ongoing chilling effect on third parties is made all the more speculative by the

6    fact that the TSP no longer exists.

7         Plaintiffs seek to distinguish *Laird*, *Reagan*, and *Halkin* by claiming that those cases

8    lacked "allegations of illegality or special vulnerability to harm" that "would have rendered it

9    objectively reasonable" for the plaintiffs in those cases to fear the surveillance at issue.  Pls.'

10   Renewed MSJ at 23, 24.  Plaintiffs are mistaken about the facts of these cases.  The plaintiffs in

11   *Laird* were challenging a program of allegedly unauthorized military surveillance of civilians.

12   *See, e.g., Laird*, 408 U.S. at 16 (Douglas, J., dissenting) ("There is . . . no law authorizing

13   surveillance over civilians, which in this case the Pentagon concededly had undertaken.");

14   *ACLU*, 493 F.3d at 662-63 ("In *Laird*, the Army was conducting 'massive and comprehensive'

15   surveillance of civilians, secretly and (apparently) without warrants.").  The allegations of

16   unauthorized conduct were actually quite extensive:

17        It is alleged that the Army maintains files on the membership, ideology,
         programs, and practices of virtually every activist political group in the country,
18        including groups such as the Southern Christian Leadership Conference, Clergy
         and Laymen United Against the War in Vietnam, the American Civil Liberties
19        Union, Women's Strike for Peace, and the National Association for the
         Advancement of Colored People.  The Army uses undercover agents to infiltrate
20        these civilian groups and to reach into confidential files of students and other
         groups.  The Army moves as a secret group among civilian audiences, using
21        cameras and electronic ears for surveillance.  The data it collects are distributed to
         civilian officials in state, federal, and local governments and to each military
22        intelligence unit and troop command under the Army's jurisdiction (both here and
         abroad); and these data are stored in one or more data banks.

23   *Laird*, 408 U.S. at 24-25 (Douglas, J., dissenting).  And the plaintiffs were political activists who

24   were particularly vulnerable to the alleged harm.  *See* Jonathan R. Siegel, Note, *Chilling Injuries*

25   *as a Basis for Standing*, 98 Yale L.J. 905, 906 (March 1989); Comment, *Laird v. Tatum:  The*

26   *Supreme Court and a First Amendment Challenge to Military Surveillance of Lawful Civilian*

27

28

1   *Political Activity*, 1 Hofstra L. Rev. 244, 245 n. 6 (1973).  Moreover, *Laird* "did not discuss the

2   reasonableness of its plaintiffs' response; it held that the mere subjective chill arising from the

3   government's investigative activity – reasonable or not – is insufficient to establish First

4   Amendment standing."  *ACLU*, 493 F.3d at 663.

5           Similarly, the plaintiffs in *Reagan* claimed that the challenged surveillance program was

6   unauthorized and illegal.  738 F.2d at 1377, 1379.  Those plaintiffs too claimed that they were

7   "more likely than the populace at large to be subjected to the unlawful activities which the

8   [challenged] order allegedly permits because (1) they have been subjected to unlawful

9   surveillance in the past and (2) their activities are such that they are especially likely to be

10  targets of the unlawful activities authorized by the order."  *Id*. at 1380.  The court rejected this

11  claim, finding that "[e]ven if it were conceded that these factors place the plaintiffs at greater

12  risk than the public at large, that would still fall far short of the 'genuine threat' required to

13  support this theory of standing."  *Id*.  The court then emphasized that "[i]t must be borne in mind

14  that this [challenged] order does not direct intelligence-gathering activities against all persons

15  who could conceivably come within its scope, but merely authorizes them."  *Id*.

16          In discussing the facts of *Halkin*, plaintiffs focus on the Fourth Amendment claim

17  involving watchlisting.  Pls.' Renewed MSJ at 23-24.  That claim clearly alleged illegal

18  interception of private communications; the court just held that the presence of one's name on a

19  watchlist cannot be presumed to establish that illegal interceptions of one's communications

20  have occurred, and that the state secrets privilege prevented the plaintiffs from proving the actual

21  interception of their communications.  690 F.2d at 997-98.  The court also held that the plaintiffs

22  lacked standing to assert their First Amendment chilling effects claim, based on *Laird*.  *Id*. at

23  1001-02.  That claim too involved allegations of unauthorized, illegal surveillance and a special

24  vulnerability to harm based on the plaintiffs' "political activities which are in opposition to

25  current United States foreign policies and which bring them in contact with foreign organizations

26  and individuals."  *Id*. at 1002 n. 89.

