Shayana Kadidal
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012-2317
Phone: (212) 614-6438
Fax: (212) 614-6499
Email: kadidal@ccr-ny.org

*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE NATIONAL SECURITY AGENCY TELECOMMUNICATIONS RECORDS LITIGATION | **No. 3:06-md-01791-VRW**<br><br>**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** in<br>***Center for Constitutional Rights v. Obama (07-1115)***<br><br>Judge: Hon. Vaughn R. Walker<br>Date: *(no hearing set)*<br>Time:<br>Courtroom: 6, 17th Floor |
| This Document Relates Only to:<br>*Center for Constitutional Rights v. Obama*,[*]<br>(Case No. 07-cv-1115-VRW) | |

---

[*] The current President (and each other current occupant of an official defendant's post) is automatically substituted in this official capacity suit pursuant to Fed. R. Civ. Proc. 25(d)(1).

**TABLE OF CONTENTS**

Introduction ........................................................................................................................... 1

Plaintiffs' proposed relief is neither expansive nor intrusive ............................................... 2

Defendants misconstrue the standing cases upon which they rely ....................................... 5

Conclusion ........................................................................................................................... 11

**TABLE OF AUTHORITIES**

*Halkin v. Helms* (*Halkin II*), 690 F.2d 977 (D.C. Cir. 1982) ........................................................9-10

*Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1096 (10th Cir. 2006) (en banc)............6

*Jabara v. Kelley*, 476 F. Supp. 561 (E.D. Mich. 1979), *vacated on other grounds sub nom. Jabara v. Webster*, 691 F.2d 272 (6th Cir. 1982) ............................................................8

*Laird v. Tatum*, 408 U.S. 1 (1972) ............................................................................... 2, 5-6, 8-10

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)..............................................................................2

*Massachusetts v. Mellon*, 262 U.S. 447 (1923).................................................................................2

*McConnell v. FEC*, 540 U.S. 93 (2003) .........................................................................................1-2

*Meese v. Keene*, 481 U.S. 465 (1987) ...........................................................................................6-8

*Menard v. Saxbe*, 498 F.2d 1017 (D.C. Cir. 1974)....................................................................8, 10

*Mohammed v. Jeppesen Dataplan*, Inc., 2010 U.S. App. LEXIS 18746
(9th Cir. Sep. 8, 2010) (en banc) .......................................................................................................1

*Paton v. LaPrade,* 524 F.2d 862 (3rd Cir. 1975) ...........................................................................10

*Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989) ............................5-8

*Socialist Workers Pty. v. Attorney General*, 419 U.S. 1314, 1318 (1974)
(Marshall, Circuit J.)......................................................................................................................5-6

*Sullivan v. Murphy*, 478 F.2d 938 (D.C. Cir. 1973),
*cert. denied,* 414 U.S. 880 .................................................................................................................3

*Turkmen v. Ashcroft*, No. 02-CV-2307, 2006 U.S. Dist. LEXIS 40675
(E.D.N.Y. May 30, 2006) (Gold, M.J.) .............................................................................................5

*Turkmen v. Ashcroft*, No. 02-CV-2307, 2006 U.S. Dist. LEXIS 95913
(E.D.N.Y. Oct. 3, 2006) (Gleeson, U.S.D.J.) .................................................................................4-5

*United Presbyterian Church v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984) ...................................8-9

**BRIEFS, PLEADINGS AND TRANSCRIPTS**

Petition for a Writ of Certiorari, *Wilner v. NSA*, No. 09-1192
(U.S. filed Mar. 30, 2010) ................................................................................................................ 1

Transcript of Oral Argument, *CCR v. Bush*, No. 07-cv-1115 (N.D. Cal. Aug. 7, 2007) ..............10

**INTRODUCTION**

The government has very little new to say in its reply brief (Doc. # 49 (filed Sep. 14, 2010), hereinafter "Gov't Reply").[1] However, defendants' failure to speak to several issues is telling.

