# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE:

NATIONAL SECURITY AGENCY
TELECOMMUNICATIONS RECORDS
LITIGATION

_____

This order pertains to:

CENTER FOR CONSTITUTIONAL RIGHTS,
a New York Nonprofit Law Firm;
TINA M FOSTER, GITANJALI S
GUTIERREZ, SEEMA AHMAD, MARIA
LAHOOD and RACHEL MEEROPOL,
United States Citizens and
Attorneys at Law,

                 Plaintiffs,

v

BARACK H OBAMA, President of the
United States; NATIONAL SECURITY
AGENCY and KEITH B ALEXANDER, its
Director; DEFENSE INTELLIGENCE
AGENCY and MICHAEL D MAPLES, its
Director; CENTRAL INTELLIGENCE
AGENCY and PORTER J GOSS, its
Director; DEPARTMENT OF HOMELAND
SECURITY and MICHAEL CHERTOFF,
its Secretary; FEDERAL BUREAU OF
INVESTIGATION and ROBERT S
MUELLER III, its Director; JOHN D
NEGROPONTE, Director of National
Intelligence,

                 Defendants.

_____/

MDL Docket No 06-1791 VRW

Case No C 07-1115 VRW

ORDER

This case is part of multi-district litigation stemming from the Terrorist Surveillance Program ("TSP"), a warrantless surveillance program carried out by the federal government from 2001 to 2007. On May 27, 2010, defendants — certain high-ranking government officials and associated government agencies — filed a renewed motion to dismiss or, in the alternative, for summary judgment based in part on plaintiffs' failure to establish standing. Doc #731/39.[1] On July 29, 2010, plaintiffs filed a renewed motion for summary judgment and opposition to defendants' motion for summary judgment. Doc ##742/46, 743/47. For the reasons discussed below, the court GRANTS defendants' motion for summary judgment and DENIES plaintiffs' motion for summary judgment.

I

On January 17, 2006, plaintiffs filed an action in the United States District Court for the Southern District of New York. Doc #333-1/16-1. Plaintiffs alleged that defendants engaged in electronic surveillance without court order and thereby violated the Foreign Intelligence Surveillance Act ("FISA"), the Separation of Powers Doctrine and the First and Fourth Amendments. Id at 2. Plaintiffs based these allegations primarily upon statements by President George W Bush and other officials in December 2005 admitting that the National Security Agency ("NSA") had monitored, without a warrant, communications between the United States and a

---

[1] Documents will be cited both to the MDL docket number (No M 06-1791) and to the individual docket number (No C 07-1115) in the following format: Doc #(MDL)/(individual).

foreign country where one of the parties was believed to be a member or affiliate of al-Qa'ida.  Id at 8.

The complaint alleges that plaintiff Center for Constitutional Rights ("CCR") represented, and continues to represent, clients who are suspected by the United States government of having some link to al-Qa'ida or other terrorist organizations.  Doc #333-1/16-1 at 2-3.  These clients include Muslim foreign nationals detained after the September 11 terrorist attacks as persons "of interest" and others detained as "enemy combatants" at Guantanamo Bay.  Id.  Plaintiffs — CCR and five of its attorneys who represent such clients — "believe that their conversations and emails with [CCR clients], and with other persons abroad with whom they have communicated in connection with these cases, have been subject to surveillance pursuant to the [TSP]." Id at 3.  Plaintiffs further allege that "[i]t is likely that [p]laintiffs' privileged attorney-client communications were and continue to be intercepted by Defendants."  Id.

Plaintiffs claim that they were harmed by the government's surveillance program in various ways.  Plaintiffs allege that, after they became aware of the program, they were compelled to "institute protective measures to reduce the potential impact of such surveillance on their representation of their clients."  Doc #333-1/16-1 at 12.  Plaintiffs allege that they were forced to stop "communicating with certain individuals at all by phone or mail," "avoid[] subjects central to the attorney-client relationship and work product in electronic communications with others" and "undertake international travel to avoid the risk of jeopardizing the confidentiality of privileged communications."  Id

3

at 12-13.  In addition to the expenses these measures imposed on plaintiffs, plaintiffs claim that they have suffered "irreparable harm to their ability to advocate vigorously on their clients' behalf."  Id at 13.