27

28

Of course, plaintiffs' attempt to distinguish *Laird*, *Reagan*, and *Halkin* does not distinguish *ACLU*, which involved the very same allegations of illegality and special vulnerability to harm as plaintiffs assert here. *See* Defs.' Renewed MSJ at 18-19. Plaintiffs say little about *ACLU* in their brief, merely incorporating by reference their response to the case made in a previous brief. *See* Pls.' Renewed MSJ at 22 n. 31. In that brief, plaintiffs primarily dealt with *ACLU* by arguing that they have standing for their First Amendment claim under *Presbyterian Church*, which was not binding on the Sixth Circuit in *ACLU* but is controlling here. As demonstrated above, however, plaintiffs' reliance on *Presbyterian Church* is misplaced.

Plaintiffs' renewed motion fails to cite any case – and we are aware of none – in which a plaintiff was found to have standing for a First Amendment chilling effects claim in the surveillance context, where the chilling effect allegedly arose not from any actual surveillance but rather from the mere possibility that the plaintiff was surveilled. Plaintiffs cite a number of cases for the proposition that "[c]ourts have recognized the continued maintenance of information in government records as an injury sufficient to underlie standing in many contexts." Pls.' Renewed MSJ at 14-15. All of these cases involved some actual search or seizure, or other governmental action taken against the plaintiff, and in some cases real, known fruits of it that the plaintiff was seeking to have expunged, to ground the plaintiff's standing, unlike the case here.

For instance, in *Mayfield v. United States*, 599 F.3d 964 (9th Cir. 2010), the FBI surveilled Brandon Mayfield, a former suspect in the 2004 Madrid train bombings, and conducted covert physical searches of his home and electronic surveillance targeting him. The government named Mayfield as a material witness, executed several search warrants, and seized his computer and paper files. Mayfield was arrested and imprisoned for two weeks. The case against Mayfield was dropped, and after he settled a *Bivens* case against the Government, he sued to challenge the constitutionality of provisions of FISA and alleged a continuing injury from the Government's retention of materials derived from FISA searches and seizures executed

1    against him.  The court held that Mayfield suffered an ongoing injury by virtue of the retention

2    of the derivative FISA materials, since the Government admitted that Mayfield was subjected to

3    surveillance, searches, and seizures, but that a declaratory judgment that the challenged FISA

4    provisions were unconstitutional would not redress that injury.  599 F.3d at 970-71.[3]

5            Without any evidence that they were actually surveilled, plaintiffs' assertion of injury-in-

6    fact to support their First Amendment claim derives entirely from their belief that they were

7    surveilled, which they claim is objectively reasonable.  Even if an objectively reasonable belief

8    that plaintiffs were surveilled were sufficient, in and of itself, to confer standing under *Laird*

9

10           [3]  *See also Church of Scientology of Calif. v. United States*, 506 U.S. 9 (1992) (taxpayer
11   church officials whose conversations with their attorneys were tape-recorded could obtain partial
     relief for alleged violation of privacy by having court order IRS to return the tapes, and case was
12   therefore not moot); *Cutshall v. Sundquist*, 193 F.3d 466 (6th Cir. 1999) (convicted sex offender
13   who was registered with law enforcement agencies in accordance with requirements of state
     registration law had standing to challenge constitutionality of registration law, which required
14   law enforcement officials to release sex offender's registry information whenever necessary to
     protect the public); *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260 (9th Cir. 1998)
15   (in suit by employees against employer for violating employees' privacy rights by testing their
     blood and urine samples for intimate medical conditions without their consent, expungement of
16   the test results would be an appropriate remedy for the alleged violation); *FTC v. Compagnie De
     Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300 (D.C. Cir. 1980) (challenge to court order
17   enforcing subpoena brought by foreign company who was subjected to subpoena by FTC and
18   who produced documents in response to subpoena); *Paton v. La Prade*, 524 F.2d 862 (3d Cir.
     1975) (high school student who was investigated by the FBI and identified in the FBI's file on
19   the investigation, marked "Subversive Matter – Socialist Workers Party," and who claimed that
     the file could endanger her future educational and employment opportunities, had standing to
20   seek expungement of the file); *Menard v. Saxbe*, 498 F.2d 1017 (D.C. Cir. 1974) (college student
21   who was arrested, booked, fingerprinted, and held in police custody for two days had standing to
     seek expungement of his arrest records, noting that injuries flowing from a record of arrest are
22   well-known); *Graham v. Jones*, 709 F. Supp. 969 (D. Or. 1989) (plaintiffs who had been
23   stopped, searched, interrogated, detained and photographed had standing to seek return of
     photographs and prevent police from using them to identify plaintiffs as gang members).