Most notably, defendants still decline to take a position on the legality of the NSA Program. As in the now-defunct FOIA action, *Wilner v. NSA*,[2] the new administration refuses to state the obvious—that the Program was illegal—or to deny that it is obvious. In light of that steadfast refusal, it is not surprising that the government's reply also fails to clearly renounce the right (which executive officials asserted even after the supposed January 2007 termination of the Program, *see* Supp. Br. (Doc. # 13) at 3-5) to resume the active operation of the NSA Program.

Less surprisingly, defendants admit that it would be a "reasonable inference" to conclude from statements of government officials "that some attorney-client communications may have been surveilled under" that Program. Gov't Reply at 4.

As to standing, defendants do not contest the legitimacy of the harms described in plaintiffs' briefing on standing. See Pls.' Memorandum in Support of Summary Judgment (Doc. # 47, hereinafter "MSJ") at 4-8 (describing harms flowing from retention of past surveillance, and concluding plaintiffs' "disclosure and disgorgement claims … are essentially equivalent for standing purposes to plaintiffs' ongoing interception claims"). Instead, the government confines its dispute with plaintiffs to the question of whether they were in fact subject to surveillance. As we have noted throughout this litigation, that is not and cannot be the legal threshold to establish standing. Whether illegal surveillance of plaintiffs actually took place is irrelevant to the question of whether the *threat* of illegal surveillance (or retention of records thereof) is capable of causing *concrete harm* to plaintiffs.

If the *threat* of future injury can never be sufficient to underlie standing, then dozens of cases involving injunctive relief designed to avert the likelihood of future harm have, unbeknownst

---

[1] The citations in the government's reply brief to specific pages in plaintiffs' summary judgment brief appear to be pincites to the page number of the ECF header of the PDF document, rather than the printed page numbers at the bottom of each page. It appears that that renders the page numbers high by 5 pages.

[2] The Supreme Court yesterday denied cert in *Wilner v. NSA*, No. 09-1192. *See* Order List, http://www.supremecourt.gov/orders/courtorders/100410zor.pdf; *cf*. Gov't Br. (Doc. # 39) at 23 ("the proper vehicle for plaintiffs' disclosure request is a request for information under [FOIA].").

to the Supreme Court, been wrongly decided over the last century. *See, e.g.*, *McConnell v. FEC*, 540 U.S. 93, 225 (2003) (injury must be "actual *or imminent*"); *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) ("injury *or threat of* injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'"); *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923) (standing may be found where plaintiff "has sustained *or is immediately in danger of sustaining* some direct injury") (emphases added). Indeed, the government's own briefs acknowledge that a "plaintiff … 'presently *or prospectively* subject[ed]' to some exercise of governmental power" may assert chilling-effect standing (Gov't Reply at 8 (emphasis added)). The government's entire argument turns on what is in effect a special standing rule for surveillance cases: no standing without proof of actual surveillance (modified, of course, by the *Al Haramain* corollary that any actual proof of surveillance shall be deemed too secret for the courts to so much as gaze upon in secret). As we have explained in the past, this special rule would be logically inconsistent with the rest of the caselaw on future harm, which, being *always* contingent, always requires an element of judicial judgment in drawing lines between those plaintiffs presenting facts sufficient to ground standing and those who do not. Moreover, as we again detail below, the cases the government cites as purported authority for such a special rule in fact do not stand for such an absolute proposition. Instead, they fit neatly into the pattern of other chilling-effect standing cases in the wake of *Laird*, which demands that would-be plaintiffs manifest *reasonable* fears of a *concrete*, *objective* harm.[3]

**Plaintiffs' proposed relief is neither expansive nor intrusive**

The government characterizes as "extraordinary disclosure and expungement relief" the relief plaintiffs seek. (Gov't Reply at 1.) In fact, neither the limited, incremental disclosure described by plaintiffs (MTD (Doc. # 47) at 21-25) nor the destruction request (*id*. at 11-12) is in any way "extraordinary" or even particularly intrusive upon government secrecy or operations.