Plaintiffs also allege that, because the government's surveillance program "permits the surveillance of conversations of people for whom the government would not be able to establish probable cause that the subject of surveillance is an agent of a foreign power," it has "negatively affected [p]laintiffs' ability to communicate with clients, co-counsel, witnesses, and other relevant individuals in the course of carrying out their role as advocates for their clients and others."  Doc #333-1/16-1 at 13. That is, "[k]nowledge that their conversations may be overheard chills persons outside the United States who are not agents of foreign powers from contacting the [p]laintiffs through electronic means to seek their legal advice and/or to provide information in connection with legal matters."  Id.  Plaintiffs allege that this has caused "irreparable harm to their ability to effectively advocate for [their clients], and will continue to inflict such harm until it is stopped."  Id.

Plaintiffs' complaint requests various forms of equitable relief.  Plaintiffs request that the court: (1) "[d]eclare that [d]efendants' program of warrantless surveillance is unlawful, and enjoin any further such warrantless surveillance"; (2) "[o]rder that [d]efendants disclose to [p]laintiffs all unlawful surveillance of [p]laintiffs' communications carried out pursuant to the program"; (3) "[o]rder that all [d]efendants turn over to [p]laintiffs all information and records in their possession

relating to [p]laintiffs that were acquired through the warrantless
surveillance program or were the fruit of surveillance under the
program, and subsequently destroy any such information and records
in [d]efendants' possession"; (4) "[a]ward costs, including an
award of attorneys' fees under the Equal Access to Justice Act, 28
[USC] § 2412(d)(1)(A)" and (5) "[a]ward such other relief as the
Court may deem just and proper."  Doc #333-1/16-1 at 15.

        On March 9, 2006, plaintiffs moved for partial summary
judgment.  Doc ##333-2/16-2, 333-3/16-3.  On May 26, 2006,
defendants moved to dismiss plaintiffs' action or, alternatively,
for summary judgment.  Doc ##327-1/12-1, 327-3/12-3.  Both
plaintiffs and defendants received amicus briefs in support of
their motions.

        On February 23, 2007, this case was consolidated with the
In re National Security Agency Telecommunications Records
Litigation multi-district litigation, Case Number 06-md-1791, and
transferred to the undersigned sitting in the Northern District of
California.  See Doc #179/xxx.[2]  Judge Lynch in the Southern
District of New York did not rule on the outstanding motions to
dismiss and for summary judgment before the case was transferred.
The parties agreed to file supplemental briefs and have oral
argument on the outstanding motions.  Doc #289/2.  On June 8, 2007,
defendants filed a supplemental brief in support of their original
motion.  Doc #308/3.  Defendants also submitted, for ex parte in
camera review, a classified memorandum and a classified

        [2] Documents contained in the MDL docket but not in the docket for
this particular case are listed with "xxx" rather than an individual
docket number.

5

declaration.  Doc ##309/4 & 310/5.  On July 10, 2007, plaintiffs filed a supplemental memorandum in support of their original motion for summary judgment and in opposition to defendants' motion.  Doc #328/13.

On August 9, 2007, the court held oral arguments on the parties' motions.  Doc #348/20.  On August 10, 2007, plaintiffs moved for leave to file a supplemental complaint challenging the Protect America Act of 2007, which temporarily amended FISA, as unconstitutional under the First and Fourth Amendments.  Doc #347/19.  Defendants opposed.  Doc #381/22.  On January 28, 2009, the court denied plaintiffs' motion as moot on the grounds that the Protect America Act had expired in February 2008 and had not been reauthorized.  Doc #555/29.