24           *Paton v. La Prade* is the only one of these cases that involved a First Amendment
25   chilling- effects claim.  Interestingly, the court held there that the chair of the social studies
     department at the plaintiff student's high school, and who was not surveilled as was the plaintiff
26   student, did not have standing for a First Amendment claim that the FBI's investigation of the
     plaintiff student impaired his ability to teach, citing *Laird*.  524 F.2d at 873-74.

27

28

**Defendants' Reply/Opp. Mem., Renewed Motions for Summary Judgment** (3:06-md-1791-VRW)
*Center for Constitutional Rights v. Obama* (07-CV-1115-VRW)                                              15

1  (which it is not, for the reasons discussed above), plaintiffs have not shown that it is objectively

2  reasonable to believe that they were surveilled.  As discussed above, all that plaintiffs have

3  shown through "circumstantial evidence" and inferences drawn therefore is a possibility, not a

4  probability, that they could have been subject to surveillance under the TSP.  *See* section I,

5  *supra*; *see also ACLU*, 493 F.3d at 655-56.

6      Finally, as demonstrated in defendants' renewed motion, the Government's assertion of

7  the state secrets privilege prevents plaintiffs from proving, and defendants from defending,

8  plaintiffs' First Amendment claim and therefore requires dismissal of this claim.  Defs.'

9  Renewed MSJ at 28-29.  To prove that the Government violated plaintiffs' First Amendment

10  rights, plaintiffs would have to prove that their individual communications were actually

11  intercepted, that the Government intercepted their communications under the TSP for the

12  purpose of violating plaintiffs' First Amendment rights, and that the Government did not have a

13  legitimate national security purpose in intercepting their communications under the TSP.  *Id*.

14  (citing *United States v. Mayer*, 503 F.3d 740, 752 (9th Cir. 2007); *Reporters Committee for*

15  *Freedom of the Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1054 (D.C. Cir. 1978); *Jabara v.*

16  *Kelley*, 476 F. Supp. 561, 572 (E.D. Mich. 1979), *vacated on other grounds*, 691 F.2d 272 (6th

17  Cir. 1982)).  In defending against plaintiffs' First Amendment claim, the Government would be

18  entitled to rebut plaintiffs' showing and to show that it did not undertake any surveillance or that

19  its interests in intercepting any of plaintiffs' communications outweighed any harm to plaintiffs'

20  First Amendment rights.  *Id*.  All of this would require an exposition of whether the alleged

21  surveillance occurred, the facts justifying it, the precise communications of plaintiffs that NSA

22  intercepted (if any), and the reasons for any such interceptions  – all of which is subject to the

23  state secrets privilege.  *Id*. at 29 (citing Public Declaration of John D. Negroponte at ¶¶ 11, 12).

24  *See also Mohamed v. Jeppesen*, – F.3d –, 2010 WL 3489913, at * 17-19 (9th Cir. Sept. 8, 2010)

25  (en banc) (holding that even if plaintiffs could make a prima facie case with nonprivileged

26  evidence on their claims that Jeppesen assisted in CIA's extraordinary rendition program, case

27

28

must be dismissed because any effort by Jeppesen to defend itself would risk disclosure of state secrets).[4]