As to the "destruction" claims, plaintiffs' proposed order contemplates quarantining any

---

[3] Put another way, *Laird* rejects "subjective" harms in two ways: it demands that plaintiffs' fears be reasonable (*i.e.* non-subjective), and that their contingent harm be concrete and objective (*i.e.* more than a mere subjective fear).

surveillance materials that exist while *in camera* disclosure is worked through, "pending further order from this Court regarding the destruction or permanent quarantining of those materials." *See* Proposed Order (appended to Doc. # 47), at ¶ (2). The government has argued that any public ruling on (presumably any aspect of) plaintiffs' requested relief would necessarily lead to disclosure of state secrets. *See* Gov't Reply at 17 ("*Ex parte in camera* examination would risk disclosure of state secrets to the extent that the Court then attempted to rule on the merits after such review. … The Court would have to issue a ruling in order to 'remedy the injuries claimed here' … but any such ruling that relied on classified information over which the Government has claimed the state secrets privilege *would* disclose state secrets."). That seems incorrect in several respects. First of all, it is unclear why any "examination" of information not in the record would be necessary prior to issuance of a contingent expungement order. If the government is incorrect in its standing argument, and plaintiffs need not show evidence of actual surveillance (using information that could only be obtained from the government through discovery), then no new information would need to be added to the record on summary judgment to decide that plaintiffs were entitled to the expungement relief they seek.

Moreover, it is not clear why any ruling would create a risk of making public the fact *vel non* of surveillance. This Court could order expungement[4] by demanding that defendants "destroy [or quarantine] any records that were acquired through the warrantless surveillance program that is the subject of this action, or were the fruit of such surveillance, and certify to the Court *in camera* that it has done so." *If such records exist*, they would be destroyed (or quarantined) under such an

---

[4] It is worth noting that, as they did in their opening brief, defendants continue to claim that any plaintiff seeking expungement must show a "real and immediate threat of irreparable harm from the hypothetical surveillance records they seek to expunge." Gov't Reply at 19. That standard is incorrect. The government fails in its reply to address plaintiffs' argument that expungement of records resulting from illegal and politically-corrosive government practices may be triggered by a finding that the remedy is "necessary and appropriate." MTD (Doc. # 47) at 11 ("Courts faced with government practices that pose a risk to the integrity of the political process have asked simply whether the expungement is 'necessary and appropriate in order to preserve basic legal rights.' (citing *Sullivan v. Murphy*, 478 F.2d 938, 968 (D.C. Cir. 1973) and *Menard v. Saxbe*, 498 F.2d 1017, 1023 n.13 (D.C. Cir. 1974)).

Of course, defendants also do not contest—nor could they—that federal courts have inherent expungement powers. MTD (Doc. # 47) at 9 ("Federal courts have the equitable power 'to order the expungement of Government records where necessary to vindicate rights secured by the Constitution or by statute,'"…; the government concedes as much." (citing opening brief at 22)).

order; if they do not, nothing would occur. Either way, the certification to the Court would indicate simply that the government had complied with the Court's order; the Court could inform the parties that its order had been complied with (as Judge Gleeson did in *Turkmen v. Ashcroft*, *see* MTD (Doc. # 47) at 23-24); and plaintiffs would receive substantial redress for their injuries as a result.

As to the "disclosure" claims, plaintiffs' first words on the shape of the actual remedy were that "[j]ust as actual knowledge of the fact of surveillance is not necessary to establish standing, full, public disclosure of the fact of surveillance might not be necessary to remedy the injuries claimed here." MTD (Doc. # 47) at 21. Our first proposal was simply that the records be disclosed to the Court, which could then review the materials *in camera* with the assistance of TOP SECRET//SCI security cleared counsel (such as the undersigned). *Id*. at 22. But among our alternative proposals was that the Court review the disclosed materials *ex parte in camera* and then decide what steps to take next, perhaps as an initial matter identifying relevant litigation contaminated by the government's intrusion upon attorney communication privileges, and consulting with the individual courts in those cases regarding what next steps were required. *Id*.