In response to the court's request on January 20, 2010, Doc #702/31, the parties submitted a joint status report on March 19, 2010 explaining the status of the case and the proceedings necessary to resolve it.  Doc #716/35.  Among the issues addressed by the parties was the fact that the TSP had been discontinued in early 2007.  Id.  Plaintiffs stated that "[e]ven if the NSA Program challenged in [p]laintiffs' original summary judgment papers is no longer in active operation with respect to the continuing interception of communications," plaintiffs' request for an order requiring defendant to disclose all unlawful surveillance of plaintiffs, turn over all information pertaining to plaintiffs that was acquired through the TSP and destroy any such information in defendants' possession was still "necessary to remedy the harms set forth in [p]laintiffs' summary judgment papers."  Id at 3. Defendants continued to argue that plaintiffs' claims should be

dismissed or summary judgment granted because plaintiffs lack standing.  Id at 4-7.  The court ordered the parties to renew their cross-motions and file new oppositions and replies.  Doc #720/36.

On May 27, 2010, defendants filed a renewed motion to dismiss or for summary judgment.  Doc #731/39.  On July 29, 2010, plaintiffs filed a renewed motion for summary judgment and an opposition to defendants' motion.  Doc ##742/46, 743/47.  On September 14, 2010, defendants filed an opposition to plaintiffs summary judgment motion and in reply to plaintiffs' opposition.  Doc #749/49.  On October 5, 2010, plaintiffs filed a reply to defendants' opposition.  Doc #750/50.

II

The following is a statement of the relevant facts of the case, drawn largely from plaintiffs' declarations and included documents, and construed most favorably to plaintiffs.

On December 17, 2005, President Bush gave a radio address stating that shortly after September 11, 2001 he authorized the NSA to intercept "the international communications of people with known links to [al-Qa'ida] and related terrorist organizations."  Doc #333-4/16-4 at 39-40.  In a December 19, 2005 press conference, Attorney General Alberto Gonzales explained that the program involved surveillance of communications between a party in the United States and a party outside of the United States where there is "a reasonable basis to conclude that one party to the communication is a member of [al-Qa'ida], affiliated with [al-Qa'ida], or a member of an organization affiliated with [al-Qa'ida], or working in support of [al-Qa'ida]."  Doc #333-4/16-4 at

**7**

62.   In a speech on January 23, 2006, Deputy Director of National Intelligence (and former NSA Director) Michael Hayden confirmed that under the program this "reasonable basis" determination was made by a NSA intelligence expert without court involvement.   Doc #333-4/16-4 at 90-91.   This program has been referred to by the government and others as the Terrorist Surveillance Program ("TSP").   See, for example, Doc #308/3 at 5.

On January 17, 2007, Attorney General Gonzales sent a letter regarding the TSP to various members of Congress.   Doc #127/xxx.   In the letter, Gonzales explained that a Foreign Intelligence Surveillance Court judge had issued orders "authorizing the Government to target for collection international communications into or out of the United States where there is probable cause to believe that one of the communicants is a member or agent of [al-Qa'ida] or an associated terrorist organization." Doc #127-1/xxx at 1.   "As a result of these orders, any electronic surveillance that was occurring as part of the [TSP] will now be conducted subject to the approval of the Foreign Intelligence Surveillance Court" — that is, in compliance with FISA.   See id. Gonzales stated that "under these circumstances, the President has determined not to reauthorize the [TSP] when the current authorization expires."   Id at 1-2.

Plaintiffs have "served as counsel in many cases alleging violations of constitutional and human rights as a result of the detention and interrogation practices of the [Bush] administration in connection with anti-terrorism policies and practices."   Doc #333-4/16-4 at 3.   Most of plaintiffs' clients are represented pro bono, with no expectation that they will ever pay any expenses

8

United States District Court

For the Northern District of California

related to their representation.  Id at 3.  CCR "is committed to
the use of law as a positive force for social change" and
"considers litigation to be not merely a tool for advancing
precedent but also a fulcrum around which to organize mass
movements for political change and a means of giving voice to the
aspirations of oppressed peoples."  Id at 2-3.