Plaintiffs do not contest this argument. Instead, they regurgitate previous arguments addressing various hypothetical defenses they believe the Government might assert to defend the legality of the TSP. *See* Pls.' Renewed MSJ at 31-34. Plaintiffs' only other response to defendants' state secrets privilege assertion is to contend that the Court could examine evidence *in camera* to remedy the injuries claimed without disclosing any state secrets. *Id*. at 27-31. That argument is meritless. *Ex parte in camera* examination would risk disclosure of state secrets to the extent that the Court then attempted to rule on the merits after such review. The Court would have to issue a ruling in order to "remedy the injuries claimed here," *id*. at 27, but any such ruling that relied on classified information over which the Government has claimed the state secrets privilege *would* disclose state secrets. *See Jeppesen*, – F.3d –, 2010 WL 3489913, at * 18 ("Our conclusion holds no matter what protective procedures the district court might employ.").[5]

---

[4] Even if plaintiffs' First Amendment claim could proceed on a theory that their First Amendment rights were violated by the mere existence of the TSP (as opposed to by the Government's actual surveillance of plaintiffs under the TSP), plaintiffs would still have to prove that the Government conducted surveillance under the TSP for the purpose of violating First Amendment rights and that the Government did not have a legitimate national security purpose in intercepting communications under the TSP. The Government could still defend against plaintiffs' First Amendment claim by showing that its interests in intercepting communications under the TSP outweighed any First Amendment harm. This too would all necessarily involve information protected by the state secrets privilege assertion. *See Jeppesen*, – F.3d –, 2010 WL 3489913, at * 17-19.

[5] The order issued by the court in *Turkmen v. Ashcroft*, No. 02-cv-2307, 2006 WL 4483151 (E.D.N.Y. Oct. 3, 2006), to deal with a specific discovery request, to which the CCR plaintiffs point, is plainly inapposite here. The plaintiffs in *Turkmen* had been detained in the United States based on the Government's suspicion that they were involved in terrorist activity. After they were released, they sought assurances that the Government was not listening, under the TSP, to their conversations with the lawyers representing them in the case. The court ordered the Government to disclose, *in camera*, whether any member of the trial team had knowledge of the substance of any intercepted communications between the plaintiffs and their attorneys. 2006 WL 4483151 at * 3. A disclosure that no one on the trial team had any such

---

1    III.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
            PLAINTIFFS' FOURTH AMENDMENT AND SEPARATION OF POWERS
2           CLAIMS.

3          Plaintiffs have effectively abandoned their Fourth Amendment claim.  Their renewed

4    motion makes no argument in support of this claim.  The term "Fourth Amendment" appears

5    only three times in plaintiffs' brief – twice discussing other cases (Pls.' Renewed MSJ at 16, 23)

6    and a third merely stating in a parenthetical in a footnote that "Plaintiffs have denominated their

7    other three claims as direct claims under the First and Fourth Amendments and the Separation of

8    Powers."  *Id*. at 16 n. 21.  Plaintiffs' brief also contains only the vaguest reference to plaintiffs'

9    Separation of Powers claim, not any substantive argument in support thereof.  *See* Pls.' Renewed

10   MSJ at 15, 16 n. 21, 17, 20 n. 26, & 25.  Plaintiffs have, therefore, abandoned that claim too.

11         In addition, plaintiffs' acknowledgment that they have no evidence that they were

12   actually surveilled under the TSP precludes their Fourth Amendment claim.  As the plaintiffs in

13   *ACLU* conceded, "it would be unprecedented . . . to find standing for plaintiffs to litigate a

14   Fourth Amendment cause of action without any evidence that the plaintiffs themselves have been

15   subjected to an illegal search or seizure."  *ACLU*, 493 F.3d at 673-74 (citing *Rakas v. Illinois*,

16   439 U.S. 128, 133-34 (1978)).

17         And, as set forth in defendants' renewed motion, litigation of plaintiffs' Fourth

18   Amendment claim is precluded by the Government's state secrets privilege assertion.  Plaintiffs'

19   Fourth Amendment claim turns on whether any surveillance occurred, whether in the particular

20   facts and circumstances of plaintiffs' case the warrant requirement was impractical, and whether

21   any particular search involving plaintiffs satisfied the Fourth Amendment's "central requirement

22   . . . of reasonableness," *Illinois v. McArthur*, 531 U.S. 326, 330 (2001), which "depends upon all

23   of the circumstances surrounding the search or seizure and the nature of the search or seizure

24   itself," *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985).  These are inherently

25   _____

26   knowledge would not reveal whether the plaintiffs had been subjected to surveillance under the
     TSP because of the fact that the trial team was not exposed to TSP surveillance.  *Id*. at * 2-3.
27