We proposed that the *Turkmen* orders could form a basis for proceeding for those individual courts. The government argues, Gov't Reply at 17-18 n.5, that because Judge Gleeson's order was limited to asking whether the DOJ "trial team" or any likely government witnesses had been privy to surveillance of the *Turkmen* plaintiffs' attorneys, it somehow posed less of a threat of disclosure of the fact of surveillance: "A disclosure that no one on the trial team had any such knowledge would not reveal whether the plaintiffs had been subjected to surveillance under the TSP because of the fact that the trial team was not exposed to TSP surveillance." The somewhat awkward negative syntax of that sentence obscures the fact that if the trial team or witnesses *had in fact* been privy to such surveillance, the fact of such surveillance would have been disclosed to Judge Gleeson.[5] Nonetheless, the government complied with Judge Gleeson's order rather than appeal it.[6]

---

[5] Again, Judge Gleeson's order directed "defendants … to state, within 14 days of this order, whether any defendant, any likely witness or any member of the trial team (which includes all attorneys and support staff, and any supervisors or other individuals who are providing guidance or advice or exercising decision-making authority in connection with the defense of these actions) has knowledge (or had knowledge in the past) of the substance of any intercepted confidential communications between the plaintiffs and their attorneys." *See* MTD (Doc. # 47) at 23 (quoting *Turkmen* Order).

If the outcome of that compliance had been a disclosure that the plaintiffs' attorneys had in fact been surveilled, Judge Gleeson did not intend to immediately disclose the fact of surveillance to plaintiffs, but instead proposed to consult with the government *ex parte* regarding remedial measures and only then inform plaintiffs that either no surveillance information would be used by the government, or give them notice of remedial action that had been implemented. *See* MTD (Doc. # 47) at 23-24 (quoting Order, Doc. # 455, *Turkmen v. Ashcroft*, No. 02-CV-2307 (E.D.N.Y. Oct. 3, 2006) (Gleeson, U.S.D.J.) at 2-6; 2006 U.S. Dist. LEXIS 95913 at *8-*14).[7]

**Defendants misconstrue the standing cases upon which they rely**

The vast majority of the government's claims regarding the chilling-effect and surveillance standing cases have already been made in their opening brief (Doc. # 39) and prior briefing. We address them briefly, seriatim:

***Laird v. Tatum*:** The government continues to press this Court to adopt its reading of *Laird* as endorsing an implicit limitation of chilling-effect standing to cases involving a coercive exercise of "regulatory, proscriptive, or compulsory" government power. Gov't Reply at 8. As plaintiffs have pointed out, that position is foreclosed by Ninth Circuit authority, *see* MTD (Doc. # 47) at 16 ("Transfer of the instant case to this district settled the issue, for in the Ninth Circuit, *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 522 (9th Cir. 1989) controls the question, definitively rejecting the notion that government action must reach the level of ''coercive action'' before standing may be found in chilling effect cases."). Moreover it is against the weight of prior authority elsewhere. *See* Pls.' SJ Reply (Doc. # 16-10) at 1-4 (citing *Socialist Workers Pty. v. Attorney*

---

[6] That is notable because it appears to be the government's position, pursuant to its interpretation of the state secrets privilege, that even disclosure to a federal judge *ex parte in camera* is a disclosure that creates a risk of national security information being disclosed (presumably accidentally).