          The individual attorney plaintiffs regularly communicate
with individuals who "fit within the criteria articulated by
Attorney General Gonzales for targets of the [TSP] * * * or are
reasonably likely to be viewed by the United States as fitting
within those criteria."  Doc #333-4/16-4 at 4.  Specifically,
plaintiffs Gutierrez, Foster and Ahmad work on habeas corpus
petitions for designated "enemy combatants" held at Guantanamo Bay.
Id at 3-5.  They regularly communicate with family members of
detainees, "former detainees who have been released and returned to
their home countries," and various witnesses, lawyers and other
individuals who reside in foreign countries, including persons who
have been designated by the United States as "enemy combatants."
Id.  Plaintiff LaHood represents Maher Arar, who resides in Canada
and has been declared by the United States to be a member of al-
Qa'ida, in a civil suit and regularly communicates with him by
phone and email.  Id at 5.  Plaintiff Meeropol is the lead attorney
in the <u>Turkmen v Ashcroft</u> civil class action on behalf of Muslim
non-citizens detained shortly after September 11, 2001 and declared
to be "of interest" to the September 11 terrorism investigation.
Id at 5-6.  Meeropol regularly communicates with these actual and
potential class members, all of whom reside outside the United
States.  Id at 5-6.

1    Plaintiffs did not produce, in response to defendants'

2   motion for summary judgment, any evidence that they were actually

3   surveilled under the TSP.  Instead, plaintiffs limited their

4   evidence and argument to the claim that their constitutional rights

5   were "chilled" by the mere risk that they were surveilled under the

6   TSP.  Plaintiffs claim that this risk forced them to review past

7   communications that may have been intercepted by the TSP, take

8   corrective action and implement measures to prevent future

9   communications from being intercepted by the government.  See Doc

10  #333-4/16-4 at 6-10.  Plaintiffs have attempted to avoid electronic

11  communication concerning sensitive matters with overseas contacts

12  and have traveled internationally to discuss such matters in

13  person.  Id at 7-9.

14       In January 2006, CCR and its staff submitted requests to

15  various agencies under the Freedom of Information Act seeking all

16  records obtained through warrantless electronic surveillance, which

17  required "[s]ubstantial expenditures of staff time and effort."  Id

18  at 7.  Plaintiffs also drafted interrogatories in Turkmen v

19  Ashcroft seeking to discover any attorney-client communications

20  that were monitored or intercepted, and CCR attorneys have been

21  instructed by CCR's director to move for such disclosure in other

22  cases where surveillance is suspected.  Id at 6, 9.  Plaintiffs

23  allege that this "divert[s] staff time and organizational resources

24  away from core mission tasks," which "hurts [their] organization by

25  reducing the number of cases [they] can bring, and undermin[ing

26  their] ability to litigate [their] existing cases in the most

27  effective manner."  Id at 9-10.

28  //

10

1    Plaintiffs also claim to have suffered less quantifiable
2  harm since learning about the existence of the TSP.  Plaintiffs
3  believe that given their knowledge of the existence and nature of
4  the TSP they are ethically required to avoid international
5  electronic communications involving sensitive information.  See Doc
6  ##333-7/16-7 at 2-5, 333-8/16-8 at 3-6, 333-9/16-9 at 2-3.
7  Plaintiffs submitted a declaration from Professor Stephen Gillers,
8  a specialist in legal ethics, stating that "[i]n light of what is
9  now known about the [TSP] and given the nature of CCR's work as
10 detailed in submissions to the Court, CCR attorneys and their
11 support persons have substantial reason to fear that telephonic,
12 fax, and e-mail communications * * * that they may have or have had
13 with CCR clients, or with third persons or each other in the course
14 of representing clients, have been or will be intercepted by the
15 United States.  Doc #333-6/16-6 at 4.  As a result, "CCR attorneys
16 may not ethically use * * * these electronic means of communication
17 in exchanging or collecting * * * [n]early all communications with
18 or about clients."  Id at 4-5.  Because international travel is not
19 an effective substitute for easy electronic communications,
20 plaintiffs have not been able to communicate with overseas clients
21 and contacts as much as desired and believe that the quality of
22 their litigation has been undermined.