28

**Defendants' Reply/Opp. Mem., Renewed Motions for Summary Judgment** (3:06-md-1791-VRW)
*Center for Constitutional Rights v. Obama* (07-CV-1115-VRW)                                    18

1  factual considerations that would require inquiry into the operation of the TSP, the extent of the

2  al Qaeda threat justifying the TSP, and the facts and circumstances surrounding any actual

3  interception of plaintiffs' communications under the TSP (if any) – areas over which the

4  Government has asserted the state secrets privilege.  *See* Defs.' Renewed MSJ at 23-25, 27-28.

5  *See also Jeppesen*, – F.3d –, 2010 WL 3489913, at * 17-19.  As with the Government's argument

6  that the state secrets privilege precludes litigation of the merits of plaintiffs' First Amendment

7  claim, plaintiffs did not respond to the Fourth Amendment argument either.

8  IV.  PLAINTIFFS HAVE NOT SHOWN THAT THEY FACE ANY REAL AND
       IMMEDIATE THREAT OF IRREPARABLE HARM TO JUSTIFY THEIR
9      EXPUNGEMENT REQUEST.

10  As set forth in defendants' renewed motion, even if plaintiffs did have standing for any of

11  their claims, which they do not, they are not entitled to the extraordinary relief of expungement

12  because they have not shown any real and immediate threat of irreparable harm from the

13  hypothetical surveillance records they seek to expunge.  *See* Defs.' Renewed MSJ at 31-32.[6]

14  "Federal courts have the equitable power to order the expungement of Government

15  records where necessary to vindicate rights secured by the Constitution or by statute."  *Fendler*

16  *v. United States Bureau of Prisons*, 846 F.2d 550, 554 (9th Cir. 1988) (internal quotations and

17  citations omitted).  "Courts which have recognized an equitable power to expunge have

18  unanimously observed that it is a narrow power, appropriately used only in extreme

19  circumstances."  *United States v. Smith*, 940 F.2d 395, 396 (9th Cir. 1991).  The Court must find

20  _____

21  [6]  Although plaintiffs have limited the relief they seek to expungement and disclosure
22  remedies, *see* Joint Status Report at 3-4 (Dkt. No. 35), they nonetheless ask the Court to order
    defendants to make a representation that they have "renounced the right to operate" the TSP and
23  if defendants fail to do so, to issue a declaratory judgment that continued operation of the TSP is
    illegal.  Pls.' Renewed MSJ at 9.  Plaintiffs lack standing for such a declaratory judgment for all
24  of the reasons discussed above, as well as the fact that the TSP no longer exists, rendering it
    impossible for plaintiffs to establish an imminent threat of future injury from the TSP.
25  Defendants have also argued that plaintiffs' challenge to the TSP is moot, which precludes entry
26  of such a declaratory judgment.  *See* Defs.' Supp. Memo. in Support of Mtn. to Dismiss or for
    Summ. Judgment at 16-21 (Dkt. No. 3).

27

28

1   that there is a "'real and immediate threat of irreparable harm before it can allow expungement.'"

2   *Fendler v. United States Parole Commission*, 774 F.2d 975, 979 (9th Cir. 1985) (quoting *Reuber*

3   *v. United States*, 750 F.2d 1039, 1068 (D.C. Cir. 1984) (Bork, J., concurring)).  *See also Fendler*,

4   846 F.2d at 554-55.

5        Plaintiffs argue that expungement is necessary because "the instant case challenges a

6   massive program of criminally unlawful surveillance by the government," "[i]t was brought by

7   attorneys involved in litigating against the same government over other illegal and embarrassing

8   conduct, often evincing executive incompetence," and "[t]he existence of such surveillance

9   makes it extraordinarily difficult to litigate effectively against other illegal activity of the

10  previous administration (which, apparently, is something the current administration is perfectly

11  at ease with)."  Pls.' Renewed MSJ at 17.  None of this rises to the level of establishing a real

12  and immediate threat of irreparable harm to come from the hypothetical surveillance records

13  allegedly in the Government's possession.  Plaintiffs rely on cases involving expungement of

14  arrest records, but the harms flowing from arrest records are well-established and distinct from

15  the alleged records here.  Pls.' Renewed MSJ at 17 (citing *Menard*, 498 F.2d 1017; *Sullivan v.*

16  *Murphy*, 478 F.2d 938 (D.C. Cir. 1973)).  The court in *Menard* explained the following *per se*

17  harms from an arrest record:

18          It is common knowledge that a man with an arrest record is much more apt to be
19          subject to police scrutiny – the first to be questioned and the last eliminated as a
            suspect to an investigation.  Existence of a record may burden a decision whether
            to testify at trial.  And records of arrest are used by judges in making decisions as
20          to sentencing, whether to grant bail, or whether to release pending appeal.