[7] Magistrate Judge Gold's recommended order would have required more: disclosure of whether any conversations between plaintiffs' counsel and their clients had been intercepted or monitored by the government, including by the NSA. *See* MTD at 22-23 (quoting *Turkmen v. Ashcroft*, No. 02-CV-2307, 2006 U.S. Dist. LEXIS 40675 at *20-*21 (E.D.N.Y. May 30, 2006)). Judge Gold did essentially order discovery and disclosure of such surveillance records, holding expressly that "any claim that sensitive secrets would be revealed by the government's disclosure of whether conversations between plaintiffs and their counsel in this case were monitored is hard to fathom." Judge Gleeson simply differed, out of what he described as an excess of caution at the initial stage of disclosure, in deference to the good faith of the Justice Department.

1  *General*, 419 U.S. 1314, 1318 (1974) (Marshall, Circuit J.) ("the Government reads *Laird* too
2  broadly") and *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1096 (10th Cir. 2006) (en
3  banc) (McConnell, J.) ("in some cases, First Amendment plaintiffs can assert standing based on a
4  chilling effect on speech even where the plaintiff is not subject to criminal prosecution, civil liabil-
5  ity, regulatory requirements, or other 'direct effect[s]'")).

6      ***Meese v. Keene*:** The government cites *Keene* as support for this interpretation of *Laird*,
7  claiming that the case is an example of such "coercive action" "to which the plaintiff was actually
8  'presently or prospectively subject[ed]'" because the movies Keene wished to exhibit were offi-
9  cially designated by the government as "political propaganda." Plaintiffs here have previously cited
10 *Keene* as standing for exactly the opposite point: that even *attenuated* effects of governmental ac-
11 tions (here, the possible effect on third parties, who might note the association between Keene and
12 these "propaganda" films and allow that to affect their view of him as a political candidate in future
13 elections) can sustain standing. *See* Pls.' SJ Reply (Doc. # 16-10) at 2 (quoting *Meese v. Keene*,
14 481 U.S. 465, 473 (1987) ("governmental action need not have a direct effect on the exercise of
15 First Amendment rights, we held [in *Laird*], [but] it must have caused or must threaten to cause a
16 direct injury to the plaintiffs")). Keene, after all, had not yet shown the films. Until he did, the label
17 had not even this indirect effect on him—instead, it simply chilled his interest in self-expression.
18 And if he had shown them, the actual harm would have been contingent upon the actions of third
19 parties. It seems farfetched to conceive of *Keene* as involving direct governmental coercion that is
20 somehow more immediate and intense than the threat posed by the surveillance at issue here.

21     ***Presbyterian Church (USA) v. United States*, 870 F.2d 518 (9th Cir. 1987):** It seems simi-
22 larly farfetched to interpret the Ninth Circuit *Presbyterian Church* case as one turning on whether
23 government action was actually applied to the plaintiff churches in that case. The government's
24 argument that *Presbyterian Church* is consistent with its interpretation of *Laird* is a curious one in
25 a number of respects. First, the government itself in *Presbyterian Church* argued that the facts of
26 that case fell outside of the "coercive action" rule that the same government now, 23 years later,
27 claims underlay standing in the case. *See* 870 F.2d at 522 ("The INS contends that the alleged chill-
28 ing effect on the congregants, and the resulting impact on church worship, are not cognizable inju-

ries because they do not derive from 'coercive action' by the INS. Brief of Appellees at 9."). The Ninth Circuit rejected that argument, finding the harm more analogous to the "reputational" or "professional" harm suffered by Keene as a mediated consequence of the actions of third parties (the churches' congregants). *Id.*