23    Plaintiffs have also deemed it necessary to inform
24 persons communicating with them via electronic means that their
25 conversation may be subject to government surveillance.  See, for
26 example, Doc ##333-7/16-7 at 3, 333-8/16-8 at 5.  William Goodman,
27 the director of CCR, states that "it is difficult to imagine a
28 worse thing to have to say at the onset of a relationship with a

11

client, witness, or other person with whom one wishes to work closely" because it "inevitably [makes] the CCR staffer appear to be in some fashion an agent of the United States government, or [makes] our organization appear suspect due to the fact that communications with us are subject to government surveillance." Doc #333-7/16-7 at 3. Plaintiffs imply that the lack of trust thereby created has negatively impacted the quality of their litigation activities.

### III

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FRCP 56(c). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial * * * since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp v Catrett</u>, 477 US 317, 322-23 (1986).

"It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." <u>City of Los Angeles v Lyons</u>, 461 US 95, 101 (1983). Standing is a jurisdictional requirement grounded in Article III of the Constitution. <u>Lujan v Defenders of Wildlife</u>, 504 US 555, 559 (1992). To establish Article III

United States District Court

For the Northern District of California

standing, a plaintiff must establish: (1) it suffered an "injury-in-fact," which is both "concrete and particularized" and "actual or imminent;" (2) a causal connection between the injury and the conduct complained of and (3) that it is likely that the injury will be "redressed by a favorable decision." Id at 560-61. The party invoking federal jurisdiction bears the burden of establishing these elements, and each element must be supported with the manner and degree of evidence required at the successive stages of the litigation. Id at 561. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice * * *. In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'[]." Id. An affidavit that contains "only conclusory allegations, not backed up by statements of fact, * * * cannot defeat a motion for summary judgment." <u>Shane v Greyhound Lines, Inc</u>, 868 F2d 1057, 1061 (9th Cir 1989).

## IV

The court first turns to whether plaintiffs have introduced sufficient evidence to establish standing for their claim under the First Amendment. Defendants contend that "[p]laintiffs' allegations of a subjective chill coupled with an unwillingness to communicate are insufficient to establish injury-in-fact." Doc #731/39 at 16. According to defendants, "where the challenged conduct has unquestionably ceased, as here, plaintiffs' allegations of a subjective chill * * * are insufficient to confer standing for their First Amendment claim." Id at 21.

1   Plaintiffs maintain that they continue to suffer harm to

2   their "First Amendment interest in litigating against the

3   government."  Doc #743/47 at 12.  Plaintiffs argue that "any

4   responsible attorney would have to conform their behavior to

5   account for the possibility that potential clients and witnesses

6   might be tainted by the possibility of past government

7   interception," meaning that "CCR will have to exercise caution

8   going forward in using such individuals in litigation."  Id at 12-

9   13.  This "need for caution interferes with [CCR's] ability to

10  construct a case under the ordinary assumptions of confidentiality

11  that underpin our adversary system of justice."  Id at 13.

12  Plaintiffs also argue that "third parties might sensibly

13  be hesitant to communicate freely with CCR staffers even absent a

14  risk of current unlawful interception," creating "a current risk

15  that third parties who communicated with [CCR] previously will now

16  be less willing to do so, knowing that the government may have been

17  listening in on those earlier calls."  Doc #743/47 at 11.

18  Other than references to "possibilities" and "risks,"

19  plaintiffs do not argue and have presented no evidence that they

20  were unlawfully surveilled.  Instead, plaintiffs characterize the

21  uncertainty about whether they were surveilled, the possible

22  existence of records of that surveillance and the purportedly

23  reasonable actions taken in response to it as the harm, alleging

24  that it exerts a "chilling effect" on the exercise of their First

25  Amendment rights.  Doc #743/47 at 21-22.

26  The question, then, is whether such chilling effects —

27  where there is no evidence that plaintiffs were actually surveilled

28  under the TSP — are sufficient to establish the "concrete and

14

particularized" injury required for Article III standing.  <u>Lujan</u>,
504 US at 560.