21          The arrest record is used outside the field of criminal justice.  Most significant is
22          its use in connection with subsequent inquiries on applications for employment
            and licensees to engage in certain fields of work.  An arrest record often proves to
            be a substantial barrier to employment.

23  498 F.2d at 1024 (internal quotations and citations omitted).  *See also Paton*, 524 F.2d at 868

24  (student had standing to seek expungement of her FBI file, marked "Subversive Matter –

25  Socialist Workers Party," where file could endanger student's future educational and

26  employment opportunities; student planned to study Chinese and then seek governmental

27

28

1   employment).  In contrast, the harms alleged to flow from the hypothetical surveillance records

2   here are purely speculative.  Plaintiffs admittedly do not know if any of those records exist, what

3   they contain, or how they may or may not be used in the future.  *See, e.g.*, Pls.' Renewed MSJ at

4   13.

5        Finally, even if plaintiffs had satisfied the high threshold for expungement of any

6   hypothetical surveillance records, which they have not, the state secrets privilege would preclude

7   the balancing required to determine whether an expungement order would be appropriate in the

8   circumstances of this case, as well as any order requiring disclosure of any hypothetical records

9   to plaintiffs.  The propriety of an expungement order is determined by applying a balancing test

10  in which the harm caused to an individual by the existence of any records is weighed against the

11  utility to the Government of their maintenance.  *Doe v. United States Air Force*, 812 F.2d 738,

12  741 (D.C. Cir. 1987); *Paton*, 524 F.2d at 868.  Plaintiffs' position that all that matters is the

13  legality of the surveillance is belied by their own citation to *Paton*, in which the court recognized

14  that factors to be weighed in the balancing of interests include the accuracy and adverse nature of

15  the information to be expunged and the value of the records to the Government.  524 F.2d at 869.

16  Both of these factors would require disclosure of whether or not plaintiffs were in fact subject to

17  electronic surveillance, whether any information derived from such surveillance exists and what

18  it may indicate – information that is protected by the Government's assertion of the state secrets

19  privilege.  *See* Defs.' Renewed MSJ at 23-25, 32.

20

21

22

23

24

25

26

27

28

1

**CONCLUSION**

2        For all of the foregoing reasons, and all of the reasons set forth in Defendants'

3  Memorandum in Support of Defendants' Renewed Motion to Dismiss or for Summary

4  Judgment, the Court should grant Defendants' Renewed Motion to Dismiss or for Summary

5  Judgment and deny Plaintiffs' Motion for Summary Judgment.

6

7  Date: Sept. 14, 2010                    Respectfully Submitted,

8                                          MICHAEL F. HERTZ
                                           Acting Assistant Attorney General
9
                                           DOUGLAS N. LETTER
10                                         Terrorism Litigation Counsel

11                                         JOSEPH H. HUNT
                                           Director, Federal Programs Branch
12
                                           VINCENT M. GARVEY
13                                         Deputy Branch Director

14
                                             *s/ Anthony J. Coppolino*
15                                         ANTHONY J. COPPOLINO
                                           Special Litigation Counsel
16
                                             *s/ Marcia Berman*
17                                         MARCIA BERMAN
                                           Senior Counsel
18                                         U.S. Department of Justice
                                           Civil Division, Federal Programs Branch
19                                         20 Massachusetts Avenue, NW, Rm. 6102
                                           Washington, D.C. 20001
20                                         Phone: (202) 514-4782—Fax: (202) 616-8460

21                                         *Attorneys for Defendants*

22

23

24

25

26

27

28

**Defendants' Reply/Opp. Mem., Renewed Motions for Summary Judgment** (3:06-md-1791-VRW)
*Center for Constitutional Rights v. Obama* (07-CV-1115-VRW)                    22