Moreover, the district court had dismissed the churches' damages claims, a ruling upheld by the Ninth Circuit. Therefore the only questions to which the Ninth Circuit's standing discussion was relevant related to *prospective* relief. *See* 870 F.2d at 521 ("because we are unable to assess the likelihood that the INS will repeat its surveillance of the churches in the future, we remand to the district court for a determination of whether the churches have standing to seek prospective relief"). While the district court, on remand, ultimately found standing to pursue injunctive relief, it predicated that standing on *the risk that future surveillance would occur*, based on the government's assertions that it had the legal authority to pursue the same sort of surveillance that had been directed against the churches prior to the filing of the lawsuit. *See Presbyterian Church (USA) v. United States*, 752 F. Supp. 1505, 1510 (D. Ariz. 1990) ("the court concludes the case is not moot because the government asserts it has the right … to conduct covert investigations of criminal activity within churches. Because the government has taken a position that it can continue to pursue criminal investigations in this manner, plaintiffs have no guarantee the government conduct will not re-occur causing further injury."). The "actual surveillance" that the churches knew with certainty that they had been subject to was *all past surveillance*, irrelevant to the prospective injunctive relief sought except to the extent that it colored the perception of the congregants (and the Court) that similar future surveillance was marginally more likely to be directed against the four plaintiff churches than against other similar churches involved in the sanctuary movement or otherwise likely to be targeted by the INS.

In short, *Presbyterian Church* is a perfect example of a case where the government announces a program of intrusive surveillance is being conducted and will continue to be conducted in the future, and the likely targets (the congregants) of that surveillance react to that threat, causing injuries to a third party (the churches). It is directly analogous to the instant case, where the risk that surveillance has happened (and records thereof are being held by the government) casts a chill-

ing effect on various third-party litigation participants and indeed affects plaintiffs behavior directly. *See* MTD (Doc. # 47) at 5-6 (describing actual and foreseeable effects on third parties of fear of government retention of surveillance records). To say that the actual past INS surveillance in *Presbyterian Church* is somehow essential to the standing finding in that case is analogous to saying that the fact that CCR's board members have in the past been subject to warrantless surveillance, *see, e.g.*, *Jabara v. Kelley*, 476 F. Supp. 561 (E.D. Mich 1979), is somehow a factor that should play into our standing here. In neither instance is the past "actual surveillance" a necessary component of the ultimate determination that plaintiffs merit standing.

***United Presbyterian Church v. Reagan* (*UPC*) and *Halkin v. Helms* (*Halkin II*):** Both these cases were discussed extensively in plaintiffs opening brief, MTD (Doc. # 47) at 16-18, but plaintiffs reiterate certain points here because the government's presentation of the facts of those cases is misleading.

The government's reply first attempts to claim that in *UPC*, *Halkin II* and *Laird*, plaintiffs were all both (1) subject to illegal government behavior and (2) specially vulnerable to harm. Of course, that is untrue for *Laird*, where the Supreme Court noted that nothing the Army intelligence operatives were doing was distinct from what a journalist could have done.[8] Plaintiffs here have argued that illegality of government surveillance is a factor in determining how reasonable plaintiffs are in fearing it. *See* MTD (Doc. # 47) at 18 n.35. The government tries to skirt around the importance of actual illegality to our arguments about the (un)reasonableness of plaintiffs' claimed harms in *Laird* by noting that the surveillance was "unauthorized." *See* Gov't Reply at 12 ("plaintiffs in *Laird* were challenging a program of allegedly *unauthorized* military surveillance of civilians. … The allegations of *unauthorized* conduct were actually quite extensive…"); *id*. (citing Justice Douglas' *dissent* in *Laird* for the supposed lack of legal authority (in the sense of constitutionally delegated power) for the surveillance activities in that case). Whatever "unauthorized" is intended to mean here, unauthorized behavior by officials surely is qualitatively different from criminally unlawful behavior.  Moreover, a threatened intrusion into the privileged communi-

---

[8]     *See Laird v. Tatum*, 408 U.S. 1, 9 (1972) ("nothing more than a good newspaper reporter would be able to gather by attendance at public meetings" (quoting D.C. Circuit opinion)).

1  cations of lawyers litigating high-profile politicized cases making claims of abuse of executive
2  power against the government simply cannot be compared to the allegations of vulnerability to
3  harm of the activists in *Laird*, especially when what the government was doing to them was not
4  even colorably unlawful (nor, as here, *criminally* unlawful).