A

In <u>Laird v Tatum</u>, 408 US 1 (1972), the Supreme Court
considered whether the chilling of First Amendment rights by the
existence of an allegedly unlawful government surveillance program
presented a justiciable controversy.  The Court recognized that
"constitutional violations may arise from the deterrent, or
'chilling,' effect of governmental regulations that fall short of a
direct prohibition against the exercise of First Amendment rights."
Id at 11.  The Court, however, found no case that involved a
"chilling effect aris[ing] merely from the individual's knowledge
that a governmental agency was engaged in certain activities or
from the individual's concomitant fear that, armed with the fruits
of those activities, the agency might in the future take some other
and additional action detrimental to that individual."  Id at 11.
The Court emphasized that "[a]llegations of a subjective 'chill'
are not an adequate substitute for a claim of specific present
objective harm or a threat of specific future harm."  Id at 14-15.

Plaintiffs attempt to distinguish <u>Laird</u> by relying
heavily on <u>Presbyterian Church (USA) v United States</u>, 870 F2d 518
(9th Cir 1989).  In <u>Presbyterian Church</u>, the plaintiff churches
claimed that their First and Fourth Amendment rights were violated
when "INS agents entered the churches wearing 'body bugs' and
surreptitiously recorded church services."  Id at 520.  The
plaintiffs alleged that their right to free exercise of religion
and association was abridged and that "as a result of the

15

United States District Court

For the Northern District of California

surveillance of worship services, members have withdrawn from active participation in the churches." Id at 520-22. The court ruled that the plaintiffs had established standing because "[w]hen congregants are chilled from participating in worship services * * * because they fear the government is spying on them and taping their every utterance, * * * a church suffers organizational injury because its ability to carry out its ministries has been impaired." Id at 522. The court distinguished <u>Laird</u> as involving a chilling effect "caused, not by any specific action of the Army directed against the plaintiffs, but only by 'the existence and operation' of the surveillance program in general." Id. That is, the plaintiffs in <u>Laird</u> did not allege that they were actually surveilled, but "only that they could conceivably become subject to the Army's domestic surveillance program." Id.

In this case, the fear that plaintiffs describe as chilling the exercise of their First Amendment rights is far closer to <u>Laird</u> than <u>Presbyterian Church</u>. The alleged injury here is, in fact, more speculative than in <u>Laird</u> given that (unlike <u>Laird</u>) the government has ceased the activities that gave rise to the lawsuit. Instead, there is only a fear that plaintiffs may have been subject to unlawful surveillance in the past combined with a fear that some "agency might in the future take some other and additional action detrimental to [them]." <u>Laird</u>, 408 US at 11. Moreover, at least some of the ongoing burdens described by plaintiff cannot fairly be traced to the TSP itself. Plaintiffs' declarations describe at length the disruption to their operations resulting from their inability to use quick and efficient electronic communications. Even assuming (without deciding) that such fears and measures were

16

United States District Court

For the Northern District of California

reasonable and that such an injury is sufficiently concrete to confer standing, the TSP cannot provide a justification for continuing to incur such costs.  The TSP ended in 2007.  Doc #127/xxx.  With no reason to believe that they or their clients are being illegally monitored, there is no imperative (ethical or otherwise) to avoid the use of electronic communications.