5  Somewhat absurdly, the government argues that *UPC* and *Halkin* are not distinguishable on
6  these grounds because the plaintiffs in those cases *asserted* that the surveillance was illegal. As we
7  have pointed out in our past briefings and at oral argument, in neither case was a *plausible* claim of
8  illegality raised. *See* MTD (Doc. # 47) at 16-18 (citing past oral argument transcripts at 16). In
9  UPC, plaintiffs challenged an executive order that "was ostensibly designed to *eliminate* illegal
10  surveillance," and

> While plaintiffs claimed they experienced chilling effects from the fact that the order might govern the process for making them targets under FISA, they made absolutely no claim against FISA itself. The only allegations of illegality they made related to government actions *prior* to the Order that their claims were directed at, as the District Court opinion makes clear. Nor were the *UPC* plaintiffs a group especially vulnerable to warrantless surveillance because of the risk of legally-recognized communications privileges being violated, as in the instant case. Plaintiffs' failure there was not that they did not show they were *actual targets* of an illegal program. Rather, they failed to make *any plausible claim of illegality*, no less any other showing of being affected by the practices at issue. Like the *Laird* plaintiffs, the *UPC* plaintiffs were worried about how a lawful system might be put to unlawful uses against them in the future.

18  MTD (Doc. # 47) at 16-17. Thus, while the government cites to the UPC plaintiffs' claims (recited
19  by the court of appeals) that "[t]hose plaintiffs too claimed that they were 'more likely than the
20  populace at large to be subjected to the unlawful activities which the [challenged] order allegedly
21  permits because (1) they have been subjected to unlawful surveillance in the past and (2) their ac-
22  tivities are such that they are especially likely to be targets of the unlawful activities authorized by
23  the order," it fails to note that ultimately the courts decided that none of those claims of illegality
24  were colorable. Gov't Reply at 13 (quoting *UPC*).

25  Similarly, the situation facing the plaintiffs in *Halkin II* by the time that case was argued is
26  no comparison to the situation facing the instant plaintiffs. The NSA Program was openly ac-
27  knowledged by the Bush administration; a world of difference from *Halkin*, where, as we said in
28  our opening brief, no plausible claim of illegality was made:

> The D.C. Circuit held that mere forwarding of watchlists from one agency to another could not be a Fourth Amendment violation, and that plaintiffs could not prove that anything *illegal* happened after the forwarding. In *Halkin II* there was also no claim that the plaintiffs were *especially vulnerable* to harm from the existence of a surveillance program in the same way that plaintiffs in our case are (e.g., the difficulty of *functioning as attorneys* because of the complained-of watchlisting). *See id*. at 998 n.78 (plaintiffs "cannot demonstrate any injury – past, present, or future" from watchlisting).

MTD (Doc. # 47) at 14. The *Halkin II* opinion makes this point more clearly than we can:

> appellants' argument … proceeds as follows: *if* the warrantless interception of a plaintiff's communications would violate the fourth amendment, *then* watchlisting -- which creates a substantial threat of such interception -- would also violate the fourth amendment…. The flaw in the argument is not in the validity of the if-then inference, but in the soundness of its premise. Manifestly, watchlisting *by itself* would never be a fourth amendment violation: the mere forwarding of a name by one agency to another involves no "search" or "seizure" triggering the constitutional limitation. Only the fact that the act of forwarding the name might *lead to* an *unlawful* search or seizure could make watchlisting constitutionally suspect. While appellants argue strenuously that watchlisting *leads to* interception, they fail to establish the critical second half of the premise, *i.e.,* that the resulting interception would be *unlawful.*

*Halkin v. Helms*, 690 F.2d 977, 997-98 (D.C. Cir. 1982).