The facts of this case are simply not analogous to Presbyterian Church, in which the chilling effect was caused by actual, substantiated unlawful surveillance of four churches lasting almost a year.  870 F2d at 520.  That set of facts demonstrated "specific present objective harm or a threat of specific future harm" in a way that plaintiffs here cannot.  See Laird, 408 US at 15; Presbyterian Church, 870 F2d at 522.  In short, there is no "specific action * * * directed against the plaintiffs," only a fear that plaintiffs may have been unlawfully surveilled, may conceivably suffer an unfair disadvantage in litigation at some point in the future and that some third parties may be unwilling to communicate or cooperate with plaintiffs based on their uncertainty about the details of the TSP.  That is insufficient to establish injury in fact for purposes of Article III standing.

B

Even if the possibility of harm in this case were sufficiently concrete to constitute injury in fact, the injury claimed by plaintiffs is not itself cognizable under the First Amendment.  Although litigation is unquestionably protected by the First Amendment when it is used as a means of political expression

17

and advocacy, the First Amendment does not protect against every conceivable burden or difficulty that may arise during litigation. Plaintiffs rely upon <u>NAACP v Button</u>, 371 US 415 (1963), to support their First Amendment claim, arguing that "[w]hat was true of the NAACP in the 1960's is certainly true of CCR today" and "the [TSP] intrudes on plaintiffs' right to 'petition for redress of grievances," * * * and on their 'political expression.'" Doc #333-3/16-3 at 47.

In <u>NAACP</u>, the NAACP and its Legal Defense and Education Fund frequently sought out aggrieved persons, informed them of their legal rights and offered to represent them without charge in school desegregation and other such cases. <u>NAACP</u>, 371 US at 419-22. Typically, the NAACP did so at meetings of parents and children at which its representatives would explain the steps necessary to achieve school desegregation and offer legal representation. Id at 421. Litigation was just one strategy used to promote the ultimate goal of the NAACP, "to secure the elimination of all racial barriers which deprive Negro citizens of the privileges and burdens of equal citizenship rights in the United States." Id at 419. In 1956, the state of Virginia enacted a statute making it a criminal violation to solicit legal business through the use of "an agent for an individual or organization which retains a lawyer in connection with an action to which it is not a party and in which it has no pecuniary right or liability." Id at 424. The Virginia Supreme Court of Appeals held that the NAACP, its members and its attorneys had practiced criminal solicitation as defined in the statute. Id at 433-34. On appeal, the United States Supreme Court read the Virginia statute as

18

United States District Court
For the Northern District of California

"proscribing any arrangement by which prospective litigants are advised to seek the assistance of particular attorneys." Id at 433. The court held that the statute "unduly inhibit[s] protected freedoms of expression and association" and posed "the gravest danger of smothering all discussion looking to the eventual institution of litigation on behalf of the rights of members of an unpopular minority." Id at 434, 437.

Unlike the plaintiffs in NAACP, whose legal activities on behalf of minorities were criminalized by an exceedingly broad state law, plaintiffs in the present case claim to be harmed because there is a risk "that the government may have access to aspects of CCR's litigation strategy" as well as a risk "that third parties who communicated with [CCR] previously will now be less willing to do so." Doc #743/47 at 11. Plaintiffs also claim to be harmed by the need to take steps to assess the scope of any past surveillance and to ensure that no confidential communications are disclosed in the future. Id at 10, 13. Although plaintiffs appear to have established that their litigation activities have become more costly due to their concern about the TSP, plaintiffs remain free to pursue their political goals by litigating against the government, and continue to do so vigorously. Plaintiffs have not provided any precedent for the notion that the First Amendment protects against a "risk * * * that the government may have access to aspects of [a plaintiff's] litigation strategy" where there is no proof that any surveillance in fact occurred. Id at 11. Nor have plaintiffs provided precedent for a protected First Amendment right "to litigate * * * cases in the most effective manner." Doc #333-4/16-4 at 9-10.

19

United States District Court
For the Northern District of California

In short, plaintiffs have not shown that they "personally ha[ve] suffered some actual or threatened injury as a result of the putatively illegal conduct," <u>Valley Forge Christian College v Americans United for Separation of Church and State, Inc</u>, 454 US 464, 472 (1982), especially in light of the "clear precedent requiring that the allegations of future injury be particular and concrete." <u>Steel Co v Citizens for a Better Environment</u>, 523 US 83, 109 (1998). Plaintiffs have therefore failed to establish standing for their First Amendment claim.