\*   \*   \*

The government's attempts to establish various cut-and-dried rules capable of explaining the entire span of the standing caselaw flounder because all of them are, ultimately, too simplistic to isolate the principles that actually guide how courts decide standing in chilling-effect cases. As plaintiffs noted in their opening brief, MTD (Doc. # 47) at 15-20, and have argued since the beginning of this litigation, *Laird* has two components: plaintiffs in chilling effect cases must have a reasonable (*i.e*. non-subjective) fear of concrete, objective harm (i.e. something going beyond mere subjective anxiety). (As we have asserted at oral argument, much of the confusion about the application of *Laird* results from the fact that the Court's famous reference to "subjective 'chill'" is quoted by lower courts indiscriminately to refer to both elements: the fear motivating the chill, and the resulting harm from the change in behavior. *See* Tr. of Oral Argument (Aug. 9, 2007) at 46.) To use one of the government's examples, *see* Gov't Reply at 15 n.3, the social studies teacher in *Paton v. LaPrade*, 524 F.2d 862, 873-74 (3d Cir. 1975), fails the second prong, because he could as-

sert no specific tangible harm beyond the anxiety the challenged mail cover program (directed at one of his students because of a class project) causes him in the course of his teaching.

\* \* \*

Finally, *Jeppesen Dataplan v. Mohammed*, 2010 U.S. App. LEXIS 18746 (9th Cir. Sep. 8, 2010) (en banc) was decided just prior to the submission of the government's reply brief. Defendants have not sought to invoke *Jeppesen* for any purpose beyond their previously-asserted standard state secrets arguments (*see, e.g.*, Gov't Reply at 16, 17, 19), as indeed they cannot given their sole argument that without absolute proof of actual surveillance, plaintiffs' claims are barred by the state secrets privilege. (While the opinion contains much speculation about the bounds of the *Totten* bar, it was ultimately decided after what the court characterized as a conventional analysis under *Reynolds*, and, like the government, plaintiffs view it as changing little about the analysis of the state secrets claims here.)

**CONCLUSION**

Neither the expungement sought by plaintiffs nor the proposed cautious, incremental disclosure under the close control of the Court would threaten disclosure of vital secrets in any way. Indeed, in the alternative, expungement could take the form of an order simply directing the government to destroy whatever records it had in its possession, without ever publicly confirming whether they existed. Absolutely nothing flowing from such an order (including a requirement that the government report back to the Court certifying that it had done so) would risk disclosure of official secrets. The fact that the government is so vigorously resisting the issuance of such an order speaks volumes about the likelihood that plaintiffs were in fact subject to the "actual surveillance" that the government ultimately seeks to protect behind the veil of the state secrets privilege. This Court should grant summary judgment for plaintiffs and order the relief they have requested, including, at a bare minimum, such an expungement order.

Respectfully submitted,

/s/
Shayana Kadidal
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor

3:06-md-1791-VRW   REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT IN   11
*CENTER FOR CONSTITUTIONAL RIGHTS V. OBAMA* (07-CV-1115-VRW)

| | |
|---|---|
| 1 | New York, NY  10012-2317 |
| 2 | (212) 614-6438 |
| 3 | *Attorney for Plaintiffs* |
| 4 | October 5, 2010 |

**Certificate of Service**

I, Shayana Kadidal, certify that on October 5, 2010 (PDT), I caused the foregoing Reply Memorandum to be filed electronically on the ECF system and served via email on the counsel for defendants listed below.

> Anthony J. Coppolino
> Special Litigation Counsel
> Marcia Berman
> Senior Counsel
> United States Department of Justice
> Civil Division, Federal Programs Branch
> P.O. Box 883
> Washington, D.C. 20044
> Email: *tony.coppolino@usdoj.gov*
> Email: *marcia.berman@usdoj.gov*

Dated: October 5, 2010

> _____/s/_____
> Shayana Kadidal
> CNTER FOR CONSTITUTIONAL RIGHTS
> 666 Broadway, 7th Floor
> New York, NY  10012-2317