V

In their renewed motion for summary judgment and opposition to defendants' motion for summary judgment, plaintiffs make little attempt to establish standing for their remaining claims under FISA, the Fourth Amendment and the separation of powers doctrine. Nevertheless, the court will briefly examine whether plaintiffs have established standing for these other claims.

FISA establishes a cause of action for an "aggrieved person * * * who has been subjected to an electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of section 1809." 50 USC § 1810. As discussed at length by this court in the related case <u>Al-Haramain Islamic Foundation v Obama</u>, Case No C 07-0109, only by presenting evidence of actual surveillance can a plaintiff establish the "aggrieved person" status necessary to proceed with a FISA claim. See <u>In re NSA Telecoms Records Litigation</u>, 564 F Supp 2d 1109, 1131-35 (ND Cal 2008). Because

United States District Court

For the Northern District of California

1  plaintiffs have presented no evidence of such surveillance, they

2  have failed to establish standing for their FISA claim.

3          The same is true of plaintiffs' Fourth Amendment claim.

4  "[T]he rights assured by the Fourth Amendment are personal rights,

5  [which] * * * may be enforced * * * only at the instance of one

6  whose own protection was infringed by the search and seizure."

7  Rakas v Illinois, 439 US 128, 133-38 (1978) (quotation omitted).

8  Plaintiffs therefore cannot establish Fourth Amendment standing

9  without showing that they were in fact subject to unreasonable

10  search or seizure.  Plaintiffs have not done so.

11          Finally, plaintiffs' claim based on the separation of

12  powers doctrine also fails.  Plaintiffs have failed to establish

13  that they were subjected to the unlawful program at issue: the TSP.

14  Plaintiffs cannot establish, therefore, that the government's

15  alleged violation of separation of powers principles by

16  implementing the TSP caused plaintiffs any "actual injury

17  redressable by the court."  United States v Hoyt, 879 F2d 505, 514

18  (9th Cir 1989) (ruling that a defendant not subject to the statute

19  at issue did not have standing to challenge it); see also

20  Immigration and Naturalization Service v Chadha, 462 US 919, 935-36

21  (1983) (claims asserted under the separation of powers doctrine are

22  subject to the traditional Article III standing requirements).

23  Unlike other cases in which standing to bring a separation of

24  powers claim was found, plaintiffs cannot establish that they were

25  actually subjected to the conduct alleged to have violated the

26  separation of powers.  See, for example, Chadha, 462 US at 923,

27  935-36 (reviewing whether one house of Congress could order the

28  plaintiff deported); Buckley v Valeo, 424 US 1, 117 (1976)

(reviewing whether the Federal Election Commission could make rulings regarding the plaintiff); <u>Glidden Co v Zdanok</u>, 370 US 530, 532-33 (1962) (reviewing whether the plaintiffs' cases could be adjudicated by judges from non-Article III courts).

Accordingly, plaintiffs have failed to establish standing for any of their claims and summary judgment in favor of defendants is appropriate.

VI

For the reasons stated above, defendants' motion for summary judgment is GRANTED. Doc #39. Plaintiffs' motion for summary judgment is DENIED. Doc #47. Defendants are ordered to submit and serve a proposed form of judgment in accordance with this order no later than February 7, 2011; plaintiffs shall submit and serve any objections to defendants' form of judgment not later than February 14, 2011.

Upon entry of judgment, the clerk is directed to terminate all motions and close the file for <u>Center For Constitutional Rights v Obama</u>, Case Number 07-cv-1115. The clerk is further directed upon entry of judgment herein to terminate all motions and close the file for the multi-district litigation <u>In re National Security Agency Telecommunications Records Litigation</u>, Docket No MDL-1791.

IT IS SO ORDERED.

VAUGHN R WALKER
United States District Judge